IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D.,<br><br>Plaintiff,<br>vs.<br><br>DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH,<br><br>Defendants. | Case No. 5:17-cv-194 |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

## INTRODUCTION

Plaintiff Misty Blanchette Porter's ("Porter" or the "Plaintiff") Motion to Compel (the "Motion") is disingenuous. After amending her Complaint almost one year after its original filing to include an ancillary state law claim under Vermont law, Plaintiff's counsel sent a detailed ten-page letter to counsel for Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital and Dartmouth-Hitchcock Health (collectively, "Dartmouth-Hitchcock" or "Defendants"), claiming, in no uncertain terms, that Vermont law controlled the scope and/or applicability of any quality assurance privilege. In a follow-up email communication, Plaintiff's counsel appeared to concede that New Hampshire's quality assurance privilege would apply. Now, in this Motion, Plaintiff engages in an "about-face" and asserts that all of the documents properly withheld by Defendants pursuant to New Hampshire's quality assurance privilege must be produced because no privilege exists under federal common law. The Court should not countenance this behavior.

For these reasons, and as set forth in more detail below, Plaintiff's Motion should be denied.

## BACKGROUND

Porter filed her initial Complaint (the "Complaint") in this matter on October 11, 2017 (Dkt. 1). The Complaint purports to bring claims against Dartmouth-Hitchcock for wrongful discharge (Count I); violation of the New Hampshire Whistleblowers' Protection Act (Count II), and discrimination/retaliation (Count III). Counts I and II of the Complaint allege only violations of New Hampshire state law. Count III alleges violations of three New Hampshire state statutes, and includes only a single claim for violation of the Americans with Disabilities Act of 1990 ("ADA"). Thus, all of Plaintiff's claims in the Complaint were based on New Hampshire state law, save for one claim under the ADA.[1]

Despite this, Plaintiff filed her Complaint in this Court in Vermont. Plaintiff asserted that this Court had diversity jurisdiction, given that Plaintiff is a citizen of Vermont, while Defendants are New Hampshire non-profit organizations with their principal places of business in New Hampshire. Plaintiff also asserted that the Court maintained federal question jurisdiction over her ADA claim and supplemental jurisdiction over her state law claims. Complaint ¶ 13.

On or about August 1, 2018, Plaintiff filed her First Amended Complaint (the "Amended Complaint") (Dkt. 50), purporting to add a claim for violation of the Rehabilitation Act of 1973 ("Rehabilitation Act") and, for the first time, a claim under Vermont state law – for violation of the Vermont Fair Employment Practices Act ("VFEPA"). Though the parties had already been engaged in discovery for several months, and indeed, Defendants had produced over 13,000

---

[1] Indeed, the draft Complaint Plaintiff sent to Defendants, prior to filing this action, contained a caption that it would be filed in the United States District Court for the District of New Hampshire.

pages of documents, no Vermont state claims were ever at issue until Plaintiff filed the Amended Complaint, almost one year after the original complaint was filed with this Court.

On or about October 4, 2018, Plaintiff's counsel sent a letter to Defendants' counsel regarding Defendants' privilege log. A copy of this letter is attached hereto as **Exhibit A**. Making no mention of federal common law, Plaintiff asserted that "*Vermont state law provisions* concerning privileges and confidentiality apply to the determination of whether defendants have properly asserted the [quality assurance] and attorney-client privileges in this matter." *Id.* at § II (emphasis added). Following a conference call in which Defendants' counsel asserted the same position it maintains now – that New Hampshire state law applies to questions of privilege in this action – Defendants' counsel provided a letter setting forth the reasoning for its approach. In a subsequent email communication, Plaintiff's counsel appeared to reverse course, by attacking Defendants' designations under the assumption that New Hampshire law would apply. A copy of the November 8, 2018 email communication is attached hereto as **Exhibit B**. At no point did Plaintiff ever raise federal common law as potentially applicable to evidentiary privileges in this action. Instead, the parties disputed whether Vermont or New Hampshire law applied—specifically Vermont or New Hampshire law regarding the quality assurance ("QA") privilege.

Now, however, in an attempt at an end-run around the protections intended to allow physicians and hospital employees to freely evaluate their performance and improve patient care, Plaintiff now claims that federal common law should apply rather than any QA privilege under applicable state law. New Hampshire state law, rather than federal common law or Vermont state law, should govern Defendants' assertions of privilege in this case.

**ARGUMENT**

    I.    Federal Common Law Does Not Govern Applicable Privileges.

While Plaintiff would like the Court to think this case is premised exclusively on federal question jurisdiction, the actual pleadings prove otherwise. In her effort to prevent Defendants from being entitled to the protections of the QA privilege under New Hampshire state law, Plaintiff characterizes this case as arising under federal law, relegating to a footnote her acknowledgement that her Complaint and Amended Complaint originally cite diversity jurisdiction as the primary basis for federal subject matter jurisdiction. Mot. at 2 n.3. And, the first basis for jurisdiction Plaintiff alleges in both her Complaint and Amended Complaint is diversity jurisdiction, given the residency of the parties. Complaint ¶ 15; Amended Complaint ¶ 15. And while Plaintiff asserts two claims under federal law (though prior to her August 1, 2018 amendment to the Complaint, Plaintiff only raised a single federal claim), the lion's share of Plaintiff's claims are rooted in New Hampshire state law. Indeed, Plaintiff asserts that Defendants violated five provisions of New Hampshire law in Counts 1, 2, and 5 of her Amended Complaint, and these claims were part of the original Complaint as well.

Plaintiff correctly acknowledges that according to Federal Rule of Evidence 501, "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." While the Second Circuit did apply the federal common law of evidentiary privilege to both state and federal claims in *von Bulow by Auersper v. von Bulow*, 811 F.2d 136, 141 (2d. Cir. 1987), the Court specifically noted "the evidence sought [was] relevant to *both* the federal and state claims," and concluded *"[i]n such situations* courts have consistently held that the asserted privileges are governed by the principles of federal law." (citations omitted) (emphasis added).

This is not the case here. The documents Defendants have withheld as protected under the QA privilege relate solely to internal evaluations of physician performance or patient care. Such documents have no relevance to Plaintiff's federal disability claims, which arise under the ADA and the Rehabilitation Act. The only claims to which the QA documents at issue relate are Plaintiff's state law claims—specifically, her claims for wrongful termination and/or whistleblower retaliation.

Plaintiff's assertion that the QA documents at issue are relevant to "all claims in this case" is not supported by the record.[2] Mot. at 6. Her only argument that such documents could be relevant to her disability-related claims—that is, her federal claims—is that the documents "may shine light on practices within the REI Division." *Id.* Such speculative musing provides no explanation of how documents relating to evaluations of physician performance or patient treatment would have any relevance to whether Plaintiff was terminated or retaliated against because of her disability. Plaintiff claims that "[h]ow Dartmouth-Hitchcock evaluated her skills during the period of disability compared to how they evaluated the work of the other physicians would be highly relevant." *Id.* However, Dartmouth-Hitchcock has never represented to Plaintiff, during the course of this litigation or otherwise, that she was terminated for any reason other than because the REI Division was shut down entirely. Plaintiff's performance as a physician is simply not at issue in this case, and is not relevant to her federal disability discrimination and retaliation claims.

Where, as here, evidence "is relevant only to state claims and defenses, privilege is determined by the applicable state law." *Lego v. Stratos Lightware*, 224 F.R.D. 576, 578

---

[2] Without any legitimate basis, Plaintiff asserts "it is clear that a number of the claimed QA-privileged documents relate to the possible transmission of the Zika virus to a conception." Mot. at 6. To the contrary, Defendants have produced numerous documents relating to the Zika issue and are not attempting to use the QA privilege to avoid discovery.

(S.D.N.Y. 2004); *see also Turner v. Vt. Ctr. For the Deaf & Hard of Hearing, Inc.*, Case No. 2:02-cv-251, 2003 U.S. Dist. LEXIS 20552, at *16-17 (D. Vt. Oct. 1, 2003) ("Evidentiary privilege is determined in accordance with state law where the claim at issue is governed by the state rule of decision, Fed. R. Evid. 501, and such privilege is a valid objection to discovery under Rule 26") citations omitted); *Evanko v. Elec. Sys. Assoc., Inc.*, No. 91 Civ. 2851, 1993 U.S. Dist. LEXIS 218, at *1 (S.D.N.Y. Jan. 8, 1993) (holding discovery of medical records relevant only to pendent state claim of emotional distress was governed by the state's physician-patient privilege). "[I]n a federal-question case with state law claims over which the court has supplemental jurisdiction, if the evidence sought is relevant only to the state-law claims, several courts have held that state law privilege applies." *Guzman v. Mem'l Hermann Hosp. Sys.*, Civil Action No. H-07-3973, 2009 U.S. Dist. LEXIS 1336, at *18-19 (S.D. Tex. Feb. 20, 2009) (collecting cases; applying state law medical peer review privilege to documents that were not relevant to federal claims).

  II. <u>Given The Nature Of Plaintiff's Claims, New Hampshire's QA Privilege Governs</u>.

"A federal court applies the choice of law rules prevailing in the state in which the court sits." *Lego*, 224 F.R.D. at 578 n.7 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)). New Hampshire's QA privilege statutes, N.H. Rev. Stat. Ann. §§ 151:13-a and 329:29-a, should apply given that Vermont employs the "most significant relationship" test to make choice of law determinations—meaning the law of the state that has the most significant relationship to the occurrence and to the parties governs a given action. *Myers v. Langlois*, 168 Vt. 432, 434 (1998). New Hampshire has the most significant relationship to this action, given that the facts and circumstances giving rise to this case all took place in New Hampshire, the Defendants are New Hampshire citizens, and three of Plaintiff's

four state law claims are under New Hampshire law.³ In addition, the communications at issue took place in New Hampshire, between parties operating under the reasonable expectation that their communications would be protected by the laws of the state in which they were conducting their activities. As such, New Hampshire's QA privilege should apply, not Vermont's.

Even if the Court finds that federal common law, rather than any state law, should govern claims of privilege in this action, it should still apply New Hampshire's QA privilege to this case. Even where courts have not recognized a federal peer review privilege, they have nevertheless applied state law privileges to state law claims. *See, e.g., Bennett v. Kent Cnty. Mem. Hosp.*, 623 F. Supp. 2d 246, 255 (D. R.I. 2009) (applying state peer review privilege to bar discovery of information "relevant only to plaintiff's state law claims"); *Sellers v. Wesley Med. Ctr., LLC*, No. 11-1340-JAR-KGG, 2012 U.S. Dist. LEXIS 155692, at *9 (D. Kan. Oct. 31, 2012) (holding that "evidence relating only to Plaintiff's pendant state law cause of action will be subject to the [medical peer review] privilege to the extent it was adequately asserted by Defendant"). This is because "Rule 501 manifests a congressional desire not to freeze the law of privilege but rather to provide the courts with flexibility to develop rules of privilege on a case-by-case basis." *University of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 189 (1990) (citing *Trammel v. United States*, 445 U.S. 40, 47 (1980)).

New Hampshire's QA privilege protects "[r]ecords of a hospital committee organized to evaluate matters relating to the care and treatment of patients . . . and testimony by hospital

---

³ Plaintiff argues that if a state law should apply, it should be Vermont, solely because "Vermont is the forum state and Plaintiff asserts a claim under Vermont state law[.]" Mot. at 7. This is plainly untenable. Plaintiff submits no authority for her assertion that these two facts alone justify the application of Vermont's QA privilege over New Hampshire's—a proposition that is made all the more unreasonable given the fact that no Vermont claim was even at issue in this case until Plaintiff filed her Amended Complaint in August 2018, almost a year after her initial Complaint, and after Defendants had already reviewed and produced over 13,000 pages of documents. If Plaintiff's argument is to be given any credence, Defendants would have been required to review all of these documents again to determine whether they were privileged dunder Vermont law, rather than New Hampshire law, once Plaintiff filed her Amended Complaint and added a claim under Vermont state law.

trustees, medical staff, employees, or other committee attendees relating to activities of the quality assurance committee" as well as the "records of a quality assurance program, including those of its functional components and committees, as defined by the physician practice's quality assurance plans, and testimony by persons participating in or appearing before the quality assurance program or its functional components or committees, relating to the activities of the quality assurance program[.]" N.H. Rev. Stat. Ann. §§ 151:13-a, 329:29-a. The purpose of such statutes is to "promote candid discussion among health care professionals to improve health care services provided to the public." *See Clement v. Dartmouth-Hitchcock Clinic*, 05-C-275, 2006 N.H. Super. LEXIS 99, at *4 (N.H. Super. Ct. Dec. 20, 2006) (applying QA privilege to resident evaluations); *see also Sevilla v. United States*, 852 F. Supp. 2d 1057, 1060 (N.D. Ill. 2012) ("The legislatures in every state in the Nation have concluded that without a peer review privilege, physicians will be discouraged from participating in the full and frank expression of opinion that is essential if peer review is to fulfill its vital role in advancing the quality of medical care.") (citations omitted). "The quality assurance privilege was meant to advance the general public interest in promoting vigorous self-criticism, which leads to improvements in health care services." *Knapik v. Mary Hitchcock Mem. Hosp.*, 2014 U.S. Dist. LEXIS 171967, at *3 (D. Vt. Dec. 21, 2014) (Crawford, J.) (applying New Hampshire QA privilege to formal and informal evaluations of resident physicians at Dartmouth-Hitchcock) (quoting *Disabilities Rights Ctr., Inc. v. Commissioner, N.H. Dep't of Corrections*, 143 N.H. 674, 732 A.2d 1021, 1023 (1999)).

The interests protected by such medical QA privilege statutes "are as substantial as any that can be imagined: Candid and conscientious evaluation of clinical practices is a sine qua non of adequate hospital care. To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations." *Woodworth v. United States*, 287 F. Supp. 3d 345, 350 (W.D.N.Y. 2017)

(quoting *Sevilla*, 852 F. Supp. 2d at 1068-69) (applying state peer review privilege as a matter of federal common law).

There is certainly no exceptional necessity for the requested documents here, and such significant policy considerations warrant application of New Hampshire's QA privilege in this case. Plaintiff's assertion that the specific facts of the case weigh against application of a QA privilege misses the mark. She first claims that because she has already seen "a sizeable portion" of the documents in question, she should be entitled to *all* of the documents withheld as protected. Not only does she fail to cite any support for this claim, but "the privilege is held by the hospital, not by its employee[,]" and as such it makes no difference whether Plaintiff has seen or authored documents covered by the privilege. *Knapik*, 2014 U.S. Dist. LEXIS at *6 (citing N.H. Rev. Stat. § 151.13-a(III)). Moreover, the fact that she improperly retained these documents does not impact application of the QA privilege.

Likewise, the parties' protective order has no significance on this particular subject. Even if the documents could not be used outside of this particular litigation, the purpose of the QA privilege is to prevent disclosure of the information at all, not solely in cases where no protective order is in place. That the documents may be relevant to Plaintiff's state law claims also does not justify their release, since the very intent of every evidentiary privilege—whether the attorney-client privilege, the work product doctrine, or the medical peer review privilege—is to withhold documents that would otherwise be relevant to the litigation at hand. Relevancy is not the appropriate calculus.

Accordingly, New Hampshire's QA privilege should apply in this action, regardless of whether state law or federal common law is deemed to govern evidentiary privilege issues.

   III. <u>The New Hampshire QA Privilege Protects The Documents In Question From Disclosure</u>.

This Court has previously applied New Hampshire's QA privilege to protect performance feedback and informal and informal evaluations of resident physicians at Dartmouth-Hitchcock, as well as their responses thereto, and should apply the privilege again here. *Knapik*, 2014 U.S. Dist. LEXIS 171967; *see also Clement*, 2006 N.H. Super. LEXIS 99 (applying QA privilege to resident evaluations). As Defendants' privilege log indicates, the withheld or redacted documents relate to internal evaluations of patient care and physician performance. Plaintiff takes issue with the fact that the log "fails to identify the supposed hospital committee(s) at issue," Mot. at 9, but there is no such requirement to do so. *Merrick v. Littleton Reg'l Hosp.*, Civil No. 10-cv-55-SM, 2011 U.S. Dist. LEXIS 35981, at *8-9 (D.N.H. March 23, 2011) (where hospital's objection was that "The Complaint Management process [] is confidential and protected as a Quality Improvement Activity under NH RSA 151:13-a," finding that material generated by a hospital during investigation and disposition of complaints about physicians "plainly qualifies as a record of a quality assurance committee and is, therefore, protected by the quality assurance privilege") (citing N.H. R.S.A. § 151:13-a(1)(a)). Moreover, Plaintiff points only to N.H. R.S.A. § 151:13-a, entirely ignoring the provisions of § 329.29-a because they expressly contradict her position.

New Hampshire R.S.A. § 329:29-a(II) provides that "[r]ecords of a quality assurance program, **including those of its functional components and committees**" are protected from discovery. (emphasis added). A quality assurance program is a "comprehensive, ongoing, and organization-wide system of mechanisms . . . for monitoring and evaluating the quality and appropriateness of the care provided to patients, so that important problems and trends in the delivery of care are identified and steps are taken to correct problems and to take advantage of opportunities to improve care." N.H. R.S.A. § 329:29-a(I)(b).

Against this backdrop, "[r]ecords of a quality assurance program" are protected. This includes documents that are generated to further the purpose of an organization's quality assurance program and provide the evaluation and analysis intended to be encouraged by the program, including, specifically, documents created by the "functional components" of a quality assurance program. There is no requirement to identify any particular committee(s) for which any particular documents were generated in order for the privilege to be applicable; rather, the statute merely provides that the protections *include* documents generated by the functional components and committees of a quality assurance program, among the other records of the program.

Plaintiff cites *In re K*, 132 N.H. 4 (1989), for her assertion that the QA privilege only applies to records of a committee organized for a QA purpose, and then concludes Defendants' claims of privilege fail where Defendants did not identify the committee generating the privileged documents. Mot. at 10. But *In re K* was decided in 1989, analyzing *only* a claim of privilege under N.H. R.S.A. § 151:13-a—because § 329:29-a, which explicitly includes protection for records beyond those generated by any particular committee, was not enacted until 2002. Because there is no requirement that a particular quality assurance committee be attached to any specific QA privileged document, it is irrelevant that a QA privileged record may have been generated during a division meeting or where other non-QA topics were discussed, instead of at a specifically denoted "QA meeting." To be sure, the privilege also extends to "records" of Dartmouth-Hitchcock's "comprehensive, ongoing, and organization-wide system of mechanisms . . . for monitoring and evaluating the quality and appropriateness of the care provided to

patients," whether these activities took place at a targeted meeting or otherwise.[4]  N.H. R.S.A. § 329:29-a(I)(b), (II).

Accordingly, Defendants have satisfied their burden of establishing that the New Hampshire QA privilege applies to the documents they have withheld or redacted—Defendants have provided the names of the individuals involved in the protected communications as well as a description of the particular quality assurance function served therein.

Plaintiff's claim that "performance review documents relate to a Human Resources function, not a QA function" flies directly in the face of this Court's decision in *Knapik*. *See* 2014 U.S. Dist. LEXIS 171967 at *4 (in wrongful termination suit, holding New Hampshire QA privilege applied to informal and formal performance reviews of resident physicians at Dartmouth-Hitchcock). Plaintiff attempts to sidestep the *Knapik* decision by making a meaningless distinction between the evaluations of residents and full-time physicians. She asserts that because "medical residents are engaged simultaneously in academic and employment capacities, they are distinguishable from attending physicians such as the REI physicians in this matter." Mot. at 10 n.5. Plaintiff cites Judge Reiss' statement in an earlier order in the same case that "a residency agreement is a hybrid relationship with both employment *and* educational features." *Id.* (citing *Knapik v. Mary Hitchcock Mem'l Hosp.*, No. 5:12-cv-175, 2014 U.S. Dist. LEXIS 199219, at *13 (D. Vt. May 30, 2014) (emphasis in original)). But the educational component of resident physicians' jobs was never the basis for applying the QA privilege to the documents at issue in *Knapik*, and Judge Reiss's statement was made solely in the context of determining the deference to be afforded to the hospital's decision to dismiss a resident. *Knapik*,

---

[4] Even to the extent a committee *was* required, Defendants maintain that their clinical departments are considered quality assurance committees.  *See Knapik*, 2014 U.S. Dist. LEXIS 171967, at *3 (noting "[Mary Hitchcock Memorial Hospital]'s internal Quality Management Plan provides that all clinical departments . . . are considered to be quality assurance committees" and applying QA privilege to performance feedback and evaluations of resident physicians).

2014 U.S. Dist. LEXIS 199319 at *13. It had no bearing on the applicability of the QA privilege.[5]

The purpose of New Hampshire's QA privilege is "to promote candid discussion among health care professionals to improve health care services provided to the public." *Clement*, 2006 N.H. Super. LEXIS 99 at *4. The same purpose is served regardless of whether the health care professionals in question are residents or full-time physicians, and this Court should follow its previous decision in *Knapik* to apply the QA privilege in this case.

IV. <u>Dartmouth-Hitchcock Met Its Burden As To Attorney-Client Privilege.</u>[6]

Defendants have satisfied their initial burden of establishing they are entitled to the attorney-client privilege. To do this, they must show that there was "(1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *Arista Records LLC v. Lime Group, LLC*, 784 F. Supp. 2d 398, 415 (S.D.N.Y. 2011) (quoting *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996)). Defendants have provided all of this information in their privilege log—for each entry, the log names the parties to the privileged communication, and describes the substance of the discussion to the extent possible, without revealing privileged information. *See, e.g.,* Mot. Ex. A, p. 17 (Noting communication is between Edward Merrens and John Kacavas, Esq., and is an "[e]mail communication seeking legal advice from counsel regarding draft press release with attachment prepared for review by counsel."); p. 22 (Noting communication is between Aimee Giglio and Kimberly Troland, Esq., Edward Merrens, and John Kacavas, Esq., and contains "[e]mail communications reflecting legal advice

---

[5] Indeed, Judge Reiss's order did not even address any question of the QA privilege, except only to state in a footnote that the hospital had raised the issue of whether certain documents were privileged and the issue was "addressed in a separate Order." *Knapik*, 2014 U.S. Dist. LEXIS 199319 at *3 n.1.

[6] As an initial matter, Defendants note that after Defendants provided additional information regarding the substance of the attorney-client privileged communications reflected on their privilege log, Plaintiff never indicated that she found the information to be deficient. Instead, months later, she filed the instant Motion.

from counsel regarding closure of REI Division."); p. 27 (Noting communication is between Kimberly Troland, Esq., and Leslie DeMars, and contains "[e]mail communications with counsel seeking legal advice regarding closure of REI division.").

Plaintiff has not demonstrated otherwise. Instead, Plaintiff provides merely 3 examples of entries she deems insufficient, and then claims entitlement to all 77 of the attorney-client privileged documents in Defendants' privilege log. Such extrapolation is wholly unjustifiable. Plaintiff first points to an entry on page 10 of the log, which lists an "email communication reflecting communications with counsel for purpose of obtaining legal advice regarding strategy for proceeding with treatment of patient" and concludes that "it does not appear that this document reflects privileged communications with counsel." Mot. at 14. Given that the document has been withheld because its substance is privileged, it is unclear what additional non-privileged information Plaintiff expects should be provided to "reflect privileged communications."[7]

Plaintiff also makes reference to entries describing communications as "seeking legal advice regarding communications with the media." Plaintiff concludes, without citing any authority, that "[s]trategies for communicating with the media are business advice, not legal advice" and that such communications thus must not be privileged. Mot. at 14. There is no reason why an attorney cannot provide legal advice regarding media communications; moreover, that business can be one purpose of an attorney's advice does not vitiate its legal nature or nullify the attorney-client privilege. *Scott v. Chipotle Mexican Grill, Inc.* 94 F. Supp. 3d 585, 596 (S.D.N.Y. 2015).

---

[7] To the extent Plaintiff seeks the name of the particular attorney with whom the privileged conversation was held, Defendants are willing to provide that, and would have done so had Plaintiff requested this prior to filing her Motion.

Aside from these flawed examples, Plaintiff fails to provide any particular reason she has deemed Defendants' privilege log insufficient in any way, let alone that she should be entitled to disclosure of all 77 documents included in Defendants' privilege log. Defendants have satisfied all of the essential elements of demonstrating the attorney-client privilege applies, and Plaintiff's Motion should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion to Compel.

Dated: January 14, 2019

Respectfully submitted,

DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH,

By their attorneys,

/s/ Tristram J. Coffin
Tristram J. Coffin
DOWNS RACHLIN MARTIN PLLC
Courthouse Plaza
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

*Attorney for Defendants*

Donald W. Schroeder (admitted *pro hac vice*)
Jessica E. Joseph (admitted *pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Telephone: 617-342-4000
Fax: 617-342-4001
dschroeder@foley.com
jjoseph@foley.com

*OF COUNSEL*

4829-0184-4869.3

16

## CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2019, I caused a true copy of the above document to be served upon the attorney of record for Plaintiff via electronic mail and first class mail.

/s/ Tristram J. Coffin
Tristram J. Coffin