**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

MISTY BLANCHETTE PORTER, M.D.,

        Plaintiff,

vs.

DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH,

        Defendants.

Case No. 5:17-cv-194

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS**

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "D-H" or "Defendants"), through their attorneys and pursuant to Fed. R. Civ. P. 56 and Local Rule 56(a), hereby submit their Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment on All Claims, being filed contemporaneously herewith.

1. Plaintiff Misty Blanchette Porter began working at Dartmouth-Hitchcock Clinic on July 15, 1996 as a staff physician. Deposition of Misty Blanchette Porter, M.D., Volume II, dated July 18, 2019 ("Porter Dep. Vol. II"), Ex. 14, p. 3, attached as Exhibit A. She was employed within D-H's OB/GYN Department, specifically in the REI Division. Porter Dep. Vol. II, transcript attached as Exhibit B, 26:17-27:2; Deposition of Daniel Herrick dated July 25, 2019 ("Herrick Dep."), transcript attached as Exhibit C, 25:22-26:1.

2. In 2014, Dr. Albert Hsu joined the REI Division as a more junior physician, soon after completing his fellowship. Deposition of Heather Gunnell dated August 2, 2019 ("Gunnell

Dep."), excerpts attached as Exhibit D, 44:2-11; Deposition of Edward Merrens, MD dated July 30, 2019 ("Merrens Dep."), transcript attached as Exhibit E, 54:19-55:4. In 2016, Dr. David Seifer joined the REI Division as the Division Director. Merrens Dep. (Ex. E) at 73:1-13. Prior to that time, Dr. Porter had been the interim Division Director for a few years. Porter Dep. Vol. II (Ex. B) at 27:3-28:6.

3. In November 2015, Dr. Porter began suffering symptoms as the result of an injury that led her to take a leave of absence in December 2015. Deposition of Misty Blanchette Porter, M.D., Volume I, dated June 11, 2019 ("Porter Dep. Vol. I"), Ex. 2 ("Plaintiff's Resp. to DHMC Ints."), attached as Exhibit F, pp. 2-3. These symptoms included dizziness, headaches, and fatigue. Porter Dep. Vol. I, transcript attached as Exhibit G, 27:9-14. She received short-term disability benefits during this time. *Id.* at 20:8-12. In April 2016, at her own request, she returned to work in a very limited capacity, working approximately 5 to 7 hours a week. *Id.* at 25:13-22.

4. In June 2016, Dr. Porter sought and received approval for long-term disability benefits. *Id.* at 36:8-14. There was no gap between her receipt of short-term disability benefits and long-term disability benefits. *Id.* at 35:17-20. In mid-June, she increased her work hours to about 12 hours per week, though she was limited to one task at a time, and was unable to handle complex cases or work in the OR. Plaintiff's Resp. to DHMC Ints. (Ex. F) at 3. She still suffered from dizziness, headaches, fatigue, and other symptoms. *Id.* In July 2016, Dr. Porter's physician, Dr. Deb Fournier, drafted a letter providing a list of approximately 11 recommended accommodations for Dr. Porter to allow her to resume her work responsibilities in a limited capacity. Porter Dep. Vol. I Ex. 3, attached as Exhibit H. These recommendations included protected, quiet, private office space, and very well described, restricted duties, with limited clinical responsibilities of no more than 12 hours a week, inclusive of administrative time and

program development, and limited to GYN ultrasound and IVF-related activity only, as well as no main operating room cases, no outpatient new patient consults, no call, and no teaching responsibilities. In addition, Dr. Porter's recommended accommodations included paced activities, additional time to complete tasks (with breaks after 1.5 hours of work), ergonomic accommodations like alternative lighting or a screen dimmer, and no work-related emails from home. *Id.* Dr. Porter provided this list of recommended accommodations to Dr. Leslie DeMars, Chair of the OB/GYN Department. Porter Dep. Vol. I (Ex. G) at 32:20-33:11. Dr. Porter admits that Dr. DeMars approved or authorized every accommodation she requested in July 2016. Plaintiff's Response to Defendants' First Requests for Admission to Plaintiff Misty Blanchette Porter, attached as Exhibit I, p. 3, ¶ 12.

5. In August 2016, Dr. Porter briefly returned to work part-time for a few days. Porter Dep. Vol. I (Ex. G) at 81:11-19. She was approved for a leave of absence as of August 10, 2016 and remained out of work until November 2016 when, having had additional treatment and surgery, she decided to return to work on a part-time basis. Plaintiff's Resp. to DHMC Ints. (Ex. F) at 3; Porter Dep. Vol. I (Ex. G) at 52:2-11. At first, Dr. Porter worked approximately 4 hours a week, and in December increased her time to approximately 7 hours a week. Plaintiff's Resp. to DHMC Ints. (Ex. F) at 3.

6. In March 2017, Dr. Porter began working about 20 hours per week, and continued to receive long-term disability benefits. Plaintiff's Resp. to DHMC Ints. (Ex. F) at 4; Porter Dep. Vol. I (Ex. G) at 36:12-23. She continued at this reduced schedule until her termination. Porter Dep. Vol. I (Ex. G) at 61:22-62:1.

7. From the period between late 2016 until its closure effective June 2017, the REI Division experienced a critical shortage of trained nurses. Gunnell Dep. (Ex. D) at 130:10-131:18;

3

169:16-170:2; 191:24-192:11.  In November 2016, one of the REI nurses, Casey Dodge, was terminated.  Porter Dep. Vol. I (Ex. G) at 106:8-24.  In December 2016, another REI nurse, Sharon Parent, retired.  *Id.* at 104:15-25.  Dr. Porter acknowledges that the nursing situation within the REI Division was dire.  *Id.* at 120:5-23.

8. Indeed, in early December 2016, the REI Division began deferring start dates for new patients until February 2017, due to the "REI nursing crunch" created by Ms. Parent and Ms. Dodge's departures, in order to allow Marti Lewis and Marlene Grossman, the two remaining nurses, a chance to catch up on the already-scheduled patients.  Affidavit of Michele Z. King in Support of Defendants' Motion for Summary Judgment on All Claims, Ex. A.  In mid-December 2016, D-H leadership determined the REI Division would not see any new patients during both January and February 2017.  *Id.* at Ex. B.

9. In April 2017, however, Marlene Grossman, the last fully trained REI nurse, also left D-H.  Porter Dep. Vol. I (Ex. G) at 106:25-107:13; Gunnell Dep. (Ex. D) at 134:8-17, 136:4-16.  REI nurses require much more specialized skills and training than the typical nurse, and the Division struggled to find any nurses with the necessary skills and experience to fill these openings.  Gunnell Dep. (Ex. D) at 143:3-144:5; 145:5-16; 192:4-11.  REI nurse staffing was important and more difficult given that the program routinely required 24/7 management of patient cycles and resulted in long hours.  Merrens Dep. (Ex. E) at 18:20-19:7; Gunnell Dep. (Ex. D) at 192:4-11.  The only remaining Registered Nurse, Ms. Lewis, was not fully trained to manage the workload of the REI Division, and even with her there, there was still insufficient nursing staff to safely care for patients.  Gunnell Dep. (Ex. D) at 134:8-17; 169:9-12, 169:16-170:2.  There were complaints about all of the physicians within the REI Division, including Dr. Porter herself.  *Id.* at 68:24-69:10; 73:2-5.

4

10. In the March/April timeframe, OB/GYN Department management and DHMC leadership had multiple discussions regarding issues in the REI Division, including the general dysfunction as well as the nursing shortage predicament. Merrens Dep. (Ex. E) at 115:20-116:5; 123:21-125:10; Herrick Dep. (Ex. C) at 13:16-23. Dr. DeMars, Chair of the OB/GYN Department, Daniel Herrick, Vice President of Perioperative and Surgical Services, and Dr. Ed Merrens, Chief Clinical Officer, participated in these meetings, along with others. Merrens Dep. (Ex. E) at 127:9-14; 128:6-20.

11. Ultimately, Dr. Merrens made the decision to shut down the REI Division due to the fact that they did not have the necessary staffing to provide safe and effective care. Merrens Dep. (Ex. E) at 18:20-19:19, 124:7-25; Deposition of Leslie DeMars, dated October 23, 2019 ("DeMars Dep."), excerpts attached as Ex. J, 129:10-15, 148:20-149:4 (Q: . . . The way you describe it, Ed Merrens ran the meeting, said what the decision was going to be and everybody else got in line. Does that sound right? A: Yes. There was again, some push-back from Maria. Daniel had said well, you know, we do have some alternative plans that we could discuss, and none of it was entertained."). Dr. DeMars was unhappy with the decision to close the Division, and believed her counterpoints to its closure were given short shrift by Dr. Merrens. DeMars Dep. (Ex. J) at 132:21-133:11. Indeed, she felt she had "absolutely no say[.]" *Id.*

12. Due solely to the decision to close the entire REI Division, Dr. Porter and the other two REI physician providers, Dr. Hsu and Dr. Seifer, were terminated. Merrens Dep. (Ex. E) at 19:20-20:9. Dr. Merrens was the ultimate decision-maker. *Id.* at 19:20-20:19.

13. Both Dr. Merrens and Mr. Herrick, who recommended the REI Division closure to Dr. Merrens, were not aware of any complaints made by Dr. Porter at the time the decision to close the REI Division was made. Affidavit of Dr. Edward Merrens in Support of Defendants' Motion

for Summary Judgment on All Claims ("Merrens Aff."), ¶¶ 2-4; Affidavit of Daniel Herrick in Support of Defendants' Motion for Summary Judgment on All Claims, ¶¶ 2-3.

14. Dr. Merrens also did not know anything about Dr. Porter's "illness, the nature of the illness, the conduct or course of her care[.]" Merrens Dep. (Ex. E) at 45:25-46:5. Dr. Merrens knew Dr. Porter was on a leave of absence, had returned working in a reduced capacity, and was receiving long-term disability benefits, but did not know the details about why she was on leave, exactly how much she was working, particulars about any accommodations, or "the specific arrangement around her return[.]" *Id.* at 46:6-47:21, 48:2-8, 48:20-49:17. During the conversations about closing the Division, there were no discussions about whether Dr. Porter could or should eventually return to full-time work. *Id.* at 50:3-12. In short, Dr. Porter's alleged disability had no bearing on Dr. Merrens' decision to terminate her. *Id.* at 216:15-217:20 ("[T]here was nothing about her disability that led to my decision about her termination[.] . . . "[N]othing about her disability or her needing time off had any component to the decision that was made, and we were pretty clear about that."); Merrens Aff. ¶¶ 2-5. Instead, Dr. Merrens was concerned about ensuring Dr. Porter would still be entitled to receive her long-term disability benefits following her termination. Merrens Dep. (Ex. E) at 50:13-51:18.

15. Based on her close relationship with Dr. Porter, Dr. DeMars wanted to somehow maintain Dr. Porter's employment with D-H in a potential part-time role reading gynecologic ultrasounds through the Radiology Department. DeMars Dep. (Ex. J) at 138:20-139:10. To that end, she asked Dr. Jocelyn Chertoff, Chair of D-H's Department of Radiology, whether Dr. Porter could work within the Department of Radiology doing ultrasounds. At the time, there was no business necessity for an additional physician in such a role. Affidavit of Dr. Jocelyn Chertoff in Support of Defendants' Motion for Summary Judgment on All Claims ("Chertoff Aff."), ¶¶ 2-3;

6

DeMars Dep. (Ex. J) at 158:5-20; Herrick Dep. (Ex. C) at 55:1-23.  Indeed, to Dr. Chertoff's knowledge, the Department of Radiology has never hired anyone in such a limited capacity. Chertoff Aff. at ¶ 4.

16. On May 4, 2017, D-H announced that it would close the REI Division.  Porter Dep. Vol. I (Ex. G) at 124:18-22.  Though Dr. Porter was offered a severance equivalent to nine months of her base salary, she declined to accept it.  *Id.* at 153:2-13.  Like Dr. Hsu and Dr. Seifer, Dr. Porter's termination was effective as of June 3, 2017.  *Id.* at 21:14-17.  Dr. Porter continued to receive long-term disability benefits for over a year following her termination.  *Id.* at 36:15-23.

Dated: January 29, 2020

Respectfully submitted,

*/s/ Tristram J. Coffin*
Tristram J. Coffin
DOWNS RACHLIN MARTIN PLLC
Courthouse Plaza
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

and

Donald W. Schroeder (admitted *pro hac vice*)
Jessica E. Joseph (admitted *pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
dschroeder@foley.com
jjoseph@foley.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 29, 2020, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Tristram J. Coffin*
Tristram J. Coffin