# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

Case No. 5:17-cv-194


MISTY BLANCHETTE PORTER, M.D.,

                    Plaintiff

vs.

DARTMOUTH-HITCHCOCK MEDICAL CENTER,
DARTMOUTH-HITCHCOCK CLINIC,
MARY HITCHCOCK MEMORIAL HOSPITAL,
and DARTMOUTH-HITCHCOCK HEALTH,

                 Defendants.




                    VOLUME II

     DEPOSITION OF MISTY BLANCHETTE PORTER, M.D.,
     taken on behalf of the Defendant at Lebanon,
     New Hampshire, on July 18, 2019, at 10:00 a.m.,
     before Cynthia Foster, RPR, LCR No. 14, a
     Licensed Court Reporter within and for the.
     State of New Hampshire.

APPEARANCES:

Geoffrey Judd Vitt, Esquire
Vitt & Associates, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, Vermont, 05055, on behalf of the Plaintiff, Misty Blanchette Porter, M.D.

Katherine Burghardt Kramer, Esquire
KBK Law
6 Mill Street
P.O. Box 23
Middlebury, Vermont, 05753, on behalf of the Plaintiff, Misty Blanchette Porter, M.D.

Donald W. Schroeder, Esquire
Foley & Lardner, LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts, 02199-7610, on behalf of the Defendants, Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health.

Misty Blanchette Porter, MD - July 18, 2019

3

INDEX

Direct Examination by Mr. Schroeder 5

EXHIBITS

14 Plaintiff's Response to Defendant Mary Hitchcock Memorial Hospital's First Set of Interrogatories Propounded on Plaintiff Misty Blanchette Porter 99

North Country Court Reporters
northcountrycr@gmail.com - 603-443-1157

S T I P U L A T I O N

It is agreed by and between the attorneys of record for the respective parties hereto as follows:

1. That the testimony of the deponent may be taken and treated as if taken pursuant to notice and order to take depositions and that all formalities of notice and order are waived by the parties, and the signatures to the stipulation are in like manner waived;

2. That all objections except as to matters of form are reserved until the deposition or any part thereof is offered in evidence;

3. That exhibits may be retained by counsel until time of trial.

4. That the deposition may be signed by the deponent before any notary public.

MISTY BLANCHETTE PORTER, M.D., DULY SWORN

DIRECT EXAMINATION CONTINUED

BY MR. SCHROEDER:

Q Good morning, Dr. Porter.

A Good morning.

Q So as you know I represent the Defendants in this case, and we're continuing your deposition today regarding the allegations that you have put forth in your Amended Complaint in this litigation.

Before we started, your counsel stated that you wanted to perhaps clarify or expand upon something related to your calendar so I'm going to give you that opportunity right now to do that.

A When you were asking me to go through my calendar --

Q Yes.

A -- I think I skipped over the times that I was teaching especially at national meetings and so that's part of our mission and goal and so you're asking specific hours.

I also was working on a project with

Heather Gunnell to facilitate ultrasound being done within the clinic with what was a research machine and so I had some hours that were related to that project.
Q Okay. Why don't we do this. Because I think it's Exhibit 8, and this is I believe the calendar that you produced in this case, and probably helpful to you to point out, why don't we do, does it make sense so there's two things that you identified, national teaching; is that correct?
A Yes.
Q What did that involve?
A I was a moderator and a lecturer at a national meeting for the American Institute of Ultrasound in Medicine for a few sessions. So I was in that conference.
Q When was that?
A Let me look it up.
Q Sure. Take your time.
A March 2016 I traveled to the meeting at, on the 16th of March.
Q Okay.

A I also had some responsibilities for the GYN Community of Practice in that period of time and --

Q Was that related to this?

A Was, yes, it's American Institute of Ultrasound in Medicine, and I was there until the 21st of March.

Q Was that a conference?

A Yes.

Q And was it in any way connected to any certifications that you need to maintain your licenses or certifications that you currently have?

A Yes.

Q Okay. Do you do that on a routine basis or on an annual basis?

A Yes.

Q Okay. And were you speaking at this event?

A Yes.

Q And that March 16th looks like a Wednesday.

A Right.

Q And how many days was the conference?

A The 16th was a travel day. The 17th, 18th,

19th, 20th, and 21st.
Q Those were conference days?
A Yes.
Q And you said you spoke at this event as well?
A Yes.
Q How many times did you speak at it?
A I have to look back at my CV, but I had, I believe, three or four talks at that meeting.
Q Okay. In prior years, had you done the same amount of activity during those kinds of conferences?
A Within a range, yes.
Q And what did your attendance at this conference and speaking engagements go towards in terms of your certification or licenses?
A We're required by the American Institute of Ultrasound in Medicine to have 30 credits over three years, CME. Speaking is in addition to that responsibility as a professional obligation.
Q Are physicians typically compensated for their attendance at these CME events?
A I have a reduction in registration, but we have

to pay for everything else.
Q My question was, are you paid by the hospital system or are physicians paid by the hospital system for their actual attendance time at these events?
A We're granted CME time. Part of the mission is education for the organization, and there is "X" number of dollars given that we can apply for remuneration that we pay so as part of our CME. Professional development.
Q With respect to, is that everything with respect to the topic of the national teaching institute that you said you attended?
A I'm going to go forward. So I went to, the copy is not very clear here at the top.
Q What's the date or the month?
A I believe it's February.
Q 2017?
A I believe so.
Q Okay.
A I was invited to speak at an international meeting, and I went to the International Tumor Analysis Group.

Q Where was that?
A Brussels. Well, Leuven, Belgium.
Q How many days was that?
A I traveled on the 4th, and it looks like I returned on the 12th.
Q Did you include vacation during that time?
A In part. There may have been. It's not marked here.
Q How many days was the conference?
A Three, and then two travel days, and then weekend days.
Q Okay. With respect to that Heather Gunnell project that you were referencing, where on your calendar is that referenced in terms of hours you committed to it?
A I'm not sure that it is registered in here.
Q Okay. So what made you think about that between the first day of your deposition and the second day today?
A Just I had a little more time to think about what I was doing.
Q Okay. How many hours did you attribute to that project with Heather Gunnell during the time

period -- well, first of all, what was the time period that you were working on this project with Heather Gunnell?
A It was in the winter/spring before, the year before the program closed.
Q So winter 2016 into the spring of 2017?
A No. It would have been probably January/February into May of 2017.
Q Okay. And during that time period, for the first half of the 2017, how much time did you devote to the Heather Gunnell project?
A Roughly 2 to 4 hours a week.
Q Is that every week during the time period January 2017 to May 2017?
A Every week to every other.
Q Is there a reason why you, despite the fact that you recorded all of your other time on your calendar, why you did not record this time?
A That was, it wasn't standard for us to do academic projects in a clinic session, and then it was when the IT person was available.
Q Were you compensated by the hospital system for this work?

A It was a project that I was asked to do.
Q Who asked you to do it?
A Leslie and Heather.
Q Well, okay. I understand that they asked you to do it. Were you compensated for this work?
A As part of my, the request for my job. Yes.
Q Well, at the time, though, you were on long-term disability, and if you didn't track your hours how would that be calculated in terms of your compensation?
A I was tracking my hours that I worked. Occasionally, it went over the period of time, and I would go home a bit later, but I tried to truncate that, that interaction. It was --
Q Well --
A -- a short aside.
Q Right. I'm just wondering how you could be compensated if there was no recording of your hours anywhere on this project?
A Compensated for this project?
Q Yes.
A Specifically? It was intermittent. It was in the process of performing my job duties. I

tracked my hours. I wrote down largely the clinical responsibilities, and I had the academic responsibilities. I didn't track my hours for the time that I spent preparing for talks. It's part of the job responsibility. I didn't track my hours that I gave talks. I didn't track my hours for writing a book chapter that I wrote for a national organization. So I think that to me it was part of the mix of, we're paid for 40 hours.

Here's the confusion. We're paid for 40 hours. Physicians work 60, 80, 100 hours. So unlike attorneys where you bill every minute, that's part of our organizational responsibility. And so I was tracking hours and I submitted my hours to DH. And that's where, I think that's where the confusion comes is that we work many more hours than what is on our pay stub.

Q I understand that. But during this entire time period that you're talking about, unlike every other physician that you're talking about, you were actually on long-term disability?

A Right.
Q Which is completely different from every other physician who is working 40, 60, 80 hours. So one of the things you said is it would be reflected in a reduction in your long-term disability benefits if you were working during that time, correct?
A Right.
Q So you had to give your insurance companies evidence of whether or not you were working during that time because it would reflect a reduction in your compensation.
A Right.
Q Right?
A Correct.
Q And what I'm hearing you say, and correct me if I'm wrong, and I know you will, is you didn't track the academic time for purposes of any kind of reporting procedure to the insurance companies that were tracking your long-term disability benefits.
A No.
Q Did you between the first day of your deposition

and the second day of your deposition today review your transcript at all?
A Yes.
Q Did you review the whole thing?
A Yes.
Q Was it accurate?
A Reasonably.
Q Well, you say reasonably, I want to know whether or not it was accurate.
A There's some misspellings of people's names.
Q Other than misspellings, any other items that you recall from reviewing your transcript that were either inaccurate or incomplete?
A No.
Q Did you speak to anyone about the substance of your testimony during the first day of your deposition?
A My attorneys.
Q Other than your attorneys, did you speak to anyone else?
A My husband.
Q Anyone else?
A No.

Q Are you taking any medication today that would affect the ability for you to testify truthfully?
A No.
Q I want to ask you about current employees and then former employees. What if any current employees have you contacted for purposes of being potential witness in your case? You personally?
A Michelle Russell, Joan Barthold, for current employees.
Q And when did you first reach out to Michelle Russell?
A Within the last four to six weeks.
Q Okay. And what do you believe she would be able to offer with respect to the allegations contained in your Complaint as a witness?
A She was present and spoke at the meeting that Ed Merrens participated in with the department following the closure of the division. So she would have observations about what happened in the content of that meeting.
Q You were at that meeting as well, correct?

A No.
Q You weren't at that meeting?
A No.
Q This is the meeting after the closure?
A Um-hum.
Q Okay. And what do you believe she would be able to say with respect to that particular meeting?
A She was clear with me that she was very vocal about my contributions to the department, to patient care, to her colleagues, to the well-being of women within New England and was very angry that Dr. Merrens would make this decision.
Q Anything else?
A She also relayed to me that he stated that my illness was apparent to the organization and defended his position by saying I was only working 20 percent. I was only working part-time.
Q When you say defended his position, his position regarding what?
A Firing me.
Q Firing you specifically?

A Yes.
Q Did somebody ask a question during that meeting to your knowledge about the basis for your termination as opposed to any of the other physicians in the REI Division?
A Yes. Michelle did.
Q Okay. And you believe she said that Dr. Merrens said that your illness was apparent to the organization and that you were only working 20 percent at that point, part-time.
A I'm paraphrasing what she told me, yes.
Q Okay. Anything else about Michelle Russell and her potential testimony on your behalf that relates to the allegations in your Complaint?
A Not that immediately comes to mind.
Q And what about Joan Barthold? What do you believe she would offer in terms of any testimony regarding the allegations in your Complaint?
A She spoke out at the same meeting with a similar amount of content with regards to my collegiality, my importance to the department, my importance to education, my importance to the

care and keeping of women at DH and supported Michelle in her statements.

Q Do you know when that meeting occurred?

A The summer of 2017.

Q And you consider Michelle Russell a friend of yours?

A Yes.

Q Do you consider Joan Barthold a friend of yours?

A Yes.

Q When did you first contact her?

A Again, same, four to six weeks.

Q Is there a reason why you reached out to both of these individuals in that time period?

A It was the request of my attorneys.

Q I don't want to get into any communications you had with your attorney, but anything else that Joan Barthold would offer in terms of testimony and support of your allegations in your Complaint?

A That's what I was asking her directly about, and otherwise, it's a broad question so could you clarify specifically what you mean?

Q Well, you reached out to Joan Barthold for a

reason, right?
A Right.
Q And you said that she would be able to offer testimony regarding this meeting in the summer of 2017 with Dr. Ed Merrens, and my question is are there any other topics that you believe she would be able to testify on regarding any of the allegations in your Complaint beyond that one topic?
A All the employees have had their own experience independently lip with David and Albert and the running of the department and the division and the importance of ultrasound and the effect on residency and fellow training so there are many elements and so each will have their own comments, yes.
Q Did Michelle Russell work in the REI Division?
A No.
Q What about Joan Barthold?
A No.
Q What about former employees and whether or not you've reached out to any of them for purposes of soliciting their testimony in support of your

Complaint in this case?
A Sharon Parent. And Judy McBean has reached out to me.
Q Anyone else?
A No.
Q What do you believe Ms. Parent would be able to offer in terms of testimony as a witness regarding the allegations in your Complaint?
A She worked in the REI Division so will have, she will have her opinion of the events involving the allegations.
Q Specifically, I want to understand what you discussed with her regarding working in the REI Division and the events regarding the allegations in your Complaint. Specifically.
A I asked her if she would speak with my attorneys.
Q How long was the conversation with Sharon Parent?
A Short. It was, will you speak with my attorneys. Yes. How is your daughter Elizabeth who's pregnant, ill, yes, I'll reach out.
Q And with respect to Sharon Parent, did you

consider her a friend?
A Yes.
Q What about Judy McBean?
A Yes.
Q And what conversation did you have with Judy McBean regarding potentially testifying in this case?
A She contacted me after Jessica contacted her.
Q Okay. And what did you discuss with Judy McBean?
A She did not understand why Jessica would be offering to represent her or meet with her in Boston.
Q What did you say?
A I said I had no knowledge of your firm contacting her.
Q What else did you discuss?
A I told her that she wasn't obligated to have your firm represent her and asked her if she would speak with Katie.
Q Okay. What did she say?
A She said she would be willing to speak with Katie.

Q Anything else regarding that discussion with Judy McBean?
A She said she was reaching out to legal counsel in Brattleboro.
Q What, if anything, do you believe Judy McBean would be able to offer by way of her testimony regarding the allegations in your Complaint?
A Again, as a member of the REI Division she'll have had her own experience with regard to the allegations in the Complaint.
Q But specifically, what do you believe she would be able to offer regarding the allegations in the Complaint?
A There will be many things that she can offer.
Q Well, what did you discuss with her during that call?
A Will you speak with Katie.
Q That's it?
A We haven't subpoenaed you to this point. I'm not sure why Foley & Lardner are reaching out to you.
Q Did you list her as a witness, as one of your potential witnesses in this case?

A Potentially, yes. I think so.
Q Yeah. You did. Right?
A Sure. But you haven't reached out to the other individuals to represent them so why was Judy different?
Q Once again, I mean, this is the third time I'm going to do it. You don't get to ask me questions during this other than to clarify a question. Okay? So I'm going to ask you questions. And the question I have for you is what specific facts do you believe Judy McBean would be able to testify about regarding the allegations in your Complaint?
A She has direct observation of David and Albert and their practice style, their billing, the conversations around process of care. She's had direct conversations with Dr. DeMars about potential employment to open, to after a pause be employed at DH. She has direct observations with Dr. DeMars about my status at the organization. She has intimate detail about the running of REI and the, as I say, the process of caring for patients.

Q During the 2015/16/17 time period, was Dr. McBean an employee of Dartmouth-Hitchcock?

A She was a consulting provider. She's an employee of Brattleboro Hospital and in her consulting role was employed. She had a clinical appointment but I believe not an academic appointment to the organization.

Q And as a result of having a clinical appointment and performing services as a consulting provider, how often would she be working at the REI Division at Dartmouth-Hitchcock?

A One to three to four days a month, and she took some call on the weekends. So she would come up in addition to that on the weekends on occasion.

Q Was that her schedule to the best of your recollection? I realize this is a long time period, but from the time period of '15 all the way until the REI Division closure?

A Yes.

Q Did you reach out to any other former employees for purposes of being a potential witness on your behalf in this litigation?

A Not that I recall at this point.

Q Turning your attention to one of your claims regarding retaliation, what I'd like to understand are all of the complaints you made on various topics which you believe support your claim of retaliation. And I know you've listed a couple of them, and I can point them out to you in Exhibit, I believe, 4. And just ask you to turn to -- I'll get you there. I'd just ask you to read to yourself paragraph 7 and let me know when you're finished.

A Okay.

Q Okay. And is that, is paragraph 7 an accurate reflection of the five categories of complaints or concerns that you raised which you believe resulted in retaliatory conduct towards you?

A Yes.

Q Okay. Now, at the time of Dr. Seifer's hiring, what was your title prior to him becoming Division Director?

A Director of Gynecological Ultrasound and Interim Director of Reproductive Medicine and Infertility. IVF Medical Director. Vice Chair of Perioperative Services, although I believe

Dr. DeMars took over those responsibilities when I became ill.

Q With respect to the Division Director role that Dr. Seifer was hired into, prior to that time were you, was that the Interim Director role that you're talking about?

A Yes.

Q Okay. And was it Interim REI Director?

A Yes.

Q Okay. And how long had you been functioning as the Interim REI Director?

A From the time that Dr. Manganiello retired.

Q Who appointed you to be Interim REI Director?

A It was through Karen Lancaster and Richard Reindollar when they were there.

Q And do you recall the year that that would have happened?

A No.

Q How many years were you in the interim role to your best recollection?

A I don't recall.

Q Was is more than one?

A Yes.

Q A couple?
A As I said, I don't recall exact number of years.
Q It was for a period of time though, right? It wasn't six months or a year. It was much longer than that, right?
A Yes.
Q And when Leslie DeMars became Chair of OBGYN, did she continue your role as the Interim REI Director?
A Yes.
Q Did you ever seek to become the actual Division Director of REI?
A Yes.
Q When was that?
A Before I became ill.
Q How did you pursue going from interim status to the actual permanent REI Division Director?
A In a conversation with Leslie, meeting.
Q Would that have been some time in 2015 or earlier?
A I don't recall the date.
Q And what transpired during that conversation with Dr. DeMars?

A She said that she was working on getting me the directorship of all of GYN Ultrasound for OBGYN for the Dartmouth Health Alliance, and in her estimation, that would be an important role for me and the use of my strengths.
Q What was your response?
A I agreed.
Q What was the role that she was trying to get you?
A Director of Gynecologic Ultrasound under the umbrella of OBGYN for the Dartmouth Health Alliance.
Q Okay. Did that actually happen?
A Yes.
Q When did that happen?
A She announced it, I don't remember the date. Around the time that she also, she also announced Rebecca Pschirrer who's a high risk obstetrician becoming the Director of Obstetric Ultrasound and OBGYN.
Q And do you recall what year it was?
A No.
Q Did you have any further conversations with

either Dr. DeMars or anyone else about becoming the full-time Director of the REI Division?
A Others have asked me about it at various times and Dr. Esfandiari was encouraging it. It was Dr. DeMars's decision.
Q And you'd reached out to Dr. DeMars because you actually wanted to be the permanent REI Division Director.
A Correct.
Q With respect to the five categories of concerns or complaints that you raised in paragraph 7 of your Complaint, I want to go through each and every one of them.
The first one is tolerance of medical care below acceptable standards of care. With respect to that concern, what, if any, complaints did you make regarding that topic?
A There are multiple over an extended period of time with regards to Dr. Hsu, with regards to Dr. Seifer, and their medical practices.
Q And who specifically did you complain to regarding Dr. Hsu and Dr. Seifer and their medical practices?

A Heather Gunnell and Leslie DeMars.

Q And you said you made multiple complaints to them about the medical practice of Drs. Hsu and Seifer?

A Correct.

Q Do you recall when you first made complaints about Dr. Hsu to Ms. Gunnell or Dr. DeMars?

A As I would define a complaint, it would be a few months after Albert started.

Q Do you recall when Albert Hsu started at the REI Division?

A He started in the summer. I don't remember the year exactly.

Q Summer of 2014?

A That may be correct.

Q Did you have anything to do with his hiring?

A No.

Q And you made complaints to Ms. Gunnell and Dr. DeMars a couple of months after his hiring?

A Within the first few months, I made complaints.

Q Did you complain to anyone else other than Ms. Gunnell and Dr. DeMars about Dr. Hsu that you recall?

A I also filled out evaluations for him as Interim Division Director for Credentialing Committee, and as Interim Division Director I also filled out evaluations that were part of the standard hiring practice.

Q Any other avenues that you pursued or communicated your complaints about Dr. Hsu's medical practices?

A I reported directly to them.

Q Okay. When did you first report any concerns about Dr. Seifer in his medical practices?

A The summer after he started.

Q Some time in 2016? Summer of 2016?

A If that's the year he started, yes.

Q With respect to Dr. Hsu's medical practice, do you recall generally the concerns you were raising to either Ms. Gunnell or Dr. DeMars?

A Yes, and I documented them extensively in a letter to Dr. Seifer and Dr. DeMars.

Q That's where you highlighted them?

A That's where I synthesized them after months of expressing concern, yes.

Q So up until that time, the concerns you were

expressing were verbally to Ms. Gunnell and Dr. DeMars?

A And the evaluations that I filled out. There may be other emails, yes.

Q Okay. And what about Dr. Seifer? When did you first express concerns in writing to either Ms. Gunnell or Dr. DeMars?

A In the summer after he started. I believe he started late winter or early spring.

Q Okay. And specifically what do you recall regarding the nature of your concerns or complaints that you raised regarding Dr. Seifer's medical practices?

A From the beginning it was he was in the clinical space with Albert seeing patients without having his licensure confirmed with the State of New Hampshire. The secretaries had raised that question to me because he was actually in treatment rooms observing Albert and his independent licensure hadn't been approved by the State of New Hampshire yet.

Q So the concerns that you raised were concerns that had been brought to your attention by the

secretaries in the REI Division?
A Yes.
Q Any other concerns about Dr. Seifer's medical practices that you recall specifically in reaching out to Ms. Gunnell or Dr. DeMars regarding Dr. Seifer's medical practice?
A Yes. Dr. DeMars asked me to go in and observe IVF egg harvest directly with Dr. Seifer in August of that summer after she had received multiple complaints from the nursing staff that patients were being put at risk and harmed.
Q How do you know she received multiple complaints from the nursing staff that patients were at risk of harm?
A The nurses told me directly. They came to me.
Q Who were they?
A Sharon Parent, Casey Dodge, Mary Martin.
Q Anyone else?
A Yeah. Pam, I'm blanking on her last name. And then a Jamie, I'm blanking on her last name right now, too. There are individuals who had been present in egg harvest with him.
Q Okay. And did you at some point then in August

2016 observe his practices, Dr. Seifer's practices with respect to the IVF egg harvest technique?

A Yes.

Q And was that the first procedure that you observed Dr. Seifer perform?

A I may have observed embryo transfers before that. I don't recall right now.

Q How did you raise your concerns? Well, let's go back to the IVF egg harvest, that technique that you saw Dr. Seifer perform in August 2016. What was your general assessment?

A That his skill and approach did not match his stated experience.

Q How so?

A He seemed to me to have very rudimentary technique. He didn't seem to understand the system necessary for the technical aspects of harvest. He struggled with the aspiration of follicles, and it was very out of context to someone of his stated stature.

Q Did you communicate any of these concerns to Dr. Seifer at the time?

A Yes. I didn't, I told him I felt that the technique that we utilize is very different than what he performed, and I gave him some remediation comments.

Q Okay. How did you express your concerns regarding Dr. Seifer's medical practices to Ms. Gunnell and Dr. DeMars?

A Verbally. In writing with Dr. DeMars at the time of his, also in writing at the time of his 30-day or 60-day and 90-day review. There were a couple of reviews that I sent comments to. And then when the nurses, the ultrasound techs, the residents, the other faculty were expressing concern to me, I asked them to both go to their bosses and to go directly to Heather and to Leslie to express their concern directly.

Q And that was based upon whatever their personal observations were, correct?

A Right.

Q It wasn't anything that you had firsthand knowledge of?

A No.

Q Other than what you testified to.

A Yes.
Q We've been going about an hour. Why don't we take a quick five-minute break.
(Recess taken 10:56 - 11:02 a.m.)
BY MR. SCHROEDER:
Q Have we exhausted all of your testimony regarding the subject of the issue of the category of tolerance of medical care below acceptable standards of care? That specific category?
A We've summarized it. I don't know that we've exhausted it. You know, I gave you a summary of the complaints.
Q To the extent that you made any complaints in writing to Ms. Gunnell and Leslie DeMars, they'd be reflected in emails or in the evaluations that you did for either Dr. Hsu or Dr. Seifer?
A Not all of them. I didn't write an email for every conversation I had with them.
Q The ones that were in writing.
A The ones that were in writing?
Q That was the question.
A Yes.

Q Okay. I want to turn to your allegation regarding concerns or complaints you made about, quote, "fraudulent billing practices." What do you recall specifically about any concerns or complaints you made about the topic of, quote, "fraudulent billing practice," end quote, to anyone at Dartmouth-Hitchcock?

A I spoke with Leslie, I spoke with Heather Gunnell, and I raised the issue at team meeting for REI, and I raised the issue at the Value Institute retreats.

Q And specifically, what do you recall you stated regarding billing practices and whether or not they were appropriate? At any, to any of these people or any of these events?

A They were ordering and performing unnecessary testing and that they were billing for that unnecessary testing.

Q Do you recall the specific forms of tests that you believe were unnecessary?

A The most notable one was the performance of trial or mock embryo transfers on every female who was being evaluated for infertility.

Q You initially said they were conducting and performing unnecessary testing. Just want to understand who "they" is?
A It was Albert and David.
Q So both Dr. Seifer and Dr. Hsu?
A Yes. Oftentimes they were in the room together doing these things.
Q How did you know that? Based on what other people told you?
A No. I observed them directly, but also based on what the ultrasound techs were talking to me about.
Q Who would the ultrasound techs be that would talk to you about Dr. Seifer's and Dr. Hsu's ordering of unnecessary tests?
A The person who roomed the patient who expressed concern was Jennifer, I believe her last name was Carpenter. She was the tech's assistant who roomed the patients. And then Jenice Gonyea and then there were one or two of the other techs expressed concerns, and to my recollection it was Bonnie Nester and perhaps Megan.
Q Who attended on a regular basis the REI team

meetings?

A It was a flex of individuals who are available, but it was Dr. Seifer, myself, Albert Hsu, Elizabeth Todd, Kelly Mousley, Heather Gunnell. Usually someone from the lab. It may have been Dr. Esfandiari at times. Whoever was available from the lab.

Q Anyone else?

A Not to my recollection at this point.

Q What about the Value Institute retreats? Would that include all of the individuals you just mentioned?

A Again, coming and going, yes.

Q Right. I understand that. I'm just trying to understand who potentially would attend and --

A And then the members of the Value Institute.

Q And who would they have been? Who's that?

A Katie Wira. There was someone who worked underneath Katie. I'm not sure. I don't remember her name.

Q Anyone else?

A There was another gentleman who came and went, and I don't remember his name.

Q Okay. Any other avenues that you believe, that you pursued for purposes of raising concerns or complaints about quote, "fraudulent bill practices," unquote?

A Not that comes to mind right now.

Q Okay. I want to turn your attention to Exhibit 2 which are the Dartmouth-Hitchcock or I should say your responses to Dartmouth-Hitchcock Medical Center's First Set of Interrogatories. It was previously marked Exhibit 2.

Ask you to turn your attention to page 19, number 12. I'd just ask you to read to yourself the question and response, and then let me know when you're done so I can ask you some questions about it.

A Okay.

Q Okay. Does this summarize, this response summarize and actually state specifically all the bases that you believe Dr. Hsu and Dr. Seifer were engaging in quote, "fraudulent," end quote, and quote, "unlawful," end quote, conduct by, quote, "order and billing for unnecessary patient testing," end quote?

A It summarizes.

Q Okay. Are there any other examples beyond the ones that you've identified here in response to Interrogatory number 12 in Exhibit 2 that you can recall sitting here today?

A It's summarized in Interrogatory 12.

Q I understand it's summarized. My question is are there any other kinds of tests that you believe were in your mind fraudulent or unlawful that were ordered by Dr. Seifer or Dr. Hsu?

A They had a pattern of ordering unnecessary blood tests and additional ultrasounds.

Q What's the basis for your believe that they had a pattern of ordering unnecessary blood tests and ultrasounds?

A Patients were being asked to come back for very frequent monitoring despite the fact there was no clinical evidence that it was necessary at that juncture.

Q How did you know that?

A I was reading the ultrasounds. There would be conversation of in-cycling patients with members of the team. The nurses asked me to approach

them to see if they would change their plans.
Q Were you responsible for reading the ultrasounds of Dr. Seifer and Dr. Hsu's patients at any point?
A Yes.
Q What time period was that?
A In the time period that I was working in the division that they were working. Dr. Hsu shared some of the responsibility of reading ultrasounds, but we had days that we covered.
Q Okay. What about blood tests; what is the basis for your knowledge that they ordered unnecessary blood tests?
A The blood tests were the corollary test that went along with the ultrasound, and there was a discussion with members of the team again of currently cycling patients and what the results were and what the plan was, had been made by the attending that was making plans for those patients.
Q How many times do you believe either Dr. Hsu or Dr. Seifer ordered unnecessary blood tests which obviously were corollary to the ultrasounds?

A 25 to 50?
Q What's the basis for your knowledge on that?
A Seeing the ultrasound, seeing the blood test results, evaluating the monitoring sheets and our computerized medical records and conversations with the nursing staff and with Albert and David about those results.
Q How many times did you approach either Dr. Seifer or Dr. Hsu about this specific issue of ordering blood tests and ultrasounds?
A At least ten.
Q What was their response?
A Albert oftentimes would reconsider but not always. David wanted to persist with his plan. And I directed the nurses to have conversations with the two of them.
Q Okay. Anything else regarding this particular category that we've just gone over?
A No.
Q I'd ask you to turn to number 13 and ask you to read to yourself. Let me know when you're finished.
A Oh, yes.

Q Let me know when you're finished.
A Okay.
Q Interrogatory number 13 asks you to identify each and every law that you contend was violated by the junior physician's alleged billing practices as alleged in paragraph 78 of the Complaint.
You go on to recite a number of statutes in there and a specific issue regarding use of space designated for inpatient care related to outpatient couples. I think you testified briefly about this the first day.
A Yes.
Q It's the same subject, correct?
A Correct.
Q How many times, this relates to Dr. Hsu, correct?
A Both of them, but it was a predominant habit of Dr. Hsu.
Q Okay. I don't think see anything in here about Dr. Seifer doing this.
A He on occasion was observing Dr. Hsu's clinic.
Q Okay. So he saw it, but he didn't do it

specifically.
A Correct.
Q How many times do you believe Dr. Hsu took outpatient couples to inpatient space and then billed for outpatient services within the inpatient space?
A Numerous. Multiple. More than 50.
Q What's the basis for your knowledge that would constitute billing fraud for somebody to see outpatient couples within inpatient space? Like what's your specific knowledge?
A Direct conversations with practice managers within OBGYN.
Q Do you know how the services that Dr. Hsu performed were actually billed, what actually occurred?
A Yes. They were outpatient services.
Q And they were billed how?
A They would have been structurally billed through the Visit Navigator in our computer system as ambulatory outpatient services because the patient was booked in an outpatient context.
Q Okay. And would that be less or more than if

they were as an inpatient?
A I don't know that.
Q Okay. And do you know specifically how Dr. Hsu's patients were billed under the scenario that you've highlighted in Interrogatory number 13?
A As outpatient services.
Q Okay. And what do you believe was fraudulent regarding or improper regarding the actual billing that was done?
A That proper billing practices do not allow for care of an outpatient in an inpatient setting, and that had been reinforced to many members of the department over many years from our practice manager such that if an inpatient needs a procedure that can be done as an outpatient, we can't bring them to the outpatient setting and the reverse is true as well. If a patient is designated as an outpatient, we cannot bring them to an inpatient setting for consultation or procedures.
And there was a consultation room set up specifically for these services that was across

the hallway from where Dr. Hsu insisted on seeing patients, and it was made very clear to me by prior coding specialists at DHMC that I needed to use that facility. We had multiple coders, and it was made very clear to me by the practice managers that we could not bill for consultative services in an inpatient setting.

Q Okay.

A And that for the many years both by coders and by the, that it was inconsistent with proper billing practice and by the practice managers.

Q With respect to this and how Dr. Hsu would have processed it in that Navigator system, they were treated as outpatients as if they had been seen in an outpatient space, correct?

A Correct.

Q So and that was what your understanding was, correct?

A They were outpatients treated as outpatients at an inpatient setting, yes.

Q And you complained about this to Dr. Seifer as well as Heather Gunnell and Dr. DeMars, correct?

A Correct.

Q Do you recall whether or not this was communicated to anyone else?
A No.
Q Did you do this verbally or in writing?
A Both verbally and in writing to Dr. DeMars, and verbally to Heather and verbally to David Seifer.
Q With respect to your comment here, inpatient space is often billed at a higher rate, right?
A I assume so. Yes.
Q Well, you said that.
A Right.
Q These are your Interrogatory Answers and you signed them under the pains and penalties of perjury. So that's a comment you made in here, correct?
A Correct.
Q And so am I correct that if somebody's billed outpatient space, it would be lesser than an inpatient space?
A Depending on what level of service they bill, Mr. Schroeder.
Q Well, you state here inpatient space is often

billed at a higher rate, right?
A Correct. That's what I said.
Q And to your knowledge, none of the patients that receive outpatient care were billed for inpatient designated rooms at a higher rate?
A I couldn't state about the rate.
Q Well, you told me that they were billed as outpatients and outpatient space, right?
A Please restate your question.
Q Can you say that again?
COURT REPORTER: And to your knowledge, none of the patients that receive outpatient care were billed for inpatient designated rooms at a higher rate?
A Again, I can't state the rate that they were billed at. Albert would have selected that himself.
Q So your testimony though earlier was that they would have been billed as outpatients in outpatient space, right?
MR. VITT: Objection. I don't think that's what she said.
MR. SCHROEDER: Can you go back?

COURT REPORTER: They would have been structurally billed through the Visit Navigator in our computer system as ambulatory outpatient services because the patient was booked in an outpatient context.

BY MR. SCHROEDER:

Q Does that refresh your recollection? So that would have been as if they had been seen in an outpatient space even though they'd been seen in an inpatient space?

A Correct.

Q Okay.

A But it doesn't say anything about rate in that comment.

Q I understand that. But your comment in your Interrogatory response is that inpatient space is often billed at a higher rate, correct?

A Correct.

Q Ask you to go back to Interrogatory 11 which is page 17. Before I ask you a question about Interrogatory 11 I just want to make sure. Have we exhausted your knowledge about the category of, quote, "fraudulent billing practices," end

quote?

A That I recall at this period of time.

Q And as you state in your Interrogatory responses.

A Correct.

Q Okay. Interrogatory 11 asks identify each and every ultrasound tech who expressed further concern that unnecessary and inappropriate procedures were being performed on patients without appropriate consent as alleged in paragraph 62. You see that?

A Yes.

Q Now the third category that we went over from paragraph 7 of your Complaint related to performing procedures on patients without consent, and I just want to understand the basis for your belief, well, the basis for your complaint or concern that you raised regarding that topic. Did you have personal knowledge or was it something that other people told you?

A I have personal knowledge from a conversation with Jenice Gonyea.

Q Personal knowledge is based upon what you

personally observed. Your knowledge is based upon what Ms. Gonyea told you?
A My knowledge is based on what Ms. Gonyea told me. Yes.
Q Do you have any personal firsthand knowledge of any instances where either Dr. Hsu or Dr. Seifer performed procedures on patients without their consent?
A I was not present for these procedures.
Q Okay. Let's try to answer the question though.
Do you have any personal firsthand knowledge of any instances where Dr. Seifer or Dr. Hsu performed procedures on patients without consent being in place?
A I did not observe any procedures where the consent had not been obtained beforehand.
Q And to your knowledge, the only person who notified you about this issue of performing procedures on patients without their consent came from Jenice Gonyea?
A She was the primary person who reported it. It was also expressed by Jennifer Carpenter, but I don't know if she personally observed it or not.

Q Okay. Any other individuals other than Jenice Gonyea or Jennifer Carpenter who raised the issue of consent regarding procedures on patients of Dr. Hsu or Dr. Seifer?
A Elizabeth Todd had a conversation with Jenice as well.
Q How do you know that?
A She brought it to my attention. She came to me about it.
Q Who brought it to your attention?
A Both Jenice and Elizabeth Todd.
Q So other than Jenice Gonyea, Beth Todd and Jennifer Carpenter, anyone else that raised concerns about lack of consent for procedures done by Drs. Hsu or Seifer?
A No. Well, I'll amend that from the fact that Dennis Seguin who is Jenice's supervisor came up to talk to me and I sent him to Dr. DeMars.
Q Did you have any discussion with him about it?
A Very truncated. We were in the middle of a work session, and I suggested that he go directly to Heather. I suggested he go to Heather, he go to Leslie and go to the head of ultrasound.

Q And do you know if he did so?
A I do not.
Q And the two people that you reached out to were Heather Gunnell and Dr. DeMars, correct?
A Correct.
Q And do you know whether or not -- did you reach out to anyone else in Dartmouth-Hitchcock management to express concerns that had been raised to you by these individuals?
A No.
Q Do you have any knowledge as to whether or not Ms. Gunnell or Dr. DeMars followed up with Drs. Hsu or Seifer?
A Dr. DeMars told me that she would speak with them and that it would stop.
Q Do you know whether she did?
A I don't directly have knowledge of whether she did or not.
Q What was the time frame when you had that conversation with Dr. DeMars?
A Within days of Jenice raising the concerns.
Q And do you recall a specific time period when that happened?

A No.
Q Do you recall the year it happened?
A It was winter/spring of 2017.
Q With respect to the -- I just want to go back to a topic we discussed before. Trial or mock embryo transfers. Have you actually ordered them for patients?
A Sure.
Q And was your issue with respect to Dr. Seifer or Hsu ordering them that they ordered them for all infertility patients as opposed to just a portion of them?
A Yes.
Q Did they actually perform the tests on those patients?
A Yes.
Q And you just believe that you shouldn't have to do them for all infertility patients?
A It is not the standard of care.
Q When you say it's not the standard of care, what's that based on?
A The American Society for Reproductive Medicine guidelines.

Q Is there something in there that says anything about trial or mock embryo transfers?
A It's not part of the paradigm for workup and evaluation of all infertility patients, and of the REI providers that I currently practice with, and the REI providers that preceded Albert and David it was not part of the new infertility patient workup.
Q I understand it was not part of the new infertility workup either with the people you work with now or the people that you worked with before Dr. Seifer and Hsu. My question is is there a specific provider in the ASRM guidelines or protocols that actually addresses this specific issue?
A It's not mentioned as part of the paradigm.
Q And you believe because it's not mentioned as part of the paradigm that it would have been inappropriate to do it for all infertility treated couples?
A Yes.
Q Have we discussed all of the issues relating to the category performing procedures on patients

without consent as identified as the third category of concerns or complaints that you raised?

A To my knowledge at this point. Yes.

Q Turning your attention to the fourth category from paragraph 7 of your Complaint, you raised a concern about a Zika-exposed patient and the fact that you raised a concern about a Zika-exposed patient being impregnated through assisted reproduction, correct?

A Correct.

Q And can you explain to me what that relates to specifically?

A Would you please rephrase your question?

Q Sure. The fourth category of concerns or complaints that you believe support your retaliation claim is regarding a Zika-exposed patient being impregnated through assisted reproduction.

A Correct.

Q And at some point you raised a concern or complaint about that, correct?

A Correct.

Q What I want to understand is what did that actually entail? What were the specifics about that event that caused you to raise a concern or complaint?

A There's an Interrogatory. Shall we refer to that?

Q If that would help you refresh your recollection. Let's go to page 24 of your Interrogatory Answers.

Just so the record reflects, the witness is reviewing the response to Interrogatory number 16 relating to paragraph 93 of her Complaint which includes a reference to the subject of Zika virus, specific patients being treated in that context.

Have you had a chance to review that response?

A I'm still reading it.

Q Read the whole response because that will also relate to the fifth category of concerns or complaints you raised which you believe support your retaliation claim.

A Okay.

Q Now, with respect to the category related to your concerns about the Zika-exposed patient, does this refresh your recollection as to the specific nature of that concern or complaint?
A Yes.
Q What do you recall as to your involvement with respect to this particular patient and the issue of whether or not one or both members of the couple had been exposed to the Zika virus?
A I was asked by Dr. Esfandiari to review their chart as he had concerns about the care of this couple. I reviewed the chart. As IVF Medical Director that would be appropriate.
Q Okay. What did you determine?
A The couple had, I believe on the day that they saw Albert in clinic they traveled that night to Brazil which is a known Zika endemic area, and there were many babies born with congenital anomalies to women in Brazil, and it was all over the news and all over our national organization's website, the American College of OBGYN's website and the CDC with guidance that had come down about the care of these patients

where there is ART care being given. The couple also traveled to the Caribbean subsequent to this which is also on the map for Zika exposure. So not one but two exposures, and they were having unprotected intercourse in that period of time. And so it's not just mosquitos. In terms of transmission, it became known in this period of time where there was a rapidly evolving science that men could transmit the Zika virus for a prolonged period of time in their semen despite having negative blood tests.

Q Okay. What, if anything, did you do as a result of reviewing the relevant charts?

A I called Risk Management.

Q Who did you call in Risk Management?

A I spoke with Karen Boedtker.

Q Did you speak with anyone else in Risk Management relating to the subject?

A Not that I recall at this point.

Q Okay. And what, if anything, did you say or do with respect to Risk Management?

A I spoke with Karen to say that we were not meeting the standard recommendations from the

CDC or from our national organization to proceed with care for this couple and allow them to go forward with an embryo transfer, and I sent her a copy of the guidance by email.
Q And the guidance you're referring to specifically, what do you recall that was?
A They should wait six months.
Q No. I understand that. But the name of the guidance that was coming from what organization?
A The CDC, ASRM which is American Society for Reproductive Medicine, and the American College of OBGYN as well as the World Health Organization had recommendations.
Q What, if any, response did you receive from Karen Boedtker?
A She told me that David and Risk Management to my recollection now had written a statement for the couple to proceed assuming the risks of that transfer.
Q Had you ever seen a consent form or a document like that in the past?
A No.
Q Used in the REI Division?

A No.
Q Did have you any personal interaction with Dr. Seifer or Dr. Hsu about this particular patient?
A Yes.
Q This couple?
A Yes.
Q And what did you -- let's first exhaust your discussions with Risk Management. How many conversations did you have with them?
A One and a subsequent email.
Q So one conversation with Karen Boedtker and then one email to her?
A One or two. Yes.
Q Anyone else in Risk Management that you spoke to?
A Not that I recall at this point.
Q And that was the one and only time that you'd reached out to Risk Management regarding Dr. Seifer and Dr. Hsu, correct?
A No.
Q What other time?
A We had other conversations about patients that were seeking remuneration for their care but

also lodging complaints about their care.
Q Well, I asked you about any concerns or complaints that you raised and you said you'd raised them with Ms. Gunnell and Dr. DeMars and I asked you anyone else and you said no. Now you're telling me you had conversation with Risk Management about other conversations regarding complaints lodged with the hospital. So when did those occur?
A Could you clarify your question? Are we talking about Zika or are we talking about the process of care?
Q I'm talking about now any time that you had reached out to Risk Management. The only time you identify in your Interrogatory responses which are 26 pages in length that you reached out to Risk Management to raise a concern or complaint related to this issue of the Zika virus. I then asked you whether or not that was the only time because that's what's reflected in all of your Interrogatory responses. Now you're telling me that you've reached out to Risk Management or spoke to them on other occasions

about Drs. Hsu and Seifer.
A What is your question?
Q I want to know how many times you spoke with Risk Management regarding any concerns or complaints about Drs. Hsu or Seifer.
A They may have contacted me and then I reached back out to them.
Q Okay. But this was the one time that you contacted them regarding an issue relating to Dr. Seifer or Dr. Hsu?
A This is the one time I reached out to them with regards to the Zika virus.
Q Right. But do you recall any other instances that you reached out to Risk Management regarding Drs. Hsu or Seifer as you sit here today?
A I had multiple conversations with them about specific patient care issues, both in email and on the phone when they contacted me. So the definition of "reaching out" is I would ask you what is the definition of "reaching out."
Q Well, so it's one way. It's one way. You reached out to them. Did you contact Risk

Management for the purposes of any concerns regarding Dr. Seifer and/or Hsu other than the Zika virus, and you said well, there were these other communications, but it's where they initially reached out to you and then you reached back out to them.

A That I recall at this point.

Q Right. And so the multiple conversations that you had with Risk Management about patient care issues, I want you to identify those specific instances. So first of all, if you spoke to Risk Management did you speak to anyone ever other than Karen Boedtker?

A Yes. And I can't recall who.

Q More than one person?

A Yes.

Q You have no idea who?

A No. Not right now.

Q Okay.

A It was whoever picked up the phone and called us back. It's how they run things in their office.

Q And you recall the specific examples of conversations you had with Risk Management about

any patient care issues for Dr. Seifer.

A No.

Q And do you recall the specific nature of any conversations you had with Risk Management about patient care issues involving Dr. Hsu?

A Yes.

Q What do you recall?

A There was a patient or a couple that I had initially cared for with one of my partners for their first pregnancy who were re-establishing care, and he was part of the Dartmouth Medical School class. They were coming back for their second pregnancy. I saw them in the clinic right before I was ill, and we had established a plan to go forward.

After I became ill, Dr. Hsu took over the care of the couple. I had documented a short note in the chart saying she got pregnant with this treatment previously. We should do the same. If it's not broke, don't fix it basically.

Q Um-hum.

A And he changed the plan in cycle and instead of

choosing to inject sperm into the egg for fertilization they elected to do a routine IVF which was just washing sperm and putting it into the dish with eggs. She was young. They had a complete failed fertilization cycle. They were paying out-of-pocket as a medical student. There was a lot of social reason for them to have a large family, and they were devastated by the failed fertilization.

Q Okay.

A They did not become pregnant and lodged a complaint, I believe, with Patient Relations, with Heather Gunnell, and I believe from there it was sent to Risk Management. Leslie became involved, and I got an email from Risk Management saying help us to understand this. So I had conversations about that patient or that couple.

There was a, there's a series of couples that I'm not recalling all the specific circumstance right now where Albert made clinical decisions and the patients were unhappy with their care, and in review by Dr. DeMars,

she asked me when I returned to assume the care of these couples directly one-on-one, and we wrote off their charges for IVF and our services.

Q Do you know how many couples you're talking about?

A I'd say five to eight.

Q To your knowledge had any patients of yours ever lodged any complaints with Patient Relations or Risk Management or anyone else at the hospital regarding care?

A Sure. Yes.

Q How many times has that happened?

A Three to five in 20 years.

Q Other than what you just stated, are there any other instances where you had communications with Risk Management about Dr. Hsu that you recall?

A It was all related to specific patient care complaints and concerns to my recollection at this point.

Q That's what you were just testifying to, correct?

A Correct. May I take a break?
Q Absolutely. I think lunch will be here momentarily.

(Lunch recess 11:59 a.m. - 12:55 p.m.)

BY MR. SCHROEDER:
Q Okay. Just going back on the record.

We just left off on the fourth category of concerns, complaints that you believe Form the basis of your retaliation claim. The fifth category relates to -- and it's the fifth and final one, failing to retain necessary personnel to validate federally required data reports upon closing the REI Division. Do you see that?
A Page 17?
Q We're on page 25 of the Interrogatory responses.
A Okay.
Q Sorry.
A That's all right. I got it.
Q It was failure to retain appropriate physician staff with knowledge as required to full-time validation and reporting obligations. That was the fifth category. And I think this second part of your response, Interrogatory 16 speaks

to that.

A Correct.

Q Am I correct?

A Yes.

Q Okay. And I understand that you believe that if you were still employed there, you would have been able to validate the data required by SART?

A Yes.

Q What does SART stand for?

A Society for Assisted Reproductive Technology.

Q Okay. With respect to that category of concerns that you believe forms the basis of your retaliation claim, did you raise those concerns or complaints with anybody at Dartmouth-Hitchcock?

A Yes.

Q When?

A I spoke to Leslie about it, and I believe that I address it in my letter which we should pull out. Right?

Q Sure. Letter on or about May 25th, I think, which is Exhibit 12.

A I'd say --

Q You're referring to Exhibit 12?
A Yes.
Q Sorry. Okay. What page?
A Third page.
Q Okay. What do you say with respect to this topic?
A Other notable roles I have served and would continue to serve that are clearly of importance to DH include providing clinical knowledge for FDA and CAP inspections for Reproductive Medicine Lab, liaison to UVM Medical Center for all infertility and ART patients including cancer patients who need urgent cryopreservation of gametes or embryos, and three, continued education resources for the residents on REI topics. I don't specifically talk about SART in there.
Q Okay. But this is one of the places that you raised just some of the things that you had been doing?
A Right.
Q And would continue to do if you were retained, right?

A Correct.
Q And with respect to the, that was May 25th, 2017. Is that the same time frame in which you spoke to Leslie DeMars about your ability to fulfill the role regarding reporting obligations to SART?
A Yes.
Q Was that one of the followup conversations after you'd been informed of the closure of the REI Division?
A Yes.
Q Anything else about this fifth category that we've just gone over beyond what you've testified to and is in your Interrogatory responses?
A No.
Q Okay. With respect to the next Interrogatory which is on the next page of --
A This is my letter.
Q I'm sorry.
A So this one?
Q As your counsel pointed out, number 17 which is page 26. And the Interrogatory asks you to set

forth the full factual basis for your contention that Defendants discriminated and retaliated against you based on your alleged disability. And after -- let me know when you've had a chance to review the whole response.

A Yes.

Q Okay. So I just want to walk through your response on this topic now that you've had a chance to review your response to Interrogatory number 17 in Exhibit 2. So can you tell me whom you believe had made complaints about you, quote, "not pulling my weight," end quote, and "to handling less complex types of work," end quote?

A Dr. Seifer, Dr. Hsu, Dr. Regan Theiler.

Q Regan Theiler?

A Yes.

Q Who was that?

A She was head of the generalists' division.

Q Do you know whether she had anything to do with the closure of the REI Division?

A I do not know that she had any, no.

Q Okay. And you believe that the concerns or

complaints about you were from Dr. Seifer and Hsu?

A Yes.

Q And how did you learn about these concerns or complaints? Who told you?

A Dr. Hsu and Dr. Seifer. Largely Dr. Seifer. And I can't remember who said there was expressed concern about my not being in the backup GYN call.

Q Do you know who made that concern known to you?

A It was said that it was from the general OBGYN group.

Q Okay. Second paragraph states, quote, "On the day the announcement was made of the closure of the REI division in the meeting with a member of the staff of Employee Relations and Dr. Ed Merrens, Dr. Merrens counseled me not once but three separate times to stay out on disability," end quote. What was the nature of that conversation that you had with Dr. Merrens?

A He was present in the room at the time that the Employee Relations individual was sitting across the table from me. Dr. Merrens was sitting to

my right, and it wasn't per se a conversation. It was me in a flood of tears sobbing as the Employee Relations person handed me my separation or my package. And I cried, and Dr. Merrens said it's okay, you can stay out on our disability. I'm sorry. I realize that this was a -- I can't remember exactly how he phrased it -- flagship program or something like that, and then he said you can stay out on our disability three times.

Q Did you make any response to him on that topic? Specifically?

A No. I was completely in a point of sadness and disbelief.

Q How would you describe your relationship with Dr. Merrens over the years?

A Up and down.

Q Up and down? In what way?

A Sometimes positive and sometimes negative.

Q How was your relationship with Dr. Merrens negative?

A He seemed less than pleased when I engaged Geoffrey around my mediation.

Q When you say you engaged Geoffrey, Mr. Vitt?
A Yes.
Q And the mediation you're referring to is back in 2013, thereabouts?
A Somewhere in there, yes.
Q Was that relating to conflicts that you were having with Dr. Reindollar?
A It was mediation with Dr. Reindollar around conflicts with Dr. Reindollar.
Q Okay. And what do you think, in what way was Dr. Merrens negative with respect to that issue?
A He said this is not what we're trying to do here, and I said I'm trying to understand the process of mediation, this is new to me, and the tenor of his involvement, I perceived, had changed.
Q In what way?
A He was far more distant than he'd been and more brusque in my communications with him.
Q Okay. Other than that one issue or event, any other instances where he was negative with you?
A Not that I recall right now.
Q And what about ways in which he was positive and

you had a positive experience with Dr. Merrens?
A When I formed the relationship to teach UVM fellows and he learned about it, he sent me a very or a copy or a very positive email that he had copied, I believe, to Jim Weinstein as well saying this is an example of, you know, collaborative or excellent work within the region between the two organizations.
Q Had you had other interactions with him over the years?
A Not that I recall directly now.
Q Did you ever seek his counsel or support or advice regarding your potential move to Hawaii?
A That was around the mediation time.
Q It was.
A Second mediation.
Q How many mediations were there?
A Two.
Q When was the first one?
A I don't recall the exact year.
Q Second one was in 2013-ish?
A I believe. And I didn't, just to correct you, I didn't seek him out.

Q Well, I'm asking you whether you did.
A I'm saying no.
Q Okay. Well, did you discuss with him or ask for his advice or counsel regarding the potential move to Hawaii?
A He called me up and asked me if I would meet with him, owing to your definition of reaching out or seeking.
Q Okay. And when he reached out to you, did you have a discussion?
A Yes.
Q As a result?
A Yes.
Q What was the nature of that discussion?
A It was positive.
Q Okay. In what way?
A He seemed to understand the issues and agreed to mediate between Richard and I initially.
Q Okay. Was he supportive of you staying, remaining at Dartmouth-Hitchcock as opposed to moving to Hawaii?
A At first. And then it was pretty clear that he wasn't going to step in to make anything

different for me.
Q In what way?
A He said to me we're not, I've spoken with Jim Weinstein and we're not going to support any of your requests.
Q What was the nature of those requests?
A More support for clinical staff, both in physician and nursing, better salary, a request to have GYN ultrasound under the umbrella of OBGYN and not radiology are the ones that come to mind right now.
Q Had you received an offer to move to Hawaii?
A Yes.
Q And did you use that offer as a negotiating chip with Dartmouth-Hitchcock?
A I made them aware of it, yes.
Q Okay. And a number of the things you were asking for had monetary component to them, correct?
A Yes.
Q In your Complaint you referred to Dr. DeMars as a vocal supporter of yours, correct?
A Yes.

Q And how was Dr. DeMars a vocal supporter of yours?

A She told me that she had sent an email to Administration to have a preliminary meeting to discuss the possibility of pausing the REI Division. And when she got to the room, instead of being Ed and maybe one other Administrator, it was a room full of people including Marketing and Risk Management or legal counsel of some sort, and that in her view it looked like the train was already on the track, and that she was very adamant with Ed that I was important to the department and I was responsible for her second child.

And she told me that she didn't know until the week before I was going that I was actually on the list to be terminated; that she understood we would be pausing, and I would be still part of the department.

Q Any other statements relating to that discussion?

A Not that I recall right now.

Q How do you believe, is that the basis for your

belief that Dr. DeMars supported the idea of maintaining or reopening the REI Division as you alleged in your Complaint?

A Actually for months she'd been telling me that in meetings that I had with her.

Q Meetings after the closure of the REI Division?

A Before. Before.

Q In your Complaint you said she supported the idea of maintaining or reopening the REI Division. Was it also assumed there would be a pause during those discussions?

A Yes. With me, yes.

Q What was the basis for the pause?

A Reorganization. She told me that Maria Padin had agreed that David was not going to be a fit for the organization, and he would be leaving. Short time later, maybe a month, six weeks, two months later she told me Albert would be going as well and that Dan Grow would be interviewed behind the scenes, and that when patient volume allowed, Judy McBean would be coming up, and that I should separate myself from the turmoil, keep my head down, and get well.

Q Would it be fair to say that you had a close friendship with Dr. DeMars?
A At one point, yes.
Q And when did that end?
A At the end of the REI Division. My last day.
Q Was that on or about the start of June 2017?
A Yes. Maybe even before that.
Q Other than the closure of the REI Division, was there anything that precipitated the end of the close friendship that you had with Dr. DeMars?
A No.
Q Do you have any facts as you sit here today that you believe demonstrate that Dr. DeMars is connected in any way to your retaliation claim?
A I'm sorry. I don't understand that question.
Q Go ahead.
A No, I understand what you said. Can you rephrase your question, please?
Q You made a retaliation claim in this case, correct?
A Right.
Q And you're claiming that you made a series of complaints and concerns known to the hospital,

correct?

A Yes.

Q And that as a result of making those claims and concerns known to the hospital that you were retaliated against by the hospital.

A Yes.

Q You understand that. You have retaliation claims in this case.

A Yes.

Q Okay. What I want to understand is how if at all Dr. DeMars is connected in any way to your claims of retaliation?

A There is a long list of individuals, patients and providers, who had sought out Dr. Merrens on behalf of the program and on my behalf to ask him to reconsider my employment.

Q And she was one of them.

A She told me she was one of them. Her emails dated around the time of the closure indicate something different.

Q And those are emails that you've seen in the course of discovery in this litigation, correct?

A Correct.

Q Prior to that though, prior to seeing those emails, and you believe those emails have what connection to your claims of retaliation?

A She was clearly presenting two sides, two different opinions to each side, and clearly in the content of those emails stating that there are reasons not to keep me.

Q And what do you believe the reasons were that she was expressing?

A I'd have to -- let's get the email out.

Q I want to ask you.

A Well, I need to see the detail of the email.

Q No. I'm going to ask you first, what are the actual reasons that you believe she put forth as to why the division should be closed and you should lose your employment.

MR. VITT: When you say -- I'm sorry. I object. The action, meaning what did she --

MR. SCHROEDER: Her reasons. Right.

MR. VITT: What did she say.

MR. SCHROEDER: Well, what her reasons were --

MR. VITT: One question is what did she

say. And the second question is what did she actually believe. And I object because I don't think the question is clear.

MR. SCHROEDER: I didn't say what she believed. I never said the word believe. If you want to go back --

MR. VITT: Don, I understand what you said. I mean, I heard the question, and the reason I'm objecting is I don't know whether the question asked Dr. Porter what did Dr. DeMars say in the emails or are you asking her what do you think she actually believed when she wrote it.

BY MR. SCHROEDER:

Q All right. I don't want to get into what Dr. DeMars did or didn't believe because you can't get into her -- that would be asking you to speculate. So what I'm asking you is what do you understand the reasons she set forth as to the basis for terminating your employment?

A That I had team-splitting behavior, and that the institution would have had to fire David and Albert for cause is what I remember about that email at the present time.

Q That's an email that you saw in the context of this case, correct?
A Yes. The email that you refuse to release.
Q Actually, since you've seen the email, it's actually an email that was produced pursuant to the court order.
A Pursuant to the court's order, yes. Judge Crawford asked you to release it.
Q Right. I'm well aware of what Judge Crawford asked us to do.
With respect to my question though about her connection to your claim of retaliation, what are the facts that you're aware of that Dr. DeMars retaliated against you?
A She had the opportunity to at least state in favor of keeping me when there was a strong tide of individuals who wanted to keep me and for whom it was necessary for the residency, for the training of medical students, for the performance of complex gynecologic ultrasound, for the performance of complex GYN surgery, et cetera, and she had the option of voting in favor of that and did not, and I do believe that

she understood the consequences of not keeping me.
Q You mean the consequences that you just testified to? The ability to reporting relationships with SART and UVM, having affiliations with UVM?
A Yes, and all the other things I just stated.
Q Anything else regarding Dr. DeMars that you believe would demonstrate that she retaliated against you?
A She stopped listening to my concerns.
Q When?
A Right before the closure.
Q You mean after the announcement in May before the actual closure?
A Before the actual closure. Well, actually before the announcement.
Q Anything else?
A Not that I recall at this time.
Q Okay. What, if any, facts are you aware of that Ms. Gunnell had anything to do with the closure of the REI Division?
A She had conversations with me about the

potential foreclosure.

Q When was that?

A Beginning in the fall of 2016?

Q Are you aware of any facts that she actually did have any involvement in the actual decision to close the REI Division?

A Yes.

Q What are you aware of?

A There are, there's an email from Ed Merrens that says that she is quote, "the unsung hero," unquote, of this closure.

Q Do you know whether or not she had any voting authority with respect to the REI Division closure?

A I know she was involved in conversations with Dan Herrick. I don't know if she had, quote, "voting," unquote, decision making.

Q With respect to the REI Division closure.

A Correct.

Q What, if any, facts are you aware of that Ms. Gunnell in any way retaliated against you for raising concerns and complaints to her attention?

A She was at the Value Institute meetings reasonably hostile to the group.
Q To the whole group?
A To the group as a whole. And when I brought concerns to her on ultimate occasions about David and Albert, my impression was that she was irritated.
Q What's the basis for your impression that she was irritated?
A Big sighs, little comments, turning her back and walking away. Leslie also told me that she was upset, Heather was upset about my supporting my secretary in her negotiations with Human Resources and Kelly Mousley.
Q What about her?
A What about her?
Q You just said "and Kelly Mousley."
A It was Human Resources, Kelly Mousley and my secretary.
Q Okay. And what was the nature of that issue?
A The way I understand it from Donna Bedard, my secretary, Heather and Kelly were making changes to office organization that would result in the

restructuring of the process of patient care and that not all of the elements had been addressed that were critical. And she raised the issue.

Q Who is she?

A Donna.

Q Okay.

A And it was seen as, in her view, antagonistic rather than information for them to make changes that would meet all of the needs, and their evaluation of this extremely long-term employee was resulting in a verbal warning and a threat for a written warning about her responses to the change.

Q Were you involved in this whole episode?

A From the perspective of Donna asked my opinion.

Q Okay. Any other facts that you believe support in any way that Ms. Gunnell -- go ahead.

A I went to Heather to tell her that there was some concerns and I was concerned about Kelly's approach to Donna and the fact that there were potentially unsubstantiated claims against Donna and that I was supporting Donna and encouraging her to move forward with her negotiations with

Human Resources.
Q What happened as a result?
A Donna sat with Human Resources and negotiated with Kelly. I don't know the outcome of that. I do know Donna is now, where she was only 18 months or so, two years from retirement, and at risk for getting a written warning after nothing but positive evaluations for many years, has moved to vascular surgery and has gotten two promotions and two raises in a different working environment.
Q Did that happen as a result of those negotiations?
A No. It was separate. She sought out that job.
Q Okay. I'm assuming HR had to support that move at some point, right?
A I would assume so. Yes.
Q Anything else that you believe supports your belief that Ms. Gunnell had anything to do, engaged in any form of retaliatory behavior towards you?
A Yes. I brought up the concern about the doors being locked to the clinic in a relatively

isolated area of the clinic and Kelly Mousley having shut the phones off at that desk where nurses were needing to recover patients from general anesthesia.

Q Okay. What happened as a result?

A I went to Leslie with it, and she just waved her hand at me and walked away, and I had brought up the concerns based on national standards for the American Academy of Anesthesiology that there needs to be appropriate staffing for recovery in an outpatient setting for anesthesia and appropriate individuals, and Heather had suggested that we get someone from The Pink Smock downstairs which is a volunteer layperson to come sit at the desk.

Q Okay. How is that connected in any way to your claim of retaliation?

A Again, they saw that, when I spoke with Leslie it was seen as another series of complaints without any move forward to make changes.

Q When was that?

A Right before the announcement of the closure.

Q What's the basis for your belief that Dr. DeMars

stepped down as OBGYN Chair as a result of some connection to the REI Division closure?

A A conversation I had with Elizabeth Todd after she spoke with Leslie once it was announced that Leslie was stepping down.

Q Okay. What did Beth Todd tell you?

A That Leslie, Leslie said she was able to negotiate some things, but that at least in part some of the heated conversation with Dr. Merrens was around the restructuring of REI.

Q You mentioned before that there was discussion that you had with Leslie DeMars in the spring of 2017 about a pause with the REI Division?

A Yes.

Q What was your understanding of what that pause would constitute?

A A brief pause of IVF procedures, but that we would continue to do new patient evaluations and offer non-IVF-related treatment and that DH was offering to not charge patients who had frozen embryos at the organization for a year of storage fees because those would be the patients in the cycles that we would most readily open

back up with.
Q Was it your understanding that the pause of IVF would be for a year as a result of offering a year of --
A No.
Q How long did you understand the pause would last for?
A Months.
Q Did you ever see anything in writing about how long that pause would last for?
A No.
Q Did you understand why the REI division needed to do a pause?
A My understanding was based on my conversations with her.
Q Right. What was your understanding of why a pause was necessary with respect to IVF at that point?
A I was answering you.
Q Why? Yes. Go ahead.
A My understanding was that we would pause, allow Dan Grow to come in, the transition of David and Albert out, Judy to come in as patient volume

allowed and we would retrain nurses.
Q Did you have an understanding of how long that would take to do those four things?
A Months. We had a conversation about months.
Q Did you ever have any discussion directly with Leslie DeMars about her stepping down as chair of OBGYN?
A No.
Q Did you have any communication with Leslie DeMars after the closure of the REI Division?
A Yes.
Q When?
A I had a discussion -- do you mean the day that it was announced or the actual closure?
Q No. After the actual closure on June 3rd.
A Yes. I had left her a message on her phone requesting a conversation with her. She called back, left a message on my answering machine saying yes, of course, she'd speak with me. And then I called her once or twice after that and left a message on her cell phone saying please reach out to me. And then I spoke with her on Sunday.

Q What Sunday?
A This recent Sunday.
Q What did you speak to her about?
A Our children.
Q Anything else?
A No. No. That's all related to our children.
Q Did you have any discussion with her about this case?
A No.
Q How did it come to pass that you actually spoke this past Sunday?
A Joan Barthold's retirement party.
Q So you saw each other in person?
A Yes.
Q Did you have a discussion about anything else relating to your case?
A Not real relating to the case, no. We talked about our children. She showed me pictures of her son and talked to me about him. Both of her sons actually, but her one son who was an IVF baby.
Q Do you have any reason to doubt Leslie DeMars' honesty or trustworthiness?

A Yes. Based on that email.
Q Other than that email, anything else?
A I think that email speaks large volumes.
Q Anything else?
A No.
Q Do you remember who that email was to? Was it to Ed Merrens?
A I think it was Ed Merrens and Dan Herrick and I'm not sure who else. I think it was the two of them, but I don't recall.
Q And that was in and around the time frame after the closure had been announced?
A Yes.
Q Okay. Just got a few minutes left.
Let me ask you about your current employment arrangement. Well, let me ask you this. If you had remained, one of the alternatives in that May 2017 letter you wrote to Aimee Giglio was an alternative position if you remained at Dartmouth-Hitchcock, correct?
A Correct.
Q And did you understand that if you remained at Dartmouth-Hitchcock, that that would be in a

reduced role?

A No.

Q You thought it would be in the same role that you had before?

A How would you define a reduction?

Q Well, would you be earning the same salary?

A Yes.

Q You believe you would be?

A Yes.

Q And despite the fact that the REI Division would not be operating, correct?

A Despite the fact that there was conversations with Dr. Conroy and Dr. Brumstead about potentially having a joint program, and I'd had that conversation with Leslie prior to the closure because she said there was going to be lots of opportunity to be working with you again. So I would have had that conversation, submitted a letter, she and I had conversations about a joint venture with UVM, and then Barry Smith raised it after I sent that letter in with, on his own with Administration.

(Exhibit 14 marked for identification)

Q This is Exhibit 14. You can have it. I'm showing you a document which is your response to Mary Hitchcock Memorial Hospital's First Set of Interrogatories, and I want to turn your attention to page 3, at the bottom of page 3, okay? And I want to just understand UVM, University of Vermont Medical Center, you started working there June 4th, 2017?
A Correct.
Q And was that in a full-time capacity or per diem?
A Per diem.
Q Okay. And are you currently employed by University of Vermont Medical Center?
A Yes.
Q And other than an increase in your per diem rate from 150 to 175, has anything changed in your employment status with UVM?
A Yes.
Q Okay. Tell me about that.
A In May of 2018 I became employed faculty with an appointment to the Medical School and a clinical appointment to the University of Vermont Medical

Center.
Q Okay. Did you receive anything in writing as a result of that?
A Yes.
Q Okay. We haven't seen anything in that regard. I'm not aware of any documents related to her current employment.
With respect to your current employment, well, that was as of May 2018?
A Correct.
Q Did you receive a salary in that capacity?
A I began receiving salary in May of 2018.
Q What was it?
A It's broken down based on partial employment to the Medical School, a variable, and employment by UVM Medical Center, and it's approximately $240,000 a year with benefits.
Q Do you know why your expert designated in this case said that one of his assumptions is that you'd receive a salary of 260,000?
A Oh, I had, I got a $20,000 raise but that, part of that is variable so it's not guaranteed.
Q When did you receive that?

A My first review which would have been end of the first summer? But we didn't get our variable this first part of this year based on performance of UVM.
Q So what is your current salary?
A I'd have to look that up.
Q Do you have any idea?
A It's approximately that, 260.
Q And do you receive any additional compensation in the form of grants or other pieces of compensation?
A I do not have any grants currently. I have received a total of $3000 to be an expert witness on a gynecologic case. And I have not yet been paid but am an expert for ultrasound interpretation for a tubal, a new tubal occlusion material.
Q And is that a set fee or is it?
A So much per hour. 350 an hour.
Q And how much work do you expect that to be?
A It's not known because it's a new product and it's a new process so they're not sure how many research sites they're going to have yet.

Q Is there anything in writing regarding that arrangement?
A Yes.
Q Okay. So there's a document that relates that?
A Yes.
Q And are there documents that relate to your terms of your employment with UVM, UVM Medical Group for 2019?
A Not -- the original from 2018 there is.
Q To the extent you have a raise, was there some document to that?
A I haven't seen any emails. It was verbally given to me by the Chair.
Q Okay. And do you receive any other forms of compensation at this point in 2018 or 2019 other than -- let's just say 2019 for now.
A Not that I recall right now.
Q And in 2018, did you, and 2017, did you receive long-term disability benefits up until the summer of 2018 under Dartmouth-Hitchcock's long-term disability policy?
A I'd have to go back and look at the dates exactly, but yes, I did, while I was on per diem

at UVM.
Q Did your status as being on per diem impact the receipt or level of LTD benefits?
A Yes.
Q When you started receiving a full-time salary in May 2018, approximately 240,000, is that the point at which your long-term disability benefits stopped?
A I'd have to go back and look at the specific date.
Q But it was some time in I think you said July or August of 2018 when your long-term disability finally ended?
A I believe so.
Q In your expert's report there was an assumption that June 2021 or thereafter that you would quit your employment with UVM, and I'm wondering what the basis for that assumption is if you know.
A It's not tenable to live away from my husband or my children.
Q Where do you currently live?
A We currently have a house in Norwich, Vermont. We own a condominium in Burlington.

Q How long have you owned the condo in Burlington?
A Just over a year.
Q What's the distance between Norwich, Vermont, and Burlington, Vermont?
A It's about 85 to 90 miles.
Q And are you working every single day at UVM?
A I'm working four days a week in the week that I'm not on call, and I work 12 to 13 days in a row on the week that I'm on call.
Q How old are your children?
A 26, 22, and 21.
Q Do any of them reside at home?
A I have a college student, and he's home during the course of the summer months. My others are home over holidays and vacations.
Q Where do they live otherwise? The two oldest?
A My daughter lives in Boulder, Colorado, and my middle child currently lives in Burlington.
Q Where is your youngest children at school?
A Colorado School of Mines.
Q Prior to a year ago, did you have any more than one residence at any point?
A Summers.

Q Summer residence?
A I'm sorry? Are you --
Q I'm just asking whether you own more than one property at the same time?
A Oh, yes. We own a lake property.
Q Where is that?
A Fairlee, Vermont. It's about a 20-minute drive north of Norwich.
Q And with respect to your employment by UVM, you receive, you're considered a full-time employee, correct?
A Yes. .75.
Q So not completely full-time.
A It's considered full-time.
Q Okay. But does that assume, I mean, 1.00 would be full-time, am I correct?
A Correct.
Q Okay. What does .75 contemplate?
A The schedule I gave you.
Q Flex time?
A No. It's, they're at a day off.
Q What's that?
A It's a .25 less pay for a day a week. It's

supposed to equal out to about a day a week.
Q Did you seek that out?
A No, it was what they could offer me.
Q Okay. So is the $260,000 salary that you receive, is that the full salary you receive?
A Yes.
Q Okay. I have nothing further. Thank you.
A Okay. Thank you.
(Deposition ended at 1:57 p.m.)

I have carefully read the foregoing deposition, and the answers made by me are true.

____________________________
MISTY BLANCHETTE PORTER, M.D.

STATE OF ___________________

_________________________, SS.

At______________________on the ___________ day of _______________________ A.D. 2019, personally appeared the above-named MISTY BLANCHETTE PORTER, M.D., and made oath that the foregoing answers subscribed by her are true.

Before me,

__________________
Notary Public

C E R T I F I C A T E

I, Cynthia Foster, Registered Professional Reporter and Licensed Court Reporter, duly authorized to practice Shorthand Court Reporting in the State of New Hampshire, hereby certify that the foregoing pages, numbered 5 through 107, are a true and accurate transcription of my stenographic notes of the deposition of MISTY BLANCHETTE PORTER, M.D., who was first duly sworn by me on July 18, 2019, for use in the matter indicated on the title sheet, as to which a transcript was duly ordered;

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this transcript was produced, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

Dated at North Sutton, New Hampshire, this 24th day of July, 2019.

Cynthia Foster, LCR