# EXHIBIT C

Daniel Herrick - July 25, 2019

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT
Case No. 5:17-cv-194

MISTY BLANCHETTE PORTER, M.D.,
            Plaintiff

vs.

DARTMOUTH-HITCHCOCK MEDICAL CENTER,
DARTMOUTH-HITCHCOCK CLINIC,
MARY HITCHCOCK MEMORIAL HOSPITAL,
and DARTMOUTH-HITCHCOCK HEALTH,

            Defendants.

DEPOSITION OF DANIEL HERRICK
taken on behalf of the Plaintiff at Norwich,
Vermont, on July 25, 2019, at 9:54 a.m., before
Cynthia Foster, Registered Professional
Reporter.

**2**

APPEARANCES:
    Geoffrey Judd Vitt, Esquire
    Sarah Nunan, Esquire
    Vitt & Associates, PLC
    8 Beaver Meadow Road
    P.O. Box 1229
    Norwich, Vermont, 05055, on behalf of the
    Plaintiff, Misty Blanchette Porter, M.D.
    Katherine Burghardt Kramer, Esquire
    KBK Law
    6 Mill Street
    P. O. Box 23
    Middlebury, Vermont, 05753, on behalf of the
    Plaintiff, Misty Blanchette Porter, M.D.

    Donald W. Schroeder, Esquire
    Foley & Lardner, LLP
    111 Huntington Avenue, Suite 2500
    Boston, Massachusetts, 02199-7610, on behalf of
    the Defendants, Dartmouth-Hitchcock Medical
    Center, Dartmouth-Hitchcock Clinic, Mary
    Hitchcock Memorial Hospital, and
    Dartmouth-Hitchcock Health.

**3**

| | | |
|---|---|---|
| 1 | Email, DeMars and Herrick, 3/29/17, DH0011363-65 | 41 |
| 2 | Email, Herrick to DeMars and Shields, 4/18/17, DH0011253-54 | 46 |
| 3 | Email, Gunnell and Herrick and DeMars, 4/19/17, DH0009582 | 52 |
| 4 | Email, Gunnell and Herrick and DeMars, 4/21/17, DH0009574 | 63 |
| 5 | Email, Gunnell and Herrick and DeMars, 4/21/17, DH0009574-76 | 64 |
| 6 | Email, Herrick to Gunnell, 4/21/17, DH0009572-73 | 69 |
| 7 | Email, DeMars to Herrick, 4/25/17, DH0025744-45 | 75 |
| 8 | Email, DeMars and Herrick, 4/27/17, DH0004461-62 | 96 |
| 9 | Email, Gunnell to Herrick, 4/28/17, DH0008918-19 | 101 |
| 10 | Email, Gunnell to Herrick and DeMars, 4/28/17, DH0008916-17 | 101 |
| 11 | Email, Gunnell to Herrick, 5/1/17, | |

**4**

| | | |
|---|---|---|
| 12 | Email, Giglio to Merrens, 5/2/17, DH0026715-16 | 105 |
| 13 | Email, DeMars to Merrens, 5/14/17, DH0010594-96 | 109 |
| 14 | Email, Herrick to Merrens, 5/12/17, DH0010582 | 121 |
| 15 | Email, Gunnell to Herrick, 6/6/17, DH0015547-48 | 128, 134 |
| 16 | Email, DeMars to Strohbehn, et al, 6/14/17, DH0009476-78 | 131 |
| 17 | Email, Padin to Merrens, 6/22/17, DH0013227 | 135 |
| 18 | Email, Pizzuti to Gunnell, 9/28/17, DH0015529-30 | 137 |
| 19 | Email, Birenbaum to Merrens, 5/12/17, DH0009053 | 139 |
| 20 | Email, Gunnell to Herrick, 6/7/17, | |

Daniel Herrick - July 25, 2019

---

**5**

**S T I P U L A T I O N**

It is agreed by and between the attorneys of record for the respective parties hereto as follows:

1. That the testimony of the deponent may be taken and treated as if taken pursuant to notice and order to take depositions and that all formalities of notice and order are waived by the parties, and the signatures to the stipulation are in like manner waived;

2. That all objections except as to matters of form are reserved until the deposition or any part thereof is offered in evidence;

3. That exhibits may be retained by counsel until time of trial.

4. That the deposition may be signed by the deponent before any notary public.

---

**6**

1              DANIEL HERRICK, DULY SWORN
2              DIRECT EXAMINATION
3    BY MR. VITT:
4    Q    Good morning, Mr. Herrick.
5    A    Good morning.
6    Q    We met a moment ago. My name is Geoffrey Vitt.
7         I'm one of the lawyers who represents Dr. Porter
8         in this lawsuit against DHMC. Would you state
9         your name for record, please?
10   A    Daniel Herrick.
11   Q    Where are you employed?
12   A    Dartmouth-Hitchcock Medical Center.
13   Q    Have you had your deposition taken prior to
14        today in other matters?
15   A    Yes.
16   Q    Okay. Let me just go over some ground rules,
17        and you've probably heard them before but just
18        for the sake of completeness. If you do not
19        understand a question that I am asking, please
20        tell me and I'll rephrase the question. Is that
21        acceptable?
22   A    Um-hum.
23   Q    And you need to say yes.
24   A    Yes.
25   Q    One of the things that we'd need to do is to

---

**7**

1         have an oral response that the court reporter
2         can take down.
3             There may be during the course of this
4         deposition objections by Dartmouth-Hitchcock's
5         lawyer to the form of my question, and if that
6         happens, I'll consider whether or not to
7         rephrase my question, but if there is not an
8         instruction to you not to answer you should
9         answer the question. Do you understand that?
10   A    Yes.
11            MR. SCHROEDER: Just on that point
12        Geoffrey, for Cindy's purposes, all objections
13        as to form, all other objections reserved until
14        the time of trial, read and sign and waive
15        notary. If that's acceptable.
16            MR. VITT: Fine by me.
17   Q    What is your position at Dartmouth-Hitchcock?
18   A    I'm the Vice President of Perioperative and
19        Surgical Services.
20   Q    And how long have you held that position?
21   A    About four and a half years.
22   Q    During the course of this case we've been
23        provided with a number of documents from
24        Dartmouth-Hitchcock which reflect that there
25        were a series of conversations among members of

---

**8**

1         management about the REI Division, some
2         involving Leslie DeMars, Ed Merrens, Heather
3         Gunnell and yourself, and there appear to have
4         been multiple emails among those individuals
5         about the REI Division. Did you send emails to
6         anyone regarding the REI Division other than
7         using the email system of Dartmouth-Hitchcock?
8    A    No.
9    Q    Do you have a private email address?
10   A    I do.
11   Q    Do you use it?
12   A    For private emails, yes.
13   Q    Only for private emails?
14   A    Yes.
15   Q    So there are no emails on that private email
16        address that relate to Dartmouth-Hitchcock,
17        Dr. Porter or the REI Division; is that correct?
18   A    No, there isn't.
19   Q    Do you text?
20   A    Yes.
21   Q    Do you text about business matters occasionally?
22   A    Yes.
23   Q    Did you check your text messages in connection
24        with the document production in this case?
25   A    Yes.

2 (Pages 5 to 8)

Daniel Herrick - July 25, 2019

9

1  Q   Did you find any texts that related to
2      Dartmouth-Hitchcock?
3  A   No.
4  Q   When you have conversations with people in a
5      substantive business matter, do you take notes
6      of those conversations?
7  A   Yes.
8  Q   Do you do file memos?
9  A   No.
10 Q   Do you keep those notes?
11 A   For as long as they're actively, if I'm actively
12     involved in a project, yes.
13 Q   And are they kept in a notebook or is there a
14     special place that you keep those notes?
15 A   No. I would have a separate file for each of
16     the initiatives that I may be working on.
17 Q   So was the closure of the REI Division one of
18     the initiatives that you worked on for a period
19     of time?
20 A   Yes.
21 Q   Did you have notes with respect to that
22     particular event or occurrence?
23 A   I'm certainly sure that I had some notes, yes.
24 Q   Did you check to see whether those notes were in
25     existence at the time this lawsuit was filed?

10

1  A   I believe I did. My practice is to consolidate
2      those notes into electronic format, and once
3      that's done, I would throw them away. So if I'm
4      working on a summary document, I'm taking
5      information from those notes. Once it's in that
6      summary form, then I would dispose of the notes.
7  Q   Did you check during the course of this case to
8      see if you still had those notes?
9  A   I have looked for all of the documents that have
10     been requested, yes.
11 Q   Did you find any notes?
12 A   No.
13 Q   Was there a summary document that you prepared?
14 A   They would have been in email form which would
15     have been in the email system.
16 Q   Do you have a calendar?
17 A   Electronic.
18 Q   Electric calendar?
19 A   Outlook calendar.
20 Q   To whom do you report now?
21 A   I report to Jeffrey O'Brien who is the Senior
22     Vice President of Clinical Operations.
23 Q   How long have you been reporting to him?
24 A   Approximately one year.
25 Q   At the time that there were discussions about

11

1      the possible closure of the REI Division, to
2      whom did you report?
3  A   Ed Merrens.
4  Q   How long had you been reporting to him?
5  A   Probably a couple of years.
6  Q   Starting, I think, in late 2076, and if I'm off
7      on the timing, please tell me, there was a small
8      group that began discussing what to do about the
9      REI division; is that accurate?
10 A   What year?
11 Q   2076?
12         MR. SCHROEDER: You said 2076.
13 Q   I'm sorry.
14 A   I was thinking 1976. 2000?
15 Q   '16. Late 2016.
16 A   Yes.
17 Q   And who were the persons who you recall were
18     involved in these discussions?
19 A   I was involved in discussions with Leslie DeMar,
20     Heather Gunnell initially.
21 Q   Anyone else?
22 A   Initially at the beginning of the conversations,
23     that would have been the two, three of us.
24 Q   Did the group grow in size?
25 A   As we got closer to making a decision, yes.

12

1  Q   Who else was involved?
2  A   Well, we would have had conversations with Ed
3      Merrens. We had conversations with folks from
4      the Value Institute who were working on process
5      improvement work.
6  Q   Anyone else?
7  A   I guess I don't understand. What timeline are
8      we talking about? You mean at any point in
9      time?
10 Q   No, I would say in the period February, March,
11     April of 2017?
12 A   No. No one else.
13 Q   And am I correct that in April of 2017 a
14     decision was made to stop or to close the REI
15     Division?
16 A   Yes. I believe that that's approximately
17     correct.
18 Q   Who were the persons involved in making that
19     decision?
20 A   So the initial recommendation to close down or
21     put the REI program on hiatus was a
22     recommendation that came from me based on work
23     that I had done with Leslie, with Heather, and
24     with members of the Value Institute.
25 Q   To whom did you make the recommendation?

3 (Pages 9 to 12)

Daniel Herrick - July 25, 2019

## 13

1  A   We made that recommendation to Ed Merrens.
2  Q   Who made the decision to stop or close the REI
3      Division?
4  A   I strongly advocated for it and asked permission
5      to do it. I guess the question, that's a hard
6      question to answer in an organization. I mean,
7      I guess the higher up, had to be a higher up so
8      it was approved by Ed Merrens.
9  Q   Did it go to the CEO?
10 A   I don't believe that the decision went to the
11     CEO. I believe it was made by Ed Merrens who at
12     the time I believe was the Chief Clinical
13     Officer.
14 Q   Do you know if it went to the Board?
15 A   I do not know that it went to the Board, no.
16 Q   Why was the decision made to close the division?
17 A   I think that was pretty straightforward. It was
18     marginally profitable. It was at that time
19     totally dysfunctional. We were unable to
20     sustain staff to run the operation. Patients
21     were not getting the care that they deserved,
22     and we were not able to provide care that was to
23     the reputation of Dartmouth-Hitchcock.
24 Q   Anything else?
25 A   No.

## 14

1  Q   In April of 2017, the physicians in the REI
2      Division were David Seifer, Albert Hsu,
3      Dr. Misty Porter, and Judy McBean was on a per
4      diem basis. Do you know of any others?
5  A   I do not.
6  Q   So Dr. Seifer and Dr. Hsu were both fairly new
7      employees, correct?
8  A   Fairly new meaning?
9  Q   Couple years max?
10 A   Yeah, within three years.
11 Q   Okay. Dr. Porter was also terminated, correct?
12 A   The entire program was shuttered so all of the
13     providers were terminated.
14 Q   So she had been there for 21 years. Was there
15     any question about her competence as a
16     physician?
17 A   As a physician, I don't believe so. Not that
18     I'm aware of.
19 Q   Do you think you would have been aware of it if
20     there were concerns?
21 A   Not necessarily, no. I'm an administrative vice
22     president so I would only be involved
23     tangentially.
24 Q   Do you think that if there were concerns about
25     her competence, there's a possibility that

## 15

1      wouldn't have filtered to you?
2  A   Yes. That's true.
3  Q   Why was her employment terminated?
4  A   She was terminated along with the closure of the
5      REI program.
6  Q   So because she was in the program and because
7      the program was closed, therefore her employment
8      was terminated?
9  A   That's correct.
10 Q   Anything else?
11 A   No.
12 Q   How long have you been working at
13     Dartmouth-Hitchcock?
14 A   Eight and a half years.
15 Q   During that period of time, has
16     Dartmouth-Hitchcock closed any division or group
17     of the size of the REI Division?
18 A   I'm not aware of, that we have.
19 Q   You'd probably be aware of it if it had occurred,
20     right?
21 A   If it were within my purview. 10,000 people
22     work there. I'm not privy to everything.
23 Q   I don't think you were, but I mean if a division
24     had been closed in the 8 and a half years that
25     you worked there, don't you think you would know

## 16

1      about that?
2  A   I might have. I don't know. I mean, it's
3      possible that I, it could have closed and I
4      would not know about it.
5  Q   Okay. But to the best of your knowledge, no
6      other division had been closed, right?
7  A   To the best of my knowledge, that's correct.
8  Q   At the time that the division was closed, was
9      there a demand for the services that the REI
10     Division provided?
11 A   Yes.
12 Q   Had the division had a long history of exemplary
13     service for women not only in the area but
14     throughout northern New England?
15 A   I don't know what "exemplary" means. I mean --
16         MR. SCHROEDER: Objection. Calls for
17     speculation.
18 Q   You don't know what "exemplary" means?
19 A   Not in your terms. So, as I said, we recognized
20     that the REI program was not able to continue to
21     provide the level of care that is up to the
22     reputation of the standards of
23     Dartmouth-Hitchcock which is one of the reasons
24     that we closed it.
25 Q   Okay. I was asking you about the history of the

4 (Pages 13 to 16)

Daniel Herrick - July 25, 2019

17

1  division. Were you told that the division for
2  20 plus years had provided excellent service to
3  women, not only in the area, throughout New
4  England?
5  A    I was told that we provided exceptional service.
6      That's correct.
7  Q    Had you been told that there were complaints
8      about the competence of Dr. Hsu and Dr. Seifer?
9  A    At what point in time?
10 Q    At the time you were providing or making the
11     decision.
12 A    No.  That was not part of the decision process
13     that we were taking.
14 Q    My question is were you told in connection with
15     the work that you were doing that there were
16     concerns about the competence of either Dr. Hsu
17     or Dr. Seifer?
18 A    No.
19 Q    Was there any discussion about the quality of
20     care that those two doctors provided?
21 A    There was -- ask the question again?
22 Q    Sure.  What I want to know is whether you
23     received any reports, information, discussion,
24     whatever broad term you want to use, that there
25     were questions about the competence of either

18

1      Dr. Hsu or Dr. Seifer?
2  A    No.
3  Q    Was there any discussion at all about the
4      quality of the work that either of them
5      provided?  Quality of the service.
6  A    Individually, no.
7  Q    Well, let's take it one by one.  You had a
8      series of meetings with individuals, Heather
9      Gunnell, Leslie DeMars, among others.  Both of
10     them were involved in directing or providing
11     services through the REI Division, right?
12 A    Correct.
13 Q    Did either of them say anything to you, either
14     directly to you or as part of a group, about the
15     quality of the work, quality of the services
16     provided by Dr. Hsu?
17 A    Not aware of -- I don't recall any conversations
18     about quality concerns.
19 Q    Same question about Dr. Seifer.
20 A    I don't recall any quality concerns about Dr.
21     Seifer.
22 Q    Now, you said a moment ago that there was a
23     question about the quality of the care being
24     provided to patients in the REI Division,
25     correct?

19

1  A    I would restate that.  Not the quality of care
2      but the quality of service and support, access,
3      followup, and the ability to run the
4      organization.
5  Q    All right.  Was there a concern expressed to you
6      about the quality of the care provided by the
7      physicians in the REI Division to patients?
8  A    I don't recall that conversation, ever having a
9      conversation about that.
10 Q    Prior to going to work at Dartmouth-Hitchcock,
11     where did you work?
12 A    How far back do you want to go?
13 Q    Ten years back.
14 A    I had my own consulting practice.
15 Q    What was the name of it?
16 A    Interlakes Advantage International.
17 Q    I'm sorry?
18 A    Interlakes Advantage International.
19 Q    What type of consulting work did you provide?
20 A    Operations and management.
21 Q    Where was it located?
22 A    Meredith, New Hampshire.
23 Q    Who were your clients?  What group of companies
24     or individuals were your clients?
25 A    Typically health care.  Not exclusively.

20

1  Q    Prior to the discussions about closing the REI
2      Division, had you on a professional level been
3      involved in closing a section, a division, an
4      office, a branch, anything like that?
5  A    Yes.
6  Q    Can you tell me a couple of examples if there's
7      more than one?  How about in health care?
8  A    I have to think about -- I've shut down
9      manufacturing facilities.  Consolidated
10     facilities, consolidated operations.  Barnes
11     Jewish Christian is a health system in St. Louis
12     where we consolidated and was a merger of
13     multiple hospitals, 13 hospitals, and my role
14     there was to consolidate various organizations
15     and pieces of the organization so that we would,
16     instead of having 13 departments doing the same
17     thing we would have one.  Could have been
18     support services, like instrument sterilization
19     or food service.  And those are some that I did,
20     those types of work.
21 Q    In connection with considering whether to shut
22     down the REI Division, was any inquiry made
23     about the number of women and couples who had
24     received services from the REI Division?
25 A    Who had previously received services?

5 (Pages 17 to 20)

Daniel Herrick - July 25, 2019

---

**21**

1  Q   Yes.
2  A   Not that I'm aware of.
3  Q   Do other hospitals in New England have what is
4      the functional equivalent of an REI Division?
5  A   Yes.
6  Q   How many?
7  A   I don't know exactly.
8  Q   Would you say it's common for substantial
9      hospitals to have a functional equivalent of a
10     REI Division?
11 A   What do you mean by common?
12 Q   How many hospitals in New England would you say
13     are medium to large size?
14 A   In New England?
15 Q   In New England.
16 A   I mean, there's Maine Med, University of
17     Vermont, Dartmouth-Hitchcock, and then CMC in
18     Manchester, Elliot in Manchester, and then
19     you're into Boston.
20 Q   Okay.
21 A   And then Rhode Island.  So ten?  Perhaps.
22 Q   Do all of those have REI divisions?
23 A   I don't believe that's true.
24 Q   Which ones do?
25 A   I don't know.

---

**22**

1  Q   So they may have.  You don't know.
2  A   I'm confident that they don't all.
3  Q   UVM have an REI Division?
4  A   Yes.  They do.
5  Q   Maine Med?
6  A   I'm not aware.  I don't believe they do, but I'm
7      not sure.
8  Q   When the decisions were being made about whether
9      to close the division and terminate the
10     employees, did anyone from Dartmouth-Hitchcock
11     seek advice from outside the institution?  For
12     example, did you go to UVM and say hey, how do
13     you guys recruit good nurses, anything like
14     that?
15 A   I don't believe that that happened.  Or I'm not
16     aware that it happened.
17 Q   Was advice sought from any outside consulting
18     firm?
19 A   I'm not aware that we did.
20 Q   You would have been aware if that had happened.
21 A   I would hope so.
22 Q   Did the institution seek advice from any public
23     relations firm about how this decision should be
24     conveyed to the public?
25 A   Externally?  I don't believe so.

---

**23**

1  Q   Did you expect that the decision would be well
2      received in the public?
3  A   No.
4  Q   Was time spent within the institution discussing
5      what the message ought to be, how it should
6      respond to inquiries, what interviews ought to
7      be granted, things like that?
8  A   Yes.
9  Q   Who was in charge of that?
10 A   Our internal marketing group.  I don't recall
11     the name.  Our communications actually.
12     Internal communications group.
13 Q   At the time the decision was made, were there
14     patients who were receiving care from the REI
15     Division?
16 A   Yes.
17 Q   Whose responsibility was it to ensure that those
18     patients continued to receive appropriate care?
19 A   That was part of our plan.  I don't recall
20     exactly who, all of that, but it was part of the
21     plan of execution in terms of making sure they
22     would be afforded level of care.
23 Q   That responsibility would have fallen on a
24     physician, correct?
25 A   Typically, yes.

---

**24**

1  Q   And in this case, that would be true, would it
2      not?
3  A   I believe so, yes.
4  Q   Who was that physician?
5  A   I believe that would have been under the
6      direction of Leslie DeMars.
7  Q   So as you understood it, it was Leslie DeMars'
8      responsibility to see to it that the patients
9      receiving care continued to receive appropriate
10     care after the closure?
11 A   To coordinate that activity.  Yes.
12 Q   Right, but I mean, it fell upon her shoulders to
13     see that it got done, right?
14 A   As the Chair, yes.
15 Q   Right.  Was Dartmouth-Hitchcock at the time of
16     this decision providing training to residents in
17     OB/GYN?
18 A   Yes.
19 Q   Did the closure of the REI Division have an
20     effect on them receiving the appropriate
21     training to be OB/GYN physicians?
22 A   Yes.
23 Q   Who was responsible for seeing to it that those
24     residents continued to receive the appropriate
25     care training?

---

6 (Pages 21 to 24)

Daniel Herrick - July 25, 2019

25

1  A   Again, under the direction of Leslie DeMars it
2      would have been one of her staff members.
3  Q   Do you know who that was?
4  A   I don't know.
5  Q   Did Dartmouth-Hitchcock have fellows who were
6      receiving training in OB/GYN besides residents?
7  A   I'm not sure.
8  Q   All right.  Was there a discussion about how
9      those fellows would continue to receive
10     appropriate education?
11 A   I'm not sure.  I'm not sure we had fellows at
12     the time.
13 Q   Well, you did.
14 A   Okay.  Then I would say yes, they were part of
15     the conversation.
16 Q   Right.  And that would have been on Leslie
17     DeMars?
18 A   Yes.
19 Q   On kind of her plate to take care of that?
20 A   Yes.  Not necessarily to have the conversations
21     but to facilitate that activity.
22 Q   You mentioned, I believe, that you were aware of
23     that the physicians in the REI Division were
24     David Seifer, Albert Hsu, and Misty Porter,
25     correct?

26

1  A   Correct.
2  Q   Did you know that Albert Hsu was a relatively
3      recent hire in the REI Division?
4  A   Of the three he was the one with the least
5      seniority, yes.  I know that.
6  Q   Did you know anything about his background?
7  A   No.
8  Q   Did you have information about his level of
9      experience when he came to Dartmouth-Hitchcock?
10 A   No.
11 Q   Did anyone raise a question in the discussions
12     that you had about Dr. Hsu's ability to perform
13     the services required of a physician in the REI
14     Division?
15 A   No.
16 Q   Do you know anything about the efforts made by
17     Dr. Porter to train or mentor him?
18 A   No details, no.
19 Q   Anything at all?
20 A   Only that she was part of a program, part of
21     helping him to grow, that she was doing some
22     work to help him.
23 Q   Other than you knew that she did "some work," do
24     you have any idea how much time she spent?
25 A   No.

27

1  Q   Do you have any idea of how successful or
2      unsuccessful she was in training him?
3  A   No.
4  Q   Do you know whether or not she took call with
5      him?
6  A   I don't.
7  Q   All right.  I want to make sure I've got this
8      right.  You have no information whatsoever about
9      how much time and effort Dr. Porter may have
10     spent in training Dr. Hsu; is that accurate?
11 A   That's correct.  I'm an administrative vice
12     president for the OB/GYN division.
13 Q   Well, I understand that, but you were involved
14     in discussions extending over a number of months
15     about what to do with the REI Division and
16     whether or not to keep or to terminate the
17     employees, right?
18 A   Correct.
19 Q   Okay.  And in connection with that, you were
20     speaking to people who actually were working in
21     the REI Division and seeing to it that the
22     patients received care, right?
23 A   Correct.
24 Q   What I'm trying to determine is whether any of
25     them said to you anything about Misty Porter and

28

1      Albert Hsu?
2  A   I have no recollection of any of those types of
3      conversations.
4  Q   Okay.  David Seifer; do you know how he came to
5      be hired?
6  A   I do not.
7  Q   Do you know where he came from?
8  A   I do not.
9  Q   Do you have any information about his qualities
10     as a manager?
11 A   I do not.
12 Q   Do you know anything about the scope of his
13     practice; that is, did it include the entire
14     OB/GYN spectrum or was it limited to IVF work?
15 A   I don't know.
16 Q   Did anyone comment to you about his skills or
17     lack of skills in performing the basic functions
18     of a physician doing OB/GYN work?
19 A   Not to my recollection.  No.
20 Q   Did anyone tell you or mention anything about
21     his interpersonal skills?
22 A   No.
23 Q   How about his dealings with patients?  Do you
24     know anything about that?
25 A   No.

7 (Pages 25 to 28)

Daniel Herrick - July 25, 2019

29

```
 1    Q   I want to ask you some questions about the
 2        nursing staff at the REI Division. Is there
 3        anything about the REI work that you understand
 4        is particularly stressful for nurses?
 5    A   I mean, all nurses in procedural areas are
 6        stressed so I guess I don't understand.
 7    Q   Well, there are some areas of nursing that might
 8        be particularly stressful. Traumatic surgery or
 9        working with children who have cancer. You
10        know, there might be some stresses there. I
11        just wonder whether anybody said anything about
12        the nurses doing REI work. Is there any
13        stressor in that position that seems unusual
14        that you're aware of?
15    A   I'm not aware of anything with the exception of
16        the demand for weekend coverage when a woman is
17        in a cycle for either extraction or
18        fertilization where they need to be on call so
19        from a time constraint, there may be some
20        challenges there.
21    Q   Okay.
22    A   Otherwise, not in the work that they do.
23    Q   Is the work particularly rewarding?
24            MR. SCHROEDER: Objection. Calling for
25        speculation.
```

30

```
 1    A   I don't know.
 2    Q   Nobody said that to you?
 3    A   No. I never had a conversation about the work.
 4        Being rewarding or not being rewarding.
 5    Q   The REI Division at Dartmouth-Hitchcock had been
 6        around for over 20 years. Do you know whether
 7        there had been reports over that period of time
 8        about the division having problems recruiting
 9        and keeping nurses?
10    A   Absolutely.
11    Q   Over the entire period of time?
12    A   No. Not over the 20 years. I don't know. I
13        was only there 8 and a half years. I only ran
14        that particular business for four and a half.
15    Q   At what point in time do you understand that
16        there became a problem in that division
17        recruiting and keeping nurses?
18    A   About the time frame that we initially spoke
19        about where we began to have conversations and
20        invited the Value Institute in to look at their
21        services and see if they can help.
22    Q   When would you say that started?
23    A   I don't have the dates. Whenever we first, when
24        you first started talking about the meetings
25        that we had. So in roughly February-ish of '17.
```

31

```
 1        In that general ballpark.
 2    Q   So prior to February of 2017 --
 3    A   Thereabouts.
 4    Q   I understand, you know, could be January or
 5        December, somewhere in that range.
 6    A   Um-hum.
 7    Q   But prior to that period in time, you hadn't
 8        heard of the REI Division having a problem
 9        recruiting and keeping nursing staff, correct?
10    A   Not that I'm aware of. No.
11    Q   Was the problem of an adequate nursing staff
12        something that you considered? Was that an
13        issue you discussed?
14            MR. SCHROEDER: Objection. Asked and
15        answered. He's already highlighted that fact.
16        That's one of the reasons for closing the
17        division.
18            MR. VITT: Excuse me. You can make
19        objections. You cannot suggest answers. I'm
20        not going to tolerate it. Don, you're going to
21        listen to me, and after I finish you may talk.
22        I'm not going to tolerate today having you
23        suggest questions as you did, suggest answers as
24        you did yesterday. That's not going to happen.
25            MR. SCHROEDER: I'm not suggesting any
```

32

```
 1        answers.
 2            MR. VITT: Well, you did yesterday, and
 3        it's not going to happen today.
 4            MR. SCHROEDER: You're not going to tell me
 5        how to object on the record.
 6            MR. VITT: Yes, actually I am.
 7            MR. SCHROEDER: I objected. Asked and
 8        answered.
 9            MR. VITT: That's all right, but you're not
10        going to go on past that.
11            MR. SCHROEDER: I'll object whatever way I
12        see fit in accordance with the rules.
13            MR. VITT: You stick with the rules, you'll
14        be fine. You go past that, we're going to
15        adjourn this deposition. I'm going to take a
16        break.
17            (Recess taken 10:29 - 10:34 a.m.)
18    BY MR. VITT:
19    Q   Could you tell me what your job duties are at
20        Dartmouth-Hitchcock?
21    A   So as I said I'm Vice President of Perioperative
22        and Surgical Services. I'm the Operating Vice
23        President for Perioperative Services. I run on
24        a day-to-day basis all of the operating rooms
25        there for 23,000 cases a year. I'm also the
```

8 (Pages 29 to 32)

Daniel Herrick - July 25, 2019

33

1      Administrative Vice President for the Department
2      of Surgery which has 13 surgical services.  The
3      Department of Orthopaedics, Department of
4      OB/GYN, the Pain and Spine Center, and the
5      anesthesia team.  So as I said, the operating
6      VP, on a day-to-day basis I'm making sure that
7      the operating rooms are being run properly.  As
8      the administrative VP for all of the others, I
9      manage budgets, I manage budget allocations, I
10     approve hiring, I approve major decisions that
11     are made that support that in a nonclinical
12     manner.  And I get involved in clinical
13     activities only in cases of quality concerns so
14     financial challenges.
15  Q    Financial what?
16  A    Financial difficulties if parts of a business
17     are not doing -- so I'm looking at performance
18     as number of patients we see a day, access time
19     for patients to get in to see a clinic, access
20     time for them to get scheduled into the OR.
21     Things like that.
22         I manage all of the OR schedulers and all
23     of the sections that all have schedulers that
24     report in for me.  I also manage the instrument
25     sterilization, case cart building, and have

34

1      roughly 800 people that report through my chain
2      of command.
3   Q    Okay.  Thank you.  And has your job functions
4      remained pretty much the same since you came to
5      Dartmouth-Hitchcock?
6   A    Well, I've only done that role the last four and
7      a half years.
8   Q    Between the time that you did consulting work
9      and coming to Dartmouth-Hitchcock, did you have
10     any other employment?
11  A    No.
12  Q    Could you give me your education?  I'm sorry.
13  A    Bachelor's degree in business management
14     finance.  I'm a Lean Six Sigma black belt and
15     Certified Professional Health Care Quality.
16  Q    What about the black belt?  I'm sorry.
17  A    I'm a Lean Six Sigma Master Black Belt
18     certified.
19  Q    What does that mean?  I'm sorry.
20  A    Lean Six Sigma is a process control, process
21     improvement operations leadership.
22  Q    Okay.
23  A    And I'm a certified professional health care
24     quality.
25  Q    And who provides that certification?

35

1   A    So the CPHQ is provided by some quality health
2      care organization.  I don't know the exact name.
3      I'm a Lean Six Sigma Black Belt certified by the
4      AMC, I believe.  And also by, I don't remember
5      the agencies.  I mean, it's a certification.  I
6      just don't remember the agencies.
7   Q    Okay.  At some point in 2016, 2017, was there a
8      recognition that there was a shortage of nurses
9      to work in the REI Division?
10  A    There was a high turnover level of nursing in
11     the REI Division which at times manifests itself
12     with shortages.
13  Q    What was the reason for the high turnover?
14  A    As I said, the information that we received was
15     that it was a dysfunctional organization, and it
16     wasn't being run in an efficient manner.
17  Q    And who had the responsibility to see that it
18     was run in an efficient manner?
19  A    So Leslie DeMars as the Chair would own that.
20     As an administrative VP I would have the
21     responsibility to support her in helping to make
22     sure that that worked.
23  Q    David Seifer was the head of the division,
24     correct?  The REI Division?
25  A    I don't know that that's -- I can't confirm

36

1      that.  I don't know.
2   Q    All right.  Did you ask Leslie DeMars why is
3      there such high turnover in the nursing?
4   A    We had conversations about why and yes, we
5      recognized there was dysfunction and that was
6      why we invited the HR and Value Institute folks
7      to come in and work with the team to see if they
8      could sort out this dysfunction.
9   Q    Did she attribute the dysfunction and the high
10     turnover to the leadership in the REI Division?
11  A    I don't recall that that would be the only --
12     that would have been one of the reasons that she
13     mentioned.  I don't know that that was the only
14     one.
15  Q    Do you think she did mention that?
16  A    I don't recall specifically having conversations
17     about that.  Just that it was dysfunctional.
18  Q    But you don't recall her describing exactly why
19     the dysfunction was occurring, correct?
20  A    No.  I would not have been all that curious as
21     to why.  I would have just recognized that we
22     had a dysfunction and we needed to fix it.
23  Q    Do you know if anyone asked the nurses who
24     either were there or who had left why they were
25     dissatisfied and why they were leaving?

9 (Pages 33 to 36)

Daniel Herrick - July 25, 2019

---

Page 37

1  A  I'm sure that the HR and the Value Institute
2     folks did when they held some group meetings to
3     try to do some process mapping and understand
4     what the challenges were. I'm sure that was
5     done. Yes.
6  Q  Did you see any reports or summaries --
7  A  No.
8        MR. SCHROEDER: Wait until he finishes the
9     question before you answer.
10 Q  Thank you. Do you think that's something the
11    Value Institute should have done or did do, find
12    out from the nurses why are you dissatisfied,
13    why are you leaving?
14 A  Yes.
15 Q  Did anyone to your knowledge go to UVM and ask
16    them whether they had a problem recruiting and
17    keeping nursing staff?
18 A  I'm not aware of that.
19 Q  Did you receive information that the UVM REI
20    Division did not have a problem keeping and
21    recruiting its nursing staff?
22 A  I don't recall a conversation about UVM's
23    operations.
24 Q  Did you believe that the location of
25    Dartmouth-Hitchcock being essentially not in the

---

Page 38

1     city, somewhat rural area, did that have
2     anything to do with the problems recruiting and
3     keeping nursing staff?
4  A  No.
5  Q  Do you know if anyone checked with the prior
6     management of the REI Division to ask whether
7     they had had a problem with the nursing staff?
8  A  I have no knowledge of that, no.
9  Q  Did you know whether prior leadership of the REI
10    Division was still in the area?
11 A  I don't even know who that is.
12 Q  Can you tell me what are the services that you
13    understand the REI Division provides or did
14    provide?
15 A  Two main functions. One is a lab that would
16    store, preserve, and maintain various specimens,
17    eggs and sperm, that are taken from in the
18    process of extracting and saving them. The
19    other would be the process of actually doing in
20    vitro fertilization for the women that are
21    seeking to become pregnant.
22 Q  Okay. Did you understand that physicians in the
23    REI Division provided consultation with cancer
24    patients, both male and female, to attempt to
25    preserve fertility?

---

Page 39

1  A  Yes.
2  Q  Did you understand that they consulted with
3     patients who for other reasons might be at risk
4     of losing fertility?
5  A  Yes.
6  Q  Did you understand that they worked with
7     patients who had genetic disorders such as
8     cystic fibrosis, sometimes kidney disease, to
9     help them?
10 A  Same question. Yes. I don't know the
11    specificity but other reproductive issues, yes.
12 Q  Did you know that they worked with patients who
13    had had recurrent pregnancy losses?
14 A  Yes.
15 Q  Did you know that they helped treat woman who
16    had various endocrine or hormonal abnormalities
17    such as pituitary tumors?
18 A  Not specifically. But yes.
19 Q  Did you know that they did work in pediatric and
20    adolescent gynecology?
21 A  No.
22 Q  Did you know that they helped women who had
23    birth defects in their reproductive tract?
24 A  Not specifically.
25 Q  Did you know that physicians in the REI Division

---

Page 40

1     worked with women who had uterine fibroids,
2     pelvic masses, endometriosis, things like that?
3  A  Yes.
4  Q  Did you know that they worked with patients who
5     had early pregnancy complications?
6  A  While they were pregnant, you mean?
7  Q  Yes.
8  A  I didn't know it. I'm not surprised, but I
9     didn't know it.
10 Q  Did you know that they handle pelvic
11    ultrasounds?
12 A  Yes.
13 Q  Do you know who within the REI Division was the
14    principal person with expertise in pelvic
15    ultrasounds?
16 A  I believe Misty Porter.
17 Q  Did you have any information about the extent of
18    her expertise in this area?
19 A  No.
20 Q  How about her reputation?
21 A  No.
22 Q  Was there anyone else in the REI Division who
23    you understood was capable of competently
24    reading pelvic ultrasounds?
25 A  I'm unaware. I don't know.

10 (Pages 37 to 40)

Daniel Herrick - July 25, 2019

41

1    Q    I'm going to mark as Herrick number 1 a document
2         11363-365.
3              (Exhibit 1 marked for identification)
4    Q    I show you what's been marked as Exhibit 1.  Is
5         the first page an email that you sent to Leslie
6         DeMars and her response that same day?
7    A    Yes.
8    Q    Yes?
9    A    Appears to be.
10   Q    Okay.  And in her email, Dr. DeMars says that
11        Misty has been on long-term disability almost
12        the entire FY including or excluding her salary
13        swings cost substantially.  Did you know that
14        she had been on a disability?
15   A    I did not.
16   Q    Was this the first time that you were aware that
17        she'd been on disability?
18   A    I believe this would have been the first time
19        that I became aware of it, yes.
20   Q    Did you ask Leslie DeMars or did she tell you
21        why she had been on leave?
22   A    No.
23   Q    Did you have information about whether going
24        forward Dr. Porter would be able to work on a
25        full-time basis in the division?

42

1    A    No.  No conversation about that.
2    Q    Was there any information about the quality of
3         her work?
4    A    No.
5    Q    In the second paragraph of her email, she says
6         you would really like Dan Grow.  I hope that you
7         two can connect soon.  He does triathlons for
8         fun and mental health.  Who is Dan Grow?
9    A    Dan Grow is a physician that Leslie knew or met,
10        had some conversations with, about potentially
11        working at Dartmouth-Hitchcock.
12   Q    Was he interviewed?
13   A    I don't believe he was formally interviewed, no.
14   Q    All right.  Was she suggesting or requesting
15        that you meet him?
16   A    Yes.
17   Q    Did you meet him?
18   A    No.
19   Q    Why not?
20   A    There was, I had no intention or interest in
21        meeting him.
22   Q    And why not?
23   A    We had taken the decision, I believe by this
24        time we had taken the decision or were close to
25        taking the decision to put the program on hiatus

43

1         and/or shut it down, and Leslie was, I believe,
2         spitballing ideas as to having the program on
3         hiatus for a very short period of time and that
4         this would be an individual who could be someone
5         who would reorganize and run the division.
6    Q    Was she suggesting that Dan Grow had the
7         training and ability to take over the division?
8    A    To, yes, to reup or reopen the division, yes.
9    Q    Was she suggesting to you that he could replace
10        the existing leadership of the division?
11   A    Over time, yes.  I believe that the conversation
12        was that we were putting the program on hiatus,
13        that we would reopen it in a year, two years,
14        three years, and Leslie was saying that we might
15        not have to wait a year or two or three because
16        she had found a candidate who she thought could
17        fit the bill.
18   Q    At the time of this email, the talk was that the
19        hiatus would be somewhere in the
20        one-to-three-year period?
21   A    Well, I think it depends on who you were asking.
22        In my mind it was one to three years.
23   Q    Why did you come to that period?
24   A    I believe that once we agreed to shut it down
25        and we were taking care of our patients that we

44

1         would take the time to develop a formal business
2         plan and be sure that we reopened the division
3         in a way that would be appropriate for the
4         entire community that we served.
5    Q    And what is that community?
6    A    Our catchment area would be anywhere in Maine,
7         New Hampshire, and Vermont.
8    Q    You thought it would take one to three years to
9         do the business plan?
10   A    To put a business plan and write an evaluation
11        and get the right staff together and get it up
12        and started again.
13   Q    Where are you in that process now?
14   A    We have some initial work, but it's very
15        preliminary.  We just replaced the Interim Chair
16        of OB/GYN with a new Chair who started July 1st,
17        and, you know, nothing was going to happen until
18        we got that new Chair in place.
19   Q    And was the new Chair hired with the expectation
20        that he or she would be responsible for helping
21        coordinate the work to restart the REI Division?
22   A    That the idea of restarting it would be part of
23        the responsibilities that they would have.  Not
24        a foregone conclusion that we would restart.
25   Q    Who is the new Chair?

11 (Pages 41 to 44)

Daniel Herrick - July 25, 2019

45

1   A   I believe her name is Ilana Cass.
2   Q   Can you spell the last name?
3   A   C A S S.
4   Q   If you could look at page 11364, the Pro-Forma.
5       Do you have that?
6   A   Um-hum.
7   Q   You need to say yes.
8   A   Yes.
9   Q   Thank you.  If you look to the right under the
10      heading of Proposed Actions, there are three
11      options as I see it; is that accurate?
12  A   That's the way I read it.
13  Q   Okay.  And what are those three possible
14      actions?
15  A   Discontinue the program, put the program on --
16      discontinue the IVF program, put the REI program
17      on hiatus and make appropriate staff
18      adjustments.
19  Q   What would be an appropriate staff adjustment?
20  A   Well, if we discontinued the program and/or put
21      it on hiatus, we would not keep staff on salary.
22  Q   So let me --
23  A   These are not three options.  These are three
24      proposed actions.
25  Q   Okay.  So would one of the proposed actions be

46

1       to make staff adjustments and to keep the REI
2       Division open?
3   A   No.  We were recommending that we discontinue
4       the IVF program, that we put the REI program on
5       hiatus and that we make appropriate staff
6       adjustments to satisfy that.  These are three
7       steps.  These are not three options.
8   Q   And as I read this at least at the time this was
9       prepared which would be roughly what, March 23,
10      around then?
11  A   Yes.
12  Q   Okay.  That there were six patients who were
13      currently receiving treatment?
14  A   They were in IVF cycles, yes.  And that our plan
15      was to make sure they continued to receive the
16      level of care that they were receiving.
17  Q   We'll mark as Exhibit 2 a document running page
18      11253 through -- there's a third page that's
19      attached, doesn't appear to have a Bates number.
20      Apparently this was produced in native format.
21          MR. SCHROEDER:  That's why.
22          (Exhibit 2 marked for identification.)
23  Q   Is Exhibit 2 an email that you sent to Leslie
24      DeMars?
25  A   Yes.

47

1   Q   Who is Samuel N. Shields, Jr.?
2   A   Right now he's the, I believe at the time he was
3       the Vice President of the Operations Excellence
4       which is the Value Institute.  Running the Value
5       Institute.
6   Q   You say in here, "I spoke with Sam today and he
7       has agreed to provide us with a project manager
8       to support our strategy to shut down IVF and put
9       the REI program on hold."
10          What was the project manager supposed to
11      do?
12  A   Just coordinate all the activities, make sure
13      that we were touching all the bases.
14  Q   Was a project manager appointed?
15  A   I don't recall whether we did or didn't.
16  Q   You go on to say, "I think we are ready to share
17      our plans with Ed and Maria."  That's Maria
18      Padine?
19  A   That's correct.
20  Q   Was she involved in these discussions?
21  A   She became involved near the end.
22  Q   Did she have a role in making the decision?
23  A   I suppose she had input in making the decision,
24      yes.
25  Q   Did you participate in discussions with her?

48

1   A   I believe that I had, I was in meetings where we
2       reviewed options that she was there, yes.
3   Q   Did she support the idea of closing the REI
4       Division?
5   A   I don't recall that she did or did not.
6   Q   You don't know what position she took.
7   A   I don't.
8   Q   Did she say anything about terminating the
9       physicians?
10  A   I don't recall that conversation.
11  Q   You don't know whether she said anything at all?
12  A   I don't.
13  Q   You indicate in your memo that Leslie DeMars
14      would take the lead, right?  Why is that?
15  A   Where I do say that?
16  Q   "I will let you take the lead on that."  It's
17      the last line of Exhibit 2.
18  A   Yes.  To set up the meeting with Ed and Maria
19      and to either have the conversations with them
20      or to include me.  It was up to her.  So I
21      collaborated with Leslie on putting the plan
22      together.  This is the plan.  It's now ready to
23      be presented to Ed and Maria for their approval.
24      She can take the lead on that.  She can do it
25      with or without me.  However she feels.  She's

Daniel Herrick - July 25, 2019

49

```
1        the Chair.
2   Q    As of April 18, 2017, are you saying that Leslie
3        DeMars supported closing the REI Division and
4        terminating the physicians?
5   A    As of that date, Leslie did support closing down
6        the function, and yes, all of the action items
7        as outlined here, yes.
8   Q    And that would include --
9   A    The staffing adjustments would include that.
10       Yes.
11  Q    How had she conveyed to you her approval of
12       closing down the division and terminating the
13       physicians?
14  A    Verbally.
15  Q    In one meeting or more than one?
16  A    So there was one meeting in particular when we
17       were, we had a presentation by the Value
18       Institute and the HR folks who were talking --
19       it was over at the other building. We were
20       talking about the dysfunction in the
21       organization and the Value Institute staff who
22       had been trying to put standard work in and
23       trying to get everybody to do everything the
24       same way to follow the same processes, to share
25       staff, and the organization, they had tried
```

50

```
1        several times to implement these changes, they
2        were unsuccessful. And the recruiting people,
3        the division of the HR team that does the
4        recruiting, informed both Leslie and I at that
5        point in time that they were no longer going to
6        recruit staff into the REI function because of
7        its dysfunction and because of the high turnover
8        rate and that they felt it was unfair to recruit
9        new staff into a dysfunctional organization.
10           Following that meeting when everyone left
11       the room, Leslie and I remained, and I shared
12       with Leslie that it was my very strong
13       recommendation that we needed to either shut the
14       program down or put it on hiatus or however that
15       would work out, but that we cannot continue. We
16       can't hire staff, we can't run the division, and
17       that was my strong recommendation. And I
18       actually asked, suggested that we shut it down.
19       She said well, is it permanent that we would
20       shut it down? And I said nothing's permanent
21       but we need to shut it down. We need to stop
22       it. We need to just fix this. This is not fair
23       to our patients. It's not fair to the rest of
24       our staff. We need to fix it.
25           We had a conversation about that, and she
```

51

```
1        agreed that based on what we had just heard that
2        she did not see another option and that based on
3        that I would begin to put together a plan
4        working with Heather and collaborating with her
5        to move forward with it. So it was at that
6        point that we made the decision to recommend to
7        the senior leadership that we would shut the
8        program down.
9   Q    What was the date of that meeting?
10  A    I don't recall the exact date of that meeting.
11  Q    In the discussions with the Value Institute, was
12       anything said about the competence of the
13       physicians working in the REI Division?
14  A    In the presentation that they gave us, in that
15       one-to-one and a half hours preceding the
16       conversation that I just described with Leslie,
17       all of the conversation was about the function
18       of the department and the inability for them to
19       get the staff, the physicians, to adopt a common
20       standard way of doing business. There was no
21       conversation about medical care.
22  Q    And no conversation about the competence of the
23       doctors who were providing the care?
24  A    No.
25  Q    And you said that because of the turnover rate
```

52

```
1        there was a decision that they would no longer
2        recruit nurses?
3   A    Any staff.
4   Q    Any staff. And who said that?
5   A    That would have been Belinda Peavey who I
6        believe at the time was the Vice President of
7        Recruiting or some part of the HR function.
8   Q    What is she now?
9   A    She's a VP of something in HR. We have lots of
10       VPs. I'm one, too.
11  Q    Congratulations.
12  A    No. It's no big deal. We were like a bank.
13           (Discussion off the record)
14  Q    Exhibit 3 will be one page document 9582 which
15       is April 19, 2017 email.
16           (Exhibit 3 marked for identification)
17  Q    The bottom of this document is an April 19 email
18       that you sent to Leslie DeMars and Heather
19       Gunnell, correct?
20  A    That's correct.
21  Q    And then at the top there's an email from
22       Heather Gunnell to you and Leslie DeMars, right?
23  A    Right.
24  Q    Okay. And Heather Gunnell says that she has
25       prepared a brief staffing plan for both a
```

13 (Pages 49 to 52)

Daniel Herrick - July 25, 2019

53

1    complete shutdown and a rebuild, correct?
2  A  Yes.
3  Q  And then she says my assumption is that MBP will
4    be refocused to Gyn U/S.  Do you understand that
5    MBP is Dr. Porter?
6  A  That would be my understanding, yes.
7  Q  And what is Gyn U/S?
8  A  I know what Gyn is.
9  Q  So Gynecology department presumably?
10  A  Yes.  I believe the U/S would be ultrasound.
11  Q  Okay.  Prior to receiving this April 19 email,
12    had there been any discussions you knew of about
13    Dr. Porter staying at Dartmouth-Hitchcock doing
14    ultrasound work?
15  A  I don't know about prior to this.
16    Coincidentally or subsequent to this there were,
17    I was aware of conversations that Leslie was
18    considering as an option to keep Misty to do
19    some GYN ultrasound work.
20  Q  How did you become aware of that?
21  A  Through conversations, maybe through this.
22    Maybe I asked a question, but just a general
23    conversation.  May be other emails.  I don't
24    recall.
25  Q  Do you recall at any point Leslie DeMars

54

1    discussing Misty Porter's ability to do
2    ultrasound work?
3  A  Yes.
4  Q  What did she say?
5  A  She said that Misty was very capable of doing
6    GYN ultrasound.
7  Q  Besides saying she was very capable, did she
8    elaborate at all?
9  A  I don't recall that we did.
10  Q  So there was at least some discussion where Dr.
11    DeMars is saying if there's a shutdown, we can
12    keep Dr. Porter.
13  A  It was more of a potential option.  Just an
14    option.  There was no plans to do it.  It was
15    just an option.
16  Q  But at least as of April 19, Heather Gunnell is
17    assuming that Misty Porter is going to continue
18    to do ultrasound at GYN; is that right?
19  A  That's what this says.  I'm not aware of that.
20  Q  Any reason to believe that that's not what she
21    was considering at the time?
22  A  I believe that it's possible she was just
23    reflecting conversations that she'd had with
24    Leslie as a desire, as an option.  It was never
25    planned in my mind.

55

1  Q  Okay.  So at least roughly in mid-April, Leslie
2    DeMars is saying there's an option of keeping
3    Dr. Porter and having her do ultrasound in the
4    gynecology department, right?
5  A  That's correct.
6  Q  Was there any discussion about the demand for
7    that work?
8  A  I believe subsequently there was conversations
9    about the demand and the viability of having
10    this work done by Dr. Porter since the work had
11    already been, was already done.  So there
12    was no new, there was no new volume, no new
13    demand.  This work was already being taken care
14    of by the radiology team.
15  Q  How do you know that?
16  A  Based on conversations that we had subsequent to
17    this.
18  Q  With whom?
19  A  With Leslie and with Heather and we pulled data.
20    So remember, that would be my job is to look at
21    the budgets and to look at options so we looked
22    at whether this was to reflect new demand, and
23    it was not to reflect new demand.
24  Q  Right.  So were there patients in the REI
25    Division who needed ultrasounds read?

56

1  A  Yes.
2  Q  Did you understand that Dr. Porter was the
3    person who did the ultrasound reading?
4  A  Not exclusively, no.
5  Q  Who else in the REI Division could do that?
6  A  I don't know if anyone in the REI Division, but
7    they were being read.  There were other people
8    in the organization capable of doing those
9    readings.
10  Q  Did you understand that there were other people
11    in the organization who were as capable as
12    Dr. Porter in reading ultrasounds?
13  A  I would say neither as capable or less capable.
14    I have no knowledge.
15  Q  You don't know whether she was the best?
16  A  I don't know.
17  Q  No idea.
18  A  No.
19  Q  You said you did an analysis of whether there
20    was sufficient demand for her to do this work.
21  A  I believe we did some conversations, some
22    analysis, some levels of look at -- you know,
23    analysis might be the wrong word.  Analysis
24    might simply have been is this new demand and
25    there was no new demand.  This was the existing

14 (Pages 53 to 56)

Daniel Herrick - July 25, 2019

57

```
1        population of patients.
2    Q   Do you believe that there was not a formal
3        analysis but rather the kind of discussion you
4        just described?
5    A   I believe, I don't recall seeing a formal
6        analysis. I do know that I asked the question
7        about whether this was new demand and there may
8        be more, but I'm not aware of any.
9    Q   Who was the question asked of?
10   A   I would have asked Heather and Leslie.
11   Q   At some point did Leslie DeMars make a
12       recommendation about whether or not to keep
13       Dr. Porter to do OB/GYN ultrasound readings?
14   A   I don't know if she -- so ask the question
15       again?
16   Q   Sure. What I want to know is, you've got this
17       reference here in the email, Heather Gunnell is
18       assuming that Misty Porter is going to continue
19       and going to do ultrasound readings within the
20       GYN department, right?
21   A   Based on this email.
22   Q   Right. Okay. And you're saying that Leslie
23       DeMars at some point was saying hey, there might
24       be a position for Dr. Porter.
25   A   As an option, yes.
```

58

```
1    Q   As an option. All right. Did there come a time
2        when Leslie DeMars weighed in, made some
3        statement either for or against this idea of
4        Dr. Porter continuing as an employee doing
5        principally ultrasounds?
6    A   I believe she had multiple conversations and
7        both put it forth as an option and also put it
8        forth as not really a practical opening. I
9        believe that this was more of a conversation and
10       not a decision.
11   Q   Did she end up on one side of the ledger or the
12       other? Either keep her or not keep her?
13   A   Well, I suspect since she's no longer employed
14       she made the decision not to keep her.
15   Q   Do you have a recollection --
16   A   I don't.
17   Q   Let me finish. Let me get the question out.
18       Do you have a recollection of Dr. DeMars
19       ultimately concluding that there would not be a
20       position for Dr. Porter?
21   A   I don't recall the specific conversation or
22       specific discussion.
23   Q   All right. Did Dr. DeMars at some point say to
24       you that Dr. Porter is capable of performing
25       certain types of surgery that nobody else here
```

59

```
1        can do?
2    A   I don't recall specifically. Perhaps. I think
3        there were times when she did indicate that
4        Dr. Porter was a very proficient staff member
5        and could technically do some things better than
6        others.
7    Q   All right. Did she elaborate on what type of
8        surgery and what the demand was for that surgery
9        and what would people do if she wasn't here to
10       perform it?
11   A   I don't recall any specifics about that.
12   Q   Generally?
13   A   I don't know.
14   Q   I want to make sure. So at some point in this
15       process you think Dr. DeMars said word to the
16       effect of Dr. Porter is a particularly talented
17       surgeon, and there's work that she can do that
18       other people can't?
19   A   I wouldn't characterize it that way.
20   Q   How would you characterize it?
21   A   That is there a way we could keep Dr. DeMars.
22   Q   Dr. Porter, you mean?
23   A   I mean Dr. Porter. And she's skilled at
24       ultrasound, and there's other things. I don't
25       recall that she was saying she's the only one
```

60

```
1        who could do things. I think she was more
2        saying there are skills that she can do. I know
3        there's a distinction, but --
4    Q   I'm just trying to figure out what you recall
5        she's saying. That's all. So the discussion
6        was she's a skilled surgeon and particularly
7        talented doing ultrasound readings, right?
8            MR. SCHROEDER: Objection. I think that
9        mischaracterizes his testimony.
10   A   I'm not, so she never said, other than the
11       ultrasound, she never said that Dr. Porter was
12       better than anybody else. Just that she was
13       capable of other surgeries.
14   Q   All right.
15   A   She did say she was very proficient at
16       ultrasound GYN.
17   Q   So it's the ultrasound she's the best, nobody's
18       any --
19   A   She's very proficient.
20           MR. SCHROEDER: Objection.
21   Q   Very proficient.
22           MR. SCHROEDER: Mischaracterizes testimony.
23   Q   Okay. And as to the surgery, she said she's
24       very proficient or just --
25   A   She's capable.
```

15 (Pages 57 to 60)

Daniel Herrick - July 25, 2019

61

1  Q   Capable. Okay. Was there any discussion with
2      Leslie DeMars about whether Dr. Porter would be
3      able to have sufficient work if she remained as
4      an employee?
5  A   Well, ask that question slightly different. I'm
6      not sure how to answer that question.
7  Q   Well, at the time of the decision that we've
8      been talking about, Dr. Porter was reading
9      ultrasounds, right?
10 A   I believe that's true. I'm not sure.
11 Q   Right. I understand you didn't look over her
12     shoulder.
13 A   Correct.
14 Q   But you understood based on what people were
15     doing, Misty Porter is doing ultrasound
16     readings, right?
17 A   That she was doing some ultrasound readings. I
18     don't know the volume.
19 Q   I understand you may not know the volume, but
20     you knew that she was at least doing some
21     ultrasound readings, right?
22 A   I believe she was doing some ultrasound
23     readings.
24 Q   That's what you were told.
25 A   I believe that's true.

62

1  Q   Did you have any information about the extent or
2      the volume of the ultrasound readings that she
3      was doing?
4  A   No.
5  Q   Did Dr. DeMars say anything about what the
6      demand would be for ultrasound readings if the
7      REI Division closed?
8  A   I don't recall that we had that conversation.
9  Q   On the surgery, did Dr. DeMars have a discussion
10     that you're aware of about whether the surgery
11     that Misty Porter could do would continue to be
12     done at Dartmouth-Hitchcock even if the REI
13     Division closed?
14 A   Not specifically, no.
15 Q   Generally?
16 A   No.
17 Q   Would it be accurate to say that at least as of
18     April 19, 2017, there had been no decision that
19     you were aware of about whether or not Misty
20     Porter would remain an employee at
21     Dartmouth-Hitchcock?
22 A   I believe that's true.
23 Q   We'll mark as Exhibit 4 a one-page document.
24     9574 is the Bates number, and it's an April 19,
25     2017, email, and a response on April 21.

63

1          (Exhibit 4 marked for identification)
2  Q   I'll show you what's been marked as Exhibit 4.
3      So the bottom --
4  A   Can I finish reading?
5  Q   I'm sorry.
6  A   Okay. Thank you.
7  Q   By April 21, 2017, when Heather Gunnell writes
8      you this response, did you understand that the
9      decision had been made to proceed to close the
10     REI Division?
11 A   The decision had either been made or was, we'd
12     had conversations that it was going in that
13     direction and we were making plans to
14     communicate, yes.
15         MR. SCHROEDER: This appears to be an
16     incomplete document. There's other documents
17     attached to it.
18         MR. VITT: Why don't we take a quick break
19     and find that, and I'm going to get the menu
20     again.
21         (Recess taken 11:24 - 11:38 a.m.)
22 Q   We'll mark the full package of documents as
23     Exhibit 5. And they run pages 9574 through 76,
24     and then there's some four additional pages in
25     native format that are not Bates numbered.

64

1          (Exhibit 5 marked for identification)
2  Q   So what I have done is to mark Exhibit 5, a
3      document that had the emails we were looking at
4      before plus what I believe are the attachments
5      that are referenced in that document. Have you
6      had a chance to just look through those?
7  A   I have. Yes.
8  Q   Do those appear to be the attachments?
9  A   Yes. They do.
10 Q   Okay. If you go to the page, third unnumbered
11     page so it has the number of new patients who
12     are scheduled, that would be 8, correct?
13 A   Correct.
14 Q   And then there are patients who are scheduled
15     for care beyond April 30 and that's 102
16     patients, correct?
17 A   Correct.
18 Q   And then it says new patient referrals not
19     scheduled, 28.
20 A   That's correct.
21 Q   What is that reference, "new patient referrals
22     not scheduled"?
23 A   So those are patients that have been referred
24     into the program for treatment, but we have not
25     yet scheduled them in for any work. So we know

16 (Pages 61 to 64)

Daniel Herrick - July 25, 2019

65

1    who they are, but we haven't actually had any
2    formal contact with them.
3    Q    Then the next page is labeled Staffing Plan,
4    correct?
5    A    Yes.
6    Q    And at least as of April 21, the future staff
7    with complete REI shutdown consists of two
8    people, right?
9    A    Yes.  1.4, I think, is right.
10   Q    So MBP that would be a .4, correct?
11   A    Yes.
12   Q    And Elizabeth Todd would be 1.0, correct?
13   A    That's correct.
14   Q    Were you involved in any discussions about
15   whether or not Elizabeth Todd should be kept as
16   an employee?
17   A    No.
18   Q    Do you know why at least that is as of this
19   point it was proposed that she be kept in a 1.0
20   position?
21   A    No.  This was a proposal.  One of the proposals.
22   Q    Okay.  She in fact was kept as an employee.  Do
23   you know why?
24   A    I don't.
25   Q    Would it be accurate to say that you were not

66

1    involved in any discussions about whether or not
2    to keep her?
3    A    Only to the extent that they would have
4    demonstrated to me that there was a need from a
5    business standpoint.
6    Q    And how would they do that?
7    A    Well, if we were to, we would, I'm assuming that
8    we would review this, and I would say why are we
9    keeping these people, and they would say well,
10   we're got this number of patients that are in
11   the backlog or they would give me some
12   information that would be valuable.  And if it
13   made sense to me, I would say okay, move on.
14   Q    So you think that that discussion, the way you
15   just described it, probably occurred but you
16   don't recall it.
17   A    It's likely that occurred, but I don't recall
18   it.
19   Q    And that would also be true about keeping Dr.
20   Porter as a .4?
21   A    I would have to say it's likely, but I don't
22   recall.
23   Q    Okay.  There's a reference on the first page of
24   Exhibit 5.  This is the Heather Gunnell email to
25   you about Alison Mumford being involved?

67

1    A    Yes.
2    Q    Who is she?
3    A    So Sam Fields, I believe as I mentioned earlier,
4    is the Vice President for Operational
5    Excellence, and at that point I believe that
6    Alison Mumford was the Director of Operational
7    Excellence and would have been the one who would
8    actually be hands-on involved in moving forward
9    with supporting any type of initiative.
10   Q    Okay.  In Heather Gunnell's email to you, she
11   writes, "We identified where each staff member
12   will need to go and I will send that to Aimee.
13   We should keep in mind that our plan for people
14   may be altered depending on what happens with
15   the meds investigation."
16        Let me ask, Aimee is Aimee Giglio?
17   A    Yes.
18   Q    And she's in HR?
19   A    She is.  Yes.
20   Q    And then the next sentence refers to perhaps
21   there being changes depending on what happens
22   with the meds investigation.  What is that?
23   A    So I don't have any direct knowledge.  I have no
24   firsthand knowledge.  I understand there was
25   some investigation related to meds in the REI

68

1    investigation, but I never got any of the
2    details.  I didn't need to know.
3    Q    And whatever the information provided to you,
4    who did that?
5    A    I believe Heather.
6    Q    Did you understand that she was involved in some
7    shape, manner or form with that investigation?
8    A    I believe she was aware of it.
9    Q    Who was handling the investigation?
10   A    I believe our internal pharmacy people.
11   Q    In broad strokes, what did you understand it
12   concerned?
13   A    I understand that there had been some meds
14   uncovered in a storage closet that were for
15   multiple patients, and they were in a bag, and
16   it was unclear why they were there.
17   Q    Was there a resolution that you're aware of?
18   A    Not aware.  I mean, I'm sure they finished their
19   investigation, but I don't know what the outcome
20   was.
21   Q    Okay.  We'll mark as Exhibit 6 an email from
22   Daniel Herrick to Heather Gunnell, page 9572 and
23   then there's 9573 indicates that a document has
24   been produced in native format, and then there
25   are five pages attached to that.

17 (Pages 65 to 68)

Daniel Herrick - July 25, 2019

69

1                (Exhibit 6 marked for identification)
2    Q    I'll give you what's been marked as Exhibit 6.
3         First page is an email you sent to Heather
4         Gunnell, correct?
5    A    Um-hum.  Yes.
6    Q    And you've looked through the document, and is
7         it accurate to say that the Assumptions document
8         which is the third page is one that you worked
9         on?
10   A    I would say anything that has DPH on the bottom
11        right-hand corner is my file, that I created it,
12        yes.
13   Q    When you created a document, was it your
14        practice to indicate on that document that by
15        putting your initials or doing something else
16        that it was something you generated?
17   A    I have a little bit of OCD so yes, I typically
18        do that.  Maybe more than a little.
19   Q    You begin with the Assumptions by saying that
20        the "Current staffing issues have rendered the
21        REI program unsustainable resulting in
22        unacceptable levels of care for our patient
23        population as well as marginal financial
24        viability."
25             Are the staffing issues you referred to

70

1         here what you were talking about earlier; that
2         is, couldn't get people on the same page?
3    A    That's correct.  Staffing and productivity,
4         throughput, the dysfunctional organization.
5    Q    You mentioned productivity.  Is that principally
6         the doctors, the physicians?
7    A    No.  It's everybody.  It's access.  It's getting
8         patients in to see nurses.  It's having
9         nurses -- with three physicians, we had three
10        nurses and each nurse was dedicated to that
11        physician only.  If that nurse was out, then the
12        phone call for that physician would go to
13        voicemail.  Part of the standard work that the
14        Value Institute was attempting to input would
15        have been having all of the nurses in a pool and
16        having them support all of the providers.
17             That's an example of some of the
18        dysfunction that we were unable to resolve, and
19        that drives the staffing issues.  That was part
20        of the reason that people were leaving, and
21        that's also part of the level of care that was
22        unsustainable or unacceptable for our patients.
23   Q    In the next sentence you talk about there being
24        "patient care variations between providers and
25        staff."  What does that mean?

71

1    A    So as I just said, each provider had their own
2         nurse and had their own protocols and their own
3         processes for how they did things, how they
4         documented them, the sequence that they did,
5         what meds they would prescribe, how they would
6         go about treating their patients; and what we
7         were trying to do is separate the operational
8         issues from the clinical issues and say from an
9         operations standpoint everybody should be doing
10        everything the same way.  We should be using the
11        same documentation, same checklist, the same
12        sequence of work.  And then the clinical side in
13        terms of which meds might be best for the
14        patient would be still left to the providers.
15   Q    So in the REI Division at the time there were
16        three principal physicians as we talked about,
17        right?
18   A    Correct.
19   Q    Two of those were hired by Dr. DeMars.
20        Recruited them, interviewed them and hired them.
21        Albert Hsu and David Seifer.  At any point did
22        someone ask her words to the effect of how did
23        you manage to hire people like this in the
24        division?
25   A    I'm not aware of any, of that type of

72

1         conversation.
2    Q    Did she express any responsibility for the
3         dysfunctional nature of the REI Division?
4    A    No.
5    Q    Did anyone ask her words to the effect of how
6         did this happen?  You're running this division.
7         It's kind of a standard question.  It's your
8         division.  What happened?
9    A    Others may have.  I never asked that question.
10        I'm not aware of anybody asking that question.
11   Q    Did you hear her say anything about being
12        partially responsible for this situation?
13   A    She took ownership as the Chair much like
14        anybody would take ownership of their own
15        organization.
16   Q    When you say "took ownership," what does that
17        mean?
18   A    That means she accepted responsibility for the
19        overall failure of the organization that drove
20        us to this decision.
21   Q    I want to come back to something I asked a
22        moment ago.  I want to make sure I've got this
23        right.  At no point in these discussions did
24        anyone focus on the competence or lack of
25        competence of the physicians in the REI

18 (Pages 69 to 72)

Daniel Herrick - July 25, 2019

73

1      Division; is that right?
2  A   I'm unaware.  So I was focused on the process,
3      the dysfunction.  We brought in the Value
4      Institute, we brought in the HR people that were
5      unable to fix it.  I recommended that we shut it
6      down.  I really, not that I'm not curious, but
7      how we got here was not of concern to me.  What
8      we were going to do next was my primary concern.
9      Perhaps my sole concern.  Assigning blame was
10     not anything I'm interested in at this point in
11     time.
12  Q   The last bullet point on this page we've been
13     talking about, you write "Embedded in this is
14     the decision is a plan to maintain our current
15     lab operations, in conjunction with UVM."
16         So what did you mean by that?
17  A   So the lab is where we store our embryos, eggs,
18     our sperm.  That function is and has had at the
19     time was being comanaged, well, managed in
20     collaboration with UVM in the sense that we had
21     Navid who was running that and was also doing
22     work for UVM.  He was, he was our Lab Director
23     and he was also our Lab Director on a PSA,
24     personal service agreement, between us.  And we
25     collaborated with UVM to be sure that we could

74

1      maintain this work and that Navid would continue
2      to do work both here and there so we could keep
3      both labs running.
4          We felt that it was important to provide
5      continuity for our patients and their specimens,
6      and that was part of our plan to provide the
7      maximum level of care for our patients and also
8      position us to reinvigorate the REI program at
9      some later date.
10  Q   And you needed to have a lab in place if you're
11     going to reinvigorate?
12  A   Yes.  Yes.  That's my understanding.
13  Q   Was the business and operating plan to restart
14     the program going to be done internally?  Did
15     you expect people at Dartmouth-Hitchcock to
16     prepare that plan?
17  A   Yes.
18  Q   And is that plan still in process?
19  A   Yes.
20  Q   Being prepared?
21  A   There is some work that's been done, yes.
22  Q   Who did that work?
23  A   It was headed up by the Interim Chair of OB/GYN,
24     Liz Erekson, who was Interim Chair for
25     approximately a year.  Just stepped down from

75

1      that role with the appointment of Ilana Cass.
2      That body of work will now transfer over to Dr.
3      Cass.
4          (Exhibit 7 marked for identification)
5  Q   I've marked as Exhibit 7 a two-page document,
6      25744 to 45.  It's an email from Leslie DeMars
7      to you.  Have you read it?
8  A   I read it.
9  Q   Prior to me handing you this document, if I'd
10     asked you a question essentially do you recall
11     Leslie DeMars writing this email, would you have
12     recalled?
13  A   No.
14  Q   She begins by saying Daniel, does she call you
15     Daniel?
16  A   Yes.  Everybody calls me Daniel.  Well, among
17     other things, but --
18  Q   "You obviously have a good sense of Ed, and he
19     is furious at me, but there are some issues that
20     he has to understand in order to get to yes and
21     hiring Dan Grow in some capacity asap."
22         Was Ed Merrens furious with Leslie DeMars?
23  A   I don't know.  He'd have to answer that.
24  Q   Did he say anything to suggest that he was
25     furious?

76

1  A   Not to me.  I don't recall.
2  Q   So you don't recall him one way or the other,
3      being furious, happy or annoyed, nothing like
4      that?
5  A   I don't ever remembering seeing Ed furious,
6      first of all, and I don't think that if he was
7      upset with one of his chairs that he would share
8      that with me.
9  Q   She goes on to talk about Dan Grow having offers
10     from the Mayo Clinic and Yale, and we need to
11     make a decision, correct?
12  A   That's what it says, yes.
13  Q   Can you explain why as of this date there hadn't
14     been some resolution about whether or not to
15     offer this guy a job?
16  A   We were never going to offer him a job.
17  Q   So why keep this guy hanging?
18  A   The institution was not negotiating with Dan
19     Grow.  Leslie was having conversations with Dan
20     Grow and trying desperately to get the
21     organization to embrace this concept, and we
22     were not going to do that.
23  Q   Did you understand that as of April 25 she had
24     been told in no uncertain terms that the
25     institution had no interest in hiring this

19 (Pages 73 to 76)

Daniel Herrick - July 25, 2019

---

77

```
 1        person?
 2     A  Yes.
 3     Q  And in this paragraph Leslie DeMars says, "When
 4        Aimee Giglio said we've never closed" --
 5     A  Just so you know it's Giglio.
 6     Q  Giglio?
 7     A  In case you meet with her.
 8     Q  I appreciate that.
 9           MR. SCHROEDER:  It's like the island.
10     Q  Aimee Giglio.  Is that better?  Said, quote,
11        "we've never closed a service at DH before," she
12        made an inflammatory statement.
13           Did you hear her say that?
14     A  I never heard her say that, no.
15     Q  In the fourth paragraph she says, "While David,"
16        that's David Seifer?
17     A  I believe that might be -- well, yes, I believe
18        that's true.  So just to be clear, in the
19        paragraph above where he talks about Axelrod,
20        his name is David Axelrod as well so --
21     Q  Right.  But I think she's talking about David
22        Seifer here, right?  We can agree?
23     A  I believe she is.
24     Q  Okay.  I mean, Misty Porter had nothing do with
25        David Axelrod.
```

---

78

```
 1     A  That's correct.  When I first read it through
 2        here, I jumped to David Axelrod.  That's why
 3        I'm -- you're right.
 4     Q  Okay.  She says, "While David is not a good
 5        leader, his failure is also the result of a
 6        masterful takedown by Misty Porter.  If she had
 7        wanted to support him, she would have made the
 8        division successful."
 9           What do you understand Dr. Porter did to
10        take down David Seifer?
11     A  I don't know.  This is Leslie writing this.  I
12        have no idea.
13     Q  Did you ask her?
14     A  I did not.  I did not follow up on this email.
15     Q  And she goes on to express the view that if she
16        had wanted to support him, some, "she would
17        have made the division successful."  How would
18        she do that?
19     A  I don't know.  You'd have to ask Leslie.
20     Q  You have no idea.
21     A  I don't.  I don't know.
22     Q  And she goes on to say "Misty is counting on her
23        longevity and my friendship to come in as the
24        savior of the division."
25           Do you know what she's referring to there?
```

---

79

```
 1     A  I believe they've worked together, I believe
 2        that Misty and Leslie were peers before Leslie
 3        became the Chair.
 4     Q  Right.
 5     A  And that they've had a long personal
 6        relationship, and it appears that she's saying
 7        that Misty could have done something to save the
 8        division, and it's unclear what that would be
 9        because all of the reasons that I recommended we
10        shut it down are reasons that are valid based on
11        performance.
12     Q  So when Leslie DeMars, at the time she was Chair
13        of the OB/GYN Department?
14     A  That's correct.
15     Q  So she's saying hey, Misty can do something to
16        save the division, she can be the savior, what
17        is she supposed to do?
18     A  I don't know.  I mean, you'll have to ask
19        Leslie.  I'm not going to presume to speak for
20        her.
21     Q  So you say you didn't follow up on this?  Why
22        not?
23     A  I didn't follow up directly with Leslie.  I felt
24        this was more of a weekend download or an
25        overnight download and that there was no real,
```

---

80

```
 1        there was no real action item for me to take
 2        here.  I knew we were not going to hire Dan
 3        Grow.  The rest of this talks about her opinion
 4        as to what's going on.  And her personal
 5        relationship with Leslie, you know, this was, I
 6        just felt this was, there was nothing there for
 7        me to do with this.  So I didn't specifically go
 8        back to Leslie and say let's go through this and
 9        tell me what you're thinking.
10     Q  Would you agree that a reasonable interpretation
11        of at the start of this email is that she thinks
12        that Dan Grow is still in the mix as somebody
13        you might hire?
14     A  Yes.
15           MR. SCHROEDER:  Objection, calls for
16        speculation.
17     Q  In the next paragraph she says Ed, meaning Ed
18        Merrens, right?  She said Merrens, correct?
19     A  I assume it is.
20     Q  Is also lumping Albert into, quote, "he's been a
21        problem since day 1," close quote.  Did you hear
22        Ed Merrens say words to that effect?
23     A  No.
24     Q  And then she goes on to say again, "Misty has
25        decided that she no longer wants to work with
```

---

20  (Pages 77 to 80)

Daniel Herrick - July 25, 2019

81

1    him or teach him, and she is bullying him."
2        Did you hear her say anything to that
3    effect?
4    A    Not until this, no.
5    Q    Not until you got this email?
6    A    No.
7    Q    So you've got the chair of a department saying
8    that one of the physicians who works under her
9    is bullying another physician. Shouldn't
10   somebody in management be doing something about
11   that?
12   A    Yes. Someone should.
13   Q    Who is that someone?
14   A    Not me.
15   Q    Okay. All right. Did you share this email with
16   anyone else? Did you pass it along?
17   A    I may have. I don't recall.
18   Q    Do you think you did?
19   A    Well --
20        MR. SCHROEDER: Objection. Asked and
21   answered.
22   A    I don't recall that I did.
23   Q    All right. So you don't know one way or the
24   other whether you passed it along?
25   A    I don't recall. I may have. If I did, I don't

82

1    know to whom.
2    Q    Well, it would be a pretty small list of who you
3    might pass it on to, right?
4    A    Yes, a very small list.
5    Q    She goes on to say that "David," that's David
6    Seifer, "is a nudge who somehow lacks
7    situational awareness, but he came into a
8    dysfunctional division with half the team
9    determined to make him fail."
10        Prior to getting this email, had she said
11   anything, words to that effect?
12   A    No.
13   Q    She says, "Despite the dysfunction, the
14   pregnancy rates were excellent during 2016, and
15   the lab is largely responsible for that."
16        Do you know what she means by that?
17   A    I don't. I mean, I can only tell you what it
18   says here, that the lab is very functional. I
19   don't know -- the lab is largely responsible for
20   that and the lab is very functional. Apparently
21   that's what she's saying.
22   Q    But that issue, the issue that she's raising
23   here, isn't one that she had raised with you
24   before this email, right?
25   A    No.

83

1    Q    She goes on to say that "The nursing dysfunction
2    is/was longstanding and preceded David. He
3    didn't hire any of the nurses, and had little
4    control over the splitting behavior that was in
5    place."
6        When there were the discussions with her
7    about what to do, this is prior to the decision
8    to close the shop down, were there conversations
9    about ways of trying to remediate the situation
10   within the division?
11   A    That would have been the work that was done with
12   the Value Institute and the HR folks.
13   Behavioral personnel folks. I was not involved
14   in any of those conversations. I never went to
15   the clinic. I never spoke to any of these
16   people. I'm an administrator. I worked, I
17   coordinated with Heather and Leslie to
18   understand that. We brought the Value Institute
19   in. I'm sure the Value Institute had lots of
20   conversations about this. I know they did team
21   building exercises and so on. I'm not aware of
22   any of the specificity around that other than
23   that the fact that that was the work they were
24   doing to try to resolve this issue and that it
25   ultimately failed.

84

1    Q    She goes on to report that, "We have to be very
2    careful about the conditions under which we can
3    terminate our providers. David's wife is a Pedi
4    Endocrinologist who works mostly in Manchester.
5    It is conceivable that he could join one of the
6    Boston IVF practices (Lord help them) and
7    compete directly for these patients."
8        Was the issue that she addresses here of
9    how you terminate providers something that was
10   discussed?
11   A    It would have been out of my purview in terms of
12   how we do it. Again, I put together the plan.
13   I'm a bit of a mercenary. I basically said the
14   program needs to shut down. Here's what we need
15   to do, and each person has their own areas of
16   responsibility. I don't own terminating
17   physicians managing them. So I would have no
18   action item here. This is, she's sharing her
19   thoughts on this. I have no action items
20   involved.
21   Q    Who would have been responsible for making the
22   decisions about how providers were terminated?
23   A    That would have been with Leslie, Maria Padine,
24   Aimee Giglio, Ed Merrens.
25   Q    Did you give the comments that she made about

21 (Pages 81 to 84)

Daniel Herrick - July 25, 2019

85

1    Dr. Porter any weight?
2  A   The same weight as I gave basically everything
3     in this email.
4  Q   Doesn't sound like much.
5        MR. SCHROEDER:  Objection.  Argumentative.
6  A   For the most part, the observations, opinions
7     that she shared in here are outside of my direct
8     responsibility and purview.  And I've read this,
9     I believe, with the idea that she's downloading
10    and maybe feeling better about writing it.
11    Throwing a Hail Mary perhaps.  I don't know
12    exactly what she was trying to do, but I don't
13    want to say I didn't give it any weight.  I
14    would just say that it, as reading it I
15    recognized that there were no action items or a
16    very few action items in here for me to do so
17    this was something that was for informational
18    purposes.  Although she may have been asking for
19    it, there was nothing for me to do here.
20  Q   Did you credit the accuracy of what she was
21    saying here or reach any judgment at all?
22  A   No.
23  Q   So you don't know whether she's spot-on or
24    couldn't be more wrong in the observations she
25    made here?

86

1  A   For the most part, that's true.  I don't, I
2     think it's true that the lab is very functional,
3     and Navid is doing a great job.  I think that's
4     true.  I think that I had some direct knowledge
5     of that.  I think for the most, the rest of
6     this, I just don't have, I'm not close enough to
7     the operation to know that this is accurate.
8  Q   So she's got comments about David Seifer and
9     Albert Hsu, you don't know whether she's spot-on
10    or totally wrong.
11  A   No.  I'm absolutely convinced these are her
12    opinions, and I have no idea the validity of
13    them with the exception of Navid is very
14    powerful and very strong in terms of running the
15    lab.
16  Q   Go to the second page.  Halfway down.  She's got
17    a, I'm not sure whether it's intentional or not,
18    but in bold she has, quote, "My life and the
19    messaging would be much easier if John Kakavas
20    determines that all three providers are at fault
21    in the medi diversion issue and are facing loss
22    of license."  That's quite a statement.
23        MR. SCHROEDER:  Is there a question?
24  Q   Did it strike you at the time that this is an
25    extraordinary statement for her to be making?

87

1  A   In the context of the rest of this?  Serious?  I
2     don't know "extraordinary" is the right word.
3     Again, as I said earlier, I only knew that they
4     found a bag of meds in a closet with more than
5     one patient's name on them, and that it went to
6     investigation.  I can only surmise or assume
7     what this means, but I have no firsthand
8     knowledge of the outcome of any of that work.
9  Q   So do you have any idea why her life and the
10    messaging would be easier --
11  A   You'd have to ask her.
12  Q   No, I know.  I get that.  Let me get the
13    question out so we've got a record here.  Why
14    her life and her messaging would be easier if
15    Kacavas concludes that these doctors were
16    responsible and they were facing loss of their
17    license to practice medicine?
18  A   You'll have to ask her what she meant by that.
19  Q   You don't know?
20  A   I don't know.  I don't know the extent of the
21    investigation, the results of the investigation.
22    I don't know how long it took.  I don't know
23    anything about that.
24  Q   I understand that you don't know about the
25    investigation and you don't know who's

88

1     conducting it.  I got all that.  I was really
2     focusing on she is saying here that the messages
3     that she has to deliver would be a lot easier if
4     she could say these three doctors screwed up and
5     are losing their medical license.  Isn't that
6     what she's saying?  I mean, as I read it here.
7     I haven't talked to her.
8  A   Well, then that's -- I'm not going to argue with
9     you.  I'm not going to draw any conclusion.
10  Q   Well, neither one of us has spoken to her about
11    what she said here.
12  A   No.
13  Q   Although you were communicating with her.
14  A   I was communicating with her, but I never asked
15    her about this.
16  Q   Okay.  And my question is at this point, that is
17    as of, what's the date here, April 25, there was
18    a decision had been made to close the REI
19    Division, right?
20  A   That's correct.
21  Q   And that decision is going to have to be
22    explained to a lot of people in the community,
23    right?
24  A   That's correct.
25  Q   Lot of people who've benefited, kids, grandkids,

22 (Pages 85 to 88)

Daniel Herrick - July 25, 2019

89

1    you name it, coming out of the REI Division,
2    correct?
3    A    I believe that's right.
4    Q    Right. So there's bound to be a lot of
5    community agitation about the decision to close
6    the REI Division, you knew that, didn't you?
7    A    Yes. I anticipated that there would be some
8    community reaction.
9    Q    And one of the things that the institution was
10   trying to do was figure out how do we message,
11   how do we explain this decision, correct?
12   A    That's correct.
13   Q    So can you tell me why Dr. DeMars' message,
14   quote, "would be much easier" if she could say
15   these three doctors screwed up and they're
16   losing their license to practice?
17   A    It's not clear to me what message she's talking
18   about or who the audience is for that message.
19   So I cannot draw that conclusion. There's a
20   number of things that could, the message could
21   refer to.
22   Q    And at no time after April 25 -- this is a
23   question -- did you have a discussion with
24   Leslie DeMars either face to face, over the
25   phone, period, about the issue that I'm

90

1    addressing here, that is, this investigation and
2    these doctors --
3    A    About the med issue?
4    Q    Yes. About the med issue.
5    A    Not that I recall.
6    Q    And about these doctors possibly losing their
7    license to practice?
8    A    I don't recall ever having a conversation about
9    that.
10   Q    In the prior paragraph, Dr. DeMars says that
11   "the messaging is very messy and we have
12   patients who are about to start meds. The right
13   thing to do is to postpone their cycles, but I
14   need three levels of message that is fair, not
15   inflammatory or defamatory, so that I can get
16   working with UVM."
17        So do you understand what she's talking
18   about here about the messages so she can work
19   with UVM?
20   A    I don't know exactly what she's talking about.
21   I don't understand "three levels of message." I
22   don't know what that means.
23   Q    In the next, paragraph, she says, "The ideal
24   message is that the because of staffing issues
25   we are stopping ART procedures, but that doesn't

91

1    answer why we can't continue doing NPW and
2    non-infertility evals." NPW is nonpregnant
3    women?
4    A    I believe that's true.
5    Q    So was there a discussion that you can recall
6    about Dartmouth-Hitchcock continuing to provide
7    services to nonpregnant women and noninfertility
8    evaluations?
9    A    Ask that again?
10   Q    Sure. What I think she's saying is I can
11   explain why Dartmouth-Hitchcock is going to stop
12   ART procedures. What's ART?
13   A    I don't know.
14   Q    All right.
15   A    I think I can guess, but I don't know.
16   Q    Well, give me your guess.
17   A    No. I don't want to guess.
18   Q    Okay.
19   A    You can give me your guess.
20        MR. SCHROEDER: Assisted reproductive
21   technology.
22   A    I think that's right.
23        MR. SCHROEDER: I know it's right.
24   Q    Well, then there we go. So we now have an
25   answer. We squared that away.

92

1    A    So now we know what it means, I still don't know
2    exactly what it means.
3    Q    You mean you don't know what the procedures are.
4    A    No, I don't know what that means for a
5    procedures.
6    Q    But she's saying why can't we continue to do
7    work --
8    A    Yes. If we shut down the program and we
9    terminate all the employees, then we obviously
10   can't do any of this work.
11   Q    By April 25, what was the discussions as you
12   understood it that either had occurred or would
13   occur in terms of working with University of
14   Vermont to provide services?
15   A    So Leslie was personally handling conversations
16   with University of Vermont to talk about the
17   options of where we might refer our patients.
18   So patients who were getting continual care for
19   maybe nonpregnancy but still needed certain
20   issues resolved or people, women who were in the
21   cycle to provide a continuum of care once we
22   shut down and that the University of Vermont was
23   one of the options that we were looking at.
24   White River was another option. We looked at an
25   option down in the Boston area. Leslie was

23 (Pages 89 to 92)

Daniel Herrick - July 25, 2019

93

1      personally managing those conversations and
2      having those conversations because they're quite
3      technical.
4   Q   Was she reporting those to you?
5   A   Only at a very high level that she was doing it.
6   Q   In the second paragraph.
7   A   On page 2.
8   Q   Yes. On page 2, please. She talks about a
9      certain process or procedure and then she said,
10     "It also prevents Misty from pulling all those
11     patients away." Was there a discussion about
12     that that you're aware of?
13  A   I believe that at high level Leslie was
14     concerned about where Misty may go if we
15     terminate our program, in terminating employment
16     for her where she could go that she had
17     previously had a relationship or had an ongoing
18     relationship with Vermont, the University of
19     Vermont, and that she may end up there and bring
20     patients with her.
21  Q   Did she suggest there were some things to do to
22     try and lessen the extent to which Misty could
23     take patients with her?
24  A   I think that she was, I mean, only if, Leslie
25     was desperate not to shut the program down. If

94

1      we hired Dan Grow, according to this paragraph,
2      if we hired Dan Grow and we didn't have to shut
3      the program down, then we wouldn't be losing all
4      those patients.
5   Q   Was it a concern of yours that if you terminated
6      Dr. Porter she might take patients with her?
7   A   It wasn't a concern of mine. I didn't have any
8      knowledge -- it would be a concern in general
9      about where our patients would go, but I was far
10     more concerned with the fact that the patients
11     would get the care that they needed than I was
12     about whether or not we would lose them as
13     patients going forward.
14  Q   So I want to talk both about sort of what was
15     going on at the time and subsequent, but would
16     it be accurate that as far as you're concerned
17     the principal issue for patients should be where
18     can they get the appropriate level of care,
19     right?
20  A   That's correct.
21  Q   Okay. And so if the appropriate level of care
22     was Dr. Porter and she's at her other
23     institution, that's not a concern to the
24     institution; if we lose a bunch of patients so
25     be it, right?

95

1   A   Well, I'm not going to say we don't want to lose
2      patients. We certainly want to keep patients,
3      but what we want to do is say we've got all
4      those patients in our program. We're
5      discontinuing our program. It's incumbent on us
6      to provide them a pathway to continue to get the
7      level of care that they deserve.
8   Q   And going out into the future, if Dr. Porter has
9      capacities that the institution doesn't have,
10     expertise that the institution lacks, the
11     institute shouldn't care in the least that the
12     patients are going some other place because
13     they're getting better care, right?
14  A   Say that again?
15  Q   Sure. If Dr. Porter can provide service, a
16     level of expertise that the institution lacks,
17     the institution shouldn't care in the least that
18     patients are going to her rather than staying at
19     Dartmouth-Hitchcock, right?
20         MR. SCHROEDER: Objection. Calls for
21     speculation.
22  A   I'll say that from my standpoint representing
23     Dartmouth-Hitchcock, first and foremost, I want
24     these women to get the care that they deserve.
25     I don't care one way or the other who does it.

96

1      I want them to go to a place that they had the
2      level of care that they deserve, and they get to
3      make that choice.
4   Q   And the institution should do nothing to prevent
5      a patient or inhibit action so that the patient
6      wouldn't be able to get services from Dr.
7      Porter, right?
8   A   Or from anyone.
9   Q   From anyone. Right. That would be unethical,
10     right?
11  A   We wouldn't do that.
12  Q   Wouldn't do it.
13         (Recess taken 12:28 - 1:07 p.m.)
14         (Exhibit 8 marked for identification)
15  Q   I'll give you what's been marked as Exhibit 8.
16     That's a two-page document with numbers 4461 and
17     4462. Do you recall receiving -- there are a
18     series of emails in here, all of whom are either
19     sent to you or you sent to others. Do you
20     recall these? Take your time. Sorry.
21  A   Okay.
22  Q   These are a series of emails that were sent on
23     the 26th and the 27th, correct?
24  A   Yes.
25  Q   Okay. So the first email in terms of time is on

24 (Pages 93 to 96)

Daniel Herrick - July 25, 2019

97

```
1        page 2, page 4462.  It's from Leslie DeMars to
2        Heather Gunnell and to you, right?
3    A   Yes.
4    Q   So this email was sent the day after that
5        two-page whatever you want to call it kind of
6        thing.  Right?  And as I read what's written in
7        her email it's the message that would be sent
8        out to the department saying here's what we're
9        going to do and here's why, correct?
10   A   That's the way I understand it.
11   Q   Okay.  And you write back and say basically you
12       agree with the message, but you want to think
13       about it overnight, correct?
14   A   Correct.
15   Q   Okay.  Were there concerns that you heard
16       expressed about how the persons in the REI
17       department were informed about the reasons for
18       closing the defendant?
19   A   About the message or about the reasons.
20   Q   Yes.  About the message.  Hey, what are we going
21       to tell these people.
22   A   Yes.  I think that yes, we just wanted to make
23       sure we were all on the same page and that we
24       were giving them a message that was clear that
25       we were going to take care of our patients and
```

98

```
1        we needed to shut down the program.
2    Q   Did you expect that for most of the people in
3        the REI Division getting an email that says
4        guess what, we're closing the division, you
5        don't have a job, would be a bit of a shock?
6    A   That wasn't the plan.  It was going to be face
7        to face.  It was going to be meetings.
8    Q   Okay.
9    A   It was not going to be done by email.
10   Q   So this message that Leslie DeMars has in the
11       April 26 email, who is this going to?
12   A   This was a message to Heather and I with
13       basically the, I assume the talking points that
14       the decision -- so the decision to close down
15       would have already been communicated, and this
16       would be how we were going to deal with the
17       patients.  The communication that we were
18       closing down REI was intended to be done face to
19       face, and I believe it was done face to face.
20   Q   The subject of her email is for your review and
21       then copy and paste to the REI Division.  Sounds
22       like it's going to be going to the entire
23       division.
24   A   Yes, but I believe it was after we had already
25       told everybody that we are closing down and this
```

99

```
1        would be specifics about how we were managing
2        the patients.  This would not be the first
3        notice.  We were not going to send this out and
4        say oh, by the way, we're closing it down and
5        here's how we're going to take care of the
6        patients.
7    Q   The idea everybody would be called in
8        individually?
9    A   I believe they had a team meeting where they got
10       people together.  My recollection is that Leslie
11       was going to talk to the providers either
12       individually or in pairs, but I believe that she
13       ended up talking to them individually serially.
14   Q   The providers, meaning the doctors?
15   A   Yes.
16   Q   Okay.
17   A   And then the team, the rest of the team was
18       pulled together with Heather and Leslie to let
19       them know what was going on.
20   Q   Was it your understanding that it would be
21       Leslie by herself?
22   A   Leslie with Heather.
23   Q   Leslie and Heather.
24   A   Yes.
25   Q   Would meet with each doctor?
```

100

```
1    A   Leslie wanted to meet, again, my recollection is
2        that Leslie wanted to meet with each of the
3        individual providers and let them know what was
4        going on one on one to give them a chance to
5        react and give them a chance to hear
6        it in a group.  And then the rest of the support
7        staff would be told as a group.  But they would
8        not be getting this message via email.  And that
9        this would be the communication about how we
10       were managing the patients.
11   Q   Did Leslie DeMars report back to you about how
12       the doctors responded to this message that we're
13       closing down the division and you're not going
14       to have a job?
15   A   She likely did.  I don't recall the specifics
16       around it.
17   Q   Okay.
18   A   She likely did.  At the very least she did
19       communicate to me that she had had these
20       conversations so that we knew that the message
21       had been delivered.  I would anticipate that she
22       shared some feedback about how they took it.
23       Maybe just what we expected, that they would be
24       unhappy, surprised, but I don't recall the
25       specifics of it.
```

Daniel Herrick - July 25, 2019

---

101

1          (Exhibit 9 marked for identification)
2    Q   I'm giving you what's been marked as Exhibit 9.
3        It's pages 8918 and 8919.  If you look at --
4        this is an email, by the way, from Heather
5        Gunnell to you, correct?
6    A   Well, to a bunch of people.
7    Q   Well, I thought it was -- tell me if I'm wrong.
8        She is sending you an email that she sent to a
9        large number of people?
10   A   Yes.  That's correct.
11   Q   Yes.  Got it.
12   A   Yes.
13   Q   All right.  And without going down through each
14       person, does this appear to be the entire
15       division?
16   A   It does appear to be.
17          (Exhibit 10 marked for identification)
18   Q   Okay.  The top of this document is an email from
19       Heather Gunnell to you, correct?
20   A   Yes.
21   Q   With a copy to Leslie DeMars?
22   A   Correct.
23   Q   And according to Heather Gunnell, apparently you
24       and she had spoken about Dr. McBean, correct?
25   A   In passing, yes, she had mentioned it and I

---

102

1        asked her to forward this, I suspect.  I would
2        typically say why don't you just send me a copy
3        of it so I can be aware of it.
4    Q   Okay.  Prior to getting this email, did you know
5        who Judy McBean was?
6    A   No.
7    Q   But I assume Heather Gunnell said basically
8        she's a doctor who does some work here.
9    A   A per diem that does work in Brattleboro, yes.
10   Q   And according to McBean's email to David Seifer
11       that the patients are confused and are starting
12       to feel abandoned.  Were there any discussions
13       that you can recall about how the patients were
14       expecting to be told about what was going on
15       with the division?
16   A   Yes.  My understanding is that the patients were
17       going to be told by each of their individual
18       providers.  So if you had 7 patients in the
19       cycle that you would reach out to them and share
20       with them that the organization had elected to
21       make a change in terms of the REI program and
22       what that meant for you specifically.
23   Q   And how were the doctors told that that was
24       their obligation?  Was that from --
25   A   That would have been from Leslie.

---

103

1    Q   Okay.
2          (Exhibit 11 marked for identification)
3          MR. SCHROEDER:  Are there documents that
4    are attached to this?  I feel like, looks like
5    there's two documents that would be attached to
6    Bates label 9567.
7          MS. NUNAN:  I can certainly ask Julia.
8          MR. VITT:  Give me two seconds and I'll ask
9    Julia to run them.
10         MR. SCHROEDER:  I just want to make sure
11   it's the complete document.
12        (Mr. Vitt leaves conference room and returns)
13         MR. VITT:  She'll bring them down.  I can
14   go ahead and we can add them to them.
15         MR. SCHROEDER:  Absolutely.
16   BY MR. VITT:
17   Q   So in her second paragraph, the one that begins
18       "A few things."  She indicates that "Dr. McBean
19       has a longstanding friendship with MBP."
20       Obviously Dr. Porter.  "It is possible she will
21       contact Misty to ask/tell her what is going on
22       when we ask her if she will arrange her schedule
23       to do the May procedures."  And there's a
24       similar comment about Dr. Lisa McGee at UVM.  Do
25       you know what she's referring to about asking

---

104

1        Dr. Porter to do the May procedures?
2    A   I don't.
3    Q   There's a reference to a care transfer plan.  In
4        the last of her comments she says "I learned
5        today MBP has a few OR cases scheduled for late
6        May that I will have to have a care transfer
7        plan.  These are cases the Generalists may be
8        able to do."
9          Do you know what that references?
10   A   I can only suspect that it refers to a couple of
11       OR cases, planned surgeries, that Misty was
12       going to do which we would transfer to another
13       provider.
14   Q   So I want to make sure I've got this right.
15       After the announcement that she was being
16       terminated, the idea was even if she had
17       something scheduled in the way of surgery that
18       somebody else would be substituted for her?
19   A   That's correct.
20   Q   So was there any discussion of how the patients
21       were to be told, you know, you thought you were
22       going to have Dr. Porter we're going to bring in
23       another person to do your surgery?
24   A   No specific discussions that I recall.  It's
25       not, it happens when a provider is out

---

26 (Pages 101 to 104)

Daniel Herrick - July 25, 2019

---

105

1      unexpectedly or there's a backlog of patients
2      that we would reach out to the patient and let
3      them know that their surgery is still scheduled
4      but that a different provider will be doing it.
5    Q  Who -- go ahead.  I'm sorry.
6    A  We would also offer the patient an option if
7      they choose not to have the surgery of course.
8    Q  And who would be making the decision about who
9      would be an appropriate person to do that
10      surgery?
11    A  That would be under the leadership of Leslie.
12    Q  As of May 1, Leslie DeMars is still the Chair?
13    A  Yes.
14    Q  We're going to mark as Exhibit 12 a two-page
15      document, pages 26715 and 26716.  The top email
16      is from Aimee Giglio to Ed Merrens.
17        (Exhibit 12 marked for identification)
18    Q  Okay.  Going to the May 1 email from Aimee
19      Giglio at the bottom of the page, you see that?
20    A  Yes.
21    Q  Apparently this was sent at 10:05 p.m., correct?
22    A  Correct.
23    Q  You often receive emails this late at night from
24      people at the hospital?
25    A  I didn't receive this email.

---

106

1    Q  Oh, I'm sorry.  Right.  Didn't go to you.  Went
2      to Merrens, Troland and John Kacavas, right?
3    A  Yes.
4    Q  She says "Thank you, Ed.  We spent extensive
5      time with her and Daniel --," that would be you,
6      right?
7    A  I would suspect it is, yes.
8    Q  Right.  " -- this evening.  I'd like to talk
9      with you about her leadership and next steps.
10      Do you recall that meeting?
11    A  I don't.
12    Q  Were any things going on around this time that
13      you can recall involving Leslie DeMars and you
14      and --
15    A  I think there was questions about, you know, now
16      that we've made the announcement and the public
17      comment was measurable, there was some question
18      as to how Leslie had been running, how we kind
19      of got into this situation.  I believe that
20      there was a meeting with Aimee, myself, and
21      Leslie although I don't recall any of the
22      details.  I suspect that we had a meeting to
23      talk a little bit about how we got here.
24    Q  Then Merrens writes an email to Aimee with
25      copies to Kacavas and Kim Troland, right?

---

107

1    A  Yes.
2    Q  Have you seen this before today?
3    A  I have not.
4    Q  Okay.  And he says, "I'm meeting with Rich and
5      Duane."  Would that be Rich Rothstein and Duane
6      Compton?
7    A  I believe Duane Compton.  I don't know why Rich
8      Rothstein -- well, yes.  I guess it would be
9      Rich Rothstein and Duane Compton.  Yes.
10    Q  That would be in connection with Leslie DeMars
11      being replaced, right?
12        MR. SCHROEDER:  Objection.  Calls for
13      speculation.
14    A  I can't confirm.
15    Q  And he goes on to say in the next paragraph,
16      "While on the surface we are pinning the
17      dissolution of our reproductive endocrinology
18      program on our failure to maintain and recruit
19      nurses for this work, it is ultimately the
20      dysfunction of the physicians who worked in this
21      area for years (as well as recent hires) and
22      ultimately a failure of leadership, for which I
23      hold Leslie fully accountable."
24        Do you agree with that?
25    A  I don't disagree with it.

---

108

1    Q  Well, do you agree with it?
2    A  I agree that the ultimate ownership and
3      accountability for the failure of the REI
4      program as it relates to the dysfunction, yes,
5      is attributable to the leadership and in this
6      case the Chair being Leslie DeMars.
7    Q  When he says "we are pinning the dissolution of
8      our reproductive endocrine program on our
9      failure to maintain and recruit nurses," what
10      he's saying is essentially that's what we're
11      telling the public, right?
12        MR. SCHROEDER:  Objection.  Calls for
13      speculation.  You can answer.
14    A  It appears that way, yes.
15    Q  And in fact, that was the message that
16      Dartmouth-Hitchcock delivered, that the reason
17      for closing the REI Division was the problems
18      recruiting and keeping the nursing staff?
19    A  Which is true.  Yes.
20    Q  I understand it's true, but it's not the reason
21      you closed the division, is it?
22    A  The reason we closed the division is because it
23      was dysfunctional.
24    Q  Right.
25    A  You can see my documents as to why I recommended

---

27 (Pages 105 to 108)

Daniel Herrick - July 25, 2019

109

1    it. It was dysfunctional.
2  Q   He goes on to report, this is Ed Merrens now,
3     "The fact that failures of such programs due to
4     nursing shortages are not common and we'll be
5     referring patients to a similar, rural academic
6     REI center in Burlington, Vermont, will make our
7     explanation to the public, patients and the
8     media, well, rather thin." Agree with that?
9  A   Not necessarily.
10         (Exhibit 13 marked for identification)
11         MR. SCHROEDER: Take your time to review
12     the whole document.
13  Q   All set?
14  A   I'm all set.
15  Q   Okay. Have you seen what we've marked as
16     Exhibit 13 prior to today?
17  A   Since my name is on it, I would say yes.
18  Q   All right. Do you recall receiving this email?
19  A   I don't recall specifically receiving this
20     email.
21  Q   Okay. Beginning email in this chain starts with
22     Ed Merrens, right?
23  A   Yes.
24  Q   And he says, "I am getting inundated with
25     heartfelt and long emails wondering why Misty

110

1     can't stay on to do her ultrasound complex
2     operative and teaching role even if we end REI.
3     I suspect that you considered this in the
4     evaluation the program and your knowledge of
5     Misty. I just need to know how better to answer
6     this question."
7         Did Ed Merrens outside this email raise
8     essentially that question with you?
9  A   I don't recall -- I will say that whether Leslie
10     was in the room or not, I do recall having
11     conversations with Ed about whether or not this
12     had been the right decision to let all three of
13     the providers go, and I did say that it was my
14     opinion that it was the right decision to make.
15  Q   One meeting or more than one?
16  A   One or two. I don't know. It wasn't a frequent
17     conversation. I know we had one conversation
18     with Leslie and me and Ed about whether or not
19     we should cut all three including Misty, and
20     then I know we had a meeting after the fact
21     where I did reiterate that I think we made the
22     right decision.
23  Q   When you say "we" on the second meeting, you
24     said just you and Ed?
25  A   No. It would have been with the three of us.

111

1  Q   Three of you.
2  A   Yes.
3  Q   So there was at least one meeting where you're
4     saying to Ed Merrens we think we should let all
5     three go, and then after the termination there's
6     another meeting in which Ed Merrens says,
7     essentially, lot of people are saying what's
8     going on, why are you firing Misty Porter, and
9     you said the right decision.
10  A   I said we shut down the program, and yes, I
11     supported our initial plan of action.
12  Q   Well, shutting down the program and terminating
13     Misty Porter --
14  A   As part of that. Yes. So my position remains
15     that when we shut the program down, we would let
16     all of the providers go because we didn't have a
17     program.
18  Q   And despite the fact that she could do other
19     work, ultrasounds, complex surgeries, et cetera,
20     decision was well, you're part of the REI
21     program, you have to go.
22  A   You're primarily part of the REI program. The
23     primary part of your work is gone, yes.
24  Q   And in response to that question, Ed Merrens
25     says hey, is this the right decision, he gets a

112

1     page and a half email from --
2  A   Leslie.
3  Q   -- Leslie. Right. Do you recall receiving a
4     copy of that email at the time?
5  A   I'm sure that I got it, and I'm sure that I read
6     it through. I'm not sure that it called for any
7     action on my part. I believe I made a point to
8     Ed Merrens that following this one-on-one either
9     in person or over email that we should hold the
10     course and keep moving.
11  Q   Okay. So in her first paragraph, she reports
12     that the attitude towards Albert and David is
13     more to, quote, don't let the door hit you on
14     the way out, close quote.
15         Did Leslie DeMars at some point in this
16     process say to you essentially two of these
17     providers, two of these doctors are not popular,
18     not well thought of, not highly regarded among
19     the staff, anything like that?
20  A   I don't recall any specific conversations
21     regarding that. Again, I focused my work on the
22     program itself. She may have said something to
23     that effect. I wasn't overly concerned with
24     whether or not they were liked by the staff.
25     The question really from my, as I said, I'm a

28 (Pages 109 to 112)

Daniel Herrick - July 25, 2019

---

113

1   bit of a mercenary. The question was is the
2   program functioning. No, it's not. It's not
3   functioning.
4   Q   So you mentioned an earlier meeting with
5       yourself, Ed Merrens and DeMars before the
6       decision was announced to terminate all the
7       providers, right?
8   A   Yes.
9   Q   Okay. How long did that meeting last?
10  A   Oh, I don't recall, I just, I just know that we
11      talked about the plan which said that we would
12      exit all of the staff.
13  Q   Exit all the staff. You mean terminate their
14      employment?
15  A   Yes.
16  Q   Okay. And in that discussion did Dr. DeMars
17      weigh in on whether all of the staff should be
18      treated the same, that they should all be
19      terminated?
20  A   I don't recall whether she did or not.
21  Q   Did Merrens ask a series of questions about
22      what's the work that they do, how good do they
23      do the work, how many patients are going to be
24      upset if they're terminated, you know, a series
25      of questions to sort of probe whether this is a

---

114

1   good decision?
2   A   I don't recall that we went into all of those
3       questions that you asked. We had provided
4       documentation with a list of all of the patients
5       that were going to be affected so that was
6       already on the table. We had already provided
7       them with a plan as to how we would or where
8       they would go for treatment. So, you know, I
9       don't recall the actual back and forth within
10      the conversations other than that that was part
11      of the content.
12  Q   I was asking more, and maybe I wasn't clear in
13      my question, probably wasn't, about whether he
14      was asking questions about the talents or the
15      capacity of the doctors. When you're going to
16      fire three doctors that doesn't happen very
17      often, right?
18  A   Right.
19  Q   Pretty unusual to tell three --
20  A   So in my mind, we didn't fire doctors. We let
21      them go because we didn't have a need for their
22      work. We shut the business down. Shut that
23      piece of the business down. And the staff that
24      were associated with that were redundant to the
25      operation, and therefore, they were let go. So

---

115

1   we didn't fire anybody.
2   Q   How many doctors are employed at
3       Dartmouth-Hitchcock?
4   A   I'm guessing 5 or 600. And I may be off. But
5       order of magnitude, it's in the hundreds.
6   Q   That's all I need to know. Are talented doctors
7       hard to find or are they a dime a dozen?
8   A   Well, we know they're difficult to find. We
9       also know that they're very specialized. That's
10      why they're so difficult to get. They're very
11      specialized.
12  Q   Okay. And if a doctor can do two or three or
13      four things well, really well, does that set
14      them apart a little bit saying I can do surgery
15      but I can also read ultrasounds, and I can do
16      "X", and I do them all at a very high level.
17      Does that make them unusual?
18  A   I don't think unusual. I think that well,
19      they're not a unicorn, but they're not
20      everywhere. That's true.
21  Q   Okay.
22  A   But we also match capacity with demand.
23  Q   Got it. And were you in a position by yourself
24      to evaluate whether Misty Porter's skills would
25      be useful in the Obstetrics and Gynecology

---

116

1   Department?
2   A   No.
3   Q   Who would you have to rely upon?
4   A   Leslie DeMars.
5   Q   In her email, Dr. DeMars says, "Everyone also is
6       remembering Misty as a full-time employee
7       wearing three hats, and not the one who has been
8       out for almost 18 months. What she has done in
9       these 18 months is help several members of the
10      department have babies (no HIPAA violations
11      here)."
12      Do you know what she's referring to about
13      people having babies?
14  A   I did not know that Misty was out on disability.
15      I have no idea what she's talking about here.
16  Q   In the second paragraph of her email, she asks,
17      "What's the talking point? My suggestion is,
18      quote, we are working with each physician on
19      their employment options as well as what is best
20      for DH and DH Ob/Gyn. I don't know how you say,
21      quote, I understand you're angry but this
22      decision was made in the best interests of the
23      division and Misty. Even if that's the truth,
24      no one will buy that at the moment."
25      Was there a discussion of having a talking

---

29 (Pages 113 to 116)

Daniel Herrick - July 25, 2019

117

1      point the way she describes it in a second, I
2      know you're angry, but we made the best decision
3      for the division and for Misty?
4    A  I'm not aware of any conversations, and I don't
5      believe I was ever part of a conversation about
6      a talking point related to that.
7    Q  On the second page, about halfway down, she
8      says, "Misty's medical disability has been
9      devastating, and I'm not sure that she should or
10     will really ever be able to do the complex
11     hysteroscopy or laparoscopy that she once did.
12     That being said, there are a few full spectrum
13     REI docs that could bring similar surgical
14     skills, but they are hard to find. I think that
15     the best outcome of this termination is the
16     chance for Misty to actually be out on leave
17     with no intervening responsibilities, so that
18     she can assess how much improvement she might
19     gain."
20         So I understand you said look, I didn't
21     know she was on disability, right?
22   A  Right.
23   Q  Are you aware of any efforts that were made by
24     Leslie DeMars or anyone else to get a handle on
25     whether or not she would ultimately be able to

118

1      come back at the same level of skill and stamina
2      that she had before?
3    A  I'm not aware. I'm not even aware what her
4      disability is.
5    Q  At the top of the email, at the top of this
6      page, second page, Leslie DeMars writes, "The
7      most desirable outcome for the department would
8      be if Misty could continue to do ultrasound and
9      be a worker bee in a new REI Division. Daniel,
10     Heather and I thought about the consequences of
11     trying to do that knowing Misty's past behavior
12     and her inability to be just a worker bee."
13         Were you involved in any such discussions?
14   A  The conversation that reflects the conversations
15     that Heather, Leslie and I had where Leslie
16     continued to explain the challenges of working
17     with Misty and that Misty was a disruptive
18     behavior.
19   Q  I don't think you mentioned that before.
20   A  Okay.
21   Q  So tell me about that conversation.
22   A  So we've had, as we were, I know that I at times
23     as we were talking about putting this program
24     together, closing down the program and looking
25     forward to go forward, where Leslie described

119

1      Misty as being a disruptive behavior, disruptive
2      influence on the team at times and that she
3      leveraged her friendship with, previous
4      friendship with Leslie to try to influence how
5      things happened.
6    Q  Is this one conversation or more than one?
7    A  Probably a couple but not specific to this, but
8      probably a couple.
9    Q  And the person who's making these comments was
10     Leslie, right?
11   A  It's all Leslie.
12   Q  All Leslie. Okay. And she said Misty Porter is
13     a disruptive influence at times.
14   A  Yes.
15   Q  What does that mean?
16   A  That means that, well, based on what, I guess
17     you'd have to ask Leslie.
18   Q  Did anybody ask her what does that mean?
19   A  Leslie just explained that she tries to use her
20     previous friendship to influence behaviors of
21     Leslie and of the team and that she is
22     disruptive at times.
23   Q  There's a lot of behavior that might fall within
24     the term "disruptive," right?
25   A  Yeah, there is.

120

1    Q  Pretty wide range.
2    A  Yes.
3    Q  You can in the office and throw things and yell.
4      That would be disruptive, right?
5    A  That would be disruptive, yes.
6    Q  Or you could have really demanding standards and
7      insist that people meet those. Some people
8      might say that's disruptive, right?
9    A  Some people might.
10   Q  And there's something sort of the middle. You
11     could say, you know, she doesn't show up on time
12     or she misses appointments or patients don't
13     like her. So saying somebody's disruptive
14     doesn't tell you a whole lot about whether
15     they're a good employee, does it?
16   A  No, it doesn't.
17   Q  Okay. So did anyone in the conversations you're
18     talking about get down to a little granular
19     level saying look, here's what she does that
20     really makes it difficult?
21   A  I don't recall any conversations about that and
22     I didn't write this. This is Leslie's
23     recollection of our conversation.
24   Q  Right. In general did you find Leslie DeMars to
25     be an accurate reporter of what people said?

Daniel Herrick - July 25, 2019

121

1   A   Not always.
2       (Exhibit 14 marked for identification)
3   Q   I show you what's been marked Exhibit 14.
4       Have you read it?
5   A   I've read it.
6   Q   So you begin, this is a email that you wrote to
7       Ed Merrens, right?
8   A   Yes.
9   Q   And "Ed, I am not including Leslie in this
10      response," close quote.  Why?
11  A   I elected not to include her.
12  Q   I bed your pardon?
13  A   I elected not to include her.
14  Q   There have been a fair number of emails which
15      we've identified and much more that I could pull
16      out where you, Leslie DeMars, Heather Gunnell
17      are going back and forth on a ton of issues.
18      This is the first one I've seen that doesn't
19      include her.  So what happened?
20  A   I was trying to -- I just decided that this
21      would not be helpful for me to share with
22      Leslie.
23  Q   In what respect?
24  A   It would not help our personal relationship in
25      terms of going forward.

122

1   Q   Did you expect there was going to be a personal
2       relationship going forward?
3   A   She was the Chair and I was her administrative
4       partner.  As long as she was the Chair, there
5       would be that relationship.
6   Q   Were you aware of discussions as of May 12 about
7       the possibility of her stepping down voluntarily
8       or involuntarily as the Chair?
9   A   So I don't know exact date.  Likely I was aware
10      that the conversations were going on, but I also
11      had been aware that no decision had been made.
12  Q   And who was involved in those discussions?
13  A   That would have been Ed Merrens and Maria Padine
14      and whoever else they would talk to.  Perhaps
15      Aimee Giglio.
16  Q   Had anyone asked your opinion, not in writing
17      but some shape, matter or form, essentially,
18      Daniel, should we keep her, should she step down
19      as Chair, anything like that?
20  A   Something like that, sure.
21  Q   And how did you weigh in?
22  A   That we could probably, that another Chair would
23      probably be more effective.
24  Q   So as of this date, you'd already weighed in
25      saying we ought to get her to step down, right?

123

1   A   That another Chair would be more effective than
2       her.
3   Q   Okay.  In the next sentence you say, "Based on
4       my observations and interactions, Misty has been
5       the biggest driver to the dysfunction within
6       REI."  What observations are you referring to?
7   A   So all of this would have been based on
8       observations in her interactions with Leslie and
9       Heather about what was going on in terms of
10      conversations, and in terms of how this
11      program -- observations may not have been an
12      appropriate word, but it was my interactions and
13      discussions with Leslie and Heather related to
14      the fact that Misty was the biggest issue.
15      Leslie continued to say that a number of times.
16  Q   Okay.  So am I correct based upon what you just
17      said in concluding that you had no observations
18      of Misty Porter's behavior?
19  A   Yes.  That's correct.
20  Q   Okay.
21  A   I have no observations of Misty herself related
22      to this, any negative or positive.
23  Q   Have you met her?
24  A   Yeah, I've met her a few times, but I've never
25      really interacted with her other than socially,

124

1       you know, hi, how are you said in a meeting.
2       Never been in an operating room with her, never
3       been with a patient with her.
4   Q   Okay.  So in terms of how she deals with
5       patients, her talents as the ultrasound or in
6       the OR, you have no information that you can
7       provide about any of those today?
8   A   That's correct.  So this is intended to be more
9       about my interactions.  Observations is again
10      inarticulate.  My observations or my
11      interactions with Leslie and the feedback that I
12      get from Leslie and from Heather.
13  Q   So tell me what Heather Gunnell said about Misty
14      being a driver of dysfunction.
15  A   I think, I can't quote her specifically.  I
16      would say she confirmed with Leslie and maybe
17      gave examples that I can't rely on from a
18      specific standpoint regarding the fact that
19      Misty is able to manipulate Leslie.  So as an
20      example, again, I don't have specifics, but
21      Leslie and I or Leslie and Heather and I or
22      Leslie and Heather may have a conversation and
23      Leslie will agree on a plan of action.  Once
24      that conversation between Leslie and Misty
25      happens, Leslie will come back and have a

31 (Pages 121 to 124)

Daniel Herrick - July 25, 2019

125

1    different strategy because Misty has been able
2    to influence her, particularly when we were
3    talking about trying to change the way we run
4    the clinics.
5        As I mentioned earlier this morning, each
6    of the physicians had their own nurse and their
7    own way of doing things, and we agreed that
8    working with the Value Institute that we were
9    going to try to get some standard work. Get
10   everybody to do that. Leslie was on board with
11   that. Leslie had conversations with Misty and
12   the other providers about that and then came
13   back and wasn't sure anymore that we should do
14   that. So she was influenced by Misty.
15   Q   How do you know that each time there was a
16   conversation Leslie came back with a different
17   view or different take that it was Misty?
18   A   I don't know. Only because Leslie had told
19   either Heather or I that that was the case.
20   Q   Did you have concerns that Leslie DeMars might
21   not be a particularly accurate reporter?
22   A   Yes. I answered that question a minute ago and
23   said yes.
24   Q   So if she says Misty said X, Y or Z she might be
25   using that has an excuse, right?

126

1    A   It's possible.
2    Q   And in considering Misty's actions in the
3    clinic, did anyone express the view that having
4    to work with people who are incompetent might
5    make you a little short-tempered?
6    A   I've never heard that. Related from Misty?
7    Q   That is working with doctors who are incompetent
8    and do not know how to perform their services in
9    a workmanlike way might make you a little
10   short-tempered?
11   A   I don't recall that. I wouldn't disagree with
12   it, but I don't recall it.
13   Q   So in fact, if you have to work with somebody
14   who doesn't know how to do their job and you
15   constantly have to correct them and work with
16   them, it could make you a little short-tempered,
17   right?
18   A   Of course it would.
19   Q   Take a quick break?
20       (Recess taken 2:05 - 2:21 p.m.)
21   BY MR. VITT:
22   Q   When we broke we were talking about Exhibit 14,
23   email to Ed Merrens, right?
24   A   Yes.
25   Q   You mentioned some comments that have been made

127

1    to you about Dr. Porter, and I want to make sure
2    that I've got a complete list of whatever was
3    said to you about her. So any other comments
4    you can recall by either Heather Gunnell or
5    Leslie DeMars other than the ones you've already
6    mentioned?
7    A   No. I mean, I would also point out what it says
8    in the email here. That there's no question of
9    her competence. It was about her behavior.
10   Q   Was anything said about keeping Beth Todd?
11   A   I'm sure there was. I don't recall any
12   conversation regarding that.
13   Q   Other than the information you provided in the
14   past ten, 15 minutes, about conversations
15   regarding Misty Porter, are there any other
16   observations or interactions to which you refer
17   in the email about Misty Porter that you can
18   recall?
19   A   No. The only conversations that I believe I
20   had, primarily conversations, would be with
21   Leslie and Heather, and Leslie's, Leslie
22   struggled with, I think I mentioned earlier.
23   They used to be peers and then Leslie became the
24   Chair and they were friends outside of work and
25   that Leslie mentioned on more than one occasion

128

1    that she felt Misty did everything she could to
2    manipulate her and manipulate their relationship
3    to get whatever it was that she wanted.
4    Q   Did Leslie talk about, at least to you, that
5    you're aware of, why she was unable to
6    apparently avoid or stand up to Misty when this
7    attempted manipulation took place?
8    A   She was conflicted because of her friendship and
9    her ability to be both a friend and a leader.
10   She wanted to be both. She was conflicted.
11   Q   But other than what you've told me today, there
12   are no other observations or reactions that you
13   can recall?
14   A   I can't recall any.
15   Q   Okay.
16       (Exhibit 15 marked for identification)
17   Q   I'll show you what has been marked as 15. Have
18   you had a chance to look at it? I'm sorry.
19   A   Okay.
20   Q   Okay. There is no author identified on this
21   document, but I believe it was prepared by
22   Heather Gunnell.
23   A   I have no way of knowing.
24   Q   And at the bottom of the page there's the
25   heading "Comments from LRD," colon, and then a

32 (Pages 125 to 128)

Daniel Herrick - July 25, 2019

---

129

1    series of comments, right?
2    A    Yes.
3    Q    There's a reference to a "Division Director
4    meeting 5/18/17: explained REI closing largely
5    due to dysfunction."
6         Do you know what Division Director meeting
7    is being referenced there?
8    A    I do not.
9    Q    Okay.  And the next bullet is "Working on a way
10   to keep MBP."  Below that, "Senior leadership
11   has no appetite to support women's health,"
12   colon, and after that, "Senior leadership did
13   not consider the implications of REI shutdown to
14   the department."  And then below that, the
15   bullet, "Now that the media backlash is what it
16   is, we are in a position to get what we need."
17   And then I'll come back to the end of it in a
18   moment.
19        Do you recall being informed in substance
20   that Leslie DeMars had been making some or all
21   the comments that are referenced here?
22   A    So let me answer your other question first.  Now
23   that I look at this, so the Division Director
24   meeting would have been division for the OB/GYN
25   only.  So it would have been Heather, Leslie and

---

130

1    the OB/GYN team, whoever would comprise that.
2    And so this was not a Director's meeting at
3    large.  This was an open GYN meeting, and that's
4    my interpretation to the best of my ability.
5         Some but not all of these comments fit with
6    comments that I heard about Leslie in terms of
7    her explanations to what was going on.  Yes.
8    Q    Which one doesn't fit?  Or which ones?
9    A    So I did know that she was continually looking
10   at ways to keep Dr. Porter on, and I did know
11   that she had said at times that she was
12   questioning whether or not senior leadership
13   fully supported the women's health program.
14   Q    That must have annoyed people.
15        MR. SCHROEDER:  Objection.  Calls for
16   speculation.
17   Q    Your people say something towards the effect of
18   what are you talking about, of course we support
19   women's health?
20   A    Well, at the senior leadership level, they would
21   all say that, yes.  I would say it as well.
22   Q    Okay.  And then the bottom bullet is, "When
23   asked who specifically:  Ed, Dan J., Steve L.
24   So "Dan J." is Dan Jansen?
25   A    Yes.

---

131

1    Q    Who's "Steve L." ?
2    A    I would have to say it's likely Steve LeBlanc.
3         (Discussion off the record)
4    Q    Exhibit 16, three-page document 9476, 9478.
5         (Exhibit 16 marked for identification)
6         MR. SCHROEDER:  Are we putting in the other
7    document separately?
8         MR. VITT:  Yes.  It's on its way.
9         MS. NUNAN:  I apologize.
10        MR. SCHROEDER:  That's okay.
11   BY MR. VITT:
12   Q    Have you had a chance to look at this?
13   A    Yes.
14   Q    And the email that goes on for two and a half
15   pages is from Leslie DeMars to Kris Strohbehn,
16   Emily Baker, Miriam Cordell, Regan Thieler,
17   Heather Gunnell and Tim Fisher with a copy to
18   herself.  Who are the individuals, if you know,
19   who received a copy of this?
20   A    Kris Strohbehn, I believe, is the Chair of share
21   of UroGyn as part of the -- Emily Baker is the
22   Chair or not Chair.  I'm sorry.  Let me start
23   again.
24        Kris Strohbehn is the Section Chief for
25   UroGyn.  Emily Baker, I believe, is the Section

---

132

1    Chief for the birthing pavilion.  Miriam
2    Cordell, not sure exactly.  Regan Thieler who I
3    think was left was the section chief for one of
4    the other sections.
5    Q    She's at Mayo now.
6    A    Okay.  Heather is the Director, and Tim Fisher,
7    I believe, is in charge of education, training
8    and things like that.  So this would be the
9    leadership team that reports to Leslie being the
10   section chiefs and the Director, of course.
11   Q    Okay.  And the subject is "unanticipated
12   downstream effects."  Does it appear to be her
13   take on the downstream effects of closing REI
14   Division?
15   A    Harms that result from closing REI.  So yes, I
16   would expect that -- that's my interpretation.
17   Q    Okay.
18   A    This is the first time I've seen this.
19   Q    So she goes through the Financial, Educational,
20   Academic, Clinical care, Personal/faculty,
21   IVF/ART services, Patients.  Those are the
22   categories, right?
23   A    Yes.
24   Q    When there were discussions about whether or not
25   to close the REI Division, did Dr. DeMars

---

33 (Pages 129 to 132)

Daniel Herrick - July 25, 2019

133

1   present to you anything close to or similar to
2   what's reflected in this email?
3   A   I don't recall seeing anything like this.
4   Q   I don't do this kind of work, but it seems like
5       a lot of effort went into preparing this.  Does
6       it seem that way to you?
7   A   Yes.
8   Q   Do you know any reason this couldn't have been
9       provided before the decision was made?
10  A   I'm not sure of the validity of all of the data.
11      Much of the data, not counting the financials,
12      much of the data is assessments based on
13      operations within a group.  I will say that we
14      did have the financials for the REI Division.
15      We knew what the profit was for one division,
16      what the loss was in another so we did have a
17      very good understanding of what the loss would
18      be.  It was minimal.
19  Q   Loss if you closed, you mean?
20  A   The net loss.  So the program was marginally
21      profitable, I think $77,000 or ballpark.  177,
22      something like that.  For a program that size
23      that doesn't include any overhead allocation, so
24      on.  So when we took the decision to shut it
25      down, we had a very good idea of what the

134

1   financial impact would be.  So this financial
2   data is certainly perhaps worthwhile but would
3   not have affected our decision.  We had, we did
4   do a due diligence from a financial perspective
5   before we made the decision to close.
6   Q   But it's the other materials, Educational,
7       Academic, Clinical care, Personal/faculty,
8       IVF/ART and Patients, that is kind of what you
9       call operational.
10  A   So we did have some conversations related to the
11      educational component as we mentioned very early
12      this morning about its impact on residents and
13      fellows, whomever would be from an academic and
14      an education standpoint.
15      The clinical care, you know, again is part
16      and parcel to the work that was within that so,
17      again, we talked about that earlier today.  The
18      work that it constitutes, what is an IVF, REI
19      program.
20      (Discussion off the record)
21      MR. VITT:  We're going to mark as a new
22      Exhibit 15 pages 15547 and 15548.  Earlier we
23      had marked only 15548, not 15547, and that page
24      reflects that there was a 6/6/2017 email from
25      Heather Gunnell to Daniel Herrick.

135

1   (Exhibit 15 remarked for identification)
2   Q   We're going to mark as Exhibit 17 a one-page
3       document, 13227.  Two emails from Ed Merrens and
4       then an email response from Maria Padine.
5       (Exhibit 17 marked for identification)
6   Q   Seen this before?
7   A   Yes.
8   Q   So the bottom message, the first one is from Ed
9       Merrens to Leslie DeMars with a copy to you.
10  A   Yes.
11  Q   Subject, "Revised draft message - look ok"?
12      This is a message that would be sent basically
13      to the community at large?
14  A   Yes.
15  Q   And says "Dr. DeMars has indicated her desire to
16      step down from her Service Line and Department
17      Chair role in OB/GYN this summer."
18      Had you been involved in discussions prior
19      to June 22 about Dr. DeMars stepping down as a
20      Service Line and Department Chair?
21  A   I was aware of it, but I don't believe that I
22      had any input other than I would have no problem
23      with this.  I concur that this would make sense.
24  Q   Would it be accurate based on what you've said
25      earlier for me to conclude that it was Ed

136

1   Merrens and Maria Padin who made this decision?
2   A   Yes.
3   Q   Was there a particular meeting that you're aware
4       of where the decision was made to have -- let me
5       back up.
6       Ed Merrens' email doesn't say directly that
7       a decision had been made to have Dr. DeMars step
8       down as Chair.  It suggests that this was
9       voluntary.
10  A   Yes.
11  Q   It wasn't voluntary at all, was it?
12  A   I would say, well, I don't know.  Voluntary with
13      encouragement?  Well, so it's a hard question to
14      answer because I believe that Dr. DeMars perhaps
15      had conversations with Maria and/or Ed about
16      what is her future, what would make sense, and
17      they may have reached a mutual agreement that
18      this would make sense.  So she was not outright
19      terminated or told to step down, my
20      understanding, but certainly it was a two-way
21      conversation.  That's my view.  I don't know.
22  Q   At around this time, and I'm referring to say
23      June 1 to the 22nd, during that few week period,
24      were you asked by either Ed Merrens or Maria
25      Padine whether you believed it would be good for

34 (Pages 133 to 136)

Daniel Herrick - July 25, 2019

137

1    the institution to have Leslie DeMars step down
2    as Chair?
3  A    In not those exact words, yes.
4  Q    But the summary idea was what do you think,
5    would this be good, and I take it you weighed in
6    and said yeah?
7  A    I felt as her administrative partner that it
8    would be better for her and for the
9    organization, yes, that was my personal opinion.
10  Q    Better for her how?
11  A    I think that being a leader was quite stressful
12    for her. Being a Chair was very stressful for
13    her. I think she -- anyway, it was very
14    stressful.
15  Q    What did you understand she would be doing?
16  A    It was unclear to me exactly at this point what
17    she would be doing other than -- well, I was not
18    clear.
19        (Exhibit 18 marked for identification)
20  Q    Exhibit 18. You're not shown as one of the
21    recipients of these series of emails. Were you
22    aware of the effort that Katherine Pizzuti
23    references about working on a comprehensive
24    business plan for a new REI program?
25  A    Yes, I was aware that Liz Erekson, the Interim

138

1    Chair, was working on a comprehensive plan. She
2    was also a candidate for the permanent Chair
3    position although she didn't get it, but as one
4    of members of the OB/GYN team and prior as the
5    Interim Chair she had begun to put together a
6    plan. And would have been a proposal.
7  Q    Heather writes to her in the middle on the first
8    page of this, "Ed," this is to Katherine
9    Pizzuti, "Ed, Maria, Joanne Conroy and Daniel
10    Herrick are all aware and supportive of the fact
11    that we are putting together a business plan
12    proposal to restart the program."
13        Was there discussion in the late summer or
14    fall of 2017 about a timing, about a plan that's
15    underway?
16  A    No. No specific timing. Just a future plan.
17  Q    Is that still where we are today? A future
18    plan?
19  A    Yes. It's still a future plan.
20  Q    Any goal or point in the future where this plan
21    would come to some sort of --
22  A    As I mentioned this morning, if Liz had become
23    the permanent Chair, we probably would have been
24    closer to actually bringing forth a proposal
25    ready to go. Now that we have a new Chair,

139

1    we'll give that Chair a chance to review that
2    particular proposal and begin to integrate that
3    and see how she deals with that going forward.
4        (Exhibit 19 marked for identification)
5  Q    Do you recall receiving this?
6  A    Yes.
7  Q    Who's Debra Birenbaum?
8  A    She's, I don't know exactly. She's one of the
9    members of the OB/GYN team. I don't know
10    exactly who she is.
11  Q    A physician?
12  A    I believe so.
13  Q    And what do you recall receiving this? I mean,
14    what about this email sticks in your mind?
15  A    I just remember that this was a note from a peer
16    who was distressed at this decision.
17  Q    In her third paragraph, Dr. Birenbaum says,
18    "Misty's expertise in gyn ultrasound far excels
19    that of the general radiology staff and in fact
20    most of us in general as well."
21        Did you have any reason to doubt or
22    disagree with that expression about the level of
23    her expertise?
24  A    I'm not in a position to make that decision, but
25    I had no reason to doubt it.

140

1  Q    The next paragraph she says, "Misty is also
2    currently our only surgeon that does advanced
3    hysteroscopic procedures including difficult
4    myomectomies and repair of uterine
5    abnormalities. She also has done complicated
6    laparoscopic procedures for treatment of
7    endometriosis and other benign conditions."
8        Do you know whether that's an accurate
9    statement?
10  A    I don't know that it's an accurate or
11    inaccurate.
12  Q    Let's take a quick break.
13        (Recess taken 2:55 - 3:02 p.m.)
14  Q    We're going to mark as Exhibit 20 a three-page
15    document, 15544 to 46.
16        (Exhibit 20 marked for identification)
17  Q    Okay. This document is an email from Heather
18    Gunnell to you, correct?
19  A    Yes.
20  Q    And the second page of the attachment, page
21    15546, the middle of the page has a heading
22    "Daniel 07 June 17" and then three paragraphs.
23    Are those three paragraphs something you wrote?
24  A    It appears to be. The first two paragraphs make
25    sense to me. The third one I'm, yes, I guess I

35 (Pages 137 to 140)

Daniel Herrick - July 25, 2019

---

141

1      did write that.  So that's a yes.
2   Q   All three?
3   A   This is my work.  Yes.
4   Q   And Tim Fisher has the position having to do
5      with education of residents and --
6   A   Yes, academics and research, I believe.
7   Q   And was the meeting with Tim Fisher about the
8      REI Division, Leslie saying messages being
9      delivered or was it about something else and you
10      just happened to get on to this?
11   A   No, this was a one-on-one meeting where I sought
12      him out because he had been in that meeting.
13   Q   And why did you want to talk to him?
14   A   I wanted to confirm some of the things that had
15      been said, and I had known him.  I knew him, of
16      all of the providers I knew him.  He came from
17      Keene, and I knew him from down there, and so I
18      felt that I could reach out to him and get a
19      fair assessment of what had been said during
20      that meeting.
21   Q   In fact, he reports, yeah, Leslie is going
22      around and basically saying these things about
23      not getting the support from senior leadership,
24      et cetera, right?
25   A   Right.

---

142

1   Q   And then apparently the way I read this, tell me
2      if I'm right, after talking to Tim Fisher, you
3      spoke to Leslie?
4   A   That's correct.
5   Q   And what did she tell you?
6   A   That she thought it was Paul Manganiello who
7      shared some of the public information on
8      Facebook and that she had asked him to remove
9      it.
10   Q   The document before your comments about who's on
11      the REI team and various other items, this is
12      all being written after the closing, right?
13   A   Yes.  I believe.  I believe that this was in
14      response to certain pieces information that were
15      shared publicly and we were wondering, the
16      organization was wondering how this information
17      had become public.  So this would be a list of
18      who had inside knowledge and then this was an
19      addendum to that.  My comments were an addendum
20      to that.
21   Q   When you say "leadership was wondering," who are
22      we talking about?
23   A   Ed, Maria, me.
24   Q   And why was that a concern?
25   A   Just wondering how information like that could

---

143

1      get out so that we could make sure we would be
2      in a position to anticipate how to respond,
3      public pressure, public information.
4   Q   I have nothing further.
5         MR. SCHROEDER:  I don't have any questions
6      at this time.
7         (Deposition ended at 3:07 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

144

I have carefully read the foregoing
deposition, and the answers made by me are true.


_____
DANIEL HERRICK


STATE OF _____

_____, SS.

At_____on the
_____ day of _____ A.D.
2019, personally appeared the above-named DANIEL
HERRICK and made oath that the foregoing answers
subscribed by him are true.
                Before me,


_____
Notary Public

---

36 (Pages 141 to 144)

Daniel Herrick - July 25, 2019

145

### C E R T I F I C A T E

I, Cynthia Foster, Registered Professional Reporter and Notary Public, do hereby certify that the foregoing pages, numbered 6 through 143, are a true and accurate transcription of my stenographic notes of the Deposition of DANIEL HERRICK, who was first duly sworn by me, taken before me on July 25, 2019, for use in the matter indicated on the title sheet, as to which a transcript was duly ordered;

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this transcript was produced, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

Cynthia Foster, RPR
Comm. expires: 1/31/2021