# EXHIBIT D

# In The Matter Of:

*Misty Blanchette Porter, MD v.*
*Dartmouth-Hitchcock Medical Center, et al.*

*Heather Gunnell*
*Vol. 1*
*August 2, 2019*
*Confidential*

*Verbatim Reporters*
*(802)869-1665*
*verbatim@vermontel.net*

Original File 8219GUNNELL.TXT
**Min-U-Script® with Word Index**

2:17-cv-00194-kjd   Document 139-6   Filed 01/29/20   Page 3 of 13
Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.
Confidential
Heather Gunnell - Vol. 1
August 2, 2019

CONFIDENTIAL                                                                 Page 1

```
                    UNITED STATES DISTRICT COURT
                         DISTRICT OF VERMONT
                       Case No. 5:17-cv-194
 MISTY BLANCHETTE PORTER, MD,    )
                                 )
                     Plaintiff   )
                                 )
 vs.                             )
                                 )
 DARTMOUTH-HITCHCOCK MEDICAL CENTER,)
 DARTMOUTH-HITCHCOCK CLINIC,     )
 MARY HITCHCOCK MEMORIAL HOSPITAL,)
 and DARTMOUTH-HITCHCOCK HEALTH, )
                                 )
                     Defendants  )
```

                    D E P O S I T I O N
                             of
                      HEATHER GUNNELL
                         Volume I

     Taken at the law offices of Vitt & Associates, PLC, 8 Beaver Meadow Road, Norwich, Vermont on Friday, August 2, 2019 commencing at 10:00 a.m. before Sunnie Donath, RPR

                      Verbatim Reporters
                        (802)869-1665
                    verbatim@vermontel.net

---

CONFIDENTIAL                                                                 Page 2

APPEARANCES:

GEOFFREY J. VITT, ESQUIRE
SARAH H. NUNAN, ESQUIRE
Vitt & Associates, PLC
8 Beaver Meadow Road, PO Box 1229
Norwich, Vermont 05055
     On behalf of the Plaintiff

KATHERINE BURGHARDT KRAMER, ESQUIRE
KBK Law, 6 Mill Street
PO Box 23, Middlebury, Vermont 05753
     On behalf of the Plaintiff

JESSICA E. JOSEPH, ESQUIRE
Foley & Lardner, LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199-7610
     On behalf of the Defendants

Also Present:  Misty Blanchette Porter, MD

                      Verbatim Reporters
                        (802)869-1665
                    verbatim@vermontel.net

---

CONFIDENTIAL                                                                 Page 3

                    INDEX OF EXAMINATION
Witness              Examined By        Page    Line
Heather Gunnell      Atty. Kramer         5      4


                     INDEX OF EXHIBITS
                                                  Page
1 - 7/6/15 Email Chain, DH0021277-78               55
2 - 5/7/16 Email Chain, DH0026525-26               65
3 - 5/13/16 Email Chain, DH0026723-24              66
4 - 2/16/17 Email Chain, DH0025441-42             114
5 - 4/19/17 Email w/attachment                    132
    DH0009582-83
6 - 4/19/17 Email w/attachment                    150
    DH0009574-76
7 - 4/27/17 Email Chain, DH0008918-19             167

                       *  *  *  *  *

                      Verbatim Reporters
                        (802)869-1665
                    verbatim@vermontel.net

---

CONFIDENTIAL                                                                 Page 4

     S T I P U L A T I O N S

     It is hereby stipulated and agreed by and between the attorneys of record for the respective parties hereto as follows:

     1. That the testimony of HEATHER GUNNELL may be taken pursuant to the Federal Rules of Civil Procedure, and treated as if taken pursuant to notice and order to take depositions and that all formalities of notice and order are waived by the parties, and the signatures to the stipulation are in like manner waived;

     2. That all objections except as to matters of form are reserved until the deposition or any part thereof is offered in evidence;

     3. That the deposition may be signed by the said HEATHER GUNNELL before any notary public.

                       *  *  *  *  *

2:17-cv-00194-kjd    Document 139-6    Filed 01/29/20    Page 4 of 13

Misty Blanchette Porter, MD v.                Confidential                Heather Gunnell - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                August 2, 2019

CONFIDENTIAL                                                                  Page 41

1 of years.
2 Q. How did you know how to handle the job? It sounds
3   like it was, it was a little bit different from what
4   you had done previously. When you showed up as the
5   practice manager, how did you get trained? What did
6   you, what did you do to learn how to fill the job?
7 A. The, I'm, I'm chuckling because it's a long
8   process. Yes, there was a fair amount of training.
9   Karen had put together a, you know, really
10  comprehensive, You need to meet with all of these
11  people and go through this. I did a lot of listening.
12  I met with everyone who would meet with me to talk to
13  them. I went through some Lean Six Sigma training to
14  be able to learn how to do that better. But I, I had a
15  long history of management and program management, and
16  I did not go into that job completely green.
17 Q. What is Lean Six Sigma?
18 A. It's a process improvement methodology.
19 Q. Do you know anything about the origins of Lean Six
20  Sigma?
21 A. I, I can't recall all those details right now.
22 Q. Do you remember -- what do you remember from that
23  training?
24 A. I remember a lot of focus on the, the process of
25  trying to ascertain and come to a root cause, the

CONFIDENTIAL                                                                  Page 42

1  process of gathering data and including your team and
2  change management. It's a very comprehensive. It was
3  about a year process that I went through.
4 Q. A year of training?
5 A. Yes.
6 Q. Is that a continual process? Have you done more
7  Lean Six Sigma training since the beginning?
8 A. No.
9 Q. And is that a, a management philosophy that's
10  embraced by the institution overall?
11 A. That's correct.
12         ATTORNEY KRAMER: Is it okay to take a quick
13  break?
14     (A recess was taken from 10:50 a.m. to 11:04 a.m.)
15  BY ATTORNEY KRAMER:
16 Q. You had testified earlier that you exchanged text
17  messages with Regan Tyler?
18 A. Yes.
19 Q. Who is Regan Tyler?
20 A. She was the division director for the generalist
21  division.
22 Q. How long did you work with Dr. Tyler?
23 A. I don't remember exactly when she left, but three
24  to four years.
25 Q. Why did you exchange text messages with her?

CONFIDENTIAL                                                                  Page 43

1 A. I don't know. We would, we would get together
2  about once a year to celebrate our new work, like, our
3  work anniversary, and we were friendly.
4 Q. Why her and not the other providers in the
5  department?
6 A. I don't know.
7 Q. Was there something different about your
8  relationship with her?
9 A. I got along quite well with Dr. Tyler.
10 Q. Why do you think that is?
11 A. Our personalities clicked. We started at the same
12  time, and so we were both trying to figure out and
13  navigate the Dartmouth-Hitchcock system together, and I
14  worked with her a lot with her division.
15 Q. Did you exchange text messages with any of the
16  other providers?
17 A. Probably occasionally but nothing of note. The
18  similar type of running late for a meeting, etc.
19 Q. Do you give out your cell phone number to work
20  colleagues?
21 A. Yes.
22 Q. Why is that?
23 A. So that they can reach me when they need me.
24 Q. Let's, let's focus on 2014 when Dr. Hsu, Albert
25  Hsu, joined REI.

CONFIDENTIAL                                                                  Page 44

1 A. Okay.
2 Q. Who is Dr. Hsu?
3 A. Dr. Hsu was an REI provider who came on board the
4  REI division right after his fellowship.
5 Q. And do you remember when it was that you first met
6  Dr. Hsu?
7 A. I met him when he started working at
8  Dartmouth-Hitchcock.
9 Q. I believe that was at some point in 2014. Do you
10  remember when specifically?
11 A. I don't remember when specifically.
12 Q. What was your initial impression of Dr. Hsu?
13 A. He seemed like a very nice guy.
14 Q. Anything else?
15 A. No.
16 Q. Did your impression of him change over time?
17 A. Yes.
18 Q. How so?
19 A. The more I got to know Albert, the more, Dr. Hsu,
20  the more I realized that he took a fair amount of
21  managing.
22 Q. What sort of managing?
23 A. He was very high need and very -- he communicated
24  a lot, so it would take a lot of conversations with him
25  to suss out what he needed from me and what we could do

2:17-cv-00194-kjd   Document 139-6   Filed 01/29/20   Page 5 of 13

Misty Blanchette Porter, MD v.  Confidential  Heather Gunnell - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.  August 2, 2019

CONFIDENTIAL                                                    Page 65

 1   whatever actions that team of people decided were
 2   necessary.
 3        (Deposition Exhibit 2 marked.)
 4   Q.  Let me show you -- this will marked as Exhibit 2.
 5   This has been -- did you have a chance to read it?
 6   A.  Um-hum.
 7   Q.  Yes?
 8   A.  Yes.  Well, I was finishing.  Yes, I have read
 9   this.
10   Q.  Okay.  So this has been marked as Gunnell Exhibit
11   2, DH26525 and 26.  It's an email chain regarding an
12   issue with a patient, MK.  The top email is Dr. Hsu
13   sending this to you.  Having reviewed this email chain,
14   what's your understanding of why Dr. Hsu was sending
15   this to you?
16   A.  I know he had spoken to me in person about this
17   patient, and it, so I think he was sending this to me
18   to just loop me into the broader conversation he was
19   having.
20   Q.  What did you understand the situation to be?
21   A.  At this point, I don't remember exactly.
22   Q.  I have another document I'll show you in just a
23   sec that may explain it a little more.  We'll see.  It
24   says here in the middle of the page, there's an email
25   from Navid Esfandiari to Dr. Hsu and Sharon Parent

CONFIDENTIAL                                                    Page 66

 1   where Navid says, "The confusion was due to lack of
 2   documentation in BBS".  What is BBS?
 3   A.  BabySentry.  It is the REI-specific electronic
 4   medical record that the REI division and the lab used.
 5   Q.  And what's your understanding of who was
 6   responsible for the lack of documentation?
 7   A.  In this particular instance, I do not know.
 8   Q.  Do you know if it was Dr. Hsu?
 9   A.  I don't know.
10   Q.  And let's mark this as Exhibit 3.  Let me know
11   when you've had a chance to review it.
12        (Deposition Exhibit 3 marked.)
13   A.  Okay, okay.
14   Q.  Okay.  So this is an email chain from May 13th
15   2016, which is around the same time period as the
16   documents we were looking at in Exhibit 2 --
17   A.  Um-hum.
18   Q.  -- DH26723 and 24.  In this email chain, it starts
19   with Albert Hsu emailing you and Karen Boedtker about a
20   situation involving patient MK, and it says that you
21   and Heather -- it says that, "Heather and I had the
22   opportunity to meet with the patient yesterday".
23        Do you recall that, that situation of meeting with
24   a patient with Dr. Hsu?
25   A.  Yes.

CONFIDENTIAL                                                    Page 67

 1   Q.  What do you recall?
 2   A.  I recall late that afternoon Albert coming down to
 3   my office to see if I had time to meet with this
 4   patient who was very upset.  I recall going into the
 5   room and listening to the patient and her husband talk
 6   to me about their dissatisfaction with the, with the
 7   communication from the division at that point.  I
 8   recall them saying that there were some specific people
 9   in that division that they did not want to receive care
10   from any further, and I remember talking to them about
11   trying to understand what they were comfortable with
12   moving forward.
13   Q.  How common was it for you to meet directly with
14   patients?
15   A.  It was not uncommon when there were patient
16   complaints.  It was uncommon for a provider to come get
17   me and bring me down to the exam room to meet with a
18   patient.
19   Q.  And in this situation Dr. Hsu came to get you?
20   A.  Yes.
21   Q.  Why did he come get you?
22   A.  The, the patient and her husband were incredibly
23   upset and wanted to be able to talk to somebody.
24   Q.  Looking at the, the second page of this, Dr. Hsu
25   says that he is thinking of emailing both of you,

CONFIDENTIAL                                                    Page 68

 1   meaning you and Karen Boedtker, with a draft of the
 2   note that he would put into the medical records.  Is
 3   that an unusual thing to do?
 4   A.  Yes.
 5   Q.  Do you think that's an appropriate thing to do or
 6   inappropriate?
 7   A.  I don't know.  This was a pretty unusual situation
 8   where he wasn't -- typically, it's not appropriate for
 9   a practice manager to be consulted on a clinical note.
10   In this situation, because it was primarily a patient
11   complaint, he seemed to think that he wanted some, some
12   extra eyes on it.  It's not something I typically do.
13   Q.  And, in this email at the, at the top of Exhibit
14   3, you say that you were going to make a similar change
15   to the language.  My interpretation of this is that you
16   were, you were therefore involved in crafting the
17   language that would go into the note.
18   A.  I was not involved in crafting the language.  I
19   remember wanting to make sure that the providers who
20   they were complaining about not be named in that
21   clinical note and that, if there was going to be a
22   complaint about providers, that that go through risk or
23   patient relations rather than in the medical record.
24   Q.  You mentioned that these patients did not want to
25   be treated by certain providers.  Which providers?

2:17-cv-00194-kjd    Document 139-6    Filed 01/29/20    Page 6 of 13
Misty Blanchette Porter, MD v.                    Confidential                    Heather Gunnell - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                        August 2, 2019

CONFIDENTIAL                                                                       Page 69

1  A.  They did not want to be treated by the nurse,
2  Sharon Parent, and they did not want to see Dr. Porter,
3  and they also had complaints about Elizabeth Todd, if I
4  remember correctly.
5  Q.  What were their complaints about Dr. Porter?
6  A.  I don't remember specifically.
7  Q.  Do you remember generally?
8  A.  I remember generally they didn't like the way they
9  were treated, not necessarily clinically, but the
10 interpersonal dynamic.
11 Q.  Who is Karen Boedtker?
12 A.  Karen Boedtker is one of the employees in risk
13 management.
14 Q.  How often did you communicate with Karen Boedtker?
15 A.  In the -- it would ebb and flow.  Sometimes it was
16 a couple of times a month.  Sometimes I'd go several
17 months without communicating with her.
18 Q.  And what is the role of risk management at
19 Dartmouth-Hitchcock?
20 A.  Can you ask -- are you looking for my impression
21 of the role of risk management?  I mean, they're
22 responsible for a lot of legal things that I'm simply
23 not aware of.
24 Q.  Your understanding of what's, what's their role?
25 A.  Right.  So my understanding is that their role is

CONFIDENTIAL                                                                       Page 70

1  to help us make sure that we appropriately deal with
2  any sort of complications or, or issues around patient
3  complaints or any sort of clinical, clinical
4  complications.  So my, my interaction with them was
5  typically with patient complaints or if one of our
6  providers would say, Hey, I'm going to give risk
7  management a heads up because of something that
8  happened with a patient's care.
9  Q.  Did you ever take issues to risk management?
10 A.  Just myself?
11 Q.  Yes.  Based on something that you saw or heard
12 about or understood to be going on.
13 A.  I don't remember.  I don't remember if there were
14 situations where it was just me going or if it was just
15 me working with the, the group that was brought
16 forward.
17 Q.  And did you talk with anybody about, at risk
18 management, about issues in the REI division?
19 A.  Yes.
20 Q.  Who did you speak to?
21 A.  I worked with Karen Boedtker quite a bit.  I
22 worked with Michele King also, and then some other
23 people in patient relations.  I don't remember his
24 name.
25 Q.  Did you speak with them about specific issues, or

CONFIDENTIAL                                                                       Page 71

1  did you ever speak about the general dysfunction of the
2  division?
3  A.  Both.
4  Q.  Talking first about the general dysfunction, what
5  was the nature of those conversations?
6  A.  The nature of those conversations was typically in
7  the context of one of the patient complaints.  But so
8  we'd get a complaint, and we'd be talking about that,
9  and then I'd be able to say, but, generally, it's, it's
10 not likely I'm going to be able to ask these nurses to
11 communicate differently, because they simply won't.
12 You know, there's a level of dysfunction here that is
13 beyond my ability to change people's personalities, and
14 so my responsibility working with risk management was
15 to help them understand the context of the situation as
16 well.
17 Q.  What response did you get from risk management
18 when you brought up these issues of what you perceived
19 as the general dysfunction of the division?
20 A.  I don't remember.
21 Q.  Do you remember generally what they said?
22 A.  I remember generally that they were trying as hard
23 as I was to try to deal with these patient complaints
24 and that there was sort of a general disheartening
25 among all of us that, that we kept having to have these

CONFIDENTIAL                                                                       Page 72

1  phone calls.
2  Q.  Over what period of time did you bring complaints
3  to risk management?
4  A.  I don't remember.
5  Q.  Was it throughout the whole time that there was
6  the REI division?
7  A.  It was probably a two- to three-year period.
8  There were periods of time when I first started where I
9  would hear from Dr. Porter or one of the nurses that
10 they were going to fire a patient and that they were
11 working with, with risk management, and so I may or may
12 not be involved in taking a look at that as well.
13 Q.  Were there any patient safety concerns that you
14 brought to risk management?
15 A.  Not that I remember.
16 Q.  Do you know if anybody else brought patient safety
17 concerns to risk management regarding the REI division?
18 A.  I don't know.
19 Q.  What was your impression of the relationship
20 between Dr. Hsu and Karen Boedtker?
21 A.  I don't know.
22 Q.  Did you see them interact?
23 A.  No, not that I remember, no.
24 Q.  Did you ever observe them talking to each other or
25 about each other?

2:17-cv-00194-kjd   Document 139-6   Filed 01/29/20   Page 7 of 13
Misty Blanchette Porter, MD v.                                    Heather Gunnell - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.    Confidential                  August 2, 2019

CONFIDENTIAL                                                          Page 73

1  A. No.
2  Q. For the patient complaints that you handled that
3     went to risk management related to REI, which of the
4     physicians within REI were they about?
5  A. All of them.
6  Q. What was the distribution?
7  A. I don't remember. The, the vast majority of the
8     complaints from patients were more global about the,
9     the dysfunction and the breakdown in communication
10    among the team. So a lot of complaints had to do with
11    the feeling that patients had that the providers and
12    the nurses simply were not communicating with one
13    another about their plan of care. I would receive
14    complaints that, you know, Dr. Hsu gave me X plan, but
15    then, when I talked to Dr. Porter two days later, she
16    gave me a different plan. Which plan am I on? No
17    one's talking to me. So those type of complaints.
18 Q. How frequently did something like that happen
19    where a patient felt that they were getting conflicting
20    information from different providers?
21 A. That escalated, and so those type of complaints
22    became more frequent in the year or so -- well, the
23    timeline's broken up in my mind, because I was on
24    maternity leave for a little while, but for, you know,
25    a year-and-a-half or so prior to the closing, those

CONFIDENTIAL                                                          Page 74

1     type of complaints became more frequent.
2  Q. Why do you think they became more frequent?
3  A. Because the team was dysfunctional and would not
4     communicate with one another, so patients would call to
5     complain more.
6  Q. Did the team get more dysfunctional over time?
7  A. Yes.
8  Q. Did it get more dysfunctional when David Seifer
9     came on board?
10 A. Yes.
11 Q. We'll talk about David Seifer in a little bit.
12    Going back to Dr. Hsu, what was your understanding of
13    what procedures Dr. Hsu could perform?
14 A. I don't remember specifics. I do remember that he
15    was not a full-scope surgeon in the same way that
16    Dr. Porter was.
17 Q. What do you mean by full-scope surgeon?
18 A. So Dr. Porter did quite a bit more GYN surgery
19    than Dr. Hsu did, and my understanding is that Dr. Hsu
20    stayed much tighter to just a, like an REI provider,
21    whereas Dr. Porter did, did more of those cases.
22 Q. Was Dr. Hsu able to read ultrasounds?
23 A. He did read ultrasounds, yes.
24 Q. Did you have any understanding of his level of
25    competency in reading ultrasounds?

CONFIDENTIAL                                                          Page 75

1  A. No. Again, the clinical piece of it was beyond
2     my, my scope of management.
3  Q. Did you have any either responsibility or
4     oversight for assigning patients to certain providers'
5     schedules?
6  A. No.
7  Q. Who had that responsibility?
8  A. So the providers would work with the scheduling
9     secretaries to, to map out who would be where, and then
10    the scheduling secretaries would book the patients into
11    those patient slots, and ultrasound was included in
12    that.
13 Q. Did you have any knowledge about Dr. Hsu's
14    pregnancy rates?
15 A. Not really, but I did see some data at one point
16    that I believe was sent from Navid about what the
17    pregnancy rates for the division were.
18 Q. Do you remember when that was?
19 A. I don't remember. I don't remember if it was
20    right before Dr. Seifer started or shortly after.
21 Q. Did you receive regular, maybe annual or
22    semiannual, reports about the pregnancy rates coming
23    out of REI?
24 A. I did not receive any reports from the BabySentry
25    system, which is where that would be held. I would

CONFIDENTIAL                                                          Page 76

1     hear anecdotally about, about the pregnancy rates, but
2     that was not a data point that came across my desk
3     regularly.
4  Q. Do you know why it wasn't?
5  A. I don't know why.
6  Q. It seems, it seems important to the functionality
7     of REI. I'm surprised that that information didn't
8     come to you. Did you go looking for it?
9  A. Looking for the pregnancy rates?
10 Q. Yes.
11 A. No.
12 Q. Why not?
13 A. Because, again, the, the clinical piece of that,
14    we have division directors, we had a chair, we had the
15    lab director. All of those people paid attention to
16    that. That was part of the clinical piece that they
17    were responsible for, and I was primarily responsible
18    for the operations and the finances.
19 Q. What did you hear anecdotally about Dr. Hsu's
20    pregnancy rates?
21 A. It depended on who I was talking to. So I would
22    hear from some people like Dr. Porter that they were
23    low, but then I would also hear from Dr. DeMars that
24    they were actually fairly normal, and so, having not
25    seen the data, I wasn't quite sure where that actually

2:17-cv-00194-kjd    Document 139-6    Filed 01/29/20    Page 8 of 13
Misty Blanchette Porter, MD v.                                    Heather Gunnell - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.    Confidential        August 2, 2019

CONFIDENTIAL                                                          Page 129

1    around that.
2  Q.  Did you hear concerns about whether Dr. Hsu was
3    managing those issues appropriately?
4  A.  I don't remember.
5  Q.  How about with Dr. Seifer?
6  A.  I don't remember.
7  Q.  Who is Beth Todd?
8  A.  Beth Todd was the nurse practitioner assigned to
9    the REI division.
10 Q.  And did she work primarily in REI?
11 A.  Yes.
12 Q.  What makes you say that?
13 A.  Because she worked primarily with REI and did some
14   GYN care as well.
15 Q.  How much GYN care did she do?
16 A.  I don't know the exact distribution.
17 Q.  What was the scope of her practice?
18 A.  I know she worked with -- she did some general GYN
19   care.  She worked with the REI providers, did IUIs.
20   I'm not sure exactly what you're asking me.
21 Q.  It sounds like that may get into more of the
22   clinical side, which is outside the range of what it
23   sounds like you're familiar with.  Is that, is that
24   true?
25 A.  Yeah.  Yes.

CONFIDENTIAL                                                          Page 130

1  Q.  All right.  So we're going to fast-forward a bit,
2    and I think we will, we'll rewind later, but I would
3    like to now move to the period of time in mid to late
4    April 2017 around the time that discussions about what
5    to do with REI were really heating up.  What was
6    happening in the REI division in April 2017?
7  A.  I'm, I'm trying to remember, because there was so
8    much that happened in that division in that, like,
9    six-, eight-month time period.  I believe --
10 Q.  What -- sorry.  What six- to eight-month time
11   period are you talking about, the six to eight months
12   before the closure?
13 A.  That's correct.
14 Q.  Okay.
15 A.  I believe in April is when we found ourselves
16   losing the last fully trained REI nurse.  I don't
17   remember exactly when she gave her notice, but I
18   believe that timeframe was when we were looking at
19   significant staffing issues.
20 Q.  Was that Marlene in Bedford?
21 A.  That's correct.
22 Q.  Would you be able to give me a, a high-level,
23   fairly brief overview of what was happening in that
24   six- to eight-month time period, understanding that
25   we'll come back and sort of drill down?  But I think

CONFIDENTIAL                                                          Page 131

1    that might be useful for setting some context.
2  A.  Okay.
3  Q.  Can you do that?
4  A.  Yes.  So, so, generally, I don't remember the
5    exact timeframe, but that six- to eight-months
6    timeframe we were working with the Value Institute and
7    some other teams in Dartmouth-Hitchcock to bring the
8    group together to work on the interpersonal dynamics,
9    the communication, and more broadly the various work
10   flows and, and paths for managing patients so that
11   there was some consistency.
12       The idea was to try to address the, the many
13   complaints both from patients and staff within that
14   division to try to bring this together.  So we were
15   doing that more globally.  We were also looking at some
16   pretty significant staffing concerns among, with the
17   nursing, trying to keep enough nurses to provide the
18   care safely and keep the division running.
19 Q.  What were the discussions that you were having
20   with anybody at that time about what to do with REI?
21 A.  At that time, the real focus was on we just want
22   to shore this team up.  We need to, we need to figure
23   out the, the dysfunction.  We need to get them to
24   communicate together.  Let's give all of the resources
25   that we have available to us to see if we can bring

CONFIDENTIAL                                                          Page 132

1    this group together and make this work.
2  Q.  What time period was that?
3  A.  I think we started the conversations with the
4    Value Institute in the fall, maybe late fall of 2016.
5    There were a couple of retreats.  I believe there was
6    one in January, February.  It was an ongoing process
7    with some really dedicated time off site.  I don't
8    remember the exact dates of that, though.
9  Q.  At some point, was there a working group put
10   together to figure out what to do with REI?
11 A.  What do you mean, a working group?
12 Q.  Maybe that's not the right term, but a smaller
13   group of people who, including you, who were tasked
14   with figuring out what was happening to REI?
15 A.  I don't know that there was really a group put
16   together for that.  I mean, I certainly brought my
17   concerns to Dr. DeMars and said, "I think we should
18   reach out to the Value Institute.  I think we need to
19   put this group together".  I worked directly with many
20   of those people to, to prepare for those retreats, to
21   pull together documents, but it wasn't necessarily a
22   formally formed group, if that makes sense.
23       (Deposition Exhibit 5 marked.)
24 Q.  I think so.  This has been marked as Gunnell 5.
25   Let me know when you're ready.

2:17-cv-00194-kjd    Document 139-6    Filed 01/29/20    Page 9 of 13

Misty Blanchette Porter, MD v.  
Dartmouth-Hitchcock Medical Center, et al.  
Confidential  
Heather Gunnell - Vol. 1  
August 2, 2019

CONFIDENTIAL                                                                Page 133

1   A.   Okay. I'm ready.
2   Q.   So this is Gunnell Exhibit 5, DH9582 and a number
3        of pages after that in attachment to this email. This,
4        the cover page is emails back and forth between you,
5        Daniel Herrick, and Leslie DeMars. Looking at this
6        email and the attachment, does this refresh your memory
7        about some of the conversations in this time period?
8        This email is dated April 19th 2017, and, before we get
9        into the specifics of this, I'm wondering if you could
10       explain to me more of the context of what was going on
11       at this time period.
12  A.   Yes, this, this helps me remember this particular
13       time period. So, best of my recollection, at this
14       point the decision had been made to close the division,
15       and so I was working with Daniel on, on that process.
16  Q.   When you say "the decision had been made", who
17       made the decision?
18  A.   My understanding is that Dr. Merrens made that
19       decision.
20  Q.   What do you know about the discussions that led to
21       that decision?
22  A.   I wasn't involved in the discussions about
23       closing, closing the division. So my understanding is
24       that there were several conversations, particularly
25       after the end of the Value Institute work, between

CONFIDENTIAL                                                                Page 134

1        Daniel Herrick and Dr. DeMars and that, and that they,
2        there was a recommendation given to senior leadership,
3        including Dr. Merrens.
4   Q.   A recommendation by whom?
5   A.   I believe that Daniel Herrick recommended, after
6        the last nurse left, that, that the program be closed
7        down.
8   Q.   When did the last nurse leave?
9   A.   I don't remember exactly.
10  Q.   Was Marti Lewis still in the division at the time
11       it shut down?
12  A.   Yes, she was.
13  Q.   And, when you say "last nurse", do you, are you
14       referring to Marti, or are you talking about somebody
15       else?
16  A.   I should clarify. The last fully trained nurse
17       for the division, who was Marlene in the south.
18  Q.   How do you know that it was Ed Merrens who made
19       the decision to close REI?
20  A.   I've heard him say that it was his decision.
21  Q.   When did you hear him say that?
22  A.   As the, after the program -- I've heard him say it
23       on several occasions, and that's how, that's how --
24       that's why that's my understanding.
25  Q.   What information was given to Ed Merrens to make

CONFIDENTIAL                                                                Page 135

1        that decision?
2   A.   I don't know.
3   Q.   Did you provide information? Did you provide any
4        information directly to Dr. Merrens?
5   A.   Not directly to Dr. Merrens.
6   Q.   How about indirectly?
7   A.   I provided information to Daniel.
8   Q.   What information did you give to Daniel?
9   A.   Anything that he asked for. So some of it is
10       right in here.
11              (Indicating Exhibit 5.)
12  Q.   What did he ask for?
13  A.   So I don't remember all of the details. I
14       remember being asked to provide an ROI.
15  Q.   What's an ROI?
16  A.   A return on investment, so the financial data
17       around the REI division, working with our financial
18       analyst at the time.
19  Q.   How would one calculate a return on investment for
20       a clinical division?
21  A.   So finance would take a look at all of the
22       expenses and all of the incoming revenue around a
23       division and put together a financial package for that.
24  Q.   Is it your understanding that the financial
25       picture around REI was a part of the decision about

CONFIDENTIAL                                                                Page 136

1        whether to keep REI open?
2   A.   My understanding is that that was not part of the
3        decision.
4   Q.   What other information did you give to Daniel
5        Herrick?
6   A.   At what point?
7   Q.   What are the different points that you're thinking
8        of?
9   A.   So I, I know that I tried to keep him up-to-date.
10       He was, he was fairly remote during the Value Institute
11       process, so I would let him know we're doing X, Y, Z
12       retreat for the group. I did communicate to him when
13       Marlene gave her notice that I was concerned that we
14       were down to having no fully trained nurses in that
15       division, and then, when he would request information
16       from me, I would, I would give it to him.
17  Q.   Other than the financial information, what did you
18       give him?
19  A.   I don't remember all of that. I don't remember
20       all the details.
21  Q.   Did Daniel Herrick ever come down and speak with
22       the providers?
23              ATTORNEY JOSEPH: That's speculation. You
24       can answer.
25

2:17-cv-00194-kjd    Document 139-6    Filed 01/29/20    Page 10 of 13

Misty Blanchette Porter, MD v.	Confidential	Heather Gunnell - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.		August 2, 2019

CONFIDENTIAL                                             Page 141

1  Q. Did she want to save Dr. Porter's job?
2  A. I suspect so. I don't know.
3  Q. In the conversations with Dr. DeMars about
4     different options for the REI division, did at least
5     some of those variations include retaining Dr. Porter
6     as an employee of Dartmouth-Hitchcock?
7  A. Yes, yes.
8  Q. Did any of those variations include terminating
9     Dr. Seifer and Dr. Hsu only?
10 A. I don't remember Dr. DeMars talking specifically
11    about terminating anybody.
12 Q. Do you remember her talking generally about moving
13    some people out, something other than as strong a word
14    as "terminate", but maybe something, a looser idea?
15 A. My conversations with Dr. DeMars about this
16    process felt very much -- my impression of them was
17    very much that she was in denial that the, that the
18    division needed to be closed and, instead, was
19    searching for ways to try to keep things going.
20 Q. What did you understand your role to be in that
21    process?
22 A. In which process?
23 Q. The process of figuring out what to do with REI.
24 A. I understood very clearly that it was not my, I
25    had no authority to make that decision, and so, during

CONFIDENTIAL                                             Page 142

1     those conversations, it was, it was my responsibility
2     to sort of talk to her and look at the reality of the
3     situation.
4  Q. It sounds to me like you have a, you had a clear
5     feeling of what should be done. What was your feeling
6     about what should have, what should be done with REI in
7     that period of late April 2017?
8  A. I, it was complicated. I, I did not actually
9     expect us to get to a place. I kept wanting to try to
10    find a way for us to keep going. When the last nurse
11    gave her notice, I wasn't sure how we were going to do
12    that.
13 Q. How you were going to keep going?
14 A. How we were going to keep the division functioning
15    and be able to provide safe care for the patients, and
16    I was very concerned that the team did not have a
17    realistic view of just how dire that situation was.
18 Q. What team are you referring to?
19 A. I'm referring to the REI providers and Dr. DeMars.
20 Q. What did you hear from the providers about their
21    perspective on what was going on?
22 A. I often heard various suggestions on how to get
23    nursing staff that were not particularly realistic,
24    and, and I did not hear any of them really understand
25    just how complicated the situation was or really

CONFIDENTIAL                                             Page 143

1     understand just how tenuous the situation in the
2     division was.
3  Q. Why did you think the proposals for getting
4     nursing staff were not realistic?
5  A. Well, it depends on the proposal. So, for
6     example, one of them was, We can just take some
7     procedure nurses from New London Hospital and, and
8     bring them in and have them help with this, and it,
9     it's not realistic to be able to do that in a week. So
10    some of the suggestions were simply not realistic to be
11    able to do in the timeframe necessary, and it was also
12    incredibly difficult for us to hire qualified nurses.
13    REI nurses are difficult to find trained, and there was
14    a nursing shortage throughout the institution, and REI
15    had a reputation for not being a great place for nurses
16    to work. So it was a very complicated dynamic.
17 Q. I'm surprised by your statement that the, the
18    providers in REI were in denial of how dire the
19    situation was, because they were the ones living it
20    day-to-day. Can you explain more why you thought the
21    providers who were living this day-to-day were in
22    denial about the reality of the situation?
23 A. So the situation I'm speaking about in particular
24    was the reality of how, how difficult it is to hire and
25    train nurses. So I suspect that they knew things were

CONFIDENTIAL                                             Page 144

1     difficult, but they did not seem to have a real
2     understanding of why it was difficult to bring nurses
3     in and did not seem to understand why I couldn't just
4     make it happen in two days. So that's the, that's the
5     situation specifically that I'm talking about.
6  Q. As of April 2017, what efforts were being made to
7     recruit nurses to REI?
8  A. As of April, at this point? So we had open
9     positions. We had been interviewing people. We had
10    been looking into per diems. HR, at the end of the
11    Value Institute process and that team dynamic, we were
12    told by -- we meaning Dr. DeMars, Dr. Seifer, Daniel
13    Herrick, and I -- were told that, with the nursing
14    shortage in the institution and very clearly that the
15    team was not coming together, HR would not actively
16    help us recruit for our nursing positions when there
17    were so many other positions open.
18 Q. And that was February 2017?
19 A. I don't remember exactly when that was.
20 Q. If I'm understanding this correctly then, from
21    approximately February 2017 until the closure, there
22    was no authorization to hire nurses into the REI
23    division?
24 A. I don't know that there was a very clear, like,
25    drop-off. We had active positions, and, when we had

2:17-cv-00194-kjd    Document 139-6    Filed 01/29/20    Page 11 of 13

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.
Confidential
Heather Gunnell - Vol. 1
August 2, 2019

CONFIDENTIAL                                                                         Page 145

1  candidates, we would call them in, and we were doing
2  our best, but it was very clear from HR that, unless
3  that dynamic could be fixed, they would not make us a
4  priority.
5  Q. How hard is it to train an otherwise competent and
6  skilled nurse to become an REI-specific nurse?
7  A. It's a, it's a long process to make sure that they
8  are fully competent in all of those areas.
9  Q. How long?
10 A. Depends on the nurse, but several months.
11 Q. What's the basis for your understanding?
12 A. The basis for my understanding is the various
13 nurses who had come into the division and the process
14 by which they were trained. The specifics of that are
15 better left to my nurse manager than me, but, but it
16 was certainly a long onboarding process.
17 Q. In Exhibit 5 here you say, "My assumption is that
18 MBP will be refocused to GYN ultrasound". Why was that
19 your assumption?
20 A. Because that's, that is based on my conversations
21 with Dr. DeMars.
22 Q. When you built this in, this assumption, to the
23 plan, was it your understanding that this was
24 definitely the plan, or was this simply one of the
25 variations that you mentioned Dr. DeMars had spoken to

CONFIDENTIAL                                                                         Page 146

1  you about?
2  A. This was simply one of the variations.
3  Q. Did you understand it to be the top choice for
4  among those variations?
5  A. So this is one of the examples that I alluded to
6  earlier today in which I said the information that I
7  would be given by Dr. DeMars that I would move forward
8  on sometimes turned out to not be, I would not have the
9  full context. This is one of those examples. So this
10 plan was based on my conversations with Dr. DeMars.
11 Q. Did you think that she was telling different
12 things to different people?
13 A. I don't know.
14 Q. You mention here the staffing plan for both a
15 complete shutdown and a rebuild. Are those two
16 different alternative plans?
17 A. I don't remember.
18 Q. You said that the information you had gotten from
19 Dr. DeMars was the basis for your assumption that
20 Dr. Porter, MBP, would be refocused to GYN ultrasound.
21 Do you know if that plan changed when Dr. DeMars spoke
22 to Daniel Herrick?
23 A. I don't know.
24 Q. Do you know what it was that caused that plan to
25 change?

CONFIDENTIAL                                                                         Page 147

1  A. I don't know.
2  Q. Did you hear anything about that?
3  A. No.
4  Q. In this process did you ever talk to Dr. DeMars
5  about patient demand for services that Dr. Porter could
6  provide?
7  A. No.
8  Q. Why not?
9  A. What do you mean?
10 Q. Why not?
11 A. So my understanding in communications with
12 Dr. DeMars was that much of which, much of the care,
13 particularly surgical care, could be provided by the
14 generalist team. If REI was closing down, then there
15 was no need for that patient care. There were
16 conversations about how we would get patients that care
17 elsewhere.
18 Q. I see that it's about 3:00 o'clock. Would you
19 like to take a break?
20 A. I'm doing okay right now.
21 Q. You're doing okay? Okay. Good. Looking at this
22 document, still Exhibit 5, I see that on the, the
23 second-to-last page with the "Future Staff with
24 Complete REI Shutdown" is the middle column. What do
25 you understand that scenario to be?

CONFIDENTIAL                                                                         Page 148

1  A. So I understand this scenario to be the difference
2  between what the division currently looked like with
3  what might happen after the closure if Beth Todd was
4  retained and moved to the generalist division to
5  provide GYN care and Dr. Porter was retained to
6  continue with GYN ultrasound.
7  Q. Do you know, as of that time, how much of
8  Dr. Porter's time was devoted to GYN ultrasound?
9  A. My recollection is that most of the time when she
10 was working was devoted to ultrasound.
11 Q. In that period in 2017?
12 A. Correct.
13 Q. And that was, really, that was a generalist
14 service, not REI-specific?
15 A. I'm, I'm not sure.
16 Q. Did she -- she looked at ultrasounds. Maybe you
17 don't know. Do you know if she, as part of that GYN
18 ultrasound work, looked at ultrasounds that were not
19 REI-specific?
20 A. My understanding is that, yes, there was some GYN
21 ultrasound that was not REI-specific.
22 Q. You mentioned a moment ago that the, the
23 generalists would be able to take over the surgical
24 work that Dr. Porter had done. Did you talk to
25 Dr. Tyler at all, Dr. Regan Tyler, at all about the

2:17-cv-00194-kjd   Document 139-6   Filed 01/29/20   Page 12 of 13

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Heather Gunnell - Vol. 1
August 2, 2019

CONFIDENTIAL Page 169

1  that point in time that there were patients scheduled
2  for June and July in addition to May?
3  A.  Yes, but I don't remember what they were scheduled
4  for or where they were in cycle.
5  Q.  Would that have made a difference?
6  A.  A difference to what?
7  Q.  How concerned everybody would be about leaving
8  them hanging.
9  A.  I don't know.  I know that the primary concern
10 from my perspective at this point was that we didn't
11 have nursing staff to safely shepherd these patients
12 through.
13 Q.  Were there -- there were no solutions to that, to
14 bring somebody in, other than just closing?
15 A.  Could you rephrase that for me, please?
16 Q.  I'm trying to understand what your position is on
17 there not being nursing staff and the concern for
18 patients in the absence of sufficient nurses.
19 A.  So, at this point, we, Sharon had retired.  Casey
20 was no longer with us.  Marlene had given her notice.
21 There was one RN who was still not fully trained to
22 manage that division and a couple of LPNs who could do
23 some work, but not near enough that was necessary.  So
24 I was concerned the day I heard Marlene was giving her
25 notice that we would not have sufficient trained

CONFIDENTIAL Page 170

1  nursing staff to be able to appropriately run the REI
2  division.
3  Q.  How far in advance had Sharon given notice of her
4  plans to retire?
5  A.  She gave us significant notice.  It was several
6  months.
7  Q.  What was the response to this email in Gunnell
8  Exhibit 7?
9  A.  I don't remember.
10 Q.  Were people confused?
11 A.  I don't remember.  I don't remember the response
12 to this specific email.
13 Q.  Did you think that this was appropriate messaging
14 to send out at that point in time?
15 A.  What do you mean by "appropriate messaging"?
16 Q.  In the context of what you knew about what had
17 been decided.
18 A.  I, I don't remember exactly what I was thinking at
19 the time.  I, I do remember thinking we need to be
20 thoughtful of about how we roll this out so that we
21 don't leave, leave patients just, just hanging.
22 Q.  Were there discussions about how to time the
23 announcement of the, the announcement of the closure
24 and then the actual closure?
25 A.  Were there, were there discussions on how to time

CONFIDENTIAL Page 171

1  from the announcement to the actual end?
2  Q.  Yes.
3  A.  Yes.
4  Q.  What were those discussions?
5  A.  I don't remember all of the details of those
6  discussions, and I don't think I was part of all of
7  those discussions either.
8  Q.  Can you tell me about the ones that you were a
9  part of?
10 A.  So I don't remember all of these details.  I
11 remember trying to figure out how can we, how can we
12 navigate not having appropriate staff and not being
13 able to provide appropriate care with managing the
14 patients who are currently in cycle and what is it that
15 we can do to, to bridge that gap.  So I do remember
16 having those conversations and looking at how many
17 patients that we had in cycle and where they were and,
18 and who, who their provider was.  I do remember looking
19 at that.
20 Q.  Who did you talk to about this?
21 A.  I remember talking to Dr. DeMars about it.  I
22 don't remember if I spoke to Daniel Herrick about it or
23 not.
24 Q.  How many times did you talk to Dr. DeMars about
25 it?

CONFIDENTIAL Page 172

1  A.  About that specific piece of it, I'm not sure.
2  Q.  How many times do you think you talked to
3  Dr. DeMars about the REI closure in general?
4  A.  Every time I met with Dr. DeMars for three years,
5  we talked about REI, every time, several times a week.
6  So, probably, every time I met with her, we talked
7  about this to some degree or another.
8  Q.  You sound a little frustrated by the amount of
9  time that you spent talking about REI.  Is that
10 accurate?
11 A.  That's accurate, yes.
12 Q.  Can you tell me more about that, about the, those
13 feelings of frustration?
14 A.  Yes.  It, it was very frustrating, I think, as I
15 said earlier today, the inordinate amount of time spent
16 on managing that division and its complications
17 compared to the scope of my actual job.  To some
18 degree, it was frustrating to feel like I'm not likely
19 to be able to solve these problems, because these
20 problems are above my pay grade, and I can't change
21 personalities.  And so it was frustrating to feel like
22 I was just spinning my wheels year after year, and it
23 was frustrating to know that the time I was spending
24 with REI could probably be better focused somewhere
25 else in the department.

2:17-cv-00194-kjd    Document 139-6    Filed 01/29/20    Page 13 of 13

Misty Blanchette Porter, MD v.  
Dartmouth-Hitchcock Medical Center, et al.  
Confidential  
Heather Gunnell - Vol. 1  
August 2, 2019

CONFIDENTIAL                                              Page 189

 1  me that everyone involved in that was leaving.
 2  Q. Did you think that closure was the right decision?
 3  A. At that time, at that time, I hadn't -- you know,
 4     I was not in a space to be able to really process it.
 5     I was just trying to make sure things happened. In
 6     hindsight now, yes, I think that was probably the right
 7     decision.
 8  Q. At the time you had had a few weeks to process
 9     what was happening, in that time did you have a sense
10     that it was the right thing to be doing?
11  A. Again, during that time, I was just trying to make
12     sure that things happened, so, so I'm still processing.
13  Q. It seems in some ways like it was a pretty quick
14     period of time between the decision to close and the
15     announcement. Is that how it feels to you?
16  A. I think it was a short period of time. However,
17     it, we also didn't have a nurse, right? So, when that,
18     when Marlene gave her notice, it was no longer safe to
19     continue care, and so, from my perspective, the
20     timeframe was likely more around the, the safety of
21     our, of our patients and how to navigate that. So
22     that's the way I see that timeframe.
23  Q. Did you think it was the right decision to
24     terminate Dr. Porter?
25  A. Yes.

CONFIDENTIAL                                              Page 190

 1  Q. Why?
 2  A. Because, when we're looking at the dynamics and
 3     the dysfunction of that team, she was a central part of
 4     that, and I am not convinced that the team, any team
 5     would be able to have a healthy dynamic if she was at
 6     the center of it.
 7  Q. What if she had been redeployed to do GYN
 8     ultrasound?
 9  A. I don't know.
10  Q. So you said that Dr. DeMars took off in the
11     morning of May 4th. When did she come back?
12  A. She was headed to a conference, and I don't
13     remember how long the conference was, but it was at
14     least a couple of days.
15  Q. So let's go back, and, and can you tell me more
16     about the response when you were there making these
17     announcements? What else happened the rest of the day
18     on May 4th?
19  A. I don't remember. I don't remember. Oh, I do.
20     We spent a fair amount of time communicating with
21     people after the department was made aware of the
22     decision. Then we deployed several people -- I don't
23     remember exactly who -- to start contacting patients to
24     let them know. We wanted patients to hear it directly
25     from us prior to hearing it in the newspaper.

CONFIDENTIAL                                              Page 191

 1  Q. Were you able to contact all of the patients?
 2  A. I believe so.
 3  Q. What was the message that you were giving
 4     patients?
 5  A. I don't remember the exact talking points.
 6  Q. Do you remember generally if there was anything
 7     that you were supposed to say or not supposed to say?
 8  A. I don't remember.
 9  Q. Were you supposed to tell people that it was
10     because of provider dysfunction?
11  A. That was not one of the talking points.
12  Q. Do you think that was the reason for the closure?
13  A. I don't think it was the whole reason for the
14     closure, no.
15  Q. But part of the reason?
16  A. I think that, had we been able to keep and retain
17     and train nurses, we would have kept trying to solve
18     the dysfunction.
19  Q. I'm sorry. Can you say that again?
20  A. I think that, had we been able to get nursing
21     staff and keep nursing staff, we would have continued
22     to try to work with that team and overcome the
23     dysfunction of the team.
24  Q. And the problem there was HR saying that you
25     couldn't continue to recruit nursing staff?

CONFIDENTIAL                                              Page 192

 1  A. I don't think that was the core problem, because
 2     we had had issues recruiting nursing long before HR
 3     made that decision.
 4  Q. It sounds like there was a nursing shortage
 5     throughout the department, right?
 6  A. Throughout the institution.
 7  Q. Throughout the institution? How much worse was it
 8     in REI than in the rest of the department?
 9  A. Worse. It was harder to get nurses, and I think
10     particularly because of the, the skill set required and
11     the, the hours required for that division.
12  Q. You said a little bit ago that you didn't think
13     that any division would be functional with Dr. Porter
14     in it or words to that effect. What's the basis for
15     that statement?
16  A. So I, I don't think I meant any division. I don't
17     think that we could have brought new people into an REI
18     division with that. I know that, largely, Dr. Porter
19     could be very difficult to work with. So I don't know
20     whether or not it would have been as difficult if it
21     was just ultrasound. I honestly don't know.
22  Q. What made Dr. Porter difficult to work with?
23  A. Things with Dr. Porter were very much her way or
24     no way, and it was difficult to find a level of
25     compromise.