# EXHIBIT E

**In The Matter Of:**

*Misty Blanchette Porter, MD v.*

*Dartmouth-Hitchcock Medical Center, et al.*

---

*Edward Merrens, MD*

*Vol. 1*

*July 30, 2019*

*Confidential*

---

*Verbatim Reporters*

*(802)869-1665*

*verbatim@vermontel.net*

Original File 73019MERRENS.TXT

Min-U-Script® with Word Index

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

**Confidential**

Edward Merrens, MD - Vol. 1
July 30, 2019

---

C O N F I D E N T I A L                                Page 1

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF VERMONT
 2              Case No. 5:17-cv-194

 3   MISTY BLANCHETTE PORTER, MD,  )
                                   )
 4             Plaintiff           )
                                   )
 5   vs.                           )
                                   )
 6   DARTMOUTH-HITCHCOCK MEDICAL CENTER,)
     DARTMOUTH-HITCHCOCK CLINIC,   )
 7   MARY HITCHCOCK MEMORIAL HOSPITAL, )
     and DARTMOUTH-HITCHCOCK HEALTH, )
 8                                 )
                  Defendants )
 9

10

11

12           D E P O S I T I O N

13                  of

14           EDWARD J. MERRENS, MD

15

16

17        Taken at the law offices of Vitt & Associates,

18   PLC, 8 Beaver Meadow Road, Norwich, Vermont on

19   Tuesday, July 30, 2019 commencing at 10:00 a.m. before

20   Sunnie Donath, RPR

21

22

23

24

25
```

---

C O N F I D E N T I A L                                Page 2

```
 1   APPEARANCES:

 2   GEOFFREY J. VITT, ESQUIRE
     SARAH H. NUNAN, ESQUIRE
 3   Vitt & Associates, PLC
     8 Beaver Meadow Road, PO Box 1229
 4   Norwich, Vermont 05055
           On behalf of the Plaintiff
 5

 6   KATHERINE BURGHARDT KRAMER, ESQUIRE
     KBK Law, 6 Mill Street
 7   PO Box 23, Middlebury, Vermont 05753
           On behalf of the Plaintiff
 8

 9   DONALD W. SCHROEDER, ESQUIRE
     Foley & Lardner, LLP
10   111 Huntington Avenue, Suite 2500
     Boston, Massachusetts 02199-7610
11         On behalf of the Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

C O N F I D E N T I A L                                Page 3

```
 1              INDEX OF EXAMINATION

 2   Witness           Examined By      Page  Line

 3   Edward Merrens, MD

 4             Atty. Kramer       6    4

 5

 6              INDEX OF EXHIBITS

 7                                            Page

 8   1 - Letter to Dr. Seifer from Dr. Porter,   62
         PORTER0000175-185
 9   2 - 1/3/17 Email, DH0025460-62             65

10   3 - 5/12/16 Email, DH0021253               79

11   4 - Chat with Richard Reindollar,      87
         DEMARS0000101-102
12   5 - 11/23/16 Email, DH0025549-51          91

13   6 - 11/23/16 Email Chain, DH0025566-67    96

14   7 - 9/12/16 Email Chain, DH0025564-65     98

15   8 - 9/7/16 Email Chain, DH0025503         98

16   9 - 9/7/16 Email Chain, DH0025572-73      98

17   10 - 2/16/17 Email Chain, DH0025077-79   117

18   11 - 2/16/17 Email Chain, DH0025437-38   117

19   12 - 2/22/17 Email, DH0025543-44         117

20   13 - 2/16/17 Email Chain, DH0025441-442  117

21   14 - 2/16/17 Email Chain, DH0025546-47   117

22   15 - 4/18/17 Email, DH0011253-54         131

23   16 - 4/19/17 Email w/ attachment,    137
          DH0009574-576
24   17 - 4/19/17 Email w/ attachment, DH0009582-83   146

25                  - Cont'd -
```

---

C O N F I D E N T I A L                                Page 4

```
 1                                            Page

 2   18 - 4/25/17 Email, DH0025744-45         161

 3   19 - 5/1/17 Email, DH0013068             176

 4   20 - 5/1/17 Email Chain, DH0026715-16    185

 5   21 - 5/1/17 Email Chain, DH0026771-72    191

 6   22 - 5/11/17 Email Chain, DH0018061-62   196

 7   23 - 5/12/17 Email Chain, DH0006600-01   201

 8   24 - 5/12/17 Email Chain, DH0010582      209

 9   25 - 5/12/17 Email Chain, DH0010594-96   214

10   26 - 5/27/17 Email w/ attachment,    222
          DH0026665-67
11   27 - 6/7/17 Email Chain, DH0015544-46    225

12   28 - 6/13/17 Email Chain, DH0009476-78   233

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD – Vol. 1
July 30, 2019

CONFIDENTIAL                                    Page 5

1   S T I P U L A T I O N S
2       It is hereby stipulated and agreed by and
3   between the attorneys of record for the respective
4   parties hereto as follows:
5       1. That the testimony of EDWARD J. MERRENS, MD
6   may be taken pursuant to the Federal Rules of Civil
7   Procedure, and treated as if taken pursuant to notice
8   and order to take depositions and that all provisions
9   of notice and order are waived by the parties, and the
10  signatures to the stipulation are in like manner
11  waived;
12      2. That all objections except as to matters of
13  form are reserved until the deposition or any part
14  thereof is offered in evidence;
15      3. That the deposition may be signed by the
16  said EDWARD J. MERRENS, MD before any notary public.
17
18
19              * * * * *
20
21
22
23
24
25

CONFIDENTIAL                                    Page 6

1           EDWARD J. MERRENS, MD,
2       duly sworn to tell the whole truth, and, nothing
3       but the truth, deposes and says as follows:
4           EXAMINATION BY ATTORNEY KRAMER
5   Q.  Good morning, Dr. Merrens.
6   A.  Good morning.
7   A.  We met a few minutes ago.  My name is Katie
8   Burghardt Kramer.  I am one of the lawyers for Misty
9   Porter in this case.  I'm here today with Sarah Nunan
10  and Geoffrey Vitt, who are also attorneys for
11  Dr. Porter.  Have you been deposed before?
12  A.  I think, a while ago in the past, yes.
13  Q.  Do you remember how many times?
14  A.  I think, twice.
15  Q.  What was the context?
16  A.  I think it was in -- I can't remember now.  I
17  think it was in the context of a legal case involving,
18  involving the hospital where I was interviewed by, by
19  counsel.
20  Q.  And have you been part of a lawsuit?
21  A.  No.
22  Q.  No?  I'll go over some of the basics of how this
23  works.
24  A.  Sure, yeah.
25  Q.  It sounds like you have some familiarity with the

CONFIDENTIAL                                    Page 7

1   process.
2   A.  Please go through that.
3   Q.  Let's go through it.
4   A.  Yeah, for sure.
5   Q.  We need to get a verbal response to questions --
6   A.  Okay.
7   Q.  -- so that our court reporter can take down
8   answers.
9   A.  Sure.
10      ATTORNEY SCHROEDER: Make sure she finishes
11  first, and then answer, because, otherwise, our court
12  reporter will have a little hard time taking down your
13  answers.
14  BY ATTORNEY KRAMER:
15  Q.  That is my next point on the list.  We have to
16  make sure not to talk over each other so that the court
17  reporter can take down a clean transcript.  Sometimes,
18  in normal conversation, it's natural to jump ahead or
19  to anticipate the end of a question.  Here I ask that
20  you wait for me to finish the question, even if you
21  know exactly where I'm going so that we get it in a
22  transcript.
23  A.  Sounds good.
24  Q.  If you don't understand a question, please ask me
25  to rephrase.  I'll be happy to do so.  Otherwise, I

CONFIDENTIAL                                    Page 8

1   will assume that you have understood the question.  If
2   you need to take break at any time, totally fine.  I
3   just ask that you answer any pending questions before
4   we take a break.
5       Your attorney may object periodically to
6   questions.  Unless he instructs you not to answer, we
7   still need you to answer the question.
8       ATTORNEY KRAMER: Don, we, last week at the
9   deposition of Daniel Herrick, we had a, you had a
10  conversation with Attorney Vitt about speaking
11  objections.  My understanding is that, for this
12  deposition, objections will be just simply stated
13  without lengthy speaking objections.  Is that, is that
14  your understanding as well?
15      ATTORNEY SCHROEDER: I don't recall having a
16  conversation about it.  I'll state the objections on
17  the record that I think are appropriate, but we'll take
18  it as it goes.
19  BY ATTORNEY KRAMER:
20  Q.  Dr. Merrens, did you take any medication this
21  morning that may affect your memory or cognition?
22  A.  I did not.
23  Q.  What did you do to prepare for this deposition,
24  without revealing any privileged communications you may
25  have had with counsel?

Misty Blanchette Porter, MD v.                    Confidential                    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                                            July 30, 2019

CONFIDENTIAL                                    Page 9

1 A.  I met with counsel.  I, I reviewed some emails
2 that I had sent and I made available in the course of
3 this case.  That's all.
4 Q.  Did you review any documents other than your
5 emails?
6 A.  No.
7 Q.  I mentioned a moment ago --
8 A.  I reviewed --
9 Q.  Oh, go ahead.
10 A.  Let me clarify that.  I'd reviewed emails that
11 might have been sent to me, not necessarily emails that
12 -- they were not just all authored by me.
13 Q.  Any documents other than emails?
14 A.  I reviewed the Complaint filed on behalf of Misty.
15 Q.  As a reminder, I saw you shake your head a moment
16 ago.  We need a verbal response.  If you, if you shake
17 your head, please also say "no".
18 A.  I will try to do that.
19 Q.  Okay, thank you.  And I can remind you as well.
20 Last week Daniel Herrick was deposed.  Did you talk to
21 Daniel Herrick at all about his deposition?
22 A.  I've had no, no interaction.
23          ATTORNEY SCHROEDER: Wait until she finishes.
24          THE WITNESS: Okay.  Yeah.  No.
25

CONFIDENTIAL                                    Page 10

1      BY ATTORNEY KRAMER:
2 Q.  You've had no interaction with Mr. Herrick --
3 A.  No.
4 Q.  -- since his deposition?  Did you receive anything
5 in writing from Mr. Herrick after his deposition?
6 A.  I did not.
7 Q.  Do you have a personal email account?
8 A.  Yes.
9 Q.  And were you asked to search your personal emails
10 in connection with this litigation?
11 A.  No.
12 Q.  What is your personal email account?
13 A.  Like, what is the account name and --
14 Q.  Yes.  Would you spell it?
15 A.  Emerrens@gmail.com.
16 Q.  Do you have any other personal email accounts?
17 A.  I do not.
18 Q.  And were you asked to search your
19 Dartmouth-Hitchcock email account in connection with
20 this litigation?
21 A.  I believe I provided access to any documents that
22 I might have either sent or put in a folder that
23 related to this case.
24 Q.  Did you personally, at any point, undertake a
25 search of your email account?

CONFIDENTIAL                                    Page 11

1          ATTORNEY SCHROEDER: Just for the record, we
2 actually did the search.  It was -- we did a custodian
3 search of his email.  So we, I think you're aware that
4 we had search terms that we applied to his
5 Dartmouth-Hitchcock email account like we did with the
6 other custodians in the case.
7          THE WITNESS: Let me try to clarify.  I was
8 not asked to undertake a personal search using terms or
9 any relevance to, that, that, based on my own filing
10 system or some mechanism.  I provided -- I have an
11 email account at work that is owned by the
12 organization.  I provided full access for the
13 organization to search the account and anything I've
14 sent or filed for the purpose of this.
15      BY ATTORNEY KRAMER:
16 Q.  Thank you.  Do you send or receive text messages?
17 A.  I do.
18 Q.  And have you ever exchanged text messages with
19 anybody else at Dartmouth-Hitchcock?
20 A.  Of course, yes.
21 Q.  Who?
22 A.  Members of my senior team, residents that I work
23 with on clinical rotations, the, the senior vice
24 president that works with me, the vice president for
25 our community group practices.

CONFIDENTIAL                                    Page 12

1 Q.  Did you ever exchange text messages with
2 Dr. Leslie DeMars?
3 A.  I did not.
4 Q.  Did you search your text messages in connection
5 with this litigation?
6 A.  I did not.
7 Q.  Were you asked to?
8 A.  I was not.
9 Q.  Do you use any devices to send messages other than
10 a phone, such as an iPad?
11 A.  On my iPad I have the ability to send the same
12 text messages that I do on my phone.  It's the same
13 account.
14 Q.  Do use the iPad for that functionality?
15 A.  Sometimes.
16 Q.  And do the messages synch between your iPad and
17 your phone such that, if you use your iPad to send a
18 message, does it then show up on your phone?
19 A.  Yes.
20          ATTORNEY SCHROEDER: Before we leave this
21 topic, one question you haven't asked him is whether or
22 not he transacted any business on his personal email
23 account.  I know you're going to follow up with me on
24 that issue, so, you know, I could wait and ask
25 questions at the end.  I'd rather just deal with it as

Misty Blanchette Porter, MD v.                  Confidential                  Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                    July 30, 2019

CONFIDENTIAL                                    Page 13

1    we go along.
2    BY ATTORNEY KRAMER:
3    Q.  Sure, we can go back to that.  With your personal
4    email account, the one that you referenced at Gmail,
5    did you use that email account to discuss anything
6    related to the REI division?
7    A.  I did not.  I don't use it for anything associated
8    with work whatsoever.
9    Q.  Do you keep hard copy files in your office?
10   A.  I do not.
11   Q.  You're paperless?
12   A.  I am.
13   Q.  Good for you.  Do you keep handwritten notes of
14   meetings?
15   A.  I sometimes take notes as reminders for to-do
16   items, but I don't generally take notes or minutes in
17   the course of meetings that, that I hold or I
18   participate in.
19   Q.  If you do take notes, do you retain those notes?
20   A.  They're usually on my schedule for the day.  Once
21   I've completed a follow-up with someone or any to-do
22   items, I usually recycle that piece of paper.  They're
23   not formal minutes or a detailed accounting of what
24   occurred in the meeting.  They're mainly what do I have
25   to follow up on and do.  They're check boxes.

CONFIDENTIAL                                    Page 14

1    Q.  Do you keep documents stored locally on your
2    computer hard drive?
3    A.  I do not.
4    Q.  So everything that you have is stored to the Cloud
5    system?
6    A.  Can you be more specific about what you're asking
7    me, what, what documents I store?
8    Q.  Well, what I'm getting at is whether any documents
9    that you created would be on a network server such that
10   somebody else coming in and running a search would have
11   access to all of them.
12   A.  Any documents that I have, anything that I have
13   would be on the, on the server at work and in my email.
14   So anything that would be sent would be via email.
15   Documents or otherwise that would be shared would all
16   be through our proprietary email system.
17   Q.  Do you ever prepare documents that you don't send
18   by email?
19   A.  I'm sure there are documents that I prepare that I
20   store that are not sent by email.  That, that may be
21   the case.
22   Q.  Do you ever save drafts of documents locally on
23   your computer?
24   A.  There are documents that I save on my computer
25   that are, may not be completed or may have been

CONFIDENTIAL                                    Page 15

1    completed, but it's -- yes, I think the answer is
2    "yes".  I'm sure, in my work -- I don't have an
3    extensive folder of Word files.  Most of the
4    communications that I do are actually within the
5    context of email.
6       I don't communicate -- you asked about texting.
7    The texting that I do with the people at work is in the
8    context of, Are you going to be at this meeting?  What
9    time should I catch up with you?  Is it still in this
10   conference room?  Have a good weekend.  It's not
11   conveying the information that I would, that I would
12   send that I would actually want to be part of a
13   document or a reference that I would send an email.
14   Q.  Understood.  Do you maintain a calendar either
15   electronically or hard copy?
16   A.  I do.
17   Q.  Is it electronic or hard copy or both?
18   A.  It's electronic.
19   Q.  Do you maintain that calendar, or does somebody
20   maintain it for you?
21   A.  My assistant maintains my calendar.  I have access
22   to it so I can add when I have a dentist appointment or
23   other things, but it's maintained by my assistant.
24   Q.  Would your calendar show all of the meetings that
25   you had over, let's say, the period of April, May, June

CONFIDENTIAL                                    Page 16

1    2017?  Would your calendar show all of the meetings?
2    A.  Absolutely.
3    Q.  Do you have meetings that don't show up on your
4    calendar?
5    A.  No.
6    Q.  If somebody dropped by, does that ever happen?
7    A.  Yes.
8    Q.  And would you then record that on your calendar?
9    A.  No.
10   Q.  Let's go briefly through your educational
11   background starting with college.  Where did you go to
12   college?
13   A.  I went to Dartmouth College.
14   Q.  And I assume after that you went to medical
15   school.
16   A.  No.  I --
17   Q.  No?
18   A.  I did research.
19   Q.  You did?
20   A.  I lived in Borneo, and then I went to medical
21   school.
22   Q.  Oh, how long did you live in Borneo?
23   A.  For a year doing rainforest research, and then
24   I --
25   Q.  And then medical school?

Misty Blanchette Porter, MD v.                    **Confidential**                    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                                July 30, 2019

CONFIDENTIAL                                        Page 17

1  A.  And then I went to medical school at Dartmouth,
2  which is now the Geisel School of Medicine.
3  Q.  What was your education after medical school?
4  A.  After medical school I went to residency at the
5  University of Washington Medical Center in Seattle.  I
6  trained in internal medicine, and I was a, selected as
7  the chief resident.  So I spent an extra year as the
8  chief resident in the University of Washington system,
9  and I was based at Harborview Medical Center, the
10  county hospital.
11  Q.  Did you receive any training post-residency?
12  A.  Following residency, when I, I -- I have a masters
13  in health care delivery science from Dartmouth College
14  and the Tuck School of Business.
15  Q.  And when did you obtain the masters from Tuck?
16  A.  2013.
17  Q.  When, when did you receive your medical degree?
18  A.  1994.
19  Q.  What, what prompted you to obtain the, the masters
20  from Tuck?
21  A.  I returned to Dartmouth in 1998 as a general
22  internist and began being involved in a lot of -- I
23  became involved in leadership roles.  I started a whole
24  section.  I took over some involvement in inpatient
25  care and became involved in health care, in health care

CONFIDENTIAL                                        Page 18

1  delivery, in leadership, in a lot of issues around how
2  health care systems are organized, and I was selected
3  to be a cohort sponsored by Dartmouth-Hitchcock to go
4  through this masters, masters program, and it was part
5  of a leadership development exercise and advancing my
6  career.
7  Q.  Has that study been helpful for your career since
8  then?
9  A.  Absolutely.
10  Q.  In what ways?
11  A.  I think the program allowed me to work with about
12  50 other people over a year-and-a-half period of time
13  who had about 20 to 25 years of experience in health
14  care delivery from around the United States.  We looked
15  at wide ranges of issues of health care, economics,
16  hospital structure, leadership, delivery of care,
17  insurance, health care finance, which is very much
18  consistent with what my role is within the organization
19  and our system now.
20  Q.  Why was the REI division closed?
21  A.  The REI division was closed for a variety of
22  reasons.  There were issues.  Finally, because it
23  lacked the staffing to be able to provide the care that
24  was necessary for a program that requires sometimes
25  24/7 management of cycles and harvest and delivery of

CONFIDENTIAL                                        Page 19

1  care.  There were challenges around recruitment and
2  turnover of nurses in that area, and I think there was
3  a, some fundamental discord amongst the, the group
4  around how the care was provided, but, ultimately, it
5  came down to the simple fact that we didn't have the
6  staffing in order to provide the safe and effective
7  care that we felt the group could.
8  Q.  What was your role in the decision to close the
9  REI division?
10  A.  Ultimately, it was my decision.  The chairs all
11  report to me in our system.  We review issues at
12  departmental level.  We review issues and problems and
13  challenges, and, in discussions with Daniel Herrick,
14  the VP for OB/GYN, and Leslie DeMars in her chair role,
15  it became clear that there were challenges and concerns
16  and, although ultimately the chair would effect the
17  decision, it was really a decision that was brought to
18  me, and I fundamentally made the final decision with
19  our counsel about that we close the REI program.
20  Q.  Why was Dr. Misty Porter terminated?
21  A.  Because we closed the program, the REI program.
22  So her termination was, occurred at the same time we
23  terminated the other physician providers in the
24  program.  We ended the program in which she worked.
25  Q.  And what was your role in the decision to

CONFIDENTIAL                                        Page 20

1  terminate Dr. Porter?
2  A.  The role was that we terminated the program.  We
3  ended the program, and, in ending the program, we made
4  the decision also that the people that provided that
5  care that was no longer going to be needed would also
6  be terminated.  So we made the decision to terminate
7  the physicians as the program ceased operation.  Misty
8  was one of the three physicians that provided care in
9  this program.
10  Q.  Ultimately, it was your decision to terminate
11  Dr. Porter?
12  A.  My decision was to -- ultimately, I mean,
13  ultimately, the program was, we ended the program, and
14  in order -- their termination was part of the closure
15  of the program.  Everything, I am ultimately
16  responsible for everything that happens from a clinical
17  aspect at Dartmouth-Hitchcock.  I oversee clinical
18  operations for the system.  So was it ultimately my
19  decision?  Yes.
20  Q.  Looking at the, the decision to close the REI
21  division, I'd like to go over the roles of various
22  players briefly.  We'll get into more detail, but for
23  now.
24  A.  Sure.
25  Q.  So, looking at the decision to close the REI

CONFIDENTIAL                                     Page 21

1  division, what was the role of Daniel Herrick?
2  A.  Daniel is the vice president who is closely
3  aligned, who oversees the department from an
4  administrative standpoint.  He's an administrator.  He
5  understands financial operations.  He understands
6  clinical, you know, how clinical delivery, hiring
7  people, budgets, planning.
8  Q.  What was Maria Padin's role in the decision to
9  close REI?
10  A.  I don't believe Maria had a specific role in the
11  decision.  Maria Padin is our Chief Medical Officer,
12  so, and she's also an obstetric and gynecologic
13  surgeon.  So she was part of this department for her
14  clinical role.  The, her role, she was someone that was
15  informed as part of the process, because she oversees
16  the medical staff, but the decision wasn't necessarily
17  hers.  She was involved in, in the discussions and kept
18  apprised.
19  Q.  How about Dr. Leslie DeMars?
20  A.  So Leslie was the chair of the department, and the
21  discussions that -- so, can you reframe your question,
22  what was her role?  Please reframe the question as it
23  relates to Dr. DeMars.
24  Q.  Sure.  What was Dr. Leslie DeMars's role in the
25  decision to close the REI division?

CONFIDENTIAL                                     Page 22

1  A.  So Leslie was ultimately the person that, that
2  made the decision, that made the announcement to, to
3  the group.  This was a decision that we supported after
4  looking at the information.  Ultimately, this was my
5  decision, but her role was really to kind of understand
6  all the information, discussions that we had, and to be
7  able to convey this to the department after a lot of
8  careful thought.
9  Q.  Did she make a recommendation to you about what
10  should happen?
11  A.  So we had a discussion.  All the discussions
12  around the recommendations to close REI included Daniel
13  Herrick and Leslie, and so the recommendation was
14  formed after a lot of discussion with both of them.
15  Q.  Still going through what the various people's
16  roles were, what was the role of Aimee Giglio in the
17  decision to close the REI division?
18  A.  She was not involved in the decision.  Her role as
19  the Chief Human Resource Officer was to, is to
20  understand, the our obligations and process from a
21  human resource, from an employee standpoint, what is
22  it, when you close a division, what are our
23  obligations, and how do we make sure that we're doing
24  everything correctly from an HR standpoint from
25  severance to, to everything from health insurance and

CONFIDENTIAL                                     Page 23

1  range like that.  So she was very key to understanding,
2  How do we go about doing this?
3  Q.  How about Heather Gunnell; what was her role in
4  the decision to close the REI division?
5  A.  Heather provided us information and data around
6  what the division had gone through, what the department
7  had gone through, and reports to, reported or reports
8  to Daniel in terms of daily operations for this group.
9  So her role in the decision was providing data,
10  information about how the, how things were operating,
11  how the process of caring for patients.  She would have
12  been the person that really knew the day-to-day
13  challenges of adequate nursing care and provision of
14  care, and she would have understood that in terms of
15  hiring and budgets and nursing and recruitment and
16  would have, that would have been, had a lot more of the
17  granular data that she would then report to Daniel
18  Herrick.
19  Q.  At the time, what was Heather Gunnell's job title,
20  if you recall?
21  A.  I think she was the practice manager.
22  Q.  Other than the individuals I've just gone through,
23  was anybody else closely involved in the decision to
24  close the REI division?
25  A.  No.

CONFIDENTIAL                                     Page 24

1  Q.  Did you speak with either the board or any board
2  members about the REI division before the REI division
3  was closed?
4  A.  Are you talking about the -- can you be more clear
5  about the board?
6  Q.  The Board of Trustees.
7  A.  Okay.  The Board of Trustees for the health system
8  or the Board of Trustees for Mary Hitchcock Hospital?
9  Q.  Both.
10  A.  There was no discussion with members of the board.
11  Q.  Do you know who Elizabeth Todd is?
12  A.  I know who she is.
13  Q.  Who is she?
14  A.  I believe she was a nurse that worked in
15  reproductive endocrinology.  Maybe, I can't remember if
16  she's a nurse or a nurse practitioner.  I think she's,
17  I think she's -- I'm not sure.  I know she works, she's
18  either a nurse or a nurse practitioner.
19  Q.  And she was in the REI division as of the time of
20  the closure, right?
21  A.  Correct.
22  Q.  Are you aware of whether she was terminated or not
23  along with the closure of REI?
24  A.  I believe Elizabeth stayed within the organization
25  but switched over entirely to do OB/GYN, and I, I don't

CONFIDENTIAL                                                           Page 25

1  know whether it was in the clinic or she did inpatient
2  care, but I know that she was doing -- I think she
3  stayed on to do obstetrics and gynecology.
4  Q.  Do you know why she was not terminated?
5  A.  Do I know why she was not terminated? Her, I,
6  when the program -- why she was not terminated?
7        ATTORNEY SCHROEDER: Just understand that,
8  when you're repeating the question out loud, it's being
9  recorded by the court reporter.
10       THE WITNESS: My understanding, and I may not
11 have the complete understanding of her role, was that
12 she had a range of other things that she did. I know
13 that she worked in REI. When the program ended, there
14 were other opportunities for her to work full time
15 within OB/GYN, and that was, that was the, the path
16 that, that occurred.
17 BY ATTORNEY KRAMER:
18 Q.  Was there an intention to rebuild the REI division
19 with Elizabeth Todd as part of the rebuilt division?
20 A.  There was no, no immediate plans to rebuild the
21 REI division when it was, when it was closed.
22 Q.  What, if anything, did Dr. DeMars tell you about
23 the reason for retaining Beth Todd?
24 A.  I don't believe I, I know. I don't know. I don't
25 remember Dr. DeMars explaining why Beth Todd was

CONFIDENTIAL                                                           Page 26

1  retained, but I specifically don't remember a plan to
2  retain Beth Todd to restart the REI program.
3  Q.  I think you may have answered this a minute ago,
4  but let's go through it again to make sure it's
5  clearer. When the REI division was closed, was there
6  any plan to reopen it, or was the plan to keep it
7  closed permanently?
8  A.  I don't think the -- so there were no formal
9  plans. So we didn't announce it to say we're closing
10 it but reopening, and here's a specific time. We
11 thought we needed, for the reasons of staffing and
12 function and patient care, to close the program. I
13 think we have the full intent of providing REI and IVF
14 services in the future, and we would restart a program
15 in the future, but we had made no specific dates or
16 promises or plans.
17 Q.  At the time of the closure, was there an
18 expectation about the time period, even if it wasn't a
19 formal plan?
20 A.  There wasn't an expectation about the time period.
21 I think all of us felt that this was an important part
22 of the care that we delivered and we weren't meeting
23 our own standards about how that, how that could happen
24 due to, primarily due to staffing and that, clearly, we
25 wanted to be able to do this in the future, but there

CONFIDENTIAL                                                           Page 27

1  was no timeframe around when that would occur.
2  Q.  Since June of 2017, have the plans or discussions
3  around REI division reopening changed?
4  A.  We've had some discussions around the needs and
5  how we might go about thinking about it. We've not
6  made any substantive decisions, and this was primarily
7  because we were going to leave this to the, the purview
8  of the new incoming chair, Ilana Cass.
9  Q.  When did Dr. Cass come on board?
10 A.  July 15th of this year, I believe, or July, mid
11 July.
12 Q.  Meaning about a couple of weeks ago?
13 A.  Two weeks ago.
14 Q.  Was there an interim chair before that?
15 A.  There was.
16 Q.  And how long -- was that Dr. Erekson?
17 A.  Correct.
18 Q.  How long was Dr. Erekson the interim chair?
19 A.  From, I believe, the end of June or early July
20 2017 until mid July of this year.
21 Q.  That seems like a long time to have an interim
22 chair. Is that an unusual period of time to have an
23 interim chair?
24 A.  It is not. We undertook a national search. We,
25 we had a robust process around selecting the interim

CONFIDENTIAL                                                           Page 28

1  chair. Then we had to go through a period of time to
2  do a national search, and it takes time to select the
3  right candidate, and we feel very happy with the
4  candidate that we selected.
5  Q.  I don't know much about Ilana Cass. Was she an
6  internal candidate?
7  A.  No.
8  Q.  Where did she come from?
9  A.  Cedars-Sinai in Los Angeles.
10 Q.  What's her subspecialty?
11 A.  I think her specialty is gynecologic oncology.
12 Q.  Let's switch gears a little bit to go through your
13 employment history over the last ten years. We touched
14 on this a little bit, but, going back to ten years ago,
15 what was your job at that time? And then we'll go,
16 just to give you a preview, we'll go through to the
17 present time what your job titles were and then go
18 through the job duties for each of those positions.
19 A.  Okay.
20 Q.  So, starting ten years ago, what was your, what
21 was your job title?
22 A.  I think in 2009 I was the section chief for
23 hospital medicine.
24 Q.  How long -- when did you start that position?
25 A.  Started the program in 2003. I became the section

CONFIDENTIAL                                    Page 29

1   chief in 2005.
2   Q.  How long did you remain section chief?
3   A.  I stepped down from the section chief role, I
4   believe, in 2012 when I was named the Chief Medical
5   Officer.
6   Q.  How long were you Chief Medical Officer?
7   A.  I'm trying to get the dates, because I think I was
8   the Chief Medical Officer until 2015 when I took on a
9   System Chief Medical Officer role, and I think the
10  title was Executive Director for System Integration,
11  and we hired a new Chief Medical Officer.
12  Q.  How long were you in that role, the system
13  something-or-other?
14  A.  Until 2016.
15  Q.  What position did you have starting in 2016?
16  A.  Chief Clinical Officer for the Dartmouth-Hitchcock
17  system.
18  Q.  Can you tell me again what the title was in
19  between your serving as Chief Medical Officer and Chief
20  Clinical Officer?
21  A.  It was a System Chief Medical Officer role.
22  Q.  System --
23  A.  CMO.
24  Q.  How is that different from regular CMO?
25  A.  Chief Medical Officer in our organization is for

CONFIDENTIAL                                    Page 30

1   the hospital itself.  So you work with the Chief
2   Nursing Officer, and you work with the Chief Operating
3   Officer for Mary Hitchcock Memorial Hospital.  I
4   transitioned to a role that had some involvement across
5   the broader system working with, working with member
6   hospitals and other, other Chief Medical Officers.  In
7   2016 I transitioned to a, a broader role over that, the
8   Chief Clinical Officer role.
9   Q.  Is there still a system CMO?
10  A.  We do not have a system CMO.
11  Q.  And you do currently have a CMO?
12  A.  Correct.
13  Q.  Why was the position of system CMO eliminated?
14  A.  I elected to continue to absorb the functions that
15  I did in that role into my Chief Clinical Officer role.
16  The Chief Clinical Officer role that I took also had
17  some academic responsibilities that were taken over by
18  someone else.  So it was just, in the job transition, I
19  elected to continue the system integration work that I
20  had done in the system role.
21  Q.  And you're still the Chief Clinical Officer --
22  A.  Correct.
23  Q.  -- now?  Have you had any interim positions along
24  the way?
25  A.  No.

CONFIDENTIAL                                    Page 31

1   Q.  Were you co-interim CEO?
2   A.  Oh, yes.  My apologies.  In the year before
3   Dr. Conroy was, arrived at Dartmouth-Hitchcock and
4   Dr. Weinstein had left, Steve LeBlanc, our Chief
5   Strategy Officer, and I shared the title of co-interim
6   CEO.
7   Q.  For what period of time?
8   A.  I believe it was for a year.
9   Q.  Let's talk about the job duties for those roles
10  starting with CMO.  What were your job duties?
11  A.  Job involves oversight of the medical staff
12  office, oversight of credentialing and privileging.
13  There are job descriptions detailed in the bylaws as it
14  relates to professionalism and the role of the, the CMO
15  mediating a number of those, being the mediator as it
16  relates to professionalism and other aspects of
17  discourse.  There are lots of other aspects of the job,
18  working with the Chief Nursing Officer, going to
19  quality rounds.  There's a whole range of things that
20  happen in that role.
21  Q.  Sure.  And is -- Dr. Padin is now the CMO, right?
22  A.  Correct.
23  Q.  Is her job now different from the responsibilities
24  you had as CMO?
25  A.  No.

CONFIDENTIAL                                    Page 32

1   Q.  Then you became the system CMO.  You described the
2   job duties to some extent previously.  Is there
3   anything you would like to add in explaining the job
4   duties when you were system CMO?
5   A.  No.
6   Q.  Chief Clinical Officer, what are your job duties?
7   A.  I oversee clinical operations for the
8   Dartmouth-Hitchcock system.  The chairs of all the
9   departments report directly to me.  The Chief Medical
10  Officer, the Chief Health Information Officer, the
11  Chief Quality Officer report to me.
12  Q.  Anything else that you would add to your job
13  description?
14  A.  I work in close collaboration with an executive
15  C-suite team that includes the CFO, the Chief Strategy
16  Officer, Chief of Health, and the, the Chief of Human
17  Resources, and the, and I report directly to the CEO.
18  Q.  Do you maintain any clinical responsibilities?
19  A.  I do.
20  Q.  How much?
21  A.  I work on average about a week a month as a
22  hospitalist at Mary Hitchcock Memorial Hospital.
23  Q.  And you mentioned that you were the, the
24  co-interim CEO with Steve LeBlanc.  What were your job
25  duties as co-interim CEO?

Misty Blanchette Porter, MD v.                 Confidential                    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                              July 30, 2019

CONFIDENTIAL                                      Page 33

1  A.  Our job was to maintain the organization in, while
2  we were between chief executives, so coordinating with
3  the other chief officers, meeting with the president of
4  the Board of Trustees, and ensuring that our
5  organization spanned that interim period without any
6  interruption. We had -- it was a time of improving and
7  restructuring our financial situation, and we
8  successfully did that over the course of the year,
9  allowing Dr. Conroy to arrive in 2017.
10 Q.  What was the period of time over which you
11 improved the financial --
12 A.  A year.
13 Q.  A year of what, what dates?
14 A.  2016 to 2017. Probably the summer, June 2016
15 through the summer of '17.
16 Q.  Was the closure of the REI division in any way
17 related to those overall financial difficulties?
18 A.  Not at all.
19 Q.  How did you and Steve LeBlanc divide up your
20 duties as co-interim CEO?
21 A.  I don't believe we had any specific guidelines for
22 the division of work. We met daily and throughout the
23 day around issues that came before us, and we decided
24 how best to handle them in a, in a partnership model.
25 Q.  At the time that you were co-interim CEO, were you

CONFIDENTIAL                                      Page 34

1  also Chief Clinical Officer?
2  A.  Yes.
3  Q.  Did you have any other roles, any other titles?
4  A.  No.
5  Q.  Who, what's the chain of command that goes up to
6  the Chief Clinical Officer?
7  A.  So all the department chairs, the chief health,
8  the Chief Health Information Officer, the Chief Quality
9  Officer, the Chief Medical Officer, the medical
10 director of our community group practice, I think those
11 are the, those are the primary chiefs and department
12 heads. Also, the Center Director for the Heart and
13 Vascular Institute, who's not a chair, but a Center
14 Director, reports directly to the Chief Medical
15 Officer.
16 Q.  Do you think, across the organization, that
17 there's collaboration between the different parts of
18 the organization, or is it, is it somewhat siloed in
19 different divisions?
20 A.  I think it's highly collaborative.
21 Q.  We spoke a little bit earlier about Daniel
22 Herrick. What's his, what's his job?
23 A.  He's the vice president for obstetrics,
24 orthopedics, surgery, and perioperative services at
25 Mary Hitchcock.

CONFIDENTIAL                                      Page 35

1  Q.  Are there a number of VPs that divide up different
2  groups?
3  A.  Correct.
4  Q.  Does he have any medical background?
5  A.  He's not a medical practitioner. He's held other
6  leadership roles in other health systems.
7  Q.  Is it unusual to have a VP in that position who
8  doesn't have medical training himself?
9  A.  No.
10 Q.  Can you explain more?
11 A.  In, he has an administrative role. It is entirely
12 common to have people that are in administrative roles
13 in a hospital or a system that may not be medical
14 practitioners but have worked in administrative roles
15 in hospitals, and he certainly came with that
16 experience.
17 Q.  Were you involved in the CEO search for Dr. Conroy
18 or for somebody to replace Jim Weinstein?
19 A.  I was not on the search committee.
20 Q.  Were you otherwise involved?
21 A.  I interviewed candidates.
22 Q.  Were you on a committee that that interviewed
23 candidates?
24 A.  There was a search committee of which I was not
25 one of the principals, but, in the process of

CONFIDENTIAL                                      Page 36

1  candidates that were selected, I was one of a core
2  group of people that interviewed prospective
3  candidates.
4  Q.  Who else was in that core group?
5  A.  Probably some of the other chief officers.
6  Q.  Did you apply for the position of CEO?
7  A.  I did not.
8  Q.  What was the time period in which you were
9  interviewing candidates for CEO?
10 A.  Are you asking how many months did this happen or
11 what was the time? I'm not sure. You just want to
12 know -- there was a period of time over a year that the
13 search occurred, and there was a process in which we
14 brought through maybe three or four candidates that I
15 interviewed. Those, and, and the, the people on the
16 search committee and those that interviewed were, that
17 information was given to the search committee who
18 ultimately made a decision.
19 Q.  When did you do the interviews of candidates?
20 A.  Can you be more specific?
21 Q.  You said that you, that you handled some
22 interviews of candidates for CEO and there were maybe
23 three or four candidates that you interviewed. When
24 did those interviews occur?
25 A.  Like --

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD - Vol. 1
July 30, 2019

CONFIDENTIAL                                    Page 37

1 Q.  Month?  Year?  Was it spring of --
2 A.  I don't --
3 Q.  -- 2017?  Was it --
4 A.  I don't remember when.
5 Q.  You don't?  Okay.
6 A.  I don't remember when the interviews for the
7    potential candidates occurred.  It might have been over
8    the winter.  I can't remember.  I'd have to go to my
9    calendar to see when those were scheduled.
10 Q.  How many times did you interview Dr. Conroy?
11 A.  I believe, twice.
12 Q.  Do you remember when those interviews were,
13    especially in relation to this closure of the REI
14    division, if it was before or after?
15 A.  They were before.
16 Q.  How much before?
17 A.  Several months before.  There, there, there's no
18    connection between the interviewing -- when I, we
19    interviewed Dr. Conroy, she came on the role, came in
20    the role the summer of 2017, and we can certainly get
21    into the timeline, but that, this evolved in the spring
22    of '17, but there was not, there was no connection
23    between the two.
24 Q.  When did, when was the decision made to hire
25    Dr. Conroy as the new CEO?

CONFIDENTIAL                                    Page 38

1 A.  I, I don't know the exact date.  There would have
2    been a public announcement.  There would have been a
3    range of things.  I just, I can't tell you the exact
4    date.
5 Q.  Is Dartmouth-Hitchcock an academic medical center?
6 A.  Yes.
7 Q.  What does that mean?
8 A.  It means that we participate in a broad range of
9    educational activities.  We have alignment with the
10    Geisel School of Medicine, Dartmouth College, the
11    Thayer School of Engineering, the Tuck School of
12    Business, a whole range of educational opportunities.
13    We have a broad and diverse residency, graduate medical
14    education residency for postgraduate, graduate medical
15    education as well as fellowships.  We participate in a
16    broad range of training programs for nurses, advanced
17    practitioners, technicians, and other roles.
18        So I think we are involved in research.  We have
19    research institutes.  We have a, a national cancer
20    center.  We're one of 30 organizations in the United
21    States that have an NCI-designated cancer center.  So
22    we have a broad spectrum of academic and educational
23    pursuits that are the characteristics of an academic
24    medical center.
25 Q.  And, and, just briefly, how, how is an academic

CONFIDENTIAL                                    Page 39

1    medical center different from a regular nonteaching
2    hospital?
3 A.  It lacks the attributes I described that are
4    characteristic of an academic medical center.  They
5    tend -- a regular medical center may, may not have
6    trainees, may not have active research, may not have a
7    broad array of learners that are engaged or and
8    involved in the care delivery.
9 Q.  And how does being an academic medical center
10    affect the core values of Dartmouth-Hitchcock?
11 A.  Our mission is around discovery of new knowledge
12    about training, training and education.  Those are part
13    of our core values as we, in the provision of care.
14 Q.  And is educational training of medical students
15    and residents part of the core mission of
16    Dartmouth-Hitchcock?
17 A.  Yes.
18 Q.  How long have you known Dr. Porter?
19 A.  I, I mean, I've known who she is for a, a long
20    period of time.  I became much more engaged with
21    Dr. Porter probably in 2012 when I took over the Chief
22    Medical Officer role and I got to know her quite well.
23 Q.  In what way did you get to know her quite well?
24 A.  At that time with the previous chair, Rich
25    Reindollar, Dr. Porter was experiencing some degree of

CONFIDENTIAL                                    Page 40

1    conflict and with her role and issues that were
2    happening in, in the, in the division and approached me
3    to help mediate the situation between her and her
4    chair, and she and I had extensive meetings over months
5    or a longer period of time.
6        This was also balanced by the fact that she was
7    also entertaining moving to Hawaii where she had been
8    offered a job in Hawaii, which I, where I think she
9    had, where she had done some training.  She had been
10    offered a role there and was really trying to balance
11    what it would mean to move her family out of Norwich,
12    where she had lived for years, to Hawaii where she had
13    trained and done that.
14        And I became very close with Misty around these
15    challenging decisions, managing conflict.  I actually
16    got her engaged with an outside mediator to work with
17    both -- I said -- I meant Reindollar.  I may have
18    mis-said -- I said Rothstein.  I meant Rich Reindollar
19    if I --
20 Q.  I think you said Reindollar.
21 A.  Okay.  Sorry.  There was a couple parts in there.
22    I apologize.
23 Q.  Yes.
24 A.  So I actually got an outside consultant to help
25    mediate between the two of them.  And so for that was

CONFIDENTIAL                                      Page 41

1    -- although I knew whom, who Dr. Porter was, this was a
2    period of time where I really became pretty close with
3    Misty around kind of understanding the situation that
4    was happening there, her perspective, and how we might
5    go forward with balancing different needs and
6    understandings and do that, and that was the beginning
7    of kind of getting to know her and knowing a lot about
8    what she did and what she was involved in, and so that
9    was the beginning.
10   Q.   And that, you said, was around 2012, 2013. Did
11   you stay in close contact with her over the years after
12   that?
13   A.   I don't -- we did not stay in close contact. That
14   was really around some difficult decisions she had to
15   make. She was offered an opportunity in Hawaii, and we
16   talked a lot about that. She decided to stay. And my
17   door was always open, and she knew that, but we didn't
18   continue discussions around that pathway, and I think
19   even the, the consultant-mediator relationship did not
20   continue.
21   Q.   Thinking about the period of, let's say, 2014 to
22   2017, how much interaction did you have with
23   Dr. Porter?
24   A.   Almost none. I, I would see Misty in the hallway
25   or in passing, but there was no, there was really no

CONFIDENTIAL                                      Page 42

1    ongoing meetings or anything. Just, if anything --
2    there was no interaction on the same level that, that
3    we had had earlier and that I engaged in.
4    Q.   Did you hear information about what was happening
5    with her practice over that period of time?
6    A.   I did not.
7    Q.   Do you have a view of Dr. Porter's clinical
8    skills?
9    A.   Yes. I think I was -- just, let me just make a
10   comment.
11   Q.   Sure.
12   A.   I'm following up on your previous question. There
13   was a time at which -- I just wanted to -- unrelated to
14   issues that were happening within REI, that UVM changed
15   from an academic focus to a private practice, and their
16   REI physicians moved to a private practice model,
17   leaving their fellow kind of stranded, and I worked
18   with Misty to allow the fellow to come down to
19   Dartmouth-Hitchcock to work down here. So I was
20   involved with her about making that happen. After that
21   -- and I was very supportive of that, and we made that
22   happen. That was another unrelated thing that Misty
23   and I worked on. Your question was -- please repeat
24   your question.
25   Q.   Sure. And with the, the fellowship issue, that

CONFIDENTIAL                                      Page 43

1    was, I believe that was 2014, 2015, 2016, in that time
2    period?
3    A.   I'd have to go back and check. It was more -- it
4    was providing kind of a landing, landing zone for, for
5    this fellow to come down, but it was an area where I
6    was very supportive of her work.
7        You had asked about my understanding of her as a
8    clinician and her, and I think she's a talented
9    clinician who is highly respected.
10   Q.   What do you know about the scope of Dr. Porter's
11   clinical practice?
12   A.   I think I know a fair amount. I know that
13   Dr. Porter is a gynecologic surgeon. She's involved
14   in, involved in reproductive endocrinology, in vitro
15   fertilization, pelvic ultrasonography and imaging, has
16   a, had a dual appointment both in the Department of
17   Radiology and Obstetrics and Gynecology.
18   Q.   And did she have that dual appointment at the time
19   of termination?
20   A.   Yes.
21   Q.   Can you describe for me the procedures that
22   Dr. Porter was able to perform?
23   A.   I'm not sure I can describe all of them. I think
24   there's a wide spectrum of procedures that are done in
25   obstetrics and gynecology. Dr. Porter, I think, had

CONFIDENTIAL                                      Page 44

1    some specialized expertise in septum, septal surgery in
2    the, in the uterus. She, but I actually don't know a
3    lot of specifics around her practice, around specific
4    surgery. I know she did some surgeries with complex
5    endometriosis, but I don't, I don't know much more.
6    Q.   What I heard you describe was a number of
7    practices that were not REI-specific. What's your
8    assessment of how much of Dr. Porter's practice was
9    REI-specific?
10   A.   I think most of her work was involved in IVF and
11   REI. She had some other areas in which she provided
12   special surgery and did imaging. I think much of the
13   imaging work she did was around, around REI, but
14   certainly had other skills.
15   Q.   Do you know if Dr. Porter was certified to perform
16   robotic surgery?
17   A.   I believe she was.
18   Q.   And -- she was. And do you know if there were
19   other physicians in OB/GYN who were also certified to
20   perform robotic surgery?
21   A.   Dr. Padin also does robotic surgery.
22   Q.   Anybody else?
23   A.   I don't know.
24   Q.   How much of Dr. Padin's time is spent on clinical
25   work?

CONFIDENTIAL                                                                 Page 45

1  A.  I don't know the exact percent, but she maintains
2  an inpatient -- she maintains an OB/GYN practice, works
3  with residents, and has an operative schedule, so --
4  Q.  When you were CMO, how much of your time was
5  devoted to clinical work?
6  A.  I would say approximately 15 to 20 percent.
7  Q.  Would you expect that it's similar for Dr. Padin?
8  A.  I would.
9  Q.  Are you aware that in late 2015 Dr. Porter became
10  ill?
11  A.  I'm, I don't know the specifics around her
12  illness.
13  Q.  Tell me what you, what you know about it.
14  A.  I know that she required a, a leave of absence due
15  to an illness, but I don't know the nature of the
16  illness.
17  Q.  Do you not recall, or did you never know?
18        ATTORNEY SCHROEDER: Objection, asked and
19  answered.  He says he didn't know.
20        THE WITNESS: I didn't know at the time.
21  BY ATTORNEY KRAMER:
22  Q.  Since that time, have you learned anything about
23  her illness?
24  A.  I've read the Complaint.
25  Q.  What do you know about Dr. Porter's medical

CONFIDENTIAL                                                                 Page 46

1  treatment at Dartmouth-Hitchcock for her illness?
2  A.  I, I've read the Complaint in which there's been a
3  description, but I know nothing and did not know
4  anything about her illness, the nature of the illness,
5  the conduct or course of her care during that time.
6  Q.  At that time, what did you know about her leave of
7  absence?
8  A.  I knew that she was on a leave of absence.
9  Q.  What did you know about her return to work?
10  A.  I didn't know anything about her return to work.
11  Q.  Would you expect to know about a physician's leave
12  of absence or return to work?
13        ATTORNEY SCHROEDER: Objection, calls for
14  speculation.  You can answer.  Go ahead.
15        THE WITNESS: I'm just trying to formulate
16  the answer.  The, I know she was on a leave of absence
17  and, at some point, she came back in some capacity and
18  was working in a reduced capacity.  I knew, didn't know
19  the details around why she was out of work or the
20  specific arrangement around her return, and, no, it
21  would not be uncommon for me to know.  I oversee 1,500
22  physicians in the organization through chairs and
23  section chiefs, and I don't necessarily know all the
24  details around return to work or leaves, and that is
25  the sole responsibility of the chair or the section

CONFIDENTIAL                                                                 Page 47

1  chief or division director.
2  BY ATTORNEY KRAMER:
3  Q.  Did you discuss Dr. Porter's leave of absence or
4  return to work with Aimee Giglio?
5  A.  Can you be more specific?  Is this in which
6  timeframe?
7  Q.  At any time.  Let's start with --
8  A.  Yeah.
9  Q.  -- pre-closure of REI, so before the beginning of
10  June 2017.
11  A.  Before the closure of the program, I might have
12  had discussions with Aimee around just understanding.
13  I didn't know what her status was, so I didn't
14  understand if she was away, if she was on disability,
15  or if she was working.  So it may have been just
16  clarifying and understanding what her status was prior
17  to closure.  I wasn't aware of how much she was working
18  or whatever.  Just wanting to know more about what was
19  the care delivery model like.  I don't remember any
20  specific meetings around interactions with Aimee around
21  this.
22        ATTORNEY KRAMER: Is it okay if we take a
23  short break?
24        ATTORNEY SCHROEDER: Absolutely.
25        (A recess was taken from 11:02 a.m. to 11:15 a.m.)

CONFIDENTIAL                                                                 Page 48

1  BY ATTORNEY KRAMER:
2  Q.  What did you know, if anything, about the
3  accommodations that Dr. Porter was receiving for her
4  illness or disability?
5  A.  I did not know anything about the accommodations.
6  You're talking about at the time, what timeframe?
7  Q.  Specifically, the spring of 2017.
8  A.  I didn't know anything about the accommodations.
9  Q.  Did you know that Dr. Porter was working a reduced
10  schedule --
11  A.  Yes.
12  Q.  -- at that time?
13  A.  Yes.
14  Q.  What did you know about her reduced schedule?
15  A.  I knew that her FTE was reduced.  I knew that she
16  was not as involved in longer operative cases, I think,
17  is my recollection.
18  Q.  Did you know why?
19  A.  I did not.
20  Q.  Did you know that she was receiving long-term
21  disability benefits as of the spring of 2017?
22  A.  I think I did, yes.
23  Q.  When did you learn of that?
24  A.  Probably in the spring of '17 as we began
25  discussions around who are the people involved in this

CONFIDENTIAL                                                               Page 49

1   program, and I, either in conversations with human
2   resources or with Leslie, I understood that she was on
3   long-term disability. Prior to that, I don't think I
4   was aware. I believe I understood that she was working
5   at a reduced rate and had been out, but I didn't know
6   the specifics.
7   Q. In the discussions, let's say, in the spring of
8   2017 about what to do with the REI division, did you
9   discuss Dr. Porter's illness?
10  A. No.
11  Q. It didn't come up?
12  A. You're saying in the discussions of the REI
13  program? I didn't know the nature of her illness.
14  Q. Well, not the nature of her illness but the fact
15  that she was not on a full-time schedule because of an
16  illness.
17  A. I was aware that she wasn't working full time.
18  Q. And did you know why she wasn't working full time?
19  A. I did not.
20  Q. Did you ask?
21  A. I don't think I did.
22  Q. Nobody told you?
23  A. I was aware that she required a leave of absence
24  and disability. I didn't require -- I didn't, I didn't
25  know the details, nor was that a requirement. It was

CONFIDENTIAL                                                               Page 50

1   not my information to know why she was on disability.
2   It's HIPAA protected, and I didn't inquire.
3   Q. Was there any discussion about expectation for
4   whether Dr. Porter would be able to return to full-time
5   work at some point?
6   A. An expectation that she would return to full-time
7   work? There was no discussion about what the time
8   course of her disability or return to work would
9   entail.
10  Q. Was there any discussion about whether she would
11  return to full-time work, would or could?
12  A. No.
13  Q. Did you raise any questions about whether
14  Dartmouth-Hitchcock could or should terminate somebody
15  who was receiving long-term disability benefits?
16  A. In the course of the discussions about the closure
17  of the program, I likely asked our Chief Human Resource
18  Officer whether, what would be the nature of closing a
19  program, terminating the physicians, and would, would
20  this in any way affect Misty being on disability? I, I
21  think I would have inquired about that as we began to
22  understand the implications of closing the program, and
23  I was informed that it wouldn't affect her disability,
24  that that would continue.
25  Q. That it wouldn't affect her benefits?

CONFIDENTIAL                                                               Page 51

1   A. Correct, the disability benefits, not her
2   disability, medical disability. It, she, her benefits
3   would continue is, is what I meant to say.
4   Q. Did you have any concern about possible exposure
5   or liability of the institution if the institution were
6   to terminate somebody who was receiving long-term
7   disability benefits?
8   A. No. I, my concern was based more around Misty. I
9   wanted to understand what I understood. I didn't know
10  that she was on disability. I knew that she had been
11  out and on disability. I wanted to understand, in the
12  course of the decisions that we were going to make,
13  were we, were we going to treat people well in the
14  context of things, give them adequate severance, give
15  them help in finding their next job, avail them of
16  outplacement services, and, in Dr. Porter's case, I
17  wanted to make sure and understand that the provision
18  of her disability coverage would be maintained.
19  Q. I asked a moment ago about whether you considered
20  possible risk or liability of the institution as a
21  result of terminating somebody who is receiving
22  long-term disability benefits. Did anybody else raise
23  similar concerns to you about that?
24  A. No.
25  Q. We talked before the break about some of your

CONFIDENTIAL                                                               Page 52

1   conversations with Aimee Giglio, and you mentioned
2   some. Can you tell me about any other meetings that
3   you had with Aimee Giglio regarding the REI division?
4   A. Not specifically.
5   Q. What do you mean?
6   A. You're -- you've asked me can I speak about any
7   other conversations I've had. I had -- my
8   conversations with Aimee were around, whatever we have
9   to do in terms of closure of a program, I want to make
10  sure that we do everything correctly in terms of the
11  people involved in this program, and that would be the,
12  that would be the nature of the conversations I had
13  with, with Aimee.
14      They may have been scheduled meetings. They may
15  have been -- she's two doors down from me, so I often
16  go to her office and just say, "I just want to make
17  sure we're doing this right". So HR was involved. As
18  we made the decision, HR was involved in everything we
19  had to do around this from communications to planning
20  to understanding the nuances of what this would entail.
21  Those were the nature of the discussions I had with
22  Aimee.
23  Q. Has Dartmouth-Hitchcock ever shut down a division
24  before?
25  A. We have -- I'm trying to remember now. We have

CONFIDENTIAL                                                   Page 53

1    stopped providing care in certain areas. Whether it's
2    a division or a service, there have been times when
3    we've had to do that.
4    Q.  That sounds different to me than shutting down a
5    division. I just want to make sure that I'm getting a
6    full answer to the question. Has Dartmouth-Hitchcock
7    shut down a division before?
8    A.  Not to my knowledge.
9    Q.  Did Aimee Giglio express any concerns about the
10   unusual nature of shutting down a division or --
11   A.  No.
12   Q.  Maybe I'm being overly specific. Did she express
13   concerns about the fact that there was a plan to shut
14   down a division?
15   A.  No.
16   Q.  Do you know if she expressed those concerns to
17   anybody else other than you?
18   A.  I wouldn't know that.
19   Q.  Aside from these three REI physicians -- ball park
20   is fine -- how many physicians has Dartmouth-Hitchcock
21   terminated in the last five years?
22   A.  I don't know.
23   Q.  Can you give a ball park?
24   A.  No.
25   Q.  Is it more than ten?

CONFIDENTIAL                                                   Page 54

1    A.  In the past ten years, you're saying?
2    Q.  I said five years, but we can --
3    A.  Five years?
4    Q.  We can say ten years.
5    A.  I would say it's less than ten.
6    Q.  In the last five years?
7    A.  Yeah.
8    Q.  How about in the last ten years? Less than ten?
9    A.  I don't know.
10   Q.  Would you say that it's unusual to terminate a
11   physician?
12   A.  Yes.
13   Q.  Let's talk about Albert Hsu. Who is Albert Hsu?
14   A.  Albert Hsu is one of the physicians in the, in the
15   division.
16   Q.  What is his specialty?
17   A.  I think he was a reproductive and endocrinology
18   infertility doctor within OB/GYN.
19   Q.  Can you describe to me briefly what your
20   interaction was with Dr. Hsu and what the basis is for
21   your knowledge of Dr. Hsu?
22   A.  I had no interaction with Dr. Hsu. I was aware of
23   his work. I was aware of his membership in the
24   division, and a -- that's my sole knowledge of Dr. Hsu.
25   Q.  Did you ever meet him in person?

CONFIDENTIAL                                                   Page 55

1    A.  No. I met him when we closed the program.
2    Q.  What -- he was hired in 2014, and you were CMO in
3    2014 --
4    A.  Correct.
5    Q.  -- correct? Did you have any role in hiring
6    Dr. Hsu?
7    A.  I would have been on the -- we have a medical --
8    we have a credentials and privileging committee. All
9    new physicians would come before that committee, be
10   presented based on, and we would do background checks.
11   We'd look at national provider databases, a whole
12   process through the medical staff office for bringing
13   on a new physician, and he would have been approved by
14   that committee and then sent on to the Board of
15   Governors and the Board of Trustees for approval before
16   hiring. That would have been the context of which his
17   name would have come before that committee.
18   Q.  And you were on that committee?
19   A.  Correct.
20   Q.  Do you recall anything about his hiring?
21   A.  No.
22   Q.  Were you aware of any concerns about Dr. Hsu
23   before he was hired?
24   A.  No.
25   Q.  Do you know if the hiring process for Dr. Hsu was

CONFIDENTIAL                                                   Page 56

1    in the normal course or if there was anything unusual
2    about it?
3    A.  No.
4    Q.  Are you aware that Dr. Hsu struggled with
5    completing his charts in a timely manner?
6    A.  At times, yes.
7    Q.  Tell me more of what you mean.
8    A.  We have a -- I instituted a, a new documentation
9    policy about six or seven years ago that required
10   physicians to complete charts in a timely manner.
11   Can't have any more than ten outstanding notes open on
12   a weekly basis, which is, has been challenging for some
13   physicians, and every week I'm apprised of the
14   physicians that have outstanding notes, and he may have
15   been one of those physicians that had struggled with
16   note completion, and but there are lots of physicians
17   like that.
18   Q.  Why did you implement the new policy?
19   A.  We thought that completion of notes was an
20   important part of patient safety and that a referring
21   physician and a patient should have the documentation
22   of their clinical visit completed in a timely fashion.
23   We have an open record at Dartmouth-Hitchcock.
24   Patients can read their medical records, and referring
25   physicians have access to them. So the policy was

CONFIDENTIAL                                    Page 57

1  around the safe provision of patient care and timely
2  records.
3  Q.  If a physician fails to complete notes in a timely
4  fashion, is that a patient care issue?
5  A.  Absolutely.
6  Q.  You said that these lists of delinquent physicians
7  or physicians who were delinquent in completing their
8  charts were circulated how often?
9  A.  Weekly.
10 Q.  Weekly?  How often was Dr. Hsu on this list?
11 A.  I can't tell you.  I don't recall.  I don't always
12 monitor the list of, that goes out.  It's managed at
13 the division level and the department level in terms of
14 documentation, and sometimes it's, it's as simple as, I
15 was away for vacation and I didn't -- these notes came
16 in later.  Sometimes it's your supervising trainees who
17 complete their documentation later.  Sometimes there
18 are plausible reasons why deficiencies are there.
19 Sometimes you're covering for a colleague and having to
20 manage their in-basket.
21      There are sometimes reasons why delinquent --
22 delinquency is a punitive term.  What we're trying to
23 get -- there are organizations where physicians are
24 flagged when they're, when they get above a thousand
25 outstanding notes.  In our organization we've decided

CONFIDENTIAL                                    Page 58

1  that the right thing is to have a smaller number, and
2  we manage that.  I don't remember him as being someone
3  that was always on the list or always having to be, to
4  be managed.
5  Q.  What's the consequence for having too many
6  delinquent notes?
7  A.  So our policy states that, that you can be
8  suspended if you fail to complete the documentation in
9  a timely fashion.  That doesn't happen.  Physicians
10 that, under New Hampshire medical --
11 Q.  Just to jump in for a second, when you say, "That
12 doesn't happen", meaning you don't actually suspend
13 people, or nobody is actually so delinquent that they
14 would trigger that, that effect?
15 A.  I should be more clear.  Most people are able to
16 complete their documentation in a timely fashion so as
17 not to be suspended.
18 Q.  I'm sorry.  I interrupted you.  Go ahead.
19 A.  New Hampshire statute states that physicians that
20 are suspended more than three times in a calendar year
21 need to be reported to the state medical board.  So
22 there's some statute around this.  Again, the goal is
23 not to be punitive.  The goal was to get to a place at
24 which we thought the standard was the safe provision of
25 care is timely completion of documents, and there are

CONFIDENTIAL                                    Page 59

1  always challenges around that, and it's, it's proven to
2  be something that we've done for a number of years now
3  and feel very proud that we, notes get done.
4  Q.  Did you monitor the list to see if the same names
5  came up again and again?
6  A.  I did not.  If there were specific situations in
7  which someone was having a problem, the chair or the
8  division director could get in touch with me and say,
9  Hey, their child is sick.  They're managing.  There are
10 lots of reasons.  And we would, we would make
11 appropriate exceptions.  That's actually the way it
12 should work.  It isn't just this happened, and we're
13 going to do this.  So there was discussion, and
14 sometimes there were people that had extenuating
15 circumstances that made sense.
16 Q.  What do you know about Dr. DeMars's efforts to
17 support Dr. Hsu in completing his charts in a timely
18 manner?
19 A.  I don't know anything specific.
20 Q.  Do you know if he received any sort of extra
21 supports?
22 A.  I don't.
23 Q.  Do you know -- what do you know about Dr. DeMars's
24 efforts to support Dr. Hsu in general?
25 A.  I know that she worked to help him develop his

CONFIDENTIAL                                    Page 60

1  practice.  I know that she was working to help him to
2  become board-certified.  I know that she wanted to
3  ensure that his clinical skills and expertise continued
4  to develop, but that would be the extent of what I
5  knew.
6  Q.  Do you know if Dr. Hsu struggled?
7  A.  My understanding is that his efficiency in the OR
8  and his -- I think his efficiency and how comfortable
9  he felt were areas that Leslie felt could continue with
10 mentoring and help, and I would say that happens with
11 junior faculty that are hired into other surgical
12 divisions.  That was the extent of my knowledge around
13 what Dr. DeMars was doing with Dr. Hsu.
14 Q.  What did you know about Dr. Porter's efforts to
15 support Dr. Hsu?
16 A.  I don't know anything.
17 Q.  Any information that you have about Dr. Hsu would
18 have come through Dr. DeMars; is that fair to say?
19 A.  Yes.
20 Q.  Were you aware of any concerns about Dr. Hsu from
21 any providers in OB/GYN?
22 A.  No.
23 Q.  If there -- at what point would you expect
24 concerns about a provider to reach you at the Chief
25 Clinical Officer level?

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

**Confidential**

Edward Merrens, MD – Vol. 1
July 30, 2019

CONFIDENTIAL                                    Page 61

1 A.   When the chair thought it was appropriate.
2 Q.   Were you aware of any concerns about Dr. Hsu from
3 patients?
4 A.   No.
5 Q.   Is that information that would have come to you in
6 any sort of channel other than through the chair of the
7 department?
8 A.   It's not uncommon for patients to reach out to me
9 directly, so that could have happened.
10 Q.   And you don't recall that happening in this
11 situation?
12 A.   It did not happen.
13 Q.   It did not happen?  Are you aware of, that Dr. Hsu
14 received an evaluation of "performance requires
15 improvement" three times in 2015, 2016, and 2017?
16 A.   I'm not aware.
17 Q.   Are you surprised to learn that a physician
18 received an evaluation like that three times in three
19 years and that that information did not reach you?
20 A.   I think the information that reached me is that
21 there were continued efforts that improving aspects of
22 his clinical care and that it is, that's all I knew of
23 around -- there are clearly areas where people need
24 practice requires improvement, and I, I think the the,
25 that aspect of his work was something that the, the

CONFIDENTIAL                                    Page 62

1 chair would have conveyed to me.
2 Q.   At what point does more need to be done if a
3 physician continues to receive "performance requires
4 improvement" evaluations?
5 A.   I think, if we feel like it's impacting patient
6 care or there are other aspects of it that we think
7 could be of more concern, and I would defer to the
8 chair to say, to elaborate more on the specific aspects
9 that require improvement.
10 Q.   Since the closure of REI, have you learned of
11 anything about Dr. Hsu that makes you concerned about
12 the amount of information that you were given by
13 Dr. DeMars?
14 A.   No.
15 Q.   Are you aware of Dr. Porter preparing a lengthy
16 written evaluation of Dr. Hsu in June of 2016?
17 A.   No.
18 Q.   Would those evaluations typically reach you?
19 A.   No.
20       (Deposition Exhibit 1 marked.)
21       (A discussion was held off the record.)
22 BY ATTORNEY KRAMER:
23 Q.   This is lengthy.  Why don't you take a minute to
24 read through this while we're getting situated?
25       (Brief pause.)

CONFIDENTIAL                                    Page 63

1       Dr. Merrens, have you seen this document before?
2 A.   I have not -- I haven't finished reading it.
3 Q.   Well, I'll give you a minute to finish reading it.
4 Have you seen it before?  Is this new to you?
5 A.   I don't believe I've seen this before.
6 Q.   So why don't you take a minute to read through and
7 --
8       (Brief pause.)
9     This is a document dated June 3rd 2016.  It's
10 eleven pages long, PORTER0000175 through PORTER0000185.
11 Have you had a chance to review this document?
12 A.   I have.
13 Q.   And is it still your testimony that you haven't
14 seen this document before?
15 A.   That's correct.
16 Q.   In this document Dr. Porter provides a review of
17 Dr. Hsu.  In this document she raises a number of
18 serious concerns about Dr. Hsu.  Do you agree that
19 Dr. Porter raises a number of serious concerns about
20 Dr. Hsu?
21 A.   Yes.
22       ATTORNEY SCHROEDER: Objection.
23 BY ATTORNEY KRAMER:
24 Q.   Are you surprised that these concerns were not
25 brought to your attention?

CONFIDENTIAL                                    Page 64

1 A.   I would -- what was brought to my attention was
2 that, as I stated before, that there were concerns
3 about his practice, efficiency, documentation, and
4 other aspects, and I expected those to be managed at
5 the departmental level.  There are a lot more -- there
6 are clearly more specifics in this document, and I
7 would expect, if a plan of addressing these was not
8 successful or not, not done, that, that I would have
9 heard more.
10 Q.   Would you hope that, if a, a longstanding and
11 well-respected physician at Dartmouth-Hitchcock had
12 concerns like this about another provider, that it
13 would come to your attention?
14       ATTORNEY SCHROEDER: Objection, calls for
15 speculation.  You can try to answer it.
16       ATTORNEY KRAMER: Don, let's try not to
17 coach.
18       ATTORNEY SCHROEDER: I said, "Objection,
19 calls for speculation.  You can try to answer it".
20       ATTORNEY KRAMER: Right.
21       ATTORNEY SCHROEDER: There's no coaching.
22       ATTORNEY KRAMER: There is.
23       ATTORNEY SCHROEDER: There's no coaching
24 involved.
25       THE WITNESS: So the -- can you repeat the

Misty Blanchette Porter, MD v.                Confidential              Edward Merrens, MD – Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                              July 30, 2019

CONFIDENTIAL                                Page 65

1  question?
2      (Question read by the reporter:
3          "Q.  Would you hope that, if a, a
4      longstanding and well-respected physician at
5      Dartmouth-Hitchcock had concerns like this about
6      another provider, that it would come to your
7      attention?")
8          THE WITNESS: It, not necessarily.  It is at
9  the chair's discretion to manage these issues and these
10 concerns.  This was addressed to the division chief.  I
11 would expect that this would be managed at the division
12 and department level and, if there was ongoing concern,
13 I would most certainly be involved.
14 BY ATTORNEY KRAMER:
15 Q.  Do you know if there was ongoing concern about
16 Dr. Hsu, seeing that this letter was dated June 3rd
17 2016 and there were negative evaluations of Dr. Hsu in
18 2017?
19         ATTORNEY SCHROEDER: Objection, assumes facts
20 not in evidence.
21         THE WITNESS: I don't have his evaluations
22 for reference.  I have Dr. Porter's detailed
23 assessment.
24     (Deposition Exhibit 2 marked.)
25

CONFIDENTIAL                                Page 66

1  BY ATTORNEY KRAMER:
2  Q.  For the record, I have handed you a document with
3  Bates Number 25460 through 25462.  It's dated January
4  3rd 2017, and, in particular, Dr. Merrens, I would like
5  to turn your attention to the second page, which
6  includes reviews.  There are three reviews.  The top
7  one is from Dr. DeMars dated January 2nd 2017.  Then
8  there's one from Dr. Porter, April 13th 2016, and a
9  third from Dr. Porter, August 14th 2015.
10     Would you agree that the top review dated January
11 2nd 2017 from Dr. DeMars indicates that Dr. Hsu's
12 performance requires improvement?
13 A.  Correct.
14 Q.  And that, in the notes, Dr. DeMars describes
15 specifically some of the struggles that Dr. Hsu had
16 with his performance?
17 A.  No.  She describes completion of medical records
18 and satisfaction scores with ambulatory encounters.
19 Q.  Okay.  Do you disagree?
20 A.  You, her -- the comment by Dr. DeMars is that he
21 struggles with timely completion and patient
22 satisfaction scores and, furthermore, there is an
23 ongoing performance improvement initiative within the
24 division that Dr. Hsu will play an integral role.
25 Q.  So you don't see this as continuing concerns about

CONFIDENTIAL                                Page 67

1  Dr. Hsu's performance?
2  A.  I do see -- I'm reading what I think -- you know,
3  his performance, you've asked me to reflect on what
4  Dr. DeMars has written.  Dr. DeMars has commented.  The
5  most recent -- you asked me to look at January 2017 --
6  indicates struggling with medical records as well as
7  his patient satisfaction scores, and he's involved in
8  an improvement initiative.  Do I view this as an
9  opportunity for improvement?  Absolutely.
10 Q.  Returning to Merrens Exhibit 1, the June 3rd 2016
11 letter from Dr. Porter, looking at the final page,
12 Bates 1, PORTER185, Dr. Porter says, "It is my opinion
13 that employment at DHMC, with the clinical demand and
14 his observed deficiencies, is not appropriate for
15 Dr. Hsu.  It is a disappointment, but I believe it
16 true".
17     Are you surprised that a recommendation of that
18 magnitude was not brought to your attention?
19         ATTORNEY SCHROEDER: Objection, calls for
20 speculation.
21         THE WITNESS: I don't know what the response
22 was to this letter around the specifics.  So I just
23 have her, her letter from June, the last documented --
24 anything I know from Dr. DeMars is written here in this
25 performance evaluation.  So I don't know any more.

CONFIDENTIAL                                Page 68

1      (Indicating Exhibit 2.)
2          ATTORNEY SCHROEDER: Make sure you just
3  identify for the record which document you're talking
4  about.  So Exhibit 2, Exhibit 1, just so that you --
5          THE WITNESS: I apologize.  You're asking me
6  if I'm surprised about the nature of what she's saying
7  here and would I not be apprised.  I was apprised that
8  there were challenges within the REI division with
9  Dr. Hsu with his documentation and his capability of
10 his practice and that they had a plan to help mitigate
11 that.  That was my understanding until the program
12 ended.  That would be the extent of, of my knowledge.
13     I didn't, I wasn't aware, I wasn't -- I was not
14 apprised of Document 1, nor did the chair raise to me
15 significant concerns that would require my involvement,
16 the Chief Medical Officer's involvement, or other
17 people in the organization around his care or
18 capability.
19 BY ATTORNEY KRAMER:
20 Q.  My, my question was specifically whether, sitting
21 here today, you were surprised that you did not learn
22 about the magnitude of Dr. Porter's position on this,
23 specifically that she viewed termination of Dr. Hsu as
24 the appropriate next step?
25 A.  I think that would be speculative.  I, I, she has

Misty Blanchette Porter, MD v.                    Confidential                    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                        July 30, 2019

CONFIDENTIAL                                                          Page 69

1  a very strong opinion about, about Dr. Hsu and his
2  capabilities. I completely respect that. But it would
3  be speculative for me to say why I shouldn't have seen
4  this document, and I don't know what happened following
5  her June 3rd communication referenced in Document 1 at
6  the department or the, the division level.
7  Q.  To be clear, I'm not asking you to speculate why
8  --
9         ATTORNEY SCHROEDER: Objection, objection.
10 He's asked and answered the question the best way he
11 sees fit.
12 BY ATTORNEY KRAMER:
13 Q.  I'm not asking you to speculate about the
14 document. To be clear, you're not able to tell me
15 whether, sitting here today, you are surprised or not?
16        ATTORNEY SCHROEDER: Objection, once again,
17 calls for speculation.
18        THE WITNESS: You're asking me whether I'm
19 surprised or not about reading a document that I had
20 not seen before, whether, whether I'm surprised now
21 reading it that this was Dr. Porter's opinion in 2016?
22 BY ATTORNEY KRAMER:
23 Q.  No. Surprised that, that, in a situation where a
24 physician had a strong opinion like this suggesting
25 termination, that that information wouldn't have

CONFIDENTIAL                                                          Page 70

1  reached you.
2  A.  If there was -- what I don't -- the information
3  that would have reached me was a plan that Dr. DeMars,
4  in the role of the chair, would have put together
5  incorporating Dr. Porter's opinion as outlined in this
6  Document 1 around what the next step should be.
7  Dr. Porter would have -- Dr. DeMars, as the chair,
8  would have come to me and said, We have a plan
9  incorporating some perspectives on his care, his
10 capability, his documentation, and a host of other
11 things, and that would have been under her purview.
12       So I'm not -- there are, there are, there's
13 management of people and their care that happens in a
14 department, and, if I need to be involved, I, I can be
15 involved. So I don't know. This is one document
16 outlining Dr. Porter's perspective. I don't know what
17 the next steps were that occurred within the
18 department. I've already stated that I clearly
19 understand that there were efforts to help Dr. Hsu on
20 many levels with documentation and care and
21 coordination, and, in my meetings with Leslie which
22 occurred on a monthly basis, I think I was apprised at
23 that level.
24 Q.  Do you have monthly meetings with all of the
25 chairs?

CONFIDENTIAL                                                          Page 71

1  A.  Yes.
2  Q.  If a physician performed a procedure without
3  informed consent of the patient, how would you expect
4  that Dartmouth-Hitchcock would handle the situation?
5         ATTORNEY SCHROEDER: Objection, calls for
6  speculation. You can answer.
7         THE WITNESS: There are processes for
8  reporting situations that aren't consistent with
9  expected practices that involve notifying the patient,
10 involving risk, and a whole range of, range of things
11 that happen.
12 BY ATTORNEY KRAMER:
13 Q.  Would you agree that performing a procedure
14 without informed consent is outside the standards of
15 acceptable care for a provider at Dartmouth-Hitchcock?
16 A.  Yes.
17 Q.  If there were such a situation, would you expect
18 it to be brought to your attention?
19 A.  Not necessarily.
20 Q.  When would it come to your attention, and when
21 would it not?
22 A.  There are situations where they realize that they
23 didn't provide the right consent. They have a
24 discussion with, with the family, the patient. They
25 involve risk. They, they're open about things, and,

CONFIDENTIAL                                                          Page 72

1  and the situation is discussed, and there's a plan
2  going forward, and I'm not necessarily involved. I'm,
3  I may be involved if there is more global concern and
4  if the chair feels like they will, they feel like this
5  is something that is affecting patient care or the
6  ongoing function of the department.
7  Q.  When issues go to risk management, do you get any
8  sort of regular report from risk management? How does
9  information filter up from risk management to you?
10 A.  It depends. Sometimes they are filtered up
11 involving the Chief Medical Officer. If there's a case
12 around consent or process or a range of things that the
13 CMO may be involved as the medical officer for the, for
14 the institution, for the hospital, MHMH. So the CMO
15 may be involved if that's an ongoing concern. It can
16 be broached with the Chief Medical Officer, or it may,
17 it may be brought to me, and there are certain
18 situations in which I'm apprised of it and I bring it
19 back to the Chief Medical Officer for the Chief Medical
20 Officer to be involved with risk and the Medical Staff
21 Office and other people that are involved in understand
22 a situation.
23 Q.  Do you know of any situations involving Dr. Hsu
24 that went to risk management?
25 A.  I'm not aware.

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD - Vol. 1
July 30, 2019

CONFIDENTIAL                                          Page 73

1 Q. Let's turn now to the spring of 2016 when
2 Dr. Seifer was hired. Do you know Dr. Seifer?
3 A. I don't.
4 Q. Have you ever met him?
5 A. Yes.
6 Q. When did you meet him?
7 A. When we announced the closure of the program.
8 Q. Had you met him prior to that?
9 A. No.
10 Q. And, for the record, who is Dr. Seifer?
11 A. Dr. Seifer was the Division Director for
12 Reproductive Endocrinology and Fertility at
13 Dartmouth-Hitchcock.
14 Q. What do you know about the hiring process for
15 Dr. Seifer?
16 A. I know that he was recruited from Oregon Health &
17 Science University. He had been recommended by Richard
18 Reindollar earlier on. I believe he had been working
19 somewhere else previously. I think, when Rich decided
20 to leave Dartmouth-Hitchcock, Dr. Seifer took the role
21 at OHSU. Leslie DeMars reached out to him to recruit
22 him to Dartmouth to join the, the REI division here.
23 Q. Was the position posted for any sort of
24 recruitment efforts?
25 A. I think they were looking for another member of

CONFIDENTIAL                                          Page 74

1 the division. I don't know how it was posted or what
2 the, what the, what the recruitment process was.
3 Q. Are positions normally posted, or is there
4 sometimes a, just a one-on-one individual recruitment
5 effort?
6 A. Usually, we have a -- usually, we have a search
7 process. That may be a national search. It may be, it
8 may be more informal. It may be an internal search.
9 I'm not aware of the process that was, that the REI
10 division director recruitment undertook.
11 Q. If you could, just tell me a little bit more about
12 what's the normal course for hiring, especially at a
13 division director level?
14 A. Typically, it involves a national search, reaching
15 out to national societies and meetings, print ads,
16 networking amongst people, applicants, a search
17 committee, a winnowing process, interviewing potential
18 candidates, and making an offer.
19 Q. Did you have any concerns about hiring of David
20 Seifer in 2016?
21 A. Yes.
22 Q. What were those concerns?
23 A. I led our credentials committee at that time, and
24 his hiring was -- initially, he was hired in an
25 administrative role to join Dartmouth as the division

CONFIDENTIAL                                          Page 75

1 director, and then he was brought in a short period of
2 time to be into a clinical role. So there was some
3 process there that we had some concerns about that,
4 and, independently, members of Oregon Health & Science
5 reached out to our faculty with concerns about his
6 practice, and those were discussed at our credentials
7 committee and with Dr. DeMars.
8 Q. What was the nature of the concerns of his
9 colleagues?
10 A. The concerns were that he didn't have the breadth
11 of -- he, he had a more limited focus in terms of his
12 approach to reproductive endocrinology, although
13 accomplished and everything. His type of -- he had a
14 different practice style and maybe different
15 capabilities than his colleagues at OHSU, and those,
16 those perspectives were shared with members at
17 Dartmouth, and there was, there was the suggestion that
18 he had also been asked to cease providing care in some
19 areas, and in my role I asked for more clarification
20 around his status at OHSU, the procedures he was asked
21 to stop, and whether this had been fully vetted for his
22 role here.
23 Q. You described that Dr. Seifer had a limited
24 breadth of skills. Did you have any concern about
25 whether somebody with a limited breadth of skills was a

CONFIDENTIAL                                          Page 76

1 good fit for a regional medical center like DHMC?
2 ATTORNEY SCHROEDER: Objection,
3 mischaracterizes his testimony. I think he said that
4 OHSU said that. You can answer.
5 THE WITNESS: The, I -- he had a different
6 set of skills. I'm not trying to say he had -- I think
7 there were things that he assumed that he would not
8 have to do as part of that practice that the colleagues
9 at OHSU routinely did, and I can't be specific about
10 this. I think they were more adept at doing certain
11 procedures that he thought would be done by a
12 technician, and he wasn't necessarily -- that wasn't
13 part of his practice.
14 BY ATTORNEY KRAMER:
15 Q. Did anybody else have concerns about Dr. Seifer?
16 A. I think there were other members of, in the
17 department who were contacted that were concerned about
18 whether he would be the, the right fit.
19 Q. And at Dartmouth-Hitchcock were there other
20 members of, I guess, the credentialing committee who
21 had concerns about whether to bring Dr. Seifer in?
22 A. I think there were other members of the committee
23 that shared our concern.
24 Q. Who?
25 A. I can't remember who was on the committee at the

CONFIDENTIAL                                                    Page 77

1   time, but we had a committee that reviewed all
2   applicants. We actually had Dr. DeMars come before the
3   committee to explain her rationale for bringing him
4   forward and her understanding. She explained that she
5   thought the role here would be different, he would be a
6   good fit and would be -- he was an accomplished
7   physician in his own right and that she was, had
8   expressed that she was not pleased that people from
9   OHSU had contacted us and expressed this concern
10  without her being able to counter it to some degree,
11  but there were concerns, and she ensured the committee
12  and myself that she would take personal responsibility
13  that he would be a success.
14  Q.  Did you rely on her statements of support of
15  Dr. Seifer in -- well, I guess I should back up.
16      Did you, did you feel that your concerns were
17  adequately addressed?
18  A.  Yes.
19  Q.  And did you -- I don't know what the right word is
20  -- approve, endorse, give a seal of approval to the
21  hiring of Dr. Seifer?
22  A.  We allowed her to hire Dr. Seifer with the
23  understanding that she would ensure that he would be a
24  success in this role.
25  Q.  What did that mean?

CONFIDENTIAL                                                    Page 78

1   A.  That she was able to convince the committee that
2   the views expressed by people at OHSU were not relevant
3   to the role he would, he would enjoy here. She had
4   reached out to other places that he had practiced
5   previously and had endorsement from them, and there was
6   -- I think her belief was that this was just a bad fit
7   for him out there and that he would be in a better
8   position in the role at Dartmouth. So the committee
9   approved his -- he was credentialed and privileged, and
10  he was hired into the clinical role from just the
11  administrative role that he had been brought to
12  Dartmouth to do.
13  Q.  And was Dr. Seifer a success?
14  A.  I don't know if I can comment on that. I don't
15  have any reason to believe that he, that he wasn't.
16  I'm, you know, he was brought to be -- I don't -- there
17  was no discussion I had from his arrival and
18  discussions with Dr. DeMars that it was otherwise.
19  Q.  You didn't hear any concerns about him?
20  A.  No.  I -- so let's go back.  I'm just trying to
21  think about what role I was in at the time, the Chief
22  Medical Officer role.  I think what, what I knew was
23  that this was a group that had a fair amount of discord
24  between the three members, lack of agreement, concern
25  about capabilities, and so I think there was a level of

CONFIDENTIAL                                                    Page 79

1   dysfunction amongst all the members in terms of how
2   they viewed their role, the spectrum of the care
3   provided, and collaborative work amongst the three of
4   them. So I think, at a high level, I think that was a
5   theme.
6   Q.  Do you know if, at that time when Dr. DeMars was
7   recruiting Dr. Seifer, whether Dr. DeMars thought that
8   the REI division required different leadership?
9       ATTORNEY SCHROEDER: Objection, calls for
10  speculation as to what Dr. DeMars thought.
11      THE WITNESS: She was recruiting for a
12  division director.  That's all I know.
13      (Deposition Exhibit 3 marked.)
14  BY ATTORNEY KRAMER:
15  Q.  Let me know when you're done reading.
16  A.  I'm done reading.
17  Q.  For the record, this is Merrens Exhibit 3, and
18  it's DH21253, an email from Leslie DeMars to Maria
19  Padin on May 12th 2016.  At that time, what was
20  Dr. Padin's role at D-H?
21  A.  2016, she would have been -- she was the Chief
22  Medical Officer at that time.
23  Q.  And you were Chief Clinical Officer?
24  A.  I was either transitioning to the chief.  I can't
25  remember the exact date I became the Chief Clinical

CONFIDENTIAL                                                    Page 80

1   Officer, but she reported to me.  Maria also,
2   interestingly, was on the credentials committee too.
3   So you had asked who was on the committee.  She would
4   have served on that committee as well, but she reported
5   to me in this role.
6   Q.  Have you seen this email before?
7   A.  I have not.
8   Q.  You have not?  Okay.  In this email Dr. DeMars
9   says that she is concerned that, "If we cannot hire
10  Dr. Seifer, that I will have to shut the program down",
11  meaning the REI division.  Were you aware at that time
12  that Dr. DeMars had concerns that they may need to shut
13  down the program?
14  A.  I don't believe I was.  I know that -- no, I, I
15  was not aware that they felt they had concerns about
16  shutting the program down.
17  Q.  During, and, during this time, you met with
18  Dr. DeMars on a monthly basis, right?
19  A.  This period, this -- I'm, so I'll have to go back
20  to my dates about when I took over as the Chief
21  Clinical Officer that, for whom the chairs reported.  I
22  think I took over that role in the fall of 2016.  So
23  this might have been a period of time where I was still
24  the system CMO.  I worked closely with Maria but didn't
25  have the same kind of reporting relationship with the

Misty Blanchette Porter, MD v.          **Confidential**          Edward Merrens, MD – Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                    July 30, 2019

CONFIDENTIAL                                                    Page 81

1  chair, who would have been Leslie at the time. But
2  this, you know, this is a communication from Leslie to
3  the Chief Medical Officer outlining her concerns.
4  Q.  When you were the, the system CMO, did you have
5  regular meetings with the department chairs?
6  A.  I did not.
7  Q.  You did not? This document says that Leslie
8  DeMars describes, quote, "Albert Hsu, my junior member,
9  is hanging by a thread". Were you aware at that time
10  that Dr. DeMars viewed Albert Hsu as hanging by a
11  thread?
12  A.  I did not. I knew there were concerns. It would
13  be speculative to provide a definition of "hanging by a
14  thread". She's clearly stating she's concerned,
15  concerned about the division, its leadership, and Misty
16  being on medical leave. So I think she's describing a
17  situation where there's concern about the ongoing
18  provision of care, and I think that's what she's
19  expressing here and the urgency that she felt in
20  recruiting David Seifer. I was aware of all those
21  issues, her urgency and the challenges within the the,
22  division.
23  Q.  When you, you described that there was a meeting
24  of the credentialing committee where Dr. DeMars came
25  in --

CONFIDENTIAL                                                    Page 82

1  A.  Yeah.
2  Q.  -- and explained the need to hire Dr. Seifer and
3  her reasons why he, he should be hired. Did she
4  express these concerns?
5  A.  She did not bring up the medical leave of
6  Dr. Porter, nor anything about Dr. Hsu. She, her
7  characterization of the recruitment was that he was a
8  talented physician, someone that we tried to recruit
9  previously under the previous chair, someone that she
10  thought could bring the division together, and was
11  countering what she perceived as a mischaracterization
12  of his capabilities by his colleagues at Oregon Health
13  & Science.
14  Q.  Did she explain why she was so convinced that it
15  was a mischaracterization?
16  A.  No.
17  Q.  In this email to Dr. Padin, she says, "I do feel
18  that the evaluations that he received from his, quote,
19  'peers',close quote, were vindictive". Do you have --
20  can you explain at all to me why you think she would
21  have said this?
22       ATTORNEY SCHROEDER: Objection, calls for
23  speculation.
24  BY ATTORNEY KRAMER:
25  Q.  I know that's speculative, but --

CONFIDENTIAL                                                    Page 83

1  A.  She expressed this when she met with the
2  committee, and that was a similar perspective. I don't
3  know why she thought that. I think her -- what we
4  understood at the time was that he may have had a
5  falling-out with his peers over issues that were not
6  around -- they just didn't -- it wasn't a good fit, and
7  I think she was saying this wasn't, he didn't have a
8  good fit and this is going to be a better fit and
9  didn't feel like their perspective as his peers was
10  justified. I think that's how we understood it.
11       Clearly, my understanding was that this hire was
12  hers to ensure success. That's how she left the
13  meeting.
14  Q.  And, if it was not successful, what was the
15  consequence? What was understood to be the
16  consequence?
17  A.  That it, this was, you know, this was on her and
18  her role and her, you know, if there's decisions about
19  her competence as a chair and her ability to lead this
20  division, if this is a -- you know, this would be --
21  she would own this in terms of a decision she made at a
22  leadership level but had implications for the
23  organization.
24  Q.  It seems like this situation with the hiring of
25  Dr. Seifer stands out pretty clearly in your mind. Is

CONFIDENTIAL                                                    Page 84

1  that a fair assessment?
2       ATTORNEY SCHROEDER: Objection,
3  argumentative.
4       THE WITNESS: I remember the, the details of
5  this event, because it was atypical for us to bring a
6  physician to our credentials committee where there was
7  this degree of outside contact and discussion.
8  Furthermore, in the State of New Hampshire, if someone
9  is denied privileges after going through a Medical
10  Staff Office hearing, it's a reportable event to the
11  National Provider Database.
12       So we take it with great seriousness around the
13  deliberations that are incurred there, often to the
14  point at which we will ask a chair to present a case
15  anonymously for some insight of whether this might,
16  might pass or fail. So we take this very seriously,
17  knowing that there's some, there's some law in New
18  Hampshire around, around the processes. So I think
19  that's an answer why I remember this.
20  BY ATTORNEY KRAMER:
21  Q.  If a provider had concerns about the clinical
22  competency of another provider, would you expect them
23  to bring those concerns to the Chief Medical Officer?
24  A.  They could. They could bring them to their
25  division, division lead. They could bring it to their

Misty Blanchette Porter, MD v.                    Confidential                    Edward Merrens, MD – Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                        July 30, 2019

CONFIDENTIAL                                                          Page 85

1   chair.  They could bring it to the Chief Medical
2   Officer.  They could bring it to me.  We have an
3   organization where, if you contact our CEO, she'll meet
4   with you.  So there are a lot of areas in which people
5   can express concerns.
6       We have a compliance hotline, an 800 number.  I
7   mean, there are lots of ways that people can contact
8   someone if they have concerns about someone's care that
9   may affect patient care.  There's no boundaries.  I
10  mean, people contact people all the time, and, and
11  we're, and we're receptive.  So, while there's a
12  hierarchy and we've spent a lot time talking about the
13  reporting levels, people reach out and express concerns
14  all the time.
15      And, you know, we began this discussion with me
16  talking about my initial relationship with Dr. Porter
17  was borne out of very similar, very similar concerns
18  and, and a very similar situation, concerns, want to
19  bring it to your attention, let's figure out how we can
20  do things.  So there are lots of opportunities to
21  express concerns.
22  Q.  To clarify that a little bit, my question was
23  about clinical competency.
24  A.  Correct.
25  Q.  In this situation involving Dr. Porter and

CONFIDENTIAL                                                          Page 86

1   Dr. Reindollar, I don't believe there were any concerns
2   about clinical competency.
3   A.  No.
4   Q.  Am I mistaken?
5   A.  No, but it was concerns around, How do we comport
6   ourselves as members of a division?  How do we work
7   together?  There were a lot of questions about
8   interoperability and how do we work together, and I
9   think that's very similar to the events that we're
10  discussing here now.
11      Your question about someone competent and whether
12  that could be expressed clearly, could be brought to
13  the Chief Medical Officer.  We have bylaws that express
14  and detail concerns about physician practice and
15  competency that anyone can raise.  Don't even need to
16  be a physician.
17  Q.  And, if there were a department chair who had
18  concerns about clinical competency of a provider in
19  that department, would you expect the department chair
20  to bring those concerns to the CMO?
21  A.  Correct.
22  Q.  And what would you think if a department chair had
23  serious concerns about clinical competency and failed
24  to bring that to the attention of the CMO?
25      ATTORNEY SCHROEDER: Objection, calls for

CONFIDENTIAL                                                          Page 87

1   speculation.  You can answer.
2       THE WITNESS:  I think, if there were serious
3   concerns around a practitioner, that we would want to
4   know about it, either at the Chief Clinical Officer
5   level or at the Chief Medical Officer level.
6   BY ATTORNEY KRAMER:
7   Q.  Did you know that Dr. DeMars had immediate
8   concerns about Dr. Seifer's clinical competency?
9   A.  I did not.
10      (Deposition Exhibit 4 marked.)
11  Q.  Here you go.  This is Merrens 4.  I'll give you a
12  minute to review.  Let me know when you're done.
13      (Brief pause.)
14  A.  I've finished reading it.
15  Q.  All right.  For the record, Exhibit 4 is a text
16  message chat between Leslie DeMars and Richard
17  Reindollar.  For the record, who is Richard Reindollar?
18  A.  He was the previous chair of obstetrics and
19  gynecology before Dr. DeMars.
20  Q.  And what's the date on this exchange?
21  A.  July 28th 2016.
22  Q.  How soon after the hiring of Dr. Seifer was this?
23  A.  I don't know his hire date.  It's within a year, I
24  believe.  I don't, I don't know the date he was hired.
25  Q.  He was hired in May of 2016.

CONFIDENTIAL                                                          Page 88

1   A.  Okay.  So it would be two months, then, by my
2   math, maybe two and a half.
3   Q.  So shortly thereafter?
4   A.  I would agree.
5   Q.  In the first message Dr. DeMars says, "Richard,
6   I'm not sure that DS is clinically competent".  And DS
7   here means Dr. David Seifer, or at least that's my read
8   of this, that this is David Seifer.  Do you have any
9   reason to believe that this is not about David Seifer?
10  A.  I do not.
11  Q.  She says, "I don't know what he's been doing for
12  25 years, but I'm not sure it was IVF".  Are you
13  surprised -- well, have you seen this document before?
14  A.  I have not.
15  Q.  Are you surprised to learn that, as of July 2016,
16  Leslie DeMars had concerns about whether or not David
17  Seifer was clinically competent?
18  A.  I am.
19  Q.  Tell me more.
20  A.  I would have expected, if she felt he was
21  clinically not competent, she would have brought this
22  up for discussion.
23  Q.  And, looking at the, her next message, there's a
24  message from her at 8:28 p.m.  Then there's a response
25  from Dr. Reindollar, and then she has another text at

Misty Blanchette Porter, MD v.                    Confidential                    Edward Merrens, MD – Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                        July 30, 2019

CONFIDENTIAL                                              Page 89

1   8:47 p.m. in which she says, "I have heard separately
2   voiced concerns from nursing, anesthesia, and
3   ultrasound techs. The lab folks complain about bloody
4   aspirates and low egg counts". Were you aware of any
5   of those concerns at this time period?
6   A.  I was not.
7   Q.  And the, the same question: Are you, are you
8   surprised that these concerns weren't brought to your
9   attention?
10  A.  I am.
11  Q.  And why?
12  A.  She has a new hire that she's concerned about his
13  competency, and I would have expected her to bring that
14  for more discussion, and, if this is involving other
15  areas, it should have been either expressed to myself
16  or the Chief Medical Officer.
17  Q.  Do you think it's a reflection of her leadership
18  that she did not bring it to your attention?
19  A.  Possibly.
20  Q.  Can you tell me more?
21          ATTORNEY SCHROEDER: More about what?
22  BY ATTORNEY KRAMER:
23  Q.  More about what you think. Why do you say
24  "possibly"?
25  A.  I think that I should have -- someone should have

CONFIDENTIAL                                              Page 90

1   known about this. If this was -- if she had clear
2   concerns about someone being not competent to perform
3   their work and is having this kind of exchange, this
4   should have been a broader discussion about how to
5   mitigate this in her perspective.
6           ATTORNEY KRAMER: I'd like to take a break
7   for lunch.
8       (A recess was taken from 12:27 p.m. to 1:26 p.m.)
9   BY ATTORNEY KRAMER:
10  Q.  Before we took a break, we were talking about
11  Dr. Seifer, and I'd like to continue talking about
12  Dr. Seifer for now. Did you become aware of a 90-day
13  review process for Dr. Seifer?
14  A.  No.
15  Q.  As part of the credentialing committee, was there
16  anything brought to your attention about a 90-day
17  review of Dr. Seifer?
18  A.  No.
19  Q.  Is it typical for there to be a 90-day review of a
20  new provider?
21  A.  I think there is, there are processes in place to
22  kind of review where people are, but I'm not sure it's
23  formalized as a standard, standard process.
24  Q.  Do you recall having a meeting in November of 2016
25  to review a focused practice performance review of

CONFIDENTIAL                                              Page 91

1   Dr. Seifer?
2   A.  So we have a process called an FPPE where we do,
3   when we -- so that's, so I think you're, you're -- we
4   have, when someone's hired, there is an FPPE process
5   that happens with a new hire, and then there can be
6   other things. FPPE is a focus if there's an issue like
7   if someone raises an issue around competency, or we
8   have different ways of invoking that process. But I'm
9   not sure I was aware of an FPPE with Dr. Seifer.
10  Q.  Is an FPPE the same thing as a 360-degree review?
11  A.  No.
12  Q.  Let's mark this as Merrens Exhibit 5. Please take
13  a minute to look this over, and we'll discuss it when
14  you're ready.
15          (Deposition Exhibit 5 marked.)
16  A.  Is the date on this the same date that's on --
17  Q.  Yes, so this is --
18  A.  This, the item, this document that you're giving
19  me is undated, and I don't know who the author is.
20  Q.  This is an email from November 23rd 2016 from
21  Michele Scearbo -- I'm talking about the cover email --
22  A.  Okay.
23  Q.  -- to Leslie DeMars and a few other people. It
24  attaches a document. The document that's attached is
25  the two, the second two pages of the exhibit. So the,

CONFIDENTIAL                                              Page 92

1   the cover email is DH25549, and then the two pages that
2   are attached are 25550 and 25551. This is, my
3   understanding of this -- and tell me if you think this
4   is something else -- is that this, the attached
5   document, is the FPPE review compiled by Dr. Leslie
6   DeMars of Dr. Seifer.
7   A.  I just don't know what date this was compiled and
8   who, who performed it, like, who, who authored this
9   document that you're sharing with me.
10  Q.  Have you seen this before?
11  A.  I don't think I have. Maybe I have. I don't
12  know. I'm just trying to -- it says my name, "The
13  progress was reviewed today by Ed Merrens -- in
14  preparation for bringing to the credentials committee".
15  Q.  Let's start with that. This email from Ms.
16  Scearbo references a progress review by you, Ed
17  Merrens, Maria Padin, and Jocelyn Chertoff.
18  A.  Okay.
19  Q.  Do you remember conducting a, a progress review of
20  Dr. Seifer?
21  A.  I don't specifically remember that.
22  Q.  Do you remember receiving this attached --
23  A.  I don't.
24  Q.  -- performance review?
25  A.  I don't remember receiving this. It's possible

CONFIDENTIAL                                                                    Page 93

1    that I did, but I, I don't remember receiving it.
2    Q.   Do you remember discussions about having an FPPE
3    for Dr. Seifer?
4    A.   I don't remember having those discussions.  So I
5    think what happened was he came in and there was a plan
6    around how he would, he would come in, and, clearly,
7    there was a proctoring plan put in place.  I don't --
8    the progress was reviewed today by Ed Merrens --
9    preparation for -- so it sounds like there was a plan.
10   Can I read this document?  I'm not exactly sure kind of
11   like, so --
12   Q.   Absolutely, please do.
13   A.   Yeah.
14   Q.   Please do.
15   A.   I'm just -- the document is a little bit out of
16   context.  I don't know the date.  I don't know the
17   author, and I don't know if this is the --
18   Q.   This is how we received the document.
19   A.   Okay.
20   Q.   I don't know if it exists in other forms --
21   A.   It's okay.
22   Q.   -- within the Dartmouth-Hitchcock servers.  We
23   haven't -- it hasn't been produced to us in a different
24   way as far as I know.  So, please, take your time, look
25   it over, and let me know when you're ready.

CONFIDENTIAL                                                                    Page 94

1                    (Brief pause.)
2    A.   Okay.  I've read the document, and the, Michele
3    Scearbo oversees our Medical Staff Office.  So now I
4    understand it in context.  It is quite likely I was
5    part of this discussion around where things were.  We
6    don't -- we do an FPPE if there was a, if part of his
7    hire was that we would hire him under a proctoring
8    plan, like his practice was limited in some ways or he
9    did things differently at OHSU or wasn't -- you know,
10   this document refers to his capability as it relates to
11   ultrasound.  There would be a proctoring plan put in
12   place, and that sounds like what Leslie -- and I'm
13   assuming Leslie is the author.
14        But we don't always call it a 360 review.  360
15   review is something else.  So I think that's how Leslie
16   characterized it.  So I don't remember the specifics of
17   this meeting three years ago, but, as a member of
18   credentials and privileging and following up on someone
19   that we, that there were concerns were raised, this
20   would be the process.
21   Q.   And it's your understanding that this attached
22   document, these two pages, are Dr. DeMars's focused
23   practice performance review of Dr. Seifer?
24   A.   You know, I can only assume that's the case.
25   Q.   This document says that Dr. Seifer started on June

CONFIDENTIAL                                                                    Page 95

1    15th 2016.  We had spoken earlier about when his start
2    was.  Does this refresh your recollection of when he
3    started?
4    A.   If that's the start date, then I accept that.
5    Q.   And, looking back at Merrens Exhibit 4, which is
6    the chat messages between Leslie DeMars and Richard
7    Reindollar, that was at the end of July 2016, which,
8    therefore, would have been roughly how long after his
9    start date of June 15th?
10   A.   So a little bit more than a month.  Five weeks.
11   Q.   This document says that you and a few others
12   reviewed the progress in preparation for bringing it to
13   the credentials committee.  Do you recall bringing this
14   review to the credentials committee?
15   A.   I don't remember kind of -- so Michele has asked
16   Leslie for some specifics that are outlined here in
17   Document 5, 1, 2, and 3.  I don't know, I don't know
18   what the response was.  Those would be important things
19   to bring back to the credentials, questions that we
20   would bring back to the credentials committee.
21   Q.   How many people are on the credentials committee?
22   A.   At that time, there might have been ten people.
23   Q.   Were you, Maria Padin, and Jocelyn Chertoff
24   members of the credentials committee?
25   A.   Yes.

CONFIDENTIAL                                                                    Page 96

1    Q.   Do you know why the three of you would have been a
2    subgroup of the credentials committee?
3    A.   Jocelyn chairs the committee, and Maria and I are,
4    you know, the Chief Medical Officer and, at that time,
5    the, the, you know, Chief Clinical Officer for the
6    organization involved.
7    Q.   Who is Patricia Spencer?  I see she's a recipient
8    of this email.
9    A.   She's the, she is the director of the medical
10   staff office, and Michele Scearbo works for her.
11   They're, they're involved in the medical staff office
12   for D-H.  So anything that comes before the committee,
13   they organize and collate and follow up on.
14   Q.   Let's mark this as Merrens 6.
15              (Deposition Exhibit 6 marked.)
16        Are you done?
17   A.   I'm done.
18   Q.   Okay.  This is an email from November 30th 2016
19   from Leslie DeMars to Michele Scearbo responding to the
20   email that we had just been looking at in Merrens
21   Exhibit 5.  The Bates number of this is DH25566.  Do
22   you recall if you ever received this email that's at
23   the top?  In this version, it's only addressed to
24   Michele.  Do you recall if this ever came to you or if
25   there was, if this information was provided to you?

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD – Vol. 1
July 30, 2019

CONFIDENTIAL                                              Page 97

1  A.  I don't recall. I'm not saying I didn't receive
2  it or understand the contents or have it discussed, but
3  I don't recall receiving the email.
4  Q.  In this document Dr. DeMars says Dr. Seifer has
5  not been the subject of repeated complaints by
6  patients, staff, or D-H colleagues. Do you view that
7  as an accurate statement?
8  A.  At the time, I was not, I would have no
9  information to think the contrary. I didn't -- I
10  wasn't in receipt of information that would make me
11  think otherwise.
12  Q.  In this review process, did you rely on the
13  statements that Dr. DeMars conveyed to you?
14      ATTORNEY SCHROEDER: What review process?
15  BY ATTORNEY KRAMER:
16  Q.  This FPPE review process.
17  A.  She's, she is charged with, with doing so. So you
18  -- we've asked her for follow-up. Michele asked her
19  for follow-up on a number of items, both in Document 5
20  and Document 6, and this is her response. So she has
21  delineated her response to these. So that was the
22  response that we got from the, the chair.
23  Q.  As part of this FPPE, did you see any of the
24  underlying reviews, or did you only receive the
25  analysis that was conducted and synthesized, for

CONFIDENTIAL                                              Page 98

1  example, the two pages that are attached to Merrens
2  Exhibit 5?
3  A.  I would have typically not seen the primary data
4  or all that information. It would have been a report
5  out in a summary document as shown in Document 5.
6  Q.  Do you rely on the accuracy of the summary that's
7  provided?
8  A.  Yes.
9  Q.  Did you have any reason to believe that the
10  summary provided by Dr. DeMars here in Exhibit 5
11  not accurate?
12  A.  No.
13  Q.  If it was inaccurate or incomplete, would that be
14  a cause for concern?
15  A.  Yes.
16  Q.  Let's take a look at -- so what I'm going to do is
17  give you a few exhibits and have you review them.
18  These are the underlying reviews that were provided to
19  Dr. DeMars as part of this FPPE process.
20  A.  Okay.
21  Q.  So bear with me. This is Merrens 7.
22      (Deposition Exhibit 7 through 9 marked.)
23      ATTORNEY KRAMER: And, for the record,
24  Dr. Merrens is now reviewing three documents that I've
25  handed to him, Merrens Exhibit 7, Merrens 8, and

CONFIDENTIAL                                              Page 99

1  Merrens 9.
2      THE WITNESS: I've completed reading the
3  documents.
4      ATTORNEY KRAMER: Okay. Thank you.
5      ATTORNEY SCHROEDER: I assume this is a
6  subset of what related to the review, or is this just
7  these three?
8      ATTORNEY KRAMER: These are the three that we
9  have.
10      ATTORNEY SCHROEDER: I think there's others,
11  but I could be wrong.
12      ATTORNEY KRAMER: There is another set of
13  reviews that occurred in February of 2017. I don't
14  know if you're thinking of those review documents.
15      ATTORNEY SCHROEDER: No. I was just
16  wondering if there were -- because it's just, it's just
17  Sharon Parent, Beth Todd, and Misty, and I just didn't
18  know whether there were others as part of this review
19  process or not.
20      THE WITNESS: Well, I think on Document 8 in
21  the document that Leslie sent out, there were a number
22  of recipients, and I don't know if they replied or if
23  their information is part of his 360.
24      ATTORNEY KRAMER: I don't know. I don't
25  know. If there, if there were other documents, we

CONFIDENTIAL                                             Page 100

1  don't have them. So, Don, if you want to check into
2  the --
3      ATTORNEY SCHROEDER: Yeah, I mean --
4      ATTORNEY KRAMER: If you want to look into
5  that, we're happy to get more documents.
6      ATTORNEY SCHROEDER: Well, I don't know that
7  that's -- quite frankly, you know, whatever documents
8  existed, we produced. So, given the fact that these
9  are in the 26,000 range, I don't have at my fingertips
10  knowledge as to whether or not the other people listed
11  here gave any feedback or not. I just don't know that.
12  I just wanted to -- I was curious as to whether or not
13  this was just a limited subset or not. I don't know
14  the answer to that right now, which is why I asked the
15  question.
16      ATTORNEY KRAMER: No, I don't believe that
17  it's a limited subset. These are the, the ones that we
18  have from this period of time. There are other reviews
19  from a few months later --
20      ATTORNEY SCHROEDER: Okay.
21      ATTORNEY KRAMER: -- that we're pulling
22  together, and we'll go over those.
23      ATTORNEY SCHROEDER: Okay.
24  BY ATTORNEY KRAMER:
25  Q.  Looking at what's been marked as Merrens 7, the

Misty Blanchette Porter, MD v.                    Confidential                    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                        July 30, 2019

CONFIDENTIAL                                Page 101

1  review from Dr. Porter, her review is two pages long
2  and raises a number of specific concerns about
3  Dr. Seifer.  Having, since you have now looked at
4  Dr. DeMars's synthesis, do you think that the specific
5  concerns that Dr. Porter raised in her review are
6  fairly expressed in the synthesized review from
7  Dr. DeMars?
8      ATTORNEY SCHROEDER: I think he said he was,
9  he assumed that Dr. DeMars did what was part of --
10     ATTORNEY KRAMER: Okay.  Well, I'm asking the
11 question to Dr. Merrens.  I don't hear an objection.
12     ATTORNEY SCHROEDER: I understand.
13 Objection.  You're mischaracterizing his testimony.  He
14 said he assumed.  So, objection, mischaracterizes his
15 testimony.  He assumed that Exhibit 5 was from Leslie
16 DeMars.  You're stating it as a declaration that it is
17 from Leslie DeMars.  I don't know that that's --
18 BY ATTORNEY KRAMER:
19 Q.  I thought that we all came to the agreement that
20 this was a document from Leslie DeMars.  Maybe I
21 misunderstood.
22 A.  I will assume that that's the case.  What I don't
23 know -- I would say, at the outset, the
24 characterization that, overall, the comments were
25 positive juxtaposed with Dr. Porter's perspective with

CONFIDENTIAL                                Page 102

1  what is written in the document that we attribute to
2  Dr. DeMars are certainly at odds.  What I don't know is
3  that -- and I fully realize this is Dr. Porter's
4  perspective limited secondary to her illness that she
5  states in the document.  I don't know if there are five
6  other documents or six other documents that counter
7  that, speak about things differently, and I'm not
8  saying there are.  I'm just saying, clearly, Dr. DeMars
9  has her perspective on things that is not characterized
10 in this document as, as --
11 Q.  You just said Dr. DeMars.  I think you meant
12 Dr. Porter.
13 A.  Dr. Porter's document, if you were to read -- when
14 I read Dr. Porter's document and I read the document
15 we're attributing to Dr. DeMars in Exhibit 5, it, I
16 don't know how you would come up with the comments were
17 positive.  So I don't view this as a positive
18 reflection on someone's practice.  I wholly understand
19 that.  I never saw these review documents.  I may have
20 seen this document, her interpretation and presentation
21 to --
22     ATTORNEY SCHROEDER: Just, what document are
23 you referring to?
24     THE WITNESS: I'm talking about Document 5.
25 Sorry.

CONFIDENTIAL                                Page 103

1      ATTORNEY SCHROEDER: Just for the record.
2      THE WITNESS: Yeah, sorry.  I have not seen
3  Documents 7, 8, and 9 previously.  Those documents
4  ostensibly went to Dr. DeMars, who then crafted a
5  document that we see in Exhibit 5, which details her
6  perspective and review that would be shared with
7  leadership, so --
8  BY ATTORNEY KRAMER:
9  Q.  We spoke about whether the comments from
10 Dr. Porter in Exhibit 7 are fairly synthesized into
11 what we're attributing to Dr. DeMars in Exhibit 5.  I'd
12 like to also look at Exhibits 8 and 9 --
13 A.  Sure.
14 Q.  -- and ask the same question as to whether, in
15 your view, the comments and the tone of the feedback in
16 Exhibits 8 and 9 are at odds with or in accordance with
17 the review from Dr. DeMars in Exhibit 5.
18 A.  Speaking, let's just talk about Exhibit 8, because
19 I'm looking at that.  I think it is a little less
20 specific than the, than the document produced by
21 Dr. Porter in Exhibit 7.  It talks about his vision and
22 mainly about how he comports himself with the group and
23 the expectations he has of them.  It's more about his
24 style, about, like, he demands people do things and how
25 they do things, and he's not used to -- I think what

CONFIDENTIAL                                Page 104

1  Sharon is reflecting is, like, the lack of a team-based
2  focus and how he respects and works with a team.
3  That's what I read from this evaluation.
4      If we go to Exhibit Number 9, produced by
5  Elizabeth Todd, respectful, inclusive, focused on our
6  division.  I think these are a little bit more broad.
7  I see how these could be interpreted as, as neutral, if
8  not positive.  They're not -- they don't have the
9  specifics that, that are included in, in document,
10 in Exhibit Number 7 authored by Misty.
11 Q.  How about the concern with referrals to REI and
12 whether Dr. Seifer --
13 A.  What document are you referring to?
14 Q.  Exhibit 9.  Sorry.  I'm looking at Exhibit 9, the
15 third bullet point about an issue that Beth Todd
16 identifies with Dr. Seifer, specifically about whether
17 he is able to handle certain referrals that went to
18 him.  Do you see that?
19 A.  I do see it.
20 Q.  Do you consider that to be a specific critique of
21 Dr. Seifer?
22 A.  I do.
23 Q.  And do you, do you see any of that incorporated
24 into Dr. DeMars's evaluation?
25 A.  I don't see these specifics incorporated, nor do I

Misty Blanchette Porter, MD v.                   Confidential                   Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                       July 30, 2019

CONFIDENTIAL                                    Page 105

1    see it raised as a concern, if we're looking at the
2    patient care aspect of this document.
3  Q. Let's look at -- I know we have a lot of pieces of
4    paper here. I'd like you to look at Merrens Exhibit 6,
5    Exhibit 7, and Exhibit 4. In Exhibit 7, which is
6    Dr. Porter's evaluation sent to Leslie DeMars,
7    Dr. Porter says that her observations are based on,
8    quote, "Complaints or expressed concerns brought to me
9    by numerous members of the department. I have referred
10   all of these individuals to you", meaning Leslie
11   DeMars, "for direct comment". Do you see that?
12  A. I do, or I did read it. I'm not sure what
13   paragraph I'm in here. Yes.
14  Q. And would you agree that, based on, based on what
15   Dr. Porter says, that she received a number of
16   complaints that Dr. Seifer and that she sent those
17   individuals to Dr. DeMars?
18       ATTORNEY SCHROEDER: Objection, assumes facts
19   not in evidence. That's what she says in here, but
20   there's no evidence that that actually happened.
21       THE WITNESS: So --
22   BY ATTORNEY KRAMER:
23  Q. My question is whether that's your understanding
24   of what this says.
25  A. I understand that she received complaints by

CONFIDENTIAL                                    Page 106

1    numerous members and referred them to Leslie for direct
2    comment.
3  Q. Do you have any reason to doubt the truthfulness
4    of what Dr. Porter is saying about receiving
5    complaints?
6  A. I do not.
7  Q. And, looking at Exhibit 4, which is the chat
8    messages, Dr. DeMars writes, "I have heard separately
9    voiced concerns from nursing, anesthesia, and
10   ultrasound techs. The lab folks complain about bloody
11   aspirates and low egg counts". Do you see that?
12  A. I do.
13  Q. Is it your understanding from this document that
14   Leslie DeMars received complaints directly about
15   Dr. Seifer?
16  A. Yes.
17  Q. And, now, looking at Exhibit 6, which is the
18   response from Dr. DeMars to Michele Scearbo about
19   Dr. Seifer's FPPE, Dr. DeMars writes, "Since this was
20   an initial evaluation, I left Number 8 blank,
21   reflecting the positive and negative comments in my
22   narrative. Dr. Seifer has not been the subject of
23   repeated complaints by patients, staff, or D-H
24   colleagues."
25       Looking at these documents and based on any other

CONFIDENTIAL                                    Page 107

1    knowledge that you may have, is this statement
2    accurate, that Dr. Seifer has not been the subject of
3    repeated complaints by patients, staff, or D-H
4    colleagues?
5       ATTORNEY SCHROEDER: Objection, that assumes
6    facts not in evidence.
7       THE WITNESS: So I don't know about repeated
8    complaints. She, she states in the text message that
9    you have here in Exhibit 4 the lab folks complained
10   about bloody aspirates and low egg counts. I have
11   heard separately voiced concerns, complaints, however
12   you want to phrase that, from nursing. So I think she
13   clearly states that she's heard complaints. It's
14   articulated in her text.
15  BY ATTORNEY KRAMER:
16  Q. What would you understand repeated complaints to
17   mean? What's threshold for repeated complaints as
18   opposed to just complaints?
19  A. Are you looking for a number, or are you looking
20   for a severity? I'm not sure what the, what the nature
21   of the question is.
22  Q. Well, I'm looking --
23  A. I don't know what "threshold" means in this case,
24   in this question.
25  Q. I'm looking here at Exhibit 6 --

CONFIDENTIAL                                    Page 108

1  A. Um-hum.
2  Q. -- the email at the bottom of the page from
3    Michele Scearbo in Subpoint 2 that, apparently, one of
4    the questions in the FPPE was Question Number 8 --
5  A. Yeah.
6  Q. -- "Has the practitioner been the subject of
7    repeated complaints by patients, hospital staff, or
8    members of the medical staff?"
9       To your knowledge, is that a question that's on
10   the FPPE?
11  A. I'm looking for the document that we have that --
12   I'm referring to Document 5, which is Leslie's --
13  Q. As another question, do you know what documents
14   are compiled as part of an FPPE?
15  A. There would be certain categories of clinical
16   care, quality, safety, knowledge. There's whole
17   categories that are listed here. You know,
18   assistance-based practice, interpersonal skills would
19   be, would be certain components of the FPPE. Your
20   question is -- let me go back to your initial question,
21   which was the question about complaints and then
22   Dr. DeMars's response. I want to make sure I answer
23   your question.
24  Q. Sure.
25  A. I think there have been, there are what appear to

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD - Vol. 1
July 30, 2019

CONFIDENTIAL                                    Page 109

1  be -- she's clearly stated that there have been
2  numerous complaints that are not reflected in, in the
3  FPPE document that she submitted to the credentials
4  committee.
5  Q.  And do you have concerns about the accuracy of the
6  statement in Merrens Exhibit 6, the statement that
7  Dr. Seifer has not been the subject of repeated
8  complaints by patients, staff, or D-H colleagues?
9  A.  Yes.
10 Q.  And what's -- tell me more.
11 A.  From the evidence that I have in front of me here,
12 there appears to be a disconnect between what she has
13 received from the, the documents used to construct the
14 FPPE and her own communications with the previous
15 chair, which all surround issues of complaints.
16 Q.  Do you know if there was a second round of reviews
17 of Dr. Seifer in early 2017?
18 A.  I'm, I don't recall.
19 Q.  I believe it was part of, it may have been part of
20 the Value Institute review.
21 A.  So I know the Value Institute was involved in
22 January and February around REI and the program in
23 general, trying to understand how everything was
24 working or not working or its level of functioning.  I
25 was aware of it, that they'd undertaken that.  I

CONFIDENTIAL                                    Page 110

1  actually didn't know prospectively that they were doing
2  it, but I discovered this later in the spring, that
3  they had undergone some work with the Value Institute.
4  Q.  Let's talk a little bit about the Value Institute,
5  and then we'll get to these review documents.  What
6  programs does Dartmouth-Hitchcock provide for divisions
7  or physicians or staff that aren't getting along?
8  A.  So we have a, we have, we have provider relations.
9  We have a variety of -- we have patient relations.  We
10 have, we have, we have people within human resources
11 that can help with interpersonal relationships, that
12 can help with team base.  We can do team-based
13 assessments like, Is this team functioning?  Are there
14 problems with how a team works in general in terms of
15 taking care of patients?
16      We have opportunities through HR to deal with
17 provider issues.  We have the ability to look at it
18 from a quality and safety standpoint.  So, if there's a
19 concern about how a procedure is being done or we've
20 had a certain number of outcomes that we're worried
21 about, we can bring the Value Institute in to kind of
22 look at what are the processes and kind of do a full
23 kind of map of processes to see where there might be
24 opportunities for improvement or identify areas that
25 are causing the outcomes that we're seeing.  So there's

CONFIDENTIAL                                    Page 111

1  a mixture of human resources and quality and safety
2  that we can bring to situations that are concerning.
3  Q.  How does the Value Institute fit into
4  Dartmouth-Hitchcock overall?
5  A.  So it's, it's our, the Value Institute so is, is
6  really our kind of quality and safety group who really
7  deal with, How, how is a team providing the safest,
8  most effective patient care, and what are the barriers
9  to do so, and how do we understand that in terms of
10 outcomes and how a team works?  So, often, the Value
11 Institute is brought in with HR in some overlap to kind
12 of figure out kind of what's going on here.
13      So, if we've had a lot of turnover in an area or
14 we've noticed we've had some adverse outcomes or
15 there's a higher rate of something happening that we
16 hadn't predicted, sometimes we go back to kind of, What
17 are the processes, kind of like a Lean Six Sigma
18 process that we lead, kind of Toyota production system,
19 looking at how systems work, and then the people
20 component of that is a part that HR is brought in as
21 well.
22 Q.  Does the Value Institute, is it always doing
23 something, or is it there as a resource and it gets
24 utilized periodically?
25 A.  I think it's a resource that gets, that can, that

CONFIDENTIAL                                    Page 112

1  can -- it's always there.  We're, you know, we're
2  beholden to a whole range of reporting criteria for
3  quality and safety that we do on a national, local,
4  state level.  That quality we report reports up to the
5  Value Committee of the Board of Trustees.  So there's a
6  lot of reporting on quality and safety, and it has
7  specific resources when we want to focus on areas that
8  there might be a little bit more concern, either due to
9  patient-reported issues or data that we're monitoring
10 or interpersonal issues that might affect patient care.
11 So they get involved there.
12 Q.  Are people who work for the Value Institute only
13 part of the Value Institute, or do they cross over into
14 other roles?
15 A.  That's a good question.
16 Q.  Thank you.
17 A.  The, the, there are people in the Value Institute
18 that are, that are clinicians.  There are some that are
19 not clinicians.  There are some people that work just
20 in the Value Institute, and there are people that have
21 roles in there from other, other places.
22 Q.  You identified a number of support programs at
23 Dartmouth-Hitchcock to provide help --
24 A.  Yeah.
25 Q.  -- if there is a struggle.  Which of these

CONFIDENTIAL                                      Page 113

1  programs were used to support the REI division?
2  A.  So I know that they engaged the Value Institute in
3  early 2017 to understand some of, some of these issues
4  about -- and I'm not sure of all the issues. I've not
5  seen the Value Institute summary. I know that there
6  was a lot of concerns about turnover of nurses in that
7  environment, about concerns about staffing and the
8  ability to continue to, to maintain essential staff.
9  So they may have been involved.
10      I'm not sure. I don't know exactly the question
11  that was asked to get them engaged, but, often, it
12  doesn't take much to say, We need some help, and we're
13  happy to help. So I know that they were involved in
14  looking at a whole range of things.
15      This is also a highly sensitive area when we are
16  talking about reproduction and oocytes and a whole
17  range. So I think there's a high degree of sensitivity
18  around, How do we do this right and make sure? So I
19  think that was part of the interest as well.
20  Q.  Were there programs utilized to support the REI
21  division other than the Value Institute?
22  A.  I think, I, I think HR was involved. I don't know
23  the, I don't know the nature of the other support. I
24  think much of what happened after the Value Institute
25  kind of determined the viability was based on some of

CONFIDENTIAL                                      Page 114

1  their insights and other aspects of what was happening
2  in REI.
3  Q.  Did you look at any of the documents that came out
4  of the Value Institute?
5  A.  I have not seen those.
6  Q.  Before you made the decision to close the REI
7  division, you didn't look at the Value Institute
8  documents?
9  A.  Correct.
10  Q.  Why not?
11  A.  I didn't -- I wasn't provided the document. I had
12  a kind of a summary report from Daniel Herrick, and not
13  all the, the decision about the program was not solely
14  based on the Value Institute approach. They were
15  trying to figure out how to staff a program and what
16  some of the issues were, and some of the issues that
17  arose were things that we discussed with Daniel Herrick
18  and Leslie and others. I didn't get a final report
19  from the Value Institute. I think that was one insight
20  into what was going on in REI.
21  Q.  I think you said that the, the issue that was
22  brought to the Value Institute was issues of staffing.
23  Is that what you said?
24  A.  I think there was concern about --
25      ATTORNEY SCHROEDER: Turnover in staffing.

CONFIDENTIAL                                      Page 115

1      THE WITNESS: I think I may have said
2  turnover. So that may have been one component that the
3  Value Institute was charged with understanding.
4  BY ATTORNEY KRAMER:
5  Q.  Do you know if the Value Institute was charged
6  with understanding any other issues in REI?
7  A.  Usually, they go in and try to understand how, how
8  the, how the group works together, what are the issues
9  around how the staff interact with the clinicians. And
10  my update about the, about the Value Institute report
11  happened with Daniel Herrick and Heather Gunnell and
12  Leslie later on.
13  Q.  You said that you didn't see any summary report
14  from the Value Institute. Did you see any preliminary
15  reports?
16  A.  No.
17  Q.  Did you see any of the documents that were
18  provided to the Value Institute?
19  A.  No.
20  Q.  What was the summary that Daniel Herrick provided
21  you? And it sounds like it was, it was verbal in a
22  meeting. Do you remember what he said?
23  A.  There was a lot of dysfunction and they were
24  unable to continue to adequately staff this, this area.
25  We had lost nurses. We were on the cusp of losing, I

CONFIDENTIAL                                      Page 116

1  think, the last nurse in Manchester that, that did
2  this, that was involved in, in REI. There had been a
3  lot of effort at kind of working to figure out how the
4  team could work better together, and that was not, not
5  viewed as being a successful endeavor.
6  Q.  In Daniel Herrick's view or in the view of the
7  Value Institute?
8  A.  I think that was Daniel's assessment of the Value
9  Institute approach.
10  Q.  Were any of the REI members sent to mediation? Is
11  that a -- was that a program that D-H still had in
12  place in 2017?
13  A.  We can provide mediation for -- we, we tailor our
14  interventions and support based on the situation. So,
15  if someone, if people need mediation or they need to
16  work with HR around provider interactions and how
17  things are, that can all be something that can be
18  afforded.
19  Q.  Was there discussion that you're aware of about
20  whether --
21  A.  I don't --
22  Q.  -- whether to send any of the providers in REI to
23  mediation?
24  A.  I don't know.
25  Q.  Earlier, I had mentioned that there was a second

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD - Vol. 1
July 30, 2019

CONFIDENTIAL                                                Page 117

1  set of reviews of Dr. Seifer in February of 2017, and I
2  asked if you had ever seen or heard about those
3  reviews.  To refresh me, had you ever -- did you know
4  about the reviews, and did you see any of the reviews?
5  A.  I don't recall the reviews in February of '17.
6  Q.  Okay.  I'm going to show you a number of the
7  reviews.  So I think, same as before, what I'm going to
8  do is give you a set of these and ask you to review all
9  of them, and then we'll talk about them individually as
10  needed or one at a time.  So, Dr. Merrens, if you
11  would, read the exhibits I gave you.
12       (Deposition Exhibit 10 through 14 marked.)
13       ATTORNEY SCHROEDER: So that's five exhibits?
14       ATTORNEY KRAMER: Yes.  So we have Exhibit
15  10, 11, 12, 13, and 14.
16       ATTORNEY SCHROEDER: Can we go off the
17  record?
18       (A recess was taken from 2:19 p.m. to 2:25 p.m.)
19       THE WITNESS: I've read all the documents.
20  BY ATTORNEY KRAMER:
21  Q.  Okay, thank you.  Have you seen these before?
22  A.  I have not.
23  Q.  Each of these five exhibits, Exhibits 10 through
24  14, are in response to an email from Leslie DeMars.
25  For example, let's look at Exhibit 10 on the second

CONFIDENTIAL                                                Page 118

1  page, the email from Dr. DeMars in February 2017 asking
2  for assessments of Dr. Seifer.  She says, "I asked you
3  all for comments at the end of Dr. Seifer's initial
4  evaluation period in the fall.  It is time for another
5  assessment".
6       Was this a standard protocol, to have another
7  assessment like this?
8  A.  I wouldn't say it was standard.  I think there are
9  areas where we hire a leader and there's informal
10  processes around how things are going.  I think this
11  was following up on concerns that were raised early on
12  and then coming back to let's readdress this in six
13  months.
14  Q.  Do you know what prompted Dr. DeMars to seek these
15  reviews?
16  A.  I, I do not know.
17  Q.  At this point in February of 2017, was the
18  credentialing committee still involved in any way with
19  Dr. Seifer?
20  A.  Probably not.
21  Q.  Are you surprised that these evaluations didn't
22  make their way back to the credentialing committee?
23  A.  I don't know if they would go back to the
24  credentials committee.  There's certainly significant
25  concern about a whole range of things that should have

CONFIDENTIAL                                                Page 119

1  made their way in a more formative way from the chair
2  to myself.  At the time, I was aware that there were
3  concerns about Dr. Seifer's practice, Dr. Hsu's
4  competency, and the overall workings within REI.  I was
5  not made aware of the specifics and the issues that
6  were raised in these detailed replies.
7  Q.  So we're clear, we're looking at reviews that were
8  provided by Dr. Porter, Beth Todd, Dr. Judy McBean,
9  Heather Gunnell, and Kelly Mousley.  We've talked about
10  Dr. Porter and Beth Todd.  Do you know who Judy McBean
11  is?
12  A.  I believe Judy is a private practitioner, REI doc
13  that did some part-time, did or does some part-time
14  work with Dartmouth-Hitchcock but works in Brattleboro,
15  maybe.  I'm not -- I, something like that.
16  Q.  Did you ever meet her?
17  A.  I have not.
18  Q.  Okay.  And who -- we spoke about Heather Gunnell.
19  At this point in time, do you know what her role was?
20  Well, I can answer that question.
21  A.  She was the practice manager.
22  Q.  She was the practice manager?
23  A.  Yeah.
24  Q.  Yeah.  And then Exhibit 14 is from Kelly Mousley.
25  Do you know who she is?

CONFIDENTIAL                                                Page 120

1  A.  I do not.
2  Q.  What's your overall take of the review of
3  Dr. Seifer provided in these documents?
4  A.  I think it raises significant concerns on many
5  levels.
6  Q.  What are those significant concerns that you see?
7  A.  Technical skill, standard of care, approach to
8  patients, collaboration with the team, overall vision.
9  I think, on many levels, it has significant concerns
10  for the people that work with him and the overall
11  function.  I see hope that we can still get on track
12  from a lot of the people, but I see significant
13  concerns.
14  Q.  At this period of time, were you meeting with
15  Leslie DeMars on a monthly basis?
16  A.  Yes.
17  Q.  Did she talk to you during any of those meetings
18  or other meetings about these concerns that were coming
19  to her about Dr. Seifer?
20  A.  No.  In, in generalities, yes, that, you know,
21  We're trying to get REI on board, and we're trying to
22  -- we're working -- you know, I think the Value
23  Institute approach was, How do we get, how do we do a
24  different approach to how we do things, new processes,
25  things like that, but not the specifics of a

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD - Vol. 1
July 30, 2019

CONFIDENTIAL                                        Page 121

1   reevaluation and here's the input that we're getting.
2   Q.  How does this fit or not fit with what happened
3   with the recruitment process of Dr. Seifer, that there
4   were red flags, as we talked about, about his hiring;
5   Dr. DeMars very much went to bat for Dr. Seifer --
6   that's my phrase, not your phrase -- and that
7   Dr. DeMars acknowledged that she was taking
8   responsibility for Dr. Seifer's success?  Looking at
9   these documents, what would you like to add about how
10  this fits in with the, the recruitment process?
11  A.  I'm not sure I understand the question.  You want
12  me to compare these reviews with the recruitment
13  process?
14  Q.  Yes.  So I'll rephrase.  That was a --
15      ATTORNEY SCHROEDER: Yeah.  Objection,
16  compound, multi-compound question.
17  BY ATTORNEY KRAMER:
18  Q.  Fair enough.  You described that, in the, in the
19  hiring process for Dr. Seifer, you made it clear to
20  Dr. DeMars that it was, that you were counting on her
21  to take responsibility for the success of Dr. Seifer;
22  is that fair?
23  A.  Correct.
24  Q.  Seeing that she received these reviews and didn't
25  bring them to your attention, do you think she was

CONFIDENTIAL                                        Page 122

1   fulfilling that responsibility?
2   A.  No.
3   Q.  Can you explain a little bit more?
4   A.  I, in my conversations with the chairs that I work
5   with, the twelve chairs, I rely on them to bring
6   concerns from the divisions and sections, and we talk
7   about much less nuanced and much less involved issues
8   than are represented here, and I was not apprised of
9   this detail of information or the dysfunction that was
10  occurring.  I think that was brought to light to some
11  degree by the Value Institute and people stepping in
12  and seeing what the processes were like.
13  Q.  But this information didn't come to you?
14  A.  No, not at all.
15  Q.  I think you described this as, these documents, as
16  raising concern about Dr. Seifer's competency.  If I'm
17  misquoting you, tell me.
18  A.  I think they question his competency, his skill.
19  I think -- I'm just reflecting what I'm reading.  You
20  know, I think there, they describe someone who has a
21  limited scope and may not be comfortable working with
22  others or learning new techniques.  I think they've, I
23  think there's a theme through this that I, that I've
24  read.
25  Q.  At this point in time in February of 2017,

CONFIDENTIAL                                        Page 123

1   Dr. Seifer was the division director, correct?
2   A.  Correct.
3   Q.  And in that role he had leadership responsibility
4   for the division?
5   A.  Correct.
6   Q.  Would it be difficult to maintain a functional
7   division with somebody in leadership who had these
8   issues as described in these documents?
9       ATTORNEY SCHROEDER: Objection, calls for
10  speculation.  You can answer.
11      THE WITNESS: I think these, these
12  perspectives raise serious concerns about someone's
13  capability to serve in a leadership role.
14  BY ATTORNEY KRAMER:
15  Q.  Does it raise concerns about functionality of the
16  division?
17  A.  Yes.
18      ATTORNEY VITT: Take a quick break?
19      (A recess was taken from 2:34 p.m. to 2:43 p.m.)
20  BY ATTORNEY KRAMER:
21  Q.  Okay.  When did you start getting involved in
22  discussions about potentially closing the REI division?
23  A.  I think we started talking probably April of 2017,
24  April or May, something like that, April.
25  Q.  The closure, the closure was in May.

CONFIDENTIAL                                        Page 124

1   A.  Then we --
2   Q.  Well, the closure was announced in May.
3   A.  Announced in May?  It was probably April,
4   beginning of -- I'd have to go back through the records
5   of kind of when we first started meeting and talking
6   about it.  So sometime in early April.
7   Q.  And who brought this up?
8   A.  I think we began discussing it with Daniel, Daniel
9   and Heather and Leslie and I.  I mean, they'd gone
10  through this Value Institute work.  Daniel's done a lot
11  around -- he's a Black Belt, so he's done a lot of
12  quality improvement work.  So I think he was saying,
13  We've got a problem.  We've lost a lot of people.  I
14  think we lost our nurse was the -- I think the staffing
15  issues were just the last wheel to come off the cart.
16  That was a big -- I mean, that was fundamentally the
17  key issue is, like, we just didn't have any nurses
18  anymore.
19      It's not all of the issues that are outlined here
20  around dysfunction, incompetence, and technique.  It's
21  like we don't have a nurse.  So that prompted us to
22  really discuss kind of some of the bigger issues and to
23  get down to the understanding and the recommendations
24  to bring some of this to light, and I think Daniel was
25  essential in bringing some of this to light.

Misty Blanchette Porter, MD v.                    Confidential                    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                              July 30, 2019

CONFIDENTIAL                                    Page 125

1  Q.  Was Daniel Herrick the one who made the
2     recommendation of closing the division?
3  A.  Yes.  In our discussions it became a
4     recommendation as we, as we discussed the issues at
5     hand.  We don't have staffing.  We have some internal
6     discord on probably every, every level, competence,
7     patient interaction, issues with staff, process,
8     patient complaints.  So some of these began coming to
9     light in those discussions, although I had not seen
10    these documents.
11         ATTORNEY SCHROEDER: When you say "not seen
12    these documents", identify what you're talking about.
13         THE WITNESS: The documents I'm referring to
14    are Documents Exhibit 11, 10, 11, 12, 13, 14, relating
15    to the review that occurred in February of '17, late
16    February of '17, of 2017.  I had not seen any of this,
17    but the issues began percolating through that prompted
18    our discussions.
19         I was informed -- I think it's late March, so a
20    month after these reviews had been produced, we
21    realized that, based on the work in the Value Institute
22    and internal work, they have stopped recruiting new
23    patients in the practice or have stopped, you know,
24    accepting new patients as a result of the internal
25    work.  So I wasn't privy to Exhibits 10, 11, 12, 13, 14

CONFIDENTIAL                                    Page 126

1     as it relates to direct data, but now it becomes
2     something that I'm apprised of in the context of the VP
3     now meeting with me and the chair of, like, We have a
4     problem.
5  BY ATTORNEY KRAMER:
6  Q.  I want to make sure that I understand the context
7     for this.  During this period of time, let's say,
8     January through April of 2017, you were having monthly
9     meetings with Leslie DeMars --
10 A.  Yes.
11 Q.  -- in her role as chair?
12 A.  Correct.
13 Q.  Did you have periodic meetings with Daniel Herrick
14    as well?
15 A.  Yes.
16 Q.  As what sort of meetings?
17 A.  I work with Daniel pretty closely as it relates to
18    perioperative work.  He reports to the senior, SVP for
19    the organization, but Daniel and I work on -- there are
20    projects that I'm working on in other institutions.  I
21    work with Daniel on a lot of things.
22         I think he was engaged in the Value Institute work
23    and beginning to understand, looking at budgets and
24    working with Heather to begin understanding how some of
25    this was evolving.  I don't know if he was completely

CONFIDENTIAL                                    Page 127

1     apprised or aware of Exhibits 10 through 14 that we're
2     discussing here, the data that was sent to him.  I
3     think he learned of some of this through the Value
4     Institute process and just the staffing issues.  So
5     he's involved with, like, a budget and how do you run
6     something, and when you can't, when you have turnover
7     and you can't hire people, he begins to delve into what
8     else is going on.
9  Q.  And, at some point in, let's say it was maybe
10    March of 2017, you had a meeting with Daniel and
11    Leslie?
12 A.  Yes.
13 Q.  Was Heather at the meeting?
14 A.  Heather might have been at the meeting as well.
15 Q.  Anybody else?
16 A.  I don't think so.
17 Q.  And is this the first time that the idea was
18    presented to you of, What do we do with REI?  Maybe we
19    should close it?
20 A.  Yes.  Well, I think we began to say, We've got a
21    problem, and the problem was ostensibly we have a
22    staffing issue, but it was, really, there were a lot of
23    other issues that had not ever been discussed with the
24    details that are described here.
25 Q.  In that meeting --

CONFIDENTIAL                                    Page 128

1         ATTORNEY SCHROEDER: What are you referring
2     to?
3         THE WITNESS: I'm sorry.  The details that,
4     that have been outlined in, in Exhibits 10 through 14.
5  BY ATTORNEY KRAMER:
6  Q.  In that meeting -- maybe it was a series of
7     meetings, or was it one specific meeting?
8  A.  You know, I think we had maybe two or three
9     meetings to discuss kind of where we go with this and
10    pretty quickly made the assessment that this was not a
11    viable program anymore for a number of reasons.
12 Q.  In those meetings who, was anybody there other
13    than the individuals that we had talked about, Daniel,
14    Leslie, Heather, yourself?
15 A.  That was the, that was the group.  At a later
16    point, we gathered together a larger group including HR
17    and communications when we wanted to think about how we
18    begin planning a discussion about this, but the initial
19    planning and the decision with discovery of what the
20    issues were with those four, those four principals.
21 Q.  Did you talk about other options for REI other
22    than shutting down?
23 A.  It became quite clear that it, that the
24    dysfunction and the inability to staff it were on so
25    many levels that it wasn't something that could have

CONFIDENTIAL                                    Page 129

1   been resurrected. It was not clear that, that it was
2   something that, that could be just, We'll do it light
3   for a little while or do something else. It was pretty
4   clear that, that it had gone too far. I, and I clearly
5   had no indication whatsoever of the sentiments
6   expressed in Exhibits 10 through 14, detailed issues
7   from a, from people who were not only nurses but, but
8   physicians.
9       I mean, I think that, while Misty is articulate in
10  this, this is also a period of time where she actually
11  wasn't there. So I think she's articulate in terms of
12  her perspective on things being the long-term member,
13  but she wasn't actually, in the moment, providing care
14  and doing those kinds of things. But I think they were
15  all connected in a lot of ways, and her, her purview
16  for making assessments of the dysfunction of the group
17  was somewhat removed, although I accept her opinion.
18  But she wasn't working -- I don't think she was working
19  at this time.
20  Q.  Now that you've seen these documents, 10 through
21  14, does that change your perspective at all about the
22  nature of the conversations that you had in -- let's
23  say it was March of 2017 -- about the REI division?
24  A.  I think it provides a lot more detail of what I
25  had a, a sense of in the discussions with Heather and

CONFIDENTIAL                                    Page 130

1   Daniel and finally Leslie. I was never aware of this
2   degree of detail in Exhibits 10 through 14, nor the
3   detail that was expressed in the, in the exhibits, and
4   I'm going to get the exhibit numbers wrong, but the
5   ones, the review that happened six months into Dave
6   Seifer's tenure.
7   Q.  Who ended up having responsibility for putting
8   together a plan for REI?
9   A.  When you say "a plan for REI", what do you mean,
10  the, the cessation of the program?
11  Q.  Yes, what that would look like.
12  A.  I want to make sure I'm answering your question.
13  Q.  Yes.
14  A.  When you say "a plan for REI" you mean --
15  Q.  A plan --
16  A.  I made the decision that this program was no
17  longer sustainable with the current people that were
18  providing care, the structure around everything that
19  we're delivering or the nursing care. So I pulled
20  together a team of administrative leads, human
21  resources, patient relations, the whole spectrum of
22  people that would be involved in, How do we communicate
23  this? Our communications team, everyone was involved
24  to kind of figure out how we might go forward and how
25  we might plan this and, in a fairly short time course,

CONFIDENTIAL                                    Page 131

1   communicate that we were closing the program and
2   terminating the providers.
3       (Deposition Exhibit 15 marked.)
4   Q.  This is a document with Bates Number DH11253, and
5   it's a, the cover document is an email from Daniel
6   Herrick to Leslie DeMars with a copy to Sam Shields,
7   and attached is an Excel spreadsheet pro forma for the
8   REI program. Have you seen this before?
9   A.  I believe I have.
10  Q.  Have you seen the cover email or just the
11  attachment?
12  A.  I think I've seen something like this in the
13  course of our discussion about how to go forward. I
14  can't tell you that I have, that the same email was
15  sent to me, but I remember seeing the financials as it
16  relates to this and the, the discussions around how to
17  go forward.
18  Q.  Who is Sam Shields?
19  A.  Sam leads -- we have a process, leads -- he's
20  involved with the Value Institute and is involved in us
21  developing programs that all of the departments lead in
22  terms of an A3 process around improvement, how they
23  view their finances, patient delivery. There's a whole
24  range of things. So he's involved in -- the other
25  thing is that I think we wanted someone to help manage

CONFIDENTIAL                                    Page 132

1   this project of how to shut down a program and how to
2   do this the right way. So Sam might have been involved
3   in the process standpoint.
4   Q.  What is A3?
5   A.  A3 is a, A3 really means the largest size paper
6   that can be sent through a fax machine when the Toyota
7   lean production system in the 1970s was all around
8   transmitting information. So people had to come up
9   with plans that they would put it on A3-sized paper.
10  It's come to be a reference to a process in Lean Six
11  Sigma and Black Belt, organizational dynamics around a
12  process. It's a size, piece of paper that you put
13  organizational process on. So it's called an, we lead
14  an A3 process. That's probably a lot more than you
15  wanted to know or Sunnie wanted to type.
16  Q.  That's exactly what I wanted to know.
17  A.  We've done a lot around Toyota production system,
18  Lean Six -- we have -- this is what the Value Institute
19  embodies is, How do you do processes, and how do you
20  make sure that they work for patients? Sam leads all
21  that.
22  Q.  And is this part of what you had learned in the
23  health care master set talk?
24  A.  We do some of that, yeah.
25  Q.  Looking at this document --

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD – Vol. 1
July 30, 2019

CONFIDENTIAL                                    Page 133

1 A.  You seem really interested in that program.
2 Q.  I am interested in it.  I'm just curious.  So here
3    in Exhibit 15 Daniel says to Dr. DeMars, "I think we're
4    ready to share our plans with Ed and Maria".
5        Does this inform your testimony about at what
6    point in time it was that Daniel and Dr. DeMars came to
7    you to discuss what to do about REI?
8 A.  Possibly.  I mean, I know that we met sometime in
9    early, early April.  We probably had some discussions.
10   They went back and actually wanted to look at all
11   aspects of the program.  I think they had some
12   inference about the things that were happening.  Daniel
13   wanted to put a finer point on it in terms of, What are
14   the financials here around, around what this includes?
15       I think the important part, and we said this in
16   our meetings, the decisions around program closure are
17   not based on financials.  It isn't based on what makes
18   money or what doesn't make money.  In the end this
19   outlines a, a decision to close down a program, you
20   know, IVF, that had a positive contribution margin and,
21   and continued to provide services around reproductive
22   endocrinology, in-house capability that loses money,
23   but it was a capability that we thought we could
24   maintain.
25 Q.  This looks to me like it's confirmation that the

CONFIDENTIAL                                    Page 134

1    program was profitable at this time, right?
2 A.  I think the total, the net total would -- yeah.
3    So the operating margin was, I think, 177,849, correct.
4    The money was not -- so, clearly, we look at these
5    numbers, and we try to understand things.  The decision
6    to close this program was not based on, on financial
7    information.
8 Q.  On, on the third page of the document here,
9    there's no Bates stamp, but it says on the bottom
10   "IVF-REI Business Review April 17 - DPH".
11 A.  Yeah.
12 Q.  Under "Proposed Actions" the suggestion is, "REI
13   Program on Hiatus".  What I think you said a moment ago
14   was that, as of this period in time, you had decided
15   that the program was being closed --
16 A.  Correct.
17 Q.  -- not that it was a pause.
18 A.  Correct.
19 Q.  Can you explain a little bit more about why
20   this --
21 A.  I think what --
22 Q.  -- says "hiatus"?
23 A.  I think what Daniel's referring to, and I don't
24   know, because we made a decision to close the entire
25   program, is that reproductive endocrinology is

CONFIDENTIAL                                    Page 135

1    different than in vitro fertilization, and
2    understanding that, while we may not be able to work
3    with women to put them through cycles, harvest eggs, do
4    implants and all this stuff, we still maybe, we have
5    the capability within our expertise to manage the
6    endocrinological aspects that may not require surgical
7    and other intervention within our practice at
8    Dartmouth-Hitchcock.
9        So, for example, we have medical endocrinologists
10   that can provide consults for women that have
11   reproductive endocrinological needs that is different
12   than IVF.  So we had to separate them just to
13   understand a little bit what we would continue doing.
14   So, on one hand, we would say, Let's support these six
15   patients.  Let's honor that.  Let's get some plans in
16   place about how, where patients can get care, but let's
17   also figure out -- let's not add -- let's, let's plan
18   for patients, patient referrals within the system.
19   What is the kind of --
20       We didn't refer to this as a hiatus, but we did
21   want to -- we thought we had the ability to manage the
22   reproductive endocrinology needs to some extent.  Does
23   that make sense?
24 Q.  I think so.
25 A.  So this was one way of Daniel projecting, Here's

CONFIDENTIAL                                    Page 136

1    just the money associated with this, and from that we
2    decided that we would move ahead and, and formally just
3    close the program.  The issue about REI and IVF is that
4    you said, Who did you bring together when you made this
5    decision?  It's what do we do for all the patients that
6    are going require this care?  Is this something that we
7    will change our, our insurance plan to make sure that
8    our patients can get care elsewhere?  Which we did.
9    Are we going to make sure that we work with medical
10   endocrinology to see women that might have
11   endocrinological needs?  Are we going to do -- those
12   were some of the, some of the things that occurred.
13 Q.  What's the difference between medical
14   endocrinology and reproductive endocrinology?
15 A.  So in, we have endocrinologists that deal with a
16   wide range of endocrinological disorders and diseases,
17   and there's some overlap with REI, and that.  So
18   someone might have a pituitary tumor that causes excess
19   expression of a hormone that they might see a
20   reproductive endocrinologist because their menses are
21   off, or they might see a medical endocrinologist.  So
22   there's some overlap in terms of expertise in which
23   that can be managed outside of REI.
24
25       (Deposition Exhibit 16 marked.)

Misty Blanchette Porter, MD v.                    **Confidential**                    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                            July 30, 2019

CONFIDENTIAL                                      Page 137

1  Q. Thank you. So, before we get to this, was there a
2     plan at some point to retain Dr. Porter to do GYN
3     ultrasound work?
4  A. I think the, not as part of this work. At this
5     time, I believe Misty was doing some work in that
6     space. I know, at the time that we're talking in late
7     April, I think she was working about 20 percent time.
8     Some of that was at home reading, reading studies.
9     Some of it was writing a book. I don't know the exact
10    nature of her work. So there was a small subset of, of
11    her work that was, that was clinical. I'm actually not
12    exactly sure what she was doing. I don't think she was
13    doing surgery at that time.
14        So there were discussions around her, what her,
15    you know, what her role would be, and I even asked
16    Leslie, Where do we envision this? I know, you know,
17    Misty had a lot of expertise. I think her primary
18    interest and passion and what a lot of those procedural
19    things like ultrasound were around were actually around
20    IVF and REI. So I think the, there was discussion
21    about that, and, you know, and I've seen documents that
22    I've authored which I've even questioned, What are the
23    opportunities, how might we think of this, and how do
24    we go forward?
25        Do you want me to read this document, or do you

CONFIDENTIAL                                      Page 138

1     want -- do you have --
2  Q. In a moment.
3  A. Okay.
4  Q. What's the basis for your belief that Dr. Porter
5     was working 20 percent time in May 2017?
6  A. I think it came out in the discussions that -- I
7     know she was only working part time during that period.
8     I, that was just my recollection of the discussions we
9     had about what was the kind of effort that was going on
10    in, in REI and who was present and who was doing what.
11    I'm not entirely sure, but I think it was a small FTE
12    that she was responsible for.
13  Q. Who did you talk to about whether Dr. Porter was
14    performing surgeries at that point?
15  A. It might have been conversations with Heather and
16    Dr. DeMars just trying to understand kind of what is
17    all, what is all happening here. It might have been in
18    the context of we were trying to understand which women
19    are in the pipeline to have procedures done. I don't
20    think Dr. Porter had anyone that she was actively
21    taking care of that would require her, her involvement.
22    Like, there were none of her patients in the pipeline.
23    So in that discussion there was probably some
24    discussion of, like, Okay, what is she doing? Does she
25    have surgeries? What's planned? Kind of planning out

CONFIDENTIAL                                      Page 139

1     so that we don't leave people hanging.
2  Q. In this process in April of 2017, did you talk
3     with any of the three physicians in REI, Dr. Seifer,
4     Dr. Hsu, or Dr. Porter?
5  A. I did not.
6  Q. Why not?
7  A. Because the discussions around closure of the
8     program were discussions that we were having at a, at a
9     high level.
10  Q. Let's look at Exhibit 16 now.
11  A. Sure.
12  Q. Have you looked through it?
13  A. You just gave it to me, and you asked me
14    questions.
15        ATTORNEY SCHROEDER: Take your time to review
16    it.
17  BY ATTORNEY KRAMER:
18  Q. Take your time. Take your time to review it.
19        (Brief pause.)
20  A. Okay.
21  Q. I see you're not on this email chain, but did you,
22    at any point, see the document that's attached to this?
23  A. I don't know if I did. First of all, the document
24    attached to 9576 is the same one that was shown in
25    Exhibit 15, I believe. Am I correct?

CONFIDENTIAL                                      Page 140

1  Q. Or at least the first, the first page.
2  A. The first page? Then there's a breakdown of
3     proposed -- so then there's a, then there's kind of a
4     checklist of proposed changes and steps that I actually
5     described in a, in a previous question about the steps
6     that we would go back and to do. Because we, we
7     undertook -- and I'm referring to Page 4, I'm sorry,
8     one, two, three, for, five, six, where we were
9     beginning to look at the number of patients that would
10    require scheduling and care beyond program closure.
11  Q. And is that the page that has the Number 150 on
12    it?
13  A. Correct.
14  Q. I'd like to look at the page after that.
15  A. Okay.
16  Q. And I'm sorry. It doesn't have a number, but it
17    says "Staffing Plan".
18  A. Correct.
19  Q. I'm looking at the middle column. It says "Future
20    Staff with Complete REI Shutdown". There are three --
21    do you see that?
22  A. I do, yes, yes.
23  Q. Okay. There are two names that are listed here,
24    Misty Blanchette Porter at 0.4 GYN US, meaning
25    ultrasound, and Elizabeth Todd at a 1.0 GYN generalist.

CONFIDENTIAL                                           Page 141

1    Do you understand that the plan at this point on
2  April 21st 2017 was to retain Dr. Porter and Ms. Todd
3  as future staff with complete REI shutdown?
4  A.  No.
5  Q.  Why not?
6  A.  I've never seen this document before.
7  Q.  You weren't aware that that was the plan?
8  A.  Well, I don't understand.  This doesn't make sense
9  to me.  Future staff with complete REI shutdown means
10  that we continue to do, we continue to do in vitro
11  fertilization?  We're shutting down REI and we do in
12  vitro fertilization?
13  Q.  The way I see this is that the plan was to
14  redeploy Dr. Porter to be only GYN ultrasound and to
15  redeploy Beth Todd to the generalist division, and this
16  would not mean continuing IVF.
17        ATTORNEY SCHROEDER:  Well, that's your
18  interpretation, but you're asking him -- you're not
19  actually even asking him a question.  So, if you want
20  to ask him a question, go right ahead, but he said he
21  hasn't seen this before.
22        THE WITNESS:  I've not seen this document,
23  nor does the spreadsheet titled "IVF/REI Business
24  Review" have the same terms that are reflected in the
25  document that we're referring to under staffing plan.

CONFIDENTIAL                                           Page 142

1  So one says discontinue IVF program, REI program on
2  hiatus.  It doesn't talk about retaining anyone.
3        I've never seen the staffing plan document, and I
4  don't understand what "Future Staff with Complete REI
5  Shutdown" means, because it's not one of the categories
6  reflected in proposed actions.  So I don't know if this
7  is a draft document.  It was a document that, you know,
8  Daniel, that they laid out some proposed things.  I
9  don't think this was a -- I don't know the provenance
10  of this document.
11  BY ATTORNEY KRAMER:
12  Q.  You never discussed the idea of a future staff
13  that would include Dr. Porter and Ms. Todd?
14  A.  No.
15  Q.  Do you know if that possibility was discussed
16  between Daniel, Leslie DeMars, and Heather Gunnell?
17  A.  I don't know.  I don't think so.  We made a
18  decision to close IVF and REI in total.  That's what
19  the communication was.  That was what the plan going
20  forward.  So I, I don't understand.  So I don't -- this
21  might have been, Hey, we can do -- I don't know if this
22  was Leslie's musings or kind of what, some other
23  thoughts about what we can do.  I just don't understand
24  the, the title, because it would, if there's complete
25  shutdown of REI, does that mean that in vitro

CONFIDENTIAL                                           Page 143

1  fertilization continues?  I just haven't seen this
2  document before.  I don't know what to make of it.  I
3  don't know who authored it, and I don't know its
4  intent.
5  Q.  Is there something in that document that makes you
6  think that IVF would continue?
7  A.  Well, it, it just says "with complete REI
8  shutdown".  It doesn't say anything about -- that's why
9  I'm saying, like, if I was in a meeting, I would ask
10  for some more explanation about this, because I don't
11  even know where this came from.
12  Q.  Well, looking at Exhibit 16, this came from
13  Heather Gunnell.
14  A.  Okay.  So she might have been, Heather, might have
15  been, had her own way of thinking about restructuring
16  things that never made it to a conversation with
17  Heather, with, with Daniel or myself.  It might have
18  been thinking about -- I just don't know what the title
19  means.  You have to ask Heather.
20  Q.  This email went from Heather to Daniel and Leslie
21  DeMars with this attachment.
22  A.  Okay.  Let me just see.  They added a couple
23  things to the list.  So what's, what I don't understand
24  is that in the, in the timeline, so "Key Action Items"
25  page, IVF program changes, you know, referral strategy

CONFIDENTIAL                                           Page 144

1  for IVF, referral strategy for REI.  So this is the,
2  the plan for closure of both programs.  The, the three
3  staffing plan models was never part of that.  There's
4  no other document that refers to future staff with
5  complete REI shutdown in the documents that you've
6  shared.
7  Q.  And you're not aware of discussions about staffing
8  plans with the shutdown?
9  A.  No.  We decided to close the program.
10  Q.  Let's go through the timeline.  I want to make
11  sure that we're not missing any of the meetings that
12  you had to discuss what to do with REI.
13  A.  Okay.
14  Q.  You made the decision.  Do either of these
15  documents clarify for you what the timeline was of when
16  you started discussing --
17  A.  Which documents are you referring?
18  Q.  Exhibit 15 and 16, about when you started
19  discussing with Daniel Herrick and Leslie DeMars.
20  A.  I'm going to say we made a decision mid, mid to
21  late April.  I'd have to go back through my calendar to
22  see the meetings.  Clearly, Heather's document from
23  4/21, the decision has been made, and we've already
24  started, as is reflected in the document, Exhibit 16,
25  Page "IVF/REI Program Changes", we've begun to outline

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD - Vol. 1
July 30, 2019

CONFIDENTIAL                                    Page 145

1    the, the step-by-step process of how we would refer
2    patients. That's why the, the subsequent page around
3    staffing plan makes no sense. There was never a plan
4    to complete REI shutdown, because it doesn't make
5    sense. I don't -- I never saw this document.
6  Q.  I thought this was a complete REI shutdown.
7  A.  Yeah, I just, I don't know what -- so the document
8    refers to both IVF and REI. So I don't know why, in
9    Heather's document, she's just referring to complete
10   REI shutdown.
11 Q.  My understanding is that REI is the broader
12   category and then IVF is one of the services that's
13   provided by REI so that you could have, either you have
14   a shutdown of IVF but you maintain everything else in
15   REI, or, if you have a complete REI shutdown --
16 A.  Yeah.
17 Q.  -- that means no IVF and nothing else in REI.
18 A.  Right. And yet they've referred to -- again, this
19   is the reproductive, but it's discontinue IVF, REI
20   program on hiatus. I'm just not -- there's a number of
21   ways that they refer to it in the, in this document. I
22   think our intent was to shut down the program. So, if
23   this is reproductive endocrinology, we were going to
24   shut down the whole program, including IVF. That was
25   the intent, and that was the effect that we had.

CONFIDENTIAL                                    Page 146

1       I was not -- there was no plan specifically to
2    shut down the program and retain Misty and Beth Todd to
3    do something else, either, kind of -- and I don't know
4    what future staff means. The plan was not, Hey, let's
5    press the pause button and then come back to this in a
6    couple of months and this is going to be the corporate
7    -- we said we are going to shut this down, and then
8    we'll think about the next steps.
9  Q.  Meaning the plan that you settled on or one of the
10   possibilities that you even discussed?
11 A.  The plan that we settled on. We didn't discuss a,
12   a plan where we had a complete shutdown of REI but
13   continued on with Beth and Misty.
14       ATTORNEY KRAMER: Let's take a break for a
15   second here.
16       (A recess was taken from 3:17 p.m. to 3:20 p.m.)
17       ATTORNEY KRAMER: Okay. So let's mark this
18   as Exhibit 17.
19       (Deposition Exhibit 17 marked.)
20       ATTORNEY SCHROEDER: Can we do this with the
21   actual document attached to it? Because he's not on
22   it.
23       ATTORNEY VITT: No. Let me get the Herrick
24   exhibits, because we went through this with him, and
25   so, rather than trying to do it again --

CONFIDENTIAL                                    Page 147

1       ATTORNEY SCHROEDER: Then put it in? Yeah,
2    that probably makes sense.
3       ATTORNEY KRAMER: Okay. We'll take a pause
4    again.
5       (A recess was taken from 3:25 p.m. to 3:34 p.m.)
6  BY ATTORNEY KRAMER:
7  Q.  Okay. So right now we have Merrens Exhibit 17,
8    which, for now, is a one-page document, DH9582. We are
9    obtaining the attachment to it the attachment that's
10   referenced on this document that's an Excel
11   spreadsheet. Once we have that, we'll supplement the
12   record with the attachment. This is an email from
13   Heather Gunnell to Daniel Herrick and Leslie DeMars
14   from April 19th 2017. Dr. Merrens, have you seen this
15   before?
16 A.  I have not.
17 Q.  I'd like -- to put this into sequence, we have
18   Exhibit 15 from April 18th 2017 that says, "I think
19   we're ready to share our plans with Ed and Maria", and
20   then we have this one the next day, April 19th, and
21   then we have Exhibit 16 on April 21st. That's the one
22   that we've been talking about previously a few moments
23   ago that includes the complete REI shutdown.
24 A.  Right. The timeline, though, is that the timeline
25   is the order of documents 15, 17, 16, in terms of

CONFIDENTIAL                                    Page 148

1    the timeline.
2  Q.  Yes.
3  A.  So it's important to note that, between 17 and 16,
4    the plan is not a complete shutdown and rebuild, but a
5    decision has been made for a complete shutdown and the
6    communication plan and everything is a complete
7    shutdown. So just want to -- in the 2 days, the 48
8    hours, between the 19th and the 21st, a little bit
9    longer, that was the final operating plan.
10 Q.  That's, that's the key decision point --
11 A.  Correct.
12 Q.  -- was April 21st or thereabouts?
13 A.  Yeah, or the 20th. I don't have the exact dates,
14   but, but what we've looked at here is a couple
15   different ways of modeling it of, you know, Do we put
16   it on hiatus? Do we just do this? And, finally, I
17   think the decision was we're just going to shut REI
18   down. We're not going to continue some select
19   services, and we're just going to shut this down and go
20   from there.
21 Q.  And what was the decision about staffing at that
22   point?
23 A.  In terms that we would shut down the program, end,
24   end the providers, terminate the providers that were
25   engaged in it, and there was very little other staffing

CONFIDENTIAL                                                          Page 149

1    that was, that was involved in the program. Beth Todd
2    was someone that could continue on working just in GYN.
3    Nurses, for some reason, she'd worked in a different
4    area.
5    Q.  In this email, this Exhibit 17 from April 19th,
6    Heather Gunnell says that, says, "My assumption is that
7    MBP" -- that's Misty Blanchette Porter -- will be
8    refocused to GYN U/S". Do you understand U/S to mean
9    ultrasound?
10   A.  Correct.
11   Q.  Yes? Was this ever communicated to you that, as
12   of April 19th, at the very least Heather Gunnell's
13   assumption was that Dr. Porter would be retained as an
14   employee of Dartmouth-Hitchcock and she would be
15   refocused to GYN ultrasound?
16   A.  No.
17   Q.  That was never communicated?
18   A.  I'm not aware of that being the plan. What I,
19   what I am aware of the plan that we talked about in 16
20   is the plan to shut down the program and talk about
21   terminating providers. There was one documentation on
22   Exhibit 16, a communication to the REI team, May 1st,
23   communicate with the patients, May 5th. That was the,
24   that was it.
25   Q.  Where --

CONFIDENTIAL                                                          Page 150

1    A.  I was not presented with a plan by Leslie, This is
2    what we want to do. We want Misty to continue with
3    ultrasound and just, just do that. That was not part
4    of the plan.
5    Q.  Where does it say in Exhibit 16 that the plan was
6    to terminate the three physicians.
7    A.  Um, communications to the REI team, that was in --
8    I'm, just my inference is that we met with the REI team
9    to communicate the plan going forward.
10   Q.  I thought you said a moment ago that in this
11   Exhibit 16 there was a statement that the plan was to
12   terminate the three physicians.
13   A.  No. I, what I'm trying to -- communication to the
14   REI team. I assumed -- I'm just commenting. Here's
15   what we discussed, communication to the REI team. We
16   set up a timeline when we actually met with the REI
17   team to say that we're ending the program and ending
18   your employment. So that's what I inferred from this.
19   Q.  That was the meeting on May 4th?
20   A.  Possibly.
21   Q.  When we get the exhibit that's an attachment to
22   Merrens 17, we'll come back and just supplement the
23   record on that, but I think, for now --
24   A.  Okay.
25   Q.  -- we'll put that to the side. At some point, did

CONFIDENTIAL                                                          Page 151

1    you have a meeting with risk management to talk about
2    the closure of REI?
3    A.  They were engaged in all, in the discussions
4    about, as were HR and a range of other areas.
5    Q.  So let's talk about that. We've, we've talked
6    about the period of time when you had meetings with a
7    very small group --
8    A.  Yeah.
9    Q.  -- with Dr. DeMars, Daniel Herrick, Heather
10   Gunnell. At some point, then you brought the decision
11   to a larger group?
12   A.  Correct.
13   Q.  Tell me about that.
14   A.  Well, as I said before, the goal was to make sure,
15   if this was the right thing, right decision, what are
16   the implications of this? Remember, too, that, before
17   we ever had these discussions, this group decided not
18   to, not to enter any, I think, decided at the end of
19   March they weren't going to add any more patients into
20   the REI program. This was already a program that had
21   recognized that it had challenges and stopped
22   recruiting new patients.
23       So, even before there was any discussion with me,
24   decisions about closing the program, who does what, it
25   had already said we're not going to add any more

CONFIDENTIAL                                                          Page 152

1    patients to our rolls. When we had made the decision
2    to end the program, we had to understand the
3    implications for patients.
4        ATTORNEY SCHROEDER: You keep saying "we".
5    Who is we?
6        THE WITNESS: Me. When I made the decision
7    to close the program based on input from Daniel Herrick
8    and Leslie, the next steps were discuss with other
9    important stakeholders within the organization to make
10   sure that we had the right process around things.
11   BY ATTORNEY KRAMER:
12   Q.  And those stakeholders included HR?
13   A.  Human resources and risk and legal and everyone
14   else that, like, How do we do this? How do we develop
15   a termination letter? How do we make contact with
16   other -- how do we have alternative plans for oocyte
17   transport? How do we make plans to continue to support
18   our lab and make sure our lab stays open in perpetuity?
19   How do we contact other people that can make plans for
20   each one of these women that had a, that had plans in
21   place? How do we -- so lots of plans about how we
22   tailor it down to individual patients and other people
23   that are involved in this program.
24   Q.  In those conversations with the broader group, did
25   anybody raise questions about whether closure was the

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.
Confidential
Edward Merrens, MD - Vol. 1
July 30, 2019

CONFIDENTIAL                                                    Page 153

1  necessary step?
2  A.  No.
3  Q.  Did anybody raise questions about the rarity of a
4  division being closed down?
5  A.  No.
6  Q.  Why did you involve risk management?
7  A.  Because I involve risk management in a lot of work
8  that we do.  This is -- we wanted to make sure that we
9  would have steps in place.  This is a highly sensitive
10 line of care.  We would have couples, women, partners
11 that, that had eggs frozen in our lab.  We would be
12 closing a program.  We wanted to make sure that we had
13 mitigated all risk around ensuring that their samples
14 were stored safely, that we viewed it from every
15 possible perspective, and I involve risk in all those
16 discussions.
17 Q.  What was the plan with the lab?
18 A.  The lab would, would remain open and functional.
19 We have a -- we had a partnership with UVM.  We would
20 have our embryologists.  We would maintain the lab and
21 its function in perpetuity, because we had samples
22 there, and we wanted to make sure those samples were
23 maintained in the highest fashion and that, and, as we
24 went forward, we would have the mechanism to transport
25 those samples to the site if people wanted to continue

CONFIDENTIAL                                                    Page 154

1  their IVF plans.
2  Q.  Isn't it expensive to maintain the lab without the
3  revenue from IVF procedures to support it?
4  A.  Yes.
5  Q.  Do you know roughly what the annual carrying cost
6  is for the lab?
7  A.  No.  Do you understand that that wasn't an issue?
8  Q.  I do.
9  A.  Yeah.
10 Q.  Yeah.  I'm still asking about it.
11 A.  The issue was that this was a really important
12 part of our plan going forward that, while we shut down
13 the program, there were people that had legacy samples
14 and were relying on the safety of that for their future
15 family planning, and we were not willing to compromise
16 that in any way, regardless of cost.  I mean, it's open
17 today.
18 Q.  So May 4th 2017 was the day that the closure was
19 announced to the members of the REI division?
20 A.  Correct.
21 Q.  Were you involved in the meeting with the
22 providers when they came in and you told them what was
23 happening?
24 A.  Yes.  We had individual meetings with each one of
25 them.

CONFIDENTIAL                                                    Page 155

1  Q.  Did you have a group meeting first?
2  A.  I can't remember.  I know we had individual
3  meetings with David, Albert, and Misty, with Leslie,
4  myself.  I think Steve Woods was present in that
5  meeting as well, from HR, as well.  We had individual
6  meetings.
7  Q.  What do you remember from that day aside from what
8  you've just described?
9  A.  That we described that we're closing the program,
10 that we would provide -- for, for a number of reasons.
11 That we would provide severance and we would provide
12 some outplacement assistance and helping get, garner a
13 new position and would be working -- so it was part
14 about, about the individual provider whose position was
15 being terminated, but also plans apprising them on
16 plans of taking care of their patients and ensuring
17 there were plans for their patients going forward.
18 Q.  Did you meet with Beth Todd before --
19 A.  We did.
20 Q.  -- you met --
21     ATTORNEY SCHROEDER: Let her finish the
22 question.
23     THE WITNESS: I'm sorry.
24
25 BY ATTORNEY KRAMER:

CONFIDENTIAL                                                    Page 156

1  Q.  Did you meet with Beth Todd before you met with
2  the larger group?
3  A.  Yes, we met with Beth Todd.
4  Q.  Why did you meet with Beth Todd first?
5  A.  I can't answer why she was first.  We wanted to
6  meet with her and tell her that was the plan going
7  forward.  There was no -- I don't think there was a
8  reason for the prioritization of her meeting.  She had
9  been someone that had been involved in all of them, and
10 we decided to meet with her first.
11 Q.  I thought that -- maybe I'm incorrect.  I thought
12 that there was a meeting with Beth Todd first and then
13 there was a meeting with the other providers --
14 A.  Correct.
15 Q.  -- and then there was a meeting --
16 A.  Individual.
17 Q.  -- with the three individuals who were being
18 terminated; is that the correct sequence?
19 A.  That may be the correct sequence.
20 Q.  Who spoke at the meeting with the providers who
21 were being terminated?
22 A.  Leslie.
23 Q.  What was she like in that meeting?  Was she -- did
24 she seem uncomfortable?  Did she seem comfortable?  Do
25 you recall?

Misty Blanchette Porter, MD v.                    Confidential                    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                        July 30, 2019

CONFIDENTIAL                                    Page 157

1  A.  I think she was direct.  I think she explained.
2  She had a -- she explained the situation and the
3  decision to term, to close the program.  I think it was
4  a difficult decision.  It was a difficult conversation
5  to have, as you can imagine, but I think she was able
6  to articulate it to each one of them and talk about
7  what the steps going forward would be.
8  Q.  Who met with the providers individually?  Were you
9  in those meetings?
10  A.  Yes.
11  Q.  Who else was in those meetings?
12  A.  Leslie DeMars, and I think Steve Woods from human
13  resources was there as well.
14  Q.  Was Aimee Giglio there?
15  A.  She was not.
16  Q.  What was the reaction of Dr. Hsu to the, to your,
17  to the meeting?
18  A.  I, as I recall, Dr. Hsu was surprised and then, I
19  think, worried about what his next steps would be and
20  his career.  I think all of them asked about their
21  patients.  What will happen with my patients, I think,
22  was the primary concern even beyond kind of what was,
23  what will happen with me.  I think, What will happen
24  with the program, my patients?
25    Remember, we had already stopped entering patients

CONFIDENTIAL                                    Page 158

1  into this program based on information, and, and what
2  had already happened.  So I think there was some sense
3  that there were already things evolving, but there were
4  questions about, in terms of Albert, Dr. Hsu, questions
5  about his patients and what the timeframe would be like
6  and when will this happen, and it was, a lot of it was
7  a lot of information all at once.  So it was just to
8  kind of say that there will be opportunity to have more
9  discussions afterwards.
10  Q.  About how many patients were there being treated
11  by the REI division at this point?
12  A.  I can't give you the exact number.  When we got
13  down to it, we had already identified those that were
14  -- we had a cutoff point about those that were
15  scheduled for procedures and how to deal with that.
16  There were people that were actively being seen and
17  plans for each one of them.  So there was an
18  individualized plan where every single one of those
19  patients were contacted.  They weren't sent letters.
20  They might have been sent letters as well, but they
21  were contacted about an individualized plan going
22  forward.
23    ATTORNEY KRAMER: Do we have the attachment
24  to 17?
25    ATTORNEY VITT: Here we go.

CONFIDENTIAL                                    Page 159

1  BY ATTORNEY KRAMER:
2  Q.  Good.  So let's replace 17 with this.  This is the
3  document that we had previously, the one pager.  So
4  let's just re-mark this.
5    (Exhibit 17 was remarked with attachments.)
6  A.  Can you tell me the difference between Exhibit 17
7  and Exhibit 16?
8  Q.  Well, in Exhibit 16 the cover email is dated April
9  21st 2017.  In Exhibit 17 the cover email is dated
10  April 19th.  I don't know if there's any difference in
11  the attachment.
12    Looking briefly at 17, the cover page of this
13  document, the email says from Heather Gunnell, "My
14  assumption is that MBP", Misty Blanchette Porter, "will
15  be refocused to GYN ultrasound".  If we look at the
16  attachment, on Page 4 of the attachment where it says
17  "Staffing Plan", again, it says "Future Staff with
18  Complete REI Shutdown", listing both Misty Porter at .4
19  GYN ultrasound and Beth Todd as 1.0 GYN generalist.
20    Seeing this, does this change your understanding
21  at all about whether there was ever an intention to
22  redeploy Misty Porter as a GYN ultrasound specifically,
23  even in light of the closure of REI?
24  A.  It looks like one of the potential plans for a
25  shutdown included a, continuing Beth Todd, Beth Todd as

CONFIDENTIAL                                    Page 160

1  a generalist and Misty, but then there's a future staff
2  where it's just Elizabeth Todd.  So I don't know what
3  model they're talking about.  So future staff, when you
4  go to, when you refer to the, the text of Exhibit 17,
5  also included is an expense breakdown for the cost of
6  keeping the lab open for a year.
7    I don't know what she's talking about.  So that's
8  lab, which is the last page.  I won't -- my refocused
9  to GYN ultrasound.  I don't know what the third future
10  staff rebuild model refers to, and it's not referenced
11  in her email.  So a future state is one where there's
12  no Dr. Porter involved and there is just Elizabeth
13  Todd.  So these are playing out current scenarios, one
14  scenario that she labeled shutdown and then a future
15  scenario.
16    I believe the future scenario is the scenario that
17  we accepted as the best plan, one in which we
18  completely shut down REI, and I don't -- there's a
19  variety of terms here like "rebuild", "restart",
20  "hiatus".  There's not a good term sheet of
21  definitions.  So I think the hard part is interpreting
22  how spreadsheets are titled with words like "hiatus"
23  and "discontinue".
24    What I see on the, on this three-phase staffing
25  plan sheet is that a future state that just includes

Misty Blanchette Porter, MD v.    **Confidential**    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.    July 30, 2019

C O N F I D E N T I A L                                           Page 161

1   Elizabeth Todd being a GYN and REI lists here. I don't
2   see where things are in terms of Dr. Porter playing a
3   role. I see the, the lab continuing, and this was the
4   model that we ended up doing and talking about in early
5   May, one in which we would continue the embryology
6   staff, Elizabeth Todd would play some role going
7   forward, but we would terminate the physicians as the
8   program was closed.
9        (Deposition Exhibit 18 marked.)
10  Q.  Have you seen this before?
11  A.  I, I believe I have reviewed this.
12  Q.  In what context?
13  A.  Materials that I reviewed with, with Don.
14  Q.  For the record, when I say "this", I'm referring
15  to Exhibit 18, which is DH25744 --
16  A.  Yeah.
17  Q.  -- an email from Leslie DeMars to Daniel Herrick
18  on April 25th 2017. Dr. Merrens, you're not copied on
19  this.
20  A.  No.
21  Q.  And you never received a copy of this --
22  A.  No.
23  Q.  -- contemporaneously?
24  A.  Correct.
25  Q.  Did you have any knowledge that something like

C O N F I D E N T I A L                                           Page 162

1   this existed?
2   A.  No.
3   Q.  It's dense, so let's go through. We'll go through
4   it, and, if you need a chance to read it again, we can
5   take that time.
6   A.  We can do this line by line.
7   Q.  Starting with, starting with the first paragraph,
8   Dr. DeMars says, "Daniel, you obviously have a good
9   sense of Ed, and he is furious at me, but there are
10  some issues that he has to understand in order to get
11  to yes on hiring Dan Grow in some capacity ASAP". Who
12  is Dan Grow?
13  A.  So Leslie came to me in the midst of what we, what
14  we've been talking about for the past five hours and,
15  in the middle of this maelstrom, said, Well, we can get
16  this guy here. He can come and do it. He can come.
17  I'm like, You've got to be kidding. I don't even know
18  this guy, but she's reaching out to --
19       ATTORNEY SCHROEDER: Again, identify who
20  you're talking about.
21       THE WITNESS: Leslie.
22       ATTORNEY SCHROEDER: Yes.
23       THE WITNESS: Sorry. So Leslie reached out
24  to me and scheduled a meeting and said, "I'd like to
25  bring Dan Grow here", and I said, "I don't know even

C O N F I D E N T I A L                                           Page 163

1   know who you're talking about". So, in between the
2   plans about how we don't have nursing support, this is
3   beginning to fall apart, there's, she's talking about
4   bringing someone in here mixed in with a whole range of
5   other things around where market share might go, and
6   I'm just saying this is not the time to, you know, so
7   --
8        BY ATTORNEY KRAMER:
9   Q.  Sorry. Where what might go?
10  A.  Market share.
11  Q.  Oh, okay.
12  A.  So I didn't -- she had one meeting with me. She
13  said we have the opportunity to hire this guy, and I
14  need to know, and I'm like, "We're not making any
15  decisions about someone new in this mix until we
16  understand the full spectrum of what's going on".
17  Q.  And that's why you were furious at her?
18  A.  I don't know what she's talking about. I don't
19  know in what context. I think I may have told her that
20  I can't imagine hiring someone now that we've gone
21  through all this work to understand that, at every
22  level, there is dysfunction and we're not sure that we
23  can safely provide care for women in an ongoing
24  fashion.
25  Q.  Did Dr. DeMars ever propose terminating

C O N F I D E N T I A L                                           Page 164

1   Dr. Seifer, terminating Dr. Hsu, and bringing in Dan
2   Grow?
3   A.  She did not.
4   Q.  What did she -- so that I understand, what did she
5   propose in terms of Dan Grow?
6   A.  I have -- I actually don't know. It may have been
7   in the context of we need more capacity. You know, it
8   may have been -- I actually don't remember, but it may
9   have been, you know, there, David can't provide the
10  full spectrum. Misty is out on disability and can work
11  a certain amount, but we need more capacity to be able
12  to do it. It may have been in that context that she
13  was, that Leslie was describing her interest in Dan
14  Grow. I never met Dan Grow, and I literally had one
15  meeting with Leslie where she described this
16  opportunity completely out of the blue.
17  Q.  If there was an opportunity to bring somebody in
18  and solve some of those clinical staffing issues,
19  wouldn't that be a viable solution to solve what had
20  been identified as the fundamental problem in REI that
21  necessitated closure?
22  A.  I think this was a, a less-than-valiant effort way
23  late in the process in which we had already discovered
24  so much was going wrong, and the addition of another
25  person to the mix, I didn't think, was going help

CONFIDENTIAL                                    Page 165

1  things.
2  Q.  I thought this process had only truly started in
3  late April.
4  A.  Well, what we discovered was that, by March, end
5  of March, they had stopped recruiting new patients.
6  They'd gone through a whole process of understanding.
7  We had already lost a nurse.  So in late April, a week
8  before we actually terminate the people and the
9  program, she's coming to me asking about, Hey, can we
10  hire someone else to bring in here to kind of like
11  shore this up?
12  Q.  It's only a few days after April 21st when you
13  had, I think, identified that as the date when a
14  decision was made, correct?
15  A.  I'm not sure what your question is.
16  Q.  The, you're describing this as late in the
17  process, and the decision had been made and in place
18  for some period of time, but it seems to me that this
19  is only a few days later and that there maybe would
20  have been room to reopen the discussion, but that's
21  what I'm asking you.  Was there, was there room to
22  reopen any discussion?
23  A.  Discussion about what?
24  Q.  What to do with REI.
25  A.  We had already determined that we had lost nursing

CONFIDENTIAL                                    Page 166

1  staffing, that we probably couldn't continue because we
2  didn't have the adequate nursing staffing.  We had had
3  a fair amount of discovery about the dysfunction of the
4  group.  Misty, as a principal, was out on disability
5  and was not fully participating in, in the full
6  spectrum of reproductive endocrinology work.
7       And, in the setting of what I was becoming aware
8  of was much more of a problem and had been much more of
9  a problem for a long period of time, the architect of
10  this dysfunctional program was now wanting to bring yet
11  another person to me in the same context she brought
12  David Seifer.  I was, so I was saying, in the context
13  of all this, I'm not sure this is the right time, and
14  I'm not sure this is the right person.
15  Q.  When you say "the architect of the dysfunctional
16  program", you're referring to Leslie DeMars?
17  A.  I am talking about Leslie DeMars.  So, as we've,
18  as I've learned in late April, there was a lot more
19  going on in terms of Dr. Hsu's capabilities, the issues
20  with David Seifer, issues with how the group all
21  comported themselves, worked together, didn't work
22  together.  So to add another person to this seemed to
23  add complexity where we didn't need it, and our goal
24  was to try to simplify things down to, How do we take
25  care of patients?  If we've lost nurses and doctors

CONFIDENTIAL                                    Page 167

1  can't agree how to work together in their capabilities,
2  this was not the right environment to bring yet another
3  person into the mix.
4  Q.  Why do you call Dr. DeMars the architect?
5  A.  She's the department chair, and she's the one that
6  has been managing the, each one of these principal
7  people in her division.  So she's been the person that
8  recruited David Seifer here.  She's been overseeing how
9  this is structured, how it delivers care, and has been
10  overseeing the, the capacity and capability assessment
11  of each of the, each of the people involved in the
12  program.  So that would be my -- she's the person
13  overseeing this.  "Architect" may have not been the
14  right term, but she is directly responsible for every
15  aspect of this division.
16  Q.  It was her recommendation to shut it down, right?
17  A.  It was my recommendation based on information in a
18  discussion with Leslie and Daniel to shut down the
19  program.
20  Q.  Did you view Albert Hsu as a problem since day
21  one?
22  A.  There was clearly -- I think that's a
23  mischaracterization of, of, there's -- lumping Albert
24  in.  He's been a problem since day one.  There were
25  clearly challenges around Albert's capability that,

CONFIDENTIAL                                    Page 168

1  that she tried to mitigate, both with working with
2  David and working with Misty.  I don't think -- "He's
3  been a problem since day one", was a direct quote.  I
4  don't think I conveyed that in writing or in person.
5  Q.  And was that your view?
6  A.  I think there were many, many problems in this
7  division, and, by this time in late April, I was being,
8  I was apprised of how significant those problems were.
9  Q.  Dr. DeMars says here maybe three-quarters of the
10  way down the page, "We have to be very careful about
11  the conditions under which we can terminate our
12  providers".  Do you know what she's talking about?
13  A.  I think she's talking about -- her concern is that
14  David's wife is a doctor in the system, and her concern
15  was about market share, that David could join, could
16  stay -- his wife lives in Manchester.  He could easily
17  move to Manchester, join one of the competing
18  companies.  So the issue about terminate is not, not
19  about the conditions that we terminate.  She may be
20  talking about some organizations have a noncompete
21  clause, of which we do not have.  So she's worried
22  about market share and him going to work for another
23  organization.  That was not my concern.
24  Q.  And here at the bottom Dr. DeMars raises the
25  possibility of offering Dr. Porter an ultrasound-only

CONFIDENTIAL                                                                            Page 169

1  position.  She says, "We could offer her an
2  ultrasound-only position".  You've said that you never
3  heard that as a possibility, right?
4  A.  I think she counters that, and, subsequently, even
5  under my query at the program --
6          ATTORNEY SCHROEDER: Just answer the
7  question.  That was never a possibility that you were
8  --
9          THE WITNESS: I, this was not -- I've said
10  this before.  That was not one of the options that was,
11  that was offered.
12  BY ATTORNEY KRAMER:
13  Q.  Okay, go ahead.  What were you starting to say?
14  A.  She counters it by saying, "We can offer an
15  ultrasound position, but keeping her out of rebuilding
16  plans will be impossible".  So I think she's musing at
17  things.  This was never a proposal to me.  There was
18  never a proposal that we're going to end the program
19  and Misty will continue on doing GYN ultrasound.  What
20  was conveyed to me was that Misty's role in GYN
21  ultrasound was very much focused around REI.
22  Q.  Looking at the second page, I don't know what
23  paragraph it is.  It's the paragraph that starts, "The
24  messaging is very messy, and we have patients who are
25  about to start meds".  Did you know that there were

CONFIDENTIAL                                                                            Page 170

1  patients who were about to start meds?
2  A.  We knew, so we knew that there were patients in
3  various stages of the reproductive cycle, and part of
4  it was understanding what we should do about patients
5  starting meds and how to transition them to other
6  programs.  It was very messy.  That was the whole
7  intent of engaging and understanding the patient needs
8  early on in this process.
9      The, the, you know, although this was disruptive,
10  there was no harm incurred.  We got everyone aligned
11  with another IVF program and have continued to kind of
12  manage reproductive needs.  So, although it was messy
13  and patients were involved in things who were upset
14  about transitions, we did this safely, and that was the
15  goal.
16  Q.  Was anybody's cycle interrupted or delayed as a
17  result of this closure?
18  A.  I think there were likely some delays.  I don't
19  know the specifics, but --
20  Q.  And then in the next paragraph there Dr. DeMars
21  says, "My life" -- this is a quote:  "My life and the
22  messaging would be much easier if John Kacavas
23  determines that all three providers are at fault in the
24  medi diversion issue and are facing loss of license".
25  Who is John Kacavas?

CONFIDENTIAL                                                                            Page 171

1  A.  Chief Legal Officer for Dartmouth-Hitchcock
2  Health.
3  Q.  What is your response to this statement from
4  Dr. DeMars?
5  A.  She's musing on the fact that there had been
6  concerns about their dispensing other people's
7  medications for other people's cycles, and that had
8  been under, under review and whether that might result
9  in something that would supersede her decision making
10  around ending the program.
11  Q.  Do you know what John Kacavas determined about the
12  --
13  A.  I do not.
14  Q.  -- medication diversion issue?
15  A.  I'm sorry.  I do not.
16  Q.  Do you think that Dr. DeMars's life would be
17  easier if these three physicians lost their licenses?
18  A.  I can't comment on that.
19  Q.  Would it make the messaging easier?
20          ATTORNEY SCHROEDER: Objection, calls for
21  speculation.
22          THE WITNESS: I, as with my comment about her
23  life and messaging, this is a hard -- certainly
24  wouldn't -- this has nothing to do with my messaging.
25  I'm happy to kind of do the messaging.  I think this is

CONFIDENTIAL                                                                            Page 172

1  more reflective of her inner angst.  I can't speculate
2  on it.
3  BY ATTORNEY KRAMER:
4  Q.  Do you think it's irresponsible of her to say
5  something like this?
6          ATTORNEY SCHROEDER: Objection, calls for
7  speculation, argumentative.
8          THE WITNESS: I don't know what to say.
9  BY ATTORNEY KRAMER:
10  Q.  When did you begin to have concerns about
11  Dr. DeMars's leadership of OB/GYN?
12  A.  I think, during this process, I had, during this
13  process of discovery and as more information was
14  shared.  I, I think, certainly in, in April there had
15  been concerns, as I expressed early on, around some
16  decision making, but, clearly, during this process.
17  Q.  Was there anything about her leadership outside of
18  REI that caused concerns for you?
19  A.  Yes.  Certainly, the, the, we talked about the
20  recruitment of David Seifer.  That was associated with
21  that.  She made a decision to transition our second
22  year of our residency program to Nashua or Catholic
23  Medical Center in Manchester, and the process of
24  coordinating a GME program's transition was not
25  well-done.  It was not well-coordinated.  It was a

CONFIDENTIAL                                   Page 173

1  process that she led and caught a number of people a
2  little bit scrambling, and it was not well-coordinated
3  with, with Catholic Medical Center and not done in a
4  way that worked well for, well for us and caught -- it
5  had sent us all -- there's a lot of work that has to go
6  into it, and she kind of made a decision without
7  telling anyone. She had kind of talked about it, but
8  never -- she had mentioned, Hey, we're thinking about
9  doing this, but then made the decision and caught
10 everyone off guard, and I was sincerely taken aback by
11 the lack of forethought in that.
12 Q.  When was that?
13 A.  We transitioned it, so it actually happened -- I
14 think that was in the beginning of '17, that summer of
15 '17 when the, when the new residents would start at
16 Catholic Medical Center.
17 Q.  That the decision was made to do that?
18 A.  The decision was made before that, and, and I
19 think that the residents, the shift in residency was
20 going to happen in the fall of '17. But you asked if
21 there were questions about her decision making that
22 were separate from REI. That would be an example of a
23 decision making and plan and process that I thought was
24 less than ideal.
25 Q.  Any other examples?

CONFIDENTIAL                                   Page 174

1 A.  Some of the -- she had a leadership style that
2 didn't involve meeting with people, and I was -- had
3 held no kind of departmental meetings or meeting with
4 her divisional leaders on a regular basis, and it
5 became clear that her understanding of things was not
6 disseminated or based on regular meetings with her
7 people. I met with her more regularly than she met
8 with her division heads, and I worried about that in
9 terms of her ability to adequately engage and assess
10 issues that were happening in the department.
11 Q.  Do you think that contributed to the dysfunction
12 of REI?
13 A.  I think it was a contributing factor, to some
14 degree.
15 Q.  Did you have concerns about DeMars's leadership
16 prior to this late April, early May 2017 period?
17 A.  Well, I was very clear with her that I was not
18 pleased with the process by which she had recruited
19 David Seifer, and I told her that.
20 Q.  Was that retroactive when it turned out to be kind
21 of a problem with him, or that was at the time?
22 A.  I told her at the time.
23 Q.  Because of the red flags?
24 A.  Yes.
25 Q.  Why didn't you send that back for a standard

CONFIDENTIAL                                   Page 175

1  recruitment process?
2 A.  We had an open position. She had already brought
3  him here for an administrative role. He already moved
4  here from Oregon to kind of lead and do the
5  administrative role in this. It was a very unique and
6  not, not the standard way that we do things. I was not
7  the Chief Clinical Officer at the time of his
8  recruitment. Over, I was not in a position overseeing
9  the chairs. We had a different, different Chief
10 Clinical Officer at the time who would have made, who
11 might have made a, who might have made different
12 decisions at the time.
13 Q.  Who was the Chief Clinical Officer at the time?
14 A.  John Birkmeyer. So yes.
15 Q.  I want to make sure that I'm understanding the
16 pieces of this. Are you saying that Leslie DeMars
17 brought in David Seifer in some sort of administrative
18 role, which was completely within her discretion to
19 hire somebody, and then, once he was in the system,
20 then she basically leveraged that to then push him in
21 as division director?
22 A.  Correct. She wanted to add a clinical role to
23 the, to the administrative role that he held.
24 Q.  When he came in for the administrative role, was
25 there any vetting process outside of the department?

CONFIDENTIAL                                   Page 176

1 A.  I don't know if there was a formal process.
2 Q.  Nothing that you knew of?
3 A.  Correct.
4 Q.  Let's mark this as 19. Please take a look at this
5  and let me know when you're ready. This is Exhibit 19,

6  a document DH13068, and there is a, at the bottom of it
7  is an email from you, Dr. Merrens, to -- well, it
8  doesn't say, but I, my interpretation of this document
9  is that the email on the bottom was sent to Duane
10 Compton and Rich Rothstein. Is that correct?
11       (Deposition Exhibit 19 marked.)
12 A.  That is correct.
13 Q.  Did you end up having a meeting with Duane Compton
14 and Rich Rothstein?
15 A.  Yes.
16 Q.  When was that meeting?
17 A.  I'm, I can't say the exact date. It was probably
18 within the few days following this.
19 Q.  Do you know if it was before or after you had the
20 meeting with the REI providers to tell them that they
21 were terminated?
22 A.  I can go back through my schedule and determine
23 the exact date, but I can't, I can't recollect now.
24 Q.  What happened in the meeting with Compton and
25 Rothstein?

CONFIDENTIAL                                    Page 177

1 A.  I elaborated my concerns that I've articulated at
2   the, in the email part of Exhibit 19 and that I
3   actually described previous to this.  Um, I met with
4   them because the chairs have a dual reporting
5   relationship to the Chief Clinical Officer, my
6   capacity, and to the Dean of the Geisel School of
7   Medicine for their academic work.  At the time,
8   Dr. Rothstein was also the Chief Academic Officer.  So,
9   in evaluating a chair and my concerns, I wanted to make
10   sure that I was also talking with other people that
11   engage in that reporting relationship, and I wanted to
12   express my sincere concerns about her ability to
13   continue in this role.
14 Q.  At this point in time, did you think that she
15   should stop being chair?
16 A.  Yes.
17 Q.  Did Duane Compton and Rich Rothstein agree with
18   you?
19 A.  Yes.
20 Q.  Do you know if they expressed any of that in
21   writing?
22 A.  I don't believe they did.
23 Q.  In this document towards the bottom when you say,
24   "Secondly, we are undergoing a programmatic change in
25   one of her clinical areas in which her lack of

CONFIDENTIAL                                    Page 178

1   leadership and engagement has been troubling", is that
2   a reference to REI?
3 A.  Correct.
4 Q.  Did you meet with Dr. Compton and Dr. Rothstein
5   more than once about Dr. DeMars?
6 A.  No.  I also didn't need their approval to move
7   ahead.  This was purely based on -- I mean, she's my
8   direct report.  She's an employee of
9   Dartmouth-Hitchcock.  This was informed courtesy and to
10   garner their perspective and support.
11 Q.  Did either of them have observations about
12   Dr. DeMars that they shared with you?
13 A.  No, they had no insights into the, into the two
14   situations I, the situations I described in Exhibit 19
15   but had no other further insights, and I just -- they
16   wanted to be apprised of whatever the next steps would
17   be.
18 Q.  At what point did you take steps to have Leslie
19   DeMars be removed as chair?
20 A.  I met with her shortly after.  I don't know the
21   exact date, and I certainly can obtain that from my
22   calendar.  And we had a meeting, and I expressed my
23   concerns around her leadership in a number of areas and
24   didn't, told her that I didn't think she could continue
25   on in, in this role and asked her to step down.

CONFIDENTIAL                                    Page 179

1 Q.  And was her stepping down as chair related to her
2   management of the REI division?
3 A.  There were a whole range of things, I think,
4   management of the physicians in REI and how they were
5   managed, the fact that there was, there were
6   complaints, there were problems.  There were
7   restructuring of oversight.  There were issues around
8   who was capable and how things would work.  There were
9   issues around the residency program.  There were issues
10   around lack of ability to recruit in other areas in the
11   department where I didn't think she was effective, and
12   I didn't think she could be effective in the role, and
13   I thought that she had adequately demonstrated that
14   deficit.
15 Q.  Do you think that Dr. DeMars is an accurate
16   reporter of information?
17 A.  No.
18 Q.  What's the basis for that assessment?
19 A.  Well, a reporter takes information and either
20   disseminates it appropriately, shares it with their
21   senior leadership, and asks for input or advice.  I
22   think she has summarized information but not shared or
23   reported it adequately.
24 Q.  Are there specific times that come to mind other
25   than things that we've talked about so far today when

CONFIDENTIAL                                    Page 180

1   Dr. DeMars reported something to you that was
2   inaccurate?
3 A.  I think there were times in which she couched
4   behavior, capability, interactions in ways that or
5   worked in vagaries that didn't allow the details and
6   the severity to become apparent, and that became
7   apparent.
8 Q.  At any point, did you feel that you could rely on
9   Dr. DeMars's judgment?
10 A.  At any point?
11 Q.  Well, thinking back to was there a point in time
12   when you felt that you could rely on her judgment?
13 A.  Maybe early on, but it became apparent that I, in
14   retrospect, there were situations in which her judgment
15   and her decisions were, incurred challenges and harm.
16 Q.  Let's talk about the messaging around the closure
17   of REI.  It's been somewhat of a topic.  How did you
18   decide what the messaging would be about the closure?
19 A.  We decided that we would be clear that we could no
20   longer continue with the program as we intended.  There
21   were staffing challenges was really the crux of just
22   the mechanics of keeping the program open, but there
23   was a lot in the, in the background, and the messaging
24   was that we did not feel like we could safely continue
25   to staff the program and we would be stopping the

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD - Vol. 1
July 30, 2019

CONFIDENTIAL                                    Page 181

1  program and we would be taking care of the patients
2  that were currently seeing people and making
3  appropriate referrals and opportunities for ongoing
4  care. That was the essence of the communication.
5  Q.  Did you discuss with anybody different messaging
6  options, different ways to explain the closure?
7  A.  I think we discussed a number of things, but I
8  wanted to be true to what the issues were at hand.
9  Q.  Did you consider ascribing the closure to issues
10 with recruiting new providers?
11 A.  No. That wasn't one of the issues.
12 Q.  Did you or anyone else who was involved in this
13 process meet with patient relations? Were they
14 included in the meetings about the closure?
15 A.  We had, we did have -- I'm, I can't remember who
16 was involved, but we had people involved in
17 communications that tapped into patient relations
18 about, What's the right way to go, to go about doing
19 this? I can't tell you who was engaged. We had
20 everyone involved, communications, patient relations,
21 patient experience. We have an office of patient -- we
22 had everyone involved so that we would try to do this
23 in the best way possible.
24 Q.  Dr. DeMars seemed to have thought that patient
25 relations was not included in the messaging

CONFIDENTIAL                                    Page 182

1  discussions. Do you think that patient relations was
2  included?
3  A.  When you say "messaging discussions", are you
4  talking about the, the statement we make to the media?
5  I'm just trying to understand how, what messaging
6  you're talking about. I'm talking about the broader
7  message that came out in the "Valley News" and "Vermont
8  Digger" and everything else.
9  Q.  I mean the talking point of when somebody says to
10 you, Why did REI close --
11 A.  Right.
12 Q.  -- what's the explanation? Obviously, situations
13 are complex.
14 A.  Correct.
15 Q.  History is complex.
16 A.  Yeah.
17 Q.  All of that.
18 A.  Patient relations was not involved in developing
19 the message. Patient relations, I think, was involved
20 in, like, making sure that we've got, that we've got
21 everything taken care of and that care will not be
22 disrupted or minimally disruptive down to the patient.
23 The message was something that I developed with HR,
24 risk, our marketing and our communications people
25 around what would be the right way of, of announcing

CONFIDENTIAL                                    Page 183

1  this closure.
2  Q.  Do you know if there were efforts made to recruit
3  more nurses in the spring of 2017?
4  A.  We've had -- I mean, we've tried desperately to
5  recruit nurses, and it's an ongoing effort, not only
6  in, in GYN but across the organization. We're at a
7  huge deficit for nursing and recruitment.
8  Q.  Was there a decision made at any point to stop
9  recruiting nurses for REI? Obviously, as of when the
10 decision was made to close, but prior to that?
11 A.  I don't think so. I mean, we were at a point
12 where we were, we had such rapid turnover that it was,
13 at some point, it was -- we couldn't do it fast enough,
14 and it was proving to be a bigger issue than we had
15 realized. I'm not sure. There was clearly a time
16 where we said we're going to close the program, so
17 we're not recruiting anymore, but we were really
18 struggling to recruit people to be able to do this.
19 Q.  Do you know who Sharon Parent is?
20 A.  I don't.
21 Q.  Have you heard the name?
22 A.  Um.
23 Q.  There was a document --
24 A.  There was, yes.
25 Q.  -- from her.

CONFIDENTIAL                                    Page 184

1  A.  I don't know her role.
2  Q.  You didn't know anything about her?
3  A.  No.
4  Q.  Did you know -- she's a nurse, and did you know
5  whether she was interested in continuing to work for
6  Dartmouth-Hitchcock in the spring of 2017?
7  A.  I didn't.
8  Q.  Did Daniel Herrick or Leslie DeMars or Heather
9  Gunnell tell you anything about Sharon Parent in your
10 meetings when you were discussing REI?
11 A.  I don't believe so.
12 Q.  Do you know who Mary Martin is?
13 A.  No.
14 Q.  Okay. And Judy McBean, we talked about her
15 before.
16 A.  We did.
17 Q.  Yes, she's the per diem physician from
18 Brattleboro?
19 A.  Yes.
20 Q.  Yes. Were you aware of whether she was interested
21 in increasing her clinical time at Dartmouth-Hitchcock
22 around this period, April, May 2017?
23 A.  I'm, I'm not sure. I think there were some
24 discussions which would we rely on Judy if, if
25 post-termination would there be some situations where

CONFIDENTIAL                                                              Page 185

1  we would need her to kind of see patients as we
2  developed some other plans and utilize her to be able
3  to do that? But that's the most I can recollect from
4  the discussions.
5  Q.  I was thinking more as an option of increasing the
6  clinical resources. Since one of the, the reasons for
7  the closure was inability to maintain clinical
8  resources, if you have somebody who is a clinical
9  resource and is offering more time, that seems to me
10 to, to go against that statement.
11 A.  I think the issue of the clinical resources we
12 were lacking were nurses and the, the staff to be able
13 to kind of run the program. I think she was a
14 well-thought-of provider who did some part-time but
15 wasn't going to be the solution to, to the program
16 going forward.
17        (Deposition Exhibit 20 marked.)
18        THE WITNESS: I've completed reading the
19 document.
20 BY ATTORNEY KRAMER:
21 Q.  Okay. This is an email chain from -- well, I
22 guess the top two emails are from May 2nd, and then
23 there's one on, there's a few on May 1st, including
24 some that are redacted. Looking at the one from Aimee
25 Giglio on May 1st at 10:05 p.m., Aimee Giglio says, "We

CONFIDENTIAL                                                              Page 186

1  spent extensive time with her and Daniel this evening".
2  Do you know who "her" is?
3  A.  I'm, I suspect it's Dr. DeMars, but I'm not sure.
4  Q.  So in this email you say, "While on the surface
5  we're pinning the dissolution of our reproductive
6  endocrinology program on our failure to maintain and
7  recruit nurses for this work, it is ultimately the
8  dysfunction of the physicians who worked in this area
9  for years (as well as recent hires) and ultimately a
10 failure of leadership, for which I hold Leslie fully
11 accountable".
12        In explaining the closure, why didn't you simply
13 explain the real reason instead of pinning it on
14 something else?
15 A.  I think the, what I've said, and I would say this
16 exact statement today, is that the failure of nursing
17 was the final straw that allowed a dysfunctional group
18 not to continue to be able to provide care. So we're
19 pinning it on the fact that I don't even have a nurse
20 to check a patient into a room to be available for a
21 harvest or a procedure on a weekend. So we ultimately
22 were saying, like, We can't do this from a staffing
23 standpoint, but underlying that is a complete
24 dysfunction of the physician group, and this goes back
25 many, many years as well.

CONFIDENTIAL                                                              Page 187

1  We've had other areas within OB/GYN where, even
2  before this, there have been people who won't talk to
3  each other. I mean, there's years of history here,
4  but, you know, ultimately, I said this is a failure of
5  leadership. So I think our, the ultimate final thing
6  was that we lost the nurses to be able to provide the
7  care. So I'm pinning it on that, and I think that's,
8  you know, I think that's the, that's the nature of
9  which I've been, which I've said all along in this
10 discussion.
11 Q.  What do you mean by "on the surface"?
12 A.  I think the most obvious reason for closing this
13 program is that we just don't have nurses. So, on the
14 surface, we don't have a nurse to check a patient in or
15 do the procedures. So I think that was the, that
16 that's the, the final straw. So I think that's one way
17 of conveying that and one way that you can express that
18 it's hard to express the multifactorial reasons for
19 closing a program. It's easier to say that we don't
20 have the staffing available to see the patients.
21        It's less easy to say this has been, now that I've
22 learned more about this, this has been a very
23 dysfunctional group with some challenges that I don't
24 think were fully addressed by the chair or the people
25 that are engaged in the, in the work amongst

CONFIDENTIAL                                                              Page 188

1  themselves.
2  Q.  When you say "less easy", less easy for whom?
3  A.  For a public message, for our own internal message
4  and how to explain this.
5  Q.  Were you worried about the response if you
6  explained the dysfunction and the lack of leadership?
7  A.  I think the lack of leadership was over a broad
8  area of things and was really the reason that I asked
9  Leslie to step down from this role. The fundamental
10 reason we had to close the program was the lack of
11 nursing. So it's, this is not blaming nursing. It's
12 just saying I can't do any more if I don't have nurses.
13 The final nurse from Manchester retired, and this thing
14 fell apart, but it fell apart for a reason that was due
15 to a lot of dysfunction at the physician level.
16 Q.  How come UVM is able to recruit nurses and
17 Dartmouth-Hitchcock can't?
18        ATTORNEY SCHROEDER: Objection, calls for
19 speculation. You can answer.
20        THE WITNESS: I have no idea. I mean,
21 there's a, there's a difference. So is this in
22 general, or is this in terms -- I'm not sure what
23 context you're asking about. We both struggle with
24 recruiting for nurses in both organizations. I've met
25 with Maine Med and UVM, and we've talked about similar

Misty Blanchette Porter, MD v.                    Confidential                    Edward Merrens, MD – Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                                      July 30, 2019

CONFIDENTIAL                                  Page 189

1  aspects.
2       I don't think they struggle in -- I don't think
3  they struggle any differently than we do in terms of
4  the major issues we face are, are human resources and
5  nursing staffing. They're in a little bit better
6  market in terms of Burlington is a more attractive
7  environment, primarily for a younger female cohort of
8  nursing staff than, than the Upper Valley. We've done
9  a lot of work in this area. We've really struggled to
10 hire nurses in this and in a whole bunch of other
11 areas.
12    BY ATTORNEY KRAMER:
13 Q. I'm looking specifically at the, I guess, the last
14 full paragraph of your email here where you say, "The
15 fact that failures of such programs are not common and we'll be referring
16 shortages are not common and we'll be referring
17 patients to a similar rural academic REI center in
18 Burlington, Vermont will make our explanation to the
19 public, patients, and the media, well, rather thin".
20 A. Yeah.
21    ATTORNEY SCHROEDER: What's the question?
22    BY ATTORNEY KRAMER:
23 Q. I'm getting there. Why did you say that it was
24 rather thin?
25 A. Well, I'm just saying that we're struggling and

CONFIDENTIAL                                  Page 190

1  explaining to the public that, well, we're struggling,
2  but we're going to send people up to Burlington, and it
3  will be like, Don't they have the same problems? I'm
4  not trying to just say this is a nursing issue. I'm
5  saying it's, that was the final straw. The issue here
6  is a lot of things weren't working well. It was the
7  people involved, all three of the providers, and the
8  fact that we couldn't get nurses to, to come and work
9  with this group or to retain them.
10      So I think it's, you know, just blaming this on
11 nursing is a little thin when we're similarly relying
12 on UVM and other resources, actually relied on other
13 resources other than UVM to provide these services. So
14 this is just part of my thoughts that I expressed in
15 email.
16 Q. Were you worried that people receiving the message
17 that you put together wouldn't believe that it was the
18 whole story?
19 A. I think that, that people would assume there's
20 lots of things going on. There are people that were
21 very dedicated to, to their clinician that was in the
22 program. There are people that worry that they'll have
23 to travel to do -- I met with numerous people
24 personally that wrote me letters, and I met with every
25 one of them to kind of talk about things. I met with

CONFIDENTIAL                                  Page 191

1  the media.
2       There's a lot of emotion around this, and I get
3  that. This is a very emotional area. Infertility,
4  having a baby, doing all these things is one of the
5  most, most sensitive issues we face. So I was just
6  being cautious about how we proceed and how we
7  articulate this.
8       (Deposition Exhibit 21 marked.)
9       Am I missing something?
10 Q. In what way?
11 A. I, this looks very similar to another document
12 that we've already discussed.
13 Q. It is very similar, and that's my question.
14 A. Isn't it --
15    ATTORNEY KRAMER: We received this document,
16 21, recently. Don, when did we get this one?
17    ATTORNEY SCHROEDER: I have no idea when you
18 were given documents, this document.
19    ATTORNEY VITT: Within the past two to three
20 days.
21    ATTORNEY SCHROEDER: I know it came from
22 Jessica. So she's handling the document production in
23 the case. I don't know when you got it. If you got it
24 in the last few days, you got it in the last few days.
25    BY ATTORNEY KRAMER:

CONFIDENTIAL                                  Page 192

1  Q. So we got this one in the last few days.
2  A. But it's the same.
3  Q. It's not exactly the same.
4  A. Okay.
5  Q. So that's, that's the question. We had received
6  what was in Exhibit 20 previously, and then a couple of
7  days before your deposition we received additional, a
8  couple of additional documents, including this one,
9  Exhibit 20, and we noticed that the email that's at the
10 top of Exhibit 20 is slightly different but very
11 similar to the email that's in the middle of Exhibit
12 20.
13      So, if you look at the one that's in Exhibit 20,
14 the time stamp is 8:20 a.m. If you look at the email
15 in Exhibit 21, the email from you is 8:17 a.m. Do you
16 know why there are two slightly different versions of
17 this same document?
18 A. I don't have any, any explanation for that. I
19 think they convey the same thing. There's different
20 wording. They went to the same people and were sent
21 within minutes of, of -- I don't have an explanation.
22 Q. Is there -- well, in Exhibit 21 it's signed,
23 "Best, Ed", and it looks like handwriting, but I assume
24 you have some electronic way of doing that. Your, the
25 signature in number Exhibit 20 doesn't have that. Is

Misty Blanchette Porter, MD v.    **Confidential**    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.    July 30, 2019

CONFIDENTIAL                                        Page 193

1  there some different functionality that you use to sign
2  emails with this decorative "Ed" as opposed to not?
3  A.  This is really a question?
4  Q.  It is a question. I'm trying to understand why we
5  have two different versions of --
6  A.  Yeah.
7  Q.  -- an extremely important document and why, after
8  21 months of this litigation, we're getting new
9  documents that we haven't seen before.
10  ATTORNEY SCHROEDER: Hold on, hold on. You
11  want to ask him questions, go right ahead, okay? You
12  know exactly -- we explained to you that there are a
13  number of documents that we produced to you last week
14  that I think were inadvertently not produced, which we
15  have produced to you now. Why there's a difference
16  between these two documents has nothing to do with the
17  merits of this case. However, we produced them, which
18  is Document 26771 --
19  THE WITNESS: Let me --
20  ATTORNEY SCHROEDER: -- hold on -- 26772.
21  Mr. Merrens has no idea about the document production
22  that we've done in this case, but we've done it in good
23  faith. We've produced them. We actually mentioned it
24  during our court call with the judge the other day. So
25  why we're retracing steps we've already gone over with

CONFIDENTIAL                                        Page 194

1  the court, I have no idea.
2  THE WITNESS: Can I try to explain a little
3  bit here?
4  BY ATTORNEY KRAMER:
5  Q.  That would be great.
6  A.  Let me just try. There's an email from Aimee sent
7  to me at 10:05 at the bottom here. What happened is
8  there were two separate replies. One was on my
9  computer that has an electronic signature and a, and a
10  signature text. It has a small image of my signature,
11  "Ed", that was done on my computer. I may have also,
12  in the context of Aimee, Kim, John, to Aimee -- I may
13  have also -- three minutes later, Aimee, Kim, John.
14  I, this may simply have been I might have left a
15  meeting -- what you're seeing in the second thing is,
16  when I compose emails on the same server on my iPad, I
17  don't have the same photograph of my, and I don't have
18  the same signature stamp. I might have just either --
19  I might have just responded to the same email a couple
20  minutes later, not having remembered that I, that or
21  thinking that it didn't get sent.
22  Sometimes, things are in draft form. Like, when
23  I, when I close out of one email, it saves it in draft
24  form, and I might have sent it. I don't know. I don't
25  have an explanation why there is a reply to Aimee and

CONFIDENTIAL                                        Page 195

1  Kim Troland and John Kacavas that essentially says very
2  similar things. I don't have an explanation for that.
3  Q.  And the email, when you say -- I think you said
4  something about the second one in what you just said.
5  You mean Exhibit 20, the one that's slightly later in
6  time?
7  A.  Correct. So Exhibit 21 was sent at 8:17:23, and
8  Exhibit 20 was at 8:22:05. I don't have an
9  explanation. I'm sorry. Was sent at 8:20. The reply
10  was at. So I can't tell you why, 2 minutes and 37
11  seconds later, I sent another email essentially saying
12  the same thing. It was probably some fluke of me going
13  to my computer, then running to something else and
14  coming back and doing that. I don't have an
15  explanation. Same audience. I, I don't have much else
16  to say about the content of the message.
17  Q.  Okay. In Exhibit 20 Aimee Giglio says, "Happy to
18  come in for a meeting. Let's discuss in the morning".
19  Do you remember if you met with Aimee Giglio and
20  anybody else on --
21  A.  I did --
22  Q.  -- that day?
23  A.  I did meet with Aimee and chatted with her about
24  the process of, of meeting with Leslie and talking
25  about asking her to step down and kind of what

CONFIDENTIAL                                        Page 196

1  processes we would put in place and to think about kind
2  of how we would do that from an HR standpoint.
3  Q.  After the closure was announced on May 4th, was
4  there confusion within OB/GYN about what was happening
5  to REI?
6  A.  I think there was a lot of concern. I think there
7  is always the opportunity for rumor and other things
8  happening. I think there was, I think there was, I
9  think there was concern, and I think that there was an
10  effort to mitigate that with meetings with the staff
11  and to talk about next steps.
12  Q.  Did you feel that there were any misconceptions
13  about what was happening with REI?
14  ATTORNEY SCHROEDER: Objection, calls for
15  speculation.
16  THE WITNESS: No.
17  ATTORNEY KRAMER: Is it okay if we take a
18  quick break?
19  THE WITNESS: Sure.
20  (A recess was taken from 4:50 p.m. to 5:15 p.m.)
21  (Deposition Exhibit 22 marked.)
22  BY ATTORNEY KRAMER:
23  Q.  Okay. We'll go back on the record. We're looking
24  at Merrens Exhibit 22. This is DH18061 and 62. This
25  is a, looks to be an email that came out from your

CONFIDENTIAL                                                    Page 197

1  office on May 11th 2017 explaining clarifications about
2  decision to close the REI program.  Did you write this
3  email, or did somebody else help you draft this?
4  A.  I wrote it, and then I worked with our
5  communications team to, to, and I vet it with the
6  people that, that I, I want to make sure that I'm
7  saying the right things.
8  Q.  And do you remember who specifically you vetted
9  this with?
10  A.  You know, I probably worked with -- I don't
11  remember.  I mean, I've got a -- we've got a
12  communications team.  This comes from an account.  This
13  wasn't ghostwritten.  I, I wrote a lot of this.  I
14  clarified with people around note, the dates of
15  notifying patients and the process and, and had
16  collected -- what had happened by this time, there had
17  been a number of news reports, "Vermont Digger" that we
18  had gotten, and a lot of communications were coming to
19  me and certainly other, other people that I wanted to
20  clarify certain tenets and points, and that was the,
21  that was the, the reason I send this out.
22  Q.  You say in the last paragraph the unsung hero in
23  this whole situation is Heather Gunnell.  Why do you
24  describe her as being the unsung hero?
25  A.  She did a lot, as the practice manager, holding

CONFIDENTIAL                                                    Page 198

1  together the issues with providers, with nurses, with
2  secretaries, with schedulers, just holding together all
3  of that at a time where people perceived a lot was
4  going on, and a lot fell to her to kind of manage all
5  the people and the residents and, you know, she's the
6  kind of mother hen of, of OB/GYN and had to make sure
7  that everyone kind of understood and did that, and
8  sometimes we don't acknowledge people who have done a
9  lot of work to kind of maintain stability during a
10  challenging time.
11  Q.  How did you know that she was doing all of those
12  things?
13  A.  Because I had contact with Daniel and others
14  around -- we had meetings, and she was in the
15  background kind of helping to arrange the meetings with
16  providers, getting it on their schedule, getting a
17  room.  I just knew what was going on.
18  Q.  Did you hear this from the folks on the ground in
19  OB/GYN, or was this information reported to you by
20  Daniel and Heather?
21  A.  That she was the unsung hero?
22  Q.  No.  The underlying, the underlying facts of what
23  she was doing and the efforts and the coordination.
24  A.  I can't remember.  I like to acknowledge people's
25  efforts during challenging times and how they did good

CONFIDENTIAL                                                    Page 199

1  work and helped.
2  Q.  You mentioned a moment ago that you received
3  responses from patients and from others.  How many -- I
4  guess, looking at this time period between announcement
5  of the closure and this May 11th 2017, how many
6  patients did you hear from?
7  A.  I heard from a mixture of patients, employees, and
8  maybe I heard from a half a dozen patients and from
9  some employees, and so it was a mixture.
10  Q.  Generally, what was the, the tenor of what you
11  were hearing?
12  A.  The spectrum was disappointment, concern about the
13  availability of services, concern about distance
14  traveled for a service that requires a lot of follow-up
15  tests, and so there was a broad spectrum.  Some of it
16  was, it was a range of things, and I replied to every
17  single one of them and offered the opportunity to meet
18  with them if they wanted.  So it was a range of
19  concerns.  They were all amicable conversations, and it
20  was hard.
21  Q.  Did anybody reach out to say that they were
22  supportive of the decision?
23  A.  I don't believe any patients reached out and wrote
24  supportive declarations around closing of the program,
25  no.

CONFIDENTIAL                                                    Page 200

1  Q.  No.  Well, providers, staff.  You said that you
2  received responses from patients, from providers, from
3  staff.
4  A.  Yeah.
5  Q.  And you said there was a wide range of responses.
6  A.  I meant a wide range of people that, that
7  responded to me.  So it might have been people that had
8  worked in OB/GYN.  It might have been someone who was a
9  patient.  It, so there was a -- there wasn't, it wasn't
10  just all patients.
11  Q.  Did anybody reach out and say, It's about time?
12  A.  No.
13  Q.  Were you surprised by the response that you got
14  from patients?
15  A.  No.
16  Q.  Why not?
17  A.  Any time there are things that change, people have
18  perspectives on it, and I respect that.
19  Q.  Were you surprised by the response that you got
20  from other providers at Dartmouth-Hitchcock?
21  A.  No.
22  Q.  And why not?
23  A.  People understood the issues, and, although there
24  were concerns about how we might continue to provide
25  certain services, how there would be coverage, how

Misty Blanchette Porter, MD v.                 Confidential                 Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                              July 30, 2019

CONFIDENTIAL                                    Page 201

1  their patients would be cared for, they understood that
2  this was a decision that needed to be made, respected
3  that, and agreed to move forward.
4  Q. Were you surprised by the response regarding the
5  termination of Dr. Porter?
6  A. No.
7  Q. What did you expect the response to be?
8  A. I expected that there would be some people that
9  were supportive and reflecting on all that she had done
10 in her career and had been involved in this program for
11 years. So I expected there would be people that would
12 reach out, and there are a lot of decisions I make that
13 people reach out and want to communicate with me their
14 support, their displeasure, their perspective, and
15 their ideas of how we might do it differently.
16     (Deposition Exhibit 23 marked.)
17 Q. Okay. So Exhibit 23 is DH6600 and 6601, a couple
18 of emails back and forth between yourself and Vicki
19 Maxfield. Do you know Vicki Maxfield?
20 A. I don't.
21 Q. Had you ever met her before you received this
22 email?
23 A. No.
24 Q. Have you had further communications with her
25 beyond this?

CONFIDENTIAL                                    Page 202

1  A. No.
2  Q. She, she writes that the, the department is
3  short-staffed already. Were you aware that the
4  department was short-staffed prior to the closure of
5  REI?
6  A. Yes.
7  Q. And how did that factor into the decision to close
8  REI?
9  A. She's talking about in general. We were, we were
10 short maternal fetal docs. We actually had had some
11 trouble recruiting physicians during Dr. DeMars's
12 tenure in areas. So we were short in a number of areas
13 in urogyn and had not been able to recruit physicians
14 to a number of areas within OB/GYN.
15 Q. Did those issues with recruitment have anything to
16 do with Dr. DeMars?
17 A. I don't know.
18 Q. How would the closure of REI impact the fact that
19 it was already short-staffed? Wouldn't it make it more
20 short-staffed?
21 A. Not in the, not in the areas of urogynecology and
22 general, general. Yeah, I mean, it would mean that the
23 physicians that were in REI were not covering those
24 other areas, which we were, we were short on, already
25 short. It would add to the overall number of people

CONFIDENTIAL                                    Page 203

1  that -- but this is closing an entire program. We
2  were, we were recruiting in maternal fetal medicine, so
3  general OB/GYN docs, and urogynecology and pelvic
4  reconstruction. Those were two areas that we'd been
5  recruiting for a while and didn't have, that were, we
6  weren't able to bring people in.
7  Q. And Vicki Maxfield says "I do hope there is a way
8  we could still keep Dr. Porter as a non-infertility REI
9  specialist, GYN surgeon, and expert in gynecologic
10 imaging". My understanding is that all of those
11 practices could be maintained without an REI division.
12     ATTORNEY SCHROEDER: Objection.
13     BY ATTORNEY KRAMER:
14 Q. Am I incorrect?
15     ATTORNEY SCHROEDER: Objection, assumes facts
16 not in evidence. You can answer.
17     THE WITNESS: So we would need to continue to
18 provide -- at present, she wasn't providing gynecologic
19 -- she wasn't performing gynecologic surgery at this
20 point in, in her employment. She truly was an expert
21 in gynecologic imaging -- there's no question -- and
22 has, clearly has reproductive endocrinology interest.
23 I think a lot of her interests in those areas were
24 around REI, around infertility, reproductive
25 endocrinology. Those are -- we were planning on ending

CONFIDENTIAL                                    Page 204

1  a lot of the areas that, really, she had sincere
2  interest in and promulgating.
3      So it would be hard to figure out. I think it was
4  just like with, we had the ability to do gynecologic
5  imaging. We had the ability to do a number of these
6  other things. I'm not sure how that would continue if
7  we're going to shut down the program, and my
8  understanding through Dr. DeMars was that her primary
9  interest in those areas was through, was around REI and
10 IVF.
11     BY ATTORNEY KRAMER:
12 Q. What is the basis for your understanding that, as
13 of May 2017, Dr. Porter was not doing surgery?
14 A. I didn't think -- I think, at that time, I think
15 that she was still on disability and was not actively
16 doing the cases that, you know, myomectomies,
17 hysteroscopy, and the surgical cases that Ms. Maxfield
18 refers to.
19 Q. In your email back to Vicki Maxfield, you say,
20 "Dr. Porter currently works at 20 percent of her time
21 currently, and I'm not sure of her interest in staying
22 on if the infertility part were to cease". You'd
23 previously testified about the, your belief that
24 Dr. Porter was working 20 percent of her time. Is that
25 still your understanding, that it was, it was 20

Misty Blanchette Porter, MD v.                    **Confidential**                    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                           July 30, 2019

CONFIDENTIAL                                          Page 205

1  percent and not 20 hours a week?
2  A.  I think she was, I think she was -- 20 hours a
3  week would be a lot of hours.  I, I, I thought she was
4  a .2 FTE was my understanding.  We could figure out
5  what that comes down to.  That was my understanding.  I
6  don't think she was working 20 hours a week, but I
7  could be wrong.  My understanding she was working at a
8  .2 FTE, which would be 20 percent effort.
9  Q.  How did the fact that you thought she was working
10  a .2 FTE factor into your assessment of whether there
11  was a place for her at Dartmouth-Hitchcock going
12  forward?
13          ATTORNEY SCHROEDER: Hold on.  Objection.
14  That's mischaracterizing his prior testimony, but you
15  can answer.
16          THE WITNESS: So Ms. Maxfield is talking
17  about a number of roles that she's worked with
18  Dr. Porter in that she's highly valued and how she
19  could, how she could continue that.  All I'm saying is
20  that she's currently only working a very small portion
21  of what she had done previously, and I was, maybe it
22  was supposition or whatever.
23          I'm not sure if we didn't, if we weren't doing in
24  vitro fertilization and the other things that had been
25  the mainstay of her career, whether that would be

CONFIDENTIAL                                          Page 206

1  interesting, interesting to her.  It was a supposition.
2  It was a reply to someone who actually knew her really
3  well, and it was just communicated to her.
4  BY ATTORNEY KRAMER:
5  Q.  In this you say, "I'm not sure of her interest in
6  staying on if the infertility part were to cease ".  At
7  any point, did you talk to Dr. Porter about whether she
8  did have an interest in staying on if the infertility
9  part were to cease?
10  A.  I did not.
11  Q.  Did you ever receive communication from Dr. Porter
12  expressing that she did, in fact, want to stay on, even
13  if the infertility part were to cease?
14  A.  Yes.
15  Q.  Did that give you information about her interest?
16  A.  She had sent a document.  I'm not sure of the
17  date.  I reviewed it as part of the, of some of the
18  information.  She conveyed to us a document expressing
19  her dismay at the closure of the program, her
20  perspectives on her value, her years of service, and
21  what she could bring to it.  There was not a mention of
22  other issues that were going on related to Dr. Hsu or
23  Dr. Seifer, nor was there any mention of her
24  disability.  It was more around there are other things
25  that I can, that, that I'm interested in.  So she did,

CONFIDENTIAL                                          Page 207

1  she did indicate her dismay at the closure of the
2  program.  That's what I can remember from the
3  communication.
4  Q.  Did it cause you to reevaluate her termination
5  when you found out that she did, in fact, have a very
6  strong interest in remaining at Dartmouth-Hitchcock,
7  even without the infertility piece?
8  A.  I would say that I thought a lot about this and
9  even reflected with Leslie, like, What are the
10  opportunities, and how do we think about this?  We came
11  to the understanding -- I came to the understanding
12  that, no matter what we did, no matter -- I'm not
13  talking about FTE or whatever -- it would never be a
14  fulsome role for her, because her, her role was we were
15  closing this program, and this would only be a step
16  towards, When can we reopen?  When can we do this?  How
17  can we continue to do this?  People would be -- we
18  would still be kind of limping along with a talented
19  physician but in a program that really needed complete
20  closure until we figure out what are the plans going
21  forward, and that was the ultimate decision.
22  Q.  When did you have those conversations with Leslie
23  about Dr. Porter?
24  A.  I even reflected with her after I was getting a
25  lot of these kind of communications from employees and

CONFIDENTIAL                                          Page 208

1  patients around, "I want to make sure that we've
2  completely thought through a lot of this", and the
3  discussion that I had with her was that there's a,
4  there's a lot here, and I was convinced that a lot of
5  what she was currently doing was, was really tied to
6  REI and IVF.  It wasn't just like, Well, I can go off
7  and do something totally different.  I'm not interested
8  in pursuing that.
9  Q.  Did you ever sit down with Dr. Porter and propose
10  to her a very limited role and assess her interest?
11  A.  No.
12  Q.  Why not?
13  A.  We had already made the decision to close the,
14  close the program, and we thought that was the best
15  thing as far as the program went, and perpetuating a
16  role just, just based on her interest and need and
17  desire wasn't going to get us to the place that we
18  wanted.
19  Q.  But there would have been work for her to do
20  outside of the REI division, right?
21  A.  Our understanding is that the work that she was
22  interested in doing was mostly associated with
23  reproductive endocrinology and infertility.
24  Q.  Mostly, but not entirely?
25  A.  I don't know.  I'm telling you what I understood.

CONFIDENTIAL                                          Page 209

1 Q. Right. I know you said "mostly". So mostly,
2 mostly implies not entirely.
3 A. That may be the case. There are, clearly, there
4 were surgeries and other things that Misty has done in
5 the past that are not directly tied to infertility, but
6 the mainstay of her work and her career is around
7 infertility and reproductive endocrinology. We had
8 made the decision to close the program. It was not
9 based on how little FTE or how great FTE she was. It
10 was not based on that at all. It was based on we need
11 to close the program and, and envision what it might,
12 what it might be like in the future, but we need to
13 close it now, because we don't have the capability of
14 continuing it.
15 Q. When you talked to Dr. DeMars after the closure
16 maybe around this time, middle of May 2017, what were
17 your discussions about Dr. Porter?
18 A. I don't think I had specific conversations with
19 Dr. DeMars about Dr. Porter.
20 Q. Did Dr. DeMars suggest finding a way to keep
21 Dr. Porter at Dartmouth-Hitchcock?
22 A. She did not.
23      (Deposition Exhibit 24 marked.)
24 Q. And this is DH10582, Exhibit 24. It starts with
25 an email from you on May 12th 2017, and then there's a

CONFIDENTIAL                                          Page 210

1 response from Daniel Herrick just to you. Your email
2 below is addressed to Leslie, so and I think, based on
3 other emails, that you had sent this email to Leslie
4 DeMars and to Daniel Herrick.
5 A. I, I, it doesn't -- the, the way that Daniel has
6 replied or at least how it's reproduced here doesn't
7 include the whole email chain to, Leslie sent this to
8 Daniel as well.
9 Q. And I think we'll see. We have another exhibit
10 that includes --
11 A. Yeah. I never send things blind. I either copy,
12 or it's either a copy or a to.
13 Q. You say here that you're getting inundated with
14 heartfelt and long emails wondering why Misty can't
15 stay on to do her ultrasound complex operative and
16 teaching role, even if we end REI, and then you go on
17 to say, "I suspect that you considered this in the
18 evaluation of the program and your knowledge of Misty".
19 Why did you say it like this?
20 A. I wanted to be sure around what I had heard from
21 colleagues, her value to the organization, her own
22 communication, and to be, to be sure in the decision.
23 I wanted, I wanted to understand more fully why, why --
24 I think I understood, but I wanted to convey to her and
25 to understand why the complete closure was the right

CONFIDENTIAL                                          Page 211

1 decision.
2 Q. Did you feel at this point on May 12th that you
3 had not adequately discussed Dr. Porter and her various
4 roles in the department?
5 A. No. I think that we, we had -- the hard part
6 about this is that there was the Misty Porter who had
7 worked and done all these roles, and then there was the
8 Misty Porter that had been out on leave and then on
9 disability, and there was this longing for the Misty
10 Porter of old to do all these complex surgeries and to
11 be the resource that people wanted to be able to do,
12 and I heard a lot of that from people.
13      So this was a reflection back to, like, like, I
14 know we've thought about this. I just want to make
15 sure that this is the right decision, and what I
16 garnered from her reply and from others is that, even
17 in the context of doing limited work -- and I'm not
18 sure what, what, you know, as Misty ramped up and was
19 reengaging, what she was actually doing.
20      I was reassured, and you're going to show me in
21 the next exhibit Leslie's response, which is what I
22 understood from her and maybe conversations with others
23 that a lot of the work that she wanted to continue to
24 do would be in the context of restarting REI now that,
25 and continuing to do this work, and we didn't feel like

CONFIDENTIAL                                          Page 212

1 that was going to be the right -- we felt like complete
2 closure was going to be the right thing.
3 Q. And then a restart at some point, maybe?
4 A. So I've always envisioned that reproductive
5 endocrinology and infertility is, needs to be part of
6 the department of OB/GYN and part of the academic
7 medical center. Clearly, it's going to be part of our
8 future. The construct that we had when this was
9 falling apart was not going to work. It would, it
10 would become something else in the future with a new
11 vision, with new leadership, with new care delivery
12 models and a completely different structure, and I was
13 willing to close the program in order to have a fresh
14 start.
15 Q. Daniel Herrick responds to you and says, "Ed, I am
16 not including Leslie in this response". Do you know
17 why he didn't include Leslie in the response? What's
18 your understanding of that?
19 A. I think he wanted to communicate this solely to
20 me.
21 Q. And then he says, "Based on my observations and
22 interactions, Misty has been the biggest driver to the
23 dysfunction within REI". When you read his statement,
24 "Based on my observations and interactions", what do
25 you think he's referring to?

CONFIDENTIAL                                          Page 213

1  A.  You're asking me to -- this is more of a
2  supposition about, What is Daniel thinking about?
3  Q.  Well, not what he's thinking about, but, when you
4  read that, do you think that he has personal
5  observations and interactions?
6  A.  I think he does.
7  Q.  Do you agree with his statements that Misty has
8  been the biggest driver of the dysfunction within REI?
9  A.  The dysfunction amongst those three physicians,
10  each had a, each had a role in the dysfunction.  She
11  was not absolved of any of the responsibility.  It was
12  not just Dr. Hsu and Dr. Seifer.  Misty played a role,
13  whether she was present or whether she was on leave, in
14  understanding, involving herself, and doing a whole
15  range of things within, within the division.  You can
16  see it from her full evaluations at times when she
17  wasn't present.  I think there was a role both positive
18  and sometimes negative that Misty played in this group.
19  They were all responsible for the events that unfolded.
20  Q.  Do you think that Daniel Herrick fully appreciated
21  Dr. DeMars's role in the dysfunction of REI?
22  A.  I think so.
23  Q.  Did you have conversations with him about that?
24  A.  He knew that I, that I was not pleased with her
25  leadership, her management of the situation, the

CONFIDENTIAL                                          Page 214

1  management of the principal physicians, and the point
2  that we had arrived at.
3          (Deposition Exhibit 25 marked.)
4  Q.  As you predicted, this is Leslie's response.
5  A.  Yeah.
6  Q.  And this one is long, so take a minute to read it
7  all over.  Okay.  So Merrens Exhibit 25, email exchange
8  starting on DH10594, and it's three pages starting --
9  this email chain starts with the same email that we had
10  been looking at in Exhibit 24, this, your email saying,
11  "I'm getting inundated with heartfelt and long emails",
12  and then it continues with a response from Dr. DeMars,
13  a lengthy response, and then you respond a couple of
14  days later saying, "I think it's a comprehensive,
15  thoughtful, and appropriate insight".  Do you stand by
16  that assessment?
17  A.  Yes.
18  Q.  Do you agree with the statements that Leslie made
19  in this email?
20  A.  I don't agree with all the statements.  I, she
21  makes a number of statements, so it's hard for me to
22  say I agree with the statements.  She makes statements
23  about the ultimate destination, about UVM, where she
24  would land.  I understand that what I understood from
25  this is that most of her work here was focused on IVF

CONFIDENTIAL                                          Page 215

1  and reproductive endocrinology, her ultrasound work,
2  and that wasn't going to be needed as we moved forward
3  with the closure of the program.
4          I was okay with the issues here.  I don't -- there
5  are a lot of behavioral issues that I don't think were
6  managed well by Leslie, and that includes Misty.  I
7  don't have -- I'm not bringing anything new to this
8  discussion.  But there were, there were challenges
9  about how things were managed and, with her, and I,
10  that's not part of this.  I was convinced by her
11  description that closing it entirely would be the best
12  option.
13  Q.  And you say here, "Ultimately, once the dust
14  settles, will" -- I assume that means we'll, "we'll be
15  in a better", something, "we will be a better position
16  with all this including Misty".  Can you explain for me
17  a little bit more about your view that this was going
18  to result in a better position for Dr. Porter?
19  A.  Ultimately, I don't think closing the program, I
20  mean, I would -- she needs to be in a place where she
21  can be involved in a fully functioning reproductive
22  endocrinology program, and that's not what we were
23  going to have, and I would hope that, you know, in, in
24  whatever transition we were going to do with the
25  closure, that she would end up in a place where she

CONFIDENTIAL                                          Page 216

1  could be able to do that.  We were not going to be able
2  to do that with the structure that we had in place.
3  Q.  In Dr. DeMars's email she expresses an interest in
4  giving Misty, Dr. Porter, a chance to rest and recover
5  and truly be on leave.  Was that a factor for you as
6  well?
7  A.  Can you --
8  Q.  I can show you.  Do you want me to show you?
9  A.  -- refer to the paragraph?
10  Q.  It's in roughly the middle of the second page, the
11  paragraph that starts with, "Misty's medical disability
12  has been devastating", and then it's the last sentence
13  of that.
14  A.  Okay.
15  Q.  Specifically, I think that -- this is from Leslie,
16  Dr. DeMars -- "I think that the best outcome of this
17  termination is the chance for Misty to actually be out
18  on leave with no intervening responsibilities so that
19  she can assess how much improvement she might gain".
20  A.  Yeah, there was nothing about her disability that
21  led to my decision about her termination, and I think
22  Leslie's making an inference about what would be best
23  for Misty.  Leslie and Misty's relationship is complex.
24  friends, coworkers, doctor-patient, they span every
25  aspect of how people relate to each other.  So I think

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD - Vol. 1
July 30, 2019

CONFIDENTIAL                                    Page 217

1  sometimes she mixes her aspirational views of what
2  might be best for Misty.
3      I didn't reply to that, because nothing about
4  what, nothing about her disability or her needing time
5  off had any component to the decision that was made,
6  and we were pretty clear about that. I, ultimately, I
7  think I said, you know, my hope is that things are
8  better for her, and that was my hope when I first met
9  Misty to talk about the issue with Rich Reindollar. I
10  had always hoped for -- I crafted emails for her
11  telling her, Maybe you should take the job in Hawaii.
12  Maybe that will be a better place, more funding, more
13  money, more overview.
14      I've always wanted the best for her. So none of
15  it was -- I wanted none of this to be confused with the
16  situation around her disability, and, frankly, I didn't
17  know anything about the nature of her disability, about
18  rest, about things, and I never, none of my
19  communications ever referenced that. I wanted the best
20  for her, and that was genuine.
21  Q.  In this email from Dr. DeMars, in the, the next
22  paragraph, the one after the one we were just talking
23  about, at the end of that paragraph, Dr. DeMars says
24  that, if she had made a decision to try and keep Misty,
25  that Heather, the nursing supervisor, and the admin

CONFIDENTIAL                                    Page 218

1  supervisor would quit. Did Dr. DeMars express that
2  concern to you prior to May 4th 2017?
3  A.  She did not.
4  Q.  Do you have any basis to know whether this is an
5  accurate statement or --
6      ATTORNEY SCHROEDER: May 4th or May 12th?
7      ATTORNEY KRAMER: May 4th, the day that the
8  closure was announced.
9      THE WITNESS: I, I don't have enough
10  information to be able to comment on Heather and the
11  admin supervisor's sense that they were intimidated.
12  BY ATTORNEY KRAMER:
13  Q.  Do you have any knowledge of whether they would
14  have quit?
15  A.  I don't know. I don't have that knowledge. I
16  know there are people that feel that sometimes, when
17  working with Dr. Porter, there was the sense of
18  intimidation, and I can see that, people making
19  decisions like that. I didn't pursue it further in
20  this discourse.
21  Q.  And then at the, at the end of Dr. DeMars's email,
22  this is on the third page of the document, Dr. DeMars
23  says, "In our communications planning, we missed
24  patient relations. I think that they would have had a
25  slightly different message to start with". Did you

CONFIDENTIAL                                    Page 219

1  have any follow-up conversations with Dr. DeMars about
2  what she thought that slightly different message would
3  have been?
4  A.  I don't. I didn't have follow-up around that, and
5  I, and I thought that we included patient relations in
6  some of the bigger communications around the, what we
7  were doing. I don't think it would have changed the
8  messaging. I think we engaged -- one of the primary
9  things we did was engage pretty fully with patients.
10  So I don't know. I don't think I followed up with her
11  around that specific concern.
12  Q.  If you were saying that you engaged patient
13  relations, do you know why Dr. DeMars is saying, "We
14  missed patient relations"?
15  A.  I don't know.
16  Q.  Who is Barry Smith?
17  A.  Barry Smith is a former chair of OB/GYN.
18  Q.  And did he reach out regarding the REI division?
19  A.  Yes.
20  Q.  What do you recall of his messages?
21  A.  Dr. Smith expressed his displeasure at the several
22  aspects of the decision, the planning, Misty, Leslie,
23  and a whole range of things. They're clearly outlined
24  in Exhibits 26 and 27.
25  Q.  Oh, are you -- that's a joke because we haven't

CONFIDENTIAL                                    Page 220

1  gotten there yet?
2  A.  I'm allowed one joke after 5:00 o'clock.
3  Q.  It's been a long day.
4  A.  It's okay. I can go a lot longer.
5  Q.  No. Yeah. We don't -- I wasn't planning to get
6  into the details of those.
7  A.  Okay.
8  Q.  What was your overall response to those emails
9  from Barry Smith?
10  A.  I agreed to meet with him.
11  Q.  When did you meet with him?
12  A.  Following he, when he reached out to me. I said,
13  "Why don't we come meet?" I met with him. I met with
14  Paul Manganiello, who was one of the founders of the
15  REI program. These are both people that the media
16  reached out to and have been caring, articulate
17  founders of this, and I reached, actually reached out
18  to Paul and visited him at his home on the date that we
19  ended the program just to inform him. He, I had no
20  obligation to do so, but I reached out to him to inform
21  him and talk about next steps.
22  Q.  What was Paul Manganiello's response?
23  A.  I think he was saddened about losing this
24  capability that he developed his whole career around
25  developing. He'd worked with Misty for years, and this

Misty Blanchette Porter, MD v.                    Confidential                    Edward Merrens, MD - Vol. 1
Dartmouth-Hitchcock Medical Center, et al.                                        July 30, 2019

CONFIDENTIAL                                Page 221

1  was his pride and something he had developed, and I
2  convinced him.  I was clear with him that I was
3  committed to restarting this in the future and I would,
4  I would do that.  But I had very good discussions with
5  --
6       Sometimes the exchanges that happen over email
7  are, are interpretable in a lot of different ways.  I
8  was pretty clear with Barry that I didn't need his
9  disapproval in the context of decisions I make and his
10 role as an emeritus professor, but I'd be more than
11 happy to meet with him and talk about the specifics
12 that I was capable of talking about.
13 Q.  Do you recall -- well, were you interviewed by
14 Rebecca Sananes of VPR?
15 A.  Yes.
16 Q.  Were you interviewed by anybody else at VPR?
17 A.  I think she was the only, only one.
18 Q.  And, when you were interviewed by her, was it on
19 the record or off the record or both?
20 A.  I think it was on the record, which means
21 everything I said, I was happy to -- I didn't redact
22 any -- I didn't say any things off the record.
23 Q.  There was -- so there was no off-the-record
24 conversation with her?
25 A.  No, no.

CONFIDENTIAL                                Page 222

1  Q.  Yeah.  She had quoted you as saying that the REI
2  closure was due to infighting between the providers.
3  Do you remember that?  And there was -- do you remember
4  that?
5  A.  I do, because I contacted her afterwards and told
6  her I never said that, and, and the way it's posted on
7  VPR now is they've redacted that line as not a part of
8  the, my, my interview.  I think it was conflated with
9  the comments from another person that was interviewed
10 in the context of that report.  Sisyphus Bradford was a
11 law student at Vermont Law School who was, and other
12 people that I think they contacted, but, if you look at
13 the online article, they've redacted that statement
14 attributable to me.
15       (Deposition Exhibit 26 marked.)
16 Q.  In this email, you're sending out an email
17 responding to, well, addressing the article from
18 Rebecca Sananes and VPR News.  You say, "Regrettably,
19 Vermont Public Radio published an article yesterday
20 indicating that I made comments to the effect that the
21 program was being ended due to interpersonal issues
22 amongst the physicians.  Nothing could be farther from
23 the truth".  Do you stand by that statement?
24 A.  That I didn't mention it in my interview with the,
25 with VPR?  Yes.

CONFIDENTIAL                                Page 223

1  Q.  How about the, "Nothing could be further from the
2  truth"?
3  A.  I'm telling you I, I didn't make that comment to
4  the reporter.
5  Q.  Aside from that issue, whether or not you said it
6  to the reporter, was REI closed due to -- we can phrase
7  it different ways, but one way to phrase it is
8  interpersonal issues amongst the physicians?
9       ATTORNEY SCHROEDER:  Objection.  I think he's
10 answered that, like, 18 times.  You can answer again.
11      THE WITNESS:  I think it was multifactorial.
12 I've used that term a number of times, that the lack of
13 effective collaboration and coordination amongst these
14 people led to, in part, due to the closure of the
15 program.
16 BY ATTORNEY KRAMER:
17 Q.  I'm looking back at Exhibit 20.  This is your
18 email from May 2nd 2017 in which you say it is
19 ultimately the dysfunction of the physicians.  Is there
20 a difference between the dysfunction of the physicians
21 and interpersonal issues amongst the physicians?
22 A.  No.  I think it's ultimately -- so I, I talk about
23 nursing staffing.  I think what I'm, what I'm trying to
24 say here -- I clearly hold them accountable.  In the
25 court, in, in an interview I did not implicate them as

CONFIDENTIAL                                Page 224

1  the reason this program fell apart.  I talked about --
2  so I wanted them to know that that was not part of my
3  written discourse with, with the reporter.  That's all
4  I was saying.
5       I think they're clearly aware, and I have, I had
6  expressed to Leslie and to others that there was
7  dysfunction in this group.  So part of it was I was
8  talking about how the, how the article was published
9  and, and reported on air.  I don't, I don't discount
10 the fact that there was dysfunction in the group and
11 that the, and that they were, they were responsible in
12 part for the dissolution of the program.
13 Q.  Were you trying to shield the three providers from
14 the extent to which you and the, the group that reached
15 this decision viewed it as dysfunction among them?
16 A.  I didn't, I didn't want to get into a situation
17 where the dysfunction was the -- I didn't -- there were
18 a lot of reasons we closed the program.  I was not
19 saying that the primary reason was the dysfunction
20 amongst the group.  Could I have phrased it
21 differently, "Nothing could be further from the truth"?
22 Maybe.  I was trying to tell them that this was
23 reported in a way that could make everyone just feel
24 bad about their doctor who they saw and who they
25 coordinated with, and I don't -- I think that's

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD - Vol. 1
July 30, 2019

CONFIDENTIAL                                Page 225

1  something I learned later in the course.
2      But I wasn't trying to shield them.  I think these
3  were people whose programs I closed and whose roles I
4  terminated.  I wanted to make sure that what I said to
5  the press was, the press was accurately reflecting
6  things that I made in the interview.  That's what I was
7  trying to correct.
8  Q.  Looking at -- sorry.  This is going to be
9  something new.
10 A.  This is not the most updated version.  If you go
11 to this online, you can find the most updated version
12 of the article with the formal redaction, and I'm
13 referring to Exhibit 26.
14     (Deposition Exhibit 27 marked.)
15     (A discussion was held off the record.)
16 BY ATTORNEY KRAMER:
17 Q.  Have you seen this before?
18 A.  I have not.
19 Q.  So this is Exhibit 27, DH1554 and an attachment,
20 15545 and 15546.  There's an email exchange between
21 Heather Gunnell and Daniel Herrick.  The top email is
22 Heather responding to Daniel and attaching something
23 called "REI Notes 07 June 17 - DPH".  Dr. Merrens,
24 you're not copied on this.
25 A.  I've never seen this document.

CONFIDENTIAL                                Page 226

1  Q.  You've never seen this?  Do you have any
2  understanding of why this document was created?
3  A.  No.
4  Q.  Are you -- what's your response to seeing it
5  today?
6      ATTORNEY SCHROEDER: Objection.  You're
7  asking him to speculate about a document he's never
8  seen before.
9      ATTORNEY KRAMER: I'm asking about his
10 reaction.  He can tell me what his reaction is.
11     ATTORNEY SCHROEDER: That's not what we're
12 here for.
13     ATTORNEY KRAMER: That's what I'm here for.
14     ATTORNEY SCHROEDER: Well --
15 BY ATTORNEY KRAMER:
16 Q.  What's your reaction to seeing this today?
17 A.  I don't -- it's a mixture of lists of people, and
18 I'm actually not sure what it all refers to.  I don't
19 know if on 15546 this is an email from Daniel, or I
20 don't, I don't know what, I don't know what this all
21 means.  So I don't know if this is Heather's way of
22 categorizing people involved in a team.
23     ATTORNEY SCHROEDER: Don't speculate.  Don't
24 guess.
25     THE WITNESS: Sorry.  I don't know what this

CONFIDENTIAL                                Page 227

1  is.
2      ATTORNEY SCHROEDER: Don't speculate.
3  BY ATTORNEY KRAMER:
4  Q.  Before you put it away, let's talk about it a
5  little bit.  What was happening in the department
6  around the time that this was sent on June 7th 2017?
7  A.  I don't know.
8  Q.  Are you aware of a division director meeting that
9  occurred on May 18th 2017?
10 A.  No.
11 Q.  Did you believe that Dartmouth-Hitchcock was, at
12 that time, working on a way to keep Misty Blanchette
13 Porter?
14 A.  No.
15 Q.  Is Dr. DeMars's attributed statement here at odds
16 with your understanding of her position at that time?
17     ATTORNEY SCHROEDER: Objection.
18     THE WITNESS: I don't know which attributed
19 statement you're referring to.
20 BY ATTORNEY KRAMER:
21 Q.  The one where it's attributed to her, to Leslie
22 DeMars, that she said, Working on a way to keep Misty
23 Blanchette Porter.
24 A.  And what is your question?
25 Q.  Was this statement that's attributed to her here

CONFIDENTIAL                                Page 228

1  in this document at odds with what you understood her
2  position to be at that time?
3  A.  You're asking me about a comment attributed to
4  Leslie and whether it's at odds with my understanding
5  of what Leslie really thought?
6  Q.  No.  What you understood her position to be, what
7  she told you so in May 18th 2018, 2017.
8  A.  I was under the -- I don't know what the
9  attribution or how this was quoted or the veracity
10 of this.  We were not working on a way to keep Misty
11 Blanchette Porter employed.
12 Q.  This document also says that multiple times in
13 one-to-one meetings or with a couple of other people in
14 the room, that Dr. DeMars stated that senior leadership
15 does not support OB/GYN, slash, women's health, and,
16 obviously, this is coming secondhand from this document
17 prepared by either Daniel Herrick or Heather Gunnell.
18 You're specifically identified as one of those people.
19 Are you surprised to see this?
20 A.  I'm sorry if that's her perspective on senior
21 leadership's perspective.
22 Q.  Did she ever express something like that to you?
23 A.  No.
24 Q.  Did you ever hear of her having expressed
25 something like that?

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD – Vol. 1
July 30, 2019

CONFIDENTIAL                                Page 229

1  A.  I've heard people say that, that that is a
2  perspective that people in OB/GYN have felt following
3  the closure of the program.  I've not heard it directly
4  from Leslie.  I've not had it in emails or letters that
5  she sent me directly.  So I don't know the provenance
6  of these quotes.
7  Q.  Can you tell me more about who you heard this
8  from?
9  A.  I think that some of the email communication from
10  patients and employees were concerns about this is
11  emblematic of not supporting women's health.  I think
12  there were inferences to that in some of the
13  communications that I received.
14  Q.  Lower down on this page -- so this is 15546 -- it
15  says that "Tim", meaning Tim Fisher, "also confirmed
16  that Leslie has been sending conflicting messages
17  within OB/GYN, both regarding finding a way to keep
18  Misty on the team as well as her belief that we will
19  reinstate the REI program and indicating that she
20  already has resumes of potential leaders on her desk".
21  Were you aware of Leslie sending any of these messages?
22  A.  I wasn't aware.  I don't know.  I don't know what
23  this document refers to, to be honest.  I don't know
24  who wrote it.  I don't know what day it was.  Is it --
25  I don't know who's saying this.  So you're asking me to

CONFIDENTIAL                                Page 230

1  interpret a document that I don't know who wrote about
2  a perspective on a chair, her perspective on the future
3  of the program.
4        I have a hard time commenting on this.  I wasn't
5  aware that she had potential leaders' resumes or that
6  she was reinstating the program.  I wasn't aware.  At
7  this point in, or soon after, you know, I had already
8  talked about her stepping down as the, the this day --
9  or I can't remember what the timeline -- stepping down
10  as the leader.  So I don't know what comments she made
11  in that period of time after she decided to tender her
12  resignation from the role.
13  Q.  Tender her resignation from what role?
14  A.  Chair.
15  Q.  When did she tender her resignation?
16  A.  I asked her to, I asked her to step down from,
17  from that role.
18  Q.  When?
19  A.  Following the meeting I had with her.
20  Q.  When specifically was that?
21  A.  I'd have to go back and find the date that we met.
22  It would be -- it had to have been sometime in, in May
23  that I met with her.  So, if these were discussions
24  that are happening in June, she had already -- I think
25  we had already discussed her stepping down from her

CONFIDENTIAL                                Page 231

1  role.  I don't have access to my calendar to know the
2  exact date that I had the meeting.
3  Q.  Do you think that stepping down as chair was a
4  good thing for Leslie?
5        ATTORNEY SCHROEDER: Objection, calls for
6  speculation.  You can answer.
7        THE WITNESS: That's a complex question.  In
8  many ways, yes.  She thanked me after we had the
9  meeting, and we talked about the next steps.  So, I
10  think, yes.
11  BY ATTORNEY KRAMER:
12  Q.  And Dr. DeMars is no longer at
13  Dartmouth-Hitchcock --
14  A.  Correct.
15  Q.  -- right?  When did she leave?
16  A.  I don't know the date.
17  Q.  Was it -- do you know the month?
18  A.  No.
19  Q.  Do you know the year?
20  A.  I feel like this is a Mini-Mental Status Exam.  I
21  don't have the date when she decided to leave.  It
22  would happen sometime in 2018, I believe, but I don't
23  have the date.  I can, I could find it, but I lack that
24  on the timeframe.  In her transition I supported her to
25  be able to do programs that she wanted to be able to

CONFIDENTIAL                                Page 232

1  do.  I offered her the ability to -- I supported her
2  interests in neonatal addiction.  I gave her protected
3  time to do so.
4        I gave her a lot of support in what that
5  transition would be.  She did that for a period of time
6  and then announced that she would be leaving the
7  organization and leaving academic medicine.  I don't
8  have the date in which that happened.  She, for a
9  period of time, months, six months, eight months or
10  longer, continued on in the department in her
11  gynecologic oncology role, seeing patients, doing
12  surgeries, and had dedicated protected time to do this,
13  this work around neonatal addiction.
14  Q.  Whose idea was it for her to focus on perinatal
15  addiction?
16  A.  It was hers.
17  Q.  When she left Dartmouth-Hitchcock, was she fired?
18  A.  No, she resigned.
19  Q.  What was her explanation for why she resigned?
20  A.  I believe she had an opportunity to work in
21  industry and was looking forward to that opportunity as
22  a change of career.
23  Q.  Is she still local in the area?
24  A.  I don't know.
25  Q.  Are you in touch with her at all?

CONFIDENTIAL                                    Page 233

1 A.  No.  I think she does still live in Norwich, but I
2 don't know.
3        (Deposition Exhibit 28 marked.)
4 Q.  Okay.  This is Merrens 28, DH9476, 77, and 78.
5 It's an email from Dr. DeMars on June 13th 2017, and,
6 again, it looks like she forwarded it perhaps to the
7 same group of recipients the next day on June 14th.
8 The subject line is, quote, "unanticipated," close
9 quote, "downstream effects".  You're not listed on here
10 as a recipient of this email.  Have you seen this
11 document?
12 A.  I have not.
13 Q.  You haven't seen it before today?
14 A.  No.
15 Q.  What's your understanding of why Leslie sent this
16 email?
17        ATTORNEY SCHROEDER: Objection.  You're
18 calling for him to speculate about a document he's
19 never seen before.  So how can he possibly understand
20 why Leslie DeMars sent this?
21        THE WITNESS: I have no idea.
22 BY ATTORNEY KRAMER:
23 Q.  She identifies several pages worth of what she
24 considers to be harms, the result from closing REI.  Do
25 you think that she is correct in her assessment that

CONFIDENTIAL                                    Page 234

1 these are harms resulting from closing REI?
2 A.  I think this is a list of some things that may be
3 relevant and some things that may not be relevant or
4 attributable or actual issues.  It's a pretty
5 broad-ranging list that includes, you know, mentored
6 students to erosion of trust and communication.  So I
7 don't know.  I don't know the purpose of this document,
8 sharing it with her division leaders or what the intent
9 is.  Is it to curate a list of, of harms, or is this
10 designed to kind of mitigate and plan for the future?
11 I don't know.  I've never seen the document before.  It
12 wasn't shared with me.
13 Q.  Are you surprised that it wasn't shared with you?
14 A.  No.
15 Q.  In this email in the subject line, Dr. DeMars has
16 the word "unanticipated" in quotes.  Were these effects
17 anticipated and considered in your assessment of the
18 REI program?
19 A.  So there were a broad range of areas that were
20 considered, including financial, reputational, contact.
21 Under all these categories there were areas that we
22 explored and wanted to understand and wanted to
23 mitigate any potential harms as part of the process.
24 So we understood the financial situation.  We
25 understood that, that they would have less of a

CONFIDENTIAL                                    Page 235

1 contribution margin because less money would be coming
2 in.  We knew that would affect them.
3        We knew there were issues around trainees' access
4 to expertise and that they would have to go out, out
5 else, outside to gain insights and have experience
6 around in vitro fertilization.  We knew that we had --
7 you know, there were, you know -- I think she lists
8 some things here that were embryonic in their
9 development.  Certainly, developing a research program
10 on endometriosis by Dr. Hsu was something that was not
11 a well-structured and established academic endeavor.
12 So I think it is a laundry list of things that would
13 require some interpretation as to intent and, I think,
14 are vague at best.
15 Q.  At this point in time, she was still chair of
16 OB/GYN, right?
17 A.  I, that may be the case.  I'd have to figure out
18 the date that she actually resigned.  I'm sorry.  I
19 don't have that at my --
20 Q.  I'll say to you it was June, it was on or around
21 June 22nd 2017.
22 A.  Okay.  So it was close.
23 Q.  So this is before.  Is an email like this what you
24 would expect from a chair?
25        ATTORNEY SCHROEDER: Objection, calls for

CONFIDENTIAL                                    Page 236

1 speculation.
2        ATTORNEY KRAMER: How is that speculation?
3        ATTORNEY SCHROEDER: What he would expect.
4 He says he's never seen it so --
5        ATTORNEY KRAMER: I don't see how that's
6 speculation.
7        ATTORNEY SCHROEDER: You're asking him to
8 speculate.
9        THE WITNESS: I don't -- the document has --
10 I don't understand what the intent of the document is,
11 other than to list a series of potential harms that
12 range from the obscure to the, to the monetary, and it
13 doesn't talk about we should understand these, we
14 should figure out what we can mitigate, how we can talk
15 about other resources, how we can do things.  It is
16 just, Send me your list of harms in different colors.
17 This is not the communication of a well-thought-out
18 plan that I expect from, from the people that I ask to
19 lead our organization.
20 BY ATTORNEY KRAMER:
21 Q.  Do you see this document as an effort by
22 Dr. DeMars to distance herself from the decision to
23 close REI?
24 A.  I don't know.
25        ATTORNEY SCHROEDER: Objection, calls for

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD - Vol. 1
July 30, 2019

CONFIDENTIAL                                    Page 237

1  speculation.
2  BY ATTORNEY KRAMER:
3  Q. Do you have a thought, since you --
4  A. I said I don't know. I, I don't view this as her
5  distancing herself. I view this as another example in
6  which she's expressing some concerns without framework
7  that do not enhance her leader's ability to have trust
8  about what's going forward. It's a vague document at
9  best.
10 Q. Before the closure of REI, what plans were put in
11 place for residency training of OB/GYN residents?
12 A. You mean, before the closing, how did we think
13 about giving them the exposure to that?
14 Q. Exactly. My understanding is that one of the
15 rotations that OB/GYN residents need to do is in REI.
16 A. I think there's opportunities for them to get that
17 experience outside of the organization, to work with
18 Boston IVF and other in vitro fertilization centers
19 where we send our patients. I think there was
20 opportunities that the interim chair worked on in terms
21 of getting them that kind of experience.
22 Q. Was there specific planning that took place for
23 that issue prior to the closure, prior to June 4th?
24 A. I think we knew that that would be an important
25 part of, clearly, part of what would need to happen for

CONFIDENTIAL                                    Page 238

1  the residency program. I'm not sure we had every part
2  of it firmly established, but it was, it was clearly
3  something that we knew needed to be addressed, and we
4  had plans to do so. I'm not sure of the specifics of
5  whether -- that was, that was the intent and that's
6  what occurred.
7  Q. Was that something that you would have handled, or
8  would you have delegated that to either DeMars or
9  somebody else in the department?
10 A. The interim chair, yes.
11 Q. When did the interim chair come on board?
12 A. We had an, we had an interview process. We had --
13 I asked the division leaders to kind of take over and,
14 and manage while we, while we were without after Leslie
15 had stepped down. I had an open recruitment process,
16 internal candidates in which candidates came forward.
17 I had a search committee, and we decided on Liz Erekson
18 as the interim chair.
19 Q. What conversations have you had with Dr. Joanne
20 Conroy about the REI division?
21 A. Joanne had just arrived at Dartmouth-Hitchcock
22 when this was occurring. I told her kind of where we
23 were, what events had unfolded, that we had made the
24 decision to close the program, terminate the providers,
25 and had worked across the spectrum of areas of D-H to

CONFIDENTIAL                                    Page 239

1  make sure that we took care of patients.
2  Q. Did you talk to Dr. Conroy about the REI division
3  or any of the providers in the division prior to her
4  joining, which I believe was in August of 2017?
5  A. No.
6  Q. Do you know if anybody else discussed the REI
7  division with her before she officially came on board?
8  A. I do not believe anyone discussed REI with her.
9  Q. In your conversations with her after she became
10 CEO in August of 2017, was anybody else in those
11 meetings when you discussed REI?
12 A. No. I think it was just Joanne and myself.
13 Q. What was her response to what you said?
14 A. I think she supported the decision that had been
15 made and understood that we were clearly interested in,
16 in getting to a point in the future where we had the
17 full spectrum of REI capabilities at our center.
18 Q. Have you discussed this lawsuit with Dr. Conroy?
19 A. No.
20       ATTORNEY KRAMER: Let's take a break, and
21 we'll see if we can wrap up.
22    (A recess was taken from 6:28 p.m. to 6:30 p.m.)
23       ATTORNEY KRAMER: Back on the record. But we
24 are, we are done as far as I'm concerned. Don may have
25 some --

CONFIDENTIAL                                    Page 240

1       ATTORNEY SCHROEDER: I don't have any
2  questions.
3       ATTORNEY KRAMER: No questions? Okay. Then
4  we're all set. Thank you so much for being here today.
5
6
7
8
9  (Whereupon at 6:30 p.m. the deposition was adjourned.)
10
11
12
13
14
15
16
17
18           * * * * *
19
20
21
22
23
24
25       I have carefully read the foregoing

Misty Blanchette Porter, MD v.
Dartmouth-Hitchcock Medical Center, et al.

Confidential

Edward Merrens, MD – Vol. 1
July 30, 2019

CONFIDENTIAL                                    Page 241

1        transcript of my deposition given on Tuesday,

2        July 30, 2019, and the answers made by me are

3        true and correct.

4

5

6                        --------------------------

7                        EDWARD J. MERRENS, MD

8        STATE OF _____

9        _____ SS.

10

11       At _____, in said

12       County, this _____ day of

13       _____, 2019, personally

14       appeared before me the above-named

15       EDWARD J. MERRENS, MD and made oath that the

16       foregoing answers subscribed by him are true.

17

18

19                        ------------------------------

20                        Notary Public

21

22       My Commission expires:

23

24       --------------------

25                    C E R T I F I C A T E

CONFIDENTIAL                                    Page 242

1             I, Sunnie Donath, RPR, Notary Public, do

2        hereby certify that the foregoing pages numbered 1

3        through 242, inclusive, are a true and accurate

4        transcription of my stenographic notes of the sworn

5        deposition of EDWARD J. MERRENS, MD, taken before me on

6        Tuesday, July 30, 2019 for use in the matter of

7        MISTY BLANCHETTE PORTER, MD -vs- DARTMOUTH-HITCHCOCK

8        MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY

9        HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK

10       HEALTH, United States District Court, District of

11       Vermont, Case No. 5:17-cv-194.

12            I further certify that I am not related

13       to any of the parties thereto or their counsel, and I

14       am in no way interested in the outcome of said cause.

15

16

17

18

19

20                        ------------------------------

21                        Sunnie Donath, RPR
                           Notary Public

22

23       My commission expires:

24       January 31, 2021

25