# EXHIBIT G

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF VERMONT
2                     Case No. 5:17-cv-194

3

4   MISTY BLANCHETTE PORTER, M.D.,      )
                                        )
5                           Plaintiff )
                                        )
6   vs.                                 )
                                        )
7   DARTMOUTH-HITCHCOCK MEDICAL CENTER,)
    DARTMOUTH-HITCHCOCK CLINIC,         )
8   MARY HITCHCOCK MEMORIAL HOSPITAL,   )
    and DARTMOUTH-HITCHCOCK HEALTH,     )
9                                       )
    _____ Defendants )
10

11

12

13

14              **D E P O S I T I O N**

15                      of

16         **MISTY BLANCHETTE PORTER, M.D.**

17

18

19         Taken at the law offices of Downs Rachlin

20   Martin, PLLC, 67 Etna Road, Lebanon, New Hampshire on

21   Tuesday, June 11, 2019 commencing at 10:00 a.m. before

22   Sunnie Donath, RPR, LCR No. 159, a Licensed Court

23   Reporter within and for the State of New Hampshire.

24

25

1    **APPEARANCES**:

2    GEOFFREY J. VITT, ESQUIRE
     Vitt & Associates, PLC
3    8 Beaver Meadow Road, PO Box 1229
     Norwich, Vermont 05055
4            On behalf of the Plaintiff

5

6    KATHERINE BURGHARDT KRAMER, ESQUIRE
     KBK Law, 6 Mill Street
7    PO Box 23, Middlebury, Vermont 05753
             On behalf of the Plaintiff
8

9    DONALD W. SCHROEDER, ESQUIRE
     JESSICA JOSEPH, ESQUIRE
10   Foley & Lardner, LLP
     111 Huntington Avenue, Suite 2500
11   Boston, Massachusetts 02199-7610
             On behalf of the Defendants
12

13
     Also Present:  Scott Monahan, DHMC
14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2     Witness              Examined By          Page        Line

3     Misty Blanchette Porter, MD

4                         Atty. Schroeder        5           8

5

6

7                    INDEX OF EXHIBITS

8                                                Page

9     1 - Leave of Absence Request Forms          17

10    2 - Plaintiff's Response to Defendant's      23
          First Set of Interrogatories Propounded on
11        Plaintiff

12    3 - 7/19/16 Letter from Deb Fournier         29

13    4 - First Amended Complaint                  30

14    5 - 8/10/16 Letter from M. Brooke Herndon, MD   49

15    6 - 2/23/17 Email, DH0004554                 58

16    7 - 7/6/16 Email, DH0001714                  73

17    8 - Calendar Entries, Porter 0000186-213     74

18    9 - 11/3/16 Email Chain, Seifer0000060-62    111

19    10 - 11/7/16 Email Chain, DH0016212          114

20    11 - 4/28/17 Email Chain, DH0004538-39       119

21    12 - 5/25/17 Letter, DH0002805-11            130

22    13 - 6/6/17 Letter, Porter 0000716-724       152

23

24

25                    *   *   *   *   *


Verbatim Reporters
(802)869-1665
verbatim@vermontel.net

```
 1                 S T I P U L A T I O N S

 2           It is hereby stipulated and agreed by and

 3      between the attorneys of record for the respective

 4      parties hereto as follows:

 5           1.   That the testimony of MISTY BLANCHETTE

 6      PORTER, M.D. may be taken pursuant to the Federal Rules

 7      of Civil Procedure, and treated as if taken pursuant to

 8      notice and order to take depositions and that all

 9      formalities of notice and order are waived by the

10      parties, and the signatures to the stipulation are in

11      like manner waived;

12           2.   That all objections except as to matters of

13      form are reserved until the deposition or any part

14      thereof is offered in evidence;

15           3.   That the deposition may be signed by the

16      said MISTY BLANCHETTE PORTER, M.D. before any notary

17      public.

18

19

20                         *   *   *   *   *

21

22

23

24

25
```

1                    MISTY BLANCHETTE PORTER, M.D.,

2    duly sworn to tell the whole truth, and, nothing but

3    the truth, deposes and says as follows:

4                    ATTORNEY SCHROEDER:   So all objections as to

5    form.  All other objections reserved until the time of

6    trial.  Do you want to do read and sign, waive notary?

7                    ATTORNEY VITT:   Sure.

8                    <u>EXAMINATION BY ATTORNEY SCHROEDER</u>

9    Q.    Could you please state your name for the record?

10   A.    Misty Blanchette Porter.

11   Q.    Okay.  And do you mind if I call you Dr. Porter?

12   A.    That's fine.

13   Q.    Okay.  My name is Don Schroeder.  We met briefly

14   beforehand.  I'm joined here by Jessica Joseph, who is

15   my colleague on this matter.  We represent all of the

16   Dartmouth-Hitchcock entities that are defendants in

17   this case, and, if I refer to Dartmouth-Hitchcock, I'll

18   just, it will refer to all the entities unless I

19   specify, okay?

20   A.    Okay.

21   Q.    I'm also joined by Scott Monahan, who is with

22   Dartmouth-Hitchcock as well.

23         Have you ever been deposed before?

24   A.    Yes.

25   Q.    Okay.  How many times?

1    A.    Twice.

2    Q.    Could you briefly describe for me the first time

3    you were deposed?

4    A.    When I was a chief resident.

5    Q.    What were the circumstances relating to that?

6    A.    There was a patient who claimed chronic hip pain

7    as a result of a vaginal hysterectomy that was

8    performed.

9    Q.    Okay.  And was there a trial?

10   A.    No.

11   Q.    And when was that deposition?

12   A.    I would have been a chief in '92.  '92, '93.

13   Q.    And what was the outcome of that case?

14   A.    It was dropped.

15   Q.    No settlement?

16   A.    None.

17   Q.    The second time you were deposed?

18   A.    When I was on staff at Dartmouth-Hitchcock.

19   Q.    And when was that?

20   A.    Would have been roughly '95.

21   Q.    Okay.  So the, and what were the circumstances

22   related to that?

23   A.    A baby that was born with a neurologic disorder

24   that I had delivered by a c-section.

25   Q.    And was that, did that matter go into litigation?

 1    A.    No.

 2    Q.    And how did it come that you were deposed in that

 3    case?

 4    A.    I was the attending physician who delivered the

 5    baby.

 6    Q.    Okay.  And, when you, when you said you were

 7    deposed but it wasn't in litigation, how, what were the

 8    circumstances that the deposition occurred?

 9    A.    Um, please restate your question.

10    Q.    Sure.  If there was a deposition, it would have

11    been in the context of a litigation.

12    A.    Yeah.

13    Q.    So I'm -- but you said there wasn't a litigation.

14    A.    Oh, I misunderstood your question.

15    Q.    That's okay.

16    A.    I thought you asked if it went to trial.

17    Q.    No.  That was the first case.  This one was

18    whether or not this matter proceeded to litigation.

19    A.    It was a, it was a -- yes, there was litigation.

20    Q.    And you were deposed in that case?

21    A.    Yes.

22    Q.    And what happened in that case?  Was there a

23    settlement?  Did it go to trial?

24    A.    It was dropped.

25    Q.    It was dropped?  No settlement?

1    A.    No.

2    Q.    Since it was a long time ago when you were last

3    deposed, it may help if I just kind of go over some of

4    my ground rules, which are the ground rules that you

5    probably were informed of by your counsel if that's

6    okay.  First one, and you're doing a great job with

7    this -- is not speaking over me, and I will try my

8    hardest not to speak over you so that the court

9    reporter can take down our answers, okay?

10    A.    Okay.

11    Q.    The next one is to make sure that you verbalize

12    your answers.  Because, even though we're sitting in

13    close proximity, I need to make sure that the court

14    reporter takes down your answers, and you can't nod or

15    gesture and do things like that, okay?

16    A.    Okay.

17    Q.    If you answer a question, I'll assume that you've

18    answered it to the best of your ability and truthfully

19    and in a complete fashion.  Is that fair?

20    A.    Okay.

21    Q.    If you can, try to differentiate between whether

22    or not you don't know something and whether or not you

23    don't recall something.  So, for instance, you may not,

24    may not have any knowledge of what I did last week, but

25    you may not recall what you did last week.  Do you

1    understand?

2    A.    I will ask for clarity.

3    Q.    Okay.  Please do.  Did you get a good night's

4    sleep last night?

5    A.    Yes.

6    Q.    Are you taking any medication that would affect

7    your ability to testify truthfully today?

8    A.    No.

9    Q.    If, at any point -- and this is not a marathon

10    session.  So, if, at any point, you want to take a

11    break, we'll take a break.  Just let me know.  I just

12    want you to finish answering the question that's

13    pending if there is one pending.  If you don't

14    understand a question, please let me know, and I will

15    try to rephrase it so that you understand it, okay?

16    A.    Okay.

17    Q.    All right.  I want to ask you a few questions

18    about matters relating to some of your claims in this

19    case, one of which relates to your claim of disability

20    discrimination.  And so my first question is, Are you

21    currently disabled in any manner?

22    A.    No.

23    Q.    And were you ever disabled?

24    A.    Yes.

25    Q.    Okay.  And what was the nature of that disability

1    specifically?

2    A.    I had a cerebrospinal fluid leak.

3    Q.    A CSF leak?

4    A.    Yes.

5    Q.    And, other than the circumstances relating to the

6    CFS, CSF leak, have you ever had any other disability?

7    A.    Define disability.

8    Q.    Well, a physical or mental impairment that

9    substantially limited a major life activity.  So it's

10    not a trick question.  I mean, when you were working at

11    Dartmouth-Hitchcock, were you, did you ever have a

12    disability which required short-term disability or

13    long-term disability leave other than the circumstances

14    relating to the CSF leak?

15    A.    Yeah, I had a -- I was out on short-term with a

16    hip arthroscopy.

17    Q.    And when was that?

18    A.    I don't remember the year exactly.  It was three

19    to five years beforehand.

20    Q.    Before the CSF leak?

21    A.    Yeah.

22    Q.    Okay.  And, other than that, the, the -- and let

23    me ask, rephrase this question.  The circumstances

24    relating to the CSF leak, was that the disability that

25    serves as the basis for your claim of disability

1    discrimination in this case?

2    A.    Yes.

3    Q.    Do you recall when you first developed symptoms or

4    any condition relating to the CSF leak?

5    A.    Yes, in November 2015.

6    Q.    Okay.  And what were the symptoms that you were

7    experiencing in November of 2015 relating to the CSF

8    leak?

9    A.    A horrible orthostatic headache.  I couldn't sit

10    up.

11    Q.    Can you -- and I realize you've been a physician

12    for a really long time and you're going to use some

13    words that I don't know.  You said something about

14    headache, orthostatic?

15    A.    Yes.

16    Q.    What does that mean?

17    A.    From laying down to sitting up, I had a

18    debilitating, horrible headache.

19    Q.    And would that happen any time you went from a

20    laying-down position to a sitting-up position?

21    A.    When I was first ill, absolutely.

22    Q.    And, when you first started -- were there any

23    other symptoms associated with your condition at that

24    point other than this debilitating headache that you

25    would get from sitting up that you recall?

1    A.    There were multiple, and I reserve the right to
2    supplement my answer, but I will --
3    Q.    And just, yeah, just so we're clear, if, at some
4    point, you answer a question -- because I think I
5    understand what you're trying to say, and, if I'm not,
6    then let me know.  If you answer a question and then,
7    later on today or at another occasion when we're
8    deposing you in your deposition, you, you determine
9    additional information related to a previous answer,
10    certainly, let me know, and we'll go back and complete
11    that answer.  Is that what you're trying to get across
12    as far as supplementing your answer?
13    A.    Yes.
14    Q.    Okay.  Sorry to interrupt you.  So and I just want
15    to get a sense of your condition back in that timeframe
16    of November 2015 and an understanding of the symptoms
17    that you were experiencing during that time.
18    A.    Yeah.  I had blurred vision that, that progressed
19    to complete double vision.  I had hyperacusis, which
20    means sounds that are simple sounds like clinking of a
21    glass were extraordinarily painful.  I had to walk
22    around the house with earplugs in and headphones on.  I
23    had difficulty sleeping.  I had horrible neck pain.  I
24    had vertigo.  I had nausea.  I had a marked decreased
25    appetite.  I had loss of depth perception over the

1    course of the next few weeks so that I couldn't tell

2    where the end of a sidewalk was to where the lines were

3    on a crosswalk without looking down.

4    Q.    When you first developed these symptoms, how long

5    did it take before you, your treating physicians

6    figured out that it was the CSF leak that was causing

7    all these symptoms?

8    A.    About three to four weeks.

9    Q.    And, during that timeframe, were you going through

10    a battery of tests to determine and rule out other

11    issues?

12    A.    Not initially.  My primary care provider ordered

13    some blood work, and that was initial, and then, when I

14    developed double vision, they ordered an MRI, and it

15    took about three to four weeks to come to that.

16    Q.    And is, when they did the MRI, is that the point

17    at which they determined that you were suffering from a

18    CSF leak?

19    A.    Yes.

20    Q.    And, with respect to your current status, have you

21    -- I'd asked you whether you're currently disabled, and

22    you said "no".  Do you have any recurring symptoms or

23    any symptoms at all related to the CSF leak condition

24    that you had back in that timeframe?

25    A.    So your question is do I have any symptoms that

1    relate to the CSF leak currently?

2    Q.    Yes, .

3    A.    No.

4    Q.    Okay.  When, if at all, were you informed that

5    you'd been completely healed with respect to the CSF

6    leak?

7    A.    Dr. Tom Ward informed me that I was completely

8    healed.

9    Q.    Tom Ward?

10    A.    Yes, in May of 2016.  He was markedly incorrect.

11    Q.    When, if at all, were you informed that you were

12    completely healed?

13    A.    The Mayo Clinic after my second surgery to correct

14    my CSF leak.

15    Q.    And when was that?

16    A.    My second surgery in September 2017.

17    Q.    And at what point -- that was when the surgery

18    was.  At what point, if at all, were you given an

19    either a clean bill of health or a full clearance to

20    work full time?

21    A.    Not until the following, the next July or August

22    from my primary care doctor.

23    Q.    And that would be July of '18?

24    A.    I believe so.

25    Q.    And who was your primary treating physician at

1    that point?

2    A.    Dr. Adam Schwartz.

3    Q.    And, since July of 2018 --

4    A.    July, August, somewhere in there, yeah.

5    Q.    Yeah.  And, listen, I, let me be clear, and I

6    appreciate your exact, attempt to be as exacting as

7    possible, and that is appreciated.  I understand that,

8    you know, we're dealing with events which were

9    obviously head trauma and also difficult events during

10   a period of a couple of years, so --

11   A.    I'm going to correct you.  It wasn't head trauma.

12   Q.    Okay.

13   A.    I'm going to correct you on that.

14   Q.    Okay.

15   A.    It was a cerebrospinal fluid leak.

16   Q.    Okay.  And it was an injury to your brain,

17   correct?

18   A.    No.

19   Q.    How would you characterize it?

20   A.    It was a cerebrospinal fluid leak.

21   Dartmouth-Hitchcock gave me the diagnosis of head

22   trauma.

23   Q.    Okay.  I, I'm not trying to get in an argument

24   with you about --

25   A.    I'm not arguing.  I'm correcting you.

1   Q.   Hold on.  Let me finish.  I'm not trying to get

2   into a characterization of what the condition was.

3   This is an, an employment case; it's not a medical

4   case, and so, if I use terminology that you don't

5   believe is accurate, I certainly want you to let me

6   know that, but I'm not trying to put words in your

7   mouth as to what the nature of it was.  I understand it

8   was an injury to your brain, whether you call it an

9   injury or not, but this is -- I'm not trying to, um,

10  you know, put words in your mouth or try to

11  characterize your condition in any other way.

12       You tell me.  How would you like me to

13  characterize your condition when we refer to it, that

14  specific condition?

15  A.   It was a tear in the dura of my back.

16  Q.   I'm sorry.  You said Durham?

17  A.   Dura, D-U-R-A.

18  Q.   Of your back?

19  A.   Yes.

20  Q.   Okay.  And that created a CSF leak?

21  A.   Yes.

22  Q.   Okay.  And, if I refer to this condition as a CSF

23  leak, you understand what I'm talking about?

24  A.   Yes.

25  Q.   And in the, say, summer of 2018, July, August

1   timeframe, at that point, you were given a clean bill

2   of health regarding this condition; is that accurate?

3   A.    Yes.

4            (Deposition Exhibit 1 marked.)

5   Q.    Dr. Porter, I'm going to be showing you a series

6   of documents today, and I'm going to ask you to -- in

7   some cases, there will be multiple pages in a document.

8   I'll ask you to turn to certain pages to ask you

9   specific questions.  So this is a document or documents

10  marked Porter Exhibit 1.  They are a series of, of

11  leave-of-absence forms, and what I'd like you to do,

12  and we'll go through a series of them, but what I'd

13  like to do is go to the last few pages, and you'll see

14  at the bottom, and these are called Bates labels, and

15  I'm just pointing for the record to the number

16  sequence, if it says it at the bottom, that I'll point

17  you to those numbers.

18          So DH21638, if you could turn to that, and there's

19  one, two, three pages here which is titled "Notice of

20  Family/Medical Leave".  It's DH21638 through DH21640.

21  Do you recall seeking, during the October, November

22  timeframe, family medical leave or application for

23  family medical leave?

24  A.    In 2005?

25  Q.    In 2015.

1    A.    This is 2005.

2    Q.    Oh, this is 2005?

3    A.    Yes.

4    Q.    So in 2005 is this related to the hip arthroscopy

5    or arthroscopic condition?

6    A.    I don't recall.

7    Q.    Okay.

8    A.    This is November 2005.

9    Q.    Right, and it said October 16, 2005 is when you

10    were notified.  You don't recall the circumstances

11    related to that?

12    A.    I don't recall.

13    Q.    Okay.  If you'd go back to, go back to the, let's

14    see, DH21632, do you see that?

15    A.    Yes.

16    Q.    Now, this has a -- it's a leave-of-absence form

17    that indicates that you went on a leave of absence

18    December 15th 2015.  The expected return date initially

19    was February 1, 2016, but the actual return date below

20    is June, June 14, 2016.  It, do you recall being on a

21    leave of absence for the period of December 15th 2015

22    to June 14th 2016?

23    A.    This is not a form that I filled out, and I

24    returned partial to work.  I believe the exact dates in

25    approximate are in the interrogatories.

1    Q.   We'll go through them.  I'm just trying to

2    pinpoint the time period of your leave of absence.  At

3    some point, you, you started developing symptoms

4    related to the CSF leak in November 2015, correct?

5    A.   Yes.

6    Q.   And were you, as a result of those symptoms, were

7    you able to actually go to work during that timeframe?

8    A.   I returned to work for, right after Thanksgiving

9    for a period of days, and then I returned to work in

10   early December.

11   Q.   And then do you recall what precipitated you going

12   out on a leave of absence in the December of 2015

13   timeframe?

14   A.   The MRI.

15   Q.   Do you recall when that was?

16   A.   December 14th or 15th.

17   Q.   And, as a result of the MRI, is that when you

18   stopped going to work?

19   A.   Yes.

20   Q.   Okay.  And, when you went out on leave in December

21   2015, was that pursuant to -- did you also fill out

22   forms relating to FMLA leave at that point?

23   A.   I don't recall.

24   Q.   Do you recall being approved for FMLA leave or --

25   A.   Yes.

1    Q.    Okay.  In that timeframe?

2    A.    Yes.

3    Q.    Okay.  And, as a result of that, you were given a

4    leave of absence for, at that point, an undetermined

5    amount of time because it wasn't clear when you were

6    coming back?

7    A.    Correct.

8    Q.    Okay.  Do you recall, as a result of going out on

9    FMLA leave during that timeframe, December of 2015,

10   also applying for and receiving benefits under a

11   short-term disability policy?

12   A.    Yes.

13   Q.    Do you know how long a period of time you received

14   short-term disability benefits in that timeframe?

15   A.    What I qualified for.

16   Q.    Do you recall how long you qualified for it?

17   A.    What was standard within Dartmouth-Hitchcock.

18   Q.    I understand that.  Do you recall what it was?

19   Because --

20   A.    No.

21   Q.    -- different STD policies have different

22   standards.

23   A.    Right.  No.

24   Q.    Would it, would it surprise you if it was six

25   months?

1    A.    No.

2    Q.    Who, if anyone, were you dealing with at

3    Dartmouth-Hitchcock related to your leave of absence in

4    that timeframe to make sure that it was approved and

5    that you applied for short-term disability benefits and

6    received approval for FMLA leave?

7    A.    Again, owing to the right to supplement my answer,

8    I worked through my primary care doctor.

9    Q.    Who was that person at the time?

10   A.    Brooke Herndon.

11   Q.    And how long did she remain your primary care

12   physician?

13   A.    Until my termination at Dartmouth.

14   Q.    And when was that?

15   A.    When was --

16   Q.    Your termination at Dartmouth-Hitchcock.

17   A.    June 3rd.

18   Q.    You're smiling at me as if I'm asking you, like, a

19   trick question.  Is that --

20   A.    I think you know when I was terminated, Mr.

21   Schroeder.

22   Q.    Right.  Well, here's how this is going to go,

23   Dr. Porter.  I'm going to ask you questions.  You're

24   going to answer them.  That's, we need to create a

25   record for this case, and so I'm going to ask you

1    questions politely, in a respectful manner, and I'm

2    going to need you to answer them, regardless of whether

3    or not I may know the answer to them, okay?  Yes?

4    A.    Okay.

5    Q.    Okay.  You need to respond.  Earlier, you

6    mentioned that, at some point prior to June of 2016,

7    you returned in some capacity to work at

8    Dartmouth-Hitchcock?

9    A.    Yes.

10    Q.    And you mentioned your interrogatory responses,

11    but I just want to ask your recollection first, and, if

12    we need to go to the interrogatory responses, we will.

13    Do you recall when you first began working again in

14    2016 at Dartmouth-Hitchcock after being on leave for

15    your CSF leak?

16    A.    Not the exact date, no.

17    Q.    Okay.  Do you recall?

18    A.    I remember the circumstances.  I don't remember

19    the exact date.

20    Q.    How did it come to be that you returned to work in

21    that timeframe earlier than June 2016?  What led you to

22    be coming back to work?

23    A.    There were the circumstances by which I returned.

24    There were multiple patients who were waiting for me to

25    return to provide their infertility care.

1    Q.    Was that the precipitating reason for you

2    returning in a limited capacity during that timeframe?

3    A.    Yes.

4    Q.    Do you recall how many patients there were that --

5    and this is rough justice on the numbers -- but how

6    many patients, your patients, that would have been in

7    the queue, so to speak, for your advice, counsel, and

8    treatment?

9    A.    Can you clarify your question?

10   Q.    Yeah.  Yes, I can.  During this timeframe in early

11   2016, April, May, sometime in there, do you recall how

12   many patients were waiting for you to return?

13   A.    There were four or five couples who had delayed

14   their plans for conception waiting for me to return,

15   and there were multiple other gynecologic patients and

16   patients in my general practice that had been waiting

17   for me to return.

18           (Deposition Exhibit 2 marked.)

19   Q.    Okay.  Showing you a document that's been marked

20   Exhibit 2, and, if you could just review that, it is

21   titled "Plaintiff's Response to Defendant

22   Dartmouth-Hitchcock Medical Center's First Set of

23   Interrogatories Propounded on Plaintiff Misty

24   Blanchette Porter".

25           So one of the questions you had asked me about or

1    you answered was that you recall going back sometime in

2    2016 to Dartmouth-Hitchcock, returning in a limited

3    capacity, and you said it's in the interrogatory

4    responses.  So I just want you to turn to Interrogatory

5    Number 3, which asks you about the, the disability you

6    developed in November 2015, and it goes on on Page 2, 3

7    and 4, and I'm going to ask you a series of questions

8    related to that, so I'd just ask you, if you would read

9    Interrogatory Number 3 to yourself and your response,

10   and I will ask you some additional questions related to

11   that time period.  Just let me know when you're

12   finished.

13                    (Brief pause.)

14   A.    Okay.

15   Q.    Okay.  Before I jump into the questions on the

16   specific circumstances of your return in, to

17   Dartmouth-Hitchcock in 2016, I just want to ask you if

18   you can turn to Page 27 and confirm for me that that's

19   your signature?

20   A.    Yes.

21   Q.    Okay.  And you signed that on April 20th 2018,

22   correct?

23   A.    April 20th 2018.

24   Q.    Okay.  Now, going back to Interrogatory Number 3,

25   in Exhibit 2, you recount in here that you started to

1     work on a very part-time basis starting in early April

2     2016, correct?

3     A.    Correct.

4     Q.    And, for the time period December 15th,

5     thereabouts, of 2015 up until that time period in April

6     2016, you were not working at all, correct?

7     A.    I wasn't physically present at Dartmouth-Hitchcock

8     for work.

9     Q.    You weren't physically present, but you weren't

10    working -- in addition, you weren't returning to work

11    at all during that timeframe, right?

12    A.    Correct.

13    Q.    And, according to your interrogatory responses,

14    you returned to work in April 2016 working a maximum of

15    2 half days per week, consisting of 90 minutes of work,

16    a 30-minute break, and then another 60 minutes of work

17    and then returning home with 2 days off between

18    working, correct?

19    A.    Correct.

20    Q.    So, during the April and May time period, you were

21    working approximately five hours a week?

22    A.    Five to seven, yes.

23    Q.    Okay.  Why do you say five to seven?  What's the

24    basis for that?

25    A.    It's an estimate of what I was doing.

1    Q.    Okay.  And were you physically located at

2    Dartmouth-Hitchcock doing work during those time

3    periods?

4    A.    Yes.

5    Q.    Okay.  And then in late, mid-June you went from

6    five to seven hours of work to about twelve hours per

7    week, correct?

8    A.    Correct.

9    Q.    Now, during this time period, so April, five to

10   seven hours; May, five to seven hours per week, right?

11   A.    Correct.

12   Q.    Mid-June 2016, you increase your work hours to

13   about twelve hours per week, right?

14   A.    Correct.

15   Q.    Now, during the April, May, June time period, do

16   you recall that you were receive, also receiving

17   short-term disability benefits during that time?

18   A.    Yes.

19   Q.    Okay.  Were you authorized by any of your treating

20   physicians to do any work during that time period, even

21   though you were on short-term disability?

22   A.    Yes.

23   Q.    By whom?

24   A.    Brooke Herndon.

25   Q.    And how were you authorized by Brooke Herndon to

1    work during that timeframe?

2    A.    In writing.

3    Q.    And she authorized you to work in some limited

4    capacity?

5    A.    Yes.

6    Q.    Okay.  And were you able to actually work in that

7    limited capacity throughout that time period?

8    A.    To my memory, yes.

9    Q.    At what point did you start suffering from

10   dizziness, headaches, fatigue, and other symptoms as

11   you stated in your interrogatory response in that

12   timeframe?

13   A.    Since November of 2015, it was intermittent,

14   persistent.

15   Q.    So the symptoms that I asked you about up front

16   about the CSF leak, the vertigo, the issues regarding

17   sound, the dizziness, the nausea, lack of appetite, did

18   that carry forward from November of 2015 up until June

19   of 2016?

20   A.    They were intermittent, waxing and waning, but I

21   had persistent symptoms, yes.

22   Q.    And I'm just trying to clarify.  On a daily basis

23   would you have them intermittently, or would it be a

24   weekly basis or a couple of days would go by without

25   any symptoms, or was it just intermittently throughout

1    the day it would come and go?

2    A.    The, the most severe symptoms improved initially.

3    It was time, as we talked about orthostatic, it was

4    time upright.   I always had the headaches.   I always

5    had some dizziness.   They would get nausea.   It would

6    get markedly worse the longer I was standing up.

7    Q.    So the only thing that would relieve it during

8    that time period was being prone?

9    A.    Yes.

10   Q.    You returned to work sometime in the June

11   timeframe where you were working approximately twelve

12   hours a week, although you were limited to one task at

13   a time, correct?

14   A.    That was the recommendation.

15   Q.    And that was the recommendation from Dr. Herndon

16   or someone else?

17   A.    My occupational therapist from the neurocognitive,

18   nurse practitioner, my team of providers.

19   Q.    Okay.   And so, at that point in the April, May,

20   June timeframe, you had a team of, of medical providers

21   assisting with dealing with your condition?

22   A.    Yes.

23   Q.    And, according to your interrogatory answer, in

24   June of 2016 you were limited to one task at a time

25   without handling complex cases or working in the OR.

1    "I was able to teach, handle IVF procedures, read

2    ultrasounds, and provide ultrasound referrals and

3    consults.  I still suffered from dizziness, headaches,

4    fatigue, and other symptoms."  Is that accurate?

5    A.    That's accurate.

6              (Deposition Exhibit 3 marked.)

7    Q.    Okay.  Showing you a document that's been marked

8    Porter Exhibit 3, if you could, please review that, and

9    let me know when you're finished reviewing it.

10   A.    Okay.

11   Q.    Now, what, what's the basis for your belief that

12   you were working five to seven hours a week in April

13   and May of 2016?  Do you have any records to support

14   that other than your recollection?

15   A.    Yeah, you have them.  You have a copy them, my

16   calendar.  I kept a, I kept a calendar, and you have

17   copies of it.

18   Q.    So the calendar would be a calendar of dates when

19   you went to work?

20   A.    Yes.

21   Q.    Did you actually track your hours during that

22   timeframe?

23   A.    Yes.

24   Q.    So, on any given day, it will show how many hours

25   you worked?

1    A.    No.  It's just the general when I was there,

2    estimates, not exact.

3    Q.    Okay.  I'm just -- I'm not sure how -- I

4    understand that, you know, doctors have to, are tracked

5    by RVUs, right?  So it's a different mechanism than

6    time records.  You didn't keep time records in the

7    normal course, did you?

8    A.    Did I punch a time clock?  No.  Did I keep an

9    estimate of what I was working?  Yes.

10   Q.    Okay.  And the estimate would be just in the

11   calendar, correct?

12   A.    Yes.

13                (Deposition Exhibit 4 marked.)

14   Q.    Okay.  So keep that document handy.  I'll show you

15   a document we'll mark Exhibit 4, and we're going to go

16   -- we're going to have that document back and forth,

17   and I'm not going to ask you to review the whole

18   document right now, but I'm going to ask you to

19   specifically go to certain pages to see if it refreshes

20   your recollection of certain events.

21        If you would go to paragraph, Page 17, now, this

22   document that I just handed you is, is the First

23   Amended Complaint in this case, and you've seen this

24   before, correct?

25   A.    Yes.

1    Q.    You reviewed it, correct?

2    A.    Yes.

3    Q.    If you go to Paragraph 43, it states, "In or about

4    December 2015, Dr. Blanchette Porter took a leave of

5    absence under the FMLA leave, Family Medical Leave Act,

6    and on December 15, 2015 she went on short-term

7    disability.  On June 14, 2016 she went on long-term

8    disability".  Is that an accurate statement?

9    A.    Yes.

10    Q.    Okay.  And then it says, Paragraph 44, "On June

11    15, 2016, Dr. Blanchette Porter was able to return to

12    work on a part-time basis".  You see that?

13    A.    Yes.

14    Q.    When did you first recall then -- there's no

15    mention in here about working in April or May of 2016.

16    It says that you returned to work on a part-time basis

17    in June of 2015, and I'm just trying to determine which

18    one's correct.

19    A.    I'd have to refer to my calendar, but I believe I

20    worked part time earlier than that.

21    Q.    In April and May?

22    A.    Again, I would defer to my calendar.

23    Q.    Okay.  With respect to the rest of, additional

24    parts of Paragraph 44, it says, "And on July 29, 2016,

25    the chair of the department gave permission for

1    Dr. Blanchette Porter to do additional work remotely

2    from her home in Vermont", and then it talks about the

3    things that you did while working from home, correct?

4    A.    Correct.

5    Q.    Okay.  And that was the first point at which you

6    did any work from home or were approved to work from

7    home by the chair of the department, right?

8    A.    In writing, yes.

9    Q.    Well, it doesn't say in writing, right?  It says

10   gave permission.

11   A.    But you also said you weren't going to hold me to

12   the exact, Mr. Schroeder.

13   Q.    Well, I'm going to hold you to the exact if those

14   are your words.  I mean, we're looking at -- I'm trying

15   to pinpoint.  That's the timeframe when she gave you

16   permission to work from home, whether verbally or in

17   writing?  It's an exact date that's listed there.  I

18   didn't list that date.

19   A.    I don't recall.

20   Q.    If you go back to the document that's been marked

21   Exhibit 3 and put that in front of you just so you can

22   review it, do you recall this document marked Exhibit

23   3?

24   A.    Yes.

25   Q.    Okay.  What is it?

1    A.    It's a letter from Deb Fournier, who was a part of

2    my care team, about my work return.

3    Q.    Okay.  And, according to this document, this is

4    dated July 19th 2016, correct?

5    A.    Yes.

6    Q.    And it lists a series of accommodations that they

7    are seeking for you on your behalf, correct?

8    A.    Correct.

9    Q.    And do you recall giving this document to

10    Dr. DeMars, the chair of the department?

11    A.    I did.

12    Q.    Okay.  And the, I just want to walk through each

13    of the requested accommodations, but, before I do that,

14    one of the things I asked you about going back to the

15    Complaint for a second was the fact that you were on

16    short-term disability leave, and then you went right to

17    long-term disability leave according to your Complaint,

18    Exhibit 4, specifically Paragraphs 43 and 44.  Is that,

19    is that accurate?

20    A.    Yes.

21    Q.    Okay.  So, during that timeframe when you were

22    approved for long-term disability benefits, do you know

23    how much you were compensated in terms of the benefit

24    that you received?

25    A.    No.

1  Q.   Do you know -- you don't know what percentage of

2  your salary you received?

3  A.   From short-term to long-term, I, I would have to

4  defer back to the paperwork --

5  Q.   Okay.

6  A.   -- to look at it specifically.

7  Q.   Was it some percentage of your salary that you

8  received --

9  A.   Yes.

10  Q.   -- like, 60 percent or 65 percent?

11  A.   As an estimate, yes.

12  Q.   Okay.  When you were approved for long-term

13  disability, do you know what steps needed to be taken

14  in order to get approved for long-term disability

15  benefits?

16  A.   I met with my primary care provider.  I met with

17  my team.  I filled out extensive paperwork.  My, my

18  providers filled out extensive paperwork.  I had

19  conversations with Dr. DeMars about it, and I needed to

20  speak with the appropriate identified individuals for

21  the disability coordinators, the businesses, the

22  companies.

23  Q.   Oh, the Hartford or Unum, the insurance providers

24  of that policy?

25  A.   Yes.

1    Q.    Okay.

2    A.    I had to have extensive conversations with them.

3    Q.    Would it be fair to say that that was an extensive

4    application process in order to qualify for long-term

5    disability benefits?

6    A.    It was a process.  Whether you define it as

7    extensive or not would be to your own belief.

8    Q.    Well, did you find it to be extensive?  You said

9    you had to meet with your providers, you had to meet

10   with the insurance policy people as well.  You had a

11   series of meetings related to that, correct?

12   A.    The entire process of continuing to qualify for my

13   disability was an extensive process.

14   Q.    And were you approved for LTD benefits upon your

15   first attempt at qualifying?

16   A.    Yes.

17   Q.    And you went immediately from short-term

18   disability benefits to long-term disability benefits,

19   correct?

20   A.    Yes.

21   Q.    Okay.  And were you, in order to qualify for

22   long-term disability benefits, did the policy require

23   that you were permanently disabled at the time?

24   A.    Define permanently disabled.

25   Q.    What was the, what was the threshold for

1    qualifying for LTD benefits?

2    A.    I'd refer to the policy.

3    Q.    Well, what do you recall other than the policy?

4    What was the, what was the standard that needed to be

5    met in terms of your condition to qualify for long-term

6    disability?

7    A.    I don't recall.

8    Q.    Either way, though, the first attempt you, you

9    made to qualify for long-term disability, you were

10   approved for benefits, correct?

11   A.    Correct.

12   Q.    And your long-term disability benefits started in

13   June of 2016?

14   A.    Correct.

15   Q.    And how long were you on long-term disability

16   benefits thereafter?

17   A.    Again, I'd refer back to the records.

18   Q.    Well, do --

19   A.    I had at least partial until the July, August that

20   we discussed already.

21   Q.    When you say "at least partial", to July, August

22   of 2018?

23   A.    That summer, yes.

24   Q.    Okay.  Do you know when it went from full LTD

25   benefits down to a lesser amount?

1    A.    I don't remember.

2    Q.    Okay.  If you go back to the document marked

3    Exhibit 3, if you could put that in front of you, now,

4    this is dated July 19, 2016, correct?

5    A.    Correct.

6    Q.    And this is from one of your team members, Deb

7    Fournier, correct?

8    A.    Correct.

9    Q.    And it has a list of recommended accommodations

10   going forward, correct?

11   A.    Correct.

12   Q.    The first one was a protected, quiet, private

13   office space, right?

14   A.    Correct.

15   Q.    And did Dartmouth-Hitchcock provide that for you?

16   A.    Initially, but it was repeatedly violated as we

17   moved forward.

18   Q.    And how was it repeatedly violated?

19   A.    Initially, the guidelines were encouraged by

20   Dr. DeMars.

21   Q.    Okay.  Well, let's start there for -- oh, go

22   ahead.  Finish your answer.

23   A.    Moving forward over the next days, weeks, months,

24   they were repeatedly violated, and, when I went to

25   Dr. DeMars and Heather Gunnell with requests to enforce

1    these, they declined.

2    Q.    Okay.  We'll, we'll go back to that topic later,

3    but let me ask you about the recommendations that are

4    contained in here.  The second one -- and they were

5    initially, you initially sought approval for these from

6    Dr. DeMars, correct?

7    A.    Yes.

8    Q.    And, in fact, she approved these recommended

9    accommodations, right?

10   A.    She approved them, but she didn't enforce them

11   over multiple weeks and days.

12   Q.    Well, at this point -- well, let's just go through

13   the accommodations first.  Initially, she approved

14   them, correct?  Is that a fair statement?

15   A.    Yes.

16   Q.    Okay.  So the first one is a protected, quiet,

17   private office space.  The second one is limited

18   duties, very well-described limited duties, limited

19   clinical duties to no more than twelve hours per week.

20   So that's, that's one of the requested accommodations,

21   correct?

22   A.    Correct.

23   Q.    And that's as of July of 2016, mid-July 2016,

24   correct?

25   A.    Correct.

1   Q.   And were you given that accommodation?

2   A.   Again, I was repeatedly requested to do more.

3   Q.   You were requested to do more, but did you

4   maintain, as you said in your interrogatory responses,

5   about twelve hours a week?  Even if you were asked to

6   do more, did you maintain about twelve hours per week?

7   A.   In what timeframe, Mr. Schroeder?

8   Q.   The June, July, August 2000 timeframe.

9   A.   I would, I went with my recommendations from my

10  providers.

11  Q.   Right, and you --

12  A.   And I would refer back to my calendar, but it was

13  a progressive increase.

14  Q.   Well, you went out on leave in August of 2016,

15  correct?

16  A.   Back out.

17  Q.   Back out?

18  A.   Yes.

19  Q.   Right.  And, according to this, your limited

20  clinical duties to no more than twelve hours a week,

21  that request for accommodation was July 19th 2016,

22  correct?

23  A.   This initial request --

24  Q.   Yes.

25  A.   -- was July 19th 2016 --

1    Q.    Right.

2    A.    -- yes.

3    Q.    And what about the additional parts of limited

4    duties, no main OR or CS, OSC cases; was that

5    accommodated?

6    A.    Yes.

7    Q.    No outpatient new patient consults?

8    A.    It's Dr. DeMars's writing to the right of that.

9    Q.    I was going to ask you about that.

10    A.    Yes, "Or as requested/vetted by Dr. Porter".

11    Q.    So was that after a discussion with Dr. DeMars

12    that you would, is a clarification?

13    A.    It was a clarification.

14    Q.    Okay.  And was that accommodation given?

15    A.    She requested that I have specific patients that I

16    follow at that point that were new to me.

17    Q.    Okay.  And you were okay with that?

18    A.    Yes.

19    Q.    Okay.  What about the limited duty of no call?

20    A.    I was not written in the call schedule, but I took

21    specific call for specific couples going through.

22    Q.    And was that at your own desire, intention?

23    A.    It was at her request.

24    Q.    At whose request?

25    A.    Dr. DeMars.

1   Q.   So you weren't on the call schedule?

2   A.   I was not written into the call schedule.  I came

3   in to take care of specific couples.

4   Q.   And was that during the twelve hours or so per

5   week?

6   A.   Yes.

7   Q.   You weren't on call, so to speak?

8   A.   I was on call for those couples, yes.

9   Q.   But you were not on -- so if, if, there's a

10  schedule, right, that has who's going to be on for a

11  particular weekend; is that correct?

12  A.   Correct.

13  Q.   And is it for nighttime as well?

14  A.   Yes.

15  Q.   Okay.  You were never on the on-call schedule that

16  other physicians had to be listed in?

17  A.   I wasn't written into the call schedule, no.

18  Q.   It then says no teaching responsibilities as part

19  of the limited duties.  Was that approved?

20  A.   It was approved initially.

21  Q.   Well, in your interrogatory responses you said you

22  were able to teach.

23  A.   Again, it was progressive, Mr. Schroeder.

24  Q.   Okay.  So it was, when you say approved initially,

25  to the extent that you then did it, you did it on your

1    -- was that of your own --

2    A.    We didn't write one of these documents every time

3    my responsibilities changed.

4                    (Indicating Exhibit 3.)

5    Q.    So, to the extent that you ramped up some of your

6    responsibilities like being able to teach, that was

7    what you were able to do at that particular time?

8    A.    Correct.

9    Q.    And it says, "Work return will be prolonged and

10   gradual in terms of both multitasking and complexity

11   (Phases of return as outlined by Greg Morneau and

12   shared with Dr. DeMars)", and was that accurate?

13   A.    Yes.

14   Q.    The third bullet point, major bullet point --

15   there's six bullet points here, black bullet points.

16   The third one is paced activities.  Do you know what

17   that accommodation was?

18   A.    It, it's -- no.

19   Q.    With respect to -- do you recall ever

20   understanding what that meant?

21   A.    It was inferred I would gradually increase my

22   responsibilities and that I would have breaks.

23   Q.    Okay.  And did you get breaks?

24   A.    Again, initially approved, repetitively violated.

25   Q.    When you say "repetitively violated", what do you

1    mean by that, or repeatedly violated?

2    A.    Repeatedly violated, the, there were chunks of

3    time that I took in between to go into my office and

4    close the door for rest.  It was very common and

5    frequent that Dr. Seifer would come in even when I told

6    him I was resting and refuse to leave.

7    Q.    With respect to this list of accommodations, and I

8    want to finish 5 and 6 first.  So the fifth one is

9    ergonomic accommodations.  Did you receive any of

10   those?

11   A.    No.

12   Q.    Did you seek them?

13   A.    No.

14   Q.    Then it says Number 6, and there's a star there,

15   and, by the way, the handwriting below -- the

16   handwriting to the side of the page you attributed to

17   Dr. DeMars.  Is the handwriting below that Dr. DeMars's

18   as well?

19   A.    Yes.

20   Q.    Okay.  And Number 6 was, "All work-related emails

21   should be completed while at the office (no work emails

22   from home)".  Do you see that?

23   A.    Yes.

24   Q.    Okay.  And then there's a request for

25   clarification that there -- it says, "Request

1    clarification that there is no expectation that

2    Dr. Porter must respond to emails at home, but that as

3    part of admin that she could chose to do some work at

4    home or complete emails at home".  Is, did I read that

5    accurately?

6    A.    Yes.

7    Q.    Okay.  And was that a, a clarification that you

8    agreed on with Dr. DeMars in July 2016?

9    A.    That I could choose to do some work at home, yes.

10   Q.    Okay.

11            ATTORNEY VITT:  Take a quick break, Don?

12            ATTORNEY SCHROEDER:  Absolutely.

13       (A recess was taken from 11:11 a.m. to 11:20 a.m.)

14   BY ATTORNEY SCHROEDER:

15   Q.    When, and, just looking at Exhibit 3, which is the

16   letter dated July 19th 2016, so that was the timeframe

17   going forward that you would be working limited

18   clinical duties to no more than twelve hours a week.

19   That's when you met with Dr. DeMars, correct?

20   A.    Yes.

21   Q.    Okay.  And was it a long meeting with Dr. DeMars,

22   short meeting?  Was it more than one meeting?

23   A.    I don't recall.

24   Q.    Did you -- was Dr. DeMars accepting of the

25   recommended list of accommodations when you met with

1   her?

2   A.    She was accepting.  She didn't enforce them.

3   Q.    Okay.  But at that meeting did she, was there any

4   pushback from Dr. DeMars about any of the

5   accommodations that you wanted?

6   A.    She was accepting, but she didn't enforce them.

7   Q.    Okay.  And, when you say she didn't enforce them,

8   this is in mid to late, well, July 19th, thereabouts.

9   Do you know how it was communicated to anyone within

10  the REI division that there were certain accommodations

11  that you would be given in your return to work?

12  A.    In my recollection?

13  Q.    Yes.

14  A.    She sent out an email to members of the

15  department.  She had conversations or a conversation

16  with Dr. Seifer.

17  Q.    And how do you know that?

18  A.    She told me.

19  Q.    And what do you recall Dr. DeMars told Dr. Seifer

20  which she then relayed to you?

21  A.    She just told me she had a conversation with him.

22  Q.    To talk about the accommodations that you needed

23  in your return to work?

24  A.    Yes.

25  Q.    Okay.  Did you share this -- and this a, the

1   document that we were just going over is one that has

2   handwriting on it from Dr. DeMars, correct?

3   A.    Yes.

4   Q.    And you went over this with Dr. DeMars.  Did you

5   specifically go over it with anyone else at

6   Dartmouth-Hitchcock?

7   A.    I don't recall.

8   Q.    You mentioned that Dr. DeMars met with Dr. Seifer.

9   Is there -- did you meet with Dr. Seifer to go over

10  your list of accommodations?

11  A.    I don't recall.

12  Q.    When you say Dr. DeMars did it with Dr. Seifer and

13  you remember that because she told you about it, does

14  that in any way refresh your recollection as to whether

15  or not you had a separate conversation with him at any

16  point?

17  A.    I had a, I had a conversation with him, yes, about

18  my limitations and restrictions both by phone and at

19  work.

20  Q.    And what timeframe was that?

21  A.    Over the course of months, when I first came back

22  and repeatedly multiple times when he was calling me

23  after hours and in my office repeatedly and following

24  me down the hallway and in ultrasound interrupting my

25  work flow.

1    Q.    And, when he was interrupting you or calling you

2    after hours, was he seeking either your advice or

3    counsel or consultation on, on a matter related --

4    A.    Yes.

5    Q.    -- to REI?

6    A.    Yes.

7    Q.    Now, during this timeframe in late July 2016, were

8    you still experiencing symptoms related to your CSF

9    leak?

10   A.    Yes.

11   Q.    Was that affecting your ability to work?

12   A.    Can you clarify your question?

13   Q.    Yes.  As I understand it, the, the symptoms you

14   were experiencing would be intermittently very

15   debilitating.

16   A.    Yes.

17   Q.    And, as a result of that, was that impacting your

18   ability to perform your essential functions of your

19   job, even in a reduced capacity?

20   A.    Can you break that question apart for me?

21   Q.    Sure.  During this timeframe, July and August

22   2016, you were experiencing the same symptoms we talked

23   about earlier related to the CSF leak, correct?

24   A.    Some of them, yes.

25   Q.    Okay.  Some of them?  And, as a result of that,

1    was that impacting your ability to do your job?

2    A.    How would you describe "impact your ability to do

3    your job" is my question.

4    Q.    Well, did you have to leave work early?  Did you

5    have to stop doing something because you were

6    symptomatic?

7    A.    I worked the prescribed hours.

8    Q.    Okay.  And the prescribed hours were twelve hours

9    a week, correct?

10   A.    Yes.

11   Q.    Did you ever share this document, Porter Exhibit

12   3, with anyone else other than Dr. DeMars?

13   A.    I don't recall this specific document.

14   Accommodations such as this I shared with my secretary.

15   Q.    Who is that?

16   A.    Donna Bedard.

17   Q.    So, other than -- and you know you talked to

18   Dr. DeMars about it because she has handwriting on the

19   document, correct?

20   A.    Yes.

21   Q.    So the two people you spoke to specifically that

22   you do recall are Donna Bedard and Dr. DeMars, right?

23   A.    And I also spoke with Dr. Seifer about them.

24   Q.    Right, but you didn't give him a copy of this

25   document, right?

1    A.    Not that I recall.

2                   (Deposition Exhibit 5 marked.)

3    Q.    I'm showing you a document, Dr. Porter, marked

4    Porter Exhibit 5 and ask you to please review it and

5    let me know when you're finished.

6    A.    I'm done.

7    Q.    In reviewing the document marked Porter Exhibit 5,

8    does this refresh your recollection that your treating

9    physician said that you would not be able to work due

10   to increased symptoms despite the accommodations?

11   A.    Dr. Herndon's opinion was, was such.

12   Q.    Right.  But is this consistent with what happened

13   at the time, that you were suffering from increased

14   symptoms in spite of accommodations?

15   A.    Persistent symptoms.

16   Q.    Okay.  Now, it also says in here, quote, "Dr.

17   Porter has no capacity to fulfill her work

18   responsibilities and is now scheduled for additional

19   testing and consultation regarding her condition",

20   period.

21         This is approximately three weeks after the July

22   19th letter, correct?

23   A.    Correct.

24   Q.    So for about three weeks you were working up to

25   twelve hours a week, and, at that point, the symptoms

```
1    were such that you could not work any longer?

2    A.    It wasn't the symptoms that precipitated this

3    letter.

4    Q.    What precipitated this letter?

5    A.    An appointment with a new neurologist.

6    Q.    Okay.  Well, this letter -- and why do you say

7    this letter was precipitated by an appointment with a

8    new neurologist?

9    A.    Tom Ward retired having told me that I was healed

10   and could return to work.  I went in in June to

11   establish with a new neurologist because Dr. Ward

12   retired.  The new neurologist, Stewart Tepper, second

13   or third sentence into my visit with him asked me why I

14   didn't go to the Mayo Clinic, and what he said was, "If

15   you were my wife, you would have been on a plane a long

16   time ago.  We are getting you to the Mayo Clinic", and

17   he approved my consultation at the Mayo.  Brooke knew

18   this and put me out because I had a consultation on the

19   books for August of that year.

20   Q.    So the, the new neurologist is Stewart Tepper?

21   A.    Yes.

22   Q.    And in this -- so sometime in early August you

23   went to go see Dr. Tepper to get a consult?

24   A.    In June.

25   Q.    In June?
```

1    A.    Yeah.  It was an established care appointment.

2    Q.    Okay.  So the care appointment then is at Mayo

3    Clinic in Rochester, Minnesota, correct?

4    A.    I saw Stewart Tepper at Dartmouth-Hitchcock.

5    Q.    Okay.

6    A.    He referred me to the Mayo.

7    Q.    When was that?

8    A.    In June.

9    Q.    Okay.  And he referred you to the Mayo, and the

10   first time you could get in there was August?

11   A.    Yes.

12   Q.    Okay.

13   A.    And Brooke knew this, and that's why she generated

14   this letter.

15   Q.    Do you recall when you actually went to the Mayo

16   Clinic?

17   A.    Mid to end of August.

18   Q.    Did Dr. Tepper indicate why he was referring you

19   to the Mayo Clinic for this particular condition?

20   A.    He strongly suspected I was still leaking.

21   Q.    And is the Mayo Clinic, to your knowledge,

22   specialized in that area?

23   A.    Yes.

24   Q.    Okay.  And, at that point, it was unclear how much

25   longer you would need to be out of work, correct?

1    A.    Correct.

2    Q.    And were you approved for a leave of absence as of

3    August 10th 2016?

4    A.    Yes.

5    Q.    Do you recall having surgery at Mayo Clinic in

6    September of 2016?

7    A.    Yes.

8    Q.    Okay.  And, from August 10th 2016 until when were

9    you out of work completely at Dartmouth-Hitchcock?

10   A.    I don't recall.  I believe I went back to work

11   part time in November.

12   Q.    It may help, since you don't recall, we'll go back

13   to Interrogatory Number 3, which I believe is Porter

14   Exhibit 4.  Is that it?  4, yeah, it is 4.  So just go

15   back to Porter Exhibit 4, and I'll direct your

16   attention to the bottom of Page 3.

17          ATTORNEY KRAMER:  Don, are we looking at

18   Porter Exhibit 4?  That's the Amended Complaint.  2 is

19   the interrogatories.

20          ATTORNEY SCHROEDER:  I'm sorry.  You're

21   right.  Thank you.

22   BY ATTORNEY SCHROEDER:

23   Q.    Dr. Porter, right to your left elbow, I think, is

24   Porter Exhibit 2, and the bottom of Page 3.

25   A.    Yeah.

1    Q.    Do you see that?  It says, "On or about November

2    4, 2016, I returned to work".  Do you know what the

3    basis -- "I worked about four hours a week at first and

4    then increased to seven hours a week in December of

5    2016".  Is that accurate?

6    A.    Yes.

7    Q.    Do you know what is the basis for your belief that

8    that was your work schedule in November and December of

9    2016?

10   A.    Same answer, I had a calendar.

11   Q.    So the calendar will show roughly what your hours

12   were during that timeframe?

13   A.    Roughly.

14   Q.    Okay.  And between November of 2014 you worked

15   roughly four hours a week, right?

16   A.    At first.

17   Q.    And then you increased it to about seven hours a

18   week in December of 2016?

19   A.    Correct.

20   Q.    Then it says you briefly returned to the Mayo

21   Clinic for treatment in January of 2017.  How many, how

22   long was that treatment in January of 2017 at Mayo?

23   A.    I flew out and flew back.  It was less than a

24   week.

25   Q.    Okay.  And, as a result -- you had the surgery in

1    September, and then what was the purpose of the

2    treatment in January of 2017?

3    A.    It was a blood patch.

4    Q.    Okay.  Can you explain to me just so I understand

5    it?  There is a -- the surgery was in September of

6    2016, and that was to do what?

7    A.    Surgically repair a leak in the dura.

8    Q.    Okay.  And then, to the extent that you had

9    follow-up treatment in January of 2017, you said it was

10    a blood patch.  Is that related to the leak, or is it

11    just a --

12    A.    It's related to the leak.

13    Q.    It is related to the leak?

14    A.    Yes.

15    Q.    Is it like a smaller leak so that it's requiring a

16    patch as opposed to surgery, or is it, is it actual

17    surgery?

18    A.    It's a -- how do you define surgery?

19    Q.    Going under general anesthesia?

20    A.    I received IV sedation.

21    Q.    Okay.

22    A.    And I had a blood patch at the leak site.

23    Q.    Okay.  And was that actual surgery that they had

24    to do?

25    A.    It's considered an, it's considered an outpatient

1    surgical procedure.

2    Q.    Okay.  And you believe you were out there for

3    about a week?

4    A.    Less than that, yes.

5    Q.    Okay.  And was there a period of time in January

6    2017 that you were out of work altogether as a result

7    of being out there for a week or so, less than a week?

8    A.    During the time I was out there, yes.

9    Q.    What about when you returned back; did you resume

10    --

11    A.    I came back to work.

12    Q.    You came back to work?

13    A.    Yeah.

14    Q.    And it's not clear.  In January of 2017 you went

15    out there for your treatment and the blood patch, and

16    then you say, "By March 2017 I was able to work about

17    20 hours per week".

18          In January and February do you recall how much, if

19    at all, you were working per week roughly?

20    A.    It will be in my calendar.

21    Q.    Is that the only place it would be?

22    A.    My record of it, yes, my personal record.

23    Q.    Do you have any -- would you have kept any records

24    of time worked during 2016 when you were dealing with

25    your CSF leak or 2017 other than in your calendar?

1    A.    I had to email my hours to Crystal Tepfer.

2    Q.    Who is she?

3    A.    She's in human resources, benefits.

4    Q.    And were you emailing your hours to Crystal Tepfer

5    in HR or employee benefits because you were getting,

6    also getting paid by D-H, Dartmouth-Hitchcock, during

7    that timeframe?

8    A.    Yes.

9    Q.    Okay.  Do you recall what compensation you were

10   receiving from Dartmouth-Hitchcock in the 2016-2017

11   timeframe when you were on long-term disability

12   benefits?

13   A.    It varied based on the hours that I worked, and

14   the disability adjusted my pay, my benefit, based on

15   the number of hours I was working.  I had to submit my

16   pay stubs to the Unum and to the Hartford.

17   Q.    So, to the extent that you worked, it would have,

18   and you were paid by Dartmouth-Hitchcock, it would

19   diminish to some extent the long-term disability

20   benefit you were receiving?

21   A.    There was a formula, a variable.

22   Q.    Okay.  When you said you had to submit documents

23   to Unum, was it pay stubs?

24   A.    It was multiple, Unum and the Hartford.

25   Q.    Okay.

1    A.    There was forms, extensive forms, and I needed to

2    send them pay stubs.

3    Q.    And did your pay stubs reflect hours worked?

4    A.    I believe so.

5    Q.    When you returned -- what was the, the reason why

6    you had to go back to the Mayo Clinic for treatment in

7    January 2017?  You said it was a blood patch, but what

8    was -- were you still suffering from any symptoms?

9    A.    Yes.

10   Q.    Okay.  And were those the same symptoms that

11   you've already testified to?

12   A.    A portion of them.

13   Q.    And were they any less or more severe than when

14   you were, with the first onset of this condition?

15   A.    Less.

16   Q.    Less?  But they still existed?  So the symptom of

17   sitting up from a prone position and being dizzy and

18   getting a headache, was that still a symptom?

19   A.    It was markedly improved --

20   Q.    Okay.

21   A.    -- but, yes, I'd have it by the mid to, depending

22   upon my activity, midday.

23   Q.    Okay.  So, at some point, you came back to work,

24   and you were working some amount of hours in January

25   and February 2017, and that would be reflected in your

1    calendars?

2    A.    Yes.

3              (Deposition Exhibit 6 marked.)

4    Q.    Showing you a document marked Exhibit 6, and this

5    is an email communication from February 23rd 2017.  I'd

6    just ask you to review it and let me know when you're

7    finished.

8    A.    Okay.

9    Q.    Do you recall that email communication relating to

10   your returning to work on limited hours and with

11   restrictions?

12   A.    Yes.

13   Q.    And you, now, it says here, "Yesterday Donna sent

14   out my schedule to David, Albert, and Kelly without my

15   permission, and I am told at the request of David.

16   Please do not ask Donna to send out emails with regards

17   to my schedule".

18             Why were you concerned that David, Albert, and

19   Kelly were being given your schedule?

20   A.    Because David was repetitively violating my

21   restrictions.

22   Q.    Well, if he didn't know your schedule, how would

23   he know whether there was accommodation?

24   A.    He knew when I was there.

25   Q.    Well, why were you -- didn't you think that your

1    colleagues should know when you were going to be

2    working there?

3    A.    I didn't think my colleagues should be

4    interrupting my scheduled rest periods.

5    Q.    Well, this wasn't your scheduled rest periods;

6    this was your schedule, correct?

7    A.    If he knows my schedule, he knows that I'm going

8    to be in my office.  He was continually violating my

9    scheduled rest periods.

10   Q.    You don't say that here, correct?  You say you

11   didn't want your schedule to be given to people that

12   you work with, right?

13   A.    I did not want constant interruption of my

14   scheduled breaks, and I did not want them interrupting

15   the work flow when I was working.

16   Q.    Well, at that point in February of 2017, you

17   reported to Dr. Seifer, correct?

18   A.    Yes.

19   Q.    Okay.  He was your boss, right?

20   A.    Yes.

21   Q.    And you didn't want your boss to know what your

22   schedule was at that point when you were coming back to

23   work?

24   A.    I didn't want my boss to be continually

25   interrupting my work flow.  I didn't want my boss to be

1    interrupting my scheduled breaks.

2    Q.    So you didn't want him to know your schedule at

3    all, right?

4    A.    I wanted him to be compliant with the work

5    restrictions.

6    Q.    Okay.  But you didn't want him to know your

7    schedule, because, to your point, if he knew your

8    schedule, he would know that he could find you to ask

9    you questions?

10   A.    No.  It says, "Please come to me if you have

11   questions about my schedule and my work return".

12   That's very different.

13   Q.    Well, you also said, "Don't ask Donna to send out

14   emails with regard to my schedule", right?

15   A.    Yes.

16   Q.    Is there a reason why you didn't send this email

17   to Albert Hsu at the time?

18   A.    It, it was not directed towards Albert.  It wasn't

19   necessary.

20   Q.    Well, he's the only one that, that received a

21   schedule that didn't receive this email, though.

22   A.    He wasn't my boss.

23   Q.    Well, he's your colleague, though, right?  You

24   guys are supposed to collaborate and coordinate things

25   together; is that right?

1    A.    He wasn't my boss.

2    Q.    He wasn't your boss, and you didn't think you

3    needed to let him know what your schedule was; is that

4    a fair statement?

5    A.    No.

6    Q.    What's wrong?  You didn't believe that he -- you

7    certainly didn't want your schedule to be given to him.

8    You were upset about that, correct?

9    A.    No.

10    Q.    You weren't upset about Albert having your

11    schedule?

12    A.    I didn't want Donna to email it out to David.

13    Q.    Okay.  And, at that point, do you know what your

14    schedule was?

15    A.    No, not right now.

16    Q.    At some point in March 2017, you started working

17    up to 20 hours per week; is that right?

18    A.    Yes.

19    Q.    At that point, were you suffering any symptoms

20    related to the CSF leak?

21    A.    Yes.

22    Q.    Okay.  And, according to your Complaint, your

23    Amended Complaint which is Exhibit 4, I believe, you

24    were working 20 hours per week and continued to work 20

25    hours per week until the closure of the REI division?

1  A.    Correct.

2  Q.    In February 2017 were you getting along with

3  Albert Hsu?

4  A.    I, I didn't see Albert very often.

5  Q.    In 2017?

6  A.    Yeah.

7  Q.    Well, despite the fact that you didn't see him

8  very often, were you personable with him?  Were you

9  working with him?

10  A.    Yes.

11  Q.    Did you have any issues with his work performance

12  in January-February 2017 timeframe?

13  A.    I had issues with his work performance for a very

14  long time.

15  Q.    And what about Dr. Seifer?  You, you didn't want

16  Dr. Seifer to have your schedule in February of 2017,

17  correct?

18  A.    February 23rd, yes.

19  Q.    Right.  And that was when you were starting to

20  work again at Dartmouth-Hitchcock after being treated

21  at the Mayo Clinic in January of '17?

22  A.    Correct.

23  Q.    Would it be fair to say that you were, that it was

24  not a satisfactory relationship with your boss at that

25  point?

1    A.    Define satisfactory.

2    Q.    Well, you tell me.  How would you describe the

3    working relationship with Dr. Seifer at that point?

4    A.    I was extraordinarily worried about his

5    performance.

6    Q.    How would you describe your working relationship

7    with him?

8    A.    Fair.

9    Q.    And what was the basis for your, your position

10   that you were extraordinarily worried about his work

11   performance?

12   A.    He appeared significantly impaired.

13   Q.    And what's the basis for your comment that you

14   believed he appeared significantly impaired?

15   A.    He was, he was intermittently cogent and

16   intermittently very confused.  He wouldn't remember

17   things that I had said to him or other team members

18   that was even five or ten minutes later.  There were

19   several behavioral things that were problematic.

20   Q.    Anything other than what you've just testified to?

21   A.    There's a whole list.

22   Q.    Well, let's go by your recollection right now.

23   What other behavioral issues or list of behavioral

24   issues do you recall?

25   A.    He had marked communication issues such that, when

1    I spoke with him, he didn't remember what I said to
2    him.  He would not leave my office when I asked him to.
3    He wanted to walk me out to the car when I told him,
4    no, he needed to stay in the building.  He had many
5    patient care issues where he didn't know or understand
6    basic physiology, and at other times he'd be quite
7    lucid.
8         I, it was not just me, but other individuals.
9    After he'd been in the bathroom, he'd urinated on the
10   wall and all over the toilet.  He appeared
11   significantly impaired.
12   Q.   Did you attribute that to any substance abuse
13   issue?
14   A.   It was a possibility.  I, I can't --
15   Q.   Who told you he urinated on the wall?
16   A.   No one told me.  I saw it.  I followed him into --
17   I used a bathroom right after him in a quiet space.  It
18   was a one bathroom.  You had to walk through another
19   room to get to it.  He came out.  I went in.
20   Q.   How do you know he's the one that urinated on the
21   wall as opposed to somebody else before him?
22   A.   It was wet, it was copious, and there was a whole
23   bunch of toilet paper towels stuffed into the toilet,
24   and one would think, if he had some concern that I
25   wouldn't be able to use it, he would have said

1    something on his way out.

2    Q.    Do you know if he actually even used the urinal?

3    A.    Oh, yeah.  It wasn't --

4    Q.    It was a toilet with a door, right?

5    A.    Yeah, I know because he was wet all over.  He was

6    washing his hands.  I could hear him in there.

7    Q.    You have no idea whether he just went in to wash

8    his hands and whether or not he even went into the

9    toilet, right?

10   A.    No.  I know that he was in the bathroom.

11   Q.    You weren't in the bathroom with him, were you?

12   A.    No, I was not.

13   Q.    But you believe that he was in the toilet and he

14   urinated?

15   A.    It's not just once, Mr. Schroeder.  It was

16   multiple times.

17   Q.    Multiple times?  Okay.  So, with respect to your

18   return to work in March 2017, 20 hours per week; April

19   2017, 20 hours per week roughly; is that right?

20   A.    Correct.

21   Q.    And did that -- and that carried forward into May

22   as well?

23   A.    Approximately.

24   Q.    Now, go back for a second, you go back to -- do

25   you recall when Mr., Dr. Seifer joined

1    Dartmouth-Hitchcock?  Do you recall it being sometime

2    in late May 2016?

3    A.    Yes.

4    Q.    And late May and June, we went over the fact that

5    in July of 2016 you started working twelve hours a

6    week, correct?

7    A.    Correct.

8    Q.    And that went until about -- that was July 19th to

9    August 10th, so that's about three weeks.  That's about

10   36 hours.  But for June to mid-July, so it's about six

11   weeks, you were working five to seven hours a week,

12   right?

13   A.    I'll look back at my records, the calendar.

14   Q.    Well, the July 19th 2016 is when you first

15   requested in writing, the only document that I've seen,

16   that, that says twelve hours a week for your return to

17   work.

18   A.    That's what the document says, but it was a

19   progressive change in my work duty hours.

20   Q.    Right, it was a progressive change from what you'd

21   been doing, five to seven hours a week up to twelve

22   hours a week, right?

23   A.    Agree.

24   Q.    Okay.  And then you were out August 10th to early

25   November, right?

```
1    A.    Yes.

2    Q.    And then in November I think you worked, let's

3    see, four hours a week if I remember correctly, right?

4    A.    Consistent with the --

5    Q.    Right.

6    A.    -- interrogatory, yes.

7    Q.    Right.  And I'm going based on your interrogatory.

8    A.    Yes.

9    Q.    Seven hours a week in December 2016.  So in

10   November 2016 you worked about 16 hours total.  In

11   December 2016 you worked about 28 hours total, right,

12   roughly, give or take?

13   A.    Again, I'd defer to my calendar.

14   Q.    Well, let's just defer to, like, simple math.  How

15   about four hours a week for four weeks in the month of

16   November?  That gets you to about 16 hours a week.  You

17   wrote in your interrogatory response four hours a week.

18   I'm just trying to quantify this.

19            ATTORNEY VITT:  Is there a question?

20            ATTORNEY SCHROEDER: Yeah.

21            THE WITNESS:  What is your question?

22   (Question read by the reporter:

23            "Q.  Well, let's just defer to, like, simple

24            math.  How about four hours a week for four weeks

25            in the month of November?  That gets you to about
```

1          16 hours a week.  You wrote in your interrogatory

2          response four hours a week.  I'm just trying to

3          quantify this.")

4    BY ATTORNEY SCHROEDER:

5    Q.    Right.  So let's just go back to November 2016

6    you're working roughly four hours a week; that's what

7    you said.  So that's about a total of 16 hours for the

8    month of November, right?

9    A.    If you want to quantify it that way, yes.

10   Q.    I'm just, I'm just asking.  Yes, I want to

11   quantify it that way.  So that's about 16 hours for the

12   entire month.  Now, with respect to December, you were

13   working 7 hours a week, so that's about 28 hours for

14   that month, right?

15   A.    Approximately.

16   Q.    Within, so in, in the entirety of 2016 when

17   Dr. Seifer first arrived up until December 31, 2016,

18   you had very, you were, had very little interaction

19   with him; wouldn't that be a fair statement?

20   A.    No.

21   Q.    No, it wouldn't?

22   A.    No.

23   Q.    How much interaction were you having with him if

24   you were only at work less than an entire month in

25   total?

1    A.    You just quantified it.

2    Q.    Right.  Well, it's an entire month, one month of

3    actual work, and you didn't want him to know your

4    schedule; you didn't like him having your schedule,

5    right?

6              ATTORNEY VITT:  Objection.  You've got two

7    things in there.  You're asking about the scheduled

8    number of hours they're working?

9    BY ATTORNEY SCHROEDER:

10   Q.    Right.  You worked a total of approximately one

11   month, total, in work hours --

12   A.    I wouldn't quantify it that way.

13   Q.    -- on a full-time basis?

14   A.    I wouldn't quantify it that way.

15   Q.    Well, I'm quantifying it that way, and that's the

16   question I'm asking.  So I understand you don't want to

17   quantify it that way, but, in total, if you were

18   working on a full-time, 40-hour-a-week basis, one

19   month, it quantifies all the time that you were

20   actually at Dartmouth-Hitchcock during that time

21   period, June 1 of 2016 up until December 31, 2016.

22        And my question is, How much interaction then were

23   you having with Dr. Seifer during that time period if

24   you were only working a total of one month of full-time

25   hours?

1    A.    And my answer is, I wouldn't quantify it that way.

2    Q.    That's not my question, though.  How much

3    interaction did you have with him during the entirety

4    of 2016?

5    A.    I'm trying to give you the most accurate

6    information and answer honestly, which is what you

7    instructed me to do.  I would not quantify it that way.

8    Q.    Right.  But you were working -- we've gone over

9    your hours, right?  We've gone over your hours for that

10   entire time period and when you were out of work and

11   when you were working on a very limited basis, right?

12   A.    We've reviewed my hours, yes.

13   Q.    Right, right.  And, during that entire time, you

14   were handling your patients, correct, just your

15   patients as you said Dr. DeMars said you could do?

16   A.    When I first came back, not during the entire

17   time, no.

18   Q.    Well, when you first came back in July 2016 to the

19   12-hour-a-week schedule.

20   A.    I was handling, when I first came back on the very

21   limited hours, I was handling my patients and patients

22   that were assigned to me by Dr. DeMars.

23   Q.    Were any patients assigned to you by Dr. Seifer?

24   A.    I don't recall.

25   Q.    Well, you're very specific about Dr. DeMars giving

1    you patients.  You don't recall any patients being

2    given to you by Dr. Seifer, right?

3    A.    No, I don't recall.

4    Q.    And were you acceptable of the patients being

5    assigned to you from Dr. DeMars?

6    A.    Yes.

7    Q.    And, in handling those patients, your own patients

8    that were waiting for you to return and, and would only

9    seek treatment with you and the patients approved by

10   Dr. DeMars, did you have any need to deal with

11   Dr. Seifer or Dr. Hsu during that time period?

12   A.    I don't recall.

13   Q.    Well, did you typically consult with anybody when

14   you were handling your patients, any, any other REI

15   physicians when you were handling your patients or

16   patients that were assigned to you?

17   A.    Can you rephrase your question?

18   Q.    When you were handling your patients --

19   A.    Right.

20   Q.    -- and/or the patients assigned to you by

21   Dr. DeMars, which you approved of --

22   A.    Um-hum.

23   Q.    -- typically, would you be able to handle those on

24   your own without any need for consultation with any of

25   the other REI physicians?

```
 1   A.   On those specific patients?  Yes.
 2   Q.   Right.  You could handle that independently
 3   without the need to consult with either Dr. Seifer,
 4   Dr. Hsu, or anyone else in the REI division, other than
 5   the nurses that were assisting you?
 6   A.   There were, there were specific reasons for me to
 7   handle those myself.
 8   Q.   What were those reasons?
 9   A.   There were faculty and OB/GYN residents who had
10   waited for me specifically to come back to do their
11   IVFs.
12   Q.   And you said specific reasons to handle those
13   yourself, correct?
14   A.   Right.  And the second reason was because it was
15   risk management cases, and, due to some poor decisions
16   made by my partners, Dr. DeMars asked me to
17   specifically handle those on my own.
18   Q.   So, since you were handling these cases on your
19   own and these patients on your own, there was no need
20   for you to interact with Dr. Seifer or Dr. Hsu on those
21   patient matters or risk management matters?
22   A.   There was no need for me to interact with them
23   about those specifics patients, no.
24   Q.   Right, right.  And those were the things that you
25   were doing in the July, June-July, and presumably when
```

1    you returned back, November-December timeframe, right?

2    A.    It was not the only thing I was doing.

3    Q.    Were those primarily the only things you were

4    doing?

5    A.    Primarily, when I first came back, yes.

6    Q.    And did you continue to handle those patients in

7    the November and December of 2016 timeframe?

8    A.    I don't recall.

9            ATTORNEY SCHROEDER:  All right.  Well, lunch

10   is here.  Why don't we go off the record?

11       (A recess was taken from 12:05 p.m. to 1:00 p.m.)

12               (Deposition Exhibit 7 marked.)

13   BY ATTORNEY SCHROEDER:

14   Q.    Showing you a document that's been marked Porter

15   Exhibit 7, it's D-H -- oh, sorry.

16           ATTORNEY VITT:  That's all right.

17   BY ATTORNEY SCHROEDER:

18   Q.    And, looking at this document, you are sending an

19   email communication to somebody in Provider Services at

20   Hitchcock.  Is that related to your disability?

21   A.    I don't know.

22   Q.    Well, here you say that you've been on long-term

23   disability, returned to work nine to eleven hours a

24   week as of June 14th, and you wrote this email on July

25   5th 2016.  Does this refresh your recollection that you

1    didn't begin working back at Dartmouth-Hitchcock until

2    sometime in mid-June?

3    A.    No.

4    Q.    You think that your calendar would be a better

5    evidence of what, if any, work you did during the

6    April-May timeframe?

7    A.    Yes.

8              (Deposition Exhibit 8 marked.)

9    Q.    I'm showing you a document that's been marked

10   Porter Exhibit 8.  It's Porter 186 through Porter 213,

11   which represents that these were documents produced by

12   your counsel with those Bates numbers, and it is, as I

13   understand it, your entire calendar that you've been

14   referring to in the course of your deposition today,

15   okay?

16   A.    Okay.

17   Q.    I want to go through and specifically Page 198,

18   Porter 198, starting there, and I'd like you to

19   identify for the next few pages, and we'll start with

20   April 1st, April 2016.  Do you see that page?

21   A.    No.  I'm sorry.

22   Q.    That's okay.

23   A.    198?

24   Q.    Yes, please.

25   A.    Okay, yeah.

1    Q.    I just want to make sure you have the same page I

2    do.   Yeah.   Oh, it is.   Yes, okay.   So, during the

3    morning session of your deposition, we were talking

4    about your interrogatory responses where you recounted

5    that you were working limited hours during the month of

6    April and May 2014, I believe, correct?

7    A.    Which page of the interrogatory are you referring

8    to?

9    Q.    It was Exhibit 2, and it was Interrogatory Number

10   3.

11   A.    Exhibit 2?

12   Q.    Yeah, Interrogatory Number 3.

13   A.    Yeah.

14   Q.    So, if you go there, in Interrogatory Number 3, I

15   believe, on Page 5 you talk about returning to work in

16   April of 2016 and that you were limited to five hours

17   per week.   This soon increased to seven hours per week.

18   And then in June it says, "I increased my work hours to

19   twelve hours per week".

20   A.    Right.

21   Q.    What I'd like you to do for me is identify which

22   days you worked at Dartmouth-Hitchcock in the month of

23   April on Bates labeled Porter 198.

24   A.    Um, again, I would have been tracking it, and I

25   certainly worked on the 6th.

1    Q.    If you worked, you would have a work notation; is

2    that correct?

3    A.    Not always, no.

4    Q.    Okay.

5    A.    Because, remember, I went back specifically to

6    take care of specific patients?

7    Q.    Okay.

8    A.    And it was variable.

9    Q.    Any other dates?

10    A.    In that week?  Which, which --

11    Q.    No, the whole month of April, I just want to start

12    from 1 and go forward.  It looks like April 6th you

13    have the notation work.

14    A.    Yeah.

15    Q.    You have the notation work for the 11th.

16    A.    The 11th.

17    Q.    You have the notation work for the 14th?

18    A.    Yes.

19    Q.    Work for the 18th and work for the 21st.  You

20    don't have any hours attributed to either of them, any

21    of those, do you?

22    A.    No.

23    Q.    Would there be any other place where you would

24    have identified any hours that you were working at

25    Dartmouth-Hitchcock during the month of April 2016?

1   A.   I, I could get into Epic and look at it, the

2   schedule.

3   Q.   Epic, the internal schedule for

4   Dartmouth-Hitchcock?

5   A.   Yeah.

6   Q.   Okay.  What about the month of May; can you

7   identify which dates have an indication that you were

8   performing work on those days?

9   A.   I don't see any specific work, no.

10   Q.   Okay.  If you go to the next page, which is May,

11   the week of May 22nd --

12   A.   Yeah.

13   Q.   -- May 16 to May 22nd and then the following page,

14   May 23rd to May 29th, do you see any indications -- and

15   it looks like you kept a fairly detailed journal at

16   least during the week of the May 16th.  Do you have any

17   notations in here of working for Dartmouth-Hitchcock?

18   A.   Not in that week.

19   Q.   All right.  And what about the week of May 23rd to

20   the 29th?

21   A.   No.

22   Q.   Okay.  Shifting gears to June of 2016, it looks

23   like you were off on vacation the week of the 20th.

24   A.   Yes.

25   Q.   Are there any dates where you believe you

1    performed work and it's notated here?

2    A.    Not notated here, no.

3    Q.    Right.  There's no, there's no reflection of any

4    work hours on this calendar, correct?

5    A.    No.

6    Q.    Now, July 2016, July 5th -- let's see.  Looks like

7    it says 1:00 to 4:00 p.m. on the 5th.

8    A.    Correct.

9    Q.    Now, that actually coincides with the July 5th

10   notation that you sent to disability about returning to

11   work, right?

12   A.    Well, is that disability, or is that provider

13   access?

14   Q.    I don't know.  You wrote the email, so I'm just --

15   I'm not sure.  Do you know?

16   A.    This is provider services.  I don't know.

17   Q.    Okay.  Is the 1:00 to 4:00, do we know what that

18   is?  Is that work, or is that --

19   A.    That's work.

20   Q.    Okay.  And then later that week 1:00 to 4:00,

21   right?

22   A.    Correct.

23   Q.    Okay.  The week of the 11th, it looks like 1:00 to

24   4:00 on the 11th and then work 10:00 to 2:00 --

25   A.    Correct.

1    Q.    -- on the 14th?

2    A.    Yeah.

3    Q.    The 18th, I don't see any, the week of the 18th, I

4    don't see any work.

5    A.    I can't tell from that.

6    Q.    Well, you don't see any?

7    A.    I suspect not, yeah.

8    Q.    Okay.  And then the week of the 25th it looks like

9    1:00 to 4:00 on the 25th, and then is that 10:00 to

10   2:00 on the 28th?

11   A.    Yes.

12   Q.    Okay.  And those would be the, the dates that you

13   worked?

14   A.    No, there's more on there.

15   Q.    Where?

16   A.    On the 6th, two hours.

17   Q.    Where do you see that?

18   A.    Right under "Craig", 8:30 to 9:30.

19   Q.    Well, 8:30 to 9:30 is one hour.

20   A.    No, that was my appointment.  Right underneath

21   there it says two hours.

22   Q.    Oh, okay, okay.

23   A.    On the 12th it says "Transfer, 10:00 o'clock".

24   Q.    What does that stand for?

25   A.    It's an embryo transfer that I did.

1    Q.    Okay.  How many hours were you there?

2    A.    I don't recall.

3    Q.    Okay.  Any other dates where you worked and it's

4    reflected on this?

5    A.    Um, I suspect on the 21st.  On the 22nd I did

6    fellow interviews.

7    Q.    You say "suspect on the 21st".  What leads you to

8    believe that?

9    A.    There's something written there above "Carry 2:00

10   p.m.", and I did fellowship interviews on the 22nd.

11   Q.    Okay.  Anything else?

12   A.    We mentioned the 25th.

13   Q.    Um-hum, and the 28th.

14   A.    And I did a transfer on the 29th.

15   Q.    How long does an embryo transfer -- is it an

16   embryo transfer?

17   A.    Yeah.

18   Q.    How, how long would they typically last?

19   A.    It's variable.

20   Q.    Um.

21   A.    You know, at least an hour.

22   Q.    Okay.

23   A.    The transfer itself, just a few minutes.  The

24   setup --

25   Q.    The procedure just --

```
1    A.    -- the conversation, the counseling --

2    Q.    Right.

3    A.    -- the waiting for the entire team to show up is

4    longer.  Can be really variable.

5    Q.    An hour or two?

6    A.    Usually.

7    Q.    Let's go to August of 2016, which is Porter 204.

8    Can you identify on this document the days that you

9    worked?  That's a question.

10   A.    What is your question?

11   Q.    Can you identify the days that you worked in the

12   month of August 2016 based on this calendar?

13   A.    Based on this calendar, most likely the 1st, the

14   2nd, the 4th, the 8th, the 9th, the 11th, and that's

15   it.

16   Q.    And you think you worked the 11th, even though the

17   letter from your physician that you were no longer able

18   to work was dated the 10th?

19   A.    Yes, because it was backdated.

20   Q.    Okay.

21   A.    She, she didn't put the proper date on it when she

22   sent it in.

23   Q.    Okay.  And no other days in August, correct?

24   A.    No.

25   Q.    Now, if we shift all the way to November 2016, can
```

1    you identify which dates you worked during the month of

2    November 2016?

3    A.    The 11th, the 14th, the 17th, and, again, most

4    likely these can be confirmed in Epic.

5    Q.    Okay.

6    A.    The 21st, the 22nd, um, most likely the 23rd, the

7    28th, the 29th, the 30th.

8    Q.    The 30th was 11:00 to 1:30, right?

9    A.    Yeah, and I probably was in earlier because it was

10   Sharon's retirement party.

11   Q.    Is that Sharon Parent?

12   A.    Yes.

13   Q.    It says "Leslie 2:00 p.m." on the 29th.  Do you

14   know what that was about?

15   A.    I scheduled a meeting with her.

16   Q.    Okay.  Next page, December 2016, can you identify

17   which days you worked?

18   A.    Monday.

19   Q.    Is that 8:00 to 11:00?

20   A.    I can't tell.  I suspect it's 1:45 or --

21   Q.    Looks like 8:00 to 11:00 a.m.

22   A.    Which date are you on?

23   Q.    December 1.

24   A.    December 1st, yes, 8:00 to 11:00.

25   Q.    Okay.  Where else?

1    A.    The 5th.

2    Q.    Oh, that was the 1:45 to 4:00 p.m. you were

3    referring to?

4    A.    Yeah.  The 8th.

5    Q.    Is that 8:00 to 11:00?

6    A.    Yes.  The 12th.

7    Q.    1:00 to 4:00?

8    A.    Yeah.  I went in to grand rounds on the 13th.

9    Q.    What's that?

10   A.    Grand rounds is department education meeting.

11   Q.    Okay.

12   A.    I worked the 15th.

13   Q.    Is that 10:00 to --

14   A.    2:00 or 3:00.

15   Q.    Okay.

16   A.    Three frozen embryo transfers is what that means.

17   Q.    Okay.

18   A.    The 19th, 1:00 to 4:00.  I went in on the 21st.

19   Q.    Do you know how long?

20   A.    No.  8:00 to noon on the 22nd, 1:00 to 4:00 on the

21   27th, 8:00 to noon on the 29th.

22   Q.    Okay.  January 2017?

23   A.    1:00 to 4:00 on the 9th, 8:00 to 2:00 on the 11th.

24   Looks like I worked on the 12th, but I can't

25   reconstruct it right now.

1   Q.    It looks like dental cleaning 7:30 a.m.

2   A.    Yeah, but there's something after that.

3   Q.    Oh, yeah.

4   A.    9:00 to noon on the 13th, and then I did some

5   retrievals on the 16th and 17th by the looks, and it

6   says 11:30 to 5:30, something I can't read, something

7   2:00 p.m. or 12:40 p.m., something.  10:00 to 2:00.

8   Q.    On the 18th?

9   A.    Yeah.  8:00 to noon on the 19th; 23rd, 8:30 to

10  12:30.

11  Q.    Was that a retreat?

12  A.    Yes.

13  Q.    Retreat was also on the 25th --

14  A.    Yes.

15  Q.    -- 10:00 to 2:00?

16  A.    Um-hum.  And then I had some transfers, too, in

17  there by the looks.

18  Q.    Where is that?

19  A.    It's, I write "TR" when there's a transfer.  It

20  looks like on the 26th there may have been a transfer.

21  Q.    Is that transfer or Tom?

22  A.    Below there is Tom's colonoscopy.  That one, I'm

23  not certain about before there.

24  Q.    Okay.

25  A.    30th, 1:00 to 4:00; 8:00 to noon on Wednesday the,

1    whatever, February now.  8:00 to 3:00 on the next day.

2    Q.    Okay.  Month of February?

3    A.    It says 8:00 to noon on the 1st.

4    Q.    Right.

5    A.    1:00 to 4:00 on the 2nd, 8:00 to 12:00 on the

6    14th.  Then we had value institute meetings on the

7    15th.  Looks like there was also value institutes maybe

8    on the 14th, 8:00 to 12:00.  8:00 to noon on the 16th.

9    I met with Leslie on the afternoon of the 16th.  I gave

10   a grand rounds down at Elliot Hospital in Manchester on

11   the 17th.

12   Q.    Okay.  Week of the 19th?

13   A.    On the 20th, 1:00 to 4:00.  21st I had an OR case,

14   and then it looks like I had clinic to follow that 1:00

15   to 4:00.  Looks like I worked the 23rd.

16   Q.    What's that?

17   A.    8:00 to 2:00.

18   Q.    Um-hum.

19   A.    And the 24th, 9:00 to 2:00.  Then all day on the

20   27th or several hours on the 27th, we had BabySentry

21   training, which is the computer program.

22   Q.    Okay.

23   A.    And then we also had a meeting on the 28th.

24   Q.    All right.  March?

25   A.    I did an ultrasound conference at UVM, attended an

1    ultrasound conference.  I worked 8:00 to noon, 9:00 to

2    noon.  I did some interviews.

3    Q.    That's March 2nd and March 3rd, right?

4    A.    Yeah.  Um-hum.

5    Q.    Okay.

6    A.    Um, I went in for -- I think it's 10:00 to 4:00 or

7    something like that.  I had a noon interview, and then

8    it says 10:00 something.  The 8th, the 7th I worked on

9    my ultrasound talks.  8th, 8:00 to noon; 9, 8:00 to

10   2:00 p.m.; 10, 9:00 to noon.

11   Q.    Um-hum.

12   A.    13th, 1:00 to 4:00; 15th, 9:30 to noon; 16th, 8:00

13   to 2:00; 17th, 9:00 to -- it's either noon or 2:00 p.m.

14   Q.    Week of the 20th?

15   A.    1:00 to 4:00.

16   Q.    Um-hum.

17   A.    8:00 to noon.

18   Q.    Where is that, 22nd?

19   A.    That's the 22nd.

20   Q.    Yeah.

21   A.    Then I had a meeting.  8:00 to 2:00.

22   Q.    On the 23rd?

23   A.    Yeah.  Then I went in.  I gave grand rounds on the

24   24th.

25   Q.    Looks like 7:00 to --

```
1   A.   It would have been a chunk of the day, because I
2   believe, I believe that grand rounds was probably at
3   Baystate.
4   Q.   Okay.
5   A.   And then I was in the OR on the 29th.
6   Q.   How long was that?
7   A.   I don't know.
8   Q.   It says two --
9   A.   May have been two OR cases.
10  Q.   Okay.  You don't know how long you were there?
11  A.   No.
12  Q.   Anything else?
13  A.   1:00 to 4:00 on the 30th.  Then it looks like I
14  was back in the OR again on the 31st.
15  Q.   Say 9:00 to noon under that?
16  A.   Probably 7:00.
17  Q.   7:00 to noon?  All right.  April?
18  A.   1:00 to 4:00.
19  Q.   On the 3rd?
20  A.   Yeah.  8:00 to 12:00.
21  Q.   On the 5th?
22  A.   Um-hum.  8:00 to 2:00.
23  Q.   On the 6th?
24  A.   9:00 to noon.
25  Q.   On the 7th?
```

1    A.    Yeah.

2    Q.    Okay.

3    A.    10th, 1:00 to 4:00, and 11th I had an OR case.

4    12th, 8:00 to noon; 13th, 8:00 to 2:00.  14th, I had an

5    OR case.

6    Q.    Okay.  What about the week of the 17th?

7    A.    Looks like 7:00 to 4:00, but it was probably -- I

8    don't know exactly if that's a one or a seven.

9    Q.    It says "Deborah 10:00 a.m."

10    A.    Yeah.

11    Q.    What would that mean?

12    A.    I had an appointment at 10:00 a.m.

13    Q.    Oh, okay.

14    A.    And then 8:00 to noon on Wednesday, and it looks

15    like maybe something in the afternoon, or here's where

16    I gave ground rounds at Baystate, and then I also

17    worked on the 21st.

18    Q.    How long there?

19    A.    I don't know.

20    Q.    Okay.  Week of the 24th?

21    A.    1:00 to 4:00, 8:00 to noon.

22    Q.    8:00 to noon was the 26th?

23    A.    Yeah.  8:00 to 2:00.

24    Q.    27th?

25    A.    9:00 to noon.

1   Q.   On the 28th?

2   A.   Um-hum.  28th, yeah.

3   Q.   The last month, May.

4   A.   1:00 to 4:00.

5   Q.   On the 1st?  Okay.

6   A.   Yeah, looks like something 11:00 to noon and then

7   1:00 to 4:00.

8   Q.   On the 2nd?

9   A.   The 2nd.  8:00 to 2:00 on the 4th.

10  Q.   Okay.

11  A.   9:00 to noon on the 5th, 1:00 to 4:00 on the

12  Tuesday, 8:00 to 2:00 on the 11th.  I worked 9:00 to

13  noon on the 12th.  It looks like --

14  Q.   Where is it?  Can you show me?  Oh, 9:00 to noon,

15  okay.

16  A.   Yeah.

17  Q.   All right.

18  A.   It either looks like on these Mondays I had picked

19  up the 11:00 to noon time, the 1st --

20  Q.   Um-hum

21  A.   -- the 8th, the 15th, and then 1:00 to 4:00.

22  Looks like I was in on the 16th because it says 11:30.

23  Q.   11:00 to 11:30?

24  A.   Well --

25  Q.   9:00, no?

1    A.    Yeah, something in there.  8:00 to 2:00 on the

2    18th, then again probably 11:00 to noon on the 22nd,

3    1:00 to 4:00 in the afternoon.  I went to Burlington on

4    the 24th.

5    Q.    What's that?

6    A.    It's related to fellowship --

7    Q.    Okay.

8    A.    -- work for the fellowship.

9    Q.    How long would that have been?

10    A.    Probably the day.  I don't know.

11    Q.    Okay.  Week of the 29th?

12    A.    I took vacation at the end after they announced

13    our termination --

14    Q.    Okay.

15    A.    -- and then I went back to the Mayo.  I took

16    vacation days.

17    Q.    Okay.  So, based on these records, these would be

18    the most accurate reflection of your work hours as you

19    recall them?

20    A.    It would be a conglomeration of being able to get

21    into Epic, those --

22    Q.    And what would Epic show?

23    A.    The patients that I saw.

24    Q.    Would it have your name next to them?

25    A.    It would be under my schedule, it would be listed,

```
1    and then it would be this --

2                    (Indicating Exhibit 8.)

3         -- but also I had been tracking them for pay

4    stubs.

5    Q.   With respect to earlier testimony, you mentioned

6    that you believed that it was possible that Dr. Seifer

7    might have been impaired at some point?

8    A.   Not at some point.

9    Q.   Well, at what point was he, do you believe he was

10   impaired, significantly impaired?

11   A.   Well, while he was working for D-H.

12   Q.   The entire time?

13   A.   Intermittently, yes.

14   Q.   And did you ever report that through the proper

15   channels for fitness-for-duty certification?

16   A.   I did.

17   Q.   To whom?

18   A.   I reported regularly to Leslie DeMars.

19   Q.   What did you report to her about this and when?

20   A.   The record will show the emails that I sent her.

21   You have them.

22   Q.   Do you recall when you sent them?

23   A.   And then in her meetings with her.  Not the exact

24   dates, no.  From the very beginning.

25   Q.   So dating back to June of 2016?
```

1    A.    Dating back at least until August, yes.

2    Q.    August of 2016?

3    A.    It, it August that he started --

4    Q.    He started in June.

5    A.    Yes.

6    Q.    I'm just tying to figure out when, when you first

7    determined that he appeared to be significantly

8    impaired.

9    A.    August.

10    Q.    And you reported that to Leslie in that timeframe?

11    A.    Yes, absolutely.

12    Q.    And you did it in writing?

13    A.    Yes.  Not in the words "significantly impaired".

14    Q.    No, but you, words to that effect?

15    A.    Yes.  He appears to be disoriented.  He doesn't

16    remember what I say to him.

17    Q.    Did you report it to anyone else?

18    A.    Yes, Heather Gunnell.

19    Q.    The same timeframe?

20    A.    It was, I will say, in terms of dates and times,

21    it was multiple conversations over multiple instances

22    over a prolonged period of time.

23    Q.    With respect to your reports to Heather Gunnell,

24    did you do any of those in writing?

25    A.    I don't recall.

1    Q.    Other than Heather Gunnell and Leslie DeMars,

2    anyone else you reported to regarding Dr. Seifer's

3    cognitive ability or lack thereof?

4    A.    I did what I was supposed to do, Mr. Schroeder,

5    which was to report directly up.

6    Q.    That's not my question.  My question is, Anyone

7    else did you report to?

8    A.    I did what I was supposed to do, which was to

9    report directly up.

10   Q.    I understand that.  You testified that it was

11   Dr. DeMars and Ms. Gunnell.  Did you report any issues

12   relating to Dr. Seifer to anyone else other than those

13   two individuals?

14   A.    Who are you referring to?

15   Q.    Heather Gunnell and Dr. DeMars.

16   A.    Yes, I reported to them.

17   Q.    Other than them, did you report to anyone else

18   your concerns about Dr. Seifer's condition?

19   A.    Yeah, Katie, the head nurse.

20   Q.    What's her name?

21   A.    Kathleen Mansfield.

22   Q.    When did you do that?

23   A.    When the nurses came to me with, multiple nurses

24   came with multiple concerns.

25   Q.    What was the timeframe on that?

1    A.    It would have been from the beginning of him

2    starting that they reported to me, somewhere in June,

3    July, August.

4    Q.    And you reported that to Kathleen Mansfield?

5    A.    Yes.

6    Q.    Okay.  Anyone else that you made any reports to

7    regarding Dr. Seifer's condition, mental condition, in

8    your, in your mind?

9    A.    Not that I recall at this point.

10    Q.    Do you know an individual by the name of

11    Dr. Joanne Conroy?

12    A.    I do.  I don't know her, but I know she's employed

13    by Dartmouth-Hitchcock.

14    Q.    Okay.  Have you ever met her?

15    A.    No.

16    Q.    Okay.  What, if any, facts are you aware of which

17    you believe demonstrate that she has some connection to

18    your lawsuit?

19    A.    I don't understand your question.

20          (Question read by the reporter:

21            "Q.  Okay.  What, if any, facts are you aware

22          of which you believe demonstrate that she has some

23          connection to your lawsuit?")

24            THE WITNESS:  I don't understand the

25    question.  Please rephrase it.

1    BY ATTORNEY SCHROEDER:

2    Q.   Well, you've got a lawsuit, an employment

3    litigation matter against Dartmouth-Hitchcock.  Do you

4    have any facts -- are you aware of any facts that she's

5    got any connection to your allegations in this lawsuit?

6    A.   Please ask me a more direct question.

7    Q.   That's as direct as it's going to get.

8    A.   I stand on my answer.

9    Q.   So you don't have an answer?  You, you're not

10   aware of any specific connection between Dr. Conroy and

11   your lawsuit?

12   A.   She's the CEO of Dartmouth-Hitchcock.

13   Q.   Right, but she became the CEO after your

14   departure, correct?

15   A.   She did.

16   Q.   Right.

17   A.   But she was already, she was already engaged by

18   Dartmouth-Hitchcock.

19   Q.   How do you know that?

20   A.   Because it was already announced that she was

21   starting.

22   Q.   And, when you say she was already engaged by

23   Dartmouth-Hitchcock, what time period?

24   A.   There's a time period by which it was announced

25   that Dr. Weinstein would be leaving.  There was an

```
 1    interim person, and then --

 2    Q.    Who was that?

 3    A.    I don't recall exactly.

 4    Q.    Okay.  Do you have -- are you aware of anything

 5    that connects Dr. Conroy to any of the allegations in

 6    your lawsuit?

 7    A.    I've already answered that.

 8    Q.    When she became CEO?

 9    A.    Please rephrase your question.

10    Q.    You've, you've made a number of allegations

11    against a number of physicians in this case, correct?

12    A.    I've made allegations against some physicians,

13    yes.

14    Q.    Right.  And what I'm asking you is what, if

15    anything, are you aware of that connects Dr. Conroy to

16    any of the allegations in your lawsuit that you're

17    alleging support your claims of either whistleblower

18    retaliation or discrimination?

19    A.    I stand on the same answer.

20    Q.    What's that answer?

21    A.    I'm not understanding your question.

22    Q.    Well, you know who Dr. Conroy is, right?

23    A.    Yes.

24    Q.    You never met her?

25    A.    No.
```

1    Q.   You're aware that she became the CEO after the

2    closure of the REI division, right?

3    A.   I don't know the exact timing, yes, but she was, I

4    believe that she was already named.

5    Q.   What's the basis for your belief that that has

6    anything to do with your lawsuit?

7    A.   I don't understand your question, Mr. Schroeder.

8    Q.   Well, you know that she's the CEO?

9    A.   Yeah.

10   Q.   And you're aware that your lawyers have sought to

11   seek her deposition in this case?  You're aware of

12   that, correct?

13   A.   Yes.

14   Q.   Okay.  What do you believe personally she has any

15   connection to your litigation?  How is she at all

16   related?

17   A.   She was named CEO.

18   Q.   So, when she was named CEO, she was named CEO in

19   August of 2018.

20   A.   She started in August.  She was named before that.

21   Q.   Okay.  And you believe that, because she was named

22   before that, that fact alone has some connection to

23   your case?

24   A.   That's not what I'm saying, no.

25   Q.   Well, what are you saying?

1    A.    I don't understand your question, Mr. Schroeder.

2    Q.    Well, let me ask you this:  What are you -- how,

3    if at all, what facts are you aware of that Dr. Conroy

4    had anything to do with the closure of the REI

5    division?

6    A.    Um, she was named as CEO.

7    Q.    That's it?

8    A.    She had multiple meetings with individuals before

9    my lawsuit went in.

10    Q.    Before your lawsuit?

11    A.    Yeah.

12    Q.    Right.  Multiple meetings with whom?

13    A.    Barry Smith.

14    Q.    About what?

15    A.    About -- well, you have the emails, Mr. Schroeder.

16    Q.    No, no.  Here's the deal:  I get to ask the

17    questions.  You have to answer the questions, okay?

18    This is a serious litigation matter where your legal

19    counsel is seeking the deposition of somebody.  I want

20    to know what you, the Plaintiff in this case, know

21    specifically what you believe to be the basis for her

22    connection, Dr. Conroy's connection, to this

23    litigation.  That's all I'm asking you.

24         And you keep saying, Well, she was named the CEO.

25    Okay.  Other than that?  You then mentioned that she

1    had multiple meetings with Dr. Smith.  What does that

2    have to do with your litigation?

3    A.    There is a conversation about keeping me employed

4    at Dartmouth-Hitchcock and my value to both UVM and to

5    D-H.

6    Q.    Do you know when that conversation occurred?

7    A.    Not exactly, but it was in the timeframe before my

8    lawsuit went in.

9    Q.    And when was your -- let's see.

10   A.    October.

11   Q.    Your lawsuit, so October of 2018, correct, or

12   October 2017?

13   A.    Correct.

14   Q.    So, sometime between her announcement as CEO and

15   the filing of your lawsuit, you believe there was a

16   conversation between Dr. Smith and Dr. Conroy?

17   A.    Um-hum.

18           ATTORNEY VITT:  You need to say "yes".

19           THE WITNESS:  Yes.  Sorry.

20   BY ATTORNEY SCHROEDER:

21   Q.    And that was well after the REI division had been

22   closed and you'd been terminated, correct?

23   A.    The conversation was after, yes.

24   Q.    Right.  At least three months after?

25   A.    Find the email, and you'll get the date.

1    Q.   Well, I'm asking you.  This isn't a hide-and-seek

2    approach.  I get to ask you questions, and you have to

3    answer them to the best of your recollection.  You do

4    not get to say to me, Go look at this email, go look at

5    that email.  There are a lot of emails in this case.

6    We produced numerous documents in this case.

7         So my question is, It's about three months after

8    your termination if that conversation even occurred,

9    correct?

10   A.   That conversation did occur, and it's not

11   necessarily three months later.

12   Q.   Well, when did it occur if you don't believe it

13   was necessarily three months later?

14   A.   It was in that summer.

15   Q.   And what do you believe happened during that

16   conversation?

17   A.   There was an email, or there was a conversation

18   that he suggested that, given my strong connections to

19   Dartmouth, my 20 years of service, my strong connection

20   to UVM, the necessary training requirements for

21   obstetrics and gynecology in reproductive medicine, and

22   the training requirements for the fellowship, there be

23   at least consideration to establishing a joint program

24   with UVM.

25   Q.   And what, if any, response was given by

1    Dr. Conroy?

2    A.    I don't recall.

3    Q.    You don't have any idea?

4    A.    I don't recall right now.

5    Q.    And was that a verbal conversation or in writing?

6    A.    Barry forwarded me the email.

7    Q.    It was an email that Dr. Smith sent to Dr. Conroy,

8    right?

9    A.    Yes.

10    Q.    So, other than that email communication from

11    Dr. Smith, are you aware of any other facts which you

12    believe demonstrate that Dr. Conroy has any connection

13    to the allegations in your lawsuit?

14    A.    Yeah.  I, I ran into Barry at the farm stand, and

15    he told me he'd, he'd met with her.

16    Q.    He'd met with her?

17    A.    Yeah.

18    Q.    So, in addition to that email communication, he

19    also met with her?

20    A.    That's what he said.

21    Q.    And what did he tell you about that meeting?

22    A.    That he strongly encouraged her to reconsider the

23    decision that had been made.

24    Q.    And what, if any, response was given?

25    A.    I don't recall.

1    Q.    Do you know when that meeting happened?

2    A.    No.

3    Q.    So you don't know what, if any, response

4    Dr. Conroy had, correct?

5    A.    Not off the top of my head right now.

6    Q.    Any other facts which you believe support your

7    belief that Dr. Conroy has any connection to the

8    allegations in your lawsuit other than what you've

9    testified to?

10   A.    I reserve the right to amend my comments, yes.

11   Q.    We understand you, you have the right to reserve

12   and supplement your comments at any given point, but

13   we're sitting here today asking you specifically these

14   questions.  It's on the record that you reserve the

15   right to supplement your answers.  You don't have to

16   keep repeating that.

17        My question is, Are there any other facts which

18   you believe support some tangible connection between

19   Dr. Conroy and the allegations in your lawsuit other

20   than what you've testified to?

21   A.    She's been asked about it publicly.  She made a

22   statement about the infertility services to the "Valley

23   News".

24   Q.    Okay.  Anything else?

25   A.    I'm sure there are others.

1    Q.    Well, I want to know what they are.

2    A.    Leslie told me she met with Joanne Conroy.

3    Q.    When did that occur?

4    A.    I don't know.  I don't recall.

5    Q.    Do you know what happened during that

6    conversation?

7    A.    I don't have the detail, no, but she alluded to it

8    was the infertility service, REI services.

9    Q.    What do you mean, she alluded to the REI services?

10    A.    Leslie said that she was going to meet with Joanne

11    about the reproductive medicine services.

12    Q.    Anything else?

13    A.    That's what I recall at this point.

14    Q.    And do you know if that meeting ever happened?

15    A.    I don't.

16    Q.    Anything else?

17    A.    I've answered that question.

18    Q.    Are there any other facts other than the ones

19    you've testified to to support your belief that there

20    is some connection between Dr. Conroy and the

21    underlying allegations in this lawsuit?

22    A.    That's what I recall right now.

23          ATTORNEY SCHROEDER:  Take a quick break?

24    (A recess was taken from 1:46 p.m. to 1:59 p.m.)

25

```
 1    BY ATTORNEY SCHROEDER:

 2    Q.    Do you recall, just shifting gears, do you recall

 3    in the late 2016 timeframe a concern within the REI

 4    division that there was a critical shortage of nursing,

 5    nursing staff?

 6    A.    Yes.

 7    Q.    And what do you recall specifically about that?

 8    A.    That the nurse that was offering to come back and

 9    work was declined after her retirement, that one of the

10    more seasoned nurses had been escorted out by human

11    resources, that we had nurses floating up from same day

12    who were willing to work more in the REI division, but

13    the job was left unposted, posted initially and left

14    unposted for a considerable period of time.

15    Q.    So let me ask you.  You talked about a couple of

16    people there.  The first person who was retiring?

17    A.    Yes.

18    Q.    Who was that?

19    A.    Sharon Parent.

20    Q.    Parent?  And she retired in December of 2016?

21    A.    I believe so.

22    Q.    Right.  We just went through the retirement party

23    thing, right?  It was sometime --

24    A.    Correct.

25    Q.    -- in December?  Okay.  Where would you have
```

1   nurses located in that timeframe?  So November-December

2   2016, how many nurses would you have, and in which

3   locations would you have them for the REI division?

4   A.    We had nurses in the inpatient and outpatient

5   setting.

6   Q.    But how many would you have?  So did you have

7   other locations other than Lebanon?

8   A.    Oh, yes.

9   Q.    That's what I'm, I'm -- let me --

10  A.    Marley, yes.

11  Q.    I didn't say that or phrase that correctly.  So

12  how many locations would you have nurses located at for

13  REI, for the REI division?

14  A.    Please clarify your question.

15  Q.    Well, did you have, did you perform REI services

16  at locations other than Lebanon?

17  A.    Yes, Manchester.

18  Q.    Okay.  What about Bedford?

19  A.    It's the Bedford/Manchester.

20  Q.    Okay.  That was a little confusing to me.

21  A.    Because we were --

22  Q.    So it's the same --

23  A.    We were in Manchester initially, and then our

24  office got moved to Bedford.

25  Q.    Okay.  So that's really one location --

106

1    A.    Yes.

2    Q.    -- ostensibly?  And then Lebanon's the other one,

3    right?

4    A.    For employed nursing, yes.

5    Q.    Is there something, is there some differentiation

6    you're making in your mind about that?

7    A.    For D-H employed nurses, yes.

8    Q.    Right, that's what I'm talking about.  So, in the

9    November-December 2016 timeframe, you had locations in

10   Lebanon, Manchester/Bedford.  Sharon was retiring.  You

11   had a more seasoned nurse that you said was escorted

12   out.  Who was that?

13   A.    Casey Dodge.

14   Q.    Okay.  She was fired, right?

15   A.    To my knowledge, she was at least put on

16   probation.

17   Q.    Did she work here any longer thereafter?

18   A.    I understand she's now employed by

19   Dartmouth-Hitchcock again.  At least she was for some

20   period of time and then left again.

21   Q.    Okay.  With respect to her being an REI nurse --

22   A.    Yes.

23   Q.    -- that stopped in November 2016?

24   A.    Approximately.

25   Q.    Okay.  So Casey Dodge stops working in REI

1    November 2016.  You also have Sharon Parent retiring in

2    December of 2016.  What other nurses, D-H employed

3    nurses, were there in the REI division?

4    A.    Marlene Grossman was in the Manchester office --

5    Q.    Okay.

6    A.    -- Manchester/Bedford.

7    Q.    Do you recall Marlene leaving for another position

8    or another practice at some point in April 2017?

9    A.    I don't remember the date, but, yes, she left.

10    Q.    Is that, does that seem likely?  Does that seem

11    reasonable or likely that she left sometime in that

12    timeframe?

13    A.    Yes.

14    Q.    And then the other nurse in the REI division was?

15    A.    Marcel Lewis.

16    Q.    Marcel Lewis, Marty?

17    A.    Yes.

18    Q.    And was she the only remaining REI-devoted nurse

19    at the time the REI division was closed?

20    A.    No.

21    Q.    Who else was in there?

22    A.    Jamie Florence was working, and there was some --

23    there were some part-time people.

24    Q.    Okay.  But nobody had been -- nobody replaced

25    Casey Dodge, correct?

1    A.    There were people willing to replace Casey Dodge.

2    Q.    Whether or not anybody was willing to replace

3    Casey Dodge, did anybody actually replace Casey Dodge?

4    A.    Not to my knowledge.

5    Q.    Okay.  And no one replaced Sharon Parent, correct?

6    A.    Not to my knowledge.

7    Q.    And you said there was an effort to bring her

8    back?

9    A.    She wanted to come back, and she had been told she

10    could come back.

11    Q.    By whom?

12    A.    Heather and Katie Mansfield.

13    Q.    And do you know why she wasn't?

14    A.    Months later they told her she wasn't going to be

15    able to come back after they had told her several times

16    that she could.

17    Q.    And are you aware of the fact that there's a

18    policy that prevents retired employees being rehired on

19    a per diem basis?

20    A.    I'm aware that D-H has not, not enforced that

21    policy with other important ancillary staff.

22    Q.    But you're aware the policy exists, regardless?

23    A.    I'm aware that D-H has not enforced that policy

24    with other important staff.

25    Q.    But are you aware of any underlying policy,

109

1    whether or not it's enforced or not?

2    A.    I've answered that question.

3    Q.    No.  The question is this:  By saying that, Well,

4    I'm aware it's not enforced means you understand that

5    there is a policy --

6    A.    Yes.

7    Q.    -- right?  And you're aware that the policy,

8    regardless of whether or not it's enforced, states that

9    words to the effect that, if somebody retires, they

10   can't be rehired back on a per diem basis, right?

11   A.    I'm aware there's an policy, yes.

12   Q.    Okay.  And are you aware of it -- what are your

13   examples of people being rehired back on a per diem

14   basis who had retired?

15   A.    One of the long-term ultrasound techs was brought

16   back.

17   Q.    Who was that?

18   A.    Sheila Foote.

19   Q.    Anyone else?

20   A.    Not that I can name by name that, but I'm aware

21   that others have come back in the organization, in the

22   OR especially.  Wherever there was a critical shortage,

23   people are allowed to come back, nurse anesthetists,

24   ultrasound techs.  So it seemed incongruous they

25   wouldn't let Sharon come back.

1    Q.    Did you have any involvement in trying to get her

2    rehired?

3    A.    Yes.

4    Q.    And who did you -- how were you involved?

5    A.    I talked to Heather, and, in fact, I'm sure you're

6    aware there's an email that says there's a critical

7    shortage, it makes sense to bring her back, and I spoke

8    with Katie Mansfield multiple times.  I spoke with

9    Leslie.  I spoke with David.

10   Q.    And what did David -- what did Leslie say in

11   response?

12   A.    Sharon needs to be with her mother.

13   Q.    Was her mother ill at that point?

14   A.    Her mother had been diagnosed with lung cancer.

15   Q.    And was she responsible as a primary caregiver?

16   A.    No.

17   Q.    And what did David say in response?

18   A.    That it was not an option he was going to pursue.

19   Q.    Did he say why?

20   A.    No.

21   Q.    So Casey wasn't replaced, and then Sharon wasn't

22   replaced, and then Marlene gave her notice in April

23   2017?

24   A.    Correct.

25   Q.    So you were down three nurses at that point?

1    A.    Ostensibly, yes.

2              (Deposition Exhibit 9 marked.)

3    Q.    Showing you a document that's been marked Exhibit

4    9, and ask you if you can identify the sequence of

5    emails, and I'll start on the last page, which is an

6    email from Heather Gunnell to a number of people dated

7    November 3rd 2016, And it talks about covering the

8    nursing tasks and recruiting, and it says in the

9    middle, "In the meantime, Katy has also reached out to

10   the Central Staffing office to start the process for

11   finding a traveling nurse and is also working with HR

12   to aggressively recruit for our open position".

13         Do you know what the open position was for at that

14   point?

15   A.    I do not.  I suspect it was Sharon's retirement.

16   Q.    Okay.  And, if you go to the, the page before,

17   there's an email on November 3rd 2016 from David Seifer

18   regarding efforts to recruit nurses.  You'd mentioned

19   before that there were a couple of people, a couple of

20   nurses that you believe wanted to work in the REI

21   division?

22   A.    Yes.

23   Q.    Do you know whether they applied for the open

24   position?

25   A.    Their names were given to Katie Mansfield.

1    Q.    Okay.

2    A.    And she never called them.

3    Q.    And how do you know that?

4    A.    Um, I had a conversation with Elizabeth Todd who

5    forwarded the names.  They were well-knows to her.  She

6    gave them to Katie, and she asked Katie multiple times

7    if she had reached out to those nurses.  Then she

8    actually saw some of the individuals and asked those

9    individuals, and they said they'd never been contacted

10   by HR or by Katie?

11   Q.    Do you know what, if any -- and what was Katie's

12   position or is her position?

13   A.    Katie's the head nurse for OB/GYN.

14   Q.    Did you have a good working relationship with her?

15   A.    Initially.

16   Q.    Well, when was it no longer a good working

17   relationship?

18   A.    When I was encouraging her to move forward with

19   the multiple nursing complaints about David.

20   Q.    What timeframe was that?

21   A.    I don't recall.

22   Q.    And what was her response?

23   A.    Initially, her response was, "I've spoken with

24   Leslie, and nothing is moving forward".

25   Q.    Do you know when that was?

1    A.    No.

2    Q.    Do you know what efforts were undertaken

3    internally to recruit nurses to the REI division based

4    on this sequence of emails?

5    A.    Clarify your question.

6    Q.    Well, do you know what actual undertakings

7    commenced in and around this timeframe to hire either

8    one or two additional nurses in the REI division?

9    A.    Initially, there was a nurse recruiter that was

10   brought to our team meeting to, to talk to us about

11   recruiting someone.  In the short-term, she left the

12   institution, and, and the recruitment was dropped, at

13   least temporarily.

14   Q.    So, so the internal recruiter for D-H left D-H?

15   A.    Well, clarify what you mean by internal.

16   Q.    Somebody that was a D-H employee that was

17   recruiting as opposed to an external recruiter.

18   A.    There was a, there was a person brought in -- I'm

19   not certain where her pay stub was from, if it was for

20   D-H or if it was an outside source -- to recruit nurses

21   to the organization, and our, initially our position

22   was on the list of many nursing positions that needed

23   to be filled.

24   Q.    Overall, was there a nursing shortage in general

25   in this area of New Hampshire?

1    A.    Overall, there's a nursing shortage in general in

2    many places in the country.

3    Q.    Well, does that include New Hampshire?

4    A.    Yes.

5              (Deposition Exhibit 10 marked.)

6    Q.    Showing you a document that's marked Exhibit 10.

7    It is an email communication.  It's two email

8    communications.  One at the bottom is from you to

9    Heather Gunnell.  You mentioned this before about the

10   fact that there was an email that you were involved in.

11   Is this the email you were talking about regarding a

12   critical shortage of skilled and trained nursing?

13   A.    That's probably one of them, yes.

14   Q.    Okay.  So you've sent more than one, you believe?

15   A.    I, I don't recall.

16   Q.    You mentioned that it's at a time when our program

17   is in decline.  What did you mean by that?

18   A.    Um, that we had patients leaving more frequently

19   than they had in the past, that we had fewer providers

20   than we'd had in the past.

21   Q.    What's the basis for your belief that more

22   patients were leaving at that point?

23   A.    Conversations I had with the secretary,

24   conversation I had with the nurses.

25   Q.    Right.  Because you, you were actually out of work

1    from August to that particular date, November 4th,

2    right?

3    A.    As the interrogatories say for dates.

4    Q.    I'm right about that, though, right?

5    A.    I've answered that question.

6    Q.    Well, do you have a specific recollection of that

7    being your first day back?

8    A.    I do not.

9    Q.    Here you say in your email dated November 4th

10   2016, quote, "To this end, we need to investigate the

11   use of Sharon at least part time.  She, herself, has a

12   family illness with her mother's recent diagnosis of

13   lung cancer.  She will need to be more present and

14   available to her parents".

15         So you agreed with Leslie DeMars's position that,

16   obviously, she was going to have to deal with her

17   parents, correct, and assist in the care of her mother,

18   right?

19   A.    I don't believe in, I don't believe in Leslie's

20   assessment, no.

21   Q.    Well, you understood that, based on what you're

22   saying here, that Sharon would need to devote at least

23   some of her time to dealing with her mom's recent

24   diagnosis of lung cancer?

25   A.    I believe her, she was going to need to help her

```
1    mother --

2    Q.    Right.

3    A.    -- yes.

4    Q.    Right, yeah.  You pointed that out in this email,

5    right?

6    A.    Correct.

7    Q.    And that she'd need to be more present and

8    available to her parents, correct?

9    A.    Correct.  But I don't agree with Leslie's

10   summation.

11   Q.    And what was Leslie's summation in your, in your

12   mind?

13   A.    I believe Sharon, as an individual, can make the

14   decision on her own about how much she wanted to work

15   and teach and how much she wanted to be available for

16   her parents.

17   Q.    Well, you had told me that Sharon retired in

18   December 2016, correct?

19   A.    I believe so.

20   Q.    It was December 2nd.  We can go back to your

21   calendar to reflect the retirement date, but it was in

22   December of 2016 and that she'd been strung along for a

23   couple months thinking that she might be able to come

24   back and that Heather and Katie Mansfield told her that

25   she could come back, correct?
```

1    A.    At least six months she was strung along.

2    Q.    Right.  Yet the email from Heather Gunnell to,

3    right above that says to David Seifer and Leslie

4    DeMars, "There may be a loophole in the retirement

5    restrictions.  The RIF process made it clear that

6    retired employees returning per diem was no longer an

7    option", and you believe, despite her saying this on

8    November 7th, that she was saying something different

9    to Sharon?

10   A.    No.  I believe she said that to Sharon.  The two

11   are not mutually exclusive.  I'm aware of other

12   employees who'd come back in that timeframe.

13   Q.    Okay.  And you mentioned one of them, correct?

14   A.    Yes.  Or had come back under similar

15   circumstances.  And, in fact, I pointed that out to

16   Heather and Leslie, that D-H had allowed it previously

17   where there was a critical shortage.

18   Q.    Do you know how long before that that that had

19   happened?

20   A.    I don't recall.

21   Q.    Who's Judy McBean?

22   A.    She's a reproductive endocrine who practices in

23   Brattleboro.

24   Q.    With you consider her a friend?

25   A.    Define friend.

```
1    Q.   You tell me.

2    A.   I'm asking you.

3    Q.   Well, something more than a personal acquaintance.

4    A.   Yes.

5    Q.   You stay in touch with her?

6    A.   Intermittently, yes.

7    Q.   Okay.  How do you define friend?

8    A.   There are different levels of friendship.

9    Q.   What level was she?

10   A.   She's a friend that I talk to once a month,

11   perhaps more frequently sometimes.  Sometimes I didn't

12   talk to her at all.  Sometimes I see her for dinner

13   every six months or so.

14   Q.   When is the last time you spoke to her?

15   A.   Last month.

16   Q.   When is the last time you spoke to her about, if

17   at all, about your case, anything relating to it?

18   A.   People have had their own experience of this, Mr.

19   Schroeder, and she knows the case is ongoing.

20   Q.   My question is, When is the last time you spoke to

21   her, if at all, about your case?

22   A.   I don't recall.

23   Q.   Well, when you did, did you speak to her about

24   your case?

25   A.   I told her we were filing, yes.
```

119

1    Q.    Have you spoken to her specifically other than you

2    told her you were filing?  Have you had any specific

3    conversations about your case?

4    A.    Not the details of it.

5    Q.    What, if any, knowledge would Judy McBean have

6    about the IVF program and the REI division and its

7    functioning in your mind?

8    A.    She worked there.  She'll have her own opinion

9    from the time she worked there.

10   Q.    And when was she working in the REI division?

11   A.    Over the course of several years.

12   Q.    Did that include 2016 and 2017?

13   A.    I believe so.

14            (Deposition Exhibit 11 marked.)

15   Q.    Okay.  Showing you a document that's been marked

16   Exhibit 11, it's a series of email communications,

17   DH4538 through DH4539, and the bottom one is April 27th

18   2017.  It, it's sent from Heather Gunnell, but it's

19   sent on behalf of Dr. DeMars, and it states, quote, "As

20   you all know, we have a critical staffing issue in REI.

21   Our obligation is to provide safe, high-quality care to

22   our patients".  It goes on to say that a series of

23   things.

24        What did you -- what was your understanding that

25   this email from Dr. DeMars meant in terms of the

1    sustainability of the REI division at that point in

2    time?

3                    (Brief pause.)

4    A.    Can you rephrase your question?

5    Q.    Sure.  Based upon this email from Dr. DeMars, what

6    did you understand?  Did you understand that there was

7    a critical shortage of nurses at that point in the REI

8    division?

9    A.    I understand, I understood there was a critical

10    shortage of nurses, yes.  I also understood there were

11    solutions to that shortage.

12    Q.    As a result of the shortage, did you understand

13    that this would have an impact upon the services that

14    would be provided on a more limited basis in that

15    timeframe?

16    A.    Yes.

17    Q.    One of those things would be deferring new

18    infertility evaluations, right?

19    A.    Correct.

20    Q.    And then there would be, the remaining patients in

21    May and July would be under review during that

22    timeframe, correct?

23    A.    Correct.

24    Q.    What does it mean when it says -- what does this

25    phrase mean:  Quote, "We will complete evaluations of

1    patients who are in the process of their infertility
2    evals, follow-up visit testing, et cetera, but they
3    will not be given a timeframe or a date for an ART
4    cycle including IUI".  What does that mean?
5    A.   We will be -- we will complete evaluations for
6    patients who are in the process of their infertility
7    evaluation.  So tests that were ordered, we'll go
8    through with.  We will complete their follow-up visits,
9    the testing, etc., but not to give them a date or
10    timeframe for their ART, assisted reproductive
11    technology, cycle including intrauterine insemination.
12    Q.   So in layman's terms that would be going forward
13    with either an embryo transfer or other IVF example of
14    assisting in people having kids at that point, right?
15    You're doing the testing and the evaluation, but you
16    weren't going to go forward with the actual procedure?
17    A.   Well, there were already cycling patients, so we
18    were in treatment already, and then we had patients who
19    were coming in for testing.  Any new patients who
20    hadn't already been cycling, she asked us to defer
21    giving them calendars, but there are already people
22    cycling.
23    Q.   Right, but these people, the completing
24    evaluations who are in the process, we're not
25    necessarily going to put them through the cycle?

1    A.    Correct.

2    Q.    Okay.

3    A.    But there were already patients who had calendars.

4    That's what this email doesn't address.

5    Q.    Explain to me what you mean by that.

6    A.    You're given a calendar for your treatment of when

7    you expected your period to start, when do you expect

8    to start medications, when your ultrasounds are, when

9    your blood work should be done, when your anticipated

10    embryo transfer date would be, or what week your

11    retrieval might be.  And so there was a group of

12    patients who were actively cycling, there's a group of

13    patients who already had their calendars and their

14    promised dates for treatment, and then there were

15    people who were coming in in earlier part of the

16    process.

17    Q.    And you're saying that didn't address the people

18    with the calendars already set up?

19    A.    Correct.

20    Q.    What happened to the individuals who had their

21    calendars set up at that point but -- like, what

22    happened as a result of this memo?

23    A.    I don't know.

24    Q.    Do you know how many people that had their

25    calendars already set?

1    A.    Not off the top of my head, no.

2    Q.    Did you have any specific patients of your own who

3    had their calendars already set that it didn't go

4    forward?

5    A.    Yes.

6    Q.    In this timeframe, correct?

7    A.    Yes.

8    Q.    When Marlene -- and this is actually right after

9    Marlene has given her notice in the Manchester office,

10   correct?

11   A.    I don't remember the date specifically.  I think

12   so.

13   Q.    And you'd sent an email communication to Beth Todd

14   on April 18th 2017 stating that, "Navid just texted me

15   that Marlene has given two weeks' notice".

16   A.    What was the date on that again?

17   Q.    April 18th 2017.

18   A.    All right.

19   Q.    So this is, you know, about nine days later.

20   A.    Yes.

21   Q.    So Marlene is out.  At that point, were you no

22   longer stop -- had there been a decision to stop

23   providing services out of Manchester, since there was

24   no nursing support there?

25   A.    Um, what services are you referring to?

1    Q.    Well, REI-related, IVF-related services.

2    A.    I understood there wasn't going to be specific

3    nursing-related duties, but I'm not clear whether or

4    not the clinics were canceled, since we were still

5    allowed to do evaluations and workup.

6    Q.    Okay.  But, without a nurse assigned to

7    Manchester/Bedford, would you be able to even do the

8    clinics?

9    A.    Yeah, oh, yeah.  It's a flow nurse.

10    Q.    What's that?

11    A.    It's a nurse that just puts patients in a room,

12    and it's a flow nurse.

13    Q.    Now, what did you understand -- shifting gears to

14    another topic.  What did you understand the reasons to

15    be for the closure of the REI division as they were

16    communicated to you?

17    A.    I didn't understand that we were closing.

18    Q.    Well, what was, what was communicated to you on

19    May 4th 2017?

20    A.    On May 4th, that the REI division would be closing

21    and the lab would be staying open, but that was the

22    first time I'd heard that.

23    Q.    And how, how did you receive notice of that?

24    A.    I walked into a meeting with Dr. Merrens, someone

25    from HR, Leslie, David, Albert, and Elizabeth Todd.

1    Q.   And was that who made the announcement to all of

2    you?

3    A.   Leslie read a statement.

4    Q.   And how long was that meeting?

5    A.   Short.

6    Q.   Was there any Q-and-A?

7    A.   No.  Maybe, it may have been that David asked a

8    question about the residency.

9    Q.   It was a short meeting, and that is the first

10   time, that was that the first time, as far as you know,

11   that any of you, you, David, Albert, and Elizabeth

12   Todd, were informed that the REI division was being

13   closed?

14   A.   Leslie had told me that the division was going to

15   be paused, not that it was going to be closing up.

16   Q.   When did she tell you that?

17   A.   Starting in the winter, late winter, early spring

18   of that year.

19   Q.   And where did that conversation happen?

20   A.   I had multiple meetings with her.

21   Q.   Well, what was the basis of those meetings?

22   A.   Discussing the REI service, discussing the

23   providers, discussing my concerns.  There was many

24   things.  She told me that the division was going to be

25   paused, not that it was going to be closed, and, in

126

1    fact, the day before she told me that the division

2    would be opening back up.

3    Q.    Day before May 4th?

4    A.    Yes.

5    Q.    What did she say in that regard?

6    A.    She said, "We will be opening back up".

7    Q.    Did she have a timetable?

8    A.    No.

9    Q.    What did you say during that conversation?

10   A.    "What if they don't let you open back up?"

11   Q.    What did she say?

12   A.    "I've drawn a very definitive line in the sand

13   that, if they don't let us open back up, I'm quitting".

14   In conversations I had with her before that, she had

15   told me the division was going to pause.

16   Q.    And do you know whether she shared that

17   information with anyone else, the issue of the division

18   being paused, with any other members of the REI

19   division?

20   A.    No, I don't know.

21            ATTORNEY VITT:  Take a quick break?  Be right

22   back.

23            ATTORNEY SCHROEDER:  Yeah.

24       (A recess was taken from 2:39 p.m. to 2:42 p.m.)

25

1    BY ATTORNEY SCHROEDER:

2    Q.    So, with respect to your conversations with

3    Dr. DeMars, did you, after the announcement that the

4    REI division was going to be closed, did you have any

5    follow-up conversations with Dr. DeMars in and around

6    that timeframe regarding the REI division being closed?

7    A.    Yes.

8    Q.    And what was the nature of those conversations?

9    A.    She told me that she was going to meet with Ed

10   Merrens and that there was a move to keep me.

11   Q.    When you say a move to keep you, what do you

12   understand that to be?  Was it her move, or was it

13   somebody else, or was it a combination of people?

14   A.    It was a combination of people.

15   Q.    And who would that be?

16   A.    There were multiple people.

17   Q.    Well, let me know who they are.

18   A.    Chris Dravine, Emily Baker, Katrina Henson,

19   Deborah Bierenbaum, Michelle Russell, Rebecca Breshear.

20   Q.    Did group include Leslie DeMars as well?

21   A.    At that time, I thought it did.

22   Q.    At what point did it, did your belief change that

23   it perhaps did not include Leslie DeMars?

24   A.    When I saw the emails that initially you declined

25   to release.

1    Q.    What are you talking about?  Emails produced in
2    this case?
3    A.    Yes.
4    Q.    Oh, so, as a result of reviewing those emails, it
5    changed your opinion as to whether or not Leslie was
6    supporting you being retained?
7    A.    Yes.
8    Q.    How many conversations did you have with Leslie in
9    that timeframe, May, June, July, August, regarding the
10   REI division closure and whether or not you would be
11   retained?
12   A.    One, To my knowledge.
13   Q.    The one that you just referred to?
14   A.    Yes.
15   Q.    Did you have any email communications or text
16   messages with Leslie DeMars in that timeframe regarding
17   this same subject?
18   A.    I texted her to see if she would meet, and she
19   left a phone message on my phone saying that she would.
20   Q.    Saying that she would or would not?
21   A.    Would.
22   Q.    Okay.  Did that happen?
23   A.    No.
24   Q.    When was the last time you spoke to Leslie DeMars
25   either in person, over the phone, or by text?

1    A.    In that meeting that I referred to earlier.

2    Q.    You just said you didn't have that meeting.

3    A.    It's, I spoke with her on the sidewalk.  No, not

4    that meeting.  The, the one that I talked to before.

5    Q.    Oh, where the discussion you had with her about an

6    effort to retain --

7    A.    Yes.

8    Q.    -- you?  Okay.  And that discussion with her

9    happened do you know when?

10   A.    Yeah, between May 4th and my last day.

11   Q.    And do you know what whether or not she met with

12   Ed Merrens and what transpired during that meeting?

13   A.    I know I submitted a letter requesting that D-H

14   retain me and that that was declined, and I was told by

15   Amy Giglio that there was going to be a meeting.

16   Q.    Amy Giglio said there would be a meeting?

17   A.    Yes.

18   Q.    When did she say that?

19   A.    When, right after I submitted the letter

20   requesting that they retain me.

21   Q.    Did you, did you met -- you met with her, correct?

22   A.    I met with her, yes.

23   Q.    And what did you discuss during that meeting in

24   late May?

25   A.    A variety of things including, but not, not

1    exhaustive list, benefits, when I could expect a

2    response from D-H.  That was mostly what it was.

3    Q.    Did you, during that meeting with Amy Giglio, ask

4    for more severance?

5    A.    I told her that what was offered was not adequate.

6    Q.    And what was offered?

7    A.    I don't remember exactly, but it was a nominal

8    amount for my years of service.

9    Q.    It was six months, right?

10   A.    Not initially, I don't believe.

11   Q.    Do you recall whether or not D-H increased that

12   offer?

13   A.    Which offer are you referring to?

14   Q.    The severance offer.

15   A.    There was a nominal amount that was offered

16   initially, and it was barely altered in the subsequent

17   documents that were mailed to me.

18              (Deposition Exhibit 12 marked.)

19   Q.    So I'm showing you a document that's been marked

20   Porter Exhibit 12.  Is that the letter that you sent to

21   HR in late May 2017?

22   A.    Yes.

23   Q.    Okay.  I want to just walk you through the letter

24   and start on the first page.  So you had, it looks

25   like, four points that you wanted the hospital to

1    reconsider, correct, on that first page?

2    A.    Yeah.

3    Q.    Is that right?

4    A.    I'm going to take a minute to read it --

5    Q.    Yeah, please do.

6    A.    -- if you're asking a specific number of points.

7                     (Brief pause.)

8    Q.    Have you a chance to review the letter?

9    A.    I had a chance to review it, yes.

10   Q.    Okay.  I want to go back first to the conversation

11   on May 4th where you said Leslie DeMars read a

12   statement.  Do you recall what she said about the

13   closure of the REI division during that meeting?

14   A.    Not specifically, no.

15   Q.    Did Dr. Merrens say anything?

16   A.    Not while she was reading the statement, no.

17   Q.    Well, did he say anything during the meeting?

18   A.    While she was present?

19   Q.    Yes.

20   A.    I don't recall.

21   Q.    Did you receive information during that meeting as

22   to the reasons why the REI division was being closed?

23   A.    Not fully, no.

24   Q.    Well, what did you receive, even if it wasn't

25   fully?

1    A.    An announcement that we were going to be closing.

2    Q.    Was there any discussion during that meeting about

3    the reasons why it was being, the REI division, was

4    being closed?

5    A.    Not a thorough discussion, no.

6    Q.    I understand it was not a thorough discussion.

7    Was there any discussion about the reasons why the

8    division was being closed?

9    A.    Not a discussion of all the reasons, no.

10    Q.    I understand not all the reasons.  I want to know

11    what reasons, if any, were discussed.  You said not all

12    the reasons, so there must have been some reasons that

13    were discussed.

14    A.    Well, there were reasons given that I didn't agree

15    with.

16    Q.    This isn't a question related to whether or not

17    you agree with something.  It's whether or not it was

18    stated to you, so whether or not you were given reasons

19    during that meeting.

20    A.    There was a statement read by Dr. DeMars about the

21    closure.

22    Q.    Right.  And what were the reasons that you

23    understood, even if you didn't agree with them?

24    A.    I don't recall the detail.

25    Q.    You don't have a recollection?

1    A.    Not right now.

2    Q.    Can you go to Exhibit, please leave that out, and

3    then pull out Exhibit 4, which is the Amended

4    Complaint?

5    A.    Which one, the letter?

6    Q.    Yeah, leave the letter there, but then Exhibit 4,

7    which is the Amended Complaint.  There it is.  There it

8    is.

9    A.    Okay.

10   Q.    So just go to Page 27.  Okay.  At the bottom

11   there, Paragraph 84 says, "On May 4, 2017

12   Dartmouth-Hitchcock issued a public announcement that

13   it would close the REI division as of May 31 2017",

14   right?

15         And then Paragraph 85 says, "Dartmouth-Hitchcock's

16   administrators have given a series of explanations why

17   they decided to close the REI division and fire all of

18   the physicians who work there, including that the right

19   staff could not be provided by Dartmouth-Hitchcock for

20   a service that required 24/7 coverage, that declining

21   birth rates were somehow responsible for the decision

22   to close the division, and that there were personality

23   problems and the doctors could not get along".  Did I

24   read that accurately?

25   A.    Yes.

1   Q.    Does that refresh your recollection of the reasons
2   that were given by D-H regarding the closure of the REI
3   division?
4   A.    This is the public announcement and discussion
5   that had and explanations that came.  You asked me in
6   the meeting do I remember the exact reasons, and my
7   answer is no.
8   Q.    All right.  Does this refresh your recollection as
9   to whether any of these reasons were identified during
10  that meeting on May 4th 2017?
11  A.    Staffing issue.
12  Q.    And was that related to the nursing shortage?
13  A.    It's the alleged nursing shortage, Mr. Schroeder.
14  Q.    What, what's the basis for you to say "alleged
15  nursing shortage" in light of the fact that you just
16  testified less than an hour ago that there was a
17  nursing shortage in April of 2017?
18  A.    I testified that D-H did not post the positions
19  properly.  They did not call nurses who were interested
20  in the position.  I testified that there were nurses
21  within the division who had more interest in working
22  more.  I testified that Sharon Parent was interested in
23  coming back.
24  Q.    You also testified that there was a critical
25  shortage of nurses at that point in April of 2017.

135

1    A.    It was pretext.  It was pretext.

2    Q.    I asked you whether Leslie DeMars's statement that

3    there was a critical nursing shortage, staffing

4    shortage at that point in April, end of April 2017,

5    whether you agreed with that, and you said yes.

6    A.    There was.

7    Q.    Right, okay.

8    A.    But there were, and there were multiple reasons

9    why that critical shortage came about.

10    Q.    I understand that.  Regardless of the reasons why,

11    the fact of the matter was there was a shortage at that

12    given point, right?

13    A.    Rephrase your question, please, Mr. Schroeder.

14        (Question read by the reporter:

15            Q.    I understand that.  Regardless of the

16        reasons why, the fact of the matter was there was

17        a shortage at that given point, right?")

18            THE WITNESS:  There was a shortage, and it

19    was a manufactured shortage.

20    BY ATTORNEY SCHROEDER:

21    Q.    And what was the basis for you to say that?  You

22    used the word "pretext".  What were you referring to?

23    A.    It was a manufactured shortage.  It was the stated

24    reason, but there were a lot more reasons.

25    Q.    What are the other reasons that you believe?

136

1    A.    I believe that it was not Leslie's intent to close

2    the division permanently, as she told me the day

3    before.

4    Q.    Do you know whether or not it was up to her?

5    A.    I believe she had a voice.

6    Q.    Okay.  And that was -- so you don't believe that

7    it was Leslie's intent to close the division.  Any

8    other reasons that you think are pretextual related to

9    the closure of the REI division?

10   A.    There's an email where she states we would have

11   had to fire Albert and David for cause.

12   Q.    What do you mean by that?

13   A.    That D-H would have had to fire Albert and David

14   for cause.

15   Q.    If they didn't close the division?

16   A.    Yes.

17   Q.    So do you think one of the reasons why the

18   division was closed was to avoid firing them for cause

19   and, instead, firing them because they closed the

20   division?

21   A.    Yes.

22   Q.    Any other reasons?

23   A.    Yes.  That there were financial constraints, and

24   Leslie had a budget that she needed to meet, and she

25   had to combine services from Alice Peck Day.

1    Q.    What's that?

2    A.    It's a community hospital.

3    Q.    So you believe one of the other, that the real,

4    one of the real reasons for closing was because of the

5    budgetary constraints and financial issues that Leslie

6    had to deal with?

7    A.    No, I don't believe that's the real reason.

8    Q.    Well, you just stated --

9    A.    You asked me what the possibilities are or what

10    the other beliefs.

11    Q.    I'm asking you what you believe the real reasons

12    were.

13    A.    That they needed, that Albert and David were going

14    to be fired, and it was easier to close the division

15    than it was to fire them by, for cause.

16    Q.    Any other reasons you think that motivated the

17    decision to close?

18    A.    I will stick with that one for now, and I will

19    amend my conversation later.

20    Q.    Well, here's what I will tell you.

21    A.    I'll leave it open.

22    Q.    You can't leave it open.  If you, if you forget

23    something and you want to clarify it later, that's

24    fine, but you can't, after the fact, supplement the

25    record on your own without answering the question as

1    clearly and concisely as you can right now.

2    A.    I'm answering honestly, Mr. Schroeder.

3    Q.    I understand.  That's what I want you to do.

4    You're under oath --

5    A.    Yes.

6    Q.    -- okay?  So what I want to know are what are the

7    other -- one of the primary bases for your case, your

8    case is that the closure of the REI division, you

9    believe, shouldn't have happened --

10   A.    Correct.

11   Q.    -- right?  And so I'm asking you what you believe,

12   what you personally believe are the real reasons behind

13   that, and you've given me one.  It was in order to

14   avoid having to fire Albert and David, Albert Hsu and

15   David Seifer for cause, and this was an easier way to

16   do it than firing them for cause.  I understand that.

17        What I'm asking you is what other reasons you

18   believe motivated the decision to close the REI

19   division.

20   A.    That's, I think there were, that was the, the

21   major reason that I have evidence for today.

22   Q.    And are you aware of any documents, email

23   communications, text messages, conversations which

24   support your belief that this was, the division was

25   being closed in order to avoid having to fire Albert

139

1    and David for cause?

2    A.    Yeah, there's the email from Leslie.

3    Q.    What email is that?

4    A.    One of the ones you declined to release that I've

5    seen recently.

6    Q.    Yeah, let's try to avoid characterizing what's

7    been produced and not produced in the case.  You've

8    seen an email communication?

9    A.    Yes.

10    Q.    Okay.  And it's from Leslie DeMars to whom?

11    A.    I don't remember.

12    Q.    And does that email communication relate to

13    actually firing you as well?

14    A.    I don't recall if it has more about firing me or

15    not.  It may.

16    Q.    In fact, it actually has to do with firing all

17    three of you, right?

18    A.    I remember the exact statement, or I remember the

19    statement -- I won't say exact -- that we would have

20    had to fire David and Albert for cause.

21    Q.    All right.  Let's go back to this letter real

22    quickly.  On the first page you identify the first

23    reason to reconsider is the fact that you spend a high

24    percentage of your time performing other important

25    services not related to the IVF program or to the REI

1    division, correct?

2    A.    Correct.

3    Q.    So, by stating that, are you basically

4    acknowledging the fact that you weren't really doing

5    much in the REI division at that point?

6    A.    No, that's not what I'm stating.

7    Q.    Well, it's saying you spend a high percentage of

8    your time performing other services.  Well, at that

9    point, a high percentage of your time, you're only

10   working 15 to 20 hours a week, and, if a high

11   percentage of your time is nonREI-related, aren't you

12   minimizing the REI division by saying that?

13   A.    Can you rephrase your question, please?

14        (Question read by the reporter:

15            "Q.  Well, it's saying you spend a high

16        percentage of your time performing other services.

17        Well, at that point, a high percentage of your

18        time, you're only working 15 to 20 hours a week,

19        and, if a high percentage of your time is

20        nonREI-related, aren't you minimizing the REI

21        division by saying that?")

22            THE WITNESS:  No.

23   BY ATTORNEY SCHROEDER:

24   Q.    You don't believe you are?

25   A.    No.

1    Q.    Now, the second reason is you tried to draw a
2    distinction between yourself and Albert Hsu and David
3    Seifer, correct?
4    A.    Correct.
5    Q.    You make mention throughout the letter that there,
6    that you were not, there was no basis to terminate you
7    for cause, correct?
8    A.    Correct.
9    Q.    No one at any point actually did terminate you for
10    cause, correct?
11    A.    Correct.
12    Q.    And, in fact, during the May 4th 2017 meeting and
13    even thereafter, you were never informed that you were
14    being terminated for cause?
15    A.    Correct.
16    Q.    The third reason is you believe it interrupts,
17    terminating your employment, interrupts your progress
18    with respect to your recovery, correct?
19    A.    Correct.
20    Q.    Now, at that point, how many more proctored
21    surgeries did you need to meet in order to regain the
22    right to go into the OR independently?
23    A.    It wasn't -- initially, Dr. DeMars gave me three
24    majors, and at the end it wasn't an absolute number
25    that was set.  It was -- I had at least one or two

1    more, I believe.

2    Q.    Okay.  The fourth point you raise is, "The

3    termination does not recognize rights to which I'm

4    entitled as a long-time senior employee".  What did you

5    mean by that?

6    A.    I was a voting member of Hitchcock.

7    Q.    What is that?  What does that mean?

8    A.    When I was first hired in 1996 into Hitchcock

9    Clinic, all new providers have to go through a five- to

10   six-year vetting process by which anyone in the

11   institution and your department can submit comments,

12   and then you'd go before the voting membership and the

13   board, and I was approved as a senior member after that

14   timeframe.

15   Q.    What rights, if any, do you believe that entitled

16   you to at this point in time?

17   A.    It wasn't clear to me, but what was clear is that

18   I wanted the communication that I had gone through that

19   process and I was a senior member.

20   Q.    Are you aware of any document that entitles you to

21   any specific rights as a senior member?

22   A.    Not at this time.

23   Q.    You mentioned further in your letter that, "Within

24   the last six months, Dr. DeMars and I have discussed a

25   role for me within the D-H organization that would

1     focus on a quality improvement for GYN ultrasound for

2     the entire D-H health network".  What you were talking

3     about there?

4     A.    She offered me and made me the vice -- I can't

5     remember the exact title at this point, but it was,

6     appointed me the head, within OB/GYN, the head of GYN

7     ultrasound for the D-H healthcare network.

8     Q.    I'm sorry.  The head of?

9     A.    GYN ultrasound.

10    Q.    What did that entail?

11    A.    We had initial conversations, but the

12    conversations included improving quality of care

13    delivered in Manchester and Nashua with the general

14    OB/GYNs reading ultrasound, helping to improve the

15    quality of the actual ultrasounds being performed,

16    doing some education for providers and for ultrasound

17    techs, and we had talked about starting an early

18    pregnancy monitoring unit and ovarian tumor analysis

19    group for both research and improving quality of care.

20    Q.    How many conversations did you have with

21    Dr. DeMars about this potential role?

22    A.    Many.

23    Q.    Did you actually put together a job description,

24    or was there any kind of formality other than the

25    conversations you had with Dr. DeMars?

1    A.    No.  She announced it at a meeting.

2    Q.    What did she announce at the meeting?

3    A.    That Rebecca Breshear was going to be head of OB

4    ultrasound and I was going to be head of GYN

5    ultrasound.

6    Q.    Rebecca?

7    A.    Breshear.

8    Q.    Was she in the REI division?

9    A.    No.

10    Q.    Was she OB/GYN?

11    A.    She's a high-risk obstetrician.

12    Q.    When was this?

13    A.    Since she became chair.

14    Q.    Well, she'd become chair, like, two years earlier,

15    right?

16    A.    Sometime in that timeframe.

17    Q.    Okay.  So not in -- sometime prior to the middle

18    of 2016?

19    A.    Sometime prior to Dr. Seifer beginning his

20    clinical work, I believe.

21    Q.    He came on board and started clinical work July of

22    2016.  So sometime before that?

23    A.    Yeah, to my recollection.

24    Q.    Now, you said that, in your letter, that you'd

25    been given, quote, "Conflicting information with

1    regards to the ability of Dr. DeMars to transfer me

2    from my current position to another division within the

3    Department of Obstetrics and Gynecology and the risk to

4    my current status on long-term disability".

5                   ATTORNEY VITT:  What page are you on?  I'm

6    sorry.

7                   ATTORNEY SCHROEDER:  It's not marked.

8                   ATTORNEY VITT:  At the bottom?

9                   ATTORNEY KRAMER:  What's the Bates number?

10                   ATTORNEY SCHROEDER:  Oh, apologies.  My copy

11   doesn't have Bates numbers.

12                   ATTORNEY VITT:  Oh, all right.  Hold on.

13                   ATTORNEY SCHROEDER:  It's, you know what?

14   I'll tell you.  It's the second-to-last page, so at the

15   back end.

16                   ATTORNEY VITT:  All right.

17   BY ATTORNEY SCHROEDER:

18   Q.   What's the conflicting information that you were

19   given?

20   A.   So can you please go back to the -- which

21   paragraph are you referring to?

22   Q.   Sure.  It's the second-to-last page.  Sorry.

23   Okay?  "I want to dispel" --

24   A.   Yes, okay.

25   Q.   -- so the second sentence there.  What's the

```
1    conflicting information that you believe you'd been
2    given?
3    A.    She told me.
4    Q.    Who told you?
5    A.    Leslie DeMars told me that she could not keep me
6    because it potentially compromised my disability, or it
7    would compromise my disability.
8    Q.    At that point, you were on long-term disability
9    benefits?
10   A.    Yes.
11   Q.    And she believed that -- well, she said she'd been
12   told that it would compromise your entitlement to
13   long-term disability benefits?
14   A.    Yes.
15   Q.    Did you ever inquire as to whether or not a
16   different position would impact your ability to retain
17   your long-term disability benefits?
18   A.    Yes.
19   Q.    Who did you reach out to for that?
20   A.    I hired an attorney from Boston.
21   Q.    What's the name of that attorney?
22   A.    Karen.  I'm blanking on her last name.
23   Q.    To the best of your recollection, you can't -- I
24   can get it later from you.  I mean --
25              ATTORNEY VITT:  Yeah, we have it.  It's on
```

1      the tip of my tongue, and I'm sure we can provide it.

2                     ATTORNEY SCHROEDER:   That's okay.

3      BY ATTORNEY SCHROEDER:

4      Q.    It seems that there was a condition attached to

5      this based upon your communications with counsel.   I

6      don't want to get into what you discussed with counsel,

7      but you state here, as long as the position and

8      clinical duties are approved in advance by the Hartford

9      and Unum, you believe that you could continue on

10     disability as long as the disability continues to be

11     documented and approved by physicians, right?

12     A.    That was what I was advised by my counsel.

13     Q.    So there were a couple of conditions that you'd

14     have to meet in order for you to potentially be

15     transferred to another position?

16     A.    That's what I understood.

17     Q.    Okay.   Do you have any -- and the decisions

18     regarding your LTD benefits, those decisions are made

19     by the Hartford and Unum, correct?

20     A.    Whether or not I'm able to continue the benefits

21     is made by the Hartford and Unum in counsel of my

22     providers.

23     Q.    Right.   But it wouldn't be made by

24     Dartmouth-Hitchcock?   Like, they don't have any ability

25     to weigh in on whether or not you get long-term

1   disability benefits?

2   A.   That's not what I was counseled by Dr. DeMars.

3   Q.   What do you mean, that you weren't counseled by

4   Dr. DeMars?

5   A.   She told me that -- I asked her.  In the

6   conversation I said, "Yeah, why didn't you keep me?

7   You could have", and she said, "No, because it risked

8   your long-term disability".

9   Q.   Do you know whether or not she had any knowledge

10  of your LTD benefit policy?

11  A.   She implied that she did.

12  Q.   At that point, you determined that -- well, at

13  that point, you were still on long-term disability,

14  correct?  You were still receiving your full --

15  A.   Correct

16  Q.   -- benefit?  Okay.  The decision as to whether or

17  not you receive long-term disability, though, that is

18  made by the Hartford and Unum, correct?

19  A.   Yes, in consultation with my providers.

20  Q.   Right.  Because your providers would have to give

21  information about the nature of your condition to the

22  Hartford and Unum --

23  A.   Correct.

24  Q.   -- right?  And, at that point in May of 2017, you

25  were scheduled to go back to the Mayo Clinic at the end

1    of May, correct?

2    A.    Yes.

3    Q.    And then was that for additional treatment?

4    A.    Yes.

5    Q.    And was that because you were still experiencing

6    symptoms?

7    A.    Yes.

8    Q.    Okay.  And, with respect to going to the Mayo

9    Clinic, you went in May, late May to early June, and

10   you were out there for, was it, a couple weeks?

11   A.    I believe just a week, ten days or so at that

12   point.

13   Q.    And then do you recall having to go back out there

14   again?

15   A.    Yes.

16   Q.    And was that -- in one of your interrogatory

17   responses, you said that you were out there for

18   treatment at Mayo May 29th to June 13th 2017.  Does

19   that --

20   A.    Correct.

21   Q.    -- seem correct?  And then you were back out there

22   for another two weeks June 28th to July 11th, correct?

23   A.    I believe so.

24   Q.    And then you were out there again a third time

25   September 26, or you were out of work, you were

1   incapacitated and not working at all from September

2   26th to November 13th 2017?

3   A.   Correct.

4   Q.   And was the basis of those treatments -- did you

5   have another surgery in that timeframe in one of

6   those --

7   A.   Yes.

8   Q.   -- instances?  Was that in the, the last time

9   period, September to November?

10  A.   Yes.

11  Q.   And was that an additional surgery on top of the

12  original surgery that you had?

13  A.   It was an additional surgery.

14  Q.   And what was the purpose of that surgery?

15  A.   To repair a leak.

16  Q.   So, the leak, was it a new leak, or was it the

17  original leak that just hadn't been fully fixed?

18  A.   Can't know.  They don't know.

19  Q.   So they have no -- you don't know one way or the

20  other?

21  A.   Correct.

22  Q.   And were the treatments at the end of May for two

23  weeks and then at the end of June for two weeks, were

24  those blood patches?

25  A.   Yes.

1    Q.    Okay, all right.  And, during that timeframe, you

2    were, you were on full disability because you weren't

3    able to work at all?

4    A.    What timeframe are you referring to?

5    Q.    September to November.

6    A.    Yes.

7              THE WITNESS:  Can we take a break?

8              ATTORNEY SCHROEDER:  Yeah, that's fine.

9         (A recess was taken from 3:25 p.m. to 3:28 p.m.)

10    BY ATTORNEY SCHROEDER:

11    Q.    After you had, you sent this letter, you had a

12    meeting with Amy Giglio, right?

13    A.    I believe that was the sequence.

14    Q.    And you testified to the fact that you went over

15    -- did you go over this letter in detail at that point?

16    A.    No.

17    Q.    Now, in this entire letter, you do not, at any

18    point, mention that you were being treated differently

19    on the basis of your disability, correct?

20    A.    Yes.

21    Q.    And you never use the words "discrimination" or

22    "retaliation", correct?

23    A.    Correct.

24    Q.    And, in the meeting with Amy Giglio on May 26th,

25    you never informed Ms. Giglio that you either believed

1    you were being treated differently on the basis of your

2    disability or that you were subjected to discrimination

3    or retaliation, correct?

4    A.    I don't remember the full context of that

5    conversation.

6    Q.    Well, do you remember any mention of the words

7    "discrimination" or "retaliation" or any words like

8    that?

9    A.    I don't remember the detail of that conversation.

10                   (Deposition Exhibit 13 marked.)

11    Q.    Final exhibit for today.  Now, do you -- this is a

12    document marked Porter Exhibit 13.  Do you recall

13    receiving this document at some point?

14    A.    Yes.

15    Q.    And this was the revised separation package?

16    A.    I believe so.

17    Q.    And it would give you 36 weeks of your base pay,

18    correct, roughly 9 months of your base salary?

19    A.    Subject to applicable taxes, withholdings, and the

20    context of the letter, yes.

21    Q.    Well, I mean, it's wages, so it would, you'd be

22    subject to typical state and federal income taxes,

23    correct?

24    A.    And the separation agreement, release agreement.

25    Q.    Correct.

1    A.    Right.

2    Q.    Right.  But the, do you recall that, in this

3    context, that your initial severance pay allocation was

4    six months and then it was increased to nine months?

5    A.    I, I remember that it was initially shorter.  Then

6    it increased.

7    Q.    And then it was increased?

8    A.    Yes.

9    Q.    And is this your recollection, that it was about

10    nine months, or was nine months --

11    A.    Yes.

12    Q.    -- 36 weeks?

13    A.    Yes.

14    Q.    Did you receive this during that meeting on May

15    26th, or was there any mention of it, that it would be

16    coming?

17    A.    No.

18    Q.    Now, in conjunction with your receipt of severance

19    for nine months, did you also understand that you would

20    be able to continue your health insurance because you

21    were still on long-term disability?

22    A.    Actually, Amy initially told me that I would not.

23    Q.    You would not what?

24    A.    She told me that I would come off -- one of the

25    things that was the most emotional for me was that she

1    told me in that meeting that my family would have to go

2    on COBRA, and I carry all of my children, college and

3    grad student, my husband, and myself.  She was

4    incorrect.

5    Q.    Right.  Because, actually, if you go to Page 719

6    here, it states, "Physician's benefits shall terminate

7    effective on the separation date, except that, to the

8    extent that physician remains approved for disability,

9    the physician will retain the status of an on-leave

10    employee during the term of that coverage", right?

11    A.    That's what it says.

12    Q.    Right.  Well, you determined that.  I'm assuming

13    you read this when you got it.

14    A.    Yes.

15    Q.    And so you determined that, as long as you were on

16    LTD benefits through Dartmouth-Hitchcock, that you

17    would still be eligible as if you were an on-leave

18    employee, and you would pay the employee portion of the

19    premium?

20    A.    I had to pay the full portion.  It was over a

21    thousand dollars a month, which may have been D-H, but

22    it was an increase in what I would have had to pay, but

23    she had told me that I would have to put my kids on

24    COBRA and my husband.  It wasn't clear to me what my

25    status would be, and then this came through, and so I

1    did pay the premium for insurance for a period of time.

2    Q.   And then, as a result, did you all stay on that

3    policy?

4    A.   Yes.

5    Q.   All right.  Because I think now the policy allows

6    for up to 26 years old, I think --

7    A.   Yes.

8    Q.   -- can stay on a policy?

9    A.   Correct.

10   Q.   Okay.  And, as a result of this being laid out

11   here, you were eligible to stay on the -- as a result

12   of being on long-term disability benefits through D-H's

13   policy, you could stay on the health insurance as well

14   during --

15   A.   Correct.

16   Q.   -- during that entire time?

17   A.   Correct.

18          ATTORNEY SCHROEDER:  Suspend for today, and

19   we'll resume at a mutually convenient date.  Thank you.

20          ATTORNEY VITT:  Okay.

21

22   (Whereupon at 3:36 p.m the deposition was suspended.)

23

24                 *   *   *   *   *

25

```
 1          I have carefully read the foregoing

 2      transcript of my deposition given on Tuesday,

 3      June 11, 2019, and the answers made by me are

 4      true and correct.

 5

 6

 7                          --------------------------

                        MISTY BLANCHETTE PORTER, M.D.

 8

 9      STATE OF _____

10      _____ SS.

11

12      At _____, in said

13      County, this _____ day of

14      _____, 2019, personally

15      appeared before me the above-named

16      MISTY BLANCHETTE PORTER, M.D. and made oath that

17      the foregoing answers subscribed by her are

18      true.

19

20

21                      -------------------------------

                            Notary Public

22

23   My Commission expires:

24

25   --------------------

26
```

1                    **C E R T I F I C A T E**

2                    I, Sunnie Donath, Registered Professional

3    Reporter and Licensed Court Reporter, duly authorized

4    to practice Shorthand Court Reporting in the State of

5    New Hampshire, hereby certify that the foregoing pages,

6    numbered 1 through 157, are a true and accurate

7    transcription of my stenographic notes of the

8    deposition of MISTY BLANCHETTE PORTER, M.D., who was

9    first duly sworn by me on Tuesday, June 11, 2019 for

10   use in the matter indicated on the title sheet, as to

11   which a transcript was duly ordered;

12                   I further certify that I am neither

13   attorney nor counsel for, nor related to or employed by

14   any of the parties to the action in which this

15   transcript was produced, and further that I am not a

16   relative or employee of any attorney or counsel

17   employed in this case, nor am I financially interested

18   in this action.

19                   Dated at Westminster, Vermont this 12th

20   day of June, 2019.

21

22

23                              _____

                                Sunnie Donath, RPR, LCR
24

25