# EXHIBIT J

Leslie DeMars CONFIDENTIAL - October 23, 2019

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT
Case No. 5:17-cv-194

MISTY BLANCHETTE PORTER, M.D.,
Plaintiff

vs.

DARTMOUTH-HITCHCOCK MEDICAL CENTER,
DARTMOUTH-HITCHCOCK CLINIC,
MARY HITCHCOCK MEMORIAL HOSPITAL,
and DARTMOUTH-HITCHCOCK HEALTH,

Defendants.

C O N F I D E N T I A L

DEPOSITION OF LESLIE DeMARS
taken on behalf of the Plaintiff at Norwich, Vermont, on October 23, 2019, at 9:00 a.m., before Cynthia Foster, Registered Professional Reporter.

## 2

APPEARANCES:
  Geoffrey Judd Vitt, Esquire
  Sarah Nunan, Esquire
  Julia Korkus, Paralegal
  Vitt & Associates, PLC
  8 Beaver Meadow Road
  P.O. Box 1229
  Norwich, Vermont, 05055, on behalf of the Plaintiff, Misty Blanchette Porter, M.D., also present.
  Katherine Burghardt Kramer, Esquire
  KBK Law
  6 Mill Street
  P.O. Box 23
  Middlebury, Vermont, 05753, on behalf of the Plaintiff, Misty Blanchette Porter, M.D., also present.
  Donald W. Schroeder, Esquire
  Foley & Lardner, LLP
  111 Huntington Avenue, Suite 2500
  Boston, Massachusetts, 02199-7610, on behalf of the Defendants, Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health.

## 3

| No. | Description | Page |
|---|---|---|
| 1 | Original Notice of Deposition of Leslie DeMars and Amended Notice of Deposition of Leslie DeMars | 6 |
| 2 | Subpoena to Testify at a Deposition in a Civil Case | 7 |
| 3 | Letter, Birkmeyer and Compton to Leslie DeMars, DH13075-13082 | 9 |
| 4 | Notice of Subpoena to Leslie DeMars, 4/3/18 | 15 |
| 5 | Notice of Subpoena to Leslie DeMars, 6/11/19 | 15 |
| 6 | Excerpt of Deposition of Joanne Conroy, 9/18/19 | 24 |
| 7 | Email string, DeMars and David Seifer, 9/8/17 DH0011349 | 25 |
| 8 | Text messages between Leslie DeMars and Misty Porter, DEMARS0000001-87 | 41 |
| 9 | Email string, DeMars and Porter and McBean, DH0021243-44 | 59 |
| 10 | Email string, Porter and DeMars re | |

## 4

| No. | Description | Page |
|---|---|---|
| 11 | Email, McBean to DeMars, 7/28/2016, DH0025543-44 | 71 |
| 12 | Email, Seguin to DeMars, 7/28/2016, DH0011269-70 | 96 |
| 13 | Email, DeMars to Padin, DH0021261-62 | 106 |
| 14 | Excerpt from deposition of Ed Merrens | 109 |
| 15 | Email, DeMars to Padin, 5/12/2016, re DS and credentialing, DH0021253 | 110 |
| 16 | Chat with Richard Reindollar, DeMars0000101-102 | 111 |
| 17 | Email, Porter to DeMars re confidential review, 2/20/2017, DH0025077-79 | 115 |
| 18 | Email, Todd to DeMars re confidential review, 2/21/2017, DH0025437-42 | 115 |
| 19 | Email, Gunnell to DeMars re confidential review, 2/24/2017, DH0025441-42 | 115 |
| 20 | Email string, Gunnell to Herrick, DeMars, re: REI/IVF Action Plan, 4/19/2017, DH0009582-83 with attachments | 159 |
| 21 | Email, DeMars to Strohbehn, et al, | |

1 (Pages 1 to 4)

Leslie DeMars CONFIDENTIAL - October 23, 2019

### Page 129

1  you included the Value Institute?
2      MR. SCHROEDER: She didn't say Ed Merrens.
3  A  I didn't say Ed Merrens.
4  Q  Was he not involved in it?
5  A  No. He was not.
6  Q  Who made the decision ultimately?
7      MR. SCHROEDER: For what?
8  Q  To close the REI Division?
9  A  Again, we were not talking about that.
10 Q  Well, somebody made a decision to close the REI
11    Division and to terminate the employees in that
12    division; is that correct?
13 A  Yes.
14 Q  Who made that decision?
15 A  Dr. Merrens.
16 Q  Okay. Now, prior to getting to that point,
17    getting to the point of deciding to close the
18    REI Division, who were the individuals who were
19    involved in the discussions about the
20    possibility of contracting the services to be
21    offered by the division?
22 A  That was me, Heather Gunnell, the Value
23    Institute, Daniel Herrick.
24 Q  Can you explain, please, what role or function
25    was performed by the Value Institute in these

### Page 130

1     discussions?
2  A  Sure. The Value Institute, we engaged them
3     twice, specifically to work with the REI
4     Division on ways of working on team building, on
5     really effective teamwork and effective
6     communication. We had a one-day workshop in the
7     fall of 2016 and then it was at least a five-day
8     workshop where we had a stand-down of all
9     activities in early February, I believe, of
10    2017. Their role is to evaluate and make
11    recommendations on the way teams are working.
12    We engaged them because the division was
13    completely fractured, and we wanted to see if
14    there was a way of repairing those fractures and
15    having a way to move forward to have a
16    successful division.
17 Q  I want to make sure I've got this right.
18    The Value Institute's job was to do the
19    team building or the team evaluation work to
20    figure out is there a way we can get everybody
21    working essentially as a team working on the
22    same page. Is that accurate?
23    MR. SCHROEDER: Mischaracterizes her
24    testimony. Two different workshops here.
25 Q  Okay. So were both workshops designed towards

### Page 131

1     figuring out a way if there's a way to make the
2     REI Division members work cohesively?
3  A  So the first one was primarily team building.
4  Q  Yes.
5  A  The second one was, again, a much longer
6     workshop that went into much more depth and more
7     preparation of the Value Institute on behalf of
8     the Value Institute to look at what was going on
9     ahead of that workshop, to evaluate, again, the
10    ways of working, the interpersonal
11    relationships, and then to devise, to work on
12    the problems that they identify and to come up
13    with that division or the team with which
14    they're working to have a process to move
15    forward.
16 Q  Were the results of the work done by the Value
17    Institute conveyed to Daniel Herrick and other
18    senior leadership at Dartmouth-Hitchcock?
19 A  Their recommendations and conclusions were
20    conveyed verbally to Daniel Herrick, Heather
21    Gunnell, and me at a meeting about a week after
22    the workshop.
23 Q  Who conveyed it?
24 A  Whether it was Katie Wira or Sam whose last name
25    I'm blanking on at the Value Institute, both of

### Page 132

1     them were there.
2  Q  One of the two of them were both conveyed the
3     conclusions of the Value Institute?
4  A  Correct.
5  Q  Let me take a short break.
6     (Recess taken 3:18 - 3:30 p.m.)
7  Q  It was pointed out to me that you and I used a
8     term a few moments ago that can be interpreted
9     two ways. We talked about "contracting" the REI
10    services, and what I understood you to mean was
11    reducing or shrinking the size of the services,
12    not contracting out those services to a third
13    party like IVF Boston. You were referring to a
14    shrinkage, right?
15 A  Correct.
16 Q  Because the transcript could be read to refer to
17    a plan to send the IVF services to Boston or
18    some place. That wasn't --
19 A  No. Limiting.
20 Q  Okay. Thank you.
21    Do you understand that you were involved
22    pretty much from the outset in the discussions
23    about what to do with the REI Division? Is that
24    accurate?
25 A  Discussions with whom?

**Page 133**

1  Q   With the senior leadership at
2      Dartmouth-Hitchcock.
3  A   I wouldn't characterize those meetings as
4      discussions.
5  Q   How would you characterize them?
6  A   I would characterize them as decisions having
7      been made without having discussions having
8      occurred, and my arguments to the contrary were
9      dismissed.  Any plans that I had were dismissed,
10     and a process was put in place over which I had
11     absolutely no say.
12 Q   Why do you believe that your arguments were
13     dismissed?
14 A   Oh, because they were dismissed publicly and
15     condescendingly.
16 Q   By whom?
17 A   By Ed.
18 Q   When you say "publicly," where?
19 A   In a meeting of senior leadership.
20 Q   Who was there?
21 A   Ed, Daniel Herrick, Heather, Joni Spring who was
22     one of the nursing leadership, Maria, John
23     Kacavas, Victoria who's the publicity
24     communications person.  Aimee Giglio.
25     MR. SCHROEDER:  Be careful whether or not

**Page 134**

1      this was an attorney/client privileged
2      communication.  I don't know what meeting you're
3      talking about.  You just mentioned that John
4      Kacavas was there.
5  Q   What was the purpose of the meeting?
6  A   The purpose of the meeting was to -- from my
7      perspective?
8  Q   Yes.  From your perspective.
9  A   The purpose of the meeting was to inform me that
10     the REI Division was going to be closed and to
11     set, to set about a plan for doing that.
12 Q   So basically it was a business decision, and you
13     were told what that business decision was,
14     correct?
15 A   It was a decision.
16 Q   Right.
17 A   And I was being told what the decision was.
18 Q   Right.  So I'm going to ask you what you can
19     recall about what was said and whoever said it
20     you can tell me, and I don't think there's any
21     issue of privilege, and if it comes up we can
22     deal with it then.  So where was the meeting?
23     Where did it take place?
24 A   Fifth floor, one of the board rooms.
25     MR. SCHROEDER:  To be honest with you,

**Page 135**

1      before we go forward, I know for a fact that we
2      have on our privilege log a document that is
3      marked privileged relating to a meeting that
4      John Kacavas attended.  I can check it.  I'm
5      almost positive that there is a document
6      relating to one of the meetings.  I think there
7      were prior meetings that he was not at so those
8      are fair game, but I believe that the document
9      relating to this particular meeting where John
10     Kacavas was and what is stated during that
11     meeting that it is a privileged document, and,
12     therefore, it's a privileged communication.
13     MR. VITT:  I'll tell you what.  I'll go
14     ahead and ask the questions and --
15     MR. SCHROEDER:  Well, we can go off -- I
16     mean, I would like to check this if we can go
17     off the record for a second.
18     (Discussion off the record)
19 Q   Can you give me the range of when the date would
20     have been for this meeting?
21 A   It was five or six weeks before we announced the
22     closure of the division.
23 Q   What did you understand was the purpose of the
24     meeting?
25 A   As I understood it, it was to convey the

**Page 136**

1      decision that the division would be closed and
2      to begin to lay out a plan for doing so.
3  Q   All right.  So prior to this meeting, had you
4      been given an opportunity to weigh in with your
5      views about what should happen?
6  A   No.  So I came prepared to that meeting because
7      I thought that's what this meeting would be
8      about would be what should we do with IVF.  And
9      not the division.
10 Q   All right.  So tell me what you did to prepare
11     yourself for what you thought was going to
12     happen at the meeting.
13 A   I prepared a list of, again, essential
14     components of REI within the department that did
15     not include IVF.  That I wanted to be able to
16     present a plan to close IVF and at a point not
17     too far down the road to be able to reopen it
18     again with a functional team, but at this point
19     because we did not have the nursing support to
20     continue to do IVF, we could not continue to do
21     that.  I had a plan for Misty, I had a plan for
22     Albert, I had a plan for David, I had a plan for
23     the others in the division, and it was a
24     stand-down on doing IVF.
25 Q   Was your plan reduced to writing?

### 137

1  A  Was my plan?  No.  It was not produced in
2     writing.
3  Q  When I say you showed up with, you had planned
4     to make a presentation, correct?
5  A  Yes.
6  Q  Okay.  Was there a handout?
7  A  No.  I had notes, but --
8  Q  Okay.  That's what I'm trying to figure out,
9     whether you had actually gone to the, taken the
10    time to write it out.
11 A  I had notes, yes, but I did not have a Power
12    Point presentation or a handout.
13 Q  Okay.  And had you thought about how to go about
14    recruiting an adequate nursing staff to be able
15    to resume the IVF program?
16 A  We had worked on that all year actually, and we
17    had multiple thoughts on how to recruit an
18    adequate nursing staff.  One of the outputs from
19    the Value Institute was that the nursing
20    leadership said that they would not hire another
21    nurse into the REI Division unless it were
22    completely revamped.
23 Q  Who in nursing leadership said that?
24 A  There were two nursing officers who were in
25    charge of outpatient.  One was Joni Spring.  The

### 138

1     other one I'm blanking on her name.  It was the
2     other one.
3  Q  Okay.
4  A  But she was basically the Associate Chief
5     Nursing Officer in charge of ambulatory nursing
6     care.
7  Q  And she said, essentially, until you get a
8     functioning division we're not going to recruit
9     any more nurses?
10 A  Correct.
11 Q  And how long had that been the stated position
12    of the nursing?
13 A  That was the output from this second Value
14    Institute workshop, so that was in mid-February
15    of '17.
16 Q  All right.  So you said you had a plan for Misty
17    Porter, a plan for Albert Hsu and a plan for
18    David Seifer, right?
19 A  Yes.
20 Q  What was the plan for Misty Porter?
21 A  So at this point --
22        MR. SCHROEDER:  What point are you talking
23    about?
24 A  At the point of this meeting.
25 Q  That's right.  The point of this meeting.  Thank

### 139

1     you.
2  A  At the point of this meeting, I wanted to keep
3     Misty in an ultrasound role that at this point
4     she was still on medical leave.  It was unclear
5     to me how long her recovery was going to take,
6     and I wanted to be able to give her as much time
7     as she needed to recover and to put her in an
8     ultrasound-heavy role that would, we could then
9     grow that role or grow her otherwise as her
10    recovery allowed.
11 Q  And what was Albert's role to be?
12 A  Albert would do the other duties of an REI
13    physician until we were able to reinstitute IVF
14    services.
15 Q  And David Seifer?
16 A  David Seifer, my plan at that point would be at
17    the end of the year would be to counsel him out
18    of his position.
19 Q  Essentially tell him it would be better for
20    everybody if he found another job?
21 A  Yes.
22 Q  I would presume he's heard that speech before.
23       Were you able to convey any parts of your
24    plan during the course of this meeting?
25 A  Yes.

### 140

1  Q  Tell me how it went.
2  A  Not well.
3  Q  Okay.
4  A  Essentially every single point I brought up was
5     dismissed, and I was told that there was not
6     going to be any plan, that I was not allowed to
7     make any plan.
8  Q  Who told you that?
9  A  Ed.  That it was my fault.
10 Q  He said it was your fault?
11 A  Yes.
12 Q  Did he explain why?
13 A  I didn't ask him to.
14 Q  Well, okay.  Let me see if I get this, the
15    context right.  You've got 6, 7, 8 people
16    sitting around the table, right?
17 A  At least, yes.
18 Q  And you're there with the understanding that
19    you'd have an opportunity to explain your plan
20    for a temporarily-reduced-in-scope size of the
21    REI Division, correct?
22 A  That was my understanding.
23 Q  Your understanding.  Okay.  And at some point
24    you were given an opportunity to speak, correct?
25    Sounds like you went through your notes.

Leslie DeMars CONFIDENTIAL - October 23, 2019

---

Page 145

1  that because there was a difficulty recruiting
2  nurses that that was a sufficient reason to
3  close the REI Division?
4  A   I apologize.  Say it one more time.  This is
5      such a miserable time in my life.
6  Q   Sure.  That's quite all right.
7         So you had this meeting.
8  A   Yes.
9  Q   And they say we're going to shut the REI
10     Division, we're going to close it down, correct?
11 A   Yes.
12 Q   And I asked you what was the public excuse or
13     reason that was going to be given for shutting
14     down the division.  You said well, we've got a
15     problem recruiting talented nurses and that's
16     the reason.  Essentially that's what they said,
17     right?
18 A   They didn't call out nurses specifically.  They
19     did not want to call out nurses specifically.
20 Q   Supporting staff.
21 A   Yes.
22 Q   Okay.  Fine.
23         MR. SCHROEDER:  Providers is what she said.
24 A   Providers.
25 Q   Did you understand providers to include

Page 146

1      physicians?
2  A   No.  It was nurses, but they did not want to
3      specifically say nurses.
4  Q   What's wrong with saying nurses?
5  A   The nursing officer did not want it laid at the
6      feet of the nurses.
7  Q   Okay.  Did you believe that the problem in
8      recruiting nurses to do the work in the REI
9      Division was a sufficient or an adequate reason
10     to close the REI Division?
11 A   Thank you.  No.  No.  I finally understand your
12     question.
13 Q   It probably was a bad question before.  I'm
14     sorry.  Okay.  Go ahead.
15 A   Our lack of nurses made it necessary for us to
16     stop doing IVF.  There was a substantial jump
17     from stopping to do IVF and closing the division
18     and making that into a business decision.  There
19     are many things that went into our inability to
20     hire nurses, but that was the ultimate final
21     push that made us have to stop doing IVF.  And
22     from there, a decision was made to close.  That
23     was never my intention.
24 Q   At either of those meetings, first meeting there
25     was discussion where Merrens says we're here to

Page 147

1      talk about closing the REI division or the
2      second meeting where there was talk about how to
3      publicly spin this.  At either of those two
4      meetings, did anyone talk about the effect of
5      that decision on women's health and whether
6      Dartmouth-Hitchcock had some obligation to meet
7      the needs of women in this area?
8  A   Yes.
9  Q   Who discussed that?
10 A   I did.  And it was broadly brought up over the
11     phone by Chief Justice Broderick who at that
12     point was, I don't know, contracted doing
13     something, but --
14 Q   He was participating by phone?
15 A   He was participating by phone.
16 Q   What did he say?
17 A   Well, he brought out the, well, what does this
18     mean to, you know, our patients, what does it
19     mean to, you know, our catchment area.  What's
20     going to be the public backlash to this.
21 Q   What did people say to that?
22 A   Well, there was only one voice that was talking.
23 Q   That was you?
24 A   And that was me.
25 Q   What did you say?

Page 148

1  A   At that point?  I mean, I said that this was a
2      service that was a valuable part of the women's
3      health services that D-H had been providing for
4      the last 25 years and that it continued to be a
5      valuable service in our collaboration with UVM.
6      You know, we were effectively covering two
7      states in expanding our catchment area.  That it
8      was short-sighted, and, again, to just say that
9      this is a business decision is insulting to
10     women's health and to women's health care.
11 Q   Okay.  Do you recall whether Heather Gunnell and
12     Daniel Herrick said anything at either of those
13     meetings in support of closing the REI Division?
14 A   They did not speak in support.  So Heather did
15     not speak.  Daniel Herrick, again, tried to
16     suggest some alternatives to closing the
17     division more in favor of let's stop, take a
18     pause, and make new plans, and those were, we're
19     not going to do that.
20 Q   I want to make sure that I've got the right
21     understanding about certainly that first meeting
22     went down.  The way you describe it, Ed Merrens
23     ran the meeting, said what the decision was
24     going to be and everybody else got in line.
25     Does that sound right?

Leslie DeMars CONFIDENTIAL - October 23, 2019

149

1  A  Yes. There was, again, some push-back from
2     Maria. Daniel had said well, you know, we do
3     have some alternative plans that we could
4     discuss, and none of it was entertained.
5  Q  Do you have any reason to believe that either of
6     those meetings were recorded?
7  A  No.
8  Q  Was someone taking official or semiofficial
9     notes?
10 A  I don't think so.
11 Q  Did you see at any point a document, email, a
12    memo, you name it, that purports to be a summary
13    of what was discussed at either of those
14    meetings?
15 A  No.
16 Q  You didn't see anything like that?
17 A  No.
18 Q  Was John Kacavas at both meetings or just one?
19 A  I don't know for sure.
20 Q  Did he say anything to you at those meetings?
21 A  No.
22 Q  Was there a discussion about the possibility of
23    litigation?
24 A  No.
25 Q  Nobody raised the possibility that hey, we fire

150

1     a bunch of people, we may get sued?
2  A  No. The discussion was we have to go back and
3     look at everyone's contracts.
4  Q  Why?
5  A  That was directed to the HR person and to --
6     shoot. The other lawyer.
7  Q  There was another lawyer there besides Kacavas?
8  A  At one of the meetings, yes. It was the woman
9     who's actually --
10 Q  Kim Troland?
11 A  Kim Troland. Thank you. My brain doesn't
12    remember names very well.
13 Q  Not a problem.
14 A  I can see her face.
15 Q  Was the fact that Misty Porter was on short-term
16    disability or part-time disability, was that
17    issue brought up?
18 A  Yes. I think it was brought up as fact that she
19    was on disability.
20 Q  Who brought it up?
21 A  I don't remember.
22 Q  Somebody brought up the fact that at the moment
23    of that meeting she was on disability.
24 A  Yes.
25 Q  Anybody respond to that, do you recall?

151

1  A  I don't remember most of this. Some of this
2     meeting I remember crystal clearly. Some of it
3     I didn't remember well because it was clearly
4     Leslie, this is not your action item. You're
5     not going to, you know, I'm done with you.
6  Q  Was that Ed Merrens essentially, I'm done with
7     you?
8  A  Yeah.
9  Q  Were you still Chair at the time?
10 A  Yes.
11 Q  Did you understand based on what had happened at
12    this meeting that your tenure as Chair was
13    somewhat tenuous?
14 A  No. No.
15 Q  You thought you would continue to be Chair.
16 A  Yes.
17 Q  And how did it come about that you ceased to be
18    Chair?
19 A  Ed and I were in a meeting together where we
20    were discussing what we had, what I and Heather
21    had been doing to try to fill in the service
22    gaps, and heal this huge wound in the
23    department, and he said I've given you enough
24    time, and I said it has been six weeks, and this
25    was a bomb that went off in our department. And

152

1     he said once again, this was your doing. This
2     is your fault. You were the one that made this
3     decision, and I looked at him and I said I
4     certainly did not. And he looked at me and he
5     said I don't think we can continue to work
6     together anymore.
7  Q  Was anyone else there besides the two of you?
8  A  No, but that was it. Like I don't think we can
9     either.
10 Q  How soon after that discussion did you step down
11    as Chair?
12 A  At that meeting he said we'll meet again next
13    week and talk about terms of your stepping down.
14    What I found out was that, this was on a
15    Wednesday, that by two days later, that Friday,
16    he had already announced to several other Chairs
17    that I was stepping down.
18 Q  That came as a surprise to you?
19 A  Yes. I hadn't even had a chance to discuss it
20    with my faculty.
21 Q  How did it come about that you, after you
22    stepped down, what position did you hold or what
23    were you going to be doing?
24 A  Well, I stayed on as a GYN oncologist.
25 Q  Right.

38 (Pages 149 to 152)

Leslie DeMars CONFIDENTIAL - October 23, 2019

### Page 157

1  Division?
2  A  No. She did not. She said it was a business
3     decision.
4  Q  Did she get into a discussion of what would have
5     to happen from an HR perspective if the decision
6     was made to close the REI division?
7  A  What she said was this is a business decision to
8     close the division. Therefore, there is no job,
9     there is no position for these physicians.
10 Q  She wouldn't know that, would she? I mean, how
11    does the --
12    MR. SCHROEDER: Objection. Calling for
13    speculation as to what she would or would not
14    know.
15 Q  How does the HR have an informed basis for
16    deciding the services that are needed, the
17    services these physicians are capable of
18    performing and whether or not it's a good idea
19    to keep them? Is that something you expect HR
20    to weigh in on?
21    MR. SCHROEDER: Objection.
22    Mischaracterizes her testimony. You're also
23    asking her to speculate as to what Amy Giglio
24    does or does not think.
25 A  I don't know what Aimee Giglio's decision-making

### Page 158

1     ability actually is. What she said was because
2     this is a business decision to close the
3     division, there is no longer a position for REI
4     physicians.
5  Q  Was there a discussion in either of the meetings
6     about redeploying Dr. Porter to do ultrasound
7     work?
8  A  That was not discussed at the meeting. That was
9     something that I had in the back of my mind
10    because, again, what I wanted to try to do was
11    to keep Misty employed. So I had a choice of
12    could I keep her within the department or could
13    I have her be a member of the Department of
14    Radiology. So I actually had a conversation
15    with Jocelyn Chertoff about potentially having
16    Misty move into Radiology.
17 Q  Was she all right with that?
18 A  No. She said I have no, I have no position
19    available in Radiology. I'm not interested in
20    hiring Misty within the department.
21 Q  Okay. Exhibit 20 will be a document that was
22    marked as Exhibit 17 during the Merrens
23    deposition. Numbers are 2582 through 2583, but
24    there are a series of documents attached to it
25    that were produced in native format so there are

### Page 159

1     no Bates numbers on those.
2     (Exhibit 20 marked for identification)
3  Q  Show you what's been marked as Exhibit 20. This
4     is an email from Heather Gunnell to you and
5     Daniel Herrick, correct?
6  A  Yes.
7  Q  And it's dated April 19, 2017. Do you believe
8     the meetings that you've referenced today that
9     we've been talking about for a while took place
10    after April 19, 2017?
11 A  This again was focused on shutting down IVF.
12    MR. SCHROEDER: Did you hear the question?
13 A  I'm sorry.
14    MR. SCHROEDER: So answer it again.
15 A  I'm sorry. I guess I didn't. Would you please
16    ask the question again?
17 Q  Sure.
18 A  Oh, I know what it -- please ask the question
19    again.
20 Q  Heather Gunnell in this email says I added a
21    brief staffing plan for both a complete shutdown
22    and a rebuild. My assumption is that MBP --
23    that's Dr. Porter -- will be refocused to Gyn
24    ultrasound. U/S, right? That's ultrasound?
25 A  Yes.

### Page 160

1  Q  Okay. Now --
2  A  The complete shutdown is actually shutting down
3     the IVF program, not shutting down the division.
4  Q  That was your understanding as of this date?
5  A  Correct.
6  Q  And this assumption of having Dr. Porter
7     refocused to begin ultrasound, that was
8     something you had considered as well, right?
9  A  Yes. That was, again, because of the
10    recommendations that were made by the Value
11    Institute that we needed a shutdown and rebuild
12    of the IVF program, and that one of the issues
13    was in Misty's leadership of that program. I
14    wanted to keep Misty in the department. I
15    wanted her to be able to concentrate on
16    something that she was really great at, and then
17    as she recovered to then work with her on what
18    we could do with the IVF program as it existed
19    at that point in the future. So again, this
20    was, I wanted to keep Misty.
21 Q  You said that Aimee Giglio mentioned apparently
22    more than once in these meetings that it was a
23    business decision to shut it down, right?
24 A  Yes.
25 Q  And you said no, it's a personal decision,

40 (Pages 157 to 160)