# EXHIBIT 6

|   |   |
|---|---|
| 1 | 3 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT
Case No. 5:17-cv-194

MISTY BLANCHETTE PORTER, M.D.,
    Plaintiff
vs.
DARTMOUTH-HITCHCOCK MEDICAL CENTER,
DARTMOUTH-HITCHCOCK CLINIC,
MARY HITCHCOCK MEMORIAL HOSPITAL,
and DARTMOUTH-HITCHCOCK HEALTH,

    Defendants.

CONFIDENTIAL

DEPOSITION OF LESLIE DeMARS taken on behalf of the Plaintiff at Norwich, Vermont, on October 23, 2019, at 9:00 a.m., before Cynthia Foster, Registered Professional Reporter.

| # | Description | Page |
|---|---|---|
| 1 | Original Notice of Deposition of Leslie DeMars and Amended Notice of Deposition of Leslie DeMars | 6 |
| 2 | Subpoena to Testify at a Deposition in a Civil Case | 7 |
| 3 | Letter, Birkmeyer and Compton to Leslie DeMars, DH13075-13082 | 9 |
| 4 | Notice of Subpoena to Leslie DeMars, 4/3/18 | 15 |
| 5 | Notice of Subpoena to Leslie DeMars, 6/11/19 | 15 |
| 6 | Excerpt of Deposition of Joanne Conroy, 9/18/19 | 24 |
| 7 | Email string, DeMars and David Seifer, 9/8/17 DH0011349 | 25 |
| 8 | Text messages between Leslie DeMars and Misty Porter, DEMARS0000001-87 | 41 |
| 9 | Email string, DeMars and Porter and McBean, DH0021243-44 | 59 |
| 10 | Email string, Porter and DeMars re | |

APPEARANCES:
    Geoffrey Judd Vitt, Esquire
    Sarah Nunan, Esquire
    Julia Korkus, Paralegal
    Vitt & Associates, PLC
    8 Beaver Meadow Road
    P.O. Box 1229
    Norwich, Vermont, 05055, on behalf of the Plaintiff, Misty Blanchette Porter, M.D., also present.
    Katherine Burghardt Kramer, Esquire
    KBK Law
    6 Mill Street
    P.O. Box 23
    Middlebury, Vermont, 05753, on behalf of the Plaintiff, Misty Blanchette Porter, M.D., also present.
    Donald W. Schroeder, Esquire
    Foley & Lardner, LLP
    111 Huntington Avenue, Suite 2500
    Boston, Massachusetts, 02199-7610, on behalf of the Defendants, Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health.

| # | Description | Page |
|---|---|---|
| 11 | Email, McBean to DeMars, 7/28/2016, DH0025543-44 | 71 |
| 12 | Email, Seguin to DeMars, 7/28/2016, DH0011269-70 | 96 |
| 13 | Email, DeMars to Padin, DH0021261-62 | 106 |
| 14 | Excerpt from deposition of Ed Merrens | 109 |
| 15 | Email, DeMars to Padin, 5/12/2016, re DS and credentialing, DH0021253 | 110 |
| 16 | Chat with Richard Reindollar, DeMars0000101-102 | 111 |
| 17 | Email, Porter to DeMars re confidential review, 2/20/2017, DH0025077-79 | 115 |
| 18 | Email, Todd to DeMars re confidential review, 2/21/2017, DH0025437-42 | 115 |
| 19 | Email, Gunnell to DeMars re confidential review, 2/24/2017, DH0025441-42 | 115 |
| 20 | Email string, Gunnell to Herrick, DeMars, re: REI/IVF Action Plan, 4/19/2017, DH0009582-83 with attachments | 159 |
| 21 | Email, DeMars to Strohbehn, et al, | |

Page 41

1 Dartmouth-Hitchcock in order to participate in
2 retrievals and transfers and very specific IVF
3 procedures.
4 Q  Okay.
5 A  Those would be things that the residents would
6 not be performing.
7 Q  Right. Back to this issue of people losing
8 respect, did you mention Daniel Herrick, was he
9 one of the ones?
10 A  No.
11 Q  Let me mark as Exhibit 8, these are the text
12 messages between you and Dr. Porter.
13      (Exhibit 8 marked for identification)
14 Q  Tell me when you first began working with Dr.
15 Porter.
16 A  1997.
17 Q  And in what context? How did you two come to
18 meet?
19 A  Both of us joined the department at
20 approximately the same time as junior faculty.
21 Q  Did you and she have a working relationship
22 before you became Chair?
23 A  We worked together as colleagues, yes.
24 Q  Okay. Did you and she serve on certain
25 committees and boards together?

Page 42

1 A  We were both examiners for the American Board of
2 Obstetrics and Gynecology.
3 Q  And who nominated Dr. Porter to be a board
4 examiner? Would that have been you?
5 A  I don't remember.
6 Q  What percentage of the OB/GYNs across the
7 country do you estimate are board examiners?
8      MR. SCHROEDER: If you know.
9 A  I have no idea.
10 Q  You and she became friends?
11 A  Yes.
12 Q  Before her illness, did you see the friendship
13 as a problem given your position as Chair?
14 A  My friendship with Misty was the most difficult
15 part of being the Chair.
16 Q  Why?
17 A  Because I was forced to accept as true actions
18 and behaviors that I didn't want to see from my
19 friend, and in my position as Chair, I tried
20 very hard to protect my friend.
21 Q  Was there any question about her competence?
22 A  Prior to her illness?
23 Q  Yes. Prior to her illness.
24 A  No.
25 Q  I'm going to be showing you parts of the text

Page 43

1 messages where you refer to "Misty magic." Do
2 you recall using that term?
3 A  Absolutely.
4 Q  What did you mean by that?
5 A  Misty, Misty is an amazingly gifted and
6 dedicated reproductive endocrinologist and
7 infertility specialist who I think through
8 technical skill and creativity was able to
9 achieve lots of desired pregnancies for women,
10 and that's her "Misty magic."
11 Q  Was she also skilled at reading ultrasounds?
12 A  I think that she is skilled at reading
13 ultrasounds.
14 Q  She also for a number of years did benign
15 surgery, correct?
16 A  Yes.
17 Q  Was she a talented surgeon?
18 A  Some things, yes.
19 Q  You mean for certain --
20 A  For certain procedures, yes.
21 Q  What procedures?
22 A  I think for infertility-related procedures such
23 as intrauterine resections, hysteroscopic
24 resections.
25 Q  Any others?

Page 44

1 A  When Misty and I did procedures together, it was
2 always something that I looked forward to doing
3 because we would problem-solve together, and we
4 would learn from one another.
5 Q  Could I ask you to look at -- so the pages are
6 numbered both at the bottom and in the upper
7 right so it's easy to follow. So if I could ask
8 you to look at the number at the bottom it's
9 DeMars and then it goes 1 and et cetera, okay?
10 So if you can go to page 44.
11      Are you on that page?
12 A  Um-hum.
13 Q  The dark portion under "Birthgiver," that's you,
14 right?
15 A  Yes.
16 Q  And if you go down to the third item, you wrote,
17 "The ultrasound techs were super psyched to see
18 you yesterday." Do you see that?
19 A  Yes.
20 Q  Why were they super psyched to see Dr. Porter?
21      MR. SCHROEDER: Objection. Speculation.
22 A  I mean, it's hard to put this into context.
23 Q  Okay. Let me try this. Was Dr. Porter talented
24 in the interpretation of first trimester
25 ultrasounds?

Page 69

1  mean, Misty had to really teach him how to do an
2  embryo transfer, had to be with him coaching him
3  on egg retrievals, had to go through cycle
4  management with him, that it was an enormous
5  amount of work that Misty took on.
6  Q  Despite that work, you conclude that "he may
7     well be unsalvageable." Those are sharp terms,
8     right?
9  A  Misty was highly critical of Albert. This is a
10    really good example of my putting a lot of
11    weight into what Misty says and a lot of weight
12    into my friendship with Misty and then having to
13    go and either verify or refute the comments that
14    she makes. I had concerns about Albert because
15    he came from a training program that didn't
16    allow him to do technical procedures. He's an
17    incredibly smart guy, but if he couldn't put the
18    technical procedures into the right context and
19    if he could not do so in a fashion that would
20    allow him to pass his boards, he could not
21    continue as a faculty member at D-H.
22 Q  Correct me if I'm wrong, but the way I read this
23    February 18, 2017, email you are taking the
24    position that it's your opinion that he might
25    well be unsalvageable. By that, you mean he

Page 70

1     couldn't continue to perform his job at
2     Dartmouth-Hitchcock, right?
3         MR. SCHROEDER: Objection.
4     Mischaracterizes her testimony.
5  A  I think you're mischaracterizing it.
6  Q  What did you mean by "unsalvageable"?
7  A  That I was spending an enormous amount of time
8     with both David and with Albert in trying to
9     make this division run in Misty's absence, and
10    there were things that he would do that were
11    repeats such as turning an ultrasound into a
12    consult. And that if he -- and he failed his
13    boards. If he couldn't get his professional
14    performance, this was not an issue of
15    competence. It was could he be a member of our
16    faculty performing the job of a REI physician.
17 Q  It wasn't just Dr. Porter who had sharp, highly
18    uncomplimentary things to say about Albert Hsu,
19    correct?
20 A  I think they were all based on conversations
21    that Dr. Porter had with individuals.
22 Q  You're telling me that every opinion that you
23    got about Albert Hsu was based on conversations
24    with Dr. Porter?
25         MR. SCHROEDER: Objection.

Page 71

1     Mischaracterizes her testimony.
2  Q  Is that what you're telling me?
3  A  I think that that the opinions were influenced
4     by Dr. Porter's opinions.
5  Q  Didn't Dr. McBean tell you that Albert Hsu in
6     the OR presented a risk to patient safety?
7  A  I think that she would have no basis for that
8     opinion.
9  Q  Do you recall receiving that opinion from her?
10 A  Not specifically.
11 Q  Let me show it to you.
12        We'll mark as 11 an exhibit that has been
13    marked Exhibit 12 during the deposition of Ed
14    Merrens.
15        (Exhibit 11 marked for identification)
16 Q  Are you ready?
17 A  Yes.
18 Q  Do you know Dr. McBean?
19 A  Yes.
20 Q  How long have you known her?
21 A  We were medical students together.
22 Q  You think she's competent?
23 A  Yes.
24 Q  She writes in her message to you of February 22,
25    "Albert does not have an adequate skill set with

Page 72

1     regard to surgery and patient care. He
2     regularly practices outside of ARSM standards
3     with the regard to IVF which is both effective
4     and costly to patients. His surgical skills
5     endanger patients."
6         Do you recall reading that?
7  A  Yes.
8  Q  Okay.
9  A  So I think that's inflammatory, and I think she
10    has no basis on which to assess his surgical
11    skills and to put that in an email that he's a
12    danger to a patient.
13 Q  Tell me the investigation you conducted after
14    receiving that.
15 A  I had regular contact with Albert and had
16    regular contact with him in the operating room.
17 Q  What kind of procedures?
18 A  When he was doing myomectomies, when he was
19    doing hysterectomies, when he was doing any open
20    GYN procedure, on some laparoscopies.
21 Q  And based on your personal observation, it's
22    your view that he was a competent surgeon.
23 A  It was my view that he was not a danger to
24    patients.
25 Q  Was he a competent surgeon?

```
                                              109
 1    made at the leadership level that had
 2    implications for your place in the organization?
 3  A  No.
 4  Q  Okay. I'm going to mark as Exhibit 14 a series
 5    of pages from Ed Merrens' testimony, deposition
 6    testimony, and they're not consecutive because
 7    there are only a few things I want to ask you
 8    about, and I think I provided sufficient context
 9    in each time so that you can understand both the
10    question that was asked and Dr. Merrens'
11    response.
12        (Exhibit 14 marked for identification)
13  Q  I've given you what's been marked as Exhibit 14.
14    If you could go to page 83, please.
15        Do you agree that what Dr. Merrens has
16    provided there is a accurate summary of what the
17    committee said to you?
18  A  No.
19  Q  In what respect do you disagree?
20  A  What Dr. Merrens said was you are responsible
21    for Dr. Seifer and his success here. He did not
22    elaborate further. He did not hold out that it
23    had consequences for my position as Chair.
24  Q  Okay. How did that make you feel when he told
25    you that it was your responsibility to ensure
```

```
                                              110
 1    his success?
 2  A  It was a challenge that I had no alternative but
 3    to take because I had no other options.
 4  Q  Did it seem fair to you that they had put that
 5    responsibility on your back?
 6  A  Sure. Yes. I made the decision to hire him.
 7    Are we done with this one?
 8  Q  For now. If you would just push it to one side,
 9    thank you.
10  A  Not in the "done" pile.
11  Q  Right. You've got the drill down.
12        I'm going to mark as Exhibit 15 what has
13    been marked as Merrens Exhibit 3. It's a May
14    12, 2016, email from Dr. DeMars to Maria Padin.
15        (Exhibit 15 marked for identification)
16  Q  Do you recall writing this email?
17  A  Yes.
18  Q  You say in here that if you can't get or can't
19    hire Dr. Seifer that you will have to shut the
20    REI program down, correct?
21  A  The IVF program.
22  Q  Oh, the program you're going to shut down is
23    IVF?
24  A  Yes.
25  Q  So what would the REI Division look like if it
```

```
                                              111
 1    didn't do IVF?
 2  A  I answered that before. I mean, again, IVF does
 3    not equal REI, and there's consultations to be
 4    done, evaluation of women with reproductive
 5    endocrinologic disorders. There were still
 6    ultrasounds to be read.
 7  Q  Was that work that Albert Hsu was capable of
 8    performing?
 9  A  Yes.
10  Q  I'm going to mark as Exhibit 16 a two-page
11    document that was marked as Exhibit 4 during the
12    Merrens deposition. It's DEMARS0000101 and 102.
13        (Exhibit 16 marked for identification)
14  Q  Does this exhibit include texts between yourself
15    and Richard Reindollar?
16  A  Yes, it does.
17  Q  And again, you're the Birthgiver?
18  A  I am Birthgiver.
19  Q  Yes, okay. And you begin by saying, "Richard,
20    I'm not sure that DS," that's David Seifer,
21    correct?
22  A  Yes.
23  Q  "Is clinically competent. I don't know what
24    he's been doing for 25 years, but I'm not sure
25    it was IVF." And then you go on later on to
```

```
                                              112
 1    say, "I have heard separately voiced concerns
 2    from nursing, anesthesia and ultrasound techs.
 3    The lab folks complain about bloody aspirates
 4    and low egg counts."
 5        What caused you to write to Richard
 6    Reindollar and say I don't think he's clinically
 7    competent?
 8  A  This is a conversation that I had with Misty
 9    that I am not attributing to her in this text.
10  Q  So the judgment that he was not clinically
11    competent is her judgment?
12  A  Yes.
13  Q  And the separately voiced concerns from nursing,
14    anesthesia and ultrasound techs, that's
15    something that she heard and not you?
16  A  Again, this was all primarily surrounding his
17    first egg retrieval.
18  Q  All right. And then that the lab folks complain
19    about bloody aspirates and low egg counts.
20    That's something that she heard and not you?
21  A  Yes.
22  Q  Did you do anything to check the accuracy of the
23    information that you put in these texts to
24    Richard Reindollar?
25  A  I was with, yes, I had separately been
```

**Page 125**

1     answered.
2 A  No.
3 Q  How do you know what she's referring to there?
4 A  Because it is the same situation that was --
5 Q  How do you know that? How do you know that
6     there weren't five times that they performed
7     tubal patency exams on a woman without consent?
8     How do you know that?
9 A  Because I addressed it with Albert. I addressed
10    the issue with the ultrasound tech, I addressed
11    it with Albert. I have to be confident that
12    Albert is not going behind my back.
13 Q  What did you say to Albert? I didn't realize
14    you spoke to him about it.
15 A  In clarifying his role of what is he doing when
16    he is doing ultrasounds. Clarifying his
17    learning doing tubal patency tests, and
18    clarifying on what patients he is doing those,
19    and clarifying the process by which those
20    happen.
21 Q  Did he or did he not have the consent of the
22    patient for this tubal patency examination?
23 A  It didn't happen.
24 Q  He didn't do it.
25 A  No.

**Page 126**

1 Q  So tell me what he told you about this
2     situation.
3 A  The ultrasound tech told me that he wanted to do
4     a tubal patency test on a patient. It was not
5     scheduled. She told him that he couldn't do it
6     and they didn't do it. That's my understanding
7     of the situation.
8 Q  And this happened one time.
9 A  Yes.
10 Q  Okay. Do you have the Merrens testimony there?
11    Page 120. Line 2. He's been shown the exhibits
12    that you have in front of you there. The
13    assessments that we've been discussing? And Dr.
14    Merrens says that those documents --
15    MR. SCHROEDER: Let her read -- if you want
16    to ask her about page 120, just let her read it.
17    MR. VITT: Oh, I'm sorry. Sure.
18 Q  Okay. Do you agree with Dr. Merrens that these
19    reviews raise significant concerns on many
20    levels. Technical skill, standard of care,
21    approach to patients, collaboration with a team
22    and overall vision. Do you agree with that?
23 A  I think if he were seeing this out of context,
24    yes. My seeing these in the course of that
25    entire year that he was at D-H, this doesn't

**Page 127**

1     surprise me at all.
2 Q  Did you talk to him about any of these issues
3     reflected in the exhibits in front of you?
4     MR. SCHROEDER: Who's he?
5 Q  Sorry. Ed Merrens.
6 A  No.
7 Q  Why not?
8 A  Because he looked at me at the Credentialing
9     Committee and said this is on you.
10 Q  When were the first discussions about the
11    possibility of closing the REI Division?
12 A  There was no discussion about it. That was
13    April of 2017, May 2017, that was after this
14    time.
15    MR. SCHROEDER: After what time?
16 A  After February.
17 Q  So Ed Merrens thought it was in March. Does
18    that sound right or do you think it was April
19    before the discussion started?
20 A  I think it was April or May. And there was, the
21    discussion was never, the discussions we were
22    having were to contract and to stop IVF. The
23    discussions were never to close the division.
24 Q  And who were the persons who were involved in
25    these discussions?

**Page 128**

1 A  Heather --
2 Q  Heather Gunnell.
3 A  Daniel Herrick.
4 Q  Okay. You?
5 A  The Value Institute. Me. Nursing leadership.
6 Q  So I want to make sure I've got this right. The
7     issue of contracting the division?
8 A  Contracting the service.
9 Q  Is that the right term? Contracting the
10    service?
11 A  Yes. We were trying to contract performing IVF
12    services.
13 Q  Was the Value Institute involved in the
14    discussions with Ed Merrens, Daniel Herrick,
15    Heather Gunnell and yourself about the
16    arrangements for possibly contracting the
17    service that was going to be provided by the
18    division?
19 A  Ask that question again, please?
20 Q  Sure. I'm just trying to figure out who were
21    the parties, who were the individuals, who were
22    having discussions about the possibility of
23    contracting the services to be provided by the
24    REI Division? And I thought it was Ed Merrens,
25    Daniel Herrick, Heather Gunnell and yourself and