# EXHIBIT 10

| | |
|---|---|
| From: | Misty BlanchettePorter [mbporter@me.com] |
| Sent: | 6/3/2016 4:51:45 PM |
| To: | David B. Seifer [David.B.Seifer@hitchcock.org]; Leslie R. DeMars [Leslie.R.DeMars@hitchcock.org] |
| Subject: | Confidential: Protected Pursuant to NH RSA 151:13a and RSA 329:29a |
| Attachments: | AH.docx |

Dear Dr. Seifert,

Please find enclosed the requested email, and additional information.

I would be willing to discuss further as you find necessary.

Kind regards,

MBP

Confidential: Protected Pursuant to NH RSA 151:13a and RSA 329:29 a

June 3rd, 2016

[ AUTOTEXTLIST ]

    I am writing in follow up of our conversation on May 25th, 2016 with regards to my observations and assessment of the performance of Dr. Albert Hsu in his role as faculty in Reproductive Medicine and Infertility at Dartmouth Hitchcock Medical Center, and The Geisel School of Medicine.

    The prior Chairman of Obstetrics and Gynecology hired Dr. Hsu, and Dr. Hsu did not go through the normal processes for hiring within the department. I was informed Dr. Hsu had been hired and would be starting at DH when he completed his fellowship, almost a year from that date.

    Dr. Hsu came to DHMC after a 3-year fellowship in RE/I at the Jones Institute at the Eastern Virginia Medical School. Prior to fellowship he had worked for 2 years at the NIH doing research, and at another DC hospital as an attending general GYN.

    In preparation for his employment, I spoke with him by phone about the extent of his experience in IVF/ART; number of procedures performed in oocyte harvest and embryo transfer, the foundation procedure for a practice in Reproductive Medicine. Dr. Hsu reported marked limited technical experience in IVF/ART. He reported he had performed ½ of ~ 20 oocyte harvests, no embryo transfers, and estimated 5 mock/trial embryo transfers. The minimum requirement for a graduating fellow in REI from the American Board of Obstetricians and Gynecologists (ABOG) is approximately 50 IVF harvests and 50 mock transfers. We soon learned, thereafter, that the Jones Institute had been placed on probation by ABOG for poor fellow experience.

    The comments below are derived from my direct experience with Dr. Hsu, observations of his clinical and technical capability in the outpatient and GYN ultrasound clinics, technical abilities in minor surgery and in the main operating room. I have been the closest mentor and direct partner to Dr. Hsu during the

entirety of his employment at DHMC. During this time frame I served as acting Division Director of Reproductive Medicine and Infertility, and received clinical performance metrics provided the Department of Obstetrics and Gynecology by administration at DHMC. I have met with him intermittently to discuss his performance, and I have met with Drs. DeMars and Hsu to review plans for performance improvement.

Given his limited experience, I spent the next 6 months directly teaching him at his side, taking call with him 7 days a week; teaching the process of ovulation induction medication management, ultrasound procedures, and the techniques of oocyte harvest, mock or trial transfer, and ultimately embryo transfer. We reviewed didactic information on these topics, and he was referred to ASRM's practice bulletins and guidelines, the scientific literature for further education. I reviewed the technique of embryo transfer from my own teaching slides. Following treatment IVF/ART cycles all of the relevant clinical information, embryology, treatment outcome, and suggestions for future cycles were reviewed at the multidisciplinary REI team meetings until these meeting were stopped secondary to my recent prolonged illness.

The REI division has known inclusion and exclusion criteria for providing IVF/ART, an elective treatment. These criteria have been developed and reviewed by a multidisciplinary team including present and past REI faculty members, the DH ethics committee, and members of DHMC administration. These were reviewed with Dr. Hsu at the beginning, and intermittently during his employment, and are published on the intranet. Dr. Hsu was given the link to find these standards of care by which we practice.

Below are my observations and opinions with regards to his performance:

*1. Marked global fund of knowledge deficiencies in REI and general gynecology*

The extent of his global fund of knowledge deficits in clinical medicine became apparent over time for both REI, and general GYN. The general GYN knowledge based deficits were more surprising as he had completed a 4 year residency, worked two years as an attending, and completed a 3 year fellowship.

He struggled with concepts in general physiology, and lacked knowledge for such basic topics as the appropriate new patient evaluation of the infertile couple, treatment of miscarriage (medical and surgical), and he did not know the proper usage and indications of such basic infertility medications as first line of care ovulation induction medications. His rational for utilizing certain treatment regimens was often not based in basic physiology, but rather "I saw the attending staff do this at the Jones."

His limited ability made it difficult for him to integrate as a productive partner in REI, and subspecialty consultant for consulting care providers. On arriving to DH he flatly declined to perform HSG's, and he did not know how to do ultrasound guided tubal patency assessments. In a practical sense, he could not himself, technically complete a new patient infertility evaluation. He frequently does not examine patients in clinic, which has led him to miss important clinical findings on his new patients.

He had difficulty interpreting semen analysis reports and selecting appropriate treatment for male factor infertility. Indeed, his new couple infertility evaluations often omitted clinically relevant and necessary information (example- male partner on an anti-androgenic medication known to effect sperm function and the patient was not counseled with regards to the effect on fertility). I saw one of these couples in second opinion after three non-conception treatment cycles, and the problem was identified. The couple was understandably disappointed that this basic assessment had been missed on their initial evaluation.

The basic fund of knowledge deficits, and inability to establish a cogent treatment plan recently had lead to a couple to seek reimbursement from our institution for a recent non-conception IVF cycle. The male partner has three abnormal semen analyses. They conceived their first child at DH with an IVF/ICSI cycle, she is young (29), and they had mediocre embryo progression in their first cycle. Prior to my illness I had completed their re-establish care appointment, and had set the plan for a repeat IVF/ICSI cycle. Dr. Hsu changed the plan to straight IVF due to "improvement" of his SA; an analysis that was still abnormal. Their cycle resulted in a failed fertilization with IVF, ICSI rescue, and ultimately a non-conception cycle.

CONFIDENTIAL
DH0025531

Prior to my illness I was available for consultation and continued mentorship and teaching. He was taught the technique of ultrasound assessment of tubal patency, and he was encouraged to take an active role in his own education.

His fund of knowledge deficits were also apparent in many areas of reproductive endocrinology, and rendered him unable to act as a consultant for residents, our fellow, and general OB/GYN care providers within the DH system. Due to these knowledge deficits, he misdirected patients and consulting care general GYN providers regards to abnormal laboratory tests, and appropriate management of basic infertility (example he told a patient and a consulting general OB/GYN care provider that a patient with moderate hyperprolactinemia did not need to be evaluated or treated). Indeed, he was unfamiliar with the national guidelines for the evaluation and management of many of the subject categories listed by ABOG as those expected for adequate knowledge base in REI. Many of these issues I was made aware after a patient/couple sought a second opinion, his management was questioned by the consulting care provider, and/or the REI nursing staff, and directed to me.

He was able to pass the oral General OB/GYN board exam, a pass rate of 83% for first time examinees (ABOG 2012).

I was not a surprise that he failed his written RE/I board exam, not once but twice, an exam that the ABOG reports a pass rate of 98% of first time takers, and 84% for all examinees, including repeat exam takers (2012 data published on line). Please note he was given adequate time for study, allowed the time he requested off where consistent with departmental and DHMC leave policies. He avoided my inquiries as to the results of his testing.

Dr. Hsu and I reviewed my concerns about his global fund of knowledge deficits in a conversation at the end of his first year. We reviewed strategies for studying for the boards, resources for clinical guidance (Department policies, ASRM and ACOG practice guidelines and committee opinions, foundation text books), and he was encouraged to ask questions of his senior GYN partners and myself. The importance of providing safe and appropriate care to patients was

stressed. We also reviewed the requirement of board certification to his employment at DH. This conversation was also repeated in a meeting with myself, Dr. DeMars, and Dr. Hsu after he failed his REI written board exam a second time.

*2. Critical thinking*

Most concerning to me has been my observation that Dr. Hsu struggles with critical thinking and assessment; he has difficult identifying the pieces of data in a patient's/couple's evaluation which are the most salient, and require attention. He has templated many note phrases, and his notes are lengthy, but where there should be a connection between relevant data points he often misses the link. The omission on his part can lead to unnecessary treatment, a delay in care, a delay in consultation with other members of the department, and failure of treatment. This failure to synthesize the information into a cogent treatment plan can lead to excessive use of expensive and limited institutional resource.

Among the many examples-

a) IVF cycle cancellation at harvest, failure to identify significant medical co-morbidity

A young patient who was paying out of pocket for her IVF cycle was converted to an IUI cycle due to inadequate planning for her treatment, and failure to recognize medical co-morbidity.

Her uterus was 20 week size due to fibroids. Dr. Hsu had not examined her in clinic, and he failed to identify the size of the uterus as a challenge to oocyte retrieval, despite having read her ovulation induction ultrasounds just days prior. The size of uterus and potential technical challenges were identified well into the process of her care, and just 2 days prior to her oocyte harvest. He had not recognized that her history of myasthesia gravis would be relevant to her anesthesia plan. She did not have a pre-procedure anesthesia consult.

Patients with adherent or enlarged uteri may be candidates for an abdominal approach to oocyte harvest; a procedure he has never seen. In our clinic spinal anesthesia is frequently required for abdominal procedures. It was the attending anesthesiologist who recognized the conflict with spinal anesthesia and myasthenia and notified me on a Sunday night, the night prior to the planned harvest. There was also limited documentation that she was counseled adequately about the limited function in pregnancy of a uterus that is markedly distorted by multiple fibroids.

b) Pre-operative Planning and Assessment

He asked me to assist him in the main OR with excision of endometriosis a patient with long standing chronic pelvic pain and known endometriosis. The patient had had several prior laparoscopies, and the extent of her disease was known from those prior surgeries. Indeed we had access to an operative report from a laparoscopy performed less than 6-9 months prior to this planned surgery. I read the OP report the night before and knew her pain was not in proportion to the extent of her disease. She had an extensive pre-operative evaluation with multiple negative imaging studies, a colonoscopy, and consultation with several DH departments. Her extensive pre operative work up was negative.

Despite a relative negative laparoscopy just a few months prior, Dr. Hsu had booked the patient with the urology team for stent placement, the colorectal surgeon for a possible bowel resection, and two members of the GYN service. A full OR day (8.5 hours) was set-aside for this patient. Excluding the members of the anesthesia service -- 4 attending surgeons were involved, the equipment of 3 services arranged and organized, and multiple nursing services were involved in the case.

We were finished the case in under an hour in the OR. We excised 3 spots of peritoneal endometriosis following stent placement. The tissue specimens were discarded in accident by the nursing staff. A multidisciplinary QA meeting was held, and the error attributed in part to a

change in usual process due to the confusion and excessive workload on the OR team. Indeed one might rightfully put forth that a patient with chronic pelvic pain despite multiple prior laparoscopies might have benefited more from sufficient outpatient management of her pain as her primary treatment.

Dr. Hsu had not reviewed her previous operative report(s) prior to making the decision to take her to the operative room. This simple and routine step could have saved morbidity, and avoided the excessive use of important and costly institutional resources.

For other patients, he has missed critical values, and significant past history which has lead to last minute case cancellations. Other members of the GYN service have had to intervene and/or delay surgery due to inadequate management of the patient pre-operatively by Dr. Hsu. In several cases the provider identifying the salient clinical information has been an ARNP or a resident; such important confounders as need for peri-op anticoagulation, markedly low hemoglobin levels.

### 3. Professionalism

Dr. Hsu has significant deficiencies in timely documentation, and has been on the list of providers at risk for suspension for countless weeks since his employment. The importance of timely chart completion has been discussed with him on several occasions with regards to integrity of the information, appropriate patient care handoffs with other members of the team, and for appropriate billing practice. His notes have often been delayed weeks at a time impacting the process of the patient's care (i.e. they present for a test and no note is in the chart with their history).

This fundamental lack of organizational skill was recognized early and address with him. The institutional policy was reviewed with him. He was given the tools to be successful and still struggled. He was given all of the REI templates, smart phrases, and order sets. By means of remediation we provided numerous "at the elbow" one-on-one help sessions with a DHMC computer help assistant. He continued to struggle with timely note completion.

We have received complaints from members of the housekeeping staff of very poor state of his office. We have counseled him to remove piles of soiled scrubs, and a numerous empty used food containers. He has been offered assistance in establishing a workable environment for himself.

He does not meet with other professionals and residents in his office. He often imposes on the workspace of others, leading to distraction of ongoing clinical care.

He has been given specific guidelines with regards to his clinical patient care schedule, and expectations for performance. It has been a consistent pattern of his to email or go directly to the secretarial staff and ask them to limit his schedule, make substantive changes; often after his schedule has been filled.

*4. Technical Skill*

I have addressed some of the issues with his fundamental deficits in IVF/ART, but it cannot be over stated that my observation is that he has trouble integrating the technical skills that he has been sufficiently taught.

Most relevant to our practice, he has regressed considerably in his ability to perform embryo transfers. He has considerably changed the process he was taught, altered the technique to a far less favorable technique, and this has resulted in drastically lower pregnancy rates.

Moreover, his lack of ability to perform simple, common general GYN procedures is notable. He will not perform office D+C's for patients with known very early miscarriages, a fundamental skill that most second year OB/GYN residents can perform, often taking them to the OR.

He has trouble completing common OR based procedures such as hysteroscopy, D+C, and he reports inexperience with many common surgical procedures performed in reproductive medicine. These deficits have lead to considerable burden placed on other members of the service, the department, delays in care, and make it difficult for him to act in a teaching capacity for the resident and fellow staff.

*5. Admitting couples into treatment despite contraindication to care and/or meeting exclusion criteria for DHMC standard of care*

Dr. Hsu has adequate knowledge of the inclusion and exclusion criteria for IVF/ART as published and recognized as the standard of care at DH. We have had to intervene in the process of several couples care when he has inappropriately entered couples into an IVF cycle that do not meet these criteria.

We discontinued care when a couple that was known to have had prior children removed from their home from state child protection services was in the process of a fertility evaluation. This is a clear and published contraindication to providing this service at our institution. Even when he was made aware of their history, he declined to immediately contact the couple and discontinue care. Employees of the department of social work, through the department of risk management had contacted him with the information. Ultimately they contacted departmental leadership to intervene.

More recently our ARNP identified a female patient of Dr. Hsu's who was in cycle for an oocyte cryopreservation to have a significant and substantial narcotic dependence (estimated 170 mg of codeine daily). The option of oocyte cryopreservation was offered, but Dr. Hsu had not evaluated her narcotic dependence and it's potential impact on pregnancy and treatment. It was not until our associate care provider, and the REI nursing staff, identified this the need for a multi-disciplinary approach that the patient/couple received the appropriate care.

It was the ARNP and nursing staff that arranged for the patient to undergo a pre-operative assessment with the anesthesia service, the pain management service, and consultation with the Maternal Fetal Medicine Service. Ultimately she received the compassionate care she required to manage her dependency prior to pregnancy; organized and arranged by the MFMS service. She will go into inpatient care for substance dependence prior to further infertility treatment.

As we provide anesthesia services in a minor surgery suite in an outpatient setting we need to be constantly vigilant with patient safety. Had it not been for a

very clinically savvy ARNP, it is entirely possible the anesthesia service could have arrived the day of her harvest without full knowledge of the extent of her dependence.

### 6. Team member

Initially, Dr. Hsu actively sought out feedback, and was very open to instruction. Most recently he has behaved in an oppositional fashion.

I have received complaints from the general GYN division, resident staff, and from mid-level providers that he has assumed the care for their patients, booked patients for surgery, when his role was one of consultative service only. The need to be a responsive consultant and a good team member has been discussed with him on numerous occasions, and the behavior continues.

Most recently Dr. Hsu has called patients who are actively being managed by other providers and changed their plan without contacting the provider of record (and not because he is on call). This happened to a patient who is a member of the DH staff who called me on the weekend upset with the change. She also voiced the concern that Dr. Hsu had intentionally undermined the physician of record.

Another patient has requested reimbursement for her IVF treatment cycle because Dr. Hsu had counseled her that the decision made by another staff member was incorrect. He inappropriately disagreed with a treatment plan made by another attending, and communicated that opinion to the patient. This was not an issue of patient safety requiring intervention, it was his opinion. This behavior pattern has lead to chaos within the service, mistrust of treatment at DH, and has led to patients asking for financial reimbursement for their cost.

I do not state these opinions and observations without recognition of their implication. I do believe he has the skill to do straight forward oocyte harvests. Early on in his employment we gave him benefit of the doubt. His fellowship experience was limited. We have done our best to give him the skills to be successful at DHMC. The department of OB/GYN has given him the time and resources to be adequately and appropriately remediated in all areas of

deficiency. It is my opinion that employment at DHMC, with the clinical demand and his observed deficiencies, is not appropriate for Dr. Hsu. It is a disappointment, but I believe it true.

[ AUTOTEXTLIST ]

[ AUTOTEXTLIST ]
[ AUTOTEXTLIST ]

CONFIDENTIAL
DH0025539