# EXHIBIT 22

EXHIBIT

**22**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,

               Plaintiff,

vs.

DARTMOUTH-HITCHCOCK MEDICAL
CENTER, DARTMOUTH-HITCHCOCK
CLINIC, MARY HITCHCOCK
MEMORIAL HOSPITAL, and
DARTMOUTH-HITCHCOCK HEALTH,

               Defendants.

Case No. 5:17-cv-194

### PLAINTIFF'S RESPONSE TO DEFENDANT DARTMOUTH-HITCHCOCK MEDICAL CENTER'S FIRST SET OF INTERROGATORIES PROPOUNDED ON PLAINTIFF MISTY BLANCHETTE PORTER

Plaintiff Misty Blanchette Porter, M.D., ("Plaintiff" or "Dr. Porter"), pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and by and through her counsel, Katherine B. Kramer, Esq., of Katherine Burghardt Kramer Law Office PLLC, and Geoffrey J. Vitt, Esq., of Vitt & Associates PLC, responds as follows to Defendant Dartmouth-Hitchcock Medical Center's First Set of Interrogatories to Plaintiff. Plaintiff reserves the right to supplement her responses.

### Defendants' Interrogatories and Plaintiff's Responses

1.     Identify each person (other than your attorneys of record in this action) with whom you have had contact regarding the allegations contained in the Complaint.

**Response: Objection, vague and ambiguous as to whether the interrogatory refers to contact with individuals about the Complaint or about the underlying factual matter of the Complaint. As to the underlying factual matter of the Complaint, I have had contact with individuals including but not limited to those individuals mentioned in the Complaint and**

1

identified in my Initial Disclosures, and listed in response to Interrogatory #6 of Plaintiff's Response to Mary Hitchcock Memorial Hospital's First Set of Interrogatories.

2.     Identify and describe in detail all communications between you and any current or former employee or agent of Defendants that in any way refer or relate to your allegations, claims, or contentions in the Complaint or in this case. For each communication identified, please include the name of the person with whom the communication occurred; the person's title, if any, and employer; the date on which the communication took place; the medium through which the communication occurred; and the substance of the communication.

**Response: Objection, overbroad and unduly burdensome, duplicative of Defendants' requests to produce, and requests information more easily accessible by Defendants. Without waiving these objections, see Plaintiff's production of documents.**

3.     Describe in detail the alleged disability you purportedly developed in November 2015, including in your answer a detailed explanation of (i) why, by December 2015, your alleged disability was sufficiently serious that you could not continue to work as alleged in Paragraph 38 of the Complaint and (ii) every job duty or responsibility that you contend your alleged disability prevented you from performing without a reasonable accommodation.

**Response:  I developed a cerebral spinal fluid ("CSF") leak with associated neurologic symptoms in November 2015.  In early November, I began having mild headaches and hazy vision occasionally.  In late November, I had more severe symptoms, including severe head and neck pain, dizziness, vertigo, balance problems, tinnitus, general ill-feeling.  At first, I continued working despite the symptoms, even though in early December I was not feeling well, with fatigue, blurred vision, and headaches.  From December 5-11, 2015, I traveled to Dallas as an oral board examiner for the American Board of OB/GYN, and I developed double vision, no depth perception, no appetite, and loss of balance over the course of that trip.  After I returned from that trip, I did not work – and was unable to work – until the**

spring of 2016. Among other neurologic symptoms, I had extreme visual difficulties from the spinal fluid leak, including double vision, along with extremely painful headaches, slurred speech, fatigue, tinnitus, and slowed cognitive processing. I had an MRI on December 14, which indicated a possible CSF leak. On December 17, 2015, I had a CT guided blood patch at Dartmouth-Hitchcock. In late December, my primary care provider, Dr. Brooke Herndon, advised that I would be able to return to work on February 1, 2016. My condition had not improved by that point, so I was not able to return to work at that point. On March 3, 2016, I had an e-consult with the Mayo Clinic.

I returned to work on a very part-time basis starting in early April 2016. My primary care physician, Dr. M. Brooke Herndon at Heater Road Primary Care, approved my return to work at a maximum of two half-days per week, consisting of 90 minutes of work, a 30-minute break, another 60 minutes of work, and then returning home, with two days off between working. I was not authorized to return to the OR at that time, or to take call.

In late May 2016, I was told by my treating physicians at D-H that my CSF leak had healed, even though that turned out not to be the case because I continued having severe symptoms. In mid-June 2016, I increased my work hours to about 12 hours per week. I was limited to one task at a time, without handling complex cases or working in the OR. I was able to teach, handle IVF procedures, read ultrasounds, and provide ultrasound referrals and consults. I still suffered from dizziness, headaches, fatigue, and other symptoms.

In late August 2016, I began treatment at the Mayo Clinic. They quickly diagnosed a high-flow leak at T12-L1 and recommended a surgical repair. The Mayo Clinic physicians confirmed that the patch I received at D-H would not be able to fix a high-flow leak and was not the right treatment. I had surgery in early September 2016 at the Mayo Clinic. For about six weeks after the surgery, I was restricted to bed rest, although I did some work anyway. I wrote a book chapter, I reviewed some ultrasounds for physicians at D-H, and I provided some IVF consultations. Also, I called in for team meetings.

On or about November 4, 2016, I returned to work. I worked about 4 hours a week at first, and then increased to about 7 hours a week in December 2016. I briefly returned to the Mayo Clinic for treatment in January 2017. My goal was to return to full-time work

within the next few months. By March 2017, I was able to work about 20 hours per week. By the time my employment was terminated in June 2017, I had recently returned to the OR – which was the final step of my planned increased in duties – and could perform the majority of my prior job duties, although I was not able to work full time.

With the approval of my physicians and occupational therapist, I returned to work gradually with a prescribed set of work hours and a set of duty restrictions, and had a gradual increase in number of hours and intensity of job responsibilities. Over time, my work restrictions gradually decreased. My care team included my primary care doctor (Brooke Herndon), an occupational therapist (Greg Morneau), a neurologist (Tom Ward MD and Stewart Tepper MD), and a general surgery neuro-rehabilitation ARNP (Debra Fournier), along with the Mayo Clinic care team. I conferred regularly with Dr. Leslie DeMars about my work restrictions and gradual increase in responsibilities. The goal and the outcome anticipated by my care team was that I would make a full recovery.

I had a second surgery in September 2017 at the Mayo Clinic. I am now able to handle all of my prior responsibilities, although I am still proctored during surgery, and I am working three days per week. As a result of my successful treatment at the Mayo Clinic, it appears that my CSF leak has fully resolved.

4.    Identify and describe in detail each and every accommodation that you requested of Defendants between November 1, 2015 and the termination of your employment with Defendants, including in your answer an explanation of the specific purpose or reason for each requested accommodation.

Response: My work return responsibilities and documentation were well outlined by my primary care provider, occupational therapist, neurologists, and neuro-cognitive therapy provider, and shared with Dr. Leslie DeMars and others within the OB/GYN Department as was necessary, including Heather Gunnell. Debra Fournier and Greg Morneau outlined my work return, progress, and restrictions. The gradual nature of the return was increasing in both complexity and physical demands of the work. I will produce copies of this documentation in my possession.

4

The two primary accommodations were a limited number of hours of work, plus restrictions on the complexity of tasks that I would handle, with the goal of reducing both of those restrictions over time and returning to full capacity.

When I first returned to work in April 2016, I was limited to 5 hours per week. This soon increased to 7 hours per week. I heard comments from colleagues about me not pulling my weight due to my limitation on work hours. I was also limited to straightforward tasks. I was also required not to multitask and to have space by myself to work so I would not be distracted.

In June 2016, I increased my work hours to about 12 hours per week. In mid-June 2016, Dr. Leslie DeMars emailed the other REI physicians to remind them of the restriction that I was not to be distracted in the ultrasound reading room.

In July 2016, I was granted the accommodation of working partly from home. I then had surgery in September 2016 and was out of work for a period of time. By November 2016, I had returned to work again on a very limited basis, about 4 hours a week at first. My work hours gradually increased. By March of 2017, I was working about 20 hours a week.

Throughout this time, I gradually increased the complexity of tasks I could handle, as well as the number of tasks I could handle at any one time. By the time of my termination, I had returned to the OR performing minor surgeries under the observation of other surgeons. My position was terminated by D-H prior to my completion of the required number of proctored minor and major OR cases in order to reach full independent status again as a surgeon. The final step of the graduated return to full, unrestricted duty as outlined by my physicians was the return to full status as a surgeon performing major cases in the OR, a status I did not achieve prior to the termination of my position at D-H. Thus, I was terminated while still on disability.

5.    Identify the couple whom you allege, in Paragraph 40 of the Complaint, threatened to commence litigation against Defendants.

Response: Objection, this information is protected by HIPAA and I am not authorized to disclose it. The patient told me she contacted the General Counsel at Dartmouth-

Hitchcock, so her identity is already known to Defendants. The patient also told me she had multiple conversations with Dr. Leslie DeMars.

6.      Identify and set forth the full factual basis for your contention in Paragraph 43 of the Complaint that David Seifer "asked [you] to resume a full call schedule, ignored [your] work boundaries, and continually pushed her to extend [your] work time to consult with him and the other REI provider on their cases."

**Response:  Without waiving the right to supplement this response, I provide the following response. Dr. David Seifer asked me repeatedly to come in to the call schedule from the time I returned to work in April 2016 to the time following my recovery from my initial surgery. He would come in to my office, or interrupt me in the ultrasound unit, or interrupt me in clinic while I was seeing patients. I told him that I would consider being in the call schedule when I was back to 20 hours a week, and not without the approval of my physician. Despite this, he asked sometimes several times a month moving forward. He became rather belligerent about it and argued with me. I did not feel comfortable taking call while I was still recovering from the CSF leak, and I was advised by my medical team not to be within the call schedule.**

**In March 2017, both Dr. Seifer and Dr. Hsu were planning to be gone for the same weekend for non-urgent, elective meetings. The IVF program had actively cycling patients, and the general rules of the OB/GYN Department for time away was that unless it was our annual meeting (usually once in a year in October), the REI service needed to be covered by an REI doctor in town, especially with actively cycling IVF patients. I advised Dr. Seifer that I was not approved by my physicians to take call, nor was I physically ready to be back into the call schedule at that time.**

**Despite my objections to Dr. Seifer and Dr. Hsu being away simultaneously and therefore requiring me to be on the call schedule, both Dr. Seifer and Dr. Hsu left town and were unavailable by phone during the entire day. The REI nurse practitioner who was carrying the pager and seeing patients in the clinic could not reach either of them, and she called me at home on the weekend to have me make all treatment decisions for those**

patients cared for on that weekend. In addition, neither Dr. Seifer nor Dr. Hsu had signed any of their patients out. They had made treatment decisions earlier in the week that necessitated the ultrasound monitoring appointments for those patients on the weekend without updating me as to those decisions. It ended up being very stressful for me and physically and psychologically taxing, and not within my agreed-upon work restrictions.

In planning my work schedule, I spoke with Dr. DeMars and Heather Gunnell about my work restrictions, particularly the issue of call. I asked Ms. Gunnell if she wanted me to cut back my hours during the week and cover weekends. She told me that both Dr. Seifer and Dr. Hsu had regular and numerous openings in their schedule during the week and were not that busy. In addition, both Dr. Seifer and Dr. Hsu had regular administrative time and/or days off. Ms. Gunnell told me that I was more valuable to the OB/GYN Department by covering the ultrasound clinic than by taking call. Dr. DeMars told me that the resident house staff needed to have regular and quality teaching in gynecologic ultrasound, and that she wanted me to also cover IVF retrievals and transfers, specifically for patients for whom she had directly assigned me to the couple's care. For example, while I was out completely on disability, Dr. Hsu had misread ultrasound studies, and had made recommendations to patients to go to surgery based on those misread ultrasound exams. He was also not appropriately teaching the resident house staff in gynecologic ultrasound procedures. Dr. DeMars and Ms. Gunnell agreed that I should return with a concentration in GYN ultrasound clinics, outpatient clinic visits for complex gynecology, and to care for particular couples in IVF.

When I returned to work, I was restricted with regards to the number and complexity of tasks I could perform simultaneously, and restricted with regards to the number of distractions. Despite these restrictions, which were known to Dr. Seifer, he frequently interrupted me in the course of my clinical responsibilities. Dr. Seifer often came into my office, or the ultrasound clinic, and then refused to leave even when I reminded him of my work restrictions. It was very intrusive and it violated my work duty restrictions. When I complained to Ms. Gunnell about Dr. Seifer's behavior towards me, she completely ignored my request for her to step in. Her response to me was that I needed to be more forceful in telling Dr. Seifer not to distract me. When I complained to Dr. DeMars, she told me the same thing.

I felt that Dr. Seifer was asking me to handle both my work load and his workload for him, and that he was trying to reassign his work to everyone else. For example, as division head, he was supposed to draft consent forms. He did not appear able to handle this task and frequently asked others for help. Also, Dr. Seifer frequently asked me to read ultrasound images for him after hours on patients that he was jointly managing with Dr. Hsu. For example, he asked me how to manage a patient with a clinical history that was concerning for a possible tubal ectopic pregnancy and wanted me to call him with results that evening, after I had worked that afternoon. Based on my work restrictions, I was not supposed to work after I was done with my scheduled hours for the day. He was aware of this restriction, yet he asked me to work in violation of those restrictions.

I recall one time that Dr. Seifer came into the ultrasound unit in the middle of a very busy morning session and asked me about a patient he was going to see in Manchester several days later. I was already multi-tasking and was not to be distracted. He insisted I give him an answer even when I told him I was busy, and I was not available. I flatly told him that I could not provide non-urgent patient care issues in the middle of my work day due to my work limitations. Dr. Seifer would not leave. Even when I told him that I was unavailable repeatedly, he refused to leave.

Dr. Seifer and Dr. Hsu both were not sensitive to the physical space restrictions of my work restrictions, as well as the restrictions minimizing the distractions in the work space. The first day I was back in ultrasound, in mid-June 2016, Drs. Seifer and Hsu continued to be in the ultrasound reading room during the beginning portion of the clinic even though I needed this space, and they didn't leave when I asked them to. I got behind with patients that day, and had to make a patient wait for a pregnancy viability scan. This was very stressful for me, since I was newly back to work and was not supposed to be distracted or stressed.

7.    Describe in detail why, at the time your employment with Defendants was terminated, you had been primarily performing "non-REI work," as alleged in Paragraph 46 of the Complaint.

8

Response: My responsibilities at D-H were numerous and complex. The following list provides an overview of my responsibilities that were not REI-related, including some specific examples of patients I handled around the time of my termination. At the time of my termination, there was plenty of this work to occupy my entire schedule, even once I returned to full-time work.

1.) Fertility preservation. For example, I provided oocyte, sperm, and embryo freezing consults for Norris Cotton Cancer patients desiring to freeze gametes and embryos in advance of chemotherapy. This is a service recommended by the American Society of Clinical Oncologists. I was regularly consulted by GYN oncology and hematology oncology for young women with cancers (e.g., breast, lymphomas, colorectal, endometrial cancer, borderline ovarian cancer, and cervical cancer) who desired fertility preservation.

2.) Minimally invasive advanced laparoscopic surgery for a host of benign gynecological diagnoses.

3.) Work-up and counseling for couples experiencing recurrent pregnancy loss.

4.) Complex operative hysteroscopy surgical consults, such as for removal of a myoma (fibroid) in a patient with primary infertility desiring to retain fertility.

5.) Subspecialty consults for the treatment of abnormal uterine bleeding in patients with complex medical diagnoses, such as in a 16-year-old with multiple congenital anomalies, including Mullerian anomaly, and multiple prior surgeries.

6.) Consult for patients with birth defect(s) of the reproductive tract, such as determining treatment of a 21-year-old with a Mullerian anomaly (uterine birth defect) with a longitudinal vaginal septum.

7.) Consults for hysterectomy for benign diseases, such as perimenopausal bleeding and uterine fibroids. While there may be other providers at D-H who can offer this service, it is frequently presented and multiple competent providers are necessary to handle the work flow in a timely fashion.

8.) Consult for benign adnexal masses in a post-menopausal patient with a complex adnexal mass.

9.) Annual appointments for prior GYN patients whom I had seen over the years for various complex gynecological problems.

10.) Basic infertility evaluation, including ultrasound guided tubal patency studies when indicated. I am a national expert in the performance of ultrasound guided tubal patency study, which is an examination of the condition of the fallopian tubes. None of the remaining gynecologists at D-H know how to do

them, and one of the generalist OB/GYNs called me shortly after my termination and asked me to walk her through how to perform the procedure, as she had never done or seen one, and a patient on her schedule later that day had requested it. This is part of the basic infertility evaluation. Even though D-H does not have an REI division now, D-H still has need for completion of basic fertility evaluations. The OB/GYN department at D-H has been trying since my termination to provide basic treatment in infertility care and has not been successful. This has caused multiple patient complaints to administration, staff, and to providers. While faculty have begun to perform tubal patency studies the traditional way (HSG), these studies are more painful to the patient, expose the patient to ionizing radiation, and do not obtain as much information in a single study as an ultrasound guided procedure.

11.) First trimester ultrasound for pregnant patients. I provided first trimester ultrasound and comprehensive first trimester care to patients with pregnancy complications. Providers at D-H are now having a difficult time scheduling their patients for dating and viability ultrasounds. Often the dates of service offered are 1-2 weeks out from the date of service requested. Understandably, a patient with a concern for pregnancy viability does not want to wait a week or two weeks to find out if her pregnancy is viable. I performed a large number of first trimester ultrasound exams in the unit imbedded with the 5th floor of the OB/GYN department. Now, the exams are largely completed in radiology, rather than OB/GYN. The patient is seen in the general ultrasound unit down on the third floor, and if it turns out to be a non-viable pregnancy, or a pregnancy complication, she has to walk all the way to another building to the 5th floor, sit in a waiting room full of pregnant patients, and wait to be counseled by the provider in the OB/GYN clinic. This is a hardship on these patients.

12.) Consultation for pregnancies in unusual locations. I provided a referral service for the diagnosis and treatment for entire DH referral network for the treatment of pregnancies in unusual locations (cesarean scar, cervical, etc).

13.) Consultation for uterine fibroids in a patient who desires fertility.

14.) Consultation for complex operative hysteroscopic for a patient with Asherman's adhesions (intrauterine adhesions) post myomectomy for surgical correction.

15.) Resident training: ACGME requires didactic lectures for the resident curriculum, and I often provided these lectures. Even if the REI Division closed, I could have participated in these lectures and provided this education to our residents. The D-H residents in OB/GYN are now traveling to UVMMC to rotate through REI to obtain this necessary educational experience.

16.) Consultation for abnormal uterine bleeding in pre- and post-menopausal women including the imaging and interpretation of those images (sonohysterography). I am a national and international expert.

17.) Ultrasound-guided benign gynecologic procedures (IUD complications, biopsy of the uterine lining, drainage of pelvic abscesses, drainage of pelvic cysts). I could do many procedures under ultrasound guidance, and in addition read the imaging study—for example, IUD removals where the string is lost, or the IUD imbedded within the uterus, or difficult IUD insertions. These services saved the patient an inpatient procedure performed in the operating room (expensive and unnecessary general anesthetic). I provided a consultative service to the entire OB/GYN department at DH for ultrasound guided procedures. I was the only provider at D-H credentialed to both perform the procedures and read the ultrasounds. There are no other gynecologists at D-H who are credentialed or adequately trained to read ultrasound. Now, procedures that I could have handled by myself at D-H require two attending physicians, one from OB/GYN and one from radiology.

18.) Consultation and re-interpretation of GYN ultrasound, such as for adnexal masses (i.e., masses in areas close to and related to the uterus, such as the ovaries, fallopian tubes, or surrounding connective tissue) in all patients, including during pregnancy. I regularly was asked to re-read ultrasound images from studies that were performed both within radiology at DH, and from outside the facility.

19.) Consults and collaboration for medical endocrinology. The medical endocrine fellows used to rotate through REI to see, for example, how we approached clinical management for patients with polycystic ovarian syndrome, or pituitary tumors such as prolactinomas who wanted to become pregnant and weren't ovulating. I frequently consulted for these issues. Indeed, I have been asked by one of the attending physicians in Division of Medical Endocrinology at D-H to give a didactic lecture to the Medical Endocrinology service on the basic infertility evaluation. The Medical Endocrinology service at D-H is now providing some care for infertility patients and the medical endocrinology service does not feel it has a way to provide a comprehensive evaluation to these patients, nor a current paradigm by which to evaluate these patients. I have seen two patients within the last week in consultation from Medical Endocrinology at DH.

20.) Consultation for pediatric gynecology. Before my termination, I was handling the overwhelming majority of consults in pediatric gynecology for such diagnoses as ovarian cysts, persistent vaginal discharge, vaginoscopy for children with vaginal bleeding, congenital reproductive tract anomalies, etc.

21.) Geisel School of Medicine lectures for second year course.

22.) Ovarian conservation surgery, such as cystectomy for women with masses who desire fertility and gonad sparing.

8.     Identify each and every job responsibility that you performed, as of the date on which your employment with Defendants was terminated, which you contend was essential to the functioning of the Department of Obstetrics and Gynecology, as alleged in Paragraph 46 of the Complaint, including in your response an explanation of why each responsibility was essential to the functioning of the Department, whether you performed the responsibility before you allegedly became disabled and, if so, the number of hours per week in which you performed the responsibility before you allegedly became disabled.

**Response: Reserving the right to supplement my response, I will provide detail as to numerous components of my responsibilities in the REI Division.**

**All of my responsibilities were essential to the functioning of the department because I brought 27 years of experience and an internationally-recognized level of expertise. Even when other physicians could perform the same tasks, I had an exceptional skill level and could help train the other physicians and the resident house staff. Plus, there were numerous types of procedures that no other physicians at D-H were able to perform. In particular, I offered a skillset in gynecologic ultrasound, advanced hysteroscopic and laparoscopic surgery, and endocrinology that was essential to the functioning of the OB/GYN Department and is not replicated to an equivalent extent by the current providers at D-H.**

**Before I was injured and disabled due to the CSF leak, I was working 1 to 1.5 days a week in the OR (8-12 hours a week) for a host of GYN surgeries, both minimally invasive and open procedures; plus 12-16 hours per week of gynecologic ultrasound procedures, first trimester ultrasound, abnormal uterine bleeding and post-menopausal bleeding, etc., and I had a resident with me most days; plus clinic 16 hours a week; and teaching fellows, residents, resident didactics, medical school teaching, etc.**

**Below is my job description:**

**Faculty member – Division of Reproductive Endocrinology and Infertility (REI), Department of Obstetrics and Gynecology**
   ***Clinical care*:**
   - **Evaluation and management of complex patients with infertility, reproductive endocrinology disorders and benign gynecologic disorders.**

- Requires acquisition and synthesis of complex information to make treatment recommendations.
- Medical management of patients requiring synthesis and management of co-morbidities.
- Surgical management including office based and OR based procedures requiring hand-eye co-ordination, fine and gross motor skills as well as real time management of intra-operative situation to achieve surgical goal and preserve patient safety. As surgeon, she is responsible for team dynamics and coordination of surgical care of the patient before, during and after the procedure. At least one full OR day per week.
- Call coverage of REI patients as well as back up call for benign gynecology. Approximately 1:3 weeks for REI, 1:8 weekends for benign gynecology

*Teaching*:
- Real time clinical training of medical students, residents in Obstetrics and Gynecology and Fellows in REI.
- Didactic sessions

*Research:*
- Active participation in standards and guidelines for evaluation of early pregnancy as well as evaluation of ovarian masses.

**Medical Director Assisted Reproductive Technology Program**
*Clinical care:*
- Evaluation and management of complex patients with infertility. Requires acquisition and synthesis of complex information to make treatment recommendations.
- Medical management of patients requiring synthesis and management of co-morbidities.
- Surgical management including office based and OR based procedures requiring hand-eye co-ordination, fine and gross motor skills as well as real time management of intra-operative situation to achieve surgical goal and preserve patient safety.

*Administrative*:
- Development of protocols, procedures, clinical practice guidelines and consent forms for ART

*Research*:
- Active participation in divisional research activity and collaboration with our clinical affiliate, the University of Vermont

**Director of Gyn Ultrasound**
*Clinical care:*
- Assessment and synthesis of complex patterns of ultrasound images to report findings and make treatment recommendations.

13

*Administrative:*
-   **Ongoing quality improvement measures for gyn ultrasound at DHMC; education of residents in Obstetrics and Gynecology and Fellows in REI about performance, interpretation and reporting of gyn ultrasound.**

*Research:*
-   **Participation in international observational trials of the evaluation of early pregnancy and ovarian masses**

9.      Identify and set forth the full factual basis for your contention in Paragraph 48 of the Complaint that "the Dartmouth-Hitchcock administration told members of the staff that the decision to terminate [your] employment was motivated by the fact that [you] had been out of work for an extended period and was only able to work part-time," including in your response:

a.      Each and every individual who provided information to you that in any way forms the basis of this allegation, in whole or in part, including the date on which such information was provided and the substance of the information provided; and

b.      Each and every member of the Dartmouth-Hitchcock administration who made the statement or statements referenced in Paragraph 48 of the Complaint to "member[s] of the staff," including the date on which such statement was made, the staff member(s) to whom the statement was made, and the substance of the statement.

**Response:  Without waiving the right to supplement, I provide the following response. After the REI Division had been closed and Dr. Leslie DeMars had stepped down as Chair of OB/GYN, Dr. Ed Merrens was asked to meet with members of the department for a formal discussion with leadership.  To my understanding, there was a general unhappiness and uneasiness within the OB/GYN department and the morale was very low.  A full OB/GYN department meeting would typically include residents, nursing staff, leadership, physicians, ARNP's and midwives—who ever could go.**

**Dr. Merrens met with many department members to discuss the status of OB/GYN, and his vision for moving forward.  To the best of my knowledge and recollection, this meeting occurred during July 2017.  He did not address the closure of REI until faculty**

14

members specifically asked him to address the closure of REI and my termination. Other faculty members made comments to Dr. Merrens that the closure of an entire academic division within the OB/GYN department would harm the educational experience of the residents and was bad for the residency program.

Michelle Russell brought up the "elephant in the room." Dr. Russell asked Dr. Merrens specifically about me, how could he possibly let me go after all of my contributions to the institution and to the department, and the continued need for my multiple skills within the department. From what I was told, Dr. Merrens was caught off-guard by the anger in the OB/GYN Department about my termination. Dr. Merrens responded to Dr. Russell that the REI Division was closed because it was understaffed. Dr. Russell responded that I contribute much more to the OB/GYN Department than simply IVF and REI procedures. Her point was that I could have been fully occupied with non-REI work if I had been reassigned to a general OB/GYN position in the department, and that I was an incredibly valuable member of the team. In responding to Dr. Russell's question, Dr. Merrens responded that I was only working part time, thus indicating that I was terminated and not reassigned to another position with OB/GYN because I was unable to work full time due to my disability. Michelle Russell told me this story when I went to her house to pick raspberries at her farm in July or early August 2017. There were many members of the OB/GYN Department at this meeting who could confirm the comments from Dr. Merrens.

Joan Barthold, MD, a long time general OB/GYN at D-H, also asked Dr. Merrens about my termination. Dr. Barthold also told me Dr. Merrens made a comment about my part-time status in responding to the questions about my termination, confirming what Michelle Russell had said. Dr. Barthold told me this when we went for a walk following a funeral we both attended in Lyme in the fall of 2017.

10.     Identify each and every REI nurse, ultrasound technician, and embryologist who approached you in July 2016 and expressed "serious reservations" about the alleged substandard technical ability of the new REI Division Director and other concerns impacting patient safety, as alleged in Paragraph 60 of the Complaint, including in your response the individual's name,

the specific reservation(s) he/she expressed, the date on which he/she expressed the reservation, and whether any other individuals witnessed the communication in which the reservation was expressed.

**Response: These complaints about the REI Division Director, Dr. Seifer, started from the very beginning of his employment at D-H in the spring of 2016 and accelerated in July 2016 when he began doing procedures. It is documented in several emails to Leslie DeMars, including specifically multiple emails evaluating David Seifer's harvest skills and when she asked for performance evaluations on him.**

I can't recall specific dates when individuals complained. It was an endless stream, from multiple sources, over multiple conversations, and in multiple different situations. Most of these conversations were witnessed by third parties, although some were not. The theme was always very clear, and the concerns were always similar – specifically, that the REI Division Director was unsafe with patients.

When each and every person complained or commented, I sent them to Dr. Leslie DeMars, to the head nurse, to their supervisors, and sometimes to Heather Gunnell, the practice manager. I always made sure to send them to report their concerns up the chain of command.

To the best of my recollection, these are some individuals I spoke with about Dr. Seifer.

- Sharon Parent (RN). She said that she believed it unethical to continue to let him perform procedures (specifically oocyte harvests). Sharon told me she gave the same feedback to Dr. DeMars. Specifically, she noted in conversations with me that he was unsafe; he did not seem to know what he is doing; he appears disoriented at times; he is unnecessarily rough with the intravaginal ultrasound probe; his patients woke up with much more pain than is typical following routine oocyte harvests; and it is unethical to allow him to continue to do oocyte harvests.

- Casey Dodge (RN). She said to me that Dr. Seifer was extremely rough with the ultrasound vaginal probe during the course of the oocyte harvest; she told me she felt he appeared disoriented at times; that he did not seem to know what he is doing during the course of the oocyte retrieval procedures; that the plastic test tubes that the follicular aspirates were collected were exceptionally bloody (and the nurses directly handle and pass these to the embryology lab during oocyte harvests, so she was familiar with the usual standard); and that she also felt he was unsafe. She asked me to come into an oocyte harvest procedure she was assisting with and she was not comfortable with him performing it.

16

- Mary Martin (RN). She said to me that there is a problem with Dr. Seifer, and that he should not be allowed to continue doing oocyte harvests.

- Jaime Florence (LPN). She said to me that there is something wrong with Dr. Seifer, and that she had learned to communicate with him like she does with her son who is on the autism spectrum.

- Pam Barlow (LPN). She said to me that there is something wrong with Dr. Seifer.

- Kathleen Mansfield (Head RN). I asked her if nurses had come to her about problems with Dr. Seifer. She said yes, they had. She told me that she had brought it up with Dr. Leslie DeMars but nothing had changed.

- Dennis Seguin (ultrasound technician). Dennis came to speak with me after he assisted Dr. Seifer during an embryo transfer. Dennis said that he had never seen anything like it, that Dr. Seifer did not seem to know what he was doing, and there was something really wrong. I told him to go to Dr. DeMars and the radiologist in charge of ultrasound to report his observations.

- Jenice Gonyea (senior ultrasound technician). She told me that there was something wrong with Dr. Seifer, and that Dr. Hsu was performing procedures without consent while Dr. Seifer was present and observing.

- Bonnie Nestler (senior ultrasound technician). She was concerned that Dr. Seifer was appeared to be struggling with embryo transfer procedures.

- Jennifer Carpenter (ultrasound technician). She was concerned that Dr. Seifer was performing procedures without patient consent.

- Navid Esfandiari (PhD lab director). He told me that Dr. Seifer would frequently come into his office and not leave, and that Dr. Seifer keeps asking him to pull data for him, which he should be able to do himself. He expressed concern that there was something wrong with Dr. Seifer, and that his technique for oocyte harvest was traumatic.

- Dennis Dela Cruz (Embryologist). Dennis told me that he observed Dr. Seifer performing oocyte harvests from the vantage point of the embryology lab and that he felt the harvest was physically rough, and that the test tubes the follicular aspirates were collected into were unusually bloody.

11.    Identify each and every ultrasound technician who "expressed further concern that unnecessary and inappropriate procedures" were being performed on patients "without appropriate consent," as alleged in Paragraph 62 of the Complaint. For each such technician

17

identified, include the individual's name, the specific concern(s) he/she expressed, the date on which he/she expressed the concern(s), the substance of the conversation in which the concern(s) was expressed, and whether any other individuals witnessed the communication in which the concern(s) was expressed.

**Response: To the best of my recollection, and reserving the right to supplement my response, I provide the following information. Jenice Gonyea told me that she observed Dr. Hsu and Dr. Seifer performing a tubal patency study on a patient whose tubes were tied (thus, it was impossible that she required a tubal patency study). For background, there are two types of fallopian tube patency studies. The traditional study is an HSG (hystero-salpingogram) completed in radiology under fluoroscopic guidance. Contrast dye is injected through the cervix, into the uterus, and out the fallopian tubes. It is a painful procedure, time consuming, and involves exposure to radiation. This is a commonly performed procedure that all REI physicians are supposed to learn when we are in fellowship. Neither Dr. Seifer nor Dr. Hsu performed this traditional and common test during the course of an infertility evaluation.**

**The second type of tubal patency study is a newer version of this test, and it is performed under ultrasound guidance. It is called a HYCOSY (Hystero-salpingo-contrast sonography). The study involves the provider placing a catheter into the cervix or uterus, and then instilling a mixture of sterile saline and air (or contrast foam) into the uterus and tubes. With the flow of air, which is echogenic, the air bubbles as they traverse the fallopian tubes into pelvis can be detected on ultrasound. Dr. Seifer did not perform either HSG or HYCOSY.**

**Jenice told me that Dr. Hsu had tried twice in the same day to perform tubal patency studies on two separate patients who presented *not for fertility concerns*, but for gynecologic concerns (abnormal bleeding) – i.e., patients for whom there was no indication for a tubal patency study. Jenice told me that she directly witnessed Dr. Hsu attempting to perform an ultrasound guided tubal patency study (HYCOSY) on a patient who had had her tubes tied, with Dr. David Seifer present, without either verbal or written consent. I asked her if she was certain that there was not a misunderstanding, and she said yes, there was no indication for the study, she was present for the entire time Dr. Hsu was present**

with the patient (as chaperone) and he never either verbally or in writing obtained consent from these patients. Jenice expressed marked concern to me several times over the next several days about these incidents. She was distressed as she spoke about it and recounted her observations. They were doing procedures without indication and without consent.

I asked her to go to Dennis Seguin, the head of ultrasound technicians and with Dennis to go to the radiologist physician head of ultrasound (either Anne Silas MD or Steve Sargent, MD at the time).

Dennis Seguin came to me in the ultrasound unit to talk about it afterwards. I asked him to go to the head of ultrasound and to Dr. Leslie DeMars with the complaint.

I also spoke with both Heather Gunnell and Dr. DeMars about it because I was seriously concerned. Ms. Gunnell told me that she had not yet heard about the incident and I asked her to follow up with Dr. DeMars. Dr. DeMars acknowledged my concern and told me she would speak with both Dr. Hsu and Dr. Seifer.


12.    Set forth the full factual basis for your contention in Paragraph 76 that two other physicians in the REI Division were engaging in "fraudulent" and "unlawful" conduct by "order[ing] and bill[ing] for unnecessary patient testing," including in your response every specific law that you contend was violated by this alleged conduct.

Response:  Objection, patient information is protected by HIPAA and Plaintiff is not authorized to reveal patient identities. Without waiving the foregoing objections, Plaintiff provides the following information. Dr. Albert Hsu and Dr. David Seifer were frequently ordering unnecessary lab tests at initial new infertility evaluations. For example, they both ordered patients to come back for unnecessarily frequent blood tests and ovulation induction monitoring that exceeded the applicable guidelines.

In addition, Dr. Seifer and Dr. Hsu both started ordering trial embryo transfers – also called mock embryo transfers – for all of their new infertility patients. This is not part of the standard infertility evaluation based on applicable guidelines. No other REI doctor in the history of D-H had ordered mock embryo transfers on *all* new infertility patients during the course of their initial testing and evaluation. When a new patient who presents

for an evaluation of their difficulty conceiving (as opposed to couples who already have been evaluated for potential causes of infertility by a consulting provider), there is a recommended evaluation for the patient/couple. A mock or trial embryo transfer is not a component of the recommended evaluation for an infertile couple.

It may be that an embryo transfer will never need to be performed, and therefore a trial embryo transfer is unnecessary. A mock embryo transfer should only be performed once the patient/couple has decided that she/they are likely to proceed with an embryo transfer. Performing a trial or mock embryo transfer on a patient who might never chose to pursue IVF and/or has no history of surgical treatments to the cervix, is unnecessary. Furthermore, many patients only have insurance for *diagnostic testing for infertility*. Performance of a mock embryo transfer for all women who are in the basic diagnostic phase of the evaluation of infertility (not those couples who know they are likely to choose IVF) is providing a service that may be unnecessary for a majority of the patients.

Insurance companies, including Medicaid, have a clear paradigm for what they will cover for the diagnostic work up. ASRM (our national organization) has a very clear outline of the recommended tests for the evaluation of the infertile female, and the routine performance of a mock or trial embryo transfer is not a part of this paradigm. This is the ASRM guideline entitled "Diagnostic evaluation of the infertile female: a committee opinion."

This caused an issue with excess billing and the potential to have the initial infertility work up denied, and it caused chaos in ultrasound regarding the work schedule. The patients didn't understand it. They came in for their ultrasound not understanding what was to be done. Dr. Seifer and Dr. Hsu made the change to order the mock transfer with the new infertility evaluations while I was out due to my CSF leak.

Performing unnecessary procedures allows for higher insurance billing – charges for radiology for both a limited pelvis and transvaginal scan, and professional OB/GYN fees for the mock transfer and the uterine/ovarian/tubal patency studies. I brought it up with Dr. Seifer and Dr. Hsu, and explained why it was unnecessary, time consuming, risked unnecessary charges and the risks of additional unwarranted procedures. Patients may decide never to go to IVF, some may decide to move to adoption, some may become pregnant with simpler means (such as ovulation induction), and some may not choose

treatment at all—yet we have charged all of them for the additional study and the study is not part of national guidelines. I also brought it up at the Value Institute and said frankly it was billing fraud to continue to bill for mock/trial embryo transfers under such circumstances. I explained to Dr. Seifer that the charges could be examined by insurance and it would be billing fraud. We knew these studies were not necessary and still Dr. Seifer and Dr. Hsu continued to order them and continued to have patients scheduled for them. It is unlawful billing fraud to order and bill for tests that you know are unnecessary.

13.     Identify each and every law that you contend was violated by the junior physician's alleged billing practices, as alleged in Paragraph 78 of the Complaint.

Response: Objection, this calls for a legal conclusion. Without waiving the foregoing objection and reserving the right to supplement, Plaintiff provides the following information. The applicable laws are federal and state statutes that prohibit billing fraud, including but not limited to the Health Care Fraud Act, the False Claims Act, the Civil Monetary Penalties Law, Social Security Act, HIPAA, the New Hampshire False Claims Act, New Hampshire Unfair Business Practices Act.

For billing purposes, physical space at D-H is designated inpatient, outpatient, etc. To avoid billing issues, you cannot evaluate and bill outpatients in space designated for inpatient care (inpatient space is often billed at a higher rate), and vice versa, we cannot bring an inpatient to the clinic and do an exam and bill for the consult in physical space designated as outpatient. We have to make certain the patient is discharged from the hospital and them bring them to clinic.

Dr. Hsu regularly took his outpatient couples to inpatient space and then billed for a full outpatient services provided within the inpatient space. I explained it to him several times and told him that aside from an occasional quick nonbillable consult in that space, he could not use those rooms for the purpose of seeing outpatients in inpatient space. Despite my explanation, he kept doing it. I explained it to Dr. Seifer who also ignored my warnings. Previous practice managers and coding specialists had told me I could not use the inpatient radiology space to see outpatients. I brought this up with Heather Gunnell as well. I knew from prior coding specialists, practice managers, and department director

that space was identified as inpatient radiology space. I told Dr. DeMars about it, and I told her that if we were audited it would be a problem. This is one of the reasons that Dr. DeMars took it upon herself to clear out Dr. Hsu's office so he could see patients in his office. Billing for procedures in the wrong space constitutes billing fraud, which is illegal. Eventually, Dr. Leslie DeMars forced Dr. Hsu to stop doing this.

It is also billing fraud to perform unnecessary procedures and tests, as discussed in response to other interrogatories.

14.    Identify each and every "experienced and competent provider," as alleged in Paragraph 81 of the Complaint, who had "been in discussions" with Defendants and were "interested in joining the REI Division." For each provider identified, state the individual's name, credentials, and experience; the date(s) on which the individual engaged in discussions with Defendants and the substance of those discussions; and set forth the full factual basis for your conclusion that the individual was competent and interested in joining the REI Division.

Response: The three providers were Judith McBean, Daniel Grow, and Erica Mahany.

Daniel Grow, M.D., M.H.C.M. is board certified in Obstetrics and Gynecology and Reproductive Endocrinology & Infertility. Dr. DeMars brought Dr. Dan Grow in for a behind-the-scenes set of interviews at the end of March 2017. Dr. DeMars told me he called her out of the blue and was interested in moving north from Baystate Medical Center. He was stepping down as Chairman of the Department at Baystate Medical Center. Dr. Grow wanted to move north, and he planned to practice for approximately another 10 years. He already owns a house in Vermont. Dr. Grow came up the night before his grand rounds, and Dr. DeMars and I took him to dinner at Three Tomatoes restaurant. He gave grand rounds on "Abnormal Uterine Bleeding" the next day, met with Dr. DeMars, and met with several members of the DH staff/community. Dr. DeMars told me on several occasions that Dr. Grow was excited to come to DH, and she felt she should discuss the issue of Dr. Hsu with him. Dr. Grow had been Dr. Hsu's faculty mentor when he was a resident at Baystate. I knew Dr. Grow previously from prior professional interactions.

Dr. DeMars had told me that Dr. Seifer was going to be leaving DHMC, and that Maria Padin was in agreement. She brought Dr. Grow in to interview to be a new senior faculty member as I was still recovering from my illness. She also told me Dr. Hsu would be leaving and that REI would look very different in the summer 2017. She told me she had multiple conversations with Dr. Grow and he confirmed his interest, and that by the summer of 2017 it would be Dr. Grow and me in REI and as the volume of patients allowed an increase in providers, Dr. Judy McBean would join us to be the third REI.

Judith McBean, MD, is a board-certified reproductive endocrinologist and infertility specialist. She trained 3 years ahead of me in residency and fellowship at UVMMC. Dr. McBean practices general OB/GYN and REI in Brattleboro, in a practice owned by Brattleboro Memorial Hospital. Dr. McBean had been working per diem for many years at DHMC as a reproductive endocrinologist in the REI Division. Her practice was considered a satellite location for the DH IVF program; however, I don't believe there was ever a financial or contractual agreement.

Dr. McBean was ready to step back and stop practicing obstetrics. Leslie had offered her a job in REI in the summer of 2016. Dr. McBean was ready to work with us 3 to 4 days a week. My understanding is that she was looking forward to a life of REI practice for the last 5-10 years of her career. Dr. DeMars had a lot of conversations with her about joining the division on more than a per diem basis.

Erica Mahany, MD is originally from Rutland, and the daughter of a long-time Rutland community-member Dr. Ernest Bove, a urologist. Dr. Mahany did a fellowship in REI in Michigan, and then stayed on as staff there. At the end of her fellowship, she was looking to move back to Vermont/ New Hampshire. She contacted me by email multiple times over the course of 18 months or so, and I spoke with her on the phone multiple times. She had spoken with one of our former residents from D-H and stated she knew we would be a good fit together in terms of practice style.

Dr. Mahany would have been a good fit for DHMC. She was strong in general gynecology, and her REI fellowship in Michigan provided excellent training. I spoke with Dr. DeMars about bringing her in before Dr. Seifer was hired, but Dr. DeMars did not want to hire another junior partner. When we couldn't hire her at DH, she stayed on at

**Michigan, but I understand she has just applied for a job in upstate or central New York and is still seeking an opportunity to come back to Vermont.**

15.    Identify each and every state law, federal law, and professional society guideline that you allege, in Paragraph 90 of the Complaint, Defendants failed to strictly comply with through their actions.

**Response: Reserving the right to supplement, Plaintiff identifies the following statutes: the Health Care Fraud Act, the False Claims Act, the Civil Monetary Penalties Law, Social Security Act, HIPAA, the New Hampshire False Claims Act, New Hampshire Unfair Business Practices Act. Plaintiff also identifies the following professional guidelines: American Society of Reproductive Medicine ("ASRM") guidelines and CDC guidelines about Zika virus; the Joint Commission guidelines about informed consent; other applicable ASRM guidelines. Plaintiff also identifies the state licensure guidelines.**

16.    For each "violation of law" referenced in Paragraph 93 of the Complaint, identify each and every law that you believed, as of the time the alleged violation occurred, had been violated. For each such law, describe in detail your basis for believing the law was violated and identify the individual to whom you reported the alleged violation, the medium through which you communicated the report, the date on which you made the report, and the substance of the report.

**Response: Plaintiff will supplement this response. Reserving the right to supplement, Plaintiff identifies the following statutes: the Health Care Fraud Act, the False Claims Act, the Civil Monetary Penalties Law, Social Security Act, HIPAA, the New Hampshire False Claims Act, New Hampshire Unfair Business Practices Act, and the Fertility Clinic Success Rate and Certification Act (FCSRCA). Plaintiff also identifies the following professional society guidelines: ASRM and/or CDC guidelines about Zika virus; ASRM guidelines about informed consent; other applicable ASRM guidelines.**

**The unlawful occurrences included (1) the transfer and implantation of an embryo where transmission of Zika virus to the conception was a known risk; (2) performing**

procedures without obtaining patient consent; (3) fraudulent billing practices; and (4) failure to retain necessary personnel to validate federally-required data reports.

The transfer and implantation of an embryo where transmission of Zika virus to the conception was a known risk occurred in February 2017. I was asked by Navid Esfandiari (the head of the embryology laboratory) to review the chart and course of care for a couple under the joint care of Dr. Seifer and Dr. Hsu. The couple had created two embryos from an anonymous oocyte donor and using the husband's cryopreserved sperm that had potentially been exposed to the Zika virus. The couple had been evaluated by Dr. Seifer or Dr. Hsu the day they were traveling to Brazil on vacation. Either Dr. Seifer or Dr. Hsu should have requested that they cryopreserve sperm *before* traveling to areas where Zika was a known risk. The generally applicable guidance is that men should wait six months after traveling to a known Zika-endemic area before participating in a pregnancy. When Dr. Esfandiari brought the care of this couple to my attention, I contacted Risk Management at D-H. Risk Management took the position that the "consent form" signed by the couple was sufficient. I took the position that it was unethical and unsafe to proceed with the embryo transfer, where the potential harm was great and there was another option with significantly less risk (i.e., waiting six months).

More information about REI physicians performing procedures without obtaining patient consent is provided in response to Interrogatory 11.

More information about REI physicians engaging in fraudulent billing practices is provided in response to Interrogatories 12 and 13.

In addition, D-H violated the law by failing to retain necessary personnel to validate federally-required data reports upon closing the REI Division. The D-H reproductive science laboratory lab director (Navid Esfandiari, PhD) compiled the outcome pregnancy data for the DH IVF/ART program as is required for 2016. It was compiled and ready to be submitted to SART (and thus the CDC). Due to the lack of an IVF Medical Director to validate the data, SART removed the DH program registry and declined to allow submission of the data. Thus, DH did not report to SART and the CDC for the entire year of 2016, nor the portion of 2017 that the REI Division was open. I had reported to SART the absence of a medical director in the summer of 2017, to then-President of SART, Kevin

Doody, MD. If D-H had retained me in my position I could have validated the data and allowed for the proper submission of the required data.

17.    Set forth the full factual basis for your contention that Defendants discriminated and retaliated against you based on your alleged disability.

**Response: Without waiving the right to supplement, Plaintiff responds as follows. Due to my CSF leak, I was disabled from November 2015 through the present. My condition has greatly improved and I anticipate making a full recovery, to the extent I'm not already fully recovered. At the time of my termination, I was only able to work part-time and had restrictions as to the types of work I could handle. Other members of the REI Division did not respect my work boundaries and limitations, and they pushed me to go beyond those restrictions. Furthermore, when I brought the persistent and ongoing violations of these work restrictions to leadership, my concerns were ignored. I heard that there were numerous complaints about me not pulling my weight when I was restricted to only working part-time and to handling less complex types of work.**

**On the day the announcement was made of the closure of the REI division, in the meeting with a member of the staff of employee relations and Dr. Ed Merrens, Dr. Merrens counseled me not once, but three separate times to stay out on disability. The representative from employee relations counseled me to meet with Aimee Giglio and that Ms. Giglio would explain my ability to stay out on disability. After I was terminated, I learned that Ed Merrens informed members of the OB/GYN Department that my termination related to the fact that I was only able to work part-time.**

18.    Identify each person who assisted in the preparation of responses to these interrogatories. Include in your response a list of the interrogatories he or she assisted with and the nature of the assistance (including any information) provided.

**Response: Katherine B. Kramer, Esq., Geoffrey J. Vitt, Esq., and Julia Korkus (paralegal), helped with preparing all responses.**

DATED at Norwich, Vermont, in the County of Windsor, this 20th day of April 2018.

_M Blanchette Porter, MD_
Misty Blanchette Porter, M.D.
Plaintiff

STATE OF VERMONT
COUNTY OF WINDSOR, SS.

Subscribed and sworn to me this 20th day of April, 2018.

Before me: _____
        Notary Public
        Commission Expires:  2/10/2019

As to objections:

_____
Geoffrey J. Vitt, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2018, I caused a true copy of the above document to be served upon the attorneys of record for Defendants via electronic mail and first-class mail.

                    /s/ Geoffrey J. Vitt
                    Geoffrey J. Vitt

27

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| MISTY BLANCHETTE PORTER, M.D., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Docket No. 5:17-CV-194 |
| DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DISCOVERY CERTIFICATE

I certify that Plaintiff's Response to Defendant Dartmouth-Hitchcock Medical Center's First Set of Interrogatories propounded on Plaintiff Misty Blanchette Porter has been served by regular mail, postage pre-paid, and via e-mail to the following:

Donald W. Schroeder, Esq.
Daniel R. Long, Esq.
Foley & Lardner LLP
111 Huntington Avenue
Suite 2500
Boston, MA  02199-7610
DSchroeder@foley.com
DRLong@foley.com

Tristram J. Coffin, Esq.
Downs Rachlin Martin PLLC
tcoffin@drm.com

Dated: April 23, 2018

/s/Geoffrey J. Vitt
Geoffrey J. Vitt
Vitt & Associates, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittandassociates.com

*Counsel for the Plaintiff*
*Misty Blanchette Porter, M.D.*