# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | | |
|---|---|---|
| **MISTY BLANCHETTE PORTER, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 5:17-cv-194** |
| | ) | |
| **DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Misty Blanchette Porter, M.D., ("Plaintiff" or "Dr. Porter"), opposes the motion for summary judgment filed by Defendants Dartmouth-Hitchcock Medical Center, et al. ("Dartmouth-Hitchcock" or "Defendants"). In further support of this opposition, Dr. Porter also submits her Statement of Disputed Material Facts, along with supporting affidavits and exhibits.

### INTRODUCTION

Dr. Porter worked for 21 years at Dartmouth-Hitchcock in the Reproductive Endocrinology and Infertility Division ("REI") which was part of the OB/GYN Department. Dr. Porter was one of the physicians who started the Division. All of the witnesses in this case agree that she is an excellent physician with a broad range of skills that include (a) In Vitro

Fertilization ("IVF"), particularly cases that present unusual problems,[1] (b) complex, benign

(non-cancer) GYN surgeries such as myomectomies (removal of fibroids) and robotic surgery,

(c) treatment of pediatric and adolescent patients to preserve fertility, e.g. surgery for a vaginal

septum or uterine anomalies, and (d) complicated ultrasounds, including first trimester

ultrasounds.

In May 2017, Dartmouth-Hitchcock abruptly announced the closure of the REI Division

and the termination of the three physician providers within that division, including Dr. Porter.

In their moving papers, Defendants claim that they decided to close the Division solely because

of the lack of an adequate nursing staff.  Defendants contend that the sole reason for Dr. Porter's

termination was their decision to close the Division.  Although Dartmouth-Hitchcock terminated

the three physicians who worked in the REI Division, it re-assigned the other professionals who

worked in the Division, including a nurse practitioner.[2]  At the time of the closure

announcement, Dartmouth-Hitchcock senior management announced that the REI Division was

profitable, and defendants' witnesses have admitted that as of the date of closure, the Division

remained profitable and there was a demand for its services.  Daniel Herrick Deposition 16:8-11,

(Herrick Dep., MSJ Ex.7)[3].  Neither decision – the closure of REI and the termination of Dr.

Porter – was quite so simple as Dartmouth-Hitchcock tries to portray it now.  Dr. Porter was

---

[1]  Dr. Porter was able to help women who had tried repeatedly without success to become pregnant.  Dr. Leslie DeMars, who at the time was Chair of the OB/GYN Department, described Dr. Porter as "an amazingly gifted and dedicated reproductive endocrinologist who I think through technical skill and creativity was able to achieve lots of pregnancies and that's her 'Misty Magic'."  DeMars Deposition 43:1-10, (DeMars Dep., MSJ Ex. 6).

[2]  According to DH's own REI program description, the program was comprised of "highly skilled professionals including:  physicians, nurse practitioners, nurses, embryologists, a clinical social worker and other health professions." MSJ Ex. 9.

[3]  Citations to "MSJ Ex." refer to the exhibits in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, as listed in the attached index of exhibits, (MSJ Ex. 1).

unlawfully terminated by Dartmouth-Hitchcock. The record is full of evidence sufficient to show that Dartmouth-Hitchcock's stated explanations – closure due to a nursing shortage and termination due to closure – were pretextual. Dr. Porter alleges claims of wrongful termination, whistleblower retaliation, disability discrimination and failure to accommodate her disability. The record shows that Dartmouth-Hitchcock fired Dr. Porter because of whistleblower retaliation, a persistent series of complaints about the incompetence of the other two physicians in the REI Division, and disability discrimination. These issues create factual disputes for a jury to decide, and summary judgment must therefore be denied.

## FACTUAL BACKGROUND

At the time of the REI Division closure, the providers in the division were Dr. Porter, Dr. David Seifer, Dr. Albert Hsu, Elizabeth Todd (a nurse practitioner), and Dr. Judith McBean who provided per diem support. Declaration of Dr. Misty Blanchette Porter ¶5, (Porter Decl., MSJ Ex. 5).

Dr. Hsu joined the REI Division in 2014 after completing a fellowship in REI and having been an attending physician at another hospital. Shortly after his arrival, Dr. Porter realized that Dr. Hsu's basic technical skills, medical knowledge, and clinical judgment were wholly inadequate. She volunteered to take call with him for a period of about six months, to provide him with additional training and supervision. Over a period of six months, Dr. Porter took call with Dr. Hsu and tried her best to give him a foundation so that he could at least handle the routine work expected of a doctor in the REI Division. (Porter Decl., ¶2, MSJ Ex. 5).

Despite additional training from Dr. Porter, it became apparent that Dr. Hsu lacked the capacity to make sound clinical judgments and he could not integrate the technical skills that he had been taught into the day-to-day work of a doctor in the Division. In June 2016 at the request

of Dr. Seifer, the newly-hired Division Director (more about him later), Dr. Porter prepared a

ten-page memorandum that described in detail the problems with Dr. Hsu's performance. ███

████████████████████████████████████████████████████████████████████████████████

Dr. Porter sent this letter to Dr. Leslie DeMars, the Chair of the OB/GYN Department and the

one who ultimately recommended Dr. Porter's termination, and Dr. Seifer.  (MSJ Ex. 10).

    Dr. Porter reported her concerns about Dr. Hsu to Dr. DeMars on a regular basis.  (Porter

Decl. ¶4, MSJ Ex. 5). Dr. Porter was not, however, the only professional who told senior

management, especially Dr. DeMars, that Dr. Hsu could not safely practice medicine.  The

record shows that Dr. DeMars continually blamed *Dr. Porter* when other members of the

OB/GYN Department presented concerns about Dr. Hsu.  (MSJ Ex. 6).  Dr. Julia MacCallum,

who spent six years at Dartmouth-Hitchcock as a trainee in the OB/GYN Department, states that

she tried to avoid working with Dr. Hsu in the OR because of his "poor reputation" which, upon

working with him, she found "fully justified."  She described his technique as "rushed and

imprecise" in surgery to remove fibroids, and she "was surprised to see him literally yank at the

fibroids to forcefully rip and tear them away from the healthy uterine tissue."  Declaration of

Julia MacCallum, MD ¶6 (MacCallum Decl., MSJ Ex. 2). Dr. MacCallum concluded that it was

"irresponsible" for Dartmouth-Hitchcock to permit him to operate because he "presented a risk

to patient safety."  (MacCallum Decl. ¶8, MSJ Ex. 2).  In addition, Dr. Michelle Russell, an

attending physician in the OB/GYN Department at Dartmouth-Hitchcock, describes Dr. Hsu as

"not qualified" and lacking "the basic skills of a physician."  In her attached Declaration, Dr.

Russell describes an incident in which Dr. Hsu failed to understand the significance of a patient's

medical history, resulting in a tragic loss.  Declaration of Michelle Russell, MD ¶14 (Russell

Decl., MSJ Ex. 3).



A long-time nurse in the REI Division expressed similar concerns. Sharon Parent worked as a nurse for 41 years at Dartmouth-Hitchcock, the last 17 years in the REI Division. She reported to Dr. DeMars that both Dr. Seifer and Dr. Hsu had poor retrieval techniques and their patients routinely reported unusual levels of pain. She expressed concerns that Dr. Seifer's retrievals were the most bloody and painful she had ever witnessed. When Ms. Parent brought these concerns to Dr. DeMars, Dr. DeMars told her that Dr. Porter set the bar high and she had to accept that other doctors did things differently. Sharon Parent Declaration ¶¶3-6 (Parent Decl., MSJ Ex. 4).

When faced with these detailed, serious complaints from a variety of experienced REI professionals about the incompetence of Dr. Albert Hsu, Dr. DeMars dismissed all the criticisms and blamed Dr. Porter. Dr. DeMars attested as much during her deposition. She was asked: "It wasn't just Dr. Porter who had sharp, highly uncomplimentary things to say about Albert Hsu, correct?" Dr. DeMars replied: "I think they were all based on conversations that Dr. Porter had with individuals." (DeMars Dep. 70:17-24, MSJ Ex. 6). She went on to say that Dr. Porter's opinions had influenced everyone else's opinion of Dr. Hsu, despite the evidence that all these individuals had witnessed concrete examples of his incompetence first-hand and were experienced enough to have made individual assessments. (DeMars Dep. 71:3-11, MSJ Ex. 6).

Aside from Dr. Hsu and Dr. Porter, the other terminated physician in the REI Division was Dr. David Seifer. In early 2016, Dr. DeMars concluded that the REI Division needed an additional physician. Instead of conducting a national search, as would be the standard practice, Dr. DeMars recruited Dr. Seifer, who was working at Oregon after switching jobs multiple times within a few years. Dr. Seifer's record contained numerous other red flags, including negative reviews from colleagues and the fact that he had ceased performing clinical work. Merrens Deposition 74:3-75:22 (Merrens Dep., MSJ Ex. 8).

Multiple members of the Dartmouth-Hitchcock credentials committee – which reviews new hires before granting them clinical privileges – expressed serious doubts about hiring Dr. Seifer. As a result of this, Dr. Merrens, the Chief Clinical Officer of Dartmouth-Hitchcock, demanded that Dr. DeMars take personal responsibility for Dr. Seifer's success or failure. Dr. DeMars promised the committee and Dr. Merrens personally that she "would take personal responsibility" for Dr. Seifer's success. (Merrens Dep. 77:11-13, MSJ Ex.8). Dr. Merrens attested that "this was hers to ensure success. That's how she left the meeting." (Merrens Dep. 83:11-13, MSJ Ex. 8).

As she did with complaints about Dr. Hsu, Dr. DeMars blamed Dr. Porter for negative comments about Dr. Seifer. Dr. DeMars went back to the credentialing committee in January 2017, for follow-up related to Dr. Seifer. During the meeting, Dr. DeMars attempted to convince the committee members that any negative comments in Dr. Seifer's evaluation were contributed by a "potentially biased source," i.e., Dr. Porter. (MSJ Ex. 12).

Dr. DeMars went as far as to blame Dr. Porter for negative things she herself had written about Dr. Seifer. Shortly after Dr. Seifer started working at D-H, Dr. DeMars texted the former chair of the REI division, Dr. Richard Reindollar: "Richard, I'm not sure that DS is clinically

competent. I don't know what he has been doing for 25 years, but I'm not sure it was IVF… I

have heard separately voiced concerns from nursing, anesthesia and ultrasound techs. The lab

folks complain about bloody aspirates and low egg counts." (DeMars Dep. 111:19 -112:4, MSJ

Ex. 6). During her deposition, Dr. DeMars blamed Dr. Porter for this criticism of Dr. Seifer:

"This is a conversation that I had with Misty that I am not attributing to her in this text."

(DeMars Dep. 112:8-9, MSJ Ex. 6).

When doctors and nurses began complaining almost immediately to Dr. DeMars about

Dr. Seifer's subpar performance and poor leadership skills, Dr. DeMars was in a quandary. If

she acted on these complaints, the members of the Credentialing Committee would inevitably

hear about it, and her position as OB/GYN chair could be at risk. But if she did nothing, the REI

Division would continue to flounder and there was a risk of patient harm, but her position as

Chair would remain secure. Dr. DeMars chose the second option of keeping quiet. When asked

in her deposition why she did not tell Dr. Merrens of the multiple complaints that she was

receiving about Dr. Seifer, Dr. DeMars admitted: "Because he looked at me at the Credentials

Committee and said this is on you." (DeMars Dep. 127:2-9, MSJ Ex. 6).

Caught in this ugly mess that she had created, Dr. DeMars' solution was to "clean house"

by closing the REI Division – thereby ridding Dartmouth-Hitchcock of two incompetent

providers and removing the problematic Dr. Porter.

In November 2015, Dr. Porter had become seriously ill with a cerebral spinal fluid leak

and associated neurologic symptoms. She initially received treatment at Dartmouth-Hitchcock,

but her treating physicians at Dartmouth-Hitchcock were unable to provide adequate care. She

ultimately underwent two surgeries at the Mayo Clinic and has now made a full recovery. (MSJ

Ex. 22, p. 2-4). During the period of approximately December 14, 2015 to June 14, 2016, she

was on a medical leave of absence and unable to work due to disabling symptoms. She returned

to work on a very limited part-time basis in April 2016, to provide care to specific patients who

had been waiting for her services.[4] From approximately June 14, 2016, to August 7, 2016, she

returned to work on a part-time trial basis at about 12 hours a week and was able to handle some

ultrasounds, IVF procedures, and consults. In August 2016, she was forced to take another leave

of absence due to continuing symptoms from the illness, and then returned to work part-time in

November 2016. (MSJ Ex. 22, p. 2-5).

By March and April 2017 – before Dartmouth-Hitchcock decided to terminate her

employment – she was working 20 hours a week and had returned to performing her full range of

prior abilities, including complex surgery. In mid-April 2017, the Chief Medical Officer of

Dartmouth-Hitchcock, Dr. Maria Padin, proctored Dr. Porter during a complex surgery. After

the surgery, Dr. Padin wrote to Dr. Porter: "You are a talented surgeon. Thanks for inviting me

to your case." (MSJ Ex. 13).

Dr. Porter's disability was front-of-mind for Dr. DeMars and Dr. Merrens when they

decided to terminate her employment. The decision to close the REI Division was made in late

April 2017, and the announcement was made – along with the announcement of the three

terminations – in early May 2017. Within a week or so after announcing the closure of REI and

the physician terminations, Dr. Merrens reached out to Dr. DeMars by email, with a copy to

Daniel Herrick, regarding the REI Division and Dr. Porter in particular. He wrote: "I am getting

inundated with heartfelt and long emails wondering why Misty can't stay on to do her ultrasound

complex operative and teaching role even if we end REI. I suspect that you considered this in

---

[4] Several medical residents who wanted IVF services were unwilling to have Dr. Seifer or Dr. Hsu handle their pregnancies.

the evaluation [of] the program and your knowledge of Misty. I just need to know how better to answer this question." (MSJ Ex. 14). Dr. DeMars wrote back to Dr. Merrens with repeated reference to Dr. Porter's disability. Among other references to Dr. Porter's disability, she wrote: "Misty's medical disability has been devastating, and I'm not sure that she should or will really ever be able to do the complex hysteroscopy or laparoscopy that she once did… I think that the best outcome of this termination is the chance for Misty to actually be out on leave with no intervening responsibilities, so that she can assess how much improvement she might gain." (MSJ Ex. 14). Dr. Merrens confirmed his agreement with Dr. DeMars's perspective, responding: "I think it's a comprehensive, thoughtful and appropriate insight. Thanks for taking the time to do this. Ultimately once the dust settles, [we] will be in a better position with all this, including Misty." (MSJ Ex. 14).

In addition, on May 12, 2017, Dr. Merrens received one of those "inundating" emails from Victoria Maxfield, a nursing coordinator at Dartmouth-Hitchcock, asking why Dr. Porter was terminated when she provided such valuable and varied work to the department. Dr. Merrens wrote back: "As you know Dr. Porter currently works at 20% of her time currently and I'm not sure of her interest in staying on if the infertility part were to cease." (MSJ Ex. 15). He specifically referenced her disability – although he inaccurately characterized her ability to contribute to the REI division, as she was working 50% time, not 20%. Additionally, he reflects the patronizing attitude also demonstrated elsewhere by Dr. DeMars, that Dartmouth-Hitchcock could make the best decision for a disabled Dr. Porter, without exploring her preference among a variety of employment options. In addition, after the closure of REI, Dr. Merrens hosted a meeting for the OB/GYN Department to discuss the closure. During that meeting, he was asked

by Dr. Michelle Russell why Dr. Porter had been terminated. Dr. Merrens' response: Dr. Porter is "on disability." (Russell Decl. ¶10, MSJ Ex. 3).

Although Dartmouth-Hitchcock attempts to portray the REI closure as the sole decision of Dr. Merrens, the record shows that Dr. Merrens relied heavily on input from Dr. DeMars and also Daniel Herrick. In an email dated May 12, 2017, Dr. Merrens wrote that "[t]he recommendations around closing the program and its staff were at the recommendation of Dr. DeMars." (MSJ Ex. 15). As noted above, Dr. Merrens reached out to Dr. DeMars after the closure announcement to find out how to answer the question of why Dr. Porter had been terminated. *See* MSJ Ex. 16 (Merrens: "I just need to know how better to answer this question.").

The evidence in this case shows that Dartmouth-Hitchcock did not close the REI Division because of a nursing shortage. Internal emails among senior management establish that the "problem" recruiting nurses was at best a convenient excuse. On May 2, 2017, Dr. Merrens wrote a deeply revealing email to the Director of HR, the General Counsel, and the Associate General Counsel regarding the closure of the REI Division, *See* MSJ Ex. 17 (Emphasis added):

> While on the surface we are pinning the dissolution of our reproductive endocrinology program on our failure to maintain and recruit nurses for this work, it is ultimately the dysfunction of the physicians who worked in this area for years (as well as recent hires) and ultimately a failure of leadership, for which I hold Leslie fully accountable.

> The fact that failures of such programs due to nursing shortages are not common and we'll be referring patients to a similar, rural academic REI center in Burlington, Vermont, will make our explanation to the public, patients, and the media, well, rather thin.

> In the context of this email and as used elsewhere by Dartmouth-Hitchcock,

"dysfunction" is a code word for tension and discord that arose because of management's refusal

to act on the frequent complaints by Dr. Porter and others about the incompetence of Drs. Hsu and Seifer, and Dr. DeMars blaming Dr. Porter for all of the trouble in the division.

Daniel Herrick, who was copied on Dr. Merrens' "I am getting inundated" email to Dr. DeMars, responded privately stating: "Ed, I am not including Leslie in this response. Based on my observations and interactions, Misty has been the biggest driver to the dysfunction within REI." (MSJ Ex. 16). In his deposition, Herrick admitted he had "no observation of Misty herself related to this, any negative or positive" but that he come to this conclusion based his discussions with Heather Gunnell and Dr. DeMars.  (Herrick Dep. 123:3-124:25, MSJ Ex. 7).  This baseless, but influential email from one decision-maker to another had the desired outcome: Dr. Porter was terminated rather than redeployed within D-H's OB-GYN department.      Dartmouth-Hitchcock management recognized that it could use the supposed nursing "shortage" as a way to justify closing the REI Division and firing the three physicians who were creating a variety of problems for Dartmouth-Hitchcock.  The evidence shows that Dartmouth-Hitchcock intentionally avoided taking steps that could have prevented a nursing shortage.  Among other such evidence, Sharon Parent, a nurse with 17 years' experience in the REI Division, gave management a year's notice of her intention to retire in December 2016, to give Dartmouth-Hitchcock management ample time to find and train replacements.  To her surprise, Dartmouth-Hitchcock "did not make a serious effort at finding a replacement."  (Parent Decl. ¶7, MSJ Ex. 4).  In addition, upon retirement, Ms. Parent offered to work 20 hours a week on a per diem basis, including weekends and weekend call.  In August 2017, after closure of the REI Division, Ms. Parent met with Dr. DeMars, who admitted that she had prevented Ms. Parent from returning on a per diem basis as a way of "protecting her" from getting caught up in the REI Division closure.  (Parent Decl. ¶8, MSJ Ex. 4).

11

In a late April 2017 email, Dr. DeMars reveals her frustration with the REI Division and her desire to find a good cover story to terminate Dr. Porter and the other REI physicians. She wrote to Daniel Herrick, a senior VP in charge of OB/GYN and other departments, that the messaging about closure of the REI Division was "very messy" and that an "ideal message" was that Dartmouth-Hitchcock was stopping IVF procedures because of staffing issues, but as she noted, "that doesn't answer why we can't continue doing NPW [non-pregnant women] and non-infertility evals." MSJ Ex. 18. Dr. DeMars bitterly concludes that "[m]y life and the messaging would be much easier if John Kacavas [Defendants' general counsel] determines that all three providers [in REI] . . . are facing loss of license." (MSJ Ex. 18).

Dr. Porter could have, and should have, remained employed at Dartmouth-Hitchcock even upon closure of the REI Division. In fact, the documents show that retaining Dr. Porter was the initial plan and presumed intention by those who were not Dr. DeMars. (MSJ Ex. 19). (Gunnell: "My assumption is that MBP will be refocused to Gyn U/S."). By the time of the closure, Dr. Porter was working 20 hours per week and had returned to performing complex gynecological surgery, along with other aspects of her practice. Even with the closure of REI or the suspension of the IVF program, Dr. Porter could have been fully occupied with other OB/GYN clinical work that was not solely REI and that other attending physicians in the OB/GYN department did not have the skill set to perform. Dr. MacCallum remained at Dartmouth-Hitchcock for a significant period of time after the REI closure and attested to the clinical gaps that resulted from losing Dr. Porter in the OB/GYN Department. "She was frequently asked to re-read and interpret ultrasounds when another attending physician had a question or was unsure of a reading. She performed ultrasound-guided procedures that no other physicians in the department performed, such as HyCoSy (hysterosalpingo-contrast-sonography),

a test used to assess for infertility caused by Fallopian tube problems. […], She was the only physician at Dartmouth-Hitchcock who was capable of performing complex hysteroscopic surgery, such as uterine septum removals." (MacCallum Decl. ¶9, MSJ Ex. 2). As further proof of the need for her general GYN skills, the OB/GYN department submitted a hiring request in June 2017 – immediately after the closure of REI – for a generalist GYN, citing short-staffing as the basis for an urgent hiring need. (MSJ Ex. 20). Moreover, Dartmouth-Hitchcock did not terminate all of the providers in REI – they retained Elizabeth Todd, a nurse practitioner, and redeployed her to generalist GYN work, on the supposed grounds that Ms. Todd's skill set was not solely REI – but then, neither was Dr. Porter's. Further, almost immediately after closing the REI Division, Dartmouth-Hitchcock began exploring options for reopening the division. (MSJ Ex. 21).

## ARGUMENT

Dr. Porter respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety and allow her to bring her case before a jury. Plaintiff's claims fall generally into two categories – whistleblower retaliation and disability discrimination. Count 1 (wrongful discharge) and Count 2 (violation of New Hampshire Whistleblower's Protection Act) both derive from Dr. Porter's wrongful termination due to her continual expression of concern and complaints regarding the wrongful practices of her colleagues, Dr. Seifer and Dr. Hsu. The legal framework for Count 1 and Count 2 differs, but the underlying theory of causation is the same. Count 3 (violation of the Americans with Disabilities Act), Count 4 (violation of Section 504 of the Rehabilitation Act), Count 5 (violation of New Hampshire anti-discrimination and retaliation statutes RSA 354-A:7, RSA 354-A:7, VII, and RSA 354-A:19), and Count 6 (Vermont anti-discrimination and retaliation statutes, 21 V.S.A. § 495 *et seq.*) derive from

disability discrimination, including both wrongful termination as a result of disability discrimination and failure to accommodate.

Dr. Porter alleges that her wrongful termination by Dartmouth-Hitchcock is illegally grounded in *both* whistleblower retaliation and disability discrimination. The record bears this out, with evidence that senior leadership at Dartmouth-Hitchcock was motivated to terminate Dr. Porter wrongfully due to both factors. However, questions of intent are factual in nature and therefore should be left to the determination of a jury, not adjudicated at summary judgment.

## I.    LEGAL STANDARD

Summary judgment is proper only if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Svcs., LP*, 22 F. 3d 1219 (2d Cir. 1994) (reversing grant of summary judgment in favor of employer on discrimination complaint). When reviewing a motion for summary judgment, a court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court does not engage in credibility assessments, nor does it choose between conflicting versions of events or weigh the evidence. *See, e.g.*, *Cincinnati Ins. Co. v. S. Vermont Sprinkler Servs., Inc.*, No. 5:17-CV-254, 2019 WL 5698930, at *2-*3 (D. Vt. July 10, 2019) (Crawford, J.).

Trial courts must be particularly cautious about granting summary judgment to employers when intent to discriminate is at issue, as it is in this matter. "Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, and, therefore, the

14

Second Circuit has repeatedly cautioned against granting summary judgment in employment discrimination claims where the intent of the employer remains at issue." *Kwon v. U. of Vermont & State Agricultural College*, 912 F. Supp. 2d 135, 141 (D. Vt. 2012). "This Court has long recognized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" *Walsh v. New York City Housing Auth.*, 828 F. 3d 70, 75 (2d Cir. 2016) (reversing district court's grant of summary judgment for employer) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F. 3d 93, 101 (2d Cir. 2010)).

## II.    SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S WRONGFUL TERMINATION CLAIM.

The Court should deny summary judgment on Plaintiff's common law wrongful termination claim and permit the claim to be presented to the jury at trial. Dr. Porter has more than enough evidence to support her claim for common law wrongful termination, thus precluding summary judgment for Defendants.

The standard for wrongful termination under New Hampshire law is simple and well-established, and the basic contours of the legal standard are accurately stated by Defendants. The standard requires that Plaintiff must show "that the defendant was motivated by bad faith, malice, or retaliation in terminating the plaintiff's employment," and "the plaintiff must demonstrate that [s]he was discharged because [s]he performed an act that public policy would encourage, or refused to do something that public policy would condemn." *Cloutier v. Great Atl. & Pac. Tea Co.*, 121 N.H. 915, 922 (1981). At this stage, Plaintiff need not prove her case, but instead must show that there is sufficient evidence to create a factual dispute that requires resolution by the jury, not the Court. *See* F.R.C.P. 56(a). Plaintiff readily meets this standard for denial of summary judgment.

As to the first prong, there is plenty of evidence that Defendants were motivated by bad faith, malice, or retaliation in terminating Dr. Porter's employment. Dr. DeMars had a strong motive to blame Dr. Porter for the problems with Dr. Seifer and Dr. Hsu, namely an interest in protecting herself from scrutiny and potential job loss herself. In a word, Dr. DeMars was compromised. During the credentialing process, Dr. Merrens warned Dr. DeMars that she was responsible for the success – or failure – of Dr. Seifer. When it became clear that Dr. Porter was continually vocal about the problems with Dr. Seifer, Dr. DeMars retaliated against Dr. Porter by terminating her employment. Further, Dr. Merrens blames the closure of the REI Division on "dysfunction," which is a code word for the combination of outspoken critique by Dr. Porter and incompetence of Drs. Seifer and Hsu. In addition, there was plenty of work for Dr. Porter to continue to perform even with the suspension of the IVF program or the closure of REI, and Dr. Porter provided skills and expertise not possessed by others in the department. By the time of the closure, Dr. Porter had returned to performing complex gynecologic surgery – including a surgery in which Dr. Padin, the Chief Medical Officer of Dartmouth-Hitchcock, declared Dr. Porter to be a "talented surgeon" – and she was able to provide numerous other services for the department. MSJ Ex. 13. Dr. DeMars told Dr. Merrens that in some ways the "most desirable outcome" for the OB/GYN Department would be retaining Dr. Porter, *except for* Dr. Porter's "past behavior and her inability to be just a worker bee," which is reference to Dr. Porter's vocal criticisms of the other two REI physicians. (MSJ Ex. 14).

As to the second prong, Dr. Porter has more than adequately demonstrated that she was discharged for performing an act that public policy would encourage. "The public policy contravened by the wrongful discharge can be based on statutory or nonstatutory policy." *Cilley v. N.H. Ball Bearings, Inc.*, 128 N.H. 401, 406, 514 A.2d 818 (1986). The public policy at issue

here is encouraging employees to voice concerns about the incompetence and misconduct of

their coworkers, including the risk of harm to patients. Further, public policy protecting

whistleblowers is demonstrated by New Hampshire statutory law, including RSA 275-E:2

("Protection of Employees Reporting Violations"). *See Karch v. Baybank FSB*, 147 N.H. 525,

537, 794 A.2d 763, 775 (2002) ("The Whistleblowers' Protection Act recognizes a public

policy favoring the good faith reporting of reasonably perceived illegal actions of employers by

employees without retaliation, even if it is ultimately determined that the employer engaged in

no illegal activity.") (internal citation omitted). In addition, summary judgment is not warranted

on this claim, given the need for evaluation by a jury. "In most instances, it is a question for the

jury whether the alleged public policy exists." *Cilley*, 128 N.H. at 406. *See also MacKenzie v.*

*Linehan*, 158 N.H. 476, 480, 969 A.2d 385, 389 (2009) ("whether the discharge of an employee

implicated a public policy is generally a question for the jury"). It is also a jury question whether

Dr. Porter's termination resulted from other acts that public policy would encourage. *See Cilley*,

128 N.H. at 406.

     Accordingly, summary judgment must be denied as to Plaintiff's common law claim for

wrongful termination.

### III.    SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S STATUTORY WHISTLEBLOWER RETALIATION CLAIM.

     Plaintiff asserts a statutory whistleblower retaliation claim, deriving from similar

circumstances as her common law wrongful termination claim. This claim is Count 2 (New

Hampshire Whistleblowers' Protection Act, RSA 275-E:2). The statute requires, in relevant part,

that "[n]o employer shall . . . discharge. . . or otherwise discriminate against any employee

regarding compensation, terms, conditions, location, or privileges of employment because . . .

[t]he employee, in good faith, reports or causes to be reported, verbally or in writing, what the

employee has reasonable cause to believe is a violation of any law or rule adopted under the laws of this state, a political subdivision of this state, or the United States[.]" RSA 275-E:2(I)(a).

Plaintiff concurs with Dartmouth-Hitchcock that her statutory whistleblower retaliation claim is analyzed under the familiar burden-shifting analysis of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the burden-shifting analysis, the initial burden is on Dr. Porter to establish her prima facie case. The burden then shifts to Dartmouth-Hitchcock to demonstrate a legitimate, non-discriminatory reason for her termination. So long as the defendant satisfies that burden, the burden then shifts back to Plaintiff to demonstrate that the offered reason is pretextual. *McDonnell-Douglas*, 411 U.S. at 802-04 (setting out burden-shifting approach). In *Appeal of Seacoast Fire Equip. Co.*, 146 N.H. 605, 608 (2001), the New Hampshire Supreme Court formally adopted the *McDonnell Douglas* burden-shifting framework for statutory whistleblower claims. *See id.* ("we formally adopt the *McDonnell Douglas* framework in whistleblower cases[.]").

Defendants should be denied summary judgment on this claim because Plaintiff easily satisfies her prima facie case, and Defendants fail to assert a credible, non-pretextual basis for her termination.

## A. PLAINTIFF ESTABLISHES HER PRIMA FACIE CASE.

A prima facie case of retaliation requires showing that (1) plaintiff engaged in a protected act; (2) plaintiff suffered an employment action proscribed by the whistleblowers' protection statute; and (3) that there was a causal link between the protected act and the proscribed employment action. *See Seacoast Fire*, 146 N.H. at 608.

First, the evidence establishes that Dr. Porter engaged in numerous acts that are protected by the whistleblower's protection statute. Under the statute, she must demonstrate that she, in good faith, reported or caused to be reported, what she had reasonable cause to believe was a

violation of any law or rule adopted by the laws of the state or the United States. *See* RSA 275-E:2. As described above, Dr. Porter engaged in an ongoing, years-long reporting to Dr. DeMars of incidents involving Dr. Hsu, Dr. Seifer, or both, that she had reasonable cause to believe were violations of law or rules. These incidents include, but are not limited to, Dr. Porter reporting: (1) procedures performed without patient consent; (2) procedures performed that were not medically necessary; (3) improper medical billing in possible violation of Medicare/Medicaid rules and regulations; (4) physical injury to patients due to poor technique or lack of adequate skills to perform necessary procedures; and (5) other risks to patient safety. (Porter Decl. ¶4, MSJ Ex. 5). *See also* MSJ Ex. 22, p. 17-22.

In addition, the record demonstrates that Dr. DeMars blamed Dr. Porter when other individuals – such as Dr. McBean and Elizabeth Todd – came to her with complaints or concerns about Dr. Hsu or Dr. Seifer. (DeMars Dep. 70:17-24, MSJ Ex. 6). Dr. Porter confirms that she regularly advised her co-workers, including Dr. McBean and Elizabeth Todd, to bring their concerns to Dr. DeMars. (Porter Dec. ¶3, MSJ Ex. 5). Although some of these instances, such as Dr. Porter writing a letter to Dr. Seifer, with a copy to Dr. DeMars, regarding her serious concerns about Dr. Hsu, occurred about a year before the termination of Dr. Porter, they are part of a single, on-going series of reports by Dr. Porter.

As to the second element, it is undisputed that Dr. Porter was terminated, which is an action proscribed by the whistleblower's protection statute. *See* RSA 275-E:2(I)(a) (proscribing "discharge" of employee due to whistleblower reporting).

As to the third element, the record demonstrates a causal link, and certainly enough evidence to allow a jury to make a final factual determination of causation. Dr. DeMars made the decision to terminate Dr. Porter, separate and apart from the decision to close the REI

Division, and presented that recommendation to Dr. Merrens, who adopted it. *See, e.g.,* Merrens email, MSJ Ex. 14, ("I just need to know how better to answer this question."); and MSJ Ex. 15 (decisions were "at the recommendation of Dr. DeMars"). Dr. DeMars was compromised by Dr. Merrens linking her fate to Dr. Seifer's success during the credentialing process for Dr. Seifer, and therefore she had an incentive to blame Dr. Porter for any problems with Dr. Seifer, rather than address them. Further, Dr. Merrens identifies the real reason for the closure of REI as "physician dysfunction." (MSJ Ex. 17). "Dysfunction" is a code word that refers to Dr. Porter's whistleblowing regarding the serious problems with Dr. Hsu and Dr. Seifer. Finally, many of the whistleblowing instances occurred near in time to the closure of REI, and Dr. Porter continued to present concerns until the announcement of the closure. (Porter Decl. ¶4, MSJ Ex. 5).

Accordingly, Plaintiff satisfies her prima facie case.

### B. DEFENDANTS' STATED "LEGITIMATE REASON" IS NOT CREDIBLE, AND IT IS DEMONSTRABLY PRETEXTUAL.

Under the *McDonnell-Douglas* framework, the burden then shifts to Defendants to articulate a legitimate reason for termination, after which the burden shifts back to Plaintiff to demonstrate that the proffered reason is pretextual.

Defendants identify their "legitimate reason" for termination of Dr. Porter as "the closure of the REI Division." (Def. MSJ, p. 6.) They paint this as "Dr. Merrens' decision to close the REI Division and terminate all of the REI physicians." (*Id.*) As noted, Defendants attempt to merge this decision into a single step – close-and-terminate – whereas the decisions were actually made in two separate steps.

After Defendants articulate a "legitimate" reason for termination, "[t]he employee then has the opportunity to show that the employer's proffered reason was not the true reason for the adverse employment action and that retaliation was. The employee may do this either indirectly

by showing that the employer's stated reasons were not credible, or directly by showing that the adverse employment action was more likely motivated by retaliation." *Appeal of Montplaisir*, 147 N.H. 297, 301 (2001) (internal citation omitted).

Defendants' stated reason for Dr. Porter's termination does not entitle Defendants to summary judgment on this claim. First, the record demonstrates that Defendants intentionally misled the public about the reason for the closure of the REI Division overall, therefore undermining their credibility. *See* MSJ Ex. 17 (admitting that the nursing shortage explanation is "rather thin" and the real reason is "dysfunction"). A jury could readily find that, given this admitted duplicity, Defendants should not be deemed credible in their explanation for why they terminated Dr. Porter, and summary judgment should be denied on this basis alone. Determinations of credibility are reserved for the jury. *See, e.g., Cincinnati Ins. Co. v. S. Vermont Sprinkler Servs., Inc.*, No. 5:17-CV-254, 2019 WL 5698930, at *2-*3 (D. Vt. July 10, 2019) (Crawford, J.) (denying summary judgment because "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment").

Second, the decisions to close the REI Division and to terminate Dr. Porter were made separately. Defendants attempt to elide the two decisions into a single step, but this is an inaccurate *post hac* fictionalization. The record shows that Defendants considered these two decisions separately. Apart from deciding what to do about the REI Division, including whether to suspend IVF services, or shut down temporarily, or to shut down indefinitely, Defendants also debated and considered what to do about Dr. Porter. The initial closure plans included retaining Dr. Porter in a GYN/ultrasound role. (MSJ Ex. 19). Moreover, soon after the closure announcement, in mid-May 2017, Dr. Merrens reached out to Dr. DeMars to ask about "why

21

Misty can't stay on to do her ultrasound complex operative and teaching role even if we end REI. . . . I just need to know how better to answer this question." (MSJ Ex. 14). If termination of Dr. Porter was necessarily the result of closing the division due a nursing shortage, Dr. Merrens would not have needed to ask "how better to answer this question." The answer would have been simple: closure = termination. Reflecting this two-step process, Dr. DeMars stated that "[i]t was the right decision to include her [Dr. Porter] in the terminations." (MSJ Ex. 14).

Third, Defendants could have (and in Plaintiff's view, should have) retained Dr. Porter even after closing the REI Division. Dr. Seifer and Dr. Hsu were not capable of performing a broad range of GYN services. But Dr. Porter and Elizabeth Todd were capable of such broad work and therefore could provide useful service even with the closure of REI. If closure = termination, then Ms. Todd should have been terminated as well, but she was not. This is solid evidence of pretext and discriminatory intent targeting Dr. Porter. Given their breadth of skills within gynecology beyond REI/IVF, Ms. Todd was more closely comparable to Dr. Porter than Dr. Seifer and Dr. Hsu were to Dr. Porter.

Fourth, Dr. DeMars was compromised, given Dr. Merrens' clear instructions to her upon credentialing Dr. Seifer that it was "hers to ensure success." (Merrens Dep. 83:11-13, MSJ Ex. 8). When Dr. Seifer immediately started to flounder and fail, Dr. DeMars needed to find another person to blame in order to protect herself. When Dr. Porter became vocal about the very real problems with Dr. Seifer, this threatened Dr. DeMars's position as chair of OB/GYN and as an employee of Dartmouth-Hitchcock. Dr. DeMars was therefore highly motivated to retaliate against Dr. Porter for her repeated criticisms of Dr. Seifer.

Fifth, almost immediately after closing the REI Division, Dartmouth-Hitchcock began considering plans to reopen REI services. (MSJ Ex. 21). By September 2017, Dartmouth-

Hitchcock had assembled a plan for reopening REI. Although the plans have not yet come to fruition, these plans belie Defendants' explanation of necessary closure due to a nursing shortage. If the closure were truly caused by a nursing shortage so drastic and intractable that it required <u>shutting a division and terminating three physicians</u>, this problem would not have been solvable within mere months. The fact that Defendants began considering reopening REI by September 2017 demonstrates the pretextual nature of this excuse.

Based upon the foregoing, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment as to her whistleblower retaliation claim.

## IV.    SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFF'S DISABILITY DISCRIMINATION CLAIMS.

Plaintiff has two distinct disability discrimination claims: first, wrongful termination based upon disability, and second, failure to accommodate her disability. These two general claims are articulated through a variety of statutory protections. Count 3 (violation of the Americans with Disabilities Act), Count 4 (violation of Section 504 of the Rehabilitation Act), Count 5 (violation of New Hampshire anti-discrimination and retaliation statutes RSA 354-A:7, RSA 354-A:7, VII, and RSA 354-A:19), and Count 6 (Vermont anti-discrimination and retaliation statutes, 21 V.S.A. § 495 et seq.) derive from disability discrimination, including both wrongful termination as a result of disability discrimination and failure to accommodate. Summary judgment should be denied as to both her disability discrimination and failure to accommodate claims.

### A. SUMMARY JUDGMENT SHOULD BE DENIED AS TO PLAINTIFF'S DISABILITY DISCRIMINATION CLAIMS.

The legal standards and burden-shifting frameworks are broadly similar between the different statutory bases for Plaintiff's disability discrimination claim. The burden-shifting framework for the disability discrimination claims follows *McDonnell-Douglas* as well.

Defendants challenge only the final aspect of Plaintiff's prima facie case for each of the disability claims, namely a causal link between her termination and her disability. *See* Motion for Summary Judgment, p. 10 ("Dr. Porter cannot satisfy the fourth prong of a prima facie case of discriminatory discharge – that she was terminated because of her disability (or, under the VFEPA, that she was terminated under circumstances giving rise to an inference of discrimination)."). Defendants also contend that, even if Plaintiff could satisfy the prima facie case, Plaintiff cannot demonstrate that their purported "legitimate reason" is pretextual. *Id.*

The record demonstrates that Dr. Porter's disability was at the top of Dr. DeMars' mind when evaluating whether Dr. Porter should remain employed at Dartmouth-Hitchcock. Dr. DeMars and Dr. Merrens concurred that in light of Dr. Porter's disability, termination of her employment would be "best" for Dr. Porter. *See* MSJ Ex. 16. Further, as attested by Dr. Russell, Dr. Merrens held a meeting with the OB/GYN Department shortly after the closure of the REI Division. During that meeting, Dr. Russell asked why Dr. Porter had been terminated, and Dr. Merrens responded that Dr. Porter was "on disability." (Russell Decl. ¶10, MSJ Ex. 3). This evidence demonstrates that Dr. Merrens was also aware of, and motivated by, Dr. Porter's disability, in reaching a decision on whether to maintain Dr. Porter's employment at Dartmouth-Hitchcock.

As described at length above, the record also shows that Defendants' purported reason for her termination – closure of the REI Division due to a nursing shortage – was pretextual. This evidence of pretext applies as well to Plaintiff's disability discrimination claims.

Accordingly, Defendants' motion for summary judgment on Plaintiff's claim for disability discrimination should be denied.

## B.  SUMMARY JUDGMENT SHOULD BE DENIED AS TO PLAINTIFF'S CLAIM FOR FAILURE TO ACCOMMODATE.

Plaintiff also asserts claims for failure to provide reasonable accommodations for her disability.  These claims arise under the ADA, Section 504 of the Rehabilitation Act, New Hampshire law (RSA 354-A:7 and 354-A:19), and Vermont law (21 V.S.A. § 495(a)(1)).

Under each of these claims, Plaintiff is required to show that (1) she suffered from a disability; (2) Defendants were aware of her disability; (3) she could perform the essential functions of the job with reasonable accommodation; and (4) Defendants failed to make such accommodation.

The record in this case adequately demonstrates that Defendants failed to provide consistent reasonable accommodations to Dr. Porter.  Although Defendants periodically provided the necessary accommodations to Dr. Porter – thus allowing her to perform at her usual high standard, as alleged in the Amended Complaint – Defendants failed to maintain these accommodations, thus violating their statutory duty.  The law requires more than agreeing in principle to provide reasonable accommodations – the accommodations must actually be provided.  Dr. Porter has put forward evidence demonstrating that her agreed-upon accommodations were regularly *not provided* in fact, despite an agreement in theory to provide them, and therefore she has demonstrated the essential elements of her claim for failure to accommodate.  (Porter Decl.¶6, MSJ Ex. 5).

The essential inquiry of these claims is whether Defendants failed to provide the necessary accommodations.  Plaintiff has demonstrated sufficient evidence to defeat summary judgment on this claim and permit a jury to evaluate the claims.

## CONCLUSION

Based upon the foregoing, Plaintiff respectfully requests that the Court deny Defendants'

motion for summary judgment in its entirety and allow this action to move ahead to trial.


DATED at Norwich, Vermont, in the County of Windsor, this 6th day of March 2020.


By: _____

VITT & ASSOCIATES, PLC
Geoffrey J. Vitt
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittandassociates.com

KBK LAW
Katherine Burghardt Kramer
6 Mill Street
P.O. Box 23
Middlebury, VT  05753
kbk@kbkramerlaw.com
(802) 989-7943

*Counsel for Plaintiff*
*Misty Blanchette Porter, M.D.*