# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | | |
|---|---|---|
| **MISTY BLANCHETTE PORTER, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 5:17-cv-194** |
| | ) | |
| **DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Misty Blanchette Porter, M.D., ("Plaintiff" or "Dr. Porter"), by and through

counsel, submits this Statement of Disputed Material Facts in Support of Plaintiff's Response in

Opposition to Defendants' Motion for Summary Judgment, pursuant to F.R.C.P. 56 and Local

Rule 56(b).

1. At the time of the announcement of closure of the REI Division, Dartmouth-Hitchcock senior

    management announced that the REI Division was profitable, and defendants' witnesses have

    admitted that as of the date of closure, the Division remained profitable and there was a

    demand for its services.  Daniel Herrick Deposition 16:8-11, (Herrick Dep., MSJ Ex.7)[1].

---

[1] Citations to "MSJ Ex." refer to the exhibits in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, as listed in the attached index of exhibits, (MSJ Ex. 1).

1

2.  According to DH's own REI program description, the program was comprised of "highly skilled professionals including: physicians, nurse practitioners, nurses, embryologists, a clinical social worker and other health professions." (MSJ Ex. 9).

3.  At the time of the REI Division closure, the providers in the division were Dr. Porter, Dr. David Seifer, Dr. Albert Hsu, Elizabeth Todd (a nurse practitioner), and Dr. Judith McBean who provided per diem support. (Porter Decl. ¶5, MSJ Ex. 5). The term "providers" is generally understood to encompass both physicians and nurse practitioners.

4.  Dr. Hsu joined the REI Division in 2014 after completing a fellowship in REI and having been an attending physician at another hospital. Shortly after his arrival, Dr. Porter realized that Dr. Hsu's basic technical skills, medical knowledge, and clinical judgment were wholly inadequate. She volunteered to take call with him for a period of about six months, to provide him with additional training and supervisions. Over a period of six months, Dr. Porter took call with Dr. Hsu and tried her best to give him a foundation so that he could at least handle the routine work expected of a doctor in the REI Division. (Porter Decl. ¶2, MSJ Ex. 5).

5.  Despite additional training from Dr. Porter, it became apparent that Dr. Hsu lacked the capacity to make sound clinical judgments and he could not integrate the technical skills that he had been taught into the day-to-day work of a doctor in the Division. In June 2016 at the request of Dr. Seifer, the newly-hired Division Director, Dr. Porter prepared a ten-page memorandum that described in detail the problems with Dr. Hsu's performance. ███

    ████████████████████████████████████████████████████

    ███████████  Dr. Porter sent this letter outlining her concerns about Dr. Hsu to Dr. Leslie

DeMars, the Chair of the OB/GYN Department and the one who ultimately recommended

Dr. Porter's termination, along with Dr. Seifer.  (MSJ Ex. 10).

6. Dr. Porter reported her concerns about Dr. Hsu to Dr. DeMars on a regular basis, and she

continued to express those concerns to Dr. DeMars through the end of April 2017.  (Porter

Decl. ¶4, MSJ Ex. 5).

7. Dr. Porter was not the only professional who told senior management, especially Dr.

DeMars, that Dr. Hsu could not safely practice medicine.  (MacCallum Decl. ¶¶6-8, MSJ Ex.

2; MSJ Ex. 6.)

8. Dr. Julia MacCallum, who spent six years at Dartmouth-Hitchcock as a trainee in the

OB/GYN Department, states that she tried to avoid working with Dr. Hsu in the OR because

of his "poor reputation" which, upon working with him, she found "fully justified."  She

described his technique as "rushed and imprecise" in surgery to remove fibroids.

(MacCallum Decl. ¶6 MSJ Ex. 2).

9. Dr. MacCallum concluded that it was "irresponsible" for Dartmouth-Hitchcock to permit him

to operate because he "presented a risk to patient safety."  (MacCallum Decl. ¶8, MSJ Ex. 2).

10. In addition, Dr. Michelle Russell, an attending physician in the OB/GYN Department at

Dartmouth-Hitchcock, describes Dr. Hsu as "not qualified" and lacking "the basic skills of a

physician."  In her affidavit, Dr. Russell describes an incident in which Dr. Hsu failed to

understand the significance of a patient's medical history, resulting in a tragic loss. (Russell

Decl. ¶14, MSJ Ex. 3).

11. ████████████████████████████████████████████



12. A long-time nurse in the REI Division expressed similar concerns. Sharon Parent worked as a nurse for 41 years at Dartmouth-Hitchcock, the last 17 years in the REI Division. She reported to Dr. DeMars that both Dr. Seifer and Dr. Hsu had poor retrieval techniques and their patients routinely reported unusual levels of pain. She expressed concerns that Dr. Seifer's retrievals were the most bloody and painful she had ever witnessed. When Ms. Parent brought these concerns to Dr. DeMars, Dr. DeMars told her that Dr. Porter set the bar high and she had to accept that other doctors did things differently. (Parent Decl. ¶¶3-6, MSJ Ex. 4).

13. When faced with these detailed, serious complaints from a variety of experienced REI professionals about the incompetence of Dr. Albert Hsu, Dr. DeMars dismissed all the criticisms and blamed Dr. Porter. During her deposition, Dr. DeMars was asked: "It wasn't just Dr. Porter who had sharp, highly uncomplimentary things to say about Albert Hsu, correct?" Dr. DeMars replied: "I think they were all based on conversations that Dr. Porter had with individuals." (DeMars Dep. 70:17-24, MSJ Ex. 6). She went on to say that Dr. Porter's opinions had influenced everyone else's opinion of Dr. Hsu, despite the evidence that all these individuals had witnessed concrete examples of his incompetence first-hand and were experienced enough to have made individual assessments. (DeMars Dep. 71:3-11, MSJ Ex. 6).

14. Aside from Dr. Hsu and Dr. Porter, the other terminated physician in the REI Division was Dr. David Seifer. In early 2016, Dr. DeMars concluded that the REI Division needed an additional physician. Instead of conducting a national search, as would be the standard practice, Dr. DeMars recruited Dr. Seifer, who was working at Oregon after switching jobs multiple times within a few years. Dr. Seifer's record contained numerous other red flags, including negative reviews from colleagues and the fact that he had ceased performing clinical work. (Merrens Dep. 74:3-75:22, MSJ Ex. 8).

15. Multiple members of the Dartmouth-Hitchcock credentials committee – which reviews new hires before granting them clinical privileges – expressed serious doubts about hiring Dr. Seifer. As a result of this, Dr. Merrens, the Chief Clinical Officer of Dartmouth-Hitchcock, demanded that Dr. DeMars take personal responsibility for Dr. Seifer's success or failure. Dr. DeMars promised the committee and Dr. Merrens personally that she "would take personal responsibility" for Dr. Seifer's success. (Merrens Dep. 77:11-13, MSJ Ex. 8). Dr. Merrens attested that "this was hers to ensure success. That's how she left the meeting." (Merrens Dep. 83:11-13, MSJ Ex. 8).

16. As she did with complaints about Dr. Hsu, Dr. DeMars blamed Dr. Porter for negative comments about Dr. Seifer. Dr. DeMars went back to the credentialing committee in January 2017, for follow-up related to Dr. Seifer. During the meeting, Dr. DeMars attempted to convince the committee members that any negative comments in Dr. Seifer's evaluation were contributed by a "potentially biased source," i.e., Dr. Porter. (MSJ Ex. 12).

17. Dr. DeMars went as far as to blame Dr. Porter for negative things she herself had written about Dr. Seifer. Shortly after Dr. Seifer started working at D-H, Dr. DeMars texted the

5

former chair of the REI division, Dr. Richard Reindollar: "Richard, I'm not sure that DS is clinically competent. I don't know what he has been doing for 25 years, but I'm not sure it was IVF… I have heard separately voiced concerns from nursing, anesthesia and ultrasound techs. The lab folks complain about bloody aspirates and low egg counts." (DeMars Dep. 111:19 -112:4, MSJ Ex. 6). During her deposition, Dr. DeMars blamed Dr. Porter for this criticism of Dr. Seifer: "This is a conversation that I had with Misty that I am not attributing to her in this text." (DeMars Dep. 112:8-9, MSJ Ex. 6).

18. Doctors and nurses began complaining almost immediately to Dr. DeMars about Dr. Seifer's subpar performance and poor leadership skills. When asked in her deposition why she did not tell Dr. Merrens of the multiple complaints that she was receiving about Dr. Seifer, Dr. DeMars admitted: "Because he looked at me at the Credentials Committee and said this is on you." (DeMars Dep. 127:2-9, MSJ Ex. 6).

19. As described above, Dr. Porter engaged in ongoing, years-long reporting to Dr. DeMars of incidents involving Dr. Hsu, Dr. Seifer, or both, that she had reasonable cause to believe were violations of law or rules. These incidents include, but are not limited to, Dr. Porter reporting: (1) procedures performed without patient consent; (2) procedures performed that were not medically necessary; (3) improper medical billing in possible violation of Medicare/Medicaid rules and regulations; (4) physical injury to patients due to poor technique or lack of adequate skills to perform necessary procedures; and (5) other risks to patient safety. (Porter Decl. ¶4, MSJ Ex. 5; MSJ Ex. 22).

20. Many of the whistleblowing instances occurred near in time to the closure of REI, and Dr. Porter continued to present concerns until the announcement of the closure. (Porter Decl. ¶4,

MSJ Ex. 5).

21. The record demonstrates that Dr. DeMars blamed Dr. Porter when other individuals – such as Dr. McBean and Elizabeth Todd – came to her with complaints or concerns about Dr. Hsu or Dr. Seifer.  (MSJ Ex. 6).

22. Dr. Porter confirms that she regularly advised her co-workers, including Dr. McBean and Elizabeth Todd, to bring their concerns to Dr. DeMars.  (Porter Dec. ¶3, MSJ Ex. 5).

23. In November 2015, Dr. Porter had become seriously ill with a cerebral spinal fluid leak and associated neurologic symptoms.  During the period of approximately December 14, 2015 to June 14, 2016, she was on a medical leave of absence and unable to work due to disabling symptoms.  She returned to work on a very limited part-time basis in April 2016, to provide care to specific patients who had been waiting for her services.  From approximately June 14, 2016, to August 7, 2016, she returned to work on a part-time trial basis at about 12 hours a week and was able to handle some ultrasounds, IVF procedures, and consults. In August 2016, she was forced to take another leave of absence due to continuing symptoms from the illness, and then returned to work part-time in November 2016.  (MSJ Ex. 22; *see also* Defendants' Statement of Undisputed Facts, ¶¶ 3-5)

24. By March and April 2017 – before Dartmouth-Hitchcock decided to terminate her employment – she was working 20 hours a week and had returned to performing her full range of prior abilities, including complex surgery.  (*See* Defendants' Statement of Undisputed Facts, ¶ 6; Plaintiff's MSJ Ex. 13.)

25. In mid-April 2017, the Chief Medical Officer of Dartmouth-Hitchcock, Dr. Maria Padin,

proctored Dr. Porter during a complex surgery.  After the surgery, Dr. Padin wrote to Dr.

Porter: "You are a talented surgeon. Thanks for inviting me to your case." (MSJ Ex. 13).

26. The decision to close the REI Division was made in late April 2017, and the announcement

was made – along with the announcement of the three terminations – in early May 2017.

Within a week or so after announcing the closure of REI and the physician terminations, Dr.

Merrens reached out to Dr. DeMars by email regarding the REI Division and Dr. Porter in

particular.  He wrote: "I am getting inundated with heartfelt and long emails wondering why

Misty can't stay on to do her ultrasound complex operative and teaching role even if we end

REI.  I suspect that you considered this in the evaluation [of] the program and your

knowledge of Misty.  I just need to know how better to answer this question."  (MSJ Ex. 14).

27. Dr. DeMars wrote back to Dr. Merrens with repeated reference to Dr. Porter's disability.

Among other references to Dr. Porter's disability, she wrote: "Misty's medical disability has

been devastating, and I'm not sure that she should or will really ever be able to do the

complex hysteroscopy or laparoscopy that she once did…  I think that the best outcome of

this termination is the chance for Misty to actually be out on leave with no intervening

responsibilities, so that she can assess how much improvement she might gain."  (MSJ Ex.

14).

28. Dr. Merrens confirmed his agreement with Dr. DeMars's perspective, responding: "I think

it's a comprehensive, thoughtful and appropriate insight.  Thanks for taking the time to do

this.  Ultimately once the dust settles, [we] will be in a better position with all this, including

Misty." (MSJ Ex. 14).

29. In addition, on May 12, 2017, Dr. Merrens received an email from Victoria Maxfield, a

8

nursing coordinator at Dartmouth-Hitchcock, asking why Dr. Porter was terminated when she provided such valuable and varied work to the department. Dr. Merrens wrote back: "As you know Dr. Porter currently works at 20% of her time currently and I'm not sure of her interest in staying on if the infertility part were to cease." (MSJ Ex. 15).

30. After the closure of REI, Dr. Merrens hosted a meeting for the OB/GYN Department to discuss the closure. During that meeting, he was asked by Dr. Michelle Russell why Dr. Porter had been terminated. In response, he stated that Dr. Porter was "on disability." (Russell Aff. ¶10, MSJ Ex. 3).

31. Dr. Merrens relied heavily on Dr. DeMars regarding the decision to close the REI Division and to terminate Dr. Porter. For example, in an email dated May 12, 2017, Dr. Merrens wrote that "[t]he recommendations around closing the program and its staff were at the recommendation of Dr. DeMars." (MSJ Ex. 15).

32. Dr. DeMars told Dr. Merrens that in some ways the "most desirable outcome" for the OB/GYN Department would be retaining Dr. Porter, *except for* Dr. Porter's "past behavior and her inability to be just a worker bee," which is reference to Dr. Porter's vocal criticisms of the other two REI physicians. (MSJ Ex. 14.)

33. Dartmouth-Hitchcock did not close the REI Division because of a nursing shortage. Internal emails among senior management demonstrate that the "problem" recruiting nurses was at best a convenient excuse. On May 2, 2017, Dr. Merrens wrote a deeply revealing email to the Director of HR, the General Counsel, and the Associate General Counsel regarding the closure of the REI Division:

> While on the surface we are pinning the dissolution of our reproductive endocrinology program on our failure to maintain and recruit nurses for this work, it is ultimately the dysfunction of the physicians who worked in this area for years (as well as recent hires) and ultimately a failure of leadership, for which I hold Leslie fully accountable.
>
> The fact that failures of such programs due to nursing shortages are not common and we'll be referring patients to a similar, rural academic REI center in Burlington, Vermont, will make our explanation to the public, patients, and the media, well, rather thin.

(MSJ Ex. 17).

34. Daniel Herrick, who was copied on Dr. Merrens' "I am getting inundated" email to Dr. DeMars, responded privately stating: "Ed, I am not including Leslie in this response. Based on my observations and interactions, Misty has been the biggest driver to the dysfunction within REI." (MSJ Ex. 16). In his deposition, Herrick admitted he had "no observation of Misty herself related to this, any negative or positive" but that he come to this conclusion based his discussions with Heather Gunnell and Dr. DeMars. (Herrick Dep. 123:3-124:25 MSJ Ex. 7).

35. The evidence shows that Dartmouth-Hitchcock intentionally avoided taking steps that could have prevented a nursing shortage. Among other such evidence, Sharon Parent, a nurse with 17 years' experience in the REI Division, gave management a year's notice of her intention to retire in December 2016, to give Dartmouth-Hitchcock management ample time to find and train replacements. To her surprise, Dartmouth-Hitchcock "did not make a serious effort at finding a replacement." (Parent Decl. ¶7, MSJ Ex. 4).

36. In addition, upon retirement, Ms. Parent offered to work 20 hours a week on a per diem basis, including weekends and weekend call. In August 2017, after closure of the REI

10

Division, Ms. Parent met with Dr. DeMars, who admitted that she had prevented Ms. Parent

from returning on a per diem basis as a way of "protecting her" from getting caught up in the

REI Division closure.  (Parent Decl ¶8, MSJ Ex. 4).

37. In a late April 2017 email, Dr. DeMars reveals her frustration with the REI Division and her

desire to find a good cover story to terminate Dr. Porter and the other REI physicians.  She

wrote to Daniel Herrick, a senior VP in charge of OB/GYN and other departments, that the

messaging about closure of the REI Division was "very messy" and that an "ideal message"

was that Dartmouth-Hitchcock was stopping IVF procedures because of staffing issues, but

as she noted, "that doesn't answer why we can't continue doing NPW [non-pregnant women]

and non-infertility evals."  (MSJ Ex. 18).  Dr. DeMars bitterly concludes that "[m]y life and

the messaging would be much easier if John Kacavas [Defendants' general counsel]

determines that all three providers [in REI] . . . are facing loss of license."  (MSJ Ex. 18)

38. Dr. Porter could have, and should have, remained employed at Dartmouth-Hitchcock even

upon closure of the REI Division.  In fact, the documents show that retaining Dr. Porter was

the initial plan and presumed intention by those who were not Dr. DeMars.  (MSJ Ex. 19).

(Gunnell: "My assumption is that MBP will be refocused to Gyn U/S.").

39. After Dr. Porter was terminated, other attending physicians in OB/GYN tried to fill her shoes

clinically, but they lacked Dr. Porter's skills.  For example, Dr. Porter was the only physician

in the department formally reading gynecologic ultrasounds and had been recognized for this

skill at an international level.  She performed ultrasound-guided procedures that no other

physicians in the department performed, such as HyCoSy (hysterosalpingo-contrast-

sonography), a test used to assess for infertility caused by Fallopian tube problems.  There

was also no one who could replace Dr. Porter's surgical skills. She was the only physician at

Dartmouth-Hitchcock capable of performing complex hysteroscopic surgery, such as uterine

septum removals. These cases had to be referred to another hospital after Dr. Porter was

terminated. (MacCallum Decl. ¶ 9 MSJ Ex. 2).

40. Dr. Porter was able to help women who had tried repeatedly without success to become

pregnant. Dr. Leslie DeMars described Dr. Porter as "an amazingly gifted and dedicated

reproductive endocrinologist who I think through technical skill and creativity was able to

achieve lots of pregnancies and that's her 'Misty Magic'." (DeMars Dep. 43:1-10, MSJ Ex.

6).

41. The OB/GYN department submitted a hiring request in June 2017 – immediately after the

closure of REI – for a generalist GYN, citing short-staffing as the basis for an urgent hiring

need. (MSJ Ex. 20).

42. Almost immediately after closing the REI Division, Dartmouth-Hitchcock began exploring

options for reopening the division. (MSJ Ex. 21).

43. Dr. Porter had an agreed-upon set of reasonable accommodations for her disability once she

returned to work. These accommodations included limited work hours, including not taking

call or working after hours, not multi-tasking, and quiet uninterrupted work space. Dr.

DeMars and Heather Gunnell were familiar with these accommodations. On a regular basis,

Dr. Seifer failed to observe these accommodations. For example, he tried to contact Dr.

Porter after work, and sometimes he followed Dr. Porter out to the parking lot to continue

asking her questions after my shift ended. He interrupted her work space. She repeated went

to Dr. DeMars and Heather Gunnell to ask for their help in enforcing her accommodations.

They did nothing to help, and the problems with Dr. Seifer not following the accommodations persisted.  (Porter Decl., ¶ 5 MSJ Ex. 5; *see also* MSJ Ex. 22).


DATED at Norwich, Vermont, in the County of Windsor, this 6th day of March 2020.

By:

VITT & ASSOCIATES, PLC
Geoffrey J. Vitt
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittandassociates.com

KBK LAW
Katherine Burghardt Kramer
6 Mill Street
P.O. Box 23
Middlebury, VT  05753
kbk@kbkramerlaw.com
(802) 989-7943
*Counsel for Plaintiff*
*Misty Blanchette Porter, M.D.*