20-3894
Porter v. Dartmouth-Hitchcock Medical Center

1    UNITED STATES COURT OF APPEALS

2    FOR THE SECOND CIRCUIT

3    - - - - - -

4    August Term, 2021

5    (Argued: February 24, 2022        Decided: February 6, 2024 )

6    Docket No. 20-3894

7    _____

8    MISTY BLANCHETTE PORTER, M.D.,

9        *Plaintiff-Appellant*,

10    - v. -

11    DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-
12    HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL
13    HOSPITAL, DARTMOUTH-HITCHCOCK HEALTH,

14        *Defendants-Appellees*.
15    _____

16    Before: LIVINGSTON, *Chief Judge*, KEARSE and WALKER, *Circuit Judges*.

17        Appeal by plaintiff from a judgment of the United States District Court

18    for the District of Vermont, Geoffrey W. Crawford, *Chief Judge*, dismissing her

1    amended complaint against her former employer, defendants Dartmouth-Hitchcock

2    Medical Center *et al.* (collectively "DHMC"), principally alleging discriminatory

3    termination of her employment (a) on account of her disability, in violation of the

4    Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, the Rehabilitation

5    Act of 1973, 29 U.S.C. § 701 *et seq.*, and the laws of Vermont and New Hampshire;

6    and (b) on account of her "whistleblowing"--and other complaints to DHMC of

7    improper, incompetent, and harmful conduct by physicians in her DHMC division--

8    in violation of New Hampshire law.  The district court granted summary judgment

9    in favor of defendants for lack of proof of causation, concluding principally that

10   although plaintiff had shown a prima facie case with regard to disability and

11   whistleblowing activity, DHMC adduced sufficient evidence of legitimate business

12   reasons for the termination of her employment, to wit, the closure of the division in

13   which she was employed and the unavailability of other suitable positions for her at

14   DHMC; and that plaintiff failed to point to evidence sufficient to permit an inference

15   that defendants' proffered reasons for her termination were pretext for the alleged

16   discrimination. *See Porter v. Dartmouth Hitchcock Medical Center*, No. 5:17-cv-194, 2020

17   WL 6789564 (D. Vt. Nov. 3, 2020).

1    On appeal, plaintiff contends principally that the district court applied

2    erroneous legal standards in assessing the causation element of her claims, and that

3    in granting summary judgment the court decided genuine issues of fact as to whether

4    defendants' explanations for their actions were pretext for such discrimination, issues

5    that should have been submitted to a jury.  We conclude that the district court did not

6    properly apply summary judgment standards in considering the evidence as to

7    pretext and causation, and hence it erred in concluding that no rational juror could

8    infer that plaintiff was terminated, and not retained, based on her disability or her

9    whistleblowing-type activity.  We affirm insofar as the court dismissed plaintiff's

10    claims that she was otherwise discriminated against by denial of a reasonable

11    accommodation for her disability prior to her termination or was retaliated against

12    for exercising her rights to such accommodation.

13    Affirmed in part, vacated and remanded in part.

14    GEOFFREY J. VITT, Norwich, Vermont (Vitt &
15    Associates, Norwich, Vermont; Katherine B.
16    Kramer, DGW Kramer, New York, New York,
17    on the brief), *for Plaintiff-Appellant*.

18    DONALD W. SCHROEDER, Boston, Massachusetts
19    (Jessica E. Joseph, Morgan McDonald, Foley &
20    Lardner, Boston, Massachusetts, on the brief),
21    *for Defendants-Appellees*.

- 3 -

1    KEARSE, *Circuit Judge*:

2             Plaintiff Misty Blanchette Porter, M.D., appeals from a judgment of the

3    United States District Court for the District of Vermont, Geoffrey W. Crawford, *Chief*

4    *Judge*, dismissing her amended complaint against her former employer, defendants

5    Dartmouth-Hitchcock Medical Center *et al.* (collectively "DHMC" or "D-H"),

6    principally alleging discriminatory termination of her employment (a) on account of

7    her disability, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C.

8    § 12101 *et seq.* ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 701(a) *et seq.*, and

9    the laws of Vermont and New Hampshire; and (b) on account of her reporting to

10    DHMC on conduct by physicians in her DHMC division that she reasonably believed

11    was unlawful (*i.e.*, whistleblowing) or unethical, improper, or harmful to patients

12    (collectively Dr. Porter's "reporting activities"), in violation of New Hampshire law.

13    The district court granted summary judgment in favor of defendants for lack of proof

14    of causation, concluding principally that although Dr. Porter had shown a prima facie

15    case with regard to her disability and her whistleblowing activity, DHMC adduced

16    sufficient evidence of legitimate business reasons for the termination of her

17    employment, to wit, the closure of the division in which she was employed and the

18    unavailability of other suitable positions for her at DHMC; and that Dr. Porter failed

- 4 -

1    to point to evidence sufficient to permit an inference that defendants' proffered

2    reasons for her termination were pretext for the alleged discrimination.  *See Porter v.*

3    *Dartmouth Hitchcock Medical Center*, No. 5:17-cv-194, 2020 WL 6789564 (D. Vt. Nov. 3,

4    2020).

5            On appeal, Dr. Porter contends principally that the district court applied

6    erroneous legal standards in assessing the causation element of her claims, and that

7    in granting summary judgment the court decided genuine issues of fact as to whether

8    defendants' explanations for their actions were pretext for such discrimination and

9    retaliation, issues that should have been submitted to a jury.  For the reasons that

10    follow, we conclude that the district court did not properly apply summary judgment

11    standards in considering the evidence as to pretext and causation, and that it erred

12    in concluding that no rational juror could infer that Dr. Porter was terminated, and

13    not retained, based on her disability or her reporting activities.  We affirm insofar as

14    the court dismissed claims by Dr. Porter that she was otherwise discriminated against

15    by denial of a reasonable accommodation for her disability prior to her termination

16    or was retaliated against for exercising her rights to such accommodation.

1                                          I.  BACKGROUND

2              The record as to the events at issue here, taken in the light most favorable

3      to Dr. Porter as the party against whom summary judgment was granted, includes

4      the following evidence.  Some portions of the record have been filed under seal; they

5      are hereby deemed unsealed to the extent that their contents are quoted or described

6      in this opinion.

7              DHMC has an obstetrics and gynecology department ("OB/GYN") that,

8      from 1979 through May 2017, included a Reproductive Endocrinology and Infertility

9      Division ("REI" or "REI Division").  REI provided services covering various aspects

10     of reproductive medicine, including the care of children and women with hormonal

11     imbalance and genetic syndromes affecting the reproductive system, procedures for

12     *in vitro* fertilization ("IVF") and for assisted reproductive technologies ("ART"),

13     complex gynecologic clinical care, surgery for women who desired to have child-

14     bearing capacity, and gynecologic and early pregnancy pelvic ultrasound.

1 A. *Dr. Porter's First 20 Years at DHMC*

2  Dr. Porter began working as a staff physician at DHMC in the REI

3 Division in 1996. She specialized in the treatment of women and their partners who

4 were experiencing difficulties with fertility. A year later she was promoted to the

5 position of Medical Director of the IVF/ART program and was appointed jointly to

6 DHMC's Department of Radiology. In 2001, she became a senior voting member of

7 the DHMC Professional Staff.

8  1. *Dr. Porter's Performance*

9  Dr. Porter was skilled in radiology, complex OB/GYN surgery, and

10 general gynecological care, and had been internationally recognized for her skill in

11 reading gynecologic ultrasounds. Dr. Michelle Russell--a physician in DHMC's

12 OB/GYN Department who specialized in maternal-fetal medicine, which focuses on

13 patients with high-risk pregnancies--worked with Dr. Porter from 2005 until Dr.

14 Porter's termination in 2017. (*See* Declaration of Dr. Michelle Russell dated March 5,

15 2020 ("Dr. Russell Decl."), ¶¶ 1-2.) She described Dr. Porter as "an outstanding

16 physician" with "a broad range of skills, including the ability to perform complex

17 surgery and read difficult ultrasounds. She was our go-to person for complex benign

1    GYN surgeries, such as myomectomies (removal of uterine fibroids).  Many GYN

2    surgery cases went to Dr. Porter."  (*Id*. ¶ 6.)  Dr. Russell stated that she "relied on Dr.

3    Porter's expertise on a regular basis. . . .  We all used Dr. Porter a lot for first trimester

4    ultrasounds . . . ."  (*Id*. ¶ 7.)

5            Sharon Parent, an OB/GYN and REI nurse, observed that "[t]here were

6    times when there would literally be a line of OB/GYN doctors waiting to see Dr.

7    Porter."  (Declaration of Sharon Parent dated February 28, 2020 ("Parent Decl."), ¶ 2.)

8            Dr. Leslie DeMars, who at the times relevant here was chair of the

9    OB/GYN Department, often discussed the skills of Dr. Porter (or "Misty") using the

10    term "Misty magic."  She testified that "Misty is an amazingly gifted and dedicated

11    reproductive endocrinologist and infertility specialist who I think through technical

12    skill and creativity was able to achieve lots of desired pregnancies for women, and

13    that's her 'Misty magic.'"  (Deposition of Dr. Leslie DeMars ("Dr. DeMars Dep.") at 43.)

14            In 2011, Dr. Porter became Acting Director of the REI Division.  A new

15    Director, Dr. David Seifer, was appointed in May 2016.  (*See* Part I.C. below.)

1          2. *Dr. Albert Hsu*

2          In 2014, Dr. Albert Hsu joined the REI Division following the completion

3    of his fellowship training in reproductive medicine.  After learning that the position

4    had been offered to Dr. Hsu, Dr. Porter--who was then REI's Acting Director--"called

5    him to ask about his experience handling IVF cases."  (Declaration of Dr. Misty

6    Blanchette Porter dated March 4, 2020 ("Dr. Porter Decl."), ¶ 1.)  Learning, to her

7    "surprise[,] . . . that he had significantly less experience in doing the basic procedures

8    than would be expected of a doctor at his level of training," she thereafter attempted

9    to mentor and train him.  (*Id.* ¶¶ 1-2.)  "Given his limited experience, I spent the next

10   6 months directly teaching him at his side, taking call with him 7 days a week[,]

11   teaching" him various relevant procedures. (Dr. Porter Report to Dr. Seifer dated June

12   3, 2016.)

13          Notwithstanding Dr. Porter's "considerable investment" of time and

14   effort, "Dr. Hsu continued to demonstrate poor clinical decision-making and

15   procedure skills."  (Dr. Porter Decl. ¶ 2.)  Dr. Porter began reporting Dr. Hsu's

16   deficiencies to Dr. DeMars and to Heather Gunnell, the OB/GYN Practice Manager,

17   within a few months after Dr. Hsu began working in REI.  (*See, e.g.*, Deposition of Dr.

18   Misty Blanchette Porter ("Dr. Porter Dep.") at 30-31.) She "regularly" told Dr. DeMars

- 9 -

1    that Dr. Hsu did not have the capacity to be a competent REI physician.  (Dr. Porter

2    Decl. ¶ 4.)

3           Other members of the DHMC medical staff were similarly critical of Dr.

4    Hsu's performance.  Dr. Porter stated that "[i]t was common for physicians, nurses,

5    nurse practitioners, technicians, and others to come to me to express a concern about

6    Dr. Hsu . . . .  I told the persons who came to me that they needed to speak with their

7    direct supervisor and Dr. Leslie DeMars, who was Chair of the OB/GYN

8    Department."  (*Id*. ¶ 3.)  Dr. Julia MacCallum, who was in the OB/GYN residency

9    program in 2012-2016, spent two years working with Dr. Porter and Dr. Hsu.  She

10   "found that Dr. Hsu did not have a good understanding of the basic knowledge that

11   would be expected of an attending physician in an REI Division," and that "[b]ecause

12   Dr. Hsu lacked a basic knowledge base, he often provided confusing or misleading

13   information to his patients."  (Declaration of Dr. Julia MacCallum dated March 5,

14   2020, ¶ 4; *see also id*. ¶ 6 (describing Dr. Hsu's lack of awareness of a certain procedure

15   with respect to a myomectomy surgery--which was therefore performed by Dr.

16   MacCallum who had been assisting--and describing Dr. Hsu's surgical technique as

17   "unrefined and unskilled," "rushed, imprecise, and crude"); *id*. ¶ 7 ("The residents

18   were all aware that there was an element of danger when Dr. Hsu was in the lead in

1    the OR."); *id*. ¶ 8 ("Every time he went into the OR, he presented a risk to patient

2    safety.").)

3             Dr. MacCallum told her "direct supervisor about Dr. Hsu being a danger

4    to patients," which her "supervisor shared . . . with Dr. DeMars"; and Dr. MacCallum

5    herself "told Dr. DeMars about the danger that Dr. Hsu posed to patients when he

6    operated." (*Id*. ¶ 7.) She stated that "[Dr. DeMars's] responses were to the effect of,

7    'thanks for telling me,'" and Dr. DeMars "did nothing to prevent him from continuing

8    to perform procedures." (*Id*.)

9             Dr. Russell had also worked with Dr. Hsu; she judged him unqualified

10   for his position at REI. (*See* Dr. Russell Decl. ¶ 9.) "Dr. Hsu didn't have necessary

11   skill level, and the additional training he received from Dr. Porter did not seem to

12   improve his abilities." (*Id*. ¶ 16.) "On a fairly regular basis" she overheard Dr. Hsu

13   on the telephone giving patients what appeared to be "incorrect advice." (*Id*. ¶ 4.) She

14   was "aware of at least one situation when Dr. Porter was called into the OR to fix a

15   series of problems that occurred when Dr. Hsu was operating." (*Id*. ¶ 18.) Dr. Russell

16   also described a case in which Dr. Hsu had failed to notice his patient's medical

17   history--a history that called for certain endocrinological precautions that Dr. Hsu

- 11 -

1    failed to undertake or recommend--a failure that resulted directly in the patient's

2    losing her pregnancy at 26 weeks.  (*See id*. ¶ 14.)

3           Nurse Parent stated that she had assisted Dr. Hsu when he was

4    performing IVF transfers and retrievals.  She described his uncertainty in performing

5    transfers, which he evinced in questions he asked of the ultrasound technicians; his

6    inefficient manual "jerk[s] or twitch[es]" even after receiving assurance that no further

7    movement was needed; and frequent reports by the patients of their discomfort and

8    pain.  (Parent Decl. ¶ 3.)  Parent went to Dr. DeMars multiple times to describe Dr.

9    Hsu's performance in those procedures.  (*See id*. ¶¶ 5-6.)

10          In June 2016, Dr. Porter sent an 11-page report to new-REI Director Dr.

11   Seifer in response to his request for an assessment of the performance of Dr. Hsu.  It

12   detailed Dr. Porter's observations as to, *inter alia*, the state of Dr. Hsu's knowledge,

13   and his deficiencies in critical thinking, in professionalism, and in technical skill.

14          In February 2017, Dr. DeMars made a division-wide request for

15   confidential feedback as to Dr. Seifer's performance.  (*See* Dr. DeMars Dep. 114.)  In

16   response, Dr. Judith McBean, a per-diem contract provider of services to REI, in

17   addition to criticizing Dr. Seifer's skills and standards of care (*see* Part I.C.2. below),

18   stated that one of her biggest concerns about Dr. Seifer was his failure to address

1    problems in the performance of Dr. Hsu.  (*See* Dr. McBean email to Dr. DeMars dated

2    February 22, 2017 ("Dr. McBean email to Dr. DeMars").)  She stated that Dr. Hsu's

3    procedures were not within standards set by the American Society for Reproductive

4    Medicine ("ASRM") and were "both ineffective and costly to patients"; that his skill

5    set with regard to patient care was inadequate; and that "[h]is surgical skills endanger

6    patients."  (*Id*.)

7    B.  *Dr. Porter's Disability*

8              In November 2015, Dr. Porter developed a cerebral spinal fluid ("CSF")

9    leak that caused her serious neurological problems, including blurred vision, severe

10   head and neck pain, tinnitus, and loss of balance.  In December she began a medical

11   leave of absence, during which she had a procedure in an attempt to stop the leak.

12             Dr. Porter returned to work in April 2016 on a part-time basis, working

13   five-to-seven hours a week.  In June, she increased her work schedule to 12 hours a

14   week, although with limitations on the scope of her work.  In July, she requested a

15   number of accommodations that were recommended by her physician, including

16   private office space, restricted duties, no multi-tasking, and a work schedule of no

17   more than 12 hours a week.  Dr. DeMars granted the requested accommodations.  As

1    discussed in Part II.D. below, Dr. Porter complains that Drs. Seifer and Hsu

2    frequently encroached on the agreed accommodations.

3          In late August 2016, Dr. Porter began a second medical leave of absence,

4    which lasted until November.  In September she underwent surgery to repair the CSF

5    leak, following which she was restricted to bed rest for six weeks.  During that time,

6    she nonetheless did some work, including reading ultrasounds, providing

7    consultations, and participating in team meetings by telephone.  She physically

8    returned to work in November, at first working four hours a week.  She gradually

9    increased her schedule, working seven hours a week in December; and by March 2017

10   she was working 20 hours a week.

11         In addition to her increased hours, the number of complex tasks that Dr.

12   Porter could perform also gradually increased, and by April 2017, she was performing

13   the full range of her prior skills.  In April, she performed a complex surgery,

14   proctored by Dr. Maria Padin, DHMC's then-Chief Medical Officer, following which

15   Dr. Padin sent her a note saying, "Misty[,] You are a talented surgeon" (Dr. Padin

16   email to Dr. Porter dated April 11, 2017 ("Dr. Padin April 2017 email to Dr. Porter")).

1    C.  *Dr. David Seifer*

2          In the meantime, Dr. Seifer had been appointed Director of REI in May

3    2016.  He became Director of REI through the efforts of Dr. DeMars.  His route to that

4    position--as described by Dr. Edward Merrens, who chaired the DHMC credentials

5    committee--was neither traditional nor uncontroversial.  REI was closed a year later;

6    Dr. Seifer's performance in the interim had been generally criticized.

7          1.  *Dr. Seifer's Hiring*

8          In May 2016, Dr. Merrens was DHMC's Chief Medical Officer (*see*

9    Deposition of Dr. Edward Merrens ("Dr. Merrens Dep.") at 78); he would soon

10   transition to Chief Clinical Officer (*see id*. at 29).  In the latter position he would

11   eventually make the decision to close REI.  (*See id*. at 19, 152; DHMC Statement of

12   Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment

13   on All Claims ("DHMC Rule 56 Statement") ¶ 11).  Dr. Merrens testified about the

14   appointment of Dr. Seifer as REI Director and about the closing of REI.

15         The credentials committee was displeased with the process by which Dr.

16   DeMars proposed Dr. Seifer's appointment as REI Director.  DHMC's usual process

17   for filling a division director position included a national search, print ads,

- 15 -

1    networking, reaching out to national societies, a winnowing process, and

2    interviewing potential candidates, before making an offer. (*See* Dr. Merrens Dep. 74.)

3    Dr. DeMars, however, a short time before proposing that Dr. Seifer be made director

4    of REI, had hired Dr. Seifer in an "administrative role, which was completely within

5    her discretion . . . and then, once he was in the system, then she basically leveraged

6    that to then push him in as division director." (*Id*. at 175; *see id*. at 74-75.)

7          The committee also had serious substantive concerns about Dr. Seifer

8    because, "independently, members of [the faculty at his previous employer had]

9    reached out to [DHMC]" to express "concerns about his practice," and to state that he

10   "had a more limited focus in terms of his approach to reproductive endocrinology,"

11   "a different practice style," and perhaps "different capabilities than his [former]

12   colleagues." (Dr. Merrens Dep. 75.) And "there was the suggestion that he had also

13   been asked to cease providing care in some areas." (*Id*.)

14         Dr. Merrens, as chair of the credentials committee, sought clarification

15   as to Dr. Seifer's "status" at his former employer, "the procedures he was asked to

16   stop," and whether he "had been fully vetted for his role" at DHMC. (*Id*.) He "had Dr.

17   DeMars come before the committee to explain her rationale for bringing [Dr. Seifer]

18   forward and her understanding." (*Id*. at 77.) Dr. DeMars expressed her displeasure

1    that Dr. Seifer's former colleagues had contacted DHMC to convey their concerns.

2    (*See id*.) She told the committee that Dr. Seifer was an accomplished physician, that

3    he might have had a falling-out with his peers, that she believed his former situation

4    had not been a good fit, and that the director role at REI would be a better fit. (*See id*.

5    at 77-78, 83.)

6    Dr. Merrens testified that Dr. DeMars assured the committee "that she

7    would take personal responsibility that [Dr. Seifer] would be a success." (*Id*. at 77.)

8    The committee thus "allowed [Dr. DeMars] to hire Dr. Seifer with the understanding

9    that *she would ensure that he would be a success in this role*." (*Id*. (emphasis added); *see*

10    *id*. at 83 ("That's how she left the meeting."); *id*. ("this was on her").)


11    2. *Dr. Seifer's Performance as REI Director*

12    Dr. Seifer began work at REI on June 15, 2016.  His tenure as REI's

13    Director was not a success.  "[C]omplaints about . . . Dr. Seifer[] started from the very

14    beginning of his employment at D-H in the spring of 2016 and accelerated in July 2016

15    when he began doing procedures." (Dr. Porter Answer to DHMC Interrogatory 10.)

16    Although Dr. Porter was unable to recall the "specific dates when individuals

17    complained," she stated that there "was an endless stream, from multiple sources,

1    over multiple conversations, and in multiple different situations." (*Id.*)  In response

2    to DHMC's interrogatory requesting identification of "each and every REI nurse,

3    ultrasound technician, and embryologist who approached [her] in July 2016 and

4    expressed serious reservations about [Dr. Seifer's] alleged substandard technical

5    ability . . . and other concerns impacting patient safety" (DHMC Interrogatory 10

6    (internal quotation marks omitted)), Dr. Porter named 12 persons as "some" of those

7    individuals: the head of the embryology laboratory, an embryologist, four ultrasound

8    technicians, and six nurses (Dr. Porter Answer to DHMC Interrogatory 10).

9        Dr. Porter stated that the principal criticisms were that Dr. Seifer was

10    unnecessarily rough with intravaginal ultrasound probes; that his patients woke up

11    with more pain than was typical following routine oocyte harvests; that the test tubes

12    into which follicular aspirates were collected were unusually bloody; that he

13    appeared to be disoriented; and that he did not seem to know what he was doing.

14    (*See id.*)  "The theme was always very clear, and the concerns were always similar--

15    specifically, that the REI Division Director was unsafe with patients," and Dr. Porter

16    instructed everyone who complained or commented to her to report their concerns

17    to OB/GYN chair Dr. DeMars and other persons in "the chain of command."  (*Id.*)

1          Parent, one of the nurses identified by Dr. Porter as concerned about Dr.

2    Seifer, had assisted both Dr. Hsu and Dr. Seifer in performing oocyte retrievals, and

3    she stated, "I went to Dr. Leslie DeMars on multiple occasions because I was worried

4    about what I saw happening to the women who were being treated by Drs. Seifer and

5    Hsu." (Parent Decl. ¶ 6.) Dr. DeMars's response was "that Dr. Porter set a high bar

6    and [Parent] had to accept that other doctors did things differently." (*Id.*) Parent, an

7    OB/GYN nurse for some four decades, including 17 years at REI (*id.* ¶ 1), stated that

8    "[Dr. Seifer's] retrievals were the most bloody and painful that I have ever witnessed"

9    (*id.* ¶ 4).

10          Dr. Russell, in her declaration, observed that "[t]he nursing staff found

11   it incredibly difficult to work with Dr. Seifer and Dr. Hsu." (Dr. Russell Decl. ¶ 17.)

12   Dr. Russell stated that she did not work much with Dr. Seifer; but her office was close

13   to his, and she regularly heard him on the telephone "say[ing] things to patients that

14   didn't sound right, including seemingly incorrect advice." (*Id.* ¶ 4.)

15          Dr. Russell also stated that when she "sent consults to Dr. Seifer, his

16   consults were not at the level of other REIs that [she had] worked with, despite his

17   many years of experience. He certainly did not have the competency needed to be a

18   division director." (*Id.* ¶ 16.)

1          In February 2017, in response to Dr. DeMars's division-wide request for

2    assessments of Dr. Seifer's performance, Dr. McBean, who served REI on a per-diem

3    basis and was "a well-thought-of provider" (Dr. Merrens Dep. 185), gave her

4    evaluation of Dr. Seifer.  As to technical skills, Dr. McBean stated that "Dr. Seifer ha[d]

5    been a practicing REI physician for years, but upon arrival [he] did not seem to

6    understand our system for oocyte retrieval," which had been standard "for over 7

7    years"; that "he does not do the standard fertility surgeries of hysteroscopy and

8    laparoscopy," despite the fact that "a broad set of skills is critical for success in a small

9    program"; and that he has "limited ultrasound skills both in performing and

10   interpreting." (Dr. McBean email to Dr. DeMars.)  As to standard of care, Dr. McBean

11   stated that Dr. Seifer "practic[ed] outside of ASRM standard of care"; that his

12   "conversations regarding ASRM guidelines during team meetings . . . do not reflect

13   current standards"; and that his "screening and evaluation of patients is often

14   incomplete or scattered and causes concern in patients."  (*Id*.)

15   D.  *Dr. Porter's Reports of Wrongdoing by Drs. Seifer and Hsu*

16          In addition to the concerns reported by REI staff as to the competence of

17   Drs. Seifer and Hsu and their non-adherence to professional standards, Dr. Porter and

- 20 -

1    staff members expressed concerns about other improprieties.  These included

2    procedures performed without the patient's consent, procedures performed or

3    repeated unnecessarily or in excess of applicable guidelines, and procedures that

4    were contraindicated by the patient's condition.

5         The most pervasive practice causing such concerns was the performance

6    by Drs. Seifer and Hsu of mock embryo transfers.  Such trial transfers were not part

7    of the standard infertility evaluation but were used after a patient or couple decided

8    that she or they were likely to proceed with an embryo transfer.  Trial transfers are

9    sometimes categorically inappropriate, because some patients decide never to have

10   IVF, or decide to adopt, or achieve pregnancy with simpler means such as ovulation

11   induction.  But Drs. Seifer and Hsu, unlike any DHMC REI physicians before them--

12   and while Dr. Porter was on her medical leave of absence--ordered that mock embryo

13   transfers be performed on every new infertility patient.  (*See* Dr. Porter Answer to

14   DHMC Interrogatory 12.)

15        Dr. Porter testified that Dr. Seifer and Dr. Hsu "were ordering and

16   performing unnecessary testing and . . . they were billing for that unnecessary

17   testing." (Dr. Porter Dep. 38.)  Many patients had insurance for diagnostic testing for

18   infertility; but such diagnostic testing did not include trial embryo transfers.  Thus,

1    the decision of Drs. Seifer and Hsu to have such mock transfers routinely performed

2    for all infertility patients invited accusations of insurance fraud.

3            Dr. Porter also identified staff members who informed her that Dr. Hsu

4    had performed unnecessary fallopian tube patency studies, *i.e.*, tests to determine

5    whether the tubes were open.  He had performed such tests on patients who

6    presented for abnormal bleeding, not for concerns regarding fertility; for these

7    patients, such a study was not indicated.  In addition, Dr. Hsu and Dr. Seifer were

8    "observed . . . performing a tubal patency study on a patient whose tubes were tied

9    (thus, it was impossible that she required a tubal patency study)." (Dr. Porter Answer

10   to DHMC Interrogatory 11.)  "It is unlawful billing fraud to order and bill for tests

11   that you know are unnecessary."  (Dr. Porter Answer to DHMC Interrogatory 12.)

12           Dr. Porter was also informed that procedures were being performed by

13   Dr. Seifer, or by Dr. Hsu with Dr. Seifer observing, without the patients' consent.  She

14   identified staff members who had observed such procedures and had first-hand

15   knowledge that patient consent, written or oral, had not been obtained.  Dr. Porter

16   asked that these infractions be reported to the supervising radiologists.  She also met

17   with the lead ultrasound technician and asked him to report these complaints to Dr.

18   DeMars.  (*See* Dr. Porter Answer to DHMC Interrogatories 10-11.)

- 22 -

1          Dr. Porter reported, or directed others to report, these concerns about the

2    acts of Drs. Seifer and/or Hsu--performing unnecessary procedures, billing for such

3    procedures, performing them without patient consent--to OB/GYN Practice Manager

4    Gunnell, and to OB/GYN chair Dr. DeMars.  (*See* Dr. Porter Answer to DHMC

5    Interrogatories 10-12.)

6          Dr. Porter also learned from the head of DHMC's embryology laboratory-

7    -and reported to DHMC's Risk Management personnel--that Drs. Seifer and Hsu, with

8    respect to a couple under their joint care, had not followed recommendations of

9    ASRM and/or the United States Center for Disease Control ("CDC") with regard to

10   embryo transfer and implantation where there was a known risk of transmission of

11   the Zika virus.  The generally applicable guidance was that men should delay

12   participation in a pregnancy for six months after traveling to a known Zika-endemic

13   area such as Brazil.  The couple in question had been evaluated by Dr. Seifer or Dr.

14   Hsu on the day they were to leave for a vacation in Brazil.  Drs. Seifer and Hsu

15   neither requested that the couple cryopreserve the husband's sperm before going to

16   Brazil nor followed the ASRM or CDC guidelines for a waiting period after their trip.

17   Less than six months after their return, the couple created two embryos from an

18   anonymous oocyte donor, using cryopreserved sperm of the husband that had

1   potentially been exposed to the Zika virus.  (*See* Dr. Porter Answer to DHMC

2   Interrogatory 16.)

3            In addition, in the summer after he started in REI, Dr. Seifer was

4   providing care to patients before he was licensed to practice in New Hampshire.

5   Although he did so in the presence of Dr. Hsu, Dr. Porter objected that Dr. Seifer's

6   actions constituted the practice of medicine without a license in violation of New

7   Hampshire law.  She reported this conduct to Dr. DeMars.  (*See* Dr. Porter Dep.

8   33-34.)

9   E.  *The Decision To Close REI*

10            By the Spring of 2017, the nursing staff in REI had dwindled to a single

11   fully trained nurse.  One REI nurse had been terminated in November 2016; and

12   nurse Parent, who had given DHMC a year's notice of her intention to retire, retired

13   in December 2016.  Those nurses had not been replaced; thus, in the spring of 2017

14   REI had only five "providers":  Dr. Seifer, Dr. Porter, Dr. Hsu, Dr. McBean who

15   provided per-diem services, and nurse practitioner Elizabeth Todd. (Dr. Porter Decl.

16   ¶ 5.)  According to DHMC,

1          [i]n the March/April timeframe, OB/GYN Department
2          management and DHMC leadership had multiple discussions
3          regarding issues in the REI Division, including *the general
4          dysfunction as well as the nursing shortage predicament*. . . .  *Dr.*
5          *DeMars*, Chair of the OB/GYN Department, *Daniel Herrick*, Vice
6          President of Perioperative and Surgical Services, *and Dr. Ed[ward]*
7          *Merrens*, Chief Clinical Officer, *participated in these meetings*, along
8          with others.

9      (DHMC Rule 56 Statement ¶ 10 (emphases added).)

10         The closing of REI was recommended by Herrick, a DHMC vice

11     president for OB/GYN who was the "administrative partner" of the department's

12     chair.  (Deposition of Daniel Herrick ("Herrick Dep.") at 122; *see id*. at 12-13, 27.)

13     Herrick testified that in or around February 2017, he and Dr. DeMars had attended

14     a workshop with DHMC's Human Resources personnel, including those who did

15     recruiting, and others, to discuss problems at REI.  (*See* Herrick Dep. 30, 49-51.)  He

16     testified that "[f]ollowing that meeting when everyone left the room, Leslie and I

17     remained, and I shared with Leslie that it was my very strong recommendation that

18     we needed to either shut the program down or put it on hiatus . . . , but that we

19     cannot continue." (*Id*. at 50.)  "[S]he agreed that based on what we had just heard that

20     she did not see another option," and "it was at that point that we made the decision

21     to recommend to the senior leadership that we would shut the program down." (*Id*.

- 25 -

1    at 50-51.)  Herrick testified that "[a]s of April 18," Dr. DeMars concurred that they

2    should  recommend  to  senior  management  that  REI  be  closed,  and  that  its  staff,

3    including physicians, be terminated.  (*Id*. at 49.)

4              Dr. DeMars, however, testified that by the time she was included in

5    discussions as to the future of the REI Division with Dr. Merrens and other senior

6    management, the decision to close REI had already been made.  She testified that at

7    her first such meeting she tried to propose a reduced REI that did not include IVF,

8    and a plan to have Dr. Porter deal with ultrasounds, to have Dr. Hsu undertake the

9    remaining REI duties, and to "counsel [Dr. Seifer] out of his position"--*i.e.*, to end his

10   employment at DHMC.  (Dr. DeMars Dep. 139; *see id*. at 136, 139-40.)  Dr. DeMars

11   testified that her plan was summarily rejected:

12              Essentially every single point I brought up was dismissed, and I
13              was told that there was not going to be any plan, that I was not
14              allowed to make any plan.

15              Q.  Who told you that?

16              A.  Ed [*i.e.*, Dr. Merrens].  That it was my fault.

17   (*Id*. at 140.)

18              The final decision to close REI was made on April 20 or 21.  (*See* Dr.

19   Merrens Dep.  148.)  Dr.  Merrens testified that

1    the decision was we're just going to shut REI down.  We're not
2    going to continue some select services, and we're just going to
3    shut this down and go from there.

4        Q.  And what was the decision about staffing at that
5    point?

6        A.  In terms that we would shut down the program, end,
7    end the providers, terminate the providers that were engaged
8    in it . . . .

9  (*Id.*; *but see id.* at 149 (noting that nurse "Beth Todd was someone that could

10  continue on working just in GYN").)

11        Despite that decision to close REI, Dr. DeMars on April 25--

12  envisioning the "rebirth of this program"--sent Herrick an email urging that she be

13  allowed to hire a certain candidate for REI "in some capacity asap."  (Dr. DeMars

14  email to Herrick dated April 25, 2017 ("Dr. DeMars April 25 email to Herrick").)

15  She stated that "it is very hard to hire REIs into an academic program.  That's how

16  we got stuck with David [*i.e.*, Dr. Seifer]."  (*Id.*)

17        In that email, Dr. DeMars also commented on REI's current staff of

18  physicians, in part, as follows:

19        *While David is not a good leader, his failure is also the result of*
20        *a masterful takedown by Misty Porter.  If she had wanted to support*
21        *him, she would have made the division successful.*

- 27 -

1        Misty is counting on her longevity and my friendship to
2        come in as the savior of the division.

3        *Ed is also lumping Albert* [*i.e.*, Dr. Hsu] into *"he's been a*
4        *problem since day 1"*.  This is not a fair characterization *of Albert*.
5        Again, Misty has decided that she no longer wants to work
6        with him or teach him, and she is bullying him.  He did an
7        amazing job by himself Jan-Aug 2016.

8        David is a nudge, who somehow lacks situational
9        awareness, but he came into a dysfunctional division with half
10       the team determined to make him fail.

11                      . . . .

12       We have to be very careful about the conditions under
13       which we can terminate our providers.  *David*'s wife is a Pedi
14       Endocrinologist who works mostly in Manchester.  *It is*
15       *conceivable that he could join one of the Boston IVF practices (Lord*
16       *help them)* and compete directly for these patients.

17    (*Id*. (emphases added).)

18        On May 4, DHMC informed the REI staff--and began informing REI

19    patients--that REI would close at the end of May.  Herrick, when asked in his

20    deposition "[w]hy was the decision made to close the division," testified that the

21    decision

22       was pretty *straightforward*.  It was marginally profitable.  It was
23       at that time totally dysfunctional.  *We were unable to sustain staff*
24       *to run the operation*.  Patients were not getting the care that they

- 28 -

1    deserved, and we were not able to provide care that was
2    [consistent with] the reputation of Dartmouth-Hitchcock.

3              Q.  Anything else?

4              A.  No.

5    (Herrick Dep. 13 (emphases added).)

6              Dr. Merrens, however, indicated that the reason for the decision to

7    close REI was not straightforward.  The shortage of nurses was only the last

8    "straw."  (Dr. Merrens Dep. 186.)  He had sought input from Aimee Giglio,

9    DHMC's head of Human Resources (*see id*. at 22), as to how to frame a solid

10   explanation for the closure, stating that

11             [w]hile *on the surface* we are *pinning* the dissolution of our
12             reproductive endocrinology program *on our failure to maintain*
13             *and recruit nurses* for this work, *it is ultimately the dysfunction of*
14             *the physicians who worked in this area for years* (*as well as recent*
15             *hires*) and ultimately a failure of leadership, for which I hold
16             Leslie [*i.e.*, Dr. DeMars] fully accountable.

17             The fact that *failures of such programs due to nursing*
18             *shortages are not common* and we'll be referring patients to a
19             similar, rural academic REI center in Burlington Vermont, *will*
20             *make our explanation* to the public, patients and the media, well,
21             *rather thin*.

22   (Dr. Merrens email to Giglio dated May 2, 2017 (emphases added).)  Giglio

23   responded:

- 29 -

1    Let's discuss this morning.  *I appreciate your candor* and
2    recognition of the issues.  PR here is very sensitive--goes
3    without saying.  *We will need to manage internal vs. external*
4    *messaging and issues*.

5    (Giglio email to Dr. Merrens dated May 2, 2017 (emphases added).)


6    F.  *The Termination of Dr. Porter's Employment at DHMC*

7          REI was closed effective June 2017.  Dr. Porter's employment at

8    DHMC ended on June 3, 2017.  Herrick testified that "[t]he entire program was

9    shuttered so all of the providers were terminated"; Dr. Porter "was terminated

10   along with the closure of the REI program."  (Herrick Dep. 14-15.)  "[B]ecause she

11   was in the program and because the program was closed, therefore her

12   employment was terminated."  (*Id*. at 15.)

13         Dr. Merrens likewise testified that Dr. Porter was terminated simply

14         [b]ecause we closed the program, the REI program.  So her
15         termination was, occurred at the same time we terminated the
16         other physician providers in the program.  We ended the
17         program in which she worked.

18   (Dr. Merrens Dep. 19.)  At the time of REI's closure, Dr. Porter also had a joint

19   appointment in DHMC's Radiology Department.  (*See, e.g., id*. at 43.)  But on June

1    3, Dr. Porter's entire employment at DHMC was ended.  (*See id.*; DHMC Answer

2    ¶¶ 95-96.)

3          Despite Herrick's statement that when REI closed all of the REI

4    providers were terminated, one provider was not.  Nurse Todd was instead

5    reassigned to OB/GYN.  (*See* Dr. Merrens Dep. 24-25.)  Dr. Merrens received

6    numerous emails suggesting that Dr. Porter should be retained, including one

7    from OB/GYN Nurse Coordinator Victoria Maxfield (*see* Maxfield email to Dr.

8    Merrens dated May 12, 2017 ("Maxfield May 12 email to Dr. Merrens" or "Maxfield

9    email") (further described below)).  In response to that email, Dr. Merrens stated,

10   *inter alia*, that decisions with regard to REI's staff had been made "at the

11   recommendation of Dr. De[M]ars."  (Dr. Merrens email to Maxfield dated May 12,

12   2017 ("Dr. Merrens May 12 email to Maxfield").)

13          1. *Dr. DeMars's Non-Recommendation To Retain Dr. Porter*

14          Both Herrick and Dr. Merrens testified in their depositions that after

15   the decision was made to close REI, there was no request by Dr. DeMars for Dr.

16   Porter to be retained in OB/GYN.  Herrick said that after Dr. DeMars on April 18

17   "supported closing the REI Division and terminating the physicians" (Herrick

- 31 -

1    Dep. 49), she suggested that "there[ was] an option of keeping Dr. Porter and

2    having her do ultrasound in the gynecology department" (*id*. at 55).  But Dr.

3    DeMars broached this as "more of a potential option" (*id*. at 54); and she then "put

4    it forth as *not* really a practical opening" (*id*. at 58 (emphasis added)).  Herrick

5    testified that in various discussions he had with Dr. DeMars and Gunnell it was

6    concluded that the ultrasound work was already adequately staffed, that there

7    was no anticipation of additional demand, and that there thus was no need for Dr.

8    Porter.  Although Herrick's domain was budgets and finance (*see id*. at 33, 55), he

9    testified that there was no actual "analysis of whether there was sufficient demand

10   for [Dr. Porter] to do this work" (*id*. at 56 ("analysis," he said, "might be the wrong

11   word")).  Herrick testified that keeping Dr. Porter at DHMC "was never planned in

12   [his] mind."  (*Id*. at 54.)

13         Dr. Merrens, in his deposition, testified that his "understanding

14   through Dr. DeMars was that [Dr. Porter's] primary interest . . . was around REI

15   and IVF" (Dr. Merrens Dep. 204), and that she would not want to do other work.

16   He said that after receiving many messages about Dr. Porter, he "reflected" about

17   her with Dr. DeMars, and that that "discussion" convinced him that Dr. Porter was

18   not interested in pursuing anything different from IVF.  (*Id*. at 207-08; *but see id*.

1    at 209 ("I don't think I had specific conversations with Dr. DeMars about Dr.

2    Porter" in mid-May).)  As discussed in Part II.E.2. below, Dr. Merrens testified that

3    "*[t]here was never a proposal that* we're going to end the program and *Misty will*

4    *continue on doing GYN ultrasound*."  (*Id.* at 169 (emphases added).)


5            2.  *Dr. Merrens's "Disability" Answer to Dr. Russell's Question*

6                    Dr. Merrens testified that "there was nothing about [Dr. Porter's]

7    disability that led to [his] decision about her termination."  (Dr. Merrens Dep. 216.)

8    However, Dr. Russell--who attended the OB/GYN department meeting that was

9    convened for Dr. Merrens to address his decision to close REI--described Dr.

10   Merrens's answer to "why" Dr. Porter was not being retained by DHMC as follows:

11                   Dr. Merrens said that the REI Division was closed due to
12                   problems recruiting adequate nursing staff for the division.  He
13                   then began discussing personnel and the termination of three
14                   physicians in conjunction with the closure.  When he began
15                   discussing personnel, I raised my hand (I was seated towards
16                   the front) and *asked Dr. Merrens why Dr. Porter had been*
17                   *terminated*.  I said something like, "I can understand why the
18                   other two needed to leave, but *why Misty*?"  *Dr. Merrens*
19                   *responded by saying that Misty was "on disability."*  I specifically
20                   recall him using the word "disability" in his response, because I

1    was so shocked that he said that.  I said something like,
2    "but she was coming back," *and Dr. Merrens moved on to a*
3    *different subject*.

4    (Dr. Russell Decl. ¶ 10 (emphases ours).)


5    　　　3. *Dr. Merrens's Response to the Maxfield Email*

6    　　　　　　Nurse Maxfield in her email to Dr. Merrens described Dr. Porter's

7    expertise and OB/GYN's staffing needs in a number of areas.  Having been

8    employed in the OB/GYN clinic for some 18 years, including the most recent eight

9    years as Nurse Coordinator and Uro/GYN Charge Nurse, and having worked with

10   Dr. Porter during those 18 years, Maxfield observed that Dr. Porter "provides

11   reproductive endocrinology expertise separate from infertility."  (Maxfield May 12

12   email to Dr. Merrens.)  She stated that Dr. Porter's "expertise in gynecologic

13   ultrasounds, myomectomies, hysteroscopy, and gyn surgeries *provide a level of care*

14   *to women that is not available from other members of the Gynecology staff*."  (*Id*.

15   (emphasis added).)  Maxfield observed that OB/GYN "*is short staffed already with*

16   *GYN MD's*," and said "I hope there is a way we could still keep Dr. Porter as a

17   non-infertility REI specialist, GYN surgeon and expert in gynecologic imaging.

18   Her expertise and skills are greatly needed!"  (*Id*. (emphasis added).)

1    Dr. Merrens promptly responded to Maxfield's email, stating in full as

2    follows:

3    Victoria,

4    Thanks for your email.  The recommendations around
5    closing the program and its staff were at the recommendation
6    of Dr. De[M]ars.  As you know *Dr. Porter currently works at 20%*
7    *of her time currently* and I'm not sure of her interest in staying on
8    if the infertility part were to cease.  I'm clearly aware how
9    difficult this is for patients and staff.  I have been answering
10   emails all week, heartfelt concerned and sad at this transition.  I
11   completely understand.

12   (Dr. Merrens May 12 email to Maxfield, at 2:19 p.m. (emphasis added).)  A few

13   minutes later, Dr. Merrens sent the following email to Dr. DeMars:

14   *I am getting inundated* with heartfelt and long emails
15   *wondering why Misty can't stay on to do her ultrasound complex*
16   *operative and teaching role* even if we end REI.  *I suspect* that you
17   considered this in the evaluation the program and your
18   knowledge of Misty.  I just need to know how *better* to answer
19   this question.

20   (Dr. Merrens email to Dr. DeMars dated May 12, 2017, 2:27 p.m. ("Dr. Merrens

21   May 12 email to Dr. DeMars") (emphases added).)

22   Dr. DeMars responded with a lengthy email, stating at the outset that

23   the inquirers asking why Dr. Porter was not being retained were "*remembering*

24   Misty as *a full time* employee wearing 3 hats, and *not the one who has been out for*

- 35 -

1    *almost 18 months*."  (Dr. DeMars email to Dr. Merrens dated May 12, 2017 ("Dr.

2    DeMars May 12 email to Dr. Merrens") (emphases added).)

3            Dr. Merrens's response to the Maxfield email had stated that he was

4    "not sure of [Dr. Porter's] interest in staying on if the infertility part were to cease."

5    As described in Part II.C.3. below, Dr. Merrens testified that at some point he

6    received a document from Dr. Porter stating expressly that she had an interest in

7    remaining in OB/GYN even if the infertility part were to cease.  However, he never

8    discussed such a possibility with her.


9    G.  *Summary Judgment Dismissing the Present Action*

10           Dr. Porter commenced the present action in October 2017.  Her six-

11   count amended complaint ("Complaint") alleged principally that the termination

12   of her employment by DHMC resulted in part from her reporting and causing to

13   be reported what she reasonably believed to be unlawful, unethical, or medically

14   dangerous conduct by Drs. Seifer and Hsu, including performance of medical

15   procedures without client consent, the performance of unnecessary procedures,

16   fraudulent billing practices, and knowingly allowing the transfer and implantation

17   of an embryo where the transmission of Zika virus was a known risk.  The

- 36 -

1    Complaint asserted that her termination in these circumstances constituted

2    wrongful discharge and whistleblower discrimination in violation of New

3    Hampshire law (counts 1 and 2).

4            In addition, the Complaint alleged that when DHMC terminated her

5    employment Dr. Porter was on long-term disability, although she had been able to

6    return to work half-time, and with that accommodation she was performing at her

7    usual high level of expertise and was able to meet all essential job requirements.  It

8    alleged that DHMC, in terminating Dr. Porter's employment, neither "evaluate[d]

9    the feasibility of restructuring her position or reassigning her to another position

10    within" OB/GYN nor told her that such an accommodation of her disability

11    "would be an undue hardship."  (Complaint ¶ 107.)  It alleged that the termination

12    of her employment was motivated in part by her disability, in violation of the

13    ADA, 42 U.S.C. § 12101, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a)

14    (counts 3 and 4), as well as in violation of the laws of New Hampshire and

15    Vermont (counts 5 and 6).  Dr. Porter also alleged that she had been denied

16    adequate other accommodation during her shorter workweeks.

17            DHMC moved for summary judgment dismissing the Complaint in

18    its entirety, contending that Dr. Porter could not show that she was denied

1    accommodation for her disability or that her termination was the result of any

2    prohibited discrimination or retaliation.  It proffered evidence, principally the

3    deposition testimony of Herrick and Dr. Merrens, to show that the decision to

4    close REI was a legitimate business decision unrelated to Dr. Porter's disability or

5    to her reporting activities, and that there was no other suitable position for Dr.

6    Porter at DHMC.

7               Dr. Porter, disputing DHMC's suggestion that the closure of REI

8    made the June 2017 termination of her employment at DHMC necessary, stated

9    that in fact in the spring of 2017 she was doing mostly non-REI work.  (*See* ¶¶ 1-22

10   of Dr. Porter Answer to DHMC Interrogatory 7, describing her responsibilities

11   that, at the time of her termination, were "not REI-related" and that were sufficient

12   "to occupy [her] entire schedule, even . . . full-time".)

13              For example, Dr. Porter "was regularly consulted by GYN oncology

14   and hematology oncology for young women with cancers (e.g., breast,

15   lymphomas, colorectal, endometrial cancer, borderline ovarian cancer, and

16   cervical cancer) who desired fertility preservation."  (*Id*. ¶ 1.)  She provided first

17   trimester ultrasounds and care for patients with pregnancy complications (*id*.

18   ¶ 11); she provided consults for, *inter alia*, pregnancies in unusual locations (*id*.

1    ¶ 12), pediatric gynecology (*id*. ¶ 20), and abnormal uterine bleeding in pre- and

2    post-menopausal women (*id*. ¶ 16).  She performed ultrasound-guided benign

3    gynecologic procedures such as biopsies of the uterine lining, draining of pelvic

4    cysts, and removal of imbedded IUDs (*id*. ¶ 17), and performed minimally

5    invasive advanced laparoscopic surgery for many benign gynecological diagnoses

6    (*id*. ¶ 2).

7            Dr. Porter also pointed out that even without an REI division, DHMC

8    still needs capability to perform fertility evaluations; until she was terminated, she

9    performed such evaluations which, when indicated, included ultrasound-guided

10   tubal patency studies, which "[n]one of the remaining gynecologists at D-H kn[ew]

11   how to do."  (*Id*. ¶ 10.)  Dr. Porter stated, "one of the generalist OB/GYNs called me

12   shortly after my termination and asked me to walk her through how to perform

13   the procedure, as she had never done or seen one, and a patient on her schedule

14   later that day had requested it."  (*Id*.)

15           As to DHMC's assertion that in June 2017, when REI was closed, there

16   was no available DHMC position to which she could be reassigned, Dr. Porter

17   submitted evidence of OB/GYN's June 2017 request to hire another GYN

18   physician.  (*See* Attachment to Gunnell email to Chief Clinical Officer Dr. Merrens

- 39 -

1    and Chief Medical Officer Dr. Padin dated June 30, 2017 ("OB/GYN's June 2017

2    Hiring Request").)  The request--signed by Gunnell and DeMars--said, *inter alia*,

3    that another GYN physician was "essential for provision of direct patient care in

4    the Ob/Gyn clinic, operating rooms, and Birthing Pavilion," and that OB/GYN

5    "ha[s] a shortage of subspecialists and generalists in the department."  (*Id*.)  It

6    stated:  "We have no capacity to fill in these duties with existing staff."  (*Id*.)

7            The district court, in an opinion dated November 3, 2020, *see* 2020 WL

8    6789564 ("D.Ct. Op."), granted summary judgment dismissing the Complaint.  For

9    Dr. Porter's disability and whistleblowing claims, the court employed the

10   *McDonnell Douglas* burden-shifting analysis, under which the plaintiff bears the

11   burden of showing a prima facie case of unlawful discrimination; the burden of

12   production then shifts to the employer to articulate a legitimate,

13   nondiscriminatory reason for its adverse employment action; if the employer

14   adduces such evidence, the plaintiff, in order to avoid summary judgment, must

15   point to evidence sufficient to permit an inference that the employer's proffered

16   reason is pretext for the alleged prohibited discrimination, *see McDonnell Douglas*

17   *Corp. v. Green*, 411 U.S. 792, 802-07 (1973).

- 40 -

1    The district court ruled that the evidence adduced by Dr. Porter,

2    viewed in the light most favorable to her, was sufficient to meet the first step of the

3    *McDonnell Douglas* analysis as to her whistleblowing and disability discrimination

4    claims.  *See, e.g.,* D.Ct. Op., 2020 WL 6789564, at *9 ("[s]ome portion of" Dr. Porter's

5    reporting activities, *i.e.,* "[h]er criticism of Dr. Seifer and Dr. Hsu[,] continued

6    through the spring of 2017," and "likely qualifies as protected whistleblowing

7    activity"); *id*. at *13 (Dr. Merrens and Dr. DeMars were aware of Dr. Porter's

8    disability).  And the court found that "Dr. Porter's complaints about the other

9    physicians are communications that would satisfy the public policy" element of a

10    wrongful discharge claim.  *Id*. at *15.  However, the court found that DHMC

11    proffered legitimate business reasons for closing REI and terminating Dr. Porter's

12    employment and that Dr. Porter failed to adduce sufficient evidence to permit an

13    inference that those reasons were pretext for the alleged discrimination, and thus,

14    all of Dr. Porter's principal claims failed for lack of proof of causation.

15    As to the causation element of the whistleblower and wrongful

16    discharge claims, the district court found that there was no evidence that Dr.

17    Merrens, as decisionmaker, knew of Dr. Porter's reporting activities (*see* Part II.E.1.

18    below).  It thus concluded that there was no evidence that DHMC closed REI and

- 41 -

1    terminated Dr. Porter because of her reporting activities.  *See* D.Ct. Op., 2020 WL

2    6789564, at *8-*11, *15.  Although Dr. Porter contended that Dr. Merrens made the

3    decision to deny her further employment at DHMC because he was influenced to

4    do so by Dr. DeMars, who had received Dr. Porter's reports and was angry at her

5    persistent complaints of improper and unlawful conduct, the court stated (as

6    described in Part II.E.2. below) that Dr. DeMars advocated for Dr. Porter's

7    retention, and that the evidence did not support an inference that her irritation at

8    Dr. Porter's criticism of Dr. Seifer was so great that she would retaliate by

9    recommending Dr. Porter's termination.  *See id*. at *9-*11.

10           As to the causation element of Dr. Porter's disability claims, the

11    district court ruled that there was no proof that her disability was a "but-for" cause

12    of DHMC's decision not to move her to another position within DHMC.  As set

13    forth more fully in Part II.C.2. below, the court ruled principally that, standing

14    alone, Dr. Merrens's reference to Dr. Porter's "disability" in response to Dr.

15    Russell's inquiry as to why Dr. Porter was not being retained was "inconclusive,"

16    and, *inter alia*, that there was no evidence of "more explicit statements of

17    discrimination" or of "a pattern of discriminatory comments," and that there were

18    "possible interpretations" of that response other than its literal meaning.  *Id*. at *13.

- 42 -

1                                    II.  DISCUSSION


2                    On appeal, Dr. Porter contends principally that the district court

3        applied incorrect legal standards in assessing the causation element of her

4        termination-of-employment claims, and that the court inappropriately resolved

5        genuine issues of fact as to whether DHMC's explanations for terminating her

6        employment, and not reassigning her to another DHMC position, were pretext for

7        unlawful discrimination and retaliation.  As to these claims, we agree.  For the

8        reasons that follow, we conclude principally that the district court did not

9        properly apply summary judgment standards in considering the evidence as to

10       DHMC's reasons for not retaining Dr. Porter within OB/GYN; and it thus erred in

11       concluding that no rational juror could infer that there was a causal connection

12       between Dr. Porter's disability or her reporting activities and defendants' decision

13       not to retain her in OB/GYN.

1      A.  *Summary Judgment Principles*

2              Principles governing consideration of motions for summary

3      judgment, and appellate review of the grant of such motions, are well established.

4              A motion for summary judgment may properly be
5              granted--and the grant of summary judgment may properly be
6              affirmed--only where there is no genuine issue of material fact
7              to be tried, and the facts as to which there is no such issue
8              warrant the entry of judgment for the moving party as a matter
9              of law.  *See* Fed. R. Civ. P. 56(c)(2) . . . .  *The function of the district*
10             *court in considering the motion for summary judgment is not to*
11             *resolve* disputed questions of fact *but only to determine whether*, as
12             to any material issue, a genuine factual dispute exists.  *See, e.g.,*
13             *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 . . . (1986)
14             ("*Liberty Lobby*").

15     *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("*Kaytor*") (emphases

16     added).

17             In reviewing the evidence and the inferences that may
18             reasonably be drawn, the court "*may not make credibility*
19             *determinations or weigh the evidence* . . . . *'Credibility*
20             *determinations, the weighing of the evidence, and the drawing of*
21             *legitimate inferences from the facts are jury functions, not those of a*
22             *judge*.'"  *Reeves[ v. Sanderson Plumbing Products, Inc.]*, 530 U.S.
23             [133,] 150 [(2000)] (quoting *Liberty Lobby*, 477 U.S. at 255 . . . ).

24     *Kaytor*, 609 F.3d at 545 (emphases in *Kaytor*).  Further,

25             *the district court may not properly consider the record in piecemeal*
26             *fashion* . . . ; rather, it must "review all of the evidence in the
27             record," . . . .  And in reviewing all of the evidence to determine

- 44 -

1           whether judgment as a matter of law is appropriate, "the court
2           must *draw all reasonable inferences in favor of the nonmoving party*,"
3           . . . even though contrary inferences might reasonably be drawn
4           . . . .

5    *Id*. (quoting *Reeves*, 530 U.S. at 150 (other internal quotation marks omitted)

6    (second emphasis in *Kaytor*; first emphasis ours)).  Thus, while the court is

7    required to review the record as a whole, it "'*must disregard all evidence favorable to*

8    *the moving party that the jury is not required to believe*.'"  *Kaytor*, 609 F.3d at 545

9    (quoting *Reeves*, 530 U.S. at 151 (intermediate quotation marks omitted) (emphasis

10    in *Kaytor*)).

11    B. *Causation Standards Governing Employment Disability Discrimination Claims*

12           The ADA and the Rehabilitation Act prohibit covered employers from

13    discriminating against qualified individuals on account of disability.  The ADA

14    prohibits "discriminat[ion] against a qualified individual *on the basis of* disability in

15    regard to," *inter alia*, "the . . . discharge of employees."  42 U.S.C. § 12112(a)

16    (emphasis added).  The Rehabilitation Act provides that

17           [n]o otherwise qualified individual with a disability . . . shall,
18           solely by reason of her or his disability, be excluded from the
19           participation in, be denied the benefits of, or be subjected to

1                discrimination under any program or activity receiving Federal
2                financial assistance . . . ."

3    29 U.S.C. § 794(a).  The ADA defines a "'qualified individual'" as one "who, with or

4    without reasonable accommodation, can perform the essential functions of the

5    employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

6    It defines "disability" as

7                (A) a physical or mental impairment that substantially
8                limits one or more of the major life activities of such
9                individuals;

10               (B) a record of such an impairment; or

11               (C) being regarded as having such an impairment . . . .

12   *Id*. § 12102(1).  The Rehabilitation Act, with respect to employment, uses

13   essentially the same definition.  *See* 29 U.S.C. § 705(9).  And as amended in 1992, it

14   uses the same standards as those applicable to employment discrimination claims

15   under the ADA:

16               The standards used to determine whether this section [*i.e.*,
17               29 U.S.C. § 794] has been violated in a complaint alleging
18               employment discrimination under this section *shall be the*
19               *standards applied under* title I of *the Americans with Disabilities Act*
20               of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections
21               501 through 504, and 510, of the Americans with Disabilities
22               Act

1    of 1990 (42 U.S.C. 12201-12204 and 12210), *as such sections*
2    *relate to employment*.

3    29 U.S.C. § 794(d) (footnote omitted) (emphases added).

4        The ADA and the Rehabilitation Act require covered employers to,

5    *inter alia*, make "reasonable accommodations to the known physical or mental

6    limitations of an otherwise qualified individual with a disability who is . . . an

7    employee," unless the employer "can demonstrate that the accommodation would

8    impose an undue hardship on the operation of [its] business."  42 U.S.C.

9    § 12112(b)(5)(A); *see* 29 U.S.C. § 794(d); 45 C.F.R. § 84.12.  "The term 'reasonable

10   accommodation' may include . . . job restructuring . . . [and] reassignment to a

11   vacant position . . . ."  42 U.S.C. § 12111(9)(B).  Unless the employer can

12   demonstrate that an accommodation would impose on its operations undue

13   hardship, the denial of a reasonable accommodation constitutes prohibited

14   discrimination.  *See* 42 U.S.C. §§ 12112(a) and (b)(5)(A); 29  U.S.C. § 794(d).

15       The "'on the basis of'" language in the ADA imposes a "but-for"

16   standard of causation.  *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019)

17   ("*Natofsky*").  And because "the Rehabilitation Act incorporates the ADA's

18   causation standard for employment discrimination claims," such a claim under the

- 47 -

1    Rehabilitation Act--notwithstanding the presence of the word "solely" in § 794(a)--

2    also is governed by the but-for standard of causation.  *Id*. at 346.  The amending

3    "text of the statute, § 794(d), requires *applying the ADA causation standard* to

4    employment discrimination claims asserted under the Rehabilitation Act."

5    *Natofsky*, 921 F.3d at 345 (emphasis added).

6           We note that the district court articulated the converse principle,

7    stating that "*Natofsky* aligned the ADA standard with the 'solely by reason'

8    standard of the Rehabilitation Act, which requires a plaintiff to demonstrate that

9    disability was the sole cause of the adverse employment action," D.Ct. Op., 2020

10   WL 6789564, at *11 (other internal quotation marks omitted); *but see id*. at *11-*13

11   (apparently applying the but-for standard).  *Natofsky* itself makes clear that

12           when a plaintiff alleges an employment discrimination claim
13           under the Rehabilitation Act, the causation standard that
14           applies is *the same one that would govern a complaint alleging*
15           *employment discrimination under the ADA,*

16   921 F.3d at 345 (emphasis added), *i.e.*, "but-for."

17          The New Hampshire and Vermont statutes invoked by Dr. Porter in

18   counts five and six of the Complaint are similar to the ADA and the Rehabilitation

19   Act in prohibiting disability-based employment discrimination, and the district

- 48 -

1    court dismissed all four disability discrimination counts for lack of proof of

2    causation.  But the district court stated that New Hampshire "follows the 'sole

3    reason' standard of the Rehabilitation Act," D.Ct. Op., 2020 WL 6789564, at *11,

4    citing a 1991 New Hampshire case; and it stated that Vermont law "[s]imilarly . . .

5    follows the language of the Rehabilitation Act," *id*., and cited a 1995 Vermont case.

6    Given that the Rehabilitation Act's own causation standard was changed with the

7    1992 amendment discussed above, and now requires that employment

8    discrimination claims under that Act be governed by the ADA's "but-for"

9    standard, we leave it to the district court on remand to reassess and reconsider the

10   causation standards governing Dr. Porter's disability claims under the relevant

11   State laws.


12   C.  *The Claims of Termination Based on Disability*

13        1.  *The Analytical Framework*

14             In cases concerning alleged employment discrimination, "[t]here will

15   seldom be 'eyewitness' testimony as to the employer's mental processes," *St.*

16   *Mary's Honor Center v. Hicks*, 509 U.S. 502, 524 (1993) (other internal quotation

17   marks omitted), as "*[e]mployers are rarely so cooperative* as to include a notation in

1    the personnel file that the firing is for a reason expressly forbidden by law,"

2    *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999) (internal quotation

3    marks omitted) (emphasis ours).  Consequently, many discrimination claims

4    depend on proof by circumstantial evidence.  But "*statements or actions by [the*

5    *employer's] decisionmakers . . . that may be viewed as directly reflecting* the alleged

6    *discriminatory attitude*" constitute the proverbial "smoking gun."  *Id*. at 446 (internal

7    quotation marks omitted) ("directly reflecting" emphasized in original; other

8    emphases ours).

9            "[T]he *McDonnell Douglas* framework does not apply in every

10    employment discrimination case."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511

11    (2002) (discussing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)

12    ("*Thurston*")).  "The shifting burdens of proof set forth in *McDonnell Douglas* are

13    designed to assure that the plaintiff [has her] day in court *despite the unavailability*

14    of *direct* evidence."  *Thurston*, 469 U.S. at 121 (internal quotation marks omitted)

15    (emphases ours).  The "*McDonnell Douglas* test is *inapplicable* where the plaintiff

16    presents *direct* evidence of discrimination," *e.g.*, that the employer's motivation was

17    "discriminatory on its face."  *Id*. (emphases added).

1          Courts in New Hampshire and Vermont also follow this approach,

2    applying the *McDonnell Douglas* burden-shifting framework when the plaintiff has

3    only indirect, not direct, evidence of discriminatory motivation.  *See Burnap v.*

4    *Somersworth School District*, 172 N.H. 632, 637, 232 A.3d 390, 395 (2019); *Robertson v.*

5    *Mylan Laboratories, Inc.*, 176 Vt. 356, 364, 848 A.2d 310, 318 (2004).

6          In the present case, there is direct evidence that the decision by Dr.

7    Merrens to terminate, rather than continue, Dr. Porter's employment was based on

8    her disability.  As set out in Part I.F. above, Dr. Russell, in the meeting of OB/GYN

9    staff convened by Dr. Merrens to explain the closing of REI, asked Dr. Merrens

10   "why Misty" was being terminated rather than retained, and his sole response was

11   that Dr. Porter was "on disability."  (Dr. Russell Decl. ¶ 10.)  As described in Dr.

12   Russell's declaration, her question was precise; and the answer--by the person who

13   had made the decision--was responsive, succinct, and explicit.  Dr. Merrens's

14   response constitutes direct evidence that Dr. Porter's employment at DHMC was

15   ended based, in whole or in part, on her disability.  Accordingly, the *McDonnell*

16   *Douglas* burden-shifting test--although its conditions were easily met on this

17   record--was inapplicable to Dr. Porter's claims that the termination of her

18   employment violated the federal and state laws at issue.

1          2.  *DHMC's Focus on Dr. Porter's Disability*

2                    In ruling that the evidence of Dr. Merrens's "on disability" response to

3     Dr. Russell's "why Misty" question was not evidence from which a rational juror

4     could infer that Dr. Porter's termination was motivated by her disability, the

5     court's discussion was principally as follows:

6               *Standing alone*, . . . this exchange *is inconclusive.  It would not be*
7               *reasonable to interpret the exchange as a confession by Dr. Merrens*
8               *before the entire OB/GYN Department that he had terminated a long-*
9               *time employee and colleague because she was partially disabled.*  That
10              is the only interpretation which *would directly* support plaintiff's
11              claim.  *There are other possible interpretations.*  These include the
12              possibility that Dr. Merrens was assuring the group that Dr.
13              Porter had access to income independent to her hospital salary.
14              *It is also possible that Dr. Merrens and Dr. Russell misunderstood*
15              *one another entirely.*  None of these interpretations would
16              support a claim of discrimination and *the court will not speculate*
17              *about what Dr. Merrens may have meant to say.*  The comment
18              *would* play a role *if it formed part of a pattern* of discriminatory
19              comments by Dr. Merrens or others within the hospital.  *By*
20              *itself*, it is insufficient to provide evidence of discriminatory
21              intent.

22    D.Ct. Op., 2020 WL 6789564, at *13 (emphases added); *see also id.* (Dr. Merrens's

23    "*[m]entioning her disability* in front of a large group of colleagues *or discussing it in*

24    *an email* with another staff member may have been insensitive," but these

25    statements "*provide no basis"* on which a reasonable jury could find disability-based

1    discrimination "*standing alone without the context of more explicit statements of*

2    *discrimination*" (emphases added)).

3            This analysis misapplied summary judgment standards in several

4    ways.  First, in finding that Dr. Merrens's "on disability" response to the "why"

5    question was "inconclusive," the court applied the wrong standard for assessing

6    evidence adduced in opposition to a motion for summary judgment.  Such

7    evidence need not be conclusive; it need only be, when viewed in the light most

8    favorable to the claimant, sufficient to present a genuine issue as to a material fact.

9    And if it meets that standard, it is the province of the factfinder, not the summary

10   judgment court, to decide what to conclude.

11           Second, even if Dr. Merrens's "on disability" response to the "why"

12   question, were not in itself a sufficiently direct explanation by the decisionmaker

13   to withstand DHMC's motion for summary judgment on the claims of disability

14   discrimination, it could not properly be assessed in isolation.  Yet the district court

15   began its analysis by viewing the exchange as "[s]tanding alone," and it ended that

16   passage by stating that this evidence was insufficient "[b]y itself."

17           Nor was the court correct in finding that Dr. Merrens's "on disability"

18   response was insufficient because it was not "part of a pattern of discriminatory

- 53 -

1    comments by Dr. Merrens or others within the hospital."  While proof of such a

2    pattern would provide additional support for a finding of discrimination, it was

3    not required.  *Cf. Arlington Heights v. Metropolitan Housing Development Corp.*, 429

4    U.S. 252, 266, n.14 (1977) (A "pattern" of discrimination is "not . . . a necessary

5    predicate to a violation of the Equal Protection Clause.  A single invidiously

6    discriminatory governmental act" is not "immunized by the absence of such

7    discrimination in the making of other comparable decisions.").  When the

8    decisionmaker was asked "why" an employee was not being retained, his answer

9    that she was "on disability" virtually precludes a ruling as a matter of law that

10   disability has played no role.

11           Further, in rejecting Dr. Merrens's "on disability" statement on the

12   ground that it was not "more explicit," the court refused to view in Dr. Porter's

13   favor a statement that on its face supported her claims, and it invaded the

14   province of the jury to decide whether the "on disability" response to "why" was

15   sufficiently clear to be accepted as showing disability motivation.

16           The district court acknowledged that an "interpretation" of the "on

17   disability" response by Dr. Merrens as genuinely meaning what he said in answer

18   to the "why" question "*would directly* support plaintiff's claim."  D.Ct. Op., 2020 WL

- 54 -

1    6789564, at *13 (emphasis added).  But the court stated that "[i]t would not be

2    reasonable" to infer that Dr. Merrens meant what he said, because he gave that

3    answer "before the entire OB/GYN Department."  *Id*.  While it likely was not

4    anticipatable that Dr. Merrens would make such a statement openly, the fact

5    remains that there is first-hand evidence that he did.  It was not within the

6    province of the court in ruling on a motion for summary judgment to decide as a

7    matter of law that Dr. Merrens's statement--which the court acknowledges was

8    literally "true," *id*.--was not in fact responsive to the plain question that

9    immediately preceded it.

10              And while stating that "the court will not speculate about what Dr.

11   Merrens *may have meant to say*," *id*. (emphasis added), the court in fact speculated

12   that it was "possib[le] that Dr. Merrens was assuring the group that Dr. Porter had

13   access to income independent to her hospital salary," or that it was "possible that

14   Dr. Merrens and Dr. Russell misunderstood one another entirely," *id*.  If there is

15   evidence in the record that could make such "other possible interpretations," *id*.,

16   more than mere speculation, the choice among them will be the responsibility of

17   the jury, not the court.

1    In addition to rejecting Dr. Merrens's "on disability" response to Dr.

2    Russell's "why" as having any evidentiary value, the district court similarly

3    rejected other such evidence, most notably, Dr. Merrens's response to the email

4    from OB/GYN nursing coordinator Maxfield who hoped that Dr. Porter could be

5    retained to fill existing gaps in the department's services.  Dr. Merrens's response

6    stated, in part:

7            "As you know Dr. Porter currently works at 20 % of her time
8            currently . . . ."

9    *Id.* (quoting Dr. Merrens May 12 email to Maxfield).  The court--stating that that

10    email was "probably unwise"--interpreted this statement as

11            Dr. Merrens referr[ing] to Dr. Porter's disability status *in*
12            *explaining his decision to terminate all three physicians*.  His
13            comment was inaccurate about the percentage of time Dr.
14            Porter was working, and, like so many emails, *probably unwise*,
15            but it is not reasonably possible to read it as evidence of animus
16            or discriminatory intent.

17    D.Ct. Op., 2020 WL 6789564, at *13 (emphases added).  This rationale for

18    disregarding Dr. Merrens's response is puzzling.

19    Maxfield had not inquired about the other two REI physicians, only

20    about Dr. Porter.  More importantly, it would make no sense to explain that two of

21    the three physicians were being terminated because the third was working only

- 56 -

1    part time (especially if the part-time percentage were as low as the Dr. Merrens

2    email mistakenly portrayed it).

3            Finally, while characterizing Dr. Merrens's statement "about the

4    percentage of time Dr. Porter was working" as "probably unwise," the district court

5    concluded that "it is not reasonably possible to read it as evidence of animus or

6    discriminatory intent."  *Id*.  Doubtless DHMC would agree that the statement was

7    "unwise" from its point of view; but that is precisely because it would be quite

8    reasonable to read that express reference to limited capability as evidence of

9    motivation based on disability.

10           That "reasonably possible" inference appears to have occurred to Dr.

11   Merrens himself, given that, just minutes after his response to Maxfield, he

12   emailed Dr. DeMars stating that he needed a "better" way to answer inquiries

13   about why Dr. Porter was not being retained (Dr. Merrens May 12 email to Dr.

14   DeMars).

15           Dr. DeMars's response may not have suggested a "better" explanation,

16   for her email itself also referred to Dr. Porter's disability.  Dr. DeMars stated, *inter*

17   *alia*, that the inquirers asking why Dr. Porter was not being retained were

18   "*remembering* Misty as *a full time employee* wearing 3 hats, and *not the one who has*

- 57 -

1   *been out for almost 18 months*."  (Dr. DeMars May 12 email to Dr. Merrens

2   (emphases added).)

3          A jury would be entitled to view Dr. DeMars's response to Dr.

4   Merrens's email as supporting Dr. Merrens's repeated references to Dr. Porter's

5   disability as a reason for her termination.


6          3.  *The Denial of a Reassignment Accommodation*

7          As noted in Part II.B. above, the ADA and the Rehabilitation Act

8   provide that reasonable accommodation for an individual with a disability may

9   include job restructuring or reassignment to a vacant position, *see* 42 U.S.C.

10  § 12111(9)(B); 45 C.F.R. § 84.12.  And "[t]he ADA envisions an 'interactive process'

11  by which *employers and employees work together* to assess whether an employee's

12  disability can be reasonably accommodated."  *Jackan v. New York State Department*

13  *of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (emphasis added).  With respect to the

14  requirement for such a reassignment accommodation, the plaintiff has the burden

15  of proving "that a vacancy existed into which he or she might have been

16  transferred."  *Id*.

1          The record shows that Dr. Porter presented such evidence.  In May

2     2017, after the impending closure of REI was announced, Dr. Merrens was

3     "inundated" with emails urging that Dr. Porter be retained.  (Dr. Merrens May 12

4     email to Dr. DeMars.)  One was the Maxfield email that noted Dr. Porter's

5     "expertise" in several specified areas and stated that OB/GYN was "is short staffed

6     already with GYN MD's."  (Maxfield May 12 email to Dr. Merrens.)  And Dr.

7     Merrens was well aware prior to the decision to close REI that OB/GYN was

8     "short-staffed"; he testified "we . . . had not been able to recruit physicians to a

9     number of areas within OB/GYN."  (Dr. Merrens Dep. 202.)

10          In response to Maxfield's email, Dr. Merrens had also stated, "I'm not

11    sure of [Dr. Porter's] interest in staying on if the infertility part were to cease."  (Dr.

12    Merrens May 12 email to Maxfield.)  But after it was announced in May 2017 that

13    REI would close, Dr. Porter informed Dr. Merrens in writing that she was in fact

14    interested in being reassigned to OB/GYN notwithstanding that "the infertility part

15    would cease."  (Dr. Merrens Dep. 206.)  Dr. Porter was a "highly respected,"

16    "talented clinician" (*id*. at 43); *see also id*. at 207 (Dr. Porter was "a talented

17    physician"); and Chief Medical Officer Padin, after observing Dr. Porter perform a

18    complex surgery in April 2017, stated that Dr. Porter was "a talented surgeon" (Dr.

1    Padin April 2017 email to Dr. Porter).  There was "no question of [Dr. Porter's]

2    competence."  (Herrick Dep. 127.)

3           Yet Dr. Merrens would not even speak to Dr. Porter about a

4    reassignment to OB/GYN.  (*See*, *e.g.*, Dr. Merrens Dep. 206 ("Q.  At any point did

5    you talk to Dr. Porter about whether she did have an interest in staying on if the

6    infertility part were to cease?  A.  I did not.").)  There was no interaction between

7    employee and employer, only the employee's request.  Although Dr. Merrens says

8    he gave Dr. Porter's request "a lot" of thought, there is no indication that he

9    considered it seriously:

10          Q.  Did it cause you to reevaluate her termination *when*
11          *you found out that she did, in fact, have a very strong interest in*
12          *remaining at Dartmouth-Hitchcock*, even without the infertility
13          piece?

14          A.  I would say that I thought a lot about this and even
15          *reflected with Leslie*, like, [w]hat are the opportunities, and *how do*
16          *we think about this*? . . . .

17          . . . .

18          Q.  *Did you ever sit down with Dr. Porter and propose to her a*
19          *very limited role and assess her interest*?

20          A.  *No*.

21    (*Id*. at 207-08 (emphases added).)

1          And in June, DHMC having just terminated Dr. Porter, OB/GYN

2     sought permission to hire a new gynecologist, stating, *inter alia*, that OB/GYN

3     "ha[s] a shortage of subspecialists and generalists in the department"; that

4     OB/GYN "ha[s] no capacity to fill in these duties with existing staff"; that another

5     GYN physician was "essential."  (OB/GYN's June 2017 Hiring Request.)

6          In sum, from Dr. Merrens's direct "on disability" answer to the

7     question of "why" Dr. Porter was being terminated and not retained, as well as

8     from the other evidence--including (a) OB/GYN's June 2017 Hiring Request, (b) Dr.

9     Merrens's awareness of "a number of areas" in which OB/GYN was "short-staffed,"

10    (c) Dr. Porter's communication to Dr. Merrens of her interest in an OB/GYN

11    position that did not center on infertility, (d) Dr. Porter's recognized skills, and (e)

12    several statements by Dr. Merrens and Dr. DeMars that, in the context of whether

13    to terminate or retain Dr. Porter, referred explicitly or implicitly to Dr. Porter's

14    disability--a jury could permissibly infer that reassigning Dr. Porter to OB/GYN

15    instead of terminating her employment would have been a reasonable

16    accommodation, and that she would have been so reassigned but for her disability.

17          Accordingly, we vacate the district court's dismissal of Dr. Porter's

18    claims that her employment was terminated on the basis of her disability in

1  violation of the ADA, the Rehabilitation Act, and the laws of New Hampshire and

2  Vermont.


3  D.  *Claims of Retaliation and Other Denials of Accommodation*

4         Dr. Porter also asserted claims that retaliatory and discriminatory

5  denials of reasonable accommodation had occurred during the period of her

6  disability prior to her termination.  The district court dismissed these claims on the

7  ground that the circumstances of which she complains in that period did not

8  constitute a denial of reasonable accommodation.  Viewing the record as a whole,

9  we agree.

10         The accommodations granted to Dr. Porter included two medical

11  leaves of absence; a very limited schedule upon her returns to work, beginning

12  with workweeks of five hours (in April 2016) or four hours (in November 2016),

13  with increases as she felt able; and permission for some of her work to be done

14  from home.  She has not asserted that any of these accommodations were not

15  fulfilled.  In June 2016, Dr. Porter presented DHMC with a list of a dozen

16  requested workplace-condition accommodations that were recommended by her

17  doctor, including limited work periods, a quiet workspace, frequent rest breaks,

1    and only gradual increases in responsibilities and multi-tasking.  Dr. Porter

2    acknowledges that Dr. DeMars informed the REI staff of these accommodations by

3    "sen[ding] out an email to members of the department."  (Dr. Porter Dep. 45.)  She

4    does not contend that DHMC refused to agree to any accommodations she

5    requested.

6             Rather, Dr. Porter contends that Drs. Seifer and Hsu encroached on

7    agreed accommodations, principally by asking her questions.  She also describes

8    two specific occasions of other encroachment, the first of which occurred in mid-

9    June 2016 on her first day dealing with ultrasounds following her return to work.

10   Dr. Porter needed space in the ultrasound reading room, and Drs. Seifer and Hsu

11   did not leave the room when she requested.  (*See* Dr. Porter Answer to DHMC

12   Interrogatory 6.)  Dr. Porter complained of this, and she acknowledges that Dr.

13   DeMars "emailed [Drs. Seifer and Hsu] to remind them of the restriction that I was

14   not to be distracted in the ultrasound reading room."  (Dr. Porter Answer to

15   DHMC Interrogatory 4.)

16             Dr. Porter's other specific complaint concerned a weekend in March

17   2017 when, although she was not in the on-call schedule, she was forced to be on

18   call because Drs. Seifer and Hsu were away (attending "non-urgent, elective

- 63 -

1    meetings") and were unreachable.  This resulted in an REI nurse's having to call

2    Dr. Porter "at home on the weekend to have [her] make all treatment decisions,"

3    even though Dr. Porter "was not approved by [her] physicians to take call."  (Dr.

4    Porter Answer to DHMC Interrogatory 6.)  However, such an encroachment on a

5    single weekend out of the several dozen weekends during her period of disability

6    is insubstantial, especially given that it occurred in March 2017 when Dr. Porter

7    was working 20 hours a week, and that she had told Dr. Seifer months earlier that

8    she "would consider being in the call schedule when [she] was back to 20 hours a

9    week" (*id*.).

10        Dr. Porter complains as a general matter that Drs. Seifer and Hsu

11    frequently interrupted her at work or telephoned her at home to ask her questions

12    or to seek opinions.  But the accommodations she had requested did not include

13    barring her less experienced colleagues from seeking her advice and counsel.

14        A reasonable accommodation is one that "enable[s] an individual with

15    a disability who is qualified to perform the essential functions of that position

16    . . . [or] to enjoy equal benefits and privileges of employment."  29 C.F.R.

17    §§ 1630.2(o)(1)(ii) and (iii).  Thus, a granted accommodation should be "effective";

18    but it need not be perfect, *see, e.g.*, *Noll v. International Business Machines Corp.*, 787

- 64 -

1    F.3d 89, 95 (2d Cir. 2015).  Dr. Porter states that with the accommodations granted,

2    she was able to perform at her usual high level of expertise.  The fact that the

3    encroachments of which she complains may have been annoying or stressful did

4    not make the accommodations ineffective.

5            Dr. Porter also claims that DHMC retaliated against her for being on

6    disability or for complaining about encroachments by Drs. Seifer and Hsu on the

7    agreed-upon accommodations, but she has not pointed to evidence sufficient to

8    support such a claim.  Although she states that when she returned to work on her

9    reduced schedule, "I heard comments from colleagues about me not pulling my

10   weight due to my limitation on work hours" (Dr. Porter Answer to DHMC

11   Interrogatory 4), she has not pointed to evidence of any adverse employment

12   action she experienced as a result of her complaints about the intrusive conduct by

13   Drs. Seifer and Hsu.

14           We affirm the grant of summary judgment dismissing Dr. Porter's

15   claims of retaliation and denial of reasonable accommodation for her disability

16   prior to her termination.

1    E.  *The Whistleblower Discrimination and Wrongful Discharge Claims*

2           New Hampshire's Whistleblowers' Protection Act provides, in

3    relevant part, that

4           [n]o employer shall . . . discharge . . . or otherwise discriminate
5           against any employee regarding . . . employment *because*:

6                  (a) The *employee, in good faith, reports or causes to be*
7           *reported*, verbally or in writing, *what the employee has*
8           *reasonable cause to believe is a violation of any law or rule*
9           adopted under the laws of this state, a political
10          subdivision of this state, or the United States . . . .

11   N.H. Rev. Stat. Ann. § 275-E:2(I)(a) (emphases added).   This statute "contemplates

12   a series of events" beginning with "notice to the employer of a violation."  *In re Fred*

13   *Fuller Oil Co.*, 144 N.H. 607, 612, 744 A.2d 1141, 1145 (2000).  New Hampshire

14   courts apply the *McDonnell Douglas* burden-shifting framework in evaluating such

15   whistleblower discrimination claims.  *See In re Seacoast Fire Equipment Co.*, 146 N.H.

16   605, 608, 777 A.2d 869, 872 (2001).

17          Under New Hampshire common law, a plaintiff may recover against

18   her former employer on a claim of wrongful discharge for, *inter alia*, being

19   "discharged because [s]he performed an act that public policy would encourage"

20   (hereafter, for present purposes, "public policy reporting"), if she shows that the

- 66 -

1    defendant, in terminating her employment "was motivated by bad faith, malice, or

2    retaliation." *Cloutier v. Great Atlantic & Pacific Tea Co.*, 121 N.H. 915, 921-22, 436

3    A.2d 1140, 1143-44 (1981). The public policy factor may "be based on non-

4    statutory policies," *id*. at 922, 436 A.2d at 1144; and malice may be established by

5    proof that "the record does not support the stated reason for the discharge," *see*

6    *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 44 (1st Cir. 2001).

7            The district court found that the record contained sufficient evidence

8    to permit a jury to find that Dr. Porter had engaged in whistleblowing activity or

9    public policy reporting by informing Dr. DeMars of conduct by her two REI co-

10   physicians that could reasonably be believed to be illegal, fraudulent, unethical, or

11   harmful to patients. But DHMC argued that it had terminated Dr. Porter because

12   it closed REI and there was no other suitable position for her, and the court

13   concluded that Dr. Porter had not pointed to sufficient evidence that the decision

14   not to retain Dr. Porter was "because" of her whistleblower or public-policy-

15   reporting activities. *See* D.Ct. Op., 2020 WL 6789564, at *9-*11 (whistleblowing

16   activity); *id*. at *15 (public policy reporting).

17           As discussed in Part II.E.1. below, the district court's conclusion that

18   there was no evidence of causation rested principally on its view that Dr. Merrens

1    was the person who made the decision to terminate Dr. Porter's employment at

2    DHMC, and that he did not know of Dr. Porter's reporting activities, *see id*. at *8.

3    Dr. Porter argued that there was sufficient evidence that Dr. Merrens did have

4    such knowledge.  But she contended, alternatively, that even if Dr. Merrens did

5    not know, DHMC could nonetheless be held liable because Dr. DeMars--to whom

6    Dr. Porter had made, or caused to be made, the critical reports--sought Dr. Porter's

7    termination in retaliation and in bad faith, and that as to Dr. Porter's termination,

8    Dr. DeMars either was the actual decisionmaker (*see* Part II.E.3. below) or caused

9    Dr. Merrens to make that decision because of her advice (*see* Part II.E.2. below,

10   discussing the "cat's paw" theory of liability).  The district court rejected both of

11   these contentions that Dr. Porter's termination resulted from impermissible

12   animus on the part of Dr. DeMars, stating that the record instead suggested that

13   Dr. DeMars wanted, and advocated, to have DHMC retain Dr. Porter.

14          As to each of the district court's factual premises--*i.e.*, that Dr. Merrens

15   had no knowledge of Dr. Porter's reporting activities, and that Dr. DeMars wanted

16   and attempted to retain Dr. Porter at DHMC--the record contains evidence that

17   would permit a factfinder to draw reasonable inferences contrary to those drawn

18   by the district court in granting summary judgment.  While as to Dr. Porter's

1    claims of whistleblowing and reporting discrimination we have not seen a

2    smoking gun similar to Dr. Merrens's immediate "disability" response to why Dr.

3    Porter had not been retained, the record contains ammunition from which a jury

4    could find (1) that Dr. Merrens had the requisite knowledge of Dr. Porter's

5    reporting activity, or (2) that if he lacked such knowledge, either (a) he as

6    decisionmaker relied on the retaliatory or bad-faith recommendation by Dr.

7    DeMars, or (b) the ultimate decisionmaker as to Dr. Porter's termination--as

8    contrasted with the decision to close REI--was not Dr. Merrens but Dr. DeMars.

9        1. *The State of Dr. Merrens's Knowledge*

10       With respect to the decision to terminate Dr. Porter, the district court

11   described the record as to the knowledge of Dr. Merrens as follows:

12       *Dr. Porter does not contest that the principal decision-maker--*
13       *Dr. Merrens--had no knowledge of her complaints about Dr. Seifer*
14       *and Dr. Hsu. He expressly denies such knowledge.* There is no
15       evidence to the contrary. *It is unsurprising* that the chief clinical
16       officer of a large hospital would not know about intra-
17       departmental complaints about disputes over patient care and
18       billing practices. The reasons DHMC offers to explain the
19       closure of the REI Division are substantial. While the parties
20       disagree about whether the closure was a good business
21       decision, *it followed months of deliberation over business concerns.*
22       No reasonable jury could find that the concerns of hospital

1    leadership about *staffing levels or physician conflict* were excuses
2    they concocted to deflect attention from their true motive of
3    retaliating against Dr. Porter.

4    D.Ct. Op., 2020 WL 6789564, at *9.  Although the district court thus apparently

5    viewed it as established that Dr. Merrens lacked knowledge of Dr. Porter's

6    reporting activities, the record does not warrant that finding as a matter of law.

7    First, the district court's view that Dr. Porter did not dispute Dr.

8    Merrens's assertion of ignorance as to her reporting activity disregarded her

9    argument that, in labeling her a cause of REI's problems, Dr. Merrens used

10    "dysfunction" as a "code word" for her reporting on the incompetence of Drs.

11    Seifer and Hsu.  (Dr. Porter Response in Opposition to DHMC's Motion for

12    Summary Judgment at 16; *see also* Dr. Porter brief on appeal at 22 (contending that

13    "dysfunction" was a code word to refer to her whistleblower and public-policy-

14    reporting activity, as well as her disability).)  Implicit in the contention that Dr.

15    Merrens used "a code word" for Dr. Porter's whistleblower and public-policy-

16    reporting activity, is a contention that Dr. Merrens knew of that reporting activity.

17    Second, while the court also relied on Dr. Merrens's "express[] deni[al

18    of] such knowledge"--apparently referring to his affidavit stating that when he

19    made and announced his decision to close REI he "*was not aware of whether Dr.*

1    Misty Blanchette *Porter had raised any complaints or concerns regarding . . . employees*

2    *. . . within the REI Division*" (Affidavit of Dr. Edward Merrens dated January 28,

3    2020, 4 (emphases added))--credibility determinations are within the province of

4    the factfinder.  A jury would not be required to believe Dr. Merrens's claim that he

5    did not know of Dr. Porter's reporting activity; thus, the court in deciding the

6    summary judgment motion could not properly rely on his disclaimer.

7                Further, the district court inferred that Dr. Merrens's denial of

8    knowledge of Dr. Porter's reporting activity was credible because it would be

9    "unsurprising that the chief clinical officer of a large hospital would not know

10    about the intra-departmental complaints about disputes over patient care and

11    billing practices."  D.Ct. Op., 2020 WL 6789564, at *9.  This may well be so as a

12    matter of routine day-to-day operation.  But, as the court also recognized, "the

13    closure of an entire division serving many women and families was a major

14    decision by DHMC."  *Id*. at *3.  DHMC stated that, in March and April 2017, before

15    that major decision was made, "OB/GYN Department management and DHMC

16    leadership,"--identified as Dr. DeMars, Herrick, and Dr. Merrens--"*had multiple*

17    *discussions regarding issues in the REI Division, including the general dysfunction.*"

18    (DHMC Rule 56(b) Statement ¶ 10 (emphases added).)  A rational juror could well

1    infer that--in the "multiple discussions regarding" REI's "issues"--before Dr.

2    Merrens made "a major decision" affecting "many women and families," D.Ct. Op.,

3    2020 WL 6789564, at *3, it was probable that he would have requested concrete

4    information as to the nature of the "general dysfunction" in order to assess

5    whether there was available a solution less drastic than dissolution.  And indeed,

6    as discussed below, Dr. Merrens testified that in those discussions they "had a fair

7    amount of discovery about the dysfunction of the group" (Dr. Merrens Dep. 166).

8              In their depositions, Dr. Merrens and Herrick were asked about the

9    nature of "the dysfunction."  Herrick, whose principal concern was finance,

10   testified that he had heard no negative comments about the skills or competence of

11   any of the physicians, and he provided no concrete information as to the nature of

12   the dysfunction, other than the dearth of nurses.  Herrick testified that Dr. DeMars

13   repeatedly "described Misty as being a *disruptive* behavior, *disruptive* influence on

14   the team."  (Herrick Dep. 118-19 (emphases added).)  But he gave little insight as to

15   what that meant:

16              Q.  What does that mean?

17              A.  That means that, well, based on what, *I guess you'd*
18        *have to ask Leslie.*

- 72 -

1                    Q. *Did anybody ask* her what does that mean?

2                    A.  Leslie just explained that [Dr. Porter] tries to use her
3    previous friendship to influence behaviors of Leslie and of the
4    team and that she is disruptive at times.

5                    Q.  There's a lot of behavior that might fall within the
6    term "disruptive," right?

7                    A.  Yeah, there is.

8              . . . .

9                    Q.  Okay.  So did anyone in the conversations you're
10   talking about get down to a little granular level *saying* look,
11   here's *what she does* that really makes it difficult?

12                  A. *I don't recall any conversations about that* . . . .

13   (*Id*. at 119-20 (emphases added).)

14          Nor did Herrick himself observe any disruptive behavior by Dr.

15  Porter.  Although in an email to Dr. Merrens he said, "[*b*]*ased on my observations and*

16  *interactions*, Misty has been the biggest driver to the dysfunction within REI"

17  (Herrick email to Dr. Merrens dated May 12, 2017 ("Herrick May 12 email to Dr.

18  Merrens") (emphasis added)), Herrick confessed in his deposition, "*I have no*

19  *observations of Misty herself related to this*, any negative or positive" (Herrick

20  Dep. 123 (emphasis added)).

1          Although no details as to the nature of Dr. Porter's alleged

2    dysfunction were forthcoming from Herrick, somewhat greater insight is available

3    from the deposition of Dr. Merrens.  With respect to senior management's

4    examination into the dysfunction of REI, Dr. Merrens was not referring simply to

5    its shortage of nurses; while that was an important factor, he said that was "just the

6    last wheel to come off the cart."  (Dr. Merrens Dep. 124.)  He testified that "there

7    were many, many problems in this division, and, by . . . late April . . . I was

8    apprised of how significant those problems were."  (*Id*. at 168.)  He stated that

9    "[t]here were clearly challenges around Albert[ Hsu]'s capability," and there were

10   "the issues with David Seifer."  (Dr. Merrens Dep. 166-67.)  He said management

11   had "gone through all this work *to understand* that, *at every level*, there is

12   dysfunction and *we're not sure that we can safely provide care* for women in an

13   ongoing fashion."  (*Id*. at 163 (emphases added).)

14          But while Dr. Merrens stated that all three REI physicians contributed

15   to the dysfunction (*see, e.g., id*. at 213), he attributed the issues of professional

16   competence only to Drs. Seifer and Hsu.  Dr. Porter, in contrast, was described as a

17   "talented surgeon" (Dr. Padin April 2017 email to Dr. Porter after observing her

18   perform surgery in April 2017); a "talented physician" (Dr. Merrens Dep. 207); and

19   a "talented clinician" (*id*. at 43).  When asked whether he agreed with Herrick's

1    statement that "Misty ha[d] been *the biggest driver to the dysfunction* within REI"

2    (Herrick May 12 email to Dr. Merrens (emphasis added)), Dr. Merrens responded

3    in part as follows:

4            [As to the] dysfunction amongst those three physicians, . . . each
5            had a role in the dysfunction. . . .  It was not just Dr. Hsu and
6            Dr. Seifer.  *Misty played a role*, whether she was present or
7            whether she was on leave, *in understanding*, *involving herself*, and
8            doing a whole range of things . . . .

9    (Dr. Merrens Dep. at 213 (emphases added).)

10           We think it peculiar to refer to a physician's "understanding" as a

11   factor contributing to dysfunction.  Indeed, as shown above, Dr. Merrens testified

12   that through management's discussions about every level of REI, he had come to

13   "understand" that it was "not sure" that REI could "safely provide care."  (*Id.*

14   at 163.)  A jury could reasonably infer that Dr. Merrens's pointing to Dr. Porter's

15   "understanding" and her "involving herself" reflected his recognition that

16   whistleblowing on illegalities and reporting on misconduct impacting patients'

17   health and safety entail (a) understanding that certain conduct was unlawful,

18   unethical, or unsafe, and (b) getting involved sufficiently to report it.  That

19   interpretation may also be viewed as further supported by Dr. DeMars's statement

20   to Dr. Merrens that, given "Misty's past behavior and her inability to just be a

21   worker bee," Dr. DeMars was disinclined to retain Dr. Porter at DHMC unless she

1   "could be put into a box enough to keep her from being disruptive" (Dr. DeMars

2   May 12 email to Dr. Merrens).

3            Given Dr. Merrens's testimony that his decisions in April and May

4   2017--to close REI and not retain Dr. Porter--were based fundamentally on the

5   problematic practices and performance of Drs. Seifer and Hsu, and on Dr. Porter's

6   "understanding" and her "involving herself" to do "a whole range of things," a

7   rational juror could permissibly infer that Dr. Merrens was in fact aware that one

8   category of "things" Dr. Porter had done was to report on practices of her two

9   colleagues that she reasonably believed to be illegal, unethical, or endangering

10  patient safety, and that his reference to a "dysfunction" on the part of Dr. Porter

11  was code for her reporting activities.

12           We conclude that the district court erred in dismissing Dr. Porter's

13  claims of whistleblower discrimination and wrongful discharge on the basis that

14  Dr. Merrens as a matter of law lacked knowledge of her reportage.


15           2.  *Dr. DeMars and the "Cat's Paw" Theory*

16           If Dr. Porter is unable to persuade the jury that Dr. Merrens, as

17  decisionmaker, knew of her reports of conduct or practices she believed to be

18  illegal or otherwise wrongful, she may nonetheless be able to recover on her

1    claims of whistleblower discrimination or wrongful discharge on a "cat's paw"

2    theory of liability--if such a theory is available under New Hampshire law, *see*

3    *generally Burnap v. Somersworth School District*, 172 N.H. at 639, 232 A.3d at 397.

4    Under that theory, an employer may be held liable for the animus of a supervisor

5    who was not charged with making the ultimate adverse employment decision but

6    who was relied on by the decisionmaker.  *See, e.g., Staub v. Proctor Hospital*, 562

7    U.S. 411, 420-21 (2011); *id.* at 415 n.1; *Natofsky*, 921 F.3d at 350; *Vasquez v. Empress*

8    *Ambulance Service, Inc.*, 835 F.3d 267 (2d Cir. 2016) ("*Vasquez*"); *Ameen v. Amphenol*

9    *Printed Circuits, Inc.*, 777 F.3d 63, 70 (1st Cir. 2015).

10              DHMC states that Dr. Porter raises the cat's paw theory of liability for

11    the first time on appeal, and it contends that the theory is available

12              "only when an employer in effect adopts an employee's
13              unlawful animus by acting *negligently* with respect to the
14              information provided . . . and thereby affords that biased
15              employee an outsize role in its own employment decision, can
16              the employee's motivation be imputed to the employer and
17              used to support a claim."

18    (DHMC brief on appeal at 27-28 (quoting *Vasquez*, 835 F.3d at 275 (emphasis in

19    DHMC brief).)  DHMC argues that "there is no evidence that Dr. Merrens closed

20    the program on Dr. DeMars' recommendation," and "no evidence that Dr. Merrens,

21    as the decisionmaker, negligently gave effect to any purported retaliatory animus

1    possessed by Dr. DeMars."  (DHMC brief on appeal at 28.)  These contentions are

2    wide of the mark.

3             First, in arguing to the district court that Dr. Merrens relied on

4    impermissible motivations of Dr. DeMars, Dr. Porter was focusing not on the

5    closing of REI but rather on the termination of her employment.  She argued that,

6    as to "the decision to terminate Dr. Porter, separate and apart from the decision to

7    close the REI Division," Dr. DeMars "presented that recommendation to Dr.

8    Merrens, who adopted it."  (Dr. Porter Response in Opposition to DHMC's Motion

9    for Summary Judgment at 19-20.)  While Dr. Porter apparently did not give her

10   argument the "cat's paw" label, she plainly asserted the main elements of the cat's

11   paw theory.

12            Second, DHMC's reliance on *Vasquez* is misplaced, as that case alleged

13   a retaliatory motive of one of the plaintiff's co-workers, not of a supervisor.  We

14   noted that

15            [w]hile the Supreme Court ha[d] approved holding an
16            employer liable for the retaliatory intent of one of its
17            "supervisors" under a "cat's paw" theory, it specifically
18            "express[ed] no view as to whether the employer would be
19            liable if a co-worker, rather than a supervisor, committed a
20            discriminatory act that influenced the ultimate employment
21            decision."

1    *Vasquez*, 835 F.3d at 273 (quoting *Staub*, 562 U.S. at 422 n.4).  We concluded that the

2    employer could be held liable if a co-worker's retaliatory act was allowed to

3    influence the employer's decision to fire the plaintiff, and if that influence was

4    "attributable to the employer's own negligence," *id*.

5           In the present case, Dr. DeMars was no mere co-worker.  As Dr.

6    Merrens described Dr. DeMars's position, "[s]he's the department chair, and she's

7    the one that has been managing . . . each of these principal people in her

8    division. . . .  [S]he is directly responsible for every aspect of this division" (Dr.

9    Merrens Dep. 167), including "management of the principal physicians" (*id*. at 214).

10   And in his May 12 email to Maxfield explaining why Dr. Porter had not been

11   retained, he began by saying that the decisions with respect to REI "staff" had been

12   made "at the recommendation of Dr. De[M]ars."  Thus, the *Vasquez* principle that

13   an employer is not liable for a non-negligent decision prompted by a mere co-

14   worker, rather than by a supervisor, is not applicable here.

15          We note, however, that if Dr. Merrens made the decision to terminate

16   Dr. Porter without knowing of her reporting activity, and if Dr. Porter were

17   required to show that he did so negligently, there is evidence from which a jury

18   could reasonably find such negligence.  The record includes testimony that:

- 79 -

1       Dr. Merrens knew that there were issues as to the capabilities of
2    Dr. Hsu and Dr. Seifer (*See, e.g.,* Dr. Merrens Dep. 166-68);

3       Dr. DeMars, in order to persuade the Credentials Committee to
4    allow her to make Dr. Seifer the REI Director, had "take[n] personal
5    responsibility that [Dr. Seifer] would be a success" in that position (Dr.
6    Merrens Dep. 77);

7       Dr. Merrens knew that Dr. DeMars was well aware that her
8    position as chair of OB/GYN was in jeopardy if Dr. Seifer failed as REI
9    Director.  He testified that it "was understood" that Dr. Seifer's
10   performance would impact "decisions about [Dr. DeMars's]
11   competence as . . . chair" of OB/GYN (*id.* at 83); and Dr. DeMars
12   testified that when the committee reluctantly allowed her to make Dr.
13   Seifer REI Director, Dr. Merrens "looked at me . . . and said this is on
14   you" (Dr. DeMars Dep. 127);

15      Dr. Merrens knew that Dr. Porter was "a talented physician"
16   (Dr. Merrens Dep. 207), "a talented clinician who [wa]s highly
17   respected" (*id.* at 43);

18      Dr. DeMars repeatedly described Dr. Porter as "disruptive"
19   (Herrick Dep. 119-20);

20      Dr. Merrens knew that Dr. DeMars had resented the fact that
21   Dr. Seifer's former colleagues were warning DHMC about Dr. Seifer's
22   shortcomings (*see* Dr. Merrens Dep. 77 ("[Dr. DeMars] *expressed that*
23   *she was not pleased* that people from [Dr. Seifer's former employer] *had*
24   *contacted us and expressed [their] concern*" (emphases added)));

25      As to Dr. Merrens's meetings with Dr. DeMars and Herrick
26   about the future of REI and its staff, Herrick could not say that anyone
27   asked Dr. DeMars what she meant by calling Dr. Porter "disruptive"
28   (Herrick Dep. 120); and

29      Dr. Merrens, despite receiving a letter from Dr. Porter stating
30   expressly that she wanted to remain at DHMC despite the cessation of

1    infertility practice, never spoke to Dr. Porter herself and instead
2    "reflected with"--and was "convinced" by--Dr. DeMars that Dr. Porter
3    was interested only in IVF (Dr. Merrens Dep. 206-208).

4    In short, the record includes evidence that Dr. Merrens knew (a) that

5    the performances of Dr. Hsu and Dr. Seifer were substandard, (b) that Dr. Porter

6    understood that their conduct was problematic, (c) that Dr. DeMars knew her

7    position as OB/GYN chair was in jeopardy because of Dr. Seifer's failure, giving

8    her a motive to retaliate against Dr. Porter for reporting Dr. Seifer's failures, and

9    (d) that Dr. DeMars was displeased about being warned--even in advance--about

10    shortcomings of a candidate she favored, and thus would not recommend

11    retaining Dr. Porter unless she could be kept in a box.  The district court

12    recognized that "Dr. DeMars's involvement in hiring Dr. Seifer in 2016" could have

13    motivated "her . . . to be angry at his critics a year later" since "his tenure at DHMC

14    did not go well."  D.Ct. Op., 2020 WL 6789564, at *11.  If Dr. Merrens made the

15    decision to terminate Dr. Porter without knowing of Dr. Porter's reporting activity,

16    a jury could reasonably find that, as he had learned of the "significant" capability

17    and performance "problems" of Drs. Seifer and Hsu, he was negligent (1) in not

18    asking what Dr. DeMars meant when she said that the highly respected Dr. Porter

19    was "disruptive," (2) in basing his decision that Dr. Porter should be terminated on

20    Dr. DeMars's representations that Dr. Porter was not interested in non-IVF work at

1    DHMC without even speaking to Dr. Porter despite Dr. Porter's having written to

2    him expressly stating that she had such an interest, and (3) in not attempting to

3    determine whether Dr. DeMars's non-recommendation of Dr. Porter's retention

4    and possible misrepresentation of Dr. Porter's interest in remaining at DHMC

5    without an IVF practice were impermissibly motivated.

6            The district court rejected any possibility that DHMC could be liable

7    for a discriminatory termination of Dr. Porter's employment on the basis of

8    retaliatory motivation by Dr. DeMars because it found--as described in the next

9    sections--that there was insufficient evidence of any bad-faith, malicious, or

10   retaliatory actions or motivation on the part of Dr. DeMars.  In so ruling, the court

11   referred to Dr. DeMars's efforts to retain Dr. Porter, and her attitude toward Dr.

12   Porter.


13        a.  *Efforts*

14           As to Dr. DeMars's efforts to retain Dr. Porter at DHMC, the court

15   stated principally as follows:

16              The evidence is *undisputed that following the announcement*
17              *of the closure of the REI Division, Dr. DeMars and Mr. Herrick*
18              *considered retaining Dr. Porter to perform ultrasound work within*
19              *the Gynecology Department.  In Dr. DeMars's initial discussions*
20              *with senior management* about reorganizing the REI Division, *she*

1    *advocated for "keep[ing Dr. Porter] in an ultrasound role" despite her*
2    *medical leave.* ([Dr. DeMars Dep.] 139.)  Dr. DeMars testified
3    that "[i]t was unclear to me how long her recovery was going to
4    take, and *I wanted* to be able to give her as much time as she
5    needed to recover and to put her in an ultrasound-heavy role
6    that would, we could then grow that role or grow her otherwise
7    as her recovery allowed." (*Id.*)

8        *Following the decision to close the division, Dr. DeMars*
9    *continued to seek a way to keep Dr*. Porter on staff at DHMC.  She
10    testified in her deposition that "I had a choice of *could I* keep her
11    within the department or *could I* have her be a member of the
12    Department of Radiology."  The Radiology Department advised
13    that they had no open position.  DHMC has supplied an
14    affidavit from the chair of the Radiology Department
15    confirming that in 2017, "the Department of *Radiology did not*
16    *have any need to hire or move a physician into the Department* to
17    perform or read only gynecologic and/or early obstetric
18    ultrasounds, or any other small sub-segment of ultrasounds."
19    Mr. Herrick determined that the *existing* patient need for
20    ultrasound evaluation was already met by *existing* staff and that
21    there was no business need for another physician to read
22    ultrasounds. ([Herrick Dep.] 54-64.)  Dr. DeMars was never
23    able to *create a new position for Dr. Porter in the OB/GYN*
24    *Department*.

25    D.Ct. Op., 2020 WL 6789564, at *10 (other internal citations to the record omitted)

26    (emphases ours).

27        We have several difficulties with the district court's characterization

28    of Dr. DeMars's actions.  First, we note that in stating that Dr. DeMars "advocated"

29    keeping Dr. Porter, the court cited deposition testimony in which Dr. DeMars said

30    she "wanted" to keep Dr. Porter (Dr. DeMars Dep. 139).  In crediting that

- 83 -

1    testimony by Dr. DeMars as to her mental state, the court both assumed Dr.

2    DeMars's veracity and, based on that assessment of her credibility, drew its own

3    inference that actual advocacy had ensued.  As will be discussed in the next

4    section, there is evidence from which a jury could infer that Dr. DeMars's

5    deposition testimony that she "wanted" Dr. Porter to remain at DHMC was not

6    genuine.  But in addition, Dr. Merrens in his deposition repeatedly denies that Dr.

7    DeMars actually advocated Dr. Porter's retention (*see*, *e.g.*, Dr. Merrens Dep. 150,

8    169, 209, 228).

9              In chronological order, the three stages at which the district court's

10   above ruling characterizes Dr. DeMars as having made efforts to keep Dr. Porter at

11   DHMC are:  Dr. DeMars's initial meeting with senior management, the period

12   between the decision to close REI and the announcement of that decision, and the

13   period after the announcement.  We see the record of Dr. DeMars's efforts at the

14   first stage as, at best, equivocal and the inference that she made such efforts later

15   as unsupported.

16             It is not clear from the present record precisely when Dr. DeMars's

17   first meeting with senior management on this matter occurred.  But as discussed in

18   Part I.E. above, Herrick's deposition testimony indicates that Herrick, Dr. DeMars,

19   and Gunnell did not meet with senior management to discuss REI until after April

1    18.  According to Herrick, by the time of that meeting, Dr. DeMars had agreed that

2    REI should be shut down and its entire staff terminated.  (*See* Herrick Dep. 49.)

3    Dr. DeMars testified, however, that she had planned to recommend at that first

4    meeting that Dr. Porter be retained to deal with ultrasounds; that the decision had

5    already been made to close REI and terminate the physicians; and that every

6    suggestion she made was summarily "dismissed, and [she] was told that there was

7    not going to be any plan, that [she] was not allowed to make any plan."  (Dr.

8    DeMars Dep. 139-40.)  She testified that, as to the possibility of "redeploying Dr.

9    Porter to do ultrasound work," there was no discussion at that meeting; "[t]hat was

10    something that I had in the back of my mind."  (*Id*. at 158.)

11          Herrick testified that after April 18, Dr. DeMars had suggested that

12    "there's an option" of keeping Dr. Porter, but "it was more of a potential option"

13    that Dr. DeMars herself then said was "not really" practical.  (*Id*. at 55, 54, 58.)

14    A jury would be entitled to infer that Dr. DeMars was not in fact advocating for

15    the retention of Dr. Porter.

16          Dr. Merrens testified that his decision to close REI was made on April

17    20 or 21; the decision was announced at DHMC internally on May 4.  Contrary to

18    the district court's view of the record, we have not seen evidence that Dr. DeMars

19    advocated retaining Dr. Porter at DHMC after April 21.  Other than her deposition,

1  the only statements we have seen in the record from Dr. DeMars after that date are

2  (a) her April 25 email to Herrick (quoted in part in Part I.E. above), commenting on

3  the three REI physicians and seeking permission to hire a new candidate in the

4  hopes that REI would soon be revived, and (b) her May 12 email to Dr. Merrens.

5           Dr. DeMars's April 25 email surely does not compel an inference that

6  she was making an attempt to retain Dr. Porter at DHMC.  Rather, Dr. DeMars

7  makes certain negative comments about Dr. Porter (*see* Part II.E.2.b. below); and

8  that email's only reference to a position for Dr. Porter at DHMC states, "We could

9  offer her [an] ultrasound only position," but that would make it "impossible" to

10  "keep[] her out of any rebuilding plans."  This email was not addressed to Dr.

11  Merrens; and when he read it in his deposition he did not interpret Dr. DeMars's

12  statements as recommending an offer, and he testified that "[t]here was never a

13  proposal . . . to end the program and Misty will continue on doing GYN

14  ultrasound."  (Dr. Merrens Dep. 161, 169.)

15           Nor could the district court's descriptions of Dr. DeMars's supposed

16  efforts to find another position for Dr. Porter in OB/GYN or in the Radiology

17  Department justify a conclusion as a matter of law that Dr. DeMars advocated for

18  Dr. Porter's retention.  The determination by Herrick, for example, that OB/GYN

19  had no need for Dr. Porter because "the *existing* patient need for ultrasound

- 86 -

1    evaluation was already met by *existing* staff," D.Ct. Op., 2020 WL 6789564, at *10

2    (citing Herrick Dep. 54 (emphases added)), was entirely superficial:  The "existing

3    staff" that met "the existing patient need" included Dr. Porter; her work included

4    non-REI ultrasounds (*see, e.g.*, paragraphs 10, 11, and 17 of Dr. Porter Answer to

5    DHMC Interrogatory 7).  Further, Herrick testified that there was no actual

6    "analysis" as to ultrasound demand in the future; "we did some conversations,

7    some analysis," which were just conversations among himself, Dr. DeMars, and

8    Gunnell; he said "you know[,] analysis might be the wrong word."  (Herrick

9    Dep. 55-57.)

10           The statement from the Radiology Department that it "did not have

11    any need *to hire* or *move a physician into* the Department," D.Ct. Op., 2020 WL

12    6789564, at *10 (internal quotation marks omitted) (emphases ours), is simply

13    puzzling:  Dr. Porter was at that time already a member of the Radiology

14    Department; she "had a dual appointment" in OB/GYN and Radiology "at the time

15    of termination."  (Dr. Merrens Dep. 43.)  When REI was closed, DHMC terminated

16    Dr. Porter's employment entirely.

17           The district court's finding that Dr. DeMars attempted to have Dr.

18    Porter retained in OB/GYN after the decision to close REI was reached on April 20

19    or 21 or announced on May 4, is also contrary to the testimony of Dr. Merrens.  His

1    view nearly from the outset had been that REI should be closed and that all of its

2    staff should be terminated.  (*See, e.g.*, Dr. Merrens Dep. 20 ("[w]e ended the

3    program, and, in ending the program, we made the decision also that the people

4    that provided that care . . . would also be terminated," including "Misty"); *id*.

5    at 128-29; *but see id*. at 148-49 (Todd was allowed to continue in OB/GYN).)

6            But after sending his May 12 email to Maxfield stating that the

7    decisions as to REI's staff had been made on Dr. DeMars's recommendations, Dr.

8    Merrens sent an email to Dr. DeMars.  Seeking an appropriate way to respond to

9    the "inundat[ion]" of "emails *wondering why Misty can't stay on* to do her

10   ultrasound complex operative and teaching role even if we end REI," he said,

11   "*I suspect* that you considered this . . . ."  (Dr. Merrens May 12 email to Dr. DeMars

12   (emphases added).)  Dr. Merrens's stating only that he "suspect[ed]" that Dr.

13   DeMars had considered why Dr. Porter should not be retained can reasonably be

14   interpreted by a factfinder as meaning that Dr. DeMars had not in fact

15   recommended to Dr. Merrens that Dr. Porter be retained.  And indeed, Dr.

16   DeMars's immediate response confirmed that she had not made such a suggestion,

17   as she hypothesized what might have occurred "*[i]f I had made a decision to try* to

18   keep her."  (Dr. DeMars May 12 email to Dr. Merrens (emphasis added).)

- 88 -

1    Dr. DeMars stated, "it was the right decision to include [Dr. Porter] in

2    the terminations, *and I don't want to change that decision*."  (*Id*. (emphasis added).)

3    We have not seen in the record any recommendation by Dr. DeMars to Dr.

4    Merrens for the retention of Dr. Porter thereafter.

5    Finally, we note that Dr. Merrens's May 12 email to Maxfield, in

6    addition to saying that the staffing decisions had been made on Dr. DeMars's

7    recommendations, said that Dr. Merrens was not sure of Dr. Porter's interest in

8    staying at DHMC if there were no infertility practice.  But in his deposition, Dr.

9    Merrens stated that at some point Dr. Porter wrote to him stating exactly such an

10   interest:

11   Q.  *Did you ever receive communication from Dr. Porter*
12   *expressing that she did, in fact, want to stay on, even if the infertility*
13   *part were to cease*?

14   A.  *Yes*.

15   Q.  Did that give you information about her interest?

16   A.  She had sent a document.  I'm not sure of the date.  I
17   reviewed it as part of the, of some of the information.  She
18   conveyed to us a document expressing her dismay at the
19   closure of the program, her perspectives on her value, her years
20   of service, and what she could bring to it.  There was not a
21   mention of other issues that were going on related to Dr. Hsu or
22   Dr. Seifer, nor was there any mention of her disability.  *It was*
23   *more around there are other things that I can, that, that I'm interested*
24   *in*.

- 89 -

1    (Dr. Merrens Dep. 206 (emphasis added).)

2            Dr. Merrens testified that he never spoke with Dr. Porter about her

3    desire to be reassigned to OB/GYN (*see id.* at 206, 208); he only "reflected" about it

4    with Dr. DeMars (*id.* at 207).  Although the timing and depth of their "reflect[ions]"

5    are unclear--(*see, e.g., id.* at 209 ("Q.  When you talked to Dr. DeMars . . . around

6    this time, middle of May 2017, what were your discussions about Dr. Porter?  A.  I

7    don't think I had specific conversations with Dr. DeMars about Dr. Porter."))--Dr.

8    Merrens testified that he "was convinced" by Dr. DeMars that Dr. Porter "was

9    really tied to REI and IVF" (*id.* at 208); and Dr. DeMars did not recommend

10   reassigning Dr. Porter to OB/GYN:

11           Q.  *Did Dr. DeMars suggest finding a way to keep Dr. Porter*
12           *at Dartmouth-Hitchcock*?

13           A.  *She did not.*

14   (Dr. Merrens Dep. 209 (emphases added); *see also id.* at 169 ("[t]here was never a

15   proposal that we're going to end the program and Misty will continue on doing

16   GYN ultrasound"); *id.* at 227 ("Q.  Did you believe that Dartmouth-Hitchcock was

17   [on May 18th, 2017] working on a way to keep Misty Blanchette Porter?  A.  No.");

18   *id.* at 228 ("[w]e were not working on a way to keep Misty Blanchette Porter

- 90 -

1    employed"); *id*. at 150 ("I was not presented with a plan by Leslie" for Dr. Porter to

2    continue just with ultrasound. "That was not part of the plan.").)

3              In sum, the record does not support the district court's conclusion as a

4    matter of law that after Dr. Merrens decided to close REI, Dr. DeMars "advocated"

5    that Dr. Porter be retained and reassigned rather than terminated.  Instead, the

6    record includes evidence that Dr. DeMars described her own early suggestions of

7    such a possible option as not really practical; that after the final decision was

8    reached to close REI, Dr. DeMars advocated to Dr. Merrens the termination of all

9    REI staff except nurse Todd; that the Radiology Department's statement that it did

10   not need to bring in a new physician was irrelevant since Dr. Porter was already a

11   member of that department; that the financial conclusions were not based on any

12   actual analysis of future need; and that Dr. Merrens, after receiving directly from

13   Dr. Porter her statement of interest in reassignment to OB/GYN for non-IVF-

14   related work, elected not to speak to Dr. Porter and instead relied only on Dr.

15   DeMars who--far from advocating for Dr. Porter's retention--said "it was the right

16   decision to include her in the terminations, and I don't want to change that

17   decision."

1          b.  *Attitudes*

2                    As to Dr. DeMars's attitude toward Dr. Porter, the district court found

3    that the evidence showed that Dr. DeMars was "[i]rritated" by Dr. Porter's

4    "criticism of" Dr. Seifer, D.Ct. Op., 2020 WL 6789564, at *9, but not "*sufficiently*

5    *angered or embarrassed by Dr. Porter's complaints against Dr. Seifer to retaliate by*

6    *opposing her retention*," *id*. at *10 (emphasis added).  The court's finding that Dr.

7    DeMars was not sufficiently angered to have a retaliatory animus was based on its

8    view that

9                    [t]here is no evidence of this anger.  It is a theory which is
10                   often stated in Plaintiff's papers but remains *unsupported by an*
11                   *email* or deposition testimony.  *No reasonable jury could infer that*
12                   *Dr. DeMars decided not to arrange for a new position within the*
13                   *OB/GYN Department because Dr. Porter had criticized Dr. Seifer*.
14                   At most, Dr. DeMars's involvement in hiring Dr. Seifer in 2016
15                   gave her reason to be angry at his critics a year later and
16                   disappointed that his tenure at DHMC did not go well.

17   *Id*. at *11 (emphases added).  The court concluded that "[t]here is . . . no evidence

18   that Dr. DeMars sought to terminate Dr. Porter's employment at DHMC.  *The*

19   *deposition testimony is to the contrary*."  *Id*. (emphasis added).

20                   We cannot see that the record supports these findings by the district

21   court.  First, the statement that "[t]here is . . . no evidence that Dr. DeMars sought

22   to terminate Dr. Porter's employment at DHMC" ignores the emails of Dr. Merrens

- 92 -

1    and Dr. DeMars themselves.  (*See* Dr. Merrens May 12 email to Maxfield, stating

2    the decisions as to REI "staff" upon its closing were made "at the recommendation

3    of Dr. De[M]ars"; Dr. DeMars May 12 email to Dr. Merrens, stating that "it was the

4    right decision to include [Dr. Porter] in the terminations, and I don't want to

5    change that decision").

6              Second, any "deposition testimony . . . to the contrary" by Dr. Merrens

7    or Dr. DeMars should not have been considered by the district court in ruling on

8    DHMC's motion for summary judgment, given that a jury is not required to credit

9    a witness's testimony.

10             Third, in noting that Dr. DeMars's interest in having Dr. Seifer

11   succeed "gave [Dr. DeMars] reason to be angry at his critics a year later" but

12   finding she was not "sufficiently angered" to have retaliated, D.Ct. Op., 2020 WL

13   6789564, at *11, *10, the district court engaged in weighing the evidence.  The

14   drawing of factual inferences and weighing the evidence is the province of a

15   factfinder, not of the court in considering a motion for summary judgment.

16             Viewing the record as a whole in the light most favorable to Dr.

17   Porter, we conclude that a jury could permissibly infer that Dr. DeMars--who,

18   according to Dr. Merrens, never recommended that Dr. Porter be retained--bore

19   Dr. Porter ill will for insistently reporting, and causing other REI staff members to

1    report their observations of, impermissible or unsafe conduct and practices by Drs.

2    Seifer and Hsu, and particularly by Dr. Seifer.  As described in Part I.C.1. above,

3    Dr. Seifer was made REI director in May 2016 despite substantial warnings from

4    his most recent former colleagues.  He was appointed on Dr. DeMars's strong

5    endorsement, with Dr. Merrens's express warning to Dr. DeMars that if Dr. Seifer

6    failed it "was on her," and it was thus "understood" that DeMars's tenure as

7    OB/GYN's chair was in jeopardy (Dr. Merrens Dep. 83).

8            Dr. Seifer began his REI work on June 15, 2016, and before the end of

9    July, Dr. Porter had heard reports from at least a dozen REI staff members as to Dr.

10   Seifer's lack of competence.  Dr. Porter instructed them to report their concerns up

11   the chain of command and to Dr. DeMars.  Dr. DeMars said she had heard such

12   reports in July from multiple sources.

13           In November 2016, Dr. DeMars collected REI staff members'

14   assessments of Dr. Seifer's performance.  Dr. Porter's evaluation, and others, were

15   negative; but Dr. DeMars sent them to DHMC's Medical Staff Office with a

16   covering summary that characterized the evaluations favorably, stating that there

17   were no repeated criticisms of Dr. Seifer from the physicians, patients, or staff (*see*

18   *id*. at 96-97, 101-02, 106, 109).  In February 2017, Dr. DeMars collected additional

19   assessments of Dr. Seifer's performance, which also were negative.  Dr. DeMars

1    did not inform Dr. Merrens of any of these negative evaluations.  (*See* Dr. Merrens

2    Dep. 118-19, 121-22.)  Dr. Merrens viewed the evaluations--when he finally saw

3    them--as raising "significant concerns" as to, *inter alia*, Dr. Seifer's technical skill,

4    approach to patients, and standard of care (*id*. at 120).  Dr. DeMars said that she

5    did not tell Dr. Merrens "about any of the[] issues reflected in the" negative

6    evaluations, "[b]ecause he [had] looked at me in the Credentialing Committee and

7    said this is on you."  (Dr. DeMars Dep. 127.)

8            In contrast to Dr. DeMars's nondisclosure of the negative views of Dr.

9    Seifer to Dr. Merrens, Dr. DeMars shared negative views of Dr. Seifer with others.

10   In July 2016--barely six weeks after Dr. Seifer started work at REI--Dr. DeMars

11   texted a former chair of OB/GYN stating,

12           *I'm not sure that DS is clinically competent*. . . .  I don't know what
13           he's been doing for 25 years, but I'm not sure it was IVF. . . .  *I*
14           *have heard separately voiced concerns from nursing, anesthesia and*
15           *ultrasound techs*.  The lab folks complain about bloody aspirates
16           and low egg counts.

17   (Dr. Merrens Dep. 88-89 (internal quotation marks omitted) (emphases ours).)  In

18   April 2017, Dr. DeMars's email to Herrick observed, *inter alia*, that after Dr. Seifer's

19   termination from DHMC "[i]t is conceivable that he could join one of the Boston

20   IVF practices," but Dr. DeMars added, "*Lord help them*."  (Dr. DeMars April 25

21   email to Herrick (emphasis added).)  And despite the fact that Dr. Seifer's REI

- 95 -

1  appointment was due solely to Dr. DeMars's own tenacious endorsement despite

2  the reluctance of the credentials committee and the warnings of Dr. Seifer's former

3  colleagues (*see* Part I.C.1. above), and that Dr. Seifer was her "responsibility" (Dr.

4  DeMars Dep. 110 ("I made the decision to hire him")), Dr. DeMars described her

5  situation as getting "stuck with" Dr. Seifer (Dr. DeMars's April 25 email to

6  Herrick); and she placed the blame for Dr. Seifer's failures squarely on Dr. Porter.

7  She said:

8          While David is not a good leader, *his failure is also the*
9      *result of a masterful takedown by Misty Porter.*  If she had wanted
10         to support him, she would have made the division successful.

11 (*Id*. (emphasis added).)

12         In her April 25 email to Herrick, Dr. DeMars also noted that Dr. Porter

13 had strong ties to the University of Vermont Medical Center ("UVM").  And,

14 apparently referring to an ongoing DHMC in-house investigation into a

15 mysteriously stored collection of medicines (*see* Herrick Dep. 68, 87 (a bag of

16 medicines found "in a storage closet . . . were for multiple patients, and . . . it was

17 unclear why they were there")), Dr. DeMars predicted that Dr. Porter would surely

18 be hired by UVM "unless she is going to be *forced to resign over the medication*

19 *diversion issues*" (Dr. DeMars April 25 email to Herrick (emphasis added)).  And

20 despite her previous friendship with Dr. Porter, Dr. DeMars said:

1          ***My life*** **and the messaging** *would be much easier if* **[DHMC's**
2          **general counsel] determines that** *all three providers* **are at**
3          **fault in the medi diversion issue and** *are facing loss of license.*

4  (*Id*. (italics ours) (bolding in original).)

5          Given this record, a rational juror would not be required to credit Dr.

6  DeMars's testimony that she wanted only the best for Dr. Porter.  The jury could

7  instead infer that Dr. DeMars's representations and recommendations to Dr.

8  Merrens convincing him to terminate Dr. Porter rather than reassigning her to

9  OB/GYN, were motivated by bad faith, malice, or retaliation, given, *inter alia*,

10         ■ Dr. DeMars's blaming Dr. Porter for Dr. Seifer's failure--
11         despite the pre-hiring warnings from Dr. Seifer's former
12         colleagues and the numerous multi-source, on-site criticisms of
13         his performance at REI;

14         ■ her assertion that Dr. Porter--"who ha[d] been out for almost
15         18 months" (Dr. DeMars May 12 email to Dr. Merrens)--could
16         have made Dr. Seifer a success; and

17         ■ her emphatic view that "**My life and the messaging would**
18         **be much easier if**" she could tell others that Dr. Porter, who
19         was "gifted and dedicated" (Dr. DeMars Dep. 43)--but who
20         reported unlawful, unethical, and harmful conduct--was let go
21         because she was at risk of "**los[ing her] license**" to practice
22         medicine.

23         We conclude that the district court erred in finding that the record

24 lacked evidence from which a jury could permissibly find that Dr. Merrens

25 terminated Dr. Porter's employment--rather than reassigning her, as she requested,

1    to fill known needs of OB/GYN--in reliance on the representations and

2    recommendations from Dr. DeMars that were motivated by malice, bad faith, or a

3    desire for retaliation.

4        3.  *Dr. DeMars as Decisionmaker*

5            In the above discussion, we have explored the record as to whether or

6    not Dr. Merrens knew of Dr. Porter's reporting activity--and the evidence of his

7    reliance on reflections or discussions he had with Dr. DeMars--on the assumption

8    that Dr. Merrens was the ultimate decisionmaker as to whether to terminate Dr.

9    Porter rather than retain her at DHMC.  In so doing we do not mean to exclude the

10   possibility that a jury could find that the actual decisionmaker with respect to the

11   termination of Dr. Porter, after Dr. Merrens decided that REI would be closed, was

12   not Dr. Merrens but Dr. DeMars, who plainly knew of Dr. Porter's reporting

13   activities.

14           While Dr. Merrens testified that he was responsible for those

15   decisions because he was "ultimately responsible for everything that happens from

16   a clinical aspect at Dartmouth-Hitchcock" (Dr. Merrens Dep. 20), it is not clear that

17   he was the actual decisionmaker with regard to termination or retention of the REI

18   staff.  For example, while his initial view was that when REI closed, all staff should

1    automatically be terminated, one staff member--nurse Todd--was in fact thereafter

2    retained in OB/GYN.  That decision was made although Dr. Merrens did "not"

3    have a "complete understanding" of Todd's capabilities (Dr. Merrens Dep. 25); and

4    his testimony lends itself to an inference that the decision was made by Dr.

5    DeMars.  He said, "I don't remember Dr. DeMars explaining why Beth Todd was

6    retained."  (Dr. Merrens Dep. 25-26.)

7              An inference that the decision to retain Todd had been made by Dr.

8    DeMars would be entirely consistent with Dr. Merrens's May 12 email to Maxfield

9    stating that the REI-closure staffing decisions had been made "at the

10   recommendation of Dr. De[M]ars").  And the jury could infer that Dr. DeMars, not

11   Dr. Merrens, had also made the decision not to retain Dr. Porter, especially given

12   that, minutes after Dr. Merrens sent his email to Maxfield in response to her

13   inquiry as to why Dr. Porter was not being retained, he emailed Dr. DeMars

14   stating that he "*need[ed] to know* how better to answer this question."  (Dr. Merrens

15   May 12 email to Dr. DeMars (emphasis added).)

16             In sum, the record is susceptible to several permissible inferences as to

17   the cause of DHMC's decision to terminate Dr. Porter.  It did not lend itself to a

18   judgment as a matter of law in favor of DHMC on her claims that she was

19   terminated because of her reporting activities.

1                                          CONCLUSION

2                    We have considered all of the parties' respective arguments

3        challenging or supporting the judgment of the district court and, except as noted

4        above, have found them to be without merit.  For the reasons discussed above, we

5        vacate so much of the judgment as dismissed plaintiff's claims of disability

6        discrimination in the termination of her employment, in violation of the ADA, the

7        Rehabilitation Act, and the laws of New Hampshire and Vermont, and her claims

8        of whistleblower discrimination and wrongful discharge in violation of New

9        Hampshire law, and we remand for trial of those claims.  We affirm so much of

10       the judgment as dismissed plaintiff's other claims that defendants, prior to her

11       termination, failed to accommodate her disability or retaliated against her on

12       account of her disability.

13                    Costs to plaintiff.