UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| **MISTY BLANCHETTE PORTER, M.D.,** )<br>      **Plaintiff,** )<br>)<br>v. )<br>)<br>**DARTMOUTH-HITCHCOCK** )<br>**MEDICAL CENTER,** )<br>**DARTMOUTH-HITCHCOCK** )<br>**CLINIC, MARY HITCHCOCK** )<br>**MEMORIAL HOSPITAL, and** )<br>**DARTMOUTH-HITCHCOCK** )<br>**HEALTH,** )<br>      **Defendants.** ) | Docket No. 2:17-CV-194 |

## PLAINTIFF'S MOTION TO UNSEAL EXHIBITS 10 & 11 FOR TRIAL

Plaintiff Misty Blanchette Porter, M.D. ("Dr. Porter") moves this Court to unseal Exhibit 10 (Doc. 140-12) and Exhibit 11 (Doc. 140-13) to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 140) so that these documents may be used at trial in the presentation of Dr. Porter's case and to allow the public to better understand the circumstances under which Dr. Porter's employment was terminated.

FACTS AND HISTORY

Exhibit 10 is an email with an attached letter dated June 3, 2016, from Dr. Porter to Dr. David Seifer, then-Director of the Reproductive Endocrinology and Infertility ("REI") Division within Defendants' ("Dartmouth-Hitchcock") Department of Obstetrics and Gynecology ("OB/GYN"), and Dr. Leslie DeMars, then-Chair of the OB/GYN Department, detailing concerns with the performance and competence of Dr. Albert Hsu, a physician within the REI Division. Exhibit 11 is an email dated February 22, 2017, from Dr. Judith McBean, then a

physician within the REI Division, sent in response to Dr. DeMars' request for feedback about Dr. Seifer. Both documents are sharply critical. Both are highly relevant to Dr. Porter's claims for wrongful termination and whistleblower retaliation. Moreover, wrongful termination, whistleblower retaliation, and the competence of practicing physicians are matters of great import to the public.

Exhibits 10 and 11 have been an ongoing subject of dispute. Early in this case and to facilitate the discovery process, the parties requested (Doc. 24) and the Court issued (Doc. 25) a protective order "creating procedures for identifying and protecting sensitive information" during discovery and providing "for the filing of sensitive documents with the court under seal." (Doc. 173 at 3.) The use of confidential information at trial and the process to do so would be "resolved by further action by the Court." (Doc. 25, ¶ 16.)

Exhibits 10 and 11 were provisionally filed under seal in connection with Dr. Porter's opposition to Dartmouth-Hitchcock's summary judgment motion. Following a June 2, 2020 hearing, Chief Judge Crawford determined that Exhibits 10 and 11 would remain sealed. (Doc. 149.) The Court granted summary judgment, and Dr. Porter appealed. The Second Circuit overturned summary judgment on all claims except Dr. Porter's disability retaliation and failure to accommodate claims and remanded for trial. *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 169 (2d Cir. 2024). The Second Circuit partially unsealed the record "to the extent that their contents are quoted or described in [the] opinion." *Id.* at 133. The Second Circuit's opinion refers extensively to the contents of both Exhibits 10 and 11. *Id.* at 134–35, 138. Indeed, as the opinion quotes all of the information in Exhibit 11 about Drs. Seifer and Hsu that might arguably be considered sensitive, *see id.* at 135, 138, Exhibit 11 should be deemed unsealed by the Second Circuit.

2

For clarity upon remand and in response to requests from the media for copies, Dr. Porter moved to unseal all documents. (Doc. 159.) The parties reached agreement on all documents except Exhibits 10 and 11. Although it acknowledged the public's interest,[1] the Court denied the motion, explaining that: (1) Drs. Hsu and Seifer were not parties to the litigation and did not have an opportunity to respond; (2) both the senders and the recipients considered the documents confidential when sent; and (3) for purposes of the retaliation claims, it matters more that Dr. Porter sent the critical document than whether her criticisms are true. (Doc. 173 at 6–7.)

Dr. Porter's claims[2] are set for trial in March/April 2025. Although the protective order allows witnesses to be shown confidential documents provided they agree to abide by the protective order's terms, (Doc. 25, ¶ 9.e), the protective order does not address how the witnesses may be questioned in open court about documents that are under seal or how the jury will be able to access sealed documents. In addition, if the documents remain under seal, the public will be deprived of access to information relevant in deciding the claims in this case and about the competence and performance of two practicing physicians.

---

[1] The Court noted the public's "substantial" interest in the decision to close the REI Division but did not discuss the public's interest in physician competence. (Doc. 173 at 7.)

[2] The claims set for trial include: wrongful discharge in violation of public policy; violation of New Hampshire's Whistleblower Protection Act; violation of the Americans with Disabilities Act; violation of Section 504 of the Rehabilitation Act; violation of New Hampshire's prohibitions against discrimination and retaliation, RSA 354-A:7 and RSA 354-A:19; and violation of Vermont's Fair Employment Practices Act.

ARGUMENT

**There is a Long-Standing Presumption of  
Access to the Courts and Court Documents.**

Providing broad protection for confidential information exchanged by the parties during the discovery phase is often appropriate. Indeed, until documents have been filed with the Court, there is generally no right of public access. *See, e.g.,* 8A Fed. Prac. & Proc. Civ. § 2042 (3d ed.).

Once documents have been filed with the Court, used in a hearing or other proceeding, or relied upon in a judicial decision, they are considered "judicial documents," and a presumption of public access applies. *See, e.g., Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 533–34 (1st Cir. 1993) (concluding that defendant failed to make a sufficiently compelling showing to justify restricting public access and noting that good cause is not enough to justify protection after discovery materials have been introduced in open court); *In re Demetriades*, 58 F.4th 37, 45–46 (2d Cir. 2023) (noting Second Circuit "strong presumption" of public access to judicial documents and judicial decisions used to determine substantive legal rights). The public's "potent and fundamental presumptive right" of access to the courts and judicial documents predates the U.S. Constitution. *Olson v. Major League Baseball*, 29 F.4th 59, 87 (2d Cir. 2022) (quoting *Mirlis v. Greer*, 952 F.3d 51, 58 (2d Cir. 2020)). The presumption of public access is part of the system of checks and balances that keeps the government accountable to its citizens. *See, e.g., United States v. Amodeo* ("*Amodeo II*"), 71 F.3d 1044, 1048 (2d Cir.1995) (noting presumption of access is to promote "a measure of accountability and for the public to have confidence in the administration of justice"); *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139–40 (2d Cir. 2016) (asking whether access "would materially assist the public in understanding the issues" and in "evaluating the fairness and integrity of the court's proceedings").

The presumption of access can arise under the First Amendment or under the common law. *Attestor Master Value Fund LP v. Argentina*, 113 F.4th 220, 235 (2d Cir. 2024). The First Amendment presumption is overcome only by "specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve them." *Id.* (internal quotations omitted). Both the First and Second Circuits employ the common law "compelling reasons" test to determine whether or not to restrict access to confidential information. Larsen, Navigating the Federal Trial § 22:37 (2024 ed.). The test is "designed to seal only those documents whose release would result in serious injury or significant prejudice to a person or institution (e.g., documents dealing with national security, trade secrets, or sensitive matters that raise privacy concerns)." *Id.* Access is restricted only if "countervailing interests favoring secrecy" outweigh the role the confidential information plays in the court's exercise of its judicial powers and the information's value to the public in monitoring the federal courts. *Attestor Master Value Fund LP*, 113 F.4th at 235. Under this test, the Court first determines whether the record at issue is a judicial document to which a presumption of access applies and the weight of that presumption; it then identifies any countervailing factors (factors that weigh against disclosure) and balances those against the weighted presumption of access. *Mirlis*, 952 F.3d at 59; *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship* ("*Aralpa Holdings*"), 714 F. Supp. 3d 416, 449 (S.D.N.Y. 2024).

### Exhibits 10 and 11 are Judicial Documents Entitled to a Strong Presumption of Public Access.

A judicial document is one that is relevant to the performance of the judicial function and useful in the judicial process. *See, e.g., Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) ("A document is thus 'relevant to the performance of the judicial function' if it would reasonably

5

have the *tendency* to influence a district court's ruling on a motion or in the exercise of its supervisory powers, without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision."). Exhibits 10 and 11 were submitted in connection with Dr. Porter's opposition to summary judgment and will be used at trial in support of Dr. Porter's whistleblower retaliation and wrongful discharge claims. This Court previously determined that the exhibits "are relevant to an understanding of the court's judicial decision." (Doc. 173 at 5.) That is all that is required. Exhibits 10 and 11 are judicial documents to which a common law presumption of public access applies.

The next question is the weight to afford that presumption. *Milazzo v. Anthony*, No. 2:23-CV-00576-KJD, 2024 WL 1616485, at *2 (D. Vt. Apr. 15, 2024). The weight is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Brown*, 929 F.3d at 49. Documents used at trial or in dispositive motions to determine the substantive legal rights of the parties have a high presumptive weight. *Id.* Only in "extraordinary circumstances" will the Court be justified in restricting access to evidence used at trial. *See Aralpa Holdings*, 714 F. Supp. 3d at 450 (noting that the presumption is at its "zenith" when the information directly affects the outcome or the litigation or is used to "determine litigants' substantive legal rights" and "thus can be overcome only by extraordinary circumstances"); *Amodeo II*, 71 F.3d at 1049 (The public's right of access to evidence introduced in trials is "especially strong."). Conversely, the weight of the presumption is low when the document plays only a negligible role. *Bernstein*, 814 F.3d at 142. Information in Exhibits 10 and 11 was used by this Court and the Second Circuit in deciding whether summary judgment was appropriate.

Dr. Porter's wrongful termination in violation of public policy and whistleblower retaliation claims depend on details about what Dr. Porter reasonably believed, what concerns she shared and to whom, and how Dartmouth-Hitchcock responded. Credibility will be important. The time, effort, and detail that Dr. Porter put into writing Exhibit 10, as well as information about the time and effort she put into trying to improve Dr. Hsu's skills (i.e., voluntarily taking call with him for six months to further his training and to keep patients safe), indicate the seriousness of Dr. Porter's concerns and her commitment to improving care at Dartmouth-Hitchcock. Dartmouth-Hitchcock has periodically made allegations that Dr. Porter and others were exaggerating their concerns for their own purposes or were on a witch hunt, or that Dr. Porter herself was at fault for being too demanding, setting her expectations too high, or failing to be part of the team. It is important to show the jury that Dr. Porter's opinion about Dr. Hsu's competence is not unreasonable, exaggerated, or part of any unjustified witch hunt. Dr. Porter spent real time preparing thoughtful, meticulous comments about Dr. Hsu after she spent months voluntarily trying to help him improve. The jury will be evaluating Dr. Porter's reliability, and her analysis in Exhibit 10 reflects the work of someone whose judgment the jury should credit.

Dr. Porter alleges that her termination was retaliatory, in part because of her refusal to back down from her concerns about Drs. Seifer and Hsu's competence. Dartmouth-Hitchcock argues that the closure of the REI division and termination of Dr. Porter's employment were simply business decisions. The message offered by Dartmouth-Hitchcock to justify closure of the REI division was a critical shortage of qualified nursing staff. Dr. Porter argues that this excuse is pretext for Dartmouth-Hitchcock's efforts to sweep patient-safety issues caused by Drs. Seifer and Hsu under the rug and to get rid of her (an outspoken, whistleblowing, disabled

7

doctor) in the process. Witnesses will be asked about what conversations had taken place about Drs. Seifer and Hsu before Dr. Porter felt compelled to write Exhibit 10. Questions will be asked about what Dartmouth-Hitchcock did to investigate these concerns, who they talked to, what data they gathered, what they concluded, and what they did in response. Exhibit 11 provides corroborating evidence and further details. The breadth and seriousness of the concerns expressed in these exhibits highlights the paucity of Dartmouth-Hitchcock's response.

Access to the information contained in Exhibits 10 and 11 will be helpful to the public in understanding the issues in this litigation.[3] *Cf. Bernstein*, 814 F.3d at 143 (stating public's interest in allegations that attorneys for a government pension fund regularly engaged in a kickback scheme with the state AG's office was not outweighed by interests favoring secrecy, as disclosure would not "reveal the details of an ongoing investigation, pose a risk to witnesses, endanger national security, or reveal trade secrets"). Keeping the exhibits under seal on the grounds that the information is available from other, non-sealed sources deprives the public of the additional evidentiary value offered by these detailed, written reviews of Drs. Seifer and Hsu's performance and unnecessarily hinders the parties, the witnesses, and the jurors without, as explained below, providing any meaningful privacy protection.

At trial, Exhibits 10 and 11 will be used by Dr. Porter in support of her claims and presumably will be used by the Court/jurors in deciding the merits. Because the exhibits have

---

[3] Physician competence and the experience of women in the health care system, particularly issues of maternal health and reproductive medicine, are topics that have been of great public interest in recent years. *See, e.g., The Retrievals*, The New York Times (June 22, 2023), https://www.nytimes.com/2023/06/22/podcasts/serial-the-retrievals-yale-fertility-clinic.html (recounting the stories of women patients at the Yale Fertility Center whose excruciating pain was not taken seriously by their physicians until it was discovered that the pain medications they were receiving had been diluted or replaced with saline by a nurse diverting opiates).

and will be used to determine substantive legal rights, they are entitled to a strong presumptive weight that can only be overcome by "extraordinary circumstances."

### The Countervailing Factors Are Minimal and Do Not Outweigh the Presumption of Access.

The Court's next step is to identify factors that weigh against disclosure and balance them against the presumption of access. *Milazzo*, 2024 WL 1616485, at *2. The burden is on the party opposing unsealing to put forth explicit, substantial countervailing considerations, and the court's role is to "carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need." *Id.* at *5. *Cf. Otto Archive LLC v. Decorilla Inc.*, No. 1:23-CV-10618 (GHW) (SDA), 2024 WL 4212683, at *2–3 (S.D.N.Y. Sept. 17, 2024) (noting, for First Amendment presumptions, that the party moving to place documents under seal bears the burden of showing that higher values overcome the presumption of public access and that the information to be sealed is narrowly tailored in support of that interest). If the countervailing interests do not outweigh the presumption of access, then sealing is not appropriate. *See Brown*, 929 F.3d at 50–51 (finding error in court's "failure to conduct an individualized review of the sealed materials" and directing the court to "unseal all documents for which the presumption of public access outweighs any countervailing privacy interests"); *Aralpa Holdings*, 714 F. Supp. 3d at 449–51 (determining that the only countervailing interests identified were the nonmovants' privacy interests and no extraordinary circumstances justified keeping judicial documents from the public); *Milazzo*, 2024 WL 1616485, at *6 (concluding that privacy interests and consistency in sealing orders between jurisdictions were not sufficient countervailing factors to outweigh the presumption of public access, particularly where

9

defendant did not distinguish interests for each document nor did defendant seek to seal the complaint which included similar information).

The bar to overcome the presumption of access is high. *See, e.g., Poliquin*, 989 F.2d at 533 (noting that only "in rare circumstances" such as where the subject is "national security, the formula for Coca Cola, or embarrassing details of private life" may material used at trial remain sealed); *Bernstein*, 814 F.3d at 143 (finding the "interests favoring secrecy … weak" and noting it was "not a case in which disclosure would reveal details of an ongoing investigation, pose a risk to witnesses, endanger national security, or reveal trade secrets"); *Brown*, 929 F.3d at 47 n.13 (noting, as potential countervailing interests, impeding law enforcement, protecting the integrity of the jury selection process, and attorney-client privilege). Similarly, privacy interests such as "family affairs, illnesses, [and] embarrassing conduct with no public ramifications," have been protected from being used merely "to gratify private spite or promote public scandal" or to satisfy the public's "morbid craving for that which is sensational and impure." *Amodeo II*, 71 F. 3d at 1051 (citing relevant cases). Here, there is no on-going law enforcement investigation to impede, no trade secrets at risk, no confidential financial information or strategic business plans (even if there was, it would be of no competitive use now, after nearly seven years), or attorney-client privilege concerns with respect to Exhibits 10 and 11, nor is the information contained in those exhibits the sort of "private" interest without public ramifications that should be protected from the public's morbid curiosity.

Dartmouth-Hitchcock's own potential embarrassment or reputational harm is not sufficient to restrict public access. *See, e.g., Demetriades*, 58 F.4th at 45–46 (stating that the "interest needed to override the public's interest in access is significant … personal interest in avoiding reputational harm is not sufficient"); *Milazzo*, 2024 WL 1616485, at *7 (stating that

defendant's privacy interests in case accusing defendant, an elected official, of aiding and abetting in alleged sexual abuse, did not overcome the presumption of access).

Judge Crawford expressed concern about "reputational injury" to nonparties[4] Drs. Seifer and Hsu, who are believed to still be practicing REI medicine but who have not worked at Dartmouth-Hitchcock since June 2017. Drs. Seifer and Hsu have had seven years to assert their interests and have not done so.[5] Many of the concerns about Drs. Hsu and Seifer described in Exhibits 10 and 11 are already part of the public record, and the trial testimony of Dr. Porter and other witnesses, based on their first-hand knowledge, will encompass much of the same information. Moreover, the criticisms of Drs. Hsu and Seifer raise issues of public health and safety. These factors reduce the weight accorded to any privacy concerns. *See, e.g., Milazzo*, 2024 WL 1616485, at *8 (noting that defendant's privacy interests were "diminished" because much of the same information was already publicly accessible and concluding that the privacy interests did not outweigh the moderately strong to strong presumptions of openness in the various documents he sought to seal); *JetBlue Airways Corp. v. Helferich Patent Licensing, LLC,*

---

[4] Other nonparties who might claim privacy interests include other providers who expressed concerns and patients. Exhibits 10 and 11 do not contain any patient names, medical record numbers, addresses, or similar details, and even if they did, such information could easily be redacted without sealing the entire document. *See Demetriades*, 58 F.4th at 46 ("Any order sealing documents should be 'narrowly tailored.'"). And while both exhibits were initially submitted in confidence (although neither were subject to quality assurance/peer review privilege restrictions), Dr. Porter and Dr. McBean, the authors of Exhibits 10 and 11, will be testifying at trial and do not object to disclosure. Sharon Parent, mentioned in Exhibit 11, will also be testifying at trial and her concerns are already part of the public record. *See Porter*, 92 F.4th at 137–38 (quoting from Parent's declaration, which was not submitted under seal and would in any event have been deemed unsealed).

[5] Given the length of time this case has been pending, the extensive media coverage it has received, and the efforts of the press to reach out to them for comment, it is inconceivable that Drs. Seifer and Hsu are unaware of this lawsuit. Despite this, neither physician has sought to intervene or otherwise requested that any documents be kept under seal.

960 F. Supp. 2d 383 (E.D.N.Y. 2013) (unsealing after concluding that strong presumption of public access was not overcome by any countervailing privacy interest, particularly as material which defendant sought to seal was already in public domain). *Cf. Demetriades*, 58 F.4th at 46 (noting that "public censure or reprimand" can be a useful "corrective measure" in professional misconduct cases).

Any sensitive aspects of Exhibit 11 were already effectively unsealed by the Second Circuit as discussed above. Exhibit 10 is not a document to which Dr. Porter gained access only as a result of the discovery process; rather, it was written by Dr. Porter and reflects Dr. Porter's personal observations and opinions, which are directly relevant to the claims in this litigation. *See* 8A Fed. Prac. & Proc. Civ. § 2043 (3d ed.) (noting that the rules do "not authorize the court to limit use by a party of confidential information of another party if the party has obtained it by some method other than discovery"). *Cf.* NH RSA 151:13-a, II (providing that even where information has been provided as part of a quality assurance program, "information, documents, or records otherwise available from original sources are not to be construed as immune from … use in any such civil or administrative action" and a person "may not be prevented from testifying as to matters within his or her knowledge").

The presumption in favor of public access to these emails, produced in connection with dispositive motions, relevant to the claims to be tried, and of importance to the public's health and safety, is high. Although the privacy interests of nonparties should be considered, under the circumstances these interests are minimal and cannot be said to outweigh the strong presumption of public access.

## Practical Problems with Maintaining Exhibits 10 and 11 Under Seal

Courts have options to manage the use and disclosure of sensitive confidential information short of blanket sealing.  Some options are expressly outlined by the rules, such as partial redaction or limiting remote access by nonparties.  *See, e.g.,* FRCP 5.2(d)-(e).  Other options derive from a court's general powers to manage its courtroom and the litigation process.  *See* 8A Fed. Prac. & Proc. Civ. § 2043 (3d ed.) (noting "[o]ther kinds of conditions may be imposed, limited only by the needs of the situation and the ingenuity of court and counsel").  *See also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978) (upholding trial court's decision not to allow recording companies to access tape recordings introduced in evidence during Watergate trial).  In one case, the court had ordered the courtroom closed and transcripts redacted during any witness testimony involving Attorney's Eyes Only information, but the media intervened and moved to unseal all documents and testimony.  Lisa C. Wood, Best Practices for Handling Confidential Third-Party Data During A Merger Trial, Antitrust, Fall 2018, at 108-110.  On appeal, the trial court was ordered to make individualized determinations about each item the parties sought to maintain under seal.  *Id.*  Ultimately, the court maintained the seal on records containing sensitive personal information and strategic financial information produced under a subpoena (i.e., not voluntarily) that were tangentially relevant and not important to the merits and unsealed some documents produced by a third-party insurer, including negotiations over reimbursement, that were "critical to the decision of the court and important to the public's ability to understand the case."  *Id.*  In another case described in Woods' article, the court instituted procedures to shield material from trial attendees other than the court and counsel, viewing the sealed material on monitors that the other attendees couldn't see, requiring counsel to phrase questions so as not to reveal the confidential material, and redacting transcripts as

necessary. *Id.* In another case, the court required that a party intending to use confidential information from a third party for cross-examination first notify the third party and allow an opportunity to agree on redactions. *Id.* The court addressed concerns about unfairly being required to preview trial strategy and lose the element of surprise by designating a "clean team" of lawyers who were not involved in representing witnesses or preparing witnesses for trial to review the materials and make confidentiality determinations. *Id.*

The protective order provides that Confidential Information and Highly Confidential – Attorneys' Eyes Only Information may be disclosed to a potential fact witness (and their counsel) "to the extent reasonably necessary in connection with their testimony at trial in this action or the preparation thereof" provided that the potential witness has first signed an agreement to abide by the terms of the protective order. (Doc. 25, ¶ 9.e.) Similarly, Confidential Information and Highly Confidential Information may be disclosed to the court and jurors "if filed under seal pursuant to Paragraph 16 of this Agreement or as otherwise ordered by the Court." (Doc. 25, ¶¶ 9.f., 10.) Paragraph 16 provides that the "use of Confidential Information or Highly Confidential Information in motions, at court hearings, and at trial, and the procedures to which the parties are subject in relation to the use of Confidential Information or Highly Confidential Information in motions, at court hearings, and at trial, shall be resolved by further action by the Court in this matter." (Doc. 25, ¶ 16.)

With a mix of details in the public record and under seal, it will be a logistical challenge to keep counsel and witnesses from accidentally straying into information still under seal. Moreover, if witness testimony puts into the public record effectively the same information and details, then it is difficult to understand how Exhibits 10 and 11 can continue to be considered confidential. It is well within the Court's powers to unseal documents that it has previously

ordered sealed, Fed. R. Civ. P. 5.2(d), and the Court should do so here with Exhibits 10 and 11. *See also Bailey v. Sears, Roebuck & Co.*, 651 A.2d 840 (Me. 1994) (upholding trial court conclusion that defendant failed to establish good cause for continued protection of discovery materials after they were admitted as evidence at trial).

## CONCLUSION

For the foregoing reasons, Dr. Porter requests that the Court order that Exhibits 10 and 11 be unsealed.

Dated: February 4, 2025

/s/ Geoffrey J. Vitt
Geoffrey J. Vitt, Esq.
Vitt & Nunan, PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittnunanlaw.com

Eric D. Jones, Esq.
Langrock Sperry & Wool, LLP
210 College Street
P.O. Box 721
Burlington, VT 05402
(802) 864-0217
ejones@langrock.com

Sarah H. Nunan, Esq.
Vitt & Nunan PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055
(802) 649−5700
snunan@vittnunanlaw.com

***Attorneys for Plaintiff,
Misty Blanchette Porter, M.D.***