# Exhibit C

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT
Case No. 5:17-CV-194

MISTY BLANCHETTE PORTER, M.D.,
Plaintiff,

V.

DARTMOUTH-HITCHCOCK MEDICAL CENTER,
DARTMOUTH-HITCHCOCK CLINIC,
MARY HITCHCOCK MEMORIAL HOSPITAL,
and DARTMOUTH-HITCHCOCK HEALTH,
Defendants.

DEPOSITION
- of -
ROBERT L. BANCROFT, Ph.D.
held on Wednesday, October 30, 2019, at
the offices of Vitt & Associates, PLC,
8 Beaver Meadow Road, Norwich, Vermont,
commencing at 10:15 a.m.

APPEARANCES:

GEOFFREY J. VITT, ESQUIRE
Vitt & Associates, PLC
8 Beaver Meadow Road, P.O. Box 1229
Norwich, Vermont 05055
(802) 649-5700 | gvitt@vittandassociates.com
On behalf of the Plaintiff
JESSICA E. JOSEPH, ESQUIRE
Foley & Lardner, LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199-7610
(617) 342-4000 | jjoseph@foley.com
On behalf of the Defendants

IN ATTENDANCE: JULIA KORKUS

COURT REPORTER: KAREN L. WRIGHT, RPR, CRR

O'BRIEN REPORTING SERVICES, INC.
(802) 747-0199

---

Page 2

1       I N D E X
2    DEPONENT: ROBERT L. BANCROFT, Ph.D.
3    EXAMINATION BY                    Page
4    ATTY. JOSEPH                       3
5
6         E X H I B I T S
7    Number   Exhibit Description        Page
8    Bancroft
9    No. 1   Curriculum Vitae            6
10   No. 2   Litigation Consulting Fees  21
11   No. 3   Summary of Testimony        24
12   No. 4   10/1/19 Expert Report       34
13   No. 5   Dr. Bancroft's File         49
14
     *(The original exhibits are attached to the
15   original transcript.)
16   *(The original transcript was sent to Atty. Vitt
     for the witness to read and sign.)
17
18
19
20
21
22
23
24
25

---

Page 3

1       Wednesday, October 30, 2019; 10:15 a.m.
2          ROBERT L. BANCROFT, Ph.D.,
3    having been duly sworn by the Notary to tell the
4    truth, the whole truth, and nothing but the
5    truth, deposes and says as follows:
6
7       EXAMINATION BY ATTORNEY JOSEPH
8    Q.  Hi, Dr. Bancroft.  My name is Jessica Joseph.  We
9       met a few minutes ago.  I'm counsel for the
10      defendants in this matter, Dartmouth-Hitchcock
11      entities.  And we're here today to talk about the
12      expert report that you submitted in this matter.
13      I know that you've been deposed
14      several times before, so I'm going to go through
15      the ground rules, but I'll go through them
16      quickly, if that's okay.
17   A.  (Witness nodding.)
18   Q.  So the first is, if you could always make sure to
19      give a verbal answer rather than nodding or
20      gesturing so that the court reporter can take
21      down the answer.  Understood?
22   A.  Yes.
23   Q.  Great.  If you want a break at any time, just let
24      me know.  We'll take breaks.  The only thing I
25      ask is that if the question is pending, we not

---

Page 4

1       take a break until the question is answered.
2       Make sense?
3    A.  Yes.
4    Q.  Okay.  And are you taking any medication that
5       would affect your ability to testify truthfully
6       today?
7    A.  No.
8    Q.  Okay.  So I'd like to start with just your
9       background.  What's your current address?
10   A.  405 Brookside Road, Westford, Vermont.
11   Q.  Okay.  And what's your date of birth?
12   A.  September 29th, 1947.
13   Q.  And could you go through your educational
14      background for me starting with college.
15   A.  I have a bachelor's in economics from the
16      University of Vermont; I have a Master of Science
17      in agricultural economics from the University of
18      Vermont; and I have a Ph.D. in agricultural
19      economics from Purdue University.
20   Q.  So you mentioned agricultural economics.  Could
21      you explain what specifically that is and, I
22      guess, how it differs from just economics?
23   A.  I think the short answer is that historically
24      agricultural economics has been the applied --
25      more applied economics than theoretical, although

---

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 5

1      the lines have gotten quite blurred.
2            People who have advanced degrees in
3      agricultural economics work in many of the same
4      areas that a -- that a -- somebody with a Ph.D.
5      in economics.  They work in labor, natural
6      resources, businesses, business management, those
7      kinds of issues.  But historically, it's been a
8      more applied economics.
9            I also should add that the first
10     economists in this country were agricultural
11     economists from the land-grant schools.
12  Q.   What are the land-grant schools?
13  A.   Well, each state has a land-grant school.  In
14     Vermont, it's the University of Vermont.
15  Q.   Okay.
16  A.   New Hampshire -- Massachusetts, University of
17     Massachusetts is the land-grant school.  They
18     were set up by the federal government and they
19     were given land to finance the building of the
20     universities.
21  Q.   Understood.  Do you have any professional
22     licenses?
23  A.   No.
24  Q.   Have you had any in the past?
25  A.   No.

Page 6

1   Q.   Okay.  So I'd like to look at this document.
2            ATTORNEY JOSEPH:  We'll mark it as
3      Exhibit 1.
4            (Bancroft Exhibit 1 was marked for
5      identification.)
6   Q.   And this is your résumé, correct?
7   A.   Yes.
8   Q.   Okay.  And so it says here that beginning in
9      June 1979 you were working at the USDA?
10  A.   Yes.
11  Q.   Until August 1981.  Could you walk me through
12     what you did there?
13  A.   I was recruited by the Economic Research Service
14     in USDA to come to Washington, D.C., from -- I
15     was at Purdue to write my dissertation.  They
16     wanted an econometric forecasting model developed
17     that they could use to forecast farmers'
18     participation in various government programs.
19            So I moved to Washington, D.C., in --
20     well, I moved to Maryland and worked in
21     Washington, D.C., I think it was the late spring
22     of '79 -- it all kind of blurs now -- and was
23     with the Economic Research Service until December
24     of 1980.  And then in '81 I went over to -- I
25     forget the -- another agency within the U.S.

Page 7

1      Department of Agriculture, which basically
2      provided testimony and research -- well, that's
3      what I was doing for the -- the remaining eight
4      months I was there, was actually going to Capitol
5      Hill and providing backup to Under Secretaries
6      when they were asked questions from
7      Representatives of the House.
8   Q.   Okay.  And so from there, you moved to the
9      University of Vermont as an adjunct professor.
10     Could you tell me a little bit about that?
11  A.   As a -- not as an adjunct, associate.
12  Q.   Oh, yes.  I was skipping over --
13  A.   Yeah.  Yeah.
14  Q.   -- '81 to '91.
15  A.   Yes.
16  Q.   Could you tell me a little bit about your time at
17     UVM?
18  A.   Well, I was fortunate.  I wanted to return home
19     and was able to return to the department where I
20     had a -- I got my master's degree.
21            And so I was -- I was hired to -- as
22     an assistant professor at the University of
23     Vermont in the Department of Agriculture and
24     Resource Economics, which then became Community
25     Development and Applied Economics.  The name of

Page 8

1      it changed.  And I was there.  So I -- starting
2      in August of 1981, I came back to Vermont, the
3      University of Vermont.
4   Q.   Okay.  And then you also, since October 1981,
5      have been self-employed as an economic
6      consultant --
7   A.   That's correct.
8   Q.   -- correct?
9            So are all of the positions you've had
10     relating to economics listed on your résumé, all
11     of the employment that you've had that's
12     economics-related?
13  A.   That I've been hired by -- where I was an
14     employee, yes.
15  Q.   Okay.  You make the distinction between when you
16     were an employee and when you weren't because?
17  A.   Well, the difference is -- in my mind is as my
18     self-employed consulting business.
19  Q.   Oh, understood.  Okay.  So aside from projects as
20     a consultant, all of the other employment is
21     listed on your résumé that's related to
22     economics?
23  A.   Yeah.  I don't know if you consider being a
24     representative for the state of Vermont
25     employment, but I do get a paycheck from them,

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 9

1    so...
2    Q.  Right.  And that's on here anyway.
3         Do you have any work experience with
4    economics outside of the field of agriculture?
5    A.  Oh, yes.
6    Q.  Okay.  Could you describe that for me?
7    A.  Well, in the -- over the -- what is it?  -- it's
8    getting to be around 38, 39 years that I've been
9    in economic consulting, I've consulted in a wide
10   area.
11        Initially, when I started out, as you
12   might expect, it was dealing primarily with
13   agricultural issues, although they may be, like,
14   personal injury, even a wrongful death having
15   to -- and then there were some lost business
16   profits.
17        But then that -- in a very short
18   amount of time, that expanded into
19   non-agriculture issues.  I happened to be at the
20   right place at the right time in Vermont.
21        And I was, at that time -- I'm not
22   very computer literate today compared to what's
23   happened, but at that time, I was computer
24   literate and used the -- probably before your
25   time, but the old Radio Shacks where they had the

Page 10

1    floppy disks about this big around.
2         And so I was able to do analysis
3    rather quickly as opposed to doing it by
4    longhand.  And if assumptions changed, it was
5    real easy to change.  And so I was -- I want to
6    say I was a big hit.
7         Anyways, I ended up getting hired
8    by -- for -- with attorneys for non-agricultural
9    work very soon, I'm going to say after about a
10   year and a half of doing ag work.  One of the
11   largest -- it may have been the largest firm at
12   that time in Vermont; if not, it was the second
13   largest -- asked if I'd be interested in doing
14   some non-agriculture type of work.  And I said I
15   was.
16        And so anyway, from that point
17   forward, at least in the forensic area, I have
18   done a lot more non-agriculture-related
19   litigation forensic work than I've done
20   agriculture.  And then, over the years, I have
21   had occasion to do other kinds of economic
22   analysis that are non-ag in nature.
23   Q.  So about what -- you said was very soon
24   afterwards.  About what year would you say that
25   it was that you started doing more

Page 11

1    non-agricultural-related work?
2    A.  I would say that it was in probably late '82 --
3    Q.  Okay.
4    A.  -- or early '83.  It was -- it wasn't very long.
5    I had a couple cases with a firm Paul, Frank +
6    Collins.  They were ag-related.  One -- the last
7    one -- the second one -- first one was a barn
8    fire and it had to do with loss of profits.
9         The second one was a personal injury
10   case on a farm.  And I was asked at that time by
11   their lead litigator if I would be interested in
12   some non-ag work.  And so that was -- boy, it
13   was -- wasn't very long after coming back to UVM
14   that I started doing non-ag work.
15   Q.  Okay.  Got it.  So currently you're a state
16   representative.  What is the time commitment for
17   that?
18   A.  Well, the hard time commitment is -- where they
19   supposedly take attendance is January.  We start
20   around the -- somewhere between the first and
21   second week of January.  I think it's, like, the
22   second Wednesday in January you start.  And then
23   it goes through -- they budget for 18 weeks.  We
24   do have a week off in March for town meeting.
25        But every year that I've been there,

Page 12

1    with the exception -- I think every year, maybe
2    one that we've gone beyond that.  So I may go
3    into -- I mean, it's gone into June at least two
4    years, if not three.  At least two.  And then the
5    others have gone into late May.
6    Q.  Okay.  And how often do you meet when you're in
7    session?
8    A.  Well, the session is -- except for the first
9    week, when we start on Wednesday, it's Tuesday
10   through Friday is the -- is when we technically
11   meet, yes.
12        But there are things on Mondays
13   that -- they might have a special committee
14   meeting or there might be a hearing on Monday,
15   so...
16   Q.  Okay.  And so you're elected to that role.  How
17   long will you serve in that position?
18   A.  How long have I served?
19   Q.  How long will you?
20   A.  Will I serve?
21   Q.  Yeah.  How long is, I guess, your appointment?
22   A.  Oh, it's -- it's elected for two years.
23   Q.  Okay.  And when were you most recently elected?
24   A.  Well, this will -- I'll -- I would be -- if I run
25   again, I'll be up for election next fall.

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 13

1  Q.  Okay.
2  A.  So it expires after -- well, my appointment
3      actually expires next -- the day that they swear
4      in the new members, which will be January of '21.
5  Q.  Okay.  And so you've listed here on page 2 of
6      Exhibit 1 "Publications:  None within the last
7      20 years"?
8  A.  That's correct.
9  Q.  Is that typical for someone in your role not to
10     do any publication?
11 A.  I think so.  I mean, I -- it varies, but I'm not
12     an academia.  So if I was a -- and many people --
13     if you're referring to forensic economists, many
14     forensic economists are still at university, so
15     they may publish work.
16         So it runs a gamut.  Some people write
17     and some people -- when I -- that -- if I was --
18     if I was so inclined would be the National
19     Journal of Forensic Economics, but I haven't
20     seemed that interested in writing an article.
21 Q.  Okay.  So your -- on the first page, under the
22     "Consulting activities" for your economics
23     consultant position, it says "I have consulted in
24     the areas of hazardous and municipal waste, land
25     use/development, pollution abatement,

Page 14

1      agriculture, child support, investment analysis
2      and forensic economics."
3         What percent of your work would you
4      say is forensic economics?
5  A.  Well, you want over the whole 38 years or would
6      you like a shorter period?
7  Q.  Let's do over the whole -- the whole time you've
8      been consulting.
9  A.  Any number I give you, no matter what we do, is
10     going to be a guess.
11 Q.  Sure.
12 A.  But I would say that over the whole 38 years,
13     probably 70 percent.
14 Q.  Okay.  What about in the last five years?
15 A.  Pretty much 100 percent.  I'm trying to think.  I
16     don't -- I still get solicitations if I'm
17     interested in submitting a proposal from the
18     State of Vermont and for other federal government
19     and that kind of stuff.  And I -- at my age,
20     I'm -- I have a full plate just doing this
21     part-time, legislature, and other interests that
22     I have, so I'm not -- I don't look for any
23     outside work other than the forensic -- I don't
24     look for it, but I get calls.
25 Q.  And so the next line reads "I have been retained

Page 15

1      in over 2,500 lawsuits covering lost business
2      profits, personal injury, wrongful death,
3      wrongful discharge, malpractice, bankruptcy, and
4      income taxes."
5         How many of those 25 -- over 2,500
6      lawsuits were relating to wrongful discharge,
7      understanding you have --
8  A.  Yeah.
9  Q.  -- to make an estimate?
10 A.  Well, let me preface that question that I don't
11     think I ever did an employment case until
12     somewhere in the early 1990s, somewhere between
13     1990 and '95.  And, again, I'm guessing here, but
14     I think maybe it was one.
15         And then, from '95 to 2000, then maybe
16     I did ten.  And then after 2000, there was a lot
17     of them.  I would say that probably since 2000 or
18     2005, 20 percent of the cases I'm involved in
19     have to do with employment.
20 Q.  Okay.  And in those cases, are you typically
21     retained by the plaintiff, or by the employee, I
22     guess?
23 A.  Particularly with regards to employment cases, I
24     have a much higher percentage plaintiff than I
25     have defense, although I do work on occasions for

Page 16

1      defense.  If there's -- somebody else hires
2      somebody else, then I'm -- I'm retained to review
3      the analysis.
4  Q.  Okay.
5  A.  But particularly in -- in employment cases, it's
6      probably 75 percent for -- or maybe slightly more
7      for plaintiffs.
8  Q.  Okay.  Meaning the employee versus the employer?
9  A.  Yeah.
10 Q.  Okay.
11 A.  Yes.
12 Q.  And in how many cases have you testified at
13     trial, any type of case, not just wrongful
14     discharge?
15 A.  Oh, boy.  I haven't testified very much recently
16     at trial.  There's been -- at least from my
17     observations, there's been kind of a structural
18     change in -- in litigation, and particularly
19     regards to at least hiring of and using of
20     economic experts.
21         So I -- I think I sent you the
22     four-year summary, which was -- and I don't think
23     there were any trials on that.  You know, I
24     haven't -- I'm trying to think of the last time
25     I've testified at trial, but I'd say it must be

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 17

1    four, five years ago anyways.
2         But I used to do it much more often in
3    the -- in the '80s and the '90s and even into the
4    early part of 2000. But even the same with
5    depositions. You know, I -- I think I sent you
6    the -- the Rule 26 disclosure on that. I think
7    there were just 12. And I think, moving that
8    forward six months, I dropped seven cases, you
9    know, running total.
10   Q.  Mm-hmm.
11   A.  If you went back and took a look at this, let's
12   say, 15, 20 years ago, there'd be over 100, a
13   little over 100. And many of them -- I want to
14   say maybe 20 percent of them would be trials.
15   Q.  Okay. In how many cases have you testified at
16   trial that were employment disputes?
17   A.  I can't give you an answer. I don't know. I'm
18   sure that -- I know -- I know there's been some,
19   but I can't tell you if it's been more than two
20   or more than ten. I just -- I don't remember.
21   Q.  Okay.
22   A.  But I think it's safe to say that the percentage
23   of cases that go to trial, in my experience, is
24   less for employment cases than it is for maybe
25   personal injury or -- or wrongful death.

Page 18

1    Q.  Okay. So --
2    A.  They get settled out before.
3    Q.  So you think probably you've testified at trial
4    in more personal injury cases than --
5    A.  Oh, yeah.
6    Q.  -- employment disputes because more of those go
7    to trial?
8    A.  Yes. I definitely have. Even in the last
9    20 years, it's been more -- I've testified more
10   at a combination of personal injury or wrongful
11   death cases than I have employment cases.
12   Q.  Okay.
13   A.  Definitely.
14   Q.  And have you ever been disqualified as an expert?
15   A.  No. I'm not sure how to -- let me explain. Back
16   in -- right after Daubert came out, I was
17   testifying on a trial in a personal injury case
18   and I was testifying about household services.
19        And at that time, there was a study
20   out of Cornell that looked at the amount of time
21   individuals spent performing household services.
22   It looked at it by sex and number of children and
23   whether you're employed or not employed.
24        And the attorney on the other side
25   objected and said that this was -- there was --

Page 19

1    that it wasn't scientifically sound.
2         And the judge, who I know, had just
3    got back from Maine attending a Daubert hearing.
4    And he -- so he implemented the Daubert hearing,
5    said I couldn't testify because of that.
6         What was really interesting, about six
7    months later same attorney -- this was a wrongful
8    death case where I talked about -- where I --
9    part of the -- one of the elements of damages was
10   loss of household services.
11        So the attorney on the other side for
12   the defense asked for a Daubert hearing. And
13   when I got there, I was basically told, you know,
14   don't worry about it. You know, it's not -- it
15   didn't make any sense to -- you know, to apply
16   Daubert to that testimony.
17        In fact, I even did a -- poor choice
18   of words, but a dog and pony show for the Vermont
19   Bar Association where we read excerpts from the
20   hearing. And there were judges on the panel.
21   And the agreement was that it really didn't
22   apply.
23   Q.  Other than that case, have there been any other
24   cases where you were disqualified as an expert?
25   A.  No. There was one other case where I wasn't

Page 20

1    allowed to testify, but that wasn't my fault.
2    That was the -- the judge ruled that the -- the
3    attorney had not presented -- didn't have -- I
4    forget what the reason was, but I got my name
5    out, that was it.
6    Q.  Okay. What type of case was that?
7    A.  That was a personal injury case.
8    Q.  Okay. And where --
9    A.  It dealt with a woman from Canada in the United
10   States. And so there was an issue about she
11   was -- had become a U.S. resident but had no work
12   experience.
13   Q.  Do you remember what court it was in?
14   A.  Chittenden.
15   Q.  Okay. And have you always been paid to testify?
16   A.  I send a bill out, yes.
17   Q.  Fair enough.
18   A.  And I've been paid most -- most every time.
19   Q.  Okay.
20   A.  There have only been a couple times when I --
21   when I've run into some problems.
22   Q.  Okay. And how do you set your rates?
23   A.  I define them. No. I don't know how I set them.
24   I just, you know, well, I think I'm going to
25   increase them or I think I -- you know, I maybe

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 21

1       want to cut back on my business, so I raise the
2       rates. No secret to it.
3           I do charge one and a half times, or I
4       charge $400 an hour for depositions, where my
5       regular rate is 260. And that 260 is for writing
6       reports and testifying in court.
7           The reason that I charge one and a
8       half is that there was an issue about six or
9       seven years ago with a law firm that I have done
10      a lot of work for, but -- but in this time, they
11      took my deposition and they said that their
12      policy was that they didn't pay for reviewing the
13      deposition, which I might add is not true and
14      actually showed them a bill where they had.
15          Anyway, so I said, Well, I'm not going
16      to argue with you folks. From now on, I'm just
17      going to add -- increase my rate and I won't
18      charge for reviewing it, so...
19 Q.  Got it.
20          ATTORNEY JOSEPH: So let's call this
21      Exhibit 2.
22          (Bancroft Exhibit 2 was marked for
23      identification.)
24 Q.  And so these are the rates that you provided to
25      our office a couple days ago reflecting the fees

Page 22

1      that you've charged in this matter, correct?
2 A.  Yes.
3 Q.  Okay. And these are the fees that you charge for
4      all cases?
5 A.  Yes.
6 Q.  Okay. And do you have any kind of fee agreement
7      in writing for this matter?
8 A.  No.
9 Q.  Okay.
10 A.  I've only had about three of those in my career,
11     I think, maybe four, but they're all out in the
12     Midwest dealing with large -- I was retained by a
13     couple of large utility companies. And so we
14     wrote up an agreement there. But this is
15     Vermont; handshake'll do it.
16 Q.  So is any part of the fee that you would receive
17     related in any way to the success of Plaintiff's
18     case?
19 A.  No.
20 Q.  Okay. And does your fee, understanding your
21     agreement, involve any indemnification?
22 A.  No.
23 Q.  How did you come to be Plaintiff's expert in this
24     case? Who contacted you?
25 A.  Well, I'm not -- someone from Mr. Vitt's office.

Page 23

1      I don't know if it was him. Oh, maybe it was --
2      it might have been...
3          ATTORNEY VITT: Katie?
4          THE WITNESS: It might have been
5      Katie, yes.
6          ATTORNEY VITT: I think it was me, but
7      I'm not sure.
8          ATTORNEY JOSEPH: Okay.
9 Q.  And how many cases have you worked with Mr. Vitt
10     on before?
11 A.  One other. I -- I think that's all I can
12     remember, is just one other.
13 Q.  And that's the Father John --
14 A.  Yes.
15 Q.  -- matter? Okay.
16 A.  What's the last name?
17 Q.  Sorry?
18 A.  What's the last name?
19 Q.  I can spell it.
20 A.  I can't even spell it.
21 Q.  Are you receiving any compensation from Vitt &
22     Associates or from Plaintiff for anything else
23     other than your expert fees in this case?
24 A.  No.
25          ATTORNEY JOSEPH: We'll mark this as

Page 24

1      Exhibit 3.
2          (Bancroft Exhibit 3 was marked for
3      identification.)
4 Q.  So this is a -- Exhibit 3 is a list of all of the
5     matters in which you've provided expert testimony
6     for the last four years; is that correct?
7 A.  Yes.
8 Q.  And at the top of this, it says "October 2015
9     through September 2019." But is this still an
10     accurate list as of today, October 30th, 2019?
11 A.  Well, the only addition would be today.
12 Q.  Right. Okay. But no other additions besides
13     today?
14 A.  No.
15 Q.  So are any of these employment cases, aside from
16     Number 2?
17 A.  Number 2. Number 9, West & Ferris. There were
18     actually -- there were two separate cases.
19 Q.  So just Number 9?
20 A.  Yeah. I've been trying to remember Number 8. I
21     don't -- I can't tell you whether that was a --
22     for some reason, I think it -- it -- it was one
23     of these unusual ones. I think it may have had
24     to do with contracting a consultant or -- I don't
25     remember much about it, but -- so maybe 8.

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 25

```
 1   Q.  Okay.
 2   A.  But definitely 9.  And I don't -- and 2 we just
 3       mentioned.
 4   Q.  Right.
 5   A.  And I think none of the -- the rest are either
 6       lost business profits, personal injury, or
 7       wrongful death.
 8   Q.  Okay.  And so for Number 9, were you retained by
 9       counsel for the plaintiff?
10   A.  Yes.
11   Q.  Okay.  And I think you had mentioned earlier that
12       you have been retained as counsel for a
13       defendant -- or as an expert by counsel for a
14       defendant before or an employer.  Do you remember
15       which cases those were?
16   A.  I don't.
17   Q.  Okay.
18   A.  And I -- it seems to be the case, particularly in
19       the last 15 years, that even when I'm retained,
20       I'm not necessarily disclosed.
21   Q.  Okay.
22   A.  There has to be a really egregious error on the
23       part of the plaintiff's expert that the defense
24       would want to put me on; otherwise, it's -- I
25       provide them with -- I may provide them a report,
```

Page 26

```
 1       I may not, but critiquing the analysis.
 2   Q.  Got it.  So what did you do to prepare for your
 3       deposition today?
 4   A.  Yest- -- not yesterday.  Monday I went through my
 5       file.
 6   Q.  Okay.
 7   A.  And then I -- yesterday I did -- I came down here
 8       at the request of Mr. Vitt and met with him for
 9       about -- met with Mr. Vitt and Ms. Kramer for
10       about an hour and a half.
11   Q.  Okay.  You said you looked through your file.
12       What documents are in your file?
13           (Julia Korkus entered the deposition.)
14   A.  I have my October 1st, 2019, report and my
15       preliminary report from October of 2018.  And
16       I've got handwritten notes.  And I've got tax --
17       some W-2s.  Several e-mails from Ms. Korkus.
18           Benefit statement from
19       Dartmouth-Hitchcock dealing with pensions, health
20       care.  A letter from Dartmouth-Hitchcock to
21       Dr. Porter regarding her benefits at -- pension
22       benefits at the time of her termination.  I've
23       got e-mails.
24           I have pay stubs from the University
25       of Vermont, 2019.  2018 income tax return.
```

Page 27

```
 1       Again, a bunch of W-2s.  More e-mails, e-mails,
 2       e-mails.
 3           I think this may be a duplicate copy,
 4       but it -- a duplicate, but it has to do with the
 5       pensions at Dartmouth.
 6           A letter from Dartmouth dealing
 7       with -- basically what was in -- what I got out
 8       of this was her current pay rate.  I think
 9       there's some fringe benefit information in there.
10           And then I believe Dr. Porter sent me
11       this summary of medical school faculty
12       compensation for all schools.  I printed it out,
13       but I didn't rely on it.
14           ATTORNEY JOSEPH:  Okay.  Could we --
15   A.  Actually, I have this information.
16           ATTORNEY VITT:  Could we do what?
17           ATTORNEY JOSEPH:  Could we go off the
18       record.
19           (Recess taken.)
20           ATTORNEY JOSEPH:  Back on the record.
21   Q.  So you mentioned that you met with Geoffrey and
22       Katie yesterday?
23   A.  Yes.
24   Q.  Did you review any documents with them?
25   A.  No.
```

Page 28

```
 1   Q.  Okay.  And can you give me -- go ahead.
 2   A.  I don't -- at the actual meeting, I did not
 3       review any documents.  When I got home, an e-mail
 4       was sent to me on an issue that we had discussed.
 5       And that was -- had to do with Dr. Porter's
 6       housing in Burlington.
 7           I had been under the assumption, based
 8       on my telephone conversation with her --
 9       obviously, I must have misunderstood or -- that
10       she had a -- wanted a three-bedroom or possibly
11       four-bedroom home so that she could have her
12       family there.
13           And when I got home yesterday
14       afternoon, there was an e-mail waiting for me
15       that said that she -- her place that they bought
16       was only a two-bedroom home, which would have
17       some implications for my rejections of her costs.
18   Q.  Okay.
19   A.  'Cause my costs were based on a three/
20       four-bedroom.
21   Q.  Okay.  We'll get into that --
22   A.  Yeah.
23   Q.  -- a little later.
24           So can you give me a description of
25       the work that you were asked to do, how -- the
```

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 29

1    way that it was described to you on this matter?
2    A.   I don't think there was much discussion.  To be
3         honest with you, I don't remember.  I can only
4         tell you what I -- I think was said, which is
5         pretty much the same in every case, you know,
6         that I've got this case.  It's a wrongful
7         termination or employment case.  Here is the name
8         of the plaintiff.  And here is the name of the
9         defendant.  I would ask for that because I want
10        to make sure I don't have any conflicts.  And
11        they would like to retain my services to develop
12        projections of the individual's economic loss.
13   Q.   What documents were you provided?
14   A.   Boy, it's rather lengthy.  And I should point out
15        that not all the documents I received are in that
16        file.  Many of them that were sent -- they're --
17        I think everything I -- or most everything, if
18        not everything, came PDF.
19             So many of them are on my computer.
20        They were just, you know, large files.  A lot of
21        them had to do with the benefit program.  I did
22        print out one of them.  I think I had '17, '18,
23        and '19, and I only printed out one of them.
24             So I was provided with income tax
25        returns for at least 2018, W-2s for '17 and '18.

Page 30

1    I don't remember if I was provided with a -- I
2    think I was provided with a '17 income tax
3    return.  I don't remember off the top of my head.
4         I was provided with pay stubs at UVM
5    for 2019.  I think I mentioned there was several
6    things on -- on Dartmouth-Hitchcock's fringe
7    benefit program which dealt with medical and --
8    and retirement plans.
9         I mentioned, I think at the -- before
10   we went on break, is that Dr. Porter sent me a
11   list of -- of pay for various doctors.  I printed
12   it out, but I never used it, never relied on it.
13        And then there's a lot of information
14   that was sent to me via e-mail that had to do
15   with questions that I had.  A lot of them had to
16   do -- many of the e-mails had to do with early on
17   in the -- in -- when I was doing my analysis, the
18   preliminary one, and there was some confusion on
19   my part.  At that point, many things had not been
20   established for Dr. Porter, so there was
21   discussions about when she -- what might happen
22   in the future.  So that information is scattered
23   throughout the -- my file.
24        And I did make an attempt to print out
25   any e-mail that was -- that was pertinent or that

Page 31

1    I relied on, but I did not always print out every
2    single one of the attached documents.
3    Q.   Okay.  So you mentioned there were some documents
4         not in your physical file that you had with you
5         today that are on your computer?
6    A.   Yes.
7    Q.   Aside from benefits summaries for
8         Dartmouth-Hitchcock, do you remember what any of
9         those other documents are?
10   A.   Those are the major, I think -- right now, I'm
11        going to say that the only ones I can think of
12        off the top of my head are the whole listing of
13        the Dartmouth-Hitchcock benefits for '17, '18,
14        and '19.  That's all that comes to mind, but
15        there -- there very may well be others; I can't
16        tell you for sure.
17   Q.   And so all of the documents that you relied on
18        are in the file that you brought with you today;
19        is that correct?
20   A.   I believe so.
21   Q.   Okay.  And who all did you talk to about your
22        analysis?
23   A.   Mr. Vitt, Ms. Kramer, Ms. Korkus, and I didn't
24        discuss the results, but I had at least one, if
25        not two conversations with Dr. Porter, but that

Page 32

1    was getting some background information.
2    Q.   Okay.  And how long did you talk to Dr. Porter
3         for, if you recall?
4    A.   You're talking to a person who not only has a
5         short-term memory deficit, but now it's turning
6         into long.  I don't remember.
7              I think one of the conversations
8         was -- was lengthy; less than an hour, but
9         probably longer than 20 minutes.  So I'll give
10        you a range there I think might be a reasonable
11        estimate.  Somewhere between 20 minutes and 60.
12        How's that?
13   Q.   Sure.  So all of the information you used to form
14        your analysis came from either Mr. Vitt's office
15        or Dr. Porter --
16   A.   Yes.
17   Q.   -- is that correct?
18             Okay.  Were there any subjects you
19        were instructed not to address when doing your
20        report, or your analysis, rather?
21   A.   No.
22   Q.   Okay.  Were there any facts you were told not to
23        consider?
24   A.   No.
25   Q.   Did you review any of the pleadings in this case?

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 33

1    A.  That's what I was trying to think, if there had
2        been one of those, if I got a copy of the
3        complaint.  I don't think I did.
4               I apologize.  You know, I have, oh,
5        20 cases right now going, and a couple of them
6        are wrongful termination.  And so it's hard to
7        remember which one I reviewed the complaint on.
8        But the complaints generally aren't terribly
9        relevant for -- other than dates.
10   Q.  And do you have an idea of the substantive issues
11       of this case, or were you more concerned with
12       just calculating the estimated loss?
13   A.  No.  I don't -- I'm sure that I was explained,
14       you know, a lot to do with the termination.  But
15       that's really not relevant for me.  That's not my
16       role.
17              My role is how much -- is to estimate
18       how much the individual would have earned if they
19       continued in the employment they had prior and
20       then offset that by projections of what they'll
21       likely earn given that they're no longer employed
22       with that initial -- original employer.
23              ATTORNEY JOSEPH:  Okay.  So let's go
24       off the record.
25              (Recess taken.)

Page 34

1               ATTORNEY JOSEPH:  Back on the record.
2        I have here what I'd like to mark as
3        Exhibit 4.
4               (Bancroft Exhibit 4 was marked for
5        identification.)
6    Q.  This is the expert report that you provided on
7        October 1st, 2019, correct?
8    A.  Yes.
9    Q.  And this reflects that it was updated or changed
10       from your original October 30th, 2018, analysis;
11       is that accurate?
12   A.  Yes.
13   Q.  Who asked you to make those changes?
14              ATTORNEY VITT:  You mean -- I object.
15       Are you asking him who asked him to provide an
16       updated report?
17              ATTORNEY JOSEPH:  Yes.
18   A.  I'm not sure if it was Mr. Vitt or Ms. Kramer,
19       but it was understood that my first report was
20       preliminary and there were lots of issues that
21       were still up in the air and that it was
22       understood that my report would need to be
23       updated with the passage of time as new
24       information became available.
25              So I'm not sure anybody called up, but

Page 35

1        there was an understanding that this had to be
2        updated.  And I think that's the -- the phone
3        call I got, and I -- it may have been from
4        Ms. Korkus, that it was time to update the
5        analysis, that there was a -- I think disclosure
6        was coming -- a disclosure was coming up.
7    Q.  You said a lot of issues were up in the air.
8        What issues were those?
9    A.  Well, at the time I did my initial report, she
10       hadn't been at UVM very long.  There was issues
11       about whether she was going to be working more.
12              There was an issue about whether she
13       was going to get a grant; and if so, maybe she
14       would get a promotion.
15              I'm not sure at that juncture if she
16       had actually bought that -- bought a house.  I
17       was under the assumption that she hadn't and that
18       she was looking for a three- to four-bedroom.
19              So there were lots of things in order
20       to just get out a preliminary report that I was
21       requested, but there were a lot of -- I
22       felt that -- with the passage of time that we
23       could update the report and wouldn't have to make
24       projections based on what might happen.
25   Q.  When you say "she," you mean Dr. Porter, the

Page 36

1        plaintiff, right?
2    A.  Yes.
3    Q.  Any other issues that you remember specifically
4        that were up in the air that needed to be changed
5        in the second report?
6    A.  Well, there always was the issue about what she
7        would be doing in the future.  So that was an
8        issue back in the -- in the original preliminary
9        report.
10              And I -- and I knew that that was
11       still an ongoing issue, that there was some
12       uncertainty what she would do in the future.  So
13       that was always -- I knew that was an issue that
14       had to be revisited.
15   Q.  Anything else?
16   A.  Not that I can think of.
17   Q.  Okay.  And so, in your report, you go through two
18       scenarios, Scenario A and Scenario B.
19              And so the first scenario is assuming
20       that Dr. Porter leaves her full-time position at
21       the University of Vermont Medical Center in
22       June 2021 and obtains a half-time position closer
23       to home in Norwich, Vermont, while continuing to
24       work one day a week at University of Vermont
25       Medical Center; is that correct?

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 37

1   A.  Yes.
2   Q.  And then Scenario B you assume that Dr. Porter
3       will continue to work part-time at the University
4       of Vermont Medical Center two days a week after
5       she resigns her full-time position in June 2021.
6       And this scenario assumes that she would not be
7       able to find suitable employment close to her
8       home; is that correct?
9   A.  Yes.
10  Q.  What's the basis for the assumption that
11      Dr. Porter will leave her full-time position at
12      the University of Vermont in June 2021?
13  A.  That was information that Dr. Porter expressed to
14      me, that she didn't know how long she would stay
15      at UVM.  She made it clear that this wasn't an
16      ideal situation.  She enjoyed the work, but she
17      didn't like being away from her family and having
18      to commute.
19  Q.  So did she give you the specific date of
20      June 2021?  Why was June specifically chosen?
21  A.  She was the source of that information.
22  Q.  Okay.
23  A.  And I don't know why she -- why she picked June
24      as opposed to May or July.
25  Q.  And she said she didn't like being away from her

Page 38

1       family.  So that refers to her husband and her
2       children?
3   A.  Yes.
4   Q.  Okay.  And where do her husband and children
5       live?
6   A.  In Norwich.
7   Q.  Okay.  Are you aware that her children are -- do
8       they live there full-time, that you know?
9   A.  I don't know that.
10  Q.  Okay.  So in your report, Exhibit 4, you have a
11      list of assumptions, 1 through 15, it looks like,
12      for each of the scenarios and then also for each
13      of the scenarios a chart with projected lost
14      earnings.  Is that correct?
15  A.  Yes.
16  Q.  And are all of the assumptions that you made in
17      creating the projected lost earnings in
18      Scenario A listed on this assumptions page for
19      Scenario A?
20  A.  Yes.
21  Q.  And are all of the assumptions that you made in
22      conducting your analysis of projected lost
23      earnings under Scenario B listed under the
24      assumptions page for Scenario B?
25  A.  Yes.  I don't know.  Just to be -- put a fine

Page 39

1       point on it, technically, I did rely on another
2       piece of information; that is, her work life.
3       And so that's not -- that's identified on the --
4       on the spreadsheet itself.
5   Q.  Okay.  So outside of what's contained in
6       Exhibit 4, there are no other assumptions that
7       you used in creating your analysis for either
8       scenario?
9   A.  Well, we did have a discussion about how long she
10      might work.  And that was sort of the -- she
11      could -- there's a possibility she would have
12      worked out to age 70 --
13  Q.  Okay.
14  A.  -- under the right circumstances.
15  Q.  Okay.  And I think that's reflected on the charts
16      for both -- for both scenarios.  Is that correct?
17  A.  Yes.
18  Q.  And so are there any other assumptions that you
19      used in coming up with the projected lost
20      earnings for either scenario that aren't in
21      Exhibit 4?
22  A.  I don't think so.  I can't think of anything.
23  Q.  Okay.  And can you, I guess, just give me an
24      outline of the general methodology you used to
25      create these projected lost earnings charts?

Page 40

1   A.  Sure.  The first step is to project out what she
2       would have earned if she'd continued her
3       employment with Dartmouth-Hitchcock.  And that's
4       composed of her salary plus the value of fringe
5       benefits.  In this case, fringe benefits that
6       were of value that I valued were contributions to
7       health insurance and also contributions to a
8       retirement plan.
9           And then the next step is to -- well,
10      I guess is looking at post-termination earnings,
11      which again is composed of income plus any
12      benefits that she might receive.  Up through
13      2018, I used what she actually earned, and then
14      in 2019 what she'd earned up through July 31, and
15      then used that as a basis to forecast forward.
16          But anyways, that was -- and then some
17      other assumptions on what she would do after
18      2021, and carried that on out, along with any
19      fringe benefits that might have been available.
20      There wasn't any after July -- after June 2021.
21          And so when -- and so then I'd have
22      the -- I'd have the projections of -- of the
23      Dartmouth-Hitchcock earnings.  And then I would
24      offset that by projections -- or actual and
25      projections of what she would earn

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 41

1    post-termination. And that would be her gross
2    loss.
3            From that, I estimate what kind of
4    income taxes she would have had to pay each year
5    on the -- on the loss. And then the next step is
6    to determine the present value. And the present
7    value, I add interest to historical and then I
8    discount future loss projections to the present.
9            And then the next step -- and then
10   I -- it's a mathematical thing. I have a running
11   total to assist the trier of fact.
12           And then the next important step is
13   estimating the tax liabilities that would be
14   assessed on any award that she might receive.
15   Q. Okay. Was there any other approach that you
16       considered?
17   A. No.
18   Q. Okay. And how did you develop this approach?
19   A. It's an approach that I've been using for -- for,
20       I don't know, 20, 25 years. Same. It hasn't
21       varied.
22   Q. Is it generally accepted amongst economists?
23   A. Yes.
24   Q. Have you seen any other approaches being used to
25       calculate projected lost earnings?

Page 42

1    A. Yes.
2    Q. And what are those?
3    A. Similar to this, where it's -- except for that
4        last component of taxes, it's no different than a
5        personal injury or a wrongful death case where
6        you project out what the person would earn
7        pre-injury and what they earn post-injury or, in
8        this case, pre-termination and post-termination.
9            And in the state of Vermont in state
10       court, at least on personal injury, it is in
11       after-tax dollars. And I think that's the true
12       economic measure of a person's loss, is in
13       after-tax dollars.
14           But because, unlike a personal injury
15       or wrongful death case, the award is taxable, so
16       that's where you need to take -- I need to take
17       account of -- I need to gross up the award to
18       take account of the income taxes that would be
19       assessed on receiving a settlement amount.
20   Q. Is there any other way of doing it that you've
21       seen anyone use?
22   A. Well, I have over the years seen people ignore
23       that last income tax thing. They -- where
24       they've -- I guess I don't want to put words in
25       their mouth, but I assume that they were assuming

Page 43

1    that it was a wash, that they wouldn't back out
2    income taxes from each year, and therefore they
3    didn't need to gross it up at the end, but that's
4    inappropriate.
5    Q. Why is it inappropriate?
6    A. Well, because if I was -- if I was owed by an
7        employer $50,000 a year for the next ten years
8        and I received $50,000 in each of the next ten
9        years, I'd have some sort of tax liability. Say
10       for the sake of mathematics we'll assume it's
11       $5,000. So over that ten years, I would pay
12       $50,000 in income taxes.
13           But now you give me a half a million
14       dollars, my taxes are going to be greater than
15       $50,000 because I'm going to be pushed into a
16       higher marginal tax bracket.
17           And as you can see from my
18       calculations, once you get above that $500,000
19       after-tax loss, the next -- not the -- it would
20       be the third -- third-to-last column, you've got
21       to give about 85 percent -- you've got to gross
22       that up by 85 percent to cover the taxes. What's
23       insidious about it is that you've got to pay
24       taxes on taxes.
25   Q. When did you do this analysis?

Page 44

1    A. The October 1st, 2019?
2    Q. Yes.
3    A. It was done sometime in the last couple weeks of
4        September of this year.
5    Q. Okay. And when did you do the analysis that
6        resulted in your original October 30th, 2018,
7        report?
8    A. I would say in September, the month prior to it.
9    Q. How long did it take you to do your original
10       analysis from the first report in 2018?
11   A. First report, I want to say maybe ten hours.
12   Q. Is that typical?
13   A. It might have been a little more. I think what
14       was maybe a little unusual is the amount of time
15       we spent on telephone conversations.
16   Q. Okay. And why do you say unusual?
17   A. Well, I generally don't ever -- not ever. I
18       generally do not talk with the plaintiff.
19       Information generally comes to me from the --
20       from the -- through the attorney. So that may be
21       that one thing that's unusual.
22           And it did seem to me there was a lot
23       of -- particularly back in -- in '18, when we
24       were discussing what her options were at UVM and
25       what might happen, there was -- there was a lot

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 45

1      of back-and-forth at that time.  So there was,
2      you know, a lot of e-mails, which add time.
3  Q.  Mm-hmm.  Why do you think you spoke to the
4      plaintiff in this case as opposed to typically
5      you said you wouldn't?
6  A.  Well, I -- the reason, that had to do with the
7      kind of questions I was asking about.  And the --
8      most of them had to do, not all of them had to do
9      with what was going to happen at UVM.
10  Q.  How long did it take you to do your analysis, the
11      updated analysis that resulted in the
12      October 1st, 2019, report?
13  A.  I'm going to say maybe six hours.
14  Q.  And is it typical for you to need to update a
15      report after some period of time?
16  A.  Yes.
17  Q.  Did you have any assistance from anyone else in
18      preparing either report?
19  A.  No.
20  Q.  Did you consult any literature to prepare the
21      report?
22  A.  No, I didn't.  I mean, I have in the past.
23      Again, I've been using this for 25 years.  So
24      when there's something in -- generally it's in
25      the Journal of Forensic Economists that might

Page 46

1      have something to do, that obviously I review
2      that; but the basic methodology hasn't changed.
3  Q.  Okay.  So in this case, you didn't review any
4      outside source for --
5  A.  For this case, no.
6  Q.  Okay.  So looking specifically at the scenarios.
7      It looks like the analysis and the calculation
8      through 2020 are the same for Scenarios A and B.
9      Is that correct?
10  A.  I'm sorry.  I didn't --
11  Q.  It looks like the analysis and the calculations
12      for Scenarios A and B are the same through 2020.
13      Is that accurate?
14  A.  I believe so.
15  Q.  Okay.
16  A.  They should be, yes.
17  Q.  And so the assumptions for the calculations made
18      through 2020 for Scenarios A and B are the same,
19      correct?
20  A.  The projections through -- want to give me those
21      years again?
22  Q.  Yeah.  The assumptions that you made in
23      calculating the projected lost earnings for the
24      years 2017 through 2020 are the same for
25      Scenarios A and B?

Page 47

1  A.  Yes.  Through 2020, yes.
2  Q.  And so the report indicates that Dr. Porter is
3      currently working full-time at the University of
4      Vermont Medical Center.  Do you know when she
5      began that work?
6  A.  No, I don't.
7  Q.  Okay.
8  A.  That information may very well be in some of my
9      documents there.
10  Q.  Okay.
11  A.  But it wasn't critical to my analysis, because I
12      actually knew what she actually earned, and
13      the representation was this was -- what she'd
14      earned for the first seven months of 2019 was
15      indicative of what she'd earn for the next nine,
16      ten months.
17  Q.  Okay.  And that was what Dr. Porter represented
18      to you?
19  A.  By counsel.
20  Q.  Okay.  So looking at the assumptions page for
21      Scenario A in the reports, which I think is the
22      third page.  So Footnote 1 lists the assumptions
23      that you made in calculating the projected lost
24      earnings column 1 in your chart; is that correct?
25  A.  Yes.

Page 48

1  Q.  Okay.  And that's the same, these footnote
2      numbers match up with the columns throughout both
3      scenarios in the chart?
4  A.  Yes.
5  Q.  Okay.  So this states Footnote 1, Assumption 1 is
6      "The projection of Dr. Porter's 2017
7      Dartmouth-Hitchcock Medical Center income is
8      composed of her actual DHMC income, an additional
9      $68,000 of disability income and one and a half
10      months at her full-time salary of $305,539."
11          How did you determine her actual
12      Dartmouth-Hitchcock income?
13  A.  There is a document in my folder that gives her
14      current salary of $305,539.
15  Q.  What type of document was it?  Would it be
16      helpful to actually look at the --
17  A.  Yeah.  If I had my file, I could look at that.
18          ATTORNEY JOSEPH:  Why don't we go off
19      the record.
20          (Recess taken.)
21          ATTORNEY JOSEPH:  Back on the record.
22  Q.  So before the break, we were talking about how
23      you determined Dr. Porter's actual
24      Dartmouth-Hitchcock income.  And you had
25      mentioned there was a document in your file that

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 49

1 you would have looked at.
2     Could you tell me which documents
3 those would be?
4     ATTORNEY JOSEPH: Actually, let's go
5 ahead and mark this as Exhibit 5.
6     (Bancroft Exhibit 5 was marked for
7 identification.)
8 Q. I'm handing you what's marked as Exhibit 5. This
9 is a copy of the file that you brought with you,
10 except for a couple documents that Counsel has
11 indicated he's reviewing to see whether they are
12 privileged.
13     Could you show me the document in that
14 group of documents that you reviewed to determine
15 her actual income?
16 A. Before I go looking in here -- 'cause I did look
17 before and couldn't find it, but there it is.
18 Q. Okay.
19 A. So that's what I'm going to be looking for.
20 Q. Okay. So this is a document with the heading
21 "Dartmouth-Hitchcock Individual Rate Increase
22 Sheets, Dartmouth-Hitchcock Clinic, 2014 Annual
23 Wage Increase."
24     It looks like it's several documents
25 paper-clipped together. It's towards the end of

Page 50

1 the back, maybe the second from the end.
2 A. There it is.
3 Q. So that's the document you used to determine
4 Dr. Porter's actual Dartmouth-Hitchcock income
5 for 2017?
6 A. Her salary, yes.
7 Q. Her salary, rather. Yes.
8     Did you review anything to determine
9 her actual income?
10 A. Yes. I had W-2s.
11 Q. Okay. And you note also that there is an
12 additional $68,000 of disability income. What
13 was the basis for that number?
14 A. There was a document somewhere in here. I don't
15 know if I'd recognize it, but there was a
16 document. It might have been a 1099. You want
17 me to go through this and --
18 Q. Yeah.
19 A. -- see if I can find it?
20 Q. That'd be good if you can find which one it is.
21 A. Okay. Let me close this up.
22     Okay. There's one. I'm looking at
23 this document that was clipped together.
24 Q. Okay.
25 A. And it was sort of toward the back.

Page 51

1 Q. Okay. It looks like this one.
2 A. And then fifth page in. I believe that this is
3 part of the -- what I was assuming for workers'
4 comp, $51,522.29. And then it's 2017. And I
5 don't think I've missed anything, but I very well
6 may have. Let's see.
7     There is one from Unum Life Insurance
8 for 17,000 -- Social Security earnings,
9 17,041.70. I'm not sure if that --
10 Q. Where is that?
11 A. Well, it's one, two, three, four, five pages from
12 the back. Although, I'm questioning -- I assume
13 that that was -- those two will add up to the
14 68,000, roughly.
15 Q. Okay. So you're referring to, for the record, a
16 W-2 from Unum Life Insurance Company and a W-2
17 from Hartford Life Insurance Company, both for
18 2017?
19 A. Yes.
20 Q. Okay. And those documents were the basis for the
21 $68,000 in disability income for Assumption 1 for
22 Scenario 1?
23 A. I believe that to be the case, yes.
24 Q. Okay. So the next item that you list as the
25 basis for your projection is one and a half

Page 52

1 months at Dr. Porter's full-time salary of
2 $305,539.
3 A. I'm sorry. Where are you reading now?
4 Q. I'm sorry.
5 A. Are you reading --
6 Q. I'm reading --
7 A. -- Footnote 1?
8 Q. -- Footnote 1 in, yeah, the assumptions page for
9 Scenario 1.
10 A. Yes. Okay. Yeah.
11 Q. So what was the basis for using one and a half
12 months?
13 A. I believe that's information I was provided. It
14 very well may be in one of these e-mails, but I
15 was provided with information that she would go
16 back to work -- would have gone back to work if
17 she hadn't been terminated from Dartmouth, that
18 after being on disability, she would have gone
19 back to work in mid-November 2017 full-time.
20 Q. Okay. And did she tell you what the basis for
21 that was, or she just gave you that date?
22 A. I don't remember what the basis was.
23 Q. Okay. Do you know if there was one that was
24 provided to you and you just don't remember it,
25 or there --

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 53

```
 1   A.  I don't remember.  What was important is what she
 2       said.
 3   Q.  Okay.  Understood.  You've assumed that in
 4       July 2018 her salary would increase by
 5       2.5 percent.  And this is, again, in Footnote 1
 6       for the assumptions for Scenario A.
 7           What's the basis for the 2.5 percent?
 8   A.  That's information provided by Dr. Porter.
 9   Q.  Okay.  And do you know what the basis was for
10       that number from her, or she just gave you that
11       number?
12   A.  I believe, and I could tell the -- the lengthy
13       telephone conversation we had, she expressed that
14       she believed that she would get promoted next
15       year, 2018.  And it was her estimate that the --
16       she thought the increase would be at least 5 --
17       at least 5 percent, so...
18   Q.  Oh, I'm asking about the 2.5 percent --
19   A.  Oh.
20   Q.  -- assumption for the increase in July 2018.
21   A.  Oh.  Oh, okay.  No.  That -- that is an
22       assumption I made based on recent salary
23       increases.
24   Q.  For Dr. Porter?
25   A.  No.  I did not look at the -- I didn't have a --
```

Page 54

```
 1       I don't have a lengthy series, at least current,
 2       of what's happening for doctors, but I do have
 3       information on how salaries in general have
 4       increased nationally.
 5   Q.  Okay.  What's the source for that information?
 6   A.  US Bureau of Labor Statistics.
 7   Q.  Okay.  And do you typically rely on that source
 8       for --
 9   A.  Yes.  Yes.
10   Q.  Okay.  And are the numbers provided there broken
11       down by industry, or is it just salaries
12       generally?
13   A.  You can find total compensation by various
14       industries.  They look at service industries,
15       manufacturing, transportation.  I can't think of
16       one that really would -- that fits with people in
17       health care.  I guess that may be services, but
18       services covers such a -- a wide swath from
19       retail clerks to -- to other people.
20           So I looked at the -- and, again, it's
21       not precise.  I looked at what's happened to
22       wages.  I know wages -- what happened to wages
23       from -- you know, you tell me what period you
24       want me to tell you what happened, I'll tell you
25       roughly how they increased.
```

Page 55

```
 1           But recently, wages have -- after the
 2       recession, wages were increasing at about 1,
 3       1-1/2 percent, somewhere -- in some years,
 4       between 1-1/2 and 2 percent.  They're now
 5       increasing at 2-1/2 to 2 plus.  That's just the
 6       income side.
 7           If you look at total compensation,
 8       which is also reported by the US Bureau of Labor
 9       Statistics, which takes into consideration not
10       only wages but also the value of fringe benefits,
11       that number tends to be at least a half percent
12       higher.
13   Q.  So the 2.5 percent that you got from the
14       US Bureau of Labor Statistics was a number across
15       all industries and professions?
16   A.  Yeah.  I -- again, I -- I can't say specifically
17       that I went and looked at that series for this
18       case, but I look at it all the time.  And, you
19       know, it wasn't I used this year or these three
20       years, but this is what I believe to be a
21       conservative estimate of what her salary would
22       increase at actually.
23           And I say conservative because it
24       really is based on what it's looking like what
25       salaries are going to be increasing at in the
```

Page 56

```
 1       last year and -- and at least into the near
 2       future.  And then, when you add in the value of
 3       fringe benefits, that number should be higher.
 4           So I -- if we were sitting here and I
 5       was working for the defense and somebody had
 6       3 percent, I would be hard-pressed to argue with
 7       them.
 8   Q.  So the 2.5 percent is just the number that you've
 9       used in cases this year as the metric for salary
10       increases?
11   A.  I think it's a reasonable estimate, a
12       conservative estimate of what salary -- how
13       salaries will increase -- how her salary would
14       increase.
15   Q.  So continuing in the first assumption here.  And
16       I think you had touched on this earlier.  You
17       state that "The 2019 projection is based on the
18       assumption she would be promoted to a full
19       professor and receive a 5 percent salary
20       increase."
21           And what was the basis for that?
22   A.  From information provided by Dr. Porter.
23   Q.  And so the 5 percent salary increase was based
24       on --
25   A.  Yeah.
```

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 57

```
 1    Q.  -- what Dr. Porter said?
 2    A.  Yeah.  I asked her what she thought would be
 3        reasonable and she thought 5.  I believe she said
 4        at least 5 percent.
 5    Q.  Okay.  Did you review the rate of her
 6        compensation increases during her employment with
 7        Dartmouth-Hitchcock?
 8    A.  No, other than I had four, five years of W-2s.
 9        But I don't remember what they were.  I don't --
10        I did not -- I don't think I wrote them down.  I
11        might have.
12            Yeah, I did have a series.  I know
13        what her -- what her actual earnings were for tax
14        purposes up through -- from 2014.  And now I --
15        and I have 2018 now, too, so...
16    Q.  Okay.  So did you look at the percentage
17        increases in her compensation from year to year?
18    A.  Well, there was a significant increase from '14
19        to '15, but then '16 and '17 were lower.  And I
20        understand that was due to some health issues.
21            And I see, if you -- if you can find
22        my handwritten notes that says "Porter."
23    Q.  So this is the document that says "Porter" on the
24        top and then it looks like "D of T 6-3-17" --
25    A.  Yes.
```

Page 58

```
 1    Q.  -- "Age 54, 7 months."  I'm just reading what it
 2        is so that we know which document.
 3    A.  Yes.  You'll notice that, if I could, I -- the
 4        calculation of the 68,000 can be found there in
 5        '17 over at Baystate, Hartford, Abvie and Unum.
 6            COURT REPORTER:  AB?
 7            THE WITNESS:  It looks like A-b-v-i-e.
 8    A.  Anyways, you'll see -- it's my understanding that
 9        she had health issues and that's why the income
10        was -- declined in '16 and that continued over
11        into '17.
12            So the point being, is that '16 and
13        '17 are not indicative of what -- her salary
14        increase because there was an exogenous factor
15        causing that to go down.
16    Q.  Okay.  So you weren't able to look at any
17        compensation increases --
18    A.  No.  I --
19    Q.  -- historically for her?
20    A.  I looked at '14, '15.
21    Q.  Okay.  But aside from '14 or '15, no; is that
22        correct?
23    A.  Yes.
24    Q.  Okay.  So the last sentence in Footnote 1 for the
25        first assumption for Scenario A is that in
```

Page 59

```
 1        subsequent years you've assumed Dr. Porter would
 2        receive annual wage increases of 2.5 percent.
 3            What's the basis for that 2.5 percent?
 4    A.  We discussed it when we were talking about in
 5        July of '18 the 2.5 percent.
 6    Q.  Okay.  So moving on to Footnote 2 or Assumption
 7        Number 2.  You state "Dr. Porter's fringe
 8        benefits, given her continued employment with
 9        DHMC, include the medical center's contribution
10        to health insurance and a retirement plan."
11            Are those the only two components that
12        you used to estimate fringe benefits?
13    A.  Those are the only two that I had of -- there are
14        other fringe benefits offered by Dartmouth, but
15        these are the two that have value.  I mean, they
16        offer life insurance; but I'm assuming she lives,
17        so --
18    Q.  Okay.
19    A.  -- no value.  And there are some other ones, too.
20    Q.  What were the others that you --
21    A.  Well, Social Security.  But I did not include
22        Social Security in there because she's at
23        least -- in most years, she's over the -- it's
24        about $132,000, I think is the cap that you
25        assess the 5.4 percent, which is -- or
```

Page 60

```
 1        5.5 percent, which is the old age of retirement,
 2        which you hope you're going to get back when you
 3        retire.  I probably -- I might get most of it
 4        back, but I don't know about you.
 5    Q.  We'll see.
 6    A.  So I didn't include that because it --
 7        post-termination, I assume that she's -- you
 8        know, that's going to be covered, she's going to
 9        be earning at least that much.
10    Q.  Okay.  Anything else that you didn't include in
11        fringe benefits?
12    A.  I don't remember.  I had the documents with the
13        fringe -- various fringe benefits they had.  You
14        know, they have a wellness program and, you know,
15        et cetera, et cetera.  But the two of significant
16        value were the health insurance and the
17        retirement.
18    Q.  Okay.  But you reviewed all of the other --
19    A.  Well --
20    Q.  -- benefits offered by --
21    A.  -- I read the document.
22    Q.  Okay.
23    A.  If you look at my reports, whether they be
24        personal injury or wrongful death or employment,
25        there's generally only three fringe benefits that
```

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 61

```
 1      I value in there:  the employer's contribution to
 2   Social Security, the employer's contribution to
 3   health insurance and the dental and vision, and
 4   contribution to retirement plan.  In this case, I
 5   did not have Social Security in here.
 6   Q.  Okay.  What's the basis for your assumption that
 7      the value of DH's medical insurance contribution
 8      is assumed to be $15,000 in 2017?
 9   A.  Well, actually, I think it's quite conservative.
10      But if you take a look -- I was hoping I could
11      find it and I -- as I said earlier, I think I
12      have your benefits.  And I think I have the one
13      for 2019 and '18.  And I think those may be on my
14      computer, but I'm hoping...
15          On page 14 of that document.
16   Q.  This is the document with --
17   A.  "Your Benefits, Your Health, Choices for Healthy
18      Living."  This is in 2017.
19          If you look at page 14, you'll see
20      that -- what the employee had to contribute,
21      which for a family program was $200 a month,
22      which is very low.  That's $2,400.  A family
23      plan's going to cost at least $25,000.  So my
24      15,000, I'd argue, is very low.  Extremely
25      conservative.
```

Page 62

```
 1          On page 14, that's what -- what the
 2      employee has to pay for -- for a health insurance
 3      plan, which is -- for a family is going to be at
 4      least $25,000.
 5   Q.  When you refer to $200, you mean this entry that
 6      says 198.56?
 7   A.  Yes.  And even if she fell into the FTE between a
 8      half and a little less than three-quarters, it's
 9      still a little less than $300.  So it's -- the
10      15,000 is an extremely conservative number.
11   Q.  What's the basis for assuming the total
12      contribution by DH based on Plaintiff's
13      contribution?
14   A.  On the retirement?
15   Q.  Yes.
16   A.  Well, if I can find that here.  I know it's in
17      the '19 one.  And I apologize.  I thought I
18      printed that one page out.  It may be in here.
19      Let me see if I can find it, if they actually put
20      it in the '17 one.  On page 34.
21   Q.  Okay.
22   A.  If you look at number of base contribution
23      points, she would be 220, I believe, based on my
24      calculations.  What she would be entitled to is
25      7 percent contribution, base contribution, plus
```

Page 63

```
 1      an additional 5 percent because her earnings
 2      would be over 118,500.
 3   Q.  And this is DH's contribution to medical
 4      insurance?
 5   A.  No.  Retirement.  I thought you asked about
 6      retirement?
 7   Q.  I was asking about medical insurance.
 8   A.  Oh, I'm sorry.
 9          ATTORNEY VITT:  No.  You asked about
10      retirement.
11          ATTORNEY JOSEPH:  Okay.
12          ATTORNEY VITT:  I mean, the question
13      was retirement.
14          ATTORNEY JOSEPH:  Oh, okay.
15   Q.  I meant -- sorry.  I meant to ask what the basis
16      was for calculating DH's medical insurance
17      contribution based on her -- her contribution,
18      which was listed on page 14.
19   A.  Well, at the time, I think I -- I think I --
20      trying to be conservative, and I was estimating
21      that the cost would be around 20,000.  And I
22      assumed she was paying, you know, around 3 or 4.
23      So it comes out to be about 16.  I used 15 to be
24      conservative.
25          But, in fact, in going back and
```

Page 64

```
 1      reviewing it, particularly when I took a look at
 2      the '19 one, 15 is way on the low side.  It
 3      probably would be -- a more reasonable estimate
 4      would be 20,000 or more, maybe 22,000.
 5   Q.  And you're basing that just based on your
 6      estimate of what the percent of her contribution
 7      would be versus the total cost?
 8   A.  Yes.  Knowing what -- having a rough idea of what
 9      cost -- medical insurance costs if you go out and
10      buy it as a private individual, versus -- and
11      then comparing that with how much the employee
12      has to contribute, there's quite a differential.
13      And I'm saying the differential's probably at
14      least 20,000, not 15.
15   Q.  And what's the basis for the assumption that the
16      value of DH's contribution to medical insurance
17      would increase at 2.5 percent annually?  Is that
18      the same as the --
19   A.  It's the same -- it is the same as the wages.
20      But actually, I think everybody -- pretty common
21      knowledge that medical expenses have -- insurance
22      premiums have been increasing much faster than
23      inflation or wages increases.
24          And I alluded to that when I said that
25      when you look at wage increases and then you
```

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 65

1    compare that with increases in total
2    compensation, which includes health insurance,
3    it's great -- it's a higher number, 'cause
4    health insurance is going up at a faster rate.
5    Q.   And then going back to what you touched on a
6         moment ago, retirement plan contributions.  That
7         was on page 34, you said.  Could you walk me
8         through how you came up with the 12 percent?
9    A.   34?
10   Q.   Yes.
11   A.   Yes.  That's how I came up with the -- it's the 7
12        plus the 5.
13   Q.   Okay.  So looking at Footnote 4, that's
14        Assumption 4, in Scenario A.  Actually, for both
15        Scenarios A and B, you've noted that for that
16        assumption "Dr. Porter's actual earned income is
17        reported for the years 2017 and 2018."
18            Did you determine her actual income
19        from her W-2s for those two years?
20   A.   Yes.
21   Q.   Okay.  And you reviewed her actual earnings -- or
22        her, I guess, actual earnings from the University
23        of Vermont Medical Center through July 31st,
24        2019, in order to project the rest of her 2019
25        income?

Page 66

1    A.   Yes.
2    Q.   Okay.
3    A.   And there is a pay stub in here.
4    Q.   Okay.  And is the basis for the assumption that
5         this income would increase at an annual rate of
6         2.5 percent the Bureau of Labor Statistics that
7         we discussed before?
8    A.   Yes.
9    Q.   Okay.  What's the basis for your assumption that
10        Dr. Porter will obtain a half-time position as
11        opposed to working full-time?
12   A.   Information provided by Dr. Porter to me
13        personally and then also through counsel.
14   Q.   Okay.  Was it considered that she might work
15        full-time instead of half-time somewhere else
16        after leaving UVM?
17   A.   My recollection of the conversation was that she
18        thought that was the best that she'd be able to
19        get.  She wouldn't be able to get a full-time
20        position.
21   Q.   Do you know why that was?
22   A.   Beg your pardon?
23   Q.   Do you know why that was?
24   A.   No, I don't.  I don't remember.  She may have
25        discussed it.  But again, what I'm interested in

Page 67

1    is, okay, this is what I believe.  And fine,
2    that's good enough for me.  It's not my role
3    to -- to say, Well, I don't believe that or,
4    You're being really conservative.
5    Q.   And is the assumption that her new position would
6         be at the New London Hospital based on
7         conversations with Dr. Porter?
8    A.   I believe it was all brought up in the
9         conversation, but I know most of the information
10        I -- I think was -- was from Dr. Porter, but
11        transmitted to me through counsel.
12   Q.   Okay.  Were there any other positions at any
13        other hospitals or employers considered?
14   A.   No.  I believe in my conversation with
15        Ms. Porter, she indicated that that was the only
16        likely place that she could get a position.  And
17        I think she said she may know somebody there and
18        thought maybe that she might be able to
19        because -- knowing the individual.
20            But again, she wasn't sure that she
21        could -- that was a possibility.  But when I did
22        my initial analysis, I -- you know, obviously,
23        when I do all of these analyses, one of the key
24        parts are what are you going to do going forward?
25        And so -- and many times it's kind of early and

Page 68

1    we have to make some assumptions.  And they may
2    prove to be correct, they may not.  I mean, as
3    time passes, we'll have more information.
4            But so anyways, it is -- she thinks it
5    is a possibility, but I -- I don't want to put
6    words in her mouth, but I think she indicated
7    that it wasn't a certainty, or far from it.
8    Q.   All right.  And you've also assumed that her 2021
9         half-time salary would be $115,000.  What's the
10        basis for that assumption?
11   A.   I was provided -- I can't remember if it was
12        Dr. Porter or if it was through counsel.  They
13        gave me a range.  I want to say it was -- the
14        range was 220 to 240.  And I think you may see it
15        in my written notes of the conversation.  And I
16        took the midpoint, which was 230.  That was for a
17        full-time position.
18   Q.   Right.
19   A.   And then took half of it.
20   Q.   And did you do any independent research on what
21        an appropriate range of earnings would be?
22   A.   No.
23   Q.   And so it also -- you've also written here under
24        Assumption Number 4 "In addition to her NLH
25        half-time position, it is assumed she would

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 69

1   continue to work at the University of Vermont
2   Medical Center one day a week for 48 weeks a year
3   at a 2021 per diem rate of $190 per hour."
4      What's the basis for assuming that she
5   would continue at UVM?
6 A. Well, that's what she said she would do.
7 Q. Okay.
8 A. It wasn't my role to question her.
9 Q. And the one day a week was also something that
10   came from Dr. Porter?
11 A. Yeah, that she would commute there one day a
12   week. I thought that was going to be hard, but
13   she said that she -- that's what she planned to
14   do. It was a possibility, I should put it.
15 Q. And what was the basis for the $190 per hour per
16   diem rate --
17 A. I believe --
18 Q. -- assumption?
19 A. -- the current rate or the rate was 175. And I
20   just increased it, I think, by 2-1/2 or whatever
21   and rounded it up to 190.
22 Q. And so she provided you with the current rate?
23 A. Yes. I think somewhere in this there's an e-mail
24   that says that the current rate is 175.
25 Q. Okay. And is the basis for the 2.5 percent

Page 70

1   increase in income the same source we discussed
2   before with the --
3 A. Yes.
4 Q. -- other 2.5 percent?
5      So looking at Assumption Number 5,
6   what's the basis for the assumption that UVM's
7   contributions to Dr. Porter's retirement plan
8   would be 9 percent?
9 A. I believe that's what she told me. Plus, I had
10   just finished up a case within six months, eight
11   months of this, I think, and I had actual
12   documents from UVM that indicated it was
13   9 percent. I'm -- anyways, I've seen the
14   9 percent.
15 Q. Were there any other post-termination fringe
16   benefits that you considered valuing?
17 A. I didn't. I mean, they're -- again, there'd be
18   Social Security, but I didn't put it in the -- in
19   the pre-injury. And then I -- I think UVM has a
20   wellness program, and so didn't Dartmouth.
21 Q. Okay. And were discussions with counsel or
22   Dr. Porter the basis for your assumption that
23   UVM's contribution to her health insurance policy
24   is comparable to Dartmouth-Hitchcock's
25   contribution?

Page 71

1 A. Yes.
2 Q. Okay. So then moving on to the eighth
3   assumption. And that goes with column 8 in the
4   projected lost earnings charts for income taxes.
5      What tax rate did you use to calculate
6   income taxes?
7 A. I don't remember. It's going to be -- it's going
8   to vary. It would depend on what the income was.
9   It would -- it would depend on what the marginal
10   income was; that is, this is what she -- what
11   she's going to earn now -- best if I -- for me to
12   explain it.
13      If she's going to earn $100,000 now
14   and would have earned 200,000 or -- well, let's
15   make it 300,000. So her loss -- and I'm talking
16   just about income, because fringes aren't -- so
17   her loss in income is 200,000. So what would be
18   the tax on that 200,000 on top of what it would
19   be for the 100,000?
20      I wouldn't count that, but I did look
21   at -- it might be a couple of different marginal
22   tax brackets in there. So if you want to find
23   out what the -- what the actual percentage is,
24   you just would have to go and subtract -- take
25   the income from Dartmouth, minus the

Page 72

1   post-termination income, which would get you your
2   gross income loss, which actually is a little
3   overstatement, because a lot of her income is --
4   you don't have to pay taxes on it because her
5   contributions to retirement and health are not
6   taxable. And then divide that by whatever tax --
7   use that as a denominator and divide that into
8   the -- whatever tax number I have will give you
9   the rate.
10      So in the example that I gave you
11   where I have $200,000 as the loss in gross income
12   and I said that the taxes would be 50,000, then
13   it's a 25 percent rate. But that 25 percent rate
14   may -- may have one rate that it's at 35 percent,
15   another one that's 18. I don't know if I'm
16   making myself clear.
17 Q. So how -- you said you weren't sure which rate
18   you used because it varied. How would you -- if
19   you were to go back and do this, how would you do
20   this? Is there a spreadsheet that you used to
21   calculate this out or...?
22 A. No. I would -- on this particular thing, I take
23   a look at the difference, as I explained, between
24   the pre- and the post-termination earnings, the
25   earnings side of it, and then make -- say --

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 73

1   well, basically what I'm saying is what would the
2   tax be on 300,000, and what would the tax be on
3   100,000. And I subtract one from the other, and
4   that'll give me the tax on the 200,000.
5       So if I earn $100,000 and I pay taxes
6   on that, let's say $10,000, and then if I earn
7   300,000 and my taxes on that are $80,000, then I
8   subtract the 10 from the 80, and my tax on that
9   additional 200,000 is 70,000. So that's
10  basically the process that I'm going through.
11  Q.  Okay. So how did you determine the rate at which
12      each amount would be taxed for each year?
13  A.  You know, for '17, '18, I looked at what tax
14      rates were and I made the assumption that those
15      tax rates will stay the same, although the
16      brackets will creep with inflation, so...
17  Q.  So you made adjustments assuming that the
18      brackets would move up?
19  A.  Yeah. They won't move up much. They move up by
20      inflation. So, you know, if the bracket for
21      the -- the 25 percent rate is -- for a married
22      couple is 100 to 120,000 -- I'm just pulling
23      these numbers out of the air -- then next year it
24      might be from 101,000 to 127,000.
25  Q.  Okay.

Page 74

1   A.  I mean, I don't get -- I don't put that fine a
2       point on it, though.
3   Q.  Would you be able to find the actual rates that
4       you used? Is that written down somewhere?
5   A.  I could. But again, you can find them by taking
6       the number in column -- if you will, column 1 --
7       column 1, which is the gross earned income from
8       Dartmouth, subtract from that the gross earned
9       income from the post-termination. That'll tell
10      you the additional income, the loss income.
11          And then look at what I've calculated
12      for the income tax. And so I would -- the income
13      tax would be the numerator. And the
14      difference -- the lost income would be the
15      denominator. And that'll give you the
16      percentage.
17  Q.  Okay. But you don't have written down somewhere
18      these are the rates that I used in 2025 or --
19  A.  No.
20  Q.  Okay. So looking back at the assumptions page,
21      Footnote 10. That's on page 2 of the assumptions
22      page for Scenario A.
23          And you've stated that "Due to the
24      distance between Dr. Porter's home in Norwich,
25      Vermont and her UVM position in Burlington, there

Page 75

1   are additional employment-related costs. These
2   extraordinary employment costs are estimated to
3   equal $45,300 a year in 2017 dollars."
4       And then you've split out that $45,300
5   into annual housing rental costs of 36,000; 1,800
6   for utilities; 600 for renter's insurance; 2,000
7   for heat; and 91 -- 9,100 miles of travel at
8   $0.53 a mile in 2017.
9       What was the basis for the assumption
10  that housing rental would cost $36,000 a year?
11  A.  Based on one of the -- there may have been more
12      than one. I think there was two conversations,
13      but don't hold me to that.
14          But one of the conversations that I
15      had with Dr. Porter was what she wanted for
16      housing, and that she -- I -- my recollection is
17      that she said she really wanted to lease a
18      three-bedroom, if not a four-bedroom to
19      accommodate her family. That's what she would
20      like.
21          So what I did is I looked at rentals
22      in the Burlington area for three/four-bedroom
23      apartments. And they ranged from anywhere from
24      the low end of 2,300, which I'm not sure that
25      she'd want to live there, all the way up to about

Page 76

1   6,000. And so I looked at what I thought would
2   be reasonable, around $3,000. And there were a
3   lot around that 3,000 range. And I used that
4   figure.
5       But as I indicated earlier in the
6   deposition, I have since found out that she only
7   has a two-bedroom. And so the rent on that would
8   be 18 to 2,000 instead of 3,000.
9   Q.  So $1,800 to $2,000?
10  A.  I beg your pardon?
11  Q.  $1,800 --
12  A.  Yeah. Reduced by 1,000 or $1,200.
13  Q.  You have to --
14  A.  I'm sorry.
15  Q.  -- wait for me, just so she can get it down.
16      Where did you look for rental prices?
17  A.  On the internet.
18  Q.  Okay. Any specific websites?
19  A.  Well, there were specific websites. I can't tell
20      you what they are now.
21          ATTORNEY VITT: You want lunch? It's
22      here. Are you at a good breaking point or do you
23      want to --
24          ATTORNEY JOSEPH: Sure. We can stop.
25          ATTORNEY VITT: It's up to you.

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 77

1    ATTORNEY JOSEPH:  No, that's fine.
2    We'll go off the record.
3        (Lunch recess taken.)
4        ATTORNEY JOSEPH:  So back on the
5    record.
6  Q.  These are some pages that also came from the file
7    that was marked as Exhibit 5 that we'd like to
8    add to Exhibit 5.
9        And so now Exhibit 5 consists of the
10   entire file that you brought with you here today?
11       ATTORNEY VITT:  Yes, it does.
12   Dr. Bancroft would not know, but it is the entire
13   file.
14 Q.  BY ATTORNEY JOSEPH:  So before we took our lunch
15   break, we were talking about the annual housing
16   rental cost estimate in Footnote 10 or
17   Assumption 10 with respect to Scenario A.
18       And I think we had talked about how
19   the monthly cost -- you received information from
20   Dr. Porter or from counsel yesterday indicating
21   that she would be renting a two-bedroom house,
22   which would lower the housing rental cost
23   annually?
24 A.  Yeah.  It's a two-bedroom house that she has,
25   yes.

Page 78

1  Q.  Okay.  And so the figure you would now assume
2    would be $1,800 a month to $2,000 a month for
3    annual --
4  A.  Yes.
5  Q.  -- housing cost?
6  A.  Yes.
7  Q.  Okay.  And you came to that costs conclusion
8    based on the same sources that you used to get
9    the initial annual estimate?
10 A.  I can't say for sure that they are the same
11   sources.  I -- in Google I typed up "rents in
12   Burlington" yesterday, and a whole bunch came up.
13   And they ranged at two bedrooms from -- well, I
14   did see one at 1,300, but then I saw -- there was
15   one-bedroom at 6,800.  Good view, though.
16 Q.  I'm sure.  Okay.  So it was from an internet
17   search that you came up with those --
18 A.  Yes.
19 Q.  -- estimated costs?  Okay.  Got it.
20       So the next assumption that you made
21   was that there would be $1,800 for utilities.
22   Can you give me the basis for that assumption?
23 A.  Well, just practical experience in my own life
24   and also in other cases where I'm looking at
25   where there's a need to quantify that.

Page 79

1        So I'm assuming about $150 a month --
2    I mean $150 a month for -- that would include
3    electricity and if there is gas appliances.
4  Q.  Okay.  Did you review any outside sources to get
5    that estimate?
6  A.  No.
7  Q.  And did counsel or Dr. Porter provide you with
8    any information that you used for that
9    assumption?
10 A.  No.
11 Q.  Okay.  You assumed $600 for renters insurance.
12   What was the basis for that?
13 A.  I asked a couple people who were -- who were
14   renting places what they were paying.  And that
15   was -- it was in that vicinity.
16 Q.  Were they renting in Burlington?
17 A.  I think they were both in Essex, which is right
18   next to Burlington.  Essex is the second largest
19   town in Vermont.
20 Q.  Okay.  Did you ask them any of the terms of their
21   insurance policies or just generally what they
22   were paying for renters insurance?
23 A.  The question what are you paying for your renters
24   insurance?
25 Q.  Okay.  What's the basis for the $2,000 estimate

Page 80

1    for heat?
2  A.  Again, just practical -- my practical experience,
3    both from heating and from, you know, doing this
4    kind of work.
5  Q.  So that's -- both utilities and heat, those are
6    the estimates that you gave assuming that she
7    would have a three- to four-bedroom house?
8  A.  Yes, they were.  Yes.
9  Q.  So would those numbers decrease given that she
10   would be renting a two-bedroom?
11 A.  Probably not the utilities, but the heating
12   might.  The utilities, electricity, you know, I'm
13   trying to think.  You know, some of that might be
14   gas if there's a gas range.  And I don't think
15   the number of bedrooms are going to affect that
16   very much.  I -- electric, I -- I probably
17   wouldn't change utilities, but probably the heat.
18   Might make it 1,500 or something.
19 Q.  And did you consult any outside sources for the
20   number that you estimate for heat?
21 A.  No.  Just, again, based on my personal
22   experience.
23 Q.  And you also estimated or assumed 9,100 miles of
24   travel at $0.53 a mile in 2017.  How much travel
25   does that envision?  Where is that 9,100 miles

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 81

1     coming from?
2     A.  That's 48 trips, round trips, at 180 or 190 miles
3         round trip.
4     Q.  Okay.
5     A.  48 weeks.  So divide 48 and it'll tell you how
6         many miles I'm assuming.  Well, I guess you'd
7         have to -- yeah.  Divide 9,100 by 48.
8     Q.  Right.
9     A.  It'll give you the number of miles round trip.
10    Q.  So you've estimated $0.53 a mile.  What was the
11        basis for that number?
12    A.  That's the federal rate.
13    Q.  Okay.  Did you subtract the estimated cost of the
14        commute Dr. Porter would have to
15        Dartmouth-Hitchcock from her home if she was
16        still employed there?
17    A.  No, I did not.
18    Q.  Okay.  What's the basis for the assumption that
19        her annual costs would increase at a rate of
20        2 percent?
21    A.  Well, projections on what inflation's going to
22        be.
23    Q.  Okay.  So similar to what we discussed before, I
24        believe, for --
25    A.  Yes.  I'm looking at inflation and not wages,

Page 82

1     though.
2     Q.  Right.  Okay.  And what sources did you consult
3         for that number, if any?
4     A.  Again, I -- you can either get it at the Census
5         Bureau or at the Bureau of Labor Statistics.  But
6         I look at that information all the time.
7     Q.  And you assume that the cost per mile in 2021
8         would be $0.59 per mile.  What's the basis for
9         that assumption?
10    A.  I think it's 57 or $0.58 right now, so.  In --
11        yeah, in '19 I think it's 58 or $0.59.
12    Q.  So now you were just sort of projecting out what you
13        thought --
14    A.  Yeah.
15    Q.  -- it would be?
16    A.  Right.
17    Q.  Okay.  Did you consider whether any utility
18        costs, for example, might go down at home for
19        Dr. Porter if she's not living there, if she's
20        living in this rental house instead of at her
21        home in Norwich, when calculating estimated
22        costs?
23    A.  No.  It's my understanding her husband still
24        lives there.
25    Q.  Okay.  Did you estimate that utilities might --

Page 83

1     or consider that utilities or grocery costs might
2     go down when there's --
3     A.  Well, I didn't look at grocery costs.  I'm
4         assuming --
5     Q.  Any costs.
6     A.  -- it's a wash on groceries.  No.  I didn't back
7         out what -- there might be a -- I don't know how
8         they heat their hot water, but I suppose there
9         could be a little savings that she's not taking
10        showers there every day.
11    Q.  What's the basis for assuming that the mileage --
12        the cost per mile will increase at an annual rate
13        of 1.5 percent?
14    A.  Just looking at what's happened to mileage rates
15        over the last four, five years, six years.
16    Q.  Okay.  And so are these -- the annual housing
17        rental, utilities, renters insurance, heat, and
18        the travel mileage costs, those are the only
19        extraordinary employment costs that you're
20        considering in your estimate, correct?
21    A.  Yes.
22    Q.  So you've stated that "Commencing in July 2021,
23        it is assumed Dr. Porter will incur hotel
24        expenses of $2,500 a year, which will increase at
25        a rate of 2 percent per year."  And that "The

Page 84

1     $2,500 figure is based on the assumption
2     Dr. Porter would stay over in Burlington 10 to 12
3     nights a year at a cost ranging from $200 to $250
4     a night."
5             What's the basis for the assumption
6     that she would stay over 10 to 12 nights a year?
7     A.  That was information provided to me, either -- I
8         don't know if that was directly.  I believe it
9         was provided -- Dr. Porter provided that
10        information to counsel and counsel forwarded it
11        on to me.
12    Q.  Okay.
13    A.  There may have been another -- I think there was
14        another phone call in there, so that very well
15        may have been discussed.  I think there was a
16        second phone call.  And that might have been
17        discussed then.
18    Q.  Okay.  But it was either from Dr. Porter or
19        counsel?
20    A.  Yes.  Right.
21    Q.  Okay.  And what's the basis for the assumption
22        that the cost would be 200 to $250 a night?
23    A.  I looked at the best hotel in Burlington, and
24        that's what it was.
25    Q.  Okay.  And do you use a -- what's the basis for

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 85

```
 1      the 2 percent per year increase for hotel
 2      expenses?  Is that the same as the annual costs
 3      2 percent number that you used before?
 4  A.  Yes.
 5  Q.  Okay.  And why did you use a simple interest rate
 6      of 12 percent for interest on historical earnings
 7      losses from 2017 to 2019?  This is in Footnote --
 8  A.  It is the state legal rate in Vermont.
 9          COURT REPORTER:  Did you want to say
10  what footnote number it is?
11          ATTORNEY JOSEPH:  Footnote Number 12.
12          COURT REPORTER:  Thank you.
13  Q.  And I see you used a discount rate of
14      1.46 percent to determine the present value of
15      future income.
16          Did you consider any alternative
17      sources for the discount rate?
18  A.  No.
19  Q.  And then moving to Footnote 14, which is the
20      settlement income tax.  Could you walk me through
21      how you calculated this?
22  A.  It's actually an iterative process, so again,
23      best if I could give you an example.
24          So if I've got a -- an after-tax loss,
25      say, of 200,000 that the person needs to be whole
```

Page 86

```
 1      in a particular year -- or over a number of
 2      years; it doesn't make any difference -- the
 3      question then is how much taxes would they have
 4      to pay?
 5          Now, if you just give them the
 6      200,000, that's all taxable.  That -- and that
 7      $200,000 figure is after taxes.  That's what they
 8      need to be whole.  So I've got to -- you've got
 9      to add some additional money in there.
10          So if you will, this is -- this is
11      sort of the process I go through, but not quite
12      so tedious.  So if I was to get a -- if they were
13      to get an additional 200,000 on top of the income
14      they already earned, how much taxes would they
15      have to pay?
16          So on 200,000, given that they're in a
17      fairly high tax bracket, it -- it might be
18      $80,000.  Or let's say it's 60,000 just to make
19      it easy.  60,000.
20          But now -- so you say, Well, I've got
21      to get them 260,000.  So now they put $260,000 on
22      their tax return.  Now it turns out they've got
23      to pay another 5,000.  On and on.  Eventually you
24      get to a point where you come up with a number.
25      And that's that number in the last column.
```

Page 87

```
 1          If Dr. Porter was awarded the number
 2      in the last column, she would have to pay the tax
 3      that's in the next-to-last column, thereby
 4      netting out what her after-tax loss would be in
 5      that particular year.
 6  Q.  Okay.  And what rate did you use for each year?
 7  A.  I used the current tax rates.  And they're in
 8      2018.  And so each one -- you know, it isn't very
 9      long before, given the high base income they
10      have, that they're in the highest marginal tax
11      bracket of 39.5 and 8 percent for the State of
12      Vermont.  So it's within three -- a couple years.
13      You know, the marginal rate does not change.
14  Q.  So you've used the same tax rates --
15      understanding you used the actual tax rates for
16      2017 and 2018, you used the same tax rate for
17      2019 onward in --
18  A.  The same marginal tax brackets, yes.
19  Q.  Okay.
20  A.  You know, the rate -- there's, what, five --
21      obviously, in the individual years, I -- some
22      of -- well, this income's quite high, so if it
23      wasn't the highest marginal rate, I was pretty
24      close to it.
25          Where when I move over to the
```

Page 88

```
 1      settlement one, because of the amount of money --
 2      they're -- on top of what they already currently
 3      earn, they're very quickly, I think maybe even
 4      the first year, if not the second year of my
 5      analysis, they're moving into the highest
 6      marginal tax bracket.
 7  Q.  Okay.  So assuming that's correct, you used the
 8      same rate for all of the years subsequent to
 9      that?
10  A.  My tax calculations in both columns are based on
11      current tax rates in 2018.
12  Q.  Okay.  Is there a spreadsheet or notes that you
13      have reflecting your calculations?  How did you
14      do those?
15  A.  There is -- there is -- to the -- to the right of
16      the table that I -- and it's in my report.  There
17      are several other columns that feed into various
18      columns within the report.
19          So there is -- there actually may be a
20      column -- there is a column there, I think, that
21      has Dartmouth-Hitchcock earnings.  It's off to
22      the right.  And it just transfers over
23      one-to-one.
24          The fringe benefits for Dartmouth are
25      based on a percentage -- a percentage figure plus
```

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 89

1    the 15,000.  And so that actually is derived by
2    multiplying the numbers in the first column by --
3    I forget, by -- by 12 percent and then adding in
4    15,000.
5         Then, when you get over to the -- the
6    last -- the next-to-last column, there are about
7    four additional columns to the right that go
8    through that whole tax calculation.
9  Q.  But since this doesn't reflect the actual rates
10    that were used, is there anywhere that I could
11    get that information, aside from having to back
12    out the calculation from the total economic loss
13    versus the settlement income tax?
14  A.  Run that by me again.
15  Q.  Is there anywhere that I could get the actual
16    rate that you -- the actual tax rate that was
17    applied to calculate the settlement income tax?
18  A.  Yes.  You can divide column 11 by column -- let
19    me put my glasses on.  You can divide -- if you
20    want the average rate, you can divide -- take
21    column 14 and divide it by the number in column
22    15.
23  Q.  Is there anywhere that you would have written
24    down not just the average rate but how you
25    actually broke down the calculation for each of

Page 90

1    the different marginal tax brackets?
2  A.  As I indicated before, to the right of this
3    spreadsheet there are -- I think it's four
4    columns that actually go ahead and calculate the
5    taxes.
6         It's an iterative process, much like I
7    explained to you before, where I plug in a
8    number, oh, that's not enough, I've got to plug
9    in more, more; eventually I get to a place where
10    it equates.
11         And that -- and that, in this case, I
12    don't know, there may only be one or two years
13    where I don't use the -- the highest marginal tax
14    bracket, but it's very quickly, say no more than
15    three years out.  The formula doesn't change.
16  Q.  Okay.
17  A.  It's the same rate.  Because they're -- they're
18    over half a million dollars -- well over a half a
19    million dollars.
20  Q.  So when you say you plug in the numbers, are you
21    just doing it by hand, or you're just calculating
22    and making notes or...?
23  A.  Yeah.  What I do is I have a column there that I
24    estimate -- I estimate what the taxes are.  Well,
25    I go to that column 12.  I say, well, I'm going

Page 91

1    to take a guess.  And I guess that it's going to
2    be $100,000.  And then 100,000 gets fed in and
3    turns out, oh, no, it really is 120,000.  So I
4    plug in -- I go up and I plug in 140,000.  Oh,
5    that's too much.  It's 130,000.  And then I
6    eventually get it down, bang, okay, it turns out
7    to be it's $127,000.
8  Q.  Did you review any of Plaintiff's actual tax
9    returns to see what her actual effective tax rate
10    was?
11  A.  Yes.
12  Q.  Okay.  Which returns?
13  A.  I have '18, I know.  That's in the file.  I
14    believe I have '17, too.
15  Q.  Okay.  So you would have reviewed both --
16  A.  I did.
17  Q.  -- 2017 and 2018?
18         And so I think that you mentioned that
19    you hadn't considered Plaintiff's existing
20    commute to Dartmouth if she was still employed
21    there in determining her pre-2021 extraordinary
22    employment costs.
23         Was it considered post-2021?  Did you
24    adjust her -- did you adjust any of the travel
25    costs based on what they would have been for

Page 92

1    Plaintiff if she was working at
2    Dartmouth-Hitchcock after 2021?
3  A.  No.  I did not -- are you -- I'm not sure what
4    your question is.  Your question's going back to
5    did I take account of the time that, if she was
6    at Dartmouth-Hitchcock, she would have traveled
7    from Norwich over to Dartmouth?
8  Q.  The mileage.
9  A.  The mileage?
10  Q.  Yes.
11  A.  I didn't.
12  Q.  Okay.
13  A.  But I -- I didn't, but I -- I don't know exactly
14    where she lives in Norwich, so the 190 miles, you
15    know, it -- it may be more than that, so.  Like I
16    indicated to you earlier today that my travel
17    down, which was a little bit further, was about
18    100 to 102 miles, somewhere in that vicinity.
19  Q.  Okay.  Moving to Scenario B.  And so we discussed
20    that the assumptions in the analysis performed
21    for Scenario B are the same as those for
22    Scenario A until July 2021; is that correct?
23  A.  That's correct.  If I might add, so Footnotes 1
24    and 2 are the same.  3 is the same.  4 is
25    different.  I don't think 5 is different,

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 93

1     although it's applied to different years. And 6,
2     7, 8, and 9, 11, 12, 13, 14, and 15 are the same.
3     And 10 is different.
4          So the difference really is 4 and 10.
5   Q.  For all of the assumptions for Scenario B, except
6     for Footnotes 4 and 10, the basis for these
7     assumptions would be the same as they were that
8     we discussed for Scenario A, correct?
9   A.  Yes.
10  Q.  Scenario B assumes that Dr. Porter will leave her
11    full-time position at the University of Vermont
12    Medical Center and work part-time.
13         Is the basis for this assumption
14    discussions with Dr. Porter or counsel?
15  A.  Yes.
16  Q.  And it assumes that she would work two days a
17    week at the University of Vermont Medical Center
18    for 48 weeks a year at a 2021 per diem rate of
19    $190 per hour.
20         What's the basis for two days a week?
21  A.  Information provided by Dr. Porter. I can't
22    remember if it was directly to me or if it was
23    through counsel.
24  Q.  Were there any other amounts of time considered?
25  A.  No.

Page 94

1   Q.  And do you know whether those two days were going
2     to be back-to-back days, so, you know, Monday and
3     Tuesday, Tuesday and Wednesday, or were they just
4     two days a week?
5   A.  I wasn't provided any guidance on that, but I've
6     assumed that they'd be back to back, because
7     otherwise I would have to have more hotels.
8          But I did -- let me back up. I did
9     assume that she would stay over 10 -- somewhere
10    between 10 and 12 nights. Some of that might be
11    because she doesn't work back to back, but
12    actually, I was thinking more about travel and if
13    she had a late day where she didn't come out of
14    surgery until, you know, late in the day, she
15    might be too tired to -- to travel, particularly
16    in the wintertime.
17  Q.  I don't think that is reflected in Footnote 10
18    for Scenario B.
19  A.  Oh, it isn't. Sorry. I did not make any
20    assumption -- I assumed that she was going to --
21    oh, I'm confused. I'm sorry.
22         No. I assumed that she would still
23    have her apartment or her condominium and still
24    incur those same -- same expenses.
25  Q.  Okay. But no hotel costs?

Page 95

1   A.  No hotel. I'm sorry. That was after -- that was
2     in the Scenario 1 --
3   Q.  Right.
4   A.  -- where she was going to commute up there one
5     day a week.
6   Q.  Okay. And is the basis for your assumption that
7     in 2021 she would be paid a $190 per hour per
8     diem rate at UVMMC the same as the basis for that
9     assumption in Footnote 4 for Scenario A?
10  A.  Yes.
11  Q.  And is your basis for assuming that her per diem
12    rate at UVMMC would increase at an annual rate of
13    2.5 percent the same as it was in Footnote 4 in
14    Scenario A?
15  A.  I used the same percent. I used the 2.5 in all
16    of the income projections.
17  Q.  Okay. For Scenario B, looking at Footnote 10,
18    you've listed for extraordinary employment costs
19    annual housing rental costs, utilities, renters
20    insurance, heat, and 9,100 miles of travel in
21    2017.
22         Are those all of the extraordinary
23    employment costs that are considered for
24    Scenario B?
25  A.  Yes.

Page 96

1   Q.  And that $45,300 a year in 2017 dollars for
2     Scenario B is the same as it was for Scenario A,
3     Footnote 10, I believe. Is that accurate?
4   A.  Yes. The difference is that this is carried out
5     right out through the year 2023, where in
6     Scenario 1 these housing costs were only carried
7     out through June of 2021.
8   Q.  Right. Are the assumptions that you made to come
9     to the total for annual housing rental costs in
10    Scenario B, Footnote 10 the same as they were
11    that we discussed for Footnote 10 with
12    Scenario A?
13  A.  Yes.
14  Q.  So for this one also, you estimate now that the
15    costs would be lower because she's renting a
16    two-bedroom?
17  A.  She owns it. She's not renting it.
18  Q.  Okay.
19  A.  But it's a two-bedroom.
20  Q.  So what is the rental cost if she owns the --
21  A.  Well, she doesn't have any rental cost, but if
22    you will, that represents she has an option of
23    either renting or buying, and she decided to buy.
24    And I think a reasonable estimate of what the
25    cost would be would be the rental. And from a

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 97

1    purely economic standpoint, the opportunity cost
2    of owning that place is what she can rent it for.
3  Q.  Understood.  So the discussion we had about
4    housing rental costs with respect to Footnote 10
5    in Scenario A would apply also to Scenario B?
6  A.  Yes.
7  Q.  And is the same true for utilities, renters
8    insurance, heat, and travel?
9  A.  Yes.
10  Q.  So it's the exact same calculation in Footnote 10
11    for Scenario B made using the exact same
12    assumptions and the same basis for those
13    assumptions as Scenario A, it's just projected
14    out beyond July 2021?
15  A.  Yes.
16  Q.  Did you consider when calculating the costs in
17    Footnote 10 for Scenario B whether they would
18    change because she's only working two days a week
19    at the University of Vermont instead of
20    full-time?
21  A.  No.
22  Q.  Okay.  What was your basis for assuming the
23    analysis out to the year 2033 for both scenarios?
24  A.  I believe in the conversation that I had with
25    Dr. Johnson that she projected there was a

Page 98

1    possibility she'd work out to 70.
2        She liked what she was doing and would
3    like to do it as long as she could.  And she had
4    no plans at that point of when she definitely
5    would retire.
6  Q.  You mean Dr. Porter?
7  A.  Dr. Porter, I'm sorry.  Dr. Porter would have
8    retired.  So therefore, I carried it out to 70.
9    But again, I want to underscore that it's up to
10    the trier of fact to determine how long he thinks
11    or she thinks it would be reasonable for
12    Dr. Porter to work out into the future.  That's
13    why I have a running total there.
14        So if the trier of fact thinks it's --
15    out through age 66 is -- is a reasonable area to
16    truncate, then they can look at the corresponding
17    number for the -- for age 66.
18  Q.  On both of the projected lost earnings charts for
19    Scenario A and Scenario B, there's a footnote
20    that states "The year 2029 (under lined) is
21    consistent with the worklife of a 56-year-old
22    female with a graduate degree."
23        What's the basis for that assertion?
24  A.  That's a study that was -- that's actually been
25    done -- updated about four times.  It's in the

Page 99

1    National Journal of Forensic Economics that looks
2    at work lives by sex and age and education level.
3        The problem with it is that it has
4    people with master's, as well as Ph.D.s and
5    M.D.s.  And if you look at education overall
6    for -- they have less than high school, high
7    school, some college, associate's degree,
8    four-year degree, and then graduate degree.  You
9    see work lives increase, everything else being
10    held constant and stuff.  You look at female
11    50 years of age, if you follow them through those
12    different education levels, the work life gets
13    greater and greater.
14        One might expect, and I would expect
15    that, that there would be an increase in work
16    lives for somebody that had a Ph.D. in general
17    than somebody with a master's.
18        So what I'm saying is that I think
19    it's a conservative estimate of -- of an average
20    work life.
21  Q.  You mentioned a study.  How recent was that
22    study?
23  A.  I think -- well, it's -- it's been -- I think
24    this is the fourth update.  And the last one, I
25    think, was 2015.

Page 100

1  Q.  Okay.  So you would have reviewed whatever the
2    most recent update was?
3  A.  Yes.
4  Q.  Did you assume any risk of normal termination,
5    that she might not be able to -- that Plaintiff
6    might not be able to work to any given year
7    because of normal life events?
8  A.  No, I did not.  And that's why there is this
9    running total in here.  Unlike maybe in a
10    personal injury case, where I'd render an opinion
11    that I think the loss is X, the person would have
12    worked out to their normal work life, and so when
13    I do all the calculations, their loss is
14    $850,000.
15        And in wrongful termination cases or
16    employment cases, I put this running total in
17    there because I'm going to let the trier of fact
18    take into account those factors of -- that a
19    person might not work there for X number of
20    years.
21        They're going to hear a lot more
22    testimony than I'm going to hear.  And then it's
23    up to them to make that decision that I think,
24    well, it's reasonable to expect she would -- that
25    Dr. Porter would work for 3 more years or 5 more

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 101

```
 1        years or 15 more years.
 2             So I'm not rendering an opinion that
 3        she would work out to age 70.  I'm not rendering
 4        an opinion that she would work out to age 60.
 5        I'm leaving that entirely up to the trier of
 6        fact.
 7   Q.  Okay.  Let's take a five-minute break.
 8   A.  Okay.
 9        (Recess taken.)
10             ATTORNEY JOSEPH:  All right.  Back on
11        the record.
12   Q.  Looking back at Exhibit 5, which is the file that
13        you brought in, could you tell me, to the best of
14        your ability, what, if any, documents you relied
15        on that aren't in that file?
16   A.  I did look at the 2000 -- I think it's 2019
17        fringe benefit package; the same as the '17,
18        except it was 2019.
19             And I think -- I think I saw 2017
20        income tax returns.  I think it may be on my
21        computer.  But more importantly was the -- in
22        2017 was the W-2s, which are in here.
23             I can't think of anything that --
24   Q.  Okay.  And is the 2017 tax return in this file?
25   A.  No.  I did not see it.
```

Page 102

```
 1   Q.  Okay.  But you recall looking at --
 2   A.  I don't -- I'm -- don't hold me to it.  I think
 3        it was there.  But I may have just used the W-2s
 4        to get the income.  But I think I did see the
 5        '17.
 6   Q.  Okay.  So aside from the 2017 tax return and the
 7        2019 benefits summary, there's nothing else you
 8        can recall that isn't in this file that's
 9        Exhibit 5 that you relied on?
10   A.  No.  No.  I'm sure -- I'm pretty sure that
11        everything I relied on in is in this, including,
12        if you will, the fringe benefit from the 2017.  I
13        don't think there was any significant change.
14             At least there was no change in the
15        retirement contribution in 2019.  The weekly
16        payments or monthly payments went up in '19 from
17        the 2017.  And that's all I can think of, yeah.
18   Q.  Okay.  And in Exhibit 5, there's this set of
19        papers that, at the top, says "Table 11, Summary
20        Statistics on Medical School Faculty Compensation
21        for All Schools."
22             Did you use this document?
23   A.  No.
24   Q.  Okay.  So you didn't rely on anything --
25   A.  No.  It was just sent to me.
```

Page 103

```
 1   Q.  Okay.
 2   A.  I didn't ask for it.
 3   Q.  That's all the questions I have.
 4             ATTORNEY VITT:  I have no questions.
 5        (Whereupon, the deposition was
 6        concluded at 1:58 p.m.)
 7
 8             *  *  *  *  *
```

Page 104

```
 1             SIGNATURE PAGE
 2        I, ROBERT L. BANCROFT, Ph.D., do hereby
 3   certify that I have read the foregoing deposition
 4   transcript of my testimony, taken on
 5   October 30, 2019, and further certify it is a
 6   true and accurate record of my testimony.  (Any
 7   corrections should be made on the separate errata
 8   sheet, which will then be attached to this signed
 9   transcript.)
10        Signed under the pains and penalties of
11   perjury this _____ day of _____ 20____.
12
13        _____
14             ROBERT L. BANCROFT, Ph.D.
15   STATE OF _____
16   _____, SS.
17   At _____, in said county,
18   this _____ day of _____ 20____,
19   personally appeared before me the above-named
20   ROBERT L. BANCROFT, Ph.D., and made oath that the
21   foregoing answers subscribed by him are true.
22
23        _____
24        Notary Public
25   My Commission expires:_____
```

Page 105

```
 1          C E R T I F I C A T E
 2          STATE OF VERMONT
 3     DEPOSITION OF:  ROBERT L. BANCROFT, Ph.D.
       RE:  MISTY BLANCHETTE PORTER, M.D. vs.
 4          DARTMOUTH-HITCHCOCK MEDICAL CENTER,
            DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK
 5          MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH
 6     CASE NO. 5:17-cv-194
 7
            I, KAREN L. WRIGHT, a Registered
 8     Professional Reporter, Certified Realtime
       Reporter, and Notary Public in and for the State
 9     of Vermont, do hereby certify as follows:
            1.  That ROBERT L. BANCROFT, Ph.D., the
10     witness whose testimony is hereinbefore set
       forth, was duly recorded by me on Wednesday,
11     October 30, 2019;
            2.  That such testimony was transcribed by
12     me and is a true and accurate record of the
       testimony given by the said witness, to the best
13     of my knowledge, skill, and ability;
            3.  I further certify that I am neither
14     attorney for, nor related to or employed by any
       of the parties, nor financially interested in
15     this matter; and
            4.  That a dash as used through this
16     transcript is meant to represent an interruption
       in thought or between a question and answer.
17          IN WITNESS THEREOF, I hereunto set my hand
       and Notarial seal this 11th day of November,
18     2019.
19
20
21     _____
            Karen L. Wright, RPR, CRR
22          Registered Professional Reporter,
            Certified Realtime Reporter, and
23          Notary Public
            My Commission Expires:  1/31/2021
24
25
```

Page 106

```
 1     WITNESS'S ERRATA SHEET
       WITNESS:  ROBERT L. BANCROFT, Ph.D.
 2     RE:  MISTY BLANCHETTE PORTER, M.D. vs.
       DARTMOUTH-HITCHCOCK MEDICAL CENTER, et al.
 3     CASE NO. 5:17-cv-194
       INSTRUCTIONS:  Enclosed herewith is the original
 4     transcription of your deposition to read and
       sign.  Please use this errata sheet to clearly
 5     identify any corrections or changes you wish to
       make, referring to the corresponding page and
 6     line number along with your change, and sign the
       next-to-last page of this transcript before a
 7     Notary Public.  DO NOT WRITE DIRECTLY ON THIS
       ORIGINAL TRANSCRIPT!  Then return the errata
 8     sheet(s) and signed original transcript to either
       your attorney or the attorney who conducted this
 9     deposition.
10
11     PAGE _____   CORRECTION _____
12     LINE _____   REASON _____

               _____
14     PAGE _____   CORRECTION _____
15     LINE _____   REASON _____

               _____
16
17     PAGE _____   CORRECTION _____
18     LINE _____   REASON _____

               _____
19
20     PAGE _____   CORRECTION _____
21     LINE _____   REASON _____
22
23             _____
24             ROBERT L. BANCROFT, Ph.D.
25
```

Page 107

```
 1          O'BRIEN REPORTING SERVICES, INC.
                    P.O. BOX 711
 2               RUTLAND, VERMONT 05702
                    802-747-0199
 3
 4     November 11, 2019
 5
       Robert L. Bancroft, Ph.D.
 6     c/o Vitt & Associates, PLC
       P.O. Box 1229
 7     Norwich, Vermont 05055
 8
 9     In Re:  Misty Blanchette Porter, M.D. v.
       Dartmouth-Hitchcock Medical Center, et al. -
       Deposition of ROBERT L. BANCROFT, Ph.D.
10
11
12     Dear Dr. Bancroft:
13     Enclosed is the printed original of your
       deposition transcript, including the Exhibits 1
14     through 5, taken in the above matter to read and
       then sign before a Notary Public.  An Errata
15     Sheet is also enclosed for any
       changes/corrections.  Kindly follow the
16     instructions on this Errata Sheet.
17
       Upon completion of the reading and signing by the
18     witness, please return this transcript to
       Attorney Joseph.
19
       If you have any questions, please call.
20
       Regards,
21
22
       Karen L. Wright, RPR, CRR
23
24     e-cc:  Atty. Joseph
25
```

540889d0-4ff5-44c5-a75e-10182bf4ad3d