# Exhibit D

# EXHIBIT 2

EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D., </br></br>Plaintiff, </br></br>v. </br></br>DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, </br></br>Defendants. | Docket No. 5:17-cv-194 |

### DECLARATION OF JULIA MACCALLUM, M.D.

I, Julia MacCallum, M.D., pursuant to the provisions of 28 U.S.C. § 1746 hereby declare as follows:

1. I am an Assistant Professor of OB/GYN at the University of Rochester School of Medicine and Dentistry (Aug 2018 to present). I received my MD in 2012 from the University of Wisconsin School of Medicine and Public Health.

2. In 2012, I began an OB/GYN residency at Dartmouth-Hitchcock Medical Center ("Dartmouth-Hitchcock"). I completed the residency in 2016, but I remained at Dartmouth-Hitchcock during the period 2016-18 to complete a Leadership Preventive Medicine Residency, through which I obtained a Masters of Public Health degree. During my residency period 2012 – 16 at Dartmouth-Hitchcock, I spent 100% of my clinical time in the OB/GYN Department. From 2016-18, 80% of my time was administrative and 20% was clinical, with my clinical time spent in the OB/GYN

1

Department. My time in the OB/GYN Department was both before and after the closing of the REI Division.

3. I was a resident within the OB/GYN Department. All OB/GYN residents rotate through the REI Division, and I spent dedicated time in the Division in my second and third years of residency. I also performed surgery with REI Division physicians through all four years of residency. During my second year rotation in the REI Division, Dr. Porter was the only physician in the Division. In my third year, Dr. Albert Hsu had joined the Division, which meant that I worked that year with both Dr. Hsu and Dr. Porter, including time in the OR.

4. I found that Dr. Hsu did not have a good understanding of the basic knowledge that would be expected of an attending physician in an REI Division. His knowledge base was less than that which I would have expected from an OB/GYN generalist attending physician, let alone the higher level of focused clinical detail expected from a subspecialist. His documentation was meandering and unfocused with little useful content. I cared for a number of patients who had been seen previously by Dr. Hsu. Because Dr. Hsu lacked a basic knowledge base, he often provided confusing or misleading information to his patients. When I treated these patients, I would often have to provide re-counseling or explain in clear terms what Dr. Hsu had been trying to explain.

5. When I began performing REI procedures, I was with Dr. Porter, as she was the only physician operating in the Division at the time. She was consistently calm and focused, highly technically skilled, held resident physicians to an appropriately high standard while fostering their surgical and clinical skill development, and if a problem arose in clinical or surgical realms, she was able to quickly resolve the issue. Among many

other surgeries, she taught me how to perform myomectomy, a procedure to remove muscular growths called fibroids from the uterus. This surgery can be important to improve pregnancy rates and outcomes in patients with infertility. She taught me very precise techniques to optimize the procedure. This included approaches to minimize intraoperative blood loss; minimize scarring and weakening of the uterus; and minimize negative effects to the endometrium (lining layer), where the fertilized egg implants in early pregnancy. She also taught me how to inject methylene blue dye into the uterine cavity, so that the surgeon would know when they were close to or had entered the uterine cavity. Entering the cavity is sometimes necessary but can negatively affect the lining layer, affecting fertility for future pregnancies, and can weaken the uterine wall, which can increase the risk for uterine rupture in pregnancy, labor, and delivery.

6. I did not look forward to working in the OR with Dr. Hsu because of his poor reputation among the residents with respect to his level of surgical competency. When I was required to work in the OR with Dr. Hsu, I determined that his poor reputation was fully justified. I assisted Dr. Hsu on a myomectomy case. At the start of the case, I asked Dr. Hsu if he intended to use the dye injection technique that Dr. Porter had taught me. He knew nothing about it, and so I performed this part of the procedure, showing him how to inject the dye. When the surgery began, I was appalled at Dr. Hsu's technique and approach. I began with approaches that I had learned from Dr. Porter and other skilled attending physician colleagues of hers during my previous laparotomies and myomectomies. He quickly interceded, using surgical technique that was rushed, imprecise, and crude with apparent confidence. I was surprised to see him literally yank at the fibroids to forcefully rip and tear them away from the healthy uterine tissue, when all of my previous exposure to this procedure involved very slow, controlled, and

meticulous sharp dissection of the fibroids from the uterus. His unrefined and unskilled surgical approach in this case unnecessarily increased the patient's surgical bleeding and increased her risk for uterine scarring and weakening of the uterus, which could affect outcomes of her future pregnancies. I was sure while watching the procedure that seasoned surgeons such as Dr. Porter and other attending physician colleagues of hers would be appalled by the obvious under- or inexperience and the dearth of surgical technique on display. Dr. Hsu's lack of competence could not have been more apparent. I assisted in other surgeries performed by Dr. Hsu, and his performance in those surgeries did not change materially – he continued to be incompetent.

7. I told Dr. DeMars about the danger that Dr. Hsu posed to patients when he operated. Her responses were to the effect of, "thanks for telling me," but she did nothing to prevent him from continuing to perform procedures. I also told my direct supervisor about Dr. Hsu being a danger to patients. To my knowledge, my supervisor shared what I had said with Dr DeMars, as well. The residents were all aware that there was an element of danger when Dr. Hsu was in the lead in the OR. I had conversations with other residents about how when operating with Dr Hsu, we realized that we were, in effect, the most senior, most competent surgeon in the OR, which is an extraordinarily vulnerable, unsafe, and frightening position in which to be put as a trainee. Dr. Hsu's surgeries routinely had a greater loss of blood for patients than would typically be expected. In addition, it was more common that a second attending surgeon would need to be called in for assistance during Dr. Hsu's procedures.

8. I believed at the time that it was irresponsible for Dartmouth-Hitchcock to permit Dr. Hsu to continue to operate on patients. Every time he went into the OR, he presented a risk to patient safety. I still do not understand why Dartmouth-Hitchcock tolerated such

incompetence in a surgeon.

9. After Dr. Porter was terminated, other attending physicians in the OB/GYN Department tried to fill her shoes clinically but they lacked Dr. Porter's skills. For example, Dr. Porter was the only physician in the department formally reading gynecologic ultrasounds and had been recognized for this skill at an international level. She was frequently asked to re-read and interpret ultrasounds when another attending physician had a question or was unsure of a reading. She performed ultrasound-guided procedures that no other physicians in the department performed, such as HyCoSy (hysterosalpingo-contrast-sonography), a test used to assess for infertility caused by Fallopian tube problems. There was also no one who could replace Dr. Porter's surgical skills. She was particularly skilled at myomectomies, laparoscopic and robotic-assisted fertility surgeries, and hysteroscopic procedures, among others. She was the only physician at Dartmouth-Hitchcock who was capable of performing complex hysteroscopic surgery, such as uterine septum removals. These cases had to be referred to another hospital after Dr. Porter was terminated.

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Dated: March 5, 2020

_____
Julia MacCallum, M.D.