# Exhibit F

# EXHIBIT 4

**EXHIBIT 4**

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D., <br><br> Plaintiff, <br><br> v. <br><br> DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, <br><br> Defendants. | Docket No. 5:17-cv-194 |

### DECLARATION OF SHARON PARENT

I, Sharon Parent, pursuant to the provisions of 28 U.S.C. § 1746 hereby declare as follows:

1. I am a registered nurse. For 41 years, I worked at Dartmouth-Hitchcock Medical Center ("Dartmouth-Hitchcock") until I retired in December 2016. For 21 years, I worked in the Labor & Delivery section and for the last 17 years, I worked in the REI Division. I worked closely with Dr. Porter in both positions.

2. When I began work in the REI Division, my office was across the hall from Dr. Porter's office. It was well-known that Dr. Porter was a resource for doctors in the OB/GYN Department, not only doctors in the REI Division. It was common for OB/GYN doctors to seek out Dr. Porter to get help, especially in the reading of ultrasound images for their patients. There were times when there would literally be a line of OB/GYN doctors waiting to see Dr. Porter.

1

3. I assisted Dr. Hsu when he performed retrievals and transfers for women involved in IVF. Dr. Hsu's retrieval technique was poor and his patients routinely reported that it was painful. In addition, the oocyte counts were low. When he performed transfers, the women reported that they were uncomfortable and in pain. Dr. Porter worked often with Dr. Hsu to improve his technique, but no matter how many time she explained the procedure, Dr. Hsu did not know what to do with his hands when doing transfers and he frequently would ask the ultrasound techs, "Am I there yet?" Even when told that he was "there," Dr. Hsu would often add an extra (and unnecessary) jerk or twitch of his hands. I learned of Dr. Hsu's low pregnancy rates and I questioned D-H officials whether it was ethical to permit him to participate in such cases given the high cost of IVF and the limited number of eggs that each woman had available for transfer.

4. I have also assisted Dr. Seifer when he performed retrievals. His retrievals were the most bloody and painful that I have ever witnessed. After leaving the procedure room after observing a Dr. Seifer retrieval, Elizabeth Todd said, "Please tell me that is not how he does this all the time." I had to tell her that the blood and pain were common in his retrievals.

5. Many of the IVF patients were paying out-of-pocket for the cost of treatment. Based on what the patients told me, I know that it was a considerable financial strain for many to have saved enough to proceed with IVF. For some of them, they literally had one or perhaps two chances to become pregnant. Given the poor techniques and pregnancy rates for Dr. Seifer and Dr. Hsu, I questioned Dr. Leslie DeMars whether Dartmouth-Hitchcock should permit them to provide IVF services.

6. I went to Dr. Leslie DeMars on multiple occasions because I was worried about what I saw happening to the women who were being treated by Drs. Seifer and Hsu. Dr. DeMars told me that Dr. Porter set a high bar and I had to accept that other doctors did things differently. I told Dr. DeMars that the pain and discomfort caused by Dr. Hsu and Dr. Seifer was sending my moral compass off the charts. As far as I could determine, Dr. DeMars did nothing to deal with the poor practice and incompetence of Dr. Hsu and Dr. Seifer.

7. In December 2015, I gave Dartmouth-Hitchcock a year's notice of my intention to retire. I wanted to give Dartmouth-Hitchcock that amount of time so that it could hire one or more nurses, and I would be available to help train whoever was hired. Although Dartmouth-Hitchcock posted the job opening internally, it did not post the position externally (I checked but could not find any of the advertisements). In my judgment, Dartmouth-Hitchcock did not make a serious effort at finding a replacement. I understood from comments by management that there was reluctance to spend money in conducting a search. I would regularly ask persons in management about what progress was being made to find my replacement. The responses were always vague. No one asked my advice on how to find a nurse to replace me (I had ideas about how to find someone). I concluded after multiple conversations with REI Division management that Dartmouth-Hitchcock did not intend to make a serious effort to find a nurse to replace me.

8. I retired as of December 2, 2016. I offered multiple times to return to work in January 2017 on a per diem basis for approximately 20 hours per week. I told Dr. Leslie DeMars that I was available to work and I made it clear to her and everyone in

3

the REI Division that I would work weekends and take weekend call. In January and February 2017, I met several times with HR and also with Heather Gunnell and Katy Mansfield to find out why I was unable to work per diem. I received from them an endless stream of reasons why I could not return to work. At first, it was budget and then there were a series of HR related reasons. Each time that I received a new reason, I went to HR, sorted out the "problem" and I would be told that I would soon be able to work. Despite these assurances, I was never given permission to return to work per diem. In August 2017 after the closure of the REI Division, I met with Leslie DeMars. In that meeting, Dr. DeMars told me that the reasons she gave me in early 2017 were essentially made up, she had instructed HR and persons in the REI Division not to hire me, and that the made-up excuses was just her way of "protecting me" from getting caught up in the mess of the closure of the REI Division. Essentially, she admitted that because a decision had been made to close the REI Division, there was no reason for them to have employed me.

9. I am convinced that if Dartmouth-Hitchcock had made a real effort to recruit nurses after receiving notice of my retirement, it would have been able to locate a nurse or nurses well before my actual retirement in December 2016 and I would have had the time to train this person in the REI Division procedures.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: February 28, 2020

_____
Sharon Parent