UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| **MISTY BLANCHETTE PORTER, M.D.,** ) | |
|     **Plaintiff,** ) | |
| ) | |
| v. ) | Docket No. 2:17-CV-194 |
| ) | |
| **DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH,** ) ) ) ) ) ) ) | |
|     **Defendants.** ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE THE TESTIMONY OF ROBERT BANCROFT**

Plaintiff Misty Blanchette Porter, M.D. ("Dr. Porter") submits this Memorandum to oppose the Motion *in Limine* to Exclude the Testimony of Robert Bancroft (Doc. 198) filed by Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health"). Dartmouth Health fails to show a valid reason for excluding Robert Bancroft's testimony, and the Court should therefore deny Defendants' motion.

According to Dartmouth Health, Robert Bancroft, Ph.D. ("Dr. Bancroft") "is unqualified" and "his opinions … are unreliable." (*See* Doc. 198-1 at 1.) Dartmouth Health's arguments are completely unfounded and should be rejected. As Dartmouth Health's local law firm is undoubtedly aware, Dr. Bancroft is a well-established forensic economist who has testified and consulted in thousands of cases pending before nearly every court—state and federal— throughout Vermont over the past four decades. He is eminently qualified to testify as an expert

economist on economic losses in all types of cases, including wrongful employment termination cases. His analyses and methodology have routinely been accepted as reliable by many courts, including this court. *See Bilodeau v. Usinage Berthold, Inc.*, No. 5:22-cv-101, 2024 WL 3744150, at *3–*4 (Crawford, J.) (D. Vt. Aug. 9, 2024) (adopting the expert report of Dr. Bancroft in awarding damages, noting "[t]he economic assumptions and projections are reasonable and reflect a conservative approach to the economic loss issues"). There is no reason to exclude Dr. Bancroft's testimony in this case.

## FACTS

Since 1980 Dr. Bancroft has worked as an economist. From serving as an Economist for the United States Department of Agriculture, to teaching as an Assistant Professor and an Adjunct Professor at the University of Vermont, to spending over 40 years as an Economic Consultant, he has spent his full career in the field of economics. (Doc. 198-4 at 6–10.) Dr. Bancroft holds a Bachelor's Degree in Economics from the University of Vermont, a Master's Of Science Degree in Agricultural Economics from the University of Vermont, and a Doctor of Philosophy (Ph.D.) Degree in Agricultural Economics from Purdue University. (*Id.* at 4.)

Dr. Bancroft has been engaged as an expert economist in over 2,500 lawsuits. (*Id.* at 15.) Since the year 2000, nearly 20% of Dr. Bancroft's consulting work has been for cases concerning employment termination. (*Id.*) Dr. Bancroft has testified in over 100 cases. (*Id.* at 17.) At the time of his deposition on October 30, 2019, Dr. Bancroft had approximately 20 current cases, "and a couple of them are wrongful termination." (*Id.* at 33.)[1]

---

[1] Dr. Bancroft is so widely known among the members of Vermont's employment law bar as a qualified forensic economist in employment cases that the Court can likely take judicial notice of his long-standing history as an expert in such cases. If needed, Plaintiff is confident that numerous employment law practitioners would submit affidavits in support of this proposition.

2

As part of this lawsuit, Dr. Porter engaged Dr. Bancroft to analyze her economic losses and provide expert testimony in support of her claims for damages (which include claims for lost wages, lost benefits, compensatory damages, and future lost income). Dr. Bancroft issued a preliminary report on October 30, 2018. (Doc. 198-2.) During the seven-and-a-half years that this case has been pending, Dr. Bancroft has updated his preliminary report twice. First, in advance of his deposition testimony in this case Dr. Bancroft updated his analyses so that the parties had current information for the deposition; this updated report was issued on October 1, 2019. (Doc. 198-3.) Then, after the United States Court of Appeals for the Second Circuit remanded this case for trial, Dr. Bancroft again issued an updated report, which is dated August 26, 2024. (Doc.198-5.) The purpose of these updates was to provide current analysis in light of new facts that occurred as time passed. (Doc. 198-4 at 33, 68.) In these updated reports, Dr. Bancroft only updated factual information to reflect what had actually happened with the passage of time. He did not change his methodology or approach.

Dr. Bancroft has relied upon a consistent and accepted methodology for decades. (*Id*. at 41, 45–46.) His first step is to project out what the plaintiff would have earned if she had not been fired (salary plus fringe benefits). (*Id*. at 39–40.) Next, he calculates post-termination earnings (again including monetary earnings plus benefits). (*Id*. at 40.) He then offsets these interim earnings from the initial lost earnings to calculate the "gross loss." (*Id*. at 41.) The next steps are (1) to estimate the income taxes that would have been paid, and (2) to determine the present value of the loss by adding interest to historical losses and discounting future loss projections to the present. (*Id*.). Finally, Dr. Bancroft analyzes the tax liability that would be incurred by payment of a settlement or damages award and compares this tax liability to the tax liability that would have resulted from the timely payment of earnings if employment had not

been terminated. Since a lump sum payment in one year likely produces a significantly larger liability than regular payments over time, a true "make whole" payment requires a "gross up" to any award. (*Id*. at 42.) This methodology is not controversial, it is not novel, and it is not experimental; in sum, it is not "junk science." Dr. Bancroft's analysis is, however, highly valuable to a jury or a judicial fact finder when undertaking the task of assessing damages. *See, e.g., Bilodeau,* 2024 WL 3744150, at *3–*4.

## LEGAL STANDARDS

Rule 702 of the Federal Rules of Evidence, as amended in 2000 to reflect the Supreme Court's decisions in *Daubert v. Merrill Dow Pharm., Inc.,* 509 U.S. 579 (1993) and *Kumho Tire v. Carmichael,* 526 U.S. 137 (1999), governs the admissibility of expert testimony. The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts and data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert,* the Supreme Court, emphasizing the "liberal thrust" of the Rules of Evidence favoring the admissibility of expert testimony, rejected the "general acceptance" test of *Frye v. United States,* 293 F. 1013, 1014 (D.C. Cir. 1923). *Daubert,* 509 U.S. at 588. In the Second Circuit, it is a "well-accepted principle" that Rule 702 embodies a "liberal standard of admissibility for expert opinions." *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005); *see also Amorgianos v. Nat'l RR Passenger Corp.,* 303 F.3d 256, 265 (2d Cir. 2002) (observing departure, under Rule 702, from the *Frye* standard); *Drake v. Allergan, Inc.,* No.

2:13-cv-234, 2014 WL 5392995, at *2 (D. Vt. Oct. 23, 2014) (*Daubert* emphasized "liberal thrust" of the Federal Rules of Evidence, favoring the admissibility of expert opinion testimony).

With the foregoing in mind, under *Daubert* and its progeny, trial courts maintain a "gatekeeping responsibility" of ensuring that expert testimony is admissible, *i.e.,* that it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597; *see also Amorgianos,* 303 F.3d at 265. To fulfill its gatekeeping role, the trial court should consider Rule 702's admissibility requirements, which the Second Circuit has delineated into three broad criteria: (1) qualifications;[2] (2) reliability; and (3) relevance. *Nimely,* 414 F.3d at 396–397. However, the trial court's gatekeeping role under Rule 702 was not intended to serve as a replacement for the adversary system. *See, e.g.,* Fed. R. Evid. 702, Advisory Committee Notes, 2000 amend.; *Royal Park Investments SA/NV v. Deutsche Bank National Trust Co.,* No. 14-CV-4394, 2018 WL 1750595, at *7 (S.D.N.Y. April 11, 2018) (despite establishment of gatekeeper function, the *Daubert* test is nonetheless "a liberal" and "permissive" standard of admissibility); *Floyd v. City of New York*, 861 F.Supp.2d 274, 286 (S.D.N.Y. 2012). Instead, the traditional method for attacking admissible expert testimony deemed "shaky" by a challenging party is not to exclude the expert testimony but rather to engage in "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Gonyea v. Irick Excavating*, No. 2:08-cv-00242, 2010 WL 11606974, at *3 (D. Vt. Aug. 12, 2010) (quoting *Daubert,* 509 U.S. at 595); *see also Olin Corp. v. Certain Underwriters at Lloyd's London,* 468 F.3d 120, 134 (2d Cir. 2006) (approving the techniques of cross-examination and presentation of opposing expert testimony to expose weaknesses in an expert's testimony).

---

[2] Courts within the Second Circuit have "liberally construed" expert qualification requirements. *See, e.g., In re MTBE Prods. Liab. Litig.*, No. M21-88, 2008 WL 1971538, at *5 (S.D.N.Y May 7, 2008).

5

Furthermore, the focus of the trial court's inquiry must be solely on principles and methodology, not on the conclusions they generate. *Daubert,* 509 U.S. at 595, *Campbell ex rel. Campbell v. Metropolitan Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (arguments that an expert's conclusions are wrong go to the weight of the evidence, not its admissibility). However, only serious flaws in an expert's methodology or reasoning warrant exclusion, *Amorgianos,* 303 F.3d at 267 (emphasis added), and as long as an expert's testimony rests upon "good grounds, based upon what is known," it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than being excluded. *Daubert,* 509 U.S. at 596. Thus, the court should not weigh the correctness of an expert's opinion or choose between conflicting expert opinions, *see, e.g., Perkins v. Origin Medsystems, Inc.,* 299 F.Supp.2d 45, 54 (D. Conn. 2000), and if an expert's testimony lies within "the range where experts might reasonably differ," the jury, and not the court, "should decide among the conflicting views of different experts." *In re Fosamax Product Liability Litig.,* 645 F.Supp.2d 164, 173 (S.D.N.Y. 2009) (quoting *Kumho Tire,* 526 U.S. at 153).

If proffered expert testimony is relevant (an element the Defendants here do not challenge), the court should then determine whether the testimony has a sufficiently "reliable foundation" to permit it to be considered by the trier of fact. *Daubert*, 509 U.S. at 597; *see also Campbell,* 239 F.3d at 185. The reliability inquiry is a "flexible one," and the trial judge enjoys "broad latitude" in deciding how to determine reliability. *Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 316 (D. Vt. 2002) (citing *Kumho Tire,* 526 U.S. at 142).

The flexible *Daubert* inquiry thus provides the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact. *Amorgianos,* 303 F.3d at 267. Indeed, "[I]t is well-

6

established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence." *Mobile Medical Intern. Corp. v. Advanced Mobile Hosp. Systems, Inc.*, No. 2:07-cv-231, 2015 WL 778553, at *2 (D. Vt. Feb. 24, 2015) (quoting *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). Thus, while expert testimony should be excluded if it is speculative or conjectural, or based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other challenges to the testimony go the weight, not the admissibility, of the testimony. *Boucher,* 73 F.3d at 21 (internal citations and quotations omitted); *Gonyea,* 2010 WL 11606974 at *6 (criticisms of expert's methodology and conclusions went to weight of testimony, and not admissibility, as testimony was likely to assist the trier of fact).

Applying these standards, Dr. Bancroft's testimony is clearly admissible.

ARGUMENT

**I.    Dr. Bancroft Is Qualified to Testify as a Forensic Economist To Show Plaintiff's Financial Losses**

Dr. Bancroft is clearly qualified to testify as an expert economist in this case. He possesses a Bachelor's degree, a Master's degree, and a Ph. D. in the field of economics. He has taught economics at the University of Vermont as an Associate Professor and as an Adjunct Professor. And, he has over 40 years of experience in the field. Moreover, as a forensic economist, he has consulted on over 2,500 cases, including testifying in over 100 cases. Courts—including this court—have routinely acknowledged his qualifications. There is no serious question about Dr. Bancroft's qualifications.

Dartmouth Health argues that Dr. Bancroft is unqualified because he has no professional licenses and he has not published a professional paper in the last 20 years. (Doc. 198-1 at 2.) This observation is completely irrelevant. There is no requirement that a person have a license to

serve as a credentialed economist. Moreover, there is no expectation or requirement that Dr. Bancroft publish professional articles in order to maintain his standing. Dr. Bancroft has relied upon a consistent and established methodology for over 20 years. He is not developing new theories or methods to support his work, so there is nothing to publish. Also, since he is no longer in academia, there is no professional reason to publish. These issues are red herrings that have no bearing on Dr. Bancroft's qualifications at all.

   Dartmouth Health then seeks to question Dr. Bancroft's qualifications by claiming that he somehow lacks experience in employment cases. In support, they rely on testimony that at the time of his deposition he had only consulted on 2 employment cases in the past 4 years. (Doc. 198-1 at 5.) This argument is disingenuous for two reasons. First, Defendants completely disregard Dr. Bancroft's significant experience in employment cases dating back to the year 2000. There is nothing special about the past four years that renders Dr. Bancroft's prior experience stale. As Dr. Bancroft testified, his methodology has not changed in the past 20 years. There is no basis to disregard Dr. Bancroft's work on employment cases just because he only worked on two such cases over a particular four-year period. Second, the lost earnings analysis and methodology Dr. Bancroft deploys is the same in employment cases as it is in personal injury cases and other cases where a plaintiff claims to have lost earnings. Dartmouth Health cannot evade Dr. Bancroft's expertise by claiming that there is something unique about the lost earnings analysis in employment cases.

   Unable to present a credible challenge to Dr. Bancroft's actual professional qualifications, Dartmouth Health instead launches a cheap personal attack based on an obvious joke Dr. Bancroft made in his deposition. Dartmouth Health suggests that Dr. Bancroft suffers from a memory deficit condition that renders him unqualified to testify. (Doc. 198-1 at 2, 7.) The basis

for this unfounded statement is a clear joke. When explaining that he could not remember how long a certain telephone conversation with Plaintiff had lasted, Dr. Bancroft made a self-effacing joke about having "a short-term memory deficit, but now it's turning into long." (Doc. No. 198-4 at 32.) It is clear from the context of the comment that Dr. Bancroft was joking. Defendants' lawyer also understood that the comment was a joke; if she thought for one second that Dr. Bancroft was serious, she certainly would have engaged in follow-up inquiry. The fact that counsel did not explore the matter at all shows that she knew that the comment was intended to be humorous.

     Finally, Dartmouth Health suggests that Dr. Bancroft is somehow unqualified because, according to them, he relied upon speculation or subjective experience in drafting his reports. (Doc. 198-1 at 5–6.) The example of speculation that Dartmouth Health cites is a preliminary assumption in Dr. Bancroft's first report that Dr. Porter would resign her full-time position with the University of Vermont and take a part time job closer to her home starting in July 2021. Then, in a subsequent report, Dr. Bancroft changed this assumption to one that she would leave her full time UVM position in January 2025. Dartmouth Health characterizes these assumptions as "hypotheticals" and then argues that Dr. Bancroft has relied upon speculation so severe that he has become unqualified to testify. (Doc. 198-1 at 6.) Dartmouth Health ignores Dr. Bancroft's explanation that he updated reports as facts unfolded with time. While Dr. Porter initially projected that she would resign her full-time position at UVM to find a part-time job closer to her Norwich home in 2021, that did not happen. Instead, she remained in her full-time position and changed her projected horizon for a change to 2025. Dr. Bancroft merely updated his report

9

to reflect these facts as they arose.[3] Thus, Dartmouth Health's final effort to question Dr. Bancroft's qualifications fails.

## II. Dr. Bancroft's Opinions and Analyses Are Reliable and Admissible

Just as Dr. Bancroft is clearly qualified to testify, his opinions and analyses are sufficiently reliable that they may be admitted into evidence. Dr. Bancroft has been recognized as a qualified and credible expert for over four decades. He relies upon a consistent and established methodology that Dartmouth Health does not even question. For this reason, Dr. Bancroft has testified at in over 100 cases. Indeed, this Court accepts Dr. Bancroft's analyses when determining damages. *See, e.g., Bilodeau*, 2024 WL 3744150 at 3–4.

Dartmouth Health's baseless attacks do not support an order excluding Dr. Bancroft's testimony. In arguing that Dr. Bancroft's testimony is not reliable, Dartmouth Health again claims that Dr. Bancroft relies upon speculation. (Doc. 198-1 at 7.) But they offer no new information to support this claim. As Plaintiff has already explained above, the fact that Dr. Bancroft updated his assumptions to incorporate facts as they actually unfolded over time does not render his opinion unreliable. Moreover, in arguing that Dr. Bancroft's opinion is unreliable, Dartmouth Health again accuses him of suffering a memory deficit. (Doc. 198-1 at 7.) Dr. Porter has already addressed this unfounded argument. The fact that Dartmouth Health repeats this spurious claim shows that they lack any serious challenge to the reliability of Dr. Bancroft's opinions.

Notably, Dartmouth Health does not question Dr. Bancroft's methodology or his analyses. Rather, they question some of the assumptions he relied upon in his report. Any dispute over his

---

[3] Of course, if Dr. Bancroft had not updated his report, Dartmouth Health would accuse him of relying upon factually inaccurate assumptions.

assumptions, however, can—and should—be addressed through cross examination and the adversarial process. It would be inappropriate to exclude an expert's testimony solely because one party disagreed with the factual basis of some of the assumptions identified in the expert report.

A primary product of Dr. Bancroft's work is his chart of financial loss projections. While Dr. Bancroft supplies a chart to guide the jury to understand the scope of a plaintiff's losses over time, Dr. Bancroft understands that his role is not to act as a finder of fact. He respects the jury's role in deciding facts and resolving factual disputes. As he testified at his deposition,

> [the jury is] going to hear a lot more testimony than I am going to hear. And then it's up to them to make that decisions that I think, well, it's reasonable to expect she would—that Dr. Porter would work for 3 more years or 5 more years or 15 more years. So I'm not rendering an opinion that she would work out to age 70. I'm not rendering an opinion that she would work out to 60. I'm leaving that entirely up to the trier of fact.

(Doc. No. 198-4 at 100-01.) Dr. Bancroft's testimony will assist the jury in their work of analyzing the parties' positions on Plaintiff's damages claims, and it is therefore entirely reasonable, reliable, and admissible.

Dartmouth Health's final effort to exclude Dr. Bancroft is their observation that this Court has twice limited Dr. Bancroft's testimony in prior cases. Both cases cited by Defendants, however, are inapposite, and neither case questions Dr. Bancroft's competence or qualifications to provide expert testimony. In the first case, *Deldebbio v. Blanchard*, No. 2:06-cv-115, 2008 WL 2581080 (D.Vt. June 26, 2008), for example, the plaintiff claimed loss of future earnings based upon a career that the plaintiff had hoped to begin but for which he had no prior experience. The Court simply ruled that the plaintiff could not pursue such a claim, and thus limited the expert testimony. But the Court did permit Dr. Bancroft to testify about the plaintiff's

general lost earning potential.  Moreover, a separate reason that the Court limited the scope of Dr. Bancroft's testimony was the plaintiff's counsel's untimely opposition to the motion *in limine* to exclude testimony; clearly, this reason had nothing to do with Dr. Bancroft's qualifications as an expert or the reliability of his methodology.

Similarly, in the second case, *Connors v. Dartmouth Hitchcock Med. Ctr.*, No. 2:10-cv-2013, 2013 WL 1221853 (D. Vt. Nov. 18, 2013), the plaintiff's counsel changed his theory of damages and submitted a new expert report based in part on data that had not been properly disclosed in discovery.  The Court was concerned about "the late and incomplete disclosure of underlying data, the plaintiff's about-face on her damages theory, and the apparent illogic of the numbers [based on the new theory]." *Id*. at *3.  In this case, Dr. Porter has not changed her theory of damages, and Dr. Bancroft's report is based on data that has been disclosed in a proper and timely manner.  None of the Court's concerns in the *Connors* case apply to the case at bar.

Of course, these two examples where Dr. Bancroft's testimony was limited (due to reasons unrelated to his qualifications or the reliability of his general methodology) out of over a hundred cases in which he has testified fails to raise a credible question about Dr. Bancroft's general qualifications as an expert economist.  Defendants have failed to raise a meaningful question about Dr. Bancroft's qualifications or the reliability of his analyses.  Accordingly, the Court should reject Defendants' arguments and deny their motion.

CONCLUSION

For the foregoing reasons, Dr. Porter requests that the Court DENY Defendants' motion.

Dated: February 28, 2025          /s/ Geoffrey J. Vitt
                                                   Geoffrey J. Vitt, Esq.
                                                   Vitt & Nunan, PLC
                                                   8 Beaver Meadow Road
                                                   P.O. Box 1229
                                                   Norwich, VT 05055-1229
                                                   (802) 649-5700
                                                   gvitt@vittnunanlaw.com

                                                   Eric D. Jones, Esq.
                                                   Langrock Sperry & Wool, LLP
                                                   210 College Street
                                                   P.O. Box 721
                                                   Burlington, VT 05402
                                                   (802) 864-0217
                                                   ejones@langrock.com

                                                   Sarah H. Nunan, Esq.
                                                   Vitt & Nunan PLC
                                                   8 Beaver Meadow Road
                                                   P.O. Box 1229
                                                   Norwich, VT 05055
                                                   (802) 649−5700
                                                   snunan@vittnunanlaw.com

                                                   ***Attorneys for Plaintiff,***
                                                   ***Misty Blanchette Porter, M.D.***