UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D., )<br>       **Plaintiff,** )<br>       )<br>   v. )<br>       )<br>DARTMOUTH-HITCHCOCK )<br>MEDICAL CENTER, )<br>DARTMOUTH-HITCHCOCK )<br>CLINIC, MARY HITCHCOCK )<br>MEMORIAL HOSPITAL, and )<br>DARTMOUTH-HITCHCOCK )<br>HEALTH, )<br>       **Defendants.** ) | Docket No. 2:17-CV-194 |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
*IN LIMINE* TO PRECLUDE DUPLICATIVE TESTIMONY
OF DR. PORTER'S QUALIFICATIONS AS A PHYSICIAN**

Plaintiff Misty Blanchette Porter ("Dr. Porter") submits this Opposition to the Motion *in Limine* filed by Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health") to prevent Dr. Porter from arguing, presenting evidence, or calling witnesses at trial to testify about her skills as a physician. Dartmouth Health claims that Dr. Porter intends to "parade" multiple witnesses in front of the jury to testify that she is a qualified physician, (Doc. 201-1 at 3–4), and that this serves no purpose other than to waste the jury's time, (Doc. 201-1 at 7). Dartmouth Health's assertions are both incorrect and misleading. For the reasons that follow, Dartmouth Health's Motion must be denied.

First, Dartmouth Health seeks to catastrophize the issue by implying, erroneously, (1) that Dr. Porter intends to call as a witness every person disclosed in discovery as potentially having

1

discoverable information about her credentials and expertise; (2) that every witness with knowledge about Dr. Porter's credentials and expertise will be extensively questioned about such knowledge; and (3) that there is no other basis for calling these witnesses. Although witness lists have not yet been exchanged by the parties, it is common sense that parties rarely call every individual in possession of relevant information. A number of the potential witnesses listed by Dartmouth Health, (Doc. 201-1 at 3–4), will not be called by Dr. Porter at trial, and every witness that will be called has relevant information to offer. The predicted impending catastrophe is unlikely to arise.

Second, Dartmouth Health's allegation that Dr. Porter's proficiency as a physician is not at issue in this case, (Doc. 201-1 at 2), is overly simplistic and ignores important aspects of Dr. Porter's claims. Dr. Porter's qualifications are relevant to her whistleblower retaliation and disability discrimination claims, particularly in the analysis of whether Dartmouth Health's purported reasons for terminating Dr. Porter's employment (rather than retaining her as an employee to perform non-REI OB/GYN tasks which she was already performing and for which she was highly qualified) were pretextual.

Dr. Porter's qualifications are relevant to her whistleblower retaliation claims. Dr. Porter made numerous complaints to Dr. DeMars about Drs. Hsu and Seifer, her fellow REI physicians at Dartmouth Health. Dartmouth Health has not volunteered to stipulate that Dr. Porter, in good faith, reported or caused to be reported what she had reasonable cause to believe was a violation of one or more laws or rules. *See* N.H. Rev. Stat. Ann. § 275-E:2, I (defining the elements of New Hampshire's whistleblower retaliation law). On more than one occasion, Dr. DeMars discounted or outright disputed Dr. Porter's concerns. Dr. Porter's qualifications and skills make her particularly suited to draw the line between less-than-perfect doctoring and incompetence.

Likewise, due to her leadership roles at Dartmouth Health and elsewhere, Dr. Porter is well versed in matters of compliance, consent, and proper billing procedures, and thus able to determine when Drs. Hsu and Seifer colored outside the lines.

Dr. Porter's qualifications are relevant to her disability discrimination claims. Although Dartmouth Health is correct that Dr. Porter was not directly or overtly terminated for performance- or skill-related concerns, evidence in the record indicates that Dartmouth Health discriminated against Dr. Porter because of her disability (or the perception of her disability). Comments from both Dr. DeMars and Dr. Merrens suggest that they viewed Dr. Porter as "less than" after she became disabled. *See, e.g., Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 150–153 (2d Cir. 2024) (discussing disability-focused responses by Drs. DeMars and Merrens as to why Dr. Porter was not being retained). Dr. Porter is entitled to show that even with a disability she remained a capable, skilled, valuable, and "qualified" physician.

Third, the depth and breadth of Dr. Porter's qualifications are relevant to the pretext analysis and the decision to terminate Dr. Porter's employment following closure of the REI Division rather than assign her to another position within the OB/GYN Department. Dartmouth Health states that the "crux of this case" is whether the decision to close the REI Division and terminate Dr. Porter's employment was pretext for disability discrimination and/or whistleblower retaliation. (Doc. 201-1 at 5.) The Second Circuit could not have been more direct in remanding the case with instructions to also consider Dartmouth Health's failure to reassign Dr. Porter to an alternative position within the OB/GYN Department. *See Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 133, 146–47, 167–68 (2d Cir. 2024). As the Second Circuit recognized, evidence in the record shows that Dr. Porter had skills that were not duplicated by any other physician in the OB/GYN Department or at Dartmouth Health. Evidence in the record also

indicates that Dartmouth Health had a continuing need for such skills, even after closure of the REI Division.

Dartmouth Health proposes to resolve the matter by stipulating that Dr. Porter "is an eminently qualified physician." (Doc. 201-1 at 1–2.) Restricting statements to "Dr. Porter was a qualified physician" (even an "eminently qualified" one) who was terminated simply as the result of a business decision to close a division denies a jury the evidence it needs to understand the magnitude of the loss to Dartmouth Health and the OB/GYN Department at a time when they could ill afford it. Understanding, for example, that Dr. Porter was performing highly-complex robotic surgeries at a time when this technology was relatively new and no one else in the OB/GYN Department was operating on benign gynecological problems using this technology, and that a need for these surgeries would continue despite closure of the REI Division, is relevant to a jury. The jury should also understand that Dr. Porter held a dual appointment in Radiology and OB/GYN and was internationally recognized for her ultrasound skills. The jury should hear how the other OB/GYN doctors used Dr. Porter's rare capabilities in ultrasound readings routinely as a consultant for complex cases. It was common for doctors who received results from Radiology to say: "I am going to run this by Misty." And finally, the jury needs to know that there was an on-going need for highly-qualified physicians like Dr. Porter in the OB/GYN Department at the time of Dr. Porter's termination. Restricting what can be said about Dr. Porter's abilities will not allow the jury to judge if the failure to reassign her to the OB/GYN Department was based on something other than a business decision.

Understanding how Dr. Porter's talents were perceived by the nurses, technicians, nurse practitioners, and doctors provides context as to why *all of them* approached her when there was real problem in the department. Dr. Porter was seen as the most qualified person to raise the

4

alarm. Because she trained residents, fellows, and was a board Examiner, and was used as a consultant by her colleagues who would literally line up outside her door to review cases with her, the perception was she was the proper person to do something about the harm being done by the two physicians in the REI division. Dr. Porter raised these concerns to the Chair of the Department and Risk Management. It is necessary for the jury to understand Dr. Porter qualifications so it can assess if Dr. Porter was terminated for her vocalization on behalf of herself and as a leader in the department or if it was simply a neutral business decision.

### Second Circuit's Opinion

The Second Circuit's choice to include detailed information about Dr. Porter's qualifications and usefulness to the entire OB/GYN Department should resolve any doubts this Court may have about the relevant of such evidence to Dr. Porter's claims. The Second Circuit at the beginning and conclusion of its opinion emphasizes that the issue for trial is not only the reason for Dr. Porter's termination, but the reason that she was not "retained" in or "reassigned" to the OB/GYN Department. The Second Circuit begins its opinion: "[W]e conclude that the district court…erred in concluding that no rational juror could infer that Dr. Porter was terminated, *and not retained,* based on her disability or her reporting activities." *Porter*, 92 F.4th at 133 (emphasis added). The Court ends its opinion with the same message: "We conclude that the district court erred in finding that the record lacked evidence from which a jury could permissibly find that Dr. Merrens terminated Dr. Porter's employment—*rather than reassigning her, as she requested,* to fill known needs of OB/GYN—in reliance on the representations and recommendations from Dr. DeMars that were motivated by malice, bad faith, or a desire for retaliation." *Id.* at 168 (emphasis added).

The Court discusses the employer's reassignment obligation. Both the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 *et seq.* and the Rehabilitation Act of 1973, 29 U.S.C. §701 *et seq.* provide that "reasonable accommodation for an individual with a disability may include job restructuring or reassignment to a vacant position." *Porter*, 92 F.4th at 152. The burden is on the plaintiff to show "that a vacancy existed into which … she might have been transferred." *Id.* The Court found that Dr. Porter "presented such evidence." *Id.*

> In sum, from Dr. Merrens's direct 'on disability' answer to the question of 'why' Dr. Porter was being terminated and not retained, as well as from other evidence--including (a) OB/GYN's June 2017 Hiring Request, (b) Dr. Merrens's awareness of "number of areas" in which OB/GYN was "short-staffed," (c) Dr. Porter's communication to Dr. Merrens of her interest in an OB/GYN position that did not center on infertility, (d) Dr. Porter's recognized skills, and (e) several statements by Dr. Merrens and Dr. DeMars that, in the context of whether to terminate or retain Dr. Porter, referred explicitly or implicitly to Dr. Porter's disability—a jury could permissibly infer that reassigning Dr. Porter to OB/GYN instead of terminating her employment would be a reasonable accommodation, and that she would have been so reassigned but for her disability.

*Id.* at 153.

The Second Circuit's opinion is replete with references to statements by doctors, nurses, administrators, and others about Dr. Porter's exceptional talents. Those statements are relevant to the jury deciding why, given the obvious need of the OB/GYN Department for Dr. Porter's well-documented skills, she was not retained or reassigned to that department. The jury would be entitled to hear from witnesses who had information about her skills and why the OB/GYN Department lacked the capacity to provide the same level of care to patients after her termination. Nurse Victoria Maxfield, who had been employed by the OB/GYN Clinic and worked with Dr. Porter for 18 years, wrote to Dr. Ed Merrens: "Dr. Porter's 'expertise in gynecologic ultrasounds, myomectomies, hysteroscopy, and gyn surgeries *provide a level of care*

6

*to women that is not available from other members of the Gynecology staff.*'" *Porter*, 92 F.4th at 143 (emphasis in original). A stipulation that Dr. Porter is well qualified, excellent, or the like simply does not provide the jury with the level of detail that it is needed to evaluate the decision not to retain or reassign her.

Early in its opinion, the Second Circuit discusses Dr. Porter's performance and quotes Dr. Leslie DeMars, former Chair of the OB/GYN Department: "Misty is an amazingly gifted and dedicated reproductive endocrinologist and infertility specialist who I think through technical skill and creativity was able to achieve lots of desired pregnancies for women, and that's her 'Misty Magic.'" *Porter*, 92 F.4th at 134. Besides professing concern that allowing the testimony of the witnesses would be a "colossal waste of time," Dartmouth Health argues that allowing mention of Dr. Porter's magic "could improperly influence the jury to make an emotional judgment." (Doc. 201-1 at 7.) Dartmouth Health again catastrophizes unnecessarily the potential impact on the jury should Dr. Porter be permitted to introduce testimony that "glorifies her abilities," complaining that "Plaintiff will surely mislead and confuse the jury into making a decision based off emotion rather than the merits of the case." (*Id.*)

Dartmouth Health's concerns about the jury losing its capacity to make a rational decision are unfounded. Discussion of Dr. Porter's exceptional talents might make jurors ask why she was not reassigned to or retained in the OB/GYN Department. And so they should, as the decision only makes sense in the context of unlawful discrimination and retaliation. Dr. Porter is confident, however, unlike Dartmouth Health, that the jury will be able to follow the Court's instructions and decide the case based on the law and an objective evaluation of the evidence.

Throughout its opinion, the Second Circuit quotes liberally from the admissible evidence that Dr. Porter submitted about her talents and why they were needed in the OB/GYN Department. We are entitled to conclude that the Court found the information probative in reaching a decision. A jury should have the same option.

## CONCLUSION

For the foregoing reasons, Defendants' Motion *in Limine* to Preclude Duplicative Testimony of Dr. Porter's Qualifications as a Physician should be denied.

A closing observation – even if the Court would permit it, Dr. Porter has no intention of calling thirteen witnesses (or some number close to that) to provide identical testimony about her proficiency. Her task is to convince the jury that the decisions to terminate her employment and not to reassign her to OB/GYN were based on her disability and whistleblowing. She intends to do that without wasting the time of the Court or the jury.

Dated: February 28, 2025                /s/ Geoffrey J. Vitt
                                                                           Geoffrey J. Vitt, Esq.
                                                                           Vitt & Nunan, PLC
                                                                           8 Beaver Meadow Road
                                                                           P.O. Box 1229
                                                                           Norwich, VT 05055-1229
                                                                           (802) 649-5700
                                                                           gvitt@vittnunanlaw.com

                                                                           Eric D. Jones, Esq.
                                                                           Langrock Sperry & Wool, LLP
                                                                           210 College Street
                                                                           P.O. Box 721
                                                                           Burlington, VT 05402
                                                                           (802) 864-0217
                                                                           ejones@langrock.com

Sarah H. Nunan, Esq.
Vitt & Nunan PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055
(802) 649−5700
snunan@vittnunanlaw.com

***Attorneys for Plaintiff,
Misty Blanchette Porter, M.D.***