IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D., <br><br> Plaintiff, <br><br> vs. <br><br><br> DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, <br><br> Defendants. | Case No. 2:17-cv-194 |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION IN LIMINE TO PRECLUDE TESTIMONY OF ROBERT BANCROFT**

Defendants submit this Reply Memorandum in Further Support of their Motion in Limine to Preclude Testimony of Robert Bancroft.

I.   Qualification Issues

As discussed in Defendants' opening memorandum, Bancroft is at best barely qualified to render expert opinions on the issues of the economic impact of termination of a specialty physician's employment at one academic medical institution and near simultaneous transfer to another similar program nearby by virtue of his advanced degree in agricultural economics 45 years ago and his career as a mostly-plaintiff-designated hired witness to provide interpretations of his clients' alleged damages.  While Bancroft has undoubtedly had many cases over the years, the fact remains that employment cases – not to mention employment cases like this -- are a

1

small part of his career and have been vanishingly infrequent at the twilight of his career. Given his at-best borderline credentials to opine on a case such as this, the Court should be cautious about permitting wide-ranging testimony dressed as expert opinion to go to the jury, and should carefully consider what testimony is really expert analysis of evidence in the case, and what is just an amplification of self-serving spin.

II.     Speculative, Conjectural and Illogical Opinions Without Foundation Should Be Barred

Plaintiff's exhibit list lists only Bancroft's August 24, 2024 report – created after expert discovery was closed and Bancroft's deposition was taken – as the apparent basis for his testimony. There has been no other discovery, and no updates to Bancroft's reliance materials since the case was with the trial court prior to summary judgment. Plaintiff's have yesterday first identified as a trial exhibit Bancroft's August 24, 2024 "analysis." See Plaintiff's Exhibit List filed March 10, 2025. Plaintiff has provided no report or analysis dated August 24, 2024.

Assuming Plaintiff's reference to the August 24, 2024 analysis on the exhibit list is mistaken and Plaintiff really is intending to offer Bancroft's August 26, 2024 report, this report would appear to be on its face inadmissible hearsay if offered by Plaintiff. The Plaintiff has not identified any exhibits they plan to use as substantive or demonstrative evidence in relation to this report, such as the Projected Lost Earnings chart on page 3 attached to the report. Nor have they provided us with any other exhibits they plan to introduce through Bancroft, such as reliance documents or the assumptions on which it is based which may found the basis for Bancroft's testimony. **See Exhibit D.**

The August 26, 2024 report was preceded by two prior, very different reports, **see Exhibits A and B,** which reached widely different conclusions. All of them suffered from the

same shortcomings: they were based on speculation, hearsay, imprecision and fuzzy logic that make Bancroft's opinions subject to challenge as improper expert testimony.

To the extent the Bancroft seeks to introduce his analysis via the Projected Lost Earnings chart as a demonstrative exhibit or otherwise, DHMC seeks to have that table or analysis in particular precluded. DHMC reserves the right to expand on its bases for objecting to Bancroft's opinions based on testimony elicited at the upcoming evidentiary hearing.

In a nutshell, Bancroft's analysis as set forth in his August 26, 2024 opinion and accompanying assumptions and table of calculations is objectionable for the following categories of reasons, among others:

    A.    <u>He assumes a 12% present value annual increase in damages</u>.

Bancroft appears to assume an annual percentage rate increase of 12% for purposes of calculating present value. Of course actual interest rates have run far lower than that rate, with a conservative range over that period of quarterly rates at 3.25 to 8.25% over the years since Dr. Porter ceased working at DHMC.[1]

As this Court noted in GU Markets LLC v. Supermarket Equip. Resale, Inc., Civil Action No. 1:01-CV-288, 2003 U.S. Dist. LEXIS 20543, at *2 (D.Vt. Sept. 9, 2003) (emphasis added): "Under Vermont law, an award of prejudgment interest is mandatory where damages are readily ascertainable and discretionary in other cases." Although the Vermont statute for pre-judgment interest, 9 V.S.A. sec. 41a(a), calls for 12% prejudgment interest, this highly inflated number is only applicable for a "sum certain", a reasonably identifiable, hardly disputable amount which would be payable by the defendant, and not an unquantifiable, indirect or disputable sum. <u>Estate</u>

---

[1] See JPMorganChase Historical Prime Rate Chart at https://www.jpmorganchase.com/legal/historical-prime-rate.

3

of Fleming v. Nicholson, 168 Vt. 495,724 A.2d 1026 (Vt. 1998); d'Arc Turcotte v. Estate of LaRose, 153 Vt. 196, 569 A.2d 1086 (Vt. 1989).

Here, many factors make Dr. Porter's calculation of damages at best uncertain, undefined or speculative. Indeed, the three reports by Bancroft over the years varying the amounts to which Dr. Porter is entitled based on differing analytic methodologies with outcomes varying by millions of dollars make that point eloquently. See Exhibits A, B, and C (calculating damages at $3.8 million, $4.8 million and $4.3 million). Furthermore, pre-judgment interest should not be allocated given the district court's summary judgment ruling in favor of Defendants in 2020, the global COVID pandemic delaying adjudication of the appeal from that judgment, and other issues that have made this case go on for longer than the norm, often at the request or with the consent of Plaintiff. Instead, the Court should not direct the jury to find a sum certain that is subject to 12% interest, and should instead instruct them to find damages from the evidence in the case as they see fit and reasonable. If prejudgment interest is deemed appropriate, the jury can find it based on their conclusions of what the evidence shows.

  B.  Huge portions of Bancroft's opinions rely on scant and inadmissible hearsay, making his analysis in admissible.

As described in his deposition testimony, and in his work papers, huge portions of Bancroft's analysis are drawn entirely from conversations and communications with Plaintiff or her counsel, rather than from non-subjective data. That makes the statements subject to hearsay challenges and further undermines the nature of the expert opinion. Bancroft is merely parroting what he has been told by plaintiff or counsel and dressing it up as "expert" testimony. This is the type of expert opinion the rules are intended to police.

4

### C. His opinions are based on assumptions that are unsupported and grossly self-serving rather than "objective science."

Dr. Bancroft's assumptions are essentially unsupported. For example, in his August 26, 2024 analysis, he assumes that in January 2025, Dr. Porter would have assumed a .6 part-time position at UVMMC, while if she had stayed at Dartmouth, she would have continued to be employed full time, resulting in over a hundred thousand dollars in claimed damages due to this difference in salary. See **Exhibit D, Assumption 4, and Projected Lost Earnings at columns 1 and 7.**

This is wholly unsupported wishful-thinking adorned as expert analysis. There is no basis for concluding or projecting, as Bancroft does, that Dr. Porter would have continued to work full-time at DHMC while accepting a part-time position at UVMMC. The only basis for this is speculation as to what Dr. Porter would have supposedly hoped to do and to happen. Dr. Porter can testify to that, if adequate foundation is laid, but Bancroft should not be able to dress that opinion up as "expert" economic analysis. Moreover, Dartmouth should not be held liable for Dr. Porter's personal life choice to reduce her employment to .6 of full time. Using this unsupportable assumption as a starting point undermines all of Bancroft's loss earning calculations after January 1, 2025.

The effect of this calculation in Bancroft's report is substantial. It increases Dr. Porter's claimed annual loss attributed to Dartmouth by over $160,000 per year over the years 2025 to 2033 for a cumulative amount of some $1.4 million. **See Exhibit D, Lost Earnings chart at column 7.**

Similarly, Bancroft appears to try to find a basis to increase Dr. Porter's losses from the alleged improper termination at every turn. He assumes, with scant basis, that she would receive

5

a 2.5% salary increase each year.  That is based on only the most stretched analysis.  Again, it is uncontroverted that the division in which she worked was eliminated.  The hospital was going through difficult financial times.  There was the effect of a global pandemic that may have affected salary increases. At the time her position was eliminated, she was not working full-time.  Regardless, Bancroft predicts Dr. Porter would have had consistent 2.5% annual raises.  This is unsupported speculation, and should not be anointed as expert economic data or analysis.  Again, the inflated rates infect the whole of Bancroft's calculations.

Moreover, he assumes, based on no data other that his client's say-so, that she would have made full professor in 2022 years after her termination and received a 5% pay increase.  We are unaware of any evidence supporting this conclusion, and it's impact on the calculations is substantial.  It should not be permitted as "expert" opinion. These speculative and unsupported calculations flow throughout Bancroft's table.

### D.   There is no explanation of the second "gross up" of Dr. Porter's damages.

This is double and even triple counting.  The basis for compensatory damages is pretty standard.  Back pay converted to present value and front pay converted to present value.  The figures for back pay and front pay that Dr. Bancroft uses as the basis for his opinion are all drawn from W2 and other salary information that are amounts before taxes.  Thus, there is no need to "gross these up".  They already include the amounts he would need to pay in taxes in them.  Moreover, to then take these amounts and "gross them up" a second time, **see Exhibit D Column 12**, is just double counting, apparently motivated by a desire to make a high analysis for the client who pays his fee.  This may be why the nature of his analysis, or its logic, was not spelled out in his chart.  Our experts could not understand it, nor reproduce it. It is notable that almost half of the $4 million in damages claimed by Bancroft is attributable to this two-step

6

grossing up process. If Bancroft's explanation is that a judgment received as a lump sum would be taxable at a higher interest rate because the lump payment would move Plaintiff into a higher tax bracket, the cost of that to Dr. Porter is only the amount that is subject to the higher marginal tax rate, not the calculation he has in his table adding some $2 million we had to the loss figure.[2] Also relevant is that Dr. Porter already is a high earner, making well-over $300,000 a year, so there is only so much higher her tax rate can go.

      E.    <u>Other problems exist as well</u>. It is anticipated other issues showing deficiencies in Bancroft's calculations and loss table will be shown via testimony.

III. <u>Conclusion</u>

For the foregoing reasons, and others that will be asserted based on hearing testimony, Bancroft's expert testimony should be excluded or significantly limited. His qualifications are too limited. His analysis is too speculative, based on hearsay and conjectural. The views on loss that he purports to bring as an expert economist are too confined to being a mouthpiece for unsupported and self-serving assertions by Plaintiff. They should not be countenanced as "expert" testimony. We reserve the right to supplement this memorandum should Bancroft express new or altered opinions, or proffer new reliance information.

---

[2] Economic experts we had assess this could not reproduce Bancroft's math from his descriptions.

Date: March 11, 2025	Respectfully submitted,

/s/ Tristram J. Coffin
Tristram J. Coffin

**DOWNS RACHLIN MARTIN PLLC**
Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

and

**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald-Ramos (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

## CERTIFICATE OF SERVICE

I hereby certify that, on March 11, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Tristram J. Coffin*
Tristram J. Coffin

23410080.1