1                  UNITED STATES DISTRICT COURT
                          FOR THE
2                  DISTRICT OF VERMONT

3

4  Misty Blanchette Porter,   )
                        )
5                        )
  v.                    ) Case No. 2:17-cv-194
6                        )
                        )
7  Dartmouth-Hitchcock Medical  )
  Center, et al.          )
8                        )
  _____)
9

10  RE:  Hearing on Motions in Limine (Docs. 198, 200-202),
    Motion to Quash Dr. Joanne Conroy's Trial Subpoena (Doc. 199),
11  Motion to Amend Complaint (Doc. 213), and an Evidentiary
    Hearing on the Motion in Limine to Preclude the Testimony of
12  Robert Bancroft (Doc. 198)

13  DATE:  March 14, 2025

14  LOCATION:  Burlington, Vermont

15  BEFORE:  Honorable Kevin J. Doyle
             Magistrate Judge
16

17  **APPEARANCES**:

18  Eric D. Jones, Esq.
    Langrock, Sperry & Wool, LLP
19  210 College Street
    PO Box 721
20  Burlington, VT 05402-0721

21  Geoffrey J. Vitt, Esq.
    Vitt & Associates
22  8 Beaver Meadow Road
    PO Box 1229
23  Norwich, VT 05055-1229

24                    - Continued on Next Page -

25

1    Donald W. Schroeder, Esq.
     Morgan McDonald, Esq.
2    Foley & Lardner LLP
     111 Huntington Avenue, Suite 2500
3    Boston, MA 02199

4    Tristram J. Coffin, Esq.
     Downs Rachlin Martin PLLC
5    199 Main Street
     PO Box 190
6    Burlington, VT 05402-0190

7

8

9

10              TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                    United States District Court Reporter
11                      *verbatim@vermontel.net*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Witness            Examined By          Page      Line

 3    Robert Bancroft    Atty. Coffin          8         17

 4                       Atty. Jones          44         13

 5

 6

 7

 8

 9                       *   *   *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (A portion of the beginning of the hearing was not
 2              recorded.  The following transcript is where the audio
 3              recording begins.)
 4              ATTORNEY COFFIN:  -- August 26th 2024, and they'll
 5   have that go to the jury and explain that to the jury either as
 6   substantive or demonstrative evidence.  You know, we'd submit
 7   that there are problems with the chart such that it really
 8   can't be produced or introduced in a way that is fair expert
 9   testimony.  It's either, you know, adding up pretty basic
10   numbers that don't need an expert, or it's expert analysis that
11   really is not sensible, logical, or grounded in information.
12              And so I'll go through kind of a focused presentation of
13   our issues with the report, but our briefing lays out some of
14   those as well, but there will be some additional ones, Your
15   Honor.
16              THE COURT:  Okay.
17              ATTORNEY JONES:  Happy to have Vermont as well.
18              THE COURT:  Sure.
19              ATTORNEY JONES:  It appears to us that defendants'
20   objections to Dr. Bancroft's analysis is that they challenge
21   his assumptions.  They're not challenging his basic
22   methodology.  They're not challenging his basic qualifications.
23   We think the qualifications and methodology are clear.  It's
24   not junk science.  This is the same methodology he's been
25   applying for 40 years in all types of cases, including
```

1    employment cases.

2        What they're challenging is the factual assumptions.  That

3    is often, if not always, the case with expert testimony, and

4    it's the party proffering the opinion, us, that bears the

5    burden of proving those facts, and we believe that we will, but

6    it's the adversary process of cross-examination that allows the

7    jury to make decisions about what to accept and what not to

8    accept with regard to those assumptions.  But, with regard to

9    Dr. Bancroft's qualifications and his methodology, there's no

10   serious question that he is a qualified expert.  He's testified

11   in this court.  Judge Crawford recently adopted his report.

12   And so we think he's fully qualified, and, if they have

13   concerns about the assumptions, that's for the trial.

14           THE COURT:  Okay.  Mr. Coffin?

15           ATTORNEY COFFIN:  And very brief volley back.  The

16   Court will need to assess the relevance of his testimony based

17   on testimony or the testimony that's actually offered at the

18   trial.  So probably it may not be something that the Court can

19   fully decide after today's hearing, and we're going to have to

20   wait to hear what the testimony that lays the foundation for

21   his testimony is should the Court rule that he is qualified to

22   even go forward.

23        That leads to an interesting problem, though, because he's

24   got a very detailed, elaborate chart which was produced in

25   August of 2024.  And so I think that the plaintiffs are either

1    in a, you know, hundred percent win or nothing comes in in

2    terms of a chart from him.  Because it's too late for further

3    expert disclosures and opinions with regard that.

4         ATTORNEY JONES:  Yeah, Judge, *Daubert* talks about the

5    Court's gatekeeping function, about whether the expert should

6    be allowed to testify in the first instance.  They asked for a

7    *Daubert* hearing.  Here we are.  I think the Court, as of

8    today's hearing, is in a position to make that ruling about

9    whether or not he is able to testify.  Again, all these issues

10   are trial issues, not expert qualification issues.

11        THE COURT:  Right.  It is a gatekeeping function for

12   the Court, as the parties are well aware of.  So are you asking

13   me at this point then to essentially make that gatekeeping

14   assessment and then, assuming it goes in plaintiff's favor,

15   then Dr. Bancroft testifies and cross-examination is how you

16   attack assumptions and all the other things that you have

17   raised in your brief?

18        ATTORNEY COFFIN:  Well, respectfully we haven't posed

19   this as a *Daubert* issue.  It's not just the qualifications of

20   the witness.  It's the substance of his testimony with the

21   analytic chart.  And so the Court may, for example, may reach a

22   decision today, Okay, I'm going to let him go forward saying

23   that it's possible that he won't provide junk science here.

24   But, you know, after the testimony is laid at trial, the Court

25   may well decide, Hey, that chart, based on what you hear at

1   this hearing and what you hear at the trial, is unfair to

2   present to the jury because it's filled with problems.

3       And that's certainly I would say a *Daubert* hearing.  It's

4   more a relevance and a 403 issue that the probative value of

5   his testimony or at least as documented in that chart endorsed

6   as provided by an expert witness outweighs the probative value.

7           THE COURT:  Okay.  So Dr. Bancroft is here.  Would

8   you like to examine him today at all, or is this just -- I was

9   under the impression that we were --

10          ATTORNEY COFFIN:  Yeah, well, I don't think we asked

11  for the hearing.

12          THE COURT:  I thought you did ask for an evidentiary

13  hearing.  No, no.  It's in the briefing, if I'm not mistaken.

14          ATTORNEY COFFIN:  I don't think it is.

15          THE COURT:  All right.  Let's --

16          ATTORNEY COFFIN:  No, it's not.  Yeah, we were

17  wondering where that came from.

18          THE COURT:  Yeah.  Defendants hereby request an

19  evidentiary hearing on this motion pursuant to Rule 702.

20          ATTORNEY COFFIN:  We did?  So I guess we did.

21          ATTORNEY JONES:  If they're withdrawing it, we agree

22  that he can do this at the trial.

23          THE COURT:  Okay.  So you're not seeking an

24  evidentiary hearing at this time?

25          ATTORNEY COFFIN:  Well, let me just confer with

1    counsel.

2              THE COURT:  Okay, sure, sure.

3              ATTORNEY COFFIN:  We'd like to proceed now, and, if

4    it makes sense, we'd have additional voir dire of him at trial,

5    but we've had this hearing now, which lays a good groundwork,

6    and the judge can, you can make rulings accordingly.

7              THE COURT:  Okay, all right.  So then would you like

8    to call Dr. Bancroft at this time?

9              ATTORNEY COFFIN:  We're going to call Dr. Bancroft.

10             THE COURT:  Okay.  Dr. Bancroft.

11                      ROBERT BANCROFT,

12             having been duly sworn to tell the truth,

13                      testifies as follows:

14             ATTORNEY COFFIN:  May I approach, Your Honor, with

15   the exhibit binders?

16             THE COURT:  Yes, yes.

17             DIRECT EXAMINATION BY ATTORNEY COFFIN

18   Q.   Good afternoon, Dr. Bancroft.

19   A.   Good afternoon.

20   Q.   I'm not sure if you remember me, but we've worked together

21   before many years ago now, but good to see you again.

22   A.   I certainly remember you.

23             ATTORNEY COFFIN:  Good.  So we'd like marked as an

24   exhibit to this a binder of exhibits which is, are numbered 1

25   through 6, and Number 6 is a placeholder for the deposition

 1    that I didn't stick the whole deposition in there, but we'd

 2    move that Dr. Bancroft's deposition of October 30, 2019 be

 3    submitted as an exhibit here today, please.

 4              THE COURT:  Mr. Jones, any objection?

 5              ATTORNEY JONES:  No objection.

 6              THE COURT:  Okay.  It's admitted.

 7    BY ATTORNEY COFFIN:

 8    Q.    And, Dr. Bancroft, if you look at that notebook in front

 9    of you that's been marked as Exhibit 1, and I guess these are

10    subexhibits -- wait.  Let's make that -- I'd suggest we make

11    that Exhibit A and then Exhibits 1 through 6 in the binder.

12    The first exhibit there is under Tab 1.  Do you recognize that

13    as your CV?

14    A.    Yes.

15    Q.    Okay.  And that sets forth your qualifications as you'd

16    assert them here today to provide the testimony in this case?

17    A.    Yes.

18    Q.    Okay.  And you've been a witness many, many times before

19    as an economic analyst; is that right?

20    A.    Yes.

21    Q.    Now, aren't I right, though, your actual academic training

22    is a masters in 1976 in agricultural economics from the

23    University of Vermont?

24    A.    I did get a masters, yes, in '76, yes.

25    Q.    And then a PhD from Purdue in 1981?

1    A.    Yes.

2    Q.    And you spent some time with USDA, but it was quite some

3    time ago; is that fair to say

4    A.    I spent some time with the economic research service, yes.

5    Q.    Okay.  And you were adjunct professor of economics at UVM

6    until 1996; is that right?

7    A.    I was an assistant professor until '91 and then an adjunct

8    after to '96.

9    Q.    Okay.  An adjunct is more part-time than an assistant; is

10    that fair to say?

11    A.    Yes.  I taught one course a year.

12    Q.    So, essentially, from basically 1996 to the present, your

13    primary occupation has been providing these sorts of expert

14    opinions to litigants; is that right?

15    A.    It has been my primary, but it was my primary probably

16    from about '86 on.

17    Q.    Okay.  And fair to say you provide expert analysis in all

18    sorts of cases; is that correct?

19    A.    Yes.

20    Q.    But your expert analysis in employment matters is a fairly

21    small subset of your overall practice; is that right?

22    A.    No.

23    Q.    Okay.  You list a number of different topics here that

24    you've provided, and I see about ten, and in there is wrongful

25    discharge.  You don't think that's a, that makes a small part

1    of your practice?

2    A.    No, I don't think it's a small part of my practice, no.

3    Q.    Would you say your practice is about 10 to 20 percent

4    employment matters?

5    A.    I would say that it varies.  I think, probably, over the

6    last 30 years, it's probably been 20, 25 percent.  Right now

7    it's actually almost 50 percent.

8    Q.    Okay.  And are you fully engaged as an economic consultant

9    at this point?

10   A.    I'm not looking for cases, no.

11   Q.    Okay.  And you've handled 2,500 cases over the course of

12   your career, I think, was your testimony; is that correct?

13   A.    Yes.

14   Q.    And about how many cases are you working on right now?

15   A.    I have 22 cases right now that I'm actively working on

16   that I know, and then there's maybe as many as another 20 that

17   I have worked on in the last, oh, six to eight months.  I've

18   rendered reports.  I assume they're still active, but I don't

19   know.

20   Q.    Okay.  And, during the bulk of your career, you said 20 to

21   25 percent was related to employment matters; is that correct?

22   A.    Yes.  And since -- let me qualify that.  Since the late

23   1990s.

24   Q.    Okay.  I imagine a fairly small subset of those dealt with

25   physicians at academic teaching hospitals; is that right?

1    A.   I've had some, but as a, in the grand total, yes, it's a
2    small, obviously a small percent.
3    Q.   Okay.  And how about cases involving the transfer of a
4    physician who is terminated at one academic teaching hospital
5    in New England to another?
6    A.   I've had other cases, not many, but I've had similar ones.
7    Q.   One or two?
8    A.   I can't say for sure, but at least one and more likely
9    two.
10   Q.   Okay.  So at least one, possibly two, that are closely
11   parallel to this case in that they involved some sort of a
12   personnel action of a physician at one academic teaching
13   hospital in New England transferring to another; is that right?
14   A.   Yes.
15   Q.   Now, you've prepared a series of reports per your work in
16   this case; is that right?
17   A.   Yes.
18   Q.   And those are set forth at, on the binder that's Exhibit
19   A, at Exhibit 3, 4 and 5.  Do you see those?  Sorry, 2, 4, and
20   5.
21   A.   Yes, I see them.
22   Q.   Am I correct that a lot of information in that report was
23   based on conversations you had with plaintiff and her counsel?
24   A.   Yes.
25   Q.   And conversations you had, but with plaintiff and her

1    counsel; is that correct?

2    A.    Yes.

3    Q.    And there's some additional materials, but you're not

4    denying that you rely heavily on what the plaintiff told you

5    for reaching your conclusions as asserting in these reports; is

6    that correct?

7    A.    On projecting out what her earnings would be

8    post-termination, yes.

9    Q.    Okay.  And the basic -- so directing your attention,

10    please, to the August 26th 2024 report --

11          THE COURT:  I don't want to interrupt your flow,

12    Mr. Coffin, but so you have moved for the admission of Exhibit

13    6?

14          ATTORNEY COFFIN:  I'm sorry.  I had meant to move for

15    the admission of all of A, which is a the whole binder.

16          THE COURT:  Okay.  Mr. Jones, any objection to 1 to 6

17    in Exhibit A?

18          ATTORNEY JONES:  No objection.

19          THE COURT:  Okay.  So then Exhibit A in its entirety

20    is admitted.  Go ahead.

21    BY ATTORNEY COFFIN:

22    Q.    Thank you.  Directing your attention to Tab 2, Exhibit 2

23    of A, is that your report dated August 26th 2024?

24    A.    Yes.

25    Q.    And that's the last report you prepared that was submitted

1    to the defense in this case; do you understand that?

2    A.    That's the last report I prepared, yes.

3    Q.    And the report includes a two-page narrative section; is

4    that right?

5    A.    Yes.

6    Q.    And then a, what looks like a table called "Projected Lost

7    Earnings for Dr. Misty Blanchette Porter" -- is that correct --

8    on the third page of --

9    A.    Yes.

10    Q.    -- Exhibit 2?  Yeah.  And then there's a couple of pages

11    of assumptions; is that correct?

12    A.    Yes.

13    Q.    And then a finally last table; is that right?  A last

14    table, last table entitled "Additional University of Vermont

15    Employment-Related Costs".

16    A.    Yes.

17    Q.    Is that right?  Okay.  And you prepared other reports

18    dated October 30th and October 1st; is that right?  Excuse me.

19    October 30th 2018 and October 1st 2019; is that right?

20    A.    Yes.

21    Q.    Okay.  And those are submitted and are at Tabs 4 and 5 of

22    Exhibit A; is that right?

23    A.    Appears to be, yes.

24    Q.    And your methodology for these reports and all of your

25    reports is fairly consistent in that you're essentially looking

1    for what her earnings were at the place from which she was

2    subject to the personnel action, Dartmouth-Hitchcock, and

3    comparing them with her earnings at the new place -- is that

4    right --  UVM Medical Center?

5    A.   Yes.  And I have issue with the adjective fairly.  They

6    are exactly the same methodology.

7    Q.   Okay.  Exactly the same methodology.  But, essentially,

8    you're comparing what she was earning at Dartmouth and what she

9    was earning and is expected to earn at UVM to determine the

10   difference between the two, which would be her loss; is that

11   correct?

12   A.   Yes.  I projecting out what her earnings would have been

13   at Dartmouth, and I'm projecting out -- well, I know what she's

14   actually earned at least as of the last year.

15   Q.   Right.

16   A.   And then I'm making projections of what I think she will

17   earn based on information she provided me.

18   Q.   Right.  And then you convert it to present value by adding

19   an amount of money to make up the difference of current dollars

20   for inflation; is that right?  Future.

21   A.   Well, you know, some of it's historical, which I add

22   interest onto, and some of it's future, which I discount back

23   to the present.

24   Q.   Okay.  So let's talk about the past earnings.  The damages

25   that you assessed to her that happened previously, you add an

1    adjustment for inflation; is that correct?

2    A.    Not for inflation.  I add an interest factor on.

3    Q.    Okay.  And what is the interest factor for if it's not for

4    inflation?

5    A.    I don't know it's not for inflation, but it's a -- I think

6    you'd have to go back and look at back in the 70s when the

7    Vermont legislature, in its wisdom, decided that prejudgment

8    interest should be calculated at 1 percent per month, simple

9    interest.

10   Q.    Okay.  So that's how you came up with 12 percent as

11   applicable for the interest on the past damages; is that right?

12   A.    12 percent simple interest, annual interest, or 1 percent

13   Vermont.

14   Q.    Got it, okay.  Now, you would agree with me that 12

15   percent interest is an unnaturally high level of interest per

16   in today's climate?

17   A.    All depends on the risk.  I understand where you're going

18   with it.  It's a high rate, but there are interest rates that

19   are higher than that, but, again, they are risk-dependent.

20   Q.    Okay.  As an economist, are you aware of interest rates

21   that are commonly available in the market that are lower than

22   that?

23   A.    Yes.

24   Q.    Consumer price index?

25   A.    That's not an interest rate.

1    Q.    Well, let's leave -- is it ever used to calculate

2    interest?  Treasury bonds?

3    A.    There are inflation index treasury bonds, yes.

4    Q.    Okay.  If you go to a bank, what they do return for a CD?

5    A.    It all depends on when and what the terms are.

6    Q.    Is it anywhere approaching 12 percent?

7    A.    I don't believe so.

8    Q.    Okay.  More like 2 or 3 percent?

9    A.    I just got one yesterday for 3.9.

10   Q.    What's the interest rate on a treasury bond right now?

11   A.    I haven't looked it up in a couple of weeks, but what year

12   and how many?  What are we talking about?

13   Q.    Approximately -- well, you know, a standard, you know,

14   United States treasury bond, what would that go for right now?

15   A.    Well, it varies on how it paid.  From, are you talking 6

16   months or are you talking 30 years?

17   Q.    Well, how about 10 years?

18   A.    Ten years is around 4 percent, give or take.

19   Q.    Okay.  20 years?

20   A.    Slightly higher, but not much.

21   Q.    Okay.  So it's not uncommon for the interest rate to be

22   somewhere in the order of 2 to 3, maybe 4 percent; is that

23   correct?

24   A.    5 percent, yeah.

25   Q.    And yet you in, in your chart, have used 12 percent as --

1    glasses.  Sorry.  You've used 12 percent as your interest

2    adjustment for all of the loss on the right side of your chart;

3    is that correct?

4    A.    For all the loss?

5    Q.    Sorry.  Let's go through your chart.  Your chart at

6    Exhibit 2 on the table, the projected lost earnings, the third

7    page -- oh, yeah.

8    A.    Thank you.  Yes.  I'm sorry

9    Q.    Okay.  You've applied a 12 percent inflation, interest

10   adjustment added to your calculation of losses for the losses

11   from 2017 through 2024; is that right?

12   A.    Yes.

13   Q.    And that's set forth in one of your assumptions on the

14   next page, Assumption 1; isn't that right?

15   A.    I think it actually states it in Assumption 10.

16   Q.    Okay, yeah.  I apologize.  Right.  The simple interest

17   rate of 12 percent is used to commute interest on the

18   historical earnings losses.  Thank you.  That's right.

19        Let's go through the chart just a little bit.  I

20   apologize.  I meant to do that.

21   A.    Okay.

22   Q.    Just so everybody's on the same page.  Directing your

23   attention to Exhibit 2, the projected lost earning chart, so

24   what you've done here is for each year you've calculated what

25   the plaintiff's gross income was at Dartmouth, her fringe

1    benefits and her total earnings; is that correct?

2    A.    Yes.  I project -- yes.

3    Q.    Okay.  And then you went on and did the same thing for her

4    post-termination projections at UVM; is that correct?

5    A.    Yes.

6    Q.    And so, and then on the left there's an index that goes by

7    year.  So 2017 to 2033 is what you have on here; is that right?

8    A.    2033.

9    Q.    And then you go from there, and then you make an

10   adjustment for the difference between those two, which is, is

11   between the UVM and the Dartmouth losses, and that is what

12   you've described as gross adjusted loss earnings; is that

13   right?

14   A.    Yes, that's the difference between the two.

15   Q.    Okay, good.  And then I'll ask you some questions about

16   some of the these later columns later on, but you sort of

17   accumulate these and make some additions to them and ultimately

18   come out with a column on the far right which is what you call

19   the total economic loss; is that correct?

20   A.    Yes.

21   Q.    And in the lower right-hand corner where it says 4.329,

22   258 million is what you estimated the total economic loss for

23   Dr. Porter; is that right?

24   A.    If she was to work out to age 70, yes.

25   Q.    Yes.

1    A.   But I'm not opining that she would work out to age 70.

2    Q.   Okay.  Because so, for example, if she were only to work

3    to age 65 in 2028, the loss figure you project would be 2.542;

4    is that right?

5    A.   Yes.

6    Q.   Okay.  Now, the loss earnings you have are based on her

7    W-2 reported income; is that right?

8    A.   I report her W-2 income, yes.

9    Q.   Yes, you drew those figures from her actual W-2s which

10   include pretax dollars; is that right?

11   A.   Yes.

12   Q.   And from that she'd have to pay whatever income tax she

13   owed, right?

14   A.   Yes.

15   Q.   Okay.  And you analyzed from, in your chart from 2017.  I

16   think you said you used up through 2023 W-2s; is that right?

17   A.   I think so, yes.

18   Q.   Now, you assume a 3 percent increase for periods in the

19   out years in her pay; is that correct?

20   A.   Yes.

21   Q.   And by out years I mean years beyond which you don't have

22   W-2s, correct?

23   A.   Yes.

24   Q.   And so anything after 2023 you're assuming there is a 3

25   percent increase in her pay; is that right?

1    A.    Yes.

2    Q.    Okay.  And that would go out to 2033 --

3    A.    Yes.

4    Q.    -- is that right?  And I think you also assumed that in,

5    again, drawing from your assumptions on -- this is assumption

6    Number 1 on the third page of Exhibit 2.  You make an

7    assumption that she would become a full professor at Dartmouth

8    in 2019; is that correct?

9    A.    Yes.

10    Q.    And that she would then get a 5 percent salary increase;

11    isn't that correct?

12    A.    Yes.

13    Q.    Aren't I correct that you drew your information that she

14    would get that promotion in 2019 to full professor from

15    Dr. Porter; isn't that correct?

16    A.    Yes.

17    Q.    And aren't I also correct that you got the information

18    that she would get a 5 percent increase from being made a full

19    professor from Dr. Porter?

20    A.    Yes.

21    Q.    What, if anything, do you know from your expert knowledge

22    of economics about her likelihood of getting a promotion or how

23    much pay increase she would get as a result of that?

24    A.    I can't opine on the likelihood of whether she would have

25    got a promotion.  I haven't done a study to it, but a 5 percent

1    increase based on my experience at least at UVM, when one got a

2    promotion like that, they tended to be at least 5 percent.

3    Q.    Okay.  So if it was a -- your experience is based on your

4    working on cases for a long time, and, in particular, you said,

5    Well, at UVM it would be 5 percent?

6    A.    Yes, I'm familiar with that.  As I indicated earlier, I've

7    only worked on maybe one or two other cases where we've had a

8    doctor.  Actually, I worked on a lot more than that because I

9    worked on some personal injury cases with doctors involved.

10   But I, those people weren't necessarily at a university.

11   Q.    Okay.  And in your chart the way that 5 percent bump would

12   be reflected is, if she had stayed at Dartmouth -- you know,

13   she left Dartmouth.  When did she leave Dartmouth?

14   A.    2017, sometime in that period.

15   Q.    Okay.  So all of those projections on, for Dartmouth are

16   not her actual W-2s from Dartmouth; they're your estimates of

17   what her W-2s would be based on your assumption that she would

18   get a 2 and a half percent annual pay increase, she would

19   become a full professor in 2019 and get a 5 percent increase

20   from that; isn't that right?

21   A.    Yes.

22   Q.    Now, and your projection on the 2 and a half percent pay

23   increase in based on just your -- I think from your deposition

24   you said it was based on your looking at US Labor Department

25   statistics; is that right?

1    A.    Yes, I looked at the average wage increases across the
2    board, yes.
3    Q.    Across the board meaning all professions, correct?
4    A.    Yes.
5    Q.    All regions, correct?
6    A.    Yes.
7    Q.    Throughout the United States --
8    A.    Yes.
9    Q.    -- correct?  And that's what you projected that to be the
10   basis for, correct?
11   A.    I did use -- that 2 and a half percent was based on a
12   review of that.
13   Q.    Okay.  Now you produced in your, as part of the deposition
14   process a lot of working papers that you used to base your
15   opinion on; is that correct?
16   A.    I assume so.  I don't remember.
17   Q.    The tools that you relied on, correct?
18   A.    I don't remember what you've, what was given to you.
19   Q.    Okay.  Well, maybe this will refresh your memory.  We
20   understood from these to be materials that you relied on in
21   reaching your opinions.  And so do you recall some analysis of
22   Dr. Porter's pension situation at Dartmouth?
23   A.    Yes.
24   Q.    And a pension table?
25   A.    Yes.

1    Q.   And something called a Dartmouth-Hitchcock Clinic

2    Calculation Summary of Pension Plan of Employees?

3    A.   I don't remember the title, but I did look at stuff from

4    Dartmouth on pensions.

5    Q.   Okay.  Look at, please, in Tab 3 of your book.  Go to the,

6    go to the last three pages from the back, please.  Okay.  Do

7    you remember seeing this document?

8    A.   I believe I saw this document.  I mean, it doesn't jump

9    out to me that I saw it, but I do believe I have seen something

10   like this, yes.

11   Q.   Okay.  Looking on the left, there's a column that says

12   "Year" and has the years 2008 to 2017 and then something says,

13   the next column says total pensionable pay and something

14   qualified pensionable pay.  Do you see these columns?

15   A.   Yes.

16   Q.   Okay.  Total pensionable pay, doesn't that look like her

17   full earnings from Dartmouth-Hitchcock?

18   A.   Her pension pay or the total pension pay?

19   Q.   Total pensionable pay, doesn't that look like her W-2

20   income from Dartmouth-Hitchock?

21   A.   I don't have her W-2s in front of me, but I wouldn't

22   disagree.  It looks like that would be -- it looks like it's

23   consistent with what my recollection is.

24   Q.   Okay.  And, if you note, the numbers there do not go

25   steadily up by 2.5 or 3 percent.  Do you see that?

1    A.    Yes.

2    Q.    In fact, they go up and down, right?

3    A.    Yes.

4    Q.    So this shows her actual experience at Dartmouth-Hitchcock

5    with a salary that does not go up 2 or 3 percent every year,

6    right?

7    A.    It doesn't go up by two and a half percent every year, no.

8    Q.    And it goes up and down, correct?

9    A.    Yes, it goes down a couple or two years, three years.

10   Q.    But your projections in Exhibit 2 on the chart don't go up

11   and down; isn't that right?

12   A.    No, they don't, no.

13   Q.    They go up 3 percent every year; isn't that correct?

14   A.    Yeah, whatever the increase is, yes.

15   Q.    Plus the amount for her professorship, correct?

16   A.    Well, that went up at one time.

17   Q.    Well --

18   A.    One time only.

19   Q.    You made an upward adjustment based on an assumption that

20   she would become a professor; isn't that correct?

21   A.    Yes.

22   Q.    Okay.  Now, and your testimony is that was worthy of a 5

23   percent increase in her salary from Dartmouth?

24   A.    When she got the promotion, she would get a 5 percent

25   increase.

1    Q.   And that is repeated throughout that table on the left

2    column at Exhibit 2, right?

3    A.   Well, it's, it's baked into the numbers in the future, but

4    every year it's not a 5 percent increase.

5    Q.   No, but -- yeah, exactly, that's my point.  Thank you.  It

6    gets baked in and amplified based on that each year at a higher

7    rate --

8    A.   Yes.

9    Q.   -- right?  And it's better for the plaintiff to have a

10   higher salary from her prior employer, right?

11   A.   Yes.

12   Q.   Because, if she has a higher salary and gets a lower

13   salary, she has lost more based on your calculations; isn't

14   that correct?

15   A.   Well, based on anybody's calculations.

16   Q.   Fair enough.  And so the flipside of that is, to the

17   extent her salary at University of Vermont is lower than it

18   otherwise would be, that also would answer a benefit in your

19   loss calculations; isn't that right?

20   A.   If her, because her salary is lower than it would be, my

21   projections at Dartmouth, yes, there is a loss.

22   Q.   Right.

23   A.   That's what I'm trying to measure is the loss.

24   Q.   Exactly.  And, if her salary is lower at the new place

25   than the old place, the lower it is, the greater the loss;

1     isn't that right?

2     A.     Yes.  Simple math.

3     Q.     Simple math.  Now, you don't calculate any professorial

4     increase from Dr. Porter's promotion to a full professorship at

5     UVM?

6     A.     I thought there was something in there where she got

7     promoted historically.

8     Q.     There is, there is something in your chart that shows a 5

9     percent bump from her becoming a professor at the University of

10    Vermont?

11    A.     I used what she actually earned up through -- well,

12    actually, I didn't have the stuff through 2024.

13    Q.     Oh, 2024?

14    A.     Well, I didn't have the W-2 for 20 --

15    Q.     You don't have the W-2 for 2024?

16    A.     Oh, yeah.  Yes.  I'm sorry.  2026.  I apologize.

17    Q.     Not '26.  Let's, the 2024 W-2.  I would just say that we

18    don't have the W-2 for 2024.  Do you?

19    A.     No.

20    Q.     Okay.  As an economic expert coming to court to provide

21    expert information, wouldn't it be sensible for you to have the

22    W-2 for her last earnings?

23    A.     Well, yes, but I did this report in August of '24, so how

24    could I get a W-2 for 2024 if I did it in August?

25    Q.     Well, you're testifying about her salary information for

1    then.  Could you have asked for it and gotten it when it came

2    out this year?

3    A.    I could have, yes, and I will be asking for that when this

4    moves on to trial.  I will be looking at all that information,

5    and I assume at the request of plaintiff's counsel I'll be

6    updating my analysis.

7    Q.    Had you been told that Dr. Porter became a full professor

8    at UVM in August of 2023, July of 2023?

9    A.    I believe, I believe I have been.

10   Q.    Okay.  Is that reflected on your report?

11   A.    I have her actual earnings for 2023, and I have what she,

12   what her contract was for '24.

13   Q.    You have her full professor contract for '24?

14   A.    That was what I based my projections on is the contract or

15   what she had earned under the new contract.  I had, may have

16   annualized it up.

17   Q.    Do you have an employment contract for her after she had

18   been promoted to a full professor at UVM Medical Center?

19   A.    I don't remember if I have a, if I had a contract, but I

20   did have what she actually earned after she got the promotion.

21   Then based -- I don't know how many months that was, but let's

22   assume that it was four months.  Then I would annualize it up

23   to a 12-month figure.

24   Q.    I don't see anything in your report or your assumptions

25   describing the effect of her promotion to full professor at UVM

1    Medical Center sort of analogous to the 5 percent inflator you

2    gave her when she became a full professor at

3    Dartmouth-Hitchcock.

4    A.    Well, I disagree, but if you read --

5    Q.    Where does it say that?

6    A.    Well, it does not say that in that many words because I, I

7    don't know if I had that, but what I did, what it does say in

8    Footnote 2, Footnote 4, is that I looked at what her earnings

9    were and used that as a basis to forecast forward.

10   Q.    But you don't -- I think what you just said is, I don't

11   know if I had that or not.

12   A.    I don't know if I have her contract.

13   Q.    I don't know if I had the information about her becoming a

14   full professor, yes or no, did you have that?

15   A.    I don't know.

16   Q.    Okay.  Because, if you did have that, you would have said,

17   Oh, I need to make the adjustment in my projections for UVM and

18   add 5 percent on top of her about $300,000 salary for all of my

19   projections going forward; isn't that right?

20   A.    No.  I've tried to explain to you that I took a look at

21   what she was getting for pay after that happened, and, while I

22   did not have a full calendar year of her earning at that level,

23   I did have some period of time where she was earning at that

24   level which I then annualized.

25   Q.    Okay.  You didn't have her 2023 W-2s that showed an

1    increase in salary there on enough of the time that you could

2    make an annualized projection, though, right?

3    A.    No.  If I just, if I rely just on the W-2 for 2023, no.

4    Q.    Because you just didn't know.  They didn't tell you that

5    she'd gotten this promotion, right?

6    A.    I don't know.  I don't remember.  That was a long time

7    ago.

8    Q.    If her salary was increased by 5 percent from 2023, July

9    2023 through the end through 2023 and it isn't reflected in

10    your chart because you didn't understand that, wouldn't that

11    make your numbers in here completely wrong?

12    A.    Well, I disagree that I didn't understand that.  But,

13    obviously, if you put a higher inflator in there, the numbers

14    are going to be greater.

15    Q.    Okay, great.  Which means the numbers for UVM are greater,

16    which means the loss figure between her job at Dartmouth and

17    her job at UVM is less significant; isn't that right?

18    A.    Well, only if, only if you're correcting your assumption.

19    Q.    Correct.  What if there was a limit on the funding that

20    went to physicians at Dartmouth-Hitchcock during the Covid

21    years, say 2021 to 2022?  Let's say that Dartmouth held flat on

22    the amount of money we're going to pay doctors.  Wouldn't that

23    mean that perhaps your numbers in here are inaccurate?

24    A.    If there was -- if that's the case, if they gave no

25    increases, obviously, those projections for those years that

1    are based on a 2.5 to 3 percent increase would not be right.

2    Q.    Now, let's talk a little bit about fringe benefits.  You

3    have a calculation in Column 2 of the fringe benefits at

4    Dartmouth-Hitchcock and Column 5 of the fringe benefits at

5    University of Vermont; is that correct?

6    A.    Yes.

7    Q.    And I think your analysis simplified the fringe benefits

8    to say, well, I'm only going to look at contributions to

9    pension and health care plans; is that correct?

10   A.    Yes.

11   Q.    Okay.  Now, directing your attention again to that

12   document that was in Tab 3, the table that is the pension plan

13   of employees of Dartmouth-Hitchcock clinical calculation

14   summary --

15   A.    Where is that located?

16   Q.    I'm sorry.  Yeah.  I have a harder time than you even.

17   It's in Tab 3 about three pages from the back.

18   A.    Yes.

19   Q.    Do you see that document?

20   A.    I see it, yes.

21   Q.    And aren't I correct that, in developing your table for

22   the August 2024 report, you calculated the costs of her

23   pensions at 12 percent of total pensionable pay; is that

24   correct?

25   A.    Yes.

1    Q.    Okay.  Now, doesn't it make more sense to do 12 percent of
2    qualified pensionable pay?
3    A.    I'm trying to remember.  I'd have to go back and look at
4    the documents.  There was an explanation in one of the
5    documents about how pensions were calculated, and --
6    Q.    It seems --
7    A.    May I finish?
8    Q.    Oh, sure.  I thought you were done.  Sorry.
9    A.    There was an explanation that, for people going over a
10    certain amount, there was a bump.
11    Q.    Okay.  So you seem to recall an explanation that you can't
12    describe in detail that conveniently answers my question; is
13    that what you're saying?
14    A.    I don't know if it conveniently answers your question.
15    All I'm saying is that there is a document in there that says
16    this is what they will contribute on a pension plan and, if
17    your income is above a certain level, which hers were, there
18    would be an additional contribution made on behalf.
19    Q.    Oh, okay.
20    A.    And I don't have that document in front of me to tell you
21    exactly what that percentage is, but I believe that is where I
22    derived the 12 percent from.
23    Q.    Okay.  I would be interested in seeing that.  So, if you
24    identify that, send that to me, please.  Qualified pensionable
25    pay, doesn't this look like what I think, and I'm not that

1   knowledgeable about pensions, but, you know, it seems like

2   that's an amount of pay that you're going to qualify for your

3   pension purposes and then above that they don't kick in any

4   more.  Is that consistent with that?

5   A.   That's your assumption, not mine.  I don't know.  I'm

6   telling you what I believe is another document that goes

7   through and talks about what percentage Dartmouth will

8   contribute of an employee's salary and that there are two,

9   there is a bump-up if you're over a certain percentage.

10  Q.   If the theory that I'm positing is correct that qualified

11  pensionable pay is the amount of salary you can earn up to the

12  point at which the institution will kick in in its maximum

13  matching contribution, if I'm correct about that and the amount

14  that is on your fringe benefit for pensions is 12 percent of

15  qualified pensionable pay as opposed to 12 percent of total

16  pensionable pay, doesn't your report overstate the value of the

17  Dartmouth fringe benefits?

18  A.   I don't know.  I can't tell from that, your hypothetical

19  here.  I mean, obviously, if you multiply 12 percent times the

20  qualified pension play, pay, it's going to be a smaller number

21  than the total pension pay.  But I'm not saying -- I'm not

22  agreeing with you.  That's what I did, and that's how I derived

23  the 12 percent.

24  Q.   Are you familiar with a program at UVM to provide tuition

25  remission to UVM employees?

1    A.    Yes.

2    Q.    Okay.  And that applies for UVM graduate schools, too, to

3    your knowledge?

4    A.    I assume so.

5    Q.    Okay.

6    A.    I have never had the opportunity to look at it.

7    Q.    Okay.  Are you aware that the plaintiff had tuition

8    remission for one of her sons in an amount of, you know, about

9    $17,000?

10   A.    No.

11   Q.    Okay.  Do you recall seeing in any of your review

12   materials that you reviewed to prepare these opinions a

13   reference to that?

14   A.    No.

15   Q.    Okay.  Directing your attention, please, just go to the

16   next page on that tab on Exhibit 3 on the next page after that

17   where you see where --

18   A.    What tab are we on?

19   Q.    I'm sorry.  We're on Exhibit 3.  It's actually the last

20   page before Exhibit 4 starts.  It states at the last thing I

21   read here it says, I also received benefits as being part of

22   the faculty at UVM Medical School from the university besides

23   pay.  My son's tuition is compensated this year.  No tuition

24   for senior year.  Yikes.  Or yippee.  Sorry.  About the college

25   tuition.

1    A.   I don't know where you're reading that from.  I'm sorry.

2    Q.   Okay.

3    A.   Oh, I see it now, okay, at the bottom, yeah.

4    Q.   Okay.  And just to -- you recall these were questions you

5    posed to her counsel and her counsel passed to Ms. Porter to

6    answer; is that right?

7    A.   I'm not sure what your question is.

8    Q.   My question is, Is that what that document is, questions

9    you provided to Ms. Porter's counsel and she provided to

10   Ms. Porter to provide you information so you could render an

11   expert economic opinion in this case?

12   A.   I don't know what you're referring to.  I don't think I've

13   seen this.

14   Q.   Okay.  You don't recall that as being part of --

15   A.   No, no.  I don't remember seeing this, no.

16   Q.   Okay.  So it would be news to you that the plaintiff, in

17   2019, had her tuition paid for by the University of Vermont for

18   her son?

19   A.   Yes.  You asked me that, and I said, no, I was not aware

20   of that.

21   Q.   Okay.  And I'm just showing you this because there are

22   references to that in your reliance materials.  Do you have an

23   explanation for why you may not have seen a reference to that

24   in the reliance materials?

25   A.   I don't remember seeing this, no.

1    Q.    If Ms. Porter had received a $17,000 fringe benefit

2    increase in 2019, that would have increased her UVM fringe

3    benefits for that year; isn't that correct?

4    A.    Yes.

5    Q.    And, due to your methodology, it would have carried

6    forward?

7    A.    Yes, but I would have had a crucial question that needed

8    to be asked before I did that.

9    Q.    Are you aware of the ages of her children?

10    A.    No.

11    Q.    How many children does she have?

12    A.    I don't know.

13    Q.    Directing your attention back to the chart which is at

14    Exhibit 2, third page in, I note that her earnings for UVM

15    dropped dramatically in 2025.  Do you see that?  On, if you

16    look at 2025 and then Column 6, she goes from to $195,411 when

17    the year before it's $338,000.  Do you see that?

18    A.    I'm not seeing your number, but I see for 2024 I have at

19    UVM $305,506, and then in 2025 it drops down to $162,750.

20    Q.    Okay, fair enough, for the earnings.  Thank you.  That's

21    Column 4.  I'd gone for total earnings.  But aren't I correct

22    there that you have that drop-down there based on an assumption

23    set forth in your report that she would, on January 1, 2025,

24    start working only a .6 time position at University of Vermont

25    Medical Center so her earnings would drop; is that right?

1    A.   Yes.

2    Q.   And yet your chart for Dartmouth projected out into the

3    future shows that her earnings would continue based on an

4    assumption that, if she was at Dartmouth, she'd work full time,

5    but, if she was at the University of Vermont having just

6    received a full professorship and everything, she would go to

7    .6 time?

8    A.   Yes.  Based on her information, she said that she was,

9    this was very stressful being in the community up into

10   Burlington as opposed to being able to commute to Dartmouth.

11   Q.   Based on the information she provided you; is that

12   correct?

13   A.   She took -- she provided me, said that, that what her

14   plans were was that, starting January of 2025, she was going to

15   be working 65 percent.

16   Q.   Okay.

17   A.   60 percent.

18   Q.   Okay.  And that she told you that either verbally or in an

19   email; is that correct?

20   A.   One or the other, yes.

21   Q.   It was not based on any kind of independent corroborative

22   information at all; isn't that right?

23   A.   I did not do any research on that, no.

24   Q.   And she didn't provide you any information that would

25   substantiate that that's what her plan was; isn't that correct?

1    A.   No, I don't think so.

2    Q.   Okay.  And doesn't that dramatically increase the loss

3    damages for her?

4    A.   Yeah, yeah.

5    Q.   Right?  So she goes from, like, well under a hundred

6    thousand dollars a year in the difference between her Dartmouth

7    and UVM salary to, you know, a couple hundred thousand dollars

8    a year; is that correct?

9    A.   Yes.

10   Q.   Extending out forever; is that correct?

11   A.   Well, not forever.

12   Q.   Well, true, fair enough.  2033, it will be here before we

13   know it, but it's a long way out, right?

14   A.   Well, yeah, it's '33.

15   Q.   Okay.  So that seems like that makes up -- that that

16   adjustment in your projections, you know, accounts for a huge

17   amount of her loss; isn't that correct?

18   A.   Yes.

19   Q.   Doesn't she benefit by going to a .6 position

20   nonmonetarily?

21   A.   Well, she obviously is saying that that's what she would

22   like to do given the situation that she's in.  It's my

23   understanding from my conversations with her she'd like to be

24   back at Dartmouth working full time and that, and that we have

25   had several conversations about her working at UVM and how

1    stressful it was and this was not her preferred position.

2    Q.    Okay.  And that was based entirely on her saying, Yeah,

3    that's what I want to do, and that's what it's going to be,

4    correct?

5    A.    Yeah, that assumption is based on what she told me, yes.

6    Q.    Her say-so?

7    A.    Yes.

8    Q.    And, if you didn't use that dramatic change to .6 from

9    full-time employed while she's at UVM, wouldn't your chart be,

10    you know, very, very different in its entries?

11    A.    It would be different.  The losses would be smaller, yes.

12    Q.    A lot smaller?

13    A.    Explain a lot.

14    Q.    Well, a lot is a normative term, but, you know, I'm just a

15    simple lawyer.  You know, when you're talking, like, $4

16    million, that's not a lot -- that is a lot.

17    A.    It wouldn't have been up by $4 million, not even close.

18    Q.    Have you done an analysis about what it would be?

19    A.    No.

20    Q.    Why not?

21    A.    Because I was asked to assume that she would go to a .6

22    appointment starting January of 2025, and that's what I

23    assumed, and my analysis is predicated on that assumption.

24    Q.    Let's talk about your cumulative present value and

25    settlement tax and your total economic loss columns.  See those

1    columns?  Those are 11, 12 and 13 on the chart.

2    A.    Yes.

3    Q.    Okay.  So what I understood from your deposition testimony

4    is this was an attempt to gross up her losses so that she would

5    be fairly compensated if a judgment was rendered and she had to

6    pay taxes on that judgment; isn't that right?

7    A.    Yes, because she does have to pay taxes on it.

8    Q.    Sure.  But aren't the salary calculations in here pretax,

9    i.e., they include an amount from which one will pay their

10   taxes?

11   A.    Yeah.  I back out taxes.

12   Q.    Okay.

13   A.    In Column 8 I am backing out the taxes that she would have

14   to pay on the difference between the Dartmouth gross income and

15   the UVM gross income.  So I'm backing out taxes, and I'm coming

16   up, and it's a key to this analysis is I'm coming with up with

17   a tax-adjusted lost earnings.  That is Column 9.  Taxes are

18   then backed out.  And, if this was like a personal injury case

19   or a wrongful death case which is not taxable, then all I would

20   do is convert the present values and have a running total, and

21   I wouldn't have to do a settlement income tax.  But the point

22   is that employment cases are taxable.  The awards are taxable.

23   Q.    Fair enough.  But the amount of earnings that you've used

24   to determine her taxable compensation are in pretax, i.e.,

25   they're already grossed up; they don't need to be grosses up a

1  second time?

2  A.    That's not true.  I just explained to you that in Column 8

3  I'm backing taxes out, and Column 9 is after-tax loss.

4  Q.    How about settlement income tax; where does that come

5  from?

6  A.    That comes from how much additional money would Dr. Porter

7  need in order to ensure that she received a specified after-tax

8  amount.  If you want to use the year 2023, the present value of

9  her loss out through the year 2033 is $2,210,000.  That's in

10  after-tax dollars.  If there was no tax consequences, end of

11  story.  There wouldn't be a Column 12, and there wouldn't be a

12  Column 13.  It would be just like if this was a wrongful death

13  or personal injury case.

14      But it is taxable, and because we have a progressive

15  income tax here, if I get money all in a lump sum, I am going

16  to be forced into the highest tax bracket relatively quickly,

17  and, secondly, what's insidious about this is you're going to

18  end up paying taxes on the taxes.

19  Q.    Well, that's where it kind of doesn't all add up, because

20  it comes up to roughly half of your total damages number.  Your

21  total economic loss is $4.3 million in your August 2024 report,

22  but your settlement tax, just the tax on the tax, is $2.1

23  million, correct?

24  A.    That's right.  But we, now, you remember you have now put

25  this person in the highest marginal tax bracket, both federal

1    and state.

2    Q.    But she's in a pretty darn high tax bracket to begin with.

3    A.    Yeah, she is.

4    Q.    So it's not like getting it in a lump sump increases her

5    marginal tax rate for, you know, huge portions of her income.

6    A.    No, it doesn't, in her case, it does not increase that

7    marginal tax bracket, but it does increase her taxable income

8    significantly.  And what those numbers in that column, Column

9    12, represent is the additional sums that she would need.

10         So, for instance, going back to the year 2033, I am saying

11   that, in order to make her whole, that is so that if she would

12   receive an award of $2,210,258 without any tax consequences,

13   she would need an additional $2,119,000, bringing the total

14   amount that she would need as a settlement of $4,329,258.  When

15   she filled out her income tax, she would put down, I received

16   $4,329,258, and after she put in her income and her husband's

17   income, the additional amount of taxes I'm estimating that she

18   would have to pay would be around $2,200,000.

19   Q.    Do you have worksheets that show how you reached this

20   calculation?

21   A.    I have tables, yes, that are to the -- I think I explained

22   in my deposition that to the right of this table are a set of

23   columns that look at what the taxes would be, a calculation of

24   the taxes give a particular settlement.

25   Q.    Would it surprise you to learn that we had some economists

1    look at this and they couldn't make heads or tails of this?

2    A.    I don't know who your economist was.  I've seen lots of

3    economists that couldn't make heads or tails out of anything.

4    Q.    Now, your projections conclude that, even though she went

5    to .6 position at University of Vermont, she would continue

6    working full time, not just through age 65, but through age 70;

7    is that correct?

8    A.    I'm not -- again, we went over that.  I'm not assuming

9    that.  I'm leaving that entirely up to the trier of fact to

10    determine how far out into the future she would work.  I'm not

11    implying that she would work to 70.  I'm not implying that she

12    would work to age 65.  I'm leaving it to the trier of fact to

13    determine that, and, if the trier of fact buys the underlying

14    assumption in my calculations, then they can use that table to

15    calculate a loss.

16    Q.    Okay.  But, if the trier of fact concluded that, you know,

17    she probably would stop working at age 65 or earlier, your loss

18    calculations would be, as they indicate for those years, for

19    that year further into the right-hand column of 11, 12 and 13;

20    is that right?  I didn't ask a very good question.  I can

21    rephrase it if you want.

22    A.    Well, I think I get what you're driving at.  Yeah, if she

23    retires -- if the trier of fact says, I believe she would

24    retire or it's reasonable to assume she would retire at 65,

25    then you need to go over to Column 13 and go down to age 65 and

1    look at the number, and that is $2,542,019.

2    Q.    Right.  Again, assuming that she would keep working at

3    Dartmouth 100 percent of the time while opting for this

4    part-time position at University of Vermont given her full

5    professorship?

6    A.    Yeah, starting in January of this year at the .6, yes.

7                ATTORNEY COFFIN:  Just a second, Your Honor.

8                THE COURT:  Okay.

9                ATTORNEY COFFIN:  Those are all the questions I have

10   right now, Your Honor.

11               THE COURT:  Okay.  Mr. Jones?

12                    CROSS-EXAMINATION BY ATTORNEY JONES

13   Q.    Good afternoon, Doctor.

14   A.    Good afternoon.

15   Q.    Just a couple of questions to follow on up on Mr. Coffin.

16   Mr. Coffin asked you a couple of times whether the source of

17   the information for your assumptions was Dr. Porter or her

18   lawyers, and you said yes.  Is that common in the cases that

19   you work on?

20   A.    Absolutely, sure.

21   Q.    You don't see her role as being a finder of fact or a

22   trier of fact?

23   A.    No.  You know, over the 2,500, 3,000 cases I've worked on,

24   there may have been a few of them where I have actually given

25   the task of looking up something, but they're unusual cases,

1    but 95 percent of the personal injury, wrongful death cases,

2    and employment cases, unless the person has found a job that

3    everybody feels comfortable with that this is indicative of

4    what they'll be able to do in the future, then there has to be

5    some assumptions made of what this person might do and might

6    work, and it is not my role to, to question them.  It's my -- I

7    accept them.  If I'm asked to assume a certain thing, I will

8    assume it, but I, it's not my responsibility to defend it.

9    Q.   Thank you.  Mr. Coffin also asked you a couple of times.

10   There's been some suggestion in the briefing that your analysis

11   has some form of double-dipping because past earnings would be

12   taxable.  Just to be clear, does your analysis take into

13   account that past earnings would be taxable?

14   A.   Yes.

15   Q.   And you've backed out the taxes, all the past earnings?

16   A.   I've backed out the taxes on past earnings, and I've

17   backed out taxes on future earnings.

18   Q.   To get present value?

19   A.   And then the next step for me is to determine the present

20   value of a after-tax number.

21   Q.   Okay.  So there's no double-dipping or triple-dipping in

22   your numbers?

23   A.   No.

24   Q.   And then Mr. Coffin asked you a lot of questions about the

25   fact that Dr. Porter, in fact, became a professor at UVM in

1    2023.  I think you said it.  I want to make sure it's clear.
2    In your August 2024 report, the numbers you used for her UVM
3    earnings were, in fact, the actual earnings she was making with
4    that professorship; is that correct?
5    A.   That's right.  I used those.  Yes, I used that
6    information, scaled it up, and then used that as the basis to
7    go forward.
8    Q.   Right.  So, if you were then to add another 5 percent,
9    wouldn't that be improper because you already had the actual
10   numbers?
11   A.   Well, yeah, it would be inappropriate to do that.  It
12   would unjustly inflate the number.
13   Q.   Because you have the actual numbers already?
14   A.   I have the actual, yes.
15   Q.   There's also been questions, at least in the papers, about
16   whether you have an appropriate level of expertise in
17   employment cases.  Does -- backing up a little bit, is what you
18   do in almost all of the cases you've worked in is provide
19   earnings projections?
20   A.   Yes.  Yeah.  That's why I, I it's hard for me when I'm
21   asked a question, How many employment cases have you worked on,
22   or, How many wrongful death cases have you worked on, or, How
23   many personal injury?  They're all lost income, and they're
24   all, with the exception -- there's one exception with
25   employment cases, but all of them deal with projecting out a

1  stream of income, whether it be before termination or before

2  injury or before death, at least in the injury cases and in the

3  employment cases, and then projecting out what is a reasonable

4  expectation of what a person would earn over their lifetime.

5      The difference being is, when we get to that gross-up for

6  taxes.  If it's a personal injury case, once you back out the

7  taxes for each individual year, you turn the present value on

8  that, end of story, but this one has an extra step involved.

9  Q.  So, before you get to the gross-up, which is unique to the

10  employment earnings, is it true that your methodology and

11  approach to an earnings projection is the same regardless of

12  whether it's employment, wrongful death, personal injury?

13  A.  Yes.  If this was a personal injury case and all the

14  underlying assumptions were the same, you know, for whatever

15  reason, can't work at Dartmouth and can't work at UVM under

16  this and that, that table would be the same, except Column 13

17  and 14 would not be there.

18  Q.  Yeah.  And, finally, providing the gross-up issue, that is

19  unique to the employment cases.  The numbers we're talking

20  about in Dr. Porter's earnings are somewhat larger than usual,

21  but can you walk the Court through an example of why grossing

22  up is essential to make a person whole with, say, smaller

23  numbers, for example, a $50,000 loss?

24  A.  Sure.  An example that I've used before is if we have a

25  situation where a person has lost $50,000, and let's assume

1    that people conclude that or reasonably conclude that they
2    would have lost this $50,000 at least in the next ten years,
3    ignoring inflation and that.  So the taxes on $50,000 for a
4    single person, just federal taxes -- and I'm not, I won't get
5    into state taxes, but the same concept applies here -- is
6    around $4,000, one year.
7         So if we were to go out ten years, multiply that by ten,
8    it comes out to be about $40,000.  If, instead of that $50,000
9    over the next ten years you were to award the person five, a
10   half a million dollars, that is $50,000 for each of those ten
11   years.  That's a half a million dollars.  The tax on that would
12   be about $125,000, about three times larger than it would be if
13   that money was paid out over ten-year period.
14   Q.   So the impact really is huge?
15   A.   It is huge.  And what really leverages these cases up is
16   that you've got to pay taxes on the taxes.  So, for instance,
17   in the example that I just gave, so I went through and so I
18   said, okay, well, if the persons needs $125,000 to pay taxes on
19   that.  So I plug that in, and, if you will, I do the tax
20   return.  I plug that $125,000 in with the settlement.  Wait a
21   minute.  They've got to pay more taxes because now that
22   $125,000 that I said was the tax is, they've got to report as
23   income, and so there's going to be tax on that.
24        So, eventually, it's going to be an iterative process
25   where you finally reach a point where you say, okay, the

1   process is 125 is too low.  So I'll increase it 150.  That's

2   still too low.  I increase it to 175.  That's too high.  I come

3   back down to 165.  That's too high, and then I come to 160.

4   Bingo.  So there it is.  So, if you give the person 160, they

5   will get out whatever their after-tax loss is.

6           ATTORNEY JONES:  Yeah, thank you.  Your Honor, if I

7   could have one second to consult with counsel.

8           THE COURT:  Okay.

9           ATTORNEY JONES:  We have no further questions.

10          THE COURT:  Okay.  Any further questions?

11          ATTORNEY COFFIN:  No further questions.  Thank you,

12  Your Honor.

13          THE COURT:  Thank you, Dr. Bancroft.  Okay.  Now, is

14  there any further argument at this time?  Mr. Coffin, you had

15  said in the beginning, I think you said this isn't a *Daubert*

16  motion, but you are ultimately objecting to the use of this

17  expert.

18          ATTORNEY COFFIN:  Yeah, I would say I don't know if

19  it's a *Daubert* motion, but it's a little bit a hybrid, I guess

20  I would say.  You know?

21          THE COURT:  Okay.

22          ATTORNEY COFFIN:  We do object to his qualifications

23  and think it is improper for him to provide this testimony in

24  this case because his qualifications do not reach the level

25  that's necessary for to reach this gatekeeper function for the

1    Court.

2          Plus, as we've heard today, there are a number of

3    significant substantive problems with his report.  And so, if

4    the plan is, and we don't know what the plan is, that he is

5    going to testify about this chart that we've been talking about

6    so much, I think that is, you know, extremely prejudicial

7    without probative value given the testimony that you've heard

8    here today.  You know, and we would just, you know, ask the

9    Court to focus on, you know, the 12 percent mark-up, the .6

10   employment, the 2.5 percent pay increases assumed.  No

11   accounting for the, you know, promotion to professor, not even

12   knowing that.

13         You know, not knowing what the current W-2 is despite what

14   my brother had him testify to here today.  I think that the

15   record is he probably doesn't have it, and we certainly don't

16   have it, Your Honor, and that's a discovery issue that we do

17   need to get right away.  The gross-up issue, does that really

18   account for $2.1 million in the total damages?

19         Again, we may need to -- the Court may think it's wise to

20   hear what the testimony is that lays the foundation and what he

21   can testify to and make a decision after cross about whether

22   that chart can come in or not, whether there's some level of

23   testimony he can provide, but right now I don't think he's met

24   his threshold.

25               THE COURT:  Okay.

1            ATTORNEY JONES:  Your Honor, can I make a few points?

2            THE COURT:  Please, go ahead.

3            ATTORNEY JONES:  Almost everything Tris just talked

4     about is an issue for trial.  Those would be great questions

5     for trial.  That would be great arguments for the jury, but it

6     does not go to the gatekeeping issue that really is what we're

7     dealing with pretrial is whether or not Dr. Bancroft can

8     testify, and I don't think any of the issues they've raised go

9     to his qualifications or to the reliability of his methodology.

10    So all the issues we've been talking about this afternoon, I

11    imagine that would be their trial position, and we'll deal with

12    it at trial, but it does not go to whether or not Dr. Bancroft

13    can testify in the first instance.

14         With regard to the 12 percent issue, that's a statute.

15    This is not some expert using discretion or pulling a number

16    out of the air.  The law says it's 12 percent.

17         With regard to the issue of her professorial promotion,

18    Dr. Bancroft used the actual earnings.  So that's a red

19    herring.  And, finally, with regard to the gross-up issue

20    there's plenty of law, and we're prepared to brief it if you

21    would like it, but the Third Circuit, Seventh Circuit, Ninth

22    Circuit, Tenth Circuit, Federal Circuit all have held in

23    employment cases grossing up earnings to account for the tax

24    liability is appropriate. So all of this, the legal stuff is

25    clear legal stuff.  The factual stuff is for a jury.

```
 1              THE COURT:  Though it appears that courts in this
 2     circuit have gone both ways on the grossing up question, which
 3     I'm sure you know, and there's, in fact, a circuit split on
 4     grossing up right now.  And I was going to ask Mr. Coffin, Is
 5     it so much that you're disagreeing with the grossing-up notion
 6     as a theory or kind of the, you know, based on your questioning
 7     of Dr. Bancroft, you have an issue with respect to how it's
 8     calculated?
 9              ATTORNEY COFFIN:  We don't know how it's calculated.
10              THE COURT:  Right.
11              ATTORNEY COFFIN:  And I think there is not some law
12     in this circuit about whether you do it and the circumstances
13     you do it and how you do it, and I think it's important that
14     the W-2 income is grossed up to begin with, and, if the notion
15     is, okay, you're going to gross it up for -- if the logic is
16     you're going to gross it up because you get a lump sum that
17     changes your marginal tax rate, this is a person who actually
18     has a pretty high marginal tax rate to begin with.
19              THE COURT:  Right.
20              ATTORNEY COFFIN:  And I do want to make one more
21     point when the Court is ready for me.
22              THE COURT:  Okay.  So I was just going to say, so it
23     sounds to me like your argument is more about the accuracy of
24     the calculations as opposed to whether grossing up is an
25     acceptable theory?
```

```
1              ATTORNEY COFFIN:  Is ever appropriate, right,
2              THE COURT:  Right, okay.  Was there another point?
3              ATTORNEY COFFIN:  Yeah, the point I wanted to make
4    was on the 12 percent and the sum certain.  12 percent is the
5    statutory interest rate, but, of course, the case law is that
6    the 12 percent is only to be applied when you have a sum
7    certain.  So it's a very different situation where you got a
8    promissory note of $20,000 which somebody has stiffed you on
9    and they've sat on that for three years as opposed to this very
10   complicated set of facts and premises about what they were
11   supposed to pay and when.
12         And, in addition, in this case, it's particularly unfair
13   because we won at summary judgment back in 2020.  You know,
14   what were we supposed to do, pay her the money after we won?
15   You know, and the Court, for a lot of reasons, the Court is
16   quite familiar with it just took a while for us to get back
17   here.  So that portion, I think, should not be considered of
18   the 12 percent.  But, really, I think 12 percent, based on my
19   review of the Vermont case law and how I've seen Vermont courts
20   handle this, they wouldn't dream of giving 12 percent in this
21   very complicated case.
22             THE COURT:  Okay.  And the complexity that you're
23   talking about here is not just because it's limited to the
24   medical community, right?  The point of your questions for
25   Dr. Bancroft was asking him about how much experience he has in
```

1    the hospital setting, but the nature of these disputes is not
2    something that's unique to the hospital setting; is that fair?
3        This goes to the gatekeeping function, right?  So, if
4    Dr. Bancroft testifies that, you know, No, I haven't done
5    dozens of projections of loss amounts in the context of
6    hospital care, that means that he shouldn't testify in this
7    case and he should be excluded kind of under the gatekeeping
8    role?
9        ATTORNEY COFFIN:  Well, I mean, I do think his
10   limited qualifications in this kind of a case make him
11   particularly lacking in qualifications that would permit him to
12   testify here.  But, you know, I would say that the complexity
13   of this matter for assessing whether a 12 percent prejudgment
14   interest, which under Vermont case law is only to be applied
15   when there's a sum certain, would not be appropriate at all
16   here because we don't have a sum certain here.
17       You know, we've got, we have three different reports in
18   three different years, each of which is quite different with
19   different methodologies.  We've landed on this notion that the
20   losses are primarily driven by the fact that she is going to
21   work .6 at UVM, but, if she'd stayed at Dartmouth, she would
22   have worked full time until age 70.  You know, and we didn't
23   know that about that, and presumably neither did she, until
24   August of this year.  How can that be a sum certain for us to
25   pay?

 1            THE COURT:  Yeah.  No.  I have to say that doesn't

 2     strike me as going to his qualifications.  That's

 3     cross-examination material, it would seem to me.  And, as you

 4     well know, I mean, the standard for allowing an expert to

 5     testify, there's definitely some principles of law that apply

 6     there, but it's not particularly onerous.  Certain threshold

 7     requirements have to be met, of course, but it's more typical

 8     that an expert is allowed in and subject to the able

 9     cross-examination that you just did of Dr. Bancroft here in

10     court.

11        All right.  Is there anything further on this particular

12     motion at this time?  It's going to be taken under advisement.

13     I'll be issuing written rulings on all of these, in fact, but,

14     if there's anything else you'd like to --

15            ATTORNEY COFFIN:  No, thank you, Your Honor.

16            ATTORNEY JONES:  Nothing further, Your Honor.

17            THE COURT:  All right.

18            ATTORNEY JONES:  Dr. Bancroft can leave?

19            THE COURT:  Yes.  I have all of your motions here in

20     a separate folder, so it's a matter of picking which one we go

21     to next.  Let's, I guess let's turn to the issue of

22     Dr. Porter's qualifications.  So, Mr. Coffin, I've read all the

23     briefing here.  I mean, we don't need to belabor what has been

24     written.  I'm sorry, Mr. Schroeder.  Are you arguing this

25     particular motion?

1              ATTORNEY SCHROEDER:  Yes, I am, and I won't belabor
2      anything, Your Honor, go ahead.
3              THE COURT:  Yeah.  No.  You stood, so I'm happy to
4      hear from you on everything.  I was just going to say I've read
5      everything.  I'm familiar with the issues, but I may have a
6      question or two here or there, but go ahead.
7              ATTORNEY SCHROEDER:  I'll keep it short, Your Honor.
8      This really goes to probative evidence and part of a bigger
9      issue as well regarding something I raised in January, which
10     was the fair distribution of time for our three-week trial, and
11     having done just a few of these over the years in various
12     courts, right now, we know that -- we have the exhibit lists
13     and the witness lists.  The witness list has 34 total people.
14     Plaintiffs have 20, actually 25.  Five of them are our
15     witnesses.  And I would submit, Your Honor, that, if you look
16     at the witness list, at least ten of them go to the issue of
17     character evidence because they certainly didn't come up in the
18     course of discovery in this case, but they go to issues of
19     working with Dr. Porter and presumably about the skills of
20     Dr. Porter and qualifications.
21             When you judge where we are and what we expect to handle
22     in this case and specifically what we, jury selection, opening
23     statements.  Dr. Porter, I suspect, will be on the stand until
24     at least Wednesday, and then you couple that with all of these
25     character witnesses -- and I count ten off this list from

1     plaintiff's witness list -- I do not see from a timing

2     perspective how we're going to get fair distribution of time to

3     put on our case in chief, including the fact that, if you take

4     her 25 witnesses, 5 of them she's calling on in their case in

5     chief our witnesses on cross, two on March 31, one on April 1,

6     full day, Dr. Merrens, and one on April 2nd, Dr. Conroy at

7     least of right now, and then presumably, if Dr. Bancroft is

8     allowed to testify, somewhere in there.

9          I'm merely -- one of the reasons for doing this is to say

10    the witness list actually bears out our concern, Your Honor,

11    about cumulative evidence that I can tell from the witness list

12    is going to happen.

13              THE COURT:  So, when you refer to them as character

14    witnesses, do you mean that you anticipate their testimony to

15    be primarily or exclusively to get on the stand and talk about

16    what a good doctor Dr. Porter is, or do they have other

17    relevance as to what they're testifying to and as part of their

18    testimony, they might say, my experience with Dr. Porter is

19    such and such and this is what kind of doctor she is?

20              ATTORNEY SCHROEDER:  I think it's the former, Your

21    Honor.

22              THE COURT:  The former?

23              ATTORNEY SCHROEDER:  The former.  Because we did a

24    lot of discovery in this case, a lot of -- I think we produced

25    over 30,000 pages of documents, and looking at a number of

1    these people that never came up in the course of discovery, I

2    submit, okay, maybe, maybe seven out of ten.  Maybe I have

3    overshot my numbers, but I can tell you, looking at knowing

4    this case from a -- Mr. Vitt and myself are the only two that

5    have been in the case since the start.

6        I can tell you that one of them is a patient.  I can tell

7    you that a number of them are former employees in different

8    departments, radiology, urology.  Those are not part of the REI

9    division, right?  So she had interactions with these people.

10   The only conclusion -- maternal fetal medicine, these are

11   different midwife and OB/GYN.  These are not part of this case

12   in terms of the relevant issues before the court.  And we had a

13   concern that this may happen when there was a suggestion that

14   they'd have 20 to 30 witnesses.

15       Well, now we know, and if we're starting on the 24th and

16   we know that the following week, Monday, Tuesday, Wednesday,

17   are already slated for them to do cross of our witnesses, well,

18   then assume for sake of argument that we somehow keep going

19   plaintiff's case.  We're going to have maybe a week to put on

20   our case, and they get two, and I think that's my concern in

21   foreshadowing what I suspect will happen, and I think this list

22   actually proves my point.

23            THE COURT:  Okay.  And so, talking about what your

24   proposal is, though, as I read your papers, you're willing to

25   stipulate to the qualifications of Dr. Porter on the one hand,

1     right, or, in the absence of a stipulation, some type of

2     limitation.

3          Curious to hear how you would propose that that be limited

4     based on what you are saying now.  Are you saying certain

5     witnesses should not be allowed to testify at all, like,

6     excluded or

7               ATTORNEY SCHROEDER:  I would submit, Your Honor, they

8     are for purposes of character evidence qualifications --

9               THE COURT:  Yeah.

10              ATTORNEY SCHROEDER:  -- that we would have some

11    limitation on this.  My concern is just we've got three weeks

12    and --

13              THE COURT:  I hear you.

14              ATTORNEY SCHROEDER:  And this is a robust list of

15    witnesses.  I expect to call, I think, at least most of my

16    witnesses, and I would say the lion's share of my witnesses.

17    So with their list it's 25.  I think we had 13 or 14.  There's

18    five that are overlap.  We're obviously going to call those

19    five in our case in chief and/or on cross-examination depending

20    upon their availability.

21         But, when you look at those numbers and you look at the

22    people that are listed here who are either current or former

23    employees in other divisions, not REI division, I think it's a

24    fair assumption that that evidence will be duplicative and

25    cumulative.  Of course, if they perhaps have some relevance to

 1    part of this case, the material facts of this case, I could

 2    understand why that would be allowed, but, if we're looking at

 3    three weeks, I just don't want to be a position where April 3rd

 4    or April 4th -- my daughter's 19th birthday.  She'd be happy

 5    that I said something about that in court -- that we're looking

 6    at just putting on our case in chief the week of April 7th

 7    where a lot of time was wasted on talking about Dr. Porter's

 8    qualifications.

 9        We've asked to submit that she's -- we even said eminently

10    qualified.  We even give a few adverbs in there, but the fact

11    of the matter is we've got three weeks, and we've got to try

12    this case 9:00 to 4:30, and I don't see how, based on that

13    list, against our motion which was -- you know, certainly

14    thought this is what was going to happen.  I just don't want to

15    be at April 4th having this discussion again when we're trying

16    to figure out how to jam all of our witnesses in one week.

17        THE COURT:  Your list of witnesses in your filing are

18    these people that you refer to them as plaintiffs seeks to

19    parade in front of the jury, I just want to be clear on that.

20    Are these witnesses that you're suggested shouldn't be

21    testifying?

22        ATTORNEY SCHROEDER:  I would say -- from their list?

23        THE COURT:  I think it is.  Isn't it?

24        ATTORNEY SCHROEDER:  Yes.  So I would submit that

25    there are a number of witnesses on this witness.  List we

1    obviously filed our motion before getting the exhibit list.

2            THE COURT:  Right.

3            ATTORNEY SCHROEDER:  But the exhibit list bears out

4    our concern, and having reviewed their list in ETL with my

5    client, I'd rather drop at least nine to ten people.  I

6    actually had ten that would be cumulative because, from

7    everything I know about the discovery in this case, that's all

8    it would go to would be the qualifications issue.

9            THE COURT:  Okay.  I mean, on the stipulation topic,

10   obviously, I can't force the other side to stipulate.  You know

11   that.  And that's also kind of been a little bit of tension

12   with the case law that talks about a plaintiff's right to kind

13   of present the case and present the facts, too, right?  So a

14   stipulation is, it happens, but in this kind of a case in

15   particular, I feel like a stipulation might not be workable, it

16   seems to me, but that's just my kind of preliminary --

17           ATTORNEY SCHROEDER:  I understand, Your Honor, and I

18   understand the tension there.

19           THE COURT:  Yeah.

20           ATTORNEY SCHROEDER:  But I have seen this play out

21   before this way, And I don't -- I'd like to be wrong that, you

22   know, we start to get our case in chief on earlier, but, even

23   by their own trial subpoenas -- which, by the way, they gave a

24   trial subpoena for one of my witnesses which we can deal with

25   later who is one of, somebody that's represented by us and gave

1    a trial subpoena to them in December and didn't even give us

2    notice of it and didn't even tell us about it.  So we'll deal

3    with that, a few minor issues or major issues later on.

4        But the fact of the matter is they're calling our

5    witnesses.  They have a right to do that.  I understand that,

6    but even based o their math, Monday, Tuesday, Wednesday of the

7    second week the likelihood that we'll even be able to get all

8    four of those witnesses done just in those three days is

9    somewhat Herculean.  And so this is just a foreshadowing of our

10   concerns in that regard.

11           THE COURT:  Yes.  If your sense of what these

12   witnesses is going to testify is correct, if -- I'm very

13   interested to hear from Mr. Vitt on this.  I mean, if they are

14   actually being called just to testify to what you refer to as

15   character, well, then, yeah, I would have some concerns about

16   cumulative evidence or duplicative evidence, but I think it

17   will be useful to hear from the other side, who I'm sure is

18   going to tell me now that this is catastrophization.  Right,

19   Mr. Vitt?

20           ATTORNEY SCHROEDER:  I only heard that word a few

21   times in the papers, yes.  Thank you, Your Honor.

22           THE COURT:  Mr. Vitt?

23           ATTORNEY VITT:  Thank you, Judge.  May it please the

24   Court, we do not intend to parade, to use their term, those 13

25   witnesses on the stand.  We intend to try this case

1    efficiently.  We intend to try it in a way to keep the jury's

2    attention, and I do not expect we will get to a situation where

3    Dartmouth-Hitchcock is jammed up in the slightest in terms of

4    being able to put on their case.

5         Do we intend to call some of their witnesses?  Yes.  Do we

6    expect them to take a day, a half day?  No, absolutely not.  We

7    intend to try this case efficiently, and the witnesses we're

8    calling are not character witnesses as that term has been used

9    in my experience, period.  Now --

10            THE COURT:  Are they purely qualifications witnesses?

11            ATTORNEY VITT:  Well --

12            THE COURT:  I think we are using the word character

13    but what we're talking about is qualifications.

14            ATTORNEY VITT:  No.  Look, these are people who were

15    involved in some way in this situation.  How do you know

16    Dr. Porter?  For example, I don't -- back up just a second.

17    Dartmouth-Hitchcock says the crux of this case is whether the

18    decision to close the REI division and terminate Dr. Porter's

19    employment was a pretext for disability discrimination or

20    whistleblower retaliation.  That is not what the Second Circuit

21    held.  Is that part of the case?  Yeah.  Is it the crux of the

22    case?  No way.

23         The court and the jury must consider why Dr. Porter was

24    not retained or reassigned to OB/GYN.  That's going to be a

25    significant part of this case, and to do that one of the things

1    we need to establish are, What are the qualifications and the

2    skills that she had that no one else had within the OB/GYN

3    department?  For example, she could read ultrasounds in a way

4    nobody else could.  She could do surgeries that no one else at

5    the institution could perform.  She had an experience in

6    endocrinology that simply was lacking within the department.

7          And there are quite a number of emails.  Victoria Maxfield

8    is going to testify she spent 18 years at OB/GYN, and she says

9    Dr. Porter's expertise in gynecological ultrasound,

10   myomectopies, hysteroscopies and GYN surgeries provide a level

11   of care to women that is not available from other members of

12   the gynecology staff.  Now, as part of her testifying, will she

13   talk about this experience and her skills?  Of course she will.

14   Will it take a long time?   No.

15         But, in order for the jury to assess whether the decision

16   not to reassign Dr. Porter made any sense whatsoever, we need

17   to explain why it should have happened.  And so that's not

18   going to take a long period of time, and, to the extent we get

19   to a point where somebody thinks we're duplicating, we'll deal

20   with it then.  We don't intend to duplicate.  We intend to try

21   this case efficiently.

22         Now, the part of the motion that I found surprising --

23   there are some other words that come to mind.  They say you

24   should not mention Misty Magic, and it would be a serious

25   mistake to allow a description from the chair of the OB/GYN

1    department, which happens to have been something that was

2    quoted in full by the Second Circuit.  And they say, and I

3    wrote this down, we're trying to glorify her abilities in an

4    effort to mislead and confuse the jury into making a decision

5    based off emotion rather than the merits of the case.

6        That is an extraordinary prank.  You're going to introduce

7    testimony that is so glowing that it ought to be prohibited or

8    restricted in some way.  What principle of law is this court

9    supposed to apply in deciding that this type of evidence should

10   be rejected?  None that I'm aware of.

11       And will Misty Magic be mentioned?  Of course it will.  It

12   was it was the kind of a common expression within the

13   department.  You know, she was able to accomplish things nobody

14   else could, and there is nothing improper and certainly

15   shouldn't be restricted as some sort of prohibition on, you

16   know, being overly -- I don't know -- generous, you know.  So

17   that part of the motion is easy to deny and, in terms of the

18   schedule, we do not intend to bog this down.  Mr. Schroeder

19   will have all the time he needs.  Thank you.

20             THE COURT:  Okay.  Mr. Schroeder?

21             ATTORNEY SCHROEDER:  Just very quickly, Your Honor.

22   I know we've got a pretty robust motions coming.

23       Two of the people that were just identified on the witness

24   list, Eunice Lee who was apparently a former patient of

25   Dr. Porter, they were just identified for the first time.  And

1    Chris Strogain who was is a doctor at Dartmouth-Hitchcock who

2    was just identified on the exhibit list.  Never disclosed

3    before, never identified.

4         So perhaps, certainly, they're going to consider

5    discussions about what was referred to by Leslie Demars and

6    cross-examine her on that.  I understand that, but it goes to

7    the bigger issue of how much evidence are we going to have

8    related to qualifications, et cetera, and if it's going to her

9    care as a patient, well, why is that particular individual as

10   well as the doctor at Dartmouth-Hitchcock who is not, was in

11   the REI division, why are they just being disclosed now at this

12   eleventh hour?

13        One additional one, Your Honor, and we did put this in our

14   papers was Dr. Bornstein who has never worked at

15   Dartmouth-Hitchcock as far as I know.  And he's, what else is

16   he other than a character or qualifying witness for the

17   plaintiff here where he never even worked at

18   Dartmouth-Hitchcock?  He works at UVM.  That's where he is.

19   So, you know, I hope we're on schedule to be done April 11th

20   but my fear is, just looking at a handful of these examples,

21   it, you know, the proof is in the pudding, so to speak.  Thank

22   you.

23        THE COURT:  Okay.  Are you also arguing the quash the

24   subpoena issue?

25        ATTORNEY SCHROEDER:  Yes, I am.

1          THE COURT:  Do you want to just stay there then?

2          ATTORNEY SCHROEDER:  I do, but I got to get another

3     group of documents here, Your Honor.  Thank you.  I'll try and

4     be short, Your Honor.  I know we've got obviously a few more of

5     these to go through.  With respect to the motion to quash,

6     we've highlighted this fact before, which is Dr. Porter was

7     announced her, was given notice of her termination May 4th.

8     Her final day of employment was June 3rd 2016.  Dr. Conroy

9     didn't come there until August 7th 2017.  Those are undisputed

10    facts in the record whether you look at Second Circuit or the

11    trial court.  She has no first --

12          And one of the arguments, Your Honor, and I'd ask you to

13    review Document Number 89, which was plaintiff's submission on

14    June 3rd 2019 which seems like a really, really long time ago.

15    However, in that submission, where we had sought a motion for

16    protective order because we said we didn't believe that

17    Dr. Conroy should have to testify.  They said, well, you know,

18    there's, she has a unique perspective on the needs and values

19    of the institution and if the REI -- this was their submission

20    of pretext -- that the REI division was closed for other

21    reasons, perhaps as an opportunity to clean house with regards

22    to Dr. Porter and the other physicians under a, under a pretext

23    and then reopening shortly thereafter, that would be, you know,

24    something that would be worth putting before the Court.  Now

25    that was 2019 which is pretty close to the closing of the REI

1    division.

2          The REI division closed, and that hasn't been opened in

3    eight years.  So that whole pretext theory that served as the

4    basis for them to get the deposition in the first place, that

5    has gone away.  They haven't opened the REI division.  It

6    hasn't even been discussed of opening the REI division over the

7    last eight years, and so that's where we are.  So that the

8    underlying assumption or submission for purposes of even

9    getting the deposition hasn't been borne out because the REI

10   division hasn't been opened, again, in eight years.

11         With respect to Dr. Conroy's deposition, we had the fact

12   that she was asked numerous hypotheticals, really being asked

13   to be a Monday morning quarterback, documents that she'd never

14   seen before, asked those questions.  They had the right to do

15   the deposition.  I think it was for three hours.  They did it,

16   but they were all hypotheticals because she wasn't on those

17   documents.  And, in fact, when you look at their opposition in

18   this case, they refer to emails by Dr. Merrens and emails by

19   Dr. Levine, all of which happened before Dr. Conroy got there.

20         And, in fact, they have already put in trial subpoenas to

21   have Dr. Merrens testify and Dr. Levine testify.  So you have

22   the argument of cumulative as well, never mind 401 or 401 and

23   403.

24              THE COURT:  Right, but the argument, right, is that

25   there's potentially an inconsistent explanation for the

1    closing.  I think that's the point, right?

2            ATTORNEY SCHROEDER:  Absolutely.  And I would ask

3    Your Honor to just review the deposition testimony that's been

4    submitted against the actual article, because it's not always

5    quoting Dr. Conroy, and I would submit there's a number of

6    instances where it actually is a misrepresentation by the

7    plaintiff of what actually she said and the implications of it.

8            For example, they had an issue with respect to one of the

9    issues they say is any inconsistency with respect to providers,

10   and here the issue of providers she actually explained that

11   that included nurses, and one of the issues, when you close a

12   division of this magnitude and they'd never close a division

13   before -- so Dartmouth-Hitchcock has 15,000 employees, $3.5

14   billion enterprise at this point, has never closed a division

15   before.  Of course, there's multiple reasons, but in those

16   multiple reasons she was consistent in what she explained out

17   of a five-minute conversation with Dr. Merrens after the fact,

18   after the fact.

19           And so, if you look at the deposition testimony against

20   the actual quotes from an article in September of 2017, they

21   extrapolate, well, these reasons are different.  I understand

22   that there might be a inconsistency.  There is not

23   inconsistencies, actually between her deposition testimony.  So

24   they finally got the chance to do it, and they have nothing to

25   show for it.

1          This is somebody who is in charge of 15,000 employees, has
2      a huge, you know, $3.5 billion in revenue, six community
3      hospitals in New Hampshire and Vermont, five multi-specialty
4      community group practices, only academic center in New
5      Hampshire, Dartmouth-Hitchcock Medical Center, only children's
6      hospital.  Dartmouth Cancer Center being one of 57 NCI
7      designate comprehensive cancer centers in the United States.
8      She's got huge responsibilities.
9          It's one thing to do her deposition in her office down the
10     hall for two or three hours.  It's another thing to basically
11     take her out of commission for at least one workday.  And so,
12     in terms of the undue burden under Rule 45(D)(3)(a), little 4,
13     it's clear in the case law that having Dr. Conroy testify on a
14     five-minute conversation that she had with doctor Dr. Merrens
15     well after the closure of the REI division where she actually
16     is consistent with those reasons, is duplicative, cumulative,
17     and an undue burden for somebody of her stature at this point
18     in this case.
19                 THE COURT:  Okay.  Thank you.
20                 ATTORNEY SCHROEDER:  Thank you.  I'm going to try to
21     keep all my presentations under five minutes.  I'm going to see
22     if I can do that.  I've got a few more I think to do.
23                 ATTORNEY VITT:  Okay.  May it please the Court,
24     Dartmouth-Hitchcock physicians have been that, although the REI
25     division was marginally profitable, it needed to be closed

1    because there was a shortage of nursing staff.  Ed Merrens, who
2    made decision to close the REI division, admits that pinning
3    the dissolution of the REI division on failure to maintain and
4    recruit nurses for this work is rather thin.
5         So why does the explanation even matter?
6    Dartmouth-Hitchcock says, Look, we had a legitimate business
7    reason to shut the REI division, get rid of all the doctors and
8    cease providing reproductive endocrinology care to women and
9    children who otherwise would have gone to Dartmouth-Hitchcock
10   to get that medical help.
11        We say this is pretext, pure and simple.  It was a way to
12   get rid of two incompetent doctors who they worried would raise
13   some sort of just cause complaint or be, you know, hearing God
14   knows what, and they could get rid of the doctor who was the
15   thorn in their side who simply wouldn't tolerate and wouldn't
16   be quiet and insisted that something had to be done to deal
17   with the situation with these doctors and, Oh, by the way, she
18   was on disability.  We can just get her out the door.
19        Now, the explanation about why they closed it is thin.
20   Joanne Conroy didn't have to say a word, but she volunteered to
21   sit down at a apparently two -- it's a little unclear, but met
22   with the press.  There were reports.  She certainly understood
23   that this issue was a big issue and was likely to be asked
24   about, and she gets a briefing from Ed Merrens, and she comes
25   up with an explanation that is different than what Ed Merrens

 1    testified about.

 2          And I'd like to hand up just one document.  There's, it

 3    was marked as Exhibit 2 during the Conroy deposition.  There is

 4    an email from David Seifer, one of the doctors who was

 5    terminated who we say couldn't do the job, and the other is

 6    from Leslie Demars who was the chair of OB/GYN and ended up

 7    losing her job because of this situation.  So may I hand it up,

 8    please?

 9          THE COURT:  Yes.  Mr. Schroeder, do you have a copy

10    of this?

11          ATTORNEY VITT:  I gave it to him, yes.

12          ATTORNEY SCHROEDER:  I just got it, yes, Your Honor.

13          THE COURT:  Okay.

14          ATTORNEY VITT:  So, beginning at the bottom, David

15    Seifer writes to Leslie Demars saying, I wasn't aware we closed

16    because we couldn't recruit new providers.  Where does revised

17    information like this come from?  And LRD, which is Leslie

18    Demars, says, I met with Joanne and told her that I hoped that

19    she'd been misquoted in the article because, if that is the

20    information that's been given her, it is completely untrue and

21    now a different narrative that is in the public eye.

22          I understand Joanne Conroy is busy and a billion this and

23    15,000 employees, and I get all that, but the way we see it,

24    Judge, Dartmouth-Hitchcock can't keep its story straight.

25    There may be an innocent explanation why this other excuse was

1    provided, but it's fundamental to this case, and our view is

2    Joanne Conroy needs to show up and describe and provide answer.

3    Thank you.

4         THE COURT:  Okay.  Thank you.  Are you replying or

5    moving on to the next motion?

6         ATTORNEY SCHROEDER:  Touche, Your Honor.  I'd just

7    want if I may, very quickly.  I think I was under my five

8    minutes, so I'm just going to use that extra 30 seconds.  This

9    goes to the issue, Your Honor, which we've raised separately,

10   but the fact of the matter is they're tying to do character

11   assassination through emails where they didn't even depose Dr.

12   Seifer.  They didn't depose Dr. Su, and Joanne Conroy, nothing

13   is attributed to her in this email exchange as far as comments,

14   nothing that Joanne said, blah, blah, blah.  It's discussion

15   back and forth between two people.  Joanne Conroy, there's

16   nothing attributable to her in this email other than, I told

17   her this.

18        And, certainly, they're going to have Leslie Demars on the

19   stand.  It's perfectly appropriate to cross-examine her on

20   that.  If they had called or deposed Dr. Seifer, they could

21   have perhaps done the same thing, but he's not a witness in

22   this trial.  It's just Leslie Demars.  They've done a trial

23   subpoena.  This is overkill, and it's between two people

24   talking about what they think as opposed to what Joanne Conroy

25   said.  It's, it proves the point.  Thank you.

1          THE COURT:  Okay, all right.  We've been talking

2     about character evidence so let's move on to the actual

3     character evidence motion.

4          ATTORNEY McDONALD:  Thank you, Your Honor.  I'll also

5     try to keep it pretty brief.  I'm mostly going to respond to

6     the opposition to the motion.

7          THE COURT:  Okay.

8          ATTORNEY McDONALD:  As you know from our papers and

9     it's in the evidence about the performance of Dr. Su and Dr.

10    Seifer, based on undue prejudice, relevance, hearsay, and

11    character evidence.

12         THE COURT:  So how is it hearsay?

13         ATTORNEY McDONALD:  What's that?

14         THE COURT:  How is it hearsay?

15         ATTORNEY McDONALD:  Well, a lot of the documents I

16    think that they intend to introduce, there will be no witnesses

17    able to testify as to the contents of those documents.

18         THE COURT:  So like Exhibits 10 and 11, you're

19    talking about, those are hearsay?

20         ATTORNEY McDONALD:  Correct.  I think there's a lot

21    of issues about those documents.  I think the biggest issue is

22    undue prejudice.

23         THE COURT:  Okay.  Your hearsay point that you still,

24    you maintain that those are hearsay because of not having a

25    declarant; is that what you said?

1              ATTORNEY McDONALD:  Correct.

2              THE COURT:  Okay.

3              ATTORNEY McDONALD:  So in the opposition it basically

4    says that evidence regarding the performance of these doctors

5    is, by definition, admissible because we did not,

6    Dartmouth-Hitchcock, did not object to the evidence being

7    included in the summary judgment briefing.

8         That's a misrepresentation of Rule 56(c) which states that

9    a party may object to the material cited in the summary

10   judgment motion on the grounds that it may not be, it is not

11   presented in a form that's admissible to the court.  There's

12   no, there's no law that would suggest that we've waived our

13   ability to contest the admissibility of that evidence at trial,

14   and the suggestion that the Second Circuit has also determined

15   that it's admissible is also complete inaccurate.  The word

16   admissible does appear in the Second Circuit opinion.  So to

17   suggest that, because it's in the Second Circuit opinion, it

18   comes into this trial, I think, is totally incorrect.

19             THE COURT:  Though it is interesting, right?  The

20   Second Circuit considered this information.  It's kind of hard

21   then to say at trial we shouldn't consider it, isn't it?

22             ATTORNEY McDONALD:  Well, I think, on the point of

23   relevance, sure, but I think there's still an undue prejudice

24   issue.

25             THE COURT:  I see, okay.

1          ATTORNEY McDONALD:  And, also, we'll have to deal

2     with the hearsay issue as well.  When the Second Circuit

3     decided that, it had no sense of who was going to be called at

4     trial.  When we did our briefing, we had no sense of who was

5     going to be called at trial.  Now we know that Dr. Su and Dr.

6     Seifer are not witnesses.  They cannot, they are not going to

7     be called to testify regarding the information in the

8     documents.  And, as I said, there is no, there's nothing in the

9     Second Circuit decision that speaks to admissibility.

10          THE COURT:  Okay.

11          ATTORNEY McDONALD:  Plaintiff's opposition also

12     suggests that Su and Seifer's performance goes to

13     Dartmouth-Hitchcock's motivation to close the division.  We

14     were a little confused by that point.  Dartmouth-Hitchcock's

15     position is that there were a number of reasons that led to the

16     decision to close the division, one of which was interpersonal

17     strife among the physicians.  So, to the extent that there is

18     evidence regarding, you know, infighting among the physicians,

19     that would actually support Dartmouth-Hitchcock's position.  So

20     more, we didn't really understand that point.

21          And, to the point that it goes, this evidence goes to

22     Dr. Demars putting herself on the hook for the performance of

23     Dr. Su and Dr. Seifer, the allegation that Dr. Demars was

24     putting herself on the hook for Dr. Su is new to us.  We always

25     understood their argument to be related to Dr. Seifer, that Dr.

1    Demars was on the hook for Dr. Seifer's performance.  And I

2    think that this is probably an eleventh-hour pivot so that they

3    can argue for the admissibility of Exhibit 10, which is the

4    self-serving 12-page email of all of Dr. Su's perceived

5    failures.  Again, defendants don't contest that Dr. Porter made

6    complaints about these physicians.

7         THE COURT:  And isn't that very relevant to the

8    whistleblower claims and the retaliation claims and the alleged

9    unlawful termination?

10        ATTORNEY McDONALD:  Certainly the fact that she made

11   those reports, and we don't contest that.

12        THE COURT:  Right.

13        ATTORNEY McDONALD:  I think the specific nature of

14   the allegations is an undue prejudice issue.

15        THE COURT:  Prejudice how?

16        ATTORNEY McDONALD:  Prejudice, this is an attack on

17   Dartmouth-Hitchcock in a way.  This is ten pages that Dr.

18   Porter herself wrote about all of the perceived failures of

19   Dr. Su.  It doesn't go to whether she made these reports.  It

20   goes to an attack on Dartmouth-Hitchcock as a whole and is

21   trying to make, attack Dartmouth-Hitchcock and trying to make

22   Dartmouth-Hitchcock look bad.

23        THE COURT:  Okay.

24        ATTORNEY McDONALD:  So I think Exhibit 11 is another

25   example of that.  It's an email from Dr. McBean to Dr. Demars.

1    I don't understand.  We don't understand why a complaint about

2    another provider that was not Dr. Porter is relevant to Dr.

3    Porter's complaints in this case.

4              THE COURT:  Okay.

5              ATTORNEY McDONALD:  So, now that we've received the

6    exhibit list, the exhibit list has at least 15 examples of

7    documents we've counted of documents that relate to specific

8    complaints that Dr. Porter made about Dr. Seifer and Dr. Su, as

9    well as other providers and other staff at Dartmouth-Hitchcock.

10   So it seems that this is going to be a major issue that they're

11   going to try to push this through, this theory through.

12             THE COURT:  Okay.  And are you still maintaining the

13   Rule 404 objection to this?

14             ATTORNEY McDONALD:  Yes.

15             THE COURT:  And the objection is under both 404(a)

16   and (b)?

17             ATTORNEY McDONALD:  Yes, that's right.

18             THE COURT:  So it's impermissible character evidence

19   as to Dr. Su and Dr. Seifer?

20             ATTORNEY McDONALD:  Correct.

21             THE COURT:  Okay.  Why don't you explain that one to

22   me?  Because I'm a little bit unclear as to why that's

23   impermissible character evidence under the first prong 404(a).

24             ATTORNEY McDONALD:  Certainly.  I think that this

25   evidence goes to specific incidents that she raises in these

1   papers goes to the suggestion that these two were prone to
2   making poor decisions and endangering patients, and that was an
3   issue that continued to crop up for years within Dr. Porter's
4   tenure at Dartmouth-Hitchcock.  So I think that she is
5   attempting to use these specific instances to argue that, for
6   the entirety of her time there, Dr. Su and Dr. Seifer were
7   creating an unsafe environment.

8             THE COURT:  Okay.  So under 404(a) you're saying that
9   that is evidence that would be sought to be used to prove that,
10  on a particular occasion, the person acted in accordance with
11  that character or trait?

12            ATTORNEY McDONALD:  I think our argument under 404(b)
13  is stronger, but 404(a) correct.

14            THE COURT:  Okay.  And then your argument under
15  404(b), so, if evidence of any other wrong or act is not
16  admissible to prove a person's character to show that on a
17  particular occasion they acted in accordance with character,
18  you've just made that argument, but, of course, there's
19  alternative bases for something to come in under 404(b).  So,
20  for example, here it seems knowledge.  Isn't this about
21  knowledge of decision makers at the hospital?

22            ATTORNEY McDONALD:  I think so, but I didn't think
23  that anyone the people to whom Dr. Porter reported these are
24  able to testify.  They are able to testify to whether they
25  report this to anyone else.  I don't think the contents of the

1    reports speaks, the complaints goes to the knowledge of anyone
2    who's higher up at Dartmouth-Hitchcock.
3             THE COURT:  Okay.  But, I mean, they are pretty
4    strongly worded assessments.
5             ATTORNEY McDONALD:  Certainly.
6             THE COURT:  So I think the knowledge notion there is
7    Dr. Porter writes these letters to decision makers at the
8    hospital, and she reports, she makes some fairly she delivers
9    some fairly strong opinions about what she views as substandard
10   performance by them.  The relevance then of the knowledge of
11   Dartmouth people receiving those and then the allegation is
12   taking adverse employment action against Dr. Porter seems like,
13   to me, that would be very much squarely within 404(b)'s rule.
14            ATTORNEY McDONALD:  Understood.
15            THE COURT:  All right.  Anything else on this?
16            ATTORNEY McDONALD:  Thank you so much.
17            THE COURT:  Thank you.
18            ATTORNEY VITT:  May it please the Court, as a
19   technical matter, I think motions in limine are not properly
20   filed to exclude evidence unless the evidence is clearly
21   inadmissible, and this is not one of those situations.  What I
22   think Your Honor has identified what's the principal argument
23   that I would have which is, Look, there are over 30 separate
24   references in the Second Circuit opinion of the competence of
25   Dr. Seifer and Dr. Su.  And the Second Circuit is critical -- I

1    could probably use a stronger term -- to describe the

2    hospital's failure to do anything despite this behavior.

3        So I really don't understand the motion, and I don't

4    understand the idea that somehow we can't refer to this as just

5    some sort of far-fetched claim and, you know, seems to me that

6    this is a big part of what the case is about.  There were

7    problems with these doctors.  The institution looked bad.  They

8    were reported, not only by Dr. Porter, but by a number of

9    witnesses who we're going to be calling to the stand.  That's

10   the case.  I mean, that's certainly a big part of the case.

11   That's the whistleblower case in part.

12       THE COURT:  Sir, did you want to address the

13   argument, though, that Dartmouth is saying the Second Circuit

14   included all those references as a matter of relevance but they

15   weren't taking into account the matter of prejudice?  The

16   argument was made.  Curious if you have a response to that.

17       ATTORNEY VITT:  I don't think I'm prepared to say

18   that the Second Circuit ignored that issue of prejudice.  Is

19   the evidence prejudicial?  Of course, it is prejudicial.

20   That's what this case is about.  It ought to be prejudicial.

21   It's not unfairly prejudicial.  It's not like we're talking

22   about somebody abusing, you know, a child or something.  I

23   mean, you know, this is -- it's damaging testimony, and is it

24   prejudicial?  Yeah, and it ought to be.

25       THE COURT:  Okay, all right.  Thank you.

1              ATTORNEY McDONALD:  One brief point.  The Second
2    Circuit decision was considering a summary judgment record.
3    They were considering the fact in the light most favorable to
4    Dr. Porter not, and as they would be perceived at trial.
5              THE COURT:  Right.  Yes, thank you.  Just want to be
6    clear.  Are you Ms. McDonald?
7              ATTORNEY McDONALD:  I am, yes.
8              THE COURT:  Okay.  Thank you.  All right.  Yes and
9    the next one cat's paw theory.  So, Mr. Schroeder, you're
10   arguing that one?  Okay.
11             ATTORNEY SCHROEDER:  Yes.
12             THE COURT:  I'll say as you walk up to the podium,
13   I'll give you something to think about.
14             ATTORNEY SCHROEDER:  Two things at once, Your Honor.
15   Okay.  I got you.
16             THE COURT:  So your initial motion talks about how
17   cat's paw theory may or may not be available under state law in
18   New Hampshire and Vermont.  There is, we'll call it a
19   concession, but just a statement of the law where you say that
20   it applies federal claims.  The reply brief comes in now and
21   says it only applies in certain federal claims and not these,
22   right?  It doesn't apply to the ADA and the Rehab Act, but it
23   applies in Title Seven.
24             ATTORNEY SCHROEDER:  Right.  And, yes, in cases --
25   yes go ahead.  Want me to explain?

1        THE COURT:  Yeah, I mean, was that kind of a, upon
2    further thought, we looked into this a little more deeply and,
3    actually, we're going parse it out more narrowly about which
4    federal claims it applies to?
5        ATTORNEY SCHROEDER:  Well, I think the issue was
6    replying to their point that this should come in through the
7    federal claims and responding to their opposition where they
8    raise these cases under Title Seven and Eucera and I think an
9    age discrimination case.  So quite frankly, it was in response
10   to that.
11       Whether or not it can come in under federal claims or
12   federal claims we understand that the Second Circuit has
13   weighed in on this in terms of Title Seven.  It's not a Title
14   Seven case, and so for the, for the -- I think everybody's in
15   agreement that New Hampshire and Vermont have not adopted this
16   doctrine yet, okay.  And so that hopefully it's four out of six
17   of the claims.  So the other two claims you're addressing their
18   point, well, yeah, we've got these federal claims.  I think it
19   certainly could be confusing to the jury, right, to explain the
20   difference between, well, these claims have this theory, but
21   this claim has this theory.
22       But set that aside.  The Zorro decision out of Connecticut
23   in 2020 says that the Second Circuit has not yet addressed
24   whether the cat's paw theory applies to claims brought under
25   the ADA or Section 504 of the Rehab Act.  Our reply was to

1    really address their issue of, well, we can still bring it

2    under federal claims.

3        They wanted to bring it under state claims as well, and I

4    think that's pretty clear, but, in terms of the federal claims,

5    they're out of luck there as well because it hasn't been

6    adopted by the Second Circuit.  So whether it's been adopted by

7    other circuits and whether or not it's not been applied to

8    Title Seven and Eucera claims, there's only ADA and Rehab Act

9    here as federal claims, and so I don't see the avenue or the

10   lane through which they can drive that theory at this point.

11       And, in light of the lack of adoption by New Hampshire and

12   Vermont, in light of the lack of adoption of this theory to ADA

13   and rehab claims, I don't see -- and, even if they -- we'll get

14   to the motion for leave to amend, but it's not applicable

15   anyway because that's a Vermont claim, and that hasn't been

16   adopted there.  I do not see a path, Your Honor, for them to

17   get there.

18           THE COURT:  Okay.  You say in your brief it's clear

19   that Dr. Merrens made the closure decision, and so the record

20   doesn't support the cat's paw theory, separate from your legal

21   argument about whether it applies, but you say, as a matter of

22   fact, it's clear that Dr. Merrens made this decision so cat's

23   paw would not be applicable here.

24       The Second Circuit decision, though, I think it's fair to

25   say, kind of opined that, you know, there is a little bit of a

1    fact question on this issue, isn't there?

2              ATTORNEY SCHROEDER:  They have laid that out, Your

3    Honor, as every inference in favor of the nonmoving party.

4    I'll acknowledge that.  But it's Rule 56.  It's whether or not

5    there's a factual dispute that gets you to the jury trial.  But

6    here Dr. Merrens has testified that he was the ultimate

7    decision maker and that he made the decision, and there's this,

8    obviously, this theory that they're now going, well, we think

9    it could be -- if it's not, if Dr. Merrens isn't at fault for

10   whistleblower retaliation and disability discrimination, well,

11   you know what?  It's really because he was the puppet, and

12   Dr. Demars was the puppeteer, right? And that's really what

13   they're saying at the end of the day and that she had it out

14   for Dr. Porter.

15        Either way, none of their claims have case law that

16   supports the use of that theory here today in this circuit.

17   And I'd submit that, as a result, we don't, I don't want to

18   have to, midstream in trial, have to brief this issue.  We know

19   it was put out there.  We actually didn't even believe that it

20   actually had been briefed by the plaintiff.  But the Second

21   Circuit obviously disagreed with that, and they referenced it,

22   and I think, because that's in play, we want to address it now.

23   It's not like the Second Circuit said, well, you know, you can

24   definitely use this theory.

25              THE COURT:  Right.  And so on that question, right,

```
 1    like, if I were now to rule on the cat's paw theory in the
 2    context of a motion in limine, right, I mean, it's a little bit
 3    unusual that a legal theory gets kind of excluded at the outset
 4    of trial, but you make the point that, if the cat's paw theory
 5    were to be excluded, that would affect the evidence that comes
 6    in.  Can you give me a little bit of a sense of how a decision
 7    on cat's paw at the outset of the trial would affect what comes
 8    in in terms of the evidence?
 9              ATTORNEY SCHROEDER:  Well, I think it goes to the
10    issue of the amount of evidence, right, that is before the
11    Court on any particular theory.  I agree with you that the
12    legal theory in and of itself isn't typically brought in the
13    context of a motion in limine.  I think this is a really rather
14    unique situation where you actually have case law under state
15    and federal law.  So it would limit, I think, perhaps, but not
16    necessarily, limit -- it depends on what Leslie Demars
17    testifies to and Dr. Merrens testifies to.
18              But I think, in terms of jury instructions and I think how
19    that plays out -- so I understand the Court may want to see how
20    the evidence plays out before making a decision on that issue,
21    but we're going to begin with jury instructions ahead of time
22    and what theories they're going to be able to use in terms of
23    proving their case.  And so it goes to the elements of their
24    claim, and I'd submit that, if you can't use the cat's paw
25    theory, well then you've got -- you can still put in evidence
```

1    as, well, we think this person made the decision, we think that

2    person made the decision, not at cat's paw theory, but we

3    really think this person was responsible for the decision and

4    certainly put that evidence in.

5            THE COURT:  So it may mean that the evidence wouldn't

6    change, that the evidence will still come in.  There will be

7    Dr. Demars.  There will be Dr. Merrens.  All that evidence will

8    come in however it comes in, and then at the jury instruction

9    stage, as you say, right, which makes some sense, after we see

10   how the evidence comes in, a decision can be made, and I'm

11   going to have to decide or determine whether it's legally

12   available, right, so not just as a factual matter.

13           ATTORNEY SCHROEDER:  Right.  And so factually --

14           THE COURT:  Yeah.

15           ATTORNEY SCHROEDER:  -- they can certainly elicit

16   testimony on that point, Your Honor.  It's just we know based

17   upon -- and this is unusual, right, that this legal theory has

18   been adopted in other places but courts have stated that it

19   hasn't been adopted in New Hampshire, Vermont or the Second

20   Circuit.  So we want to limit the amount of all the different

21   legal theories that are going to be at play in the jury

22   instructions.  Well, one of those theories merely isn't

23   applicable under the law.  Let's deal with it now ahead of time

24   which is, you know, why we would do it as a motion in limine.

25   I realize it's a rather unique, but it's just a precursor to,

1    well, we're going to make that same argument at the jury

2    instruction stage.  It's not going to change, and for that

3    reason we think it's, it's relevant and probative to deal with

4    it today.  Thank you.

5              THE COURT:  Okay.  All right.  Thank you.  Mr. Jones?

6              ATTORNEY JONES:  Thank you, Your Honor.  Defendant

7    seeks to preclude the so-called cat's paw theory.  This theory

8    has an odd name.  It's not an odd concept.  It's not an unusual

9    theory at all.  It's not even really controversial.  We can

10   thank Judge Hollingsworth for the metaphor and the name.  At

11   the end of the day they're talking about the simple law of

12   agency and a body of law that has remained unchanged for

13   hundreds of years.  As the Supreme Court clarified in Staub

14   versus Proctor Hospital, this theory is just the application of

15   agency to an employment decision where more than one person

16   participated or influenced the decision.  That's it.  We're

17   just talking about agency law here.  It's not some weird novel

18   thing that some circuits have to struggle with, do we accept it

19   or not, or states have to accept it.  It's just agency law.

20             THE COURT:  But it applies differently in federal law

21   depending on the cause of action.  So, even if it is a general

22   agency principle, apparently the case law says it applies to

23   certain types of federal claims, but not all.

24             ATTORNEY JONES:  Right.

25             THE COURT:  So is it really an agency principle that

1    carries across all cases?

2              ATTORNEY JONES:  Well, it is.  It's an application of

3    agency to -- and in those indications, the courts that have

4    questioned its application, for example, at ADA have said,

5    well, does that really in a but-for context?  Does that agency

6    principle apply in this causation context?  So it's still

7    agency law at the end of the day.  It's not some weird, novel

8    theory, and, because of that, it's not remarkable that every

9    federal circuit court of appeals who looked at it squarely has

10   recognized it.

11         Similarly, every state Supreme Court case where the court

12   has squarely addressed the issue has recognized it.  Nowhere in

13   their papers is a single court that rejects it.  There are

14   plenty of courts that, as a matter of judicial conservatism

15   say, I don't have to get to it because, even if we accept it,

16   the facts don't exist in this case, but no one's rejected it.

17         So, well, anyway, there's no example of a court rejecting

18   it.  That being the case, there is no reason to think that the

19   New Hampshire Supreme Court or the Vermont Supreme Court would

20   reject the theory if it was squarely brought to their

21   attention.  Both courts have had occasion to look at it.  Both

22   courts have analyzed it but then found in those cases

23   insufficient evidence that even if it was recognized, it could

24   fly.

25         But they never said we reject it, and there is no indicia

1     or anything to think that they would reject it.  Notably, both
2     New Hampshire Supreme Court and Vermont Supreme Court have held
3     that their states' respective discrimination laws look to
4     federal law for guidance.  So it has been recognized under some
5     federal law claims.  I understand the issue with the case that
6     was cited, and it has been universally recognized by the states
7     that have squarely considered it.  In light of those two
8     factors, it is the most compelling reason to expect that both
9     Vermont Supreme Court and the New Hampshire Supreme Court, if
10    pushed to resolve the issue, would recognize it.
11    Again, it's not a weird theory.
12         With regard to the factual dispute which I think Your
13    Honor had made the point I was going to make so I won't belabor
14    it, but the Second Circuit did find that a reasonable juror
15    could, in fact, based on the record evidence, reach a
16    conclusion directly opposite from the very factual foundation
17    of defendants' motions.  They say Dr. Merrens was the decision
18    maker and Dr. Demars was not a part of the decision and, in
19    fact, fought for Dr. Porter, and the Second Circuit said, no, a
20    reasonable junior could find the other way on both those
21    policies.  So this is not the time to exclude a theory based
22    upon hotly disputed facts.
23            THE COURT:  And do you think either way, if it was
24    excluded or allowed in limine, that would impact the way the
25    evidence comes in or the nature of the evidence that comes in?

 1              ATTORNEY JONES:  Well, if you were to rule that it's
 2      excluded that, under Vermont and federal law, well, to the
 3      extent we are argue it's still viable under federal law, no.  I
 4      think the case comes in, the case comes in, and we can argue
 5      the law at jury charge, as you pointed out.  But this is not a
 6      motion in limine resolution situation.
 7              THE COURT:  Okay, all right.  Thank you.
 8              ATTORNEY SCHROEDER:  Very briefly, Your Honor, just
 9      to retort on that?
10              THE COURT:  Yes.
11              ATTORNEY SCHROEDER:  There's been a lot of comments
12      made by plaintiff's counsel about the import of the Second
13      Circuit decision.  Well, interestingly enough and one of the
14      points you raised in January was to hear the significance or
15      lack of significance of that decision.  We'll have a bench memo
16      to you this coming week on that issue because I think it's
17      important.  It was a summary judgment case.
18          They repeatedly talked about how important that decision
19      was to say this, that, or the other thing, but what it doesn't
20      say is that the cat's paw theory applies under Second Circuit
21      case law.  I mean, they took 100 pages to talk.  They could
22      have used a few words on that, and they don't, and I think
23      that's informative.  They also say, If it's even available
24      under New Hampshire law, and, yes, we could wait for the jury
25      instructions phase of this case to deal with it, but that will

1    be after perhaps that evidence has all come in, and I want to

2    be clear about what, how this case is going to be tried and

3    what legal claims and theories each party, you know, they're

4    allowed to go into.

5             THE COURT:  Right.  Which is why I keep asking that

6    question.  I want to know what impact it will have on the

7    actual presentation of evidence, and I don't mean to press you

8    on this, you know, unnecessarily, but that's relevant, right?

9             ATTORNEY SCHROEDER:  It is relevant, Your Honor.  I

10   understand that.  I think it goes to what can be said in the

11   opening statements, right?  I think it could have some

12   significance there and perhaps in closing statements, and I

13   want to deal with the jury instructions.  I think it's, it,

14   given the fact that the law it hasn't been adopted state and

15   federal on these claims that are before us, it's not germane to

16   even have it in play at all as a theory in the case.

17        Is it necessarily going to change what questions are asked

18   or not asked?  I don't know yet.  I don't think so.  But, if

19   we're going to have to deal with this at the jury instruction

20   stage, why can't we deal with it now where it's one less issue

21   to deal with down the line and we'll, the point of doing this

22   pretrial, in part, is to try to narrow what's before the Court,

23   right, and, to the extent that that's possible and is fair and

24   reasonable and judge's discretion, obviously.

25        So I would submit that the, you know, Second Circuit could

1    have taken any number of liberties on this one, and they

2    didn't, and I think that's because it's not adopted in the

3    Second Circuit for that, for these particular claims.

4              THE COURT:  Right.  And, with respect to the state

5    law claims, they said it may apply, almost suggesting that a

6    trial court then might make the decision to predict what the

7    state high courts might do on this issue for purposes of trial,

8    right?

9              ATTORNEY SCHROEDER:  Absolutely, yeah, I think it's

10   up to your discretion.

11             THE COURT:  Yeah.  Short timing, though, to make that

12   kind of a decision with trial starting in a week.

13             ATTORNEY SCHROEDER:  Correct.  I understand that.

14             THE COURT:  Right.  Okay.

15             ATTORNEY SCHROEDER:  Thank you.

16             THE COURT:  Thank you.  All right.  So what remains

17   is the motion to amend the complaint.  Am I missing a motion?

18             ATTORNEY COFFIN:  No, that's it.

19             ATTORNEY VITT:  That's it.

20             ATTORNEY SCHROEDER:  No, Your Honor.  That's the last

21   one.

22             THE COURT:  Okay.  So, Mr. Vitt, obviously, I'll hear

23   from you at this point on this one at this point, or, sorry,

24   Mr. Jones.  I shouldn't assume.  You're going to predict the

25   obvious question.  We are a week out from trial now.  A new

 1    legal theory is being added to a case that's been around for
 2    eight years.  I'm trying to understand why.  I've read, I've
 3    read the pleadings.  I was trying to figure out, Is there some
 4    additional remedy available under the Vermont whistleblower
 5    statute?  Is that what this is about?
 6           ATTORNEY JONES:  Yeah.
 7           THE COURT:  Because you're saying that there's no
 8    additional facts.  There's no change in the showing that would
 9    have to be made.  I don't know this myself.  I haven't
10    researched the statute, but that's what you're saying.  I'm
11    kind of, I'm just wondering why?  Why this late?
12           ATTORNEY JONES:  Yeah, to be very transparent, you
13    got it.  We believe that, under the Vermont whistleblower
14    statute, remedies are simply much clearer, specifically with
15    regard to the availability of punitive damages.  But it does
16    not change any of the legal theory.  It does not change a
17    single fact, and allowing the case to proceed will not change
18    the way this case is tried at all.
19        In fact, I would submit that, even if we tried the case
20    under the current pleadings, you would be able at the
21    conclusion of evidence to file a motion to amend the pleadings
22    to conform to the evidence.  The facts would be identical.
23    They tick off the elements.  It changes nothing.  And, yes, it
24    makes clear what the available remedies are in a way that the
25    New Hampshire statute doesn't.

1          THE COURT:  Okay.  And what about the legal elements

2    of the claim?  Are they the same as New Hampshire's?

3          ATTORNEY JONES:  They are the same.  The only

4    difference is that in the Vermont statute the specific language

5    that, with regard to protective whistleblower conduct it

6    applies, not just to recording violations of law but reporting

7    substandard patient care.  Now, while that language is not in

8    the New Hampshire statute, the Second Circuit has clearly

9    defined the claim under the New Hampshire statute as improving

10   the Court's substandard patient care.  So, to the extent that a

11   slightly difference in the two statutes, that's already in the

12   case.

13      So there's literally no difference in factual or legal

14   presentation of the case.  We're just adding another theory

15   that's available on the same elements with the same factual

16   finding.

17          THE COURT:  Okay.  All right.

18          ATTORNEY SCHROEDER:  I should note, Your Honor, I'm

19   not sure.  Either there is a new theory, or there is not a new

20   theory, and I guess it seems like there's a different theory

21   that they're going on under Vermont statute.  You know, we laid

22   out the chronology on this, Judge.  They wanted to have a

23   status conference in October.  You agreed that that was not

24   really necessary because I suspect you had a pretty heavy

25   caseload as did the rest of us.  And then that January 8th.

1    Then we have we had a submission from them on January 8.  No

2    mention of that.  Then January 13th, pretrial conference.  No

3    Mention of that.

4        We really want to get these deadlines done.  We really

5    want to brief everything.  No surprises.  That was the theme,

6    right?  We all agree on what, how we're going to do it, and

7    then we, not even the eleventh hour, like 11:58, they are now

8    saying, well, you know, I know we have a Vermont statute claim,

9    but we're going to add another claim under Vermont law.

10       We are going to have to amend our answer.  We obviously,

11   based on just what he said, we're go going to have to have jury

12   instructions amended to deal with that issue, and there's a lot

13   to do in one week, and adding this to that pile is under the

14   standard, right, for denying to leave to amend.  In fact, two

15   of the cases they cited actually deny leave to amend.

16       Undue delay, bad faith, undue prejudice, we hit the

17   trifecta, Your Honor.  I submit we hit the trifecta on that,

18   and it is going to open up a Pandora's box of stuff that we

19   have to deal with because they've now come up with this new

20   theory that they want under Vermont statute relating to, I

21   guess, substandard patient care.

22       Either way, and I thought I heard him say punitive

23   damages.  So, if that's really true, I haven't analyzed Vermont

24   case law on this particular claim yet.  Obviously, we will.

25   But, to then add another damages theory, how is that not

1    different if the supposition is, well, we can't get punitive

2    damages perhaps under New Hampshire law, but we might be able

3    to get it under Vermont law if we add this claim.  That, that's

4    adding a whole new realm of briefing.

5            THE COURT:  So is that what you're referring to in

6    your papers when you talk about it would inevitably involve

7    problems of proof?  Do you mean as to damages --

8            ATTORNEY SCHROEDER:  Yes.

9            THE COURT:  -- or the way the evidence would come in

10   generally?

11           ATTORNEY SCHROEDER:  No.  It would come down to

12   proof.  It would come down to jury instructions.  And they've

13   even said it's another legal theory.  Well, if it's another

14   legal theory, then it's not based upon everything else that's

15   already in the case if it's another legal theory.  So it's too

16   little, too late, I would submit.  We've been down this road

17   already.  We set up this schedule to do all these things ahead

18   of time.  And to then say, you know, 11:58, well, you know,

19   we're going to add this claim as well.  Perhaps maybe they have

20   a basis to do it at the end of the evidence, but they certainly

21   don't have a basis to do it right now, we would submit.  Thank

22   you.

23           THE COURT:  Thank you.

24           ATTORNEY JONES:  Just one comment.  Punitive damages

25   have been a part of this case since day one.

1        THE COURT:  Right.  It was in the demand for relief.

2        ATTORNEY JONES:  Yes.

3        THE COURT:  Yes, in the beginning, but -- yeah, okay.

4    Have we covered everything?  We have.  Okay.  All right.  Well,

5    thank you.  Helpful to have the conversation.  Yes Mr. Vitt?

6        ATTORNEY VITT:  I have one question.  It's not a

7    question.  It's a -- we're trying to honestly put our exhibit

8    list together, and we've gotten there.  There's a question of

9    authentication, right, and I'm hoping that the parties can

10   agree that the documents exchanged in discovery are authentic.

11   If that's not going to be the case, we're going to have to

12   serve subpoenas early next week on multiple officials at

13   Dartmouth-Hitchcock.  I'd just as soon not go through that, but

14   I've raised this issue before, and I don't want to be in a

15   situation where we get stuck trying to get evidence admitted

16   and there is the question about, you know, we're not

17   stipulating to authenticity.

18       THE COURT:  So you mean like all the emails, things

19   like that?

20       ATTORNEY VITT:  Yeah, basically, it's what they

21   produced.  I mean, all of them have a stamp.  You know, we

22   produced them with ours and they produced it with theirs.  And,

23   yeah, these are, there's a ton of emails, as you can imagine,

24   and it's mostly emails we're talking about here.

25       THE COURT:  So, when you say you've raised it before,

1    you mean with counsel?

2            ATTORNEY VITT:  Yeah and the only reason I'm raising

3    it now is we're getting close to trial.  I would suggest

4    subpoenas served.  I would prefer not to go that route, but I'm

5    surprised we don't have it resolved.

6            THE COURT:  All right.  Mr. Schroeder?

7            ATTORNEY SCHROEDER:  Judge, two issues.  Well,

8    there's a couple of issues with that.  First of all, they just

9    raised it this week.  I think it was this week or maybe like

10   late week.  That was the first time they asked us to stipulate

11   to authenticity.  And, to the extent they might have an

12   authenticity problem, well, that's their problem at trial, and

13   we'll deal with it at trial, but to then say to us, we expect

14   you to stipulate to every single thing, they did not produce

15   any of their documents with any metadata.  So how am I supposed

16   to stipulate to or I'm willing to stipulate to that

17   authenticity of their documents?

18        It's one thing to be emails.  Perhaps that will be true

19   that we'll stipulate to the authenticity of that, but to come

20   in here and say, well, I hope we don't have to worry about that

21   next week.  Well, that's not my fault that you didn't ask about

22   this issue beforehand and you asked about this week while we're

23   were getting ready for motions to be heard today.  I said we

24   would be available to discuss -- guys, I just have to say,

25   Judge.  Throughout today, they've been back-benching the whole

1     time, and it's really disruptive, and I don't want to do it at

2     trial, and I certainly don't do it in front of any judge, but

3     they've been doing it the whole time, and it's inappropriate.

4            THE COURT:  Okay.  So, listen, are you saying that

5     there are certain types of documents that Dartmouth is willing

6     to stipulate to?

7            ATTORNEY SCHROEDER:  I'm sure there will be documents

8     that we will stipulate to, yes, Your Honor.

9            THE COURT:  All right.  So you may be able to work

10    through at least some of these?

11           ATTORNEY SCHROEDER:  Right.

12           THE COURT:  And, for the ones that you can't, then

13    witnesses will be called to lay a foundation for these

14    documents to get in.  And you, yourself, raised the question

15    about whether you're going to have enough time to put your case

16    in, too, so additional witnesses --

17           ATTORNEY SCHROEDER:  I don't --

18           THE COURT:  -- to establish authenticity and

19    foundations.

20           ATTORNEY SCHROEDER:  I understand that, but then they

21    have to have the witnesses for foundation, Your Honor, because

22    they're trying this case without a number of people that

23    they're engaging in character assassination about that they

24    never deposed and never had them here for trial and they could

25    have done all those things.

1           So, yes, you're right, but they did not produce their

2     documents with any metadata.  So, for me to say I stipulate to

3     the authenticity of that document, for example, there is a

4     document that where Misty Porter sent it to her own personal

5     email.  Well, how am I -- I don't know that she did it on that

6     particular day and whether or not that's authentic.  That's

7     just one example.

8           But do I think that we will be able to stipulate to a fair

9     amount, obviously, a lot of these emails that there's a fair

10    amount of crossover?  Absolutely.  But there's also ten

11    examples of duplicate emails that they put in their exhibit

12    list.  So, you know, we didn't do that.  There's ten.  So

13    there's a lot to be done.  I already said that we would be

14    available on Tuesday to go over authenticity and stipulation

15    issues.  I sent that email, I think, Wednesday night at 11:30.

16          So we've already said that we would have that meeting.

17    We're just not doing it on his timeline, but so be it.  We're

18    certainly going to be dealing with it ahead of trial.  Thank

19    you.

20               THE COURT:  Okay, all right.  Anything further,

21    Mr. Vitt?

22               ATTORNEY VITT:  Nothing further, Judge.

23               THE COURT:  Okay.  I mean, with respect to the

24    comment about the back-benching and everything, you know,

25    you're going to be in front of a jury.  So I don't expect the

1    alleged back-benching to be happening at the trial.  That would
2    not be good for either side, right?  So all right.  Well, I
3    will see you then Monday.  There will be rulings on all of
4    these, yes, not this Monday.

5            ATTORNEY SCHROEDER:  Sorry, Your Honor.  Ms. McDonald
6    just raised one question. Sequestration, your rules on that and
7    how we should comport ourselves with respect to witnesses and
8    having them sequestered?  Obviously not Dr. Porter or if it's
9    going to be Dr. Merrens, it's Dr. Merrens.  There's a corporate
10   representative.  But for everyone else we just want to be
11   mindful of where they should go to before they get called so
12   that we can actually make sure we're moving things on.

13           THE COURT:  Right, right.  I mean, typically, your
14   witnesses will be sequestered, except for the ones that you
15   just identified, presumably the expert as well.  Typically, the
16   way it functions is they are outside the courtroom.  You know,
17   don't forget, we're not going to be in this courtroom.  We're
18   going to be in the first floor courtroom, and there's kind of a
19   lobby area there, and someone on your trial team, when you know
20   that that person is next up, can go out and get that person.
21   After they testify, obviously, they can stay in the courtroom.

22           ATTORNEY SCHROEDER:  Sure.  And, Your Honor, just on
23   that point, is it your expectation that we'll have some kind of
24   discussion between the parties during, you know, at the end of
25   the day, like, okay, we've got this many witnesses?  They don't

1    have to tell me necessarily who they're going to call.

2                THE COURT:  Yeah, I think --

3                ATTORNEY SCHROEDER:  But they go first, so I just

4    want to make sure we know.

5                ATTORNEY VITT:  We'll let them know.

6                THE COURT:  Yes, that's typically how it goes.

7                ATTORNEY VITT:  Absolutely.

8                THE COURT:  At the end of every day, whoever is

9    putting their case in chief on will give some indication of who

10   they expect to testify the next day.

11               ATTORNEY VITT:  Absolutely.

12               THE COURT:  Sounds like Mr. Vitt plans on doing that.

13   So, yeah, we'll have a sense of the dramatis personae for the

14   next day.  Okay.  All right.  Thank you.

15               (Whereupon the hearing was adjourned.)

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2              I, Sunnie Donath, RMR, Official Court Reporter

3      for the United States District Court, District of Vermont, do

4      hereby certify that the foregoing pages are a true and accurate

5      transcription of an audio recording of the hearing taken in the

6      above-titled matter on March 14, 2025 to the best of my skill

7      and ability.

8

9

10

11

12                          *Sunnie Donath, RMR*

13              ---------------------------------

14                    Sunnie Donath, RMR

15

16

17

18

19

20

21

22

23

24

25