UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

      Plaintiff,

      v.                         Civil Action No. 2:17–cv–194

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

      Defendants.

## ORDER
(Docs. 198, 235)

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health") filed a Motion *In Limine* to exclude in full the testimony of Plaintiff's expert witness, Dr. Robert Bancroft. (*See generally* Doc. 198.) Dr. Porter seeks to introduce Dr. Bancroft's testimony on her economic losses, including lost wages, lost benefits, compensatory damages, and future lost income. (*See* Doc. 208 at 3.)

Dartmouth Health asks the Court to exclude Dr. Bancroft's testimony for two reasons. First, Dartmouth Health argues that Dr. Bancroft is unqualified because he lacks sufficient experience with employment cases and because his expert report relies on speculation and opinion. (*See* Doc. 198-1 at 4–6.) Second, Dartmouth Health contends that Dr. Bancroft's testimony is not reliable because his expert report incorporates several of Dr. Porter's predictions regarding her future earning potential and because Dr. Bancroft assumes that Dr. Porter's damages should be increased to account for taxes (that is, "grossed up"). (*Id.* at 7.)

Dr. Porter opposes Dartmouth Health's Motion. (*See generally* Doc. 208.) The Court held an evidentiary hearing on March 14, 2025. On March 20, 2025, Dartmouth Health filed its Renewed Motion to Preclude the Testimony of Robert Bancroft Based on New March 19, 2025 Report. (Doc. 235.) Dr. Porter filed her memorandum in opposition to the Renewed Motion on March 21, 2025. (Doc. 236.)

## **Standard**

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 obligates the court to serve as a gatekeeper for expert testimony, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

Although the proponent of the expert testimony bears the burden of establishing by a preponderance of the evidence that the demands of Rule 702 are met, "the district court is the ultimate gatekeeper," *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted), and the court has "broad latitude" to admit or exclude proffered expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142, 153 (1999). "[T]he Second Circuit has espoused a particularly broad standard for the admissibility of expert testimony," *Sec. Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 275 (S.D.N.Y. 2016)

(internal quotation marks and alterations omitted), where exclusion is "the exception rather than the rule." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (quoting Fed. R. Evid. 702 Advisory Comm. Note (2000)).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also United States v. LaVictor*, 848 F.3d 428, 444 (6th Cir. 2017) (holding that "[a]ny emerging prejudice [from an expert witness's testimony] was addressed during cross-examination").

To determine whether the requirements of Rule 702 have been satisfied, the Court considers: (1) the proposed expert's qualifications; (2) whether the expert's opinion is based on reliable data and methodology; and (3) whether the expert's testimony will assist the trier of fact. *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005).

## A.    Dr. Bancroft's Qualifications

A witness may give opinion testimony if "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The Court first asks "whether the proffered expert has the educational background or training in a relevant field by looking at the totality of the witness's background." *I.M. v. United States*, 362 F. Supp. 3d 161, 192 (S.D.N.Y. 2019) (internal alterations and quotation marks omitted). Next, the Court "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony to ensure that the expert will actually be testifying on issues or subject matters within his or her area of expertise." *Id.* (internal quotation marks omitted). "Courts in the Second Circuit liberally construe the expert qualifications requirement, and generally will not exclude expert testimony provided the expert has educational and experiential qualifications in a

3

general field closely related to the subject matter in question." *Id.* (internal quotation marks omitted); *see also United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (holding that the qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the Rule").

Dr. Bancroft has extensive education and work experience in a field relevant to Dr. Porter's economic losses: applied economics. Dr. Bancroft holds a bachelor's degree in economics from the University of Vermont ("UVM"); a Master of Science in agricultural economics from UVM; and a Ph.D. in agricultural economics from Purdue University. (Doc. 198-4 at 2, 4:15–19.) Agricultural economics focuses more on practical application of economics than on economic theory. (*Id.* at 2–3, 4:20–5:8.) Individuals with advanced degrees in agricultural economics work in a range of disciplines including labor, natural resources, and business management. (*Id.*)

From June 1979 until August 1981, Dr. Bancroft worked for the United States Department of Agriculture to develop an econometric forecasting model to forecast farmers' participation in certain government programs and to provide testimony and research to the U.S. House of Representatives. (*Id.* at 3, 6:8–8:3.) Next, Dr. Bancroft began work as an assistant professor in the Department of Agriculture and Resource Economics—later renamed the Department of Community Development and Applied Economics—at the University of Vermont in August 1981. (*Id.*) Dr. Bancroft continued as an assistant professor of economics until 1991, when he became an adjunct professor. (Doc. 230 at 10:5–11.) He worked as an adjunct professor of economics until 1996. (*Id.*)

Dr. Bancroft's proffered testimony on economic losses falls squarely within his area of expertise. While at UVM, Dr. Bancroft started a solo practice as an economic consultant in

4

October 1981. (Doc. 198-4 at 3, 8:4–7.) His practice as an economic consultant has been his primary occupation since approximately 1986. (Doc. 230 at 10:12–16.) Dr. Bancroft estimates that 70% of his work in his thirty-eight years as a consultant has been in the field of forensic economics. (Doc. 198-4 at 5, 14:3–15.) In the last five years, that percentage has increased to "pretty much 100%." (*Id.* at 14:25–15:19.) Dr. Bancroft has been retained in over 2,500 lawsuits. (*Id.*) Since the early 2000s, Dr. Bancroft estimates that 20% of his cases relate to employment lawsuits. (*Id.*) Considering Dr. Bancroft's extensive credentials in the field of applied economics, including his education, experience, and general knowledge of the subject matter, the Court finds him qualified to offer expert testimony on Dr. Porter's damages.

Although Dartmouth Health points out that Dr. Bancroft has not testified in many, if any, employment cases over the last several years, (Doc. 198-1 at 4–5), that does not impact Dr. Bancroft's qualifications as an expert witness. The threshold question under Rule 702 is "whether the witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions," not whether the expert has recent experience testifying at trial. *Nimely*, 414 F.3d at 396, n.11 (internal quotation marks omitted); *see also, e.g.*, *First Marblehead Corp. v. House*, 541 F.3d 36, 41 (1st Cir. 2008) (although defendant's expert witness was not certified financial planner who focused entirely on individual investment decisions, expert, who had extensive consulting experience in economics, finance, and strategy and provided investment advice to employees and accredited investors, was qualified to testify about how individuals choose investments and arrange portfolios); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) ("It is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."); Dr. Porter

has shown that Dr. Bancroft is qualified by education and experience to give his opinion on

Dr. Porter's economic losses. Such a showing is sufficient for the first step in the Court's inquiry.

Dartmouth Health also contends that Dr. Bancroft is unqualified because he relies on

subjective experience and speculation for his opinions. (Doc. 198-1 at 5–6.) In particular,

Dartmouth Health contends that Dr. Bancroft's opinions are speculative because: (1) he relied on

"imprecise statistical evidence," including a 2.5% annual salary increase, to support his findings;

(2) he considers multiple possibilities for Dr. Porter's career; (3) he "assumes that Dr. Porter

would remain employed at Dartmouth Health on a full-time basis until 2033;" (4) his most recent

report, in which he assumes that Dr. Porter will not leave her full-time position at UVM until

January 2025, differs from an assumption used in an earlier report; (5) "Dartmouth Health is

unfairly held responsible for . . . Dr. Porter's voluntary decision to fundamentally alter her work

arrangements with UVM by assuming a part-time position;" and (6) he inappropriately applied

Vermont's statute requiring 12% prejudgment interest. (*Id.* at 6); (Doc. 223 at 3.)

The Court does not find that any of these objections warrant excluding Dr. Bancroft's

testimony in its entirety. Although a court should exclude expert testimony "if it is speculative or

conjectural," or "based on assumptions that are so unrealistic and contradictory as to suggest bad

faith or to be in essence an 'apples and oranges comparison,' other contentions that the

assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v.

U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (per curiam) (internal citations and

quotation marks omitted). Dartmouth Health challenges Dr. Bancroft's use of information from

the U.S. Bureau of Labor Statistics ("BLS") regarding average annual salary increases of 2.5%

nationwide as "imprecise statistical evidence," but courts have frequently upheld use of similar

statistics by both lay and expert witnesses. *See, e.g.*, *id.* at 23 (internal quotation marks and

alterations omitted) ("Statistical charts, such as the mortality tables and the work-life expectancy tables prepared by the United States Department of Labor are often deemed authoritative. . . ."); *Carroll v. Xerox Corp.*, 294 F.3d 231, 240 (1st Cir. 2002) (holding that a plaintiff might have shown that he was limited from other jobs besides his own using expert vocational testimony or publicly available labor market statistics); *Higgins v. Kinnebrew Motors, Inc.*, 547 F.2d 1223, 1225–26 (5th Cir. 1977) (upholding expert witness's use of statistics from the BLS instead of a couple's actual expenses); *Kenealy v. Saul*, No. 19-cv-40-jdp, 2019 U.S. Dist. LEXIS 206866, at *17 (W.D. Wis. Dec. 2, 2019) (internal quotation marks omitted) ("An expert can support her estimates by drawing on knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources or from placing workers in jobs."). The same is true for Dr. Bancroft's use of data on work-life expectancy to predict that Dr. Porter may continue to work until the year 2033. (*See* Doc. 198-4 at 26, 98:18–99:25); *see also Boucher*, 73 F.3d at 23; *Weil v. Seltzer*, 873 F.2d 1453, 1465 (D.C. Cir. 1989) ("Statistics, such as those prepared by the Department of Labor on work-life expectancy, are only one tool which may be used by an expert in forming an opinion.").

Nor does the Court find that Dr. Bancroft's choice to consider multiple possible future career paths for Dr. Porter or to update the assumptions used in his August 2024 report render his opinion testimony too speculative. Dr. Porter's most recent filing clarifies that the "internal inconsistencies" in Dr. Bancroft's expert reports resulted from new information that impacted Dr. Bancroft's economic loss analysis:

> While Dr. Porter initially projected that she would resign her full-time position at UVM to find a part-time job closer to her Norwich home in 2021, that did not happen. Instead, she remained in her full-time position and changed her projected horizon for a change to 2025. Dr. Bancroft merely updated his report to reflect these facts as they arose.

(Doc. 208 at 9–10.) Dr. Bancroft's decision to update his expert reports after receiving new information was entirely appropriate, as was his decision to include multiple scenarios for Dr. Porter's potential damages depending on how many years she continues to work. *See Rosario v. City of New York*, No. 18 Civ. 4023 (LGS), 2021 U.S. Dist. LEXIS 91675, at *15 (S.D.N.Y. May 13, 2021*)* ("[E]xperts may provide opinions tailored to different factual scenarios that the jury may consider.")

The Court is also not persuaded that Dr. Porter's plan to decrease her work at UVM from full-time employment ("FTE") to .6 FTE is too speculative for Dr. Bancroft's use. Dr. Bancroft "may base an opinion on facts or data in the case." Fed. R. Evid. 703. Dr. Porter is the most reliable—perhaps the only—source of information on whether and when she intends to decrease her working hours. And as Dr. Bancroft testified, Dr. Porter has a reasonable explanation for why she intends to decrease her hours at UVM: she finds it more stressful to commute from her home in Norwich, VT, to Burlington (as opposed to Lebanon). (Doc. 230 at 37:2–17, 38:21–39:1; *see also* Doc. 198-4 at 11, 37:10–18 (testimony that Dr. Porter said that she didn't know how long she would stay at UVM because she enjoyed the work but "didn't like being away from her family and having to commute")).

As to Dartmouth Health's argument that it has "no legal obligation to finance Dr. Porter's voluntary decision to fundamentally alter her work arrangements with UVM by assuming a part-time position," (Doc. 198-1 at 6), the Court finds this objection goes to the weight of Dr. Bancroft's testimony rather than its admissibility. It appears to pertain more to Dr. Porter's duty to mitigate damages than to Dr. Bancroft's qualifications as an expert. *See, e.g.*, *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998). Dr. Bancroft may properly rely on Dr. Porter's assumption that she will decrease her work at UVM to .6 FTE because this

assumption is "not so unrealistic and contradictory as to suggest bad faith" given that the substantial commute from Norwich to Burlington apparently increases her stress and reduces time with her family. *See Boucher* 73 F.3d at 21; *cf. Bergerson v. New York State Off. of Mental Health, Cent. New York Psychiatric Ctr.*, 526 F. App'x 109, 111–12 (2d Cir. 2013) (summary order) (finding district court erred in concluding that employee failed to mitigate damages when she resigned from employment located two and a half to three hours from her home because employee "was not obligated to mitigate damages by pursuing or continuing employment located such an unreasonable distance from her home"). Considering the broad standard for admissibility of expert testimony in this Circuit, the Court declines to find Dr. Bancroft unqualified on this basis. Dartmouth Health will have the opportunity to challenge Dr. Porter's alleged damages through cross-examination or the presentation of conflicting evidence at trial. *See Daubert*, 509 U.S. at 596.

Dartmouth Health further contends that Dr. Bancroft's opinion relies on subjective experience and speculation because he applies 9 V.S.A. § 41a(a), which mandates a prejudgment interest rate of 12% per year, in the absence of an agreement as to the rate of interest, to his analysis. (Doc. 223 at 3.) Dartmouth Health argues that Dr. Bancroft should not have used Vermont's statutory prejudgment interest rate to calculate Dr. Porter's damages because the statute only applies to a "sum certain" and not an "unquantifiable, indirect or disputable sum." (*Id.*) The Court disagrees for two reasons.

First, the Court anticipates that the Vermont Supreme Court would hold that prejudgment interest is available as of right in this case. Prejudgment interest is "awarded as of right when the principal sum recovered is liquidated or capable of ready ascertainment and may be awarded in the court's discretion for other forms of damage." *Hirchak v. Hirchak*, 2024 VT 81, ¶¶ 36–37,

9

___ Vt. ___, ___ A.3d ___ (internal quotation marks omitted). The Vermont Supreme Court has upheld a trial court's award of mandatory prejudgment interest for lost wages and medical expenses as "reasonably ascertainable"[1] because the plaintiff's "salary was known with reasonable certainty, as was the general nature of her injuries and the likely course of treatment." *See Smedberg v. Detlef's Custodial Serv., Inc.*, 2007 VT 99, ¶¶ 37–39, 182 Vt. 349, 940 A.2d 674 (2007). Noting that "reasonable ascertainment" does not mandate that "the amounts be precisely or infallibly ascertainable," the *Smedberg* court rejected the defendant's "proposed rule, which would appear to limit prejudgment interest to a very narrow class of cases in which a known sum of money was converted to the tortfeasor's use on a precisely known date" because "[p]rejudgment interest on compensatory damage awards is meant to restore—to the extent possible—harmed plaintiffs to the financial position they would have enjoyed but for the tort, and should not be limited to such a tiny fraction of tort cases." *Id.* at ¶¶ 38–39. Under *Smedberg*, Dr. Porter's compensatory damages—comprised of lost earnings and extraordinary employment costs—are "reasonably ascertainable" because they can be "measured against a reasonably certain standard." (S*ee* Doc. 198-5 at 5–6); *Smedberg*, 2007 VT at ¶ 37. Therefore, Dr. Porter is likely entitled to prejudgment interest as of right under 9 V.S.A. § 41a(a).

Second, even if Dr. Porter could not receive prejudgment interest as of right under 9 V.S.A. § 41a(a), a jury may still award her prejudgment interest in a discretionary capacity. *See Est. of Fleming*, 724 A.2d at 1030 (emphasizing that the trier of fact has the discretionary capacity to award prejudgment interest in cases where damages are not liquidated or reasonably ascertainable "where it is required to make the plaintiff whole"). Therefore, Dr. Bancroft's use of

---

[1] The Vermont Supreme Court has acknowledged that the terms "readily ascertainable" and "reasonably ascertainable" are substantively similar with respect to an award for prejudgment interest. *See Est. of Fleming v. Nicholson*, 724 A.2d 1026, 1030 n.2 (Vt. 1998).

the statutory prejudgment interest rate in 9 V.S.A. § 41a(a) is not based on unreliable data and methodology, and the Court declines to exclude Dr. Bancroft's testimony on this basis.

In short, the Court finds Dr. Bancroft qualified to give testimony on Dr. Porter's economic losses and proceeds to the next step of the analysis: whether Dr. Bancroft's testimony is reliable.

**B.    Whether Dr. Bancroft's Testimony Is Based on Reliable Data and Methodology**

Dartmouth Health asks the Court to find that Dr. Bancroft's testimony is not reliable for two reasons. First, Dartmouth Health argues that Dr. Bancroft's analysis "relies on Dr. Porter's subjective belief that she would be promoted by Dartmouth Health to a full professor and receive a 5% salary increase in 2017" without considering whether this belief is reasonable. (Doc. 198-1 at 7.) Second, Dartmouth Health argues that Dr. Bancroft's report impermissibly "grosses up" Dr. Porter's damages to account for federal and state taxes. (*Id.*)

"[W]here lost future earnings are at issue, an expert's testimony should be excluded . . . if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Sinkov v. Americor, Inc.*, 419 F. App'x 86, 90–91 (2d Cir. 2011) (summary order) (internal quotation marks omitted), quoting *Boucher*, 73 F.3d at 21. It is within the district court's discretion to "determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Shatkin v. McDonnell Douglas Corp.,* 727 F.2d 202, 208 (2d Cir. 1984). While a court may exclude opinion evidence when the "court concludes that there is simply too great an analytical gap between the data and the opinion proffered," the Second Circuit has noted that "[f]requently . . ., gaps or inconsistencies in the reasoning leading to the expert's opinion go to the weight of the evidence, not to its admissibility." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (internal quotation marks and alterations omitted).

On this record, the Court does not find that Dr. Porter's assumption that she would have been promoted to full professor and received a 5% salary increase in 2018 is unrealistic such that Dr. Bancroft's opinion testimony is unreliable. Dr. Porter's professional skills are widely recognized. Dr. Porter began working as a staff physician at Dartmouth Health in 1996. (Doc. 139-3 at 4.) One year later, she was promoted to Medical Director of the IVF/ART program and appointed jointly to Dartmouth Health's Department of Radiology. *Porter v. Dartmouth-Hitchcock Med. Ctr.* 92 F.4th 129, 133 (2024). Dr. Porter became a senior voting member of Dartmouth Health's Professional Staff in 2001. *Id.* In 2011, she became Acting Director of the REI Division and continued in that role until Dr. David Seifer was appointed Director in May 2016. *Id.* at 134. Before Dr. Porter became ill, she also served as Vice Chair of Perioperative Services and Director of Gynecological Ultrasound. (Doc. 139-4 at 28–30, 27:3–29:20.) Dr. Leslie DeMars, the chair of the OB/GYN Department and Dr. Porter's supervisor at Dartmouth Health, has described Dr. Porter as "an amazingly gifted and dedicated reproductive endocrinologist and infertility specialist" and described her skills using the term "Misty magic." (Doc. 140-8 at 3, 42:25–43:10.) Other providers at Dartmouth Health have also attested to the high quality of Dr. Porter's professional skills. (*See, e.g.*, Doc. 140-5 at 2–4; Doc. 140-6 at 2; Doc. 140-4 at 2–6.)

In short, while the Court does not express an opinion on whether Dr. Porter would indeed have been promoted to full professor at Dartmouth Health, "the possibility . . . was hardly so unlikely as to preclude the jury from considering it." *See Sinkov*, 419 F. App'x at 90–91 (upholding damages award based on expert analysis providing three alternative calculations of loss of earning potential, including that of a secondary schoolteacher and a typical man with either an associate's or a bachelor's degree, because expert's appraisals were "rooted in the

evidence" that individual had already earned educational credits towards his associate's degree and stated his intention to become a teacher). In fact, after leaving Dartmouth Health Dr. Porter did get promoted to full professor at UVM Medical Center, a "similar, rural academic REI center" to Dartmouth Health. (*See* Doc. 230 at 28:7–29:3; Doc. 140-19 at 2.)

      Moreover, Dr. Porter's possible promotion at Dartmouth Health differs from the types of assumptions the Second Circuit has considered speculative because it is rooted in record evidence. *See Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 511 F. App'x 54, 56–57 (2d Cir 2013) (summary order) (finding no error in district court's exclusion of expert testimony composed of "sweeping statements that were detached from the actual evidence"); *Boucher*, 73 F.3d at 22 (overturning damages awards when expert estimated lost earnings based on assumptions that plaintiff would work full-time every week with fringe benefits and regular pay increases for the rest of his career when plaintiff's "sporadic employment had yielded fluctuating low levels of income, with long spells of no income whatsoever" and few, if any, fringe benefits). Dr. Bancroft reasonably assumed that Dr. Porter would be promoted to full professor at Dartmouth Health in 2018, and any gaps in the reasoning go to the weight of the evidence, not to its admissibility. *See Shatkin*, 727 F.2d at 208; *Restivo*, 846 F.3d at 577.

      As to Dartmouth Health's argument that Dr. Bancroft's use of a 5% increase in salary from becoming a full professor is speculative, Dr. Bancroft's analysis may properly rest on his personal knowledge and experience. (*See* Doc. 230 at 21:10–22:6) (testimony of Dr. Bancroft that in his experience, a promotion to full professor at UVM tended to include a 5% increase in salary). The Court declines to strike Dr. Bancroft's testimony on this basis.

      Finally, Dartmouth Health argues that Dr. Bancroft's analysis is not based on reliable methods because it "artificially inflat[es]" Dr. Porter's damages through a "post-tax calculation

where state and federal taxes should be deducted from compensation attributable to back pay or front pay." (Doc. 198-1 at 7.) Dartmouth Health challenges Dr. Bancroft's assumption that Dr. Porter's total damages award should include funds to cover state and federal taxes because the salary numbers that he uses "are all drawn from W2 and other salary information that are amounts before taxes." (Doc. 226 at 6.) Therefore, "there is no need" to account for tax liability from a damages award because the salary numbers Dr. Bancroft uses "already include the amounts [Dr. Porter] would need to pay in taxes in them." (*Id.*) In other words, Dartmouth Health argues that Dr. Bancroft is double counting. (*Id.*)

The Court need not exclude Dr. Bancroft's testimony on this point as unreliable. To the Court's understanding, Dr. Bancroft's analysis estimates and subtracts federal and state income taxes from Dr. Porter's damages before calculating the current present value of Dr. Porter's lost earnings. (*See* Doc. 198-5 at 4–5, n.7–9.)[2] In other words, Dr. Bancroft uses a post-tax potential damages award to calculate the estimated settlement tax Dr. Porter would incur. (*See id.* at 4–6, n.9.) Thus, Dr. Bancroft's analysis appears to account for tax liability only once rather than double-counting. Dr. Bancroft has explained that he uses this method because the progressive income tax causes an individual who receives lost earnings as a lump sum award to pay higher taxes on that award than she would have if she had received the same amount divided over several years as part of her salary. (*See* Doc. 230 at 41:4–18; Doc. 198-4 at 12, 41:24–43:24.)

---

[2] In addition to challenging the substance of Dr. Bancroft's testimony, Dartmouth Health characterizes Dr. Bancroft's expert report dated August 26, 2024, as "inadmissible hearsay" and asks the Court to preclude him from using the Lost Earnings Chart (Doc. 198-5 at 4) at trial because Dr. Porter "has not identified [it] as substantive or demonstrative evidence in relation to" the expert report. (Doc. 223 at 2–3.) Dr. Porter's Exhibit List identifies "Bancroft Analysis" as Exhibit 1. (Doc. 219 at 1.) The descriptor "Bancroft Analysis" adequately identifies the Lost Earnings Chart because Dr. Bancroft's "analysis" encompasses the detailed breakdown of each step of his damages calculations contained within the Chart. And Dr. Bancroft's expert report, including the Chart, is "not inadmissible hearsay, because it reflects his own opinions." *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 980 F. Supp. 2d 425, 442 (S.D.N.Y. 2013); *see also Muto v. Cty. of Mendocino*, Case No. 20-cv-06232-SK, 2022 U.S. Dist. LEXIS 80131, at *31 (N.D. Cal. May 3, 2022) ("It is axiomatic that the opinion of an expert witness is not hearsay.").

For the reasons explained above, the Court finds that Dr. Bancroft's proffered testimony on Dr. Porter's damages is based on reliable data and methodology.

**C.      Whether Dr. Bancroft's Testimony Will Assist the Trier of Fact**

Finally, the Court must determine whether Dr. Bancroft's opinion will assist the trier of fact. The Court must make a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) (internal quotation marks omitted).

Dartmouth Health does not appear to contest that Dr. Bancroft's testimony would assist the trier of fact. (*See generally* Docs. 198, 223.) The Court finds that Dr. Bancroft's testimony would be helpful to a jury. The use of a damages expert at trial "is . . . commonplace and may be essential." *In re KeySpan Corp. Sec. Litig.*, No. CV 2001-5852 (ARR) (MDG), 2005 U.S. Dist. LEXIS 29068, at *21 (E.D.N.Y. Aug. 25, 2005). Dr. Bancroft's testimony would benefit a jury because the advanced economics and mathematics required to calculate lost earnings goes beyond the knowledge of the average juror. (*See* Doc. 198-4 at 11–12, 39:23–43:24) (describing Dr. Bancroft's methodology for projecting gross loss, present value, and estimated tax liabilities); *see also*, *e.g.*, *Jackson v. State Farm Fire & Cas. Co.*, Civil No. 1:23-cv-24-HSO-BWR, 2024 U.S. Dist. LEXIS 38993, at *27 (S.D. Miss. Mar. 6, 2024) (internal alteration and quotation marks omitted) ("Generally speaking, expert testimony on damages frequently will help the trier of fact because damage calculations often involve complex aspects of economics and mathematics.").

**D.      Dartmouth Health's Request to Present Its Own Expert Economist**

Dartmouth Health has requested that, if the Court does not preclude Dr. Bancroft's testimony in full, Dartmouth Health be permitted to "present its own expert economist to provide analysis of the discrete universe of financial documents in the case." (Doc. 235 at 7.) In general, before a party can introduce expert testimony at trial, it must disclose the expert at least ninety days before the date set for trial. Fed. R. Civ. P. 26(a)(2)(D)(i). Moreover, Rule 26(a)(2)(B) requires that the disclosure of the expert must be accompanied by a written report prepared and signed by the witness. According to the most recent scheduling order, Dartmouth Health's deadline to submit any expert reports was December 15, 2018. (Doc. 138 at 2.) If the party fails to make a timely disclosure, the undisclosed witness cannot testify at trial unless the failure to disclose was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).

The Court cannot find that Dartmouth Health's untimely disclosure is substantially justified or harmless. Dartmouth Health has not identified or provided any information about its expert witness and that witness's expected testimony or explained why it did not disclose an expert witness sooner in compliance with the Federal Rules. Courts in this Circuit have ruled that the failure to disclose an expert witness may prejudice the opposing party. *See, e.g.*, *Evans v. United States*, 978 F. Supp. 2d 148, 153 (E.D.N.Y. 2013); *Palma v. Pharmedica Commc'ns, Inc.*, No. 00-CV-1128 (AHN), 2002 WL 32093275, at *2 (D. Conn. Mar. 27, 2002). The untimely disclosure and the absence of an expert report may prejudice Dr. Porter by denying her a clear understanding of the expert's intended testimony and compromising her ability to prepare effective cross-examination or rebuttal evidence. Under these circumstances, the Court cannot find that Dartmouth Health's disclosure of a potential expert witness four days before trial is

substantially justified or harmless. The Court therefore declines Dartmouth Health's belated

request "to present its own expert economist." (Doc. 235 at 7.)

**<u>Conclusion</u>**

For the reasons explained above, Dartmouth Health's Motion *In Limine* to Preclude the

Testimony of Robert Bancroft (Doc. 198) and Renewed Motion to Preclude the Testimony of

Robert Bancroft Based on New March 19, 2025 Report (Doc. 235) are DENIED.

Dated at Burlington, in the District of Vermont, this 21st day of March 2025.

           */s/ Kevin J. Doyle*
           United States Magistrate Judge