UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 5:17-cv-194 |
| | ) |
| DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH HITCHCOCK HEALTH, | ) |
| | ) |
| Defendants. | ) |

<u>Motion In Limine Regarding Undisclosed Expert Opinions of Bancroft</u>

Now comes Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health" or "Defendants") and submits this Motion in Limine Regarding Undisclosed Expert Opinions of Bancroft.

At day-five of the trial in the above-captioned matter, while on direct examination, Dr. Bancroft was asked to describe his opinions regarding how he factored in certain pension information about Plaintiff from a defined benefit plan pension she was making payments toward while employed at Dartmouth Health. Defendants objected, stating that this analysis was not set forth in the expert report nor in the analytic chart or assumptions that were provided to Defendants prior to trial (albeit, Plaintiff provided the last full expert report incorporating "eight substantive changes"; four from "new information" and four from "passage of time", a mere five

1

days prior to trial). This new report reduced the projected Total Economic Loss by some $2.6 million.

Aside from identifying the pension testimony as an undisclosed expert opinion, Defendants further asserted that the chart did not take into account the present value of the amount of benefit which Plaintiff would obtain by getting life-long payments from her Dartmouth Health pension plan. Defendants also understood Dr. Bancroft to be saying that she would not receive a pension benefit from Dartmouth Health, notwithstanding her separation.[1]

Plaintiff's counsel asserted that this opinion was to be magically devined from the chart, that the analysis was always baked into the chart even in its earlier iterations, and that Defendants just needed to understand that analysis. Dr. Bancroft, on examination outside of the presence of the jury, and Plaintiff's counsel, appeared to acknowledge that the analysis for the pension difference was not stated in any of Dr. Bancroft's four expert reports in this case, nor was it stated forthrightly in the assumptions sections of his reports.

## Background

Some background is relevant here.

Dr. Bancroft's expert opinion to be offered here is based on the latest of four expert reports and analytic charts he has provided in this case. All of the reports are based on massively differing assumptions and reach widely divergent conclusions about Total Economic Loss and numerous sub-issues that he has assessed to make up his claimed loss. These reports and the bottom-line results they reach are:

-- October 30, 2018: Total Economic Loss: $3.0 million. See Exhibit 1.

---

[1] Dr. Bancroft, on examination outside of the jury's presence, appears to now acknowledge that Dr. Porter would receive a pension benefit from Dartmouth Health, only that it would be reduced due to her separation and employment at another institution.

-- October 1, 2019: Total Economic Loss: $4.8 million. See Exhibit 2.

-- August 26, 2024: Total Economic Loss: $4.3 million[2]. See Exhibit 3.

-- March 19, 2025: Total Economic Loss: $1.787 million[3]. See Exhibit 4.

Moreover, these reports and the changes to the assumptions accompanying them, are based to an unusual degree solely on the Plaintiff's say so. As part of expert discovery in the case, Dr. Bancroft produced his "file" prior to the October 30, 2019 deposition at which his October 2018 and October 2019 reports was the basis for his testimony. Plaintiff has not provided any additional working papers for any of the two subsequent reports or otherwise in the case until after the evidentiary hearing on March 14, 2025, when Defendants' counsel wrote to Plaintiff's counsel asking them specifically to update their discovery, and in particular to produce the most recent earnings information, including her 2024 W2s, and her full professor/currently employment contract. No other information was provided.[4]

Defendants understand, therefore, that the only basis for certain key assumptions in Dr. Bancroft's August 2024 changed opinion and analysis and the March 2025 opinion and analysis are the hearsay statements of Dr. Porter or her counsel. For example, assumptions key to the

---

[2] Interestingly, this report was prompted by a scheduled mediation session at which the parties would meet to formally negotiate a settlement to the case.

[3] This report, dropping the Total Economic Loss opinion by some $2.6 million, followed an evidentiary hearing at which, *inter alia*, certain deficiencies in Plaintiff's expert and fact discovery became apparent. Namely, that Plaintiff had been promoted to Full Professor at UVMMC **effective July 1, 2023** and that Dr. Bancroft had not obtained or reviewed and Plaintiff had not produced her 2024 W2 or other material earnings information for her post-promotion earnings. This information was highly relevant because Dr. Bancroft expressed the opinion that Dr. Porter would have received a 5% pay increase for being promoted to a professorship at Dartmouth Health, but made no such adjustment for that eventuality in his pay calculations for UVMMC in his August 2024 report fifteen (15) weeks after her promotion. This resulted in Dr. Porter's earnings at Dartmouth Health being overstated and her earnings and UVMMC being understated based on Dr. Bancroft's expert opinion. The damages were accordingly exaggerated because they are purportedly the difference between her compensation she would get at Dartmouth Health and what she will get at UVMMC.

[4] Nor, despite repeated requests, have Plaintiffs produced prior invoices of Dr. Bancroft. After multiple requests, Plaintiff provided one invoice on March 27, 2025, provided an invoice of some $6,900 for work done in year 2024. No invoices for work on prior or subsequent reports have been provided.

opinion that Dr. Bancroft presents are based wholly on the Plaintiff. Among those are: her plan to work .6 time in the August 2024 report, her plans to work .75 in the 2025 report, her speculation that she would have been chosen as a full professor at DHMC in 2019, and her likelihood to work to age 70, as implied in the August 2024 and March 2025 charts. These changes to the premises of the reports, and the modified conclusions, alter the loss projections by millions of dollars and are based on the unforeseeable and unverifiable subjective whims of Plaintiff. Of course, these alterations of the information provided by Plaintiff and her lawyers, could not be forecast by Dartmouth Health. These factors show that, far from being a sum readily ascertainable by Defendant, over the years, the Total Economic Loss Projections have varied at Plaintiff's say-so with no predictability or basis other than her hearsay support.

      Which brings us to the issue at bar. After such divergent and evolving opinions, without being provided any additional working papers or reliance materials to support them, Defendants are understandably on guard for new, unanticipated or unanticipatable opinions being offered at trial. Responding to them on the fly at trial is challenging and prejudicial, and is not what the rules of expert disclosure require. Although it was difficult for Dartmouth Health's counsel to understand in the moment, Dr. Bancroft, on direct examination, began to provide an undisclosed opinion of how he calculated the effect of Dr. Porter's pension contributions on his damages calculations in his March 19, 2025 report. To Defendants, these were new calculations and assessments that were not stated with any clarity whatsoever in prior reports, charts or assumptions. Defendants objected on that specific basis. Defendants also are concerned that Dr. Bancroft's mention of the effect of her pension benefits is one-sided, and does not include any recognition that Dr. Porter will still get a pension (although of lesser total amount), or the present value of that life-long earnings stream. Defendants' have had the value of that pension over her

4

lifetime to be worth some $1.47 million.  Dr. Bancroft does not appear to calculate the present value of that benefit in his calculations.  Suffice it to say, that such calculations are, at best, complex and should have been openly disclosed rather than hidden among the weeds of a chimeric report disclosed on the eve of trial.

Before discussing the legal rules and principles that apply, another example of the varying whims of Dr. Bancroft's report is apropos.  In Dr. Bancroft's October 1, 2019 report, Dr. Bancroft, presumably based on what he was told by Dr. Porter and counsel, opined that she would cease working in 2029 at age 66, noting that: "The year 2029 (underlined) is consistent with the work life of a 56-year-old female with a graduate degree."  Because of this note, his analytic chart for that report included an underline of the yearly income and damages figures for that year and age.  The most recent reports have dropped that underline and the presumption note.  Again, presumably based entirely on Dr. Porter's changed reportage of her plans.  See Exhibit 2, emphasis in original. [5]  Rather, from the chart, and her testimony, one would infer she in fact plans to work until the age of 70.

## Discussion

The rules for expert discovery are set forth primarily in Rule 26 of the Federal Rules of Civil Procedure.  According to Rule 26(a), a retained expert is required to produce a report which "must contain" . . . "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i).  Further, it "must contain" . . . "the facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B)(ii).  Further, it

---

[5] A skeptic might conclude that the altered assumptions and the faltering discovery are motivated by the fact that Dr. Porter has so successfully mitigated her damages by obtaining an excellent position as a full OB-GYN professor at UVMMC, that she is striving for ways to inflate her Total Economic Loss number, albeit perhaps unsuccessfully since Dr. Bancroft's loss opinion is down to $1.787 million if she works to age 70, and $1.36 million if she works to age 65.  This opinion of course is down from $4.3 million in August 2024 prior to the final settlement mediation, and was only offered for the first time last week.

"must contain" . . . "any exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2)(B)(iii).

Under our local rules, the timing of disclosures related to expert witnesses is based on the discovery schedule pursuant to Local Rule 26(a). Assuming that the court would find exceptional circumstances to extend the deadline to expert disclosure in this case to cover post-remand events to a degree, while such an extension might govern the timing of subsequent expert reports, it does not alleviate the Plaintiff from her discovery obligations under Fed. R. Civ. P. 26. Accordingly, while perhaps Plaintiff could have extended the discovery deadline to submit an additional report or reports[6], she still needs to comply with the expert discovery requirements in her expert disclosure and opinions to be rendered at trial. She has not satisfied these requirements.[7]

The case law regarding late disclosed and inadequately disclosed expert opinions warrants many remedies to preclude the testimony, including preclusion of the expert opinion. Examples of cases dealing with this subject include the following:

In *Chart v. Town of Parma*, the Court found the expert's "Second [] Report [was] an untimely new opinion because it [was] supported by different calculations and assumptions." No. 10-CV-6179P, 2014 WL 4923166, at *23 (W.D.N.Y. Sept. 30, 2014) ("As a general matter, courts should not permit untimely disclosure of new opinions to fill gaps in expert proof, particularly where those gaps are revealed through the opposing party's summary judgment

---

[6] Although, notably, the Plaintiff did not make a motion to extend the discovery expert discovery deadlines, and merely helped herself to that prerogative.

[7] Notably, Dr. Bancroft has not supplemented his work papers other than responding to Plaintiff's post-hearing letter request to provide Dr. Porter's current full-professor employment contract and her 2024 W2s from her UVM Medical Center and UVM College of Medicine positions, since the work papers provided prior to Dr. Bancroft's deposition way back in October 2019. There is no information that has been produced on which he bases many of the conclusions he intends to offer in his new report. We are left to infer that the new opinions are literally based on haphazard conversations with Dr. Porter or her lawyers.

motion."). The Court further found that the expert's new opinions did not merely "elaborate upon prior opinions, but instead [were] untimely opinions." *Id.* at *22.

In *Morritt v. Stryker Corp.,* the Court found that the expert affidavit submitted in opposition to defendant's summary judgment motion was "unquestionably designed to fill a significant and logical gap in his expert report" and was produced "only after defendants raised [the] deficiency in their motion ... constitut[ing] a clear violation of Rule 26." No. 07-CV-2319 RRM RER, 2011 WL 3876960, at *6 (E.D.N.Y. 2011) (internal quotations omitted).

In *Connors v. Dartmouth Hitchcock Med. Ctr.*, the Court excluded Dr. Bancroft's newly proposed testimony on future lost earnings that was disclosed on the eve of trial. Dr. Bancroft's "supplementation" or "correction" of his expert report was excluded because it "was not timely" and there was "no reason to conclude that Plaintiff was substantially justified in the . . . failure to supplement her expert's report until the eve of trial." No. 2:10-CV-94, 2013 WL 12221853, at *4 (D. Vt. Nov. 18, 2013).

Moreover, in *McLaughlin v. Langrock, Sperry & Wool, LLP,* the Court found that the "supplementation was not timely" and "contain[ed] previously undisclosed opinions on new subject matters." No. 2:19-CV-00112, 2020 WL 3118646, at *5 (D. Vt. June 12, 2020). The Court stated that the "supplemental disclosure [sought] to rectify [a] deficiency and offer[] new opinions that could and should have been disclosed previously." *Id*. However, the Court's conclusion "is not altered by Defendant's suggestion that Plaintiff could and should have asked [the expert] questions about [the subject matter] in his deposition" as "[s]uch an inquiry would have been outside the scope of [the] expert witness disclosure, and a party has no obligation to ferret out any other opinions an expert witness may have." *Id.*

4925-1988-9200.2

As the Rule and these authorities unexpectedly show, the deficiencies in expert discovery are taken seriously by courts in this Circuit and include remedies up to and including preclusion of the testimony regarding the new opinions. Given the late and inadequate expert disclosures in this case, there are several potential remedies are available to the Court to attempt to provide a fair trial. These include:

(1) Limiting or striking Dr. Bancroft's testimony in full;

(2) Limiting his testimony regarding the impact of the effects of the differential fringe benefit calculation between Dartmouth-Hitchcock and UVMMC as inadequately disclosed pursuant to the expert disclosure rules;

(3) Finding, with the evolving, serial and undisclosed nature of his opinions and required discovery surrounding them, that Plaintiff has not shown a sum certain was readily ascertainable by Defendants, such that the 12% prejudgment interest order is inappropriate[8]; or

(4) Some combination of the above.

## Conclusion

For the foregoing reasons, Dartmouth Health respectfully requests that the Court grant its Motion in Limine Regarding Undisclosed Expert Opinions, and order the relief requested.

---

[8] Contrary to the testimony and leading questioning on direct examination about the materials provided to and reviewed by Dr. Bancroft, the reliance materials produced back in 2019 include only a portion of one year of tax returns, very paltry and incomplete pay stub information, an incomplete set of W2s and only a very limited snapshot of documentation of Dr. Porter's financial situation, augmented by her and her counsel's hearsay statements to clarify details.

4925-1988-9200.2

Respectfully submitted,

*/s/ Tristram J. Coffin*
Tristram J. Coffin
**DOWNS RACHLIN MARTIN PLLC**
Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

and

**FOLEY & LARDNER LLP**
Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald-Ramos (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

*Attorneys for Defendants*

4925-1988-9200.2

## CERTIFICATE OF SERVICE

      I hereby certify that, on March 29, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

                                          */s/ Megan E. Martinez*
                                           Megan E. Martinez

23453976.1

4925-1988-9200.2