UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D.,<br>      Plaintiff,<br><br>v.<br><br>DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH,<br>      Defendants. | Docket No. 2:17-CV-194 |

**PLAINTIFF'S OPPOSITION TO MOTION IN LIMINE**
**REGARDING UNDISCLOSED EXPERT OPINIONS OF BANCROFT**

This is Defendants' fourth effort to exclude or limit Dr. Bancroft's expert opinion. Like the others, it must fail. As this Court has already determined, Dr. Bancroft is an eminently qualified economist and expert on the economic losses experienced by Dr. Porter in this case. (Doc. 238 at 4 (denying Defendants' first two motions to preclude Dr. Bancroft's testimony[1] and acknowledging that Dr. Bancroft has "extensive education and work experience" in economics and his "proffered testimony on economic losses falls squarely within his area of expertise").) The scope of his report and testimony, the categories of data considered, and the methodology

---

[1] Defendants' Renewed Motion to Preclude the Testimony of Robert Bancroft Based on New March 19, 2025 Report (Doc. 235); Defendants' Motion in Limine to Preclude the Testimony of Robert Bancroft (Doc. 198). The Court found no basis to exclude Dr. Bancroft's testimony and noted that any challenges to the facts and assumptions would go to weight rather than admissibility. (Doc. 238 at 6.) *See also Walsh v. Chez*, 583 F.3d 990, 992-95 (7th Cir. 2009) (concluding that two expert reports were admissible and "any weaknesses in those reports should have gone to the weight of the evidence before the jury" where they provided defendant with "ample notice of the theory against which he had to defend, and they alerted him to the kind of rebuttal and cross-examination he would need to undertake").

used have remained identical for over seven years, and for Defendants to now argue surprise is totally unfounded.

Plaintiff has not offered—or tried to offer—an undisclosed expert opinion at all. Defense counsel's alleged failure to understand the basis of Dr. Bancroft's fringe-benefit analysis is not due to any failure of the Plaintiff. Dr. Bancroft's fringe benefit analysis (including the DH pension plan) has been a part of his analysis since his first report, and it has remained in each report since. Indeed, at Dr. Bancroft's deposition in 2019 (six years ago), Defense counsel at the time, Jessica Joseph, specifically asked about the pension assumption. (*See* Ex. A (Bancroft Dep. Tr.) at 59-63, 65.) While the questioning was not in depth (as the Court noted at the hearing on March 28, 2025), that is on Defendants' counsel, who had the opportunity to inquire further if she wanted to do so. Plaintiff had no obligation to stop her before she changed topics to urge her to dig deeper. More troubling, however, is that DH counsel Tris Coffin actually inquired further about this issue at the pre-trial hearing regarding Dr. Bancroft's testimony. (Ex. B (March 14, 2025 Hearing Tr.) at 18:22 to 19:2; 23:21 to 24:20; 31:2 to 33:23.) Defendants have been on notice of Dr. Bancroft's opinion as well as Plaintiff's intention to claim retirement losses for seven years, and two of their lawyers have had the chance to inquire about it. To claim surprise at trial is simply unfounded.

## Legal Standard

In the ordinary course, a party must disclose the identity of an expert witness it may use at trial to present evidence, along with a signed, written expert report, within the timeframe ordered by the court or. FRCP 26(a)(2). The report must include, in relevant part: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them." FRCP 26(a)(2)(B). These disclosures must be

supplemented "if the party learns that in some material respect the disclosure or response is incomplete or incorrect" and, in the case of an expert witness, "the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition." FRCP 26(a)(2)(E); FRCP 26(e).

Failure to timely disclose the required information, unless "substantially justified" or "harmless," can result in exclusion of the undisclosed or untimely disclosed information. Fed. R. Civ. P. 37(c)(1). The Court has discretion to allow the information in appropriate circumstances and, where needed, in conjunction with additional to reduce possible prejudice. *See, e.g., Hein v. Cuprum, S.A., De C.V.*, 53 F. App'x 134, 135-37 (2d Cir. 2002) (noting that sanctions for abuse of discovery are within the court's discretion and acknowledging that even if defendant's expert failed to disclose some of his testimony in his report, "it was not an abuse of discretion for the trial judge to have allowed the challenged testimony where he took appropriate steps to ensure that plaintiff would not be harmed by the defendants' nondisclosure"); *Centrella v. Ritz-Craft Corp. of Pennsylvania, Inc.*, No. 2:14-CV-111-JMC, 2018 WL 840038, at *8–10 (D. Vt. Feb. 12, 2018), *aff'd sub nom. Brennan-Centrella v. Ritz-Craft Corp. of Pennsylvania*, 788 F. App'x 799 (2d Cir. 2019) (court was within its discretion to admit expert opinion testimony that went beyond the scope of the report where it took steps to mitigate any prejudice from the failure to timely disclose, including allowing defendant's own expert to testify beyond the scope of his own report in response). Courts in the Second Circuit and in Vermont consider the four "*Outley* factors" to assist them in determining whether and how to allow the challenged information. These factors include: "(1) the party's explanation for failure to comply with a discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988). *See also*

*Grajeda v. Vail Resorts Inc.*, No. 2:20-CV-00165, 2023 WL 4803755, at *6–7 (D. Vt. July 27, 2023) (using the *Outley* factors and excluding four paragraphs from the expert's declaration).

<u>Defendants Mischaracterize Dr. Bancroft's Testimony</u>

At trial, Defendants' counsel argued that Dr. Bancroft claimed Dr. Porter would lose the pension by virtue of her termination from DH. (Ex. C (March 28, 2025 Trial Tr.) at 20:2 to 20:5. *See also* Doc. 254 at 2 ("Defendants also understood Dr. Bancroft to be saying that she would not receive a pension benefit from Dartmouth Health, notwithstanding her separation.").) Dr. Bancroft did not. Asked if he had calculated "what would have been the payment to her yearly if she retired when she was 65 under the terms of that plan," Dr. Bancroft agreed that he had, and that he had also performed the same calculation for other possible retirement years, noting that there is a reduction in benefits for retirement prior to the age of 55. (Ex. C at 19:15 to 19:21.)

Defense counsel alleged that "these were new calculations and assessments that were not stated with any clarity whatsoever in prior reports, charts or assumptions." (Doc. 254 at 4.) Dr. Bancroft calculated post-2017 retirement contributions based on DH's 12% defined contribution.[2] The information is not new and, indeed, can be found in Dr. Bancroft's very first report in 2018. The pension portion of Dr. Porter's retirement as of her termination date was set. Had she remained at DH and participated in the defined contribution plan, however, she would

---

[2] When Dr. Porter was hired in 1996, Defendants offered a defined benefit retirement plan (effectively, a pension). The nature of a defined benefit plan is that the plan is funded through employer contributions. After retirement, the employee receives a benefit that is calculated based on a combination of average compensation at the time of retirement, years of creditable service, and a percentage set by DH. DH moved to a defined contribution plan for new employees after 2006; however, certain employees were offered the option of remaining in the old defined benefit plan. Dr. Porter chose that option. After 2017, the prior defined benefit plan was "frozen," and all DH employees went to a defined contribution plan where the employee and the employer contribute funds into a 401(a) account. (*See* Ex. E (DH 2017 Benefit Guide) at 34-35.)

have received, in addition to the pension benefit, income from the defined contribution plan. Dr. Bancroft was asked, in relevant part, to determine the amount by which Dr. Porter's retirement benefits would be reduced as a consequence of her termination from DH. Using data provided by DH, Dr. Bancroft calculated that additional amount. Defendants now complain that this analysis is "one-sided" because it does not make clear that Dr. Porter will still receive sizeable retirement benefits. (Doc. 254 at 4-5.) But the relevant analysis is what Dr. Porter *has lost* not what she has retained.

### No Surprise That Plaintiff Sought Compensation for Reduced Retirement Benefits

From the beginning, Plaintiff has been clear that she would seek compensation for "[r]educed retirement benefits" and that economist Dr. Bancroft would provide expert testimony as to the extent of her damages. (Ex. D (Pl.'s Resp. to Def. MHMH 1st Set of Interrogs.).) Dr. Bancroft's preliminary expert report was provided within the October 31, 2018 discovery deadline for plaintiff's expert disclosures. (Doc. 198-2; Doc. 138 at 2.) In that initial report, Dr. Bancroft stated that the calculation for "lost fringe benefits" included DH's contributions to health and retirement. (Doc. 198-2 at 2.) The projected lost earnings chart includes columns for fringe benefits both at DH and UVM. Dr. Bancroft lists the assumptions he made in projecting lost earnings. Assumption #2 states that "Dr. Porter's fringe benefits, given her continued employment with DHMC, include the medical center's contribution to health insurance and a retirement plan. … DHMC's retirement plan contributions is assumed to be 12% of her earned income." Assumption #5 notes that UVM's contributions to retirement are assumed to be 9%.

The retirement portion of the DH fringe benefit calculation has not changed. Since the 2018 report, Dr. Bancroft has issued three updated reports. (Doc. 198-3; Doc. 198-5.) Because of the passage of time, some of Dr. Porter's plans and some of the assumptions made have

5

played out differently than initially projected. For example, Dr. Porter's income for the period between 2018 and 2024 was initially estimated; however, over time, the actual values for these years became known. Dr. Bancroft replaced estimated values with actual values as they arose. In another example, some of the assumptions made about Dr. Porter's career path after DH have shifted over time and Dr. Bancroft has either provided multiple scenarios to account for possible alternative paths, (*see* Doc. 198-3 (providing calculations for two alternative scenarios, depending on whether Dr. Porter was able to find a position closer to her Norwich, Vermont home in 2021)), or has updated the assumptions to reflect present reality, (*see* Doc. 198-5; Doc. 208 at 9 (as of August 2024, Dr. Porter had not found employment closer to home and continued to work at UVM but hoped to reduce her hours and call obligations by January 2025; UVM's retirement contribution was recalculated at 8.5% instead of 9%)).[3] These changed assumptions altered the calculations for her income and benefits losses but did not change the overall method Dr. Bancroft used to calculate such losses nor did they impact the base figures calculated for the retirement portion of DH's fringe benefits.

Prior counsel for DH conducted a deposition of Dr. Bancroft on October 30, 2019. At that time, Dr. Bancroft had produced both the initial 2018 report and the revised October 2019 report. During the deposition, counsel for DH and Dr. Bancroft explored the contents of his working file and the information he had referred to or relied on in making his reports. In explaining his methodology for calculating losses, Dr. Bancroft explained that the first step was to project out what Dr. Porter would have earned if her employment at DH had continued,

---

[3] Defendants' Motion in Limine to Preclude the Expert Report (Doc. 248) seeking to prevent Plaintiff from introducing into evidence Dr. Bancrofts' March 19, 2025, and August 26, 2024, expert witness reports. The Court accepted the parties' stipulation after a hearing to a modified version of the expert report and agreed to "revisit demonstrative/evidentiary admissibility at a future point in trial." (Doc. 251.)

including her salary and certain fringe benefits such as health and retirement contributions. (Ex. A at 40:1 to 40:8.) Dr. Bancroft then looks at what she has earned or is expected to earn post-termination and subtracts that from what she would have earned at DH to determine her "gross loss." (*Id.* at 40-41.) Afterwards, he factors in tax consequences and present value adjustments.[4] (*Id.* at 41.) This is the approach he has used for more than a quarter of a century and the method he has used in each of the reports produced for this case. (*Id. See also* Ex. B at 14:17 to 15:7 (Dr. Bancroft stated that he is using "exactly the same methodology.").) Counsel for DH questioned Dr. Bancroft about his calculations for DH fringe benefits, including Dr. Porter's retirement benefits. (Ex. A at 26:11 to 31:20, 59-65, 70, 97-101.) *See Minebea Co. v. Papst*, 231 F.R.D. 3, 8 (D.D.C. 2005) (drawing distinction between information in report and information raised during deposition, which may or may not have been covered in the initial report, and noting that plaintiff is not prohibited from eliciting testimony from expert about any "evidence, issues or opinions" raised during the deposition).

Although Defense counsel implies otherwise, the updates made by Dr. Bancroft supplement his prior reports based on new information; they do not introduce new methodology or theories. *See* FRCP 26(e) (permitting supplements or corrections in response to new information). *See also, e.g., Kahle v. Leonard*, 563 F.3d 736, 741 (8th Cir. 2009) (finding district

---

[4] "Aside from identifying the pension testimony as an undisclosed expert opinion, Defendants further asserted that the chart did not take into account the present value of the amount of benefit which Plaintiff would obtain by getting life-long payments from her Dartmouth Health pension plan." (Doc. 254 at 2.) Defense counsel repeatedly complains that Dr. Bancroft has not provided "any additional working papers" to support his updated reports. (Doc. 254 at 3 (noting that defense counsel asked for updated recent earnings information).) This allegation has been addressed generally, but as it relates to DH pension calculations, the simple answer is that there are no new working papers to account for. DH did provide certain information to Dr. Bancroft regarding a wage freeze during COVID at the March 14, 2025 hearing, which Dr. Bancroft incorporated into his most recent report. Plaintiff did not have access to her 2024 W2s until recently. All the invoices that have been issued to Bancroft have already been provided. Again, these did not impact the DH pension calculations.

court within its discretion in admitting psychologist expert report updated shortly before trial where the report "updated a previously-disclosed assessment of Kahle's treatment needs based on additional information—her expected release date"); *Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1332 (10th Cir.2004) (noting that "an expert's initial Rule 26 report cannot always anticipate every possible challenge to the report" and that refusing to allow the expert "to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning" may, in some instances, "even constitute an abuse of discretion"); *Minebea Co. v. Papst*, 231 F.R.D. 3, 6–8 (D.D.C. 2005) (noting the exception permitting a supplemental expert report "for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report").  Indeed, after hearing argument from all parties and testimony from Dr. Bancroft, this Court determined that "Dr. Bancroft's decision to update his expert reports after receiving new information was entirely appropriate, as was his decision to include multiple scenarios for Dr. Porter's potential damages depending on how many years she continues to work."  (Doc. 238 at 8.)  Nor did the Court find Dr. Bancroft's reliance on information from Dr. Porter about "whether and when she intends to decrease her working hours" to be problematic, particular where, as here, "Dr. Porter has a reasonable explanation for why she intends to decrease her hours at UVM:  she finds it more stressful to commute from her home in Norwich, VT, to Burlington (as opposed to Lebanon)."  (Doc. 238 at 8-9.)

      Defense counsel had an additional opportunity to question Dr. Bancroft about his report and expected testimony at the March 14, 2025 evidentiary hearing.  Counsel for DH specifically questioned Dr. Bancroft about his pension analysis.  (Ex. B at 23:21 to 24:20; 31:2 to 33:23.)  The issue of taxes and present value calculations was also addressed.

      The purpose of the expert report disclosures is to "eliminate unfair surprise" and allow

the opposing party to understand the substance of the expected testimony and take steps to prepare a response. *See, e.g., Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007) (describing the purpose of Rule 26 expert disclosures and stating that the rule "does not limit an expert's testimony simply to reading his report" but rather "contemplates that the expert will supplement, elaborate upon, [and] explain … his report in his oral testimony") (internal citations, quotations, and alterations omitted); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir.2010) ("The purpose of expert reports is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary.") (internal quotations and alterations omitted). Defense counsel has had every fair opportunity to explore the retirement issue; their failure to do so in more depth is their own responsibility.[5] *See, e.g., Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 63-64 (1st Cir. 2011) (finding that although expert's testimony used different language than the report, "it was a reasonable elaboration of the opinion disclosed in the report," and that plaintiff could reasonably have anticipated the testimony based on the report "and, therefore, could not have been unfairly surprised to warrant striking the challenged testimony"); *Walsh v. Chez*, 583 F.3d 990, 992-95 (7th Cir. 2009) (noting that the purpose of an expert report "is not to replicate every word that the expert might say on the stand" but rather to "convey the substance of the expert's opinion … so that the opponent

---

[5] Neither is Plaintiff's counsel responsible for Defense counsel's failure to educate themselves on the differences in the retirement plans offered by DH. For example, Defense counsel writes that "Dr. Bancroft was asked to describe his opinions regarding how he factored in certain pension information about Plaintiff from a defined benefit plan pension she was making payments toward while employed at Dartmouth Health." (Doc. 254 at 1.) Plaintiff did not make payments towards a defined benefit pension plan at DH, because the nature of such a plan is that it is funded by the employer. Although the DH plan changed in 2017 to a defined contribution plan under which Dr. Porter could have made contributions, Dr. Bancroft disclosed repeatedly that he calculated the post-2017 contributions based on DH's 12% defined contribution.

9

will be ready to rebut, to cross-examine, and to offer a competing expert if necessary").

## CONCLUSION

For the foregoing reasons, Defendants Motion in Limine should be denied.

Dated: March 30, 2025            /s/ Geoffrey J. Vitt
                                 Geoffrey J. Vitt, Esq.
                                 Vitt & Nunan, PLC
                                 8 Beaver Meadow Road
                                 P.O. Box 1229
                                 Norwich, VT 05055-1229
                                 (802) 649-5700
                                 gvitt@vittnunanlaw.com

                                 Eric D. Jones, Esq.
                                 Langrock Sperry & Wool, LLP
                                 210 College Street
                                 P.O. Box 721
                                 Burlington, VT 05402
                                 (802) 864-0217
                                 ejones@langrock.com

                                 Sarah H. Nunan, Esq.
                                 Vitt & Nunan PLC
                                 8 Beaver Meadow Road
                                 P.O. Box 1229
                                 Norwich, VT 05055
                                 (802) 649−5700
                                 snunan@vittnunanlaw.com

                                 ***Attorneys for Plaintiff,***
                                 ***Misty Blanchette Porter, M.D.***