# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT
Case No. 5:17-CV-194

_____
MISTY BLANCHETTE PORTER, M.D.,
          Plaintiff,

V.

DARTMOUTH-HITCHCOCK MEDICAL CENTER,
DARTMOUTH-HITCHCOCK CLINIC,
MARY HITCHCOCK MEMORIAL HOSPITAL,
and DARTMOUTH-HITCHCOCK HEALTH,
          Defendants.

_____

D E P O S I T I O N

- of -

ROBERT L. BANCROFT, Ph.D.

  held on Wednesday, October 30, 2019, at
  the offices of Vitt & Associates, PLC,
  8 Beaver Meadow Road, Norwich, Vermont,
  commencing at 10:15 a.m.

APPEARANCES:

GEOFFREY J. VITT, ESQUIRE
Vitt & Associates, PLC
8 Beaver Meadow Road, P.O. Box 1229
Norwich, Vermont 05055
(802) 649-5700 | gvitt@vittandassociates.com
          On behalf of the Plaintiff

JESSICA E. JOSEPH, ESQUIRE
Foley & Lardner, LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199-7610
(617) 342-4000 | jjoseph@foley.com
          On behalf of the Defendants

IN ATTENDANCE:  JULIA KORKUS

COURT REPORTER:  KAREN L. WRIGHT, RPR, CRR

O'BRIEN REPORTING SERVICES, INC.
(802) 747-0199

Page 26

```
 1        I may not, but critiquing the analysis.
 2   Q.   Got it.  So what did you do to prepare for your
 3        deposition today?
 4   A.   Yest- -- not yesterday.  Monday I went through my
 5        file.
 6   Q.   Okay.
 7   A.   And then I -- yesterday I did -- I came down here
 8        at the request of Mr. Vitt and met with him for
 9        about -- met with Mr. Vitt and Ms. Kramer for
10        about an hour and a half.
11   Q.   Okay.  You said you looked through your file.
12        What documents are in your file?
13                 (Julia Korkus entered the deposition.)
14   A.   I have my October 1st, 2019, report and my
15        preliminary report from October of 2018.  And
16        I've got handwritten notes.  And I've got tax --
17        some W-2s.  Several e-mails from Ms. Korkus.
18                 Benefit statement from
19        Dartmouth-Hitchcock dealing with pensions, health
20        care.  A letter from Dartmouth-Hitchcock to
21        Dr. Porter regarding her benefits at -- pension
22        benefits at the time of her termination.  I've
23        got e-mails.
24                 I have pay stubs from the University
25        of Vermont, 2019.  2018 income tax return.
```

Page 27

```
 1        Again, a bunch of W-2s.  More e-mails, e-mails,
 2        e-mails.
 3                  I think this may be a duplicate copy,
 4        but it -- a duplicate, but it has to do with the
 5        pensions at Dartmouth.
 6                  A letter from Dartmouth dealing
 7        with -- basically what was in -- what I got out
 8        of this was her current pay rate.  I think
 9        there's some fringe benefit information in there.
10                  And then I believe Dr. Porter sent me
11        this summary of medical school faculty
12        compensation for all schools.  I printed it out,
13        but I didn't rely on it.
14                  ATTORNEY JOSEPH:  Okay.  Could we --
15   A.   Actually, I have this information.
16                  ATTORNEY VITT:  Could we do what?
17                  ATTORNEY JOSEPH:  Could we go off the
18        record.
19                  (Recess taken.)
20                  ATTORNEY JOSEPH:  Back on the record.
21   Q.   So you mentioned that you met with Geoffrey and
22        Katie yesterday?
23   A.   Yes.
24   Q.   Did you review any documents with them?
25   A.   No.
```

Page 28

```
 1   Q.   Okay.  And can you give me -- go ahead.

 2   A.   I don't -- at the actual meeting, I did not

 3        review any documents.  When I got home, an e-mail

 4        was sent to me on an issue that we had discussed.

 5        And that was -- had to do with Dr. Porter's

 6        housing in Burlington.

 7                    I had been under the assumption, based

 8        on my telephone conversation with her --

 9        obviously, I must have misunderstood or -- that

10        she had a -- wanted a three-bedroom or possibly

11        four-bedroom home so that she could have her

12        family there.

13                    And when I got home yesterday

14        afternoon, there was an e-mail waiting for me

15        that said that she -- her place that they bought

16        was only a two-bedroom home, which would have

17        some implications for my rejections of her costs.

18   Q.   Okay.

19   A.   'Cause my costs were based on a three/

20        four-bedroom.

21   Q.   Okay.  We'll get into that --

22   A.   Yeah.

23   Q.   -- a little later.

24                    So can you give me a description of

25        the work that you were asked to do, how -- the
```

 1         way that it was described to you on this matter?

 2    A.   I don't think there was much discussion.  To be

 3         honest with you, I don't remember.  I can only

 4         tell you what I -- I think was said, which is

 5         pretty much the same in every case, you know,

 6         that I've got this one.  It's a wrongful

 7         termination or employment case.  Here is the name

 8         of the plaintiff.  And here is the name of the

 9         defendant.  I would ask for that because I want

10         to make sure I don't have any conflicts.  And

11         they would like to retain my services to develop

12         projections of the individual's economic loss.

13    Q.   What documents were you provided?

14    A.   Boy, it's rather lengthy.  And I should point out

15         that not all the documents I received are in that

16         file.  Many of them that were sent -- they're --

17         I think everything I -- or most everything, if

18         not everything, came PDF.

19              So many of them are on my computer.

20         They were just, you know, large files.  A lot of

21         them had to do with the benefit program.  I did

22         print out one of them.  I think I had '17, '18,

23         and '19, and I only printed out one of them.

24              So I was provided with income tax

25         returns for at least 2018, W-2s for '17 and '18.

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 30

1       I don't remember if I was provided with a -- I

2       think I was provided with a '17 income tax

3       return.  I don't remember off the top of my head.

4                 I was provided with pay stubs at UVM

5       for 2019.  I think I mentioned there was several

6       things on -- on Dartmouth-Hitchcock's fringe

7       benefit program which dealt with medical and --

8       and retirement plans.

9                 I mentioned, I think at the -- before

10      we went on break, is that Dr. Porter sent me a

11      list of -- of pay for various doctors.  I printed

12      it out, but I never used it, never relied on it.

13                And then there's a lot of information

14      that was sent to me via e-mail that had to do

15      with questions that I had.  A lot of them had to

16      do -- many of the e-mails had to do with early on

17      in the -- in -- when I was doing my analysis, the

18      preliminary one, and there was some confusion on

19      my part.  At that point, many things had not been

20      established for Dr. Porter, so there was

21      discussions about when she -- what might happen

22      in the future.  So that information is scattered

23      throughout the -- my file.

24                And I did make an attempt to print out

25      any e-mail that was -- that was pertinent or that

Page 31

1       I relied on, but I did not always print out every

2       single one of the attached documents.

3   Q.  Okay.  So you mentioned there were some documents

4       not in your physical file that you had with you

5       today that are on your computer?

6   A.  Yes.

7   Q.  Aside from benefits summaries for

8       Dartmouth-Hitchcock, do you remember what any of

9       those other documents are?

10  A.  Those are the major, I think -- right now, I'm

11      going to say that the only ones I can think of

12      off the top of my head are the whole listing of

13      the Dartmouth-Hitchcock benefits for '17, '18,

14      and '19.  That's all that comes to mind, but

15      there -- there very may well be others; I can't

16      tell you for sure.

17  Q.  And so all of the documents that you relied on

18      are in the file that you brought with you today;

19      is that correct?

20  A.  I believe so.

21  Q.  Okay.  And who all did you talk to about your

22      analysis?

23  A.  Mr. Vitt, Ms. Kramer, Ms. Korkus, and I didn't

24      discuss the results, but I had at least one, if

25      not two conversations with Dr. Porter, but that

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 40

1   A.   Sure.  The first step is to project out what she
2        would have earned if she'd continued her
3        employment with Dartmouth-Hitchcock.  And that's
4        composed of her salary plus the value of fringe
5        benefits.  In this case, fringe benefits that
6        were of value that I valued were contributions to
7        health insurance and also contributions to a
8        retirement plan.
9             And then the next step is to -- well,
10       I guess is looking at post-termination earnings,
11       which again is composed of income plus any
12       benefits that she might receive.  Up through
13       2018, I used what she actually earned, and then
14       in 2019 what she'd earned up through July 31, and
15       then used that as a basis to forecast forward.
16            But anyways, that was -- and then some
17       other assumptions on what she would do after
18       2021, and carried that on out, along with any
19       fringe benefits that might have been available.
20       There wasn't any after July -- after June 2021.
21            And so when -- and so then I'd have
22       the -- I'd have the projections of -- of the
23       Dartmouth-Hitchcock earnings.  And then I would
24       offset that by projections -- or actual and
25       projections of what she would earn

1       post-termination.  And that would be her gross

2       loss.

3                  From that, I estimate what kind of

4       income taxes she would have had to pay each year

5       on the -- on the loss.  And then the next step is

6       to determine the present value.  And the present

7       value, I add interest to historical and then I

8       discount future loss projections to the present.

9                  And then the next step -- and then

10      I -- it's a mathematical thing.  I have a running

11      total to assist the trier of fact.

12                 And then the next important step is

13      estimating the tax liabilities that would be

14      assessed on any award that she might receive.

15   Q.  Okay.  Was there any other approach that you

16      considered?

17   A.  No.

18   Q.  Okay.  And how did you develop this approach?

19   A.  It's an approach that I've been using for -- for,

20      I don't know, 20, 25 years.  Same.  It hasn't

21      varied.

22   Q.  Is it generally accepted amongst economists?

23   A.  Yes.

24   Q.  Have you seen any other approaches being used to

25      calculate projected lost earnings?

Page 59

1       subsequent years you've assumed Dr. Porter would

2       receive annual wage increases of 2.5 percent.

3                    What's the basis for that 2.5 percent?

4   A.  We discussed it when we were talking about in

5       July of '18 the 2.5 percent.

6   Q.  Okay.  So moving on to Footnote 2 or Assumption

7       Number 2.  You state "Dr. Porter's fringe

8       benefits, given her continued employment with

9       DHMC, include the medical center's contribution

10      to health insurance and a retirement plan."

11                   Are those the only two components that

12      you used to estimate fringe benefits?

13  A.  Those are the only two that I had of -- there are

14      other fringe benefits offered by Dartmouth, but

15      these are the two that have value.  I mean, they

16      offer life insurance; but I'm assuming she lives,

17      so --

18  Q.  Okay.

19  A.  -- no value.  And there are some other ones, too.

20  Q.  What were the others that you --

21  A.  Well, Social Security.  But I did not include

22      Social Security in there because she's at

23      least -- in most years, she's over the -- it's

24      about $132,000, I think is the cap that you

25      assess the 5.4 percent, which is -- or

Page 60

1       5.5 percent, which is the old age of retirement,

2       which you hope you're going to get back when you

3       retire.  I probably -- I might get most of it

4       back, but I don't know about you.

5   Q.  We'll see.

6   A.  So I didn't include that because it --

7       post-termination, I assume that she's -- you

8       know, that's going to be covered, she's going to

9       be earning at least that much.

10  Q.  Okay.  Anything else that you didn't include in

11      fringe benefits?

12  A.  I don't remember.  I had the documents with the

13      fringe -- various fringe benefits they had.  You

14      know, they have a wellness program and, you know,

15      et cetera, et cetera.  But the two of significant

16      value were the health insurance and the

17      retirement.

18  Q.  Okay.  But you reviewed all of the other --

19  A.  Well --

20  Q.  -- benefits offered by --

21  A.  -- I read the document.

22  Q.  Okay.

23  A.  If you look at my reports, whether they be

24      personal injury or wrongful death or employment,

25      there's generally only three fringe benefits that

Page 61

1    I value in there:  the employer's contribution to

2    Social Security, the employer's contribution to

3    health insurance and the dental and vision, and

4    contribution to retirement plan.  In this case, I

5    did not have Social Security in here.

6  Q.  Okay.  What's the basis for your assumption that

7    the value of DH's medical insurance contribution

8    is assumed to be $15,000 in 2017?

9  A.  Well, actually, I think it's quite conservative.

10   But if you take a look -- I was hoping I could

11   find it and I -- as I said earlier, I think I

12   have your benefits.  And I think I have the one

13   for 2019 and '18.  And I think those may be on my

14   computer, but I'm hoping...

15            On page 14 of that document.

16  Q.  This is the document with --

17  A.  "Your Benefits, Your Health, Choices for Healthy

18   Living."  This is in 2017.

19            If you look at page 14, you'll see

20   that -- what the employee had to contribute,

21   which for a family program was $200 a month,

22   which is very low.  That's $2,400.  A family

23   plan's going to cost at least $25,000.  So my

24   15,000, I'd argue, is very low.  Extremely

25   conservative.

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 62

1               On page 14, that's what -- what the
2       employee has to pay for -- for a health insurance
3       plan, which is -- for a family is going to be at
4       least $25,000.
5  Q.   When you refer to $200, you mean this entry that
6       says 198.56?
7  A.   Yes.  And even if she fell into the FTE between a
8       half and a little less than three-quarters, it's
9       still a little less than $300.  So it's -- the
10      15,000 is an extremely conservative number.
11 Q.   What's the basis for assuming the total
12      contribution by DH based on Plaintiff's
13      contribution?
14 A.   On the retirement?
15 Q.   Yes.
16 A.   Well, if I can find that here.  I know it's in
17      the '19 one.  And I apologize.  I thought I
18      printed that one page out.  It may be in here.
19      Let me see if I can find it, if they actually put
20      it in the '17 one.  On page 34.
21 Q.   Okay.
22 A.   If you look at number of base contribution
23      points, she would be 220, I believe, based on my
24      calculations.  What she would be entitled to is
25      7 percent contribution, base contribution, plus

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 63

1      an additional 5 percent because her earnings

2      would be over 118,500.

3   Q.  And this is DH's contribution to medical

4      insurance?

5   A.  No.  Retirement.  I thought you asked about

6      retirement?

7   Q.  I was asking about medical insurance.

8   A.  Oh, I'm sorry.

9           ATTORNEY VITT:  No.  You asked about

10     retirement.

11          ATTORNEY JOSEPH:  Okay.

12          ATTORNEY VITT:  I mean, the question

13     was retirement.

14          ATTORNEY JOSEPH:  Oh, okay.

15  Q.  I meant -- sorry.  I meant to ask what the basis

16     was for calculating DH's medical insurance

17     contribution based on her -- her contribution,

18     which was listed on page 14.

19  A.  Well, at the time, I think I -- I think I --

20     trying to be conservative, and I was estimating

21     that the cost would be around 20,000.  And I

22     assumed she was paying, you know, around 3 or 4.

23     So it comes out to be about 16.  I used 15 to be

24     conservative.

25              But, in fact, in going back and

Page 64

1       reviewing it, particularly when I took a look at

2       the '19 one, 15 is way on the low side.  It

3       probably would be -- a more reasonable estimate

4       would be 20,000 or more, maybe 22,000.

5   Q.  And you're basing that just based on your

6       estimate of what the percent of her contribution

7       would be versus the total cost?

8   A.  Yes.  Knowing what -- having a rough idea of what

9       cost -- medical insurance costs if you go out and

10      buy it as a private individual, versus -- and

11      then comparing that with how much the employee

12      has to contribute, there's quite a differential.

13      And I'm saying the differential's probably at

14      least 20,000, not 15.

15  Q.  And what's the basis for the assumption that the

16      value of DH's contribution to medical insurance

17      would increase at 2.5 percent annually?  Is that

18      the same as the --

19  A.  It's the same -- it is the same as the wages.

20      But actually, I think everybody -- pretty common

21      knowledge that medical expenses have -- insurance

22      premiums have been increasing much faster than

23      inflation or wages increases.

24                  And I alluded to that when I said that

25      when you look at wage increases and then you

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 65

1       compare that with increases in total

2       compensation, which includes health insurance,

3       it's a great -- it's a higher number, 'cause

4       health insurance is going up at a faster rate.

5    Q.  And then going back to what you touched on a

6       moment ago, retirement plan contributions.  That

7       was on page 34, you said.  Could you walk me

8       through how you came up with the 12 percent?

9    A.  34?

10   Q.  Yes.

11   A.  Yes.  That's how I came up with the -- it's the 7

12      plus the 5.

13   Q.  Okay.  So looking at Footnote 4, that's

14      Assumption 4, in Scenario A.  Actually, for both

15      Scenarios A and B, you've noted that for that

16      assumption "Dr. Porter's actual earned income is

17      reported for the years 2017 and 2018."

18          Did you determine her actual income

19      from her W-2s for those two years?

20   A.  Yes.

21   Q.  Okay.  And you reviewed her actual earnings -- or

22      her, I guess, actual earnings from the University

23      of Vermont Medical Center through July 31st,

24      2019, in order to project the rest of her 2019

25      income?

Page 69

1          continue to work at the University of Vermont

2          Medical Center one day a week for 48 weeks a year

3          at a 2021 per diem rate of $190 per hour."

4                    What's the basis for assuming that she

5          would continue at UVM?

6     A.   Well, that's what she said she would do.

7     Q.   Okay.

8     A.   It wasn't my role to question her.

9     Q.   And the one day a week was also something that

10         came from Dr. Porter?

11    A.   Yeah, that she would commute there one day a

12         week.  I thought that was going to be hard, but

13         she said that she -- that's what she planned to

14         do.  It was a possibility, I should put it.

15    Q.   And what was the basis for the $190 per hour per

16         diem rate --

17    A.   I believe --

18    Q.   -- assumption?

19    A.   -- the current rate or the rate was 175.  And I

20         just increased it, I think, by 2-1/2 or whatever

21         and rounded it up to 190.

22    Q.   And so she provided you with the current rate?

23    A.   Yes.  I think somewhere in this there's an e-mail

24         that says that the current rate is 175.

25    Q.   Okay.  And is the basis for the 2.5 percent

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 70

1          increase in income the same source we discussed

2          before with the --

3    A.    Yes.

4    Q.    -- other 2.5 percent?

5                So looking at Assumption Number 5,

6          what's the basis for the assumption that UVM's

7          contributions to Dr. Porter's retirement plan

8          would be 9 percent?

9    A.    I believe that's what she told me.  Plus, I had

10         just finished up a case within six months, eight

11         months of this, I think, and I had actual

12         documents from UVM that indicated it was

13         9 percent.  I'm -- anyways, I've seen the

14         9 percent.

15   Q.    Were there any other post-termination fringe

16         benefits that you considered valuing?

17   A.    I didn't.  I mean, they're -- again, there'd be

18         Social Security, but I didn't put it in the -- in

19         the pre-injury.  And then I -- I think UVM has a

20         wellness program, and so didn't Dartmouth.

21   Q.    Okay.  And were discussions with counsel or

22         Dr. Porter the basis for your assumption that

23         UVM's contribution to her health insurance policy

24         is comparable to Dartmouth-Hitchcock's

25         contribution?

Page 97

1        purely economic standpoint, the opportunity cost
2        of owning that place is what she can rent it for.
3   Q.   Understood.  So the discussion we had about
4        housing rental costs with respect to Footnote 10
5        in Scenario A would apply also to Scenario B?
6   A.   Yes.
7   Q.   And is the same true for utilities, renters
8        insurance, heat, and travel?
9   A.   Yes.
10  Q.   So it's the exact same calculation in Footnote 10
11       for Scenario B made using the exact same
12       assumptions and the same basis for those
13       assumptions as Scenario A, it's just projected
14       out beyond July 2021?
15  A.   Yes.
16  Q.   Did you consider when calculating the costs in
17       Footnote 10 for Scenario B whether they would
18       change because she's only working two days a week
19       at the University of Vermont instead of
20       full-time?
21  A.   No.
22  Q.   Okay.  What was your basis for assuming the
23       analysis out to the year 2033 for both scenarios?
24  A.   I believe in the conversation that I had with
25       Dr. Johnson that she projected there was a

Page 98

1       possibility she'd work out to 70.

2                       She liked what she was doing and would

3       like to do it as long as she could.  And she had

4       no plans at that point of when she definitely

5       would retire.

6   Q.  You mean Dr. Porter?

7   A.  Dr. Porter, I'm sorry.  Dr. Porter would have

8       retired.  So therefore, I carried it out to 70.

9       But again, I want to underscore that it's up to

10      the trier of fact to determine how long he thinks

11      or she thinks it would be reasonable for

12      Dr. Porter to work out into the future.  That's

13      why I have a running total there.

14                      So if the trier of fact thinks it's --

15      out through age 66 is -- is a reasonable area to

16      truncate, then they can look at the corresponding

17      number for the -- for age 66.

18  Q.  On both of the projected lost earnings charts for

19      Scenario A and Scenario B, there's a footnote

20      that states "The year 2029 (under lined) is

21      consistent with the worklife of a 56-year-old

22      female with a graduate degree."

23                      What's the basis for that assertion?

24  A.  That's a study that was -- that's actually been

25      done -- updated about four times.  It's in the

540889d0-4ff5-44c5-a75e-10182bf4ad3d

1          National Journal of Forensic Economics that looks

2          at work lives by sex and age and education level.

3                    The problem with it is that it has

4          people with master's, as well as Ph.D.s and

5          M.D.s.  And if you look at education overall

6          for -- they have less than high school, high

7          school, some college, associate's degree,

8          four-year degree, and then graduate degree.  You

9          see work lives increase, everything else being

10         held constant and stuff.  You look at female

11         50 years of age, if you follow them through those

12         different education levels, the work life gets

13         greater and greater.

14                   One might expect, and I would expect

15         that, that there would be an increase in work

16         lives for somebody that had a Ph.D. in general

17         than somebody with a master's.

18                   So what I'm saying is that I think

19         it's a conservative estimate of -- of an average

20         work life.

21    Q.   You mentioned a study.  How recent was that

22         study?

23    A.   I think -- well, it's -- it's been -- I think

24         this is the fourth update.  And the last one, I

25         think, was 2015.

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 100

1    Q.    Okay.  So you would have reviewed whatever the

2          most recent update was?

3    A.    Yes.

4    Q.    Did you assume any risk of normal termination,

5          that she might not be able to -- that Plaintiff

6          might not be able to work to any given year

7          because of normal life events?

8    A.    No, I did not.  And that's why there is this

9          running total in here.  Unlike maybe in a

10         personal injury case, where I'd render an opinion

11         that I think the loss is X, the person would have

12         worked out to their normal work life, and so when

13         I do all the calculations, their loss is

14         $850,000.

15              And in wrongful termination cases or

16         employment cases, I put this running total in

17         there because I'm going to let the trier of fact

18         take into account those factors of -- that a

19         person might not work there for X number of

20         years.

21              They're going to hear a lot more

22         testimony than I'm going to hear.  And then it's

23         up to them to make that decision that I think,

24         well, it's reasonable to expect she would -- that

25         Dr. Porter would work for 3 more years or 5 more

540889d0-4ff5-44c5-a75e-10182bf4ad3d

Page 101

1      years or 15 more years.

2                So I'm not rendering an opinion that

3      she would work out to age 70.  I'm not rendering

4      an opinion that she would work out to age 60.

5      I'm leaving that entirely up to the trier of

6      fact.

7  Q.  Okay.  Let's take a five-minute break.

8  A.  Okay.

9                (Recess taken.)

10               ATTORNEY JOSEPH:  All right.  Back on

11     the record.

12 Q.  Looking back at Exhibit 5, which is the file that

13     you brought in, could you tell me, to the best of

14     your ability, what, if any, documents you relied

15     on that aren't in that file?

16 A.  I did look at the 2000 -- I think it's 2019

17     fringe benefit package; the same as the '17,

18     except it was 2019.

19               And I think -- I think I saw 2017

20     income tax returns.  I think it may be on my

21     computer.  But more importantly was the -- in

22     2017 was the W-2s, which are in here.

23               I can't think of anything that --

24 Q.  Okay.  And is the 2017 tax return in this file?

25 A.  No.  I did not see it.