# EXHIBIT B

1                    UNITED STATES DISTRICT COURT
                              FOR THE
2                       DISTRICT OF VERMONT

3

4    Misty Blanchette Porter,      )
                                    )
5                                   )
     v.                             ) Case No. 2:17-cv-194
6                                   )
                                    )
7    Dartmouth-Hitchcock Medical    )
     Center, et al.                 )
8                                   )
     _____)

9

10   RE:  Hearing on Motions in Limine (Docs. 198, 200-202),
     Motion to Quash Dr. Joanne Conroy's Trial Subpoena (Doc. 199),
11   Motion to Amend Complaint (Doc. 213), and an Evidentiary
     Hearing on the Motion in Limine to Preclude the Testimony of
12   Robert Bancroft (Doc. 198)

13   DATE:  March 14, 2025

14   LOCATION:  Burlington, Vermont

15   BEFORE:  Honorable Kevin J. Doyle
                   Magistrate Judge

16

17   **APPEARANCES**:

18   Eric D. Jones, Esq.
     Langrock, Sperry & Wool, LLP
19   210 College Street
     PO Box 721
20   Burlington, VT 05402-0721

21   Geoffrey J. Vitt, Esq.
     Vitt & Associates
22   8 Beaver Meadow Road
     PO Box 1229
23   Norwich, VT 05055-1229

24                        - Continued on Next Page -

25

2

```
1    Donald W. Schroeder, Esq.
     Morgan McDonald, Esq.
2    Foley & Lardner LLP
     111 Huntington Avenue, Suite 2500
3    Boston, MA 02199

4    Tristram J. Coffin, Esq.
     Downs Rachlin Martin PLLC
5    199 Main Street
     PO Box 190
6    Burlington, VT 05402-0190

7

8

9

10             TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                       United States District Court Reporter
11                         verbatim@vermontel.net

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    counsel; is that correct?

2    A.   Yes.

3    Q.   And there's some additional materials, but you're not

4    denying that you rely heavily on what the plaintiff told you

5    for reaching your conclusions as asserting in these reports; is

6    that correct?

7    A.   On projecting out what her earnings would be

8    post-termination, yes.

9    Q.   Okay.  And the basic -- so directing your attention,

10    please, to the August 26th 2024 report --

11          THE COURT:  I don't want to interrupt your flow,

12    Mr. Coffin, but so you have moved for the admission of Exhibit

13    6?

14          ATTORNEY COFFIN:  I'm sorry.  I had meant to move for

15    the admission of all of A, which is a the whole binder.

16          THE COURT:  Okay.  Mr. Jones, any objection to 1 to 6

17    in Exhibit A?

18          ATTORNEY JONES:  No objection.

19          THE COURT:  Okay.  So then Exhibit A in its entirety

20    is admitted.  Go ahead.

21    BY ATTORNEY COFFIN:

22    Q.   Thank you.  Directing your attention to Tab 2, Exhibit 2

23    of A, is that your report dated August 26th 2024?

24    A.   Yes.

25    Q.   And that's the last report you prepared that was submitted

1   to the defense in this case; do you understand that?

2   A.   That's the last report I prepared, yes.

3   Q.   And the report includes a two-page narrative section; is

4   that right?

5   A.   Yes.

6   Q.   And then a, what looks like a table called "Projected Lost

7   Earnings for Dr. Misty Blanchette Porter" -- is that correct --

8   on the third page of --

9   A.   Yes.

10  Q.   -- Exhibit 2?  Yeah.  And then there's a couple of pages

11  of assumptions; is that correct?

12  A.   Yes.

13  Q.   And then a finally last table; is that right?  A last

14  table, last table entitled "Additional University of Vermont

15  Employment-Related Costs".

16  A.   Yes.

17  Q.   Is that right?  Okay.  And you prepared other reports

18  dated October 30th and October 1st; is that right?  Excuse me.

19  October 30th 2018 and October 1st 2019; is that right?

20  A.   Yes.

21  Q.   Okay.  And those are submitted and are at Tabs 4 and 5 of

22  Exhibit A; is that right?

23  A.   Appears to be, yes.

24  Q.   And your methodology for these reports and all of your

25  reports is fairly consistent in that you're essentially looking

1    for what her earnings were at the place from which she was
2    subject to the personnel action, Dartmouth-Hitchcock, and
3    comparing them with her earnings at the new place -- is that
4    right --  UVM Medical Center?
5    A.   Yes.  And I have issue with the adjective fairly.  They
6    are exactly the same methodology.
7    Q.   Okay.  Exactly the same methodology.  But, essentially,
8    you're comparing what she was earning at Dartmouth and what she
9    was earning and is expected to earn at UVM to determine the
10   difference between the two, which would be her loss; is that
11   correct?
12   A.   Yes.  I projecting out what her earnings would have been
13   at Dartmouth, and I'm projecting out -- well, I know what she's
14   actually earned at least as of the last year.
15   Q.   Right.
16   A.   And then I'm making projections of what I think she will
17   earn based on information she provided me.
18   Q.   Right.  And then you convert it to present value by adding
19   an amount of money to make up the difference of current dollars
20   for inflation; is that right?  Future.
21   A.   Well, you know, some of it's historical, which I add
22   interest onto, and some of it's future, which I discount back
23   to the present.
24   Q.   Okay.  So let's talk about the past earnings.  The damages
25   that you assessed to her that happened previously, you add an

```
 1    adjustment for inflation; is that correct?
 2    A.    Not for inflation.  I add an interest factor on.
 3    Q.    Okay.  And what is the interest factor for if it's not for
 4    inflation?
 5    A.    I don't know it's not for inflation, but it's a -- I think
 6    you'd have to go back and look at back in the 70s when the
 7    Vermont legislature, in its wisdom, decided that prejudgment
 8    interest should be calculated at 1 percent per month, simple
 9    interest.
10    Q.    Okay.  So that's how you came up with 12 percent as
11    applicable for the interest on the past damages; is that right?
12    A.    12 percent simple interest, annual interest, or 1 percent
13    Vermont.
14    Q.    Got it, okay.  Now, you would agree with me that 12
15    percent interest is an unnaturally high level of interest per
16    in today's climate?
17    A.    All depends on the risk.  I understand where you're going
18    with it.  It's a high rate, but there are interest rates that
19    are higher than that, but, again, they are risk-dependent.
20    Q.    Okay.  As an economist, are you aware of interest rates
21    that are commonly available in the market that are lower than
22    that?
23    A.    Yes.
24    Q.    Consumer price index?
25    A.    That's not an interest rate.
```

1    Q.    Well, let's leave -- is it ever used to calculate

2    interest?  Treasury bonds?

3    A.    There are inflation index treasury bonds, yes.

4    Q.    Okay.  If you go to a bank, what they do return for a CD?

5    A.    It all depends on when and what the terms are.

6    Q.    Is it anywhere approaching 12 percent?

7    A.    I don't believe so.

8    Q.    Okay.  More like 2 or 3 percent?

9    A.    I just got one yesterday for 3.9.

10    Q.    What's the interest rate on a treasury bond right now?

11    A.    I haven't looked it up in a couple of weeks, but what year

12    and how many?  What are we talking about?

13    Q.    Approximately -- well, you know, a standard, you know,

14    United States treasury bond, what would that go for right now?

15    A.    Well, it varies on how it paid.  From, are you talking 6

16    months or are you talking 30 years?

17    Q.    Well, how about 10 years?

18    A.    Ten years is around 4 percent, give or take.

19    Q.    Okay.  20 years?

20    A.    Slightly higher, but not much.

21    Q.    Okay.  So it's not uncommon for the interest rate to be

22    somewhere in the order of 2 to 3, maybe 4 percent; is that

23    correct?

24    A.    5 percent, yeah.

25    Q.    And yet you in, in your chart, have used 12 percent as --

1    glasses.  Sorry.  You've used 12 percent as your interest

2    adjustment for all of the loss on the right side of your chart;

3    is that correct?

4    A.   For all the loss?

5    Q.   Sorry.  Let's go through your chart.  Your chart at

6    Exhibit 2 on the table, the projected lost earnings, the third

7    page -- oh, yeah.

8    A.   Thank you.  Yes.  I'm sorry

9    Q.   Okay.  You've applied a 12 percent inflation, interest

10   adjustment added to your calculation of losses for the losses

11   from 2017 through 2024; is that right?

12   A.   Yes.

13   Q.   And that's set forth in one of your assumptions on the

14   next page, Assumption 1; isn't that right?

15   A.   I think it actually states it in Assumption 10.

16   Q.   Okay, yeah.  I apologize.  Right.  The simple interest

17   rate of 12 percent is used to commute interest on the

18   historical earnings losses.  Thank you.  That's right.

19        Let's go through the chart just a little bit.  I

20   apologize.  I meant to do that.

21   A.   Okay.

22   Q.   Just so everybody's on the same page.  Directing your

23   attention to Exhibit 2, the projected lost earning chart, so

24   what you've done here is for each year you've calculated what

25   the plaintiff's gross income was at Dartmouth, her fringe

1    benefits and her total earnings; is that correct?

2    A.    Yes.  I project -- yes.

3    Q.    Okay.  And then you went on and did the same thing for her

4    post-termination projections at UVM; is that correct?

5    A.    Yes.

6    Q.    And so, and then on the left there's an index that goes by

7    year.  So 2017 to 2033 is what you have on here; is that right?

8    A.    2033.

9    Q.    And then you go from there, and then you make an

10   adjustment for the difference between those two, which is, is

11   between the UVM and the Dartmouth losses, and that is what

12   you've described as gross adjusted loss earnings; is that

13   right?

14   A.    Yes, that's the difference between the two.

15   Q.    Okay, good.  And then I'll ask you some questions about

16   some of the these later columns later on, but you sort of

17   accumulate these and make some additions to them and ultimately

18   come out with a column on the far right which is what you call

19   the total economic loss; is that correct?

20   A.    Yes.

21   Q.    And in the lower right-hand corner where it says 4.329,

22   258 million is what you estimated the total economic loss for

23   Dr. Porter; is that right?

24   A.    If she was to work out to age 70, yes.

25   Q.    Yes.

1    A.    But I'm not opining that she would work out to age 70.

2    Q.    Okay.  Because so, for example, if she were only to work

3    to age 65 in 2028, the loss figure you project would be 2.542;

4    is that right?

5    A.    Yes.

6    Q.    Okay.  Now, the loss earnings you have are based on her

7    W-2 reported income; is that right?

8    A.    I report her W-2 income, yes.

9    Q.    Yes, you drew those figures from her actual W-2s which

10   include pretax dollars; is that right?

11   A.    Yes.

12   Q.    And from that she'd have to pay whatever income tax she

13   owed, right?

14   A.    Yes.

15   Q.    Okay.  And you analyzed from, in your chart from 2017.  I

16   think you said you used up through 2023 W-2s; is that right?

17   A.    I think so, yes.

18   Q.    Now, you assume a 3 percent increase for periods in the

19   out years in her pay; is that correct?

20   A.    Yes.

21   Q.    And by out years I mean years beyond which you don't have

22   W-2s, correct?

23   A.    Yes.

24   Q.    And so anything after 2023 you're assuming there is a 3

25   percent increase in her pay; is that right?

1    A.    Yes.

2    Q.    Okay.  And that would go out to 2033 --

3    A.    Yes.

4    Q.    -- is that right?  And I think you also assumed that in,

5    again, drawing from your assumptions on -- this is assumption

6    Number 1 on the third page of Exhibit 2.  You make an

7    assumption that she would become a full professor at Dartmouth

8    in 2019; is that correct?

9    A.    Yes.

10    Q.    And that she would then get a 5 percent salary increase;

11    isn't that correct?

12    A.    Yes.

13    Q.    Aren't I correct that you drew your information that she

14    would get that promotion in 2019 to full professor from

15    Dr. Porter; isn't that correct?

16    A.    Yes.

17    Q.    And aren't I also correct that you got the information

18    that she would get a 5 percent increase from being made a full

19    professor from Dr. Porter?

20    A.    Yes.

21    Q.    What, if anything, do you know from your expert knowledge

22    of economics about her likelihood of getting a promotion or how

23    much pay increase she would get as a result of that?

24    A.    I can't opine on the likelihood of whether she would have

25    got a promotion.  I haven't done a study to it, but a 5 percent

1    increase based on my experience at least at UVM, when one got a

2    promotion like that, they tended to be at least 5 percent.

3    Q.   Okay.  So if it was a -- your experience is based on your

4    working on cases for a long time, and, in particular, you said,

5    Well, at UVM it would be 5 percent?

6    A.   Yes, I'm familiar with that.  As I indicated earlier, I've

7    only worked on maybe one or two other cases where we've had a

8    doctor.  Actually, I worked on a lot more than that because I

9    worked on some personal injury cases with doctors involved.

10   But I, those people weren't necessarily at a university.

11   Q.   Okay.  And in your chart the way that 5 percent bump would

12   be reflected is, if she had stayed at Dartmouth -- you know,

13   she left Dartmouth.  When did she leave Dartmouth?

14   A.   2017, sometime in that period.

15   Q.   Okay.  So all of those projections on, for Dartmouth are

16   not her actual W-2s from Dartmouth; they're your estimates of

17   what her W-2s would be based on your assumption that she would

18   get a 2 and a half percent annual pay increase, she would

19   become a full professor in 2019 and get a 5 percent increase

20   from that; isn't that right?

21   A.   Yes.

22   Q.   Now, and your projection on the 2 and a half percent pay

23   increase in based on just your -- I think from your deposition

24   you said it was based on your looking at US Labor Department

25   statistics; is that right?

1    A.    Yes, I looked at the average wage increases across the
2    board, yes.
3    Q.    Across the board meaning all professions, correct?
4    A.    Yes.
5    Q.    All regions, correct?
6    A.    Yes.
7    Q.    Throughout the United States --
8    A.    Yes.
9    Q.    -- correct?  And that's what you projected that to be the
10   basis for, correct?
11   A.    I did use -- that 2 and a half percent was based on a
12   review of that.
13   Q.    Okay.  Now you produced in your, as part of the deposition
14   process a lot of working papers that you used to base your
15   opinion on; is that correct?
16   A.    I assume so.  I don't remember.
17   Q.    The tools that you relied on, correct?
18   A.    I don't remember what you've, what was given to you.
19   Q.    Okay.  Well, maybe this will refresh your memory.  We
20   understood from these to be materials that you relied on in
21   reaching your opinions.  And so do you recall some analysis of
22   Dr. Porter's pension situation at Dartmouth?
23   A.    Yes.
24   Q.    And a pension table?
25   A.    Yes.

1   Q.   And something called a Dartmouth-Hitchcock Clinic

2   Calculation Summary of Pension Plan of Employees?

3   A.   I don't remember the title, but I did look at stuff from

4   Dartmouth on pensions.

5   Q.   Okay.  Look at, please, in Tab 3 of your book.  Go to the,

6   go to the last three pages from the back, please.  Okay.  Do

7   you remember seeing this document?

8   A.   I believe I saw this document.  I mean, it doesn't jump

9   out to me that I saw it, but I do believe I have seen something

10  like this, yes.

11  Q.   Okay.  Looking on the left, there's a column that says

12  "Year" and has the years 2008 to 2017 and then something says,

13  the next column says total pensionable pay and something

14  qualified pensionable pay.  Do you see these columns?

15  A.   Yes.

16  Q.   Okay.  Total pensionable pay, doesn't that look like her

17  full earnings from Dartmouth-Hitchcock?

18  A.   Her pension pay or the total pension pay?

19  Q.   Total pensionable pay, doesn't that look like her W-2

20  income from Dartmouth-Hitchock?

21  A.   I don't have her W-2s in front of me, but I wouldn't

22  disagree.  It looks like that would be -- it looks like it's

23  consistent with what my recollection is.

24  Q.   Okay.  And, if you note, the numbers there do not go

25  steadily up by 2.5 or 3 percent.  Do you see that?

1    A.    Yes.

2    Q.    In fact, they go up and down, right?

3    A.    Yes.

4    Q.    So this shows her actual experience at Dartmouth-Hitchcock

5    with a salary that does not go up 2 or 3 percent every year,

6    right?

7    A.    It doesn't go up by two and a half percent every year, no.

8    Q.    And it goes up and down, correct?

9    A.    Yes, it goes down a couple or two years, three years.

10   Q.    But your projections in Exhibit 2 on the chart don't go up

11   and down; isn't that right?

12   A.    No, they don't, no.

13   Q.    They go up 3 percent every year; isn't that correct?

14   A.    Yeah, whatever the increase is, yes.

15   Q.    Plus the amount for her professorship, correct?

16   A.    Well, that went up at one time.

17   Q.    Well --

18   A.    One time only.

19   Q.    You made an upward adjustment based on an assumption that

20   she would become a professor; isn't that correct?

21   A.    Yes.

22   Q.    Okay.  Now, and your testimony is that was worthy of a 5

23   percent increase in her salary from Dartmouth?

24   A.    When she got the promotion, she would get a 5 percent

25   increase.

1    Q.    And that is repeated throughout that table on the left
2    column at Exhibit 2, right?
3    A.    Well, it's, it's baked into the numbers in the future, but
4    every year it's not a 5 percent increase.
5    Q.    No, but -- yeah, exactly, that's my point.  Thank you.  It
6    gets baked in and amplified based on that each year at a higher
7    rate --
8    A.    Yes.
9    Q.    -- right?  And it's better for the plaintiff to have a
10    higher salary from her prior employer, right?
11    A.    Yes.
12    Q.    Because, if she has a higher salary and gets a lower
13    salary, she has lost more based on your calculations; isn't
14    that correct?
15    A.    Well, based on anybody's calculations.
16    Q.    Fair enough.  And so the flipside of that is, to the
17    extent her salary at University of Vermont is lower than it
18    otherwise would be, that also would answer a benefit in your
19    loss calculations; isn't that right?
20    A.    If her, because her salary is lower than it would be, my
21    projections at Dartmouth, yes, there is a loss.
22    Q.    Right.
23    A.    That's what I'm trying to measure is the loss.
24    Q.    Exactly.  And, if her salary is lower at the new place
25    than the old place, the lower it is, the greater the loss;

1    isn't that right?

2    A.    Yes.  Simple math.

3    Q.    Simple math.  Now, you don't calculate any professorial

4    increase from Dr. Porter's promotion to a full professorship at

5    UVM?

6    A.    I thought there was something in there where she got

7    promoted historically.

8    Q.    There is, there is something in your chart that shows a 5

9    percent bump from her becoming a professor at the University of

10   Vermont?

11   A.    I used what she actually earned up through -- well,

12   actually, I didn't have the stuff through 2024.

13   Q.    Oh, 2024?

14   A.    Well, I didn't have the W-2 for 20 --

15   Q.    You don't have the W-2 for 2024?

16   A.    Oh, yeah.  Yes.  I'm sorry.  2026.  I apologize.

17   Q.    Not '26.  Let's, the 2024 W-2.  I would just say that we

18   don't have the W-2 for 2024.  Do you?

19   A.    No.

20   Q.    Okay.  As an economic expert coming to court to provide

21   expert information, wouldn't it be sensible for you to have the

22   W-2 for her last earnings?

23   A.    Well, yes, but I did this report in August of '24, so how

24   could I get a W-2 for 2024 if I did it in August?

25   Q.    Well, you're testifying about her salary information for

1  then.  Could you have asked for it and gotten it when it came

2  out this year?

3  A.   I could have, yes, and I will be asking for that when this

4  moves on to trial.  I will be looking at all that information,

5  and I assume at the request of plaintiff's counsel I'll be

6  updating my analysis.

7  Q.   Had you been told that Dr. Porter became a full professor

8  at UVM in August of 2023, July of 2023?

9  A.   I believe, I believe I have been.

10  Q.   Okay.  Is that reflected on your report?

11  A.   I have her actual earnings for 2023, and I have what she,

12  what her contract was for '24.

13  Q.   You have her full professor contract for '24?

14  A.   That was what I based my projections on is the contract or

15  what she had earned under the new contract.  I had, may have

16  annualized it up.

17  Q.   Do you have an employment contract for her after she had

18  been promoted to a full professor at UVM Medical Center?

19  A.   I don't remember if I have a, if I had a contract, but I

20  did have what she actually earned after she got the promotion.

21  Then based -- I don't know how many months that was, but let's

22  assume that it was four months.  Then I would annualize it up

23  to a 12-month figure.

24  Q.   I don't see anything in your report or your assumptions

25  describing the effect of her promotion to full professor at UVM

1    Medical Center sort of analogous to the 5 percent inflator you

2    gave her when she became a full professor at

3    Dartmouth-Hitchcock.

4    A.    Well, I disagree, but if you read --

5    Q.    Where does it say that?

6    A.    Well, it does not say that in that many words because I, I

7    don't know if I had that, but what I did, what it does say in

8    Footnote 2, Footnote 4, is that I looked at what her earnings

9    were and used that as a basis to forecast forward.

10   Q.    But you don't -- I think what you just said is, I don't

11   know if I had that or not.

12   A.    I don't know if I have her contract.

13   Q.    I don't know if I had the information about her becoming a

14   full professor, yes or no, did you have that?

15   A.    I don't know.

16   Q.    Okay.  Because, if you did have that, you would have said,

17   Oh, I need to make the adjustment in my projections for UVM and

18   add 5 percent on top of her about $300,000 salary for all of my

19   projections going forward; isn't that right?

20   A.    No.  I've tried to explain to you that I took a look at

21   what she was getting for pay after that happened, and, while I

22   did not have a full calendar year of her earning at that level,

23   I did have some period of time where she was earning at that

24   level which I then annualized.

25   Q.    Okay.  You didn't have her 2023 W-2s that showed an

1    increase in salary there on enough of the time that you could

2    make an annualized projection, though, right?

3    A.    No.  If I just, if I rely just on the W-2 for 2023, no.

4    Q.    Because you just didn't know.  They didn't tell you that

5    she'd gotten this promotion, right?

6    A.    I don't know.  I don't remember.  That was a long time

7    ago.

8    Q.    If her salary was increased by 5 percent from 2023, July

9    2023 through the end through 2023 and it isn't reflected in

10   your chart because you didn't understand that, wouldn't that

11   make your numbers in here completely wrong?

12   A.    Well, I disagree that I didn't understand that.  But,

13   obviously, if you put a higher inflator in there, the numbers

14   are going to be greater.

15   Q.    Okay, great.  Which means the numbers for UVM are greater,

16   which means the loss figure between her job at Dartmouth and

17   her job at UVM is less significant; isn't that right?

18   A.    Well, only if, only if you're correcting your assumption.

19   Q.    Correct.  What if there was a limit on the funding that

20   went to physicians at Dartmouth-Hitchcock during the Covid

21   years, say 2021 to 2022?  Let's say that Dartmouth held flat on

22   the amount of money we're going to pay doctors.  Wouldn't that

23   mean that perhaps your numbers in here are inaccurate?

24   A.    If there was -- if that's the case, if they gave no

25   increases, obviously, those projections for those years that

1    are based on a 2.5 to 3 percent increase would not be right.

2    Q.    Now, let's talk a little bit about fringe benefits.  You

3    have a calculation in Column 2 of the fringe benefits at

4    Dartmouth-Hitchcock and Column 5 of the fringe benefits at

5    University of Vermont; is that correct?

6    A.    Yes.

7    Q.    And I think your analysis simplified the fringe benefits

8    to say, well, I'm only going to look at contributions to

9    pension and health care plans; is that correct?

10   A.    Yes.

11   Q.    Okay.  Now, directing your attention again to that

12   document that was in Tab 3, the table that is the pension plan

13   of employees of Dartmouth-Hitchcock clinical calculation

14   summary --

15   A.    Where is that located?

16   Q.    I'm sorry.  Yeah.  I have a harder time than you even.

17   It's in Tab 3 about three pages from the back.

18   A.    Yes.

19   Q.    Do you see that document?

20   A.    I see it, yes.

21   Q.    And aren't I correct that, in developing your table for

22   the August 2024 report, you calculated the costs of her

23   pensions at 12 percent of total pensionable pay; is that

24   correct?

25   A.    Yes.

1    Q.   Okay.  Now, doesn't it make more sense to do 12 percent of
2    qualified pensionable pay?
3    A.   I'm trying to remember.  I'd have to go back and look at
4    the documents.  There was an explanation in one of the
5    documents about how pensions were calculated, and --
6    Q.   It seems --
7    A.   May I finish?
8    Q.   Oh, sure.  I thought you were done.  Sorry.
9    A.   There was an explanation that, for people going over a
10   certain amount, there was a bump.
11   Q.   Okay.  So you seem to recall an explanation that you can't
12   describe in detail that conveniently answers my question; is
13   that what you're saying?
14   A.   I don't know if it conveniently answers your question.
15   All I'm saying is that there is a document in there that says
16   this is what they will contribute on a pension plan and, if
17   your income is above a certain level, which hers were, there
18   would be an additional contribution made on behalf.
19   Q.   Oh, okay.
20   A.   And I don't have that document in front of me to tell you
21   exactly what that percentage is, but I believe that is where I
22   derived the 12 percent from.
23   Q.   Okay.  I would be interested in seeing that.  So, if you
24   identify that, send that to me, please.  Qualified pensionable
25   pay, doesn't this look like what I think, and I'm not that

1    knowledgeable about pensions, but, you know, it seems like
2    that's an amount of pay that you're going to qualify for your
3    pension purposes and then above that they don't kick in any
4    more.  Is that consistent with that?
5    A.   That's your assumption, not mine.  I don't know.  I'm
6    telling you what I believe is another document that goes
7    through and talks about what percentage Dartmouth will
8    contribute of an employee's salary and that there are two,
9    there is a bump-up if you're over a certain percentage.
10   Q.   If the theory that I'm positing is correct that qualified
11   pensionable pay is the amount of salary you can earn up to the
12   point at which the institution will kick in in its maximum
13   matching contribution, if I'm correct about that and the amount
14   that is on your fringe benefit for pensions is 12 percent of
15   qualified pensionable pay as opposed to 12 percent of total
16   pensionable pay, doesn't your report overstate the value of the
17   Dartmouth fringe benefits?
18   A.   I don't know.  I can't tell from that, your hypothetical
19   here.  I mean, obviously, if you multiply 12 percent times the
20   qualified pension play, pay, it's going to be a smaller number
21   than the total pension pay.  But I'm not saying -- I'm not
22   agreeing with you.  That's what I did, and that's how I derived
23   the 12 percent.
24   Q.   Are you familiar with a program at UVM to provide tuition
25   remission to UVM employees?