```
 1

 2                  UNITED STATES DISTRICT COURT
                            FOR THE
 3                     DISTRICT OF VERMONT

 4   MISTY BLANCHETTE PORTER, MD,    )
                                     )
 5             Plaintiff,            )
          v.                         )    2:17-CV-194
 6                                   )
     DARTMOUTH-HITCHCOCK MEDICAL     )
 7   CENTER, DARTMOUTH-HITCHCOCK     )
     CLINIC, MARY HITCHCOCK MEMORIAL )
 8   HOSPITAL, and                   )
     DARTMOUTH-HITCHCOCK HEALTH,     )
 9                                   )
               Defendants.           )
10                                   )

11   _____

12             BEFORE THE HONORABLE KEVIN DOYLE
                UNITED STATES DISTRICT JUDGE
13   _____

14       TRIAL TESTIMONY OF DR. MISTY BLANCHETTE PORTER

15

16   APPEARANCES:

17   For the Plaintiff:

18   ERIC JONES
     GEOFFREY J. VITT
19   SARAH H. NUNAN

20

21   For the Defendants:

22   DONALD W. SCHROEDER
     MORGAN McDONALD
23   TRISTRAM J. COFFIN

24

25   Jan-Marie Glaze, CCR, RPR, CRR      Certified Court Reporter
```

1                              **PROCEEDINGS INDEX**

2     **Proceeding:**                                              **Page**

3     March 25, 2025                                                  3
      March 26, 2025                                                 62
4     March 27, 2025                                                257

5                              **EXAMINATION INDEX**

6     **Witness:**                                                 **Page**

7     **MISTY BLANCHETTE PORTER:**
            Direct Examination By Mr. Vitt                          3
8           Cross Examination By Mr. Schroeder                     114
            Redirect Examination By Mr. Vitt                       319
9           Recross Examination By Mr. Schroeder                   329

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Tuesday, March 25, 2025

 2                     Afternoon Session

 3                          *  *  *

 4                    (Jury present.)

 5               MISTY BLANCHETTE PORTER, witness herein,

 6               being first duly sworn on oath, was

 7               examined and testified as follows:

 8               THE WITNESS:  I do.

 9               THE CLERK:  Thank you.  You may have a seat.

10       If you could state and spell your name, please.

11               THE WITNESS:  My name is Misty, M-i-s-t-y,

12       Blanchette, B-l-a-n-c-h-e-t-t-e, Porter, P-o-r-t-e-r.

13                     DIRECT EXAMINATION

14  BY MR. VITT:

15  Q    Good afternoon.

16  A    Good afternoon.

17  Q    Would you state your name, please?

18  A    Misty Blanchette Porter.

19  Q    What's your profession?

20  A    I'm an attending physician at the University of

21       Vermont.

22  Q    Medical Center?

23  A    Medical Center.

24  Q    Where is your home?

25  A    Norwich, Vermont.
```

```
1   Q    How long has that been your home?

2   A    30 years.

3   Q    What's your immediate family?

4   A    My husband is Tom Porter, and I have three children --

5        a daughter, and two sons.

6   Q    Are they living at home?

7   A    One is in the apartment over my garage, and one lives

8        about a mile from us, and my daughter lives in Maine.

9   Q    How long have you worked at University of Vermont

10       Medical Center?

11  A    I started per diem initially for about a year, year and

12       a half, and then -- approximately seven years.

13  Q    And what's your current position?

14  A    Attending physician at the University of Vermont

15       Medical Center.  I am the vice chair for education and

16       for faculty in the department of OB-GYN, and I am a

17       complex gynecologic surgeon.

18  Q    Tell me, what does it involve, being the vice chair?

19  A    For vice chair, I oversee the education of medical

20       students with the clerkship directors for the third-

21       and fourth-year medical students that are coming

22       through to experience OB-GYN, and I work with their

23       directors.

24            I oversee the residency at OB-GYN and work with

25       the residency directors; there are two of them.  And I
```

```
 1            also oversee the fellowship directors, and then I'm
 2            also -- I have a role in mentorship of junior faculty
 3            and representing the faculty at the University of
 4            Vermont Medical Center, in the department, when there
 5            are challenges or there are issues with the faculty
 6            that they would like to bring forward to administration
 7            for resolution.
 8     Q      And you're often the person that's kind of the spear
 9            point or the head point for that?
10     A      Yes.  I am the defined person.
11     Q      Okay.  Do you enjoy working with the residents and the
12            students?
13     A      Yeah.  I very much love it.  It's the way that we give
14            the gift of our knowledge back to those that are going
15            to care for our daughters, for our mothers, for
16            ourselves.  And so, yes, I very much like -- these many
17            years of experience, I'm able to pass on knowledge and
18            to support them through their growth.
19     Q      Let me go back to when you were growing up and thought
20            about what you wanted to be.  When did you decide you
21            wanted to be a doctor?
22     A      I decided in high school I wanted to be a doctor.
23     Q      And what do you think led you to that?
24     A      My mother's a doctor.  She had three kids really young,
25            and then went back on -- back into education and got
```

```
 1        her -- first her undergraduate degree and then an MD,

 2        and then she did her internal medicine residency at

 3        Dartmouth.  And so I got to see first-hand what she was

 4        doing for work and how she really loved it.  She went

 5        on to do a fellowship at Harvard in geriatric medicine,

 6        and then -- we had lots of conversations about how

 7        fulfilling it is to care for patients.

 8             So I decided in high school.  And she and I have

 9        this joke that I see them in, and she sees them out.

10        It's meaning that, and it's giving the gift of children

11        to people in their lives.

12             And so I read about Louise Brown, who was the

13        first IVF baby born in the world, and I thought in high

14        school, This is -- I have a natural interest in

15        science.  I said, This is really wonderful.  We can

16        take science and technology and then help individuals

17        have a baby.  And so I knew pretty early on that I

18        would go into reproductive medicine and infertility.

19   Q    Is fertility preservation still part of what you do in

20        your job?

21   A    Yes, and in a different way now.

22   Q    Okay.  How about now?

23   A    So I work very closely as a surgeon to help individuals

24        maintain their fertility, especially with GYN oncology.

25        I scrub with a GYN oncologist for young individuals who
```

```
 1            have cancer.  It may be ovarian cancer or uterine
 2            cancer, and we do fertility-sparing surgeries
 3            side-by-side.  My office mate is a GYN oncologist.
 4                 And I also counsel individuals about
 5            fertility-sparing procedures, and also help
 6            individuals -- I do a lot of ultrasound work, and so
 7            some of the things we do is to do screening.  We follow
 8            women who have had, say, ovarian cancer in their 20s or
 9            their 30s, and they have one ovary out, so we're
10            screening them to look for recurrence.  So I counsel
11            those individuals.
12       Q    Let me go back to some of the starting of your
13            education.  Where did you go to medical school?
14       A    I went to Dartmouth-Hitchcock Medical School, the
15            Geisel School of Medicine.
16       Q    All right.  And how about a residency and fellowship
17            following that?
18       A    I did both my OB-GYN residency and my fellowship in
19            reproductive medicine and infertility at the University
20            of Vermont.
21       Q    Okay.  And what was the residency and fellowship in?
22       A    The residency was in OB-GYN.
23       Q    Right.
24       A    And the fellowship was in reproductive endocrinology
25            and infertility.
```

```
 1  Q   Okay.  So the term "reproductive endocrinology" comes
 2      up quite a bit in this case.  Can you give a brief
 3      description of what that entails?
 4  A   Yes.  So reproductive endocrinology and infertility is
 5      basically anything to do with hormones that affects the
 6      reproductive tract.  So in my fellowship, we took care
 7      of individuals who were girls who had pubertal
 8      disorders or birth defects of the reproductive tract
 9      all the way through the reproductive lifespan, and then
10      did complex menopause consults.
11          And reproductive endocrinology is also surgery.
12      It's also, besides the hormonal aspects of it, and then
13      while a really important part of what we do and very
14      cherished part of what I do is IVF, it's really only a
15      sliver of what REI actually does.
16  Q   Would it be -- I've heard you use this before, would
17      you say that IVF is no more than 10 to 15 percent of
18      reproductive endocrinology?
19  A   Yes, it's an important part of it.
20              MR. SCHROEDER:  Objection, Your Honor.
21              THE COURT:  Hold on.
22              MR. SCHROEDER:  Overly -- there's no
23      testimony on it.
24              THE COURT:  It's background to the
25      discipline.
```

```
 1              MR. VITT:  Thank you.

 2              THE WITNESS:  So, yes, IVF is an important

 3         part, and a cherished part, of what we do, but it's

 4         really only a sliver of what a global REI service is.

 5   Q    (By Mr. Vitt) When you were doing the residency and the

 6         fellowship, did you have a chance to develop your

 7         surgical skills?

 8   A    Yes.  I -- all through residency, I knew that I had a

 9         marked interest in surgery, and so my mentor all

10         through surgery -- all through residency was John

11         Brumsted, and he became -- he was my fellowship

12         director.  I stayed to work with John in the OR because

13         he's an amazingly talented -- or was an amazingly

14         talented surgeon, and he brought new technologies to

15         the University of Vermont and a really excellent set of

16         really complex laparoscopic, open and hysteroscopic,

17         skills, and so I had -- when I was considering

18         fellowship, I had him promise me that he would stay all

19         through fellowship so that I could get that training.

20         And there was two ten-hour OR days in my fellowship

21         from anything from -- and we were the benign

22         gynecologists, we were the benign GYN surgeons.

23   Q    When you say "benign" -- I'm sorry to interrupt you --

24         what does that mean?

25   A    So when we consider where patients might get shuttled,
```

```
 1          there's GYN oncology, and they do the cancer surgery,
 2          ovarian cancer, uterine cancers; whereas for benign
 3          surgery, that might be individuals with abnormal
 4          uterine bleeding, fibroids, endometrioses, infertility
 5          surgery, ovarian cysts, adnexal masses, those are the
 6          things, anything that in any age group -- and I operate
 7          on kids as well as post-menopausal women -- that have a
 8          non-cancerous GYN problem.
 9    Q     Okay.  You mentioned laparoscopic surgery?
10    A     Yes.
11    Q     Can you provide a quick set of -- a snapshot of what
12          that is?
13    A     Yeah.  So laparoscopic surgery is a minimally invasive
14          approach, so we can do quite complex surgery with
15          little, tiny incisions, so a little tiny incision in
16          the belly button, and two or three other little
17          incisions in the abdomen; and, really, oftentimes, we
18          can do fairly extensive surgery with that.
19    Q     In order to become adept at laparoscopic surgery, what
20          amount of effort is involved?
21    A     There's a fair amount of effort and practice, both as
22          Dr. MacCallum was talking about in kind of the staged,
23          progressive, advancing your surgical skills with
24          something simpler, and then you move forward.  We also
25          have an ability in a non-human model to operate and
```

```
 1        practice.
 2              And so there's -- in residency, the residents have
 3        to take an extra test at the end to look at whether or
 4        not, for example, in a plastic model can they tie a
 5        knot with laparoscopic instruments kind of outside off
 6        of video screen?  So we do lots of surgery with a
 7        patient that's mentored and progressive, but we also do
 8        a lot of training outside to be able to hone our skills
 9        over time.
10   Q    And do you do robotic surgery as well?
11   A    Yes, I'm a robotic surgeon for benign GYN surgery.
12   Q    And when you use the term "robotic surgery," what does
13        that entail?
14   A    So what I like to tell patients is that it's just a
15        fancy laparoscopy, and then I'll bring up pictures to
16        show them what the difference is, but there's some
17        really complicated surgeries that we can do with the
18        use of the robot by taking advantages of the robot.
19        And so the robot, on a regular laparoscope, it's just
20        one camera; and a robotics procedure, it's two cameras
21        side by side.  And so we get this 3D view of what we're
22        doing, better depth perception, and we get much better
23        detail of the anatomy, and so there's less blood loss
24        associated with it.  And we can also dissect.  And then
25        I get my wrist back when I'm operating with a robot.
```

1          So, for example, if I'm taking a fibroid out of

2     the uterus, which is a benign muscle tumor, we can

3     remove it, and then we have instruments that are just

4     like the open instruments where we can use our wrist.

5     It's called what's called wristed, so I can do a lot of

6     suturing with that, and a lot more fine dissection

7     given those characteristics.  So that's what robotic

8     surgery is.

9  Q  Do you still perform those surgeries?

10 A  Yes, absolutely.

11 Q  Okay.  And is it -- is it necessary for you to stay up

12    to date on, you know, the changes in the technology and

13    any other changes that affect how that surgery is done?

14 A  Always.  The technology rapidly changes, instruments

15    change; and so, yes, we are regularly keeping up to

16    date.

17 Q  How did you end up at Dartmouth-Hitchcock?

18 A  So when I was a third-year resident here, my husband is

19    part of a multi-generation building firm.  He's a

20    contractor/builder, and he was in business with his

21    father, which is why we're in Norwich, Vermont.  And

22    Barry Smith was the chairman of the OB-GYN at Dartmouth

23    at the time, and I had trained there, and Barry called

24    me out of the blue one day and just said we have a job,

25    and we'll keep it for you for a year.  We just want to

```
 1        know what your plans are.
 2             And so I talked to my husband, and I approached
 3        John and I said I would like to stay for fellowship
 4        here, you know, given that, you know, my husband is a
 5        seventh-generation Vermonter and very deeply rooted
 6        here.  He's in business with his father.  I can go off
 7        and do fellowship elsewhere, but I would really like to
 8        stay, and I wouldn't have stayed if it wasn't a really
 9        good, quality education, and it was.
10   Q    Okay.
11   A    And so I then called Barry back and said I'm thinking
12        about doing this fellowship, but I would like to know
13        that I have a job when I'm done.  And so Barry said let
14        me talk to everyone, and he called me back.  He said
15        he'd spoken with Dr. Manganiello who had established
16        the REI program at Dartmouth, and I had worked with
17        Paul when I was a medical student, and then he had gone
18        to the head of the clinic to make certain I would have
19        a job after the fellowship.  And, at the time, that was
20        Dr. Steve Plume, and Steve said, Yep, we'll take her,
21        absolutely.
22   Q    When did you start the job?
23   A    I started in 1996.
24   Q    There's been a series of comments in the trial about
25        your disability, and I want to turn to that for a few
```

```
 1        minutes.

 2   A    Mm-hm.

 3   Q    Tell me about the first symptoms that you experienced

 4        and when that happened.

 5   A    So in November, early November, mid November of 2015, I

 6        was the most fit ever in my life.  I was running half

 7        marathons and swimming on a regular basis, and in the

 8        pool I noticed that I had blurred vision, a headache

 9        and saw my primary who told me she thought I had maybe

10        a complex migraine or meningitis.

11             Then by Thanksgiving, I couldn't even get out of

12        bed.  I couldn't sit up without excruciating pain in my

13        head and neck and the sensation that things were

14        dragging.  In fact, I had said to the kids at that

15        point, Well, either you guys can cook Thanksgiving and

16        I'll lay on the couch and point to what to do, or we'll

17        have to wait a few days.

18             And I had the beginnings of ringing in my ears and

19        I had some pressure in my ears and some real blurred

20        vision, but my primary said, hmm, this should go --

21        this should get better on its own, and so -- with rest.

22        And with this particular illness, laying down flat and

23        hydrating, really pushing fluids, the symptoms get

24        better.  It's very, what we call, dependent from laying

25        down to standing up.
```

```
1    Q    So ultimately what was the diagnosis or the cause of
2         this problem?
3    A    Ultimately, the diagnosis was a cerebral spinal fluid
4         leak.  The -- there's a layer of fluid around the brain
5         and the spinal column.  There's typically a connective
6         tissue layer around that that holds that fluid all into
7         place, and I had a tear in that.
8    Q    Sometimes it's called a dural spinal leak?
9    A    Yes.  It's called a dural leak, mm-hm.
10   Q    Did these symptoms impact your ability to work?
11   A    Absolutely, yeah.
12   Q    You made a trip to Dallas, I think in November?
13   A    Right after Thanksgiving, for 20-plus years, I think,
14        almost 25 years, I was an oral board examiner for the
15        American College of OB-GYN, and there are weeks where
16        the board examiners fly in to the testing center in
17        Dallas.  And so my travel to Dallas at that time, I
18        still know better, and my primary had reassured me
19        that, you know, you probably just have viral meningitis
20        and you can go off.
21   Q    Did anybody from Dartmouth accompany you?
22   A    On that trip, Dr. Leslie DeMars was also there, yes.
23        And she had nominated me to be an oral board examiner.
24   Q    Did the two of you share a room?
25   A    We had shared a room.
```

Porter - Direct by Mr. Vitt

```
 1   Q   At some point, did you go on short-term disability?
 2   A   Yes, so when I was in Dallas, I started getting double
 3       vision, and just towards the end of that week, and I
 4       had worsening headaches.  I lost all depth perception.
 5       I noticed when I was walking down the sidewalk, I
 6       couldn't tell where the end of the sidewalk was and
 7       where it ended.  And Leslie actually got on a plane and
 8       flew back on her own for an emergency meeting at
 9       Hitchcock, and I was in Dallas by myself.
10           And I called my primary and she said, Well, you
11       can go to the ED in Dallas or come home, and so I said,
12       Well, I'm not going to the ED in Dallas by myself with
13       nobody else here.  I was afraid I had a brain tumor is
14       what I was worried I had.
15           So when I got back, I called my primary, and she
16       saw me.  That was about mid December, and she ordered
17       an emergent MRI.  So I had the MRI that evening.
18   Q   And then from the short-term disability, that
19       eventually became a long-term disability?
20   A   Yeah.  So six months I was on short-term disability
21       receiving care at Dartmouth-Hitchcock, and then I was
22       not better, and it converted to long-term disability.
23   Q   So you say you started the care when you were at
24       Dartmouth-Hitchcock, right?
25   A   Correct.
```

```
 1    Q    And then did it transition to some other place?
 2    A    Yeah.  So the care I received at Dartmouth was not
 3         successful, and I had a new neurologist after my
 4         neurologist retired.  And the new neurologist was a
 5         headache specialist from the Cleveland Clinic, and he
 6         was working part-time at Dartmouth, and I walked in to
 7         see him just as an established-care appointment because
 8         my retired neurologist told me that I was completely
 9         healed and I could return to work but that I might have
10         some persistent symptoms for a while.
11    Q    Did that turn out to be right?
12    A    No.  It was absolutely not right.
13    Q    And did you get referred to the Mayo Clinic?
14    A    Yeah.  Dr. Tepper saw me, and within three minutes of
15         walking into his office, he said to me, I've read your
16         chart; I know what's wrong with you.  This is
17         100 percent curable.  I can tell you're leaking, that
18         you're still leaking.  If you were my wife, you would
19         have been on a plane six months ago.  We are getting
20         you on a plane, and I literally walked a hundred yards
21         down the hallway, and I had a phone call from the Mayo
22         Clinic, and I went to the Mayo in Rochester.  And to be
23         clear, I had been asking to go to the Mayo Clinic for
24         six months.
25    Q    So when you got to the Mayo Clinic, you ended up with a
```

1       major surgery, correct?

2   A   I did.

3   Q   And how long was the rehab on that, that first surgery?

4   A   I was on strict bed rest in the Mayo Clinic for 36

5       hours.  I couldn't even sit up.  Then my husband and I

6       stayed for another four or five days in a hotel room

7       until I could get well enough.

8           I had a spinal surgery where they had removed a

9       little piece of bone from the back of my spine and had

10      patched the dura, which was -- it was a tear down in my

11      lower back -- and then I was on modified bed rest for

12      six weeks at home.  I could get up to go to the

13      bathroom and to eat, but they wanted me to be hydrating

14      and relatively -- relatively still until the bone

15      healed well and correctly.

16  Q   So when you got back home and was starting to get

17      better, when did you begin to return to work from the

18      long-term disability?

19  A   I had a graded plan for my providers at

20      Dartmouth-Hitchcock, so I began to return to work

21      several weeks later as I was allowed to return.  And,

22      you know, when -- I was trying to go back.  I really

23      wanted to go back to work, and one of the biggest

24      reasons was that I had patients who had delayed their

25      attempts at pregnancy to wait for me to come back, and

```
 1            it was the balance of I know I need to get well, and I
 2            know I can do this, but these people are potentially
 3            moving out of the area, and they delayed their life for
 4            me to come back.  And so it was -- I know it's odd to
 5            say come back seven hours a week, but it was for
 6            specific reasons to come back in that time frame.
 7       Q    All right.  So by the time you came back and were
 8            working this reduced schedule, did you still have some
 9            symptoms?
10       A    Yeah.  I still had -- the first surgery I had cured
11            about 90 percent of my symptoms.  And because I had
12            been leaking for so long, the neurosurgeon that I
13            talked to on the phone, his team said to me, It may
14            take a while for things to re-equilibrate.  You know,
15            meaning, I had some swelling in the tissue in the
16            covering in all of that.  My brain was absolutely fine.
17            There was never any question about that.  It was the
18            other related symptoms.
19       Q    Were you worried that you might not be able to return
20            to do the surgery that you had been doing for so long?
21       A    No.  Because the team at the Mayo Clinic were experts
22            in the field, and everyone there told me, This is
23            100 percent fixable.  You will be back to yourself; we
24            just have to get it right.  Sometimes it's more than
25            one surgery.  Sometimes we have to do another blood
```

```
 1        patch, but you will be 100 percent yourself.  In fact,
 2        I was one of nine patients they had seen that week with
 3        this.  It was like the common cold to them.
 4    Q   You mentioned a blood patch.  What is that?  Can you
 5        describe it?
 6    A   Yeah.  So a blood patch, is where they prep your arm
 7        and they take a sample of blood from your arm, and then
 8        they, under imaging, inject that at the site of the
 9        leak using your own blood and the parts of the blood
10        that help you coagulate to help you clot over it to
11        help form a patch or a clot or, you know, a little
12        healing area in that area.
13    Q   When you came back and were considering going into the
14        operating room, was there a need or a desire to have a
15        proctor to be with you?
16    A   Absolutely.  So I wanted it, right?  I had been out for
17        a really long time, and they had told me, "You will be
18        absolutely fine."  But it's a normal thing for someone
19        to have been out that long to kind of re-proctor them
20        back in.
21    Q   So when I use the term "proctor" in this context what
22        does it mean?
23    A   So I would book the case.  I would see the patient in
24        the clinic, book them, and I was disclosing there would
25        be another surgeon with me there, and then you ask
```

1       another senior surgeon to come watch you, and they're

2       not necessarily scrubbed.  They're just watching how do

3       you organize things?  How do you communicate with the

4       staff?  How are you able to do the procedure?

5                   MR. VITT:  I'm going to show Dr. Porter

6       Exhibit 30, our Plaintiff's Exhibit 37.  I don't know

7       if I should do this through paper or electronically.

8                   THE COURT:  Go ahead and show the witness the

9       paper.

10   Q   (By Mr. Vitt) I'm going to show you what's been marked

11      as Exhibit 37.  Can you tell me what it is, please?

12   A   So I sent an e-mail to Dr. Maria Padin who is -- is the

13      chief medical officer at the time and also working one

14      day a week in OB-GYN.  And part of when you have your

15      proctor, part of it is finding a person who's available

16      to evaluate you who has some ability to watch you in

17      the OR.

18   Q   Right.  Did she watch you?

19   A   Yes.  So I had to keep -- Dr. DeMars had given me the

20      goal of do three minor procedures and do three major

21      procedures proctored, which is pretty standard when

22      someone is coming in.  And so I wrote her a note

23      saying, "Maria, thank you for proctoring and for your

24      kind encouragement."

25   Q   And -- go ahead.  I'm sorry.

| | | |
|---|---|---|
| 1 | A | "I dictated the operative report.  Please let me know |
| 2 | | if the report needs signature." |
| 3 | | THE COURT:  Mr. Vitt, this isn't admitted |
| 4 | | yet? |
| 5 | | MR. VITT:  No, I'm going to move its |
| 6 | | admission. |
| 7 | | THE COURT:  But the witness is reading from |
| 8 | | it. |
| 9 | | MR. VITT:  Right.  I would like to move the |
| 10 | | admission of Exhibit 37. |
| 11 | | THE COURT:  Any objection? |
| 12 | | MR. SCHROEDER:  No objection, Your Honor. |
| 13 | | THE COURT:  Okay.  It's admitted. |
| 14 | | THE WITNESS:  What it says is, "Misty, you |
| 15 | | are a talented surgeon.  Thanks for inviting me to your |
| 16 | | case." |
| 17 | Q | (By Mr. Vitt) Okay.  Thank you. |
| 18 | | I want to turn now to how you dealt, and what you |
| 19 | | did, with Dr. Albert Hsu.  When did Dr. Hsu join the |
| 20 | | practice? |
| 21 | A | Roughly 2014, in the summer, fall. |
| 22 | Q | And what was his position when he arrived? |
| 23 | A | He was an attending physician. |
| 24 | Q | Had you interviewed him before he came to work? |
| 25 | A | No. |

```
1   Q   Did you assess his skills as he entered the practice?

2   A   Yes.

3   Q   And what did you discover?

4   A   I had discovered that in speaking with him before he

5       came that he had not completed the appropriate number

6       of procedures in order to graduate from fellowship.

7       And, from my perspective, that wasn't necessarily his

8       fault.  The Jones Institute where he trained is a very

9       well-known IVF program, and it was the first in the

10      United States to have an IVF baby, but the year that

11      Dr. Hsu graduated, that program was put on probation

12      for poor fellow experience, and when I spoke with him,

13      it was very clear that he had not met even minimum

14      numbers in order to be able to sit as an attending.

15  Q   So when he showed up at work, and you had a chance to

16      talk to him and evaluate his level of experience and

17      expertise, what did you decide to do?

18  A   It's -- sometimes individuals just need a little bit

19      more exposure and a little bit more encouragement, and

20      that's what we do as faculty, right?  We take someone

21      to where they are and then bring them up from there.

22          And so I decided that, to be fair to Albert, I

23      would sit with him and do additional procedures.  And I

24      offered myself to do -- to take call with him 24/7 for

25      the next six months and to sit and teach him IVF
```

```
 1          procedures and embryo transfer procedures.  And when he
 2          came in, he had done half of 20 egg harvests, which is
 3          less than half of what he should have done, and he had
 4          done zero embryo transfers.  He had only seen five
 5          trial or mock transfers.  And so I tried to see if we
 6          could give him the experience needed to be able to act
 7          as an attending physician.
 8   Q      So over six months, did you take call with him nights,
 9          weekends, holidays?  If he was on call, were you on
10          call?
11   A      24/7 for six months.
12   Q      Had you been asked by anyone in the administration to
13          do this?
14   A      No.
15   Q      Did you let the chair at least know that you were going
16          to do this; you were going to take call so that in an
17          effort to train him?
18   A      Yes.  So I had spoken to him October before he came
19          that next summer, and because he was going to be seeing
20          patients with me in clinic, he was going to be doing
21          procedures with me in the IVF suite and procedures in
22          the OR, we could not book him an independent schedule,
23          and so what I arranged with Dr. DeMars and with Heather
24          Gunnell is that he would be with me largely and then we
25          would progressively increase his schedule and increase
```

```
 1        his responsibilities.

 2   Q    He was an attending physician when he came?

 3   A    He was an attending physician.

 4   Q    Is it unusual for a newly hired attending physician to

 5        have somebody on the staff basically at their side for

 6        six months of taking call?

 7   A    It's highly unusual.  It's extraordinarily rare.

 8   Q    What did you find out about his skill level?  Was he

 9        trainable?

10   A    From an IVF procedure standpoint, he could actually do

11        a reasonable egg harvest.  I didn't have any concern

12        about that.  I did a number of ultrasound-guided trial

13        or mock transfers on our IVF patient population with

14        him, and then we did embryo transfers with me standing

15        behind him.  And when I was behind him, he had a

16        reasonable pregnancy rate.

17            I teach IVF procedures nationally at ultrasound

18        conferences.  I teach the technique of embryo transfer,

19        and so I have a teaching deck of slides.  I got those

20        out, and we went through those, and the issue became

21        when he needed to be independent.

22            I felt that he was fine for oocyte retrieval.  We,

23        as part of our quality assurance for the IVF clinic,

24        we -- every quarter followed pregnancy rates for

25        individuals both with frozen embryo transfers --
```

```
 1         embryos that had been frozen previously, and what we
 2         call fresh, or embryos that had never been frozen.  So
 3         every provider had their statistics done quarterly, and
 4         Albert's very quickly dropped off and were less than a
 5         third of the other attendings.
 6    Q    So when he was on his own, right, without you looking
 7         over his shoulder, did he perform up to acceptable
 8         standards?
 9    A    For an egg retrieval, yes, but for the clinic, the OR,
10         and for embryo transfers, he wasn't able to make that
11         transition.
12    Q    How about his method of practice?  Was he organized?
13    A    He was extremely unorganized.
14    Q    How about his charts?  Were they acceptable?
15    A    No.  He was regularly on the list from our
16         administration for individuals who were at risk for
17         being suspended, which caused a huge amount of problems
18         in the office because he had office -- I know, a full
19         office schedule, and he also had OR cases and IVF
20         responsibilities.  And so very regularly he was down to
21         the wire of coming off the suspension list.
22    Q    In terms of, kind of, an approach to medicine and the
23         safety of patients, is it important that charts be kept
24         current?
25    A    Absolutely, for a couple of reasons.  One is, we depend
```

1          on those notes when you come in for a follow-up visit

2          to know what your health information is, especially for

3          a procedure.  So it's a patient safety issue if those

4          notes aren't available.  And oftentimes I was finding

5          myself in ultrasound for a procedure without a note.

6          Also, that's the way we communicate with referring care

7          providers or we get someone ready to the OR so we have

8          a good review of your personal health history.

9               But we did what we could to help him.  So he got

10         an extra hour at the end of every day that none of the

11         other attendings had for documentation.  We had someone

12         from IT come up and help him to learn to be more

13         efficient with our computerized medical record.  In

14         fact, he had what's called at-the-elbow help for that,

15         which is someone with him in clinic.  And then also

16         we -- I gave him my templates from the computerized

17         medical record for him to then alter or change for his

18         own habits so that we can try and facilitate the

19         development of these skills.

20    Q    Were there patient complaints about Dr. Hsu during the

21         first six months of his practice?

22    A    Absolutely, yes.

23    Q    And what were the nature of those complaints, in

24         general?

25    A    The most predominant patient complaint was that his

1    embryo transfers were painful.  And when we do an

2    embryo transfer, the chance for pregnancy is dependent

3    upon how atraumatic you place that embryo into the

4    sweet spot of the uterus.  So meaning, everything needs

5    to be quiet.  We put a speculum in atraumatically.  We

6    don't manipulate the cervix.  We're careful under

7    ultrasound guidance, because there's really good data

8    that the more the uterus contracts, the lower the

9    pregnancy rate is, and so patients were complaining

10   about both not achieving pregnancy and also the amount

11   of pain they were having at the time of the embryo

12   transfer.

13  Q    If the embryo transfer is properly done, should it be

14       painful?

15  A    No.  In fact, just the opposite.

16  Q    So you've got these patient complaints, you've got

17       somebody who doesn't get his notes in on time.  What

18       did you do?

19  A    So I met with him and Dr. DeMars, because I was the

20       acting division director at the time, and we came up

21       with strategies to help him become more successful, and

22       I had been asked to fill out evaluations for him, and

23       Dr. DeMars also was sending in some kind of remediation

24       step-wise plans for him.

25  Q    Did the additional training help?

```
1    A    No.

2    Q    Did you conclude that he was untrainable?

3    A    Yes, for some things.  Yes.

4    Q    And then you got your illness and went out on

5         disability, right?

6    A    Yes.

7    Q    And he was left on his own?

8    A    Yes.

9    Q    Did that go well?

10   A    It did not go well.

11   Q    How do you know that?

12   A    I had multiple reports from multiple individuals at the

13        hospital.  There was nothing I could do.  I was sick,

14        you know.  And I know that Dr. DeMars tried to cut back

15        his schedule and make sure he was just focused on

16        certain things and decreased his responsibilities at

17        the academic medical center which included decreasing

18        his teaching responsibilities, et cetera.

19   Q    So eventually you came back to work, right?

20   A    Mm-hm.

21   Q    And were you asked to write an assessment about Dr. Hsu

22        to go to David Seifer who was then the division

23        director?

24   A    I was, by Dr. Seifer first and -- so that you know, I

25        asked Leslie if I should really write this now.  She
```

```
 1        and I, over all of these months, had been having
 2        conversations about all of the issues for Albert, so it
 3        was not new information.  It was a summary of
 4        conversations she and I had had with Albert and that
 5        she and I had had between each other, and so she wrote
 6        me back an e-mail and said please write an assessment,
 7        and I did.
 8     Q  All right.  How long did you take to think about and
 9        write the assessment?  How long did this process take?
10     A  About two or three days.  I had kept a list of some
11        concerns, because I was doing his evaluations, and I
12        had a list of patient medical record numbers to be able
13        to illustrate what the specifics were, and so I wrote
14        the evaluation.
15     Q  I'm going to hand you what's been marked as Plaintiff's
16        Exhibit 123.  It's a June 3, 2016, letter from you to
17        Dr. Seifer?
18             MR. SCHROEDER:  Your Honor, may we be heard
19        on an objection relating to authenticity and
20        completeness?
21             THE COURT:  Okay.  You may approach.
22                  (Bench conference held.)
23     Q  (By Mr. Vitt) I'm going to return -- I shouldn't say
24        return.  I'll ask you questions about the letter at a
25        later point.
```

```
 1   A    Okay.

 2   Q    But I do want to focus on Dr. Hsu's practice after the

 3        date of that letter, which is, what, June 3, 2016?

 4   A    Correct.

 5   Q    Did Dr. Hsu continue the scope of the practice that he

 6        had had before June 3, 2016?

 7   A    Yes.

 8   Q    And did complaints continue?

 9   A    Yes.

10   Q    Did the residents complain about Dr. Hsu's action in

11        the OR?

12   A    Frequently.

13   Q    Did that concern you?

14   A    Absolutely.  We have a responsibility for safe patient

15        care, and we have a responsibility to our trainees to

16        not put them in that position.

17   Q    Did you talk to Leslie DeMars?

18   A    Multiple times.

19   Q    And describe what the substance was of the

20        conversations that you had with Leslie DeMars about

21        Albert Hsu.

22   A    I told her it gave me no joy to have these

23        conversations with her; that this person had gone

24        through many years of training and wasn't able, in my

25        view, to function at the level an attending, and that
```

```
 1          our responsibility, to our core, we take an oath for
 2          the care and protection of patients; that we should
 3          talk to Albert about what brings him satisfaction in
 4          work.
 5              He's a smart person.  He has an MIT degree, and I
 6          had been told by his mentor in residency that he had a
 7          real knack for research, and that I had suggested to
 8          Leslie that helping him in a compassionate way with
 9          kindness transition into a position where he could use
10          his strengths and his skills would be the appropriate
11          thing to do, and so we had many conversations around
12          perhaps being in a primary research position, perhaps
13          looking for a job in industry, in biotech, to help, you
14          know, develop new medications, something to help him
15          transition.  And I also talked to her about it was
16          unfair to patients and unfair to the residents to allow
17          him to continue in clinical practice.
18    Q     Did she do anything to investigate the claims that you
19          made?
20    A     Initially, she looked into many of the concerns, and I
21          asked her to follow up directly with the individuals
22          who had come to me with concerns so that she could do
23          her own checking and background.
24    Q     Did you find out whether or not she had done that?
25    A     Initially, she said that she was, and when I asked her,
```

```
 1        she said she was in process, but I never had a
 2        definitive plan from her.
 3   Q    Well, did she do anything to reflect that she had
 4        investigated in the slightest?
 5   A    Not really.
 6              MR. SCHROEDER:  Objection, Your Honor.
 7              THE COURT:  Yes...?
 8              MR. SCHROEDER:  Leading.  He can certainly
 9        ask what she told her, Dr. Porter, or what she observed
10        her do, but just a blatant statement that, Well, did
11        she do that?  And I think there's a lack of foundation
12        as well.
13              THE COURT:  All right.  Sustained.
14   Q    (By Mr. Vitt) I want to turn now to the issue of what
15        the steps are when either a couple or a woman comes in
16        and is interested potentially in proceeding with IVF,
17        okay?
18   A    Or infertility care?
19   Q    Yes, or infertility care.
20              So assuming that a person actually gets to the
21        point of proceeding with IVF, how many visits are
22        usually included in this process of actually getting to
23        the point of doing the IVF?
24   A    In a new individual --
25   Q    New individual.
```

```
 1   A     -- or a couple comes in, there's an initial consult
 2         with a provider, and that could be our nurse
 3         practitioner or one of the physicians, and then we
 4         describe the recommended testing.
 5   Q     I'm going to interrupt you.  So let's start with the
 6         number.  One, two, or three?
 7   A     There's one consultation, there's a second follow-up.
 8   Q     Right.
 9   A     And then they decide what treatment they want.
10   Q     Okay.  So it's -- in this process, we can reasonably
11         expect that there will be three visits, assuming that
12         they don't stop after the first one, right?
13   A     Correct.
14   Q     Okay.  So let's talk the first visit is they come in.
15         Let's assume it's a couple.  What do you do?
16   A     We review their histories.  We had a several-page
17         questionnaire that patients would fill out before they
18         came in, so we would review that.  We would review
19         their medical history, both medical and surgical.  We
20         would also review their family histories for genetics
21         to see if there was anything that we wanted to test
22         for, and there were recommendations for offering
23         genetic screening.  We'd also recommend a consult with
24         their insurance to know what their coverage was before
25         they proceed, and then we would review lifestyle
```

```
 1            modifications that might affect fertility, and we would
 2            talk to them about blood testing, semen analysis, and
 3            an assessment of the shape of the uterus and whether
 4            the fallopian tubes were open or not.
 5   Q    Okay.  So you've got the first visit, and some people
 6            decide it's not for me for whatever reason, right, they
 7            can't afford it or not interested, or they just don't
 8            go down it, right?
 9   A    Correct.
10   Q    Okay.  What percentage, approximately, of the patients
11            who come in decide it's not for me, I don't want to do
12            it?
13   A    About 10 percent.  10 to 15 percent would say that it's
14            too much, or we're going to continue to try on our own,
15            or it's too expensive.
16   Q    Okay.  So let's go to Step No. 2, right?  They decide,
17            you know, they're not going to go away, they actually
18            decide they might come back.  What's the second option
19            that you cover?
20   A    So when we get the testing back, we'll have an idea if
21            they're dropping an egg, or ovulating, every month.
22            We'll have an idea about the shape of the uterus or
23            whether the tubes are open or not, and the semen
24            parameters, because some male parameters, there's just
25            a mild motility issue, a mild count issue, and they may
```

```
 1            respond to just washed intrauterine insemination.
 2                 And then there is a group of individuals who will
 3            come in who will require IVF for fertility
 4            preservation, and so we were doing, oftentimes,
 5            same-day or next-day consults from the Norris Cotton
 6            Cancer Center for people with cancer who wanted to
 7            freeze eggs or sperm or embryos, but there's some
 8            individuals who have blocked tubes or bad
 9            endometriosis, who or are older or have a genetics
10            issue and are going to go straight to IVF.
11     Q    Okay.  So you have this second group of individuals who
12            come in and some of them go with IUI, right?
13     A    Mm-hm, intrauterine insemination, IUI.
14     Q    Okay.  So what's the approximate percentage of the
15            people who show up who fall into this second category?
16     A    About 50 to 60 percentile in our population because
17            some were just single women who wanted access to the
18            donor sperm program, so there wasn't any barriers.  So
19            we wouldn't necessarily -- we would tailor the
20            evaluation just for what was necessary for them.  And
21            then some were just not ovulating, so they might need a
22            little oral tablet a few days a month to help them
23            ovulate.  So it was a fair number of individuals who
24            would be in that middle category.
25     Q    I got it.
```

```
 1              And then you've got the third category of people
 2         who are actually going to go with the IVF approach,
 3         right?
 4    A    Correct.
 5    Q    Okay.  So what's the percentage, and I realize these
 6         numbers are not exact, but the rough percentage of the
 7         people who fall within the final category, third
 8         category?
 9    A    It's 10 to 20 percentile.
10    Q    Okay.  So let's assume that they're attempting or
11         intend to proceed with IVF.  Is part of the process of
12         proceeding with IVF going through something calls a
13         mock transfer?
14    A    Yes.  So there's a -- it's called mock, or trial,
15         embryo transfer, yes.
16    Q    All right.  And in brief terms, what's included in a
17         mock transfer?
18    A    It's an ultrasound-guided procedure where we take an
19         empty embryo catheter and pass it through the cervix to
20         make sure there's no barriers in the cervix and to get
21         measurements of the uterus so that when we actually
22         have an embryo loaded, we're efficient.
23    Q    Okay.  And is there a charge to the patient for this
24         mock transfer?
25    A    Yes.  There's a charge both from the imaging side.
```

```
 1  Q    Right.
 2  A    And then there's a professional side for the physician.
 3  Q    All right.  And round numbers, what's the charge,
 4       about?
 5  A    If you take the whole thing to count, it's about
 6       $1,200.
 7  Q    Okay.  So to do one of these mock transfers it's about
 8       $1,200, right?
 9  A    Mm-hm.
10  Q    Okay.  And the people who need it, who might actually
11       get some use from it, are people who are going to
12       proceed with IVF, right?
13  A    Correct.
14  Q    And that's about 10 to 20 percent, correct?
15  A    Correct.
16  Q    Okay.  Now, when you are out on disability, was there a
17       change in the point in the process where the mock
18       transfer was performed?
19  A    Yes.  Dr. Hsu and Dr. Seifer had changed the
20       infertility evaluation so that all patients coming in
21       for their ultrasound tubal study were getting mock
22       transfers.
23  Q    All right.  And while we're talking about the cost of
24       these various procedures and processes, when you were
25       at Dartmouth-Hitchcock, round numbers, what's the rough
```

```
 1          amount for the cost of proceeding with IVF?

 2   A      It was between 12 -- well, 10 to $15,000 an attempt.

 3   Q      Okay.  And what percentage of the persons going through

 4          the process were paying out of pocket?

 5   A      About 50 to 60 percentile.

 6   Q      So as I listened to your testimony.  The 10 to

 7          15 percent who decide they don't want to go forward and

 8          the 50 to 60 percent who go with IUI, do they get any

 9          benefit whatsoever proceeding with a mock transfer?

10                 MR. SCHROEDER:  Objection, Your Honor.  I've

11          allowed a lot of leading questions, but now we're

12          getting way beyond the typical leading question, and

13          it's -- it really looks like cross-examination

14          examination, if you will.

15                 THE COURT:  Yeah.  This is direct

16          examination, Mr. Vitt, open-ended questions.

17                 MR. VITT:  All right.

18   Q      (By Mr. Vitt) Did you object to the process that

19          Dr. Seifer -- Dr. Seifer and Hsu installed, or put in

20          place, to do the mock transfer at the start instead of

21          in the third stage when you used to do it?

22   A      Yes, absolutely objected.

23   Q      And why did you object?

24   A      The predominant reason is that most of our patients

25          were paying out of pocket.  And what that means is
```

```
 1            they're exhausting their savings to have a baby.  They

 2            are borrowing from their family to have a baby.

 3            They're second mortgaging their house to have a baby.

 4            And so we had to be mindful that we wanted to give them

 5            the best chance for pregnancy and to conserve all of

 6            their resources, whether it be emotional or financial.

 7            And when you do unnecessary and frequent testing, you

 8            risk exhausting their financial resource well before

 9            they ever get to treatment or limiting their

10            treatments.

11    Q       Let me ask you:  What was the experience of the

12            patients while you were there, assuming that it's done

13            competently, what's the average number of attempts that

14            have to be made before a patient gets pregnant?

15    A       With IVF or other --

16    Q       With IVF, I'm sorry.

17    A       Yeah.  So it's between two to three attempts, on

18            average, usually three, and then I'm going to qualify

19            that to say there's fresh where we stimulate eggs and

20            inseminate them to make embryos, and then some couples

21            get frozen embryos from that cycle, and they can come

22            back if they're not pregnant or for a future pregnancy

23            with those frozen embryos, and that was about $3,500.

24            So we wanted to make certain we were optimizing their

25            IVF and giving them the best shot.
```

```
 1    Q    To whom did you object that wasn't proper, in your
 2         view, to be billing for mock transfer for each time
 3         they come in?
 4    A    I spoke directly with Dr. Hsu and Dr. Seifer.  I spoke
 5         with Leslie DeMars.  I spoke with -- and sent e-mails.
 6         I spoke with Heather Gunnell, and I also brought it up
 7         at the Value Institute, when we were looking at
 8         processes, to say this is not right.
 9    Q    How many times did you bring it up with Dr. Seifer and
10         Hsu?
11    A    Multiple.
12    Q    What was their response?
13    A    "Well, the patients might need this, so we're going to
14         do it."
15    Q    Did that make any sense to you?
16    A    No.
17    Q    Did they tell you what they meant by it?
18    A    No.
19    Q    When you raised the issue with Leslie DeMars, what did
20         she do?
21    A    She said she would talk with them about it.
22    Q    Did the practice continue?
23    A    Yes.
24    Q    All right.  Did you talk to her more than once about
25         it?
```

Porter - Direct by Mr. Vitt

```
 1   A    Absolutely.

 2   Q    Did you have a view about the propriety or the

 3        appropriateness of billing this way for people who were

 4        coming in to try and get pregnant?

 5   A    It was absolutely not right.

 6              MR. VITT:  Your Honor, can we have an

 7        afternoon break?

 8              THE COURT:  The plan was to go all the way

 9        through to the end of day.

10              MR. VITT:  All right.  We're going to go to

11        4:30?  That's fine.

12              THE COURT:  To 4:30.

13              MR. VITT:  All right.

14   Q    (By Mr. Vitt) One other point I meant to raise before:

15        What's ASRM?

16   A    The American Society for Reproductive Medicine.  It's a

17        national governing body that oversees reproductive

18        medicine and infertility recommended practice.

19   Q    Did they have a recommended process as to when to do

20        the mock transfer?

21   A    They had a recommended process for the appropriate

22        evaluation of a new couple, and they have suggestions

23        for the appropriate evaluation pre-IVF.

24   Q    I want to turn now to another issue that concerns

25        Dr. Seifer and Dr. Hsu and that is the performing of
```

```
 1              procedures and the issue of patient consent.
 2     A    Yes.
 3     Q    When a patient comes in to see you, is the issue of
 4          patient consent something that you address?
 5     A    If they're electing a procedure, yes, absolutely.
 6     Q    And tell me the process that you've followed in both
 7          advising the patient and obtaining their consent.
 8     A    When we're preparing to do a procedure, whether it's a
 9          minor outpatient procedure or a more extensive
10          inpatient procedure, typically, I will discuss with the
11          patient their evaluation thus far and what the options
12          will be for them in terms of observation, medical
13          treatment options, and surgical options, so they have
14          an understanding of what more common options and what
15          the guidelines say around recommendations.
16              And then if they choose to proceed, then we talk
17          about the options and the types of procedures we might
18          do, and then -- I oftentimes we have screens in
19          clinic -- I'll bring up a picture to show them what the
20          possible options are for treatment and then walk
21          through that procedure in terms of how we would expect
22          to do it, what the more common complications might be,
23          what a standard recovery might look like for them, and
24          then I ask some questions to make certain that they're
25          comfortable with the information and they've processed
```

```
 1          it all so that they understand, and then allow them to
 2          ask questions.
 3     Q    Do you discuss with them whether the procedure might be
 4          painful or uncomfortable?
 5     A    Absolutely.
 6     Q    Is the issue of patient consent fundamental to the
 7          practice of medicine?
 8     A    It's foundational to what we do.  Patients have a right
 9          to decide for their own body what decisions they'll
10          make.  It's called body autonomy.
11     Q    Is the consent reflected in anything that the patient
12          signs?
13     A    Yes.  We have a patient sign either a written document,
14          or we have electronic documents.
15     Q    You've ordered a lot of ultrasounds over the years,
16          haven't you?
17     A    Absolutely.
18     Q    And you're familiar with the staff at
19          Dartmouth-Hitchcock who perform the ultrasounds?
20     A    Yes.
21     Q    Were they competent?
22     A    Extremely competent.
23     Q    Experienced?
24     A    Very experienced.
25     Q    Do you have confidence in their abilities?
```

1  A    Absolutely.

2  Q    And you see them handle ultrasounds, have you not?

3  A    Yes, for many years.  I was there 21 years.

4  Q    When the patient arrives to have an ultrasound, what's

5       the process?  What happens?

6  A    They check in.  The sonographer -- and there's often,

7       not always, but oftentimes there's an assistant that

8       helps them clean the rooms and room the patient.  They

9       will double-check the procedure to be performed, and

10      then the patient is brought in to the room, and there's

11      a description of what they need to do, whether it's get

12      undressed or whatnot, and then the sonographer will

13      perform the ordered ultrasound.

14 Q    Were you in the ultrasound read room right after Albert

15      Hsu had performed a procedure?

16 A    Yes, came in to cover clinic that afternoon in the

17      ultrasound suite.

18 Q    When you arrived in the ultrasound suite who was there?

19 A    Jenice Gonyea, who is a very experienced ultrasound

20      technician, and Jenny Carpenter had been there earlier

21      in the morning.  I'm not sure if she was still there.

22 Q    Have you worked with Jenice Gonyea for a while?

23 A    Many years.

24 Q    All right.  Can you describe what you observed when you

25      arrived?

```
1   A    When I arrived to the ultrasound clinic Jenice who is

2        normally very composed, very professional, was jittery.

3        Her voice was high-pitched.  She was markedly

4        distressed when I walked in.

5   Q    Did you ask her why?

6   A    Yes.

7   Q    What did she tell you?

8             MR. SCHROEDER:  Objection, Your Honor,

9        hearsay.

10            MR. VITT:  I think what's critical here is

11       Dr. Porter's state of mind because she's going to be

12       making complaints.

13            THE COURT:  We should have a discussion about

14       this outside the presence of the jury, if it's going to

15       be an extended conversation, so I'll ask you to

16       approach.

17            MR. VITT:  Okay.

18            (Bench conference held.)

19            THE COURT:  So earlier, members of the jury,

20       you may have heard me say plans to power through to

21       4:30, and I thought maybe I saw some looks on your

22       faces.  So I'm going to give you all a very brief

23       five-minute break to stretch your legs, use the

24       restroom.  We'll come back very quickly.  We just have

25       about 45 minutes left of your trial day.  So, thank
```

```
 1        you.
 2                          (Jury exits.)
 3                          (Recess taken.)
 4                          (Jury present.)
 5   Q    (By Mr. Vitt) I am not asking you now to tell me what
 6        Jenice Gonyea said.  She will appear as a witness in
 7        the next day or two, and she will describe the
 8        substance of the conversation.  But after you left the
 9        ultrasound room, did you take any steps to report
10        anything to anybody in administration?
11   A    I immediately went to Heather Gunnell and explained the
12        situation, and Heather is a non-medical person, so I
13        spent some time going through with her what was
14        reported to me and that, in my view, it was an absolute
15        violation of our responsibility as healthcare
16        providers.
17             I also spoke with Leslie DeMars a little bit later
18        in the day.  I also spoke with Jenice, and I suggested
19        that she go directly to her immediate supervisor, who
20        was Dennis Seguin who oversaw all the ultrasound
21        technicians, and report her observations and concern.
22        And then I suggested that this was a severe enough
23        fundamental violation of patient rights that they
24        should go to the head of ultrasound and the head of
25        radiology.
```

```
 1              My conversation with Leslie DeMars was that it

 2         should be reported to risk management as well because I

 3         felt that it was severe enough they should know and

 4         that the provider who was involved, there should be an

 5         investigation, there should be education, and that the

 6         patient should be contacted, the situation explained,

 7         and an apology extended and have their questions

 8         answered.

 9    Q    So when you used the term "provider," in this context,

10         it means doctor, right?

11    A    Yes.

12    Q    I'll move to a new topic.  I'm going to show you what's

13         been marked as Plaintiff's Exhibit 9.

14              MR. VITT:  I'm not going to be introducing

15         it.  I just want to show it to the witness.

16              MR. SCHROEDER:  Judge, I apologize.

17              MR. VITT:  I'm sorry?

18              MR. SCHROEDER:  Objection, but I would like

19         to be heard on it.

20              THE COURT:  Okay.

21              (Bench conference held.)

22    Q    (By Mr. Vitt) After David Seifer was hired as the

23         division director, did you and Leslie DeMars talk

24         periodically about his suitability for the job, his

25         competence, how he was measuring up?
```

1    A    Yes.  Before he started with us.  It was completely

2         coincidental, Leslie and I were at the boards together

3         again, a different year.  And at the boards there was a

4         lunch break, and the examiners all are at tables of 10

5         or 12 people, and I was sitting next to a group of REIs

6         and a physician who had been a medical student here UVM

7         who was now in Portland, Oregon, and I was just

8         chatting with them about who was joining us, and the

9         physician who was from Portland perked up, and said we

10        need to have a conversation --

11                  MR. SCHROEDER:  Objection.

12                  THE COURT:  Sustained.

13   Q    (By Mr. Vitt) Let me interrupt.  I'm not sure we want

14        to get to that right now.

15   A    Okay.

16   Q    So I understand that you had a conversation with

17        somebody at the board meeting?

18   A    Yeah.

19   Q    What I want to focus on now is after he was hired, he's

20        in the job, he's acting as division director --

21   A    Yeah.

22   Q    -- did you and Leslie DeMars periodically talk about:

23        Is this person capable of doing the job as the division

24        director?

25   A    Absolutely.

1    Q    All right.  And what did you say to Dr. DeMars about

2         your view of his competence?

3    A    I was really worried that he was not competent; that he

4         was incompetent.

5    Q    All right.

6    A    And that he appeared disoriented at times.

7    Q    And did you cover or discuss what the lab was reporting

8         about the quality of the retrievals that he was -- or

9         the aspirates that came back in the egg counts?

10   A    There was multiple reports from several of the

11        embryology staff, including Dr. Esfandiari, directly to

12        me, and I was IVF medical director at the time so he

13        would come to me with problems as would the

14        embryologists, and they reported two things:  One, the

15        egg count, we can usually predict to plus or minus a

16        few what the number of eggs we expect, based on testing

17        beforehand, ultrasound, blood work.  The egg counts

18        were repetitively low, and that's important because it

19        significantly decreases someone's chance for pregnancy

20        if we're not getting all the eggs that we can get.  And

21        they were complaining about how bloody the fluid was in

22        the traps with clots.  And why that's important to them

23        is if the egg is stuck in a big clot, they risk

24        damaging it as they're trying to isolate the eggs out

25        of the follicular aspirates.  And occasionally there

```
 1           will be bloody traps, but it should not be at all a
 2           regular finding.  Normally, a trap -- which is a
 3           plastic tube that we collect the aspirates in -- is the
 4           color of champagne, and they were markedly concerned
 5           about the number and the appearance and the difficult
 6           work they were having trying to isolate the eggs.
 7    Q      What does the presence of blood tell you about the
 8           likelihood that you're going to have a successful
 9           transplant or planting of the embryo?
10    A      Well, in a trap, it significantly decreases the number
11           of embryos that we'll get, and that significantly
12           decreases the chance for pregnancy.
13    Q      And is the presence of blood, in particular, harmful
14           for the chances of successful --
15    A      Well, within the trap itself, yes, it increases a
16           likelihood the eggs will not be dissected out properly
17           and they will be injured in that process in the lab.
18           And there is also a different type of blood in the
19           coldus (?) that can be a real problem.
20    Q      Did you discuss with Dr. DeMars whether it was ethical
21           for the division to be offering IVF services if David
22           Seifer was doing retrieval?
23    A      Yeah.  I told her that he needed to be pulled and
24           pulled quickly.
25    Q      When you say "pulled," what do you mean?
```

```
 1   A    That he needed to have his credentials pulled for doing
 2        IVF.  She had asked me to go in and observe his
 3        procedures.  And it was, you know, fine because there
 4        was this possibility that maybe he wasn't as familiar
 5        with the technique, so we demonstrated the technique.
 6             And I went in to watch him for three procedures on
 7        the same day, and the first one, it was very clear he
 8        didn't know how to use our particular equipment, so I
 9        sat down and demonstrated.  It was very odd because we
10        had not used -- in an IVF needle, it can have one
11        opening all the way down called a single lumen or two.
12        We had not regularly used a double lumen needle in more
13        than ten years.  And a single lumen needle is standard
14        IVF practice right now with very rare use of a double
15        lumen.
16             And he appeared to really be struggling with
17        reading the ultrasound images, which should, again, be
18        extremely standard practice.  And then I demonstrated
19        in the second one, and then I did half of the third
20        one, and had him do the other half to go through the
21        procedure for the third one.
22   Q    Was Leslie DeMars receptive to your idea of restricting
23        or limiting his ability to perform these?
24   A    No.
25   Q    Did you ask her why?
```

```
1   A    Yes.

2   Q    What did she say?

3   A    She said, "You have a different skill set, and your bar

4        is too high."

5   Q    Okay.  Since I've mentioned Leslie DeMars, let me spend

6        a few minutes talking about your history of dealings

7        with her professionally and outside the hospital.

8   A    Mm-hm.

9   Q    When did you meet her?

10  A    She started around the same time, in 1996, at

11       Dartmouth.

12  Q    And by 2017, you had almost 20 years of working with

13       her?

14  A    Yes.

15  Q    How would you describe your working relationship?

16  A    We largely didn't see much of each other unless we were

17       at a faculty meeting or scrubbed on an occasional case

18       together, but it was collegial.  It was a collegial

19       working relationship with respect for each other's

20       skill.

21  Q    When you say you scrubbed together...?

22  A    Oh, we did OR cases together, occasionally, yeah.

23  Q    Okay.  And those would be cases where the patient had

24       some cancer?

25  A    Cancer or a really complicated benign surgery where I
```

```
 1          thought the risk of injury to other structures was
 2          quite high.  And that's not uncommon for us to call in
 3          a gynecologic oncologist if, for example, the tube that
 4          comes from the kidney under the uterus is really stuck,
 5          we will call them in so we don't injure it.  It's
 6          planned.  We know in advance we need them.
 7   Q      Okay.  Did your work overlap with her in the division
 8          over the years?
 9   A      Yes.
10   Q      Okay.  As the chair of the OB-GYN department, what did
11          you understand were her main duties?
12   A      She was responsible for all of the faculty, overseeing
13          the educational mission and overseeing the finance and
14          budgets of the department.
15   Q      Okay.
16   A      And representing the department in the greater
17          organization.
18   Q      Do you know of a situation where Dr. DeMars implemented
19          performance improvement plans for surgeons where you
20          were involved?
21   A      Yes.
22   Q      Can you describe that please?
23   A      Yes.  So Leslie was also head of GYN oncology, and she
24          had a junior female partner who, over the course of
25          many years, had really struggled in being able to --
```

```
 1           maintain, retaining operating room nurses, meaning, she
 2           was so verbally abusive to them that they could not get
 3           faculty -- I mean, I'm sorry.  They could not get scrub
 4           techs and OR nurses to go into her room.  And it became
 5           a patient safety issue because there would be a big
 6           cancer case scheduled, and the nurses would come in to
 7           see their assignments and refuse to go in with her.
 8    Q      And did you have some role in trying to work with this
 9           surgeon?
10    A      Yes.  Leslie DeMars felt that she had failed in her
11           efforts and that she had involved Human Resources to
12           provide appropriate counseling for this individual, and
13           so she asked me to sit as -- I was -- at Dartmouth I
14           was vice chair for perioperative services.  I, for more
15           than 20 years, sat on the OR, operating room,
16           committee, and in that role, she asked me to sit with
17           this provider and do some counseling to try and provide
18           some active feedback and to look over the next several
19           months at her performance in the OR, the ability to
20           support and retain staff.
21    Q      So did you meet the four times?
22    A      We met four times for about an hour and a half with a
23           representative from Human Resources to -- three of us,
24           in this physician's office to provide feedback and
25           counseling.
```

```
 1   Q   Did it work out?
 2   A   Initially, she would get better, and then she would
 3       repetitively have problems.  And, ultimately, it did
 4       not work out for this physician over the course of the
 5       next several years.  She was terminated.
 6   Q   So I want to turn to your understanding of Leslie
 7       DeMars' responsibilities as the chair of OB-GYN.  Who
 8       do you believe had the responsibility to investigate
 9       the multiple reports of the incompetence of Dr. Hsu and
10       Dr. Seifer?
11   A   Leslie DeMars.
12   Q   If it was reported that they were not following the
13       ASRM guidelines, whose obligation would it be to make
14       sure that they changed their progress?
15   A   Leslie DeMars.
16               MR. SCHROEDER:  Objection, Your Honor.
17       Assumes facts not in evidence, lack of foundation, and
18       leading.
19               THE COURT:  I'll allow it.
20   Q   (By Mr. Vitt) There have been discussions about --
21               THE COURT:  Mr. Vitt, was the question
22       answered?
23               THE WITNESS:  Leslie DeMars is responsible.
24   Q   (By Mr. Vitt) Thank you, Doctor.
25           Whose obligation was it to prevent patient harm
```

```
 1        that was caused by the failures of these doctors?
 2   A    Leslie DeMars.
 3   Q    How often would you say you went to Dr. DeMars with
 4        complaints about Dr. Seifer and Dr. Hsu?
 5   A    Weekly.
 6   Q    She get tired of seeing you?
 7   A    Yes.
 8   Q    Did she tell you that?
 9   A    Yes.
10   Q    You keep going back?
11   A    Yes.
12   Q    Why?
13   A    To our core, we are to protect and care for patients.
14   Q    At some point, did she tell you that she had spoken to
15        folks in management and that Dr. Seifer was going to
16        leave or go?
17   A    Yes.
18             MR. SCHROEDER:  Objection, Your Honor.
19             THE WITNESS:  She told me that she had
20        spoken --
21             MR. SCHROEDER:  Objection, Your Honor.
22             MR. VITT:  Hold on.
23             THE COURT:  Hold on.  Overruled.  Go ahead.
24   Q    (By Mr. Vitt) All right.  Go ahead.
25   A    Yes.  It was really concerning to me that she did not
```

1      seem to be taking the appropriate steps to provide a

2      safe environment for patients or for our learners, and

3      at one point, we had an argument.  I set up a meeting,

4      and I met with her in her office, and I told her, This

5      is not right.  We had an obligation.  We need to

6      protect our patients.  We need to protect our learners.

7      There's a way to compassionately counsel people and get

8      them into the right position and fix --

9   Q   When was this conversation?

10  A   Around February before the -- before the program

11      closed, that year, so February 2017.  And that's when

12      she started saying to me, "I've had a conversation with

13      Maria Padin.  I've spoken with Ed Merrens.  Dave is

14      going to go."  And I -- and I said to her, "Good."  And

15      I said, "About Albert?"  And she would say to me, "Keep

16      your head down; stay out of it.  You need to work on

17      getting well and do your job."

18  Q   How often did this topic of you need to do -- you need

19      to work on getting well, how often did that come up?

20  A   Every time I met with her.

21  Q   And do you have -- what did you understand that to

22      mean?

23  A   I thought it was a two-pointed message which was,

24      You've reported it to the appropriate person; this is

25      not your concern now.  But also, You've been sick,

```
 1           you've been out on disability, and you need to focus on
 2           getting well.
 3      Q    Did you tell her that you were doing fine, you were
 4           recovering, and you're perfectly capable of doing, you
 5           know, complicated surgeries?
 6      A    What I told her at that time was that while I was about
 7           90 percent healed from my initial surgery, I was going
 8           back to the Mayo Clinic periodically for blood patches.
 9           I would be gone for a few days and come back to work
10           part-time.  She knew that this was 100 percent curable.
11           And, at that point, she was expressing a desire for me
12           to -- to get well.
13      Q    All right.  To the 100 percent curable, was that
14           information you got from the folks at the Mayo?
15      A    Yes.
16      Q    And you passed that along to Dr. DeMars?
17      A    Absolutely, and Dr. Tepper, my new neurologist at
18           Dartmouth said to me, "This is 100 percent curable."
19      Q    So you got that advice from two sources --
20      A    Yes.
21      Q    -- first at Dartmouth-Hitchcock and the folks at the
22           Mayo Clinic, right?
23      A    Yeah.  At all levels at Mayo Clinic, I had four
24           different providers at the Mayo Clinic.
25      Q    Okay.  And, at some point, you had to go back for what
```

```
 1        I call a touch-up surgery?
 2   A    Right.  After the third blood patch, I still had about
 3        10 percent of my symptoms, and they said this is
 4        100 percent curable.  And, at that point, they said,
 5        you know, it's probably time for you to go back for a
 6        second surgery; it's not uncommon.  You know, sometimes
 7        people need two or three surgeries.  Not a surgery I
 8        wanted to do again, which is why I was patient with the
 9        blood patches.
10            You know, I think people might know Steven Kerr,
11        who is a professional basketball coach, had three
12        surgeries to repair his leak.  100 percent.  He coached
13        the Olympic team.
14   Q    So when you were out at the Mayo Clinic the last time,
15        do you recall -- I think it was the last time, do you
16        recall being on the table and thinking, I'm not going
17        to let this have an effect on my career?
18   A    Yeah.
19   Q    Tell me about that.
20   A    I had been sick for a really long time.  I was trying
21        really hard to come back, and I was sitting there for
22        my third blood patch toward the end of the day, and
23        you're in a little holding room, in one of those awful
24        hospital Johnnies.  My whole arm was painted up with
25        Betadine, and I had two big IVs in, and I had always
```

1          wanted my career.  I highly value my career.  It

2          brought me great joy.  And I knew the possibilities

3          were to stay out on long-term disability or to get

4          well, and I, for all kinds of reasons, made the choice.

5          I said, I do not want this illness to keep me from

6          doing the job that I love, and off I went for my third

7          blood patch.

8    Q    Okay.

9               MR. VITT:  I've got a new section.  Do you

10         want me to move on, or do you want to break?

11                   (Court at recess for the day.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    March 26, 2025

 2                    Morning Session

 3                        *  *  *

 4                    (Jury present.)

 5            MISTY BLANCHETTE PORTER, witness herein,

 6            being first duly sworn on oath, was

 7            examined and testified as follows:

 8            THE WITNESS:  I do.

 9            THE CLERK:  Thank you.

10                    DIRECT EXAMINATION

11   BY MR. VITT:

12   Q    All set?

13   A    All set.

14   Q    Good morning.

15   A    Good morning.

16   Q    I want to circle back to something that came up

17        yesterday.  Who is Joan Barthold?

18   A    Joan Barthold is a general OB-GYN at

19        Dartmouth-Hitchcock Medical Center.

20   Q    Did you receive a phone call from Joan Barthold in the

21        summer of 2017 after you had been terminated?

22   A    Yes, I did.

23   Q    What did she want from you?

24   A    Joan called to ask me to explain to her how to do an

25        ultrasound-guided tubal patency study.
```

```
 1   Q   Is this sometimes called a hycosy?
 2   A   Yeah.  The short is hycosy which hystero, referring to
 3       uterus, contrast, using fluid in bubbles to look at the
 4       tubes, whether they're open or not, so we call it a
 5       hycosy.
 6   Q   And she wanted you to explain this over the phone?
 7   A   Yes.  She called me and asked me -- she told me that
 8       she had been asked to do the procedure in ultrasound
 9       for a patient that had been scheduled, and she had
10       never seen one or done one before.
11   Q   What was your first thought when you got this request
12       to walk through this procedure over the phone?
13   A   Joan and I had been friends and colleagues for a long
14       time, and so I felt badly for her, but I also was
15       like -- felt badly for the patient, but it seemed to
16       me, this is nutty.  They have a patient need, and
17       patients are still going to require these services, and
18       no one is available to provide the services.
19   Q   How long did you train to learn how to perform this
20       procedure?
21   A   We trained in fellowship to learn to do the x-ray
22       variation of this, so I had done hundreds in fellowship
23       down in radiology with an attending behind me.  And
24       there are parallel skills to be able to do this, but
25       the ultrasound version itself has its own variants, and
```

| | | |
|---|---|---|
| 1 | | I actually teach how to do these procedures nationally, |
| 2 | | and I have for years.  And so it's not as easy as see |
| 3 | | one, do one, teach one for these types of procedures. |
| 4 | | It requires months of learning, both didactically and |
| 5 | | then learning as you're doing it for patients. |
| 6 | Q | Were you the only doctor at Dartmouth-Hitchcock at this |
| 7 | | time who was performing hycosy? |
| 8 | A | I was the only person in the department, and then I |
| 9 | | taught Albert to do them. |
| 10 | Q | As a general rule, what would be the basic steps in, |
| 11 | | say, an attending physician trying to learn how to do a |
| 12 | | new procedure like this? |
| 13 | A | In any procedure is the question? |
| 14 | Q | Well, let's say hycosy. |
| 15 | A | Well, in hycosy.  So learning by reading at a national |
| 16 | | meeting, demonstration -- and that's what I do; I teach |
| 17 | | how they're done and the advantages and disadvantages |
| 18 | | and complications of them -- then standing behind |
| 19 | | somebody else who is doing them for demonstration |
| 20 | | purposes, and then having an experienced person stand |
| 21 | | behind you to do them all under consenting the patient |
| 22 | | so that they're aware who is in the room and what is |
| 23 | | being done and what the expectations are, and then also |
| 24 | | learning from your procedures what went well, what |
| 25 | | didn't go well and how you might optimize that care. |

```
 1   Q   In a situation like this where the doctor has never
 2       performed a procedure that she's going to perform on a
 3       patient, what would you expect that the patient would
 4       have to be told?
 5   A   That that individual had never done that procedure
 6       before; to be fully advised is part of the informed
 7       consent procedure.
 8   Q   How did you make it clear to Dartmouth-Hitchcock that
 9       you should have been kept on to do non-infertility work
10       after the closure of the REI division?
11   A   I wrote a letter to administration, and there are a few
12       different things, stating the ways in which I felt that
13       I could contribute to the care of patients, to the
14       academic mission, and there had been raised a concern
15       about Dr. DeMars; that she couldn't keep me because I
16       was on long-term disability; that it would compromise
17       my disability.  So I wrote -- in that letter, I wrote a
18       letter saying that my understanding, having spoken with
19       legal counsel, is that it would not compromise my
20       disability to stay as faculty.
21               MR. VITT:  Your Honor, could we approach the
22       bench about the admission of this letter?
23               THE COURT:  Yes.
24                   (Bench conference held.)
25               MR. SCHROEDER:  No objection.
```

```
 1   Q    (By Mr. Vitt) Ms. Porter, I'm going to show you what is
 2        marked at the bottom B12, and it's -- well, you can
 3        tell me what it is.
 4             Let me show you what's been marked as Defendant's
 5        Exhibit B12.  So what's the first page?
 6   A    The first page is just the cover e-mail.
 7   Q    That you wrote?
 8   A    Yes.
 9   Q    And how about the letter that's attached to that?  Is
10        that your letter?
11   A    It's the letter, yes.
12                 MR. VITT:  I would like to move its
13        admission, Judge.
14                 THE COURT:  Mr. Schroeder, no objection?
15                 MR. SCHROEDER:  No objection.
16                 THE COURT:  Okay.  It's admitted.
17   Q    (By Mr. Vitt) Did you make it clear that you were
18        willing to work in the OB-GYN department even if the
19        job didn't involve infertility?
20   A    Absolutely, yes.
21   Q    Did anyone from Dartmouth-Hitchcock reach out to you
22        and work through, in some sort of interactive process
23        because you were on long-term disability, how this
24        would work?
25   A    No.
```

```
 1   Q   Why do you believe that you were not reassigned to the
 2       OB-GYN department?
 3   A   Because I was on long-term disability.
 4   Q   Were you available to meet with officials at
 5       Dartmouth-Hitchcock to explain the work that you were
 6       prepared to do in the OB-GYN department?
 7   A   Yes.  I had been working mostly in gynecology for the
 8       last several months, and working with my nurse
 9       practitioner who had been my nurse practitioner for 16
10       years in a joint complex OB-GYN practice and she was
11       ept (sic).
12   Q   When you say a complex OB-GYN practice, what do you
13       mean?
14   A   Our shared clinics.  She would do things such as annual
15       exams, and then my patients had abnormal bleeding,
16       endometriosis, consults for all types of surgery,
17       difficulty IUD placements, meaning anything that was
18       beyond annual exams, she and I were a team together in
19       clinic.
20   Q   All right.  When did you first hear that the REI
21       division was going to be closed?
22   A   On the day that I was called into an unexpected
23       meeting.
24   Q   How did you learn that there was going to be a meeting?
25   A   I received an e-mail that was just an Outlook Calendar
```

```
 1         request by Dr. DeMars at like 7 or 8:00 at night.
 2    Q    And the date of the meeting was what?
 3    A    I believe May 4th.
 4    Q    All right.  And when you arrived, who was there?
 5    A    When I arrived, it was Leslie DeMars, Dr. Ed Merrens,
 6         Dr. David Seifer and Albert Hsu, Elizabeth Todd, and a
 7         member of HR, who I believe is Steven Woods.
 8    Q    And what happened next after everybody gathered?
 9    A    Leslie stood up and read a short, like, three-sentence,
10         statement saying that the REI division was going to be
11         closed, and she left the room.  And then Elizabeth Todd
12         left the room, and I was directed to stay with
13         Dr. Merrens and the representative from HR, and the
14         other two physicians were instructed to go to their
15         offices.
16    Q    And what happened?
17    A    They read a statement saying that we were being
18         terminated and that there was information in a folder
19         that had a separation agreement and some information
20         about my pension plan.  I completely dissolved.  I was
21         just sobbing, and it was completely unexpected, and I
22         had been ill for many months trying to get well and get
23         back to my career, and had been given many reassurances
24         by Dr. DeMars that the program would either slow down
25         or pause, but that it wouldn't be a termination, and
```

```
 1         that, in fact, the day before, we met and she told me I
 2         would be okay and to keep my head down and that we
 3         would be opening back up.  So to go into this was
 4         completely unexpected and completely shocking.
 5    Q    And did Dr. DeMars -- excuse me, did Dr. Merrens say
 6         anything to you in the meeting?
 7    A    Yes.  I was sobbing, and Steven Woods was sitting
 8         across from me reading.  Dr. Merrens was sitting to the
 9         right, and he said to me to "stay out on disability,"
10         and at first I was like, you know, that's never what I
11         wanted.  I always wanted to go back to work.
12              And as they're reading, I was just sobbing, and he
13         said it again:  "Stay out on disability, Misty."  And I
14         was thinking, That's never what I wanted.  I want to
15         work.  And after he said it a second time, Steven
16         was -- kind of paused, and then he continued reading
17         and talking a little bit about what my next steps would
18         be, and Dr. Merrens, a third time, said, "Stay out on
19         disability, Misty," and that's when Steven Woods
20         stopped and shot him a look like, you know, this is --
21         you know, you shouldn't be saying that or whatnot.  He
22         didn't say anything, but --
23                   MR. SCHROEDER:  Objection, Your Honor.
24                   MR. VITT:  I'll move on.
25    Q    (By Mr. Vitt) What were you told was the reason that
```

```
 1            the REI division was being closed?

 2  A    None of it made any sense to me because there was a

 3        series of various reasons that were given, none of

 4        which were foundational at all.  There was this

 5        question about nursing coverage which was not accurate.

 6        There was a comment about in-fighting which was not

 7        accurate.  There was this whole series of reasons that,

 8        in my experience of 21 years being there and being the

 9        REI medical director, had no basis.

10  Q    All right.  What happened next?

11  A    I went to my office, and because they had told us, and

12        we had actively cycling IVF patients, we had patients

13        going through infertility care, and if you think about

14        how fragile these people are to hear that we're closing

15        the program in the same few weeks that you're getting

16        this very intimate care was very ungrounding for them.

17            I tried as hard as I could just to keep it

18        together because of all things, I felt I could try and

19        help them through it and also leave well with my

20        integrity intact.  And so I grabbed my things out of

21        the office, and I went out to the car and sat there and

22        sobbed.

23  Q    You eventually made it home?

24  A    Eventually.  I had to be out in the car for a while

25        before I felt safe enough to drive.
```

```
 1   Q    When was the next time that you saw Leslie DeMars?
 2   A    There was about a two- or three-week period after that.
 3        There's a sidewalk and parking garage between the staff
 4        parking and the clinic building, and we passed each
 5        other on the sidewalk, and I was sobbing when I saw her
 6        and, again, trying to keep it together and trying to be
 7        the best person I could be for patients and staff.  And
 8        Leslie gave me a big, huge hug as I was crying, and
 9        looked me in the eye and held my hand up and said,
10        "Mostly, I want you to get well."  And I said to her,
11        "You could have kept me."  And she knew my abilities in
12        gynecology.  She knew my abilities in ultrasound, and
13        she said to me, "I couldn't have because of your
14        disability.  That would have compromised your long-term
15        disability."
16             And that didn't make any sense to me because I had
17        been working really hard to come back and reporting my
18        hours as I was coming back and reporting to the
19        disability company.  And I early on had hired because
20        of how sick I was, I had hired an attorney in Boston to
21        help me manage the complexities of the disability claim
22        so I would understand it, and she had said to me that
23        working with --
24             MR. SCHROEDER:  Objection, Your Honor.
25             THE WITNESS:  -- would not.
```

```
1                    THE COURT:  Hold on.  Objection.  Basis?
2                    MR. SCHROEDER:  Hearsay.
3                    THE COURT:  This is Dr. DeMars?
4                    THE WITNESS:  No, my attorney in Boston.
5                    THE COURT:  Okay.  Sustained.
6                    THE WITNESS:  Okay.  But Dr. DeMars said it
7          would compromise my disability if she had kept me as an
8          employee.
9      Q   (By Mr. Vitt) Did Dr. DeMars tell you that your
10         employment was being terminated because of splitting
11         behavior or anything about your behavior?
12     A   Absolutely not.
13     Q   Had Dr. DeMars ever spoken to you about your behavior
14         and, sort of, being critical?
15     A   Never.
16     Q   Had you ever been put on a performance improvement
17         plan?
18     A   Never.
19     Q   In the parking lot, did Dr. DeMars tell you that your
20         inability to work full-time was the reason that you
21         were not being kept on?
22     A   No.
23     Q   Did she mention anything about you no longer being --
24         having the ability to be a worker bee or anything like
25         that?
```

```
 1   A    No.
 2              MR. SCHROEDER:  Objection, Your Honor, overly
 3        leading.
 4              THE COURT:  Sustained.
 5   Q    (By Mr. Vitt) Was there any discussion with Dr. DeMars
 6        about you going to work at UVM?
 7   A    No.  We were training UVM fellows at that time in IVF
 8        at Dartmouth, and I had an appointment as the on-site
 9        fellowship director.  We were teaching them IVF and to
10        increase their IVF volume as the -- there was a prior
11        practice that opened up in Burlington, and that the
12        fellows had lost a huge amount of volume, so we took
13        that responsibility at Dartmouth to train those
14        fellows.
15   Q    At any point in the middle of May 2017 onward, did Ed
16        Merrens set up a meeting with you and discuss whether
17        you would be willing to do OB-GYN work if it did not
18        involve infertility?
19   A    No one asked to meet with me.
20   Q    If you had been asked by anyone at Dartmouth-Hitchcock
21        whether you were interested in doing OB-GYN work that
22        did not involve infertility, what would you have said?
23   A    Yes.  My husband and I had been married 36 years, and I
24        would want a job that I had for 21 years, yes.
25   Q    Were you already, at the time that you were terminated,
```

```
 1          spending most of your working time doing what I would
 2          call regular OB-GYN work?
 3   A      Yes.  I was more than 80 percent doing ultrasound,
 4          complex ultrasound, GYN ultrasound, and complex GYN in
 5          the office.
 6               During the Value Institute, they had asked the
 7          providers if they would shift their responsibilities
 8          away from fertility care while they reorganized, and I
 9          raised my hand and said, "I'm already doing that.  I
10          will do that no problem.  It's easy for me to do that.
11          I've done that my entire career."
12   Q      And had you made it clear to Leslie DeMars that the
13          surgery that you were going to have at the Mayo Clinic
14          would result in 100 percent you being cured of the
15          problem you had before?
16   A      Multiple times.  I had multiple conversations with
17          Leslie that this was 100 percent curable.
18   Q      So we've talked, I guess yesterday, about OB-GYN
19          departments relying upon your expertise to read
20          ultrasounds.  I want to turn for a minute or two about
21          the surgeries that you are able to perform that no one
22          else at Dartmouth-Hitchcock could perform.
23               Were there surgeries that you could perform in the
24          OB-GYN area that no one else could perform?
25   A      Yes.
```

```
 1   Q    How do you know that?
 2   A    I'm the -- I was the -- at Dartmouth, I was the vice
 3        chair of perioperative services, and part of that vice
 4        chair role, we had a departmental operative committee
 5        that met every week to review cases and case volumes.
 6        And so I knew intimately what people were doing within
 7        the department and at what volume because we met weekly
 8        to look at how many cases there were, what type of
 9        cases, and how we were booking our operating room
10        efficiency.  So I knew what people were doing on a
11        regular basis.  And I also knew that my training was
12        unique and that I was receiving referrals from just
13        about every division in the department to perform
14        surgeries that other people didn't perform.
15   Q    Currently, are you able to perform surgeries that are
16        not capable of being performed by any of the doctors at
17        Dartmouth-Hitchcock?
18   A    Yes.
19                MR. SCHROEDER:  Objection, foundation.
20                THE WITNESS:  I --
21                THE COURT:  Objection sustained.
22   Q    (By Mr. Vitt) Let me try to -- do you get referrals
23        from Dartmouth-Hitchcock to perform surgeries?
24   A    Yes.  Regularly.
25   Q    And do you know why those referrals go to you instead
```

```
 1         of being kept at Dartmouth-Hitchcock?
 2    A    Yes.  Because they don't have the capacity or ability
 3         to do them.
 4    Q    All right.
 5    A    I'm getting referrals from Manchester, New Hampshire,
 6         within the Dartmouth-Hitchcock network to do surgery.
 7         I'm getting referrals regularly from
 8         Dartmouth-Hitchcock providers.
 9    Q    Are the surgeries that you are being asked to perform
10         what I would call -- are they complicated surgeries?
11    A    Yes.
12    Q    Are they important?
13    A    Yes.  It's anywhere from women and girls who are born
14         with birth defects or variants of the reproductive
15         tract, and so recreating a normal tract or trying to
16         significantly impact both their hygiene and ability to
17         have a normal pregnancy.  That's what we call a uterine
18         mullerian anomalies.
19              Also, some women, very early in life, have a
20         disorder where they get multiple fibroids which causes
21         pain and bleeding and can potentially significantly
22         impact their fertility.  And that's something that I've
23         done for many years.  And so as a fertility specialist
24         and a complex gynecologist, the myomectomy
25         Dr. MacCallum described, I do these procedures both
```

1      robotically and open, and I get regular referrals for

2      those and also pelvic pain and endometriosis surgery

3      for complex patients with advanced-stage endometriosis.

4      I also get referrals to have a second look at

5      ultrasounds.  So across the board, I'm getting consults

6      and referrals.

7   Q  You mentioned the surgery where somebody might have two

8      linings of the uterus?

9   A  Yes.

10  Q  And you, as part of the surgery were removing one of

11     those linings?

12  A  We are -- women are sometimes -- about one in a hundred

13     women are born with a different shape of their uterus

14     and vagina, and sometimes there's a little arc at the

15     top, and sometimes it's a septum, it's an extra wall

16     that comes down, and it can vary how far it comes down.

17     So on ultrasound, it looks like two linings, and we can

18     put -- through a little telescope in the cervix, we can

19     put scissors in to take that extra wall down to create

20     that more triangular shape.

21         I do that very regularly especially in

22     consultation with the high-risk OB service at

23     Dartmouth, because some of those patients have

24     delivered preterm, sometimes profoundly preterm and

25     have affected babies.  Sometimes they detect it before

```
 1          they get pregnant, so they're sent up to me to help
 2          decrease the likelihood they're going to miscarry or
 3          decrease the likelihood that they're going to have a
 4          preterm delivery.
 5    Q     Okay.  And you're still getting referrals from
 6          Dartmouth-Hitchcock with respect to surgeries like
 7          this?
 8    A     Yes.  Just before I went to prepare for this, I had a
 9          consult for Manchester, New Hampshire.  And I get
10          consulted for Boston IVF providers who aren't
11          operating.
12    Q     I want to turn for a minute to the importance of taking
13          an accurate family history when a doctor is
14          interviewing a new patient.
15              Can you tell me why it's important to get an
16          accurate family history?
17    A     As part of our routine, when we were talking yesterday
18          about that first visit that people come in as part of
19          the routine medical history is that genetics screening
20          history; that their own but also their family and we're
21          looking for, is there any specific reason that we would
22          want to offer or recommend they get blood testing to
23          look to see if they carry a gene that would affect
24          their ability to conceive and have a healthy baby or
25          affect a potential offspring.
```

```
 1   Q   Let me ask you about teaching residents about REI since
 2       you've been at UVM.
 3   A   Yes.
 4   Q   Have you taught reproductive endocrinology to
 5       Dartmouth-Hitchcock residents since you've been at UVM?
 6   A   Yeah, absolutely.  In all three forums, which is in the
 7       clinic; they've been in REI clinic with me.  In the
 8       operating room, I've had Dartmouth-Hitchcock residents
 9       scrubbed with me, and also in ultrasound in our complex
10       GYN ultrasound clinics that I participate in.
11   Q   Let me back up.  Is there an understanding, as you
12       understand it, that Dartmouth-Hitchcock residents would
13       receive the reproductive endocrinology instruction
14       through you?
15               MR. SCHROEDER:  Objection, foundation.
16               THE COURT:  Overruled.
17               THE WITNESS:  So when I -- when I started at
18       UVM, I started per diem because there wasn't per se a
19       job here for me, and I had felt, from an integrity and
20       honesty standpoint, the chair knew that I would need
21       more surgery as the division head, and what I
22       understood, I started three days a week here, was that
23       while Boston IVF could provide -- again, we talked
24       about that sliver of IVF and infertility that's part of
25       reproductive endocrinology -- it could not provide the
```

```
 1            other full spectrum of what we should provide our young
 2            trainees and residents about the care of girls and
 3            women all through the hormonal aspects and surgery and
 4            whatnot.  And so within my first week of starting at
 5            UVM, I had a Dartmouth resident in clinic and in our
 6            reproductive medicine didactics, because that's the
 7            other part, is having them learn the full aspect and
 8            have some exposure.  So they were in didactics with us,
 9            and they were also in clinic, the OR, and in
10            ultrasound.
11      Q     (By Mr. Vitt) All right.  So was there an understanding
12            that Dartmouth-Hitchcock residents would actually come
13            to UVM to receive their reproductive endocrinology
14            instruction through you?
15      A     As part of the team.  They did not come before the
16            shutting of the program at all.  We were providing that
17            at Dartmouth, but when the program shut -- because this
18            is an essential women's healthcare service, and it's
19            required by the ACG, meaning the national governing
20            board, that our residents are exposed to the full
21            spectrum of REI -- our chair received a phone call, as
22            did the division head, from the residency director at
23            Dartmouth.
24                  MR. SCHROEDER:  Objection, Your Honor.  Calls
25            for hearsay.
```

```
 1                    THE COURT:  Sustained.

 2                    THE WITNESS:  And so --

 3    Q    (By Mr. Vitt) Hold on.  Let me try it this way.

 4    A    Okay.

 5    Q    Did there come a time when, on a regular basis, the

 6         Dartmouth-Hitchcock residents would come to UVM to

 7         receive instruction in reproductive endocrinology?

 8    A    Yeah.  And they still come, eight years later.

 9    Q    Okay.  How often do they come to -- up to the

10         University of Vermont Medical Center to receive the

11         instruction?

12    A    It is continuous.  Meaning, I think it's Monday through

13         Thursday for two months, I believe they're here.  It's

14         somewhere in there, six to eight weeks.

15    Q    Okay.  So the instruction that you're providing to them

16         at the University of Vermont Medical Center is the same

17         instruction you were providing when you were an

18         employee at Dartmouth-Hitchcock, right?

19    A    Absolutely, yeah.

20    Q    The only difference is they have to come from Lebanon,

21         New Hampshire up to UVM to get the instruction, right?

22    A    Right.  They're also spending that part of the week in

23         a hotel to get this experience.

24    Q    Did Dartmouth-Hitchcock have the option of simply not

25         providing reproductive endocrinology instruction to its
```

```
 1        residents?
 2                MR. SCHROEDER:  Objection, foundation.
 3                THE COURT:  I'll sustain the objection.  If
 4        you could rephrase the question, Mr. Vitt.
 5                MR. VITT:  Sure.
 6    Q   (By Mr. Vitt) Is reproductive endocrinology instruction
 7        an essential component of the training of residents?
 8    A   Absolutely.  It's a requirement by the ACGB and the
 9        American Board of OB-GYN.
10    Q   And who was in charge of providing the scope of the
11        reproductive endocrinology instruction when you were
12        employed at Dartmouth-Hitchcock?  Who was the person
13        who was in charge of that?
14    A   It was the responsibility of the division to provide
15        that in conjunction with our residency director as part
16        of their overall residency curriculum.  And Dr. DeMars
17        was responsible for our departmental educational
18        mission, but there is a representative of ACGB at
19        Dartmouth-Hitchcock and at UVM that's responsible for
20        all of the training of all of the residents and
21        fellows.
22    Q   Were you the person who was the principle person to
23        provide the instruction on that?
24    A   For a very long period of time, yes, but it was a
25        shared responsibility within the division.
```

```
 1   Q    I want to turn to -- moving on to the question of the
 2        economic or financial effects of you losing your job
 3        and having to get a position at UVM.  All right?
 4             Did you hire an expert to provide assistance to
 5        you in connection with providing a report on the
 6        economic consequences of losing your job?
 7   A    Yes.
 8   Q    And who did you hire?
 9   A    Dr. Robert Bancroft.
10   Q    And did you understand that he had been associated with
11        the faculty of UVM for a number of years?
12   A    Yes.
13   Q    Did you provide him with access to your financial
14        records?
15   A    Yes.
16   Q    Paystubs and, you know, W-2s and things like that?
17   A    Extensively.  I worked for months and months collecting
18        paystubs, tax records, all of my expenses at the
19        condominium, as you can imagine are extensive, and also
20        we talked about things like commuting, and I lived
21        intermittently in a hotel, meaning three days a week
22        for the first year and a half that I was at UVM.
23   Q    All right.  And the information that you provided him
24        is up to date?
25   A    Yes.
```

```
 1   Q    And you understand that he provided a recent report

 2        within the past week or ten days?

 3   A    Yes.

 4   Q    All right.  I want to discuss several of the

 5        assumptions that appear in that report.  All right?

 6   A    Okay.

 7   Q    The report assumes that you would have been promoted to

 8        full professor --

 9              MR. SCHROEDER:  Objection, Your Honor.  This

10        is overly leading.  May we be heard?

11              THE COURT:  Okay.  Please approach.

12                  (Bench conference held.)

13              THE COURT:  Okay.  So at this time, we'll

14        take our mid-morning break.  We'll be back and ready to

15        go at 10:15.  Okay?

16                  (Jury exits.)

17                  (Recess taken.)

18                  (Jury present.)

19              THE COURT:  Okay.  Mr. Vitt.

20              MR. VITT:  Thank you.

21   Q    (By Mr. Vitt) Dr. Porter, did you make a request to UVM

22        to change your schedule to go to a .6 instead of a 1.0,

23        full-time equivalent job, and be excused from call?

24   A    I did.

25   Q    And when did you make that request?
```

```
 1    A    I believe it was last spring.

 2    Q    And why did you want to make that request?

 3    A    For two reasons.  One is, this has been many years of

 4         commuting, and the challenges of commuting through

 5         Vermont winters and trying to balance that with my

 6         responsibilities.  So I have to be at the OR by 7 a.m.

 7         on those days, and I have to be at conference by

 8         7 a.m., and that means, given the weather, I usually

 9         need to come up the night before, so it's more time

10         away from home and my husband and friends.

11              The second reason is that the intensity of call

12         has really markedly increased, and I have a very strong

13         work ethic that I come by rightly from my parents, and

14         I had worked full-time my entire career, but the

15         community hospitals now are not doing anywhere near as

16         much surgery in the middle of the night, and so I'm

17         getting called in on a really regular basis for

18         ruptured ectopic pregnancies or cases that need to go

19         within a half hour to an hour for ovaries being twisted

20         on their blood supply and things like that and still

21         working a full day the next day.

22    Q    Did you get a response from UVM?

23    A    They were initially willing to consider it, as one of

24         my peers had done the same, but given some long-term

25         health issues of some of my partners, they denied it.
```

```
 1   Q   So as a consequence of them denying it, what is the
 2       full-time equivalency that you're currently working?
 3   A   .75, which --
 4   Q   Go ahead, I'm sorry.
 5   A   .75 is what my current --
 6   Q   Does that involve a call obligation?
 7   A   100 percent of this .75.  Your call is prorated based
 8       on your equivalency.
 9   Q   So you've been continuing to provide call obligations
10       under the terms of your employment with UVM?
11   A   Yes.
12   Q   And do you intend to continue doing that going forward?
13   A   Yes.
14   Q   I would like to show you what is marked as Plaintiff's
15       Exhibit 103.  It's a May 27th, 2017, e-mail from
16       Dr. Merrens to a number of people including Dr. Porter.
17             MR. SCHROEDER:  No objection.
18             THE COURT:  Okay.  It's admitted.
19   Q   (By Mr. Vitt) All right.  I'm going to put it on the
20       screen and see if I -- you got that, Misty?
21   A   Yes.
22   Q   I'm going to back up just a moment and ask you about
23       the session that you had with Dr. Merrens, Dr. DeMars,
24       Steve Woods, right, where you were terminated.
25             Was there any discussion during the course of that
```

```
 1        meeting about in-fighting or problems among the

 2        doctors?

 3   A    No.  I misspoke if that's what I said.  I would correct

 4        that record.  No.  That was my error.  I was thinking

 5        in general.

 6   Q    In looking at the letter you got from Dr. Merrens, or

 7        the e-mail --

 8   A    I can't see it, sorry.

 9   Q    -- do you recall that there was a --

10             THE COURT:  Mr. Vitt, I'll ask you to pause.

11        I can see Dr. Porter's screen, and it's black.  So the

12        exhibit is not appearing there.  Just give us a moment

13        to figure this out, the technological.

14             MR. VITT:  I've got an extra copy.

15             THE COURT:  Give Mr. Howe a moment.

16             THE WITNESS:  I'll try not to bump the cable.

17             MR. VITT:  Okay.  All right.  Okay.

18             THE COURT:  Do you have it?

19             THE WITNESS:  Yes, I do, thank you.

20   Q    (By Mr. Vitt) Okay.  Do you recall that there was a

21        Vermont Public Radio article about the closure of the

22        REI division?

23   A    Yes.

24   Q    And could you just read that first sentence of the

25        e-mail, please?
```

| | | |
|---|---|---|
| 1 | A | "Dear colleagues:  Regrettably, Vermont Public Radio |
| 2 | | published an article yesterday indicating that I made |
| 3 | | comments to the effect that the program was being ended |
| 4 | | due to interpersonal issues amongst the physicians." |
| 5 | Q | Okay.  And then Dr. Merrens' next sentence, please? |
| 6 | A | "Nothing could be further from the truth, and in the |
| 7 | | recorded interview I did with him two weeks ago, there |
| 8 | | was no such statement whatsoever." |
| 9 | Q | Thank you.  I want to go to a new topic.  Zika? |
| 10 | A | Okay. |
| 11 | Q | What is Zika? |
| 12 | A | So Zika is a virus that, in the midst of an infertility |
| 13 | | practice, is really critical to know and understand. |
| 14 | Q | And what are the consequences of potentially being |
| 15 | | exposed to Zika virus? |
| 16 | A | The consequences if a patient has -- the person |
| 17 | | carrying the baby has a Zika infection has the |
| 18 | | potential anyways for a continuum of potential issues |
| 19 | | anywhere from a baby born with a very small brain that |
| 20 | | doesn't function well and very small head to, if it's a |
| 21 | | milder form, potential learning disabilities in school. |
| 22 | Q | Was it something that the REI division was following |
| 23 | | closely in 2016 and 2017? |
| 24 | A | Yes.  So the jury will understand with our recent |
| 25 | | pandemic that the information is rapidly changing, and |

1          as time went on, we learned a lot more information

2          about Zika, but we had in warmer areas, in South

3          America, through the Caribbean and as far north as

4          Miami and I believe Orlando, there was an outbreak of

5          the mosquitoes that carried this virus.

6               And so we were actively, every patient who came

7          in, counseling them against travel to those areas,

8          which at the time was really a problem because it was

9          common for people to go to destination weddings.  And

10         also we weren't clear exactly how people could get this

11         virus and how it would potentially affect pregnancy.

12         But every week, we were getting e-mails from our

13         national organization to every two or three weeks as

14         the things changed and also intermittently was getting

15         information from the Centers for Disease Control and

16         World Health Organization about counseling patients,

17         especially pre-conceptually, to avoid what was a huge

18         outbreak in South America with many women being --

19         having babies affected with these very small heads and

20         brain abnormalities.

21    Q    Did this become an issue with a patient in the REI

22         division in 2017?

23    A    It did, and I was the IVF medical director, so our lab

24         director, Dr. Esfandiari brought a case for me to

25         review and asked me to look at it.

```
 1   Q    And with this particular situation, was the exposure

 2        avoidable?

 3   A    Yes.

 4                  MR. SCHROEDER:  Objection, foundation.

 5                  THE COURT:  Rephrase the question.  Objection

 6        sustained.

 7                  MR. VITT:  Sure.  Okay.

 8   Q    (By Mr. Vitt) Can you elaborate on the situation that

 9        the lab director presented to you?

10   A    At the time that it was presented to me, there was a

11        couple seeking care in the infertility division who had

12        suffered many losses.  I don't mean pregnancy losses,

13        but just had an extensive infertility history, and they

14        were patients of my partners.  I didn't know them or

15        see them initially.  And they had created embryos at an

16        outside donor egg facility.

17             It wasn't uncommon for us to send a specimen of

18        prepared sperm frozen from our lab to an outside egg

19        bank and have that egg bank make embryos with that

20        sperm and send those embryos back to us, and it also

21        was extraordinarily common for us, either for fertility

22        preservation or for travel reasons, to see -- or even a

23        basic evaluation, to see a couple in clinic and have

24        the male partner collect a specimen that same day for

25        evaluation and/or freezing.
```

1          So in terms of this couple, what had happened is
2      they had been seen in clinic by one of my partners and
3      they knew at that visit the next day they were flying
4      to Brazil where there was a huge outbreak of Zika.
5  Q   Okay.  When you use the term "partners," do you mean
6      Dr. Hsu and Dr. Seifer?
7  A   Yes.
8  Q   Go on, I'm sorry.
9  A   And no specimen was collected before they flew and went
10     on vacation.  And when he got back, that specimen was
11     collected and that specimen was then stored in our lab
12     tank, and then that specimen was sent to the embryology
13     bank or the donor egg bank to make embryos.  And so the
14     question was, is it possible -- and we just didn't
15     know; there was no test to be able to tell us -- that
16     those embryos would be affected with Zika.
17         But also at the same time, there was a regular set
18     of standards and guided recommendations that were
19     coming out about how long people should wait, how long
20     the female partner should wait, whether they had
21     symptoms or not, and the thing that really changed is
22     how long the male partner should wait.  And when I was
23     in clinic, I realized that the handout that was in all
24     of our clinic rooms about Zika for patient education
25     was not current.  It was behind several months and not

1    current with the current guidance.  And the reason why

2    it wasn't current was that it was reported that while

3    men can have very mild symptoms -- much like COVID, you

4    can have very mild symptoms and still be affected --

5    men could have very mild symptoms, have a negative

6    blood test for Zika exposure, but they could

7    concentrate the Zika into their semen and sperm, and so

8    they could still pass on Zika to their partners.

9         And so my -- when I reviewed this, I said the

10    recommendations that had been made to that couple were

11    old guidance.  The new guidance had come out saying men

12    should wait six months.  And also when I reviewed it,

13    it was clear, because I had spoken with my partners,

14    that no one had counseled the couple to have protected

15    intercourse, and they had gone on a second vacation in

16    the Caribbean where Zika was endemic.

17         So there was all these various things.  So to get

18    to "was it avoidable," my thought was, we should have

19    collected that day when he was there, and it would have

20    avoided the whole issue.  And in the absence of that,

21    we, as part of informed consent, we should talk to them

22    about this and also offer -- because when I came back,

23    Dr. DeMars had given me several couples for me only to

24    take care of because my partners had made some errors

25    in decision making that had led to poor outcomes in

```
 1            their IVF.  So we had already established that we were
 2            offering a compensatory IVF cycle for free, and -- to
 3            make up for the errors in decision making that led to
 4            the poor outcome.
 5      Q     Going back to the Zika situation, what did you believe
 6            was the appropriate course of action that should be
 7            taken?
 8      A     I believed that we should have offered the couple the
 9            compensation to wait the six months, make sure they
10            were having protected intercourse.  They could check
11            their blood test, but, again, men could have a negative
12            blood test and still have positive semen, and also the
13            testing for semen was not verified.  So even if you
14            tested semen for Zika and send it off to a national
15            organization, it might come back negative, but none of
16            those tests were verified to be negative.  So I thought
17            at least in part of informed consent, we should offer
18            them a cycle for free, compensate them, and wait six
19            months before we did that.
20      Q     Did you feel strongly that that was the right course of
21            action?
22      A     I felt strongly that offering them and giving them the
23            informed consent choice was the right course of action
24            given that the potential for this couple and their
25            offspring would be at least, you know, theoretically
```

```
 1              catastrophic, and that we had a responsibility to offer
 2              that option to them and that six months, given that it
 3              was an egg donor situation where those eggs would be
 4              good for a really long time, would not necessarily
 5              significantly delay their conception, and we would
 6              provide the financial support.
 7    Q    Did you go to risk management about this?
 8    A    I did.
 9    Q    Did you go to Leslie DeMars?
10    A    I did.
11    Q    What did she say?
12    A    She said she would investigate it.  That was it.
13    Q    Can you name for me, please, the different subjects
14              that you went to Leslie DeMars to complain about in
15              2016 and 2017?
16    A    It was extensive.  It was, as we covered yesterday,
17              periodic conversations about Dr. Hsu and his
18              performance.  And understand, it didn't -- it gave me
19              no joy to do this.  And, in fact, I was encouraging
20              everyone else who had concerns to go where they needed
21              to go to report.  It is our duty to report, and it is
22              part of what we train annually at every medical
23              institution about the duty to report.
24                   I also feel that it's our duty to keep patients
25              safe, and the duty to report is in keeping them safe,
```

1        and I believe it's the duty of academic and other

2        medical centers to report and to make certain that we

3        are keeping the patients' interest and patients' safety

4        as our first priority.

5   Q    You mentioned Dr. Hsu.  Did you also mention

6        Dr. Seifer?

7   A    Yes.  From early on, I had lots of conversations with

8        her about Dr. Seifer, the multiple complaints I was

9        receiving from everywhere.  It was -- it was uniform.

10       And it was from places that we never get complaints

11       from.  So very early on, it was from the nurses on a

12       really regular basis who were in IVF procedure room

13       with him, and it was the nurses in clinic.  It was the

14       ultrasound techs, multiple of them, who worked with

15       him.  It was the embryology staff.  It was also

16       genetics, the genetics counselors.  It was the maternal

17       fetal medicine staff, and then it was also the

18       anesthesiologist which is really like, in all my years

19       there, I had never received a concern expressed by the

20       anesthesia staff.  So I was talking regularly, per as

21       my duty to report this to her, and to Heather Gunnell

22       oftentimes.

23            I talked to her at length about multiple issues in

24       terms of billing issues and my concerns about

25       compliance, billing compliance.  I talked to her about

```
 1          the Zika issues.  I talked to her about the trainees

 2          and the residents and the issues that we were facing

 3          and the issues that patients were facing in that.  So,

 4          yes.

 5   Q      Thank you.  I want to turn for a few minutes and talk

 6          about the impact that the firing at Dartmouth-Hitchcock

 7          had upon you.

 8   A      Mm-hm.

 9   Q      Can you tell me what was your -- you or your attachment

10          or your connection to the REI division?

11   A      I'm a Dartmouth Medical School Graduate.  I had a lot

12          of pride in being a graduate of the Geisel School of

13          Medicine.  I worked really hard to get there, and I

14          worked really hard while I was there.  I had a lot of

15          pride working with Dartmouth-Hitchcock and helping grow

16          an IVF program from 25 cycles to just under 200 cycles,

17          and it was all aspects of it from nursing, marketing,

18          the embryology lab to bringing on a computerized

19          medical record to all of that.

20              I had a lot of pride working at that organization

21          and for years -- 20, maybe more, I think -- early on, I

22          was identified as the person to work on the

23          perioperative surgery committee, and that had different

24          iterations over the years, but I was the OB-GYN

25          representative to that and became vice chair of
```

1       perioperative services.  And those meetings were

2       oftentimes early morning, late evening, but I felt like

3       I was contributing to the mission of the organization

4       financially that way.  And I felt like I was

5       contributing to the educational aspects of it and the

6       research aspects of it.

7           So when I lost my job, I was in process of

8       establishing at Dartmouth the first or second -- I

9       believe first -- U.S. site for a research project as

10      part of a multi-international project looking at the

11      treatment of ovarian masses and ovarian cysts that

12      could be non-cancerous versus cancerous.  It's called

13      the International Ovarian Tumor Analysis Group.  And I

14      was the first U.S. member that was invited to their

15      meetings.

16          So I felt like I was contributing to the research

17      aspects of what we do, and that cutting-edge research

18      has changed how we evaluate and we treat women with

19      ovarian masses through all age groups.  So I felt like

20      I was contributing a good deal.

21  Q   Had you ever heard of a division being closed or

22      shuttered at Dartmouth-Hitchcock before?

23  A   No.

24  Q   Tell me how being terminated from your position, from

25      your job, how did that feel?

```
1    A    If I -- if I go back there, it was absolutely
2         devastating.  I think I cried all summer.  I was trying
3         to drive to UVM and meet their needs.  I was trying to
4         sort out where I was with my illness at the time.  I
5         had been told that I would be 100 percent cured, but I
6         knew that I was going back to the Mayo Clinic for
7         another surgery which in itself is scary.  None of us
8         voluntarily jump up on the operating room table, you
9         know.  And I was not sleeping well.
10            I was trying to maintain some semblance of being
11        normal for my children.  I had lots of colleagues
12        reaching out and coming over, but it was also, you
13        know -- I had been there 20 years.  I had patients that
14        entire 20 years.  And so it was a loss of that
15        community.  I had colleagues for 20 years, and they
16        cared for me, and I cared for them, and we had that
17        connection.
18   Q    I mentioned in the opening about the importance of
19        being part of a community and going to a soccer game
20        and having somebody across the field hold up a child.
21        Can you talk about that?
22   A    Yeah.  One of the great gifts of being in a small
23        community is that I was able to -- and understand
24        HIPAA.  I was able to see the children and the families
25        that were created, you know, from individuals who were
```

```
 1        really sad and oftentimes depressed, to have the joy of
 2        children in their lives.  So I could go to the grocery
 3        store or a soccer game or a football game or even at my
 4        own dinner table was one of my IVF babies.  And he told
 5        my son that he was an IVF baby, so there was no HIPAA.
 6        I still see him.  He's in medical school now.  He comes
 7        home from medical school and has dinner with us.  And
 8        that was a really fulfilling, great joy, and I still
 9        see them, you know, individuals who work and live in
10        the community and these many years later, I still get
11        holiday cards and Christmas cards of these children as
12        they grow and lots of thank yous and how their life has
13        changed.
14   Q    What were your choices in terms of jobs after you lost
15        the position at Dartmouth-Hitchcock?
16   A    I was on long-term disability.
17   Q    Right.
18   A    Which meant that there was no way I was ever going to
19        be able to get a personal loan to open a private
20        practice in the community.  I was on long-term
21        disability, and I thought it not likely that any other
22        academic center or private practice would hire me.  So
23        it was because I had an open-door policy at the
24        University of Vermont that -- and they had a fellowship
25        training need that I was able to work per diem at UVM
```

1      until I proved that I was well.

2   Q  How long did it take for you to get off per diem and go

3      to actually becoming a full-time employee?

4   A  Over a year, I would say.  14 to 16 months, something

5      like that.

6   Q  Okay.  And when you began, after becoming a full-time

7      employee, you were at .8, correct?

8   A  Yes.

9   Q  Okay.  And full-time is 1.0, right?

10  A  1.0, yes.

11  Q  All right.  So why did you want to work a .8 instead of

12     a 1.0?

13  A  My life is in Norwich.  You know, I have now -- I had

14     to re-establish myself with work colleagues here, but I

15     have been with my husband 40-something years and

16     married over 36, and I've also had children who were

17     home for the summers and home for holidays, and I

18     wanted to be able to make certain that, given the

19     physical distance and the requirement for being here

20     when I'm on call within 30 minutes of the hospital,

21     that I was still able to spend time with those that I

22     love and to maintain my marriage and to make sure that

23     I was the mother I wanted to be with my children.

24  Q  Did your former colleagues still contact you and ask

25     for help?

1   A   Yes, regularly.  I've had long-term relationships with

2       many of these physicians, and so as always in my

3       practice I'm more than happy, if I have the ability and

4       not on work restrictions, to help them.

5   Q   Give me some range of the description of the range of

6       questions that you get from them when they contact you.

7   A   Anywhere from recently from the Manchester Hitchcock

8       clinic, which is in the southern region, an

9       individual -- a lot of what I did at Hitchcock was

10      complicated first trimester pregnancy problems.  As the

11      resource for the network, they would come to us.  So

12      Manchester had a patient with a cesarean scar

13      pregnancy, so the pregnancy was not actually in the

14      uterine cavity.  It was in the C-section scar which is

15      a life-threatening location, and so they consulted me

16      about how to treat that.

17          I've received patients in referral for huge, large

18      uterine fibroids and to do them, the removal of those

19      fibroids from the uterus, for endometriosis and pelvic

20      pain for medical management or surgical management, for

21      how to provide reliable contraception for a patient --

22      in a patient who was admitted with a blood clot at

23      Dartmouth.

24          I, you know, we like to make certain that these

25      patients are also registered here so that I can write a

```
 1          quick note to make sure that they communicate with the
 2          Dartmouth.  Many patients with birth defects of the
 3          reproductive tract.  I consult on for the high-risk OB
 4          service, I do consults and do that collaborative work.
 5     Q    Let me make sure that I get this right.  What you're
 6          describing are contacts that are coming to you now from
 7          Dartmouth-Hitchcock physicians to ask you for your help
 8          and expertise, correct?
 9     A    Correct.
10     Q    When you first took the job at UVM, where were you
11          staying when you had to come up and spend several days?
12     A    I was staying in a hotel.  I would go in -- I think I
13          was working usually around three days a week.  So I
14          went usually Tuesday, Wednesday, Thursday, sometimes
15          other days.  Sometimes I was helping cover the IVF
16          service over the weekends up here, but I was staying in
17          a hotel.
18     Q    And then eventually did you and your husband decide to
19          buy a condo to avoid the hotels?
20     A    Yeah.  I had to wait until UVM could have an official
21          job.  So one, I wanted to wait until I had my second
22          surgery because I felt, for my integrity, that I
23          shouldn't offer myself to be a full-time faculty
24          position until I knew I was back to who they told me I
25          would be.  So Dr. Bernstein and I had several
```

```
 1              conversations around that.  I had my second surgery in
 2              September of 2017.
 3    Q    Is Ira Bernstein the chair of the OB-GYN department?
 4    A    Yeah.  And I had to go back through the proctor system
 5              that we had described before, so I was proctored in the
 6              OR, which I fully welcomed.  It's the natural process
 7              of bringing someone back in.  I would have had to do
 8              fewer cases if I was a brand new faculty, but in -- I
 9              would say that was perfectly acceptable, but it was to
10              prove to me and to my colleagues, yep, she's back on
11              her game and she can take a full-time job.
12    Q    You were back on your game?
13    A    I was absolutely back on my game.  And I think that if
14              I reflect on it, in many ways, I'm better.
15    Q    How so?
16    A    I'm more patient, you know -- and they had told me at
17              Mayo that how you problem solve may be different.  And
18              so when I think about OR cases, I do think I have a
19              different perspective in terms of how to solve a
20              problem, which is better.  I'm more patient with
21              myself.  I'm more patient with how we get things
22              through challenges.  But what happened is it was not an
23              official job.
24              So Dr. Bernstein had to submit for a faculty
25              position for me through the physicians workforce which
```

1    took a while, and then it had to go over to the
2    University to go through the provost office to get it.
3    So that's why.  Once that was done, then I started on
4    faculty, and I had to be on -- because I had been on
5    long-term disability, I had to be on faculty before we
6    could re-mortgage our house in Norwich to be able to
7    afford a down payment for a condominium in Burlington.
8  Q    All right.
9              MR. VITT:  Will the Court indulge me for a
10    second?
11              THE COURT:  Yes.
12                (Pause.)
13  Q    (By Mr. Vitt) You mentioned that it was a stressful
14    time during the summer after your termination.
15  A    Yes, very.
16  Q    Any physical manifestations of how that stress played
17    out?
18  A    Yeah.  I had a marked clinical depression.  I spent, as
19    I said, most of the summer crying.  I was grinding my
20    teeth so much at night that, despite my best efforts, I
21    cracked a molar and ended up with a dental abscess and
22    a pulled tooth and a year later a dental implant after
23    multiple courses of antibiotics to try and help cure
24    the abscess.
25              I lost a ton of weight in that period of time, and

```
 1            I had to go back to the Mayo in that situation to --
 2            had the tooth pulled because I had to go back for
 3            another neurosurgery, and I couldn't have an active
 4            infection and have my second surgery.
 5       Q    All right.  Going back to the economic effects of the
 6            termination, were you making less money at the
 7            University of Vermont than you were being paid at
 8            Dartmouth-Hitchcock?
 9       A    Yes.
10       Q    So there was a period of time you were on per diem,
11            correct?
12       A    Yeah.
13       Q    Yes?
14       A    Yes.  Yeah.
15       Q    And then you went to a .8 which was less than you were
16            being paid at Dartmouth-Hitchcock, correct?
17       A    Yes.  Yes.
18       Q    If you stayed at Dartmouth-Hitchcock, would you have
19            been promoted, in your view, to full professor?
20       A    I met the criteria to be promoted to full professor
21            when I was there.  I had been working at it with this
22            international research group, and I had been the head
23            of the American Institute of Ultrasound and Medicine
24            GYN of community practice, that was six years.  So I
25            had national recognition, and I was teaching nationally
```

```
 1            and internationally in GYN ultrasound and writing book

 2            chapters and writing papers on a whole host of GYN

 3            ultrasound to infertility-related ultrasound.  So in

 4            terms of the checkboxes that you need for a promotion,

 5            I had met them.

 6                  The issue I had is that the standards for

 7            promotion at the University of Vermont is that you have

 8            to be on faculty for five years before you can be

 9            promoted, and so as soon as Ira -- as soon as I met

10            that criteria -- in that first year, I was per diem

11            because of my illness.  As soon as Ira was able to put

12            me up, he put me up for a promotion, and I easily was

13            promoted, but that takes a year.

14    Q      But if you had stayed at Dartmouth-Hitchcock, given the

15            publishing and the speaking that you've referred to, do

16            you believe you would have been promoted to full

17            professor?

18    A      Yes.

19    Q      Did you receive raises each year at

20            Dartmouth-Hitchcock?

21    A      For the most part, yes.

22    Q      And let me talk for a minute about how long you intend

23            to work.  You're how old now?

24    A      62.

25    Q      And how long do you expect to continue to work?
```

1    A    I expect to work at least until 2033 at this point, and

2         while many people would retire at 65 and then be

3         available for a significantly reduced pension from

4         Dartmouth, so one of the fallouts -- I was on the old

5         pension plan, I never converted.  One of if fallouts of

6         my termination is that my pension plan significantly

7         altered both when I can take it and how much money I

8         would get.

9              My mother is 80, and she is still working two

10        jobs.  She is the -- she was the chair of geriatric

11        medicine at the University of Hawaii and is the medical

12        director for nine nursing homes, and she also does

13        consulting memory work.  My grandmother was 86 when she

14        finished working her job.  And so in my lifetime, it

15        will be the balance of the pressures of commuting and

16        call and the joy I have with working and training

17        trainees.

18   Q    You're still enjoying the work that you do at UVM?

19   A    I do, yes.

20   Q    You still enjoy the surgery?

21   A    Very much so.

22   Q    You're still doing the complicated surgeries you did

23        before?

24   A    Yes.

25   Q    Laparoscopic and robotic?

```
 1   A    Laparoscopic, robotic, open, combined with GYN

 2        oncology, hysteroscopic.

 3   Q    Okay.  I want to show you what's been marked as an

 4        exhibit as Plaintiff's Exhibit 68.

 5              MR. VITT:  Maybe we'll go with paper?  How do

 6        we want to proceed?

 7              THE COURT:  If it's not in evidence yet, you

 8        should show it to the witness.

 9              MR. VITT:  It is not.

10              THE COURT:  And not publish it.

11              MR. SCHROEDER:  Objection, Your Honor.

12        Hearsay, foundation.

13              THE COURT:  Okay.  I don't think Mr. Vitt has

14        asked any questions yet.

15              MR. SCHROEDER:  That's true.

16              MR. VITT:  Not yet.  But I can accommodate

17        him.

18   Q    (By Mr. Vitt) Can you tell me, is the top part of that

19        document an e-mail that you received?

20   A    Yes.

21   Q    From whom?

22   A    Katrina Thorstensen who, when I was at Dartmouth in the

23        clinic, each advanced practice provider, whether it be

24        the midwives, the nurse practitioners, the physicians

25        assistants, were mentored and teamed with an attending
```

```
 1          staff physician to run questions by and talk about

 2          clinical care and also help them in clinic when they

 3          were having trouble.  And so Katrina was a midwife, or

 4          is a midwife, who provides largely gynecologic care in

 5          clinic, and so she was one of the two -- Elizabeth Todd

 6          was the other one -- the two mid-level, I would say,

 7          advanced practice providers, that I was supporting and

 8          mentoring in clinic.

 9     Q    Is the bottom part the letter that she wrote to folks

10          in the administration?

11     A    Yes.  Yeah.

12               MR. VITT:  I would like to move the admission

13          of this, Judge.

14               THE COURT:  Objection?

15               MR. SCHROEDER:  Objection, hearsay, Your

16          Honor.

17               THE COURT:  Objection, overruled.  I'll allow

18          this.

19               MR. VITT:  I'm going to show 69, and while

20          you're doing it 86 and 94 as well.

21               MR. SCHROEDER:  I'm sorry.  What was the

22          other one, P69 --

23               MR. VITT:  Sure.  It's 69 and 86 and 94.

24               MR. SCHROEDER:  Okay.  Just give me a second,

25          please.
```

1          MR. VITT:  You bet.

2          MR. SCHROEDER:  No objection.

3          THE COURT:  All right.  So no objection to

4     69, 86 and 94, just to be clear?  Well, 69 you already

5     objected to, if I'm not mistaken.

6          MR. SCHROEDER:  No.  That was 68.  These

7     are -- I think that Mr. Vitt has are 69, 86 and 94.

8          THE COURT:  Okay.  And there's no objection

9     to all three of those?

10          MR. SCHROEDER:  No objection.

11          THE COURT:  Okay.  Then they are admitted.

12  Q   (By Mr. Vitt) Looking at 69 in front of you, right?

13  A   Yes.

14  Q   Who is that e-mail from?

15  A   Kathy Jacobson who was also a nurse practitioner at

16      Dartmouth-Hitchcock Medical Center at the time.

17  Q   Let me hand --

18  A   I'm sorry, Kathy Jacobs.

19  Q   Okay.  86 is from whom?

20  A   Debra Birenbaum who is an MD at -- was, she's retired

21      now -- at Dartmouth-Hitchcock Medical Center.

22  Q   While I was up there I should have given you the other

23      one.

24          This is Exhibit 94.  Tell me who that is.

25  A   Sharon A. Hart Silveira.  She's an OB-GYN and

1       generalist at -- I believe she was at

2       Dartmouth-Hitchcock Manchester or Nashua.  In the

3       south.

4                    MR. VITT:  Excuse me, Your Honor.

5    Q   (By Mr. Vitt) Without getting into the details of the

6       letters and the e-mails, can you describe for us the

7       substance of what you were hearing from the persons at

8       Dartmouth-Hitchcock with whom you had worked?

9    A   Following the announcement of my termination, I had

10      multiple e-mails, and multiple individuals who were

11      coming to see me in clinic in shock and dismay, and a

12      couple of the very senior people came to me and said,

13      independently, We would like to go upstairs and talk on

14      your behalf and meet with Dr. Merrens and senior

15      leadership to make a case for you to stay.  And we just

16      want to know if you would stay, given everything that's

17      happened.  And I said absolutely.

18           You know, this is my community, my -- my work

19      family, my community colleagues and also the community

20      that I raised my children and where my husband's

21      business is.  And multiple of these e-mails go

22      through -- these are all the things that she does for

23      us from reinterpreting ultrasounds and putting that in

24      the context of clinical care.

25           I'm -- not to not sound humble, but I'm a GYN

```
1         ultrasound expert, and even general radiologists will
2         do a general interpretation, but in all national
3         guidelines, one of the things you can do before you
4         take someone under surgery or do an expensive
5         additional test is to run it by an expert.  And so
6         that's a way to avoid excessive surgery and excessive
7         imaging.  So I was the resource for that in the
8         department.  Also, extensive different surgeries that I
9         was referred.  And so there were many requests to keep
10         me and to keep those skills at Dartmouth-Hitchcock.
11   Q    Okay.  This case has gone on for a long time.
12   A    Mm-hm.
13   Q    Bringing a case like this takes a little out of you,
14         doesn't it?
15   A    It's taken a lot out of me at times.
16   Q    So why are you doing it?
17   A    It's many reasons.  The first is that I should not have
18         lost my job for reporting patient safety issues.  It is
19         our duty to report.  I should not have lost my job
20         while I was on long-term disability and working really
21         hard to come back.  I should not have lost my job when
22         I had translatable skills to the rest of the
23         department.
24              I also wanted to shine the light on the
25         administrative errors that were made here and those
```

1    that were responsible.  And I say that in the context

2    that it was not easy to make a decision to submit a

3    lawsuit.  It was a real challenge for me, especially

4    when I was sick, and I did so with very careful

5    contemplation.

6        My mother has been a chief medical officer.  My

7    mother has been the CEO of a major large medical

8    practice, and she has been dean of clinical services at

9    the University of Hawaii, and she looked at me and she

10   said, What happened to you is not right.  She had lots

11   of experience to draw from.  This is not fair.  This is

12   not right.

13       And I think the other reason why this has been

14   important to me, and there's been significant financial

15   loss, no doubt.  I sought some counsel before to

16   understand that it wasn't just a matter of severance,

17   it was a significant financial loss.  But the other

18   reason I felt really motivated, and it's continued to

19   be really important to me, is the why.  Why did this

20   happen to me?  Why?  Because what was being said made

21   absolutely no sense to me.

22       I had grown an IVF clinic from 25 cycles a year

23   and we had one nurse for many of those years.  And

24   there was things being said that was just really

25   incongruous.  Like I couldn't put the two together, and

1      I learned that a lot of things in discovery that were

2      painful, but really important in my life for me to

3      know, and understand, and so that's been the reason

4      why.  While some of these things are really painful,

5      it's essential for me to understand it.

6              MR. VITT:  No further questions.

7              MR. SCHROEDER:  I would just ask, Your Honor,

8      just a question of Plaintiff's counsel on an exhibit

9      that I wanted to share just to make sure we kind of

10     dealt with that up front.  Let me just find out where

11     we are in that.

12             THE COURT:  Okay.

13             MR. SCHROEDER:  Thank you, Your Honor.

14                      **CROSS-EXAMINATION**

15     **BY MR. SCHROEDER:**

16     Q    Good morning, Dr. Porter.

17     A    Good morning.

18     Q    And I would like to bring up, if I may, one of the last

19          exhibits that you were shown, which is it was

20          Plaintiff's Exhibit 86, and this was a document that

21          was shown to you by your counsel, correct?

22     A    Correct.

23     Q    Okay.  And I would like you to read just the first

24          sentence of that e-mail for the record.

25     A    The first sentence says:  "I don't think anyone in our

```
 1        department was surprised by the decision to close down
 2        the infertility service."
 3   Q    Oh, sorry.  The second sentence as well.
 4   A    "We have been aware of the dysfunction and lack of
 5        consistent care and support for a long time."
 6   Q    And who is Debra Birenbaum?
 7   A    Debra Birenbaum is a colleague of mine at
 8        Dartmouth-Hitchcock, and she has remained a friend.
 9   Q    Okay.  She was a colleague of yours at DH.  Was she a
10        physician?
11   A    Yes.
12   Q    And was she in the OB-GYN department?
13   A    Yes.
14   Q    And she refers to the fact that there was dysfunction
15        in the REI division, right?
16   A    She refers to it.
17   Q    Right.  And she uses that word, right?
18   A    She uses that word.
19   Q    And she is somebody that was in -- so in the OB-GYN
20        department, underneath that would have been a couple of
21        divisions, correct?
22   A    There are several divisions, yes.
23   Q    Okay.  And I just want to make sure I understand them.
24        So one of them was the REI division, right?
25   A    One, yes.
```

```
1    Q    What were the other ones?

2    A    General OB-GYN.

3    Q    Yes.

4    A    Uro-gynecology.

5    Q    Okay.

6    A    GYN oncology, and maternal fetal medicine.

7    Q    Okay.  So it looks like there were five different parts

8         to the OB-GYN department?

9    A    And the midwives.  I'm sorry, the APPs, the advanced

10        practice providers, yes.

11   Q    So six?

12   A    Yes.

13   Q    Okay.  And your group when you were employed by

14        Dartmouth-Hitchcock, you were in the REI division,

15        correct?

16   A    I was in the REI division doing a lot of complex

17        gynecology.

18   Q    Right.  But you were in that specific division,

19        correct?

20   A    I was in that specific division.

21   Q    And Dr. Birenbaum, which division was she in?

22   A    She was in the general OB-GYN group.

23   Q    Okay.  And according to her e-mail to you -- and this

24        is dated May 12th, 2017, right?

25   A    May 15th, 2017.
```

1    Q    Well, it's -- okay.  Right below that is the e-mail

2         from Debra Birenbaum?

3    A    May 12th, yes.

4    Q    Okay.  So this is shortly after the closure of the REI

5         division, correct?

6    A    Correct.

7    Q    Okay.  And she's referring to the fact, quote, "We've

8         all been aware of the dysfunction and lack of

9         consistent care and support for a long time."  Right?

10        You read that into the record?

11   A    I read it.

12   Q    And she's actually in a different division.  She wasn't

13        in the REI division, but she was part of the overall

14        OB-GYN department --

15   A    Correct.

16   Q    -- right?

17             And so she knew that there were problems in the

18        REI division at that point, right?

19   A    She states so.

20   Q    Right.  And she's a friend of yours, and that's not the

21        first time you heard that, correct?

22   A    I -- I wouldn't -- I wouldn't go there, no.

23   Q    You wouldn't go there?  Well, she was a friend of

24        yours.  She sends this e-mail to Dr. Merrens and

25        Mr. Herrick, and she says, yeah, we've been aware of

```
 1        the dysfunction for a while.  So --
 2   A    That was the first time I heard her say it.
 3   Q    So you never had any discussion with her ever before
 4        May 12th?
 5   A    Not using the word "dysfunction."
 6   Q    Okay.  Had you had discussions -- but you did have
 7        discussions with her about problems in the REI division
 8        in general as opposed to the word "dysfunction"?
 9   A    No.
10   Q    Never?
11   A    No, not to my recollection.
12   Q    Okay.  So this is the first time out of the blue where
13        she says, "We've all been aware of the dysfunction."
14        That's the first time that you're ever hearing about
15        that?
16   A    From Debbie yes.  I was shocked that she put it down.
17        But from Debbie, yes, to my recollection.
18   Q    Okay.  Now, you testified earlier about a couple of
19        things, and I'm going to try and -- I may jump around,
20        and I'm going to try to -- to the extent that you may
21        need a minute to digest something, let me know.
22            In May of 2017, you said that the REI division
23        closure and announcement was, I wrote, completely
24        unexpected, right?
25   A    Yes.  For me, yes.
```

Porter - Cross by Mr. Schroeder

```
 1   Q    Okay.  And for you it was completely unexpected?

 2   A    Yes.

 3   Q    You said you knew there was a slowdown or a pause might

 4        happen, right?

 5   A    That Leslie and I had a discussion the day before there

 6        may be a slowdown or a pause, yes.

 7   Q    But the pause actually, in the REI division, had

 8        actually already happened back in December of 2016,

 9        right?

10   A    Not to my knowledge.

11   Q    You never heard the word REI division pause or pause on

12        admitting new patients?

13   A    No.  It was not -- not to my recollection, no.

14   Q    Well, was there a pause in the admission of new

15        patients in December of 2016?

16   A    Not to my knowledge, no.

17   Q    Okay.  And you said -- when you were given reasons for

18        the REI closure, you said one of them was the nursing

19        shortage and your response from Mr. Vitt's question was

20        "not accurate," right?

21   A    Correct.

22   Q    And your -- another reason that you said was mentioned

23        was in-fighting, right?

24   A    I corrected that.

25   Q    Oh, you corrected that?
```

```
 1   A   Not in that meeting, but I thought he said more
 2       globally so we just corrected that.  It was not in that
 3       meeting, no.
 4   Q   Not in that meeting.  I'm just asking about in general.
 5       Other issues that were in the REI division, did you not
 6       identify in-fighting as one of the reasons that was
 7       given?
 8   A   Not my personal reason, no.  It was something that was
 9       in the media.
10   Q   Not your personal reason, but you were aware of that
11       being one of the reasons, because there's only two that
12       were listed here.
13   A   No, I wasn't aware of any in-fighting in REI at all.
14   Q   You weren't aware of any interpersonal issues between
15       the REI division between you and Dr. Hsu and Seifer?
16   A   There were no personal issues in terms of in-fighting.
17       I wouldn't define it that way.
18   Q   Well, I understand you wouldn't define it that way, but
19       would you say that there was conflict between you and
20       Dr. Hsu and Dr. Seifer in terms of how procedures were
21       done and in general?
22   A   I would not characterize it as conflict.
23   Q   Not -- so no conflict whatsoever?
24   A   Not interpersonal conflict; I would not characterize it
25       that way.
```

```
1    Q    Okay.  Well, did you get along with Dr. Hsu and
2         Dr. Seifer?
3    A    I got along with them, yes, but I also was reporting
4         repeated patient safety and patient care issues.
5    Q    Okay.  But in terms of just your overall personalities,
6         you got along otherwise?
7    A    I would characterize it as not a conflict with them.
8    Q    And not a dissension amongst the ranks between you?
9    A    I would not characterize it as a dissension.
10   Q    How would you characterize it?
11   A    Not a conflict.  If I were to go back and characterize
12        it, it was trying to do my work and maintain patient
13        safety and to report, as I had a duty to report, and
14        also trying to get well and follow my requirements of
15        my team.
16   Q    Okay.  Just so that the jury has an understanding of
17        the time period, in May of 2017 is when the REI
18        division was closed, correct?
19   A    Mm-hm.
20   Q    And you were given notice of that on May 4th --
21   A    Correct.
22   Q    -- right?
23             And the other two physicians, Dr. Hsu and Seifer,
24        were given notice of that on May 4th, correct, at the
25        same time?
```

Porter - Cross by Mr. Schroeder

```
 1   A   To my knowledge.

 2   Q   Well, you were with them, right?

 3   A   They weren't in the room.  They went off and I went

 4       into another place.  So we were not together in the

 5       room when we were counseled out of the job, no.

 6   Q   But the termination of the REI division was announced

 7       to all three of you at the same time, correct?

 8   A   Yes.

 9   Q   Okay.  So you understood that the division that the

10       three of you were in was closing, correct?

11   A   And I also understood that Elizabeth Todd who I had

12       worked with for many years and shared many patients in

13       complex GYN was staying.

14   Q   Okay.  But you understood that you and Dr. Hsu and

15       Dr. Seifer were all being terminated otherwise?

16   A   Correct.

17   Q   And Ms. Todd, she had actually a dual appointment.  She

18       had been working part of her FTE status, so her

19       full-time equivalency, part of her hours were with the

20       OB-GYN department, correct?

21   A   No.  I have no knowledge of that.

22   Q   You didn't know that?

23   A   She was in REI, and she was in REI for 16 years from

24       when I trained her, or 12 years, whenever it was.

25   Q   But you don't know whether or not she -- her hours were
```

```
 1          being charged to the overall OB-GYN department as
 2          opposed to the REI division, you don't know that?
 3    A     Not to my knowledge, but for many years she was housed
 4          entirely in REI.
 5    Q     I understand many years, but you don't have any
 6          personal knowledge as to whether or not, at the time of
 7          the closure, her hours were being charged to OB-GYN, or
 8          she was committing hours to OB-GYN as opposed to the
 9          REI division?
10    A     We were both doing complex GYN in the clinic.  And, in
11          fact, I was doing 80 percent GYN and ultrasound in the
12          clinic at the time of the closure.
13    Q     I understand that.  But my question is:  You're not
14          aware of whether or not her other hours, some of her
15          hours, her work hours, were part of her appointment
16          within the OB-GYN department?  You don't know how those
17          hours were charged?
18    A     I understood she was 100 percent REI, and I don't know
19          if her hours had changed over time, but the long-term
20          history was that she was in REI.
21    Q     I understand the long-term history, but I just want to
22          get to that point in time, not the long-time history.
23          That point in time, you do not have any personal
24          knowledge, one way or the other, that's fine, of how
25          her hours were charged, whether she was committing
```

```
 1         hours to the OB-GYN department in addition to the REI

 2         division.  At that specific point.

 3    A    I don't know.

 4    Q    Okay.  Thank you.

 5             I want to get to a few questions about, it sounds

 6         like, at this point, you are an empty nester; is that a

 7         fair statement?

 8    A    Our son lives in the apartment over our garage, so I'm

 9         not an empty nester.

10    Q    Okay.  You've never -- so even though he's above the

11         garage, all three of your kids are out of college,

12         right?

13    A    Yes.

14    Q    Okay.  And one -- was that the son -- I have two boys

15         and a girl as well.  Was that the son who went to UVM

16         at the time that you were working at UVM?

17    A    No.

18    Q    That was another child?

19    A    Mm-hm.

20    Q    Okay.  And so when you bought the condo in Burlington,

21         you also had a -- one of your kids was at UVM for a

22         couple of years?

23    A    Correct.

24    Q    What years was your child at UVM?

25    A    He -- he was at UVM prior to my starting at UVM, and he
```

1    had one year left when I started on faculty.  No, I

2    needed to be on faculty for a full year before we would

3    get any tuition remission.

4  Q    Okay.  And you were on -- so there was another year

5    that he was there after that, right?

6  A    No.  I got one semester of tuition remission.

7  Q    Okay.  And so he was there for part of the time that

8    you started working -- he was already there at UVM?

9  A    Yeah.  He was already at UVM living off campus.

10  Q    Okay.  All right.  He didn't want to live with you,

11    right?

12  A    What college boy wants to live with his mother?

13  Q    Well, apparently one does now, but I may have that same

14    issue.

15        So there was a part of the time that you were

16    there you had one of your kids was there at UVM, right?

17  A    Yes.

18  Q    Okay.  Now I want to turn your attention to a document

19    that's been marked B12, if we could put that up.

20        Now, you were shown this document by Mr. Vitt,

21    correct?

22        And we can go to the next page, please.  Thank

23    you.

24        Now, this was a letter that you sent to

25    Ms. Giglio, Dr. Merrens, and Dr. Padin and Dr. DeMars,

1      correct --

2   A   Correct.

3   Q   -- at some point, but first you sent it to yourself,

4       right?  That was the first page?

5   A   I wrote this at home.

6   Q   Understood.  I just -- the first e-mail in this

7       sequence, which is B12(001) which is an e-mail sent to

8       yourself and then the letter is attached.

9   A   I think there are multiple copies of this, and so I --

10      one of the issues with the challenges is that when I

11      reviewed the documents, there are multiple.  So, you

12      know, we got, I don't know, 30,000 documents, or some

13      large number, and there are multiple copies of all of

14      it.  So I can't say whether -- it looks like I did

15      e-mail this particular one to myself.

16  Q   That's all I'm asking.

17  A   Okay.

18  Q   That's all I'm asking.  I understand your point about

19      documents, but this was a document that you e-mailed to

20      yourself, right?  That's all I'm asking.

21  A   It appears so.

22  Q   Thank you.  Okay.  And you wrote this on or about

23      May 25th, correct?

24          We could go to the next page.

25  A   I did spend several days writing it, but that was the

```
 1          final copy.
 2   Q   Understood.  It was a long letter, and you took several
 3          days to write it, right?
 4   A   Correct.
 5   Q   And, in fact, this is several weeks after you had
 6          received notice of your termination, correct?
 7   A   Termination was May 4th notice.  This was submitted
 8          May 25th.
 9   Q   Right.  And my question was:  This was several weeks
10          after you received notice of your termination?
11   A   I would define it as two weeks.
12   Q   Well, May 4th and May 25, I think that's three.
13   A   Okay, three.
14   Q   Okay.  Several weeks, right?
15   A   Three weeks.
16   Q   Okay.  And you took several days to write it, right?
17   A   Correct.
18   Q   And I just want to ask you about the individuals you've
19          identified here.  Ms. Giglio, who is she?
20   A   I believe her name has changed since then, but she was
21          the interim director of Human Resources.
22   Q   Did you -- actually, her name has changed.  It's Aimee
23          Claiborne.  So I'll refer to her as Aimee Claiborne if
24          that's okay with you.  She was the interim head of HR,
25          CHRO?
```

```
 1    A    Correct.

 2    Q    So she was the highest ranking person in HR, as far as

 3         you knew?

 4    A    As far as I knew.

 5    Q    And Dr. Merrens, we've spoken about him.  And then

 6         Dr. Padin and Dr. DeMars, right?

 7    A    Correct.

 8    Q    Okay.  Now, you had said on your direct testimony that

 9         no one -- no one at DH ever spoke to you about this

10         letter.

11    A    That's not what I said.

12    Q    You didn't say that?

13    A    I said no one reached out to me.

14    Q    Okay.

15    A    I reached out to them, and I asked for a meeting with

16         Ms. Claiborne.

17    Q    Okay.

18    A    So it's a matter of did anyone contact me and ask me

19         about the content of this letter?  No.  Did I reach out

20         and ask for a meeting?  Yes.

21    Q    And, in fact, that meeting was held -- so

22         Ms. Claiborne, you reached out to her, and she said

23         fine, let's have a meeting, right?

24    A    Correct.

25    Q    And that meeting happened just a few days later,
```

```
 1        correct?
 2   A    I don't recall.
 3   Q    And -- but she didn't say, No, I'm not going to meet
 4        with you, right?
 5   A    Correct.
 6   Q    And she was the head of HR at that point, correct, for
 7        Dartmouth Health?
 8   A    She was, I believe, the interim director, yes.
 9   Q    Right.  The interim head.  Right.  Okay.
10            And you then proceeded to highlight in this letter
11        a number of issues, correct?  You looked at this letter
12        before --
13   A    I have not read through it in the last couple of days,
14        no.
15   Q    Okay.  Well, you know you were going to be asked about
16        it on your direct examination, right?
17   A    Yes.
18   Q    Okay.  So you know you were going to be asked about the
19        specific document.  And you raised -- do you recall
20        raising four different points, and if you want to read
21        it --
22   A    Yeah, I would like to re-read it.
23   Q    Okay.  That's fair.
24            MR. SCHROEDER:  Just take a minute for her to
25        read it.
```

```
 1                THE COURT:  Yes.

 2                MR. SCHROEDER:  Thank you.

 3   Q   (By Mr. Schroeder) And just let me know when you're

 4       finished, Dr. Porter.

 5   A   There's only one page here, can I see the entire

 6       document?

 7   Q   Absolutely.

 8                MS. McDONALD:  It's in Volume 1.

 9                MR. SCHROEDER:  I'm sorry.  May I approach

10       the witness?

11                THE COURT:  Yes.

12   Q   (By Mr. Schroeder) Okay.  Apologies, so that one,

13       and --

14   A   Please take it out for me.

15   Q   Sure.

16                     (Pause.)

17   A   Okay.

18   Q   Okay.  You've had a chance to review that?

19   A   Mm-hm, yes.

20   Q   Okay.  I'll just ask you a few quick questions.  One of

21       the first points that you wanted the hospital to

22       reconsider -- this was your -- I think it was seven

23       pages, right?  I counted them.  I think I'm right.  But

24       as a lawyer, math is not my specialty.

25   A   They're not page numbered.
```

1  Q    Okay.  Well, I counted.  It was seven, but you could

2       verify it on a break.  We're almost there.

3  A    Okay.

4  Q    One of the things that you said in your statement to

5       these four individuals -- and you raised this letter,

6       by the way, with Ms. Claiborne, correct, when you met

7       with her a few days later, right?

8  A    I don't recall.

9  Q    You don't recall raising this seven-page letter?

10 A    I know I had sent it to her.  I don't recall if I

11      raised it to her at the time.

12 Q    Okay.  You wrote a seven-page letter.  You asked for a

13      meeting with her.  The meeting happened two days later.

14 A    I don't recall.

15 Q    Are you telling me you don't recall having any

16      discussion with her about the letter, the contents of

17      the letter?

18 A    I don't recall specifically reviewing the letter, no.

19 Q    Or any of its contents?

20 A    I don't remember that, no.

21 Q    Okay.  But you did have that meeting in person with

22      Ms. Claiborne, correct?

23 A    Correct.

24 Q    And at that point, in May, you had -- so this is May of

25      2017.  And I want to just make sure that the jury

```
 1            understands the time sequence of things.  Your first
 2            surgery -- just to get the perspective of the time,
 3            your first surgery was in December of 2015?
 4   A   I had a blood patch in December of 2015.
 5   Q   Okay.
 6   A   My first surgery was not until September of 2016.
 7   Q   Okay.  And when you had that blood patch in December of
 8            2015, were you out on short-term disability at that
 9            point, or did you go out on short-term disability?
10   A   Yes.
11   Q   And you were out for approximately six months?
12   A   On short-term disability, yes.
13   Q   Right.  And short-term disability is, generally
14            speaking, a six-month policy.  Are you aware of that?
15   A   For all providers, there are -- for all employees at
16            Dartmouth-Hitchcock, I believe that's correct.
17   Q   Okay.  And so you were out on short-term disability
18            from mid December, right, to mid June of 2016, right?
19            Mid December of --
20   A   I was out on short-term disability for six months, yes.
21   Q   Okay.  I want to make sure we have a perspective of
22            time here.  Mid December of 2015 to roughly mid June of
23            2016?
24   A   Mid December 2015 to six months later.
25   Q   Okay.  And the -- at this point in time, which is the
```

```
 1        letter that's in front of you, this is May 2017.  I

 2        just want to make sure that we have the -- so mid

 3        December 2015 to mid June or so of 2016, that's six

 4        months, right?

 5   A    Correct.

 6   Q    Okay.  I just want to make sure that -- we'll come back

 7        to this document in a minute, but I just want to make

 8        sure that from just a perspective issue and chronology

 9        of events.  So you were out for that period of time.

10        You came back to work sometime in June of 2016, right?

11   A    I believe I came back earlier.

12   Q    And you were part -- well, you just said you were out

13        for six months on short-term disability, so I'm just

14        trying to track this in general terms right now.

15   A    Well, we can pull the timeline if you would like to be

16        specific.

17   Q    I'm just trying to get answers as to how long you were

18        out on short-term disability.  You said six months?

19   A    I was on short-term disability for six months.

20   Q    Okay.

21   A    I would refer to the timeline that's published for the

22        exact numbers and hours of when I returned.

23   Q    Understood.  You came back at some point in the summer

24        of 2016, correct?

25   A    Correct.
```

```
 1   Q    And then your first surgery was in the fall of 2016?

 2   A    Yes.

 3   Q    Okay.  And do you recall you were out for a couple of

 4        months at that point?

 5   A    I was on modified bed rest for six weeks --

 6   Q    Okay.

 7   A    -- after my surgery.

 8   Q    And that was sometime -- was that sometime in August to

 9        November of 2016?

10   A    I was at the Mayo Clinic in August of 2016 and then out

11        on modified bed rest, but I started attending team

12        meetings by phone, and I wrote a book chapter, and I

13        was doing some work in that period of time.

14   Q    Okay.  And then you were gradually coming back at

15        various levels in January, February, March, April of

16        2017, correct?

17   A    I had a programmed return schedule that I had to meet

18        certain criteria of complexity by my healthcare team

19        and followed that.

20   Q    Okay.  I understand that.  I just want -- I want you to

21        just answer the question.

22             You were gradually increasing your hours over that

23        period of time?

24   A    Yes.

25   Q    And that happened to be pursuant to the instructions
```

```
 1           from your healthcare team at the Mayo Clinic?
 2    A      No, my healthcare team at Dartmouth.
 3    Q      Okay.  Your healthcare team at Dartmouth.
 4              But then your first surgery, you said, was where?
 5           Was that at Mayo?
 6    A      I had a spinal surgery at the Mayo Clinic in September
 7           of 2016.
 8    Q      Okay.  That's what I thought.  So you had a healthcare
 9           team at the Mayo, and then you had a healthcare team at
10           Dartmouth Health?
11    A      Correct.
12    Q      Okay.  And pursuant to that, you were increasing the
13           number of hours that you were working at Dartmouth
14           Health in January, February, March, April, right?
15    A      Yes.
16    Q      Now, in fact, and you alluded to this, or you testified
17           to this before, the fact that you had to have a second
18           surgery at the Mayo Clinic.
19    A      Correct.
20    Q      And that was in the fall of '17.  This is after the REI
21           division is closed, correct?
22    A      Correct.
23    Q      And as a result of that second surgery, that was the
24           fall of 2017; that was September to, say, mid November
25           when you were out?
```

```
 1    A    Yes.

 2    Q    Okay.  Prior to that, before it came to a head that you

 3         had to have this second surgery, do you recall having a

 4         few visits for varying lengths of time at the Mayo

 5         immediately after the REI division closure?

 6    A    I did not immediately afterwards go.  I went to the

 7         Mayo in September for my second surgery, but I was not

 8         physically there, to my recollection, no.

 9    Q    Right.  But in May through -- May 29th through

10         June 13th of 2017 and then June 28th to July 11th, do

11         you recall having to go out the Mayo for various

12         visits?

13    A    In 2017?

14    Q    Right.

15    A    No.

16    Q    You don't recall that at all?

17    A    No.

18    Q    Okay.  Were you experiencing symptoms related to your

19         condition at that point?

20    A    Yes.

21    Q    Okay.  Now, with respect to -- and I would like to go

22         back to your letter.  The second reason that you gave

23         or differentiate -- the second reason or factor that

24         you wanted the four individuals to consider was that

25         Dr. Seifer and Hsu have a limited scope of practice,
```

Porter - Cross by Mr. Schroeder

```
 1        correct?

 2    A   Correct.

 3    Q   And I want to go to just the -- let's see here.

 4            Now, to the extent -- would you agree with me that

 5        if a doctor has a limited scope of practice or doesn't

 6        feel that they should do something or some sort of

 7        practice that, in fact, it's safer for them not to

 8        perform that procedure?

 9    A   I think that's speculative.

10    Q   You think it's speculative?

11    A   I think that it would depend on what they thought their

12        abilities were and what procedure we were talking

13        about.

14    Q   In this letter, you're making a statement to these four

15        individuals that, comparatively speaking, they had a

16        limited scope of practice, correct?  You say that,

17        correct?

18    A   Dr. Seifer didn't do any GYN surgery nor was he

19        credentialed to do ultrasound; and Dr. Hsu did not do

20        complex robotic surgery, and he also was not an

21        ultrasound expert.

22    Q   Right.  I'm just asking whether or not, and we've

23        highlighted here for you on the screen, whether you

24        said -- on the screen there, on the screen -- "both the

25        other two clinicians have a very limited scope of
```

```
 1          practice," right?  You said that?
 2     A    Correct.
 3     Q    And you were differentiating yourself from the other
 4          two physicians, correct?
 5     A    Correct.
 6     Q    And you understood, though, that you and the other two
 7          physicians were being terminated at the same time,
 8          right?
 9     A    Correct.
10     Q    Now, at the time, you had -- you were going through
11          proctored surgeries, correct?
12     A    Correct.
13     Q    And that meant having other physicians in the room with
14          you?
15     A    Correct.
16     Q    As a result of the second surgery, I think you
17          testified on direct exam, you had to go through that
18          whole proctoring process again, correct?
19     A    I volunteered to do it, yes.  And as a new faculty at
20          UVM, it was an expectation.
21     Q    Okay.  And you would have had to do that -- would you
22          have had to do that as well at Dartmouth Health just
23          because of the second surgery, if you were still there?
24     A    Most likely, and I would have accepted it.
25     Q    Okay.  I just wanted to know "yes" or "no" whether you
```

1          were doing it.

2                  In looking at the seven-page letter that you

3          wrote, you do not make any claims in here of disability

4          discrimination, right?

5     A    I wanted my job back, and at that point, a lot of the

6          data and information about the disability

7          discrimination was still evolving.  So I wanted my job.

8          And it was very clear to me in the three times that

9          Dr. Merrens said it at that meeting where I was

10         terminated, he said three times to me to stay out on

11         disability, and when I saw Dr. DeMars on the sidewalk,

12         she also said to me, she could not have kept me because

13         of my disability.

14    Q    My question though, just my question, was not about

15         comments that Dr. Merrens did or did not make, or

16         Dr. DeMars.  In fact, you don't reference any of those

17         conversations in this specific document, right?

18    A    Not that I recall.

19    Q    Well, you just read it and you were -- you knew you

20         were going to be asked it on direct exam by your

21         counsel because it was an exhibit; it was one of the

22         few exhibits that came in.  You knew you were going to

23         see this documents, so when you say you don't recall,

24         you've read it, right?

25    A    So I would like to read you the part of the letter that

```
 1        might answer your question.

 2   Q    No.  I would appreciate it if you would just answer my

 3        questions.  Your counsel can ask you questions

 4        afterwards.

 5             My question to you though was:  You do not refer

 6        or make any claims of disability discrimination --

 7        those words -- or retaliation, anywhere in this

 8        document, right?

 9   A    That's not how I interpret it, no.

10   Q    Whether you interpret it -- how you interpret it is not

11        the question.  The question is:  You do not use those

12        words in any which way, right?

13   A    "The termination of my employment will impact my

14        recovery from the debilitating condition I suffered

15        last year."

16   Q    Okay.  That --

17             MR. SCHROEDER:  I would ask the Court just

18        for instruction, just to answer my question.

19             THE COURT:  Dr. Porter, you should answer the

20        question that's being asked of you by counsel.

21   Q    (By Mr. Schroeder) Okay?  Nowhere in this document do

22        you use the phrase "disability discrimination" or

23        "retaliation," right?

24   A    No.

25   Q    Okay.  And, at that point, you already had legal
```

```
 1        counsel, correct?

 2   A    Yes.

 3   Q    Okay.  I think --

 4                MR. SCHROEDER:  Your Honor, if it's okay,

 5        before I switch to another topic, I think this would

 6        be --

 7                THE COURT:  Yes.  It's about the lunch break.

 8        So we'll take our one-hour break for lunch.  I have

 9        12:05.  So we'll start again at 1:05.  All right.

10        Thank you.

11                     (Jury exits.)

12                     (Noon recess taken.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       Afternoon Session

 2                             *  *  *

 3                        (Jury present.)

 4             THE COURT:  Go ahead.

 5             MR. SCHROEDER:  Thank you, Your Honor.

 6    Q   (By Mr. Schroeder) Good afternoon, Dr. Porter.  I want

 7        to go back to that May 25th letter that you had sent to

 8        those four individuals, right, Aimee Claiborne -- I'm

 9        not going to ask you anything specific about it so you

10        don't have to read it.

11    A   I would like to have it if we're going to talk about

12        it.

13    Q   Okay.  I'm not going to ask you a specific question

14        about the document.  I'm just asking you about the four

15        people.  So there was Aimee Claiborne, Dr. DeMars,

16        Dr. Merrens, and Dr. Padin, correct?

17    A   Correct.

18    Q   Okay.  And you approached -- out of the four, you

19        immediately approached, or I should say, a few weeks

20        later approached Ms. Claiborne, correct?

21    A   I asked for a meeting with her, yes.

22    Q   Okay.  And that meeting happened sometime in that time

23        frame after your May 25th letter, correct?

24    A   Correct.

25    Q   Now, was that the only -- that was the only person you
```

```
 1        specifically reached out to regarding this letter to

 2        have a meeting with, right?

 3   A    Correct.

 4   Q    Okay.  And up until that point, you knew Dr. Merrens,

 5        correct?

 6   A    I don't know Dr. Merrens.  Well, I know who he is, yes.

 7   Q    You know who he is, but you knew him, right?

 8   A    Yes.  I hadn't talked to him in years, but yes.

 9   Q    Right.  It had been a couple years since you talked to

10        him regularly, right?

11   A    No, it had been many years, I believe.

12   Q    Many years?

13   A    To my knowledge; to my recollection, yes.

14   Q    Okay.  But you knew him, correct?

15   A    I knew who he was, yes.

16   Q    Well, you had prior dealings with him, right?

17   A    Yes.

18   Q    You'd had interaction with him by e-mail, right?

19   A    Yes.

20   Q    You met with him in person, correct?

21   A    Many years ago, yes.

22   Q    You say "many years ago."  Well, we'll get to that

23        later, but your dealings with him in that prior

24        instance, you had -- you were able to communicate with

25        him, right?  You looked to him for guidance on certain
```

1        issues?

2    A    I had a conversation with him.

3    Q    You had more than one conversation, didn't you?

4    A    I don't recall.

5    Q    Okay.  We'll try to refresh your recollection later.

6         But it had been a couple years, right, since you hadn't

7         had any dealings with him in say 2014, 2015, 2016,

8         right?

9    A    When I started taking the fellows, I got an e-mail from

10        him, and that's all I recall at this point.

11   Q    In that time period?

12   A    In that time frame.

13   Q    Okay.  But other than an e-mail about the fellows --

14        and do you remember when that was?

15   A    No, I don't.

16   Q    Okay.  Other than that one e-mail about the fellows, in

17        that three-year time period, you don't recall any other

18        interactions with Dr. Merrens, right?

19   A    Not to my recollection currently, no.

20   Q    Right.  And with respect to 2017, you didn't have any

21        interaction with him in January, February, March, or

22        April, right?

23   A    Not to my recollection.

24   Q    One of the questions I asked you earlier was about when

25        you were on short-term disability and long-term

Porter - Cross by Mr. Schroeder

1       disability, and I just want to be sure we're clear on

2       the time frames.

3                   MR. SCHROEDER:  So if we could pull up

4       Exhibit U?

5                   MS. McDONALD:  We're having a little bit of a

6       technical difficulty at the moment.  The program

7       appears to be frozen.

8                   THE COURT:  Are you asking to bring up

9       something that's not in evidence?

10                  MR. SCHROEDER:  It's not in evidence yet.

11                  THE COURT:  Do you mean just for the witness

12      stand?

13                  MR. SCHROEDER:  Oh, because it would be over

14      here.

15                  THE COURT:  Right.

16                  MR. SCHROEDER:  I got it.

17                  THE COURT:  So you have a paper copy; you can

18      hand that to the witness.

19                  MR. SCHROEDER:  We could do that.

20                  THE COURT:  Or I'm sure we could have it on

21      the screen just for the witness.

22                  MR. SCHROEDER:  I don't want to make -- I

23      think we have enough technical problems as it is.  Let

24      me get a hard copy of it.

25                  MS. McDONALD:  It should be Volume 1.

```
 1   Q    (By Mr. Schroeder) Okay.  I'm showing you a document
 2        that's been marked Exhibit U.  Do you recognize that
 3        document?  Just one page.
 4   A    I don't.
 5   Q    Okay.  Is that an e-mail from you to somebody in
 6        Provider Services on July 5th, 2016?
 7   A    July 6th, 2016, correct.
 8   Q    Right.  And that's your e-mail address, correct?
 9   A    When I was at Hitchcock, correct.
10   Q    Okay.  Do you have any reason to doubt its
11        authenticity?
12   A    No.
13             MR. SCHROEDER:  Move for admission.
14             THE COURT:  Any objection?
15             MR. VITT:  No objection.
16             THE COURT:  Okay.  It's admitted.
17             MR. SCHROEDER:  Thank you.  May I now put it
18        up on the screen?  I'll get this down.  We're still
19        having technical difficulties.
20             MS. McDONALD:  Do you want to do it on the
21        Elmo?
22             MR. SCHROEDER:  I'll just have her read it
23        into the record.
24   Q    (By Mr. Schroeder) Let me just ask you to read the
25        e-mail into the record Ms. -- Dr. Porter, dated
```

| | |
|---|---|
| 1 | Tuesday, July 5, 2016, from you to Provider Services |
| 2 | regarding the subject "Disability." |
| 3 | A | "I've been on long-term disability, returned to work 9 |
| 4 | to 11 hours a week as of 6/14." |
| 5 | Q | Does that refresh your recollection that -- and I think |
| 6 | you testified to this, and I want to make sure that the |
| 7 | jury understands the chronology because we go back and |
| 8 | forth.  December 15 of '15, thereabouts, to June 14 of |
| 9 | 2016 is about six months.  Is that about the time |
| 10 | period that you were on short-term disability? |
| 11 | A | I was on short-term disability for six months, yes. |
| 12 | Q | Okay.  After short-term disability, were you qualified |
| 13 | at some point for long-term disability? |
| 14 | A | Yes. |
| 15 | Q | And did that -- whether or not it happened in right |
| 16 | sequential order, was there a gap in coverage, or did |
| 17 | the short-term disability, after you had those |
| 18 | benefits, convert then to long-term disability? |
| 19 | A | I believe there wasn't a gap in coverage, but to the |
| 20 | best of my knowledge, there wasn't. |
| 21 | Q | Okay.  There was not? |
| 22 | A | Yes. |
| 23 | Q | Okay.  With respect to -- so then you went on long-term |
| 24 | disability sometime in June of 2016, correct? |
| 25 | A | I believe so. |

Porter - Cross by Mr. Schroeder

```
1   Q   Okay.  And did you have long-term disability benefits
2       then until the summer of 2018, thereabouts?
3   A   I had continued long-term disability while I was on per
4       diem, yes.
5   Q   Okay.  So when the division closed in May or June of
6       2017, you were already on long-term disability benefits
7       at that point, correct?
8   A   Correct.
9   Q   And you were receiving compensation through that, I'll
10      call it, LTD plan?
11  A   I was receiving part of my salary as being on long-term
12      disability, yes.
13  Q   Okay.  And despite the termination or the closure of
14      the REI division and your termination of employment,
15      you continued to receive long-term disability benefits
16      until somewhere in the summer of 2018; is that right?
17  A   I received partial -- I received long-term disability
18      benefits that were prorated based on the amount I was
19      working, and I also had to pay my own health insurance.
20  Q   Okay.  My question though is that the long-term
21      disability benefits still -- there was no gap even
22      after the closure of the REI division; they carried
23      forward into the period after your termination of
24      employment all the way through until May or June of
25      2018?
```

```
 1   A    I had partial reimbursement from long-term disability,
 2        and I was also earning a per diem salary, yes.
 3   Q    Right.
 4   A    And until my primary care provider approved I come off
 5        long-term disability, yes.
 6   Q    And that happened when?
 7   A    Well, let's look at the deposition to be sure, but it
 8        was the spring of 2018, I believe, spring/summer.
 9   Q    We'll get to the deposition if we have to, but I just
10        want -- this isn't a trick question.  I'm trying to
11        figure out for chronology for the jury when you came
12        off long-term disability and you had a full, clean bill
13        of health.
14   A    Well, when my primary care provider had me come off
15        long-term disability.
16   Q    And was that in and around May, June 2018?
17   A    I believe so.
18   Q    Okay.  And, at that point, you were working at UVM,
19        correct?
20   A    On per diem, yes.
21   Q    Right.  And with respect to your long-term disability
22        benefits, whatever the plan was, you said they were
23        prorated.  Was it prorated because, if you worked,
24        there would be a deduction from your benefit?
25   A    Correct.  I was submitting what I was earning, and they
```

```
 1         would be reduced based on my -- the Hartford and the
 2         disability would reduce my payments based on my income.
 3    Q    Right.  So in September, October, and November, that
 4         time period right after you had your second surgery,
 5         you were out completely, you were receiving the full
 6         long-term disability benefit right?
 7    A    Correct.
 8    Q    Okay.
 9              MS. McDONALD:  Would you like a copy for the
10         Elmo?
11              MR. SCHROEDER:  Sure.  Your Honor, a quick
12         second so I can kind of figure this one out.
13              THE COURT:  Yes.
14    Q    (By Mr. Schroeder) Now, I would like to turn to you
15         working in the REI division.  You said when the REI
16         division -- when you started there, were you one of the
17         first people there?
18    A    I joined -- Dr. Manganiello was the first person there,
19         and I joined several years after he had been there.  I
20         think he started in the late '70s, and I started in
21         '96.
22    Q    Okay.  Was it a fairly -- so when you got there, there
23         was just Dr. Manganiello?
24    A    And myself, yes.
25    Q    Okay.  So just the two of you?
```

```
 1   A   Yeah.
 2   Q   Okay.  So is it fair to say that that was a pretty
 3       small program at that point?
 4   A   The REI service itself was actually pretty global.  He
 5       was a specialist in genetics and menopause and
 6       everything else, so it was not particularly small.  The
 7       IVF, again, which is that sliver of REI, was small.
 8   Q   Okay.
 9   A   IVF was, but not the infertility service per se.
10   Q   Okay.  But other than you and Dr. Manganiello, it was
11       just the two of you, right?
12   A   And we had nurse practitioners.  We had one or two
13       nurse practitioners as well.
14   Q   Okay.  So it was you, one other doctor, and one or two
15       nurse practitioners, right?
16   A   Correct.
17   Q   And that was the REI division, right?
18   A   Correct.
19   Q   Okay.  So when I said it was small, would you agree
20       with me that a handful of people is a small program,
21       say, compared to, you mentioned before, Boston IVF,
22       right?
23   A   They're not equivalent.
24   Q   Right.  Boston IVF is a fairly large program, right?
25   A   Boston IVF does IVF; it's not a reproductive medicine
```

```
 1           program, no.
 2   Q    So compared to what the REI division was at that time
 3           which did IVF at Dartmouth Health?
 4   A    If you're looking at the comprehensive reproductive
 5           medicine program, that's not Boston IVF.
 6   Q    Okay.  Let me turn your attention to the REI division
 7           in 2016.  We'll go back in time in a second, but with
 8           respect to the REI division -- and this is before David
 9           Seifer becomes division director of the REI division,
10           okay.
11   A    Mm-hm.
12   Q    So just time period.  So early 2016, there's
13           yourself -- and I just want to go by the doctors for a
14           second.  I want to make sure the jury understands who
15           is in the division and who is not.  You had -- and I'm
16           just talking about physicians and nurses that are
17           providers within the REI division.
18               So at that point, you have yourself and Dr. Hsu,
19           correct?
20   A    And our nurse practitioner Elizabeth Todd.
21   Q    Beth Todd?
22   A    Yes.
23   Q    So those are the three, right.  So it's you, Albert Hsu
24           and Beth Todd?
25   A    And I believe we had fellows with us as well.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  And do the fellows go in and out of the program? |
| 2 | A | We had a fellow assigned each year for three years, and |
| 3 | | they would be assigned for a year.  Some would come |
| 4 | | down for certain days.  And one of the fellows, Dr. Joe |
| 5 | | Finlay, was there assigned the entire year. |
| 6 | Q | So Dr. Finlay was there the entire 2016? |
| 7 | A | He was there during his fellowship when he came.  So he |
| 8 | | had -- he was mostly there in 2016, I believe, yeah. |
| 9 | Q | Okay.  And how many days a week? |
| 10 | A | It varied based on whether the IVF schedule was up or |
| 11 | | not.  So when I was there, he was there operating in |
| 12 | | the OR with me.  He was doing IVF with me in clinic. |
| 13 | | If IVF wasn't there, I would have to look back at the |
| 14 | | dates specifically, but we had Dr. Dundee from here. |
| 15 | | We had Joe Finlay, and we had Ranju Raj that were |
| 16 | | fellows here, and I would have to go back and look at |
| 17 | | the specific dates they were there.  They were there |
| 18 | | variably to get exposure to REI and IVF. |
| 19 | Q | But they were -- I'm sorry.  They were fellows, |
| 20 | | correct?  They weren't full-fledged, full-time |
| 21 | | positions? |
| 22 | A | But they were working in the division, yes. |
| 23 | Q | Right.  But you weren't there, though, for the first |
| 24 | | five and a half months of 2016, right? |
| 25 | A | Correct. |

```
 1   Q    Okay.  I want to ask you about the nurses in the REI

 2        division specifically --

 3   A    Mm-hm.

 4   Q    -- during that time frame.

 5             And I want to just see if I've got the right

 6        number and verify this.  So early 2016, you had Casey

 7        Dodge, right?

 8   A    I believe so.

 9   Q    Okay.  Sharon Parent?

10   A    I believe so.

11   Q    Was Marlene Grossman there?

12   A    No.

13   Q    Okay.  And then a woman by the name of Julie?

14   A    I suppose so.

15   Q    Okay.

16   A    Marlene may have been -- Marlene was not at Hitchcock

17        clinic proper campus, ever.  She was down in the

18        Manchester/Bedford office outpatient only.

19   Q    Right.  So she was -- was she handling the southern

20        sphere of New Hampshire?

21   A    Not completely, no.

22   Q    Well, no.  Not completely, but was that -- out of the

23        REI nurses, that one in particular was stationed at the

24        Manchester/Bedford location?

25   A    She was employed down there.
```

Porter - Cross by Mr. Schroeder

```
 1   Q    Yes.  She was part of your time?

 2   A    Not completely.  She also did GYN services.

 3   Q    She had other responsibilities?

 4   A    Yes.

 5   Q    Is that because the REI services there were not a high

 6        enough volume to fill her plate?

 7   A    No.  It was expected that the nurses would cross cover

 8        each other.

 9   Q    So it had nothing to do with volume of patients?

10   A    No.

11   Q    Okay.  I would ask you to -- I want to ask you about

12        specifically who is in and who's out of the REI service

13        at that point.

14             MR. SCHROEDER:  If I may approach the witness

15        to show her another document?

16             THE COURT:  Yes.

17             MR. SCHROEDER:  This is J.  Just so I know

18        what I'm doing here, Emerson, do I just put it down

19        flat or upside down?  I feel like I'm back in eighth

20        grade.

21             THE CLERK:  Text up.

22   Q    (By Mr. Schroeder) Well, before I put it on the screen,

23        let me show you -- I'm showing you Exhibit J, and that

24        is -- can you identify -- are you -- is this e-mail

25        string to and from you, Dr. Porter.
```

```
1   A    I believe it's to Karen George and from me.

2   Q    Right.  And that's May 4th, 2016, right?

3   A    Yeah.

4   Q    And then it goes -- and there's a series of e-mails and

5        I'll start from the back and I'll move my way up.

6   A    I'm not sure I have the complete one.

7   Q    You do, it's just in the book.

8   A    Okay.

9                 THE COURT:  It's not an admitted exhibit.

10                MR. SCHROEDER:  Understood.  I was just going

11       to move for admission.

12                THE COURT:  Okay.

13                MR. VITT:  Give me a second.  I'm sorry.

14                MR. SCHROEDER:  Sure.

15                MR. VITT:  Have you moved to admit this?

16                MR. SCHROEDER:  That's what I was seeking.

17       That's what I thought you were doing.

18                MR. VITT:  No objection.

19                THE COURT:  Okay.  So Defendant's Exhibit J

20       is admitted.

21                MR. SCHROEDER:  Thank you.  May I use the

22       Elmo to put this on the screen?

23                THE COURT:  Yes.

24                MR. SCHROEDER:  Thank you.

25   Q    (By Mr. Schroeder) This is the third page of the
```

```
 1        exhibit, J(003), and do you see that e-mail?
 2   A    Yes.
 3   Q    Okay.  And it is from Kathleen Mansfield, correct?
 4   A    Yes.
 5   Q    And you testified about her yesterday.  She goes by
 6        Katy?
 7   A    I don't remember testifying about her, but, yes.
 8   Q    Okay.  But my question is she goes by Katy, right?
 9   A    I believe so, yes.
10   Q    You had regular interaction with her, right?
11   A    Right.
12   Q    Over a period of years?
13   A    Yes.
14   Q    Okay.  So if we go to Page 2, I'll put that in front of
15        you.  At the bottom, it's from Katy Mansfield and
16        that's the e-mail, Marti and Green Team.  Does that
17        refresh your recollection that Marti Lewis was joining
18        the REI division at that point?
19   A    I don't have a recollection of this series of
20        communications, no, but she did join REI service.
21   Q    Okay.  Does that refresh your recollection by looking
22        at this document that that was communicated to you,
23        among others, that she was joining the division?
24   A    I don't remember it coming through here, but she did
25        join us.
```

```
1   Q   Well, you got the e-mail, right?

2   A   It appears so.

3   Q   Well, do you have any reason to doubt it?

4   A   No.

5   Q   Okay.  And you state -- sorry, the Elmo is not close

6       enough to the mic.

7           You state here on May 4th, 2016, from you to Karen

8       George -- and who is Karen George?

9   A   Karen George is a generalist who also was the residency

10      director.

11  Q   Okay.  So the residency director for the REI program,

12      or just the residency director for OB-GYN?

13  A   So we had trainees in general OB-GYN, 16 of them, and

14      Karen George was their director.

15  Q   And you wrote an e-mail to her, correct?

16  A   I've written several e-mails to her.

17  Q   Right.  Well, this particular e-mail though says,

18      "Okay.  You'll need to let me know the story.  They did

19      an intervention with Julie and switched out Marti.

20      We've had so many failures, and this one is

21      particularly demoralizing for Sharon.  Really, the job

22      is much too big and needs to be remodeled.  We need

23      someone just for prior authorizations, comma, and

24      triage."  Did I read that correctly?

25  A   I believe so.
```

```
 1   Q    Okay.  So Julie was one of the REI nurses at that
 2        point, and she was being switched out, right?
 3   A    Correct.
 4   Q    This is May 2016, correct?
 5   A    Correct.
 6   Q    So this is just about -- actually, it's one year from
 7        the date that the REI division is closed, correct?
 8   A    Correct.
 9   Q    And, at this point, Marti is coming into the division,
10        the REI division, right?
11   A    Correct.
12   Q    You go to the top and there's an e-mail from Karen
13        George where she says, "She is terrible as a generalist
14        triager.  Maybe the focused subspecialty will be
15        better.  She really has bad communication skills, dot
16        dot dot."  Did I read that correctly?
17   A    Which page are you looking at?
18   Q    Page 2, right at the top.  Right at the top.  It's
19        actually on your screen.  Right at the top.
20   A    Yes, May 4, yes, from Karen George, yes.
21   Q    Okay.  You then respond to her, right?
22   A    Yeah.
23              MR. SCHROEDER:  And, Emerson, is there a way
24        to get this --
25              THE CLERK:  Are you looking to zoom?
```

Porter - Cross by Mr. Schroeder

```
 1              MR. SCHROEDER:  Yeah, a little bit because
 2       it's not... and I don't want it the whole page with my
 3       hand there.
 4              THE CLERK:  That's as far out as it will
 5       zoom.  You can also zoom in and out on the device
 6       itself.
 7              MR. SCHROEDER:  Now you're really challenging
 8       me.  Thank you.
 9  Q    (By Mr. Schroeder) This is the whole e-mail.  If you're
10       looking at this, at the bottom, it's you to Karen
11       George, May 4th, 2016.  Can you read that into the
12       record for me?
13  A    Do you want me to start from the very bottom one?
14  Q    No.  Yes.  I'm sorry, yes.  At 12:34 p.m. from you to
15       Karen George, and it's "Re: Marti and Green Team."
16  A    "Well, that won't work.  The REI workload is huge,
17       multiple software programs, physiology, procedures and
18       airway management -- or airways, et cetera, et cetera.
19       The patients require and demand good communication
20       skills and, frankly, it is a nightmare in REI right now
21       with Albert Hsu and Julie.
22          "There were some human resources reasons that
23       Heather and Katy wanted to do the switch.  Julie
24       completely melted down, and there were multiple
25       documentation of patient safety issues.  She needs to
```

Porter - Cross by Mr. Schroeder

1      have a very narrow scope of responsibilities, and not

2      much interest in learning new things."

3  Q   At this point, you're a year out from the closure of

4      the REI division.  You've got one nurse who is failing;

5      is that a fair statement, Julie?

6  A   Julie, yes.

7  Q   Okay.  And you're switching out and putting Marti into

8      the REI division.  I'm not saying you specifically, but

9      she's being placed into the REI division, right?

10 A   Yes.

11 Q   And the early critiques of her from Dr. George are,

12     let's say, less than favorable?

13 A   Yes.

14 Q   And you seem to agree, right, because you say, "Well,

15     that won't work," right?

16 A   Yes.

17 Q   Karen George then says to you above that on May 4th at

18     12:35 p.m.  "I'm sorry that I got you worked up.  The

19     nursing situation on all fronts is a nightmare."  Did I

20     read that correctly?

21 A   Correct.

22 Q   Right.  And so at that point, you got some issues with

23     the REI nurses because you're switching out one and now

24     you're bringing somebody in who is -- doesn't have the

25     skill set yet to be an REI nurse; is that a fair

1        statement?

2    A    Correct.

3    Q    Okay.

4              MR. SCHROEDER:  May I approach the witness?

5              THE COURT:  Yes.

6              MR. SCHROEDER:  With respect to Exhibit J, I

7        want to make sure we've admitted that into evidence,

8        correct, Your Honor?

9              THE COURT:  Yes.  That was the one that you

10       just admitted.

11             MR. SCHROEDER:  Yes.  That's what I thought.

12       The other one that I want move to admit.

13             THE WITNESS:  This was one of my care

14       providers.  Can we admit it?  This is one of my

15       healthcare providers.

16             THE COURT:  There isn't a pending question.

17             MS. NUNAN:  We're not sure what she's looking

18       at.

19             MR. SCHROEDER:  We are on Exhibit K.

20       Exhibit K.

21             THE WITNESS:  Yes, she is a healthcare

22       provider of mine.

23             MR. SCHROEDER:  I understand that.  Your

24       Honor, I was reminded by my able co-counsel,

25       Ms. McDonald, that I didn't ask to admit Exhibit U.

```
 1        Move for admission of U.

 2                THE COURT:  Mr. Howe is telling me that it

 3        was previously admitted.

 4                MR. SCHROEDER:  Apologies.

 5                THE COURT:  Exhibit U.  But now you are

 6        dealing with Exhibit K with the witness, not admitted.

 7                MR. SCHROEDER:  Not admitted, and I'm going

 8        to ask a few questions to hopefully get it admitted.

 9                THE WITNESS:  This one?

10   Q    (By Mr. Schroeder) Yes, Exhibit K that I just put in

11        front of you.

12   A    She's a healthcare provider of mine.

13   Q    I understand that, and I'm asking you whether this was

14        a back-and-forth between you and your healthcare

15        provider on May 10th?

16   A    Yes.

17   Q    Okay.  And does this refresh your recollection as to

18        the back-and-forth that you were having with getting

19        short-term disability and long-term disability benefits

20        approved?

21                THE COURT:  Okay.  So you're asking questions

22        of the witness about this document that's not in

23        evidence?

24                MR. SCHROEDER:  Right.

25                MR. VITT:  May we approach the bench?
```

1              THE COURT:  Sure.

2                   (Bench conference held.)

3   Q   (By Mr. Schroeder) I'm not going to ask you anything

4       about your personal health information at all.  I'm

5       just referring to one specific sentence in it.

6              MR. SCHROEDER:  And I ask -- move for

7       admission before I do that.

8              THE COURT:  Right.  Any objection to the

9       admission of Defense Exhibit K?

10             MR. VITT:  After it's redacted, no.

11             THE COURT:  Right.  So it will be admitted

12      now, Defense Exhibit K admitted without objection,

13      except for redactions that will be made before the

14      exhibit is available to the jury.

15  Q   (By Mr. Schroeder) Just so that we focus on the one

16      specific part that has nothing to do with yourself,

17      Dr. Porter, am I correct that in one of your e-mails on

18      May 10th, 2016, you say, "Sharon back now from

19      vacation.  Beth and Sharon will be holding down the

20      fort.  Problem nurse fired last week.  It was a mess.

21      Patients left without care."

22  A   Correct.

23  Q   Thank you.

24             MR. SCHROEDER:  We'll submit a redacted

25      version of that.

```
1    Q    (By Mr. Schroeder) Do you recall, Dr. Porter -- so at

2         that point, Marti comes into the REI division, Julie's

3         out, right?

4    A    Correct.

5    Q    And this would be -- right.  This would be sometime in

6         the May 2016 time frame?

7    A    Correct.

8    Q    And, at that point, the nurses that are in the division

9         are Casey, Marti, Sharon, and Marlene in the south; is

10        that accurate?

11   A    No.

12   Q    That's not accurate?

13   A    No.  Because we had involved a lot of other nurses who

14        were working with us per diem, and we had other nurses

15        from the outpatient clinic also working with us.  So it

16        wasn't just those nurses.

17   Q    Okay.  But with respect to the ones that were working

18        full-time -- and that's a fair question, fair point.

19        The ones that were working full-time in the REI

20        division at that point:  Casey, Marti, Sharon, Marlene.

21        Am I missing anybody?

22   A    I couldn't tell you if the others were working

23        full-time, but we had a whole cadre of other nurses who

24        were working from same-day surgery were coming up to

25        work with us from the clinic, and the other individuals
```

```
 1          who were floating with us in all different roles.  So
 2          it wasn't just them, and I couldn't comment on the
 3          full-time status or not.
 4     Q    Okay.  But the people that you were working with on a
 5          regular basis, on a daily basis --
 6     A    We were working on a daily basis with all kinds of
 7          other nurses, yes.
 8     Q    I understand that.  But were they assigned on a
 9          full-time basis to the REI division?
10     A    Some of them, yes.
11     Q    Some of them I identified, correct?  Casey, Marti,
12          Sharon, Marlene, right?
13     A    There were other nurses working with us, and I couldn't
14          tell you if they were on a full-time basis just to us
15          or not, but there were several other nurses working
16          with us, yes.
17     Q    Well, in May 2016 -- this is right around the time that
18          Dr. Seifer is close to joining the REI division,
19          correct?
20     A    Correct.
21     Q    Okay.  So up until that point, it's you and Dr. Hsu in
22          the REI division, right?
23     A    And a nurse practitioner, yes.
24     Q    And Beth Todd?
25     A    Yes.
```

```
 1   Q    Okay.

 2   A    And the fellows.

 3   Q    Right.  And the full-time positions were you and

 4        Dr. Hsu, right?

 5   A    I was on disability part of that, correct.

 6   Q    Right.

 7   A    Yes.

 8   Q    Right.  So, actually, in 2016 before Dr. Seifer gets

 9        there, it's just down to Dr. Hsu?

10   A    For a short time, yes, for that time that I was on

11        disability, yes.

12   Q    Right.  So for that six-month time period, December of

13        2015 through June of 2016, right, the only REI doctor

14        in the REI division was Dr. Hsu?

15   A    Correct.

16   Q    So any REI services in the REI division were being run

17        through Dr. Hsu during the time that you were out?

18   A    No, because Elizabeth Todd was doing REI services, and

19        the nurses were doing REI services, so...

20   Q    Right.  I'm just talking about physicians.

21   A    Dr. Hsu was the only physician.

22   Q    Okay.  I asked you earlier about whether or not before

23        May of -- during the time frame of May 2017, there was

24        a pause or you thought there would be a pause, right,

25        in April?
```

Porter - Cross by Mr. Schroeder

```
 1   A    There are multiple different iterations of a pause

 2        versus limiting the scope of some services.  So it

 3        wasn't just a pause.  There was different iterations

 4        being presented, yes.

 5   Q    And that was in the April 2017 time frame?

 6   A    Correct.

 7   Q    And that's what the information you received from

 8        Dr. DeMars, correct?

 9   A    She gave me different information over the course of

10        time.  So she gave me the information that we were

11        going to continue with, as I said, REI services; that

12        we were going to continue with a lot of the infertility

13        services, and that we would take a pause of the IVF

14        services.  She said that to me at one point.  In fact,

15        even the day before the close, that's what she said to

16        me.

17   Q    Right.  And that was the first time that you were

18        hearing the word "pause"; is that right?

19   A    There were various iterations.  That was the first time

20        that I remember at this point, yes.

21   Q    Okay.  I'd ask you to go back to --

22             MR. SCHROEDER:  I would ask if I may approach

23        the witness with her deposition transcript?

24             THE COURT:  Yes.

25             MR. SCHROEDER:  And this is -- for counsel's
```

```
 1        standpoint, this is -- for counsel's sake, June 11,
 2        2019, deposition.  This is the first version.
 3                    THE COURT:  Is there an exhibit number or
 4        letter?
 5                    MR. SCHROEDER:  No.  This is the deposition
 6        transcript.  I'm just asking her to read something.
 7   Q    (By Mr. Schroeder) Now, I know that -- I just want to
 8        refresh your recollection.  You were deposed two
 9        different occasions?
10   A    Yes.
11   Q    Okay.  And obviously this predates the pandemic, so
12        everything seems like it was a really long time ago.
13            I would ask you to turn your attention to Page
14        125.
15   A    (Witness complies.)
16   Q    Okay.  Do you see that?
17   A    Yes.
18   Q    Okay.  Now, at the top of Page 125, I'm asking you
19        about your -- the announcement that was made, and that
20        announcement was the May 4th, 2017, announcement,
21        correct?
22   A    Correct.
23   Q    And then I ask you:  "It was a short meeting, and that
24        is the first time -- that was the first time as far as
25        you know that any of you -- David, Albert, and
```

Porter - Cross by Mr. Schroeder

1      Elizabeth Todd -- were informed that the REI division

2      was being closed?"

3  A  Closed.

4  Q  Right.  I read that correctly, right?

5  A  What lines are you on?

6  Q  The lines?  Line 9 through Line 13.  Do you see that?

7  A  I'm reading it.  Correct.  Being closed.

8  Q  All right.  And what was your answer in response?

9  A  "Leslie told me that the division was going to be

10     paused, not that we were closing up."

11  Q  Okay.  And then I asked you:  "When did she tell you

12     that?"  And what was your answer?

13  A  "Starting the late winter, early spring of that year."

14  Q  Actually it says, "Starting the winter, comma, late

15     winter, comma, early spring of that year," right?

16  A  Right.

17  Q  So the idea of a pause had been discussed or mentioned

18     to you and others in the REI division well before April

19     of 2017, right?

20  A  Yes.

21         THE COURT:  So, Mr. Schroeder, I would just

22     ask that that be marked for identification.  I don't

23     think there's any mark on it now, so it's a document

24     that's been used for the witness but not identified by

25     exhibit number, there needs to be a record of that.

 1                  MR. SCHROEDER:  How would you like me to

 2        refer to that?

 3                  THE COURT:  I'm just saying that putting a

 4        letter or number on it, just something so that we can

 5        keep a record of the fact that this was used.

 6                  MR. SCHROEDER:  Understood.

 7                  THE WITNESS:  I would like to place some

 8        context that there was various conversations that we

 9        had, and --

10                  THE COURT:  So, Dr. Porter, I'm sorry.  I'm

11        just going to stop you there.  There isn't a question

12        pending as far as I know.

13                  THE WITNESS:  Okay.  I was trying to provide

14        some clarity.

15                  MR. SCHROEDER:  There was no question

16        pending, Your Honor.  I was waiting -- I wanted to be

17        polite about that.

18   Q    (By Mr. Schroeder) With respect to the REI division,

19        and specifically the services that the REI division was

20        giving to its patients, do you recall a slowdown or a

21        pause in certain kinds of services that the REI

22        division was giving to its patients in December of

23        2016?

24   A    No.

25                  MR. SCHROEDER:  May I approach the witness?

                     Porter - Cross by Mr. Schroeder

```
 1                    THE COURT:  Yes.  Is this also the same
 2          thing, a document that's not going to be admitted?
 3                    MR. SCHROEDER:  It will be admitted, but I
 4          have to show it to her first, and I want to make sure
 5          that --
 6                    THE COURT:  Right.  Mr. Howe has exhibit
 7          stickers for you for the last document that was used so
 8          we can keep track of this now so we won't lose track of
 9          it.
10                    MR. SCHROEDER:  Just put that on there?
11                    THE CLERK:  Yes, please.
12                    MR. SCHROEDER:  Sure.  May I leave this right
13          here for now?
14                    THE COURT:  Yes.
15                    MR. VITT:  Is there an exhibit number?
16                    MR. SCHROEDER:  I'm going to tell you in a
17          minute.  It is A16.
18    Q     (By Mr. Schroeder) I'm showing you a document that's
19          been marked A16(001), and I would ask you whether you
20          recognize this document as being something that was
21          sent to you on December 6th, 2016?
22    A     I don't have a recollection of it, but my name is on
23          it.
24    Q     Okay.  And that is your e-mail address, correct?
25    A     That was my work e-mail address, correct.
```

```
 1    Q    Right.  And, at that point, were you back to performing

 2         services for Dartmouth Health?

 3    A    I would have to look at the timeline.  I believe so.

 4    Q    Okay.  Did you routinely look at your e-mails?

 5    A    Yes.

 6    Q    Okay.

 7              MR. SCHROEDER:  Move for admission of

 8         Exhibit A16.

 9              THE COURT:  Any objection?

10              MR. VITT:  No objection.

11              THE COURT:  It's admitted.

12              MR. SCHROEDER:  Thank you.

13         Your Honor, if I may have a second, so I can

14         switch to the other technology.

15              THE COURT:  Yes.

16              MR. SCHROEDER:  Hopefully, we'll go a little

17         bit quicker now.

18    Q    (By Mr. Schroeder) So this was a document that was sent

19         to you among others, right, Dr. Porter?

20    A    Correct.

21    Q    And I would like to highlight the first two paragraphs,

22         and I'll read them into the record.  It's sent on

23         behalf of Dr. DeMars and Dr. Seifer, right?

24    A    Correct.

25    Q    And this was December 6th, 2016, right?
```

```
 1   A    Correct.

 2   Q    And it states:  "To all:  We are facing an imminent REI

 3        nursing crunch that will require significant changes in

 4        nursing workflow and task allocation.  With Casey and

 5        Sharon's departures, we have fewer resources to

 6        maintain the quality of care our patients expect."  Did

 7        I read that correctly?

 8   A    I believe so.

 9   Q    Okay.  Now Casey, was Casey Dodge, correct?

10   A    Correct.

11   Q    And she left in and around the time frame of November

12        of 2016.

13   A    I believe so.

14   Q    Okay.  And Sharon Parent was leaving in December of

15        2016 pursuant to her retirement, right?

16   A    Correct.

17   Q    Now, it states in the second paragraph:  "Effective

18        immediately, we will focus our efforts to provide

19        excellent patient care to the patients who currently

20        have a tentative start date for IVF/FET or IUI in

21        December or January.  For the patients who are waiting

22        for start dates, we will defer their scheduled start

23        dates ideally until February.  This will give Marlene

24        and Marti a chance to catch up on the patients that are

25        on the schedule.
```

1            "Pregnancy rates are fantastic and that is why we

2        come to work each day.  Despite the outstanding

3        pregnancy rates, we need to make adjustments for the

4        present staffing as we make every attempt to recruit."

5        Do you see that?

6   A    Yes.

7   Q    Does that refresh your recollection that in and around

8        that time frame there was an effort in the REI division

9        to slow down the intake of patients through the system

10       in light of nursing staffing challenges?

11  A    My recollection of this is that we changed some patient

12       dates in terms of their start date and that we also had

13       other nurses that were resourced to help us in this

14       period of time so that we wouldn't have to push too

15       many back; that we had some adjustments following this.

16  Q    Okay.  But at that point, the only two nurses that are

17       identified here are Marlene and Marti, correct?

18  A    No.

19  Q    They're not?

20  A    Those are the IVF nurse coordinators.  We had nurses

21       who were coming up from same-day surgery to help us.

22       We had other nurses who are also in clinic who were

23       helping us.  So we had a whole cadre of nurses.  When

24       you say Marlene and Marti, you're speaking specifically

25       of the IVF nurse coordinators, not about the whole

1           cadre of nurses that we had helping us.

2      Q    I understand that.  He's referencing Marlene and Marti

3           here and no one else, right?

4      A    Correct.

5      Q    And there is an attempt to slow down the intake of

6           patients from IVF services by way of this e-mail,

7           right?

8      A    There was a reorganization of start dates in what we

9           were going to do; and that's what happened, yes.

10     Q    And, at that point, you were working a handful of hours

11          a week?

12     A    Yes.

13     Q    Like three or four?

14     A    No, I think a bit more.

15     Q    Less than ten though, right?

16     A    I believe so.  I would have to go back.  And if you

17          would like to look at my exact hours, it's in the

18          deposition.  I'm happy to get that out.

19     Q    Sure.  I don't need you to do that right now, and I

20          don't know that we need to go through every single

21          calendar entry.

22              So but at that point, you were working part-time;

23          you were not working full-time, correct?

24     A    I was working part-time, I believe.  I would have to go

25          back and look.

```
 1    Q    Okay.  You don't know that off the top of your head
 2         though?
 3    A    No.  Because what happened is I went in and out of
 4         work.
 5    Q    I understand that.
 6    A    That's -- as my physicians allowed me to come back,
 7         because there were patients who were waiting for me to
 8         come back.  There was a period of time that I was out
 9         definitely, yes.  And it -- I would have to go back and
10         look at the dates.
11    Q    Sure.  Okay.  I'd just appreciate it, Dr. Porter, just
12         answer the question asked, and this will move a lot
13         quicker.
14              MR. SCHROEDER:  With respect to A -- if I may
15         show the witness a document marked A17; may I approach
16         the witness?
17              THE COURT:  Yes.
18              MR. SCHROEDER:  And with respect to this,
19         A16, just want to make sure that it's moved for
20         admission.
21              THE COURT:  A16 is admitted.
22              MR. SCHROEDER:  Yes.  Okay.  Great.  So the
23         next one is A17.
24              MR. VITT:  Give me a sec.
25              MR. SCHROEDER:  Sure.
```

```
1              MR. VITT:  No objection.

2              MR. SCHROEDER:  Thank you.

3              THE COURT:  Exhibit A17 is admitted.

4    Q    (By Mr. Schroeder) Thank you.  With respect to this

5         document, this is a document from David Seifer dated

6         December 14th, 2016, correct.

7    A    Correct.

8    Q    And it relates to an REI division meeting, right?

9    A    Correct.

10   Q    And did these meetings happen on a regular basis in the

11        REI division?

12   A    Yes.

13   Q    Okay.  And I want to refer you to specifically 2(B),

14        just highlight that, Ray.

15   A    Yeah.

16   Q    Do you see that?

17   A    2 subparagraph --

18   Q    Yeah.  Just highlighting it.  And just for your

19        assistance, Dr. Porter, I'll try, when we can, to

20        highlight this so that you can see it on the screen as

21        well, just to cut to the chase.

22             So here, it says, quote, "As e-mail from

23        Dr. DeMars and DBS said, looking at a, quote, halfway

24        pause, end quote, to reduce patient load coming through

25        so that the team can have several chunks of time to
```

```
1          review things with Value Institute and Process
2          Improvement Group to review workflows."  Right?
3     A    Correct.
4     Q    So there was some form of pause that was being -- now,
5          this is --
6     A    Halfway pause.
7     Q    Right.
8     A    We were reorganizing some dates, yes.
9     Q    Right.  And so slowing down the intake of IVF patients
10         through the long cycle that they go through, correct?
11    A    I wouldn't characterize it that way, no.
12    Q    Well, it says "to reduce the patient load coming
13         through."  How else do you interpret that?
14    A    I think you're confusing new IVF patients coming in for
15         evaluation and reorganizing the actual retrieval and
16         transfer dates so that we could have chunks of time to
17         do retrievals called up weeks and chunks of time to
18         have time with the Value Institute.
19              So if I understood you correctly, we weren't
20         changing how new IVF patients were coming in, we were
21         altering the weeks that once they were in the system
22         allowing for some time to go to Value Institute.
23    Q    And the Value Institute, the Dartmouth Health Value
24         Institute, that's actually a process improvement group
25         within Dartmouth Health, right?
```

1    A    Yes.

2    Q    And they are sometimes called upon to attempt to

3         schedule retreats with members of a specific group to

4         go over process improvement plans, right?

5    A    Yes.  I look at them as, for example, if we need

6         instruments cleaned more efficiently in the operating

7         room, that they would model that for us versus looking

8         at the dynamics of biology and patient care.  Their

9         models weren't as readily accessible to understanding

10        the subspecialty like REI.

11   Q    Did you have an understanding that the point of these

12        Value Institute meetings that were going to take place

13        in January and February of 2017, that the specific

14        purpose of them was to deal with workplace dynamic

15        issues internal to the REI division?

16   A    No, I didn't understand that, no.

17   Q    You had no understanding of that?

18   A    It was one of the stated missions among many, but I

19        didn't understand that is what the issue was, no.

20   Q    Hang on a second.  You just said it was one of the

21        stated missions for the meetings, but then you didn't

22        understand that that was one of the stated missions?

23   A    Go ahead and re-ask your question for me because I

24        thought you said it was, in isolation, that that's what

25        the issue -- that's what they were trying to address.

1    Q    I didn't say the word "isolation" at any point.

2         Dr. Porter, let's just listen to the question and

3    try to answer it.  One of the reasons for having this

4    Value Institute retreat, if you will -- there was a

5    series of daytime meetings, correct?

6    A    Yes.

7    Q    Okay.  One of the reasons for it, not all of them, but

8    one of them, was to deal with workplace dynamic issues

9    and collaboration and team work?

10   A    Correct.

11   Q    Right?  Yes?

12   A    Correct.

13   Q    So that was happening, that was already being scheduled

14   in January and February of 2017, right?

15   A    Correct.

16   Q    In Subparagraph C here, (2)(c) if you could highlight

17   that, Ray.

18        We're still looking at A17.  "We've had open

19   positions for seven to eight months, and we haven't

20   gotten applicants for a while.  Look at it

21   comprehensively.  Look at workflow in a way that makes

22   sense.  Try to streamline it."

23        Did you have an understanding that the REI

24   division was seeking full-time nurses throughout this

25   time period?

1   A   The entire hospital was seeking full-time nurses.

2   Q   Dr. Porter, I just ask you to please answer the

3       question.  This will go a lot quicker.

4           I asked you:  Was the REI division seeking REI

5       nurses specifically during this time frame?

6   A   Yes.

7   Q   Okay.  And the reason they were seeking REI nurses

8       during this time frame is because Casey Dodge left,

9       right?

10  A   Correct.

11  Q   And Sharon Parent was in the process of retiring --

12  A   Correct.

13  Q   -- right?

14              MR. SCHROEDER:  May I approach the witness?

15      The next exhibit I would like to show the witness is

16      A20.

17              THE COURT:  Yes.

18              MR. SCHROEDER:  Any objections to its

19      admission?

20              MR. VITT:  No objection.

21              THE COURT:  Okay.  Defendant's A20 is

22      admitted.

23              MR. SCHROEDER:  Okay.

24  Q   (By Mr. Schroeder) I'm showing you a document,

25      Dr. Porter, dated 12/16/2016 from David Seifer, and it

```
 1        is -- you're among the people it's addressed to,

 2        correct?

 3   A    Correct.

 4   Q    Okay.  And the subject line says, quote, "Pause," end

 5        quote, "in January and week in February."  Do you see

 6        that?

 7   A    Correct.

 8   Q    Okay.  And the first line of the -- this e-mail is

 9        to -- well, let me --

10            Before I get there, I just want to ask you:  You

11        keep talking about these other nurses and other

12        physicians and fellows.  I'm just looking to see who is

13        getting this e-mail.  So let's just go back up to that

14        for a second.  I'll get into the body of that in a

15        second.  First you have Katy Mansfield, right?

16   A    Correct.

17   Q    For the jury's edification, she's the -- one of the

18        nurse managers, patient manager?

19   A    Yes.

20   Q    Okay.  And then you have Kelly Mousley, right?

21   A    Yes.

22   Q    What was her role?

23   A    She was a supervisor for the support staff.

24   Q    Okay.  She was a supervisor just like Katy Mansfield,

25        correct?
```

```
 1   A   She was -- Katy was the supervisor for the nurses, and
 2       Kelly Mousley was the supervisor for our administrative
 3       support such as scheduling secretaries, OR secretaries,
 4       et cetera.  She was more the administrative portion of
 5       it.
 6   Q   Okay.  That's helpful.  So those two are managers that
 7       are part of the REI division, but they're not
 8       performing REI services, right?
 9   A   No.
10   Q   Then you have Albert Hsu, right?
11   A   Correct.
12   Q   David Seifer, right?
13   A   Correct.
14   Q   Who is Dennis Dela Cruz?
15   A   Dennis Dela Cruz is one of the embryologists.
16   Q   I'm sorry, the younger...?
17   A   He's an embryologist.
18   Q   Embryologist, okay.  So he's in the lab?
19   A   Yes.
20   Q   Okay.  So he's dealing with whenever embryos and,
21       really, helping with the REI process but in the lab
22       specifically, correct?
23   A   Correct, yeah.
24   Q   Okay.  So he's not a nurse or a fellow or anybody like
25       that.
```

```
 1              Donna Bedard, she's a secretary, right?
 2   A    She was our program secretary, yes.
 3   Q    And you have Beth Todd, she's a nurse practitioner,
 4        right?
 5   A    Mm-hm.
 6   Q    And then you have Heather Gunnell?
 7   A    Correct.
 8   Q    And then you have Jennifer Blakelock?
 9   A    She was in embryology.
10   Q    She was in embryology as well as Dennis.  So those
11        people are in the lab, correct?
12   A    Correct.
13   Q    Okay.  And then you have Judy McBean.  She was a per
14        diem physician?
15   A    Yes.
16   Q    And so from time to time she would assist in the REI
17        division?
18   A    Actually, we should have amended that Judy was one of
19        the physicians as well.  I had forgotten to add that.
20   Q    Did you know that she worked a total of 20 hours in the
21        year 2017 for Dartmouth Health?
22   A    I didn't know that.
23   Q    Okay.  You didn't know that?
24   A    No.
25   Q    Marlene Grossman.  We talked about her.  She's in the
```

```
 1        southern part.  She's in either the Manchester or

 2        Bedford location, right?

 3   A    Right.

 4   Q    Then we had Marti Lewis, right?

 5   A    Yes.

 6   Q    And that's -- she's the nurse that came in to the REI

 7        division just a few -- about six months prior?

 8   A    Correct.

 9   Q    Then you have yourself.  Then you have Navid

10        Esfandiari.  He's the director of the lab, right?

11   A    Correct.

12   Q    And then you have -- Casey Dodge is in this e-mail, but

13        she's long gone at this point, right?

14   A    Yes.

15   Q    Pavel Zagadamof (phonetic)?

16   A    He was an embryologist.

17   Q    So he's in the lab as well.  And Sara Gibson.  Is she

18        in the lab?

19   A    Yes.

20   Q    Okay.  So four of those people that I just mentioned

21        are in the lab; the other people are either the

22        physicians, the nurse practitioner, or the nurses or

23        the staff assistant or the two managers, right?

24   A    Correct.  And so the other nurses that --

25   Q    No.  That is my only question.  That's -- I don't have
```

1          a question pending.

2                 This e-mail is addressed to "Hello, REI team,"

3          right?

4     A    It's missing several people.

5     Q    Okay.  But the people that are on it are all part of

6          the REI team, right?

7     A    Well, you said Casey Dodge was gone at that point.

8     Q    Right.  You agreed with me.  Well, sometimes people's

9          e-mails still are on the system.

10                Other than Casey Dodge, who is no longer there,

11         and Sharon Parent, is she on this?  She is on this,

12         right?  She had already left?

13    A    Right.  So it's not an accurate accounting of the

14         individuals who were working there.

15    Q    Okay.  Either way, you got this e-mail, right?

16    A    I believe so.

17    Q    You don't have any reason to doubt that, right?

18    A    No, but I don't recall getting it.

19    Q    Okay.  And it says in the first line, "Dr. DeMars,

20         Heather and I met with leadership from the Value

21         Institute this morning and now have more information

22         regarding our plan for focused process improvement.

23                "During the months of January and February, we

24         will not see any new patients, and will be limiting our

25         patient appointments to only those necessary for the

```
 1        patients currently in cycle who will need retrievals or

 2        transfers in January or February."

 3             Did I read that correctly?

 4   A    You read it correctly.

 5   Q    And, in fact, there's also an accounting by days of

 6        when in January and February it was expected that the

 7        REI division would be doing its Value Institute

 8        workshop, right?

 9   A    Correct.

10             MR. SCHROEDER:  Take that down.  Thank you.

11   Q    (By Mr. Schroeder) Now, you understood that this Value

12        Institute was coming up, and that it had been on the

13        back burner at that point because there was some

14        suggestions that it would happen earlier than January

15        and February of 2017, right?

16   A    I'm sorry.  Clarify your question for me.

17   Q    Sure.  You understood that the idea of having the Value

18        Institute run at a retreat program for the REI division

19        had been communicated back in the fall of 2016, you

20        said.

21   A    I wouldn't characterize it that way, no.

22   Q    How would you characterize it?

23   A    We had a different team that did a retreat sometime in

24        the fall, and then we had these series suggested, and I

25        had suggested that we wait until I get back because I
```

1    wasn't going to be able to participate fully because of

2    my work restrictions, and I wanted to participate fully

3    in all of this as the most longitudinal individual who

4    understood how to run an IVF program and who had

5    functioned with a single nurse previously for a very

6    long time and had drawn in resources from other parts

7    of the institution in order to support the service.

8         We would have patients go to labor and delivery to

9    recover from their retrievals.  We had patients going

10   to same-day surgery to recover.  We had same-day

11   surgery nurses coming up to recover the patients to

12   take the burden off of the IVF nurses.  And, in fact,

13   that's how Casey Dodge came to work for us.  So there

14   was a mechanism by which we could make this service

15   work which included one of the same-day nurses, Mary

16   Martin, was working with us, and she wanted to do more

17   work.  In fact, she went to Ed Merrens' office to say

18   she would do more work.  And Sharon wanted to come

19   back.

20        So we had a very functional way to be able to run

21   this service in a way that I had experienced

22   previously.  So I don't agree that we didn't have

23   enough nurses because we had Jamie Florence coming from

24   clinic and wanted to do more work with us and was

25   actually going to school to get her RN.

1          We had Mary Martin coming up from same-day surgery

2     to work with us who wanted to do more work and had a

3     conversation with Dr. Merrens about doing more work.

4          We had Sharon who wanted to come back from

5     retirement to both train and do work.  So we had a real

6     way to make this program function.

7               MR. SCHROEDER:  Your Honor, move to strike

8     that as nonresponsive.

9   Q  (By Mr. Schroeder) Do you even know the question that I

10    asked you, Dr. Porter?  Do you know what I just asked

11    you.

12  A  No.

13  Q  Right.

14              MR. SCHROEDER:  I would move to strike the

15    answer.

16              THE COURT:  So I'm going to strike the last

17    response, and I am going to direct the witness to

18    respond to the questions.  Mr. Vitt, you're standing?

19              MR. VITT:  No.  That's perfectly -- I agree

20    with that.

21              MR. SCHROEDER:  Thank you.

22         If we could -- Plaintiff's Exhibit 138.  Do you

23    have an objection?

24              MR. VITT:  We haven't been able to...

25         No objection.

```
 1                  MR. SCHROEDER:  Thank you.  May I approach
 2       the witness?
 3                  THE COURT:  What exhibit is this?
 4                  MR. SCHROEDER:  This is P138.
 5                  THE COURT:  Okay.  No objection from
 6       Mr. Vitt, then P138 is admitted.
 7                  MR. SCHROEDER:  Thank you, Your Honor.
 8    Q   (By Mr. Schroeder) Showing you, Dr. Porter,
 9       exhibit marked P138.
10                  MR. VITT:  Your Honor, may I interrupt for
11       just a second?  May I approach?
12                  THE COURT:  Yes.
13                      (Bench conference held.)
14                  THE COURT:  Okay.  So at this time, we'll
15       take our afternoon break, and we'll reconvene at 2:45.
16                      (Jury exits.)
17                      (Recess taken.)
18                      (Jury present.)
19                  THE COURT:  Okay.  Please go ahead,
20       Mr. Schroeder.
21                  MR. SCHROEDER:  Thank you, Your Honor.  I
22       think we moved for admission of Plaintiff's 138, but I
23       want to make sure before I --
24                  MR. VITT:  I think I said yes.
25                  MR. SCHROEDER:  Okay.
```

```
1                    THE COURT:  Okay.  Then it's admitted.
2                    MR. SCHROEDER:  Admitted?
3              Emerson, can you switch it out?  Thank you.
4    Q    (By Mr. Schroeder) Do you have Exhibit 138 in front of
5         you?
6    A    Correct.
7    Q    Okay.  I want to turn your attention to the e-mail
8         below.  That's January 12th, 2017, and it's with you
9         and Heather Gunnell?
10   A    Correct.
11   Q    Do you see that?
12             And I'll just highlight the response or I should
13        say the question.  It says, "Heather, can you please
14        clarify the purpose of this exercise?  What are the
15        goals and what are the roles she will play during
16        meeting with us?  How long and when does she plan to
17        meet and what are the end goals?  Agree I have not
18        received any agenda or time commitment or stated
19        purpose for her participation."  Did I read that
20        correctly?
21   A    Correct.
22   Q    Is it fair to say that you were less than enthused
23        about doing this Value Institute?
24   A    I wouldn't characterize it that way.
25   Q    Okay.  So this question wasn't meant to be in any way
```

```
 1        criticizing the process?

 2   A    I wouldn't characterize it as a criticism, no.  It was

 3        a statement of interest.

 4   Q    Okay.

 5              THE COURT:  Dr. Porter, I would ask that you

 6        sit up to the microphone, please, and make sure the

 7        jury can hear you.

 8              THE WITNESS:  My apologies.  I'm sorry.

 9   Q    (By Mr. Schroeder) Okay.  Turn your attention --

10              MR. SCHROEDER:  If I may I approach the

11        witness, if I can show her Exhibit B2.

12              THE COURT:  Yes.  And this is Defense

13        Exhibit B2?

14              MR. SCHROEDER:  Yes, Your Honor.  If you're

15        trying to follow, number sequence for Plaintiffs and

16        letter sequence for defendants.

17           Any objection?

18              MR. VITT:  No objection.

19              MR. SCHROEDER:  Thank you.

20              THE COURT:  Okay.  Defendant's B2 is

21        admitted.

22              MR. SCHROEDER:  Thank you.

23   Q    (By Mr. Schroeder) Showing you a document that's been

24        marked Defendant's Exhibit B2, and it is an e-mail that

25        you wrote.  It's rather long.  I'm only going to ask
```

```
 1        you about the first four paragraphs, maybe the fifth
 2        paragraph.  So if you want to let me know when you're
 3        done just reading the e-mail to yourself, I may have
 4        other questions, so just so that you feel comfortable
 5        that I've given you the ability to read all of it, I
 6        would appreciate you letting me know.
 7   A    (Witness reading.)
 8   Q    Let me know when you're finished.
 9   A    Okay.
10   Q    Okay.  If, Ray, you could just -- before you go to
11        that, I just want to get the date up there, of the
12        e-mail.
13             It's the an e-mail, to you, Dr. Porter, to Leslie
14        DeMars, correct?
15   A    Correct.
16   Q    And then at some point, subsequent to the termination
17        of the REI division, you sent it to your personal home
18        address, right?
19   A    Correct.
20   Q    Your other e-mail address?
21   A    Correct.
22   Q    And I want to focus on the first four paragraphs at
23        least initially.
24             And if you could blow them up, Ray, I would
25        appreciate it.
```

```
1            And you wrote this on February 20th, 2017, right?
2   A   Correct.
3   Q   And that comes on the heels of a series of retreat days
4       with the Value Institute, right?
5   A   Correct.
6   Q   And would it be fair to say that the Value Institute
7       exercise and retreat program was not successful?
8   A   I wouldn't characterize it that way.
9   Q   You wouldn't?  Would you say that it was a rousing
10      success?
11  A   I wouldn't characterize it that way.
12  Q   Okay.  You wrote this e-mail, though, right on the
13      heels of that particular series of retreats, and you
14      say, "Dr. DeMars, the tenure of Dr. Seifer's leadership
15      has been a difficult one in the REI service with
16      resulting consequences for the Department, the service
17      line, and the greater DH institution.  Long-established
18      systems that were in place, the efficient delivery of
19      skilled RE services, and the foundation and
20      infrastructure of the division have nearly dissolved."
21      Did I read that correctly?
22  A   Yes.
23  Q   Those are your words, right?
24  A   Though are my words.
25  Q   And then you say -- I think yesterday you were asked
```

```
 1        this question, and I'm pretty sure that the pregnancy

 2        rates were really not good, right?

 3   A    I wouldn't characterize it that way, no.

 4   Q    Oh, you didn't characterize it that way?  They weren't

 5        low?

 6   A    They were low for Albert Hsu, and mine were really

 7        good.  So if you took an average, you would get to an

 8        average.  So Dr. Hsu's pregnancy rates were

 9        repetitively, over the long time, with a low pregnancy

10        rate.  That's what I said.

11   Q    Okay.  Well, actually, what you really said was, "While

12        it is true the overall pregnancy rates have improved,

13        this positive aspect of the care we deliver is to be

14        attributed to the work of Dr. Esfandiari and his lab in

15        providing the best quality embryos available for

16        transfer."  You said that, correct?

17   A    That's correct, and I can provide some context.

18   Q    No, thank you.

19            You don't say these rates are improving because of

20        just you, right, in this sentence?

21   A    I didn't say that in this particular e-mail, no.

22   Q    Right.  Right.  And then you say, "It should not be

23        mistaken for an improvement in any other aspect of the

24        process of IVF.  Indeed, the program is close to

25        dissolution."  Right?
```

Porter - Cross by Mr. Schroeder

```
 1   A   Correct.

 2   Q   So as of February 20th, 2017, you were acknowledging to

 3       the chair of the OB-GYN department your belief that the

 4       IVF program is close to dissolution, right?

 5   A   In response to the confidential review for David

 6       Seifer, yes.

 7   Q   Well, regardless of the confidential review, those are

 8       your words, right?

 9   A   Those are my words.

10   Q   Now, with respect to the volume of patients.  I just

11       want to -- on that same page at the bottom, the second

12       to last paragraph -- the last full paragraph, which

13       starts, "There is not enough," on that page?

14   A   "There is not enough IVF at Dartmouth."

15   Q   Right.  "There is not enough IVF at DHMC --" that

16       stands for Dartmouth-Hitchcock Medical Center, right?

17   A   Correct.

18   Q   "Nor has there ever been, despite heavy efforts in

19       marketing and outreach, for many providers with RE to

20       focus only on IVF.  I had this conversation with him

21       during his interview last winter, before he started at

22       DHMC."

23           There you're commenting on the fact that the

24       volume of patients within the REI division hasn't been

25       very high; is that a fair statement?
```

```
 1   A   I wouldn't characterize it that way, no.

 2   Q   Okay.  Well, you -- let's not get into characterizing.

 3       Let's go to your words.  "There's not enough IVF at

 4       DHMC nor has there ever been, despite heavy efforts in

 5       marketing."  You said that, right?

 6   A   I believe you asked me about REI.  Can you restate your

 7       question please for clarity because REI, again, is this

 8       whole global service, and we talked about IVF being a

 9       small specific part of it.

10   Q   Right.  It's a small and important part of it, right?

11   A   Correct.

12   Q   In vitro fertilization, and that's related to

13       infertility, right?

14   A   It's a portion of the global infertility services,

15       correct.

16   Q   And the REI has, in its name, reproductive

17       endocrinology and infertility, right, division?

18   A   IVF is a small portion of infertility services.

19   Q   Regardless of the size of the IVF program, you were

20       painting a really dire picture for the REI division at

21       this point; fair to say?

22   A   I'm painting a really dire picture of Dr. Seifer's

23       leadership.

24   Q   And you say it's been a difficult one for the REI

25       service, correct?
```

Porter - Cross by Mr. Schroeder

```
 1   A    It's been a difficult -- this was to put some context

 2        on this.

 3   Q    No.  I really -- I don't -- your counsel can ask you

 4        questions.  I want you to just answer my questions if

 5        that's okay.  Okay?

 6             At this point, February of 2017, you'd been -- in

 7        a previous year, you were out from December 15th to

 8        June 14th, thereabouts, six months, and then you were

 9        slowly coming back to work, and then you were out again

10        in September -- or I should say August to sometime in

11        November of '16, right?

12   A    Yes.

13   Q    So roughly about nine months out of the last, say, 14

14        months, close to -- ballparking it?

15   A    Ballpark.

16   Q    Right.  9 out of the 14 months.  And it was your belief

17        at this point that his tenure as the division director

18        was a disaster, right?

19   A    It was a disaster.  It wasn't just my belief.  It was a

20        disaster.

21   Q    Well, I'm just asking for your belief because you're

22        the only one that's testifying right now.  We can ask

23        other people later.  But, at this point, in that last

24        14 months, nine of those you weren't even there, and he

25        got there --
```

Porter - Cross by Mr. Schroeder

```
 1   A   I wouldn't qualify that nine of it I wasn't there.

 2   Q   Well, I just went through the math.  Six and three

 3       equals nine, and nine out of 14 which would be

 4       January 1 of '16 through February of '17 is 14 months.

 5       So I'm just trying to keep the math simple.

 6   A   I would go back to the timeline in my deposition to

 7       tell you what hours I was working.

 8   Q   Okay.  That's not the question I asked.  I'm talking

 9       about when you were there and when you were definitely

10       not there, so 9 out of 14 months.

11           And you're doing this review of Dr. Seifer.  Now,

12       you had serious reservations about Dr. Seifer well

13       before February of 2017, right?

14   A   Correct.

15   Q   Like, almost from the get-go; is that a fair statement?

16   A   Correct.

17   Q   And, at that point, Dr. Seifer became the division

18       director in May or June of 2016?

19   A   Correct.

20   Q   And prior to that time, you'd been the interim division

21       director?

22   A   Correct.

23   Q   And that had been for a number of years.

24   A   Correct.

25   Q   And you had been appointed to that position by Richard
```

Porter - Cross by Mr. Schroeder

```
 1        Reindollar?
 2   A    Correct.
 3   Q    And you were in that position for a couple years but
 4        you weren't made permanent, the permanent division
 5        director, by Richard Reindollar, correct?
 6   A    No.
 7   Q    And you weren't made the permanent division director of
 8        the REI division by Leslie DeMars?
 9   A    Correct.
10   Q    And Leslie DeMars was the chair of the OB-GYN
11        department right after Richard Reindollar, correct?
12   A    Correct.
13   Q    And you had a series of issues dealing with
14        Dr. Reindollar as well; is that fair to say?
15   A    I wouldn't say a series but, yes, there were issues
16        with Dr. Reindollar, yes.
17   Q    When I say "series," you had conflict and disputes with
18        him, correct?
19   A    I was in mediation with Dr. Reindollar, yes.
20   Q    Mediation internally to DH, correct?
21   A    Correct.
22   Q    And you were in mediation with Dr. Reindollar.  And
23        this is back in 2012, 2013, right?
24   A    Potentially, yes.
25   Q    Well, he left by the end of December of 2013, right?
```

```
 1   A   I don't remember when he left.

 2   Q   And you were happy to see him go?

 3   A   I was very happy to see him go.

 4   Q   Right.  And he became -- after he left Dartmouth Health

 5       he became the chair of ASRM, correct?

 6   A   No.

 7   Q   Oh, he didn't?

 8   A   No, he was the CEO.

 9   Q   Okay.  The CEO?

10   A   Yes.

11   Q   Of, is it the American Society for Reproductive

12       Medicine?

13   A   Yes.

14   Q   That's ASRM?

15   A   Correct.

16   Q   And so he left Dartmouth Health and became the CEO of

17       ASRM?

18   A   Correct.

19   Q   Is that the gold standard for the guidelines and

20       regulations of how doctors in the REI field work?

21   A   Correct.

22              MR. SCHROEDER:  Just give me a second, Your

23       Honor.  I'm just trying to find the right binder here.

24       If I may I approach the witness to show her a document

25       marked Defendant's Exhibit A26?
```

```
 1                    THE COURT:  Yes.

 2                    MR. SCHROEDER:  Any objection?

 3                    MR. VITT:  Give me a second, if you will.

 4                    MR. SCHROEDER:  Sure.

 5                    MR. VITT:  No objection.

 6                    THE COURT:  Okay.  Then A26 is admitted.

 7                    MR. SCHROEDER:  Thank you.  Your Honor.

 8     Q    (By Mr. Schroeder) Showing you a document, Dr. Porter,

 9          marked A -- Defendant's Exhibit A26, and I

10          specifically -- it's a long series of e-mails, and I

11          don't want to go through each one of them, but just on

12          the -- around this time period, do you recall there was

13          some kind of HR review in February of 2017 relating to

14          the departure ever Casey Dodge?

15     A    I was out when that happened.

16     Q    Okay.  Were you part of that HR review?

17     A    No.

18     Q    Well, at the bottom of the page, it's an e-mail from

19          you to Leslie DeMars, and it says, "Leslie, thank you.

20          Should I contact Dr. Fuhrman about his concerns?  Dave

21          is not able to tell me what to fix and does not respond

22          to my e-mails.  You should speak with Jude but she told

23          me she would not go to DH with Albert here.  This week

24          was very difficult.  Dichotomous to have a Casey HR

25          review one afternoon and be in the Value Institute the
```

Porter - Cross by Mr. Schroeder

```
 1          next morning.  My head is down, and I'm very relieved
 2          to be out of the Casey review.  You can tell on the
 3          faces of Katy and Heather it's been really tough."  Did
 4          I read that correctly?
 5     A    Correct.
 6     Q    You were part of some kind of review at that point,
 7          right?
 8     A    No.
 9     Q    No?
10     A    It says, "My head is down, and I am very relieved to be
11          out of the Casey review."
12     Q    Right.  It says, "And very relieved to be out of the
13          Casey --" so you had nothing to do with that?
14     A    No, I wasn't in it.  I wasn't part of it.
15     Q    Got it.  But you understand that there was an internal
16          HR issue related to her departure?
17     A    I did, yes.
18     Q    Was that a distraction, at least from you on the
19          outside of it --
20     A    No --
21     Q    -- to the REI division?
22     A    -- it was not a distraction to me personally, no.
23     Q    Now, in this e-mail exchange, you actually -- this is
24          one of the e-mails that you sent to yourself on May 21,
25          right?
```

```
 1   A   Yes.

 2   Q   You sent a whole slew of e-mails to yourself on May 21,

 3       right?

 4   A   I did.

 5   Q   And halfway through in the middle of the first page,

 6       February 19th, there's an e-mail from Leslie DeMars to

 7       you, and she mentioned, "Just had a great conversation

 8       with Dan Grow.  He wants to be a full-time clinician

 9       again.  He's a full-scope REI doctor."  Do you see

10       that?

11   A   Yes.

12   Q   Okay.  Did you have -- did you have an understanding

13       from Leslie DeMars that she was hoping to recruit

14       additional REI physicians to the REI division?

15   A   Yes.

16   Q   Okay.  And you were aware of the fact that that didn't

17       go anywhere, correct?

18   A   My understanding is she wasn't allowed to talk to him

19       right before the closure is what she told me.

20   Q   Okay.  Well, based on this e-mail, she did talk to him,

21       right?

22   A   He actually came on campus and interviewed, and we took

23       him to dinner.

24   Q   Okay.  And that -- do you know where he ended up?

25   A   Yeah.  I think he's in Connecticut somewhere.
```

```
1    Q    And he had a series of offers at that point, correct?
2    A    I'm sorry, I don't know that.
3    Q    You had dinner to potentially court him --
4    A    As division head, yes, to come in.  Leslie -- in
5         February, when he was coming in, Leslie and I took him
6         to dinner in Lebanon, New Hampshire to recruit him to
7         be the division head, yes.
8    Q    And you're not aware of him talking to anybody else in
9         leadership at DH, correct?
10   A    She told me that he was going to have several meetings
11        in both research and in -- within the organization in
12        kind of mid-level and research areas, yes.
13   Q    But you, yourself, are not aware ever him having any
14        actual meetings with anybody in DH leadership other
15        than --
16   A    I was not present at those meetings, no.
17   Q    Right.  And you're not aware of those meetings, right,
18        other than what Leslie told you?
19   A    I was there when he was on the floor of OB-GYN and
20        going to those meetings because I spoke with him, and
21        he made grand rounds before that meetings.
22   Q    Who did he go to speak with?
23   A    I don't recall.
24   Q    Okay.  So you don't know?
25   A    I don't recall who he met with, but I know he had a
```

1       series of meetings.

2   Q   I want to show you --

3               MR. SCHROEDER:  If I may I approach the

4       witness -- first have that admitted into evidence.  I

5       think we already did.

6           If I may I approach the witness to show her

7       Exhibit X, Defendant's Exhibit X.

8               THE COURT:  I just confirmed it's admitted.

9               MR. SCHROEDER:  Thank you.

10              THE COURT:  No, that has not been admitted.

11              MR. SCHROEDER:  I had a distinct memory or

12      recollection that it had not had been.  If I may move

13      for admission of A26 first.

14              THE COURT:  Is there any objection?  Oh, to

15      A26?  That was already admitted.

16              MR. SCHROEDER:  That, I was concerned about,

17      Your Honor.  Just to Exhibit X.

18              MR. VITT:  No objection.

19              THE COURT:  Okay.  Exhibit X is admitted.

20              MR. SCHROEDER:  Move for admission.  Thank

21      you.

22              THE WITNESS:  Which, where is it?

23              MR. SCHROEDER:  Oh, may I approach the

24      witness?

25              THE COURT:  Yes.

```
1    Q    (By Mr. Schroeder) Showing you a series of documents,
2         Dr. Porter, that relate to the July 24, 2016, time
3         frame, and you had sent -- you had a series of
4         back-and-forths with Dr. DeMars, correct, about
5         Dr. Seifer?
6    A    Yes.
7    Q    Okay.  And I want to focus on the first page, really
8         the last few sentences of the first e-mail exchange.
9         Where you say, "Leslie, have a blast in Fenway.  I can
10        talk by phone.  I'm in tomorrow 1 to 4.  I can come in
11        at lunch.  I'm in Thursday and Friday.  While I'm gone,
12        I favor having Albert do the harvests and freezing a
13        lot of embryos.  I do not favor David doing harvests
14        and transfers while I'm gone.  I suspect David has not
15        done clinical medicine in some time.  David is far
16        worse than both Paul and Richard in cycle management,
17        clinical management, and harvest skill."  Did I read
18        that correctly?
19   A    You did.
20   Q    And Paul is whom?
21   A    Paul Manganiello.
22   Q    And was that the first doctor of the REI division?
23   A    Yes.
24   Q    Okay.  Richard is Richard Reindollar?
25   A    Correct.
```

```
 1   Q    So based on this e-mail, is it fair to say that you
 2        were critical of the cycle management, clinical
 3        knowledge, and harvest skill of Paul and Richard?
 4                      (Court reporter asks for a repeat.)
 5             Is it fair to say, based on this e-mail exchange
 6        where you say "David is far worse than both Paul and
 7        Richard in cycle management, clinical knowledge and
 8        harvest skill," that you had negative opinions or
 9        critical comments about all three of them?
10   A    I wouldn't characterize it, no, I didn't have that.
11        That's not what I'm saying there.
12   Q    Okay.  So you weren't being critical of either Paul or
13        Richard?
14   A    No.  I was being critical of David.
15   Q    Just David, right?
16   A    Yeah.
17   Q    In July 24, 2016, that's about two months after he
18        started working there?
19   A    Yeah.  She had asked me to go in and observe his IVF
20        skills because she was concerned.
21   Q    Okay.  And you said he's far worse than those two,
22        right?
23   A    Correct.
24   Q    Okay.  That's Paul Manganiello and Richard Reindollar,
25        right?
```

```
1   A   Correct.

2   Q   Did you have criticisms or negative opinions about the

3       work performance of Richard Reindollar?

4   A   No.

5   Q   No?

6   A   Not his clinical skill, no.

7   Q   Well, here it's cycle management, clinical knowledge,

8       and harvest skill, right?

9   A   For David is who I'm referring to.

10  Q   Got it.  Okay.  And this was literally less than two

11      months after he's got there, correct?

12  A   Yes.  It was very clear from the very beginning there

13      was something catastrophically wrong.

14  Q   Okay.  And with respect -- just asking whether the time

15      period, but thank you.

16          The -- he was made the division director, and you

17      didn't even interview him, correct?

18  A   No.  I interviewed David.

19  Q   Oh, you did?

20  A   Yeah.

21  Q   Okay.  And were you supportive of his hiring or not?

22  A   I knew from a conversation I had before that there were

23      problems with his prior employment, so I was not

24      supportive from that -- from that viewpoint.  I

25      welcomed a new division head, not David.
```

1    Q    Okay.  You made that clear to Leslie DeMars?

2    A    Yes.

3    Q    Okay.  And that was before he got hired?

4    A    Before and after, yes.

5    Q    Right.  And when I deposed you, because you keep

6         talking about the deposition, you recall the fact that

7         I asked you, you wanted to be division director at some

8         point, correct?

9    A    Initially, when we had a candidate who was finishing

10        from University of Michigan who was from Rutland, I had

11        said let's make me division head and bring this Erica

12        Mahahey (phonetic) was her name and bring her in as a

13        junior person to be with Albert.  So then she had

14        called me five or six times as she was finishing her

15        fellowship because her father is a predominant

16        urologist in Rutland, and she wanted to come back.  But

17        Leslie then made me the women's health service line

18        chief of GYN ultrasound, which is my passion and love,

19        and so I gladly said if that is what you would like me

20        to do for quality improvement and to expand our

21        infertility ultrasounds in the south to expand our GYN

22        ultrasound and procedures throughout the whole network,

23        I would love to have that job; please bring in another

24        division head.  And, at that point, I was really ready

25        to give Albert's mentorship over to somebody else.  So

Porter - Cross by Mr. Schroeder

```
 1        I was happy to have another division head come in.
 2   Q    Do you remember my question?
 3   A    Yes.
 4   Q    Yeah.  I asked you whether or not you wanted to be
 5        division head at some point.
 6   A    I did, and I answered it.
 7   Q    That's all I need to know, "yes" or "no."  I don't need
 8        the whole monologue.
 9              MR. SCHROEDER:  If we could go to A8,
10        Defendant's Exhibit A8, please.
11          If I may approach the witness?
12              THE COURT:  Yes.
13              THE WITNESS:  Please take it out for me.
14              MR. SCHROEDER:  Okay.
15          Any objection to its admission?
16              MR. VITT:  No objection.
17              THE COURT:  I'm going to ask counsel to
18        approach, please.
19                  (Bench conference held.)
20              THE COURT:  So is admission still pending?
21              MR. SCHROEDER:  I believe it is, Your Honor,
22        I would like to move for admission of Exhibit A8.
23              THE COURT:  Okay.  Mr. Vitt?
24              MR. VITT:  No objection, Your Honor.
25              THE COURT:  Okay.  A8 is admitted.
```

```
 1                    MR. SCHROEDER:  Thank you.
 2    Q    (By Mr. Schroeder) Dr. Porter, I'm just showing you
 3         what's been marked as Defendant's Exhibit A8.  I just
 4         want to go to the back page for a second, the second
 5         page.  There is an e-mail from yourself to, it looks
 6         like, Donna Bedard, Heather Gunnell, and other people.
 7         After Donna Bedard says it looks like everybody is
 8         going to be available to have this meeting and you say,
 9         "I am out of town until Monday.  I prefer Monday."
10         Right?
11    A    Yeah.
12    Q    And on the next page, first page forward, and this is
13         November of '16, the first line of the e-mail from
14         Dr. Seifer, if you go back to the first page, thank
15         you.  The e-mail dated November 3, 2016, at 12:34 p.m.,
16         it states, "In the interest of heading off people's
17         anxiety about our current nursing shortage, we want to
18         have this initial brief meeting tomorrow, Friday, so
19         that we can hear what is currently being explored."  Do
20         you see that?
21    A    Yes.
22    Q    Okay.  So your response is "Meeting tomorrow is not
23         possible," right?  For me, is not possible, right?
24    A    Correct.
25    Q    Right.  So and you say, "Since I have --" it looks like
```

 1           a spelling error.

 2    A      Typo.

 3    Q      We all have them.  "Since I have the most experience

 4           with nursing on the service, it would seem a missed

 5           opportunity.  Minutes do not make for discussion."

 6           That was your response, correct?

 7    A      Right.

 8    Q      Is that a rather curt, abrupt response?  No?

 9    A      I wouldn't characterize it that way.

10    Q      And even though you were out of town, you would have

11           been able to call in for the meeting, right?

12    A      No.

13    Q      You wouldn't have been able to do that?

14    A      No.

15    Q      Okay.  The previous e-mail, though, you say, "I prefer

16           Monday," not that it had to be Monday.  You said, "I

17           prefer Monday," right?

18    A      Correct.

19    Q      But -- so you then, just I guess a few minutes later

20           you're saying well, no, I can't do Monday, or it has to

21           be Monday.  I can't do tomorrow.

22    A      Correct.

23    Q      If we could turn to --

24                    MR. SCHROEDER:  I would like to show the

25           witness Exhibit B5, marked B5.

Porter - Cross by Mr. Schroeder

```
 1              May I approach the witness?

 2                   THE COURT:  Yes.

 3   Q    (By Mr. Schroeder) Is that an e-mail that you sent?

 4   A    Yes.

 5   Q    Okay.  And that's dated February 23, 2017?

 6   A    Correct.

 7                   MR. SCHROEDER:  Your Honor, move for

 8        admission.

 9                   THE COURT:  Any objection?

10                   MR. VITT:  No objection.

11                   THE COURT:  Okay.  It's admitted.

12   Q    (By Mr. Schroeder) Now, I just want to understand this.

13        You sent this e-mail on February 23rd to David Seifer,

14        Heather Gunnell, Kelly Mousley, and Donna Bedard,

15        correct?

16   A    Correct.

17   Q    And is it fair to say -- you say in here:  "David,

18        Kelly and Heather:  Please come to me if you have

19        questions about my schedule and work return.  I will

20        share the transition with the appropriate individuals."

21        Did I read that correctly?

22   A    Correct.

23   Q    And further down, where it starts "yesterday," it says,

24        "Yesterday, Donna sent out my schedule to David,

25        Albert, and Kelly without my permission, as I am told,
```

```
 1              at the request of David.  Please do not ask Donna to
 2              send out e-mails with regards to my schedule."  That
 3              seems like a rather curt, abrupt e-mail by you,
 4              correct?
 5    A    No, I wouldn't characterize it that way.
 6    Q    You wouldn't characterize it that way?
 7    A    No.
 8    Q    Would it be fair to say that you were annoyed that your
 9              schedule had been shared with your colleagues?
10    A    No.
11    Q    Not at all?
12    A    I was on work restrictions, and Dr. Seifer was
13              violating my work restrictions.  If you look at the
14              sentence above, it says, My schedule is in EDH, which
15              is our computerized medical record, and Qgenda, which
16              was our scheduling for all physicians, residents,
17              et cetera.  So my schedule was available in two digital
18              formats that David, Heather, and Kelly could easily
19              check.  When it was e-mailed, David would not leave me
20              alone when I was supposed to be resting.
21    Q    Okay.  So even though it was in two other formats, by
22              e-mailing it to you -- by e-mailing it to this group,
23              you felt that violated your work restrictions?
24    A    I felt that David was violating my work restrictions.
25    Q    But wouldn't the schedule tell everyone what your work
```

```
 1           restrictions were?
 2    A      No.  It was telling when I was clinically active.  When
 3           I was resting and when I was clinically active.  So I
 4           had -- from my care providers, I had a programmed
 5           schedule for returning which included a period of time
 6           of working and, as you recall, I had dependent
 7           symptoms, meaning the longer that I was standing up,
 8           the worse headache I would get, the more symptoms I
 9           would get.  So I had to lay down for a period of time,
10           and then I could work.
11                So I was functioning very well as long as I didn't
12           get overfatigued.  And David would come into my office
13           and follow me around the clinic.  So I was actually --
14           I don't know.  Can I add more without --
15    Q      I think we're way beyond the question at this point.
16    A      Okay.
17    Q      This is -- so there's three iterations of your
18           schedule.  Three of two that were on the system?
19    A      Right.
20    Q      And there's this one that was by e-mail from Donna,
21           right?
22    A      Mm-hm.
23    Q      And even though people could have accessed your
24           schedule otherwise through these two other avenues,
25           this third avenue, you believe, was inappropriate?
```

1    A    Right, because it didn't have my rest periods in it.

2    Q    Got it.

3    A    And he was bothering me on my rest periods.

4    Q    Right.  And so without knowing when your rest periods

5         were, he could still bother you, right?  Because if he

6         didn't know the rest periods, how would he know not to

7         bother you?

8    A    The rest periods were documented in here.  So --

9    Q    Documented in where?  In where?

10   A    The rest periods were scheduled into my schedule for

11        when I was seeing patients, and then when I wasn't

12        seeing patients, but the e-mail that went out didn't

13        have the rest periods in it, to my recollection.

14   Q    Okay.

15   A    And that's what I was worried about was that I -- my

16        care providers had told me that if my fatigue was such

17        that if I couldn't do normal activities at home when I

18        got home, they would pull me out of work, and I didn't

19        want to be pulled out of work.  So I was trying to be

20        compliant with my work restrictions.

21   Q    With respect to your work restrictions and your rest

22        schedule and everything you just said in this answer,

23        none of that is highlighted in this e-mail, right?

24   A    No.

25   Q    Thank you.

Porter - Cross by Mr. Schroeder

```
 1                  MR. SCHROEDER:  You can take that down.

 2   Q   (By Mr. Schroeder) Turning your attention --

 3                  MR. SCHROEDER:  If I may approach the witness

 4       to show her an exhibit marked Defendant's Exhibit B7?

 5                  THE COURT:  Yes.

 6   Q   (By Mr. Schroeder) I've just shown you a document

 7       marked Defendant's Exhibit B7.  Do you recognize that

 8       document?

 9   A   I don't right now.

10   Q   You're on that e-mail exchange, correct?

11   A   Yes.

12   Q   And it relates to, if you go to the bottom onto the

13       next page, an e-mail to Heather Gunnell dated

14       April 27th.

15   A   I don't have that.

16                  MR. VITT:  I don't have a next page.

17                  MR. SCHROEDER:  I'm sorry.  On the back page

18       to it, you don't?

19                  MR. VITT:  No.

20                  MR. SCHROEDER:  Give me one second.  I just

21       need one second, Your Honor.  We're missing a page.

22                  THE CLERK:  Mr. Schroeder, my copy doesn't

23       have a second page.

24                  MR. SCHROEDER:  I may myself have been using

25       the wrong document.  So we're going to go with just
```

```
 1          this one page.  I was looking at another document that
 2          had another page.  We'll stay with this one.
 3     Q    (By Mr. Schroeder) This is an e-mail that you received
 4          on April 27th, correct?
 5     A    Yes.  May I read it?
 6     Q    Of course you can.
 7                    MR. SCHROEDER:  I would like to move for
 8          admission of B7, Your Honor.
 9                    THE COURT:  Okay.  Any objection?
10                    MR. VITT:  I don't think so, but I want to be
11          clear.  This is just the one-page document, right?
12                    MR. SCHROEDER:  It is.  I myself have a
13          multipage document.  That was my fault.
14                    MR. VITT:  I have no objection.
15                    THE COURT:  Okay.  Then B7 is admitted.
16                    MR. SCHROEDER:  Could you put that up on the
17          screen, Ray?
18     Q    (By Mr. Schroeder) Let me know when you're finished
19          reviewing.
20     A    Okay.
21     Q    Okay.  So this was a document dated April 27th, 2017,
22          right?
23     A    Correct.
24     Q    And this is approximately one week or so before --
25          excuse me, before you and Albert Hsu and Dr. Seifer
```

```
 1        were informed of the closure of the REI division,

 2        right?

 3   A    And Elizabeth Todd.

 4   Q    And Elizabeth Todd, right; is that correct?

 5   A    Correct.

 6   Q    I just want to go through the various points that are

 7        raised by Dr. DeMars who had Heather Gunnell send this

 8        e-mail.  So the first one is, "As you all know, we have

 9        a critical staffing issue in REI," right?

10   A    That's what she says.

11   Q    Right.  You didn't respond to this e-mail in any way to

12        say that's not true, right?  That's what she says,

13        right?

14   A    I don't recall.

15   Q    Well, at this point, in April of 2017, late April,

16        April 27, 2017, Marlene Grossman had given her

17        resignation, notice, right?

18   A    I suppose so, yes.  I don't remember the date.

19   Q    I understand you might not remember the date, but in

20        this time frame --

21   A    In the time frame, yes.

22   Q    Right.  So that left just Marti Lewis as a full-time

23        REI nurse, right?

24   A    The full-time IVF nurse coordinator, not a full-time

25        IVF nurse.  We had other IVF nurses.
```

```
 1   Q    Okay.

 2   A    REI nurses, I'm sorry.

 3   Q    Who were those other REI nurses?

 4   A    We had nurses who were working from the general clinic

 5        in the REI division.

 6   Q    Okay.  And --

 7   A    Marti was the trained IVF nurse coordinator.

 8   Q    Right.  She was performing REI nursing duties as well,

 9        correct?

10   A    Please clarify your question.

11   Q    Well, you said that she's the REI nurse coordinator,

12        right?

13   A    Correct.  That's a sliver of what REI does, and so she

14        was doing IVF nurse coordination.

15   Q    Right.

16   A    Yes.

17   Q    So, at that point, will you agree with me that she was

18        the only REI nurse doing IVF?

19   A    No.

20   Q    Oh, there were other nurses?

21   A    She was doing the coordination of the cycles.

22   Q    Okay.

23   A    But we had other nurses doing planning, retrievals,

24        transfers, and other aspects of IVF including Mary

25        Martin and Jamie Florence and one or two others that I
```

```
 1          can't remember.  So Marti was doing the cycle
 2          coordination, which is a portion of overall IVF
 3          services.
 4     Q    Right.  Despite these other people, Dr. DeMars says,
 5          "We have a critical staffing issue in REI."
 6     A    That was her characterization.
 7     Q    Right.  At that point, she was the chair of the OB-GYN
 8          department, right?
 9     A    Correct.
10     Q    Right.  And that was her characterization that related
11          to the REI nursing, right?
12     A    That's what she states.
13     Q    Right.  Because at that point, Casey Dodge, Sharon
14          Parent, Marlene Grossman, are now no longer working in
15          the REI division, right?
16     A    They weren't coordinating at that time, no.
17     Q    Right.  And the REI division -- you were here for the
18          testimony of Dr. MacCallum, right?
19     A    Correct.
20     Q    And there was -- either Dr. MacCallum or Sharon Parent,
21          it may have been Sharon Parent, but my colleague showed
22          one of them the ASRM staff REI nurse job posting from
23          June of 2016.  Do you remember that?
24     A    There was a posting, and it quickly came off.
25     Q    Oh.  And when you say "quickly came off," you don't
```

```
1          believe that they were actually trying to hire an REI
2          nurse?
3     A    No, I believe they were actually trying to hire.  I
4          don't think that the posting stayed on as it should to
5          re-enroll.
6     Q    Oh.  And how do you know that?
7     A    I was checking and letting them know.  I would have to
8          go back and look at the specific dates, but I was
9          letting Katy Mansfield know that it had come off the
10         posting periodically.
11    Q    So did you understand that she was trying to make sure
12         that it went back up?
13    A    I asked her to, and she said she would, but I don't --
14         I don't believe it came up in a timely fashion.
15    Q    Okay.  And you have a specific recollection on this
16         particular point that it wasn't posted?
17    A    Yeah.  Because I talked to her about it, yes.
18    Q    Yeah.  Okay.  Thank you.
19              With respect to the other points in here, it's
20         like "the remaining patients" -- we can highlight that,
21         Ray.
22              "The remaining patients May-July are currently
23         under review and updates will be forthcoming."
24              The next paragraph says, "We will complete
25         evaluations of patients who are in the process of their
```

```
 1              infertility evals, follow-up visit, testing, et cetera,
 2              but they will not be given a time frame or date for ART
 3              cycle including IUI."
 4                   ART stands for what?
 5    A    Assisted reproductive technologies.
 6    Q    And IUI?
 7    A    Intrauterine insemination.
 8    Q    Just wanted to make sure we got all the acronyms.
 9                   The last paragraph states, "No further patients
10              will be scheduled for an ART cycle until we are able to
11              offer the patients the care they deserve and expect."
12              Did I read that correctly?
13    A    Correct.
14    Q    So it's true at this point that you are, or I should
15              say, the REI division is certainly putting more than
16              just a pause on IVF services, wouldn't you agree?
17    A    No.
18    Q    You think it was a pause?
19    A    That's what she told me.  And also I know that despite
20              this e-mail, there were patients still coming in to the
21              service.  So it was -- there was a disconnect between
22              this and what actually happened.  So that -- this is
23              her stated mission, and what she was telling me
24              personally was very different than what was on this
25              piece of paper.
```

1   Q   Okay.  But that's April 27th.  And then May 4th, the

2       REI division has announced that it's going to be

3       closed, right?

4   A   Correct.

5   Q   So what you're saying is perhaps some new patients came

6       in the door between April 27th and May 4th?

7   A   For REI, yes.

8   Q   Okay.  And they would have been told within a couple

9       days that they were not going to be able to proceed,

10      right, because the REI division is closing?

11  A   As of May 4th, yes.

12  Q   Right.

13              MR. SCHROEDER:  If I may approach the

14      witness, Your Honor, to show her Defendant's Exhibit

15      A10?

16              THE COURT:  Yes.

17              MR. SCHROEDER:  Thank you.

18  Q   (By Mr. Schroeder) Showing you a document that's been

19      marked Defendant's Exhibit A10, it's an e-mail from

20      you -- down below it's an -- up top it's an e-mail from

21      you to you, but the one below it is from you to Heather

22      Gunnell.  Do you see that?

23  A   Heather Gunnell and Katy Mansfield, yes.

24  Q   Right.  It's dated November 4th, 2016, right?

25  A   Correct.

1    Q    Any doubt that you sent that e-mail to yourself?

2    A    Not at all.

3              MR. SCHROEDER:  Your Honor, move for

4         admission of Exhibit A10.

5              THE COURT:  Okay.  Any objection?

6              MR. VITT:  No, Your Honor.

7              THE COURT:  Okay.  It's admitted, A10.

8    Q    (By Mr. Schroeder) So this is November -- I realize

9         we're jumping around a little bit on time frames.  This

10        goes back to November -- early November of 2016,

11        specifically November 4th.  And you state to Heather

12        and Katy, the first two paragraphs, if we can highlight

13        them.  "I know this is a particularly difficult time

14        for all involved with recent decisions and departures.

15        I personally do not have all of the information nor do

16        I have any expectation I will have more than I do

17        currently.  I believe Leslie's e-mail that it was a

18        decision made with many involved and with careful

19        thought and with that knowledge trust the right

20        decisions were made.

21            "It does leave us in a critical shortage of

22        skilled and trained nursing at a time when our program

23        was in decline and the competition within the region is

24        well organized and patient centered.  Our patients are

25        largely cash paying and can choose to go where they

Porter - Cross by Mr. Schroeder

1        like and they will."

2             Did I read that correctly?

3    A    Correct.

4    Q    Okay.  So at this point, is this in and around the time

5        that Casey Dodge is -- her employment is terminated?

6    A    Yes.

7    Q    Okay.  And was that the impetus for the subject line

8        "nursing"?

9    A    Yes.  I was advocating to bring Sharon back.

10   Q    Okay.  And you wanted to bring Sharon back because

11       there was a critical shortage of skilled and trained

12       nursing, right?

13   A    Correct.

14   Q    For the REI division program, right?

15   A    Correct.

16   Q    And you weren't talking about any of the nurses that

17       you talked about earlier in any of your responses to me

18       throughout the Dartmouth Health system?  You don't

19       refer to any of those people?

20   A    I'm sorry, rephrase.  I lost you.

21   Q    In this e-mail communication, you don't refer to any

22       other nurses like the ones that you referred to earlier

23       that may work in the OB-GYN department; here you're

24       referring to critical shortage of skilled and trained

25       nursing at a time when our program is in decline.

```
 1          Those are your words, right?
 2   A      Yes.  And --
 3   Q      I'm just asking.  Those are your words, right?
 4   A      Those are my words.
 5   Q      Right.  So isn't it true, based on that language, that
 6          you're identifying a nursing shortage within the REI
 7          division?
 8   A      For a trained IVF nurse coordinator.
 9   Q      Okay.
10   A      Nurses are more global than that.
11   Q      I understand that.  "Skilled and trained nursing" is
12          what you say, correct?
13   A      For IVF nurse coordination.
14   Q      That's not what you say, Dr. Porter.  That's not what
15          you say.
16   A      That was the intent.
17   Q      Okay.  But that's not what you said, right?
18   A      That's not what I said there.
19   Q      Right.  At this point, on November 4th, 2016,
20          Dr. Seifer was the division director, correct?
21   A      Correct.
22   Q      And you didn't send it to him, right?
23   A      No.
24                  MR. SCHROEDER:  You can take that down.
25          Thank you.
```

```
1   Q    (By Mr. Schroeder) Dr. Porter, you were asked a series
2        of questions about Dr. Albert Hsu by your counsel
3        earlier today.  And you had a series of complaints
4        about his performance throughout his employment,
5        correct?
6   A    I wouldn't characterize it that way.
7   Q    You wouldn't characterize the things that you would
8        report to Dr. DeMars as complaints about Albert Hsu?
9   A    I wouldn't characterize it as complaints.  I would
10       characterize it as observations about his clinical
11       skill.
12  Q    Well, you had concerns even before he got there?
13  A    I did.
14  Q    Right?
15  A    Yes.
16  Q    In fact, you signed a declaration in this case where
17       you talked about the fact that you spoke to him well
18       before he even got there, right?
19  A    Correct.
20  Q    And you had a less -- you were concerned about his
21       skill set, right?
22  A    I was concerned he had inadequate training.
23  Q    And that was based upon a conversation with him,
24       correct?
25  A    And other conversations that I had with his previous
```

```
 1            mentors, yes.
 2    Q       His previous mentors?
 3    A       Yeah.
 4    Q       Okay.
 5                    MR. SCHROEDER:  May I approach the witness
 6            with a new exhibit?  It's Defendant's Exhibit C3.
 7                    THE COURT:  Yes.
 8                    MR. SCHROEDER:  Defendant's Exhibit C3.
 9    Q       (By Mr. Schroeder) I would just ask you to review that
10            document that I just put in front of you and let me
11            know when you've had a chance to review.
12    A       (Witness complies.)
13    Q       Just let me know when you've had a chance to finish
14            reviewing it.
15    A       Okay.  (Witness reading.)  Okay.
16    Q       Does that refresh your recollection that out of the
17            gate, right, even before he got there in the fall of
18            2013, you called him -- he was already slated to come
19            work there, right, in 2014?
20    A       He was slated to start, yes.
21    Q       Right.  And he had gone to MIT, right?
22    A       Correct.  Yes.
23    Q       And he had a fellowship in IVF?
24    A       No.  Fellowship in reproductive endocrinology and
25            infertility.
```

```
1    Q    So REI?

2    A    Yes.

3    Q    So the broader part as opposed to IVF?

4    A    That's what the fellowship is, is the global context of

5         REI, yes.

6    Q    Right.  Right.  So just based on talking to him, you

7         made certain conclusions about whether or not he had

8         the clinical skills to join the REI division, right?

9    A    I made the assessment based on what he told me in terms

10        of his numbers, that he did not meet the training

11        criteria by our national standards and organization

12        before he got there; that that fellowship had gone on

13        probation.

14   Q    Right.  And you -- did you interview him?

15   A    No.

16   Q    Okay.  And yet he was selected to be an REI physician,

17        right?

18   A    Yes.

19   Q    And so right out of the gate, you're concerned about

20        his numbers, right?

21   A    Yes.

22   Q    And you're concerned about his training, right?

23   A    Yes.

24   Q    And, in fact, you raise those concerns -- whether you

25        call them complaints, grievances, concerns, comments --
```

```
 1        about his performance dating all the way back to 2014,
 2        right?
 3   A    I didn't comment about his performance.  I was making
 4        plans for his training.
 5   Q    I'm asking about when he got there, right?  So first of
 6        all, your first impression of him isn't great just
 7        based on one call with him because you're concerned
 8        about his training and whether or not he's up for being
 9        an REI physician at DH?
10   A    I would not characterize it that way, no.
11   Q    Well, you had less than favorable opinions about his
12        training, right?
13   A    I wouldn't characterize it that way.
14   Q    Okay.  Well, how would you characterize it?  Would you
15        characterize it as less than positive?
16   A    No.
17   Q    You wouldn't?  Okay.  But you made it clear that -- or
18        you had this call with him -- you didn't interview him.
19        You had this call with him, and you had concerns about
20        his training and his numbers, right?
21   A    I had concerns about his exposure, yes, and his ability
22        to act independently, yes.
23   Q    And those concerns about Dr. Hsu continued after he
24        joined the REI division sometime in mid 2014, right?
25   A    Yes.
```

```
 1   Q   And those -- you raised those concerns to Dr. DeMars,
 2       right?
 3   A   Yes.
 4   Q   And you raised those concerns to Heather Gunnell,
 5       right?
 6   A   Yes.
 7   Q   I don't recall anyone else you raised concerns to about
 8       his work product and his technique, et cetera.  Any
 9       other members of leadership?
10   A   I was responsible for filling out his evaluations,
11       which there were several as part of being the interim
12       division head, and so I did write those evaluations
13       carefully, and so those would have gone to the
14       individuals within administration responsible for -- to
15       evaluating those.  So, yes, there was some written
16       documentation, and then there was some written
17       communications and verbal communications with our
18       departmental leadership, yes.
19   Q   Right.  And those communications, whether they're
20       formal performance evaluations or e-mails or
21       conversations with Dr. DeMars, all of those were
22       critical Dr. Hsu in one way or the other, right?
23   A   I wouldn't characterize it as critical.
24   Q   So if his ratings were he needs -- performance needs
25       improvement, you don't consider that critical?
```

```
 1   A    I consider that an observation and a goal to help him
 2        move forward, yes.
 3   Q    You wouldn't consider that critical?
 4   A    I wouldn't characterize it that way.
 5   Q    You wouldn't characterize it that way?  So if he
 6        received any ratings from you, and I really don't want
 7        to go through all the ratings with you, but assuming he
 8        did receive ratings of "performance needs improvement,"
 9        you don't consider that to be a negative comment about
10        his work product?
11   A    I would -- I would say that it is negative in terms of
12        he needs improvement, yes.
13   Q    Okay.  And you raise those concerns, and -- so they're
14        negative.  So would you agree with me that the word
15        "negative" could be synonymous with critical?
16   A    No.
17   Q    No, you don't think so?
18   A    No.
19   Q    Okay.  So we'll go with your word then, negative.  So
20        your reviews of him were in 2014, 2015, 2016, correct?
21   A    I don't recall.
22   Q    Well, you just told me two minutes ago that you did
23        reviews for him, right?
24   A    I don't recall the dates.  You asked me --
25   Q    I didn't ask you the dates.  I didn't ask you the
```

Porter - Cross by Mr. Schroeder

| 1 | | dates.  I asked you whether you do reviews in 2014, |
|---|---|---|
| 2 | | 2015, 2016. |
| 3 | A | I don't recall the exact dates. |
| 4 | Q | Okay.  But you did do reviews of him, right? |
| 5 | A | Yes. |
| 6 | Q | And they contained negative comments about Dr. Hsu? |
| 7 | A | They contained observations that were concerning and |
| 8 | | patient safety issues, yes. |
| 9 | Q | All right.  All right.  Patient safety issues would be |
| 10 | | an alarm bell, right? |
| 11 | A | Yes. |
| 12 | Q | And those alarm bells, you were ringing all the way |
| 13 | | back in 2014, shortly after he got there? |
| 14 | A | I wouldn't characterize it that way, no. |
| 15 | Q | Right.  I understand you wouldn't characterize it that |
| 16 | | way, but weren't you making comments that were negative |
| 17 | | about Dr. Hsu dating back to the time he first got |
| 18 | | there? |
| 19 | A | No. |
| 20 | Q | You weren't? |
| 21 | A | No. |
| 22 | Q | So we're going to go through all those documents, every |
| 23 | | single one, where you made critical comments about |
| 24 | | Dr. Hsu. |
| 25 | A | As I said, I was asked to fill out the evaluations for |

```
 1            him that I thought about and carefully, as needed, and
 2            then when requested.  So I filled out that letter at
 3            the request of Dr. Seifer and Dr. DeMars.  I wouldn't
 4            characterize that as critical per se, but an honest
 5            assessment of what his skills were.
 6     Q      I understand --
 7     A      To my recollection, yes.
 8     Q      Right.  I understand it may be an honest assessment,
 9            but it was a negative assessment, was it not?
10     A      Yes.
11     Q      Right.  And in one of those negative assessments that
12            you gave to Dr. Seifer and Dr. DeMars, that was in
13            early June 2016, right?
14     A      Yes.  Yes.  I don't remember the date.
15     Q      Well, you were shown the document, I think yesterday --
16            you've seen the document, right?
17     A      I have.  I do not remember the date.
18     Q      But it would have been around the time that Dr. Seifer
19            joined the practice, right?
20     A      Yes.
21     Q      Okay.  And that was around June of 2016, right?
22     A      Correct.
23     Q      And you gave Dr. DeMars and Dr. Seifer negative
24            comments about Dr. Hsu's technique, right?
25     A      Yes.
```

```
1    Q    His skills, right?

2    A    Yes.

3    Q    His clinical knowledge, right?

4    A    Yes.

5    Q    And you did that based on historically working with

6         him, but you were out of the office on leave from mid

7         December to mid June -- mid December of 2015 to mid

8         June of 2016.  So all of your comments about his work

9         related to a time period at least six months earlier,

10        right?

11   A    I was coming back for part of that week, you can check

12        the dates, but I wouldn't characterize it that way, no.

13   Q    Well, you were out, though, from December of '15 to

14        June of '16, right?

15   A    No, I was coming back sooner.  And, again, my

16        deposition will have the exact dates.

17   Q    Sure.  You testified earlier, I think three times, that

18        it was a six-month leave, short-term disability, right?

19   A    Right, but I was coming back part-time.  It doesn't

20        mean that I was out all of that.

21   Q    Okay.  With respect to Dr. Hsu, though, those negative

22        comments about his clinical skill, technique, just

23        overall performance, those negative comments date back

24        to shortly after he got there, right?

25   A    No, I didn't -- in the first six months, I observed
```

Porter - Cross by Mr. Schroeder

```
 1          him.  In the first six months, I tried to help him.
 2          And so I would have to look to go back and see when I
 3          started collecting it, but in the first six months, I
 4          was actually really trying to help him.
 5     Q    I understand that, but you had concerns even when you
 6          were trying to help him as his -- mentoring him that he
 7          wasn't up for the task, right?
 8     A    That's correct, yes.
 9     Q    Okay.  You shared those concerns with other members of
10          Dartmouth Health leadership, correct, including
11          Dr. DeMars?
12     A    I shared them with Dr. DeMars, and I filled out his
13          evaluations, yes.
14               MR. SCHROEDER:  Give me a second, Your Honor.
15          I'm just trying to transition here.
16               THE COURT:  Okay.
17               MR. SCHROEDER:  I would ask to approach the
18          witness to show her Defendant's Exhibit H?
19               THE COURT:  Yes.
20               MR. SCHROEDER:  Thank you.
21     Q    (By Mr. Schroeder) Showing you a document that's been
22          marked Defendant's Exhibit H, Dr. Porter, and it's a
23          series of e-mails between you and Leslie DeMars,
24          correct?
25     A    A series of e-mails between -- there's two e-mails,
```

```
 1          Leslie DeMars at the top.  And the bottom is Leslie
 2          DeMars, Navid Esfandiari, and Elizabeth McGee.
 3   Q    Let me ask you this before we proceed:  Elizabeth
 4        McGee, does she go by the name Lisa McGee?
 5   A    Yes.
 6   Q    Who is she?
 7   A    Lisa McGee, at the time, was the fellowship director
 8        for REI at University of Vermont, and we had a joint
 9        fellowship training program.
10   Q    She's at the University of Vermont Medical Center?
11   A    She's on leave currently, but, yes, she was at that
12        time, yes.
13   Q    Okay.  Well, I'm not worried about that time
14        necessarily, but she's at UVM -- she may be on leave,
15        but she's at the University of Vermont Medical Center?
16   A    To my knowledge, yes.
17   Q    Do you stay in contact with her?
18   A    Now?
19   Q    Yeah.
20   A    No.
21   Q    No contact with her?
22   A    No.  I haven't for months.
23   Q    Okay.  So she's on leave of absence right now?
24   A    Correct, as far as I know.
25   Q    But back then, in 2016, you -- were you in regular
```

```
1         contact with her?

2    A    All the time because of the fellowship.

3    Q    And as a result of the joint fellowship between UVM

4         Medical Center and Dartmouth Health, would it be fair

5         to say that there was close ties between those REI

6         programs at that time?

7    A    Yes.

8    Q    Okay.  And you developed relationships, or continued

9         relationships, with people at UVM dating back to the

10        time that you were a fellow there, correct?

11   A    Dating back to the time that I was a resident there,

12        yes.

13   Q    Right.  Right.  So you had been a resident at UVM

14        Medical Center and you had been a fellow at UVM Medical

15        Center, right?

16   A    Yes.

17   Q    And at that time you were still living in Norwich,

18        Vermont, but you were doing your fellowship here at UVM

19        Medical Center in Burlington?

20   A    No, we were living in Montpelier.

21   Q    Oh, okay.  All right.  So you did your residency at UVM

22        Medical Center.  You did your fellowship there.  And

23        then, certainly, in 2016, you had close connections

24        between the Dartmouth Health REI program and the UVM

25        Medical Center program, right?
```

Porter - Cross by Mr. Schroeder

```
 1   A    Correct.

 2   Q    And those close relationships carried over into 2017,

 3        right?

 4   A    Correct.

 5   Q    Now, in the lower e-mail, this is January 30th --

 6        before we go any further --

 7             MR. SCHROEDER:  Can I move for admission,

 8        Your Honor?

 9             THE COURT:  Is there any objection?

10             MR. VITT:  No objection.

11             THE COURT:  Okay.  Then Exhibit H is

12        admitted.

13             MR. SCHROEDER:  Thank you.

14   Q    (By Mr. Schroeder) So showing you Exhibit H, there's

15        two e-mails.  Let me start with the bottom one, and

16        then we'll go up.

17             The bottom one is an e-mail from you to Elizabeth

18        McGee -- Lisa McGee, right -- Leslie DeMars, and Navid

19        Esfandiari, right?

20   A    Correct.

21   Q    At this point, you are -- you, yourself, were on a

22        leave of absence, right?

23   A    Correct.

24   Q    So you weren't at work at all during January of 2016?

25   A    Correct.
```

```
 1   Q    Okay.  Now, the third paragraph down it says, quote,
 2        "This would be a potential win/win for both programs.
 3        It provides extra support and much needed relief for
 4        Albert and thus ease his stress, provide some collegial
 5        support."  Do you see that?
 6   A    Yes.
 7   Q    You wrote that, correct?
 8   A    I did.
 9   Q    Because, at that point, right, when you were out on
10        your leave of absence, December of '15 to sometime
11        around June of '16, on your short-term disability leave
12        of absence, the only doctor in the REI division was
13        Dr. Hsu, right?
14   A    At Dartmouth-Hitchcock, and Judy McBean was doing some
15        work, I understand.
16   Q    You understand she was doing some work; she was a per
17        diem, though, correct?
18   A    Right, filling in where she could.
19   Q    Right.  And where is she located?
20   A    She's in a practice in Brattleboro, Vermont.
21   Q    And how far away is that from?
22   A    About an hour from Dartmouth-Hitchcock.
23   Q    And do you know how often she was there in 2016?
24   A    I can't, off the top of my head, say.
25   Q    Right.  And you don't know how often she was there in
```

```
 1         2016 or 2017 I think you said, right?
 2    A    I don't know.
 3    Q    Right.  And so here, you're saying also, further down,
 4         "I know Judy McBean has been a huge help as has Leslie
 5         with decisions and surgery, and I am tremendously
 6         thankful."  You appreciated the efforts by Dr. McBean
 7         and Dr. DeMars, correct?
 8    A    Correct.
 9    Q    And, in fact -- but then you go up top, and you have an
10         e-mail just with Leslie DeMars and halfway down or
11         towards the end of that, it says, quote, "I'm hearing
12         from multiple sources that Albert, despite relatively
13         open schedules, is not coping that well.  He's also on
14         the list to be suspended again despite relatively light
15         schedules."
16              Now, at that point, to the extent that you were
17         learning anything, it was through other people that
18         were working in the REI division, correct?
19    A    Or e-mails.
20    Q    Or e-mails, correct?
21    A    Yeah, I was getting e-mails still.
22    Q    Okay.  And in terms of being suspended, was it related
23         to getting the charts in on time?
24    A    Yes.  He didn't close his documentations in a timely
25         fashion.
```

| | | |
|---|---|---|
| 1 | Q | Right.  And if you get too high up on the amount of |
| 2 | | days your charts aren't up to date, you could be |
| 3 | | suspended? |
| 4 | A | Correct. |
| 5 | Q | Okay.  And so, at that point, he -- other than Judy |
| 6 | | McBean who is working on a per diem basis, he's the |
| 7 | | only one performing REI physician services in the REI |
| 8 | | division of Dartmouth Health, right? |
| 9 | A | I wouldn't characterize it that way.  Judy was around, |
| 10 | | and we had the fellows from -- and Lisa and -- from UVM |
| 11 | | at the same time to provide some support. |
| 12 | Q | But to the extent that there was support or not support |
| 13 | | at that point, you weren't there, right? |
| 14 | A | No. |
| 15 | Q | Okay.  So you don't have any first-hand knowledge of |
| 16 | | what was happening on a daily basis, first-hand |
| 17 | | knowledge? |
| 18 | A | I was not physically with him then, no. |
| 19 | Q | Okay.  You were not physically there either, right? |
| 20 | A | Right. |
| 21 | | MR. SCHROEDER:  If I may approach the witness |
| 22 | | to show her Defendant's Exhibit R? |
| 23 | | THE COURT:  Yes. |
| 24 | Q | (By Mr. Schroeder) Showing you a document marked |
| 25 | | Exhibit R, Dr. Porter, it is a number of e-mails on one |

```
1          page between yourself and Heather Gunnell and Leslie

2          DeMars and Donna Bedard.  You were part of these

3          e-mails, correct?

4    A     Correct.

5    Q     Okay.

6                    MR. SCHROEDER:  Your Honor, I would like to

7          move for admission of Exhibit R.

8                    THE COURT:  Any objection?

9                    MR. VITT:  No objection.

10                   THE COURT:  Okay.  Exhibit R is admitted.

11   Q     (By Mr. Schroeder) Halfway down the page you say to

12         Leslie, "Today did not go well.  I suspect I will be

13         pulled back out of work if we cannot make this trial

14         work."  By "trial," you meant the fact that you were

15         coming back a couple hours a week, right?

16   A     I was coming back on limited work restrictions as

17         outlined by my physicians.

18   Q     Right.  That's what I said, correct?

19   A     Correct.

20   Q     Now, halfway down, you said, "I spoke with Heather two

21         weeks ago and asked her to be certain Albert was set up

22         in his office; that she make it clear to him that he

23         needs to be out of the ultrasound --" US space, I

24         assume that's ultrasound?

25   A     Ultrasound.
```

1  Q    "He is covering ultrasound.  This should include the

2       consult rooms.  He's seeing clinic patients in US

3       consult space," right?

4  A    Correct.

5  Q    And you were annoyed that he was doing so?

6  A    I wouldn't characterize it that way.

7  Q    Well, the last sentence of your e-mail says, "In the

8       end, is it frustrating me to tears that I can't seem to

9       make this work?"  You were frustrated, right?

10 A    I was really disappointed.  I was -- Yeah.

11 Q    And you were frustrated because Dr. Hsu wasn't

12      listening to you?

13 A    No.  I wouldn't characterize it that way.

14 Q    Okay.  And either way, that day in the office didn't go

15      well, correct?

16 A    They weren't compliant with my work restrictions the

17      first or second day I came back.

18 Q    Right.  And this first or second day that you came back

19      is right around that mid June time period, correct?

20 A    Correct.

21 Q    And you recall going over your work restrictions in

22      person with David Seifer and Albert Hsu specifically?

23 A    I went over in person with Leslie DeMars, with --

24 Q    I asked you -- please answer the question.

25 A    I recall going over my work restrictions with David

```
1         Seifer, yes.
2    Q    Just David Seifer?
3    A    Right.
4    Q    Okay.  Not Albert Hsu?
5    A    Not specifically, no.
6    Q    Right.  In fact, when I asked you about going over it
7         with Albert Hsu and David Seifer, the first person you
8         said was Leslie DeMars.  Neither of them were the
9         people that I asked you about, right?
10   A    She sent an e-mail out to the group.
11   Q    I understand that.  My question though was whether or
12        not you personally said to David Seifer and Albert Hsu,
13        Hey, listen.  I'm coming back, and here's my list of
14        work restrictions.  You didn't do that, right?
15   A    I wouldn't characterize it that way, no.
16             MR. SCHROEDER:  Your Honor, I've got another
17        big section coming up.  I'm not sure whether -- I'm
18        going to try to condense my questions, but if you want
19        me to keep going, I'll keep going, but --
20             THE COURT:  Let's keep going.
21             MR. SCHROEDER:  Okay.  Sure.  May I approach
22        the witness to show her Exhibit T?
23             THE COURT:  Yes.
24   Q    (By Mr. Schroeder) Okay.  Showing you Defendant's
25        Exhibit T.  This is a series of e-mail communications
```

 1        with you on them, right?

 2   A    Yes.

 3   Q    And I just want to ask you --

 4             MR. SCHROEDER:  I actually move for admission

 5        of Exhibit T.

 6             THE COURT:  Any objection?

 7             MR. VITT:  None.

 8             THE COURT:  Exhibit T is admitted.

 9   Q    (By Mr. Schroeder) Now, this is a series of e-mail

10        communications between you and Leslie DeMars, right?

11   A    Correct.

12   Q    And you were frustrated, right, in this series of

13        e-mail communications about the fact that Albert Hsu

14        was continuing to use the ultrasound space, right?

15   A    I wasn't frustrated.  I wouldn't characterize it that

16        way; I was disappointed.

17   Q    Well, you're disappointed, and you felt the need to

18        write this e-mail to her, right?

19   A    Yes.

20   Q    Right.  And then Leslie DeMars responded to you,

21        correct?

22   A    Correct.

23   Q    And then you responded, "I'm really sorry, but I'm

24        laughing."

25   A    Yeah.  I was responding to her coming in to clean out

```
 1        his office so he could move there --
 2   Q    Okay.
 3   A    -- and take care of patients in his own office rather
 4        than the ultrasound room.
 5   Q    Okay.  Now, to that, June 2016, would it be fair to say
 6        that you had a pretty close relationship with Leslie
 7        DeMars?
 8   A    We were friendly, yes.
 9   Q    You were more than friendly, weren't you?
10   A    I would not characterize her as my best friend, as you
11        did on opening in no way.  We were friendly work
12        colleagues.
13   Q    Well, you texted with each other all the time, didn't
14        you?
15   A    No, I wouldn't characterize that.
16   Q    Really?  Okay.  Well -- you both bought and purchased
17        the same kind of car, right?
18   A    Yes.
19   Q    Right?  Porsche Macan?
20   A    No, she has --
21             MR. VITT:  Objection, Your Honor.  Do we
22        really need to go down this road?
23             MR. SCHROEDER:  I'll show -- we'll go through
24        the text messages, Your Honor.
25             THE COURT:  Overruled.
```

```
 1              MR. SCHROEDER:  Thank you.
 2    Q    (By Mr. Schroeder) You were friendly with her -- she
 3         wasn't your best friend, right?
 4    A    No.
 5    Q    But you certainly got together with her outside of
 6         work, right?
 7    A    No, not very often.
 8    Q    Okay.  Well, I want to go to the first e-mail at the
 9         top.  So, yes, we do have to go into this question.
10              This is you saying, "I'm really sorry, but I'm
11         laughing.  I'm really sorry it has to be this way.  I'm
12         going to go to the lake mid afternoon before the
13         graduation ceremony, if you want a place to relax, iced
14         tea or a beer or glass of wine in between."  Right?
15         You did get together with her outside of work, right?
16    A    Not very often at all.  This was the evening before
17         graduation, which was within a ten-minute drive from
18         our lake cabin, so I was saying, If you want to come
19         up, fine, because these other people are coming too.
20         So it wasn't specific to her.
21    Q    Okay.  But you would get together with her outside of
22         work, right?
23    A    Not in a really long time.
24    Q    No.  No.  No.  I'm not asking a really long time.
25    A    No, other than work-related things and the boards.
```

```
1   Q    In 2017 -- I'm talking about 2016, not in a really long
2        time since a really long time closures of the REI
3        division, pandemic, et cetera.  I'm talking about 2016,
4        you were very friendly with her in that time frame?
5   A    We were friendly, yes.
6   Q    And you would do things together and get lunch, get
7        dinner, maybe go for drinks, right?
8   A    No.  Just work-related activities.
9   Q    Just work-related?
10  A    Mostly, yes, I would say.  Uh-huh.
11  Q    Mostly or always?
12  A    We rarely got together for social things that weren't
13       work related in that time frame.
14  Q    Okay.  Well, and is it your testimony that you did not
15       exchange regular texts?  You weren't in a regular text
16       message string with Dr. DeMars?
17  A    I would say that I text her about specific things
18       frequently, yes, but not regularly like everyday or
19       every evening like I do my children or my best friend
20       who I do clinic -- I mean, I run trails with.  So it
21       wasn't that type of a relationship, no.
22  Q    Okay.  I understand that it's not a type of
23       relationship like your family or your kids or your best
24       friend.
25  A    Right.
```

1   Q   But setting aside that small group of people, she was

2       certainly in the upper tier of your friends in terms of

3       regularly texting with her; is that fair to say?

4   A   I wouldn't characterize it that way, no.

5   Q   You wouldn't characterize it that way?

6   A   No.

7   Q   Okay.  This is an e-mail exchange between you and

8       Dr. Porter -- I'm sorry, Dr. DeMars, and in this e-mail

9       exchange you say that you did, at the bottom, explain

10      your work restrictions to David over the phone, right?

11  A   Correct.

12  Q   The real issue -- and then you say, "The real issue is

13      Albert camping in the reading room and using it as his

14      personal office."  And then further down you say,

15      "Albert has been asked not to use these spaces unless

16      for their intended purposes.  He ignores the request.

17      While the billing issue are likely to go unnoticed, if

18      we are audited, it could be a problem."

19          Was this really kind of a big bugaboo for you that

20      he was using spaces that you didn't believe he should

21      be in?

22  A   What he was doing was not complying with billing

23      practice.

24  Q   And that really bothered you, right?

25  A   I wouldn't characterize it that way.

```
 1   Q    Okay.
 2                  MR. SCHROEDER:  I want to just, if I may,
 3        Your Honor, show Dr. Porter Exhibit W, Defendant's
 4        Exhibit W.
 5                  THE COURT:  Yes.
 6   Q    (By Mr. Schroeder) Now --
 7   A    I would like some time to read this please.
 8   Q    Sure.  Let me know when you're finished.
 9   A    (Witness reading.) Okay.
10   Q    Thank you.  I just -- I wanted to ask you a few quick
11        questions.  So this is July of -- late July of 2016,
12        right?
13   A    Correct.
14   Q    And you write, "This weekend suggestions going
15        forward."  And you were giving Dr. DeMars kind of a
16        review of Dr. Seifer, in your mind, right?
17   A    At her request, yes.
18   Q    Okay.  I understand that it was at her request, and you
19        were giving -- and your comments, would you consider
20        them to be negative or critical?
21   A    I wouldn't characterize it that way.  I would say I was
22        concerned.
23   Q    You were concerned then, right?
24   A    I was concerned about patient safety, yes.
25   Q    Right.  And you say -- now, go to the second page --
```

1              MR. SCHROEDER:  I'm sorry.  I didn't ask for

2       admission first.

3              MR. VITT:  No objection.

4              MR. SCHROEDER:  Move for admission.

5              THE COURT:  Okay.  Exhibit W is admitted.

6              MR. SCHROEDER:  Thank you.

7   Q   (By Mr. Schroeder) Go to the second page, Dr. Porter.

8       Right before you state the options, you state, quote,

9       "The larger issue to be addressed is the ongoing

10      concern surrounding David's technical abilities and the

11      ongoing team, quote, no confidence, end quote, in him."

12      Did I read that correctly?

13  A   Correct.

14  Q   And then further down at the end of number one, you

15      say, quote, "I suspect that the ongoing team worry

16      about David's technical ability, this option may not

17      work/be challenging."  At this point, he's been there a

18      handful of months, right, Dr. Seifer?

19  A   Correct.

20  Q   And he was the division director, right?

21  A   Correct.

22  Q   Right.  And did you feel like you reported to him or

23      no?

24  A   Yes.

25  Q   You did?  Okay.  And your comments about him, you

```
 1        wouldn't characterize them as negative or critical,
 2        just concerned, right?
 3   A    I would characterize them as patient safety issues.
 4   Q    Okay.  And you then say -- but the ongoing team -- at
 5        this point, you had just come back from a six-month
 6        short-term disability, just back in June, right?
 7   A    I was coming back earlier hours, yes, and starting to
 8        return in a more concerted fashion, yes.
 9   Q    Well, when I showed you the document earlier, your
10        first day back was around June 14th, 2016.
11   A    Well, let's go back to the timeline in my deposition,
12        and it will give you the detailed --
13   Q    Well, we don't really have time for that, but what I'm
14        asking you is:  Your comments about Dr. Seifer's
15        performance happened within six weeks of you coming
16        back a few hours a week, right?
17   A    Yes.
18   Q    Okay.
19                    (Court at recess for the day.)
20
21
22
23
24
25
```

```
 1                    Thursday, March 27, 2025

 2                       Morning Session

 3                          *  *  *

 4                      (Jury present.)

 5                    CROSS-EXAMINATION

 6   BY MR. SCHROEDER:

 7   Q    Dr. Porter, the first exhibit I would like to show you

 8        is P126.

 9                 MR. SCHROEDER:  If I may approach, Your

10        Honor?

11                 THE COURT:  Yes.

12                 MR. SCHROEDER:  I want to see if the

13        Plaintiff's Exhibits are up here.  I don't know that

14        they are.

15   Q    (By Mr. Schroeder) Dr. Porter, I'm showing you a

16        one-page document marked -- originally marked

17        Plaintiff's Exhibit 126.  It's an e-mail exchange

18        between yourself and Dr. DeMars on June 30, 2016; is

19        that right?

20   A    Yes.  I would like to read it first.

21   Q    Sure.  Take your time.  Just let me know when you're

22        finished.

23   A    (Witness reading.)

24                 MR. SCHROEDER:  Your Honor, may I have this

25        published for the jury?
```

```
1                    THE COURT:  Yes.

2                    THE WITNESS:  Okay.

3    Q    (By Mr. Schroeder) Okay.  And this was a document that

4         was marked by your counsel for this trial, correct?

5    A    Yes.

6    Q    You saw this before testifying today, correct?

7    A    Correct.

8    Q    Okay.  And I want to focus on the second page, which is

9         up on the screen.  At this point, you had just returned

10        to the office recently, correct, June 30, 2016?

11   A    As I said, I was going in and out, but, yes, I was

12        trying to return a bit more frequently, but I was

13        increasing my hours over time, yes.

14   Q    Okay.  And this -- were you still exhibiting symptoms

15        related to your condition at that time?

16   A    Yes.

17   Q    Okay.  And the second paragraph, you state, "He is

18        sending me to the Mayo Clinic and thinks I may still be

19        leaking despite my normal recent MRI.  He thinks I am

20        not clinically behaving as if I'm healed.  No wise

21        cracks," smiley face, right?

22   A    Right.

23   Q    The fourth paragraph that starts with "I am keeping,"

24        do you see that?

25   A    Yes.
```

1   Q   "I am keeping an open mind and trying very hard to be

2        partner and colleague.  I've learned from my own

3        mistakes in the past.  I am certainly willing to look

4        at new ways of doing things, but would like to look at

5        the literature and be clear the literature supports the

6        change.  He does have some reasonable requests."

7           Were you talking about Dr. Seifer there?

8   A   Yes.

9   Q   Okay.  And so in terms of his skills and techniques

10       and -- he had different ways of doing things than you,

11       correct?  Is that a fair statement?

12   A   Correct.

13   Q   However -- now, he had just joined, right?

14   A   Yes.

15   Q   You then say in the paragraph right after that, quote

16       "I'm concerned that David perhaps -- that David perhaps

17       going in the wrong direction in looking into the ins

18       and outs of the IVF program.  He seems to take limited

19       data and make broad assumptions."  You said that

20       statement, right?

21   A   Correct.

22   Q   Did you consider that statement to be negative or

23       critical about Dr. Seifer?

24   A   I wouldn't characterize it that way.

25   Q   Okay.  If we may proceed --

```
 1                    MR. VITT:  Could you get a little closer to
 2         the microphone?
 3                    THE WITNESS:  Oh, I'm sorry.
 4                    MR. SCHROEDER:  I thought Mr. Vitt was
 5         talking about me and I was, like, I can't get any
 6         closer.
 7    Q    (By Mr. Schroeder) So the next exhibit is C16, and
 8         that's --
 9                    MR. SCHROEDER:  If I may approach, Your
10         Honor?
11                    THE COURT:  Yes.  The deputy clerk may not
12         have a copy of that exhibit.  You may know that.
13                    MR. SCHROEDER:  I actually anticipated this
14         one.  If I may approach?
15                    THE COURT:  Yes.
16                    MR. SCHROEDER:  May I have it published for
17         the jury?
18                    THE COURT:  Yes.
19    Q    (By Mr. Schroeder) Let me know when you've had a chance
20         to review this e-mail, Dr. Porter.
21    A    (Witness reading.)  Okay.
22    Q    Okay.  Thank you.
23         So this is an e-mail dated July -- July 14, 2016,
24         correct?
25    A    Correct.
```

```
 1   Q    And it's titled "Observations," right?

 2   A    Observations, yes.

 3   Q    And this was an e-mail between you and Dr. DeMars,

 4        correct?

 5   A    Correct.

 6   Q    And were you out of the office -- between the last

 7        e-mail which was, I think, June 30 and then July 14,

 8        were you -- had you gone to the Mayo Clinic in the

 9        interim?

10   A    Had I gone to the Mayo Clinic in the interim?  No.

11   Q    Okay.  At this point, you tell Dr. DeMars:  "All is not

12        well with the ART program."

13   A    Correct.

14   Q    And that's part of the REI division, correct?

15   A    Yes.

16   Q    And just ART stands for what?

17   A    Assisted reproductive technologies.

18   Q    Okay.  And was that a criticism about the state of

19        affairs with the ART program within REI division?

20   A    It was a list of concerning observations.

21   Q    And Dr. Seifer had just gotten there, correct?

22   A    Yes.

23   Q    Now, further down in the --

24   A    I believe he started in May.

25   Q    Okay.  And he wasn't actually in the OR until June
```

```
 1            sometime, correct?
 2    A    I couldn't swear to when he started, but sometime
 3            very -- around then, yes.
 4    Q    Because he had to get his credentialing privileges,
 5            correct?
 6    A    Yes.  He started seeing patients before he had
 7            credentials.
 8    Q    Okay.  So if we go down further, you say -- there's a
 9            line that starts "there has been."  Do you see that?
10    A    I'm sorry?
11    Q    It's right below No. 2.  Can you highlight that on the
12            screen there?
13    A    "There has been too frequent testing, repeating labs
14            that have been done and imaging."  Yes.
15    Q    Right.  And then you say, "This is an expense to the
16            patient and will drive us out of the market."
17    A    Correct.
18    Q    Right?
19            You testified earlier that you had a difference of
20            opinion as to what tests and how many tests were being
21            done by Dr. Seifer, correct?
22    A    Yes.
23    Q    Right.  And -- but in the last e-mail I showed you, you
24            said, well, he's got some new ways of doing things,
25            right?
```

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | And I think you said, "I'm trying to keep an open mind. |
| 3 | | I've learned from my own mistakes in the past," right? |
| 4 | | You did say that? |
| 5 | A | Correct. |
| 6 | Q | Okay. |

7              MR. SCHROEDER:  You can take that down.

8       Thank you.

9           Next Exhibit is C13.  If I may approach the

10      witness, Your Honor?

11              THE COURT:  Yes.

12              MR. SCHROEDER:  Publish this for the jury?

13              THE COURT:  Yes.

14              MR. SCHROEDER:  You can go to the next page,

15      Ray.  Thank you.

16  Q   (By Mr. Schroeder) I'm only going to ask you questions

17      about the cover page --

18  A   Wait.  Wait.  I would like to read it, please.

19  Q   I know that.  I just wanted to direct your attention --

20      there's an agreement behind it.  I'm not going to ask

21      you any questions about it.  I'm just going ask you

22      about this particular page that's up on the screen.

23      Let me know when you're done.

24  A   Okay.  (Witness reading.)  Okay.

25  Q   Okay.  Thank you.  So this is -- the name -- the date

1        of this letter is June 5th, 2017, correct?

2    A   Correct.

3    Q   And in the first line, this is from Aimee Giglio, her

4        name is now Aimee Claiborne, as you correctly pointed

5        out.  The first sentence says, "This letter serves as a

6        response to your letter dated May 25, 2017, and to

7        questions posed during our meeting together with your

8        husband on Friday, May 26, 2017."  Correct?

9    A   Correct.

10   Q   So you sent this letter, which we've already referred

11       to in prior testimony, on May 25th, and then the

12       interim chief human resources officer, you have no

13       reason to believe -- she was the highest person in HR,

14       correct?

15   A   To my knowledge.

16   Q   Okay.  And you reached out to her, you wanted to have a

17       meeting.  She set the meeting up for the next day,

18       correct?

19   A   Apparently, yes.

20   Q   Okay.  Well, you don't have any reason to doubt that,

21       correct?

22   A   No.

23   Q   In fact, it's only a week or so later when she sends

24       you the letter and attachment.  And then she goes on to

25       say in the second paragraph, "First, on behalf of

```
 1              Dartmouth-Hitchcock, I would like to thank you for your

 2              years of service to DH and to our patients and for your

 3              many accomplishments over the years, as you outlined in

 4              your letter which have supported DH's clinical and

 5              academic mission."  She says that, right?

 6     A        Correct.

 7     Q        And she sent sentiments along those same lines on

 8              April -- I'm sorry, on May 26, right?

 9     A        I don't recall.  I think so, but I don't recall.

10     Q        And when you had that meeting with Ms. Claiborne, you

11              didn't raise any concerns or use the phrase, I should

12              say -- strike that.

13                  You didn't say that you believed you had been

14              discriminated against on the basis of your condition or

15              that you had been retaliated against, correct?

16     A        I can't recall what I said or not in that meeting.  I

17              was very emotional.

18     Q        It's possible you didn't say anything about it, right?

19     A        I can't recall.

20     Q        Right.  It's possible, as a result of the fact that you

21              can't recall, that you said none of those words, right?

22     A        It's possible.

23     Q        Okay.  Now, the fourth paragraph down, it states, "In

24              addition, in our meeting, you had requested an increase

25              in the severance amount.  After considering this
```

 1        request, DH is willing to extend severance to 36 weeks

 2        of severance."

 3             Now, I want to ask you:  When I deposed you, and

 4        you referenced your deposition a couple times, you --

 5        do you recall testifying that you thought that initial

 6        severance package was a nominal amount?

 7   A    I don't recall that, no.

 8   Q    Okay.

 9             MR. SCHROEDER:  Your Honor, may I approach

10        with the deposition transcript for Dr. Porter?

11             THE COURT:  Yes.  Mr. Schroeder, is that

12        marked for identification at this time?

13             MR. SCHROEDER:  I think it was originally.

14        There were two days, so I don't know if the full

15        transcript was marked, but...

16             MS. McDONALD:  Day 1 was marked as ID 1.

17             THE COURT:  I believe that is an exhibit that

18        the deputy clerk has if that's the same exhibit you're

19        using, if you want to --

20             MR. SCHROEDER:  Yes, I believe it is, and

21        I've got a copy of it to hand to the witness, if I may.

22   Q    (By Mr. Schroeder) I would like to turn your attention

23        to Page 130.

24   A    Okay.

25   Q    Okay.  Specifically, Lines 3 through 17, if you would

```
 1          just review that, I'll have some specific questions.
 2   A    I'm sorry, which lines?  I lost you.
 3   Q    3 through 17.
 4   A    3 through 17.
 5   Q    Yeah.  It's basically Page 130.
 6   A    Okay.
 7   Q    Okay.  So I want to refresh your recollection on our
 8          discussion during your deposition on this topic of
 9          severance, and I asked you:  "Did you, during that
10          meeting with Aimee Giglio, ask for more severance?"
11          And your answer was:  "I told her what was offered was
12          not adequate," right?
13   A    Correct.
14   Q    And then I asked:  "And what was offered?"  Your answer
15          was:  "I don't remember exactly, but it was a nominal
16          amount for my years of service," right?
17   A    Correct.
18   Q    So you did say that the first offer of severance was a
19          nominal amount?
20   A    Correct.
21   Q    And that was the meeting that you had with her on
22          May 26, correct?
23   A    Correct.
24   Q    I then asked you:  "Do you recall whether or not DH
25          increased that offer?"  Your answer:  "Which offer are
```

```
 1          you referring to?"  I said:  "The severance offer," and
 2          you said, quote, "There was a nominal amount that was
 3          offered initially, and it was barely altered in the
 4          subsequent documents that were e-mailed to me."  Did I
 5          read that correctly?
 6     A    You did.
 7     Q    All right.  So, at that point, in your deposition, you
 8          said that the first amount was a nominal amount, right?
 9     A    That's correct.
10     Q    Not adequate, right?
11     A    It was a nominal amount --
12     Q    Right.  And the --
13     A    -- for my years of service, is what I said.
14     Q    Right.  I understand that.  And, at first, you didn't
15          recall though that you said it was a nominal amount.
16              The first offer was six months of severance,
17          correct?
18     A    I'm not certain about that.
19     Q    You're not -- you're not certain about that?
20     A    No, I'm not.
21     Q    Assuming it was six months of severance, at that time,
22          you were earning close to 300,000 -- maybe a little bit
23          over?
24     A    Correct.
25     Q    Okay.  So if it was six months of service -- if it was
```

```
 1         six months of severance, it would be a little over

 2         150,000 give or take?

 3    A    Okay.  Yeah.

 4    Q    Do you agree with me?

 5    A    Okay.  Yes.

 6    Q    Then, if we go back to this document, specifically that

 7         paragraph --

 8    A    Which one, I'm sorry?

 9    Q    The one that's right up on the screen that's

10         highlighted.

11    A    Well, I can't see it very well there, so I would like

12         to see it in front of me.

13    Q    Okay.  It's the fourth paragraph on the fourth page

14         there, "In addition."

15    A    Okay.

16    Q    I will read for you -- I've already read it, but I'll

17         read it again.  "In addition, in our meeting, you had

18         requested an increase in the severance amount.  After

19         considering this request, DH is willing to extend

20         severance to 36 weeks of severance," right?

21    A    Correct.

22    Q    So is 36 weeks, roughly nine months of severance?

23    A    Correct.

24    Q    And so if you take a $300,000 salary and nine months of

25         severance, that's a little bit over $200,000, right?
```

```
 1   A    Okay.  Yes.
 2   Q    Do you have any reason to doubt me on the math on that
 3        one?
 4   A    No.
 5   Q    Okay.  And, in addition, if we go to the next paragraph
 6        down, Ms. Claiborne references the fact that you were
 7        part -- you were still receiving long-term disability
 8        benefits correct?
 9   A    I was, yes.
10   Q    And those long-term disability benefits had been
11        approved in or about June or July of '16?
12   A    Correct.
13   Q    And so you were still receiving them in June of '17,
14        correct?
15   A    Correct.
16   Q    And they ended in June of '18 or thereabouts?
17   A    Correct.
18   Q    Okay.  Now, she refers to the fact that you -- in your
19        direct testimony, I think you said that you had to pay
20        for your own health insurance during that time
21        post-termination, right?
22   A    I had to pay because I was considered an employee on
23        leave by -- it wasn't -- I mean, this is just is a
24        descriptive because I had been terminated.  But while I
25        was on long-term disability, I had to pay the full, or
```

1    close to the full, premium for my entire family for

2    insurance, as soon as I went from short-term to

3    long-term, and I carried all five of us.  So I had to

4    pay the entire premium and as well, when I was on

5    long-term disability and during per diem, I had to pay

6    the entire premium for everybody.

7  Q  Well, this says here that in that paragraph halfway

8    down, "Please note that you will remain responsible for

9    the portion of the medical and dental insurance

10   premiums that all active employees are responsible for.

11   And then all premiums for medical and dental insurance

12   are billed directly to you for as long as you continue

13   to -- continue long-term disability payments."

14   Correct?

15 A  That's what it says.

16 Q  Okay.  And did you follow up with Ms. Claiborne to

17   confirm that you were eligible -- you just have to pay

18   your portion of the premium as a typical active

19   employee?

20 A  Well, the interesting thing is that one of the things

21   that was so emotional for me as a physician and mother

22   is that initially she gave me the wrong information.

23   So, in that meeting, it seemed like a real moral wound

24   that I would be dropped from insurance.  And I have to

25   admit I was extremely emotional during that time, and

```
 1        what I understood, because as soon as I went to
 2        long-term disability and I was an employee on leave, I
 3        was responsible for a good, huge portion of the health
 4        premium that covered dental and -- but to me, again,
 5        she did not give me the accurate information in that
 6        meeting, and then this letter came, and so I was paying
 7        what I had been paying previously on long-term
 8        disability.
 9    Q   Okay.  And that was pursuant to the long-term
10        disability plan, whatever the plan documents say?
11    A   Yes.
12    Q   Okay.  And you were receiving long-term disability --
13        you were receiving salary -- a portion of your salary,
14        correct?
15    A   Yes.
16    Q   Close to 70 percent, or was it more than that?
17    A   It was -- what was it?  Two-thirds plus it was reduced
18        by the amount that I was working.  So every paystub I
19        had to send in to insurance, and they would reduce my
20        payment based on how much I was working.
21    Q   Right.
22    A   So it didn't go above that, yes.
23    Q   Right.  If you weren't working at all for the periods
24        of time that you were out completely, you would receive
25        the full, long-term disability payment for that
```

```
 1          relevant time period.
 2   A      The portion of my salary that was due based on
 3          disability insurance, yes.
 4   Q      Understood.
 5               MR. SCHROEDER:  Okay.  You can take that
 6          down, thank you.
 7   Q      (By Mr. Schroeder) Now, with respect to your current
 8          situation at UVM -- or I should say your current
 9          employment at UVM Medical Center, I think on your
10          direct testimony, you'd referenced the fact that you
11          were .8, but was it really .75?
12   A      I had varied between .75 and .85, and the -- there's a
13          transition recently with the new chair that because of
14          the Green Mountain Care Board's ruling that UVM all
15          individuals have to reduce their academic time.  So I
16          was .8, and my chair, just in the last few weeks, has
17          asked me to cut back my academic time to go .75.
18   Q      And .75 means that you work four days a week?
19   A      Well, it means that I work -- not -- it's not
20          necessarily four days a week, but it is -- it's .75 of
21          a 1.0, and it varies based on call and other
22          obligations and responsibilities.
23   Q      And you receive your -- but it's less than full-time,
24          correct?
25   A      Correct.
```

1   Q   So it's not -- that's not five days a week, right?

2   A   Correct.

3   Q   And so if it's .75, would you agree with me that's

4       roughly four days a week or somewhere around there?

5   A   Yes.

6   Q   At UVM Medical Center, you receive a pension?  You're

7       eligible for a pension?

8   A   No.

9   Q   You're not eligible at all for a pension?

10  A   No.

11  Q   So if we had documents that show that you're eligible

12      for a pension at some point, they would be wrong?

13  A   I don't believe I'm eligible for a pension.  I have a

14      401(k) or a 403(b) but --

15  Q   And you receive a matching contribution for that,

16      right?

17  A   A part, yes.

18  Q   Right.  Upwards of nine, ten percent?

19  A   No, I believe -- I looked it up right before the

20      Bancroft report, and what I gathered off it was seven

21      match.

22  Q   So if the documents say ten, then the documents are

23      wrong, from UVM?

24  A   That portion, I recently looked back up again, and it

25      may have changed in that period of time.

```
 1   Q    Okay.

 2   A    So I looked it up just three or four days ago.

 3   Q    Your current salary --

 4   A    I would like to correct something.  I think I can put

 5        in three percent and they can put in seven percent, and

 6        maybe that's where that ten percent comes from.

 7   Q    That wasn't a question, but thank you.

 8            With respect to your current salary, your full

 9        salary at 1.0, FTE, full-time equivalent, I realize

10        you're not working at a full-time equivalent of 1.0,

11        but your full-time salary is in the range of 340,

12        $340,000?

13   A    Potentially, yes, because part of it is variable, and

14        that variable varies from year to year.  So it depends

15        on the financial productivity of the institution and

16        the department.  So the variable is not a given.

17   Q    Okay.  Last year though, you made over $300,000,

18        correct?

19   A    I would have to look at my W-2s.

20   Q    Okay.  Well, we'll take a break and pull them out.

21        Does that refresh your recollection -- do you have a

22        recollection of making over $300,000?

23   A    No.

24   Q    You have no recollection of that whatsoever?

25   A    I need to check my W-2s, yes.
```

```
 1   Q    Okay.  I want to specifically ask, so you received two

 2        W-2s for 2024, right?

 3   A    Yes.

 4   Q    And you just produced those through your counsel

 5        recently, right?

 6   A    The most recent ones yes.

 7   Q    Well, 2024, right?

 8   A    Correct.

 9   Q    Right.  So you received them -- so unless they do

10        things differently for UVM, you received your W-2s

11        fairly recently, right?

12   A    Correct.

13   Q    And so you produced them to your counsel recently,

14        right?

15   A    Correct.

16   Q    And so you knew what they were, right?

17   A    Yes.

18   Q    Just a one-page document, correct?

19   A    Correct.  Well, two pages -- one from UVM and one from

20        UVMMC.

21   Q    Right.  You received compensation from UVM and UVM

22        Medical Center, correct?

23   A    Correct.  Yeah.

24   Q    Now, with respect to UVM, do you receive a pension from

25        any of those entities?
```

```
 1    A    My understanding from my chair, since a small portion
 2         of my salary comes from UVM, that I would not be
 3         eligible for the pension for UVM is the way I
 4         understand it.
 5    Q    So when I asked you about whether or not you were
 6         eligible for a pension, you said no, no pension.  Now
 7         you're saying to me that, well, now I understand that I
 8         may not be eligible because of only so much work that I
 9         do at UVM; is that right?
10    A    I'm sorry, say it again.  I lost you in there.
11    Q    I asked you initially whether you're eligible for a
12         pension.  You said nope, nope, no pension, right?
13    A    Correct.
14    Q    Right.  And then I just asked you a specific question
15         though about UVM Medical College or any of these
16         entities that you receive W-2s from, right?
17    A    Correct.
18    Q    I just asked you that.
19    A    Correct.
20    Q    And then you said, Well, my understanding is that I
21         wouldn't be eligible for the pension based on my
22         current status; is that right?
23    A    That's correct.
24    Q    Okay.  So you are potentially eligible for a pension if
25         your status changed to, say, 1.0 FTE?
```

Porter - Cross by Mr. Schroeder

```
 1   A    Not from my discussion with Dr. Bernstein who is chair,
 2        because a majority of my salary overwhelmingly comes
 3        out of UVM Medical Center, and a very small portion
 4        comes out of UVM as part of my responsibility for
 5        teaching.  So when I spoke with Ira and I took the job,
 6        he said that because of the structure, his
 7        understanding was that I would not be eligible for the
 8        UVM pension.  That's the counseling I received.
 9   Q    Right.  You didn't look at any documents to determine
10        whether that was true, right?
11   A    I believe Ira, because he's been responsible for the
12        financial compensation for all of the physicians.
13   Q    What's his title?
14   A    Ira was my chairman of OB-GYN, and he was also head of
15        the finance committee at UVMMC, and so he has -- for
16        many years, he was head of finance committee so he has
17        a very good understanding of compensation packages.
18   Q    I'm just asking you what his title was.  That's all my
19        question was.
20   A    Well, I'm giving it to you.
21   Q    That's all I wanted.  Thank you.
22             MR. SCHROEDER:  Your Honor, I would like to
23        approach the witness, C15.
24             THE COURT:  Yes.
25             MR. SCHROEDER:  I've given a copy of the
```

1    truncated version of this group of messages, and I just

2    want to check with counsel.  I would move for admission

3    of them so I can -- as well.  Initially, I thought we

4    had a stipulation, but I just want to make sure we're

5    okay on whether I can move for admission so that I can

6    publish it to the jury.

7                MR. VITT:  Your Honor, we do not agree to the

8    admission of these.  And I certainly don't agree to

9    them in bulk, and I think perhaps we ought to approach

10   before we get into a discussion of --

11               THE COURT:  Yes, please approach.

12                   (Bench conference held.)

13               THE COURT:  Okay.  Members of the jury, we

14   are going to take a brief five- to ten-minute bathroom

15   break and return momentarily.

16                   (Jury exits.)

17                   (Recess taken.)

18                   (Jury present.)

19               THE COURT:  Go ahead.

20               MR. SCHROEDER:  Thank you, Your Honor.

21   Pursuant to the parties' stipulation on the

22   admissibility of certain pages of C15, may I approach

23   the witness to show her C15?

24               THE COURT:  Yes.

25   Q    (By Mr. Schroeder) Dr. DeMars, this --

```
 1   A   I'm sorry?

 2   Q   Excuse me?

 3   A   I think you called me Dr. DeMars.

 4   Q   I'm sorry.  Dr. Porter, these are Dr. DeMars' text

 5       messages between you and her, and I just want to ask

 6       you a series of questions.  A portion of these have

 7       been admitted into evidence, and I'm only going to ask

 8       you specific pages, which I'll put up on the screen

 9       pursuant to a stipulation with your counsel.

10           Your -- and these are text messages that were from

11       Dr. DeMars to you, and I just want to highlight the

12       first page.  Where it says "Participants,

13       802-296-1701."  Is that your cell phone number?

14   A   That is.

15   Q   And the first page here is dated November 20, 2013?

16   A   Correct.

17   Q   Right?  And you attended Dr. DeMars' deposition in this

18       case, right?

19   A   Yes.

20   Q   And you were -- your counsel asked Dr. DeMars questions

21       about these text messages, correct?

22   A   I don't recall that but possibly, yes.

23   Q   You were there for the whole deposition, correct?

24   A   I was.

25   Q   And you were aware that one of the things that happened
```

```
 1        was in this case, in discovery, as you recall us

 2        referring to, is that Dr. DeMars produced her text

 3        messages to and from you, correct?

 4   A    Correct.

 5   Q    So on this first page, and I'll be very brief on the

 6        pages.  They're all in sequential order as produced

 7        because as a printout -- the first page, there is an

 8        identity of the code name "Earth Giver."  Is that

 9        Dr. DeMars?

10   A    That's Dr. DeMars.

11   Q    Okay.  And then, obviously, you're the recipient of the

12        e-mail, correct?

13   A    Correct.

14   Q    So you're in the light gray coloring; Dr. DeMars is in

15        the dark gray coloring?

16   A    Dr. DeMars is in the darker color, yes.

17   Q    Right.  And you're in the lighter color, correct?

18   A    Correct.

19   Q    Okay.  And at the bottom of the page, and this is

20        November 20, 2013.

21   A    Right.

22   Q    You refer to Albert as a limited surgeon, correct?

23   A    Correct.

24   Q    And this is November of 2013, and he hadn't even

25        started with the REI division yet, right?
```

```
 1    A    Correct.
 2    Q    He'd been interviewed and accepted a position, but you
 3         hadn't seen him do anything in the OR?
 4    A    I never interviewed him, and it was based on a
 5         conversation I had with him.
 6    Q    That wasn't my question.  My question was:  You'd never
 7         seen him do anything in the OR at this point?
 8    A    No.
 9    Q    And this was based on a single conversation you had
10         with him?
11    A    No.
12    Q    How many conversations did you have with him in this
13         time period?
14    A    I don't recall.
15    Q    You don't recall testifying that you had one
16         conversation with him in that time period?
17    A    I had a conversation with him, but you asked if I had
18         others, and I don't recall if I had more than that, but
19         the IVF planning and schedule was based on a
20         conversation I had with him, yes.
21    Q    You do recall one conversation, but you don't recall
22         any others, specifically?
23    A    Correct.
24    Q    And do you recall during this time frame having regular
25         text messages with Leslie DeMars?
```

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | And it wouldn't surprise you that on this particular |
| 3 | | day that you had upwards of 30 to 40? |
| 4 | A | Perhaps, yes. |
| 5 | Q | Okay. |
| 6 | A | I don't recall. |
| 7 | Q | Okay.  But perhaps you did. |
| 8 | A | Perhaps. |
| 9 | Q | Yeah.  And so you regularly texted with her, at least |
| 10 | | during this time frame, late 2013, right? |
| 11 | A | I had text conversations with her, yes. |
| 12 | Q | Right.  And would you say not necessarily daily, but |
| 13 | | certainly on a regular basis, right? |
| 14 | A | Sure. |
| 15 | Q | Okay.  Turning your attention to Page 4, and I'm just |
| 16 | | doing -- all I'm asking you here is just to -- well, |
| 17 | | all I'm pointing out to you is -- this date is |
| 18 | | November 21, 2013, right? |
| 19 | A | I'm sorry? |
| 20 | Q | The date in the middle of the page is Thursday, |
| 21 | | November 21; 2013? |
| 22 | A | Yes. |
| 23 | Q | Okay.  And that follows, obviously, November 20th, |
| 24 | | 2013, which was the previous set of messages. |
| 25 | | Now, if -- |

Porter - Cross by Mr. Schroeder

```
 1   A    A week later.  No, a day later.  Okay.

 2   Q    It's a day later, right?

 3   A    Yeah.

 4   Q    So they're in sequential order.  And that's how they

 5        were produced to you and to us.

 6             If you go to Page 8, please.

 7   A    I'm sorry.

 8   Q    So Page 4 goes all the way from 4 to 5 to 6 to 7 to 8,

 9        and Page 8 is still in this string on November 21,

10        2013.

11             MR. SCHROEDER:  And just go back for a

12        second, Ray, to Page 4.  Okay.  And proceed through

13        each page just one at a time.

14   Q    (By Mr. Schroeder) So Page 4, that's November 21.  It's

15        a series of text messages between you and Dr. DeMars.

16             MR. SCHROEDER:  Go to Page 5.  Page 5?  Thank

17        you.

18   Q    (By Mr. Schroeder) You see more text messages that same

19        day.  Go to Page 6.  More text messages that same day,

20        go to Page 7.  More text messages that day, and then go

21        to Page 8.  Now, on Page 8, seems like it's pretty

22        rapid succession.  Page 8, you're talking about --

23        Dr. DeMars says something, "That's what we said about

24        Richard."  Do you see that about halfway down the page?

25   A    I'm sorry.  I lost you.
```

```
 1   Q    Sure.  Page 8?

 2   A    Page 8, yes.

 3             MR. SCHROEDER:  Ray, if you could highlight

 4        that:  "That's what you said about Richard," by

 5        Dr. DeMars, and the one below it, please.  Actually --

 6        Ray told me this before, and I didn't remember it.

 7   Q    (By Mr. Schroeder) I'm just asking you about that

 8        exchange.  Leslie DeMars says, "That's what we said

 9        about Richard."  And your response was: "Yes I've

10        outlasted him and now I can sense a relief.  Finally,

11        good riddance.  He'll leave me with some big mess."

12        And then without Dr. DeMars responding, you say, "But

13        he will be gone," right?

14   A    Correct.

15   Q    So is that fireworks after that.  I can't tell if

16        that's a firework or an ice cream cone.  Fireworks?

17   A    I don't know.

18   Q    Well, you wrote it, so I'm just asking you.

19   A    In 2013.

20   Q    I know, but you used emojis, right?  You know what that

21        emoji is, I would assume.

22   A    I'm not clear.

23   Q    Okay.  And then right below that, Leslie says, "But no

24        rules to encumber you.  Ha, ha, ha."  And then you

25        wrote, "No asshole narcissist comments," right?
```

| | | |
|---|---|---|
| 1 | A | Mm-hm, yes. |
| 2 | Q | Is that a dancing figure and a bunch of smiley faces? |
| 3 | A | Perhaps, yes. |
| 4 | Q | Perhaps, or it is? |
| 5 | A | I don't know.  I know it looks like dancing figures.  I |
| 6 | | can't see the others. |
| 7 | Q | You can't see the smiley faces? |
| 8 | A | It's not clear here, but it does look like it here, |
| 9 | | yes. |
| 10 | Q | Well, you can read the screen, right? |
| 11 | A | I can read the screen, yes. |
| 12 | Q | Okay.  And those are smiley faces, right? |
| 13 | A | Correct. |
| 14 | Q | Okay.  Thank you. |
| 15 | | I would ask you to turn to Page 39.  I'm going to |
| 16 | | ask you very quick questions at the bottom of the page, |
| 17 | | and we're going to go to the next page in a second. |
| 18 | | This is December 1, 2015.  So from November of 2013 |
| 19 | | through December of 2015, you would have periodic text |
| 20 | | messages with Leslie DeMars, correct? |
| 21 | A | Correct. |
| 22 | Q | And were these your personal phones or your work |
| 23 | | phones; do you know? |
| 24 | A | I believe personal phones. |
| 25 | Q | Okay.  So if you had -- would you separate your work |

Porter - Cross by Mr. Schroeder

| | |
|---|---|
| 1 | matters from your personal matters?  Meaning did you |
| 2 | have another phone for work matters? |
| 3 | A | I did not.  The division had another phone for weekend |
| 4 | call, but I didn't use it. |
| 5 | Q | Okay.  This one, on December 1, 2015, you had testified |
| 6 | on direct exam about going to Dallas, correct? |
| 7 | A | Correct. |
| 8 | Q | And you went to Dallas because that was a conference |
| 9 | or, was it, oral boards, board of examiners? |
| 10 | A | Yes.  One week a year we went to the oral boards. |
| 11 | Q | Okay.  And this was -- this would be the time period |
| 12 | when you were going to the oral boards in 2015? |
| 13 | A | Yes. |
| 14 | Q | Okay.  Go to the next page, please -- actually, go back |
| 15 | for a second.  So you were talking to her about, Hey, |
| 16 | do you want to get massages?  We'll take care of that, |
| 17 | manis, pedis, et cetera, correct? |
| 18 | A | Correct. |
| 19 | Q | Go to the next page, please.  And in here you're |
| 20 | talking about the fact that your husband is going to |
| 21 | drive both of you to the airport, right? |
| 22 | A | I'm sorry, where are you? |
| 23 | Q | Just at the top.  If you go to the previous page. |
| 24 | We're just dealing with 39 and 40.  At the bottom it |
| 25 | says, "Tom is going to drive us to Manchester."  That's |

1              your husband, right?

2    A     Yes.  Yes.  Yes.

3    Q     And then you have a series of exchanges that same day,

4          and then December 6th, I guess, is that weekend, right?

5    A     Yes.  We were there, I believe.

6    Q     And you were there that week -- were you there for the

7          whole week?

8    A     I was; she was not.

9    Q     Right.  And you said that you guys shared rooms?

10   A     Yes.

11   Q     Okay.  And at some point, Dr. DeMars had to go back to

12         New Hampshire for, was it, a patient emergency?

13   A     No, it was an emergency meeting called by the DHMC

14         administration, and it is highly unusual to leave the

15         boards for any reason because once you're there, you

16         are assigned for the entire week, and she left towards

17         the end of the week, either Wednesday or Thursday,

18         without fulfilling her obligations at the board and

19         when I had developed double-vision.

20   Q     Okay.  There's no mention of any of your symptoms in

21         this exchange with her, correct?

22   A     I don't know.  I haven't read all the way through it,

23         but --

24   Q     Well, actually, we can tell based on this one page.

25         And, by the way, Dr. Porter, when you produced text

Porter - Cross by Mr. Schroeder

```
 1          messages in this case with Dr. DeMars, you only

 2          produced a handful of text messages --

 3                    MR. VITT:  Objection.

 4                    THE COURT:  Sustained.

 5                    MR. SCHROEDER:  Okay.

 6     Q    (By Mr. Schroeder) With respect to this exchange here,

 7          it goes from December -- it goes December 6th,

 8          December 10th, and Dr. DeMars is referring to the fact

 9          that she's going to the airport, right?

10     A    Yes.

11     Q    And so does that refresh your recollection that that

12          was when she was leaving Dallas?

13     A    Yes.

14     Q    Okay.  And then the next exchange referred to here is

15          January 8th, 2016, right?

16     A    Correct.

17     Q    There's no discussion in this text message string of

18          anything relating to the fact that you came down with

19          symptoms related to your condition.

20     A    Not within the text, no.

21     Q    Right.  Okay.  Thank you.  Just ask you to go to Page

22          83, and I'm only going to ask you a question about the

23          bottom text message.

24                    MR. SCHROEDER:  Ray, if you could just

25          highlight that.
```

```
 1              THE WITNESS:  I'm not certain that we can --
 2       it's not completely redacted --
 3  Q    (By Mr. Schroeder) We're going to produce a redacted
 4       portion of this and only this page, so there's not
 5       going to be any -- that's why we produced this as a
 6       redacted portion, and so --
 7  A    My copy is not completely redacted.
 8  Q    I understand that.  The parties have already stipulated
 9       to the admissibility.  We're going to handle that on a
10       break.
11              I'm asking you about one specific comment.  On
12       Thursday, February 23, 2017, you wrote to Dr. DeMars,
13       quote, "I'm texting as your friend.  I'm really very
14       sorry this has been so hard and the RE service has been
15       a sequence of problems, not small ones at that.  No
16       need to reply."  You wrote that, correct?
17  A    I did.
18  Q    And you didn't say IVF; you just said RE, right?
19  A    Correct.
20  Q    And RE meant reproductive endocrinology, right?
21  A    Correct.
22  Q    And you were referring to the division, correct?
23  A    Correct.
24  Q    And this was late February of 2017, right?
25  A    Correct.
```

```
 1   Q   Thank you.
 2               MR. SCHROEDER:  We could remove that
 3       document.
 4   Q   (By Mr. Schroeder) Dr. Porter, I was asking you
 5       about -- during the cross-examination yesterday
 6       afternoon about Dr. Merrens.  Do you recall that?
 7   A   Yes.
 8   Q   And, initially, when I asked you about Dr. Merrens, you
 9       didn't recall your interaction with him earlier than
10       2017, right?
11   A   No, I believe I said an interaction several years
12       before.
13   Q   Several years before, okay.
14   A   Yeah.
15   Q   I want to ask you --
16   A   Very, very long time ago, yes.
17   Q   Okay.  I want to ask you specifically about that
18       interaction with Dr. Merrens.
19               MR. SCHROEDER:  Your Honor, may I approach to
20       show her Exhibit A?
21               THE COURT:  Yes.
22               THE WITNESS:  Can you please take it out?
23   Q   (By Mr. Schroeder) Sure.
24   A   Thank you.
25   Q   I just want to refresh your recollection to the time
```

```
 1        frame when you were dealing with Dr. Merrens.  This is
 2        an e-mail dated September 28, 2012?
 3   A    Correct.
 4   Q    Okay.  And you were having a series of e-mail exchanges
 5        with Dr. Merrens, correct?
 6   A    Correct.
 7   Q    And the subject line of it says "Thanks," right?
 8   A    Yes.
 9   Q    And you told him in this e-mail exchange, quote, "I'm
10        appreciative of your care, gentleness and kindness."
11        Correct?
12   A    Correct.
13              MR. SCHROEDER:  Now, if I may show the
14        witness Exhibit B?
15   Q    (By Mr. Schroeder) During this time period, you had a
16        series of exchanges with Dr. Merrens, correct?
17   A    Correct.
18   Q    And those were positive exchanges, correct?
19   A    I would have to review it, but my recollection is
20        initially they were positive, yes.
21   Q    Okay.  And you trusted his guidance, did you not?
22   A    I wouldn't characterize it that way.
23   Q    Let me go back to Exhibit A for a second.  Do you still
24        have that in front of you?
25   A    Is that the text messages?
```

1   Q    No, the exhibit I just showed you.

2   A    I think you put it back.

3   Q    Okay.  We'll hold out Exhibit A.  I'm sorry, Exhibit B.

4        I'll give you Exhibit A.

5             Actually, you know what, I apologize.  Go to

6        Exhibit B, please.  If you go to Exhibit B, it's a

7        series of e-mails between you and Dr. Merrens, correct?

8   A    Correct.

9   Q    And subsequent to that -- that was initially September

10       of 2012, and you were still dealing with him in

11       November of 2012, correct?

12  A    Correct.

13  Q    And if you go to the second page --

14  A    Can I read the whole thing to refresh my memory?

15  Q    Sure.  I'm only going to ask you very specific

16       questions.

17  A    Yes.  I would like to read it so I can answer those

18       truthfully.

19  Q    Okay.

20  A    (Witness reading.)

21  Q    Let me know when you're finished, please.

22  A    (Witness reading.)  Okay.

23  Q    Okay.  I would ask you to read -- the second page of

24       that is an e-mail from you to Dr. Merrens dated

25       November 1, 2012, right?

```
1    A    Correct.

2    Q    And you wrote, "Hi, Ed."  Right?

3    A    Yes.

4    Q    Okay.  You didn't call him Dr. Merrens.  You certainly

5         knew him, right?

6    A    Correct.

7    Q    And you said, "I appreciate your kindness and

8         sensitivity in this process," right?

9    A    Correct.

10   Q    Okay.

11                  MR. SCHROEDER:  If I may approach the

12        witness, Your Honor, and show Dr. Porter Exhibit D.

13                  THE COURT:  Yes.

14   Q    (By Mr. Schroeder) Actually, let's stay there before we

15        go to D.  Let's stay with B for a second.

16            On the first page, you reference the fact that you

17        thought that he was -- he could be a neutral person,

18        right?

19   A    Yes.  I was hoping he would be, yes.

20   Q    Right.  Well, actually, you believed he would be,

21        right?

22   A    I wouldn't characterize it that way.

23   Q    Well, let's just go to the statement then.  It says,

24        quote -- these are your words, right?  "It's hard for

25        me to see how you would not be neutral," end quote.
```

1      Did I read that correctly?

2  A   That was the statement.  There was more behind it.

3  Q   I understand it.  You made that statement?

4          THE COURT:  I'll advise the witness, when the

5      question calls for a yes-or-no answer, you should give

6      a yes-or-no answer.  Your attorney will have an

7      opportunity to ask you additional questions.

8          THE WITNESS:  Yes, thank you, Judge.

9          THE COURT:  Go ahead, Mr. Schroeder.

10         THE WITNESS:  That's my statement.

11 Q   (By Mr. Schroeder) Right.  Those are your words.  Thank

12     you.

13         MR. SCHROEDER:  Your Honor, may I approach

14     the witness to show her Exhibit D, Defendant's Exhibit

15     D?

16         THE COURT:  Yes.

17 Q   (By Mr. Schroeder) Is it fair to say during this time

18     period of September, November, December, you were in

19     regular communication with Dr. Merrens?

20 A   I had some e-mails with him, yes.

21 Q   You had conversations with him?

22 A   I had -- I don't recall exactly -- two conversations

23     with him, and then some e-mail exchanges, yes.

24 Q   Okay.  My only question to you on this exhibit, at the

25     bottom of Page 1 -- it is an e-mail message from you

1          dated December 14, 2012, to Dr. Merrens, right?

2    A    Yes.

3    Q    My only question to you about this document, you state,

4          "Ed, thank you for your response, time and

5          consideration to the issues," right?

6    A    I'm not seeing that right now.

7    Q    It's on the next page.

8    A    On the next page.

9    Q    At the top of the page.  So it's December 14, 2012, a

10         few months later from the first e-mail I showed you.

11         And you say, do you not --

12   A    Yeah.

13   Q    "Thank you for your response, time, and consideration

14         to the issues."

15   A    Correct.

16   Q    Okay.

17              MR. SCHROEDER:  May I approach the witness to

18         show her Exhibit E?

19              THE COURT:  Yes.

20              MR. SCHROEDER:  Could I have a sidebar, Your

21         Honor?

22              THE COURT:  Yes.

23                  (Bench conference held.)

24   Q    (By Mr. Schroeder) Dr. Porter, did I put Exhibit E in

25         front of you?

```
 1   A   No.
 2                    MR. SCHROEDER:  May I approach, Your Honor?
 3                    THE COURT:  Yes.
 4   Q   (By Mr. Schroeder) Now, I asked you earlier --
 5   A   Wait.  May I read it, please?
 6   Q   Sure.
 7   A   Okay.  (Witness reading.)  Correct.  Okay.
 8   Q   So just one e-mail, right?  Just one page?
 9   A   Yes.
10   Q   Okay.  And this is dated -- this is an e-mail that you
11       sent on February 8, 2013?
12   A   Correct.
13   Q   And the subject line was "meeting follow-up," right?
14   A   Yes.
15   Q   Okay.  So you'd had a series of e-mail communications
16       with Dr. Merrens in September, November, December, and
17       now February of 2013, right?
18   A   Correct.
19   Q   And you say in the second paragraph -- this is the only
20       thing that I want to ask you about, and just confirm
21       that you said this -- quote, "We believe it is
22       essential that structural changes be made within the
23       division of reproductive medicine.  We also believe
24       that the changes need to be made soon," end quote.
25   A   Correct.
```

```
 1   Q    And that was February of 2013, correct?

 2   A    Correct.

 3   Q    And this predated Dr. Hsu's arrival, even, I think

 4        consideration of his candidacy, right?

 5   A    Correct.

 6   Q    And certainly predated Dr. Seifer joining the REI

 7        division in 2016?

 8   A    Correct.

 9   Q    All right.  Thank you.

10             MR. SCHROEDER:  Your Honor, I would like to

11        approach the witness to show her Exhibit C6.

12             THE COURT:  Yes.

13             MR. SCHROEDER:  And I've shared with counsel

14        for the plaintiff a specific subset of that, and I

15        would like to move for its admission.

16             THE COURT:  Any objection?

17             MR. VITT:  Just a second, please.  May we

18        approach the bench?

19             THE COURT:  Yes.

20                 (Bench conference held.)

21             THE COURT:  Okay.  We are so close to lunch,

22        I think rather than forge ahead, we're going to give

23        you your lunch break now, and we'll convene at 1 p.m.

24        Okay?  Thank you.

25                 (Jury exits.)
```

1                    (Noon recess taken.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       Afternoon Session

 2                            *  *  *

 3                       (Jury present.)

 4              THE COURT:  Okay.  Please go ahead,

 5      Mr. Schroeder.

 6              MR. SCHROEDER:  Thank you, Your Honor.  Your

 7      Honor, I would like to approach the witness to show her

 8      Exhibit C6.

 9              THE COURT:  Yes.

10   Q  (By Mr. Schroeder) I don't want the jury to think that

11      I'm going to ask you about that really large group of

12      documents altogether, but that large group of

13      documents, is that -- do you recall in this case

14      producing a series of -- groups of text messages for

15      everyone that you had text messaged with during the

16      relevant time period?

17   A  I turned in my phone, and the text messages were taken

18      off that, yes.

19   Q  Okay.  And that's why the label in the corner, separate

20      from the label for C6, which is a different page number

21      and is the exhibit for the trial, the -- it says

22      Porter, the first one I have -- one of the first ones,

23      but the first one is 894.

24   A  I have 897.

25   Q  Right.  That's the subset of the -- I'm only going to
```

1      ask you a very small subset of questions related to the

2      subset that is in front of you.

3          So you turned in your phone and you were able to

4      download all the text messages, correct?

5   A  My attorneys did, I believe, yes.

6   Q  Okay.  Yeah, I understand.  You wouldn't have done it.

7      I certainly wouldn't know how to do it.

8          So I'm just going to ask you a very few questions,

9      but these are the text messages that are all labeled

10     with the Porter label so those are documents that were

11     produced through your counsel, right?

12  A  Yes.

13  Q  I would ask you to turn your attention --

14             MR. SCHROEDER:  And, Your Honor, through

15     stipulation with counsel, there's been an agreement on

16     moving for admission of this exhibit with just the

17     specific pages that were referenced in the sidebar.

18             THE COURT:  Right.  So is there going to be

19     another exhibit number on this, because C6 is much

20     larger?

21             MR. SCHROEDER:  Correct.  Yes.

22             THE COURT:  Okay.  So what is this identified

23     then as now?

24             MR. SCHROEDER:  This would be a subset of

25     Dr. Porter's text messages.

1           THE COURT:  Right.  No.  I understand that.

2      But putting a specific number on it other than C6

3      because that's a lot of documents.

4           MS. McDONALD:  C6-A.

5           THE COURT:  Okay.  So then the subset is

6      marked as C6-A.  So C6-A is admitted without objection.

7           MR. SCHROEDER:  Your Honor, should I just

8      read off some of the Bates labels so that we are clear

9      on what's coming in?  I'll use the exhibit tabs from

10     the -- from Dr. Porter's production of documents.  So

11     Porter 897, 936, 946, 950, 954 through -56 and 1061.

12     Thank you.

13          THE COURT:  Thank you.

14          MR. SCHROEDER:  Your Honor, may I publish

15     6-A, a series of text messages -- may I publish that

16     for the jury?

17          THE COURT:  Yes.  A particular page, right?

18          MR. SCHROEDER:  Yes.  A specific page.  And

19     specifically Page 897 is the first one.

20  Q  (By Mr. Schroeder) So just going back to the series of

21     text messages, Dr. Porter, and I'm actually -- I'll

22     represent to you on some of these that I'm showing you,

23     and it's a very small handful, but on the ones that I

24     am showing you, there's certain days where the date may

25     not be on it, but I'll represent to you the date if we

1          need to look in the bigger group of documents to just

2          corroborate me, we can do that, but I'll represent to

3          you the dates.

4              And this particular one, this is 8 -- 4 --

5          April 8, 2016, right?

6     A    Correct.

7     Q    Okay.  And this is with Leslie DeMars, correct?

8     A    Correct.

9     Q    And in the bottom, the second to the last text message

10         from -- and you're -- in this one, you're in the dark

11         text on the screen, and she's in the white text; is

12         that right?

13    A    Correct.

14    Q    Okay.  And the second to last text message there, you

15         say, "You know you have -- you know you have been

16         exceedingly kind and caring through this."  And "this"

17         is in reference to the fact of your condition at the

18         time, right?

19    A    I don't recall.

20    Q    Well, at this time in April, you've been out for five

21         or six months?

22    A    Since December.

23    Q    Okay.

24    A    Mid December.

25    Q    And you don't know whether "this" is related to you

1    being out and coming back?

2  A    I don't know what this is in reference to, because it's

3    taken out of context.

4  Q    Okay.  Well, these are your text messages though,

5    right?

6  A    Yes.

7  Q    And right above it is the text message from Leslie

8    DeMars.

9         MR. SCHROEDER:  Ray, if you could highlight

10    that.

11  Q    (By Mr. Schroeder) "You're so nice to let Tom borrow

12    your car.  I'm excited to have you back."  I don't

13    know, looks like fireworks or ice cream cone to me.

14    "No overdoing it."  So she's saying to you really

15    excited to have you, back, right?

16  A    Correct.

17  Q    And then your response is, "You know you've been

18    exceedingly kind and caring through this."  Does that

19    refresh your recollection --

20  A    Yes.

21  Q    -- or point you to the fact that "this" relates to the

22    fact that you've been out, and she's really excited to

23    see you back?

24  A    Right.  So it does establish that I was back 4/16 and

25    you've been saying July or June.

```
 1                    MR. SCHROEDER:  Your Honor, motion to strike;
 2           that's non-responsive.
 3                    THE COURT:  Okay.  I'll strike the response
 4           but there may have been a reference to July earlier.
 5           Is that true?
 6                    MR. SCHROEDER:  No, there wasn't a reference
 7           to July.  No.
 8                    THE COURT:  Okay.
 9   Q       (By Mr. Schroeder) If I could have you turn to
10           Porter936, and I'll reference for the record that this
11           is February 4th, 2017, and the way we know that is if
12           you go to 930.  And we don't need to put this on the
13           screen, so stay on this, Ray.
14               But for purposes of your understanding,
15           Dr. Porter, 931 shows it's a string of text messages
16           that were printed between you and Lisa McGee, correct?
17   A       I'm on 936.  I don't have 9 --
18   Q       That's in a small subset, but in the big group of
19           documents that I pulled out of the binder, right, if
20           you go to 936 in that, I just want to verify for the
21           record -- I'm sorry, 931 -- that that's the string of
22           text messages between you and Lisa McGee.
23                    THE COURT:  That's in C6?
24                    MR. SCHROEDER:  Correct, Your Honor.  And
25           that was put beside Dr. Porter.
```

Porter - Cross by Mr. Schroeder

```
1    Q    (By Mr. Schroeder) Is that right?

2    A    I'm looking at it, yes.  It's from Ms. McGee, yes.

3    Q    Right.  It says, "Chat with Lisa McGee" and then export

4         details and then the participant, right, on 931?

5    A    Say that again, please?  You lost me.

6    Q    The document that you're looking at in front of you out

7         of the big group of documents which is C6 --

8    A    Yes.

9    Q    -- this is the group of text messages between you and

10        Lisa McGee that were printed through your cell phone

11        provider?

12   A    Yes.

13   Q    Okay.  And the first date there is January 31, 2017,

14        right?

15   A    Yes.

16   Q    Okay.  And if you go a little bit further in that

17        stack, still in that stack, is 933, the big stack, C6.

18        933 has a date of February 4, 2017.  I just want to

19        reference so that you know what date I'm talking about

20        when we get to 936 because if you move forward all the

21        way to 936, and that's the one in front of you, we're

22        still on that date February 4, 2017.  Okay?

23   A    Yes.

24   Q    Thank you.  So if you go to 936, this is text exchanges

25        between you and Lisa McGee.
```

```
 1              Now, Lisa McGee, her full name is really Elizabeth
 2      McGee, correct?
 3   A  Elizabeth McGee, yes.
 4   Q  And at the time of 2017, where was she employed?
 5   A  University of Vermont.
 6   Q  Medical Center?
 7   A  Medical Center, yes.
 8   Q  What was her role?
 9   A  She was -- she was head of fellowship and division
10      head.
11   Q  Division head of what?
12   A  Reproductive endocrinology and infertility.
13   Q  So at UVM Medical Center she was the head of REI?
14   A  Yes.
15   Q  So, at that time, in 2017, she's the REI division
16      director at UVM Medical Center, and David Seifer is the
17      REI division director at Dartmouth Health?
18   A  Correct.
19   Q  All right.  And at the bottom of this exchange, it's a
20      series of text messages between you and Lisa McGee.
21      Did you regularly text with her?
22   A  Intermittently.
23   Q  Okay.  Well, I went back to Page 933, which is where
24      this date started, and it looks like you had a series
25      of text messages in one particular day, upwards of 40
```

Porter - Cross by Mr. Schroeder

1          or so.

2               With respect to 936 though in front of you on the

3          screen, at the bottom, you're having a discussion with

4          her about, I think, candidates for positions.  And you

5          say -- if we could highlight the "maybe I'm in," and

6          the one below it.  "Maybe I'm smarting because she

7          swore how clinically good Sophia was and what a

8          wonderful surgeon," and then you immediately text, "And

9          she was horrible at both, plain horrible."  Do you see

10         that?

11    A    Yes.

12    Q    And Sophia, is that one of the former doctors in the

13         REI division?

14    A    Where?

15    Q    At Dartmouth Health?

16    A    Yes.

17    Q    Okay.  You knew what I was talking about, right, when I

18         said Sophia, right?

19    A    I was asking you to be specific, yes.

20    Q    But you knew exactly who I was talking about because

21         she was employed in the REI division with her husband

22         Neil, right, at some point?

23    A    Yes.

24    Q    And you had less than favorable things to say about

25         Sophia in this text string, correct?

```
 1    A    Yes.

 2    Q    Go to 945, just in your book, in the bigger book, and

 3         not 945, Ray, but 946, Ray.  945 will show you the date

 4         that I'm talking about.

 5                   THE COURT:  That's in C6, Mr. Schroeder?  I'm

 6         sorry to interrupt you, I just want to be clear.

 7                   MR. SCHROEDER:  I agree with you, Your Honor.

 8         I appreciate it.  Yes, C6, just -- take that page down.

 9    Q    (By Mr. Schroeder) If you look in the book, so it's

10         April 5, 2017, right, on Porter945, which is part of

11         C6.

12    A    I'm sorry, I'm losing you.  So --

13                   MR. SCHROEDER:  May I approach, Your Honor?

14                   THE COURT:  Yes.

15    Q    (By Mr. Schroeder) 945 is right in front of you.  This

16         is the big group of documents, I'm not going to ask you

17         about the big group of documents.  So the Court

18         understands, it's C6, but we're going to refer to

19         specific texts in C6-A.

20    A    Yeah.

21    Q    So just clarifying on Porter945 to your right, if you

22         look to your right, Dr. Porter, the date there is

23         April 5, 2017, right?

24    A    Correct.

25    Q    Okay.  If we go to 946 --
```

1          MR. SCHROEDER:  If you can bring that up on

2      the screen, Ray.

3  Q    (By Mr. Schroeder) When I was having a discussion with

4      you yesterday on your cross-examination, Dr. Porter, I

5      had asked you about your interactions with Dr. Hsu and

6      Seifer; do you remember that?

7  A    Correct.

8  Q    And I asked you about whether or not there was any

9      in-fighting in the REI division, and you said no, there

10     wasn't, right?

11 A    Correct.

12 Q    And that there were no personal issues in terms of

13     in-fighting, right?

14 A    Correct.

15 Q    And you wouldn't characterize that as a conflict,

16     right, no interpersonal conflict?

17 A    Correct.

18 Q    And you said -- when I said well -- I said, "Okay."

19     And then I said, "Well, did you get along with Dr. Hsu

20     and Seifer?"  You said, "I got a long with them, yes,"

21     right?

22 A    Right.

23 Q    I want to ask you, a specific reference to what you

24     were talking about with Lisa McGee.  So we're still

25     talking -- these are text messages between you and Lisa

```
1          McGee in April of 2017, right, correct?
2     A    April 2017, correct.
3     Q    Okay.  And you're talking about somebody taking boards
4          named Jennifer?
5     A    Yes.
6     Q    And then -- was Dr. Hsu taking the board -- scheduled
7          to take the board exams at that time?
8     A    I don't recall.
9     Q    Okay.  But you say -- regardless of whether he was or
10         not, you say in response to Lisa McGee saying, "Not
11         sure whether Jenn has passed," you say, "Gives me hope
12         Albert will fail," right?
13    A    Correct.
14    Q    And you were talking about him taking board exams,
15         right?
16    A    Correct.
17    Q    Okay.  So he must have been scheduled at some point
18         fairly soon to take the board exams, correct?
19    A    I don't recall.
20    Q    I would ask you to turn to Page 950, which is still on
21         April 5th, 2017, still with Lisa McGee, and there's a
22         conversation about some meeting coming up.  Do you see
23         that, up top?
24    A    I'm sorry.  Where are you?
25    Q    I'm on Page 950, which is on the screen right in front
```

```
 1           of you, and it is still April 5th, 2017, with Lisa

 2           McGee.

 3                And what I'm asking you on this specific string of

 4           text messages --

 5    A      Yeah.

 6    Q      -- is, there was some scheduled meeting with the

 7           various REI doctors at UVM Medical Center and Dartmouth

 8           Health, right?

 9    A      I don't recall.

10    Q      Well, let's see if we can refresh your recollection.

11           So here you say, "Not certain how David and Albert were

12           invited."  You were referring to David Seifer and

13           Albert Hsu, correct?

14    A      Correct.

15    Q      And then it's -- Lisa McGee says, "The cast may be

16           different for the next one," and your response was,

17           "But in the end, spending an entire day with them would

18           be horrible."  Now, you were referring to David Seifer

19           and Albert Hsu, right?

20    A      I don't recall.

21    Q      Well, you don't recall, but just look at the line right

22           below it.  It says -- these are your words, right,

23           you're in the dark text here?

24    A      Yes.

25    Q      Right?  You say, "David is insane, and Albert is
```

```
 1        pompous," right?
 2   A    Yes.
 3   Q    Those are your words?
 4   A    Those are my words.
 5   Q    And then you say, "And not as bright as he thinks he
 6        is," right?
 7   A    Yes.
 8   Q    And then you say, "Hearing him pontificate about his
 9        research would be torture," right?
10   A    Correct.
11   Q    And when you say "research and torture," you were
12        talking about Albert Hsu, correct?
13   A    I don't recall.
14   Q    Well, it's one of the two, though, right?  It's either
15        David Seifer or Albert?
16   A    Most likely.
17   Q    Well, is there anybody else that it could be?
18   A    Yes, there were many people at that meeting.
19   Q    But in this specific string you literally are talking
20        about David and Albert?
21   A    I presume.
22   Q    Well, you just talked about, in an earlier string
23        message on the same day, with Lisa McGee that you hoped
24        that Albert would fail his board exams, right?
25   A    That's what it says, right.
```

```
1    Q    Well, you said it, right?

2    A    It's in the text, yes.

3    Q    Okay.  All right.  We're almost done.

4            955, please, if you could go to that page.

5         Actually, 954, first.

6            Now, you're texting with Lisa McGee a whole series

7         of text messages on April 5th.  You've now got a series

8         of text messages on April 13th.  And Lisa McGee, at the

9         bottom of 954 -- and this is the subpart of -- it's one

10        of the pages for C6-A, she says the following and I

11        just want to highlight this.  "Hey, I remembered

12        something Dottie told me today.  There is a business

13        plan position that is going before the workforce

14        committee next week, it was Zahers which is why I

15        didn't connect while we were talking, but it is open

16        rank and there is leeway to tweak it.  I think if you

17        come, we should shoot for professor.  You have

18        international presence now, but I have a lot to work

19        out first to make things work.  Do what you need to do

20        but leave some time to come talk with us before you

21        make any solid plans, and we don't know what could

22        happen down your way either."  Did I read that

23        correctly?

24   A    I believe -- yes.

25   Q    Right.  And so in April of 2017, is it fair to say that
```

```
 1           Lisa -- you were having discussions with Lisa McGee, at
 2           least exploratory, about potentially working at UVM
 3           Medical Center?
 4    A      Yes.
 5    Q      And this predates the actual closing a few weeks later
 6           of the REI division, correct?
 7    A      Yes.
 8    Q      Okay.  And if you go to the next page, 955, at the top,
 9           you say, "I appreciate the follow-up, it sounds
10           promising.  We'll see what happens here, but your
11           suggestions are interesting."
12                So when you said it sounds promising, there was
13           some potential for a position at UVM Medical Center in
14           April of 2017 that you were at least exploring, right?
15    A      Correct.
16    Q      And you were exploring it because you knew that the REI
17           division was likely to close, or at least the IVF
18           program would be on pause or some combination of the
19           two, right?
20    A      No.
21    Q      You didn't know that, but you were still dipping your
22           toe in the water, if you will, for a potential new job?
23    A      No.
24    Q      You weren't?
25    A      No.
```

Porter - Cross by Mr. Schroeder

```
 1   Q   Okay.  Well, let's go to 956.  And, by the way, so
 2       these dates are in -- that last one, 955, was still on
 3       April 13th.  And now we go to 956, if we could bring
 4       that up on the screen, and this is May 5th, 2017, so
 5       this is the day after you were notified of the REI
 6       division closing, right?
 7   A   Correct.
 8   Q   And you said -- this is Lisa McGee, not you.  Lisa
 9       McGee says to you, "Hi, Misty.  I spoke with Ira this
10       morning --" and by the way, Ira is Ira Bernstein?
11   A   Correct.
12   Q   And in that time period, in May of 2017, what was his
13       position?
14   A   He was chair of OB-GYN.
15   Q   Chair of OB-GYN of UVM Medical Center?
16   A   Correct.
17   Q   Okay.  And she says, "Hi, Misty.  I spoke with Ira this
18       morning, and he agreed."  Now, I'm assuming that's the
19       same Ira, right?
20   A   Yes.
21   Q   Okay.  "If you want it, we can do a per diem
22       arrangement pretty quickly for June.  This could give
23       you some breathing room to have time to think things
24       through and make longer term decisions.  It could start
25       later too.  No strings attached to longer term, so you
```

```
 1              could still take the Boston option if it suits your
 2              needs better.  We are here for you."  Did I read that
 3              correctly?
 4    A    Correct.
 5    Q    Okay.  So the day after the REI division closure is
 6              announced to you and Albert Hsu and David Seifer,
 7              because you're all being terminated, you're having a
 8              text string with Dr. McGee about a potential position
 9              immediately, almost immediately with UVM Medical
10              Center, right?
11    A    Correct.
12    Q    And, in fact, even though your announcement -- the
13              announcement of the division closure was May 4th, you
14              were -- your employment would not terminate until
15              June 3rd at Dartmouth Health, right?
16    A    Correct.
17    Q    Okay.  And she also mentioned here "you could still
18              take the Boston option."  So were you also looking at
19              another option at another program during that time
20              frame?
21    A    No.
22    Q    So do you know what she's talking about here?
23    A    No.
24    Q    No idea?
25    A    No idea.
```

```
 1   Q    Okay.  "No strings attached for longer term so you
 2        could still take the Boston option if it suits your
 3        needs better."  And you have no idea what she's talking
 4        about?
 5   A    No.
 6   Q    And you traded lots of text messages in this time
 7        period with Lisa McGee, and you still have no idea?
 8   A    Correct.
 9             MR. SCHROEDER:  If I may have a minute to
10        talk to my co-counsel, Your Honor?
11             THE COURT:  Yes.
12             MR. SCHROEDER:  I have nothing further at
13        this time, Your Honor.
14        We will ensure that C6-A as the relevant pages
15        that were published to the jury.
16             THE COURT:  All right.  Thank you.
17             MR. SCHROEDER:  Thank you.
18             THE COURT:  Mr. Vitt.
19             MR. VITT:  Thank you.  Your Honor, when
20        Dr. Porter was on the stand before, we sought to
21        introduce into evidence Exhibit 123, which is the
22        May 25 -- sorry.  June 3, 2016, letter to Dr. Seifer
23        regarding Albert Hsu, and the concern was that there
24        was a cover e-mail directing who that letter went to
25        that we didn't have.  I now have that cover e-mail, and
```

1          we've marked that full set as 123-A, and I'm hoping we

2          can now get that admitted into evidence.

3                    THE COURT:  Okay.  Is there any objection?

4                    MR. SCHROEDER:  No objection.  If I could

5          have a full copy of that, that would be great.

6                    THE COURT:  Of course.

7                    MR. SCHROEDER:  I would just like to see it.

8                    MR. VITT:  Oh, here.

9                    MR. SCHROEDER:  Thank you.

10                   THE COURT:  So then Plaintiff's Exhibit 123-A

11         is admitted.

12                   MR. VITT:  May I approach the witness?

13                   THE COURT:  Yes.

14                      **REDIRECT EXAMINATION**

15    **BY MR. VITT:**

16    Q    Misty, I've given you what's been marked as

17         Exhibit 123-A.  Why did you write that letter?

18    A    Dr. Seifer asked me if I would write an assessment for

19         Albert, and it turns out that Leslie DeMars had

20         instructed him to ask me.

21    Q    When you returned from your disability, what did Leslie

22         DeMars ask you to fix?

23    A    Oh, a whole host of things she asked me to fix.  In

24         part, there were several patients who had very poor

25         outcomes with their IVF, and there were several

```
 1           patients who had requested reimbursement and/or had
 2           errors in Albert's management of their IVF, and they
 3           were requesting financial remuneration, meaning free
 4           cycles of IVF, and/or threatening lawsuit through risk
 5           management, and she decided to provide those free IVF
 6           cycles and asked me to take those patients
 7           specifically.
 8    Q      Did you do that?
 9    A      I did.
10    Q      Things work out all right?
11    A      Yes.
12    Q      Okay.  When you wrote that letter, was that a current
13           assessment of Dr. Hsu?
14    A      Yes.
15    Q      And your evaluation of him was current as of that date,
16           correct?
17    A      Correct.
18    Q      There's been mention of Elizabeth Todd.  Who was she?
19    A      She was the nurse practitioner that I worked very
20           closely with in REI and in general GYN.  She was on
21           service for 15, 16 years, something like that.
22    Q      Had you worked with her for that period of time?
23    A      Yes, very closely.
24    Q      You were asked earlier in your examination whether
25           Elizabeth Todd had a dual appointment in the OB-GYN
```

```
 1              department at the time of closure of the REI division.
 2              Did she have a dual appointment as you understood the
 3              term?
 4    A    Not as I understood it, no.
 5    Q    Do you have a dual appointment?  Do you have a dual
 6         appointment?
 7    A    In my current job?
 8    Q    I'm sorry.  When you were at Dartmouth Health in the
 9         REI division --
10    A    Yes, I had a dual appointment.
11    Q    What was the dual appointment in?
12    A    In OB-GYN and in radiology.
13    Q    All right.  What happened to Elizabeth Todd when the
14         REI division was closed?
15    A    She was retained to work in OB-GYN.
16    Q    So she was essentially reassigned over to OB-GYN?
17    A    She was retained within the department, yes.
18    Q    All right.  I want to turn to Defendant's B2.
19                   MR. VITT:  May I approach the witness, Your
20         Honor?
21                   THE COURT:  Yes.
22                   MR. SCHROEDER:  Mr. Vitt, could you tell me
23         the number?  I didn't hear your number.
24                   MR. VITT:  B2.  B, as in boy, 2.
25                   MR. SCHROEDER:  Thanks.
```

```
 1    Q    (By Mr. Vitt) Could you turn to the third page, please?

 2            Who asked you to write that document?

 3    A    Leslie DeMars.

 4    Q    And was that part of a formal review?

 5    A    Yes.

 6    Q    If you go to the end of that, there were a number of

 7         persons who were asked to comment or provide a review,

 8         correct?

 9    A    Correct.

10    Q    Basically, everyone in the REI division?

11    A    The majority of the individuals in the REI division.

12    Q    And that's at the bottom of Page 2, correct?

13    A    Correct.

14    Q    So this evaluation didn't come out of the Value

15         Institute at all, did it?

16    A    No.

17    Q    It was a response that was directed initially to the

18         whole department?

19    A    To the majority of the individuals.

20    Q    All right.  Would you read, please, for me at the

21         bottom of Page 1 starting "there is not enough IVF work

22         in DHMC"?

23    A    "There is not enough IVF at DHMC nor has there ever

24         been, despite heavy efforts in marketing and outreach,

25         for many providers within RE to focus only on IVF.  I
```

```
 1          had conversations with him during his interview last
 2          winter before he started at DHMC."
 3     Q    Who is the him?
 4     A    David Seifer.
 5     Q    Why is this a problem for him?
 6               MR. SCHROEDER:  Objection, Your Honor.
 7          Calling for getting into the mind of Dr. Seifer.
 8               THE COURT:  Sustained.  I'll ask you to
 9          rephrase the question, Mr. Vitt.
10               MR. VITT:  Sure.
11     Q    (By Mr. Vitt) Was there sufficient IVF work within the
12          REI division for Dr. Seifer?
13     A    No.
14     Q    Why not?
15     A    Dr. Seifer could not do a basic infertility evaluation,
16          complete it himself.  REI is a very broad subject
17          matter for subspecialty.  It -- the IVF itself is an
18          important but small section of what REI does, and there
19          was not enough work to do only IVF consultation, which
20          is what he was able to do within his scope of practice.
21     Q    What percentage of the infertility work was actually
22          limited to IVF?
23     A    About 10 to 20 percent, in my -- my view, yes.
24     Q    What percentage of the work that you did within the REI
25          division had to do with IVF?
```

Porter - Redirect by Mr. Vitt

```
1    A    10 to 15 percent.

2    Q    All right.  Is there a problem conflating REI and

3         infertility?

4    A    Absolutely.  REI is a very global subject, you know,

5         from pediatrics all the way through menopause, hormonal

6         issues, microsurgery, surgery, you know, consultative

7         for contraception, et cetera.  And IVF is that small

8         portion of it.

9    Q    You stated yesterday that you wanted to give the

10        context of the e-mail that Mr. Schroeder didn't want

11        you to.  What else would you like to add --

12                   MR. SCHROEDER:  Objection, Your Honor.

13                   THE COURT:  Sustained.

14                   MR. SCHROEDER:  Come on.

15   Q    (By Mr. Vitt) Well, what's the context of the e-mail?

16   A    This one?

17   Q    Yes, the one you have there.

18   A    Yeah.  This was a confidential review that Leslie

19        DeMars asked of the majority of the REI division in

20        response to ongoing evaluations and performance reviews

21        of Dr. Seifer.

22   Q    So I'm going to --

23                   MR. VITT:  May I approach the witness?

24                   THE COURT:  Yes.

25   Q    (By Mr. Vitt) I'm going to hand you what's been -- it's
```

1          Defendant's Exhibit A10.  I think it's been admitted.

2                    MR. SCHROEDER:  A10?

3                    THE COURT:  It has been admitted.

4                    MR. SCHROEDER:  As has B2.

5    Q    (By Mr. Vitt) Could you read out loud the last

6         paragraph starting with "I have knowledge that the

7         restrictions" --

8    A    "I have knowledge that the restrictions from working at

9         DHMC can be waived, and have been in the past,

10        specifically with ultrasound techs.  To this end, I

11        would encourage that we pursue this with HR and make

12        plans to have continuity for the service matters and

13        commit to our patients.  We can provide the most

14        consistent care available to us."

15                   MR. SCHROEDER:  Objection, Your Honor,

16        just -- the document was admitted, but this is beyond

17        the scope of the cross.  I did not get into this

18        subject, not that it's relevant.

19                   THE COURT:  Overruled.

20   Q    (By Mr. Vitt) Did you have thoughts about how the REI

21        division should handle the nursing shortage?

22   A    Yes.

23   Q    And what were they?

24   A    The thoughts that I had were that we had, for many

25        years, had a single IVF nurse coordinator, and that we

1    functioned in the context of a major medical center and

2    had resources that we were able to provide the patients

3    for consistency of care.  And, in fact, we had Nurse

4    Mary Martin from same-day, who wanted to do more work

5    with us, and had asked to do more work with us, and had

6    met with Dr. Merrens shortly after the closure to

7    explain, and she told me that directly.

8         Also, there was the opportunity to bring Sharon

9    Parent back, and she was willing to do that, and I was

10   aware that both in the OR and in ultrasound that while

11   there was this waiting period for pension and

12   retirement, there had been letters written, and there

13   were several individuals who were allowed to come back

14   within that three-month period, and I knew that an

15   ultrasound tech, Sheila Foote, was able to come back in

16   that time frame to provide that care when it was

17   considered a critical shortage.

18  Q   I'm going to show you what's been marked as Plaintiff's

19      Exhibit 86.

20           MR. VITT:  Approach the witness, Your Honor?

21  Q   (By Mr. Vitt) The first two sentences of that first

22      paragraph were read to you yesterday during your exam.

23      Could you read the remainder of that first paragraph?

24  A   "However, many of us were totally shocked and

25      unprepared for your decision to terminate Misty Porter.

1         Misty has been here -- has been her entire career here

2         and has developed an active gynecologic practice in

3         addition to her infertility practice."

4    Q    Thank you.  And I'm going show you Defendant's B12.

5         It's an eight-page document.  Yesterday, you were asked

6         if you referred in that document to alleged disability

7         discrimination, and I think there was a place you

8         wanted to refer to.

9              MR. SCHROEDER:  Objection, Your Honor.

10        Overly leading.

11             THE COURT:  Sustained.

12   Q    (By Mr. Vitt) In that letter, do you believe that you

13        provided to Dartmouth-Hitchcock a reference to the

14        claims that you may have against the hospital?

15   A    Yes.

16   Q    Where?

17   A    B12(006).

18   Q    Can you read it, please?

19   A    "The termination of my employment will impact my

20        recovery from the debilitating condition I suffered

21        last year.  Despite the disability from which I am

22        currently suffering, I have been working diligently to

23        a full recovery of my clinical responsibility at DH

24        since the onset of my illness in November 2015.  At

25        that time, I received notice -- at the time that I

1     received notice of my termination of my employment,

2     less than 10 to 20 percent of the 20 hours a week I had

3     been working have been dedicated to the performance of

4     infertility and IVF with 60 to 70 percent of my time

5     dedicated to the performance of gynecologic ultrasound

6     and procedures and the remainder complex REI consults,

7     complex benign gynecology, and gynecologic surgical

8     consults."

9             THE COURT:  Mr. Vitt, this is not an admitted

10    exhibit.  I don't know if you're aware of that.

11 Q  (By Mr. Vitt) Can I see the letter a second?

12            MR. VITT:  I would like to move its

13    admission; it hasn't been admitted.

14            THE COURT:  Is there any objection?  B12?

15            MR. SCHROEDER:  No objection, Your Honor.

16            THE COURT:  Okay.  Defendant's B12 is

17    admitted.

18            MR. VITT:  Thank you, Your Honor.

19 Q  (By Mr. Vitt) One last thing on this letter.  If you

20    could go to Page 7 at the bottom.  The sentence at the

21    bottom, could you read that, please?

22 A  "If Dartmouth-Hitchcock decides not to reconsider the

23    termination decision, I will be in touch about my

24    rights as a member and under federal and state law."

25 Q  Thank you.

Porter - Redirect by Mr. Vitt

```
 1                    MR. VITT:  No further questions, Judge.

 2                    THE COURT:  Okay.  Thank you.  Any recross?

 3                    MR. SCHROEDER:  Just one minute, Your Honor?

 4                    THE COURT:  Yes.

 5                         RECROSS EXAMINATION

 6   BY MR. SCHROEDER:

 7   Q    Just very specific questions related to the redirect

 8        from Mr. Vitt, Dr. Porter.

 9             You're not aware of any litigation involving any

10        of the care that Dr. Hsu or Dr. Seifer provided while

11        they were employed by Dartmouth Health, right?

12                    MR. VITT:  Objection.  It's beyond the --

13                    MR. SCHROEDER:  You asked -- may I be heard?

14                    THE COURT:  Overruled.  Go ahead.

15                    MR. SCHROEDER:  Thank you.

16   Q    (By Mr. Schroeder) You're not aware of any litigation

17        brought by anyone against Dartmouth Health related to

18        the care by Dr. Hsu or Seifer?

19   A    I am not aware, no.

20   Q    And with respect to Ms. Todd, she had similar concerns

21        as you relating to Dr. Hsu and Seifer, correct?

22   A    Yes.

23   Q    Right.  She had complaints about them, correct?

24   A    Correct.

25   Q    And she -- despite those complaints -- and those
```

```
 1        complaints happened in 2017, correct?

 2   A    Correct.

 3   Q    And despite those complaints, she was retained by

 4        Dartmouth Health as a nurse practitioner, right?

 5   A    Correct.

 6                 MR. SCHROEDER:  Thank you.

 7                 MR. VITT:  Nothing further.

 8                 THE COURT:  Thank you, Dr. Porter.  You may

 9        step down.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          CERTIFICATE

2

3          I, Jan-Marie Glaze, RPR, CRR, Pro-Tem Court

4   Reporter for the United States District Court for the

5   District of Vermont at Burlington, do hereby certify that I

6   was present in court during the foregoing matter and

7   reported said proceedings stenographically.

8

9          I further certify that thereafter, I have caused

10  said stenographic notes to be transcribed under my direction

11  and that the foregoing pages are a true and accurate

12  transcription to the best of my ability.

13

14

15

16  _____

17  JAN-MARIE GLAZE
    COURT REPORTER

18

19

20

21

22

23

24

25