VOLUME: 6
PAGES: 1-221

1

2                    UNITED STATES DISTRICT COURT
                              FOR THE
3                       DISTRICT OF VERMONT

4

5    Misty Blanchette Porter        )
                                     )
6                                    )
     v.                              ) Case No. 2:17-cv-194
7                                    )
                                     )
8    Dartmouth-Hitchcock             )
     Medical Center, et al.          )
9                                    )
     _____)

10

11   RE:  Day 6 of Jury Trial

12   DATE: March 31, 2025

13   LOCATION: Burlington, Vermont

14   BEFORE:  Honorable Kevin J. Doyle
              Magistrate Judge

15

16   **APPEARANCES**:

17   Geoffrey J. Vitt, Esq.
     Sarah H. Nunan, Esq.
18   Vitt & Nunan, PLC
     8 Beaver Meadow Road
19   Norwich, VT 05055

20   Eric D. Jones, Esq.
     Langrock, Sperry & Wool
21   210 College Street, Suite 400
     Burlington, VT 05410

22

23   Donald W. Schroeder, Esq.
     Morgan McDonald, Esq.
     Foley & Lardner, LLP
24   111 Huntington Avenue, Suite 2500
     Boston, MA 02199

25
                   - Continued on Next Page -

VOLUME: 6
PAGES: 1-221

1    Tristram J. Coffin, Esq.
     Downs Rachlin Martin, PLLC
2    199 Main Street, Suite 600
     Burlington, VT 05401-8339

3

4

5

6            TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                     United States District Court Reporter
7                          *verbatim@vermontel.net*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME: 6
PAGES: 1-221

1                           INDEX OF EXAMINATION

2    Witness                   Examined By              Page        Line

3    Robert L. Bancroft        Atty. Vitt                38           4
                               Atty. Coffin             61           3
4                              Atty. Vitt              145          22
                               Atty. Coffin            150           3
5
     Leslie DeMars             Atty. Nunan             153          10
6

7

8                           INDEX OF EXHIBITS

9                                              Page      Admitted

10   Plaintiff Exhibits

11        2                                    164          Y
          7                                    174          Y
12        9                                    216          Y
          11                                   214          Y
13        28                                   185          Y
          52                                   206          Y
14        89                                   157          Y
          148                                  192          Y
15

16   Defense Exhibits

17        B21A                                 116          Y
          B21B                                 116          Y
18        C18                                   70          Y
          C18A                                  77          Y
19        C19                                  141          Y

20

21                    *   *   *   *   *

22

23

24

25

1              (Court opened at 8:09 a.m.)

2              COURTROOM DEPUTY:  Your Honor, this is Case Number

3    17-cv-194, Misty Blanchette Porter versus Dartmouth-Hitchcock

4    Medical Center.  Present on behalf of the plaintiff are

5    Attorneys Geoffrey Vitt and Eric Jones and, excuse me, Attorney

6    Sarah Nunan.  Present on behalf of defendants are attorneys

7    Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We are

8    here on a motion in limine regarding undisclosed expert

9    opinions of Dr. Bancroft.

10             THE COURT:  Good morning.

11             ATTORNEY COFFIN:  Good morning, Your Honor.

12             THE COURT:  Okay.  So I have received the parties'

13   submissions over the weekend.  Plaintiff filed twice, right, to

14   add your exhibits yesterday evening?  I received that.  Thank

15   you.  Defendants have received a second copy with the exhibits,

16   I assume.  Mr. Coffin, you've received the second filing?

17             ATTORNEY COFFIN:  Oh, yes, Your Honor.

18             THE COURT:  Okay, all right.  So, as I say, I have

19   read both sides' filings.  Happy to hear if there's any

20   additional argument.  I may have some questions for you, but,

21   Mr. Coffin, your motion.  Would you like to be heard?

22             ATTORNEY COFFIN:  Thank you, Your Honor.  I think our

23   position is pretty well laid out the papers, but just to sort

24   of briefly recap, if this was implicit in the expert analysis

25   as it's evolved over the years from Dr. Bancroft, it was not

1    spelled out with adequate clarity as required under the rules,

2    and, you know, fundamentally, we're just dealing with an issue

3    where we have to wait until what we hear coming out of

4    Dr. Bancroft's mouth as he testifies and as this evolves, and

5    we have to wait until another report comes in that changes

6    things, and that's not how it's supposed to go.  It's very

7    difficult to manage that situation in trial because, you know,

8    I don't know what he's going to say until it comes out, and I

9    don't even know kind of completely what he's going to say

10   requiring me to object or waive.

11       I will say that the plaintiff's explanations of how he

12   looked at the fringe benefits and kind of the proffer of

13   testimony that I was able to see in writing, you know, albeit

14   only last night after 7:00 o'clock, or 6:30 or so, was helpful.

15   That's just not exactly how we're supposed to run the railroad

16   here, and I think some of the cases we've cited, the case, the

17   Judge Sessions opinion and the Judge Reiss opinions, kind of

18   talk about the way this is supposed to be done under the rules.

19   So and, you know, we provided some additional information to

20   the Court about the level of disclosure that we've seen in

21   addition under the, under the discovery rules for experts.

22       And so we'd submit that there, you know, we're prejudiced

23   because this is kind of a slow-rolling thing that's coming out.

24   What the Court should do about it is, practically, is a, is a

25   more difficult question, and we've made some suggestions, but

1    obviously, the opinions by Judge Reiss and Judge Sessions talk

2    about limiting or even excluding testimony.  Some of the

3    lawyers in those decisions are here today, and so they've had

4    some probably more notice than I have about the import of those

5    decisions.

6         But, you know, I'd suggest that, you know, something,

7    something ought to be done to provide some limits and some

8    guidance to Dr. Bancroft's testimony, and, to me, the theme

9    that goes throughout these is that, like, they're allowed to

10   disclose and change their analysis and add to the bottom line

11   and, in the most recent case, reduce it a week before trial by

12   $2.6 million, and we're just meant to sort of respond to that a

13   little bit on the fly.

14        You know, so I've proposed some possible resolutions to

15   the Court, and, really, you know, I look to the wisdom of the

16   Court of what the fair thing to do here is, but, to me,

17   fundamentally, you can't say that this is an obligation that

18   was a sum certain like in a sort of more normal employment case

19   because of the new opinions, the new position, the new

20   analytical models.  And so I just, I think, fundamentally, the

21   thing that's really unfair is to say, Oh, well, Dartmouth

22   should have been able to foresee these changes, which, again,

23   are based largely on whatever the plaintiff happens to be

24   telling Dr. Bancroft at the moment.

25        Let's go back to the most recent report last Tuesday which

1    occurred three or four days after the evidentiary hearing where
2    Dr. Bancroft was confronted and crossed on some information.
3    The two big things that came out of that hearing -- well, there
4    are many big things that came out of that hearing, but two of
5    the bigger things that came out of the hearing is he had not
6    been informed that Dr. Porter was promoted to full professor at
7    UVM, which happened in July of 2023, and he had not been
8    provided the most recent tax return information for her fiscal
9    year 2024.
10        That was information that was uniquely in the hands of the
11   plaintiff and her counsel, and Dr. Bancroft, being a
12   prestigious economist, you think he might have followed up and
13   asked those questions because he was analyzing that she would
14   become a professor at Dartmouth based on what she was telling
15   him, and he didn't -- and that would cause a 5 percent increase
16   in her pay and would not, did not opine at all what would
17   happen with her at UVM.
18        Well, guess what?  She became a professor at UVM, and he
19   did not project the 5 percent increase.  And, fundamentally,
20   the, two of the key variables here, of course, are the
21   plaintiff is trying to show that she would have made more at
22   Dartmouth than she made at UVM and the bigger difference
23   between those results in larger damages calculations.  So,
24   fundamentally, Your Honor, I think the Court needs to address
25   in some fashion, and we would accept the Court's wisdom on

1    this.

2             THE COURT:  Okay.  So the idea of preclusion in these

3    circumstances is not a general issue.  It gets really in the

4    weeds about the specific allegation of the nondisclosure.  So

5    what specifically are you claiming is the new opinion that was

6    not disclosed, okay?

7         So I've reviewed everything that has been attached to the

8    plaintiff's filing.  You have the preliminary report issued

9    sometime in 2018.  You have defense counsel deposing

10   Dr. Bancroft in 2019.  There is a discussion of the methodology

11   that he applies to reach his kind of loss projections.  Then

12   you have a lengthy period of time where the case, as you know

13   better than I, is dealing with summary judgment proceedings and

14   appellate proceedings and everything but eventually comes back.

15        A new report is issued in August 2024.  I've looked at the

16   assumptions and the cover letter of the August 2024 report.

17   I've looked at the March 2025 report.  The assumptions are

18   basically the same.  The methodology is basically the same.  So

19   I'm almost wondering, you know, having taken a look at the

20   hearing transcript from Friday, what the initial impetus was

21   for the objection, and I wonder if it perhaps -- maybe I'm

22   wrong, but I wonder if it was perhaps a misperception of what

23   Dr. Bancroft was saying.

24        Let me explain what I think this might mean.  So it

25   appeared that, that your objection was that Dr. Bancroft might

 1    be claiming that there is not going to be a continuing

 2    Dartmouth-Hitchcock pension benefit going forward, which,

 3    obviously, would be a different type of premise to his ultimate

 4    opinion.  But you'll look at the chart, the chart going back to

 5    August, the chart in March, and there are continuing

 6    projections for the Dartmouth-Hitchcock pension plan going

 7    forward, offset by what Dr. Porter eventually makes at UVM

 8    Medical Center.

 9        So, you know, I've read your case law, too, right?  So,

10    for example, the *Parma* case, *Town of Parma* I think, you know,

11    quite different on the facts, right?  So, in that case, it's a

12    complex environmental matter.  The expert apparently opines in

13    his first report on one aspect of environmental damages, and

14    then, later on down the road, has a whole new assessment of

15    environmental damages with new assumptions, new mathematical

16    calculations.  I'm not so sure that I see that here.

17        And the case that you mentioned with Judge Sessions also

18    involving Dr. Bancroft, so there Judge Sessions says the theory

19    of damages is so novel, almost getting back to the 702 kind of

20    analysis, getting back towards the liability, seems like it's

21    not, again, on all fours with what we have here.

22        So, I guess, let me come around to a question.  What is

23    the specific claim of inconsistency here or the new

24    information?

25            ATTORNEY COFFIN:  Sure.  Let me try to speak to

1    those, Your Honor.  Your Honor is correct that, to a degree, in

2    part correct that the thing that sort of prompted me was my

3    concern of where he was going that he was not going to

4    acknowledge that she would get a damages or would get a pension

5    if she continued on at Dartmouth or, sorry, if she had left and

6    wasn't acknowledging that and where that was going to go in his

7    testimony.

8         That was clarified at sidebar and by additional testimony

9    and in the briefing.  It doesn't -- that was not my only

10   concern.  My concern is on the pensions issue as exemplary, but

11   on all of these issues we need to read between the lines for

12   what his opinion is going to be, and, you know, in the 2019

13   report there was, like, no calculation of fridge benefits, and

14   I'm concerned that the Court --

15             THE COURT:  Did that report precede the deposition?

16             ATTORNEY COFFIN:  Yes, it did, by less than a month.

17             THE COURT:  So there was no mention in the 2019

18   report about fringe benefits involving pension, but yet there

19   was questions at the deposition about percentages and

20   assumptions on the pension plan?

21             ATTORNEY COFFIN:  There was some questioning at, some

22   questioning in the deposition.

23             THE COURT:  So where did the defense -- where did

24   counsel get this information about asking about the 9 percent

25   and the 12 percent assumptions in the various pension plans

1     with no report?

2             ATTORNEY COFFIN:  I don't know the answer to that

3     question myself.  Perhaps Mr. Schroeder can speak to that.  I

4     was not involved in that deposition.

5             ATTORNEY SCHROEDER:  I think the fundamental issue on

6     it, Judge, if you look at the October 1, 2019 report and

7     whether or not there's an offset, right, there's nothing in the

8     column for fringe benefits for UVM at all, and that's maybe

9     taken into account later in the August 2024 fringe benefit

10    column for UVM, but there is no offset for it in the earlier

11    reports.  There's zeros.

12            THE COURT:  So then why -- I'm looking at Page 40 of

13    the deposition, Document 257-1 attached to plaintiff's

14    opposition.  There's an extended explanation by Dr. Bancroft as

15    to the offset.  So where is this coming from if it's not in a

16    report?  Why is counsel questioning Dr. Bancroft about this if

17    counsel has no basis to even understand how he was calculating

18    damages?

19            ATTORNEY COFFIN:  I don't know the answer to that

20    question, but I would suggest that that's, to a degree,

21    immaterial because the expert report is supposed to provide the

22    basis for their opinions and the actual opinions that are

23    rendered, and whether or not that lawyer had some level of

24    knowledge of that, I don't know, but I'd suggest that that is

25    actually immaterial to whether or not the plaintiff still has

1     discovery obligations on expert disclosures.

2         You know, the fact is Dr. Bancroft's reports in seriatim

3     are extremely bare bones, and then the chart is very, very

4     thorough giving him a lot of leeway, if the Court were to not

5     require disclosure of the report, for deposing counsel to have

6     to sort of guess at what he's about, and questioning counsel

7     would have to guess what he's about.

8         And, you know, to see these reports evolve and change, you

9     know, both as to substance and methodology, but, you know, even

10    if it's only as to substance, you know, they change radically

11    because, Oh, I do the same thing.  I provide a 12 percent

12    markup on whatever it is, but yet his information has changed

13    so the bottom line to us has changed radically and requires a

14    different analysis that we're not on notice of.

15            THE COURT:  Okay.  But you say the methodology has

16    changed.  How has the methodology changed?

17            ATTORNEY COFFIN:  The methodology --

18            THE COURT:  That is critical to the case law, right?

19    If it's new methodologies, new assumptions, then that might

20    lead to a preclusion result, but if there's not new

21    methodology, that would seem to then fall on the side of the

22    ledger that says it doesn't need to be.  So I really want to

23    narrow it down on, What is the changed methodology?

24            ATTORNEY COFFIN:  I guess I would say, Your Honor,

25    I'm not confident it's not changed methodology because where he

1    describes where the methodology is is so de minimis and hidden

2    in the report that I'm just not confident.  I haven't run the

3    numbers enough to really know that.  But I would suggest that I

4    disagree with your reading of the case law because it's really

5    both things.  If he radically changes the information and it

6    hasn't been disclosed to us, I do think those cases show that,

7    you know, that, too, is a failure to update information in his

8    expert report.

9        THE COURT:  Definitely.  So what information hasn't

10   been disclosed?

11       ATTORNEY COFFIN:  So, for example, the changes in, in

12   the salary, the changes in her professor, the changes in

13   position, the allocation of the income in 2004 updated at the

14   very end.  And, with regard to the pension, I don't see a

15   discounting to present value for the income stream coming on.

16   And, again, this is all stuff to have disclosed well beforehand

17   so one can understand it and think it through, but I believe

18   she can claim a pension right now at Dartmouth and could be

19   receiving that income stream, and that would be something

20   that's part of her income and would change the damages

21   calculation.

22       THE COURT:  Okay.  And the discounting of present

23   value, so the fact that the chart does talk about a present

24   value, that is inadequate?  Third-to-last column seems to have

25   a calculation as to present value, but that, is in your view,

1    inadequate?

2              ATTORNEY COFFIN:  Yeah, because depends what you mean

3    by inadequate, inadequate without further explanation and

4    guidance what it is.  Because these are, you know, these are

5    numbers on the chart, and we get them, you know, a week before

6    trial.  We get them after the case has been in hibernation for

7    years, and, you know, we're supposed to penetrate what these

8    numbers amount for and, you know, be prepared to, you know, get

9    whatever we can from cross-examination on the witness,

10   essentially unguided, and, you know, kind of take, take it on

11   the fly what the math is.

12             THE COURT:  Okay.

13             ATTORNEY SCHROEDER:  Judge, I think, just big

14   picture-wise --

15             THE COURT:  Yes.

16             ATTORNEY SCHROEDER:  -- when you look at the October

17   1, 2019 report, right, if there's a calculation for, well, you

18   should be getting income from Dartmouth, right, going forward,

19   they, they don't account for that as an offset for UVM.

20   There's zeros all the way down, so that's one issue.  But here,

21   big picture, big picture, when you look at -- I mean, we

22   highlighted this in the outline.  The numbers go from, like,

23   4.3 to 4.4 to 6.4 as of August 2024, and the number now is 1.8

24   million in economic damages?  By itself, Your Honor, by -- and

25   this is eight years later, right?  It, there's an incongruity

1    that falls out of the assumptions that Dr. Bancroft has made.

2    Like, on its face it is, it is a far cry from a clear

3    methodology and clear assumptions.

4        And, to the extent that the assumptions are new and the

5    numbers are lower, okay, I guess, good for Dartmouth-Hitchcock,

6    right?  But we got those assumptions on March 19th of 2025, and

7    there's no way that that, that that can't be calculated within

8    the judge's decision and consideration of all the issues that

9    are before the Court.  These are assumptions that were made

10   March 19th, and the only reason they were made -- and, by the

11   way, one of those assumptions is that Dr. Porter became a

12   full-time professor in May or June of 2023.  Well, is that

13   reflected in Dr. Bancroft's August 2024 report?  No, it wasn't,

14   and it's inexplicable why.  It's a year later.

15       And so I would submit that, to the extent -- and I think

16   it's a far cry, Your Honor, to say -- I've had a lot of cases

17   with expert reports where there's actually writing in the

18   report as opposed to, Here's my list of a few assumptions and

19   some methodology and, here's the chart.  This is the most bare

20   bones report I've ever seen, and I've seen it before from

21   Dr. Bancroft because I've had other cases with him dealing with

22   plaintiff's counsel.

23       So this is about as bare bones as you get.  It's not a

24   quote, unquote, report because there's not really a lot of meat

25   on the bones.  And so you take that and you couple that with

1    the assumptions that are made on March 19th 2025 and on the

2    heels of trial, brand-new assumptions, I mean, they obviously

3    lower the economic value of the case.

4            THE COURT:  And, with respect to those assumptions,

5    I'm looking at the cover letter March 19th.  Assumption 1, no

6    DHMC salary increases for 2020 and 2021.  So that assumption

7    was put into this report based on Mr. Coffin's

8    cross-examination at the motion in limine, correct?

9            ATTORNEY SCHROEDER:  Correct, on March 14th.

10           THE COURT: So, Number 2, an additional UVM fridge

11   benefit of $7,698 for the son's UVM tuition, that was also in

12   response to Mr. Coffin's cross-examination at the motion in

13   limine, correct?

14           ATTORNEY SCHROEDER:  Correct.

15           THE COURT:  Okay.  The no loss of DHMC's medical

16   insurance contributions beyond April 2018, does that derive

17   from the evidentiary hearing?

18           ATTORNEY SCHROEDER:  I don't recall.  With such an

19   exquisite cross-examination from Mr. Coffin, I may have been

20   lost in that.  I'm not entirely sure, Your Honor.

21           THE COURT:  Okay.  Then I just want to understand

22   what the genesis is of the various changes in the report.

23           ATTORNEY SCHROEDER:  Yeah.

24           THE COURT:  So Dr. Porter's actual -- I'm sorry.

25   UVM's retirement contribution is equal to 9 percent of her

1    income.  So that is relatively similar to the assumption listed

2    in the August report, if not the same, right?  One was 8.5

3    percent.  The other was 9.

4              ATTORNEY SCHROEDER:  Yes, I think you're right.

5              THE COURT:  Okay.  So this change is not particularly

6    --

7              ATTORNEY SCHROEDER:  Meaningful.

8              THE COURT:  Right, okay.  Dr. Porter's actual 2024

9    UVM earned income, now, this was a topic explored at the motion

10   in limine hearing about, and I believe Dr. Bancroft essentially

11   was saying, Well, I don't have the W-2 yet.  He was

12   cross-examined on that.  Clearly, he, not clearly, but he must

13   have received a W-2 after that hearing and made this adjustment

14   to the report.  Do you have that information, the W-2?

15             ATTORNEY SCHROEDER:  We got it.  We got it after we

16   wrote to them that week right before trial.  And just on that

17   point, Your Honor --

18             THE COURT:  I just want to finish this list.  All

19   right.  So with that, though, what that amounts to is what

20   perhaps was initially a projection of lost income in 2024 Has

21   now been substantiated for the actual amount earned in that

22   year based on the W-2, right?

23             ATTORNEY SCHROEDER:  I would assume so, Your Honor.

24   The problem I have is that it should have been disclosed in

25   January of 2025 when everybody, I believe, that is a W-2

VOLUME: 6
PAGES: 1-221

1    employee gets their W-2 delivered to their house or through

2    their employer.  It wasn't disclosed.  It wasn't disclosed.

3            THE COURT:  Okay.  And then 6, the assumption that

4    Dr. Porter will go to a 75 percent part-time position, as I

5    recall, there may have been some questions.  I'm not sure if it

6    got to this point, though, at the motion in limine hearing.

7            ATTORNEY SCHROEDER:  This is -- I don't know whether

8    it came up then or in his cross-examination on Friday, Your

9    Honor, but there is no question that that assumption standing

10   alone is brand new.  And, and there's been some testimony as

11   to, Well, I couldn't do this, I couldn't do that.  All those

12   things, whether that's true or not, are things that have

13   apparently or allegedly happened within the last six months.

14       I don't know when that happened.  But you can't say that a

15   deposition in October of 2019, you know, would suffice to be

16   able to say, Well, I've got to be a fortune teller and figure

17   out what it would look like.  That assumption is brand-new.

18           THE COURT:  Right.  Of course, that kind of an

19   assumption, I guess, could change over time based on the

20   plaintiff's kind of plans for her life, couldn't it?  So, if

21   you have -- I mean we're in a little bit of a tough spot here,

22   right?  Because I hear your point about how, at a deposition in

23   2019, how are you to kind of know what the report might be?

24   You wouldn't have known that the final report is going to come

25   out some six years later.

VOLUME: 6
PAGES: 1-221

1          ATTORNEY SCHROEDER:  Understood.

2          THE COURT:  And, I guess, you know, on the one hand

3    -- obviously, you can see what I'm getting at here -- some of

4    these revised assumptions were because of issues raised at the

5    evidentiary hearing.  So what am I to do to not permit those

6    types of changes to be made in response to questioning,

7    legitimate questioning of the witness if I didn't -- or not

8    that I have anything to do with whether a revised report was

9    issued, but, once it was issued if somehow I were to say that

10   that's inappropriate, then wouldn't there kind of be a separate

11   issue then there too?  Mr. Coffin?

12         ATTORNEY COFFIN:  Not to come up in here, Your Honor,

13   but with the Court's permission, I'd just like to add.  The

14   Court views our eliciting of this information at

15   cross-examination as somehow something that should redound to

16   the benefit of the plaintiffs here.  On the contrary, this is

17   stuff, every single one of those they should have disclosed

18   earlier on, in my view.

19         ATTORNEY SCHROEDER:  And just, Your Honor, one last

20   point just to jump on -- no, you used word redound very well.

21   Thank you.  The issue we have is one assumption was made, one

22   assumption that he makes is based on a fact from May, June of

23   2023.  There is no question about that, that Dr. Porter assumed

24   a full-time, received a promotion to a full-time professor at

25   UVM.  We may have learned that fact by way of great

1    cross-examination by my brother, Mr. Coffin.  However, that

2    fact should have been disclosed certainly before the August

3    2024 report, right?

4         In terms of this going to a .75, I don't believe there is

5    any testimony that that just happened magically in the last two

6    months, that she could only go, that Dr. Porter could only go

7    to .75 and not .6.  That is not what the testimony was, I

8    believe, in the record.  So that's another assumption that -- I

9    understand, things change over time, but they need to be timely

10   disclosed, Your Honor, and that was not timely disclosed.

11        And, in terms of the W-2, the only reason we knew that

12   there was -- well, we had asked for the W-2, and it should have

13   been disclosed when the W-2 was issued, and unless they do

14   things differently in Vermont, I'm pretty sure that most W-2s

15   get issued in January, and they should have been disclosed well

16   in advance of March 19th or, actually, after March, around

17   March 19th when we asked for the documents.  Where are the

18   documents?  We shouldn't have to ask for those documents.

19   Those should be disclosed on a timely fashion.  They weren't.

20   They came out of that March 14th hearing.

21        And, to Mr. Coffin's point, well, because we were able to

22   examine Dr. Bancroft and elicit that testimony, that shouldn't

23   inure to the plaintiff's benefit because they were late in

24   disclosing these things.  Leave it up to the Court's discretion

25   on how that's dealt with with Dr. Bancroft, but that's the

1    conundrum we're in.

2              THE COURT:  And, in practical effect, so before you

3    actually get a W-2 for that year -- this is kind of the point I

4    was making before or trying to make before.  Until you get the

5    actual income as established by that W-2, before that you're

6    working off of an income projection, right?

7              ATTORNEY SCHROEDER:  Yes, but here's the other issue,

8    though.  In 2023, right, there would be a W-2 for 2023 which

9    would, which would show a jump in salary assumption.  Now, you

10   wouldn't necessarily see that.  You'd have to, you know, the

11   baked-in figures.  And, by the way, there was no report until

12   August of 2024, and I don't believe -- so there's a disclosure

13   issue on the, on that issue because you're talking about two

14   years of data, the W-2 for 2023 and the W-2 for 2024.

15        You are making projections, but the problem is the

16   projections, I don't believe, are being, are taken into account

17   and certainly not disclosed in any way in the August 2024

18   report, and that would have related to a year earlier when she

19   was appointed to full professor.

20             THE COURT:  Right.  But, as to the more recent

21   information, my point is simply, what was projected income

22   becomes actual income now based on that W-2 --

23             ATTORNEY SCHROEDER:  Yes, Your Honor.

24             THE COURT:  -- in terms of prejudice to the defendant

25   on that point?

1          ATTORNEY SCHROEDER:  Correct, Your Honor, yes.

2          THE COURT:  Okay.

3          ATTORNEY JONES:  May I?

4          THE COURT:  Yes, Mr. Jones.

5          ATTORNEY JONES:  I'm not sure where to begin, but let

6    me start with this.  The kerfuffle on Friday was triggered by

7    questions about the pension.  Everything else that they

8    mentioned this morning was part of their renewed motion to

9    preclude Dr. Bancroft's testimony that they filed before trial.

10   You've already ruled on that, so I don't know why we are

11   relitigating all that stuff, okay?  That was already dealt

12   with, first of all.

13         Second of all, you're absolutely correct, Your Honor.

14   Nothing has changed about the fundamental assumptions.  Nothing

15   has changed about the methodology.  There has been no change.

16         Third, the October 2019 report did, in fact, have

17   information about the pension, which is why Attorney Joseph

18   inquired of it.  The columns that my colleague seems so

19   obsessed about under UVM having zero was because, at that time,

20   my client was a per diem, not eligible for that benefit.  But,

21   in the August report and the most recent report, we have that

22   data.  No one is hiding anything.  The only surprise, frankly,

23   is that this happened last Friday.

24         THE COURT:  Okay.  Did you want to speak to the point

25   about the full-time professorship and the part-time?

1            ATTORNEY JONES:  Well, that was part of the pretrial

2     renewed motion that was an account then.  At the hearing on

3     October, on March 14th, Dr. Bancroft actually even addressed

4     that, at that time, he was using current pay stubs so that he

5     already had the salary reflecting her promotion so he no longer

6     had to add a 5 percent increase.  I think I even asked him the

7     question, Because he was using actual pay stubs, it would be

8     inappropriate to then add 5 more percent, and he said "yes".

9            So that was part of the pretrial rulings on this issue

10    that have been heard and resolved already.  The only thing that

11    blew up on Friday was this pension issue, and that wasn't new.

12            ATTORNEY COFFIN:  I'd just say we have received no

13    pay stubs from 2025 or 2024, any reliance materials since prior

14    to the deposition, not for the 20, August 2024 report and

15    certainly not related to the basis for Dr. Bancroft's

16    testimony.  So, if he was basing them on those, we haven't been

17    provided that reliance material.

18            THE COURT:  Mr. Jones?

19            ATTORNEY JONES:  On what material?

20            ATTORNEY COFFIN:  You said that -- I think you just

21    said in court that Dr. Bancroft based his opinion about the

22    full professorship and her salary going forward on recent pay

23    stubs.  I have seen no pay stubs like that.

24            ATTORNEY JONES:  After that hearing you asked us for

25    the W-2s, which we promptly provided, and those are the full

1    year's actual salary.

2              ATTORNEY COFFIN:  I guess, my misunderstanding.  I

3    thought pay stubs are different than W-2s.  W-2 is a report of

4    your yearly earnings for the IRS, is my understanding, and pay

5    stubs are the stubs you get with your pay.  I, I, we haven't

6    received pay stubs.

7         And, of course, I believe -- you know, we'd have to check

8    the transcript, but I believe, in response to questioning by

9    Mr. Vitt, Dr. Bancroft described reviewing pay stubs, W-2s, tax

10   return information.  That would surprise me because we have

11   received none of that in recent times and none, no pay stubs,

12   essentially, no pay stubs from earlier times.

13             ATTORNEY JONES:  After the hearing Mr. Coffin asked

14   us for some documents.  We gave him every document.

15             THE COURT:  When you say after the hearing --

16             ATTORNEY JONES:  After the March 4th motion in limine

17   hearing.

18             THE COURT:  Okay.  What did you provide, Mr. Jones?

19             ATTORNEY JONES:  I'm sorry.  After the March 14th

20   motion in limine hearing, Mr. Coffin sent us a list of

21   documents he wanted.  We gave it to him, and they're all

22   actually now on defendant's exhibit list.  So, I mean, not only

23   do they have it, it's on their exhibit list.

24             THE COURT:  Consisting of, what, though?  Are these

25   W-2s?

1          ATTORNEY JONES:  It's the W-2s.  It's the letter

2     memorializing Dr. Porter's promotion to her full professorship.

3     I forget what else.

4          ATTORNEY COFFIN:  There is nothing else.  Well, the

5     the letter request was more fulsome than that, but one thing --

6          THE COURT:  Mr. Jones.  Go ahead, Mr. Coffin.

7          ATTORNEY COFFIN:  The letter requested certain

8     things.  There was a follow-up letter sent on Monday or

9     Tuesday.  I did mention to them after the hearing on Friday

10    that we wanted the most recent pay information, including the

11    W-2s.  We were told that would be coming.  We did not

12    immediately receive it over the weekend, so we sent a letter.

13    I think the next day we got the contract between UVM and

14    Dr. Porter for her full professorship, and we got the most

15    recent 2024 W-2s.

16        I believe that was all.  Checking and verifying.  That's

17    all we got.  Our request for pay information was broader than

18    that.  But, in any event, it specifically requested the W-2s,

19    and we only got the W-2s and the pay contract.

20         THE COURT:  And that's for 2024 and 2023?

21         ATTORNEY COFFIN:  Yes.  From the time of her full

22    professorship, which was she was appointed, I believe, in May

23    2023, effective July 1, 2023.

24         THE COURT:  Okay.  Are you suggesting that the W-2s

25    are, or the pay stubs are required in addition to the W-2s and

1    that you're somehow prejudiced without getting pay stubs as

2    opposed to W-2s?

3            ATTORNEY COFFIN:  I would suggest that a qualified

4    economist may need to look at those and that Dr. Bancroft

5    testified that he did, and plaintiff's counsel said that, on

6    direct examination, a question implying that he was provided

7    them to him and followed up by Mr. Jones making the same

8    implication here.  All I'm saying is we would have requested

9    those as materials that Dr. Bancroft relied on and had not been

10   provided to them.  They had not been provided to us.

11           THE COURT:  Okay.  Anything further?  Mr. Jones?

12           ATTORNEY JONES:  No, Your Honor.

13           THE COURT:  Okay.  I'm just going to take a very

14   brief five minutes.  I want to collect something, and I'll be

15   right back.

16       (A recess was taken from 8:43 a.m. to 9:01 a.m.)

17           THE COURT:  Okay.  So, just beginning with a couple

18   of the factual issues that were discussed this morning, with

19   respect to the pay stubs issue, so I do not think pay stubs

20   were brought up at the motion in limine hearing from a review

21   of the transcript.  Just kind of putting that out there.

22       With respect to pay stubs mentioned on Friday as part of

23   direct, so the transcript that I received, of course, of

24   Friday's hearing is incomplete.  It's just an excised portion

25   of that transcript.  But, based on that transcript, limited

1    though it is, there is no reference to pay stubs there.  I

2    don't have a recollection myself about the mention of pay

3    stubs.  Look, if it turns out that the full transcript says

4    otherwise, it is what it is.  But, at least in terms of what I

5    can recall sitting here today, I don't recall mention of that.

6        With respect to the discussion about the 2019 Dr. Bancroft

7    report, particularly the section that has zeros in it with

8    respect to UVM pension plans, after 2021 I believe that report

9    then has a series of zeros.  The assumption in that 2019

10   report, though, I believe, was that Dr. Porter would leave UVM

11   in July of 2021, which would appear to account for the fact

12   that that earlier report has zeros from the summer of 2021 and

13   beyond.

14       The August 2024 report, however, does again, as you know,

15   picks up the UVM benefits from 2021 on, to reflect what, in

16   fact, happened, which was that Dr. Porter did not leave UVM.

17   So that is an explanation for that particular observation made

18   earlier.  So it does seem to me then that defendants did have

19   pension information relevant to both Dartmouth-Hitchcock and

20   UVM prior to that deposition in 2019.

21       With respect to the full professorship, I believe the

22   suggestion was that Dr. Bancroft didn't know about the full

23   professorship and didn't include it in his August 2024 report

24   but that it was included in the March 2025 report in response

25   to questioning.  But, as I recall from the motion in limine

1    hearing, Dr. Bancroft had said he used the 2023 W-2 and

2    information from UVM as to what salary Dr. Porter would earn as

3    a result of the full professorship.  There was discussion of

4    the letter that the University of Vermont sent detailing that,

5    and, as I understand it, that is in the possession of counsel.

6    And then the updated report in March of 2024 incorporates that

7    W-2, but that does not mean that Dr. Bancroft did not have

8    knowledge of that full professorship at the time that he

9    rendered his report.

10         So, with respect to the decision now, I'm just going to

11    create a record here as to what brings us here.  So Plaintiff's

12    counsel, on Friday, began his direct examination of

13    Dr. Bancroft on Friday, March 28th.  When counsel began to ask

14    Dr. Bancroft questions about his assessment of damages as it

15    related to a retirement plan Dr. Porter participated in while

16    employed at Dartmouth Health, defendants objected.

17         The apparent basis for the objection at that time was

18    defendants' assertion that Dr. Bancroft's retirement plan

19    analysis was not included in the expert report, and that report

20    included his stated assumptions on the line report and the

21    chart representing the results of his analysis and that the

22    chart did not take into account the present value of the

23    benefit plaintiff would obtain by receipt of lifelong payments

24    from her Dartmouth Health pension plan.

25         The Court excused the jury and heard from the parties on

1    their respective positions.  Dr. Bancroft was also examined on

2    the issue, and the Court ultimately reserved judgment on the

3    issue and directed the parties to file written submissions over

4    the weekend, which the parties did.

5        In the case cited by defendants, *McLaughlin v. Langrock,*

6    *Sperry & Wool*, 2020 Westlaw 3118646, this court cited authority

7    for the proposition that, quote, "Although experts must

8    supplement their reports if incorrect or incomplete, they're

9    not free to continually bolster, strengthen, or improve their

10   reports by endlessly researching the issues they already opined

11   upon or to continually supplement their opinions.

12   Supplementation under Rule 26(e) is thus generally only

13   appropriate when the expert learns of information that was not

14   previously made known or available to him or her."

15       In this case, it appears that Dr. Bancroft's initial

16   expert report issued more than five years ago.  Plaintiff's

17   exhibit list for this trial includes a revised analysis dated

18   August 26th 2024, and the cover letter of the report suggests

19   that, in part, the reason for the revised analysis was to

20   account for new data acquired since the last report was issued

21   years earlier.  As I mentioned earlier, there were obviously

22   summary judgment proceedings in this court and then appealed to

23   the Second Circuit, which accounts for a period of years

24   between the report issued in 2019 and the revised analysis in

25   August of 2024.

1        In a second case cited by defendants, *Chart v. Town of*
2   *Parma*, 2014 Westlaw 4923166 at Star 20, the court stated, "An
3   expert should be precluded from testifying about previously
4   undisclosed opinions, particularly where they expound a wholly
5   new and complex approach.  In contrast, expert testimony can
6   provide additional information or elaborate on previously
7   expressed opinions so long as the testimony is within the scope
8   of the expert's report."
9        *Chart v. Town of Parma* provides an illustration of the
10  type of subsequent opinion that warrants preclusion of the
11  expert's subsequent report.  There, in the context of a case
12  involving contaminated soil in a town park and complex
13  mathematical calculations of potential risk to human health,
14  the court precluded certain portions of the subsequent opinion
15  stating as follows:
16       "The human health risk assessment contained in the second
17  report is an untimely new opinion because it is supported by
18  different calculations and assumptions."
19       In this case, the evidence does not amount to a previously
20  undisclosed opinion that expounds a wholly new and complex
21  approach.  Rather, the testimony objected to on Friday is an
22  elaboration on a previously expressed opinion, and the
23  testimony was within the scope of the expert's report.
24  Dr. Bancroft was deposed on October, in October of 2019.  At
25  the deposition defendant's counsel, Jessica Joseph, asked

1    Dr. Bancroft what documents he had reviewed to reach his

2    damages opinion.

3         He responded that he had reviewed a benefits statement

4    from Dartmouth-Hitchcock dealing with pensions and a letter

5    from Dartmouth-Hitchcock to Dr. Porter regarding her pension

6    benefits at the time of her termination.  And that's at

7    Document 257-1 at 3, using the ECF page numbers.

8         Also, at deposition Dr. Bancroft explained to counsel the

9    analytical process he followed, explicitly stating that it

10   included accounting for gross earnings at Dartmouth-Hitchcock,

11   which was salary plus fringe benefits, and offsetting that

12   amount by the value of total benefits received

13   post-termination, again, including salary and fringe benefits.

14   Dr. Bancroft confirmed that he has used this approach for

15   estimating loss for some 20 or 25 years and that the approach

16   was generally accepted by economists.

17        Defendant's counsel also inquired about the basis for

18   assuming that Dartmouth-Hitchcock would contribute 12 percent

19   to retirement.  Counsel also inquired about the basis for the

20   assumption in the report that UVM's contribution to

21   Dr. Porter's retirement plan would be 9 percent.  That is at

22   Document 257-1 at 19.

23        The August 2024 report assumes Dartmouth-Hitchcock Medical

24   Center's retirement plan contributions to be 12 percent of

25   earned income.  It also assumes UVM's contribution to a

1    retirement plan to equal 8.5 percent of income.  The report

2    also assumes, quote, "the difference between DHMC and

3    post-termination projections of total earnings".  That is

4    Assumption 7.

5         The March 19th 2025 updated analysis similarly assumes a

6    12 percent Dartmouth-Hitchcock Medical Center contribution and

7    a slightly higher UVM contribution at 9 percent.  The report

8    again assumes, quote, "the difference between DHMC and UVMMC

9    post-termination projections of total earnings".

10        In terms of changes to the most recent report, as

11   discussed with counsel this morning, these appear to be either

12   in response to issues counsel explored with Dr. Bancroft at the

13   motion in limine evidentiary hearing on March 14th, for

14   example, no salary increases from 2020 to 2021, tuition

15   remission at UVM in 2019, and actual earned income in 2024.

16   More additional information reflecting Dr. Porter's actual 2024

17   income and adjusted assumed settlement date to account for the

18   timing of this trial and the current interest rate.

19        Importantly, Dr. Bancroft confirmed that his methodology

20   had not changed across all his reports, and that is at 257-2 at

21   5, that the exercise is to determine total earnings at DHMC and

22   offset it by total earnings post-termination.  And Dr. Bancroft

23   was also questioned about fringe benefits at DHMC and UVM.  The

24   August 2024 report and March 2025 reports reflect this

25   particular aspect of the analysis, which appears to have been

1    consistent over time.

2        So, having addressed some of the factual issues at the

3    outset and explaining why I think this does not fit within the

4    scope of the cited case law, I am not going to preclude

5    Dr. Bancroft from testifying further this morning or otherwise

6    impose any other sanction related to his testimony.  So I'm

7    going to ask that the jury be brought in.

8        ATTORNEY VITT:  I have a scheduling issue, Your

9    Honor, and I hesitate, and I do mean hesitate, to raise this

10    issue, but I think it's best that I get it out on the table

11    now.  Dr. Bancroft is here.  We are prepared to put him on and

12    proceed with his direct and, what I expect and have been told,

13    maybe a lengthy cross-examination.  In addition, Dr. Leslie

14    DeMars is here, at least I think so.  I saw somebody out in the

15    lobby that I think was Leslie DeMars.

16        And the reason I'm up here now is I've been told that she

17    has a need to absolutely finish her testimony today, got to be

18    done.  She has to leave.  She has an appointment or something.

19    I don't know what it is.  But, anyway, the representation is

20    she has to finish her testimony today, and, in light of that

21    and the amount of time that I think it's going to take with

22    Leslie DeMars -- this is not going to be a short exam.  There

23    are multiple exhibits.  Her testimony, you know, her name comes

24    up repeatedly.

25        And we'd suggest that, all right, Dr. Bancroft lives

1    locally.  He's made a number of trips here, and, if necessary,

2    we can do him, you know, after Leslie DeMars, but I gather that

3    that's not possible, and I just don't want to be in a situation

4    where it gets to the end of the day, we're not finished, and

5    our position is, until she's excused, she needs to be back

6    here.  So I'm raising this issue now.  Again, I hesitated to do

7    it, but I thought, Let's get this issue on the table before we

8    start the testimony.

9            THE COURT:  Okay.  Mr. Schroeder?

10           ATTORNEY SCHROEDER:  Your Honor, it's our position

11    that Dr. Bancroft's on the stand, right?  He's under

12    examination right now, and we believe that we should proceed

13    with that.  They sent the subpoena for Leslie DeMars -- they

14    didn't even tell us about it, even though it's my client -- on

15    December 19th, right?  Purposeful, obviously, even though her

16    testimony wasn't going to be until today.  It doesn't say

17    "March 31 and continuing thereafter", which I have had

18    subpoenas say.

19        She's here today.  She has another job, an important job.

20    She had to take a vacation day to be here.  She also has travel

21    at the end of the week going into next week into Massachusetts

22    to where the company is located.  She shouldn't have to take

23    two vacation days to be here because of a timing issue by

24    plaintiff's counsel in how they put witnesses on.  They had a

25    list of 25.  They went down miraculously to a much smaller

1    list.

2         They've always had her.  They decided they wanted to call

3    her in their case in chief, which they have the  right to do,

4    but they've got to do it today.  That's our submission.  We'll

5    obviously defer to the Court's discretion and ruling, and but,

6    you know, on the one hand, they want to have their cake and eat

7    it too.  I mean, not really on the one hand.  On both hands,

8    right, they want to have their cake and eat it too because they

9    want to call her in their case in chief.

10         We have said from day one, Your Honor, that we would call

11    her in our case in chief if they wanted to wait because then

12    they could cross-examine her as long as they wanted, but they

13    can't have it both ways, Your Honor, and they've been

14    manipulating the schedule up through now, and we are doing our

15    level best to -- and we actually told them last week a number

16    of witnesses that we had taken off of our list so that they

17    could go act accordingly and not have to worry about prepping

18    for those witnesses because we were trying to streamline our

19    case.  We told them that last week.

20              THE COURT:  All right, okay.  Well, Friday we

21    obviously ended early and unexpectedly, right?  Dr. Bancroft

22    was supposed to be finished on Friday.  This issue was raised.

23    I think the jury left around 2:00 o'clock, before 2:00 o'clock.

24              ATTORNEY SCHROEDER:  3:00 o'clock, Your Honor.

25              THE COURT:  3:00 o'clock, it was that late?  Okay.

1    And, as a result of that, that obviously set us back a bit on

2    the timing of getting Dr. Bancroft done.

3        So I certainly hear what you're saying, but we're also

4    kind of in a little bit of a situation here where there's very

5    little choice, given that we didn't get through everything that

6    we were going to get through on Friday.  So let's start with

7    Dr. Bancroft, see what kind of progress we can make, and

8    hopefully get Dr. DeMars on the stand as quickly as possible.

9            ATTORNEY SCHROEDER:  She's here, Your Honor.

10            THE COURT:  She is here now?

11            ATTORNEY SCHROEDER:  She is.

12            THE COURT:  Okay.  So is there any -- I don't know if

13    you spoke to this already, Mr. Vitt.  Is there any suggestion

14    that -- we already have Dr. Bancroft on the stand, so I guess

15    we can't adjust that.  So, all right, go ahead with

16    Dr. Bancroft.

17            ATTORNEY VITT:  Excuse me, Your Honor, a second.

18            THE COURT:  So I just want to let the parties know

19    the deputy clerk has advised me that one of our jurors has a

20    family member in the hospital, and the juror, at this time, is

21    fine to be here, but I just wanted to put that on the people's

22    radar screens in case those circumstances change.  Just wanted

23    to mention that to you.  We're going to go forward at this

24    time.

25            ATTORNEY VITT:  All right.  And is Your Honor leaving

1    for another moment the issue of whether Dr., if we do not

2    finish Dr. DeMars, whether she comes back tomorrow?  That issue

3    is kind of on the table but not being resolved now?

4            THE COURT:  Perhaps it's one that won't need to be

5    resolved depending on how things go.

6            ATTORNEY VITT:  There's always hope.

7            THE COURT:  I think we'll put Dr. Bancroft on the

8    stand and then bring the jury in.

9            (The Jury enters the courtroom.)

10           COURTROOM DEPUTY:  Your Honor, the matter before the

11   Court is Case Number 17-cv-194, Misty Blanchette Porter versus

12   Dartmouth-Hitchcock Medical Center.  Present on behalf of the

13   plaintiffs or plaintiff is Attorneys Geoffrey Vitt, Eric Jones,

14   and Sarah Nunan.  Present on behalf of the defendants are

15   Attorneys Tristram Coffin, Morgan McDonald, and Donald

16   Schroeder.  We are here for day six of a jury trial.

17           THE COURT:  Okay.  Good morning, everyone.  Over the

18   weekend, have you spoken to anyone about the case or otherwise

19   heard about this case since Friday?  Okay.  Seeing no hands

20   raised.

21       Dr. Bancroft is back on the stand.  As I mentioned to you

22   on Friday, sometimes it's necessary for the Court to speak with

23   the lawyers.  That has happened, and we are ready to proceed.

24   So thank you for your patience.  Mr. Vitt.  We can swear in

25   Dr. Bancroft again.

1                         Robert L. Bancroft,

2               having been duly sworn to tell the truth,

3                    testifies as follows:

4               DIRECT EXAMINATION BY ATTORNEY VITT

5    Q.    Good morning, Dr. Bancroft.

6    A.    Good morning.

7               ATTORNEY VITT:  Your Honor, when Dr. Bancroft was on

8    the stand before, I think we had Plaintiff's Exhibit 1B on the

9    screen.  If that could come back up, I'd appreciate it.

10              THE COURT:  Okay.

11              ATTORNEY VITT:  Actually, I've got a paper copy.

12              ATTORNEY JONES:  I'm sorry.  We're going to have to

13   use the projector.

14   BY ATTORNEY VITT:

15   Q.    Just to recap where we were when we had the little break,

16   the analysis that you did reflects lost earnings for what

17   years?

18   A.    From 2017, actually, from June 3rd of 2017 through 2033.

19   Q.    2033?

20   A.    Yes.

21   Q.    And, at that point, Dr. Porter would be 70 years old?

22   A.    Yes, that's correct.

23   Q.    All right.  And you're not projecting or predicting that

24   she would work up until she's 70, right?

25   A.    No, I'm not.  I'm leaving that to the jury to decide

VOLUME: 6
PAGES: 1-221

1    what's a reasonable expectation on how long she's going to

2    work.

3    Q.    And could you briefly recap how you proceeded with your

4    analysis and reached your conclusions?

5    A.    Sure.  Just a quick overview, what I'm doing is projecting

6    out what her earnings, what I believe her earnings would be if

7    she continued to work at Dartmouth.  That's being offset by her

8    actual earnings to date or through 2024, and then I'm

9    projecting what her earnings could be in the future, and that's

10    based on her continuing employment at UVM.  And then I make

11    some other calculations, back out taxes, determine present

12    value, and have to look at settlement taxes that would be

13    assessed on a settlement.

14    Q.    Okay.  What assumption -- I'm going to back up.  Excuse

15    me.  Did you make assumptions about the raises that Dr. Porter

16    would receive at UVM?

17    A.    Yes.  In developing my projections of her earnings, which

18    is -- and I'm going to refer to the footnotes as the column

19    numbers, but in Column 1 under the Dartmouth-Hitchcock Medical

20    Center gross earned income, there are assumptions about how her

21    income would have grown over time.  It's predicated for the

22    most part with prior to 2017 is predicated on what her salary

23    was in 2017.

24    Q.    Right.

25    A.    Most of the years have a 2.5 percent salary inflator.

1    There are two exceptions, well, three exceptions to that, if

2    you will.

3    Q.    Okay.

4    A.    One is in 2019.  Instead of 2.5, I assumed that the

5    increase would be 5 percent based on Dr. Porter's

6    representation that she would have been promoted to a full

7    professor.

8    Q.    And, in fact, she was promoted to full professor, correct?

9    I'm sorry.  This was for 2019?

10   A.    This is 2019.

11   Q.    I'm sorry.  At Dartmouth, okay.

12   A.    Yes.  And then the other two exceptions are in the year

13   2000 and 2021.  Based on representation from defense counsel

14   that there were no wage increases during those two years, I

15   eliminated the 2.5 percent figure.  And then that, starting in

16   2022, I used the 2.5 percent wage salary inflator.

17   Q.    Did you make an assumption about whether there would be a

18   raise to try and make up for the Covid years?

19   A.    No, I didn't.  I, again, I went back and used the 2.5.

20   Q.    Okay.  So, using the report, can you explain your analysis

21   by year and what you're attempting to do?

22   A.    Sure.  So, as I just discussed, the first three columns

23   are under the Dartmouth-Hitchcock Medical Center, and what I'm

24   estimating there is what I believe the value which she would

25   have earned and the value of fringe benefits if she continued

1    to work at Dartmouth.

2         The first column, the gross earned income, I think I

3    pretty much went over, but it's, for all intents and purposes,

4    it's based on her salary in 2017 at the time she was terminated

5    and a 2.5 percent inflator for most years with, with three

6    exceptions.  the 5 percent in 2019, when I, based on her

7    representations, she would have been promoted to a full

8    professor, and then no increases for 2000 and 2021.

9         2017 was a little different because she was, obviously,

10   she worked part of the year, but she was on disability, and the

11   expectation is that she wasn't going to go back full time until

12   the fall.  And so that's, those numbers are relatively small,

13   and, actually, there's minimal loss in the year 2017.

14   Q.    And the disability income that she received, is that

15   reflected in your chart?

16   A.    Yes.

17   Q.    You also project fringe benefits do you not, Column 2?

18   A.    Yes.

19   Q.    How did you do that?

20   A.    So the Column 2, for all intents, for most every single --

21   in every single year I have assumed, estimated the value of

22   Dartmouth's contribution to her retirement plan for the years

23   2018 going forward, very simple.  In 2018 they made everybody

24   go onto a defined contribution plan, and Dr. Porter, if she was

25   there, would have received a, 12 percent of her salary would

1    have been put into a 403(b).

2        In 2017, if she continued to work for that additional

3    seven months, she would have been under their prior defined

4    benefit program.  And so in that year I had to estimate what,

5    how much her, her pension would go up if she had worked that

6    additional seven months, and it turned out it was around -- I

7    think it was about $3,000 or $4,000 a year.  And then I had to

8    do some calculations, how much money would Dartmouth need to

9    have put into the defined benefit program that would fund that

10   additional three, the additional $3,000 when she retired, and

11   that turned out to be about 12.4 percent.  But I just, I used

12   12 percent to be, to be consistent with the other years.

13   Q.   You mentioned two types of plans, a defined benefit versus

14   defined contribution.  Can you describe briefly what the

15   differences are?

16   A.   Sure.  The defined benefit program, there's not many of

17   those around.  State employees of the  State of Vermont have a

18   defined benefit.  Teachers have a defined benefit.  And that's,

19   there's a formula for it.  In Dartmouth's case, you have to

20   take the average of your high five years of earnings, and then

21   there is a formula that you break the earnings down between

22   some covered and some -- I forget what the term they use for

23   it.

24       Basically, the first 10 percent, roughly 10 percent is,

25   there's a factor of 1.75 percent.  It's multiplied by that

VOLUME: 6
PAGES: 1-221

1    number, and then for the 90 percent the factor is 2.3 percent,

2    and both, both calculations also have the number of years that

3    the employee has served.  In Dr. Porter's case, she had served

4    20.69 years.  So you go through that calculation.  There's

5    basically two calculations, one for the 1.75 percent and the

6    other one for the the 2.3 percent.

7    Q.   Will Dr. Porter still receive a retirement payment, will

8    be eligible to receive a retirement payment from

9    Dartmouth-Hitchcock when she turns 65?

10   A.   Yes, she would be.  She, that's locked in.  The defined

11   benefit plan locks that number in.  And so whether, even if she

12   had continued working on, she would have received what she,

13   what she was entitled to up through June 3rd of 2017, and then

14   she would have got a little bit more if she continued to work a

15   little bit more under that defined benefit plan until the end

16   of 2017.  And then in 2018 Dartmouth moved all, everybody into

17   a defined contribution plan, and she would get 12 percent.

18   Q.   If she had remained an employee at Dartmouth-Hitchcock,

19   would the retirement payments that she would be entitled to

20   receive be higher?

21   A.   Oh, absolutely.

22   Q.   And you've taken that into account when you're analyzing

23   the fringe benefit component on your chart, right?

24   A.   Yes.  I'm measuring the additional benefit that she has.

25   She has, still has a benefit that she's going to receive when

1    she retires or decides to draw on that retirement.  I'm only
2    interested in how that would have increased, what was the value
3    of the increases over time.  So I'm looking at the marginal or
4    the additional value of that benefit.
5         I should also point out that in the fringe benefits in the
6    year 2017 and 2018, I do have Dartmouth's, some measure of
7    Dartmouth's contribution to a health insurance.  For the first
8    seven, for the last seven months of 2017, She had no health
9    insurance, and then for the first four months of 2018, she had
10   no health insurance.  So I put in the value of Dartmouth's
11   health insurance.  Going forward, I eliminated it because she
12   was getting coverage at UVM and so it was a wash.
13   Q.   Is it your understanding that, while she was a per diem
14   employee before she was a full-time employee, UVM did not
15   provide her with health insurance?
16   A.   That's correct.
17   Q.   And that, after she became a full-time employee, did you
18   understand that health insurance was part of the package?
19   A.   That's right, yes.
20   Q.   So, going back to your chart --
21   A.   Okay.  So the third column there, it's a mathematical
22   calculation.  It's adding the numbers from Column 1 and Column
23   2.  So that's my estimate of what the total value of her
24   earnings would be if she continued to work at Dartmouth.
25   Q.   You've done that for each year?

1    A.    Added it up for each year, yes, correct.  And then the

2    next three columns over are my, are the post-termination.  I

3    title them post-termination projections UVM although for '17

4    through 2024 I'm using her actual earnings.  So my notes start

5    projecting until the year 2025, and the projections on 2025 are

6    based on what she earned in 2024 and Dr. Porter's

7    representation that she would go to a 75 percent part-time

8    position where she's currently at an 8 percent.

9         So in 2025 I've got, I have a 3 percent wage inflator that

10   I'm assuming in the UVM projections.

11   Q.    Do you believe that's reasonable?

12   A.    Yes, and I, the reason that I had 3 percent, half a

13   percent higher than I had in the Dartmouth one was, when I

14   initially did this analysis in 2018 and then I did do an update

15   early in 2019, she'd just started at UVM it's been me

16   experience that new employees, at least initially for one, two

17   years get slightly above average wage increases, assuming they

18   prove themselves.  So I used the 3 percent and to, I just

19   continued on using it, although, you know, probably to be

20   consistent I really probably should have used 2.5 percent

21   starting in 2005, but I didn't.

22   Q.    But you using 3 percent instead of 2.5 reduces the loss of

23   Dr. Porter, right?

24   A.    Yeah, because it increases her earnings at UVM.  So, in

25   determining the 2025 earnings at UVM I had, there was two

1    operations.  In July 1, because the raise, UVM is on a fiscal

2    year, July 1 to June 30th.  So I assumed that she would get a 3

3    percent increase on June 1 of 2025, but, at that point, she

4    would go from an 80 percent part-time employment to a 75

5    percent, which that's really about a 6 percent reduction, and

6    so I reduced it by 6 percent.  And then, going forward from

7    that, I used that number as a basis for a forecasting forward

8    with a 3 percent annual salary inflator that goes into effect

9    every July 1.

10   Q.   I want to make sure I've got this right.  So, going

11   forward, the assumption is that Dr. Porter would work at a .75,

12   75 percent of a full-time position, right?

13   A.   Yes, starting in July 1 of this year.

14   Q.   Right.

15   A.   And so the next -- so that's how I developed the gross

16   earned income under the post-termination projections.  The next

17   column over, it's fringe benefits, and for the only fringe

18   benefit I've included in here in this analysis is UVM's

19   contribution to a retirement plan, which is 9 percent.  And

20   then the next column over would be 6.  It is nothing more than

21   the addition of prior two columns, the gross earned income and

22   the fringe benefits, and so that's added up each one of the

23   years out through 2033.

24   Q.   So that's Column 6, right, on your report?

25   A.   Yes.

1    Q.    All right.  And what does Column 7 reflect?

2    A.    Column 7 is another simple mathematical calculation, and

3    what it does is it takes the numbers from Column 3, the total

4    earnings for Dartmouth-Hitchcock, and then I subtract out the

5    total earnings under the post-termination projections.  So it's

6    a, it's a, I subtract Column 6 from Column 3 to come up with

7    what I'm titling as the gross, and that's a key word, the gross

8    adjusted lost earnings.

9    Q.    And then, going to the next column, which is --

10   A.    Yes.  The next column is I back out income taxes.  And so

11   the premise here is that, if Dr. Porter had earned this

12   additional money at Dartmouth, she'd earned more at Dartmouth

13   than she would have at UVM, which she did for all the years

14   except for one, she would have to pay taxes on that money.

15   Q.    Right.

16   A.    So I estimated what would be a tax liability of earning

17   this additional money, and, and that calculation is based on

18   looking at the difference between Column 1 and Column 3.

19   Fringe benefits aren't taxable.  You will notice that in one

20   year, the year 2021, it's not a negative number.  It's a

21   positive number, because in that year, in 2021, she actually

22   earned more at UVM than she did at, or would have, my

23   projections of what she would have earned at Dartmouth.  And

24   that's primarily because of no wage increases for 2000 and

25   2021.

1      So that's actually a credit that her, her taxes would have
2   been $1,600 less.  So it's a, I'm crediting her with that, if
3   you will.  It offsets the other taxes that she would have had
4   to pay.  So that's how I estimated Column 8 was estimating what
5   she, what she would have to pay in taxes, and in doing that I
6   look at what the income that I looked at, you know, prior tax
7   returns, and I look at what income she earned.  Well, I know
8   what I'm projecting what her income, but then her husband's
9   income and what their taxes would be based on that, and then I
10  recalculate with the additional loss and see how much the taxes
11  would go up, and that's what Column 8 is measuring is the
12  additional taxes.
13  Q.   Then what does Column 9 reflect?
14  A.   That's a simple mathematical calculation there.  It's
15  subtracting the income taxes from the gross adjusted lost
16  earnings.  So it's a, I'm titling it tax adjusted lost
17  earnings.
18  Q.   Right.  This column reflects the income assuming that
19  Dr. Porter pays the income taxes owed on the additional amount,
20  right?
21  A.   Yes.  In each year if she earned higher income, she would
22  have to pay taxes on it, and so I'm backing those taxes out.
23  If you will, the numbers in Column 9 are what I believe she
24  should be made whole if she received those numbers depending on
25  which year you pick or, well, in each one of the years, and

1   there were no tax consequences of receiving a settlement.

2   Q.   Sorry.  So, if we could go to Column 10 which is entitled

3   "Present Value" --

4   A.   Yes.

5   Q.   -- what is that?

6   A.   So what I'm doing there is I'm converting those numbers to

7   how much would be needed now to -- I'm not sure how to explain

8   this -- what the present value is, and there's two components

9   to that.  One is the historical.  So that's from 2017 up

10  through 2024 Is historical.  And the law in Vermont passed by

11  the legislature is that interest on past losses are to be

12  calculated at the rate of 1 percent per month simple interest.

13  So --

14          ATTORNEY COFFIN:  Objection, Your Honor.  We have to

15  approach for a second, please.

16          THE COURT:  Yes.

17          (Bench conference begins.)

18          ATTORNEY COFFIN:  I don't mean to slow things down,

19  but I think we need to clearly cross this bridge or figure out

20  what we're going to do.  First of all, Dr. Bancroft shouldn't

21  be providing legal opinions about what the law in Vermont is,

22  and we ask that to be struck.

23          Secondly, the 12 percent interest statute that's, you

24  know, supported by case law only applies to a sum certain.  I

25  would renew strenuously or our continued objection that, you

1    know, we do not have a sum certain that can be applied here,

2    and it really is the for the jury to determine based on

3    examination of the Witness what the proper interest rate to be

4    applied, if any, is and if anything that changed from the

5    August '24 report coupled to the change to the report last week

6    demonstrates that there is, you know, no way one could have

7    come up with a sum certain in this case.

8             THE COURT:  Okay.  So, if we strike his answer with

9    respect to his representation as to the law that Vermont

10   requires and then his testimony just talks about what interest

11   rate he applied, does that satisfy your concern?

12            ATTORNEY COFFIN:  Yeah, that's fine, as long as the

13   way he answers it does not indicate there's some sort of rule

14   or authority for that but that he, in his expertise, applied 12

15   percent.

16            ATTORNEY VITT:  That's fine.  As Your Honor, I'm

17   sure, appreciates, we disagree, and I'm sure we'll brief this

18   at the appropriate point saying it's 12 percent in this

19   situation, period, but, for purposes of the testimony, saying,

20   you know, the Court will instruct the jury on the law or

21   however you want to do it is fine.  And then, obviously, the 12

22   percent is included.  So he's done that calculation.  So I just

23   want to make clear that that's, he's included that calculation

24   in the information that appears on the report.

25            ATTORNEY COFFIN:  Very good.  And I would just ask

1    the ability, as described by the case law, to be able to

2    cross-examine him on that point.

3            THE COURT:  Yes.  So what I'll indicate then is that

4    I'm striking the last answer to the extent that it makes a

5    representation about what Vermont law requires.  Is that --

6            ATTORNEY VITT:  Fine with me.

7            ATTORNEY COFFIN:  Yes.  And then, you know, I will,

8    and I'm sure I can take care of it.  That's good.  Thank you.

9            THE COURT:  Okay.  Thank you.  We're good.

10           (Bench conference ends.)

11           THE COURT:  Okay.  So, before we proceed, I am going

12   to strike the Witness's last answer to the extent that it made

13   a representation about what Vermont law requires with respect

14   to interest rate, okay?  Mr. Vitt.

15   BY ATTORNEY VITT:

16   Q.   Dr. Bancroft, without getting into what the law is, what

17   you did was you used 12 percent as the calculation for each of

18   these, for each year in the calculation, right?

19   A.   Yes.  So 1 percent per month.

20   Q.   Per month?  Okay, got it.  And was there any other part of

21   the answer that you --

22   A.   No.

23   Q.   -- didn't get to in terms of calculating the present

24   value?

25   A.   Present value?  Yes.  Going forward, what I want to do is

1    convert those numbers.  Just the opposite of adding interest, I

2    want to convert them back to a present value, and, basically,

3    what I'm calculating there in each one of those years is how

4    much money would be needed right now to generate that, that

5    figure in that future year.

6          So I'm looking at, for instance, in order for -- let's

7    take the year 2033 because it's at the bottom of the page and I

8    can read it.  In 2033 I'm estimating that the after-tax loss is

9    $51,744.  I'm, after calculating the present value of that, the

10   number is $41,329, and what that's saying is that, if you take

11   $41,329 and you invested it into a tax-free municipal bond

12   paying around 2.8 percent, that would generate, in the year

13   2033, $51,744.

14   Q.   Is this process or approach that you've just described

15   standard for economists who are trying to evaluate future

16   losses?

17   A.   Yes, it is.

18   Q.   And then you've got, I believe the next column is

19   settlement income tax, correct?

20   A.   Well, the next, actually, the next column is the

21   cumulative present value --

22   Q.   I'm sorry.

23   A.   -- which is nothing more than a running total, just taking

24   the numbers from Column 10 and adding them up over time.  And I

25   should point out that I think it's important to understand

1    that, if this was a personal injury case, in a personal injury

2    case, the award is not taxable.  That would be -- the table

3    would end there.  There wouldn't be -- the next two columns

4    would be, would not be necessary because the awards are not

5    taxable.  But in an employment case, the awards are --

6                ATTORNEY COFFIN:  Objection, Your Honor.  Approach?

7    I think it's a legal issue.

8                THE COURT:  Yes.

9                (Bench conference begins.)

10                THE COURT:  Similar objection?

11                ATTORNEY COFFIN:  Yeah, similar.  I just don't think

12    he should be providing, you know, legal opinion.  You can, you

13    can ask and he can answer the question based on sort of an

14    understanding that such-and-such.

15                THE COURT:  Right.  You can just ask him generally

16    about the fact that the settlement income tax figure -- so,

17    obviously, he should not be testifying as to the difference

18    legally between a personal jury case and an employment case,

19    but he can testify generally to the fact that he did do a

20    settlement income tax calculation.

21                ATTORNEY VITT:  All right.

22                ATTORNEY SCHROEDER:  I still feel like he's doing the

23    direct and the cross.  I'm not quite sure what the question

24    was.  I mean, we're trying to move this along.  Not really

25    getting there with the long-winded answer that has nothing to

1    do with the question when he starts going off on personal

2    injury.

3            THE COURT:  So he's not going to be talking about

4    personal injury.

5            ATTORNEY VITT:  All right.  That's fine.

6            (Bench conference ends.)

7            THE COURT:  Yes, proceed.

8    BY ATTORNEY VITT:

9    Q.   So the settlement income tax, I've got a quick question.

10   Can you explain the difference in taxes calculation when

11   they're paid each year versus in a lump sum?

12   A.   Sure.  Obviously, in calculating the taxes in Column 8,

13   I'm looking at one year, the loss in one year where, if you

14   move over to Column 11 where I have a cumulative total, I'm

15   looking at lumping several years together.

16   Q.   Right.

17   A.   And so it's critical to understand that in column the

18   present values in Column 10 are after-tax dollars because I've

19   already backed taxes out.  So now, because it's taxable, I need

20   to calculate the taxes, and, because I'm getting so much more,

21   my taxes are going to be significantly higher.

22           I'll give you an example.  If an individual has lost, has

23   lost, somebody caused somebody to lose $50,000 a year for the

24   next ten years, the taxes on, for a single person, just federal

25   taxes -- lower for state taxes -- the taxes for that individual

1    would be about $4,000.  The federal tax would be about $4,000.

2    Q.    That's per year?

3    A.    That's per year.

4    Q.    All right.

5    A.    So over the ten years they would pay about $40,000.  Now,

6    if they were to receive that $50,000 for all ten years at once,

7    that's $500,000 all at once.  When they report that on their

8    income tax, they're going to be kicked up into the -- some of

9    them actually might be in the highest tax bracket, and in that

10   case, assuming they earned no other income that they were -- so

11   that, the tax on that would be, I think, about $125,000, three

12   times higher than it would be if it was spread out over time.

13         And the higher the income is, the greater that difference

14   becomes.  So that's what I, in calculating the settlement

15   income tax, I've had to estimate, determine what kind of taxes

16   Dr. Porter would have to pay if she was to receive a

17   settlement.  And so Column 13 is the addition of the cumulative

18   values in 1 and the settlement taxes.  So let me go through an

19   example in case there's some confusion.

20   Q.    Go ahead.

21   A.    So, in the year 2033 I'm estimating that the total

22   economic loss is $1,787,722.

23   Q.    That's if she works up to when she's 70?

24   A.    Yes.  I'm not saying that she would, but I'm just using it

25   as an example.  So, if she was to be awarded that amount when

1    she filled out her income taxes in 2005, she would put that
2    down along with her other income, her income this year at UVM
3    and any investment income, plus her husband's in income.
4         I took that into account.  I made an estimate of what
5    their income would be, what kind of taxes they would pay on
6    this income.  And so what I'm now estimating is that, if she
7    was to get this award of $1,787,000 on top of her other income,
8    she would have to pay $878,000 in income taxes on that, that
9    over and above the income taxes she'd pay on her salary and her
10   husband's business income.  And so, if you subtract the
11   $878,000 from the $1,787,722, you get cumulative present value
12   in that column for 2033 of $909,722.  And so it's my contention
13   that then she would be made whole.
14   Q.   I want to make sure that the point you covered when we
15   were talking about the income taxes and the tax adjusted lost
16   earnings that's Column 9, right?
17   A.   Yes.
18   Q.   That column assumes that Dr. Porter has paid the income
19   taxes on that lost income, correct?
20   A.   That's correct.  Yes.
21   Q.   All right.  So the taxes have already been paid, and what
22   you're calculating is -- tell me if I got this right.  You're
23   calculating the additional amount that would be incurred
24   because it comes in a lump sum at a later date?
25   A.   That's correct, yes.  What, getting all that income lumped

1    in one year, what the impact would be.  Now, if excuse me.  I

2    hope this doesn't complicate things, but, if she was to be paid

3    in each one of those years in the year that the loss occurred,

4    -- you'd have to go back to 17 --

5    Q.    Right.

6    A.    -- then there you could eliminate the Column 8, But that's

7    not the case.  She's going to receive one payment.  Assuming

8    she prevails, she's going to receive one payment, and so,

9    therefore, because of the marginal tax bracket, both federal

10   and state, significant tax consequences.

11   Q.    Your last column reflects total economic loss, and the

12   amount through 2033 is what?

13   A.    Yes.  That's my projections of what her total economic

14   loss is.  That takes into account what her present value

15   cumulative loss is, plus whatever, in each year, what the

16   income tax, income tax liability would be.

17   Q.    Can you bring up the last page which is entitled

18   "Additional University of Vermont Employment-Related Costs"?

19   It's the last page of the exhibit.

20          COURTROOM DEPUTY:  I don't have the ability to bring

21   it up here.  You can -- can you put it up on the ELMO?

22          ATTORNEY VITT:  I can put it up.  Does that show up?

23          COURTROOM DEPUTY:  Yes.

24          ATTORNEY VITT:  Will that show up on all the --

25          COURTROOM DEPUTY:  Yeah.

```
1    BY ATTORNEY VITT:

2    Q.   I would like to direct your attention to the page of the

3    chart that appears on your screen there, at least I hope it

4    does.

5    A.   Yes, I see it, yes.

6    Q.   Okay.  Tell me what that reflects, please.

7    A.   It reflects the additional costs, employment costs that

8    Dr. Porter has incurred, basically by having to set up

9    housekeeping, if you will, in the Burlington area, Chittenden

10   area and that she has to commute and her husband are commuting

11   from their home in Norwich.  The costs were provided by Dr.

12   Porter to me what her costs were.

13        For the first year or so when she was up here, she was

14   renting, and then they ended up buying a place.  I didn't

15   include anything associated with the buying.  But so she had

16   provided information on what she was having to pay utilities on

17   their house, well, in their apartment initially and then on

18   their house and then what they had to pay in heat, again, on

19   the rental unit and then on the house.  And then the rent, she

20   provided me information on the rent.

21   Q.   The rent's only for two years, right?

22   A.   Beg your pardon.

23   Q.   The rent is for two years?

24   A.   Well, it's not even two years.  It was a partial year in

25   2018.  Well, both years were partial.
```

1    Q.   Okay.

2    A.   Both years were partial.

3    Q.   And, when she bought a home or a condominium, there was

4    there was no rent component, correct?

5    A.   That's correct, no rent component.  And then, moving

6    across the table, the next two columns are travel, and that is

7    based on the number of miles that Dr. Porter represented to me

8    that she traveled on a weekly basis, monthly basis -- I scaled

9    it up to an annual basis -- traveled between Norwich and her

10   place in her condominium, well, in her rental unit, condominium

11   here in Chittenden County and also her husband assuming the

12   assumption.  She said that he came up as much as she did.

13        So that's, those were the one, two, three, four,

14   categories of additional expenses, and so Column 6 is the

15   addition of those five.  And then I go through the same

16   exercise that I talked about on the previous table of

17   determining the present value, the historical amounts from 2017

18   to 2024.  That's, I'm using that 12 percent simple interest

19   rate figure and then going forward, 2005 out to 2033.  I'm

20   discounting those numbers and discounting.  The interest rate

21   that I'm using to discount that is based on tax-free municipal

22   bonds, Triple A value.

23   Q.   You've got a number under the travel column.  Do you see

24   that?

25   A.   Yes.

VOLUME: 6
PAGES: 1-221

1    Q.    How do you come up with that number?  What does it

2    reflect?

3    A.    What I did was I took the mileage that Dr. Porter gave me

4    and multiplied it by the federal mileage rate over, in each one

5    of the years.  I went and got the historical mileage rate in

6    each year, and I multiplied the mileage times that federal

7    mileage rate.

8    Q.    And it appears to go up each year.

9    A.    Beg your pardon.

10    Q.    It appears to go up each year, the amount?

11    A.    Yes.  I used, in all the columns, I used an inflator of

12    2.5 percent, which inflation over this period has averaged

13    historically.  If you look at the last, since the year 2000,

14    inflation has been increasing on average about 2.65 percent a

15    year, but I used 2.5.  The mileage rate has increased at around

16    3.2 percent.  Average increase has been around 3.2 percent, but

17    I used the 2.5 percent inflator on this to be conservative.

18         So I forget where we were, but so I determined the present

19    value, and then if you want me, the last column is a running

20    total.

21              ATTORNEY VITT:  Excuse me a second, Your Honor.

22              THE COURT:  Yes.

23              ATTORNEY VITT:  Nothing further, Your Honor.

24              THE COURT:  Okay.  Cross-examination?

25              ATTORNEY COFFIN:  Thank you, Your Honor.  Give me a

1    moment to make the move here.

2              THE COURT:  Yes.

3              CROSS-EXAMINATION BY ATTORNEY COFFIN

4    Q.   Good morning, Dr. Bancroft.

5    A.   Good morning.

6    Q.   Are you able to get a drink water and clear your throat a

7    little bit?  Good.

8    A.   I just did.  Hopefully it will work.

9    Q.   Perfect.  Thank you.  Good to see you again.  You've been

10   qualified as an expert economist many times, isn't that right?

11   A.   Yes.

12   Q.   And, particularly, your credentials that we went through a

13   little bit with plaintiff were that you got a BA in economics

14   at UVM in '74, right?

15   A.   Yes.

16   Q.   And then you got a masters in agricultural economics at

17   UVM in '76; is that right?

18   A.   Yes.

19   Q.   And then you got a PhD in agricultural economics from

20   Purdue in 1981; is that correct?

21   A.   Yes.

22   Q.   And you served as a policy analyst at USDA for a time in

23   the 70s and 80s before your PhD was awarded; is that right?

24   A.   Yes.

25   Q.   Okay.  And that was essentially analyzing agricultural

VOLUME: 6
PAGES: 1-221

1    economic policy?

2    A.    Well, it wasn't, it wasn't analyzing actual policy.  It

3    was developing an econometric statistical model, a forecasting

4    model.

5    Q.    Okay.  For agricultural?

6    A.    Agricultural, yes.  Yeah.

7    Q.    Okay.  And then you had an assistant professorship from

8    August 1981 to July of 1991 in the department of agricultural

9    and resource economics at UVM; is that right?

10    A.    Yes.

11    Q.    Okay.  Again, oriented towards agricultural economics,

12    isn't that right?

13    A.    Well, some of it was, but not all of it.

14    Q.    Okay.  But you were in the department of agricultural and

15    resource economics?

16    A.    Yes, I was.  There was a small business program.

17    Q.    It says that on your CV, right, that you were in the

18    department of agricultural and resource economics?

19    A.    Yes.

20    Q.    Okay.  And then you were an adjunct professor in the

21    department of community development and applied economics at

22    UVM from 1992 to 1996; isn't that right?

23    A.    I think from July of '91 when I left UVM into 1996.

24    Q.    Okay.  Now, throughout that time, though, your primary

25    role has been to be an economic consultant in litigation; isn't

1    that right?

2    A.   Well, during the first -- it grew from --

3         ATTORNEY VITT:  Objection, Your Honor.  Can he finish

4    the answer, please?

5         THE COURT:  He's rephrasing the question.

6    BY ATTORNEY COFFIN:

7    Q.   Yeah, I'm just trying to expedite things.  I should have

8    said, since about 1986 to present, your primary role in

9    economics has been as an economic litigation consultant; isn't

10   that right?

11   A.   Yes, but that '86 to '91 I would say that my earnings at

12   UVM were equivalent to what I was earning in consulting.  I

13   might have earned a little bit more in consulting, but,

14   basically, but then after '91 that really did become the

15   predominant source of my income.

16   Q.   So, basically, from 1991 until the present, your primary

17   income as a consulting litigation witness; isn't that right?

18   A.   Well, over that year -- so the, the consulting income, the

19   majority of it -- I'm going to say -- I don't know what the

20   percent is -- 80 percent came from forensic, but I did a lot of

21   other types of consulting over those years that were

22   nonlitigation types of work.

23   Q.   My question was -- it will go quicker if you answer my

24   questions -- is, from 1986 to the present, the majority of your

25   income has been made by being an economic litigation

1    consultant; isn't that right?

2    A.    Yes.

3    Q.    Now, am I correct that you've worked on, as of the time

4    you were deposed in this case in 2019 -- there's been some

5    hiatus -- but you gave a figure of about 2,500 cases at that

6    time you'd served as a litigation witness?

7    A.    That's my estimate back then, how many cases I worked on.

8    Q.    And so that's going back now, like, 30 years or so; is

9    that right?

10    A.    Back to my first litigation case was in 1982.

11    Q.    Okay.  So however long that is, right?

12    A.    Yes.

13    Q.    Quite a long time?

14    A.    Yes.

15    Q.    Okay.  And how much do you charge per hour for your work

16    as a litigation consultant?

17    A.    Today, I assume?

18    Q.    Yes.

19    A.    $400 an hour.

20    Q.    Say that again.

21    A.    $400 an hour.

22    Q.    Okay.  And since, you know, about 2010 to the last time

23    your rates changed, were they the same, or how did they differ?

24    A.    They've grown.

25    Q.    In say 2010 to 2025, how would you describe your rates

1    other than they've grown?

2    A.    I don't remember what they were in 2010, but I'm going to

3    say maybe they were around 200.

4    Q.    About 200?

5    A.    I'm, I don't know that for sure, but --

6    Q.    $200 an hour?

7    A.    $200 an hour, yes.

8    Q.    Do did you charge a difference for court testimony or

9    deposition testimony and review or --

10   A.    No.  It's the same rate across for everything I do except

11   for travel, and I basically charge half rate for travel.

12   Q.    Okay.  And, between 2000 and 2010, were your rates the

13   same as during the later period of 2010 to 2020?

14   A.    No.  My rates were, but may I go back to the previous

15   question?  I should point out that, recently, in the last four

16   or five years, I, my rate for depositions is, is half again as

17   higher than my regular rate.  That's to take account of

18   reviewing the depo, deposition.

19   Q.    Okay.  Meaning it's more than $400 an hour?

20   A.    Yes.  It would be $600 an hour.  I used to charge for both

21   the deposition time and reviewing it, and so now I just,

22   instead of having to put in the time for reviewing it.

23   Q.    Okay.  So, currently, you charge $400 an hour for your

24   work on the case, right?

25   A.    Yes.

1    Q.    For deposition testimony it's $600 an hour; is that right?

2    A.    Yes.  Now it is.

3    Q.    How about trial testimony?

4    A.    $400.

5    Q.    $400?  Okay.  And, you know, to the best you can kind of

6    reconstruct it from about 2000 to 2010, what were your hourly

7    rates?

8    A.    2000 to 2010?  I don't know.

9    Q.    $200 an hour?

10   A.    Well, I said that I'm guessing that in 2010 they were

11   $200, but I don't remember what they were in 2000.

12   Q.    Can you give me an approximation?

13   A.    Yes.  Somewhere between 150 and 50.

14   Q.    Okay.  So your testimony here today is, from 2000 to 2010,

15   your expert witness rates were somewhere between $50 and $150?

16   A.    I'm guessing.  I don't know what --

17   Q.    Could it be that they were higher than that?

18   A.    It might have been, yeah.  I think you have a bill that I

19   submitted to, to in this case that goes back to 2019, and on

20   that has my hourly rate.  I don't remember offhand what it is,

21   but you have it.

22   Q.    Okay.  About how many cases would you estimate you've

23   served as an expert witness on?

24   A.    Well, as I indicated, it's probably closer to 3,000 now.

25   Back when in 2019 when my deposition, I was saying

1  approximately 2,500.  I have not kept a, you know, an itemized

2  number.  I am estimating.

3  Q.  This is a question that you're asked regularly in

4  depositions, though, isn't it?

5  A.  No, not necessarily, no.

6  Q.  Not necessarily?

7  A.  No.

8  Q.  But regularly?

9  A.  Actually quite seldom.

10  Q.  Say that --

11  A.  Quite seldom am I asked about the number of cases I worked

12  on.

13  Q.  So in the 3,000 or so cases you've done, that's a question

14  that's asked seldomly?  That's a question you're seldom asked

15  in depositions?

16  A.  Yeah.  That's, yes.

17  Q.  And about how many times have you given a deposition out

18  of the 3,000 cases you've served as an expert consultant?

19         ATTORNEY VITT:  Could Mr. Coffin closer to the

20  microphone?  It's a little hard to hear.

21         ATTORNEY COFFIN:  Maybe I'll turn it this way.

22  Apologize.  Thank you.  Sorry.  Sometimes I can be a low talker

23  too.

24         THE WITNESS:  I wouldn't have the foggiest idea over

25  that from '82 to present how many depositions I've given, but

1     there have been many.

2     BY ATTORNEY COFFIN:

3     Q.   Would you say thousands?

4     A.   No, I wouldn't say thousands.

5     Q.   High hundreds?

6     A.   I don't know if I'd go high hundreds, but I'd certainly

7     say it's well into the hundreds.

8     Q.   Okay.  And am I correct that you do about 75 percent of

9     your work for the plaintiff's side in your litigation

10    consulting?

11    A.   Yeah.  Yes.  Currently, that's what it is.  If you went

12    back to -- if you looked at the longer period of time, it would

13    be slightly less for plaintiffs.  Back in the 90s if you asked

14    me that question, I would say that it was 65 percent defense.

15    Q.   But for, like, the last 20 years, about 75 percent

16    plaintiffs?

17    A.   I'd say the last 20 years about 75 percent, yes.

18    Q.   Okay.  And the work that you do is all sorts of

19    plaintiff's side litigation; is that right?

20    A.   Well, I do defense work too.

21    Q.   And so some defense work?  Fair enough, okay.

22    A.   Yeah.

23    Q.   But it's the broad spectrum of litigation; is that right?

24    A.   Yes.  Predominantly personal injury, wrongful death,

25    employment cases, and lost business profits, and then there are

1    a couple of other types in there.

2    Q.   More unusual types?

3    A.   More unusual.

4    Q.   And am I correct that about 20 percent of your litigation

5    consulting work in the last 10 or 15 years has related to

6    employment claims?

7    A.   I would think that's a reasonable estimate.  Again, I

8    haven't kept count of it, but it's a reasonable estimate

9        ATTORNEY COFFIN:  We're not publishing anything.  I

10   wanted to display for the parties Dr. Bancroft's December 30,

11   2024 invoice preliminary to its introduction.

12       COURTROOM DEPUTY:  Just the parties?  Who should be

13   seeing this?

14       ATTORNEY COFFIN:  Oh, I'm sorry.  Witness, judge, and

15   litigants.

16       COURTROOM DEPUTY:  Oh, okay.  Thank you.

17   BY ATTORNEY COFFIN:

18   Q.   Dr. Bancroft, you mentioned an invoice for your work

19   previously.  I'm showing you a document dated December 30th

20   2024 which is a unsigned letter from you to Geoffrey Vitt.

21   Does that appear to be an invoice for work you've done on this

22   case?

23   A.   Yes.

24       ATTORNEY COFFIN:  We'd move its admission, Your

25   Honor.

1              THE COURT:  Any objection?

2              ATTORNEY VITT:  No objection.

3              THE COURT:  Okay.  It's admitted.

4              ATTORNEY COFFIN:  If we could publish to the jury,

5       please.

6              THE COURT:  Yes.  Do we have an exhibit number for

7       that?

8              ATTORNEY COFFIN:  I'm not sure we do.  C18, Your

9       Honor.

10             THE COURT:  Okay.  Defendant's C18 is admitted.

11      BY ATTORNEY COFFIN:

12      Q.   Okay.  Dr. Bancroft, is this an exhibit or, sorry, an

13      invoice for work you've done on this case?

14      A.   Yes.

15      Q.   And by an invoice it describes generally the nature of the

16      work you've done and the amount you've done and charged for the

17      case; is that correct?

18      A.   Yes.

19      Q.   And I note that it's not signed.

20      A.   No.

21      Q.   What do you make of that?

22      A.   Well, you requested a copy of the file, and I went in my

23      computer and printed it off, but, when I sent one out, it was

24      signed.

25      Q.   Okay, okay.  When did you print this out and provide it?

1    A.    This one was printed out last, sometime last week.

2    Q.    Okay.  So scrolling up, please, the date on this is

3    December 30th 2024, right?

4    A.    Yes.

5    Q.    And so that describes work that you've done this calendar,

6    in the calendar year of 2024; is that right?

7    A.    It turns out it was all done in '24.

8    Q.    It turns out --

9    A.    Everything was done, in this particular case, everything

10    was done in '24.

11    Q.    Okay.  And by that you mean everything that was done was

12    done in '24, you know that you issued three prior reports in

13    this case.  They were done in '24?  I'm not following.

14    A.    No, no.  All I'm saying is that many times the bills that

15    I send out may include a couple of years.  This one only

16    included time that I spent in 2024.

17    Q.    Okay.  I see what you're saying.  Okay.  So this describes

18    accurately the work you've done on the case and did in the case

19    in 2024 then?

20    A.    Yes.

21    Q.    And this work involved $6,650 worth of work; is that

22    right?

23    A.    Yes.

24    Q.    And the reports that you generated in 2024 were one dated

25    August 26th 2024; is that right?

1     A.   Yes.

2     Q.   And so this would be the work that went into that report;

3     is that correct?

4     A.   Yes.  Yeah.  I was -- I had, was contacted by Mr. Vitt in

5     the first part of 2024, and I had thrown my file away.

6     Q.   Okay.

7     A.   So I had to resurrect my file.  I had to, if you will,

8     kind of reinvent the wheel.

9     Q.   Okay.  You had thrown your work file away; is that what

10    you're testifying here today?

11    A.   Yes, yes.  I had my electronic file, but I had a file

12    with some notes in it from over the years, and I, after not

13    hearing anything for five years, I assumed the case had, had

14    gone away, and I had a house fire last April, and I believe it

15    may have gotten destroyed then too.

16    Q.   Okay.  But you don't have your original work file in this

17    case; is that what you're telling me?

18    A.   I don't have those original handwritten notes, no.

19    Q.   And we didn't receive in discovery any other invoices for

20    your work in this case.  How come?

21    A.   When Mr. Vitt asked me to print out my invoices, I thought

22    I'd printed out both of them.  It appears what I did was I

23    printed out this one twice, but I provided him today with the

24    invoice from 2019.

25              ATTORNEY COFFIN:  Okay.  I hate to do this, Your

1    Honor, but could we approach, please?

2            (Bench conference begins.)

3            ATTORNEY COFFIN:  I truly don't want to take more

4    time than we need to, but this document was specifically

5    requested.  It was requested in discovery.  Should have been

6    produced then.  It was requested in seriatim many times over

7    the last few days, and for me to be hearing from this witness

8    on the stand that Mr. Vitt has a copy of this and it wasn't

9    provided to us is, shall I say, extremely surprising.

10           THE COURT:  Mr. Vitt?

11           ATTORNEY VITT:  I just got this this morning.  I

12   don't -- Your Honor, this is a bill for $2,648 going back to

13   November of 2019.  I don't see this as a particularly shocking

14   or surprising document, you know, and I'm not sure it was

15   requested either, but we're certainly not hiding the ball.

16           THE COURT:  So, Mr. Vitt, I received this document

17   this morning from your witness, but you didn't provide it to

18   opposing counsel?

19           ATTORNEY JONES:  He literally handed it to me as he

20   was walking to the stand.  I didn't have a chance to give it to

21   Mr. Vitt or do anything because the jury was seated, and we

22   were walking to the stand.  I was hoping for a break.

23           ATTORNEY COFFIN:  Just to be really clear, it's not

24   really so much the size of the document that's the issue.  You

25   know, I asked many Mr. Vitt -- Sorry.  Sometimes I can be a

VOLUME: 6
PAGES: 1-221

1    loud talker.

2            THE COURT:  A little less loud.

3            ATTORNEY COFFIN:  I asked Mr. Vitt and Mr. Jones

4    specifically about this.  Mr. Jones deferred me to Mr. Vitt.  I

5    followed Mr. Vitt last week, had, you know, some

6    back-and-forths with him, was told by him on Friday, Oh,

7    there's only this one invoice, there aren't other invoices,

8    which was different than what he had told me before.  And so,

9    you know, I'm just surprised that, given the weekend's work on

10   these, briefing these issues, given the hour-long conference on

11   these issues today, to find this out on direct examination of a

12   witness.  But this is what it's been like for this witness, and

13   it's not okay.

14           THE COURT:  Okay.  So this is the same line of

15   questioning, obviously, for this witness.  I hear your

16   objection.  I agree.  I'm not sure why this wasn't turned over

17   before.  That's not acceptable.  The request was made.  It

18   wasn't disclosed.  I'm not hearing a good reason why it wasn't

19   disclosed.

20      That said, it's impeachment of this witness along the same

21   lines of what you're doing now.  I'm happy to give you a break

22   if you want to review this.  We're coming close to a break.

23   You know, I want to allow you make to make full use of this if

24   that's what you'd like to do.

25           ATTORNEY COFFIN:  Sure, yeah.  I haven't seen it yet.

 1    Just looking over his shoulder, it appears to be something that

 2    I can absorb quickly and incorporate quickly.  It's 10:30.  If

 3    the Court wants to take a break, I'm totally good with that.

 4             THE COURT:  Why don't we take the morning break, and

 5    then you can take a look at that?

 6             ATTORNEY COFFIN:  Can I get a copy?

 7             ATTORNEY VITT:  You can have this one.

 8             ATTORNEY COFFIN:  Oh, this is for me?  Okay.

 9             THE COURT:  Okay.

10             (Bench conference ends.)

11             THE COURT:  Okay.  At this time, we're going to take

12    our morning break.  So I will see you back here at 10:40.

13        (A recess was taken from 10:27 a.m. to 10:42 a.m.)

14             THE COURT:  Okay.  Anything to take up before I bring

15    the jury back?

16             ATTORNEY COFFIN:  No, Your Honor.  Thank you.

17             THE COURT:  Okay.  Plaintiff?

18             ATTORNEY VITT:  No.

19             THE COURT:  Okay.

20             (The Jury enters the courtroom.)

21             THE COURT:  Mr. Coffin?

22             ATTORNEY COFFIN:  Thank you, Your Honor.

23    BY ATTORNEY COFFIN:

24    Q.   Good morning, Dr. Bancroft.

25    A.   Good morning.

VOLUME: 6
PAGES: 1-221

1    Q.    When we took a break, I was asking you about invoices you

2    prepared in this case, right?

3    A.    Yes.

4    Q.    And I think you mentioned that you had thrown out your

5    entire file for this case because you thought the case was

6    over; is that right?

7    A.    Yes.

8    Q.    And you mentioned that there was a fire at your house?

9    A.    Yes.

10    Q.    Which I apologize for that.  I'm sorry for you.  You're

11    not sure whether these, the file was destroyed in that fire,

12    were you?

13    A.    No, I'm, I'm not sure.  When I first was contacted about

14    the case, I knew that I -- I went and looked at the electronic

15    file, and then sometime after that, a month or two months, I

16    said, Well, I'll see if I can find the paper file, the notes

17    that I had, and I wasn't able to find it.

18    Q.    Okay.  I'd ask you to please answer my yes-or-no questions

19    with a "yes" or "no" if you can, please.  So the bottom line is

20    you know your file disappeared; is that right?

21    A.    Yes.

22    Q.    And you don't -- you're not saying it was because of the

23    fire here today?

24    A.    No, I'm not saying it's because of the fire.

25    Q.    And it sounded from the import of your answer, but I want

VOLUME: 6
PAGES: 1-221

1    to probe you jut a second on that, is you think that you

2    thought the case was over so you got rid of those materials?

3    A.   Yes.

4    Q.   But, at Mr. Vitt's request, you dug up two invoices

5    related to the case; is that right?

6    A.   Yes.

7    Q.   And one was the one we admitted into evidence December

8    30th 2024, correct?

9    A.   Yes.

10   Q.   And there was another one that you provided to Mr. Vitt

11   dated November 19th 2019; is that correct?

12   A.   I believe that's correct, yes, the date.

13           ATTORNEY COFFIN:  Your Honor, I'd ask that the

14   document that the Witness provided and attorneys provided that

15   we had a sidebar on be introduced into evidence at this time,

16   and let's call it C18-A.

17           THE COURT:  Okay.  Any objection?

18           ATTORNEY VITT:  No objection.

19           THE COURT:  Okay.  C18-A is admitted.

20           ATTORNEY COFFIN:  And, with the Court's permission

21   and help from the deputy clerk, I'd like to display it on the

22   ELMO.

23           THE COURT:  Yes.

24   BY ATTORNEY COFFIN:

25   Q.   And so this is an invoice, is it not, Dr. Bancroft, for

1    $2,628 for work you've done on this case; is that correct?

2    A.    Yes.

3    Q.    And it lists the dates and the nature of the work you did;

4    is that right?

5    A.    Yes.

6    Q.    Okay.  Specifically, it says, "Economic analysis,

7    consultation, and report update, $1,352".  Is that what it

8    says?

9    A.    Yes.

10   Q.    And noting the billable hour was $260 an hour; is that

11   right?

12   A.    Yes.

13   Q.    So down from the $350 an hour you were charging in your,

14   under the prior invoice; is that right?

15   A.    I'm sorry.

16   Q.    That's less than the $350 an hour you charged in your 2024

17   invoice that we looked at, right?

18   A.    Yes.

19   Q.    Okay.  Now, it says report update, doesn't it?

20   A.    Yes.

21   Q.    And that would imply that there was work done on a report

22   prior to this that wasn't a report update, wouldn't it?

23   A.    There were two reports that I generated.

24   Q.    Well --

25   A.    The last one -- well, that --

1    Q.   There were four reports that you generated, right?

2    A.   Yes.

3    Q.   Okay.  And what I think you're saying is that this bill is

4    meant to reflect the work done on one of those reports; is that

5    right?

6    A.   No.

7    Q.   Okay.  And there was another report that was done in 2018;

8    is that right?

9    A.   Yes.

10   Q.   Okay.  And this report -- strike that.

11        Does this invoice cover and bill for the work done on the

12   initial report in 2018?

13   A.   Yes.

14   Q.   Okay.  And so --

15   A.   At least I was not able to find in my billing file another

16   invoice.

17   Q.   Okay.  Are you here today testifying that you're sure you

18   sent an invoice as to that 2018 report or that you didn't?

19   A.   I don't remember.

20   Q.   One way or the other?

21   A.   Yeah.  Because it's not in the file, my computer file, I

22   would suspect that this covers both reports.

23   Q.   Even though it says it's a bill for a report update?

24   A.   Yes.

25   Q.   Okay.  So the billings you've sent to Mr. Vitt in this

 1    case are this bill that's on Exhibit 16A for --

 2             THE COURT:  I think it's 18A.

 3    BY ATTORNEY COFFIN:

 4    Q.   I apologize.  18A, right?

 5    A.   Yeah.

 6    Q.   And the amount that you provided for $6,650 on C18, is

 7    that right?

 8    A.   I believe that's correct.

 9    Q.   And so those cover three of the four reports that have

10    been done in this case, correct?

11    A.   Yes.

12    Q.   And now you issued another report more recently; is that

13    right?

14    A.   Yes.

15    Q.   The one that has been introduced into the, well, the

16    report, the chart that has been introduced into evidence

17    earlier through Mr. Vitt; is that correct?

18    A.   Yes.

19    Q.   And you haven't submitted an invoice yet for that work; is

20    that right?

21    A.   That's correct.

22    Q.   You plan to, though?

23    A.   Yes.

24    Q.   And for your time here today; is that correct?

25    A.   Yes.

VOLUME: 6
PAGES: 1-221

1    Q.    Now, so we've got for three reports, a tick under $10,000;

2    is that right?

3    A.    Yes.

4    Q.    And, with another report coming, that would be another 3

5    or $4,000, estimated, with your testimony time?

6    A.    Maybe.  I don't know.  I don't know.  I haven't written

7    the time down, but that seems high, but I don't know.

8    Q.    What would you approximate it as?

9    A.    I don't know.  I just don't remember the amount of time

10    I've got put in, and I've been down to the courthouse here

11    several times.

12    Q.    So that would strike me as maybe it's higher than --

13    A.    I don't know.  It's, I --

14    Q.    Just guessing, you can't estimate?

15    A.    No.

16    Q.    Okay.  So, if I said that the, suppose that that report

17    will be worth $5,000 when that invoice is in, would you argue

18    with me about that?

19    A.    Yeah, I would.  I hope it is, but I'm sure it is.

20    Q.    Okay.  $2,500, how about that?

21    A.    It's probably at least $2,500.

22    Q.    Okay.  At least $2,500.  So the work that you've done in

23    the case for the three reports and the report you've done now

24    is about $12,000; is that right?

25    A.    Yes.

1    Q.   Okay.  So you've worked on about 3,000 of these cases over

2    the years?

3    A.   I've been involved in about 3,000 litigation cases, yes.

4    Q.   And I presume that a $10,000, $12,000 bill is on the high

5    end of the report and billing services that you charge; is that

6    fair to say?

7    A.   Extremely high.

8    Q.   Okay.  And more average is about 4 or $5,000?

9    A.   No, less than that.

10   Q.   Okay.  $3,000?

11   A.   Less than that.

12   Q.   $2,000?

13   A.   Between 2 and now, with my current rates, it's between 2

14   and 3,000 for a normal wrongful termination case.

15   Q.   Okay.  So, if we called it 3,000 to make math simple,

16   3,000 times 3,000 cases --

17              ATTORNEY VITT:  Objection.  Can we approach the

18   bench?

19              ATTORNEY COFFIN:  Equals --

20              THE COURT:  He's in the middle of a question, but

21   come on up.

22              ATTORNEY COFFIN:  Well, if I can finish the question

23   -- equals $9 million?

24              THE COURT:  Okay.

25              THE WITNESS:  No, that ain't no $9 million.  You're

1    multiplying my rate now to what I got back in '82?

2    BY ATTORNEY COFFIN:

3    Q.   I asked you what your average case was, and I think you

4    said $2,000 to $3,000.  So the exact question, Doctor, is,

5    What's 3,000 times 3,000?

6                 ATTORNEY VITT:  Objection.

7                 THE WITNESS:  Maybe I misunderstood you.  I thought

8    you were talking about how much I would be a normal case today.

9    I can't tell you what a normal case was 25 years ago, what the

10   bill was.  Today, a wrongful employment case is going to be

11   somewhere, assuming there's nothing unusual in the case and I

12   don't have to spend a lot of time on the phone, it's going to

13   be somewhere between 2 and $3,000.

14                THE COURT:  So there's a request for a bench

15   conference.  Is that still the request?

16                ATTORNEY VITT:  Yes, please.

17                THE COURT:  All right.  Please approach.

18                (Bench conference begins.)

19                ATTORNEY VITT:  Your Honor, I understand that counsel

20   gets considerable latitude, but going back this far, and,

21   basically, I'm not even sure what the argument is.  25 years of

22   work, how much do you charge in each one, trying to come up

23   with some sort of number.  What is the point that this is

24   driving toward?  I don't understand it.

25                ATTORNEY COFFIN:  It's driving towards the obvious

1     point that he's fiscally biased because of the millions of

2     dollars he's made through his expert analysis, and it's totally

3     appropriate, relevant cross-examination on, Are you unbiased?

4     And Dr., Mr. Vitt can ask his questions to clarify it, even

5     though, I would say, just like Dr. Bancroft has expanded beyond

6     my cross to provide a lot of his rationale as well.

7             THE COURT:  It's valid on cross-examination.  I'll

8     allow it.  You can ask him questions on redirect.

9             (Bench conference ends.)

10    BY ATTORNEY COFFIN:

11    Q.   Okay.  Again, my questions, I think, will go more quickly

12    if you answer "yes" or "no", please, to them.  You estimated on

13    direct that sort of your average case in recent times, maybe

14    not going back to the 1980s, but recent times was $2,000 to

15    $3,000 a case; isn't that right?

16    A.   No.

17    Q.   You didn't?  Okay.  And you estimated that you'd done

18    about 3,000 cases; isn't that right?

19    A.   Yes, since '82.

20    Q.   So, if you'd done, your average for a case was $3,000 a

21    case and you've done 3,000 cases, what would that be in terms

22    of the amount of compensation you've received from doing these

23    cases?

24    A.   Well, if you did that calculation, if that was correct,

25    that would be a lot of money, and I'm sure, if I'd earned

1    $3,000 in each one of those cases, I'm pretty sure I wouldn't

2    be here now.

3    Q.    Well, you know the math is the math, right?  So 3,000

4    times 3,000 is what, $9 million?

5    A.    You are twisting this around.  I did not charge --

6         THE COURT:  Dr. Bancroft, I'll direct you to answer

7    the question, please.

8         THE WITNESS:  I did not charge $400 an hour back in

9    1982.  My charge in '82 was probably well less than $50, and

10   it's grown over that period of time.

11   BY ATTORNEY COFFIN:

12   Q.    We've had testimony significantly about your rates and

13   case work in the 2000s, and I'll ask you again.  If your

14   average remuneration for a case was $3,000 and you'd done 3,000

15   cases, wouldn't be that be $9 million?

16   A.    I'll take your word for it, but I haven't earned anywhere

17   near that, not anywhere near that.

18   Q.    Now, you have worked with Attorney Vitt before?

19   A.    Yes, I think one time before.

20   Q.    Okay.  And what was the nature of that case?

21   A.    I believe it was an employment case.

22   Q.    Was it also an employment case involving my client,

23   Dartmouth-Hitchcock?

24   A.    I don't remember.

25   Q.    Okay.  It was an employment case where you were asked to

1    provide opinions related to a resident who was terminated from

2    the residency program; is that correct?

3    A.   I don't know.  I said I don't know if it was against

4    Dartmouth or not, so I can't answer the question.

5    Q.   And do you recall a judge ruling on your opinions in that

6    case?

7    A.   No.

8    Q.   No.  You don't recall the judge excluding your opinions

9    based on improper speculation?

10        ATTORNEY VITT:  Objection.  Can you repeat the

11   question, please?  I'm sorry.

12   BY ATTORNEY COFFIN:

13   Q.   Do you recall a judge ruling your opinions were not to be

14   admitted due to improper methodology and speculation on your

15   part?

16   A.   No.  I remember that there was one time that it was not

17   allowed in because it was too, the disclosure was too late.

18   Q.   And so that's the only case you've worked on with

19   Mr. Vitt; is that right?

20   A.   That's the only one I remember.

21   Q.   Oh, okay.  Think hard.  Can you remember any others where

22   you've worked with him as a retained expert witness in his -- I

23   don't know -- 20-plus years of practicing law?

24   A.   I'll think real hard on it.  That's the only one I

25   remember.

1    Q.   Okay.  How about the firm Langrock Sperry; have you ever
2    done work for them?
3    A.   Yes, a lot.
4    Q.   A lot of work for them?
5    A.   Yes.
6    Q.   Okay.  And Langrock Sperry is the firm that Mr. Jones is a
7    partner at; is that right?
8    A.   Yes.
9    Q.   And what do you mean by doing a lot of work for them?
10   A.   Well, over the years, I think probably I go back into the,
11   you know, in the 90s and maybe into the 80s that I had some
12   cases with them.  But, over the years, I've had some cases with
13   them, and I suspect it's less than 20, but maybe more than 10.
14   Q.   Less than 20 and more than 10?
15   A.   Over a 30-some-odd-year, 40-year period.
16   Q.   Okay.  And same assumption.  Assuming you're charging
17   three, just to make the math easy, $3,000 per case and you've
18   had 20 cases or so with them, that firm; is that right?
19   A.   I've had 20 -- I don't know if it's 20 cases or not, but
20   I'm --
21   Q.   You're estimating?
22   A.   I don't know.  I think it's probably somewhere between 10
23   and 20.
24   Q.   So we'll call it 15, 15 cases with them where you've made
25   $3,000 a case?

1    A.    No.

2    Q.    That comes out to about -- well, or your average case, if,

3    if you assume it's $3,000 a case, and you fight that

4    assumption, but let's, for the sake of discussion, assume that

5    it is.  You would have made some $45,000 on cases from Langrock

6    Sperry; is that fair to say?

7    A.    No, nowhere close to that, because the average over the 40

8    years that I have worked and done cases for Sperry Langrock,

9    the average value was not $3,000.  And I'm not sure that I ever

10   had a case with Sperry Langrock that had to do with employment.

11   Q.    Okay.  Now, do you have any cases with Mr. Vitt's firm

12   other than this now?

13   A.    No.

14   Q.    And how about with Langrock Sperry?

15   A.    I don't think I do, but there's one that I haven't thrown

16   the file away.  It's been a couple years since I've heard

17   anything about it, so I'm not sure if it's still active.

18   Q.    Now, you described that about 20 percent, maybe 25 percent

19   of your cases are employment discrimination cases, correct?

20   A.    In recent years, yes.

21   Q.    Now, we had a hearing last week where I asked you a bunch

22   of questions about things.  Do you remember that?

23   A.    Yes.

24   Q.    And do you recall me asking you some questions about your

25   work on academic medical cases involving the transfer of a

1    physician from one academic medical institution to another?

2    A.    Vaguely.  I think that was a topic, but I don't remember

3    much about it, but --

4    Q.    Okay.  Do you remember testifying that you had maybe one,

5    maybe two of those cases in your experience prior to this?

6    A.    An employment -- let me make sure I understand you.  An

7    employment case where we're dealing with a doctor in a

8    hospital, is that --

9    Q.    Yes, transferring employment.

10   A.    I think that's probably fair.  I don't remember, but I'm

11   going to say it's probably at least maybe three.

12   Q.    You wouldn't fight me if you said at the hearing it was

13   one, maybe two?

14   A.    Well, maybe.  I don't remember, so --

15   Q.    Now, you prepared four reports in this case; isn't that

16   correct?

17   A.    Yes.

18   Q.    And am I correct that one was on October 30th 2018?  Is

19   that correct?

20   A.    I'll take your word for it, yes.

21   Q.    And, in all of the reports, you have a chart similar to

22   the chart that's been introduced here today or shown to the

23   jury today.  It's not in evidence yet, but shown to the jury

24   today, right?

25   A.    Yes.

1    Q.    And the right column is kind of the ultimate loss column

2    where it says "Total Economic Loss"; is that fair to say?

3    A.    Yes.

4    Q.    And it's divided up by years; is that right?

5    A.    Yes.

6    Q.    Now, in the October 30, 2018 report, do you agree that you

7    calculated the total economic loss there in this case for as

8    $3,000,022?

9    A.    I'll take your word for it.  I don't have it in front of

10    me.

11    Q.    Okay.  And how about would you take my word for it that,

12    on October 19, 2019, you calculated the loss at $4,835,000?

13    A.    I'll take your word for it.

14    Q.    Similarly, August 26th 2024, would you take my word that

15    you calculated a loss of $4,329,258?

16    A.    I'll take your word for it.

17    Q.    And then, most recently on March 19th, last Tuesday, you

18    calculated a total economic loss of $1,787,722; is that right?

19    A.    Yes.

20    Q.    That's right?

21    A.    Yes.

22    Q.    So your loss figures dropped by almost $2.6 million

23    between August 26, 2024 and your most recent report last week;

24    isn't that right?

25    A.    Dropped how much?

1   Q.   About $2.6 million.

2   A.   Okay.  I'll take your representation, yes.

3   Q.   Well, do you agree with that?

4   A.   I don't, I don't have them in front of me so I can't tell

5   you, but I'll take your word for it.

6   Q.   Do you want me to put it in front of you?

7   A.   Sure.

8   Q.   Can you show him --

9                    (Brief pause.)

10       Let me keep going.  We can circle back to this.  In any

11  event, I'll refresh your recollection with it, but I don't hear

12  you saying that you disagree with my assertion that your August

13  26, 2024 report had a total economic loss of $4,328,258.

14  A.   No.  I think that's in the area, yeah.  I know it was, it

15  was much larger than this one.

16  Q.   Okay.  And so the most recent report from last week

17  dropped it down to $1,787,722.  That sounds right?

18  A.   Yes.

19  Q.   Okay.  And you report that you did most recently made

20  eight substantive changes from your report before; is that

21  right?

22  A.   Yes.

23  Q.   And four were due to new information, and four were due to

24  the passage of time?

25  A.   Yeah, I think it's four and four.  It might be five and

VOLUME: 6
PAGES: 1-221

1   three.  I think it's three and five, but I may have said four
2   and four.
3           ATTORNEY COFFIN:  Okay.  Can we please display the
4   March 19th 2025 report?  It's been admitted for identification.
5   I believe that has been shown to the jury, hasn't it?  I just
6   want to make sure I'm not --
7           THE COURT:  Talking about the chart?  The chart has
8   been.
9           ATTORNEY COFFIN:  Okay.  Not the report, but the
10  chart?
11          THE COURT:  Right.
12          ATTORNEY VITT:  Could we move for the admission of
13  that chart now?  Will that be possible, or should I wait until
14  I redirect?
15          ATTORNEY COFFIN:  Objection for reasons we've gone
16  over thoroughly.
17          THE COURT:  I'll reserve ruling on that at this time.
18          ATTORNEY COFFIN:  Please put it up for the Witness,
19  the judge, and myself, please.
20          COURTROOM DEPUTY:  Hold on one second.
21  BY ATTORNEY COFFIN:
22  Q.   Okay.  Does everybody have it?  Okay, good.  Thank you.
23  Now, Dr. Bancroft, directing your attention to the screen, this
24  is your March 19th 2025 projected lost earnings for Dr. Porter
25  chart; is that right?

VOLUME: 6
PAGES: 1-221

1    A.    Yes.

2    Q.    And you described the structure of the report as it goes

3    along on direct examination.  Now, am I correct that your

4    reports as you generate them, all these reports, are based

5    significantly on what the plaintiff and her lawyers have told

6    you?

7    A.    Yes, that and Dr. Porter, primarily on UVM side.

8    Q.    Dr. Porter, what Dr. Porter and her attorneys have told

9    you; is that correct?

10   A.    Yes.

11   Q.    Like, in conversations, right?

12   A.    Yes.

13   Q.    In emails, right?

14   A.    There probably was some emails.  I'm not sure.

15   Q.    Okay.  It's not all based on sort of objective economic

16   financial information; isn't that right?

17   A.    Well, I don't know.  You'll have to talk with Dr. Porter

18   on this.  What she's was basing it on, I don't know, but I took

19   her, I took her word that this is what her employment was going

20   to be in the future.

21   Q.    Right.  And so the point is the transmission to you is you

22   are relying on what she is telling you; is that correct?

23   A.    Absolutely.

24   Q.    You're basically a microphone for what she is telling you

25   is her career situation; isn't that right?

1    A.    Well, I might put it a different way, but I'll stipulate.

2    I'll agree.

3    Q.    And she's ultimately your client, isn't she?

4    A.    Ultimately, I guess, yes.

5    Q.    You're getting paid pretty well for providing her a

6    microphone for her views; is that right?

7    A.    I am representing -- I was detained by her to estimate

8    what her losses were, yes.

9    Q.    Well, one of the things that's embedded in your report is

10    the assumption that in 2019 she would become a full professor

11    at Dartmouth; isn't that right?

12    A.    Yes.

13    Q.    And that would have resulted in a 5 percent increase in

14    her salary at Dartmouth; is that correct?

15    A.    Yes.  Technically, it would have been a 2.5 percent

16    increase because there would have been a 2.5 percent normal

17    increase irrespective of being promoted.

18    Q.    But it would be 5 percent for that year because of the

19    midyear timing of that; is that your point?

20    A.    Yes.

21    Q.    But, ultimately, the net from that is a 5 percent increase

22    for her for becoming a professor at Dartmouth, right?

23    A.    Yes.

24    Q.    And you're not on the credential committee or the

25    professor review committee or anything like that at Dartmouth,

1   correct?  And so you don't know whether she can qualify to be a
2   professor at Dartmouth or not, right?
3   A.    No, I did not look into it, no.
4   Q.    No, because you relied on what she told you, right?
5   A.    Yes, and I wouldn't -- I don't know how I'd even begin to
6   do it.
7   Q.    Now, she ultimately wasn't selected to be a professor at
8   Dartmouth because her employment was terminated when the REI
9   division ended; isn't that right?
10  A.    I don't know about that.
11  Q.    Now, you did not include -- so the chart, just to kind of
12  make it simple for me anyways, essentially, your, one of your
13  primary tasks here is to compare what she would have made at
14  Dartmouth to what she would be making and did make at the
15  University of Vermont, correct?
16  A.    Yes, that's the primary objective.
17  Q.    Because you want to compare the difference between the two
18  so, if her pay at Dartmouth was higher than her pay at UVM she
19  may have sustained some damages from that, correct?
20  A.    Yes.
21  Q.    And she has a duty to mitigate her damages; you understand
22  that, correct?
23  A.    I'm not a lawyer here, but that's my understanding, that
24  the plaintiff does have an obligation to mitigate.
25  Q.    You know, in your 3,000 cases, all of them have dealt with

VOLUME: 6
PAGES: 1-221

1    the issue that a plaintiff can't just let the damages

2    accumulate, they need to do what they can reasonably to make up

3    for those damages; is that correct?

4    A.    Well, no.  I've had cases where a person had a very unique

5    profession and it was unreasonable for them to pick up their

6    family and move cross-country to mitigate their losses.

7    Q.    Okay.

8    A.    And by that several, I've had several over the, over the

9    30 years that I've been doing employment cases where that

10    situation has arisen.

11    Q.    Okay.  But that's in contrast to the general rule where an

12    employee who is wrongfully terminated needs to attempt to gain

13    gainful employment, right?

14    A.    It's my understanding, within reason.

15    Q.    Yes.  Now, you, at the time of the hearing we had last

16    week when I asked you some questions, you had issued a report

17    in August of 2024, as I discussed, that outlined the damages as

18    being $4.3 million, correct?

19    A.    As of, yes, 2033.

20    Q.    Yeah.  And one of the things I pointed out to you in the

21    report is that we at least had not received the 2004 pay

22    information from Dr. Porter.  Do you remember that?

23    A.    No, I don't.

24    Q.    Do you remember that you testified under oath like you are

25    today that you had not used the 2004 (sic.) pay information in

 1    calculating your August 2004 report?

 2    A.    Yeah, I did use the information that I had on her earnings

 3    up, in 2004 up to about the time that I issued my report.

 4    Q.    But, when you came into court, you had not received her

 5    W-2 from 2004; isn't that right?

 6    A.    It would be pretty hard to receive her W-2 for 2004 in

 7    August of 2004.  W-2s aren't generated until the end of the

 8    year.

 9    Q.    Yes, but you, but you didn't obtain the 2004 and update

10    your report until I specifically pointed that out to you; isn't

11    that right?

12    A.    No.  I had received her W-2 after the 1st of the year.  I

13    had that in my possession before I came to court last week, the

14    W-2.

15    Q.    You had the 2024 W-2 in your possession before you came to

16    court last week?

17    A.    Yes.

18    Q.    Had you provided it to Ms. Porter, Dr. Porter's counsel?

19    A.    I received it from Dr. Porter's counsel, I believe, or Dr.

20    Porter.  I don't remember which one sent it to me.

21    Q.    In your August 2024 analysis, you hadn't used the most

22    recent numbers; is that correct?

23    A.    I used what she had for information up to this point in

24    time.  I looked at what she had earned and what her earnings

25    were after July 1 and used that as a basis to forecast forward.

1  Q.   Okay.  And you also hadn't been made aware that, in July

2  of 2023, she became a full professor at the University of

3  Vermont; isn't that right?

4  A.   I don't remember.  I'm sure that I was told that, but I

5  don't remember that.

6  Q.   Your testimony here today under oath is that you were told

7  that and you just don't remember that?  Is that, is that what

8  your testimony is?

9  A.   I believe I was -- I don't remember.  I assume that I was

10 told.  I had extensive, as the bill demonstrates, I had, the

11 reason that bill is so high is I spent an inordinate amount of

12 time on the phone with attorneys and with Dr. Porter.  It's

13 hard to remember everything that was said and/or provided to me

14 in 2024.

15 Q.   Your August 2024 report which was heading into a big

16 settlement conference with, at the hospital, by the way, showed

17 $4.3 million, correct?

18          ATTORNEY VITT:  Your Honor, objection.  I don't think

19 there's any testimony about some big settlement conference.

20          THE COURT:  Please approach.

21          (Bench conference begins.)

22          THE COURT:  So what's your point here?

23          ATTORNEY VITT:  I don't think -- I don't believe that

24 there's some big settlement conference.  I mean, I'm not sure

25 what he's referring to.

VOLUME: 6
PAGES: 1-221

```
 1              ATTORNEY SCHROEDER:  There was a mediation on
 2    September 9th.
 3              ATTORNEY VITT:  Yes.
 4              ATTORNEY SCHROEDER:  Yes.
 5              ATTORNEY VITT:  Well, I wouldn't describe that as a
 6    big settlement conference.  I don't want to get into the
 7    discussion of it, but I think we have a different view about
 8    how things shook out.  I mean, he certainly prepared a report
 9    to try.  You know, the case came back to the Second Circuit.
10    We tried to, you know --
11              THE COURT:  Okay.  You're going to --
12              ATTORNEY COFFIN:  I'm not going to go into it, but it
13    is relevant, I think, for the reasons that we've outlined and
14    can explain those if necessary.  I'm not going to go into it
15    much more, but it's not improper at all to ask that he made a
16    report really high before the settlement conference to try and
17    leverage this.
18              THE COURT:  She's telling me she can hear you.
19              ATTORNEY COFFIN:  I apologize.  And try and leverage
20    a settlement and, after that, when he's got to put it on for
21    trial, he drops it down a lot.
22              THE COURT:  I just want to be clear about the comment
23    you just made.  Did you not hear that the law clerk could kind
24    of overhear?  I want to be clear on the record.  So, basically,
25    if Mr. Coffin going to be asking not much more on this topic
```

VOLUME: 6
PAGES: 1-221

1    and certainly not getting into the substance of that, but,

2    basically the point is, in preparation for mediation, I think

3    the point he's trying to make is, Wouldn't you have gotten up

4    to speed on exactly what your report says?

5            ATTORNEY SCHROEDER:  There's a court record that

6    reflects the fact that there was a mediation on September 9th

7    before John Schraven, because he charged moneys by both sides

8    to conduct that mediation here in Burlington, just for the

9    record.

10           THE COURT:  Right.  Just a little bit concerned about

11   getting into that --

12           ATTORNEY COFFIN:  I don't need to get into it.

13           THE COURT:  -- to any more degree.  Frankly, even

14   another mention if this gave me pause because now the jury is

15   hearing that there was prior proceedings in the case that

16   didn't involve litigation.  So I think it's something we should

17   be frankly steering clear of.

18           ATTORNEY COFFIN:  I can steer clear.

19           THE COURT:  While we're still here, with respect to

20   the other claim that was made, I think it was about the W-2,

21   you asked him questions about whether it was presented before

22   the hearing.  Are you talking about the motion in limine

23   hearing?

24           ATTORNEY COFFIN:  Yeah.

25           THE COURT:  His first testimony on Friday in this

1    trial?

2              ATTORNEY COFFIN:  I'm talking about the motion in

3    limine hearing.  I needed to clarify that.

4              ATTORNEY SCHROEDER:  March 14th?

5              THE COURT:  March 14th.  That's the W-2 that was then

6    disclosed to you?

7              ATTORNEY COFFIN:  Yes, right.

8              (Bench conference ends.)

9    BY ATTORNEY COFFIN:

10   Q.   Now, in your, in your practice calculating income and lost

11   income, you believe it's important to get the most accurate and

12   immediate payroll information, correct?

13   A.   I agree, yes.

14   Q.   Because how much money someone's making at the time is

15   important if you're going to compare a prior employer to a

16   current employer; isn't that right?

17   A.   It's important to have, yeah, appropriate and current

18   information.

19   Q.   A simple yes-or-no will suffice.  I don't mean to cut you

20   off, but we're taking a long time.

21              And you did that when you obtained the information that

22   went into your report that I have on the screen before you now,

23   which is the March 19th 2025 report, correct?

24   A.   I had what?  What did I have?

25   Q.   You obtained her most recent payroll information from 2024

1    when you prepared this report that's on the screen in front of

2    you from March 19th 2025, right?

3    A.    Yes.

4    Q.    And you did didn't choose to do that when you prepared

5    your 2024 report; isn't that right?

6    A.    I beg your pardon.

7    Q.    When you prepared your August 2024 report.

8    A.    Yes.  What did I do?  What are you saying I did?

9    Q.    Aren't I correct, Dr. Bancroft, that, when you prepared

10    your August 2024 report, you did not consider Dr. Porter's most

11    recent payroll information?

12    A.    I considered her payroll information at the time I did the

13    report.

14    Q.    From 2023, correct?

15    A.    No, from 2024.  I had information of what she'd earned up

16    through -- I don't -- I assume up through July.  I don't know

17    exactly when I had it up to, but I had her earnings that she

18    earned in 2024 for a significant part of the year.

19    Q.    Okay.  And was that provided to you by counsel?

20    A.    I don't remember if it was provided by counsel or directly

21    from Dr. Porter.

22    Q.    Okay.  You did not get the information that she'd actually

23    been elevated to full professor a year before that in July of

24    2023, though, did you?

25    A.    I had --

1    Q.   Yes or no, please.

2    A.   Well, it's not -- I can't answer the question yes or no.

3    I'm sorry.

4              THE COURT:  Dr. Bancroft, it is a yes-or-no question.

5    You're going to have to answer the question yes or no.  Your

6    attorney will have an opportunity to ask you further questions

7              THE WITNESS:  No.

8    BY ATTORNEY COFFIN:

9    Q.   You didn't have that information --

10   A.   Yes.

11   Q.   -- correct?  And am I correct that you did not have that

12   information?

13   A.   I don't know.  I don't know how to answer the question.

14   Q.   Okay.  In any event, your report in August 2024 did not

15   include any assumed 5 percent pay bump from becoming a

16   professor at UVM correct?

17   A.   I used her current earnings at the time I issued the

18   report.

19             ATTORNEY COFFIN:  And, Your Honor, please ask the

20   Witness to be responsive.

21             THE COURT:  Answer the question, Dr. Bancroft.

22             THE WITNESS:  No.

23   BY ATTORNEY COFFIN:

24   Q.   Okay.  And you did assume a 5 percent pay increase for her

25   professorship, which she never even got when she was at

1    Dartmouth, correct?

2    A.    I did, yes.

3    Q.    And changing those numbers matters because it is, again,

4    if she's making more at Dartmouth and less at UVM the

5    difference between the two is greater, correct?

6    A.    Yes.

7    Q.    And so you chose not to include that information on the

8    report in August of 2024 for UVM but you did for Dartmouth; is

9    that right?

10   A.    No.

11   Q.    Now, your report in March of 2025 does include some

12   increase in her salary while she's at University of Vermont

13   from your August 2024 report, doesn't it?

14   A.    Yes.

15   Q.    Now, the March 2025 report includes a number of new

16   assumptions.  Well, you assume -- just put the chart up.  You

17   assume that there are -- if you can turn that, please.  You

18   assume that, for a couple of years, pay was stable at Dartmouth

19   due to, due to Covid; is that correct?

20   A.    Yes.

21   Q.    You assume that she received $8,000 for one semester, a

22   little less than $8,000 for one semester of tuition remission

23   for her son?

24   A.    Yes.

25   Q.    Okay.  And that wasn't done in your prior report, correct?

1    A.   No, it was not.

2    Q.   And who pointed that out to you?

3    A.   You did.

4    Q.   Yes.  And same thing with the Covid increases?

5    A.   Yes.

6    Q.   And how about the professor, did I point to that out to

7    you too?

8    A.   I don't remember if you did or not.

9    Q.   Oh, you don't remember me in court on March 14th telling

10   you that Dr. Porter had been, had become a professor and asking

11   you if you knew that?

12   A.   I don't specifically remember that.  I'm not saying it

13   didn't happen.

14   Q.   Now, this report on the right-hand column, total economic

15   loss, uses a compound interest rate to account for the

16   expansion in dollar amounts due to inflation, basically; isn't

17   that correct?

18   A.   I'm not sure I understand your question.

19   Q.   The right-hand column, total economic loss, provides a

20   running total of losses that increases in part due to

21   compounding that value using an interest rate; isn't that

22   right?

23   A.   Only on the historical.

24   Q.   Okay.  And the historical rate you chose to use was 12

25   percent; isn't that correct?

 1    A.   Yes.

 2    Q.   And there are other interest rates an economist could use,

 3    correct?

 4    A.   Not in Vermont.

 5              ATTORNEY COFFIN:  Your Honor, I think we need to have

 6    a quick approach on that.

 7              THE COURT:  Yes.

 8                   (Bench conference begins.)

 9              THE COURT:  Okay.  So this obviously is going to lead

10    him to testifying something about Vermont law again.  I think

11    that's the concern.

12              ATTORNEY COFFIN:  Yeah, and, really, the witness

13    should have been instructed.

14              ATTORNEY VITT:  Excuse me.  I'm sorry.  It's loud

15    enough that everybody can hear.

16              ATTORNEY COFFIN:  I would have expected that the

17    witness, during a break, would have somehow been instructed

18    about the Court's rulings, but, regardless, he should not be

19    testifying with the tone, Vermont says this, and Vermont says

20    that.  It's not his role.  It's an implication that it's a

21    Vermont law thing, and we need to unwind that.

22              THE COURT:  He was on the stand on cross-examination

23    when the break happened, right?

24              ATTORNEY COFFIN:  Well, I still think he's -- I would

25    say there's a difference between discussing substantive

1    testimony and informing him about the Court's rulings about

2    guiding and limiting their testimony.

3        ATTORNEY VITT:  I understand that the defendants want

4    to argue that there is some other rate that ought to be

5    applied.  We will address that on substance.  I think they're

6    dead wrong, but we're going to deal with that, and we're happy

7    to brief the issue, Judge.  Dr. Bancroft understands that his

8    job is to determine in Vermont what's the amount that somebody

9    normally gets in terms of interest rates, and he says it's 12

10   percent.  He's not saying necessarily it's the law, but is he

11   saying that's what he does on employment cases?  Yeah.  Every

12   case is 12 percent.  That's what he does.  He calculates 12

13   percent interest on back pay.  I don't know how to avoid that.

14       THE COURT:  He believes Vermont law requires it?

15       ATTORNEY COFFIN:  Well, he shouldn't be testifying

16   law.

17       THE COURT:  No, totally.

18       ATTORNEY COFFIN:  And I would say this case has

19   federal law, Vermont law, and New Hampshire law, and it's an

20   open question.  You know, Attorney Vitt and I may not see

21   eye-to-eye on what the ruling on it for, right ruling on it is

22   for the law that applies, but it is not what Dr. Bancroft says

23   it's going to be.  That's not how it works.

24       ATTORNEY VITT:  He was in the legislature for eight

25   years.  He's got some familiarity with these issues.  So I'm

VOLUME: 6
PAGES: 1-221

1    not saying he's an expert, but --

2         THE COURT:  I am going to have to instruct him about

3    not testifying as to what the law requires.  I've already

4    stricken an answer from earlier saying that he testified that

5    he felt that's what Vermont law requires.  So I may instruct

6    the witness to say, As you answer questions, answer Mr.

7    Coffin's questions on this topic, you shouldn't be speaking as

8    to your understanding of the law but just as to what your

9    analysis is.

10        ATTORNEY COFFIN:  I think you need to remove the

11   geographic reference because that as well -- I would just say

12   to cure it, you know, he can't say -- he said, Well, that's

13   what it is in Vermont, like, implying there's some sort of

14   Vermont rule, and I think you need to be clear that, you know,

15   even just talking about law, because he might not understand

16   that, but and also strike the reference to Vermont or somehow

17   modify it.  I don't have a verbatim suggestion for Your Honor,

18   but I think you get my import.

19        THE COURT:  Mr. Vitt?

20        ATTORNEY VITT:  I'm certainly fine with Dr. Bancroft

21   avoiding it, and you're right.  I didn't talk to him on the

22   break.  I didn't think it was my position to do that.  Avoiding

23   saying, you know, this is what Vermont requires, but this is

24   what happens all the time in Vermont, that's fine.  He does, as

25   a matter of practice when it's an employment case in Vermont,

1    use 12 percent.  I happen to think he's right, but we'll get to

2    that another day.

3          THE COURT:  I mean, on the other hand, it feels like

4    he has the right to testify how he makes use of this particular

5    rate, and it's a tough question to balance here.  I don't think

6    he can provide a backbone opinion on it.

7          ATTORNEY COFFIN:  He can say he used it because he

8    thought it was appropriate, but he can't say, Well, it's

9    because my understanding of law is such-and-such because it

10   just is too much of an open legal question, especially on this

11   record, and, you know, I'll just restate my concerns about, you

12   know, repeated admissions of discovery failures here, and it's

13   a little concerning.

14         THE COURT:  Okay.  So then I'm going to do my best to

15   -- he shouldn't be testifying as to what he thinks the law and

16   particularity the law in Vermont requires.

17         ATTORNEY COFFIN:  Perfect.  Okay.

18         ATTORNEY SCHROEDER:  Will you strike the answer as

19   well?  Because he said, In Vermont it is blank.

20         THE COURT:  Right, yeah.  I think I'll have to.

21         ATTORNEY SCHROEDER:  Thank you.

22         (Bench conference ends.)

23         THE COURT:  Okay.  So the Court is going to strike

24   the previous answer to the extent that it references what the

25   State of Vermont, in the Witness's view, requires, and I'll

1    also direct the Witness not to, not to answer any of the

2    questions along this line involving your understanding of the

3    law or particularly what Vermont law requires.

4            THE WITNESS:  Okay.

5    BY ATTORNEY COFFIN:

6    Q.   All right.  You said, Dr. Bancroft, that you used the 12

7    percent figure as an interest rate for accounting for inflation

8    on past damages in your total economic loss column; is that

9    right?

10   A.   If I got to answer yes or no, no.

11   Q.   Okay.  Aren't I correct that you used the figure of 12

12   percent as an inflator as an adjustment in your total economic

13   loss column?

14   A.   I used 12 percent interest, right.

15   Q.   12 percent interest, okay.  Sorry about that.  And so, if

16   you had used another interest rate such as 3 percent, wouldn't

17   the damages on past economic loss be about a quarter of what

18   you have opined here?

19   A.   Well, I don't think they'd be a quarter, but they'd be

20   lower.

21   Q.   A lot lower?

22   A.   Um, no.  I don't know if you want me to deal with a

23   particular year, try to give you an idea what.

24   Q.   Well, yeah.  So, like, each year your total economic loss,

25   you adjust the amount of the prior year's loss by 12 percent,

VOLUME: 6
PAGES: 1-221

1    and my question to you is, If you adjusted it by a quarter of

2    that, say 3 percent, wouldn't the total economic loss be

3    essentially a quarter of your projection for a particular year?

4    A.    No.

5    Q.    No?

6    A.    No.  It's going to reduce the present value.  It will

7    reduce the interest part, but the basic loss that is in Column

8    9 is going to stay the same.  The interest, if you use 3

9    percent as opposed to 12 percent, the interest on that

10   component will be about a quarter.

11   Q.    Okay.

12   A.    But you've still got the base loss.

13   Q.    Okay.

14   A.    So you can't, you can't just go over to the further column

15   and say, If I use 3 percent, that number is going to be reduced

16   by 75 percent.

17   Q.    Okay.  So it wouldn't be a full reduction there, but,

18   basically, all of the accumulating interest in those losses

19   would be reduced by a quarter if you used 3 percent instead of

20   12 percent; is that right?

21   A.    Yes.

22   Q.    Okay.  And you wouldn't describe that as a significant

23   difference?

24   A.    Yes.

25   Q.    You would describe it as a significant difference?

1   A.   Yes.

2   Q.   Okay.  And so that would make, if the economic loss

3   figures were significantly different as a result of using 3

4   percent versus 12 as an inflator, basically, everything in your

5   chart is not correct; isn't that right?

6   A.   Yes, because it has a cumulative total, and the present

7   value numbers out through 2024 would be smaller.

8   Q.   Okay.  And you described in Assumption 10 of the March

9   19th 2025 report which is C11, if you could go to the second

10  page of the assumptions, please.  You described a discount rate

11  of 2.79 percent, five-year tax-free Triple A municipal bonds,

12  March 19th, is used to derive the present value for future

13  income, right?

14  A.   Yes.

15  Q.   And so that's an example of another interest rate one

16  could use based on those tax-free municipal bonds, right?

17  A.   I guess you could use whatever interest rate you wanted

18  to.

19  Q.   Now, your exercise on the fringe benefits attempted to

20  compare the value of her fringe benefits at Dartmouth to the

21  value of her fringe benefits at UVM; is that correct?

22  A.   Yes.

23  Q.   And, again, a lot of that was dependent on what she told

24  you, correct?

25  A.   No.

1    Q.   She didn't tell you, for example, that she got a fringe

2    benefit from the University of Vermont for tuition remission,

3    free tuition for her son; is that correct?

4    A.   That part is true.  I did not know that until you brought

5    it up.

6    Q.   I told you that, right?

7    A.   Yes, you did.

8    Q.   And okay.  And she continues to have the benefit of

9    tuition-free school for her kids going forward; isn't that

10   right?

11   A.   I assume she does.

12   Q.   And I'm not sure if she has any kids in school or not.  Do

13   you know?

14   A.   No, I don't.

15   Q.   Okay.  But you don't account for that specifically in your

16   report, right?

17   A.   Well, it would be speculation.

18   Q.   Now, can we please put up Page 34 of the Exhibit 5 of the

19   deposition testimony?  Okay.  And this should just go to the

20   witness, the judge.  And do you recognize this document,

21   Dr. Bancroft?

22   A.   I do.

23   Q.   And is this a part of your work papers that was produced

24   in discovery?

25   A.   I believe, yes, it was, and I had it in my initial file,

1    yes.

2    Q.   And we talked a little bit about this at the hearing on

3    March 14th, didn't we?

4    A.   I think we did.  I don't know if we talked about this

5    specific piece of paper.

6    Q.   Maybe this will refresh your memory.  This document looks

7    like it's a page of something called "Pension Plan of Employees

8    of Dartmouth-Hitchcock".  See that?

9    A.   Yes.

10   Q.   And you reviewed information about the pension in her

11   fringe benefits isn't that correct?

12   A.   Yes, I did.

13   Q.   Okay.  And I think you testified that the amounts you put

14   in her fringe benefits were 12 percent of her pay; is that

15   correct?

16   A.   Yes.

17   Q.   And, and, really, not so much her past pay, but your

18   projections of her future pay; isn't that right?

19   A.   Yeah, not her past pay, only on what she would, my

20   projections of what she would have earned at Dartmouth.  The

21   contribution to a defined contribution is spent, laid right out

22   by the Dartmouth document as 12 percent.

23   Q.   And my question is, So the, the, first of all, the total

24   pensionable pay that you see there, from your review of the

25   records, those look like her earnings at Dartmouth; is that

 1    fair to say?

 2    A.    Well, that's what they're using to calculate with.

 3    Q.    Okay.  Do you remember testifying that you thought those

 4    were her earnings at the hearing last week?

 5    A.    I don't -- no.  I don't remember seeing this.

 6    Q.    Okay.

 7    A.    This wasn't up there last week.

 8    Q.    And do you recall -- strike that.

 9          Would her qualified pensionable pay, is that the amount of

10    her salary above which they no longer pay additional fringe

11    benefits to her retirement program, to your knowledge?

12    A.    Run that by me again.

13    Q.    Yeah.  So the total pensionable pay on the column on this

14    document is larger than the qualified pensionable pay, isn't

15    it?

16    A.    What numbers are you referring to?

17          ATTORNEY COFFIN:  First of all, may I move this

18    document's admission?  We're getting into it more than I

19    expected.

20          THE COURT:  Okay.  Any objection?

21          ATTORNEY VITT:  I didn't hear the question.  I'm

22    sorry.

23          THE COURT:  Asking for the admission into evidence of

24    this document.

25          ATTORNEY VITT:  Can we get a little more information

1    about where it came from?

2                ATTORNEY COFFIN:  I believe the witness, the witness

3    testified it was part of his work papers.  You produced it in

4    discovery.

5                ATTORNEY VITT:  No objection.

6                THE COURT:  And is this B21, Mr. Coffin?

7                ATTORNEY COFFIN:  Yeah, let's call it that.  Yes.

8                THE COURT:  All right.  Then Defendant's B21 is

9    admitted.

10        (Defense Exhibit B21 is admitted into evidence.)

11    BY ATTORNEY COFFIN:

12    Q.   Okay.  So qualified pensionable pay is lower throughout

13    the total than total pensionable pay; do you see that?

14    A.   No, I don't see that it's lower.  Oh, yeah, I do see that.

15    There's two columns here.  Yes.  There's different calculations

16    for this.  The column over on the right-hand side is by law.

17    Law specifies the maximum amount of income that you can

18    calculate a pension on.

19    Q.   Okay.  And so, if you make more than that, it doesn't

20    calculate in your pension; is that what you're saying?

21    A.   That's correct.

22                ATTORNEY COFFIN:  Okay.  And so -- oh, yeah, yeah.

23    Yes.  Can we publish this to the jury?  Thank you?

24                THE COURT:  Yes.

25    BY ATTORNEY COFFIN:

VOLUME: 6
PAGES: 1-221

1    Q.   Sorry.  So here we see total pensionable pay, qualified

2    pensionable pay years 2008 to 2017, right?

3    A.   Yes.

4    Q.   Okay.  And so, if, and you note that throughout here

5    qualified pensionable pay is lower than total pensionable pay,

6    correct?

7    A.   Yes.  There's a formula for calculating that.  You can see

8    at the bottom of the, at the bottom of the original document

9    you had up there.

10   Q.   Okay.  And on the right there's sort of a cap that occurs

11   above which you don't get your income to count towards your

12   increased pension; is that right?

13   A.   Yes.

14   Q.   Okay.  And so, when you calculated her fringe benefits

15   going forward, you calculated them to be 12 percent of her

16   total pay; isn't that right?

17   A.   Yes, because that is what the defined contribution, not,

18   not the defined benefit package.  This right here is the

19   defined benefit package that ended at December 31st of 2017.

20   Going forward, it's a defined benefit package, which there's a

21   document that was in my folder back in my deposition that laid

22   it right out.  It was published.  It was a colored folder that

23   laid out that Dr. Porter was eligible, not eligible, would

24   receive contributions to a 403(b) equivalent to 12 percent of

25   her actual earnings.

1    Q.    Actual earnings, not qualified pensionable pay?

2    A.    Not qualified pensionable pay, because this is under a

3    different, whole different law.  It's a defined benefit

4    package.

5    Q.    Okay.  And still you have made the assumption in assessing

6    what her fringe benefits would be that they'd be 12 percent of

7    the, of your estimated pay that she would receive from

8    Dartmouth?

9    A.    I'm using --

10    Q.    Yes or no?

11    A.    Yes.

12    Q.    Okay.  And so, to the extent that she would not receive

13    2.5 percent increases every year, that may result in a lower

14    salary from Dartmouth and mean your 12 percent figure is

15    exaggerated; isn't that right?

16    A.    Well, it would lower the fringe benefits, yes, but it

17    would still be 12 percent of whatever the number is in that

18    first column.

19    Q.    But it's of whatever the number is, not necessarily your

20    projections, correct?

21    A.    It's 12 percent times the number, the income projection.

22    Q.    Now, you don't calculate -- you can take that down.  You

23    don't calculate -- well, actually, put it back up really

24    quickly.  Sorry.  Just real quick, one more question on this,

25    maybe two.

VOLUME: 6
PAGES: 1-221

1       The earnings in this column do not go up uniformly 2.5

2    percent each year; isn't that correct?

3    A.    As I said before --

4    Q.    Yes or no, isn't that correct?

5    A.    They do not.  They, pensionable income does not go up by

6    law.  It goes up by a set amount that's specified each year by

7    law, not by what Dartmouth wants to do.

8    Q.    Let's go to -- you can take that down, please.  Do you

9    know whether Dr. Porter qualifies for a pension from UVM

10   Medical Center or UVM Medical College, also known as the

11   College of Medicine or the Larner College of Medicine?

12   A.    Yeah, there's a 403(b) plan at UVM of which UVM

13   contributes 9 percent of her salary into it so she will have a,

14   when she retires, she can draw on that fund just as if she

15   could if she continued working at Dartmouth.  She could draw on

16   that fund that they contributed 12 percent to.

17   Q.    Do you know whether she would qualify for a pension as a

18   professor of OB/GYN at the University of Vermont?

19   A.    No.  There's no such thing.  I don't know what your

20   definition of pension is.  If your definition -- I believe, if

21   I remember correctly -- it may have been last week -- the

22   pension you associated with the defined benefit package where

23   there's a formula to determine it.  That's not the case at UVM

24   nor is it the case at Dartmouth now.

25   Q.    Okay.  Not talking about Dartmouth now.  I'm asking about

1    UVM

2    A.    Well, it's the same thing.  There's a 403(b) plan of which

3    money is put in.  UVM puts money into that plan, and that's her

4    money and she can start withdrawing that at -- I forget

5    exactly.  I think there's some qualification where you might be

6    able to draw it before 65, but that's her money, and she can

7    decide how she wants to withdraw it.

8    Q.    And how much is her yearly benefit from that?

9    A.    It's whatever she wants to withdraw.  There will be, there

10   are rules and regulations.  There's a required minimum

11   withdrawal specified by law, but you can take the minimum, and

12   you don't have to start taking that until 73, or you can take

13   more, but it's entirely up to the individual how they want to

14   receive that money.

15   Q.    Can you put up 34, please?  And just for the judge, the

16   witness, and the -- page, oh, I'm -- 35, 35 is what I wanted.

17   Sorry.  Looking at this document, does that refresh your

18   recollection about what the withdrawal would be for certain

19   years?

20   A.    On, yes, on her old plan.

21   Q.    Yes.

22   A.    The one that they, they eliminated as of January 1 2018.

23   Q.    Right.  And what does that say?

24   A.    It says --

25         ATTORNEY COFFIN:  Can we move the admission, please?

VOLUME: 6
PAGES: 1-221

1          THE COURT:  Any objection?

2          ATTORNEY VITT:  No objection.

3          THE COURT:  All right.  And what is -- hold on,

4    Dr. Bancroft.  What is the number on this exhibit?

5          ATTORNEY McDONALD:  This is a different page from the

6    same exhibit.

7          THE COURT:  So C?

8          ATTORNEY McDONALD:  B21.

9          THE COURT:  Oh, so this has already been admitted?

10          ATTORNEY COFFIN:  I think that's next page of the

11    same exhibit, and only those two pages should be admitted.  We

12    can clear that up at a break, Your Honor.

13          THE COURT:  Okay.  So then C21 is admitted, this

14    page.

15          ATTORNEY McDONALD:  B21, Your Honor.

16          ATTORNEY COFFIN:  I apologize, Your Honor.  It's B21.

17          ATTORNEY McDONALD:  B, as in boy, 21.

18          THE COURT:  Okay, thank you.  B21 is admitted.

19    BY ATTORNEY COFFIN:

20    Q.    Dr. Porter, does that say that -- excuse me, Dr. Bancroft,

21    does this say that Dr. Porter gets a pension from Dartmouth

22    still?  Even though she's separated from them, she's eligible

23    for a pension where she could get a single life annuity worth

24    $9,431?

25    A.    Yes, she's entitled to that for the work that she did up

1    to '17.

2    Q.    Okay.  And so she's entitled to that, and she could be

3    getting that even now, correct?

4    A.    Well, there is a, there's penalties if she was to take it

5    before 65.  They're quite severe.

6    Q.    And no penalties at 65?

7    A.    No penalties at 65.

8    Q.    Your chart doesn't show that addition to her income, does

9    it?

10    A.    No.  Don't need to.  I'm only interested in that, in

11    estimating what the loss is.  I'm not going to -- I don't need

12    to put down on the chart what she earned in the past --

13    Q.    Okay.

14    A.    -- both as income and as benefits.  This program is done.

15    She's going to receive, depending on how they she ticks it, if

16    she ticks a single life annuity, she's going to get $9,400, but

17    the issue is, How much more would she get from a 403(b) if she

18    continued to work at Dartmouth?

19    Q.    Now you can take that down and put up the chart from March

20    19th 2025, please.  Now, this chart goes to the out years of

21    2033; isn't that right?

22    A.    Yes.

23    Q.    And you testified at the beginning that you're not

24    projecting that she'll work until age 70; is that correct?

25    A.    Yes, correct.

1    Q.   And, however, you have underlined the amounts at age 70;

2    isn't that right?

3    A.   Yes.

4    Q.   And it says in a little note at the bottom, "The year

5    2033", underlined, "is consistent with the work life of a

6    62-year-old female with a graduate degree"; is that correct?

7    A.   Yes.

8    Q.   And that's the basis for your emphasis of that; is that

9    correct?

10   A.   Yes, yes.

11   Q.   But you're not estimating that she would work this long;

12   is that correct?

13   A.   No, I'm not.  I put that in there to help the jury.  It's

14   some additional information.

15   Q.   Because you have breakdowns for each year.  So at 65, for

16   instance, it's the, the total economic loss would be 1.360,

17   correct?

18   A.   Yes.

19   Q.   You know, not accounting for the higher compound interest

20   rate than I've suggested you might be appropriate; isn't that

21   right?

22   A.   Repeat that last part.

23   Q.   Yeah.  It's 1.3 million, but that doesn't take any amount

24   you might reduce if you used an interest rate of, say, 3

25   percent versus 12 percent?

1    A.   No, it takes -- that represents a 12 percent on historical

2    losses.

3    Q.   Right.  And, if you used a lower rate, you'd have a lower

4    number?

5    A.   Yes.

6    Q.   And, looking at this, you have the gross earned income

7    from Dartmouth in Column 1 and the gross earned income from UVM

8    in Column 4; is that correct?

9    A.   Yes.

10   Q.   And looking at between '24 and '25, the gross income from

11   Dartmouth or, excuse me, from UVM drops from $313,000 to

12   $302,000; isn't that correct?

13   A.   Yes.

14   Q.   And that is to reflect, is it not, the change in her work

15   from full-time, 1.0, to .75; isn't that correct?

16   A.   No.

17   Q.   No, it's not?

18   A.   No.

19   Q.   Why does it go down after that?

20   A.   She's moving from a .8 part-time position.  She is not

21   working full time.  She works .8, and she's moving down to a

22   .75.

23   Q.   I see.  I see.  And so the salary numbers that you used in

24   there reflecting a .8 position, not a full-time position; is

25   that correct?

VOLUME: 6
PAGES: 1-221

1    A.    Her --

2    Q.    Yeah, the numbers you put in there -- strike that.

3          For 2017 to '24, the numbers you put in there are assuming

4    a .8 position?

5    A.    Well, from 2017 to 2024, the numbers in that gross earned

6    income column under the UVM are her actual earnings.  I'm not

7    doing any forecasting.  Those are her actual earnings out

8    through the year 2024.  Projections start in 2025.

9    Q.    Okay.  And actual being a 1.0 position?

10   A.    No, I don't think she was 1.0.  It's, I don't know if she

11   ever had a 1.0.  I know recently it's .8.  But what I'm

12   concerned about, well, not concerned -- the important thing is

13   I need to put in what she actually earned.

14   Q.    Yes.

15   A.    And I did.

16   Q.    But you do more than that, because you project going

17   forward earnings at what you calculated would be a .75 position

18   at UVM isn't that right?

19   A.    Yes.  I went forward forecasting.  Starting at 2025, I'm

20   starting to forecast, project out what her earnings, what I

21   believe her earnings would be, and I, that's based on starting

22   July 1 on a .75 part-time appointment.

23   Q.    Okay, okay.  Got you.  Just a second, please.  Did you --

24   you must have come up with this number by reducing to .75 from

25   what you, her, her projection was for her; isn't that right?

1    A.    Yes.

2    Q.    Okay.  So you'd done that math before, correct?

3    A.    I'm not sure what quite what your question is, but, if

4    you're talking about 2025 --

5    Q.    Yeah.

6    A.    As I explained on direct, two-step process.  The first

7    thing I did was increase her 2024 income by 2.5 percent, and

8    then, starting on July 1, I reduced it by a little over 6

9    percent, reflecting her moving from a .8 to a .75 position.

10   Q.    Okay.  So what I would like to do is just have you do a

11   little math with me, please.  Take the numbers of her total

12   earnings from -- I'll give you a pad you can write on in a

13   second.

14         ATTORNEY VITT:  I'm having a hard time hearing.  I'm

15   sorry.

16   BY ATTORNEY COFFIN:

17   Q.    I apologize.  Doing the math, from 2005 to 2027 and

18   looking at gross earned income, I'm going to have you divide

19   that by .75, which would give you the figure for a 1.0

20   position.

21         THE COURT:  So, Mr. Coffin, I'll ask you to pull the

22   microphone a little closer to you.  People are having a

23   difficulty hearing you.

24         ATTORNEY COFFIN:  I apologize.  Do I need to repeat

25   that?

 1                ATTORNEY VITT:  We couldn't hear it.  I'm sorry.

 2                ATTORNEY COFFIN:  Yeah, I apologize.  I'll try and

 3       project.

 4                THE COURT:  If you want to discuss it with the

 5       Witness at the stand, you might be able to take his microphone.

 6       BY ATTORNEY COFFIN:

 7       Q.   Share?  Do you mind if I share?  Thank you.  Okay.

 8       Dr. Bancroft, I'm showing you the -- you have before you the

 9       March 19th 2025 chart, and I'd like you, with the calculator,

10       and I'm going to get you a pad so you can write it down in a

11       second, to calculate what the gross earned income for a .75

12       position you have in there is for a 1.0.  So you divide 302 by

13       .75 for that, for year 2025.  And I'll be back in a second.

14       You can use my calculator.  Let me just get a pad and --

15       A.   Well, may I comment?  The 2025 figure includes six months

16       at .8 and six months at .7.  So calculation is not as simple as

17       dividing it by .75.  Now, when I get to year 2026 and forward,

18       I can divide that by .75 to see what a full-time position is.

19       Q.   Just for rough, rough cutting here, can you please do what

20       I asked you to do and divide the $302,000 that is on your chart

21       for her total earnings at UVM for 2024 by .75, which would give

22       you what 1.0 is for that figure?

23       A.   No, it will not.

24       Q.   Well, can you just do it and --

25       A.   I'll do it anyways, but it's not correct.

```
 1                (The Witness uses the calculator.)

 2   Q.   That's $403,000?

 3   A.   Yes.

 4   Q.   I'll go put a star by that so because you've raised some

 5   points about how you calculated that.  Do the same thing for

 6   2006 and 2027.  I'll let you write it.

 7                (Witness complies.)

 8   A.   I'll let you write it.

 9   Q.   What is it?

10   A.   $427,888.

11   Q.   $427,888?  That's a 1.0 position for 2026 at University of

12   Vermont Medical Center --

13   A.   Yes.

14   Q.   -- correct?  2027, please.

15   A.   That was 2027.

16   Q.   Can you do 2026 then?

17   A.   Oh, I'm sorry.

18   Q.   That was 2027?  You're sure?

19   A.   No, I'm not.  Hold on just a second.

20   Q.   Sure.

21   A.   That number I gave was for '27.

22   Q.   Okay.  $427,888 for 2027; is that right?

23   A.   Yes.  And '26 --

24   Q.   What's 2026?

25   A.   $415,425.
```

1    Q.    Okay, thank you.  I'll take my phone.  So you calculated a

2    full-time position for 2025 with a couple of notes that, you

3    know, you had differing methodologies for the first half of the

4    year, second half of the year, but the .75 to 1 conversion was

5    $403,000, approximately, right?

6    A.    I'll take your word for it.  I don't have in front of me.

7    Q.    2026, the calculation of a full-time position, and, again,

8    here looking at the chart -- what is this exhibit number, by

9    the way?  C11, looking at this chart that's C11 and going down

10   to 2026, the amount you have written there for a gross income

11   from Dartmouth at or from UVM you have at a .75 position.  If

12   that was a full-time position, 1.0, the amount you calculated

13   would be $415,925; isn't that correct?

14   A.    I don't know.  I'll take your word for it.

15   Q.    Okay.  And 2027, the calculation if you converted the .75

16   gross figure from $320,000 to 1.0 would be $427,888, correct?

17   A.    Take your word for it.

18   Q.    Okay.  So I note that all three of those years her

19   earnings at Dartmouth if she was a 1.0 employee, a full-time

20   employee, would be higher, excuse me, at UVM would be higher

21   than what it was at Dartmouth; isn't that right?

22   A.    Higher than what I'm projecting, yes.

23   Q.    Okay.  And so, by that time, she would have fully

24   mitigated her losses and, going forward, luckily for her, she's

25   going to be making more at the University of Vermont than she

1    is at Dartmouth?

2                ATTORNEY VITT:  Objection.  It's speculation, Judge.

3                THE COURT:  Overruled.

4                ATTORNEY COFFIN: Can you read the question back,

5    please?

6                (Question read by the reporter.)

7                THE WITNESS:  She would be making more at UVM based

8    on a full-time position than my projections at Dartmouth.

9    BY ATTORNEY COFFIN:

10   Q.   Okay.  Now, thank you.  Now I'd like you to make another

11   --

12               THE COURT:  I'm sorry, Mr. Coffin Dr. Bancroft, can

13   you please pull the microphone closer?

14               THE WITNESS:  Sorry.

15               ATTORNEY COFFIN:  And I think we'll be done with

16   cross soon if that's okay, Your Honor.  I don't have a lot more

17   to do.

18               THE COURT:  All right.  Go ahead.

19   BY ATTORNEY COFFIN:

20   Q.   Now, more math, but you're a math guy.  You're an

21   economist.  36 weeks is 9 months, approximately?

22   A.   What's that?

23   Q.   36 weeks equals 9 months, approximately?

24   A.   Yeah.

25   Q.   Yeah.  Four weeks in a month, right?

1    A.    A little over, yes.

2    Q.    And nine months is about three-quarters of a year?

3    A.    Yes.

4    Q.    Okay.  Now, you estimated that, at Dartmouth, when she

5    left Dartmouth, she would have been making a gross income of

6    $309,000 in 2018; is that right?

7    A.    That's my estimate.

8    Q.    Okay.

9    A.    I don't know because I have to estimate it.

10    Q.    Okay.  And so you might be able to do this in your head,

11    but we'll do with it with the calculator.  .75 times $309,000

12    is what?

13    A.    I don't know.  You have the calculator.  What am I

14    supposed to do here?

15    Q.    .75 times $309,000, your 2018 projection.

16    A.    319,000?  $232,019.

17    Q.    Okay.  So in 2018 if she had received three-quarters' pay

18    for the year, that means that that would be, like, $232,000; is

19    that right?

20    A.    Well, that's the -- the math works out that way.

21    Q.    Right, right.  Fair enough.  And you never heard -- well,

22    strike that.

23          Wouldn't all of your assumption be thrown radically off

24    course if she had received $228,000 in the second half 2017 and

25    had been able to keep working at UVM?

1  A.   Run that by me again.

2  Q.   Yeah.  Assume, please, that in 2017 -- strike that.

3       In the second half of 2017 and into early 2018, she had

4  received $228,000, just gift, but had been able to pursue her

5  now current employment which started then at University of

6  Vermont Medical Center.  Assume that.  How, wouldn't that mean

7  that your calculations here are completely thrown out the

8  window?

9  A.   Well, if you're going to assume less Dartmouth earnings,

10 obviously, my numbers are going to be off because my numbers

11 are predicated on my projections of what she would have earned

12 at Dartmouth, and so, if you change those numbers, it's going

13 to change the total economic loss.

14 Q.   Correct.  And you base a lot of your projections both for

15 Dartmouth and UVM on what she told you, correct?

16 A.   Yes.

17 Q.   And what Counsel Vitt told you, correct?

18 A.   Yes, I mean, but, but most of the times I talked with

19 counsel, Dr. Porter was on the line.

20 Q.   Okay.  No one mentioned to you, I presume, that anything

21 well -- strike that.

22       Can you please show what's been admitted as C6A?  And I'm

23 publishing this to the jury, Your Honor.

24            THE COURT:  Okay.  It's published.

25            ATTORNEY COFFIN:  And now please publish C13.  Blow

1     up that paragraph on severance pay.

2               ATTORNEY VITT:  May we approach the bench, Judge?

3               THE COURT:  Yes.

4               (Bench conference begins.)

5               ATTORNEY VITT:  I think what they're doing is taking

6     the severance offer if she had agreed to waive her rights and

7     accept the money. They can't take the severance offer and say,

8     Well, you should have taken that and, therefore, the payment

9     would have been greater.  That is -- I just figured out what

10    they're doing here.

11              ATTORNEY COFFIN:  Well, I'm asking this economic

12    expert to describe another "what if", which is, What if she had

13    taken the severance offer, which has been admitted into the

14    evidence without objection, and say whether he could project

15    how that would affect her future earnings.  And, of course, it

16    would affect them greatly because he doesn't, it appears he

17    doesn't know about that because he's relying on selective

18    information from the plaintiff, which is all impeachment.  It

19    goes to his credibility, and it goes to the substance of what's

20    going on here.

21              ATTORNEY VITT:  She has no obligation to accept a

22    severance offer that asks her to give up her various rights.

23    She had no obligation.  You can't say, Well, we made a decent

24    offer; you had to give up your rights, you know,

25    confidentiality.  I mean, you know, there's settlement offers,

VOLUME: 6
PAGES: 1-221

1    I've seen these before.  Basically, you know, you have to be
2    quiet.  You can't disclose the amount.  You can't talk, you
3    know, nondefamation clause in there.  Absolutely not.  You
4    don't get to say, Here's a settlement offer, and, oh, by the
5    way, when it comes time for damages, we're going to consider
6    that and you should have accepted it, and this somehow affects
7    your damages.

8         ATTORNEY COFFIN:  So we have been asked to deal with,
9    on the fly, repeated last-second reports, nondisclosure,
10   varying economic opinions, and that's all supposed to be good
11   for us, and we're supposed to deal with it, but the remedy for
12   that, of course, is cross-examination on these documents, and,
13   if this information has been already submitted without
14   objection, it's relevant, already found, already admitted to
15   the case for any purposes, no limiting purposes.  I think it's
16   a fair point.

17        THE COURT:  It's in evidence.  So, Mr. Vitt, it would
18   be very difficult for me to limit cross-examination on this
19   when it's before the jury already and has been since last week.
20   You'll obviously have an opportunity to speak to your witness
21   again on redirect and examine him on this.

22        ATTORNEY VITT:  All right.  Thank you.

23             (Bench conference ends.)

24

25   BY ATTORNEY COFFIN:

1    Q.   Now, Dr. Bancroft, you saw, as we published to the jury,

2    the last two exhibits which are -- find I piece of paper here

3    -- C6A and C13, correct?

4    A.   Yeah, I believe so.  I'm seeing C13.

5    Q.   Yes or no, you see them?

6    A.   I see 13.

7    Q.   Before you were just shown C6A.

8    A.   I'll take your word for it.

9    Q.   Would you like to see it again?

10   A.   If you want me to, absolutely, sure, yes.

11   Q.   Could you put up C6A, please?  And, directing your

12   attention to that first paragraph -- the rest is on another

13   issue -- you've read that now?

14   A.   Yes.

15   Q.   And look at, please -- we're going to put C13 up again.

16   And, directing your attention to the highlighted paragraph,

17   which there it is, this paragraph describes that they're

18   willing to give a severance to 36 weeks, see that?

19   A.   Yes.

20   Q.   Did Dr. Porter or Attorney Vitt discuss anything about the

21   payment of $228,000 in 2017 to Ms. Porter, Dr. Porter, excuse

22   me, with you prior to your testifying here today?

23   A.   I don't remember if they specifically talked about it, but

24   what I looked at is what she actually earned, and if you'll

25   notice in 2017 I'm saying her loss is, what, $600.

1    Q.    Yes-or-no questions are really important here, not side

2    tours, please.  You cannot testify that they provided this

3    information that she was offered a $228,000 severance in 2017

4    today, correct, yes or no?

5    A.    I don't see that number, so I don't know what she was

6    offered.

7    Q.    Excuse me.  Yes or no, please?

8           ATTORNEY COFFIN:  Can you read me my question back,

9    please?

10           (Question read by the reporter.)

11    A.    I don't remember.

12    Q.    If they had described a 228-some-odd-thousand-dollar

13    payment that would be made then, would that have affected your

14    economic analysis?

15    A.    No.

16    Q.    Okay.  And so, if Dr. Porter had received -- can you put

17    up the 2025 chart, please?  If Dr. Porter had received a

18    $228,000 payment in 2017, your gross earnings figure for that,

19    assuming it was earnings, your gross earnings figure for that

20    year would have gone up by $228,000; isn't that right?

21    A.    Well, if you were to add those two together, it would, but

22    I looked at what she actually received.

23    Q.    I understand what you did.  I'm just asking you a

24    hypothetical.

25    A.    If it's a hypothetical, yes, it's a hypothetical.

1    Q.   Okay.  And so that increased earnings capacity or that

2    lump sum earnings --

3              ATTORNEY VITT:  Objection, Your Honor.

4              ATTORNEY COFFIN:  Would have --

5              ATTORNEY VITT:  Accepting a severance payment to give

6    up your claims is not --

7              THE COURT:  Well, Mr. Vitt, instead of a speaking

8    objection, I'd ask you to come up.

9                   (Bench conference begins.)

10             THE COURT:  I understand your point.  I think what

11   you're asking to say is accepting a severance --

12             ATTORNEY VITT:  Is not an increased earnings

13   capacity.

14             THE COURT:  He's asking him this as a hypothetical,

15   if she had accepted the severance pay, right?  Why can't you

16   come back on redirect and reestablish what he's saying now,

17   which is that she --

18             ATTORNEY VITT:  Severance, but it's not, it doesn't

19   increase her earnings capacity.  That's what that increases

20   earnings capacity.  No, it doesn't.  She's simply accepting a

21   severance, giving up rights that she otherwise has.  That

22   doesn't increase her earning capacity.

23             THE COURT:  I don't know that your questioning is to

24   make the point that it increases earning capacity.

25             ATTORNEY COFFIN:  No, it's not.

1          THE COURT:  It would have been in red of that
2     particular amount.
3          ATTORNEY COFFIN:  Yes, and he should and she would
4     have had less to mitigate, and she would have been able to
5     mitigate earlier, though it's crazy how quickly she did
6     mitigate.
7          ATTORNEY VITT:  There wouldn't have been a lawsuit.
8          ATTORNEY COFFIN:  It might have been in her interest
9     to take that, but, yes, it's a legitimate cross.
10         THE COURT:  As I said before, you can come back on
11    redirect, and he'll make that point for you.  It sounds like
12    she didn't accept it and his basis of calculation is what she
13    actually received.
14         ATTORNEY COFFIN:  This is probably the one or two, if
15    I can spit them out, and then we're done.
16         ATTORNEY VITT:  Take a break and then --
17         THE COURT:  Yes.
18         (Bench conference ends.)
19    BY ATTORNEY COFFIN:
20    Q.   Dr. Bancroft, if Dr. Porter had received a payment of
21    $280,000 as earnings in 2017, that would have increased her
22    earnings column in Column 1, Line 1 on 2017 by some $228,000;
23    isn't that correct?
24    A.   I'm not sure of that.  I can't answer yes or no.  I don't
25    know.  I'd have to see the circumstances what she got.  I told

1    you the measure I have there is actual earnings.

2    Q.    Okay.  I'm asking for a hypothetical.

3    A.    Okay.

4    Q.    Okay.  So please answer my question.

5    A.    Make it clearer to me that it's a hypothetical.

6    Q.    Okay, I'll try.  If she, if, if, hypothetically, she had

7    received $228,000 in earnings in 2017 and that would be in

8    something using the methodology you've talked about here, you

9    would add it to her gross earned income, right?

10   A.    No.  Maybe.  I don't know.  I can't answer.  I don't know,

11   no.

12   Q.    You can't say that, if it's earnings and she had it, you'd

13   consider it?

14   A.    I put in her actual earnings.

15   Q.    Well, let's assume she actually earned that, she got,

16   actually got a $228,000 payment in 2017, she actually got that

17   as reflected by the letter offering her that, for example,

18   right?  Then you would have that added to the gross earned

19   income column, correct?

20   A.    If it's not already taken into account.

21   Q.    Okay.  And from there that flow-down would be moneys that

22   she could use to offset other deficiencies in her earnings

23   later on, correct?

24   A.    Yes.  So you're assuming that she would have, she would

25   have left Dartmouth?

1    Q.   Let's assume what happened happened, she left and she went

2    to UVM

3    A.   Yeah, I'm just trying to understand your hypothetical.

4    Q.   Okay.  Apologize.  And she's working away at Dartmouth for

5    a while, but she leaves and is offered a position, you know,

6    pretty much right way at UVM and she works there and has a

7    successful career there, correct?

8    A.   Yes.

9    Q.   But maybe in the first couple of years it's a little bit

10   less than what she was making at Dartmouth, correct?

11   A.   Quite a bit.

12   Q.   Okay.  But $228,000 could do quite a lot to fill up that

13   divot; isn't that correct?

14   A.   If this is some new money that she would have received,

15   yes.

16            ATTORNEY COFFIN:  Okay.  Those are all I got, Your

17   Honor.

18            THE COURT:  Okay, all right.  So we'll take our lunch

19   break.  We'll be ready to go at 1:30, please.

20            (A recess was taken from 12:26 p.m. to 1:32 p.m.)

21            THE COURT:  Okay.  Mr. Coffin

22            ATTORNEY COFFIN:  On very minor matter, Your Honor.

23            THE COURT:  Yes.

24            ATTORNEY COFFIN:  In the rush to get jury and all of

25   us to lunch, I wanted to move the admission of what I'm calling

1    C19, which is the little handwritten chart that Dr. Bancroft

2    prepared during his cross.  I propose that this be admitted at

3    this time as demonstrative evidence and that we likely will

4    follow with asking for it be substantive evidence should the

5    plaintiff's chart be admitted as substantive evidence.

6            THE COURT:  Is there any objection, Mr. Vitt?

7            ATTORNEY VITT:  Well, we certainly object to it being

8    admitted into evidence under any circumstances.  Dr. Bancroft

9    said it was inaccurate.  So, to the extent it's been used

10   demonstrably, fine, but I don't know about admitting as

11   demonstrative.  I don't know what that means.

12           THE COURT:  So a demonstrative would be that,

13   obviously, he did some calculations on cross-examination.  It

14   could be shown to the jury for, for whatever purpose the

15   defense has asked him to do those calculations.  If it's

16   admitted as a demonstrative now, then on redirect, if you

17   choose, you can make use of that as well to speak to

18   Dr. Bancroft about that.

19           ATTORNEY VITT:  I don't intend to use it at all.

20           THE COURT:  Okay.  Do you object to it?

21           ATTORNEY VITT:  I do.

22           THE COURT:  Okay.  Can I actually see it?  I haven't

23   --

24           ATTORNEY COFFIN:  If I might approach, Your Honor.

25           THE COURT:  Yes of course.  This is

1          ATTORNEY COFFIN:  This is the only copy in the world.

2          THE COURT:  So it says very little, but I know it's

3     because your questions were kind of prompting.  So this is the

4     ultimate sum total on the cell phone of the calculations you

5     directed him to make?

6          ATTORNEY COFFIN:  Yes.  These were the calculations

7     that were made using the addition based on the cell phone

8     calculator and written in.

9          THE COURT:  Okay.  And, if this were to be admitted

10    as a demonstrative now, Mr. Vitt objects to that, but he is

11    also not going to be making any use of it.  Is there any reason

12    why we can't take this up at a later time?

13         ATTORNEY COFFIN:  No.  I just didn't want him to be

14    deprived of it on redirect.  We just created it, and I wanted

15    him to be aware of it.

16         THE COURT:  Given that he's not going to use it, I

17    guess I won't rule on this right now, but let's not forget it.

18         ATTORNEY COFFIN:  Okay.  I do view this as important

19    cross-examination admissions of this witness, by the way.

20         THE COURT:  Okay.  But, again, Mr. Vitt, you have no

21    intentions of using this on redirect?

22         ATTORNEY VITT:  None.

23         ATTORNEY SCHROEDER:  Judge, I also asked Emerson if

24    we could come in a little bit early, just to go over, knowing

25    that we have a lineup for tomorrow.  I've spoken with

1    Dr. DeMars about, Hey, I don't think the other side is going to

2    be done with you today.  Can you figure out how to come back

3    tomorrow?  She's making arrangements to do that.

4        But then we have Dr. Conroy, CEO, coming, and it's really

5    important to get her on and off since Dr. DeMars is sitting out

6    there for the whole day since 9:00 a.m. without her phone.  So

7    she doesn't have the ability to get any work done.  The same is

8    going to be true for Dr. Conroy.  I know of they have a few

9    other witnesses that may or may not have some other issues,

10   Dr. DeMars was here for today.  We're making arrangements to

11   have her back tomorrow morning.  But, given the fact that they

12   don't have the ability to sit out there and do work while

13   they're here, it is really important for us that Dr. Conroy

14   then gets on right after and gets off quickly.  Because I don't

15   think that's going to take more than 15 minutes.

16           THE COURT:  Okay.  And Dr. Conroy is for tomorrow?

17           ATTORNEY SCHROEDER:  Correct.

18           ATTORNEY NUNAN:  Well, okay.  So we had given

19   Michelle Russell a subpoena for 9:00 o'clock tomorrow, which we

20   understand she would go on after Dr. DeMars, and we had been

21   accommodating to allow Dr. Conroy to come on Tuesday instead of

22   Wednesday.  So, again, I do not think that Dr. Russell will

23   take long, but she does have childcare duties at the end of the

24   day in the Upper Valley, and I am going to try to get her on,

25   like I told her, as soon as possible in the morning.  And she

VOLUME: 6
PAGES: 1-221

1    also will be without her phone and not able to work in the

2    lobby.

3            THE COURT:  Okay.  So Dr. DeMars, after the remaining

4    redirect today, possibly coming back in the morning if

5    necessary.  Plaintiff then intended to call Dr. Russell after

6    that and then Dr. Conroy, right?

7            ATTORNEY NUNAN:  Right.

8            ATTORNEY SCHROEDER:  Yes.

9            THE COURT:  Dr. Conroy after that.  So thank you for

10   letting me know.  Let's see how the day goes, see what we get

11   through, and I'll be asking the same questions at the end of

12   the day.  Anything else?

13           ATTORNEY McDONALD:  One minor exhibit issue.  I think

14   the Court admitted the entirety of B21.  I've spoken with

15   opposing counsel, and I think the intention was just that two

16   pages from that larger set be admitted.  So they have agreed

17   that B21A should be Page 34 from B21 and B21B should be Page 35

18   from the original B21 but that the entirety of B21 not be

19   admitted.

20           THE COURT:  Okay.  Mr. Vitt, is that accurate?

21           ATTORNEY VITT:  Yes.  Thank you, Your Honor.

22           THE COURT:  Okay.  So then B21A and B21B are

23   admitted, B21A being Page 34 and B21B being Page 35.

24           ATTORNEY McDONALD:  Thank you, Your Honor.

25           THE COURT:  Okay.  The bench conferences, I have to

1    tell you.  It's, it's a little cacophonous up here.

2              ATTORNEY COFFIN:  I apologize, Your Honor.

3              THE COURT:  Yeah, I know we have to be very much on

4    top of this.  If people are not going to keep the volume down,

5    I'm just going to have to ask the jury to leave every time we

6    have a bench conference.  I honestly don't know what else I can

7    do in that circumstance.  Please be mindful of it.  I certainly

8    have noticed -- how could you not notice it -- that there does

9    seem to be a fair amount of tension here between the lawyers.

10   I know you're both advocates for your position, but it

11   certainly hasn't gone unnoticed.  This really is, it seems to

12   me, anyway, among some of the more contention interactions

13   between the lawyers.

14        Again, I'm not trying to rein people in in terms of being

15   zealous advocates, but, when it comes to things like this,

16   let's please do our best to keep it within the bounds of normal

17   in terms of volume level, okay?  All right.  We'll bring the

18   jury in.

19              (The Jury enters the courtroom.)

20              THE COURT:  Mr. Vitt, redirect?

21              REDIRECT EXAMINATION BY ATTORNEY VITT

22   Q.   Thank you.  Dr. Bancroft, all set?

23   A.   Yes.

24   Q.   You were asked on cross-examination if you had worked with

25   my firm and Eric Jones's firm on other employment matters,

1   correct?

2   A.   Yes.

3   Q.   Do you also with work with Downs Rachlin Martin, the firm

4   Mr. Coffin is associated with?

5   A.   Yes.

6   Q.   For how long a period?

7   A.   I believe my first litigation case for them was in 1984,

8   and I just finished up one with them in January of this year.

9   Q.   I'd like to direct your attention, if I may, to the 2023

10  earnings for Dr. Porter.  Had you obtained documents from Dr.

11  Porter to support the earnings data that you provided in your

12  report?

13  A.   Yes.

14  Q.   Was it relevant whether Dr. Porter was a full professor or

15  not, so long as you had accurate salary information for her for

16  that year?

17  A.   No, it wasn't relevant.  What I want is the actual.

18  Q.   All right.  And you actually had the actual numbers that

19  you obtained from documents provided by Dr. Porter?

20  A.   Yes.

21  Q.   There is a question or two about reductions in

22  Dr. Porter's salaries in 2016 and 2017 at Dartmouth-Hitchcock.

23  Was she on disability during those years?

24  A.   Yes.

25  Q.   Did that have an impact on her salary?

1    A.   Yes.

2    Q.   I'm going to show you what has been marked as -- I think

3    it's C13.  It's defendant's June 5, 2017 letter to Dr. Porter

4    and then a number of documents, including a confidential

5    separation agreement and general release.  Hand that up to you.

6         Over the years in working on employment cases, have you

7    seen settlement documents that include a general release?

8    A.   I'm sorry.

9    Q.   Have you seen settlement documents that include a general

10   release over the years in working on employment cases?

11   A.   I probably have.  None come to mind.

12   Q.   All right.  If you look at that, there is a reference to,

13   I think, Paragraph 4, a general release.  Do you see that,

14   Paragraph 4?

15   A.   Paragraph 4 on the June 5, 2017 --

16   Q.   Yes

17   A.   -- letter?

18   Q.   Well, actually, it's in the document.  I'm sorry.  My

19   fault.  Okay.  I'll get it for you.  Hold on.  What's the title

20   of that paragraph?

21   A.   Paragraph 4?

22   Q.   Yes, please.

23   A.   Release by physician.

24        THE COURT:  Mr. Vitt, I'm not seeing this exhibit.

25   Did you intend to show this exhibit or just ask the witness

1     about it?

2               ATTORNEY VITT:  Actually, if I could show it, I would

3     appreciate it, Judge.

4               THE COURT:  Okay.  This is admitted?

5               ATTORNEY VITT:  Yes, C13.

6               THE COURT:  Yes.

7               ATTORNEY VITT:  If that's the case, if you'll give

8     that back to me, it will show up here on your screen.

9               THE WITNESS:  Do you want the whole packet?

10    BY ATTORNEY VITT:

11    Q.    Thanks.  I realize you're an economist and don't spend a

12    lot of time reading general releases and documents like that,

13    but are you aware generally that, when employment cases get

14    settled, the person receiving money is expected to release any

15    and all claims that they have against the employer?

16    A.    That's sort of roughly my understanding, but, again, I

17    have all I can do to handle the economics.

18    Q.    And, right, and if you go to Paragraph 5, there is a move

19    to Paragraph 5.

20    A.    It's not here.

21    Q.    Oh, it's not on your screen?  Let me put it here.  Thank

22    you.  Do you see that?

23    A.    Paragraph, what's the first couple words?  The term?

24    Q.    Paragraph 5 confidential physician --

25    A.    Oh, yes okay.  Yes.

1    Q.   "Physician agrees to keep the terms and conditions

2    relating to this agreement confidential", do you see that?

3    A.   Yes.

4    Q.   Okay.  And then I'm going to put Paragraph 6 up here

5    entitled "nondisparagement".  Do you see that?

6    A.   Yes.

7    Q.   The first sentence, "Neither physician nor anyone acting

8    on physician's behalf will make derogatory, disparaging, or

9    critical statements about employer or any employer releasee".

10   Do you see that?

11   A.   Yes, I do.

12   Q.   So, given the obligations that Dartmouth-Hitchcock sought

13   to impose on Dr. Porter in order to receive this payment of

14   $228,000, did you see any reason that that $228,000

15   hypothetical payment should be reflected in your report?

16              ATTORNEY COFFIN:  Objection, totally leading.

17              THE COURT:  I'll allow it.

18              THE WITNESS:  No.

19              THE COURT:  Go ahead.  You may answer the question.

20              THE WITNESS:  No.

21   BY ATTORNEY VITT:

22   Q.   No reason to include it, correct?

23   A.   No.

24              ATTORNEY VITT:  Nothing further.

25              THE COURT:  Any recross, Mr. Coffin?

VOLUME: 6
PAGES: 1-221

1          ATTORNEY COFFIN:  Yeah, briefly, Your Honor.

2               RECROSS-EXAMINATION BY ATTORNEY COFFIN

3    Q.   You testified that, beginning in 2025 for this analysis,

4    one of your assumptions is the plaintiff would be working .75

5    hours for her position at UVMMC; isn't that right?

6    A.   Yes, starting July 1.

7    Q.   And yet you continued when she was at Dartmouth from 2025

8    until your posited age of her retirement in 2033 --

9          ATTORNEY VITT:  Objection.

10   BY ATTORNEY COFFIN:

11   Q.   -- that she would be working in a full position; isn't

12   that right?

13        ATTORNEY VITT:  Objection, Judge.  This is beyond

14   scope.

15        THE COURT:  No, I'll allow this.

16        ATTORNEY VITT:  All right.

17        THE WITNESS:  Yes, I'm assuming.  Based on her salary

18   at the time she was terminated, I've used that number to go

19   forward, and I'm assuming that was for a full-time position.

20   BY ATTORNEY COFFIN:

21   Q.   Your assumption is, while at Dartmouth, she would work

22   from 2025 until her posited retirement age in 2033 full time,

23   correct?

24   A.   Yes, I think that's the case.

25   Q.   While at UVM she would work from 2025 until the time of

1    her retirement in 2033 only at .75; isn't that correct?

2    A.   Yes.

3    Q.   And that's based on what she told you; isn't that correct?

4    A.   Yes.

5    Q.   Now, the difference between what she's making at Dartmouth

6    as a full-time employee and what she's making at UVMMC as a

7    theoretical .75 employee you calculate each year as damages

8    incurred by the plaintiff; isn't that right?

9    A.   Yes.

10   Q.   So, if she's working less than full time at UVMMC, her

11   damages are increased just because of that hypothesis?

12   A.   If she's working -- yes.

13   Q.   And we went through some of the numbers which showed, if

14   you converted the .75 first to full time during her '25 through

15   '27 UVMMC employment, she actually would be making more in

16   salary at UVMMC; isn't that right?

17   A.   Yes.

18   Q.   Now, we talked a little bit about your cases, your prior

19   work as an expert witness, and we talked about 2,500 cases, and

20   it was hard to pin down some amounts related to your less

21   recent work.  Let me ask you about your more recent work.

22        If we take the 500 cases or so that you've described doing

23   since the time of your deposition in October of 2019, I think

24   you said that was your estimate about the number of cases

25   you've done, correct?

VOLUME: 6
PAGES: 1-221

1          ATTORNEY VITT:  Objection.

2          THE WITNESS:  That was what is on my resume.

3          THE COURT:  Dr. Bancroft, please don't answer the

4     question.

5          ATTORNEY VITT:  Objection, Judge.  This is well

6     beyond scope of what I covered in my redirect.

7          THE COURT:  Sustained.

8          ATTORNEY COFFIN:  No further questions.

9          THE COURT:  All right.  Dr. Bancroft, you may step

10    down.  Plaintiff may call the next witness.

11         ATTORNEY NUNAN:  We call Leslie DeMars.

12                    Leslie DeMars,

13         having been duly sworn to tell the truth,

14              testifies as follows:

15         THE COURT:  Please proceed.

16         ATTORNEY NUNAN:  Just a technical issue, can we shut

17    the ELMO off?  I'm going to plug in my computer.  The document

18    that's going to come up first has already been admitted, 83.

19         THE COURT:  Okay.

20         ATTORNEY SCHROEDER:  Sorry, Sarah.  What number is

21    that?

22         ATTORNEY NUNAN:  83.  Sorry.

23         ATTORNEY VITT:  If you could get a little closer to

24    the microphone --

25         ATTORNEY NUNAN:  Yeah, not a problem.  I have one

 1    more thing.  I'd like to get Dr. DeMars a book of the documents

 2    so that she can read the paper version in full before I ask her

 3    questions about them.  Is that okay?

 4             THE COURT:  Okay.

 5             ATTORNEY NUNAN:  Easier to read them in paper than it

 6    is to review them all.  So the only two that are in the second

 7    notebook are here.  So I'll just direct you when the time

 8    comes.

 9             DIRECT EXAMINATION BY ATTORNEY NUNAN

10    Q.   Good afternoon, Dr. DeMars.  My name is Sarah Nunan.  Will

11    you please tell me your medical education history?

12    A.   So I was a medical student at the University of Vermont.

13    I then did my residency and fellowship at the University of

14    North Carolina, Chapel Hill.

15    Q.   And did you come to Dartmouth-Hitchcock about 1996?

16    A.   1997.

17    Q.   Great.  Was that your -- let's see.  What was your

18    specialty when you got there?

19    A.   Gynecologic oncology.

20    Q.   And you worked in the OB/GYN department?

21    A.   Yes.  GYN oncology is a subspecialty of obstetrics and

22    gynecology.

23    Q.   And you came to Dartmouth-Hitchcock the same time as

24    Dr. Porter?

25    A.   Approximately, yes.

1    Q.    And when did you leave Dartmouth-Hitchcock?

2    A.    End of December 2018.

3    Q.    2018?  Okay.  Are you a board examiner?

4    A.    Not anymore.

5    Q.    Were you for a period of time?

6    A.    Yes.

7    Q.    How many years?

8    A.    20.

9    Q.    Okay.  Any other honors that you had over the course of

10   your career?

11   A.    None that I would count as being subspecialty oriented.

12   Q.    Great.  If you want to open up your notebook to Tab 83, I

13   have most of the documents here, but, if you like the paper

14   copy, it's there.  You all set?

15   A.    Yes.

16   Q.    Okay.  This is the email that Dr. Merrens received from

17   Nurse Victoria Maxfield.  Do you know who she is?

18   A.    Yes.

19   Q.    And he makes statements at the top of the page to Nurse

20   Maxfield.  He says, "As you know, Dr. Porter currently works at

21   20 percent of her time".  Do you see that?

22   A.    Yes.

23   Q.    So this was in May of 2017.  Dr. Porter was back working.

24   Do you know if that is a correct statement?

25   A.    It's difficult to put exactly together how many hours

1    Dr. Porter was working from month to month, and the timeline is

2    really hard to remember.  Dr. Porter was working a limited

3    number of hours in a limited capacity.

4    Q.   Fair.  If I, if I said to you that she was not working one

5    day a week, but that she was working four days a week, she was

6    working approximately 50 percent of the time, would you

7    disagree with me?

8    A.   I would disagree with you.

9             ATTORNEY SCHROEDER:  Objection.  Calls for

10   speculation.  I realize this is on cross, but --

11            THE COURT:  Sustained.  I

12            ATTORNEY SCHROEDER:  And, Dr. DeMars, just wait until

13   the objection is handled by the judge.  Thank you.

14   BY ATTORNEY NUNAN:

15   Q.   Dr. Merrens says here, "The recommendation around the

16   closing of the program and its staff, and its staff were at the

17   recommendation of Dr. DeMars".  Do you agree with that

18   statement?

19   A.   I disagree that I recommended to close the division.  We

20   had recommended that we close temporarily the IVF services at

21   DH.

22   Q.   Was it your experience that the administration conflated

23   IVF and the other resources, the other services that the REI

24   division provided?

25            ATTORNEY SCHROEDER:  Objection, Your Honor.  Assumes

1   facts not in evidence.

2            THE COURT:  Sustained.  I'll ask you to rephrase the

3   question.

4   BY ATTORNEY NUNAN:

5   Q.  Okay, sure.  When there were discussions about closing the

6   division, was it your experience that they were saying to you

7   that the IVF portion was what the REI doctors did?

8   A.  I don't think that's an accurate representation.

9   Q.  Okay.  How much of the REI division was IVF?

10  A.  I can't give you a percentage because each, each REI

11  division member had their own particular interests.

12  Q.  Would it be fair to say that it was somewhere between 10

13  and 20 percent?

14           ATTORNEY SCHROEDER:  Objection, Your Honor.  Assumes

15  facts not in evidence.

16           THE COURT:  Overruled.

17           THE WITNESS:  That may have represented Dr. Porter's

18  practice, but it probably did not represent the practice of the

19  other members of the division.

20  BY ATTORNEY NUNAN:

21  Q.  Okay.  Will you take a look at what time Dr. Merrens sent

22  this email?  Do you agree it's sent at 2:19 p.m.?

23  A.  Yes.

24           ATTORNEY NUNAN:  Okay.  I would like to show the

25  Witness Exhibit 89.

1          THE COURT:  Is that admitted in evidence, Ms. Nunan?

2          ATTORNEY NUNAN:  It is not.

3          THE COURT:  Okay.

4     (Plaintiff Exhibit 89 was shown to the Witness.)

5     BY ATTORNEY NUNAN:

6     Q.   Dr. DeMars, is this an email that you sent to Daniel

7     Herrick?

8          ATTORNEY SCHROEDER:  Counsel, just, I don't want to

9     interrupt your question, but it's a pretty long email.  So I'd

10    just, if you want her to read it, all of it, that's fine.  I

11    just --

12         ATTORNEY NUNAN:  Sure.  I'd like to get it admitted

13    in evidence before she starts reading it.

14    BY ATTORNEY NUNAN:

15    Q.   I'm sorry.  At the top is this an email that you sent to

16    Ed Merrens?

17    A.   It's a series of emails that I sent to Ed Merrens, yes.

18    Q.   And the date is May 14th 2017?

19    A.   There's one from May 12th and one from May 14th.

20         ATTORNEY NUNAN:  Sure.  I'd like to move this into

21    evidence.

22         THE COURT:  Any objection?

23         ATTORNEY SCHROEDER:  No objection.

24         THE COURT:  Okay.  Plaintiff's 89 is admitted.

25    (Plaintiff Exhibit 89 is admitted into evidence.)

1    BY ATTORNEY NUNAN:

2    Q.   So I'd like to go to the last page on Page 3.  We had

3    mentioned in Exhibit 83 that Ed Merrens had sent an email May

4    12th at 2:19, and this email at the very bottom, he turns

5    around at 2:27 and sends you an email; is that correct?

6    A.   Yes.

7    Q.   Is it says, "Leslie, I'm getting inundated with heartfelt

8    and long emails wondering why Misty can't stay on to do her

9    ultrasound complex operative and teaching role even if we end

10   REI.  I suspect that you considered this in the evaluation of

11   the program and your knowledge of Misty.  I just need to know

12   how to better answer these, this question".

13        Did I read that correctly?

14   A.   Yes.

15   Q.   I'd like you to turn to the first page now where you

16   respond at 5:59 p.m.  You say, "Yes, there has been enormous

17   backlash, mostly heartfelt based on Misty's longevity and with

18   only a token nod to the elephant in the room of her disruptive,

19   slash, splitting behavior that everyone has seen.  They are

20   angry and fearful that, if Misty could be terminated, any of us

21   could be".

22        And I'm going to skip down to the second highlighted part

23   that says, "Everyone is also remembering Misty as a full-time

24   employee wearing three hats and not the one who has been out

25   for almost 18 months".  Did I read that correctly?

1    A.    Yes.

2    Q.    Being out for 18 months, you're referring to her

3    short-term then long-term disability?

4    A.    That she has not been work full term for almost, full time

5    for almost 18 months.

6    Q.    And, when you say three hats, what do you mean?

7    A.    That Misty was a skilled gynecologic surgeon, she was a

8    skilled ultrasonographer, and she was a skilled infertility

9    physician.

10   Q.    I'd like turn to turn to the next page.

11        ATTORNEY SCHROEDER:  And, just for the record,

12   Counsel, is this your highlighting as opposed to the actual

13   document that's been admitted?

14        ATTORNEY NUNAN:  It is.  It is.  In my attempt to run

15   my own exhibits.

16        ATTORNEY SCHROEDER:  Nothing wrong with that.

17        ATTORNEY NUNAN:  I asked Geoffrey to, but I decided I

18   needed a little guidance.  So please forgive me.  This is my

19   highlighting to keep me on track.

20        ATTORNEY SCHROEDER:  Just wanted the record to

21   reflect that.  Thank you.

22   BY ATTORNEY NUNAN:

23   Q.    Yeah, okay.  So this paragraph that's highlighted is one,

24   two, three, four down.  It's not going to be highlighted on

25   your paper document, but you can see it on the screen.  I'm

1    going to read what you wrote here:  "Misty's medical disability

2    has been devastating, and I'm not sure that she should or will

3    really ever be able to do the complex hysteroscopy or

4    laparoscopy that she once did.  That being said, there are a

5    few full-spectrum REI docs that could bring similar surgical

6    skills, but they are hard to find.  I think that the best

7    outcome of this termination is the chance for Misty to actually

8    be out on leave with no intervening responsibilities so she can

9    assess how much she, how much improvement she might gain".

10        Did I read that correctly?

11   A.   You did.

12   Q.   That was your decision to make for Misty?

13   A.   Excuse me.

14   Q.   That was your decision, the best outcome of the

15   termination was for Misty to go off?

16   A.   That was -- I disagreed with the decision to close the

17   division.  Heather Gunnell and I, with Daniel Herrick, were

18   trying to put a plan in place by which we could pause IVF

19   services, maintain Misty as an employee, and eventually reopen

20   IVF services.  Those plans we were unable to present to

21   leadership, and those plans were designed to be, to allow Misty

22   to recover on her own time.  My statement that her termination

23   would allow her to recover was my heart speaking that she was,

24   she would be allowed to recover without the stress and chaos of

25   the IVF service.  It was never my intention that I thought she

1    would be better off by being terminated, nor did I agree that

2    she should be terminated.

3    Q.    You didn't agree that she should be terminated?

4    A.    I did not.

5    Q.    Okay.  I would like to go down to the next paragraph.  It

6    says, "As much as it hurts, it was the right decision to

7    include her in the terminations, and I don't want to change

8    that decision".

9    A.    At this point, the decision had been publicized.  I

10   disagreed with it.  I was unable to argue my disagreement, and

11   I was unable to turn back the fact that the actions had been

12   taken, the terminations actions had been taken, and it had been

13   publicized.

14   Q.    Further down you say, "If she doesn't really get better

15   and can only work 16 to 20 hours a week, she will have to

16   choose between ultrasound and REI and will be an effective

17   teacher for the REI fellowship at UVM".

18         So you're telling me that you are not -- you wanted her to

19   stay on at Dartmouth-Hitchcock?

20   A.    I absolutely wanted her to stay on.  I had a job for her

21   that I was trying to plan.

22   Q.    And you do not see Dr. DeMars's (sic.) email on the third

23   page as asking you why she can't do those other three items

24   that you counseled she was so skilled at?

25   A.    I was not allowed to present that plan before the decision

1    was made to terminate the decision -- the division.  If I said

2    decision, sorry.  I think Misty was an incredible, valuable

3    department member.

4    Q.    I have another question for you.  Dr. DeMars writes back

5    to you that what you've written is a comprehensive, thoughtful,

6    and appropriate insight.  Do you see that?

7    A.    Yes.

8    Q.    "Ultimately, once the dust settles, we'll be in a better

9    position with all of this, including Misty."

10          Did you think Misty was in a better position being

11    terminated?

12    A.    That's a really hard question to answer.

13    Q.    Okay.  I'll ask you another question.  Was Misty not as

14    useful to you when she could not wear three hats because of her

15    disability?

16    A.    It wasn't about me.  Misty was on leave, and my job was to

17    protect her leave and help her and allow her to get better.

18    Q.    So that was your decision, to terminate her so that she

19    could recover?

20    A.    It was not my decision to terminate her.

21    Q.    But you agreed that terminating her would allow her to

22    recover?

23    A.    She would have remained on leave.  Had she not been

24    terminated, she still would have been on leave.

25    Q.    Are you referring to the fact that she came to you in late

1    April and said she had to have another surgery?

2    A.    No.    That she wasn't fully recovered yet and she was still

3    on leave and she would have been on leave throughout much of

4    2017.    We had no idea what was to come, but she was still not

5    back to being fully recovered, and she would have still been on

6    leave, and I wanted to protect a position for her.

7    Q.    Okay.    I'd like you to turn to Document 2 in your book.

8    This is Plaintiff's Exhibit 2.    Dr. DeMars, this is an email

9    written to you.

10    A.    I'm not even close to that yet.    Sorry.

11    Q.    Thank you for letting my know.    You let me know when

12    you've reviewed it.

13            ATTORNEY SCHROEDER:    And just give her a hot second

14    to actually read the text.

15            THE COURT:    I'm going to ask counsel to approach,

16    please.

17            (Bench conference begins.)

18            THE COURT:    So you may want to object, but I'm not so

19    sure you should be giving a narrative of what the Witness

20    should do.    That's my job.    So you can make an objection or

21    have a bench conference instead of talking to the Witness.

22            ATTORNEY SCHROEDER:    Understood.

23            THE COURT:    All right.

24            (Bench conference ends.)

25    BY ATTORNEY NUNAN:

1    Q.   Are you set?

2    A.   Yes.

3    Q.   Great.  You received this -- no.  You sent this email to

4    Dr. Reindollar on September 17th 2015; is that correct?

5    A.   Yes.

6              ATTORNEY NUNAN:  I'd like to move for the admission

7    of Plaintiff's Exhibit 2.

8              THE COURT:  Any objection?

9              ATTORNEY SCHROEDER:  No objection.

10             THE COURT:  Plaintiff's Exhibit 2 is admitted.

11        (Plaintiff Exhibit 2 is admitted into evidence.)

12   BY ATTORNEY NUNAN:

13   Q.   I'm going to read to you starting at, "I need some

14   advice".  "I need some advice about unbiased performance

15   evaluation.  Albert is still struggling.  Technical competence,

16   ovulation induction plans, basic endocrine and infertility

17   knowledge, timely completion of medical records, and he hasn't

18   told us if he's passed his written boards, parentheses, I know

19   the results are out.  UVM can't review his clinical competence

20   in infertility world, in the infertility world.  Does ASRM have

21   resources to evaluate clinical practice?  I can't go by MBP's

22   evaluation, and I do think that she has been good" -- I think

23   you mean at, but -- "a providing guidance, at least initially".

24   Did I read that correctly?

25   A.   Yes.

1    Q.    Okay.  First off, is Albert referring to Dr. Albert Hsu?

2    A.    Yes.

3    Q.    And is MBP Dr. Porter?

4    A.    Yes.

5    Q.    Okay.  And I want to start with the last phrase about what

6    I believe is Dr. Porter, "And I do think that she has been good

7    at providing guidance, at least initially".

8         Dr. Porter spent six months training Dr. Hsu when he first

9    arrived, didn't she?

10   A.    Yes.

11   Q.    Okay.  He came out of the Jones Institute?

12   A.    Yes.

13   Q.    He had had a fellowship?

14   A.    Yes.

15   Q.    It was of poor quality?

16   A.    According -- Dr. Porter had concerns about Dr. Hsu coming

17   to Dartmouth because of the experience that he would have had

18   at the Jones Institute.

19   Q.    And she spent six months of nights and weekends working

20   with him.  He didn't have his own independent schedule; is that

21   right?

22   A.    I don't remember.

23   Q.    Okay.  Do you remember her spending six months of nights

24   and weekends and call with him?

25   A.    I don't remember, but that I wouldn't be surprised.

VOLUME: 6
PAGES: 1-221

1    Q.    Okay.  And what you're saying, I believe, here is that she

2    worked hard with him, she gave him good guidance?

3    A.    Initially.  I think that it was her responsibility to

4    bring Dr. Hsu up to a level of competence.

5    Q.    And she trained residents?

6    A.    She trained residents.

7    Q.    And, eventually, she trained fellows as well?

8    A.    Eventually, yes.

9    Q.    Okay.  And you saw her?  That was her responsibility?

10    A.    Yes.

11    Q.    Okay.  And she was competent to do that?

12    A.    Yes.

13    Q.    So I'm going to direct you to the first statement which

14    is, "I need some advice about unbiased performance evaluation",

15    and then down below you say, "I can't go by MPB's evaluation".

16    Why?

17    A.    There were two conversations that I had with before I, I

18    -- excuse me.  There were two conversations that I had that

19    concerned Dr. Porter's history of being critical and

20    undermining members of the REI division.

21    Q.    Okay.  Let's start with her being critical.  Was she

22    demanding?

23    A.    Yes

24    Q.    Did she have high standards?

25    A.    She had her standards?

1    Q.   Which were high?

2    A.   Which I think were high.  We all have to understand that,

3    when we are trying to evaluate competence as we try to evaluate

4    competence at our board exams, that there is a spectrum of what

5    is competent and what is not competent, and there is a very

6    wide spectrum of competence.  I believe Dr. Porter had a very

7    high standard of competence and was very critical of anyone who

8    did not rise to her standard or she didn't expect could rise to

9    her standard.  That caused friction among department members,

10   division members.  It caused friction among division

11   physicians, and it was a longstanding behavior.

12   Q.   So her standard of care for her patients was too high?

13   A.   Her standard of care was her standard of care.

14   Q.   Fair enough.

15   A.   She refused to acknowledge that there was a range of what

16   is standard of care.

17   Q.   And, when people in the department came to you over the

18   next two years and reported concerns about Albert Hsu and

19   patients, is that explanation right there the one that you gave

20   them?

21   A.   I'm not sure I understand your question.

22   Q.   Sure.  Sharon Parent testified that she came to you and

23   said, "I am watching Dr. Seifer" -- this is not Dr. Hsu -- "I'm

24   watching Dr. Seifer hurt patients, hurt the women that come to

25   this department, and I have concerns", did you tell her what

VOLUME: 6
PAGES: 1-221

1    you just said here, which is Dr. Porter's standards are too

2    high, and you have to understand that some doctors are

3    different than Dr. Porter and we have to accept that?

4    A.   I never said that Dr. Porter's standards were too high,

5    first of all.

6    Q.   Okay.  I think Dr. Porter is an excellent physician.  She

7    is a fantastic physician.

8    Q.   I agree with that.

9    A.   I think that I was told very early on that Dr. Porter had

10   a very long history --

11   Q.   Is there any -- excuse me.  I'm going to interrupt you.

12   Is this by Dr. Reindollar?

13   A.   It's by more than Dr. Reindollar.

14   Q.   Who?  Who told you this?

15   A.   Dr. --

16           ATTORNEY SCHROEDER:  Objection, Your Honor.

17           THE COURT:  Okay.  Basis?

18           ATTORNEY SCHROEDER:  Not allowing her to finish her

19   answer.

20           ATTORNEY NUNAN:  Excuse me.  Go ahead.

21           THE COURT:  To the extent that's the objection,

22   sustained.

23   BY ATTORNEY NUNAN:

24   Q.   So I'm hearing Dr. Reindollar and Dr. Manganiello?

25   A.   And Dr. Manganiello.

1    Q.   Dr. Manganiello left the practice in 2009; is that

2    correct?

3    A.   Maybe.

4    Q.   And Dr. Reindollar, I'm not going to get this quite right,

5    but approximately at the end of 2013?

6    A.   Yes.

7    Q.   I'd like to get back to what you're saying about Albert

8    Hsu here.  You list a pretty wide range of issues that he is

9    having; is that correct?

10   A.   Yes.  I think I'm reflecting what, what Misty had, what

11   Dr. Porter had reported to me.

12   Q.   Okay.

13   A.   And I'm trying to find some, some way of an unbiased

14   performance evaluation because I've been told that Dr. Porter's

15   performance evaluations can be biased, can be deliberate, and

16   they can be, they can be designed to split the division and to

17   cause discord within the division.  So I'm looking for

18   independent confirmation of what Dr. Hsu's competence is.

19   Q.   But Dr. Hsu -- you don't attribute these statements to Dr.

20   Porter; is that correct?  And you have the knowledge here that

21   he is struggling?

22   A.   So I don't know what these, what these exact points, to

23   whom I should be attributing those to at this point, no.

24   Q.   Okay.  At the point that you wrote this email, Dr. Porter

25   hadn't gone out on disability yet -- is that right -- September

1    2015?

2    A.    I don't know.

3    Q.    Okay.  Did you go to Dallas with Dr. Porter Novemberish of

4    2015 to the board examiners?

5    A.    Probably December.

6    Q.    Normally, you go in November, December?

7    A.    Normally, we went December.

8    Q.    Okay.  And that's something the two of you had done for

9    years?

10    A.    Yes.

11    Q.    Okay.  And in 2015 do you remember Dr. Porter developing

12    double vision and headaches while she was at the boards?

13    A.    I have a vague recollection of it, yes.

14    Q.    And is it your recollection that she went out on

15    short-term disability in December of 2015 and, while she might

16    have worked a little bit in the next six months, she was out

17    for approximately six months on short-term disability?

18    A.    For the first half of 2016, yes.

19    Q.    Okay.  You do remember that?

20    A.    Yes.

21    Q.    Okay.  Dr. Karen George testified that Dr. Porter was

22    excellent at assessing where a resident was in their skill set

23    and then advancing them.  Do you agree with Dr. George's

24    assessment of Dr. Porter?

25            ATTORNEY SCHROEDER:  Objection, Your Honor.

VOLUME: 6
PAGES: 1-221

1          THE COURT:  Okay.  Basis?

2          ATTORNEY SCHROEDER:  She wasn't here for that

3   testimony, and I think this is -- well, can I be heard sidebar?

4          THE COURT:  Yes.

5          (Bench conference begins.)

6          ATTORNEY SCHROEDER:  Sure.  The objection is that

7   she's characterizing the testimony that has been heard as if

8   that is the testimony, and I don't know that that's -- she's

9   saying this is what she said.  I don't believe that that's

10   necessarily the case.

11          THE COURT:  Do you have a reason to think it's

12   inaccurate?

13          ATTORNEY SCHROEDER:  Well, I think it's -- I don't

14   know that it's accurate, and I don't know that -- it's a

15   long-winded question relating to something that obviously she

16   can ask, If she said this, would you agree with that?  I'm just

17   struggling with the fact that, yes, it's on cross.  I

18   understand that.  But saying that this is what this person

19   testified to as a declarative statement without any

20   verification of that, I don't recall her saying exactly those

21   words, so, you know, I don't recall it specifically.

22      I just, if we're going to have all these questions based

23   upon testimony that this witness would not have heard because

24   she wasn't here because she was sequestered -- she can ask, If

25   this person testified this way, would you agree with it?

1    That's perfectly fine, but to say this is what this person

2    testified to, you know, unless she's got a record in front of

3    her of the transcript, I'm not going to feel comfortable saying

4    that that's exactly what was said, and I think it's a fair

5    objection just based on the circumstances of this being a

6    person being called as for cross.

7              ATTORNEY NUNAN:  I believe that it's evidence that is

8    in the record.  Dr. George said that one of Dr. Porter's skills

9    was assessing residents where they stood and advancing them.  I

10   thought that was in evidence.

11             THE COURT:  I think that's his point is that he's not

12   sure if it's in evidence as you are describing it.  So,

13   apparently, if you say to her, If the Witness has testified to

14   the following, would you agree with that --

15             ATTORNEY SCHROEDER:  Right.  And I think that's a

16   fair statement and, correct, that's a fair question, just so

17   that I'm not coming up here for objections on this point.  But

18   thank you.

19             THE COURT:  Right.

20             (Bench conference ends.)

21   BY ATTORNEY NUNAN:

22   Q.   If Dr. Karen George testified that Dr. Porter was

23   excellent at assessing residents' abilities and helping them

24   develop their skills in REI, would you disagree with that

25   statement?

1    A.    I would not.  I would confine it to REI.

2    Q.    Thank you.  I'd like to look at the bottom paragraph where

3    you state, "Also, I need to find an REI doctor with seniority

4    who could put Albert under his wing".  Is this the email that

5    eventually led to the recommendation of David Seifer?

6    A.    It led to opening up the search.

7    Q.    Dr. Reindollar did not give you a recommendation?

8    A.    No.

9    Q.    And the search turned up David Seifer?

10   A.    The search eventually turned up David Seifer.  We had

11   searched before.  We had had a search open for quite some time,

12   and, ultimately, we did hire Dr. Seifer.

13   Q.    You and Dr. Porter interviewed Dr. Seifer in the fall of

14   2015?

15   A.    I don't know when the dates were, honestly, at this point.

16   He was interviewed by more than Dr. Porter and myself.

17   Q.    I'd like you to turn to Exhibit 7 in your book.  Have you

18   reviewed it?

19   A.    Yes.

20   Q.    Okay.  Is this an email that you wrote to Maria Padin?

21   A.    Yes.

22   Q.    Okay.  On May 12th 2016?

23   A.    Yes.

24         ATTORNEY NUNAN:  I'd like to move the admission of

25   Plaintiff's Exhibit 7.

1           THE COURT:  Any objection?

2           ATTORNEY SCHROEDER:  No objection.

3           THE COURT:  Plaintiff's 7 is admitted.

4       (Plaintiff Exhibit 7 is admitted into evidence.)

5   BY ATTORNEY NUNAN:

6   Q.   You write here, "Maria, I would like to meet or talk with

7   you as soon as possible to discuss David's assessment.  His

8   position is essential to keeping the REI division afloat, and I

9   do feel the evaluation that he received from his peers", and

10  you put that in quotes, "were vindictive and not a good

11  representative, and not a good representation of his value and

12  ability.  The picture that I received from David, the chair

13  Aaron Caughey, and the laboratory director just don't mesh with

14  his past performance or with the person.  I am concerned that,

15  if we cannot hire Dr. Seifer, that I will have to shut the

16  program down with Misty Blanchette Porter still out on medical

17  leave and Albert Hsu, my junior member, hanging by a thread.

18  Even with Misty returning, we need different leadership."

19       Did I read that pretty much correctly?

20  A.   Yes, you did.

21  Q.   Is it fair to say that, in January to the time you wrote

22  this email, Dr. Hsu was not doing well in the REI division?

23  A.   Dr. Hsu was overworked, overstressed, and had no support.

24  Q.   It was not going well; is that a fair characterization?

25  A.   It was really difficult for him.  He, if you back up to

1    his hiring, he was a junior faculty member who came from a

2    program that didn't give him the requisite experience that he

3    needed to be, to be able to hit the ground running.

4    Q.   I have a question for you.  When Dr. Porter finished her

5    six months, nights, weekends with Dr. Hsu, did she talk to you

6    then about Albert Hsu?

7    A.   I don't remember.

8    Q.   And did he then go out and have his own schedule?  He was

9    no longer -- he was actually independent?

10   A.   I don't remember.

11   Q.   Okay.  And, if I represented to you that, when he went out

12   on his own after that six months and his skills reverted, is

13   that a conversation you remember having with Dr. Porter?

14   A.   If the timing is correct, six months would have been

15   somewhere at the beginning of 2015, and, if his skills had

16   reverted, then it was back to Dr. Porter for additional

17   training and support.

18   Q.   Wasn't he brought in in the beginning of 2014?

19   A.   No.

20        ATTORNEY SCHROEDER:  Objection, Your Honor.

21   BY ATTORNEY NUNAN:

22   Q.   Okay.  So, if Dr. Porter saw his skills revert and she got

23   out her teaching slides and then went over them again with him

24   and had a discussion with you, do you remember that discussion?

25   A.   No.  But this was her responsibility to bring his skills

1    back up.

2    Q.   Do you remember Dr. Porter telling you he was untrainable?

3    A.   I don't remember that.  I also don't believe anyone is

4    untrainable who makes it that far.  I think that's a fairly

5    inflammatory statement and, again, in keeping with some of the

6    behavior that I was told Dr. Porter had done over the years.

7    Q.   I'd like you to turn to Document 123.  We have 123A.  I

8    think your notebook only has 123, but I will -- actually, I

9    think it's right up there.  You're right.  123A, I did get a

10   copy.

11        I'd just like to ask Emerson.  If my management of this is

12   unbearable, will somebody speak up?

13             COURTROOM DEPUTY:  No.  You're good.  Yes, thank you.

14             ATTORNEY NUNAN:  Great.  This document is admitted,

15   right, so I can show the jury?

16             THE COURT:  Yes, 123A is admitted.

17             (Witness reading.)

18   BY ATTORNEY NUNAN:

19   Q.   Okay.  Are you finished?

20   A.   Yes.  Skimming through it, yes.

21   Q.   Thank you.  Did you ask Dr. Porter to write an assessment

22   of Dr. Hsu?

23   A.   I don't remember.

24   Q.   Do you remember telling Dr. Porter to have a discussion

25   with Dr. Seifer about Albert Hsu?

 1    A.   I don't remember.

 2    Q.   Okay.  Do you remember Dr. Seifer being hired about May of

 3    2016?

 4    A.   Yes.

 5    Q.   And do you remember Dr. Porter returning in a more

 6    consistent fashion about June, May or June of 2016 from her

 7    short-term disability?

 8    A.   No.

 9    Q.   You don't remember that?

10    A.   No, she didn't return in a more consistent fashion.  She

11    returned in a very limited fashion and primarily to do

12    ultrasound.

13    Q.   Okay.  But she was in the REI division --

14    A.   Yes.

15    Q.   -- at that time?  And do you believe that that document

16    there was a document she was asked to write?

17    A.   I can't tell you that.

18    Q.   Okay.  And what is the overall conclusion Dr. Porter comes

19    to in that eleven-page document?

20    A.   Dr. Porter concludes, "With the clinical demand and his

21    observed deficiencies, it is not appropriate for Dr. Hsu to be

22    employed at DHMC".

23    Q.   Was Dr. Porter in a position to assess Dr. Hsu?

24    A.   She was in a position to provide her opinion.  She was in

25    a position to provide her observations of Dr. Hsu directly.  I

1    think what is most challenging is interpreting her opinion and

2    the reports of anything that was going on between January of

3    2016 and June of 2016 where she was primarily not at DH and she

4    was on medical leave.

5    Q.   I'm glad you brought that up.  I'm going to ask you a

6    question about that.  When she got back from her disability,

7    did you ask her to take over the care of some patients that had

8    not been well cared for by Albert Hsu?

9    A.   I would have asked her to take over care of some of the

10   patients if those were patients that were, that may have been

11   previously her patients.  They may have previously been

12   Dr. Hsu's patients.  We had several patients that were, that

13   were quite challenging IVF patients that, again, Dr. Porter is

14   a fantastic IVF doctor.

15   Q.   That didn't quite answer my question.  My question was --

16   A.   Well, I'm not sure I can answer that question.

17   Q.   Do you remember discussing with Dr. Porter giving free IVF

18   cycles to people who had been treated by Dr. Hsu while she was

19   out on disability?

20   A.   We had, we, as in the department, had made the decision to

21   provide an uncompensated IVF cycle to at least one couple that

22   I can remember.  The circumstances around that uncompensated

23   cycle, to me, weren't very clear, and it made more sense to be

24   able to offer an uncompensated cycle to that particular couple.

25   A second one I don't remember.

1    Q.   So, when you receive a document -- I would like to go

2    through kind of some of the elements, just the points in this

3    document.  On Page 3 she says, "Below are my observations and

4    opinions with regard to her performance".  She lays it all out

5    there.  It's comprehensive, isn't it?

6    A.   Yes.

7    Q.   She has, "One, marked global fund of knowledge deficiency

8    in REI and general gynecology."  On Page 6 -- give you a second

9    to turn there -- she has, "two, critical thinking".  She says,

10   "Most concerning to me has been my observation that Dr. Hsu

11   struggles with critical thinking and assessment.  He has

12   difficulty identifying pieces of data in a patient's or

13   couple's evaluation which are the most salient and require

14   attention".

15   A.   What you skipped over also is that Dr. Hsu passed his oral

16   general board exams which --

17   Q.   But not his written, right?

18   A.   He had to have passed his written general board exams to

19   be able to take his oral board exams.  So he passed his oral

20   board exams in general obstetrics and gynecology, which

21   directly assesses his ability to synthesize information, and

22   general obstetrics and gynecology directly assesses his ability

23   and performance of general gynecology.

24   Q.   So that fact alone tells you that whatever is written in

25   this document shouldn't be taken seriously?

1          ATTORNEY SCHROEDER:  Objection, Your Honor.

2          THE COURT:  I'll allow it.

3          THE WITNESS:  I think that it needs to be taken as

4     Dr. Porter's opinion and with a grain of salt.

5     BY ATTORNEY NUNAN:

6     Q.   Can you explain one more time why I need to take a grain

7     of salt with this?  I'm not sure I could articulate that.

8     A.   Because she is assessing his -- her opinion is that he was

9     deficient in his knowledge of general obstetrics and

10    gynecology, which is completely distinct from REI, and the fact

11    that he had passed his general boards says that he had an

12    adequate fund of knowledge and defended that fund of knowledge

13    and ability to synthesize plans and problems in general

14    obstetrics and gynecology to the satisfaction of the national

15    examiners.

16    Q.   Okay.  So I understand that, the general OB/GYN, but you

17    go on to do a fellowship and work in a subspecialty.  REI is a

18    subspecialty, is it not?

19    A.   Yes.

20    Q.   Okay.  So that is knowledge beyond general OB/GYN, what

21    you were just describing?

22    A.   So I'm not disputing that.  What I'm disputing is the

23    general idea that he's unable to synthesize general facts.

24    Q.   She goes on on Page 7, "B, preoperative planning and

25    assessment".  She talks about that.  Page 8, she talks about

1  professionalism.  Did you take anything that she wrote under

2  "Professionalism" seriously, or did you take that with a grain

3  of salt?

4  A.   So we had actually been in, in the areas of

5  professionalism, we had been working on his timely completion

6  of medical records.  That had been an ongoing --

7  Q.   He was always behind in his charts, and that was a

8  problem, wasn't it?

9  A.   That was a not, an uncommon problem for many of the

10  faculty members.  He was not out of range of what, of other

11  faculty members, but it was a consistent problem for Dr. Hsu.

12  Q.   He was often on the list that said his chart, he was

13  behind in his charts; is that correct?

14  A.   Among many other providers.

15  Q.   Got it.  And that's a problem for billing, isn't it?

16  A.   In a very broad sense, because bills are not generated as

17  soon as a, as a note is completed.

18  Q.   How about a problem of team communication?  Is it a bigger

19  problem in a division where women are coming in routinely and,

20  when you call up that woman's chart and it hasn't had the last

21  entry by Dr. Hsu that's a problem, is that an issue, a

22  communication issue?

23  A.   I think that was a problem with the, with the division in

24  general, that there was very poor communication among team

25  members, because not, because not always, that the plans were

1    not always documented actually in a note.

2    Q.    Was Dr. Porter behind on her charts regularly?

3    A.    She's actually very good at her charting.

4    Q.    Thank you.  Okay.  I'd like you to turn to 9, Page 9,

5    where she goes over his technical skills.  Okay.  "I have

6    addressed some of the issues with his fundamental deficits in

7    IVF ART, but it cannot be overstated that my observation is he

8    has trouble integrating the technical skills that he has been

9    sufficiently taught."

10        The next paragraph says, "Most relevant to our practice,

11   he has regressed considerably in his ability to perform embryo

12   transfers."

13        So my understanding -- please correct me if I'm wrong --

14   is IVF is egg harvest and then embryo transfer.  Is that a

15   basic understanding?

16   A.    Yes.

17   Q.    Thank you.  And this was written in June of 2016; is that

18   correct?

19   A.    Yes.

20   Q.    And Albert Hsu had been in the practice for 2014, 2015,

21   and 2016, to June of 2016; is that correct?

22   A.    Yes, under Misty's guidance.

23   Q.    Except when she was out on disability?

24   A.    Which was primarily 2016.

25   Q.    Okay.  When you received notice from Misty that he had

1    regressed considerably in his ability to perform embryo

2    transfer, that's a pretty basic skill for an REI specialist,

3    isn't it?

4    A.    Yes.

5    Q.    Okay.  So you have been put on notice that you have a

6    doctor that has problems with women who are coming to the

7    clinic to become pregnant and he has performance problems?

8    A.    This is, also, this is a provider who has been under

9    Dr. Porter's tutelage for 2014 and 2015 and, if she identified

10   that he has regressed in his skills, there needs to be some

11   sort of remediation that, if she's unable to do it, then it's

12   another senior member who is able to provide that remediation.

13   Q.    Okay.  So you're not saying that his regression is Misty's

14   fault?  That's not what you're saying?

15   A.    Absolutely not.

16   Q.    Okay.

17   A.    But, if that were the case, if there was regression in

18   technique, then there needs to be remediation to get back to an

19   appropriate technique.

20   Q.    And who was responsible for putting that plan in place?

21   A.    That would have been Dr. Seifer coming in.

22   Q.    Okay.  We'll get to Dr. Seifer, but did you, as chair,

23   have an obligation, given that Dr. Seifer had just arrived and

24   Misty Porter was back from disability, did you have an

25   obligation to do something with a report like this?

VOLUME: 6
PAGES: 1-221

1    A.    I think my obligation is to make sure that there is a

2    remediation plan in place for Dr. Hsu.

3    Q.    Did you put one in place in June of --

4    A.    That's not my --

5    Q.    -- June of 2017?

6    A.    That is not my role.

7    Q.    Did you direct Dr. Seifer to put one in place in 2017, in

8    2016?

9    A.    In 2016 that would have been his responsibility.

10   Q.    Did he?

11   A.    That would have been part of his responsibility.  I don't

12   know what he, what the details, but I know one of his

13   responsibilities was to assess the performance of Dr. Hsu.

14   Q.    What I'm hearing from you is it was not your

15   responsibility.

16   A.    It was not my responsibility.  I don't have the skills or

17   ability to put that remediation plan in place.  This requires a

18   skilled physician in REI.

19              THE COURT:  Ms. Nunan, it's time for our afternoon

20   break.  So we'll return at 3:15.

21         (A recess was taken from 3:03 p.m. to 3:16 p.m.)

22              THE COURT:  Please go ahead.

23   BY ATTORNEY NUNAN:

24   Q.    We established this letter was written in June of 2016,

25   correct?

1    A.    Yes.

2    Q.    And Dr. Albert Hsu was allowed to continue practicing with

3    no restrictions from this time until the division closed in May

4    of 2017; is that correct?

5    A.    Yes.

6    Q.    I'd like --

7    A.    Because he --

8    Q.    I'd like you to turn to Exhibit 28, please.  Have you had

9    a chance to review it?

10   A.    Yes.  Trying to put it into context, yes.

11   Q.    So this is an email thread that starts on December 3rd

12   2016 at the bottom of Page 1 and carries over into December 4th

13   2016 and then finally December 5th 2016, and the last one is

14   between you and Judith McBean; is that correct?

15   A.    Yes.

16   Q.    Okay.  I would like to move Plaintiff's Exhibit 28.

17              THE COURT:  Go ahead.

18              ATTORNEY NUNAN:  Are we good?

19              THE COURT:  Any objection?

20              ATTORNEY SCHROEDER:  No objection, Your Honor.

21              THE COURT:  Okay.  Plaintiff's 28 is admitted.

22        (Plaintiff Exhibit 28 is admitted into evidence.)

23   BY ATTORNEY NUNAN:

24   Q.    All right.  So Dr. Porter writes to you on December 3rd

25   2016.  She says, "There are two patients that I have discussed

VOLUME: 6
PAGES: 1-221

1    with all you who had HyCoSy/SHGs to evaluate the cavity that

2    were read as septums.  Neither patient has a septum.  One

3    normal uterus, one arcuate, which is a considered a normal

4    variant."

5         Okay.  So we are talking about uterus septi, is that

6    correct, or septum?

7    A.   No.

8    Q.   No?

9    A.   Well, we're, we are, we're discussing uterine cavity shape

10   and uterine cavity normal versus abnormal.

11   Q.   Thank you.  Thank you.  Do you remember receiving this

12   email and remember this issue?

13   A.   In detail, no, not at all.

14   Q.   Okay.  So, if I was to say to you that Dr. Hsu had

15   assessed two patients to say that they had septums or abnormal

16   septums that needed maybe surgical repair, is that close to

17   being the case here?

18   A.   I don't know that Dr. Hsu read these.

19   Q.   Okay.

20   A.   And, also, that the, the ultrasounds were not performed

21   properly.

22   Q.   Oh.  So this could be an ultrasound tech's fault, not

23   Albert Hsu's fault?

24   A.   Correct.

25   Q.   Got it.  All right.  I would like you to come up to the

1    top where you write back where you say, "I had a pointed

2    discussion with Albert yesterday on two issues".

3        Does that refresh your recollection that this was an issue

4    about Albert?

5    A.    No.

6    Q.    It doesn't?  Okay.  You just responded to this about

7    Albert, nothing related?  You don't think there is a connection

8    there?

9    A.    I don't know.

10   Q.    Okay.  Thank you.  I'm going to read what you wrote.  You

11   have two points, and then down here you write, "I can't tell

12   him not to do it because I'm not the content expert, but I

13   would suggest Beth that you call her and suggest that she

14   postpone and see Judy or Misty, if Misty you believe the images

15   have been overread.  I don't want her to be harmed.  She works

16   here and should be able to pop in for another visit."

17       So my understanding of this email is that a woman was

18   scheduled for surgery who didn't need it.  Is that your

19   understanding of this issue?

20   A.    I don't know that for sure.  One a patient appears to have

21   been scheduled for surgery for a metroplasty.  There is, there

22   is discordance or a difference in how the ultrasound images

23   were read.  I don't know whether Dr. Hsu read these images or

24   was present when these ultrasounds were done.  Albert had --

25   Dr. Hsu, excuse me.  Dr. Hsu had had a habit of, if he were

1     called in to look at an ultrasound, if he were reading

2     ultrasounds or called in to see a patient, that he would

3     convert that to a formal consultation, which we had discouraged

4     him.  That, we had told him that that is not proper practice

5     that, if the patient needed to be seen by him, that that

6     patient should be scheduled for a separate appointment.

7     Q.   So right.  That's a maybe a billing or a -- that's, that

8     is a separate issue.  I get that.  That's point one.  But point

9     two, you have a patient who he was going to do surgery on who

10    didn't need it, and you state, "I don't want her to be harmed";

11    is that correct?

12    A.   So what I am being told is that a patient who had a, who

13    was diagnosed as having a septum, which is a uterine, an

14    intrauterine abnormality, was scheduled to have that corrected.

15    I don't know -- and then I was informed by Misty that these

16    ultrasounds were not performed correctly and that this perhaps

17    was not the correct interpretation because of the, the

18    ultrasounds not being performed correctly.

19         The part about harm, absolutely, you never want to have a

20    patient undergoing a surgical procedure, any procedure, any

21    visit that is not necessary.  Part of what is required before

22    you take a patient to the operating room is a preoperative

23    consultation and that you bring that patient in for the

24    appropriate counseling of what the problem is, what the options

25    are for treating that problem, what the implications are for

1    not treating the problem, or what the implications are for

2    treating it.  So you give them a full idea of what is truly the

3    medical issue, how to fix it if it requires fixing, and what

4    are the risks to fix it?

5    Q.    Thank you, Dr. DeMars.  I appreciate that.  Will you read

6    the top line that you wrote about your conversation with

7    Albert?

8    A.    That goes back to --

9    Q.    I'd like you to read it, please.

10   A.    Yes.  Sorry.  I didn't hear you.

11   Q.    That's okay.  Could you please --

12   A.    Yes.

13   Q.    -- read the top line that I have highlighted?  Please

14   excuse --

15   A.    "The most unfortunate part of my conversation with Albert

16   is it became clear that, even if he passes his written exam, he

17   would not pass the oral exam."  So the oral exam is when you

18   sit before, again, national experts to discuss --

19         THE COURT:  So, Dr. DeMars, I'm going to direct you

20   to only answer a question that has been asked.

21         THE WITNESS:  Sorry.

22   BY ATTORNEY NUNAN:

23   Q.    Thank you.  So this email, this last email was with Judith

24   McBean.  Can you tell me who Judith McBean was?

25   A.    Judith McBean is a colleague of ours who had completed an

1    REI fellowship at UVM at about the same time that Dr. Porter

2    did and was, had an OB/GYN practice in Brattleboro, and she

3    would refer her infertility patients up to DH for their

4    procedures.

5    Q.    She also worked per diem since 2005 to 2017 in the REI

6    division; isn't that correct?

7    A.    Per diem is -- she worked on a very limited basis.

8    Q.    I appreciate you saying that, but she was in the

9    department, and she was included on REI division emails as part

10   of the department; isn't that correct?  Do you know?

11   A.    I don't know.

12   Q.    Thank you.  My understanding -- correct me if I'm wrong --

13   is that Dr. McBean would come up on Fridays and, because REI

14   was a seven-day-a-week operation, she would cover the weekends

15   sometimes, not always, but sometimes.  Does that sound correct

16   to you?

17            ATTORNEY SCHROEDER:  Objection, Your Honor.

18            THE COURT:  Okay.  Basis?

19            ATTORNEY SCHROEDER:  Foundation.  Assumes facts not

20   in evidence.

21            THE COURT:  Yeah.  You should ask a question instead

22   of a narrative leading into a question.

23   BY ATTORNEY NUNAN:

24   Q.    Sure.  This issue of uterine septum, septi -- I'm probably

25   not --you smiled.  I'm probably not pronouncing that correctly.

1    Do you recall a conversation with Judith McBean about a uterus

2    septum surgery that Albert Hsu had performed on one of her

3    Brattleboro patients?

4    A.    No.

5    Q.    You don't remember her --

6    A.    No.

7    Q.    -- coming to you?

8    A.    No.

9    Q.    Not at all?

10   A.    No.

11   Q.    Okay.  You do not remember her saying that the patient had

12   believed she'd had her septum removed by Dr. Hsu?

13   A.    I do not remember a conversation whatsoever.

14   Q.    Did you have an email exchange with her?

15   A.    I do not remember this.

16   Q.    Do you remember her stating that she'd gone in and done a

17   second surgery to remove the septum that the patient thought

18   she'd had removed by Albert Hsu?

19   A.    Do not remember that.

20   Q.    I'd like you to turn to document -- just confirm this --

21   148, please.  I believe it's up top because it was in the

22   second notebook.  Great.  That last exhibit we looked at was

23   Exhibit 28 was written on 12/5/2016.  That was exactly six

24   months after you'd written, you'd received an eleven-page

25   assessment from Dr. Porter about Dr. Hsu, right?  That was six

1    months later?

2    A.    Yes.

3    Q.    This is an email thread that starts on January 29th 2017

4    and goes until February 19th 2017.  This top email is from

5    Misty Porter to you.  Do you recognize this email?

6    A.    Yes.

7          ATTORNEY NUNAN:  I'd like to move Plaintiff's Exhibit

8    148 into evidence.

9          THE COURT:  Any objection?

10         ATTORNEY SCHROEDER:  No objection.

11         THE COURT:  Plaintiff's 148 is admitted.

12         (Plaintiff Exhibit 148 is admitted into evidence.)

13   BY ATTORNEY NUNAN:

14   Q.    I'd like you to turn to the last page where there is a

15   chart, please.

16   A.    Yes.

17   Q.    Okay, great.  My understanding is FET on the top left-hand

18   side stands for frozen embryo transfer; is that correct?

19   A.    Yes.

20   Q.    And on the right-hand side "fresh" means not frozen?

21   A.    Correct.

22   Q.    Great.  Got that right.  Was this sent by Navid

23   Esfandiari?

24   A.    This was sent by Dr. Porter.

25   Q.    Okay.  The way I read it just above the chart it says on

VOLUME: 6
PAGES: 1-221

1   January 29th 2017, 2:12 p.m., Navid Esfandiari wrote.  So the

2   original document looks like -- the chart looks like it was

3   from Navid.

4   A.   Correct.

5   Q.   Who is Navid; can you tell us?

6   A.   Navid Esfandiari was our IVF lab director.

7   Q.   He was an embryologist as well?

8   A.   Yes.

9   Q.   Okay.  Did he track all the statistics in a program called

10  Baby Sentry?

11  A.   I don't know that they were in Baby Sentry.

12  Q.   Okay.  On this chart MB stands for Misty Blanchette?

13  A.   Yes.

14  Q.   DS stands for David Seifer?

15  A.   Yes.

16  Q.   AH, Albert Hsu?

17  A.   Yes.

18  Q.   And JMB, Judy McBean?

19  A.   Yes.

20  Q.   And I'm just going to highlight the numbers for Albert Hsu

21  here.  I think I am.  Do we agree that the percentages as you

22  go across are 28 percent, 28 percent, over under "Fresh", 21

23  percent, and 19 percent?

24  A.   Yes.

25  Q.   And on the right-hand side where it says 19 percent, the

1    numbers above it are 78, excuse me, 58 percent, 57 percent, and

2    57 percent for the other three providers?

3    A.    Yes.

4    Q.    Okay.  I'd like you to move to the bottom of Page 3.

5    Dr. Porter writes to you, "Leslie, pregnancy rates from 2016.

6    Albert has a very low rate and a lot of biochemical pregnancies

7    suggesting traumatic, slash, poor technique.  Albert's

8    pregnancy rates are not going up.  David has been aware of the

9    trend, and I've spoken to David about this issue.  It is unfair

10   to patients to allow Albert to continue to transfer."

11        Did you know how many of the REI IVF patients were paying

12   out-of-pocket?

13   A.    No.

14   Q.    No idea?

15   A.    No idea.

16   Q.    If I said 50 to 60 percent of the women were paying

17   out-of-pocket, would you disagree with that?

18   A.    I have no basis to agree or disagree.

19   Q.    Were you aware that people were paying out-of-pocket, a

20   large percentage were paying out-of-pocket?

21             ATTORNEY SCHROEDER:  Objection.

22             THE COURT:  Okay.  Basis?

23             ATTORNEY SCHROEDER:  Foundation.

24             ATTORNEY NUNAN:  I didn't hear him.  I'm sorry.

25             THE COURT:  Foundation.

1              ATTORNEY NUNAN:  Foundation?  I'm trying to get to

2       the basis of why it's unfair to the patients.

3              THE COURT:  Overruled.  I'll let you ask the

4       question.

5              ATTORNEY NUNAN:  Okay.

6              THE WITNESS:  I'm sorry.

7       BY ATTORNEY NUNAN:

8       Q.   So you can answer the question.  Could you read back my

9       question?

10             (Question read by the reporter.)

11      A.   So I didn't, I don't know what the percentage of patients

12      who were paying out-of-pocket.  New Hampshire does not have

13      favorable infertility laws requiring insurance coverage.  So it

14      may be that patients truly were paying out-of-pocket if they

15      weren't working for a family-friendly company.

16      Q.   Okay.  You respond to Dr. Porter above on February 18th.

17      You state, "It's worth looking at the month-to-month trend.  I

18      know that the FET rate January to June was horrible,

19      attributable to both technique and poor embryos per Navid".

20      We're talking about 2016 here, right?

21      A.   Yes.

22      Q.   And you know that his rates from January to June were

23      horrible?

24      A.   Yes, attributable to primarily poor embryos.

25      Q.   Well, it says both technique and poor embryos.  So do you

1    have an understanding of how embryos can become poor if they're
2    poorly harvested?
3    A.   I would not even try to answer that question.  Embryos are
4    poor based on their, their many other things other than their
5    harvest.
6    Q.   On Page 2 Dr. Porter writes back to you.  I'm going to go
7    -- if you can see on the screen, I want to make sure you're
8    following me, the part I've highlighted.  "The fresh PR" -- PR
9    stands for pregnancy rates?
10   A.   Yes.
11   Q.   "The fresh PR numbers say it all.  Navid and the nurses
12   have been aware of his PR and have expressed repeated concerns
13   about Albert.  I have had comments from patients about pain
14   during the transfers when Albert does the transfers.  If the
15   uterus contracts, rates go down.  He knows this.  I have
16   reviewed teaching slides with him and counseled him.  The same
17   quality fresh embryos have been given to all of us.  Albert did
18   a lot of fresh cycles, ETs.  He is one-third PR as compared to
19   the rest of us.  It's not new."
20        So this is February of 2017, and you are getting, yet
21   again, reports about Albert Hsu.  How concerned are you about
22   this?
23   A.   So I think, once again, this is -- there are many reasons
24   why pregnancy rates can be low.  Dr. Esfandiari was a fantastic
25   embryologist, so I think he tried to give the best quality

1    embryos that he could have, but women have different quality

2    embryos, that women, that pregnancy rates differ depending on

3    the age of the, the age of the oocytes, the age of the eggs.

4    There are many things that call into what a pregnancy rate is

5    going to be and to attribute it only to transfer technique is

6    an unfair characterization.

7    Q.   You're in a position to assess that over Dr. Porter?

8            ATTORNEY SCHROEDER:  Objection, Your Honor.

9            THE COURT:  Overruled.

10           THE WITNESS:  What I'm saying is that that is an

11   unfair characterization because she also knows that there are

12   many factors that come into poor pregnancy rates other than

13   transfer technique.

14   BY ATTORNEY NUNAN:

15   Q.   Let me try it this way.  What would you have had to hear

16   from someone that would have made you pull Albert Hsu from

17   treating patients?

18   A.   This entire time I was trying to find someone who would be

19   able to provide experienced supervision of Dr. Hsu and an

20   unbiased assessment of Dr. Hsu.

21   Q.   That's not quite what I was asking.

22   A.   That's what it would require, someone who is unbiased,

23   skilled, and understood the complete picture of pregnancy

24   rates, infertility, IVF.

25   Q.   So you could not take that from Dr. Porter?

1    A.    I was unwilling to take that as written from Dr. Porter.

2    Remember, Dr. Porter spent decades cutting down members of her

3    division.

4    Q.    Let's talk about Dr. Porter's behavior since you bring

5    that up.  This is, what, the second time you've brought up her

6    behavior, alleged behavior?

7    A.    Her behavior, yes.

8    Q.    Okay.  I heard you use the word "splitting" before.

9    A.    Yes.

10   Q.    Okay.  So did you ever have a doctor while you were chair

11   that had behavior problems that was not Dr. Porter?

12   A.    Yes.

13   Q.    Okay.  So talk to me about the process, the DH policies

14   that you followed when you went, when you had a doctor that had

15   behavior problems.

16   A.    We actually had a process in place by which there was a

17   graduated correction plan in that, if there was a complaint or

18   problem that was identified, you would immediately have a

19   discussion with the provider that, that had the complaint

20   against them.  And it was done in a nonjudgmental way as a,

21   This was raised.  Can you review this incident in your mind and

22   see where, where the basis of this complaint could lie?  And we

23   expect that whatever that behavior was would not continue.

24   Q.    Perfect.  I would like to talk about one of your partners

25   in the urogyn department that had just this behavior.  Her

1    initials are EF.  I would prefer not to say her -- do you know

2    that surgeon that had a problem?

3              ATTORNEY SCHROEDER:  Objection, Your Honor.  May we

4    approach?

5              THE COURT:  Yes.

6              (Bench conference begins.)

7              ATTORNEY SCHROEDER:  I've got a series of objections.

8    The first one of which is I have no idea what she's asking

9    about.  She's going to ask a question and hope that Dr. DeMars

10   knows who she's talking about, yet I have no idea who she's

11   talking about.  There's no foundation.  Assumes facts not in

12   evidence.  There is no -- I don't even know what we're even

13   talking about.

14             ATTORNEY NUNAN:  Sure.  I'm happy to explain.  So I

15   am aware of a situation in the OB/GYN department that

16   Dr. DeMars dealt with properly when there was a behavior issue.

17   She had a surgeon.  She counseled her on her behavior.  She put

18   her on a pit plan.  She had Dr. Porter counsel her.  Then she

19   sent her to Acumen.  The behavior did not stop.  She knows the

20   proper process in which a doctor with a behavior problem should

21   be handled, and this is where I'm headed with this which is,

22   every time I turn around, I hear her say there's a behavior

23   problem with Dr. Porter, and, as far as I know --

24        I'm interested.  She's, believe me, I bet we're going hear

25   more, Every time I turn around I hear -- and I should keep my

1     voice down.  Excuse me.  I believe that I have a right to show

2     that she knows the process and that Dr. Porter was not afforded

3     that due process, that this was an excuse.  I hope I've done a

4     good job explaining that.

5             ATTORNEY SCHROEDER:  I don't know.  I think she, at

6     one point, was testifying for Dr. DeMars as to how many times

7     she complained about her behavior.  She certainly has the right

8     to ask her about all these questions, but to say that there's

9     this unknown person X --

10             ATTORNEY NUNAN:  Would you like me to use her name?

11     I would prefer not to.  I don't think that's fair.

12             ATTORNEY SCHROEDER:  But I don't know.  I don't know

13     who we're talking about.  So I don't even --

14             ATTORNEY NUNAN:  Evelyn Fleming, who was terminated

15     from the urogyn department.

16             ATTORNEY SCHROEDER:  Okay.  You can use maybe her

17     initials.

18             ATTORNEY NUNAN:  I just did.

19             ATTORNEY SCHROEDER:  I didn't hear you.

20             ATTORNEY NUNAN:  That's what I though I said.  Maybe

21     I wasn't clear.  I used her initials.  I'm trying to be super

22     respectful here, but I do think that that is a major point I'd

23     like to make with her because that notion that this is a

24     behavior problem, I'm not buying it.

25             ATTORNEY SCHROEDER:  Hold on.  You have every right

1    to cross-examine her, but you can't then say you've said it
2    twice in the course of two hours of testimony.  So, if she said
3    it twice, fine, but characterizing her testimony, that's fine.
4    You have the right to ask that.  If you're going to go by
5    initials, I have no problem with that.  I just wanted to
6    understand.
7        THE COURT:  Ask questions, okay?  There tends to be a
8    little bit of kind of narrative, and please don't take this as
9    a criticism, but you want to really stay focused, and I know
10   you're trying to pivot from topic to topic.  You really, you
11   can have a little bit of leeway there, but you should be asking
12   questions instead of saying, My understanding, and kind of a
13   narrative and then asking for that to be informed.
14       ATTORNEY NUNAN:  Okay.  I will take that.  I
15   appreciate that.  I do feel like her talking early on, I think
16   the jury watching her come up with these excuses is not --
17       THE COURT:  I understand your opinion, but in terms
18   of the Rule of Evidence --
19       ATTORNEY NUNAN:  Sure, I will ask questions.
20       ATTORNEY SCHROEDER:  My early issue, Your Honor, was
21   just make sure -- and it's hard to do because I've had this
22   issue too -- just making sure she lets her finish her answer.
23   She has what I would call a pregnant pause in her, just how she
24   talks.  She just does and so --
25       THE COURT:  The Witness?  No pun intended.

1          ATTORNEY SCHROEDER:  Yeah.  No.  This is, like, just
2     how she talks.  So what?  No pun intended, exactly.
3          THE COURT:  Yeah.  So just make sure.  There is a
4     kind of long, pregnant pause at the end of the first part of
5     the answer, and then she starts.
6          ATTORNEY SCHROEDER:  I understand that.
7          ATTORNEY NUNAN:  I should be jumping in and
8     controlling it more.
9          ATTORNEY SCHROEDER:  I'm not going to talk to the
10    Witness afterwards other than to say which I've said before,
11    just, once you starts your answer, just let you finish your
12    answer, and we need to move along.
13         THE COURT:  So it sounds like the objection is, not
14    so much that she's going to ask about this, but that she used
15    initials, which she can.
16         ATTORNEY SCHROEDER:  Well, now at least I understand
17    who she's talking about because I would have had no context.
18    There's no context.  So I understand the context.  So I think
19    we can proceed with the initials.  Thank you.
20         THE COURT:  Objection overruled.
21         ATTORNEY SCHROEDER:  Thank you.
22              (Bench conference ends.)
23    BY ATTORNEY NUNAN:
24    Q.   Dr. DeMars, you had a physician within the urogyn division
25    who was a surgeon whose initials were EF.  Do you know who I'm

1    talking about?

2    A.    Within urogyn?

3    Q.    I believe so.  Am I wrong?  Do you know somebody who is

4    just in OB/GYN?

5    A.    I know another physician who was not in urogyn that we --

6    Q.    Okay.  And did this physician have trouble in the OR with

7    the staff?

8    A.    Yes.

9    Q.    Okay.  And this is a situation, a behavior issue that you

10   dealt with?

11   A.    Yes.

12   Q.    Okay.  So did you speak to this physician about her

13   behavior pointedly?

14   A.    Yes.

15   Q.    Did you ask Dr. Porter to counsel her four times?

16   A.    I may have.  I don't know.

17   Q.    Did you put this physician on a performance improvement

18   plan?

19   A.    I don't think we got that far.

20   Q.    Okay.  Did this physician go to bad doctor school, for the

21   lack of another word, Acumen?  There's schools that help with

22   behavior issues?

23   A.    Not during that time.  I think, ultimately, she may have,

24   but not during the time I was with her.

25   Q.    Okay.  So there are regulated ways or that you deal with

1    physicians with behaviors; is that correct?

2    A.    Yes.

3    Q.    Okay.  If Dr. Porter's supposed behavior problems that

4    you've referenced rose to such a problematic level as you

5    claim, why wasn't she given an opportunity to address those

6    problems like you did with this other physician?

7    A.    That goes back to the conversation that I had with

8    Dr. Manganiello that I had --

9    Q.    In 2009?

10   A.    No, I had that conversation in 2014 after he had retired.

11   Because I --

12   Q.    And that conversation somehow overrid Dr. Porter's ability

13   to understand that you thought she had a behavior problem?

14   A.    Say that again.

15   Q.    Sure.  I'm sorry it wasn't clear.  So, Dr. Porter, if you

16   thought she had a behavior problem, had a right to understand

17   what you thought that problem was, right?

18   A.    This was probably one of the biggest mistakes that I made.

19   Q.    You didn't tell Dr. Porter that you thought she had a

20   behavior problem?

21   A.    Correct.

22   Q.    You did not give her an opportunity to address or fix that

23   behavior problem?

24   A.    I was, I was unwilling in 2014 to address that

25   immediately.

1   Q.   How about in 2015?

2   A.   In 2015 there weren't -- the beginning of 2015, I would

3   say, in 2015 the -- no, I didn't.  I would say that that was

4   probably one of the biggest mistakes that I made was not to

5   address the behavior problems that were occurring at the time.

6   Q.   If they were occurring at all?

7   A.   They were occurring.  They were occurring, that there was

8   team Hsu, and there was team Porter within the general, within

9   the REI division.  That was part of the general behavior of

10  creating sides and creating disharmony among the division.

11  Q.   Okay.  I'd like to move on to Exhibit 52, please.  To the

12  best of your knowledge, Dr. Porter was never on a performance

13  improvement plan, correct?

14  A.   That's correct.

15  Q.   Okay.  This email is from you to Daniel Herrick, correct?

16  A.   Yes.

17  Q.   Who is Daniel Herrick?

18  A.   Daniel Herrick was the sort of the operations manager for

19  the department of obstetrics and gynecology and also for

20  anesthesia.

21  Q.   Okay.  And this email was written on April 25th 2017,

22  correct?

23  A.   Yes.

24           ATTORNEY NUNAN:  I'd like to move the admission of

25  52, Plaintiff's 52, into evidence, please.

1          THE COURT:  Any objection?

2          ATTORNEY SCHROEDER:  No objection, Your Honor.

3          THE COURT:  Plaintiff's 52 is admitted.

4     (Plaintiff Exhibit 52 is admitted into evidence.)

5  BY ATTORNEY NUNAN:

6  Q.   In April, by April 25th 2017 had the decision been made to

7  close the REI division?

8  A.   No.

9  Q.   What date would you put to that decision?

10  A.   I would put it later in April.

11  Q.   You write to Daniel Herrick, "Ed is also lumping Albert

12  into, quote, 'he's been a problem since day one', end quote.

13  This is not a fair characterization of Albert.  Again, Misty

14  has decided that she no longer wants to work with him or teach

15  him and she's bullying him.  He did an amazing job by himself

16  January to August of 2016."

17          Is that a correct statement, that he did an amazing job by

18  himself from August, from January to August of 2016?

19  A.   This is a very frustrated email.  Dr. Hsu, who we knew had

20  limitations, was by himself from January essentially to August

21  of 2016, and he was overworked, overstressed, and was trying to

22  do the job of two people when he couldn't actually do the job

23  thoughtfully.  And I -- did he do an amazing job?  It was

24  incredibly hard to watch him trying to work during that time.

25  Q.   Okay.  I'd like to direct your attention back to what you

1    wrote two months earlier which is, "I know that the FET rate

2    January to June was horrible", correct?

3    A.   Yes, frozen.

4    Q.   Frozen?  That's fine.  From a patient standpoint, did you

5    have an obligation to keep Albert from trying when he was

6    failing to do these embryo transfers?

7           ATTORNEY SCHROEDER:  Objection, Your Honor.

8           THE COURT:  Basis?

9           ATTORNEY SCHROEDER:  I think she's mischaracterizing

10   Dr. DeMars's prior testimony and also mischaracterizing, I

11   think, the actual statement that she's referring to.

12          THE COURT:  Overruled.

13          THE WITNESS:  Ask the question again, please.

14          (Question read by the reporter.)

15          THE WITNESS:  I think that to characterize that

16   embryo transfers were the reason for poor pregnancy rates is a

17   gross oversimplification, and I would disagree with that

18   statement.

19   BY ATTORNEY NUNAN:

20   Q.   Two lines later you state, "Despite the dysfunction, the

21   pregnancy rates were excellent".  Is that true?

22   A.   Yes.  They went up in 2016.

23   Q.   Why did they go up in 2016?

24   A.   Because of Dr. Esfandiari.

25   Q.   So what I'm noticing here is that what you say to

1    Dr. Porter and what you say to top administration officials is

2    different; is that correct?

3              ATTORNEY SCHROEDER:  Objection, Your Honor.

4              THE COURT:  Sustained.

5              ATTORNEY NUNAN:  Okay.  I would like to turn to a

6    document that I believe is already admitted.  Can we check?

7    Defendant's Exhibit W.

8              THE COURT:  That is admitted.

9              ATTORNEY NUNAN:  Okay.  I'm not sure that you have a

10   paper.  Do you have a paper copy?  I don't think you do, so I'm

11   going to have you read it on the screen.  I apologize for that.

12   If you guys have a paper copy for her, I would appreciate it.

13             ATTORNEY SCHROEDER:  Give me one second, and we'll --

14             ATTORNEY NUNAN:  Sure.

15             ATTORNEY SCHROEDER:  I think it's Volume 1.  There's

16   a notebook up there, I think.

17             ATTORNEY NUNAN:  Okay.  If you would like a paper

18   copy, there is a Volume 1 of defendant's, and that should have

19   a W under it.  Sorry.

20             THE WITNESS:  It's empty.

21             ATTORNEY NUNAN:  Okay.

22             ATTORNEY SCHROEDER:  We've got a copy to hand up if

23   you'd like.

24             ATTORNEY NUNAN:  Okay, great.  I'm actually going to

25   switch gears on you.  I apologize.  Is Exhibit 7 admitted?

1           THE COURT:  No.

2           ATTORNEY NUNAN:  Okay.  Will you please look at

3    Plaintiff's Exhibit 7?

4           THE COURT:  Correction.  The Deputy Clerk tells me it

5    is admitted in evidence.

6    BY ATTORNEY NUNAN:

7    Q.   Okay, thank you.  I'd like to switch now to David Seifer.

8    If you could please read Exhibit 7, that would be great.  Set

9    this here for the future.  Okay.  We've looked over this

10   document already today, right?

11   A.   Yes.

12   Q.   Okay.  In March of 2016, the credentialing committee

13   received a negative report about David Seifer, correct?

14   A.   Yes.

15   Q.   Dr. Amato had written a negative evaluation?

16   A.   He had, yes.

17   Q.   You asked the credentialing committee that the requirement

18   of current letters of recommendation be waived because Dr.

19   Seifer could not provide them, right?

20   A.   I don't know.  I may have.

21   Q.   Did you go in front of the credentialing committee and

22   state that you wanted to hire David Seifer?

23   A.   Yes.

24   Q.   Okay.  Is it fair to say that the credentialing committee

25   had concerns about Dr. Seifer?

1    A.    Yes.

2    Q.    Who was on the credentialing committee at the time?

3    A.    I don't remember.

4    Q.    Was Dr. Maria Padin?

5    A.    I don't, I don't remember for sure.

6    Q.    Do you remember?

7    A.    Probably.  She was, she was chief of the medical staff.

8    Q.    Do you remember Jocelyn Chertoff being on there?

9    A.    I don't remember.

10    Q.    Do you remember Dr. Ed Merrens being on the credentialing

11    committee?

12    A.    No, I don't.  Honestly, I don't remember.  That was a

13    while ago.

14    Q.    Okay.  Do you remember what the credentialing committee

15    told you about David Seifer's hire?

16    A.    No.

17    Q.    Okay.  Do you remember Dr. Ed Merrens saying to you that

18    David Seifer's success, quote, "was on you"?

19    A.    Yes.

20    Q.    He made that statement?

21    A.    I'll say "yes".

22    Q.    Okay.  In fact, you, you, in the past, have described that

23    as the charge you were given?  Does that ring a bell?

24    A.    No.

25    Q.    Okay.  I'm going to read from your deposition.  Do I mark

1    this as ID3?  I believe.

2                THE COURT:  You should mark it, yes.

3                ATTORNEY NUNAN:  This is the deposition transcript of

4    Leslie DeMars.

5    BY ATTORNEY NUNAN:

6    Q.   You were asked, "Did you appear before the credentialing

7    committee to explain your rationale for Dartmouth-Hitchcock to

8    hire Dr. Seifer?"  Your answer was, "Yes, I went before the

9    committee because, at that point, we had one physician in the

10   division.  We had Dr. Hsu who could not continue working at the

11   pace he was working, nor was it appropriate for him as a junior

12   provider to continue to try to keep the division going.  We had

13   had a search for several years for another REI provider, and

14   Dr. Seifer was the only candidate interested in coming to work

15   at Dartmouth."

16        You were then asked, "Did you represent to the committee

17   that you would take personal responsibility that Dr. Seifer

18   would be a success?"  And you answered, "I was given that

19   charge".  And the question was, "They told you that?"  The

20   answer was, "Yes."

21        Do you remember that now?

22   A.   Honestly, I don't remember that now, but that would have

23   been my responsibility if I went before the, the credentialing

24   committee.  It was my responsibility for his hire.

25   Q.   Is it a little unusual that his success is tied to your

VOLUME: 6
PAGES: 1-221

1    success?

2              ATTORNEY SCHROEDER:  Objection, Your Honor.

3              THE COURT:  Sustained.

4    BY ATTORNEY NUNAN:

5    Q.   We'll come back to that.  When did Dr. Seifer start

6    working in an administrative capacity?

7    A.   May or June of '16.

8    Q.   And did he have to wait to see patients?

9    A.   Yes.

10   Q.   Okay.  Why was that?

11   A.   Because he wasn't licensed or credentialed as yet.

12   Q.   And this was about the same time that Dr. Porter was

13   returning in a limited capacity?

14   A.   In a very limited capacity.

15   Q.   Okay.  And did you ask Dr. Porter at that point to assess

16   Dr. Seifer's skills?

17   A.   So part of the credentialing process is that a certain

18   number of specialty procedures have to be observed.

19   Q.   Proctored?

20   A.   Observed.

21   Q.   And there's a form you fill out --

22   A.   Yes.

23   Q.   -- called an FPPE assignment form?

24   A.   That may be the name of it, but, yes, there is a, there is

25   a formal process by which particular procedures need to be

1    observed.

2    Q.   I would like to turn to W now if I can find it.  Can you

3    please read W?  Do you remember receiving this email?

4    A.   Do I remember it?  Specifically, no.

5    Q.   Dr. Porter says here, "I watched retrievals this week.  It

6    has either been some time since DS did retrievals regularly and

7    he is rusty, unfamiliar with the setup.  He's been doing half

8    the cases with Albert.  Technically, he is poor and/or some

9    combination of these.  He has some fairly old concepts of

10   retrieval techniques, quote, 'you need to curette the

11   follicle'".  Did I read that correctly?

12   A.   Yes.

13   Q.   Farther down she says, "I took the opportunity to pull him

14   aside Thursday and ask questions about his embryo transfer

15   preferences.  He gave me a blank stare when I asked which

16   transfer technique he prefers".

17       So, when you received this email, do you remember being

18   worried or concerned?

19   A.   I remember discussing it, discussing with Dr. Seifer.

20   Q.   You had a discussion with Dr. Seifer?

21   A.   Yes.

22   Q.   Did you have a discussion with Dr. Porter about this?

23   A.   No.  I had a discussion with Dr. Seifer.

24   Q.   Okay.  I want to turn -- I'd like to look at Exhibit 11,

25   please.  I do not think it's admitted.  Okay?

1   A.   Yes.

2   Q.   Who -- so this is an email from Dennis Seguin to you; is

3   that correct?

4   A.   Yes, Seguin.

5   Q.   Thank you.  July 28th 2016?

6   A.   Yes.

7        ATTORNEY NUNAN:  I'd like to move the for the

8   admission of Plaintiff's Exhibit 11.

9        THE COURT:  Any objection?

10       ATTORNEY SCHROEDER:  No objection.

11       THE COURT:  Plaintiff's 11 is admitted.

12       (Plaintiff Exhibit 11 is admitted into evidence.)

13  BY ATTORNEY NUNAN:

14  Q.   Tell me, who is Dennis?

15  A.   Dennis was the head ultrasonography tech at DH.

16  Q.   He writes here, "Misty and I spoke earlier today, and she

17  has asked m me to forward you some of the details about the

18  recent, about a recent embryo transfer performed by Dr. Seifer.

19  The details of my observation only regarding this procedure.

20  The embryo transfer did not go well.  Dr. Seifer, while he

21  performed the procedure using sterile technique, his skill set

22  was somewhat alarming to me".

23       The ultrasound techs are in on all of these embryo

24  transfers, right?

25  A.   Yes.

1    Q.    He would have seen many, many?

2    A.    I don't know.

3    Q.    He was experienced?

4    A.    I don't know how many he would have seen.

5    Q.    Got it.  Do you think he was an experienced ultrasound

6    tech?

7    A.    He is an experienced ultrasound tech.

8    Q.    Okay.  He says farther down here, "While I am not an

9    expert, this was clearly not a well-performed embryo transfer.

10   I later learned that the patient was paying out-of-pocket for

11   the entire procedure.  While this does not influence my message

12   to you, it does make me unhappy to see, quote, 'our patients

13   not receiving the best care'".

14        Were you concerned when you received this email?

15   A.    I went and talked to Dennis.

16   Q.    And what was the content of that conversation?

17   A.    As I recall, Dennis recounted his experience with this

18   embryo transfer.  He backtracked a bit on the details, but he

19   recalled essentially that he thought that this transfer was

20   not, not the same as what he would see if Dr. Porter or

21   Dr. McBean would do a transfer.

22   Q.    Did you have reason to doubt his ability to say whether or

23   not this embryo transfer was not well-performed?

24   A.    I think it goes back to what is, what is the level of,

25   what is excellent?  What is good?  What is acceptable?  What is

1    unacceptable?  And does, does Dennis have that ability to

2    judge?  No, he does not.

3    Q.   How do you know that?

4    A.   Because he is not an REI physician.

5    Q.   I would like you to look at Exhibit Number 9.  Is this a

6    text message exchange with Richard Reindollar and yourself?

7    A.   Yes, it is.

8    Q.   On Thursday July 28th 2016?

9    A.   Yes.

10            ATTORNEY NUNAN:  I'd like to move for the admission

11   of Plaintiff's Exhibit 9.

12            THE COURT:  Any objection?

13            ATTORNEY SCHROEDER:  No objection, Your Honor.

14            THE COURT:  Plaintiff's Exhibit 9 is admitted.

15       (Plaintiff Exhibit 9 is admitted into evidence.)

16   BY ATTORNEY NUNAN:

17   Q.   The highlighting is mine.  You write, "Richard, I am not

18   sure that DS is clinically competent.  I don't know what he's

19   been doing for 25 years, but I'm not sure it was IVF".  Then

20   you write further down, "I am trying really hard, because I

21   spoke to many people who were highly supportive, and I am

22   always relentlessly optimistic.  I have heard separately voiced

23   concerns from nursing, anesthesia, and ultrasound techs.  The

24   lab folks complain about bloody aspirates and low egg counts.

25   I haven't talked to Navid to get true data because Navid is on

1    vacation.  He is scared to death of OHSS and has very slow

2    induction regiments".

3        Please turn to the next page.  You write, "I'm venting and

4    I really want to help him be successful".  This is a private

5    text message with Richard Reindollar, right?

6    A.   Yes, it is.

7    Q.   And what you describe here is a little inconsistent with

8    the conversation you had with Dennis Seguin, isn't it?

9    A.   This actually happened right after my conversation with

10   Dennis.

11   Q.   Because the date of Dennis's exhibit is also the 28th?

12   A.   Yes.

13   Q.   Great.  Okay.  So you had a conversation with Dennis, and

14   then you went and wrote this email?

15   A.   Because I'm trying to get independent, some sort of

16   independent assessment or -- I am not the medical expert for

17   competence for REI physicians.  I am trying to get some idea of

18   how I can determine from an independent assessor whether our

19   physicians are competent.

20            ATTORNEY NUNAN:  Give me just a second, please.

21            THE COURT:  Yes.

22   BY ATTORNEY NUNAN:

23   Q.   I'll return to that.  So this is July 28th of 2016, and,

24   as chair of the OB/GYN department, at this point, you had

25   notice that David Seifer was not clinically competent, your

1    words, and you had notice a month or two months earlier from

2    Dr. Porter that there were significant problems with Albert

3    Hsu.  So you were on notice that you had two physicians in the

4    REI division the summer of 2016 that were problematic, right?

5    A.    The summer of 2016 was right when Dr. Seifer started.

6    Q.    How long was Dr. Seifer at his former employment, do you

7    know?

8    A.    A couple of years.

9    Q.    In Washington?

10   A.    Oregon.

11   Q.    Oregon?

12   A.    I think Oregon.

13   Q.    How long was he in Oregon?

14   A.    Couple of years.

15   Q.    He was not there for a matter of months before they pulled

16   his credentials?

17   A.    I don't believe so.

18              ATTORNEY SCHROEDER:  Objection, Your Honor.

19              THE COURT:  Basis?

20              ATTORNEY SCHROEDER:  Foundation.

21              THE COURT:  Overruled.

22   BY ATTORNEY NUNAN:

23   Q.    So the complaints during the credentialing process that

24   you heard, what was your understanding of what had happened in

25   Oregon?

1    A.    My understanding was that Dr. Seifer was hired in Oregon

2    to be the division director in Oregon and that there were,

3    there was a physician who was the division director there who

4    was retiring and he was brought in to be the new division

5    director.  The three remaining providers there, one of them

6    wanted to be the division director, and the three of them

7    essentially rejected that David was going to be their division

8    director.

9    Q.    Is that what the evaluation you heard from Dr. Amato

10   stated?

11   A.    So Dr. Amato, he was the physician who wanted to be the

12   division director, and that was inconsistent with what I had

13   heard from both the lab director as well as the chair of the

14   department.

15   Q.    And the reports you're hearing at this time in late July,

16   Dr. Porter, Dennis, your reporting it to Richard Reindollar,

17   aren't those reports consistent with the same thing you were

18   hearing out of Oregon that you had to go in front of the

19   credentialing committee about?

20   A.    No.

21   Q.    They were different?

22   A.    No.

23        THE COURT:  So, Ms. Nunan, it's 4:30.  Is this an

24   okay time?

25        ATTORNEY NUNAN:  This is a great place to stop.

1    Thank you.

2            THE COURT:  All right.  Thank you.  Okay.  So we'll

3    break for the day.  See you tomorrow at 9:00 o'clock.  Please

4    don't speak to anyone about the case or do any independent

5    research on the case yourselves.  Thank you.

6            (The Jury leaves the courtroom.)

7            THE COURT:  Thank you.  Okay.  So, just generally on

8    the topic of scheduling, so Dr. DeMars is still on the stand,

9    and I believe there is -- is it Dr. Russell that you had said?

10           ATTORNEY NUNAN:  Dr. Russell, yes.

11           THE COURT:  Dr. Russell, Dr. Conroy.  Any other plans

12   for tomorrow on plaintiff's?

13           ATTORNEY NUNAN:  I doubt we'll get to Ira Bernstein,

14   but we have him on as well.  We've asked him to be available

15   for the afternoon.

16           THE COURT:  Okay.  And how many witnesses do you

17   anticipate after those four?

18           ATTORNEY NUNAN:  Just Dr. Merrens, and then we will

19   be done.

20           THE COURT:  Okay.  So maybe Wednesday?

21           ATTORNEY NUNAN:  Sounds good to me.

22           ATTORNEY JONES:  That's my best guess.

23           THE COURT:  All right.  Anything else to take up?

24   Mr. Schroeder, did you want to take up any scheduling issues

25   today?

VOLUME: 6
PAGES: 1-221

1        ATTORNEY SCHROEDER:  I mean, I always like to take up

2    scheduling issues, Your Honor.  Just, the only thing is that

3    Dr. Conroy, we've just got to make sure, if you're going to put

4    Dr. Russell on, I want to give her some clarity on when she

5    needs to be here because I want her to be able to work outside

6    of the courthouse and then get here when you need her to

7    testify.

8        ATTORNEY NUNAN:  I think that it's safe to say not

9    until 1:00 o'clock.

10        ATTORNEY SCHROEDER:  Okay.  That's fair.

11        THE COURT:  This is for Dr. Conroy?

12        ATTORNEY SCHROEDER:  Yes.

13        THE COURT:  Okay.  Thank you, everyone.

14    (Whereupon at 4:32 p.m. the hearing was adjourned.)

15            C E R T I F I C A T E

16        I, Sunnie Donath, RMR, Official Court Reporter

17    for the United States District Court, District of Vermont, do

18    hereby certify that the foregoing pages are a true and accurate

19    transcription of my stenographic notes of the hearing taken

20    before me in the above-titled matter on March 31, 2025 to the

21    best of my skill and ability.

22

                    *Sunnie Donath, RMR*

23    --------------------------------

24            Sunnie Donath, RMR

25