VOLUME: 7
PAGES: 222-431

1                         UNITED STATES DISTRICT COURT
                                    FOR THE
2                             DISTRICT OF VERMONT

3

4      Misty Blanchette Porter        )
                                      )
5                                     )
       v.                             ) Case No. 2:17-cv-194
6                                     )
                                      )
7      Dartmouth-Hitchcock            )
       Medical Center, et al.         )
8                                     )
       _____)

9

10     RE:  Day 7 of Jury Trial

11     DATE: April 1, 2025

12     LOCATION: Burlington, Vermont

13     BEFORE:  Honorable Kevin J. Doyle
                Magistrate Judge

14

15     **APPEARANCES**:

16     Geoffrey J. Vitt, Esq.
       Sarah H. Nunan, Esq.
17     Vitt & Nunan, PLC
       8 Beaver Meadow Road
18     Norwich, VT 05055

19     Eric D. Jones, Esq.
       Langrock, Sperry & Wool
20     210 College Street, Suite 400
       Burlington, VT 05410
21
       Donald W. Schroeder, Esq.
22     Morgan McDonald, Esq.
       Foley & Lardner, LLP
23     111 Huntington Avenue, Suite 2500
       Boston, MA 02199
24

25                       - Continued on Next Page -

VOLUME: 7
PAGES: 222-431

1      Tristram J. Coffin, Esq.
       Downs Rachlin Martin, PLLC
2      199 Main Street, Suite 600
       Burlington, VT 05401-8339

3

4

5

6               TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                     United States District Court Reporter
7                          *verbatim@vermontel.net*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME: 7
PAGES: 222-431

1                    INDEX OF EXAMINATION

2    Witness              Examined By          Page      Line

3    Leslie DeMars        Atty. Nunan          227        11
                          Atty. Schroeder      260        23
4                         Atty. Nunan          332        22
                          Atty. Schroeder      344         7
5

6    Michelle Russell     Atty. Nunan          356         5
                          Atty. Schroeder      374         6
7

8    Joanne Conroy        Atty. Vitt           381        24

9    Ira Bernstein        Atty. Vitt           404         8
                          Atty. McDonald       416        17
10

11

12                     INDEX OF EXHIBITS

13                                           Page     Admitted

14   Plaintiff Exhibits

15        12                                 228         Y
          13                                 231         Y
16        18                                 249         Y
          23                                 250         Y
17        25                                 254         Y
          64                                 330         Y
18       109                                 256         Y
         110                                 256         Y
19       129                                 299         Y

20

21   Defense Exhibits

22        Z                                  306         Y
          A4                                 310         Y
23        B1                                 314         Y
          G                                  326         Y
24

25                   *   *   *   *   *

VOLUME: 7
PAGES: 222-431

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME: 7
PAGES: 222-431

```
 1                    (The trial began at 9:02 a.m.)
 2              THE COURT:  Okay.  Good morning.  Anything to take up
 3     before we get the jury?
 4              ATTORNEY SCHROEDER:  Nothing, Your Honor.
 5              THE COURT:  Okay.  Plaintiff, nothing?
 6              ATTORNEY JONES:  Nothing
 7              THE COURT:  Okay.  Please get jury.
 8              ATTORNEY SCHROEDER:  Should I go get the Witness?
 9              THE COURT:  Yes, please.
10              ATTORNEY SCHROEDER:  Okay.
11              (The Jury enters the courtroom.)
12              COURTROOM DEPUTY:  Your Honor, the matter before the
13     Court is Civil Case Number 17-cv-194, Misty Blanchette Porter
14     versus Dartmouth-Hitchcock Medical Center, et al.  Present on
15     behalf of the plaintiff are Attorneys Geoffrey Vitt, Eric
16     Jones, and Sarah Nunan.  Present on behalf of the defendants
17     are Attorneys Tristram Coffin, Morgan McDonald, and Donald
18     Schroeder.  We are here for day seven of a jury trial.
19              THE COURT:  Okay.  Good morning, members of the jury.
20     I'll begin with the usual question.  Has anyone spoken to you
21     about this case since yesterday, or have you learned any
22     information about the case from outside the courtroom since
23     yesterday?  Okay.  Seeing no hands raised, Ms. Nunan.  So I'll
24     ask the deputy clerk to swear in Dr. DeMars again for today.
25
```

VOLUME: 7
PAGES: 222-431

```
 1                    LESLIE DEMARS,

 2           having been duly sworn to tell the truth,

 3               testifies as follows:

 4           ATTORNEY NUNAN:  I'm going to put Exhibit Number 9

 5    up.  It has been admitted.

 6           ATTORNEY SCHROEDER:  Is that defendant's or

 7    plaintiff?

 8           ATTORNEY NUNAN:  Plaintiff.

 9           ATTORNEY SCHROEDER:  Oh.

10           ATTORNEY NUNAN:  Number 9.

11           DIRECT EXAMINATION BY ATTORNEY NUNAN

12    Q.   Good morning, Dr. DeMars.

13    A.   Good morning.

14    Q.   We left off yesterday on Exhibit Number 9.  I just want to

15    confirm with you that, despite this understanding that Dr.

16    Seifer was clinically incompetent in July of 2016, you took no

17    action to restrict his IVF procedures on patients that summer;

18    is that right?

19    A.   That's not the case.

20    Q.   I'd like to turn to Document Number 12, Exhibit,

21    Plaintiff's Exhibit Number 12.

22    A.   Yes.

23    Q.   This is an email to you from Elizabeth Todd --

24    A.   Yes.

25    Q.   -- dated September 11th 2016?
```

1    A.    Yes.

2            ATTORNEY NUNAN:  I'd like to move for the admission

3    of Plaintiff's Exhibit 12, please.

4            THE COURT:  Any objection?

5            ATTORNEY SCHROEDER:  No objection.

6            THE COURT:  Okay.  Plaintiff's Exhibit 12 is

7    admitted.

8            (Plaintiff Exhibit 12 is admitted into evidence.)

9    BY ATTORNEY NUNAN:

10   Q.    Okay.  Here's the top of the exhibit.  I'd like you to

11   look at the bottom.  You mentioned yesterday that there was a

12   requirement for an FPPE assessment of Dr. Seifer; is that

13   correct?

14   A.    Yes.

15   Q.    Okay.  And in September did you reach out to the members

16   of the REI division to get their feedback on their experiences

17   with Dr. Seifer?

18   A.    Yes.

19   Q.    That's what's going on here at the bottom of the page?

20   A.    Yes.

21   Q.    Okay.  Remind me again who Elizabeth Todd is.

22   A.    Beth Todd was the nurse practitioner for the REI division.

23   Q.    And she writes back to you.  She says, "I do not feel that

24   I can go to David for consultation collaboration with the

25   noninfertility patients that I see.  Misty, Judy, Paul M.,

1    Neil, and even Richard have been a clinical resource to me for

2    a broad scope of patients.  This is a very big concern for me,

3    as I see a wide range of patients.  I am grateful for Judy,

4    you, Chris, Ivy, Regan, Debbie, Julie, Karen George and Joe

5    Findlay for being gracious resources for me during Misty's

6    absence."

7        That list of names that she puts at the very end, those

8    are -- Joe Findlay is a fellow, correct, in the REI division?

9    A.    Joe Findlay was a UVM fellow.

10    Q.    Karen George was an OB/GYN?

11    A.    Faculty member for OB/GYN.

12    Q.    So these are the folks during 2016 that helped run the REI

13    division.  She cites it as the noninfertility patients,

14    correct?

15            ATTORNEY SCHROEDER:  Objection.

16            THE COURT:  Basis?

17            ATTORNEY SCHROEDER:  Mischaracterizes her testimony.

18            THE COURT:  Okay.  Well, you can ask the question of

19    the Witness, and she can clarify.

20    BY ATTORNEY NUNAN:

21    Q.    Okay.  Beth Todd is referring to noninfertility patients

22    about when she can go to David Seifer; is that correct here in

23    this document?

24    A.    Correct.

25    Q.    Okay.  And she's saying that she was able to get help from

VOLUME: 7
PAGES: 222-431

1    these other individuals; is that correct?

2    A.    Yes.

3    Q.    Okay.

4    A.    These would be for general GYN questions.

5    Q.    Well, I'm sorry.  Beth Todd was in the REI division,

6    correct?

7    A.    Yes.  She also saw patients, as did Misty, who had GYN

8    problems and not infertility problems.

9    Q.    But they would be under the reproductive endocrinology,

10   not the infertility, but under the REI division?  There was

11   noninfertility issues, correct?

12   A.    There were also nonreproductive endocrine issues seen in

13   REI.  There were general gynecology issues seen in the REI

14   division as well.

15   Q.    Okay.  Did you also solicit input from Misty Porter for

16   this FPPE assessment?

17   A.    I solicited from all members of the, of the division.

18   Q.    And she was part of the division?

19   A.    Yes.

20   Q.    Okay, great.  I'd like you to turn to Exhibit 13, please.

21   A.    Yes.

22   Q.    Okay.  Give me just a second.  I'm having an issue with

23   this document.  This is an email that Misty wrote to you on

24   September 12th 2016; is that correct?

25   A.    Yes.

VOLUME: 7
PAGES: 222-431

1          ATTORNEY NUNAN:  Okay.  I would like to move into

2    evidence Plaintiff's Exhibit 13.

3          THE COURT:  Any objection?

4          ATTORNEY SCHROEDER:  No objection.

5          THE COURT:  Okay.  Plaintiff's Exhibit 13 is

6    admitted.

7      (Plaintiff Exhibit 13 is admitted into evidence.)

8    BY ATTORNEY NUNAN:

9    Q.   Okay.  Again, starting at the bottom of Page 2, that's you

10   soliciting information for the -- part of the hiring, part of

11   hiring a new MD is a comprehensive 360 review at 90 days.  So

12   you are doing Dr. Seifer's 90-day evaluation, correct?

13   A.   Correct.

14   Q.   What I've highlighted at the top on the screen, the second

15   paragraph, it says, "Forgive the tardiness as I have been

16   settling in from a long day of travel after recovering from a

17   fairly lengthy surgery".

18        Dr. Porter had gone in August to the Mayo Clinic?

19   A.   Yes.

20   Q.   And she had, that was the first surgery she had at the

21   Mayo Clinic, and she was returning and writing this email to

22   you, correct, about David Seifer?

23   A.   Yes.

24   Q.   Okay.  In the first paragraph she writes, "It is late, and

25   the review is tomorrow".  Is this the review of David Seifer?

1    What is the review?

2    A.    It may have been the due date that I had set.

3    Q.    "Yet most of what I would add I have already shared with

4    you over the last several weeks may be colored more strongly by

5    the financial stressors at DHMC".

6         What does she mean, the financial stressors at DHMC?

7    A.    In general, DHMC, during this time, was going through a

8    significant scrutiny of their budget.  Their overall margin for

9    a nonprofit, a nonprofit hospital isn't technically supposed to

10   make money, but it has to at least not lose money so that it

11   can pay their workers, et cetera.  And we were going through

12   some significant budget scrutiny, budget planning, and, if I

13   recall correctly, there were some considerations of reductions

14   in force or, you know, a hospital-wide reduction.

15   Q.    Thank you.  The REI division was a money-making department

16   within OB/GYN, correct?  Division, sorry, not department.

17   A.    I'd have to go back and look at the, look at the

18   financials.

19   Q.    You don't remember that, in general, the REI division --

20   A.    Honestly, I don't.  I remember that gynecologic oncology

21   made money for the department.  I don't remember whether REI

22   did.

23   Q.    Right, okay.

24         THE COURT:  So please wait for the question to be

25   finished before you respond.  Thank you.

1    BY ATTORNEY NUNAN:

2    Q.    Thank you.  Was it your memory that IVF was a money-making

3    procedure for the department?

4    A.    Yes.

5    Q.    Okay.  So you would agree that on September 12th Dr.

6    Porter might be back and maybe even writing from home but she

7    is able to do a comprehensive review at this point?

8    A.    No.

9    Q.    No?

10            ATTORNEY SCHROEDER:  Objection, Your Honor.  Calls

11    for speculation.

12            THE COURT:  Sustained.

13    BY ATTORNEY NUNAN:

14    Q.    This is a two-page assessment of Dr. Seifer by Dr. Porter,

15    is it not?

16    A.    It is.

17    Q.    Okay.  Do you have any reason to believe that Dr. Porter

18    didn't write this on September 12th?

19    A.    No.

20    Q.    Okay.  So was she back in the clinic at this point?

21    A.    No.

22    Q.    Okay.  Working from home?

23    A.    No.  She was on leave.

24    Q.    But you emailed her during this time period?

25    A.    I did.

1    Q.    Okay.  And it appears that she had the ability to

2    communicate back to you?

3                ATTORNEY SCHROEDER:  Objection, Your Honor.

4                THE COURT:  Basis?

5                ATTORNEY SCHROEDER:  Calling for speculation.  I

6    think the document speaks for itself.  Calling for speculation

7    as to what we know that the -- may we approach?

8                THE COURT:  Sure.

9                (Bench conference begins.)

10               ATTORNEY SCHROEDER:  I'm trying not to do a speaking

11   objection because I'm being mindful of the fact that you want

12   to do it as a sidebar as opposed to --

13               THE COURT:  No.  You can raise objections as long as

14   your objection is, you know, a one- or two-word objection.

15               ATTORNEY SCHROEDER:  That's what I've understood.

16               THE COURT:  So I'm told by the court reporter I need

17   to bring this closer when I speak, so you're going to see me

18   moving it.  Sorry.  Go ahead.

19               ATTORNEY SCHROEDER:  Sorry.  The issue is she sent

20   that on a certain date.  I don't know how long she took to

21   write this email.  I don't really care.  But neither is

22   Dr. DeMars going to know when she actually sent the email and

23   how long it took her to write that email because all we know is

24   when it was sent on a certain date.  But we got -- I want this

25   witness off the stand this morning because she was here for one

1    day, and now we're on the second day, and asking about, like --

2    well, she asked a lot of questions about the emails.  I think

3    we've moved on admission very quick, but we've got to get, move

4    this witness along.

5            THE COURT:  So is your objection moving the witness

6    along, or do you have an objection?  Is the objection that, is

7    the objection that she shouldn't be asking the questions for

8    purposes of efficiency, or is there a problem with the form of

9    the question?

10           ATTORNEY SCHROEDER:  The form of the question is

11   asking her to speculate as to, well, and making comments on

12   when she may have sent the email or things of that nature.  So

13   that's the specific objection.  But what I wanted to raise with

14   the Court is the fact that we need to move this along because

15   this is the second day of vacation that this individual has had

16   to take to be here.

17           THE COURT:  Okay.  I understand that.  But evidence

18   is going to come in, Mr. Schroeder, right?

19           ATTORNEY SCHROEDER:  Understood.

20           THE COURT:  I'm not going to be curtailing the

21   attorney's opportunity to ask the questions she wants to ask.

22   I'm very sensitive to what you've raised, but there's very

23   little of what I can do when it comes to efforts to curtail her

24   asking questions in the name of efficiency.

25           ATTORNEY SCHROEDER:  I understood that, Your Honor,

1    but the subpoena was for one day.  It wasn't for every day

2    thereafter, as it could have been.

3              THE COURT:  I understand.  So what was the question

4    that you asked?

5              ATTORNEY NUNAN:  I asked if she was capable of giving

6    an assessment at that point, whether she was at home or if she

7    -- this is a very relevant point for the next document, you

8    will see.

9              THE COURT:  Okay.  So the question was just, Do you

10   know when she wrote it or where she was when she wrote it?

11             ATTORNEY NUNAN:  She was capable of writing an

12   assessment of David Seifer on September 12th.  She was able to

13   do an assessment.  She was back from surgery.  You'll see in

14   the next document --

15             THE COURT:  Okay.  But, as to this particular

16   objection that's been raised, so the question of, Is she

17   capable, what do you mean by that?

18             ATTORNEY NUNAN:  Okay.  So in the next document

19   Dr. DeMars signs a document for Dr. Porter, and what I'm going

20   to hear from her is that Dr. Porter wasn't back and she

21   couldn't sign things or write things or do anything, and I am

22   using that document to show she was perfectly capable of

23   writing an assessment and sending it and speaking on her own.

24             THE COURT:  Okay.  I mean, asking the Witness to

25   assess whether she's capable of writing, can't you establish

VOLUME: 7
PAGES: 222-431

1    that just by the fact that the email was written on a certain

2    date?

3              ATTORNEY NUNAN:  Fine, yeah.

4              THE COURT:  Does that answer your objections?

5              ATTORNEY SCHROEDER:  Yes.

6              THE COURT:  Okay.  So then the objection is

7    sustained.

8              ATTORNEY NUNAN:  Fine.  We'll move on, yes.

9              ATTORNEY SCHROEDER:  And apologies for speaking over

10   you.

11             THE COURT:  Okay.  Thank you.

12             (Bench conference ends.)

13   BY ATTORNEY NUNAN:

14   Q.   Dr. DeMars, you received this lengthy email from

15   Dr. Porter.  I'm going to you read to you from the bottom.  She

16   writes, "Technically, he does not appear to be at ease with

17   commonly performed procedures and limited in his ability to

18   work up a couple with infertility, tubal patency assessment.

19   When I observed him doing IVF harvest, it was clear he was

20   struggling with the basics, this basic procedure".  Did I read

21   that correctly?

22   A.   You did.

23   Q.   Okay.  On the second page Dr. Porter writes to you, "He

24   orders excessive testing on patients at a considerable expense

25   to the couples, a practice that will quickly encourage couples

VOLUME: 7
PAGES: 222-431

1   to seek care elsewhere".

2        Did you understand that was an issue with Dr. Seifer?

3   A.   I understand that Dr. Seifer had a different practice

4   pattern than Dr. Porter.

5   Q.   Great.  I'd like to, I'd like you to look at Document 15,

6   which I believe is already in evidence.  Is that correct?

7            THE COURT:  So I have Document 15 listed as marked,

8   but not admitted.  We're trying to get some clarity on that

9   now.

10           ATTORNEY NUNAN:  Yes, please.

11           ATTORNEY SCHROEDER:  Your Honor, we have it as

12  admitted.

13           THE COURT:  And so does the deputy clerk.  Please go

14  ahead.

15  BY ATTORNEY NUNAN:

16  Q.   Give me a second while I just -- have you reviewed the

17  document?

18  A.   Yes.

19  Q.   Good.  Please excuse the hiccup.  Okay.  The cover email

20  is to you.  Who is Michelle?

21  A.   Michelle Scearbo?

22  Q.   Yes.

23  A.   She was part of the medical staff office.

24  Q.   Got it.  And in this email is she writing on behalf --

25  let's see.  Is it the credentialing committee, or it's the

VOLUME: 7
PAGES: 222-431

1    review committee?  What would you call this?  I guess the

2    credentialing committee, correct?

3    A.    Yes.

4    Q.    Okay.  So what she says here is, "The progress was

5    reviewed today by Ed Merrens, Maria Padin, and Joyce Chertoff

6    in preparation for bringing the credentials committee, to the

7    credentials committee, and they have a question here for you

8    because you left Number 8 blank"; is that right?  It says --

9    A.    That's what it says.

10    Q.    -- "has the practitioner been subject, the subject of

11    repeated complaints by patients, hospital staff, or members of

12    the medical staff", correct?

13    A.    Yes.

14    Q.    Okay.  So I'd like to take a look at what you have written

15    before we come back to this.  You wrote a two-page narrative,

16    right, that I've just scrolled through?  Page 2 and 3 is a

17    two-page narrative that you wrote?  Dr. DeMars, I'm sorry.  Is

18    that a two-page narrative you wrote?

19    A.    Yes.  I'm sorry.  Yes.

20    Q.    Okay.  I'm going to read what you wrote under "Medical

21    Knowledge".  "Most reviewers rated his fund of knowledge as

22    excellent with critics quickly dismissing some of his

23    suggestions as being out of date.  He is, in fact, practicing

24    evidence-based specialty care and has advanced the evaluation

25    and management of IVF patients.  He has extensive expertise in

1    evaluation of infertility and has an active analytical

2    approach".

3         The email that you received from Dr. Porter did not state

4    this?

5    A.   That's correct.

6    Q.   The opposite of this, correct?

7    A.   That's correct.  That is the, that is the only email I

8    received that was critical of Dr. Seifer's medical knowledge.

9    Q.   Why didn't you credit Dr. Porter's input here?

10   A.   I did with, "Critics quickly dismissing some of his

11   suggestions as being out of date".

12   Q.   After the two pages of narrative, on Page 4 this is the

13   initial cover page of the form for the FPP assignment, correct?

14   A.   Yes.

15   Q.   And, as part of this under "New Applicant", the box has

16   been checked, "Current competence and clinical activity does

17   not meet the guidelines as determined in the FPP policy.  Five

18   case reviews will be required within 90 days of initial

19   clinical activity."

20   A.   Yes.

21   Q.   Okay.  So, as part of his assessment because he, he did

22   not meet the guidelines, he had to be proctored, essentially,

23   in five cases?

24   A.   Yes.

25   Q.   And I just want to draw your attention down here.  This

1    form had to be returned to the medical staff office September

2    12th 2016?

3    A.    Correct.

4    Q.    On the next page I'd like to call your attention to what

5    you've written here.  Can you read your handwriting here for

6    me, please?

7    A.    It says, "Approval for unrestricted privileges with

8    planned coaching as Dr. Porter returns to" -- sorry.

9    Q.    I'm sorry.  At the -- I might not have been clear.  At the

10   bottom of that box, you have written Dr. Porter --

11   A.    Oh, sorry.  "Dr. Porter would like to continue coaching to

12   improve technical skill."

13   Q.    And you signed this document on 9/26/16, correct?

14   A.    Correct.

15   Q.    And can you read what's written right here, your

16   handwriting, approval for?

17   A.    "Approval for unrestricted privileges with planned

18   coaching as Dr. Porter returns to maximize technical

19   proficiency."

20   Q.    Okay.  So the next page says your name has been checked,

21   and you say in handwriting, "See proctoring forms".  So we move

22   on to the proctoring forms.  So, flipping through the

23   proctoring forms just as an overview, you have Albert Hsu

24   proctoring David Seifer, and in this first one you have Albert

25   Hsu proctoring David Seifer in an embryo transfer, correct?

1    A.    Yes.

2    Q.    Is that Albert Hsu's signature at the bottom of that page?

3    A.    Yes.

4    Q.    You have Albert Hsu proctoring David Seifer on 7/20/16 in

5    an oocyte retrieval.  That's an egg harvest, correct?

6    A.    Yes.

7    Q.    And that's Albert Hsu's signature at the bottom, right?

8    A.    Yes.

9    Q.    He signed that on 9/26.  On the next page, you have Albert

10   Hsu proctoring David Seifer in another embryo transfer, and

11   that's his signature at the bottom, right?

12   A.    Yes.

13   Q.    And in this next document the proctor's name is Misty

14   Blanchette Porter, and it's an oocyte retrieval.  So this is an

15   egg harvest?

16   A.    Yes.

17   Q.    The date of the procedure was 7/20/16 --

18   A.    Yes.

19   Q.    -- is that correct?  Did you fill out this form here?

20   A.    Yes.

21   Q.    How did you know about the oocyte retrieval on 7/20/16?

22   A.    I would have discussed it with Dr. Porter.

23   Q.    You didn't go into the medical records to get it?

24   A.    I didn't think so, no.

25   Q.    Sorry.  I'm flipping around here.  And so, at the bottom

1    of this document, you sign "DeMars for Blanchette Porter
2    9/26/16".
3    A.    Yes, because Dr. Porter was out.
4    Q.    She was out?  Did she know you were filling out this form?
5    A.    Yes.
6    Q.    Did she give you permission to sign this form for her?
7    A.    I would expect so.
8    Q.    Are you sure?
9    A.    Am I -- I wouldn't have filled it out without discussing
10    it.
11    Q.    Okay.  Let's turn to the next page.  It says at the very
12    bottom, "See other side".
13    A.    Yes.
14    Q.    So you've added a whole -- can you please read your
15    writing on this page for us?
16    A.    "Dr. Porter is a senior member of the division and has
17    been out on medical leave of absence since 12/15.  She returned
18    in July 2016 for very limited clinical duties before going out
19    on full disability again in August 2016.  During that time, Dr.
20    Porter observed Dr. Seifer in oocyte retrieval.  She observed
21    that he appeared to be unfamiliar with the aspiration pump that
22    DHMC uses.  She reviewed the details of the apparatus with him
23    and gave him intraprocedural pointers.  The procedure was
24    completed successfully and without complication.  Dr. Porter
25    would like to continue to work with Dr. Seifer to refine his

1    technique on this equipment."

2        I completed this form based on written and verbal comments

3    from Dr. Porter.  Dr. Porter has been observed to be one of the

4    most technically skilled REI doctors in the region.  She is a

5    demanding proctor, as evidenced by her continued work with

6    other division members.

7    Q.   You received a highly critical email on July 24th from Dr.

8    Porter after she spent the week watching David Seifer; is that

9    correct?

10   A.   After she spent -- I don't know whether it was a week

11   after she, after she spent time watching him do one or two

12   oocyte retrievals.

13   Q.   Okay.  We looked at that email yesterday --

14   A.   Yes.

15   Q.   -- Exhibit W.

16   A.   Yes.

17   Q.   Okay.  And that, do you recall in that document at all if

18   she said she was willing to continue to coach him?

19   A.   I don't recall.

20   Q.   Okay.  If I said to you that Dr. Porter did not know that

21   you were filling out this form, would you be surprised?

22   A.   I would be.

23   Q.   And, if I told you that Dr. Porter said she did not give

24   you permission to sign on her behalf, would you be surprised?

25   A.   Yes, I would.

VOLUME: 7
PAGES: 222-431

1    Q.    Okay.  Dr. Porter wrote you a lengthy review on September

2    12th giving her opinions on David Seifer, did she not?

3    A.    Yes.

4    Q.    Okay.  And so she was perfectly capable of filling out a

5    form like this and signing it by herself?

6             ATTORNEY SCHROEDER:  Objection.

7             THE COURT:  Sustained.

8    BY ATTORNEY NUNAN:

9    Q.    So two of those documents you have Albert Hsu observing

10   Dr. Seifer in embryo transfers?

11   A.    Yes.

12   Q.    Do you recall yesterday we reviewed the June 3rd 2016

13   assessment of Albert Hsu?

14   A.    Yes.

15   Q.    And, on Page 9 of that document, we looked at Dr. Porter's

16   assessment that he had regressed in his abilities to do embryo

17   transfers?

18   A.    Yes, I remember that.

19   Q.    Why would he be an appropriate person then to evaluate Dr.

20   Seifer in embryo transfers?

21   A.    He was the only person at Dartmouth-Hitchcock who was not

22   on disability, who was not on leave in a position to observe

23   Dr. Seifer.  I was trying to understand where on the spectrum

24   of, of ability of Dr. Seifer lay.  This was, he just started at

25   Dartmouth.  Because of our credentialing procedure, he needed

VOLUME: 7
PAGES: 222-431

1    to be observed.  The most appropriate people to observe him are

2    those who understand the procedure.

3    Q.   I'm sorry.  I'm going to interrupt you.  You knew when he

4    came on at the beginning of the summer that he needed to have

5    this FPP proctoring evaluation done, correct?

6    A.   All new physicians need that done.

7    Q.   That's great.  So Dr. Porter was in and at least observing

8    him the week -- on Saturday, July 24th, she wrote you an email

9    that said she'd been overseeing him that week.  Why didn't you

10   have her fill out all of the proctoring evaluations for him?

11   A.   She should have.

12   Q.   Okay.  Did you ask her to?

13   A.   She should have.

14   Q.   So this is, this is her responsibility?

15   A.   Yes.

16   Q.   Is it her responsibility to submit it to the credentialing

17   committee or yours?

18   A.   It's hers.

19   Q.   You were doing this on behalf of her?

20   A.   She was, she was observing for the purpose of proctoring.

21   That form should have been filled out on the day that it was,

22   the observation was performed.

23   Q.   Were the Albert Hsu -- so flip to Page 8, please.  Albert

24   Hsu was working all of the summer of 2016.  This, on Page 8 the

25   oocyte retrieval, Albert Hsu.  7/20/16 was the date of the

1    procedure.  He signed this on 9/26/16.  That's not consistent

2    with what you just said.

3                ATTORNEY SCHROEDER:  Objection.

4                THE COURT:  Overruled.

5                THE WITNESS:  I would stand by that statement.

6    BY ATTORNEY NUNAN:

7    Q.   Fair.  I'm going to turn to Exhibit 16.  That's been

8    admitted; is that correct?  Will you please turn to Exhibit 16,

9    Dr. DeMars?

10   A.   Yes, I have it.

11   Q.   This is your response email, is it not?

12   A.   Yes, it is.

13   Q.   Okay.  You state, "Since this was an initial evaluation, I

14   left Number 8 blank".

15        That was the question about whether or not there had been

16   repeated complaints, correct?

17   A.   Yes.

18   Q.   "Reflecting the positive and negative comments by, n my

19   narrative.  Dr. Seifer has not been the subject of repeated

20   complaints by patients, staff, or DH colleagues".  You wrote

21   that?

22   A.   Yes.

23   Q.   Dr. Porter had written you two lengthy critiques of David

24   Seifer, did he not?

25   A.    She did.

VOLUME: 7
PAGES: 222-431

1   Q.   Did she not?

2   A.   Yes, she did.

3   Q.   And did Sharon Parent meet with you with Casey Dodge in

4   her office to complain about Dr. Seifer?

5   A.   Sharon Parent came, and Casey Dodge came as well, to

6   defend Dr. Seifer.

7   Q.   It's your testimony that Sharon Parent was defending Dr.

8   Seifer?

9   A.   No.  Casey was defending Dr. Seifer.

10  Q.   Did you hear complaints --

11       THE COURT:  Please let the Witness finish her answer

12  before asking the a question.

13  BY ATTORNEY NUNAN:

14  Q.   Sorry.  Sure.  Did you receive complaints from Sharon

15  Parent?

16  A.   I received, I received complaints from Sharon.  This was

17  reflective of the complaints that there was poor communication.

18  Q.   Not of patient pain and harm?

19  A.   Not of patient pain and harm.

20  Q.   Okay.  I would like you to turn to Exhibit 18, please.  I

21  do not believe this has been admitted.  Did you receive this

22  email from Dr. Porter?

23  A.   Yes, I did.

24  Q.   February 20th 2017?

25  A.   Yes, I did.

VOLUME: 7
PAGES: 222-431

1            ATTORNEY NUNAN:  I'd like to move for the admission

2    of Plaintiff's Exhibit 18, please.

3            THE COURT:  Any objection?

4            ATTORNEY SCHROEDER:  No objection, Your Honor.

5    Actually, it may be a duplicate.  We can clarify that later.

6            THE COURT:  So Plaintiff's Exhibit 18 is admitted.

7        (Plaintiff Exhibit 18 is admitted into evidence.)

8    BY ATTORNEY NUNAN:

9    Q.   Okay.  I'm having trouble with the exhibits.  Please

10   forgive me.  So in February of 2017, were you doing a follow-up

11   evaluation of Dr. Seifer?

12   A.   Yes.

13   Q.   Okay.  Did you ask everyone in the REI division to give

14   you feedback on their experience with Dr. Seifer?

15   A.   I did.

16   Q.   Did Dr. Porter write a response to you?

17   A.   She did.

18   Q.   Can you remember who else in the department responded to

19   you during this time period?

20   A.   I think I got responses from everyone in the department.

21   In the division, excuse me, not the department.

22   Q.   Okay.  And were they largely negative?

23   A.   No.

24   Q.   Were a majority of them negative?

25   A.   No.

1    Q.   Would you classify Dr. Porter's review of Dr. Seifer as

2    negative?

3    A.   I would.

4    Q.   I would like you to turn to Exhibit 23, please.  Okay.

5    This is an email you received from Judith McBean?

6    A.   Yes.

7    Q.   February 22nd 2017?

8    A.   Yes.

9    Q.   As part of that review?

10   A.   Yes.

11        ATTORNEY NUNAN:  I'd like to move for the admission

12   of Exhibit 23?

13            THE COURT:  Any objection?

14            ATTORNEY SCHROEDER:  No objection.

15            THE COURT:  Plaintiff's Exhibit 23 is admitted.

16        (Plaintiff Exhibit 23 is admitted into evidence.)

17   BY ATTORNEY NUNAN:

18   Q.   Dr. McBean -- excuse me.  All right.  Give me just a

19   second,  please.  I apologize.

20            THE COURT:  Yes.

21   BY ATTORNEY NUNAN:

22   Q.   Dr. McBean writes a lengthy email to you reviewing her

23   beliefs about David Seifer's technical skills, correct?

24   A.   Yes.

25   Q.   His standard of care?

1    A.    Yes.

2    Q.    And his leadership?

3    A.    Yes.

4    Q.    Would you qualify this or would you describe this document

5    as negative?

6    A.    Yes.

7    Q.    On the second page she writes about David Seifer, "One of

8    my biggest concerns that I have is with regard to his

9    management of Albert Hsu.  Albert does not have an adequate

10   skill set with regard to surgery and patient care.  He

11   regularly practices outside of ASRM standards with regards to

12   IVF which is both ineffective and costly to patients.  His

13   surgical skills endanger patients.  Dr. Seifer has not

14   addressed this issue, and there has been no improvement in his

15   practice."

16       Was this alarming to you?

17   A.    This was actually something we were addressing that

18   Dr. McBean was not aware of.

19   Q.    You received notice, an eleven-page document in June of

20   2016, seven months before this email was written to you,

21   correct?

22   A.    Yes.

23   Q.    Albert Hsu had been able to continue since that time

24   performing egg harvests and embryo transfers on patients,

25   correct?

VOLUME: 7
PAGES: 222-431

1   A.   Yes.

2   Q.   No restrictions?

3   A.   Dr. Porter had trained him and had completed his approval

4   of being able to do those procedures without restriction.

5   Q.   Was she telling you in June of 2016 that he should not be

6   performing these procedures?

7   A.   She, she said that his skills had regressed.

8   Q.   And, as the chair of the OB/GYN department, was it your

9   responsibility to do something about a physician that could not

10  perform procedures?

11  A.   As I said yesterday, my job was to try to find some

12  independent verification of this, of his abilities.  There was

13  no one other than Dr. Porter who was saying this.  While I

14  think that Dr. Porter has tremendous skill and she does have

15  tremendous ability to train and to teach, she had worked with

16  Dr. Hsu, and then the division in 2015 divided into a team Hsu

17  and a team Porter.

18  Q.   Who was on -- I'm going to cut you off.  Please excuse me.

19  Who was on team Hsu?

20  A.   Casey, Marlene down in Manchester.

21  Q.   I understood you yesterday to say in response to the June

22  16th assessment by Dr. Porter that you had brought Dr. Seifer

23  in to assess him.

24  A.   Yes.

25  Q.   Okay.  So how long would Dr. Seifer need to determine

1    whether or not Albert Hsu should be doing egg harvests and

2    embryo transfers on patients?

3    A.    I would expect that that should be done within the first

4    90 days.

5    Q.    Was it done?

6    A.    We didn't have a performance improvement plan for him, but

7    Dr. Seifer was working with Dr. Hsu.

8    Q.    And you've heard here from Dr. McBean that Dr. Seifer is

9    not effectively addressing these issues; is that correct?

10   A.    This had already been identified, and this was something

11   that we were addressing.

12   Q.    I'd like you to turn to exhibit -- I'd like you to turn to

13   Exhibit 25.  It's not clear to me if that has been entered as

14   an exhibit or not.

15              THE COURT:  It has not.

16   BY ATTORNEY NUNAN:

17   Q.    Okay.  Thank you.  Have you reviewed that email?

18   A.    Yes.

19   Q.    Okay.  Can you tell me the date of that email?

20   A.    6/14/2017.

21   Q.    Who is it from?

22   A.    It's from me.

23   Q.    To whom?

24   A.    To the division directors and the residency program

25   director.

VOLUME: 7
PAGES: 222-431

1    Q.   And what is the subject line?

2    A.   "Unanticipated downstream effects."

3    Q.   Is unanticipated in quotes?

4    A.   Yes.

5    Q.   Why is that?

6    A.   Because I think they these are all things that we did

7    foresee and didn't and don't consider them unanticipated.

8    Q.   And when you say we, who do you mean?

9         THE COURT:  Okay.  So before asking any further

10   questions about this exhibit, are you seeking its admission?

11        ATTORNEY NUNAN:  I am.

12        THE COURT:  Any objection?

13        ATTORNEY SCHROEDER:  No objection.

14        THE COURT:  Plaintiff's Exhibit 25 is admitted.

15   (Plaintiff Exhibit 25 is admitted into evidence.)

16        THE WITNESS:  We being those that are on the email.

17   BY ATTORNEY NUNAN:

18   Q.   Who do you believe should have anticipated those

19   downstream effects?

20   A.   We did anticipate them.

21   Q.   Meaning this group was part of the decision?

22   A.   This group was charged with picking up the pieces after

23   the REI division was let, was let go and the REI division was

24   dissolved.  We had to make plans on how to absorb the nursing

25   staff, give them options of where they could remain within the

VOLUME: 7
PAGES: 222-431

1    department, and then also understand what services we still

2    would be able to retain and then ideally to be able to put

3    together a plan to be able to reopen our services in the

4    future.

5    Q.   This document here has some financials in the center of

6    it.  Does this refresh your memory that the IVF was a

7    money-making division?

8            ATTORNEY SCHROEDER:  Objection, Your Honor, asked and

9    answered.  Mischaracterizes.

10           THE COURT:  Sustained.  That question was answered.

11   BY ATTORNEY NUNAN:

12   Q.   So were you part of the decision to close the REI

13   division?

14   A.   My recommendation had been to pause IVF services.

15   Q.   Let me ask it a different way.  Were you -- did, did you

16   get on board with the decision to close the division once it

17   was made clear to you that it was going to be closed?

18   A.   I had no choice.

19   Q.   I would like you to turn to Document 110, please.  Have

20   you reviewed it?

21   A.   Yes.

22   Q.   Who is in an email -- it's an email from you to whom?

23   A.   This is a short email.  David Seifer had sent me a copy of

24   an article in the "Concord Monitor", and it was a reply back to

25   Dr. Seifer.

VOLUME: 7
PAGES: 222-431

1          ATTORNEY NUNAN:  All right.  I'd like to move for the

2     admission of this Document 110.

3          THE COURT:  Any objection?

4          ATTORNEY SCHROEDER:  Just for rule of completeness,

5     Your Honor, we just want the article attached to it.  I'm not

6     sure if we already have it in evidence, but, just under Rule

7     106, but we can hopefully deal with that on a break and

8     proceed.

9          THE COURT:  So no objection to this exhibit, subject

10    to the provision of the article at some point in time if it's

11    not already in evidence?

12          ATTORNEY SCHROEDER:  Correct, Your Honor.

13          THE COURT:  Okay.  Then Plaintiff's Exhibit 110 is

14    admitted.

15          (Plaintiff Exhibit 110 is admitted into evidence.)

16    BY ATTORNEY NUNAN:

17    Q.   David Seifer writes to you in September of 2017 after the

18    closure of the REI division.  He says, "In case you haven't

19    seen or read this article, interested in your take of

20    Dr. Conroy's interpretation of closing REI.  In bold face

21    below, wasn't aware we closed because we couldn't recruit new

22    providers.  Where does revised information like this come

23    from?"

24          And what did you say back?

25    A.   I met with Dr. Conroy, and I, I hoped that she had been

1    misquoted because I thought it was a mischaracterization of the

2    reasons that we closed the REI division.

3    Q.    So the fact that you couldn't recruit new providers was

4    not correct; is that right?

5    A.    Correct.

6    Q.    And you wrote, "I met with Joanne and told her I hoped she

7    had been misquoted in the article because, if that is the

8    information that has been given to her, it is completely untrue

9    and now a different narrative that is in the public eye.  I'm

10   not sure that she really cares."

11        Why do you write you're not sure that she really cares?

12   A.    Because my meeting with her was incredibly unsatisfactory.

13   Q.    Why?

14   A.    Because I went to talk to her.  I had not met with her

15   before about the closure of the division, and I met her for

16   coffee, and she, she said, Well, this is what I understand, and

17   wasn't willing to have a conversation.  It was a very short

18   meeting, and I felt like she was not giving me time or

19   attention.

20   Q.    Messaging surrounding the closure of the REI division was

21   important, correct?

22   A.    It was important.

23   Q.    Why?

24   A.    It was important because the reason that we, the reason

25   that the division closed was that we were going to have to shut

1    down our IVF services.  We wanted to pause them, but we could

2    not support our IVF services.

3    Q.   Was Beth Todd reassigned to the OB/GYN division?

4    A.   Yes.

5    Q.   Why wasn't Misty Porter reassigned to the REI division?

6    A.   I tried very hard to make that happen.

7    Q.   Why wasn't she reassigned?

8    A.   That was not a decision I was allowed to make.

9    Q.   Did you weigh in on her termination?

10   A.   I argued against her termination.

11        ATTORNEY NUNAN:  I'd like to turn to Document 52.

12   Please forgive me.  Is that in evidence?

13        THE COURT:  Yes, it is admitted.

14        ATTORNEY NUNAN:  Yes?  Okay.

15

16   BY ATTORNEY NUNAN:

17   Q.   Would you agree, at the time of the closure, there was a

18   lot of discussion about the messaging?

19   A.   Yes.

20   Q.   Okay.  And you say in this email that the messaging is

21   very messy, correct?

22   A.   Yes.

23   Q.   And you say that, "The ideal message is that, because of a

24   staffing issue, we are stopping the ART procedures, but that

25   doesn't answer why we can't continue to do, continue doing NPW

1    and noninfertility evaluations".

2        So the staffing issue message wasn't, it was a little

3    thin?

4            ATTORNEY SCHROEDER:  Objection.

5            THE COURT:  Overruled.

6            THE WITNESS:  The reason that I had recommended to

7    stop doing IVF and, in fact, we had contracted our IVF services

8    was because of staffing.  I wanted to put a pause on IVF

9    services.  We had an ongoing quality improvement project for

10   the REI division.  Part of that was the pause on IVF services.

11   BY ATTORNEY NUNAN:

12   Q.   You say down at the very bottom, "My life and the

13   messaging would be much easier if Jon Kakavas determined that

14   all three providers are at fault in the med diversion issue and

15   are facing a loss of license".

16       Your life would have been easier if Dr. Porter had lost

17   her license?  This is a yes-or-no question.

18   A.   Yes.

19   Q.   I would like you to turn to Document 89, please.  At the

20   bottom of Page 1 in response to Ed Merrens saying he's being

21   inundated and why can't Misty essentially be reassigned, you

22   respond, "What is the talking point?  My suggestion is we

23   working with each physician on their employment options, as

24   well as what is best for DH and DH OB/GYN.  I don't know how

25   you say, quote, I understand you are angry, but this decision

VOLUME: 7
PAGES: 222-431

1    was made in the best interest of the division and Misty.  Even

2    if that's the truth, no one will buy that at the moment".

3         In the paragraph above, Dr. DeMars, were you talking about

4    Misty's disability, her being out for 18 months on long-term

5    disability?  This is a yes-or-no question.

6    A.   No.  Oh, excuse me.  I don't know how to answer yes-or-no

7    to that.

8    Q.   Okay.  When you say, "Everyone is remembering Misty as a

9    full-time employee wearing three hats, and not the one who has

10   been out for almost 18 months", you're referring to her

11   long-term disability there, correct?

12   A.   Yes.

13            ATTORNEY NUNAN:  Okay.  I'd like just a minute.

14            THE COURT:  Yes.

15            ATTORNEY NUNAN:  I'm done for now.  Thank you.

16            THE COURT:  Okay.

17            ATTORNEY NUNAN:  Sorry about the technical

18   difficulties.

19            THE COURT:  All right.  Mr. Schroeder?

20            ATTORNEY SCHROEDER:  Thank you, Your Honor.  If I

21   could just have a few seconds to get set up if that's okay.

22            THE COURT:  Yes.

23            CROSS-EXAMINATION BY ATTORNEY SCHROEDER

24   Q.   Thanks for the Court's indulgence.  Good morning,

25   Dr. DeMars.

1    A.    Good morning.

2    Q.    You referred back to the use of the phrase providers in an

3    article in one of the documents that was shown by Ms. Nunan.

4    Do you remember that?

5    A.    Yes.

6    Q.    And how did you define providers in your mind?

7    A.    Providers, to me, are the independent providers.  They're

8    physicians, nurse practitioners.

9    Q.    Okay.  I just want to go back, Your Honor, just for

10    purposes of my direct examination, go beyond scope of the

11    cross.

12        Could you just tell the jury, Dr. DeMars, where you're

13    currently employed?

14    A.    I'm employed at a biotech company called Bicycle

15    Therapeutics.

16    Q.    Okay.  And how long have you been there?

17    A.    Since September of '23.

18    Q.    Okay.  And, just very briefly, what are you doing at

19    Bicycle Therapeutics?  What is your job?

20    A.    So Bicycle is a company that is making new drugs for

21    cancer patients.  And my job is to, to run or administrate two

22    global trials for patients with cancer for, to hopefully bring

23    this new drug to cancer patients.

24    Q.    Okay.  And you're currently working on that right now?

25    A.    Yes.

1    Q.    Would you describe your duties as global at this point?

2    A.    Yes.  One trial is in 6 countries, but my other trial is

3    in 28 countries, Has almost 200 sites.

4    Q.    Okay.  You're currently working on those studies right

5    now, correct?

6    A.    Yes, I am.

7    Q.    And am I correct that, when you do those studies, you then

8    have to present them to the FDA?

9    A.    Yes.

10    Q.    That's the Food and Drug Administration?

11    A.    Correct.

12    Q.    For whether or not they'll get approved, correct?

13    A.    Correct.  So I'm responsible for determining, well, the

14    proper conduct of the trial to prove whether the drug works and

15    also whether the drug is safe, and then we present those data

16    to the FDA and to European agencies and Asian agencies as well.

17    Q.    With respect to -- and I want to go back in time.  So when

18    did you, when were you employed by Dartmouth Health?

19    A.    From January 1997 until December 31st 2018.

20    Q.    And did you leave on your own accord?

21    A.    Yes.

22    Q.    Prior to that time, were you, you were the head of the,

23    chair of the OB/GYN department?

24    A.    For part of that time.

25    Q.    Okay.  How long was that?

1    A.    That was from 20, the January 2014 until August, I would

2    say, of 2017.

3    Q.    That was when you were the chair of the OB/GYN department?

4    A.    Yes.

5    Q.    And, just so that the jury can understand your

6    responsibilities of chair of the OB/GYN department, how many

7    divisions -- and we'll go by time period, 2016 to 2017.  Up

8    until the time that you were no longer the chair, how many

9    divisions are there in the OB/GYN department?

10   A.    So there is the maternal fetal medicine division, the

11   urogynecology division.  There is the generalists, general

12   OB/GYN division.  There is gynecologic oncology, and there is a

13   division of midwifery.

14   Q.    And did that, and then there's a --

15   A.    And the division of reproductive endocrinology and

16   fertility.

17   Q.    Let's see if my math is correct.  I count six divisions

18   underneath OB/GYN

19   A.    Yes.

20   Q.    And just make sure you verbalize your answers, okay?

21   A.    Yes.

22   Q.    So there is maternal fetal medicine?

23   A.    Yes.

24   Q.    Urogyn?

25   A.    Yes.

VOLUME: 7
PAGES: 222-431

1    Q.    Having a hard time reading my handwriting.  Generalist?

2    A.    Yes.

3    Q.    And what's the generalist division, by the way?

4    A.    The generalists are the nonspecialty OB/GYNs.

5    Q.    Okay.

6    A.    So they do general gynecology.  They do obstetrics as

7    well.

8    Q.    Okay.  And obstetrics includes the labor and delivery?

9    A.    Correct.

10    Q.    So that's the third one.  Gyn onc?

11    A.    Yes.

12    Q.    Is that your specialty?

13    A.    Yes.

14    Q.    Okay.  Midwifery?

15    A.    Yes.

16    Q.    Did I say that correctly?

17    A.    Yes.

18    Q.    Okay.  And REI?

19    A.    Yes.

20    Q.    So you had six divisions under you?

21    A.    Yes.

22    Q.    How many physicians at that time?  So 2016 into 2017, how

23    many physicians reported to you directly or indirectly as chair

24    of the OB/GYN department?

25    A.    Including the midwives?

VOLUME: 7
PAGES: 222-431

1    Q.    Yes.  If you can recall.  I realize this is --

2    A.    It's probably 40.

3    Q.    40 physicians?

4    A.    40 physicians, midwives.

5    Q.    Okay.  So and in addition, so the midwives as well?

6    A.    Yes.

7    Q.    And about 40 physicians which includes that?

8    A.    Correct.

9    Q.    Okay.  And then on top of that there are nurses, correct?

10   A.    Yes.

11   Q.    And there are other staff, correct?

12   A.    Yes.

13   Q.    In each of those divisions?

14   A.    Yes.

15   Q.    So, in total -- so set aside the providers, the

16   physicians, and the midwives including nurses and staff, and

17   how many people directly or indirectly reported up through your

18   chain of command as the chair of the OB/GYN department?  And

19   just rough estimates here.  I'm not asking --

20   A.    I would say another 80.

21   Q.    Okay.  So over, in total, would it be fair to say that

22   over a hundred people reported to you directly or indirectly?

23   A.    Directly or indirectly.

24   Q.    Okay.  There was a reference to, on your cross-examination

25   by Ms. Nunan, to an individual named Beth Todd.  Do you recall

1    that?

2    A.    Yes.

3    Q.    And Beth Todd was employed as a nurse practitioner?

4    A.    Yes.

5    Q.    And she -- do you recall whether or not she had an

6    appointment, not only in the REI division, but that also in the

7    OB/GYN department?

8    A.    She, she would have had an appointment in OB/GYN as part

9    of REI.

10   Q.    Okay.  And do you recall what her full-time status was in

11   terms of her hours towards the OB/GYN department versus REI

12   division at the time?

13   A.    I don't.  I think they were predominantly REI.

14   Q.    Okay.  So one of the questions I wanted to ask you about

15   in addition to that was, obviously, there's been a lot of

16   testimony about Dr. Misty Porter on your cross-examination, and

17   I just want to ask you a few questions without getting too

18   personal.  But how long have you known Dr. Porter?

19   A.    Since I arrived at DH.

20   Q.    1996, '97?

21   A.    Yes.

22   Q.    Okay.  And how did you meet?

23   A.    I mean, we met as members of the department.  At the time,

24   DH had very few full-time female physicians on staff, so we

25   were two of the few.

VOLUME: 7
PAGES: 222-431

1    Q.    Small cohort?

2    A.    A small cohort.

3    Q.    And did you become friends as opposed to just colleagues?

4    A.    I would have considered us friends, absolutely.

5    Q.    Okay.  And let me know if I'm getting too personal, but

6    were you ever a patient of Dr. Porter's?

7    A.    Yes.

8    Q.    And, without getting into all the details, did she assist

9    you in having any of your children?

10    A.    Yes.

11    Q.    And could you tell me, was that your second son?

12    A.    That was my second son, yes.

13    Q.    Okay.  And, just for the jury's understanding, how many

14    kids do you have?

15    A.    I have two.

16    Q.    Two boys?

17    A.    Two boys.

18    Q.    Okay.  And Dr. Porter assisted you with respect to having

19    your second son?

20    A.    Correct.

21    Q.    And when was he born?

22    A.    He was born in 2003?

23    Q.    Okay.  And, after that point of 2003, did your

24    relationship with Dr. Porter become further?  Did it develop

25    further?

VOLUME: 7
PAGES: 222-431

1   A.   I, I would have considered that we were, that we were

2   always friends.

3   Q.   Well, did the fact that you had this physician-patient

4   relationship with her, did that further cement the bond with

5   her?

6   A.   I'm, it's, the Upper Valley is a really small place.  We,

7   we would -- I think Misty went out of her way to help me have

8   my second son, and I think that was really a point of how

9   strong our friendship was.

10  Q.   Okay.  And, after your second son was born, did there come

11  a time where you had play groups, so to speak, with Dr.

12  Porter's children and your children?

13  A.   Not after my second son.  I mean, it was more initially

14  because, after my second son, Dr. Porter's kids were, were

15  older than my second son.

16  Q.   So let's go back to before that time.  So from '96, '97 to

17  2003 when you had your second son, what, if any, socializing

18  did you and your family do with Dr. Porter and her family?

19  A.   I mean, we did kid things together.  You know, our kids

20  had birthday parties.  Our kids had Boy Scouts, you know, all

21  the, all the usual kid activities that you do.

22  Q.   And did that happen on a regular basis, not every week,

23  but just throughout the year?

24  A.   I mean, yeah.  I mean, I don't -- I think we were also

25  really busy with all of the other things that we had to do.

VOLUME: 7
PAGES: 222-431

1   Both of us were working a lot.  So but we would get together

2   to, to, for family things, for kid things.

3           ATTORNEY NUNAN:  Objection.  This is beyond the scope

4   of her direct.

5           THE COURT:  Okay.  So I'll ask you to approach,

6   please.

7                   (Bench conference begins.)

8           ATTORNEY NUNAN:  I was trying to be patient, but I do

9   -- excuse me.  I'll keep my voice down.

10          THE COURT:  So this might be a good time for us to

11  talk about kind of the rules of the game just in terms of the

12  initial examination was a witness associated with an adverse

13  party, treated like a cross-examination.  I know you had stated

14  when you started your examination about going beyond the scope

15  of the cross given the nature of --

16          ATTORNEY NUNAN:  Is that where we are now?  That

17  wasn't made clear to me.

18          THE COURT:  Well, I thought Mr. Schroeder had said at

19  the beginning of his exam that, given the nature of this

20  particular witness, he would be asking questions beyond the

21  scope of the cross-examination.

22          ATTORNEY NUNAN:  Okay.

23          THE COURT:  Question for you, though.  So this line

24  of questioning about personal relationships, family and

25  everything else, what is this getting to for your case?

 1          ATTORNEY SCHROEDER:  For my case?

 2          THE COURT:  Is this part of the case, or is it some

 3   type of establishing some other kind of perception issue?

 4          ATTORNEY SCHROEDER:  I think it goes to both.  I

 5   think it goes to the answering the nature of the relationship,

 6   which obviously they discussed on cross, but also goes to the

 7   uniqueness of their relationship and the natural, the naturally

 8   complicated relationship.  So there was -- well, we can get --

 9   if you want to take it on the break, I'm okay to do that, too,

10   Your Honor, but I've raised this issue repeatedly with

11   plaintiff's counsel.  I've raised it repeatedly in court,

12   because of the nature of calling her on cross, could we flip it

13   over, and I think I'm asking very direct questions, but,

14   regardless, I've sort of been doing direct and cross with her

15   because I'm not calling her in the case in chief.

16          ATTORNEY NUNAN:  And I want to apologize because I

17   had a very black-and-white notion here, and but you're telling

18   me that it's all mixed in together?

19          THE COURT:  Well, I mean, a lot of your questions in

20   what would be a direct really amounted to a cross.  So,

21   Dr. DeMars, under the rules I interpreted her as being a

22   witness associated with an adverse party, which gives you some

23   leeway to kind of ask kind of your leading questions on your

24   direct, slash, cross, which was more a cross-examination, and

25   now Dartmouth comes back and is doing her examination after you

1    went on kind of cross posture.

2              ATTORNEY NUNAN:  Great.  Obviously, I appreciate

3    that.  Thank you.

4              THE COURT:  Sure, sure.  Okay.  So we're on the same

5    page.  So I'll tell them that we'll take a break now.

6              ATTORNEY NUNAN:  All right.  Thank you.

7              ATTORNEY SCHROEDER:  Thank you, Your Honor.

8                   (Bench conference ends.)

9              THE COURT:  Okay.  So, at this time, we'll take our

10   midmorning break, and we'll be ready to go, please, at about

11   10:35.  Thank you.

12        (A recess was taken from 10:24 a.m. to 10:37 a.m.)

13             THE COURT:  So, in light of the bench conference that

14   we had before, I did want to continue the discussion a little

15   bit with counsel.  I'm wondering if maybe it's best if we come

16   back up to the bench on this.

17             ATTORNEY SCHROEDER:  Sure.

18             THE COURT:  So I just wanted to get some clarity.

19   Mr. Schroeder, do you plan on -- I just want to make sure I'm

20   alert to the facts here.  Is Dr. DeMars going to be called as

21   part of your case in chief also?

22             ATTORNEY SCHROEDER:  No.

23             THE COURT:  Got it.  Okay.  And, if you said that and

24   I missed it, I'm sorry, but I just wanted to make sure.  That

25   changes a little bit.

```
 1                    ATTORNEY NUNAN:  I wasn't complete -- you might have
 2         said that to me as well, but I wasn't completely clear on that.
 3                    THE COURT:  Okay, all right.  All right.  You might
 4         guess what my concern is going to be, right?  So more leeway on
 5         your examination here amounts to two direct examinations in the
 6         case, which obviously we wouldn't do if you were calling her as
 7         part of your case in chief, but you're not.  So you're
 8         essentially doing your direct examination now, and that would
 9         be it?
10                    ATTORNEY SCHROEDER:  Correct.
11                    THE COURT:  Okay.
12                    ATTORNEY NUNAN:  And what do you call what I do after
13         this, if I have an opportunity to go up, that is?
14                    ATTORNEY SCHROEDER:  Recross.
15                    ATTORNEY NUNAN:  Recross?  Thank you.
16                    THE COURT:  You'll be able to re --
17                    ATTORNEY SCHROEDER:  Sorry, Judge.  I jumped in on
18         this.
19                    THE COURT:  No, I think we all knew the answer on
20         that.  Does that help you in terms of clarity?
21                    ATTORNEY NUNAN:  It does.
22                    THE COURT:  Helps all of us, frankly.
23                    ATTORNEY NUNAN:  Thank you.
24                    ATTORNEY SCHROEDER:  Thank you.
25                    (The Jury enters the courtroom.)
```

 1                    THE COURT:  Okay.  Please proceed, Mr. Schroeder.

 2      BY ATTORNEY SCHROEDER:

 3      Q.    Thank you, Your Honor.  Just going back, Dr. DeMars, to

 4      your reference to the OB/GYN department, prior to you becoming

 5      the chair of the OB/GYN department, were you the head of any of

 6      those divisions within the OB/GYN department?

 7      A.    GYN oncology.

 8      Q.    Okay.  And is that your specific area of subspecialty?

 9      A.    Yes, it is.

10      Q.    And has that always been the case?

11      A.    Yes.

12      Q.    Okay.  And, with respect to the REI division, and -- well,

13      let me, for purposes of educating me as well as the jury and

14      the Court, what does GYN onc involve?

15      A.    So GYN oncology is the specialty within obstetrics and

16      gynecology that takes care of women who have cancers of the

17      female reproductive tract, so ovarian cancer and uterine cancer

18      and cervix cancer, and we are both surgeons as well as

19      prescribers of chemotherapy.

20      Q.    And, throughout the time that you were the OB/GYN chair,

21      did you also have clinical duties relating to work in the GYN

22      onc, as I'll call it, division?

23      A.    Yes.  I was half time as a gynecologic oncologist.  So 50

24      percent of my time was as a, as a GYN oncologist, and then the

25      other 50 percent was supposed to be administrative.

1    Q.   Okay.  Let me see if I can break that down.  So 50 percent

2    of your time is administrative, and is that as the chair of the

3    OB/GYN department?

4    A.   Yes.

5    Q.   And we went over this already.  Six divisions, over a

6    hundred employees, correct?

7    A.   Yes.

8    Q.   So that only half of your time out of your whole day, FTE

9    1.0 was accorded to that?

10   A.   Yes.

11   Q.   And the other, and the other half of your time you were

12   supposed to be doing clinical work?

13   A.   Yes.

14   Q.   So in the OR, chemotherapy, meeting with patients, is that

15   fair?

16   A.   Yes.

17   Q.   And, within that 50 percent of time as the chair of the

18   OB/GYN department, you had six divisions you were in charge of,

19   right?

20   A.   Yes.

21   Q.   And one of those divisions was the REI division, correct?

22   A.   Correct.

23   Q.   And, out of the six divisions, was that one of the larger

24   divisions, or was it one of the smaller divisions under your

25   supervisory and oversight responsibility?

1    A.    It was, as an entire division, it was actually one of the

2    larger if you take into account both the lab and the, and the

3    physicians and nursing staff of the REI division.  So the, the

4    IVF lab also fell under REI.

5    Q.    Okay.  And the IVF lab we've heard testimony about.

6    Dr. Navid Esfandiari?

7    A.    Yes.

8    Q.    And there were a whole series of people that were in that

9    lab, correct?

10    A.    Yes.

11    Q.    And the lab is not where the REI division physicians would

12    be meeting with patients or performing surgeries, right?

13    A.    Correct.

14    Q.    Okay.  So you had all these responsibilities as chair of

15    OB/GYN department, and that was supposed to take up 50 percent

16    of your time?

17    A.    Yes.  Most chairs are .1 or .2 clinical rather than 50.5

18    or 50 percent.

19    Q.    And, given the fact that you were designated .5 clinical,

20    did that mean you had to actually perform services to meet that

21    threshold?

22    A.    Yes.

23    Q.    So there were requirements of meeting with patients,

24    performing surgeries, et cetera, that there were metrics that

25    you were expected to meet from a clinical demand perspective

VOLUME: 7
PAGES: 222-431

1    which was, at least was 50 percent of your FTE status?

2    A.    Yes.

3    Q.    And did you do that?

4    A.    Yes.

5    Q.    And, on top of that, the other 50 percent was the

6    administrative duties related to the OB/GYN department?

7    A.    Yes.

8    Q.    Okay.  With respect to the REI division and IVF, we've

9    heard all those acronyms throughout your testimony, and others.

10   Do you have any specific expertise in REI or IVF?

11   A.    No.

12   Q.    Okay.  And, when you testified earlier about needing to

13   independently evaluate either Dr. Hsu, Dr. Seifer, or anyone

14   else for that matter, what did you do to understand the level

15   of capabilities for those individuals?

16   A.    So I was, I was speaking fairly frequently with other REI

17   physicians, Dr. Reindollar being one of them, another physician

18   who was at Baystate who was a senior REI physician to try to

19   understand where the differences in standard of care lie and

20   what the, what the current standards should be.

21   Q.    And have you done that from time to time for other

22   specialty divisions that would be under your purview that you

23   didn't have specific expertise in?

24   A.    I didn't have a need to.

25   Q.    Okay.  But, in this particular instance with respect to

1    REI, you reached out to people like Richard Reindollar,

2    correct?

3    A.   Yes.

4    Q.   Okay.  If we could bring up P9, which I believe has been

5    admitted.  Okay.  Showing you a document that you've already

6    been shown, Dr. DeMars, and I just want you to take a quick

7    look at it, and then there's a second page to it which we'll go

8    to in a second.

9    A.   Yes.

10   Q.   Do you remember this exchange --

11   A.   Yes.

12   Q.   -- with Dr. Reindollar?

13   A.   Yes.

14   Q.   And was this one of the exchanges that you had with

15   Dr. Reindollar.  Thank you, Rick.  Was this one of the

16   exchanges you had with Dr. Reindollar about the REI division

17   and the members of it?

18   A.   Yes.

19   Q.   Okay.  Now, Dr., at that point in July of 2016, was

20   Dr. Reindollar the chair or CEO of ASRM?

21   A.   He was the head of ASRM.  I don't know what exact title it

22   was.

23   Q.   Okay, that's fair.  And ASRM is what?

24   A.   American Society of Reproductive Medicine.

25   Q.   And I don't want to put words in your mouth, but is that

1    like the gold standard for matters relating to REI?

2    A.    So that -- sorry to interrupt.  That would be the, the

3    body that would set the standards for practice in reproductive

4    medicine, in REI.

5    Q.    Okay.  And was your understanding that, after he left

6    Dartmouth Health, that he went to be, have some executive level

7    title at ASRM?

8    A.    Yes.

9    Q.    And had you worked -- prior to leaving Dartmouth Health,

10   what was his role?  What was his title at Dartmouth Health?

11   A.    He was the chair of the OB/GYN department.

12   Q.    Okay.  So the prior chair before you assumed the interim

13   title?

14   A.    Correct.

15   Q.    And did you work closely with him when he was the chair of

16   the OB/GYN department?

17   A.    No, not particularly.

18   Q.    Were you, at that point when he was the chair of the

19   OB/GYN department, were you the head of, I'm sorry, GYN onc?

20   A.    Yes, I was.

21   Q.    Okay.  And did you have dealings with him as a result of

22   being the head of a division underneath the OB/GYN department?

23   A.    Yes.

24   Q.    Which he was chair of, correct?

25   A.    Yes.

VOLUME: 7
PAGES: 222-431

1    Q.    Okay.  Now, I just want to read into the record that this

2    back-and-forth.  You were asked by Ms. Nunan a handful of

3    questions about the exchange, but I want to go a little bit

4    deeper.  And she focused very much on your comment, but then

5    the next, Richard Reindollar's response is that, "It's hard to

6    believe.  He was in a large New York IVF practice for a number

7    of years.  He inspired a number of residents to go into REI who

8    all speak highly of him.  Remember when I came to Dartmouth,

9    the same was said of me, and I had done more ZIVF cycles a year

10   that Dartmouth did in five or more years.  Beware of where you

11   get your info.  I had never heard that he wasn't clinically

12   competent.  Of course, anything is possible."

13       Was this a series of efforts by you to independently get

14   some help in determining the abilities of the various providers

15   in the REI division?

16   A.    Well, this was the beginning of it.  I mean, almost all of

17   these texts were followed by a phone call --

18   Q.    Okay.

19   A.    -- to get additional detail.

20   Q.    And, during this time period of July 2016, Dr. Seifer had

21   just arrived there, correct?

22   A.    Yes.

23   Q.    And so he'd only been there a handful of weeks at that

24   point, correct?

25   A.    Correct.

1    Q.   And the REI division was just one of the six divisions

2    that you were responsible for out of 50 percent of your

3    full-time status, correct?

4    A.   Yes.

5    Q.   Okay.  I want to ask you about the second page and

6    specifically the last exchange.  By the way, it has a tag line

7    here "Birth Giver".  Did you give yourself that tag line?

8    A.   No.  That was from my second son.  He tagged me that as

9    part of our family chat so it became my name in all texts.

10   Q.   So you didn't, you didn't come up with that name yourself?

11   A.   No, no.  My son.

12   Q.   My middle son is the IT director in my house as well.  So,

13   with respect to this last comment, you state, "I'm venting.  I

14   really want him to be successful.  I'm trying to keep the

15   hyenas at bay and get everyone in the boat.  After everyone is

16   in the boat, I can work on getting everyone to paddle in the

17   same direction.  I like him as a person, and I think he has

18   good ideas".

19        Who are you referring to there?

20   A.   So I'm referring to Dr. Seifer.

21   Q.   Now, Dr. Reindollar -- everybody's a doctor here.

22   Dr. Reindollar, he states, "The problem is that the REI

23   division has never been welcoming to outsiders or want to learn

24   if they have different ideas.  Much of Sharon's behavior is to

25   protect Misty's turf.  There could be clinical problems, but

1    that is one aspect of David that would surprise me".

2        Did I read that correctly?

3    A.   Yes, you did.

4    Q.   He references the fact that the REI division has been

5    unwelcoming to outsiders.  Did you have an understanding --

6    you've testified a little bit about the REI division.  In this

7    timeframe or prior to this timeframe before Hsu and Dr. Seifer

8    were there, were you aware of whether or not the REI division

9    was unwelcome to outsiders?

10   A.   Yes.

11   Q.   Okay.  And in what, what kind of examples can you give me?

12   A.   We'd had another pair of junior REI faculty members join

13   the staff during Dr. Reindollar's tenure, and they ultimately

14   left very abruptly.  They left Dartmouth and found a different

15   practice.  They were -- one of them was the focus of a fair

16   amount of criticism very similar that she was unable to perform

17   the full scope REI activities and was not going to be a

18   productive member of the division, and the two of them left.

19   Q.   Okay.  Well, I want to break that down a little bit

20   because you mentioned a few things, and I want to make sure

21   that it's clear to the jury.  There were two junior REI faculty

22   members that had been in the REI division when Richard

23   Reindollar was the chair of the OB/GYN department?

24   A.   Yes.

25   Q.   And were they married?

1    A.    Yes.

2    Q.    And just go by first names here, Sophia and Neil?

3    A.    Sophie and Neil, yes.

4    Q.    Oh, Sophie?  And you mentioned criticism of Sophie,

5    correct?

6    A.    Yes.

7    Q.    Who had that criticism?

8    A.    Dr. Porter --

9    Q.    Did she share that?

10    A.    -- to me.

11    Q.    Okay.  You jumped ahead there.  Just --

12    A.    Sorry.

13    Q.    -- take your time.  Did she share that criticism with you?

14    A.    Yes, she did.

15    Q.    Did she share criticisms during the time period that

16    Dr. Reindollar was the chair of the OB/GYN department about

17    other members of the REI division?

18    A.    Yes.

19    Q.    Can you name who those individuals are?

20    A.    She shared criticisms of Dr. Reindollar as well.

21    Q.    Okay.  Are you aware of what those -- what were those

22    criticisms that Dr. Porter had, if you recall, of

23    Dr. Reindollar?

24    A.    I, I don't recall in any detail.  I think they were

25    challenging his standards of care and plans, the similar

VOLUME: 7
PAGES: 222-431

1    ovulation plans and things.

2    Q.    You say they.  Do you mean the, the criticisms or Dr.

3    Porter or --

4    A.    The criticisms.  Sorry.

5    Q.    And were they from Dr. Porter?

6    A.    Yes.  Those were from Dr. Porter to me.

7    Q.    And they were criticisms of Dr., from Dr. Porter about the

8    former chair of the OB/GYN department, Dr. Reindollar?

9    A.    They were.  Those occurred while he was chair.

10    Q.    Okay.  And did she share criticisms of other members of

11    the REI department with you throughout that time period other

12    than Sophie?

13    A.    I don't remember criticisms of Neil, and I, I don't

14    remember if there were criticisms of other nursing staff during

15    that time.

16    Q.    Okay.  Did the REI division, when Dr. Reindollar was the

17    chair of OB/GYN, encounter turnover in its ranks?

18    A.    Neil and Sophie left.

19    Q.    Do you recall nurses leaving?

20    A.    And nurses left as well.  I don't know as much of the

21    detail about who actually left during that time.

22    Q.    Okay, fair enough.  With respect to Dr. Reindollar's

23    comment about Sharon's behavior is to protect Misty's turf, do

24    you understand what that means?  What, how did you interpret

25    that phrase?

VOLUME: 7
PAGES: 222-431

1    A.    So in, in my conversations with Dr. Reindollar, he also

2    described that there was a division within the division of REI,

3    that there was a Misty team and there was the other team,

4    whoever, whoever else there might be, but there were, there

5    were people who were long-term division members, Sharon, Beth

6    --

7    Q.    Sharon Parent?

8    A.    Sharon Parent.

9    Q.    And Beth Todd?

10   A.    -- Beth Todd -- who were firmly aligned to Misty and

11   aligned with Misty.

12   Q.    And did you encounter that same phenomenon when Dr. Hsu

13   and Seifer joined the REI division?

14   A.    It was, it was, there was clearly friction among the

15   nursing staff about who should take whose phone calls.  There

16   was friction among the nursing staff about who should be

17   training, training a new nurse.  There was, there was forever

18   friction and question about communication to patients.  There

19   was friction about communication to providers and then also who

20   was actually covering or who was, was going to be doing a

21   specific task.  It was this really frustrating, chaotic

22   environment.

23   Q.    Are you aware of whether or not the REI division, this

24   frustrating, chaotic environment, as you call it, had a

25   reputation throughout Dartmouth Health of having these negative

1    qualities?

2    A.    It did.

3    Q.    And did you hear that from more than one source?

4    A.    It came from the nursing supervisor.  It came from the

5    float pool.  It came from our nursing HR folks trying to hire

6    new nurses.

7    Q.    Okay.  Did during the -- I want to shift gears a little

8    bit.  During the 2016-17 timeframe, are you aware of whether or

9    not the REI division had any challenges -- you can take that

10   down -- had any challenges in recruiting nurses into the

11   division?

12   A.    Yes.

13   Q.    And do you recall whether or not there was a shortage of

14   nurses in the REI division as a result of a number of nurses

15   either leaving or departing for either termination or

16   resignation or retirement?

17   A.    Yes.

18   Q.    Just pull up P148 for a second?  I just want to finish a

19   few thoughts before we get into another topic, specifically the

20   second page.  The two side-by-side.

21        Dr. DeMars, you were asked a series of questions about the

22   back-and-forth here of Plaintiff's Exhibit 148.  And if we go

23   to the next page, please.  So specifically that, that middle

24   email, if you could highlight that, please where it says

25   "Misty" in the middle of it.  Thank you.

1          Now, Dr. DeMars, just a few real quick questions on this

2     because we're going to jump around a little bit to try to cover

3     everything so we can get you back out of here.  So here you

4     say, "Misty, first don't apologize for our how our meeting

5     ended, frustration.  It is worth looking at the month-by-month

6     trend.  I know that the FET rate January through June was

7     horrible attributable to both technique and poor embryos per

8     Navid.  Many left over still from Judy Stern's cryopreservation

9     protocol.  July to December, much better.  I think that it is

10    worth looking at all of the cycles in detail, including

11    technique.  Jude's numbers are also oddly low, and I know that

12    she has exquisite technique".

13         And I, really, we're just going to stay on this section or

14    this topic for a second.  Do you recall this comment that you

15    made, now looking at it again?

16    A.    I mean, honestly, only looking at it --

17    Q.    Just looking at it right now, right.  It was prepandemic,

18    about eight years ago so understood.  Fair response.  Jude's

19    numbers, who is Jude?

20    A.    That's Dr. McBean.

21    Q.    Judy McBean?

22    A.    Um-hum.

23    Q.    Okay.  And you were referring to the pregnancy rates?

24    A.    Yes.

25    Q.    Okay.  And but she had, in your opinion, exquisite

VOLUME: 7
PAGES: 222-431

1    technique, correct?

2    A.    Yes.

3    Q.    And did you receive that information from Dr. Porter about

4    Judy McBean?

5    A.    Yeah.  I think that, that she had been practicing for a

6    very long time and, you know, it was very accepted that she was

7    a consistent, high-performing provider.

8    Q.    Okay.  But, and despite being a high-performing provider

9    as a doctor or provider, her pregnancy rates were low, oddly

10   low, as you called them, right?

11   A.    Yes.

12   Q.    And you testified about this when Ms. Nunan asked you a

13   series of questions, but, in terms of pregnancy rates and

14   whether they're high, low, medium, there's a multitude of

15   factors that can go into that, correct?

16   A.    Yes.

17   Q.    And so, despite the fact that Dr. McBean maybe having a

18   sterling reputation and is an excellent provider and has, in

19   your words, exquisite technique, in this particular instance in

20   this particular year, her pregnancy rates were low?

21   A.    Lower than usual, yes.

22   Q.    Okay.  So there's a number of factors, and you testified

23   to them, and I don't want to retread that territory again.

24   Okay, thank you.  You can pull that down.

25        Do you recall a time period -- let me motion to strike

1    that.

2         With respect to your friendship with Dr. Porter, did you

3    continue to be friends throughout the 2000s and 2010 time

4    period into when you became chair of the OB/GYN department?

5    A.    I considered ourselves friends, yes.

6    Q.    Okay.  And did you regularly text message with her?

7    A.    Absolutely.

8    Q.    Okay.  Was she in -- I don't want to get too technical on

9    this question, but, in terms of your friends, right, we have

10   our top-tier friends, people that we regularly are in

11   communication with.  Then we have the second level, maybe

12   college med school people, not med school for me, but law

13   school.  And then, you know, you have the acquaintances in

14   town.  Where would she rank in my little, you know, chart of

15   friends for you?

16   A.    So, I mean, we would, we would be texting at least on a

17   weekly basis about things.  We both had incredibly busy lives.

18   So, you know, we weren't going out to happy hour anywhere

19   because both of us were usually either working past happy hour

20   or at home with the kids for happy hour.

21   Q.    Okay.

22   A.    But, but she was a person that I would consider that I

23   would totally rely on if I had had a problem or an issue.

24   Q.    On anything?

25   A.    On anything.

1    Q.    And, in terms of your daily, did you have daily

2    interaction with her or because you were in a totally different

3    area?

4    A.    Yeah.  No, because my clinical area was, was in a very

5    different place from, from the general OB/GYN department.

6    Q.    Okay.  So, in terms of proximity, you -- and I've been on

7    the Dartmouth Health campus.  It's like a college campus.  Your

8    area, general area of work on a daily basis was nowhere near

9    where Dr. Porter would be doing her work?

10   A.    Correct.

11   Q.    Okay.  But, despite that, you certainly, on a weekly

12   basis, texted with her, right?

13   A.    Yes.

14   Q.    And did you socialize with her and her husband and you and

15   your husband?

16   A.    Some.

17   Q.    Okay.  And, in addition, would you get together with her

18   for coffee or perhaps a late-night dinner or a snack?

19   A.    No, not usually.  Again, both of us, if we were -- Misty

20   was really very good about getting done with her work and

21   getting home to her family, and I admired her ability to do

22   that.  I was quite a bit worse than that and usually either had

23   to take work home or stayed very late to get my work done.

24   Q.    Okay.  But you considered Dr. Porter to be somebody that,

25   if something happened at, say, 4:00 in the morning and you

VOLUME: 7
PAGES: 222-431

1    needed somebody, would she be in the top tier of people that

2    you would reach out to?

3    A.    Yes.

4    Q.    Okay, shifting gears.  With respect to 2015 into 2016 and

5    specifically at the end of 2015, kind of orient you to that

6    time period, do you recall going on a board examiners trip with

7    Dr. Porter?

8    A.    Yes.

9    Q.    And you guys shared a room?

10    A.    Yes.

11    Q.    And, in prior years, did you typically share rooms

12    together?

13    A.    Yes.

14    Q.    Did you do that as a normal course with any other

15    physician at Dartmouth Health?

16    A.    So we did that as tradition for a number of years.

17    Q.    Okay.  But that wasn't my question.

18    A.    Did I do that with anyone else from DH?  No.

19    Q.    Yeah, okay.  That was my question.  But you did, you guys

20    shared rooms once a year for -- how long was that board

21    examiner exercise?

22    A.    It was, it was, generally, it was a solid week, but we

23    would come in often a day early, so Sunday to Saturday or

24    Saturday to Saturday.

25    Q.    Okay.  I'm familiar with that routine.  With respect to

 1    that board examiner exercise, so every year, would you do this
 2    every year with her?
 3    A.   Yes.
 4    Q.   So every year.  Was it always in December?
 5    A.   Yes.
 6    Q.   So every year you would spend seven, eight days together
 7    sharing a hotel room?
 8    A.   Yes.
 9    Q.   And, during the course of that seven or eight days every
10    single year, did you have meals together?
11    A.   Yes.
12    Q.   Did you socialize together?
13    A.   Yes.
14    Q.   And you were doing that throughout 2014, 2015, right,
15    2013, going back, 2012?
16    A.   Yes.
17    Q.   Okay.  So for at least four or five years?
18    A.   For, oh, for probably longer than that, for at least, I'd
19    say, ten.
20    Q.   Ten years?  So for ten years you guys had one week, not
21    that it was an easy week, but you had one week together sharing
22    a hotel room every single year --
23    A.   Yes.
24    Q.   -- for ten years?
25    A.   Yes.

1    Q.   Do you recall shortly after that week -- well, do you
2    recall specifically that particular board examiners week in
3    December of 2015?
4    A.   Yes.
5    Q.   Okay.  Did you leave that conference early?
6    A.   I believe I did.  I don't know.  I don't remember what the
7    reason was.
8    Q.   Okay.  Would that have been highly unusual for you to
9    leave that early --
10   A.   Yes.
11   Q.   -- leave early?
12   A.   Yes.
13   Q.   Okay.  Because, if you leave early, does that somehow
14   invalidate the whole board examiner exercise?
15   A.   It makes it more complicated because there's a very
16   complex way that the examiners are matched with the examinees,
17   and to be taken out of that planning that takes months to do
18   puts a significant monkey wrench into the process.
19   Q.   Okay.  Did Dr. Porter, at any point before you left early,
20   indicate that she needed your assistance with respect to any of
21   her, any symptoms that she might be experiencing?
22   A.   I remember that she was just starting to have some
23   symptoms that were making her go back to the room as soon as
24   she finished her exams.
25   Q.   Did you or Dr. Porter have any idea what that was?

1    A.    No.

2    Q.    And did she ask you at any point, like, I need you to stay

3    here with me, or, You need to get me assistance at the

4    hospital, or anything like that?

5    A.    No.

6    Q.    Okay.  But you stayed in touch with her by texting after

7    you left her early for that week, right?

8    A.    Yes.

9    Q.    And do you recall that, shortly after that, perhaps a week

10   or two later, that Dr. Porter's symptoms persisted to such an

11   extent that she had to go out on leave?

12   A.    Yes.

13   Q.    Okay.  And was that the -- did you have any understanding

14   at that point in mid-December of 2015 as to the specific nature

15   of her illness?

16   A.    No.  I don't think anybody did.

17   Q.    Okay.  And, when you say symptoms, or what were some of

18   the symptoms that Dr. Porter was expressing to you that she was

19   experiencing, if you recall?

20   A.    As I recall, it was vision changes, and it was -- I think

21   it was headache, and it may have been -- those two, I'm pretty

22   sure.  I don't remember others.

23   Q.    Okay.  And do you recall then that Dr. Porter was out of

24   the office completely on a leave of absence for about six

25   months?

1    A.    Yes.

2    Q.    At that point in time, Dr. Seifer -- so December of 2015

3    all the way to June of 2016, towards the end of that leave of

4    absence is when Dr. Seifer joined?

5    A.    Yes.

6    Q.    But, prior to that time, Dr. Hsu was already there

7    working, right?

8    A.    Correct.

9    Q.    And, with respect to her leave of absence, did you have an

10   understanding of her condition at any point during that time

11   period while she was on a leave of absence?

12   A.    I mean, from what I remember, this is a, this is a

13   condition that really disabled Dr. Porter.  It was not clear

14   what was going on.  It was not clear the extent of her

15   disability, nor was it clear about the trajectory or path to

16   recovering.

17   Q.    Was she communicating that to you?

18   A.    Yes.

19   Q.    Because, even though she was out on leave, did you

20   continue to text with her or call her on the phone?

21   A.    We would usually text.

22   Q.    Okay.  And, based on your friendship with her, did you

23   have, were you texting with her as an employee of your, of

24   OB/GYN, or were you texting her as a friend, or was it both?

25   A.    I was texting her as a friend.  As an employee, it was my

1    job to, to not text her.  You know, that, that, she was out on

2    leave, and, if you are out on a medical leave, that leave

3    should be respected.  No one, no one calls.  No one bothers.

4    Q.   So, with respect to when you were texting her, though,

5    during that time period, were you texting her about work

6    matters, or were you texting her about her health condition?

7    A.   I was texting her about her health.

8    Q.   Because you were concerned about her?

9    A.   Yes.

10   Q.   Okay.  When Dr. Porter came back to work in the summer of

11   2016, do you recall her asking for a series of accommodations?

12   A.   Yes.

13            ATTORNEY SCHROEDER:  If I can just show the Witness,

14   the Court, and plaintiff's counsel P129.  And also the Witness.

15            COURTROOM DEPUTY:  All set.

16   BY ATTORNEY SCHROEDER:

17   Q.   Thank you.  Okay.  Can you read that okay, Dr. DeMars?

18   A.   Yes.

19   Q.   Now, this is a, it's Plaintiff's Exhibit 129, and it's

20   titled -- the date of it's July 19th 2016, "To whom it may

21   concern".  Do you recall this, receiving this communication at

22   some point?

23   A.   Yes.

24   Q.   Okay.  And what was it just generally?

25   A.   So this is, this is a list of accommodations for someone

1    with a brain injury and that these were recommended to her.

2    Q.    To Dr. Porter?

3    A.    Excuse me.  To, to the department in order to allow Dr.

4    Porter to resume some work responsibility.  So they were

5    highly, highly restricted.

6              ATTORNEY SCHROEDER:  Okay.  I move for admission of

7    Plaintiff's Exhibit 129.

8              ATTORNEY NUNAN:  Could we have a bench consult for a

9    second?

10             THE COURT:  Yes.

11             (Bench conference begins.)

12             ATTORNEY NUNAN:  We're not litigating whether or not

13   she was accommodated or not, so I'm not quite sure why we're

14   going through this part.  Maybe I'm misunderstanding something,

15   but we are not saying that she was not accommodated.

16             THE COURT:  At work, right?

17             ATTORNEY SCHROEDER:  That claim -- sorry.  That claim

18   was dismissed by the court.  However, there is a claim of a

19   failure to accommodate with respect to disability

20   discrimination regarding her termination, Dr. Porter's

21   termination so that that is a claim before the Court, whether

22   or not DH had an obligation to accommodate her disability by

23   putting her into a different position in the OB/GYN department,

24   and, in fact, Mr. Vitt actually was quoted in an article about

25   that very same issue.  So they are litigating that issue.

I have, I'm not going to go beyond this document more than three minutes, but it certainly goes to Dr. Porter, Dr. DeMars as well, in terms of her intent and what she was doing and whether or not she was accommodating to Dr. Porter.

THE COURT: Okay.

ATTORNEY SCHROEDER: I'm sorry. I had another pause there.

THE COURT: So the live kind of accommodation issue is about whether she was given another position -- is that accurate -- as opposed to --

ATTORNEY SCHROEDER: Correct.

THE COURT: -- whether she was given medical accommodation while at work? And does this go more to medical accommodation as opposed to the accommodation of a transfer to another department?

ATTORNEY SCHROEDER: Correct, Your Honor, it does, but it goes -- you can't separate the two, Well, I had, yeah, I got all these accommodations over here, but then this one accommodation I didn't get, without actually talking about the fact that she did all these other accommodations.

And, certainly, I mean, set aside relevance. I mean, it's certainly probative of Dr. DeMars's credibility with respect to how she was treating Dr. Porter. This is a disability discrimination case. These were accommodations she gave during that time period. She's going to say, she'll say that those

1     are the ones that she wanted.  They were given to her.  This is

2     a plaintiff's exhibit, by the way, so I'm not sure why we have

3     an objection on admission, but --

4               THE COURT:  It is your exhibit, that's true.

5               ATTORNEY NUNAN:  It is.  That is true.

6               THE COURT:  So do you still oppose its use?

7               ATTORNEY NUNAN:  I do.  But, yes, I do.

8               THE COURT:  Okay.  So are you planning on introducing

9     this at some point in time?

10              ATTORNEY NUNAN:  I think, at one point, we were.

11    We're not now.

12              THE COURT:  Okay.  And your argument is that these

13    particular accommodations that are requested is relevant to the

14    question of whether she should have been accommodated in terms

15    of another position as well?

16              ATTORNEY SCHROEDER:  Of course.

17              ATTORNEY McDONALD:  I think it also goes to the issue

18    of whether Dr. DeMars discriminated against Dr. Porter with

19    respect to her disability, because we do have a cat's paw

20    theory in play, and in that theory Dr. DeMars was the one who

21    purportedly discriminated against her, and ultimately --

22              ATTORNEY NUNAN:  I see the reassignment and the

23    interactive process as different than accommodations.  That's

24    what I would say.

25              THE COURT:  Okay.  Doesn't this, I mean, testimony

1    further to this point, doesn't it seem to go the cat's paw

2    issue?

3              ATTORNEY NUNAN:  Sure.

4              THE COURT:  Okay.  That's a live issue still.

5              ATTORNEY NUNAN:  Okay, sure.

6              THE COURT:  All right.  So I'll allow you to inquire

7    into that.  Question about the mode of questioning.  So this is

8    your direct.

9              ATTORNEY SCHROEDER:  Partially, yes.

10             THE COURT:  Okay.  Because of the format of the

11   questions, I haven't heard a lot of typical direct examination

12   form of questions.  There is definitely a leading element.

13             ATTORNEY SCHROEDER:  Understood.  I will attempt to

14   fix that, Your Honor.

15             THE COURT:  Okay, thank you.

16             ATTORNEY McDONALD:  May I just ask counsel to ask

17   their client to speak a little bit more quietly?  We can hear

18   her from our table, and I'm a little concerned the jury can

19   hear her as well.  Thank you.

20                  (Bench conference ends.)

21             ATTORNEY SCHROEDER:  Move for admission of

22   Plaintiff's Exhibit 129.

23             ATTORNEY NUNAN:  No objection.

24             THE COURT:  Okay.  Then Plaintiff's 129 is admitted.

25        (Plaintiff Exhibit 129 is admitted into evidence.)

1              ATTORNEY SCHROEDER:  May I have it published to the

2    jury?

3              THE COURT:  Yes.

4    BY ATTORNEY SCHROEDER:

5    Q.   Thank you.  Dr. DeMars, very quick follow-up on this

6    particular document.  There is a list here of various

7    recommended accommodations, as they're called.  Do you see

8    that?

9    A.   Yes.

10   Q.   And there is also some additional handwriting there for

11   additional, it looks like, accommodations, correct?

12   A.   Yes.

13   Q.   And this was -- did you receive this in and about July 19,

14   2016?

15   A.   Yes.

16   Q.   And did you take steps to approve the accommodations that

17   were listed here?

18   A.   Absolutely.

19   Q.   And so there, did you do that in your capacity as the

20   chair of the OB/GYN department?

21   A.   Yes.

22   Q.   Okay.  Did you communicate these accommodations to members

23   of the REI division?

24   A.   Yes.

25   Q.   You can take that down.  Thank you.  With respect to -- I

VOLUME: 7
PAGES: 222-431

1    want to shift gears to -- well, let me just stay on the

2    disability issue for a second.

3        After Dr. Porter returned to the office in the summer of

4    2016, did she require another leave of absence thereafter?

5    A.    Yes, she did.

6    Q.    And did that, do you recall how many months that was that

7    -- did she require a leave of absence for a period of time?

8    A.    Yes.  It was essentially the rest of 2016.

9    Q.    Okay.  So did there come a time where she had an actual

10   surgery in 2016?

11   A.    I believe so, yes.

12   Q.    And was that the August-September timeframe?

13   A.    I believe so, yes.

14   Q.    And then after that there was a leave of absence related

15   to that surgery?

16   A.    Yes.

17   Q.    Now, prior -- shifting gears back to prior to Dr. Porter

18   being out of the office for two different leaves of absence,

19   right?  By the way, before I go further, were those leaves of

20   absence related to each other?

21   A.    Yes.

22   Q.    Okay.  And in the June-July -- do you recall, during the

23   summer of 2016, whether or not Dr. Porter was approved for

24   long-term disability benefits?

25   A.    I don't know that for sure.

1    Q.   Sure.  So, with respect to the post-Reindollar time

2    period, so this would be when you became the interim chair of

3    the OB/GYN department.  This would be 2014, 2015, 2016.  Did

4    the, did you receive any information as to whether or not the

5    members of the REI department, division at that point in 2014

6    and '15 were experiencing any interpersonal friction?

7    A.   Yes.

8    Q.   Okay.  And I'd asked you examples about that before with

9    respect to when Dr. Reindollar was the OB/GYN chair and the

10   interpersonal friction that he referred to, the Misty team

11   versus the everyone else.  Was there any kind of friction --

12   well, what are the examples of friction that you could identify

13   in the 2014 to 2016 timeframe?

14   A.   The friction was, largely surrounded the division into a

15   Hsu team and a Porter team and the nurses who were assigned to

16   the Porter team versus those who were assigned to the Hsu team

17   and then the, the lack of communication and the lack of

18   training among those nurses caused an intense amount of

19   friction.  It also led to friction from nurses up to the

20   providers because there was questioning about plans, and my

21   understanding is that the, the meetings, the divisional

22   meetings, were not necessarily cordial and cooperative, but

23   that there was dissent during those meetings.

24   Q.   And do you recall whether -- do you recall, as chair of

25   the OB/GYN department, receiving actual complaints from members

1    of the REI division about that behavior?

2    A.   What I, what I received was complaints about Albert, about

3    Dr. Hsu.  I did not directly get the, the internurse

4    complaints.  Those went to the nurse manager.

5    Q.   Who was that?

6    A.   I think that was Katy Mansfield.

7    Q.   Katy Mansfield was the nurse manager?

8    A.   I think so.

9    Q.   And so, if there were nursing complaints about turf wars,

10   if you will, they would have gone to the nurse manager?

11   A.   Yes.

12   Q.   Okay.  But then they would bubble up to you?

13   A.   Yes.

14   Q.   And, with respect to the complaints about Dr. Hsu, did

15   they come from people other than Dr. Porter?

16   A.   They usually came from those people who closely aligned

17   with her.

18   Q.   And who would that be?

19   A.   That would be Sharon Parent.

20   Q.   Okay.

21   A.   And that would be Beth Todd.

22   Q.   Okay.  And Beth, are you aware of the fact that Beth Todd

23   is still employed by Dartmouth Health?

24   A.   No.

25   Q.   Okay.  Well --

1    A.    I don't.

2    Q.    Let me ask you.  Let me see if I can get back to your

3    recollection or a period where you would recall.  After the REI

4    division was closed, that was May, June of 2017?

5    A.    Yes.

6    Q.    Beth Todd remained employed by Dartmouth Health?

7    A.    Yes.

8    Q.    And she was in the OB/GYN department, correct?

9    A.    Yes.

10   Q.    And she was the only nurse practitioner from the REI

11   division, at the REI division at that time, right?

12   A.    Yes.

13   Q.    Okay.  And she remained employed there throughout 2017

14   while you were still there, correct?

15   A.    Yes.

16   Q.    And she remained employed there throughout 2018 while you

17   were still employed?

18   A.    Yes.

19   Q.    I want to ask you about specific complaints from members

20   of the REI division.  If we could put Exhibit Z on the screen

21   just for the Witness, lawyers, and the Court.  Sorry.  It's

22   Defendant's Exhibit Z.  I'm not going to ask you any questions

23   about the attachment, Dr. DeMars, but this is, there is a email

24   exchange up top and below.  Do you recall this series of email

25   communications?

1    A.    No.

2    Q.    Okay.  Just take the time to read it, if you will, and let

3    me know when you're finished.

4    A.    Okay.

5    Q.    Okay.  Does that refresh your recollection of the email

6    communication?

7    A.    No.

8    Q.    Okay.

9    A.    Unfortunately.  Sorry.

10    Q.    Okay.  No reason to doubt the fact that you received this

11    email, though, correct?

12    A.    Correct.

13    Q.    And this is from Dr. Seifer to you?

14    A.    Yes.

15    Q.    And did you receive, during the 2016 early, well, late

16    2016, early 2017 timeframe, complaints from Dr. Seifer that

17    related to interpersonal conflicts with Dr. Porter?

18    A.    Yes.

19    Q.    Okay.  Would you consider this email to be one of those

20    examples?

21              THE COURT:  Are you seeking admission of this?

22              ATTORNEY SCHROEDER:  I would like to seek admission,

23    Your Honor.  Apologies.  I'd like to seek admission of

24    Defendant's Exhibit Z.

25              THE COURT:  Any objections?

1            ATTORNEY NUNAN:  No objection.

2            THE COURT:  Okay.  Defendant's Exhibit Z is admitted.

3        (Defense Exhibit Z is admitted into evidence.)

4            ATTORNEY SCHROEDER:  Thank you, Your Honor.  May we

5    publish it to the jury?  Thank you.

6            THE COURT:  Yes.

7    BY ATTORNEY SCHROEDER:

8    Q.   And I really just want to focus on the top, well, the

9    first page.  So on the bottom email it's from Dr. Porter to

10   Elizabeth Todd, Albert Hsu, Sharon Parent, and Judy McBean,

11   correct?

12   A.   Yes.

13   Q.   Now, at this point, this is August 2016, right?

14   A.   Yes.

15   Q.   Okay.  At this point, Dr. Seifer is the division director,

16   correct?

17   A.   Yes.

18   Q.   And, prior to him being the division director, was there

19   an interim director?

20   A.   That was Dr. Porter.

21   Q.   Okay.  How long had she been the interim director?

22   A.   I'm not sure.

23   Q.   Okay.  Was she the interim director before you became the

24   interim board, the chair of the OB/GYN?

25   A.   Yes.

1    Q.    Okay.  And, well, why didn't you make her the division

2    director?

3    A.    There were two reasons.  The first, the first and foremost

4    was that I was named an interim chair, and it was a position

5    that I did not intend to continue indefinitely, and I didn't

6    believe that it was the prerogative of an interim, while

7    awaiting the hiring of a full chair, to make that, make that

8    appointment.

9        The second reason was that, in my discussions with

10   Dr. Reindollar, one of the things I remember very clearly his

11   advice was not to make Dr. Porter the division chair as that

12   would not be in the best interests for the division.

13   Q.    And so Dr. Porter, up until the time Dr. Seifer is

14   appointed division director, Dr. Porter was the interim

15   division director of the REI division, correct?

16   A.    Yes.

17   Q.    But she, and she remained the interim division director

18   for 2014, 2015, into early 2016, correct?

19   A.    Yes.

20   Q.    And then Dr. Seifer was hired above her into the division

21   director role, correct?

22   A.    Yes.

23   Q.    Now, with respect to this specific example or, I should

24   say, this specific exhibit, Exhibit Z, you see who the -- Dr.

25   Porter sent it to everybody except Dr. Seifer, correct?

1    A.    Well, I think that there are probably some other folks who

2    were not included on it, but Dr. Seifer certainly was not

3    included on it.

4    Q.    Right.  He wasn't included on this, and then he sent you

5    an email up top on Exhibit Z, and it says here in the middle,

6    the middle paragraph, "As we previously discussed, below is the

7    initial email that Casey, Marti, Marlene, Navid and I were not

8    included in on sent by Misty.  This was then followed by

9    another email on Sunday with additional articles not included

10   here on the same subject to the same group of people excluding

11   us five as well".  Did I read that correctly?

12   A.    Yes, you did.

13   Q.    And then he goes on to say in the next paragraph, "The

14   email sent by Misty to everyone this morning in anticipation of

15   a planned, scheduled consensus meeting previously arranged

16   weeks ago between Emily and me for this Wednesday and not today

17   as she had apparently believed, with MFM/REI included three

18   articles but did not include the ones sent last Wednesday,

19   August 3rd, below or on Sunday, August 7, to her select group

20   below.  Such an approach does not foster inclusiveness or frank

21   discussion.  It undermines what we are trying so hard to

22   foster".  Did I read that correctly?

23   A.    Yes, you did.

24   Q.    During this timeframe, did you receive from Dr. Seifer or

25   anyone else in the REI division frustrations relating to the

1    interpersonal dynamics within the REI division?

2    A.   Yes.

3    Q.   And did those continue?  Those frustrations, did you

4    receive examples of that into the fall of 2016?

5    A.   Yes.  I think those were actually reflected in Dr.

6    Seifer's FPPE.

7    Q.   Okay.  And you referred to that before as part of the

8    evaluation process, correct?

9    A.   Correct.

10   Q.   And, if we may show the Witness and just the Court and

11   lawyers A, Defendant's Exhibit A4, as well as the Witness.

12   Okay.  This is an email exchange between you and Dr. Seifer,

13   Dr. DeMars, and I'm going to focus really just on the -- well,

14   I'm going to focus on both, all three pages, so just take a

15   quick look to review it and let me know when you're finished.

16   We could bring up the other two pages.

17              ATTORNEY SCHROEDER:  Your Honor, may I approach the

18   Witness just to give her a copy so she can see it in front of

19   her?

20              THE COURT:  Yes.

21              ATTORNEY SCHROEDER:  Sorry.  Should have done that.

22   So, if you go to Tab A4.  Sorry.  That's the same document.

23              THE WITNESS:  Okay.

24              ATTORNEY SCHROEDER:  Just let me know when you've had

25   a chance to review it.  Your Honor, while Dr. DeMars is

1    reviewing it, I'd like to move for admission of A4.

2                    THE COURT:  Is there any objection?

3                    ATTORNEY NUNAN:  No objection.

4                    THE COURT:  Okay.  Defendant's A4 is admitted.

5             (Defense Exhibit A4 is admitted into evidence.)

6                    ATTORNEY SCHROEDER:  May we publish that to the jury,

7    Your Honor?

8                    THE COURT:  Yes.

9    BY ATTORNEY SCHROEDER:

10   Q.    Have you had a chance to review it?

11   A.    Yes.

12   Q.    Okay.  On the first page at the top, there is an email

13   from you to Heather Gunnell, correct?

14   A.    Yes.

15   Q.    Who is Heather Gunnell?

16   A.    Heather Gunnell was the practice manager for the

17   department of obstetrics and gynecology, so sort of the

18   business, business manager.

19   Q.    And was Ms. -- she's not a doctor, correct?

20   A.    That's correct.

21   Q.    Okay.  Ms. Gunnell was the practice manager for the entire

22   OB/GYN department?

23   A.    Yes.

24   Q.    Okay.  Did you receive from her any complaints ever about

25   Dr. Porter and her dealings with her?

1    A.    I don't remember.

2    Q.    Okay.  With respect to that time period, though,

3    Ms. Gunnell was the practice group manager, so she had a

4    business role for each of the divisions?

5    A.    Yes.

6    Q.    And what would her business role be for the REI division

7    in November of 2016?

8    A.    Heather and I were both heavily involved in trying to

9    develop a division improvement plan with the Value Institute at

10   Hitchcock.

11   Q.    Division improvement plan through the Value Institute?

12   A.    Yes.

13   Q.    And this was in the November 2016 timeframe?

14   A.    So we, the Value Institute was involved from early,

15   mid-2016 through at least March of 2017.  They facilitated an

16   initial, an initial half-day, off-site meeting when Dr. Seifer

17   first arrived.  They organized another workshop for the entire

18   division, which, if I remember appropriately, was in the

19   October timeframe and then another, another workshop for the

20   division in February.

21        Between all of those times where the entire division

22   participated, Heather Gunnell and I met with them on at least

23   an every-other-week basis, if not a weekly basis, to try to

24   implement or clarify issues that were raised during the

25   workshops.

1  Q.   With respect to these workshops, is that unusual to have

2  that series of workshops for an improvement plan?  What was the

3  purpose of these?

4  A.   So the, the Value Institute is a, is a department at DH

5  that is highly skilled in, in looking at various aspects of

6  running a clinical program, whether that is efficiency, whether

7  that is communication, whether that is a process improvement.

8  They can take a very narrow focus, or they can take a very

9  broad focus.  And we specifically were looking at the REI

10  division because of its historic difficulties with

11  interpersonal relationships and communication.

12  Q.   Okay.  And, specifically, with respect -- and that

13  happened into late '16 and early 2017, correct?

14  A.   Yes.

15  Q.   And, with respect to the Value Institute, at the end of

16  February '17, did they have, did they present any solutions to

17  you as chair of the OB/GYN department?

18  A.   So this was extraordinarily hard because, after six months

19  of an amazing amount of work, their conclusions were twofold.

20  Their first conclusion was that the division as currently

21  constituted was unsalvageable, that the relationships had been

22  irreparably damaged and they were unsalvageable.

23       The second conclusion that they, and recommendation that

24  they made was that, in my intention to keep Dr. Porter on as a

25  member of the department, that I had to do two things upon her

1    return from her leave.  The first was to very clearly confront

2    her that she was central to the dysfunction that occurred

3    within the division and that, if she were to continue in the

4    department of obstetrics and gynecology, that it could not be

5    in a leadership role within REI.

6              ATTORNEY SCHROEDER:  Okay.  I'd ask if we could show

7    the witness Defendant's Exhibit B, as in boy, 1.

8              COURTROOM DEPUTY:  Is this just to the Witness?

9              ATTORNEY SCHROEDER:  I'm sorry.  Yes, Emerson, just

10   for the Witness and the Court and lawyers for now.

11   BY ATTORNEY SCHROEDER:

12   Q.   And were you able to locate that document in the binder,

13   Dr. DeMars?

14   A.   Yes.

15   Q.   I'm just going to ask you about the first page, but,

16   certainly, take the time to understand what it is, okay?

17   A.   Yes.

18   Q.   This is an email dated February 20th 2017, right?

19   A.   Yes, it is.

20   Q.   And it's from Elizabeth Baker to you?

21   A.   Yes.

22   Q.   And the subject is "Personnel Issues"?

23   A.   Yes.

24             ATTORNEY SCHROEDER:  Okay.  Your Honor, may I move

25   for admission of Exhibit B1?

1             THE COURT:  Any objection?

2             ATTORNEY NUNAN:  No objection.

3             THE COURT:  Okay.  Defendant's B1 is admitted.

4             ATTORNEY SCHROEDER:  Thank you, Your Honor.  May we

5    publish for the jury?

6             THE COURT:  Yes.

7        (Defense Exhibit B1 is admitted into evidence.)

8    BY ATTORNEY SCHROEDER:

9    Q.    Thank you.  Who is Elizabeth Baker, Dr. DeMars?

10   A.    I don't remember her specifically, but I think she's part

11   of employee relations.

12   Q.    And do you recall reaching -- was she part of human

13   resources at Dartmouth Health?

14   A.    I think she was actually part of the work with the Value

15   Institute.

16   Q.    Okay.  So was this document that you were receiving from

17   Dr., from Ms. Baker, was that document in conjunction with the

18   Value Institute that you were previously testifying about?

19   A.    Yes.

20   Q.    Okay.  Now, in the first paragraph if we could just blow

21   that up, it says, "I'm following up on our conversation a

22   couple of weeks ago regarding the provider issues within REI.

23   We discussed your concerns about leadership within the division

24   as well as certain undermining behavior by Dr. Porter.  One

25   tool that we discussed was a memorandum of expectations at

1    least with regard to Dr. Porter's conduct.  At that time, you

2    had stated you wanted to wait until February 15 to evaluate Dr.

3    Seifer and Dr. Porter's efforts and collaboration on the action

4    plan that was set for them as part of the work with the Value

5    Institute".

6          Did I read that correctly?

7    A.   Yes.

8    Q.   Does this refresh your recollection about any concerns

9    about Dr. Porter's behavior within the REI division that you

10   enunciated to the HR department at Dartmouth Health?

11   A.   Yes.

12   Q.   And attached to this efforts and collaboration was a

13   memorandum of expectations, a draft template.  Do you see that?

14   A.   Yes.

15   Q.   Okay.  And the draft template was to address -- what was

16   the, what was the purpose of the draft template memorandum of

17   expectations as you understood it?

18   A.   As, as we talked about yesterday, that there is a series

19   of steps when there is unprofessional behavior that has been

20   identified, and a memorandum of expectations would be a very

21   clear outline of what those, what the preferred behaviors are,

22   and it's a next-level step up from just an inform that what you

23   have been doing is not in keeping with the standards of

24   behavior that we would expect at DH.

25   Q.   Did you ever formally present this document or a template

1    of it to Dr. Porter?

2    A.    I did not.  She was out on leave at this time.

3    Q.    Okay.  And what about when she came back from leave; did

4    you present it to her at that point?

5    A.    She didn't get back from leave.

6    Q.    Well, in March and April of 2017, did she return in some

7    capacity?

8    A.    No.

9    Q.    You don't recall that?

10   A.    No.

11   Q.    Okay.  So in 2017 right before the closure of the REI

12   division, do you recall her doing ultrasound at some point?

13   A.    She may have come in, been working on a very limited

14   basis, but she, I remember that she was largely still on leave.

15   Q.    Okay.  Was she still on long-term disability benefits, if

16   you know?

17   A.    I don't know.

18   Q.    Okay.  But, as far as you understood, she was still on a

19   leave of absence?

20   A.    Correct.

21   Q.    And were you still texting with her on occasion as a

22   friend?

23   A.    Yes.

24   Q.    Okay.  And were you conflicted about giving your friend a,

25   potentially a memorandum of expectations when she did return?

1    A.   I remember looking at the person who talked to me about

2    this and saying that this would have been the hardest thing I

3    would have ever had to do.

4    Q.   Okay.  And you never actually did it, right?

5    A.   No.

6              ATTORNEY SCHROEDER:  Your Honor, I am, not to

7    jump-start lunch, but I might be able to really condense over

8    the lunch break my continued examination so that we can move

9    more quickly.

10             THE COURT:  Okay.  Well, it is 12:00 o'clock, so

11   we'll take an hour break for lunch, and we'll see you back at

12   1:00.

13        (A recess was taken from 12:00 p.m. to 1:03 p.m.)

14             THE COURT:  Okay.  Mr. Schroeder?

15             ATTORNEY SCHROEDER:  Yeah, I had just a quick

16   logistical issue, but also then one issue related to

17   Dr. Russell's proposed testimony making sure that we're heading

18   off any surprises.  We have got Dr. Conroy here.  I only have a

19   handful of questions for Dr. DeMars.  I suspect there will be

20   some recross.  I'm concerned about getting her out on time.  I

21   understand they want to do Russell first then Conroy.  I just

22   want to make sure that we get Dr. Conroy out of here by today.

23             ATTORNEY NUNAN:  Right.  If, so I do think that we

24   don't have much more with Dr. DeMars, and we will not have a

25   lot with Dr. Russell.  So I do believe we will be able to get

1    Dr. Conroy on.

2            ATTORNEY SCHROEDER:  So then okay.  And I understand

3    that, and I appreciate it.  With respect to Dr. Russell, there

4    is, I have a concern based upon her declaration.  If her

5    testimony is limited to things that relates to this comment

6    that she purports Dr. Merrens said, that's one thing.  There's

7    a reference in here to a case, unnamed.  It's specifically

8    Paragraph 146 of her declaration.

9            THE COURT:  And where is that?

10            ATTORNEY SCHROEDER:  Sure.  I'm sorry, Your Honor.

11   It's declaration of Michelle Russell.  I think it's -- I don't

12   know which exhibit that is.  I think it's a plaintiff's

13   exhibit.  C5?  C5.  If plaintiff's counsel intends to -- and

14   it's C5, Paragraph 14.  I'm certainly not putting it into

15   evidence, but, if we're getting into this specific example of

16   this specific case, then I would object to its, one, relevance

17   but, two, being highly prejudicial, and I don't want to deal

18   with that midstream.

19            THE COURT:  All right.  So I'm still looking for C5.

20            ATTORNEY SCHROEDER:  Sure.

21            THE COURT:  This is Plaintiff's C5?

22            ATTORNEY SCHROEDER:  Defendant's.

23            THE COURT:  Defendant's?  Okay.  That makes more

24   sense.  Okay.  So this is five pages long.  I haven't read it.

25            ATTORNEY SCHROEDER:  And I understand that, Your

VOLUME: 7
PAGES: 222-431

1    Honor.  Specifically, just Paragraph 14.  It's really that's

2    the only objectionable part.

3              ATTORNEY NUNAN:  C what?

4              THE COURT:  So a couple of thoughts about this, but I

5    certainly want to hear from plaintiff.  Would you like to say

6    something now?

7              ATTORNEY NUNAN:  Yeah.  Give me just two seconds.

8    Yes, now I know what you're talking about.  First, this is the

9    first here we're hearing about this, and, second, it's my

10   understanding that the actions of Hsu and Seifer were the

11   motion of, there was a motion in limine, and their acts and

12   what happened with them is relevant here, and we have been

13   proceeding under that fashion.

14             THE COURT:  And which motion in limine are you

15   talking about?

16             ATTORNEY NUNAN:  The hearsay and character motion in

17   limine where we were talking about the acts of Hsu and Seifer.

18             THE COURT:  Okay.  You think this goes to hearsay and

19   character, that aspect of the motion in limine?

20             ATTORNEY NUNAN:  No.  I'm saying my understanding was

21   in this trial we are allowed to talk about what happened with

22   Hsu and Seifer in terms of the witnesses that we bring forward.

23             THE COURT:  Right.  Well, there was a ruling on that,

24   definitely.  I'm not sure why this wasn't raised a long time

25   ago.

VOLUME: 7
PAGES: 222-431

1           ATTORNEY SCHROEDER:  Judge, to be honest with you, in

2      preparing for trial and specifically Ms. Russell or

3      Dr. Russell, I knew what the primary basis of her bringing this

4      up was for her testimony which was this OB/GYN department

5      meeting.  I didn't recall that until looking at this last night

6      and seeing this specific paragraph, but I think it goes to

7      being -- it's one thing to say we're going to talk about these

8      cases and, you know, care that I watched or witnessed.

9          This is, this is like triple levels of hearsay, and I

10     suggest, I submit that this is, this specific paragraph and the

11     specific case, which there's no facts correlating her to it

12     other than to say, I know about this case that he handled.  I

13     don't know how she does or any of specific facts, but it would

14     be highly prejudicial to get into this specific example here

15     today.  It's not, this isn't a med-mal case.

16          THE COURT:  Okay.  And this is also a defense

17     exhibit?

18          ATTORNEY SCHROEDER:  Well, we had it for impeachment

19     purposes.  That's the only reason we had it on our Exhibit

20     list.  We didn't seek to admit it, but, certainly, to your

21     instruction about not preserving things for impeachment or any

22     surprises, we put it on there in an effort to be overinclusive,

23     but I would not have otherwise put it on there but for

24     impeachment.

25          THE COURT:  Okay.  Go ahead.

VOLUME: 7
PAGES: 222-431

 1              ATTORNEY NUNAN:  Dr. Russell cared for this patient.

 2    She interviewed this patient.  She has experience with this

 3    specific patient and with Dr. Hsu's care.  We think it's very

 4    relevant and not prejudicial, or, if it's prejudicial, it's not

 5    highly prejudicial.

 6              THE COURT:  Well, it's certainly relevant, right?  I

 7    mean, it goes to an example of performance by Dr. Hsu, and

 8    that's kind of a central theme of the case, right, the

 9    reporting of, in Dr. Porter's view, the substandard care of Dr.

10    Seifer and Dr. Hsu.  So, in terms of the first prong of the

11    analysis, it's relevant.  I don't hear you saying its

12    irrelevant.

13              ATTORNEY SCHROEDER:  No, Your Honor, I wasn't

14    president saying that.

15              THE COURT:  I just wanted to be clear for the record.

16    So your argument is under 403 the balancing favor is excluding

17    this?

18              ATTORNEY SCHROEDER:  Absolutely, Your Honor.  There's

19    one thing to say -- one, there's no indicia of when this

20    happened, where it happened, but also she's extrapolating.

21    She's Monday morning quarterbacking decisions like, well, if

22    they had had this prepregnancy test, then perhaps she wouldn't,

23    they would have detected it.  It's all after the fact.  She's

24    making summary conclusions about this particular care.

25              I can assure you there is no case involving this, so

VOLUME: 7
PAGES: 222-431

1    there's no, there's no medical malpractice case involving this

2    particular incident.  But she's saying, well, he should have

3    had, he should have done this testing, and then we necessarily

4    would have figured that out, and then we necessarily would not

5    have would have been able to solve it before pregnancy and then

6    there's no way to actually -- she's making these summary

7    conclusions as if she's an expert, and that's, that's highly

8    prejudicial just in and of itself, set aside the subject

9    matter, which is tragic.

10    The fact of the matter is, if you read the whole

11    paragraph, Your Honor, she's making summary conclusions after

12    the fact about what should have been done, and we're going down

13    a rabbit hole that's completely unrelated to a disability

14    discrimination retaliation case.  It is.

15    THE COURT:  I don't know if I agree with you on that.

16    I do think it's relevant to the claims here, but what is the

17    proffer as to Dr. Russell's knowledge?  What is she going to

18    say on the stand about this particular incident?  Is this, I

19    heard that this happened?  Ms. Nunan?

20    ATTORNEY NUNAN:  Sure.  No.  She's going to say that

21    a patient was admitted because of hypertension on the floor.

22    She was working.  She came in.  She took the patient's history.

23    She heard things about thyroid cancer that was extremely

24    unusual, and she went digging back into the patient's record

25    and discovered that there was a very clear early on indication

 1    that this patient had issues that should have been caught.

 2         Treatment should have been given to the underlying

 3    condition before Dr. Hsu got this woman pregnant and that, if

 4    she could put it together on a one interview, it goes back to

 5    Dr. Porter saying in her eleven-page assessment of Dr. Hsu, he

 6    did not have critical thinking skills, and he could not put one

 7    and one together to make two, and this was the result.  And

 8    this was a common -- this is an example in the OB/GYN where the

 9    generalists were saying, We've got a problem.  We're supposed

10    to be able to rely on reproductive endocrinology specialists to

11    catch this stuff.

12         THE COURT:  And so, if I heard you correctly, you're

13    saying Dr. Russell actually reported to the floor where this

14    patient was.  You say she was called in; is that correct?

15         ATTORNEY NUNAN:  Well, she was, she went to work, and

16    part of her job at work was to see this patient.  She went in.

17    She sat down.  She interviewed.  She did a medical history of

18    this patient, and the answers she got, she'll tell you, she

19    went home, and she was thinking, This isn't right, and she went

20    in and dug around in her chart and discovered that this was a

21    problem that was very identifiable beforehand.

22         THE COURT:  Mr. Schroeder?

23         ATTORNEY SCHROEDER:  Thank you.  Set aside the fact

24    that we're now relying on hearsay of a patient, whomever that

25    is, for purposes of this.  This actually bears out exactly what

1    I was thinking it was, which was an after-the-fact little

2    investigation to determine on her own, a generalist who is not

3    qualified as an REI IVF doctor, making summary conclusions.

4    She's going to come in here and act as if she's an expert, and

5    that's what the testimony that want, and that's highly

6    prejudicial.  It's relying on hearsay.  She wasn't.

7        It might be on the balancing act, if she had been the

8    treating physician at the time that the patient became

9    pregnant, that's one thing, but then to say at some future

10   point she comes into the hospital for hypertension and then she

11   does this analysis herself and these are her conclusions.  How

12   is that not highly prejudicial?  It's also relying on

13   inadmissible hearsay.

14       THE COURT:  The hearsay being the statement of the

15   patient to Dr. Russell?

16       ATTORNEY SCHROEDER:  The statement of the patient to

17   Dr. Russell, as well as any documents that she may or may not

18   have reviewed.  I don't know what those documents are.

19       THE COURT:  Okay.  Ms. Nunan?

20       ATTORNEY NUNAN:  Dr. Russell is in the maternal fetal

21   medicine.  She's a high-risk OB/GYN.  This was right within her

22   wheelhouse to take care of this patient.

23       THE COURT:  Okay.  So Dr. Russell is going on after

24   Dr. DeMars?

25       ATTORNEY NUNAN:  That's correct.

1                    THE COURT:  Okay.  So I'm going to read the whole

2       affidavit.  I'm not going to do it now.  I'd like to get the

3       jury back.  Before Dr. Russell takes the stand, we can, we

4       should obviously talk about this again so you can get a ruling

5       from me on this, okay?

6                    ATTORNEY SCHROEDER:  Appreciate it, Your Honor.  Just

7       trying to head it off.

8                    (The Jury enters the courtroom.)

9                    THE COURT:  Mr. Schroeder.

10      BY ATTORNEY SCHROEDER:

11      Q.   Thank you, Your Honor.  Dr. DeMars, just a few quick

12      follow-up questions.  In the REI division specifically, do you,

13      would you be aware of patient complaints that would happen from

14      time to time about care in the 2015-16 timeframe?

15      A.   Yes.

16      Q.   Okay.  And do you recall whether those patient complaints

17      applied to all of the physicians, the providers in the

18      department, or was there one in particular?  Patient

19      complaints.

20      A.   About all in the department?

21      Q.   Well, just in the REI division specifically.

22      A.   Within the division?

23      Q.   Right.  From time to time, would there be complaints just

24      about relating to the fact that whether or not they became

25      pregnant or any other issues relating to their care?

 1    A.    I recall a handful.

 2    Q.    Okay.  If I could have the Witness turn to Defendant's

 3    Exhibit G, so G as in girl, or guy, and just for the Witness

 4    and counsel and the Court.  Just, it's a -- I'm going to focus

 5    specifically on the second page, but I just want to see if

 6    you've had a chance to review it.  Had a chance to review it?

 7    A.    Yes.

 8    Q.    Okay.  On the first page this is an email exchange from

 9    Michelle King, July 10th 2015, to Karen Boedtker, Keith Loud,

10    and yourself, right?

11    A.    Yes.

12               ATTORNEY SCHROEDER:  I'd like to move for admission

13    of Defendant's Exhibit G, please.

14               THE COURT:  Any objection?

15               ATTORNEY NUNAN:  No objection.

16               THE COURT:  Okay.  Defendant's Exhibit G is admitted.

17         (Defense Exhibit G is admitted into evidence.)

18               ATTORNEY SCHROEDER:  May I publish it for the jury?

19               THE COURT:  Yes.

20    BY ATTORNEY SCHROEDER:

21    Q.    Thank you.  So just going back to July of '15, I realize

22    we are jumping around on dates here, but Michelle King, is she

23    somebody that's at Dartmouth Health risk management group?

24    A.    Yes.

25    Q.    What about Karen Boedtker?

VOLUME: 7
PAGES: 222-431

1    A.    Yes, both.

2    Q.    And who is Keith Loud?

3    A.    Keith Loud was the chair of the pediatrics division of

4    CHAD.  The Children's Hospital at Dartmouth or the pediatrics

5    department.

6    Q.    Okay, thank you.  Now, on the second page there is an

7    email addressed to Mr. Loud, and in the second paragraph it

8    says the following:  "During a conference call today that I

9    initiated with Misty Blanchette Porter who put me on speaker

10   phone with Albert Hsu, my former attending, I was abruptly

11   dismissed from the care, they claimed at the advice of the risk

12   management team, question mark.  Why were they even involved,

13   question mark?  While just having initiated IM stimulation meds

14   with no concrete phone numbers, names, medical record transfers

15   or instructions on how to wean safely off the meds, et cetera.

16       After I had tried unsuccessfully to smooth things over and

17   move forward with my care on a positive note, she put me on the

18   defensive.  I can honestly say I've never been treated so

19   disrespectfully and so cruelly by another medical professional.

20   After I voiced my concerns and experience and desire for a

21   reassurance that things would improve, she then responded,

22   quote, Well, I was all set to help you get pregnant, but now

23   that I have spoken with you, I think you have violated the

24   physician-patient trust for us, end quote, paren, by

25   complaining, close paren.

1       She ended by saying, quote, Try Eastern Reproductive Med.

2    They're private, end quote.  And, when I voiced concern they

3    were not in network with my plan and I need other options, she

4    said, quote, I'm ending this call now, end quote, and actually

5    hung up on me, all because I complained in writing and verbally

6    that the care I was receiving was sloppy, and that I was

7    disappointed given Dartmouth's reputation.

8       After I got nowhere with customer relations, I did make

9    contact with the other group, which turned out to be, quote,

10   Northeastern Reproductive Medicine, end quote.  Within two

11   hours, they had confirmed my insurance and given me an

12   appointment next Tuesday, something that took Misty's group

13   over two months to do, despite many phone calls and emails".

14      Did I read that correctly?

15   A.   Yes.

16   Q.   Do you recall whatever happened to this complaint?

17   A.   I do not.

18   Q.   Okay.  But, at some point, this was a complaint that was

19   brought up to the risk management team at Dartmouth Health?

20   A.   Yes.

21   Q.   Okay, thank you.  You can take that down.  I want to ask

22   you about an individual whose name has come up here before,

23   Lisa McGee or Elizabeth McGee.

24   A.   Yes.

25   Q.   And so her name's Elizabeth McGee, but she goes by Lisa?

1    A.    Correct.

2    Q.    And back in 2017 were you in contact with her on a regular

3    basis?

4    A.    Yes.

5    Q.    Okay.  And what was her role back then in, you know, at

6    UVM Medical Center?

7    A.    So Dr. McGee was the division director for the REI

8    division at the University of Vermont.

9    Q.    So she, would it be fair to say that she was in the same

10   role as Dr. Seifer?

11   A.    Yes.

12   Q.    And do you recall being in contact with her after you were

13   informed that the REI division was closing?

14   A.    Yes.

15            ATTORNEY SCHROEDER:  Okay.  I'd like to show the

16   Witness Plaintiff's Exhibit 64.  I'm showing you a document

17   marked Plaintiff's Exhibit 64, Dr. DeMars.  Do you know what

18   that document is?

19            THE WITNESS:  I don't have it.

20            ATTORNEY SCHROEDER:  May I approach the Witness?

21            THE COURT:  Yes.

22            THE WITNESS:  Oh, in this one.  Sorry.

23            ATTORNEY SCHROEDER:  That's okay.

24            THE WITNESS:  Too many books.  Yes, yes.

25   BY ATTORNEY SCHROEDER:

1    Q.   I just asked whether you recognize it.

2    A.   Yes.

3    Q.   And what is this?

4    A.   So it's a series of text messages between me and

5    Dr. McGee.

6              ATTORNEY SCHROEDER:  Okay.  I'd like to move for the

7    admission of Exhibit Plaintiff's 64.

8              THE COURT:  Any objection?

9              ATTORNEY NUNAN:  No objection.

10             THE COURT:  Plaintiff's 64 is admitted.

11        (Plaintiff Exhibit 64 is admitted into evidence.)

12   BY ATTORNEY SCHROEDER:

13   Q.   Now and may I publish it for the jury too?  Just Page 2.

14   Now, I want to just ask you about this timeframe.  There's an

15   exchange that you have with Lisa McGee on May 3rd and May 4th

16   of 2017, but I want to ask you what communications, if any, did

17   you have with Lisa McGee in this timeframe related to the REI

18   division closure?

19   A.   So we had, we had been having regular conversations about

20   the REI division but specifically relating to the division

21   closure.  We had been -- we were preparing to close down our

22   IVF, and Lisa had been part of the conversation of where we

23   would send our patients to.  But, but very specifically, once

24   it became very clear that the division was being dissolved, I

25   called Dr. McGee to tell her what was going to happen and to

1    recommend that she hire Misty for their open position that they

2    had.

3    Q.   Okay.  So did you call her before it had been announced

4    to, internally to the, that the REI division was closing?

5    A.   I did.

6    Q.   Okay.  Did you tell her to keep it confidential?

7    A.   Yes.

8    Q.   And you said you recommended that she hire Dr. Porter for

9    an open position at UVM Medical Center?

10   A.   Yes.

11   Q.   This is before May 4th, correct?

12   A.   Yes.

13   Q.   And then, if you look at the bottom of Page 2 here, it

14   says -- well, there's a comment from Lisa McGee on May 3rd.

15   You send a smiley face and then you also say on May 4th at 8:08

16   a.m. Is that right before the announcement of the REI division

17   closure?

18   A.   That was right before our actions, yes.

19   Q.   Okay.  And you say, "You might want to reach out to our

20   friend tonight", right?

21   A.   Yes.

22   Q.   If you go on the next page, Lisa McGee writes to you.  She

23   says, "Will do.  She texted me yesterday, and I put it off to

24   have her call me this morning.  Thanks for the heads up",

25   right?

VOLUME: 7
PAGES: 222-431

1    A.    Yes.

2    Q.    And then you said, "Speaking as a friend", right?

3    A.    Correct.

4    Q.    Who were you referring to?

5    A.    A friend of Misty's.

6    Q.    Okay.  And, with respect to reaching out and texting, were

7    you telling Lisa McGee to text with Dr. Porter?

8    A.    Yes.

9    Q.    And was this in conjunction with the conversation you had

10   separate from this text string to Dr. McGee to hire Dr. Porter?

11   A.    Yes.

12   Q.    She then says, "Absolutely.  Spoke with her just now for a

13   bit and will talk with her later.  She's in clinic.  She will

14   be okay, and you guys friendship will remain intact, but it is

15   an uncomfortable time".  Right, that's what she said?

16   A.    Yes.

17   Q.    And then you said, "Thank you"?

18   A.    Yes.

19              ATTORNEY SCHROEDER:  That's all the questions I have

20   for now, Your Honor.

21              THE COURT:  Okay.  Ms. Nunan?

22              REDIRECT EXAMINATION BY ATTORNEY NUNAN

23   Q.    Dr. DeMars, during the credentialing process, you received

24   a charge from Dr. Merrens that Dr. Seifer's success was on you,

25   right?

1    A.    Um-hum.  Yes.  Sorry.

2    Q.    And you understood that you needed to make David Seifer

3    succeed; is that correct?

4    A.    That I was responsible for his success, yes.

5    Q.    And you went to great lengths to try to make David Seifer

6    succeed, right?

7    A.    I went to great lengths to try to make that division

8    succeed.

9    Q.    I asked you about David Seifer.

10    A.    I had hoped that David Seifer would be the successful

11    leader that I needed.

12    Q.    He didn't turn out to be?

13    A.    He did not.

14    Q.    And what did Dr. DeMars say to you, I mean, Dr. Merrens

15    say to you when he asked you to step down as chair?

16           ATTORNEY SCHROEDER:  Objection, Your Honor.  First,

17    beyond the scope.

18           THE COURT:  Overruled.

19           THE WITNESS:  He said that we no longer had a working

20    relationship.

21    BY ATTORNEY NUNAN:

22    Q.    Did he tell you it was a failure of leadership?

23    A.    I'll accept that.

24    Q.    So, during the summer of 2016, you had received a fairly

25    lengthy email from Dr. Porter stating there were real problems

 1    with David Seifer's egg harvests and transfers, right?

 2    A.    Those were the first harvests that she observed.

 3    Q.    Okay.  And you started meeting on a weekly basis with

 4    David Seifer, is that right, during that summer?

 5    A.    Yes.

 6    Q.    And you helped him plan the retreats that you spoke about,

 7    the Value Institute retreats?

 8    A.    I wouldn't say that I helped him plan it.  I think those

 9    were planned by Heather in the Value Institute.

10    Q.    I'd like to read you your deposition answer.  "So I met

11    with him on a weekly basis regarding his own thoughts and plans

12    for the division.  We planned a fall retreat, a one-day retreat

13    with the Value Institute shortly after he got there to be able

14    to set up expectations for ways of working and team building".

15    Does that refresh your recollection?

16    A.    Well, that was not what we were always meeting about.

17    Q.    That's fair.  But you did set up the Value Institute

18    retreats with him?

19    A.    I met with him and talked about our expectations for that

20    meeting, yes.

21              THE COURT:  Can I ask counsel to approach, please?

22                  (Bench conference begins.)

23              THE COURT:  Sorry to bring everyone back again, but

24    it's a process point.  If you're going to use a deposition, I'm

25    assuming you were trying to -- you said, Did that refresh your

VOLUME: 7
PAGES: 222-431

1    recollection?  I initially interpreted that as you were

2    impeaching the Witness.  So there is a procedure we have to

3    follow here when we're using prior sworn statements, okay?  You

4    have to ensure that the other side has a copy of it.  You have

5    to establish a foundation with the witness as to when the

6    deposition occurred, the date of the deposition.  You have to

7    give the witness, if you're impeaching, you have to give the

8    witness an opportunity to admit that something was said in a

9    prior statement.

10    If the witness does admit that, then that that ends it,

11    and then the deposition transcript, goes away.  That's as far

12    as it goes.  If you're using a depo transcript that hasn't been

13    used already, you need to identify it, okay?  This kind of goes

14    for everyone, but to just kind of make a general reference to

15    at your deposition without being any more specific leaves us in

16    a spot where it's just not kind of impeachment.  It's just not

17    adequately documented.

18    ATTORNEY NUNAN:  Okay, okay.  It's ID3.  We've

19    already put it in.  Okay.  So I want to make sure I understand.

20    THE COURT:  Yeah.  I know, and this goes for everyone

21    so I hope you don't think I'm saying this to you specifically.

22    So a document, I mean, you could say, you know, you can

23    reference ID3, right, so we know what you're talking about, but

24    then you should be establishing with the witness just kind of,

25    again, a general timeframe.

VOLUME: 7
PAGES: 222-431

 1              ATTORNEY NUNAN:  So I did.  I did say it was to
 2     refresh her recollection, but I did mean to impeach her with
 3     it.
 4              THE COURT:  Because, if you are refreshing her
 5     recollection -- I hope this doesn't come across to people as
 6     I'm speaking down to people.
 7              ATTORNEY COFFIN:  Good info.  Keep it going.
 8         ATTORNEY NUNAN:  I am probably the least experienced up
 9     here so --
10              THE COURT:  No, you're doing fine, but, in terms of
11     refreshing recollection, right, so you're going to have to get
12     a response from the witness that the witness does not remember,
13     not, I don't know, doesn't trigger refreshing her recollection.
14     So, if the witness says, I don't remember, then there has to be
15     kind of a, Well, you know, what would refresh your
16     recollection?
17         Now, this is not your witness, so I think there's some
18     leeway.  If you say, Would your deposition transcript refresh
19     your recollection?  If you're going to use it, though, then you
20     place it in front of the witness, have the witness read it, and
21     then you have to take it back and ask it if refreshes her
22     recollection, and then, if it does, she confirms that it does,
23     then you can ask the question, okay?
24         I just want to you know there's been a little bit of this
25     going on since the trial started, and I just want us to kind of

VOLUME: 7
PAGES: 222-431

1   be clear on the procedure.  So all right.  So, when Ms. Nunan

2   is done, by the way, you know, this is a different witness in

3   terms of the posture.  So make sure we're all on the same page,

4   Ms. Nunan started out with cross.  You did your direct.  She's

5   recross-examining.  When she's done, do you have an expectation

6   of getting up again?

7           ATTORNEY SCHROEDER:  No.  I am hoping that we go on

8   after the depo transcript because it was a minor point in my

9   mind, and I really want to -- I'm more worried about Dr. Conroy

10  being able to leave today.  So I, to be specific, I don't

11  expect any questions if we are going to end up real soon.

12          THE COURT:  And, if you do, though, that's proper,

13  right?  I just want make sure we're --

14          ATTORNEY SCHROEDER:  I assumed I would be able to get

15  up.  I'm just telling you, Your Honor, that I'm hoping not to.

16          THE COURT:  I just wanted to be clear on that, and I

17  hope you understand the way that was intended.  Yeah.

18          ATTORNEY NUNAN:  Like I said, I do not mind taking

19  that.

20          THE COURT:  Okay.  Thank you.

21              (Bench conference ends.)

22  BY ATTORNEY NUNAN:

23  Q.   Dr. DeMars, earlier today with Attorney Schroeder, you

24  said you set up the Value Institute meetings and for entire

25  division participation?

1      A.   Yes.

2      Q.   And the purpose of this was team building, correct?

3      A.   The purpose was multifold.

4      Q.   Okay.  And you're aware that Dr. Porter was unable to

5      attend 50 percent of the Value Institute retreats that were

6      held?

7      A.   Yes, because she was on leave.

8      Q.   So I'd like to put up Exhibit 13, which is in evidence.

9      She says right here on Page 2, "At point when I was aware it

10     was reasonably unlikely I'd be able to attend the recent full

11     team retreat, I made a request to postpone the meeting to a

12     time when I could attend.  In early to mid-August, I personally

13     asked him to move the date out.  I do not know if proceeding

14     the preceding the date, if proceeding with the date was his

15     decision alone, but as the longstanding REI division member, to

16     be excluded from the team function was alienating".

17          This is an email to you, correct, from Dr. Porter?

18     A.   Yes.

19     Q.   So I want to put it on the ELMO because I do not have a

20     digital copy of this.  The email that you looked at -- try to

21     speak up because I'm not in front of the microphone.  The email

22     that you looked at with Attorney Schroeder, this is A4.

23               COURTROOM DEPUTY:  This is not admitted; is that

24     correct?

25               ATTORNEY NUNAN:  A4 is not admitted in evidence?

VOLUME: 7
PAGES: 222-431

 1           COURTROOM DEPUTY:  Oh, I'm sorry.  It is.  My

 2      apologies.

 3      BY ATTORNEY NUNAN:

 4      Q.    That's okay.  I'd like to run through this quickly.  So

 5      this is a three-page document.  Heather Gunnell is reaching out

 6      to everyone, "REI clinical team, I would like to find a time

 7      Friday or Monday, whichever works best for the team, for all of

 8      us, for us all to meet and discuss the plan for covering the

 9      nurse tasks and for recruiting", okay?

10           There is some back-and-forth.  Donna says, "I think Friday

11      might work well".  Dr. Porter responds back to the Friday or

12      Monday question and says, "I'm out of town until Monday.  I

13      would prefer Monday".  Dr. Seifer then proceeds with talking

14      about a Friday meeting, and on the first page Misty writes back

15      to him and says, "Meeting for tomorrow for me is not possible.

16      Since I have the most experience with nursing on the service,

17      it would seem a missed opportunity", and Dr. Seifer responds

18      and then sends this thread to you.

19           Isn't Dr. Porter asking to be included in this meeting?

20      Isn't this asking for inclusion?

21      A.    I think that Dr. Porter is actually trying to direct the

22      meeting, that she, again, is on disability, she is out.  She

23      has limited opportunity to be included and limited opportunity

24      to be present for meetings and that, when the majority, when

25      the majority of the, of the division is available as documented

1    by Donna, then that's the best time to have the meeting.  It
2    cannot turn on a single person.
3    Q.    I'm sorry.  She's given the option of Friday or Monday.
4    She says she's out of town.  I don't quite understand why this
5    is not just a scheduling issue.  Why do you then --
6    A.    Because perhaps most of the rest of the division was not
7    available on Monday.
8    Q.    It doesn't say that in here, does it?
9    A.    Donna says it will work best for the division for Friday.
10   It only doesn't work for Misty on Friday.
11   Q.    And then you forward this email to Heather Gunnell, who is
12   not a doctor.  She's not a nurse practitioner.  She's just the
13   practice manager, correct?
14   A.    She is the practice manager who has been involved in
15   working with the Value Institute, and this is after our first
16   Value Institute retreat, in which case this, this behavior of
17   splitting was identified.
18   Q.    Is it appropriate for the chair of the OB/GYN department
19   to be writing to the practice manager that this is splitting
20   behavior?
21   A.    This was splitting behavior, and this is exactly what we
22   were working on at the Value Institute.  You could see that
23   when we were working at the retreats.
24   Q.    That Misty wasn't at?
25   A.    That Misty would intermittently be at.  She would phone in

VOLUME: 7
PAGES: 222-431

1    for part of it, and, when she phoned in, the entire tenor of

2    the interactions would change.

3    Q.    This is B1.

4    A.    Yes.

5    Q.    The Memorandum of Expectation which is mentioned in this

6    email, you never filled it out, did you?

7    A.    I did not.

8    Q.    You never gave it to Dr. Porter?

9    A.    She was on her leave of absence.

10   Q.    Okay.  In the spring of 2017, Dr. Porter was working 16 to

11   20 hours a week.  Is that information that you were aware of?

12   A.    I don't believe she was working that much consistently,

13   no.

14         ATTORNEY NUNAN:  Okay.  Were you aware -- this is

15   Exhibit 37, which has been admitted, right?  I just don't want

16   to put it up until it has.

17         COURTROOM DEPUTY:  Yes.

18   BY ATTORNEY NUNAN:

19   Q.    In the spring of 2017, Dr. Porter was working her way back

20   and being proctored into surgery.  Do you have any recollection

21   of that?

22   A.    Yes.

23   Q.    Okay.  So the email in front of you is Dr. Padin saying --

24   A.    I have no email in front of me.

25   Q.    Okay.

1             ATTORNEY NUNAN:  Is it on her screen?  My apologies.

2             COURTROOM DEPUTY:  Give me one second.  There it is.

3     Sorry.

4     BY ATTORNEY NUNAN:

5     Q.   So, if I represented to you that, in the spring of 2017,

6     Dr. Porter was working 16 to 20 hours a week, you would

7     disagree with that?

8             ATTORNEY SCHROEDER:  Objection.

9             THE COURT:  Overruled.

10             THE WITNESS:  I don't remember.  I don't think she

11     was working 16 to 20 hours consistently.

12     BY ATTORNEY NUNAN:

13     Q.   Do you remember?

14     A.   No.

15     Q.   Okay.  And in this email Dr. Padin has proctored a surgery

16     and is telling Misty she's a talented surgeon, right?  Do you

17     see that?

18     A.   Yes.

19     Q.   So I guess you are receiving reports in the spring of 2017

20     from people like Judy McBean that Dr. Hsu is a harm to patient

21     safety in the OR.  Why are you focused on Dr. Porter's emails

22     about whether or not she can attend a meeting or not?

23             ATTORNEY SCHROEDER:  Objection, Your Honor.

24     BY ATTORNEY NUNAN:

25     Q.   Why aren't you focused on the patient harm issue at the

1    time?

2              THE COURT:  An objection has been made.  Basis?

3              ATTORNEY SCHROEDER:  Mischaracterizes her earlier

4    testimony.

5              THE COURT:  So I'll --

6              ATTORNEY SCHROEDER:  Also a compound question.

7              THE COURT:  I'll sustain the objection and ask you to

8    rephrase, maybe in the form of a couple of questions.

9    BY ATTORNEY NUNAN:

10   Q.   Sure.  This is Exhibit 23.  Dr. McBean is saying to you

11   about Dr. Seifer, "One of my biggest concerns that I have is

12   with regard to his management of Albert Hsu.  Albert does not

13   have an adequate skill set with regard to surgery and patient

14   care.  He regularly practices outside of the ASRM standards

15   with regard to IVF, which is both ineffective and costly to

16   patients.  His surgical skills endanger patients".

17   A.   We had two things in place.  The --

18             THE COURT:  I don't believe there's a question posed.

19   Is there?

20             THE WITNESS:  Excuse me.

21   BY ATTORNEY NUNAN:

22   Q.   Got it.  My question is, Isn't this a higher priority at

23   this time for you as chair of the OB/GYN department?

24   A.   I had two things in place addressing this.  First was that

25   Albert was having to review the cases that he was going to be

1    doing, and he had another surgeon with him.

2    Q.    Who?

3    A.    It depended on what the procedure was going to be.

4            ATTORNEY NUNAN:  Okay.  No further questions.

5            ATTORNEY SCHROEDER:  Judge, just two questions.

6            THE COURT:  Okay.

7            RECROSS-EXAMINATION BY ATTORNEY SCHROEDER

8    Q.    Just on that.  Thank you, Your Honor.  Dr. DeMars, just

9    very quickly, Judy McBean, I want focus just on a comment that

10   Ms. Nunan just asked you about.  Judy McBean was a per diem

11   doctor for the REI division?

12   A.    Yes.

13   Q.    And her principal practice was in Brattleboro, Vermont?

14   A.    Yes.

15   Q.    Okay.  And do you recall how often she would be in the REI

16   division in 2017?

17   A.    In 2017, once, maybe once monthly.

18   Q.    Once a month?  Okay.  Do you know her relationship with

19   Dr. Porter?

20   A.    So, first of all, Dr. McBean was actually a medical

21   student with me at UVM and then was a, was a fellow in the REI

22   division at UVM with Dr. Porter.

23   Q.    Okay.  Did they have a close relationship?

24   A.    Yes.

25           ATTORNEY SCHROEDER:  Thank you.  Thank you, Your

1    Honor.

2              THE COURT:  Okay.  All right.  Dr. DeMars, you may

3    step down.

4              THE COURT:  All right.  So, before the next witness

5    is called, I am going to ask the jury if you would just retire

6    to the jury room.  I have to speak with the lawyers.  Thank

7    you.

8              (The Jury leaves the courtroom.)

9              THE COURT:  Okay.  So, at this time, I'm just going

10   to step off briefly and read the declaration and come back, and

11   we can have a discussion about the issue that was raised at the

12   lunch break, and I will be back momentarily, okay?

13             ATTORNEY SCHROEDER:  Thank you, Your Honor.

14        (A recess was taken from 1:52 p.m. to 2:12 p.m.)

15             THE COURT:  Okay.  So I have read the affidavit, and

16   the affidavit, just for the record, is contained in Defendant's

17   Exhibit C5, Exhibit 3.  So I'll just begin by framing the issue

18   as I understand it.  So there's a declaration that was

19   completed by Dr. Michelle Russell who is going to be testifying

20   this afternoon.  An objection was raised by the defendants

21   specifically as to Paragraph 14 of the declaration.

22        Obviously, the objection is not so much to the

23   declaration, as I understand it, but to the testimony of

24   Dr. Russell if she were to testify to the substance of what is

25   in Paragraph 14.  The declaration itself would not be coming in

VOLUME: 7
PAGES: 222-431

1    as substantive evidence of a prior statement of this witness.

2    Presumably, it would be consistent with what the witness is

3    testifying to.

4        So, beginning with relevance, as I said before, given that

5    one of the themes of plaintiff's case is that she believed that

6    Dr. Hsu, as relevant here, provided substandard care and had

7    made reports to individuals within the Dartmouth Health system.

8    With respect to Dr. Porter's theory of the case, I find that

9    the substance of Paragraph 14 is relevant because it is

10   commentary on an incident in which Dr. Hsu is alleged to have

11   provided substandard care.

12       With respect to there was a hearsay objection in there,

13   and I interpreted the hearsay objection to be to a statement

14   that the patient, this particular patient may have made to

15   either Dr. Hsu, or probably more relevant here, to Dr. Russell

16   when the proffer is that Dr. Russell responded and provided

17   care to this particular patient.  So under Rule 803.4 any kind

18   of a statement made by a person in connection with treatment or

19   diagnosis is not hearsay.  So, with respect to that issue, I

20   don't think that is a hearsay issue.

21       Turning then to the question of prejudice, so under Rule

22   403 the rule provides that the court may exclude relevant

23   evidence if its probative value is substantially outweighed by

24   a danger of one or more of the following.  As relevant here,

25   the argument is unfair prejudice.

VOLUME: 7
PAGES: 222-431

1        So Rule 403 is a rule of inclusion, not a rule of

2    exclusion, as a general matter.  Courts are directed to or

3    directed that exclusion under 403 is an extraordinary remedy

4    that should not be lightly undertaken.  So I am going to permit

5    Dr. Russell to testify to the substance of Paragraph 14, but

6    there is going to be a limitation on it.

7        So the last two sentences, I believe, in Paragraph 14

8    where the statement is made, "If Dr. Hsu had been able to

9    connect the dots between the medical history and the need for a

10   consult, the tragedy could have been avoided".  So I do think

11   the defendants are correct here that, while Dr. Russell does

12   have a certain level of expertise because of her training to

13   speak to this issue, I'm not going to let her testify to this

14   ultimate issue of causation as to that this would not have

15   happened but for her opinion here.

16       So the incident can be spoken about.  Dr. Russell

17   obviously can talk generally about the history of thyroid

18   issues as relevant perhaps to risk factors and the conclusion

19   that this particular pregnancy was unsuccessful, but it should

20   stop basically at that point.  Is that clear, Ms. Nunan?

21       ATTORNEY NUNAN:  That is clear.  I would like an

22   opportunity to just go and explain that to Dr. Russell so we do

23   not cross that line.  I have not been speaking to witnesses of

24   any substance before, and I just want to make sure.  I'm going

25   to go speak to her.

VOLUME: 7
PAGES: 222-431

1           THE COURT:  You must do that, in fact.  You'll have

2    to advise your witness that that is the limitation, and please

3    be clear about that.  Yes?

4           ATTORNEY SCHROEDER:  Your Honor, may I just be heard

5    on one point?

6           THE COURT:  Yes.

7           ATTORNEY SCHROEDER:  If you go two lines above that,

8    so it says, "Dr. Hsu failed to connect the dots with this

9    patient's medical history, failed to bring in a specialist for

10   a consult before getting the patient pregnant".  One, it says

11   "connect the dots" again, which was one of the things that you

12   said was stricken or should not be spoken about.  But, two, it

13   goes to the same issue, and I would submit that that line,

14   "Dr. Hsu failed to connect the dots", is the same as, "if

15   Dr. Hsu had been able to connect the dots".  It's actually even

16   more declarative.

17      So I would ask -- I just want to be really clear and

18   understand the scope of the inquiry that I would submit, Your

19   Honor, that the two lines, the two sentences above that should

20   also be excluded from any examination.

21           THE COURT:  Okay.  So the line that you mentioned,

22   the failure to connect the dots line, the clause after that

23   after the comma, "failed to bring in a specialist for a

24   consult", so what's the objection to Dr. Russell potentially

25   testifying that, to her knowledge, a specialist was not brought

VOLUME: 7
PAGES: 222-431

1    in for a consult in this case?  Which doesn't go to causation,

2    right?  Doesn't -- she's not opining on any kind of ultimate

3    issue here.

4         ATTORNEY SCHROEDER:  I think she's -- one, we don't

5    even know when she actually looked at these records and whether

6    or not that was accurately reflected in his charts.  So we

7    don't know that for sure.  There are no charts here.  And fail

8    -- so I don't know that she can make that declarative

9    statement.  That goes to the issue of causation like, Well, he

10   didn't do this; he didn't do that.  Well, I don't know.  She

11   doesn't know that, first of all, and I don't know the temporal

12   proximity or lack thereof between when this individual became

13   pregnant and when she happened to see this individual after the

14   fact for hypertension for whatever reason.

15        THE COURT:  So earlier in that paragraph, though, she

16   references the standard of care, which she appears qualified to

17   opine on, and she says, "The standard of care is to send a

18   patient with this history to a specialist like me".  So then,

19   if she were to testify simply to the fact that a specialist --

20   I assume that's the consult -- did not occur here, that seems

21   consistent with what was above.

22        ATTORNEY SCHROEDER:  I'm not in any way suggesting,

23   Your Honor, that she is not a very qualified maternal fetal

24   medicine doctor, but she did not see this patient before she

25   became pregnant, so how can she opine on what actually happened

1    back then?

2              THE COURT:  So now you are objecting from the, like

3    you did initially?  You want none of this to come in is what

4    I'm hearing.  I mean, I've kind of ruled on that already.

5              ATTORNEY SCHROEDER:  I understood that.  I was just

6    trying to respond here.

7              THE COURT:  You are, but --

8              ATTORNEY SCHROEDER:  Fair enough.

9              THE COURT:  -- you're responding and expanding.

10             ATTORNEY SCHROEDER:  Well, yes, Your Honor, I did.  I

11   think the, my main issue, Your Honor, or the main issue is that

12   Dr. Hsu failed to connect the dots with this patient's medical

13   record, and he failed to bring in a specialist for a consult

14   before getting the patient pregnant.  I don't know where that

15   would -- how could I cross her on where there's no evidence

16   that that's actually true?  I don't -- there's no document.

17   There's no -- I have no idea when it happened.

18        And so I was only speaking about those two, those two

19   sentences because it goes to causation.  It goes to whether or

20   not -- she's basically, after the fact, doing her own

21   investigation and saying, Well, I would have done it this way,

22   or he should have done this.

23             THE COURT:  Well, if the question is asked on direct,

24   Did you call, how do you -- well, if the question is asked to

25   her, Do you know if Dr. Hsu called in a consulting physician,

VOLUME: 7
PAGES: 222-431

1    and the answer is, Yes, I know he didn't, then you can come up

2    and ask, Well, how do you know that, right?

3          ATTORNEY SCHROEDER:  I think I could, Your Honor, but

4    I guess I would submit -- I would first say that we know just

5    based on this back-and-forth that she did not treat this

6    patient before she became pregnant.  We know that based on this

7    paragraph.  So how is it definitive that she can say, well, she

8    didn't get a consult?  I don't know that every consult that's

9    ever given is recorded.  I mean, I'd like it that -- any time

10   that Ms. McDonald or Ms. Martinez came into my office to ask me

11   something, I don't bill for that time.  I mean, it's the same

12   thing.

13         THE COURT:  Okay.  So I'm going to, as I said, I'm

14   going to allow Dr. Russell to testify as to the incident.  The

15   failure to connect the dots, to the extent that it's about

16   causation, right, like Dr. Hsu failed to connect the dots with

17   this patient's medical history, I don't think Dr. Russell

18   should be questioned on that.

19         And, as I've already stated, the line below that about the

20   causation issue, that this would not have happened had the dots

21   been connected between the medical history and the need for a

22   consult, but the general question about whether Dr. Russell is

23   aware that a consult had occurred, I'll allow that question to

24   be asked.  So, Ms. Nunan, I'll give you an opportunity to speak

25   to your witness just about this particular instruction, and

VOLUME: 7
PAGES: 222-431

1    then, when you come back in, we'll call the jury back.

2            ATTORNEY NUNAN:  Yes.

3            (Brief pause.)

4            ATTORNEY VITT:  I have a scheduling issue that maybe

5    we could use the time efficiently and try and get that squared

6    away now.

7            THE COURT:  Okay.

8            ATTORNEY VITT:  We intend to call Dr. Ira Bernstein,

9    who is the former chair of the OB/GYN department at University

10   of Vermont, MMC, and I thought we were going to move a little

11   quicker today, so he came over and is now waiting outside.  We

12   have Dr. Russell.  We have Dr. Conroy.  And is it possible we

13   could get to him?  Yes, it seems unlikely, but I don't want it

14   to be a situation where it's, you know, 10 minutes of 4:00 and

15   how long -- we can probably get him on in 40 minutes, but I

16   don't want to be in a situation where you're looking at me and

17   saying, Where is your next witness, and I say, Well, I excused

18   him.  So that's why I'm up here.

19           THE COURT:  Okay.  So it's all right.  So I guess it

20   all depends on how these witnesses go, right?  So what's

21   anticipated for Dr. Russell?

22           ATTORNEY VITT:  I would say probably half an hour for

23   direct, maybe a little more.

24           THE COURT:  Okay.  Probably hard, Mr. Schroeder, for

25   you to predict cross, but maybe you have a sense?

VOLUME: 7
PAGES: 222-431

1              ATTORNEY SCHROEDER:  I would say about a half hour,

2      at most, but I would -- I'd say I've got a good amount

3      depending upon what topics go into, and I suspect it would be

4      about a half hour.

5              THE COURT:  Okay.  So roughly an hour, total, for

6      Dr. Russell?

7              ATTORNEY VITT:  And Dr. Conroy.

8              THE COURT:  Right.  And Dr. Conroy same, same

9      exercise.  Is that going to be -- as I understand it, the

10     subject matter for Dr. Conroy is fairly limited.

11             ATTORNEY VITT:  It is.  I would say probably 15 to 20

12     minutes.

13             THE COURT:  Okay.  And probably --

14             ATTORNEY SCHROEDER:  Two.  Don't hold me to it,

15     though, Judge.

16             THE COURT:  Two minutes?

17             ATTORNEY SCHROEDER:  You know, I'd like to think it's

18     two minutes, I would.

19             THE COURT:  And then after that would be

20     Dr. Bernstein.  All right.  So what is the ask, if any, here?

21     Are you requesting asking for, to let Dr. Bernstein go and, if

22     we are finished at 10 to 4:00, we just end for the day?

23             ATTORNEY VITT:  That would be fine by me.  I can

24     check and make sure he would be available tomorrow.  Let me do

25     that.  I think he's available, and let me check.

 1            THE COURT:  And, if he is available and we have time

 2    today, I say we put him on for as long as he can.

 3            ATTORNEY VITT:  All right.

 4            THE COURT:  Open to suggestions from the parties.

 5            ATTORNEY SCHROEDER:  Yeah.  I think the only thing

 6    with Dr. -- I don't have a problem if we end a little early,

 7    Your Honor.  I think tomorrow we have three witnesses after

 8    Dr. Merrens where I suspect that will only keep my cross, my

 9    direct to the scope of the cross because we do intend to call

10    him in our case in chief, which I have communicated to

11    plaintiff's counsel already a couple of times.  So I would keep

12    that fairly short.

13            We have three witnesses, though, that are two of whom --

14    well, maybe four potentially, but three, at least.  One of them

15    works for us, but the other two don't.  No, that's right.  One

16    out of three work for us.  So I just want to make sure we get

17    them on and off tomorrow afternoon.  They're pretty short

18    witnesses.  So I just don't want to get backed up tomorrow if

19    we start our case in chief.  Because they've told me that we

20    are going to start our case in chief tomorrow, so I've made

21    arrangements for these three witnesses to travel from New

22    Hampshire to here for this reason.  So I want to make sure

23    we're not getting jammed up.  And, if we had to actually stay a

24    little bit longer, I don't know what the rule is on that, Your

25    Honor, in your courtroom, but tomorrow --

VOLUME: 7
PAGES: 222-431

```
 1              THE COURT:  For tomorrow?
 2              ATTORNEY SCHROEDER:  -- it would be pretty close.
 3    You know, tomorrow I'd want to finish the other three.  They're
 4    very short witnesses.
 5              THE COURT:  Right.
 6              ATTORNEY JONES:  I wasn't here when this all started.
 7    So did you say you're not going to do a lengthy cross of
 8    Dr. Merrens?
 9              ATTORNEY SCHROEDER:  I do not intend to do that,
10    correct.
11              ATTORNEY JONES:  Because you're going to call him
12    later in your case in chief?
13              ATTORNEY SCHROEDER:  Yes, yes.
14              THE COURT:  Okay.  So I'm going to suggest that we
15    keep Dr. Bernstein here.  It's already 2:30.  We only have two
16    more hours to the trial day.  So keep him here, and, if we can
17    put him on, just to make sure that we have enough time for
18    tomorrow's witnesses.
19              ATTORNEY SCHROEDER:  Thanks, Your Honor.
20              ATTORNEY VITT:  Okay.
21              THE COURT:  Are we ready for the jury?  Okay.
22              (The Jury enters the courtroom.)
23              THE COURT:  Plaintiff may call the next witness.
24
25
```

VOLUME: 7
PAGES: 222-431

1                    MICHELLE RUSSELL,

2          having been duly sworn to tell the truth,

3               testifies as follows:

4               THE COURT:  Please proceed.

5                    DIRECT EXAMINATION BY ATTORNEY NUNAN

6     Q.    Dr. Russell, what is your occupation?

7     A.    I am a doctor.

8     Q.    And where do you work?

9     A.    I work at Dartmouth-Hitchcock Medical Center in Lebanon.

10    Q.    When did you start there?

11    A.    In about 2005.

12    Q.    Okay.  And which department do you work for?

13    A.    I work in the department of OB/GYN, but specifically in

14    the division of maternal fetal medicine.

15    Q.    And can you give us a basic description of maternal fetal

16    medicine?

17    A.    Sure.  I take care of high-risk pregnancies kind of from

18    the very beginning to the delivery of their complicated,

19    high-risk pregnancy and do prenatal diagnosis.

20    Q.    And what board certifications do you have?

21    A.    I have, I am certified by the American Board of Obstetrics

22    and Gynecology in OB/GYN and maternal fetal medicine.

23    Q.    How long have you known Dr. Porter?

24    A.    Since I started in about 2005.

25    Q.    Almost two decades?

VOLUME: 7
PAGES: 222-431

1    A.    Um-hum.  20 years.

2    Q.    How would you describe Dr. Porter as a physician?

3    A.    A very experienced, skilled, compassionate, caring

4    physician.

5    Q.    How would you describe her as a colleague?

6    A.    A very helpful, collaborative, colleague.  She was the

7    type of person whose door was always open, that you could go to

8    if you had a clinical question, that you couldn't answer

9    yourself.  She was very easy to collaborate with.

10   Q.    What was your understanding of Dr. Porter's noninfertility

11   work at Dartmouth-Hitchcock?

12   A.    It was quite extensive.  Dr. Porter did a lot of benign

13   gynecologic surgeries for women who perhaps wanted to maintain

14   their reproductive potential but had gynecologic complications

15   such as fibroids, endometriosis, things like that.  She also

16   did things like interpreting first trimester ultrasounds,

17   particularly complicated first trimester ultrasounds where

18   pregnancies were implanted in the wrong place like in the

19   cervix or the cornua of the uterus or the fallopian tubes.  She

20   was our experienced go-to person for those kinds of things.

21         She also provided services in managing adolescent

22   gynecology.  So she had expertise in managing young women with

23   gynecologic problems to preserve their fertility later on in

24   life.

25   Q.    So how would you use Dr. Porter and her expertise in

VOLUME: 7
PAGES: 222-431

1    ultrasound?

2    A.    Sure.  So ultrasound interpretation, things like the

3    pregnancy implanted in a dangerous location for the pregnant

4    woman, the pregnancy implanted in the cervix.  If we found

5    something like that, Misty would be the person that would help

6    us make that interpretation and sometimes, oftentimes would be

7    the person that we'd collaborate with to manage these

8    complicated pregnancies or a pregnancy in the cesarean section

9    scar, which can be a devastating complication later on in a

10    pregnancy.

11    Q.    Why wouldn't you go back to the radiologists for that kind

12    of information?

13    A.    Raidologists read ultrasounds, but they don't have the

14    gynecologic expertise to take an ultrasound to the actual

15    clinical management and the expertise in how to go forward with

16    this ultrasound diagnosis.

17    Q.    How did you and other OB/GYN generalists collaborate with

18    Dr. Porter as a GYN surgeon?

19    A.    So, if I had patients that, say, had a pregnancy

20    complication and had uterine septum that was found at the time

21    of surgery or a patient with recurrent miscarriages or large

22    fibroids, this might be a patient that I would refer to Dr.

23    Porter to manage so that their future pregnancy would be less

24    complicated.

25         The gynecologic surgeons would often work with her as

VOLUME: 7
PAGES: 222-431

1    either assistants or have her as an assistant to take them

2    through complicated surgeries preserving a woman's fertility.

3    So many gynecologists can do hysterectomies or myomectomies,

4    but they're not quite so skilled at making sure that the

5    ability to conceive in the future is preserved as somebody like

6    Misty can be.

7    Q.   Why would you need to preserve fertility for the future?

8    What are some examples?

9    A.   A young woman needing surgery because she has large

10   fibroids or a teenager with a congenital uterine abnormality

11   who wants to go on and have babies at some point later on in

12   their life or imperforate hymens or vaginal septums.  It can go

13   on and on.

14   Q.   I'd like to turn to the meeting about the closure of the

15   REI division that you attended now.

16   A.   Sure.

17   Q.   What was your initial reaction or feeling when you heard

18   that the REI division had been closed completely?

19   A.   Shocked and in disbelief that that could possibly be

20   happening.

21   Q.   When did you attend the meeting of the closure of the REI

22   division?

23   A.   It was sometime in May of the year of closure, so just

24   before the closure.  It was a large department meeting.

25   Q.   Where was it held?

 1    A.   I think it was in Auditorium A and B, which is a combined

 2    auditorium, I believe, that the two were opened up together,

 3    and it was a full room.

 4    Q.   How many people were there?

 5    A.   Many.  It was a full room.

 6    Q.   And who were the people that attended that meeting; do you

 7    remember?

 8    A.   The meeting was open to all the physicians, the nurses,

 9    support staff, secretaries, LNAs.

10    Q.   Who from the administration spoke at that meeting?

11    A.   I only personally recall Dr. Ed Merrens speaking during

12    that meeting.

13    Q.   What question did you ask him during that meeting?

14    A.   I asked Dr. Merrens.  I said, "I understand why the other

15    two members of the department needed to go, but I don't

16    understand why Misty is being let go as well".

17    Q.   Why did you ask that question?

18    A.   Because Misty is a valuable colleague, and I couldn't

19    imagine that there was any reason why her job would be

20    terminated.

21    Q.   What did Dr. Merrens say in response?

22    A.   He said she's on disability.

23    Q.   How did his response make you feel?

24    A.   I was shocked that this would be the response.

25    Q.   Why?

1    A.    Because I didn't think a person could be terminated
2    because of a disability.
3    Q.    How did you respond to Dr. Merrens in that meeting?
4    A.    I said, "But she's coming back".
5    Q.    And your understanding was she was returning from
6    disability and starting to work again?
7    A.    That was my understanding.  I had seen her.  I knew that
8    she was only part-time and that we weren't supposed to bother
9    her or assume her door was as open as it used to be but that
10   she was coming back.
11   Q.    Did Dr. Merrens say anything in response to that?
12   A.    No, he moved on.
13   Q.    When the REI division was closed and Dr. Porter was
14   terminated, could the OB/GYN department have used her services?
15   A.    We all could have used her services.  We didn't have that
16   person anymore that had the expertise in the unusual early
17   first trimester pregnancies, or where do we send the patients
18   that come into our schedule with recurrent pregnancy losses or
19   with infertility questions or concerns?
20   Q.    Was the OB/GYN department already short-staffed in 2017?
21   A.    I'm not the administrative person, but, yes, I believe
22   that we were already short-staffed, we'd been short-staffed,
23   and, in fact, since Misty's departure, I can count about eight
24   or nine new hirees.  So we were definitely short-staffed.
25   Q.    In this trial we have heard about Dr. Porter's splitting

1    behavior.  Have you, did you experience any of that?

2                    ATTORNEY SCHROEDER:  Objection, Your Honor.

3                    THE COURT:  Basis?

4                    ATTORNEY SCHROEDER:  Sequestration of witnesses

5    regarding testimony that has been previously offered.

6                    THE COURT:  Overruled.

7    BY ATTORNEY NUNAN:

8    Q.   I'm going to ask the question again.

9    A.   Sure.

10   Q.   We've heard about Dr. Porter's splitting behavior, alleged

11   splitting behavior.  Have you, did you ever experience that?

12   A.   I never experienced that.  She was always very helpful for

13   me.

14   Q.   I'd like to turn to Dr. Hsu.

15   A.   Sure.

16   Q.   You said a minute ago, "I could understand why the other

17   two had to go", I think.  Is that what you said?

18   A.   Um-hum.  Yes.

19   Q.   I'm sorry.  I want to discuss your experience with

20   Dr. Hsu.  How did you see him working?

21   A.   Where I read ultrasound, still do and did at the time, he

22   would often be in the same room reading ultrasound or finishing

23   up a work from previous consults or patients that he had seen,

24   and, also, he would, the room where the REI nurses sat and

25   worked was right across the hall with open doors from the

1    ultrasound room.

2    Q.    Okay.  If you had to describe Albert Hsu as a physician,

3    how would you describe him?

4    A.    He was a very nice person, but he lacked clinical skills

5    and lacked knowledge.

6    Q.    How long a period of time did you observe Dr. Hsu like

7    this?

8    A.    Probably about three years, his duration of hire there.

9    Q.    Did you ever hear Dr. Hsu giving medical advice to

10   patients?

11   A.    I would occasionally hear him on the telephone, talking to

12   patients on the phone.

13   Q.    And what would you think to yourself?

14        ATTORNEY SCHROEDER:  Objection, calls for

15   speculation, hearsay.

16        THE COURT:  Overruled.

17        THE WITNESS:  Overruled?  I would often hear what I

18   thought was incorrect medical advice being given to patients or

19   incorrect description of physiology that we often teach medical

20   students.

21   BY ATTORNEY NUNAN:

22   Q.    What was your experience with one of Dr. Hsu's negative

23   outcomes?

24   A.    If you're talking about the woman that I shared in care

25   with him, I was the maternal fetal medicine rounding on

1    patients that were admitted inpatient for complications during

2    their pregnancy.  We all sit down together in rounds, and we

3    talk about patients, and then we individually go to the bedside

4    and interview or discuss kind of what is going on with the

5    patient.

6        This particular patient was admitted at about 26 weeks of

7    pregnancy with hypertension in her pregnancy.  She'd achieved

8    her pregnancy through some sort of reproductive technology

9    assistance, and but she was admitted at 26 weeks with

10   hypertension.  And so I had heard that her history was

11   significant for thyroid cancer, and, when I went to meet her in

12   the room, I gathered a little more history and learned that her

13   father had also had thyroid cancer.  That's a pretty unusual

14   family history, thyroid cancer in two individuals and

15   particularly in a male family member.

16       And so that was a little concerning to me.  It didn't sit

17   quite right, and I tried to think about the diagnoses of

18   hypertensive disorders with these thyroid abnormalities, and I

19   went home that night quite concerned and thinking about what

20   was going on, thinking, I'm going to go back and put this

21   together tomorrow.  I think I know what's going on.

22       And, when I came in in the morning, unfortunately, she had

23   been delivered the night before for a severe hypertensive

24   episode.  And the condition that she had when I started digging

25   through her chart and went back into very old records from when

1    she was a teenager is that she had a condition called multiple

2    endocrine neoplasia, which she wasn't aware of.  It was a

3    diagnosis that was made as an adolescent, and that condition

4    comes with the risks of having multiple thyroid endocrine

5    tumors, including adrenal tumors and tumors called

6    pheochromocytomas which can lead to hypertensive conditions.

7    Q.    She deliver -- how many weeks was the baby when she

8    delivered?

9    A.    26.

10   Q.    Did the baby live?

11   A.    For a short period of time.

12   Q.    I'd like to move on to David Seifer, Dr. David Seifer.

13   Was your office close to David Seifer's?

14   A.    It was the same relationship in that I could hear his

15   discussions with the REI nurses that were across the hallway

16   and occasionally had meetings with him.

17   Q.    Did you overhear him from time to time?

18   A.    I overheard him discussing with the REI nurses and often

19   had what sounded like disagreements with management with the

20   REI nurses.

21   Q.    I'd like to move on to Dr. Porter's termination.  When did

22   you see Dr. Porter next after her termination?

23   A.    In the end of June, July, during raspberry-picking season.

24   Q.    How was she doing?

25   A.    Well, we picked raspberries in the berry patch, and across

1    the berry patch we talked about life and how things were going,

2    and she was crying in the raspberry patch.  She was very

3    tearful.

4    Q.   Did you have her out each year to pick raspberries?  This

5    was an annual event?

6    A.   I invite her out every year.  The patch is always open for

7    her to come out and pick raspberries.

8    Q.   How do you think Dr. Porter, based on what you saw, was

9    emotionally impacted by this decision to terminate her?

10            ATTORNEY SCHROEDER:  Objection.

11            THE COURT:  Sustained.

12   BY ATTORNEY NUNAN:

13   Q.   Okay.  At this point in the summer, had Dr. Porter been

14   offered a position of employment?

15   A.   I believe that was part of our conversation in the

16   raspberry patch, that she had had employment gained at UVM.

17   Q.   What were her concerns?

18   A.   Oh, being separated from her community, her colleagues at

19   Dartmouth-Hitchcock, her family, the distance of travel from

20   her home in Hanover to Burlington, and not seeing her patients

21   that she helped to get pregnant.  That's part of our kind of

22   what keeps us going sometimes is being able to see the people

23   that you've helped periodically.

24   Q.   What is rewarding the most for you as a doctor with

25   respect to what you just said?

1    A.    Going to the grocery store and seeing the older dad with

2    his two twin sons, wrangling them into the grocery cart when I

3    know that they've had a very complicated pregnancy and that

4    we've taken them through that.  He doesn't know that I see him,

5    but I see them.  I see them happy.

6    Q.    And that's a benefit being in a community that you work

7    and live in?

8    A.    That is a big benefit.

9    Q.    How was Dr. Porter when you spoke to her that day handling

10   the fact that she'd been terminated?

11   A.    I believe she was devastated.  She said to me, "I just

12   want my job back".

13   Q.    The fact that she had employment, was that not a comfort?

14             ATTORNEY SCHROEDER:  Objection.

15             THE COURT:  Sustained.  Rephrase the question.

16   BY ATTORNEY NUNAN:

17   Q.    Sure.  How was employment at UVM going to impact her life?

18   A.    She was going to have to travel or relocate to have her

19   practice here while her family, her homestead, her husband,

20   were in Hanover.

21   Q.    Okay.  How was the rest of the OB/GYN department after her

22   termination?

23   A.    Quite shook up, actually.  The day of that meeting I

24   remember kind of scanning the room and catching the eyes of one

25   of my colleagues who was in tears in the room that this had,

1    was happening, and afterwards I think we all felt very

2    vulnerable and confused as to why an entire division would be

3    severed from our department.

4    Q.    Why would you feel vulnerable?

5    A.    Because Misty was such a cherished colleague and a skilled

6    surgeon and a skilled clinician that, if it could happen to

7    her, it could happen to any one of us with little notice.

8    Q.    How did the explanation that this was the result of a

9    nursing shortage sit with you?

10   A.    It didn't seem believable because there is always nursing

11   shortages.  There are nursing shortages now in the OB/GYN

12   department, and yet we don't close the OB/GYN department.

13   There are nursing shortages on the labor floor, and yet we

14   don't close the labor floor.  They train people.  They recruit

15   nurses.  They use traveling nurses.

16        The same thing with the main OR, most of the OR is run by

17   traveling nurses or has been run by traveling nurses, and they

18   don't close those services, service lines.

19            ATTORNEY NUNAN:  That's all I have.  Thank you.

20            THE COURT:  Cross-examination?

21            ATTORNEY SCHROEDER:  Thank you, Your Honor, may we

22   approach, brief sidebar?

23            THE COURT:  Yes.

24            (Bench conference begins.)

25            ATTORNEY SCHROEDER:  I'm sorry.  I just I want to ask

VOLUME: 7
PAGES: 222-431

1    her -- I don't think this is controversial at all -- whether

2    Misty helped her have a baby through IVF, because my

3    understanding is it was common knowledge that that's true, and

4    I didn't want to take her by surprise with that, but I also

5    want to limit it just to that.

6              ATTORNEY NUNAN:  I think that's a HIPAA violation.  I

7    would not go there.

8              ATTORNEY SCHROEDER:  Well, that's the reason why I

9    wanted to have --

10             ATTORNEY NUNAN:  I don't know the answer to that.

11             THE COURT:  You said it was not controversial.

12             ATTORNEY SCHROEDER:  You got me, Judge.  Sorry.  Go

13   ahead.

14             ATTORNEY NUNAN:  I would not ask her that question.

15   I did not ask her that question.  I was, I was very careful

16   because she, I don't think she -- I don't think anyone should

17   go there.

18             THE COURT:  Okay.  So, when the question was asked

19   earlier today of Dr. DeMars, is it the same question you asked

20   her?

21             ATTORNEY SCHROEDER:  It was.

22             THE COURT:  So how was the potential HIPAA concern

23   there addressed, with her consent?

24             ATTORNEY SCHROEDER:  It was consent before, because I

25   asked her that.  In fact, I actually got her consent before I

1    said it in my opening.

2              ATTORNEY NUNAN:  I do not believe there is consent

3    here.

4              ATTORNEY SCHROEDER:  Well, understood, but it goes to

5    the issue of bias, obviously, and so is there a way to say that

6    she was a patient of Dr. --

7              ATTORNEY NUNAN:  No.

8              ATTORNEY SCHROEDER:  Hold on.

9              ATTORNEY NUNAN:  Excuse me.

10             ATTORNEY SCHROEDER:  I know this to be true.  It is

11   apparently common knowledge that she was considered a, quote,

12   and this is what I was told, that she was a department baby.

13   So I'd like -- there's a lot of people that were helped

14   internally at DH by Misty Porter and others in the REI

15   division.  She's one of them.  It goes completely to her bias.

16             THE COURT:  I understand the relevance in terms of

17   bias, but I'm not sure so sure how we get beyond this issue of

18   it's her medical information and there's no consent to ask the

19   question.

20             ATTORNEY SCHROEDER:  Okay.  But --

21             THE COURT:  Right.

22             ATTORNEY SCHROEDER:  Could I not ask her, Do you have

23   a physician-patient relationship with her?  That doesn't go

24   into anything.  That's not a HIPAA violation, asking her that,

25   whether or not she has a physician-patient relationship with

1    her.

2              THE COURT:  To be honest with you, I don't know if

3    that is a HIPAA violation.  I'm uncomfortable even kind of

4    opining on it.  Maybe it is, maybe it isn't.the other question

5    I have to ask you is, Michelle Russell has been on the witness

6    list for how long?

7              ATTORNEY SCHROEDER:  Well, there's 25 people on the

8    witness list.

9              THE COURT:  I know, but, if this is part of

10   cross-examination and this was not brought out on direct, so

11   you've thought about this before.

12             ATTORNEY SCHROEDER:  No.  Actually, Your Honor, I

13   just learned about this a week ago, so I did not know this

14   fact.

15             THE COURT:  A week ago?

16             ATTORNEY SCHROEDER:  Or maybe a few days ago.  Which,

17   well, I think we've been pretty busy the last --

18             THE COURT:  So I just don't know what we can do with

19   this now.  I mean, you see the pickle that it puts me in?

20             ATTORNEY SCHROEDER:  I understand.

21             THE COURT:  And puts you in and puts everyone in.

22             ATTORNEY COFFIN:  There HIPAA are exceptions that

23   cover situations where people are called to testify in hearings

24   or for government proceedings.  I'm not sure whether that

25   exception applies or not here.  I have to say it would seem to

1    me it would be a question about whether this is an issue that

2    is actually put an issue by the question, and, to me, it's a

3    question of how closely the claim of bias from this association

4    is by keeping this matter from the jury, and I think there is

5    an exception that would apply to provide medical testimony in

6    court hearings.  But so I don't think that fully answers the

7    question.

8              THE COURT:  Right.

9         ATTORNEY COFFIN:  But what it unfortunately raises is

10   another question, and, you know, I think the parties are going

11   to be heard and the Court decide, you know, kind of the level

12   of degree to which that issue is in play here.

13        ATTORNEY JONES:  I was just going to say that her

14   condition and her patient relationship has not been placed in

15   issue.  I don't think there's a single HIPAA exception in play

16   here.  So it's, this is just anybody working in the health care

17   field, people understand that this is simply a no-go zone

18   without patient consent.  I don't think that's an open

19   question.

20        ATTORNEY SCHROEDER:  Actually, I --

21        ATTORNEY JONES:  I don't think we need to research in

22   this case.

23        ATTORNEY COFFIN:  What I was going to say, I don't

24   know what your view on that is, but I thought that the question

25   about whether it was a physician-patient treating relationship

VOLUME: 7
PAGES: 222-431

1    is not private medical information and probably would be --

2                 ATTORNEY JONES:  Just like the attorney-client

3    relationship context, the ethics rules make it clear even

4    revealing an attorney-client relationship is a violation of the

5    rules.  It's the same thing.  Yes, it is.

6                 ATTORNEY SCHROEDER:  HIPAA is separate.

7                 ATTORNEY JONES:  I understand, but it's the same

8    concept.

9                 ATTORNEY SCHROEDER:  I was trying, Your Honor, and,

10   by the way, I've got, like, 200 people in the health care

11   department, so I reject the idea that somehow you're an

12   authority on the health care issue, but, on this point, Judge,

13   asking just that question, Do you have a physician-patient

14   relationship, it goes to the relationship and just and leave it

15   there.  I'm --

16                 THE COURT:  It does, but I don't know if that's, if

17   that's an okay question to ask.  And I hear Mr. Coffin's point.

18   Maybe it is an exception.  But, without any kind of authority

19   that lets me kind of know that for a fact, I'd be very

20   reluctant to allow questioning into this particular area.  I

21   hear your point about bias and everything else, I do.  But,

22   without some kind of authority that tells me that kind of

23   question is not some type of violation of HIPAA, I'm not going

24   to allow it.

25                 ATTORNEY NUNAN:  Okay.

VOLUME: 7
PAGES: 222-431

1          ATTORNEY SCHROEDER:  Okay, okay.  Thank you.

2          THE COURT:  All right.  Thank you.

3              (Bench conference ends.)

4          ATTORNEY SCHROEDER:  May I proceed?

5          THE COURT:  Yes.

6              CROSS-EXAMINATION BY ATTORNEY SCHROEDER

7   Q.   Thank you, Your Honor.  Good afternoon, Dr. Russell.

8   A.   Good afternoon.

9   Q.   You and I have never met before, right?

10  A.   No.

11  Q.   Okay.  Checking.

12          THE COURT:  Dr. Russell, I'll just ask you to keep

13  your voice up, please.

14          THE WITNESS:  Sure.

15  BY ATTORNEY SCHROEDER:

16  Q.   Thank you.  That was going to be my next point, but thank

17  you.  You have known Dr. Porter for about 20 years?

18  A.   Correct.

19  Q.   And have you become friends outside of work as a result of

20  that?

21  A.   Work colleagues and friends across the raspberry patch.

22  Q.   Okay.  And you mentioned raspberry patch, and you

23  mentioned the fact that -- would she come over from time to

24  time?

25  A.   Just for picking raspberries.

VOLUME: 7
PAGES: 222-431

1    Q.    Okay, all right.  But would she come over for that purpose

2    to your house?

3    A.    Yes, she came and picked raspberries, yes.

4    Q.    Okay.  By the way, for everyone's edification, what is the

5    actual season for raspberries?

6    A.    End of June, early July.  And I wasn't always there.  She

7    would often pick raspberries without me in my raspberry patch.

8    Q.    Okay.  And how long does that season last?

9    A.    About two weeks.

10    Q.    Okay.  Pretty short season?

11    A.    Yeah.

12    Q.    So, on occasion over the years, she would come over to

13    your house to pick raspberries, whether you were there or not?

14    A.    Correct.

15    Q.    And do you text with her on occasion?

16    A.    Just to say, The raspberries are in.  I'm not going to be

17    there.  You're welcome to come and get them so they don't fall

18    off the vine.

19    Q.    Okay.  And you specifically recall having a discussion

20    with her in July, August of 2017?

21    A.    June, July of 2017, Yes.

22    Q.    June, July.  I'm sorry.

23    A.    Yeah, that's all right.

24    Q.    And she came over to your house?

25    A.    Correct.

VOLUME: 7
PAGES: 222-431

1    Q.    And you guys were together for a little bit that

2    afternoon --

3    A.    Correct.

4    Q.    -- whenever that was in June or July?  The subject of the

5    OB/GYN meeting came up, correct?

6    A.    Correct, or, not of the meeting, but of the department

7    closure.

8    Q.    Right.  And you discussed the department closure with her?

9    A.    Correct.

10   Q.    And you discussed, you discussed the OB/GYN meeting at

11   some point during that conversation, did you not?

12   A.    I don't think so.

13   Q.    Okay.  Would you be surprised to know that Dr. Porter has

14   sworn under oath that that conversation happened during that

15   meeting?

16   A.    It might have.  It was a conversation back and forth about

17   what had gone on and the department closure.

18   Q.    Okay.  And so you're not sure exactly whether or not the

19   OB/GYN department meeting came up?

20   A.    I don't know if, in the raspberry patch, the OB/GYN

21   department meeting came up, but it might have because it was

22   part of the whole closure and loss of job.

23   Q.    Right.  And the REI division closed May 4th.  It actually

24   shut down June 3rd, and then there was the meeting with the

25   OB/GYN department happened sometime in that timeframe?

VOLUME: 7
PAGES: 222-431

1    A.    Correct, yes.

2    Q.    So it was fairly recent, right?

3    A.    Yes.

4    Q.    And would you be surprised to know that Dr. Porter does

5    not say anything about this comment with respect to that

6    particular raspberry patch discussion that she had with you,

7    the specific comment you attributed to Dr. Merrens?

8    A.    Can you rephrase that?  I don't exactly know what you're

9    asking.

10   Q.    Okay.  You had a, we'll call it, raspberry patch

11   get-together?

12   A.    Correct.

13   Q.    Okay.

14   A.    Sure.

15   Q.    Just the two of you, right?

16   A.    Well, my daughter, yes.

17   Q.    She's important.  And you guys got together in the

18   raspberry patch, and my question was, Would you be surprised if

19   Dr. Porter had, in her written responses in this case, stated

20   nothing about this comment about, that you attributed to

21   Dr. Merrens?

22   A.    No, I wouldn't be surprised by that because I would have

23   felt uncomfortable telling her that.

24   Q.    You would have felt uncomfortable telling her that?

25   A.    I probably would have felt uncomfortable saying that I had

1   heard that comment from Dr. Merrens.

2   Q.   How many people were in this room when that comment was

3   made?

4   A.   It was a whole crowd of people.  I don't know. 50, maybe,

5   or more.

6   Q.   Were you aware that you're the only one that's testified

7   to this specific comment as of now?

8   A.   I asked it, and I --

9   Q.   You asked a comment about her being on disability, did you

10  not?

11  A.   I asked the comment about why was she being let go with

12  the other two gentlemen that I felt reasonable reasons for

13  termination, yes.

14  Q.   Okay.

15  A.   But I did not ask her, I did not ask about disability.

16  That did not come from me.

17  Q.   Okay.  But, at the time, just so we're clear, at the time,

18  you knew that Dr. Porter was out on disability, right?

19  A.   I knew she was, that she was out on disability, yes.

20  Q.   Right.  Long-term disability?

21  A.   I don't know exactly.  I knew that she was out of work.  I

22  have no idea about whether she signed paperwork for disability,

23  but I assumed she probably did because it was long-term process

24  that she was out for.

25  Q.   Right, long-term disability benefits, right?

VOLUME: 7
PAGES: 222-431

1    A.    Right.

2    Q.    And that's a pretty -- in your experience, do you know

3    anything about long-term disability benefits?

4    A.    I have never had them, so no.

5    Q.    Okay.  But you knew that she had long-term disability

6    benefits at that point?

7    A.    I did not.

8    Q.    Okay.  But you knew that she was out of, out of the office

9    correct on a leave?

10    A.    Correct.

11    Q.    Okay.  And, in fact, during that time, July or June, July

12    of 2017, do you recall the fact that she had to go out to the

13    Mayo Clinic for a series of visits?

14    A.    I heard that at some point, but I don't think I knew about

15    it at the time, but I heard it at some point that she had gone

16    out to the Mayo Clinic.

17    Q.    And were you aware at that point in the summer of 2017

18    that she was still experiencing symptoms related to her

19    condition?

20    A.    Yes.  I believe that she was still in the process of

21    recovering from her condition that had led to her disability,

22    that she was still having treatment for it.

23    Q.    And you're aware of the fact that she then had to have a

24    second surgery in the fall of 2017?

25    A.    I didn't know all of these details before.  I am aware of

VOLUME: 7
PAGES: 222-431

1    it now, but I did not know that at the time.

2    Q.   Fair enough.  Give me second, Your Honor.  Just want to

3    see if I can expedite this.

4         In terms of your role, Dr. Russell, you are a physician in

5    the maternal fetal medicine division of OB/GYN, correct?

6    A.   Correct.

7    Q.   And you are, that's a separate division from what was the

8    REI division, correct?

9    A.   Yes.  The OB/GYN encompasses several divisions, including

10   maternal fetal medicine and reproductive endocrinology.

11   Q.   And so you didn't have any oversight responsibility for

12   the REI division at any point, correct?

13   A.   No.

14   Q.   And you haven't had -- you do not currently have a

15   management role at Dartmouth Health, correct?

16   A.   I do not.

17   Q.   And, in the relevant timeframe of September of 2016 and

18   2017, you did not have a management role at Dartmouth Health?

19   A.   I've never had a management role or administrative role at

20   Dartmouth Health.

21   Q.   Okay.  Prior to today, you met with plaintiff's counsel to

22   prep for your hearing today?

23   A.   I was asked by the plaintiff's counsel to come here, yes.

24   Q.   Right.  And you spoke with them?

25   A.   Yes.

1    Q.    All right.  And, in this case, you did, in fact, sign

2    paperwork related to the case, correct, at some point earlier?

3    A.    I believe so.

4    Q.    Okay.  And that was at the direction of plaintiff's

5    counsel, correct?

6    A.    Correct.

7    Q.    In terms of responsibility for hiring and firing and

8    reassignment, those management decisions, you never had any

9    oversight over those, correct?

10   A.    No.

11            ATTORNEY SCHROEDER:  Okay.  Just give me one second,

12   Your Honor.

13            THE COURT:  Yes.

14            ATTORNEY SCHROEDER:  Nothing further, Your Honor.

15   Thank you.  Thank you, Dr. Russell.

16            THE COURT:  Any redirect?

17            ATTORNEY NUNAN:  None.

18            THE COURT:  Okay.  You may step down.  Thank you.

19   Plaintiff may call its next witness.

20            ATTORNEY VITT:  Joanne Conroy.

21                JOANNE CONROY,

22            having been duly sworn to tell the truth,

23                testifies as follows:

24            DIRECT EXAMINATION BY ATTORNEY VITT

25   Q.    Good afternoon, Dr. Conroy.  Are you the CEO of Dartmouth

1    Health?

2    A.    Yes, I am.

3    Q.    And I believe you became CEO in August of 2017?

4    A.    That's correct.

5    Q.    The decision to close the REI division and terminate the

6    doctors who worked there was made before you became the CEO?

7    A.    That's correct.

8    Q.    You were aware of the decision when you took the position

9    of CEO?

10   A.    No, I was not.

11   Q.    Did you learn about it shortly after becoming CEO?

12   A.    No, I did not.

13   Q.    When did you learn that the REI division had been closed?

14   A.    In a brief touch-base meeting with Dr. Ed Merrens probably

15   in the first month of my tenure.

16   Q.    So roughly in August of 2017?

17   A.    Probably.

18   Q.    Okay.  And you say a touch-base.  Was that just a brief

19   get-together, or what was the nature of the --

20   A.    We used to meet about 30 minutes, you know, every week,

21   every two weeks just to discuss high-level issues that were

22   going on across Dartmouth-Hitchcock, and my expectation would

23   have been it would have been mentioned within one of those

24   brief meetings.

25   Q.    Okay.  And I think you told me in your deposition that the

1    session on the REI division closure took maybe five minutes.

2    That sound right?

3    A.   Correct.

4    Q.   Okay.  You're an anesthesiologist; am I correct?

5    A.   That's correct.

6    Q.   You have no expertise, I believe, in reproductive

7    endocrinology; is that right?

8    A.   I do not.

9    Q.   You're aware, I believe, that that is a subspecialty of

10   OB/GYN?

11   A.   I am.

12   Q.   In a large hospital like Dartmouth-Hitchcock Medical

13   Center, it's kind of inevitable that, on a regular basis,

14   you're going to be getting women and young girls showing up who

15   have the need for somebody who has the specialty in

16   reproductive endocrinology?

17             ATTORNEY SCHROEDER:  Objection.

18             THE COURT:  Basis?

19             THE WITNESS:  It would be speculation.

20             THE COURT:  I'll direct the Witness not to answer the

21   question until the objection has been ruled on.

22             ATTORNEY VITT:  Let me rephrase the question.

23             THE COURT:  So that objection is sustained.

24   BY ATTORNEY VITT:

25   Q.   Okay.  And I'm going to rephrase the question.  When

1    Dartmouth-Hitchcock had an REI division, did it have, in that

2    REI division, doctors who had a specialty in reproductive

3    endocrinology?

4    A.    I am not aware of that.  That was a decision made to close

5    the division before I came.

6    Q.    Have you worked in hospitals that had a reproductive

7    endocrinology section or division?

8    A.    My previous large facility was in Morristown, New Jersey,

9    and our fertility services were managed by a private practice

10   across the street from the hospital.

11   Q.    All right.  So I want to make sure I've got this right.

12   You are unsure whether Dartmouth-Hitchcock has ever had a

13   division that was staffed by doctors who were specialists in

14   reproductive endocrinology; is that what you're telling me?

15   A.    No.  Let me rephrase myself.

16   Q.    Okay.

17   A.    I do not know the specifics of the division.  My

18   expectation is there probably was a division, since that is the

19   question at play here.  The division was closed before I came

20   there.  My previous experience of those services were offered

21   by private practitioners outside the facility.

22   Q.    That wasn't the situation at Dartmouth-Hitchcock Medical

23   Center, right?  You had, on the staff, doctors whose job it was

24   to provide health care in connection with the reproductive

25   health of women and girls, right?

1          ATTORNEY SCHROEDER:  Objection, argumentative, asked

2     and answered.

3          THE COURT:  Overruled.  The Witness may answer if she

4     knows.

5          THE WITNESS:  If they had that division, I don't have

6     any specific personal knowledge of it, and it was there and

7     then closed before I arrived there.

8     BY ATTORNEY VITT:

9     Q.    What's your understanding of the specialty of the doctors

10    who would work in a reproductive endocrinology division?

11    A.    I would be speculating.  I'm an anesthesiologist.  I put

12    them to sleep and wake them up.

13    Q.    All right.  I understand, I understand the anesthesiology

14    part.  That, I've got, but I want to make sure.  You're saying

15    that, when Dartmouth-Hitchcock had a reproductive endocrinology

16    division, you have no idea of the specialty of the doctors who

17    were working there?

18    A.    You know what?  I can tell you from my perspective as an

19    anesthesiologist.  We all are board-certified in anesthesia,

20    but many of us have subspecialties in obstetric anesthesia,

21    transplant anesthesia, or cardiac anesthesia.  It's not

22    uncommon for primary certification to have subspecialties.  I

23    do know in OB/GYN nationally they have many specialties, just

24    like anesthesia does.  They're certified in OB/GYN, but they

25    subspecialize in certain areas, and reproductive endocrinology

1    is one of them.  But, if you're asking me about specifics at

2    Dartmouth-Hitchcock, that service was closed before I was

3    there.

4    Q.    Do you recall that you provided or were available for an

5    interview with two local papers?

6    A.    Yes.

7    Q.    One would be the "Valley News" and the other "Concord

8    Monitor", correct?

9    A.    I don't believe the "Concord Monitor" --

10   Q.    All right.

11   A.    -- interviewed me.

12   Q.    So the interview was from the "Valley News"?

13   A.    The interview was from the "Valley News".

14   Q.    And that's the, kind of the paper for the local area

15   around Lebanon and into Vermont, right?

16   A.    They have a subscriber basis 12,000, yes.

17   Q.    How do you know it has a subscriber base of 12,000?

18   A.    I make it my business to know.

19   Q.    Okay.  Excuse me a second.  So, other than the briefing

20   that you received from Ed Merrens, did you have any information

21   about the reason that the REI division at Dartmouth-Hitchcock

22   was closed?

23   A.    Other than my conversations with Ed Merrens?

24   Q.    You're quoted as saying that there was a, quote,

25   "declining birth rate in the area, which made it less

1    attractive for up-and-coming providers".  Do you recall saying

2    that?

3    A.    That was a generalization.  Yes, I do recall saying that,

4    but that was a generalization that applied to some of the

5    challenges in rural health care, especially in New Hampshire

6    and Vermont where we have declining birth rates and it's hard

7    to attract nurses, physicians, technicians to serve in a

8    practice that has inadequate volume for them to have a vibrant

9    practice.

10   Q.    You added that, "Young providers want to join a thriving,

11   growing practice".  Do you recall that?

12   A.    Yes.

13   Q.    Okay.  Providers normally refers to doctors and nurse

14   practitioners.  Is that what you meant?

15              ATTORNEY SCHROEDER:  Objection, Your Honor.  Sidebar?

16              THE COURT:  Yes.

17              (Bench conference begins.)

18              ATTORNEY SCHROEDER:  I understand this is

19   cross-examination.  If he's going to ask, he's summarizing

20   quotes which are not actually fully accurate from the article.

21   Whether or not they actually are, are actually accurate quotes

22   as well is another issue, but, if he wants to ask her about the

23   question, that's fine, but he's trying to put words in her

24   mouth.  Isn't it true that you -- there's no foundation.

25              On top of that, he is summarizing what was said in the

1    article.  If he wants to ask her about what was said, what she

2    was interviewed about, and what she is quoted on, that's fine,

3    but he can't summarize and say, Well, that's what you said.

4         THE COURT:  Is there a reason why the article is not

5    in evidence?  Is it going to be in evidence?

6         ATTORNEY VITT:  I think it will be in evidence.  In

7    fact, we have to provide the foundation, I think, to get that

8    other document in, but what I was quoting from was the

9    deposition where it was actually, in the deposition, referred

10   to as the quote, and she says, Yes, that's what I said.

11        THE COURT:  I thought you were quoting from the

12   article.

13        ATTORNEY VITT:  Well, the deposition quotes the

14   article, and then so I thought, Well, she's already testified

15   under oath, and, if necessary, I can show it to you, to her,

16   but she agreed with me.

17        THE COURT:  So, of course, the issue is about the

18   accuracy of the quotation.  I'm wondering if you should just

19   introduce the article.  Not telling you what to do.  This is

20   your case.  Is that what you planned on doing?  Because that

21   might resolve this particular issue with respect to questions

22   about putting words in her mouth.  It's a cross-examination.

23        ATTORNEY SCHROEDER:  Understood, but he was getting

24   ready to ask a question, which was the reason for the

25   objection, which actually contradicts her deposition testimony.

VOLUME: 7
PAGES: 222-431

1    So he can't have it both ways.  If he wants to use the

2    disposition to impeach her, that's fine, but don't ask a

3    question that actually is contradictory to what she actually

4    testified to.

5        And, secondly, you talked about the Court and us, defense

6    counsel, both interpreted that he was quoting from the article,

7    not from her deposition transcript.  If he wants to quote the

8    deposition transcript, I would respectfully submit that he

9    needs to actually put it in front of her.  We went through this

10   exercise before of showing her the deposition transcript and

11   then impeaching her.

12       THE COURT:  Is the quotation in the deposition

13   transcript taken straight from the article that you're

14   referencing?

15       ATTORNEY VITT:  I believe so, Judge, but I'll tell

16   you what.  I'm pretty sure I'm right, but I'm perfectly happy

17   to show her the deposition.  Here's what the deposition says.

18   You agreed with me.  But, just to move this along, I'm happy to

19   show her the deposition where she --

20       THE COURT:  This now circles back to the discussion

21   we had earlier today about using the deposition transcript for

22   impeaching her, not refreshing her recollection.

23       ATTORNEY VITT:  Well, I wasn't planning -- look, I

24   wasn't planning to use it, but Mr. Schroeder basically said I

25   misquoted her, this is somehow inaccurate.  I'm willing to do

VOLUME: 7
PAGES: 222-431

1    it with her the easiest way, Judge.  I'm just trying to -- I'm

2    surprised we're stuck on this point.  She talks about young

3    providers.  That is the term she uses in the deposition.  She

4    talks about, you know, providers.  All I was saying is

5    providers normally means doctors and nurse practitioners.  I

6    understand that she wants to expand it to include nurses, so be

7    it.

8         ATTORNEY SCHROEDER:  She testified to that in her

9    deposition.  And the bigger issue is you were just telling us

10   that you were quoting from her deposition.  I actually thought

11   you were quoting from the article.  I just want it to be an

12   accurate quote.  That's it.  If you want to impeach her on the

13   deposition, go right ahead, but her deposition actually says

14   providers includes nurses.  I can actually give you the page

15   and quote for that.

16        THE COURT:  Reading from the deposition, I think, is

17   not appropriate.  Reading from the deposition, I don't think,

18   would be appropriate here, just as offering that as kind of

19   evidence that's not being used to impeach.  So, if the debate

20   here is about the accuracy of the quotation you're attributing

21   to Dr. Conroy, I'm wondering if the article is the way to go.

22        ATTORNEY VITT:  Let me see if I can put my hands on

23   the article.  All right, fine.

24        THE COURT:  Okay.

25             (Bench conference ends.)

VOLUME: 7
PAGES: 222-431

1              ATTORNEY VITT:  Do we have this?  We'll start with

2       publishing to you and to the clerk and then, assuming that

3       we've got agreement, we'll move its admission.  It's

4       Plaintiff's Exhibit 109.

5              THE COURT:  Okay.  Is that on your screen,

6       Dr. Conroy?

7              THE WITNESS:  I can see the screen.

8       BY ATTORNEY VITT:

9       Q.   I just want to make sure it's there.  Is this the article

10      that you were referring to before that appeared in the "Valley

11      News"?

12      A.   Yes.

13             ATTORNEY VITT:  I think, rather then spend much time

14      on it, I'd like to move for the admission of the article.

15             THE COURT:  Okay.  Any objection?

16             ATTORNEY SCHROEDER:  No objection, Your Honor, if we

17      could put a copy in front of Dr. Conroy.

18             ATTORNEY VITT:  She has it on her screen, I think.

19             ATTORNEY SCHROEDER:  That's just the first page.  I

20      think it's separate pages.

21             THE COURT:  So then Plaintiff's 109 is admitted.

22             ATTORNEY VITT:  May I approach the Witness?

23             THE COURT:  Yes.

24      BY ATTORNEY VITT:

25      Q.   I'm going to show you what's been marked as Exhibit 109.

1    Would you take a look at that and tell me if that's entire

2    article?

3    A.    Yeah, seven pages.

4    Q.    Do you recall saying that the declining birth rate in the

5    area made it less attractive for up-and-coming providers to

6    come to this area?

7    A.    Yes.

8    Q.    And I believe you also indicated that young providers want

9    to join a thriving, growing practice, correct?

10   A.    Yes.  However, that would apply to any practice.

11   Q.    Okay.  By providers do you mean doctors and nurse

12   practitioners?

13   A.    Nurses, technicians, every single health care

14   professional.

15   Q.    How do you know that young providers who are interested in

16   reproductive endocrinology want to join a thriving, growing

17   practice?

18   A.    Everyone, when they start their career, wants to achieve

19   mastery, and mastery is achieved with close to 10,000 hours of

20   work in the specialty of their choice.  Writ large across

21   Dartmouth Health, we have a harder time recruiting

22   professionals from all walks simply because they're not joining

23   practices where they can quickly achieve mastery, meaning it

24   takes much longer to really become outstanding in their field

25   and really well-known across the region and across the country.

1    Q.   Are you aware that the University of Vermont Medical
2    Center has an REI division within its department of OB/GYN?
3    A.   I know that.
4    Q.   You do know that?  Okay.  And is the birth rate around the
5    Burlington area any different than the birth rate around the
6    Lebanon, New Hampshire area?
7    A.   Well, actually Chittenden County is quite populated.  We
8    are the most rural academic medical center in the country.  We
9    have only 130,000 people within 30 miles of Lebanon.  I believe
10   Chittenden County has far more people in their county.
11   Q.   So do you think that that distinction makes it easier for
12   them to recruit than Dartmouth-Hitchcock?
13   A.   I would be speculating.
14   Q.   When you're talking about a thriving practice in this
15   area, what is the nature of the services that you're talking
16   about that are provided by the doctors?
17   A.   Could you clarify?
18   Q.   Sure.  One of the things that an REI division might do is
19   provide IVF services, right?
20   A.   We are outside my area of expertise, but I expect they do.
21   Q.   Do you have any sort of concept -- and I didn't mean it
22   use necessarily that term -- some grasp of the scope of the
23   work done by an REI division?
24   A.   I have some understanding from my experience at Morristown
25   Memorial Hospital in northern New Jersey when the private group

VOLUME: 7
PAGES: 222-431

1    across the street did both assessment of fertility, some

2    reproductive endocrinology, as well as harvesting and

3    implanting of fertilized embryos.

4    Q.   So is it your understanding that the scope of the practice

5    at Dartmouth-Hitchcock was roughly as you just described it?

6                ATTORNEY SCHROEDER:  Objection.

7                THE COURT:  Overruled.

8                THE WITNESS:  That is my basic knowledge.  I have not

9    reality checked it against the activities at

10   Dartmouth-Hitchcock, which were the service which was closed

11   before I came there.

12   BY ATTORNEY VITT:

13   Q.   Do you recall that Leslie DeMars asked you to meet and

14   discuss precisely the topics that were covered in that

15   interview?

16   A.   I was meeting with Leslie DeMars the first time as a new

17   chair.  When I came to Dartmouth, I tried to meet with all the

18   chairs, and she, at that time, was the chair of OB/GYN, and

19   that is why I met with her.

20   Q.   In that meeting did she tell you that she hoped you had

21   been misquoted because the information that you provided in the

22   interview was completely untrue?

23   A.   Our first meeting she was distressed and almost

24   noncommunicative and nearly in tears.  She was obviously

25   struggling with some leadership challenges.  We ended that

1    interview in my office in less than 30 minutes.  I was

2    concerned enough about her well-being that I asked to have

3    coffee with her the next week to make sure she was okay.  We

4    did not talk about the reproductive endocrinology division or

5    IVF services in either of those meetings.

6    Q.  All right.  Did she say anything to you in either of those

7    meetings to the effect that the description that you provided

8    about the reason for the closure, closing of the REI division

9    was inaccurate or mistaken in any respect?

10   A.  She did not.

11   Q.  When you received the briefing from Ed Merrens, did he

12   indicate to you that, for a period of over probably 25 years,

13   Dartmouth-Hitchcock in the OB/GYN department had provided IVF

14   services to women?

15   A.  Our conversation was brief.

16   Q.  Right.

17   A.  It was less than five minutes.  The steps that he and

18   other colleagues took to thoughtfully evaluate whether or not

19   they could continue to offer those services, the decision was

20   "no" and how they were actually executing on closing that

21   service.  That was the limit to our conversation, which was

22   probably less than five minutes.

23   Q.  I believe you provided information or testified that

24   Dartmouth-Hitchcock now uses Boston IVF to provide reproductive

25   endocrinology instruction to its residents, correct?

1    A.   That is my understanding.

2    Q.   Okay.  And I think you indicated that residents now go to

3    the Catholic Memorial.  What's the hospital?

4    A.   They used to do their obstetrical training at Catholic

5    Medical Center in Manchester.  However, they however they spent

6    two months with Boston IVF to get their experience in

7    reproductive endocrinology.

8    Q.   And is it your understanding that's still where they get

9    the reproductive endocrinology instruction is through Boston

10   IVF?

11   A.   I have not been informed it's otherwise.

12   Q.   So do I correctly infer that you're saying that, as far as

13   you know, that's still the relationship, right?

14   A.   No one has informed me that that's changed.

15   Q.   No one has informed you?  Okay.  Has anyone told you that

16   the residents at Dartmouth-Hitchcock get reproductive

17   endocrinology instruction at the University of Vermont Medical

18   Center here in Burlington?

19   A.   They have not.

20   Q.   And has anyone said to you that the person providing that

21   instruction is Dr. Misty Porter, who is the same person who

22   provided instruction when she was at Dartmouth-Hitchcock?

23   A.   They have not.

24   Q.   What is it that makes you believe that Boston IVF is cape

25   -- do you believe that Boston IVF is capable of providing

VOLUME: 7
PAGES: 222-431

1    adequate instruction in reproductive endocrinology to the

2    residents?

3    A.    In my previous experience of Morristown Memorial Hospital

4    in northern New Jersey, our reproductive endocrinology and IVF

5    experience for our residents was provided by the private group

6    across the street who had a robust practice.  One has to

7    consider that, when residents are doing subspecialty training,

8    it is to introduce them to the subspecialty so, as a general

9    obstetrician, they understand when they should refer people to

10   that specialty.

11        If they choose to continue their training, they would then

12   take a fellowship in that subspecialty in order to get

13   additional training, but it is an introduction and making sure

14   that they have the appropriate awareness that they can practice

15   OB/GYN, general OB/GYN effectively.

16   Q.    Does Boston IVF do anything other than to provide IVF

17   services?

18   A.    I do not know.

19   Q.    For example, if you have young girls, women showing up

20   with uterine abnormalities, is that something they deal with?

21   A.    I do not know.

22   Q.    If they show up with difficulties with abnormal bleeding,

23   is that something they deal with?

24   A.    Most of the things that you're talking about would show up

25   in our emergency room.

VOLUME: 7
PAGES: 222-431

1    Q.    I was wondering about the instruction that you think

2    they're getting when they go to Boston IVF for reproductive

3    endocrinology.

4    A.    I would rely on Ilana Cass, the current chairman of the

5    department of OB/GYN, to make sure that her residents get the

6    appropriate training.  She, her program is reviewed on a

7    periodic basis by the American College of OB/GYN to make sure

8    that their training is appropriate and sufficient.

9    Q.    When you met with Ed Merrens and you got this briefing

10    about the REI division, that was, what, maybe two months, three

11    months after the REI division was closed, correct?

12    A.    It was probably in late August or early September,

13    probably late August.

14    Q.    Okay.  And were there still ongoing discussions about

15    placement of physicians, nurses, others who had worked in the

16    REI division?

17    A.    I do not know.

18    Q.    So whatever, when you say you don't know, you don't know

19    whether he said it, or you don't know whether it was, it

20    actually was occurring?

21    A.    He did not say anything about that to me, and I have no

22    knowledge whether or not those conversations were continuing.

23    Q.    Other than this one five-minute briefing with Ed Merrens,

24    other than that one session, have you had discussions with

25    anyone else at Dartmouth-Hitchcock about the circumstances

1    leading to the decision to close the REI division?

2    A.    No.

3    Q.    And what I think I'm hearing you say is, as far as you

4    were concerned, by the time you had the briefing from Ed

5    Merrens, it was done, over, closed.  That's in the past, and

6    you were going forward, right?

7             ATTORNEY SCHROEDER:  Objection.

8             THE COURT:  Sustained.

9    BY ATTORNEY VITT:

10   Q.    Did you think that there was any residual issues

11   associated with the decision to close the REI division at the

12   time you spoke to Ed Merrens?

13   A.    I had no reason to think that there was any other issue

14   that would require my involvement or attention.

15   Q.    So, as far as you were concerned, it was a closed matter,

16   over, done with it, right?

17            ATTORNEY SCHROEDER:  Objection, Your Honor.

18            THE COURT:  It's the same question.  Sustained.

19   BY ATTORNEY VITT:

20   Q.    All right.  Do you receive -- do you recall receiving a

21   letter from medical students, alumni medical students and

22   residents who had gone through the REI program?

23   A.    No.

24   Q.    Let me show you a letter, see if this refreshes your

25   recollection.  It's a two-page letter addressed to you signed,

1    I think, by 28 -- and I'll give a copy to --

2            ATTORNEY SCHROEDER:  May we approach, Your Honor?

3            THE COURT:  Yes.

4                (Bench conference begins.)

5            ATTORNEY SCHROEDER:  I haven't seen this document

6    yet, but I can assume that it's not an exhibit on the list and

7    he's just going to throw it in play here, because he wanted to

8    give me a copy.  So, therefore, I have to assume it's not on

9    any of the lists.  So I would object to any line of inquiry on

10   that.  We've talked at length about including all documents

11   that might be exhibits in this case, and I have to assume that

12   this article is from, I don't know, eight years ago.  And so,

13   therefore, why he's just bringing it up at 3:40 today, the

14   seventh day of trial, I'd like to understand why before we get

15   into an objection.

16           THE COURT:  What is it?

17           ATTORNEY VITT:  I'm sorry.  What?

18           THE COURT:  What is it?  What's the document?

19           ATTORNEY VITT:  It's a letter from, I think it's 28

20   alums of either medical students who had trained in the REI

21   division or residents who had trained in the REI division to

22   Joanne Conroy talking about the circumstances leading to the

23   closure of the REI division.

24           THE COURT:  That wasn't part of the deposition?

25           ATTORNEY VITT:  I think --

1          ATTORNEY SCHROEDER:  No.  It's not even dated.  This

2     is, this is -- I object to this whole line of inquiry, Judge.

3     He's been sitting on this.  This is just par for the course in

4     this whole case, Judge, sitting on documents, not sharing them,

5     and then throwing them out at the last minute.  This is not how

6     you instructed us to conduct ourselves, and we certainly didn't

7     act that way.  And I haven't seen this document before.  It

8     wasn't raised in her deposition.  I don't know.  It's not even

9     dated.  So yeah.

10          ATTORNEY VITT:  Well, actually, I didn't have it at

11     the time of the deposition.  That, we got it --

12          ATTORNEY SCHROEDER:  Are you representing that you

13     just got it?

14          ATTORNEY VITT:  Define just.

15          ATTORNEY SCHROEDER:  No.  The deposition happened in

16     2019.

17          ATTORNEY VITT:  Yeah.

18          ATTORNEY SCHROEDER:  Okay.  You haven't produced it

19     in this case, right?

20          ATTORNEY VITT:  Well, by the time we got this, we

21     were already, this case was, I think, over and done, I mean,

22     including it went to the court of appeals.  Just refreshing her

23     recollection.  Go ahead.

24          THE COURT:  As I recall, you were going to introduce

25     this to refresh Dr. Conroy's recollection, which means you will

VOLUME: 7
PAGES: 222-431

1    read from the document like you would from a deposition?

2              ATTORNEY VITT:  I wouldn't be reading from the

3    document I would be presenting this to the Witness to see if it

4    refreshes her recollection.

5              THE COURT:  And then removing the document, and it

6    wouldn't be in evidence?

7              ATTORNEY SCHROEDER:  Understand, Judge, it hasn't

8    been shared at any point in this case.  I haven't even looked

9    at it.

10             ATTORNEY COFFIN:  The discovery has been closed for

11   years in this case due to the unusual procedural circumstances,

12   but this should have been produced to us.  We've had repeated

13   nondisclosure issues.

14             ATTORNEY SCHROEDER:  Judge.  This isn't a letter from

15   2025 or 2024 or 2023.  It's a letter from 2017.

16             THE COURT:  Parties can refresh a witness's

17   recollection with any material.

18             ATTORNEY JONES:  He's offering it just, he's offering

19   it solely for the purpose of determining, for seeing if it

20   refreshes her recollection.  If it does, then he'll ask her

21   about her recollection.  If it doesn't, he'll move on.  But

22   this is not a responsive document to any discovery request.

23             ATTORNEY SCHROEDER:  Why would he be asking questions

24   about it?

25             ATTORNEY COFFIN:  He can't ask anything substantive

VOLUME: 7
PAGES: 222-431

1    about it if she remembers it or not, and it's hearsay issues,

2    and we still have this nondisclosure, anything substantive

3    about the letter.

4        ATTORNEY SCHROEDER:  Judge, you asked us earlier

5    about the declaration of Dr. Russell and why it was on our

6    list.  We put anything that could be possibly used on

7    impeachment on the list because we wanted to make sure, I

8    think, not to surprise anybody.

9        THE COURT:  And the parties have generally been

10   complying with that particular directive, right, disclosing

11   everything that is used for impeachment.  So this is not

12   disclosed, and I appreciate you're trying to use it to refresh

13   recollection, but it seems like it would be not in the spirit

14   of kind of the reciprocal disclosures you've all been making

15   until now.  So I'm going to say you can't use it.

16       ATTORNEY VITT:  All right.

17       (Bench conference ends.)

18       ATTORNEY VITT:  No further questions, Judge.

19       THE COURT:  Okay, thank you.  Mr. Schroeder?

20       ATTORNEY SCHROEDER:  No questions at this time, Your

21   Honor.

22       THE COURT:  Okay.  You may step down.

23

24       THE WITNESS:  Thank you.  What should I do with this?

25            (Indicating.)

VOLUME: 7
PAGES: 222-431

1           THE COURT:  You can just leave that there.  Mr. Vitt,

2    you have some exhibits up here if you'd like to take those.

3    Okay.  Plaintiff may call the next witness.

4                      IRA BERNSTEIN,

5           having been duly sworn to tell the truth,

6                  testifies as follows:

7           THE COURT:  Please go ahead.

8                  DIRECT EXAMINATION BY ATTORNEY VITT

9    Q.   Good afternoon, Dr. Bernstein.

10   A.   Good afternoon.

11   Q.   Would you provide us with a little background of what your

12   position is now and how long you've held that position?

13   A.   Well, right now I am a professor and university scholar at

14   the Larner College of Medicine at the University of Vermont.

15   Up until June of last year, I was also the John Van Sicklen

16   Maeck chair of the department.  So for 12 years I was the chair

17   of the department of OB/GYN and chief of the clinical service,

18   which is at the hospital.  So the hospital has an affiliated

19   connection to the departments which are on the academic side.

20   So I ran the clinical service as well as the academic service.

21   Q.   Do you know Dr. Misty Porter?

22   A.   I do.

23   Q.   How do you know her?

24   A.   I think I first met her in 1989 when she began her

25   internship with us at the University of Vermont.  I was a

VOLUME: 7
PAGES: 222-431

1    third-year fellow in maternal fetal medicine and joined the

2    faculty right after that.  So, during the time of her residency

3    and then following that during her fellowship, we were, I was

4    her teacher and a colleague.

5    Q.   All right.  So you've worked closely with her for many

6    years?

7    A.   Well, certainly, during the years of her residency, we

8    worked closely.  During her fellowship, not as close, because

9    that was a subspecialty that I was not engaged in.  But, for

10   the part of her residency, very close.

11   Q.   How would you describe her performance as a resident?

12   A.   She was a really good resident.  She was quite skilled

13   surgically.  She was committed to excellence, and I never had a

14   problem with her relative to the performance of her clinical

15   activities.

16   Q.   Does she hold herself to high standards?

17   A.   Very much so, yes, perhaps higher than some of her

18   colleagues and others, yes.

19   Q.   All right.  Has the University of Vermont had a

20   reproductive endocrinology division?

21   A.   Yes, we have, yes.

22   Q.   For how long?

23   A.   So I don't know exactly when it started.  The American

24   Board of OB/GYN recognized and identified reproductive

25   endocrinology as a subspecialty in 1972.  I was a medical

1    student at UVM from 1978 to 1983, and, during that time, I

2    rotated on the reproductive endocrine service.  So I know that

3    in 1981 it existed.  I don't know exactly between 1972 and 1981

4    when it started.  And I know that their first fellow graduated

5    in 1984, so subspecialty trained in reproductive endocrinology

6    was 1984, and so the division had to have been present for

7    quite some time before that.

8    Q.   Does a reproductive endocrinology division do things

9    besides IVF?

10   A.   Yeah, absolutely.  In fact, the American Board of OB/GYN

11   identifies a whole series of competencies and excellences that

12   are expected for those who train in reproductive endocrinology:

13   minimally invasive surgery and the care of gynecologic

14   complications and medical issues related to gynecology are

15   among those.

16   Q.   Would it be accurate to say that IVF is a small portion of

17   what a reproductive endocrinology division does?

18              ATTORNEY McDONALD:  Objection, Your Honor.

19              THE COURT:  Basis?

20              ATTORNEY McDONALD:  He doesn't have a foundation to

21   testify with regard to all REI divisions.

22              THE COURT:  So I'll overrule the objection.  The

23   Witness can answer if he knows.

24              THE WITNESS:  So I will say it's highly variable,

25   frankly.  In fact, there are some reproductive endocrine groups

1    which are predominantly focused on IVF.  Academic reproductive

2    endocrine groups tend to be less focused on IVF.  So there is

3    often a broader spectrum of clinical care involved in academic

4    reproductive endocrine groups, but it varies tremendously,

5    frankly.

6    BY ATTORNEY VITT:

7    Q.    So the group at University of Vermont is an academic

8    focused?

9    A.    Yes, correct.

10    Q.    And how about the reproductive endocrinology division at

11    Dartmouth-Hitchcock?

12    A.    So, in its affiliation with Dartmouth and it's a

13    university hospital, I would consider it an academic center,

14    and I think they probably consider themselves an academic

15    center.

16    Q.    Right.  Do you recall hearing that Dartmouth-Hitchcock had

17    decided to close its REI division?

18    A.    Yeah, I had it communicated to me through, electronically

19    through email, yes.

20    Q.    Do you recall your reaction?

21    A.    Well, I was surprised.  It certainly was an unusual move

22    for an academic medical center to close a primary division

23    within its department of OB/GYN, so it surprised me.

24    Q.    And do you recall hearing that Misty Porter's employment

25    had been terminated?

VOLUME: 7
PAGES: 222-431

1    A.    I remember hearing that.  Again, I can't tell you exactly

2    who I heard that from, but I knew that it was part of the

3    disbanding of the division at Dartmouth-Hitchcock.

4    Q.    Was that a surprise to you?

5    A.    It was a surprise to me.  I knew her work, and I knew her

6    history and her commitment to Dartmouth-Hitchcock.  So it

7    definitely was a surprise.

8    Q.    Can you imagine the University of Vermont ever deciding to

9    close its REI division?

10   A.    So I can imagine it, but I can't imagine planning it,

11   frankly.  I mean, I think that, you know, there are a number of

12   primary divisions within the department of obstetrics and

13   gynecology that we are responsible to train our residents in,

14   and we have a fellowship to train fellows in that subspecialty.

15   And so in that, excuse me, in that context it's a primary

16   division, and things happen.  People leave voluntarily, and

17   sometimes you go without certain kinds of providers for periods

18   of time, but as a chair it's hard for me to imagine

19   intentionally closing down a primary division.

20   Q.    Have there been times when the University of Vermont

21   Medical Center has had, say, difficulty with having enough

22   nurses?

23   A.    Yeah, absolutely.

24   Q.    Tell me about it.

25   A.    So our reproductive endocrine division is actually a

1    really good example of that.  When I first became chair in
2    2012, we had a group of reproductive endocrinologists who
3    elected to go into private practice in the community, and, when
4    they left to do predominantly IVF -- and so this was moving the
5    IVF facility out of our program -- they took with them our IVF
6    nurses and our IVF staff, and so we were left without an IVF
7    team, which, as I said, it's not exclusively the piece of
8    reproductive endocrinology that we manage, but it was, it's a
9    significant portion.
10         And so we had no IVF nurses and no IVF doctors.  Actually,
11   we had one IVF doctor who shortly left after that.  So we
12   needed to rebuild the program, but there was never a question
13   of us rebuilding the program.  We were not going to abandon the
14   program.
15   Q.   You managed to get the nurses hired and trained?
16   A.   Yes, yes.
17   Q.   Did Dartmouth-Hitchcock agree -- excuse me.  Did
18   Dartmouth-Hitchcock make a request to UVM after the REI
19   division was closed?
20   A.   Yes.
21   Q.   Can you tell me about that?
22   A.   Well, I'm confident that they recognized that the training
23   of their residents in reproductive endocrinology and fertility
24   was an important piece of their residency program, and they
25   also recognized that they had patients who needed care.  So

1    there were two pieces to the requests that came forward.  One

2    was how could we coordinate clinical care to best facilitate

3    the care of patients that were still in their region and then

4    how could we facilitate the training of their residents in some

5    way to allow them to have exposure to academic reproductive

6    endocrinology and fertility.

7    Q.   So did you assist in the training of the residents?

8    A.   Yes.

9    Q.   Tell me how you did that.

10   A.   The nature and structure of the residency programs are

11   such that residents rotate through different rotations and get

12   to see different pieces of the subspecialties of OB/GYN.  At

13   the time, I think it was our third-year residents -- it might

14   have been second- or third-year residents -- were rotating

15   through our reproductive endocrine rotation, but they only use

16   six months to get their rotations completed.  We have three

17   residents per year.  They each do a two-month rotation.

18        So six months in that year, that same year that our

19   residents were rotating through, we had six months that were

20   uncovered and had the opportunity to continue to train

21   residents, in this case, the Dartmouth-Hitchcock residents,

22   during the other six months.

23   Q.   And was there a doctor on your staff who ended up doing

24   most of that training?

25   A.   I can't speak to that because I wasn't in the rooms at the

VOLUME: 7
PAGES: 222-431

1    time, but I would say that we had a team of REI docs at that

2    time who were very active in the training and they, they owned

3    that training, both the division director and the members of

4    the division at that time.

5    Q.    Was Dr. Porter one of those?

6    A.    She sure was, yes.

7    Q.    And did she take an active role in the training?

8    A.    Yes, she did.

9    Q.    These were the actual residents who had been at

10    Dartmouth-Hitchcock when she was there, except now she's

11    training them at UVM?

12    A.    Well, for some window of time, that was true, and then,

13    obviously, three of them graduated, and new residents came

14    through.

15    Q.    Can you tell me, please, the circumstances under which

16    Misty Porter came back to working at UVM?

17    A.    Well, I think it started right around the time that --

18    first, the nurses left and created a vacuum for the service,

19    and then the division was disbanded.  I think both Leslie

20    DeMars, who was the chair at the time, and Misty reached out to

21    us to try to facilitate the care of their patients, and we were

22    trying to figure out how could we accommodate Misty, so how

23    could we put her into our clinical schedule to let the patients

24    come up to Burlington to get the kind of care that they needed.

25          And that was a process that took some time.  Both the

VOLUME: 7
PAGES: 222-431

1 residency training and the clinical affiliation took some time

2 to work through the details and figure out exactly how that was

3 going to work, and we went through several iterations of what

4 that might look like, both first an affiliation with Dartmouth

5 and then, after Misty formally left Dartmouth-Hitchcock, for

6 her to continue to provide care to some of those patients, as

7 well as the new patients.

8 Q. And did she come to work at a .8 FTE?

9 A. I can't say I remember exactly where she started, but, at

10 some point during her time with us, she either requested or

11 maybe even when we started she was working at a .8 FTE.

12 Q. And did that include covering call?

13 A. Yes, yes.

14 Q. Could you describe what's entailed in being available to

15 provide call services in an OB/GYN department?

16 A. So I think people typically think of OB/GYN department

17 call as delivering babies, which it is, but that's on the

18 obstetric side.  On the gynecologic side, we have emergencies

19 that come through our emergency room every day:  women who have

20 bleeding problems, abnormal pregnancies in very early pregnancy

21 that need acute care.  And on the gynecology side that's very

22 common, and sometimes those women need some, need skilled

23 surgeons, and not all of our docs who are on call have those

24 skills.  So we have a back-up system for providing those

25 skills.

VOLUME: 7
PAGES: 222-431

1          If we think about the reproductive endocrine group

2     specifically, they're managing medications and other kinds of

3     issues for their IVF patients but also complicated surgeries

4     and backup to the general gynecologists who are on.

5     Q.    Is Misty one of the surgeons who could provide the

6     necessary surgical skills in the complicated cases?

7     A.    Yeah, she's actually one of our most skilled surgeons.

8     Q.    Could you elaborate a little bit about the types of

9     surgery she is trained to perform?

10    A.    Yeah.  I think, and, in fact, one of the board

11    expectations of those who train in reproductive endocrinology

12    and infertility is to be really good at what we call minimally

13    invasive surgery.  That's the kind of surgery where you don't

14    make full incisions in people, but you make small incisions and

15    you work through a scope, and there are two primary ways that

16    we do that.

17         We do that with something called straight-stick

18    laparoscopy where you put in a telescope and you look through

19    it directly and you do surgery with other holes that have

20    instruments in them, and you do it robotically where you sit at

21    a console and all of the instruments are controlled remotely

22    with a robot.  And Misty is very skilled at both the

23    straight-stick laparoscopy and the robotic surgery.

24    Q.    Is that unusual, to have the skills to be able to do both

25    of those things with some measure of expertise?

VOLUME: 7
PAGES: 222-431

1    A.   Well, I mean, we have a number of providers who do that,

2    but it's not all the providers and not a majority of the

3    providers.  So we probably have a handful of providers who have

4    that skill set.

5    Q.   In terms of taking call for gynecological reasons, is it

6    necessary that the doctor be relatively close to the hospital

7    so that the doctor can get there quickly after getting the

8    call?

9    A.   That may seem intuitive, but we certainly have people who

10   live all over the place, but we try to create a guideline that

11   you need to be able to be at the hospital within 30 minutes of

12   a call predominantly for surgical, urgent surgical cases, but

13   as well as for urgent obstetrical cases.

14   Q.   So, for Misty to do it, she has to be, have a residence

15   somewhere in the Burlington area, right?

16   A.   Well, she's got to be able to get to the hospital within

17   30 minutes.  So, unless she's got a personal helicopter, I

18   think she's got to live pretty close.

19   Q.   All right.  I'd like to talk about Misty as a colleague.

20   You and she have worked together for number of years.  What's

21   she like as a colleague?

22   A.   Yeah, I think we touched on this earlier.  I think she's

23   someone who has high expectations of herself for excellence and

24   high expectations of others and she likes to work in a

25   high-performing environment.

1    Q.   What does that mean?

2    A.   An environment that provides the highest level of clinical

3    care, that interacts efficiently to standard of care end

4    points.

5    Q.   And have you found that she has been willing -- let me --

6    has she been willing to assist residents and nurses in

7    connection with training and getting them up to speed and

8    getting to be better?

9    A.   Very much so, very much committed to supporting, you know,

10   and being available.  We have, the nature of our academic

11   practice is we have new people coming in all the time, and

12   figuring out how to support those new people and learning how

13   to do surgery is a really important part.  And, in fact, Misty

14   helped us create in our department a policy around bringing new

15   people in in her role for vice chair for education and academic

16   affairs and took the lead role in helping to bring people in

17   and train them.

18   Q.   When you say she was vice chair, can you explain the scope

19   of her duties?

20   A.   So our vice chair for education and academic affairs, the

21   primary responsibility is coordinating our retreat.  We have an

22   annual retreat for education which focuses on all of the levels

23   of education involved in our department and includes medical

24   student education, resident education, and fellow education, as

25   well as education of our faculty, and we have a retreat each

1    year to do that.

2        She would schedule that retreat and coordinate it.  We

3    also developed a program which I just mentioned which was, How

4    can we best help our new faculty to, first, to know that

5    they're up to speed in terms of their performance and then to

6    support them and help provide mentorship, and she helped to

7    create that program as well.

8    Q.   The mentorship part, she's quite good at, is she?

9    A.   Yeah, she was very good at it in our department, very

10    good.

11    Q.   Would you say that it would be accurate to describe her as

12    a straight shooter?

13    A.   Very much so.

14        ATTORNEY VITT:  Excuse me a second.  no further

15    questions, Judge.

16        THE COURT:  Okay.  Cross-examination?

17        CROSS-EXAMINATION BY ATTORNEY McDONALD

18    Q.   Dr. Bernstein, how are you?

19    A.   Good.  Nice to meet you.

20    Q.   Nice to meet you.  My name is Morgan McDonald.  First, I

21    just want to start by asking, did you review any documents in

22    preparation for your testimony today?

23    A.   I did look back at some of my email exchanges around the

24    time of the events that led to our, this discussion.  In other

25    words, when I first learned that the nurses, the first

1    communication I had around when the nurses were no longer

2    available and then the first communication from Leslie DeMars

3    about re, what she described, I think, initially as

4    reorganization of the REI division.

5    Q.    Did you review any materials that were prepared by counsel

6    for Dr. Porter?

7    A.    No.

8    Q.    I'm going to show you what's been admitted into evidence

9    as Exhibit C6A if I could just ask that to be pulled up,

10    please.  I'm going to ask -- yes, Page 7.  Thank you.  I'll

11    just ask you to take look at that.  First, well, I'll give you

12    a moment to review.

13    A.    Yeah, I got it.

14    Q.    Great.  So this is a text that was sent on May 5th 2017

15    from Lisa McGee, and she says, "Hi Misty.  I spoke to Ira this

16    morning and he agreed, if you want it, we can do a per diem

17    arrangement pretty quickly for June".

18          Fair to assume that you're the Ira in that text?

19    A.    I am.  I think so too.

20    Q.    So would you agree with me that, as of May 5th, you had

21    agreed to offer Dr. Porter a job at UVM?

22    A.    So per diem, I would -- the question of a job is a

23    different one.  So a per diem agreement means that somebody can

24    come and work hours that aren't defined.  We don't consider

25    that a formal position or a job, but that we consider it a

VOLUME: 7
PAGES: 222-431

1    opportunity.  And I would say that this was very clearly in

2    follow-up to her and her, the chair of the department reaching

3    out to try to figure out how to provide continuity for the

4    patients who were not going to be able to be available at

5    Dartmouth-Hitchcock.

6    Q.   And are you aware that the day before Dr. Porter had been

7    informed that her employment at Dartmouth-Hitchcock was being

8    terminated?

9    A.   I don't think I knew that at the time.

10   Q.   All right.

11            ATTORNEY VITT:  Could you get closer to the

12   microphone?  I'm sorry.

13   ATTORNEY McDONALD:

14   Q.   Sorry.  I'll direct your attention to the second-to-last

15   sentence there, "No strings attached for longer term so you

16   could still take the Boston option if it suits your needs

17   better".

18            So the reference to Boston option, would you agree with me

19   that it appears that Dr. Porter had other options as well?

20   A.   Yeah, it looks like she was trying to figure out what she

21   was going to do next.  And, in that same context, so the idea

22   that we were offering her a job wasn't exactly -- she was going

23   to look around, and we were going to try to give her a

24   temporary opportunity.

25   Q.   Sure.  Do you have a sense of what the Boston option

1      refers to?

2      A.   I don't, actually.

3      Q.   All right.  And then I'll just ask you to take a look at

4      the next page, which is 8.  We'll put it on the screen for you.

5      Sorry.  That's not the correct page.  I'll actually move on

6      from that one.

7           So you testified today that Dr. Porter joined UVM in less

8      than a full-time capacity.  You're not sure if it's maybe .7 or

9      .8.  Actually, let me rephrase.

10          You testified today that, at some point, Dr. Porter worked

11     in less than a full-time capacity; is that right?

12     A.   We actually consider full-time at UVM  .75 or more.  So I

13     would consider it full-time at .8.  They get full benefits, but

14     not a 1.0, if that's the question, yes.

15     Q.   It is.  Thank you.  And are you aware that she worked at a

16     1.0 basis at Dartmouth-Hitchcock?

17     A.   I did not know that.  Yeah.

18     Q.   And you testified today about Dr. Porter's call schedule

19     at UVM.  You're not aware of what her call schedule looked like

20     at Dartmouth Health, correct?

21     A.   Correct.

22     Q.   You also testified today about a number of surgeries that

23     Dr. Porter is skilled in.  You're also not aware that, about

24     whether anyone at Dartmouth Health could perform those kinds of

25     surgeries, are you?

1    A.    That's correct.  I do not know.

2    Q.    Are you eligible for a pension?  Or, excuse me, were you

3    eligible for a pension during your time at UVM?

4    A.    So there is no pension option at UVM.  We have a 403(b)

5    contribution that's matched by the institution which is

6    independently supported.  So there's no specific pension, no.

7    Q.    Do you know whether Dr. Porter Would be eligible for that

8    program that you just described?

9    A.    Yeah.  So, after about six months of employment at the

10   university, there are matching plans that both the medical

11   center and the university offer based on your income, and it's,

12   it's varied depending on how long you work on the UVM, on the

13   hospital side, and it's 10 percent on the UVM side.  And so

14   each of the employees -- it's complex because each of the

15   employees who works at the hospital actually has two paychecks,

16   a university paycheck which is part of the academic

17   appointment, and a hospital paycheck which covers their

18   clinical effort.

19   Q.    Got you.  Okay.  Thank you.  You testified today that,

20   from your perspective, Dr. Porter has high expectations of

21   herself and others.  Would you say those expectation are higher

22   than most?

23   A.    Yes.  Higher than most, I would agree with that.

24   Q.    Has Dr. Porter ever raised any concerns or complaints

25   about the processes and procedures at UVM?

VOLUME: 7
PAGES: 222-431

1    A.    Yes.

2    Q.    And what were the nature of those complaints?

3    A.    I think she was concerned in our IVF program.  When she

4    first joined, I think she was concerned about some of the

5    clinical decisions that were being made, and I think she didn't

6    always agree with them, and I think that she was concerned

7    about the process by which those decisions got made.

8    Q.    And are you aware of any complaints or concerns from

9    Dr. Porter about her colleagues?

10   A.    Yes.

11   Q.    Can you describe the nature of those concerns or

12   complaints?

13   A.    I don't know that I could give you details because it was

14   a while ago, but I think she was concerned about some of the

15   clinical decision making around her in the reproductive

16   endocrinology group.

17   Q.    And how did she raise those concerns or complaints?

18   A.    I think she raised them -- oh, so by hearsay I've heard

19   that she raised them in group meetings when she was meeting

20   with other team members in the IVF, and then she, I would have

21   meetings with her regularly as I did with all my faculty, and

22   he raised occasional concerns with me directly.

23   Q.    During your time as chair, how many people reported

24   directly or indirectly to you?

25   A.    Approximately okay?

1    Q.   That's fine.

2    A.   About ten.

3    Q.   And would it be fair to say that each of them sort of had

4    a different method of practicing?

5    A.   Yeah, absolutely.

6    Q.   Because there's no really one way to practice medicine,

7    right?  Everyone kind of has their own individual way of doing

8    things?

9    A.   Yes, yes.  So there are standards of care that are

10   well-established practice patterns that are consensus patterns

11   based on evidence, and so there are limits to the expectations

12   for care, but there is, within excepting those standards,

13   outside of those there's always variation in clinical care and

14   decision making, for sure.

15   Q.   And it's fair to say that different physicians have

16   different strengths and weaknesses, correct?

17   A.   Yes.

18   Q.   And also that physicians sort of will progress in their

19   skills at different speeds, correct?

20   A.   Absolutely.

21   Q.   And you would agree with me as well, I think, that

22   there's, to build a successful team division in a hospital,

23   OB/GYN division, for example, there has to be a certain level

24   of communication between everyone on the team, correct?

25   A.   Absolutely.

1    Q.   And everyone has to sort of listen to one another's ideas?

2    A.   Yeah.

3    Q.   And physicians have different ways of practicing, and they

4    would have to sort of listen to one another and understand that

5    there are differences in the way they practice, correct?

6    A.   Yeah, but I think that, as long as those are within

7    reasonable standards of care, that -- again, I haven't

8    practiced clinical medicine for a little while, but, when I was

9    doing it, it was very common to have a lack of consensus

10   necessarily for some issues, and you allow the person who's in

11   charge at that day to make that final decision.

12   Q.   I'm sorry.  Your testimony was that the person who is in

13   charge would be the one that would make the final decision on

14   that?

15   A.   Yeah.  I mean, we try to segregate responsibilities so

16   that one person is in a decision-making capacity at any given

17   point in time in a given environment, and you try to encourage

18   them to do what you think is right, and you have legitimate

19   academic arguments, and then that person ultimately decides.

20   Q.   And so is it fair to say that a division, in order to be a

21   successful division, a division would have to have a general

22   willingness to communicate among everyone that's within the

23   division?

24   A.   Yes.

25   Q.   Switching gears a little bit, are you aware of any recent

1    division or program closures at UVM?

2    A.    Well, not in OB/GYN, but I know that, in response to the

3    Green Mountain Care board, there was some changes

4    institutionally.  I don't really know the details of what was

5    closed.  I think the renal support, some of the renal support

6    was closed as an institutional decision.  I don't really

7    remember.  I think transplant may have been closed as a result

8    of some cost-cutting measures, couple of cost-control measures.

9    So, yeah, I am definitely aware that there are things that do

10    change over time.

11    Q.    And would, is, decision to close those, I think you said

12    was subsequent to your retirement; is that right?

13    A.    Yes, it was after I stepped down.  My understanding is

14    that they were fiscally based.  They were financially based on

15    the Green Mountain Care Board decision.

16    Q.    Okay.  So it's fair to say that there are instances in

17    which hospitals will close divisions for reasons including

18    perhaps financial decisions and that those are difficult

19    decisions that have to be made?

20    A.    Absolutely, yes.

21            ATTORNEY McDONALD:  Thank you.  I have nothing

22    further.

23            THE COURT:  Okay.  Any redirect?

24            ATTORNEY VITT:  No, Your Honor.

25            THE COURT:  Okay.  Thank you, Dr. Bernstein.  You may

VOLUME: 7
PAGES: 222-431

1    Step down.

2              ATTORNEY VITT:  I'm sorry.

3              THE COURT:  Mr. Vitt?

4              ATTORNEY VITT:  I think we have gone through all our

5    witnesses for the moment.  If Your Honor would be inclined to

6    call it a day, that would be great.

7              THE COURT:  Okay.  I don't think there will be

8    protest from the jury.  Okay.  So it's almost 4:20.  You're

9    going to break ten minutes early today.  As usual, please do

10   not talk to anyone about the case or to one another or do any

11   independent research on your own about the case.  Have a good

12   evening.

13             (The Jury leaves the courtroom.)

14             THE COURT:  Okay.  Mr. Jones, I feel like, at this

15   time of day, you and I are the ones who end up talking about

16   scheduling.

17             ATTORNEY JONES:  We do.  Tomorrow morning we will be

18   calling Dr. Ed Merrens, who I believe is the final witness of

19   our case in chief.

20             THE COURT:  Okay.

21             ATTORNEY JONES:  I predict we'll be done by lunch,

22   but, I mean, I think cross-examination, if any, would

23   contribute to that estimate.

24             THE COURT:  Okay, all right.  So then the plaintiff

25   anticipates resting tomorrow, and then defense case?

VOLUME: 7
PAGES: 222-431

 1         ATTORNEY SCHROEDER:  Well, before that, Your Honor,
 2    we might move for directed verdict, so I'm sure you anticipated
 3    that I might say that.  And we'll be ready to go right after
 4    that, and I've already communicated earlier that, more likely,
 5    the first three witnesses, not sure of the order yet, but Judy
 6    Stern, Katy Mansfield, and Kelly Mousley, and I suspect --
 7    well, not only do I suspect, I'm fairly confident we'll be able
 8    to finish them by the end of the day.
 9         THE COURT:  Okay, all right.  I had mentioned a
10    couple of days ago about getting together and talking about
11    whether aspects of the jury instructions, if there's any
12    aspects of that that you're in agreement on.  As I'm working
13    through these instructions, as you can imagine, you've
14    generated proposed instructions.  Even some of the more kind of
15    what I'll call simpler elements can be a little somewhat
16    involved.
17         So, if there are agreements, I'm thinking in particular
18    about whether Dartmouth is an employer subject to the ADA, for
19    example; whether Dr. Porter had a disability within the meaning
20    of the ADA, just putting these out there.  And, also, the
21    question of otherwise qualified to perform the essential
22    functions of a job, if that's something that the parties may be
23    in agreement on, or any other things.  I raised it a couple of
24    days ago.  I think now I should put a finer point on it.
25         How about, by this time tomorrow, let's figure out if

VOLUME: 7
PAGES: 222-431

1    there is anything that you can agree to with respect to these

2    instructions.  Is that reasonable?

3              ATTORNEY SCHROEDER:  I think that's reasonable, Your

4    Honor.  I do know that we expect to supplement this week to

5    you.  And so I think tomorrow is Wednesday.  I think, by the

6    end of the day, we'll be able to figure out which ones we are,

7    the simpler ones that I think we can get to.  But I certainly

8    expect that by Thursday to get some additional supplemental

9    jury instructions for opposing counsel to consider as well --

10             THE COURT:  Okay.

11             ATTORNEY SCHROEDER:  -- to supplement it.  Because I

12   do think there they may be a robust set of jury instructions

13   that you end up having at the end of the day.  Just, there are

14   six claims in the case, and there's a number of theories that

15   are bandying about.  So I think, by Thursday afternoon, we

16   would expect to get them to you if that's acceptable to the

17   Court.

18             THE COURT:  Okay.  So I know your case hasn't started

19   yet, but, in terms of -- do you know the number of witnesses at

20   this time, just to give us a little preview in terms of how far

21   we anticipate going into next week?  And I only ask that

22   because, at some point, obviously, we're going to need to have

23   a charge conference, and, assuming -- I know you're making a

24   motion tomorrow, but, assuming we move forward, to discuss

25   those jury charges.

VOLUME: 7
PAGES: 222-431

1      So I just wanted to make sure that I'm giving counsel

2    enough time to take a look at what the Court has generated so

3    we can have kind of a meaningful charge conference.

4            ATTORNEY SCHROEDER:  I think I appreciate, Your

5    Honor.  I think that, at this point, the likelihood of us

6    resting on Monday is fairly high.

7            THE COURT:  Okay.

8            ATTORNEY SCHROEDER:  And I would hope -- the hope was

9    to get to you by Thursday our supplemental jury instructions so

10   that, to the extent that you wanted us to look at anything over

11   the weekend, we will hopefully be close to wrapping up, and

12   then on Monday one or two witnesses and then, obviously,

13   closings and dealing with those issues.  But I certainly

14   expected that we would be in a position, both sides, to review

15   a number of these issues over the weekend to the extent that

16   you had anything you wanted us to review for the charge

17   conference in addition to preparing closing statements.  So

18   that maybe that would slide into Tuesday morning, but I don't

19   know.  I'm pretty optimistic that we can move things along and

20   be done with our case in chief by Monday afternoon.

21           THE COURT:  Monday afternoon?  Okay, all right.

22           ATTORNEY SCHROEDER:  If not sooner.

23           THE COURT:  So, if you finish it, say, Monday

24   morning, then it's possible we could go into closings Monday

25   afternoon?

1                ATTORNEY SCHROEDER:  I think by Friday we'll know
2      whether or not we, whether or not that's likely, Your Honor.  I
3      think we've got -- I've already shared with opposing counsel
4      days ago witnesses we were taking off our witness list.  We are
5      calling, we are going to call back, just for the Court's own
6      knowledge, and we've already shared it with opposing counsel,
7      we are going to call back Dr. Merrens.  We expect to call back
8      Dr. Padin.  We have, besides the three tomorrow, I think, four
9      other witnesses, but I think, realistically, I think Monday,
10     close of all evidence on Monday at some point is, is a good
11     estimate right now.
12               THE COURT:  Okay.  In light of that, then, it's
13     possible that it sounds like we would have to have the charge
14     conference this week.
15               ATTORNEY SCHROEDER:  We're at the pleasure of the
16     Court.
17               THE COURT:  Right.  Just, again, trying to kind of
18     map it out here so that we have enough time to finish it on my
19     end.  And, also, you're telling me that you're going to be
20     giving me more robust proposed instructions by the end of the
21     day Thursday.  That's really not going leave tons of time.
22               ATTORNEY SCHROEDER:  I will verify where we are on
23     that tonight.
24               THE COURT:  Okay.
25               ATTORNEY SCHROEDER:  Your Honor, I'll try to get them

VOLUME: 7
PAGES: 222-431

1   to you as quickly as possible, but I wanted to at least have a

2   little bit of a buffer to the extent that we will, that you

3   need us to have a discussion perhaps late Friday if we need to

4   stay after or early Monday morning.

5        I'm at the Court's mercy on when to have the charge

6   conference, and if it might be that we could finish evidence

7   midday Monday, perhaps have the charge conference in the

8   afternoon, and do closings Tuesday morning?  That's just an

9   idea.  I'm not, I haven't really put a lot of thought into it,

10  but I understand your point of wanting to make sure we have a

11  robust charge conference and having the parties have the

12  ability to discuss it with you.

13          THE COURT:  Right, okay.  Well, thank you for that,

14  and I know you can't predict this with scientific precision.

15  The idea of perhaps, if evidence closes on Monday, you know,

16  halfway through the day, early afternoon, since we are ahead of

17  the anticipated schedule, then we can have a conversation about

18  closings on Tuesday morning, in which case then it seems like

19  we might be able to do a charge conference on Monday at some

20  point.  So okay.  Anything from plaintiff?

21          ATTORNEY JONES:  Well, no.  I think this is the first

22  I've heard about potential supplemental instructions.  I just

23  would like to make sure we have enough time to digest and react

24  to it.

25          THE COURT:  Yeah.

VOLUME: 7
PAGES: 222-431

1        ATTORNEY JONES:  Other than that, I'm, with regard to
2   scheduling, there's the potential for a rebuttal case.  If it
3   happened, it would be probably brief, but I just want to make
4   sure that we also keep some room for that potential.
5        THE COURT:  Yeah.  No.  Thank you for bringing that
6   up.  We didn't discuss that.  So that might add more time.
7   Okay, all right.  I think we've done enough on that topic for
8   today.  All right.  If there's nothing else, then have a good
9   evening, and see you at 9:00 tomorrow.
10       (Whereupon at 4:28 p.m. the hearing was adjourned.)
11                    C E R T I F I C A T E
12       I, Sunnie Donath, RMR, Official Court Reporter
13  for the United States District Court, District of Vermont, do
14  hereby certify that the foregoing pages are a true and accurate
15  transcription of my stenographic notes of the hearing taken
16  before me in the above-titled matter on April 1, 2025 to the
17  best of my skill and ability.
18
19
20
                          *Sunnie Donath, RMR*
21       --------------------------------
22              Sunnie Donath, RMR
23
24
25