VOLUME: 8
PAGES: 432-646

1                    UNITED STATES DISTRICT COURT
                              FOR THE
2                        DISTRICT OF VERMONT

3

4     Misty Blanchette Porter        )
                                     )
5                                    )
      v.                             ) Case No. 2:17-cv-194
6                                    )
                                     )
7     Dartmouth-Hitchcock            )
      Medical Center, et al.         )
8                                    )
      _____)

9

10    RE:  Day 8 of Jury Trial

11    DATE: April 2, 2025

12    LOCATION: Burlington, Vermont

13    BEFORE:  Honorable Kevin J. Doyle
                 Magistrate Judge

14

15    **APPEARANCES**:

16    Geoffrey J. Vitt, Esq.
      Sarah H. Nunan, Esq.
17    Vitt & Nunan, PLC
      8 Beaver Meadow Road
18    Norwich, VT 05055

19    Eric D. Jones, Esq.
      Langrock, Sperry & Wool
20    210 College Street, Suite 400
      Burlington, VT 05410
21
      Donald W. Schroeder, Esq.
22    Morgan McDonald, Esq.
      Foley & Lardner, LLP
23    111 Huntington Avenue, Suite 2500
      Boston, MA 02199

24

25                    - Continued on Next Page -

VOLUME: 8
PAGES: 432-646

1   Tristram J. Coffin, Esq.
    Downs Rachlin Martin, PLLC
2   199 Main Street, Suite 600
    Burlington, VT 05401-8339
3

4

5

6           TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                    United States District Court Reporter
7                       *verbatim@vermontel.net*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME: 8
PAGES: 432-646

1                           INDEX OF EXAMINATION

2     Witness              Examined By           Page        Line

3     Edward Merrens       Atty. Jones           436          24
                           Atty. McDonald        484           2
4

5

6     Judith Stern         Atty. Schroeder       542          13
                           Atty. Jones           563           6
7

8     Kathleen Mansfield
                           Atty. Schroeder       570           1
9                          Atty. Jones           602          14

10    Kelly Mousley        Atty. Schroeder       607           1
                           Atty. Nunan           626          20
11                         Atty. Schroeder       643          13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXHIBITS

2                                              Page      Admitted

3          Plaintiff Exhibits

4              3                               441       Y
               6                               443       Y
5              27                              640       Y
               28                              630       Y
6              60                              462       Y
               63                              456       Y
7              79                              460       Y
               83                              454       Y
8              89                              476       Y
               103                             467       Y
9              109                             465       Y
               110                             467       Y
10

11         Defense Exhibits

12             A6                              584       Y
               A9                              588       Y
13             A16                             593       Y
               A24                             595       Y
14             B3                              616       Y
               B5                              620       Y
15             C14                             586       Y
               V                               582       Y
16

17

18

19

20

21

22

23

24                     *    *    *    *    *

25

VOLUME: 8
PAGES: 432-646

 1                          (The trial began at 9:02 a.m.)

 2                 THE COURT:  Good morning.  So, as I understand it,

 3       there's nothing to take up this morning.  Okay.  Plaintiff?

 4                 ATTORNEY JONES:  Not for us.

 5                 THE COURT:  Okay.  Then we'll get the jury, please.

 6                          (The Jury enters the courtroom.)

 7                 COURTROOM DEPUTY:  Your Honor, the matter before the

 8       Court is Civil Case number 17-cv-194, Misty Blanchette Porter

 9       versus Dartmouth-Hitchcock Medical Center, et al.  Present on

10       behalf of the plaintiff are Attorneys Geoffrey Vitt, Eric

11       Jones, and Sarah Nunan.  Present for the defendants are

12       Attorneys Tristram Coffin, Morgan McDonald, and Donald

13       Schroeder.  We are here for day eight of a jury trial.

14                 THE COURT:  Good morning, members of the jury.

15       Again, as I always do, since you left the courthouse yesterday,

16       have you spoken to anyone about this case, or have you learned

17       anything about the case?  Okay.  Seeing no hands raised,

18       plaintiff may call the next witness.

19                 ATTORNEY JONES:  Thank you, Your Honor.  Plaintiff

20       calls Dr. Ed Merrens.

21                          EDWARD MERRENS,

22                 having been duly sworn to tell the truth,

23                          testifies as follows:

24                 DIRECT EXAMINATION BY ATTORNEY JONES

25       Q.   Good morning, Dr. Merrens.

1   A.   Good morning.

2   Q.   We've sat across the courtroom for a week and a half, but

3   we haven't actually met.  So I'm Eric Jones.  I'll be asking

4   you some questions this morning.

5   A.   Thanks, Eric.

6   Q.   Dr. Merrens, what is your current employment?

7   A.   I'm employed by Dartmouth Health.

8   Q.   In what capacity?

9   A.   I'm the chief clinical officer.

10  Q.   And how long have you been the chief clinical officer?

11  A.   Since 2016.

12  Q.   Okay.  Can you just tell us briefly what your

13  responsibilities are as chief clinical officer?

14  A.   I oversee all clinical operations for the Dartmouth Health

15  system, including all reporting relationships from the chairs,

16  center directors, clinical operations at five critical access

17  hospitals, a community group practice, information technology,

18  quality, compliance, and a range of other things.

19  Q.   Okay.  So all of the department chairs, though, they are

20  direct reports to you; is that correct?

21  A.   Yeah, I'm the designee for the CEO of the organization.  I

22  report directly Dr. Joanne Conroy.

23  Q.   Okay.  And we heard over the last couple of days from

24  Dr. DeMars.  When she was the chair of the OB/GYN department,

25  she reported directly to you, correct?

VOLUME: 8
PAGES: 432-646

1   A.   That is correct.

2   Q.   Okay.  And, in your capacity as chief clinical director,

3   officer, do you have a role with regard to patient care issues

4   or patient safety issues?

5   A.   They do sometimes roll up to me, and I'm the -- I may

6   become involved in things, but we have mechanisms for dealing

7   with that across a broad range.

8   Q.   And how about doctor competence issues, would that come to

9   your attention?

10  A.   If they needed to.  I oversee over 1,500 physicians across

11  our system, as well as nurse practitioners.  We have a broad

12  range of mechanisms of dealing and with quality and

13  competence.

14  Q.   Okay.  And, as chief clinical officer, do you have a role

15  in the credentialing process?

16  A.   I do not.

17  Q.   Did you serve on the credentialing committee in 2016?

18  A.   I did.

19  Q.   Okay.  In what capacity?

20  A.   I was a member of the committee.

21  Q.   So that wasn't by virtue of you being the chief clinical

22  officer; you were just a member?

23  A.   Correct.

24  Q.   How long were you on the credentialing committee?

25  A.   Maybe about five or six years.  I had been in a previous

1    role, and I transitioned off that committee as I took on this

2    role as the chief clinical officer.

3    Q.    Okay.  And, during that five to six years, how many times

4    would you estimate the committee oversaw the process of hiring

5    a division head?

6    A.    There were certainly several opportunities to hire both

7    division heads and section chiefs.  Over that period of time,

8    there might have been maybe, maybe ten.

9    Q.    Can you tell us what the normal process would be for

10   Dartmouth Health recruiting a division head and then having

11   that person go through the credentialing process?

12   A.    Well, there would be a recruitment process in which, you

13   know, people would be, there would be ads and people would

14   reply.  We would have our talent acquisition team involved, and

15   people from the department and outside the department would

16   interview people.  Once it got to the point where -- the

17   credentialing process is really reviewing, you know, what

18   training someone's done, their board status, where they've

19   worked.  That's really comes in terms of where you present kind

20   of your credentials, everything that says you can do what you

21   can do, and that's where it would come to that committee for

22   review.

23   Q.    Okay.  Were you on the committee when Dr. Seifer's

24   application to the credentialing committee was processed?

25   A.    I was.

VOLUME: 8
PAGES: 432-646

1    Q.   And that was not a normal process, was it?

2    A.   No.

3    Q.   Can you explain what was abnormal about it?

4    A.   I think the, Dr. Seifer had been recruited to be a

5    division chief but to oversee from an administrative standpoint

6    and had been hired, and then later on there was a desire and a

7    presentation to the credentials committee that he play a

8    clinical role, and that's why the credentials and the review of

9    his application came to that committee.

10   Q.   But it was unusual that he was first brought in in an

11   administrative capacity and then was presented to the

12   committee?

13   A.   Correct.

14   Q.   Okay.  That's not the normal way things are done, right?

15   A.   Correct.

16   Q.   But Dr. DeMars did it that way, correct?

17   A.   Correct.

18   Q.   Is there a reason to do it that way?

19   A.   I don't know.

20   Q.   Would it make it more difficult for the committee to deny

21   credentialing if someone had already been brought on at the

22   administrative capacity?

23   A.   No.

24   Q.   Was there anything unusual about Dr. Seifer's

25   credentialing process in terms of information you received from

VOLUME: 8
PAGES: 432-646

1    the prior employer?

2    A.    Yes.

3    Q.    What was that?

4    A.    I think there were concerns about, expressed about his

5    practice and whether he was, about his style and practice and

6    his expectations were conveyed.

7    Q.    And those concerns were expressed by members of his

8    previous employer, correct?

9    A.    That is my understanding.

10    Q.    Dr. Merrens, I'm going to show on the monitor a document

11    that's been admitted as Plaintiff's Exhibit 3.  If you prefer

12    we also have a hard copy in the binder for you.

13    A.    Yeah, whatever.

14    Q.    Yeah, that's fine.  So I'm, this has been admitted so --

15    So, Dr. Merrens, I want to start about halfway down that first

16    page with the email from Kayla Hollis to you, Dr. Padin, and

17    Dr. Chertoff.  Ms. Hollis worked for the medical staff office,

18    correct?

19    A.    Yes.

20    Q.    Okay.  So in this email she is telling you in the first

21    paragraph, second sentence, "This is a very unusual

22    circumstance in which the department chair who has completed a

23    telephone reference and is the one requesting that I initiate

24    the credentialing process".  Is that unusual?

25    A.    I don't think so, actually.

VOLUME: 8
PAGES: 432-646

1    Q.    Okay.  So it would be normal for the department chair who
2    is requesting that the process be commenced also be the one who
3    completed the telephone interview?
4    A.    It would not be -- for a division director or a section
5    chief, this would be a person reporting directly to the chair,
6    and that person would have called and done reference checks.
7    That is a higher level position.  So I don't think it's that
8    unusual, but I respect that's what's written here.
9    Q.    Okay.  And then Ms. Hollis notes in the italicized
10   paragraph, "Dr. Seifer is leaving his position as division
11   director at OHSU after less than two years".
12        Would that strike you as unusual, that you were
13   considering a candidate who had left his prior position in less
14   than two years?
15   A.    No.
16   Q.    Okay.  There's a comment here from somebody from the prior
17   employer, "I either had to fire the rest of the division or
18   find a new role for Dr. Seifer because he was not going to be
19   successful leading the division".  Did you see that?
20   A.    Yes.
21   Q.    And, as, when you received this email, did that concern
22   you?
23   A.    Yes.
24   Q.    Why did that trouble you?
25   A.    Well, I think any information around someone's success

1    would be of concern and would require additional information.

2    Q.    And, at the bottom on Page 2 at the end of the email,

3    Ms. Hollis notes, "On a related note, I was asked if I can, we

4    can waive the need for current letters of recommendation as he

5    is unable to provide them for his current practice".

6        Did that concern you, that he was unable to get letters of

7    recommendation?

8    A.    Yes.

9    Q.    Would you agree with Dr. Padin that this is a red flag?

10   A.    Yes.

11   Q.    I'd like to show you now what's been admitted in evidence

12   as Exhibit 6 that will be on the screen in a minute.  And,

13   again, if we go to Page 2 of the exhibit, again, Ms. Hollis is

14   writing what's the email to Dr. DeMars but then CCing other

15   members of the committee, including yourself.  Do you see that?

16   A.    I do.

17   Q.    Okay.  And she is reporting that she received some

18   information including a response to the question, "Have you

19   ever received any complaints against this individual?"  And the

20   answer was "Yes".  Do you see that?

21   A.    I do.

22   Q.    And then the second bullet point says, "Were there any

23   problems with the requested privileges being carried out

24   satisfactorily at your institution?"  Answer, "Yes.  Noted

25   substandard ultrasound skills".  Do you see that?

1    A.    I do.

2    Q.    And did that also trouble you when you were processing

3    this application?

4    A.    I think it required further information.

5    Q.    And, again, do you agree with Dr. Padin that that was also

6    a red flag?

7    A.    Correct.

8    Q.    Did other members of the committee share your concerns, to

9    your knowledge?

10   A.    I believe it required more information to be able to

11   better understand, and that was the consensus of the committee.

12   Q.    All right.  But, despite some of these concerns that were

13   being raised in the process, Dr. DeMars insisted and advocated

14   that the committee approve the application, correct?

15   A.    Correct.

16   Q.    She testified yesterday that she had a conversation with

17   you where she essentially had to assure Dr. Seifer's success.

18   Do you recall that?

19   A.    Yes.

20   Q.    Can you tell us about that conversation from your

21   perspective?

22   A.    Well, we required additional information to better

23   understand what Dr. Caughey at Oregon Health Science was

24   relating and wanted to better understand some of the concerns,

25   and those were fully further detailed understanding his

1    practice and a range of things, and it was our understanding

2    that, if, if we were going to do this, that we wanted her to

3    ensure that he was going to be successful in this endeavor,

4    understanding a lot more of the details that were raised.

5    Q.    And the process she was following was not usual.  We've

6    already discussed that, correct?

7    A.    Correct.

8    Q.    And some red flags came up during the process, correct?

9    A.    Correct.

10   Q.    Nevertheless, she wanted you to go ahead and approve his

11   credentials, correct?

12   A.    With additional information.

13   Q.    Yeah.  And isn't it true that you told her that the

14   committee would proceed to approve his application but this was

15   on her?

16   A.    To some effect, yes.

17   Q.    Did you use that language, "This is on you"?

18   A.    I can't remember the exact language, but I made it very

19   clear that his success was, and supporting him and

20   understanding what he would need to be successful given the

21   different practice style, was certainly something I was

22   counting on her to achieve.

23   Q.    And, by indicating that it was on her and that she had to

24   ensure his success, isn't it true that what you meant by that

25   was that her job was on the line if he was unsuccessful?

VOLUME: 8
PAGES: 432-646

1    A.    Yes.

2    Q.    And did you also -- isn't it true that you also told

3    Dr. DeMars that you were not pleased with the process that she

4    used to recruit Dr. Seifer?

5    A.    Correct.

6    Q.    You explained earlier that the department chairs report

7    directly to you?

8    A.    Correct.

9    Q.    Can you talk to me a bit about what authority the

10    department chairs themselves have when running their

11    departments?

12    A.    Can you be more specific?  I mean, they have the ability

13    to -- they have reporting relationships with division and

14    sectional directors underneath them.  They're involved in

15    understanding programs of care, developing research

16    allocations, mentoring individuals, developing training

17    programs, working with trainees on various levels.  They

18    oversee all the actives of the department.

19    Q.    Are they authorized to handle complaints about physician

20    competence?

21    A.    Yes.

22    Q.    And are they authorized to handle complaints about patient

23    care and patient safety?

24    A.    Yes.

25    Q.    Okay.  Is there a point at which they're expected to

VOLUME: 8
PAGES: 432-646

1    escalate those matters, or do they have the authority to

2    resolve them on their own?

3    A.   It would be at the discretion of the chair or any other

4    concerns, but those concerns do not need to go through the

5    chair.  If there are significant concerns, we have mechanisms.

6    We have, we have anonymous compliance and risk hotlines for

7    anyone to raise concerns.  So, while it does go to the chair,

8    and that is the initial point, there are many other

9    opportunities for expressing concerns about patient care.

10   Q.   Okay.  And how about with regard to employment decisions,

11   hiring, discipline, firing, what level of authority do

12   department chairs have?

13   A.   I think they have the ability to raise those issues, and,

14   certainly, levels of hiring and firing are things that are

15   discussed with other members of leadership, including the chief

16   medical officer.  So hiring comes before a committee, and a

17   termination would be, of an individual, would be cause for more

18   broad discussion.  It wouldn't just happen with a single

19   individual.

20   Q.   Okay.  And so for hiring we've discussed that

21   particularly, for example, with Dr. Seifer that Dr. DeMars

22   decided she wanted to hire Dr. Seifer and then she presented

23   the case to the committee, correct?  But she recommended the

24   hire, correct?

25   A.   Correct.

VOLUME: 8
PAGES: 432-646

1    Q.   And does the department chair's recommendation have

2    weight?

3    A.   Well, they've gone through a search process.  They've

4    identified a candidate.  And that candidate would have

5    interviewed with a number of people, and they've recommended

6    that individual.  Coming to the credentials committee is a step

7    around ensuring that they have the training and the capability

8    to serve in a clinical role.

9    Q.   But the fact that a department chair wants to hire

10   somebody and recommends the hire, that carries some weight for

11   the perspective of the credentialing committee?

12   A.   Correct.

13   Q.   Like, for example, with Dr. Seifer we discussed that you

14   had concerns that Dr. DeMars didn't follow the right process,

15   there were some red flags.  Nevertheless, Dr. DeMars

16   recommended the hiring, wanted it, and, ultimately, the

17   committee agreed but said, "This is on you"?

18   A.   Yeah, there was a fair amount of other information that

19   was provided, and all the positions that come to the

20   credentialing committee have the approval of their department

21   chair.

22   Q.   While the committee ultimately approved it, this was a

23   decision she wanted and recommended, correct?

24   A.   Correct.

25   Q.   With regard to discipline, we heard some testimony about

1    performance improvement plans.  Do department chairs have the
2    authority to put a provider on a performance improvement plan
3    alone?
4    A.    It's usually in collaboration with the chief medical
5    officer or other supports, depending on what the deficiency or
6    issue is.
7    Q.    Okay.  Do department chairs need your permission to put a
8    doctor on a PIP?
9    A.    They do not.
10   Q.    And, if there is an issue with regard to termination, say
11   a department chair has concluded that there is cause to
12   terminate an employment relationship with a provider, do they
13   make that recommendation to you?  How does that work?
14   A.    A termination for cause would be a discussion with human
15   resources, with general counsel, with the chief medical
16   officer.  It would be -- we would have to understand the
17   situation around it in terms of kind of what was going on.  It
18   wouldn't be a single determination, and it might not rise to
19   me.  We have mechanisms for understanding things, and we have
20   bylaws that have language around this.
21   Q.    Okay.  So this getting support from HR and general
22   counsel.  I understand that.  But do I understand your
23   testimony that, assuming that there was consultation with HR
24   and general counsel, that there are times when a department
25   chair can make a termination decision without your signing off

1    on it?

2    A.    Correct.

3    Q.    And, when Dr. Padin testified, she testified about the

4    just cause process.  Would it be a department chair that

5    initiates that process?

6    A.    Can you describe -- I'm not sure what you're describing.

7    Q.    Well, if a department chair concludes that they have what

8    they believe is cause to terminate a provider, there's a just

9    cause process at the hospital?

10    A.    Correct.

11    Q.    Would it be the department chair that initiates that

12    process?

13    A.    Correct.

14    Q.    I want to talk now about the decision to close the

15    reproductive endocrinology and infertility unit, division.  Who

16    was involved in that decision?

17    A.    It was myself; it was Dr. DeMars; it was Heather Gunnell,

18    the director of OB/GYN; and Daniel Herrick who was the vice

19    president for surgical and perioperative services was our core

20    group of people, and there were others involved in the

21    discussion.  Dr. Padin had been involved in some of it, yeah.

22    Q.    Okay.  But others that may have been involved in some

23    parts?

24    A.    That's the core group.

25    Q.    That group of four is the core group?

1    A.    Correct.

2    Q.    And Dr. DeMars's role as the chair of the OB/GYN, I mean,

3    she had an important role in those discussions, correct?

4    A.    Correct.

5    Q.    But is it true that this was the only time in Dartmouth

6    Health's history that it ever closed a division?

7    A.    No.

8    Q.    Oh, it's not?  Okay.  When else has Dartmouth Health

9    closed a division?

10   A.    Well, we have closed other offerings at the hospital and

11   member hospitals in the past.

12   Q.    Closed offerings?  I'm talking about an established

13   division, a subdivision of a department.

14   A.    I would say that this is the first time that an entire

15   division was closed.

16   Q.    So this was the first time?  Just the four of you were

17   involved as the core group?

18   A.    Yes.

19   Q.    How long would you say it took for that core group to

20   start its discussions and then ultimately conclude it was going

21   to shutter the program?

22   A.    Probably within a month.

23   Q.    The notice of the closure was in early March of 2017; does

24   that sound right, the announcement?

25   A.    No.

1    Q.   I'm sorry.  May.  If I said March, I'm mistaken.  Early
2    May of 2017; is that right?
3    A.   The program was closed on May 4th, and there was a
4    subsequent announcement.
5    Q.   And you say it took about a month for that decision to be
6    made?
7    A.   There were discussions leading up to that that were
8    probably several weeks.
9    Q.   So is it fair to say starting early April was when --
10   A.   There were discussions and understandings in April, I
11   believe.
12   Q.   Okay.  So there were these four people in the core group.
13   Isn't it true that you have said Leslie was ultimately the
14   person that made the decision?
15   A.   No.
16   Q.   That's not true?  Do you recall giving deposition
17   testimony in this case?
18   A.   Yes.
19   Q.   The date of the transcript is July 30, 2019.  Does that
20   sound familiar?  That sound correct?
21   A.   Yes.
22              ATTORNEY JONES:  No reason to doubt that?  Your
23   Honor, the transcript of Dr. Merrens's deposition has been
24   marked as ID4.  May I deliver it to the Witness?
25              THE COURT:  Yes.

VOLUME: 8
PAGES: 432-646

1    BY ATTORNEY JONES:

2    Q.   So, Dr. Merrens, you recall giving a deposition.  Do you

3    recall that you were sworn and put under oath in that

4    deposition?

5    A.   Correct.

6    Q.   Just like this morning?

7    A.   Yes.

8    Q.   I'd like to direct your attention to Page 21 of the

9    transcript.  When you're there, if you could direct your

10   attention to Line 24:

11        "Q.  What was Leslie DeMars's role in the decision to

12   close the REI division?"

13        Do you see that?  Do you see that?

14   A.   Yes.

15   Q.   Page 22.

16        "A.  Quote, so Leslie was ultimately the person that

17   made the decision, that made the announcement to the group.

18   This was a decision that we supported after looking at the

19   information."

20        That was your testimony in response to that question,

21   correct?

22   A.   Correct.

23        ATTORNEY McDONALD:  Objection.

24        THE COURT:  Basis?

25        ATTORNEY McDONALD:  Incomplete response.  Read the

VOLUME: 8
PAGES: 432-646

1    entirety of his response.

2              THE COURT:  Is there more to the response?  I'm

3    talking now to Mr. Jones.

4              ATTORNEY JONES:  I'm sorry.  I'm listening.

5              THE COURT:  I think the objection is that there's

6    more to the response in the deposition transcript.

7              ATTORNEY JONES:  There's a lot more, but those were

8    the first two sentences of your answer, correct?

9              THE COURT:  So objection overruled.

10             THE WITNESS:  Yes, followed by, "Ultimately, this was

11   my decision".

12   BY ATTORNEY JONES:

13   Q.   I'd like to direct your attention to a document that's

14   been admitted in this case as Plaintiff's Exhibit 83.  You can

15   either look at the hard copy, or your monitor has it now,

16   whatever you prefer.

17   A.   Just move the notebooks around.

18   Q.   One of those notebooks is quite uncumbersome, cumbersome.

19   I'm sorry.

20   A.   Yeah.

21   Q.   So this document begins as an email from Vicky Maxfield to

22   you.  Do you recall receiving this email?

23   A.   Yes.

24   Q.   And we discussed this email with Ms. Maxfield herself.

25   But, basically, it starts with her writing to express her

1    concern about the decision not to retain Dr. Porter.  Does that

2    sound right?

3    A.    Correct.

4    Q.    And in your response you say, "Victoria, thanks for your

5    email.  The recommendations around closing the program and its

6    staff were at the recommendation of Dr. DeMars".  Do you see

7    that?

8    A.    I do.

9    Q.    So is it correct to conclude that you were telling

10    Ms. Maxfield that the recommendations around closure of the

11    program and the termination of Dr. Porter were Dr. DeMars's

12    recommendations?

13    A.    That's what I stated in the communication.  This is a

14    nurse who worked in the department.  I'm under no obligation to

15    tell her the number of people, the decision making process, or

16    how we ended up on the decision.  I wanted her to understand

17    this was really involving her chair involved in this decision.

18    Q.    Okay.  But you communicated to Nurse Maxfield that it was

19    on Dr. DeMars, right?

20    A.    I think we produced 30,000 pages of documents in this and

21    there are numerous statements, like in my deposition, in which

22    I said this was my decision.

23    Q.    Dr. Merrens, this email to Nurse Maxfield, you said the

24    recommendations around the closing of the program and

25    terminating its staff were on Dr. DeMars.

VOLUME: 8
PAGES: 432-646

1    A.    Correct.

2    Q.    I'd like to discuss about some of the reasons that have

3    been provided for the decision to close the REI division.

4    Isn't it true that you have said the key issue is we just

5    didn't have nurses anymore?

6    A.    Correct.

7    Q.    But you were here on day one of the trial when Nurse

8    Sharon Parent testified that she wanted to continue working,

9    correct?

10   A.    Correct.

11   Q.    So you did have a nurse, an REI, a trained and experienced

12   REI nurse willing to continue working in the division, correct?

13   A.    I wasn't aware of Nurse Parent's intentions when this

14   decision was made.

15   Q.    Any reason to doubt her testimony?

16   A.    I have no reason to doubt.

17   Q.    I'd like to direct your attention to a document that has

18   not yet been admitted into evidence, and so I'd like it to be

19   put on the screens only for the judge, the witness, and the

20   litigants.  And this is Plaintiff's Exhibit 63.  There we go.

21        Dr. DeMars -- I mean, I'm sorry, Dr. Merrens, there is a

22   -- well, the first email is unrelated to the substance of the

23   primary email.  The primary email appears to be an email from

24   Steven Woods to you and Dr. DeMars.  Do you see that?

25   A.    I do.

1   Q.   This is dated May 4th 2017?

2   A.   I do.

3   Q.   Who is Steven Woods?

4   A.   He works in employee relations.

5   Q.   That's basically HR?

6   A.   Yes.

7   Q.   And you, in fact, received this document?

8   A.   I did.

9        ATTORNEY JONES:  Your Honor, we move the admission of

10  Plaintiff's 63.

11       THE COURT:  Any objection?

12       ATTORNEY McDONALD:  No objection.

13       THE COURT:  Okay.  Plaintiff's 63 is admitted.

14       ATTORNEY JONES:  Thank you.  May we publish it to the

15  jury now?

16       THE COURT:  Yes.

17  BY ATTORNEY JONES:

18  Q.   So, Dr. Merrens, the REI division was closed May 4,

19  correct?

20  A.   Say it again.

21  Q.   The REI division was closed May 4, 2017?

22  A.   Correct, yes.

23  Q.   And did you have a meeting that day with the providers of

24  the division?

25  A.   Yes.

1    Q.    And this document from Mr. Woods says, "Dear Doctors

2    Merrens and DeMars, attached is the meeting script for this

3    afternoon".

4         So did Steven Woods provide a script for you and

5    Dr. DeMars for the meeting when you met with the providers?

6    A.    We met with him to develop talking points to make sure

7    that we were complete in the discussion, and Steve worked to

8    put this document together.

9    Q.    Okay.  And he sent you the final version?

10   A.    Correct.

11   Q.    It says at the bottom of the middle paragraph, "I believe

12   we have" --

13   A.    It's not on the screen.

14   Q.    Oh, I'm sorry.

15   A.    It's not on my screen.  I'm sorry.  Okay.

16   Q.    That's okay.  So the email starts, "Dear Doctors Merrens

17   and DeMars", and I was going to ask you a question about the

18   middle paragraph that starts --

19   A.    Sure.

20   Q.    -- "I will make sure".  So at the end it says, "I believe

21   we have worked out the issues with Misty's notice letter".

22   What were those issues, do you know?

23   A.    I'm unaware.

24   Q.    So, if you could turn to the fourth page of this document

25   which bears a Bates number of DH0010541 -- that's it.  Looking

VOLUME: 8
PAGES: 432-646

1    at the bullet points of the meeting script, it starts by

2    saying, "We need to give you the difficult news that we are

3    ending the REI program", correct?

4    A.    Correct.

5    Q.    And then the next bullet point:  "An inability to maintain

6    the highly specialized clinical resources required for an

7    infertility program makes it increasingly difficult to offer

8    the kind of care DH is committed to offering".  Do you see

9    that?

10   A.    Yes.

11   Q.    So a reason, the reason identified in this bullet point is

12   an inability to maintain the highly specialized clinical

13   resources; is that right?

14   A.    Correct.

15   Q.    And then the next bullet point, "Based on this assessment,

16   we have determined that the REI program is not sustainable".

17   Do you see that?

18   A.    Yes.

19   Q.    So the, at least based on the script -- did you stick to

20   the script at the meeting?

21   A.    Yes.

22   Q.    So the only reason you provided for closing the division

23   was an inability to maintain the highly specialized clinical

24   resources, correct?

25   A.    Correct.

VOLUME: 8
PAGES: 432-646

1    Q.    Nothing about infighting among the providers?  That wasn't

2    listed, right?

3    A.    No.

4    Q.    And there is nothing here listed about dysfunction in the

5    department, right?

6    A.    No.

7    Q.    There's nothing listed in here about alleged splitting

8    behaviors, correct?

9    A.    No.

10    Q.    Okay.  I'd now like to direct your attention to another

11    exhibit that has not yet been admitted.  So I'd like to have a

12    limited appearance, not before the jury at this time.

13    Plaintiff's Exhibit 79.  Dr. Merrens, do you recognize

14    Plaintiff's Exhibit 79 on the monitor?

15    A.    I do.

16    Q.    Okay.  It appears to be an email from you dated May 11,

17    2017 to the entire OB/GYN staff.  Is that correct?

18    A.    Correct.

19          ATTORNEY JONES:  Your Honor, Plaintiff moves the

20    admission of Plaintiff's 79.

21          THE COURT:  Any objection?

22          ATTORNEY McDONALD:  No objection.

23          THE COURT:  Okay.  Plaintiff's Exhibit 79 is

24    admitted.

25          ATTORNEY JONES: Dr. Merrens -- I'm sorry.  Can we

1    have it published to the jury?

2                    THE COURT:  Yes.

3    BY ATTORNEY JONES:

4    Q.    Dr. Merrens, the subject line on this email is

5    "Clarifications about decision to close REI program".  Do you

6    see that?

7    A.    Indeed.

8    Q.    I don't intend to read the entire document, but is it fair

9    to conclude that you were explaining in this email to the

10    entire OB/GYN department the reasons for the decision that you

11    had taken?

12    A.    I was providing clarifications.

13    Q.    Okay.  And among that clarification was reasons for your

14    actions?

15    A.    Correct.

16    Q.    Okay.  And, if you look at the second paragraph that

17    begins "first and foremost", you start by saying, "This was a

18    difficult decision that was not taken lightly".  Do you see

19    that?

20    A.    Indeed.

21    Q.    And then, if you go down to the fourth line, there's a

22    sentence that says, "But because it has been difficult to

23    maintain clinical resources and staffing at the appropriate

24    level, we finally concluded we could no longer keep the program

25    open".  Do you see that?

1    A.   Correct, yeah.

2    Q.   Again, you're telling the entire OB/GYN department in this

3    email that the reason was based upon the difficulty in

4    maintaining clinical resources and staffing, correct?

5    A.   Correct.

6    Q.   Nothing about infighting among the providers, correct?

7    A.   Correct.

8    Q.   There's nothing listed here about dysfunction of the

9    department, correct?

10   A.   Correct.

11   Q.   And nothing here about alleged splitting behaviors,

12   correct?

13   A.   Correct.

14   Q.   I'd like to direct your attention now to another document

15   that's not yet in evidence.  This is Plaintiff's Exhibit 60.

16   Again, I'll ask that the document be presented to the judge,

17   the witness, and the litigants.

18        Dr. Merrens, do you recognize this document?

19   A.   I do.

20   Q.   It's an, well, it's an email that begins with some

21   redacted communications.  Is Kimberly Troland an attorney?

22   A.   Yes.

23   Q.   Yeah.  So it starts with some attorney-client privileged

24   information, but then the next communication we have is an

25   email from Amy Giglio.  Is that how you pronounce her name?

1    A.    "Jill-yo".

2    Q.    Ms. Giglio to you, and then next email up you have a

3    response email dated May 2nd 2017 that you respond to

4    Ms. Giglio and copy some other people.  Do you see that?

5    A.    I do.

6    Q.    And you sent this email?

7    A.    Yes.

8              ATTORNEY JONES:  Your Honor, we'd move the admission

9    of Plaintiff's 60.

10             THE COURT:  Any objection?

11             ATTORNEY McDONALD:  No objection.

12             THE COURT:  Okay.  Plaintiff's Exhibit 60 is

13   admitted.

14   BY ATTORNEY JONES:

15   Q.    Dr. Merrens, so starting on the second paragraph -- I want

16   to make sure I publish it to the jury.  Can we do that?

17             THE COURT:  Yes.

18   BY ATTORNEY JONES:

19   Q.    In the second paragraph you state to Ms. Giglio, "While on

20   the surface we are pinning the dissolution of our reproductive

21   endocrinology program on our failure to maintain and recruit

22   nurses for this work, it is ultimately the dysfunction of the

23   physicians who work in this area for years, as well as recent

24   hires, and ultimately a failure of leadership, comma, for which

25   I hold Leslie fully accountable".

VOLUME: 8
PAGES: 432-646

1          You wrote that, correct?

2     A.    Correct.

3     Q.    And Leslie is Dr. DeMars?

4     A.    Correct.

5     Q.    So you state, "It is ultimately the dysfunction of the

6     physicians and ultimately a failure of leadership, for which I

7     hold Leslie fully accountable".  Are you holding Leslie fully

8     accountable for both the dysfunction of the physicians and

9     ultimately the failure of leadership or --

10    A.    Yes.

11    Q.    Okay.  Isn't it true that part of what Dr. DeMars

12    considered to be dysfunction in the department was the fact

13    that Dr. Porter was complaining about the incompetence of two

14    of her colleagues?

15    A.    That's what she stated.

16    Q.    And isn't it true that some of the dysfunction was the

17    fact that Dr. Porter was complaining about the fact that her

18    colleagues were causing patient harm?

19    A.    I don't recall.  Well, I had no knowledge of this at the

20    time.

21    Q.    At that time, but you do now?

22    A.    Correct.

23    Q.    Do you recall stating that you believed Dr. DeMars was the

24    architect of the dysfunction?

25    A.    No.

1    Q.   If you still have your deposition transcript in front of

2    you, I'd like to direct your attention to Page 166.  When

3    you're there, if I could direct your attention to Lines 15 and

4    16:

5              "Q.   When you say the architect of the dysfunctional

6    program, you're referring to Leslie DeMars?

7              "A.   I am talking about Leslie DeMars."

8         Do you see that?

9    A.   I do.

10   Q.   So does that refresh your recollection that you did, in

11   fact, refer --

12   A.   I believed that, yes.

13   Q.   Okay.  Yesterday afternoon we saw information about a

14   newspaper article in the "Valley News" in which CEO Conroy was

15   quoted as identifying declining birth rates as a reason for the

16   closure of the REI division.  Do you recall that?

17   A.   I recall the article.

18   Q.   And in that article, and I'm reading from what's been

19   admitted as Plaintiff's Exhibit 109.  The article, CEO Conroy

20   is quoted as saying, "We were just affected by the declining

21   birth rate in this area".  Do you recall that quote?

22   A.   Yes.

23   Q.   Was that true?

24   A.   No.

25   Q.   Okay.  She testified that the sole source of her knowledge

VOLUME: 8
PAGES: 432-646

1    about the closure of the REI was you.  Do you remember that?

2    A.    Correct.

3    Q.    Okay.  So you did not tell her that the declining birth

4    rates was a reason for the closure of the REI division?

5    A.    I did not.

6    Q.    What did you do to correct her quote upon reading it?

7    A.    I, it was not something that I informed her about.

8    Q.    Did you read the newspaper article when it came out?

9    A.    Yes

10   Q.    Were you aware of the quote she had given?

11   A.    Yes.

12   Q.    Did you discuss with her that she had been misquoted?

13   A.    I can't remember.  I think her understanding -- I think

14   she was just talking about in general.  She has a broad

15   perspective on health care in the United States.  I think she

16   was -- I think her comments why broad and not necessarily about

17   this.  I don't recall correcting her about her comments.

18   Q.    So you read a newspaper article in which she gave a reason

19   to the public for closing the REI division and, when you read

20   it, you didn't feel the need to have that corrected somehow?

21   A.    I don't remember or recall correcting her about her

22   statement.

23   Q.    Okay.  And we also heard from Dr. DeMars yesterday that,

24   when she read the article, she also thought it was incorrect,

25   what was stated in the newspaper article.  Do you recall that?

VOLUME: 8
PAGES: 432-646

1    A.    Yes.

2    Q.    And, in an email from Dr. DeMars that was admitted into

3    evidence as Plaintiff's 110, she wrote to Dr. Seifer, "I hope

4    that she had been misquoted in the article because, if that's

5    the information that has been given to her, it is completely

6    untrue", and it was completely untrue, correct?

7    A.    Correct.

8    Q.    I'd like to direct your attention to a document that has

9    been admitted into evidence.  This is Plaintiff's 103, and my

10   colleague will bring it up on the screen.

11        So, in addition to the "Valley News" article, there were

12   other media reports of the closure of the REI division,

13   correct?

14   A.    Correct.

15   Q.    And one of those was from Vermont Public Radio, correct?

16   A.    Correct.

17   Q.    Do you recall what they published?

18   A.    Yes.

19   Q.    In an article published by Vermont Public Radio, and, if

20   we go to Page 2 of Plaintiff's Exhibit 103 to the kind of

21   grayed-out section in the middle of page -- there we go.  It

22   says, "Dr. Edward Merrens, the chief clinical officer at

23   Dartmouth-Hitchcock, says that the program is being disbanded

24   because of infighting between doctors and nurses.  Quote, 'This

25   wasn't a program that was losing money.  In fact, this was a

1    program that makes money', says Merrens.  'Ours was basically a

2    decision that was, Could we continue a high level of care and

3    coordination that we needed to do seven days a week across our

4    system?'"

5         Is that the quote that was in the article?

6    A.   That's the quote in the article.  It is not what I said.

7    Q.   Okay.  Let's start with the part about money, though.  I

8    mean, did you, in fact, tell the reporter that the program was

9    not losing money?

10   A.   Yes.

11   Q.   And did you, in fact, tell the reporter that the program

12   makes money?

13   A.   I may have.

14   Q.   And those statements are true, correct?

15   A.   Yes.

16   Q.   The REI division was profitable, correct?

17   A.   Correct.

18   Q.   And financial considerations had nothing to do with the

19   closure, correct?

20   A.   Correct.

21   Q.   So now we go back to the first page of Plaintiff's Exhibit

22   103, and you write to Dr. Porter, Dr. Hsu, and Dr. Seifer.  You

23   say, "Dear colleagues, regrettably Vermont Public Radio

24   published an article indicating that I made comments to the

25   effect that the program was being ended due to interpersonal

1    issues amongst the physicians".  Do you see that?

2    A.    Correct.

3    Q.    Okay.  You state next, "Nothing could be further from the

4    truth, and, in the recorded interview I did with him two weeks

5    ago, there was no such statement whatsoever".

6         So this, this statement here, you are telling the

7    providers who just lost their jobs that the comment that the

8    program was being ended due to interpersonal issues among the

9    physicians, nothing could be further from the truth, correct?

10   A.    I didn't make that comment, and it was redacted.  Vermont

11   Public Radio apologized and made a correction.

12   Q.    Okay.  Because it was incorrect, right?

13   A.    The statement was never attributed to me.  It wasn't part

14   of the recording or the discussion.

15   Q.    Okay.  But, when you say, when your -- when the article

16   attributes to you the comment that the decision was based upon

17   interpersonal issues among the physicians, you wrote to the

18   providers, "Nothing could be further from the truth".

19   A.    That I, that I made that statement to Vermont Public.

20   Q.    Well, you said, "Nothing could be further from the truth,

21   and, in the recorded interview I did with him two weeks ago,

22   there was no such statement".

23   A.    That's correct.

24   Q.    In this statement here, you're denying both that you made

25   that statement to the reporter and that nothing could be

1    further from the truth, right?

2                ATTORNEY McDONALD:  Objection.

3                THE COURT:  I'll allow it.

4                THE WITNESS:  I stand by my statement.

5    BY ATTORNEY JONES:

6    Q.   Okay.  I want to go back to Plaintiff's Exhibit 60, which

7    was the email exchange between you and Ms. Giglio.  We had

8    discussed earlier the second paragraph starting, "While on the

9    surface we are pinning the dissolution of our reproductive

10   endocrinology program on our failure to maintain and recruit

11   nurses".

12       I want to focus now on the next paragraph.  You state,

13   "The fact that failures of such programs due to a, due to

14   nursing shortages are not common and we'll be referring

15   patients to a similar rural academic REI center in Burlington

16   Vermont will make our explanation to the public patients and

17   media, well, rather thin".  You wrote that, right?

18   A.   Correct.

19   Q.   Okay.  And you're saying here that the explanation with

20   regard to the nursing shortage, you're acknowledging that is,

21   "Well, rather thin"?

22   A.   I was embarrassed that we had to close a program because

23   of a nursing shortage, and I explained the reasons why.

24   Q.   Okay.  And then you acknowledged that your explanation to

25   the public, patients, and the media were rather thin?

1  A.   That's what I stated in the communication.

2  Q.   And in response Ms. Giglio writes, "I appreciate your

3  candor".  Do you see that?

4  A.   I do.

5  Q.   I'd like to direct your attention now to a document that's

6  been admitted in evidence as Exhibit 83.  If we, this is the

7  email between you and Vicky Maxfield.  We discussed the first,

8  well, the second sentence.  We discussed the recommendation

9  around closing the program and its staff were at the

10  recommendation of Dr. DeMars.

11       The next sentence now I want to talk about:  "As you know,

12  Dr. Porter currently works at 20 percent of her time

13  currently".  Did you believe that to be the case when you wrote

14  the email?

15  A.   I did.

16  Q.   Do you believe that to be the case now?

17  A.   I do.

18  Q.   Okay.  Isn't it true that she wasn't working 20 percent,

19  but was working 20 hours a week?

20  A.   My recollection at the time that over 18 months and at

21  periods of time Dr. Porter would come back and work between 7

22  to 10 hours per week in a limited capacity.  I think it was a

23  calculation based on that.

24  Q.   Okay.  Then you state, "I'm not sure of her interest in

25  staying on if the infertility part were to cease".  Do you see

VOLUME: 8
PAGES: 432-646

1    that?

2    A.    I do.

3    Q.    Did you ask Dr. Porter?

4    A.    I did not.

5    Q.    You could have picked up the phone, correct?  If you were

6    interested in knowing whether she would be interested, you

7    could have picked up the phone and asked her, correct?

8    A.    Sure.

9    Q.    You could have sent an email, correct?

10   A.    It was an assumption about the nature of the practice.

11   Q.    It was an assumption you made, but you're telling

12   Ms. Maxfield that you're not sure of Dr. Porter's interest.

13   I'm asking you, It would have been pretty easy to figure out

14   whether or not Dr. Porter was interested, correct?

15   A.    Correct.

16   Q.    All you would have had to do was ask somehow, correct?

17   A.    Yes.

18   Q.    Okay.  And, in fact, she did eventually send a letter

19   explicitly stating that she would be interested in staying on

20   even if the infertility part were to cease, correct?

21   A.    Correct.

22   Q.    And, regardless of whether it was 20 percent or 20 hours,

23   the fact is that the time she wasn't working her regular

24   schedule was because of her disability, correct?

25   A.    Correct.

1    Q.   So you're explaining to Ms. Maxfield, in response to her

2    question about why we can't keep Dr. Porter, you're explaining,

3    "As you know, Dr. Porter currently works 20 percent of her time

4    currently", right?

5    A.   Correct.

6    Q.   And that's a reference to her disability leave, correct?

7    A.   I was just commenting on her current, what her current

8    status and what she was, what she was working.

9    Q.   And her current status was she was on partial disability

10   leave, correct?

11   A.   Absolutely.

12   Q.   In the spring, April, May timeframe of 2017, the OB/GYN

13   department was short-staffed, right?

14   A.   Yes.  It's a broad department, so I'm not sure what you're

15   talking about in terms of what category of short-staffed.

16   Q.   Okay.  How about, well, after you closed REI, there were

17   then five divisions remaining, correct, within OB/GYN?

18   A.   Correct.

19   Q.   Are you aware of any of those divisions being adequately

20   staffed?

21   A.   I don't have knowledge about their staffing

22   Q.   Do you know whether or not the general OB/GYN

23   practitioners were overstaffed or understaffed?

24   A.   I don't have information about, about them.

25   Q.   Okay.  Well, you were here when Dr. Padin testified,

1    correct?

2    A.    Correct.

3    Q.    And do you recall her testifying that she, herself, even

4    rolled up her sleeves and chipped in?

5    A.    I do.

6    Q.    And that was because OB/GYN was short-staffed and she

7    could help?

8    A.    Indeed.

9    Q.    And Dr. Porter had general gynecological skills as well,

10   correct?

11   A.    I think Dr. Padin served as a generalist in terms of labor

12   and delivery and generalist GYN-related skills.  I'm not aware

13   of Dr. Porter's capability in that sense.

14   Q.    Okay.  Do you dispute that she had skills that could have

15   been used by the OB/GYN department after May of 2017?

16   A.    I don't know that.

17   Q.    So you can't dispute it?

18   A.    I'm --

19   Q.    If you don't know, you can't dispute it, correct?

20   A.    I think Dr. Porter's skills as a surgeon, as an

21   ultrasonographer were centered around her reproductive

22   endocrinology and fertility related work.

23   Q.    You were here when she testified, correct?

24   A.    Correct.

25   Q.    All right.  So are you questioning her testimony that a

1    lot of her work was not related to IVF or infertility?

2    A.    No.

3    Q.    Who was Nurse Elizabeth Todd?

4    A.    I think she was a nurse practitioner who worked in the

5    department.

6    Q.    And she was retained in the OB/GYN department, correct,

7    after the REI closed?

8    A.    Correct.

9    Q.    And she had been primarily an REI nurse practitioner

10   before the closure, correct?

11   A.    Correct.

12   Q.    And then after the closure she nevertheless did work in

13   the OB/GYN department generally, correct?

14   A.    Correct.

15   Q.    And Dr. Porter could have done the same thing, correct?

16   A.    She was not a nurse practitioner.

17   Q.    Well, as a doctor, she could have done the same thing.

18   When the REI division was closed, she could have been retained

19   in the OB/GYN department, correct?

20   A.    I don't know if that's the case.

21   Q.    Do you know of any reason why she couldn't?

22   A.    I'm saying that we ended the division and its function and

23   the physicians that worked in it.

24   Q.    But do you have any reason to believe that she could not

25   then provide necessary services to the OB/GYN department?

```
 1                ATTORNEY McDONALD:  Objection, asked and answered.
 2                THE COURT:  Overruled.  Go ahead.
 3                THE WITNESS:  I don't know the nature of the,
 4      distinct nature of the skills that she would provide that were
 5      not associated with reproductive endocrinology and fertility
 6      related work.
 7      BY ATTORNEY JONES:
 8      Q.   I'd like to turn to another document.  I'd like to direct
 9      your attention to Plaintiff's Exhibit 89 which is in evidence.
10      Do you recall this document, Dr. Merrens?
11      A.   I do.
12      Q.   So this document begins on the third page with an email
13      from you to Dr. DeMars dated May 12th 2017; is that correct?
14      A.   Correct.
15      Q.   And you state, "Leslie, I am getting inundated with
16      heartfelt and long emails wondering why Misty can't stay on to
17      do her ultrasound, complex operative and teaching role even if
18      we end REI".  You see that?
19      A.   I do.
20      Q.   And were you getting inundated with phone calls and
21      letters?
22      A.   I did.
23      Q.   From what, what types of people were sending you emails
24      and making phone calls?
25      A.   I think there were physician colleagues and some nurses.
```

1    Q.    Okay.  Any patients?

2    A.    No.  Um.  Yes, there were patients, yes.

3    Q.    So patients, nurses --

4    A.    Yeah.

5    Q.    -- physicians?  So you were hearing this from a lot of

6    different classes of people, correct?

7    A.    Correct.

8    Q.    And then you say to Dr. DeMars, "I suspect you considered

9    this".  You're asking whether she took that into account,

10   correct?

11   A.    Correct.

12   Q.    Okay.  "In the evaluation of the program and your

13   knowledge of Misty.  I just need to know how to better answer

14   this question."

15        So, before you wrote this email to Dr. DeMars, how were

16   you answering the question that you felt needed improvement?

17   A.    How was I answering which question?

18   Q.    The question of why Misty can't stay on to do her

19   ultrasound, complex operative and teaching role even if we end

20   REI.

21   A.    I wanted to have a better understanding of some of the

22   nature of the other work that Dr. Porter was engaged in that

23   was referenced in those communications.

24   Q.    Okay.  You end this email to Dr. DeMars by saying, "I just

25   need to know how better to answer the question".  That would

VOLUME: 8
PAGES: 432-646

1    suggest that you had answered the question and felt that it

2    need to be better.

3    A.    I needed more information.

4    Q.    Okay.  So how were you answering the question before you

5    got more information?

6    A.    That we ended the program and the physicians that were

7    engaged in it and I understood that they did a wide range of

8    things.

9    Q.    So, after getting more information from Dr. DeMars, did

10    you have a better way to answer the question?

11    A.    I did.

12    Q.    Okay.  So, taking a look at Dr. DeMars's response, the

13    lengthy one, Almost a page and a half single spaced.  Starting

14    at the first paragraph, it says, "Yes, there has been an

15    enormous backlash, mostly heartfelt based on Misty's

16    longevity".  It goes on.  Two sentences down, "Make no mistake,

17    though, that Misty hasn't been contributing to those emotions".

18        So Dr. DeMars is suggesting Misty herself is responsible

19    for some of those emotions, correct?

20    A.    In her statement, yes.

21    Q.    Yeah.

22        ATTORNEY McDONALD:  May we approach the bench?

23        THE COURT:  Yes.

24        (Bench conference begins.)

25        ATTORNEY McDONALD:  I just want to make sure we've

1    giving the witness enough time to review the document before

2    flying into questions.  If you could just give him a minute

3    once he gets there.  Thank you.

4                ATTORNEY JONES:  Okay.  I can do that.

5                ATTORNEY McDONALD:  Great, thank you.

6                (Bench conference ends.)

7    BY ATTORNEY JONES:

8    Q.   Dr. Merrens, back to this first paragraph, Dr. DeMars then

9    states -- I want to go down to the last two sentences of this

10   paragraph.  It says, "Everyone also is remembering Misty as a

11   full-time employee wearing three hats and not the one who has

12   been out for almost 18 months.  What she has done in those 18

13   months is help several members of the department have babies".

14        So she's saying everyone, the people, the backlash, the

15   people who want to bring Misty back are wondering why she can't

16   be retained.  According to Dr. DeMars, "Everyone is remembering

17   Misty as a full-time employee wearing three hats and not the

18   one who has been out for almost 18 months".

19        Is it your understanding that her reference to Misty being

20   out for almost 18 months, that's a reference to her disability

21   leave?

22                ATTORNEY McDONALD:  Objection, calls for speculation.

23                ATTORNEY JONES:  Is that how you understood it?

24                THE COURT:  Objection overrule.  The witness can

25   answer if he know.

1          THE WITNESS:  Yes.

2     BY ATTORNEY JONES:

3     Q.    And she says, "What's the talking point?  My suggestion is

4     we are working with each physician on their employment options

5     as well as what is best for DH and DH OB/GYN.  I don't know how

6     you say, quote, I understand you are angry, but this decision

7     was made in the best interests of the division and Misty".

8     Do you see that?

9     A.    I do.

10    Q.    Okay.  And then she says, "Even if that's the truth, no

11    one will buy it at the moment".

12          So, with regard to her reference to what's the best

13    interest of Misty, did you have a reaction when Dr. DeMars

14    suggested that what was happening was in the best interest of

15    Misty?

16    A.    This decision was not made in the best interest of Misty.

17    It was made in the best interest of her patients.

18    Q.    Right.  And then, if we turn to the next page, right in

19    the middle in the fourth, fifth paragraph down beginning

20    "Misty's medical disability", Dr. DeMars writes, "Misty's

21    medical disability has been devastating, and I'm not sure she

22    would or will really ever be able to do the complex hister" --

23    I'm sorry.  I'm not a physician.  I'm not even --

24    A.    Hysteroscopy.

25    Q.    And --

1       A.   Laparoscopy.

2       Q.   -- there you go -- "that she once did".  So Dr. DeMars is

3    now directly referring to Dr. Porter's disability, correct?

4       A.   She's reflecting she's not sure she's going to be able to

5    return to do these procedures.

6       Q.   Okay.  Exactly.  So she has concluded, she's expressing

7    doubt about Dr. Porter's ability to become fully recovered and

8    return to her former skills, correct?

9       A.   Correct.

10      Q.   And then says, "I think that the best outcome of this

11   termination is the chance for Misty to actually be out on leave

12   with no intervening responsibilities".  Do you see that?

13      A.   I do.

14      Q.   Despite what Dr. DeMars thinks would be best for Dr.

15   Porter, you heard Dr. Porter testify that she wanted to return

16   to work, correct?

17      A.   Correct.

18      Q.   So Dr. DeMars is purporting to opine on what she thinks is

19   best for Misty and that Misty losing her job would be best for

20   Misty.  You respond to this email, and you say, "Leslie, I

21   didn't get it, get back to you when you sent this on Friday,

22   but I think it's a comprehensive, thoughtful, and appropriate

23   insight".

24           Do you think everything we just covered there was

25   appropriate and thoughtful?

1    A.    It was her response, and I appreciated everything that she

2    put into it.

3    Q.    You think her opining on what she thinks best for Misty is

4    appropriate and thoughtful?

5    A.    I didn't say that.

6    Q.    But you said that her responses was comprehensive,

7    thoughtful, and appropriate, correct?

8    A.    It was appropriate to frame her perspective for me, and

9    that's all I asked for.

10   Q.    Okay.

11   A.    I didn't say it was the decision maker.  I said it was

12   really appropriate for her to frame everything that she was

13   thinking.

14   Q.    I'd like to direct your attention now to a different

15   topic.  I'd like to talk about Dr. DeMars.  Isn't it true that

16   you have stated that Dr. DeMars is not an accurate reporter of

17   information?

18   A.    Correct.

19   Q.    You said that in your deposition, correct?

20   A.    Correct.

21   Q.    And you have stated that she's not a good leader?

22   A.    Correct.

23   Q.    And you have stated that you hold her accountable for the

24   REI's failure?

25   A.    Correct.

1    Q.   And, in fact, after the REI's closure, you asked her to

2    step down, correct?

3    A.   Correct.

4    Q.   Because you had lost faith in her leadership, correct?

5    A.   Correct.

6    Q.   But you still followed her recommendation to close the

7    REI, correct?

8    A.   No.

9    Q.   No?

10   A.   I included her perspective as part of the decision to

11   close the division.

12   Q.   Okay.  And you followed her recommendation to terminate

13   the employment of Dr. Porter?

14   A.   I followed her recommendation, along with the other people

15   that we spoke about, and we formulated a plan to close the

16   division and terminate the employment of three physicians.

17   Q.   Okay.  And you relied upon her input as part of the

18   process --

19   A.   Correct.

20   Q.   -- to decide not to keep Dr. Porter in some other capacity

21   in OB/GYN?

22   A.   Correct.

23            ATTORNEY JONES:  Your Honor, if I may have --

24            THE COURT:  Yes.

25            ATTORNEY JONES:  No further questions, Your Honor.

VOLUME: 8
PAGES: 432-646

1           THE COURT:  Okay.  Ms. McDonald.

2               CROSS-EXAMINATION BY ATTORNEY McDONALD

3    Q.   Hi, Dr. Merrens.

4    A.   Hello.

5    Q.   Who made the decision to the close the REI division?

6    A.   I did.

7    Q.   Is there a distinction in your mind between the IVF

8    program and the REI division?

9    A.   I think one, I think the REI division encompasses the

10   provision of IVF-related services.

11   Q.   I'll ask you to take a look back at Exhibit 83 which

12   Mr. Jones just showed you.  Do you have that in front of you,

13   or do you need it on the screen?

14   A.   I can find 83.

15   Q.   Thank you.  Okay.  I'll ask you to take a look back at the

16   first few lines of that email.  Mr. Howe, could you publish

17   that for the jury?  This one's in evidence, 83.

18           COURTROOM DEPUTY:  From where?

19   BY ATTORNEY McDONALD:

20   Q.   From Ray's computer.  All right.  The second sentence

21   there where you say, "The recommendations around closing the

22   program and its staff were at the recommendation of Dr.

23   DeMars".

24       When you say program, are you referring to the IVF program

25   or the REI division?

1    A.    The REI division.

2    Q.    In the discussions about closing the REI division, did you

3    consider information that Dr. DeMars provided you?

4    A.    Yes.

5    Q.    What kind of information did you consider?

6    A.    Issues with availability to see patients, nursing,

7    staffing, the ability of the team to coordinate and to be

8    effective in terms of providing care.

9    Q.    At the time that you made the decision to close the REI

10   division, did you have any knowledge about the specific nature

11   of Dr. Porter's disability?

12   A.    No.

13   Q.    Did you have any knowledge about specific complaints that

14   Dr. Porter made about Dr. Hsu or Dr. Seifer?

15   A.    I did not.

16   Q.    In your role would you expect to hear certain specific

17   complaints about physicians as the chief clinical officer?

18   A.    Not specifically, unless it was significant and -- no.

19   Q.    I think you -- how many physicians reported to you in,

20   reported to you indirectly or directly at this time?

21   A.    Probably close to 1,500.

22   Q.    If you had been aware of Dr. Porter's desire to stay on in

23   a noninfertility capacity, would that have changed your

24   decision about whether Dr. Porter should be terminated?

25   A.    No.

1    Q.   You testified today that discussions about closure of the
2    REI division began around the April of 2017 timeframe.   Prior
3    to April of 2017, were you aware of issues with the REI
4    division?
5    A.   I was not.
6              ATTORNEY McDONALD:  If I could just have one moment.
7              THE COURT:  Yes.
8              ATTORNEY McDONALD:  Nothing further.  Thank you.
9              THE COURT:  Okay.  Thank you.  Any further questions,
10   Mr. Jones?
11             ATTORNEY JONES:  Nothing further.
12             THE COURT:  Okay.  Dr. Merrens, you may step down.
13   Okay.  So, at this time, we will take our midmorning break.
14   This break may be a little bit longer than typical, I'll just
15   let you know.  Maybe it won't be, but maybe.  So I don't want
16   you to be surprised by that, all right?
17             (The Jury leaves the courtroom.)
18             THE COURT:  Does the plaintiff have any more
19   witnesses to call?
20             ATTORNEY JONES:  That's it, Judge.  We're done with
21   our case in chief.
22             THE COURT:  So you rest?  Okay.
23             ATTORNEY JONES:  We rest.
24             THE COURT:  Defense, Mr. Schroeder?
25             ATTORNEY SCHROEDER:  Yes, Your Honor.  We'd like to

1    move under Rule 50 for a motion for -- oh, I will apologize.

2    My co-counsel wanted to deal with an admission of an exhibit

3    issue.

4            ATTORNEY COFFIN:  Yeah.  Your Honor, we would like to

5    renew our request to admit what I think has been marked C19,

6    but it's the chart that Dr. Bancroft made on cross-examination.

7            THE COURT:  Okay.  Could I see a copy of that again?

8    I do have questions about what exactly it shows.

9            ATTORNEY COFFIN:  Sure.  Just a second, Your Honor,

10   if I might.

11           THE COURT:  Yes.

12           ATTORNEY VITT:  To refresh my recollection, can I see

13   that for a second, please?

14           THE COURT:  Let me just take a quick look.  I think I

15   know exactly -- yeah.  Okay, thank you.  All right.  So,

16   Mr. Coffin, you're requesting admission of C19 into evidence as

17   some type of demonstrative?

18           ATTORNEY COFFIN:  Yes, correct.

19           THE COURT:  Okay.  So why is this different than

20   Dr. Bancroft's chart which has been offered as a demonstrative?

21           ATTORNEY COFFIN:  It may or may not be, but we want

22   this into evidence.  I do think it's different because it is

23   impeachment.  It's a statement by a party opponent.  It goes

24   directly to his methodology in how he calculated the loss

25   figure, and he chose to do it in a way that is not readily

1    apparent.  And, in fact, it shows that she was actually, if you

2    used the same amount of employment, 1.0 at Dartmouth and 1.0 at

3    UVM, that she mitigated her damages by 2025.  So I think it's a

4    statement by a party opponent, impeachment, and directly

5    relevant to the case.

6         THE COURT:  Okay.  Impeachment doesn't necessarily

7    mean it's evidence, right?

8         ATTORNEY COFFIN:  No, but it is substantive if it

9    goes to the core matter in the case, which is the damages for

10   this witness.  It is admissible.  It's his statement of -- it's

11   sort of a parallel way of doing the chart and statement about

12   that.

13        THE COURT:  Okay.  I'm just concerned about this

14   going back to the jury room as is and the jury picking this up.

15   I mean, I understand what you did with it with the Witness when

16   the Witness was testifying.  This seems to me to be more in the

17   category, if it's going to be any type of an exhibit, it would

18   be a demonstrative, perhaps, that you would be able to

19   reference during closing, but it just doesn't real speak for

20   itself.

21        ATTORNEY COFFIN:  Well, but the Witness testified

22   about it extensively and explained what he was doing without

23   objection, and it would be, I think, helpful to the jury to

24   remember that important testimony and have those numbers there.

25   We will use a demonstrative exhibit to explain it, but I don't

 1    see any basis for excluding it from evidence.  It's clearly

 2    relevant, certainly not more prejudicial than probative, and

 3    it's not confusing to the jury.  And, indeed, in comparison,

 4    the testimony and the, you know, charts that were put, provided

 5    at the very last minute to us and after discovery violations,

 6    by the way, and we were asked to respond to, though, I don't

 7    think it's unreasonable for us to seek its admission as

 8    substantive evidence.

 9             THE COURT:  Okay.  Mr. Vitt or whoever wants to argue

10    this point?

11             ATTORNEY VITT:  We object, Judge.  It's inaccurate,

12    it's incomprehensible, and I see no reason this should go back

13    to the jury at all.  It shouldn't be admitted.  Dr. Bancroft

14    said it was inaccurate.  In his testimony, he said it's simply

15    inaccurate.  So we object.

16             THE COURT:  Okay.  Do you have any objection to this

17    being used as a demonstrative?

18             ATTORNEY VITT:  I mean, in closing?

19             THE COURT:  Yes.

20             ATTORNEY VITT:  I think I do.  I want to think about

21    that, but, certainly, for purposes of admissibility now, we

22    disagree.

23             THE COURT:  All right.  So this is being brought up

24    now because of the anticipated motion.  So is this kind of your

25    -- you want this to be part of the record right now so that,

1    because it's relevant to your Rule 50?

2            ATTORNEY COFFIN:  I'm worried that, if we proceed

3    with our motion and we rest without this being introduced, we

4    may not be able to get it introduced into evidence in our case.

5    So we raised this before when this first came up with this

6    witness, and the Court deferred a ruling on it.  I just didn't

7    want to lose our opportunity to have it admitted.  I do think

8    it is directly impeachment.  Doesn't matter that Dr. Bancroft

9    disagreed with it.  That's the point.  We should be able to

10   show that.  You know, we've been left with the remedy of

11   cross-examination as an alternative to present his projections,

12   and I think this is part and parcel to that.

13           THE COURT:  Okay.  So, at this time, I'm going to

14   decline the request to make it substantive evidence admitted

15   into evidence in the case.  The issue of whether it can be used

16   as a demonstrative is something I'm certainly open to

17   considering at a later time in the case, but, at this time,

18   anyway, not as substantive evidence.

19           ATTORNEY VITT:  While we're on the issue of the

20   Bancroft report and the chart, I think you might have deferred

21   the issue of admissibility, and I want to make sure.

22           THE COURT:  Yes, at the request of defense counsel,

23   right?  Mr. Coffin?

24           ATTORNEY COFFIN:  Oh, I didn't realize that look was

25   asking for me to comment.

1           THE COURT:  Well, I don't know.  Mr. Vitt's bringing

2      it up.  I do recall that --

3           ATTORNEY COFFIN:  I do think you had deferred that.

4           THE COURT:  Yes.

5           ATTORNEY COFFIN:  I disagree that they are exactly

6      equivalent, but the plaintiffs have now rested, and I don't

7      know what the Court's plan to do with that deference, and I

8      don't know what Mr. Vitt's request to the Court.  I don't think

9      I've heard him say that he now wants to seek its admission or

10     permission to use it as demonstrative evidence.  Perhaps that's

11     where he's going, but I haven't quite heard that from him.

12          THE COURT:  Okay.  Mr. Vitt?

13          ATTORNEY VITT:  Well, we're to the point of resting,

14     and I don't want to leave it sort of hanging out there.  If

15     it's going to be resolved at a later time, that's fine, as long

16     as we're not prejudiced in any way not getting it admitted now.

17          THE COURT:  Okay.  As I recall -- please correct me

18     if I'm wrong -- I thought Mr. Coffin said, We may be okay with

19     it being a demonstrative, we may be okay with it coming in as

20     substantive evidence, and the request was that I wait in ruling

21     on it, and I thought I was going to be hearing back from

22     defendants on that issue.  I figured you were waiting for your

23     cross-examination of Dr. Bancroft.

24          ATTORNEY COFFIN:  Well, I guess what I was waiting

25     for was what the plaintiffs were going to seek the Court to do,

VOLUME: 8
PAGES: 432-646

1    and they've now rested without renewing their motion to admit

2    it.  I don't know if that formality matters or not, but we

3    wanted to make sure that we were able to have that document

4    admitted as substantive evidence, and I'll leave it to them to

5    sort of decide what they want to do with their document.

6        You know, we continue to think that their chart with its

7    various iterations and the discovery problems and the late

8    disclosures and the very elaborate analysis is unclear and

9    misrepresentative and should not be admitted as substantive

10   evidence.  To the extent that their chart is admitted as

11   substantive evidence, certainly, ours should be, and, you know,

12   I leave it to the Court's discretion about whether the

13   appropriate thing to do with both is to admit them only as

14   demonstrative evidence.

15       I would urge the Court, though, to see ours just a little

16   differently, because that was direct impeachment on something

17   that was incredibly important and central to the case, and it's

18   a statement by the Witness on the stand, and it's sort of a

19   different category of item.

20           THE COURT:  Okay, all right.  So, with respect to the

21   Bancroft chart, so I will not allow its admission as

22   substantive evidence.  It can be used as a demonstrative

23   exhibit, which is parallel and the equivalent of the ruling

24   with respect to C19 that was made today.  So both can be used

25   as demonstrative exhibits, okay?

VOLUME: 8
PAGES: 432-646

```
1                   ATTORNEY COFFIN:  Thank you, Your Honor.

2                   THE COURT:  You're welcome.

3                   ATTORNEY COFFIN:  May I approach to grab that?

4                   THE COURT:  Yes, of course.

5                   ATTORNEY JONES:  And, Mr. Coffin, could we get a copy

6       at some point?  Because you have the only copy that exists

7       right now.

8                   ATTORNEY COFFIN:  Fair enough.  We'll make you a

9       copy.

10                  ATTORNEY SCHROEDER:  Your Honor, if we may, at this

11      point, defendants would like to move for directed verdict

12      pursuant to Rule 50.  I'd appreciate if we had perhaps a quick

13      break, because this will, I think, be rather lengthy.

14                  THE COURT:  Okay.

15                  ATTORNEY SCHROEDER:  If we could have five minutes,

16      I'd appreciate that, to come back, and if you are prepared to

17      hear oral argument on that.

18                  THE COURT:  Okay.  So five minutes, is that what

19      you're asking?

20                  ATTORNEY SCHROEDER:  That would be ideal.

21                  THE COURT:  Okay.  We'll do that.

22                  ATTORNEY SCHROEDER:  Thank you.

23          (A recess was taken from 10:27 a.m. to 10:42 a.m.)

24                  THE COURT:  Mr. Schroeder?

25                  ATTORNEY SCHROEDER:  Thank you, Your Honor.  May I
```

1    approach to the podium?

2              THE COURT:  Yes.

3              ATTORNEY SCHROEDER:  Thank you.  Thank you, Your

4    Honor.  We are, as defense counsel and on behalf of the

5    defendants, all defendants, making a Rule 50 motion for

6    directed verdict.  As the Court well knows and --

7              THE COURT:  Oh, I'm sorry, Mr. Schroeder.  I meant to

8    take an issue up preliminarily, but I apologize.  The jury, I

9    don't know how long this is going to take.  I was going to ask

10   the parties how you feel about perhaps my letting them go now

11   to come back a little later.

12             ATTORNEY SCHROEDER:  I think that's appropriate, Your

13   Honor.  I was going to raise that after we had oral argument.

14   My concern, so we've got three witnesses this afternoon.

15             THE COURT:  Yeah.

16             ATTORNEY SCHROEDER:  They're, one is here.  The other

17   two will be here at 1:00 o'clock.  But, based upon

18   representations by plaintiff's counsel that they were going to

19   be done around lunchtime with Dr. Merrens and we've got people

20   flying in from other places and coming in from other places,

21   those three witnesses, I think, are fairly short.  Not knowing

22   how long this process would take and your consideration of our

23   motion, plaintiff's opposition, obviously, I certainly think

24   having them take a break for at least a couple of hours seems

25   appropriate, but I'd defer to the Court.

VOLUME: 8
PAGES: 432-646

1            THE COURT:  Yeah, I was thinking maybe ask them to

2    come back at 12:30 so they get kind of a longer-than-usual

3    lunch, but I could say 1:00.  I mean, if you were planning on

4    plaintiff's case being done by noon, so you wouldn't get going

5    until 1:00 anyway.

6            ATTORNEY SCHROEDER:  That was the concern, Your

7    Honor, and I think the three witnesses maybe will get done a

8    little bit earlier than 4:30, but we have everything lined up

9    for the next few days to, to go in real cadence, so to speak,

10   and I'm confident that we'll have the people available and

11   ready to go in that order just given that.  Sure, I actually

12   was thinking closer to 2:00 o'clock, but I, once again, I defer

13   to the Court.  I'm not sure how long, Judge, you will need to

14   consider our motion.

15           THE COURT:  Okay, all right.  So, plaintiffs, I think

16   I'll tell the jury to return at 1:00 o'clock at this time,

17   okay?

18           ATTORNEY JONES:  That's fine.

19           ATTORNEY VITT:  That's fine.

20           THE COURT:  So sorry about that, Mr. Schroeder.  You

21   came up to the podium to argue your motion.  I should bring the

22   jury in and let them know that.

23           ATTORNEY SCHROEDER:  Can I leave my stuff up here?

24           THE COURT:  Yes, yes.  Okay.

25               (The Jury enters the courtroom.)

VOLUME: 8
PAGES: 432-646

1          THE COURT:  Okay.  So there are some items that I'm

2     going to need to speak to counsel about.  So I'm going to be

3     releasing you early for lunch today, as in now, and you can be

4     prepared to get going again at 1:00 o'clock.  All right?  Thank

5     you.

6               (The Jury leaves the courtroom.)

7          THE COURT:  Mr. Schroeder?

8          ATTORNEY SCHROEDER:  Thank you, Your Honor.  Your

9     Honor, pursuant to Rule 50, as the Court knows, and we are now

10    making a defendant's motion for directed verdict pursuant to

11    Rule 50.  As the Court knows, if a party, as it states under

12    the rule, if a party has been fully heard on an issue during a

13    jury trial and the Court find that a reasonable jury would not

14    have a sufficient evidentiary basis to find for the party on

15    that issue, then the defendants would be entitled to a verdict

16    on this case.

17         Just by way of overview, Your Honor, and just as an

18    overview of the case, the entire REI division was shut down in

19    May of 2017, resulting in the termination of both Dr. Porter

20    and the two other physicians as of June 3rd 2016.  DH had

21    legitimate business reasons for closing the REI division.

22    There were longstanding issues with recruitment and staffing

23    shortages of skilled nurses, and we've heard, I think,

24    unrebutted testimony on this point.

25         Between 2016 and 2017, June 2017 or May, REI experienced a

1    particularly critical shortage of trained nurses, and we heard

2    testimony relating to November and December of 2016 that DH,

3    Dartmouth Health, was forced to defer new patients between

4    December 2016 and February 2017 to allow remaining nurses to

5    catch up.  The last fully trained REI nurse left Dartmouth

6    Health in April 2017.  That was the Nurse Marlene Grossman who

7    was covering the Bedford location, so the southern part of the

8    state.

9        Dartmouth Health doesn't dispute that Dr. Porter made

10   complaints about her colleagues.  In fact, there were patient

11   complaints about all REI physicians, including Dr. Porter

12   herself.  One individual who you've heard testimony about,

13   Nurse Practitioner Beth Todd, she had had complaints as well,

14   and she is still employed by Dartmouth Health.  So there's no

15   evidence of retaliation there.

16       But, also, there is testimony in the record that the

17   evidence relating to complaints by Dr. Porter, that they far

18   predated even Dr. Hsu's arrival in May, June of 2014.  In fact,

19   complaints that Dr. Porter had relating to various individuals

20   in the REI division, as well as the former chair of the OB/GYN

21   department, Dr. Richard Reindollar.

22       Dr. Merrens just testified that he had no knowledge,

23   specific knowledge of Dr. Porter's complaints and no knowledge

24   about the details of her disability and that he was the

25   ultimate decision maker in deciding to terminate the REI

VOLUME: 8
PAGES: 432-646

1    division and the three individuals that were terminated at that

2    time:  Dr. Porter, Dr. Hsu, and Dr. Seifer.

3         Now, that brings us to the claims in the case, Your Honor,

4    and there are six claims in the case, a handful of claims

5    under, under the New Hampshire law as well as an ADA claim,

6    Section 504 Rehabilitation Act claim, and a Vermont disability

7    discrimination claim as well.  I think there's really two

8    buckets here, Your Honor, that this case is about, and we've

9    had preliminary arguments or, I should say, pretrial arguments

10   on this issue.  There's disability discrimination on the one

11   hand, and then there's this retaliation case on the other, and,

12   if you put -- if I may start with the disability

13   discrimination, I'll work my way to the retaliation part.

14        With respect to disability discrimination in particular,

15   whether we're dealing with New Hampshire claim, Vermont claim,

16   or the ADA/Rehab Act claim, you have the issue of, Is somebody

17   disabled under the ADA?  And I don't think there's any dispute

18   about Dr. Porter, at the time, being disabled under the ADA.  I

19   think, for purposes of this motion at least, we would assume

20   that she was a person with a, Dr. Porter was a person with a

21   physical or mental impairment that substantially limits a major

22   life activity.  I think, just given the fact that she was on

23   long-term disability benefits all the way through the summer of

24   '18, so another 12 to 14 months after the closure of the REI

25   division, kind of speaks for itself.  So we can assume that she

VOLUME: 8
PAGES: 432-646

1    was disabled under the ADA for purposes of this motion.

2         But then that begets the question of qualified individual

3    with a disability, which is the next part of this.  And,

4    because this case is now down to the issue of termination, so

5    disability discrimination and an alleged failure to reasonably

6    accommodate in the context of termination, that's specifically

7    what's left in this case, you then get to the issue of, Well,

8    was she a qualified individual with a disability?  Was she able

9    to perform the essential functions of her position with or

10   without reasonable accommodation?

11        And so, specifically, we're now dealing with just the

12   issue of reasonable accommodation upon termination, and there

13   has been a significant amount of litigation under the ADA since

14   1993.  The term "reasonable accommodation", according to 42

15   U.S.C. Section 12111(9)(B) states the following:  "The term

16   reasonable accommodation may include, subpart B, job

17   restructuring, part-time or modified work schedules,

18   reassignment to a vacant position, acquisition or modification

19   of equipment or devices, appropriate adjustment or modification

20   of examinations, training materials or policies, the provision

21   of qualified readers or interpreters and other similar

22   accommodations for individuals with disabilities."

23        And I really want to focus on reassignment to a vacant

24   position and why the disability discrimination claims brought

25   by Dr. Porter fall apart at this stage of the proceedings

1    without defendants having to put on their case in chief.

2    Specifically, in this case, we come back to the fact that the

3    REI division was closed and, I think, the fact that Dr. Porter,

4    Dr. Hsu, Dr. Seifer, were all terminated in conjunction with

5    the closure of the REI division.  And I think we've heard

6    undisputed evidence at this point that this was the first time

7    a division had been closed completely by Dartmouth Health.

8    This was a fairly significant decision.  It impacted a lot of

9    people's lives, and, as Dr. Ed Merrens testified, it related to

10   the issue of not having the right level of clinical resources

11   for the patients in ensuring excellent patient care.

12        What this then comes down to, though, what we have not

13   heard, though, other than Dr. Porter's own subjective opinion

14   and belief that she could have remained in some job in the

15   OB/GYN department or could have gone into the radiology

16   department, there is no evidence in the record of an open,

17   vacant position that was available that Dr. Porter could have

18   been slotted into.  And we've heard testimony of Dr. Porter,

19   and they've called a number of our witnesses in their case in

20   chief, Dr. Padin, Dr. DeMars, and now Dr. Merrens.  There is

21   not one piece of record evidence that there was an open, vacant

22   position that Dr. Porter could have been reassigned to as a

23   reasonable accommodation to her disability at the time of the

24   termination of the REI division.

25        What's instructive here, Your Honor, is *Graves v. Finch*

1    *Pruyn*.  It's a Second Circuit 2006 decision which states,

2    quote, "The ADA lists reassignment to an existing vacant

3    position as a possible re, possible reasonable accommodation,

4    comma, 42 U.S.C. Section 1211(9)(B)", which I just quoted, "but

5    the ADA does not require creating a new position for a disabled

6    employee".  And, in fact, Your Honor, that's Second Circuit

7    precedent.

8                THE COURT:  Do you have a citation for that?

9                ATTORNEY SCHROEDER:  I do, Your Honor.  457 F.3d 187,

10   string cite -- I'm sorry -- 181 to 187, Second Circuit 2006.

11   *Graves v. Finch Pruyn*, P-R-U-Y-N and Company, Inc.

12       In addition, Your Honor, there are cases from the Sixth

13   Circuit, *Cooper v. DolgenCorp*, LLC, 93 F.4th 360, 371, 372

14   Sixth Circuit 2024 decision.  You can now tell by the citation

15   I'm dating myself because I remember when it was F Supp 2d, so

16   we've come a long way, apparently, in the treatises of law.

17   And, in that case, *Cooper v. DolgenCorp*, it was, "When the

18   requested accommodation is a job transfer, employers have a

19   duty to locate suitable positions for employees with

20   disabilities pursuant to the ADA.  However, this duty does not

21   require employers to create new jobs or displace existing

22   employees from their positions to accommodate a disabled

23   individual, nor does a reasonable accommodation require

24   employers to eliminate or reallocate an essential job

25   function."

VOLUME: 8
PAGES: 432-646

1        In addition, *Ehlers v. University of Minnesota*, 34 F.4th
2    655, Eighth Circuit 2022, and that stands for the proposition
3    that an employer is not required under the ADA to create a new
4    position or move other employees from their jobs in order to
5    open up a position as accommodation for an employee's
6    disability.  Rather, reassignment to another position is
7    required accommodation only if there is vacant position for
8    which the employee is otherwise qualified.

9        Finally, the *Perdue v. Sanofi-Aventis U.S.*, case 999 F.3d
10    954, comma, 960.  It's a Fourth Circuit 2021 case.  "The ADA
11    does not require that the employer create new positions for
12    disabled employees.  Moving employees to part-time work may be
13    reasonable accommodation under the ADA only when the employer
14    has part-time jobs readily available.  That is, when part-time
15    positions, when a new part-time position does not need to be
16    created."

17        And I want to hearken back to Dr. Padin's testimony in
18    conjunction with Dr. Porter's testimony.  Dr. Porter said,
19    Well, I could have stayed on in the OB/GYN department.  She did
20    not identify a specific position that she was qualified to go
21    into at the time the REI division was closed.  She was on a,
22    she was on intermittent leaves of absence and, actually, as she
23    testified, she was out of the office on two different leaves to
24    go to the Mayo Clinic post-termination and then a second
25    surgery in the fall of 2017, and she remained on long-term

VOLUME: 8
PAGES: 432-646

1    disability for, until the following summer of 2018.

2         So set aside whether or not she'd be able to actually come

3    back in whatever capacity.  So set aside that issue.  She's

4    testified that she could.  And then there's her history,

5    chronological history or timeline, of her actual condition and

6    the periods of time that she was out.  But set that aside for a

7    second.  There is no testimony that there was a open, vacant

8    position for her in the OB/GYN department.

9         Dr. Padin, who testified under cross-examination, was

10   asked, Well, what about the OB/GYN department?  Wasn't there a

11   need for doctors in that department, right, and overall?  And

12   so this gets into whether a doctor has credentialing or

13   privileges for the specific needs of the department at the

14   time, one of which was generalist, which was, and really was

15   the only major area of need.  And Dr. Padin testified, Well, I

16   don't believe she had, that Dr. Porter didn't have privileges

17   for obstetrics at that point because you need to be up to

18   speed, so to speak, credentialed and privileged for the

19   specific area that you would like to have a job in.

20        And so, to the extent that there is testimony in the

21   record that there were open positions in the OB/GYN department

22   or that there was a need for additional assistance, there is no

23   evidence in the record that Dr. Porter was privileged or had

24   credentials at that point in obstetrics, which was the need

25   that Dr. Padin has testified to.  And there's an email string

1    or an email that actually Mr. Jones referred to the fact that

2    Dr. Padin that summer did assist.  Well, she was privileged in

3    that specific area and that's why she was jumping in to assist.

4         So there is no evidence in the record at the end of the

5    day that there was an open, vacant position for Dr. Porter to

6    be reassigned to within either the OB/GYN department or the

7    radiology department.  There has not been any testimony on the

8    radiology department at all.  It's really come down to the

9    OB/GYN department.  And Dr. Padin, I think, has offered

10   unrebutted testimony that where the need for additional

11   doctors, physicians was doctors and physicians that were

12   actually had privileges at that point in obstetrics.

13        There was testimony about the fact that the Alice Peck Day

14   acquisition had happened the year before and the labor and

15   delivery part, which was what Alice Peck Day was known for, was

16   rolled into Dartmouth Health and so, at that time, there was

17   certainly a need for obstetrical privileged physicians, and Dr.

18   Porter was not one of those.

19        So we come back to Dartmouth Health was not under a duty

20   to create a new vacant position for Dr. Porter, and, as a

21   result, her claims for disability discrimination should be

22   dismissed at this stage of the case.  And, if I may, Your

23   Honor, move on to issue of retaliation.

24             THE COURT:  Yes.

25             ATTORNEY SCHROEDER:  Now, with respect to

VOLUME: 8
PAGES: 432-646

1    retaliation, there is a claim for wrongful discharge under New

2    Hampshire law.  There is a claim for whistleblower retaliation

3    under New Hampshire law.  There is a claim for retaliation, I

4    believe, under Vermont law as well, and what it comes down to,

5    Your Honor, is the following:  There is, in this case, three

6    elements for a prima facie case.  Protected activity, and it

7    doesn't matter whether we're under New Hampshire, Vermont or

8    federal law on this point, but, in order to have a prima facie

9    case for retaliation, there must be protected activity and an

10   adverse employment action and a causal connection between the

11   two.

12        For purposes of this motion, I'll assume that there's

13   sufficient evidence on protected activity and there is an

14   obviously an adverse employment action as a result of the REI

15   division closure impacting Drs. Porter, Hsu, and Seifer all at

16   the same time.  However, what is lacking is a causal connection

17   between the two.  There is sufficient evidence in the record

18   that Dr. Porter's complaints about a slew of different

19   physicians, nurses, et cetera, date back many, many years, and

20   with Dr. Hsu it actually relates to October, November of 2023

21   where she already was critical of Dr. Hsu before he even gets

22   there.

23        But, regardless of that particular sequence of events,

24   there is no question that her complaints about Dr. Hsu began

25   and continued over a very long period of time in 2014, 2015,

1    2016, and 2017.  And so there is no temporal proximity between

2    her complaints, whether they're about Hsu or Seifer.  And, by

3    the way, I'm on Dr. Seifer.  Those started before he got there

4    as well.  I mean, there's a continuing theme here that, you

5    know, that the deck was stacked against both of them.

6            THE COURT:  But, even if it continued through 2017 as

7    you say now, that's not enough to create the temporal proximity

8    to allow the jury to find causation?

9            ATTORNEY SCHROEDER:  I don't believe so, Your Honor,

10   because the evidence in the record in terms of -- because then

11   you would have, then you basically have, like, a retaliation

12   claim for 10 to 15 years potentially because she made complaint

13   about those individuals.  I think the lack, the temporal

14   proximity if Dr. Porter -- if the evidence in the case was,

15   First time I made complaints about Dr. Hsu and Seifer were in

16   January of '17 or February or March or April, and then my

17   employment was terminated, well, then I think the case is

18   really clear that there would be a temporal proximity

19   connection there.  But, where the evidence in the case

20   demonstrates that, that Dr. Porter made complaints about

21   Dr. Hsu certainly dating back to 2014, there is case law that

22   even an eight-month period of time between a complaint and

23   adverse employment action, that there's no causal, that there

24   is no temporal proximity.

25           But set that aside.  Here we know, based on upon testimony

 1    by Dr. Porter, that she had complaints about Dr. Reindollar

 2    relating back to 2012, 2013, and then you go into 2014.  And so

 3    I think the temporal proximity falls, argument falls apart when

 4    you look at all the record evidence in this case.  The evidence

 5    is that Dr. Porter had complaints about other individuals

 6    dating back to 2012 all the way up until 2017.  And so, unlike

 7    all the other cases out there, which there's a lot of a wealth

 8    of case law on this, this case stands differently compared to

 9    those cases.

10         THE COURT:  So you don't think that there's a

11    substantive difference between complaints that might have been

12    made in 2014-15 about which we don't really have much in the

13    way of detail, but then the Hsu and Seifer complaints, a jury

14    might be justified in inferring that those were complaints of a

15    different kind, they took it to a different level?  I mean, if

16    I'm not mistaken, there's no, you say there's evidence of

17    comments about or criticisms of people, but is it of the same

18    type and substance, say, as the long letter about Dr. Hsu and,

19    you know, kind of the extended comments about those physicians

20    that do seem, when you think about the common law New Hampshire

21    claim or the whistleblower claim, that do seem to raise public

22    policy type issues, right, the Zika virus, the informed

23    consent.  I don't think there's as much information about prior

24    complaints going back to 2014-15, but what's your take on that?

25         ATTORNEY SCHROEDER:  Well, Your Honor, certainly, if

VOLUME: 8
PAGES: 432-646

1    we have to get to that part of this case, there will be.

2    Here's what I would say.  The Zika virus matter, I believe, was

3    2015.  I think it was.  Yeah, I'm fairly confident on that,

4    Your Honor, that the Zika virus one was 2015.  I would submit

5    to you, and I believe the evidence is clear that the complaints

6    about Hsu, the same complaints about Hsu's technique, his

7    abilities, his clinical knowledge, his skill set, all of those

8    were consistent dating back to 2014 when he got there.  There

9    is no difference between -- and, in fact, the Zika virus one, I

10   think, was in 2015, and that's almost at least 18 months, if

11   not longer, between that complaint and the termination of the

12   division and the closure of the REI division.

13       And so I believe, Your Honor, if you look at the whole

14   history of the evidence in the case of specific complaints,

15   that one, they don't really differentiate -- there's not a

16   differentiation between them.  So whether they were for public

17   policy reasons or not, I believe that those public policy

18   related complaints also were in the same group.  I don't think

19   there is a differentiation based on record evidence before the

20   Court between complaints in 2014 and '15 and complaints in 2016

21   and '17 With respect to Dr. Hsu and Seifer.  I just, I think

22   they were the same.

23       Dr. Porter was very specific in all of her emails, and

24   there were fairly lengthy ones relating to Dr. Hsu, and so, for

25   your, for your example, Your Honor, with respect to Dr. Hsu,

1    that was an eleven-page report that was dated June 3rd 2016.

2    That's almost a year, and I don't -- I believe the case law is

3    fairly robust on that point that the lack of temporal proximity

4    in that regard where it's June 3rd versus May, June of the

5    following year.

6        But I will say, Your Honor, that, and I think the evidence

7    that, emails that are all in from Dr. Porter date back far

8    before June of 2016 where Dr. Porter testified that she told

9    Dr. DeMars on a routine basis about issues with Dr. Hsu's

10   clinical skill, competence, knowledge, abilities, and they date

11   back to 2014 and 2015.  So I think it's all consistent along

12   the way, which is why I think, I don't think you can parse out,

13   Well, these complaints in 2016 and 2017 are any different from

14   the complaints she had about Dr. Hsu and Seifer previously.

15           THE COURT:  I'm assuming there's authority out there,

16   though, that causation can still be found on a timeline such as

17   we have here.  I don't hear you saying, as a legal matter,

18   courts looking at this kind of fact pattern -- how could you

19   say that, right -- say that there is not the required temporal

20   proximity for causation to be found, and if you can't say that,

21   then why isn't it a question for the jury to determine?

22           ATTORNEY SCHROEDER:  And I agree.  You were going to

23   ask me a question, then I answered it, and you're correct, Your

24   Honor, right?  So then that gets us to the second part, right?

25   That gets us to the legitimate nondiscriminatory reasons,

1     right?  And so, setting aside the prima facie case, if you

2     shift gears to legitimate nondiscriminatory reasons, it's

3     unrebutted testimony that the REI division was closed as of

4     June 3rd 2017.  That's unrebutted testimony.  It's also

5     unrebutted that that division hasn't reopened or been any

6     plans, concrete plans, to reopen this division for the last

7     eight years.

8          And so that, standing alone, that's a legitimate

9     nondiscriminatory reason for why Dr. Porter, Dr. Seifer, and

10    Dr. Hsu were all terminated at the same time.  And, remember,

11    this is not just Dr. Porter we're dealing with here.  The

12    context of this is that all three individuals were terminated

13    at the same time.  There is no -- that's unrebutted.  And so

14    it's undisputed that the division was closed and that all three

15    physicians were terminated at the same time.

16         Also, there's testimony in the record that, despite the

17    fact that Beth Todd had complaints about -- everybody had

18    complaints about Dr. Hsu and Seifer but, and including Beth

19    Todd.  Beth Todd is still employed by Dartmouth Health today.

20    So that's another indicia of legitimate nondiscriminatory

21    reasons for why the complaints don't suffice to get further,

22    and, if you go to the third step of pretext, that falls apart

23    at that stage as well.

24         But the fact that the REI division was closed, that was a

25    seminal event.  Three physicians were terminated, all at the

1    same time.  They're all in the same capacity, including the

2    division director.  So this is not even a differentiation

3    between, say, a leader and people that are in nonleadership

4    positions.  It's all of them, all three physicians, and that's

5    unrebutted.  There is no testimony that somehow the, that there

6    is any, any pretext relating to the actual decision.

7        And what it comes down to then when you get back to, Well,

8    what about that decision?  And Dr. Merrens testified he didn't

9    have any knowledge of specific complaints about Hsu or Seifer

10   from Dr. Porter, and that makes sense given his, the fact that

11   he oversees 1,500 physicians.  And he didn't know anything

12   specific about her disability other than she'd been out on a

13   leave of absence.  And, so when you take all of that evidence,

14   Your Honor, I'd submit that the retaliation claims in this case

15   also fall apart.

16       Finally, if I may be heard just on the specific issue of

17   --

18           THE COURT:  So I assume then, right, the assumption

19   in the argument is that this cat's paw notion is not at play,

20   right?

21           ATTORNEY SCHROEDER:  I don't think there is, I don't

22   think there's sufficient evidence to even -- there's no cat,

23   Judge, never mind the paw.  There's no cat, no cat.  Never mind

24   the fact that I don't like cats, for the record, but there's no

25   cat in play here.

1          THE COURT:  And, when you say the cat, let's just be

2     clear what we're talking about.  Are you talking about the

3     upper level decision maker and the paw is the midlevel decision

4     maker?  So is the paw Dr. DeMars?

5          ATTORNEY SCHROEDER:  Well, it's interesting, Your

6     Honor.  I actually didn't even know what the fable stood for.

7     I always thought, cat's paw, it must be a cat pawing after the

8     string, right?  Then I had to read the fable as enunciated in

9     their papers.  Here I think the implication was that Dr. DeMars

10    was somehow the mastermind and puppeteer and Dr. Merrens was

11    the puppet, and I think Dr. Merrens has been very clear, like,

12    you know, a number of people were included in the, in the

13    recommendation process, but he made the, he made the call at

14    the end of the day.

15         THE COURT:  He did, but there is a factual issue on

16    this point, isn't there?  There's emails to suggest that

17    Dr. Merrens is making communications about Dr. DeMars actually

18    being -- I know what this testimony was today, but, in terms of

19    whether there's a question for a jury on this issue, right,

20    there's emails where he's telling people it was Dr. DeMars.

21         ATTORNEY SCHROEDER:  Well, I think there's a

22    recommendation by Dr. DeMars, and he's testified to that.

23    However, you also have the, you also have, you know, the

24    testimony of Dr. DeMars, right, I didn't want to close it down.

25    And they tried their best on cross-examination to rattle her,

VOLUME: 8
PAGES: 432-646

1    and she was unrattled.  She said, Listen, I didn't want to do

2    this.  I didn't want to go ahead with it.  And whether

3    Dr. DeMars tells a nurse that there's a recommendation, at the

4    end of the day, there's no dispute that, there's no evidence

5    that he didn't make the ultimate decision.

6        So set aside the recommendations or whatever because we'll

7    obviously have more testimony on this if this proceeds on this

8    point, but Dr. DeMars was clear that he was the ultimate

9    decision maker and whether there was recommendations relating

10    to just IVF or REI, you heard the testimony of Dr. DeMars.

11    Yes, she recommended the IVF program had to be paused.  There

12    was certainly a wealth of information on this.  Dr. Merrens

13    didn't go into detail vis-a-vis an email to a nurse not even in

14    that group as to what was his thinking.

15        But he also -- I want to really differentiate between --

16    and there's this issue of, well, they said this to the press,

17    and they didn't say this to the press.  Whether or not --

18    there's no obligation on the part of any business to say, I've

19    got to tell the media everything that we're doing and why we're

20    doing it.  There's just no obligation, and that doesn't create

21    a pretext for a discrimination and retaliation case.  It just

22    doesn't.

23        Listen we've, Your Honor, you denied our motion to have

24    Dr. Conroy testify.  That was a nothing burger.  That went

25    nowhere.  And that just goes to show that their entire case is

VOLUME: 8
PAGES: 432-646

1   trying to parse words from, from articles in the media.  That
2   does not mean that that's what happened or exactly how things
3   happened or that the employer was under any obligation to
4   disclose everything about its decision making with respect to
5   important decisions before it.
6           THE COURT:  Sure, but isn't that separate from the
7   factual kind of record?  When the employer is not under an
8   obligation, we only have what we have in terms of the evidence,
9   right?
10          ATTORNEY SCHROEDER:  Sure.
11          THE COURT:  And there's some evidence to suggest that
12  that might be a disputed issue.
13          ATTORNEY SCHROEDER:  Well, I think, Your Honor, most
14  of the evidence has gone back to the "Valley News" articles and
15  whether or not you can parse specific decisions out of that and
16  as opposed to what actually happened, right?  Because that's
17  what is at the heart of this case.  And so I would submit that,
18  up until now, plaintiff's case had been built largely upon,
19  Well, we've got this email here.
20          All of these emails, by the way, postdate the actual
21  termination decision and the actual implementation of that
22  decision, and you heard testimony from Dr. DeMars of what she
23  did and how she did it, and I think with her text messages
24  proves out that she was looking out for Dr. Porter all along
25  the way, regardless of the fact that the REI division was being

VOLUME: 8
PAGES: 432-646

1    closed.  But I got a little far away from your question.

2        I believe, Your Honor, that the evidence that plaintiffs

3    have shown rests largely on parsing out, out of context,

4    certain comments from news articles, and I think that, in and

5    of itself, is insufficient to get them to a jury on the

6    specific issue of whether or not there was sufficient evidence

7    of retaliation.  Because, remember, the prima facie case, even

8    if they get past the temporal proximity argument, and I'd

9    submit that they don't because there's not sufficient causal

10   connection, we had a legitimate nondiscriminatory reason for

11   doing what we did.  We implemented that.  Dartmouth Health

12   implemented that.

13       And now they've get to show pretext.  Is there sufficient

14   evidence of pretext here?  And on the issue of news articles

15   and whether or not they divulged all of the real, all of the

16   reasons for why something happened doesn't suffice to establish

17   evidence of pretext for purposes of establishing retaliation.

18           THE COURT:  Okay.  But it's more than just the news

19   article, right?

20           ATTORNEY SCHROEDER:  I'd submit, Your Honor, that

21   there are email communications that were, that postdate actual

22   decisions in this case, but they relate back, in large part, to

23   -- so, yes, there are emails to that point, but the lion's

24   share of them, I believe, relate to, in some way, what was said

25   or not said in, to the "Valley News".  That goes back to

VOLUME: 8
PAGES: 432-646

1    Dr. DeMars's email to Dr. Seifer, et cetera.

2         And, if I may, just on the issue of damages, Your Honor?

3              THE COURT:  Yes.

4              ATTORNEY SCHROEDER:  I don't believe, I don't believe

5    -- we submit that there is clearly no basis for punitive

6    damages under Vermont law or under federal law on the facts in

7    this case.  There is no basis to show that anything was done in

8    a reckless, malicious, willful, wanton way, and punitive

9    damages are only, are a remedy that should, are extraordinary

10   and should not have the, should not be before the jury at this

11   point if the case goes forward on the disability discrimination

12   retaliation claims.  So we'd submit that the punitive damages

13   claim should be struck, at minimum.

14             THE COURT:  So, if the jury were to conclude that

15   administrators at Dartmouth-Hitchcock were aware of physician

16   conduct that may have had a potentially harmful effect on

17   patients, that wouldn't be sufficiently outrageous for punitive

18   damages?

19             ATTORNEY SCHROEDER:  I think, Your Honor, if that was

20   the --

21             THE COURT:  Were aware of it and did nothing.  I

22   guess I should complete the thought.  If the jury thinks that

23   the evidence shows that, you know, Dr. Hsu and Dr. Seifer

24   communications were brought to a higher level within

25   Dartmouth-Hitchcock to say, Look at all the stuff that's going

1    on, and, if the jury were to credit that and say, Yeah, what

2    was done about that, that would not be enough for them to find

3    punitives?

4         ATTORNEY SCHROEDER:  I don't think so on the, on this

5    record, Your Honor.  I think under your hypothetical that could

6    be possible, but on this record where -- your hypothetical

7    assumed high-up decision makers, right?  And what we have heard

8    is that Dr. Merrens made this decision, was not aware of any

9    patient safety concerns about Hsu or Seifer, had no knowledge

10   of those.  So the ultimate decision maker made the decision.

11   He doesn't have knowledge of those complaints, and, therefore,

12   that, this fact patter that's the record evidence is different,

13   I'd submit respectfully, to your hypothetical.

14        THE COURT:  Okay.  Yeah, I mean, I guess, if you

15   accept, if the jury accepts that Dr. Merrens is the final

16   decision maker -- and this goes back to what I said before, the

17   DeMars factor.

18        ATTORNEY SCHROEDER:  Yes.

19        THE COURT:  And, you know, if they look at the

20   evidence and say, Well, I'm not so sure.  I mean, yes, I know

21   what you're saying, that he signs the dotted line, so to speak,

22   in terms of making the final decision, but, if there's evidence

23   in there to show that Dr. DeMars was very influential in that

24   that decision, then is that, if the jury were to credit that,

25   is that sufficient if Dr. DeMars knew that and made her

VOLUME: 8
PAGES: 432-646

1    recommendations?

2         ATTORNEY SCHROEDER:  So two points on this, Your

3    Honor.  One, Dr. DeMars was very clear, and she was not shown

4    any contradictory evidence that, while she really wanted --

5    this is parsing out REI versus IVF.  She said, you know, IVF

6    had to be paused.  In fact, they did make several moves to

7    pause it, right?  She was very clear, I was not in favor of the

8    REI division closure, right?  That's the record testimony from

9    Dr. DeMars, and there's nothing rebutting that in the record in

10   terms of emails where Dr. DeMars is -- you know, she certainly

11   went along with the decision.  She had to because her boss made

12   the decision.

13        And so, on that point, I would submit that she is the one

14   that said, I was in favor of pausing IVF.  I did not want to

15   shut down the entire division.

16        THE COURT:  Isn't there email evidence, though, that

17   it's the other way, that she was fine with the closure of the

18   division?

19        ATTORNEY SCHROEDER:  She does say in May, after the

20   division has been announced and after she has recommended Dr.

21   Porter for a position at UVM, she certainly goes along with it

22   on May 12th and thereafter.  There's no doubt about that,

23   Judge, but those are all postmortem comments, and she

24   acknowledges those comments.  She didn't dispute that she sent

25   those emails, but those are postmortem comments where her boss

VOLUME: 8
PAGES: 432-646

1    has made that decision, right?

2        So does she go along with it at that point?  Well, the

3    decision's already been made.  So all of those emails that

4    plaintiffs have put before the Court, the lion's share, and not

5    even the lion's share, the ones that have been really put front

6    and center, if you look at the dates of those and what

7    Dr. DeMars says in response, those all postdate the actual

8    announcement of the closure.  There's nothing for her --

9    there's nothing to rebut.  At that point, the horse has left

10   the barn, to stay with animals today.

11       And so I'd submit against that record there's no basis for

12   punitive damages under either the one Vermont claim or under

13   the ADA, regardless of the fact that there's a cap on it.

14            THE COURT:  Okay.

15            ATTORNEY SCHROEDER:  Thank you for allowing me to

16   indulge the Court.

17            THE COURT:  Absolutely.  All right.  Plaintiff?

18            ATTORNEY JONES:  Your Honor, obviously, there's a few

19   points that I want to make.  I kind of feel like I had a brief

20   read to me right now.  I'm trying respond on the fly.  Let me

21   start by saying, for the most part, much of the arguments that

22   Mr. Schroeder has made are positional, and our position is that

23   there is plenty of evidence in the record from which a

24   reasonable juror could reach an opposite conclusion.

25       One example is the whole discussion we were having about

VOLUME: 8
PAGES: 432-646

1    the decision maker.  Was it DeMars, or was it Merrens, and who

2    is pointing at who?  This morning Dr. Merrens, he confirmed his

3    deposition testimony where he said Dr. DeMars made the

4    decision.  We approved it.  I understand he backtracked and

5    has, at other times, given inconsistent testimony, but we have

6    a statement from Dr. Merrens saying it was Dr. DeMars's call.

7    We have multiple emails where Dr. Merrens either refers Nurse

8    Maxfield to, It was DeMars's call, in response to her question.

9    We have Dr. DeMars herself saying, I don't want to change that

10   decision.

11        So, I mean, there's plenty of evidence in the record from

12   which a reasonable juror could conclude it was DeMars, and,

13   frankly, DeMars, as the department chair, certainly has enough

14   authority in the organization that her discriminatory actions

15   bind the employer.  So whoever made the call binds

16   Dartmouth-Hitchcock here, right?  From that perspective,

17   whether there's a cat or a paw doesn't matter.  They are both

18   sufficiently authorized to bind the organization with their own

19   animus.  So all we have to prove is one of them had it.

20        And I think there's plenty of evidence that Dr. DeMars

21   certainly had plenty of animus, both with regard to disability

22   and with regard to whistleblower.  With regard to Dr. Merrens,

23   there's evidence that he specifically cited Dr. Porter's

24   disability as a reason for not considering retaining her in

25   some capacity.  There is evidence that he refers to the

VOLUME: 8
PAGES: 432-646

1    dysfunction of the department, and that, in part, refers to

2    complaints that Dr. Porter was making.  So we think there's

3    plenty of record evidence from which a reasonable juror could

4    find factually in favor of Dr. Porter in this case.

5         I would also point out that the extensive trial record

6    that we have now put on in eight days or seven-and-a-half is

7    not identical, but very much, very closely tracks and is much

8    more robust than the record that was submitted to the Second

9    Circuit Court of Appeals.  And so, you know, a lot of the

10   Second Circuit identified as being foundational for a

11   reasonable juror's belief that would support Dr. Porter's case

12   is evidence in this case as well.

13        So that covers a general global statement.  Those are the

14   comments I have.  With regard to the -- there was a discussion

15   about whether there was a sufficient temporal inference and

16   that Mr. Schroeder was suggesting that many of these complaints

17   go back many years.  Your Honor noted that the salient

18   complaints that bring us here were, in fact, made in the

19   mid-2016 to, summer of 2016 to late winter, early spring of

20   2017, this eight- to nine-month period before the REI was

21   closed and Dr. Porter was terminated.  So that's clearly within

22   the zone of a sufficiently proximate time zone to be the basis

23   of discriminatory animus.

24        I also just want to clarify.  Despite Mr. Schroeder's

25   confidence, the testimony was very clear that the Zika virus

VOLUME: 8
PAGES: 432-646

1    issue was 2017.  So the complaints of billing, improper

2    billing, unlawful billing, those were made when Dr. Porter

3    returned from her disability leave on a partial basis and

4    discovered that this had been going on.  Again, we're talking

5    2017, I believe.

6        So the salient complaints with regard to the providers

7    were there, complaints about Dr. Hsu that go back to the time

8    he got there, going back, even more disturbing and critical,

9    when Dr. Seifer shows up in 2016, and then the complaints are

10   coming in the context of Dr. Seifer's review, and people are

11   screaming that he's not dealing with Dr. Hsu.  So it's in that

12   context that things are taking on a much weightier, much more

13   weight.

14       And, frankly, no one is saying that, because Dr.

15   Porter made one complaint about Dr. Hsu, Dr. DeMars decided to

16   get rid of her, but she sure as hell had a growing frustration

17   that was building over the years that Dr. Porter just wouldn't

18   stop, and it was getting -- she became a real thorn in her

19   side.

20       And it's, you know, quite frankly, I think the jury saw

21   what could be characterized as contempt.  You know, she would

22   not credit Dr. Porter reporting patient harm because she just

23   said, It's just more splitting behavior.  The jury saw that.

24   So I think it's, you know, there's plenty of evidence from

25   which a juror could conclude that Dr. DeMars developed

1    retaliatory animus due to Dr. Porter's protected conduct.

2         I, just want to see if I have anything else on

3    whistleblower before I switch over the disability.  Let me just

4    touch a little bit on the damages issue.  We believe there's

5    plenty of evidence to support a punitive damages instruction in

6    this case, not only what you mentioned about the fact that this

7    is a case that includes repeated complaints to senior

8    administrators of patient harm and nothing was done, in fact,

9    Dr. DeMars hid it.

10        She was motivated to hide it because, as Dr. Merrens

11   confirmed this morning, her job was on the line.  If Dr. Seifer

12   fails, she loses her job.  It was on her.  Dr. Seifer's success

13   is on her, so she's motivated, because of an act of an even

14   more senior official, she's now motivated to not do the

15   responsible, lawful, or appropriate thing in response to the

16   complaints of patient harm.  So, yeah, that is outrageous.

17        Second of all, Dr. DeMars, you know, she wrote in an email

18   that her life would be easier if Dr. Porter lost her license.

19   That email alone is malicious.  I was stunned when, on the

20   stand, she confirmed that that's how she feels.  I would have

21   thought she would have backed off and said, Oh, I wrote this in

22   frustration.  I don't really mean that.  She said, Yeah, my

23   life would have been easier if my so-called friend lost her

24   license to practice.  I think a juror could conclude that

25   that's malice.

VOLUME: 8
PAGES: 432-646

1              THE COURT:  So what about the reasonable

2     accommodation question?

3              ATTORNEY JONES:  That's what I was moving to.  So I

4     want to touch on the reasonable accommodation issue.  I guess,

5     first of all, I don't think the plaintiff views the

6     reassignment issue as being limited to a request for a

7     reasonable accommodation.  Rather, we look at the decision to

8     take the extraordinary step of closing a division at the first

9     and only time it's ever happened at Dartmouth-Hitchcock and get

10    rid of all the providers and keep none of them.  We believe, in

11    part, that was motivated by disability discrimination.

12             Our claim, our claim that they could have and should have

13    retained Dr. Porter is not really, Oh, she made a request for a

14    reasonable accommodation, and it was denied.  This isn't that

15    case.  This is, we believe the evidence would support a finding

16    that Dartmouth found itself with two incompetent doctors

17    causing patient harm and one person who was just annoying the

18    heck out of everybody about it because they weren't doing

19    anything and they just decided, You know what?  The heck with

20    all of them.  We're just going to close this place down, fire

21    them, and we're not keeping her.  And, when pushed about why

22    they couldn't keep her, Dr. DeMars said, I want to keep the

23    decision the way it is.  I don't want her coming back.

24             We believe all of that is the discriminatory, the

25    discriminatory animus that leads to all of that decision

VOLUME: 8
PAGES: 432-646

1    making.  So it's not purely a request for accommodation that's

2    denied case.  It's a case that they, not only fired her, but an

3    extraordinarily talented physician who had unique skills, they

4    felt so strongly about getting rid of her that they wouldn't

5    even consider retaining her, even in those areas that were not

6    related to REI that she was already performing.  So we think

7    that's part of the termination decision, really.

8        But, with regard to accommodation -- I will acknowledge,

9    I've been an employment lawyer for a very long time.  I will

10   acknowledge that there is, you know, the statute and

11   regulations provide that, you know, there's no obligation to

12   create a new job to accommodate, true.  And, you know, but the

13   regulations say reassignment to a vacant position can be a

14   reasonable accommodation.  So then we get into the question of,

15   What can be a reasonable accommodation?  I have been to CLE

16   course where the materials are thicker than the notebooks we

17   gave in our exhibits of case law about what can be a reasonable

18   accommodation.  It can be anything.

19       So I think, in this case, certainly, at the time of the

20   decision to close the REI, the information that Dr. Porter's

21   physicians were providing here was that her condition was 100

22   percent curable and she was on the way back to 100 percent

23   reentry.  So it can be a reasonable accommodation to provide

24   somebody a short-term alternate arrangement until they come

25   back full-time.  It can be a reasonable accommodation, and it

VOLUME: 8
PAGES: 432-646

1    can be a reasonable accommodation to create a new job.

2        Just because the statute says that there's no obligation

3    to do it doesn't mean it can't be a reasonable accommodation as

4    part of the interactive process, and I've sure seen a lot of

5    employers do it, and, in this case, Nurse Practitioner Todd was

6    given the opportunity to be reassigned.  So we think there's

7    enough facts in the record to support a finding of

8    discrimination for all those reasons.

9        THE COURT:  Okay.  So then you obviously disagree

10    with Mr. Schroeder's point, I think, all the F.4th recent case

11    law that he cited to me really stands for the proposition that,

12    according to him, that you need to demonstrate that there was

13    actually a position available and there's no need to create a

14    position, the defendant doesn't have to create a position.  It

15    has to be available, and you have to identify a position that

16    Dr. Porter could have been reassigned to.

17        ATTORNEY JONES:  Correct.  I do not think that that's

18    the strict legal finding under the facts of this case.

19        THE COURT:  And, as a legal matter, though, I mean,

20    it's not -- you're saying that the, that the notion of

21    reassignment is broader and more flexible than -- you have to

22    identify a particular position that was available at the time,

23    and you didn't get it?

24        ATTORNEY JONES:  Yes.  I also think the concept of

25    reasonable accommodation is far broader than simply, you know,

1    reassignment to a vacant position.  It can be that the parties

2    can discuss and come to terms of what's reasonable to both

3    people.

4            THE COURT:  And here, though, your general position

5    is that she could have stayed within OB/GYN in a more general

6    role?

7            ATTORNEY JONES:  Absolutely.

8            THE COURT:  And there's evidence in the record of

9    that?

10            ATTORNEY JONES:  Well, OB/GYN and radiology.  She was

11    dual appointed.  There was plenty of ways she could have been

12    fully engaged, and it's all set forth the letter where she

13    submitted Dr. Merrens where she said, Even if you don't have me

14    working in fertility, look at all the things I've been doing

15    and could do.

16            THE COURT:  Okay.  All right.

17            ATTORNEY JONES:  I think I probably have more points,

18    but I'd rather just answer any questions you have.

19            THE COURT:  Well, let's make sure we've hit -- so you

20    talked about causal connection with legitimate

21    nondiscriminatory reasons.  Mr. Schroeder made the argument

22    that the evidence in the record is clear that there was a

23    business reason for doing it.  Does that kind of end the

24    inquiry as a jury question?

25            ATTORNEY JONES:  That's clearly a jury question.  We

VOLUME: 8
PAGES: 432-646

1    don't accept that that -- Dr. Merrens confirmed this was the

2    only time they've ever closed a division.  Dr. Bernstein, he

3    said that, even when they lost their providers, they found a

4    way to rebuild because you just don't close divisions.  It is

5    an extraordinary thing to close a division.  The idea that it

6    was just because we had a nursing shortage, which, by the way,

7    can be rejected factually.  Sharon Parent testified she wanted

8    to keep working, and Dr. Merrens said he has no reason to doubt

9    her testimony.

10    So the jury can reasonably find that that was just bunk

11    from the beginning.  So we just don't think that there was a

12    legitimate nondiscriminatory reason to take an extraordinary

13    act of closing a division.  We believe the record evidence

14    shows that that decision was made for the discriminatory

15    reasons I discussed earlier.  But, yeah, we, we do not accept

16    that there was a legitimate nondiscriminatory reason, and, even

17    if they have articulated it enough to continue the analysis, we

18    believe that the record is replete with pretext.

19    THE COURT:  Okay.  Thank you.

20    ATTORNEY JONES:  Thank you.

21    THE COURT:  Mr. Schroeder?

22    ATTORNEY SCHROEDER:  Quick retort, Your Honor?

23    THE COURT:  Yes.

24    ATTORNEY SCHROEDER:  Certainly available to answer

25    any question you have, Your Honor, but I just wanted to make a

VOLUME: 8
PAGES: 432-646

1    few responses relating to what Mr. Jones just said.  We get to

2    the issue of legitimate nondiscriminatory reasons, and he

3    immediately pivoted to Dr. Bernstein.  Dr. Bernstein is

4    employed by, as far as I know, UVM Medical Center and

5    acknowledged on the stand that they've actually closed

6    programs.  So that has nothing to do at all with the decision

7    by Dartmouth Health to close a division, which is --

8         And, to his point, I am in violent agreement that it was

9    an extraordinary event.  Yes, it was.  The evidence is

10   unrebutted and undisputed that they hadn't closed an entire

11   division like this ever before, and that's compelling evidence.

12   I believe, or we submit, that Dartmouth Health had legitimate,

13   nondiscriminatory reasons for doing it.  It goes to the issue

14   of a number of things that were going on at that time, nursing

15   shortage, the issue of dysfunction.

16        I know he said, Mr. Jones, said, Well, you know, there's

17   the issue of dysfunction, and that was, that could be evidence

18   that Dr. Merrens knew about the complaints of others.  That's

19   what the Second Circuit inferred on a summary judgment record.

20   That's not what the evidence is before the Court, and I would

21   submit that the evidence before the Court is markedly different

22   and a lot less, and anything that the Second Circuit, quote,

23   unquote, inferred may or may not be true because it has to be

24   admissible evidence at the end of the day.

25        With respect to the ADA, and I think this is really

1    compelling, Your Honor, you asked Mr. Jones to answer the, the

2    fact that there is case law in four circuits, four or five

3    circuits, at least, that we found, at least, in response to

4    this, including the Second Circuit, and he said, Well, you can

5    certainly create a new job, and the phrase "reasonable

6    accommodation" is very broad.  The regulations are very clear.

7    It has to be a vacant position, and the case law that's

8    developed since that time -- so that's the regulations pursuant

9    to the statute -- the case law is very clear.  There's no,

10   there is no split on this issue.  You've got to identify a new,

11   vacant position.

12        And, in fact, the corollary to that is the plaintiff

13   doesn't get to decide, Well, I think this will be a reasonable

14   accommodation.  The employer has a duty to implement an

15   effective accommodation pursuant to the law, not necessarily

16   whatever -- whatever the plaintiff wants doesn't magically

17   become a reasonable accommodation.  At the end of the day, the

18   record in this case before you has no evidence that there was a

19   vacant, part-time or full-time position in OB/GYN that Dr.

20   Porter was privileged and qualified for.  Remember, you have to

21   be a qualified individual with a disability.

22        We will assume, for sake of argument -- we don't even have

23   to worry about the issue of what stage her condition was at.

24   We will assume, for sake of argument, that she was disabled,

25   but the next prong in that or the next step in that is a

1    qualified individual with a disability.  So you have to have

2    the ability to do a potential job, and the only job in the

3    record before you that Dr. Porter might be considered for but

4    couldn't, according to Dr. Padin, was the issue of an OB/GYN

5    generalist position because they needed that in obstetrics, and

6    Dr. Padin offered unrebutted evidence on that point that Dr.

7    Porter did not have the credentialing or privileges for that.

8         So, to the extent that there is any evidence of possibly a

9    position, and I would submit that there isn't, but, even if you

10   went one step further and said, Well, there was testimony about

11   the OB/GYN department needing additional help, the only

12   testimony about that is the need for a physician with

13   privileges in obstetrics.

14             THE COURT:  Okay.

15             ATTORNEY SCHROEDER:  Thank you, Your Honor.

16             THE COURT:  All right.  Thank you.  So, in terms of

17   timing, I want to make sure everyone, including myself, has a

18   little time for lunch.  Should we return at 12:30?  Does that

19   work for everyone?

20             ATTORNEY SCHROEDER:  Your Honor, my able co-counsel

21   just reminded me about something.  Do you mind if I add one

22   specific point?

23             THE COURT:  Go ahead.

24             ATTORNEY SCHROEDER:  We made these arguments on the

25   motion in limine.  This relates to the cat's paw theory, and we

1    resubmit the arguments that we already briefed on, which is

2    that the cat's paw theory isn't available under New Hampshire

3    and Vermont law as of today, and, to the extent that it is

4    recognized by federal law, it has been recognized in claims

5    under Title VII and USERRA and ADEA, but it has not been

6    recognized for claims under the ADA or Rehab Act, which are the

7    claims that are before the Court now.  Thank you for allowing

8    me to --

9            THE COURT:  So what's the difference, though?  I

10   think Mr. Jones, at the motion in limine hearing, had talked

11   about how it's not just -- maybe using this term "cat's paw"

12   makes it sound like more of a novelty than it really is, that

13   it's really just a general agency principle.  So do general

14   agency principles apply across the claims, I guess, is the

15   question.

16           ATTORNEY SCHROEDER:  I think, Your Honor, the way it

17   was raised at -- and, just procedurally, the way it was raised

18   by plaintiff's counsel was at the Second Circuit as a theory

19   under cat's paw where they enunciated the actual Aesop's fable.

20   So that was their argument.  I submitted that it hadn't even

21   been raised before, but they raised it there.  Second Circuit

22   said you can raise it.

23           THE COURT:  Yeah.

24           ATTORNEY SCHROEDER:  And the way it's been enunciated

25   throughout this case and throughout the papers leading up to

VOLUME: 8
PAGES: 432-646

1    this is not, quote, unquote, agency, it's -- because, at the

2    end of the day, who is the agent here?  The decision maker,

3    right, is Dr. Merrens, or at least the record evidence supports

4    that.  And then the only way you would then be able to go down

5    one step to Dr. DeMars is through this cat's paw theory, and I

6    would submit that that's the argument they've raised all along.

7    I don't think it's any different just because you use the word

8    "agency".  I think it's the same thing.

9            THE COURT:  So then you don't think, for purposes of

10   corporate liability, someone at Dr. Merrens's level and someone

11   at Dr. DeMars's level both occupy sufficient positions within

12   the organization that they could be agents of the corporation?

13           ATTORNEY SCHROEDER:  Well, certainly, Dr. DeMars

14   could be an agent of the corporation, but I think, on the facts

15   in the case and in the record, there's, it's unrebutted that

16   Dr. DeMars made the ultimate call.  Like, so regard -- and so

17   then the only way you can penetrate that for purposes of

18   corporate liability would be through this cat's paw theory

19   because then you're saying, Well, he wasn't really the decision

20   maker.  He must have been taking some discriminatory animus

21   from some other agent of the corporation and been poisoned by

22   it, and that's the cat's paw theory.  And so, you know, they've

23   presented it that way at the Second Circuit and since then,

24   even in their motion in limine papers.  So, yes, as a corollary

25   argument, they have this agency argument, but it's really just

VOLUME: 8
PAGES: 432-646

1    the same thing in a different color, so to speak.

2         THE COURT:  Okay.  Thank you.  Anything from the

3    plaintiffs?

4         ATTORNEY JONES:  No, Your Honor.

5         THE COURT:  Okay.  All right.  So then I'll see you

6    back here at 12:30.  Like I said, if there is an interest in

7    having a little more time, we can, probably.  I just want to

8    make sure, since the jury's been out for a while, that we get

9    going close to 1:00, if we can come back at 12:45.

10        ATTORNEY SCHROEDER:  That's fine, Your Honor.  I was

11   thinking about what you had told the jury.  So apologies. 12:45

12   would be ideal.

13        THE COURT:  Okay.  We'll do that.

14        (A recess was taken from 11:57 a.m. to 12:51 p.m.)

15        THE COURT:  Okay.  So defendants have moved under

16   Federal Rule of Civil Procedure 50 for a directed verdict

17   judgment as a matter of law.  To succeed on a Rule 50 motion

18   for judgment as a matter of law, the moving party must show

19   that, after a full hearing on an issue at trial, there is no

20   legally sufficient evidentiary basis for a reasonable jury to

21   resolve the issue in favor of the nonmoving party.  In

22   considering a Rule 50 motion, the Court may consider all of the

23   record evidence, but, in doing so, it must draw all reasonable

24   inferences in favor of the nonmoving party and may not make

25   credibility determinations or weigh the evidence.

VOLUME: 8
PAGES: 432-646

1          With respect to the New Hampshire Wrongful Discharge and

2     Whistleblowers' Protection Act claims, this requires a showing

3     of a discharge in violation of public policy.  Generally

4     speaking, there are two elements:  One, that a defendant's

5     termination of the plaintiff was motivated by bad faith,

6     malice, or retaliation; and, two, that the defendant terminated

7     the plaintiff because she performed one or more acts that

8     public policy would encourage.  And bad faith is malice and is

9     established by discharge for pursuing policies condoned by the

10    employer or if the record does not support the stated reason

11    for discharge or if there is disparate treatment administered

12    to a similarly situated employee.

13         The New Hampshire Whistleblowers' Protection Act prohibits

14    an employer from discharging or otherwise discriminating

15    against an employee regarding employment because the employee,

16    in good faith, reports or causes to be reported, verbally or in

17    writing, what the employee has reasonable cause to believe is a

18    violation of any law or rule adopted under state law or federal

19    law.

20         So, with respect to the evidence that has come in at this

21    trial, this is not an exhaustive list of the evidence, just

22    enough to demonstrate that there is a sufficient evidentiary

23    basis for a reasonable jury to find in favor of the nonmoving

24    party.  So, in this case, we have plaintiff's testimony that

25    she reported to Dr. DeMars her belief that Dr. Hsu and Dr.

VOLUME: 8
PAGES: 432-646

1  Seifer were not meeting the standard of care for physicians in
2  the practice and placing patients at risk.
3       In evidence is the June 2016 letter Dr. Porter wrote to
4  Dr. Seifer reporting on, among other things, her reasons for
5  believing that Dr. Hsu's conduct presented a risk to patients.
6  There has also been evidence that Dr. Porter reported to Dr.
7  DeMars her concerns about Dr. Seifer's work.
8       There is evidence in the record for the jury to infer
9  Dr. Merrens's knowledge of Dr. Porter reporting complaints
10  about other physicians.  Dr. Merrens's use of the word
11  "dysfunction", which should be noted, as the Second Circuit has
12  already found, could be interpreted as a code word to refer
13  whistleblower and public policy reporting activity.
14       There has been testimony by Dr. Porter regarding her
15  reporting of what she believed were violations in the law, in
16  particular, her testimony regarding the transfer and
17  implantation of an embryo when she believed the transmission of
18  Zika virus was a known risk, her further testimony that Dr. Hsu
19  performed procedures on patients without obtaining informed
20  consent, and her testimony regarding her belief that there were
21  billing improprieties.
22       So, with respect to the New Hampshire claims, I find that
23  that is sufficient for that issue, the issues under those
24  claims to go to the jury.
25       With respect to the disability discrimination and

 1     retaliation claims under federal and state law, I'll just begin

 2     with a brief statement of the law.  The ADA and Rehabilitation

 3     Act prohibit covered employers from discriminating against

 4     qualified individuals on account of disability.  The ADA

 5     prohibits discrimination against a qualified individual on the

 6     basis of disability with respect to the discharge of employees.

 7          The Rehabilitation Act provides that no otherwise

 8     qualified individual with a disability shall solely by reason

 9     of her disability be excluded from participation in, be denied

10     benefits of, or be subjected to discrimination under any

11     program or activity receiving federal financial assistance.

12     And the ADA defines a qualified individual as a person who,

13     with or without a reasonable accommodation, can perform the

14     essential functions of the employment position that such

15     individual holds or desires.

16          And disability, I recognize, is not disputed here, but it

17     is defined as a physical or mental impairment that

18     substantially limits one or more of the major life activities

19     of such individuals or a record of such impairment or being

20     regarded as having such an impairment.  And the Second Circuit

21     has explained that the Rehabilitation Act uses essentially the

22     same definition and the Rehabilitation Act also uses the same

23     standards as those applicable to employment discrimination

24     claims under the ADA.

25          The ADA and the Rehabilitation Act require covered

VOLUME: 8
PAGES: 432-646

1    employers to make reasonable accommodations to the known

2    physical or mental limitation of an otherwise qualified

3    individual with a disability who is an employee, unless the

4    employer can demonstrate that the accommodation would impose an

5    undue hardship on the operation of its business.  And

6    reasonable accommodation may include reassignment to a vacant

7    position, and, if there has been no showing of an undue

8    hardship, the denial of a reasonable accommodation is

9    prohibited discrimination.

10       So, with respect to the evidence related to this aspect of

11   the claims, Dr. Russell testified that Dr. Merrens convened a

12   meeting of the OB/GYN staff to explain the closing of the REI

13   division.  She testified that, when asked why Dr. Porter was

14   being terminated rather than retained, Dr. Merrens responded

15   that Dr. Porter was, quote, "on disability".  Dr. Porter

16   testified that, during the meeting when she was informed that

17   her employment was being terminated, Dr. Merrens told her

18   several times, "Stay on disability, Misty".

19       Also in evidence is a May 12th 2017 email exchange between

20   Nurse Victoria Maxfield and Dr. Merrens in which Nurse Maxfield

21   expresses her hope that, notwithstanding the closure of the REI

22   division, Dr. Porter could remain in some other capacity in the

23   gynecologic practice.  Dr. Merrens responded, "As you know, Dr.

24   Porter currently works at 20 percent of her time currently".

25       Also in evidence is a May 12th 2017 email exchange between

VOLUME: 8
PAGES: 432-646

1    Dr. DeMars and Dr. Merrens in which Dr. Merrens seeks guidance

2    on how to answer inquiries about retaining Dr. Porter, despite

3    the closure of REI.  In that exchange, Dr. DeMars states that

4    those inquiring were, quote, "Remembering Misty as a full-time

5    employee wearing three hats and not the one who has been out

6    almost 18 months".

7        With respect to the evidence pertaining to the denial of a

8    reassignment accommodation, Dr. Porter testified that she

9    communicated with Dr. Merrens her interest in an OB/GYN

10   position that did not center on infertility.  There has been

11   testimony and email evidence recognizing Dr. Porter's skills as

12   a physician.  There was testimony from Dr. Padin that the

13   OB/GYN department, in June of 2017, sought permission to hire a

14   new gynecologist.  The May 2017 email from Nurse Maxfield to

15   Dr. Merrens advises of OB/GYN being short-staffed and that her

16   department was in the interviewing process.  Dr. Porter

17   testified that she communicated to Dr. Merrens her interest in

18   an OB/GYN position that was not focused on infertility.

19       And, as already mentioned, there are statements by

20   Dr. Merrens and Dr. DeMars in which Dr. Porter's disability is

21   referenced in the context of termination versus retention.  So,

22   given these items from the evidentiary record in this trial, I

23   think that is sufficient for the matter to go to the jury.

24   There is a sufficient evidentiary basis for a jury to find in

25   favorite of the nonmoving party.

1        Finally, with respect to damages, the defendant's Rule 50

2    motion focuses on punitive damages.  With respect to punitive

3    damages, the law generally provides that punitive damages are

4    associated with conduct that is outrageous, and there must also

5    be a showing of malice which generally is outrageous conduct

6    that was deliberate and motivated by bad motive or ill will.

7        To the extent that the jury might find discrimination and

8    retaliation in this case, there is evidence in the trial record

9    from which a reasonable jury could find bad motive or ill will.

10    In particular, there is email evidence in which Dr. DeMars

11    expresses a desire for Dr. Porter to be terminated.  There is

12    an email from Dr. DeMars to Dr. Merrens in which she says that

13    people were remembering Dr. Porter as a person wearing 3 hats

14    and not someone who has been out for 18 months, as opposed to

15    the prior period when she was not disabled.

16        To the extent that the jury finds wrongful discharge,

17    there is evidence in the trial record from which a reasonable

18    jury could find outrageous conduct in that administrators were

19    aware of physician conduct that harmed patients and did not

20    take action to remedy it.  There is evidence that, evidence

21    that was discussed during this trial of Dr. Seifer's failure

22    being on her, meaning on Dr. DeMars, which is at least

23    suggestive that there could be a lack of incentive to remedy

24    the complaints that were lodged against Dr. Seifer.  And there

25    is evidence in the record of Dr. DeMars saying that her life

1     would be easier if Dr. Porter lost her license.

2         So I think there is, assuming a finding of, of liability

3     on relevant claims, the evidence in the record is sufficient,

4     provides a sufficient evidentiary basis for reasonable jury to

5     resolve this issue in favor of the nonmoving party as well.

6     So, for all of these reasons, I'm going to deny defendant's

7     motion for judgment as a matter of law under Rule 50.

8         Mr. Vitt, before the defense presents its case, when I

9     bring the jury back in, for the record in front of the jury,

10    I'll ask you if there's any more witnesses to be called, and

11    you can establish that you don't have any further witnesses and

12    that you rest.

13            ATTORNEY VITT:  Thank you.

14            THE COURT:  And then I'll advise the jury of what

15    happens next, okay?

16            ATTORNEY VITT:  Thank you, Your Honor.

17            THE COURT:  All right.  Then we'll bring the jury in.

18            (The Jury enters the courtroom.)

19            THE COURT:  All right.  The plaintiff may call the

20    next witness, if they have one.

21            ATTORNEY VITT:  We have no further witnesses, Your

22    Honor.

23            THE COURT:  Okay.  Does the plaintiff rest?

24            ATTORNEY VITT:  We do rest.

25            THE COURT:  Okay.  So the plaintiff has rested, which

VOLUME: 8
PAGES: 432-646

1    means now the defendants will have an opportunity to present

2    their case.  Mr. Schroeder?

3             ATTORNEY SCHROEDER:  Thank you, Your Honor.  The

4    first witness for the defendants is Judy Stern, if I may go get

5    her from the lobby.  Thank you.

6             THE COURT:  Yes.

7                      JUDITH STERN,

8             having been duly sworn to tell the truth,

9                  testifies as follows:

10            COURTROOM DEPUTY:  Thank you.

11            ATTORNEY SCHROEDER:  May I proceed?

12            THE COURT:  Yes

13             DIRECT EXAMINATION BY ATTORNEY SCHROEDER

14   Q.    Good afternoon.  Dr. -- Ms. Stern, are you a doctor?

15   A.    A PhD doctor, yes.

16   Q.    Okay.  And you go by Dr. Stern?

17   A.    Yes.

18   Q.    And what is you PhD in?

19   A.    Zoology.

20   Q.    Okay.  Did you -- where are you currently employed?

21   A.    Right now?  I'm retired.

22   Q.    Congratulations.

23   A.    Thank you.

24   Q.    Were you employed at some point by Dartmouth Health?

25   A.    Yeah.  They were called Dartmouth-Hitchcock then and

1    several other names in between, but, yes, I was employed by

2    them from 1984 until 2010, no, 2014, and then I transitioned

3    over to Dartmouth College and then back to Dartmouth Health

4    under a research job.

5    Q.    So, Dr. Stern, you were employed at Dartmouth Health or

6    Dartmouth-Hitchcock from 1984 to 2014 --

7    A.    Yeah.

8    Q.    -- correct?

9    A.    Yes.

10   Q.    Okay.  Make sure you verbalize your answers.

11   A.    Yes.

12   Q.    Okay, thank you.  And then you assumed employment at

13   Dartmouth College?

14   A.    Yeah.  I had a federal research grant, an NIH grant.  I

15   was the principal investigator on that grant.  I was a faculty

16   member at Dartmouth all along through my medical employment at

17   Dartmouth Health, and, when I retired from running the

18   laboratory at Dartmouth Health, I transitioned over to college

19   employment being paid under that grant that I had.  And then,

20   because of complications between Dartmouth and Dartmouth

21   Health, they moved me back to Dartmouth Health, but that was

22   something they did to everybody in the clinical departments who

23   was a researcher.

24   Q.    Okay.  So let's focus just to differentiate the two stints

25   that you had.  So the first stint that you had with Dartmouth

1    Health was about 20 years, correct?

2    A.    Yeah, it was longer than that, but --

3    Q.    Actually, no.  You know what?  It's my math.

4    A.    Yeah.

5    Q.    Lawyer math. 30 years?

6    A.    30 years.

7    Q.    30 years.  Sorry.  Short-changing you there.

8    A.    Yeah.

9    Q.    30 years --

10   A.    Um-hum.

11   Q.    -- at Dartmouth Health.  And what was your last role

12   there?

13   A.    My first and last role there was as director of the human

14   embryology and embryology, human embryology and andrology

15   laboratory, which was the laboratory that performed in vitro

16   fertilization.  If you want me to explain what embryology and

17   andrology are, I could do that quickly.

18   Q.    Okay.  Well, let's hold on.  Hold on.  Let's, one step at

19   a time here.  The, you were the director of embryology and

20   andrology, correct?

21   A.    Yes, of the laboratory.

22   Q.    Of the laboratory?

23   A.    The laboratory.

24   Q.    And did that become known as the IVF lab at some point?

25   A.    Well, it was the IVF Lab initially.  We changed the name

VOLUME: 8
PAGES: 432-646

1    to the human embryology and andrology early on because there

2    were other IVF labs in the northeast that were starting, and we

3    wanted to differentiate ourselves, but basically that's what it

4    was was the IVF lab.

5    Q.    Okay, thank you.  Was it generally known by everyone as

6    the IVF lab --

7    A.    Yeah, yeah.

8    Q.    -- internally?

9    A.    Yeah.

10   Q.    Okay.  And what were your duties as the director of

11   embryology and andrology?

12   A.    So that laboratory is the laboratory that grows the

13   embryos in culture.  We prepare the sperm samples for

14   inseminating the eggs when they first come out of the patient.

15   We did embryo freezing.  We did a variety of things like that.

16   Part of running that laboratory involved quality control work

17   within the laboratory, making sure all the conditions in the

18   lab were appropriate for growing the embryos and making sure

19   that, that our protocols and procedures were written and

20   functional and doing what they needed to do.

21   Q.    And, in terms of the work that you were doing, you had

22   that same title throughout your employment, correct?

23   A.    Um-hum.

24   Q.    You need to say --

25   A.    Yes.

1    Q.   With respect to other divisions that you worked with,

2    could you identify which divisions you would work with under

3    the OB/GYN --

4    A.   Well --

5    Q.   -- umbrella?

6    A.   I worked with the REI division, the reproductive

7    endocrinology and infertility division.  That's the, the

8    laboratory was part of that division.  The IVF program involves

9    physicians, laboratory, nurses, and secretaries and a whole

10   variety of different people that are part of that division.

11   That was the division I worked with all along.

12        We occasionally did some work for somebody else.  For

13   example, we occasionally did work for urologists who wanted to

14   get sperm frozen for a patient who was, might lose his

15   fertility, something like that.  So we would do sperm freezing

16   for those people, but most of the work involved the REI

17   division of the OB/GYN department.

18   Q.   Okay.  And let me just focus on that.  Your work with the

19   REI division, was that on a regular, routine basis, on a daily

20   basis?

21   A.   Yes.

22   Q.   Okay.  And, in terms of the different roles and the

23   different actors or players, if you will, that have to interact

24   with each other to assist in helping a patient become pregnant,

25   who are all the players there?  So first explain the IVF lab

VOLUME: 8
PAGES: 432-646

1    people that work there and then help the jury understand who

2    they interact with within the REI division.

3    A.    Okay.  I think it might be easier to start with the

4    physicians as opposed to the laboratory.

5    Q.    Whatever works.

6    A.    The physicians see the patients.  They do a preliminary

7    testing with those patients.

8    Q.    The REI physicians?

9    A.    The REI physicians.

10    Q.    Just so that the jury understands.

11    A.    Yes.  And then a diagnosis is made, infertility diagnosis

12    of some sort.  There is an assessment of what procedures will

13    work for that patient.  At that point, not only is the woman

14    evaluated, but the husband is evaluated.  So that's where the

15    lab starts to come in.  We do semen analysis and determine

16    whether or not the sperm are appropriate for fertilization to

17    occur and so forth.

18        At that point, once the patient has gone through those

19    preliminaries, there is a determination of what needs to be

20    done to help them achieve a pregnancy, and that can be a

21    variety of different things.  The laboratory is involved, was

22    involved with several different procedures.  One is called

23    intrauterine insemination, which involved preparation of the

24    sperm to be put within a woman's uterus.  This is not the same

25    as IVF.  This is, this is a simpler procedure in which the

VOLUME: 8
PAGES: 432-646

1    sperm are just placed within the uterus, or the womb, of that

2    woman to help her achieve pregnancy.

3         If those things don't work, or there's other procedures as

4    well, but, if the preliminary procedures don't work, then the

5    patient often goes on to IVF, and the IVF procedure involves

6    providing hormonal supplementation for this woman so that she

7    can make multiple eggs.  The eggs are then retrieved from that

8    woman.  When the eggs are retrieved, they come into the

9    laboratory, and that's where the laboratory is most involved.

10        We collect, we collect the fluids that are retrieved

11   during that regular egg retrieval procedure.  She, once the

12   fluids come into the lab, the lab assess those fluids to find

13   the eggs, and, once we find the eggs, there's a variety of

14   things we could do with them.  One might be adding the sperm

15   directly to the eggs.  Another might be intracytoplasmic sperm

16   injection, which is a procedure where we take the egg and we

17   pick up a sperm and inject it directly into the egg.  You've

18   probably seen pictures of this on TV.  And that, these

19   procedures are to help get fertilization to occur.

20        Once fertilization occurs, the laboratory is involved with

21   maintaining those eggs in culture or those now embryos in

22   culture and growing them for several days.  And, when they're

23   ready to be transferred back to the woman, the laboratory

24   personnel pick them up into the catheter and pass them to the

25   physician who then puts them back into the patient to hopefully

VOLUME: 8
PAGES: 432-646

1    achieve a pregnancy.

2         So that's the IVF procedure, and these procedures all

3    involve a variety of staff.  So there's always the physicians,

4    the laboratory, nursing staff.  Anesthesiology was involved

5    with the retrieval procedures.  So there's a variety of

6    personnel.

7    Q.   So there's a variety of different groups from different

8    parts --

9    A.   Yeah.

10   Q.   -- of Dartmouth health involved?

11   A.   Yeah, sort of, yes.

12   Q.   Well, you say "sort of".

13   A.   Well, it's, most of the people involved were involved from

14   the REI division.  We did, for a retrieval and an

15   anesthesiologist would be necessary.  So there are a few

16   additional people that are brought in, but the majority of the

17   personnel involved with these procedures are REI division

18   personnel.

19   Q.   Right.  And that's part, and that includes the IVF lab?

20   A.   Yes.

21   Q.   And in the IVF lab how many employees were under your

22   direct or indirect supervision?

23   A.   Well, during the course of that timeframe, somewhere

24   between one and four at various points in time.

25   Q.   Toward the end of your stint there, was it more than --

1    A.    Yes.

2    Q.    Okay.  Closer to four?

3    A.    Yeah.

4    Q.    And how important is it that all of these players from

5    either the IVF lab, the REI physicians all work together

6    closely?

7    A.    It's critically important that the staff from these

8    different parts of the unit work together and work together

9    well.  One of the things that came out very early when IVF

10   first began is that people started to realize that this

11   procedure is a little bit different than your standard medical

12   procedure.  In most situations, a physician works alone.  They

13   see the patient.  They deal with the patient.  And they might

14   have a nurse with them, but it's, it's a sort of simple

15   straight line from the initial encounter to the, to the later

16   treatment.

17         IVF is a little more complicated.  First of all, it

18   involves people like me, a PhD trained very differently than

19   the physicians and the lab staff, and people realized early on

20   that this was a different dynamic, and one of the things that's

21   needed in a situation like that is a lot of coordination

22   between the different groups.  And there are multiple

23   appointments the patient needs to have.  There is a lot of

24   coordination between the different groups, making sure

25   everybody is in the right place at the right time, making sure

VOLUME: 8
PAGES: 432-646

1    that all of these individuals are working together to do the

2    best job for the patient.

3    Q.    Okay.  With respect to the REI division, and I want to

4    focus more in the 2010 forward timeframe, okay?  Do you recall

5    team meetings occurring on a regular basis?

6    A.    Team meetings occurred on a regular basis all the time,

7    yes, even from early on.

8    Q.    Okay.  And I want to focus more into 2010 forward, Just

9    for purposes of my discussion of questions.

10   A.    Okay.  Um-hum.

11   Q.    You would have regular team meetings in the REI division?

12   A.    Yes.

13   Q.    And was the expectation that the REI physicians, the REI

14   nurses, the REI staff, as well as the members of the IVF lab

15   met in those meetings?

16   A.    Yes.

17   Q.    Okay.  And, at some point during this timeframe, was

18   Richard Reindollar the head, the chair of the OB/GYN

19   department?

20   A.    Yes.  He was the chair of the OB/GYN department.  He was

21   also an REI physician who had come to us from Boston IVF, which

22   is a huge program down in the Boston area.  They do about 1,000

23   procedures a year, and he had a lot of experience and was a

24   part of our division, and he was part of our meetings, yes.

25   Q.    Okay.  So, in addition to being the chair of the OB/GYN

VOLUME: 8
PAGES: 432-646

1    department, Dr. Reindollar's expertise was actually in REI?

2    A.    Yes.

3    Q.    Okay.  And he attended these regular team meetings?

4    A.    Most of the time, not all the time.

5    Q.    Okay.  And did -- and the plaintiff in this case is

6    Dr. Misty Porter.  Do you know her?

7    A.    Yes, yes.

8    Q.    And was she part of the REI division at this time?

9    A.    She was part of the REI division at that time, yes.

10   Q.    And, in terms of Dr. Porter, and did you have regular

11   interaction with Dr. Porter during that time?

12   A.    Yes.

13   Q.    And how would you describe Dr. Porter's style or

14   communications?

15   A.    Dr. Porter is not a team player.

16   Q.    What do you mean by that?

17   A.    The team meetings, the goal of the meetings was to get

18   everyone together to talk about the patients coming up, to talk

19   about what things might be improved in the unit, what things

20   weren't working.  Dr. Porter's style was, I want it to be done

21   my way, and that caused, that caused a lot of problems for the

22   unit over time, a lot of frustration for me, I have to say, and

23   a lot of, a lot of difficulty, interactive difficulty between

24   the different people involved.

25   Q.    And did you experience that frustration and difficulty in

VOLUME: 8
PAGES: 432-646

1    those team meetings?

2    A.    Oh, yes, yes.

3    Q.    In what ways?

4    A.    There were, there were numerous situations, numerous times

5    when I wanted something done a particular way, and we never got

6    there.  I can give you an example of a --

7    Q.    Hold on a second.  Hold on.

8    A.    Yeah, yeah.

9    Q.    Slow down.  We're not in a rush here.

10    A.    Yeah, okay.

11    Q.    We, I want to ask you about an example of where there was

12    some conflict that you experienced or you were part of

13    involving Dr. Porter.

14    A.    The kinds of, the kinds of situations would be, and I'm

15    not -- this was a long time ago, so I'm not going to remember

16    certain specifics, but I know that there were numerous

17    situations in which, in which we needed to discuss something,

18    we needed to get something worked out amongst ourselves, and we

19    just never got there.  We just never got those things done.  We

20    never got them finished because that was not what she wanted to

21    do.  And I'm sorry to say it that way, but that's --

22    Q.    Okay.

23    A.    That's what happened.

24    Q.    And did that continue through the years that --

25    A.    Yes.

1    Q.   You have to wait until I finish the question.

2    A.   Okay.

3    Q.   Did that happen throughout your employment as the director

4    of the IVF lab?

5    A.   Yes.

6    Q.   Okay.  And, in terms of, We never got there, we never

7    accomplished this or that, and then you said she, and what I'm

8    -- hold on.  What I'm trying to understand is, What was the --

9    who were you talking about, first of all?

10   A.   So I should -- Dr. Porter and I worked okay together.  We

11   did things.  There were times when we made changes.  There were

12   times when we did things that, that improved and changed the

13   program and so forth, but it wasn't a consistent thing that

14   could be counted on.  Because, if she wanted to do something,

15   if Dr. Porter wanted to do something a particular way, Dr.

16   Porter did it Dr. Porter's way.  And that was regardless of my

17   opinion or the opinion of other physicians in the division,

18   including Dr. Reindollar, and there were a number of other

19   physicians over the years.

20   Q.   Well, I want to ask you about that.  The other -- do you

21   recall any conflicts between Dr. Reindollar and Dr. Porter,

22   either at these team meetings or in conjunction with the

23   normal, everyday REI division work?

24   A.   The main -- there's one particular incident that I

25   remember very clearly that happened.

1    Q.   And what was that incident?

2    A.   And that incident involved a meeting which was not a full

3    team meeting.  It was a meeting that included the physicians in

4    the department, and, at the time, it was Dr. Mangianello,

5    Dr. Reindollar, Dr. Porter, Dr. Mahoot and Dr. Ulal, as well as

6    Dr. Nadia, I believe -- I believe he was there -- who was a

7    urologist that worked with us, dealt with the male infertility,

8    and myself.

9         And we were in a meeting, and the goal of that meeting was

10    -- Dr. Reindollar had called the meeting, if I recall

11    correctly.  He wanted everybody in the unit to use a particular

12    intake form, the physicians in particular, the REI physicians

13    in particular, to use a particular intake form that he had.  It

14    was modified some from what he had used at Boston IVF.

15    Q.   What was the purpose of having this intake form?

16    A.   The purpose of the intake form, when, with that number of

17    physicians in the department, and we had a number of them at,

18    you know, at the time, obviously, it's always possible that the

19    person who initially saw the patient was not the person who did

20    the egg retrieval or was not the person who did the transfer or

21    had some reason to interact with the, with the patient at

22    another time during their cycle that was an emergency, and that

23    was the person and there was a different person on call or

24    something.

25         So what was very important was that information be

VOLUME: 8
PAGES: 432-646

1    conveyed from one physician clearly to another so that they all

2    were on the same page when something happened and everybody

3    would know how to deal with the patient that they were treating

4    at that particular moment.  So the goal of this form was to

5    have a structured form that everybody used that was the same

6    for everybody that would make it easy for the other physicians

7    to know what was going on with that patient and that, that way,

8    they wouldn't have to go through the chart, either the physical

9    chart and look things up on paper, or even the medical record,

10   the, the electronic medical record, which can be sometimes

11   rather obtuse to find things in.  And this would be an easier

12   way to do it.

13        And we, we had this meeting that Dr. Reindollar called.

14   There had already been some conflict in the department at this

15   point.

16   Q.   What conflict are you talking about?

17   A.   Well, there had been conflict at other meetings.  There

18   had been conflict between -- I don't know the specifics of it,

19   but there had been conflict between the physicians, and so he

20   called this meeting, in part, because of this.

21   Q.   I know you don't know the specifics.  Did that conflict,

22   were you aware of whether or not that conflict with the other

23   physicians involved Dr. Porter and those other physicians?

24   A.   Yes.

25   Q.   Okay.  We're just going to go to this meeting now.  What

1    happened at that meeting?

2    A.    So Dr. Reindollar presented the form, and Dr. Porter said,

3    "I will not use that form", and that was the end of the

4    meeting.  Everybody's mouth kind of dropped open, and that was

5    the end of the meeting.

6    Q.    So that kind of interaction or tension, did that happen on

7    other occasions with Dr. Porter?

8    A.    I don't think it happened quite that dramatically any

9    other time that I can recall.  I think that's why it stuck in

10   my head, because it was so dramatic.  But there was conflict

11   often, and there was conflict between various members of the

12   team often.

13   Q.    I want to focus just on Dr. Porter and any other

14   physicians.  So there were a number of other physicians, you

15   said, Sophie --

16   A.    Sophia Ulal.

17   Q.    Sophia Ulal and Neil --

18   A.    Neil Mahoot.

19   Q.    Okay.  Are you aware of whether or not Dr. Porter had

20   conflicts with those physicians?

21   A.    I am indirectly aware of that because Dr. --

22          ATTORNEY JONES:  Objection.

23          THE WITNESS:  -- Mahoot in particular talked to me.

24          ATTORNEY JONES:  Your Honor, she's getting into

25   hearsay.

1           THE COURT:  Well, I don't know yet, but, I guess,

2    sustained.  Maybe you could rephrase the question.

3    BY ATTORNEY SCHROEDER:

4    Q.   Were you aware -- I just want to -- just listen to the

5    question.  Were you aware of instances where Dr. Porter had

6    conflict with other physicians in the REI division?

7    A.   I remember another conflict that, that happened in that

8    division about transfer, about the embryo transfer, which is

9    where you take the embryos and put them back into the uterus.

10   Q.   Did you have -- did it involve Dr. Porter?

11   A.   It involved Dr. Porter.

12   Q.   What was the nature of that conflict?

13   A.   The, Dr. Reindollar did the embryo transfers for some

14   patients differently from the way Dr. Porter did them, and what

15   he did was --

16   Q.   A different technique?

17   A.   He, when you do the embryo transfer, there's a catheter,

18   and there's, the catheter involves two pieces.  There's an

19   outer catheter which is called the stylet which is a sort of

20   more rigid catheter to help, and what that catheter does it is

21   it helps move the catheter through the cervix, through the

22   opening into the uterus so that you can thread it through the

23   cervix easily so that the embryos can be placed in the uterus.

24   The inner catheter is a very flexible catheter, and that's the

25   catheter that we actually put the embryos into.  The one

VOLUME: 8
PAGES: 432-646

1    catheter would be inserted into the other.

2        Dr. Porter did all of her embryo transfers with the

3    stylet, and Dr. Reindollar didn't, and she did not, Dr. Porter

4    was not happy with that.  She was not willing to try anything

5    else, and there was a certain amount of conflict.  She felt he

6    was doing it wrong doing it that way.

7    Q.   Now, prior to that time, Dr. Reindollar was at Boston IVF?

8    A.   Um-hum.  Yes.

9    Q.   Okay.  And his specialty, actually, his subspecialty was

10   REI?

11   A.   Yes.

12   Q.   And was he the, was he the de facto division director

13   because of being the chair of the OB/GYN but also the

14   subspecialty, or was there somebody else, if you know?

15   A.   I don't, I don't remember.  I think he called himself the

16   REI director, but I don't remember whether that's --

17   Q.   Either way, he was --

18   A.   -- the structure.  He was still the chair of the

19   department.

20   Q.   Okay.

21   A.   Yes.

22   Q.   And was it your testimony that Dr. Porter did not agree

23   with the technique and style of Dr. Reindollar?

24   A.   Yes.

25   Q.   Okay.  And did she voice that criticism?

VOLUME: 8
PAGES: 432-646

1    A.    Yes.

2    Q.    Okay.  More than once?

3    A.    I'm sure.

4    Q.    Okay, okay.  And, in terms of conflict between

5    Dr. Reindollar and Dr. Porter, are you aware of an occasion

6    where facilitators were brought in to deal with the dynamics of

7    the REI division?

8    A.    Yes.  There was an outside consulting company that was

9    brought in.  Actually, at the meeting that I told you about

10   with the, with the form, we had a Dartmouth-Hitchcock

11   facilitator at the meeting, and she left.  She got actually

12   quite upset with what happened at that meeting, felt she

13   couldn't handle it because it was such direct conflict.  But we

14   had brought in a, Hitchcock had brought in a consulting team

15   before that.

16   Q.    And what was the purpose of bringing the consulting team,

17   if you know?

18   A.    To deal with the problems within the division, the

19   problems being clear conflict that was going on and to figure

20   out what that conflict was about.

21   Q.    And what did you believe the conflict was about?

22   A.    I thought it was the fact that Dr. Porter would not give

23   in to any of the other opinions of any of the other physicians.

24   Q.    Okay.  Now, fast forward a little bit here to when you are

25   now in a research position.  There comes a period of time where

1    you then became reaffiliated with Dartmouth Health after --

2    A.    Yeah.

3    Q.    -- no longer being at the IVF lab, correct?

4    A.    Yes.  I wasn't at the IVF lab, but I was in the department

5    of OB/GYN the whole time.  It's just an administrative thing as

6    to which entity I was working for.

7    Q.    Understood.

8    A.    I don't want to confuse things with that, but --

9    Q.    Okay, that's fine.  But, and did you become aware of

10   criticisms or conflict that Dr. Porter had with some of the

11   newer physicians like Dr. Hsu?

12   A.    I knew that there was conflict there, yes.

13   Q.    Right.  Were you working with Dr. Hsu at some point on

14   research?

15   A.    Yes.  Dr. Hsu had actually gotten a grant from NIH, not

16   from NIH, I'm sorry, from the American Society for Reproductive

17   Medicine, to do a research project.  He worked with me a little

18   bit in writing that grant.  He asked for my help in mentorship

19   in doing the work on that grant, and so I was working with him

20   on that project at that point.

21   Q.    And did you encounter or understand that Dr. Porter had

22   critical comments about Dr. Hsu's technique and skills?  Did

23   you become aware of that?

24   A.    I became aware of that.  I mean, I don't want to get into

25   the hearsay thing.

VOLUME: 8
PAGES: 432-646

1    Q.   Well, I just want to know.  Just answer the question.

2    A.   Yes.

3    Q.   Did you become aware of it?

4    A.   Yes, I was aware of it.

5    Q.   And you were working with Dr. Hsu on a regular basis on

6    these research issues?

7    A.   Yes.

8    Q.   Okay.  And did you understand, upon becoming aware of it,

9    that Dr. Porter had criticisms of Dr. Hsu's skills and

10   performance and technique?

11   A.   Yes.

12   Q.   Court's indulgence.  I don't have a question right now,

13   but did you want to finish an answer there?

14   A.   I just wanted to say that Dr. Porter had criticisms of all

15   the physicians in the division.

16   Q.   Was that your experience throughout the time?

17   A.   That was my experience throughout the time.  She also had

18   a lot of criticisms about the nursing staff, often about some

19   of my lab staff, they didn't do things the way she thought I

20   would have done them.

21   Q.   And she would bring those to your attention?

22   A.   The lab staff stuff, absolutely.

23   Q.   Okay.

24   A.   Yes.

25              ATTORNEY SCHROEDER:  Thank you.  If I may have one

1    second, Your Honor?

2                THE COURT:  Yes.

3                ATTORNEY SCHROEDER:  Nothing further at this time,

4    Your Honor.

5                THE COURT:  Okay.  Cross-examination?

6                CROSS-EXAMINATION BY ATTORNEY JONES

7    Q.   Dr. Stern, good afternoon.

8    A.   Good afternoon.

9    Q.   My name is Eric Jones, and I'll ask you some questions

10   this afternoon.  If I understood your testimony, your first

11   stint running the lab for the hospital ended in 2014; is that

12   right?

13   A.   Yes.

14   Q.   And Dr. Hsu was relatively new at that time, right?

15   A.   Yes.

16   Q.   And that was before Dr. Seifer arrived, correct?

17   A.   Yes.  I was still in the division when Dr. Seifer arrived,

18   though.

19   Q.   Okay.  Well, he arrived in 2016, right?

20   A.   Maybe that's -- I don't know.  I do know that I

21   interviewed him.

22   Q.   If the evidence in the case is that he started in 2016,

23   you would have been over at Dartmouth College, right?

24   A.   Yeah.  Although I was sitting in, you know, still in the

25   OB/GYN area.  I mean, I was still around, yes.

1  Q.  Okay.  That, in your role running the lab, you were not in

2  the procedure room when the physicians performed, like, egg

3  retrieval, for example, right?

4  A.  The way, the way the, the unit was set up, the procedure

5  room here, the laboratory with an open door was right there.

6  So we weren't, technically speaking, in the same room, but we

7  were in the same space.

8  Q.  Okay.  But, during a procedure, you were not in the room

9  when an egg retrieval was being done, correct?

10  A.  Yes, that's correct.

11  Q.  Okay.  And that's also true of embryo transplants,

12  correct, or transfers?

13  A.  Sometimes we would walk into the embryo transfer room and

14  actually press the plunger of the, of the stylet, of the

15  catheter to push the embryos in.  It depended on the, whether

16  the physician wanted us to do that.  Some did, and some didn't.

17  Q.  Okay.  And, if it was a physician who wanted you to do

18  that, you'd come in for that brief moment?

19  A.  Yes.

20  Q.  And then leave, correct?  So you would -- I'm sorry.

21  Correct?

22  A.  Yes, correct.

23          ATTORNEY SCHROEDER:  If you could just let her answer

24  the question.

25  BY ATTORNEY JONES:

1  Q.   I thought I did.  But my point is, if, like, for example,

2  if Dr. Hsu was performing a procedure, you were not in the room

3  for the entirety of the procedure, correct?

4  A.   As I said, I wasn't specifically in that room, but I would

5  be in the adjoining room with the door open so that --

6  Q.   I understand.

7  A.   Yes.

8  Q.   You do not --

9  A.   Correct.  I was not standing next to the, next to her or

10  next to the physician.

11  Q.   Let me try this.  Can we try to answer yes-or-no, confine

12  it to yes-or-no questions?

13        THE COURT:  Before you ask you question, let me just

14  say, please, you have to let the attorney ask the question

15  fully, and, Mr. Jones, let the Witness answer fully before you

16  ask a question.

17  BY ATTORNEY JONES:

18  Q.   I apologize.  Isn't it true that you do not have direct

19  personal knowledge of Dr. Hsu's skills performing egg

20  retrievals because you were not in the room when he did them?

21  A.   Correct.

22  Q.   And the same thing with regard to embryo transfers,

23  correct?

24  A.   Correct.

25  Q.   Okay.  And, for the same reason, you do not have a basis

VOLUME: 8
PAGES: 432-646

1    upon which to judge Dr. Hsu's skills, correct?

2    A.    Technically correct, yeah.

3    Q.    Okay.  If there was patient harm occurring in the

4    procedure room and you weren't in the room, you wouldn't know

5    about it, correct?

6    A.    Until afterwards.

7         ATTORNEY SCHROEDER:  Objection, Your Honor.  Calls

8    for speculation.

9         THE COURT:  What was the question, Mr. Jones?

10         ATTORNEY JONES:  I said, if a patient was harmed

11    during a procedure, she wouldn't know because she was not in

12    the room.

13         THE COURT:  I'll let her answer that.  Objection

14    overruled.

15    BY ATTORNEY JONES:

16    Q.    You wouldn't know that, right?

17    A.    I wouldn't know that at the time.

18    Q.    Would you consider yourself close to Dr. Reindollar at the

19    time?

20    A.    No.

21    Q.    You worked closely with him when he was working in the

22    department?

23    A.    He was working in the department, and I worked with him,

24    and I worked well with him.  I don't know what you mean by

25    close, I guess, is the truth.

VOLUME: 8
PAGES: 432-646

1    Q.    You were aware of his views of Dr. Porter?

2    A.    At the time, no.

3    Q.    Okay.  Later?

4    A.    Later, yes.

5    Q.    Okay.  Not favorable, right?

6    A.    Correct.

7    Q.    Okay.  With regard to this big conflict at the meeting

8    about the intake form, isn't it true the department already had

9    an intake form and the department was transitioning to

10    computer-based intake?

11    A.    Part of the, part of the objective of that form, as I

12    understand it, was to have an easy way of facilitating the

13    computer intake if the computer was not available immediately.

14    Q.    But, yes or no, isn't it true that the department already

15    had an intake form that did that?

16    A.    Not an intake form that was as comprehensive as the one

17    that was presented.

18    Q.    Okay.  You know, with regard to this other conflict you

19    mentioned about a difference between Dr. Reindollar and Dr.

20    Porter in terms of their methodology for embryo transfers,

21    there was testimony in the case that, from Dr. DeMars, that

22    different doctors have different ways of doing things, and

23    that's okay.

24        Understanding that, isn't it true that the conflict

25    between Dr. Reindollar and Dr. Porter was that Dr. Reindollar

VOLUME: 8
PAGES: 432-646

1    was insisting that Dr. Porter do it his way?

2    A.   I think he was suggesting that Dr. Porter do it his way,

3    and what happened was she wouldn't.

4    Q.   Okay.  She had her own way of doing it, correct?  Yes or

5    no?

6    A.   I assume so.

7    Q.   Okay.  Now, with regard to this situation where an outside

8    facilitator had to come help mediate with the conflict, you

9    said you thought that that was, that the reason for that was

10   that Dr. Porter just wasn't going along or playing along well,

11   something like that.  Were you aware --

12             ATTORNEY SCHROEDER:  Objection, Your Honor.  He's

13   making a comment about her testimony.  If he has a question,

14   that's fine.

15             THE COURT:  All right.  Sustained.  Ask the next

16   question, Mr. Jones.

17   BY ATTORNEY JONES:

18   Q.   With regard to the outside company having to come in to

19   mediate, what's your understanding of how that conflict arose?

20   A.   I think there was ongoing conflict within the division,

21   and, after discussion of that conflict with leadership,

22   leadership decided to bring in a consulting company.

23   Q.   Okay.  Do you know whether or not REI nurses had

24   complained to human resources about Dr. Reinhart --

25   A.   Reindollar.

1    Q.    -- Reindollar's behavior that they thought was abusive and

2    harassing?

3    A.    I have no recollection of that, nor do I have any

4    recollection of Dr. Reindollar being harassing.

5    Q.    Okay.  But you don't, you have no knowledge that these

6    complaints were made to HR?

7    A.    No.

8    Q.    Okay.  And do you have any knowledge about any complaints

9    that Beth Todd may have had about Dr. Reindollar?

10    A.    No.

11    Q.    Okay.  So, well, one last question.  Did you meet with

12    Dartmouth Health's counsel to prepare for your testimony today?

13    A.    Very briefly.

14            ATTORNEY JONES:  Okay.  No further questions.

15            THE COURT:  Any redirect?

16            ATTORNEY SCHROEDER:  No questions, Your Honor.

17            THE COURT:  Okay.  Dr. Stern, you may step down.

18            ATTORNEY SCHROEDER:  Next witness, Your Honor, if I

19    may escort Dr. Stern out, is Kathleen Mansfield.

20                    KATHLEEN MANSFIELD,

21            having been duly sworn to tell the truth,

22                testifies as follows:

23            ATTORNEY SCHROEDER:  May I proceed, Your Honor?

24            THE COURT:  Yes.

25

```
 1              DIRECT EXAMINATION BY ATTORNEY SCHROEDER

 2      Q.   Thank you.  Good afternoon.

 3      A.   Good afternoon.

 4      Q.   Do me a favor, Ms. Mansfield, if you could bring that a

 5      little bit closer, not all the way.  That's fine.

 6      A.   Okay.  Better?

 7      Q.   Thank you.  Ms. Mansfield, where you are you currently

 8      employed?

 9      A.   Dartmouth-Hitchcock.

10      Q.   And how long have you been employed by

11      Dartmouth-Hitchcock?

12      A.   30 years.

13      Q.   Okay.  Is it okay if I use Dartmouth Health?

14      A.   Sure.  Sorry.  Yes, Dartmouth Health.

15      Q.   Same entity?

16      A.   Yes.

17      Q.   Okay.  And you've been there 30 years?

18      A.   Correct.

19      Q.   And currently, just currently, in what capacity are you

20      employed by Dartmouth Health?

21      A.   I am currently a case manager for hematology, oncology,

22      and medicine services.

23      Q.   Okay.  That's a rather long title.  When did you take on

24      that position?

25      A.   December of 2019.
```

VOLUME: 8
PAGES: 432-646

1    Q.   And, just briefly, what does that job entail?

2    A.   I help patients get discharged from the hospital, whether

3    it's rehabs, visiting nurses, medical equipment, gathering

4    guardianships or long-term care, Medicaid to get them placed

5    for long-term care.

6    Q.   And, prior to 2019 when you were employed by Dartmouth

7    Health, what position were you employed in?

8    A.   I was the nurse manager in the OB/GYN department.

9    Q.   And, as the nurse manager in the OB/GYN department, how

10   long were you in that position?

11   A.   About five years, from 2014 to 2019.

12   Q.   Okay.  Do you recall the time period roughly -- and I

13   realize this is now eleven years ago -- what time of the year

14   you joined the OB/GYN department the nurse manager?

15   A.   In 2014, I think it was, around May, but I can't honestly

16   remember the date.

17   Q.   Sometime in that time period?

18   A.   Yes.

19   Q.   Okay.  Just briefly, before I ask you a few more questions

20   about that specific time period, could you just tell the jury a

21   little bit about yourself?  Where did you go to school?

22   A.   I went to college at University of New Hampshire, got my

23   bachelors in nursing in 1995, and then I went to Plymouth State

24   University and got a masters in business administration in

25   2004.

1    Q.    Okay.  And did you assume employment with Dartmouth Health
2    at that point?
3    A.    No.  I had started in 1994 as a licensed nursing assistant
4    and worked on weekends while I attend school at UNH.
5    Q.    Okay.  And then, after you graduated from UNH, did you
6    assume full-time employment at Dartmouth Health?
7    A.    Yes, I did.
8    Q.    Okay.  And then, at some point, you got your MBA from
9    Plymouth State in 2004?
10   A.    Yes.
11   Q.    And, when you worked -- prior to being in management, if
12   you will, were you a nurse?
13   A.    Yes, I was.
14   Q.    And performing nurse duties?
15   A.    Correct.
16   Q.    And what department or division were you in at Dartmouth
17   Health?
18   A.    Prior to OB/GYN, I was a liver, kidney, pancreas
19   transplant coordinator.  I did that for about five or six
20   years.  Prior to that I was on 4 West, which is a surgical
21   floor, taking care of surgery patients post-op, and before that
22   I was a dialysis nurse as an RN.
23   Q.    Okay.  Kind of a wide range of areas you were in?
24   A.    Yes.
25   Q.    And then, and then you got promoted to the nurse manager

VOLUME: 8
PAGES: 432-646

1    role in mid-2014?

2    A.    Correct, correct, yes.

3    Q.    And then, since that time -- and you were in that nurse

4    manager role in the OB/GYN department from mid 2014 to late

5    2019?

6    A.    Yes, December, I left, of 2019.

7    Q.    And that's when you became your current job, case manager?

8    A.    Correct, yes.

9    Q.    And that's outside of the OB/GYN department?

10    A.    Yes.

11    Q.    Okay.  Now, I just want to ask you a few things about your

12    duties as a nurse manager in the OB/GYN department.  First of

13    all, as a nurse manager in the OB/GYN department, how many

14    employees directly or indirectly reported to you?

15    A.    I had about 26 at the time.  You know, it varied if people

16    left, coming and going, but 26 nursing assistants, LPNs, and

17    RNs.

18    Q.    What's an LPN?

19    A.    Licensed practical nurse.

20    Q.    Okay.  And --

21    A.    Licensed nursing assistant.

22    Q.    And RN is, obviously, a registered nurse?

23    A.    Yes.

24    Q.    And in the, say, 2014 to 2017 timeframe in the OB/GYN

25    department, how many divisions were there?

VOLUME: 8
PAGES: 432-646

1    A.    Six.

2    Q.    Okay.  Can you name them for the Court?

3    A.    Yes.  Gynecology, oncology, maternal fetal medicine, the

4    midwives, general OB/GYN, urogynecology, and REI.

5    Q.    And, at this time, who did -- you were the nurse manager.

6    Who did you report to?

7    A.    Heather Gunnell.

8    Q.    And what was her title?

9    A.    She was the director.  I believe she started as practice

10   manager and then moved up to director.

11   Q.    Okay.  Were you the practice manager?  No, you were the

12   nurse manager?

13   A.    Nurse manager.

14   Q.    Okay.  And so you reported up to Heather Gunnell?

15   A.    Yes.

16   Q.    And, as the manager, generally speaking, what you were job

17   duties?

18   A.    Helping to train staff, making sure we had enough staff,

19   interviewing for new employees, helping make processes, improve

20   processes through the clinic.

21   Q.    Did you work with the individual divisions as a result?

22   A.    Yes.  You mean each division would have the -- each

23   division usually had different meetings that we would need to

24   attend, myself or the charge nurses or you know.  So, if we

25   were invited to the meeting to help make things, you know,

VOLUME: 8
PAGES: 432-646

1    improve the processes.

2    Q.    When you joined the OB/GYN department in 2014 as the nurse

3    manager, did you have an understanding of the dynamics,

4    interpersonal dynamics of the REI division specifically?

5    A.    I was made aware of it from nursing staff, yes.

6    Q.    Okay.  What was your understanding, without getting into

7    what they said, what was your understanding of the reputation

8    of the REI division?

9    A.    That it was a difficult division and that there was,

10   people didn't get along very well within the division.

11   Q.    When you became the nurse manager of the OB/GYN department

12   and you were responsible for the RNs and LPNs in the REI

13   division, what did you experience in terms of the interpersonal

14   dynamics of the REI division?

15   A.    Well, the nurses, the two nurses that were there had

16   different views on how things should be done, and they didn't

17   really interact well together.  They got the job done, but they

18   didn't always, you know, see eye to eye.

19   Q.    And who were those nurses?

20   A.    Casey Dodge and Sharon Parent.

21   Q.    Casey Dodge and Sharon Parent?

22   A.    Um-hum.  Yes.

23   Q.    And how do you know that those two nurses specifically

24   didn't get along?

25   A.    Because they were in my office a lot talking about how

1   things were going each day, and I was behind closed doors a lot

2   with each of them.

3   Q.   Out of all the divisions that you were responsible for,

4   those six divisions, how would you characterize the amount of

5   time you devoted to the REI division versus all the other ones?

6   A.   Definitely more time trying to work with the nurses to get

7   along better with REI than other groups.  Other groups did have

8   issues as well, but not as much.

9   Q.   Not as many issues?

10   A.   Not as many, yes.

11   Q.   I want to come back to that account in a second, but I

12   just want to ask you a little bit about the plaintiff in this

13   case.  Do you know Dr. Misty Blanchette Porter?

14   A.   Yes.

15   Q.   And how was your -- how would you characterize your

16   professional relationship with her?

17   A.   I was intimidated as a new nurse manager, at first.  You

18   know, I felt that, you know, I needed to make everything right,

19   you know, for her as well as other providers.

20   Q.   Okay.  How would you compare her style compared to the

21   other providers that you worked with?

22   A.   I think, as I said, as a new nurse manager, I felt, you

23   know, I had to do everything for everybody and get it done.  So

24   but Dr. Porter, you know, you know, if she came to my office, I

25   would feel intimidated that I needed to get it done what she

1    needed to get done.

2    Q.   Did she express that to you?

3    A.   That she --

4    Q.   Did she express her -- did she make demands upon you?

5    A.   She, if she asked for things, yes, and, usually, if it was

6    something that I couldn't do myself, I'd go to Heather and say,

7    How do we, you know, get this done, you know, if it was

8    something out of my realm as a middle manager.  I didn't have

9    the final say in anything, really.

10   Q.   And, with respect to Dr. Porter, were there times where

11   you didn't get something done for her and she expressed

12   disappointment, frustration, or what did she say?

13   A.   If we didn't get it done, she would probably come back and

14   ask why, but, you know, then we'd, I'd work with Heather and

15   try to figure out if we could figure out the issue.

16   Q.   Did she ever, in your mind, go over your head, so to

17   speak?

18   A.   I don't think so.  I think she would come to me about

19   nursing issues, and then, if it was bigger than I could manage,

20   then that's when I would talk to Heather.

21   Q.   Okay.  Did you have an opinion of -- well, do you recall

22   when Dr. Seifer was made the division director of the REI

23   division?

24   A.   Yes.  I don't know what date, but I remember him being

25   hired on.

VOLUME: 8
PAGES: 432-646

1    Q.    Okay.  And, after he was hired, do you recall Dr. Porter

2    having any reaction to Dr. Seifer's hiring as a division

3    director as opposed to herself?

4    A.    No, not, nothing personal to me.

5    Q.    Okay.  I want to go back to the REI division for a second.

6    In terms of Sharon -- you jut said there was conflict between

7    Sharon Parent and Casey Dodge?

8    A.    Yes.

9    Q.    And did you witness any tension among the providers, the

10    doctors, in the REI division?

11    A.    They seemed to have different styles of work, and, you

12    know, they liked to work with certain nurses.  So each provider

13    kind of had a certain nurse they liked to work with.  Dr.

14    Porter liked to work with Sharon, it seemed like, and Beth

15    Todd, and then Casey was more working with Dr. Hsu and Dr.

16    Seifer when he arrived.

17    Q.    Would it be fair -- now, that's how things happened,

18    right, that they developed these -- would it be fair to say

19    clique?  How would you describe it?

20    A.    They, I feel they worked better, they liked working better

21    with that provider than the other provider, and each of them

22    got -- you know, so it was like silos, maybe.

23    Q.    Okay.  You know, and did that impact the ability to get

24    things done by having these silos or no?

25    A.    I don't think so, no.  I mean, if one of the doctors

VOLUME: 8
PAGES: 432-646

1    wasn't there, the other nurse would pick up.  You know, they

2    weren't going leave patient care.  Neither nurse would leave a

3    patient stranded because it was someone else's patient.

4    Q.    And are you aware of -- well, did the conflicts with the

5    nursing, the nurses Sharon Parent and Casey Dodge, did that

6    continue throughout the time that you were nurse manager?

7    A.    Yes.

8    Q.    And so 2014, 2015, 2016, did those conflicts occur?

9    A.    Yes.

10   Q.    Now, do you recall a period of time when an entity or

11   organization within Dartmouth Health called the Value Institute

12   was involved with the REI division?

13   A.    Yes.

14   Q.    Okay.  What was your understanding -- when was that, do

15   you recall?

16   A.    2016, I believe.

17   Q.    Okay.  And did it carry forward into 2017?

18   A.    I believe we had, like, three meetings.  I, honestly, I

19   can't remember that far back.

20   Q.    Okay.  Did -- well, let me ask you this.  Would you have

21   attended those meetings as a nurse manager?

22   A.    Yes.

23   Q.    And were these meetings specifically for the REI division?

24   A.    Yes.

25   Q.    And do you recall that these meetings being conducted by

1    the Value Institute were to work on interpersonal dynamics

2    within the REI division?

3    A.    Yes.

4    Q.    And was one of the purposes to create more teamwork

5    between the different groups?

6    A.    Yes.

7           ATTORNEY JONES:  Your Honor, a bit of leading.  Maybe

8    we could have some direct questions?

9           THE COURT:  Okay.  Sustained.

10   BY ATTORNEY SCHROEDER:

11   Q.    What was your understanding, if you had one, of the reason

12   for those meetings?

13   A.    To try to bring the group together and be able to function

14   well within the division and work better together.

15   Q.    What, if any, end result happened as a result of those

16   meetings in 2016 and 2017?

17   A.    I don't think it changed anything.

18   Q.    Okay.  You don't believe it changed anything?

19   A.    No.  The, the relationships with my nurses seemed to be

20   the same until people, until nurses started leaving.

21   Q.    Okay.  Let me ask you about that topic, nurses leaving.

22   In the late 2016 early 2017 timeframe, do you recall what, if

23   any, shortages there were in the REI division in terms of

24   nurses?

25   A.    So we had two nurses.  Sharon and Casey were the main

VOLUME: 8
PAGES: 432-646

1    nurses, and then they hired Naomi Moyer for a short time

2    period.  She was from the Birthing Pavilion that came over, but

3    she didn't last long.  She went on to something else.  And then

4    Casey -- I don't know the actual -- I can't remember the dates,

5    but Casey was let go, and then Sharon retired shortly after

6    that.

7    Q.    Okay.  Was that in the -- do you recall whether or not

8    this was in the late 2016 timeframe?

9    A.    Yes.

10   Q.    And do you recall even prior to the late 2016 timeframe a

11   shortage of nurses in general?

12   A.    Yes, and that's -- yes.

13   Q.    Okay.

14   A.    For performing the procedures and things.

15   Q.    And performing procedures for the REI division, correct?

16   A.    Correct.

17   Q.    And, in terms of the skill set for REI nurses and given

18   your background in nursing, they've got to learn a certain

19   skill set to do that job; is that fair to say?

20   A.    Yes.

21   Q.    And there's specific things that nurses need to learn in

22   order to be an REI nurse, right?

23   A.    Yes.

24   Q.    And the REI division, with respect to nursing

25   capabilities, do they operate on a Monday-through-Friday

1   schedule, or is it throughout the week?

2   A.   Not, they did have people on call if they needed to do

3   procedures during the weekend, so Monday through -- you know, I

4   think they did -- I can't remember that, but I know there was

5   people on call for the weekends to do procedures if they needed

6   to do things.

7   Q.   Okay.  So a 24/7 kind of operation?

8   A.   Not at night, I don't think.

9   Q.   Not at night, just on the weekend?

10   A.   Yes.

11         ATTORNEY SCHROEDER:  Okay.  If I could put up on the

12   screen Defendant's Exhibit V, has already been admitted, and

13   ask to show the Witness as well as the jury.  May I approach

14   the Witness to show her a hard copy?

15         THE COURT:  Yes.

16   BY ATTORNEY SCHROEDER:

17   Q.   Ms. Mansfield, I'm showing you a document which is

18   Defendant's Exhibit V, as in Victor.  It's already been

19   admitted into evidence, and I'm not going to ask you about all

20   of the documents behind it.  There's more than one.  But this

21   is an email from you dated July 18th 2016 to a variety of

22   people, including Dr. Porter Dr. Hsu and Dr. Seifer.  Do you

23   see that?

24   A.   Um-hum.  Correct, yes.

25   Q.   Does that refresh your recollection as to any efforts

VOLUME: 8
PAGES: 432-646

1     being made to recruit new REI staff nurses?

2     A.    Yes.

3     Q.    And what do you recall specifically about that subject?

4     A.    Well, we met, I believe, meeting with the division to

5     determine how we were going to do the recruiting, and I know

6     Heather worked with Leslie DeMars and HR to figure out how to

7     recruit as quickly and easily as we could and how many areas to

8     place the, you know, job posting.

9     Q.    And was, were you involved in making sure that the job

10    postings were placed at various places on the Google, so to

11    speak?

12    A.    No, that was through HR.

13    Q.    Through HR?  Okay.

14    A.    So we, I think what happened was the clinic and us

15    determined what we needed, sent it to HR, and they would post

16    it to where it was needed to be, because that was not part of

17    my role.

18    Q.    To your knowledge, was this posting that's listed here for

19    the American Society for Reproductive Medicine, was that the

20    place -- do you know whether or not this posting was given to

21    HR for purposes of recruiting REI nurses?

22    A.    Yes.

23    Q.    Okay.  And this was done sometimes in the July 2016

24    timeframe, correct?

25    A.    Correct.

1    Q.   And did the REI division, during that timeframe and into

2    the fall and winter, have meetings to discuss recruiting REI

3    nurses?

4    A.   Yes, we had meetings, and we had, you know, trying to

5    figure out how to get more nurses and, you know, would it be

6    from within Dartmouth and train them, or would we, you know,

7    post in this, you know, American Society to look for outside

8    resources?

9    Q.   And was this American Society for Reproductive Medicine,

10   was this one of the places that was selected to attempt to find

11   REI nurses?

12   A.   Yes.

13           ATTORNEY SCHROEDER:  Okay, thank you.  You can take

14   that -- you can close that for now.  Your Honor, I'd like to

15   show the Witness and the Court, just the litigants, Defendant's

16   Exhibit A6.

17           THE COURT:  Okay.

18           ATTORNEY SCHROEDER:  If I may approach the Witness.

19           THE COURT:  Yes.

20   BY ATTORNEY SCHROEDER:

21   Q.   This is a document dated November 3, 2016.  Do you

22   recognize it?

23   A.   Yes, I do.

24   Q.   And do you recall being a recipient of this?

25   A.   Yes.

VOLUME: 8
PAGES: 432-646

1          ATTORNEY SCHROEDER:  Okay.  I'd move for admission of

2     he document marked Defendant's Exhibit A6.

3          THE COURT:  Any objection?

4          ATTORNEY JONES:  No objection.

5          THE COURT:  Defendant's A6 is admitted.

6          ATTORNEY SCHROEDER:  Thank you, Your Honor.  May I

7     have it published for the jury?

8          THE COURT:  Yes.

9     BY ATTORNEY SCHROEDER:

10    Q.   And the subject of this email is Casey Dodge, right?

11    A.   Yes.

12    Q.   And it's dated November 3, 2016, right?

13    A.   Yes.

14    Q.   And you'll recall at some point you were trying to

15    remember when she left the REI division at Dartmouth Health.

16    Does this refresh your recollection of the timeframe?

17    A.   Yes.

18    Q.   Okay.  At the -- and this is a message from Heather

19    Gunnell, and it says, "Hello, I wanted to inform you that Casey

20    Dodge resigned her position in REI as of yesterday.  Katy and I

21    will be working with the team to help provide coverage for the

22    division until we are able to hire someone".

23    A.   Yes.

24    Q.   When she refers to Katy, is that the name you go by?

25    A.   Yes, it is.

1   Q.   Understood.  And so were you working with Heather Gunnell

2   for continuing efforts to recruit REI nurses at that time?

3   A.   As well as, yes, recruiting REI nurses with HR, as well as

4   trying to find resources within the clinic to help keep the

5   program, you know, the division running.

6   Q.   Okay.  And, at that time, do you recall whether the REI

7   division was struggling to have enough nursing coverage for all

8   of its procedures?

9   A.   Yes, it was.

10          ATTORNEY SCHROEDER:  Okay, thank you.  Your Honor, if

11  I may, Defendant's Exhibit C14, it's already been admitted, if

12  we can put that up on the screen, and may I approach the

13  Witness to show her?

14          THE COURT:  Yes.

15  BY ATTORNEY SCHROEDER:

16  Q.   Ms. Mansfield, you can look either at the screen or hard

17  copy, whatever is easier for you.  This is a document dated

18  November 3, same date.  Do you recognize this document from Dr.

19  Seifer?

20  A.   Yes, I do.

21  Q.   And below it halfway down there's a list of six items.

22  A.   Yes.

23  Q.   Do you see that?

24  A.   Yes.

25  Q.   Okay.  And do you recall what this involved, why Dr.

1    Seifer was sending this information out to the entire REI

2    division?

3    A.    Because, at that time after Casey left, we were down to

4    one nurse, Sharon, who was then actually planning her

5    retirement.

6    Q.    And it says here, "Below are six potential pools of

7    recruiting a nurse", and it highlights, recontact previous

8    applicants as Number 1 if they took jobs elsewhere within DH or

9    outside DH; is that right?

10   A.    Yes.

11   Q.    Two, headhunter.  Did Dartmouth Health use headhunters

12   from time to time?

13   A.    Yes, they did, I believe.  I'm not sure on this case,

14   though.  I don't remember.

15   Q.    Three, recruit a current internal GYN or OB nurse at DH or

16   out of the outpatient surgery center, right?

17   A.    Yes.

18   Q.    And then there's three more, recruiting a GYN or OB nurse

19   from a DH southern location, right?

20   A.    Yes.

21   Q.    UVT, what does that relate to?

22   A.    I'm unsure.

23   Q.    Okay.  It's one of the items, but -- and then the sixth

24   one is explore part-time options, right?

25   A.    Yes.

1    Q.   And were you responsible for undertaking efforts to

2    recruit at that point as well?

3    A.   Yes.  So my, my role in that was this was to try to figure

4    out within the department who we could look at to pull to help

5    with procedures and other things within the department, patient

6    care.

7    Q.   And did you engage in efforts to -- do you recall engaging

8    in efforts to aggressively recruit for REI nurses?

9    A.   Within the department?

10   Q.   Well, within the department and outside the department,

11   correct.

12   A.   Yeah, mine was mostly, as I said, in the department, but

13   Heather was working with HR and Leslie outside the department

14   with HR.

15   Q.   And you're aware that, excuse me, that Heather Gunnell and

16   Leslie DeMars were working with HR to identify ways to recruit

17   REI nurses?

18   A.   Yes.

19            ATTORNEY SCHROEDER:  Okay, thank you.  You can take

20   that down.  Your Honor, I'd like to introduce Exhibit A,

21   Defendant's Exhibit A9 to show the Witness, the Court, and

22   lawyers.  May I approach the Witness?

23            THE COURT:  Yes.

24   BY ATTORNEY SCHROEDER:

25   Q.   Showing you a document that's been marked A9, Defendant's

VOLUME: 8
PAGES: 432-646

1    Exhibit A9, it's an email from Heather Gunnell to you,

2    Ms. Mansfield, dated November 4, 2016.  Do you recognize this?

3    A.    Yes, I do.

4              ATTORNEY SCHROEDER:  Okay.  Your Honor, I'd move for

5    admission of Defendant's Exhibit A9.

6              THE COURT:  Okay.  Any objection?

7              ATTORNEY JONES:  No objection.

8              THE COURT:  Defendant's A9 is admitted.

9              ATTORNEY SCHROEDER:  May I have that Exhibit A9

10   published for the jury?

11             THE COURT:  Yes.

12   BY ATTORNEY SCHROEDER:

13   Q.    Thank you.  Okay.  Can you describe what the nature of

14   this email communication is, the back-and-forth, related to?

15   A.    Yes.  Heather was letting me know that she had been

16   approved through Steve Boyce, who was a VP, that we could post

17   for a traveler.

18   Q.    Okay.  And, just so that the jury understands and the

19   Court, a traveler is what?

20   A.    A traveler is a nurse who works through a travel agency,

21   and they do different assignments at different hospitals and

22   are trained in a variety of nursing specialties.

23   Q.    And, in terms of the traveler nurse, would, are they

24   usually -- do hospitals employee them on a, on a sporadic basis

25   to fill gaps?

1    A.    They employ, a lot of hospitals employ a lot of travelers,

2    but you have to be able to find the right ones for the specific

3    area of specialty.

4    Q.    Right, specific area of specialty, and also somebody

5    that's in the Lebanon, New Hampshire area, right?

6    A.    No.  A traveler could be anywhere --

7    Q.    Oh, they can be anywhere?

8    A.    -- and work for a travel agency, and Dartmouth hires

9    through the travel agency.

10   Q.    Were you able to secure a traveler to perform REI nursing

11   at this point?

12   A.    No.

13   Q.    Did you undertake efforts to try to find a traveler

14   through some of these travel staffing agencies?

15   A.    That's an HR role.

16   Q.    Okay.  Did you have --

17   A.    But, yes, they were, they were looking for one.

18   Q.    Okay.

19   A.    Yes, HR was looking for a traveler.

20   Q.    Okay.  You understood that HR was responsible for looking

21   for a traveler?

22   A.    Correct, yes.

23   Q.    I want to turn your attention to the email that was

24   forwarded to you, but it's the first paragraph under -- we're

25   on this document.  Sorry.  Where it says, "Hi, Belinda",

1    there's a paragraph there if you could just highlight that for

2    the jury and the Court.

3        Ms. Mansfield who is Belinda Peavey?

4    A.   Belinda worked for HR, but I'm not 100 percent sure.

5    Q.   Was Steve Boyce in HR?

6    A.   Steve Boyce was a VP.

7    Q.   Oh, a VP?

8    A.   Vice president over -- I believe he was over the OB/GYN

9    division.

10   Q.   Okay.  A VP in HR over the OB/GYN?

11   A.   No, a VP in medicine like over --

12   Q.   Okay.  But over the OB/GYN department?

13   A.   Yes.

14   Q.   Now, in this first paragraph it says, "Within OB/GYN there

15   are 3 nurse positions to care for reproductive endocrinology

16   and infertility patients.  While this is 3 of 25 nurses in all

17   of OB/GYN, the other 22 are not capable of covering because

18   they do not have the technical skills.  The rest of my approval

19   is based on this nurse practice assumption.  I have Karen

20   Clement CCed, and she can weigh in if she wants".

21       So, at that point, does this refresh your recollection

22   that, after Casey Dodge has left, there was Sharon Parent,

23   right?

24   A.   Correct.

25   Q.   And do you recall two other nurses by the names of Marlene

1    Grossman and Marti Lewis?

2    A.    Yes.  Well, Marlene worked in the southern region, so I

3    didn't know Marlene or manage her.

4    Q.    Okay.  When you say the southern region, southern region

5    of New Hampshire?

6    A.    Sorry, yes.

7    Q.    Okay.  Just want to make sure.  Was that Bedford,

8    Manchester?

9    A.    Manchester, Bedford.  I can't recall which office they

10   were actually in, but southern New Hampshire, Marlene worked

11   down there.

12   Q.    So Marlene Grossman worked in the southern New Hampshire

13   facility of Dartmouth Health in the REI division?

14   A.    Yes.

15   Q.    Okay.  But you weren't responsible for managing her?

16   A.    No.

17   Q.    Okay.  Marti Lewis?

18   A.    Yeah, Marti Lewis, she was a nurse that was in under

19   regular OB/GYN doing, you know, basic OB/GYN and showed an

20   interest in learning REI, so we moved her over to try to get

21   her trained.

22   Q.    Okay.  And, at this point, was the REI division in the

23   process of trying to train Marti Lewis to be an REI nurse?

24   A.    Yes.

25   Q.    So that was still in the process, correct?

1    A.    Yes.

2    Q.    And then Sharon Parent was retiring at the end of

3    December, correct?

4    A.    Yes.

5    Q.    And then the last paragraph, it says, "In fact, since the

6    section is already down by one of three specialized nurses and

7    another is leaving in three weeks, the situation is desperate

8    enough to require a traveler if there are no other internal

9    strategies to provide a nurse"; is that correct?

10    A.    Yes.

11    Q.    And did you agree with that?

12    A.    Yes.

13    Q.    So it was pretty desperate at that point?

14    A.    Yes.

15           ATTORNEY SCHROEDER:  Your Honor, if I may have the

16    Court or may I put up on the screen Defendant's Exhibit A16,

17    which is already admitted?

18           THE COURT:  Yes.

19           ATTORNEY SCHROEDER:  Thank you.  May I approach the

20    Witness to show her?

21           THE COURT:  Yes.

22    BY ATTORNEY SCHROEDER:

23    Q.    Okay.  I'm showing you a document that's been marked

24    Defendant's Exhibit A16.  It's dated December 6, 2016 from

25    Heather Gunnell.  Do you recall this email communication?

1    A.   Yes, I do.

2    Q.   And take a second to review it if you need a minute just

3    to understand it.  I just have a few questions.

4    A.   Okay, thank you.

5    Q.   Okay.  I want to direct your attention to the first

6    paragraph and, just, if we could highlight that.  So this is

7    from Heather Gunnell, and she was sending this on behalf of

8    Dr. DeMars and Dr. Seifer.  Did that happen from time to time

9    that communications would come from, Ms. Gunnell would be

10   responsible for sending out communications for them?

11   A.   Yes, yes.

12   Q.   In this particular email communication, it states, "We are

13   currently facing an imminent REI nursing crunch that will

14   require significant changes in nursing work flow and task

15   allocation.  With Casey and Sharon's departures, we have fewer

16   resources to maintain the quality of care our parents expect".

17   Did I read that correctly?

18   A.   Yes.

19   Q.   Do you recall -- well, did you agree with that statement

20   that there was an imminent REI nursing crunch?

21   A.   Yes.

22   Q.   Okay.  And were you doing your level best in your role as

23   nurse manager of OB/GYN to assist in recruiting for that REI

24   nursing position?

25   A.   Yeah.  Well, through HR, yes.  They did that.  But I was

1    also trying to figure out nurses I could pull from the clinic

2    to help with procedures as needed.

3    Q.    Okay.  Would it be fair to say that this was a stressful

4    time period for you?

5    A.    Yes.

6              ATTORNEY SCHROEDER:  Okay, okay.  If we could, next

7    exhibit which I'd just like to show the Court or introduce is

8    Defendant's Exhibit A24.  It is not admitted yet.  May I

9    approach the Witness, Your Honor?

10             THE COURT:  Yes.

11   BY ATTORNEY SCHROEDER:

12   Q.    Ms. Mansfield, I'm showing you a document that's dated

13   January 17th 2017 from an individual Stephanie Jackson to you.

14   Do you recognize this document?

15   A.    Yes, I do.

16             ATTORNEY SCHROEDER:  Okay.  Your Honor, I'd move for

17   admission of Defendant's Exhibit A24.

18             ATTORNEY JONES:  Just popped up on my screen, if I

19   could have one second.  No objection.

20             THE COURT:  Okay.  So Defendant's A24 is admitted.

21             ATTORNEY SCHROEDER:  Thank you, Your Honor.  Can I

22   have it published to the jury?

23             THE COURT:  Yes.

24   BY ATTORNEY SCHROEDER:

25   Q.    Thank you.  This document is, it's dated November, I'm

1    sorry, January 17th 2017.  Do you recognize this?

2    A.    Yes, I do.

3    Q.    What is it?

4    A.    It's from recruiting letting me know that they have, want

5    to meet with me to discuss the needs of the division in order

6    to hire nursing.

7    Q.    And did you work with Stephanie Jackson to ensure that

8    this ad was placed in the appropriate places?

9    A.    I do not remember this specific meeting, but I know I did

10   meet with, with them.  I'm not sure who was in the meeting, but

11   I know we discussed having it go as many places as we could,

12   but I don't remember the actual meeting.

13   Q.    Okay.  That's fair enough.  That's over eight years ago,

14   so that's fair.  But the point of the meeting was to finalize

15   an ad for an REI staff nurse, correct?

16   A.    Correct, yes.

17   Q.    And, to your knowledge, was HR and specifically the

18   recruiter in talent acquisition, charged with finding a staff

19   nurse?

20   A.    Yes, posting it and recruiting and doing the initial

21   interviews.

22   Q.    And was that effort successful?

23   A.    No.

24   Q.    Switching gears, do you remember -- well, you testified

25   earlier about a nurse, Sharon Parent, correct?

VOLUME: 8
PAGES: 432-646

1    A.    Yes.

2    Q.    And do you recall having meetings with her to discuss her

3    potentially working on a per diem basis after her retirement?

4    A.    She did talk to me about that.  However, I deferred her

5    back to Heather and Leslie DeMars, Heather Gunnell and Leslie

6    DeMars, as that was out of my scope to approve that.

7    Q.    And, when you say out of your scope, what do you mean?

8    A.    As a nurse manager, I'm not able to, you know, hire

9    someone without HR's approval.

10    Q.    Okay.  And --

11    A.    And -- oh, go ahead.

12    Q.    Go ahead.

13    A.    And, as I was saying, usually, at Dartmouth after you

14    retire, you have to wait, I think it's three months, or I don't

15    know if the rules have changed, but a certain period of time

16    before you can come back and work per diem once you've -- you

17    have to leave for an extended period of time before you can

18    come back.

19    Q.    Okay.  And did you understand, at least at that point,

20    that that was the policy as you --

21    A.    Yes.

22    Q.    But, in terms of dealing with that policy and its impact

23    on Ms. Parent, that was outside your authority --

24    A.    Yes.

25    Q.    -- to deal with?

VOLUME: 8
PAGES: 432-646

1    A.   Yes.

2             ATTORNEY SCHROEDER:  I've got a few more topics, Your

3    Honor.  I don't know whether you want to take a break or

4    whether we push through.

5             THE COURT:  Yeah, why don't we take our afternoon

6    break?  So we'll be back at 2:45.

7         (A recess was taken from 2:32 p.m. to 2:48 p.m.)

8             THE COURT:  Get the jury.

9         (The Jury enters the courtroom.)

10            THE COURT:  Okay, Mr. Schroeder.

11   BY ATTORNEY SCHROEDER:

12   Q.   Thank you, Your Honor.  Ms. Mansfield, just a few more

13   questions.  I want to specifically focus on the 2016-2017

14   timeframe.

15   A.   Okay.

16   Q.   Do you recall when David Seifer was hired as the division

17   director in REI?

18   A.   Yes.

19   Q.   And did you ever form an opinion about Dr. Seifer's

20   leadership skills or clinical skills?

21   A.   I didn't work with him clinically, and he would come to me

22   with things he needed in the division, but I didn't work with

23   him clinically.

24   Q.   Okay.  And did anyone come to you with any concerns or

25   complaints about Dr. Seifer from the REI division?

1    A.    A lot of people felt that -- some people, yes.  Some

2    people did come to me concerned about, you know, his -- he was

3    kind of ramped up a bit and, you know, wanted things done, you

4    know, and we didn't always have the answers, you know, that he

5    needed.

6    Q.    When you say people would come to you, who would come to

7    you?

8    A.    Nursing, Sharon and Casey.

9    Q.    Okay.  Anyone else?

10   A.    No.

11   Q.    Okay.  On this particular point, were they in agreement

12   with each other, well, just with respect to what Dr. Seifer was

13   asking for?

14   A.    Yes, yes.

15   Q.    Okay.  And, in terms of their conflict that they had up

16   until the time that both of them leave, what was the -- was

17   there a general description of the conflict between the two of

18   them, what it related to?

19   A.    They just, they just didn't, they didn't see eye to eye in

20   -- you know, they each felt the other one, you know, could do

21   things differently.  I think it was more personality-wise than

22   -- you know, I mean, they both knew their jobs.  They did their

23   jobs their own way.  I mean, as sometimes always two ways to

24   get to the same endpoint, you know, and I just don't think they

25   agreed on how each other would do things.

1    Q.    Okay.  And did Dr. Porter ever raise any specific concerns

2    to you about Dr. Seifer?

3    A.    Not directly to me, no.

4    Q.    Well, indirectly?

5    A.    No, I mean, no.

6    Q.    Okay.  So never raised any concerns to you about

7    inappropriate testing or billing or issues relating to patients

8    that might be exposed to Zika, anything like that?

9    A.    Nothing directly that I remember.

10   Q.    Okay.

11   A.    I would believe those would probably go above me.

12   Q.    But you didn't receive any reports from Dr. Porter?

13   A.    No.

14   Q.    How would you describe Dr. Porter's relationship with Dr.

15   Seifer if you could?

16   A.    I didn't see much interaction with them, so I don't really

17   know how to describe that.

18   Q.    Were you aware of whether or not Dr. Porter agreed with

19   Dr. Seifer's techniques or how he did his skill set?

20   A.    That, I do not know.

21   Q.    Fair enough.  In terms of Dr. Hsu, did you have any

22   interaction with him with respect to either his clinical work

23   or what he was doing in the REI division?

24   A.    No.  Again, I didn't work directly with him clinically.

25   He was -- I don't even know who -- I believe his mentor was Dr.

VOLUME: 8
PAGES: 432-646

1    Porter, and, you know, I don't know where, how he was trained.

2    You know, he was there before me as well, so I can't really

3    speak to that.

4    Q.    Okay.  And you don't know what, if any, training Dr.

5    Porter, as his mentor, gave him?

6    A.    No.  I don't know anything about his training.

7    Q.    And did Dr. Porter raise any concerns to you about

8    testing, issues with testing or billing by Dr. Hsu or anyone at

9    his direction?

10   A.    No.

11   Q.    I want to ask you about the REI closure, REI division

12   closure, and that was announced publicly May 4th 2017.  Do you

13   recall when that was announced?

14   A.    Yes.

15   Q.    And do you recall, at some point after that announcement,

16   that there was a big meeting for the OB/GYN department?

17   A.    Yes.

18   Q.    Okay.  Did you attend, do you recall, that meeting?

19   A.    Yes.

20   Q.    Did you attend that meeting?

21   A.    Yes, I did.

22   Q.    Okay.  And were you there for the whole meeting?

23   A.    Yes.

24   Q.    And do you recall that Dr. Merrens spoke during the

25   meeting?

1    A.    Yes.

2    Q.    Okay.  And do you recall any specific statements

3    Dr. Merrens made about Dr. Porter at any point?

4    A.    No.

5    Q.    Okay.  And you don't recall him referencing anything about

6    Dr. Porter's condition or anything like that, right?

7    A.    No.

8    Q.    Okay.  And, if Dr. Porter, Dr. Merrens had made a comment

9    about, say, for example, Dr. Porter's disability status or

10   where she was out on leave, you'd recall that, wouldn't you?

11   A.    I believe, yes, I would recall something like that.

12              ATTORNEY SCHROEDER:  Thank you, Your Honor.

13              THE COURT:  Okay.  Cross-examination?

14                   CROSS-EXAMINATION BY ATTORNEY JONES

15   Q.    Thank you, Your Honor.  Good afternoon, Ms. Mansfield.

16   A.    Good afternoon.

17   Q.    Just a few moments ago, Attorney Schroeder was asking you

18   about people, whether people came to you to complain about

19   either Dr. Hsu or Dr. Seifer.  Do you remember that question?

20   A.    Yes.

21   Q.    Isn't it true that Sharon Parent came to you and expressed

22   some concerns that she had about Dr. Hsu?

23   A.    She may have had concerns about working with him, but as

24   medically, I, those, I can't answer to his medical care.

25   Q.    Isn't it true she came to you to complain that she felt

VOLUME: 8
PAGES: 432-646

1    his procedures were causing patients more pain than usual?

2    A.    I don't recall that.

3    Q.    And more blood than usual?

4    A.    I don't recall that.

5    Q.    Okay.  And do you recall -- isn't it true she complained

6    to you about Dr. Seifer, same problem, that his procedures were

7    causing, they were very bloody and very painful to patients?

8    A.    That, I don't remember.

9    Q.    Okay.  Do you recall -- isn't true that -- well, do you

10   recall a conversation with Dr. Porter where you discussed what

11   was going to happen about the complaint that Nurse Parent had

12   made about Drs. Hsu and Seifer?

13   A.    Can you repeat that question?

14   Q.    Well, do you recall a conversation with Dr. Porter about

15   nursing complaints, nurses' complaints about Drs. Hsu and

16   Seifer and what was happening with those complaints?

17   A.    If, I don't remember specific conversation about with Dr.

18   Porter, but, if she had come to me about nursing at any time in

19   general, we would, probably, I would have discussed that with

20   Heather and how we would manage it because, as I said, I can't

21   speak to Dr. Hsu or Seifer's abilities.  So that was, should

22   have gone to way above me.

23   Q.    So are you saying you don't recall telling Dr. Porter that

24   Dr. DeMars wasn't doing anything so you were going to go to the

25   head of nursing to try to escalate the matter?

1    A.   No.

2    Q.   With regard to the questions you were asked about the

3    nursing shortage issue, Attorney Schroeder showed you an

4    exhibit, Exhibit V, which was a posting for a nurse position

5    that was posted in the ASRM.  Do you recall that?

6    A.   Yeah.

7    Q.   Isn't it true that that particular ad was just on the

8    online version of the ASRM journal and not in the print

9    publication?

10   A.   That, I would not know.  That would have been through HR.

11   Q.   And isn't it true that that was taken down in less than

12   three months?

13   A.   I do not know that.

14   Q.   Okay.  Do you recall how much notice Nurse Sharon Parent

15   gave that she was going to be retiring?

16   A.   I don't know the exact timeframe, but it had been, she had

17   been talking about it for a bit of time.  So we knew.

18   Q.   She testified she gave a year.  Does that sound right?

19   A.   Possibly.  I don't recall the exact timeframe.  I mean,

20   she had been, she'd been there forever, so she'd been talking

21   about it.

22   Q.   Okay.  And she retired in December of 2016; is that right?

23   A.   Yes, I believe that was December.

24   Q.   And some of the documents that Mr. Schroeder was showing

25   you about meetings to discuss recruiting, those were in

1    November of 2016, right?

2    A.    November, and I thought before that as well, but November,

3    some of these.

4    Q.    All right.  But almost eleven months after Sharon Parent

5    gave notice that she was going to be retiring?

6    A.    Yes.

7    Q.    Isn't it true that both Dr. Porter and Beth Todd gave the

8    names of two people who were potentially willing to work as REI

9    nurses?

10   A.    I believe they talked about people who had worked there

11   before, yes.

12   Q.    And isn't it true that you did not call them to see if

13   they would be interested?

14   A.    I can't remember.

15   Q.    So you don't remember calling them?

16   A.    No.

17   Q.    Okay.  And, finally, isn't it true that Sharon Parent

18   wanted to come back on a per diem basis to work in the REI?

19   A.    That is what she said, yes.

20   Q.    Yeah.  And you mentioned that your understanding is that

21   she would have to wait three months before she could do that,

22   right?

23   A.    Yes.

24   Q.    And she retired in December of 2016, so, if my lawyer math

25   is right, she would have been eligible to come back around

1    March of 2017; is that correct?

2    A.    Yes.

3    Q.    And the decision to close the REI was announced in May of

4    2017, right?

5    A.    Yes.

6    Q.    So, at that time, Sharon Parent was available to work in

7    the REI, correct?

8    A.    If that's the HR rules, yes.

9              ATTORNEY JONES:  All right.  No further questions.

10             THE COURT:  Okay.  Any redirect?

11             ATTORNEY SCHROEDER:  Nothing, Your Honor.

12             THE COURT:  Okay.  Ms. Mansfield, you may step down.

13   Thank you.  Okay.  The next witness?

14             ATTORNEY SCHROEDER:  Thank you, Your Honor.

15   Defendants call individual Kelly Mousley.  I'm going to go out

16   and get her if that's okay.

17             THE COURT:  Okay.  And, Mr. Schroeder, I'll just note

18   that there are exhibit binders open on the witness stand right

19   now.

20             ATTORNEY SCHROEDER:  I can close them up until I need

21   them, if I may.

22             THE COURT:  Yes.

23                  KELLY MOUSLEY,

24        having been duly sworn to tell the truth,

25             testifies as follows:

VOLUME: 8
PAGES: 432-646

1              DIRECT EXAMINATION BY ATTORNEY SCHROEDER

2     Q.    Good afternoon.

3     A.    Good afternoon.

4     Q.    Can you just, Ms. Mousley, just state your full name for

5     the record again?

6     A.    Kelly Mousley.

7     Q.    Thank you.  And, Ms. Mousley, where are you currently

8     employed?

9     A.    At the Upper Valley Aquatic Center in White River

10    Junction.

11    Q.    Sorry.

12    A.    The Upper Valley Aquatic Center in White River Junction.

13    Q.    And what is your title there?

14    A.    The HR director.

15    Q.    And what do you do for them?

16    A.    I oversee their HR department, so employer relations,

17    recruiting, payroll, benefits.

18    Q.    And, with respect to your role in HR at the Upper Valley

19    Aquatic Center, how long have you held that position?

20    A.    Almost five years.

21    Q.    Okay.  Sometime -- when did you join them, if you recall?

22    A.    February 4th of 2020.  I initially started out in another

23    role and then went into HR, so it's been almost five years in

24    that role.

25    Q.    So about five years in the HR role?

VOLUME: 8
PAGES: 432-646

1   A.   Yes.

2   Q.   Prior to joining the Upper Valley Aquatic Center, do you

3   recall working for Dartmouth Health?

4   A.   Yes.

5   Q.   And was that directly preceding your current position?

6   A.   Yes.

7   Q.   Okay.  And what was your position at Dartmouth Health

8   previously?

9   A.   I was the clinic support manager.

10  Q.   How long had you been employed at Dartmouth Health, total?

11  A.   Total?  It was March of 2015.

12  Q.   So March 2015 to February 2000?

13  A.   2020, Yeah.

14  Q.   2020, I'm sorry.

15  A.   So just about five years.

16  Q.   Just about five years?  And did you leave voluntarily?

17  A.   I did.

18  Q.   Okay.  And, when you were employed by Dartmouth Health as

19  the clinic support manager, was that for the entirety of the

20  time you were employed at Dartmouth Health?

21  A.   No.  I started out as the administrative supervisor in

22  radiation and oncology.

23  Q.   Okay.  And then when did you become the clinic support

24  manager?

25  A.   In August of 2016.

1    Q.    Okay.  So August 2016 you become the clinic support
2    manager, and for which department?
3    A.    OB/GYN.
4    Q.    Okay.  And, as the clinic support manager for the OB/GYN
5    department in August of 2016, what were your job duties?
6    A.    So I had some of the operation responsibilities within the
7    department, but my main role was oversight of the
8    administrative staff, specifically the scheduling secretaries.
9    Q.    And, with respect to the scheduling secretaries, would
10   that include the secretaries or assistants throughout OB/GYN
11   department?
12   A.    Yes, it was all of them, all the administrative ones.
13   Q.    Okay.  So, in terms of your management role, you were in
14   charge of the administrative staff within the OB/GYN
15   department; is that correct?
16   A.    Yes, yes.  Um-hum.
17   Q.    And, at the time, there were six divisions?
18   A.    Yes.
19   Q.    Okay.  And do you recall, in your capacity as the clinic
20   support manager for the overall OB/GYN department, working with
21   the REI division staff?
22   A.    Yes.
23   Q.    And how would you describe the interpersonal dynamics of
24   that group?
25   A.    So you mean providers as well as the scheduling staff?

VOLUME: 8
PAGES: 432-646

1    Q.   Yes, to the extent you have personal knowledge about that

2    and know about it, yes.

3    A.   Okay.  So, when I first started, Dr. Porter was on leave,

4    and Dr. Seifer and Dr. Hsu were there, and then there was one

5    scheduling secretary in that area.

6    Q.   Who was that?

7    A.   What was the name?

8    Q.   Yes.

9    A.   Donna, Donna Bedard.

10   Q.   Okay.

11   A.   And then there was a backup person that, when she took

12   breaks and things like that.  And, as soon as I started, you

13   know, I was responsible for all of the divisions.  There were

14   secretaries at this point -- Dartmouth changed it while I was

15   there, but, at this point, they were kind of scheduling just

16   for their particular areas, right?  So there would be an REI

17   secretary and a, you know, urogyn secretary, that type of

18   thing.

19       And right from the beginning people were speaking to me

20   and saying, like, as far as the scheduling secretaries, they

21   would say to me, We won't schedule down there.  We won't go

22   down.  It was kind of the end of the clinic.  We won't go down

23   there and schedule.  It's too dysfunctional.  There's too much

24   -- it's too intimidating.  The word they used, it's too

25   intimidating to be down there.

1        And so, initially, right from the start, I had a hard time
2    finding people that would be willing to go down and cover down
3    there, and then the dynamic within the providers, it just felt
4    dysfunctional.  People, like, I felt like, whether it was
5    nursing staff or some of the secretarial staff, would say to me
6    right from the start, you know, like, there's two camps.  Try
7    to stay out of it.  Don't get in the middle of it and --
8    Q.   Who were the two camps?
9    A.   Amongst the providers, right?  So there was Dr. Porter and
10   Elizabeth Todd, and then there was Dr. Hsu and Dr. Seifer.  So
11   there was kind of this division of providers.
12   Q.   Okay.  And who was in Dr. Porter's camp?
13   A.   For another provider was Elizabeth Todd.
14   Q.   Okay.  And she was a nurse practitioner?
15   A.   Yes.
16   Q.   Any nurses that would were in, quote, unquote, Dr.
17   Porter's camp?
18   A.   Yeah, I didn't know the nurses very well, but there was --
19   yes, there was, there were two nurses, I believe, when I
20   started that were specific to REI, and their names were Sharon
21   and Casey, I believe.
22   Q.   Do you recall whether or not Ms. Parent, Sharon Parent,
23   was in Dr. Porter's camp or not?
24   A.   That was my understanding.  I didn't work closely with the
25   nurses, but that was my understanding.

VOLUME: 8
PAGES: 432-646

1    Q.    And what about -- but you were responsible for Donna

2    Bedard, correct?

3    A.    Yes, she reported to me.

4    Q.    Okay.  And she was an assistant or secretary for the REI

5    division?

6    A.    Yes.

7    Q.    And did you have -- did there come a need for you to try

8    to get additional secretarial help for the REI division?  You

9    said nobody would want to go down there.

10   A.    Yeah, well, we, everyone kind of had their own areas, but

11   we had been to a little bit interchangeable, right?  If someone

12   was out or if someone was on vacation, just covering breaks,

13   and so they had to learn to also be interchangeable and say, I

14   can take the phones line for that division as well as the phone

15   lines for my own division, and people didn't want to.  So I ran

16   into a problem with that right away.

17   Q.    Okay.  And did you have any encounter, any problems with

18   Donna Bedard's performance as the only secretary for the REI

19   division?

20   A.    Um-hum.  Yeah.  She was defensive with me.  I was trying

21   to learn the department, learn the divisions, learn how REI

22   worked, and she was just extremely protective of her work, and

23   it was almost like she wanted to me to keep my hands off of it,

24   that they had their routine, they had their way of doing

25   things, and that it wasn't really my place to be involved.

VOLUME: 8
PAGES: 432-646

1    Just let her do her thing.  She'd been there a long time, and

2    she didn't need my interference, but that's not how it really

3    worked.  I was responsible for ensuring that all the provider

4    schedules were full.  That was my main responsibility.

5    Q.   Okay.  It's a lot there, so I just want to unpack it a

6    little bit.

7    A.   Sorry.

8    Q.   With respect to Donna Bedard, did you encounter any

9    instances or incidents where she was favoring, engaging in

10   favoritism towards one of the providers versus the other

11   providers?

12   A.   Well, that's how I ended up getting a little bit more

13   involved in it, because I was hearing, whether it was Dr.

14   Seifer or Dr. Hsu, they were saying that there was an instance

15   where a patient was on Dr. Seifer's schedule and then suddenly

16   it wasn't, and he can couldn't understand why his schedule

17   wasn't getting filled up.

18        And so, when I tried to have a conversation with Donna to

19   understand it, there was, there was -- it was almost like a

20   side list outside of EDH, outside of the scheduling system of,

21   like, a waiting list of patients.  It was almost like this

22   vetting system, and patients were being put onto this list for

23   when there was availability with Dr. Porter, even though there

24   were clear openings on EDH with Dr. Seifer and Dr. Hsu.

25        And so I was trying to understand, as the person that's

VOLUME: 8
PAGES: 432-646

1    responsible for that, like, why would we have gaps on a waiting

2    list.  It didn't add up for me.  And so, when I tried to

3    intervene and I tried to understand and find out, like, this

4    policy that we're using, this isn't okay, I received an email

5    that, from Dr. Porter saying that I needed to not involve

6    myself, that I needed to not be requesting copies of her

7    schedule.

8    Q.    Okay.  So you'd requested Dr. Porter's schedule trying to

9    figure out how to deal with scheduling patients across the

10   board, correct?

11   A.    Yes.  It was just, it was an across-the-board.  It was

12   really just trying to understand what was happening, why

13   patients weren't getting in when we clearly had openings.

14   Q.    And what did you surmise based upon seeing this side list

15   with Donna Bedard?

16   A.    Yeah, I felt that Donna felt very protective of Dr. Porter

17   and felt that, in her mind, that these patients would be best

18   served with Dr. Porter, and so she was going to ensure that the

19   patients who they saw with whatever method she needed to do to

20   try to work around the system.  And then I did -- sorry.

21   Q.    Go ahead.

22   A.    I did, at one point, have to give her a written warning

23   because she was making her feelings toward those physicians

24   clear in a -- you know, she was sharing it verbally, and it

25   came back to my office, and I did have to give a warning about

1    that, that we have to support all the physicians equally.

2    Q.   And, when you say her feelings, was she making comments

3    about Dr. Hsu and Seifer?

4    A.   Yes.

5    Q.   Because of that you gave -- I'm assuming they weren't

6    positive, were they?

7    A.   No, they weren't positive.

8    Q.   And, because of that, did you give her some disciplinary

9    action?

10   A.   Yes.

11   Q.   So did the favoritism or effort at favoritism by doctor,

12   by Ms. Bedard towards Dr. Porter, did that continue despite the

13   written warning?

14   A.   I can't give any specific examples of that, whether they

15   did.  It was just a, it was kind of an ongoing struggle with

16   Donna and myself of me trying to be involved and understand,

17   just like I would with any of the divisions.

18   Q.   Okay.  Did you spend more time dealing with the REI

19   division and these administrative struggles than the other

20   divisions?

21   A.   There were periods of time that I felt like it was my

22   full-time job.

23   Q.   Dealing with the REI division?

24   A.   The REI division was part of it, yeah.

25            ATTORNEY SCHROEDER:  All right.  Your Honor, I'd like

1    to introduce Defendant's Exhibit B3 and show the Witness.

2                  THE COURT:  Yes.

3                  ATTORNEY SCHROEDER:  Thank you.  May I approach?

4                  THE COURT:  Yes.

5    BY ATTORNEY SCHROEDER:

6    Q.   Ms. Mousley, I'll just ask you to review the document I

7    put in front of you.

8    A.   Okay.

9    Q.   And let me know when you've had a chance to review it.

10   A.   Okay, okay.

11   Q.   Had a chance to review it?

12   A.   Um-hum.

13   Q.   Does that refresh your recollection of an email you sent

14   on February 20, 2016?

15   A.   Yes.

16                 ATTORNEY SCHROEDER:  Your Honor, I'd like to move for

17   admission of Defendant's Exhibit B3.

18                 THE COURT:  Any objection?

19                 ATTORNEY NUNAN:  No objection.

20                 THE COURT:  Okay.  Exhibit B3 is admitted.

21                 ATTORNEY SCHROEDER:  Thank you, Your Honor.  May I

22   have it published for the jury?

23                 THE COURT:  Yes.

24   BY ATTORNEY SCHROEDER:

25   Q.   Ma'am, if you could, I want to direct your attention to

 1    the paragraph titled "REI Team Potential" and blow that up.

 2    Now, you were asked by Leslie DeMars to do a review of Dr.

 3    Seifer, correct?

 4    A.   Yes.

 5    Q.   And that's DS review feedback, right?

 6    A.   Yes.

 7    Q.   Okay.  Now, you write in here that on the REI team

 8    potential, "With the current provider structure we have in

 9    place, the future of the REI service and patient/staff

10    experience is in jeopardy".  Is that true?

11    A.   Yes, I did feel that way.

12    Q.   You believed that to be accurate?

13    A.   Um-hum.

14    Q.   And you say, "The providers are divided, entrenched in

15    their way of doing things".  Were you talking, when you

16    mentioned the providers, who were you talking about?

17    A.   The four providers, so Dr. Hsu and Seifer and Dr. Porter

18    and Elizabeth Todd.

19    Q.   Okay.  And then it says, "on one side we have two

20    providers that have a long history with the program and will

21    continue to sabotage any suggestion of progress".

22         Who were you talking about there?

23    A.   The providers that had been there a long time were Dr.

24    Porter and Elizabeth Todd.

25    Q.   And what do you recall was the basis for you saying that

1    they would continue to sabotage any suggestion of progress?

2    A.   Because my experience was strictly on the administrative

3    side, right, and it's the things that I described.  Like, I

4    felt like they weren't working as a team.  They weren't trying

5    to figure out how to take care of the patients by filling the

6    schedule and getting patients in.  And so we had this

7    administrative person that was, for whatever reason, working

8    with two providers and trying to support their services and

9    then, for some reason, the other two providers just the

10   opposite, right?

11        And so I felt like they, the people that had been there a

12   long time -- so I'm including Donna in that.  The people that

13   had been there a really long time, they felt like, This is the

14   way we've done things for a long time.  These are our patients.

15   This is our history, and weren't necessarily open to new people

16   being in the roles.

17   Q.   Did you experience this level of struggle or lack of

18   professionalism in the other divisions to this extent?

19   A.   No, nothing like this.

20   Q.   Would this be kind of an outlier compared to the other

21   divisions in terms of the administrative support?

22   A.   It was an outlier for me in my role, yes.

23   Q.   Okay.  Now, the next sentence says, "The other two are new

24   and floundering, which leaves the team with no clear leader".

25        Who were you talking about there?

VOLUME: 8
PAGES: 432-646

1    A.    Dr. Hsu and Dr. Seifer.

2    Q.    And then you go on, "Do they follow the voice that is the

3    loudest and most intimidating or the leader who has the title

4    on paper?"

5          Who are you referring to there?

6    A.    So the title on paper was Dr. Seifer, and the loudest and

7    the most intimidating was based on Dr. Porter.

8    Q.    And you had personal experience with that, correct?

9    A.    So I had personally met Dr. Porter in person one time.  We

10   had a meeting not long after I had started there.  So I was

11   really basing that on the secretaries not being willing to

12   cover the line or to go down and cover that division for me and

13   people telling me that, if I met with Dr. Porter, to stand my

14   ground and not allow her to intimidate or bully me, to do what

15   was right, and so that's what I was basing it on.

16   Q.    Was there a consistent theme from the people that were

17   voicing their concerns to you?

18   A.    Yeah, they were just kind of trying to warn me to be

19   prepared.

20   Q.    Okay.

21   A.    To be strong.

22   Q.    Now, it says here then, "Either of those scenarios feels

23   like a lose-lose and leaves the team looking for support and

24   direction.  I can see the team are all just doing their best to

25   hold the pieces together for the patients.  The majority of the

1    team wants and needs to see something done to shake things up

2    and allow them to truly hit the reset button for the sake of

3    the program, their job satisfaction, and the patients".  And

4    then you say, quote, "If you keep doing what you have always

5    done, you will keep getting what you have always gotten", end

6    quote, "Very true when I think of REI".

7    A.    Um-hum.

8    Q.    And you believed that at that time, correct

9    A.    I did.

10   Q.    And, during the following months after February 2017, did

11   this infighting or struggles that you witnessed or heard about

12   or received complaints about, did that continue?

13   A.    Yeah.  I mean, I don't recall a time where it felt smooth

14   in the time that I was there.

15   Q.    Okay.  I'd like to put up on the screen, it's a document

16   that's already been admitted, Defendant's Exhibit B5.  Showing

17   you a document that's already been admitted into evidence,

18   Ms. Mousley, if you could just review that and let me know when

19   you're finished.

20   A.    Okay.

21   Q.    Finished?

22   A.    Yes.

23   Q.    Do you recognize this document?

24   A.    I don't.

25   Q.    Okay.  In looking at it, though, it's dated February 23,

1    2017.  It's a couple of days after that last email I showed

2    you.  Was it unusual for Dr. Porter to be directing an email to

3    you, David, and Heather at the same time?

4    A.   I must be looking at the wrong document.

5                ATTORNEY SCHROEDER:  It's B5.  If I may approach the

6    witness, Your Honor.

7                THE COURT:  Yes.

8    BY ATTORNEY SCHROEDER:

9    Q.   There you go.  That's my fault.

10   A.   Okay.

11   Q.   Let me know when you've finished reviewing that email.

12   A.   Okay, okay.  Yes.

13   Q.   Okay.  Do you recall this email --

14   A.   I do.

15   Q.   -- exchange?

16   A.   I do.  Yes, yes.

17               THE COURT:  Ms. Mousley, I'll just ask you to keep

18   your voice up, please.  Thank you.

19   BY ATTORNEY SCHROEDER:

20   Q.   Just to make sure the record's clear, do you recall this

21   particular email?

22   A.   I do, yes.

23   Q.   You mentioned earlier your efforts to figure out

24   everybody's schedule, correct?

25   A.   Um-hum.

1    Q.    You have to verbalize your answers.

2    A.    Okay.  Yes.

3    Q.    And were, was this the timeframe in which you were trying

4    to figure out the doctors' schedules so that you could ensure

5    equilibrium with respect to patient flow?

6    A.    Yes.  This was the result of what I had said before of Dr.

7    Seifer saying, Why aren't people on my schedule?  I thought I

8    saw a name on my schedule.  It's not there.  Those types of

9    things were coming to me, and so I started to try to do a

10   little legwork.

11   Q.    Okay.  And in legwork you were trying to figure out the

12   schedules of everybody's patients, correct?

13   A.    Right, yes.

14   Q.    Okay.  And in that process you found the side note in that

15   process that Donna Bedard had for patients?

16   A.    Yes.

17   Q.    Okay.  And you were also asking for all the providers to

18   provide their schedules, correct?

19   A.    Yes.

20   Q.    And this was the response that you received from Dr.

21   Porter, correct?

22   A.    Yes.  I didn't speak directly to Dr. Porter.  I had spoken

23   to Donna, and it looks like, based on the email that I

24   received, that she had then conveyed that to Dr. Porter, that I

25   had requested the schedule.

VOLUME: 8
PAGES: 432-646

1   Q.   And was it pretty unusual to receive an email from Dr.

2   Porter at the same time as, say, David and Heather?  Does this

3   stand out as something unusual?

4   A.   I don't recall if it was unusual in how, if she, if that's

5   how she would choose to communicate.

6   Q.   Okay.  But she didn't reach out to you?  Dr. Porter didn't

7   reach out to you, right?

8   A.   No, she didn't reach out to me directly, other than the

9   email.

10  Q.   Right.  The only thing you received from Dr. Porter was

11  that email, and the first sentence says, "Please come to me if

12  you have questions about my schedule and work return.  I will

13  share the transition with the appropriate individuals"?

14  A.   Right.

15  Q.   Did you have a reaction to that sentiment?

16  A.   Well, I thought I was an appropriate individual, and

17  that's why I had inquired about the schedule, because that was

18  my responsibility.

19  Q.   Okay.

20  A.   Yes.

21  Q.   Did you --

22  A.   So I was surprised by it, yes.

23  Q.   All right.  You were surprised by it.  Were you, did you

24  have a -- how did you interpret this email other than being

25  surprised by it?

1    A.    I was a little taken aback of, like, Well, I have to be

2    involved.  I have to be involved, as I would with any of the

3    secretaries and the work they're doing.

4    Q.    And did you interpret this email -- how, if at all, did

5    you interpret this email from Dr. Porter as an indication that

6    you needed to go through her versus Donna?

7    A.    Right.  I mean, I could tell that -- I read between the

8    lines that she was upset with me about it.

9    Q.    Okay.  And it says at the end, "Please do not ask Donna

10   send out emails with regard to my schedule", right?

11   A.    Right.

12   Q.    Did you interpret that to be drawing a line in the sand,

13   if you will?

14   A.    Yes, that almost as if Donna doesn't report to me.  That's

15   the way I interpreted it.

16   Q.    Right.  But, at that time, Donna Bedard did report to you,

17   correct?

18   A.    Yes.  She did the entire time I was in the clinic.

19   Q.    Okay.  What, if anything, did you do to address the

20   administrative imbalances and favoritism that you saw Donna

21   Bedard was engaging in?

22   A.    I just would go down and address it, and, as I said, at

23   one point I gave her the written warning, but I, I just would

24   go down and address it.  I didn't hide behind it.  I didn't

25   stand back.  I just kept trying to move forward and making sure

VOLUME: 8
PAGES: 432-646

1    people's schedules were filled.

2    Q.   Okay.  And were you successful at getting past those

3    challenges, or did you keep meeting those challenges?

4    A.   I'm not sure that we ever got past the challenges.  It

5    never felt smooth.

6    Q.   Okay.  Do you recall -- so, for purposes -- you can take

7    that down.  For purposes of the time period, May 4th was the,

8    May 4th 2017 was the announcement of the closure of the REI

9    division.  Do you recall sometime in that timeframe a meeting

10   held for the entire OB/GYN department?

11   A.   I mean, it's vague, but I know there was a meeting, yes.

12   Q.   And did you attend that meeting?

13   A.   I'm sure that I did.

14   Q.   Okay.

15   A.   I wouldn't have not gone.

16   Q.   What's that?

17   A.   I wouldn't have not gone.

18   Q.   Okay.  So, if there was a meeting and it was for the

19   OB/GYN department and you were a clinic nurse manager, you

20   would have gone to that meeting?

21   A.   Right.

22   Q.   And I realize it was a long time ago.  Do you recall

23   Dr. Merrens speaking at that meeting about the REI division

24   closure?

25   A.   As much as I remember the meeting, yes, that he would have

1    spoken at that, yes.  I knew that he was the one involved.

2    Q.   Okay.  Do you recall Dr. Merrens making any mention of Dr.

3    Porter's condition, whether she was out on a leave of absence

4    or anything related to her?

5    A.   I never heard anything about any communication about her

6    leave, right?  All leave communication that I ever had or heard

7    was all in regards to kind of what I have described, which was

8    kind of the dysfunction between the group of providers which

9    kind of bled into nurses and staff, but I did not hear him make

10   any statement like that.

11   Q.   Okay.  And so, if there was a meeting that you would have

12   attended, you didn't hear him make any statement about Misty

13   Porter's condition or anything about her personally?

14   A.   No.  I feel like that's something I would remember.  Yeah,

15   that feels big.

16            ATTORNEY SCHROEDER:  Okay, thank you.  Mr. Jones or

17   Ms. Nunan may have a few questions for you.  Thank you, Your

18   Honor.

19            THE COURT:  Okay.  Cross-examination?

20                 CROSS-EXAMINATION BY ATTORNEY NUNAN

21   Q.   Hi, Ms. Mousley.  My name is Sarah Nunan.

22   A.   Hi.

23   Q.   I represent Misty Porter.  Can you tell me what medical

24   training you have?

25   A.   I don't have medical training.

VOLUME: 8
PAGES: 432-646

1    Q.   Okay.  And would it be possible for you to put B5 back up?

2    I don't have a digital copy of it.  Would that be possible, the

3    last exhibit that was just up?

4         ATTORNEY SCHROEDER:  Sure.  Just give us a second.

5    BY ATTORNEY NUNAN:

6    Q.   Yeah. Did you understand that Dr. Porter was returning

7    from long-term disability?

8    A.   Yes, I knew that she was coming, like, it's a gradual

9    schedule, a gradual return.

10   Q.   Got it.  And did you understand that she had had

11   accommodations as she was coming back into the clinic?

12   A.   I can vaguely recall those, that I knew that Donna was

13   making phone calls and having conversations with Dr. Porter in

14   regards to her schedule.  Because it wasn't just a straight,

15   like with Dr. Seifer and Dr. Hsu, where it was just in EDH and

16   it was kind of flooded and we filled it, and that's where the

17   disconnect was for me was trying to understand, trying to

18   understand what it was going to look like.

19   Q.   Right.

20   A.   Yeah.

21   Q.   Did you understand, as part of her accommodations, she

22   needed rest periods during the day?

23   A.   I don't think I knew that.

24   Q.   Got it.  And did you understand that the rest periods were

25   on these two EDH and QGendas?

VOLUME: 8
PAGES: 432-646

1    A.    If it was in EDH, if there was a mention in there, I would

2    have seen that, yes, but I don't recall that.

3    Q.    You don't recall that?

4    A.    No.

5    Q.    But, if I said that there were rest periods built into her

6    schedule, would that surprise?

7    A.    No, that wouldn't surprise me, no.

8    Q.    And were you aware that Dr. Seifer was repeatedly

9    violating her accommodation restrictions and those rest

10   periods?

11   A.    No.

12   Q.    And did you understand that the reason she asked you not

13   to send out her schedule was because the schedule you sent out

14   didn't have the rest periods built in?

15   A.    No, there was no mention of that.

16   Q.    Got it.  And did you come to Dr. Porter and say, Could you

17   explain to me what's going on here?

18   A.    No, I didn't.  I mean, I think that every, we both were

19   communicating through Donna.

20   Q.    Got it.  So there could have been a reason for her asking

21   you to do this that you didn't understand; is that correct?

22   A.    Yes, that's possible.

23   Q.    Great.  Thank you.

24         ATTORNEY SCHROEDER:  No questions, Your Honor.

25         ATTORNEY NUNAN:  I'm not done.

1                    ATTORNEY SCHROEDER:  I thought you were.

2                    ATTORNEY NUNAN:  Nice try.  Okay.

3                    ATTORNEY SCHROEDER:  Sorry.

4                    ATTORNEY NUNAN:  No, no not a problem.

5       BY ATTORNEY NUNAN:

6       Q.   So you talked about this side list that Donna was

7       creating --

8       A.   Yes.

9       Q.   -- that you found, and you start in August of 2016?

10      A.   Yes.

11      Q.   Okay.  Did you hear in the department anything about

12      complaints of patient harm?

13      A.   I heard customer-service-related complaints, and I think I

14      covered them in that document that I just read few minutes ago

15      about him, he had a strange style, right, of communicating with

16      people.

17      Q.   That's a little different than what I'm asking.  I'm

18      asking you if you heard complaints of patient harm by Dr.

19      Seifer.

20      A.   I didn't know anything about the clinical side of that.  I

21      don't know about harm but definitely about demeanor.

22      Q.   Okay, right.  Did you know complaints about Dr. Hsu,

23      problems with patient harm with him?

24      A.   I didn't know about patient harm.  I don't recall

25      anything.

1    Q.   Got it.  So that's not something that, when you spoke to

2    Donna, that she said back to you that there were issues about

3    patient harm?

4    A.   I don't recall that.

5            ATTORNEY NUNAN:  Okay, yeah.  So I'd like to show an

6    exhibit that is in evidence, 28.  Just confirming.

7            COURTROOM DEPUTY:  Yes.

8    BY ATTORNEY NUNAN:

9    Q.   I'm going to describe this situation.  This is an email

10   between Dr. Porter, Dr. Leslie DeMars, who was chair of the

11   department.  Did you know that?

12   A.   Yes.

13   Q.   Judy McBean, did you understand she was a doctor in the

14   REI division?

15   A.   Yeah.  I didn't really know her, but yes.

16   Q.   And Beth Todd?

17   A.   Yes.

18   Q.   So the jury has seen this document before.

19           THE COURT:  So Ms. Nunan --

20           ATTORNEY SCHROEDER:  Objection, Your Honor.

21           ATTORNEY NUNAN:  Sorry.  Is it not coming up?

22           THE COURT:  Objection because the document is not on

23   the screen or something else?

24           ATTORNEY SCHROEDER:  Objection related to the

25   document, if I may be heard at sidebar.

VOLUME: 8
PAGES: 432-646

1              (Bench conference begins.)

2              THE COURT:  So, when you took the exhibit down, I

3    didn't know if that's --

4              ATTORNEY SCHROEDER:  It's admitted, Your Honor, no

5    question about that.  Beyond the scope of the direct.  It's

6    also asking her a question about a document she's not on.

7    She's characterizing the document and characterizing what the

8    jury was told.  And so I object on those grounds as well.

9              ATTORNEY NUNAN:  So here's my intent.  I would like

10   to show her the fact that Dr. DeMars was directing Beth Todd to

11   switch around the schedule, taking a patient off Dr. Hsu's

12   schedule and getting Beth Todd or Misty or Judy to deal with

13   the situation and that this is exactly what was going on, that

14   this speaks to what she's been talking about in terms of stuff

15   coming up.  I don't think she's aware of it, and this is a

16   prime example that the jury knows about that I would like to

17   mention this side list that was going on and this

18   back-and-forth.  She doesn't appear to have any knowledge, and

19   I want to make the point that that's what was going on here.

20             THE COURT:  Okay.

21             ATTORNEY SCHROEDER:  Just for the record, she does

22   have knowledge of the side note, and maybe I can understand the

23   that, the line of questioning, but characterizing the document

24   --

25             THE COURT:  Can you put the exhibit up for me?  Thank

1   you.  So I know what we're talking about.  It never appeared in

2   front of me.

3           ATTORNEY SCHROEDER:  Okay.  I didn't really -- I was

4   actually just looking down at it when I raised the objection.

5           ATTORNEY NUNAN:  So the top of Page 2 is where

6   they're talking about Dr. Hsu has identified a patient who

7   needs surgery for a septum, and Dr. DeMars -- we went over this

8   yesterday -- above that is saying, you know, You need to -- I

9   don't want to create patient harm.  I don't want this patient,

10  I don't want there to be surgery on this patient, so, Beth

11  Todd, will you please take care of this, take her off the

12  schedule?  There was a lot of this going on in the background.

13  I don't think she saw it, and I would like to make it clear to

14  the jury that, while she has an experience, she didn't have the

15  full view.

16          THE COURT:  Okay.  Well, all right.  I'm going to

17  allow her to question on this.

18          ATTORNEY SCHROEDER:  Totally understand your

19  position, Judge, and we'll proceed accordingly.  But, if I may,

20  Donna Bedard is not on this email exchange.  So I think I

21  understand the scope.  I still make my objection on scope and a

22  continuing objection to the extent that we, Donna Bedard is not

23  even on this email.  So I understand her point of argument, but

24  that's argument, not -- you know, she's not on the,

25  Ms. Mousley, is not on this email.  Donna is not on this email.

1     There's nothing about this, quote, unquote, theory related to

2     this.  And so I just want to be careful that the testimony,

3     it's not characterizing prior testimony in the form of

4     declarative statement as opposed to a question.  She has

5     cross-examination.  That's fine, but --

6                THE COURT:  Okay.  And you'll be speaking, obviously,

7     about this email in your --

8                ATTORNEY NUNAN:  I will speak to that email.

9                THE COURT:  While I have everyone here,

10    scheduling-wise, is Ms. Mousley your last witness?

11               ATTORNEY SCHROEDER:  Yes.

12               THE COURT:  So after that I'll take your -- I just

13    wanted to make sure I didn't do it and you had another witness

14    lined up.

15               ATTORNEY SCHROEDER:  Thank you.

16                    (Bench conference ends.)

17    BY ATTORNEY NUNAN:

18    Q.   Can everybody see 28?  Not yet.  Ms. Mousley, this is an

19    email that was written in over a couple of days in the

20    beginning of December of 2016.  I'm going to read from the top

21    of the second page:  "There are two patients that I have

22    discussed with all of you".  I'm sorry.  "There are two

23    patients that I have discussed with all you who had HyCoSy SHGs

24    to evaluate the cavity that were read as septums.  Neither

25    patient has a septum."

VOLUME: 8
PAGES: 432-646

1        And I'm not going to finish the sentence because I was

2    corrected last time as to how I pronounced it, but essentially

3    what's going on here is Dr. Hsu misread ultrasounds and

4    scheduled a patient to do surgery on himself, okay?  And --

5                ATTORNEY SCHROEDER:  Objection, Your Honor.

6                THE COURT:  Yeah, sustained.

7                ATTORNEY SCHROEDER:  Thank you.

8    BY ATTORNEY NUNAN:

9    Q.   Okay.  Above, I'm going to read to you what Dr. DeMars

10   wrote back to Dr. Porter, Judy McBean, and Elizabeth Todd, and

11   I'm going to direct you right, starting right here:  "I can't

12   tell him not to do it, because I am not the content expert, but

13   I would suggest, Beth, that you call her and suggest that she

14   postpone and see Judy or Misty if, Misty, you believe that the

15   images have been overread.  I do not want her to be harmed.

16   She works here and should be able to pop in for another visit."

17       So they are redirecting that to come off Dr. Hsu's

18   schedule and for Beth Todd.  Did you have --

19                ATTORNEY SCHROEDER:  Objection, Your Honor.  That is

20   not --

21                THE COURT:  Sustained, sustained.

22                THE COURT:  Maybe counsel should approach at this

23   time.

24                ATTORNEY NUNAN:  Okay.  Sorry.

25                (Bench conference begins.)

1          THE COURT:  So I asked you come up because I
2    understand what you want to do with this line of questioning,
3    and, obviously, I'm allowing you to do it, but I'm a little
4    concerned about how you're going to go about doing this without
5    explaining the context of this email, which is you testifying,
6    and I can't have that.
7          ATTORNEY NUNAN:  Okay.  So, if I ask her if she had
8    knowledge of why people were being removed from schedules, is
9    that fair?
10          THE COURT:  Did she have knowledge unrelated to this
11    email?
12          ATTORNEY NUNAN:  Yeah.
13          THE COURT:  So what's your question?  Were you going
14    to say --
15          ATTORNEY NUNAN:  I'm not sure I'm doing a good job
16    with this.
17          THE COURT:  No.
18          ATTORNEY NUNAN:  So without -- so I've said what my
19    understanding is.  I've said, I have described the situation,
20    but my point is this was part of the reason the schedule,
21    people were being taken off David Seifer's schedule and Albert
22    Hsu's schedule.  And she's testified there was this side list,
23    and we didn't -- you know, she disciplined Donna Bedard for
24    things that were going on that she didn't understand.  There
25    was clearly direction behind the scenes, so --

1          THE COURT:  I understand that, and I think this is

2     similar to what you said when you were last up here, and I

3     understand the general line.  I'm just, I don't see how you're

4     going to do this the way you've been attempting to do it.  So,

5     you know, if you want to -- I'm not going to tell you what to

6     do, but, if you want to ask a question generally about whether

7     she was aware of other kinds of scheduling issues potentially

8     --

9          ATTORNEY SCHROEDER:  Judge, if I may be heard?

10          THE COURT:  Yeah.

11          ATTORNEY SCHROEDER:  This is all argument, okay?  She

12     wants to make that -- if Sarah wants to make, Ms. Nunan, wants

13     to make these points in closing argument, she can do that.

14     She's trying to do her closing argument by way of this witness

15     and this document.  She's not on -- we're way beyond the scope

16     at this point.  We came up here for this conference, and it's

17     like deja vu all over again, right?  It's like we're here

18     discussing the same exact issue.  I'm going to continue to

19     object, and I don't want it to be considered kind of badgering

20     of Ms. Nunan by doing that, but this is wholly inappropriate,

21     way beyond the scope.

22          THE COURT:  I do -- I'm not sure how I see this

23     happening, so --

24          ATTORNEY NUNAN:  All right.  I'll take it down.

25     That's fine.

VOLUME: 8
PAGES: 432-646

1          THE COURT:  Okay, thank you.

2          (Bench conference ends.)

3    BY ATTORNEY NUNAN:

4    Q.   I'm going to take this exhibit down.  Would it be possible

5    that the patients would be taken off of Dr. Seifer's schedule

6    for medical reasons?

7    A.   I just feel like it's something that should have been

8    communicated when I was trying to find out why Donna was

9    creating this list, and that was not shared with me.  So I had

10   to treat it for what it was, which was that they weren't

11   putting patients on Dr. Seifer and Dr. Hsu's schedule.

12   Q.   But it's possible you don't know the whole story?

13   A.   I guess it's possible, yeah.

14   Q.   So you said that you didn't have any medical training?

15   A.   I don't.

16   Q.   Okay.  And you don't have any understanding of the ASRM

17   guidelines; is that right?

18   A.   Correct.

19   Q.   Okay.  So, if you witnessed provider disagreement, is it

20   possible that you didn't understand the medical disagreements

21   that were going on behind the scenes?

22   A.   It's possible I didn't understand the medical

23   disagreements, but just kind of professional communication and

24   etiquette and all of that, that I understand very well, and

25   that's what was missing between the team of providers.

1    Q.   Sure.  I'd like to put back up what we've already looked

2    at.  It's, for us, it is -- I only have a copy of Plaintiff's

3    Exhibit 19.  I don't believe it's been admitted.  It's the same

4    document that defense put up before.  Can I, can you turn to

5    Exhibit 19 in the book, please?

6    A.   Is it B19?  Is that --

7    Q.   No.  I'm sorry.  So sorry.  Plaintiff's 19.  Turn back to

8    19.

9    A.   Yeah.  I'll get there.

10   Q.   Sorry.  They are not easy.

11              THE COURT:  So, just to be clear, Ms. Nunan, so

12   Plaintiff's 19 has not been admitted, but you're saying that

13   this particular exhibit has been admitted under a different

14   number?

15              ATTORNEY NUNAN:  It has.  I'd just like to go over it

16   with her again.  The only copy that I have and can show and

17   review with her is ours.  I don't have to admit this because

18   it's already been admitted.

19              THE COURT:  Just, in terms of publishing it, if that

20   was your intent.

21              ATTORNEY NUNAN:  Please.

22              THE COURT:  The only thing is we don't know what

23   number it is.  So if we could get that --

24              ATTORNEY NUNAN:  What number the defendants?

25              THE COURT:  Yes.

VOLUME: 8
PAGES: 432-646

1              ATTORNEY SCHROEDER:  B3.

2              ATTORNEY NUNAN:  B3, please.

3              THE COURT:  Thank you.

4    BY ATTORNEY NUNAN:

5    Q.   So this is the same document you saw before --

6    A.   Yes.

7    Q.   -- dated 2/20/2017.  This is your assessment of David

8    Seifer; is that right?

9    A.   Yes.

10   Q.   Okay.  I'm going to put that back up.  So I'd just like to

11   read from the middle paragraph here.  Under "Leadership" you

12   wrote:  "Leadership, David seems unable to bring his team

13   together, and his actions, or lack thereof, often has the

14   opposite effect.  His lack of direction and guidance from

15   facilitating a team meeting to making a decision when the team

16   is looking for closure continues to have a negative impact on

17   the team's progress.  He requires constant coaching and

18   feedback and validation before he can move forward.  It can be

19   exhausting working alongside him."

20        Those are some of the challenges you had?

21   A.   Yes.

22   Q.   Is it possible that those were some of the challenges Dr.

23   Porter had with him?

24   A.   Possible.

25   Q.   Great, okay.  I would like you to turn to the book,

1    Plaintiff's Exhibit 27, please.  This is an email from you to

2    Heather Gunnell; is that right?

3    A.   Yes.  Can I read it?

4    Q.   Absolutely.  Take your time.

5         THE COURT:  Ms. Nunan, is there a way for you to put

6    that up for me and for counsel?

7         ATTORNEY NUNAN:  If I plug it in, you can control

8    that?

9         COURTROOM DEPUTY:  Yes.

10        THE COURT:  Okay.  Thank you.

11   BY ATTORNEY NUNAN:

12   Q.   Okay?

13   A.   Yeah.

14   Q.   Do you recognize this email?

15   A.   I don't.  I mean, I can see obviously I did it, but --

16   Q.   You wrote it?

17   A.   Yes.

18        ATTORNEY NUNAN:  It's dated November 10th 2016, and

19   it is a list of patient complaints.  I'd like to move for the

20   admission of Plaintiff's Exhibit 27.

21        THE COURT:  Any objection?

22        ATTORNEY SCHROEDER:  Objection, Your Honor, hearsay.

23        THE COURT:  All right.  I'll ask you to approach.

24        (Bench conference begins.)

25        ATTORNEY NUNAN:  I'm causing a lot of trouble.

1    Sorry.

2         THE COURT:  Okay.  So what's the hearsay objection?

3         ATTORNEY SCHROEDER:  These are all comments by three

4    different patients.  I don't know.  So these are, this is just

5    a recording of what patients reported.  I don't know

6         ATTORNEY NUNAN:  To her.

7         ATTORNEY SCHROEDER:  I don't know that.  These are

8    comments that are made to a nonclinical person.  This is, these

9    aren't medical records or diagnoses where they're made to where

10   they would fall within the hearsay exception under 804.

11   They're just a series of patient comments that Kelly is, I'm

12   sorry, Kelly Mousley is communicating to Heather Gunnell, but

13   the underlying comments by the patient, whatever they are, are

14   hearsay.

15        THE COURT:  So this is just an email that Kelly

16   wrote, right?

17        ATTORNEY NUNAN:  Right.  And I got to ask the

18   circumstances under which she was aware of -- I mean, did she

19   take those calls?  How did she know this?  It seems to me like

20   there's quite a bit of awareness of Dr. Seifer's issues here.

21        THE COURT:  Okay.  I'll allow you to question her on

22   this.

23            (Bench conference ends.)

24        ATTORNEY NUNAN:  So are we allowed to publish to the

25   jury, or I'm just going to ask questions?

1           THE COURT:  Yeah.  So objection overruled, and it

2     would be admitted, Plaintiff's Exhibit 27.

3     BY ATTORNEY NUNAN:

4     Q.   Ms. Mousley, do you remember the circumstances under which

5     you wrote this email?

6     A.   I don't remember exactly, but I'm assuming that I had

7     received information from a patient or through a secretary to

8     get this information.

9     Q.   Okay.  Do you remember if this would have been through

10    phone calls that you had taken or somebody else?  Do you have

11    any recollection of how you gathered this information?  It's

12    pretty specific.

13    A.   Yeah, I don't remember exactly how I got this, but, if I,

14    when I did receive this type of information, it would have been

15    either a call came through to someone in OB/GYN, some

16    administrative person and they would have sent it to me, or

17    they would have come to me and said, Hey, I have a patient on

18    the phone.

19    Q.   Okay.  And is it fair to characterize that these are

20    complaints about David Seifer?

21    A.   Yeah, it seems like that, yeah, Dr. Seifer, the changing

22    of nurses, Dr. Hsu, Beth Todd.  Looks like there were several

23    concerns.

24           ATTORNEY VITT:  Can you speak into the microphone,

25    please?  It's a little hard to hear.

1           THE WITNESS:  Oh, I'm sorry.  Yes.

2    BY ATTORNEY NUNAN:

3    Q.   And this was in November of 2016?

4    A.   Yes, according to this.  I don't recall sending the email,

5    but --

6           ATTORNEY NUNAN:  Okay, great.  I have no further

7    questions.

8           THE COURT:  Okay.  Any redirect?

9           ATTORNEY SCHROEDER:  Real quick, Your Honor.  Just at

10   the end of this document, if we could put up Plaintiff's

11   Exhibit 27 --

12          ATTORNEY NUNAN:  I can put it up.

13          REDIRECT EXAMINATION BY ATTORNEY SCHROEDER

14   Q.   Just the second page.  I'm going to refer to the last

15   part.  Can we go to the second page at the top?

16        I know Ms. Nunan said that there was a series of

17   complaints about Dr. Seifer, but I want to direct your

18   attention to the last few lines that relate to these notes.  It

19   says, "The second time she saw him she brought her husband with

20   instructions that he help her get her questions answered before

21   Dr. Seifer ran out of the room.  However, Dr. Seifer was much

22   different and answered their questions and gave a thorough

23   explanation.  So they left feeling much different about their

24   experience.  She also enjoyed working with Marti for her last

25   visit and wants to bring her a fruit basket."

1         That was a positive response, correct?

2     A.    Correct.

3     Q.    Okay.  Now, thank you.  With respect to any concerns that

4     you may have raised to Ms. Gunnell in Plaintiff's Exhibit 27 or

5     in later February 20th 2017 when you gave a review of Dr.

6     Seifer with some critical comment, did you ever suffer any form

7     of retaliation or poor treatment by Dartmouth Health after

8     being, after giving those reviews?

9     A.    No.

10    Q.    And, in fact, you remained employed there until when?

11    A.    February of 2020.

12    Q.    Thank you.

13            THE COURT:  Any further cross?

14            ATTORNEY NUNAN:  None.

15            THE COURT:  Okay.  Ms. Mousley, you may step down

16    thank you.  Okay.  So, members of the jury, this is where we'll

17    conclude for today a little bit earlier.  We'll see you again

18    tomorrow ready to go at 9:00.  Please don't speak to one

19    another or anyone else about the case or do any type of

20    independent research about the case.  Have a good evening.

21            (The Jury leaves the courtroom.)

22            THE COURT:  Okay.  So tomorrow's witnesses?

23            ATTORNEY SCHROEDER:  Sure, Your Honor.  Let me just

24    consult with my --

25            THE COURT:  Yes.

VOLUME: 8
PAGES: 432-646

1          ATTORNEY SCHROEDER:  -- co-counsel here.  Your Honor,

2     I expect we'll see Dr. Merrens again, Heather Gunnell, and, if

3     we have time, Jocelyn Chertoff.

4          THE COURT:  Okay.  So you expect those three, then,

5     to take the bulk of the day?

6          ATTORNEY SCHROEDER:  I think so, Your Honor.

7          THE COURT:  Okay, all right.

8          ATTORNEY SCHROEDER:  We've got, we've had to move

9     some people around, given that, initially, this was looking

10    like a three-week trial, and I think we're, both sides have

11    condensed it, but some of our witnesses are coming from rather

12    far.  So we've had to try to make sure that we can fill the

13    time on each of these days, and I think that will be

14    appropriate and fill most of the day tomorrow.

15         THE COURT:  Okay, all right.  Thank you.  Anything

16    else to take up at this time?

17         ATTORNEY JONES:  Not from the plaintiff.

18         ATTORNEY SCHROEDER:  Nothing, Your Honor.  Thank you.

19         THE COURT:  Thank you.  Have a good evening.  be

20

21

22         (Whereupon at 4:02 p.m. the hearing was adjourned.)

23

24

25

VOLUME: 8
PAGES: 432-646

1                    C E R T I F I C A T E

2              I, Sunnie Donath, RMR, Official Court Reporter

3      for the United States District Court, District of Vermont, do

4      hereby certify that the foregoing pages are a true and accurate

5      transcription of my stenographic notes of the hearing taken

6      before me in the above-titled matter on April 2, 2025 to the

7      best of my skill and ability.

8

9

10

11

12

13      *Sunnie Donath, RMR*
        --------------------------------

14                    Sunnie Donath, RMR

15

16

17

18

19

20

21

22

23

24

25