1                    UNITED STATES DISTRICT COURT
                              FOR THE
2                        DISTRICT OF VERMONT

3

4    Misty Blanchette Porter         )
                                     )
5                                    )
     v.                              ) Case No. 2:17-cv-194
6                                    )
                                     )
7    Dartmouth-Hitchcock             )
     Medical Center, et al.          )
8                                    )
     _____)

9

10   RE:  Day 9 of Jury Trial

11   DATE: April 3, 2025

12   LOCATION: Burlington, Vermont

13   BEFORE:  Honorable Kevin J. Doyle
              Magistrate Judge

14

15   **APPEARANCES**:

16   Geoffrey J. Vitt, Esq.
     Sarah H. Nunan, Esq.
17   Vitt & Nunan, PLC
     8 Beaver Meadow Road
18   Norwich, VT 05055

19   Eric D. Jones, Esq.
     Langrock, Sperry & Wool
20   210 College Street, Suite 400
     Burlington, VT 05410
21
     Donald W. Schroeder, Esq.
22   Morgan McDonald, Esq.
     Foley & Lardner, LLP
23   111 Huntington Avenue, Suite 2500
     Boston, MA 02199

24

25                  - Continued on Next Page -

VOLUME: 9
PAGES: 647-860

1    Tristram J. Coffin, Esq.
     Downs Rachlin Martin, PLLC
2    199 Main Street, Suite 600
     Burlington, VT 05401-8339
3

4

5

6              TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                      United States District Court Reporter
7                           verbatim@vermontel.net

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME: 9
PAGES: 647-860

1                     INDEX OF EXAMINATION

2    Witness              Examined By            Page       Line

3    Edward Merrens       Atty. McDonald         667         1
                          Atty. Jones            731         1
4

5    Daniel Herrick       Atty. Schroeder        752         1
                          Atty. Vitt             795        13
6

7

8    Heather Gunnell      Atty. McDonald         803        12
                          Atty. Nunan            839         1
9                         Atty. McDonald         855         9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME: 9
PAGES: 647-860

1                    <u>INDEX OF EXHIBITS</u>

2                                              <u>Page</u>    <u>Admitted</u>

3     <u>Plaintiff Exhibits</u>

4         20                                   711      Y
          23                                   706      Y
5         40A                                  782      Y
          50A                                  787      Y
6         63                                   697      Y
          71                                   743      Y
7         73                                   744      Y
          79                                   702      Y
8         80                                   736      Y
          83                                   714      Y
9         84                                   722      Y
          101A                                 715      Y
10        103                                  719      Y

11

12    <u>Defense Exhibits</u>

13        A9                                   814      Y
          A17                                  824      Y
14        A18                                  832      Y
          A22                                  826      Y
15        A25                                  830      Y
          B                                    674      Y
16        B4                                   708      Y
          C                                    671      Y
17        C13                                  835      Y
          D                                    676      Y
18        N                                    817      Y
          P                                    820      Y
19        Q                                    822      Y
          S                                    776      Y

20

21

22

23                      *    *    *    *    *

24

25

VOLUME: 9
PAGES: 647-860

1          THE COURT:  Okay.  Good morning.  Couple of issues to

2     take up, I hear.  Ms. Nunan?

3          ATTORNEY NUNAN:  Hi there.  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          ATTORNEY NUNAN:  There were some documents that

6     defendants have identified as incomplete, and we've been trying

7     to locate the native documents.  So the nature of the

8     incomplete is there's an email with an Excel attachment, and

9     the attachments, if you go up and hit the review, there are

10    comments, apparently, that are within the, that are attached to

11    the Excel spreadsheet.  So, during the depositions, it was not

12    clear to me that there were comments on there, and nothing came

13    up about that, but I respect the fact that they are saying

14    these documents are not complete without them.

15          I have spent some time, and I can't find the natives.  So

16    I can't go in and just reprint them, and they were kind enough

17    to locate two of the exhibits with the Excel files, but there's

18    about seven of them.  And so I propose that -- well, I will let

19    you decide how to handle it.  I would like to use all of them

20    today, and, to the extent it takes us a little bit longer to

21    get the comments on the Excel sheet, I propose that we submit

22    that at a later date.

23          THE COURT:  So these are all related to exhibits to

24    be admitted today, potentially, not already admitted exhibits?

25          ATTORNEY NUNAN:  Yes, that's exactly right.

VOLUME: 9
PAGES: 647-860

1          THE COURT:  What is the defense's position?

2          ATTORNEY SCHROEDER:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          ATTORNEY SCHROEDER:  Here's our position.  There are,

5    there were seven documents, seven exhibits we identified on

6    March 20th, which is only two weeks ago, but it seems much

7    further.  We identified in a very long email to plaintiff's

8    counsel the issues with a variety of their exhibits.  We

9    pointed out that the Excel does not contain comments from our,

10   from the native version.  We've produced everything, all the

11   metadata, et cetera.  I think it was 27,000, to 28,000 pages in

12   this case.  We identified on March 20th the errors.

13        Despite under no obligation to do so out of professional

14   courtesy, Ms. Martinez, last night, actually identified some

15   additional documents for two of the exhibits, and we have given

16   them to plaintiff's counsel, but I'm not -- I'm going to object

17   strenuously, in the words of Demi Moore.  The fact that we're

18   not going to have incomplete documents being put in front of

19   our witnesses.  That's inappropriate.

20        And we identified these errors two weeks ago, and we

21   certainly have worked very hard to assist in helping them on

22   that, but, at some point, there is a, you know, my colleagues

23   are not working for plaintiff's counsel.  So we did our level

24   best late last night to give, get two of the documents

25   complete, but I'm going to object to any line of questioning on

 1    any documents that are incomplete.

 2              THE COURT:  Okay.  And so the notations, so the, if

 3    these exhibits were complete -- just want to make sure I

 4    understand what the nature of the incompleteness is.  So

 5    there's kind of attachments, Excel spreadsheets, deposition

 6    transcripts?

 7              ATTORNEY NUNAN:  Can I approach so you can see the --

 8              THE COURT:  Yes.  Obviously, you've seen them,

 9    Mr. Schroeder, right?

10              ATTORNEY SCHROEDER:  Yeah.  We might be able to put

11    them on the screen.

12              ATTORNEY NUNAN:  So the yellow boxes, which are not

13    relevant to what we're going to be asking about, are the

14    comments.

15              ATTORNEY SCHROEDER:  Which one is that, Sarah?

16              ATTORNEY NUNAN:  You had given us 40A and 50A.

17              THE COURT:  So you know what these are then, Mr.

18    Schroeder?  Would you like to see them before I --

19              ATTORNEY SCHROEDER:  No, no.  You can go ahead, Your

20    Honor.  I was going to introduce them as well just to kind of

21    speed things along this morning in Mr. Herrick's direct

22    examination.

23              THE COURT:  Okay.  So, for example, then 40A, what is

24    incomplete then about this?

25              ATTORNEY SCHROEDER:  It's not incomplete, Your Honor.

1          THE COURT:  Oh, this is complete?

2          ATTORNEY SCHROEDER:  Now it is.  So 40A and 50A,

3    which we've already talked to plaintiff's counsel and we're in

4    agreement, I believe, on the complete documents.  So what the

5    complete document for the other ones, I don't know for sure

6    what's incomplete.  Ms. Martinez has a photographic memory.  I

7    don't.  But there are additional comments that people have

8    embedded into the Excel sheets that we know exist.

9       We didn't have them on our exhibit list.  We don't need

10   them.  But they're on plaintiff's exhibit list.  We identified

11   these issues two weeks ago, including these two.  We just

12   happened to go through this process last night at the request

13   of plaintiff's counsel, and we've now complete documents.  So

14   now, that's now a complete document, but there are five other

15   documents that are not complete.

16          THE COURT:  And these are all exhibits anticipated to

17   be, admission to be sought through Dr. Merrens or --

18          ATTORNEY SCHROEDER:  No.

19          ATTORNEY NUNAN:  Heather Gunnell.

20          THE COURT:  Who is a little later?

21          ATTORNEY SCHROEDER:  Right, she's going to testify

22   today.  They're Plaintiff's Exhibits.  They're not our

23   exhibits.

24          THE COURT:  Right, right.  But it wouldn't be for

25   Dr. Merrens.  So I guess what I'm getting at is, Is there a

VOLUME: 9
PAGES: 647-860

1    chance that these documents can become complete by the time

2    they're proposed to be used?

3            ATTORNEY NUNAN:  I don't have the native format.  I

4    would have been happy to convert them.  I can't find the

5    originals.  I have the what came to us as PDFs, but I do not

6    have the original native Excel spreadsheets.  So I would have

7    been happy to do that last night.  I could not locate them.

8            THE COURT:  Okay.  So it sounds like, then, this

9    particular issue will never be resolved, right?

10            ATTORNEY NUNAN:  Unless we're able to get them from

11    them tonight.  We've asked.  I mean, leading up to now, we have

12    worked quite well together.  I have to say Megan and Morgan

13    have been lovely about going back and forth.  They couldn't

14    find some of their documents before trial.  We provided them.

15    And this seems like in the same vein.

16        I would like to say it's the cover email that I'm

17    interested in.  The spreadsheet is great, but I don't find

18    those comments to be incredibly relevant to what I'm asking.  I

19    understand the completeness issue.  Yeah, I haven't seen them

20    but --

21            THE COURT:  The exhibits right now are incomplete, so

22    --

23            ATTORNEY NUNAN:  The exhibits right now are the cover

24    email and the Excel spreadsheet without the metadata, without

25    going in and -- you know, you have to go into Excel, and you

1    have to click "Review", and you have to plug in the comments.

2    This isn't obvious on the face of the Excel spreadsheet.

3            THE COURT:  Okay.  So, when you say metadata, though,

4    so, looking at the complete Exhibits 40A and 50A, the

5    information in the yellow boxes, are you counting that as

6    metadata?

7            ATTORNEY NUNAN:  That is what my understanding is.

8    It's comments that have been attached to the Excel spreadsheet,

9    and I'm not saying it's not, without them it's not complete.

10   It's not apparent when you open the Excel spreadsheet that it's

11   actually there.

12           THE COURT:  Okay.  So these are -- I just want to be

13   clear.  These are like the notes that would be missing from the

14   other exhibits?

15           ATTORNEY NUNAN:  That is exactly right.

16           THE COURT:  Okay.  And so your initial proposal when

17   we came out was you're proposing that you be allowed to

18   introduce these exhibits, conduct an examination without this

19   additional information.  I thought you had said, and then it

20   can be added later, but it may never be able to be added,

21   right, based on what you're telling me?

22           ATTORNEY NUNAN:  I think we could probably come up

23   with the complete attached spreadsheet later.  The email, the

24   cover email itself is complete, as far as I know.

25           THE COURT:  Right.  But, now, for defendants to do

VOLUME: 9
PAGES: 647-860

1    their examination, you anticipate wanting to get into this

2    information that's on the Excel spreadsheet?

3        ATTORNEY SCHROEDER:  Absolutely.  And, Judge, just

4    for the Court, if you'll indulge me for a second.  Plaintiff's

5    counsel filed, I believe, eight motions to compel discovery in

6    this case.  In 31 years, almost, of practicing, I have never

7    had a single plaintiff discrimination case where I produced

8    27,000 pages of documents, including all metadata.  So we've

9    produced all that.  We've gone above and beyond to complete

10   these two documents, but we are not going to expend resources

11   tonight to try to find documents that may or may not complete

12   the exhibits that they would like to identify.

13       We identified this specific issue on March 20th.  That's

14   two weeks ago.  A whole list of issues, specifically a

15   category, Excel does not contain comments from native version

16   for seven different -- these are the seven documents.  We, out

17   of professional courtesy, completed two of them last night, but

18   I am not, I don't believe, under any obligation to complete

19   plaintiff's exhibits so that they can then examine my witnesses

20   when we've identified these issues two weeks ago.

21       We actually expended time last night, despite the fact

22   that we had to shuffle witnesses around because one couldn't

23   get here in time, and we alerted them at 6:00 o'clock last

24   night of that fact.  That's above and beyond, Your Honor, any

25   obligation that we would have.

VOLUME: 9
PAGES: 647-860

1        We produced these documents in native form.  We produced

2    all the metadata at the appropriate time.  I understand

3    Ms. Nunan's issue.  We assisted in finding additional documents

4    for two of them last night, but the, we're going to put on

5    Dr. Merrens, Ms. Gunnell, and Mr. Herrick today.  And

6    Mr. Herrick is retired, so he's under no obligation to coming

7    back here, and Ms. Gunnell is employed separately as well.

8    These are not DH employees.

9        THE COURT:  And these are related, of course, to the

10   Gunnell examination?

11       ATTORNEY SCHROEDER:  They, they may be related to

12   both Ms. Gunnell and Mr. Herrick.  I don't know.  I haven't

13   asked which one they're for, but they could be both of them

14   because I think there are a number of them that might apply to

15   both of them.

16       THE COURT:  But two people who will be testifying

17   today?

18       ATTORNEY SCHROEDER:  Exactly.

19       THE COURT:  I'm not sure what I can do about this at

20   this point, Ms. Nunan.  I mean, if the exhibit is not complete

21   and the defense anticipates conducting an examination that

22   wants to deal with the information that's not part of the

23   exhibit, right, I mean, even if somehow the exhibit could be

24   reconstructed after the witness examination is concluded, that

25   doesn't seem to be satisfactory, does it?

VOLUME: 9
PAGES: 647-860

1          ATTORNEY NUNAN:  I guess not.

2          THE COURT:  I'm trying to work with you here.  I just

3     don't know how, you know, not at the risk of being repetitive,

4     I just don't know how these witnesses could get up there and be

5     questioned by the other side without having all of the relevant

6     information, unless I'm missing something here.

7          ATTORNEY NUNAN:  I would just submit that the yellow

8     boxes are relevant in those documents to numbers on the

9     spreadsheet, and I'm not going to be asking about the numbers

10    on the spreadsheet.

11         THE COURT:  No, but I'm hearing that defendants will

12    be asking the witnesses about those numbers.

13         ATTORNEY NUNAN:  Sure.

14         THE COURT:  Right?

15         ATTORNEY NUNAN:  Okay.

16         ATTORNEY SCHROEDER:  Exactly, Your Honor.

17         THE COURT:  And this is obviously information

18    produced by Dartmouth over the course of the case.  Plaintiffs

19    are using these exhibits to examine Dartmouth witnesses.

20         ATTORNEY SCHROEDER:  Correct.

21         THE COURT:  You, it sounds like you likely do have

22    the relevant information, but I'm hearing your argument today

23    is that notice was given and you're not under an obligation to

24    provide this to plaintiff's counsel at this time.

25         ATTORNEY SCHROEDER:  No, Your Honor.  We produced

VOLUME: 9
PAGES: 647-860

1    that information.  They have access to it.  She just couldn't

2    locate it and so --

3              THE COURT:  Right.

4              ATTORNEY SCHROEDER:  It's not that they don't have

5    it.  They just haven't figured out how to put the exhibit

6    together like we did for the other two.  I mean, we've gone

7    above and beyond, Your Honor.  You know, it's not our

8    obligation to put together their exhibits for the exhibit list.

9         I will tell you, in the lead-up to this trial, we spent

10   hours going through all of their exhibits and identifying out

11   of, close to 75 out of 193 that were incomplete or had other

12   issues with that.  That's not our obligation.  We did it anyway

13   because we wanted to make sure that the documents went in and

14   they were complete and accurate, but, you know, the fact that

15   this is now coming up and we addressed it way ahead of time on

16   March 20th, and we laid this out, and they could have reached

17   out and said, Hey, we don't have this, we don't have that.  You

18   know, because they can't locate it at this point.  We had, we

19   had time to do that before trial.  That was the whole point.

20   And so this came up last night for the first time.

21             ATTORNEY NUNAN:  No, that's not accurate.

22             ATTORNEY SCHROEDER:  Well --

23             THE COURT:  But it was produced in native format,

24   you're saying?

25             ATTORNEY SCHROEDER:  Of course, yes.

VOLUME: 9
PAGES: 647-860

1          THE COURT:  It was produced with all this information

2     on it?

3          ATTORNEY SCHROEDER:  Absolutely, yes.

4          THE COURT:  And so I'm just trying to be practical

5     here.  If you produced it in native format, is it producible

6     again in native format for these two documents?  I hear your

7     point about getting all this early and providing notice, but

8     can you give me a sense of how onerous that would be?

9          ATTORNEY SCHROEDER:  Well, I don't know.  It took

10    Ms. Martinez a while last night to put these two documents

11    together.  I don't know, Your Honor.  We produced 27 -- I know

12    we have the systems to go on the computer tonight if we had to,

13    but then that would mean we'd have to bring these witnesses

14    back.

15         THE COURT:  Right.  No, they're testifying today.

16         ATTORNEY SCHROEDER:  Right.  And, to be honest with

17    you, Your Honor, the other thing I wanted to raise is we've got

18    two witnesses tomorrow.  I think we'll be done, we will rest

19    our case in chief, perhaps, by midday.

20         THE COURT:  Tomorrow?

21         ATTORNEY SCHROEDER:  Yes.

22         THE COURT:  Wow, okay.  That moves things up

23    significantly.

24         ATTORNEY SCHROEDER:  But I, I wanted you to be aware

25    of that just in light of us having to shuffle some witnesses

VOLUME: 9
PAGES: 647-860

1    around, but also I believe these three witnesses will be fairly

2    -- I think today will be a full day, and we'll be done with

3    them.  But we could -- we've gone through this process, Your

4    Honor, and we spent a lot of time last night, which we didn't

5    have time for, because we had to move witnesses around because

6    one of them didn't maker her flight because a flight delay,

7    Dr. Chertoff.  And so we have to put Mr. Herrick on the stand.

8    Despite that change, we went to the nth degree to supplement

9    these two exhibits, but to put an onus on us to put together

10    their documents for examination, I think, is, is a bit much.

11         ATTORNEY NUNAN:  I did approach them three mornings

12    ago to talk about this and try to understand.  I did not

13    understand by looking at the face of this what the issue was.

14    We did meet and talk on March 20th, and I addressed there were

15    definitely issues with our exhibits, but I did stop somewhere

16    around 60 or 70 when I was finding that the incomplete

17    documents meant that the blank page after the email.  I

18    thought, You know what?  This is a waste of my time.  I have

19    other things to do.

20         So we went through and identified everything that they

21    said was incomplete at that time for what we've needed so far.

22    We've worked very hard to do that.  I did not understand the,

23    the review aspect of the Excel spreadsheet, and I did bring it

24    up three mornings ago and try to start the process then.

25         THE COURT:  Okay.  Well, you know, in the interest of

1    trying to have all relevant evidence, you know, before the jury

2    in this case, that's why I'm probing a little bit further to

3    see if there's a way that we might still be able to work this

4    out, but it sounds like -- you know, I've heard your point,

5    Mr. Schroeder, you don't think that you're under an obligation

6    to do it and, apparently, it would take too much time to be

7    able to assist in that regard.

8         ATTORNEY SCHROEDER:  Well, just on that point, Your

9    Honor, we went to the nth degree last night to do that for two

10   of the exhibits, okay?  At what point is enough enough in terms

11   of putting together these documents?  And this email was sent

12   on March 20th, and I have a copy for the Court if the Court

13   would like to consider it, enunciating every category.  There

14   were at least ten categories of documents that there were

15   problems with.  That's not -- we spent a lot of time trying to

16   fix plaintiff's exhibits, and, at some point, now you're going

17   above and beyond professional courtesy, I believe, and we've

18   produced these documents, and we've produced them and we put

19   them on notice that they were incomplete.

20        We produced all the metadata.  They asked for the

21   metadata.  I think it's inappropriate to say, Well, they asked

22   for it, and we just couldn't find it.  You have to click on

23   this.  Well, that's what they asked for, and that was our

24   obligation under the rules, and we met that obligation.  And

25   now it's, Well, we can't really locate it.  Can we get some

VOLUME: 9
PAGES: 647-860

1    help to find it?  I'm not going -- we shouldn't be under any

2    obligation to do anything above and beyond what we've already

3    done, which is above and beyond even our obligations in this

4    case.

5            THE COURT:  Okay.  It seems like there's not much I

6    can do here, Ms. Nunan, on this point.  I obviously appreciate

7    your raising it, but, if the exhibit is incomplete, it would be

8    obviously objected to, and I'd be hard-pressed to find a way to

9    allow the exhibit to come in if it's not a complete exhibit as

10   produced, so --

11           ATTORNEY NUNAN:  Can I approach and get those

12   documents?

13           THE COURT:  Of course.

14           ATTORNEY NUNAN:  Okay, great.

15           THE COURT:  Is there anything else to address at this

16   time?

17           ATTORNEY SCHROEDER:  Yes, Your Honor.  We just want

18   to make you aware, though, and we made plaintiff's counsel

19   aware last night at 6:00 o'clock when it became clear that

20   Dr. Chertoff missed her connection from Oregon, that, in light

21   of the fact that we have Dr. Merrens and Ms. Gunnell today, we

22   added Mr. Herrick today instead of tomorrow.  So we put them on

23   notice of that at 6:10 last night.  So that's the lineup today.

24   Mr. Herrick may go before Ms. Gunnell.  But we gave them the

25   lineup last night and wanted to make sure that you understood.

VOLUME: 9
PAGES: 647-860

```
 1        We will put Dr. Chertoff on the stand tomorrow, and my
 2    expectation -- just, I realize wait until the end of the day to
 3    ask this question, but, while we're here, we might as well go
 4    through it.  Dr. Padin and Dr. Chertoff will testify tomorrow.
 5    I do not expect any additional witnesses right now.  I reserve
 6    the right to perhaps supplement later today, but I actually
 7    believe that those will be our last two witnesses and that we
 8    will end our case in chief at that point, I suspect, around
 9    lunchtime, if not sooner.
10            THE COURT:  Okay.  Do the plaintiffs, at this time,
11    anticipate a rebuttal case?
12            ATTORNEY VITT:  We do.
13            THE COURT:  Okay.  Do you have a sense of how long
14    that would be?  So you'd start tomorrow afternoon, potentially,
15    if the defense rests.  Would that carry over into Monday?
16            ATTORNEY NUNAN:  It depends on what time.  I don't
17    know.
18            THE COURT:  Okay.
19            ATTORNEY VITT:  I mean, I don't want to make
20    commitments that we'll absolutely finish.  I don't know how
21    long, you know, when they're going to get done, so --
22            THE COURT:  Yeah.  I'm just thinking ahead about
23    charge conference and things like that.  So I was kind of
24    thinking that this was going, the defense case would end on
25    Tuesday and then with rebuttal we might not be doing a charge
```

1    conference then until Tuesday or Wednesday of next week, but

2    now we're on a more accelerated path, it seems.

3            ATTORNEY SCHROEDER:  I think, Your Honor, when we

4    were talking about when we'd finish, I thought there would a

5    good chance we might finish Monday.  I think, at this point

6    recalibrating, that we'll be done by midday tomorrow.

7            THE COURT:  All right.  We'll take it as it goes,

8    then, or as it comes.  All right.  I think that's all.  I don't

9    have anything for you, so we'll bring the jury in and get

10   going.

11           ATTORNEY SCHROEDER:  Thank you.

12           (The Jury enters the courtroom.)

13           COURTROOM DEPUTY:  Your Honor, the matter before the

14   Court is Civil Case Number 17-cv-194, Misty Blanchette Porter

15   versus Dartmouth-Hitchcock Medical Center, et al.  Present on

16   behalf of plaintiffs are Attorneys Geoffrey Vitt, Eric Jones,

17   and Sarah Nunan.  Present on behalf of defendants are Attorneys

18   Tristram Coffin, Morgan McDonald and Donald Schroeder.  We're

19   here for day nine of a jury trial.

20           THE COURT:  Okay.  Good morning.  Since you left the

21   courthouse yesterday, has anyone spoken to you about the case,

22   or have you learned anything about the case other than what

23   you've heard in this courtroom?  Okay.  Seeing no hands raised,

24   defendant may call its next witnesses.

25           ATTORNEY McDONALD:  Defendants call Dr. Ed Merrens.

VOLUME: 9
PAGES: 647-860

1              DIRECT EXAMINATION BY ATTORNEY McDONALD

2    Q.   Good morning, Dr. Merrens.

3    A.   Good morning.

4    Q.   Welcome back to the witness stand.  We heard from you

5    yesterday, but I don't think I got a lot about your

6    background.  So can we just start off, can you give us a little

7    bit of information about your educational background?

8    A.   How far back do you want to go?

9    Q.   Let's go college.

10   A.   I went to -- I grew up in Plattsburgh, so I spent a lot of

11   time in this area, and I went to Dartmouth college.  Following

12   that, I went to medical school at Dartmouth.  It was Dartmouth

13   Med School at that time.  Now it's the Geisel School of

14   Medicine.  Following that, I trained at the University of

15   Washington in Seattle in internal medicine.  I was chosen as a

16   chief resident, and I served another year as a chief resident

17   at the University of Washington, and then I joined

18   Dartmouth-Hitchcock in 1998.

19   Q.   And have you been with Dartmouth-Hitchcock since 1998?

20   A.   Correct, yes.

21   Q.   Can you give us a sense of the various roles you've held

22   during your time at Dartmouth-Hitchcock?

23   A.   Yeah.  I joined as a general internist in 1998 and grew

24   and developed a new, a whole new practice within internal

25   medicine called hospital medicine.  I started a section.  I

VOLUME: 9
PAGES: 647-860

1    became the section chief of this new section of hospital

2    medicine, taking care of patients in the hospital.  I was

3    involved in the residency program.  I was a medical director in

4    2000.  I led the section and grew it from 4 people, and now

5    it's about 70 people.

6        I became the chief medical officer in 2011 for the

7    hospital, the role that Dr. Padin who has testified before the

8    court held for, and she's a chief medical officer, so I held

9    that role until 2016 when I became the chief clinical officer.

10   Q.   What sort of duties do you have as the chief clinical

11   officer?

12   A.   I oversee really the clinical care delivery across our

13   entire system.  So and we have a number of critical access

14   hospitals, community hospitals, PPS hospitals in both Vermont

15   and New Hampshire and a wide array of community group practices

16   down in southeastern New Hampshire where the real population

17   center is for the state of New Hampshire.  All the chairs, all

18   the chairs, clinical chairs of all the departments, and we've

19   heard about OB/GYN, but we have medicine, surgery, pediatrics,

20   cancer, and centers, again, a center for digestive health, a

21   heart and vascular center, all those leaders report to me.

22       I have a series of chief medical officers across the

23   hospitals and in our own system that report to me:  our

24   information system, informatics, compliance, supply chain, a

25   whole range of things that have physicians engaged in that work

VOLUME: 9
PAGES: 647-860

1    all report to me.  I have a direct report to our chief

2    executive officer, Joanne Conroy.

3    Q.    Thank you.  And I think you testified yesterday.  I want

4    make sure I have this right.  You oversee around 1,500

5    physicians throughout the organization?

6    A.    Correct.  It is a mix.  We have physicians and advanced

7    practitioners.  Those are the professional staff that we think

8    about.

9    Q.    Do you know a Dr. Misty Porter?

10   A.    I do.

11   Q.    And how do you know her?

12   A.    I know her, and I knew her as a doctor within reproductive

13   endocrinology and infertility, and I knew her as a member of

14   the Hitchcock Clinic, the group that we're in, but I really, I

15   met Misty in my role as the chief medical officer really in

16   2012.

17   Q.    And can you describe the circumstances under which you

18   became more familiar with Dr. Porter in the 2012 timeframe?

19   A.    Yeah.  At that time, Dr. Porter was having some challenges

20   working with her chair at the time, Dr. Reindollar.  He was the

21   chair of obstetrics and gynecology and also, I believe, led

22   reproductive endocrinology and infertility, and I think they

23   were having some issues working together and how they

24   collaborated, and I think it was incredibly stressful for her,

25   and she came to me in that role as the chief medical officer to

VOLUME: 9
PAGES: 647-860

1    talk about that.

2        I think it was also a time in her life when she'd been

3    offered a position in Hawaii to take a role there, and that was

4    part of the discussion as well, and I think she was thinking

5    about where she would go with her career, what were the

6    opportunities here, and a range of things.  So this was a

7    discussion about some stress she was having with working with

8    Dr. Reindollar and the work that she was engaged in but also

9    some more broader issues around what was the nature of her

10   career and some decision making.

11       So I think she reached out to me as kind a neutral

12   ombudsman, and that is really the role of the chef medical

13   officer.  I think Dr. Padin talked about that, that in the

14   organization that's someone that physicians can go to if they

15   have concerns, and, even if they're lesser concerns, there's a

16   lot that reports up to the chief medical officer.

17       So she reached out to me.  We had a number of meetings in

18   my office.  I worked to engage someone to help her from outside

19   of the organization, and I think that process that started in

20   2012 went into 2013 around how she could better work with

21   Dr. Reindollar and figure out how things went. So that was the

22   nature of those interactions, those interactions and several

23   meetings.  I think we met maybe three times in my office from

24   September through December of 2012, and I know some of this

25   work continued into 2013.

1    Q.   Thank you.  I'm going to show you a few documents that I

2    think relate to the issue that you just described.  I'd like to

3    talk about them with you if I could.  Can you to flip to

4    Exhibit C which is in the defendant volume, one of the black

5    binders?  Should be Volume 1.

6    A.   I'm just going to read this.

7    Q.   Take your time.

8         THE COURT:  Can we please put that exhibit up for the

9    Court and counsel?

10   BY ATTORNEY McDONALD:

11   Q.   Mr. Howe might need to.  Have you had a chance to review

12   it?

13   A.   I have.

14   Q.   Is this an email that you wrote to Alan Weston and

15   Michelle King on November 1st 2012?

16   A.   I did.

17        ATTORNEY McDONALD:  I'd like to move for the

18   admission of Exhibit C.

19        THE COURT:  Any objection?

20        ATTORNEY JONES:  No objection.

21        THE COURT:  So Defendant's Exhibit C is admitted.

22        (Defendant Exhibit C is admitted into evidence.)

23    BY ATTORNEY McDONALD:

24   Q.   Does this email refer to the issues that you were just

25   describing?

VOLUME: 9
PAGES: 647-860

1    A.    Yes, it does.

2    Q.    Okay.  Line 2 of this email states, "She", and I assume

3    she is Misty, "will not meet with him", being Richard

4    Reindollar, "alone due to past interactions and requests

5    another person to be there".  Did I read that correctly?

6    A.    That is correct.

7    Q.    Do you have any understanding of why Dr. Porter did not

8    want to meet alone with Dr. Reindollar?

9    A.    I think she'd had interactions with him that she felt were

10   not positive.  There might have been an issue of kind of the

11   power differential or -- I wasn't aware of all the issues.  We

12   had developed actually a pretty, I think, a good relationship

13   around these issues, and she actually, I think she wanted me to

14   be at this meeting, and so I think that that's what's being

15   stated.

16              ATTORNEY McDONALD:  I apologize.  Could we publish

17   this for the jury?

18              THE COURT:  Yes.

19   BY ATTORNEY McDONALD:

20   Q.    Thank you so much.  Dr. Merrens, you anticipated my next

21   question --

22   A.    Sorry.

23   Q.    -- which was about -- no, it's great -- which is the

24   sentence that begins with, "Misty has requested my presence".

25   Am I understanding correctly that Dr. Porter wanted you to be

VOLUME: 9
PAGES: 647-860

1    there for the meeting with Dr. Reindollar?

2    A.    Yes.

3    Q.    I'm sorry.  Go ahead.

4    A.    I'm sorry.

5    Q.    No, no, finish.  Go ahead.

6    A.    I just said "yes".

7    Q.    Okay.  And do you have a sense of why she wanted you to be

8    there?

9    A.    I think we had met a number of times, and I think in those

10   discussions she had found me to be neutral, understanding, and

11   a someone that was her advocate for having a discussion, not

12   necessarily knowing all the issues.  Certainly, a discussion

13   that would follow would be a shared discussion around how

14   things work, but mediation, sometimes going into mediation is

15   stressful in and of itself, and you want to bring someone with

16   you who has heard the story and things like that, and,

17   typically, in our organization we have ombudsmans and people in

18   HR that can do that, but I think that, in this case, we'd had

19   several meetings and she wanted me to be engaged.

20   Q.    You referenced mediations.  Were there sort of formal

21   mediations related to this issue?

22   A.    I actually don't know.  I think, I think it, I think what

23   happened there might have been a meeting with HR that happened,

24   and we have people from human resources that are involved with

25   departments and can step in and be there as a, you know, a

VOLUME: 9
PAGES: 647-860

1    patient, you know, employee-relations-related human resources

2    expert, and they usually step in there.

3    Q.   Thank you.  All right.  You can set that one aside.  I'm

4    going to ask you now to look at Defendant's Exhibit B.

5    A.   Are you going to put it up on the screen?  Okay.

6    Q.   It's also in the binder, whatever is easier.

7    A.   The screen is fine.

8           ATTORNEY JONES:  I hat to interrupt, Your Honor, but

9    we're having a hard time hearing you, Morgan.  Can you just do

10   something with the microphone?

11          ATTORNEY McDONALD:  Sorry.

12          THE WITNESS:  Can you hear me okay?

13          ATTORNEY JONES:  You're fine.

14   BY ATTORNEY McDONALD:

15   Q.   And I'll give you chance to review that.  Let me know when

16   you're all set.

17   A.   I've read the two pages.

18   Q.   Great.  Do you recognize this email?

19   A.   I haven't seen it in a while, but, yeah, I sent this, or I

20   participated in this exchange.

21          ATTORNEY McDONALD:  Okay.  Move for the admission of

22   Defendant's Exhibit B, as in boy.

23          THE COURT:  Any objection?

24          ATTORNEY JONES:  No objection?

25          THE COURT:  Okay.  Defendant's Exhibit B is admitted.

VOLUME: 9
PAGES: 647-860

1          (Defendant Exhibit B is admitted into evidence.)

2          ATTORNEY McDONALD:  So, turning to the second page of

3     this document, this appears to be an email from Dr. Porter to

4     you, subject "Meeting with Richard".  And can we have this

5     published to the jury as well?

6          THE COURT:  Yes.

7     BY ATTORNEY McDONALD:

8     Q.   Sorry.  Okay.  And Dr. Porter writes, "Hi, Ed.  I

9     appreciate your kindness and sensitivity in this process", and

10    then skipping a paragraph, the next paragraph says, "I have

11    felt bullied repeatedly by Dr. Reindollar and I have felt he

12    has misrepresented what I have said in the past.  Thus, I do

13    not feel I can meet with him alone".  Did I read that

14    correctly?

15    A.   Yes.

16    Q.   Okay.  Do you remember receiving this email from Dr.

17    Porter?

18    A.   I do.

19    Q.   What was your response to that information?

20    A.   Do you want me to read -- is my response here?

21    Q.   Yeah.  Just generally, did you have a reaction when you

22    received that information?

23    A.   Well, there's a couple things in here, and I forgot the

24    name, but, when we had initially met working with human

25    resources, I put Dr. Porter in touch with Marcia Borling as

1    someone she could meet with and could help with mediation.

2    That was one.  This sounds like it is a new discussion and

3    going forward.  So I hadn't remembered that, that name.

4        Yes.  So I think she wants someone to be part of this

5    discussion and is entering into it with a lot of concerns, and

6    I certainly understood that, and I think, if it -- and I

7    probably am not the right person to be involved in a, in an

8    employee relation case, and we have other people that could do

9    that, but I sensed that she was worried that she was going to

10   go into this meeting and not have the support that I think that

11   she wanted.  I think also in this exchange -- yeah.  That's

12   probably my answer.

13   Q.   And, if you turn to Page 1 of this document, underneath

14   the piece that says "Original message sent on November 1, 2012

15   at 6:08 p.m.", Dr. Porter writes, "It's hard for me to see how

16   you would not be neutral".  Did I read that correctly?

17   A.   You did.

18   Q.   So fair to say, in the 2012 timeframe, Dr. Porter felt

19   that you could be a neutral person that might be able to assist

20   with conflict with her colleagues?

21   A.   Yes.

22   Q.   Set that one aside.  I'll ask you now to turn to Exhibit

23   D, please.  I'll give you a moment to review that as well.

24   This is a few pages, so I'm not sure if it would be easier to

25   look in the binder for you.

VOLUME: 9
PAGES: 647-860

1    A.    Which binder is it?

2    Q.    It is defense binder.  Should be Volume 1, one of the

3    black binders.

4    A.    E?

5    Q.    D, as in dog.

6              THE COURT:  And can that be placed up on the screen?

7    Thank you.

8              THE WITNESS:  So I'm just -- the more recent stuff is

9    the first part, and you have to go back and see the start of

10   it.

11   BY ATTORNEY McDONALD:

12   Q.    Yeah, it might be helpful to review it from the back

13   forward.

14   A.    Okay.  I have read the documents.

15   Q.    Do you recognize this email?

16   A.    I do.

17   Q.    Is this an email chain with the top email being sent from

18   Dr. Porter to you in December of 2012?

19   A.    Correct.

20             ATTORNEY McDONALD:  Move for the admission of

21   Defendant's Exhibit D, as in dog.

22             THE COURT:  Any objection?

23             ATTORNEY JONES:  Assuming it's just this one page, no

24   objection.

25             ATTORNEY McDONALD:  There are four pages.

1          ATTORNEY JONES:  Okay.  I only see one right here.

2          ATTORNEY SCHROEDER:  You have Defendant's Exhibits.

3          ATTORNEY JONES:  I don't have my notebook right here.

4     No objection.

5          THE COURT:  Okay.  Exhibit D is admitted.

6     (Defense Exhibit D is admitted into evidence.)

7          ATTORNEY McDONALD:  Could we have that published for

8     the jury, please?

9     BY ATTORNEY McDONALD:

10    Q.   So, turning to the third page of this document, there is a

11    reference to a mediation that is to take place in December.  So

12    was that what we discussed before?

13    A.   Yeah, I think there was going to be a process of a

14    mediation.

15    Q.   Okay.  And it says, "Scope, the purposes of the mediation

16    are to improve the working relationship between Dr. Reindollar

17    and me", and this is written by Misty Porter, "and to improve

18    the working relationship between Dr. Reindollar and staff".

19    Did I read that correctly?

20    A.   Yes.

21    Q.   And in the email above that there is some discussion about

22    whether legal counsel should be involved in this process.  Do

23    you have a memory of that discussion?

24    A.   The discussion, I think, occurred -- I can't remember if

25    we met.  There was some, some reference in here to a

1    discussion.  At this point, I considered this a

2    workplace-related issue that we would talk about and use HR.  I

3    didn't see this as a legal issue, and I, I, the issues that we

4    had discussed I didn't recognize as legal issues.  They were

5    how people interact, how people feel about those interactions,

6    how we can work better together as a team.

7        That was how I viewed it, and I thought getting a mediator

8    to bring people together, I didn't see this as a legal process,

9    and I think these emails are the first time this is being

10   raised as a legal, something that would, that would evolve to

11   be a legal claim or a legal process involving an attorney.

12   Q.   Dr. Porter wanted to be represented by a legal counsel in

13   this mediation; is that correct?

14   A.   That, that is correct.

15   Q.   And do you have an understanding as to who her legal

16   counsel was at that point?

17   A.   I think she stated that Attorney Vitt was her

18   representative counsel.

19   Q.   Thank you.

20   A.   This, the only other thing is that there's references

21   about Elizabeth Todd.  I hadn't met with Elizabeth Todd, and

22   the discussions that Dr. Porter and I had I don't think

23   involved Elizabeth Todd.  There may have been discussions about

24   the, the bigger team.  I was really focused on Dr. Porter and

25   what she was representing.

VOLUME: 9
PAGES: 647-860

1    Q.    And I think you're referring to the final paragraph on the

2    third page, correct?

3    A.    Yes.

4    Q.    And that says, "Elizabeth Todd and I will attend the

5    mediation.  I assume that Dr. Reindollar will attend as well.

6    Elizabeth Todd and I are represented by Geoffrey Vitt, and we

7    would expect him to attend".  Did I read that correctly?

8    A.    That's correct.

9    Q.    Thank you.  Dr. Merrens, you can set that one aside.  Do

10   you have any memory as to whether this particular conflict was

11   ever resolved?

12   A.    I actually don't.  I don't.  I set the wheels in motion in

13   terms of discussions and where things went and a discussion

14   that would happen.  Somewhere in the midst of this, the woman I

15   referred to, Marcia Borling, had a devastating stroke, and that

16   may have disrupted some of the work that was happening as she

17   wasn't able to participate in the mediation process.  But I, I

18   believe that, by virtue of the discussions that I had with Dr.

19   Porter that we had really activated the human resources

20   component.  The chief of human resources was involved.

21   Michelle King, who worked in human resource, was also involved.

22   We had the mechanism of understanding within employee relations

23   and human resource that, I think we have a problem here, and I

24   expected they would pick this up and kind of continue to work

25   with it.

1    Q.   Subsequent to this issue that was in the 2013 timeframe,

2    did you continue to have frequent interactions with Dr. Porter?

3    A.   I did not.

4    Q.   How often would you see Dr. Porter subsequent to that?

5    A.   I didn't.  I mean, I would see Dr. Porter maybe walking in

6    the hallway or in the cafeteria, but we didn't have any regular

7    or any kind of interactions.

8    Q.   Did you have any understanding as to what was happening

9    with her practice in the 2013 to 2017 timeframe?

10   A.   Related to her practice, the only thing that I was aware

11   of was that, at some point, Dr. Porter was out on partial and

12   then long-term disability.

13   Q.   Did Dr. Porter ever reach out to you with a complaint

14   about Dr. Hsu or Dr. Seifer?

15   A.   She did not.

16   Q.   Switching gears a little bit, as you know from watching

17   the testimony in this trial, the REI division closed in the May

18   of 2017 timeframe, correct?

19   A.   Correct.

20   Q.   At the time of the closure of the REI division, did you

21   have any knowledge as to the nature of Dr. Porter's illness?

22   A.   No, I didn't.  I had no, no knowledge of her illness then

23   or when I was deposed.  I only learned the nature of her

24   illness when it was in the "Valley News" two weeks ago, shared

25   with them, and then what's been shared in the trial.  I had no

VOLUME: 9
PAGES: 647-860

1    knowledge of any aspect of her illness or reason for needing to

2    be on leave.

3    Q.   No, no knowledge as to the specifics of her course the

4    care?

5    A.   None whatsoever.

6    Q.   Okay.  And would it be abnormal for you to not know about

7    a particular clinician's leave of disability in your role?

8    A.   I would not -- you know, I would never need to know the

9    reason for someone being on leave or disability, and I might

10   not know in the, of all the sections, all the departments,

11   hospitals who might be out on disability.

12        You know, it came at a time for this division in which we

13   were hiring new people and, and, you know, even in the, even

14   early on staffing was a challenge.  And so I knew in the

15   context of meeting with Dr. DeMars that there were staffing

16   issues and that Dr. Porter was on leave for a period of time.

17   So that's the only context that I, that I knew about it.  I

18   knew that we had recruited a new physician, Dr. Albert Hsu, but

19   I didn't, I didn't -- I knew nothing about the details of her

20   disability.

21   Q.   How often did you interact with Dr. Hsu?

22   A.   I didn't interact with Dr. Hsu.

23   Q.   Did you ever meet him in person?

24   A.   I did not.  I met him on May 4th when we announced to the

25   individual members of the division that we were closing the

1    division.

2    Q.    Prior to the decision to close the division, were you

3    aware of any patient concerns about Dr. Hsu?

4    A.    I was not.

5    Q.    In the months preceding the closure of the REI division,

6    were you aware of concerns about Dr. Hsu from any of his

7    colleagues, any other providers at Dartmouth Health?

8    A.    I was not.  I think that the only concern that was raised

9    was there was a time in which he was the solitary reproductive

10   endocrinology and infertility physician in the division and was

11   struggling with completing his documentation.  That came up in

12   conversations with Dr. DeMars.  I believe Dr. Hsu reached out

13   to me saying, I'm buried in documentation and trying to keep up

14   with things.  I can't remember.  I mean, we had implemented a

15   pretty strict guideline around completing notes and

16   documentation, and every week we -- so I think he was, he was

17   getting behind.  I believe Dr. DeMars mentioned this and he

18   reached out to me personally, and I think they were working

19   with him on note completion.  That was all I knew about

20   Dr. Hsu.

21   Q.    So it's safe to say that you weren't aware of any report

22   that Dr. Hsu had performed a procedure without patient consent?

23   A.    Absolutely not.

24   Q.    Or any report related to fraudulent billing practices?

25   A.    No, none whatsoever.

1    Q.    Do you recall seeing evidence in this trial of an

2    eleven-page letter that Dr. Porter wrote about Dr. Hsu?

3    A.    I do.

4    Q.    Had you, at the time you made the decision to close the

5    REI division, had you seen this letter?

6    A.    I had not.

7    Q.    Had anyone made you aware of that letter, the existence of

8    that letter?

9    A.    No.  I had never seen it nor aware of its content.

10    Q.    Do you know where Dr. Hsu is working now?

11    A.    Dr. Hsu is now the IVF medical director at the University

12    of Cincinnati, part of their women's health division.  I don't

13    know how long he's been there, but he's associate professor and

14    works -- I think they have three centers in Cincinnati.

15    Q.    Turning now to Dr. Seifer, have you ever met Dr. Seifer?

16    A.    I only met Dr. Seifer on May 4th when we closed the

17    division.

18    Q.    At the time of the closure of the division, were you aware

19    of any specific concerns from patients about Dr. Seifer?

20    A.    None whatsoever.

21    Q.    Any specific concerns from Dr. Seifer's colleagues?

22    A.    None.

23    Q.    Do you know where Dr. Seifer is working now?

24    A.    I believe he's at Yale in their reproductive endocrinology

25    and infertility division.

VOLUME: 9
PAGES: 647-860

1    Q.   Do you have any knowledge of whether any malpractice

2    claims were brought against Dr. Hsu or Dr. Seifer during their

3    time at Dartmouth Health?

4    A.   There have been no claims whatsoever.  We're a

5    self-insured program.  I'm actually the president of our

6    malpractice group.  We're entirely self-insured.  We have no

7    claims from the period of time that kind of we've been

8    discussing in this courtroom, like 2013 to the ending of the

9    program in 2017, none that have been made, none that are

10   pending.

11   Q.   Thank you.  Are you familiar with the Value Institute at

12   Dartmouth Health?

13   A.   Yes.

14   Q.   Can you describe what that is?

15   A.   The Value Institute is kind of an internal consulting

16   group led by people that are experts in process, identifying

17   problems, solutions, and kind of pathways.  So there's all this

18   work in the business and manufacturing industry around Lean Six

19   Sigma and black belt.  Really what it is is, like, How do you

20   understand production systems?  And it really grew out of

21   Toyota's production system around how processes can be very

22   efficient and anyone can kind of pull the cord to stop things

23   and do things.

24        So, at any rate, we developed our own internal kind of

25   team of black belts that could come into a department, a

1    section, an area and understand what's working well in here, of

2    what's not working well in here in terms of patient care

3    delivery, how an operating room flows, how people work

4    together.  So it's, nd it's really getting that group to kind

5    of go through, How do things work in your division?

6        And it's sometimes triggered by, Gosh, we need help, and a

7    lot of people can do that.  We might have a practice manager or

8    a director or a VP say, We really need to get the Value

9    Institute in here to kind of get someone to understand things,

10    and they can bring a lot of resources and understanding in

11    terms of kind of everything.  It's really designed around how

12    teams can function and ultimately deliver really good care.

13        So we've been doing this for a number of years, and we

14    have the other thing that the Value Institute does is it trains

15    people in value, kind of, this kind of training.  So we have

16    our own -- you can be a yellow belt, a green belt.  You do

17    projects around efficiency and quality and safety and teams and

18    dynamics and things like that.

19        So we train people as part of this as well, but we've got

20    an expert team that comes in.  I mean, there are organizations

21    nationally that will do this.  You can bring in an organization

22    to kind of look at your processes as a consultant, and we've

23    really developed this internally.  It's been actually a really

24    great asset.  You seldom have the opportunity to kind of

25    reflect on things.

VOLUME: 9
PAGES: 647-860

1    They come in sometimes just to actually look at really

2    good process like, How are you able to do this, and could we

3    extrapolate that to other areas?  And sometimes they come in

4    when there is like things aren't going well, and this is what

5    we're seeing, but sometimes what you're seeing isn't exactly

6    why it's, the reason why it's happening, and they can, they can

7    look at the processes.  So that's, that's what the Value

8    Institute it.

9    Q.   Do you know whether the Value Institute ever became

10   involved with the REI division?

11   A.   Yes.

12   Q.   And how do you know that?

13   A.   So I've been, you know, part of my work as well is working

14   with the other executive leaders in the organization.  So all

15   the -- we have a small team of vice presidents.  One of them

16   was Daniel Herrick.  So I was aware that that team and working

17   with Heather Gunnell, who was the director in OB/GYN, that they

18   had engaged the Value Institute, I'm thinking, maybe in the, in

19   2016, 2017.  I'm not sure of the dates, but they had reached

20   out.

21        It wasn't at my behest.  It was, they had reached out to

22   engage with them, and Daniel had, Daniel, who I met with kind

23   of regularly to touch base on a range of things, he covered the

24   enter perioperative service, both at the hospital and some of

25   the system, but all of the surgical services.  So I was aware

1     that they were engaged in some way.

2     Q.   When you said they reached out, did you mean that the

3     Value Institute reached out to the REI division or the REI

4     division reached out to the Value Institute?

5     A.   I think that it is my understanding that the leadership in

6     the department, likely Heather Gunnell and Daniel, reached out.

7     That's my understanding of how it worked.  And what happens is

8     there's an intake process where someone says okay, and then

9     they decide who is going to, how are they going to staff it,

10    how are they going to schedule it?  They do things in the form

11    of retreats where they actually kind of pick you up and have

12    you meet in a conference room kind of thing, but I wasn't aware

13    of anything that happened there.

14         I believe it was Heather and probably Daniel who was

15    involved in that.

16    Q.   And do you have a sense of what the goal of that

17    particular interaction was, or would that be a better question

18    for maybe Daniel?

19    A.   I'm not sure of what the question was.  A rough, you know,

20    from my perspective talking with Daniel is that they were at a

21    time even before the Value Institute was involved.  And I

22    didn't know this at the time, but we've talked about this is

23    that they had began -- they had trouble, they had trouble with

24    staffing, and they were putting a pause on patients coming in,

25    and there were certainly issues that were happening with the

1     team in terms of coordinating of patient care, and I think it

2     was with that outreach they said, We need to figure out how we

3     can do things.

4          So I think it was my understanding at a really high level

5     is like, we have a patient care, scheduling, team coordination,

6     working together kind of issue, and how can we, how can we get

7     some insights into this?  And I think early in 2016 we were

8     struggling with nurses.  We heard about nurses leaving, how

9     that was going to work, the amount, you know, and that was,

10    that was one of the growing concerns that was happening.  So I

11    think that was part of it, but I wasn't, I didn't request it,

12    and I wasn't part of the process of working with the Value

13    Institute.

14    Q.   And you said, We were struggling with nurses.  Did you

15    mean the entirety of the hospital system, or are you referring

16    to the REI division?

17    A.   I think everyone has said that we're all struggling,

18    struggling with nurses.  The nurses are the most important

19    people within the patient care paradigm in any hospital.  24/7

20    nurses are working in the hospital and are essential components

21    of the clinic.  They're highly specialized.  They require a lot

22    of training.  And I think my understanding was that, especially

23    in REI, we were losing people.  Some people had left, had been

24    asked to leave, had retired, and we were not able to recruit

25    the people to step in and be trained in those roles.  That was

VOLUME: 9
PAGES: 647-860

1    my very generalized understanding of kind of what was

2    happening, especially in REI.

3    Q.    Did you ever receive information about findings or

4    conclusions from the Value Institute with respect to their

5    interactions with the REI division?

6    A.    I didn't receive a formal document.  I had discussions

7    primarily with Daniel Herrick, who was the VP, around some of

8    the initial findings and perspectives on things.

9    Q.    And what did Mr. Herrick share with you about those

10   findings?

11   A.    I think the sense after a number of meetings that, that

12   there were some significant issues in terms of how this group

13   of physicians worked together or don't work together, how we

14   could or could not collaborate as it relates to protocols or

15   patient care, and that tenor and tone made it difficult to

16   recruit nurses to work in that group, and we would recruit

17   people, but we were worried about retention in that area.  And

18   maybe the fact that we couldn't recruit nurses was a symptom of

19   something much larger in terms of a group that had, were not

20   working well together, complete dysfunction in terms of how

21   they worked with each other, mentored each other, shared

22   patients, did things, even agreed on things.

23        I think one of the things was the lack of agreement around

24   how to do things, and I think, you know, these were all really

25   good people, I mean, these are talented people, gone on to do

1    great things and but couldn't work with each other.  And I

2    think that was echoing through the rest of the division and

3    their ability to kind of schedule patients, as we heard, but

4    also just be able to recruit nurses who want to be part of a

5    bigger team.

6        If there's anything that we recognized, and I recognize

7    this as a health care leader, is that what we do is team

8    support.  It's not the great physician.  It's actually the

9    great team, and that goes down to, like, the scheduler, the

10    secretary, the counselor.  It's how we all work together, and,

11    if we're ever going to deliver, you know, care that doesn't

12    have a lot of variation and a lot of exceptions, we have to do

13    it together.  And I think my sense was that was a real

14    challenge with that group, a significant challenge.

15    Q.    Do you know whether Dr. DeMars was involved with the Value

16    Institute's interactions with the REI division?

17    A.    I don't know.

18    Q.    Okay.  You testified both today and yesterday that you

19    made the decision to close the REI division.  What information,

20    if any, did you rely on in making that decision?

21    A.    Well, I made the decision, and I think that that came

22    after some understanding of what came out of a series of

23    meetings where after, after some discussions with the Value

24    Institute and discussions with Heather Gunnell, Daniel Herrick,

25    and Leslie DeMars, it became clear that, not only were we

VOLUME: 9
PAGES: 647-860

1    unable to hire nurses as kind of the last straw, that we had a

2    team that couldn't work together and couldn't provide effective

3    care for our patients, and that's what, you know, what brought

4    about the decision.

5        I think there was discussion about how this could happen

6    that preceded meeting with me, and I think there was efforts,

7    and I think we certainly heard from Dr. DeMars that her intent

8    was just to close the in vitro fertilization component of it,

9    but, when I looked at the sum total of work, it was the same

10   team working in reproductive endocrinology, working doing

11   surgery, doing procedures, doing ultrasound, seeing patients in

12   clinic that were doing the IVF.

13       And, you know, a little bit of my own, you know, putting

14   things together is that I was not able, after lots of

15   discussions, to kind of separate, Well, in vitro fertilization

16   is just something else.  You know, we can stop doing that, but

17   we can continue doing this, because -- and I couldn't get

18   beyond the because.  Because this team works well together?

19   This is a completely dysfunctional area of people that don't

20   agree on anything, and no one wants to work with them.

21       So I was unwilling -- you know, I am not an expert in

22   hysteroscopy, myomectomy, IVF, dual lumen chamber.  You know,

23   I'm not an expert in that, and I don't pretend to be.  I am an

24   expert in how you lead a health care system, how you work with

25   people, how effective teams can come together and ultimately

1    provide incredible patient care.  That's what I know.  And,

2    from everything I heard -- I heard from Dr. DeMars.  I heard

3    from Heather Gunnell.  I heard from Daniel Herrick -- there was

4    no way this team could continue providing safe and effective

5    care in any manner, both in REI and IVF, and I made that

6    determination and decided to end the program.

7    Q.   So I think you just said that you, in conversations with

8    Dr. DeMars and Dr., excuse me, and Daniel Herrick and Heather

9    Gunnell you got information pertaining to the decision to

10   close.  Can you just give us some understanding of who Daniel

11   Herrick is?  You started to speak about him a little bit

12   earlier, but can you just describe his role?

13   A.   So Daniel was -- he subsequently retired -- was our vice

14   president.  We had a handful, maybe four vice presidents in the

15   organization, that oversaw various enterprises, ambulatory

16   care.  He oversaw all the surgical departments and the

17   perioperative environment.  And so he was the person that

18   Heather Gunnell reported to.  He was the person that -- so he

19   was, and, in addition to being a VP and kind of the person that

20   saw the big picture of things, actually, you know, one of these

21   people who had started Value Institute, had been involved and

22   was really skilled in kind of, you know, these kind of

23   processes.  He brought fishbone diagrams to every discussion

24   that we had and was really involved in kind of that process.

25   So he had that additional expertise.

VOLUME: 9
PAGES: 647-860

1        I would meet with Daniel regularly around a range of

2    things, surgical programming, productivity of organizations,

3    what we could do at other hospitals.  So he was, he was totally

4    aware of things that were happening in this area.

5    Q.    And did he, Daniel Herrick, have a recommendation as to

6    whether the REI division should be closed?

7    A.    He did.

8    Q.    And what was his recommendation?

9    A.    I think his recommendation was that the entire division

10    should be closed.

11    Q.    And he told that to you?

12    A.    Yes.

13    Q.    You also said that you spoke with Heather Gunnell about

14    this issue.  Did she have a recommendation as well?

15    A.    I think she felt similarly.

16    Q.    Did you trust Ms. Gunnell's judgment?

17    A.    I did.

18    Q.    And how about Mr. Herrick's?

19    A.    Yes.

20    Q.    What was Dr. DeMars's role in these conversations?

21    A.    Dr. DeMars was the chair of the department, the interim

22    chair, and had been deeply involved in all these discussions.

23    There was lots of meetings that happened without me, so these

24    people met and discussed.  I think her approach and her

25    perspective were complicated.  There were things that she knew

1    that were never represented to me.  There were things that

2    occurred that she was aware of that were never shared with

3    anybody.

4         But, even though I didn't know things, I had already lost

5    my trust and faith in her as a leader, and she had a

6    perspective, and she was very adamant that she wanted to close

7    IVF but maintain REI, but I didn't see the thesis and the way

8    you would come around to that conclusion.  So I listened to

9    her.  I heard her recommendations and took those

10   recommendations and appreciated her thoughtful perspective on

11   things, and I wasn't dismissive in any way, but I had

12   completely lost faith in her as a leader, which really led to

13   me asking her to step down shortly afterwards.

14   Q.   Yesterday Mr. Jones asked you to read from a portion of

15   your deposition and suggested that you testified that

16   Dr. DeMars recommended closure of the division.  Do you

17   remember that interaction?

18   A.   Part of it, yes.  Yeah.

19   Q.   Did Mr. Jones allow you to read the entirety of your

20   answer?

21   A.   No.  It was just a, it was the first sentence, but there

22   was a, there was more to that.  I think -- I can't remember if

23   it was an email or a statement.  There was more to that.  I

24   tried to say it.

25   Q.   Do you recall the specifics of your statement in the

1    answer that was not complete?

2    A.   I, there was a part about recommendation, I think.  I

3    don't have it in front of me, but I think it was that,

4    ultimately, I made the decision and that was a part that I,

5    that wasn't referenced in the question.

6    Q.   Would it refresh your recollection if I showed you the

7    deposition testimony that we reviewed?

8    A.   I think anything you show me will help with my

9    recollection.

10           ATTORNEY McDONALD:  May I approach?

11           THE COURT:  Yes.

12   BY ATTORNEY McDONALD:

13   Q.   So Mr. Jones was referring to Page 21, Lines 24 through

14   Page 22, Line 8, if I could just ask you to read that, please.

15   A.   I'm sorry.  You want me to read through, read what, where

16   to where?  So Leslie was the chair the of the --

17   Q.   The question beginning at Line 24.

18   A.   Okay.  Am I -- so:

19           "Q.   Sure.  What was Dr. Leslie DeMars's role in the

20   decision to close the REI division?

21           "A.   So Leslie was ultimately the person that made

22   the decision, that made the announcement to the group.  This

23   was a decision that we supported after looking at the

24   information.  Ultimately, this was my decision, but her role

25   was really kind of, to kind of understand all the information,

VOLUME: 9
PAGES: 647-860

1    discussions that we had, and had to be able to convey this to

2    the department after a lot of careful thought."

3    Q.   Thank you.

4            THE COURT:  And is that ID4?

5            ATTORNEY McDONALD:  Apologies.  That is ID4.

6            THE COURT:  Okay.  Thank you.

7    BY ATTORNEY McDONALD:

8    Q.   In any of these discussions that we've just talked about

9    with Ms. Gunnell, Mr. Herrick, or Dr. DeMars, did the subject

10   of Dr. Porter's disability ever come up?

11   A.   Never.

12   Q.   Did the subject of complaints Dr. Porter made about

13   Dr. Hsu or Dr. Seifer ever come up?

14   A.   They did not.

15   Q.   Who made the decision to terminate Dr. Porter?

16   A.   I made the decision to close the division and terminate

17   the employment of three physicians, including Dr. Porter.

18   Q.   Was anyone else terminated in connection with the closure

19   of the division?

20   A.   Just Dr. Seifer and Dr. Hsu, in addition to Dr. Porter.

21   Q.   I'm going to ask you to take a look at Plaintiff's Exhibit

22   63, and that document has been admitted, so I'll ask that to go

23   to be published to the jury.

24       Do you recall Mr. Jones showing you this document

25   yesterday?

VOLUME: 9
PAGES: 647-860

1   A.   I do, yes.

2   Q.   And do you recall Mr. Jones pointing to a reference to an

3   inability to maintain highly specialized resources?  And I

4   believe that that was on the page with the Bates number ending

5   in 10541.  I can give you a hard copy if that would be easier.

6   A.   It's on the screen.  Just tell me where.

7   Q.   I believe Mr. Jones referred to the second bullet point on

8   this page.  Do you recall that?

9   A.   Yes.

10  Q.   And Mr. Jones noted the absence of any reference to

11  dysfunction in the department as between providers, correct?

12  A.   Correct.

13  Q.   Can you provide us with some context for this document?

14  A.   The document that we talked about yesterday was a document

15  that I worked on with, with Dr. DeMars and people from the

16  division, as well as Steve Woods from employee relations.  It

17  was really the script around the decision had been made.  It

18  was not around the details of anything that went into the

19  decision being made.  It wasn't a discussion.  It was an

20  inability to maintain a highly specialized clinical resource.

21  It was really a description of everything that we couldn't

22  maintain, the people, the processes, the nurses.

23       So this was really, at a high level, the decision has been

24  made and these were the talking points.  It wasn't a discussion

25  about or anything that we had that had been part of our

1    decision making.

2    Q.    Any particular reason why this document does not

3    specifically state interpersonal conflict or communication

4    issues?

5    A.    That may have -- this document isn't designed to highlight

6    those issues.  You know, it's at my discretion to kind of ask

7    as we think about how we want to talk with people around

8    things.  It is not to vet every little single thing.  I'd made

9    a decision to close this program and wanted to highlight that,

10   you know, we couldn't maintain on many levels the ability to do

11   things well. That was the, that was the point that needed to be

12   made.  It wasn't a discussion of, Hey, I want to discuss every

13   one of these little points.

14        And the information we sometimes share, that I sometimes

15   share in communications has to be based on the recipient in a

16   lot of ways.  Like, if a nurse emails me, I might reply in a

17   way that a leader of a health organization might reply that is

18   supportive.  It might be appreciative.  It may be very

19   different from the underlying thinking or the decisions that

20   everything that has gone into the decision making.

21        So I think communications and emails and texts are really

22   important in this case.  It belies the fact that much of our

23   work, like you do when you approach the judge, is done in

24   consultation, in coordination and discussion, and a lot went

25   into this.  So this document was some talking points that we

1    had for discussion where we informed people for the first time

2    that we were ending a program and ending their employment.

3    Q.    Just for some context, Dr. Merrens, was that the first

4    time that you had to make decision to terminate the employment

5    of physicians in the organization?

6    A.    No.

7    Q.    Had you had to do it on multiple occasions prior to this?

8    A.    Yes.

9    Q.    So you were sort of familiar with how to handle a

10   situation like this?

11   A.    Correct.

12   Q.    On this page with the Bates label 10541, there is a note

13   that we will be meeting, at the very bottom, "We will be

14   meeting with each of you individually to discuss your unique

15   situation".  Was this the case for all three physicians --

16   A.    Correct.

17   Q.    -- that were terminated?

18   A.    Yes.

19   Q.    Each of Dr. Hsu, Dr. Seifer, and Dr. Porter all received

20   an individual meeting?

21   A.    Yeah, we met with them.  Dr. DeMars, Steve Woods from

22   employee relations, and myself met with them -- I think it was

23   in the conference room or the library in the department of

24   OB/GYN.

25   Q.    And can you tell us or describe the meeting with Dr.

VOLUME: 9
PAGES: 647-860

1    Porter?

2    A.    Dr. DeMars did the talking, described that we were -- it

3    was a pretty brief meeting.  She described that we were ending

4    the REI program, the entire program, and that we were

5    terminating the employment of the physicians, including Dr.

6    Porter, and there would be time and date and we would offer

7    severance and we would offer outplacement support and things

8    like that.

9         I made it really -- one of the things that I clarified for

10   myself going into the meeting is that this -- at the time, Dr.

11   Porter was on long-term disability, and I wanted to make it

12   clear in this meeting, while this was a termination and ending

13   the program, it had no impact on her long-term disability, and

14   I mentioned that in the meeting.  Had no impact.  It was --

15        So I, I actually had reached out to our chief human

16   resource officer just to make sure of this because it was so

17   important.  Didn't want it to -- it is a shock enough to end a

18   program, and I'm sensitive enough to know that this is a big

19   impact on people, but I also wanted to understand all the, be

20   clear about the implications of a federal program and the

21   protection was not reliant on employment, so I mentioned that.

22   Q.    What was Dr. Porter's reaction?

23   A.    I think Dr. Porter was very quiet, like all the

24   physicians, I think was shocked.  These were brief meetings.

25   It wasn't an opportunity -- there wasn't a, you know, there

1    wasn't really any discussion.

2    Q.   And you mentioned, I think, support services were offered

3    to Dr. Porter and to the other physicians.  Do you have any of

4    the details of those?

5    A.   You know, I think that part of this was we would offer

6    counseling and outplacement services, like if we wanted to

7    engage them with a headhunter and be able to help them find

8    employment.  I think that was those kind of services following

9    the termination.

10   Q.   Thank you.

11   A.   I think that the other thing that all of them would be

12   provided six months of severance as part of this, this deal so

13   that they would still be paid for six months while they engaged

14   in the process of finding another job.

15   Q.   Do you know whether Dr. Porter accepted the six months'

16   severance?

17   A.   No.  I know that she met with our chief human resource

18   officer and was then offered nine months of severance.  I think

19   Amy Giglio -- now she's Amy Claiborne -- met with her and made

20   the decision to offer her a longer period of severance.

21   Q.   Okay, thank you.  I'll ask you now to turn to Plaintiff's

22   Exhibit 79, which is another document that Mr. Jones showed you

23   yesterday, and this has been entered into evidence.  So if I

24   could just ask that it be published to the jury.

25              THE COURT:  Yes.

VOLUME: 9
PAGES: 647-860

1     BY ATTORNEY McDONALD:

2     Q.    Do you recall Mr. Jones showing you this document?

3     A.    Yes.

4     Q.    And I'll give you a moment to review.  I apologize.

5     A.    Yeah, thanks.  Yeah, I've read it.

6     Q.    Who are the recipients of this email?

7     A.    That's a good question.  It went to, it went to a range of

8     people in the department.  I'm actually not completely sure who

9     the friends of OB/GYN are.  I think I was not the -- it didn't,

10    it came -- I think communications probably helped with the

11    department, like things the department probably worked with our

12    communications team to kind of like make sure it got out to a

13    lot, all the people that would, that would want to know that

14    we'd made this significant change.

15    Q.    A number of people received this email, correct?

16    A.    Yes, yes.

17    Q.    And did you feel an obligation to provide this group of

18    people with each and every one of the reasons that the REI

19    division closed?

20    A.    I think I felt a desire to clarify and provide a little

21    bit more information around kind of what the next steps would

22    be.  I think this group was primarily concerned with, like,

23    What do, what about our patients, and what about the rest of

24    our dedication to reproductive health and women's care?  There

25    are always things that end up in the news, and we didn't put

VOLUME: 9
PAGES: 647-860

1    out a news article around this.

2         So it was, it was also put out at a time where we spent --

3    and I think this team did a, did a lot of work contacting women

4    and tried as much as possible by phone around the upcoming

5    changes -- people had appointments, or some were in a variety

6    of cycles or things like that -- to contact people.  So it was

7    some clarification and more information to the group.

8    Q.   Okay.  I'd ask you now to turn to Plaintiff's Exhibit 60.

9    That one has also already been admitted, so if that could be

10   published to the jury as well.  You all set reading it?

11   A.   I've read it, yes.

12   Q.   Thank you.  And Mr. Jones pointed to the paragraph that is

13   roughly in the middle of Page 1 where you state that, "On the

14   surface, we are pinning the dissolution of the REI program on

15   our failure to maintain and recruit nurses for this work, there

16   is ultimately a dysfunction of the physicians who worked in

17   this area for years, as well as recent hires, and ultimately a

18   failure of leadership for which I hold Leslie fully

19   accountable".

20        Can you explain why you did not want the dysfunction of

21   physicians who worked in this area for years to be the public

22   story?

23   A.   Well, I may have said it yesterday.  I'm not sure.  I was

24   frankly embarrassed that we'd gotten to a point in which we had

25   completely, we had people that couldn't relate to each other,

VOLUME: 9
PAGES: 647-860

1    couldn't coordinate and had gotten to the point we couldn't

2    hire nurses.  I was embarrassed as an organization we had

3    gotten to this point.  You know, the nursing issue is not like,

4    Oh, there's a shortage of nurses, and let's get a traveler,

5    we'll hire this person, we'll rehire this person.

6         This was a completely broken division.  We had silos.  All

7    these terms.  People didn't agree.  We couldn't even figure out

8    how to agree on how to do an intake form.  We couldn't agree on

9    protocols, whether to us a stylette or not or how to do certain

10   things.  And that rippled through, and it was clear that these

11   people couldn't work together, and in that context we couldn't

12   hire nurses and that was the, that was the thing that was hard.

13        I didn't feel obligated in any way to share with the media

14   that, Hey, by the way, we have, we have a dysfunctional group

15   of physicians, talented, you know, ultimately going to be

16   really successful, but they cannot work together, and it's

17   impacting what we can do.

18        I didn't know a lot of other things that were happening.

19   I could just get the sense this was not working.  So I was

20   embarrassed that we got to that point, and I, also, this was a

21   failure of leadership, and I recognized that at that point as

22   well.

23   Q.   Thank you, Dr. Merrens.  Moving forward in time a little

24   bit, you had your deposition taken in the case, correct?

25   A.   Correct.

VOLUME: 9
PAGES: 647-860

1    Q.    And do you remember when that was?

2    A.    I'm going to say the summer of 2019.

3    Q.    Does July 30th of 2019 sound right?

4    A.    That's exactly the date I was thinking.

5    Q.    Great.  And, in the course of your deposition, were you

6    shown evidence of complaints that other providers in the REI

7    division made about Dr. Hsu and Dr. Seifer?

8    A.    I was.

9    Q.    Had you ever seen those reports and those documents prior

10   to your deposition?

11   A.    I had not.

12   Q.    I'll ask you to take a look at Plaintiff Exhibit 23.  I

13   believe this one is in evidence, but I'll just ask -- thank

14   you.  So can we have this published to the jury as well?  I'll

15   ask you to take a moment to review that.

16   A.    Should I be looking at the left, or which one?  It's not

17   the one on the right, is it, or is that part of it?

18   Q.    It looks like the one on the right is not part of it.

19   A.    Okay.

20   Q.    Look at the one on the left.

21   A.    Okay.

22   Q.    There is a second page so it might make more sense to look

23   at the hard copy in your binder.

24   A.    Okay.  I'll look at this.

25   Q.    We might be having technical difficulties.

1     A.    I have finished reading.

2     Q.    Is this an email from Judith McBean?

3     A.    Yes.

4     Q.    And this is a, pertains to her concerns about Dr. Seifer,

5     correct?

6     A.    Yes.

7     Q.    She sent them to Leslie DeMars, correct?

8     A.    Correct.

9     Q.    Do you know whether Dr. McBean was retained after the REI

10    division was closed?

11    A.    She was not part of the termination when we closed the

12    division.  My understanding is that Dr. McBean was a generalist

13    OB/GYN who had trained at UVM but also did reproductive

14    endocrinology and worked in a per diem fashion helping out in

15    working with the group.  That was my understanding of her.  So

16    I don't think she was directly employed.  I think she either

17    had her own practice or was at Brattleboro.  That's the extent

18    of my knowledge.  But she was part of the, she was part of the

19    team, but I thing she was, she was mainly employed at

20    Brattleboro.

21    Q.    But you're not aware of any adverse employment action that

22    was taken towards Dr. McBean after she submitted this report,

23    are you?

24    A.    No.  I had never seen this.

25          THE COURT:  Okay.  So I was going to say it's close

1    to 10:30.  Take our break now?

2                ATTORNEY McDONALD:  Agree.

3                THE COURT:  All right.  So we'll take our midmorning

4    break, and we'll be back at 10:45.

5         (A recess was taken from 10:29 a.m. to 10:48 a.m.)

6    BY ATTORNEY McDONALD:

7    Q.   Dr. Merrens, before the break we were looking at

8    Plaintiff's Exhibit 23, which was the report from Judith McBean

9    to Dr. DeMars concerning her feedback regarding Dr. Seifer.  I

10   may have asked you this question already, and I apologize if I

11   did, but had you ever seen this document prior to your

12   deposition?

13   A.   I have not.  I did not.

14   Q.   And, again, your deposition was July of 2019, correct?

15   A.   Correct, July 30th.

16   Q.   July 30th, so more than two years after the closure?

17   A.   Correct.

18                ATTORNEY McDONALD:  All right, thank you.  Going to

19   move on now to Exhibit B4, which I don't believe has been

20   admitted yet.  Mr. Howe, can check me on that.

21                COURTROOM DEPUTY:  Correct.

22   BY ATTORNEY McDONALD:

23   Q.   Thank you very much.  So could B4 please be published to

24   litigants, the Witness, and the Court?  I'll give you a minute

25   to review that.

VOLUME: 9
PAGES: 647-860

1    A.    I have finished reading.

2    Q.    And B4 is an email from Elizabeth Todd to Leslie DeMars.

3    Do you recall being shown this document at your deposition?

4    A.    I believe so.

5          ATTORNEY McDONALD:  I move for the admission of

6    Exhibit B, as in boy, 4.

7          THE COURT:  Any objection?

8          ATTORNEY JONES:  No objection.

9          THE COURT:  Okay.  B4 is admitted.

10   BY ATTORNEY McDONALD:

11   Q.    This document is written by Beth Todd, and it is her

12   comments about David Seifer, correct?

13   A.    Yes, correct.

14   Q.    If I could have you read the first two sentences of the

15   first large paragraph.

16   A.    "His clinical practice has deficits.  He does not seem" --

17   oh, there we go -- "he does not always seem to make clinical

18   decisions based on recommended standard practices or with the

19   awareness of patient costs and convenience".

20         ATTORNEY McDONALD:  Could I ask that this document be

21   published to the jury?

22         THE COURT:  Yes.

23         THE WITNESS:  Do you want me to read that again or

24   keep reading?

25   BY ATTORNEY McDONALD:

1    Q.    That's good.  Thank you.

2    A.    Okay, yeah.

3    Q.    Okay.  So fair to say that this document is a complaint or

4    a criticism by Beth Todd about David Seifer; would you agree?

5    A.    Yes.

6    Q.    Okay.  Do you know whether Beth Todd was terminated in

7    connection with the closure of the REI division?

8    A.    She was not.

9    Q.    Is she still employed at Dartmouth Health today, if you

10   know?

11   A.    I think she is, but I'm not entirely sure.

12   Q.    You can take that one down.  You were here for Kelly

13   Mousley's testimony yesterday, correct?

14   A.    Correct.

15   Q.    Do you recall her testimony about her complaint about Dr.

16   Seifer?

17   A.    I think so.

18   Q.    I'll show.  You

19   A.    Not specifically.

20   Q.    I'll ask you to take a look at B3, which has been

21   admitted, so I'll ask that it be published to the jury as well.

22   A.    I have finished reading it.

23   Q.    Thank you.  Do you know whether Ms. Mousely faced any

24   adverse employment action as a result of her criticisms of Dr.

25   Seifer?

VOLUME: 9
PAGES: 647-860

1    A.    I don't believe so.

2    Q.    And you heard her testify that she left Dartmouth Health

3    in 2020, I believe, correct?

4    A.    Correct, yes.

5    Q.    All right.  You testified on this earlier, and I'm sorry.

6    This one can be taken down.  Thank you.

7         Who is Heather Gunnell?

8    A.    She was the director within the department of obstetrics

9    and gynecology, so the, the lead administrative person within

10   the department, a partner to the chair and reported to the vice

11   president for surgical and perioperative services, Daniel

12   Herrick.

13   Q.    Could you please turn to or display, please, Plaintiff

14   Exhibit 20?  And I don't believe this one has been admitted

15   yet.  So, if this could just be published to the Court and the

16   litigants and the Witness.

17        Do you recall this document being a document you were

18   shown in your deposition?

19   A.    Yes.

20   Q.    And had you ever seen this document before July of 2019?

21   A.    No, I had not.

22        ATTORNEY McDONALD:  Move for the admission of

23   Plaintiff's Exhibit 20.

24        THE COURT:  Any objection?

25        ATTORNEY JONES:  None.

VOLUME: 9
PAGES: 647-860

1            THE COURT:  Okay.  Plaintiff's Exhibit 20 is

2      admitted.

3            (Plaintiff Exhibit 20 is admitted into evidence.)

4      BY ATTORNEY McDONALD:

5      Q.    I'll give you a minute to review.

6      A.    Yeah, I've reviewed it.

7      Q.    Okay.

8      A.    Yes.

9      Q.    How would you characterize this communication from Heather

10     Gunnell?

11     A.    Troubling.  Little regard for policy, procedures, and, in

12     some cases, legal restrictions, which is a alarming and

13     frustrating.  It's a concerning communication.

14     Q.    Do you know whether Ms. Gunnell faced any adverse

15     employment action in connection with her submission of this

16     report?

17     A.    No.

18     Q.    All right.  Thank you.  You can take that one down.  The

19     documents that we just reviewed that pertained to complaints

20     about Dr. Seifer, had you seen any of those documents prior to

21     your deposition in 2019?

22     A.    I had not.

23     Q.    Thank you.  Dr. Merrens, do you know if there was ever a

24     plan to reassign Dr. Porter to another department or division?

25     A.    There was no plan.

VOLUME: 9
PAGES: 647-860

1    Q.    Do you know whether the OB/GYN department needed a

2    generalist in this timeframe?

3    A.    I'm not sure I knew the needs of the department at this

4    time.  I'm not sure what they were searching for at the time.

5    Q.    Do you know whether Dr. Porter would have been an

6    appropriate candidate for a generalist position in the OB/GYN

7    department?

8    A.    I don't think she has the -- well, she's in the

9    department.  I think the generalist skills are different, and I

10   don't think her practice consists of the labor and delivery

11   work that the generalists are engaged in.  But I, yeah, I know

12   she wasn't engaged in that work and they have different

13   privileges that they're engaged in doing.

14   Q.    Do you know whether Dr. Porter's work had a particular

15   focus?

16   A.    I think Dr. Porter's work was entirely focused around

17   reproductive endocrinology and infertility.  I think her, and a

18   broad spectrum of that she was a surgeon who performed

19   surgeries to preserve the ability to become pregnant.  She read

20   ultrasounds around, specifically around the female reproductive

21   tract.  She performed intra, IVF.  So her practice was

22   severalfold in, completely around reproductive endocrinology

23   and infertility.

24   Q.    At the time you made the decision to close the REI

25   division, were you aware of Dr. Porter's desire to stay on at

1    Dartmouth Health in a nonfertility capacity?

2    A.   I was not.

3    Q.   Yesterday Mr. Jones showed you an email from Nurse

4    Maxfield, and that was Plaintiff's Exhibit 83.  I believe that

5    that's been admitted as well.  I'd ask that that be published.

6              COURTROOM DEPUTY:  I don't have 83 as admitted.

7              ATTORNEY McDONALD:  I apologize.  Then just for the

8    litigant, the Witness, and the Court.

9              ATTORNEY NUNAN:  Morgan, can we ask you to just speak

10   up, please?

11   BY ATTORNEY McDONALD:  Yes, sorry.

12   Q.   Okay.  Do you have Plaintiff's Exhibit 83 in front of you?

13   A.   Not on the screen.

14             ATTORNEY McDONALD:  Can we ask that this be published

15   to the Witness?

16             COURTROOM DEPUTY:  Yes.  Apologies.  That was

17   admitted.

18             ATTORNEY McDONALD:  No worries.

19   BY ATTORNEY McDONALD:

20   Q.   Perhaps you were shown another version of this Nurse

21   Maxfield email.  Do you recall Mr. Jones raising the -- oh,

22   excuse me.  Let me back up for a minute.

23        Do you recognize this as an email that you sent to

24   Victoria Maxfield in May of 2017?

25   A.   Yes.

VOLUME: 9
PAGES: 647-860

1          ATTORNEY McDONALD:  Request that Plaintiff's Exhibit

2     83 be admitted.

3          THE COURT:  Mr. Howe, are you saying it's already

4     admitted in evidence on your list?

5          COURTROOM DEPUTY:  It is admitted.

6          THE COURT:  It is admitted.

7          ATTORNEY McDONALD:  Okay, thank you.  All right.  So,

8     if we could publish this one to the jury as well.

9     BY ATTORNEY McDONALD:

10    Q.   And I believe there was some discussion yesterday about

11    your comment here that you're not sure of Dr. Porter's interest

12    in staying on if the infertility part were to cease.  Do you

13    recall that?

14    A.   I do.

15    Q.   At the time you sent this email, did you have any

16    interest, any reason to believe that Dr. Porter had an interest

17    in staying on if the infertility part were to cease?

18    A.   I did not.

19    Q.   There's been testimony in evidence in this case about the

20    letter from Dr. Porter in which she expressed a desire to stay

21    on to do noninfertility work, and that's Plaintiff's Exhibit

22    101 which has already been admitted if we can put that on the

23    screen, publish to the jury.  What's the date on this email?

24    A.   May 25th 2017.

25    Q.   So does that postdate the email that you sent to Nurse

VOLUME: 9
PAGES: 647-860

1 Maxfield in which you indicated you were not aware of her

2 interest in staying on?

3 A. Correct.  I'm not sure the date of that Maxfield.  Was it

4 the 12th of May?

5 Q. Yes.

6    THE COURT:  So, Ms. McDonald, I'm advised that that's

7 not in evidence.

8    ATTORNEY McDONALD:  It's not?  Is 101A in?  Perhaps

9 there is a version of this letter in evidence.

10    COURTROOM DEPUTY:  I don't believe so.

11    ATTORNEY McDONALD:  No?

12    ATTORNEY JONES:  For what it's worth, we believe that

13 101A was admitted.  We had to add an email cover to resolve a

14 completeness concern, and then we believe it was admitted, and,

15 if not, we would have no objection.  I think it's already in.

16    ATTORNEY McDONALD:  My notes said 101A is in as well.

17    THE COURT:  So then 101A is admitted.

18 BY ATTORNEY McDONALD:

19 Q. So, again, this letter postdated the email that you sent

20 to Nurse Maxfield, correct?

21 A. That's correct.

22 Q. Okay.  Do you have a sense of how much of Dr. Porter's

23 practice related to reproductive health?

24 A. I don't think I had a good sense of how she apportioned

25 her time and the work she did.  So I wouldn't say -- my sense

VOLUME: 9
PAGES: 647-860

 1    was that her entire effort was designed around reproductive

 2    endocrinology and infertility.  I think I was aware at the time

 3    that she was not performing some of the more complex surgeries

 4    but may have been in the process of doing that, and we heard

 5    from Dr. Padin who proctored Dr. Porter in that.  So I think

 6    that my understanding is that the surgical, ultrasound, clinic,

 7    IVF was all part of a REI doctor's work.

 8    Q.   And, at the time of the closure of the REI division, were

 9    you aware of any open roles to which Dr. Porter could have been

10    reassigned?

11    A.   I wasn't aware of open positions in the department or in

12    other areas.  I think Dr. Porter had an appointment in the

13    department of radiology, meaning that she had an appointment in

14    two departments, but I believe Dr. Porter's expertise was

15    really around ultrasound of the female reproductive system.

16         The ultrasounds that are done in radiology are a wide

17    array of ultrasounds, testicular ultrasounds, liver, biliary

18    tract, vascular structures.  So there was a wide range of

19    things, and I'm not sure how much that was part of her regular

20    work, although she did have an appointment there and was part

21    of that.  But her practice, my understanding, was pretty

22    limited to a very important area but just around the female

23    reproductive tract.

24    Q.   All right.  Switching gears again and to return to some

25    comments that you made at the beginning of your testimony

VOLUME: 9
PAGES: 647-860

1   today, why did you make the decision to close the REI division?

2   A.   Because I thought that it could no longer continue in its

3   current form with the current people involved in it and

4   adequately serve our patients in the safe provision of care in

5   a coordinated fashion.  I listened to the counsel of people

6   engaged and who had met with this group and, in the words of

7   people that have testified here, it was an unsalvageable

8   situation and one in which we didn't feel like we could

9   continue.

10   I made that decision solely, and it was a very difficult

11   decision but one in which I continue to stand by and even

12   after, and even in the setting of not having all the

13   information about things that had happened.  And I think in

14   reflection what pains me most is that we have a really robust

15   way of sharing concerns about patients in our organization.  We

16   have hotlines.  We have confidential, you know, compliance

17   numbers.  Every year we go through E-learning training where

18   we're reminded of reporting systems on our computers called

19   OWLs, occurrence with learning.  I don't know how they came up

20   with it.  But you can anonymously report something.

21   We had so many opportunities to say, Hey, we have a

22   problem here, and that could have come from anybody.  It didn't

23   need to go to me.  It needed to go somewhere.  And what we've

24   heard is that -- and I'm sad that we didn't have an opportunity

25   to address that earlier on in terms of the context of what's

1   happened.

2       So we had lots of opportunities to broaden that, and even

3   from our discussion at the beginning, I had a relationship with

4   Dr. Porter, and she felt very comfortable reaching out to me,

5   and, you know, the incidents we're talking about, we had met in

6   2012 and 2013.  Everything we're talking about started in 2013

7   and 2014 and 2015.

8       So I felt like, even on that level even though I was in a

9   different role, I felt like she could have reached out to me in

10  the context of what I think was a trusting relationship and

11  said, I'm really worried, and I, I felt sad mostly because of

12  that.  And I'm totally reassured that we have not had any

13  claims or harm or things that have people come forward and

14  said, you know, We've had discussions of people concerned about

15  harm.

16      As a leader in the organization, I would have wanted to

17  know that much earlier on so we could make changes and not get

18  to a place at the end where a group of physicians can't work

19  with each other, can't hire nurses, can't maintain

20  collaborative care in a way that we value, and I had to end the

21  program.

22  Q.  Thank you, Dr. Merrens.  If you take a look at Plaintiff's

23  Exhibit 103, which was admitted yesterday, if we could put that

24  on the screen and publish it to the jury.

25      Do you recall Mr. Jones asking you about a comment you

VOLUME: 9
PAGES: 647-860

1    made to Vermont Public Radio?

2    A.    I do.

3    Q.    Did Vermont Public Radio ever retract statements that you

4    made?

5    A.    Yes.

6    Q.    Excuse me.  That they allege that you made?

7    A.    They retracted the, they retracted, and, yes, they

8    retracted and apologized for attributing a statement to me that

9    I never made.

10   Q.    And they acknowledged that they had attributed a statement

11   to you that you had never made?

12   A.    That's correct.

13   Q.    Thank you.  We can take that one down.  Thank you.  We've

14   heard you and others who have testified in this trial use the

15   word "dysfunction" to describe the REI division.  What does

16   that word mean to you?

17   A.    I think it means, it really describes a group.

18   Dysfunction is not about a person.  It's really, I think, about

19   it in the context of a group, and I framed this as a team and

20   how nurses need to work with doctors and all the other people

21   need to -- there's so many critical components, and I think, if

22   anything, we've all learned a lot about how reproductive

23   endocrinology works.

24        The important role of the lab person behind the door and

25   the nurse that does insemination and how things work is really

VOLUME: 9
PAGES: 647-860

1    a team, and sometimes the team can have the right components

2    but doesn't work well together, even talented people but

3    doesn't work well together, and not working well together is,

4    Hey, we've got to work on it and fix it or not.

5         And, from my perspective, the word "dysfunction" describes

6    a team that cannot work within itself, can't agree on things,

7    doesn't have trust in each other, doesn't respect each other,

8    doesn't want to help the other members, and that changes the

9    nature of how care is provided.

10        We know, when there's a high degree of variation or a

11   fractured team, they can't provide the same kind of care, and

12   we develop silos of care and nurses on teams and aligned with

13   one person, and that's just not the best thing.  So that's the

14   dysfunction I'm speaking to.

15   Q.   In your mind, is there any connection between the nursing

16   shortages or the failure to recruit and retain nurses and the

17   dysfunction that you just described?

18   A.   In my mind, they're inexorably linked.  I think people

19   come into an area and are, like, Wow, this is a great team to

20   work with.  I'm going to tell other people, and/or not, or get

21   a sense that, Boy, it's hard to kind of get things done.

22   There's nurses and other people that work on teams.  You know,

23   they're infighting.

24        This happens in everything, everything we do, lots of

25   other jobs.  You know, you have great restaurants with

1    incredible chefs, and they may be talented, but they're

2    impossible to work with or can't work with each other.  They

3    can't hire people to work in the restaurant.  It's same in

4    health care.  People who work there want to be part of a team,

5    and I think we were unable to recruit people to be part of

6    these teams because it was not a team.

7    Q.   I'll ask you to take a look at Plaintiff's Exhibit 84.

8    I'm not sure whether this one has been admitted.  Not admitted.

9    Thank you.  So I'll ask that one just be published to the

10   Witness, the Court, and the litigants.  I'll give you a moment

11   to review that, Dr. Merrens.

12   A.   I've read this.

13   Q.   Do you recognize this document?

14   A.   Yes.

15   Q.   And is this an email Daniel Herrick sent you on May 12,

16   2017?

17   A.   Correct.

18            ATTORNEY McDONALD:  Move for the admission of

19   Plaintiff's Exhibit 84.

20            THE COURT:  Any objection?

21            ATTORNEY JONES:  No objection.

22            THE COURT:  Plaintiff's 84 is admitted.

23        (Plaintiff Exhibit 84 is admitted into evidence.)

24   BY ATTORNEY McDONALD:

25   Q.   I'll draw your attention to the second sentence in

VOLUME: 9
PAGES: 647-860

1    Mr. Herrick's email, "Based on my observation and interaction"

2    -- oh, and I'm sorry.  Could this be published to the jury?

3        "Based on my observations and interactions, Misty has been

4    the biggest driver to the dysfunction within REI".  Did you

5    have any understanding as to what Mr. Herrick meant when he

6    said that?

7    A.    I think he's reflecting after, after taking a bigger, a

8    deeper dive through the Value Institute work and having other

9    discussions.  I don't think the email outlines the specifics.

10   It does come on the heels of a fair amount -- and I mentioned

11   it below -- with a lot of, with a number of emails -- and I

12   think we discussed this yesterday -- talking about a lot of the

13   other things that Dr. Porter did, which I think really further

14   made it very clear in my mind that she did a lot of things all

15   in the context of REI, surgery, ultrasounds.  Her work were all

16   within the context of that.

17       And I appreciated the people's input and what they were

18   saying.  Daniel had a different perspective after, after being

19   very much involved in it and seeing, at the physician level,

20   how they interact, interacting with the director about how

21   things work, seeing how challenging it was to schedule patients

22   or understand schedules or to have communications or be able to

23   come to meetings or be able to kind of -- I think he began to

24   understand some of the dynamics.  This was his description.

25   This was his summary.

VOLUME: 9
PAGES: 647-860

1    Q.   And taking a look at the next sentence, which is, "The

2    personal relationship that Leslie has with Misty contributed

3    significantly to this not being addressed in an appropriate and

4    timely manner", did I read that correctly?

5    A.   Yeah.  Yes.

6    Q.   Do you have any understanding of what Mr. Herrick meant by

7    that?

8    A.   I think the relationship between these two physicians is

9    complex, probably the most complex that you can imagine.  They

10   both trained at UVM then came to Dartmouth.  They were friends.

11   They shared time with family.  One was a patient of the other.

12   You know, in many instances there were so many conflicts of

13   interest and clouding of judgment that, at this point, you

14   know, this was one of the reasons that I had a hard time really

15   understanding kind of what Leslie's, Dr. DeMars's perspective

16   was on this because it was so complicated.

17       So I don't know what Dr. DeMars's decision making was in

18   the process, but it certainly contributed to this dysfunction,

19   and when I include, when I describe dysfunction, again, not a

20   person.  Dr. DeMars was part of this dysfunction, maybe for

21   some of these same reasons.

22   Q.   Understood.  You can take that one down.

23            ATTORNEY McDONALD:  Your Honor, did I already move

24   for admission of that one?  I did?  Great, thank you.

25   BY ATTORNEY McDONALD:

1    Q.   Did Dr. Porter's disability play into your decision to
2    terminate her employment in connection with the closure of the
3    REI division?
4    A.   Absolutely not.
5    Q.   At the time you made the decision, did you even know what
6    her disability was?
7    A.   I did not.
8    Q.   Did you hear Michelle Russell's testimony in this trial
9    about a meeting in which you made comments to the OB/GYN
10   department in an auditorium related to the closure of the REI
11   division?
12   A.   I did.
13   Q.   Do you recall the meeting that Dr. Russell was referring
14   to?
15   A.   I do.
16   Q.   How many people attended that?
17   A.   Well, it was kind of two adjoining conference rooms, so a
18   room about this size, maybe a little smaller.  So there might
19   have been 30, 40 people in that room, maybe more.
20   Q.   Do you recall whether Dr. Russell asked about Dr. Porter?
21   A.   I don't remember.
22   Q.   Do you recall saying anything about Dr. Porter's
23   disability in that auditorium?
24   A.   I wouldn't.  I would have never said anything about her
25   disability in a large meeting with the department.  I did not.

VOLUME: 9
PAGES: 647-860

1    Q.    Thank you.  In connection with the decision to close the

2    REI division, were the patients notified of what was happening?

3    A.    My understanding is that the decision to close and the

4    timing of the closure would impact a number of patients that

5    were expecting to have, to go on medication, to have

6    procedures, to have a range of things, and, following the

7    announcement of the closure, I think the staff and the

8    department worked to contact people over the phone and to send

9    people letters and contact people as best as possible.

10        I don't know to what extent.  I don't think it was

11   everyone who had ever been seen in reproductive endocrinology

12   and infertility, but probably the people that had upcoming

13   appointments or had been engaged, maybe even people that were

14   expecting to have an appointment.  So I think there was that

15   effort on a person-to-person basis.

16   Q.    And were there any efforts made to assist these patients

17   with getting transferred to other facilities?

18   A.    So part of the plan was to do a number of things.  We had

19   made contact with a number of other infertility, REI and

20   infertility centers across New England including UVM, Baystate,

21   Tufts, and maybe some place, some other places around our

22   closure and that our patients may need care, services and

23   coordination.  I think our plan would be that we would continue

24   to maintain -- and we do it to this day.  We have a freezer

25   that has all the eggs, embryos, and sperm maintained, and we

VOLUME: 9
PAGES: 647-860

1    would work to transfer, as needed, if people had samples.

2        We would work with patients.  In some instances, we had

3    patients that had specific insurance that was covered and

4    noncovered.  We made sure that our employees were able to have

5    Tier I coverage for their care in Vermont and come to UVM as if

6    they were coming to Dartmouth.  So we made it pretty clear

7    about this and worked to develop, worked to help patients with

8    that.

9    Q.    I think I heard a mention that the lab remained open.

10   Does the lab, is the lab still, is it open today?

11   A.    We still have the freezer, and the lab does do some

12   things.  It's obviously not in the process of collecting eggs

13   and that, but we have everything stored really in perpetuity in

14   terms of patients' needs.  I mean, that's, those things, the

15   sperm, egg, whatever is in there is in there and can be

16   transferred and used.

17   Q.    And is that at a cost to Dartmouth Health?

18   A.    Yes.

19   Q.    Does Dartmouth Health refer patients to Dr. Porter?

20   A.    Yes.

21   Q.    With what frequency?

22   A.    I think it depends.  So there is -- what we know is that,

23   if we look back over the past couple of years, what I've

24   described in terms of kind of people needing IVF, there's

25   probably about 550 referrals we've made over the past two years

VOLUME: 9
PAGES: 647-860

1    for in vitro fertilization.  The majority of those have gone to
2    our partner, Boston IVF, about 60 percent.  About 20 percent
3    have gone to other New England -- there are other IVF centers,
4    and then about 11 percent have been referred to UVM to Dr.
5    Porter and ostensibly her colleagues.
6         This is a mixture of insurance coverage wouldn't cover
7    going to Boston IVF, which has become our partner as it relates
8    to REI- and IVF-related work, and also, frankly, we have a huge
9    catchment area, and there are women and couples who it is more
10   convenient to come to Burlington than it is to go down to
11   Boston.  So we've done that.
12        I think there are also case in which complex surgeries
13   that can't be done by members of our team have been referred to
14   Dr. Porter, but, for the most part, those are completed by our
15   surgeons, both in our community group practices which are the
16   southern part of New Hampshire that Maria Padin oversees or in
17   Lebanon.  So yes.
18   Q.   Has the Dartmouth Health REI division reopened in the
19   nearly eight years since it closed?
20   A.   It has not.
21   Q.   Are there any plans to reopen it at this time?
22   A.   There are no plans at this time.  I mean, I think what
23   we've done and we said is that we will ensure patients' access
24   to these services.  So and it's not just patients.  I think
25   that we've been really committed to resident education, and I

VOLUME: 9
PAGES: 647-860

1    think what we've had has been a, you know, our residents in

2    other areas travel to get other experiences.  And, although we

3    would love to be able to do everything in Lebanon, we can't.

4    We send residents to Maryland shock trauma to see those kinds

5    of things, and we have experiences all across the country for

6    residents to be part of.

7        With the ending of the program, we made opportunities for

8    them to work with Boston IVF, for people to come to the Lebanon

9    campus to teach the residents, and residents come up here to

10   UVM.  There's no question.  We've actually had a really long

11   and robust relationship with UVM around training, and I think

12   it's actually one of our strengths.

13       I mean as an executive, I meet with Sunny Eappen, the

14   president of UVM Health System, on a regular basis, and we

15   share a lot.  I actually worked with Dr. Porter years ago when

16   the entire, I think the entire REI program decided to become

17   private and left a fellow hanging, and we arranged to bring the

18   fellow down to Dartmouth.  I collaborated with to ensure that

19   we could do that.

20       So we want to avail our residents of the best experience,

21   and that has not been something that has been altered by the

22   closing of the program or the proceedings that we're engaged in

23   now.  I think we've got a really robust ability to train

24   residents, and, where appropriate, Dr. Porter and her

25   colleagues at UVM are certainly a part of it.

VOLUME: 9
PAGES: 647-860

1    Q.   As you sit here today kind of looking back on the decision

2    to close the REI division, do you feel that it was the correct

3    decision?

4    A.   Absolutely.

5    Q.   Do you feel that the decision to include Dr. Porter in the

6    terminations associated with that REI division was the correct

7    decision?

8    A.   Yes.  I think, you know, this is -- made the decision to

9    terminate three physicians as part of this program, and Dr.

10   Porter was one of them, and I stand by that, that decision.  I

11   own that decision.  I made that decision, and, to this day, I

12   think it was the right decision.

13             ATTORNEY McDONALD:  Thank you, Dr. Merrens.  If I

14   could just have one moment.

15             THE COURT:  Yes.

16             ATTORNEY McDONALD:  Nothing further at this time.

17   Thank you.

18             THE COURT:  So before cross-examination I'm just

19   going to step off the bench for just a moment.  I'll ask the

20   jurors remain in place, but feel free to stand up to stretch

21   your legs.

22                  (Brief pause.)

23             THE COURT:  Okay.  Cross-examination?

24             ATTORNEY JONES:  Yes, Your Honor.

25

VOLUME: 9
PAGES: 647-860

1                    CROSS-EXAMINATION BY ATTORNEY JONES

2    Q.    Good morning, Dr. Merrens.

3    A.    Good morning.

4    Q.    In the beginning of your examination by Ms. McDonald this

5    morning, you were discussing the situation at the end of 2012

6    regarding some issues between Dr. Porter and Dr. Reindollar.

7    Do you recall that testimony?

8    A.    Correct, yes.

9    Q.    Isn't it true that part of what was going on at that time

10   was that all of the division heads in OB/GYN had come to you to

11   express concern about Dr. Reindollar?

12   A.    That is not the case.

13   Q.    That's not the case?  Isn't it true that four nurses had

14   gone to HR to complain about sexual jokes and sexism from

15   Dr. Reindollar?

16   A.    I'm not aware of that.

17   Q.    Okay.  Do you recall that Dr. Porter, part of her concern

18   was that she was supporting the nursing staff in having their

19   concerns addressed?

20   A.    I can't remember the specifics, but I clearly understood

21   that Dr. Porter was representing, that she was struggling with

22   Dr. Reindollar for a variety of reasons, and I took that very

23   seriously.  I don't recall discussions, her representing nurses

24   or other things.  There were a variety of things that were

25   happening, and her, I think it was more centered around the

VOLUME: 9
PAGES: 647-860

1    relationship that she had with her chair and concerns that she

2    had.

3    Q.   And one of those concerns we saw in one of the emails was

4    that she felt that she was bullied by Dr. Reindollar, correct?

5    A.   I think that was in one of the emails.

6    Q.   But you don't recall her also expressing concern about

7    Dr. Reindollar's treatment of staff?

8    A.   I actually don't.

9    Q.   I want, I'm going to pull up, or my colleagues are going

10   to call up Exhibit D, which Ms. McDonald asked you about.  And

11   if we can go to Page 3, so D3, thank you.  And if you see at

12   the bottom there the email that starts, "Dear Mr. Weston and

13   Dr. Merrens", in the second paragraph that's titled "Scope", do

14   you see that?

15   A.   Yes.

16   Q.   And it refers to, "The purposes of the mediation are to

17   improve the working relationship between Dr. Reindollar and me

18   and to improve the working relationship between Dr. Reindollar

19   and staff".  Do you see that?

20   A.   I do.

21   Q.   So, I mean, at least Dr. Porter, at this time, was

22   including issues involving the work relationship between

23   Dr. Reindollar and staff as part of the issues to be discussed,

24   correct?

25   A.   I think it's a pretty broad scope and statement.  I think

1    what I respected in Dr. Porter's discussion at the time was

2    concern for herself but also concern for, you know, her working

3    relationship with this chair, and I think there's, I think

4    that's -- you know, when you think about we spoke earlier, this

5    is a team sport, and I think, you know, if there is discussions

6    that need to happen, I'm all for that.

7    Q.    Okay.  Now, you provided some testimony about the

8    severance offer that was made to Dr. Porter.  Do you recall

9    that?

10   A.    I do.

11   Q.    Isn't it true that part of a severance agreement is that

12   Dr. Porter would have to release all of her claims against

13   Dartmouth Health?

14   A.    I think that's a typical requirement in severance in

15   organizations and was not particular to Dr. Porter.  It happens

16   in all severance.

17   Q.    Right.  And also what happens in all severance is

18   confidentiality clauses, correct?

19   A.    Correct.

20   Q.    Okay.  So --

21   A.    I actually can't speak to the legal nature of what was

22   offered.

23   Q.    Okay.  But it's not as if Dartmouth Health was just

24   offering Dr. Porter six or nine months of a severance payment;

25   that was, there were strings attached.  She would have to waive

VOLUME: 9
PAGES: 647-860

1    all of her claims to sue the organization?

2    A.    I'm not an attorney, and nor, and we have normal processes

3    about how we offer severance and people that leave the

4    organization.

5    Q.    Right.  Actually, you testified a second ago it's normal

6    that these would include release of claims.

7    A.    I think whatever was offered to Dr. Porter would be the

8    same that we offer for anyone that we provide severance.  It

9    was the same for Dr. Hsu and Dr. Seifer.

10    Q.    Now, with regard to, again, you testified during your

11    testimony this morning about the nursing shortage issue.

12    Again, though, you were here when Nurse Sharon Parent testified

13    that she was willing and able to continue providing nursing

14    services to REI, correct?

15    A.    Correct.

16    Q.    And you testified yesterday that you have no reason to

17    doubt her testimony?

18    A.    I have no reason to doubt that she said that.  She was

19    interested in coming back and in some fashion.  That was her

20    testimony.

21    Q.    You also testified that, as part of the package that you

22    were offering to Drs. Hsu and Seifer when you met with them

23    about the closure, that you would offer outplacement services

24    to -- I think I got this right -- to help them find employment.

25    So Dartmouth Health was helping Dr. Hsu and Dr. Seifer find

1    employment, correct?

2    A.   I think that was an option.  If they wanted that, it was

3    something that HR would help them with.  It was not something

4    that I was overseeing.

5    Q.   Are you aware of whether or not anybody from Dartmouth

6    Health wrote letters of recommendation for either of them?

7    A.   I do not know.

8    Q.   You testified that Dr. Hsu is currently working at the

9    University of Cincinnati?

10   A.   That's my understanding.

11   Q.   Do you know whether or not he went to University of

12   Missouri first?

13   A.   I don't know.

14   Q.   You don't know that?  Okay.  So you don't have any

15   knowledge about the -- you don't have knowledge of the

16   circumstances under which that program closed?

17           ATTORNEY McDONALD:  Objection.  Assumes facts not in

18   evidence.

19           THE COURT:  Overruled.

20           THE WITNESS:  I have, I have no idea about things

21   that happened at other places.

22   BY ATTORNEY JONES;

23   Q.   You testified also that Dr. Seifer went to Yale, correct?

24   A.   He's currently at Yale.

25   Q.   And what's the basis of your knowledge?

VOLUME: 9
PAGES: 647-860

1    A.   I think, if you -- I think I was just aware of it.  If you

2    look up Dr. Seifer on Yale's women's health website, he comes

3    up as a physician in that program.

4    Q.   Okay.  And are you aware that, after he arrived at Yale,

5    that physicians have left the REI program?

6    A.   I'm not aware of anything that happened at other programs.

7    I was referring to current employment.

8    Q.   So do you have any knowledge of the fact that, after Dr.

9    Seifer joined Yale, there was significant litigation by

10   patients arising from the REI care at Yale?

11   A.   I'm not aware of anything regarding his work.

12              ATTORNEY JONES:  May I have one moment?

13              THE COURT:  Yes.

14   BY ATTORNEY JONES:

15   Q.   Dr. Merrens, you were testifying towards the end of your

16   testimony this morning about issues regarding the impact of the

17   closure of REI on patients, and you covered issues such as

18   notice to patients and what you, what the former patients are

19   now able to do in terms of alternate services.  Do you recall

20   that testimony?

21   A.   I do.

22   Q.   I'd like to show you a document that has not yet been

23   admitted into evidence.  It's Plaintiff's Exhibit 80.  So, if

24   we could have this on the witness, judge, and litigants'

25   screens.  Apparently, we need a moment.  Well, perhaps, while

VOLUME: 9
PAGES: 647-860

1    we're working on the technical issues, I can establish some

2    foundation.  Actually, here it is.

3            THE COURT:  Okay.

4    BY ATTORNEY JONES:

5    Q.   Doctor Merrens, I'm directing your attention to the

6    monitor.  We've placed an exhibit marked Plaintiff's Exhibit

7    80.  Do you recognize this document?

8    A.   Well, it's a partial document.  I see the top page.

9    Q.   Okay, fair enough.  It begins with an email to you dated

10   May 11th 2017.  Do you see that at the bottom of Page 1?

11   A.   I see part of it.

12   Q.   Yeah.  And we can scroll down to complete it so you can

13   see the rest of it.

14   A.   Do you want me to read it?

15   Q.   I don't want you to read it, no.  I just want -- we're

16   just trying to identify what the document is before we get into

17   the actual substance.

18           ATTORNEY McDONALD:  Counsel, can you give him an

19   opportunity to read it?

20   BY ATTORNEY JONES:

21   Q.   Yeah, take the time to read it if you want.  I'm not

22   asking you to read it out loud at this time.

23   A.   I'm just not sure what you're asking me.

24   Q.   How about take your time, read the document, and let me

25   know when you get a chance.

1                ATTORNEY NUNAN:  Excuse me.  There should be a

2     notebook there with a paper copy in it.

3                THE WITNESS:  What document is this?

4                ATTORNEY NUNAN:  80.

5                THE WITNESS:  I've completed reading the email.

6     BY ATTORNEY JONES:

7     Q.   Thank you.  Is it fair to characterize this as starting as

8     an email to you from a patient of the former REI clinic?

9     A.   Correct.

10    Q.   And then you forward it on to somebody named Victoria

11    McCandless?

12    A.   Yes.

13    Q.   And who is Ms. McCandless?

14    A.   I'm actually, I am not sure if Victoria was in HR.  I'm

15    not sure where Victoria was, actually.  I apologize.

16    Q.   That's no problem.  But so the initial patient email was

17    dated May 11th --

18    A.   Correct.

19    Q.   -- of 2017?

20    A.   Yeah.

21    Q.   You forward it to Ms. McCandless on May 11th as well?

22    A.   Yeah.

23    Q.   And then it looks like you then forward it again on May

24    12th and you include other people besides Ms. McCandless.  Do

25    you see that?

1    A.    I think what happened in the in between is that I asked

2    for some help in responding.  This is a tragic email.

3    Q.    Sure.

4    A.    This is someone who is our employee and is reaching out,

5    and there are some sad parts to this.

6    Q.    No, I understand.

7    A.    And what I'm trying to say --

8          THE COURT:  So, Dr. Merrens, before you speak further

9    about this exhibit, I think Mr. Jones is going to be eventually

10   seeking its admission.

11   BY ATTORNEY JONES:

12   Q.    Exactly.  You, in fact, received the email and then

13   forwarded it to the other people in the chain, correct?

14   A.    I asked for help in how I might best respond.

15         ATTORNEY JONES:  Got it.  Now I'd like to move the

16   admission of Plaintiff's 80.

17         THE COURT:  Any objection?

18         ATTORNEY McDONALD:  No objection, subject to, I

19   believe, some redactions need to be made.  There's a patient

20   name in this email.

21         ATTORNEY JONES:  It's been redacted.

22         ATTORNEY McDONALD:  The version on my screen I see a

23   name, unless that's not a patient name.

24         ATTORNEY JONES:  No.  If you scroll down to the

25   bottom -- there you go.  And then, if you scroll to the

VOLUME: 9
PAGES: 647-860

1    beginning to the very end of that email --

2                    THE WITNESS:  I think there's a name.

3                    ATTORNEY McDONALD:  There is, yes, in the middle of

4    the page attached to the draft response to the name.

5                    ATTORNEY JONES:  Can I speak with Ms. McDonald?

6                    THE COURT:  Of course.

7                    ATTORNEY NUNAN:  I just redacted it.

8                    THE COURT:  Okay.  It's been redacted, so no

9    objection?

10                   ATTORNEY McDONALD:  No objection.

11                   THE COURT:  Okay.  Then Plaintiff's 80 is admitted.

12                   ATTORNEY JONES:  And may we publish it to the jury?

13                   THE COURT:  Yes.

14   BY ATTORNEY VITT:

15   Q.    So, Dr. Merrens, you described this as a tragic email.

16   This is basically from a patient who is distressed about what's

17   going to happen with her REI care now that the REI division has

18   been closed, correct?

19   A.    Correct.

20   Q.    And she starts off by expressing that it was distressing

21   that she didn't get notice from the hospital and she had to

22   learn -- she states in the third line on Page 2, "I had to find

23   out on the radio on my way to work that the REI clinic was

24   closing May 31st".  You see that?

25   A.    That's what she says.

VOLUME: 9
PAGES: 647-860

1    Q.    Yeah.

2    A.    It wasn't the intent.  I mean, the goal was to contact

3    everyone.  Could everyone be contacted?  She clearly had been

4    in touch through this with her physician, so her physician had

5    gotten in touch with her, and it says, you know, she got in

6    touch with her physician, Dr. Hsu, and I realize it was at this

7    time that he had also been terminated.  So he directed her to

8    contact us.  So she had some contact, but, you know, I can only

9    imagine not everyone could be contacted in a timely fashion.

10            THE COURT:  So, Dr. Merrens, this is

11    cross-examination.  I'll direct you to answer the question

12    asked.  Your attorney will have an opportunity to speak with

13    you again.

14            THE WITNESS:  Yes, Your Honor.

15    BY ATTORNEY JONES:

16    Q.    And, Dr. Merrens, in addition to her concern about not

17    receiving what she believed was adequate notice, I mean, that

18    it actually has an impact on her ability to receive adequate

19    REI care, correct?

20    A.    No.

21    Q.    Well, she, if she is in midcycle and she needs to complete

22    services at a very specific time, that can impact her care,

23    correct?

24    A.    I'm not sure of the plans that were provided her in

25    follow-up.  I'm not sure if we said, We can get you in to be

1    seen at one of the other centers that we had contacted in

2    advance to make sure.  So I don't know the outcome of this.  I

3    say it's tragic because, yes, the ending of a program disrupts

4    things that are going on like this, but it was necessary.

5    Q.   She states just two lines below the one we just read, she

6    says, "I have been waiting a long time to finally have the

7    chance to become a mother, and now the opportunity is just

8    taken away without notice".

9         So she felt that her opportunity to become a mother had

10   been taken away.  You see that?

11                ATTORNEY McDONALD:  Objection.

12                ATTORNEY JONES:  Isn't that what she says?

13                THE COURT:  Overruled.

14                THE WITNESS:  That is what she says.  What we don't

15   have is the follow-up that was provided to her around next

16   steps, and that's not included in this.

17   BY ATTORNEY JONES:

18   Q.   Well, and your lawyer can get into that if she wants to.

19   There were other patients who wrote to you with similar

20   concerns, correct?

21   A.   There were some.

22   Q.   Excuse me.

23   A.   Yes.

24   Q.   Okay.  I'd like to show you what's been marked but not

25   admitted yet as Exhibit 71.  And, again, I'd ask that this be

1    shown on the witness, judge, and litigant screens.  And can you

2    let me know when you've had a chance to read that?

3    A.    I've read the email.

4    Q.    And is it, in fact, an email that another patient sent to

5    you on May 9th 2017?

6    A.    That is correct.

7    Q.    And you, in fact, received it?

8    A.    Correct.

9            ATTORNEY JONES:  Your Honor, we would move the

10    admission of Plaintiff's 71.

11            THE COURT:  Any objection?

12            ATTORNEY McDONALD:  No objection.

13            THE COURT:  Plaintiff's 71 is admitted.

14            ATTORNEY JONES:  I'd ask that the exhibit be

15    published to the jury.

16            THE COURT:  Yes.

17    BY ATTORNEY JONES:

18    Q.    So, Dr. Merrens, is it fair to characterize this as

19    another distressed patient contacting you?

20    A.    Yes.

21    Q.    And she expresses, "I feel that you need to hear the

22    patient's perspective, and I'm still looking for answers", at

23    the end of the first paragraph.  Do you see that?

24    A.    I do.

25    Q.    And, if you go down to the paragraph that starts, "The

1    frustration abounds for me with this interruption and

2    inconvenience".  Then she states, "But my bigger concern is the

3    fact that I'm being forced to transfer my embryo out of the

4    facility which increases its chance of death".  Do you see

5    that?

6    A.    I do.

7    Q.    That's a pretty distressing place for a patient to be,

8    correct?

9    A.    Correct.

10   Q.    But you understand that patients like this patient were in

11   that position when they received notice that the REI was

12   closing?

13   A.    I fully understood that there would be patients whose

14   lives would be disrupted because of this change.  And I

15   accepted that.

16   Q.    And that the transfer of some patients' embryos would risk

17   the viability of those embryos?

18   A.    Correct.

19   Q.    I'd like to now show you what we've marked as Exhibit 73.

20   Again, not yet admitted into evidence so we should have limited

21   publication at this time.  Is that on your screen, Dr. Merrens,

22   or in front of you, whichever you prefer?  But, if you can just

23   read it and let me know when you've had a chance to read it.

24   A.    I've completed reading the document.

25   Q.    Okay, thank you.  And is this another email from a patient

VOLUME: 9
PAGES: 647-860

1    to you that you received?

2    A.   Yes.

3    Q.   And it's dated May 10, 2017; is that correct?

4    A.   Yes, that's correct.

5           ATTORNEY JONES:  Your Honor, I move the admission of

6    Plaintiff's 73.

7           THE COURT:  Any objection?

8           ATTORNEY McDONALD:  No objection.

9           THE COURT:  Plaintiff's 73 is admitted.

10          ATTORNEY JONES:  And I'll ask that it be published to

11   the jury.

12          THE COURT:  Yes.

13   BY ATTORNEY JONES:

14   Q.   So, Dr. Merrens, again, is it fair to characterize this as

15   yet another example of a patient expressing distress at the

16   closure of the REI?

17   A.   I believe so.

18   Q.   And, if we turn to Page 2 of the exhibit, you know, the

19   text that she actually has in bold, I'll start a little

20   earlier.  She says, "It is now May.  I'm about a week into my

21   second IVF cycle with my egg retrieval due next week.  I am

22   now, as a result of the imminent closure of the fertility

23   center, faced with the very real possibility that I will be

24   unable to conceive a child".  You see that she says that?

25   A.   I do.

1    Q.   And -- well, strike that.  The next highlighted section
2    she says, "However, I am now going to lose all future potential
3    beyond this treatment cycle because I cannot conceivably travel
4    to the next closest IVF clinic to receive treatment while
5    working due to time commitments needed for each cycle".  Do you
6    see that?
7    A.   I do.
8    Q.   So for this patient it was not at all convenient for her
9    to go to Boston IVF or to UVM, correct?
10   A.   Correct.
11   Q.   And, in fact, it was so inconvenient that there was a real
12   possibility that she would not be able to continue with her IVF
13   efforts, correct?
14   A.   That's correct.
15   Q.   And then the final bold sentence of that paragraph, "This
16   abrupt closure is minimally anxiety producing during a time
17   when I need to keep my stress as low as possible."
18        You can understand her stress at this situation, can't
19   you?
20   A.   I can.
21   Q.   All right, thank you.  When you were describing in
22   response to some of Ms. McDonald's questions about the reasons
23   you felt it was necessary to close the REI, you referred to you
24   felt that the circumstances at that time, if I got this right,
25   prevented DH from being able to provide safe and effective care

VOLUME: 9
PAGES: 647-860

1    in the REI unit.  Is that basically what you were saying?

2    A.   Effective, yeah, that we couldn't provide the service

3    effectively.

4    Q.   I think you used the word "safely" too.  Is that correct?

5    A.   I think what I said was that any team that isn't

6    coordinated and can hire people to be able to be involved in it

7    can't provide safe or effective care.  That would be my

8    statement.

9    Q.   And safe and effective care is essential at a hospital,

10   correct?

11   A.   Yes.

12   Q.   Now, you're the chief clinical officer of Dartmouth

13   Health, correct?

14   Q.   Correct.

15   Q.   That's a C-level executive position, correct, C-suite

16   level?

17   A.   Yeah.

18   Q.   And you've been involved in this case since it was

19   started?

20   A.   Correct.

21   Q.   And you've reviewed the evidence in the case?

22   A.   Yes.

23   Q.   And you're aware that this case includes evidence from Dr.

24   Porter and other witnesses regarding actual patient harassment

25   caused by Dr. Hsu and Dr. Seifer, correct?

1    A.   I was aware at the time of my deposition that those

2    allegations had been made and those concerns had been raised.

3    I was not aware of any of that at the time of closure of the

4    program.

5    Q.   Understood.  But you became aware of that throughout the

6    course of the litigation, correct?

7    A.   Correct.

8    Q.   And that includes reports of patient harm from Dr. Porter,

9    Dr. McCallum, Dr. George, Dr. Baker, Nurse Parent, stenographer

10   Denise Gonyea and Dr. McGee, right?  McBean.

11   A.   I would agree that those people all expressed their

12   concerns.  They were never raised through the normal channels

13   of how we might understand concerns about quality or the safe

14   delivery of care, and I never was made aware of that, nor was

15   our quality team or the other people involved.

16   Q.   At the time of the decision?

17   A.   Correct.

18   Q.   But, throughout the course of this litigation, you have

19   become aware of that?

20   A.   I have heard the testimony and read the documents, yes.

21   Q.   Okay.  And you understand that evidence and Dartmouth

22   Health's positions in this case, correct?

23   A.   Yes.

24   Q.   As chief clinical officer, do you deny that Dr. Hsu and

25   Dr. Seifer caused actual patient harm?

VOLUME: 9
PAGES: 647-860

1          ATTORNEY McDONALD:  Objection.

2          THE WITNESS:  I'm not aware of actual harm.  I'm

3     aware of concerns.  I'm aware of people's testimony of what

4     they saw, but I'm not aware of actual harm.

5     BY ATTORNEY JONES:

6     Q.   So are you denying that actual harm occurred?

7     A.   I am saying that I'm not aware that harm, harm occurred.

8     I have read testimony and heard testimony about people's

9     concern that harm occurred, but I'm not -- we would have to do

10    a full investigation.  We'd have to do -- we'd have to really

11    understand what happened at the time and in the moment to

12    determine whether harm occurred.

13    Q.   In the eight years that this case has been pending and in

14    litigation and that you have received these complaints, you did

15    not initiate an investigation?

16    A.   We terminated the entire division and the people that were

17    responsible for the care.  I think that is the ultimate

18    expression of that I was not happy even in the, even not

19    knowing this information that this team could not continue

20    coordinated and effective care.  So we did not undergo an

21    investigation because these, these claims were only -- I only

22    was, I was only apprised of them two years later.

23    Q.   But they were troubling claims, correct?

24    A.   I think what was, what I was apprised of at my deposition

25    in 2019 was concerning.

1    Q.    Yeah.  And, if, in fact, the information you were getting

2    was correct, then that would mean that patients had been

3    harmed, correct?

4              ATTORNEY McDONALD:  Objection, asked and answered.

5              THE COURT:  The question has been answered, I

6    believe.

7    BY ATTORNEY JONES:

8    Q.    Okay.  You testified that -- well, in your testimony this

9    morning, you characterized Dr. Porter's relationship with

10   Dr. DeMars as being friendly.  Do you remember that?

11   A.    I said they were friends.

12   Q.    Yeah.  You were here when we introduced an email in which

13   Dr. DeMars expresses that her life would have been easier if

14   Dr. Porter had lost her license.  Do you recall that email?

15   A.    I do.

16   Q.    And you were here when Dr. DeMars herself on the stand

17   read that email and, when asked whether that was how she felt,

18   she said "yes".  Do you think friends wish for the loss of

19   professional licensure of their friends?

20   A.    I think she made a statement in an email.  I, it wasn't my

21   statement.  That's her statement about things.  But I think

22   there have been other things that have been shared in the

23   process of this trial in which their friendship over the years

24   was well demonstrated.

25   Q.    That statement was not a friendly statement, was it?

1    A.    No.

2    Q.    When you think of your friends, can you imagine wishing

3    that one of them lost their professional license?

4    A.    Again, this was her statement.  I don't think it has any

5    bearing on the fact that she described a robust relationship

6    with Dr. Porter for years leading up to this, including

7    conceiving a child.

8              ATTORNEY JONES:  No further questions.

9              THE COURT:  Any redirect?

10             ATTORNEY McDONALD:  No, nothing.  Thank you.

11             THE COURT:  Okay.  Thank you, Dr. Merrens.  So it's

12   12:00 o'clock.

13             ATTORNEY SCHROEDER:  Yes, it is.

14             THE COURT:  Mr. Schroeder, you're standing.  Is there

15   a question, or did you just want to go to lunch?

16             ATTORNEY SCHROEDER:  No, I thought I was going

17   introduce the next witness, but I also thought you might look

18   at your watch and talk about the time.

19             THE COURT:  Okay.  So we'll take our lunch break, and

20   we'll be ready to go at 1:00.

21        (A recess was taken from 12:00 p.m. to 1:03 p.m.)

22             THE COURT:  So, with some of the discussion this

23   morning about patient names and redactions, I just wanted to

24   point out, actually, the deputy clerk noticed the exhibit list.

25   The second updated exhibit list, Document 250 lists patient

1    names, and that's filed on the docket, several entries.  So you

2    should file something that requests to file a redacted, same

3    document just with redacting those names.  It's last names in

4    there, so I just want to bring that to your attention.

5               ATTORNEY JONES:  Thank you.  We'll take care of that.

6               THE COURT:  Anything else before we bring the jury

7    in?

8          (The Jury enters the courtroom.)

9               THE COURT:  Okay.  Defendant may call its next

10   witness.

11              ATTORNEY SCHROEDER:  Thank you, Your Honor.

12   Dartmouth Health calls Daniel Herrick, if I may go get him.

13              THE COURT:  Yes.

14                         Daniel Herrick,

15              having been duly sworn to tell the truth,

16                    testifies as follows:

17              THE COURT:  Mr. Herrick, if you could just maybe pull

18   the microphone little closer to your mouth.  Thank you.

19              DIRECT EXAMINATION BY ATTORNEY SCHROEDER

20   Q.   Good afternoon, Mr. Herrick.  I'd like to ask you a few

21   questions about yourself.  What's your current occupation?

22   A.   I'm retired.

23   Q.   Congratulations.  When did you retire?

24   A.   May two years ago, so it will be two years in May.

25   Q.   And, just to start a little bit further closer to the

VOLUME: 9
PAGES: 647-860

1   beginning, could you briefly describe your educational

2   background starting with college?

3   A.   So I have a bachelors degree in business management and

4   finance with one year's focus on engineering as well.  I am a

5   master black belt in Lean Six Sigma.  I'm a certified

6   professional in health care quality and I'm a phlebotomist and

7   I'm, I guess, also trained and certified in simulation-based

8   training.

9   Q.   Okay.  Let me ask you about this Lean Six Sigma black

10  belt.  What does that actually entail?

11  A.   So Lean Six Sigma is a focused operational management

12  practice.  It was originally developed by Toyota, and most

13  people know it as a Toyota system, and it looks at statistical

14  analysis looking at variation in process flows and looking at

15  ways of optimizing process flows, and there's a large set of

16  tools that go with that, including Pareto charts and Five Why

17  charts and fishbones, et cetera, and it's a formal process to

18  analyze operational flow and look for optimization.

19  Q.   And have you specialized in that area or used those tools

20  in the health care setting?

21  A.   Yes.

22  Q.   Okay.  How long have you been -- well, just briefly about

23  your career, how long have you been on the operational side of

24  things in your private sector career?

25  A.   Since the late 70s, 1970s.

VOLUME: 9
PAGES: 647-860

1    Q.    Okay.  So largely most of your career?

2    A.    Most of my career, yes.

3    Q.    Okay.  And, in terms of your operational experience, have

4    you also been employed in health care settings?

5    A.    Yes.

6    Q.    Okay.  Can you briefly describe them?

7    A.    So I served as the senior vice president of operations for

8    Columbia Presbyterian Medical Center in New York City.

9    Q.    Columbia Presbyterian?

10    A.    Yes.

11    Q.    I served as the vice president for perioperative surgical

12    services at Dartmouth, as well as the regional vice president

13    for perioperative and interventional services for the Dartmouth

14    Health system.

15    Q.    Say that one again, because I -- you're the vice

16    president, just for Dartmouth Health?

17    A.    So I was the vice president for perioperative and surgical

18    services for five years at the Dartmouth-Hitchcock facility in

19    Lebanon, and for two years after that I was the regional vice

20    president or system vice president for all perioperative and

21    interventional systems within the Dartmouth Health system.

22    Q.    Okay.

23    A.    I also did some operational work with Barnes-Jewish in St.

24    Louis.  There were 13 hospitals that were merging into one

25    health system, and I spent two years out there working with

VOLUME: 9
PAGES: 647-860

1    them, helping them standardize and consolidate.  So, instead of

2    having 13 departments sterilizing surgical instruments, we

3    consolidated into one consolidated laundry, consolidated OR

4    scheduling, things like that, and used the Lean Six Sigma tools

5    and the Lean focus to do that.

6    Q.   How long did it take you to do all this training for this

7    Lean Six Sigma?

8    A.   To be a Lean Six Sigma black belt, it was two years.  To

9    become a Lean Six Sigma master black belt requires being a Lean

10   Six Sigma black belt and then teaching, developing curriculum

11   and teaching Lean processes and doing multiple projects, being

12   published and lecturing in that field and then being evaluated

13   based on your body of work.  We did 24, I personally led 24

14   process improvement processes using Lean at Dartmouth system

15   through the Dartmouth Health system.

16   Q.   Okay.  So what level are you at now?

17   A.   I'm at the highest level, master black belt.

18   Q.   That's a master black belt?

19   A.   Yes.

20   Q.   I got to be honest, every time I say that out loud, I

21   think of Karate Kid.  This is just all about processes and how

22   to have better operational flow?

23   A.   It's, it's focused on quality, safety, access, throughput,

24   and flow.  So to optimize the assets that we have and to

25   eliminate roadblocks or blockages that delay or inhibit the

VOLUME: 9
PAGES: 647-860

1    process flows.

2    Q.    Okay.  And did you employ -- when did you become a master

3    black belt in Lean Six Sigma?

4    A.    In, I believe, 2016 or '17.

5    Q.    Okay.  During the time that you were at --

6    A.    It would have been, it would have been 2015.  It was while

7    I was employed at Dartmouth, yes.

8    Q.    Okay.  So in Dartmouth Health let's just focus on that

9    now.  How, when did you start there?

10   A.    I start in 2011 at Dartmouth.

11   Q.    So 2011 Dartmouth Health as the VP of perioperative

12   services?

13   A.    No, no.  I started as the manager of process improvement

14   within the periop space focused on identifying opportunities to

15   improve flows and within the periop place and, within the

16   periop space and within related areas, cath lab, EP lab,

17   endosuites, CT imaging, MRI imaging, that kind of thing.

18   Q.    Okay.  And what, if any, promotions did you receive at

19   Dartmouth Health?

20   A.    So after one year I was promoted to the position of

21   manager of quality safety and process improvement for the

22   perioperative services within Dartmouth.

23   Q.    Okay.  Did you receive any promotions after that?

24   A.    So I became the director of the Value Institute.  The

25   facility created the Value Institute as an opportunity to

VOLUME: 9
PAGES: 647-860

1    expand the utilization of standard work, standard process

2    improvement work, Lean processes.  We developed a green belt

3    and a yellow belt curriculum, and we delivered it, and we

4    coached students through their process using a project to

5    become certified in process improvement.  I eventually became

6    the director of that Value Institute process?

7    Q.   When was that?

8    A.   That would have been in 2014.

9    Q.   Okay.  So you became -- was that a -- this Value

10   Institute, there's been testimony in this case about the Value

11   Institute.  Were you the first director of it?

12   A.   I was second director.

13   Q.   Second director?  Okay.  And, during the time that you

14   were director of the Value Institute, is that when you were

15   doing some of these tutorials and programs and other

16   examinations for people to learn the processes of Lean Six

17   Sigma?

18   A.   Yes, sir.

19   Q.   Okay.  And you were doing that internally at Dartmouth

20   Health, correct?

21   A.   Yes.

22   Q.   And was that for a wide variety of employees?

23   A.   Yes.  Any employee could be nominated if they had an

24   interest in participating, so it was not focused just on

25   periop.  It was on the entire system or the entire

VOLUME: 9
PAGES: 647-860

1    organization.

2    Q.   Okay.  What, if any, further promotions did you receive

3    after being the director of Value Institute?

4    A.   So around the third quarter October of 2015, I was invited

5    to assume the role of vice president of perioperative and

6    interventional services, surgical services.

7    Q.   So vice president of perioperative and surgical services?

8    A.   Yes.

9    Q.   And that was in late 2015?

10   A.   Yes.

11   Q.   And what were your duties as the VP of perioperative and

12   surgical services?

13   A.   So principally --

14   Q.   Just briefly.

15   A.   Okay.

16   Q.   I'll get more specific once you give me a brief

17   description.

18   A.   So I had, I'm going to say I had two main categories of

19   business.  I had a direct piece of business that I managed and

20   a chain of command which managed all of the operating rooms,

21   including the ancillary services that supported that that would

22   be the pre-op area, the surgical suites, the post-op area, also

23   the standardization or sterilization of surgical instruments,

24   the building out of case carts, and centralized OR scheduling

25   for all of the procedures.

VOLUME: 9
PAGES: 647-860

```
 1           We had 37, a total of 28 operating rooms in the main OR, 6

 2     operating rooms in the outpatient surgery center, and 3 hybrid

 3     operations that included inline imaging.  So we had MRI and CT

 4     imaging in the operating room that could be used during the

 5     service, surgery.  And so that was my direct line of authority.

 6     I had about 800 staff there, and that included all operations

 7     from the time a patient arrived for surgery until they were

 8     discharged out of the hospital from surgery or admitted into a

 9     patient bed.

10           So that was, that was my direct line of authority.

11     Q.   And, with respect to your direct line of authority, I just

12     want to make sure it's clear.  First, just break this down for

13     me.  What does perioperative stand for?

14     A.   It's, it's inter-op.  It's the pre-op, the inter-op, and

15     the post-op.  So it's when a patient arrives and they're going

16     to be evaluated and set up for surgery, and then it's actually

17     the surgery and then it's the care after surgery to wake them

18     up from anesthesia and make sure they're ready to either be

19     discharged home or to be admitted to an inpatient bed.

20     Q.   Would it be fair to characterize the three phases as

21     pre-op, peri-op, and post-op?

22     A.   You could say that, or pre-op, intra-op, and post-op, but

23     it's peri-op is that, that's the term, yeah.

24     Q.   Right.  And peri-op is when they're in surgery and the

25     surgery is actually happening?
```

1    A.    Yes.

2    Q.    Okay.  And, with respect to your duties as the VP of

3    perioperative and surgical services, you oversaw 25 ORs or 28?

4    A.    I think 28 in the main OR and then 6 in the outpatient

5    surgery center and then 3 of the hybrid procedures surgical

6    suites.

7    Q.    Surgery suites?

8    A.    Yeah.

9    Q.    Okay.  Just make sure you enunciate.  When you say the

10   surgery center, is that those ambulatory surgery centers that

11   you see from time to time?

12   A.    Yes.  We have one located on the grounds across the

13   parking lot, and we were running six operating rooms at the

14   time.

15   Q.    Okay.  And that was in addition to the 25 or 28 ORs that

16   you had going on?  And this, you started in this VP role in the

17   fall of 2015?

18   A.    Yes.

19   Q.    And, at that time across the DH system, how high up the

20   food chain were you?

21   A.    Pretty high up.  I was --

22   Q.    Who did you report to?

23   A.    I reported to Dr. Merrens.

24   Q.    Okay.  So you weren't a manager at that point, right?  You

25   were --

1    A.    No.  I was a vice president.  I was a senior leader.

2    Q.    And you reported directly to Dr. Ed Merrens?

3    A.    That's correct.

4    Q.    And he was the chief clinical officer?

5    A.    Yes.

6    Q.    Okay.  And you said you had 800 or so people that reported

7    directly or indirectly to you?

8    A.    Through my chain of command, yes.

9    Q.    Okay.  And then did you have somebody that reported -- and

10   strike that.

11         Vice president of perioperative and surgical services, was

12   that, at the time in late 15, so before you became regional VP

13   of the systemwide, was that attached to a certain department,

14   like the OB/GYN department, or was there --

15   A.    No.  It was for all surgeries.

16   Q.    All surgeries?

17   A.    All surgeries.

18   Q.    Across the system?

19   A.    Yes.

20   Q.    Okay.  As a result of -- and who reported directly to you?

21   A.    So in that role I had a director of perioperative

22   services.  I had a director of OR scheduling, director or

23   manager that ran surgical sterilization, CSR, the supply chain

24   folks.  I also had, through that chain of command, all of the

25   nursing staff, the surgical technologists, the anesthesia nurse

1    anesthetists.  So they all reported up through that.

2    Q.    And, with respect to the specific OB/GYN department, did

3    you have a reporting relationship further down the line from

4    you?

5    A.    So yes.  So everything we've discussed so far has been

6    that first part of business which is where I had direct span of

7    control from an operational standpoint, and I was responsible

8    for all of the operational duties within that span of business.

9    I had a second span of business, and I operated as a partner

10   with the chair of each of the surgical sections in a

11   partnership mode.

12       So, for instance, the chair of orthopedics and I worked

13   together.  I had a director that reported directly to me but

14   was physically located with the chair, and they were

15   responsible for managing the day-to-day operations within that,

16   that service.  So I had one in the department of surgery, one

17   in OB/GYN, one in orthopedics, one in spine and pain, and one

18   in anesthesia.  So I had five additional directors that

19   reported up to directly to me.  They were on my budget.  I did

20   their performance reviews, but they were collocated with each

21   of the chairs, and they worked daily with those chairs as, in a

22   collaborative manner.  It was a way for the chair and myself to

23   represent the operational side and the clinical side.

24   Q.    So with respect to, and I want to just focus on the OB/GYN

25   department.

1    A.    Yes.

2    Q.    So there's the chair of the OB/GYN department, right?

3    A.    Yes.

4    Q.    And in 2015 do you know who the interim chair of the

5    OB/GYN department was?

6    A.    I believe it was Leslie DeMars.

7    Q.    Okay.  So and would she be in charge of the clinical side

8    of things?

9    A.    Yes.

10   Q.    Okay.  And then did you have a director embedded in the

11   OB/GYN department?

12   A.    Yes, I did, who reported directly to me.

13   Q.    So you had a direct report?

14   A.    Yes.

15   Q.    Who was that?

16   A.    Heather Gunnell.

17   Q.    And Heather Gunnell, what was her title?

18   A.    She was the director of OB/GYN.

19   Q.    Okay.  But she was coming up through the reporting

20   relationship to you in terms of perioperative services?

21   A.    From an operational standpoint, yes.

22   Q.    Okay.  And so you had these directors embedded in each of

23   the other departments?

24   A.    Yes.

25   Q.    Okay.  And, in terms of the operational side of things for

VOLUME: 9
PAGES: 647-860

1     the OB/GYN department, what subjects are included within the

2     operational side of things for OB/GYN?

3     A.    So it would be clinic operations.  In particular, one of

4     the reasons that we organized the function this way was that

5     each function that has surgical procedures had in place and had

6     in place surgical schedulers, and they were scheduling for

7     their specific surgeons to get access and utilization of the

8     block allocation in the OR suite.  And the challenge was that

9     each of those functions, department of surgery, department of

10    surgery had 13 services.  Orthopedics had a service.  Spine and

11    pain had a service, GYN had a service, and each of those

12    surgical services, the schedulers were utilizing different

13    technologies and processes in order to schedule into the

14    operating room.

15         One of the things that we did was standardize all of those

16    schedulers and have them remain physically there, but we

17    standardized how they did the work to be sure that they all

18    used the same system, that they put all of the schedules up the

19    same way so that we would have visibility into all of the

20    pending surgical schedules and all of pending surgeries that

21    were back-ordered and logged ready to go, and so that's how,

22    that was why we structured it that way.

23    Q.    When you say we, was that one of your charges, so to

24    speak, when you became the VP of perioperative services to

25    coordinate this very complex web of surgical services across

1    the entire spectrum?

2    A.    Yes.    That was, that was the charge to standardize, and

3    that was one of the process improvement type of initiatives

4    that we undertook, and that was to standardize all of the

5    scheduling so that we would have a better way as an

6    organization to have visibility into how to efficiently utilize

7    the blocks, and it yielded significant improvement in our block

8    utilization.

9    Q.    When you say you block utilization, do you mean when

10    surgeries were being performed so that they were done in an

11    efficient manner and used effectively so that other people can

12    get into the next block?

13    A.    Yes.

14    Q.    Okay.

15    A.    That's a good way of saying it.

16    Q.    Thank you.    With respect to -- just run through very

17    specifically your duties.    So on a day-to-day basis, you had

18    oversight of all the operating rooms; is that correct?

19    A.    Yes.

20    Q.    Okay.    And you had to ensure that the different

21    departments, specifically the ones that had surgical services,

22    were managing their budget and their budget allocations,

23    correct?

24    A.    Yes.

25    Q.    Were you responsible for making major decisions on the

VOLUME: 9
PAGES: 647-860

1    nonclinical part of things?

2    A.    Yes.

3    Q.    Okay.

4    A.    That's correct.

5    Q.    And, in terms of OR scheduling, instrument sterilization,

6    case cart building, those were all things that were under your

7    purview?

8    A.    Yes, under my direct purview.

9    Q.    You were the VP of perioperative services in late '15, and

10   then how long did you stay in that role before going up to the

11   system RVP role?

12   A.    About five years.

13   Q.    Five years?  So from October of 2015 to roughly October of

14   2020?

15   A.    Yes.

16   Q.    Okay.  And then, from October of 2020, you were promoted

17   to a regional VP role across the entire system?

18   A.    Yes, that's correct.

19   Q.    The Dartmouth Health system, correct?

20   A.    Yes, yes.

21   Q.    And you remained in that role until your retirement --

22   A.    Yes.

23   Q.    -- in May of 2023?

24   A.    Yes.

25   Q.    Okay.  I just want to ask you just a brief question

VOLUME: 9
PAGES: 647-860

 1    because we're kind of spanning a period of time that included

 2    the pandemic.  During the pandemic, do you recall

 3    implementation of a wage freeze across the board by Dartmouth

 4    Health?

 5    A.   Yes.  Things were very tight, and no raises were given.

 6    Yeah.

 7    Q.   So for historical purposes, first of all, the fiscal year

 8    for Dartmouth Health, does that run on a June 30, July 1 --

 9    A.   Yes.

10    Q.   -- timeframe?  So in 2020, June 30, 2020 would have been

11    -- July 1, 2020 would have been the start of the next fiscal

12    year, correct?

13    A.   That's correct.

14    Q.   And that would be considered, quote, unquote, fiscal year

15    '21?

16    A.   Yes.

17    Q.   And so July 1, 2020 going all the way to June 30, 2021,

18    that would be fiscal year '21?

19    A.   Yes.

20    Q.   And then the following year after that would be fiscal

21    year '22?

22    A.   That's correct.

23    Q.   Were those the years during which a wage freeze was

24    implemented by Dartmouth Health?

25    A.   That's true, yes.

VOLUME: 9
PAGES: 647-860

1    Q.    Okay.  Now, with respect to the people that were in your

2    chain of command, just kind of jumping back to your duties

3    again, did you have any oversight over clinicians, or was that

4    left to the chairs of the different departments?

5    A.    That was the chair's responsibility.

6    Q.    Did you have an ability to judge their technical

7    competence from a clinical standpoint?

8    A.    No, with an exception basis.  If a problem arose that

9    would have report through if there was a quality service issue,

10    but, no, I did not judge their clinical skills.

11    Q.    To the extent -- sorry to interrupt you.  To the extent

12    that there were clinicians and their clinical duties, that was

13    outside your purview?

14    A.    That's correct.

15    Q.    Okay.  And do you recall working with the OB/GYN

16    department and specifically the divisions under the OB/GYN

17    department when you were VP of perioperative surgical services?

18    A.    Yes.

19    Q.    Okay.  And you said you recalled the chairperson Leslie

20    DeMars, the interim chair?

21    A.    Yes.

22    Q.    Okay.  And what, if any, responsibilities did your direct

23    report, Heather Gunnell, have vis-a-vis the OB/GYN department

24    during that timeframe?

25    A.    Well, Heather would have responsibility for coordinating

1     the services from an operational standpoint within the clinics,

2     including managing budgets and process flows.

3     Q.   Okay.  And were you -- and did that include also the REI

4     division underneath the OB/GYN department?

5     A.   Under Heather, yes.

6     Q.   And how often were you in contact with Heather Gunnell

7     with respect to her duties vis-a-vis the OB/GYN department and

8     specifically the REI division?

9     A.   Well, we spoke weekly, and whenever issues arose, if she

10    needed help or required assistance, she would bring it to me.

11    We would review budgets quarterly.

12    Q.   Okay.  And I want to focus just on the REI division in

13    particular.  Did you know any of the physicians that were in

14    the REI division?

15    A.   By name only.

16    Q.   Okay.  Are you aware of the name Albert Hsu?

17    A.   Yes.

18    Q.   Okay.  Did you have any knowledge at any point while you

19    were employed there of any complaints, concerns, reports, made

20    by anyone regarding the competency of Dr. Hsu?

21    A.   No.

22    Q.   Another physician that was in the REI division at that

23    time or shortly thereafter in 2016 was an individual by the

24    name of David Seifer.  Do you have any knowledge, or did you

25    have any knowledge during the time that you were employed at DH

VOLUME: 9
PAGES: 647-860

1    of any complaints, concerns, or reports regarding the

2    competency of Dr. Seifer?

3    A.    No direct knowledge, no.

4    Q.    Okay.  Any knowledge whatsoever?

5    A.    No.

6    Q.    Okay.  And, with respect to -- and this would apply to any

7    complaints about safe, patient safety, patient harm, anything

8    like that.

9    A.    I'm not aware of any.

10   Q.    Okay.  Did you have any interactions with David Seifer as

11   a physician in the REI division?

12   A.    No.

13   Q.    You don't have any knowledge -- did you ever meet David

14   Seifer?

15   A.    I may have.  I don't recall.

16   Q.    You don't have any specific recollection?

17   A.    No.

18   Q.    Okay.  Do you know the plaintiff in this case, Dr. Misty

19   Blanchette Porter?

20   A.    No.  I mean, by name and maybe by appearance.

21   Q.    Okay.  When you were the VP of perioperative services

22   during this timeframe, 2015, 2016, and into 2017, did you ever

23   receive any knowledge, any information about any leaves of

24   absence that Dr. Porter had?

25   A.    No.

VOLUME: 9
PAGES: 647-860

1    Q.    Okay.  Did you become aware at some point that Dr. Porter

2    was on a leave of absence during that timeframe?

3    A.    Yes.

4    Q.    Okay.  Were you aware of the reason for any of her leaves

5    of absence during that timeframe?

6    A.    No.

7    Q.    I'm going to ask you some questions about the REI division

8    specifically, as well as its closure.  Do you recall the REI

9    division being closed in May of 2017?

10   A.    Yes, I do.

11   Q.    Okay.  Were you part of a small cohort of people that was

12   involved in the closure of the REI division?

13   A.    Yes, I was.

14   Q.    Okay.  And was that within the realm of your job duties as

15   VP of perioperative services?

16   A.    Yes.

17   Q.    And, at that point in May of 2017, you were still in that

18   role, correct?

19   A.    Yes, that's correct.

20   Q.    And, with respect to your reporting relationship, you

21   reported up directly to Ed Dr. Merrens, correct?

22   A.    That's correct.

23   Q.    And did you have regular communications with Dr. Merrens

24   in that capacity?

25   A.    Yes.

VOLUME: 9
PAGES: 647-860

1    Q.   While you may have been aware of her leave of absence at

2    some point, do you know whether or not Dr. Porter was on a

3    leave of absence or reduced schedule in May of 2017?

4    A.   I do not know.

5    Q.   Okay.  So, in light of that lack of knowledge, did you,

6    did Dr. Porter's status, whether she was on leave or minimally

7    on leave or reduced schedule or working part time, did any of

8    that impact your recommendations relating to the REI division

9    in that timeframe?

10   A.   No, sir.

11   Q.   With respect to the REI division closure, that was, would

12   you, how would you -- would you characterize that as a

13   significant event?

14   A.   Yes.

15   Q.   Okay.  Do you recall when discussions began regarding a

16   potential closure of some or all of the REI division?

17   A.   It would have been in January or February of 2017.

18   Q.   At that point, were you aware of whether or not the REI

19   division was doing any programs or projects or reviews by the

20   Value Institute?

21   A.   Yes.

22   Q.   And how were you aware of that?

23   A.   So Heather reported to me that there had been some issues

24   regarding service issues within the division and that she was

25   working with the Value Institute to have them come in and do

VOLUME: 9
PAGES: 647-860

1    some assessments, and I told her I thought that was appropriate

2    and encouraged her to develop a project charter and be sure

3    that we use the Value Institute tools and go ahead and keep

4    that going and keep me apprised.

5    Q.    Okay.  So you understood that Ms. Gunnell was going to

6    spearhead that effort with the Value Institute?

7    A.    Yes.

8    Q.    And did you have full faith in her abilities?

9    A.    Yes.

10   Q.    During the time that you were her, she was your direct

11   report, did you give her favorable performance reviews?

12   A.    Yes, I did.

13   Q.    Okay.  Did you have a solid working relationship with her?

14   A.    Yes.

15   Q.    Did you think highly of her abilities?

16   A.    I still do.

17   Q.    Okay.  And, with respect to the Value Institute in the

18   January, February 2017 timeframe, you said that Ms. Gunnell had

19   identified issues regarding service issues.  Did she, at least

20   in a general way, explain to you what the, what the issues were

21   that precipitated having to use the Value Institute?

22   A.    Yes, that there was an inordinately high turnover rate

23   among nursing staff and that there had been some customer

24   complaints related to communication and service, service

25   satisfaction rates.  She included the, the information that it

VOLUME: 9
PAGES: 647-860

1    appeared there were three silos of the three physicians, that

2    they were each working their program differently, and that it

3    was a perfect example of where the Value Institute and the Lean

4    tools could be utilized to standardize the processes and that

5    she'd engage the Value Institute to help them do that.

6    Q.    So sometime in that timeframe, say, December 2016 leading

7    into 2017, she made you aware of the fact that she encountered

8    silos within the REI division?

9    A.    Yes.

10   Q.    And that was with respect to the three physicians that

11   were there?

12   A.    That's correct.

13   Q.    Okay.  Does this, was this a microcosm?  Would it be fair

14   to call this a microcosm or a small example of what you were

15   charged with doing vis-a-vis the perioperative functions of all

16   the surgery groups?

17   A.    Exactly, a great example.

18   Q.    When you came back, when you were promoted into the VP of

19   perioperative services, was there a, were you met with the

20   challenge of trying to coordinate the 13 surgical clinics

21   across the board?

22   A.    Yes.

23   Q.    Okay.  And, with respect to this specific issue of the REI

24   division in early 2017, was this an example reminiscent of

25   that?

VOLUME: 9
PAGES: 647-860

1    A.   It is, yes.

2    Q.   Can you explain that for the jury, why?

3    A.   Why it was reminiscent?

4    Q.   Why it was reminiscent, and then I'll ask you a follow-up

5    question as to what was the plan to do about it?

6    A.   Well, it, again, it illustrated the lack of coordination,

7    the lack of system, the lack of standard work, and which was

8    yielding issues related to staffing.

9    Q.   And did you have an understanding that there was a

10   shortage of specific REI nurses in the REI division at that

11   time?

12   A.   Yes.

13   Q.   And did Ms. Gunnell go into detail with you as to what she

14   think precipitated that?

15   A.   Well, as a result of the Value Institute work, she shared

16   with me some of the results, yes.

17   Q.   And how did she describe the dynamic, the team dynamic to

18   you within the REI division at that point?

19   A.   Dysfunctional and --

20   Q.   In what way?

21   A.   -- inefficient.  Well, so as an example, because each

22   provider had their own staff, administrative staff, nursing

23   staff, if a patient called in to the REI division to have a

24   conversation about issues, clinical or scheduling issues and so

25   on and their particular team was not there, the call would go

VOLUME: 9
PAGES: 647-860

1    to voicemail and would not be responded to until that team

2    returned.

3         In a normal clinic space with three providers, you would

4    expect that all calls would be answered and screened and not

5    left in voicemail.  So that's one example, and that was one of

6    the complaints that had come up from some of the patients, that

7    they were unable to communicate efficiently with their team.

8    Q.   And so with respect -- and would that be the effect, the

9    cause being the silo by the effect being that calls would go

10   unanswered?

11   A.   Yes.

12              ATTORNEY SCHROEDER:  Your Honor, I'd like to show Mr.

13   Herrick a document marked Defendant's Exhibit 6 just for the

14   Court and attorneys and Mr. Herrick for the time being.

15              THE COURT:  Okay.

16              ATTORNEY SCHROEDER:  May I approach him?

17              THE COURT:  Yes.

18   BY ATTORNEY SCHROEDER:  Thank you.

19   Q.   Mr. Herrick, this is a rather long document.  I'm not

20   going to ask you about all the powerpoint slides behind it, but

21   could you identify this document?  Do you know what it is?

22   A.   I'm reading it.

23   Q.   Okay.

24   A.   Give me a second.

25   Q.   It's dated June 17, 2016 from Heather Gunnell to you,

VOLUME: 9
PAGES: 647-860

1    Leslie DeMars, and Nancy Devenger.

2    A.    Yes.  So it looks to be a letter of transmittal

3    identifying a project charter that she had put together at my

4    request to look at the communications and work flow challenges

5    that were currently being realized within the division.

6            ATTORNEY SCHROEDER:  Okay.  Your Honor, may I move

7    for admission of Defendant's Exhibit S?

8            THE COURT:  Any objection?

9            ATTORNEY VITT:  No objection.

10            THE COURT:  Okay.  Defendant's Exhibit S is admitted

11            ATTORNEY SCHROEDER:  May I have it published for the

12    jury?

13            THE COURT:  Yes.

14    BY ATTORNEY SCHROEDER:

15    Q.    And I'm just going to stick on the first page,

16    Mr. Herrick, and not go through the powerpoint, but this dates

17    back to June 17, 2016.  So, at that point in time, were you,

18    does this refresh your recollection as to when you became aware

19    of certain challenges in the work flow and processes within the

20    REI division?

21    A.    So ask that again.  I'm sorry.

22    Q.    Sure.  I realize you were looking at the document.  Does

23    this refresh your recollection as to the first time that you

24    were becoming aware of any challenges with the work flow,

25    teamwork, coordination of services, by members of the REI

VOLUME: 9
PAGES: 647-860

1    division?

2    A.    Yes.

3    Q.    Okay.  And did you charge Ms. Gunnell with coming up with

4    a proposed plan to tackle those challenges and frustrations?

5    A.    Yes.

6    Q.    Okay.  And is this part of that effort to do so?

7    A.    Yes.

8    Q.    Thank you.  You can take that down.  Actually, you know

9    what?  I'm sorry.  Bring it back up.  Few more questions.  So,

10   if you just thumb through this document for me, which is a long

11   powerpoint of slides, and we can perhaps go to the seventh page

12   titled "OB/GYN REI Time Study Results".  What were, what was

13   the purpose of this endeavor, do you know?

14   A.    So each of these slides are standard tools that the Value

15   Institute developed in terms of how to identify opportunities

16   to separate the symptoms from the root cause, and this is a

17   typical request that we would make of the Value Institute to

18   come in and observe, do process mapping and time analysis.

19   Q.    Okay.  And so these efforts were being undertaken during

20   this timeframe to put in place better processes for ensuring

21   that your patients' service satisfaction scores would go up, in

22   part?

23   A.    Yeah.  So the Lean process basically looks at defining the

24   current state and understanding what the current state is

25   mapping it all out and doing the time study.  So this would

1    have been under the defined step, and then the next step would

2    be to analyze that data, and then we do identify opportunities

3    to improve them and then to implement them.

4    Q.    Okay.  You can take that down now.  What did you determine

5    at the outset of this process in terms of where the REI

6    division was in terms of how it dealt with work flow issues and

7    patient calls and navigating a patient from the start to the

8    end?

9    A.    So we understood that there was challenges, that it was

10   not being run efficiently, and that there were likely

11   significant opportunities to improve the flow, the efficiency,

12   and the customer service.

13   Q.    And, during the late summer, fall, and winter of '16, did

14   Ms. Gunnell, to your knowledge, engage the Value Institute in

15   attempting to address those challenges and frustrations?

16   A.    Yes, she did.

17   Q.    Okay.  And do you recall whether or not they were

18   successful as a result of -- whether or not REI division and

19   Ms. Gunnell's coordination of this project successful at

20   achieving better work flows and processes?

21   A.    They were unsuccessful.

22   Q.    They were unsuccessful?  And when did you learn that?

23   A.    In mid-March to April, somewhere in that timeframe, we had

24   a report out from the Value Institute team that had been doing

25   the work, and I was invited to that meeting along with

1    Dr. DeMars and Heather.

2    Q.    And so, just so that the jury understands, so in March or

3    April of 2017, there was a meeting between yourself, Heather

4    Gunnell, Leslie DeMars, and members of the Value Institute?

5    A.    Members of the Value Institute as well as a vice president

6    from HR.

7    Q.    And VP of HR?

8    A.    Yeah.

9    Q.    And what was the conclusion of the report out from the DH

10   Value Institute?

11   A.    So the DH Value Institute team, I learned from them that

12   they had identified a number of opportunities to improve the

13   flow and the structure within the organization, but they were

14   unable to get the team to agree to make those changes, that it

15   was, in their mind, an unsustainable function because the team

16   was not willing to make those enhancements to the process flow

17   and that it would not be sustainable.

18   Q.    And was that related to all members of the team?

19   A.    Yes.

20   Q.    So, not just the nurses and the staff, but also the

21   physicians within the REI division?

22   A.    That's, yes.  And, and I learned at that meeting also from

23   the vice president of HR that they were going to stop

24   recruiting nurses for the REI division because the nurses that

25   they were recruiting and hiring in, the turnover was so short

1    and at such a high rate that, with a housewide shortage of

2    nurses, they were going to attend all of their time recruiting

3    nurses for other parts of the business.  We just had too many

4    shortages, and they just were not going to do it any longer.

5    Q.    And this was in the March, April 2017 timeframe?

6    A.    Yes.

7    Q.    And, up until that point, though, to your knowledge, was

8    the organization, specifically HR, working to staff the REI

9    division?

10   A.    Yes.

11   Q.    With REI nurses?

12   A.    Yes.

13   Q.    And there were challenges in that regard, correct?

14   A.    That's correct.

15   Q.    And Ms. Gunnell attributed that in part to challenges of

16   the dynamic of people working in the REI division?

17   A.    That is, that's correct.

18   Q.    Now, after learning that the efforts with the Value

19   Institute and trying to address concerns and frustration about

20   how, the work flow of the REI division in that March, April

21   timeframe, what, if anything, did you do to address that issue?

22   A.    Immediately following that meeting, I asked Dr. DeMars to

23   remain behind with me after everyone else left, and I shared

24   Dr. DeMars my strong opinion that this system was unsustainable

25   and that the best option would be for us to shut down this

VOLUME: 9
PAGES: 647-860

1    division.  Dr. DeMars was saddened.  I will say she cried.  But

2    she did agree with me that, given everything that we had just

3    heard, that it did make sense for us to shut the division down.

4    It was just no longer workable.

5              ATTORNEY SCHROEDER:  Okay.  Your Honor, I'd like to

6    show the Witness a document that's been marked Plaintiff's

7    Exhibit 40A and also give the Court a copy of it.  It is a, now

8    a complete version of that document and ask to show it to the

9    Witness as well.

10             THE COURT:  Okay.

11             ATTORNEY SCHROEDER:  Plaintiff's counsel has seen

12   this as well.

13   BY ATTORNEY SCHROEDER:

14   Q.   Showing you a document that's been marked Plaintiff's

15   Exhibit 40A, Mr. Herrick, do you recognize this document?

16   A.   Yes, I do.

17   Q.   It's a two-page document, correct?

18   A.   That's correct.

19   Q.   And it's dated April 18, 2017 from you to Leslie DeMars?

20   A.   Yes.

21             ATTORNEY SCHROEDER:  Okay.  Ask for admission, Your

22   Honor, of Plaintiff's Exhibit 40A.

23             THE COURT:  Any objection?

24             ATTORNEY VITT:  No objection.

25             THE COURT:  Okay.  40A is admitted.

1          ATTORNEY SCHROEDER:  May I have it published for the

2     jury, please?

3          THE COURT:  Yes.

4     BY ATTORNEY SCHROEDER:

5     Q.   Now, this is April 18, 2017, correct?

6     A.   That's correct.

7     Q.   And you're writing this email to Leslie DeMars, right?

8     A.   Yes.

9     Q.   And who is Sam Shields?

10    A.   Sam Shields was the director of the Value Institute at the

11    time.

12    Q.   The director of the Value Institute?  Okay.

13    A.   Yes.

14    Q.   And here on the first page you say, "Attached is a summary

15    worksheet that we put together.  I spoke with Sam today and

16    he's agreed to provide us with a project manager to support our

17    strategy to shut down IVF and put the REI program on hold.  I

18    think we are ready to share our plans with Ed and Maria.  I

19    will let you take the lead on that".

20         Ed is Ed Merrens?

21    A.   Yes, that's correct.

22    Q.   And Maria is Maria Padin?

23    A.   Yes, that's correct.

24    Q.   Now, at this point, it says, "Shut down IVF and put the

25    REI program on hold".  Was that your recommendation or someone

1    else's?

2    A.    That was my recommendation to shut the system down.

3    Q.    Okay.  Well, it says here, "Shut down IVF and put REI

4    program on hold".

5    A.    Put it on hold until we decided whether or not we were

6    shutting everything down, yes.

7    Q.    Did, during this process, did Dr. DeMars express any

8    reservations about putting the whole REI program?

9    A.    Dr. DeMars would like to have kept the REI in place and to

10   shut down only the IVF program.

11   Q.    And that was her sentiment?

12   A.    Yes.

13   Q.    But what was your sentiment?

14   A.    My sentiment was to shut the entire system down.

15   Q.    Okay.  Before any, before your consideration of whether or

16   not it was an IVF shutdown or a complete REI shutdown including

17   IVF, do you recall whether or not the budget and revenue

18   projections for the REI division overall?

19   A.    Marginally profitable for the combined IVF/REI.

20   Q.    If you go on the second page, there are a couple of things

21   here, and I just want to identify what this document is.  And,

22   in the right-hand corner at the bottom, it says DPH.  Is that

23   you?

24   A.    Yes.

25   Q.    Okay.  And did you attach your initials to documents that

1    you assisted in drafting?

2    A.    That's correct.

3    Q.    Okay.  Now, there's notes in here from Heather Gunnell,

4    and what was the purpose of those notes?

5    A.    So I had -- so this is my document.  I created this

6    document.  I collected data.  I formatted it, and I shared it

7    with Heather.  She identified the addition of the percentages

8    just to add, I guess, a depth to the document.

9    Q.    Okay.  So this was just looking at the profit and loss

10   statement for the overall division?

11   A.    Yeah.  And so I'll point out that the IVF was profitable

12   to the tune of approximately a million dollars, that the REI

13   division was unprofitable to the tune of roughly $800,000.  So,

14   therefore, we were, you know, in the neighborhood of 177,

15   $178,000 total marginal profitability.  To shut down the IVF

16   division and maintain the REI division would have then led us

17   at an $800,000 loss.  I did not recommend that.  I recommended

18   shutting everything down.

19   Q.    And who's Tamara Heath here?

20   A.    Tamara Heath was a financial analyst at the time.

21   Q.    So the purpose this document was just to show what?

22   A.    To show financially where we were and to marry that with

23   the information we learned from the report out from the Value

24   Institute about the dysfunction within the department.

25   Q.    Okay.  And, in terms of -- you can take that down.  In

VOLUME: 9
PAGES: 647-860

1    terms of your recommendation even at this point -- set aside

2    economics.  Your recommendation was what?

3    A.    Shut it all down.

4    Q.    So, not just the IVF, but the REI, the entire REI

5    division?

6    A.    Yes.

7    Q.    Okay.  And that came, that came out of the results of the

8    Value Institute?

9    A.    Yes.

10   Q.    Okay.  And, at that point, was Dr. DeMars, quote, unquote,

11   on board with your recommendation, or did she have a different

12   recommendation?

13   A.    Dr. DeMars vacillated.  When she and I had the initial

14   conversation immediately following the Value Institute

15   presentation, she was 100 percent on board with shutting it all

16   down, and then over time she began to waver and express desire

17   to at least hope that, at some point in the future, we may be

18   able to reinstitute the program and, therefore, would like to

19   keep the REI division up and running so that we would have a

20   foundation in order to rebuild IVF.

21   Q.    But that was not your recommendation, correct?

22   A.    No, it was not.

23   Q.    What about Heather Gunnell, did she make any

24   recommendations regarding the REI division?

25   A.    I believe that Heather Gunnell was on the same page as I

1    was.

2    Q.   Okay.  Now, did you, at some point, communicate your

3    recommendations, as well as the recommendations of Heather

4    Gunnell, to Dr. Ed Merrens?

5    A.   Yes, I did.

6    Q.   Okay.  And, in terms of the ultimate decision maker on

7    whether or not REI division would continue, who made the, who

8    made the decision to close the REI division?

9    A.   Ultimately, it would have been Dr. Merrens.

10   Q.   Okay.  And do you recall how soon after you communicated

11   your recommendation that Dr. Merrens made that decision?

12   A.   Relatively short.

13          ATTORNEY SCHROEDER:  Okay.  Your Honor, if I may give

14   the Court, as well as the Witness, Plaintiff's Exhibit 50A, it

15   is a complete version of plaintiff's Exhibit 50.

16          THE COURT:  Yes.

17          ATTORNEY SCHROEDER:  Already given that to the

18   opposing counsel.  Thank you.

19   BY ATTORNEY SCHROEDER:

20   Q.   Mr. Herrick, I am showing you a document marked

21   Plaintiff's Exhibit 50A.  It's dated April 21, 2017 from you to

22   Ms. Gunnell.  Do you recognize this document?

23   A.   Yes, I do.

24   Q.   And what is it, just generally speaking?

25   A.   So it is a summary of the assumptions that we would use

VOLUME: 9
PAGES: 647-860

1    that were used in the evaluation of whether or not to shut down

2    the division.

3    Q.    Okay.

4    A.    And the assumptions meaning the points of information that

5    we identified to validate the analysis.

6    Q.    And did that include the financial projections that we

7    just went over in the previous exhibit?

8    A.    Yes, it did.

9            ATTORNEY SCHROEDER:  Your Honor, I'd move for the

10    admission of Plaintiff's Exhibit 50A.

11            THE COURT:  Any objection?

12            ATTORNEY VITT:  No objection, Judge.

13            THE COURT:  Okay.  50A is admitted.

14            ATTORNEY SCHROEDER:  And may I publish that for the

15    jury?

16            THE COURT:  Yes.

17    BY ATTORNEY SCHROEDER:

18    Q.    Now, the subject line for this or the attachment says "REI

19    Program Strategy", right?

20    A.    Yes.

21    Q.    I want to go to the second page for a second.  Did you

22    share this document?  This document was shared between you and

23    Ms. Gunnell, and it's got some assumptions here.  What was the

24    basis for the assumptions?

25    A.    Well, as you look at the assumptions, it summarizes the

1    information that we learned from the report out at the Value

2    Institute about staffing turnovers, about the operations being

3    dysfunctional, that the ability to fix them had failed, the

4    efforts had failed, that we assume that the demand continues to

5    exist, and that we're going to stop the program immediately.

6    Q.    Okay.  So the first, the first bullet point says, "Current

7    staffing issues have rendered the REI program unsustainable,

8    resulting in unacceptable levels of care for our patient

9    population as well as marginal financial viability", right?

10   A.    Yes.

11   Q.    The next one says, "Internal department operations

12   acknowledged to be totally dysfunctional with significant

13   process and patient care variations between providers and

14   staff", right?

15   A.    Correct.

16   Q.    And that, that problem stemmed back from the summer of

17   2016, correct?

18   A.    That work, yes.

19   Q.    Specific, the next one, "Specific attempts to rectify

20   operations dysfunction have failed", right?

21   A.    Yes.

22   Q.    "Despite current marginal", the next one, "Despite current

23   marginal financial performance, it's assumed that the patient

24   demand exists to support this program when operated in a

25   proficient manner", right?

VOLUME: 9
PAGES: 647-860

1    A.    Correct.

2    Q.    Then it says, "Decision has been taken to immediately stop

3    this program, accepting no new patients and referring all

4    existing patients to other program", right?

5    A.    That's correct.

6    Q.    And had that already been underway in a smaller version or

7    variation of stopping new patient intake and referring or at

8    least putting a pause on services for IVF?

9    A.    Yes.  We had stopped new patients, and we were completing

10    the cycle of patients that were in.

11    Q.    Okay.  Now I want to ask you about this last bullet point

12    which says, "Decision has also been taken to develop a business

13    and operating plan to restart the REI program at a later date

14    based on review and approval of the new business plan.

15    Embedded in this decision is a plan to maintain our current lab

16    operations in conjunction with UVM".

17         Now, at that point, was there any business plan or

18    operating plan to continue to have REI division in place?

19    A.    There was not.

20    Q.    There was not?  Was that one of the things that Dr. DeMars

21    was advocating for at that time?

22    A.    Yes.

23    Q.    Okay.  This document was just shared with Heather Gunnell,

24    right?

25    A.    That's correct.

VOLUME: 9
PAGES: 647-860

1    Q.    You didn't share this document with Dr. Merrens or

2    Dr. Padin?

3    A.    I did not.

4    Q.    Okay.  And why didn't you do that?

5    A.    There really was no plan to reinvigorate the IVF program

6    at that point, but we did not want to put a roadblock, but we

7    had no plans.  There had been no plans, and I had no plans.

8    Q.    Okay.  And then, after having this discussion with Ms. or

9    sending this to Ms. Gunnell, did Dr. Merrens communicate his

10   decision on what should happen with the REI division?

11   A.    Yes.

12   Q.    And what was that?

13   A.    To shut it down completely.

14   Q.    Okay.  And that was consistent with the recommendations

15   that you and Ms. Gunnell had given, correct?

16   A.    That's correct.

17   Q.    But also partially in compliance or partially in support

18   of the recommendations of Dr. DeMars, at least with respect to

19   the IVF program?

20   A.    That's correct.

21   Q.    Okay.  At this point, was Dr. DeMars still trying to

22   figure out a way to, or was she attempting to figure out a way

23   to have some kind of pause on the REI division overall?

24   A.    She wanted to continue to keep the REI and to keep the

25   door open to reinvigorating the IVF program.

1    Q.    And but that, that idea was rejected by Dr. Merrens,

2    correct?

3    A.    Yeah, yes, and by me as well.

4    Q.    And did you share the specific bases as to why you were

5    recommending that the REI division should be shut down

6    altogether to Dr. Merrens?

7    A.    Yes.

8    Q.    Then after that Dr. Merrens made a decision to shut down

9    the REI division altogether?

10   A.    That's correct.

11              ATTORNEY SCHROEDER:  Your Honor, if we can show the

12   Witness Plaintiff's Exhibit 84, I believe it's been admitted

13   into evidence earlier today.

14              COURTROOM DEPUTY:  B4?

15              ATTORNEY SCHROEDER:  84, is that correct?

16              COURTROOM DEPUTY:  Yes.

17   BY ATTORNEY SCHROEDER:

18   Q.    Okay, thank you.  Just a few quick questions, Mr. Herrick.

19   First of all, I want to ask you about your relationship or

20   working relationship with Leslie DeMars.  Did you, in the

21   process of the REI division being closed down, did you have

22   interaction with Leslie DeMars?

23   A.    Yes.

24   Q.    What were your thoughts on her leadership skills, if any?

25   A.    I did not think that Leslie was a very strong leader.

1    Q.    Why?

2    A.    She was hard to -- it was hard for her to make a decision

3    and stick with it.  She was, I guess, wishy-washy is the way to

4    say it, and she was influenced by whomever she spoke with, and

5    she also, as a leader, was, found it extremely difficult to

6    make the hard choices, the hard decisions that needed to be

7    made.

8    Q.    And did you understand that to be, the REI division

9    closure to be an example of those weaknesses?

10   A.    Yes.

11   Q.    Okay.  Did you communicate that to Dr. Merrens?

12   A.    Yes.

13   Q.    Did you have any knowledge of the relationship, at least

14   tangentially, knowledge of the relationship between Leslie

15   DeMars and Dr. Porter?

16   A.    To the extent that Dr. DeMars shared with me, yes.

17   Q.    Okay.  And in this email it's just an email from you to

18   Dr. Merrens, and it's dated May 12th, correct?

19   A.    Correct.

20   Q.    And this is after, it's eight days after the REI division

21   closure is announced to the, within the organization, correct?

22   A.    Correct.

23   Q.    And it's eight days after those three physicians in the

24   REI division were notified of their termination, correct?

25   A.    I believe that's true, yes.

1    Q.   Okay.  And here you say, "Ed, I'm not including Leslie in

2    this response.  Based on my observations and interactions,

3    Misty has been the biggest driver to the dysfunction within

4    REI.  The personal relationship that Leslie has with Misty

5    contributed significantly to this not being addressed in an

6    appropriate and timely manner.  There is no question regarding

7    competence; however, I have also received unsolicited input

8    from a surgeon who has been here for a long time thinking out

9    loud that it's about time.  It will be interesting to see how

10   Leslie responds".

11        Your knowledge of the relationship between Dr. DeMars and

12   Dr. Porter was based on your communications with Dr. DeMars,

13   correct?

14   A.   Exclusively, yes.

15   Q.   And, with respect to the issue of the driver of

16   dysfunction within REI, did that in any way relate to the

17   findings of the Value Institute that you received prior to the

18   date of this email?

19             ATTORNEY VITT:  Your Honor, leading.

20             THE COURT:  Sustained.

21   BY ATTORNEY SCHROEDER:

22   Q.   With respect to the conclusions regarding, or I should say

23   the statement, "Misty has been the biggest driver to the

24   dysfunction within REI", what did, what was the basis, factual

25   basis for that statement?

VOLUME: 9
PAGES: 647-860

1    A.    The basis would have been what I was told by Dr. DeMars.

2    Q.    Okay.  And did, this followed -- did this, did that

3    conversation follow the report from the Value Institute which

4    had been sometime in March, April?

5    A.    Actually, I think it's accumulation of conversations both

6    before and after.

7    Q.    So both before and after the Value Institute's findings?

8    A.    Yes.

9            ATTORNEY SCHROEDER:  Nothing further at this time,

10   Your Honor.

11           THE COURT:  Okay.  Cross-examination?

12               CROSS-EXAMINATION BY ATTORNEY VITT

13   Q.    Good afternoon, Mr. Herrick.

14   A.    Good afternoon.

15   Q.    You talked about the scheduling of surgery.  Is it

16   accurate to say that the IVF procedures are not performed in

17   the operating room?

18   A.    That's correct.  That only was referring to surgeries that

19   are performed in the operating suites.

20   Q.    Okay.  I took a look at the information about the loss,

21   and in round numbers the REI division without having IVF would

22   have a loss of about $800,000 a year?

23   A.    Yeah, that's correct.

24   Q.    Okay.  At this time, how many women and girls received

25   reproductive health care every year from Dartmouth-Hitchcock?

VOLUME: 9
PAGES: 647-860

 1    A.    I'm not aware of what that answer is.

 2    Q.    Thousands, perhaps?  Hundreds?

 3    A.    I doubt it's thousands.

 4    Q.    Hundreds?

 5    A.    I don't know.

 6    Q.    Well, certainly you understand, I think, that women and

 7    girls went to Dartmouth-Hitchcock to get reproductive health

 8    care other than IVF, right?

 9    A.    Yes.

10    Q.    Okay.  Do you have any idea of the scope of the health

11    care that was provided to them?

12    A.    I guess I don't understand the question.

13    Q.    Well --

14    A.    The types of work that GYN services provide?

15    Q.    Yes.  If women and girls are going to Dartmouth-Hitchcock

16    for reproductive health care, do you have some sense of the

17    scope of the reproductive health care that they receive?

18    A.    I'm not a clinician, so no.

19    Q.    You don't know?  Okay.  The process that you've described

20    of kind of evaluating the situation in REI and coming to a

21    recommendation, that lasted for, what, several months, perhaps?

22    A.    Yes.

23    Q.    Okay.  At any point before the decision was made and

24    announced to close the REI division, did you or anyone working

25    for you contact the OB/GYN department and ask, What is Misty

VOLUME: 9
PAGES: 647-860

1    Porter's current workload doing regular OB/GYN work?

2    A.    I'm not aware of that conversation.

3    Q.    Could we agree that trying to find that out might take a

4    few hours at max?  I mean, it wouldn't take very long to come

5    up with that information, would it?

6              ATTORNEY SCHROEDER:  Objection, calls for

7    speculation.

8              THE COURT:  Overruled.

9              THE WITNESS:  I can't imagine it would take an

10   extended period of time.

11   BY ATTORNEY VITT:

12   Q.    Do you recall that -- I think you came to my office.  I

13   forget where it was -- we had a deposition together?  I took

14   your deposition, right?

15   A.    Yes, yes, you did.

16   Q.    Okay.  And I believe that you said, We didn't fire

17   doctors.  We let them go because we didn't have a need for

18   their work.  Do you recall that?

19             ATTORNEY SCHROEDER:  Objection, Your Honor.

20             ATTORNEY VITT:  Let me --

21             THE COURT:  Basis?

22             ATTORNEY SCHROEDER:  It's inappropriate.

23             ATTORNEY VITT:  I'm going to hand you what's been

24   marked as 97.

25             THE COURT:  No.  Did you ask to approach the bench?

1    I think there's an objection.

2              ATTORNEY SCHROEDER:  There is an objection.

3              ATTORNEY VITT:  You want to approach?

4         (Bench conference begins.)

5              ATTORNEY SCHROEDER:  Objection to the question in

6    trying to summarize whatever his testimony was in his

7    deposition.  If he wants to attempt to impeach him with his

8    deposition transcript, he can do that.  And I assumed he was

9    going to do that because he had actually identified them

10   already during a break before we came back.  So that's what I

11   assumed was going to happen, but I object to this manner and

12   procedure in which he was trying to ask the question.

13             THE COURT:  Might be premature.  He didn't ask a

14   question yet.

15             ATTORNEY SCHROEDER:  Well, he was asking a question

16   specifically about his testimony, and he was actually trying to

17   quote the testimony from the deposition.

18             THE COURT:  Right, like what happened this morning on

19   direct for witnesses that Ms. McDonald examined.

20             ATTORNEY SCHROEDER:  Except for that was to correct

21   the fact that that answer yesterday that Dr. Merrens gave was

22   only a partial part of that answer.  It was not his complete

23   answer.

24             THE COURT:  Okay.  I don't know what he's going to

25   ask.  So it might be a little early.  Maybe we can start to

1    address it so we don't have to come back up here.

2            ATTORNEY SCHROEDER:  That would be helpful.

3            ATTORNEY VITT:  I'm going to give him the transcript.

4    I actually did quote it.  I'm not trying to sort of sideswipe

5    the guy.  I'll show him the transcript and ask him, you know --

6            THE COURT:  And are you attempting to impeach him?

7    And then I'd like to know what you're impeaching.  I don't

8    remember the question that led up to it.

9            ATTORNEY VITT:  I can approach the topic generally,

10   but there's also obviously a particular place where he says

11   what I've just said in the question.  I'm not sure what the --

12   you know, it might be easier if I get to the question, I think,

13   than going through --

14           ATTORNEY SCHROEDER:  Your Honor, respectfully, you

15   can't impeach a witness unless there's an underlying question

16   that is subject to impeachment, and there was not one, and then

17   the question was starting.  So I was anticipating, Do you

18   recall testifying in my office, and saying he was starting to

19   quote it.  So that was my objection.

20           THE COURT:  If you're going to ask him if he made a

21   statement at his deposition and then an inconsistency comes out

22   or then perhaps approaching him, but just to go up there and

23   have him read the deposition transcript would be inappropriate

24   impeachment.  So you are going to ask him a question about does

25   he recall making a statement at his deposition, and then, if he

VOLUME: 9
PAGES: 647-860

1    says "no" or if he answers and its inconsistent with what's in

2    there, it goes away.

3                ATTORNEY VITT:  Okay.

4                ATTORNEY SCHROEDER:  Thank you.

5                (Bench conference ends.)

6    BY ATTORNEY VITT:

7    Q.   Mr. Herrick, do you recall making a statement at your

8    deposition that we, meaning Dartmouth-Hitchcock, didn't fire

9    doctors.  We let them go because we didn't have any need for

10   their work?

11   A.   I don't recall specifically saying that, nor the context.

12               ATTORNEY VITT:  I'd like to show you what's been

13   marked as ID7.  It's your deposition.  Let me get you a page

14   number.  If you can go to Page 114, Line 21.

15               ATTORNEY SCHROEDER:  Can we, for clarity purposes,

16   are you going to ask the question, or are you just the answer?

17   BY ATTORNEY VITT:

18   Q.   Are you there?

19   A.   I'm on Page 114, yes.

20   Q.   Line 21?  See where it says, "We didn't fire doctors.  We

21   let them go because we didn't have the need for their" --

22   A.   I see that, yes.

23   Q.   Okay.  At the time that the REI division was closed, I

24   believe you were aware that Dr. Porter was reading ultrasounds

25   for the OB/GYN department?

1    A.    I believe that's correct, yes.

2    Q.    Okay.  Did you do anything to inquire about the scope of

3    the work that she was then performing at the OB/GYN department?

4    A.    I did not.

5    Q.    Do you recall, in connection with the work that was being

6    done to evaluate the REI division, making any inquiries about

7    the scope of Dr. Porter's work that did not involve IVF?

8    A.    No.  Again, I'd just say that, on Line 21 when I said we

9    didn't fire people, that meant that -- you said we didn't let

10   them go because we didn't fire people, that we don't fire

11   doctors.  My intent there was that we don't fire, we didn't

12   fire people for cause, that we shut down the program.  That's

13   what I was saying.

14   Q.    That was the intent?  It doesn't say that, but that's what

15   you're saying that was your intent?

16   A.    That we weren't firing people.

17             ATTORNEY SCHROEDER:  Object.

18             THE COURT:  Overruled.  Mr. Vitt, do you want to take

19   the deposition transcript back?

20             ATTORNEY VITT:  Sure.  I'll take it back.  I may have

21   with you one other time to show it to him I'm happy to take it

22   back.  Thank you.

23   BY ATTORNEY VITT:

24   Q.    Do you know whether, at the time the REI division was

25   closed, whether Dr. Porter was already spending a large

VOLUME: 9
PAGES: 647-860

1    percentage of her time doing regular OB/GYN work not related to

2    IVF?

3    A.    I did not.

4    Q.    The top of this document, Mr. Herrick is something you

5    wrote?

6    A.    Yes.

7    Q.    Okay.  And you say here that, based on your observations

8    and interactions, Misty has been the biggest driver to the

9    dysfunction within the REI.  Is that what you wrote?

10    A.    That is what I wrote.

11    Q.    Okay.  Isn't it accurate that you had no observations

12    whatsoever of Misty Porter's conduct?

13    A.    That's correct.

14    Q.    All right.  And it's also true that you really had no, no

15    personal information that provides the basis for that

16    statement?

17    A.    Only information that I heard from Dr. DeMars, correct.

18    Q.    Okay.  So it's not exactly accurate to say it's your

19    observation and interactions?

20    A.    It's, it's inarticulate, correct.

21    Q.    Well, it's inaccurate, right?

22    A.    Yes.

23            ATTORNEY VITT:  Nothing further.

24            THE COURT:  Okay.  Any redirect?

25            ATTORNEY SCHROEDER:  Nothing, Your Honor.

VOLUME: 9
PAGES: 647-860

1              THE COURT:  Okay.  Mr. Herrick, you may step down.

2    Okay.  We'll take our afternoon break and come back at 2:45.

3          (A recess was taken from 2:26 p.m. to 2:45 p.m.)

4              THE COURT:  Okay.  Defense may call its next witness.

5              ATTORNEY McDONALD:  Defendants call Heather Gunnell.

6                  HEATHER GUNNELL,

7              having been duly sworn to tell the truth,

8                  testifies as follows:

9              ATTORNEY McDONALD:  May I proceed?

10             THE COURT:  Yes.

11             DIRECT EXAMINATION BY ATTORNEY McDONALD

12   Q.   Hi, Ms. Gunnell.

13   A.   Hi.

14   Q.   To get started, can you give a little bit of your

15   educational history, starting with college?

16   A.   Sure.  I have a bachelors of science in management, and I

17   have a masters in public policy.

18             THE COURT:  Ms. Gunnell, if I could just ask you to

19   move into the microphone a little bit.  Thank you.

20   BY ATTORNEY McDONALD:

21   Q.   Are you currently employed?

22   A.   I'm self-employed, yes.

23   Q.   Were you ever employed by Dartmouth Health?

24   A.   Yes, I was.

25   Q.   During what time period were you employed by Dartmouth

VOLUME: 9
PAGES: 647-860

1    Health?

2    A.   From April 2013, I believe, until June of 2023.

3    Q.   And what was your role?

4    A.   I started as the practice manager in the OB/GYN

5    department, and then I became the director of employee

6    well-being for a couple of years.

7    Q.   Practice manager OB/GYN department; is that right?

8    A.   That's right.  I skipped one.  I went from practice

9    manager to the administrative director in OB/GYN.

10   Q.   And what year did you become administrative director?

11   A.   I think it was near the end of 2017.  I don't remember

12   exactly.

13   Q.   And what years did you serve as practice manager?

14   A.   It would have been 2013 up until I became director, so

15   probably 2017.

16   Q.   And both of those roles related to the OB/GYN department,

17   correct?

18   A.   That's correct.

19   Q.   Can you give us a sense of your duties as the practice

20   manager and administrative director for the OB/GYN department?

21   A.   I oversaw all of the day-to-day operations of the clinic.

22   So that included budgets, finance, work flows, overseeing all

23   of the administrative and nursing staff and working with the

24   division directors in the department.

25   Q.   So you said that you oversaw the administrative staff and

VOLUME: 9
PAGES: 647-860

1    the nursing staff.  Did Katy Mansfield report to you?

2    A.    She did.

3    Q.    Did Kelly Mousley report to you?

4    A.    Yes.

5    Q.    And who did you report tot?

6    A.    I reported, when I started, I reported to the director, so

7    initially Karen Lancaster, and then, ultimately, I ended up

8    reporting to Daniel Herrick when I was the director.

9    Q.    When did you leave Dartmouth Health?

10   A.    June of 2023.

11   Q.    What were the circumstances surrounding your departure?

12   A.    I was part of their reduction in force.  I was laid off.

13   Q.    In your role as practice manager and administrative

14   director of the OB/GYN department, did you receive any training

15   related to policy and procedure?

16   A.    Training in regard to policy and procedure?  Nothing

17   formal.

18   Q.    What about with respect to process improvement?

19   A.    Yes, I did.

20   Q.    Can you describe the training?

21   A.    I went through the Lean Six Sigma program through the

22   Value Institute, which is the part of the organization that

23   handles all the process improvement.  So I don't remember how

24   long the program was, but it was a pretty extensive program

25   learning that methodology.

VOLUME: 9
PAGES: 647-860

1   Q.   Does Dartmouth-Hitchcock, excuse me, have a risk

2   management department?

3   A.   Yes, they do.

4   Q.   And what's their role?

5   A.   I don't know that I could explain the nuance, but their

6   role how I interacted was, when something looked like it might

7   come up against something challenging legally or if there were

8   patient concerns, then we would reach out to them.

9   Q.   So it was within the scope of your duties to interact with

10  the risk management --

11  A.   Yes.

12  Q.   -- department?  Did you have any responsibilities with

13  respect to patient relations?

14  A.   Yes.

15  Q.   Can you describe those responsibilities?

16  A.   I worked with patient relations, usually when there were

17  patient complaints.  So sometimes those complaints would go

18  into patient relations, who would reach out to me, and

19  sometimes I would hear from patients directly, and then I would

20  reach out to patient relations.

21  Q.   And just to orient us, as the practice manager and

22  administrative director of the OB/GYN department, that would

23  encompass all of the divisions underneath the larger OB/GYN

24  department?

25  A.   That's correct.

VOLUME: 9
PAGES: 647-860

1    Q.    Was there any division within the OB/GYN department that

2    required more attention than the other divisions?

3    A.    Yes.  The REI division took up a lot of my time.

4    Q.    And can you explain a little bit about why the REI

5    division took up more of your time than the other divisions?

6    A.    There were a lot of inter, like, there was a lot of tough

7    dynamics with that group.  There was a lot of team friction,

8    and it just took a lot of time talking to people and nuance and

9    the sort of chaos that surrounded that sometimes.

10    Q.    What do you mean when you say chaos and friction?

11    A.    There was a dynamic in that group that really split the

12    team.  So there were -- I kind of viewed it as having two teams

13    within that division.  They didn't often communicate well with

14    one another.  The process would differ often between nurses

15    and/or providers, and so, and they didn't always get along.  So

16    it was difficult to navigate that with them.

17    Q.    When you referenced two teams, do you have a sense of

18    which individuals were on each team?

19    A.    Yeah.  I mean, it changed over the years, but it was

20    really, like, Dr. Porter, Beth Todd, and Sharon Parent, the

21    nurse, were a very tight unit, and then it tended to be whoever

22    else was in the division.

23    Q.    So it would be Dr. Porter, Beth Todd, Sharon Parent, and

24    then everyone else typically?

25    A.    That's the way I experienced it, yes.

VOLUME: 9
PAGES: 647-860

1    Q.    In your role, how often did you meet with the chair of the

2    OB/GYN department?

3    A.    That changed over time.  So, when I started, it was

4    Dr. Reindollar, and I almost never met with him.  When I was

5    practice manager, as Dr. DeMars stepped in, I met with her at

6    least weekly.

7    Q.    What do you attribute that sort of change in the frequency

8    of communications to?

9    A.    I think a lot of it was just their different style, and

10   there was also a change in administrative director right about

11   that time.

12   Q.    Did you discuss the REI division in your meetings with

13   Dr. DeMars?

14   A.    Yes.

15   Q.    And what, in particular, would you discuss about the REI

16   division with Dr. DeMars?

17   A.    It depended really on what was going on, but it often

18   circled around the challenges that the team was facing and how

19   we could help fix those.

20   Q.    Did you have any understanding as to the relationship

21   between Dr. DeMars and Dr. Porter?

22   A.    Yeah.  My understanding is that they worked together for a

23   long time and that they were also friends outside of the

24   workplace.

25   Q.    From your perspective, did the fact that Dr. DeMars and

1    Dr. Porter were friends have any impact on the way Dr. DeMars
2    led the department?
3    A.    Yes.
4    Q.    Can you explain?
5    A.    I think, in general, I mean, Dr. DeMars is a great
6    clinician and has a really big heart, so she really puts people
7    first in general, but it seemed to be more difficult because
8    they seemed to be pretty good friends, and so I think it was
9    harder for Dr. DeMars to be able to step back from that.
10   Q.    So you just testified about some friction, and I think you
11   used the word "chaos" with respect to the REI division.  Was
12   that the case in the 2014 to 2016 timeframe as well?
13   A.    I wouldn't use the word "chaos" for that timeframe.  I
14   know that there was friction, but it certainly was not taking
15   up as much of my time, and it didn't seem quite as drastic.
16   Q.    In the 2014 to 2016 timeframe, do you have a sense of
17   whether the providers within the REI division were able to
18   communicate with one another effectively?
19   A.    From 2014 to 2016?  It seemed to be better, but I don't, I
20   wasn't involved quite as much, so I don't know.
21   Q.    Why were you involved less during that time?
22   A.    I think there were several reasons.  One, I was relatively
23   new in the position.  So, in that 2014 to 2016 timeframe,
24   Dr. Reindollar, who was the chair, was also in the REI
25   division, and so there was more focus there, and it wasn't, it,

VOLUME: 9
PAGES: 647-860

1    frankly, it just wasn't quite as bad.  There wasn't quite as

2    much infighting, so I wasn't as involved.

3    Q.   So you're referring, when you refer to the period that you

4    felt like there was less infighting, you're referring to the

5    period when Dr. Reindollar was the chair of the department?

6    A.   Yes.

7    Q.   Okay.  Is it possible Dr. DeMars was chair of the division

8    during that timeframe?

9    A.   I think I might have misheard your dates.  Could you

10   repeat that, please?

11   Q.   Sure.  I'm asking specifically about 2014 to 2016.

12   A.   She was interim during that time, so it is possible that

13   I'm mixing up my timeframes, yes.

14   Q.   But, to be clear, the time that you're talking about where

15   there was less sort of friction, that would have been the

16   Reindollar era, so to speak?

17   A.   That's right.

18   Q.   Subsequent to that when Dr. DeMars was the chair of the

19   OB/GYN department, how did you feel the dynamics of the REI

20   division were?

21   A.   It started to shift over time, so when new providers

22   started coming in, so it got to where it was just more

23   complicated and they didn't seem to communicate as well.

24   Q.   During this timeframe, did patient complaints come to you?

25   A.   During which timeframe?

VOLUME: 9
PAGES: 647-860

1    Q.    When Dr. DeMars was the chair.

2    A.    Some, some of them would come to me, yes.

3    Q.    Do you recall any patient complaints with respect to the

4    REI division specifically?

5    A.    Yes, I do.

6    Q.    And were there any providers in particular that the

7    complaints were about?

8    A.    I would get complaints about all three of them.

9    Q.    And can you describe generally the nature of those

10   complaints?

11   A.    Often, the complaints were -- I don't remember all of the

12   details, but many of them were around communication.  So I'm

13   working with one provider and one nurse, and this was the plan

14   they gave me, and then I called and talked to somebody else,

15   and they said it should be something different.  So I got some

16   of those complaints.  I got some complaints, which was not

17   uncommon, that a patient just didn't like a provider's bedside

18   manner, so to speak.  So there were some of those complaints.

19   A lot of it was around the miscommunication during that

20   timeframe, though.

21   Q.    Did the REI division receive more or less or the same

22   amount of patient complaints than the other divisions you were

23   responsible for?

24   A.    You know, I don't remember the exact numbers.  It felt

25   like more.  Yeah.

1    Q.    Would you describe there as being a friction in any of the

2    other divisions that you managed?

3    A.    There was some friction in some of the other divisions but

4    nothing compared to the REI division.

5    Q.    Do you have a sense of how much time you spent managing

6    the REI division as compared to the other divisions you were

7    responsible for?

8    A.    Like, as a percentage?

9    Q.    As best you can.

10    A.    Okay.  It seemed to me that there were some weeks when all

11    I did was deal with REI.  It was very frustrating to have so

12    much attention disproportionate one area of the department.

13    Q.    From your perspective, did Dr. Porter contribute to the

14    friction that you described?

15    A.    Yes.

16    Q.    How so?

17    A.    Dr. Porter could be really difficult to work with if she

18    wasn't getting her way.  So there was some challenges with

19    communication with the other providers, and there just seemed

20    to be -- it was really challenging to make any improvements in

21    the department, to bring people together, to try to come to

22    some sort of collective agreement, and she contributed in that

23    way.

24    Q.    How did Dr. Porter get along with the nursing staff within

25    the REI division?

VOLUME: 9
PAGES: 647-860

1   A.   Depended on the nurse.

2   Q.   Nurses other than Beth Todd and Sharon Parent, how did she

3   get along with those nurses?

4   A.   They, she got along best with Sharon and Beth.  Some of

5   the other nurses she could work better than others, but there

6   was a lot more friction with the other nurses that I was aware

7   of.

8   Q.   Are you aware of issues with the REI division's ability to

9   recruit and retain nurses?

10  A.   Yes, I am.

11  Q.   Do you have any opinion as to whether Dr. Porter's

12  behavior impacted the ability to retain nurses in the REI

13  division?

14  A.   So I would say that, collectively, the dynamic in that

15  division made it difficult to retain nurses, and I do know that

16  there were some of the nurses that felt excluded or kind of

17  ostracized by Dr. Porter and Sharon as a team.

18  Q.   Beyond those kind of interpersonal issues that you just

19  described, are there any other factors that you think played

20  into the REI division's ability to recruit and retain nurses?

21  A.   Yes.  It was a different role as a nurse than many of them

22  in the clinic.  So it did require call on weekends and

23  holidays.  There was a higher level of expertise that was

24  required with those nurses, and the patient population

25  required, in my opinion, like, a different level of compassion

1    and empathy.  So there were a lot of factors that made that a
2    challenging role to recruit for.
3    Q.  And I think you mentioned that the REI nurses required a
4    higher level of expertise.  Can you explain that a little bit
5    more?
6    A.  Well, my not being a clinician, my understanding was that
7    they had to be able to do work with procedures.  The timing of
8    the care required a lot of precision.  They, it was a lot more
9    than being a generalist RN in the division, and it required
10   quite a lot of training.
11   Q.  Training specific to REI work?
12   A.  That's correct.
13   Q.  Are you familiar with efforts that the REI division made
14   to recruit nurses?
15   A.  Yes.
16           ATTORNEY McDONALD:  I'll ask you to take a look at
17   Exhibit A9, and my notes indicate that this has already been
18   admitted.  I'll ask Mr. Howe to confirm that.
19           COURTROOM DEPUTY:  Yes.
20           ATTORNEY McDONALD:  Could I please ask that that be
21   published to the jury and the Witness?
22   BY ATTORNEY McDONALD:
23   Q.  Give you a moment to review that.  I'm going to ask you
24   specifically about the information on the second page, okay?
25   A.  Okay.

VOLUME: 9
PAGES: 647-860

1    Q.   Let me back up a little bit for a moment.  This is an

2    email that you sent to Katy Mansfield on November 4th 2016,

3    correct, the top of the email?

4    A.   That's correct, yes.

5    Q.   And, turning to the second page and the final large

6    paragraph there, it says, "OB/GYN is requesting an expedited

7    posting of a staff nurse position in our REI department for the

8    following reasons".  The first bullet says, "The position is

9    one of three and is currently vacant", and then final bullet in

10   that paragraph is, "One of our two remaining nurses retires as

11   of December 2nd 2016".

12        Do you know who, which nurse that that last bullet point

13   is referring to?

14   A.   That would have been Sharon Parent.

15   Q.   So this is suggesting that there's a need for an

16   additional nurse above and beyond Sharon Parent, correct?  That

17   is, even before Sharon Parent retires, there was a need for

18   another nurse, correct?

19   A.   That's my recollection.

20   Q.   Okay.  So, if Sharon Parent had not retired, there would

21   still be a need for another nurse?

22   A.   Yes.

23   Q.   All right.  We can take that one down.  Thank you.  What

24   is the Value Institute?

25   A.   The Value Institute is the group in the organization that

VOLUME: 9
PAGES: 647-860

1    works on process improvement projects.  So they do all of the

2    training like the one I went through, and then they could also

3    help with focused process improvement projects.

4    Q.   At some point, did the Value Institute become involved

5    with the REI division?

6    A.   Yes, they did.

7    Q.   And how did they become involved?

8    A.   I called them.

9    Q.   Why did you call them?

10   A.   I called them you because I felt like the situation had

11   gotten so complicated and we just weren't making any progress.

12   So I reached out to them almost as a last-ditch effort to see

13   if we could get some outside support to help bring that team

14   together.

15   Q.   And did the Value Institute agree to meet with members of

16   the REI division subsequent to your call to them?

17   A.   Yes.

18   Q.   How did those meetings go?

19   A.   I can only speak to the ones I was in, some of the group

20   meetings.  There was a lot of work that was done to look at the

21   difference in processes to try figure out how we could create

22   efficiencies.  I would say the, well, they obviously did not go

23   well, because it didn't work, but I think the meetings

24   themselves were a mixture of productive and frustrating.

25   Q.   And why do you say that they were, in part, frustrating?

VOLUME: 9
PAGES: 647-860

1    A.    I, my perception was that the providers were just simply

2    not willing to do the type of compromise necessary to come

3    together.

4    Q.    And, when you say the providers, who are you referring to?

5    A.    I'm referring to Dr. Porter, Dr. Hsu, and Dr. Seifer.

6    Q.    Did the Value Institute work with the REI division in

7    2016?

8    A.    Yes, late fall, I believe.

9    Q.    And did that work continue into 2017 as well?

10    A.    Yes, it did.

11    Q.    Beyond the work the Value Institute was doing, at some

12    point, were weekly meetings instituted in the REI division to

13    try to repair some of the issues you've described?

14    A.    Yes.  I, I believe it was after the Value Institute

15    started doing time studies but before the big meetings started,

16    and so the REI division started having their weekly team

17    meetings again.

18    Q.    Could I please ask that Defense Exhibit N be displayed to

19    the Court and to the Witness and the litigants?  And I don't

20    believe this has been admitted yet.  If it's easier for you to

21    read, there's also a hard copy in a binder, whatever you

22    prefer.

23    A.    This one?

24    Q.    It would be one of the black binders, and it would be

25    Volume 1, if that's easier for you to review.

1    A.    Volume 1?  Okay.

2    Q.    Tab N.  Have you had a chance to review it?

3    A.    Yeah, I have.

4    Q.    Do you recognize this document?

5    A.    Yes.

6    Q.    Is this an email that you circulated with meeting minutes

7    from one of the meetings we just described?

8    A.    Yes.

9              ATTORNEY McDONALD:  I move to admit Exhibit N.

10             THE COURT:  Any objection?

11             ATTORNEY NUNAN:  No objection.

12             THE COURT:  Okay.  It's admitted, Exhibit N.

13   BY ATTORNEY McDONALD:

14   Q.    And I would ask you turn to the second page and

15   specifically looking at Paragraph D, which is around the middle

16   of the second page.

17   A.    Okay.

18   Q.    And it says, "Heather State of the State".  Are you the

19   Heather that that refers to?

20   A.    I am.

21   Q.    Okay.  And then it says, "We've heard some patient

22   complaints about their perception of communication between team

23   members.  We are also having issues with workload, work flow

24   for the nurses".  Did I read that correctly?

25   A.    That's correct.

VOLUME: 9
PAGES: 647-860

1    Q.   And then it says, "Heather has reached out to the Value
2    Institute for help with process improvement.  Hillary will
3    spend next week observing our baseline, nurses, Donna, Beth.
4    She'll do observation, data gathering, and point our areas that
5    we need to focus".
6         So we talked about this a little bit, but are your
7    references to communication between team members and patient
8    complaints, does that refer, to your understanding, to the
9    inability to communicate among the providers in the REI
10   division?
11   A.   Yes.  But I think it also included the nurses to some
12   degree.
13   Q.   Okay.  Who is Hillary in the quotes below?  Is she from
14   the Value Institute?
15   A.   Yes.
16   Q.   So this email is dated May 20th 2016.  So is it fair to
17   assume that work with the Value Institute began around May 20
18   of -- oh, I'm sorry.  I apologize.  Could we have this
19   published to the jury?  Thank you.  Sorry.
20   BY ATTORNEY McDONALD:
21   Q.   So does this, am I right that that suggests that the work
22   with the Value Institute began at least as early as May of
23   2016?
24   A.   Yes.
25   Q.   Okay.  And, in that time period, do you have a sense of

1    what work the Value Institute was doing with the REI division?

2    A.    My recollection is that they started with kind of a time

3    study where they followed the nurses and the secretaries at the

4    time to get a sense of what that work flow looked like.

5              ATTORNEY McDONALD:  Thank you.  You can set that

6    document aside.  I'm going to ask you next to look at

7    Defendant's Exhibit P, which should be in the same binder, just

8    tab P.  This one has also not been admitted.  So I'd just ask

9    that this just be displayed to the litigants, the Court, and

10   the Witness at this time.

11             ATTORNEY VITT:  Could we hear the letter again?  I'm

12   sorry.

13             ATTORNEY McDONALD:  P.

14             ATTORNEY VITT:  Okay.  That's why.

15             THE WITNESS:  Okay.

16   BY ATTORNEY McDONALD:

17   Q.    Have you had a chance to review?

18   A.    I have.

19   Q.    Do you recognize this document?

20   A.    Yes.

21   Q.    Is this a document that you sent to members of the REI

22   division with meeting minutes from a May 25, 2016 REI meeting?

23   A.    Yes.

24             ATTORNEY McDONALD:  Move for the admission of Exhibit

25   P.

VOLUME: 9
PAGES: 647-860

1          THE COURT:  Any objection?

2          ATTORNEY NUNAN:  No objection.

3          THE COURT:  Exhibit P is admitted.  Would you like it

4     published?

5          ATTORNEY McDONALD:  Yes, please.  Thank you.

6     BY ATTORNEY McDONALD:

7     Q.   So about midway through the first page there it says,

8     "Participating by phone, Heather Gunnell".  That's you, right?

9     A.   That's me, yes.

10    Q.   And, looking down the page a little bit at sub.2, about

11    the final 25 percent of the page, "We have an IVF RN

12    coordinator candidate who is coming for interviews at some

13    point TBD.  Katy will send out a notice about that".

14         Does this suggest to you that the efforts to recruit

15    nurses were discussed at this meeting?

16    A.   Yes.

17    Q.   And, again, this meeting is May 25, 2016, correct?

18    A.   That's correct.

19    Q.   And 2C states that, "We've had this position open for a

20    month, and we've only had one candidate, and we're not getting

21    the volume of candidates that we're used to getting".

22         Is that accurate from your perspective?

23    A.   Yes.

24    Q.   And then at Part D it says towards the end of that, 2D,

25    "Sharon pointed out that the optimal situation would be three

VOLUME: 9
PAGES: 647-860

1    full-time nurses".  Would you agree with that assessment?

2    A.    Yes.

3    Q.    Turning to the second page of that document, Paragraph 5,

4    which is about the middle of the page, beginning with

5    discussion, "Discussion about basic communication within the

6    division and with patients.  Let's all work on the quality of

7    every communication we have with each other" and then it's

8    bolded, "be inclusive of any provider that may come in contact

9    with the patient so they are all kept informed".  Did I read

10   that correctly?

11   A.    You did.

12   Q.    Do you remember this being an issue with respect to

13   providers in the REI division?

14   A.    Yes.

15   Q.    Can you explain that a little bit?

16   A.    Yeah.  I'm thinking about how to think about that.  So I

17   think it was fairly common for providers to send communication

18   to either, the nurse that they worked with primarily or just

19   their kind of team, as instead of sending it to all of the

20   providers.  So I think there was a lot of, like, friction

21   around this idea of who should be included in which

22   communications.

23   Q.    All right.  Thank you.  You can set that document aside as

24   well.  I'm going move next to Defendant's Exhibit Q.  Has also

25   not yet been admitted, so I'd just ask for now it be published

VOLUME: 9
PAGES: 647-860

1    just to the Court, the litigants, and the Witness.  And it's

2    Tab Q in your binder.  Had a chance to review.

3    A.    Okay.

4    Q.    Do you recognize this document?

5    A.    Yes.

6    Q.    And this meeting minutes from a June 2016 REI meeting?

7    A.    That's correct.

8    Q.    And the bottom third of the page, Paragraph 2 -- oh, could

9    I move for the admission of Exhibit Q?

10            THE COURT:  Any objection?

11            ATTORNEY NUNAN:  No objection.

12            THE COURT:  Okay.  Exhibit Q is admitted.

13            ATTORNEY McDONALD:  Can I also ask that this be

14    published to the jury?  Got it now.

15    BY ATTORNEY McDONALD:

16    Q.    The bottom third of the page beginning with, "Follow-up,

17    slash, update", so, "Follow-up, slash, update on IVF RN

18    coordinator candidate.  The job is a 40-hour position, plus

19    weekend call, has been post for four to five weeks.  Per Beth

20    and Casey, we have had eight RN coordinators in our program

21    here over the past 12 to 13 years.  People have left because

22    didn't want to do call/hours, not a good fit, unsuccessful at

23    job.  Common themes of why:  Lack of understanding of job,

24    hours, and work needed".  And then attributes this quote to

25    you, Heather:  "Job also takes a certain type of personality

VOLUME: 9
PAGES: 647-860

1    and a close working team".  Did I read all of that correctly?

2    A.    Yes.

3    Q.    And is all of that information accurate from your

4    perspective?

5    A.    Yes.

6    Q.    And do you recall having the opinion or expressing the

7    opinion that the job takes a certain type of personality and a

8    close working team?

9    A.    Yes.

10   Q.    Can you expound on that a little bit?

11   A.    Yeah.  I think nurses in this division needed to be able

12   to have a high level of kind of touch and compassion with the

13   patient.  So some of the these patients were high-maintenance,

14   but I don't say that in a derogatory way.  They just required a

15   lot more attention because of all of the details.  And, also,

16   because that team was so complicated, that I think it required

17   a personality that could be a good mediator that could also

18   work really autonomously because the role required that, and

19   yet they still needed to be able and willing to be part of a

20   cohesive team.  So it was a complicated position for us to

21   recruit for.

22   Q.    Thank you.  You can set that document aside as well.

23   Continuing with the theme of meeting minutes, I'm going to ask

24   you to a take a look at A17, which I have a note already has

25   been admitted.  I ask that this be published to the jury.

VOLUME: 9
PAGES: 647-860

1          So the date on this document is December of 2016, correct?

2     A.   That's correct.

3     Q.   So this is roughly seven months after the first meeting

4     minutes that we looked at, correct?

5     A.   Yes.

6     Q.   Turning to Paragraph C, which is in the lower half of this

7     first page, "We've had open positions for seven to eight

8     months, and we haven't gotten applicants for a while".  Did I

9     read that right?

10    A.   Yes.

11    Q.   Does that refer to nursing positions?

12    A.   Yes, in the REI division.

13    Q.   In the REI division?  Do you recall that positions would

14    be posted for as long as eight months without applications?

15    A.   I don't remember it, but I remember it being a long time

16    and that Katy, the nurse manager, was having a really difficult

17    time finding candidates.

18    Q.   And then, moving up in this document to point 1, "We need

19    to discuss how to pull together and reset everything in the

20    month of January.  Heather has a plan".  Do you know what that

21    refers to?

22    A.   I think that line is funny, that that's how that was

23    categorized.  I believe that refers to the plan to do what we

24    called the pause on accepting new patients for the month of

25    January and to only maintain the patients currently in cycle,

 1    and the goal there was to free up enough time and space to

 2    implement some of the recommendations from the Value Institute.

 3    Q.   So I think you just testified, and correct me if I'm

 4    wrong, that there would be a pause on new patients, or would

 5    there be a pause on old patients as well?

 6    A.   My recollection is that anyone who wasn't in active cycle

 7    we would not start so that there would be enough of a break in

 8    the clinical care.

 9    Q.   And can you give us a sense of why that suggestion was

10    made to pause patients during the month of January?

11    A.   I'm trying to remember the details of that.  It's been so

12    long.  I think we were down nurses.  The team still had not

13    come together around better work flows.  There were still

14    communication issues, and what I remember is that the idea was

15    we needed to be able to -- we can't fit this in around the

16    margins of the day-to-day work, and we have to be able to call

17    a time out and let this group come together and see if we can

18    streamline some of this work.

19    Q.   And was this proposed pause implemented?

20    A.   Yes.

21    Q.   One more meeting minutes for you to look at.  Could you

22    take a look at Defendant's Exhibit A22, which should still be

23    in the same volume of your book?  This one has not been

24    admitted yet, so if I could just ask that this be just

25    displayed for the Court and the litigants.

1          Have you had a chance to review?

2      A.   Yes.

3      Q.   Do you recognize this document?

4      A.   Yes.

5      Q.   This is a document from David Seifer sent to a number of

6      folks on 12/28/2016, subject "REI Minutes Wednesday 12/28".  Is

7      that what this is?

8      A.   Yes, yeah.

9          ATTORNEY McDONALD:  I move for the admission of A22.

10          ATTORNEY NUNAN:  No objection.

11          THE COURT:  Okay.  A22 is admitted.

12          ATTORNEY McDONALD:  And could this please be

13      published for the jury?

14      BY ATTORNEY McDONALD:

15      Q.   Taking a look at the first page, David, I assume David

16      wrote this email.  He writes, "Please note Alison Mumford will

17      be here to observe", and then lists a number of dates.

18          Who is Alison Mumford?

19      A.   She was in the Value Institute and was working with us.

20      Q.   Do you recall her coming to observe in the January

21      timeframe on a number of dates?

22      A.   I know she did.  I don't remember the details.

23      Q.   Fair enough.  Turning to Page 2 of this document, are

24      these meetings minutes from what looks to be December 28 of

25      2016?

VOLUME: 9
PAGES: 647-860

1    A.    Yes.

2    Q.    Okay.  Looking at Paragraph 1, this appears to be related

3    to ongoing efforts to recruit nurses; is that correct?

4    A.    That's correct.

5    Q.    And, "Barbara Dennis is our recruiter working from home

6    right now".  Do you recall a recruiter being brought on to find

7    nurses?

8    A.    Yes.

9    Q.    And it says that, "Barbara Dennis will go back to the last

10   two years of applicants, reach out to old applicants for REI

11   positions to see if there's anyone else out there.  Could also

12   look into a signing bonus, which might not help with retention

13   but could help".  Did I read that correctly?

14   A.    Yes.

15   Q.    And then, "Also looked at ad agency, looked at pricing and

16   journals", and the first bullet there is ASRM, and the final

17   bullet there is, "Total of $2,000 for advertising.  Would need

18   leadership to proceed".

19         Do you recall whether a nurse or a posting for a nurse job

20   was submitted to ASRM?

21   A.    Yes, I remember that.

22   Q.    And do you recall whether there was a cost associated with

23   that posting?

24   A.    I don't remember.

25   Q.    All right.  And then Subparagraph F of 1, "Plan for

1    advertising:  Facebook, advertising in reproductive nursing

2    sites mentioned above, Indeed.com targeting reproductive nurses

3    and reproductive nurse groups".  Did I read that correctly?

4    A.   Yes.

5    Q.   Do you have a memory of advertising on these various

6    sites?

7    A.   Yeah, I remember Katy working on that.  I don't remember

8    all of the details around this, but we put in a lot of effort

9    to try to recruit nurses.

10   Q.   All right.  Now I'll ask you to turn to the third page of

11   this document, the second half of the page, Point L which

12   begins with the word "Pavel".  Who is DBS, do you know?

13   A.   I think that's David Seifer.

14   Q.   And under A.3 it says, "The ultimate goal is for us to

15   works as one team, not three teams".  Is that consistent with

16   what you've testified to today with respect to the teams in the

17   REI division?

18   A.   Yes.

19   Q.   And so does that suggest to you that the Value Institute

20   was focused on trying to be one team rather than three teams?

21   A.   Yes.

22   Q.   At the bottom of this page, Point F, "Katy after the

23   shadowing.  They came back and said, You guys obviously don't

24   communicate well, and so we had a retreat".

25        Is the "they" there the Value Institute?

1    A.   I believe so.

2    Q.   So fair to say that the Value Institute concluded that

3    there were communication issues in the division?

4    A.   Yes.

5    Q.   All right, thank you.  You can set that document aside

6    that will be the last meeting minutes I bother you with.  I'll

7    ask you now to turn to Document Defendant's Exhibit A25, and

8    I'll give a minute to review that.

9    A.   Okay.

10   Q.   I now ask that that be published to the litigants and the

11   Court as well.  Do you recognize this document?

12   A.   Yes, I do.

13   Q.   Is this an email from Alison Mumford to a number of

14   people, subject "Action Plan"?

15   A.   Yes.

16              ATTORNEY McDONALD:  Move to admit A25.

17              THE COURT:  Any objection?

18              ATTORNEY NUNAN:  No objection.

19              THE COURT:  Okay.  A25 is admitted.

20   BY ATTORNEY McDONALD:

21   Q.   I think you testified, correct me if I'm wrong, that

22   Alison Mumford was associated with the Value Institute.

23   A.   Yes.

24   Q.   So do you have a sense of what this email is?

25   A.   My sense of this email is that it included the summary of

VOLUME: 9
PAGES: 647-860

1    a lot of work they did observing the team with some

2    recommendations.

3            THE COURT:  Ms. McDonald, would you like that

4    published?

5            ATTORNEY McDONALD:  Oh, yes.  Thank you.

6            THE COURT:  Okay.

7    BY ATTORNEY McDONALD:

8    Q.   And I'll ask you to turn to Page 3 of this document.  So

9    at the bottom it will say A25.  And the ground rules are,

10   include speaking clearly, listening, being respectful.  Is

11   there a reason, from your perspective, that that needed to be,

12   that instruction needed to be given to the REI division?

13   A.   Yeah.  I mean, I think it's always good advice when you're

14   doing a group session like this to have those, but I think this

15   group in particular did not do a good job of listening to one

16   another.

17   Q.   And did you attended some of these Value Institute

18   meetings; is that correct?

19   A.   Yes, I did.

20   Q.   And, from your perspective in those meetings, did that

21   group have difficulty speaking with one person speaking at a

22   time, listening, and being respectful?

23   A.   I don't remember the details of the day-to-day in those

24   session.  I remember it feeling sort of tense and often feeling

25   like it was just like they weren't actually speaking to each

VOLUME: 9
PAGES: 647-860

1    other but sort of past each other, even if they weren't

2    interrupting.

3    Q.    That would be all of the providers that attended?

4    A.    That's correct.

5    Q.    Thank you.  Did the Value Institute make any findings or

6    reach any conclusions about the future of the REI division?

7    A.    About the future of the division?

8    Q.    Or just general about the REI division and its function.

9    A.    Yeah, so there were some, if I remember correctly, very

10   clearly that there were different work flows depending on which

11   team in the division was working on.  So they recommended

12   having to streamline it to reduce the variation.  They also

13   recommended figuring out some communication.  I mean, it was

14   just a mess.  They couldn't get along, and it was really

15   difficult to be able to navigate that, and patients were being

16   impacted.  So they had a number of recommendations.  I don't

17   remember all of the details.

18   Q.    Thank you.  Going back a little bit to our discussion

19   earlier about the pause that was put in place at the end of

20   December of 2016, beginning of 2017, could I ask you to take a

21   look at Exhibit A18?  That should also be in Volume 1 of your

22   book, and I would ask it to be published to the Court and the

23   litigants.

24   A.    Okay.

25   Q.    Do you recognize this document?

1    A.    Yes, I do.

2    Q.    And is this an email and attachments you sent to a number

3    of people in the REI division on December 15th 2016?

4    A.    That's correct.

5              ATTORNEY McDONALD:  Move for the admission of A18.

6              THE COURT:  Any objection?

7              ATTORNEY NUNAN:  No objection.

8              THE COURT:  Okay.  A18 is admitted.

9              ATTORNEY McDONALD:  Could this be published to the

10   jury?

11   BY ATTORNEY McDONALD:

12   Q.    Please take a look at the second page.  You testified

13   earlier that the decision was made to pause new patients at the

14   end of 2016 and there were a number of reasons for that

15   decision, correct?

16   A.    That's correct.

17   Q.    Okay.  I'll ask you to take a look at the first paragraph

18   on Page 2.  I'll ask you to read that first paragraph,

19   beginning with "situation".  If you wouldn't mind reading it

20   out loud.  I wasn't clear.  Thank you.

21   A.    It says, "Situation.  Over the last year, REI, a division

22   of the OB/GYN at Dartmouth-Hitchcock, has struggled.

23   Challenges have included tough team dynamics, new leadership,

24   staff on leave, organizational layoffs that have affected the

25   team as well as other staff attrition.  Currently, REI has only

1    one nurse and is having significant difficulty recruiting new

2    nurses, partly due to the difficult team environment and partly

3    due to the specialized knowledge needed.  At the same time, the

4    REI team has, over the past three to four months, had a highly

5    successful pregnancy rate at 90 percent."

6    Q.   Is all that accurate from your perspective?

7    A.   Yes.

8    Q.   All right.  Now turning to the paragraph that begins with

9    "assessment", if I could ask you to read that paragraph out

10   loud.

11   A.   Okay.  "Assessment.  Given the work and the team

12   environment, possible solutions include shutting down the REI

13   department or moving a significant amount of patient cycle

14   management to the Bedford location.  Given the high pregnancy

15   rate, it has been determined by the section chair, VP

16   Dr. DeMars, that they would like to pause in order to reset the

17   division in order to appropriately move forward".

18   Q.   Do you recall discussions about the possible shutting down

19   of the REI division in as early as December of 2016?

20   A.   Yes.

21   Q.   And can you describe how those conversations came about or

22   how you became aware of those conversations, I should say?

23   A.   So I met with Dr. DeMars weekly, and this division was

24   usually the topic of conversation, and so that is how I became

25   aware of it.  I know it was after the work, a lot of work with

VOLUME: 9
PAGES: 647-860

1    the Value Institute, although we did still, we were still

2    working with them in 2017 as well.

3    Q.   Thank you.  In your role as practice manager of the OB/GYN

4    department and administrative director of the OB/GYN

5    department, were you familiar with the nurse practitioners?

6    A.   Yes.

7    Q.   And, in particular, are you familiar with Beth Todd?

8    A.   Yes.

9    Q.   Do you know whether she performed work in the REI

10   division?

11   A.   She did.

12   Q.   Do you know whether she was also appointed in the OB/GYN

13   generalist division?

14   A.   Yes, she was.

15   Q.   I'm going to ask you to take a look at C13, which has

16   already been admitted, and I'm going to specifically ask that

17   Page 12 of C13 be published to the jury and to the litigants

18   and the Court.

19        So take a look at this chart, and I should give you some

20   context.  This relates to an exhibit that's already been

21   admitted related to a severance agreement.  This is attached to

22   that document, and, at the top of this document, it says, "The

23   following chart provides a list of the job titles for those

24   positions considered for elimination and, if eligible, an offer

25   of severance in connection with the decision to close the

1    reproductive endocrinology and infertility program".

2         Taking a look at that chart -- before I go there,

3    actually, the first star below that chart suggests that, "A

4    single asterisk indicates that employee primarily worked

5    outside of the REI program and the employee's duties were

6    reassigned such that the employee was not ultimately selected

7    for layoff".  Did I read that correctly?

8    A.   That's correct.

9    Q.   And it looks like there's only one individual in this

10   chart that that applies to, and it's the first individual

11   listed in that chart.  Would you agree with me?

12   A.   That's right.

13        THE COURT:  So the monitor over there is flickering

14   on and off, and the exhibit is appearing and disappearing.  We

15   can ask Mr. Howe to work his technical expertise.

16        ATTORNEY McDONALD:  Could you please?  Thank you very

17   much.

18        THE WITNESS:  Must be a different binder than this

19   one.

20        ATTORNEY McDONALD:  That probably is a different

21   binder.  May I approach?

22        THE COURT:  Yes.

23        THE WITNESS:  Thank you.

24   BY ATTORNEY McDONALD:

25   Q.   You may not have seen what I was referring to, but, "A

1    single star indicates that employee primarily worked outside of

2    the REI program".  Did I read that correctly?

3    A.    Yes, you did.

4    Q.    And you see at the top the first individual listed in this

5    chart, "ADV prac NRS".  Do you know what that refers to?

6    A.    That refers to the APRN, so Beth Todd.

7    Q.    So that's Beth Todd from your perspective?

8    A.    Yes.

9    Q.    Okay.  So is it your understanding that Beth Todd

10    primarily worked outside the REI program?

11    A.    I don't remember the exact FTE allocation, but this tells

12    me it was at least .5.

13    Q.    Thank you.  Switching gears a little bit, as I'm sure

14    you're aware, the REI division closed in May of 2017.  Did you

15    support the decision to close the REI division?

16    A.    Yes, I did.

17    Q.    Can you tell us why?

18    A.    I think that, you know, ultimately, I think the division

19    was beyond repair.  So the providers simply were not willing to

20    compromise or come together.  We had lost the last fully

21    trained nurse, and there was only one RN, and, from my

22    perspective, it just wasn't, it wasn't safe for patients, and I

23    couldn't see how we could fix it quickly enough.

24    Q.    Do you know whether others in the OB/GYN department agreed

25    with those sentiments?

1    A.    I know I had conversations with Dr. DeMars about it quite

2    a bit.  I think it probably depended on who we were talking to.

3    Q.    And, now, as you sit here today and you look back on this

4    decision, do you still think that closing the division was the

5    right decision?

6    A.    Yes, I do.

7    Q.    Do you think that the decision to include Dr. Porter in

8    the terminations associated with the closure was the right

9    decision?

10    A.    Yes, I do.

11    Q.    And why do you say that?

12    A.    I don't, I don't actually think that restarting that

13    program with her would have been successful.  I don't know that

14    she would have supported a division director leading her.

15    Q.    And can you expand on that a little bit?

16    A.    In my observation, Dr. Porter wanted to be the person in

17    charge, and so I don't have any reason to believe she would

18    have supported somebody in that role.

19           ATTORNEY McDONALD:  Thank you.  If I could just have

20    one moment?

21           THE COURT:  Yes.

22           ATTORNEY McDONALD:  Thank you.  Nothing further.

23    Thank you.

24           THE COURT:  Okay.  Cross-examination?

25                CROSS-EXAMINATION BY ATTORNEY NUNAN

VOLUME: 9
PAGES: 647-860

1    Q.   Hi, Ms. Gunnell.  I'm Sarah Nunan.  We met at your
2    deposition.
3    A.   I vaguely remember, yes.
4    Q.   Would you describe Sharon Parent as always professional
5    and very careful with her words?
6    A.   Yes, I would.
7    Q.   Those are your words, aren't they?
8    A.   Probably, yes.
9    Q.   And do you remember that she gave one year's notice that
10   she was leaving?
11   A.   I do remember.
12   Q.   Yeah.  So that was about December of 2015?
13   A.   Yes.
14   Q.   Great.  And do you remember that she intended to come back
15   and work per diem?
16   A.   I don't remember that that was the intention.  I remember
17   it being talked about.
18   Q.   By her by someone else?
19   A.   By, I don't remember exactly, but it was a topic of
20   conversation in the division.
21   Q.   Is it your memory that Dr. Porter only attended about 50
22   percent of the Value Institute?
23   A.   I don't remember exactly what -- I don't think she was at
24   all of them.
25   Q.   Right.

1    A.   Right.

2    Q.   And were you aware that she asked to have them moved so

3    that she could attend at times because of her disability?

4    A.   I don't remember that.

5    Q.   You were the practice manager, so you were on the

6    operational side, correct?

7    A.   That's correct.

8    Q.   We heard before that you were paired with the chair of the

9    OB/GYN department, Leslie DeMars; is that right?  She was on

10   the clinical side, you were on the operations side?

11   A.   Yes, that's correct.

12   Q.   Great.  And you reported up to Daniel Herrick?

13   A.   Yes.  When I, once I was the director and in that interim

14   time when there was no director, yes, I reported up to him.

15   Q.   Okay.  And, as practice manager, did you meet with him

16   weekly?

17   A.   No.

18   Q.   And did you meet with him quarterly to review the budget?

19   A.   Yes.  I don't remember, like, a specific cadence of

20   meeting.

21   Q.   It was sporadic?

22   A.   Correct.

23   Q.   Got it.  And did Kelly Mousley report to you?  She was the

24   scheduler?

25   A.   She was the administrative supervisor, not the scheduler,

1    but, yes, she did report to me.

2    Q.   Okay.  Was she in charge of the scheduling?

3    A.   She was in charge of overseeing the scheduling

4    secretaries.

5    Q.   Right.

6    A.   Yeah.

7    Q.   And did you report in the summer of 2016 to Daniel Herrick

8    about the REI division?

9    A.   I don't remember the details.

10   Q.   Okay.  If I said to you that you reported in the summer of

11   2016 that there was an inordinate, inordinately high staff

12   turnover, customer complaints, three silos, and a need for the

13   Value Institute, does that sound somewhat familiar about what

14   you told Daniel Herrick in the summer of 2016?

15   A.   Yes, I did tell him we were engaging the Value Institute.

16   Q.   And by customer complaints, did you mean patients when you

17   said that?  Do you have any idea?

18   A.   It would have been patients.

19   Q.   Patients, not customers?

20   A.   Yeah, correct.

21   Q.   Okay.  And so were you aware that, in the beginning of

22   June of 2016, that there was an eleven-page assessment written

23   about Dr. Hsu and his competence?

24            ATTORNEY McDONALD:  Objection, outside the scope.

25            THE COURT:  Overruled.

VOLUME: 9
PAGES: 647-860

1          THE WITNESS:  Can you repeat that, please?

2     BY ATTORNEY NUNAN:

3     Q.    Sure.  Were you aware that, at the beginning of June 2016,

4     there was an eleven-page assessment written about Dr. Hsu and

5     his competence?

6     A.    I never saw it.  I remember Leslie mentioning that there

7     was something about that.  I didn't know it was 11 pages.

8     Q.    Okay.

9     A.    Yeah.

10    Q.    But you were aware that it was written?

11    A.    I don't remember.  I remember hearing that there were

12    complaints about that.  I don't remember knowing that there was

13    a report written.

14    Q.    Complaints about that, what did you mean, complaints about

15    that?

16    A.    So I know that it was talked about a lot that people, that

17    Dr. Porter talked a lot about Dr. Hsu's competence.

18    Q.    Did Dr. DeMars tell you that there was an eleven-page

19    assessment written about his incompetence?

20    A.    I don't remember that.

21    Q.    Okay.  And would you agree that incompetence creates chaos

22    and problems?

23    A.    In general?

24    Q.    With a physician, if there is a physician that is

25    incompetent, do you think, within an operation, that would

1    create chaos and problems?

2    A.    It certainly could.  I would say that those problems

3    existed prior to Dr. Hsu in some cases.

4    Q.    Is the fact that there was a report written about Dr. Hsu

5    that you had some knowledge of, is that something that you

6    would report up to Daniel Herrick?

7    A.    Again, if that's on the clinical competency side, that

8    would have been Dr. DeMars's realm, and that would not have

9    been something that I would have been actively involved in.

10   Q.    Because you're on the operational side?

11   A.    That's correct.

12   Q.    Okay.  And were you aware that, at the end of July in

13   2016, that Dr. DeMars came to the conclusion that David Seifer

14   was clinically incompetent?

15   A.    No.

16   Q.    You weren't aware of that?

17   A.    That she said he was?

18   Q.    Clinically incompetent.

19   A.    No.

20   Q.    Okay.  Did she tell you that?

21   A.    No, I don't ever remember her saying that to me.

22   Q.    Okay.  If you had known that information, is that

23   something you would have reported up to Dr.,  I mean, to Daniel

24   Herrick?

25   A.    You're asking me to speculate on something that is so far

1    out of my realm.  That would have been something that Leslie

2    would have really been actively managing.

3    Q.    Okay.  So because you're on the operations side,

4    incompetent doctors doesn't come into your realm as the

5    practice director?

6    A.    That's not what I said.  I said whether or not I would

7    have reported that up feels like that's just not something that

8    I was aware of and that would have been what Leslie would have

9    been managing, not that I wouldn't have cared about that.

10   Q.    Fair.  My understanding of the process that the

11   operational group brought to the division was that it was about

12   better process; is that right?

13   A.    Can you repeat that, please?

14   Q.    Sure.  The lean sigma six, did I get that right?

15   A.    Lean Six Sigma.

16   Q.    I'm dyslexic, so please forgive me.  I do that all the

17   time.

18         So that system, was that bringing better process to the,

19   the different divisions?

20   A.    Yes, the goal was to bring it in and help streamline that

21   and have consistency and reduce the variation in how the nurses

22   and the providers were interacting with each other and with the

23   patients.

24   Q.    Great.  And I heard from Daniel Herrick.  I understood it

25   to be quality, safety, and flow.  Is that about right?

1    A.    Yeah.

2    Q.    Okay.  So, if there were safety issues, doesn't that

3    somewhat fall into your operational side or figure into your

4    operational equation as you're looking at this situation?

5    A.    Yeah, certainly, that's something that I looked at.

6    Q.    Okay.  I'd like to explore with you a little bit about

7    what you knew what was going on with Dr. Hsu.

8              ATTORNEY McDONALD:  Objection, outside the scope.

9              THE COURT:  So I'll ask you to approach.

10             (Bench conference begins.)

11             THE COURT:  Okay.  So scope is not the only

12   consideration on cross.  So what is the purpose, just so I can

13   better address this objection?

14             ATTORNEY NUNAN:  Sure.  She was aware of all of the

15   different safety issues going on in the department at that

16   time, and it's my opinion that she should have been reporting

17   that up to Daniel Herrick.

18             THE COURT:  Is what it is?  Okay.  So what does that

19   go to?  What are you trying to prove with that?

20             ATTORNEY NUNAN:  Just that that was --

21             THE COURT:  A lack of action?

22             ATTORNEY NUNAN:  A lack of action on the

23   administrative side.

24             THE COURT:  To make what larger point?

25             ATTORNEY NUNAN:  That there was an administrative

1    awareness of the incompetence of the doctors in that division

2    at the time in 2016, the summer of 2016.

3              ATTORNEY McDONALD:  She's testified that she didn't

4    report this up to Mr. Herrick, so I'm not sure how this could

5    possibly be demonstrating that it was larger administrative

6    awareness of this issue.

7              THE COURT:  Did she already answer a question about

8    whether she knows anything about Dr. Hsu?  I can't recall if

9    you asked that question.

10             ATTORNEY NUNAN:  I'm not sure if I asked that

11   question.  I know that in her deposition she testified to all

12   of the things that she heard from billing to OR, incompetence,

13   all of that.

14             THE COURT:  Okay.

15             ATTORNEY NUNAN:  Patient problems, everything, she

16   was aware of everything.

17             THE COURT:  Okay.  And how much do you have on this

18   topic?  How deeply did you intend to get into Dr. Hsu?

19             ATTORNEY NUNAN:  I intend to just hit on each one of

20   those topics to lay it out that she was aware of that and it

21   didn't get reported up.

22             THE COURT:  Okay.  So I'll let you ask some questions

23   on this.  I don't think it should be something that you spend a

24   lot of time on.

25             ATTORNEY NUNAN:  I'll hustle through it.  Great,

VOLUME: 9
PAGES: 647-860

1    thank you.

2                        (Bench conference ends.)

3    BY ATTORNEY NUNAN:

4    Q.    You were in the department when Dr. Porter did a six-month

5    mentorship with Dr. Hsu, right?

6    A.    When he first started?

7    Q.    Yes.

8    A.    Yes.

9    Q.    Okay, great.  And Dr. Porter let you know or told you at

10   some point that he lacked clinical skills?

11   A.    That's what she said, yes.

12   Q.    Okay.  You were aware that Dr. Hsu was not able to

13   complete his charts on time?

14   A.    Yes.

15   Q.    And you found that very aggravating?

16   A.    Yes, I did.

17   Q.    Yeah.  You were aware that Dr. Hsu's pregnancy rates were

18   fairly low?

19   A.    I don't remember the rates.  I remember they were lower

20   than Dr. Porter's.

21   Q.    Dr. Porter said to you at some point that she was very

22   concerned about Dr. Hsu's level of knowledge?

23   A.    Probably.

24   Q.    And were you aware that Dr. Porter was concerned about

25   Dr. Hsu's approach to making plans for patients?

VOLUME: 9
PAGES: 647-860

1    A.    I was aware of that, and all of these things I recommended

2    she go talk to Leslie as the clinical chair who could address

3    them better than I.

4    Q.    Great.  Did you ever take any of these concerns over to

5    quality or risk management?

6    A.    I don't remember.

7    Q.    Was that within your scope in the operational sphere?

8    A.    To take them where?

9    Q.    If you heard something of concern, was it your obligation

10   to report it to quality or risk management?

11   A.    It depended, and if I heard specifics, and often, if it

12   was coming second or thirdhand to me, then it would be my role

13   to encourage the other person to call.  So there are some

14   circumstances where that would be true, but I wouldn't do that

15   without a lot of information.

16   Q.    Okay.  Did Dr. Porter talk to you at some point that she

17   was concerned that Dr. Hsu was going to miss something with a

18   patient?

19   A.    I don't remember.

20   Q.    Okay.  And did you understand that Dr. Porter had concerns

21   about Dr. Hsu's skill in the OR?

22   A.    Yes, I remember that.

23   Q.    And you were aware that Dr. Hsu performed a procedure

24   without consent?

25   A.    I don't remember that.

VOLUME: 9
PAGES: 647-860

1    Q.    Do you remember going and talking to Janice Gonyea?

2    A.    I don't remember her name.

3    Q.    Okay.  She was an ultrasound tech that you went down to

4    the --

5    A.    It's ringing a bell, yes.  Thank you.  I remember talking

6    to that tech, yes.

7    Q.    Okay.  And did you find that -- I believe you said very,

8    you were very alarmed by that situation?

9    A.    Yeah, I don't remember the details of this anymore, but I

10    remember that situation being very complicated.

11    Q.    Do you remember talking to Dr. DeMars about it?

12    A.    Yes, I'm sure I did.

13    Q.    Okay.  And do you remember that your belief was Dr. DeMars

14    went to risk management?

15    A.    I don't remember, but that would have been the appropriate

16    step.

17    Q.    Okay.  And did you have discussions, or did other OB/GYN

18    generalists talk to you about their concerns about Dr. Hsu?

19    A.    In generalities, yes.  No one ever came directly to me to

20    talk about that, but I knew that that was something people had

21    gone to Dr. DeMars about.

22    Q.    Okay.  And none of this happened in a one-month period;

23    this, all of these things happened over quite a long period of

24    time?

25    A.    Yes.  It wouldn't have been a one-month period.  Yeah.

VOLUME: 9
PAGES: 647-860

1    Q.   Did you ever have a discussion with any of the things we

2    just talked about with Daniel Herrick?

3    A.   I don't remember discussing this with Daniel Herrick.

4    Q.   Okay.  I would briefly like to turn to your knowledge of

5    Dr. Seifer.  We talked about him before.  Just a few questions.

6         In the summer that Dr. Porter returned on a limited basis

7    with her long-term disability, were you aware that Dr. Seifer

8    was violating Dr. Porter's accommodations?

9    A.   I became aware of that and addressed it with him multiple

10   times.

11   Q.   Multiple times, yeah.  And did Dr. Porter tell you that

12   she thought David Seifer was clinically incompetent?

13   A.   I don't remember her using those words.  I do remember her

14   complaining about his technique and, again, directing her to

15   Dr. DeMars.

16   Q.   Got it.  Do you have any medical training?

17   A.   No.

18   Q.   Okay.  Did you remember hearing from multiple people that

19   David Seifer was causing excessive pain and there was more

20   blood with his egg harvests?

21   A.   From multiple people?  No.  I remember hearing that they

22   were talking to each other about it and that there was probably

23   that large concern, but I did not have multiple people come to

24   me about that.

25   Q.   Was the "they" the nurses?

VOLUME: 9
PAGES: 647-860

1    A.    Yes.

2    Q.    Casey Dodge?

3    A.    Yes.

4    Q.    She was concerned?

5    A.    I don't remember the details.  I remember this being a

6    concern, and all of those people spoke to Dr. DeMars.

7    Q.    Got it.  And do you remember that there were complaints

8    about Dr. Seifer ordering all sorts of lab and blood work that

9    was considered excessive?

10   A.    So I remember that as an offhand sort of flippant remark

11   while there were a lot of other complaints about him, so I

12   remember that as part of, like, longer venting that I would

13   hear from people.

14   Q.    So you bring up venting.  Is it, is venting the same word

15   as people not getting along in your mind?  You used that quite

16   a bit in your deposition.  I want to make sure I understand

17   your use of the word "venting".

18   A.    What do you mean?

19   Q.    So, when say somebody came and vented to you, what do you

20   mean by that?

21   A.    I mean someone talking to me one-on-one and complaining

22   about their colleagues.

23   Q.    Got it.  Is there a difference in your mind between

24   venting and reporting incidents?

25   A.    Yes.

1    Q.    Okay.  And do you feel like anybody coming to you with the

2    things from Seifer and Hsu, they were reporting incidents to

3    you?

4    A.    Can you say that again?

5    Q.    Sure.  When they, when we've just gone through what you

6    heard from Dr. Porter, maybe from other generalists, from the

7    nurses.  Could you distinguish between venting and them

8    reporting what they felt were incidents to you?

9    A.    Yes.  It was often very mixed up, right?  So there were

10   some times very clearly where someone would come in and it was

11   clear they were reporting, and that is one thing.  There was

12   also times were, in the hallway or as part of a larger

13   conversation about things happening, there was just a lot of

14   venting and complaining about personalities or style or

15   whatever.

16   Q.    Do you think you have the medical training to identify

17   when somebody is reporting something that is maybe outside the

18   scope of practice?

19             ATTORNEY McDONALD:  Objection, asked and answered.

20             THE COURT:  Sustained.

21   BY ATTORNEY NUNAN:

22   Q.    Okay, okay.  I am going to either put on the ELMO or ask

23   you guys to put up 50A.  Happy to put it on the ELMO.

24             ATTORNEY SCHROEDER:  We can try.

25             ATTORNEY McDONALD:  Sorry.  What was the number?

VOLUME: 9
PAGES: 647-860

1    BY ATTORNEY NUNAN:

2    Q.    50A which I believe is already admitted.  Will you please

3    take a look at this email for me?

4    A.    Okay.

5    Q.    Okay.  I might hand you -- I'll go up.  Might actually

6    look at the whole thing, so just so you can know what I'm

7    talking about.

8    A.    Great, thank you.  Okay.

9    Q.    Okay.  This is an email you received from Daniel Herrick?

10   A.    Yes.

11   Q.    April 21st 2017?

12   A.    Yes.

13   Q.    And it's the subject line is "Updated File", right?

14   A.    Yes.

15   Q.    And the attachment is "REI program strategy"?

16   A.    That's correct.

17   Q.    Okay.  And Leslie DeMars is not on this email, correct?

18   A.    That's correct.

19   Q.    Okay.  Do you remember this being a document, the

20   attachment being a document that was passed back and forth

21   during this timeframe from about April 18th and the division

22   closure was decided through the next week or so?

23   A.    Yes.  I have a vague recollection of that, yes.

24   Q.    That's fair.  Can you turn to the last page?  And the

25   title is called "Staffing Plan", correct?

1    A.   Yes.

2    Q.   Okay.  And it has the current staff on the left-hand side?

3    A.   Yes.

4    Q.   And it has Dr. Porter as .4 GYN, ultrasound/REI?

5    A.   Yes.

6    Q.   Okay.  And then Dr. Seifer, Dr. Hsu.  Nurse practitioner

7    Elizabeth Todd, she's GYN/REI.  Marti Lewis, Marlene Grossman,

8    and then a vacant position, right?

9    A.   That's correct.

10   Q.   Okay.  And then the lab staff below.  And on the

11   right-hand side you have, "Future staff with complete REI

12   shutdown".  And in that scenario there on April 27th, you have

13   Dr. Porter being in .4 of GYN ultrasound, correct?

14   A.   That's correct.

15   Q.   So the same amount of time that she's in the current staff

16   but just in ultrasound, not REI?

17   A.   That's correct.

18   Q.   Okay.  And you have Elizabeth Todd listed to go over to

19   REI in the generalist division, correct?

20   A.   Correct.

21   Q.   Okay.  And after the REI was closed, Elizabeth Todd was

22   reassigned to the generalist division, wasn't she?

23   A.   The rest of her FTE was reassigned there.  That's correct.

24   Q.   And Dr. Porter was terminated?

25   A.   That's correct.

1          ATTORNEY NUNAN:  Okay.  Give me just a second,

2     please.

3          THE COURT:  Yes.

4          ATTORNEY NUNAN:  I have no further questions.

5          THE COURT:  Okay.  Redirect?

6          ATTORNEY McDONALD:  Yes, just briefly.

7          THE COURT:  Okay.

8          REDIRECT EXAMINATION BY ATTORNEY McDONALD

9     Q.   Ms. Gunnell, I'll ask you to keep 50A in front of you if

10    you wouldn't mind, and, looking at the same page that you were

11    just looking at, the very last page.  Actually, to begin with,

12    if I could ask you to take a look at the first page, I believe

13    Ms. Nunan said this was dated April 27th.  Can you read the

14    date at the top of that?

15    A.   April 21st 2017.

16    Q.   Thank you.  Now, returning to that last page, do you have

17    a sense of what department GYN US falls under?

18    A.   GYN ultrasound, that is radiology.

19    Q.   And radiology is separate from the OB/GYN department,

20    correct?

21    A.   That is correct.

22    Q.   Did you come up with the idea to include Dr. Porter in the

23    side of the chart of future staff?

24    A.   These projections were largely based on what Dr. DeMars

25    wanted to build out and was talking to me about.  So I would

VOLUME: 9
PAGES: 647-860

1    back it up with this information.

2    Q.   So is it fair to say that it was Dr. DeMars's suggestion

3    to include her?

4    A.   That's correct.

5    Q.   Okay.  And then, backing up a little bit, if Sharon Parent

6    had been allowed to return after her retirement on a per diem

7    basis, from your perspective, would that have solved the

8    nursing crisis in the REI division?

9    A.   Solved the crisis?  Absolutely not.

10   Q.   Why do you say that?

11   A.   Because it would have only been per diem, and we were down

12   so many nurses that it just wouldn't have been able to maintain

13   the volume.  It could have been useful had we been able to

14   recruit.  She would have been great training people, but this

15   certainly would not have solved the crisis.  We still would

16   have only had one full-time RN who was not completely trained.

17          ATTORNEY NUNAN:  All right.  Thank you so much.

18   Nothing further.

19          THE COURT:  Any recross?

20          ATTORNEY NUNAN:  Nothing further.

21          THE COURT:  Okay.  You may step down, Ms. Gunnell.

22   Okay.  And I think there are no further witnesses for today,

23   right?

24          ATTORNEY SCHROEDER:  No, Your Honor.  Hopefully, the

25   one who had a flight delay will be here.

1              THE COURT:  Okay.  So that concludes the trial day

2      for today.  Please, as always, don't speak to one another or

3      anyone else about the case or do any research on your own about

4      the case.  Have a good evening.

5              (The Jury leaves the courtroom.)

6              THE COURT:  Okay.  So one witness for tomorrow for

7      the defense?

8              ATTORNEY SCHROEDER:  We have two, Your Honor.  It

9      will be Dr. Maria Padin and Dr. Jocelyn Chertoff.  I expect us

10     to be done in and around the morning break.

11             THE COURT:  Okay.

12             ATTORNEY SCHROEDER:  Maybe I'm a little overzealous

13     in that estimation, but certainly by lunch.

14             THE COURT:  Okay, all right.  Thank you.

15             ATTORNEY SCHROEDER:  And then we will, we will be

16     done with our case in chief.

17             THE COURT:  Okay.  And, plaintiff, do you know how

18     many witnesses, if any, if you're going to have rebuttal?

19             ATTORNEY JONES:  Two.

20             THE COURT:  Two?  Okay.

21             ATTORNEY SCHROEDER:  Can we have their names?

22             THE COURT:  Could you?

23             ATTORNEY JONES:  Yeah.  Eunice Lee and Dr. Porter.

24             THE COURT:  Okay, okay.  Anything else to take up at

25     this time?

1          ATTORNEY SCHROEDER:  No, Your Honor.  Well, one thing

2     Your Honor.  We did submit, and I think, I believe we filed the

3     supplemental jury instructions to, and I assume, I assume, if

4     we have time tomorrow afternoon, we'll get ready for, I guess,

5     the charge conference for Monday?

6          THE COURT:  Yeah.  So my, at this point, I was

7     thinking I will be able to provide you instructions first thing

8     Monday morning, and then we could have the conference that I

9     anticipate having it that afternoon --

10          ATTORNEY SCHROEDER:  Understood.

11          THE COURT:  -- on Monday because you'll be closing

12     Tuesday, and, if we are finished tomorrow, then Monday would be

13     an off day for the jury, anyway, if that makes, if that works

14     for everyone.

15          ATTORNEY SCHROEDER:  Works for the defendants, Your

16     Honor.

17          THE COURT:  Okay.  So, yeah, you should be able to

18     either access the jury instructions.  I haven't decided yet

19     whether I'll post them in ECF and you can get them that way,

20     or, if not, we'll have them available for you here first thing

21     Monday morning, and then we can, maybe tomorrow we can talk

22     about setting a specific time on Monday for the actual charge

23     conference.  I was thinking sometime kind of early to

24     midafternoon.  Okay?

25          ATTORNEY SCHROEDER:  Very acceptable.  Thank you.

VOLUME: 9
PAGES: 647-860

1            THE COURT:  All right.  Plaintiff, anything?

2            ATTORNEY JONES:  Nothing.

3            ATTORNEY VITT:  Nothing.

4            THE COURT:  Okay.  Have a good evening.

5

6    (Whereupon at 4:13 p.m. the hearing was adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                    C E R T I F I C A T E

VOLUME: 9
PAGES: 647-860

1          I, Sunnie Donath, RMR, Official Court Reporter

2     for the United States District Court, District of Vermont, do

3     hereby certify that the foregoing pages are a true and accurate

4     transcription of my stenographic notes of the hearing taken

5     before me in the above-titled matter on April 3, 2025 to the

6     best of my skill and ability.

7

8

9

10                          *Sunnie Donath, RMR*

11        ----------------------------------

12                       Sunnie Donath, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25