VOLUME: 10
PAGES: 861-969

1                    UNITED STATES DISTRICT COURT
                              FOR THE
2                       DISTRICT OF VERMONT

3

4    Misty Blanchette Porter        )
                                     )
5                                    )
     v.                              ) Case No. 2:17-cv-194
6                                    )
                                     )
7    Dartmouth-Hitchcock             )
     Medical Center, et al.          )
8                                    )
     _____)
9

10   RE:  Day 10 of Jury Trial

11   DATE: April 4, 2025

12   LOCATION: Burlington, Vermont

13   BEFORE:  Honorable Kevin J. Doyle
                 Magistrate Judge
14

15   **<u>APPEARANCES</u>**:

16   Geoffrey J. Vitt, Esq.
     Sarah H. Nunan, Esq.
17   Vitt & Nunan, PLC
     8 Beaver Meadow Road
18   Norwich, VT 05055

19   Eric D. Jones, Esq.
     Langrock, Sperry & Wool
20   210 College Street, Suite 400
     Burlington, VT 05410
21
     Donald W. Schroeder, Esq.
22   Morgan McDonald, Esq.
     Foley & Lardner, LLP
23   111 Huntington Avenue, Suite 2500
     Boston, MA 02199
24

25                    - Continued on Next Page -

VOLUME: 10
PAGES: 861-969

1    Tristram J. Coffin, Esq.
     Downs Rachlin Martin, PLLC
2    199 Main Street, Suite 600
     Burlington, VT 05401-8339
3

4

5

6              TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                    United States District Court Reporter
7                        verbatim@vermontel.net

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME: 10
PAGES: 861-969

1                        INDEX OF EXAMINATION

2    Witness              Examined By          Page      Line

3    Jocelyn Chertoff     Atty. Schroeder      866       19
                          Atty. Nunan          880       20
4                         Atty. Schroeder      885        7
                          Atty. Nunan          886       20
5

6    Maria Padin          Atty. Schroeder      887       19
                          Atty. Jones          913       10
7

8    Eunice Lee           Atty. Nunan          944       12
                          Atty. Coffin         963       13
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME: 10
PAGES: 861-969

1

2                          INDEX OF EXHIBITS

3                                              Page      Admitted

4    Plaintiff Exhibits

5    None offered.

6

7    Defense Exhibits

8    None offered.

9

10                        *    *    *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME: 10
PAGES: 861-969

1          (The hearing began at 9:08 a.m.)

2          THE COURT:  Okay.  Good morning.  Okay.  I understand

3    that there might be couple of issues to take up.

4          ATTORNEY SCHROEDER:  I asked Your Honor to just

5    briefly discuss our case in chief.  We've got these two

6    witnesses this morning.  I think we'll be done fairly quickly,

7    I suspect, and then defendants will rest.  We'd like the

8    opportunity to be heard on a motion for directed verdict at

9    that time, but we'd also like to be heard before any rebuttal

10   evidence is put on to discuss that issue as well.

11         THE COURT:  Okay.  So maybe during the break, do you

12   think, to discuss scope of the rebuttal?  Do you think, to the

13   extent you can anticipate, your witnesses this morning will

14   probably take us to roughly 10:00 o'clock or thereabouts?

15         ATTORNEY SCHROEDER:  I think that's fair, yes.

16         THE COURT:  So then maybe I propose that you finish

17   with your two witness and, even if the break is a little

18   earlier than usual, I think that's okay.  And we can take up

19   the issues you've just mentioned at that time.

20         ATTORNEY SCHROEDER:  That would be ideal.  Thank you.

21         THE COURT:  Okay.  Anything from the plaintiff?

22         ATTORNEY JONES:  Nothing from us.

23         THE COURT:  Okay.  Bring in the jury then.

24         (The Jury enters the courtroom.)

25         COURTROOM DEPUTY:  Your Honor, the matter before the

VOLUME: 10
PAGES: 861-969

1    Court is Civil Case Number 17-cv-194, Misty Blanchette Porter

2    versus Dartmouth-Hitchcock Medical Center, et al.  Present on

3    behalf of the plaintiff are Attorneys Geoffrey Vitt, Eric

4    Jones, and Sarah Nunan.  Present on behalf of the defendants

5    are Attorneys Tristram Coffin, Morgan McDonald, and Donald

6    Schroeder.  We are here for day ten of a jury trial.

7            THE COURT:  Okay.  Good morning, members of the jury.

8    Since you left here yesterday, have you spoken to anyone about

9    the case, or have you learned anything about the case other

10   than what has been presented in court?  Okay.  Seeing no hands

11   raised, the defendants may call their next witnesses.

12           ATTORNEY SCHROEDER:  Thank you, Your Honor.

13   Defendants call Dr. Jocelyn Chertoff, if I may bring her in.

14           THE COURT:  Yes.

15                   JOCELYN CHERTOFF,

16           having been duly sworn to tell the truth,

17                   testifies as follows:

18           THE COURT:  Okay.  Go ahead, Mr. Schroeder.

19           DIRECT EXAMINATION BY ATTORNEY SCHROEDER

20   Q.   Thank you, Your Honor.  Good morning, Dr. Chertoff.  Where

21   do you currently reside?

22   A.   It's not a simple question, but I currently reside

23   primarily in Hanover, New Hampshire, but I am spending long

24   periods of time now on the West Coast as well.

25   Q.   And earlier -- do you have a residence in Portland,

VOLUME: 10
PAGES: 861-969

1    Oregon?

2    A.    Yes, I do.

3    Q.    And were you there earlier this week?

4    A.    Yes, I was.

5    Q.    And did you have difficulty making it from Portland,

6    Oregon to lovely Burlington, Vermont?

7    A.    Yes.  I sat on the tarmac through two of my flights being

8    canceled and ultimately spent the night in Chicago.

9    Q.    Wednesday going into Thursday?

10   A.    That was --

11   Q.    Today's Friday.

12   A.    Yes.

13   Q.    Okay, thank you.  Could you briefly describe, from high

14   school on, your educational background?

15   A.    I went to the Bronx High School of Science.  Then I went

16   to Brown University.  I went to University of Vermont College

17   of Medicine for medical school.  I went to Hartford Hospital

18   and UCONN for 18 months of internship and then did two years in

19   a physician shortage area in upper New York state.  I worked at

20   two different jobs waiting for my residency.  So I worked here

21   in Vermont as the medical director for Vermont Emergency

22   Medical Services in what we used to call a "doc in the box" or

23   urgent care center.  Then I started my residency at University

24   of Vermont in radiology, and I did a fellowship in body imaging

25   at University of Vermont.

VOLUME: 10
PAGES: 861-969

1   Q.   Okay.  After all that schooling, did you become employed

2   at some point by Dartmouth-Hitchcock Medical Center, Dartmouth

3   Health, as it's called now?

4   A.   Yes, I finished my fellowship in 1991, and I moved to

5   Hanover to begin my job at Dartmouth-Hitchcock Medical Center.

6   Q.   When was that?

7   A.   1991.

8   Q.   And then how long were you employed by Dartmouth Health as

9   a physician?

10  A.   I retired in 2023, December 2023.  I was at Dartmouth that

11  entire time.

12  Q.   Roughly -- this is lawyer math -- about 32 years?

13  A.   I think it might be 33, but, yes, roughly.

14  Q.   Sorry to shortchange you on that.

15  A.   That's okay.  32 and a half.

16  Q.   And, during that entire time that you were employed by

17  Dartmouth Health, were you employed in the radiology department

18  of Dartmouth Health?

19  A.   Yes.

20  Q.   When you came on, did you assume the head of any

21  particular part of radiology?

22  A.   Yes.  When I came on, I was head of gastrointestinal

23  radiology.

24  Q.   And, in terms of radiology and -- oh, what is the

25  radiology department?  What are the services?  Just briefly,

VOLUME: 10
PAGES: 861-969

1    quick overview for the jury's sake, quick overview of what the

2    radiology department, what the services are performed by the

3    radiology department physicians.

4    A.    Okay.  So we do all kinds of imaging, different

5    modalities.  We use the word modality to refer essentially to

6    the machines.  So, when we look at what we do, we think about

7    it in terms of parts of the body and in terms of the imaging

8    modality.  So we do -- x-rays are plain films; fluoroscopy is a

9    kind of dynamic plain film where you can watch what's

10   happening; ultrasound; CAT scan; MRI; nuclear medicine, which

11   involves the administration of radioactive material for

12   imaging.  We do interventional radiology, which is an area that

13   concentrates largely on different procedures that are done

14   percutaneously, in other words, through the skin or sometimes

15   through the vascular system where we might inject dyes or put

16   instruments into where we do biopsies.

17        But, anyway, we do a whole variety of procedures.  We also

18   do procedures in other sections.  Frequently, ultrasound is

19   used for the procedures, but sometimes it's fluoroscopy or even

20   CT or MR.  I'm just trying to think if I've forgotten anything.

21        When we talk about neuroradiology, we use all of those

22   different modalities in order to image the nervous system, so

23   the brain and spine.  So, in some cases, we refer primarily to

24   the body system, like when I say gastrointestinal or body

25   imaging, and, in some cases, we refer primarily to the

1    modality.  So, for example, you might staff ultrasound and look

2    at a lot of different body parts.

3    Q.   And, in terms of the parts of the body generally speaking

4    that you focus on in the radiology department and specifically

5    on the topic of ultrasound, what parts of the body are you, do

6    you generally focus on?

7    A.   So in the department we look at everything, but in

8    ultrasound we are primarily, but not entirely, looking at the

9    lung bases through the pelvis.  Now, we do some work

10   particularly now on the extremities, but a great deal of the

11   routine work is in the abdomen and pelvis.

12   Q.   And would that include gynecological ultrasounds?

13   A.   Yes.

14   Q.   Okay.  I just want to ask you about some of the positions

15   you have held in the radiology department.  You became, when

16   you joined, you were the head of gastrointestinal radiology?

17   A.   Yes.

18   Q.   And did you, and did you have a dual appointment?

19   A.   Yes.  I had an appointment in radiology, and I had a

20   secondary appointment in obstetrics and gynecology.

21   Q.   Would that be considered a dual appointment?

22   A.   Yes.

23   Q.   And, given Dartmouth Health's status as an academic

24   center, academic medical center, was it common for physicians

25   to have dual appointments?

1    A.    Yes.

2    Q.    And you were there a little bit over, almost 33 years.

3    Did you, at some point, assume a management role in the

4    radiology department?

5    A.    Yes.  Do you want me to describe some of them?

6    Q.    Sure.  Just the titles first, and then we'll get in a

7    little bit more detail.

8    A.    So in the radiology department I was program director for

9    the residency program for 17 years.  There was a, there was a

10    period, and I don't remember the dates, where I was vice chair.

11    There was only, at that point, one vice chair, and that was

12    starting around 2004.  At a later date, there were five vice

13    chairs, and I became one of the vice chairs.  I then became

14    interim chair, and ultimately I was chair of the department.

15    Q.    Chair of the radiology department?

16    A.    Correct.

17    Q.    How long were you chair of the radiology department?

18    A.    I think I started in 2015, so about eight years.

19    Q.    And you held that title as chair of the radiology

20    department from roughly 2015 to 2023?

21    A.    Yes.

22    Q.    When you started way back when in 1991, how many

23    radiologists were there at Dartmouth Health?

24    A.    I'm guessing about ten.

25    Q.    Okay.  When, and this is just an estimate.  I'm not trying

VOLUME: 10
PAGES: 861-969

1    to get a hard number necessarily.  When you left in 2023, how

2    many radiologists were employed within the radiology

3    department?

4    A.    Somewhere in the range of 50 to 60.

5    Q.    Okay.  So, over the years, it had grown in numbers,

6    correct?

7    A.    Correct.

8    Q.    And it also grew in numbers during the time that you were

9    chair of the department, correct?

10    A.    Correct.

11    Q.    I want to ask you just briefly about your responsibilities

12    as chair of the radiology department.  Did you have any

13    responsibilities as chair of the radiology department for

14    hiring?

15    A.    Yes.

16    Q.    Did that include hiring physicians?

17    A.    Yes.

18    Q.    Did you have any responsibilities with respect to the

19    academic mission of the radiology department?

20    A.    Yes.

21    Q.    Did you have any responsibilities for the budget?

22    A.    Yes.

23    Q.    Was there a separate budget for the radiology department?

24    A.    Yes.

25    Q.    Okay.  Did you have any responsibilities for residents,

1    fellows, and physicians within the radiology department?

2    A.    Yes.

3    Q.    And, during -- I just want to ask about specifically

4    ultrasounds and the area of gynecological ultrasounds and early

5    obstetric ultrasounds.  Are radiology physicians within the

6    radiology department skilled in handling and performing or

7    reviewing ultrasounds -- I'm not sure what the right word is

8    here -- in the area of gynecological ultrasounds and early

9    obstetric ultrasounds?

10    A.    I would say the correct word is interpreting and

11    reporting, and, yes, we are all trained in our residency to

12    read or interpret gynecologic and early OB ultrasound, and part

13    of our responsibility when we are staffing in ultrasound,

14    staffing meaning working in ultrasound, our responsibilities

15    include gynecologic and early OB ultrasound.

16    Q.    And, in terms of interpreting, to use your phrase,

17    ultrasounds, does, do the radiology physicians, including

18    yourself, regularly perform interpretations of ultrasounds,

19    gynecological or early obstetric?

20    A.    Yes.

21    Q.    And does that happen in the normal course?

22    A.    Yes.

23    Q.    On a daily basis?

24    A.    Yes.

25    Q.    As chair of the department, do you regularly assess the

VOLUME: 10
PAGES: 861-969

1    staffing needs of your department?

2    A.    Yes.

3    Q.    And I want to go back to -- do you know the plaintiff in

4    this case?

5    A.    I do.

6    Q.    And the plaintiff in this case is Dr. Misty Blanchette

7    Porter.  Did you have any interaction with her while she was

8    employed at Dartmouth Health?

9    A.    Yes.

10   Q.    Was it regular?

11   A.    I would say --

12   Q.    Minimal?

13   A.    -- regularly irregular.  I didn't see her every day, but I

14   saw her frequently.

15   Q.    Okay.  And do you know if she had a dual appointment in

16   OB/GYN and radiology?

17   A.    I think she did.

18   Q.    Okay.  In 2017 you were you aware of the closure of the

19   REI division?

20   A.    Do you mean before it closed or at the time it closed?

21   Q.    Well, let's start with before it closed.

22   A.    Immediately before.

23   Q.    Okay.  You were informed about that?

24   A.    I was informed.

25   Q.    Okay.  And do you recall Leslie DeMars -- who is Leslie

1    DeMars?

2    A.    Leslie DeMars was the chair of OB/GYN.

3    Q.    And, in May of 2017, she was the chair of the OB/GYN,

4    correct?

5    A.    I don't have those dates.  I assume you're correct.

6    Q.    Okay.  Do you recall Leslie DeMars coming to you to

7    inquire as to whether you might have an available position for

8    Dr. Porter in some kind of capacity for gynecological

9    ultrasounds?

10    A.    I recall her coming to tell me that the REI division was

11    closing, and I have a somewhat vague, but real, recollection of

12    her asking whether I could hire Dr. Porter.

13    Q.    Okay.  And, in asking you about hiring Dr. Porter, did you

14    have an understanding of the subspecialty of ultrasounds that

15    Dr. Porter had expertise in?

16    A.    Yes.

17    Q.    And what was that?

18    A.    Gynecologic, especially, well, general gynecologic

19    ultrasound, absolutely.  Particular expertise in REI ultrasound

20    as it refers, as it relates to REI and early OB ultrasound.

21    Q.    Okay.  And did you, at that point in roughly the May 2017

22    time period, before that period and after that period, did you

23    perform gynecologic ultrasounds and early obstetric

24    ultrasounds?

25    A.    I would say interpret.  Occasionally, I performed but --

VOLUME: 10
PAGES: 861-969

1    Q.    I'm sorry.  Interpret, yes.

2    A.    The reason I make the distinction is that performing means

3    actually holding the probe and doing the entire scan, and

4    generally it was too busy in ultrasound for me or any of the

5    other providers to spend the time with each patient performing

6    each scan.  We had six rooms all coming to us for

7    interpretation.  So we had techs in each room performing.  The

8    images would come to us.  The tech would review it with us, and

9    we would go in and scan if there was a question.

10    Q.    Just to check to determine how to interpret the ultrasound

11    if you needed further clarification?

12    A.    Correct.

13    Q.    And, in terms of who performed the ultrasound, the actual

14    doing of the ultrasound, that would be done by the ultrasound

15    techs?

16    A.    Largely, yes.

17    Q.    Okay.  And, in terms of interpreting gynecologic

18    ultrasounds and early obstetric ultrasounds, did you and other

19    members of the radiology department, before May 2017 and after

20    May 2017, perform, interpret those types of ultrasounds on a

21    regular basis?

22    A.    Yes.  I still do on a per diem basis.  I still work there

23    occasionally on a per diem basis.

24    Q.    Okay.  And that would include gynecologic ultrasounds and

25    early obstetric ultrasounds as well as other parts of the body?

 1    A.    Yes.

 2    Q.    Okay.  In that time period when the REI division was

 3    closed and you had this conversation with Dr. DeMars, do you

 4    recall what your response was to her at that point as to

 5    whether or not the radiology department had the need for

 6    somebody with Dr. Porter's subspecialty expertise in either a

 7    part-time or full-time basis?

 8    A.    Yes, I do.

 9    Q.    What did you say?  What was your response?

10    A.    That I did not have a position for somebody to do only GYN

11    and early OB ultrasound.

12    Q.    Okay.  If you brought somebody in -- and I want to just

13    ask so that the jury can understand how you staff for

14    ultrasounds and how you did staff for ultrasounds.  Take your

15    time.  I don't want you to --

16    A.    Okay.

17    Q.    In terms of staffing for ultrasounds, why would it be a

18    challenge or not necessary to have somebody that just did a

19    subspecialty of ultrasounds on a routine basis?

20    A.    So the way we staff in ultrasound, I think, in 2017 we may

21    have only had four or five rooms, but, at this point, we have

22    six.  We have, we have techs in each room that are scanning a

23    series of patients.  The patients that go into each room,

24    really, it has mostly to do with the machine and, you know,

25    what the machine is particularly good for.

VOLUME: 10
PAGES: 861-969

1      But, over the course, when I -- as soon as we start in the

2   morning, the techs start maybe a half an hour before we start.

3   So they perform their first scans, and, as soon as you walk in,

4   there are scans to be interpreted.  The techs wait, take turns,

5   essentially, talking to the attending, and the attending is the

6   radiologist.  Review their findings, including whatever history

7   they may have gotten from the patient, and I, as the provider,

8   check the images, make sure I have no questions.

9      If there's time, I redictate and sign it on the spot.  If

10   there's another tech waiting, I make notes, and the next tech

11   comes and shows me their case.  So, throughout the day with a

12   break in the middle of the day, there are multiple rooms

13   essentially feeding cases one after the other to the

14   interpreting physician.

15   Q.   And are they, in terms of the ultrasounds that the

16   radiologist that is assigned that day to interpret ultrasounds,

17   are they for a variety of different body parts?

18   A.   Yes, they're for, not only a variety of different body

19   parts, but they come from different locations.  So, in between

20   the regularly scheduled cases, there are cases from the

21   emergency room, from the clinics that may have varying degrees

22   of urgency or suspected urgency.

23   Q.   Okay.  So, if you had somebody that was only performing

24   gynecologic ultrasounds or early obstetric ultrasounds, how

25   would that impact your staffing and schedule of other

1     radiologists in the radiology department?

2     A.    Well, you would have to -- I would have had to staff two

3     physicians at a time, one being the one who was doing only the

4     GYN and early OB and the other doing all of the other cases.

5     And, if the OB/GYN reader were not available for any reason,

6     then the person, the other person, would have to read, would

7     read all of those cases as well.

8     Q.    Do you typically have one -- sorry to interrupt, but do

9     you typically have one radiologist on to handle all the

10    ultrasounds at once?

11    A.    Yes.

12    Q.    So this would require having two radiologists on at work

13    at the same time, if, if you considered having somebody that

14    had a subspecialty in ultrasound?

15    A.    Yes.

16    Q.    Okay.  Did you have a business need for that at that point

17    in 2017?

18    A.    I did not think that I had a business need for that at

19    that time, no.

20    Q.    And have you ever hired anybody or moved anybody into the

21    radiology department to do just a specific subset of

22    ultrasounds for the radiology department?

23    A.    No.  I have, at times, particularly later in the last few

24    years when things became very subspecialized, certain exams

25    might go to a radiologist in a different part of the department

VOLUME: 10
PAGES: 861-969

1    who was very subspecialized, for example, in musculoskeletal

2    ultrasound.  But, no, I have never hired someone only to do a

3    subset of ultrasound with no other responsibilities in the

4    department.

5    Q.    And was there any need back when Dr. DeMars approached you

6    to have somebody in either a part-time or full-time basis to do

7    gynecologic or early obstetric ultrasounds only?

8    A.    I did not believe that I had a need for someone to do that

9    at that time, no.

10   Q.    And you were in charge of all staffing for the radiology

11   department, correct?

12   A.    Correct.

13              ATTORNEY SCHROEDER:  Just give me one second, Your

14   Honor.

15              THE COURT:  Yes.

16              ATTORNEY SCHROEDER:  I don't have any further

17   questions at this point, but plaintiff's counsel may have some

18   questions.

19              THE COURT:  Okay.  Cross-examination?

20                   CROSS-EXAMINATION BY ATTORNEY NUNAN

21   Q.    Good morning, Dr. Chertoff.

22   A.    Good morning.

23   Q.    I'm Sarah Nunan.  I'm the attorney for Dr. Porter.  Who is

24   Emily Baker?

25   A.    Emily Baker is a MFM, or a maternal fetal medicine,

1    physician in OB/GYN.

2    Q.   And how long has she been there?

3    A.   I don't know how long she's been there.  She's been there

4    a long time.

5    Q.   Long time, yeah.  And was she the division director for a

6    long time?

7    A.   I think so.

8    Q.   Okay.  Were you aware that Emily Baker wrote to Maria

9    Padin in May of 2017 and said, "We have now lost GYN

10   ultrasound.  The radiology department is no substitute.  The

11   residents will not get GYN ultrasound training.  We cannot do

12   SHGs"?

13   A.   No, I was not aware of that.  SHGs are not done under

14   ultrasound, though.

15   Q.   Are they not done in the radiology department, or are they

16   not done with ultrasound?

17   A.   They are done in the radiology department, but they are

18   not done with ultrasound.

19   Q.   Okay.

20   A.   Oh, actually, there's two different procedures.  There's a

21   sonohysterogram which is done under ultrasound, and then

22   there's the hysterosalpingogram which is not done under

23   ultrasound.

24   Q.   Is that a HyCoSy, a procedure called a HyCoSy?

25   A.   I don't know what a HyCoSy is.

VOLUME: 10
PAGES: 861-969

1    Q.   You don't?

2    A.   No.  But, yeah, I think SHG stands sono -- I'm sorry.  It

3    was done under ultrasound.

4    Q.   Got it.  Are you aware that HyCoSy and SHGs were the kind

5    of procedures that Dr. Porter was performing?

6    A.   I don't know what a HyCoSy is, so no.

7    Q.   Okay.  Were you aware that SHGs were the type of procedure

8    that Dr. Porter was performing?

9    A.   As I recall, I don't recall it being exclusively something

10   that Dr. Porter did.  I assume she did them, as other people

11   did as well, but I don't remember that she was ever the only

12   person doing them, but I may be wrong there.

13   Q.   If Emily Baker is reporting in May of 2017, "We cannot do

14   SHGs", you don't have reason to doubt her?

15   A.   Well, actually, I do, because my recollection is that

16   other people did SHGs, I believe, and we interpreted the

17   results.  But I'm not questioning Emily's assessment at that

18   time.

19   Q.   Okay.  Do you know who Joan Barthold is?

20   A.   Yes.

21   Q.   Okay.  Are you aware that, in the summer of 2017, she

22   called Dr.Porter and asked her to walk her through an

23   ultrasound procedure over the phone?

24        ATTORNEY SCHROEDER:  Objection, hearsay and beyond

25   the scope.

1              THE COURT:  I'll allow it.

2              THE WITNESS:  I'm not aware of that.

3    BY ATTORNEY NUNAN:

4    Q.   Okay.  This was after Dr. Porter had been fired.

5    A.   Again, I'm not aware of it before or after or during.  I'm

6    not aware of it.

7    Q.   Okay.  I noted in your testimony that you said that the

8    ultrasounds were largely performed by the ultrasound techs,

9    correct?

10             ATTORNEY SCHROEDER:  Objection.

11             THE COURT:  Well, she's asking about her prior

12   testimony.

13             ATTORNEY SCHROEDER:  Yes, I know.  Mischaracterizes

14   the testimony, performed the ultrasound --

15             THE COURT:  Okay, okay.  So then you can ask the

16   question, and Dr. Chertoff can answer according to her

17   recollection.

18   BY ATTORNEY NUNAN:

19   Q.   Okay.  Was it common that the ultrasound techs performed

20   the actual imaging and then they were read by a doctor in the

21   reading room; is that correct?  Is that my understanding of

22   your testimony?

23   A.   Yes.

24   Q.   Okay.  But that, occasionally, there would be someone who

25   was a doctor, not the tech, performing the scan, right?

VOLUME: 10
PAGES: 861-969

1    A.    Correct.

2    Q.    Okay.  And were you aware that one of the benefits of Dr.

3    Porter's practice was the fact that she was the one often doing

4    the ultrasound?

5    A.    Well, I think you're actually asking me two questions.

6    One is, Was it a benefit?  And one is, Was I aware that she was

7    performing the scans?  I was aware that, at times, she was

8    performing the scans.

9    Q.    Okay.  And the benefit to that would be that the patient

10   doesn't have to come in and have the scan and then come back

11   for an appointment for the interpretation, correct?

12   A.    No, that's not correct.  The patient does not come back in

13   for an appointment for the interpretation.

14   Q.    Okay.  So were you aware that Dr. Porter was able to do

15   the scan, read it, and do a biopsy all in one appointment?

16   A.    I'm just thinking about whether I was aware of that.

17   Certainly, she would be able to do that.

18   Q.    All right.

19   A.    I wasn't aware she was doing biopsies --

20               (Simultaneous speaking.)

21               THE COURT:  Please let her.  Let's let the Witness

22   answer the question before you pose the next question, please.

23               ATTORNEY SCHROEDER:  Thank you.

24               ATTORNEY NUNAN:  Great.  Just a second, please.

25               THE COURT:  Yes.

VOLUME: 10
PAGES: 861-969

1           ATTORNEY NUNAN:  That's all the questions I have for

2      you.  Thank you.

3           THE COURT:  Any redirect, Mr. Schroeder?  I'm asking

4      Mr. Schroeder if he has any redirect.

5           ATTORNEY SCHROEDER:  Very briefly, Your Honor.

6           THE COURT:  Okay.

7                REDIRECT EXAMINATION ATTORNEY SCHROEDER

8      Q.   Dr. Chertoff, did you, on occasion, perform the actual

9      ultrasound scan?

10     A.   Yes.

11     Q.   And did that happen in the regular course of you being the

12     chair of the radiology department and a member of the

13     department?

14     A.   Well, so, throughout my time as a resident, as a fellow,

15     and as an attending physician, there were times when I

16     performed an ultrasound examination with my own hand, yes.

17     Q.   Okay.  And are you aware, as the chair of the radiology

18     department, whether other physicians in the radiology

19     department performed ultrasound scans from time to time?

20     A.   Yes, they did.

21     Q.   Okay.  Really quick estimate or approximation.  You were

22     employed at Dartmouth Health for almost 33 years, right?  You

23     have to verbalize your answer.  So almost 33 years there,

24     right?

25                THE COURT:  So what is the answer to the question?

1                    THE WITNESS:  Wait.  What's the question?

2        BY ATTORNEY SCHROEDER:

3        Q.   I just said -- you were just nodding your head.  You have

4        to verbalize.

5        A.   I'm sorry.  Yes, I was employed there for something in the

6        range of 33 years, yes.

7        Q.   Throughout your employment, if you had to estimate, how

8        many gynecologic ultrasounds or early obstetric ultrasounds --

9        we'll put it in that wider group -- do you think --

10       A.   Yes.

11       Q.   -- you've interpreted throughout your career?

12       A.   So a complete back-of-the-napkin guess, and I think that

13       this would be possibly an understatement based on some quick

14       math, at least 10,000.

15       Q.   10,000 ultrasounds?

16       A.   Just of early OB and GYN, yes.

17                   ATTORNEY SCHROEDER:  Thank you.  Thank you, Your

18       Honor.

19                   THE COURT:  Any recross?

20                        RECROSS-EXAMINATION ATTORNEY NUNAN

21       Q.   Were you aware that it was the routine practice of the

22       generalists in the OB/GYN department to take their radiology

23       readings and run them by Dr. Porter?

24       A.   When you say regular practice, I'm not sure what you mean,

25       if you mean every time.  But, no, I'm not -- I was not aware

1    that it was a general practice for them to have our cases

2    reread.

3    Q.   Were you aware that there was often a line at Dr. Porter's

4    door for people to get their ultrasounds read by her?

5    A.   I was not, never in the vicinity of Dr. Porter's door.

6              ATTORNEY NUNAN:  That's all the questions I have.

7    Thank you.

8              THE COURT:  Okay.  You may step down, Dr. Chertoff.

9    Thank you.

10             ATTORNEY SCHROEDER:  If I may, Your Honor, escort her

11   out and bring our next witness, Dr. Maria Padin?

12             THE COURT:  Yes.

13                   MARIA PADIN,

14             having been duly sworn to tell the truth,

15                testifies as follows:

16             THE COURT:  Please go ahead.

17             ATTORNEY SCHROEDER:  May I proceed, Your Honor?

18             THE COURT:  Yes.

19              DIRECT EXAMINATION BY ATTORNEY SCHROEDER

20   Q.   Good morning, Dr. Padin.

21   A.   Good morning.

22   Q.   Welcome back.  I want to ask you to just briefly describe

23   your educational background.

24   A.   I went to undergrad in California and did a bachelors in

25   language and literature, and then I went to medical school at

VOLUME: 10
PAGES: 861-969

1    Dartmouth, and, following that, I did my residency at Maine

2    Medical Center in obstetrics and gynecology.

3    Q.    Okay.  Where did you grow up?

4    A.    I grew up between New York and Puerto Rico.

5    Q.    Okay.  And how did that come about?

6    A.    I call it the Puerto Rican Diaspora.  We went back and

7    forth, as many other families did during that time.  And I was

8    born in New York, but then we moved to Puerto Rico, and then,

9    when I was about five or six, I became ill, and my family moved

10    to New York so I could get medical care.

11    Q.    Did that experience somehow spawn a desire to enter the

12    field of medicine?

13    A.    Absolutely.

14    Q.    Okay.  Do you have any kids?

15    A.    Four.

16    Q.    Any grandkids?

17    A.    Nine.

18    Q.    Congratulations.

19    A.    Thank you.

20    Q.    Currently, where are you employed?

21    A.    I'm employed at Dartmouth.  I work in the southern part of

22    the state.  As an obstetrician and a gynecologist, I still see

23    patients, but primarily the preponderance of my role now is

24    managing the various clinics for Dartmouth in the southern

25    part.

1    Q.   Southern part of New Hampshire?

2    A.   Correct.

3    Q.   And, in terms of your -- what's your title?

4    A.   I'm the chief medical officer for the southern region

5    community group practices.

6    Q.   Okay.  Is that CGP?

7    A.   That's CGP.

8    Q.   And what does that entail, so that the jury understands

9    what exactly the scope of your duties are as a CMO?

10   A.   So we have 13 sites, 90 clinics, 398 providers, over 1,200

11   staff members.  We provide a full range of services from

12   pediatric care, primary care, surgical specialties, OB/GYN,

13   across all of the different clinics, three major sites, and we

14   also have a perioperative space, meaning an ambulatory surgical

15   center.

16   Q.   Okay.  And you said 13 sites, 1,200 staff members.  How

17   many clinics?

18   A.   90 clinics.

19   Q.   90?

20   A.   90 clinics.

21   Q.   And, are you, as the CMO, ultimately responsible for the

22   daily operation of all of those parts of the Dartmouth Health

23   system?

24   A.   In conjunction with my chief operating officer.

25   Q.   Who is that?

VOLUME: 10
PAGES: 861-969

1    A.    Craig Beck.

2    Q.    And do you still do clinical work as a generalist in the

3    OB/GYN department?

4    A.    Correct.

5    Q.    And when did you become the CMO?

6    A.    I became the CMO for the southern practices in 2020.

7    Prior to that, I was the CMO at the medical center, and I

8    became the CMO at the medical center in the late fall of 2015.

9    Q.    So, between 2015 and 2020, you were the CMO at the medical

10   center in Lebanon, New Hampshire?

11   A.    That's correct.

12   Q.    And then after that in 2020 you became the CMO for the

13   southern region of New Hampshire?

14   A.    The week that Covid was announced, yes.  I still remember

15   that.

16   Q.    I'm sure you do.

17   A.    I do.

18   Q.    So no shortage of responsibilities as a result of that, I

19   assume.

20   A.    Not a day off for several months, yeah.

21   Q.    So, with respect to the emphasis on or your assumption of

22   the role in the southern part of New Hampshire, what was the

23   reason for that at Dartmouth Health?  Why was there a need for

24   you to be handling issues in the southern part of New

25   Hampshire?

1    A.    So we have a fairly broad clinical delivery system in the

2    south, and we are an organization that really values physician

3    leadership.  So part of it was really there had been a

4    transition of a medical director at that time that was a

5    regional medical director, and our medical staff was growing in

6    the south.  So there was a desire to change the role to a CMO

7    role.  And we were also, at that time, expanding our clinical

8    services to include a surgical site, and, having been at the

9    medical center and also, as a GYN, being familiar with the

10   surgical environment, I was asked if I would consider taking or

11   interviewing for that role.

12   Q.    Okay.  And you were promoted into that role, correct?

13   A.    Yes.

14   Q.    Okay.  And you have held, you've held that role since that

15   time, correct?

16   A.    Correct.

17   Q.    And, with respect to -- and who do you report to?

18   A.    So I report to Joanne Conroy.  I also report to Dr. Edward

19   Merrens.

20   Q.    And, despite being in the role of a CMO, you've continued

21   to be a generalist in the OB/GYN department?

22   A.    Correct.

23   Q.    And you continue to provide clinical services in the

24   OB/GYN department?

25   A.    Yes.

VOLUME: 10
PAGES: 861-969

1    Q.    And is your specialty within that obstetrics, or is it

2    another, or just generalist?

3    A.    So a generalist has both components, meaning that a

4    generalist is someone who has privileges to do obstetrical

5    care, which is caring for pregnant women, not only during

6    pregnancy, but also assessing and caring for conditions that

7    may impact pregnancy and, of course, managing labor and

8    delivery and the postpartum period.  So that's one part of a

9    generalist's job.

10        The other part of the generalist's job is managing the

11    care of women's health needs as it relates to gynecological

12    issues or illnesses or diseases that may impact their

13    reproduction.

14    Q.    And, with respect to your privileges, what's the

15    difference between, say, privileges in one particular area and

16    obstetric privileges for OB/GYN?

17    A.    So people can have various levels of privileges, but, as a

18    generalist, you have both, meaning that you can cover labor and

19    delivery and you can also do GYN care.  There are, for example,

20    people who focus mostly on the obstetrical care of patients and

21    disease conditions that impact pregnant mothers.  Those are

22    maternal fetal medicine doctors, for example.  There are

23    individuals who focus on GYN oncology, meaning cancer in women

24    that are gynecological in origin.  Those individuals tend not

25    to do both things.

VOLUME: 10
PAGES: 861-969

1        So a generalist can do all of those things to a certain

2    level, and, but again, a GYN oncologist would not be doing

3    obstetrical deliveries because that's not what they do every

4    day, and a MFM would not be covering, for example, the

5    emergency room when a gynecological emergency arose.

6    Q.    So, with respect to being a generalist, the privileges are

7    as a generalist, correct?

8    A.    Correct.

9    Q.    And those privileges allow you then to do obstetrics and

10   also handle matters involving gynecological health care?

11   A.    Correct.

12   Q.    Okay.  And have you maintained those privileges throughout

13   the last ten years?

14   A.    I have maintained all of my privileges throughout the last

15   ten years.  I will say that, in the last year, I have not done

16   obstetrics, so I probably will not maintain those privileges in

17   the next recredentialing cycle.

18   Q.    Okay.  But, in terms of your privileges during, say, the

19   2015 to 2020 time timeframe, did you maintain your generalist

20   privileges in OB/GYN?

21   A.    I maintained all of my obstetrical privileges.

22   Q.    Okay.  And have you ever been a part of the credentialing

23   committee for Dartmouth Health?

24   A.    Yes.

25   Q.    When?

VOLUME: 10
PAGES: 861-969

1    A.    I have been part of that committee since 2015.

2    Q.    How many people are on the credentialing committee for

3    Dartmouth Health?

4    A.    There are a fair amount of people.  So there are two

5    representatives from every system member, meaning all the

6    hospitals that are affiliated with Dartmouth Health.   In

7    addition to that, there are some members at large or members of

8    the medical staff that have been selected and voted to be part

9    of that credentialing committee.

10    Q.    How many people would that be?  And just an estimate would

11    be --

12    A.    So I'm going to do the math in my head thinking about all

13    the members.  So probably at least 15 to 16 people.

14    Q.    Okay.  And, in terms of credentialing, what is the role of

15    the credentialing committee?

16    A.    So the committee really is responsible for verification,

17    meaning, when someone applies to be part of the medical staff,

18    there is a process that you want to validate that what they say

19    they can do and who they say they are is actual.  The other

20    thing that the committee does in the office is validate

21    people's license, make sure that their license is indeed an

22    active license.  They seek to and do queries as it relates to

23    any claims or suits that the provider may have had.

24        They also query what's called the National Practitioner

25    Database, which is a place where outcomes that may be adverse

VOLUME: 10
PAGES: 861-969

1  are reported.  There are some mandatory reporting requirements.

2  They validate that you went to the school you said you went to,

3  and, also, as part of that, also receive letters of

4  recommendation.  So there is a broad list of different things

5  that they have to verify.

6  Q.   Okay.  Do you know -- you may have been asked this what is

7  now maybe two weeks ago -- I'm not -- maybe a week ago --

8  actually, it is a week ago.  Do you know the plaintiff in this

9  case, Dr. Porter?

10 A.   I do know Dr. Porter.

11 Q.   Okay.  Did you ever work directly with her?

12 A.   I worked in the same office briefly in Concord.  She was

13 in -- she came to Concord as an outreach when I was the medical

14 director there, and then, obviously, when I was in the medical

15 center in 2015 as a member of the department, I was in the same

16 office, but we didn't really see each other very frequently.

17 Q.   When you worked in the, when you worked in the outreach

18 clinic with Dr. Porter, what was your, what was your general

19 impression of her style and interactions with staff?

20 A.   So I did not interact with her very frequently there,

21 though we were in the same department when she came down.  I

22 was the medical director at that time for that division.  And

23 so the interaction with staff, I would say that some of the

24 feedback I got from staff was she wasn't very engaging of them.

25            THE COURT:  There's an objection.

VOLUME: 10
PAGES: 861-969

1          ATTORNEY JONES:  This is hearsay.

2          THE COURT:  Okay.  I'll ask you to approach on this

3     issue.

4              (Bench conference begins.)

5          ATTORNEY JONES:  She testified that she had not much

6     interaction with Dr. Porter, and she's now going to convey what

7     staff reported to her.  I think that's hearsay and should not

8     be permitted.

9          ATTORNEY SCHROEDER:  The question was, What was your

10    general impression?  She said the feedback.  She didn't say

11    this person said that or that person said anything.

12         THE COURT:  It's functionally the same thing, though,

13    isn't it?

14         ATTORNEY SCHROEDER:  Not necessarily.  I don't know

15    if it was in writing.  She can testify to that.

16         THE COURT:  Whether it was in writing or verbal,

17    isn't that feedback, isn't that a statement?

18         ATTORNEY SCHROEDER:  Yes, it's a statement, but I

19    would submit that I was asking about her general impression of

20    her.

21         ATTORNEY JONES:  When she first answered, she said, I

22    didn't have much interaction with her.  She then pivoted into

23    what other people were telling her, and that's when I objected.

24         ATTORNEY COFFIN:  It's also we've had tons of

25    testimony along these lines from both sides, and there's been

VOLUME: 10
PAGES: 861-969

1      technical argument that could have been made and sometimes were

2      not, but they've been essentially rejected in favor of a

3      general, Hey, what was your impression based on what other

4      people said about that?  She's in a supervisory role, and this

5      comes to directly to Dartmouth-Hitchcock's motives, what's the

6      understanding of this person.

7              THE COURT:  So, to the extent that she had

8      conversations with people if this can be interpreted as

9      conversations with people in this department relevant to this,

10     wouldn't she be entitled to kind of give essentially the other

11     side of the conversation, if that's what actually going to get

12     into?

13             ATTORNEY JONES:  She's testifying about her so-called

14     impressions of Dr. Porter's style.  She's now going to talk

15     about other people's impressions.  Presumably, we'll have more

16     testimony about how difficult she was, but she's conveying, now

17     she's a medium for somebody else's impression.

18             ATTORNEY SCHROEDER:  I agree with my brother, Tris

19     Coffin's, comments.  The amount of hearsay that's been allowed,

20     whether objected to or not, as the fact that we would now, at

21     the late hour on the tenth day of trial --

22             THE COURT:  So wait a minute.  The amount of hearsay

23     that's been allowed, you're saying improperly?

24             ATTORNEY SCHROEDER:  No.  I think there's been

25     objections.

VOLUME: 10
PAGES: 861-969

1           THE COURT:  Sometimes.

2           ATTORNEY SCHROEDER:  Sometimes, right, and they've

3    been overruled.  Generally speaking, I believe --

4           THE COURT:  Hold on.

5           ATTORNEY SCHROEDER:  I think the testimony in this

6    case, we've spent more -- we're going to be able to move on

7    from this immediately, and Mr. Coffin's comments, though, are

8    true that the amount of hearsay that's been allowed.  This goes

9    to her impression and what she understood in the interactions

10   in that office with her.

11          ATTORNEY JONES:  If it was her impression, I wouldn't

12   be objecting, but she's going to convey other people's

13   impressions.  That's my problem.

14          THE COURT:  It is true.  There has been testimony up

15   until now, though, without attributing actual statements to

16   people that conversations have happened and, as a result of

17   that, some folks have reached conclusions, and I think this

18   gets kind of in the same -- you shouldn't be asking her about

19   specific comments or statements.

20          ATTORNEY SCHROEDER:  I would not.

21          THE COURT:  I think this is kind of like a

22   one-question area.

23          ATTORNEY SCHROEDER:  It was.

24          THE COURT:  And you're going to ask her what was her

25   impression as a manager based on kind of her general--

VOLUME: 10
PAGES: 861-969

1          ATTORNEY SCHROEDER:  Style, yeah, pretty much.

2          THE COURT:  And then you're going to be able to come

3  back on cross and reestablish your point that it's not based on

4  personal knowledge, so --

5          ATTORNEY SCHROEDER:  Thank you.

6          (Bench conference ends.)

7  BY ATTORNEY SCHROEDER:

8  Q.   Dr. Padin, in terms of your role back in the days of the

9  outreach clinic in Concord and when you would have some

10  interaction with Dr. Porter, what was Dr. Porter's reputation,

11  as you understood it?

12  A.   From a clinical perspective, she was someone that people

13  did respect clinically.  The program did end there because of

14  the demand was not that great, frankly, in terms of patients

15  that were seeking more subspecialized REI.

16  Q.   Okay.  What about her reputation nonclinically?  And I

17  don't want you --

18  A.   Can you clarify?

19  Q.   Sure.  What was your, in terms of her reputation as far as

20  her interactions and style with staff and other people in the

21  department?

22  A.   I mean, I think she went, did her work, and sort of kept

23  to herself, but really did not interact much with the staff.

24  We had some challenges as it related to documentation.

25  Q.   What were those challenges?

1    A.   That they were not completed in a timely fashion.  So

2    there were times when I did have to call Dr. Reindollar to

3    request that the charts be completed and closed so that the

4    referring clinicians could know what the recommendations were.

5    Q.   And, when you say the charts weren't timely done, who are

6    you talking about?

7    A.   The charts that Dr. Porter was supposed to complete as

8    part of the encounters for her consults.

9    Q.   And why did you have to reach out to Dr. Reindollar?

10   A.   Because he was her supervising clinician as the chair of

11   the department.

12   Q.   And did that happen on more than one occasion, that you

13   had to reach out to him?

14   A.   Yes.

15   Q.   And that reason, that related to Dr. Porter's completion

16   or noncompletion of the charts?

17   A.   Correct.

18   Q.   How would you describe, just based on your -- now, when

19   you assumed the CMO position between 2015 and 2020 at

20   Dartmouth-Hitchcock Medical Center, how would you describe Dr.

21   Porter's personality, your own impression?

22   A.   I did not interact with her much during that time, so it

23   would be unfair of me to sort of make a judgment.  But, when I

24   did see her as well as other members of the department,

25   overall, they were all very cordial.

1    Q.    Okay.  And, in terms of -- do you recall testifying last
2    week about the fact that you were proctoring a surgery for Dr.
3    Porter?
4    A.    That's correct.
5    Q.    Okay.  And that happened sometime in the April 2017
6    timeframe?
7    A.    Yes.
8    Q.    Okay.  And you commented at that time she was a talented
9    surgeon, correct?
10    A.    Yes, that's correct.
11    Q.    And you were, you made yourself available to proctor that
12    particular operation, correct?
13    A.    That's correct.
14    Q.    In your belief, is there a difference between a talented
15    surgeon and, say, a talented provider?
16    A.    I think a provider, a good or talented provider is someone
17    who is rounded in all areas.  There are a lot of talented
18    surgeons, but a good provider is not just talented as a
19    surgeon.  They have good bedside manner.  They are professional
20    to their colleagues.  They are team players.  They do what I
21    will always sort of say that, with privilege comes duty, and
22    there are duties that we all do, some which we may not like,
23    but we still do them as part of our obligation to serve our
24    patients.
25    Q.    And, in terms of Dr. Porter, you certainly thought she was

VOLUME: 10
PAGES: 861-969

1    talented in terms of her technical skills, correct?

2    A.    Correct.

3    Q.    Okay.  But, in terms of whether or not she was a good

4    provider or a talented provider, what was your impression of

5    her?

6    A.    I think there were some challenges.

7    Q.    And what were the challenges?

8    A.    I think it was more as to how she related to some of her

9    team members.

10   Q.    Okay.  And did you have an experience -- did you have an

11   understanding -- so in 2015-2016 the REI division was part of

12   the OB/GYN department, correct?

13   A.    That's correct.

14   Q.    And did you have a sense of whether or not there was any

15   tension within the REI division at that point?

16   A.    I think there was tension in the whole department, and a

17   lot of it was associated with challenges around staffing and

18   turnover, and that was certainly palpable when you walked in.

19   Q.    And what do you mean by that when you say palpable?

20   A.    Well, you know, you would walk in, and, certainly, it

21   wasn't the -- you didn't feel like you were in a friendly

22   environment.  You would walk in, and there was, there was a lot

23   that was not said, and people tended to not really interact

24   with each other in a very friendly or sociable manner, even

25   when you're working side-by-side.  So it was palpable that

1    there was, I would, not a lack of trust, but a sense of sort of

2    separation, of everyone just sort of kept to what their work

3    was, but they didn't really relate to each other.

4    Q.    And did, and was that generally the atmosphere, if you

5    will, in the REI division?

6    A.    The REI division was just one of the many divisions, but

7    you could feel it across all of divisions in that department.

8    Q.    And, in terms of just the REI division, were there

9    challenges in staffing and turnover during that timeframe?

10   A.    Yes.  My understanding was that there were challenges in

11   staffing and turnover.

12   Q.    And did you -- did Dr. DeMars ever contact you to discuss

13   challenges in staffing in the REI program specifically, REI

14   division specifically?

15   A.    Yes, she did talk to me about it and was concerned about

16   it.

17   Q.    And did she identify issues in team dynamics and

18   challenges in staffing as well as turnover?

19   A.    She did share that with me.

20   Q.    In terms of your -- I just want to go back to your

21   training as a generalist in the OB/GYN department.  Did you

22   perform services as a generalist in the OB/GYN department

23   related to reproductive endocrinology?

24   A.    As it related to diseases that impact reproduction, yes.

25   Q.    Okay.  Did you perform, or have you performed as a

1    generalist in the OB/GYN department, advanced laparoscopy?

2    A.   Yes, I was credentialed in advanced laparoscopy.  I was

3    credentialed robotic surgery.  I was credentialed in pelvic

4    floor reconstruction procedures.

5    Q.   What about myomectomies?

6    A.   Myomectomies were part of the things that were in my

7    credentialing and in my privileges.

8    Q.   And you performed all of these, have performed all of

9    these procedures throughout that time period?

10   A.   Correct.

11   Q.   Okay.  Going back to the time REI division, with respect

12   to do you recall, prior to the REI division's closure, having

13   any concerns about the REI division and its ability to perform

14   satisfactorily?

15   A.   I think there were several concerns associated with the

16   REI division.  Among them was the concern of the consistency of

17   the ability to grow the program in volumes, particularly if we

18   think about the -- and that was part of the reason that they

19   had had some outreach clinics to the south was because, if you

20   think about New Hampshire, the area that we serve in our

21   clinics in the south has probably the largest population in the

22   state.  So our service catchment area has about 800,000 people.

23        And so what we were seeing was really an increase of

24   programs in the southern part of the state that offered those

25   services, which patients chose to go to because of convenience

VOLUME: 10
PAGES: 861-969

1    and reputation.  So, certainly, we were seeing a degradation of

2    volume referrals, and so that was a concern.

3        I think they had had an outreach clinic in Manchester that

4    had had a longstanding nurse there that was leaving, and it

5    does require nurses to have a certain scope of practice and

6    ability to work in REI, particularly when they are, when you

7    have patients who are going through cycles of stimulation in

8    order to be able to get pregnant, in, describing that in lay

9    terms.  And that nurse was leaving, so there was concerns

10   whether they would be able to maintain that outreach clinic

11   where there was a broader population base for capture.  There

12   were also turnovers of staffing at the medical center as it

13   relates to the department at that time, so yes.

14   Q.   In terms of the nurse, you said there was an outreach

15   clinic for the REI division in Manchester, New Hampshire,

16   correct?

17   A.   That's correct.

18   Q.   Do you recall the REI nurse being staffed there by the

19   name of Marlene Grossman?

20   A.   That was her name.

21   Q.   Okay.  And do you recall that she left or resigned from

22   Dartmouth Health in and around April 2017?

23   A.   I don't remember the exact date, but I knew she was

24   leaving.

25   Q.   Okay.  And did that happen immediately before -- do you

1    recall whether or not that happened immediately before the REI
2    division closure?
3    A.    I, again, I don't recall exactly the date, but I knew that
4    she was leaving, and Dr. DeMars was concerned around the
5    staffing.
6    Q.    Okay.  And, to your knowledge, were there any other REI
7    nurses staffed for that particular office?
8    A.    Not that I'm aware of.
9    Q.    So that was a challenge, right?
10   A.    Yes.
11   Q.    Okay.  In terms of your own practice and to the extent
12   that you -- did you have patients that required REI services?
13   A.    I certainly had patients.  REI is a component of all of
14   our generalist training because we do manage diseases that
15   impact reproduction and fertility, but it is not the full scope
16   of what we are trained to do.  So, for example, I would not be
17   -- I am not trained, while I have been exposed, and I do not
18   hold as a privilege, for example, doing an IVF cycle or doing
19   oocyte retrieval.  That's not part of my scope of privilege.
20   That would be a privilege held by someone who has done
21   fellowship training.
22   Q.    So, prior to the REI division closure, did you refer your
23   own patients internally to the REI division to the extent that
24   they needed services outside your scope, or did you use outside
25   providers to do that?

1    A.    I referred to Boston IVF.

2    Q.    Why?

3    A.    For a number of reasons.  The preponderance of my patients

4    were in the southern part of the state and did not want to

5    travel to the medical center to have their services rendered

6    there.  There were offices that were easily accessible in the

7    southern part of the state from a transportation perspective to

8    my patients, and, frankly, they had a very well-established,

9    broad program with a lot of providers, and they were very

10    responsive in terms of their consultations.

11        And many times for them, too, it was a collaborative

12    process where they might evaluate the patient and make a

13    determination, for example, that the patient needed a

14    hysterosalpingogram, for example, which is an imaging study

15    that you do in radiology to assess the cavity of the uterus.

16    Or they needed a laparoscopy, and they would refer them back,

17    too, to do that component, and it was more a comanagement for

18    things that were within our scope, obviously, not things that

19    would not be, we, things that we could not do safely or

20    appropriately based on our training.

21    Q.    In terms of the patient population and the demographics of

22    that, what knowledge do you have regarding that issue

23    specifically regarding, you know, women of a certain

24    reproductive age group?

25    A.    Can you clarify your question?

1    Q.   That was not a question, very good question.  You talked

2    about where your clinics in the south because that's where the

3    population of New Hampshire was.  Just so that the jury

4    understands, what knowledge do you have about the data and

5    demographics, patient population, specifically the subgroup of

6    patients who may be seeking reproductive endocrinology and

7    infertility services?

8    A.   So we do track our referrals, if that's what you're

9    asking, as it relates to infertility programs.  So a good

10   example would be, in 2027 (sic.) from January through May, we

11   had 58 referrals that went out for reproductive endocrinology

12   infertility, and of those 2 went to Dartmouth, and the rest

13   went to Boston IVF and New England Fertility Centers.

14   Q.   And, in terms of comparison, comparing the volume practice

15   or size of practices of the REI services, there's been

16   testimony, and you've just testified about Boston IVF, New

17   England -- is it New England Fertility?

18   A.   New England Fertility Centers, yeah.

19   Q.   New England Fertility Centers.  In terms of the volume,

20   say, in early 2017 and the volume of patients seeking REI

21   services, how would Dartmouth Health's REI division stack up in

22   terms of a volume of patient volume?

23   A.   I don't know what their total volumes were at the medical

24   center, but what I do know is that the preponderance of the

25   volumes from the southern part of the state were not coming to

VOLUME: 10
PAGES: 861-969

1    our program for the reasons I have enumerated prior.

2    Q.    In terms of the REI division closure in May of 2017, I

3    want to just ask you about the status of the overall OB/GYN

4    department at that point.  Are you aware of any plans to

5    refocus Dr. Porter to OB/GYN upon the closure of the REI

6    division?

7    A.    No.

8    Q.    Okay.  I want to ask you about your thoughts on the

9    feasibility of potentially having her reassigned to the OB/GYN

10   department.  In the summer or May through summer of 2017, did

11   the OB/GYN department have any need for somebody with the

12   subspecialty practice that Dr. Porter had, or were they looking

13   for generalists at that time?

14   A.    I think the biggest need the department had at that time

15   was more for generalists.  The reason for that was they were

16   also struggling with coverage of the labor and delivery unit.

17   At that time, there were two MFMs, which are the maternal fetal

18   medicine doctors, who could do OB, but, again, as I mentioned

19   before, they could not necessarily manage emergency procedures

20   or gynecological issues that arose or came through the

21   emergency room, and, when you're on call, you cover both.

22        In addition, we really needed someone who, in their scope

23   of practice and in their privileges, had the ability to do

24   intrapartum management, meaning care for women in labor,

25   somewhat complex conditions at the time of delivery, and,

VOLUME: 10
PAGES: 861-969

1    certainly, a generalist was able to do that.

2    Q.    Okay.  And do you recall, during that timeframe, actively

3    recruiting generalists?

4    A.    We actually did open a generalist position because that

5    was what the department needed was someone who could do both

6    things.

7    Q.    And, to your knowledge, was Dr. Porter, did she have

8    obstetrics privileges at that point?

9    A.    She did not have the ability to do intrapartum management

10    at that point.  She was a fellowship-trained REI, and her focus

11    was not obstetrics from an intrapartum and delivery

12    perspective.

13    Q.    So, in terms of what the needs of the department in the

14    OB/GYN department at that time, is it fair to say that you did

15    not have a need for Dr. Porter's subspecialty expertise?

16    A.    What the department needed at that time was a generalist

17    who could do both GYN and obstetrics.

18    Q.    Right.  And she did not have the -- did Dr. Porter have

19    the appropriate privileges for what you needed?

20    A.    Not for the obstetrical perspective.

21    Q.    In terms of the REI division closure, as the CMO at

22    Dartmouth Health, was the closure of that division at that time

23    the right decision, in your opinion?

24    A.    Yes.

25    Q.    Why?

VOLUME: 10
PAGES: 861-969

1    A.    I think for all the reasons we have enumerated.  It was a

2    program that had a lot of challenges.  It was also a program

3    where the long-term sustainability as it relates to patient

4    referrals and where the population was growing was in question.

5    It was a program that had staffing challenges as well, and it

6    was certainly a program that had some internal personal

7    challenges as it related to the professional staff.

8    Q.    And did you believe that that was the right decision then?

9    A.    I said "yes".

10    Q.    Okay.  And, now, eight years later do you still believe it

11    was the right decision to close the REI division?

12    A.    Yes.

13    Q.    How would you compare the atmosphere of the general

14    dynamics of the OB/GYN department in general between, say, 2017

15    and today?

16    A.    I think there are a lot of things that have changed in the

17    department that have made the department more productive.  So,

18    for example, some of the staffing challenges have been

19    addressed.  And everyone knows, when there's staffing

20    challenges, there is stress, and, when you're more

21    appropriately staffed, people are in a happier environment.

22    Q.    What about in terms of interpersonal relationships and

23    just in general the environmental working environment?

24    A.    I think the working environment is more collegial.

25    Q.    Okay.  What about in terms of leadership of the OB/GYN

VOLUME: 10
PAGES: 861-969

1    department then and now?

2    A.   Well, the leadership is different now, and I think the

3    leadership now has focused a lot in team building and building

4    up the department and the resources and the staffing, and that

5    has contributed to a better sense of well-being among the

6    practitioners, and I think there's been also a lot of new hires

7    within the department which, again, has helped significantly

8    and, certainly, people who are really, you know, great team

9    players and communicate well together.

10   Q.   And, in terms of comparing -- who is the current chair of

11   the OB/GYN department?

12   A.   Ilana Cass.

13   Q.   And how long has she been in that role?

14   A.   I don't recall exactly how many years now, but it's been

15   at least three or four years, I would say.

16   Q.   And, in terms of her leadership abilities versus, say,

17   Dr. Leslie DeMars, how would you compare them?

18   A.   Very different leadership style, but Ilana had held

19   leadership roles before.  So I think that that was, you know,

20   certainly, she was more experienced.

21   Q.   And did you encounter, back in the day when Leslie DeMars

22   was the chair of the OB/GYN department, interim or otherwise,

23   any challenges in her leadership abilities?

24   A.   I think Leslie was an excellent clinician as a GYN

25   oncologist, but my sense was that she had taken the position

VOLUME: 10
PAGES: 861-969

1    out of a sense of duty since they had a chair leave, and I

2    could feel she was challenged by it.

3    Q.   And, in terms of the -- the closure of the REI division

4    happened in May of 2017.  Are you aware of any plans formally

5    to reopen the REI division in any way that it looked like back

6    in 2017?

7    A.   No.

8              ATTORNEY SCHROEDER:  Thank you.

9              THE COURT:  Okay. Cross-examination?

10                  CROSS-EXAMINATION BY ATTORNEY JONES

11   Q.   Thank you, Your Honor.  Good morning, Dr. Padin.

12   A.   Good morning.

13   Q.   You testified during the questioning we just heard about a

14   time when you had challenges with Dr. Porter's documentation

15   when she was doing visits at the Concord clinic.  Do you recall

16   that?

17   A.   That's correct.

18   Q.   Isn't it true that that happened during a time when

19   Dartmouth Health was upgrading their charting systems and was

20   going towards a computerized electronic chart system?

21   A.   I don't recall exactly if that was the time.

22   Q.   But there was a time when that happened, right?

23   A.   We already -- we've had an electronic chart system since

24   2000.

25   Q.   But there was a time, though, when some members of the

1  health system had converted to the electronic chart system and

2  others had not?  It took time to get everybody onto the new

3  system, right?

4  A.  Yes.

5  Q.  And isn't true that there was a time when both

6  Dartmouth-Hitchcock Medical Center in Lebanon and the outreach

7  clinic Manchester were on the electronic system, but the

8  Concord system was not yet on the electronic system?

9  A.  The Concord system, I don't recall exactly the time of the

10  transition, so I can't, with certainty, say that, during that

11  time, we were, had not transitioned to Epic yet.

12  Q.  But there was a time when there was a lag, though, right,

13  when both Lebanon and Manchester were online, but not Concord?

14  A.  Yes, they did go live before.  That is correct.

15  Q.  Right now, isn't it true that, during the time that you

16  say you had concerns about Dr. Porter doing her charts, that,

17  when she went to do the visits in Concord, she, in fact, did

18  her notes and submitted the charts in a timely manner on the

19  electronic system that DHMC had and she did not know that the

20  Concord system had entered a duplicate visit?

21  A.  I am not aware that that was the concern.

22  Q.  Okay.  Isn't it true that, after you called Dr. Ryan --

23  gold?

24  A.  Reindollar.

25  Q.  Dollar.  I'm sorry.  I can't get that name right, but

1    thank you.  After you called him, the IT department at DHMC was

2    able to correct the system by deleting the duplicate charts

3    because it was true that Dr. Porter's notes were timely

4    submitted?

5    A.   I cannot say that that was the case.  I am not privy to

6    that, and I cannot speculate on that.

7    Q.   So you can't dispute that?

8    A.   I cannot dispute, nor can I verify that.  What I can say

9    is that, indeed, in more than one occasion the charts were not

10   completed, and it required me to do multiple calls over time to

11   Dr. Reindollar.

12   Q.   Okay.  But, at that time, Concord had not yet converted to

13   the electronic system?

14   A.   Concord was on an electronic system, but not Epic.

15             ATTORNEY JONES:  Thank you.  No further questions.

16             THE COURT:  Any redirect?

17             ATTORNEY SCHROEDER:  Nothing, Your Honor.

18             THE COURT:  Okay.  Thank you, Dr. Padin.  You may

19   step down.  Okay.  So, at this time, we'll take our midmorning

20   break.

21             (The Jury leaves the courtroom.)

22             THE COURT:  Okay.  So that concludes the defendant's

23   case.  I'll ask you that question when the jury comes back to

24   put it on the record, if that's accurate.

25             ATTORNEY SCHROEDER:  Yes, it is accurate, Your Honor.

1                THE COURT:  Okay.

2                ATTORNEY SCHROEDER:  At which time I would make a

3        renewed motion for directed verdict.

4                THE COURT:  Okay.

5                ATTORNEY SCHROEDER:  On all of the same grounds that

6        we had submitted previously, but with even more specific

7        hyperfocus on the fact that there is no evidence relating to

8        specifically the only issue on the disability discrimination

9        part of this case in terms of termination versus reassignment,

10       potential reassignment.  As I'm loath to get into all the

11       back-and-forth of the Second Circuit's hundred-page opinion,

12       but what is clear from that opinion is that the only part of

13       the disability discrimination case relating to termination is

14       whether or not the defendants were under a duty as a reasonable

15       accommodation to reassign Dr. Porter to some other position.

16            And the Second Circuit referred to, well, perhaps there

17       was an OB/GYN position available, or perhaps there was a

18       position in radiology, and what you have heard is unrebutted

19       testimony that there was no position available that Dr. Porter

20       was privileged in in OB/GYN at that time, and there was no

21       availability of a position in a part-time capacity to read

22       gynecologic or early obstetric ultrasounds either.

23            So the evidence in its totality in the record, so whatever

24       the Second Circuit said, that evidence is not in the record.

25       So perhaps there were inferences that they made, and they made

VOLUME: 10
PAGES: 861-969

1    a lot of inferences, but that evidence is not in the record of

2    this case, and, in fact, it's contrary to it.  It is clear that

3    there was no position that Dr. Porter, an existing open, vacant

4    position that Dr. Porter could be reassigned to.

5        And the law on that, Your Honor, respectfully, is clear.

6    Not just the Second Circuit, the Fifth Circuit the Sixth

7    Circuit, the Eleventh Circuit, there is -- in fact, it's the

8    statute.  So we could talk about the scope of reasonable

9    accommodation and the terminology of reasonable accommodation,

10   but the law is clear, the statute is clear, the regulations are

11   clear that there was no existing vacant position for which Dr.

12   Porter could be reassigned.  And so, for that reason alone,

13   that part of this case should, should be dismissed at this

14   juncture.

15       In addition, we renew all of the arguments that we had for

16   purposes of our initial motion for directed verdict.  Thank you

17   very much.

18           THE COURT:  Okay.  And so, on the point that you were

19   just making about the reassignment question, what, in your

20   view, is the role of credibility of witnesses to conclude what

21   you have just argued?

22           ATTORNEY SCHROEDER:  There is no --

23           THE COURT:  It's not clear.

24           ATTORNEY SCHROEDER:  There is no need to even get to

25   credibility, Your Honor.

VOLUME: 10
PAGES: 861-969

1          THE COURT:  But I guess my point is -- so you're

2     talking about the testimony this morning of Dr. Padin

3     primarily, right?

4          ATTORNEY SCHROEDER:  No, Your Honor.

5          THE COURT:  Well, definitely that's included?

6          ATTORNEY SCHROEDER:  Absolutely, yes, absolutely.

7          THE COURT:  So you're saying it's evidence that's

8     established and so there isn't really a jury question there.

9     My question for you is, In terms of the Rule 50 standard, what

10    is the kind of the role of the jury there in interpreting or

11    weighing the credibility of those witnesses before they credit

12    that kind of evidentiary foundation?

13         ATTORNEY SCHROEDER:  So what I would submit, Your

14    Honor, is the burden of proof is on the plaintiff, and the

15    burden of proof is to establish that there was an existing

16    vacant position.  There was no testimony, record evidence or

17    testimony, that there was an existing vacant position by the

18    plaintiff in this case.  There is no testimony to that effect.

19         In addition, we then have the testimony by our witnesses

20    to refute even the notion that there was, and so we didn't need

21    the testimony necessarily, but, obviously, if it goes to the

22    jury, we have the credibility issues, and then it would be up

23    to the jury to decide that issue based upon the credibility of

24    the witnesses, the testimony, and the documentary evidence

25    before the Court.

VOLUME: 10
PAGES: 861-969

1      But you don't even get there, Your Honor.  You get -- you

2  start with and end with the plaintiff's case in chief.  There

3  is no evidence in the record by the plaintiff that there was an

4  existing vacant position in the REI, in the OB/GYN department

5  or the radiology department.  In fact, they didn't even ask any

6  questions of Dr. Padin or Dr. Chertoff on those two issues. So,

7  to the extent that they could have or should have or maybe

8  wanted to create a potential issue to go, a factual issue to go

9  back to the jury, they didn't even do that.

10     But you start with the plaintiff's case in chief, and you

11  end there.  There is no evidence in the record of an existing

12  vacant position that possibly could be a reasonable

13  accommodation under the ADA or Rehab Act.

14          THE COURT:  Okay.  Thank you.

15          ATTORNEY SCHROEDER:  Thank you.

16          THE COURT:  Any response?

17          ATTORNEY JONES:  Yes, Your Honor.  These are the same

18  arguments they made earlier, and we renewed our arguments at

19  that time as well to start.  Second, quite frankly, there is

20  plenty of evidence that, from which the jury could conclude

21  that there was ample need for Dr. Porter's services.  The Emily

22  Baker email which was used in cross-examination for

23  Dr. Chertoff, the testimony of multiple witnesses talking about

24  the unique skills that Dr. Porter had that were essential and

25  the devastating impact to the remaining OB/GYN department with

1    her not being able to perform those.

2        So certainly enough of an inference for a jury to conclude

3    that they could have, and, actually, witnesses were saying they

4    needed her.  The fact that we have somebody calling Dr. Porter

5    to ask her to walk her through a procedure by phone after she

6    had been fired proves that there was an ongoing need for her

7    unique services.  So there's plenty of evidence that is part of

8    the record that the Second Circuit considered and from which

9    the Second Circuit concluded a reasonable juror could infer

10   that the failure to reassign was part of this case.

11       And I'll point out in a hundred pages the Second Circuit

12   frequently described this case as wrongful termination and

13   failure to retain.  So the idea here is, yeah, they closed the

14   division, but they also acknowledged that the failure to retain

15   Dr. Porter to perform those essential services is a part of the

16   analysis of the general discrimination claim in the first

17   instance.  So this is not a situation where an employee says, I

18   have a disability, and I need an accommodation.  I can't

19   perform my current job; therefore, I would like you to assign

20   me to another job.  And, in that case, if there's no current

21   available position, then, correct, it's not a reasonable

22   accommodation if there's no currently available vacant

23   position.

24       That's not this case.  This is a case where Dartmouth shut

25   down the whole division.  We allege that that was all part of a

VOLUME: 10
PAGES: 861-969

1    ruse to just solve all of the problems, get rid of the

2    incompetent doctors and get rid of the whistleblower.  But so

3    it's all part of the global analysis of that decision, which

4    was the ultimate goal of which was to get rid of Dr. Porter and

5    not even consider retaining her in any capacity, particularly

6    the capacity in which multiple witnesses, through email and

7    testimony in this trial, said were essential.  So we produced

8    plenty of evidence from which a reasonable juror could conclude

9    in Dr. Porter's favor, and this motion should be denied.

10           THE COURT:  Okay.

11           ATTORNEY SCHROEDER:  If may I be heard very quickly

12   Your Honor, your just very quick rebuttal?

13           THE COURT:  Yes.

14           ATTORNEY SCHROEDER:  We put a bench memo in to Your

15   Honor on the issue that you asked us to brief relating to the

16   import or lack thereof of the Second Circuit decision.  The

17   Second Circuit made all sorts of inferences for purposes of the

18   summary judgment standard.  What the Second Circuit said,

19   though, were inferences that had to be proven through

20   admissible evidence in this court in this trial, and that has

21   not happened.

22       We cited a flurry of cases to support our position that

23   there was no evidence by the plaintiff in this case that there

24   was an existing vacant position to which she could be

25   reassigned.  The email that Mr. Jones referred to, Dr. Baker,

VOLUME: 10
PAGES: 861-969

1    she is not even a generalist; she's in the MFM part of the

2    OB/GYN department, and that was an email that Dr. Chertoff was

3    not even on.  And they certainly could have asked questions of

4    Dr. Padin about it.  They chose not to.  But it doesn't matter.

5    It's not something that was in -- that email by itself does not

6    get them there.

7          The law is clear, and, in fact, they have not cited any

8    case law to rebut the four Circuit decisions that we cited in

9    our original motion for directed verdict.  The law is clear on

10   this, and, if the law is clear, I'd submit respectfully that

11   the Court can award us dismissal of that part of this case at

12   this point.  There is no evidence to go forward on that

13   specific point.

14         Whether somebody thought highly of Dr. Porter and her

15   skills is one thing, but that doesn't establish that there was

16   an existing vacant position, which is the requirement under the

17   ADA and Rehab Act, in order to demonstrate sufficient evidence

18   that there might be a reasonable accommodation possible.  There

19   is not even a possibility of that even put into testimony in

20   this case, a specific existing vacant position to which Dr.

21   Porter could have been reassigned.

22              THE COURT:  Okay.  Mr. Jones?

23              ATTORNEY JONES:  If I could just add, yesterday there

24   was testimony during Mr. Herrick's time on the stand, and we

25   introduced Exhibit 50A, or maybe, I think, defendants even

1  introduced it.  That was a plan for what might happen after REI

2  was closed, and it's at that point in time they were

3  envisioning a role for Dr. Porter.  So they were envisioning a

4  position.  Eventually, someone decided against it.  But there

5  was certainly a position contemplated that she could have been

6  performing there.

7       Second of all, you know, part of the case is also that

8  they didn't even engage in an interactive process to explore

9  other possible accommodations.  So this is not, again, this is

10  not the case where you have an employee who finds themselves

11  unable to do their job and is now seeking a new job as an

12  accommodation for that disability and the question becomes, Is

13  there an open, vacant position?  This is a much more

14  complicated scenario with a much more complicated factual

15  background, so the cases they're citing just aren't applicable

16  to this situation.

17       THE COURT:  Okay, all right.  Thank you.  I'm going

18  to step off and considering the arguments, and I'll return.

19       (A recess was taken from 10:41 a.m. to 11:03 a.m.)

20       THE COURT:  Okay.  Hopefully everyone had a little

21  bit of a break there.  This is the break for everyone, so we'll

22  be bringing the jury back after this discussion.  Actually, I

23  need to bring up the rebuttal issue as well.

24       Okay.  So, with respect to the renewed Rule 50(a) motion,

25  so I'm going to deny it again at this time, specifically with

1    respect to the more pointed issue.  I recognize that defendants

2    have renewed the motion on all grounds that were raised

3    previously, but, focusing on the one that was specifically

4    raised today, and that's the reassignment or duty to reassign,

5    you know, considering all of the evidence that has come in, I

6    won't, I won't specifically lay out the evidence that I cited

7    in considering the last Rule 50(a) motion, but I incorporate it

8    here now.

9        And that includes Dr. Porter's testimony about

10   communicating with Dr. Merrens about her interest in an OB/GYN

11   position that didn't focus on fertility, the evidence of Dr.

12   Porter's medical skills that has come in.  I do think a

13   reasonable jury could conclude that she was qualified for

14   another position, and, as I said kind of during the argument, I

15   recognize the defense argument that there has been testimony

16   about the unavailability of a suitable position, but I do think

17   that question is kind of bound up with the jury's consideration

18   of credibility as to the testimony that they heard related to

19   that particular issue.  And there is some evidence in the

20   record to support plaintiff's claim that there was a lack of

21   engagement in the interactive process about a potential new

22   position.  So I think all of this together establishes that

23   granting a Rule 50 motion at this time would be inappropriate.

24       And, with respect to the renewal of the other arguments

25   that were made, the motion is denied for the same reasons I

1    gave at the last Rule 50(a) discussion.

2        So, with respect to rebuttal, so who has the issue here?

3    Is it Mr. Schroeder that you wanted to talk about or

4    Mr. Coffin?

5        ATTORNEY SCHROEDER:  I'm going to hand it over to my

6    able cocounsel.

7        ATTORNEY COFFIN:  He gives me all the tough issues,

8    Your Honor.  No.  We just wanted to have a little discussion

9    with the Court before the rebuttal begins.  Rebuttal is

10   intended to respond to issues raised by the defendant in their

11   case and not sort of an attempt to go back and rehash earlier

12   issues that were discussed or could have been discussed in the

13   case in chief.  Obviously, the Court has discretion on that,

14   and there are multiple reasons you can allow rebuttal

15   testimony, but we would ask for a little bit of discussion

16   before we begin into this so that the parties understand the

17   Court's considerations on these and the guidelines.

18       And, again, we would just sort of say that rebuttal here

19   really should be narrowly focused on responding and not

20   rehashing or relitigating or restating things.  It's not an

21   opportunity for them to begin anew their presentation.

22       THE COURT:  Right.  I can't imagine there's

23   disagreement on that concept, but I'm glad you're bringing up

24   the standard.  I think it's worth it for all of us to consider

25   what the appropriate standard is.

VOLUME: 10
PAGES: 861-969

1    So, yes, as far as the law on kind of the permissible
2    scope of rebuttal evidence, it's not meant to be a buttressing
3    of the case in chief.  I'm sure plaintiff's counsel is very
4    well aware of that principle.  Though, in reminding myself this
5    morning doing a little bit of research, the federal procedure
6    treatise, I guess I'll call it, with an update from March 2025,
7    I'll just explain this or read this to the parties.

8        It says, "Rebuttal evidence may be introduced to explain,
9    repel, contradict, or disprove an adversary's proof.  The
10    proper use of rebuttal evidence includes the contradiction,
11    impeachment, or diffusion of the impact of the evidence offered
12    by an adverse party.  Rebuttal evidence may be used to
13    challenge the evidence or theory of an opponent, not to
14    establish the case in chief.  Testimony offered only as
15    additional support to an argument made in the case in chief, if
16    not offered to contradict, impeach, or diffuse the impact of
17    evidence offered by the adverse party, is improper on
18    rebuttal".

19        So it's not simply what specific items of evidence did the
20    defendants raise and then rebuttal is only allowed to address
21    that.  It seems to me it's a little broader than that in terms
22    of dealing with the theory or potentially impeaching the nature
23    of the evidence that has come in.

24        With that as kind of a general roadmap, Mr. Coffin, are
25    there specific areas of concern?

VOLUME: 10
PAGES: 861-969

1          ATTORNEY COFFIN:  No, I think that, hard to argue

2     with the hot-off-the-presses court guide, and I think that

3     essentially states what I was trying to say.  You know, we do

4     not have a proffer of evidence as to at least one of the

5     witnesses, Attorney Lee, who they are going to call, and it

6     would be interesting to hear that.  I don't know whether she is

7     straight rehash or not, and, if the Court thought it

8     appropriate, it might be helpful to understand.  If you can

9     give us some kind of a proffer of her testimony, it might make

10    this completely moot and eliminate a sidebar soon when we get

11    into areas that we wondered about.  That's all.

12          THE COURT:  Okay.  Who is speaking for plaintiff?

13    Okay, Mr. Jones.

14          ATTORNEY JONES:  Thank you, Your Honor.  I'd be

15    pleased to give a brief proffer.  I am aware of the limits of a

16    rebuttal case, and I believe our evidence will be within the

17    bounds of a rebuttal case.  We intend to call a witness who was

18    a patient of Dr. Hsu.  She will testify about an adverse

19    outcome she experienced.

20          THE COURT:  Is this, and which witness is this, Mr.

21    Jones?

22          ATTORNEY JONES:  Eunice Lee.

23          THE COURT:  Okay.  So that's a patient of Dr. Hsu?

24          ATTORNEY JONES:  Correct.

25          THE COURT:  All right, go ahead.

VOLUME: 10
PAGES: 861-969

1           ATTORNEY JONES:  So she will testify about her

2      experience, including highly unusual and prolonged pain after

3      his procedures.  And the timing of this procedure was six

4      months after Dr. Porter had submitted her 11-page assessment of

5      Dr. Hsu putting the hospital on notice that he should not be

6      performing these procedures because they caused patient harm.

7      So she will verify that he, in fact, caused patient harm.

8           We believe it rebuts the defendant's case in chief in

9      several ways including, but not limited to, through several of

10     their witnesses, they've gone to great lengths to try to

11     minimize Dr. Porter's complaints and to characterize her as

12     simply a disagreeable person who didn't play well with others

13     and that she didn't have a legitimate complaints of actual

14     patient harm.  This witness will prove that, in fact, what she

15     was complaining about was causing patient harm.  And, also, I

16     very pointedly cross-examined Dr. Merrens yesterday about his

17     knowledge of the evidence in this case, the theories in this

18     case, and his knowledge of all the evidence of harm, and still

19     he testified that he was unaware of any actual harm, and we

20     intend to directly rebut that testimony.

21          So we think it is rebuttal and it's clearly relevant.

22     It's relevant to the case in that it corroborates Dr. Porter's

23     complaints.  The actual harm to patients is why Dr. Porter blew

24     the whistle louder and more persistently as time went on, which

25     is what our theory is ultimately angered Dr. DeMars to the

VOLUME: 10
PAGES: 861-969

1     point of terminating her employment.

2          And, finally, we think it's highly relevant with regard to

3     punitive damages because we believe it's outrageous that this

4     institution was aware that Dr. Hsu was causing patient harm and

5     allowed him to continue to perform procedures.  So, for all

6     those reasons, we think it's clearly relevant and tailored as a

7     rebuttal to the case in chief, theory of the case, and

8     testimony.

9          THE COURT:  Mr. Coffin?

10         ATTORNEY COFFIN:  Well, I'd just respond.  This

11    sounds like we're going to have a mini-malpractice action

12    without expert witnesses, without Dr. Hsu being able to respond

13    or rebut.  My understanding -- correct me if I'm wrong -- is

14    that this patient never filed a claim.  There's been no

15    adjudication of any conduct outside of the standard of care.

16         Obviously, harm is a loaded and ambiguous term.  You know,

17    often completely normally patients will have some pain when

18    they go and are treated completely properly by a health care

19    provider, and what's necessary under the law is for an expert

20    to testify and ground that as being outside of the standard of

21    care.  Here, we're going to be having this witness come in and

22    describe in graphic terms, you know, an experience that she

23    had, I presume, with the implication that it was outside of the

24    norm and improper, and there's been absolutely no adjudication

25    or expert support of that as you'd have in a normal case.

VOLUME: 10
PAGES: 861-969

1        Under those circumstances, if that's what this witness is

2    offered for, I think we've got a major 403 problem here, Your

3    Honor, and we've had no chance to know this was going to

4    happen.  I did try and call Attorney Lee -- she did not return

5    my call -- when this was disclosed, and, you know, it's the

6    kind of thing that, had we known she was going to talk about a

7    granular treatment issue that caused her harm, which I

8    understand to mean treatment outside of the standard of care

9    resulting in injury which was not claimed and supported in the

10    regular way, we would have appropriately prepared to respond to

11    that.

12        ATTORNEY JONES:  Quickly.  She's going to testify

13    that she had IVF experience in Denver, IVF experience at

14    Dartmouth-Hitchcock, and IVF experience at UVM, and she's going

15    to testify that she knows what the normal procedure is, what

16    the normal cramping might be after a procedure, and she's going

17    to testify that Dr. Hsu's procedure left her in excruciating

18    and disabilitating pain for days and it was extraordinary.  She

19    can testify to her own experience.  He can ask

20    cross-examination.  This isn't a malpractice allegation.  This

21    is establishing that, in fact, Dr. Hsu caused patient harm.

22        ATTORNEY COFFIN:  Well, specifically, she's had three

23    experiences with three different IVF practitioners.  She knows

24    -- I'm trying to quote here -- what the normal amount of pain a

25    patient should get from IVF.  I would submit that that's

1    exactly the kind of thing that 403 is intended to limit, and,

2    you know, a malpractice action based on that testimony, that

3    evidence, would be dismissed out of hand.

4        And so I think it, you know, after three weeks of trial on

5    rebuttal to bring in this witness now, which could have been

6    brought in the case in chief and could have dealt with this as

7    plenty of these issues were parsed is, you know, a real

8    surprise, unfairly prejudicial, and, you know, kind of throwing

9    this whole other issue in the hands of the jury to decide when

10   we've had, you know, weeks of testimony on this.

11       THE COURT:  In terms of bringing it on the case in

12   chief, so what would have been the relevance just asking you to

13   bring in?  You know, the whole kind of point was the fact that

14   Dr. Porter reported on other physicians.  Are you saying that

15   they should have brought in Ms. Lee to then testify about an

16   actual incident?

17       ATTORNEY COFFIN:  Well, I think we would have had the

18   same position now, but it would have been part and parcel and

19   the Court would have reached this decision, you know, earlier

20   on in the case, and either that testimony would have been

21   admitted or excluded.  If it had been admitted, then the

22   testimony would have happened in their case in chief.  There's

23   nothing that happened in rebuttal that makes this witness

24   proper.

25       Moreover, you know, the kind of testimony we're talking

VOLUME: 10
PAGES: 861-969

1    about here really is a patient's judgment on what a medical

2    malpractice claim is based on the fact that she has had IVF

3    experiences with different providers at different institutions.

4    And so, you know, to me, certainly, limits have to be put on

5    her testimony to guard against her own personal assessments.

6    She can say that she had pain after being at Dartmouth and what

7    her experience is with Dartmouth, but comparisons to other

8    situations and other settings and other clinicians is, I think,

9    you know, irrelevant, unsupported testimony.

10         But, you know, my kind of final point is, you know, to

11    have a patient come in and describe a unique, singular

12    treatment by this provider as, which happened after the fact

13    as, you know, somehow buttressing the claim which has not been

14    uncontested and there's been plenty of testimony about that,

15    that Dr. Hsu had interactions with patients that were deemed by

16    other people who were experts in this area to be unreasonable

17    or improper.  You know, that's, that's, to me, totally

18    cumulative and at this point unsupported and a violation of

19    403.

20         ATTORNEY JONES:  Can I respond to Number 1 before

21    Number 2?

22         THE COURT:  Yes.

23         ATTORNEY JONES:  Thank you.  With regard to the issue

24    that Tris raises with regard to this being a patient talking

25    about her own experience, we heard multiple doctors and

1  physicians and nurses in this case testify about what the

2  normal level of pain should have been and what the pain was

3  from Dr. Hsu.  So we have the medical evidence that establishes

4  that already.  This is simply a patient confirming that her

5  experience was, in fact, corroborative of what all the doctors

6  have already told us.

7      Second, there's no surprise here.  As Mr. Coffin

8  acknowledges, he tried calling her, so they knew that she was

9  on our list.  And, third of all, this is directly responsive to

10  their case.  Two points.  They have tried through repeated

11  witnesses to recharacterize Dr. Porter's complaints as simply

12  being middle school drama, that she's hard to get along with,

13  she complains about everybody, and they weren't really serious

14  patient harm complaints.  So, because they took that tack, we

15  felt the need to put on a patient to say, I actually was

16  harmed, A.

17      B, Dr. Merrens testified yesterday that he denied

18  acknowledging actual patient harm.  If they had admitted it,

19  then I probably wouldn't be standing here, but they didn't, so

20  we're rebutting those two theories with this testimony.  It

21  will be brief.

22          THE COURT:  Okay.  So, just, you can go next,

23  Mr. Schroeder, but, just kind of thinking generally about the

24  purpose of rebuttal, right?  So Mr. Jones is saying, which I

25  think is consistent with the testimony, that there was

VOLUME: 10
PAGES: 861-969

1    testimony from, during the defense case that there was either

2    no knowledge of patient harm, right, or no actual harm.  So,

3    just as a legal matter, this particular proffer or proposed

4    testimony does seem to fit within the category of rebuttal as a

5    general concept.  I don't think it's cumulative or any of the

6    other prohibited uses that I read when I ran through the legal

7    standard with everyone.

8         The question, though, becomes, further to Mr. Coffin's

9    point, I guess, is whether there's a way that that kind of

10   testimony, which does seem to be legally relevant on rebuttal,

11   does not, though, get so detailed or so graphic or, you know,

12   get, gets into basically the patient opining as to standard of

13   care issues, which, obviously, which she wouldn't be competent

14   to do.  I guess my point is I'm wondering if, finding that it's

15   legally relevant, is there a way that it can be tailored?

16        ATTORNEY SCHROEDER:  I'm going to defer on that

17   issue, Your Honor, to Mr. Coffin, but I wanted to raise a

18   procedural point for the record, that Eunice Lee was not

19   disclosed at any point in the disclosures by plaintiff in this

20   case.  In fact, they supplemented their disclosures in January

21   to include Dr. Ira Bernstein.  They did not include anything

22   about Eunice Lee.  The first time we saw her name was on the,

23   just the witness list.  So, in terms of the procedural rules of

24   this case, she was never disclosed, nor was it identified what

25   she would testify about.

VOLUME: 10
PAGES: 861-969

1       And so I want to make sure that the record is clear that
2   we're making an objection, not just on substantive grounds, but
3   on procedural grounds as well.  I'll turn it over to Mr. Coffin
4   to deal with your specific question, but I at least wanted the
5   record to reflect that.
6           THE COURT:  But, just to be clear, so Eunice Lee's
7   name was on the exhibit, excuse me, the witness list for this
8   trial.  You're not saying that you heard Eunice Lee's name
9   yesterday?
10          ATTORNEY SCHROEDER:  No.  That was the first time,
11  whenever, March 10 was the first time we saw her name.  Now, we
12  assumed that we didn't need to raise it because there were a
13  whole slew of other names on plaintiff's witness list that
14  haven't testified, but now we're at a different juncture at
15  this case.  So I just wanted to make sure that that at least
16  was put on the record because it's an important point relating
17  to the duty of plaintiffs in this case to identify their
18  witnesses through their disclosures.
19          THE COURT:  So, Mr. Coffin, before you get up, I just
20  want to confirm with Mr. Jones.  So can you explain to me again
21  your proffer of what this testimony will be?  I mean, there
22  isn't going to be testimony, proposed testimony here by Ms. Lee
23  as to basically, This is not how it's supposed to work, right?
24  I mean, that seems to bleed over a little bit into kind of
25  expert territory, perhaps.

1          ATTORNEY JONES:  If I may defer to my colleague,

2     Ms. Nunan, who actually will be presenting the examination --

3          THE COURT:  Okay.

4          ATTORNEY JONES:  -- and knows the scope better than I

5     do.

6          THE COURT:  Okay.

7          ATTORNEY NUNAN:  Sure.  Eunice Lee will be testifying

8     that she had IVF egg harvest in Denver, Colorado, that she

9     moved to the Upper Valley.  She saw Dr. Porter in the fall.

10     Dr. Porter, of 2016, went out on disability, and the egg

11     retrieval was done by Albert Hsu.  She's going to describe

12     waking up from the anesthesia and the unusual interaction she

13     had with Dr. Hsu at that time and what happened in the

14     following days in terms of her experience.

15          She's going to testify about meeting in the spring of 2017

16     with Dr. Porter as the follow-up, and then she's going to

17     testify, she can go on and testify about how she heard about

18     the closure of the REI division and how she found out about

19     this lawsuit and the case and, putting together what she didn't

20     understand at the time -- she understood she had unusual pain.

21     She couldn't understand the experience she was having in terms

22     of why Dr. Hsu was saying the things he was to her, and then

23     she reads about the lawsuit, a portion of the Second Circuit

24     decision, and is stunned that her understanding of what she

25     kind of believed was really wrong at the time is confirmed by

1    what she's reading, and she has to stop reading that.  And the

2    fact that she went on to have a hysterectomy and was not able

3    to have children and her experience after that.

4        So that is, that is her experience.  We feel like it does

5    speak to the harm.

6            THE COURT:  Mr. Coffin?

7            ATTORNEY COFFIN:  So she had three years to bring a

8    claim.  Under the statute of limitations, this has now run.

9    She, there's no way this can be kind of adjudicated.  There's

10   no way it can be meaningfully understood by the jury here, and

11   for us to have, you know, in the plaintiff's rebuttal case this

12   whole malpractice case narrated by a nonexpert witness without

13   any practical way to respond at this, the 11:59 minute, is

14   unreasonable and unfair to us.

15       I think, if she testifies, her testimony should be

16   narrowly focused on her IVF treatment, how she felt after that,

17   and none of this kind of follow-up reading in the newspaper and

18   reacting and suddenly learning what caused this.  Those kinds

19   of things seem completely out of the competence of this witness

20   and not relevant.

21           THE COURT:  Okay, yeah.  What is the relevance of the

22   kind of after-the-fact proposed testimony about reading about

23   the lawsuit and everything else?  What is the relevance of that

24   to the issues here?

25           ATTORNEY NUNAN:  Right, sure.  So she made statements

1    to her husband after the procedure, This is wrong.  Like, I

2    shouldn't be in this much pain.  I've never bled this much

3    before.  Like, I'm, this is really wrong, and had no

4    understanding of what was really going on behind the scenes.

5    When she reads about it, it confirms everything she's been

6    feeling that this was wrong, and I think that, I think that it

7    is relevant.

8         THE COURT:  So, I mean, reading about the lawsuit,

9    though, doesn't confirm that everything was wrong.

10        ATTORNEY NUNAN:  The details in the Second Circuit,

11   that there were other women that had the same experience she

12   did.

13        THE COURT:  Okay, all right.  Is this the -- but

14   there's a second witness, right, on rebuttal?

15        ATTORNEY JONES:  We initially planned to also call

16   Dr. Porter.  We have decided not to.  So this will be our only

17   witness.

18        THE COURT:  Oh, okay.  All right.  So, you know, this

19   is a little bit of an issue.  I hate to keep kind of taking a

20   break to think about it, but I do want to kind of give a little

21   consideration to this particular issue.  Mr. Coffin, are you --

22        ATTORNEY COFFIN:  No, no.  When you're finished, I

23   did want to make a comment.

24        THE COURT:  Okay.  No.  So I'm just wondering what we

25   should do with the jury.  I don't think this is going to take

VOLUME: 10
PAGES: 861-969

1    forever, but I do want to kind of be thoughtful about what we

2    end up doing with this testimony.

3        So I could bring the jury back in -- they've already been

4    on a very long break -- and send them out.  If I come back, you

5    know, at quarter to 12:00 and we, you know, we have a ruling on

6    what the issue is going to be, then we'd end up going past 1:00

7    o'clock before they get their lunch break.  So it may make more

8    sense to let them go now and come back.  You know, I guess I

9    could have them come back at quarter to 1:00 or so.  Is that --

10   we can all have lunch then, and I can give you the ruling

11   before we get going.  Does that make sense to everyone?

12       ATTORNEY COFFIN:  That was essentially the kind of

13   thing I was going to suggest, that maybe we take a moment here.

14   That's fine.

15       THE COURT:  Okay.  Anything else then before I bring

16   them back in?

17       ATTORNEY JONES:  Nothing else.

18       ATTORNEY SCHROEDER:  No, Your Honor.

19       THE COURT:  All right, thank you.

20       (The Jury enters the courtroom.)

21       THE COURT:  Okay.  Mr. Schroeder, does the defense

22   have any further witnesses at this time?

23       ATTORNEY SCHROEDER:  No, Your Honor.  Defense rests.

24       THE COURT:  Okay.  Thank you.  All right.  So,

25   members of the jury, I know you've been out on a long break,

1    and I'm about to tell you that you're going on lunch now for --

2    we're going to ask you to come back at 12:45.  I know it might

3    seem like, What are we doing here?  We took a long break, and

4    we're taking another long break.  As I mentioned to you, you

5    know, this is the way a trial works.  Sometimes the Court needs

6    to speak with the lawyers about some issues, and that's what's

7    going on now.  So, yeah, so I will excuse you now, and please

8    be back and ready to go around 12:45, okay?

9            (The Jury leaves the courtroom.)

10           THE COURT:  Okay.  So I anticipate I'll be back

11   around 12:30, and we can continue the conversation and get a

12   ruling and then move on, okay?

13           ATTORNEY SCHROEDER:  Yes, Your Honor.

14           ATTORNEY JONES:  Thank you, Your Honor.

15       (A recess was taken from 11:31 a.m. to 12:32 p.m.)

16           THE COURT:  Okay.  Good afternoon, everyone.  All

17   right.  So with respect to this issue, I have considered it

18   over the lunch break, thought about the testimony that has come

19   in up until now, and I have concluded that, you know, the

20   defendants essentially have kind of opened the door to this

21   topic of lack of patient harm, particularly with respect to

22   Dr. Hsu.  As I recall from the testimony, Dr. Merrens was asked

23   about knowledge of patient harm and indicated no knowledge of

24   patient harm.  There was further testimony about any medical

25   malpractice claims against Dr. Hsu.  The testimony, as I

1    recall, was that there really was no evidence of any kind of

2    claims with respect to Dr. Hsu.

3        So the proposed testimony by this witness, as I commented

4    before the lunch break, is relevant and actually highly

5    probative of the issues raised in this case.  There has been

6    essentially a suggestion in the defense case that there were a

7    series of complaints by Dr. Porter and frankly a questioning of

8    whether the complaints were legitimate, and this definitely

9    contradicts the testimony to the effect that perhaps the

10   suggestion is the complaints were not justified.

11       That said, I am going to provide instructions about the

12   permissible scope of Ms. Lee's testimony.  So she can speak

13   about her experience generally, but she cannot speak to whether

14   Dr. Hsu did not provide competent medical care.  I think that

15   that gets into the realm of her essentially providing an

16   opinion on the standard of care.

17       I mean, really, in short, I do not want Ms. Lee to be

18   testifying to any legal or medical conclusions.  I also do not

19   want Ms. Lee to be speaking in any way about the Second Circuit

20   decision in this case.  I'm not sure if that was her intention,

21   but there should be no discussion of that.

22       To the extent that there is going to be discussion of the

23   lawsuit, she can't say that, by reading about the lawsuit, it

24   confirmed to her that something was wrong, right?  The filing

25   of the lawsuit doesn't confirm that something was wrong.  It's

1    merely her reading about the lawsuit, she can talk about her

2    reaction to that based on her own experience.

3        Is that, is that clear?  I want to be really clear with

4    plaintiff's counsel on this.  I understand Ms. Lee is an

5    attorney so she should be able to follow these explicit

6    directions, perhaps even to a greater degree than an ordinary

7    lay witness.  So that's the ruling.

8        With respect to the procedural objection, so, as it was

9    explained to me earlier, Ms. Lee was on plaintiff's initial

10   disclosed witness list several weeks ago, and this witness is a

11   rebuttal witness, right?  So there may not have even been a

12   rebuttal case.  That's a decision that plaintiff makes after

13   the defense puts on its case.  So I'm satisfied that, in terms

14   of disclosure, there was disclosure several weeks before the

15   trial.  So I won't rule that that's a basis for Ms. Lee to be

16   excluded today.

17       So that's the ruling.  Ms. Nunan, I understand this will

18   be your witness.  Are there any questions about what the scope

19   of what I have just indicated?

20           ATTORNEY NUNAN:  There are not.  I would like the

21   opportunity to go speak with her, like I did with the other

22   witness that we limited the scope.

23           THE COURT:  Yes.  We told the jury to come back in

24   ten minutes, so you have some time.  Okay.  Mr. Coffin?

25           ATTORNEY COFFIN:  Just briefly a clarification.

VOLUME: 10
PAGES: 861-969

1    Thank you for this ruling.  Understood.  Good guidance.  On

2    Number 4, the reaction to the story, I presume that Number 4,

3    her reaction can't get into whether that caused her to think

4    that something had happened that was wrong here or something.

5    That shouldn't be part of the testimony either because that

6    would be stating a legal or medical conclusion.

7         THE COURT:  Right.  I'm assuming -- Ms. Nunan, you

8    know her better than all of us.  You know, her reaction to the

9    lawsuit is going to be what?

10        ATTORNEY NUNAN:  So this is what I've heard twice

11   from her, "When I read about it, I couldn't get all the way

12   through it because I felt absolutely sick to my stomach.  I

13   thought I was going to throw up, and I had to walk away".

14   That's her reaction to reading, and I, that's what she's told

15   me twice very consistently.

16        THE COURT:  Okay.  So that's not expressing an

17   opinion.

18        ATTORNEY COFFIN:  Yeah, and, if confined to that, I

19   agree with that.  I hope we don't have to spill over into these

20   other things, and I trust we don't.

21        THE COURT:  All right.  So then I'll step off, and

22   I'll be back for quarter to 1:00.

23        (A recess was taken from 12:40 p.m. to 12:50 p.m.)

24            (The Jury enters the courtroom.)

25        THE COURT:  Okay.  So, as you heard before the break,

VOLUME: 10
PAGES: 861-969

1    the defendants have rested their case.  So, at this time, we're

2    going to turn back to the plaintiff, and the plaintiff will

3    have an opportunity -- I think I mentioned this to you in the

4    preliminary instructions when we first started -- to present

5    evidence in rebuttal, and we anticipate one witness this

6    afternoon.  Please, go ahead.

7                    ATTORNEY NUNAN:  We call Eunice Lee.

8                            EUNICE LEE,

9            having been duly sworn to tell the truth,

10                testifies as follows:

11           THE COURT:  Okay.  Please go ahead.

12                    DIRECT EXAMINATION BY ATTORNEY NUNAN

13   Q.   Good afternoon, Ms. Lee.  Thank you.  Where do you live?

14   A.   Lebanon, New Hampshire.

15   Q.   And what do you do for work?

16   A.   I'm an attorney.

17   Q.   How long have you been an attorney?

18   A.   Oh, my gosh.  Since 2009, So do the math.

19   Q.   What kind of work do you do?

20   A.   I do estate planning.

21   Q.   Great.  I want to talk to you today about your IVF

22   journey.  Can you tell me where your IVF journey started?

23   A.   Yeah.  It started in the fall of 2013 in Denver, which is

24   where my husband and I were living then.  I, my initial

25   consultation was with the REI clinic at University of Colorado

1    in Denver, and then just sort of got the process rolling around

2    that time with the actual retrieval happening January of the

3    following year.  So 2014 is when the retrieval.

4            ATTORNEY COFFIN:  So objection.  Could we approach?

5    I think this is subject to the earlier ruling.

6            THE COURT:  Okay.

7            (Bench conference begins.)

8            ATTORNEY COFFIN:  I think certainly some contextual

9    questions are appropriate with the Witness, but I'd understood

10   the Court's ruling to be that she could talk about the

11   treatment by Dr. Hsu and there wasn't going to be a comparison

12   of the Denver experience and later experiences that would be

13   relevant to imply that that was what was done by Dr. Hsu was

14   different and, therefore, not competent.

15           THE COURT:  Yeah.  No.  I think it's okay for her to

16   talk about her background and just give factual testimony on

17   kind of her experience.

18           ATTORNEY NUNAN:  I'll keep this to -- I heard that.

19           ATTORNEY COFFIN:  Okay.  So I didn't want to jump the

20   gun, but I also didn't want to let the cat get out of the bag.

21           ATTORNEY NUNAN:  This is what happened in Denver.

22   This is what happened in Hanover.  This is what happened at

23   UVM.

24           THE COURT:  With the express understanding that, when

25   she gets to the Dr. Hsu portion of the testimony, there's going

VOLUME: 10
PAGES: 861-969

1    to be no suggestion of kind of opinion, whether it comes up by

2    implication

3           ATTORNEY COFFIN:  Well, that's my concern is the

4    questioning has to be guided appropriately and the Witness

5    counseled appropriately, not to be designed to leave the

6    implication that it was different here, therefore, it was

7    outrageous and terrible because that's not what the Court

8    ruled.

9           ATTORNEY NUNAN:  She will talk about her experience.

10   We've been very clear about it just needs to be what she

11   experienced here, what she experienced there.  She's not going

12   to speak to what she thought Dr. Hsu had done.

13          ATTORNEY COFFIN:  But what she experienced there has

14   no relevance to this case except by the comparison that I have

15   been concerned they are trying to make by implication exactly

16   contrary to the Court's instructions.

17          THE COURT:  At the same time, her ultimate testimony

18   is going to be -- I think we know where it's going, right?

19   It's going to be, My experience was negative with Dr. Hsu, but

20   she knows it's negative in comparison.  I don't think that's

21   her opining as to the standard of care.

22          ATTORNEY COFFIN:  Well, I thought the Court's ruling

23   was that she wasn't going to be saying anything that would

24   describe any medical or legal conclusions and nothing about

25   Dr. Hsu's competence.  Essentially, as long as we can stick to

1      that, that's all.

2                    THE COURT:  I expect that there are going to be no

3      questions expressly asking her to draw a conclusion as to the

4      standard of care.  To the extent she testifies about her

5      experience Denver and then her experience with Dr. Hsu, I think

6      that's the facts of her experience, okay?

7                    ATTORNEY COFFIN:  Thank you.

8                    (Bench conference ends.)

9      BY ATTORNEY NUNAN:

10     Q.    I'm going to ask you to keep your voice up.  I'm going to

11     try to speak into the microphone.

12     A.    Okay.

13     Q.    I had asked you about your IVF journey, and you had

14     started to talk about your experience in Denver.

15     A.    Um-hum.

16     Q.    You had an egg retrieval in Denver?

17     A.    I did.

18     Q.    What was that like?

19     A.    I mean, it was my first one, so I didn't have another one

20     to compare it to, but, in my experience, it went pretty well.

21     The staff and the doctors there, you know, were great.  I felt

22     well taken care of.  They ended up retrieving 20 eggs, which is

23     amazing for anyone familiar with IVF.  And then they ended up

24     freezing four -- all of this is IVF language which might not be

25     familiar -- but four five-day blastocysts that, on day six,

1    were frozen, and then after that I had a transfer in December

2    with two other frozen eggs.  It was not successful.  And then

3    followed in May with the remaining two, and that also was not

4    successful.

5    Q.   When you had your egg retrieval in Denver, can you talk to

6    me about your experience coming out of anesthesia and what you

7    felt?

8    A.   Yeah.  So, I mean, a lot of the detail I don't remember,

9    again, because I'm under anesthesia and sort of fuzzy when

10   you're coming out of it.  I, you know, before going in I

11   remember being told that sort of the what to expect and that,

12   once I sort of come to, at some point, the doctor will come in

13   and check in with me, let me know how the procedure went, and

14   my husband will be able to come and join me.  Pretty much what

15   happened.

16        I mean, I was a little, I think, uncomfortable.  There was

17   some, like, you nausea from the anesthesia medication, but,

18   once I was in a place where I think, you know, I was rested

19   enough, I felt fine to get up from the bed and go home.  They

20   discharged me with instructions and for IVF retrieval these are

21   just typical instructions I'm familiar with.  You might

22   experience some mild cramping.  Some spotting is normal.  And

23   that they prescribe painkillers to take if it's too painful,

24   but, otherwise, to take ibuprofen or Tylenol as needed.  Yeah.

25   Q.   Were you able to cook dinner that night?

VOLUME: 10
PAGES: 861-969

1    A.    Yes, we were.  I felt well enough, and I was starving, so

2    we stopped by one of my favorite places to have lunch there.  I

3    mean, I wasn't 100 percent there, but well enough to walk and

4    have lunch, and then we drove home and then just took it easy.

5    You know, I think maybe I cooked, like, a light dinner or

6    something.  Nothing, I mean, I like to cook a lot, but nothing

7    anything fancy, just a light dinner and then probably watched a

8    movie on the couch, which would have been very typical for us

9    on an evening, but it wasn't anything unusual.

10   Q.    And were you able to, two days later, move around?  One

11   day later, move around freely?

12   A.    Oh, yeah.  I mean, that day I was moving around freely.

13   It was just, you know, you're told don't operate heavy

14   machinery, don't drive, don't sign legal documents, all that

15   stuff.  So I didn't do any of that stuff, but, otherwise, I

16   felt reasonably fine, yeah.

17   Q.    Okay.  When did you move to the Upper Valley?

18   A.    June of 2015.

19   Q.    Okay.  And what was your initial DH experience in the REI

20   division?

21   A.    So that was, my priority was I wanted to get started on

22   our IVF process as soon as possible, in part because, honestly,

23   age works against women in this.  So I wanted to get another

24   cycle started.  We had researched, you know, REI clinics around

25   the area.  DH made the most sense, one, for proximity purposes,

VOLUME: 10
PAGES: 861-969

1    it was just convenient, but I have a history of endometriosis

2    and adenomyosis which are uterine conditions.  So my preference

3    would have been to find a doctor who is familiar with it in the

4    IVF context that they can provide me with the treatment that I

5    needed.  When I was looking at the profiles of different

6    doctors, Dr. Porter, in terms of her expertise that was listed

7    on, so I picked her and requested an initial consultation

8    meeting with her.

9    Q.   And did you meet with her?

10   A.   I did, in September of 2015.

11   Q.   Okay.  When did you have your retrieval?

12   A.   So that was a while.  I met with her in September of 2015.

13   My retrieval did not happen until over a year later in December

14   of 2016.

15   Q.   Okay.

16   A.   And it was December 4th on a Sunday.

17   Q.   Okay.  Who did the retrieval?

18   A.   Dr. Hsu.

19   Q.   Dr. Hsu did the retrieval?  What did you experience after

20   you woke up from the retrieval?

21   A.   Similar to my experience in Denver, the initial, you know,

22   when you're coming out of the anesthesia, you don't remember a

23   lot.  I thought and expected that, at some point, the doctor

24   would come to the recovery room where we're at to, again,

25   explain, check in and explain how the procedure went to let us

1     know how many eggs were retrieved.  That did not happen.  We

2     weren't sure what was going on.

3          That entire day started off oddly in the OR.  At some

4     point, we had to be discharged.  So my husband had -- I had to

5     be put in a wheelchair because I think that's the hospital

6     policy to leave.  I didn't want to leave until we had spoken to

7     Dr. Hsu, just because I wanted to know what happened and

8     whether we had retrieved the number of eggs we had hoped for.

9          I don't know how long we were waiting in the hallway, and

10    I remember being in pain and telling my husband, like, I want

11    to go home soon, because the crampings are getting worse, but I

12    didn't want leave until we see the doctor.  and, honestly, I

13    don't know how long we waited.  It could have been minutes.  It

14    could have been longer than.  I think, to me, just because of

15    the pain I was going through, in felt like a long time, but who

16    knows?  It could have been a shorter period than that.

17         And no one came to check in on us.  It was just the two of

18    us in the hallway, and, at some point, I saw him approaching

19    us.  Something was off about his body language.  He wasn't,

20    like, looking at me, even though I was in his field of vision.

21    Sort of kind of more like shuffling.  And, again, I just had

22    this feeling something's off.  Why he doesn't feel comfortable?

23    It's almost like maybe he has bad news or something.  And he

24    moved to us and finally made eye contact, and the first thing I

25    remember him saying is, "I'm really sorry".

VOLUME: 10
PAGES: 861-969

1      That, in my head, I'm thinking, Why would a doctor start

2    with that?  I mean, are doctors even supposed to say that to

3    patients?  I mean, and it was followed by, "Looks like we only

4    were able to retrieve one egg".  That was a huge shock to me

5    because we went in there with at least five lead follicles, and

6    this is sort of a good indication of how many eggs you could

7    retrieve.  I had more than that.  There were five lead

8    follicles that were good in length and volume.  And I think I

9    thought I had misheard.

10      There was a part of me that thought, Is this, like, the

11    anesthesia?  Did he really say that?  I looked at my husband.

12    I saw his face, and, when I saw his face, I knew I didn't

13    mishear anything because he sort of had that same look on his

14    face.  And I think, I mean, I wanted more, like, answers and

15    follow-up, but it was sort of clear that the follow-up had

16    ended up, and I think I also just wanted to go home.

17      I mentioned that I'm having some cramping, it feels a

18    little like more cramping than I'm used to I had in the past

19    and was told, you know, cramping is normal.  Some bleeding is

20    normal.  Go home and take your, you know, take pain meds as

21    needed, and that was it, and he walked away.  And then my

22    husband took me to our car, and we went home.

23    Q.   What was your experience when you got home in terms of

24    pain and symptoms?

25    A.   So I had, I mentioned I have a history of endometriosis

1    and adenomyosis that causes debilitating cramping and heavy

2    bleeding.  It's common for me to just be out of commission for

3    three to four days of the month, not being able to do anything.

4    So my threshold, I think, for pain unfortunately is pretty

5    high.

6        This was that level of cramping.  It didn't feel like

7    normal cramping and not cramping I had before in my prior

8    retrieval.  I also, the bleeding was more than spotting.  I had

9    to change -- sorry, this is, like, too much detail, but, like,

10    I had to change pads probably every three hours or so.

11        And our neighbor had moved in that day, and she was having

12    sort of an open house, come meet us, and I think, based on my

13    past experience, I thought Oh, you know, I'm not going to go

14    and drink and do anything, but I can least walk over, say "hi",

15    and come back home after half an hour or so.  I wasn't able to

16    get out of bed.  I was just crying and telling my husband that

17    something, that this isn't normal.  Like, this is not the

18    normal cramping.  I think something happened.  I don't -- this

19    is just my gut feeling, but something just -- I think something

20    happened.

21        And, you know, obviously, I was, I don't remember anything

22    because I was under anesthesia, but this just does not feel

23    normal, and my body is just in so much pain.  I forget how many

24    Vicodin he had prescribed.  I took the whole thing, I mean, all

25    of it because I needed to, like, every four hours, and that's

1    how much pain I was in.  I think on, like, day two we had

2    considered going to the ER, but by then the pain had subsided

3    enough where it was bearable for me, and, honestly, I didn't

4    want to deal with going to the ER and being in the waiting

5    room.  So I decided not to.

6        But that day and the few days that followed, I just, it

7    was something that I always thought of just your gut feeling,

8    my gut feeling telling me something isn't right.  I don't know

9    what happened, but something isn't right.

10   Q.   Okay.  Did you return to Dartmouth-Hitchcock in the spring

11   of 2017?

12   A.   So, after the retrieval in 2016, my hope was that the

13   transfer would be done by Dr. Porter, whenever that might be,

14   even it meant I had to wait a while for her to come, you know,

15   back.  I was thinking maybe it would be late spring.  But May

16   of 2017 I read in the "Upper Valley News", which is a local

17   paper --

18   Q.   Can I interrupt you for a second?  Did you, did you need

19   surgery after?  Was there a need for surgery?

20            ATTORNEY COFFIN:  Objection, Your Honor.  Approach?

21            THE COURT:  Okay.

22            (Bench conference begins.)

23            ATTORNEY COFFIN:  I'm concerned that we're going to

24   get into a statement that she, did she need surgery, and so I

25   just want to, before we let the cat out of the bag, get a

VOLUME: 10
PAGES: 861-969

1    proffer of what's going on.

2              ATTORNEY NUNAN:  Sure.  So she, it was determined by

3    Dr. Porter that she had Asherman's, which means, before they

4    could do the transfer after the retrievals, she diagnosed her

5    with Asherman's, so she needed a surgery.  So it was because

6    she needed a surgery to remove those fibroids so, if they

7    implanted the embryo, it could actually stick.  She needed a

8    specific kind of surgery, and Dr. Porter referred her to Boston

9    for that surgery.

10             ATTORNEY COFFIN:  And I don't see how that has any

11   relevance to any issues in the case at this point.

12             THE COURT:  Okay.  So you're going to ask her about,

13   so Dr. Porter told her she needed a new surgery for something

14   unrelated to the retrieval process?

15             ATTORNEY NUNAN:  Well, I think where she was, she was

16   obviously upset.  You have egg retrieval.  Then you have embryo

17   transplant, but it was determined in the meantime that, before

18   you do that transplant, you have to have this surgery to get

19   that Asherman's taken care of so that, when we do the

20   transplant, you have a place for the embryo to go.  Otherwise,

21   you're going miscarry again.

22             THE COURT:  I think I'm just wondering about the

23   implications of whether the need for that surgery is somehow

24   going to be tied to the procedure that Dr. Hsu had done.

25             ATTORNEY NUNAN:  It is simply the next step before

VOLUME: 10
PAGES: 861-969

1    the embryo transfer, which was not successful, and that's --

2    like, honestly, I'm happy to move on if you feel like this is a

3    problem.  I don't see it as a problem because it's not, it has

4    nothing to do with the egg.  It's not like they have to fix

5    anything from the egg retrieval.  This was just her experience

6    afterwards, and Dr. Porter told her to go to Boston to have

7    that kind of surgery.

8         ATTORNEY COFFIN:  Her experience isn't relevant to

9    the case, except for the point that it is relevant, and the

10   Court has ruled that the Denver surgery and what she felt there

11   and the egg retrieval was relevant to what she experienced with

12   Dr. Hsu.  She's described what she experienced with Dr. Hsu.

13   You know, Dr. Porter's, you know, I can't even think of the

14   word, but that procedure doesn't have any apparently relevance

15   to that, and where she referred her doesn't have any relevance

16   either, because where people are being referred does not have

17   any issue in the case.

18        ATTORNEY NUNAN:  So what I've heard her say and,

19   again, what I heard her say what I understood at that time is

20   that she was trying to protect me.  I thought, Wait a minute.

21   There's no male surgeons here, and Dr. Porter clearly was

22   shipping outside of DH to have this surgery because she

23   couldn't do it because she was on disability.  She will testify

24   in that meeting the room was dark.  She was whispering.  She

25   didn't understand what was going on with Dr. Porter, but

1    Dr. Porter was meeting with her as she was trying to return

2    from her disability, and she was saying, Don't have the surgery

3    here.  Go to Boston.

4            ATTORNEY COFFIN:  That has absolutely no relevance to

5    impeachment or any of these things.  You know, Dr. Porter

6    interacting with her and referring her to Boston is not

7    relevant to the whistleblower claim or the complaints about

8    Dr. Hsu.  We've allowed her to have, you know, a lot of sort of

9    semi-expert testimony by this witness about her medical

10   conditions and her needs, and this is going to unnecessary

11   lengths into those things, and no notice, no nothing, and

12   really tangentially relevant, if relevant.

13           THE COURT:  I don't think it's semi-expert testimony,

14   just for the record.  But so it sounds like you want to get

15   into this to kind of complete the narrative, but you also don't

16   need to get into it to establish what you had said a moment

17   ago.

18           ATTORNEY NUNAN:  I'll take instruction.  I would like

19   to get this out.  This is her experience.  I think she needs to

20   say it.

21           THE COURT:  But are you saying the ultimate kind of

22   point of this is that Dr. Porter recommended that she go to

23   Boston for what reason now?

24           ATTORNEY NUNAN:  So she needed a surgery that Dr. --

25           THE COURT:  Right.  I got that, but I thought you

1    were kind of suggesting that there was some issue at Dartmouth

2    that she was seeking to have her avoid.

3            ATTORNEY NUNAN:  What she told me when I interviewed

4    her was, I didn't understand at the time, but I understood

5    later that Dr. Porter, by referring me out, was saying she was

6    trying protect me.

7            THE COURT:  From?

8            ATTORNEY NUNAN:  From the harm of going under the

9    surgery with Dr. Hsu again.  The other option was to have Dr.

10   Hsu do the surgery, and what she understood was Dr. Hsu, that

11   Dr. Porter was telling her, Go somewhere else.  She didn't say

12   that, but she said afterwards, I realized at the time I was

13   thinking, Why would I go to Boston when you have somebody here

14   who can to this?  Anyway.

15           ATTORNEY COFFIN:  This is enormously prejudicial

16   without the normal basis in medical expertise and medical

17   records and things like that.  This is like story, legend

18   telling from a witness based on the personal experience on

19   something that really she doesn't have the expertise on with

20   zero notice to us.

21           THE COURT:  All right.  So don't go into that area,

22   and, if you could ask her, please, to lean into the microphone,

23   I'm having a very hard time.

24           ATTORNEY NUNAN:  Sure, that's fair.  Okay.

25               (Bench conference ends.)

VOLUME: 10
PAGES: 861-969

1    BY ATTORNEY NUNAN:

2    Q.    Eunice, could I get you to speak into the microphone?

3    A.    Oh, yeah.  Sure.

4    Q.    Not a problem.  Eventually, did you go to UVM to get

5    further IVF care?

6    A.    After the REI clinic closed down, yeah.

7    Q.    Okay.  And who did you see at UVM?

8    A.    So the first physician I saw was Joseph Findlay, and then,

9    at some point, Dr. Porter joined UVM, and then she became

10    involved with my care.  So the two of them were my primary

11    doctors.

12    Q.    Did you have an egg harvest and embryo transfer at UVM?

13    A.    I did, Two cycles, one in 2018 and then another one in

14    2019.

15    Q.    And can you just tell me the experience coming out of your

16    egg retrieval at UVM?

17    A.    It was more similar to my Denver experience in that, you

18    know, when I was coming out of the anesthesia, at some point,

19    my husband came back to join me, and then Dr. Porter or

20    Dr. Findlay or both came to let me know how it went and how

21    many eggs were retrieved and just to check in to see how I was

22    doing and to, you know, tell me to take it easy, and yeah.

23    Q.    Were you able to move around?

24    A.    Um-hum.  Yeah.

25    Q.    Were you able to get pregnant?

1    A.    The 2018 one, I was, and we had implanted or transferred,

2    sorry, three eggs or embryos, including the one that came from

3    DH.

4    Q.    Ultimately, were you able to carry that to the end?

5    A.    No.

6    Q.    Did you have to have a procedure with Dr. Porter,

7    eventually?

8    A.    Yes.  Um-hum.

9    Q.    Okay.  What was that procedure?

10   A.    So, at the end of 2019 when I did my last transfer or IVF

11   cycle, I mean, thereafter, Covid happened, honestly, and kind

12   of gave me pause to think of, What I have gone through, what I

13   was willing to go through.  And I just decided that I had done

14   everything I could possibly do and that that my body just, it

15   couldn't give anymore.  And I, you know, for me, I just wanted

16   to be a mom.

17        So I went looking into adoption, but, because of my

18   history with endometriosis and adenomyosis and the pain that it

19   causes, I didn't want it to affect my ability to care for my

20   baby if we end up matching.  And hysterectomy was the, really

21   the only option for me, and I wanted, asked Dr. Porter if she

22   would be willing to do the surgery for me because I wanted the

23   best care and the care of somebody who I trust and has

24   followed, you know, me from the beginning of this.  And I, you

25   know, shared with her my main reason, that I was ready to move

1    on and just want to be a mom in the healthiest, best way

2    possible, and she supported me and just said, "If you're ready,

3    I'm here.  Let's do this".  And --

4    Q.   This story has a very happy ending, right?

5    A.   Yeah.

6    Q.   Okay.  Tell me about that.

7    A.   So my surgery was in August, and it was, I mean, I

8    shouldn't -- it's weird to say the surgery was so great because

9    it was a medical procedure, but there was just so much, like,

10   warmth and care in the room.  The last thing I remember Dr.

11   Porter telling me is to say, "Let's take care of you.  Let's

12   get you a baby".  And then exactly a week later we matched with

13   a birth mom.

14   Q.   And that birth mom had how many babies?

15   A.   Two, so I have twins.

16   Q.   Great.

17   A.   Yeah.

18   Q.   That's great.  Okay.

19   A.   Yeah.

20   Q.   This is clearly a very painful experience for you to come

21   into public and tell.  Why did you want to do it?

22   A.   When I read about the news, the lawsuit and what had been

23   going on at DH, there was several things that I felt.  One was

24   relief in knowing that, okay, this wasn't in my head, and, for

25   a while, I had been carrying with me that I had done something,

1    that this had been my fault.  For that part, I just, I had a

2    sense of relief that okay.

3    Q.   When you read the story, what was your reaction?

4    A.   I felt sick to my stomach, and I actually didn't finish

5    reading.  I read enough to know that, okay, this wasn't in my

6    head, that gut feeling that I had this entire time, and, like,

7    that day that I'd been reliving over and over again, that there

8    was, like, truth and validity to it.  So, for me, there was a

9    sense of relief as I kind of let that go because I'd been

10   carrying it with me.

11       Another part of it was I can't imagine just feeling, you

12   know, awful for Dr. Porter about what, not -- I had no idea

13   what was going on and what she had been going through.

14       And but the third part, and maybe this is, like, the most

15   important part for me, is I kept thinking, What about us?

16   Like, what about the patient?  I can't be the only woman who is

17   finding about it this way and the only woman who, for years,

18   has been wondering, Did I do something wrong, and was this my

19   fault?  And not knowing what.  And it just, I had, like, anger

20   and disappointment and sadness, and I didn't want us just to be

21   these nameless patients out of, like, a billing statement.

22   Because this is so personal to me, and, if this is what it's

23   doing to me ten years later, I can't imagine what other women

24   are going through, and I kept thinking there has to be a face

25   to this.  And a person was assigned to this that, that this is

1    what it has caused, and the pain is still here and just as raw

2    after ten years.

3    Q.   Okay, okay.

4    A.   Sorry.

5    Q.   It's okay.  I really appreciate you being here.  I think

6    we should probably stop.

7    A.   I'm sorry.

8             ATTORNEY NUNAN:  Don't be sorry.  No further

9    questions.

10            THE COURT:  Mr. Coffin.

11            ATTORNEY COFFIN:  If I may have a moment, Your Honor?

12            THE COURT:  Yes.

13            CROSS-EXAMINATION BY ATTORNEY COFFIN

14   Q.   Good afternoon, Ms. Lee.

15   A.   Hi.

16   Q.   I'm Tris Coffin.  I'm a lawyer for Dartmouth-Hitchcock.

17   How are you today, hanging in there?

18   A.   Hanging in there, yeah.

19   Q.   You might recall I called and left a message at your law

20   office.

21   A.   Yes, I do remember.

22   Q.   A couple of weeks ago.  Time has gone by quickly.  Anyway,

23   good to see you today.  And I don't have many questions for

24   you, but I just have a couple.  Thank you for coming in and

25   sharing your experience.  Obviously, very heartfelt, and I just

1    want to say, by the way congratulations on your family

2    situation.  That's wonderful.

3    A.   Thank you.  They're wonderful.

4    Q.   You saw Dr. Hsu that one time; is that right?

5    A.   Um-hum.  Yes.

6    Q.   And he didn't come out and deal with you very effectively

7    as a  doctor; is that right?

8    A.   Correct.

9    Q.   And then you went home, and you had some pain, correct?

10   A.   Correct.

11   Q.   And the prior surgery or egg retrieval when you were in

12   Denver, you had some pain from that as well?

13   A.   Yes, mild cramping, I would say.

14   Q.   But this was significantly worse?

15   A.   Yes.

16   Q.   And you took some Vicodin to take care of that that had

17   been prescribed for you, correct?

18   A.   Yes.

19   Q.   And you thought about going to the emergency room the next

20   day, but the pain had subsided by then; is that correct?

21   A.   Correct.

22   Q.   And, with regard to Dr. Hsu, I take it from your

23   experience with Dr. Porter and Dr. Hsu and the Denver doctors

24   that your experience with him was different; is that right?

25   A.   Yes.

1    Q.    And, in your view as an attorney and a patient,

2    appropriate to have some follow-up by a supervisor of Dr. Hsu

3    to remedy that kind of, type of approach with a patient, fair

4    to say?

5    A.    Could you say that again?  Sorry.

6    Q.    You know, wouldn't you agree that it would be reasonable

7    for there to be some follow-up with Dr. Hsu about how he

8    conducts himself with patients based on your experience that

9    one time, right?

10   A.    Yeah.  I mean, in general, I just thought we have the

11   retrieval and then, at some point, there's a follow-up

12   appointment of sort where we go over, you know, numbers, what

13   went wrong, or that kind of thing.

14   Q.    Yeah.  My question is slightly different that, if there

15   was a doctor who had problems interacting with patients and

16   providing care that they needed in an appropriate and effective

17   way, you'd expect that to be the subject of some concern by the

18   institution; is that right?

19   A.    Yes.

20   Q.    And so, if there was follow-up attempts to mentor,

21   training, that would be in line with that, right?

22   A.    In line with correcting his behavior, you mean?

23   Q.    Yeah.

24   A.    Yeah, I think so.

25   Q.    Yeah, right.  Okay.  And, if the behavior wasn't

1    corrected, even up to possibly terminating the physician might

2    be a reasonable thing to do; isn't that right?

3    A.    I mean, I would think, if there was an issue with a

4    physician and there is attempts correct whatever issue there is

5    that can't be remedied by training or whatever follow-up, it

6    would be very reasonable to expect to terminate that physician.

7    I mean, again, I don't practice medicine.  I'm not sure, but,

8    logically, that seems to be reasonable.

9    Q.    Okay.

10   A.    Yeah.

11          ATTORNEY COFFIN:  Those are all the questions I have.

12   Thank you again for coming in here, and congratulations.

13          THE WITNESS:  Thank you.

14          THE COURT:  Ms. Nunan, any further questions?

15          ATTORNEY NUNAN:  No further questions.

16          THE COURT:  Okay.  Ms. Lee, you may step down.  Okay.

17   And does that conclude the plaintiff's rebuttal case?

18          ATTORNEY JONES:  It does, Your Honor.  Thank you.

19          THE COURT:  Okay.  So, members of the jury, that

20   means the evidence is now closed in the case.  There will be no

21   further presentation of evidence, so I'll kind of explain the

22   process to you from here.  So, as you may recall from when we

23   first met and I gave you preliminary instructions, I told you

24   that the final stage of a trial is the closing arguments by the

25   attorneys.  That is the next stage, and, in this case, that

1    will not be happening today.  The attorneys will be delivering

2    their closing arguments to you on Tuesday morning, which means

3    then the remainder of this afternoon you will be off, and we

4    will not be meeting on Monday, okay?  So you'll return to court

5    on Tuesday to get going again at 9:00 a.m.

6        After the attorneys present their closing arguments to you

7    on Tuesday, then I'll be instructing you on the law, and, at

8    that point, you will officially then get the case, and you will

9    retire then to the deliberations room, jury room, for your

10   deliberations, and that's, that's what you can expect next,

11   okay?

12       So, at this time, I will excuse you.  Have a good weekend,

13   and we will see you Tuesday at 9:00.  The usual admonition,

14   please don't talk to anyone or to your fellow jurors about the

15   case or do any independent research on the case between now and

16   Tuesday.  Thank you.

17           (The Jury leaves the courtroom.)

18           THE COURT:  Okay.  So, just in terms of jury

19   instructions, charge conference, Emerson will email all of the

20   attorneys copies of the Court's jury instructions Monday

21   morning.  I think I mentioned this to you yesterday.  You will

22   have the morning and some of the afternoon to review this, and

23   then we'll meet at 1:00 o'clock.  I think the best thing to

24   advise is you can come here to the courtroom and Emerson can

25   take you upstairs.  I'm anticipating that we'll do the charge

VOLUME: 10
PAGES: 861-969

1    conference either in my chambers or in the jury room on the

2    fourth floor.  It all depends on how many people are coming.  I

3    think, if the past is any indication, everyone's coming.  So it

4    might make sense then for us to do it in the jury room.  There

5    was a knock on the door, so I'll just pause here for a moment.

6                    (Brief pause.)

7         All right.  So that was all I was going to tell you.  So

8    you'll get the jury instructions Monday morning.  You can come

9    here a few minutes before 1:00.  Emerson can escort the group

10   to the fourth floor to where we're going to meet, and, as I

11   said, that will be at 1:00 o'clock, okay?

12        Anything from the parties at this time?

13             ATTORNEY JONES:  Nothing for the plaintiff.

14             ATTORNEY SCHROEDER:  Nothing for the defendants.

15             THE COURT:  Okay.  Enjoy your weekends.

16

17        (Whereupon at 1:36 p.m. the hearing was adjourned.)

18

19

20

21

22

23

24

25

VOLUME: 10
PAGES: 861-969

1          C E R T I F I C A T E

2                  I, Sunnie Donath, RMR, Official Court Reporter

3    for the United States District Court, District of Vermont, do

4    hereby certify that the foregoing pages are a true and accurate

5    transcription of my stenographic notes of the hearing taken

6    before me in the above-titled matter on April 4, 2025 to the

7    best of my skill and ability.

8

9

10

11

12                                *Sunnie Donath, RMR*

13        --------------------------------

14                  Sunnie Donath, RMR

15

16

17

18

19

20

21

22

23

24

25