1                    UNITED STATES DISTRICT COURT
                            FOR THE
2                     DISTRICT OF VERMONT

3

4    Misty Blanchette Porter        )
                                     )
5                                    )
     v.                              ) Case No. 2:17-cv-194
6                                    )
                                     )
7    Dartmouth-Hitchcock Medical     )
     Center, et al.                  )
8                                    )
     _____)
9

10   RE: Day 11 of Jury Trial, Charge Conference

11   DATE: April 7, 2025

12   LOCATION: Burlington, Vermont

13   BEFORE:  Honorable Kevin J. Doyle
                  Magistrate Judge
14

15   **APPEARANCES**:

16   Geoffrey J. Vitt, Esq.
     Sarah H. Nunan, Esq.
17   Vitt & Nunan, PLC
     8 Beaver Meadow Road
18   Norwich, VT 05055

19   Eric D. Jones, Esq.
     Langrock, Sperry & Wool
20   210 College Street, Suite 400
     Burlington, VT 05410
21
     Donald W. Schroeder, Esq.
22   Morgan McDonald, Esq.
     Foley & Lardner, LLP
23   111 Huntington Avenue, Suite 2500
     Boston, MA 02199

24

25                 - Continued on Next Page -

VOLUME:  11
PAGES:   970-1056

1     Tristram J. Coffin, Esq.
      Downs Rachlin Martin, PLLC
2     199 Main Street, Suite 600
      Burlington, VT 05401-8339
3

4

5

6

7

8

9     TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
          United States District Court Reporter
10          *verbatim@vermontel.net*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME:  11
PAGES:  970-1056

1          (The hearing began at 1:03 p.m.)

2          COURTROOM DEPUTY:  Your Honor, the matter before the

3     Court is Civil Case Number 17-cv-194, Misty Blanchette Porter

4     versus Dartmouth-Hitchcock Medical Center, et al.  Present on

5     behalf of the plaintiff are Attorneys Geoffrey Vitt and Eric

6     Jones.  Present on behalf of the defendants are Attorneys

7     Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We are

8     here for a charge conference.

9          THE COURT:  Good afternoon.  Nice to see everyone

10    again.  Okay.  So, turning to the charge conference, so just

11    kind of for your knowledge, I've kind of set aside about 90

12    minutes.  I'm hoping that that should be enough to get through

13    this.  So let's start with the actual charge, of course, and

14    particularly the "General Instructions" beginning on Page 1.

15    I'll just go through kind of what I'll call, you know, the more

16    general charges that this court issues in pretty much every

17    case just to make sure that people are okay with that for the

18    record.

19         So, in terms of Page 1 as well as leading onto Page 2,

20    "Jurors as Finders of Fact/Rulings of the Court", do plaintiffs

21    have any comments or objections to those?

22         ATTORNEY JONES:  No objection.

23         THE COURT:  Okay.  Defendants?

24         ATTORNEY COFFIN:  No, Your Honor.

25         THE COURT:  Okay.  "Sympathy/Prejudice" is the next

VOLUME:  11
PAGES:  970-1056

1    category, as well as "Evidence in the Case".  Plaintiffs have

2    any objections to that?

3              ATTORNEY JONES:  No objection.

4              THE COURT:  Okay.  And defendants?

5              ATTORNEY COFFIN:  No, Your Honor.

6              THE COURT:  All right.  Page 3,

7    "Arguments/Statements/Objections of the Attorneys", "Court's

8    Rulings on Objections", and "Evidence: Direct or

9    Circumstantial", does plaintiff have any objections?

10             ATTORNEY JONES:  No, Your Honor.

11             THE COURT:  Okay.  And defendants?

12             ATTORNEY COFFIN:  No.

13             THE COURT:  Okay.  On Page 4, "Credibility of

14   Witnesses", plaintiff, any objections to that charge?

15             ATTORNEY JONES:  No.

16             THE COURT:  And defendants?

17             ATTORNEY COFFIN:  No, Your Honor.

18             THE COURT:  On Page 5, "Impeachment of a Witness",

19   plaintiff, any objections to that?

20             ATTORNEY JONES:  No, Your Honor.

21             THE COURT:  And defendants?

22             ATTORNEY COFFIN:  No.

23             THE COURT:  Okay.  Page 6, "Expert Witnesses", any

24   objections from the plaintiff?

25             ATTORNEY JONES:  None.

VOLUME:  11
PAGES:  970-1056

```
 1              THE COURT:  And defendant?
 2              ATTORNEY SCHROEDER:  Just a minor edit, Your Honor,
 3     and, if it pleases the Court on this one, we've got our red
 4     lines that we actually did so that, to the extent that they
 5     would be beneficial to the Court to understand our position on
 6     a few things.
 7              THE COURT:  Do you mean red lines with law or just
 8     kind of a proposed --
 9              ATTORNEY SCHROEDER:  Just proposed red lines of your
10     instructions.  We just figured that was the most efficient way
11     to do it if you --
12              THE COURT:  Okay.  Well, let's see how it works if
13     you just explain to me what your proposals are.
14              ATTORNEY SCHROEDER:  Sure.  I would just say in the
15     first line it would be better read to say, "You may have heard
16     from one witness -- you have heard from one witness, Dr. Robert
17     Bancroft, who was presented by Dr. Porter as an expert
18     witness".  I don't think saying "who was known as an expert
19     witness" is necessarily appropriate.  So this is more of a
20     proposed revision.
21              THE COURT:  Okay.
22              ATTORNEY SCHROEDER:  That's it on that one.
23              THE COURT:  That's it?  Okay.  Plaintiff, any
24     objection to that proposed change?
25              ATTORNEY JONES:  No.  That would be acceptable.
```

VOLUME:  11
PAGES:  970-1056

1              THE COURT:  Okay, all right.  And then the next

2    charge, "Number of Witnesses", plaintiff, any objection?

3              ATTORNEY JONES:  No, Your Honor.

4              THE COURT:  And defendant?

5              ATTORNEY SCHROEDER:  No, Your Honor.

6              THE COURT:  Okay.  The next category, "Personal

7    Knowledge and Experience of Jurors", plaintiff, any objection

8    to that?

9              ATTORNEY JONES:  No.

10             THE COURT:  Okay.  And defendants?

11             ATTORNEY SCHROEDER:  None.

12             THE COURT:  Page 7, "Burden of Proof: Preponderance

13   of the Evidence", any objections, plaintiff?

14             ATTORNEY JONES:  No.

15             THE COURT:  And defendants?

16             ATTORNEY SCHROEDER:  Your Honor, minor comments.  At

17   the -- so I would just go through them very quickly.  At the

18   bottom, "If you find that the credible" -- it's the last

19   paragraph, "If you find that the credible evidence on an issue

20   is evenly divided between the parties, you must decide that

21   issue", I would just say "against Dr. Porter", because it is

22   her burden, instead of just "the party having the burden of

23   proof".

24             THE COURT:  Okay.

25             ATTORNEY SCHROEDER:  The same, just inserting

1     "Dr. Porter" instead of "he or she", and then at the end of the

2     second full paragraph on Page 8 --

3                THE COURT:  And where is that, "he or she"?

4                ATTORNEY SCHROEDER:  I'm sorry.  Right at the top,

5     Your Honor, of Page 8, "simple equality of the evidence, he or

6     she", I would just put "Dr. Porter".  And the first full

7     paragraph would suggest language at the end that says, "You

8     must find for Dartmouth Health on those claims", period.

9                THE COURT:  Okay.  Where exactly are you in that

10    section?

11               ATTORNEY SCHROEDER:  Sure.  Oh, I'm looking at Page 8

12    before "Corporation Acts Through Its Employees".

13               THE COURT:  Yes.

14               ATTORNEY SCHROEDER:  I would request, respectfully

15    request, "You must find for Dartmouth Health on those claims",

16    at the end of that paragraph, just inserting the words "on

17    those claims".

18               THE COURT:  Oh, okay.  Just so I'm clear, so on Page

19    7 at the bottom of that line, are defendants proposing that the

20    second clause of that sentence read, "You must decide that

21    issue against Dr. Porter", period, and then the next sentence,

22    "That rule follows from the fact that the party bearing this

23    burden must prove more than simple equality of evidence:  Dr.

24    Porter must prove the element at issue"?

25               ATTORNEY SCHROEDER:  Yes, Your Honor.

VOLUME:  11
PAGES:  970-1056

1            THE COURT:  And then the final sentence of that

2      section, the final clause, "Then Dr. Porter has failed to

3      sustain her burden, and you must find for Dartmouth Health on

4      those claims", or on these claims?

5            ATTORNEY SCHROEDER:  I'm agnostic on that part, Your

6      Honor.

7            THE COURT:  Plaintiff, any objections to that

8      proposal?

9            ATTORNEY JONES:  Well, I think it should be "on that

10     claim".  Otherwise, it sounds like it's global, like a failure

11     to meet a burden of proof on one means it affects others.

12     Otherwise, I don't have a problem with that concept.

13       With regard to the remaining edits, my concern is that

14     there are affirmative defenses in this case on which Dartmouth

15     Health bears the burden of proof.  So I don't think it's

16     accurate to say that only Dr. Porter bears the burden of proof

17     on all issues before the Court.

18       So I would argue that you retain the language at the

19     bottom of Page 7, "the party having the burden of proof",

20     because, for example, mitigation of damages is an issue on

21     which Dartmouth Health has that burden.  On Page 8 I understand

22     getting rid of "he", but maybe it should be, "Dr. Porter or

23     Dartmouth Health must prove the element" to be accurate with

24     regard to multiple burdens of proof in this case.

25            THE COURT:  Dr. Porter or Dartmouth Health?

VOLUME: 11
PAGES: 970-1056

1          ATTORNEY JONES:  Correct.

2          THE COURT:  Yeah, it is true there are affirmative

3    defenses in the case, right?

4          ATTORNEY SCHROEDER:  Well, there's only -- I believe

5    it's affirmative defense of mitigation of damages, but there

6    are six claims in this case, and all six are plaintiff's

7    burden.  So is there an affirmative defense at the end?  Yes,

8    but you have a specific jury instruction to that point.  But

9    this isn't a case of claims and counterclaims, right?  It is

10   six claims.  All of them are Dr. Porter's.  That, I think, is

11   the general point of why, raising that up front.  I think you

12   deal with it, quite honestly, Your Honor, to the extent that

13   there is an affirmative defense, it is at the end of the jury

14   instructions relating to just that one issue.

15         ATTORNEY JONES:  I would just be concerned, Your

16   Honor, that, if the jury is thinking about that and there's a

17   question in the jury room about who does bear the burden of

18   proof and they go back to your burden of proof section and

19   there's no reference to the fact that both parties may bear a

20   burden depending on the issue, that it could be confusing to

21   the jury.

22         THE COURT:  So on the top of Page 8, Mr. Jones, where

23   you have suggested, I believe, "Dr. Porter or Dartmouth

24   Health", right?

25         ATTORNEY JONES:  That's correct, but, also, at the

1    bottom of Page 7, I would just retain the language you had that
2    refers to, "You must decide that issue against the party having
3    the burden of proof", because it depends on who has the burden
4    of proof on that issue.
5              THE COURT:  Okay, all right.  So this particular
6    issue, let me take a look at the later instructions and figure
7    out what I'll do there, and you'll have another opportunity to
8    see that.  So, just by the way, if it turns out -- looks like
9    there may be some edits that we'll have to make,
10   unsurprisingly, and, if that happens, what I'll do is we're
11   going to get you another copy this evening of any changes that
12   were made, and, because it will be later tonight, hopefully
13   we'll get you a red line kind of track changes version as well
14   so you can see whatever has been made, and then we can come
15   back tomorrow morning a little bit on the earlier side.  This
16   way, if you want to lodge any additional objections, you'll
17   have an opportunity to.
18             ATTORNEY SCHROEDER:  Thank you, Your Honor.  That's
19   why we did the red line as well and give copies to the Court so
20   that, if I'm not as articulate as our red lines are, you'll at
21   least know what I was speaking about today.
22             THE COURT:  Okay, all right.  "Corporation Acts
23   Through Its Employees", plaintiff, any objection to that?
24             ATTORNEY JONES:  No objection.
25             THE COURT:  And defendants?

1          ATTORNEY SCHROEDER:  Your Honor, one change there,

2     and, actually, it really relates to the next paragraph.  The

3     next paragraph, we would agree to the whole paragraph but move

4     it up first, because I think it actually flows, like first

5     stating "All Persons Equal Before the Law" and then

6     "Corporation Acts Through Its Employees".

7          And then, with respect -- but more specifically on just

8     this paragraph, "Corporation Acts Through Its Employees", the

9     third sentence, "Therefore, the act", I think the law is more

10     appropriate to say that the act of a high-level Dartmouth

11     Health employee that occurred while he or she was on duty and

12     acting within the scope of his or her employment duties.

13          I mean, otherwise, you could hold Dartmouth Health liable

14     for any act of any employee, and I don't think that's -- even

15     with the more liberal standard of agency law under the Second

16     Circuit precedent, it needs to be a high-level employee acting

17     within the scope.

18          THE COURT:  Okay.  Plaintiffs, do you have any

19     objection to that?

20          ATTORNEY JONES:  Well, I guess that begs the question

21     of what's a high-level employee, and how is that going to be

22     defined and how is that going to provide guidance to the jury?

23          THE COURT:  Mr. Schroeder, is that the specific

24     language you're proposing is the words "high-level"?

25          ATTORNEY SCHROEDER:  That's what we have here, but,

1    you know what, Your Honor?  I would be inclined to put

2    executive.

3              THE COURT:  Executive?

4              ATTORNEY JONES:  I think that's a very limited

5    statement of the law.

6              THE COURT:  Yeah.  Is executive the same as

7    supervisory?  I don't think so.

8              ATTORNEY JONES:  Officials well below the executive

9    level can bind a corporation.

10             THE COURT:  That seems true.

11             ATTORNEY SCHROEDER:  Management level then, I guess,

12   would be -- management level, Your Honor?

13             THE COURT:  It seems like supervisory would work

14   better there, little more --

15             ATTORNEY SCHROEDER:  Maybe I'll let Ms. McDonald

16   argue since she's the one that actually suggested that

17   language.  But very well, Your Honor.

18             THE COURT:  Mr. Jones?

19             ATTORNEY JONES:  We would agree to that.

20             THE COURT:  Okay.  And, again, in the section,

21   "Corporation Acts Through Its Employees", then the last

22   sentence of that section, "Therefore, the act of any

23   supervisory level Dartmouth Health employee" is the agreement?

24             ATTORNEY JONES:  Yeah.

25             THE COURT:  Okay.  And, Mr. Jones, what about the

VOLUME:  11
PAGES:  970-1056

1    proposal that the two sections be kind of --

2        ATTORNEY JONES:  That's fine.

3        THE COURT:  So then the "All Persons Equal Before the

4    Law" would precede "Corporation Acts Through Its Employees".  I

5    believe Mr. Schroeder has already indicated no substantive

6    objections to "All Persons Equal Before the Law".

7        ATTORNEY SCHROEDER:  Correct, Your Honor.

8        THE COURT:  And, plaintiff, any objections to the

9    language in "All Persons Equal Before the Law"?

10        ATTORNEY JONES:  No objection.

11        THE COURT:  Okay, all right.  So those are kind of

12    the general charges.  On Page 9 then, "Influenced

13    Decision-Maker", plaintiff have any objection to that?

14        ATTORNEY JONES:  No objection.

15        THE COURT:  Defendants?

16        ATTORNEY SCHROEDER:  Continuing objection, Your

17    Honor, just on the inclusion of anything relating to the cat's

18    paw theory.  One of the supplemental jury instructions that we

19    sent the Court, which was not a case that we cited before but

20    we did cite in the supplemental jury instructions, was

21    *Gentleman v. State University of New York Stony Brook*, Second

22    Circuit, May 9, 2022, Westlaw cite 2022 WL 1447381.

23        In that the court said, quote, "We have never determined

24    whether the 'cat's paw' theory of liability can apply under the

25    'but-for' standard of causation applicable to claims under the

1    ADA and Rehab Act", end quote.

2         And so I'd submit, Your Honor, that that should not be

3    before the Court.  Obviously, you've heard our arguments -- I'm

4    not going to repeat them -- on New Hampshire and Vermont law,

5    but this, I think, is, this particular case, I think, from it

6    you can glean that that is not a theory that has been

7    recognized under ADA and Rehab Act cases as opposed to Title

8    VII cases, which this case is not, and so I'd submit that the,

9    that the entire instruction is inappropriate.

10        In addition, I don't think it's appropriate to say, use

11   the words "without reassignment to another position at

12   Dartmouth Health" in this particular section, but that's a

13   separate issue that we would raise.  So I would remove that

14   language in both places, but I think that the overall

15   objection, Your Honor, is based on Second Circuit precedent

16   that, where we're talking about ADA or Rehab Act claims, and

17   what I understood from earlier hearings that it is, the cat's

18   paw theory, is recognized under Title VII as well as ADA and

19   USERRA claims.  This case, though, the *Gentleman* case, I think,

20   is helpful guidance or instructive guidance for the Court on

21   why the cat's paw theory shouldn't be given to the jury.

22        The other issue separate and apart from that, the law, is

23   just from the facts in the record, Your Honor, that,

24   respectfully, unlike the Second Circuit, which made lots of

25   inferences in its decision, there is a stark difference between

 1    what was inferred by the Second Circuit and the record evidence

 2    in this case.  And I don't believe there is any evidence to

 3    suggest even remotely that somehow Leslie DeMars was playing

 4    the role of the supervisor under, you know, the supervisor with

 5    animus under the cat's paw theory.

 6          THE COURT:  Okay, all right.  Obviously, that all

 7    depends on what the jury makes of the facts that have been

 8    presented, but let me just be clear, Mr. Schroeder, on the

 9    objection.  So you are objecting globally, first off, to the

10    instruction.  I think I got that much.  To the extent that the

11    instruction is included, then your objection is more

12    specifically to the last words of that section, "without

13    reassignment to another position at Dartmouth Health"?

14          ATTORNEY SCHROEDER:  Right.  And then further down it

15    actually says "without reinstatement to another position at

16    Dartmouth Health".  So that's, I think that's inappropriate,

17    anyway.

18          THE COURT:  Oh, sorry.  So let me just be clear about

19    that.  So in the second paragraph, fourth line up where the

20    sentence begins, well, not the sentence begins, but the line

21    begins "unlawful bias" --

22          ATTORNEY SCHROEDER:  Yes.

23          THE COURT:  -- "or retaliatory motive to terminate

24    Dr. Porter", you object to "without reinstatement to another

25    position at Dartmouth Health"?

VOLUME: 11
PAGES: 970-1056

1          ATTORNEY SCHROEDER:  Correct.

2          THE COURT:  And then the next line you also object to

3    "without reassignment to another position at Dartmouth Health"?

4          ATTORNEY SCHROEDER:  There as well as at the -- yes,

5    Your Honor, but also at the second line of that paragraph where

6    it also says "without reassignment to another position at

7    Dartmouth Health", so it's actually three places.

8          THE COURT:  And, just so I'm clear, the basis for

9    that objection is what if this instruction were included?

10          ATTORNEY SCHROEDER:  I think where the cat's paw

11    theory -- the cat's paw theory, to the extent that it's been

12    employed, is with respect to termination, and I, we'll get into

13    the issue of where the ADA relates to, and Rehab Act, relate to

14    disability discrimination in the context of termination and

15    potential claims for disability discrimination relating to

16    retaliation or a failure to reassign to another vacant, open

17    position.

18          I think part of my issue here, Your Honor, is that the law

19    is really clear on this, the statute's clear, the case law is

20    clear that it has to be a vacant, existing, open position.  It

21    has to be an available position, and I think throughout the

22    charge it's stated as reassignment to another position.  That's

23    not the, that's not what the statute says, and it's certainly

24    not what the case law that's developed under the statute since

25    1993 has held.

1          So my general objection, really, and, again, it flows

2     through our red line, is to the issue of, to the extent that

3     the Court is going to insert language on potential

4     reassignment, potential reassignment to an open, vacant,

5     existing position, that would be in concert with the law, as

6     opposed to just saying reassignment or, in this case,

7     reinstatement to another position.  That's not, that's not

8     consistent with the ADA, in our opinion.

9          THE COURT:  Okay, all right.  So I will take another

10    look at the *Gentleman* case that you cited, but, at this time,

11    I'm going to leave the "Influenced Decision-Maker" section in,

12    but I've heard your objections and will take that into

13    consideration after the hearing.

14         So, with respect to "Overview of Claims" on Page 9,

15    plaintiff, any objection to that section?

16         ATTORNEY JONES:  No objection.

17         THE COURT:  Okay.  Defendants?

18         ATTORNEY SCHROEDER:  Just at the last line, Your

19    Honor, of that paragraph, I would propose or will propose right

20    before the next heading to say, "regarding potential damages,

21    if any".

22         THE COURT:  Oh, where it now says "and regarding

23    damages", you're saying "and regarding potential damages"?

24         ATTORNEY SCHROEDER:  If any.

25         THE COURT:  Plaintiff, what's your view on that?

VOLUME:  11
PAGES:  970-1056

1          ATTORNEY JONES:  I think we prefer the existing

2     language.  I think that it's standard language.  I think

3     injecting the phraseology of potential coming from a judge kind

4     of suggests to the jury that maybe there aren't any.  So I

5     think the language currently is neutral and that makes it less

6     than neutral.

7          THE COURT:  Though, in the damages section of the

8     instruction, there is language "if any".

9          ATTORNEY JONES:  Exactly.  That's fine, talking about

10    the damages there, that's fine.

11         THE COURT:  Okay, all right.  I'll take that under

12    consideration too.  I see the arguments on both sides there.

13    Okay.  Now, getting into the substance, "New Hampshire

14    Whistleblowers' Protection Act", plaintiff, any objections?

15         ATTORNEY JONES:  No objection, Judge.

16         THE COURT:  Okay.  Defendants?

17         ATTORNEY SCHROEDER:  Your Honor, a couple of points

18    here.  I'm not necessarily going to go in the same order.

19    Well, let me start at the top.  In the first paragraph, and

20    I'll just go according to the chronology of paragraphs here.

21    The second-to-last line of the first full paragraph it states,

22    "asserts that it had a legitimate business reason".  I think

23    we've put sufficient evidence on in the case to say it had

24    legitimate business reasons.  It was not one reason.

25         In terms of the next paragraph, I think the third

1    sentence, "its purpose", I don't think that's necessary for

2    purposes of the instruction, but, obviously, it's the

3    discretion of the Court in terms of whether that's necessary or

4    not.  I don't believe it's necessary.

5              THE COURT:  Okay.

6              ATTORNEY SCHROEDER:  But the bigger issue, Your

7    Honor, really comes down to the elements, the first, second,

8    third elements and specifically, not the first, but on the next

9    page, the Whistleblower Act claim as alleged in the first

10   amended complaint does not include in it a failure to reassign

11   her to another job at Dartmouth Health, and so it's our

12   position that that would be inappropriate to include that as

13   part of the elements.  It's a Whistleblower Act claim.  When

14   you look at the first amended complaint, it does not include

15   any allegations regarding that statement there in the second

16   and third elements.

17        In addition, with respect to "Termination of Employment",

18   which is Paragraph 2, I don't -- I, I think there is a, perhaps

19   a disagreement in terms of whether or not we agree on the

20   second element.  I think saying that Dartmouth Health

21   terminated Dr. Porter's employment and did not reassign her to

22   another job at Dartmouth Health leaves out the fact that there

23   was an REI division closure and she was terminated along with

24   two other physicians.

25        And so whether it just says "Dartmouth Health terminated

1    her employment", period, that would perhaps be a secondary or

2    alternative statement, but I think getting into whether or not

3    we even had a duty to reassign and the fact that it doesn't say

4    anything about the REI division closure, as well as the fact

5    that, the undisputed fact that two other physicians were

6    terminated at the same time, I think, if the Court was going to

7    say that we agreed to certain language, I think it would be, it

8    needs to be more comprehensive than as currently constituted.

9         THE COURT:  But doesn't closure go to the kind of

10   legitimate business reason part of the instruction?

11        ATTORNEY SCHROEDER:  It does, but I think putting in

12   there "and did not reassign her to another job at Dartmouth

13   Health", once again, that's not part of the Whistleblower Act

14   claim as it's been alleged in this case.

15        THE COURT:  Okay.  Anything else for --

16        ATTORNEY SCHROEDER:  Yes.  I think, on the next page,

17   which is Page 12, still in the top paragraph, I'm not sure I

18   understand the last sentence of the first paragraph on Page 12.

19   It states, "Other ways you may find causation could be through,

20   A, Dartmouth Health's disparate treatment of fellow employees

21   who engaged in similar conduct as Dr. Porter".  I'm not sure.

22   I would think that that would say, "Other ways you may find

23   causation does not exist would be disparate treatment of fellow

24   employees".  I think it might need some wordsmithing.

25        The other issue is relating to subparagraph B,

 1    "deficiencies in Dartmouth Health's articulated".  I would

 2    recommend language that says "actual", and I think here, Your

 3    Honor --

 4              THE COURT:  Let me just stop you, Mr. Schroeder.

 5    Where are you in the --

 6              ATTORNEY SCHROEDER:  Sure.  It's still in that same

 7    paragraph, Your Honor.

 8              THE COURT:  So Page 12 at the top?  Okay.

 9              ATTORNEY SCHROEDER:  Yeah, right at the top in the

10    second-to-last.  The last sentence says, "Other ways you may

11    find causation could be through Dartmouth Health's disparate

12    treatment of fellow employees who engaged in similar conduct as

13    Dr. Porter".

14              THE COURT:  Right.

15              ATTORNEY SCHROEDER:  It's actually the inverse.  It's

16    that, you know, our -- causation, if other people who had

17    complained were not fired or terminated or subject to adverse

18    employment action, well, that would obviously go against

19    causation, actually.  Subparagraph B, our suggested language is

20    actual instead of articulated reasons, because articulated

21    reasons doesn't make the distinction, and, obviously, we've put

22    a lot of evidence in front of the jury.

23         What you say to the media or what you say to a nurse who

24    is not in that division in an email or what you say to the

25    media in terms of whether or not you share all the information,

1    that doesn't make it pretext because you do that.  They can

2    argue that, but to say "articulated reasons" is a loaded term,

3    I believe, and it should be "actual reasons", because that's,

4    that's our position in this case, and it's also a way to rebut

5    a whistleblower claim.

6          THE COURT:  Okay.  But then aren't I kind of

7    crediting then kind of your theory of the case in the

8    instructions if I leave it as actual, kind of saying, This is

9    what was proffered, and it's the actual reasons?

10          ATTORNEY SCHROEDER:  No.  I think they're still going

11    to argue that, Well, they said this in writing, so isn't that

12    their actual reasons?  And we obviously have explained why what

13    is said to the media and what may or may not be attributed as a

14    quote to the media does not suffice.  If it's articulated, I

15    think that's a loaded term as it is.

16          Actual, they can still argue, and they have argued, that,

17    Well, look at what they say in this email to this one nurse,

18    and look what they say to the media, and I think they, based on

19    that, saying the actual reasons, and they have to determine

20    that, right?  They either believe Dartmouth Health, or they

21    don't, and they may determine that the actual reasons are

22    contrary to what we say, but that's open for dispute by both

23    sides, and I think it's neutral in that regard.

24          THE COURT:  Okay.  Anything else for that section?

25          ATTORNEY SCHROEDER:  I think further down, Your

1    Honor, on that page, on Page 12, the last full paragraph starts
2    "Dartmouth Health claims it did not terminate Dr. Porter
3    because of her whistleblowing activity".
4        Now, she's claimed a lot of different things, but saying,
5    "i.e. reporting that two Dartmouth Health physicians were
6    engaging in conduct that she thought was unlawful, unethical,
7    or dangerous to patients", I think the "i.e." clause is
8    inappropriate because she's -- and I would just leave it at
9    whistleblowing activity because she's complained about a lot of
10   things, and whether or not that rises to the level of
11   whistleblowing activity is for the jury to decide, but saying
12   "i.e. reporting that two Dartmouth Health physicians were
13   engaging in conduct that she thought was unlawful, unethical,
14   or dangerous", I think we're getting into parsing the facts in
15   the record through testimony and emails as opposed to leaving
16   it to the jury to decide.
17       THE COURT:  I can't recall exactly what the
18   allegations were in the first amended complaint under this
19   particular claim, but is it along those lines where that's
20   specifically articulated?
21       ATTORNEY SCHROEDER:  I think, Your Honor, it goes
22   above and beyond that.  In the first amended complaint, I think
23   it -- well, I have it in front of me.  It's 35 pages.  Page 31
24   relates to this issue, relates to the compensation,
25   participating in activities she believed in good faith violated

 1      the law.

 2              THE COURT:  A, B, C, and D, that's Dr. Hsu and Dr.

 3      Seifer, isn't it?

 4              ATTORNEY SCHROEDER:  That is Dr. Hsu and Dr. Seifer,

 5      but she's not enunciate -- I just think we're getting into,

 6      Well, are we guiding the jury on what plaintiff's claims are at

 7      this point as opposed to anyone else -- specifically pointing

 8      out "i.e.", I would just say it should be whistleblowing

 9      activity.  They've got to determine that.  You've got

10      instructions on that.

11              And further in that paragraph, to this, to the point of

12      "but rather made a business decision to close its REI division

13      resulting in the termination of all three physicians in the REI

14      division".  It then goes on to say, "and that there was no

15      other suitable position for Dr. Porter at Dartmouth Health".

16      That's not the standard under a whistleblower claim, and I

17      would just delete the phrase "and that there was no other

18      suitable position for Dr. Porter at Dartmouth Health".  That's

19      not part of a whistleblower claim.

20              The same holds true, Your Honor, and this is all reflected

21      in what we'll give you so that the Court understands our

22      position, but the last full sentence of that section which goes

23      on to Page 13 then says, quote, "and not reassigning her to

24      another job at Dartmouth Health", end quote.  That's not the

25      standard under -- that's not a whistleblower claim, but, also,

1    it's not the standard under the ADA, and my fear, our fear is

2    that we need to make sure that the standard -- well, first of

3    all, what is the requirement under each claim?  And that's

4    certainly not part of their whistleblower claim, but also

5    that's kind of a watered-down version of what the law is under

6    the ADA and Rehab Act for purposes of reasonable accommodation.

7          THE COURT:  All right.  So that's kind of a global

8    concern you've raised for that particular charge.  Obviously,

9    I'm going to give that consideration.

10          ATTORNEY SCHROEDER:  I understand that.  Thank you.

11          THE COURT:  Yeah, yeah.  No.  I understand your

12    objections.  I just wanted to be clear on them.  So,

13    plaintiffs, let's go back to this particular --

14          ATTORNEY JONES:  Can I just start with that global

15    issue?

16          THE COURT:  Yes.

17          ATTORNEY JONES:  Because, from our perspective, the

18    nonreassignment issue is very much part of the whistleblower

19    claim.  In fact, from our perspective, it's part of all the

20    claims, that this is a case where Dartmouth Health terminated

21    Dr. Porter and failed to retain her in some capacity, either in

22    retaliation for whistleblower activities or as a form of

23    discrimination or retaliation with regard to the disability

24    issue.  So we believe that is part of all of the claims.  It's

25    not limited to the ADA.

1        And I would also note that the Second Circuit was very

2    clear in its articulation of all the various claims, and they

3    also used that language.  So, from our view, you have correctly

4    identified the claims.  So that's the global issue.

5              THE COURT:  Okay.

6              ATTORNEY JONES:  Did you want to start from the

7    beginning?

8              THE COURT:  Yes.  So, so the first objection on Page

9    10 in the first paragraph, the last sentence, I believe the

10   objection was, not "a legitimate business reason", but

11   "legitimate business reasons".

12             ATTORNEY JONES:  Well, I mean, I guess it's disputed

13   as to whether it had any legitimate business reason or how many

14   there may have been, but that's not a hill I need to die on.

15   So, if the Court were inclined to take that correction, I

16   wouldn't object.

17             THE COURT:  Okay, all right.  And then, and then the

18   next paragraph, Dartmouth is claiming that the sentence

19   beginning "its purpose is to encourage employees", the purpose

20   is not necessary in the charge.

21             ATTORNEY JONES:  I disagree.  I think the purpose is

22   important.  It explains why we have whistleblower protection

23   laws.  So I think, I think it's valuable to have it in there,

24   and I don't see any prejudice from it.

25             THE COURT:  I'm going to leave the purpose sentence

1    as it is for that.  And, with respect to the one that we just

2    talked about in the first paragraph, you know, reason versus

3    reasons, I'll, you know, take that under consideration and make

4    a decision about that.  So I think, I think those were all of

5    them, if I'm not mistaken, for that section.

6         ATTORNEY JONES:  Well, there was the issue of, on

7    Page 12 at the bottom of the first paragraph, Mr. Schroeder

8    wants to change the word "articulated" to "actual".  I would

9    object to that.  As Your Honor points it out, that, that does

10   seem to credit their case.  But, more importantly,

11   Mr. Schroeder calls it a loaded term.  I call it a legal term.

12   Every case I think I've ever read that refers to, you know, an

13   employer's burden in these cases, that the employer must

14   articulate a legitimate business reason.  So it's, it's the

15   articulation that is the legal standard.  So I think that

16   should stay in.  That's the accurate statement of the law.

17        THE COURT:  And that's why the term, frankly, was

18   used, so I'm going to leave that term in there.  And then,

19   going down two paragraphs, the "i.e." clause --

20        ATTORNEY JONES:  Well, I think that that is her

21   claim, and, as was discussed, that's in the complaint.  Again,

22   that's also exactly how the Second Circuit describes her claim.

23   So I, I don't see any -- I think it's accurate.  I'd note that

24   the remainder of the paragraph is a full description of their

25   defenses.  So if, you know, if they get to talk about -- well,

1    if the Court is going to talk about the defenses of closing the

2    REI, terminating all the other physicians, I don't see any

3    problem with the balance of accurately describing what her

4    claim is.

5              THE COURT:  Yeah, that was in the Porter decision, if

6    I'm not mistaken.

7              ATTORNEY SCHROEDER:  Judge.

8              THE COURT:  No, the description.  I'm not talking

9    about the facts how they came in.  I understand your point on

10   that, I do.

11             ATTORNEY SCHROEDER:  Right, right.  If I may just on

12   this one point, because I knew it was going to come up and --

13   well, you know, the Second Circuit said this, and the Second

14   Circuit said that.  We put a bench memo on that issue, Your

15   Honor, which didn't even receive a response, so -- because I

16   think the law is clear, right?  They were talking about the

17   summary judgment standard, all inferences in favor of the

18   nonmoving party.  That is not what happened here.  That is --

19             THE COURT:  No, no.  Mr. Schroeder, I am crystal

20   clear on your point in that regard, but, to the extent that the

21   Second Circuit has described the whistleblower activity as the

22   reporting on those two physicians, that has nothing to do with

23   the summary judgment standard versus the standard at trial.

24             ATTORNEY SCHROEDER:  It doesn't, Your Honor, other

25   than the fact that there was evidence in the trial of

1   complaints about a whole range of things, not just -- I don't
2   believe it was just complaints about those two physicians.  She
3   complained about Dr. DeMars.  She complained about a whole
4   range of issues, including Dr. Reindollar, including the former
5   physician Sophia.
6       So I think limiting it to the two physicians is, would be
7   inappropriate because then you're basically -- that's different
8   from, and this is why this goes back to what was in the Second
9   Circuit decision and what was put in front of the jury was the
10  complaints to Reindollar, the conflicts with Reindollar, the
11  complaints about other physicians.
12      We had Judy Stern, Kelly Mousley, Katy Mansfield, all of
13  those people, so I think it's way beyond that, Your Honor, and
14  limiting it to, well, the two physicians, yes, she did make
15  those complaints, no question.  I don't even think we disputed
16  that.  I think we even acknowledged it in the opening
17  statement, but the evidence of whistleblowing activity is much
18  broader than that, and hyperfocusing on just the two
19  physicians, I think, would be inappropriate.
20              ATTORNEY JONES:  Your Honor, if I may.
21              THE COURT:  Okay.
22              ATTORNEY JONES:  The way you have it actually
23  describes the complaints that we say were the whistleblowing
24  activity.  All the other complaints they're talking about is
25  their attempt to say she complained about everything.  The

1    petty complaints they're talking about, that's not our

2    whistleblowing.  She wasn't blowing the whistle over that

3    stuff.

4         THE COURT:  Yeah, and, in particular when you look on

5    Page 11, Number 1, "Reported in good faith", I mean, that kind

6    of, you know, provides a little bit more in the way of context

7    as to what type of reporting fits within a whistleblower claim.

8    It's not simply kind of complaining about other people

9    generically, it's about the types of things that she reported

10   in her letters about Dr. Hsu and Dr. Seifer, isn't it?

11        ATTORNEY SCHROEDER:  It could be.  I think it's way

12   beyond just that, and there are other complaints.

13        THE COURT:  So whistleblowing -- I just want to be

14   clear.  So, in your view, there is other evidence in the record

15   of whistleblowing activity, legitimate kind of -- legitimate,

16   that suggests the answer, I guess, but, in terms of the charge,

17   this particular charge, you're saying there's other evidence in

18   the record that meets the legal definition of reported in good

19   faith other than the commentary on Dr. Hsu and Dr. Seifer?

20   There's other evidence of whistleblowing activity?

21        ATTORNEY SCHROEDER:  I think there's evidence that

22   they could argue is whistle -- listen, I don't believe any of

23   this meets the definition of a whistleblower retaliation claim,

24   Your Honor.  Let me be clear about that.  My point is that

25   whistleblowing activity, stating that just in and of itself is

1    sufficient, and then to say "i.e." and making a specific

2    reference to just those two physicians leaves out all the other

3    times in evidence.

4         Because, when we get into a retaliation case, one of those

5    issues further on down the line is temporal proximity, right?

6    So there is evidence of complaints, and we could assume for

7    sake of argument for this purpose that they were legitimate

8    back to 2012 with Dr. Reindollar and conflicts and disputes

9    about skills and techniques.  So my only point here is that

10   you're hyperfocusing the jury on one specific item that was in

11   the record, and I'm not disputing that it was in the record,

12   but calling attention to it, I think, is inappropriate in the

13   jury instruction.

14        THE COURT:  Okay, all right.  And, you know, as I

15   said, you know, the complaint under this section, though, does

16   essentially zero in on the Hsu/Seifer information, and that's

17   in large part why this instruction reads the way it does,

18   right?  Because that's what the claim is focusing on in the

19   complaint.

20        ATTORNEY SCHROEDER:  I understand your point, Your

21   Honor.

22        THE COURT:  Okay, all right.  So, I mean, we'll, at

23   least I'll take another look in terms of the way it's phrased

24   in terms of the "i.e.", but, at this point, I'm going to leave

25   that in there but take under consideration, as I say, your

VOLUME:  11
PAGES:  970-1056

1    arguments in that regard.

2         Mr. Jones, I'm not sure if you responded to everything, or

3    maybe you did.  No other suitable position, I have in my notes

4    here on Page 12, the last full paragraph.

5              ATTORNEY JONES:  Yeah, that's part of my global.  I

6    addressed that.

7              THE COURT:  Got it.

8              ATTORNEY JONES:  Like I said, it's part of our case.

9              THE COURT:  Yeah, yeah.

10             ATTORNEY JONES:  I don't see anything else that we

11   haven't covered here.

12             ATTORNEY SCHROEDER:  And, just on that last point,

13   Your Honor --

14             THE COURT:  Yes, yes.

15             ATTORNEY SCHROEDER:  Thank you for your indulgence.

16   We're either going to live by the first amended complaint, or

17   we're not, and I understand the Court's highlighting of the

18   various things that can be related to Hsu and Seifer, but, if

19   the Court is so indulged in that point, well, there is nothing

20   about reassignment as part of a whistleblower claim in this

21   case.  There's just nothing.  And that's not part of what a

22   typical whistleblower claim.  It's discrimination and

23   termination or retaliation with respect to termination.

24        But adding in this commentary about there was no other

25   suitable position, that's not what the law says.  It's, Did you

1   retaliate by terminating somebody, period?  And so I'd submit

2   that that's going way beyond the pale.  It's also not in their

3   claim.

4          THE COURT:  Okay.  So you're saying as a legal

5   matter, though, reassignment is not part of this particular

6   claim?  As a matter of law, you're saying that can't be part of

7   it?

8          ATTORNEY SCHROEDER:  Correct, reassignment, correct,

9   Your Honor.  One, it's not pled that way.  Two, it's never been

10  alleged that way in any of, in any of the discovery in this

11  case.  Three, the reassignment issue goes to the ADA and Rehab

12  Act claims and disability discrimination claims.  It does not

13  go to, well, reassignment is something that should be

14  considered in the context of a whistleblower claim.  I've never

15  -- so, yes, I would submit legally that that would not be an

16  appropriate remedy or a suitable part of the elements of the

17  claim.

18         THE COURT:  Excuse me.  So I was just handed a copy

19  of the actual New Hampshire statute.  So it reads, "No employer

20  shall harass, abuse, intimidate, discharge, threaten, or

21  otherwise discriminate against any employee regarding

22  compensation, terms, conditions, location, or privileges of

23  employment".

24         So, in your view, that particular language is not broad

25  enough to encompass that aspect of the claim?

1          ATTORNEY SCHROEDER:  Reassignment to another suitable

2     position as it's stated three or four times in this instruction

3     is not an appropriate basis for relief under the whistleblower

4     statute.

5          ATTORNEY JONES:  And we would submit that it is a

6     form of otherwise discriminating against a covered employee.

7     Also, in this case, I've heard Mr. Schroeder argue this many

8     times, but this has been a part of the case for many years.  It

9     was part of the appellate proceedings, and the Second Circuit

10    certainly has characterized all the claims as including that

11    part of it.  This has been part of the case for a very long

12    time.  I know Mr. Schroeder wants to box this issue into a

13    sliver of ADA land where a reasonable accommodation can be

14    reassignment to a vacant position.  That's not this case.  So I

15    think you understand our position.

16         THE COURT:  Right.  We've been over that before,

17    yeah, that particular argument.  All right.  So "Americans With

18    Disabilities Act", I'm on Page 13.  Plaintiff, maybe we should

19    take it piece by piece.

20         ATTORNEY JONES:  I'll make it easy for you.  No

21    objection.

22         THE COURT:  To the whole charge?

23         ATTORNEY JONES:  The whole thing's acceptable to us.

24         THE COURT:  Okay.  Defendants?

25         ATTORNEY SCHROEDER:  This is not my first rodeo,

1  Judge.  I knew that this was going to be the way that we would

2  be doing jury instructions.  Most of the time plaintiff, in

3  every other case I've had, usually agrees to the jury

4  instructions, and I seem to be standing up making suggested

5  recommendations on revisions to language.

6      If we go by the compliant, the ADA claim is disability

7  discrimination and retaliation.  There's not three types;

8  there's two types, first of all, as just a threshold issue.

9  Saying that Dr. Porter may prove that Dartmouth Health

10  retaliated against her for making a reasonable accommodation

11  request, if we're going to go back to the Second Circuit

12  decision, they were very clear.  The issue of reasonable

13  accommodation only comes up in the context of termination.  All

14  of the other claims relating to reasonable accommodation were

15  dismissed or affirmed dismissal at the Second Circuit, and I

16  think the Court was clear on that.

17      So saying, well, making it retaliating against her for

18  making a reasonable accommodation request, I think that's the

19  third type.  I think it's only disability discrimination in the

20  context of termination and retaliation.

21          THE COURT:  But isn't kind of failure to accommodate

22  and the allegation of retaliating against someone for

23  accommodations two separate kind of conceptually distinct

24  things?

25          ATTORNEY SCHROEDER:  I think they are, Your Honor,

VOLUME:  11
PAGES:  970-1056

1     but I think there's two types of allegations here, not three.

2     And so I've never interpreted this case to be -- and, if I'm

3     wrong, I'm wrong, and you'll certainly correct me, but I don't

4     believe that there were three types of disability

5     discrimination claims in this, that were brought in this case.

6     It was disability discrimination and retaliation, and I think

7     breaking it down in that regard would be inappropriate.  I have

8     a few other comments.

9          THE COURT:  Okay, yeah.  Please go ahead.

10          ATTORNEY SCHROEDER:  Okay.  Bear with me a second

11     here.  This is just a general statement on the "Otherwise

12     qualified to perform essential functions", 1.3, subsection 14.

13     So under the ADA the definition of -- first, you have to show

14     that somebody's disabled.  Then you have to -- then the

15     plaintiff has to show that they're a qualified individual with

16     a disability, meaning they can perform the essential functions

17     of the job with or without reasonable accommodation.

18          We don't agree that they are otherwise, that Dr. Porter

19     was otherwise qualified to perform the essential functions of

20     her job because there was no job.  And what I don't think

21     anybody's disputing that, at the time she was terminated, that

22     she could do her job, but then it gets to the issue of

23     reasonable accommodation, and we believe there was -- it's our

24     position, as shown by the evidence, that there was no

25     reasonable accommodation.  So, therefore -- for her, there was

VOLUME: 11
PAGES: 970-1056

1    no open, vacant position for her to go to.  Under that scenario

2    she is not considered an otherwise qualified individual with a

3    disability under the ADA.

4         THE COURT:  Okay.  So this comes back again, though,

5    to the position, your position about there needing to be an

6    open, vacant position.  This is your global issue?

7         ATTORNEY SCHROEDER:  Correct.

8         THE COURT:  And, therefore, your 1.3 objection

9    derives from that?

10         ATTORNEY SCHROEDER:  Correct.  But also then, not --

11    I don't think anybody's disputing that, at the time she, her

12    position was terminated, that she could perform the essential

13    functions of her job, but she was not a qualified individual

14    with a disability, meaning able to perform the essential

15    functions of her job with or without reasonable accommodation.

16    There was no position for her at that point.  That's our

17    position, and so, therefore, there was no reasonable

18    accommodation for her.

19         THE COURT:  Right, okay.  So is there a proposal

20    about what that should look like?

21         ATTORNEY SCHROEDER:  Yes, yes, Your Honor.

22         THE COURT:  Okay.

23         ATTORNEY SCHROEDER:  That paragraph, we would submit,

24    should read, "You must determine whether Dr. Porter was

25    qualified to perform the essential functions of the job she

 1   held".  So it's getting into that's just on the essential

 2   functions part.  So, "You must determine whether Dr. Porter was

 3   qualified to perform the essential functions of the job she

 4   held", that's not the whole story, but that's how we would read

 5   it there in that particular place.

 6              THE COURT:  Okay.  So obviously not agreed?

 7              ATTORNEY SCHROEDER:  Yes, Your Honor.

 8              THE COURT:  Okay.

 9              ATTORNEY SCHROEDER:  In the next paragraph, 1.4, I

10   think the second paragraph there, the first two lines, I think,

11   blur the distinction.  I mean, this is a but-for.  We've gone,

12   we've had some discussion about the ADA but-for causation

13   standard.  I think that actually blurries it or blurs the lines

14   there when it says, quote, "Keep in mind that an employee does

15   not need to prove that discrimination was the only or even the

16   predominant factor that motivated an employer.  You may decide

17   that other factors were involved in the decision to terminate

18   Dr. Porter's employment".  I think the earlier instruction, I

19   think, is very clear that you've got to, it's got to be

20   but-for, but for her disability, this would not happen, as

21   opposed to you could look at other motivations, et cetera.

22        So we would submit that we would strike those two lines

23   after "as you assess causation" and just then proceed to, "For

24   Dr. Porter to meet her burden, you must conclude".  Going on to

25   the next page at the end of that sentence, we would, we would

VOLUME:  11
PAGES:  970-1056

1    submit that it should say, "She would not have been terminated

2    but for her disability", just to be consistent with Second

3    Circuit precedent.

4            THE COURT:  Okay.  So the bottom of Page 14 it would

5    read, "For Dr. Porter to meet her burden, you must conclude

6    that she has proved by a preponderance of the evidence", and

7    you're proposing taking out the next clause?

8            ATTORNEY SCHROEDER:  No, no.  There are -- everything

9    is fine until the last part of it.  I would just say she would

10   not have been terminated but for her disability, just to be

11   consistent with *Natofsky*.

12           THE COURT:  Okay.  Again, something I'll take a look

13   at, but I'm inclined to leave that in.  We also researched the

14   law on this pretty exhaustively.  We're not employment lawyers

15   like you are, but I'm going to leave it for now, and, like I

16   said, we'll take a look at that.  Next paragraph?

17           ATTORNEY SCHROEDER:  In the middle of the paragraph

18   on Page 15, there is a phrase "however misguided they may

19   appear to you".  We would strike that part of the sentence.

20           THE COURT:  That didn't come from your proposed

21   charges?

22           ATTORNEY SCHROEDER:  I don't think so.

23           THE COURT:  I think it did.

24           ATTORNEY JONES:  I think it's in there.

25           ATTORNEY SCHROEDER:  Well, if it is, I would, then I

1    guess we'll keep it in, Your Honor.  I didn't have a chance to

2    go -- I mean, this took a little while to get through 30 pages

3    this morning.

4            THE COURT:  No, I understand.  Because, when I first

5    read it, too, I was thinking, trying to be down the middle, and

6    I'm almost positive I checked defendants' charge and that was

7    in there.

8            ATTORNEY SCHROEDER:  Your Honor, if it's in there,

9    then let's keep it.  That's one less thing that we have to

10   worry about or the Court needs to consider.

11           THE COURT:  I'll just turn to the law clerks here.

12   Am I mistaken about that?  No, it was in your proposed charge.

13           ATTORNEY SCHROEDER:  I take everybody's word for

14   that.

15           THE COURT:  Okay.

16           ATTORNEY SCHROEDER:  The last paragraph before Number

17   2 on Page 15, once again, this goes to whether you believe

18   Dartmouth Health's reasons for the decision.  If you do not

19   believe Dartmouth Health's reasons, you may consider whether

20   the reasons are so unbelievable that they are a cover-up to

21   hide the true discriminatory reason for the decision.  So I

22   just want to make sure that globally that it's reasons, because

23   there were reasons.  It wasn't just one reason.

24           THE COURT:  Okay.  This is the last paragraph before

25   2, right?

VOLUME: 11
PAGES: 970-1056

1          ATTORNEY SCHROEDER:  Correct, Your Honor.

2          THE COURT:  And doesn't -- so the "for example"

3     sentence, is that the one that you're -- towards the bottom of

4     that paragraph?

5          ATTORNEY SCHROEDER:  Yes, right before that there is,

6     it starts, For example, you may consider whether you believe

7     Dartmouth Health's reasons for the decision.  If you do not

8     believe Dartmouth health's reasons, you may consider whether

9     the reasons are so unbelievable.

10          THE COURT:  So they're plural now, and that's your

11     suggestion, right?

12          ATTORNEY SCHROEDER:  Yes.

13          THE COURT:  Okay.  So no change?

14          ATTORNEY SCHROEDER:  I was just wordsmithing a little

15     bit there, Your Honor, but --

16          THE COURT:  Okay, all right.  Now I'm in 2 on Page

17     15, "Failure to grant reasonable accommodation request".

18          ATTORNEY SCHROEDER:  No issues there.  No issues in

19     2.1.  No issues in 2.2.  In 2.3 where it states "first" in the

20     second line, we would remove everything after "first" and put

21     that she was, put the following:  "That she was able to perform

22     the essential functions of her job with or without reasonable

23     accommodation".

24          THE COURT:  Okay.

25          ATTORNEY SCHROEDER:  On the top of Page 17, Your

VOLUME:  11
PAGES:  970-1056

1    Honor -- so nothing in 2.3.1 other than the, 2.3.1, other than

2    at the end of that paragraph which goes on to the top of Page

3    17.  We would ask that "with or without a reasonable

4    accommodation" as opposed to just "an accommodation".

5             THE COURT:  Okay.  Top of Page 17, second line, "with

6    or without a reasonable accommodation" is the request?

7             ATTORNEY SCHROEDER:  Correct.

8             THE COURT:  Okay.

9             ATTORNEY SCHROEDER:  In 2.3.2 "Essential Functions",

10   at the end of the first paragraph, we would just put what this

11   case is about, which is really the only reasonable

12   accommodation is, may include job reassignment or reassignment,

13   just include reassignment.  Because that's really the only

14   issue before the jury.

15            THE COURT:  So, even if that is generally part of the

16   law of what a reasonable accommodation could be, do you think

17   that should come out?

18            ATTORNEY SCHROEDER:  I do, Your Honor, because

19   there's no -- I think they can get confused by part-time or

20   modified work schedule or job restriction.  Those are certainly

21   under the statute, Section 12111(B), (9)(B), they are listed as

22   potential reasonable accommodations, no question about that.  I

23   just think this case is all about reassignment, and I don't

24   want, I don't want the jury to think that there are other

25   things at play here in this particular case, because there's no

1    evidence to suggest that there was a part-time or modified work

2    schedule or a job restructuring.  There's no evidence of that

3    in the record.

4             THE COURT:  Okay.

5             ATTORNEY SCHROEDER:  In terms of the end of Paragraph

6    17 which goes on to 18, I don't think that the parties are

7    disputing the job functions and whether they're essential.  So

8    I don't -- I think it's superfluous to put in, "In determining

9    whether a job, particular job function is essential", and then

10   it goes all the way to the middle of Paragraph 18.  I don't

11   think it's necessary to go through all that with them because

12   we're, really, what the case is about is whether or not there

13   was reassignment to a vacant, open position.

14        And so, obviously, these instructions are long.  I just

15   did not think in this particular case that we were talking

16   about whether or not something was an essential function or

17   whether or not it was a marginal job function, which is in play

18   in a lot of ADA cases, but that's not really at play in this

19   case.

20            THE COURT:  So you're saying A through H, all of that

21   should come out?

22            ATTORNEY SCHROEDER:  Yes, Your Honor.

23            THE COURT:  And the objection, though, is just

24   superfluous, not legally inappropriate?

25            ATTORNEY SCHROEDER:  Correct.  I think it's not

VOLUME:  11
PAGES:  970-1056

1    really an issue that this jury needs to worry about, and,

2    obviously these are 30 pages long, and I just --

3                THE COURT:  I thought they'd be longer.

4                ATTORNEY SCHROEDER:  Yeah.  Well, I'm doing my level

5    best to hopefully keep it short with you.  So that, that's just

6    a suggestion just based upon what's before the Court.

7         In 2.4 our suggestion is the following, that that first

8    paragraph and second paragraph should be limited to the

9    following:  So delete what's there and put, "You must determine

10   whether Dartmouth Health failed to make a reasonable

11   accommodation for Dr. Porter by reassigning her to a vacant,

12   existing position", period.

13        Once again, I think putting in language about the term

14   "reasonable accommodation", I think it's redundant with the

15   following paragraph where you actually do have language about

16   what a reasonable accommodation may include and that we're not

17   objecting to that or the following paragraph.  But I think the

18   whole case comes down to whether or not Dartmouth Health had a

19   duty to reassign her to a vacant, open position, and so --

20               THE COURT:  So, to the extent that that's your

21   objection, I think we've established now that you have your

22   view on that.  It may be a little bit more fluid and a little

23   bit more nuanced than that.  That's my understanding of the law

24   as well.  So, to the extent that that is your objection, I

25   mean, obviously, make those objections for the record as you

1   will, I know, but, you know, again, I'm not, I'm not certain

2   that that's something that the Court agrees with on that point.

3   So but I hear your position.

4        ATTORNEY SCHROEDER:  Just on that, Your Honor, and

5   I'm not trying to belabor this point, but the *Graves v. Finch*

6   case, the *Payne v. Cornell University* case, the *Finch v. New*

7   *York City Department of Persons* case, the *Noll v. International*

8   *Business Machines Corp.* case, all of those are Second Circuit

9   decisions on this specific issue, and I know I mentioned them

10  in my motion for directed verdict in fairly quick fashion, but

11  they go right to the heart of that issue, and I realize that

12  I'm making somewhat of a continuing objection in that regard,

13  but and I appreciate the Court's indulgence.

14       THE COURT:  Okay.  So are we still on 2.4 with your

15  --

16       ATTORNEY SCHROEDER:  Yes, Your Honor, the middle of

17  Page 19 now.  The paragraph, there's two paragraphs identifying

18  the term "reasonable accommodation".  We have no objections

19  there.  What we object to, though, is the third paragraph which

20  starts "an employer has a duty".  We would strike that entire

21  paragraph with the exception of the last part which is, "Both

22  employer and employee must cooperate in the interactive process

23  in good faith".

24       The law on the ADA, specifically physical disabilities as

25  opposed to mental disabilities, is that the employee has a duty

1    to request an accommodation.  The only place where the duty

2    kind of falls back to the employer is on the issue of mental

3    health disabilities because, as courts have logically said,

4    well, if somebody's got a mental health disability, they may

5    not be in a position to actually ask for an accommodation.  So

6    I don't believe that that paragraph as written is consistent

7    with the law on that point.

8              THE COURT:  Okay.  So your proposal is to strike the

9    entire paragraph except for the --

10             ATTORNEY SCHROEDER:  The last sentence.

11             THE COURT:  -- last sentence?

12             ATTORNEY SCHROEDER:  Which is true.  The last

13   paragraph on that page we would strike the last sentence which

14   is, states, quote, "An employer, by failing to engage in a

15   sufficient interactive process, risks not discovering a means

16   by which an employee's disability could have been accommodated

17   and thereby increases the chances of failing to reasonably

18   accommodate the employee".  I think that's making a judgment

19   call, and I'm not sure why we would be calling out one side

20   versus the other there.  I think it's inappropriate to have

21   that sentence.

22             THE COURT:  Okay.  So I'm hearing your objections,

23   but I, I know they're based on kind of your view of the law, so

24   I'm not kind of ruling on these particular ones with respect to

25   the ADA until revisiting some of these legal questions.  So

1    that's the bottom of Page 19?

2              ATTORNEY SCHROEDER:  Yes, Your Honor.

3              THE COURT:  Okay.  So I know plaintiffs indicated no

4    objection at all to this section.  Any comments on the

5    objections that have been raised?

6              ATTORNEY JONES:  Well, the last two proposed

7    revisions would completely eliminate all reference to the

8    interactive process from the instructions, which I think would

9    be highly inappropriate.  We do think there was a failure to

10   engage in the interactive process here, and that's part of our

11   alleged violation.  With regard to all the others, I think our

12   global position on the nature of the case we've already

13   articulated and the Court understands.

14             THE COURT:  Okay, okay.  So now sub 3, "Retaliation",

15   on Page 20, defendants, any objection?

16             ATTORNEY SCHROEDER:  Yes, Your Honor, not in

17   subsection "Retaliation", but further down in "Protected

18   Activity", 3.1 on Page 20.  The second paragraph, "The parties

19   have agreed on the first element:  that Dr. Porter made a

20   reasonable accommodation request", I think that's -- well,

21   first of all, "for changes to her work schedule and

22   environment", those were parts of the things that she asked for

23   during her, the term of her employment.  The Court has already

24   dismissed those.  So I don't think this is one that we've, that

25   it would be -- we could say that she's made a reasonable

1    accommodation request and leave it at that.

2              THE COURT:  Okay.

3              ATTORNEY SCHROEDER:  The second point is in 3.2,

4    "Aware of Activity".  Once again, this is not about work

5    schedule or environment.  It's made a reasonable accommodation

6    request.  I would delete the rest of that sentence and put the

7    following:  "Seeking reassignment to the OB/GYN department or

8    radiology department", period.  And that's consistent with the

9    evidence in the record.

10             THE COURT:  Okay.  And so are you saying then that

11   the parties are in agreement on the second element with those

12   proposed changes; is that the idea?

13             ATTORNEY SCHROEDER:  No, no, I didn't suggest, I

14   didn't suggest that plaintiff's counsel agree to it.  I'm, I

15   bet I can predict that they would be fine with keeping it as

16   is, but I would submit that that is what this case is about and

17   that, therefore, we're only dealing with termination on

18   accommodation and whether or not there is a position available

19   for her, available position available at the time that the REI

20   division was closed.

21             THE COURT:  All right.  "Adverse action", 3.3?

22             ATTORNEY SCHROEDER:  With respect to that one, Your

23   Honor, this is the point we raised earlier, and I'm not going

24   to belabor it.  We would just have it state, instead of that we

25   agree to that element, just that, in conjunction with the

1  closure of the REI division, Dartmouth Health terminated Dr.

2  Porter along with two other physicians, and whether it says

3  "along with two other physicians", I don't think we want to say

4  adverse employment action.  I would just say terminated her

5  employment.

6           THE COURT:  That's the language of the law, though,

7  isn't it, adverse action?

8           ATTORNEY SCHROEDER:  I think it's easier for a jury

9  to understand what the law is based on that, but I'd defer to

10  the Court on that.

11           THE COURT:  And the closing of the REI division, it's

12  kind of similar to an objection you made earlier that kind of

13  goes to the legitimate --

14           ATTORNEY SCHROEDER:  Understood.

15           THE COURT:  I know.  Kind of you have similar

16  arguments, and I have similar responses, so --

17           ATTORNEY SCHROEDER:  I just have to put them on the

18  record, Your Honor.

19           THE COURT:  No, I totally understand that.

20  Mr. Jones, did you have any comments on these?

21           ATTORNEY JONES:  No.  We were content with the

22  language as it was.  I do think adding that language, "in

23  conjunction with the closure of the REI division" makes it very

24  one-sided and it becomes inaccurate in terms of the nature of

25  plaintiff's claim.

VOLUME:  11
PAGES:  970-1056

1          THE COURT:  Okay.  "Causal connection", 3.4?

2          ATTORNEY SCHROEDER:  In the second paragraph of 3.4,

3    Your Honor, we would delete the first sentence.  I think it, it

4    confuses it for the jury because it gets away from the but-for

5    standard for the ADA claims.  I think the rest of the paragraph

6    reads well and actually is consistent, but I don't think that

7    the first sentence of that paragraph is appropriate.

8          THE COURT:  Okay.  And that's related to the argument

9    you made earlier about causation, the but-for standard?

10         ATTORNEY SCHROEDER:  Correct, Your Honor.

11         THE COURT:  Okay, all right.  The Rehabilitation Act

12   claim, so, as you can see, it's a shortened section just

13   because of how it follows the ADA.  So, plaintiffs, no

14   objections, I'm assuming, to that?

15         ATTORNEY JONES:  Correct.

16         THE COURT:  Okay.  And, Mr. Schroeder, how do you

17   want to do this with respect to the Rehab Act?  Are you

18   basically the same objections that you raised to the ADA you

19   raise to the Rehab Act section?

20         ATTORNEY SCHROEDER:  Exactly, Your Honor.

21         THE COURT:  Okay, all right.  Then "Disability

22   Discrimination Claims Under New Hampshire State Law", Page 22,

23   plaintiff, any objections?

24         ATTORNEY JONES:  No objection.

25         THE COURT:  Okay.  And defendants?

VOLUME:  11
PAGES:  970-1056

1          ATTORNEY SCHROEDER:  Nothing.

2          THE COURT:  Okay.  "Disability Discrimination Claims

3     Under Vermont State Law", Page 22, plaintiff?

4          ATTORNEY JONES:  No objection

5          THE COURT:  Okay.  Defendants?

6          ATTORNEY SCHROEDER:  Your Honor, our submission would

7     be just an objection for the record on whether or not it should

8     be motivating factor versus but-for.  So we're just stating

9     that objection for the record.

10          THE COURT:  Okay.  But no, no specific changes other

11     than that objection to that particular legal standard?

12          ATTORNEY SCHROEDER:  Correct, Your Honor.

13          THE COURT:  Okay, okay.  "Wrongful Discharge under

14     New Hampshire Law", Page 24, plaintiff, any objection?

15          ATTORNEY JONES:  No objection, Judge.

16          THE COURT:  Okay.  Defendants?

17          ATTORNEY SCHROEDER:  Just a second, Your Honor.

18          THE COURT:  Yes.

19          ATTORNEY SCHROEDER:  Your Honor, we'd submit that the

20     third paragraph on Page 24 that that's really what should be

21     above the paragraph on the prevailing rule.  Because,

22     otherwise, if you read the prevailing rule section first, it

23     looks like there's only one element, and we want to make sure

24     that the jury is aware there's two.

25          THE COURT:  Okay.  So no objection to the substance

1    of the paragraph that contains the elements, just where it's

2    located?

3            ATTORNEY SCHROEDER:  Yes.

4            THE COURT:  Plaintiff, any objection to moving that

5    around?

6            ATTORNEY JONES:  I mean, I think it makes sense as it

7    currently is if it's kind of a background of the nature of

8    at-will employment and that there are exceptions to that nature

9    of employment, and then it explains that one of those

10   exceptions is this bad faith exception that is then explained.

11   I think it makes logical sense the way it currently reads.  I

12   think that actually would be more confusing if it's altered the

13   way that Mr. Schroeder suggests.

14           THE COURT:  Okay.  I'm going to leave it the way it

15   is for now, and we'll also take another look at that after

16   reading all of them together.  Number 1, "Termination motivated

17   by bad faith, malice, or retaliation", Mr. Schroeder?

18           ATTORNEY SCHROEDER:  On that one, Your Honor, the

19   first element, the first subparagraph, little I, I don't -- I

20   think that's circular, "an employee is discharged for pursuing

21   policies condoned by the employer"?  I'm not -- maybe I'm,

22   maybe I'm misreading that, but I'm not sure if that's what was

23   meant there.

24           THE COURT:  So you're saying little I is circular?

25           ATTORNEY SCHROEDER:  I'm going to remove that

1    objection, Your Honor.

2              THE COURT:  Okay, all right.

3              ATTORNEY SCHROEDER:  Nothing else in subparagraph 1

4    at all.

5              THE COURT:  Okay.  Subparagraph 2, "Acts that public

6    policy would encourage", plaintiff, any objection to that?

7              ATTORNEY JONES:  No objection.

8              THE COURT:  Okay.  Defendants?

9              ATTORNEY SCHROEDER:  Your Honor, I think it's on Page

10   26.  There's a couple of examples of what could be, you know,

11   what could be considered acts that public policy would

12   encourage, but I think it's prejudicial to then say after the

13   third example, "Other examples of acts that public policy would

14   encourage could be reporting physician conduct that is illegal,

15   fraudulent, unethical, or unlawful to patients; ensuring that a

16   medical provider or medical facility obtain patient consent

17   before performing procedures on patients; and objecting to

18   improper patient billing procedures".

19       We would agree to the first three examples, but I think

20   now we're getting into how the jury is going to interpret the

21   evidence in the record and apply it to the law.  I think now we

22   are getting into multiple examples beyond the three that are

23   there, and I think that would be unfairly prejudicial to us.

24              THE COURT:  And, obviously, these acts are this case,

25   right?

1          ATTORNEY SCHROEDER:  I'm not suggesting they aren't,

2    Your Honor.

3          THE COURT:  No, no.  I understand that.  I understand

4    that.  I'm just wondering if part of the objection is the

5    example begins to become too much about the facts of this case,

6    which may not be improper, but that's part of your objection,

7    presumably?

8          ATTORNEY SCHROEDER:  Correct, that, that we are

9    getting into the nitty-gritty of what we're alleging, and, if

10   we're not going to get into the REI division closing and three

11   physicians terminated at the same time, well, I'd submit that

12   we can't get into this specific issue, which obviously is part

13   of the plaintiff's case.

14         THE COURT:  Yeah, but, again, we're going to go round

15   and round, you know, on this, but that's, that wouldn't be an

16   act that public policy would encourage, the closure of the

17   division, right?

18         ATTORNEY SCHROEDER:  I agree with you, Your Honor,

19   except that that's the fourth, fifth, sixth example.  I don't

20   think we need to give the jury six examples.  I think there's

21   three already, and I think that it's unfairly prejudicial of

22   our case.

23         THE COURT:  Okay.  Plaintiff, any response?

24         ATTORNEY JONES:  We think it's simply a description

25   of the claim and it's appropriate, and we would note that the

1    sentence starts, "Other examples of acts that public policy

2    would encourage could be".  I mean, you're not saying it is; it

3    could be.  And it just simply summarizes the claim made.  So I

4    think it's okay as written.

5             THE COURT.  All right.  I'll take a look at that.

6    "Damages", Page 26, plaintiff?

7             ATTORNEY JONES:  No objection.

8             THE COURT:  And defendants?

9             ATTORNEY SCHROEDER:  We would strike the second

10   bullet point at the bottom of Page 27.

11            THE COURT:  That's a different section, right?  I was

12   just talking about the first paragraph.

13            ATTORNEY SCHROEDER:  Oh, I'm sorry, Your Honor.

14            THE COURT:  Yeah, "Damages" on 26, 27?

15            ATTORNEY SCHROEDER:  No, no objection, Your Honor.

16            THE COURT:  So the next section, "Economic and

17   Non-Economic Damages", plaintiff, any objections?

18            ATTORNEY JONES:  No objection.

19            THE COURT:  Okay.  Go ahead, Mr. Schroeder, on this

20   section.

21            ATTORNEY SCHROEDER:  Sure.  The first bullet point

22   and the third bullet point we would have it state that Dr.

23   Porter "may be entitled to damages" as opposed to "is entitled

24   to damages", and we would strike the second bullet because

25   there has been no evidence put forth in the record about

1    medical care and treatment relating to her claims.  There's

2    just no --

3              THE COURT:  Yeah, I was going to ask about that.  I

4    mean, this is obviously coming from a, you know, more general

5    charge relating to these kinds of damages, so I appreciate that

6    information.

7              ATTORNEY SCHROEDER:  Understood.

8              THE COURT:  Is there any objection to that?

9              ATTORNEY JONES:  No objection.  There's no claim here

10   for medical expenses.

11             THE COURT:  So then the second bullet will be

12   removed.  And the first, Mr. Schroeder, your objection to the

13   first bullet is "may be entitled"

14             ATTORNEY SCHROEDER:  Yes, the same as the third, Your

15   Honor.

16             THE COURT:  So what about above, in the paragraph

17   right above it, "These damages may include compensation for

18   past and future harm, depending on the evidence", doesn't that

19   kind of make the point that it's certainly not required, but

20   it's based on the evidence in the case?

21             ATTORNEY SCHROEDER:  Your Honor, it's a fair point.

22   I just, I think I just want to make sure they understand that

23   it's not a fait accompli.

24             THE COURT:  Okay.  So, for the reason that I've just

25   said, I'm just going leave it, the first bullet, as "Dr. Porter

 1    is entitled" because I think the paragraph before makes the
 2    point that damages are not required.  The third bullet,
 3    anything there?
 4            ATTORNEY SCHROEDER:  Just the same suggestion as
 5    before, Your Honor, "may be".
 6            THE COURT:  Okay.  The "is entitled" language?
 7    Mr. Schroeder, I was just confirming.
 8            ATTORNEY SCHROEDER:  I'm sorry.  I didn't hear you,
 9    Your Honor.
10            THE COURT:  Okay.  The third bullet, your objection
11    is to the "is entitled" language?
12            ATTORNEY SCHROEDER:  Right, correct, Your Honor.  I'm
13    sorry.  I didn't hear you.
14            THE COURT:  All right.  Okay. "Mitigation of
15    Damages", Page 28, plaintiff, any objections?
16            ATTORNEY JONES:  No objection.
17            THE COURT:  Okay.  Defendants?
18            ATTORNEY SCHROEDER:  Your Honor, in the first
19    sentence as well as the sentence, "If you find", we would just
20    -- the first sentence -- well, let's start with the first
21    sentence.  It's Dartmouth Health's position that Dr. Porter has
22    mitigated or could have fully mitigated her damages.  It's not
23    that she's failed to mitigate or minimize.  We know she's
24    mitigated some of her damages, if not all of them.  In fact, we
25    believe, based upon the demonstrative that we want to show that

VOLUME: 11
PAGES: 970-1056

1    we talked about before, that she has mitigated all of her

2    damages.  So stating that she has mitigated or could have fully

3    mitigated her damages would be appropriate there.

4            THE COURT:  Sorry.  Has mitigated or --

5            ATTORNEY SCHROEDER:  Could have fully mitigated her

6    damages.

7            THE COURT:  Mr. Jones?

8            ATTORNEY JONES:  I mean, I'm not sure I understand

9    that so I'm not sure the jury would understand it.  I mean, the

10   way this is phrased is the law of the duty to mitigate.  So

11   then rephrasing it as the defense claims that she mitigated her

12   damages, that just seems illogical.

13           THE COURT:  Yeah, it does seem to be -- I don't know

14   about illogical, but I don't know if it works given that this

15   section is all about the duty to mitigate and we're saying

16   Dartmouth Health claims that Dr. Porter did mitigate.

17           ATTORNEY SCHROEDER:  Well, I think we put -- the

18   evidence in the record is clear, at least from our standpoint,

19   that, based upon her ability to get this other job right away,

20   have it right away, that she had mitigated her damages, and, in

21   fact, if you compared her at a 1.0 FTE at Dartmouth Health,

22   which is how her expert assumed it, and you did the same for

23   UVM Medical Center, she's actually making more money as of 2025

24   going forward.

25           So we are making the -- we're not suggesting that she

1    hasn't mitigate her damages.  We believe she's fully mitigated

2    her damages, to the extent that there were any.

3            THE COURT:  Okay.  Mr. Jones?

4            ATTORNEY JONES:  I mean, that sounds like an argument

5    that they're making that she has not suffered damages, which I

6    think is somewhat different than the mitigation issue.  I do

7    think it's important to have something about the mitigation

8    issue, however, in an instruction because a big part of this

9    case, you know, their argument that she suffered no losses or

10   has fully mitigated her damages assumes that she should have

11   been working a full-time position.  We argue that for her to do

12   a full-time FTE at University of Vermont would have required

13   her to relocate, and that's not reasonable, and the duty to

14   mitigate doesn't require that.

15       So I think we need to be able to argue to the jury what

16   the duty to mitigate is, what it requires, what's reasonable,

17   what is not reasonable, and to explain to the jury that her

18   actions exceeded any duty to mitigate that she had and she

19   still suffered significant financial loss.

20           THE COURT:  Okay.  I'm going to leave it as worded

21   right now.  Anything else in that section?  I think that -- was

22   that the only objection from the defendants?

23           ATTORNEY SCHROEDER:  Yes.

24           THE COURT:  Okay.  Next section, Page 29, "Punitive

25   Damages", plaintiff?

1    ATTORNEY JONES:  No objection.

2    THE COURT:  Okay.  Defendants?

3    ATTORNEY SCHROEDER:  Yes, Your Honor.  I think that

4    we would suggest halfway down in the, where it says second,

5    well, "Second", comma, halfway down it says, "You may also find

6    malice even if Dartmouth Health's motivation behind the

7    intentional, outrageous conduct was to benefit itself".  We

8    would add "in a way tantamount to a crime" rather than "to harm

9    Dr. Porter".

10    THE COURT:  So the fact that the second paragraph in

11    that section lays out this "to a degree of outrage frequently

12    associated with a crime", that's not sufficient?

13    ATTORNEY COFFIN:  If I might, Your Honor.

14    THE COURT:  Yes.

15    ATTORNEY COFFIN:  The concern there is that to

16    describe that punitive damages are appropriate where Dartmouth

17    Health has done something to benefit itself, you know,

18    obviously, a legitimate business reason, part of the reasons

19    they're doing that is to benefit the institution, and we just

20    thought that that needed a little bit more elaboration, that

21    the benefit has to be something, you know, commensurately

22    outrageous, immoral, like a, tantamount to a crime.

23    The "tantamount to a crime" language, there's nothing

24    magic about that, but I do think that, if you just leave that

25    implication that a benefit could be, Hey, if they benefit, that

VOLUME:  11
PAGES:  970-1056

1   could be subject to punitive damages, is not the law.

2          THE COURT:  Okay.  So the proposal then is "in a way

3   tantamount to a crime" rather than "to harm Dr. Porter"?

4          ATTORNEY COFFIN:  Yes.

5          THE COURT:  Okay.  Mr. Jones?

6          ATTORNEY JONES:  We believe that the language as

7   written is appropriate.  The second paragraph already provides

8   for the basic standard, which concludes the language up to a

9   degree of outrage, frequently associated with a crime.  I don't

10  think that needs to be reinforced here.  So we would stick with

11  the language as drafted.

12         THE COURT:  Is the "in a way tantamount to a crime"

13  linked to the outrageous conduct or to the benefit?  Is your

14  idea that it's both?

15         ATTORNEY COFFIN:  Sort of both, but I think that the

16  notion fundamentally more, if you can split it, is that the

17  receiving a benefit in those circumstances in that context

18  would be extreme bad behavior rather than, you know, reasonable

19  business behavior which benefits the company.

20         THE COURT:  Okay.  I'm just going to leave that the

21  way it is for now and, again, take that under consideration.

22  "Remaining Damages Issues", plaintiff?

23         ATTORNEY JONES:  No objection.

24         THE COURT:  Okay.  And defendants?

25         ATTORNEY SCHROEDER:  Just, Your Honor, before you get

1    there, at the last part of "Punitive Damages", the

2    second-to-last paragraph had a provision, "Where the management

3    of the corporation has knowledge of wrongful conduct by

4    lower-level employees, the corporation may be deemed to have

5    permitted the conduct", we don't believe that that's consistent

6    with Vermont law on punitive damages.  Specifically, the issue

7    of punitive damages in this case only comes up in the context

8    of the ADA and, obviously, the Rehab Act then because of the

9    ADA, but there's a cap limit.

10       There are a couple of cases under Vermont law,

11   specifically *Shortle v. Central Vermont Public Service*

12   *Corporation*, *Sparrow v. Vermont Savings Bank*, which relate to

13   -- and these were not FEPA claims, but they go to the issue of

14   punitive damages and whether or not the malicious or unlawful

15   act relied upon is that of a governing officer.  So just

16   saying, Well, the management of the corporation knew what

17   somebody was doing, I think that has kind of watered down the

18   standard of what it takes to hold a corporation liable for

19   punitive damages.

20       THE COURT:  Okay.  And do you have citations for your

21   cases?

22       ATTORNEY SCHROEDER:  I do, Your Honor.  137 Vt. 32,

23   and 95 Vt. 29.  That's a rather old case from 1921.  The first

24   one is *Shortle v. Central Vermont Public Service Corp.*  That's

25   from 1979.  These are not FEPA claims, but they go to the issue

1    of punitive damages and when they may be assessed against a

2    corporation.

3                THE COURT:  Okay, all right.  I'll take a look at

4    those cases.  And then is there a proposal for that particular

5    sentence?

6                ATTORNEY SCHROEDER:  My, the proposal, Your Honor, is

7    to delete that sentence.

8                THE COURT:  Oh, delete it?  Okay, all right.  And

9    "Remaining Damages Issues", plaintiff, any objection?

10               ATTORNEY JONES:  No objection.

11               THE COURT:  Okay.  Defendants?

12               ATTORNEY SCHROEDER:  No objection.

13               THE COURT:  "Insurance and Taxes", plaintiff?

14               ATTORNEY JONES:  No objection.

15               THE COURT:  Okay.  Defendants?

16               ATTORNEY SCHROEDER:  No objection.

17               THE COURT:  "Final Instructions", plaintiff?

18               ATTORNEY JONES:  Not an objection but just a

19    suggestion.

20               THE COURT:  Yes.

21               ATTORNEY JONES:  I think it would be best if we could

22    clarify that the jury is expected to answer "yes" or "no" with

23    regard to each of the Roman numeral I through VI items on the

24    form.  I just want to avoid a situation where the jury answers

25    some of them and not all of them and then there's confusion

VOLUME:  11
PAGES:  970-1056

1    about what the jury did.

2              THE COURT:  Okay.  So are you saying the third line

3    of that section, "The answer to each question" should be more

4    specific about, like, listing the actual issues?

5              ATTORNEY JONES:  Well, I might -- I have here my

6    handwritten notes are to add a fourth sentence.  After saying,

7    "The answer to each question on the form must be the unanimous

8    answer of the jury", I would say, "In addition, each question

9    numbered Roman numeral I through VI must be answered".

10             THE COURT:  Okay.  Defendants, any objection to that?

11             ATTORNEY SCHROEDER:  Just a second, Your Honor.

12             THE COURT:  Yes.

13             ATTORNEY SCHROEDER:  No issue, Your Honor.

14             THE COURT:  Okay.  So we'll add that.  And everything

15   else with the "Final Instructions" section, no objections?

16             ATTORNEY JONES:  Yeah, correct, no further

17   objections.

18             ATTORNEY SCHROEDER:  Yes, Your Honor.

19             THE COURT:  Okay, all right.  Let's turn to the

20   verdict form then.  So I'll just take, I guess, objections from

21   each side all at once.  Seven-page document.  Plaintiff have

22   any objections?

23             ATTORNEY JONES:  No objections.

24             THE COURT:  Okay.  Defendants?

25             ATTORNEY SCHROEDER:  Yes, Your Honor.

VOLUME:  11
PAGES:  970-1056

1          THE COURT:  Okay.

2          ATTORNEY SCHROEDER:  With respect to Roman Numeral I,

3     we would delete the phrase, "and failed to reassign her to

4     another position at Dartmouth Health", for all the reasons

5     we've stated previously.

6          THE COURT:  Right.

7          ATTORNEY SCHROEDER:  There are no changes to Roman

8     numeral II.  Roman numeral III, "Rehabilitation Act", we would

9     insert the word "intentionally".

10         THE COURT:  Before "terminated"?

11         ATTORNEY SCHROEDER:  Yes.  Because the Rehabilitation

12    Act requires intentional violation.  That's the *Loeffler v.*

13    *Staten Island University Hospital* decision from the Second

14    Circuit, 582 F.3d 268.  So we would insert the word

15    "intentionally" in each subparagraph A, B, and C.

16         THE COURT:  Even though the legal instructions

17    section for them to make the finding lays that out?

18         ATTORNEY SCHROEDER:  From the jury instructions, Your

19    Honor?

20         THE COURT:  Yes.

21         ATTORNEY SCHROEDER:  Well, I think, you know, there's

22    one thing to go through 30 pages of jury instructions and then

23    you've got the verdict form.  So I think, you know, I think

24    saying it more than once would be appropriate, especially since

25    that's what the law requires.

VOLUME:  11
PAGES:  970-1056

1              THE COURT:  Okay.

2              ATTORNEY SCHROEDER:  Ms. McDonald just referred to

3    the fact that she did not believe that the jury instructions

4    actually refer to the word "intentionally".

5              THE COURT:  Okay.

6              ATTORNEY SCHROEDER:  In Roman numeral IV, I think --

7    and this is a continuing rephrasing of subparagraph B for Roman

8    numeral IV and Roman numeral V.  we would just have it say,

9    instead of "by reassigning her to another department instead of

10   terminating her employment", we would have it say "by

11   terminating her employment instead of reassigning her in

12   violation of the law", so by terminating her employment instead

13   of reassigning her in violation of whatever law we're talking

14   about, whether it's Roman numeral IV or Roman numeral V.

15             And we, certainly like the jury instructions, we'll send

16   Your Honor, too, red-lined provisions.

17             ATTORNEY McDONALD:  In the punitive damages question,

18   Section 3, where it states, "If you checked 'yes' to any of the

19   questions in parts 2, 4, or 5 above", we would strike the Roman

20   numeral IV.

21             THE COURT:  Yes, I had a feeling you might say that,

22   but please go ahead, let me hear why.

23             ATTORNEY McDONALD:  We don't -- we believe that's a

24   New Hampshire claim.  We don't believe that punitive damages

25   are available under that claim.

VOLUME: 11
PAGES: 970-1056

1           THE COURT:  Right.  So we found the same, but there

2    is a -- what's the term of art for it -- kind of like excess

3    compensatory damages under New Hampshire law.

4           ATTORNEY VITT:  I think it's enhanced.

5           THE COURT:  Enhanced, that's it, enhanced

6    compensatory damages.  The legal distinction between the two,

7    there must be one, but I think, as I understand it from the

8    law, that's kind of New Hampshire's kind of way of getting at

9    that concept.

10          ATTORNEY McDONALD:  It's, we do have a case, and it's

11   *State v. Hynes*, which is 159 N.H. 187, a 2009 case, and at Page

12   198 there's a quote, "Enhanced compensatory damages are, as

13   their name indicates, compensatory and not punitive in nature".

14          THE COURT:  Yeah.  So what's the difference between

15   punitive damages and enhanced compensatory damages, or what's

16   the difference between compensatory damages and enhanced

17   compensatory?

18          ATTORNEY SCHROEDER:  Well, I think compensatory goes

19   the issue of back pay, front pay.  Perhaps you add emotional

20   distress in there.  But it certainly doesn't include the

21   category of punitive, which has its own standard no matter what

22   state we're in, and compensatory is always considered looking

23   back and saying, all right, How do we -- whether it's back pay,

24   front pay, reimbursement for expenses, it is not anything

25   that's, quote, unquote, punitive.

 1          THE COURT:  Okay.  Mr. Jones, any thoughts on that?

 2          ATTORNEY JONES:  Well, admittedly it's been a while

 3   since I did extensive research into the New Hampshire law of

 4   enhanced compensatory damages.  My recollection -- and my first

 5   bar license was in New Hampshire -- is that this really is New

 6   Hampshire's attempt to get at a similar notion that, in cases

 7   involving particularly egregious behavior, there is the ability

 8   to have the jury award an extra amount to take that into

 9   account, and they call that enhanced compensatory damages.

10          THE COURT:  That was kind of my understanding as well

11   with some research this morning on this.  This came up for me

12   this morning, so that's why the form you have didn't even make

13   that change to it.  But, Ms. McDonald, do you --

14          ATTORNEY McDONALD:  I was just going add.  I think

15   also enhanced compensatory damages relate to they're in lieu of

16   an administrative fine, right?  So I think the amount, that

17   goes to the amount of the --

18          THE COURT:  So you're looking at the statute?

19          ATTORNEY McDONALD:  Yes.

20          THE COURT:  So I'm at the same provision, "Except

21   that in lieu of an administrative fine, enhanced compensatory

22   damages may be awarded when the court finds the respondent's

23   discriminatory conduct to have been taken with willful or

24   reckless disregard of the charging party's rights under this

25   chapter".

1      Seems kind of cognate of punitive to some degree.  I'm not

2    saying they're the same, but it seems like New Hampshire's way

3    of getting at similar type conduct.  But we're looking at this,

4    and I will make an adjustment to that and any necessary kind of

5    adjustments to the jury instructions in that regard.  Is that

6    it for the verdict form, defendants?

7              ATTORNEY SCHROEDER:  Yes, Your Honor.

8              THE COURT:  Okay.  And, plaintiffs, you're good with

9    it?

10             ATTORNEY JONES:  We are, yes.

11             THE COURT:  Okay.  So the motions, then, filed over

12   the weekend.  So, first, taking up Document 266, defendant's

13   memorandum regarding law applicable to a potential award of

14   prejudgment interest, I'm wondering if this is kind of mooted

15   out just because you have probably seen the instructions say

16   that interest is not to be taken into account?

17             ATTORNEY COFFIN:  Yes, that was our understanding,

18   Your Honor, and they've agreed to that instruction, so this

19   would be mooted out.

20             THE COURT:  Okay, thank you.  And then the other one,

21   267 filed by plaintiffs, so motion to preclude any reduction of

22   damages based on conditional offer of severance pay.  So what

23   is the request here, right?  So I understand your argument,

24   certainly, right, that her decision to forego a severance

25   agreement or severance payment in favor of proceeding with

1    legal claims means she made her decision and that is her

2    decision and she shouldn't be, you know, any award of damages

3    she might receive in this case shouldn't be reduced by that

4    amount.  Is that --

5                ATTORNEY JONES:  Correct.  And we want to make sure

6    that there's no argument that, as a matter of mitigation of

7    damages, that somehow the duty to mitigate would have required

8    her to accept a severance payment when that would have required

9    her to sign a general release of all her claims.  And the idea

10   that you have to sign a separation agreement with a general

11   release to comply with the duty to mitigate would seem to be

12   legally contrary, and so I think that would be confusing if

13   that were allowed to be an argument to the jury, that the duty

14   to mitigate somehow required her to or that she should

15   otherwise somehow be penalized and that the damage award should

16   be reduced by what she would have been offered.

17       Had she accepted a severance payment without a general

18   release, then obviously that payment would be a reduction of

19   her damages, but in this case the fact that she was offered it

20   in exchange for a general release we don't think should be used

21   in argument to the jury as a way to offset, reduce, or

22   otherwise be a part of the duty to mitigate.

23                THE COURT:  Okay.  So this is not a request for any

24   kind of an instruction, it is more of a statement about what

25   you think they should be able to argue at closing relative to

1    this?

2              ATTORNEY JONES:  Correct.

3              THE COURT:  So, defendants, so your response is all

4    about Rule 408.  I'm not sure that this is really a Rule 408

5    question so much as it is mitigation.  408, right, as I

6    understand it, is just about you shouldn't be introducing

7    evidence of settlement.  I understand the severance issues are

8    in evidence.

9              ATTORNEY COFFIN:  Yeah, I wasn't sure exactly what

10   they were seeking, and so we responded substantively.  One, the

11   information was admitted without any kind of an objection by

12   them and without any kind of request that it be so limited.  I

13   think, at that point, the parties are able to point to the

14   evidence before the jury and present the matter and reasonable

15   inference is drawn from the evidence in the case, including

16   damages and including mitigation.  They did offer and question

17   witnesses following up on that with regard to the contours of

18   the severance and what's normal in a severance situation and so

19   forth.

20             Furthermore, we've cited in that memo two cases that

21   discuss, you know, in very similar circumstances that the 408

22   does not apply in this context because they are not actually

23   offers to compromise a dispute.  And the Ninth Circuit case we

24   cited there, *Cassino*, actually found that the offer of

25   severance could be presented in favor of mitigation.

1       And the Second Circuit case is very similar.  It tracks

2   that and cites it approvingly, the *Tripler* case.  So I don't

3   understand how the evidence being admitted and the jury having

4   heard testimony about this that damages are, and mitigation of

5   damages are kind of such a central issue in the case that we

6   should be limited in reasonably pointing to the inferences that

7   can be drawn from the evidence in the case.

8           THE COURT:  But what are those inferences?  I guess

9   I'm curious what that would look like in closing, right?  She's

10  offered severance.  She chooses not to take severance.  She

11  chooses to bring legal claims.  Is the argument going to be,

12  not to put words in your mouth, but is the argument going to

13  essentially she could have taken the severance agreement, and

14  that would have reduced her damages?  I feel like that's a

15  tough spot, isn't it, for the plaintiff to be in for you to

16  argue that when she chose to pursue legal claims instead of

17  severance.

18          ATTORNEY SCHROEDER:  Well, first of all, Your Honor,

19  there was no objection to the admission of that evidence in

20  this case.  They could have made that argument before.  So it's

21  in.

22      But it also goes to the issue of meeting with the

23  plaintiff after the letter that went -- actually, she

24  references it in her letter about going to meet with Aimee

25  Claiborne to go over whether or not, you know, what's going to

1  happen with her job, and it's a fact that she did not accept

2  the severance package.  They've heard that testimony.  I think

3  that it's, it's -- how I present it, I mean, I think we're

4  certainly open to present it however we want because it's

5  evidence in the record.

6          THE COURT:  I don't know about that.  Truly, I don't

7  know the answer to that, but to make the argument that she

8  failed to mitigate because she didn't accept the severance

9  package, which is her right --

10         ATTORNEY SCHROEDER:  No, no, I'm not really getting

11  -- I'm not saying it for just fact of failure to mitigate, Your

12  Honor.  I think one of the issues is that she had a severance

13  package on the table.  She sought more money, and she didn't

14  take it, period, full stop.  I don't have to get into, Well,

15  she didn't mitigate her damages.  I wasn't going to make that

16  statement.  But the facts in the record, C13 is a document in

17  the record, and so I certainly feel I have the ability to refer

18  to the actual language of it.

19     She's already admitted that on the stand, Well, it was a

20  nominal amount.  Well, I mean, that just goes to, you know,

21  some of our, some of the statements that we'll make

22  specifically on the issue of she was asking for additional

23  money at the time in addition to what she had in the letter

24  that she was sending to a number of individuals, and this was

25  their response.  They did meet with her.  They enunciated that

1    there was no position for her.  It's all in that document.

2         In addition, at the end of that severance agreement, there

3    was testimony by Heather Gunnell, the fact that it states that

4    Beth Todd was already a point, was already working in the

5    OB/GYN department, was part of the OB/GYN department, and was

6    assumed back into the OB/GYN department on a full-time basis.

7    That goes to our defenses, Your Honor.  She made complaints

8    about Dr. Hsu and Seifer.  That's in the record.  But that

9    document has already been -- the horse has left the barn on

10   that.  How do we not have the liberty of at least referring to

11   it, not necessarily to say, Well, she failed to mitigate her

12   damages?

13        I'm not, I don't need to say that, nor was I planning on

14   it, but, certainly, referring to the sequence of events and

15   what the company did, what they were prepared to do in terms of

16   severance.  I mean, this whole case is about intent, right?

17   Well, they put a severance package on the table.  She rejected

18   it.  They said, Okay, you know what?  We've reconsidered.

19   We're going to put $228,000 on the table for you.  How do I not

20   get to talk about that?  This whole case is about intent,

21   respectfully.

22        THE COURT:  I guess the question is just how you go

23   about using it.  I still have questions about that.  Mr. Vitt?

24        ATTORNEY VITT:  If I may be heard, Judge.  Yes, the

25   severance document was introduced really on the issue of, Was

 1    there some offer?  It wasn't sort of minimal.  But, when they

 2    made this argument, it was stunning.  The idea that a defendant

 3    can present a discharged employee with a severance agreement

 4    which requires confidentiality, no disparagement, and a total

 5    waiver of all of her rights and then go to a jury and say, We

 6    offered, whatever it is, a hundred, $150,000, and that should

 7    be deducted from whatever damages you're going to give her.

 8        There is simply no law in the Second Circuit and no law

 9    that we could find that supports that.  And, as you said, it

10    puts the plaintiff in a terrible position.  It's absolutely

11    outside the bounds, and it shouldn't happen.  They should not

12    be able to make that argument.

13        THE COURT:  Mr. Coffin?

14        ATTORNEY COFFIN:  Mr. Vitt says there is no Second

15    Circuit case law on this.  There is.  The *Tripler* case

16    discusses this, and the *Cassino* case, you know, in very similar

17    circumstances provides that the offer of severance which wasn't

18    rejected could be offered into evidence in that case and was

19    used to mitigate damages.  You know, so I do think there is law

20    on this.  I think the cases that he cited for various reasons

21    just are not factually specific and don't hold, as these two

22    cases we found do hold, that this evidence is admissible.

23        You know, furthermore, we're not even at that point

24    because this evidence has been admitted, and I don't see why

25    it's not proper impeachment of Dr. Bancroft, of the information

1    the plaintiff was telling him and whether that was

2    cherry-picked or not.  And, of course, you know, we have this

3    version of events from Dr. Bancroft which is highly transmitted

4    from the plaintiff to him, and, if they're allowed to describe

5    all of these ramifications of what would happen with her salary

6    and her position and her pay and her damages, this seems to me

7    to be totally legitimate cross-examination, which was admitted

8    and the jury has now heard and it's part of the case, and we

9    should be able to argue it from there.

10         I don't see prejudice here, at least I've not heard kind

11    of what the prejudice is other than it is, you know, frankly

12    powerful evidence that she had a chance to bridge over to a

13    good position which she had at the time and that it would have

14    helped her carry through and not have kind of damages in the

15    case.

16         ATTORNEY SCHROEDER:  One other point, Your Honor.

17    This harkens back to earlier in the case when Dr. Porter was on

18    the stand.  She opened the door to this subject for a lot of

19    reasons, but one of which was, I had to take a second mortgage

20    on my home in order to buy this condo in Vermont.  So, one, she

21    opened the door to it.  Two, the evidence is in the case.

22    Like, how do I not have the ability, Your Honor?

23         And, certainly, obviously, I do not want to be interrupted

24    in my closing argument, not as I'm sure plaintiff's counsel

25    doesn't want to be interrupted.  So I certainly want to deal

1    with this ahead of time.  Not to say, I mean, this is a small

2    part of my closing argument because, obviously, our position is

3    she's not entitled to any damages, but, based upon the somewhat

4    all-over-the-map presentation by Dr. Bancroft, how do I not

5    have the opportunity?  How do I not have the ability to refer

6    to, This is what was on the table.  They had this discussion?

7         She said, Nobody talked to me about this.  She actually

8    refers to it in her letter.  You know, I don't want to -- this

9    is going to be a really small part of the presentation because,

10   like I said, I don't really feel that we need to get into

11   damages very much, but, certainly, it's part of the case.  It's

12   going to be part of my closing, and the fact that it's in the

13   case makes it germane to my closing argument.

14         THE COURT:  Okay.  Well, I'm definitely going to take

15   -- it's *Tripler*, I believe, is the case that Mr. Coffin cites?

16   I'm just curious.  Is it, procedurally, is it similar?  You say

17   the court there says the evidence of the severance agreement is

18   relevant to come in for similar purposes, that there are, there

19   was kind of a, a waiver of the severance in favor of, say,

20   discrimination claims, and the Court found that the severance

21   information was still relevant to come in in a case like that?

22         ATTORNEY COFFIN:  I think that the *Cassino* case is

23   more relevant to the facts that the Court is describing.  The

24   Second Circuit case had similar facts, but it cited *Cassino*

25   approvingly for that proposition.

VOLUME: 11
PAGES: 970-1056

1           THE COURT:  Okay, all right.  Well, as you can tell,

2     I mean, I do have, I have some questions about that.  I'm going

3     to read those cases, and I think I understand both sides of the

4     argument.  Okay.  I think that was it as far as motions go.

5           ATTORNEY JONES:  Yes.

6           THE COURT:  Right?

7           ATTORNEY SCHROEDER:  Yes, Your Honor.  The only thing

8     I would ask -- obviously up to your discretion, but I want to

9     know exactly where my bounds are in terms of my closing

10    argument.

11          THE COURT:  Right.

12          ATTORNEY SCHROEDER:  And, if you do need us to come

13    in early to discuss that, I'd rather know today, but I

14    understand that you have to consider it, and that is

15    understandable.  I just, I want to make sure that I am

16    following the Court's instruction.

17          THE COURT:  Right.  No, I think, if you come in a

18    little early tomorrow to receive kind of the final version of

19    the jury charge so you can see where things ended up in light

20    of the objections that were made, we'll have a talk about that

21    at that time as well.  So I certainly understand your desire to

22    have kind of guidance.

23          ATTORNEY SCHROEDER:  One last point, it's kind of

24    corollary to that, and I realize, Your Honor, you set aside

25    only 90 minutes, and so I want to be mindful of that.  We would

1    like the opportunity to do a very short PowerPoint

2    demonstrative of what the evidence we believe shows.  And,

3    obviously, we'd be prepared to show it to the plaintiff's

4    counsel.  We haven't drafted it yet, so there's nothing to

5    share right now.  But a very short PowerPoint which would --

6        You know, one of the demonstratives is the issue of her

7    pay at 1.0 FTE, which is the document that we've had various

8    discussions about.  We'd like to be able to show that but, in

9    conjunction with that, a very short PowerPoint that would lay

10    out some of the facts as we see them and as far as the record

11    is reflecting them.

12        THE COURT:  Okay.  So, obviously, plaintiff needs to

13    see it and determine -- you know, obviously, if you have the

14    consent of plaintiff, it's kind of an easy issue.  In that

15    regard, it has to, obviously, you know, the standard has to

16    accurately summarize the testimony and kind of the evidence in

17    the case.  So I'll leave that to you to confer with plaintiff

18    on it.

19        On the related topic, though, C19, that's the other

20    exhibit you're talking about, the Dr. Bancroft letter.  So I

21    want to tell you I've reconsidered that issue.  I'm not going

22    to allow it as substantive evidence or as a demonstrative, and

23    I'm going to read into the record right now why, okay?  I've

24    been able to give this more thought.

25        So, by oral motion during a break in the trial, defendants

1   requested that a handwritten note generated by Dr. Bancroft

2   during cross-examination be admitted into evidence or,

3   alternatively, that it be permitted as a demonstrative aid.

4   That exhibit has been marked as Exhibit C19.  The Court ruled

5   that C19 would not be admitted into evidence but that it could

6   be used as a demonstrative aid during closing.  As I said,

7   since that ruling, I've had an opportunity to review the

8   transcript of Dr. Bancroft's testimony pertaining to the

9   generation of the note, as well as consider the legal arguments

10  of defendant's counsel for its proposed admissibility.

11      So, as to the factual setting of the generation of this

12  note, Dr. Bancroft was asked to explain his forecasting of

13  plaintiff's earnings.  As part of the cross-examination,

14  counsel asked Dr. Bancroft to perform specific calculations

15  using numbers provided by counsel.  Before performing the

16  requested calculations, Dr. Bancroft disagreed that the

17  proposed calculations would result in the conclusion counsel

18  sought to establish.

19      He was directed to perform the calculations anyway.

20  Dr. Bancroft specifically stated, quote, "I'll do it anyways,

21  but it's not correct".  That's at Page 91 of the transcript,

22  Lines 1 to 3.  He then wrote down the numbers on the paper.

23  That paper is C19.

24      So, first, I reaffirm the ruling that the handwritten note

25  will not be admitted as evidence, finding that the note is not

 1    admissible as a statement by a party opponent under Rule 801.

 2    Dr. Bancroft is not a party for purposes of Rule 801(d)(2)(A).

 3    The note he generated on cross-examination is also not

 4    admissible under 801(d)(2)(C) as the statement of an agent

 5    authorized to speak on behalf of the party.

 6        Courts have been skeptical of the notion that an expert is

 7    an agent of the party who retained them.  As one example, I

 8    cite *Kirk v. Raymark Industries*, 61 F.3d 147, Third Circuit

 9    1995.  The circumstances of this note do not raise the

10    reasonable possibility of an adopted admission under the rules.

11    Defendants have asserted, at the time of the argument last

12    week, I believe, on this, that it is impeachment evidence.

13    Defendants may comment on the calculation to argue that the

14    damage calculations are flawed, but it is not evidence in the

15    case.

16        As to whether it is proper for the note to be used as a

17    demonstrative exhibit, as I say, I'm altering the ruling to

18    find that it may not be used as a demonstrative.  The general

19    rule is that the Court may allow the use of demonstrative aids

20    such as charts or tables, so long as those charts or tables

21    accurately summarize the content of the primary testimony and

22    do not misstate the testimony of the expert witness or

23    otherwise mischaracterize the expert's opinion.

24        For that I'll cite *Castaldi*, 363 Fed.App'x 761, a Second

25    Circuit decision from 2009.  So here the circumstances of the

1    testimony that resulted in the generation of the note raised a

2    significant question about whether it accurately summarizes the

3    testimony.  Dr. Bancroft acquiesced in performing the requested

4    calculations while protesting that the calculations were not

5    correct.  Under these circumstances, I don't think it's

6    appropriate to permit C19 to be used as a demonstrative

7    exhibit.  Obviously, it was his testimony at the trial, and, if

8    counsel wants to discuss his testimony on that point, that's

9    fine.  Mr. Schroeder?

10           ATTORNEY SCHROEDER:  Your Honor, just on a related

11   point, with respect to the demonstrative exhibits that the

12   plaintiff wanted to use in this case, obviously, you've heard

13   from my partner here, Mr. Coffin, on the issue of the federal

14   rate of interest versus the state equivalent.  For that reason

15   and that reason among maybe 50 other reasons, then

16   Dr. Bancroft's chart should not be used as a demonstrative

17   exhibit in plaintiff's closing because it relies upon the 12

18   percent interest rate in coming to those calculations among

19   other things that we've objected to already.

20           THE COURT:  Right, but, when an expert is subject to

21   cross-examination and the cross-examination lays out perhaps

22   flaws in the analysis, you're saying that's a reason for a

23   demonstrative aid for the expert's primary testimony on direct

24   not to come in?  I mean, experts are undermined all the time in

25   their cross-examinations.

1          ATTORNEY SCHROEDER:  I understand.  This just goes to

2     the demonstrative exhibit, Your Honor, and whether or not the

3     plaintiffs can use his chart as a demonstrative in the closing.

4          THE COURT:  Right.

5          ATTORNEY SCHROEDER:  Since Dr. Bancroft's testimony,

6     we have put in motions regarding the issue of prejudgment

7     interest and whether or not, which one should be used.  Well,

8     if they get to put in a chart that includes the 12 percent

9     calculation embedded into their numbers, how is that not

10    prejudicial to us?

11         THE COURT:  Well, I mean, that was part of kind of

12    the analysis that he generated.  I understand you disagree with

13    it.  This was created on cross-examination with numbers that he

14    did not even agree were accurate predicates for the

15    calculations.  Arguably, all Bancroft did on the stand was

16    perform certain calculations with certain numbers.  He didn't

17    draw any conclusions as to what those numbers showed.  I think

18    they're substantively different.  Mr. Coffin?

19         ATTORNEY COFFIN:  Yeah.  So I guess I parsed Dr.

20    Bancroft's testimony a little differently.  First, there was

21    really only, as I see it, only as to 2025 that he had a

22    colorable claim to disagree with it.  Because all we did was

23    take the numbers from his chart for three years and divide them

24    by .75 to equal what the numbers he used would be at 1.0.

25         And I would suggest his protestations that, Oh, that's

1   going to be wrong; Oh, that doesn't make sense; I don't agree

2   with it, you know, were actually very effective impeachment for

3   the jury because they could see what was going on with him, and

4   it was really a credibility assessment that they should be

5   allowed to make.

6       Nonetheless, that was just for one year and, again, for

7   sort of a, a reason that didn't have a lot of water to it,

8   which was, in 2025 for half the year, he used a calculation

9   before he had adopted the assumption that she would go to .75

10  in July.  So you had sort of like a half year that there really

11  wasn't a full year at 1.0, and yet the difference in the salary

12  was something like close to $50,000.  So it was a lot more than

13  reasonably could be found to have been the difference.

14      You know, I would ask the Court, if we took out year 2025,

15  could we present our chart with just 2026 and 2027, you having

16  read the testimony closely?  So that's one comment I'd make,

17  but, overall, I do think it's important impeachment as to him

18  and what he's about.  And, again, we had this rapidly evolving

19  chart, and we're forced to kind of take assumption after

20  assumption, you know, a week before trial that just radically

21  changed by millions of dollars his conclusions, and our remedy,

22  since we didn't disclose an expert five years ago, is to

23  cross-examine.  Well, I think we should be entitled to that

24  remedy, Your Honor.

25      And I, so I would sort of ask the Court what the Court's

1    view on our demonstrative chart were we to use 2026 and 2027,

2    which he didn't have that problem with.

3             THE COURT:  Yeah.  I mean, it's not really a chart.

4    That's also part of the problem.  It's minimal.  It's, it's, he

5    puts a couple of numbers down with the years next to it.  I

6    don't know how that's kind of a summary of testimony in the

7    same way that the plaintiff's kind of chart is.

8             ATTORNEY COFFIN:  Well, if I might politely push back

9    on that, Your Honor --

10            THE COURT:  Sure.

11            ATTORNEY COFFIN:  You know, a chart isn't defined by

12   having lots and lots of parts and lots and lots of columns.

13   It's designed by, defined and considered to be useful to the

14   jury by kind of the information that can import, and, really,

15   this just shows what two years of his particular earnings.  And

16   we could have done, you know, out ten years, but, you know,

17   three, we thought, made the point.

18            And so I don't think the fact that the chart is simple and

19   understandable is the basis for the Court to allow or disallow

20   it.  It's whether it's something that the jury would find

21   reasonable and probative.  So I would suggest that we do be

22   allowed to use a '26 and '27 year chart.  And then sort of my

23   follow-on is I just want to get clarification on behalf of Don,

24   I think, which is what I do understand the Court to be saying.

25   While we can't use the chart, we can still point to

VOLUME: 11
PAGES: 970-1056

1    Dr. Bancroft's testimony, the Court's, sorry, the Court's

2    ruling on it; is that correct?

3            THE COURT:  Right, right.  Yes.  No.  You're

4    obviously allowed to talk about what was said on the stand

5    during cross-examination, but I've ruled on the, on the chart,

6    on C, whatever, C19.  So that will remain the ruling, but it

7    can be commented on at closing.

8            ATTORNEY COFFIN:  All right.  Thank you, Your Honor.

9            THE COURT:  Okay.  Does that cover everything, two

10   hours later?

11           ATTORNEY JONES:  From our perspective, yes, Your

12   Honor.  Thank you.

13           THE COURT:  Okay.  Defendants, Mr. Schroeder?

14           ATTORNEY SCHROEDER:  Yes, Your Honor.

15           THE COURT:  Okay, all right.  So, as I said, we will

16   get you a new version of the jury instructions, and why don't

17   we plan to meet at 8:30, if that works for everyone, tomorrow?

18   Thank you.

19

20           (Whereupon at 3:03 p.m. the hearing was adjourned.)

21

22

23

24

25

VOLUME:  11
PAGES:  970-1056

1          C E R T I F I C A T E

2          I, Sunnie Donath, RMR, Official Court Reporter

3     for the United States District Court, District of Vermont, do

4     hereby certify that the foregoing pages are a true and accurate

5     transcription of my stenographic notes of the hearing taken

6     before me in the above-titled matter on April 7, 2025 to the

7     best of my skill and ability.

8

9

10

11

12                    *Sunnie Donath, RMR*

13     ---------------------------------

14              Sunnie Donath, RMR

15

16

17

18

19

20

21

22

23

24

25