# EXHIBIT A

** ROUGH DRAFT **

```
 1

 2                     UNITED STATES DISTRICT COURT
                                FOR THE
 3                         DISTRICT OF VERMONT

 4    MISTY BLANCHETTE PORTER, MD,      )
                                        )
 5              Plaintiff,              )
            v.                          )  2:17-CV-194
 6                                      )
      DARTMOUTH-HITCHCOCK MEDICAL       )
 7    CENTER, DARTMOUTH-HITCHCOCK       )  March 28, 2025
      CLINIC, MARY HITCHCOCK MEMORIAL   )
 8    HOSPITAL, and                     )
      DARTMOUTH-HITCHCOCK HEALTH,       )
 9                                      )
                Defendants.             )
10                                      )

11    _____

               BEFORE THE HONORABLE KEVIN DOYLE
12                UNITED STATES DISTRICT JUDGE

13    _____

14                      ** ROUGH DRAFT **

15

16    APPEARANCES:

17    For the Plaintiff:

18    ERIC JONES
      GEOFFREY J. VITT
19    SARAH H. NUNAN

20

21    For the Defendants:

22    DONALD W. SCHROEDER
      MORGAN McDONALD
23    TRISTRAM J. COFFIN

24

25    Jan-Marie Glaze, CCR, RPR, CRR    Certified Court Reporter
```

** ROUGH DRAFT **

1                  UNCERTIFIED ROUGH DRAFT

2                        DISCLAIMER

3

4          THIS UNCERTIFIED ROUGH DRAFT (HARD COPY OR

5      ELECTRONIC) CANNOT BE QUOTED IN ANY PLEADING OR FOR ANY

6      OTHER PURPOSE AND MAY NOT BE FILED WITH ANY COURT.

7

8          Inasmuch as this transcript is in

9   rough draft form, please be aware that there may be

10  discrepancies regarding page and line numbers when

11  comparing it to the final transcript.

12          Also please be aware that the unedited,

13  uncertified rough draft transcript may contain

14  untranslated steno, an occasional reporter's note, a

15  misspelled proper name, and/or nonsensical English word

16  combinations. All such entries are corrected on the final

17  certified transcript.

18

19

20

21

22

23

24

25

** ROUGH DRAFT **

```
 1              THE COURT:  Yes.

 2                  (Bench conference.)

 3              THE COURT:  So when you say "admission,"

 4      you're treating it like an exhibit that's in evidence.

 5              MR. VITT:  So I want to be able to obviously

 6      show it to the jury.

 7              THE COURT:  Right, and the agreement is that

 8      it can be shown to the jury as a demonstrative.

 9              MR. VITT:  And at the end, we'll figure out

10      whether it's --

11              MR. COFFIN:  It specifically should be -- I

12      suggest our position would be, it needs to be made

13      clear to the jury that this is being shown to you for

14      illustrative or demonstrative purposes but it is not

15      admitted into evidence until it is.  There's a

16      distinction there.

17              THE COURT:  All right.  So when you do that,

18      when you ask it to be put up, we'll make that statement

19      then.

20              MR. VITT:  Close enough.  I'll get to it.

21                  (End of bench conference.)

22   Q  (By Mr. Vitt) I believe that the agreement is that the

23      report, Exhibit 1-B, will be shown to you and it will

24      appear on the screens so the jury has a way to follow

25      your testimony, but it is not, at this time, being
```

Bancroft - Direct by Mr. Vitt

** ROUGH DRAFT **

```
 1      offered in evidence?

 2              THE COURT:  Yes.  This exhibit, I'll instruct

 3      the jury is meant to be illustrative.  It is not in

 4      evidence at this time.

 5              MR. VITT:  Thank you.

 6   Q  (By Mr. Vitt) What's the date, Dr. Bancroft, of the

 7      most recent report that you prepared?

 8   A  March 19th of this year.

 9   Q  And is the -- what's been marked as Exhibit 1-B that

10      report?

11   A  I assume so, I don't see a mark on this.  Oh, I do now.

12   Q  All right.  So is this the most recently report you

13      prepared, correct?

14   A  Yes.

15   Q  And does it reflect your analysis of Dr. Porter's lost

16      earnings by reason of losing her employment at

17      Dartmouth-Hitchcock and then becoming employed at

18      UVMMC?

19   A  Yes.

20   Q  And the lost earnings are for what period of time?

21   A  From year 2017 through -- I made projections through

22      the year 2033.

23   Q  All right.  You're not asserting that Dr. Porter would

24      necessarily work until she's 70, correct?

25   A  That's correct, I'm not.
```

Bancroft - Direct by Mr. Vitt

** ROUGH DRAFT **

```
 1   Q    But you simply provided, by year, what the losses would

 2        be up to that age, correct?

 3   A    Yeah.  That's correct.  You can look at any particular

 4        year, and there's a loss associated with it.

 5   Q    And how do you begin your analysis?

 6   A    Well, to begin my analysis, I have to get information.

 7        The support that I get, biographical information, date

 8        of birth, education level, and obviously in employment

 9        cases, termination cases, I need a date of termination.

10        And then once I sort of understand the -- some of the

11        parameters of the case, I'm going to require additional

12        information regarding the employment that the person

13        was terminated from.

14           I need information regarding wages that the person

15        was receiving, and information on fringe benefits.  I

16        need tax returns.  And then if the person, as in this

17        case, they have found alternative employment, sometimes

18        that's not the case, but I do the same thing.  I look

19        at what their salary is, or wages, and the fringe

20        benefits associated with it.  And I didn't mention

21        income tax returns right up to present.

22   Q    And did you receive from Dr. Porter the information you

23        described, the tax returns, W-2s, the information that

24        allowed you to calculate what she was earning at

25        Dartmouth-Hitchcock?
```

** ROUGH DRAFT **

```
 1   A    Yes.

 2   Q    And did you also receive that same information from

 3        University of Vermont and University of Vermont Medical

 4        Center?

 5   A    Yes.  Dr. Porter provided that to me, yes.

 6   Q    Okay.  Can you explain how you undertook your analysis

 7        and reached your conclusions?

 8   A    Sure.  As I mentioned, the -- if you will, kind of two

 9        basic steps.  First step is to estimate out what the

10        person what I believe is a reasonable estimate what the

11        person would have made if they had continued

12        employment.  In this case, continued -- Dr. Porter had

13        continued her employment at Dartmouth-Hitchcock.  And

14        then from that, I need to estimate out what --

15        actually, I'll have her actual earnings, and then going

16        forward, I've got to project out what she would likely

17        to make now that she's no longer there.  Then I've got

18        to compare those two, and then there's several steps

19        before I get to what I would classify the present value

20        of the losses in any particular year.  I can go through

21        those individual steps if you would like.

22   Q    Yeah.  If you can continue on the individual steps, I

23        would appreciate it.

24   A    Yeah.  Right.  Looking at the chart, I think the first

25        column -- well, the first column is year.  Second
```

```
1         column is age.  The first column that requires some

2         forecasting is under the Dartmouth-Hitchcock Medical

3         Center, and it's under the gross earned income.  And

4         here, this is where I developed the projections of what

5         I believe are reasonable estimates of what I believe

6         Dr. Porter would've made if she continued to work at

7         Dartmouth-Hitchcock.

8             In developing those estimates, I looked at what

9         her past earnings were, what her current contract was,

10        and then there was a little -- 2017 was a bit unusual

11        because she was on disability for part of the year, so

12        I had to take that into account for 2017, but --

13   Q    For 2017, did you include the amount she received in

14        disability payments when you're calculating the gross

15        income for the year?

16   A    Yes, I did.  But then starting in 2018, I just based on

17        what she would receive as a salary as a doctor at

18        Dartmouth-Hitchcock.  In developing those forecasts, I

19        used -- in most years, I used -- I assumed that her

20        wages would grow at an annual rate of 2.5 percent.

21   Q    Did you believe that was reasonable?

22   A    Yeah.  That's significantly below what the average

23        wages have grown.  I don't care what -- any length of

24        period.  If you use 10, 15, 20, 30 years, it's up in

25        the three to three and a half percent.
```

** ROUGH DRAFT **

```
 1   Q   So the number you chose was lower than historic data?

 2   A   Yes.  Yes.

 3           MR. COFFIN:  Objection, Your Honor.  This is

 4       all totally leading, and I understand that he needs to

 5       set the foundation, but the witness should be

 6       testifying, not Attorney Vitt.

 7           THE COURT:  Okay.  Sustained.

 8        You'll have some leeway, Mr. Vitt.  I understand

 9       it's an expert witness.

10   Q   (By Mr. Vitt) Will you continue, please?  We were at

11       the 2018 -- you assumed an increase of 2.5 percent.

12   A   Yes.  I assumed -- for most years, I assumed an

13       increase of 2.5 percent.  There were three exceptions

14       to that annual increase of 2.5.  The first one was --

15       and I assumed the increases would happen in July of

16       each year; that's the fiscal year for Dartmouth and

17       that's when raises went into effect, in July.

18        I assumed that in the year July of 2018 that she

19       would receive a 5 percent salary increase because she

20       would be promoted to a full professor.

21        And then the other two exceptions were in the

22       years 2000 and 2021, I assumed no increase.

23   Q   2020 and 2021?

24   A   2020, and 2021.

25   Q   Go ahead.
```

** ROUGH DRAFT **

```
 1    A    That there would be no increases, and that was based on

 2         information that was provided by Defense saying that

 3         there were no increases during those two years.

 4    Q    Those were the COVID years?

 5    A    Yes.

 6    Q    And so, essentially, Dartmouth-Hitchcock, the

 7         representation was, that there would be no raises, and

 8         we were prepared to accept that, right?

 9    A    I had -- yes.  I accepted it, and I had no way to

10         verify it, so I accepted it.

11    Q    And did you make an assumption about whether there

12         would be raises subsequent to the COVID years to

13         essentially make up for the two years of, you know, no

14         raises?

15    A    No.  I used the conservative two and a half percent,

16         you know, recognizing that, you know, when you can

17         forecast out into the future, you pick what you think

18         is a reasonable rate.  You're not saying that every

19         single year would be exactly that rate, but on average,

20         over the forecasting period, that it would -- would be

21         what you're assuming.  In this case, I'm assuming two

22         and a half percent which, again, I believe to be a very

23         conservative estimate of --

24    Q    Just to be -- to recap it, for those two years, the

25         COVID years, 2020 and 2021, your report assumes no
```

Bancroft - Direct by Mr. Vitt

** ROUGH DRAFT **

```
 1        raise for Dr. Porter, right?
 2   A    That's correct, yes.
 3   Q    Okay.  Continue, please.
 4   A    So anyway, I took her basically -- for 2018, I took her
 5        salary that she had -- contracted salary in 2017 --
 6        actually it went from July of 2017 through June of
 7        2018, so I used that as the basis, and then I applied a
 8        two and a half percent in 2018.  2019 I applied the
 9        5 percent.  Then no increases in '20 and '21, and then
10        after that, an increase of two and a half percent.
11        That's how I was able to develop that first column
12        there on the gross earned income under the
13        Dartmouth-Hitchcock Medical Center estimates.
14   Q    So the June 2017 date was used because that's when she
15        ceased to be employed by Dartmouth-Hitchcock, correct?
16   A    That's correct, yes.
17   Q    Okay.
18   A    The next column over is my estimate of the fringe
19        benefits that she would have received if she remained
20        employed at Dartmouth.  Typically, there are three
21        fringe benefits that I'm generally interested in.  One
22        is the employer's contributions Social Security, the
23        employer's contribution to health insurance, and the
24        employer's contribution to retirement.
25            In this particular case, I wasn't concerned about
```

** ROUGH DRAFT **

```
 1        Social Security because that contribution only goes up

 2        to about -- currently it's about $150,000, so the

 3        earnings were all over that, so there's no loss on that

 4        contribution that Dartmouth would have made to Social

 5        Security, because there's a similar contribution being

 6        made at UVM.

 7    Q   So because the contribution was equal, there's no loss,

 8        correct?

 9    A   Correct.  It washes so it was excluded from my

10        estimates at Dartmouth and also when I get to the UVM,

11        it was excluded from the UVM fringe benefits.

12             And then the next one was I looked at was medical

13        insurance.  And medical insurance, the only years that

14        I put Dartmouth's contribution to medical insurance was

15        the six months or so of 2018 after she was let go, and

16        then for, I think, it was through April of 2018,

17        because after April, she got a position at UVM where

18        she got medical insurance.  So, again, going forward

19        from May of 2018, the value of Dartmouth's medical

20        insurance was equivalent to the value of the UVM

21        contribution of medical insurance, so it's a complete

22        wash.

23    Q   All right.

24    A   So it's not included in there.

25    Q   All right.
```

Bancroft - Direct by Mr. Vitt

** ROUGH DRAFT **

```
 1   A    The other factor that is included in there is

 2        Dartmouth's contribution to retirement which, based on

 3        my analysis, is equivalent to about 12 percent of her

 4        earned income.  And in her case, she was actually able

 5        to be grandfathered in.  She has what is called --

 6        referred to as a defined benefit package.  That is

 7        it's -- not many of those around anymore; State of

 8        Vermont has one -- where your retirement is based on

 9        the average of three to five years, your number of

10        years of creditable service, and then some percentage.

11        And she was able to be grandfathered into that.

12        Dartmouth, at that time, in that 2017 period, was

13        moving to a defined contribution where she would put in

14        an X amount of money every year into an account.

15   Q    What I'm hearing you say is that Dr. Porter qualified

16        for a defined benefit plan at Dartmouth-Hitchcock,

17        right?

18   A    Yes, she did.

19   Q    And if she had remained at Dartmouth-Hitchcock, she

20        would have been eligible to receive the payments under

21        that plan, correct?

22   A    Yes.

23   Q    And did you calculate -- I realize it's not reflected

24        in the report, but did you calculate what would have

25        been the payment to her yearly if she retired when she
```

** ROUGH DRAFT **

```
1          was 65 under the terms of that plan?
2    A     I did at 65.  I did it for several years.
3    Q     All right.
4    A     I looked at if she retired at 65.  I actually looked at
5          it earlier.  There's a reduction in your benefits if
6          you retire before 65.
7                    MR. COFFIN:  Objection, Your Honor.  If we
8          could approach, please?
9                    THE COURT:  Yes.
10                       (Bench conference.)
11                   MR. COFFIN:  The fact that she would lose a
12         pension is nothing that was raised in the report.  And,
13         in fact, our evidence is that she is going to get a
14         pension.  She would get a pension that is somewhat
15         smaller than if she had stayed at Dartmouth but
16         prorated, based on her contributions and her years
17         there.  So for him to -- if you would, please.  For him
18         to, at the very last minute, offer all these changes in
19         this report that this is a new undisclosed expert
20         opinion is improper.
21                   THE COURT:  Go ahead.
22                   MR. VITT:  This was simply predicate for to
23         get Dr. Bancroft to say, essentially, that the
24         calculation in that report reflects the damages.  We
25         are not asking for any more.  It was simply an example
```

Bancroft - Direct by Mr. Vitt

** ROUGH DRAFT **

```
 1        of why there is -- in the report, there is an analysis

 2        that reflects the loss of the retirement benefit.  It's

 3        already in there.  It's baked into those numbers, so

 4        I'm not saying that there's an additional loss.  It's

 5        simply saying, okay, what would she have received,

 6        having calculated that it is reflected in the report.

 7                MR. COFFIN:  It is not spelled out as such in

 8        the report so it's completely opaque.  It should have

 9        been noticed early.  And, in addition, I think it's

10        untrue.

11                MR. VITT:  Okay.  Well, you took his

12        deposition.  You had an opportunity to call an expert

13        witness if you wanted to put somebody on who was going

14        to prepare a report to say that.  You were entitled to

15        do that.  We think the report is accurate.  You can

16        cross-examine him on it, but this is not something that

17        we hid or tried to sneak in.

18                MR. COFFIN:  It's an undisclosed expert

19        opinion.  I don't know what your motives were, but it

20        was not disclosed.

21                THE COURT:  It's not this is something that

22        was in the assumptions is that your --

23                MR. COFFIN:  Yes.

24                MR. VITT:  He has described how he calculated

25        it.  This amount is in there.  It is already baked into
```

Bancroft - Direct by Mr. Vitt