IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D.,<br><br>Plaintiff,<br><br>vs.<br><br>DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH,<br><br>Defendants. | Case No. 2:17-cv-194 |

**DEFENDANTS' MOTION FOR A NEW TRIAL RELATED TO DAMAGES ISSUES**

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Defendants" or "Dartmouth Health") hereby move, in the alternative to their motion for amendment of the judgment or a new trial on Plaintiff's VFEPA claim (ECF No. 305), for a new trial limited to the issue of Plaintiff's damages.

**I.   Plaintiff Failed to Abide by Her Expert Discovery and Disclosure Obligations and the Court Admitted this Crucial and Prejudicial Testimony**

Dartmouth Health is entitled to a new trial because Plaintiff repeatedly and flagrantly violated the Federal and Local Rules of Civil Procedure. Notwithstanding these discovery violations, Plaintiff's economics expert, Dr. Robert Bancroft, was permitted to testify at length

1

regarding opinions that were not timely disclosed and based on information that was discoverable and not timely disclosed or disclosed at all prior to his testimony. These failures had a material impact on at least the damages evidence presented to the jury. A new trial on the issues of damages should be awarded.

Expert disclosures are governed by Rule 26(a)(2) of the Federal Rules of Civil Procedure. That rule provides that a disclosure be made of "all opinions the witness will present and the basis and reasons for them", "the facts and data considered by the witness in forming them", and "any exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2)(b)(i)-(iii). The timing and contents of the expert disclosure in the District of Vermont are also governed by Local Rule 26, dealing with the discovery schedule. After the discovery deadline expires, the discovery schedule can only be extended due to "extraordinary circumstances." Local Rule 26(a)(7).

In this case, pursuant to the last Discovery Order entered by the Court, discovery was closed on December 15, 2019. Based on the discovery produced at the time, Dartmouth Health filed for summary judgment pursuant to Rule 56. The court entered judgment in favor of Dartmouth Health on November 3, 2020. Plaintiff appealed.

Ultimately, the Second Circuit Court of Appeals affirmed in part and reversed in part, and remanded a portion of the case back to the district court on February 27, 2024. Neither side moved to reopen discovery. The court held a status conference, and after a period, scheduled the case for trial. Discovery was not reopened, and no discovery schedule upon remand was entered.

On August 26, 2024, Plaintiff's expert economist, Dr. Robert Bancroft, Ph.D., issued a new expert opinion in the case. A copy of that opinion is attached as Exhibit 1. The August 2024 opinion included many complex and intertwined assumptions and projections, many of which were based on Plaintiff's undisclosed and undocumented assertions to Dr. Bancroft. The opinion

expressed a total economic loss figure of $4.3 million that Plaintiff allegedly incurred due to Dartmouth Health's conduct.

As the case progressed toward trial, Dartmouth Health moved *in limine* against permitting Dr. Bancroft to offer opinions in the case, including the August 2024 opinion. The court held an evidentiary hearing on March 12, 2025 at which Dartmouth Health was able to cross-examine Dr. Bancroft. Defendants' cross examination focused on the insubstantial underpinnings of Dr. Bancroft's August 2024 opinion and assumptions. It was revealed that Dr. Bancroft had not included key facts and assumptions in his August 2024 opinion, such as Dr. Porter's promotion to full professor in July 2023 and her most recent earnings from UVMMC at a higher rate of pay than what Dr. Bancroft had projected. These facts undermined the findings of the August 2024 report because they demonstrated that Dr. Porter had made more money at UVMMC than Dr. Bancroft had projected, and thus her purported damages from her termination were less.

A few days after the hearing, Dr. Bancroft made a new expert report, the March 19, 2025 report. This report attempted to correct some of the shortcomings revealed in the evidentiary hearing, and concluded that Dr. Porter's total economic loss was in fact $1.787 million. This dramatic shift in the expert opinion came merely five days before trial.

Dartmouth Health continued to object to the evolving nature of the report and to Dr. Bancroft's testimony. It specifically objected to Dr. Porter's failure to disclose key economic information to her expert or to provide expert discovery to Dartmouth Health. Dartmouth Health also requested the opportunity to provide its own expert witness to rebut Dr. Bancroft's expert opinion and chart, but this request was denied. The remedy for Dartmouth Health to rebut Dr. Porter's changing economic loss opinions was left to cross examination of Plaintiff's expert. Thus, even though Plaintiff was permitted to author and present to the jury repeated versions of her expert

loss analysis, bolstering and fine-tuning her expert's opinions along the way, Dartmouth Health was not permitted the same opportunity.

At trial, Dr. Bancroft testified largely, although not completely, in accord with his March 19, 2025 opinion. Dartmouth Health did engage in cross of him, pointing out how if Dr. Bancroft had adjusted the term of Dr. Porter's position to .75 at DHMC, rather than assuming she would work fulltime at DHMC and part-time at UVMMC, her losses as calculated by Dr. Bancroft would have been fully mitigated by 2025 or 2026. Further, Dr. Bancroft was forced to admit that his loss calculations set forth in the March 19, 2025 report would be incorrect and have to be changed if it was assumed that Dr. Porter accepted a large severance package of 9 months of salary ($228,000) at the time of her termination, and also accepted her new position at UVMMC as an attending OB-GYN. Accepting the severance would have essentially allowed Dr. Porter to double bill as a senior attending physician and assistant professor for nine months. This was not something that was set forth in Dr. Bancroft's complex figures or on his chart.

Dartmouth Health should be permitted a new trial due to these shortcomings in expert discovery and the uneven treatment of the parties regarding them. In short, Plaintiff was permitted multiple, late, unjustified revisions to her expert reports and opinions to be presented to trial. This included a drastic revision less than a week before trial. Dartmouth Health was not permitted the opportunity to disclose its expert economist to appropriately rebut these repeated, new opinions by Plaintiff. Plaintiff never showed cause for the delay in these opinions and the discovery violations regarding them. Dartmouth Health thus had to face unwarned, constantly evolving, weakly-based and sharply prejudicial expert opinions and was not permitted its own opposing presentation to be voiced through its own witness. Instead, it was forced to be satisfied with whatever its counsel could elicit on cross examination. Respectfully, this decision was not evenhanded and was unfair.

Key to all of this was the use of Dr. Bancroft's expert analytical chart, attached as Exhibit 2, as a demonstrative exhibit to guide Dr. Bancroft's testimony and for use at closing argument. This chart, very succinctly and in a focused way, allowed Plaintiff to train the jury's attention on the bottom-line: nearly $1.8 million in losses supported by an allegedly expert economist. Dartmouth Health was afforded no such opportunity.

Because of the decisions to permit Dr. Bancroft to testify to his report without providing proper discovery and notice and also precluding Dartmouth Health from presenting its own expert at trial to explain its view of the evidence, Dartmouth Health was severely prejudiced and should be afforded a new trial. At least as to damages, a new trial is warranted.

## II.    The Court Improperly Instructed the Jury on Mitigation

The court also erred in instructing the jury on mitigation issues. The court did not clearly and directly inform the jury that it could account for and deduct the amount of salary that Dr. Porter received and was receiving as a UVMMC OB-GYN attending physician and medical school full professor from her loss of salary damages.

On mitigation, the court instructed the jury in relevant part as follows: "[i]f you find that Dr. Porter failed to mitigate her damages, you must reduce your award of damages, if any, by the amount you find she could have avoided." Jury Charge at 30 (ECF No. 275).

The law on compensatory damages provides that a damaged party be made whole, not obtain a windfall. These instructions did not make that clear to the jury, and instead were framed as "if you find that the plaintiff has failed to mitigate damages" you may consider this. The directions from the court unfortunately thus conditioned deduction of other salary on the jury finding as a preliminary condition that Plaintiff failed to mitigate her damages. This was confusing and does not accurately reflect the law. The jury can consider Dr. Porter's outside pay in arriving

at an award of damages, whether or not they find that she failed to mitigate her damages. Indeed, the whole point of the defense's theory on damages was that Dr. Porter found another job – with the help of Dartmouth Health medical staff – in her highly specialized subspeciality, and did mitigate her damages.

Dartmouth objected to the mitigation of damages instruction because the defense was "not that she's failed to mitigate or minimize" but rather, Dartmouth's assertion that she "mitigated some of her damages, if not all of them." Tr. of Jury Trial at 1026:14–1028:22 (ECF No. 295). As such, Dartmouth was requesting an instruction that would advise the jury on how to calculate damages based on this mitigation, not an instruction that she couldn't recover if she failed to mitigate damages. Here, the jury was instructed that "[i]f you find that Dr. Porter failed to mitigate her damages, you must reduce your award of damages, if any, by the amount you find she could have avoided" but does not similarly instruct the jury to reduce her damages by the amount she actually avoided through successful mitigation. Jury Charge at 30 (ECF No. 275). From these instructions, the jury could read this as "we found she mitigated her damages, so we don't need to reduce the award because of this mitigation." This wording unfortunately was unclear and confusing to the jury. Dartmouth Health objected to it, but the court declined to change the instructions.

In the employment discrimination context, after calculating an appropriate amount of compensation, "courts must then subtract any mitigation that reasonably could be obtained." *See Tudor v. Se. Oklahoma State Univ.*, 13 F.4th 1019 (10th Cir. 2021) (citing *Davoll v. Webb*, 194 F.3d 1116, 1143 (10th Cir. 1999)). Here, the evidence of what Dr. Porter could have reasonably obtained was not hypothetical, but rather evidence to be decided upon based on her new employment. Failing to instruct the jury to adjust the damages accordingly invited a windfall for Plaintiff. *See*

6

*Jones v. Consol. Rail Corp.*, 800 F.2d 590, 594 (6th Cir. 1986) (finding jury instruction on mitigation of damages caused by loss of past earnings did not adequately inform jury that plaintiff was entitled to difference between what he would have earned on the railroad and what he might have earned in another position and thus in view of the fact that jury instruction may have affected award of damages, it constituted reversible error); *cf. Moysis v. DTG Datanet*, 278 F.3d 819, 829 (8th Cir. 2002) (affirming the district court's conclusion that, in light of the plaintiff's current employment, awarding front pay would confer a windfall to plaintiff).

Accordingly, a new trial should be awarded based on improper mitigation instructions as well.

### III. The Court Improperly Declined Introduction of Dartmouth Health's Demonstrative Exhibit and Limited Argument at Closing about Crucial Mitigation Evidence

On cross examination, counsel for Dartmouth Health sought to elicit key testimony undermining Dr. Bancroft's damages opinions by having him calculate what his projected salary would be if he assumed Dr. Porter was working a 1.0 position at UVMMC in three years, since he had calculated she would be working at that full time rate at Dartmouth Health for the same time period. At defense counsel's request, Dr. Bancroft actually did the math on an iPhone calculator to adjust his figures to account for equivalent positions. Dr. Bancroft wrote out these figures in hand on a document which was marked for identification as Exhibit C-19, which is attached hereto as Exhibit 3. The figures showed that if you adjusted for the equivalency of the positions, Dr. Bancroft's damages calculations were essentially fully mitigated by year 2025 or 2026. Thus, this testimony, and the chart Dr. Bancroft wrote out by hand were very powerful admissions and impeachment of Plaintiff's key damages witness.

Dartmouth Health moved for the admission of the chart, C-19, into evidence. The court declined to do that. Dartmouth renewed the request for admission in later conferences, and

7

ultimately moved for it to be used as a demonstrative exhibit at closing. The court denied admission of this exhibit and denied permission for Dartmouth Health to use it as a demonstrative exhibit at closing. Despite the late disclosure, unrebutted discovery violations, and the misrepresentative nature of Dr. Bancroft's March 19, 2025 chart, Plaintiff was permitted to present her demonstrative chart to the jury both in Dr. Bancroft's testimony and at closing, which she did.

Respectfully, permitting Plaintiff to display a late disclosed chart, which represented a massive change in Dr. Bancroft's opinions on the eve of trial, and use it as a demonstrative exhibit at closing, while affording Dartmouth Health no such opportunities, was not evenhanded, violated the rules of evidence, and was inequitable. This was an admission by the (highly-paid) agent of a party opponent. It was directly relevant. It was necessary to rebut key testimony which the court had prohibited Dartmouth Health from rebutting through offering its own expert witness. Moreover, by seeking to use the chart as a demonstrative exhibit in Dr. Bancroft's testimony and before the jury at closing, Plaintiff surely opened the door to such demonstrative or even substantive evidence by Dartmouth Health. Dartmouth Health's chart should have been admitted as substantive evidence, or at least Dartmouth Health should have been able to use it as a demonstrative exhibit at closing.

The court's reliance at trial on *Kirk v. Raymark Industries,* 61 F.3d 147 (3d Cir. 1995) to deny admission of C-19 is inapposite. In *Kirk*, the court was considering whether to admit the prior testimony of an out-of-court witness. The purported statement of a party opponent in that case was testimony from one of the parties' expert witnesses in a different case—not on trial in that case or subject to cross in that case—which was read into trial by a different expert. Here, the statements and C-19 exhibit were made by the declarant during the trial and subject to cross-examination. As such, the court's reliance on excluding the exhibit because Dr. Bancroft was not

8

an agent of the party was improper. Not only was it a party admission by the party's agent, but it was also an in-court statement, and was thus admissible. *See ONTI, Inc. v. Integra Bank*, No. CIV. A. 14514, 1998 WL 671263, at *3 (Del. Ch. Aug. 25, 1998) (distinguishing *Kirk*); *see also Long v. Fairbank Farms, Inc.*, No. 1:09-CV-592-GZS, 2011 WL 2516378, at *9–10 & n. 18 (D. Me. May 31, 2011) (distinguishing *Kirk*).

### IV.     The Court Improperly Limited Use of Evidence of the Severance Package at Closing

As described above, Dartmouth Health introduced evidence at trial that it offered Dr. Porter a severance package of 6 months salary, which was increased at Dr. Porter's request to 9 months. See Exhibit 4. This evidence was introduced without objection. Multiple witnesses testified about this evidence. Dr. Bancroft was cross-examined, over Plaintiff's objection, about the effect of the offered severance package on his conclusions. In summary, on cross examination, he admitted that if Plaintiff had received a $228,000 payment at the time of her termination, it would have affected his loss calculations.

At the charge conference, the court informed the parties that it had concerns that it had admitted the evidence of the severance package, and limited the extent to which Dartmouth Health could argue at closing that Plaintiff could have mitigated her damages if she had taken it.

The evidence relating to the severance package was properly admitted and should have been able to be freely referred to by Dartmouth Health in arguing the proper amount of compensatory damages in closing.

First, the evidence of the severance package was admitted without objection or limitation. Therefore, the contemporaneous objection rule required that the evidence having been admitted without objection could not later be challenged as inadmissible. No Federal Rule of Evidence 408

issue was raised by Plaintiff when the evidence was offered, and no objection was made at the time to the relevance of the testimony about the severance and job offer.

Second, the email transmitting the severance proposal, and granting Dr. Porter's request that it be raised from six to nine months was not a settlement proposal or communication subject to Rule 408, notwithstanding the waiver issue noted above. The severance offer is admissible because it was offered relatively contemporaneously with her termination and was not offered in compromise of a claim, following a Rule 408 analysis. The critical distinction is it was not a "settlement agreement" that arose during the post-termination negotiation of a dispute, which implicates Rule 408, but rather a "termination agreement" offered contemporaneously with termination, which does not implicate Rule 408. *See Pierce v. F.R. Tripler & Co.*, 955 F.2d 820 (2d Cir. 1992) (citing *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338 (9th Cir. 1987)).

Further, as the Court had already ruled, the severance offer was relevant. The issue of whether the severance offer was made in good faith (there was no testimony to the contrary, nor was there cross on this issue), and whether Dr. Porter acted reasonably in refusing to accept the offer, are questions for the finder of fact. *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298 (2d Cir. 2017). Arguably, it is also relevant for determining whether the court should impose prejudgment interest in its discretionary capacity. Dr. Bancroft was permitted to testify to broad and changing factual assumptions. Cross of his testimony was the only permissible way to challenge his conclusions. The evidence was admitted without objection and without limitation. The parties should have been able to argue to the jury reasonable inferences to be drawn therefrom without limitation.

**V.       Request for Oral Argument**

Pursuant to Local Rule 7(a)(6), Dartmouth Health respectfully requests to be heard at oral argument.

**VI.      Conclusion**

For the reasons stated herein, the Court should grant Dartmouth Health's request for a new trial.

Date: May 22, 2025

Respectfully submitted,

*/s/ Tristram J. Coffin*

**DOWNS RACHLIN MARTIN PLLC**

Tristram J. Coffin
199 Main Street
Burlington, VT 05402
Telephone: 802-863-2375
tcoffin@drm.com

**FOLEY & LARDNER LLP**

Donald W. Schroeder (admitted *pro hac vice*)
Morgan McDonald (admitted *pro hac vice*)
Megan E. Martinez (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
dschroeder@foley.com
mmcdonald@foley.com
memartinez@foley.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

      I hereby certify that, on May 22, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

                                  */s/ Morgan McDonald*
                                  Morgan McDonald