1

1    IN THE UNITED STATES DISTRICT
          FOR THE DISTRICT OF VERMONT
2

3   MISTY BLANCHETTE PORTER, M.D., )
                                   )
4                     Plaintiff, )
                                   )
5        vs.                       )
                                   ) CASE NO. 2:17-cv-194
6   DARTMOUTH-HITCHCOCK MEDICAL    )
    CENTER, DARTMOUTH-HITCHCOCK    )
7   CLINIC, MARY HITCHCOCK         )
    MEMORIAL HOSPITAL, and         )
8   DARTMOUTH-HITCHCOCK HEALTH,    ) Closing Arguments
                                   )
9                     Defendants. ) Jury Charge
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )
10

11

12       Continuation of trial held on Tuesday, April 8,

13   2025, at 8:30 a.m., Burlington, Vermont, before

14   Honorable Kevin J. Doyle, Magistrate Judge.

15

16

17

18

19   Clerk of Court:  Emerson F. Howe

20

21   Sarah M. Bentley, CCR-B-1745
      Registered Professional Reporter and Notary Public
22

23

24
                   BENTLEY COURT REPORTING
25                 sbireland7@gmail.com

2

```
 1                  A P P E A R A N C E S

 2    For the Plaintiff:

 3            GEOFFREY J. VITT, ESQ.
              SARAH N. NUNAN, ESQ.
 4            Vitt & Nunan, PLC
              8 Beaver Meadow Road
 5            Norwich, Vermont  05055-1229
                (802) 649-5700
 6              gvitt@vittnunanlaw.com
                snunan@vittnunanlaw.com
 7

 8            ERIC D. JONES, ESQ.
              Langrock, Sperry & Wool, LLP
 9            210 College Street
              Burlington, Vermont  05402-0721
10              (802) 864-0217
                ejones@langrock.com
11

12    For the Defendants:

13
              DONALD W. SCHROEDER, ESQ.
14            MORGAN MCDONALD-RAMOS, ESQ.
              Foley & Lardner, LLP
15            Suite 2500
              111 Huntington Avenue
16            Boston, Massachusetts  02199
                (617) 342-4041
17              dschroeder@foley.com
                mmcdonald@foley.com
18

19            TRISTRAM J. COFFIN, ESQ.
              Downs, Rachlin, Martin, PLLC
20            199 Main Street
              Burlington, Vermont  05402-0190
21              (802) 863-2376
                tcoffin@drm.com
22

23
      Also Present:
24
              Edward Merrens, Chief Medical Officer
25                (Dartmouth-Hitchcock Medical Center)
```

3

1                          I N D E X

2

3                                                    PAGE

4   Charge Conference                                 4

5

    Closing Argument on behalf of Plaintiff          24
6

7   Closing Argument on behalf of Defense            62

8

    Rebuttal Closing Argument on behalf of Plaintiff 121
9

10  Conference with the Court regarding arguments    125

11

    Jury Charge by the Court                         132
12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    P R O C E E D I N G S

2

3

4           (The following took place in open court

5      without the jury present.)

6           THE CLERK:  Your Honor, the matter before

7      the court is Civil Case No. 17-cv-194, Misty

8      Blanchette Porter vs. Dartmouth-Hitchcock

9      Medical Center, et. al.

10          Present on behalf of the plaintiff are

11     Attorneys Geoffrey Vitt, Eric Jones, and Sarah

12     Nunan.

13          Present on behalf of the defendants are

14     Attorney Tristram Coffin, Morgan McDonald, and

15     Donald Schroeder.

16          This morning we're here for a charge

17     conference.

18          THE COURT:  Okay.  Good morning.  So just

19     to confirm for the record that all parties have

20     received the revised copy of the jury

21     instructions.

22          Plaintiff?

23          MR. JONES:  Yes, we received it.

24          THE COURT:  And defendants?

25          MR. SCHROEDER:  Yes, your Honor.

5

1          THE COURT:  Okay.  So at this time I'll

2     give you an opportunity, if you'd like, to kind

3     of make any objections to the instructions as

4     received last night.

5          I'll also tell you that you'll have

6     another opportunity after the charge is

7     administered to the jury to make any objections

8     to the charge as given, meaning the way it was

9     read.

10          But, if you would, I'll leave it up to

11     you as to what you'd like to do to preserve your

12     objections.  If you'd like to say anything now,

13     feel free.

14          Plaintiff?

15          MR. JONES:  We have no objections to the

16     proposed instructions.  One I just wanted to

17     address with the Court is we noticed that on the

18     proposed jury verdict form there was a revision

19     made of plaintiff damages, to strike the

20     reference to New Hampshire law.

21          THE COURT:  Right.

22          MR. JONES:  And so I had understood from

23     our conversation yesterday that there was a

24     sense that enhanced compensatory damages were

25     similar, not the punitive.  They would kind of

6

1    be dealt with together.  If that's not the case,

2    then I do think now we do the enhanced damages

3    instructions, if we're separating out.  I think

4    it could be very simple.  We could put it right

5    after the punitive damages section.

6         I think it could be as simple as, If you

7    find for plaintiff on the New Hampshire claim,

8    you may award enhanced compensatory damages for

9    wanton, malicious, or oppressive conduct,

10   something like that.

11        THE COURT:  So you're correct that it

12   doesn't address that, and that was -- first,

13   there really wasn't much in the way of law

14   provided on this topic.  It seems like enhanced

15   compensatory kind of came up yesterday, frankly.

16        MR. JONES:  Right.

17        THE COURT:  They weren't asked for in the

18   proposed instructions from the plaintiff.

19        Some legal research done on it yesterday,

20   maybe the parties are aware of this, but there's

21   certain kind of questions that have been raised

22   about the credibility of those particular

23   damages in New Hampshire.

24        There was a federal court case from a few

25   years ago, I believe it's McPatten, where the

7

1    district judge in that case was addressing the

2    application of this particular damages provision

3    in New Hampshire and ultimately ended up asking

4    certification from the New Hampshire Supreme

5    Court on this topic.  And several of the

6    questions listed in the certifications order

7    from the district judge I think are relevant

8    from what we have going on here.  It appears the

9    case settled before the New Hampshire Supreme

10   Court could answer the certified questioning.

11        So this was kind of my thinking at this

12   point and on this -- is this a jury question,

13   too, or is it a court question?

14        At least the plain language of the

15   statute talks about how the Court may so, you

16   know, frankly this really was omitted from the

17   instructions because it just seems like there is

18   a lot of unknowns about that.  And the issue, as

19   I say, really only percolated to the surface

20   yesterday, and that's why it was omitted.

21        But, so with that said, is plaintiff then

22   objecting to the fact that it's not included?

23        MR. JONES:  Yes, your Honor.

24        THE COURT:  Okay.

25        Defendants on that topic?

8

1          MR. COFFIN:  I think the Court's approach

2     to that is practical.  There doesn't seem to be

3     a lot of law on it, and the statute does speak

4     to the Court decision.

5          THE COURT:  All right.  So I'll leave it

6     the way it is.  Again, if there is other

7     authority provided to the Court, I would suggest

8     that it is appropriate here.  Of course I will

9     review that, but none that you found and none

10    was provided.

11         Anything else from plaintiffs in that

12    regard?

13         MR. JONES:  Nothing further, your Honor.

14         THE COURT:  Okay.

15         The defendants?

16         MR. COFFIN:  We had just a couple brief

17    items, your Honor.

18         THE COURT:  Yes.

19         MR. COFFIN:  First of all, on Page 9,

20    under the topic of corporate acts through its --

21    corporation acts through its employees, I

22    thought we had agree to an insertion of the term

23    advisory Dartmouth health employee as to any.

24    That seems to have not have made it into the

25    draft.

9

1          THE COURT:  To say that a corporation

2     acts through its supervisory employees.

3          MR. COFFIN:  Therefore, the act -- I

4     thought we had agreed that the term any

5     supervisory.

6          We had suggested, you know, management

7     level or upper level and various formulations,

8     and I thought we had landed on the modifier

9     "supervisory" to be put in there, and it did not

10    appear to have made it in there.

11         THE COURT:  Right.  So there's the

12    question of -- you know, there's the question of

13    liability for the corporation, which probably

14    can't be premised on just the act of an employee

15    versus an act of a supervisor.  This

16    instruction, the intention here was to make a

17    much more general point.  Corporations act

18    through people, just in terms of corporate acts,

19    which I see as separate from the notion of

20    liability based on acts.

21         MR. COFFIN:  Very good.  I just raise

22    that only as -- I wasn't sure if that was an

23    intentional measure or not and, of course, it

24    was planned.

25         THE COURT:  Anything else?

10

1          MR. COFFIN:  Yes, briefly as well.

2          On Page 13, third line down from the top,

3     I thought we had said, agreed to again language

4     that we had.  The modifier "suitable" position

5     in front of the word "position".  Other

6     position, where it says there is no other

7     position.  I thought we had agreed that the term

8     "suitable" was going to be inserted there.

9          I think that does track the statute and

10    the instructions the Court would intend to

11    agree.  It isn't just any position.  It's a

12    particular kind of position.

13         THE COURT:  Okay.  I don't recall that

14    being an agreed-upon change.

15         Was it, plaintiffs?

16         MR. JONES:  I don't recall it being.

17         THE COURT:  And then the --

18         MR. COFFIN:  Okay, I'm corrected.  We

19    don't think it was agreed upon.  I apologize.

20         THE COURT:  Okay.

21         MR. COFFIN:  But we would assert that

22    that is an appropriate modifier.

23         THE COURT:  Okay.  So I'm going to leave

24    that charge as it is.

25         Mr. Coffin, anything else?

11

1          MR. COFFIN:  Yes, one final thing, Judge.

2          On page -- on the mitigation of damages

3     section, which begins on Page 30 and spills over

4     to 31, this is all past in terms of if you find

5     that Dr. Porter failed to do such-and-such, then

6     which requires sort of a preliminary finding

7     that she failed to do.

8          You know, our proof and our argument to

9     the jury is that she did mitigate her damages,

10    so that it's kind of a threshold question of

11    whether she failed to do something or not

12    doesn't necessarily come up in a way that's

13    confusing to the jury.  And we'd like some sort

14    of an assertion there that says basically if you

15    find the plaintiff mitigated her damages, that

16    that should be deducted from the damages award.

17         And rereading some of the cases on our

18    motion last night actually prompted me to think

19    that I think that is something that is required

20    under the law for the instruction to say

21    something like -- just to make it clear to the

22    jury that if you find mitigation, that should be

23    deducted.  And then, you know, sort of making

24    them preliminarily find whether she did or did

25    not abide by the term "mitigate".

12

1          So what I would say is, you know, that

2     last sentence above the punitive damages award,

3     something along the lines of, If you find that

4     she did mitigate damages, you may reduce your

5     award accordingly.

6          THE COURT:  So I'm just a little unclear

7     about -- this argument was made yesterday, too.

8     So affirmative defense in the case was failure

9     to mitigate.  The discussion yesterday about

10    severance agreement and things related to that

11    seems to suggest failure to mitigate.

12          What I'm hearing yesterday and today is

13    that Dartmouth's position is that she mitigated?

14          MR. COFFIN:  Well, it is, and that was

15    clearly our position at trial because she got

16    hired for a well-compensated subspecialty

17    position at an eminent academic teaching

18    hospital and was making, within a few years, we

19    would assert, more money than she was at

20    Dartmouth.

21          And so really she did mitigate her

22    damages, you know, by perhaps 2021 but call it

23    2025, and Dr. Bancroft's chart, of course,

24    having had her losses continuing on until her

25    retirement age at Age 70.

13

1          And so like our position is that she --
2     it wasn't a question of whether she failed to or
3     not.  She did mitigate her damages, and we
4     shouldn't be attributed to having those
5     continuing damages into perpetuity.  That's just
6     not allowed.
7          THE COURT:  Mr. Jones?
8          MR. JONES:  Your Honor, I think that
9     argument yesterday and today confuses an
10    argument that there was no loss but the issue of
11    mitigation of damages.
12         If they want to argue that there was no
13    loss for those reasons that's one thing, but the
14    proposed change in the language that they've
15    made confuses the whole defense of failure to
16    mitigate.  As you mentioned, comes under the
17    failure to mitigate.  So I don't think it would
18    be appropriate to make that position.
19         THE COURT:  That is my concern, too.  I'm
20    just not going to make that change to that
21    particular instruction.
22         All right.  Anything further from the
23    defendants on that?
24         MR. SCHROEDER:  No, your Honor.  We
25    incorporate all of the objections that we put on

14

1    the record yesterday, including but not limited

2    to the case law relating to the ADA,

3    specifically Section 12111 and the fact that an

4    employer can only be held to a reasonable

5    accommodation or reassignment to a vacant

6    position, as the statute says and as the five

7    circuit cases, including the 2nd Circuit, have

8    said already.

9         THE COURT:  All right.  Well, then that

10   concludes that portion.  As I've said, you'll

11   have an opportunity after the instructions are

12   given to list any additional objections at that

13   time.

14        Okay, and then I'll turn now to the

15   plaintiff's motion to preclude any reduction of

16   damages based on conditional offer of severance

17   pay.

18        So having heard the arguments yesterday

19   and considering this, I think that it would be

20   inappropriate to comment on the severance

21   agreement.  To the extent I don't know what the

22   defendants might actually argue so I can't

23   really speak specifically to perhaps what the

24   intention is.  But would you like to let me

25   know, or I can give you my thoughts on it first?

1          Mr. Schroeder?

2          MR. SCHROEDER:  Sure, your Honor.  I want

3    to make sure we're clear on that.

4          The evidence in the record is that C-13,

5    I believe, I'm certainly going to reference it

6    because C-13 was given after the meeting, which

7    arguably was part of the interactive process.

8          You may recall Dr. Porter said, Well, I

9    set up a meeting with Amy Claiborne.  She then

10   sends the May 25th letter, and then on May 26th

11   she meets with Ms. Claiborne.  And that's the

12   genesis of that.

13         There's a couple things.  First of all,

14   the severance agreement is admitted in evidence.

15         THE COURT:  Right.

16         MR. SCHROEDER:  And they didn't object to

17   it, and we can't undo that, unring that bell.

18   So I don't intend to discuss it in the context

19   of mitigation of damages --

20         THE COURT:  Okay.

21         MR. SCHROEDER:  -- but it's certainly

22   something that was presented to her, and she

23   rejected it.

24         They can make their arguments as to why

25   she rejected it, that's fine, but the bottom

16

1    line is she asked for it in that meeting.  And

2    in fact, the letter says that she asked for more

3    severance.

4         THE COURT:  Okay.

5         MR. SCHROEDER:  And that's all wrapped up

6    in that chronology of events.  She argued, and

7    this goes to lack of malice, et cetera, and also

8    just to intent, right?

9         THE COURT:  Lack of malice.  You said

10    this yesterday, too.  So when you say lack of

11    malice, meaning that Dartmouth was making an

12    effort to reach some type of a severance

13    agreement with her?

14         MR. SCHROEDER:  Exactly, just like they

15    did with the other two physicians at the time.

16         THE COURT:  Okay, but the argument during

17    closing is not going to be -- I just want to be

18    really clear -- it's not going to be making the

19    point that if they should find damages, it's

20    going to be reduced by the amount of the

21    severance agreement?

22         MR. SCHROEDER:  No, I have no intent of

23    saying that, your Honor.

24         THE COURT:  Okay.

25         MR. SCHROEDER:  But I want to come back

1    to the fact that this document, I certainly have

2    the ability to discuss it as much as I want, I

3    believe, in terms of admitted evidence into the

4    record, and it relates exactly to the chronology

5    of events.

6         It actually rebuts many of the things

7    that Dr. Porter testified to.  I never talked to

8    anybody.  Never talked to anybody.  Well, no,

9    actually you did.  You talked to the head of HR.

10        THE COURT:  Okay.

11        MR. SCHROEDER:  So I want to know that I

12   have free reign to at least talk about the

13   document, not its import in terms of damages,

14   but I do want to know that I don't have to go

15   rewrite my closing to deal with the fact that

16   I'm addressing -- and I'm going to put it on the

17   screen.  Admit it an exhibit.  We're not going

18   to have a PowerPoint, but we're going to put in

19   exhibits on the screen, and I want to make sure

20   that I have full carte blanche to discuss what

21   he said in that agreement.

22        THE COURT:  Okay.  I understand your

23   argument.  I appreciate that.  Thank you.

24        So plaintiff, ultimately the memorandum

25   concludes by saying the mitigation issue, it

18

1    should not be -- they should not be allowed to

2    talk about the severance agreement to the extent

3    that damages are found to reduce the damages

4    amount.  So based on that proffer, what we

5    talked about in closing, that seems then to

6    be -- what's your view on that?

7        MR. JONES:  No, I agree.  Our request was

8    that it simply not be brought up for the

9    purposes of saying that there should be an

10   offset or a reduction of the damages by that

11   amount.

12       THE COURT:  All right.  So then it sounds

13   like we have clarity on this.

14       Mr. Schroeder, just to be clear then,

15   your discussion of the document, as you said in

16   the ways that you have described, will be fine.

17   We're just talking about the mitigation of the

18   damages issue and the amount of the severance

19   agreement.

20       MR. SCHROEDER:  Understood.

21       THE COURT:  Okay.

22       MR. SCHROEDER:  Just on that subject,

23   your Honor, and I don't want to put the cart

24   before the horse here, but on the issue of

25   talking about the cross-examination of

19

1        Dr. Bancroft, I realize we're not putting the

2        chart as a demonstrative and it's not in

3        evidence, but I want to make sure I'm okay to

4        discuss, and I believe I am, the

5        cross-examination and to the extent that he was

6        asked to make figures that he may not agree

7        with, but they actually show that if he did an

8        apples-to-apples comparison, you know, she's

9        actually making more at UVM.  And that's really

10        the import of that.

11            I'm not -- I'm not going to be putting

12        any documents up or anything in that regard or

13        even showing the numbers, for that matter.  But

14        that was what I understood you were saying

15        yesterday, and I just wanted to make sure.

16            THE COURT:  Yes.  That was my intention.

17            Mr. Jones?

18            MR. JONES:  I think that that's fine

19        except to the extent that part of that

20        cross-examination was examining Dr. Bancroft on

21        the issue of whether he considered the severance

22        amount and, if she had taken that amount,

23        wouldn't have that reduced her damages.  That

24        was the genesis of our motion.

25            THE COURT:  Okay.

1           MR. SCHROEDER:  That's a completely

2    separate topic.  We're talking about the issue

3    of going to UVM at a 1.0 FTE as opposed to

4    Dartmouth-Hitchcock, which is where he did his

5    damages, at a 1.0, and then incorporates it at

6    .75 magically in July of 2025, and so that's the

7    issue.

8           I'm not talking about the severance issue

9    this in that regard.

10           MR. JONES:  That's fine.

11           THE COURT:  That sounds fine to me, too.

12           Anything -- so you mentioned PowerPoints,

13    so you're not doing a PowerPoint?

14           MR. SCHROEDER:  No, your Honor.  The only

15    thing we would show on the screen are admitted

16    exhibits as I reference them and that's it.  And

17    just listening to me.

18           THE COURT:  Okay.

19           Anything else from the plaintiffs to take

20    up at this point?

21           MR. JONES:  Nothing further, Judge.

22           THE COURT:  So just generally, talking

23    more about the jury once they get the case, I

24    just want to kind of give you a sense of kind of

25    what I'll be telling them.

21

1          So in terms of how long they deliberate,

2     you know, I can tell them or probably will tell

3     them that it's up to them.  If they want to

4     deliberate into the night they can but they

5     don't have to, is what I plan on telling them.

6          And that if they decide to kind of stop

7     deliberating for the evening, they should send a

8     note, let us know.  I'll bring them back in,

9     give them kind of the admonishments that I have

10    been giving each day at trial; just about not

11    talking about it, not doing any research.  Also,

12    not doing any research in the jury room, like

13    those kinds of topics.

14         And then I'll tell them to come back.  If

15    they come back tomorrow, come back at 9:00 in

16    the morning, like they would for kind of any

17    other day.  And then, obviously, the contact

18    between all of us and them will be basically

19    zero unless we get a note from them.

20         It will come as no surprise to you if I

21    do get a note from the jury I'm not going to

22    deal with it.  I'm going to come back here and

23    first talk to you, unless it's something

24    extremely minor like can we have an extra

25    notebook.  I'll make sure they get an extra

1    notebook, but anything greater than that I'll

2    talk to counsel about any notes received.

3          Any objections to that kind of procedure?

4          MR. JONES:  None.

5          MR. SCHROEDER:  No objection, your Honor.

6          THE COURT:  Okay.  Well, I'm not sure if

7    everyone is here.  We do have a few minutes so

8    I'll just briefly step off, and we'll be ready

9    to go as soon as they all get here.

10          (End of conference without the jury

11    present at 8:55 a.m.)

12          THE CLERK:  All rise.

13          (Honorable Doyle entered the courtroom.)

14          THE CLERK:  Please be seated.

15          (Brief pause.)

16          THE CLERK:  All rise for the jury.

17          (The jury entered the courtroom.)

18          THE CLERK:  Please be seated.

19          Your Honor, the matter before the Court

20    is Case Number 17-cv-194, Misty Blanchette

21    Porter vs. Dartmouth-Hitchcock Medical Center,

22    et al.

23          Present on behalf of plaintiffs are

24    Attorneys Geoffrey Vitt, Eric Jones, and Sarah

25    Nunan.

23

1          Present on behalf of the defendants are

2     Attorneys Tristram Coffin, Morgan McDonald, and

3     Donald Schroeder.

4          We are here for a jury trial.

5          THE COURT:  Okay.  Good morning, Members

6     of the Jury, and welcome back.

7          I'll ask you, as we always do, since we

8     were last in court last week have you heard

9     anything about this case?

10          Have you researched the case in any way,

11     or have you spoken to anyone about the case?

12          Okay, I see no hands raised.

13          So, Members of the Jury, we're now going

14     to be hearing closings arguments from the

15     attorneys.  And the rules, so to speak, are as

16     follows.

17          So the plaintiff will argue first, and

18     then the defendants will have an opportunity.

19     After the defendants are done the plaintiff will

20     have an opportunity to make a short rebuttal

21     argument.  In other words, the plaintiff has the

22     burden of proof so the plaintiff gets to argue

23     first.

24          Okay.  Plaintiff, you may proceed.

25          MS. NUNAN:  Good morning.

24

1          THE JURY:  Good morning.

2          CLOSING ARGUMENT ON BEHALF OF PLAINTIFF:

3          MS. NUNAN:  Dr. Porter's disability and

4     her whistleblowing activities caused her to lose

5     the job that she loved, the job that she held

6     for 21 years.

7          When Dr. Porter heard reports of nurses,

8     residents, nurse practitioners, ultrasound techs

9     and other doctors, reports of Dr. Hsu and

10    Dr. Seifer's incompetence, endangering patients,

11    she had a duty to report.  She spoke up often

12    and loud.  She hounded Dr. DeMars as chair of

13    the department.  She put it all in writing.

14         In addition, despite her best efforts to

15    work as much as possible while she was

16    recovering, Dr. Porter's disability made her

17    extraordinary skills worthless to Dr. DeMars and

18    Dr. Merrens.  Quote, Everyone is also

19    remembering Misty as a full-time employee,

20    wearing three hats and not the one that's been

21    out for almost 18 months, Dr. DeMars wrote.

22         In response to this and other astonishing

23    statements in that e-mail about Dr. Porter's

24    disability, Dr. Merrens wrote back that this was

25    a thoughtful and appropriate insight.

1          Individuals as well as corporations have

2     choices when things go sideways.  They can look

3     at a situation and they can do what they can do

4     to remedy it, to fix it, to make it right, or

5     they can choose to double down on their initial

6     position, deny responsibility, and find somebody

7     to blame.  Dartmouth Health had chosen the

8     latter.  Eight years has elapsed since it made

9     the decision to close the REI division.

10          When you heard last weak from Maria

11     Padin, Daniel Herrick, Josselyn Chertoff, and Ed

12     Merrens, they were all the same lines.  Closing

13     the REI division was the right decision in 2017,

14     and it's the right decision now.  The decision

15     to terminate Dr. Porter was the right decision

16     in 2017, and it's right decision now.

17          It was not the right decision.  Dr. Julia

18     MacCallum described in detail the harm that

19     Dr. Hsu caused in the OR.  Sharon Parent told

20     you her moral compass was going off the charts

21     when she watched Dr. Seifer perform the

22     procedures.  She had been in the REI division

23     for 17 years at that point.  Both women reported

24     what they saw to multiple superiors, and yet

25     Dr. Merrens still claims, I'm not aware of

1    actual harm.

2          Dr. Hsu performed a procedure on Eunice

3    Lee six months and one day after Dartmouth

4    Health was in possession of Dr. Porter's 11-page

5    assessment of him, stating that he should not be

6    performing such procedures.  He caused harm.

7          Dartmouth Health did not ask

8    Dr. MacCallum on the stand about the harm she

9    saw in the OR.  Dartmouth Health did not ask

10   Sharon Parent about the details of Dr. Seifer's

11   harm in the procedure room.  Silence.

12         Instead, Dartmouth Health dug up everyone

13   who Dr. Porter has annoyed in the past 15 years.

14   What did we hear?  That Dr. Porter refused to

15   use a paper intake form when there was a

16   perfectly good electronic system available.  She

17   preferred her own tools and her own approach.

18   She was abrupt with some people.  Her standard

19   of care was too high.  She stood up to

20   Dr. Reindollar.  She did not want her schedule

21   e-mailed to Dr. Seifer.

22          This is what Dartmouth Health chose to

23   investigate and present to you.  Not seeking out

24   the patients who did not give informed consent

25   to Dr. Hsu; not looking into the free IBF cycles

1    that were given out to compensate for Dr. Hsu's

2    mistreatment; not looking into the excessive

3    pain claims or the statements by Dr. McBean that

4    Dr. Hsu's surgical skills endangered patients.

5        The deal.  Maria Padin described to us

6    the role of the credentialing committee as

7    verifying a broad list of qualifications about a

8    candidate.  She said when someone applies to be

9    part of the medical staff, there's a process

10   that you want to validate that what they say

11   they can do and who they say they are is actual,

12   and part of this is checking on their letters of

13   recommendation from their last employer.

14       What we heard was that in the spring of

15   2016 Dr. Seifer did not meet this criteria.  The

16   e-mail sent to the credentialing committee by

17   his prior provider stated, quote, I either had

18   to fire the rest of the division or find a new

19   role for Dr. Seifer because he was not going to

20   be successful at leading the division.

21       There had been complaints about

22   Dr. Seifer.  They could not comment on his

23   surgical skills, but they did note that he had

24   substandard ultrasound skills.  Maria Padin

25   admitted there were red flags.

28

1        The members of the credentialing

2    committee -- Maria Padin, Joselyn Chertoff, Ed

3    Merrens -- should have denied Dr. Seifer the

4    right to proceed.  Instead, a deal was struck.

5    The deal was that Dr. DeMars could hire

6    Dr. Seifer, but she had to ensure his success.

7    As Ed Merrens pointedly told Leslie DeMars;

8    Dr. Seifer's success is on you.  This put into

9    motion, predictably, the inevitable coverup when

10   Dr. Seifer turned out to have all the red flag

11   qualities and concerns raised during the

12   credentialing committee.

13       This shifted the responsibility of the

14   assessment and the success of Dr. Seifer away

15   from the committee onto Dr. DeMars.  With her

16   job on the line, who would expect Dr. DeMars to

17   report honestly when she received almost

18   immediate negative reports on Dr. Seifer's

19   skills?  They knew in the summer of 2016.

20   Dr. DeMars knew in July, 2016.

21       She reported in a private text; quote,

22   I'm not sure DS is clinically competent.  I

23   don't know what he's been doing for 25 years,

24   but I'm not sure it's IVF.

25       Eight weeks earlier she had been given

29

1    full report on Dr. Hsu.  Leslie DeMars did

2    nothing to restrict Dr. Hsu or Dr. Seifer's

3    practice.  They were allowed to continue, until

4    the closure of the division one year later, to

5    perform procedures on women; women like Eunice

6    Lee.

7         There's been a lot of testimony in the

8    last two weeks, and there's a pile of documents

9    that we've put together.  My job this morning is

10   to provide you with a roadmap to address the

11   various claims and testimony in these exhibits.

12   Let's get started.

13        I'm going to walk through the claims.

14   Dr. Porter's first claim is for whistle-blowing

15   retaliation.  She asserts she was not terminated

16   and not reassigned because she reported conduct.

17   She reported the conduct of Dr. Hsu and

18   Dr. Seifer, conduct that she reasonably

19   considered to be illegal, fraudulent, unethical

20   and harmful to patients.  To prevail on that

21   claim, Dr. Porter must demonstrate the following

22   elements.

23        One, Dr. Porter in good faith reported

24   what she reasonably believed was a violation of

25   law or legal rule.

1        Two, Dartmouth Health terminated

2   Dr. Porter's employment and failed to reassign

3   her.

4        And, three, there is a causal connection

5   between Dr. Porter's reports and her termination

6   without reassignment.

7        The evidence Dr. Porter presented during

8   this trial supports a finding in her favor of

9   those elements.  Here we go.

10       For number one, Dr. Porter made multiple

11  reports raising concerns about patient harm and

12  unlawful conduct that Dr. Hsu and Dr. Seifer

13  were causing.

14       First, she reported substantial

15  medical -- substandard, excuse me, medical care

16  causing patient harm, including the fact that

17  they were not following the ASRN standards.  She

18  reported procedures without patient consent.

19  She reported there was improper billing going on

20  and that Dr. Seifer and Dr. Hsu were ordering

21  excessive testing.

22       Dr. Porter tried to stop Dr. Seifer from

23  using sperm that was possibly contaminated with

24  Zika.  This was a situation that had been

25  preventable from the start, and she tried to get

31

1    Dr. Seifer and Dartmouth Health's risk

2    management to follow the most recent Zika

3    guidelines to avoid harm to the future fetus.

4    These were the concerns that needed to be raised

5    and addressed.  When Dartmouth-Hitchcock did not

6    respond, Dr. Porter blew her whistle louder and

7    more persistently.  She did not stop.

8            Number two.  Dartmouth Health terminated

9    Dr. Porter and failed to reassign her.

10   Dr. Porter was terminated on May 4th, 2017, as

11   you will see in Exhibit 50-A, we hope.  Please

12   look at the highlighted parts.

13           As evidenced in Exhibit 50-A, in April,

14   on April 21st of 2017, in the plans listed,

15   there is a column for the current staff in which

16   Dr. Porter was listed as 0.4 GI ultrasound/REI.

17   And then on the right hand, in the column that

18   says future staff with complete REI shutdown,

19   this is the scenario in which they put

20   Dr. Porter, with 0.4 GYN/ultrasound.

21           Dr. Porter was already doing

22   non-fertility IVF work, non-fertility REI, REI

23   work, and she could have easily been reassigned

24   to do the work she was already doing in the

25   OB/GYN department.

1          Exhibit 52.  Dr. DeMars was annoyed and
2     dismissive and discredited Dr. Porter's
3     complaints.  She wanted Dr. Porter to be quiet,
4     but Dr. Porter was a thorn in her side.
5     Dr. DeMars acknowledged in this e-mail, the
6     highlighted part at the bottom, We could have
7     offered her ultrasound-only position, but
8     keeping her out of any real building plans would
9     be impossible.  She wouldn't be quiet.
10          Further, on the second page of
11     Exhibit 52, Dr. DeMars stated that her life
12     would be easier if Dr. Porter lost her license,
13     and her testimony at trial confirmed this.
14          Exhibit 89, Dr. DeMars states on the
15     second page, on the second page, As much as it
16     hurts to say, it was the right decision to
17     include her in the terminations.  I don't want
18     to change that decision.  If I had tried to
19     make -- if I had made a decision to try to keep
20     her, I think that Heather, our new nurse
21     supervisor, and our other administrator would
22     have quit because she's tried to intimidate each
23     of them and they are done with the behavior.
24          Dr. Porter in good faith reported
25     problems to Heather Gunnell and Katie Mansfield,

33

1      as reported here, the new nursing supervisor.

2      Dartmouth Health has tried to minimize

3      Dr. Porter's reports and complaints, but there

4      were other people that came before you that

5      corroborated Dr. Porter; Nurse Sharon Parent,

6      Dr. MacCallum, Dr. George, Dr. Russell, and

7      Ultrasound Tech Janice Gonyea.  They all spoke

8      to the harm or the unconsented treatment given

9      by Dr. Hsu.

10             Dartmouth Health brings up during the

11     trial this idea that there were complaints by

12     others in the department about Dr. Seifer and

13     Dr. Hsu, specifically referring to the feedback

14     in the fall of 2016 and the spring of 2017, in

15     response to Dr. DeMars's request for feedback.

16     They keep saying, Well, these people complained,

17     and we didn't fire them.  They still have no

18     explanation for why they ignored all of these

19     people.  And Dr. Porter was the one who

20     persistently, persistently would not stop

21     bringing these issues to the forefront.

22             The third element that I brought up at

23     the beginning, making a causal connection

24     between Dr. Porter's reports and her termination

25     without reassignment.  In Exhibit 60,

34

1      Dr. Merrens brings up and admits that

2      dysfunction was a reference to Dr. Porter's

3      complaint.  He brings this up in his testimony

4      as well.  Dr. Merrens says, Well, on the surface

5      we are pinning the dissolution of our

6      reproductive endocrinology program on our

7      failure to maintain and recruit nurses for this

8      work.  It is ultimately the dysfunction of the

9      physicians who worked in this area for years, as

10     well as recent hires.

11          Dr. Merrens' testimony.  He was asked, So

12     you state it was ultimately the dysfunction of

13     the physicians and ultimately a failure of

14     leadership for which I hold Leslie fully

15     accountable.

16          Closing the REI division and firing all

17     the providers was an extraordinary act.  It had

18     never been done before.

19          In Exhibit 52 you will see that Amy

20     Giglio says, We've never closed a service at D-H

21     before.  This was so extraordinary it can only

22     be explained as discriminatory or retaliatory in

23     its motive.

24          Dartmouth Health argued in its opening

25     statement that it was a reduction in force and

1    that all three doctors were treated equally.

2    This doesn't make sense.

3         Dartmouth-Hitchcock had two incompetent

4    doctors that were causing harm, and they had

5    Dr. Porter who was world renown for her

6    ultrasound skills, her complex surgical skills,

7    and she is the one that tried to stop the harm

8    and clean up the mess created by others, but

9    their argument is they treated them all the

10   same.  Talk about throwing the baby out with the

11   bath water.

12        Wrongful termination under New

13   Hampshire's law.  Dr. Porter also claims

14   wrongful termination under the common law of New

15   Hampshire.  For this claim she prevails if she

16   shows, one, Dartmouth Health's termination of

17   her employment was motivated by bad faith,

18   malice, or retaliation.

19        Dartmouth Health terminated Dr. Porter's

20   employment because she performed one or more

21   acts that public policy would encourage.  We

22   submit that the evidence we discussed under the

23   previous whistleblower claim also supports this

24   claim, this common law claim.

25        Finally, I want to turn to the disability

36

1    discrimination claim.  Dr. Porter alleges

2    disability discrimination, a failure to

3    accommodate, and retaliation was in violation of

4    several laws, including two federal laws, a New

5    Hampshire state law, and a Vermont law.  The

6    claims are very similar under each one of these

7    laws, so I will address them all at once.

8         Number one, under these laws an employer

9    may not terminate an employee because of an

10   employee's disability.

11        Two, in addition, an employee may show a

12   violation of law if the employer failed to

13   provide reasonable accommodation.

14        Finally, three, the disability laws

15   prevent an employer from retaliating against an

16   employee for seeking a reasonable accommodation.

17        The evidence that supports the disability

18   discrimination.  Dr. Porter testified that

19   Dr. Ed Merrens stated three times during her

20   termination meeting, quote, Stay out on

21   disability, Misty.  During his testimony

22   Dr. Merrens did not deny the fact that he

23   referenced her disability during that meeting.

24        Three.  Dr. Porter told Dr. DeMars in the

25   parking lot -- this is her testimony -- You

37

1    could have kept me, meaning she could have been

2    reassigned.  Dr. Porter testified that

3    Dr. DeMars said in response, I couldn't have

4    because of your disability.  That would have

5    compromised your long-term disability.

6    Dartmouth Health did not put on testimony

7    opposing Dr. DeMars on this point.

8        You saw the testimony of Dr. Russell, who

9    stood up and asked Dr. Merrens in the

10    post-closure OB/GYN meeting why Dr. Porter had

11    not been kept out to do her non-infertility

12    work.  Dr. Merrens referred -- Dr. Merrens'

13    response referred to Dr. Porter as being on

14    disability.  Dr. Russell remembers this comment

15    because she was the one that asked the question,

16    and she was absolutely stunned that he would say

17    that in a public meeting.

18        All Dartmouth Health has offered in

19    response were witnesses that could not recall

20    the statement.  Further evidence of disability

21    discrimination is on Exhibit 83.  If you

22    remember, Victoria Maxfield wrote to

23    Dr. Merrens, asking why Dr. Porter could not be

24    kept on for all of her non-infertility work.

25        In response to Victoria Maxfield's

1      e-mail, Dr. Merrens writes, As you know,

2      Dr. Porter currently works at 20 percent of her

3      time.  This is a reference to her disability.

4              In Exhibit 89, Dr. DeMars writes to

5      Dr. Merrens, again, quote, Everyone also is

6      remembering Misty as a full-time employee

7      wearing three hats and not the one who has been

8      out for almost 18 months.

9              On Page 2, Dr. DeMars writes, Misty's

10     medical disability has been devastating, and I'm

11     not sure that she should or will really ever be

12     able to do the complex hysteroscopy or

13     laparoscopy that she once did.  That being said,

14     there are few full-spectrum REI docs that could

15     bring similar surgical skills, but they're hard

16     to find.  I think the best outcome of this

17     termination is a chance for Misty to actually be

18     out on leave with no intervening

19     responsibilities so she can assess how much

20     improvement she might gain.  This is a clear

21     reference to her disability.

22             Dr. Porter's disability was a significant

23     reason for Dartmouth Health's decision to fire

24     her and not reassign her.

25             I'd like to talk for a minute about the

1    denial of reassignment and the denial of the

2    interactive process.

3         When an employee has a disability, an

4    employer may have a duty to make a reasonable

5    accommodation.  The discussion to explore the

6    possible accommodation is called an interactive

7    process.  You will hear an explanation of this

8    law.

9         If the employer knows or should have

10   known that the employee was disabled, the

11   employer is obligated to engage in an

12   interactive process with the employee to

13   determine whether the possible reasonable

14   accommodation exists.  Both employer and

15   employee must cooperate in this interactive

16   process in good faith.

17        We submit Dartmouth Health did not even

18   attempt to participate in the interactive

19   process with Dr. Porter.  They brought her into

20   a room and told her she was fired.

21        Further evidence of lack of engaging in

22   the interactive process is, if you look at

23   Exhibit B-12, Dr. Porter wrote a letter after

24   her termination telling Dartmouth Health

25   administrators that she was willing and able to

40

1      work in other capacities at Dartmouth Health,

2      and they would not engage in the interactive

3      process.

4           There was no testimony by Dartmouth

5      Health witnesses about engaging in the

6      interactive process with Dr. Porter.  There was

7      testimony from Dr. Merrens.  He stated he did

8      not ask Dr. Porter if she was interested in

9      staying on in a non-infertility capacity.

10           There was the testimony of the following

11      women:  Dr. Julia MacCallum, Victoria Maxfield,

12      Dr. Michelle Russell, and Dr. Karen George all

13      spoke to Dr. Porter's non-infertility

14      reproductive endocrinology skills and her

15      ultrasound skills and her benign complex

16      surgical skills that were needed in the summer

17      of 2016 in the D-H OB/GYN department.

18           If you look at Exhibit 96, Emily Baker

19      states that they had lost GYN ultrasounds, and

20      it was very much needed and that the radiology

21      department was no substitute.

22           If Dartmouth Health had engaged in the

23      interactive process, the parties would have

24      likely found a reasonable accommodation.

25      Dartmouth Health made no effort whatsoever to

41

1     explore these options with her.  This failure is

2     a refusal to accommodate and violates the

3     disability laws.

4          I want to talk for a minute about who the

5     decisionmaker was.  You have heard, and you will

6     hear, Dartmouth Health said Dr. Merrens was the

7     only decisionmaker.  They assert that

8     Dr. Merrens did not know about Dr. Porter's

9     complaint of Dr. Hsu and Dr. Seifer or the

10    details of her disability.  There is evidence

11    that disputes those assertions, and I will

12    discuss those in a minute.

13         This argument does not help Dartmouth

14    Health avoid the liability for the actions of

15    Dr. DeMars.  Both Dr. Merrens and Dr. DeMars

16    were senior administrators, and when they acted

17    they were acting on behalf of Dartmouth Health.

18    So if either took an action that resulted in an

19    adverse employment action against Dr. Porter,

20    Dartmouth Health is responsible.  From this

21    perspective it does not matter who the ultimate

22    decisionmaker was.  They both had the ability to

23    bind the institution.

24         Let's talk about the evidence.  Let's

25    talk about Dr. DeMars as the decisionmaker; the

42

1     evidence that Dr. DeMars either made the

2     decision or significantly recommended the

3     termination of Dr. Porter.

4          If you look at Exhibit 83, at the top

5     Dr. Merrens attributes the decision to

6     Dr. DeMars.  Quote, The recommendation around

7     the closing of the program and its staff were at

8     the recommendation of Dr. DeMars.  You'll

9     remember that almost immediately after writing

10    this e-mail Dr. Merrens turns around and writes

11    to Leslie DeMars in Exhibit 89.  He asks how to

12    better answer the questions that he's receiving.

13    If he had been the sole decisionmaker, why would

14    he have needed to ask Dr. DeMars?

15         In Exhibit 89 Dr. DeMars responds, As

16    much as it hurts, it was the right decision to

17    include her in the terminations.  I don't want

18    to change that decision.  If I had made the

19    decision to try to keep her -- and then she goes

20    on to list negative consequences.  This is the

21    answer of someone who's made a significant

22    contribution to the decision, if not made the

23    decision itself.

24         Dr. Merrens, at the top of Page 1 in

25    Exhibit 89, responds to these statements.  He

43

1    says, I think it's a comprehensive, thoughtful,

2    and appropriate insight.  Thanks for taking the

3    time to do this.  Ultimately, once the dust

4    settles, we'll be in a better position with all

5    of this, including Misty.

6         When shown his deposition transcript,

7    Dr. Merrens was asked if he had made the

8    following two statements.  He acknowledged he

9    did.

10         The first statement was, quote, Leslie

11    was ultimately the person that made the

12    decision.  And the second statement was, This

13    was a decision we supported after looking at the

14    information.  This is further evidence that

15    Dr. DeMars and Dr. Merrens were responsible for

16    this decision.

17         Next we move on to pretext.  Dartmouth

18    Health claims it had a legitimate business

19    reason to close the REI division, to fire all

20    the REI doctors and to not reassign Dr. Porter.

21    We maintain that this is not true.

22         The evidence presented in this trial

23    shows that Dartmouth Health's reason is a

24    pretext and that the real reason was retaliation

25    for Dr. Porter's whistleblowing and

44

1    discrimination based on her disability.

2            When thinking about pretext, you look at

3    Exhibit 60.  Amy Giglio responds to Ed Merrens

4    on May 2nd.  She says, Let's discuss this in the

5    morning.  I appreciate your candor and

6    recognition of the issues.  PR here is very

7    sensitive, it goes without saying.  We need to

8    manage the internal and external message --

9    messaging and issues.

10            So you're going to see a lot in the

11    record of messaging, internal and external, and

12    talking points.

13            This is the same concept used by

14    Dr. DeMars when asked by Dr. Merrens how to

15    better respond to the heartfelt messages he was

16    receiving.

17            At the bottom of Page 89, Dr. DeMars

18    candidly answers, quote, What's the talking

19    point?  My suggestion is we are working with

20    each physician on their employment options as

21    well as what's best for D-H and D-H OB/GYN.  I

22    don't know how you say, quote, I understand

23    you're angry, but this decision was made in the

24    best interest of the division and Misty.  Even

25    if it's the truth, no one will buy it at the

45

1    moment.

2         External messaging and talking points.

3    What Dr. Merrens says in public to the public is

4    spin.  It's polished spin, but it's spin

5    nonetheless that serves the best interest of the

6    corporation.  It's not always the truth.

7         How do you know that Dartmouth Health's

8    reason is pretext?  First, Dartmouth Health

9    keeps changing the reason.  This alone is

10   evidence of pretext.  Second, the reasons that

11   they give are inconsistent.  Again,

12   inconsistency is evidence of pretext.  Third,

13   some of the reasons, like when COE Conroy says

14   that it's due to declining birth rates, were

15   reasons that even Dr. Merrens said were not

16   true.  Some of these reasons were just not

17   supported by the evidence.

18        I want to talk for a minute about the

19   evidence that goes against the idea that the

20   nursing shortage was the official reason for

21   closing the REI division.  The list is long; my

22   apologies.

23        Sharon Parent gave one year's notice that

24   she was leaving.  This was her testimony.  That

25   would have been in December of 2015.  She told

46

1    them it would take six months to train the REI

2    division nurse.

3        When you look at the documents that

4    Dartmouth Health put in front of you about

5    approval of the nursing, you will note that

6    those documents are dated November of 2016; one

7    month before Sharon Parent leaves, one year

8    after she gave notice, or 11 months after she

9    gave notice.

10        It's Dr. Porter's testimony that she has

11    knowledge of what the REI division has done in

12    the past when they've been down on nurses, and

13    she offers up solutions.

14        Dr. Porter also testified that the IVF

15    nurses had specialized training, but there was a

16    whole other group of nurses who could support

17    the REI services that were non-IVF.  Victoria

18    Maxfield was one of those nurses.  There were

19    others.

20        Dr. Porter testified that only 10 to

21    20 percent of what the REI division did was IVF.

22        Victoria Maxfield testified that she was

23    one of a group of nurses who supported

24    Dr. Porter in the non-IVF capacity in the REI

25    division.  She also stated until her e-mail,

47

1    Exhibit 83, that during the past five to six

2    years I have also been her GYN surgical nurse,

3    taking care of all of her post-op patients due

4    to the staffing issues in REI.  Again, further

5    evidence that other nurses were capable of

6    supporting the REI division.

7         You've seen plenty of testimony that what

8    Dr. Porter did was not just infertility work.

9    You also heard the testimony of Sharon Parent,

10   who said she was willing and able to come back

11   to work after her retirement not only to work as

12   a nurse in the REI division but also to train

13   and support less experienced nurses.

14        Sharon Parent said she had done her due

15   diligence about how to return in a per diem

16   fashion.  She returned near the end of the

17   90 days and spoke to Heather Gunnell and Katie

18   Mansfield but was rebuffed.

19        You'll note in Exhibit 23 that Dr. McBean

20   worked -- Dr. McBean, who you'll remember worked

21   per diem in the REI division, wrote a review of

22   Dr. Seifer regarding his technical skills, his

23   standard of care, and his leadership.

24        If you look at the bottom of the first

25   page of 23, you will see that she says,

48

1    Dr. Seifer was disrespectful to Sharon as she

2    prepared for retirement.  After Casey was

3    unexpectedly let go, we were critically

4    shorthanded.  Sharon has both the depth of

5    knowledge and the long-term clinical experience

6    necessary to help solve this problem and train

7    our newest nurse.  She was willing to stay and

8    help in a more limited basis but was

9    marginalized and not encouraged to continue

10   working.  We are now in a crisis situation.

11        You also heard the testimony of

12   Dr. Merrens that he was aware that Sharon Parent

13   had offered -- he was unaware, excuse me -- he

14   was unaware of the fact that Sharon Parent had

15   offered and was willing to come back.

16        If you turn to Exhibit 60, please.

17   Dr. Merrens writes, While on the surface we are

18   pinning the dissolution of our reproductive

19   endocrinology program on the failure to maintain

20   and recruit nurses for this work, it is

21   ultimately the dysfunction of the physician who

22   worked in this area for years, as well as recent

23   hires, and ultimately a failure of leadership,

24   for which I hold Leslie fully accountable.  The

25   fact that failures of such programs due to

49

1    nursing shortages are not common and will be

2    referring patients to a similar rural academic

3    REI center in Burlington, Vermont will make our

4    explanation to the public, patients and media,

5    well, rather thin.

6            Dr. Porter testified that there were

7    other -- there was a nurse from another unit

8    that spoke to her about coming and working in

9    the REI division.  Sharon Parent testified that

10   Leslie DeMars interfered and told her she was

11   protecting her by keeping her from coming back.

12           I would like to turn to other evidence of

13   pretext.  In Exhibit 60, I just read to you a

14   moment ago that Dr. Merrens wrote, While on the

15   surface we're pinning the dissolution of our

16   reproductive endocrinology program on the

17   failure to maintain and recruit nurses for this

18   work, it is ultimately the dysfunction of the

19   physicians who worked in this area for years, as

20   well as recent hires.

21           If you look at Exhibit 103, Dr. Merrens

22   writes, Regrettably, Vermont Public Radio

23   published an article yesterday indicating I made

24   comments to the effect that the program was

25   being ended due to interpersonal issues amongst

1    the physicians.  Nothing could be further from

2    the truth.

3         Dr. Merrens also stated in his testimony

4    that Leslie was the architect of the

5    dysfunction.

6         Dr. Conroy stated that there were

7    declining birthrates and that was the reason

8    that the REI division had closed.  All of these

9    arguments are pretext for what was really going

10   on.

11        They closed the REI division and

12   terminated all of the providers as a clever

13   solution to getting rid of three problem

14   physicians.

15        I'd like to turn next to the damages

16   section.  If you find in favor of Dr. Porter on

17   any of her claims, then your next task will be

18   to consider and award appropriate damages.

19        In this case Dr. Porter is seeking

20   damages to compensate her for her financial

21   losses and to re-dress her emotional distress.

22   In addition, Dr. Porter is asking you to award

23   punitive damages.

24        Economic losses.  With regard to economic

25   losses for Dr. Porter, you may award damages for

51

1    any lost earnings that Dr. Porter suffered in

2    the past and any probable loss of ability to

3    earn money in the future.  You heard from

4    Economist Dr. Bancroft.  He analyzed these types

5    of losses.  We're going to pull up Exhibit 1-B,

6    the chart.

7         Dr. Bancroft summarized his opinions in

8    this chart.  This is where he calculated

9    Dr. Porter's losses by being terminated from

10   Dartmouth Health.  His methodology was

11   relatively simple.  He started with what

12   Dr. Porter would have earned had she been

13   allowed to continue her career at Dartmouth

14   Health.  Then he compared that to what she had

15   already earned and what she was likely to earn

16   going forward at UVM.

17        He made conclusions about the amounts

18   Dr. Porter would need to receive in order to be

19   made whole for Dartmouth Health's wrongful

20   conduct.

21        You may consider Dr. Porter's expected

22   work life when calculating her losses.  You

23   heard Dr. Porter say that she plans to work

24   until she's 70.  That would be until 2033.  If

25   you find that testimony credible, then you can

52

1    go to the bottom of the page, the bottom line on

2    the chart and look in the far right column for

3    Dr. Bancroft's calculation of what her losses

4    are.  As you will see, he calculates that figure

5    to be 1,787,722.

6          When Mr. Coffin cross-examined

7    Dr. Bancroft, he suggested that if you changed

8    the numbers used in the analysis, then the

9    conclusion is different.  That would seem

10   obvious, but that misses the point.  Because if

11   you use accurate numbers, then you get an

12   accurate conclusion.  I submit that Dr. Bancroft

13   used accurate numbers.

14         You have also heard throughout this trial

15   that lawyer math is suspect.  So when you hear

16   about the calculator math done at the stand with

17   Mr. Coffin's calculator and his framework, I

18   would encourage you to think about whose math

19   you want to follow; the lawyer or the economist.

20         Remember, when doing Mr. Coffin's

21   calculation, Dr. Bancroft stated, I'll do it,

22   but this is not correct.

23         Please show Exhibit 1-B, Page 4.

24         Dr. Bancroft prepared a chart showing the

25   extraordinary expenses that Dr. Porter incurred

53

1    by having to commute to Burlington from Norwich.

2    To make her whole, we request an award to

3    compensate her for those expenses as well.  The

4    amount is $366,553.

5         Duty to mitigate.  Dartmouth Health

6    argues that Dr. Porter's damages should be

7    limited because of what is called a duty to

8    mitigate.  You will hear that when someone is

9    seeking damages to compensate them for losses,

10   they have what is called a duty to mitigate

11   damages.  But this duty only applies to those

12   damages that Dr. Porter could have avoided with

13   reasonable effort and without undue burden or

14   expense.  She's not required to undertake

15   extraordinary measures.

16        So in this case Dr. Porter had a duty to

17   take reasonable steps to minimize or reduce her

18   losses.  The evidence shows that she complied

19   with this duty by taking a job at UVM.

20   Dr. Porter testified she was on long-term

21   disability and could not get a loan to be able

22   to set up her own IVF clinic in the Upper

23   Valley.  The robotic equipment with which she

24   does her complex surgeries are only available at

25   big teaching hospitals at UVM or Boston -- like

54

1    UVM or Boston, excuse me.  So for her to do her

2    work, she had to relocate to either Boston or

3    Burlington.

4         Being a 1.0 FTE, however, would require

5    her to move.  Dr. Porter testified that in order

6    to keep her household running, her home in

7    Norwich, she needed to be home at least one day

8    a week so 0.8 was all she could handle.

9         She has deep roots in the Upper Valley

10   community where she lives.  The house that she

11   and her husband built, her husband's

12   multigenerational business that he runs in our

13   community all made it impractical for her to

14   move to Burlington, and it would not be

15   reasonable to expect her to move to Burlington.

16   She has done all she can to mitigate her losses.

17   Dr. Porter maintains that there should be no

18   further reduction in her damages.

19        You will hear from Dartmouth Health that

20   she should have taken a 1.0 FTE job, but this

21   would not have been practical unless she moved.

22   And she's not required to move just to mitigate

23   her damages because that would be unreasonable

24   and an extraordinary burden and expense.

25        Two more sections.

1          Emotional distress.  In addition to

2     damages for economic losses, Dr. Porter seeks

3     damages for her emotional distress.  You may

4     award damages for noneconomic harm, such as loss

5     of enjoyment of life, mental anguish, anxiety,

6     humiliation, and other mental or emotional

7     distress.

8          The following evidence was put on during

9     this trial that Dr. Porter, indeed, suffered

10     emotional distress.

11          I'd like to start with Dr. Porter first.

12     It was her testimony that being fired caused her

13     to cry all summer.  She was clinically

14     depressed.  She ended up grinding her teeth to

15     the point she ended up with a tooth abscess, and

16     that had to be repaired.

17          Being away from her family, the

18     uncertainty of it all, having to drive to

19     Burlington and stay in a hotel while dealing

20     with all of these emotions by herself.  She was

21     away from her family, she was away from her

22     Dartmouth Health work colleagues.  It was awful.

23          All of this time she was still working to

24     recover from her disability.  It was pretty

25     quite admirable, actually.  You heard Julia

1      MacCallum testify that she witnessed Dr. Porter

2      the summer after she was terminated.  You heard

3      her talk about the crying.  You heard her talk

4      about the emotional turmoil.  You heard her talk

5      about receiving a phone call and Dr. Porter's

6      state of mind after she returned -- she received

7      that phone call.

8           Dr. Porter testified that she had been

9      asked to walk a colleague through doing a HyCoSy

10     procedure over the phone after she was

11     terminated.  The colleague had never done the

12     procedure before, and it was -- a patient of

13     hers was put on the schedule.

14          You heard Michelle Russell testify that

15     Dr. Porter would annually show up and pick

16     raspberries in her patch.  She said that 2017

17     was memorable because Dr. Porter was crying and

18     try to wrestle with what had happened to her at

19     Dartmouth Health.  According to Dr. Russell,

20     Dr. Porter was, indeed, distressed.

21          We leave it to your collective wisdom to

22     determine the amount of damages to compensate

23     Dr. Porter for her noneconomic loss.

24          Final section of damages is punitive.

25     Dr. Porter seeks an award of punitive damages.

57

1     Punitive damages are meant to punish a defendant

2     for its clearly outrageous conduct and stop

3     others from acting in a similar manner in the

4     future.  You may award punitive damages if you

5     find Dartmouth Health's conduct was outrageous.

6     That means morally deserving the blame.

7          And if you find that Dartmouth Health

8     acted with malice in deciding whether a

9     corporation acted with malice, you may consider

10    the actions of its managers who acted on behalf

11    of the corporation.  Dr. Porter submits that

12    these standards have been met in this case.

13         The evidence of ill will and malice.  In

14    Exhibit 52 you saw that Leslie DeMars wrote, My

15    life and messaging would be easier, and then a

16    little farther on, if essentially Dr. Porter

17    lost her license to practice medicine.

18         Dr. DeMars claimed to be a friend of

19    Dr. Porter's, and yet she not only put this in

20    Exhibit 52, she said it on the stand.  She stood

21    by what she said; that, yes, it would have made

22    her life easier if Dr. Porter had lost her

23    license.

24         Dr. DeMars in Exhibit 89 stated that she

25    chose not to change her decision.  Quote, As

58

1    much as it hurts to say, it was the right

2    decision to include her in the decision -- in

3    the termination, and I do not want to change

4    that decision.

5         Most disturbing are the comments about

6    Dr. Porter's disability in Exhibit 89.  The

7    comments about the three hats and nobody

8    remembering that she's been out.  The comments

9    about her disability being devastating and she

10   needed to go away and figure out what she could

11   actually do.  The fact that Dr. Merrens

12   responded to this; that it was appropriate and

13   thoughtful insight.  That's outrageous.

14        Also outrageous is the fact that the

15   responsibility of the credentialing committee

16   was circumvented; that Dr. Merrens told

17   Dr. DeMars that Dr. Seifer's success was, quote,

18   on you and he, therefore, created the incentive

19   for Dr. DeMars to cover up the clinical

20   incompetence and ignore patient harm.

21        The administrators of Dartmouth Health

22   were put on notice of patient harm, and they

23   took no action to restrict Dr. Seifer and

24   Dr. Hsu from performing procedures or protecting

25   patients from harm.

1          Dr. Merrens testified that Dartmouth

2     Health offered Dr. Hsu and Dr. Seifer placement

3     services after being terminated to help them

4     find now employment.  He passed the problem

5     along.

6          Daniel Herrick testified that they did

7     not fire doctors for cause but closed the

8     division instead.  For the women who were

9     harmed, like Eunice Lee, for the women with the

10    procedure without consent, and for the woman who

11    was impregnated with a thyroid problem who lost

12    her baby, these were all outcomes that we submit

13    could have been prevented.  That's outrageous.

14         Dr. DeMars, in her FPTE of Dr. Seifer,

15    whitewashed all of Dr. Porter's comments.  She

16    used Dr. Hsu to evaluate Dr. Seifer when he

17    clearly -- when she clearly had information in

18    the 11-page assessment that he should not be

19    doing the procedures himself.  She used him to

20    assess Dr. Seifer, and the credentialing

21    committee allowed it.

22         In the summer of 2016 you had an 11-page

23    assessment of Dr. Hsu by Dr. Porter stating that

24    he could not do this work, and you had a text

25    message on July 28 from Leslie DeMars stating

60

1      that Dr. Seifer was clinically incompetent.  And

2      yet they allowed these individuals to perform

3      procedures on women for the following year.

4      This is outrageous.

5           These women were paying out-of-pocket and

6      were desperate to get pregnant.  You saw in one

7      of those e-mails where Dr. Porter was pointing

8      out how poor the pregnancy rates were for 2016.

9           If you decide that it was the right

10     decision, if you decide that Dr. Porter -- I'm

11     sorry, excuse me.  If you decide that these

12     statements, this evidence is outrageous, you can

13     award punitive damages.

14          Conclusion.  Finally.

15          Dartmouth Health had a choice as to how

16     it handled the REI division issues and closure.

17     It chose what probably seemed at the time as a

18     clever solution.  There were consequences to

19     these choices.  There was harm caused to

20     patients.  There was harm caused to the

21     community.

22          I keep coming back to the testimony of

23     Daniel Herrick.  Why are we applying car

24     manufacturer processes to women's healthcare?

25     Daniel Herrick could not tell you how many women

61

1     and girls his decisions impacted.  Where does

2     that leave you?

3            When you go back to the jury room to

4     deliberate, this becomes your case, too.  This

5     is where you get to write the final chapter.

6     You get to decide what happened, who you

7     believe, and what harm was caused.  Then you get

8     to decide an appropriate remedy for Dr. Porter.

9            Unfortunately this case does not give you

10    an opportunity to remedy the harm to patients,

11    but you do have a chance to make Dartmouth

12    Health think twice before it turns the other way

13    the next time patients receives -- it receives

14    reports of harm by its medical staff.

15            Thank you.

16            THE COURT:  Okay.  At this time we'll

17    just take a very brief five-minute restroom

18    break, and we'll come back for the next

19    statement.

20            THE CLERK:  All rise for the jury.

21            (The jury left the courtroom at

22    10:10 a.m.)

23            THE CLERK:  Please be seated.

24            (A recess was taken from 10:11 a.m. to

25    10:20 a.m.)

62

1          THE CLERK:  All rise.

2          (The judge entered the courtroom.)

3          THE CLERK:  Please be seated.

4          (Brief pause.)

5          THE CLERK:  All rise for the jury.

6          (The jury entered the courtroom at

7     10:20 a.m.)

8          THE CLERK:  Please be seated.

9          THE COURT:  Defense make their closing

10    argument.

11         MR. SCHROEDER:  Thank you, your Honor.

12         (Brief pause.)

13         MR. SCHROEDER:  Emerson, may I have

14    control of the exhibits?

15         Thank you.

16         CLOSING ARGUMENTS ON BEHALF OF DEFENSE:

17         MR. SCHROEDER:  Good morning.  First I

18    want to say a few words of thanks.  Thank you

19    for your attention this entire two weeks, two

20    and a half weeks, and I'm sure it seems to you

21    that it has been a very long time.  And it has.

22         We've had 20 witnesses; 21, 20 witnesses,

23    90 exhibits.  On behalf of my client and on

24    behalf of Laurie and Ray and Tris and Ed and

25    Megan, we really appreciate your time and

63

1    attention to everything.  You've been extremely

2    attentive, and we really appreciate that.

3         So I only get one chance to talk.  You

4    may actually like that, I don't know, but it's

5    one; one and done.  Kind of like the NC double A

6    tournament.

7         Members of the jury, you've heard a great

8    deal over the course of this trial, most

9    recently some very emotional testimony from a

10   patient who took the stand and shared a deeply

11   personal and painful experience.  But her

12   testimony, like the testimony of Dr. Ira

13   Bernstein, related to topics that are not

14   pertinent to the actual claims in this case.

15        You'll hear the jury instructions from

16   Judge Doyle.  I'm not going to go through all of

17   the elements of each claim.  You'll have a

18   chance to match the facts in the case to the

19   law.

20        But I want you to remember that that

21   individual's testimony, as well as the testimony

22   of Dr. Ira Bernstein, related to topics that are

23   not related to this case.

24        This is an employment discrimination and

25   retaliation case.  It is not a medical

1    malpractice case.  And while counsel for

2    Dr. Porter had attempted to distract from the

3    actual issues by presenting evidence that is

4    designated to elicit sympathy and fear, this is

5    quite frankly an emotional Hail Mary and a

6    shameless attempt by Dr. Porter to leverage a

7    patient's difficult fertility journey for her

8    own financial gain.

9            What's more, Dr. Porter has flooded the

10   record with evidence of how talented she is as a

11   surgeon, despite the fact that Dartmouth Health

12   has never asserted anything to the contrary.  In

13   fact, there were lots of testimony by Dr. Porter

14   and her friends; Dr. Russell, Sharon Parent,

15   Dr. MacCallum about how Dr. Porter was such a

16   skilled surgeon.

17           I want to harken back to my opening

18   statement.  We didn't dispute it then.  We don't

19   dispute it now.  She is a talented surgeon, but

20   that is not the whole calculus for determining

21   who is a great provider in a system where you

22   have to work with people day in and day out.

23   Different people and different titles, different

24   positions and different departments.

25           Everyone must remember why we're here.

1    This is a case about employment decisions, about

2    whether Dartmouth Health wrongfully terminated

3    Dr. Porter, retaliated against her for

4    whistleblowing, or discriminated against her

5    because of her disability.

6        And while Dr. Porter has brought

7    witnesses to the stand who have evoked emotion

8    and stirred sympathy, the stories they've told

9    don't provide any evidence to support her

10   disability discrimination and retaliation

11   claims.  They are not connected to the legal

12   questions before you.

13       Because at the end of the day you are

14   going to be asked to marry the facts to the law.

15   That is going to be your duty.  And with care

16   and respect, I suggest to you that some of the

17   emotional testimony, however genuine, draws

18   focus away from the core issues before you.

19       And on those issues it's our position

20   that the plaintiff has failed, simply failed to

21   present sufficient evidence to meet her burden

22   of proof.  And you'll hear about the burden of

23   proof and the standard for that.

24       The plaintiff has the burden on all of

25   her claims, we submit, based upon the record in

1    this case after two weeks of testimony,

2    20 witnesses, 90 exhibits, that she fails to

3    meet her burden of proof.

4         And let me just say a few words about the

5    showing of exhibits that you saw before.  I

6    counted seven, I think.  There are multiple

7    iterations or multiple references to a number of

8    exhibits.  There are only seven references in

9    the closing statement by Ms. Nunan.  However,

10   there are 90 exhibits in this case, and we want

11   you to take a look at them.  And look at the

12   totality of the circumstances.

13        Now, one thing that Mr. Nunan didn't

14   mention in her closing is really the ballgame

15   here.  It's credibility.  It's credibility of

16   the witnesses, and that is all within your

17   domain.  You get to determine the credibility of

18   the witnesses.  You've been with us for two

19   weeks, over two weeks.  During that time you've

20   heard from a whole range of witnesses, and no

21   doubt you've made assessments about whether you

22   found them credible.  Because credibility is

23   everything in this case.

24        And I'd like to take some time now to

25   review the testimony of a few key witnesses as

67

1       it relates to credibility.

2               Let me start with Dr. Porter.  As you

3       heard from both Dr. Porter's witnesses and

4       Dartmouth Health witnesses, including

5       Dr. DeMars, Dr. Porter is a very smart, very

6       talented, has the potential to -- potential to

7       be a great provider.

8               However, you also heard from both

9       Dartmouth Health's witnesses and Dr. Porter's

10      witnesses she is not a team player and is not

11      someone who could be relied on to put her needs

12      over the group or the team.  Not surprisingly,

13      she might have a fairly large ego and can be

14      thin-skinned, manipulative, and demanding.

15      These characteristics work against an effective

16      team.  As a result, Dr. Porter simply could not

17      be the leader of the REI division.

18              Indeed, Richard Reindollar, the former

19      chair of the OB/GYN division, who then became

20      the chair of the ASRN, indeed told Leslie DeMars

21      in no uncertain terms that making Dr. Porter the

22      director of the REI division would be a mistake.

23              This is way before Dr. Hsu and Dr. Seifer

24      got there.  And you may recall we went through

25      the chronology of events in very good detail,

68

1    and we did that because the timing of events and

2    the chronology of events is important for you to

3    understand.

4         Dr. Reindollar made his assessment long

5    before Dr. Porter developed her brain injury and

6    long before she made complaints about Dr. Hsu

7    and Seifer.  Her personality characteristics and

8    not her disability led her superiors at

9    Dartmouth Health to consistently judge her

10   incapable of carrying the responsibility of

11   moving the REI division forward in a leadership

12   role.  That was back in 2012, 2013.

13        Indeed, after testifying on direct

14   examination pursuant to a carefully drafted

15   script, we saw an indication of Dr. Porter's

16   true personality on cross-examination.  To say

17   she was combative would probably be an

18   understatement.

19        This was even the case when I even asked

20   Dr. Porter about noncontroversial topics.  She

21   said, quote, I would not characterize it that

22   way, end quote, 36 times.  I thought it was

23   more, but we checked the record.

24        After viewing that testimony, I hope you

25   asked yourselves just a few simple questions.

1        Would you want to work with this person?  Do you

2        think this person is a team player?  Do you

3        think there is any setting in which Dr. Porter

4        would view her colleagues as being competent?

5              I recall that Dr. Porter's own witness,

6        Dr. Ira Bernstein, testified that Dr. Porter was

7        continuing to complain and criticize her

8        colleagues even now that she's at an entirely

9        new hospital.  And at the end of the day this

10       case comes down to credibility, and Dr. Porter

11       simply is not credible.

12             And, remember, you say a number of

13       exhibits, and they were shown to you multiple

14       times in Ms. Nunan's closing statement.  Why?

15       Because that's all they had is a handful of

16       exhibits.  You've got to look at all the

17       testimony, all of the exhibits in the case and

18       make your determination on credibility.

19             What about Leslie DeMars, who's chair of

20       the OB/GYN department?  Dr. Porter denied that

21       she was ever friends with Dr. DeMars and refused

22       to even acknowledge that they were anything

23       beyond collegial co-workers, but the evidence

24       revealed the following.  They texted regularly.

25       Their children played together.  Their boys did

1    Boy Scouts.  They bought the same fancy luxury

2    cars.  Dr. Porter went above and beyond to help

3    Dr. DeMars get pregnant with her second son.

4    That was a personal fact that Dr. DeMars was

5    willing to share with you.

6          And on top of all that, they shared --

7    they went away every single year for 10 to

8    15 years and shared a hotel room.  You know, who

9    does that if they're not really close friends?

10   By the way, I wouldn't do that with my close

11   friends.  I'm not sure about you.

12         As Dr. DeMars testified, Dr. Porter was

13   the kind of friend she would have called at

14   4:00 a.m. in the event of an emergency.

15         When I asked her about Dr. Seifer and

16   Dr. Hsu, she testified she had no personal

17   issues with Albert Hsu or David Seifer.  More

18   specifically, she stated the following.  Once

19   again, this comes down to what was the witness

20   testimony and what were the documents that were

21   put in front of you.

22         What did she say?  I wasn't aware of any

23   infighting in REI at all.  There were no

24   personal issues in terms of infighting.  I would

25   not characterize it as conflict.  I got along

71

1    with them, yes.

2          And you may recall she said, My

3    complaints about Dr. Hsu brought me no joy.  She

4    said that multiple times, and I just want you to

5    remember what was said and testified to in

6    determining the credibility of the witnesses.

7          But Dr. Porter could not deny the text

8    messages where she told her now UVM colleague,

9    Lisa McGee, that she hoped Albert Hsu would fail

10   his Boards.  She said Dr. Seifer was insane and

11   Albert Hsu was pompous and not as bright as he

12   thinks he is.  Hearing him pontificate about his

13   research would be torture.

14         Dr. Porter testified that she was

15   completely taken aback by the closure of the REI

16   division.  Remember when I asked her that?

17   Really?

18         Exhibit C-6-A is an excerpt of

19   Misty Porter's text messages.  Dr. Porter was

20   trading text messages with Lisa McGee at UVM

21   about a potential position at UVM Medical Center

22   on April 13th.  We went through all of the

23   chronology of this case because chronology of

24   events matters, and when things happened

25   matters.

72

1           On April 13th, almost three weeks before

2      she was notified that the REI division was being

3      closed, Lisa McGee says to her, Do what you need

4      to do but leave some time to come talk with us

5      before you make any solid plans.

6           And then one day after the REI division

7      closure, on May 5th, 2017; so the REI division

8      closure is announced May 4th, then you have

9      May 5th.  Lisa McGee texted Misty to say the

10     following:  Hi, Misty.  I spoke with Ira.  We

11     all know who Ira is at this point.

12          I spoke with Ira this morning, and he

13     agreed.  If you wanted, we could do a per diem

14     arrangement pretty quickly for June.  This could

15     give you some breathing room to have time to

16     think things through and make longer-term

17     decisions.  You could start later, too.  No

18     strings attached for longer term so you could

19     still take the Boston option if it suites your

20     needs better.  We are here for you.

21          Dr. Porter couldn't remember exactly what

22     the Boston option was.

23          What about Dr. Merrens?  Obviously I told

24     you upfront that Dr. Merrens was going to be

25     here for the entire of the trial with all of

1    you, and I submit on the opposite end of the

2    credibility spectrum is where Dr. Merrens sits.

3    He testified on two different dates.  He was

4    consistent.  He was articulate.  He was frankly

5    believable.  And make no mistake about it,

6    Dr. Merrens made the decision to close the REI

7    division and terminate Dr. Porter's employment.

8        Now, why is that important?  Because at

9    the time that he made the decision he had no

10   knowledge of either the specific nature of

11   Dr. Porter's disability or the complaints she

12   raised about Dr. Hsu and Dr. Seifer.

13       In fact, there's no evidence in the

14   record to the contrary, and that's what this

15   case comes down to; the evidence in the record.

16       You've been presented with a whole lot of

17   information in this case, but I'll represent to

18   you that this information is the most critical

19   of everything that you have heard.  How could

20   Dr. Merrens possibly have discriminated or

21   retaliated against Dr. Porter if he didn't have

22   any specific knowledge of it in the first place?

23       And remember, the REI division, the REI

24   division was closed.  First time they've ever

25   closed a division in the entirety of Dartmouth

74

1    Health's history, as far as anybody can testify

2    to.  There was no -- there was no dispute about

3    that.  And three positions were fired all at the

4    same time.  They were let go.

5         Now, how you judge Dr. Merrens'

6    intentions?  And Ms. Nunan glossed over these

7    exhibits, but I would ask that you please review

8    them when you're back in the deliberation room.

9         Exhibits B, C and D.  Easy to remember.

10   When Misty -- Misty Porter was involved in a

11   dispute with a former chair of the OB/GYN

12   department, Richard Reindollar, back in 2012 and

13   2013, she thought that Dr. Merrens was helpful,

14   respectful, a good sounding board to address her

15   conflicts with Dr. Reindollar.  Her e-mail

16   responses demonstrate that he was a caring,

17   thoughtful, and solid leader then and as well as

18   further on down the line, three and a half years

19   later.  He helped her back then.

20        She never approached him again after

21   that.  They didn't stay in contact over the next

22   three and a half years, but she certainly knew

23   that she could go to him as a neutral sounding

24   board.

25        Let me review a few of the key events

1    here.  We went -- there was a lot of testimony

2    on a number of these key issues, and this goes

3    to the heart of the case.  Dr. Porter cannot

4    overcome several undisputed facts, which are

5    fatal to her claims of whistleblower retaliation

6    and disability discrimination.

7        Remember, the REI division closed,

8    permanently closed in May of 2017.  That was

9    eight years ago.  Almost eight years ago.

10       Dartmouth Health announced the closure of

11   its REI division in early May, 2017.  Multiple

12   people testified this was the first time that it

13   had ever happened.  There's no -- there's no

14   dispute about that.

15       Well, Dr. Porter apparently believes that

16   this first-of-its-kind closure, which involves

17   the termination of multiple positions, not just

18   herself, came after a series of formal and

19   informal attempts to fix the REI division.

20       What you heard from Ms. Nunan is their

21   case.  Well, this was a big reach.  This was a

22   big conspiracy.  Really what they were trying to

23   do was terminate Dr. Porter, and so they

24   concocted this big scheme of shutting down a

25   division, which they had never done before, in

1    order to get rid of Dr. Porter.

2         And what you heard was -- from

3    Dr. Merrens was this was a tough business

4    decision made by Dartmouth Health's chief

5    clinical officer.  That's part of his job

6    responsibilities in running a healthcare system.

7    This was not an overnight decision, and it

8    impacted a number of people internally and

9    externally as well.  He understood the gravity

10   of the decision, and he made these decisions

11   even though they're unpopular.

12        To suggest that all of this was done just

13   to target Dr. Porter is another example of her

14   ego getting in the way.  This was not about her.

15   Three physicians were terminated; Dr. Seifer,

16   the division director, Dr. Misty Porter,

17   Dr. Albert Hsu.  All three positions were

18   terminated one month after notice of its

19   closure.  Each of them was offered a severance

20   package.

21        When Dr. Porter asked her for severance

22   they gave it to her.  Nine months of her base

23   salary; $228,000.

24        If we could bring up C-13.

25        You may recall the testimony about this

1    time of events, this sequence of events.  There

2    was the May 25th letter from Dr. Porter to a

3    series of individuals.  She said, Well, I never

4    talked to anybody from Dartmouth Health.  I

5    never reached out to them.  I never heard from

6    them.

7         Well, when you see this letter there's a

8    couple of really important things in it.

9         Number one, Dr. -- Ms. Giglio, her name

10   is now Claiborne, Amy Claiborne says, This

11   letter serves as a response to your letter dated

12   May 25th, 2015, and questions posed during our

13   meeting together with your husband on Friday,

14   May 26th.

15        She also says to her she'd like to thank

16   her for her accomplishments and also let's her

17   know that, I reviewed your request with clinical

18   and operational leadership, and this related to

19   wanting to reconsider her employment termination

20   date.  And she's informed that, no, they can't

21   do that.

22        But then she says, In addition -- and

23   this is in the fourth full paragraph -- in our

24   meeting you had requested an increase in the

25   severance amount.  After considering this

1    request, D-H is willing to extend severance to

2    36 weeks of severance.  That was offered to her.

3    That shows Dartmouth Health's intent.

4         Actually the amount of money, or I should

5    say the number of months was certainly more than

6    the other two positions received.

7         And remember, again, Dartmouth Health

8    hasn't reopened this division, nor does it have

9    any current plans to do so.  The closure is now

10   almost eight years ago.  So any speculation that

11   this closure was like a short-term fix to get

12   rid of Dr. Porter and then, well, we can go back

13   and open the REI division, that still hasn't

14   happened eight years later.  So I'd submit that

15   that theory, that conspiracy theory has gone out

16   the window.

17        Now, it's clear that Dr. Porter disagreed

18   with the decision to close the REI division.  No

19   doubt about that, and a lot of other people

20   disagreed with it.  But this was a business

21   decision that was made by Dartmouth Health and

22   specifically a business decision made by the

23   chief clinical officer, Dr. Ed Merrens.

24        You'll hear the judge explain the

25   business judgment rule during his charge to you.

1    You may not agree with the decision.  It may not

2    be popular.  It may not be something that you

3    want to happen or others wanted to happen or the

4    media said shouldn't have happened, but

5    Dartmouth Health had the responsibility and

6    certainly within their province to decide

7    whether or not it made sense to keep the REI

8    division open any longer.

9         And just because a business decision may

10   be unpopular and result in difficult decisions

11   that impact the employment of the individuals

12   does not make it discriminatory or retaliatory.

13        Remember what this case is about.  It's a

14   disability discrimination and whistleblower

15   retaliation case.  And you may have thought at

16   some point when you were listening to the

17   evidence, like what are we listening to?

18   Because there were a number of witnesses where

19   it was really unclear to me whether or not we

20   were actually talking about an employment

21   discrimination and retaliation case.

22        Upfront I gave you a little bit of a

23   preview of the evidence to say, well, here's

24   what happened.  I suspect at this point you can

25   see how we got here.

1          Now, through a series of e-mails that

2     were sent, shown to you a couple of times in the

3     closing, the same e-mails, plaintiff attempts to

4     cast doubt on the legitimate basis for the REI

5     division closure, and I submit that they fall

6     flat.

7          Let's go over the issue of the REI

8     division closure itself and the reasons for it.

9     There's been a lot of testimony about the

10    reasons for the REI division closure.

11         Plaintiff's counsel tried to demonstrate

12    that Dr. Merrens or others like Dr. Conroy were

13    not credible because they did not articulate

14    each and every reason for the closure when they

15    spoke to the employees or the media.

16         You heard from Dr. Conroy.  She had a

17    five-minute conversation with Dr. Merrens.  This

18    happened before she even got there as the CEO,

19    and that goes to the heart, the credibility of

20    this case and the lack of evidence to support

21    the claims.  She didn't have anything to add in

22    that regard.

23         Ms. Nunan brought up declining

24    birthrates, declining birthrates.  She talked

25    about the lack of providers in that interview.

81

1    She didn't know anything about the REI division

2    closure other than what Dr. Merrens told her.

3         Plaintiff's counsel also wondered why

4    their public comments made no mention of

5    infighting among the physicians, dysfunction in

6    the REI division, interpersonal conflicts.  Why

7    didn't we say that to the public and to the

8    media?

9         Does that really -- just step back and

10   listen to that line of reasoning.  Does that

11   really make sense to you?

12        Would you have really expected

13   Dr. Merrens to put a spotlight on all of the

14   underlying reasons for the closure when he spoke

15   to employees outside of the REI division?  Or

16   when he spoke to the media?

17        His messaging to staff was meant to

18   provide some details, not all the reasons why.

19   It was high level.  It would have been

20   unprofessional and, quite frankly, caused even

21   more reputational harm if he went into detail

22   about the fact that all three of these

23   physicians couldn't get along in the sandbox

24   together.  They couldn't get along and

25   collaborate and engage in teamwork.

82

1              And, by the way, this isn't just

2       Dr. Porter.  It's all three of them, right?  I

3       referred to the land of misfit toys upfront

4       because that's just what I think of when I think

5       of this group of individuals who all bear

6       responsibility for the dysfunction in the REI

7       division.  It's not one person.  We're not in

8       any way saying, well, this is all Dr. Porter.

9       No.  All three of them share some level of

10      responsibility and culpability for why the REI

11      division wasn't working.

12              And, to be sure, e-mails don't tell the

13      full story, especially ones that are -- that are

14      sent postmortem after the fact of the closure

15      had happened.

16              And Dr. Merrens testified.  He was asked

17      pointblank.  I was embarrassed.  I was

18      embarrassed that this happened; that this

19      division couldn't get its act together for a

20      variety of different reasons, but the

21      dysfunction was the root cause for the real

22      problem, which was an inability to recruit and

23      retain highly specialized nurses.

24              As he testified, they were inextricably

25      linked.  And I think Ms. Nunan asked you about

83

1    Exhibit 60, if we can pull that up.

2         Thanks, Ray.

3         As Ms. Nunan noted, it's ultimately the

4    dysfunction of the physicians who worked in this

5    area for years, as well as recent hires, and

6    ultimately a failure of leadership, for which I

7    hold Leslie fully accountable.

8         Certainly Dr. DeMars has some culpability

9    here for her failure of leadership.  No doubt.

10   No doubt.  And part of the problem is having two

11   friends where one is now the supervisor of the

12   chair of the OB/GYN department.  That made it

13   awkward.  A natural awkwardness is probably an

14   understatement.  And because of the fact that

15   there was this dysfunction, they did not have

16   sufficient nursing assistance.

17        Ms. Nunan was trying to call into

18   question Dr. Merrens and, well, why didn't he

19   share something with the public and why didn't

20   we say something to the public or to the media?

21   He was under no duty to do that.  And the fact

22   that he didn't do that doesn't call into

23   question the legitimacy of his decision-making

24   or, for that matter, raise a question of his

25   overall credibility.

84

1          The same holds true in terms of where

2     Dr. Porter's counsel tried to call into question

3     the basis for Dr. Porter's termination.

4     Dr. Merrens was crystal clear on this point.

5     The REI division closure resulted in the

6     termination of all three positions, no question,

7     including Dr. Porter.

8          And plaintiff's counsel had one witness

9     who testified that in a big audience of members

10    of the OB/GYN department, she asked about

11    Misty's termination.  Dr. Merrens said she was,

12    quote, on disability, end quote.  Now, does that

13    really make sense?

14          Now, that's Dr. Russell who said, well, I

15    then saw her fairly shortly thereafter, and I

16    think I referred to it as the raspberry patch.

17    She never makes any mention of this alleged

18    comment by Dr. Merrens.

19          And Dr. Merrens could not be any more

20    clear.  He never discussed anyone's status and

21    certainly nothing specific about Dr. Porter.

22    He's the chief clinical officer of a hospital

23    and had been for a number of years.  He wasn't a

24    rookie at this.  He understood how to make

25    presentations to staff and what he would and

85

1    would not say.  And he was clear; he never said

2    that.

3         And, in fact, Dr. Porter's suggestion

4    that this experienced, high-level executive

5    would go before a room of 30 or 40 people and

6    announce that Dr. Porter had been terminated

7    because of her disability is just plain

8    illogical.  It doesn't -- it doesn't make sense.

9         And, in fact, while you had one person

10   say that with respect to -- on behalf of

11   Dr. Porter, you had Kelly Mousley, who doesn't

12   work for Dartmouth Health.  And by the way, I

13   think six out of ten Dartmouth Health's

14   witnesses don't work for Dartmouth Health

15   anymore, one of whom, Ms. Gunnell, had been laid

16   off.

17        So when you look at credibility, I really

18   want you to look at the credibility of the

19   witnesses.  I mean, she certainly didn't want to

20   be here.  She got laid off a couple years ago.

21   Does anybody really think they want to be

22   testifying in a court case if they had been laid

23   off by that same employer?  But she was

24   credible.  She was believable.

25        Let's go back to that issue of the big

1    OB/GYN department meeting.  Katie Mansfield who

2    attended the meeting, Ms. Nunan said, well, they

3    didn't recall it.  What did Katie Mansfield

4    actually say?  She testified that Dr. Merrens

5    did not say that, and she would have recalled

6    something like that.  Quote, And she would have

7    recalled something like that, end quote.

8         Kelly Mousley, another former Dartmouth

9    Health manager, testified in no uncertain terms

10   that Dr. Merrens said nothing about Misty

11   Porter's condition or anything about her

12   personally.  In her words, quote, I feel like

13   that's something I would remember.  Yeah, that's

14   big, end quote.  That was her testimony.  This

15   just didn't happen.

16        Let me give you a few comments just about

17   the state of the REI division because

18   plaintiff's entire case rests on this conspiracy

19   theory.  They concocted this idea that we're

20   just going to get rid of a division, get rid of

21   all three positions.  Ms. Nunan said, yep, the

22   baby out with the bath water.  All because of

23   Dr. Porter.  The evidence doesn't support it.

24   The facts don't support it.  The testimony

25   doesn't support it.

1          Let's go back to what the REI division

2     was and was not.  It's undisputed that this was

3     a small rural program.  It didn't have a high

4     volume of patients.  It had a good amount of

5     turnover of physicians and nurses between 2005

6     and 2015.  And as I predicted in the opening

7     statement, current and former Dartmouth Health

8     employees testified that the REI division was a

9     tough environment to work in.  And REI's

10     reputation far and away preceded it.

11          I think we all know, and have in our own

12     respective businesses where we may work,

13     examples of, well, that department is pretty

14     tough.  I don't want to really deal with them.

15     That's exactly what the case was with the REI

16     division.

17          In the early years of the REI division

18     there were two factions.  There was the Misty

19     Porter team.  There was Sharon Parent, her

20     nurse, and then the other team.

21          And later on it became three different

22     camps and three different silos, right?  And it

23     was clear and certainly clear from the evidence

24     that Dr. Hsu and Dr. Seifer didn't help to

25     bridge the gap in teamwork and collaboration

88

1    along with Dr. Porter.

2              You may recall that Sharon Parent was the

3    first witness to testify in support of

4    Dr. Porter.  You might also recall that

5    Ms. Parent's testimony about the recruitment of

6    nurses to the REI division was proven to be

7    totally false.  She testified -- this is

8    Ms. Parent.  She was the first witness, which I

9    realize, I'm not sure if it was true for all of

10   you, that seems like that was months ago.  She

11   testified no one ever asked her for ideas on how

12   to recite nurses, and Dartmouth Health never

13   posted the position externally.

14             But then she was presented by

15   Ms. McDonald with evidence of the contrary;

16   that, in fact, there was an e-mail showing that

17   they had been looking for ways, Dr. Seifer had

18   been looking for ways to recruit nurses to the

19   REI division.  And this predated the

20   November/December time period.  There's postings

21   that were sent out in June of 2016.

22             In fact, I'd ask you to look at

23   Exhibit V, if you'd bring that up, Ray.

24             This was the posting that went out in

25   June of 2016.  They had been looking for REI

1    division nurses for a really long time.  And

2    Ms. Parent said, Well, it should take you about

3    six months to find somebody.  They didn't.  They

4    couldn't find anybody.  That's the reality.

5         Now, in terms of the atmosphere within

6    the REI division, the environment, they had a

7    number of people come up before you.  Again,

8    Dr. Judy Stern, the retired director of

9    embryology, and I think you all agree she was an

10   honest broker, unvarnished and heartfelt, and

11   right out of the gate without any prompting said

12   Dr. Porter is not a team player.  She worked

13   with her for 10 to 15 years.

14        A couple of times I'm not sure who was

15   asking the questions, me or Dr. Stern, because

16   she wanted to explain the environment that

17   they -- everybody was operating in.  She

18   testified she worked with Misty Porter for many

19   years, and her comments were credible.

20        She stated, quote, I just wanted to say

21   that Dr. Porter had criticisms of all the

22   physicians in the division, end quote.  And that

23   that was her experience throughout the time she

24   was there.

25        She said that Dr. Porter had a lot of

1    criticisms about the nursing staff, often about

2    some of her lab staff, and they didn't do things

3    the way she thought they should be done.  And,

4    yes, she gave one example about an internal form

5    that the chair of the department wanted to use.

6    And that may seem like meaningless to some

7    people, but it's just par for the course on how

8    the dynamic in this group was.  It was

9    untenable.  There was a lot of tension.  And

10   that happened before Dr. Hsu came on the team,

11   it was before Dr. Seifer came on the team, and

12   before Dr. Porter had her disability or her

13   condition, her medical condition.

14        What about Kelly Mousley?  Another former

15   D-H employee who was asked to testify.  She was

16   direct.  She was forthright.  She was clear.

17   The nurses didn't get along.  She talked about

18   the fact that she supervised the administrative

19   staff across all six OB/GYN divisions and

20   testified about the REI division.  There were

21   periods of time, in her words that, quote, I

22   felt like it was my full-time job, end quote.

23        You also heard that from Ms. Gunnell,

24   right?  Corroboration of testimony.

25   Corroboration of the fact that to the extent

91

1    that there were individuals that had

2    responsibility for the REI division as well as

3    other divisions within the OB/GYN department,

4    they spent the lion's share of their time on

5    dealing with conflict, disagreements, disputes

6    in the REI division.

7            I asked Kelly Mousley if she experienced

8    this level of struggle or lack of

9    professionalism in other divisions.  No.  Quote,

10   no, nothing like this.  It was an outlier, end

11   quote.

12           People warned Ms. Mousley of Dr. Porter.

13   She said, quote, People telling me that if I met

14   with Dr. Porter to stand my ground and not allow

15   her to intimidate or bully me, to do what's

16   right.  Quote, Try to warn me to be prepared and

17   to be strong.

18           Now, remember, she doesn't work for

19   Dartmouth Health.  She came in to testify about

20   her experiences in that division.  There was no

21   coordination between teams on how to handle

22   incoming patient calls.  And you heard a lot

23   about that, this territorialness.  Well, if a

24   patient came in and it wasn't for that

25   particular provider, it didn't get over to the

92

1    other provider.  I mean, hopefully the evidence

2    as you saw it demonstrated that this group had

3    no teamwork, no collaboration whatsoever.  There

4    was lots of dissension.

5         And then other than her few supporters,

6    her team, if you will, Dr. Porter was critical

7    of a slew of physicians and nurses, many of them

8    junior and less experienced.  You heard the

9    testimony about the fact that Dr. Porter

10   criticized some of the other former physicians;

11   a woman by the name of Sophia as well as her

12   husband, Neil.  You saw many, many e-mail

13   communications from Dr. Porter herself where she

14   is, at a minimum, critical and, at worse,

15   downright mean-spirited.

16        Now, let me just turn to the two

17   physicians who were subjected to, if you will,

18   character assassinations throughout this trial.

19   I told you that Dr. Porter didn't call them as

20   witnesses, and I think that's telling.

21        With respect to Albert Hsu, where do we

22   begin with him?  Dr. Porter had a negative view

23   of Dr. Hsu before he even got there.

24   Dr. Porter, whether she was his formal mentor or

25   not, seemed to give up on Dr. Hsu after his

1    first six months.  She testified, the first six

2    months I was there for call, et cetera, and then

3    let him go on his own to be independent and

4    then, well, he didn't do things according to the

5    way that she thought they should be done.

6         What should she have done?  She's there

7    as the more senior person in the division.  So

8    even though she had been out for six months on

9    her leave of absence, December of '15 through

10   June of '16, in June she writes this long letter

11   basically gaslighting Dr. Hsu for all the

12   shortfalls of his practice; clinical skills,

13   competency, et cetera.

14        And when David Seifer came on the scene

15   right in that same time period, he gets this

16   long list of basically trashing Dr. Hsu.

17        Now, Dr. Seifer got the job that

18   Dr. Porter always coveted but was never

19   considered for, and there had to be just a tinge

20   of jealousy masked by some of her numerous

21   critical comments.

22        She immediately found everything wrong

23   with his clinical knowledge, his skills, his

24   technique.  Of course, Dr. Seifer joined a small

25   REI program where the lines had been drawn well

94

1    before he got there.  No one was as great as

2    Dr. Porter in her mind.  Dr. Seifer's brief

3    11-month tenure was probably doomed from the

4    start.

5            Now, Dr. Seifer had his own problems with

6    proper social graces and communication skills,

7    I'm not minimizing those issues, but needless to

8    say the lack of collaboration and teamwork

9    created a negative environment which really

10   expedited the eventual demise and closure of the

11   REI division just a few months into 2017.

12           And what about the REI division?  What

13   about the reasons why they closed it?  Now,

14   there's not just one reason, and that's

15   understandable, right?  You're -- there's not

16   one reason why something happens that's a really

17   complex critical decision that's going to affect

18   a number of people.

19           The final six months Dr. Porter calls

20   into question, well, there wasn't really a

21   nursing shortage.  There wasn't really a

22   problem.  There are ways to fix the nursing

23   shortage.  They should have been able to do it,

24   but time and again the testimony across the

25   board was consistent and it was corroborated by

1    multiple e-mail communications and documents.

2         And despite claiming it was somehow

3    artificially manufactured, even Dr. Porter had

4    to reluctantly acknowledge it.  Remember, by

5    late 2016 the REI division was down two people.

6    Casey Dodge had been terminated or resigned.

7    Sharon Parent retired in December of 2016.

8         And Dr. Porter's counsel repeatedly

9    suggested that had Sharon Parent been allowed to

10   return from retirement, the nursing shortage

11   would have been solved.  You saw documents and

12   heard evidence establishing that that simply was

13   not true.  The REI division was looking for

14   additional nursing support at that time above

15   and beyond Ms. Parent, and when she did retire

16   the shortage only became more dire.

17        And Heather Gunnell testified; remember

18   she was the individual who had been laid off by

19   Dartmouth Health.  She was asked whether Sharon

20   could have solved the nursing crisis, and her

21   testimony was clear.  Absolutely not.  That was

22   not -- that was a small Band-Aid on a major,

23   major problem.  And by April of 2017 it's

24   undisputed that they were left to one

25   less-than-fully-trained REI nurse.

1          Exhibit J, if we could pull that up, that

2     was an exchange between Dr. Porter and Karen

3     George.  You heard testimony from Karen George.

4     They both acknowledged that they -- quote,

5     Nursing situation on all fronts is a nightmare.

6     Nursing needs to change.

7          Now, you then saw, if we can bring up

8     A-16, and I'll run through this fairly quickly

9     because the evidence of this was overwhelming.

10    December 6th there's a message from Dr. DeMars

11    and Dr. Seifer about the imminent REI nursing

12    crunch and requiring significant changes in

13    nursing workflow and task allocation.  And that

14    they had to focus their efforts on providing

15    excellent patient care for those who already had

16    a tentative start date, and they were pushing

17    off the start dates for other people.  This is

18    December, right?  Early December.  Mid-December.

19          A-20, if we could.

20          December 16th.  This is the e-mail from

21    Dr. Seifer, just ten days later.  During the

22    months of January and February we will not see

23    any new patients, and we will be limiting our

24    patient appointments to only those necessary for

25    the patients currently in cycle who will need

1    retrievals or transfers from January or

2    February.

3         Once again, Dr. Porter's whole case rests

4    on this was a conspiracy to get her out.  They

5    created this entire rouse.  So all of these

6    documents, the 90 documents you saw, were all a

7    rouse and conspiracy to get Dr. Porter out of

8    Dartmouth Health.

9         But then you have not just those events

10   where they're really slowing down or pausing new

11   patient referrals, right?  Because they don't

12   have capacity to handle it.  You then have the

13   January/February, 2017 Value Institute.  And in

14   that there are a couple things that happened.

15   There's a couple of meetings in December, or I

16   should say the fall of 2016 and then January and

17   February of 2017, and they have a couple of

18   retreat dates.

19        And Dr. DeMars testified that the

20   evaluation by the Value Institute was twofold.

21   One was that the division was unsalvageable.

22   And, two, that if she was going to keep

23   Dr. Porter on in the department that she had to

24   do two things.  First was to very clearly

25   confront her that she was central to the

1     dysfunction and that, if she were to continue,

2     that it could not be in a leadership role.

3          And Dr. DeMars testified, quote, I

4     remember looking at the person who talked to me

5     about this and saying, This would have been the

6     hardest thing I would ever have to do, end

7     quote.

8          Heather Gunnell and Daniel Herrick both

9     testified that this was not salvageable; that

10    this -- that the report out of the Value

11    Institute was that we couldn't do anything about

12    it.  It was not -- we couldn't fix it at the end

13    of the day.

14         Go to B-2 for a second.  Then you have

15    Dr. Porter's comments about the program itself,

16    and those comments are particularly telling.

17    She said, Indeed, the program is close to

18    dissolution.

19         Further on down she says, There's not

20    enough IVF at DHMC, nor has there ever been,

21    despite heavy efforts at marketing and outreach

22    for many providers within REI to focus only on

23    IVF.  Again, these are her words.

24         And by April the writing was on the wall,

25    if we could bring up B-7.

99

1           This is April 27.  This is the e-mail

2      from Ms. Gunnell to Dr. Porter regarding patient

3      scheduling.  Actually it's to everybody, and it

4      was sent on behalf of Dr. DeMars.  We have a

5      critical staffing issue in REI, and once again

6      they're deferring new infertility evaluations.

7      They're not scheduling any patients for an ART

8      cycle.  And the remaining patients, May through

9      July, are currently under review.  Updates will

10      be forthcoming.

11           And this was just the final straw.

12      Because by that date Marlene Grossman, who was

13      the one REI, full-time REI nurse in Bedford;

14      Bedford/Manchester, New Hampshire, she resigned,

15      and so now you're left with one

16      less-than-fully-trained nurse.

17           I want to turn your attention to the

18      claims in this case, right?  I said upfront the

19      claims in this case are employee discrimination

20      and retaliation.

21           Based upon the evidence in the record

22      Dr. Merrens was the ultimate decisionmaker on

23      the REI closure.  He didn't know anything about

24      Dr. Porter's medical status or condition at that

25      point.  He didn't know anything about any

1    complaints she made about Dr. Hsu or Dr. Seifer.

2    And so when you're looking at the analysis, the

3    legal analysis that you're being asked to

4    perform, remember those facts.  Because that's

5    factually what the record reveals.

6         And despite trying to rattle him by

7    calling them in their case, Dr. Merrens was

8    emphatic.  I received recommendations from

9    Daniel Herrick -- who by the way is no longer

10   employed by Dartmouth Health -- to close the REI

11   division.

12        Leslie DeMars, while plaintiff's counsel

13   also called her in their case-in-chief, which

14   they have a right to do.  They tried to

15   challenge her on various points on

16   cross-examination right out of the gate.  She

17   was unflappable.  She told you what happened and

18   where she was in the recommendation process.

19        She recommended the closure of IVF but

20   not the REI division.  She was clear about that.

21   And she also said that she disagreed with the

22   decision to close the division.  Quote, I

23   disagree with it.  I was unable to argue my

24   disagreement, and I was unable to turn back the

25   fact that the actions had been taken, the

1    termination actions had been taken and it had

2    been publicized, end quote.

3            Quote, I was not allowed to present that

4    plan before the decision was made to terminate

5    the division, end quote.

6            And with regard to Dr. Porter, Dr. DeMars

7    testified, I absolutely wanted her to stay on.

8    I had a job for her that I was trying to plan

9    for.  You saw that Exhibit 50-A, if we could

10   pull that up for a second.

11           Because this gets down to your analysis

12   of what was available for her, what position

13   could she potentially go to.  And there was

14   testimony by Heather Gunnell who testified that

15   she and Daniel drafted this theoretical plan to

16   retain Dr. Porter at the request of Dr. DeMars.

17           But the record is clear on a couple

18   points.  One, this document never went to

19   Dr. Merrens, so he didn't consider it in his

20   decision.  And, two, Dr. Chertoff will

21   testify -- testified, and remember she's the

22   doctor that travelled from Portland, Oregon by

23   planes, trains and automobiles to get here,

24   albeit a day later.  She testified that they

25   already had gynecological ultrasound experts in

1    the radiology department.

2              And it would be -- when it became clear

3    that Dr. Merrens was unwilling to keep the REI

4    division open, Dr. DeMars called a colleague at

5    UVM to get her a job.  You saw those text

6    messages asking her to help her friend.  Yeah,

7    you should call our friend.  There's no unlawful

8    animus here.  There's no discriminatory motive

9    at play here.  Just a conflicted individual

10    who's struggling to do right by her friend while

11    also doing the right thing for the OB/GYN

12    department.

13              But at the end of the day, at the end of

14    the day she didn't make the decision.  She just

15    didn't make the decision.  That was Dr. Merrens.

16              You saw him testify.  He testified on two

17    days, not one.  And the evidence throughout this

18    case sustained that Dr. DeMars's friendship with

19    Misty was a complicated one and one that created

20    numerous challenges for her leadership.

21              Dr. DeMars was fully aware of the issues

22    Dr. Porter created within the REI division, and

23    she kind of put up with it for a long period of

24    time.  And it even went so far as to approach

25    human resources to ask him to prepare a

1    memorandum of expectation about Dr. Porter's

2    behavior.  You remember seeing that.  She said,

3    Well, it's the biggest mistake of my life.  I

4    really should have held her accountable, but she

5    couldn't.  She was her friend.  She actually

6    helped Dr. DeMars get pregnant with her second

7    son.  Like how conflicted can you be?  Never

8    mind a friendship and the fact that they shared

9    rooms together.  Dr. Porter helped Dr. DeMars

10   get pregnant with her second son.  That's

11   undisputed.

12        And if anybody doesn't think that that

13   created a level of conflict, awkwardness to deal

14   with her friend and colleague who was difficult

15   to deal with from a teamwork and collaboration

16   standpoint, I don't know what is.

17        She didn't deliver the memo to Dr. Porter

18   and testified that was her biggest mistake.  And

19   Dr. Merrens didn't rely on any recommendation by

20   Dr. DeMars with respect to the REI closure.  In

21   fact, he testified he, quote, completely lost

22   faith in her as a leader.

23        So you're being asked before, well, you

24   know, Dr. DeMars harbored this animus towards

25   Dr. Porter and that should be imputed to

1    Dr. Merrens and, therefore, Dartmouth Health

2    should be held responsible.  How can that be?

3    Dr. Merrens was really clear.

4         At this point Dr. DeMars, her judgment

5    and inability to actually run the OB/GYN

6    department was clear.  She couldn't do it.  And

7    he saw that, and he certainly wasn't listening

8    to her.  In fact, she testified, hey, I think we

9    should shut down the IVF department but not the

10   REI division.  She was clear about that.

11        And he made the decision, I'm shutting

12   down the entire thing.  And he did that even

13   though it was unpopular, but it needed to be

14   done for a lot of reasons.

15        Now, what about the potential

16   accommodations that Dr. Porter thinks she should

17   have received at the time of the REI closure?

18   I'm not going to go into all of the law here

19   because you're going to hear that from Judge

20   Doyle.  But under the ADA, the Rehab Act, the

21   disability discrimination laws, if somebody has

22   a disability, you might have -- you've got a

23   duty to reasonably accommodate them.  And

24   "reasonably accommodate" includes reassignment

25   to a vacant position.  That's what the law

1    states.  Reassignment to a vacant position.

2    Those words are really important for you to

3    understand.

4         There are a number of other things that

5    could be a reasonable accommodation, but here

6    this is a big issue, right?  You receive a

7    charge from the Court that the ADA does not

8    require creating a new position with somebody,

9    even somebody with a disability.

10        Now, I don't want to -- even though there

11   was not a significant amount of testimony on

12   this topic, it goes to intent, motive,

13   et cetera, I want you to remember what Dartmouth

14   Health did to reasonably accommodate Dr. Porter

15   from December 15 to the closure of the REI

16   division in May of 2017.  That's about

17   18 months.  She was on two leaves of absence for

18   nine months total.

19        And when she was there it was a fairly

20   sporadic, reduced schedule while she was on

21   long-term disability, which started in June of

22   2016.

23        If we can show Exhibit 129, Ray, I'd

24   appreciate that.

25        This just highlights the laundry list of

1       accommodations that she sought and Dr. DeMars

2       approved and authorized for her.  Dr. Porter

3       does not dispute that Dr. DeMars approved and

4       authorized all of the requested accommodations

5       in June of '16; allowed her to work from home,

6       allowed her to have space at work by herself.

7       She had essentially created her own schedule.

8       You heard testimony about the fact that she

9       didn't want anybody else knowing her schedule.

10              While she blames the termination of her

11      emotional well-being over the summer of 2017,

12      she acknowledged that after the REI division had

13      been closed she had two separate visits to the

14      Mayo Clinic for two-week periods.  So two

15      two-week periods; June/July, July/August.  And

16      then she had another surgery in September of

17      2017 and was on another leave of abscess, albeit

18      at UVM, from September to November of '17.

19              Now, I went back to the opening statement

20      in this case, and Mr. Vitt referred to the fact

21      that Dr. Porter did surgeries that no one could

22      perform.  He said it a couple times.  What's the

23      actual evidence in this case?

24              There was no vacant position in the

25      radiology department.  Leslie DeMars testified

107

1      that she went to the chair of the radiology

2      department, at the time Joselyn Chertoff, to

3      inquire about any potential vacancies for her

4      friend, Misty Porter.  And she went to the

5      radiology department and asked her, and then you

6      heard not just from Leslie DeMars, you heard it

7      from Dr. Chertoff.  And she testified in May of

8      2017 there were no open positions in our

9      radiology department.  They already had a

10     sufficient number of radiologists, and there's

11     no evidence in the record to suggest otherwise.

12           Remember, it's the plaintiff's burden

13     here.  Plaintiff has to show that there was a

14     vacant position available to be reassigned to.

15     It was glossed over in Ms. Nunan's initial

16     statement, but it's important for you to

17     remember because that's the law.

18           If somebody has a disability and the

19     employer has a reasonable duty to accommodate in

20     this particular place, Dr. Porter is asserting

21     that, well, I should have been reassigned.  I

22     should have been reassigned to OB/GYN.  I should

23     have been reassigned to radiology.  I'll get to

24     OB/GYN in a second.

25           Let's just stay with radiology for a

1    second because there's two different places that

2    she could have ended up.  Dr. Chertoff was clear

3    and articulate that she, as well as many other

4    physicians in the radiology department,

5    interpreted gynecologic and early obstetric

6    ultrasounds on a routine and regular basis.  So

7    Dr. Porter's skills were not unique, special, or

8    missing after she left Dartmouth Health.

9        And the testimony by friends, many of

10   Dr. Porter's friend that testified were all in

11   other divisions or other subdivisions of

12   Dartmouth Health.  That doesn't change the fact

13   that Dr. Porter was not a unicorn.

14       And to be sure, you heard Dr. Chertoff,

15   right?  She testified she's interpreted over

16   10,000 gynecologic and early obstetric

17   ultrasounds.  That's undisputed.  That's

18   unrebutted testimony.  There's nothing to

19   contradict that.

20       But Dr. Chertoff was already clear that,

21   you know, I wasn't the only one, but as the

22   chair she certainly had that expertise.  And

23   they routinely handled gynecologic and early

24   obstetric ultrasounds on a daily, weekly,

25   monthly basis.  They have six ultrasound rooms

1    there.

2         Now, what about possible reassignment to

3    the OB/GYN department?  Dr. Porter testified

4    that three weeks after the REI division closure

5    she wrote a letter to Dr. Merrens, Dr. Padin and

6    others.  Exhibit B-12.  That's the May 25, 2017

7    letter, okay?  This is a key document.

8         There's a lot of important documents in

9    this case, but I would submit that this is a key

10   document.  And it's interesting, out of the

11   seven exhibits that we heard in the initial

12   closing statements, this was not one of them.

13   This is a key document for you to review because

14   why?

15        Dr. Porter send it three weeks after she

16   received notification in person that the REI

17   division was being shut down.  She obviously

18   took a long time to write the letter.  It's

19   important for what is in it and what is not in

20   it.  Please review it when you can.

21        She doesn't mention anything about being

22   treated differently by Dartmouth Health as a

23   result of her condition or any complaints about

24   anything; patient harm, patient safety, anything

25   about Dr. Hsu or Seifer.

110

1           If anything, all she does is try to show,

2       well, you know, compared to the other two

3       doctors I'm much more superior, and you should

4       keep me in some capacity.

5           Now, as you heard, she had the same legal

6       counsel in this case, Mr. Vitt, as she did back

7       in 2013, and she had every opportunity in this

8       letter, three weeks after, to raise any issues

9       in this letter on the claims that are now in her

10      lawsuit.  She didn't raise them in the letter,

11      and she didn't raise them in her meeting with

12      the head of human resources.  Think about it.

13          We can go back to C-13 for a second, and

14      then I'll come back.  We'll go to the second

15      page.

16          This is a letter where she meets with the

17      head of HR, the head of HR for the entire

18      Dartmouth Health system.  This is in response to

19      your letter dated May 25 and to the questions

20      she posed during this meeting on May 26th,

21      right?

22          Okay, now, go back to the B-12 for -- if

23      you would.

24          In the document she says, quote, As a

25      gynecologic surgeon I perform complex

1    hysteroscopic -- this is definitely

2    challenging -- laparoscopic and robotic

3    procedures not offered by many, if not most of

4    the other gynecologists, end quote.  That was

5    Dr. Porter's words.

6          Now, what can you glean from those words?

7    Well, one, she's actually admitting that other

8    people at Dartmouth Health actually do these

9    things, right?  Other people.  Not many, if not

10   most, but that leads you to think, well, there's

11   a couple people that do that.

12         And Dr. -- we'll get to Dr. Padin in a

13   second.  And you heard from her, right?

14   Dr. Padin, she testified not once but twice.

15   And during her first round of testimony

16   Dr. Padin could not be more clear.

17         In 2017, June/July, 2017 the hospital

18   needed a generalist to assist in labor and

19   delivery.  And despite Dr. Porter's dual

20   appointment in OB/GYN and radiology, she didn't

21   have current credentials or privileges in

22   obstetrics.  There is no dispute about that.

23   This is not a factual dispute.  Dr. Porter did

24   not have privileges in obstetrics, period, full

25   stop.

1          When Dr. -- and it's clear from the

2     record that because she didn't have those

3     privileges, she was not qualified to be

4     reassigned to that position in the OB/GYN

5     department in the summer of 2017.

6          And during her second stint of testimony

7     Dr. Padin, this past Friday, which also seems

8     like a long time ago, Dr. Padin says she

9     performed many procedures under the umbrella of

10    the reproductive endocrinology, advanced

11    laparoscopies -- I'm definitely saying that

12    wrong -- myomectomies, robotic surgeries.

13    Right?  She said all these things.  She

14    performed these surgeries.

15          And, remember, Dr. Padin is the one that

16    proctored that surgery back in April for

17    Dr. Porter, and she proctored it because she has

18    those privileges.  She does those surgeries.

19          There was no vacant, open, existing open

20    position for Dr. Porter at that point.  And

21    under the law we submit, under the ADA Rehab

22    Act, the state disability discrimination laws,

23    there was no open vacant position for her to be

24    reassigned to as a potential reasonable

25    accommodation.

1          Let me turn to whistleblower retaliation
2     and why Dr. Porter cannot establish pretext, and
3     you heard a little bit about that from
4     Ms. Nunan.
5          Dr. Merrens had no knowledge of
6     Dr. Porter's long trail of complaints about the
7     other REI positions, meaning Dr. Hsu and Seifer,
8     which dated back many years.
9          And, by the way, when we look at
10    retaliation, think about that issue for a
11    second.  Well, her complaints about Dr. Hsu
12    started in 2013, and somehow, even though she
13    had complaints in 2013, '14, '15, '16, '17 about
14    Dr. Hsu, somehow those complaints are the reason
15    why she was terminated in May of '17.  It
16    doesn't ring true.  It just doesn't.
17         Again, the evidence in the record, the
18    exhibits before you, the witness testimony,
19    which is corroborated, all of the points that
20    I've presented to you.
21         She can't be considered a whistleblower
22    because here Dr. Merrens had no knowledge of
23    Dr. Porter's history of complaints.  His
24    decision to close the REI division was his
25    decision alone, and Dr. Porter didn't make any

114

1    comments to Dr. Merrens.  And think about that,

2    right?

3          Back in 2012, 2013, she's got this

4    dispute with the OB/GYN chair.  She has

5    Dr. Merrens there as kind of a neutral.  She

6    says very glowing things about him in

7    Exhibits B, C and D, which are admitted into

8    evidence, and then she doesn't go back to him

9    when she's having any problems with anyone else

10   in the REI division.

11         While she -- the record is clear.  While

12   she had relied upon his counsel and guidance on

13   other earlier occasions, she had not spoken to

14   him in a couple years.  She certainly knew that

15   she could reach out to him.  She didn't do it.

16         Now, what about the other people

17   involved?

18         Daniel Herrick, he says he didn't have

19   any knowledge of complaints or concerns about

20   Dr. Porter on anything.  Heather Gunnell, ditto.

21         Now, Leslie DeMars certainly had been in

22   communication with Dr. Porter about her range of

23   grievances with Dr. Hsu and Seifer, but she

24   was -- the record is clear in this case that she

25   didn't tell Merrens, Herrick, or Gunnell about

115

1       Dr. Porter's complaints regarding Dr. Hsu and

2       Seifer.

3            Let me just say that one more time

4       because it's important.  She didn't tell

5       Merrens, Herrick, or Gunnell about Dr. Porter's

6       specific complaints regarding Hsu and Seifer.

7            And that brings you then to the reason

8       why there's no causal connection, right?

9       There's an issue of engaging in protected

10      activity.  There's an adverse employment action.

11      But the third prong of that, of a prima facia

12      case for retaliation is a causal connection

13      between the two things.  There has to be a

14      causal connection.

15           Dr. Porter's complaints about other

16      physicians and nurses dates back at least ten

17      years, and you heard from Dr. Stern, Kelly

18      Mousley, Katie Mansfield, so it's not surprising

19      that Dr. Porter had complaints about her newer

20      colleagues.

21           And from shortly after Dr. Hsu started

22      until the time of her termination, Dr. Porter

23      reported concerns to Dr. DeMars.  We're not

24      saying that she didn't do that.  We're not

25      saying that.  We're just saying that those

1    complaints, whatever they are, had nothing to do

2    with her termination of her employment when they

3    closed the REI division.

4         Because, remember, to the extent that

5    Dr. Porter raised complaints in 2014, in 2015,

6    in 2016 about Dr. Hsu, nothing negative happened

7    to Dr. Porter during any of those periods of

8    time.

9         You also heard testimony, and this is

10   important for purposes of understanding the

11   evidence and whether or not Dr. Porter meets her

12   burden of proof.  There were similar complaints

13   by others in the REI division; Beth Todd,

14   numerous complaints about Dr. Hsu and Seifer.

15        And while Dr. Porter complains she was

16   retaliated against for making those identical

17   complaints and for failing to be reassigned to

18   an unknown, unspecific position, Beth Todd is

19   still gainfully employed at Dartmouth Health

20   today.

21        And you saw in Exhibit C-13, the last

22   page talked about the fact that Beth Todd

23   actually had a dual appointment and actually did

24   a lot of work in OB/GYN, and she's the one

25   person, the nurse practitioner who remained

117

1    employed at Dartmouth Health.

2              Finally -- and I appreciate everybody's

3    patience in listening and attentiveness -- let

4    me get to the subject of damages.

5              We didn't put an expert on the stand

6    because we don't think you should even get to

7    the subject of damages at all, but let me make a

8    few comments about it.

9              You heard from Dr. Bancroft, Dr. Porter's

10   quote, unquote, hired gun.  You have to make a

11   decision on whether or not he was credible after

12   multiple iterations of multiple reports and

13   multiple conclusions about multiple numbers.

14             Yes, it's true, lawyers aren't great at

15   math, but I'm not sure that this guy is either.

16   And some of the members of the jury would

17   remember an SNL character by Jon Lovitz who

18   always said, Yeah, that's the ticket, and that's

19   exactly who Dr. Bancroft is.  Anything that

20   Dr. Porter said or Dr. Porter's counsel said to

21   him, he created new assumptions, he created new

22   facts, and that's how he came up with his

23   numbers.

24             You remember he said, Well, actually I

25   didn't even have the documents initially.  I

1    threw them away.  But then he said my house

2    burned down, and then he wasn't sure where they

3    were.  But on cross-examination he admitted that

4    he hadn't been told some critical information.

5         Now, what is in the record is the fact

6    that his opinions vary dramatically over the

7    years.  At one point he said it was 4.3 million

8    dollars, and then it dropped all the way down to

9    1.7 million dollars but it was still a grossly

10   inflated number.

11        And then you get to the retirement age.

12   In his earlier reports he said, well, you should

13   look at 65 years old as the date she would

14   retire.  But when he had to actually reduce all

15   of these assumptions for her potential damages

16   all the way through 2033, he now says,

17   magically, well, you got to assume that she was

18   going to work until she was 70.

19        But it didn't stop there in terms of his

20   manipulation of the assumptions.  All of this is

21   speculation and in an obvious attempt to juice

22   up the numbers because he's moving the -- it's a

23   sliding scale, and all of his reports are all

24   over the place based on different assumptions.

25        And only this latest analysis, which he

1    did five days before trial where he had to now

2    acknowledge that Dr. Porter was a full-time

3    professor, doesn't really come through.

4            He now had -- he also tries to make an

5    assumption.  Well, she was going to reduce her

6    schedule from 1.0 to .75 in July of this coming

7    year.  But when Mr. Coffin actually asked him to

8    do the analysis, to do an apples-to-apples

9    comparison, like, okay, if you're making

10   assumptions that she was going to be 1.0 FTE,

11   full-time equivalent at Dartmouth Health, you

12   should at least do the same when she was working

13   at UVM.

14           If he did the math, and he asked him to

15   do it, and whether he disagreed with him or not,

16   there was no basis for economic damages because

17   by 2025 and further on she was actually earning

18   more at UVM.  There's no basis for economic

19   damages.  There's no basis for emotional

20   distress.  There's no basis for punitive

21   damages, which is even an higher standard that

22   Dr. Porter can't meet.

23           Because, remember, this comes back to

24   credibility of witnesses and corroboration of

25   evidence.

1          There are 90 exhibits and 20 witnesses.

2     All of you listened to the evidence intently,

3     took notes throughout the trial.  Everybody

4     appreciates that.

5          My final thoughts.  Dartmouth Health's

6     closure of the REI division in 2017 was done

7     after thoughtful deliberation relating to its

8     continuing viability.  Dr. Merrens, Dr. Padin,

9     Daniel Herrick, Heath Gunnell all testified it

10    was the right call.

11          Dr. Merrens was here with you throughout

12    the entire trial.  You've got to judge his

13    credibility, too, right?  His testimony was

14    unwaivering.  He was emphatic.  He made the

15    decision to shut down the REI division

16    altogether.  He had no knowledge, no knowledge

17    of Dr. Porter's disability, no knowledge of her

18    complaints regarding Dr. Hsu and Seifer.  Yet,

19    he's the one that made the decision, and that's

20    where legally Dr. Porter's claims fall apart.

21          He made the decision to shut down the REI

22    division because it was a dumpster fire, for

23    lack of a better term.  It was never about

24    Dr. Porter.  It was about an unsalvageable

25    program.  That's what the Value Institute said.

1                And plaintiff's theory of the case

2        consists of the following.  Dartmouth Health

3        concocted a plan to terminate her by closing an

4        entire division, something it had never done

5        before.

6                Ask yourself, would Dartmouth Health

7        really have shut down a whole division,

8        something it's never done before, just to get

9        rid of one employee, especially a talented

10       surgeon like Dr. Porter?

11               And I want you to look at the record.

12       Look at the testimony and the exhibits against

13       the credibility of the witnesses who came before

14       you.

15               Respectfully we request that you render a

16       verdict on behalf of Dartmouth Health in this

17       case on all of Dr. Porter's claims.

18               Thank you.

19               THE COURT:  Okay.  Any rebuttal from the

20       plaintiff?

21               REBUTTAL CLOSING ARGUMENT ON BEHALF OF

22       PLAINTIFF:

23               MS. NUNAN:  Attorney Schroeder stated

24       that Dr. Porter had shamelessly exploited

25       Patient Eunice Lee.

1          I specifically asked Eunice Lee why she

2     had chosen to come forward and tell her very

3     personal and painful story about her experience

4     at Dartmouth Health.  She was harmed by Dr. Hsu.

5     Her response was, I'm one of many women, and I

6     do not want to be a faceless name on a billing

7     statement.

8          Her testimony came in the face of

9     Dr. Merrens' statement at this trial:  I am not

10    aware of any actual harm.  D-H does not want to

11    talk about patient harm.  It does not want you

12    to consider patient harm, and this is why

13    Dr. Porter spoke up.  She could not tolerate it.

14    She would not be quiet about it, and she could

15    not watch these two doctors operate

16    incompetently.

17         If Dr. Porter had accepted the severance

18    package that Dr. -- that Attorney Schroeder

19    keeps pointing out, all of this would have been

20    swept under the rug.  She wouldn't have been

21    able to talk about it.

22         Attorney Schroeder labeled the women who

23    came forward; Sharon Parent, Julia MacCallum,

24    Vicky Maxfield, Janice Gonyea, and Dr. Karen

25    George as Dr. Porter's friends.  This is

1    insulting.  These are women who have decades of

2    professional experience as nurses and doctors

3    who take their duty to report seriously, their

4    duty to come and speak in public about these

5    issues seriously.  They are not Dr. Porter's

6    friends first.  They're professionals first.

7         Dr. Julia MacCallum testified that she

8    reported what she saw in the OR at Dartmouth

9    Health in 2015; Dr. Hsu's ripping and yanking in

10   surgery.  She reported that as a resident way

11   before she became close with Dr. Porter.

12        Hospital transparency matters.  It

13   matters all the way to the top.  What

14   Dr. Merrens says, what Dr. Conroy says, the

15   public has to trust what top administrators --

16   that they're going to tell the truth.

17        What he says, what Dr. Merrens says to

18   the staff and what he says to the media matters.

19   The public has to trust that when they go to D-H

20   to get services, women -- women like you, like

21   your mom, your daughter, that the people who are

22   there performing the procedures are qualified.

23        Dartmouth administrators had noticed in

24   the summer of 2016 that they had two incompetent

25   doctors on their hands.  They allowed them to

124

1       perform procedures on women for another

2       12 months.

3              This case is about patient harm and

4       Dr. Porter holding Dartmouth Hitchcock

5       accountable by speaking up loudly about it.

6              THE COURT:  Okay, so that concludes

7       closings arguments.

8              The next part of the case I'll be

9       instructing you on the law.  We're going to take

10      our lunch break before I do that, but I do want

11      to remind you, you do not have the case yet for

12      deliberation, so you should not be speaking with

13      each other.  You should not be researching the

14      case.  You should not be talking to anyone about

15      the case.

16             I'll ask you to come back and be ready to

17      go at 12:45, at which time I will provide you

18      instructions.

19             Okay?  Thank you.

20             THE CLERK:  All rise for the jury.

21             (The jury left the courtroom at

22      11:38 a.m.)

23             (Court officers were administered their

24      oath by the Clerk of Court.)

25             THE CLERK:  All rise.

1          (Judge Doyle entered the courtroom.)

2          THE COURT:  Issue to be taken up?

3          MR. SCHROEDER:  Yes, your Honor.

4     Defendants want to move to strike the rebuttal

5     statement for this specific reason; that what

6     Ms. Nunan said quoting Eunice Lee was not

7     actually what she said in the trial, as evidence

8     in the record.

9          What Ms. Nunan said was, quote,

10    attributing it to Ms. Lee, I'm one of many

11    women, and I don't want to be a faceless name on

12    a billing statement, end quote.  That's not what

13    she said.

14          In fact, she said, I can't be the only

15    woman who is finding out about this way and the

16    only woman who for years has been wondering did

17    I do something wrong and was this my fault.

18          So, first of all, one, it wasn't said,

19    and so attributing a quote to evidence in the

20    record.  All of our quotes were from the actual

21    transcript, number one.

22          Number two, it wasn't said, and so

23    there's the assumption that that was said, as if

24    that's evidence.

25          Three, it implies that there's other --

1     there's other patients or other women that had

2     made any complaints about Dr. Hsu.

3          And, fourth, it contradicts actually what

4     she testified to.  She has no idea.

5          So I wasn't going to do it during her

6     rebuttal because I think that's poor form, but

7     we're moving to strike that statement from the

8     rebuttal statement because it is not accurate.

9     It's not what the evidence in this record is.

10    It's highly prejudicial, and it leaves -- it

11    leaves sentiments of something that there is no

12    evidence in the record to support.

13         THE COURT:  Okay.  Can you read again for

14    me the statement that was made during rebuttal

15    and the statement that you believe was made

16    during the trial?

17         MR. SCHROEDER:  Yes, your Honor, we

18    checked with the court reporter.

19         The statement made during rebuttal was,

20    and attributing to Eunice Lee, quote, I'm one of

21    many women, and I don't want to be a faceless

22    name on a billing statement, end quote.

23         THE COURT:  Okay.

24         MR. SCHROEDER:  That was never said in

25    the trial of this case.

1        What she did say in the transcript of the

2    trial of this case is, I can't imagine what --

3    well, two things.

4        I can't be the only woman who is finding

5    out about it this way and the only woman who for

6    years has been wondering did I do something

7    wrong or was this my fault, question mark, and

8    not knowing what.

9        Further down in her answer, I can't

10   imagine what other women are going through, and

11   I kept thinking there has to be a face to this

12   and a person who was assigned to this that --

13   that this is what it has caused and the pain is

14   still here and just as raw after ten years, end

15   quote.

16        THE COURT:  Okay.

17        Plaintiff?

18        MR. JONES:  We're trying to pull up the

19   transcript, but I believe it is a very fair

20   summary of what was said.

21        There were two statements that Ms. Lee

22   made in her testimony.  One was referencing

23   other women and that she was one of other women,

24   and the other one was that she, when asked why

25   she was doing this, there was a reference to not

128

1    just being a faceless name on a billing

2    statement.  That was, I believe, in the

3    testimony.

4            MR. SCHROEDER:  Judge, we actually

5    ordered the transcript.

6            MR. JONES:  So did we.

7            MR. SCHROEDER:  The whole transcript?

8    You did?

9            MR. JONES:  Parts.

10           MR. SCHROEDER:  Parts.  You didn't order

11   that part.

12           Judge, I would ask the Court to just

13   please review this issue.  It's highly

14   prejudicial.  That testimony should -- we've

15   already had our arguments on that issue of

16   whether or not the testimony should have even

17   happened, but this is now going one step beyond

18   even that, and I respectfully ask the Court to

19   please review it.

20           THE COURT:  Okay.  And are you asking for

21   it to be stricken and not replaced by the actual

22   testimony on that point?  Just stricken?

23           MR. SCHROEDER:  I ask that it be stricken

24   completely.  I don't think it should be replaced

25   at all.

129

1          THE COURT:  Okay.  So I am going to want

2     written copies of the two statements that you

3     just mentioned.  I didn't write it down.  I was

4     listening to you.

5          MR. SCHROEDER:  That's okay.  I'll be

6     happy to get that.

7          Well, I'd have to ask the court reporter

8     to print it out first, but we took it down

9     verbatim.

10          THE COURT:  Okay.  Anything further from

11     plaintiff in response to this about a potential

12     remedy?

13          MS. NUNAN:  Okay.  And, but the third

14     party, and maybe this -- like the most important

15     part for me is I keep thinking, what about us?

16     Like what about the patients?  I can't be the

17     only woman who is finding out about it this way

18     and the only woman who for years has been

19     wondering did I do something wrong, and was this

20     my fault?  And not knowing what, and just like

21     anger and disappointment and sadness.  I didn't

22     want us to just be nameless patients out of like

23     a billing statement.

24          THE COURT:  That's the trial testimony?

25          MS. NUNAN:  This is on Page 19 of the

1    trial transcript of Eunice Lee.

2            THE COURT:  So please provide me with

3    both statements.  I'm going to take a look at it

4    before we bring the jury back.  Okay?

5            THE CLERK:  All rise.

6            (Judge Doyle left the courtroom at

7    12:56 p.m.)

8            (The court reporter provided Judge Doyle,

9    in chambers, the statement from Ms. Nunan's

10   closing argument.)

11           (The following took place in open court

12   without the jury present, at 1:08 p.m.)

13           THE COURT:  Okay.  So with respect to the

14   request to strike the statement made during

15   rebuttal, I have reviewed the trial testimony of

16   Ms. Lee as well as the statement that was made

17   in plaintiff's rebuttal.

18           So with respect to the trial testimony,

19   this is a reference to Page 19, the relevant

20   part, Lines 4 to 20.  In the trial testimony

21   Ms. Lee, again in relevant part, said, I can't

22   be the only woman who is finding out about it

23   this way and the only woman who, for years, has

24   been wondering did I do something wrong and was

25   this my fault.  And not knowing that, and it

1    just -- I have like anger and disappointment and

2    sadness, and I didn't want us just to be these

3    nameless patients out of like a billing

4    statement.  So that is the trial testimony.

5         The statement on rebuttal is, quote -- by

6    Ms. Nunan attributing this to Ms. Lee -- I am

7    one of many women, and I don't want to be a

8    faceless name on a billing statement.

9         So I don't think -- well, first off,

10   counsel is permitted to summarize testimony that

11   came in at trial.  It certainly can't be

12   inaccurate, but I don't think in comparing these

13   two statements that the message is frankly that

14   inconsistent.

15        It's a reference to other women not being

16   a faceless name on a billing statement, so I

17   just don't think that rises to the level that I

18   need to strike it.  So I won't be striking that

19   statement from the record.

20        Okay.  Is there anything else to take up

21   at this time, or can we bring the jury in?

22        MR. JONES:  Not from us.

23        MR. SCHROEDER:  Nothing, your Honor.

24        (The jury entered the courtroom at

25   1:11 p.m.)

1    JURY CHARGE BY THE COURT:

2         THE COURT:  Members of the jury, at this

3    time I'm going to be providing you with my

4    instructions that will guide your deliberations.

5         As you can see on your seats, you have

6    also received a written copy.  This is the jury

7    instructions charge that I will be reading to

8    you now so you can follow along.  It is a

9    33-page document, so it may take a little while,

10   but okay.

11        Now that you have heard the evidence and

12   arguments, it is my duty to instruct you on the

13   applicable law.  My instructions come in two

14   parts.

15        The first part consists of general

16   instructions about the task of the jury and the

17   rules and principals that should guide you in

18   your deliberations.  The second part consists of

19   instructions that apply to the specific claims

20   and defenses in this case.  I ask that you pay

21   equal attention to both parts.

22        It is your duty as jurors to follow the

23   law and to apply it to the facts as you find

24   them from the evidence presented in the

25   courtroom.  You are not to single out one

133

1    instruction alone as stating the law but must

2    consider the instructions as a whole.

3            You are not to be concerned with the

4    wisdom of or reason behind any rule of law

5    stated by the Court.  Regardless of any opinion

6    you may have as to what the law is or ought to

7    be, it would be a violation of your sworn duty

8    to base a verdict on any view of the law other

9    than that given to you in these instructions.

10           It would also be a violation of your

11   sworn duty as judges of the facts to base a

12   verdict upon anything other than the evidence

13   presented during the trial.

14           The lawyers have referred to some of the

15   rules of law in their arguments.  If any

16   difference appears between the law as stated by

17   the lawyers and the law as stated by the Court

18   in these instructions, you must follow the

19   Court's instructions.

20           Our judicial system requires that you

21   carefully and impartially consider all of the

22   evidence, follow the law, and reach a just

23   verdict regardless of the consequences.

24           Jurors as finders of fact/rulings of the

25   Court:

134

1          You and you alone are the triers of the

2     facts.  Each of you as jurors must determine the

3     facts for yourself in reaching a verdict.  By

4     the rulings that I made during the course of the

5     trial I did not intend to express my own views

6     about this case.

7          Sympathy/prejudice:

8          Neither sympathy nor prejudice for or

9     against the parties or any other person involved

10     with this case should influence you in any

11     manner in reaching your verdict.  Your

12     deliberations should be well reasoned and

13     impartial.

14          Evidence in the case:

15          The evidence in this case consists of the

16     sworn testimony of the witnesses, the exhibits

17     admitted into evidence and any stipulated facts,

18     regardless of which party presented the

19     evidence.

20          When the attorneys on both sides

21     stipulate or agree to the existence of the fact,

22     you must, unless other instructed, accept the

23     stipulation and regard that fact as proved.  You

24     may give the stipulated fact, like any other

25     evidence, the weight you think it deserves.

135

1          Any evidence that has been stricken or

2     excluded, as when an objection is sustained by

3     the Court, must be disregarded, and you may not

4     consider it in rendering your verdict.

5          Arguments, statements, objections of the

6     attorneys:

7          The opening statements and closing

8     arguments of the attorneys, their questions and

9     objections and all other statements they made

10    during the course of the trial are not evidence.

11    The attorneys have a duty to object to evidence

12    that they believe is not admissible.  You should

13    not draw any conclusions or make any judgment

14    from the fact that an attorney has objected to

15    the evidence.

16         The Court's ruling on objections:

17         From time to time the Court has been

18    called on to determine the admissibility of

19    certain evidence following the attorney's

20    objections.  You should not concern yourself

21    with the Court's reason for any rulings on

22    objections.

23         Whether offered evidence is admissible is

24    purely a question of law for the Court and not a

25    concern of the jury.  In admitting evidence to

136

1    which objections have been made, the Court does

2    not determine what weight should be given to

3    that evidence, nor does it assess the

4    credibility of the evidence.

5         If the Court excludes evidence in

6    response to an objection, attorney's objection,

7    you will dismiss the evidence from your mind

8    completely and entirely, and you will refrain

9    from the speculation about the nature of any

10   exchange regarding the evidence between the

11   Court and the attorneys held out of your

12   hearing.

13        Evidence, direct or circumstantial:

14        There are two types of evidence from

15   which you may find the facts of this case;

16   direct and circumstantial.

17        Direct evidence is the testimony of

18   someone who asserts actual knowledge of a fact,

19   such as an eyewitness.

20        Circumstantial evidence is prove of a

21   chain of facts and circumstances tending to

22   prove or disprove an issue in the case.

23        For example, if a witness were to testify

24   that he or she had seen cows in a field, that

25   would be an example of direct evidence that

137

1    there were cows in a field.

2              On the other hand, if a witness were to

3    testify that he or she had seen cow tracks in

4    the field, that would be an example of

5    circumstantial evidence that there had been cows

6    in the field.

7              The law does not require a party to prove

8    its claims or defenses by direct evidence alone.

9    Rather, one or more of the essential elements of

10   each of the claims or defenses may be

11   established by a reasonable inference from other

12   facts which are established by direct testimony.

13             And circumstantial evidence alone may be

14   sufficient proof.  The law makes no distinction

15   between the weight to be given to direct or

16   circumstantial evidence, nor is a greater degree

17   of certainty required with circumstantial

18   evidence than of direct evidence.  You should

19   consider all the evidence in the case and give

20   it as much or as little weight as you think it

21   deserves.

22             Credibility of the witnesses:

23             You are the sole judges of the

24   credibility of the witnesses, and the weight to

25   give their testimony is up to you.  In

138

1    considering the testimony of any witness, you

2    may take into account his or her ability and

3    opportunity to observe, his or her demeanor

4    while testifying, any interest or bias he or she

5    may have, and the reasonableness of his or her

6    testimony considered in light of all the

7    evidence in the case.

8         Consider, also, any relation each witness

9    may bear to either side of the case, any bias or

10   prejudice, the manner in which each witness

11   might be affected by the verdict, and the extent

12   to which each witness's testimony is either

13   supported or contradicted by other evidence in

14   the case.

15        Inconsistencies or discrepancies in the

16   testimony of a witness or between the testimony

17   of different witnesses may or may not cause you

18   to discredit a witness's testimony.  Two or more

19   persons witnessing an incident or transaction

20   may see or hear it differently.  It is your duty

21   to reconcile conflicting testimony, if you can.

22        In weighing the effect of a discrepancy

23   consider whether it pertains to a matter of

24   importance or to an unimportant detail and

25   whether the discrepancy may result from innocent

139

1    error or intentional falsehood.

2         You may give the testimony of each

3    witness the amount of weight you think it

4    deserves.  You may believe all of it, part of

5    it, or none of it at all.  You do not have to

6    accept the testimony of any witness, even if it

7    is uncontradicted.  It is for you to say what

8    you believe and disbelieve.

9         In other words, what you must try to do

10   in deciding credibility is to size up a witness

11   in light of his or her demeanor, the

12   explanations given, and all the other evidence

13   in the case.  Always remember that you should

14   use your common sense and good judgment.

15        Impeachment of a witness:

16        A witness may be discredited or impeached

17   by contradictory evidence by a showing that the

18   witness testified falsely concerning a matter or

19   by evidence that at some other time the witness

20   said or did something inconsistent with the

21   witness's present testimony.

22        It is your exclusive province to give

23   testimony of each witness whatever degree of

24   credibility or amount of weight you think it

25   deserves.  If you find that a witness testified

140

1    untruthfully in some respect, you may consider

2    that fact in deciding what credence to attach to

3    other testimony from that witness.

4         Considering that fact, as well as all

5    other relevant evidence, you may accept or

6    reject testimony of the witness in whole or in

7    part.  In making this determination, you may

8    consider whether the witness purposely made a

9    false statement or merely made an innocent

10   mistake, whether the inconsistency concerns an

11   important fact or a small detail, and whether

12   the witness had a reasonable explanation for the

13   inconsistency.

14        Expert witnesses:

15        You have heard evidence from one witness,

16   Dr. Robert Bancroft, who is known as an expert

17   witness.  An expert witness is a person who has

18   special knowledge, experience, training, or

19   education in his or her profession or area of

20   study.  Because of his expertise, an expert

21   witness may offer an opinion about one or more

22   of the issues in the case.

23        In evaluating the testimony of

24   Dr. Bancroft in this case you should evaluate

25   his credibility and statement just as you would

1    for any other witness.  You should also evaluate

2    whether Dr. Bancroft's opinion is supported by

3    the facts that have been proved and whether the

4    opinion is supported by Dr. Bancroft's

5    knowledge, experience, training, or education.

6         You are not required to give the

7    testimony of Dr. Bancroft any greater weight

8    than you believe it deserves just because he has

9    been referred to as an expert witness.

10        Number of witnesses:

11        The fact that one side may have called

12   more witnesses than the other side is of no

13   significance.  Your task is to evaluate the

14   credibility of witnesses and to weigh all of the

15   evidence.

16        Personal knowledge and experience of

17   jurors:

18        In deliberating you are not expected to

19   put aside your common sense, nor your own

20   observations and life experience.  However, a

21   juror having special knowledge of a subject may

22   neither state this knowledge to fellow jurors,

23   nor act upon it himself or herself in arriving

24   at a verdict.  You must not tell your fellow

25   jurors about matters that are based on your own

1          special knowledge concerning an issue in a case

2          that did not come from the evidence received in

3          the courtroom.

4               As jurors your job is to decide this case

5          based solely on the evidence presented during

6          the trial and my instructions to you.  As you

7          were instructed at the beginning of the trial,

8          you are not to investigate or research the law

9          or facts relevant to the trial.

10              I remind you that you must not seek or

11         receive any information about this case from the

12         internet, including Google, Facebook, Wikipedia,

13         or any other websites or from any other source,

14         including newspapers, magazines, law books or

15         dictionaries.  Do not search for or receive any

16         information from the party, the lawyers, the

17         witnesses, the evidence, the law, or any place

18         or location mentioned in the trial.

19              Until I tell you that your jury service

20         is completed, do not communicate with anyone,

21         including your family and friends, about the

22         evidence or issues in this case.

23              Burden of proof/preponderance of the

24         evidence:

25              Because Dr. Porter is the one bringing

1    this case, she has the burden of proof.  She

2    must prove each essential element of the claim

3    she alleges by what is known as a preponderance

4    of the evidence; i.e., the greater weight of the

5    evidence.

6         To establish a fact by a preponderance of

7    the evidence means to prove that the fact is

8    more likely true than not.  In other words, a

9    preponderance of the evidence means evidence

10    that, when considered and compared with the

11    evidence opposed to it, has more convincing

12    force and produces in your minds a belief that

13    what is sought to be proved is more likely true

14    than not true.

15         A preponderance of the evidence refers to

16    the quality and persuasiveness of the evidence,

17    not to the number of witnesses or documents.

18         In determining whether a claim has been

19    proven by a preponderance of the evidence, you

20    may consider the relevant testimony of all the

21    witnesses regardless of who called them, and all

22    exhibits received into evidence regardless

23    perform who submitted them.

24         If you find that the credible evidence on

25    an issue is evenly divided between the parties,

144

1    you must decide that issue against the party

2    having the burden of proof.  That rule follows

3    from the fact that the party bearing its burden

4    must prove more than simple equality of

5    evidence.  He or she must prove the element at

6    issue by a preponderance of the evidence.

7         On the other hand, the party with its

8    burden of proof need prove no more than a

9    preponderance.  So long as you find that the

10   scales tip, however slightly, in favor of the

11   party with its burden of proof, meaning what

12   that party claims is true is more likely true

13   than not true, then that element will have been

14   proven by a preponderance of the evidence.

15        If, after considering all the evidence,

16   you are satisfied that Dr. Porter has carried

17   her burden on at least one of the claims she

18   alleges, then you must find for Dr. Porter on

19   that, those claims.

20        On the other hand, if after such

21   consideration you find the evidence to be in

22   balance or equally probable, or if you find the

23   evidence tips in favor of Dartmouth Health, then

24   Dr. Porter has failed to sustain her burden and

25   you must find for Dartmouth Health on those

145

1      claims.

2              All persons equal before the law:

3              The fact that Dartmouth Health is a

4      corporation and Dr. Porter is an individual must

5      not enter into or affect your verdict.  This

6      case should be considered and decided by you as

7      a dispute between parties of equal standing in

8      the community.  All persons, both corporations

9      and individuals, stand equal before the law and

10     are to be treated as equals in a court of

11     justice.

12             Corporation acts through its employees:

13             Defendants Dartmouth Hitchcock Medical

14     Center, Dartmouth-Hitchcock Clinic, Mary

15     Hitchcock Memorial Hospital, and

16     Dartmouth-Hitchcock Health referred to

17     throughout this trial and in this document as

18     Dartmouth Health are corporate entities.

19             A corporation acts through its employees.

20     Therefore, the act of a Dartmouth Health

21     employee that occurred while he or she was on

22     duty and acting within the scope of his or her

23     employment duties shall be consider the act of

24     Dartmouth Health.

25             Influenced decisionmaker:

1           An employee may be liable for unlawful

2      acts even when so-called neutral decisionmakers

3      made a final decision regarding the act if the

4      employee proves by a preponderance of the

5      evidence that the neutral decisionmaker relied

6      on a supervisor who had an unlawful bias or

7      retaliatory motive against the employees.

8           In other words, if you find that

9      Dr. Merrens was the decisionmaker regarding the

10     termination of Dr. Porter's employment without

11     reassignment to another position at Dartmouth

12     Health and if you find that Dr. Merrens did not

13     personally have an unlawful bias or retaliatory

14     motive against Dr. Porter, Dartmouth Health may

15     nonetheless be held liable if you find, by a

16     preponderance of the evidence, that a supervisor

17     of Dr. Porter's, like Dr. DeMars, had an

18     unlawful bias or retaliatory motive to terminate

19     Dr. Porter without reassignment to another

20     position at Dartmouth Health and Dr. Merrens

21     relied on that supervisor when deciding to

22     terminate Dr. Porter's employment without

23     reassignment to another position at Dartmouth

24     Health.

25           Overview of claims:

1        As you have seen and heard in this trial,

2    this is an employment lawsuit brought by

3    Dr. Misty Blanchette Porter against Dartmouth

4    Health.  Dr. Porter claims that she was

5    terminated by Dartmouth Health because of her

6    whistleblower complaints about conduct by other

7    physicians and because of her disability.

8        Dartmouth Health claims it had

9    legitimate, non-discriminatory business reasons

10   for terminating employment of Dr. Porter in

11   conjunction with the closure of Dartmouth

12   Health's Reproductive, Endocrinology and

13   Infertility (REI) Division.

14       Now I will instruct you regarding each of

15   Dr. Porter's claims; one, violation of the New

16   Hampshire Whistleblowers' Protection Act; two,

17   disability discrimination and retaliation under

18   the Americans with Disabilities Act (ADA), the

19   Rehabilitation Act, and the applicable laws of

20   New Hampshire and Vermont; three, wrongful

21   discharge under New Hampshire law; and, four,

22   retaliation under the applicable laws of New

23   Hampshire.  I will also instruct you regarding

24   Dartmouth Health's defenses and regarding

25   damages.

1          New Hampshire Whistleblowers' Protection

2     Act.  Dr. Porter alleges that she was terminated

3     by Dartmouth Health and was not reassigned to

4     another position at Dartmouth Health in

5     retaliation for her reporting about and/or

6     advising others to report about the conduct of

7     two physicians at Dartmouth Health that she

8     reasonably believed to be illegal, fraudulent,

9     unethical, or harmful to patients in violation

10    of New Hampshire's Whistleblowers' Protection

11    Act.

12          Dartmouth Health denies these claims and

13    asserts that it had legitimate business reasons

14    for its decision to terminate Dr. Porter's

15    employment and not reassign her to another

16    position with Dartmouth Health.

17          New Hampshire's Whistleblowers'

18    Protection Act prohibits employers from

19    retaliating against an employee for reporting

20    what he or she reasonably believes is a

21    violation of the law.  The act safeguards

22    employees from being discriminated against for

23    making a good faith report verbally or in

24    writing.

25          Its purpose is to encourage employees to

1    come forward and to report violations without

2    fear of losing their jobs and to ensure that as

3    many alleged violations as possible are resolved

4    informally within the workplace.

5         In order to establish a claim under New

6    Hampshire's Whistleblowers' Protection Act,

7    Dr. Porter must demonstrate by a preponderance

8    of the evidence the following three elements:

9         First, Dr. Porter, in good faith,

10   reported or caused to be reported what she had

11   reasonable cause to believe was a violation of

12   any law or rule adopted under the laws of New

13   Hampshire, a political subdivision of New

14   Hampshire or the United States.

15        Second, Dartmouth Health terminated

16   Dr. Porter's employment and failed to reassign

17   her to another job at Dartmouth Health.

18        And, third, there was causal connection

19   between Dr. Porter's reporting and her

20   termination from Dartmouth Health without

21   reassignment to another job at Dartmouth Health.

22        One, reported in good faith.

23        In this context good faith means absence

24   of malice and honesty of intention.  Reporting

25   in good faith means the employee reasonably

1    believed that a violation of a law or a rule was

2    happening.  The employee did not prove that a

3    violation of a law or rule was, in fact,

4    happening.

5          In other words, the act does not require

6    an actual violation of a law or rule but only

7    that an employee reasonably believed that such a

8    violation has occurred.

9          In regarding a violation to her employer,

10    the employee is not required to reference any

11    specific law or rule that the employer has

12    allegedly violated.  The employer is presumed to

13    be familiar with the laws and regulations

14    governing its business and to consider a report

15    to have been made if a reasonable employer would

16    have understood from an employee's complaint

17    that the employee was reciting a violation of

18    law.

19          Two, termination of employment.  You must

20    decide whether Dartmouth Health terminated

21    Dr. Porter's employment and did not reassign her

22    to another job at Dartmouth Health.

23          Three, causal connection.  To find in

24    favor of Dr. Porter on this claim, you must find

25    a causal connection between her termination and

1    her reporting about and/or advising others to

2    report about the conduct of two physicians at

3    Dartmouth Health that she reasonably believed to

4    be illegal, fraudulent, unethical, or harmful to

5    patients.

6          In other words, you must find that

7    Dr. Porter's termination occurred because of her

8    reporting.  This may be shown by circumstantial

9    evidence.

10          For example, you may find that there is

11   sufficient causation through temporal proximity;

12   that is, that Dartmouth Health's termination of

13   Dr. Porter followed shortly after Dartmouth

14   Health became aware of Dr. Porter's reporting.

15          Other ways you may find causation could

16   be through, A, Dartmouth Health's disparate

17   treatment of Dartmouth fellow employees who

18   engaged in similar conduct as Dr. Porter or, B,

19   deficiencies in Dartmouth Health's articulated

20   reasons for terminating Dr. Porter.

21          In addition, to support the required

22   finding of causation for this claim you must

23   find that Dr. Porter reported the alleged

24   violations to a person having supervisory

25   authority over her.

1          In other words, at least one supervisor

2     or decisionmaker at Dartmouth Health must have

3     known that Dr. Porter had reported about and had

4     advised others to report about the conduct that

5     she believed to be illegal, fraudulent,

6     unethical, or harmful to patients.

7          Dartmouth Health claims it did not

8     terminate Dr. Porter because of her

9     whistleblowing activity; here, reporting that

10    two Dartmouth Health physicians were engaging in

11    conduct that she thought was unlawful,

12    unethical, or dangerous to patients, but rather

13    because it made a business decision to close its

14    REI division, resulting in the termination of

15    all three physicians in the division, and that

16    there was no other position to which Dr. Porter

17    could be reassigned at Dartmouth Health.

18         Dr. Porter asserts that the reasons given

19    for her termination are not the true reasons but

20    instead are a pretext or excuse to cover up

21    Dartmouth Health's unlawful retaliation against

22    her for whistleblowing.

23         If you do not believe the reasons that

24    Dartmouth Health has offered for termination of

25    Dr. Porter's employment and not reassigning her,

153

1    then you may, but are not required to, infer

2    that retaliation was a factor that made a

3    difference in Dartmouth Health's decision to

4    terminate Dr. Porter's employment and not

5    reassign her to another job at Dartmouth Health.

6         Americans with Disabilities Act (ADA)

7    claim.

8         In this case Dr. Porter claims that

9    Dartmouth Health terminated her employment and

10   did not reassign her to another division because

11   of her disability.  Dr. Porter has reported

12   three distinct but related types of disability

13   discrimination claims.

14        First, Dr. Porter may prove that

15   Dartmouth Health would not have terminated her

16   employment but for her disability.

17        Second, Dr. Porter may prove that

18   Dartmouth Health failed to reasonably

19   accommodate her disability by reassigning her to

20   another division instead of terminating her

21   employment.

22        Third, Dr. Porter may prove that

23   Dartmouth Health retaliated against her for

24   making a reasonable accommodation request.

25        You must determine whether Dr. Porter has

1    proven that Dartmouth Health discriminated

2    against her because of her disability in any or

3    all of these ways or none of these ways.

4            For Dr. Porter to prove her ADA claim

5    against Dartmouth Health, she must prove that

6    Dartmouth Health discriminated against her in at

7    least one of these ways:

8            One, but-for discrimination.  To prevail

9    under this theory, Dr. Porter must prove all of

10    the following by a preponderance of the

11    evidence.

12            First:  Dartmouth Health is an employer

13    subject to the ADA.

14            Second:  Dr. Porter has a disability

15    within the meaning of the ADA.

16            Third:  Dr. Porter was otherwise

17    qualified to perform the essential functions of

18    her job, either with or without reasonable

19    accommodation.

20            Fourth:  Dr. Porter was terminated

21    because of her disability.

22            To prevail under this theory Dr. Porter

23    must prove all of the following by a

24    preponderance of the evidence:

25            1.1.  Employer.  The parties have agreed

1    on the first element that Dartmouth Health is an

2    employer subject to the ADA.  Thus, the first

3    element is satisfied.

4            1.2.  Disability.  The parties have

5    agreed on the second element; that Dr. Porter

6    has a disability as defined by the ADA.  Thus,

7    the second element is satisfied.

8            1.3.  Otherwise qualified to perform

9    essential functions.  You must determine whether

10   Dr. Porter was a qualified individual to satisfy

11   this element.

12           Dr. Porter must prove two things by a

13   preponderance of the evidence.  First, that she

14   was otherwise qualified for the position she

15   held and, second, that either with or without

16   reasonable accommodation she could perform the

17   essential functions of that position.

18           1.3.1.  Otherwise qualified.

19           An individual is otherwise qualified if

20   they have the requisite skill, experience,

21   education, and other job-related requirements of

22   the employment position involved in the case.

23           If Dr. Porter cannot satisfy this

24   standard, then she is not a qualified

25   individual, even if the reason that Dr. Porter

1    is not qualified is solely a result of her

2    disability.  The ADA does not require an

3    employer to hire or retain an individual who

4    cannot perform the job in question, either with

5    or without an accommodation.

6         1.3.2.  Essential functions.

7         If you find that Dr. Porter was otherwise

8    qualified, then the next step is to determine

9    whether she has proven by a preponderance of the

10   evidence that she was able to perform the

11   essential functions of the position either with

12   or without reasonable accommodation.

13        A reasonable accommodation may include

14   job restructuring or part-time or modified work

15   schedule.  To make this determination, you will

16   need to determine the essential functions of the

17   employment position.

18        The essential functions of an employment

19   position are the basic fundamental duties of a

20   job that a person must be able to perform to

21   hold a particular position.  Essential functions

22   do not include marginal job duties or position.

23        A job function may be considered

24   essential for any of several reasons.  These

25   include but are not limited to the following.

1    One, the reason that the position exists

2    is to perform that function; two, there are a

3    limited number of employees available among whom

4    the performance of that job function can be

5    distributed; and, three, the job function is

6    highly specialized, and the person in that

7    position is hired for their expertise or ability

8    to perform that particular job function.

9    In determining whether a particular job

10    function is essential, you may, along with all

11    of the evidence that has been presented to you,

12    consider the following factors.

13    A.  The employer's judgment as to which

14    functions of the job are essential.

15    B.  Written job instructions prepared by

16    the employer for advertising or position.

17    C.  Written job instructions prepared by

18    the employer for use in interviewing applicants

19    for the position.

20    D.  The amount of time spent performing a

21    function.

22    E.  The consequences of not requiring the

23    person holding the position to perform the

24    function.

25    F.  The terms of any collective

1    bargaining agreement.

2         G.  The work experience of the past

3    employees who have held the position.

4         And H.  The work experience of current

5    employees who hold similar positions.

6         An employee must have been able to

7    perform all of the essential functions of the

8    position either with or without reasonable

9    accommodation at the time of their termination.

10        An employer may not base an employment

11   decision upon speculation that the employee's

12   disability might worsen to the extent that they

13   would not be a qualified individual at some time

14   in the future.

15        On the other hand, an employer is not

16   required to speculate that an employee's

17   condition will improve if that employee is not

18   able to fulfill all of the essential functions

19   of the position at the time in question.

20        1.4.  You must determine whether

21   Dartmouth Health terminated Dr. Porter's

22   employment because of her disability.  An

23   employee must prove that the employer would not

24   have terminated their employment but for that

25   disability.

1          To determine that Dartmouth Health

2     terminated Dr. Porter because of her disability,

3     you must decide that Dartmouth Health would not

4     have terminated Dr. Porter had Dr. Porter not

5     had a disability but everything else had been

6     the same.

7          An employee does not need to prove that

8     discrimination was the only or even the

9     predominant factor that motivated an employer.

10     You may decide that other factors were involved

11     in the decision to terminate Dr. Porter's

12     employment.  But, for Dr. Porter to meet her

13     burden, you must conclude that she has proved by

14     a preponderance of the evidence that, although

15     there may have been other factors, she would not

16     have been terminated if she had not had a

17     disability.

18          An employer may not discriminate against

19     an employee because of the employee's

20     disability.  But an employer may terminate an

21     employee for any other lawful reason, good or

22     bad, fair or unfair.  An employer is entitled to

23     make subjective policy and business judgments,

24     and an employer may therefore terminate an

25     employee, even an outstanding employee, for

160

1    reasons that it considers to be in its best

2    interests.  An employer is entitled to make its

3    own personnel decisions, however misguided they

4    may appear to you.

5         If you believe Dartmouth Health's reasons

6    for its decision to terminate Dr. Porter and

7    find that its decision was not because of

8    Dr. Porter's disability, you must not substitute

9    your own judgment, even if you do not agree with

10   Dartmouth Health's decision.

11        As I have explained, Dr. Porter has the

12   burden to prove that Dartmouth Health's decision

13   to discharge her was because of her disability.

14   I've explained to you that evidence can be

15   direct or circumstantial.  To decide whether

16   Dartmouth Health's decision to discharge

17   Dr. Porter was because of her disability, you

18   may consider the circumstances of Dartmouth

19   Health's decision.

20        For example, you may consider whether you

21   believed the reasons Dartmouth Health gave for

22   their decision.  If you do not believe the

23   reasons it gave for the decision, you may

24   consider whether the reasons were so

25   unbelievable that they are a coverup to hide the

1    true discriminatory reason for the decision.

2         Two.  Failure to grant reasonable

3    accommodation request.

4         An employee may also establish a claim

5    under the ADA by showing that the employer

6    failed to provide a reasonable accommodation.

7    To establish such a claim, Dr. Porter must prove

8    each of the following elements by a

9    preponderance of the evidence.

10        First:  Dartmouth Health is an employer

11   subject to the ADA.

12        Second:  Dr. Porter has a disability

13   within the meaning of the ADA.

14        Third:  Dr. Porter was otherwise

15   qualified to perform the essential functions of

16   her job, either with or without reasonable

17   accommodation.

18        Fourth:  Dartmouth Health failed to make

19   a reasonable accommodation.

20        2.1.  Employer.

21        The parties have agreed on the first

22   element; that Dartmouth Health is an employer

23   subject to the ADA.  Thus, the first element is

24   satisfied.

25        2.2.  Disability.

162

1           The parties have agreed on the second

2       element; that Dr. Porter has a disability as

3       defined by the ADA.  Thus, the second element is

4       satisfied.

5           2.3.  Otherwise qualified to perform

6       essential functions.

7           You must determine whether Dr. Porter was

8       a qualified individual.  To satisfy this element

9       Dr. Porter must prove two things by a

10      preponderance of the evidence.  First, that she

11      was otherwise qualified for the position she

12      desired and, second, that either with or without

13      reasonable accommodation she could perform the

14      essential functions of that position.

15          2.3.1.  Otherwise qualified.

16          An individual is otherwise qualified if

17      they have the requisite skill, experience,

18      education, and other job-related requirements of

19      the employment position involved in the case.

20      If Dr. Porter cannot satisfy the standard, then

21      she was not a qualified individual, even if the

22      reason that Dr. Porter is not qualified is

23      solely a result of her disability.

24          The ADA does not require an employer to

25      hire or retain an individual who cannot perform

163

1      the job in question, either with or without a

2      reasonable accommodation.

3              2.3.2.  Essential functions.

4              If you find that Dr. Porter was otherwise

5      qualified, then the next step is to determine

6      whether she has proven by a preponderance of the

7      evidence that she was able to perform the

8      essential functions of the position either with

9      or without reasonable accommodation.

10             A reasonable accommodation may include

11     job restructuring or part-time or modified work

12     schedules.  To make this determination, you will

13     need to determine the essential functions of the

14     employment position.

15             The essential functions of an employment

16     position are basic fundamental duties of a job

17     that a person must be able to perform to hold a

18     particular position.  Essential functions do not

19     include marginal job duties of a position.

20             A job function may be considered

21     essential for any of several reasons.  These

22     include but are not limited to the following:

23             One.  The reason that the position exists

24     is to perform that function.

25             Two.  There are a limited number of

1    employees available among whom the performance

2    of that job function can be distributed.

3            And 3.  The job function is highly

4    specialized, and the person in that position is

5    hired for their expertise or ability to perform

6    that particular job function.

7            In determining whether a particular job

8    function is essential you may, along with all of

9    the evidence that has been presented to you,

10    consider the following factors.

11            One, the employer's judgment as to which

12    functions of the job are essential.  Sorry,

13    that's i, not one.

14            j.  Written job descriptions prepared by

15    the employer for advertising or posting new

16    position.

17            k.  Written job descriptions prepared by

18    the employer for use in interviewing applicants

19    for the position.

20            l.  The amount of time spent performing

21    the function.

22            m.  The consequences of not requiring the

23    person holding the position to perform the

24    function.

25            n.  The terms of any collective

165

1    bargaining agreement.

2           o.  The work experience of past employees

3    who have held position.

4           And p.  The work experience of current

5    employees who hold similar positions.

6           An employee must have been able to

7    perform all of the essential functions of the

8    desired position either with or without

9    reasonable accommodation at the time of their

10   termination.

11          An employer may not base an employment

12   decision on speculation that the employee's

13   disability might worsen to the extent that they

14   would not be a qualified individual at some time

15   in the future.

16          On the other hand, an employer is not

17   required to speculate that an employee's

18   condition will improve if that employee is not

19   able to fulfill all of the essential functions

20   of the position at the time in question.

21          2.4.  Failed to make a reasonable

22   accommodation.

23          You must determine whether Dartmouth

24   Health failed to make a reasonable accommodation

25   for Dr. Porter by reassigning her to another

1  department instead of terminating her

2  employment.

3          The term "reasonable accommodation" means

4  making modifications to the workplace that

5  allows a person with a disability to perform the

6  essential functions of the job or allows a

7  person with a disability to enjoy the same

8  benefits and privileges as an employee without a

9  disability.

10         A reasonable accommodation may include

11 job restructuring, part-time or modified work

12 schedules, reassignment to a vacant position, or

13 other similar accommodations for individuals

14 with disabilities.  A reasonable accommodation

15 does not require an employer to create a new

16 position for an employee.

17         The term "reasonable accommodation" does

18 not include efforts that can cause an undue

19 hardship; an action requiring significant

20 difficulty or expense on an employer.  An

21 employer must show special, typically case

22 specific, circumstances to demonstrate undue

23 hardship in a particular case.

24         An employer has a duty to make a

25 reasonable accommodation for an employee if the

167

1    employer knows or reasonably should have known

2    that the employee was disabled, even if the

3    employee did not explicitly request an

4    accommodation.

5          If the employer knows or should have

6    known that the employee was disabled, the

7    employer is obligated to engage in an

8    interactive process with the employee to

9    determine whether a possible reasonable

10   accommodation exists.  Both employer and

11   employee must cooperate with this interactive

12   process in good faith.

13         Neither side can prevail in this case

14   simply because the other did not cooperate in

15   the interactive process.  However, you may

16   consider whether the party cooperated in good

17   faith in evaluating the merit of that party's

18   claim that a reasonable accommodation did or did

19   not exist.

20         An employer, by failing to engage in any

21   sufficient interactive process, risks not

22   discovering means by which an employee's

23   disability could have been accommodated and

24   thereby increases the chance of failing to

25   reasonably accommodate an employee.

168

1        3.  Retaliation.

2        The ADA prohibits an employer from

3   discriminating against an employee because the

4   employee has opposed an unlawful employment

5   practice under the ADA.  This is called

6   retaliation.  To establish retaliation

7   Dr. Porter must prove each of the following

8   elements by a preponderance of the evidence.

9        First:  Dr. Porter engaged in activity

10  protected by the ADA.

11       Second:  Dartmouth Health knew that

12  Dr. Porter engaged in protected activity.

13       Third:  Dartmouth Health took adverse

14  action against Dr. Porter.

15       Fourth:  The causal connection exists

16  between the adverse action and the protected

17  activity.

18       3.1.  Protected activity.

19       A protected activity is an act that

20  opposes any perceived discriminatory practice

21  made unlawful by the ADA.  Protected activity

22  includes making a request for a reasonable

23  accommodation.

24       The parties have agreed on the first

25  element; that Dr. Porter made a reasonable

1    accommodation request.  Thus, the first element

2    is satisfied.

3           3.2.  Aware of activity.

4           The parties have agreed on the second

5    element; that Dartmouth Health was aware that

6    Dr. Porter made a reasonable accommodation

7    request seeking reassignment to the OB/GYN

8    Department or the Radiology Department.  Thus,

9    the second element is satisfied.

10           3.3.  Adverse action.

11           You must determine whether Dartmouth

12    Health took adverse action against Dr. Porter by

13    terminating her employment.

14           3.4.  Causal connection.

15           You must determine whether there is a

16    causal connection between Dr. Porter's

17    reasonable accommodation request and Dartmouth

18    Health's decision to terminate Dr. Porter's

19    employment.  Dr. Porter must prove that

20    Dartmouth Health would not have terminated her

21    employment but for her reasonable accommodation

22    request.

23           To determine there is a causal connection

24    between Dartmouth Health's decision to terminate

25    Dr. Porter's employment and Dr. Porter's

1    reasonable accommodation request, you must

2    decide that Dartmouth Health would not have

3    terminated Dr. Porter if Dr. Porter had not made

4    a reasonable accommodation request but

5    everything else had been the same.

6         Dr. Porter does not need to prove that

7    retaliation was the only or even the predominant

8    factor that motivated Dartmouth Health.  You may

9    determine that other factors contributed to

10    Dartmouth Health's decision to terminate

11    Dr. Porter's employment.  But, in order to

12    return a verdict in favor of Dr. Porter on her

13    ADA retaliation claim, you must conclude that

14    she has proved by a preponderance of the

15    evidence that, even if other factors contributed

16    to the decision, Dartmouth Health would not have

17    terminated her employment if she had not made a

18    reasonable accommodation request.

19         Rehabilitation Act claim.

20         Dr. Porter has already brought disability

21    discrimination claims under Section 504 of the

22    Rehabilitation Act, 29 U.S.C. Section 794.

23    Section 504 of the Rehabilitation Act applies to

24    entities that receive federal funds, and it

25    prohibits these entities from excluding or

1    discriminating against individuals based on

2    their disability.

3         Dr. Porter has brought claims for

4    discriminatory termination, failure to make a

5    reasonable accommodation, and retaliation under

6    Section 504 of the Rehabilitation Act.  The

7    elements and instructions for these claims are

8    the same as those under the ADA.  Thus, the

9    instructions I previously gave you on disability

10   discrimination under the ADA apply equally to

11   the claims under Section 504 of the

12   Rehabilitation Act.

13        Disability discrimination claims under

14   New Hampshire state law.

15        In addition to the federal claims, there

16   are also claims in this case for disability

17   discrimination under New Hampshire's law against

18   discrimination.  New Hampshire state law

19   prohibits discrimination in employment based on

20   disability.

21        Dr. Porter has brought claims for

22   discriminatory termination, failure to make a

23   reasonable accommodation, and retaliation under

24   the New Hampshire law against discrimination.

25   The elements and instructions for these claims

172

1    are the same as those under the ADA.  Thus, the

2    instructions I previously gave you on disability

3    discrimination under the ADA apply equally to

4    the claims under the New Hampshire law against

5    discrimination.

6         Disability discrimination claims under

7    Vermont state law.

8         In addition to the federal claims and the

9    claims under New Hampshire state law, there are

10   also claims in this case for disability

11   discrimination under Vermont's Fair Employment

12   Practices Act (FEPA).  Vermont state law

13   prohibits discrimination in employment based on

14   disability.

15        Dr. Porter has brought claims for

16   discriminatory termination, failure to make a

17   reasonable accommodation, and retaliation under

18   Vermont's FEPA.  The elements and instructions

19   for these claims are mostly the same as those

20   under the ADA.  However, there is one important

21   difference in the claim for discriminatory

22   termination.

23        For the fourth element the FEPA uses the

24   "motivating factor" test instead of the "because

25   of" test used under the ADA.  For example,

1    Dr. Porter must prove the following by a

2    preponderance of the evidence:

3         First:  Dartmouth Health is an employer

4    subject to the FEPA.

5         Second:  Dr. Porter has a disability

6    within the meaning of FEPA.

7         Third:  Dr. Porter was otherwise

8    qualified to perform the essential functions of

9    her job, either with or without reasonable

10   accommodation.

11        Fourth:  Dr. Porter's disability was a

12   motivating factor in Dartmouth Health's decision

13   to terminate her employment.

14        Under the "motivating factor" test an

15   employee must prove that their disability was a

16   motivating factor that prompted the employer to

17   terminate the employment.  It is not necessary

18   for the employee to prove that disability was

19   the sole or exclusive reason for the employer's

20   decision.  It is sufficient if the employee

21   proves that the alleged disability was a

22   motivating factor in the employer's decision.

23        A motivating factor is a factor that

24   played some part in an employer's adverse

25   employment action.  Under the "motivating

174

1    factor" test an employer cannot avoid liability

2    by proving that it would still have taken the

3    same adverse action in the absence of

4    discriminatory motivation.  This is a difference

5    between "motivating factor" test and the

6    "because of" test.

7            You should apply the "motivating factor"

8    test, not the "because of" test to Dr. Porter's

9    claim for discriminatory termination under the

10   FEPA.  With this exception, the instructions I

11   previously gave you on disability discrimination

12   under the ADA regarding failure to make a

13   reasonable accommodation and retaliation apply

14   equally to the claims under the FEPA.

15           Wrongful discharge under New Hampshire

16   law.

17           Based on Dartmouth Health's termination

18   of Dr. Porter's employment at

19   Dartmouth-Hitchcock Medical Center, Dr. Porter

20   has brought a claim for wrongful discharge

21   against Dartmouth Health under New Hampshire

22   law.

23           The prevailing rule in New Hampshire is

24   that where, as here, there is no employment

25   contract between employer and employee, the

1     relationship is termed "at will".

2          In an at-will employment situation both

3     parties are generally free to terminate the

4     employment relationship at any time with or

5     without cause, and it is implied that the

6     parties will carry out their obligations in good

7     faith.

8          But there is an exception to this at-will

9     rule.  An employer termination of an employee

10    that is motivated by bad faith or malice, or is

11    based on retaliation, is not in the best

12    interest of the economic system of the public

13    good and is therefore unlawful.  An employer's

14    interest in running his business as he sees fit

15    must be balanced against the interest of the

16    employee in maintaining his employment and the

17    public's interest in maintaining a proper

18    balance between the two.

19         In order to establish a claim for

20    wrongful discharge under New Hampshire law,

21    Dr. Porter must prove the following two elements

22    by a preponderance of the evidence:

23         First:  Dartmouth Health's termination of

24    Dr. Porter was motivated by bad faith, malice,

25    or retaliation.

1          And, Second:  Dartmouth Health terminated

2     Dr. Porter because she performed one or more

3     acts that public policy would encourage.

4          One.  Termination motivated by bad faith,

5     malice, or retaliation.

6          For purposes of this claim, bad faith is

7     the equivalent of malice and may be established

8     where, one, an employee is discharged for

9     pursuing policies condoned by the employer; two,

10     the record does not support the stated reason

11     for the discharge; or, three, disparate

12     treatment was administered to a similarly

13     situated employee.

14          Bad faith can also be discerned from the

15     course of events surrounding an employee's

16     discharge, the manner in which the plaintiff was

17     discharged, or shifting reasons for an

18     employee's termination.

19          Stated another way, malice or bad faith

20     may be shown where the employer's decision to

21     terminate an employee was without reasonable

22     cause or excuse as the facts would have appeared

23     to a reasonable person and that the termination

24     was willful and intentional.  That is, the

25     employer knew that the termination was

1    unreasonable and still decided to terminate the

2    employee's employment, or that the termination

3    was motivated by ill will or a purpose to

4    harass.

5            Bad faith or malice may therefore be

6    established by proof that the evidence does not

7    support the stated reason for the discharge.

8            The general meaning of retaliation is the

9    act of doing someone harm in return for actual

10    or perceived injuries or wrongs.  In other

11    words, revenge.

12            Two.  Acts that public policy would

13    encourage.

14            Public policy as used in this claim

15    includes a wide range of society goals,

16    including safety and public welfare, protection

17    of an at-will's employee's promised

18    compensation, and good faith reporting of

19    reasonably perceived improper activity.

20            The employee need not show a strong and

21    clear public policy, and the public policy may

22    be based on statutory or non-statutory policies

23    at the state or federal level.  An employee's

24    mere expression of disagreement with a

25    management decision, however, is not an act

178

1    protected by public policy.

2         Moreover, the public policy exception to

3    termination of at-will employment does not

4    deprive an employer of the right to make

5    business decisions which are not necessary to

6    effectuate the efficient and profitable

7    operation of its business, nor does the public

8    policy exception interfere with an employer's

9    ability to hire and retain those individuals

10   best qualified for the job.

11        An example of a case where an employee is

12   terminated for doing an act that public policy

13   would encourage is an employee being terminated

14   for refusing to provide to his or her employer

15   private medical reports and personal health

16   information on patients.

17        The second example is an employee

18   terminated for missing work because they

19   reported to jury duty.

20        A third example is an employee being

21   terminated for protecting employees who worked

22   under him from workplace hazards that could

23   cause serious physical harm to those employees.

24        Other examples of acts that public policy

25   would encourage could be reporting physician

179

1    conduct that's illegal, fraudulent, unethical,

2    or unlawful to patients; ensuring that a medical

3    provider or medical facility obtain patient

4    consent before performing procedures on

5    patients, and objecting to improper patient

6    billing procedures.  In these cases if the

7    termination is because of the act that public

8    policy encourages and the employer acted with

9    malice and bad faith or in retaliation, the

10    employee is entitled to recover damages for

11    wrongful termination.

12        It is your job to determine if Dartmouth

13    Health terminated Dr. Porter because of her

14    performance of one or more acts that public

15    policy would encourage.  In determining whether

16    Dr. Porter performed an act that public policy

17    would encourage, you are not limited to the

18    above examples, nor must you find that the facts

19    support the above examples in this case.

20        In order to find in favor of Dr. Porter

21    on this claim, you not only must find that

22    Dr. Porter performed one or more acts that

23    public policy would encourage and that Dartmouth

24    Health's termination of Dr. Porter was motivated

25    by bad faith, malice, and retaliation, you must

1    also find that Dr. Porter was terminated because

2    of her performance of an act that public policy

3    would encourage.

4              Thus, Dr. Porter must show a causal link

5    between her performance of an act that public

6    policy would encourage and her termination.

7              Damages.

8              If you decide in favor of Dartmouth

9    Health on all claims, you will not consider

10    these instructions about damages.  But if you

11    decide for Dr. Porter on any claim, you must

12    determine the amount of money that will

13    compensate her for each item of harm that was

14    caused by Dartmouth Health's conduct.  This

15    compensation is called damages.

16              Please keep in mind the following general

17    principles as you deliberate.  Remember that

18    Dr. Porter has the burden of proving damages by

19    a preponderance of the evidence.  Damages may

20    not be based on sympathy, speculation, or

21    guesswork.  In making your decision, you should

22    be guided by the evidence, common sense, and

23    your best judgment.

24              Economic and noneconomic damages.

25              Damages for Dr. Porter's claims can fall

1    into two different categories; economic damages

2    and noneconomic damages.

3         Economic damages includes such items as

4    lost income and medical expenses.  Non-economic

5    damages include such items as lost enjoyment of

6    life, mental anguish, pain and suffering,

7    disability, and disfigurement.  These damages

8    may include compensation for past harm and

9    future harm, depending on the evidence.  If you

10   find that Dr. Porter is entitled to damages, you

11   must determine the total amount and place that

12   amount on the verdict form.

13        There is no precise standard for

14   calculating these damages.  Your damages

15   determination must be just and reasonable in

16   light of the evidence.  In determining the

17   damages that Dr. Porter has suffered as a result

18   of her injuries, you should consider the

19   following items:

20        Dr. Porter is entitled to damages for any

21   earnings lost in the past and any probable loss

22   of ability to earn money in the future caused by

23   Dartmouth Health's conduct.  When considering

24   Dr. Porter's future earnings, you should

25   consider Dr. Porter's expected working lifetime.

182

1          Dr. Porter is entitled to damages for any

2     lost enjoyment of life, mental anguish, and pain

3     and suffering caused by Dartmouth Health's

4     conduct.  These damages may include any pain,

5     discomfort, fears, anxiety, humiliation, lost

6     enjoyment of life's activities, and any other

7     mental and emotional distress suffered by her in

8     the past or likely to be suffered in the future.

9          Mitigation of damages.

10          Dartmouth Health claims that Dr. Porter

11     has failed to mitigate, or minimize, her

12     damages.  A plaintiff ordinarily has a general

13     duty to mitigate the damages she incurs, meaning

14     she has a duty to take steps to try to minimize

15     the harm or prevent it from increasing further.

16     In this context, that means Dr. Porter has a

17     duty to attempt to secure or to secure

18     employment that is a suitable alternative to her

19     employment at Dartmouth Health.  This duty

20     applies only to those damages that Dr. Porter

21     could have avoided with reasonable effort and

22     without undue risk, burden, or expense, as the

23     duty to mitigate requires only reasonable,

24     practical care and diligence, not extraordinary

25     measures.

1          The burden is on Dartmouth Health to

2     prove this affirmative defense by a

3     preponderance of the evidence.  As part of

4     bearing this burden, Dartmouth Health must

5     present evidence not only that Dr. Porter did

6     not make reasonable efforts to obtain employment

7     but also that suitable work existed.  To sustain

8     its burden Dartmouth Health must present

9     concrete evidence.  Mere speculation is not

10     sufficient.

11          If you find that Dr. Porter failed to

12     mitigate her damages, you must reduce her award

13     of damages, if any, by the amount you find she

14     could have avoided.

15          Punitive damages.

16          Punitive damages are meant to punish a

17     party for its clearly outrageous conduct and to

18     stop others from acting similarly in the future.

19     In order to award punitive damages, you must

20     find two things.

21          First, you must find that Dartmouth

22     Health's wrongful conduct was outrageously

23     reprehensible.  That is, that the conduct,

24     whether acts or failures to act, was egregious,

25     morally deserving of blame, to a degree of

1   outrage frequently associated with a crime.

2           Second, you must find that Dartmouth

3   Health acted with malice.  You may find malice

4   if you find that Dartmouth Health's

5   reprehensible conduct was intentional and

6   deliberate.  That is, that the conduct was the

7   result of Dartmouth Health's bad motive, ill

8   will, or personal spite or hatred toward

9   Dr. Porter.  You may also find malice even if

10  Dartmouth Health's motivation behind the

11  intentional, outrageous conduct was to benefit

12  itself rather than to harm Dr. Porter.

13          Alternatively, you may find malice if

14  Dartmouth Health's wrongful conduct was not

15  intentional but instead was done with a reckless

16  or wanton disregard of the substantial

17  likelihood that it would cause egregious harm to

18  Dr. Porter.  That is, if Dartmouth Health acted

19  or failed to act with conscious and deliberate

20  disregard of a known, substantial, and

21  intolerable risk of harm to Dr. Porter, with the

22  knowledge that the conduct was substantially

23  certain to result in the threatened harm.

24          Where the defendant is a corporation, as

25  is the case here, in order to find that the

185

1      corporation must pay punitive damages you must

2      find that conduct justifying punitive damages

3      was corporate conduct or was conduct permitted

4      by a corporation.

5           Where the management of the corporation

6      was involved in the conduct itself, it may be

7      considered to be corporate conduct.  Where the

8      management of the corporation has knowledge of

9      wrongful conduct by lower-level employees, the

10     corporation may be determined to have permitted

11     the conduct.

12          If you find either corporate conduct or

13     conduct permitted by the corporation, you may

14     find the corporation must pay punitive damages.

15          In determining the amount of punitive

16     damages to award, if any, you may consider such

17     factors as the nature of Dartmouth Health's

18     conduct, the nature of the resulting harm to

19     Dr. Porter, Dartmouth Health's wealth or

20     financial status, and the degree of malice or

21     wantonness in its acts.

22          Remaining damages issues.

23          It is solely the province of the jury to

24     decide the amount of any damages award.  I am

25     giving you these damages instructions so you

1    will know how to proceed if you reach this point

2    in your deliberations.  But by giving you these

3    instructions I do not intend to suggest that an

4    award is appropriate or what the amount of that

5    award should be.

6         Where the amount of damages can be

7    calculated in specific dollar terms, the parties

8    seeking damages must present evidence to

9    demonstrate the appropriate amount.  With

10   certain types of damages, however, there is no

11   precise measurement, and it is up to you to

12   decide what is fair monetary compensation for

13   those damages.  Under no circumstances may you

14   award damages that are speculative or

15   conjectural.

16        I remind you that any amount of recovery

17   that may have been suggested by the attorneys is

18   not evidence.  Moreover, you need not adopt the

19   approaches the attorneys have suggested for

20   calculating damages.  As the jury it is your

21   obligation to arrive at an amount which is

22   supported by the evidence and fair to both

23   parties.  The amount of damages, if any, is a

24   determination for the jury.

25        You should not add any sum for interest

1    to the damages awarded in this case.  The Court

2    will make such award, if appropriate.

3           Similarly, you must not include in your

4    reward any costs that Dr. Porter may or may not

5    have incurred due to her filing of this lawsuit

6    or her attorney's fees.  These are matters for

7    the Court.

8           You should not award damages for one item

9    that duplicates an award for another item.  In

10   other words, a party is entitled to only one

11   recovery for his or her damages.

12           Insurance and taxes.

13           You should not speculate about whether

14   Dartmouth Health or Dr. Porter has any insurance

15   that might cover or has covered any damages that

16   you find Dr. Porter has experienced.  You also

17   should not speculate about what taxes Dr. Porter

18   might owe on any damage award.

19           You have heard testimony from

20   Dr. Bancroft that Dr. Porter's damages include

21   amounts owed in taxes on any damages award.  You

22   may or may not take this into account in

23   assessing the amount of Dr. Porter's damages, if

24   any.

25           The rules that jurors are not to

1    speculate about insurance and taxes are special

2    rules that apply to lawsuits.  Those issues are

3    not relevant to your task here.  Your job is to

4    award the amount of damages that you determine

5    has been established by the evidence presented

6    to you.  Any other issues that have to be

7    resolved are my job, not yours.

8         Final instructions.

9         This completes my instructions to the

10   jury.  I will now provide a copy of these

11   instructions to you -- you already have a

12   copy -- and you will retire to the jury room to

13   deliberate in privacy about the issues in this

14   case.

15        I will also provide a verdict form to

16   guide you in your deliberations.  The answer to

17   each question on the form must be the unanimous

18   answer of the jury.  This means you cannot

19   answer a question on the verdict form unless and

20   until all 12 of you agree on the answer.  Each

21   question Numbered 1 through 6 must be answered.

22        You will also receive the exhibits which

23   are admitted into evidence.

24        I appoint Kattie Lafontaine as your

25   foreperson.  She will be responsible for making

189

1      sure that deliberations occur in an orderly

2      fashion and that every juror has an opportunity

3      to participate.

4              She will record the unanimous answers of

5      the jury on the verdict form and date and sign

6      the jury form.  She will also be your

7      spokesperson here in court.

8              If you need to communicate with the

9      Court, please do so in writing.  I will then

10     confer with the lawyers about your question and

11     send a written response to you.

12             Please advise the court officer after you

13     reach a verdict but do not tell the court

14     officer or anyone else what the verdict is until

15     you return to the courtroom, at which time I

16     will receive the verdict form from your

17     foreperson.

18             So that concludes the instructions.  At

19     this time I'll ask that the jury retire to the

20     deliberation room, and the exhibits will be

21     provided to you for your consideration of the

22     case.

23             THE CLERK:  All rise for the jury.

24             (The jury left the courtroom at

25     2:13 p.m.)

190

1          THE CLERK:  Please be seated.

2          THE COURT:  Okay, so at this time I'll

3      take any objections from the parties to the

4      instructions as given.

5          MR. JONES:  Only with regard to the issue

6      with regard to New Hampshire enhanced

7      compensatory damages, renewing that issue.

8          THE COURT:  Yes, okay.  Thank you.

9          Mr. Schroeder?

10         MR. SCHROEDER:  Your Honor, not to review

11     all the previously stated on objections related

12     to the jury instructions, included but not

13     limited to the instructions regarding the ADA,

14     reassignment to a vacant position, we

15     incorporate herein all of the prior objections

16     that we've stated on the record.

17         THE COURT:  Okay.  All right.  Thank you.

18         Anything else from either side at this

19     point?

20         MR. SCHROEDER:  Just logistics, your

21     Honor.

22         THE COURT:  Yes.

23         MR. SCHROEDER:  Where you would like us

24     to remain?  What's the assigned period?  How

25     close you would like us to remain?  Just your

1    general decorum rules on that.

2              THE COURT:  I think so long as Mr. Howe

3    has cellphones, contact information for you.

4    Cellphone I think probably is the best.  You

5    certainly don't have to stay here in the

6    courtroom.  You can leave the building

7    certainly, but as long as you can be back in a

8    five- to ten-minute time period if you do get a

9    call from me about a note, that would be fine.

10             MR. SCHROEDER:  Should we report back

11   here at 4:30 or -- well, you tell us.

12             THE COURT:  Right.  So I don't -- you

13   know, I haven't spoken to them.

14             Well, I haven't spoken to them about

15   that, about how long they want to deliberate

16   for.  As I mentioned to you this morning, I

17   probably should mention that to them at this

18   time, so that will answer your question.

19             So I'll ask for the jury to be brought

20   back in so I can speak to them about that.

21             THE CLERK:  All rise for the jury.

22             (The jury entered the courtroom at

23   2:15 p.m.)

24             THE CLERK:  Please be seated.

25             THE COURT:  So you may be wondering how

1    long you would be deliberating.  That's up to

2    you ultimately, but in terms of how far you go

3    into the evening it's up to you.

4         If you would like to deliberate past, say

5    the 4:30 cutoff time, that's entirely up to you;

6    whatever decision you make in that regard.

7         If as a group you determine to stop

8    deliberating at any point in time this evening,

9    I'd ask that you provide a note to the court

10   security officer advising me that that is what

11   you intend to do, and then I'll bring you back

12   into court briefly to speak to you before you

13   leave for the evening.

14        And then if your deliberations carry over

15   until tomorrow, then 9 a.m. if you would come

16   back to court and report to the jury room as you

17   always have, and you will not be seeing us or

18   the attorneys during your deliberations.  Okay?

19        Any issues that arise during your

20   deliberations, as I say, provide a note to the

21   court security officer, and it will be taken up

22   here.

23        Okay.  Thank you.

24        THE CLERK:  All rise for the jury.

25        (The jury left the courtroom at

193

1      2:17 p.m.)

2                    THE CLERK:  Please be seated.

3                    THE COURT:  So, having said that, I don't

4      know that I'll direct you to come back at 4:30

5      because it may be too early, it may be too late.

6      I'll let you -- who knows, so we'll be in touch

7      with you.

8                    MR. SCHROEDER:  Thank you, your Honor.

9                    THE COURT:  Okay.  Thank you.

10                   (The jury started their deliberations at

11     2:18 p.m.)

12                   (A note was received from the jury, and

13     the following is in open court without the jury

14     present at 4:31 p.m.)

15                   THE COURT:  Okay, so we received a note,

16     and I'm going to read the note to you.  It's

17     written by the foreperson, and it simply reads:

18                   We collectively would like to leave at

19     4:30 p.m. tonight.

20                   So I called you back to let you know

21     that, and now I'm going to call the jury in and

22     I'm going to honor their request.

23                   (The jury entered the courtroom at

24     4:32 p.m.)

25                   THE COURT:  Okay, so I received your

1    note, and I shared the contents of the note with

2    counsel.  So, of course, you can leave at 4:30

3    tonight.

4         So as you know, you are in deliberations

5    now so really now, more than ever, it's

6    absolutely critical that you not talk to anyone

7    about the case or take in any other information

8    about the case or let anyone talk to you about

9    the case.  You shouldn't speak to family or

10   friends, court officers; no one about the case.

11        So you'll return tomorrow at 9 a.m., and

12   please remember that you cannot resume

13   deliberations unless everyone is present.  Okay?

14        All right.  Well, have a good evening.

15        THE CLERK:  All rise for the jury.

16        (The jury left the courtroom at

17   4:33 p.m.)

18        THE COURT:  I'm assuming we're all good

19   at this point?

20        (All counsel nodded their heads.)

21        THE COURT:  All right.  Have a good

22   evening.

23        (End of court proceedings on April 8,

24   2025, at 4:33 p.m.)

25

195

1                    C E R T I F I C A T E

2

3              I, SARAH M. BENTLEY, Certified Court

4    Reporter, Registered Professional Reporter and Notary

5    Public, do hereby certify that the said proceedings

6    were taken in machine shorthand by me at the time and

7    place aforesaid and were thereafter reduced to

8    typewritten form under my direction, Pages 1 - 195;

9    that the foregoing is a true, complete, and correct

10   transcript of said proceedings.

11              I further certify that I am not employed

12   by, related to, nor counsel for any of the parties

13   herein, nor otherwise interested in the outcome of

14   this litigation.

15              IN WITNESS WHEREOF, I have affixed my

16   signature and seal this 31st day of May, 2025.

17

18

19                    /s/ Sarah M. Bentley, RPR

20                    SARAH M. BENTLEY, CCR-B-1745

21

22

23

24

25