IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| MISTY BLANCHETTE PORTER, M.D.,<br><br>Plaintiff,<br><br>vs.<br><br>DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH,<br><br>Defendants. | Case No. 2:17-cv-194 |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL RELATED TO DAMAGES ISSUES**

Plaintiff's Memorandum in Opposition to Defendants' Motion for a New Trial Related to Damages Issues (ECF No. 316) ("Opposition" or "Opp.") does not respond to the substance of Dartmouth Health's Motion for New Trial Related to Damages Issues (ECF No. 308) ("Motion"), namely that the repeated expert disclosures violated the discovery rules and unfairly impacted Dartmouth Health's defense, and that other issues with evidence and jury instructions undermined Dartmouth Health's ability to present its damages case. Rather, Plaintiff sets up the straw man (again) that these issues have already been decided and there is nothing to see here.

1

Dartmouth Health submits that the unwillingness to engage directly on the issues[1] speaks to the strength of Dartmouth Health's points, and the weakness of the Opposition.

A.  Improper Admission of Expert Testimony

The plain fact of the matter is that Plaintiff's serial roll-outs of ad hoc, new information at her own time and choosing, amplified by making this evidence "expert" opinion from a well-paid mouthpiece, materially affected the ability of Dartmouth Health to present its defense. Speaking to the expert disclosure issues, which are intertwined with most of the issues in the current Motion, this was not in keeping with the expert disclosure and discovery rules, and the inability of Dartmouth Health to present its own economist in response to these last-minute changes on the heels of trial had a severe negative impact on the trial presentation.

Dr. Bancroft's repeated reports were not mere updates made necessary and predictable by the passage of time. They included multiple, significantly revised assumptions and added material factual information. For example, the March 2025 report added the "new" information that Dr. Porter had received a full professorship at UVM medical school almost two years earlier, which naturally triggered higher pay at UVMMC (and higher pay in a position at UVMMC meant that Dr. Porter suffered less damages from her position being eliminated at Dartmouth Health). Since this actually occurred in July 2023, it was hardly "new" information. Yet after the defense elicited it from Dr. Bancroft on cross-examination at an evidentiary hearing less than two weeks before trial, suddenly it resulted in a new report from Dr. Bancroft tailored to address this new, undisclosed fact.

Similarly, at the evidentiary hearing, defense counsel – not Plaintiff or Plaintiff's expert – revealed that Dr. Porter's prior year earnings figure was not used in the August 2024 expert

---

[1] "[R]ehash," "misleading and inaccurate", "tired", "unfounded", "absolutely no evidentiary value", "absurd" etc. See Opp. at 1-2.

report. Because her earnings were quite high, again this showed that she had less damages from losing her Dartmouth Health position and working at UVMMC. Indeed, in many respects, she made more at UVMMC. These revelations, and the new report in March 2025 – five days before trial – that they precipitated, were not mere updates or new information provided at the first reasonable opportunity because a trial was upcoming. There was absolutely no showing of cause for these delays in disclosure. Flouting the rules at every turn, they were permitted by the Court without any legitimate excuse.

The March 19, 2025 report – five days before trial – changed the assumptions for how long Dr. Porter planned to work, and the amount of time she would work at UVMMC versus Dartmouth Health, both aimed at increasing her damages figure and bolstering deficiencies in her report. These were not just "routine updates" before trial. They were new, drastically different damages approaches and calculations. Against this backdrop, Plaintiff's reliance on case law to support revised expert testimony is, at a minimum, misplaced.

The purpose of the expert disclosure rule is to prevent unfair surprise at trial. This did not happen here. The problem was compounded because Dartmouth Health was denied its motion to have its own expert economist provide a rebuttal to the new opinions presented by Dr. Bancroft at this late juncture. Dartmouth Health could not predict that Plaintiff's expert would present a fundamentally different report – his fourth one –immediately before trial. Thus, Plaintiff was unfairly advantaged by the dropping of surprise, significantly revised reports with no basis for predictability and no showing of cause, while Dartmouth Health was not permitted a corresponding expert economist witness to rebut the new presentations. Dartmouth Health was left with eliciting from the Plaintiff's highly experienced expert witness whatever admissions that could be obtained. That sequence of events which unfairly titled the balance in Plaintiff's

favor on an important evidentiary issue– which was implicitly condoned by the Court – was naturally prejudicial to Dartmouth Health's interests.

      B.  <u>Limitations on Mitigation Admissions Elicited on Cross Examination</u>

Further, the only remedy with which the Court left Dartmouth Health – eliciting evidence on cross examination – was improperly hampered when the Court would not permit admission of key statements from Plaintiff's expert elicited in cross examination for use in evidence or even as a demonstrative piece of evidence at closing. When Dr. Bancroft performed the iPhone calculations showing that, when calculated with an equivalent work position at Dartmouth Health and UVMMC, Dr. Porter would have fully mitigated her damages by 2025 or 2026 (at the latest), it was a definite "moment" in the trial. In defense counsel's view, that evidence, presented in a simple handwritten chart from the stand, was critical because it undermined the complex, meandering, and evolving expert tables of Dr. Bancroft. His protestations and asserted inability to answer direct questions on cross were non-sensical, and even further undermined his credibility. The math was the math. Even if others observing it disagreed with defense counsel's assessment, it was up to the jury to make that determination.

The handwritten entries or "chart" that Dr. Bancroft made on the stand should have been admitted as the admissions of the Plaintiff's agent, just as he was allowed to testify to so many facts based wholly on Plaintiff's hearsay statements to him. Precluding this important cross-examination as substantive or even demonstrative evidence was doubly prejudicial to Dartmouth Health when it was not permitted to have its own expert testify in rebuttal to Dr. Bancroft. Respectfully, this evidence should have been admitted and Dartmouth Health permitted to use it in full in arguing its damages position to the jury. The form did not matter. The substance did.

C.  <u>The Court's Instruction on Mitigation Was Unfortunately Unclear</u>

Dartmouth Health should be granted a new trial additionally because the Court's instruction on mitigation issues was unclear. The way the mitigation concept was formulated for the jury, it could be misunderstood that the jury needed to find that the Plaintiff failed to mitigate her damages before it could offset earnings between her "new" promotion at UVMMC and her similar position at Dartmouth Hitchcock. The formulation was unfortunately confusing. Nowhere in the instructions was it clearly stated that the jury should deduct from Dr. Porter's damages calculation the amount of her earnings at UVMMC. The lack of a clear statement on this left the jury unguided on this point, and was error.

D.  <u>The Court Improperly Limited the Use of Evidence on Plaintiff's Severance Agreement.</u>

Finally, Plaintiff offers nothing in response to the two federal appeals court decisions – one of them from the Second Circuit – that support the premise that severance package offers can be admissible to prove the extent of mitigation of damages. The Court erred in limiting the full use of this admitted evidence at closing. Dartmouth Health, again, reiterates that under the <u>Tripler</u> and <u>Cassino</u> cases, this was not evidence of settlement of a claim precluded by Rule of Evidence 408. Rather, this was a termination agreement offered contemporaneously with Dr. Porter's termination. <u>See</u> <u>Pierce v. F.R. Tripler & Co.</u>, 955 F.2d 820 (2d Cir. 1992); <u>Cassino v. Reichhold Chemicals, Inc.</u> 817 F.2d 1338 (9th Cir. 1987). It is relevant (as the Court found) because evidence that Dr. Porter chose to forego receiving nine months' salary ($228,000), when she had a new position that paid her essentially the same as the position that was eliminated at Dartmouth Health within days of her separation, plainly goes to whether she chose to mitigate her damages. It does not take a Ph.D. in economics to know that if Dr. Porter had received $228,000 in 2017 as a severance payment, at the same time she was essentially double-dipping

5

for her position as an attending physician at UVMMC, her compensatory damages would be "different" (as Dr. Bancroft admitted).

Having $228,000 dropped into her compensation in addition to the amount paid by UVMMC and UVM Medical College would have made her losses from the change in jobs clearly less or non-existent. An expert economist called by Dartmouth Health would have been helpful in explaining that point. But barring that, there should have been no limitation placed on Dartmouth Health's counsel's use of this evidence at closing. It was highly probative, extensively undercut Plaintiff's damages claims from the very beginning of her separation, and was permissible based on the authority of two circuit cases, one of them from the Second Circuit. Plaintiffs have offered no authority or logical explanation for their claim that this evidence was wrongly admitted, other than calling it absurd. Dartmouth Health should have been permitted to argue the full implications of this evidence. It was for the jury to decide this issue of how the $228,000 severance package would have impacted Dr. Porter's damages, and Dartmouth Health should not have been limited on this point.

Equally troubling, and perhaps most important, the Court acknowledged that Plaintiff's counsel did not object to admission of the severance agreement or damning cross examination by Defendants' counsel. As a result, this evidence was "fair game" for closing arguments and should not have been limited by the Court.

E. Conclusion

Due to these material issues during trial, Dartmouth Health unfortunately was not able to make a full and fair presentation of its case on damages. It is therefore entitled to a new trial. There could perhaps be a way that the Court could keep the liability verdict in place and have an expedited trial just on the damages issues, but a new trial is warranted nonetheless.

| | |
|---|---|
| Date: June 20, 2025 | Respectfully submitted, |
| | */s/ Tristram J. Coffin* |
| | **DOWNS RACHLIN MARTIN PLLC** |
| | Tristram J. Coffin<br>199 Main Street<br>Burlington, VT 05402<br>Telephone: 802-863-2375<br>tcoffin@drm.com |
| | **FOLEY & LARDNER LLP** |
| | Donald W. Schroeder (admitted *pro hac vice*)<br>Morgan McDonald (admitted *pro hac vice*)<br>Megan E. Martinez (admitted *pro hac vice*)<br>111 Huntington Avenue<br>Boston, MA 02199<br>Tel: (617) 342-4000<br>dschroeder@foley.com<br>mmcdonald@foley.com<br>memartinez@foley.com |
| | *Attorneys for Defendants* |

## CERTIFICATE OF SERVICE

      I hereby certify that, on June 20, 2025, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

      */s/ Morgan McDonald*
      Morgan McDonald