UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| MISTY BLANCHETTE PORTER, M.D., | ) | CIVIL ACTION NO. |
| Plaintiff, | ) | 2:17-cv-194 |
| | ) | |
| v. | ) | |
| | ) | |
| DARTMOUTH-HITCHCOCK MEDICAL CENTER, | ) | |
| *et al.* | ) | |
| Defendants. | ) | |

POSTTRIAL MOTIONS
Tuesday, July 1, 2025
Burlington, Vermont

BEFORE:

THE HONORABLE KEVIN J. DOYLE,
Magistrate Judge

APPEARANCES:

GEOFFREY J. VITT, ESQ., and SARAH H. NUNAN, ESQ., Vitt & Nunan, PLC, 8 Beaver Meadow Road, P. O. Box 1229, Norwich, VT 05055, Counsel for the Plaintiff

ERIC D. JONES, ESQ., Langrock, Sperry & Wool, LLP, 210 College Street, 4th Floor, Burlington, VT 05402-0721, Counsel for the Plaintiff

DONALD W. SCHROEDER, ESQ., MEGAN E. MARTINEZ, ESQ., and MORGAN McDONALD-RAMOS, ESQ., Foley & Lardner LLP, 111 Huntington Avenue, Suite 2500, Boston, MA 02199, Counsel for the Defendants

Johanna Massé, RMR, CRR
Transcriber
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

(Proceedings recorded by electronic sound recording, transcript produced by transcription service.)

Tuesday, July 1, 2025

(The following was held in open court at 10:30 AM.)

COURTROOM DEPUTY:  Your Honor, this is civil case number 17-CV-194, Misty Blanchette Porter v. Dartmouth-Hitchcock Medical Center, *et al.*  Present with the plaintiff are Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan; and present on behalf of the defendants are Attorneys Donald Schroeder, Megan Martinez, and Morgan McDonald.

The matter before the Court is a hearing on plaintiff's motion for prejudgment interest, Document No. 296; motion for attorney fees, Document No. 300; motion to alter judgment, Document 302; plaintiff's bill of costs, Documents 301 and 319; defendants' motion to alter judgment and motion for new trial on plaintiff's VFEPA claim, Document 305; and the motion for new trial related to damages issues, Document 308.

THE COURT:  Good morning.

MR. JONES:  Good morning, Judge.

MS. McDONALD:  Good morning, Your Honor.

MR. SCHROEDER:  Good morning.

THE COURT:  Nice to see everyone again.

MS. McDONALD:  Nice to see you.

THE COURT:  All right.  So let's start with defendants' motion to alter the judgment on the FEPA claim.

MR. SCHROEDER:  Your Honor, would you like me to approach or --

THE COURT:  It's up to you, Mr. Schroeder.  Whatever you prefer.  If you want to be near your papers, fine to argue from the table.

MR. SCHROEDER:  Okay.

THE COURT:  Okay?

MR. SCHROEDER:  Thank you, Your Honor.

THE COURT:  All right.

MR. SCHROEDER:  Good morning.

THE COURT:  Good morning.  So I'll just start with some language in your motion.  So page 1 and 2, you refer to the jury instruction as an "inexplicable departure from federal and state court precedent," suggesting that the law is clear, but then you're looking to certify the question to the Vermont Supreme Court.  Is that a conceptual inconsistency?  And I think as we talk about the merits of this, that will be teased out.

MR. SCHROEDER:  Thank you, Your Honor.  You want me to start there?

THE COURT:  Yes, please.

MR. SCHROEDER:  Sure.  I don't think it's an internal inconsistency or -- or inconsistency at all.  I think as a primary matter, it's our position that the jury instruction was improper and that not only Second Circuit precedent, federal district court precedent in this court, and Vermont state court precedent all support Dartmouth Health's position that the

appropriate causation standard should be but-for, not motivating factor.

THE COURT:  Okay.  So it sounds like this is based on *Natofsky*, right?  This is the Second Circuit decision that suggests that but-for should apply after the Supreme Court decisions under the ADA that applied but-for.  This is the 2019 Second Circuit decision, right?

MR. SCHROEDER:  Correct.

THE COURT:  We know that FEPA in Vermont follows Title VII standards.  After the 2019 Second Circuit decision, we have the Vermont Supreme Court's *Hammond* decision in 2023, and that reiterates the pre-*Natofsky* observations of the case law that says we still follow Title VII.  Makes no reference to the ADA. So why wouldn't -- why wouldn't it be fair to kind of assume that the Vermont Supreme Court would continue to apply the precedent it always has:  We're following Title VII; the express language of Title VII is motivating factor?

MR. SCHROEDER:  I think a couple reasons, Your Honor. And if I may jump back, it's not just -- it's not just the Second Circuit *Natofsky* decision but also the federal court cases *Newton v. Kohl's* and Judge Crawford's decision in the underlying *Porter* case as well as an earlier decision, *Mueller*. But let's take it from where you started.  Okay?

This is not a Title VII case, and if you look at the statute, one of the things that plaintiff's counsel brought up

in their opposition brief was a Connecticut Court of Appeals decision, and it talked about -- now, in that case the issue was whether the "because of" language in the statute requires but-for causation.  And the Connecticut statute had "because of" language which was tied to all of the protected categories, including disability.

However, the Vermont statute, and that's really where you start, doesn't say that.  It actually says the following:  "It shall be an unlawful employment practice . . . for any employer . . . to harass or discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability."

And so it's our position that -- and in fact, when you look at all of the case law, Vermont state court -- and there are cases regarding this.  So if the *Hammond* -- The *Hammond* decision didn't discuss the issue of disability, and so if you look at the case -- the Vermont state court cases that do say that, the disability discrimination -- this is the *Gates v. Mack Molding*, *Kennedy v. Department of Public Safety* --

THE COURT:  But wasn't *Hammond* a disability discrimination case?

MR. SCHROEDER:  I don't recall, Your Honor.  Hold on a second.  But it did not discuss the issue of -- it discussed

the issue of Title VII, not the issue of the ADA and Rehab Act in terms of federal court precedent assisting the Court in deciding these issues.  If you --

THE COURT:  Right.  And which is why I ask you the question, though, right?  They know that the federal precedent exists, but yet I'm on page 430 of that decision.  It says "The FEPA 'is patterned on Title VII of the Civil Rights Act of 1964, and the standards and burdens of proof under the FEPA are identical to those under Title VII'" in an employment -- in a disability discrimination case.  Why is that not a definitive statement of the law from the Vermont Supreme Court?

MR. SCHROEDER:  Well, what's interesting, Your Honor, is that this Vermont -- we already have a Vermont federal court case in this court by this court in November of 2024, so -- that goes to the issue of what the proper standard is, and in fact, it is the --

THE COURT:  This is *Newton*, right?

MR. SCHROEDER:  -- *Newton v. Kohl's* case where Judge Crawford said that the proper standard for a FEPA claim is but-for causation based upon federal court precedent, ADA, Rehab Act, and if you look at the -- so you've got a trifecta here of not just Vermont -- not just Second Circuit precedent, but then you also have the persuasive decisions from this court, *Newton v. Kohl's*, which actually is after the *Hammond* decision, and in fact --

THE COURT:  Did *Newton* reach the question of causation actually?

MR. SCHROEDER:  It does.  It actually says, Your Honor, "a plaintiff need only show that her disability" -- it didn't get to this issue --

THE COURT:  Right.

MR. SCHROEDER:  -- but it states it.  "A plaintiff need only show that her disability was a but-for cause of the adverse employment action."  And in fact, that's consistent with the judge's ruling -- I guess this was predating *Hammond*, but if I go back to -- go back to the *Hammond* decision where they were -- where there was a discussion of this, Your Honor, I would submit that it is not definitively determined, because then why would this court in a case that's a year later refer to FEPA having a but-for causation standard?

And in fact, that's consistent -- what's interesting is plaintiff's counsel actually made this argument at the Second Circuit.  It actually was for New Hampshire and Vermont state -- state laws.  They've since abandoned the -- the New Hampshire state law issue, but they made that argument there, and so we believe that it's actually clear, and this goes to your first issue of the consistency or inconsistency, because I have thought this through.

We submit that the proper causation standard, which was the -- which should have been the same for all -- was the same

for all the other disability discrimination statute claims in this case. We had three other claims, right? ADA, Rehab Act, New Hampshire state law, disability discrimination claims.

THE COURT: Right.

MR. SCHROEDER: There's no basis to say, oh, we have to use but-for causation for just -- that we don't have to use but-for causation for purposes of the Vermont state law claim. I'm like, why -- why is that outlier? And I don't believe that *Hammond* is -- is dispositive of that issue.

And in fact, this -- this own court made a ruling a year later that said FEPA's standard should be but-for causation on the fourth element, and so when you look at -- and I'll get to the issue of certification in a second.

When you get to the issue of where we are and what our position is, you've got four out of -- four of the claims included disability discrimination as a theory. The jury rejected five out of six claims, correct? And one of the claims -- out of the five claims Dr. Porter lost on, three of them were federal or state disability discrimination claims.

The jury verdict form had "No" on 13 out of 14 claims. There's only one theory of one state law disability discrimination claim, and it's FEPA, on this issue of whether or not the termination was based upon disability, and so we would submit that one -- in this particular case, but-for causation follows federal law -- well, first of all, Second

Circuit precedent, number one; number two, decisions from this court as late as November of 2024; as well as the Vermont Supreme Court in terms of dealing with disability discrimination cases.  In fact, you have the *Gates v. Mack Molding* case, which I realize is a year before the *Hammond* --

THE COURT:  And that's a reasonable accommodation case.

MR. SCHROEDER:  Right.  Except that the Court says the disability discrimination provisions under the FEPA are patterned after the federal Rehab Act, which in turn incorporates standards from the federal Americans with Disabilities Act.

THE COURT:  Right.  So what I have to do, Mr. Schroeder, right, is predict what the Vermont Supreme Court would do if I don't certify the question, right?  That's what has to happen here.  The Vermont Supreme Court has said federal precedent in interpreting or construing these statutes is relevant but not necessarily controlling.  It's persuasive authority.  And the Vermont Supreme Court routinely looks to other state courts that apply similar statutory regimes.

So I want to ask you about this question of the unified statutory regime question that's been raised, right?  So as I understand this concept, the idea is Vermont has chosen not to kind of have this fractured causation issue, the way the case law refers to it, in federal antidiscrimination law.  Depending

on the statute, different standards are applied.

So in Vermont, there's a whole series of protected characteristics. They have this unified regime meant to prevent discrimination, and they want to apply one causation standard, right? So assuming that that one causation standard is the motivating factor test, right, and other courts from other states who have unified statutory regimes, same thing, also apply a motivating factor test, why is it not reasonable to assume that the Vermont Supreme Court would follow the same approach?

MR. SCHROEDER: So a couple reasons. One, I think if you look at the statute in this particular case -- so I understand -- on the countervailing argument -- first of all, plaintiff's counsel actually argued to the Second Circuit that it's undecided, right? It's undecided. We think it should be certified. And the only excuse they -- so this goes to the issue of we think it's actually clear. We think it actually is clear. Second Circuit precedent; this own court, Judge Crawford; as well as Vermont Supreme Court precedent, okay? We think that's clear.

In the alternative, obviously if the Court disagrees, which obviously it seems inclined to, we believe that this case is ripe to go to the Vermont Supreme Court and have them decide it. This is ripe for that. And the only excuse -- this is like an excuse that, like, I don't know --

THE COURT:  So it's ripe for certification if I disagree that federal law is controlling.  It's not ripe for certification based just kind of on an objective view of the law being unclear.

MR. SCHROEDER:  I think -- there's an argument that the law is unclear, so in that -- if that -- if the law is unclear, as an alternative argument, we'd submit, put it up to the Vermont Supreme Court.  Plaintiff's counsel asked twice in their brief, twice to the Second Circuit, well, we think it's undecided; we think it should be mixed motive, but it's undecided.

There's no case post-*Natofsky*, and of course, we raised that issue and then, of course, there's the *Newton v. Kohl's* case which obviously is a year after the *Hammond* case where the Court, this court, says exactly that:  that FEPA applies a but-for causation standard.  So if it -- if there is any concern one way or the other, well, then, we -- we ask for it to be submitted to the Vermont Supreme Court.  This is exactly the kind of issue if the Court accepts that it's undecided and we have to make a judgment call.

The other issue, Your Honor -- and this goes back to that Connecticut case that plaintiff's counsel referred to.  That statute where you talk about uniform application of the motive and you have "because of" all of those categories, that is not what the Vermont statute says.  It says because of those

protected categories or against a qualified individual with a disability, and it's well established, well established, that Title VII has this line of cases regarding motivating factor but that the ADA and Rehab Act, a disability discrimination case, stands on the other side.  Now --

THE COURT:  So the "because of" language in the statute you're saying should not apply to the disability discrimination aspect of FEPA.

MR. SCHROEDER:  Correct.

THE COURT:  Okay.  So what else in the statute language-wise can you point to that would help me determine what the causation standard was intended by the Vermont Legislature?

MR. SCHROEDER:  Well, I think that "or against a qualified individual with a disability" derives from federal court precedent, which gets you back to the *Natofsky* decision. So it's kind of -- it brings you back to federal court precedent, the ADA and the Rehab Act, where -- which talk about "or against" -- you know, discriminating against somebody on account of their being a qualified individual with a disability.  This is "or against."  Why does it not say, like Connecticut statute, which plaintiff's counsel referred to, because of blank blank blank or disability?  Right?  It doesn't say that.  "Or against a qualified individual with a disability."  And when you untether that from the rest of the

statute, you get that analysis.

Now, to the extent that there seems to be -- we personally believe -- or I should say we submit that this case is clear based upon -- and we made this argument at court. We objected to it. It's inconsistent also, which is the whole -- we talk about uniform application of the law. Federal Rehab Act claim, ADA claim, New Hampshire state law claim all have but-for causation, but now we have this outlier on a -- on the FEPA claim that, well, on this particular claim, we're going to have a motivating factor? I mean, if we're talking about uniform application of the laws, I would submit that that would be the most consistent application and uniform application of the law.

THE COURT: Well, no, but that's the whole reason why we're here, aren't we, that different laws have different causation standards. I mean, the fact that the remaining claims that went to the jury all applied but-for, there's not something, like, impermissibly anomalous about the fact that one of the claims that went to the jury had a different legal standard. And frankly, I think the statutory language, the state court interpretations, the federal court interpretations, if nothing else, shows that perhaps this is not quite as clear as you think it is. Right?

MR. SCHROEDER: Your Honor, I -- I respectfully disagree.

THE COURT: Okay.

MR. SCHROEDER:  But -- but you asked me, well, then, why are you asking for certification?

THE COURT:  Yeah.

MR. SCHROEDER:  Because in the alternative, this is -- this case is ripe for certification.  Plaintiff's counsel asked for it twice, and for them to say right now, "Well, you know, time has passed by and things have changed," is that really -- that's their -- that's the rebuttal argument.  That's the rebuttal argument in this case for why it shouldn't be certified, and that's not a legitimate rebuttal.

THE COURT:  Okay.

MR. SCHROEDER:  There's no basis to -- because they've already said it in court papers.

THE COURT:  Okay.  But, I mean, I have to make my own decision on whether it gets certified, right?

MR. SCHROEDER:  Absolutely, Your Honor.

THE COURT:  The fact that a party -- the fact that a party years later may shift its position on the question of certification shouldn't really be controlling as to what I do, right?

MR. SCHROEDER:  No, Your Honor, but --

THE COURT:  It's a legal decision.

MR. SCHROEDER:  -- I think -- no.  Of course -- of course it's your decision, Your Honor.

THE COURT:  But not mine.  I say it's a legal -- well,

I guess it's mine, but it's a legal decision, right?

MR. SCHROEDER:  It's an -- right.

THE COURT:  Yeah.

MR. SCHROEDER:  But it is very -- I think it's very persuasive and instructive for the Court to consider that plaintiff's counsel made the same exact argument for certification, so therefore -- and that was in -- we had oral argument in 2022.

THE COURT:  Um-hum.

MR. SCHROEDER:  So the decision came down in 2024.  So for all those reasons, I would submit that -- it's our position that we believe that the case law is clear where the Vermont Supreme Court would come out, but if the judge is unwilling to accept my magic ball view of things, well, then, let's go to the Vermont Supreme Court.  How is this not one of those issues if we get -- if there is this uncertainty as to whether or not but-for should apply or not?  Because this case is so unique in how the jury verdict came down.

THE COURT:  Right.

MR. SCHROEDER:  There's just one theory of one claim, and it's on this specific issue.  Obviously if plaintiff won on the whistle-blower case or the other disability discrimination cases, we wouldn't have any of these arguments, but that's not what happened, and so this one -- the jury took the instruction I assume at face value because it was different from everything

else, and you made it clear to the -- to the jury that it was different from -- from everything -- the other -- the other disability discrimination claims, and if that's the case, look what happened.  It's one theory on one claim, and this is -- if there -- if there was ever a case that was ripe for -- for going up to the Vermont Supreme Court, this would be it, setting aside my arguments about why it shouldn't need to go there.

You know, there -- I didn't grow up in Boston, but, you know, there's a -- there's a movie *The Verdict*, right, and Paul Newman says, in character -- I suspect, Your Honor, you might know it.  My colleagues, Megan and Morgan, did not know it.  But he says in that case, "There is no other case.  This is the case."  And ironically, we were just talking about this this morning, and Ms. McDonald made a comment that actually jogged my memory of that -- of that movie because I've watched it about 50 times.  This is that case.  It's one specific theory of one specific claim.

THE COURT:  Okay.

MR. SCHROEDER:  And so for that reason, I'd submit that it's ripe for going to the Vermont Supreme Court.

THE COURT:  Okay.

MR. SCHROEDER:  And if you have anything else --

THE COURT:  Yeah.  I'm just curious.  This question that I asked you before about the unified statutory regime

thing, so as I said before, right, the Vermont Supreme Court can look to federal court precedent on how it's going to interpret the statute.  It can also look at other state supreme courts.  It appears, based on our research, that there are other states that have this kind of unified statutory regime approach involving similar language not applying but-for but applying motivating factor.

I'm curious if you are aware of any cases from those other similar unified statutory regime jurisdictions where the Court has applied but-for in the face of the suggestion that motivating factor is the appropriate standard.

MR. SCHROEDER:  The only case that actually came up that we -- we saw was this Connecticut case, Your Honor.

THE COURT:  Okay.

MR. SCHROEDER:  And the statutory language in that is not the same as the statutory language in Vermont.  That was raised by plaintiff's counsel.  We didn't uncover any other cases in that regard, but I have to come back to:  What about New Hampshire?  Like, what about that issue?  It's one of the other state law claims in this case.  And plaintiff's counsel made that argument to the Second Circuit:  "Well, we think it should be motivating factor."  Well, somehow that was abandoned because of -- of precedent in New Hampshire, so that state uses but-for causation, and that's one of the claims in this case.

So in terms of looking to what would be most persuasive in

this case where you actually had another claim from another contiguous state that was in this case, how would that not be more persuasive than perhaps Connecticut, which actually doesn't even have the same statute in terms of the language? And I keep going back to "or against a qualified individual with a disability."

THE COURT:  Okay.  Is there anything else on this point?  I think you had a secondary argument about, you know, even if discrimination were -- were shown, the employer can avoid liability by showing they would have taken the same --

MR. SCHROEDER:  Yes.

THE COURT:  -- same action.  Is that still part of your argument, that that should have been part of the instruction?

MR. SCHROEDER:  Well, that that part of the instruction was in our position or our argument, it was incorrect.  I know plaintiff's counsel has argued, well, that was waived.  No.  We actually objected to the motivating factor causation standard itself.  We don't have to go to every single corollary to that, because this was subsumed within the motivating factor.  We objected to it being used at all.

But one of the subsets of the jury instructions was the fact that the jury was instructed that under the motivating factor test, an employer cannot avoid liability by proving that it would still have taken the same adverse action in the

absence of discriminatory motivation.

In fact, the *Knapp* case from the Vermont Supreme Court in 1998 held that the jury should have been instructed that if an employee showed that her handicap was a motivating factor in employer's decision to terminate her employment, then the employer had to prove that it would have made the same decision even absent the discriminatory motive.  So that's certainly a secondary argument, Your Honor.

THE COURT:  But is that still good law is my question.  I don't think it is.  *Knapp* is a 1998 case.

MR. SCHROEDER:  Reversing and remanding.  Correct.

THE COURT:  That particular legal principle is derived from *Price Waterhouse*, isn't it?  *Price Waterhouse* is overruled by the 1991 amendments to Title VII.

MR. SCHROEDER:  Title VII, yeah.  1991 amendments.

THE COURT:  And the 1991 amendments say that that is no longer a possible -- a possible legal principle that applies.  So I'm not sure that *Knapp* is still good on this.

MR. SCHROEDER:  While plaintiff's counsel has a chance to say something, Your Honor, let me just take a quick second to review that.

THE COURT:  All right.  Well, I think --

MR. SCHROEDER:  I'd submit that that --

THE COURT:  Go ahead.

MR. SCHROEDER:  -- that is a secondary argument to

the --

THE COURT:  Okay.

MR. SCHROEDER:  -- primary one that we made.

THE COURT:  All right.  I don't think there was anything else that you wanted to address.  I mean, I certainly want to hear from plaintiffs on this, but is there any -- any other points that I have missed?  You've addressed certification.  Was there anything else that you wanted to make on this particular motion?

MR. SCHROEDER:  I don't believe so, Your Honor.

THE COURT:  Okay.  All right.  Mr. Jones.

MR. JONES:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. JONES:  I'd like to start by addressing the *Newton v. Kohl's* case.  I think Mr. Schroeder cited it somewhere between seven and ten times - I lost count - for the proposition that this court has already resolved this issue. Not true.

First of all, as I think you were hinting, the Court never even got to the issue of the standard, never applied the standard, disposed of the case on the issue of whether or not there's a disability and never got to it.

But secondly, more importantly, the judge was not purporting to define the standard of causation.  He was just providing a general statement of the standards.  And in fact,

when referencing the but-for issues that the plaintiff pretty much -- well, I'm not sure it was the sole reason but a but-for reason, and the only citation Judge Crawford made was to *Porter v. Dartmouth Health* Second Circuit decision, so we know what that court already held, and that court asked you to decide it. So the *Kohl's* case means absolutely nothing. It's not precedential value for the proposition that it's being used.

So we go back to, as you outline, Vermont law on this issue is actually quite clear. We've had multiple decisions in the disability context post-*Natofsky* holding that the standard to be applied is -- it would date back, so we think it's clear.

THE COURT: So the idea that this one claim that was found in favor of plaintiff is somehow anomalous to the others and that that should inform the analysis, did you want to speak to that?

MR. JONES: [Unclear]. That one claim had a different statutory standard pursuant to the law, so it's an outlier because of the law that applies to the claims at issue. So but-for causation applied to the other claims. We acknowledge that and didn't object to the jury instruction. But for the FEPA case, the Court properly concluded that motivating factor is the established standard [unclear].

With regard to certification, again, I think the issue is clear there's no need for certification. You know, Mr. Schroeder keeps saying, well, we argued differently in the

Second Circuit years and years ago. First of all, that was an alternative argument. Mr. Schroeder is making an alternative argument that the law is unclear enough that it requires certification. We were arguing before the Second Circuit that the motivating factor standard should apply. In the alternative, if the Court found a lack of clarity, then we suggested certification, but that was years and years ago.

At this point, yeah, things have changed. It's been eight years. A jury has now ruled in favor of Dr. Porter, and there's no need for the additional consumption of time. You know, quite frankly, I think if Mr. Schroeder had his strategic way, this case would become *Jarndyce and Jarndyce* from Dickens' *Bleak House* [unclear]. But we would prefer a more streamlined and reasonable approach, and there's absolutely no reason to certify the question to the Vermont Supreme Court.

THE COURT: What about the question of *Knapp* that I asked Mr. Schroeder? I want to make sure I'm correct about that. This is with respect to this "an employer can avoid liability by proving it still would have taken the same adverse action in the absence of discriminatory motivation." I want to make sure I'm reading the amendments to the statute correctly. It seemed to me that *Knapp* is no longer kind of good because of the amendments to the statute. Do you agree with that?

MR. JONES: We do agree with that.

THE COURT: All right. Okay.

MR. JONES:  So with regard to the unified statutory regime, I think the Court has accurately stated the law.  Those states that have a unified regime have one standard, and for all the reasons the Connecticut Supreme Court identified, so we don't think there's any reason to think that the Vermont Supreme Court would have a different approach.

THE COURT:  You think -- do you think this does kind of boil down to whether the Court is required to follow federal precedent on this issue or whether the Court could predict that the Vermont Supreme Court might look to other states' supreme court decisions?  I mean, it seems like, yes, it's clear that -- that courts in Vermont, when interpreting the statute, do look to federal decisions, but those federal decisions are not necessarily binding in terms of the definitive interpretation that the Vermont Supreme Court might choose to give it.

MR. JONES:  That's exactly right.  And we quoted -- I can't think of the case off the top of the head right now, but we quoted the case where the Vermont Supreme Court said just that, that we look at federal cases as precedential but not binding.  Clearly Vermont is not bound by the Second Circuit's application of the federal law.

THE COURT:  Okay.  All right.  Thank you.

Mr. Schroeder, any response?

MR. SCHROEDER:  Just two quick things, Your Honor.

THE COURT: Yes.

MR. SCHROEDER: One, on the *Hammond* case --

THE COURT: Yup.

MR. SCHROEDER: -- I think that dealt with the issue of whether or not somebody actually had a disability and whether or not there was a failure to accommodate. I don't see -- I don't recall there being, and I confirmed, any discussion about the causation standard in that regard. They were terminated because of their disability based on an adverse employment action, went through the prima facie case. That discussion was on a page and a half, and perhaps I'm missing something, but I didn't see anything in there regarding the but-for or versus motivating factor standard, so I don't think --

THE COURT: No. I appreciate that. But, you know, the language I read to you earlier from page 430, right, I mean, I acknowledge -- I think I agree with the point that you're making that that is kind of a general statement of the law. In fact, that paragraph begins, "We begin by reviewing the legal framework." But then they talk about FEPA being patterned on Title VII and they say we apply the standards and burdens of proof under Title VII.

If in fact the Vermont Supreme Court felt that the ADA kind of modulates their interpretation of this statute, wouldn't that be the place to comment on it?

MR. SCHROEDER:  I think -- now I think we're just surmising, Your Honor.

THE COURT:  But only -- it's a discrimination case.

MR. SCHROEDER:  I understand that.

THE COURT:  They say we're applying the standards of Title VII.  If *Natofsky* and other cases say, yes, as mediated by ADA, which applies a but-for standard of causation, I mean, I certainly understand your point, but, boy, to leave the statement of the law out there that, kind of, generally without drawing that distinction, if it's not in fact true that all of Title VII standards apply to FEPA, wouldn't the Vermont Supreme Court say that?

MR. SCHROEDER:  Well, but if -- if it was in fact the law --

THE COURT:  Yeah.

MR. SCHROEDER:  -- then we wouldn't even be here discussing the issue, Your Honor.  I mean, I think you're asking me to surmise what -- why the Vermont Supreme Court didn't weigh in on this.  There's no question that Title VII cases are treated differently from ADA cases and disability discrimination cases.

THE COURT:  Right.

MR. SCHROEDER:  That is very well established.  And just to go back to your point about *Knapp v. State*, I went back to check to make sure there's Shepardizing, that it was still

good law.  This is still good law.  That's a state law claim. So to the extent that Title VII of -- of federal law claims are treated a certain way under Title VII, that doesn't carry forward necessarily to the Vermont state law claim.  So maybe I'm missing something, but --

THE COURT:  So --

MR. SCHROEDER:  -- we checked out the law in *Knapp*, and it's still good law as far as we can tell, and --

THE COURT:  Yeah, so -- but if that's no longer allowable under Title VII as a statutory matter, then how is that still good?

MR. SCHROEDER:  Well, we have Vermont state law claims that have -- that have different standards, right?  So --

THE COURT:  That interpret their laws according to Title VII.

MR. SCHROEDER:  But here, Your Honor, you have the statute that -- if you look at the statutory language, because of all of those protected categories, you see the same ones under Title VII or against a qualified individual with a disability.  The statute -- so we start there.  The statute has distinct language.  It doesn't have, like Connecticut -- which is the only state that was discovered by either party that had this issue of uniformity or how they applied it, at least that was raised by either party.  Connecticut says because of -- and it has in that language, Your Honor, the fact that it was

because of all those protected categories, including disability. So it's separate -- it is distinct.

So I understand the argument about uniform application of the law. I don't believe that *Hammond* stands for that, that you take the jump then that, well, it applies even to disability discrimination cases.

And if you look at all the persuasive authority at the Second Circuit and the *Newton v. Kohl's* case, whether it was -- I guess the argument from plaintiff's counsel was that it was *dicta*. The Court was clear, at least in that language, but-for causation for a FEPA claim for disability discrimination. So I think that, one, *Hammond* doesn't stand for the proposition that this has been a decided issue or that -- or that it actually is persuasive for the Court, and respectfully submit that the Court takes the leap that this is what Vermont would say.

We never asked for certification of this question at the Second Circuit. They did.

THE COURT: Right. Okay.

MR. SCHROEDER: And, yes, times may change and maybe they have a different -- difference of opinion now, but just because they don't want to doesn't make that a legitimate rebuttal, respectfully.

THE COURT: Okay. All right. It's an interesting question. It is.

All right. Let's move on to the motions pertaining to

damages issues. Defendants' motion. Mr. Schroeder, I wonder if I should take these motions out of order so I can give Mr. Jones the opportunity to jump up so that you can take a breather.

MR. SCHROEDER: Yeah. Don't worry. This is -- this is -- other than the prejudgment interest, Ms. McDonald and then plaintiff's counsel will have a chance. I'll do whatever you want. It does go in this -- I figured this was the order that you were probably picking.

THE COURT: Okay.

MR. SCHROEDER: Because obviously if you decide the first matter --

THE COURT: Right.

MR. SCHROEDER: -- a certain way, then the other things probably don't matter until later point.

Very quickly, Your Honor, and a number of these arguments obviously were made during trial, they were made during objections. Mr. Coffin is somewhere with his family, so I said, hey, we'll take this -- this up in his stead.

So a couple -- a couple bases. And if -- Your Honor, if you've got something you want me to address first --

THE COURT: No. Go ahead, please.

MR. SCHROEDER: I'll try to be very quick, because obviously I want to be mindful of time.

We have a couple of reasons why we would ask for a new

trial on the issue of damages. Number one, plaintiff failed to abide by her expert discovery and disclosure obligations, and the Court admitted this crucial and prejudicial testimony. You may recall, Your Honor, that discovery in this case ended December 2019. Dr. Bancroft issued entirely new report in August of 2024. We had a *Daubert*-like hearing, for lack of a better description, on March 12th, and the Court allowed cross-examination of Dr. Bancroft, which revealed two important facts that completely gutted his third report, because that was the one from August of 2024.

One, he never -- and he did it in August of 2024. He never referred to the fact that Dr. Porter was given a full-time appointment, professorship. Number two, didn't include anything about her earnings in 2022 and 2023. And the Court allowed basically a do-over at the last minute for plaintiff to -- even though they'd been cross-examined and everything had been decimated in terms of his underlying premises, and in fact his own new report demonstrates that -- because it went from 4.3 million to 1.787, but the Court allowed them to put that report in and have Dr. Bancroft talk about that report, in our estimation improperly. We didn't have a chance to actually put on a rebuttal expert.

Now, the Court may say, "Well, you didn't have an expert up front." You're right, we didn't have an expert in December of 2019 because we didn't think we would need one, and

that's -- that was our prerogative, but because the Court allowed the plaintiff to put in a fourth report -- this is a single-plaintiff discrimination case -- fourth report which completely -- it's not like it went from 4.3 million to, say, I don't know, 4.8 million, which you would expect in a plaintiff case where, time delay, many times the number goes up.  In this case it was dramatically different.

So not only was the *Daubert* hearing, *Daubert*-like hearing, effective- -- was used for the purpose that it exists, which is to determine whether or not this person is qualified to give an expert opinion, all of his opinions were gutted.

He then gets -- he pivots and puts a new report in on March 19th, five days before trial.  How is that not prejudicial to defendants in this case?  And you could submit, Your Honor, "Well, you didn't have an expert before."  Well, obviously we didn't have an expert back five years ago, nor did we think that the expert, despite the rules, would be allowed to amend their report so much so that we'd never have the opportunity to cross -- to depose him again and establish a record for purposes of cross-examination at trial, and so we'd submit that that is the first issue for which we believe that we should be entitled to a new trial.

The second one -- and this gets to the issue of -- of mitigation of damages, Your Honor, and our position was that when you get to the -- this goes to what the Court said in

terms of page 30 of the jury charge on April 8th, and it was -- the jury was told, "If you find that Dr. Porter failed to mitigate her damages, you must reduce your award," dot dot dot, and that was page 30, ECF No. 275.

And our position was, yes, failure to mitigate, affirmative defense, no question. But we should have been given the opportunity, and the instruction should have included language, and we objected to this, the -- a number of times, the fact that she actually did mitigate her damages, but you need to actually consider that in terms of deciding the award.

Now, we can talk about the severance issue subsequent- -- we'll get to that issue, but in terms of mitigating her damages, it was like -- it was the inverse of what defendants' position was, which was actually Dr. Porter did a good job of mitigating her damages. We only learned that because of the March 12th hearing, really. And we should have been able to establish that -- or that should have been an instruction to the jury so they can understand how mitigation of damages works so that if they -- we say failure to mitigate because that's an affirmative defense that an employer would always have, but we also wanted to establish that, assuming she did mitigate, you certainly can take that into account in determining her actual damages on the back end if you find a violation.

The third issue was the fact that the Court -- and this goes to the demonstrative exhibit issue, page -- Exhibit 3 to

our motion.  The Court improperly declined introduction of Dartmouth Health's demonstrative exhibit and limited argument at closing about crucial mitigation evidence.  Whether Dr. Bancroft disagreed with the underlying assumptions, that argument could be made by plaintiff's counsel in closing, but the fact that the Court originally said we could introduce the demonstrative evidence, just like they were allowed to in their closing, but the fact that we could and then it was rescinded, just in and of itself, that was -- we believe the first call was the right call, that in fact that was an admission. Whether -- whether there was color to it or not, he did the exercise, and it was on a piece of paper.  It was submitted as C19.

The Court initially ruled we could refer to it and show it as a demonstrative - it's not going back with the jury - but then flipped -- reversed course the next day or a few days later, and we believe that that was inappropriate, because there was a legitimate basis for putting it in.  It was admitted -- it was cross-examination of the plaintiff's expert, and we should have been able to refer to that at least as a demonstrative exhibit, just as the Court originally ruled.

The other issue and the final issue in terms of seeking a new trial is C13, the severance agreement.  And I went back to the transcript, and I know -- I was very mindful of the judge's ruling and instruction, and I wanted to be extremely careful

about what I said about the severance agreement, and the Court was very clear that there were certain areas that we were not allowed to go into on the severance agreement in terms of mitigation of damages at the closing.  However, Your Honor, what I submitted at the time, and certainly cross-examined Dr. Porter without objection, the document was admitted.  I should have had no restrictions whatsoever about what I said about the severance agreement.

THE COURT:  So it's interesting you raise the transcript.  I was going to raise it with you.  I wonder if we're talking about the same lines of the transcript.  Because I want to make sure I fully understand your argument on the severance agreement.  Are you -- are you arguing now that you should have been able to talk about basically mitigation in terms of, you know, reduction of damages based on the severance agreement?  So as I look at this, and I don't know if you have the transcript in front of you, but --

MR. SCHROEDER:  I did.

THE COURT:  -- page 16, Document 322:

"THE COURT."  I am saying that "the argument during closing is not going to be . . . making the point that if they should find damages, it's going to be reduced by the amount of the severance agreement?"  I don't know if you -- if you're following along.

MR. SCHROEDER:  Judge, I do -- if you just give me one

second, Your Honor.

THE COURT: Yes, of course.

MR. SCHROEDER: Let me just refer to it.

THE COURT: Yeah.

MR. SCHROEDER: I've got, like, various transcripts.

THE COURT: Yeah.

MR. SCHROEDER: Which --

THE COURT: It's Document 322, page 16, beginning around line --

MR. SCHROEDER: What day was it, Your Honor? I think it was the 7th?

THE COURT: You know, I don't have the -- I have an excerpt. The deputy clerk is telling me it was -- when was it?

COURTROOM DEPUTY: Day 12.

THE COURT: Day 12.

COURTROOM DEPUTY: April 8th.

MR. SCHROEDER: So that would be April 8th.

COURTROOM DEPUTY: 8th.

MR. SCHROEDER: Just give me one second, Your Honor.

THE COURT: Yes.

MR. SCHROEDER: I -- I did -- I did review it this morning.

Do you have it right there?

Just give me one second. Page 16?

THE COURT: Yes. Page 16, line 16.

MR. SCHROEDER:  Yes.

THE COURT:  See where it says "THE COURT:  Okay, but the argument during closing is not going to be . . . to be making the point that if they should find damages, it's going to be reduced by the amount of the severance agreement?

"MR. SCHROEDER:  No, I have no intent of saying that, your Honor."

Next page.  Middle of the page.

"MR. SCHROEDER:  So I want to know that I have free reign *[sic]* to at least talk about the document, but not its import in terms of damages."

So that, in your view, is not acquiescing?  You're telling me that you're following the Court's order at that point?

MR. SCHROEDER:  I -- I actually was, Your Honor. You made -- I raised it because I wanted to know where the line was and whether I said, "Well, Your Honor, I object for the record and let's put this on the record," you made it very clear and I -- that that was a no-go zone, and so -- and that was your ruling, and -- and so I would submit that, one, I should have had the opportunity to discuss the severance agreement in any way I wanted to because it was an admitted exhibit and it was admitted into evidence, and so I should have had free rein to say whatever I wanted about it, specifically the number as well as any description to it.  But to the extent -- I wasn't going to violate the Court's instruction on

that, which is why I asked for real clarity on that, and you made it very clear where I could and could not go, but I raised it for that very reason.

THE COURT: Okay.

MR. SCHROEDER: And I submit that because it was an admitted exhibit with no objection, that it was open season to discuss it in any way I wanted to for -- for the jury's consideration in any way they might apply it, not even have to say mitigation. So I understood that you didn't want me to say anything about mitigation, but the import of your ruling was that I steered very clear and I did not want -- and the reason why I raised it is because I've seen this happen. We have a sidebar during closing arguments, right, and that's just -- I want to avoid that at all costs, and that was the reason for why I made that inquiry.

THE COURT: Okay. And with respect to your other arguments about the note, the demonstrative, everything else, I was fairly clear at trial in terms of what the ruling was on that, which is why I'm not kind of engaging with you right now.

MR. SCHROEDER: Understood.

THE COURT: You kind of know what my view was on that. I don't foresee myself changing my perspective on that, but I certainly understand your position on that. Okay?

MR. SCHROEDER: Thank you.

THE COURT: All right. Plaintiff.

MR. JONES:  I think I'll be pretty brief, Judge.  You know, on the -- on the Bancroft issue, there's nothing new in the motion that hasn't already been decided multiple times by Your Honor.  I think you got it right the first time you ruled, and they haven't given you a reason now to change that.

Just a couple of quick points on that.  They keep saying things like it was revealed at the *Daubert* hearing that Dr. Bancroft never mentioned or referenced the fact that Dr. Porter had received a promotion.  He testified on the stand in this room - I remember it - very clearly that while he did not know if she had received a promotion in that year, he was relying on actual wage data from her.  So it's the numbers and the salary that's being reported that matters, not the fact that she got a different salary because she got promoted.  Again, it's the same red herring being recycled.

You know, nothing was hidden.  Dr. Bancroft never changed the basic methodology of his analysis, as you have noted many times before, so I don't believe there's any grounds to that argument.

The mitigation instruction, we think the jury instruction accurately reflects the law and was not confusing at all.  As we noted -- quite frankly, I heard Mr. Schroeder, again, make the argument "I'm still confused by what their argument is."  I think they are confusing a lack of damages argument with a failure to mitigate, but the failure to mitigate was the

instruction you gave.  It was accurate.  It was appropriate. Not confusing.

Again, for the reasons we've already said, we don't think the handwritten notes prepared at Mr. Coffin's instructions under a protest by the witness was probative at all and was properly limited.

And then with regard to the severance agreement, we went over it at length that morning, so I don't think I have more to add than that, but it would have been unduly confusing and prejudicial to suggest that a plaintiff should be punished for not having accepted a severance agreement that would have included a release of all of her claims and prevented the trial at all from ever having happened, that that's somehow relevant to -- under the [unclear] analysis [unclear].

For all those reasons, we think the motion should be denied.

THE COURT:  All right.  Thank you.

Mr. Schroeder, anything in reply?

MR. SCHROEDER:  Nothing, Your Honor.

THE COURT:  Okay.  All right.  So now plaintiff's motion for prejudgment interest I believe is the last -- well, there's attorney's fees as well, but let's start with the prejudgment interest motion, plaintiff.

MR. JONES:  I think I'll be just as brief.

THE COURT:  So could I just ask you right out, so

your -- your papers talk about prejudgment interest through the end of the year 2024. I just had a question generally about is there a reason why prejudgment interest request is not being made into 2025, or maybe there's a legal rule here or principle that I'm just not aware of as to why that -- that's the case.

MR. JONES: Honestly, I don't know.

THE COURT: Okay.

MR. JONES: It would seem to make sense that it be -- well, I think prejudgment interest should run up until judgment. Maybe they're referring to the chart we gave where we were suggesting how the million dollars could be allocated over different years and [unclear] on that.

THE COURT: Yeah. I thought there was a -- I can find it here in all this paper, but I thought there was a 2024 date in there for the time frame for which that interest was being requested, so I guess I would -- I would ask you today, to the extent that this -- this were granted, are you going to be seeking interest for any period into 2025 up until the judgment?

MR. JONES: Yeah. We -- we believe judgment *[sic]* should run up until the day of judgment.

THE COURT: Okay.

MR. JONES: And the reason is, as the prevailing party and to make plaintiff whole, interest is appropriate. Particularly in a lost wages and economic loss case, as the

million dollar portion of the judgment is, in order to make Dr. Porter completely whole, interest is required.

We also believe that the -- the damages are sufficiently ascertainable to trigger the Vermont 12 percent mandatory rate as well. We believe -- the basic methodology here has never been that complex. Now, with the passage of eight years, complicating factors can arise, but essentially if you want to find out what the economic loss is on any particular day, you calculate the salary she would have earned, you calculate the salary she actually earned and the economic benefits she earned, you subtract that, you have your number. At any point in time that analysis could have been done. We think that is sufficient in an employment case for the 12 percent.

We note that the Vermont Supreme Court has also held precision is not needed for reasonably ascertainable. So reasonable certainty is enough. We think calculating lost wages is a relatively straightforward process, so therefore the damages are reasonably ascertainable and the 12 percent rate should apply.

THE COURT: And so if it's awarded, is it your view there's no kind of discretion in terms of a rate? So the defendants have made some arguments about a windfall, and I know the Supreme Court has kind of -- Vermont Supreme Court has spoken to this issue a little bit.

MR. JONES: Yeah.

THE COURT:  But 12 percent is the statutory rate in Vermont.

MR. JONES:  Right.

THE COURT:  If prejudgment interest is awarded, must it be 12 percent, or is there any -- any room for it to come down?

MR. JONES:  We believe, because damages are reasonably ascertainable, that triggers the "shall" language of the Vermont [unclear] interest statute, that the interest rate shall be 12 percent.  There is no discretion under the Vermont statute in those circumstances.

THE COURT:  Um-hum.  And this kind of other argument that Dartmouth is making, I believe it was in this motion about kind of extraordinary circumstances, this case has been around for a long time.

MR. JONES:  Right.

THE COURT:  There was the COVID pandemic in the middle of it all.  Things were kind of on hold for a certain period of time.  Is that a sufficient basis to -- to amend that percentage?

MR. JONES:  We don't believe so, Judge.  We think as between the victim of discrimination who was denied receipt of the damages she was lawfully entitled to and the wrongdoer who was found by a jury to engage in discrimination, that the law puts the burden on that passage of time on the defense.

THE COURT: Okay. Anything further?

MR. JONES: No. Thank you, Judge.

THE COURT: All right. Mr. Schroeder?

MR. SCHROEDER: Thank you, Your Honor.

The statute is clear that it requires that damages be readily or reasonably ascertainable at the time of accrual of cause of action to be awarded as of right and that, in the alternative, the Court has discretion. We certainly think this falls within the discretionary end of things.

What you have here is four different reports from Dr. Bancroft. The numbers are all over the place: 3.0, 4.8, 4.3, then 1.787. So the final figure, by the way, is $1 million. It is not tied to anything. It is not tied to any evidence in the record regarding her salary at any given point or between Dartmouth Health and working at UVMMC, and so we'd submit there's no -- there is nothing in the record to support that this number was readily ascertainable. We'd submit that it was actually, you know, just a number that they came up with out of thin air, because it's a million dollars. It was not tied to any piece of record evidence in this case, nor is it tied to anything in Dr. Bancroft's report.

THE COURT: Well, I guess a question for you. How -- how closely does the jury's damages award have to be correlated to, say, the conclusion of the expert, right? I think the number you had mentioned earlier, the final report from

Dr. Bancroft, where does that come in at for damages?  1.4?

MR. SCHROEDER:  1.787.

THE COURT:  1.787.  Okay.  So the jury returning a verdict for $1 million, you're saying that's kind of -- the basis for that, it's an irrational verdict, there's no -- all the testimony of Dr. Bancroft as to, in his view, what justified the damages that he reached, that's insufficient?

MR. SCHROEDER:  Well --

THE COURT:  I understand your point about the various reports.  I understand that point.  But that was insufficient to -- to assess whether it was a rational verdict?

MR. SCHROEDER:  Well, I don't see how it becomes -- I mean, the statute's clear, right, Your Honor?  And I want to go -- shift to discretionary in a second.  And I understand you're -- maybe perhaps that could lead to the discretionary standpoint, but it certainly is not readily or reasonably ascertainable that 1 million versus 1.8 million is somehow in the same ballpark.  It's just not.  And so we think that not only were they not readily ascertainable because of -- the million dollar number, right, it was just -- it literally was -- it's not like -- and I've had awards where it's -- in fact, Ms. McDonald and I had an award where it was $1,020,000 and change.  Like, okay.  They obviously did some math there.  They -- they actually put pen to paper.  But putting a million dollars on a piece of paper and saying that that's somehow

readily ascertainable, I don't think it meets the sniff test on that one.

In terms of discretion and where it flies, you latched on to a very good point: Well, we should be looking at 2024. Now they want to shrink the period of time -- they want to increase the amount of back pay, right? Before it was -- her retirement date's all over the place. Sometimes it's 65. Sometimes it's 66. Sometimes it's 70. Well, if you do 70 and you go out to 2033 and you actually took the million dollar award and put it out across that evenly, not to say that that's the right way to do it, but their attempt to kind of massage the numbers to make it fit so that they get a 35 percent kicker on top of the million dollars, the two are not tethered appropriately under the circumstances, and so their math is almost as bad -- or actually, it's worse than -- probably on par with Dr. Bancroft's math.

But there's nothing that gets them there, and they're just massaging the numbers and condensing it so that they get the most back pay to be awarded for purposes of applying the prejudgment interest rate.

THE COURT: So are you saying that's kind of part of the analysis that the ultimate amount -- the sum total of any prejudgment interest awarded, if it amounts to, I think you said, a 35 percent -- 35 percent of the jury award --

MR. SCHROEDER: Yes.

THE COURT: -- is that somehow relevant to whether that amount should be awarded? I'm just wondering, is there some proportionality? It doesn't seem like there is if you have a statutory rate, and I recognize your distinction between mandatory and discretionary.

MR. SCHROEDER: Right.

THE COURT: But once prejudgment interest is applied under state law, it has to be applied at a certain rate.

MR. SCHROEDER: Yes.

THE COURT: And where that falls in terms of what it amounts to in terms of the percentage of the jury verdict, is that something the Court can consider or should consider?

MR. SCHROEDER: I think it should consider that. I think a prejudgment interest award of 35 percent of the overall jury verdict, I think that's way out of bounds. And it's way out of bounds because when you actually use the modeling that they use, they've now manipulated the facts in a certain way to get to that number. And it's -- it's contradictory to the record evidence on this subject. And to the extent that the Court is looking at this from a discretionary standpoint, then I think that everything's in play. Everything's in play in that regard.

THE COURT: Is there -- do you know if there's law on that? I don't know myself, so I'm just --

MR. SCHROEDER: I believe --

THE COURT:  Is there law on that question?

MR. SCHROEDER:  -- in terms of --

THE COURT:  You know, the percentage, you know, what ends up getting --

MR. SCHROEDER:  Oh.

THE COURT:  -- potentially awarded as prejudgment interest in comparison to the entire jury award.

MR. SCHROEDER:  I think the *Estate of Fleming v. Nicholson* case, 168 Vt. 496 *[sic]*, 1998 case, it is in place to avoid injustice, not to award windfall.  Prejudgment interest is in place to avoid injustice, not to award a windfall.

And I think that -- I think the other case that's instructive is *Windsor School District*.  It's a 2008 Vermont case as well on that issue.  I think certainly not meant to be a windfall to the plaintiff.  That's not what it's for.

And I think, Your Honor, you touched on another part of this case, right?  This is a rather unique case.  There's not going to be another -- I think a fact pattern necessarily, certainly not in Vermont federal court, from what I can tell, of where we have this eight-year gap between when it was filed and when it goes up to court.

You have the fact that the Vermont -- the FEPA claim wasn't even filed until almost a year later into the case, so set that aside for a second.  You have the fact that summary judgment was awarded November of 2020, went up to the Second

Circuit, pandemic, *et cetera*. You don't get a decision back until 20- -- February of 2024, so for that time period I understand the argument, well, you know, the plaintiff ultimately won, but somehow that period of time should count for the plaintiff because defense won during that period of time? And it was through no fault of their own. Oral argument happened in February of '22. It took two years for the Second Circuit to issue their decision, and so I'd submit that when you're -- when you're looking at the big picture from a discretionary standpoint, I think the Court has a lot of discretion. And one theory of one claim.

You know, that gets to some issues that Ms. McDonald will address on the attorney's fees, *et cetera*, so I don't want to steal her thunder, but I'd submit that that all needs to be taken into account. We certainly submitted where it's not readily ascertainable -- and, yes, the Court has discretion. It's kind of wide-open discretion. I don't think there's a mandate that, well, we've got to apply 12 percent. We gave the Court various options. I know I looked at -- the adjusted prime rate yesterday was 7.5 percent. 12 percent's a very draconian amount, and -- but this case does not warrant application of that for an eight-year period.

THE COURT: So there's a case in the Vermont Supreme Court, *Gritman*, 2016, and some of the relevant language there: "'there is no constitutional mandate that the statutory

interest rate' be pegged to the national prime rate. . . .  The argument that a fixed 12 percent rate creates a windfall to plaintiffs and is punitive to defendants in periods like the present when market interest rates are low is more appropriately presented to the Legislature."

It seems like the Vermont Supreme Court has kind of rejected the idea of there being discretion to prevent a windfall, at least -- at least according to that -- that language from that decision.

MR. SCHROEDER:  Your Honor, I think that when we are talking about this particular case and the actual procedural history, it's rather unique, and to, one, use the -- the math as it was applied by the plaintiff I think would be inappropriate just based upon the record evidence, but I think the record evidence demonstrates that for purposes of trying to increase her damages case, she was trying to say that she was going to work to at least 70.  And you may recall, and it stands out distinctly to me, that I believe the plaintiff's mother was working well into her 80s, and that was evidence in the case.  So we can't have it both ways at the end of the day.

THE COURT:  Okay.

MR. SCHROEDER:  Thank you.

THE COURT:  All right.  Thank you.

Mr. Jones, so what about this idea that there was -- you know, the case goes up to the Second Circuit, it's pending

there for a while. You know, is there -- do they have a point in terms of that prejudgment interest running while the case is in stasis?

MR. JONES: No. Because during that time Dr. Porter didn't have access to the money that was rightfully hers. The result here is that Dr. Porter was the victim of discrimination and suffered economic losses in the amount of a million dollars. She did not have the use of that money for eight years. They did. So it's not a windfall. It's to make her whole. And as I said before, as between the wrongdoer, the party that the jury found to have engaged in discrimination against federal law, and the victim, the law says, you know, the interest goes to the victim to make her whole. She is not made fully whole if she's denied interest on the years that she doesn't have that money.

THE COURT: Okay. What about the -- the argument Mr. Schroeder makes about discretion in terms of the rate? He talks about the uniqueness of this case, years it was pending, everything else. Are you aware of any authority that -- that permits the Court to exercise that kind of discretion?

MR. JONES: I don't -- I'm not aware of any. I think the statute is clear that once you decide that damages are reasonably ascertainable, the statute is the interest rate shall be 12 percent. I'm not aware of cases that [unclear] discretionary [unclear].

I wanted to address one issue about -- Mr. Schroeder referenced on multiple occasions his belief that this million dollars was just pulled out of thin air and it's untethered and the jury didn't do math.  Actually, when we came up with our chart, one reason why they picked, you know, 65 being the end point is if you remember Dr. Bancroft's chart, the final column on the right side was the cumulative total of losses based upon which year the jury concludes the plaintiff would have retired. If you look at 65, pretty darn close to a million bucks.

So we thought the best way to tie an analysis to what the jury seems to have actually done was perhaps they accepted Mr. Schroeder's arguments that she would not have worked until 70, and maybe the reason they didn't give her 1.78 was because they concluded she would have retired at 65, in which case damages were a million dollars.

So that's why our chart uses that analysis, and that's why we believe this verdict makes complete sense, that it's not completely arbitrary.  So we're not trying to gin up the chart to maximize damages.  We're just trying to find a way to reconcile the jury's award with the evidence.

THE COURT:  Okay.

MR. JONES:  Thank you.

THE COURT:  Mr. Schroeder, anything further on that point?

MR. SCHROEDER:  One final point --

THE COURT: Yes.

MR. SCHROEDER: -- Your Honor, and I'll rest. The chart actually says 2024, not 2027, so when you look at the math, it doesn't add up, and the only reason is because they're putting all the back pay up front so that they can get a higher prejudgment interest award. Thank you.

THE COURT: Okay. Thank you.

Okay. Attorney's fees.

MR. JONES: I will finally give the Court a break from my voice.

THE COURT: Mr. Vitt.

MR. VITT: Good morning, Your Honor. May it please the Court.

We're here on Dr. Porter's motion that seeks an award for 1,738,341 in attorney's fees. In view of the years of work and the result, that attorney's fees request is reasonable. This case has been long and difficult. We've been working on it for over eight years. The case is complex. That should not be disputed, and I expect, given the number and length of the pretrial motions, the *Daubert* hearing, and a jury trial that lasted over two weeks, the Court will agree about it being complex. But if there were a doubt, the number and length of the posttrial motions should provide an answer.

The case has been hard fought. Dartmouth-Hitchcock adopted a strategy of resistance and a no-holds-barred

approach.  It was apparent pretty much from the jump that discovery would be a struggle.  Dartmouth-Hitchcock decided to fight everything.  A case with one or two motions to compel is unusual.  A case with eight motions to compel is unheard of. Dartmouth-Hitchcock took a hard line from the outset, and that approach continued through trial, and we see it now in the posttrial filings.

The lawyers and paralegals who worked on the case kept careful track of their time.  The total for their years of work comes to a lodestar figure of the 1,738,341.  That is a considerable sum for sure, but given the hard work and the jury verdict that exceeds $1 million, that is a reasonable amount for the attorney's fees.

I'll turn in a moment to some of Dartmouth-Hitchcock's specific criticisms about the fee application, but before I do that, I want to suggest that the Court focus on the basics and ask:  Is this a reasonable total given the case complexity, the aggressive defense, and a jury verdict of $1,125,000?

An indicator of whether this is a reasonable lodestar would be what Dartmouth-Hitchcock spent in its defense. Dartmouth-Hitchcock claims that the amount sought in attorney's fees for eight years of work is astounding, especially given what it describes as the, quoting now, "limited damages award" of only 1,125,000.

Dartmouth-Hitchcock is sharply critical of our

overstaffing, our inefficiencies for not appropriately using associates, and our overall performance. We've responded to those charges. But before doing that, I suggest we take a step back and say, given the case complexity, the delays, none of which Dr. Porter caused, and the no-holds-barred approach by Dartmouth-Hitchcock, is the lodestar amount of 1.7 million reasonable?

The Second Circuit and the Vermont Supreme Court have held that the lodestar number is a presumptively reasonable fee. We believe that our lodestar request falls well within the reasonableness standard. In view, however, of the sharp criticisms by Dartmouth-Hitchcock and the claims that the total fee request is way out of line, it would be instructive to require the defendants to provide their rates and hours in the case.

There is support in the Second Circuit for requiring a defendant in a case similar to this to provide the Court with information about the fees and hours charged. In *Frommert*, a New York district court case, there had been two appeals to the Second Circuit; a defendant that was represented by two substantial law firms, just as in this case; and a defendant that was highly critical of the plaintiffs' fee request. In deciding to require disclosure, the district court said, "because of the unique and long history of this case, I believe that rates and fees charged and paid by defendants . . . are

clearly relevant and would be helpful to this Court in determining the amount of fees that should be awarded to plaintiffs' counsel."  Dartmouth-Hitchcock insists that plaintiff's hours and charges are way out of line, and given that criticism, we think it is fair to demand, or to suggest, that we see the defendants' fees.

Dartmouth-Hitchcock has multiple criticisms of how we staffed the case and inefficiency in the way we spent our time. The principal argument, however, is that Dr. Porter was, quoting now, "overwhelmingly unsuccessful" with a "limited damages award."  Dartmouth-Hitchcock performs a series of calculations and concludes that the lodestar amount should be adjusted downward by no less than 83.3 percent or as much as 92.86 percent, two decimal points.  In arguing for this downward adjustment, Dartmouth-Hitchcock bears the burden.

Now, the parties agree that the Supreme Court's decision in *Hensley* is the correct starting point.  In *Grant v. Martinez*, the Second Circuit discusses the analytic framework mandated by *Hensley* for evaluating whether there should be a reduction because of a partial success.  In step one, the Court looks to see if there are totally unrelated claims that were unsuccessful, and in step two, the Court determines whether there are unsuccessful claims interrelated with the successful claims, and if there are unsuccessful claims, the Court must decide whether the level of success warrants a reduction in the

attorney's fees.  The Second Circuit includes, "If a plaintiff has obtained excellent results, however, the" attorney's fees "should be fully compensated."

Step one is an analysis whether the plaintiff failed to succeed on any claims wholly unrelated to the claims on which plaintiff succeeded.  If there are wholly unrelated claims that plaintiff lost, they must be deducted from the lodestar calculation.

In this case, there were no unrelated claims.  There's not a separate HIPAA claim or a malpractice claim.  There are no wholly unrelated claims.  All of her claims, by Dr. Porter, focus on why she was terminated, and we had to review thousands of pages of documents produced, take multiple depositions, and review hundreds of pages of depositions to figure out what had happened at Dartmouth-Hitchcock such that a doctor with 21 years of impeccable service was terminated.

What many of them reveal is that there were multiple reasons that Dr. Porter was fired.  They often cite both her disability and her whistle-blowing claims, many in the same e-mail.  The Court, I believe, will remember Dr. Leslie DeMars' statements in Exhibit 89.  That's a series of exchange between her and Dr. Merrens.

In her first paragraph, Dr. DeMars cites to Dr. Porter's disability and whistle-blowing as a reason she was terminated and should not be retained.  Quoting briefly:  "Yes, there has

been an enormous backlash, mostly heartfelt based on Misty's longevity, and with only a token nod to the elephant in the room of her disruptive . . . behavior that everyone has seen. . . .  Everyone is also remembering Misty as a full time employee wearing 3 hats, and not the one who's been out for almost 18 months. . . .  As much as this hurts to say, it's the right decision to include her in the termination, and I don't want to change that decision."

This references both Dr. Porter's disability and the whistleblower claim, and Exhibits 82 -- excuse me, 52 and 83 include similar comments about Dr. Porter, referring to both her disability and whistle-blowing.  They were all together.

Now, returning to the *Hensley* analytic framework, in step two the Court must determine if there are unsuccessful claims interrelated with the successful claims, and if so, the Court must determine whether the level of success warrants a reduction in the fee award.  In the *Grant* case, the Second Circuit relies on *Hensley*.  Quoting now, "If a plaintiff has obtained excellent results, however, the attorneys should be fully compensated."

A judgment on behalf of a single plaintiff in an employment case for $1,125,000 is an excellent result, period. But there's no reason to believe that Dr. Porter would receive -- would have received a dollar more if she prevailed on the whistleblower claims.  The measure of damages was the

same.  There was no separate instruction.  Her economic loss would not have changed had she prevailed on those claims.

The Supreme Court in *Hensley* directs that "the most critical factor is the degree of success obtained," and using that metric, a lodestar calculation of 1.7 million for eight years of work is a reasonable fee.  That 1.7 million number obviously was as of May 8th, and there's been time spent since then, and at the appropriate time, we'll be submitting something.

Now, Dartmouth-Hitchcock complains about our inefficient overstaffing, and it cites the two examples.  First, it says that two partners were present at every deposition.  This is incorrect.  I was the only partner present at those depositions.  Katie Kramer was present as a contract employee at an hourly rate of 175, and given that she had two federal court clerkships and over five years of experience, 175 is certainly reasonable, and in fact, it's a bargain rate.

And second, our staffing was criticized because of zero associates, which, according to Dartmouth-Hitchcock, is a -- they say it's a clear sign of inefficiency.  First --

THE COURT:  So, Mr. Vitt, I'm just going to ask you to keep an eye on the time.  We're going on an hour and a half, so how much --

MR. VITT:  I've got about 15 seconds.

THE COURT:  Okay.

MR. VITT:  Maybe 20.

THE COURT:  All right.

MR. VITT:  We had three timekeepers.  They had five. There were zero associates.  We only had zero associates because in 2021 Sarah Nunan became a partner and we lost our only associate.  We have no associates.  We staffed the case with the three individuals we had, Sarah Nunan, Eric Jones, and myself, and our rates are reasonable, and the fee request we believe is totally within the reasonable realm.  We believe it should be granted.

Thank you.

THE COURT:  All right.  Thank you.

Ms. McDonald.

MS. McDONALD:  Thank you, Your Honor.  I'll stay here, if that's okay.

THE COURT:  Yup.  Absolutely.

MS. McDONALD:  As Mr. Vitt suggests, the touchstone for an award of attorney's fees in this case is reasonableness. In this case the request for over $1.7 million in a claim in which Dr. -- in a case in which Dr. Porter won one of her six claims, one out of 13 jury questions, and she lost on the claims that Mr. Vitt in his opening statement described as the most important to her case, $1.7 million is simply not reasonable.

Mr. Vitt is attempting to characterize this case as highly

complex.  Ultimately, this is a single-plaintiff employment discrimination case.  This is not a highly complex case that would warrant some sort of upward adjustment.

As Mr. Vitt previewed, the standard here is a calculation of a reasonable amount of hours multiplied by a reasonable fee reduced by any fees that were not reasonably incurred.  And then step two would be the upward or downward adjustment.  We take issue not with the -- the hourly rate but with the amount of fees both at step one and at step two.

We highlighted some of the major areas where we think that there were -- was excessive billing in our opposition.  I'm happy to go through them if you'd like to hear them, but I'm mindful of time.  Okay.

At step one, we think that work unrelated to the unsuccessful claims should be reduced at step one, and we think the easiest way to do that is to remove all of the fees that were incurred prior to the addition of the VFEPA claim. Certainly there is some factual intermingling there, but I think that that's probably the easier way to calculate it as opposed to going through time by time and trying -- time entry by time entry and trying to figure out which entry refers to which claims.  And the bills before the VFEPA claim were added are -- total approximately $150,000 in fees, so we think that that part should be reduced in step one.

So after the Court excludes all of the -- the

unnecessarily incurred fees, we think that a downward adjustment is appropriate based on the degree of success in this case. I'm going to quote from Mr. Vitt's opening statement: "The unlawfulness in this case consists of two things: One, they discharged her because of her disability, and more important, and you'll probably hear about it, is that she was discharged because she was a whistle-blower." As the Court knows, the jury did not find in Dr. Porter's favor on either of the whistle-blower claims. She also lost on three of her four disability discrimination claims and on her claim under the VFEPA that she should have been transferred to another position.

THE COURT: And so, of course, your position is not that there should be no compensation for the claims for which there was no liability found but that somehow there should be a reduction for those claims?

MS. McDONALD: Well, I think if the Court can easily identify anything that went strictly to the other claims, then, yes, certainly, but I understand the point that it's difficult to do --

THE COURT: Right.

MS. McDONALD: -- with mathematical certainty.

THE COURT: Right.

MS. McDONALD: And -- and I don't think the law suggests that it needs to be done with --

THE COURT:  Right.

MS. McDONALD:  -- mathematical certainty.

As we put in our brief, the lodestar amount we believe should be reduced by between 83 percent and 93 percent.

With respect to the amount of claims that were won, on the idea that the damages award was extremely successful, as you've heard many, many times, Dr. Porter's -- originally -- her expert originally requested -- or said she was entitled to over $4 million in damages.  Her award was ultimately 1 -- about a quarter of that, so I don't think that that can be said to be an extremely successful measure either.  I would actually say that's extremely unsuccessful with respect to the damages award that she was seeking originally.

THE COURT:  So that's how you measure success?

MS. McDONALD:  In part.

THE COURT:  What was ultimately awarded versus what was anticipated to be the damages to begin with as opposed to maybe some type of an objective assessment of a dollar amount awarded?

MS. McDONALD:  I think -- I think there are a lot of things that you can consider, and I think that's one of them that you can consider in making your decision.

And then just on this request for prejudgment interest on the attorney's fees, there's no -- there's no case law that would support that that's the case.  Dr. Porter cites to a

District of Massachusetts decision in support of that claim, and I believe she does that in the motion to amend judgment rather than in this motion, but that case refers to the -- an award of prejudgment interest on attorney's fees as "clearly not the norm." I don't want to belabor this point because I'm not sure that Dr. Porter actually believes that this is a reasonable avenue.

And on the request for Foley's attorney -- excuse me, for Dartmouth Health's attorney fees, this is a different case. Dartmouth Health was facing -- had to defend itself against claims that put its reputation at stake. They are related to claims of patient safety. This is more than just a single-plaintiff employment case as to Dartmouth Health. Its reputation was on the line. Moreover, Dartmouth Health was not paying a contingency fee basis, so it's sort of an apples-to-oranges comparison. Our client determined our fees were reasonable. They paid our fees. I think that's a different situation than a contingency fee situation.

THE COURT: So then you would oppose the request to --

MS. McDONALD: We would oppose that request.

THE COURT: Okay. Okay.

MS. McDONALD: Oh, and, I'm sorry, one more point. We would just move to strike the supplemental brief that they filed significantly after the deadlines --

THE COURT: Okay.

MS. McDONALD:  -- that cites old law.

THE COURT:  All right.  Thank you.

MS. McDONALD:  Thank you, Your Honor.

THE COURT:  Any response, Mr. Vitt?

MR. VITT:  No, Your Honor.

THE COURT:  Okay.  I think that covers everything.  Have I missed anything?  It's been an hour and a half.

MR. JONES:  No, Your Honor.

THE COURT:  Okay.  All right.  Well, obviously I'll take it under advisement, actively working on all of these motions.  Thank you very much for the argument today.  I appreciate everyone's preparation and kind of helping me to kind of think through these issues.

All right.  If there's nothing else, then have a nice holiday weekend coming up, and maybe I'll be seeing you again soon.

MR. JONES:  You too.  Thank you, Your Honor.

MS. McDONALD:  Thank you, Your Honor.

MR. SCHROEDER:  Thank you, Your Honor.

COURTROOM DEPUTY:  All rise.

(Court was in recess at 11:57 AM.)

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the audio recording of proceedings in the above-entitled matter.

July 24, 2025

Johanna Masse

Digitally signed by Johanna Masse
Date: 2025.07.24 15:38:13 -04'00'

_____
Johanna Massé, RMR, CRR