UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| Misty Blanchette Porter, M.D., | |
| Plaintiff, | |
| v. | Civil Action No. 2:17–cv–194 |
| Dartmouth-Hitchcock Medical Center,<br>Dartmouth-Hitchcock Clinic,<br>Mary Hitchcock Memorial Hospital, and<br>Dartmouth-Hitchcock Health, | |
| Defendants. | |

**OPINION AND ORDER**
(Docs. 300, 302, 318, 319, 330)

In March and April 2025, the Court held a fourteen-day trial in this employment lawsuit brought by Plaintiff Misty Blanchette Porter, MD, against Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health"). Dr. Porter claimed she was unlawfully terminated by Dartmouth Health because of her disability and her whistleblowing complaints to Dartmouth Health supervisors about the allegedly incompetent and unethical conduct of two other Dartmouth Health physicians. Dartmouth Health claimed it had legitimate, nondiscriminatory business reasons for terminating Dr. Porter's employment, in conjunction with its 2017 closure of Dartmouth Health's Reproductive Endocrinology and Infertility (REI) Division.

The jury found in favor of Dr. Porter on her disability discrimination claim under the Vermont Fair Employment Procedures Act (VFEPA), and against Dr. Porter on her remaining claims under New Hampshire law and under federal disability discrimination and retaliation laws,

including the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. (*See* Doc. 281 at 1–4.) The jury awarded Dr. Porter $1,000,000 in economic damages for lost income and expenses, and $125,000 in non-economic damages for lost enjoyment of life, mental anguish, or pain and suffering, for a total award of $1,125,000. (*Id.* at 5.) Finally, the jury found that Dr. Porter was not entitled to punitive damages. (*Id.* at 6.)

This Opinion and Order addresses Dr. Porter's Motion for Attorney Fees (Doc. 300) and Bill of Costs (Doc. 319). Dr. Porter requests $1,738,341.50 in attorney fees. (Doc. 318 at 1, 8; *see* Doc. 300 at 1, 12.)[1] Dartmouth Health has filed an Opposition to Dr. Porter's Motion for Attorney Fees (Doc. 309); and Dr. Porter has filed a Reply (Doc. 318) and a "Supplemental Memorandum" (Doc. 326) in support of the Motion. At the Court's request (*see* Doc. 329), Dr. Porter filed a "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees" (Doc. 330) to provide particular information required by the Court to decide the Motion. In the "Second Supplemental Memorandum," Dr. Porter seeks an additional $70,439 in attorney fees for work done by her attorneys since the filing of the pending Motion for Attorney Fees. (*See* Doc. 330 at 1; Doc. 330-2.) Dartmouth Health filed a "Response in Opposition to Plaintiff's Second Supplemental Memorandum," asking the Court to deny Dr. Porter's request for additional attorney fees in full. (Doc. 331.)

As to costs, Dartmouth Health filed a Notice of Objection to Dr. Porter's original Bill of Costs (Doc. 307; *see* Doc. 301), resulting in Dr. Porter's subsequent revision of the Bill of Costs (*see* Doc. 319). The Court considers only the most recently filed Bill of Costs in which Dr. Porter seeks $9,420.79. (*Id.*)

---

[1] Dr. Porter originally sought $1,742,649.70 in her Motion for Attorney Fees. (*See* Doc. 300 at 1, 12.) She subsequently revised the amount requested to $1,738,341.50, explaining that she discovered an "oversight" when she "checked the addition of the multiple invoices of the lawyers who have worked on the case." (Doc. 318 at 1.)

On July 1, 2025, the Court held a hearing on all post-trial motions, including Dr. Porter's

Motion for Attorney Fees. (*See* ECF No. 328.) At the hearing, Dr. Porter requested that the Court

require Dartmouth Health's counsel to submit their billing records to compare them to Dr. Porter's

counsel's billing records in support of the Motion for Attorney Fees.[2] Courts in this Circuit have

_____

[2] Dr. Porter also included this request in her Reply brief on the Motion for Attorney Fees. According to Dr. Porter, "[i]f Defendants insist on criticizing Dr. Porter's fees as 'astounding,' it is reasonable to ask what Defendants' attorneys' fees and expenses have been," and "if Defendants proceed with their challenge to the amount of fees Plaintiff seeks, then they should be required to produce information on the fees they have paid." (Doc. 318 at 2–3.) At the hearing on the Motion, Dartmouth Health's counsel resisted the request to provide its own billing records to the Court, contending that comparing the billing records of Dartmouth Health's attorneys to those of Dr. Porter's attorneys would be an "apples-to-oranges comparison," in part because "Dartmouth Health . . . had to defend itself against claims that put its reputation at stake," given that Dr. Porter's claims "are related to . . . patient safety," which in their view made the case "more than just a single-plaintiff employment case." (Doc. 332 at 62:10–16.) This argument is not well-taken. Though it is true that corporate defendants are often represented by larger law firms, which generally have higher overhead costs that may be reflected in their billing rates, the Court is unaware of any principle of law directing that an individual plaintiff's attorney fees should generally be lower than those of a corporate defendant because the corporate defendant is defending its reputation whereas the plaintiff is merely pursuing claims of alleged wrongdoing against the corporation. Regardless the party requesting attorney fees, be it an individual or a corporate entity, the Court's responsibility is the same—to determine fair compensation under governing legal standards for services rendered on behalf of the party entitled to a fees award.

Dartmouth Health's counsel also argued at the hearing that comparing the billing records of Dartmouth Health's attorneys and Dr. Porter's attorneys would not be useful because Dartmouth Health "determined [their attorneys'] fees were reasonable" and "paid [their attorneys'] fees," whereas Dr. Porter's attorneys worked primarily under a contingency fee arrangement. (*Id.* at 62:16–17.) This distinction is not material, as "a [prevailing] plaintiff's recovery [of attorney fees] will not be reduced by what he must pay his counsel." *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989); *see id.* at 92 ("[T]he fee arrangement is but a single factor [in the calculation of a fee award] and [is] not determinative."). As the Second Circuit has explained, "[t]he reasonableness of a fee award does not depend on whether the attorney works at a private law firm or a public interest organization, nor is the award necessarily limited because the attorney has agreed to undertake the case for a reduced fee compared to the customary market rate." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 184 n.2 (2d Cir. 2008) (citing *Blum v. Stenson*, 465 U.S. 886, 894 (1984) and *Reiter v. MTA N.Y. City Transit Auth.*, 457 F.3d 224, 233 (2d Cir. 2006)). Indeed, courts have held that prevailing plaintiffs whose attorneys were employed under a contingency agreement may merit an *increase* in the lodestar to reflect the risk of nonpayment, particularly in civil rights cases. *See, e.g.*, *Yates v. Mobile Cnty. Pers. Bd.*, 719 F.2d 1530, 1533 (11th Cir. 1983) ("Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result. . . . The standard of compensation must enable counsel to accept apparently just causes without awaiting sure winners." (internal quotation marks omitted)); *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1357 (11th Cir. 1983) ("The Fifth Circuit has held that a bonus multiplier may be applied to increase an award of attorney's fees in civil rights actions since recovery of attorney's fees in such actions is contingent on success."); *Palmigiano v. Garrahy*, 466 F. Supp. 732, 737 (D.R.I. 1979) ("Certainly the contingency factor is cause for a more liberal application of the consideration guiding a court in awarding a fee[.]"), *aff'd*, 616 F.2d 598 (1st Cir. 1980). In any event, counsel may not be penalized by a reduction in, or a cap on, the amount of their fee award due to the contingency-fee arrangement. *See Hughes v. Repko*, 578 F.2d 483, 487–88 (3d Cir. 1978) (finding that the contingency factor "may not be used to decrease the amount of the final fee award"); *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 142 (2d Cir. 2007) ("It is true that a reviewing authority may consider the contingency fee paid in determining a reasonable attorney's fee; it is also undisputed, however, that the contingency fee may not serve as a cap on an attorney fee award." (citations omitted)).

found merit to such comparisons of billing records. *See, e.g.*, *Frommert v. Conkright*, 00-CV-6311L, 2016 WL 6093998, at *3 (W.D.N.Y. Oct. 19, 2016) (stating that, although there need not be "a dollar-for-dollar equivalence," "the rates and fees charged and paid by defendants to their several law firms are clearly relevant and would be helpful to th[e] [c]ourt in determining the amount of fees that should be awarded to plaintiffs' counsel," especially given "the unique and long history of th[e] case"); *Mendez v. Radec Corp.*, 818 F. Supp. 2d 667, 669–70 (W.D.N.Y. 2011) ("recogniz[ing] that there may be significant differences in the ways that plaintiffs' counsel and defense counsel litigate a case, and that this could cause a disparity between the two sides' respective hours and hourly rates[, and that s]uch a disparity would not necessarily mean that one side's fees were necessarily unreasonable or excessive," but finding that "[s]uch considerations . . . are best taken into account in determining the weight to be given to defense counsel's billing records, and do not render them non-discoverable").

Nevertheless, the Court declines to require Dartmouth Health counsel to submit their billing records. The Court finds that requiring Dartmouth Health to submit its counsel's billing records would waste judicial resources and cause unnecessary delay in this case. The Court is fully capable of evaluating Dr. Porter's fee application based on its knowledge of the case, its general experience with fee applications in this District, and the parties' briefs, affidavits, and billing records. *See, e.g.*, *Costa v. Sears Home Improvement Prods., Inc.*, 178 F. Supp. 3d 108, 113 (W.D.N.Y. 2016) (finding that "the Court's task in evaluating the reasonableness of Plaintiff[']s fee application would not be promoted by comparing the time spent by Plaintiff's counsel on various tasks with the time incurred by defense counsel" because "[t]his would not reflect an appropriate use of the Court's or the parties' time, as such an evaluation would rest on the faulty assumption that Defendants' billing records are a benchmark for reasonableness").

Also at the July 1 hearing, Dartmouth Health moved for the Court to strike the "Supplemental Memorandum" Dr. Porter filed in support of the Motion for Attorney Fees because it was "filed significantly after the deadlines." (Doc. 332 at 62:24.) This request is DENIED, given Dartmouth Health's delay in making the request and the Court's finding that, although the Supplemental Memorandum was unnecessary, its filing has not prejudiced Dartmouth Health.

## Background

Dr. Porter filed the initial Complaint in this case on October 11, 2017, asserting claims of wrongful discharge, violation of the New Hampshire Whistleblowers' Protection Act, and disability discrimination and retaliation under the ADA and New Hampshire law. (Doc. 1.) On July 30, 2018, the Court granted Dr. Porter's Stipulated Motion for Leave to Amend, and the First Amended Complaint was filed on August 1, 2018. (Docs. 49, 50.) The First Amended Complaint alleged claims of wrongful discharge (Count 1); violation of the New Hampshire Whistleblowers' Protection Act (Count 2); disability discrimination and retaliation under the ADA (Count 3); disability discrimination under Section 504 of the Rehabilitation Act of 1973 (Count 4); disability discrimination and retaliation under New Hampshire law (Count 5); and disability discrimination and retaliation under the VFEPA (Count 6). (Doc. 50.) Over the next sixteen months, through approximately December 2019, the parties engaged in discovery, including taking/defending thirteen depositions, and filing/opposing at least five motions to compel[3] and one motion for protective order. According to Dr. Porter's counsel, discovery was "time[-]consuming," with Dartmouth Health producing approximately 32,000 documents and Dr. Porter producing approximately 1,200 documents. (Doc. 300-1 at 3.) In November 2019, the parties attended an

---

[3] Dr. Porter filed all of the Motions to Compel. (*See* Docs. 20, 26, 61, 64, 120.) The Court granted four of the Motions in full (*see* Docs. 51, 73, 123), and the fifth in part (*see* Doc. 84). Dr. Porter asserts that she "file[d] and litigate[d] eight motions to compel" (Doc. 300 at 6; *see* Doc. 300-1 at 2). However, she has not referenced the specific motions by name or ECF document number, and the Court is unable to confirm Dr. Porter's count based on a review of the docket.

Early Neutral Evaluation (ENE) session with Gregory Clayton, but no settlement was reached. (Doc. 131.)

In January 2020, Dartmouth Health filed a Motion for Summary Judgment, attaching ten exhibits and four affidavits. (Doc. 139.) Dr. Porter opposed the Motion, attaching twenty-two exhibits including four affidavits. (Doc. 140.) Dartmouth Health filed a Reply, attaching one exhibit. (Doc. 143.) The parties also filed memoranda regarding designating several documents confidential. (Docs. 141, 142, 145.) The Court held a status conference in June 2020. At that conference, the Court ordered Documents 10 and 11 sealed, and discussed with the parties possible settlement, oral argument on the pending Motion for Summary Judgment, and trial. (*See* ECF No. 148.) The Court granted Dartmouth Health's Motion for Summary Judgment on November 3, 2020 (Doc. 152), and Dr. Porter appealed.

The Second Circuit held oral argument on February 24, 2022. (Doc. 300-1 at 4.) On February 27, 2024, the Second Circuit issued a 100-page Judgment affirming in part, and vacating and remanding in part. (Doc. 157.) Specifically, the Second Circuit found that the District Court "did not properly apply summary judgment standards in considering the evidence as to pretext and causation, and therefore it erred in concluding that no rational juror could infer that plaintiff was terminated, and not retained, based on her disability or her whistleblowing-type activity." (Doc. 157-1 at 3.) The Judgment vacated "so much of the [district court] judgment as dismissed plaintiff's claims of disability discrimination in the termination of her employment, in violation of the ADA, the Rehabilitation Act, and the laws of New Hampshire and Vermont, and her claims of whistleblower discrimination and wrongful discharge in violation of New Hampshire law, and . . . remand[ed] for trial of those claims." (*Id.* at 100.) The Judgment affirmed insofar as the District Court had dismissed Dr. Porter's claims "that she was otherwise discriminated against by denial of

6

a reasonable accommodation for her disability prior to her termination or was retaliated against for exercising her rights to such accommodation." (*Id.* at 3.)

On remand, the Court appointed John Schraven as "special settlement master," allowing each party time to object or otherwise respond. (Docs. 158, 170.) At a March 2024 hearing, the Court introduced the parties to Mr. Schraven and discussed reassignment of the case to the undersigned Magistrate Judge. (*See* ECF No. 169.) Upon consent of the parties, the case was reassigned to the undersigned on April 16, 2024. (Doc. 174.) At some point afterwards, the parties participated in a mediation session with Mr. Schraven, but "failed to make progress toward settlement." (Doc. 300-1 at 6.) On June 17, 2024, the Court set the case for jury draw and trial beginning on March 24, 2025. (Doc. 179.)

In August 2024, Dr. Porter's designated damages expert, Robert Bancroft, Ph.D., submitted an expert report opining that Dr. Porter's total economic loss in connection with her loss of employment with Dartmouth Health was $4,329,258.[4] (*See* Doc. 235-1.)

The Court held a pretrial conference on January 13, 2025,[5] and set a February 14 filing deadline for any pretrial motions including motions *in limine*. (*See* ECF No. 194.) On February 4, Dr. Porter filed a Motion to Unseal Documents 10 and 11 (Doc. 197), which the Court granted over Dartmouth Health's opposition (*see* Doc. 226). On February 14, Dartmouth Health filed four Motions *in Limine*, including a motion to preclude the testimony of Dr. Bancroft and a Motion to Quash Trial Subpoena. (Docs. 198–202.) Oppositions and replies were filed regarding these five Motions. On March 14, the Court heard oral argument on the Motions and held a *Daubert* hearing

---

[4] Dr. Bancroft had previously submitted two expert reports in October 2018 and October 2019. (*See* Docs. 198-2 and 198-3.) The 2018 report estimated Dr. Porter's damages at $3,022,020 (*see* Doc. 198-2 at 4); and the 2019 report estimated the damages at either $4,835,551 or $6,438,646, depending on several variables (*see* Doc. 198-3 at 3, 6).

[5] All dates referenced from this point forward are for the year 2025, unless otherwise indicated.

regarding Dr. Bancroft's qualifications, ultimately taking the Motions under advisement. (*See* ECF No. 228.) During the course of the above-described briefing, Dr. Porter filed a Motion for Leave to Amend Complaint (Doc. 213), seeking to file a second amended complaint adding a claim under Vermont's Whistleblower Protection Act, 21 V.S.A. § 507 *et seq*. (*see* Doc. 213-2 at 32–33). Dartmouth Health opposed the Motion. (*See* Doc. 224.)

On March 19, Dr. Bancroft submitted an additional expert report, reducing Dr. Porter's total economic loss from approximately $4 million, as noted above, to $1,787,722. (Doc. 235-2.) This prompted Dartmouth Health to file a renewed motion to preclude Dr. Bancroft's testimony, arguing that if the Court allowed such testimony, it should permit Dartmouth Health to present its own expert witness, who could be deposed "perhaps over one of the weekends during trial." (Doc. 235 at 7 n.3.) Dr. Porter opposed the renewed motion, explaining that Dr. Bancroft's updated report simply included "the most current and accurate information" and responded to issues that Dartmouth Health had identified during its questioning of Dr. Bancroft at the March 14 evidentiary hearing. (Doc. 236 at 2.)

Between March 18 and March 21, the Court issued orders denying Dartmouth Health's four Motions *in Limine*, its renewed Motion *in Limine* regarding Dr. Bancroft, and its Motion to Quash. (Docs. 229, 231, 234, 238–39.) The Court also issued an order denying Dr. Porter's Motion for Leave to Amend Complaint. (Doc. 233.)

On March 24, a jury was selected and counsel delivered opening statements. (*See* ECF No. 247.) Over the fourteen days of trial, each party was represented by three attorneys: Gregory Vitt, Eric Jones, and Sarah Nunan for Dr. Porter; and Tristram Coffin, Donald Schroeder, and Morgan McDonald for Dartmouth Health.[6] Dr. Porter called fourteen witnesses, including expert witness

---

[6] Attorney Megan Martinez also assisted in the representation of Dartmouth Health, but did not make any oral argument or question any witnesses.

Dr. Bancroft, and Dartmouth Health called eight witnesses. (*See* Doc. 286.) Ninety documentary

exhibits were admitted into evidence. (*See* Doc. 285.) Notwithstanding the Court's earlier denial

of Dartmouth Health's two Motions *in Limine* to preclude the testimony of Dr. Bancroft (*see*

Docs. 198, 235, 238), on March 26 and March 29 Dartmouth Health filed a Motion *in Limine* to

preclude the admission of Dr. Bancroft's expert report (Doc. 248) and a Motion *in Limine* to limit

or strike Dr. Bancroft's undisclosed expert opinions (Doc. 254). Dr. Porter filed an Opposition to

the latter Motion. (Doc. 257.) The Court issued an oral ruling on March 31 denying the Motion.

(*See* ECF No. 258.) On April 1, Dartmouth Health made an oral motion regarding the testimony of

Dr. Porter's witness Dr. Michelle Russell, which the Court granted in part and denied in part,

issuing a limiting instruction regarding Dr. Russell's testimony. (*See* ECF No. 260; *see also* Doc.

291 at 124–210.)

Dr. Porter rested her case on April 2, and Dartmouth Health renewed its request to

preclude the admission of Dr. Bancroft's expert report. The Court ruled that the report would not

be admitted into evidence but could be used for demonstrative purposes. (*See* ECF No. 261; *see*

*also* Doc. 292 at 59–61.) On the same date, Dartmouth Health made an oral motion for directed

verdict, which the Court denied. (*See* ECF No. 261; *see also* Doc. 292 at 65–110.) On April 4,

Dartmouth Health rested its case and renewed its motion for directed verdict, which the Court

again denied. (*See* ECF No. 264.) On April 6, Dartmouth Health filed a memorandum requesting

jury instructions regarding the interest rate that should apply to any damages awarded to Dr. Porter

(Doc. 266), and Dr. Porter filed a motion to preclude any reduction of damages based on

Dartmouth Health's conditional offer of severance pay at the time of her termination (Doc. 267).

Each party opposed in writing the other party's filing. (*See* Docs. 268–29.) The Court found that

Dartmouth Health's memorandum was moot. (*See* Doc. 295 at 69.) After providing counsel with

the proposed jury charge and verdict form (*see* Docs. 270–71), the Court held the charge

conference with counsel on April 7 (*see* ECF No. 272). On April 8, the Court granted in part and

denied in part Dr. Porter's motion seeking to preclude a reduction in damages based on the offer of

severance (*see* Doc. 267); the parties made their closing arguments; Dartmouth Health moved to

strike Dr. Porter's rebuttal statement; the Court denied Dartmouth Health's motion to strike; the

Court read the Jury Charge to the jury; and jury began its deliberations. (*See* ECF No. 274.)

After deliberating for part of the day on April 8 and all day on April 9, the jury submitted a

note to the Court requesting transcripts of testimony from four key trial witnesses: Dr. Porter,

Dr. DeMars, Dr. Merrens, and Dr. Herrick. (*See* ECF No. 277, Doc. 279.) On the morning of April

10, the jury withdrew its request for transcripts, deliberated for almost all of that day, and rendered

a verdict in favor of Dr. Porter on the VFEPA claim in the amount of $1,125,000. (ECF No. 280;

*see* Doc. 281.)

## <u>Analysis</u>

### I.    **Motion for Attorney Fees**

State law governs the determination of attorney fees in diversity cases. *Grand Union Co. v.

Cord Meyer Dev. Co.*, 761 F.2d 141, 147 (2d Cir. 1985) (citing *Alyeska Pipeline Service Co. v.

Wilderness Society*, 421 U.S. 240, 259 n. 31 (1975)). In Vermont, parties are generally required to

bear their own litigation costs, including attorney fees, absent a statutory or contractual provision

to the contrary. *See Ring v. Carriage House Condo. Owners' Ass'n*, 2014 VT 127, ¶ 19, 198 Vt.

109, 119, 112 A.3d 754, 762; *L'Esperance v. Benware*, 2003 VT 43, ¶ 21, 175 Vt. 292, 300, 830

A.2d 675, 682. A prevailing party in a VFEPA action may seek compensation for "reasonable

attorney's fees." *Spooner v. Town of Topsham*, 2010 VT 71, ¶ 8, 188 Vt. 293, 297, 9 A.3d 672,

675 (quoting 21 V.S.A. § 495b(b)). In relevant part, VFEPA provides: "Any person aggrieved by

a violation of the provisions of this subchapter may bring an action in Superior Court seeking,"

among other items, "costs [and] reasonable attorney's fees." 21 V.S.A. § 495b(b); *see Payne v.*

*U.S. Airways, Inc.*, 2009 VT 90, ¶ 15, 186 Vt. 458, 467, 987 A.2d 944, 950; *McHugh v. Univ. of Vermont*, 758 F. Supp. 945, 948–49 (D. Vt. 1991), *aff'd*, 966 F.2d 67 (2d Cir. 1992); *Clark v. Metro. Life Ins. Co.*, CIV. A. No. 88–95, 1990 WL 1222107, at *7 (D. Vt. May 3, 1990).

In determining a reasonable attorney fees award, courts generally "begin by calculating the 'lodestar' amount—the number of hours reasonably spent on the case times a reasonable hourly rate." *Ring*, 2014 VT 127, ¶ 20, 198 Vt. at 119, 112 A.3d at 762 (citing *Huard v. Henry*, 2010 VT 43, ¶ 11, 188 Vt. 540, 999 A.2d 1264 (mem.)). "Once the court arrives at a lodestar amount, the court can then adjust the number upward or downward based on a number of factors, including the novelty of the legal issue, the experience of the attorney, and the results obtained in the litigation."[7] *Ring*, 2014 VT 127, ¶ 20, 198 Vt. at 119, 112 A.3d at 762 (internal quotation marks omitted); *see Spooner*, 2010 VT 71, ¶ 8, 188 Vt. 293, 297, 9 A.3d 672, 675 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) and enumerating twelve *Johnson* factors). Because the attorney fees award is based on the specific facts of each case, trial courts are granted wide discretion in determining the amount of the award, and the appellate court "will not reverse that

---

[7] The case law refers to these considerations as "the *Johnson* factors," which include: (1) "[t]he time and labor required"; (2) "[t]he novelty and difficulty of the questions"; (3) "[t]he skill requisite to perform the legal service properly"; (4) "[t]he preclusion of other employment by the attorney due to acceptance of the case"; (5) "[t]he customary fee"; (6) "[w]hether the fee is fixed or contingent"; (7) "[t]ime limitations imposed by the client or the circumstances"; (8) "[t]he amount involved and the results obtained"; (9) "[t]he experience, reputation, and ability of the attorneys"; (10) "[t]he 'undesirability' of the case"; (11) "[t]he nature and length of the professional relationship with the client"; and (12) "[a]wards in similar cases." *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 90, 92–93, 96 (1989); *see Hensley v. Eckerhart*, 461 U.S. 424, 429–30 (1983). More recently, the Second Circuit held that the District Court should, "in determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation." *Arbor Hill*, 522 F.3d at 184; *see id.* at 190 (abandoning the term "lodestar," finding that its meaning "has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness"). In sum, the Second Circuit explained that "[t]he net result of the fee-setting jurisprudence here and in the Supreme Court is that the district courts must engage in an equitable inquiry of varying methodology while making a pretense of mathematical precision." *Id.* at 189.

award absent an abuse of discretion." *L'Esperance*, 2003 VT 43, ¶ 28, 175 Vt. 292, 303, 830 A.2d 675, 684.

"For purposes of an award of attorney's fees under Vermont law, the touchstone is reasonableness." *Perez v. Travelers Ins. ex rel. Ames Dep't Stores, Inc.*, 2006 VT 123, ¶ 13, 181 Vt. 45, 52, 915 A.2d 750, 755. Similarly, VFEPA explicitly provides for an award of "reasonable attorney's fees." 21 V.S.A. § 495b(b). "The presumptively reasonable fee boils down to 'what a reasonable, paying client would be willing to pay,' given that such a party wishes 'to spend the minimum necessary to litigate the case effectively.'" *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quoting *Arbor Hill Concerned Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 118 (2d Cir. 2007), *amended and superseded on other grounds by* 522 F.3d 182 (2d Cir. 2008) and 575 F.3d 170 (2d Cir. 2009)). "Both [the Second Circuit] and the [United States] Supreme Court have held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'" *Degreenia-Harris v. Life Ins. Co. of N. Am.*, Case No. 2.19-CV-00218, 2021 WL 5979683, at *8 (D. Vt. Dec. 17, 2021) (first alteration in original) (footnote omitted) (quoting *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011)) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008); *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010)). The Vermont Supreme Court adheres to the same principle. "There is a strong presumption that th[e] 'lodestar figure' represents a reasonable fee." *Hum. Rts. Comm'n v. LaBrie, Inc.*, 164 Vt. 237, 250, 668 A.2d 659, 668 (1995). Given the strong presumption of reasonableness, "the lodestar can be adjusted only in 'rare and exceptional circumstances.'" *Degreenia-Harris*, 2021 WL 5979683, at *8 (quoting *Perdue*, 559 U.S. at 552–53).

A request for attorney fees "should not result in a second major litigation." *Hensley*, 461 U.S. at 437. In fact, "[i]deally, . . . litigants will settle the amount of a fee." *Id.* Where

settlement is not possible, "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* But "trial courts need not, and indeed should not, become green-eyeshade accountants" in determining attorney fee motions. *Fox v. Vice,* 563 U.S. 826, 838 (2011). The Supreme Court has described the nature of the fee determination inquiry and the corresponding deference to a trial court's reasonable assessment of fees:

> The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of the district court's superior understanding of the litigation. We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it.

*Id.* (citations and internal quotation marks omitted). To arrive at an appropriate award, the district court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award" by a reasonable percentage. *Hensley*, 461 U.S. at 436–37. "[D]istrict courts in our Circuit regularly employ percentage reductions as an efficient means of reducing excessive fee applications." *Pasini v. Godiva Chocolatier, Inc.*, 764 F. App'x 94, 95 (2d Cir. 2019) (quoting *Marion S. Mishkin L. Off. v. Lopalo*, 767 F.3d 144, 150 (2d Cir. 2014)); *see Pasini*, 764 F. App'x at 95 ("Where a fee application is excessive, . . . a district court may exercise its discretion to 'use a percentage deduction as a practical means of trimming fat from a fee application.'" (quoting *McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006))); *New York State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983) ("In . . . cases with voluminous fee applications, courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application[, and t]hese courts have endorsed percentage cuts as a practical means of trimming fat from a fee application" (citations omitted)).

Dr. Porter requests an attorney fees award of $1,738,341.50, which she asserts is the lodestar amount, representing the number of hours that her lawyers and paralegals reasonably expended on the case multiplied by the normal and customary hourly billing rates of these attorneys and paralegals.[8]

### A.    Reasonableness of Hourly Rates

In calculating the lodestar, the first step is to determine reasonable hourly rates. "A district court has discretion to determine a reasonable hourly rate based on considerations such as the complexity of the case, the prevailing rates in similar cases in the district, and the quality of representation." *Pasini*, 764 F. App'x at 95. As this Court recently explained, "[a] court calculating the appropriate hourly rate will . . . consider . . . factors . . . [such as] the time and labor required, the novelty and the difficulty of the questions, and the level of skill required to perform the legal service properly." *Chaney v. Vermont Bread Co.*, Case No. 2:21-cv-120, 2024 WL 1270788, at *2 (D. Vt. Mar. 26, 2024) (citing *Arbor Hill*, 522 F.3d at 186 n.3, 190); *see Shapiro v. United States Soc. Sec. Admin.*, Case No. 2:19-cv-000238, 2022 WL 951371, at *2 (D. Vt. Mar. 30, 2022) (listing factors) (quoting *Arbor Hill*, 522 F.3d at 186 n.3); *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 204 (E.D.N.Y. 2006), *aff'd*, 531 F.3d 127 (2d Cir. 2008) ("The specific rate that is reasonable for a given attorney depends on such factors as the attorney's experience and expertise, the novelty and complexity of the issues presented, and the overall success achieved in the case."). Courts may consider these factors "holistically, rather than applying each factor

---

[8] Dr. Porter includes in her Motion for Attorney Fees a request for costs totaling $29,959.20, which she claims she incurred for: (1) attorney travel, hotel stays, and meals during the trial; (2) the deposition of her expert witness, Dr. Robert Bancroft; (3) Dr. Bancroft's attendance at the pretrial *Daubert* hearing; and (4) two mediations. (Doc. 300 at 11–12.) Dartmouth Health notes, however (*see* Doc. 306 at 5, Doc. 309 at 10–11), that neither the Motion for Attorney Fees nor any subsequent filing by Dr. Porter—including the revised Bill of Costs which attaches documentation of other costs (*see* Doc. 319–319-2)—includes a receipt, invoice, proof of payment, affidavit, declaration, or any other documentation evidencing these costs. Furthermore, Dr. Porter has presented no legal argument in any of her post-trial submissions to support an entitlement to these particular costs. The Court therefore does not consider them part of Dr. Porter's request for either attorney fees or costs. Moreover, at this late date the Court will not entertain a future request for consideration of these costs.

individually to the facts of the case." *K.K. v. New York City Dep't of Educ.*, 23-CV-4430 (JMF) (VF), 2024 WL 4203783, at \*5 (S.D.N.Y. Aug. 22, 2024), *report and recommendation adopted*, 2024 WL 4203251 (Sept. 16, 2024). As noted above, the court's goal should be "to do rough justice, not to achieve auditing perfection." *Id.* (quoting *Fox*, 563 U.S. at 838); *see Lochren v. County of Suffolk*, 344 F. App'x 706, 709 (2d Cir. 2009) ("*Arbor Hill* did not hold that district courts must recite and make separate findings as to all twelve *Johnson* factors.").

"Because fee-shifting statutes provide little incentive to negotiate rates prior to litigation, the court 'bears the burden of disciplining the market' and setting a 'reasonable hourly rate' for the services of counsel." *Shapiro*, 2022 WL 951371, at \*2 (quoting *Arbor Hill*, 522 F.3d at 184). The "touchstone" of fee-shifting statutes is "that district courts should award fees *just high enough* to attract competent counsel." *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 176 (2d Cir. 2009) (internal quotation marks omitted).

Courts typically apply the "forum rule" in determining reasonable hourly rates, which sets "the hourly rates employed in the district in which the reviewing court sits" as a "presumptively reasonable fee." *Bergerson v. N.Y. State Off. of Mental Health*, 652 F.3d 277, 290 (2d Cir. 2011) (internal quotation marks omitted); *see Fine Foods, Inc. v. Dahlin*, 147 Vt. 599, 605, 523 A.2d 1228, 1232 (1986) (holding that, in deciding reasonableness of fees, courts must consider "the usual prices charged by other attorneys for similar services in the same vicinity and in the same court"). To determine the prevailing market rate, the court is to "take judicial notice of the rates awarded in other cases," and may "rely on its own familiarity with the prevailing market rates in the . . . [d]istrict." *Farbotko v. Clinton County*, 433 F. 3d 204, 210–11 (2d Cir. 2005); *see Chaney*, 2024 WL 1270788, at \*2. When considering rates awarded in other cases, the court should increase those rates to account for the passage of time. *See, e.g.*, *Minott v. Google LLC*, 24-CV-01674 (MMG), 2024 WL 3518525, at \*6 (S.D.N.Y. July 24, 2024) (finding that increase in

attorney's hourly rate was warranted where rate was determined in a case approximately two years earlier), *aff'd sub nom. Minott v. The Washington L. Firm PLLC*, No. 24-2275, 2025 WL 2111878 (2d Cir. July 29, 2025); *Wang v. Shun Lee Palace Rest., Inc.*, 17-CV-840 (VSB), 2023 WL 5022758, at *3 (S.D.N.Y. July 24, 2023) ("Given that two calendar years have passed between the first instance of sanctioned behavior and the currently discussed behavior, and that annual increases in billing rates are customary at many law firms, . . . rate increases . . . [are] reasonable."). The court may also consider "any credible evidence that [the moving party] submits in advocating a higher prevailing rate." *Brady*, 455 F. Supp. 2d at 204. The burden rests with the attorney seeking a fee award to establish the hourly rate "with satisfactory evidence—in addition to the attorney's own affidavits." *Hugee v. Kimso Apartments, LLC*, 852 F. Supp. 2d 281, 298 (E.D.N.Y. 2012) (internal quotation marks omitted).

To aid in the determination of the appropriate hourly rates in this case, the Court reviews rates awarded in this District in recent cases. Approximately seven years ago, this Court allowed attorneys hourly rates of $225 and $275 in a case involving relatively straightforward consumer protection and warranty issues. *See Centrella v. Ritz-Craft Corp. of Pa., Inc.*, Civil Action No. 2:14–cv–111–jmc, 2018 WL 840041, at *6–7 (D. Vt. Feb. 12, 2018). About three years later, this Court allowed hourly rates of $350 for a senior partner, $225 for associate attorneys, and $110 for paralegals at the Vermont law firm Langrock Sperry & Wool (one of the firms representing Dr. Porter in this case). *See Sullivan v. Saint-Gobain Performance Plastics Corp.*, Case No. 5:16-cv-125, 2021 WL 1851404, at *2 (D. Vt. May 10, 2021). In the same case, the Court found that, with respect to "national-level environmental counsel," hourly rates of $400 for senior attorneys, $250 for associate attorneys, and $125 for legal assistants were appropriate. *Id.* at *3. In a 2021 case, where one Vermont attorney sought hourly fees of between $400 and $450 and a second Vermont attorney requested an hourly rate between $350 and $400, and where an expert witness

testified that such fees "are on the high end of what the Vermont market will bear and are reserved for cases with complex issues," this Court reduced the rates to $275 and $225, respectively. *Degreenia-Harris*, 2021 WL 5979683, at *10–11. In a 2022 Freedom of Information Act case against the Social Security Administration, the Court allowed hourly rates of $270 for a partner and $185 for an associate at the Langrock Sperry & Wool firm. *See Shapiro*, 2022 WL 951371, at *3.

In a 2023 tort case that did not require specialized legal expertise, this Court allowed an hourly rate of $225 for Vermont counsel, despite a request for $350–$365, and an hourly paralegal rate of $125. *See Ha v. Conn*, Case No. 2:20-cv-155, 2023 WL 5287214, at *2 (D. Vt. Aug. 17, 2023). In a contemporaneous case involving claims of libel, defamation, negligence, and false light, a Vermont Superior Court Judge allowed an hourly rate of $435 for local counsel, finding the rate to be "commensurate with [counsel's] statewide experience, training, reputation, and expertise in this specific area of law." *Rivard v. Smallheer*, No. 22-CV-04364, 2023 WL 7309300, at *2 (Vt. Super. Wash. Cnty. Oct. 20, 2023).

In 2024, this Court allowed hourly attorney rates of $200, $225, $350, $450, and $600, depending on the location and experience of each attorney. *See Chaney*, 2024 WL 1270788, at *3–4. The Court explained that the case was a "uniquely complex" class action, "requiring specialized knowledge of the [Worker Adjustment and Retraining Notification] Act." *Id.* at *3. In another 2024 case, this Court allowed an hourly request for attorney fees in the amount of $205, agreeing with the expert opinion of local counsel that "$205 is at the lower end of usual and customary rates charged in Burlington and Vermont for litigation in 2022." *Cole v. Foxmar, Inc.*, Case No. 2:18-cv-00220, 2024 WL 4609023, at *4 (D. Vt. Oct. 29, 2024) (internal quotation marks omitted), *vacated and remanded on other grounds*, 2025 WL 3152782 (2d Cir. Nov. 12, 2025). In a third 2024 case, the Court allowed the requested hourly rate of $250. *Jankowski v. Centurion of*

*Vermont, LLC*, Civil Action No. 2:22-cv-169-cr-kjd, 2024 WL 48855, at *2 (D. Vt. Jan. 4, 2024). Finally, in July 2025, the Court allowed an hourly attorney rate of $350, noting the attorney's "skill and experience," and the case's "complex legal issues" and "protracted discovery dispute." *Concepts NREC, LLC v. Xuwen Qiu*, Civil Action No. 5:20-cv-133, 2025 WL 2793049, at *3 (D. Vt. July 21, 2025.) The decision explained that "this Court has deemed a $300 hourly rate reasonable for an experienced attorney in a standard case." *Id.* The Court further reasoned that the case warranted a higher than normal hourly rate because it "involved complex legal issues, including the development of an evidentiary record substantiating personal jurisdiction under an alter ego theory to enforce subpoenas against a non-party foreign corporation, as well as litigation regarding potential legal consequences to [a company] in China for its compliance with [a] subpoena." *Id.*

In this case, Dr. Porter seeks reimbursement for services rendered by various attorneys and paralegals, all but one of whom are affiliated with two Vermont law firms. One of the firms, Vitt & Nunan, has two member attorneys, Geoffrey Vitt and Sarah Nunan, and one "of counsel" attorney, Sarah Merlo. The firm is based in Norwich, Vermont. The other firm, Langrock Sperry & Wool, has approximately twenty-five attorneys, including one of Dr. Porter's trial attorneys, Eric Jones. The Langrock firm has offices in Burlington and Middlebury. The remaining attorney who represented Dr. Porter in this case is Attorney Katie Kramer. When Attorney Kramer entered an appearance on behalf of Dr. Porter in January 2018, she was a solo practitioner in Middlebury, Vermont. (Doc. 300-1 at 2.) In late 2020, Kramer joined the New York law firm DGW Kramer LLP (*id.* at 2, 7),[9] and in 2024 she joined the New York office of DTO Law (*id.* at 7), at which

---

[9] According to DGW Kramer LLP's billing records, a timekeeper named Gareth Turo billed for .3 hours of time on July 16, 2020, at a rate of $250/hour, for a total charge of $75. (*See* Doc. 300-4 at 4.) This individual is not referenced in any of Dr. Porter's filings. Accordingly, the Court does not include this charge in its lodestar calculation.

time her hourly rate increased substantially (*see id.* at 6–7). Dr. Porter has submitted

contemporaneous time records from each law firm and from Attorney Kramer, as well as

affidavits from Attorney Vitt and Attorney Jones. Dr. Porter seeks the following hourly rates for

the legal professionals involved with the case:

> <u>Vitt & Nunan Attorneys (Norwich, VT)</u>
>
> | Geoffrey Vitt | $320 (2017–2022); $400 (2024–2025) |
> | Sarah Nunan | $150 (2020–2022); $250[10] (2024–2025) |
> | Sarah Merlo | $200–$230 (2017–2020)[11]; $325 (2024–2025)[12] |
>
> <u>Langrock Sperry & Wool Attorneys (Burlington and Middlebury, VT)</u>
>
> | Eric Jones | $375 (2024); $395 (2025) |
> | Alison Bell | $415 |
> | Bridget Grace | $225 |
> | Wendy Radcliff | $250 |
>
> <u>Solo Attorney (Middlebury, VT) and DGW Kramer LLP Attorney (New York, NY)</u>
>
> | Katie Kramer | $175 (2018–2020) |

---

[10] Although Dr. Porter states in her Motion for Attorney Fees that Attorney Nunan billed at a rate of $*260*/hour from 2024 through preparation of the Motion (*see* Doc. 300 at 4; Doc. 300-1 at 6), the actual billing records attached to the Motion indicate that her billing rate was $*250*/hour during that period (*see, e.g.*, Doc. 300-5 at 127–34). Likewise, the chart attached as Exhibit A to Dr. Porter's "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees" indicates a rate of $250/hour and not $260/hour. (*See* Doc. 330-1 at 1.) The Court therefore uses the $250 hourly rate for Attorney Nunan's work done in 2024 and 2025 in calculating the lodestar.

[11] Dr. Porter does not state in her Motion for Attorney Fees or in either of the attached Declarations what Attorney Merlo's hourly rates were before 2024. The billing records themselves, however, indicate that Attorney Merlo billed at a rate of $200/hour in 2019 (*see, e.g.*, Doc. 300-3 at 198, 224), and the chart attached as Exhibit A to Dr. Porter's "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees" indicates an hourly rate of "$200-230" for Attorney Merlo during the years 2017 through 2020 (Doc. 330-1 at 1). Given the Court's inability to accurately calculate the lodestar without knowing the hours expended at each rate within this range, the Court assigns an hourly rate of $200 to Attorney Merlo for the period from 2020 and earlier.

[12] In Exhibit A to her "Second Supplemental Memorandum in Support of Her Motion for Attorney's Fees," Dr. Porter lists an attorney named Phillipa Lilienthal among the timekeepers in this case, indicating that this attorney billed a total of $340 in 2018 and 2019. (*See* Doc. 330-1 at 1.) This attorney is not mentioned in Dr. Porter's Motion for Attorney Fees or in either of the attached Declarations. This attorney also was not mentioned in Dr. Porter's Reply or in either of her supplemental memoranda. The Court therefore does not include any time billed by Attorney Lilienthal in calculating the lodestar.

DTO Law Attorney (New York, NY)

Katie Kramer          $450 (2024)

Paralegals (all firms)  $50–$155 (2017–2025)

As an initial matter, the Court notes that Dartmouth Health does not challenge the requested rates. Moreover, the Court finds that this case was fairly complex, raising federal claims and claims under Vermont and New Hampshire law. Moreover, the Second Circuit's lengthy decision over six years after the lawsuit was filed represented a substantial change in the posture of the case as the matter was remanded for trial. The Court also takes into account the following factors: (1) the pendency of the case for nearly eight years; (2) the heavily contested nature of the litigation, evidenced by the filing of numerous pretrial motions—including discovery motions and motions *in limine*—and at least two unsuccessful mediations conducted by a special settlement master; (3) the almost three-week trial during which each party was represented by three or more attorneys; and (4) the jury's deliberations over approximately three days before reaching a verdict.

Although these factors might warrant somewhat higher than normal hourly rates, the Court is nevertheless constrained by market rates in this District to find that some of the requested hourly rates are either not reasonable or not warranted in this case. "[A] cost-conscious, rate-paying client would not necessarily seek out the most expensive trial lawyers in Vermont" for this case, but rather would hire competent Vermont attorneys with the requisite skill in employment litigation and knowledge of the state and federal laws governing the asserted claims. *Degreenia-Harris*, 2021 WL 5979683, at *10.

Mindful of rates this Court has applied in previous cases (and the parties having provided no reason to depart from these rates), I find that attorney hourly rates of over $350 and paralegal hourly rates of over $90 are not reasonable in this case. This conclusion is consistent with the Second Circuit's admonition that "attorney's fees are to be awarded with an eye to moderation,

20

seeking to avoid either the reality or the appearance of awarding windfall fees." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 266 (2d Cir. 2014) (internal quotation marks omitted). In the end, "a reasonable, paying client wishes to spend the minimum necessary to litigate the[ir] case effectively." *Degreenia-Harris*, 2021 WL 5979683, at *11 (internal quotation marks omitted). Accordingly, after consideration of the factors identified above and the information Dr. Porter includes in her fees submissions to the Court, including the Declarations of Attorneys Vitt and Jones, I find that the following rates are reasonable in this case:

| | |
|---|---|
| Geoffrey Vitt | ~~$320~~ $300 (2017–2022); ~~$400~~ $350 (2024–2025) |
| Sarah Nunan | $150 (2020–2022); $250 (2024–2025) |
| Sarah Merlo | $200 (2017–2020); ~~$325~~ $250[13] (2024–2025) |
| Eric Jones | ~~$375~~ $325 (2024); ~~$395~~ $350 (2025) |
| Alison Bell | ~~$415~~ $300[14] |
| Bridget Grace | $225 |
| Wendy Radcliff | $250 |
| Katie Kramer | $175 (2018–2020) |
| Katie Kramer | ~~$450~~ $350 (2024) |
| Paralegals | ~~$50–$155~~ $90[15] (2017–2025) |

---

[13] Although Attorney Merlo apparently billed at an hourly rate of $325 in 2024 and 2025, Dr. Porter has not provided any information regarding Attorney Merlo's experience or background. Therefore, the Court finds that an hourly rate above $250 is not justified.

[14] Dr. Porter represents in her Motion for Attorney Fees that Attorney Bell is a partner at Langrock Sperry & Wool, LLP (Doc. 300 at 4), but beyond that provides no further information bearing on the hourly rate determination. Therefore, the Court finds that an hourly rate above $300 is not justified.

[15] The Court has received no information regarding the professional experience of any of the paralegals who billed for work in this case other than the very limited information in Attorney Vitt's Declaration about former paralegal Nunan. (*see* Doc. 300-1 at 6). Dr. Porter also has not cited caselaw supporting the hourly paralegal rates prevailing in this case. Therefore, the Court sets a uniform rate, relying on its own familiarity with hourly paralegal rates prevailing in this District, reduced slightly to account for the absence of information about each individual paralegal who billed in this case. *See, e.g.*, *H.B. Auto. Grp., Inc. v. Kia Motors Am., Inc.*, 13cv4441 (VEC) (DF), 2018 WL 4017698, at *9 (S.D.N.Y. July 25, 2018) (finding that "courts . . . have reduced [paralegal] rate[s] substantially where there was no explanation of a paralegal's expertise or experience"), *report and recommendation adopted sub nom. H.B. Auto. Grp., Inc. v. Kia Motors Am.*, 2018 WL 4007636 (Aug. 22, 2018); *Malletier v. Apex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 362 (S.D.N.Y. 2010) ("Where the moving party fails to provide information on the attorneys' and paralegals'

B.     **Reasonableness of Hours Expended**

The Court must next determine whether the number of hours that the attorneys and

paralegals worked on the case was reasonable. A fee award should compensate only for those

hours that were "reasonably expended." *McDonald*, 450 F.3d at 96 (quoting *Hensley*, 461 U.S. at

434–35). "As evidence that the number of attorney hours are reasonable, the fee application must

be supported by contemporaneous time records that specify, for each attorney, the date, the hours

expended, and the nature of the work done." *Drywall Tapers and Pointers of Greater New York*

*Loc. Union 1974, IUPAT, AFL-CIO v. Bronx Base Builders, Ltd.*, 18 Civ. 1088 (VSB) (JLC),

2019 WL 181214, at *5 (S.D.N.Y. Jan. 14, 2019) (internal quotation marks omitted); *see Carey*,

711 F.2d at 1154 ("All applications for attorney's fees, whether submitted by profit-making or

non-profit lawyers, . . . should normally be disallowed unless accompanied by contemporaneous

time records indicating, for each attorney, the date, the hours expended, and the nature of the work

done."). In determining the number of hours reasonably expended, the court "should exclude

excessive, redundant[,] or otherwise unnecessary hours." *Quaratino v. Tiffany & Co.*, 166 F.3d

422, 425 (2d Cir. 1999). The court should also consider whether a case was "particularly

complicated" or involved "novel legal issues significant to the legal community." *Millea*, 658 F.3d

at 167 (internal quotation marks omitted). "In evaluating the reasonableness of hours expended,

courts consider 'not whether hindsight vindicates an attorney's time expenditures, but whether, at

the time the work was performed, a reasonable attorney would have engaged in similar time

expenditures.'" *O.R. v. N.Y.C. Dep't of Ed.*, 340 F. Supp. 3d 357, 366–67 (S.D.N.Y. 2018)

(quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1999)).

---

backgrounds and experience, courts have used their discretion to award fees at a rate lower than requested."); *Gen. Motors Corp. v. Villa Marin Chevrolet, Inc.*, 240 F. Supp. 182, 188 (E.D.N.Y. 2002) (reducing paralegal fees because "[n]o information was submitted . . . concerning the levels of experience or expertise of any of the paralegals, and no information was submitted concerning the rates customarily charged for paralegals in this area").

The determination of reasonable hours expended is "best made by the district court on the basis of its own assessment of what is appropriate for the scope and complexity of the particular litigation." *Carey*, 711 F.2d at 1146; *see also Lore v. City of Syracuse*, 670 F.3d 127, 175 (2d Cir. 2012) (holding that "the district court, which is intimately familiar with the nuances of the case," is in the best position to determine an appropriate fee award (internal quotation marks omitted)). In making this decision, the district court "does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir. 1998) (quoting *DiFilippo v. Morizio*, 759 F.2d 231, 236 (2d Cir. 1985)). The court has "ample discretion" in assessing "the amount of work that was necessary to achieve the results in a particular case." *Ortiz v. Regan*, 980 F.2d 138, 141 (2d Cir. 1992); *see LaBrie*, 164 Vt. at 252, 668 A.2d at 670 (holding that trial court's factual determination that hours claimed for attorney activities were not excessive "is best left undisturbed absent strong evidence of excessiveness"). The court may exercise that discretion, "based on its experience in general and with the particular case at issue, to 'trim[ the] fat from a fee application.'" *N.Y. Youth Club v. Town of Harrison*, 12-CV-7534 (CS), 2016 WL 3676690, at *2 (S.D.N.Y. July 6, 2016) (alteration in original) (quoting *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998)). In other words, "[i]f a court finds that the fee applicant's claim is excessive, or that time spent was wasteful or duplicative, it may decrease or disallow certain hours[,] or, where the application for fees is voluminous, order an across-the-board percentage reduction in compensable hours." *Santa Fe Nat'l Tobacco Co. v. Spitzer*, Nos. 00 Civ. 7274(LAP), 00 CIV 7750(LAP), 2002 WL 498631, at *3 (S.D.N.Y. Mar 29, 2002).

Dr. Porter has submitted over four hundred pages of billing records documenting the time each legal professional spent on the case. (*See* Docs. 300-2 at 4 through 300-5 at 135.) Moreover,

at the Court's request, Dr. Porter has submitted a chart listing the total number of hours each legal professional spent on the case and their respective hourly rates. (*See* Doc. 330-1 at 1–2.) Given the volume of billing records in this case, the Court has not "engage[d] in a painstaking line-item review of each billing entry" in its determination of the appropriate number of compensable hours. *R.P. v. N.Y.C. Dep't of Educ.*, 21-CV-4054 (JMF), 2022 WL 1239860, at *5 (S.D.N.Y. Apr. 27, 2022); *see Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) ("We do not require that the court set forth item-by-item findings concerning what may be countless objections to individual billing items."); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 64 (2d Cir. 2014) (upholding district court's "across-the-board 50 percent reduction based on a perceived lack of detail in the billing records"). The Court has considered Dartmouth Health's objections in its review of the records and addresses the objections below.

### i.    Impermissibly Vague or Block-Billed Entries

Dartmouth Health argues that Dr. Porter's counsel's billing records "are replete with vague and incomplete narrative entries." (Doc. 309 at 4.) Dartmouth Health further asserts that many entries in the billing records "utilize block billing," or "grouping multiple tasks into a single entry without itemization." (*Id.*) Although Dartmouth Health does not point to any specific instances of vague/incomplete entries or block billing, they are readily apparent in the records. For example, a January 13, 2025 entry bills 7.7 hours of attorney time and includes the following explanation: "Prepare for and attend hearing with Judge Doyle re: status conference; review outline for witnesses and conf. E. Jones and S. Nunan re: order of witnesses and testimony of multiple possible trial witnesses; review Dr. Porter draft statements and comments." (Doc. 300-5 at 93.) Another example is found in a December 17, 2024 entry billing for 5.0 hours of attorney time and explaining: "Review and analyze documents regarding witnesses; analyze trial presentation strategy; video conference with Geoffrey Vitt and Sarah Nunan regarding trial preparation;

research HIPAA issues regarding witness examinations." (Doc. 300-2 at 6.) The billing records also contain vague or incomplete entries. For example, a March 13, 2024 entry states: "Work on motion" and "Call with G. Vitt" (Doc. 300-5 at 63), without identifying the type of motion and the purpose of the call. And a February 13, 2025 entry states only: "Research" and "Conf. with C. Lyon." (*Id.* at 105.)

Attorneys are not required to "record in great detail how each minute of [their] time was expended," but their billing records should "identify the general subject matter of [their] time expenditures." *Cole v. Foxmar, Inc.*, Case No. 2:18-cv-00220, 2024 WL 4609023, at *5 (D. Vt. Oct. 29, 2024) (quoting *Hensley*, 461 U.S. at 437 n.12), *vacated and remanded on other grounds*, 2025 WL 3152782 (2d Cir. Nov. 12, 2025). Although "[b]lock billing is not automatically prohibited, . . . the practice makes it difficult for the court to assess the reasonableness of individual activities." *Id.* (internal quotation marks omitted); *see Green v. City of New York*, 403 F. App'x 626, 630 (2d Cir. 2010) (affirming district court's across-the-board reduction due to "obfuscation inherent in block billing"); *Degreenia-Harris*, 2021 WL 5979683, at *11, 12 (finding that "the court cannot determine whether the hours incurred are reasonable" because "[s]ome entries are too vague to determine what work was performed" and because of "[t]he extensive use of block billing," resulting in a failure to "indicat[e] the amount of time spent on discrete tasks"). "[B]lock billing is most problematic where large amounts of time (e.g., five hours or more) are block billed; in such circumstances, the limited transparency afforded by block billing meaningfully clouds a reviewer's ability to determine the projects on which significant legal hours were spent." *King Fook Jewellry Grp. Ltd. v. Jacob & Co. Watches, Inc.*, 14 Civ. 742 (ER) (JLC), 2019 WL 2535928, at *9 (S.D.N.Y. June 20, 2019) (alteration in original) (internal quotation marks omitted), *report and recommendation adopted sub nom. King Fook Jewellery Grp. Ltd. v. Jacob & Co. Watches Inc.*, 2019 WL 4879212 (Oct. 3, 2019); *see id.* (citing cases and applying a

10% across-the-board reduction where some billing records "contain[ed] vague entries and extensive block-billing, . . . mak[ing] the overall reasonableness of the listed tasks difficult to discern").

The Court can generally discern the tasks completed and the amount of time expended in many of counsel's vague/incomplete and block-billed entries. But that is not the case for all of such entries. Therefore, the Court will reduce the fee award to account for these deficiencies in the billing. *See Raja v. Burns*, 43 F.4th 80, 87 (2d Cir. 2022) (holding that, to address vagueness and other deficiencies in the billing records, "the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application" (internal quotation marks omitted)); *Kirsch*, 148 F.3d at 172, 173 (upholding percentage reduction of award due to vague entries and "other deficiencies in the billing records").

### ii.    Fees Incurred Before Addition of VFEPA Claim

Dartmouth Health contends that any attorney fees Dr. Porter incurred before the addition of the successful VFEPA claim are not recoverable. (Doc. 309 at 4–5.) Dartmouth Health argues that "[w]hile it may be difficult to parse through every invoice entry to determine which entries relate to which claims, here the Court must, at the very least, deduct any fees and costs incurred prior to August 1, 2018, which total 833.45 hours, $146,338.50 in fees, and in $894.39 in costs." (*Id.* at 5.) Dartmouth Health cites *Anderson v. Sebelius*, No. 5:09–cv–16, 2011 WL 1832771, at *5 (D. Vt. May 12, 2011), to support its position. But *Anderson* is inapposite. In that case, this Court reduced an attorney fees award in favor of an individual plaintiff because the plaintiff's unsuccessful effort to obtain discovery and to terminate referral of the case to the magistrate judge were "distinct from other parts of the case and were wholly unsuccessful." *Id.*

As discussed in more detail below, Dr. Porter's VFEPA claim is not distinct from the other claims alleged in this lawsuit. All of Dr. Porter's claims are interrelated both factually and

legally.[16] Moreover, the original Complaint in this case included disability discrimination claims under the ADA and New Hampshire law. The substance of those claims did not change in the Amended Complaint; Dr. Porter simply added additional claims of disability discrimination, including under VFEPA. The work that Dr. Porter's lawyers had done on the case before they filed the Amended Complaint was likely the impetus to pursue the VFEPA claim as an alternative theory of liability.

Therefore, the Court will not reduce Dr. Porter's attorney fees award by the amount of fees incurred prior to the addition of the VFEPA claim to the case. *See, e.g.*, *Post & Beam Equities Grp., LLC v. Sunne Vill. Dev. Prop. Owners Ass'n*, 2015 VT 60, ¶¶ 49, 50, 199 Vt. 313, 337, 124 A.3d 454, 472–73 (2015) (rejecting argument that evidence regarding claims litigated before plaintiff filed amended complaint were "distinct and easy to parse," and finding that "most of the evidence presented was relevant to all claims" and that "the overarching narrative at the heart of th[e] case from the outset was part and parcel of the . . . claims [on which plaintiff prevailed]").

### iii.    Number of Depositions Conducted

Dartmouth Health claims it was excessive for Dr. Porter to have deposed eleven witnesses, one over two days, especially given that Dartmouth Health deposed only two witnesses and that Dr. Porter ultimately called only four of her deponents to testify at trial. (Doc. 309 at 5.) Dartmouth Health asserts that it should not be penalized for Dr. Porter's "needlessly overbroad discovery tactics." (*Id.*)

The Court finds no reason to reduce the number of hours billed based on the number of depositions counsel conducted. It is not unusual for plaintiffs, who bear the burden of proof, to

---

[16] Dartmouth Health's counsel conceded this fact, at least to some extent, at the hearing on the Motion for Attorney Fees: "Certainly there is some factual intermingling [between the VFEPA claim and the other claims]." (Doc. 332, at 59:18.) As a result of this "intermingling," counsel acknowledged that it would be difficult for the Court to separate out the work Dr. Porter's attorneys performed on the VFEPA claim, from the work they performed on the other claims. (*See id.* at 59:17–22, 60:17–22.)

take more depositions than defendants. Particularly in an employment case like this, where an individual employee is suing her prior employer, it is understandable that the employee would need to depose individuals who were also employed by the employer during the relevant period.

About four months after filing this case, Dr. Porter attempted to limit the number of depositions by requesting authorization to contact certain Dartmouth Health employees on a more informal basis, explaining: "Given the factual complexity and the large number of individuals with knowledge of relevant facts, [Dr. Porter] wants to engage in informal discovery, including interviews of current and former [Dartmouth Health] employees." (Doc. 20 at 3.) Dartmouth Health strenuously opposed the Motion, arguing that Dr. Porter was improperly asking the Court "to sanction her attempt to do an end-run around the discovery process." (Doc. 21 at 1.) Although the Court granted Dr. Porter's request, in part, listing categories of Dartmouth Health employees that Dr. Porter could not contact informally and allowing contact with all other Dartmouth Health employees (*see* Doc. 51 at 6), Dr. Porter ultimately opted to formally depose the relevant Dartmouth Health employees, thereby assuaging Dartmouth Health's concerns. Now, after Dr. Porter obtained a hard-fought verdict in her favor, Dartmouth Health argues that Dr. Porter should have deposed fewer individuals. The Court finds the argument unpersuasive. *See Ring*, 2014 VT 127, ¶ 26, 198 Vt. at 122, 112 A.3d at 764 (increasing attorney fee award "because of the role defendants played in increasing the costs of the litigation").

### iv. Overstaffing Depositions and Trial / Redundant Billing Before Trial

Dartmouth Health next argues that Dr. Porter overstaffed depositions "with at least two partners present." (Doc. 309 at 5; *see id.* at 5–6 (chart documenting attorneys that attended depositions).) Dr. Porter responds that Attorney Kramer was not a partner; she was a contract employee charging Dr. Porter only $175/hour at the time of the depositions (Doc. 318 at 5), a lower rate than most associate attorneys bill in this District, as discussed above. Moreover, the

billing records reveal that Sarah Nunan was also not a partner during the relevant period, and in fact may not have been an attorney yet, as she was charging only $80/hour for her time at the depositions. (*See, e.g.*, Doc. 300-3 at 162, 163, 165, 168, 177, 178.) Furthermore, Dr. Porter notes that "it is easier to defend a deposition than to take one," and that "[h]aving a second lawyer present [at a deposition] is helpful especially when[,as here,] there has been an extensive document production and the subject matter is complicated." (Doc. 318 at 5.)

"In assessing the extent of staffing . . . appropriate for a given case, a district court must be accorded ample discretion." *Carey*, 711 F.2d at 1146. "While a court can generally reduce the number of hours charged by attorneys due to duplication, there are situations in which a certain level of duplication between attorneys is reasonable." *Spooner*, 2010 VT 71, ¶ 18, 188 Vt. at 302, 9 A.3d at 678 (citations omitted). The Vermont Supreme Court has explained that "[a] reduction in a fee is warranted only if the attorneys are *unreasonably* doing the *same* work," and that "[a]n award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation." *Id.* (quoting *Afro-American Patrolmen's League v. City of Atlanta*, 817 F.2d 719, 725–26 (11th Cir. 1987)). "[I]f multiple attorneys performed unique work on the case, plaintiff should be compensated for each attorney's distinct inputs." *Spooner*, 2010 VT 71, ¶ 19, 188 Vt. at 303, 9 A.3d at 679. Therefore, although "prevailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions," "where two attorneys appear at a deposition on behalf of a single set of clients, they have some burden to show that each had a distinct responsibility in the case necessitating his or her presence." *Walker v. Coughlin*, 909 F. Supp. 872, 880 (W.D.N.Y. 1995) (internal quotation marks omitted).

Dartmouth Health does not identify specific duplicative work conducted by Dr. Porter's attorneys at depositions in this case. By the same token, Dr. Porter offers no particular reason why

two attorneys (plus a paralegal in some cases) needed to attend these depositions. Dr. Porter does not carry her burden by generally asserting that it is helpful to have a second lawyer at depositions in cases where there has been extensive document production and where the subject matter is complicated. Though there are situations where it is reasonable for two (or more) attorneys to attend a deposition, Dr. Porter has not offered sufficient explanation as to why it was reasonable with respect to each particular deposition at issue in this case. (*See* Doc. 318 at 5–6; *see also* Doc. 309 at 5–6 (chart).) Therefore, the Court will reduce Dr. Porter's fee award to account for this duplicative billing. *See IMS Health Inc. v. Sorrell*, No. 1:07–cv–188–jgm, 2012 WL 2915845, at *5 (D. Vt. July 17, 2012) (finding that plaintiffs "staffed the case with an inordinate number of attorneys, and other timekeepers, causing . . . inefficiency," and explaining that "[w]hen a large number of attorneys work on a case, duplicative billing is often the result").

The Court will also reduce the fee award to account for the substitution of Attorney Eric Jones for Attorney Katie Kramer shortly before trial. This substitution resulted in inefficiencies, as Attorney Jones was required to spend significant time acquainting himself with the facts and law of this case after it had been pending for approximately seven years. *See id.* (reducing the claimed hours, in part because "Plaintiffs' choice to retain separate appellate counsel required . . . more time for new counsel to familiarize themselves with the litigation"); *Concrete Flotation Sys., Inc. v. Tadco Constr. Corp.*, No. 07–CV–319 (ARR)(VVP), 2010 WL 2539771, at *6 (E.D.N.Y. Mar. 15, 2010) ("Staffing this litigation with a high number of attorneys ensured that (1) unnecessary time was spent so that each attorney acquainted himself or herself with the facts and the issues; and (2) unnecessary time was spent in communication with the other attorneys on the matter."), *report and recommendation adopted*, 2010 WL 2539661 (June 17, 2010).

On the other hand, the fee award will not be reduced due to Dr. Porter's staffing of attorneys at trial. Dartmouth Health claims that Dr. Porter "flagrant[ly] overstaff[ed]" her team at

trial because she had "three partners and zero associates" in attendance, which Dartmouth Health calls "a clear sign of inefficiency." (Doc. 309 at 6.) First, Dartmouth Health staffed its trial team with four attorneys (plus a paralegal), seemingly reflecting its own determination that three attorneys, whether partner or associate, were not enough to defend against Dr. Porter's claims in this case. As the plaintiff, Dr. Porter's burden to prove her claims was more substantial than Dartmouth Health's burden to defend against them. Therefore, the Court is not persuaded that Dr. Porter should have required fewer attorneys than Dartmouth Health at the trial of this case. *See Williamsburg Fair Hous. Comm. v. Ross-Rodney Hous. Corp.*, 599 F. Supp. 509, 518 (S.D.N.Y. 1984) ("[D]ivision of responsibility may make it necessary for more than one attorney to attend activities such as depositions and hearings[, and] [m]ultiple attorneys may be essential for planning strategy, eliciting testimony[,] or evaluating facts or law."). Second, the Court cannot credit Dartmouth Health's criticism that Dr. Porter staffed her trial team with "zero associates" when the law firm of Vitt & Nunan consists of only two member attorneys, Attorney Vitt and Attorney Nunan (*see* Doc. 318 at 6).

### v.    Number of Hours Spent on Opening Statement

Dartmouth Health claims Dr. Porter's attorneys spent excessive time preparing Attorney Vitt's opening statement for trial, noting that Attorneys Vitt, Nunan, and Jones collectively billed 94 hours to complete this task over the course of multiple months. (Doc. 309 at 6.) Dr. Porter responds that, by the time counsel began preparing for trial, it had been many months since they had worked on the case, and there were "hundreds upon hundreds of documents to review and thousands of page[s] of depositions to read, and then witnesses to contact about possible trial testimony." (Doc. 318 at 6.) Recognizing the lengthy duration of this case and the large number of relevant documents and potential witnesses, the Court nonetheless finds that Dr. Porter's counsel excessively billed for their preparation of Dr. Porter's opening statement at trial. Therefore, the

Court will reduce Dr. Porter's fee award to account for her attorneys' excessive billing for preparation of the opening statement at trial.

### vi.     Number of Hours Spent on Initial Discovery

Dartmouth Health contends that Dr. Porter's counsel spent excessive time on initial disclosures and discovery requests, which Dartmouth Health describes as "routine discovery" work. (Doc. 309 at 7.) Specifically, Dartmouth Health states that Dr. Porter's counsel required over 38 hours to prepare initial disclosures and document requests. (*Id.*) Dr. Porter responds that the hours spent on these tasks were reasonable, "given the number of issues in the case and the uncertainty about what caused the decision to close the REI Division and to terminate Dr. Porter's employment." (Doc. 318 at 6.)

Counsel may in some cases be justified in spending over 38 hours on initial disclosures and discovery requests, but Dr. Porter has not provided sufficient specific justification in this case. Therefore, the Court reduces Dr. Porter's fee award to account for her attorneys' excessive billing for initial disclosures and discovery requests. *See HVT, Inc. v. Port Auth. of N.Y. & N.J.*, 15 Civ. 5867 (MKB) (VMS), 2018 WL 6079932, at *6 (E.D.N.Y. Nov. 21, 2018) (reducing 67.3 hours to 20 hours for time spent preparing initial disclosures and responding to interrogatories, considering that "there were no issues of fact with regard to liability to be uncovered in this case"); *Brady*, 455 F. Supp. 2d at 212 (reducing lodestar hours by 30% due to excessive charge of 36 hours to draft initial disclosures and discovery requests).

### vii.     Amount of Time Spent on Motion for Attorney Fees

Finally, Dartmouth Health claims the amount of time that Dr. Porter's counsel spent preparing the pending Motion for Attorney Fees—over 91 hours—was excessive. (*See* Doc. 309 at 7–8.) Dr. Porter does not directly respond to this argument. (*See* Doc. 318.) The Court finds that, although the prevailing party has a right to seek reimbursement for fees incurred for preparing and

32

arguing a motion for attorney fees, *see Murray ex rel. Murray v. Mills*, 354 F. Supp. 2d 231, 241 (E.D.N.Y. 2005) ("recogniz[ing] Plaintiffs' right to bill for time spent applying for fees and costs"), Dr. Porter's attorneys' billing records demonstrate excessive billing for their work on her Motion for Attorney Fees. Therefore, the Court will reduce the fee award on this ground. *See H.W. v. N.Y.C. Dep't of Educ.*, No. 1:21-CV-08604 (JLR), 2023 WL 5529932, at *11 (S.D.N.Y. Aug. 28, 2023) (reducing number of hours billed by 25% and noting: "[c]ourts in this District . . . routinely reduce the hours spent on attorneys' fees litigation when those actions concern only the simple and straightforward issue of the reasonable amount of fees and costs that Plaintiff's attorneys should be paid for prevailing on behalf of the Plaintiff" (omission in original) (internal quotation marks omitted)); *Brady*, 455 F. Supp. 2d at 212 (reducing lodestar hours by 50% due to excessive charge of 257 hours on attorney fees litigation); *Levy v. Powell*, No. CV–00–4499(SJF), 2005 WL 1719972, at *8 (E.D.N.Y. July 22, 2005) (reducing lodestar hours by 35% due to excessive charge of 101.3 hours on attorney fees motion); *Murray*, 354 F. Supp. 2d at 241 (finding that fifteen hours was a reasonable amount of time to spend on attorney fees motion in that case, and that even in a complex case, attorney fees motion should not require more than thirty hours of attorney time).

### C.    Lodestar Calculation/Amount

Using the approved hourly rates for each attorney and paralegal who worked on the case, as noted above, and the number of hours requested in Dr. Porter's Motion for Attorney Fees, the lodestar is $1,562,286, as shown in the following chart:

| Timekeeper | Approved Hourly Rate | Hours Billed | Total |
|---|---|---|---|
| Attorney Geoffrey Vitt | $300 (2017–2022) | 1,240.5 | **$372,150** |
| | $350 (2024–2025) | 1,093.9 | **$382,865** |
| Attorney Sarah Nunan | $150 (2020–2022) | 152 | **$22,800** |
| | $250 (2024–2025) | 760.8 | **$190,200** |
| Attorney Sarah Merlo | $200 (2017–2020) | 419.7 | **$83,940** |
| | $250 (2024–2025) | 281 | **$70,250** |
| Attorney Katie Kramer: solo and at DGW Kramer, LLP at DTO Law | $175 (2018–2020) | 787.9 | **$137,882.50** |
| | $350 (2024) | 20.4 | **$7,140** |
| Attorney Eric Jones | $325 (2024) | 36.1 | **$11,732.50** |
| | $350 (2025) | 358 | **$125,300** |
| Attorney Alison Bell | $300 | 9.6 | **$2,880** |
| Attorney Bridget Grace | $225 | 2 | **$450** |
| Attorney Wendy Radcliff | $250 | .25 | **$62.50** |
| Paralegals | $90 | 1,718.15 | **$154,633.50** |
| **TOTAL** | | | **$1,562,286** |

But given the above-described deficiencies—including vague/incomplete and block-billing entries; duplicative billing for multiple counsel at depositions; substitution of counsel shortly before trial; excessive time spent on preparation of the opening statement, initial disclosures and discovery requests, and preparation of the Motion for Attorney Fees—the Court imposes a 20% reduction to the lodestar. The revised lodestar is therefore **$1,249,828.80** ($1,562,286 − $312,457.20).

### D.    Adjustment of Lodestar Based on Degree of Success Obtained

The court's determination of the amount of the attorney fees award "does not end with the lodestar calculation." *Grant*, 973 F.2d at 101. Although there is a strong presumption that the lodestar represents the reasonable fee, "other considerations may lead to an upward or downward departure from the lodestar." *Id.* (citing *Hensley*, 461 U.S. at 434). "The party advocating such a departure . . . bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee." *Id.* (citing *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 413 (2d Cir. 1989)).

Noting that Dr. Porter prevailed on only one of six claims, that she secured less than 25% of the damages she originally sought, and that the jury answered only one of fourteen questions in Dr. Porter's favor, Dartmouth Health contends that "[Dr. Porter's] limited success and comparatively small damages award warrant a substantial downward adjustment" of the lodestar amount. (Doc. 309 at 8.) Dartmouth Health seeks a downward reduction in the amount of "no less than 83.3% (5/6) and as much as 92.86% (13/14)." (*Id.* at 9.) Dr. Porter, on the other hand, describes her award of over one million dollars as "an extraordinary verdict," "exceptional," and "an excellent result," particularly in an employment case brought by one person. (Doc. 318 at 2, 8–9 (internal quotation marks omitted).) Dr. Porter asserts that "based on an admittedly informal survey, this [verdict] is among the largest verdicts in Vermont for an individual employment case." (*Id.* at 2.)

The Court does not agree with Dartmouth Health that the jury's verdict awarding Dr. Porter over one million dollars was "overwhelmingly unsuccessful" (Doc. 309 at 1), warranting a downward adjustment of 80–90% to the lodestar amount. Although the jury found in Dr. Porter's favor on only one of six claims, that single successful claim resulted in a substantial monetary award. It strains credulity to accept that a Vermont jury awarding over one million dollars to a single plaintiff is not a significant verdict for the plaintiff.

The subject matter of this case further persuades the Court that a significant reduction would be inappropriate. Under statutes such as VFEPA, the purpose of fee-shifting is "to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." *Raishevich v. Foster*, 247 F.3d 337, 344 (2d Cir. 2001) (internal quotation marks omitted). But for the availability of fee-shifting, Dr. Porter may not have retained counsel able to expend the substantial time and resources to litigate civil rights claims against a corporate defendant. *See Brady*, 455 F.

35

Supp. 2d at 203; *King Fook Jewellry Grp.*, 2019 WL 2535928, at *10 ("[P]reventing . . .

prevailing parties from recovering fees for unsuccessful efforts during the course of an otherwise

successful litigation may discourage attorneys from zealously representing their clients and raising

novel but reasonable arguments on their behalf." (omission in original) (internal quotation marks

omitted)). The Court agrees with Dr. Porter that a significant reduction to the lodestar amount in

this case would: (a) demonstrate "why it is often hard for [individual civil rights] plaintiffs to find

counsel equally competent as those employed by deep-pocket defendants," and (b) "disincentivize

future counsel from taking similar cases." (Doc. 300 at 10.)

      The parties agree, as they must, that "[t]he 'most critical factor' in determining the amount

of attorney's fees 'is the degree of success obtained.'" *Anderson v. Sebelius*, No. 5:09–cv–16,

2011 WL 1832771, at *4 (D. Vt. May 12, 2011) (quoting *Hensley*, 461 U.S. at 436). "Where the

plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims,

the hours spent on the unsuccessful claim should be excluded in considering the amount of a

reasonable fee." *Hensley*, 461 U.S. at 440, In determining whether the losing claim is "distinct in

all respects" from the successful claims, the court considers whether the claims "involve a

common core of facts" or are "based on related legal theories." *Id.* at 435. Where "[m]uch of

counsel's time [is] devoted generally to the litigation as a whole, making it difficult to divide the

hours expended on a claim-by-claim basis," the suit "cannot be viewed as a series of discrete

claims," and thus the court "should focus on the significance of the overall relief obtained by the

plaintiff in relation to the hours reasonably expended on the litigation." *Id.*; *see Quaratino*,

166 F.3d at 425 ("Attorney's fees may be awarded for unsuccessful claims as well as successful

ones . . . where they are inextricably intertwined and involve a common core of facts or are based

on related legal theories." (internal quotation marks omitted)); *Post & Beam Equities Grp.*, 2015

VT 60, ¶ 48, 199 Vt. at 335–36, 124 A.3d at 471 (noting that "it is frequently impossible to parse

out, claim-by-claim, legal services rendered in cases involving a common core of facts," and

therefore, "the trial court has the discretion to focus on the significance of the plaintiff's overall

results in relation to the work reasonably performed in cases where the plaintiff's claims contained

a common core of facts or were based on related legal theories" (internal quotation marks

omitted)).

To determine whether a plaintiff's partial success requires a reduction in the lodestar

amount, courts in this Circuit apply the following framework:

> At step one of this analysis, the district court examines whether the plaintiff failed to
> succeed on any claims wholly unrelated to the claims on which the plaintiff
> succeeded. The hours spent on such unsuccessful claims should be excluded from
> the calculation. At step two, the district court determines whether there are any
> unsuccessful claims interrelated with the successful claims. If such unsuccessful
> claims exist, the court must determine whether the plaintiff's level of success
> warrants a reduction in the fee award. If a plaintiff has obtained excellent results,
> however, the attorneys should be fully compensated.

*Grant v. Martinez*, 973 F.2d at 101 (citations omitted). Where a plaintiff's claims were "based on

a common core of facts," then the successful and unsuccessful claims are not considered "wholly

unrelated." The Court then proceeds to step two of the analysis. *Id.*; *see Brady*, 455 F. Supp. 2d at

216 (in disability lawsuit brought under the ADA and New York Human Relations Law, finding

that "all of [plaintiff's] claims involve a common core of facts and related legal theories," "[a]s is

often true of lawsuits arising from alleged deprivations of civil rights" (internal quotation marks

omitted)); *Baird v. Boies, Schiller & Flexner LLP*, 219 F. Supp. 2d 510, 521–22 (S.D.N.Y. 2002)

("[A]ll of plaintiffs' claims—whether styled as Equal Pay Act, Title VII, or state law claims—

involve a common core of facts resulting in one injury. The legal claims interrelated and

overlapped; plaintiffs' EEOC charges alleged violations of Title VII, the Equal Pay Act, and New

York State's Equal Pay and Human Rights Laws based on the same factual allegations.").

All of the claims in Dr. Porter's case, including the VFEPA claim, share a common core of facts and legal issues. The evidence presented at trial in this case underscores the relatedness of the facts and legal issues. For example, a May 2017 email from Dr. DeMars to Dr. Merrens discusses in the same paragraph both Dr. Porter's claimed "disruptive/splitting behavior," which the jury could have understood to include Dr. Porter's whistleblower complaints about Drs. Hsu and Seifer, and Dr. Porter's disability: "[e]veryone . . . is remembering [Dr. Porter] as a full time employee wearing 3 hats, and not the one who has been out for almost 18 months." (Doc. 140-16 at 2.) Furthermore, all the claims in this case are premised on whether Dartmouth Health's reason for Dr. Porter's termination was unlawful. The jury found that Dartmouth Health unlawfully terminated Dr. Porter based on disability in violation of VFEPA, which was only one of the legal claims she asserted. The jury awarded Dr. Porter a considerable monetary verdict. It is plausible that the amount of the verdict would have been the same had the jury found in favor of Dr. Porter on any of her other claims instead of the VFEPA claim or in addition to the VFEPA claim. *See, e.g.*, *Dominic v. Consol. Edison Co. of N.Y.*, 822 F.2d 1249, 1259–60 (2d Cir. 1987) (where factual and legal theories underlying unsuccessful age discrimination and successful retaliation claims were inextricably intertwined, court found fully compensatory fee award "justified" "because [plaintiff] recovered the same relief on the retaliation claim that he would have on his discrimination claim"). For these reasons, step one of the analysis does not support a substantial reduction in the lodestar amount.

At step two of the analysis, the Court determines whether there are any unsuccessful claims interrelated with the successful claims and whether the ultimate level of success justifies a reduction in the award. *Grant*, 973 F.2d at 101. Although Dr. Porter's unsuccessful non-VFEPA claims are interrelated with her successful VFEPA claim, the Court must account for the fact that the jury did not find in Dr. Porter's favor on five of her six claims; declined to award punitive

damages; and awarded a lesser amount of damages than Dr. Porter's expert opined she incurred. These considerations warrant a modest downward adjustment to Dr. Porter's fee award, notwithstanding what may fairly be considered an "excellent result," i.e., a jury verdict exceeding one million dollars. *See, e.g.*, *Kassim v. City of Schenectady*, 415 F.3d 246, 256 (2d Cir. 2005) (affirming district court's authority "to reduce the fee awarded to a prevailing plaintiff below the lodestar by reason of the plaintiff's partial or limited success" (internal quotation marks omitted)); *Centrella*, 2018 WL 840041, at *10 (finding downward adjustment of lodestar warranted, "though in a lesser amount than requested," because plaintiffs achieved success on only one of three claims); *McDow v. Rosado*, 657 F. Supp. 2d 463, 469–70 (S.D.N.Y. 2009) (reducing fee by 12% and explaining, "it is difficult to conclude that plaintiff achieved anything close to what was sought"); *Parrish v. Sollecito*, 280 F. Supp. 2d 145, 173 (S.D.N.Y. 2003) (reducing lodestar by 10%, "despite [plaintiff's] obviously considerable success entailed in the jury's punitive damage award," because punitive damage award was capped at $50,000, plaintiff succeeded on only one of two claims, and jury awarded "far less than [plaintiff] sought"). The Court therefore applies an across-the-board reduction of 10% to the revised lodestar (noted above) to account for Dr. Porter's somewhat limited success in this case.

Accordingly, Dr. Porter's attorney fees award is reduced to **$1,124,845.92** ($1,249,828.80 − $124,982.88).

## II.    Additional Fees Incurred After Filing Motion for Attorney Fees

Dr. Porter filed her Motion for Attorney Fees on May 8, 2025. She advised in the Motion that she would "supplement [it] with a final accounting" to seek "additional compensable fees" incurred after the filing of the Motion, including for time spent "in connection with litigation

associated with th[e] Motion and with litigating other post-trial motions."[17] (Doc. 300 at 3 n.2.) On

July 11, 2025, Dr. Porter filed a "Second Supplemental Memorandum in Support of Her Motion

for Attorney's Fees," which includes a request for a "supplemental award of the attorney's fees

incurred by [Dr. Porter's] lawyers from May 8, 2025, through July 1, 2025." (Doc. 330 at 1.)

Attached to the Memorandum are: (a) a chart displaying the hourly rates and hours billed for the

four attorneys representing Dr. Porter from May 8 through July 1 (*see* Doc. 330-2); and (b) billing

records of Vitt & Nunan and Langrock Sperry & Wool documenting the work that Dr. Porter's

attorneys completed on the case in the same time period (*see* Docs. 330-3, 330-4). The total

amount of fees requested in these documents for the period from May 8 through July 1 is $70,439.

(Doc. 330-2.) Dartmouth Health has filed an Opposition to Dr. Porter's Second Supplemental

Memorandum, asserting both procedural and substantive reasons for the Court to disallow the fees

requested in the Second Supplemental Memorandum. (Doc. 331 at 4.)

In an effort to avoid a third major litigation regarding Dr. Porter's Motion for Attorney

Fees, *see Hensley*, 461 U.S. at 437, the Court will rule on Dr. Porter's request for supplemental

fees at this time. In doing so, the Court notes that Dartmouth Health has had ample opportunity to

respond to Dr. Porter's supplemental submission of billing records and has in fact responded to

those records (*see* Doc. 331). Therefore, Dartmouth Health suffers no prejudice from the Court

deciding this issue without further briefing and without a hearing.

The Second Circuit, Vermont state courts, and this Court all agree that "[a]ttorney fees for

the preparation of an attorney fee application and other post-trial motions [are] compensable,"

particularly in civil rights cases. *See Centrella v. Ritz-Craft Corp. of Pa., Inc.*, Civil Action No.

2:14–cv–111–jmc, 2018 WL 1750568, at *2 (D. Vt. Apr. 11, 2018) (citing *Weyant v. Okst*, 198

---

[17] Dr. Porter also represented that she "will submit a supplemental accounting to cover fees incurred during post-trial matters." (Doc. 318 at 1 n.1.)

F.3d 311, 316 (2d Cir. 1999) ("[A] reasonable fee should be awarded for time reasonably spent in preparing and defending an application for [statutory attorney] fees."); *Vt. Hum. Rts. Comm'n v. Benevolent and Protective Order of Elks*, No. 404–8–98 Wncv, 2009 WL 5454429 (Vt. Super. Wash. Cnty. Apr. 6, 2009) ("Plaintiffs are . . . entitled to an award of fees and expenses for litigating the fee application itself."); *Monahan v. GMAC Mortg. Corp.*, No. S0275–01 RcC, 2003 WL 25782721 (Vt. Super. Rutland Cnty. Oct. 6, 2003) ("Supplementary fees that result from prosecution of post[-]trial fees have been allowed to prevailing parties in federal cases dealing with civil rights."); *LaBrie*, 164 Vt. at 252, 668 A.2d at 669 ("[P]laintiff is entitled to fees for time spent on the motion [for attorney fees.]")). The reason courts permit attorney fees for work performed related to a fees application is clear:

> If an attorney is required to expend time litigating his fee claim, yet may not be compensated for that time, the attorney's effective rate for all the hours expended on the case will be correspondingly decreased. . . . Such a result would not comport with the purpose behind most statutory fee authorizations, Viz, the encouragement of attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies. . . . [T]o hold otherwise would permit a deep pocket losing party to dissipate the incentive provided by an award through recalcitrance and automatic appeals.

*Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir. 1979), *aff'd* 448 U.S. 122 (1980) (first omission in original) (internal quotation marks omitted); *see Donovan v. CSEA Loc. Union 1000, Am. Fed'n of State, Cnty. & Mun. Emps., AFL–CIO*, 784 F.2d 98, 106 (2d Cir. 1986) ("The fee application is a necessary part of the award of attorney's fees. If the original award is warranted, we think that a reasonable amount should be granted for time spent in applying for the award."); *Weyant*, 198 F.3d at 316 ("A culpable defendant should not be allowed to cause the erosion of fees awarded to the plaintiff for time spent in obtaining the favorable judgment by requiring additional time to be spent thereafter without compensation. Thus, a reasonable fee should be awarded for opposing the culpable defendant's unsuccessful postjudgment motions.").

Accordingly, Dr. Porter is entitled to recover a reasonable fee for her attorneys' handling of post-trial motions in this case, including her Motion for Attorney Fees. *See LaBrie*, 164 Vt. at 250, 668 A.2d at 658 ("Fee awards are to be reasonable, reasonable as to billing rates and reasonable as to the number of hours spent in advancing the successful claims." (internal quotation marks omitted)).

Dr. Porter seeks $70,439 for attorney fees incurred from May 8 through July 1. (Doc. 330-2; *see* Doc. 330-3.) As explained above, the Court maintains Attorney Nunan's 2025 hourly rate of $250, but reduces the remaining 2025 hourly rates as follows: Attorney Vitt's rate is reduced from $400 to $350; Attorney Merlo's rate is reduced from $325 to $250; and Attorney Jones's rate is reduced from $395 to $350. After these reductions, the amount of hours billed at these rates yields a lodestar amount of $60,970.

Additionally, the billing records attached to the Second Supplemental Memorandum (*see* Docs. 330-3 and 330-4) contain several of the same deficiencies that the pre-May 8 billing records contain, including vague/incomplete entries (*see, e.g.*, Doc. 330-3 at 1 ("Emails with S. Nunan" and "Meeting with S. Nunan, E. Jones, and G. Vitt"); *id.* at 2 ("T/c S. Merlo"); *id.* at 6 ("Emails S. Merlo")) and block-billing entries (*see, e.g.*, Doc. 330-3 at 1 ("Prepare and revise fee petition and supporting documents; conf. with S. Merlo; emails with S. Merlo; conf. with G. Vitt and E. Jones; prepare and file attorney fee petition"); Doc. 330-4 at 2 ("Preparation for motions hearing; correspondence with client regarding motions hearing; attend motions hearing")). Further, the billing records reveal that excessive or duplicative time was spent on certain tasks, including: (1) preparation of the Motion for Attorney Fees (see above discussion); (2) preparation of the "Supplemental Memorandum in Further Support of" the Motion for Attorney Fees (*see* Doc. 326), which Dartmouth Health correctly notes added no new law or argument regarding the Motion; and (3) preparation of reply briefs and for the hearing regarding Dr. Porter's post-trial motions.

Regarding counsel's preparation of reply briefs, it is unclear from the billing records which attorneys drafted which replies, and some of the time spent appears to have been duplicative. (*See* Doc. 330-3 at 4.) Moreover, as Dartmouth Health notes (*see* Doc. 331 at 3), the billing records reflect that Attorneys Vitt and Nunan spent over thirty-one hours preparing for the July 1 hearing (*see* Doc. 330-3 at 4–7), but Attorney Vitt argued only one of the four Motions under review at that hearing and Attorney Nunan did not present any argument at the hearing. In comparison, Attorney Jones's billing records indicate that he spent only approximately ten total hours preparing for the July 1 hearing (*see* Doc. 330-4 at 1–2), though he argued the majority of the Motions at the hearing. The Court recognizes that counsel could not have anticipated the issues the Court would focus on during the hearing, and it is possible that Attorney Vitt was prepared to present a more extensive argument on the Motion for Attorney Fees than was actually required at the hearing. The Court's observations are not intended to suggest that counsel should spend less time preparing for hearings. In this instance, however, the billing records indicate that some of the work performed on Dr. Porter's behalf in preparation for the July 1 hearing was excessive or duplicative.

To account for these deficiencies, the Court reduces the lodestar amount for fees incurred from May 8 through July 1 by 20%, resulting in a total of **$48,776** ($60,970 − $12,194). Adding this amount to the revised and adjusted lodestar for attorney fees incurred from the beginning of this case until the filing of the Motion for Attorney Fees ($1,124,845.92), results in an attorney fee award totaling **$1,173,621.92** ($1,124,845.92 + $48,776).

## III.  Interest

In the Motion for Attorney Fees and Motion to Amend Judgment, Dr. Porter argues that prejudgment interest should be added to her attorney fees award,[18] and that both pre- and postjudgment interest on the award should be calculated at Vermont's rate of 12% pursuant to 9 V.S.A. § 41a(a). (*See* Doc. 300 at 3 n.3, 4 nn.4–5; Doc. 302 at 3, 5 n.3.) Dartmouth Health responds that Dr. Porter is not entitled to any prejudgment interest on her attorney fees award, and that postjudgment interest should be calculated at the federal rate of 3.98%. (*See* Doc. 306 at 4; Doc. 309 at 11.)

Dr. Porter does not cite binding precedent, or advance persuasive argument, to substantiate the claim that prejudgment interest should be applied to her attorney fees award,[19] or that the postjudgment interest rate on the attorney fees award should be Vermont's 12% rate.[20] Generally, prejudgment interest is not recoverable on attorney fees awards because "those fees are not liquidated until fixed by the trial court." *Ring*, 2014 VT 127, ¶ 35, 198 Vt. at 126, 112 A.3d at 766; *see Vastano v. Killington Valley Real Est.*, 2010 VT 12, ¶ 10 n.3, 187 Vt. 628, 632, 996 A.2d 170, 174 (2010) (noting "general rule prohibiting an award of prejudgment interest on attorney's fees" and "delet[ing]" from fee award "that portion [that was] attributed to prejudgment interest"); *Salatino v. Chase*, 2007 VT 81, ¶ 15, 182 Vt. 267, 275, 939 A.2d 482, 488 (2007) (citing cases)

---

[18]  It is unclear if Dr. Porter is claiming that prejudgment interest should be added only to that portion of her attorney fees that she paid. Her Motion for Attorney Fees appears to request prejudgment interest on *all* fees incurred (*see* Doc. 300 at 3–4, nn. 2–4), while her Motion to Amend Judgment explicitly requests prejudgment interest only for the attorney fees she paid, i.e., for attorney work done through August 2020 (*see* Doc. 302 at 5 n.3 ("The Court should include an award of prejudgment interest on [$475,096] in order to compensate Dr. Porter for the loss of use of the funds used to pay attorneys' fees prior to August 2020.")). The Court need not resolve this issue because it concludes that no prejudgment interest should be added to the attorney fees award.

[19]  Although Dr. Porter cites a case in her Motion to Amend Judgment that recognizes the court's discretion to award prejudgment interest on attorney fee awards in civil rights cases (*see* Doc. 302 at 5 n.3), the case is from the District of Massachusetts and no argument is made to support the Court's application of that case here.

[20]  Dr. Porter cites two cases in her Motion to Amend Judgment for the proposition that, in cases decided based on state claims, "[c]ourts appl[y] the interest rate of the state rather than the federal rate." (Doc. 302 at 3.) The cases, however, discuss only prejudgment interest, not postjudgment interest.

(noting that courts have generally concluded that, "for purposes of prejudgment-interest awards, . . . attorney's fees are not liquidated until fixed by the trial court following discretionary calculations [to determine the amount of a reasonable fee award]"); *cf. Wells Fargo Bank N.A. v. Sinnott*, No. 2:07–CV–169, 2010 WL 297830, at *12 (D. Vt. Jan. 19, 2010) ("In Vermont, it is unclear whether attorney's fees are 'liquidated' before the Court determines the exact amount to be paid."). Although there may be cases where attorney fees are liquidated, Dr. Porter has offered no basis for such a conclusion in this case. Therefore, Dr. Porter's request for prejudgment interest on her attorney fees award is DENIED.

Dr. Porter is, however, entitled to postjudgment interest on her award. *See Kirshner v. Smith*, Civil Action No. 2:23-cv-397, 2024 WL 3640619, at *8 (D. Vt. July 10, 2024), *report and recommendation adopted*, 2024 WL 3638901 (Aug. 2, 2024); *Brady*, 455 F. Supp. 2d at 217 (holding that "a plaintiff who prevailed on a federal claim . . . is entitled to interest on his entire damage award from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment" (internal quotation marks omitted)). "[F]ederal law governs post-judgment interest." *SuperCom Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*, No. 21 CV 2857 (LAP), 2023 WL 8372271, at *2 (S.D.N.Y. Dec. 4, 2023). 28 U.S.C. § 1961(a) provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment." Accordingly, "under § 1961, federal district courts must apply *the federal rate* of post-judgment interest to judgments rendered in diversity actions, even when those judgments have been docketed in state court." *Cappiello v. ICD Publ'ns, Inc.*, 720 F.3d 109, 112 (2d Cir. 2013) (emphasis added). The "primary objective" of § 1961 is "to maintain

the federal court system without altering the substantive rights and interests the system

adjudicates." *Id.* at 114. As the Second Circuit has explained:

> Unlike pre-judgment interest, post-judgment interest is not awarded to make a plaintiff whole for his injury. Rather, [o]nce a claim is reduced to judgment, the original claim is extinguished and merged into the judgment; and a new claim, called a judgment debt, arises. Section 1961 acts only upon final federal judgments, not upon the claims—whether state or federal—that give rise to, and are extinguished by, them.

*Id.* at 115 n.6 (alteration in original) (citations and internal quotation marks omitted).

Dr. Porter has not provided legal authority justifying the application of an interest rate

different from the rate specified in § 1961. Therefore, the Court GRANTS Dr. Porter's request for

postjudgment interest but DENIES the request that a rate of 12% should apply. The Court will

calculate postjudgment interest from the date of entry of the Judgment in this case—April 24,

2025—until satisfaction of the Judgment, consistent with the formula set forth in 28 U.S.C.

§ 1961.

## IV.    Costs

In addition to an award of attorney fees, Dr. Porter seeks payment from Dartmouth Health

for the reasonable costs she has incurred in this case. (*See* Doc. 300 at 11–12, Doc. 302 at 3–5,

Doc. 317, Doc. 318 at 5, Doc. 318-1, Docs. 319–319-2.) Specifically, Dr. Porter seeks $19,899.69

in total, for the following costs incurred: $10,478.90 for deposition transcripts (*see* Doc. 318-1;

*see also* Doc. 318 at 5), $4,478.72 for trial transcripts (*see* Doc. 319 at 1, Doc. 319-1 at 1);

$1,106.65 for clerk, docket, and witness fees (*id.*); and $10.43 for service of summons and

subpoena fees (*id.*).[21] Dartmouth Health generally argues that the Court should "exercise [its]

---

[21] As noted in footnote 8 above, Dr. Porter requested additional costs in her Motion for Attorney Fees, totaling $29,959.20, for attorney travel, hotel stays, and meals during the trial; costs related to the deposition of expert witness Dr. Bancroft and Dr. Bancroft's attendance at the *Daubert* hearing; and two mediations. (*See* Doc. 300 at 11–12.) But Dr. Porter has not submitted documentation substantiating these costs. The Court finds that Dr. Porter has since abandoned the request, as she has filed numerous documents since the filing of the Motion for Attorney Fees and none have addressed or reflected those costs.

discretion and decline to award any costs [to Dr. Porter] based on [her] procedural blunders," including her failure to "attach any affidavit or supporting billing statements, invoices, or receipts to her Bill of Costs." (Doc. 306 at 5.) This argument is no longer tenable because Dr. Porter has filed a revised Bill of Costs (Doc. 319) that includes documentation supporting the request for costs (Docs. 319-2), as discussed in detail below. Dartmouth Health has not filed an objection to the revised Bill of Costs.

VFEPA permits an award of costs to a prevailing plaintiff. *See* 21 V.S.A. § 495b(b) ("Any person aggrieved by a violation of the provisions of this subchapter may bring an action in Superior Court seeking compensatory and punitive damages or equitable relief, including . . . costs, reasonable attorney's fees, and other appropriate relief."). Federal Rule of Civil Procedure 54(d)(1) similarly provides that "costs--other than attorney's fees--should be allowed to the prevailing party." In deciding the costs that the prevailing party may recover, the Second Circuit has consistently held that "attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *H.B. Auto. Grp., Inc. v. Kia Motors Am., Inc.*, 13cv4441 (VEC) (DF), 2018 WL 4017698, at *3 (S.D.N.Y. July 25, 2018) (quoting *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir. 1989)), *report and recommendation adopted sub nom. H.B. Auto. Grp., Inc. v. Kia Motors Am.*, 2018 WL 4007636 (Aug. 22, 2018). "Such costs may properly include, for example, shipping fees, filing fees, printing, process servers, travel, telephone costs, legal research, deposition-related expenses, and litigation support." *Id.*

Courts may tax costs pursuant to Federal Rule 54(d)(1) "only if authorized by 28 U.S.C. § 1920." *Grajeda v. Vail Resorts Inc.*, Case No. 2:20-cv-00165, 2024 WL 3950919, at *1 (D. Vt. Aug. 27, 2024). This Court's Local Rule of Civil Procedure 54(a) explicitly limits the taxation of costs "to those specified by 28 U.S.C. § 1920," and provides that all costs "must be itemized and

47

include supporting documentation, such as billing statements, invoices, or receipts for expenses."

28 U.S.C. § 1920 lists the following costs as those that may be awarded under the applicable

Federal and Local Rule:

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Because an award of costs against the losing party "is the normal rule . . . in civil litigation,

not an exception[,] . . . the losing party has the burden to show that costs should not be imposed."

*Whitfield v. Scully*, 241 F.3d 264, 270 (2d Cir. 2001), *abrogated on other grounds by Bruce v.*

*Samuels*, 577 U.S. 82 (2016); *see Portelos v. Hill*, 830 F. App'x 66, 67 (2d Cir. 2020); *Hiramoto*

*v. Goddard Coll. Corp.*, Case No. 5:14-cv-142, 2019 WL 13248656, at *3 (D. Vt. Sept. 12, 2019).

The decision to award costs "rests within the sound discretion of the district court" and "will be

reviewed . . . only for abuse of discretion." *Javier v. Deringer-Ney Inc.*, 501 F. App'x 44, 45 (2d

Cir. 2012) (internal quotation marks omitted).

Preliminarily, the Court considers Dr. Porter's request to include in her attorney fees

award—as opposed to in her taxed costs—the costs she incurred for deposition transcripts. (*See*

Doc. 300 at 11; Doc. 302 at 5–6; Doc. 318 at 5.) Dr. Porter relies on case law from the Second

Circuit and from this Court to argue that these expenses are "recoverable as a component of

attorney's fees," even though they are not considered "taxable costs." (Doc. 300 at 11 (internal

quotation marks omitted).) Dartmouth Health counters that: (a) these expenses may not be "double

counted," and thus if the Court includes them in the attorney fees award, it must exclude them

from the costs taxed; (b) 28 U.S.C. § 1920 does not provide for an award for the cost of court reporter services at depositions, so those costs should not be taxed; and (c) if the Court includes deposition-related expenses in Dr. Porter's award, those expenses should be reduced to account for depositions that Dr. Porter needlessly conducted in this case. (*See* Doc. 306 at 5–6; Doc. 309 at 10.) Regarding the last item, Dartmouth Health provides a chart of the alleged "unnecessary" depositions, showing the cost of transcripts for those depositions totaling over $6,000. (Doc. 306 at 6.) As explained above, however, the Court does not agree that Dr. Porter conducted an excessive number of depositions in this case. Therefore, it is not a reason to reduce the allowable costs.

Furthermore, the Court does not agree that Dr. Porter's costs related to either deposition or trial transcripts are not allowed under the applicable statute, 28 U.S.C. § 1920. To the contrary, section (2) of the statute provides that the court may tax as costs "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case." Many courts in this Circuit, including this Court, have interpreted this section to include the costs of deposition and trial transcripts provided they are "necessarily obtained." *See, e.g.*, *Perks v. Town of Huntington*, 331 F. App'x 769, 770 (2d Cir. 2009) (identifying "no error" in finding that daily trial transcripts were taxable costs, as they were "necessarily obtained by defendants for use in the case" (internal quotation marks omitted)); *In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975*, 687 F.2d 626, 631 (2d Cir. 1982) (finding no error in taxing costs of "transcripts of depositions not used . . . at trial, of transcripts of pretrial proceedings, and of daily transcripts of the trial"); *Cole v. Foxmar, Inc.*, Case No. 2:18-cv-00220, 2023 WL 2632845, at *2 n.1 (D. Vt. Mar. 24, 2023) ("Transcript fees are recoverable under 28 U.S.C. § 1920(2)."); *Vermont Right to Life Comm., Inc. v. Sorrell*, No. 2:09–cv–188, 2015 WL 1481619, at *2 (D. Vt. Mar. 31, 2015) (finding that awarding costs for deposition transcripts was appropriate under 28 U.S.C. § 1920(2));

*Lasek v. Vt. Vapor, Inc.*, 2014 VT 33, ¶ 28, 196 Vt. 243, 257, 95 A.3d 447, 457 (2014) (finding that "trial court has broad discretion" to award prevailing party costs of obtaining copies of deposition transcripts "provided that the depositions were reasonably necessary to prepare for the litigation" (internal quotation marks omitted)); *Carrasco Flores v. NYC Pasta & Risotto Co.*, 17-CV-6915 (LGS)(KNF), 2019 WL 8331463, at *4 (S.D.N.Y. Sept. 19, 2019) (citing § 1920 to award costs for deposition transcripts and trial transcripts); *Cleveland v. N. Am. Van Lines, Inc.*, 154 F.R.D. 37, 38 (N.D.N.Y. 1994) (finding that depositions "properly taken within the bounds of discovery [are] . . . necessarily obtained for use in the case" for purposes of taxing costs under § 1920). Accordingly, the Court includes Dr. Porter's costs for deposition transcripts and trial transcripts in her request for costs, rather than as part of her request for attorney fees.

In terms of the substance of Dr. Porter's requested costs for deposition and trial transcripts, the depositions reflected in the billing documents attached to Dr. Porter's Reply (*see* Docs. 318-1 at 2–12) were "necessarily obtained for use in the case," as required by 28 U.S.C. § 1920(2), even though not all of the deponents testified at trial. Therefore, they are allowable costs.[22] *See Zulu v. Barnhart*, 9:16-CV-1408 (MAD/ML), 2019 WL 4544420, at *2 (N.D.N.Y. Sept. 19, 2019) (taxing deposition costs where "[losing party] has not demonstrated that any portion of his deposition was not related to an issue relevant to the case at the time the deposition was taken"); *Jim Billado Roofing, LLC v. Custom Copper & Slate, Ltd.*, No. 1:08-CV-97, 2010 WL 1881097, at *3 (D. Vt. May 10, 2010) (holding that "deposition costs are taxable so long as the deposition reasonably seemed necessary at the time it was taken," and noting that although plaintiff "did not use the deposition transcripts at trial, . . . it was reasonable to anticipate requiring them," and therefore

---

[22] The last two documents attached to the Reply are checks from Attorney Nunan for transcription services. (*See* Doc. 318-1 at 13–14.) As they do not reference this case or any particular deposition or other event in this case, the Court does not include them in its cost award.

"these costs are allowed"); *Anderson v. City of New York*, 132 F. Supp. 2d 239, 246 (S.D.N.Y. 2001) (holding that "deposition transcripts need not be introduced into evidence at trial in order to be taxed as costs; it suffices that at the time the deposition was taken it was reasonably expected that the transcript would be used for trial preparation").

However, each of the court reporter costs listed in the chart attached to the Reply (*see* Doc. 318-1 at 1) is not supported by the documentation attached to the chart. Specifically, Dr. Porter has not provided sufficient documentation to support the chart's listed deposition transcription charges of $174.25, $625.35, $1,181.40, $923.75, $597.15, and $548.80. (*See id.*) Therefore, these amounts are not included in the taxable costs. Documentation attached to the chart does, however, support deposition transcript cost totals that are not listed in the chart, specifically in the amounts of $225.75 (*Id.* at 4), $441 (*id.* at 5), and $346.75 (*id.* at 7). Therefore, the total amount of costs taxed for deposition transcripts, as reflected in the documents attached to Dr. Porter's Reply regarding her Motion for Attorney Fees (Doc. 318-1), is **$7,441.70**.

In addition, Dr. Porter seeks $4,478.72 for the cost of trial transcripts, as reflected in her Bill of Costs[23] (Doc. 319 at 1) and attached documents (Doc. 319-1 at 1, Docs. 319-2 at 23–29, 33–34). Trial transcript costs may be taxed, provided they were "necessarily obtained for use in the case." 28 U.S.C. § 1920(2). The Court finds that the trial transcripts documented in Dr. Porter's Bill of Costs and attached documents were necessarily obtained for use in this case and therefore the associated costs are recoverable. *See, e.g.*, *Karibian v. Columbia Univ.*, No. 91 Civ. 3153 (TPG), 1997 WL 2538, at *2 (S.D.N.Y. Jan. 3, 1997) (finding it "appropriate" to tax cost of daily trial transcripts, where trial was "of substantial length" and "involv[ed] hotly contested

---

[23] As noted earlier, after her initial filing of a Bill of Costs on May 8, 2025 (Doc. 301), and after Defendants filed their "Objection to Plaintiff's Bill of Costs" (Doc. 307), Dr. Porter filed a revised Bill of Costs on June 5, 2025 (Doc. 319). The Court refers to that most recent Bill of Costs, docketed as ECF No. 319, as Dr. Porter's "Bill of Costs" herein, given that it provides the most accurate and up-to-date information and attached documentation.

issues including sharp and crucial questions of credibility," and where there were "extensive post-trial motions"). However, it is unclear why $224.27 for "Grafton County Sheriff" is included in the amount of costs requested for "Transcripts." (Doc. 319-1 at 1.) Moreover, the only documentation for that cost is a check in the amount of $224.27 to the Grafton County Sheriff, which includes no reference to this case and no indication of its purpose. (*See* Doc. 319-2 at 5.) This cost is therefore not taxed. The total amount of costs taxed for trial transcripts is **$4,254.45**.

The remaining requested costs are for clerk fees ($31), docket fees ($400), fees for service of summons and subpoena ($10.43), witness fees ($675.65), copy fees ($1,620.94), and half of Special Master John Schraven's mediation-related fees ($2,204.05). (*See* Doc. 319 at 1–2, Doc. 319-1.) The Court allows the requested clerk fee, docket fees, and witness fees in their entirety, totaling **$1,106.65**. *See* 28 U.S.C. § 1920(1), (3), (5); *see also Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441–42 (1987) (finding that witness fees are part of section 1920 taxable costs); *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 601 (2d Cir. 2020) (taxing filing fees); *Degreenia-Harris*, 2021 WL 5979683, at *15 (taxing "costs of initiating the action"); *Zulu*, 2019 WL 4544420, at *2 (finding that "costs attributed to [prevailing party's] witnesses from [an evidentiary] hearing and [the] trial are both properly taxable to [losing party]"); *Anderson v. City of N.Y.*, 132 F. Supp. 2d 239, 245 (S.D.N.Y. 2001) (finding that costs for filing and witness fees are "ordinarily recoverable as costs pursuant to 28 U.S.C. § 1920 and [the applicable] Local Rule").

Although fees for service of summons and subpoena are generally allowed, *see U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 172 (2d Cir. 1996) (citing 28 U.S.C. § 1920(1)), the Court deducts $4.85 from the $10.43 requested because the receipt in the amount of $4.85 from the United States Postal Service contains no indication of what the payment is for, and no reference to this case, and no affidavit or

declaration has been submitted to testify to these facts. (*See* Doc. 319-2 at 6.) Therefore, only **$5.58** is taxed for service of summons and subpoena costs.

Regarding copy fees, no costs are taxed because the documentation provided does not reference the case in any way, and the Bill of Costs does not attach an affidavit or declaration explaining the reason for these fees. (*See* Doc. 319-2 at 30–32.) *See King Fook Jewellry Grp.*, 2019 WL 2535928, at *11 ("The Court . . . will not award costs for photocopying and meals because these expenses did not come with supporting documentation."); *Whitehead v. Mix Unit, LLC*, 17 Civ. 9476 (VSB) (JLC), 2019 WL 384446, at *6 (S.D.N.Y. Jan. 31, 2019) (plaintiff "not entitled to full recovery of costs," where "counsel . . . failed to provide any documentation to support . . . request for costs"), *report and recommendation adopted*, 2019 WL 1746007 (Apr. 18, 2019); *Lee v. Santiago*, No. 12 Civ. 2558(PAE)(DF), 2013 WL 4830951, at *5 (S.D.N.Y. Sept. 10, 2013) ("A mere assertion that a certain cost was incurred . . . is insufficient, where such an assertion is made in a conclusory fashion in a brief or bill of costs, without a supporting affidavit, declaration, or documentation.").

Finally, the Court denies Dr. Porter's request to tax half of the fees billed by Special Master John Schraven for his work on this case. (*See* Doc. 319-1 at 1; Doc. 319-2 at 3–4.) Dr. Porter has not cited authority holding that a special master appointed by the court to assist parties with settlement efforts may be considered a "court[-]appointed expert[]" within the meaning of 28 U.S.C. § 1920(6) for the purpose of taxing costs. Because section 1920 embodies a congressional policy "to impose rigid controls on cost-shifting in federal courts," *Crawford Fitting Co.*, 482 U.S. at 444, the Court is reluctant to adopt a broad interpretation of its provisions. But the Court need not decide whether § 1920 generally allows for the taxing of a court-appointed special master's fees because the Court expressly directed that "[e]ach side shall be responsible for half" of Mr. Schraven's compensation. (Doc. 158 at 2; *see also* Doc. 170 (providing that Mr. Schraven's

fees "shall be . . . divided evenly between the two parties"). The Court declines to revisit or amend that directive.

Accordingly, the Court will tax Dr. Porter's costs as follows: $7,441.70 for deposition transcripts; $4,254.45 for trial transcripts; $1,106.65 for clerk, docket, and witness fees; and $5.58 for fees for service of summons and subpoena. The total amount of taxable costs is **$12,808.38**.

## Conclusion

For these reasons, the Court finds as follows:

### *Attorney Fees*

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's Motion for Attorney Fees (Doc. 300), awarding Dr. Porter $1,124,845.92 in attorney fees for work completed through May 7, 2025, which reflects a 20% reduction of the lodestar amount ($1,562,286.00 − $312,457.20 = $1,249,828.80) to account for the instances of vague/incomplete and block-billing entries, duplicative billing, and excessive billing; and a 10% reduction of the revised lodestar amount ($1,249.828.80 − $124,982.88 = $1,124,845.92) to account for Dr. Porter's success on only one of six claims in this lawsuit.

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's Second Supplemental Memorandum in support of her Motion for Attorney Fees (Doc. 330), awarding Dr. Porter $48,776 in attorney fees for work completed from May 8, 2024 to July 1, 2025, which reflects a 20% reduction of the lodestar amount to account for the same billing deficiencies listed above ($60,970 − $12,194).

The total amount of the attorney fees award is **$1,173,621.92** ($1,124,845.92 + $48,776).

### *Costs*

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's request for costs (*see* Docs. 300, 302, 318, 319), awarding Dr. Porter **$12,808.38** in costs, including costs related to

deposition and trial transcripts, clerk and docket fees, witness fees, and fees for service of summons and subpoena, which represents approximately a 35% reduction of the amount of costs requested ($19,899.69) due to insufficient documentation of certain costs and failure to provide a justification for taxing Special Master John Schraven's fees.

### *Total Attorney Fees and Costs Awarded*

The total award to Dr. Porter for attorney fees and costs is therefore **$1,186,430.30** ($1,173,621.92 + $12,808.38).

### *Prejudgment Interest*

The Court DENIES Dr. Porter's request for prejudgment interest on her attorney fees award. (*See* Doc. 300 at 3 n.3, 4 nn.4–5; Doc. 302 at 3, 5 n.3.)

### *Postjudgment Interest*

The Court GRANTS IN PART AND DENIES IN PART Dr. Porter's request for postjudgment interest. (*See* Doc. 302 at 2, 3.) The Court GRANTS the request for postjudgment interest but DENIES the request to apply Vermont's 12% interest rate. Postjudgment interest shall be calculated from the date of entry of the Judgment in this case—April 24, 2025—until satisfaction of the Judgment, in accordance with the formula set forth in 28 U.S.C. § 1961.

### *Motion to Amend Judgment*

As explained above, the Court GRANTS IN PART AND DENIES IN PART certain requests contained in Dr. Porter's Motion to Amend Judgment. (*See* Doc. 302 at 1, 3–6.) Regarding the request in that Motion for an award of prejudgment interest on the jury award at the rate of 12% (*see id.* at 1–3), the Court addresses this issue in a separate order.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

*/s/ Kevin J. Doyle*
United States Magistrate Judge