UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| Misty Blanchette Porter, M.D., | |
| Plaintiff, | |
| v. | Civil Action No. 2:17–cv–194–kjd |
| Dartmouth-Hitchcock Medical Center et al., | |
| Defendants. | |

# ORDER
(Doc. 308)

Contending that the Court committed several errors during the trial of this case, Defendants (Dartmouth Health) move under Federal Rule of Civil Procedure 59 for a new trial limited to the issue of Dr. Porter's damages. First, Dartmouth Health argues that the testimony of Dr. Porter's damages expert, Dr. Bancroft, should have been excluded due to untimely disclosure under Rule 26. Second, Dartmouth Health challenges the Court's jury instructions on economic damages for failing to clearly instruct the jury to consider Dr. Porter's earnings from her job at the University of Vermont Medical Center (UVMMC). Third, Dartmouth Health objects to the Court's exclusion of a note written by Dr. Bancroft on cross-examination. The note consists of three numbers Dr. Bancroft wrote after defense counsel requested that he perform alternative damages calculations. Finally, Dartmouth Health claims that the Court improperly restricted its closing arguments concerning a severance offer Dartmouth Health extended to Dr. Porter. Dr. Porter opposes Dartmouth Health's Motion.

For the reasons explained below, Dartmouth Health's Motion (Doc. 308) is DENIED.

**Standard**

"A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 112 n.34 (2d Cir. 2013) (citation modified). In reviewing a motion for a new trial, the Court must view the evidence in the light most favorable to the nonmoving party. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 624 (2d Cir. 2001).

**Analysis**

I. **Dartmouth Health has not shown error under Rules 26 and 37 warranting a new trial.**

Dartmouth Health contends that the Court erred by admitting testimony and exhibits offered by Dr. Porter's expert damages witness, Dr. Bancroft, because Dr. Porter failed to timely disclose several of his expert opinions under Rule 26. According to Dartmouth Health, "[p]laintiff was permitted multiple, late, unjustified revisions to her expert reports and opinions to be presented [at] trial," including "a drastic revision less than a week before trial," and Dartmouth Health "thus had to face unwarned, constantly evolving, weakly-based and sharply prejudicial expert opinions and was not permitted" to "disclose its expert economist to appropriately rebut these repeated, new opinions." (Doc. 308 at 4.) Dartmouth Health argues that Dr. Porter's Rule 26 violations warranted exclusion of Dr. Bancroft's testimony in its entirety.

Rule 26(e)(1) provides:

> A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

2

Rule 26(e) "does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect." *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011). A party's duty to "supplement its initial expert report does not arise when [the party] seeks to bolster its earlier submission, but rather, arises only if the expert *subsequently* learns of information that was previously unknown or unavailable, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete." *Levinson v. Westport Nat. Bank*, Civil Action No. 3:09-CV-1955(VLB), 2013 WL 3280013, at *4 (D. Conn. June 27, 2013) (citation modified) (alteration in original). Therefore, "if an expert's report does not rely on any information that was previously unknown or unavailable to him, it is not an appropriate supplemental report under Rule 26." *Id.* at *5 (citation modified). In other words, Rule 26 permits supplemental expert reports after the deadlines provided in the Rule "only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Minebea Co., Ltd. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005).

With respect to the August 26, 2024 supplemental report, a motion for a new trial may be based only on the grounds on which the party objected at the time the evidence was offered for admission. *See Rivenburgh v. CSX Transp.*, 280 F. App'x 61, 63–64 (2d Cir. 2008) (summary order); Fed. R. Evid. 103. Dartmouth Health did not object under Rules 26 and 37 to the timeliness of the disclosure of Dr. Bancroft's August 26 report in motions in limine or at trial. (*See, e.g.*, Doc. 198.) Dartmouth Health challenged Dr. Bancroft's testimony under Rule 702. (*Id.*) For this reason, Dartmouth Health has waived its timeliness arguments concerning the August 2024 report.

Even assuming Dartmouth Health has not waived its arguments, it has not shown that the timing of the August 2024 disclosure warrants a new trial. The October 1, 2019 expert report calculated Dr. Porter's lost earnings and employment costs assuming that she left her full-time position at UVMMC in June 2021 to obtain a position closer to her home in Norwich, Vermont. (Doc. 198-3 at 2.) Dr. Porter ultimately remained at UVMMC full-time longer than she had anticipated. However, this Court granted summary judgment for Dartmouth Health on all claims on November 4, 2020. (Doc. 153.) In other words, Dr. Porter did not submit an updated expert report because her case was not expected to proceed to trial at that time. On February 27, 2024, the Second Circuit vacated judgment on Dr. Porter's claims of disability discrimination, whistleblower discrimination, and wrongful discharge and remanded the case for trial. (Doc. 157-1 at 100.) After remand, Dr. Porter supplemented her expert's report based on information that was not available in 2019—that she would continue working full-time at UVMMC. This is precisely the type of correction that Rule 26(e) requires.

The Court further finds that the timing of the disclosure of Dr. Bancroft's March 19, 2025, supplemental report does not warrant a new trial. The March 2025 supplemental report was a direct response to defense counsel's cross-examination of Dr. Bancroft at a hearing on Dartmouth Health's motion to exclude Dr. Bancroft from testifying as an expert witness at trial. Cross-examination elicited that Dr. Bancroft was unaware of certain information relevant to his calculations, including that Dartmouth Health instituted salary freezes in 2020 and 2021 and that Dr. Porter received a $7,698 tuition credit for her son's undergraduate education at UVM in 2019. Dr. Bancroft subsequently updated his report on March 19 to incorporate this new information. Dartmouth Health plainly knew this information before Dr. Bancroft issued his March 19 report, as defense counsel raised the issue at the evidentiary hearing. *Cf. Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1332 (10th Cir. 2004) (citation modified) ("On occasion it may be appropriate to permit the

4

party using the expert to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning.") Moreover, Dr. Bancroft did not change the substance of his opinion. He used the same methodology in his March supplemental report as in his prior reports, changing only the inputs to produce updated damages calculations.

The Court does not share Defendants' view that Dr. Bancroft issued his corrective March 2025 report because his testimony at the March 12 evidentiary hearing revealed that his August 2024 report "had not included key facts and assumptions . . . such as Dr. Porter's promotion to full professor in July 2023 and her most recent earnings from UVMMC at a higher rate of pay than what Dr. Bancroft had projected." (Doc. 308 at 3.) Rather, Dr. Bancroft testified at the hearing that although he was uncertain whether he knew at the time of his August 2024 report that Dr. Porter became a professor in summer 2023, he *did* know Dr. Porter's compensation for the relevant period of time after she became a professor and used that information to predict her annual salary. (*See* Doc. 230 at 28:7–29:24, 45:24–46:14.) Dr. Porter's salary—not her job title—appropriately factored into Dr. Bancroft's assessment of her damages.

Even if the disclosures were untimely, admitting Dr. Bancroft's testimony was not error because the disclosures were substantially justified or harmless under Rule 37. The Second Circuit has identified a broad range of non-exclusive factors to consider when deciding whether to preclude evidence as a sanction for failure to disclose. *Negron v. Cigna Health & Life Ins. Co.*, No. 3:16-cv-01702 (JAM), 2021 WL 2010788, at *4 (D. Conn. May 20, 2021). In one case, the Second Circuit instructed courts to consider: (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Funk v. Belneftekhim*, 861 F.3d 354, 366 (2d Cir. 2017). In another case, the non-exclusive factors included: (1) the party's explanation for the failure to comply with the

5

disclosure requirement; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new evidence; and (4) the possibility of a continuance. *See Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (citation modified). Any sanctions imposed under Rule 37 must be "just," and their severity must be "commensurate with the non-compliance." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007).

The first factor—the willfulness of the non-compliance regarding the March 2025 report and the reason for the noncompliance—does not weigh definitively in either party's favor. Dr. Porter knew well before March 2025 that she had received a $7,698 tuition credit for her son's undergraduate education at UVM in 2019, and Dr. Bancroft could have included that information in his August 2024 report. On the other hand, Dartmouth Health knew that it had approved salary freezes in 2020 and 2021, and Dartmouth Health does not allege that Dr. Porter or Dr. Porter's expert had that information until March 2025. Dr. Porter also explained that she had asked UVMMC to adjust her schedule to a .6 FTE with no call obligation, but UVMMC had not yet agreed to that arrangement as of trial. (Doc. 236 at 2.) Therefore, Dr. Porter worked .75 FTE instead of the predicted .6 FTE with no call, and the March 2025 report accounted for this change in Dr. Bancroft's revised damages calculations. The first factor is therefore inconclusive.

The efficacy of lesser sanctions and the possibility of a continuance weigh against excluding Dr. Bancroft's testimony. Dartmouth Health's proposed alternative—introducing its own expert witness to rebut Dr. Bancroft's supplemental report—was simply not feasible only four days before a three-week trial. *See* Fed. R. Civ. P. 26(a)(2) (providing for disclosure of expert witnesses and specifying deadlines for disclosures of experts and rebuttal experts). Dartmouth Health did not identify or provide any information about its proposed expert witness or explain why it did not disclose an expert witness sooner in compliance with the Federal Rules.

6

Nor did Dartmouth Health offer any proposals for reopening discovery in the middle of trial beyond suggesting that it could "offer the Plaintiff the opportunity to depose its expert economist witness prior to testimony, perhaps over one of the weekends during trial." (Doc. 235 at 7 n.3.) Dartmouth Health itself acknowledged it was "not yet able to determine" whether it was "fully viable" to produce an expert witness only four days before trial. *Id.* at 7. As the Court previously explained, "[t]he untimely disclosure and the absence of an expert report may prejudice Dr. Porter by denying her a clear understanding of the expert's intended testimony and compromising her ability to prepare effective cross-examination or rebuttal evidence." (Doc. 238 at 16.) Nor was the Court obligated to continue an anticipated three-week trial—with multiple out-of-state witnesses scheduled to testify—to cure the potential prejudice, particularly when Dartmouth Health did not make this request. *See Patterson*, 440 F.3d at 118 (citation modified) ("Though a continuance might have cured the alleged prejudice to Patterson, Balsamico cannot rely on this possibility when there is no indication in the record that he requested a continuance at the time. Given the fact that, after almost four years of litigation, the case was set for trial within ten days of Balsamico's Rule 26(a)(3) disclosure, we cannot say that the district court was obligated to continue the trial on its own initiative.").

The duration of noncompliance factor is inconclusive. As discussed above, although Dr. Porter was aware of some information that impacted her expert's damages calculations well in advance of the March 2025 report, other information was only in the possession, custody, or control of Dartmouth Health until the March evidentiary hearing. Dr. Bancroft submitted his updated report one week after the evidentiary hearing.

The Court is unaware of any previous warning to Dr. Porter that an untimely supplemental expert report could result in exclusion of the expert witness. This factor weighs against excluding Dr. Bancroft's testimony.

7

The importance of Dr. Bancroft's testimony also weighs against excluding his testimony. Without Dr. Bancroft's testimony, Dr. Porter would have been severely disadvantaged in quantifying her claimed economic damages. Such a sanction would have been disproportionate to the alleged noncompliance given that the late disclosure had a reasonable basis; Dr. Bancroft's methodology did not change from one report to the next, and Dr. Bancroft's final report substantially reduced Dr. Porter's estimated damages.

The potential for prejudice to the opposing party further weighs against excluding Dr. Bancroft's testimony. As discussed, Dartmouth Health already had a significant amount of the updated information Dr. Bancroft relied on for his March 2025 supplemental report. It is difficult to conceive how admitting the March 2025 report, or Dr. Bancroft's testimony consistent with that report, prejudiced Dartmouth Health given that the report estimated substantially lower damages figures than any of Dr. Bancroft's previous reports.

In sum, the relevant factors weigh against excluding Dr. Bancroft's testimony. On this issue, Dartmouth Health has not demonstrated a seriously erroneous result or a miscarriage of justice warranting a new trial.

## II.     Dartmouth Health has not shown that the Court erred in its instructions to the jury on damages.

Dartmouth Health contends that the Court incorrectly instructed the jury on the assessment of damages. "Instructions are erroneous if they mislead the jury as to the correct legal standard or do not adequately inform the jury of the law." *Hudson v. New York City*, 271 F.3d 62, 67 (2d Cir. 2001) (citation modified). When considering challenges to jury instructions, the Court must "review[] the charge as a whole to see if the entire charge delivered a correct interpretation of the law" and, if the charge contains an error, determine whether "the error was prejudicial." *See United States v. Vargas-Cordon*, 733 F.3d 366, 379 (2d Cir. 2013) (citation modified).

Dartmouth Health contends that the Court "did not clearly and directly inform the jury that it could account for and deduct the amount of salary that Dr. Porter received" from her work at UVMMC "from her loss of salary damages." (Doc. 308 at 5.) Dartmouth Health's theory of damages "was that Dr. Porter found another job—with the help of Dartmouth Health medical staff—in her highly specialized subspecialty, and did mitigate her damages." *Id.* at 6. Dartmouth Health challenges one instruction in particular: "If you find that Dr. Porter failed to mitigate her damages, you must reduce your award of damages, if any, by the amount you find she could have avoided." (Doc. 275 at 30.) According to Dartmouth Health, the jury instructions do "not similarly instruct the jury to reduce [Dr. Porter's] damages by the amount she actually avoided through successful mitigation." (Doc. 308 at 6.) In other words, Dartmouth Health contends that "[f]rom these instructions, the jury could read this as, 'we found she mitigated her damages, so we don't need to reduce the award because of this mitigation.'" *Id.*

Dartmouth Health appears to combine two distinct legal concepts: 1) that Dr. Porter's lost earnings after termination from Dartmouth Health were reduced by earnings from her new job at UVMMC; and 2) that Dr. Porter suffered economic damages from termination but, according to Dartmouth Health, those damages should be reduced because Dr. Porter failed to take reasonable steps to minimize her losses ("failure to mitigate"). The instruction Dartmouth Health challenges accurately informs the jury to deduct any damages Dr. Porter could have avoided—by, for example, taking another job—from the damages award. (*Jury Charge*, Doc. 275 at 29-30) ("A plaintiff ordinarily has a general duty to mitigate the damages she incurs, meaning she has a duty to take steps to try to minimize the harm or prevent it from increasing further. In this context, that means Dr. Porter has a duty to attempt to secure or to secure employment that is a suitable alternative to her employment at Dartmouth Health.").

Dartmouth Health contends that the Court should have further instructed the jury to reduce the award by the amount Dr. Porter earned at UVMMC. But the Court had already instructed the jury on how to calculate Dr. Porter's economic damages: "Economic damages include such items as lost income and medical expenses . . . . Dr. Porter is entitled to damages for any earnings lost in the past . . . caused by Dartmouth Health's conduct." (Doc. 275 at 29.) The terms "lost income" and "lost earnings" informed the jury to consider the difference between what Dr. Porter would have earned at Dartmouth Health and what she earned at UVMMC when calculating damages. By definition, "lost earnings" excludes earnings that Dr. Porter actually received. Additional instruction was unnecessary to explain the concept. Dr. Porter's UVMMC earnings are necessarily excluded from what Dr. Porter "lost."

Moreover, the Court is unaware of—and Dartmouth Health has not offered—any authority recommending or applying Dartmouth Health's requested instruction. *Cf. Vt. Civ. Jury Instructions* § 11.5 (Vt. Trial Ct. Civ. Jury Instruction Comm.) (emphasis added) (a plaintiff "is entitled to compensation for *any earnings lost* in the past, and any probable loss of ability to earn money in the future, because of" defendant's violations); Dinse, Berger, & Lane, *Vt. Jury Instructions—Civil & Criminal* § 7.43 (1993) (emphasis added) (a plaintiff "is entitled to be compensated for *all lost earnings or wages* to date caused by the injuries resulting from" defendant's violations).

Even assuming the jury instructions did not adequately inform the jury on how to calculate Dr. Porter's economic damages, the error did not prejudice Dartmouth Health. Dr. Bancroft's expert testimony explicitly subtracted Dr. Porter's actual earnings at UVMMC from the damages projections. (*See* Doc. 235-2 at 3, n. 4–7); (Doc. 290 at 39:3–10, 47:1–8.) And the jury's economic damages award suggests that the jury deducted Dr. Porter's actual earnings when calculating damages. The damages period for back wages alone spanned more than seven years—

from Dr. Porter's termination in 2017 to trial in March 2025. Dr. Bancroft projected Dr. Porter's total earnings at Dartmouth Health in 2024 as $391,779, and Dr. Porter actually earned $341,457 at UVMMC that year. (Doc. 235-2 at 3.) But the jury awarded $1,000,000 in economic damages—a much smaller amount than would be expected if the jury had double-counted Dr. Porter's Dartmouth Health income and UVMMC income for several years. The relatively lower award suggests that the jury correctly understood the Court's instructions on lost earnings. Viewing the evidence in the light most favorable to Dr. Porter as the non-moving party, the Court is not "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *See In re Methyl*, 725 F.3d at 112 n.34.

        The cases Dartmouth Health cites do not alter the Court's decision. In *Jones v. Consol. Rail Corp.*, 800 F.2d 590 (6th Cir. 1986), the court addressed whether jury instructions properly explained that the plaintiff was entitled to the difference between what he would have earned at his prior job and what he might have earned at a potential new job. *See id.* at 594. *Jones* held that the jury instructions did not adequately explain the law. Specifically, the instruction that the jury "must not award [plaintiff] damages for loss of whatever earnings for the period of time during which he might have worked . . . could refer just as easily to his previous railroad job's wages as to his potential new job's wages." *Id.* (citation modified). As discussed above, however, the phrase "lost earnings" in this case could not reasonably be interpreted to include both Dr. Porter's earnings from UVMMC and her projected earnings at Dartmouth Health. Finally, Dartmouth Health's reliance on *Moysis v. DTG Datanet*, 278 F.3d 819 (8th Cir. 2002) is misplaced because, as Dartmouth Health acknowledges, the case addressed whether an award of front pay constituted an unnecessary windfall. *Id.* at 829.

        Dartmouth Health has not shown error in the jury instructions warranting a new trial.

**III. The Court correctly excluded Exhibit C-19 from evidence because the exhibit did not fairly or accurately represent Dr. Bancroft's testimony.**

At trial, Dartmouth Health "sought to elicit key testimony undermining Dr. Bancroft's damages opinions by having him calculate what his projected salary would be if he assumed Dr. Porter [were] working a 1.0 position at UVMMC in three years." (Doc. 308 at 7.) During cross examination, defense counsel provided Dr. Bancroft a calculator and directed him to enter specific numbers, perform certain calculations, and write down the results. (Doc. 290 at 127:7–128:25.) Dartmouth Health subsequently moved to admit that document, marked for identification as C-19, into evidence. The Court denied Dartmouth Health's motion. Dartmouth Health also requested to use Exhibit C-19 as a demonstrative exhibit during closing argument. The Court also denied this motion. Dartmouth Health contends that these denials were "not evenhanded, violated the rules of evidence, and [were] inequitable" because "the figures showed that if" Dr. Porter had worked a 1.0 position at UVMMC, "Dr. Bancroft's damages calculations were essentially fully mitigated by year 2025 or 2026." (Doc. 308 at 7, 8.)

Dartmouth Health primarily argues that Exhibit C-19 was admissible as an admission of a party opponent. (*Id.* at 8-9.) During the trial, the Court explained its reasoning on the record for excluding Exhibit C-19 as substantive evidence and as a demonstrative exhibit. (Doc. 295 at 78–82.) The Court has considered Dartmouth Health's cited authorities and finds no basis to revisit the ruling. The Court further observes that while the note was excluded, counsel was of course free at closing to make use of Dr. Bancroft's testimony associated with the creation of the note. (*Id*. at 82.)

Apart from its admissibility as an evidentiary matter, the Court properly excluded Exhibit C-19 from evidence because of the danger of confusing the issues or misleading the jury. *See* Fed. R. Evid. 403. Assuming Exhibit C-19 is properly considered a "chart," "[s]ummary charts should

12

not be admitted unless a proper foundation is established connecting the numbers on the chart with the underlying evidence." *United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986). "Courts have long required that district courts ascertain that summary charts fairly represent and summarize the evidence upon which they are based. Unless this requirement is met, the chart is more likely to confuse or mislead the jury than it is to assist it." *Id.* (citation modified). A similar requirement applies to demonstrative aids. A court may only exercise its discretion to permit the use of demonstrative aids "accurately summarizing the content of primary testimony." *See Castaldi v. Land Rover N. Am., Inc.*, 363 F. App'x 761, 762 (2d Cir. 2009) (summary order) (citing *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988)).

Dartmouth Health did not demonstrate that the handwritten note fairly represented the testimony at trial. As the Court previously explained in its verbal decision excluding Exhibit C-19, "the circumstances of the testimony that resulted in the generation of the note raised a significant question about whether it accurately summarizes the testimony. Dr. Bancroft acquiesced in performing the requested calculations while protesting that the calculations were not correct." (Doc. 295 at 81–82, 1050:25–1051:5); (*see also* Doc. 290 at 127:8–25) (testimony by Dr. Bancroft that the calculation defense counsel asked Dr. Bancroft to perform would not accurately reflect Dr. Porter's earnings at UVMMC for 2025 if she had worked a 1.0 FTE position and that Dr. Bancroft would "do it anyways, but it's not correct").

Because Exhibit C-19 did not amount to a fair representation of Dr. Bancroft's testimony, the Court did not err by excluding the exhibit from evidence and denying Dartmouth Health's request to use it as a demonstrative aid.

IV. **Dartmouth Health voluntarily limited its use of the severance offer in its closing argument, and the Court made no express ruling restricting its use.**

Dartmouth Health contends that the Court improperly "limited the extent to which Dartmouth Health could argue at closing that Plaintiff could have mitigated her damages if she had taken" the severance package and that it should have been able to "freely refer[]" to the severance package "in arguing the proper amount of compensatory damages in closing." (Doc. 308 at 9.) The Court first notes that while it raised concerns regarding counsel's intended use of the severance agreement at closing, it made no express ruling barring Dartmouth Health from using the proposed severance agreement as part of a failure to mitigate defense. Further, the colloquy between the Court and Dartmouth Health's counsel on this issue is clear that Dartmouth Health itself elected not to use the severance package as part of a failure to mitigate defense:

> THE COURT: Okay, and then I'll turn now to the plaintiff's motion to preclude any reduction of damages based on conditional offer of severance pay. So having heard the arguments yesterday and considering this, I think that it would be inappropriate to comment on the severance agreement. To the extent I don't know what the defendants might actually argue so I can't really speak specifically to perhaps what the intention is. But would you like to let me know, or I can give you my thoughts on it first? Mr. Schroeder?
>
> MR. SCHROEDER: Sure, Your Honor. I want to make sure we're clear on that. The evidence in the record is that C-13, I believe, I'm certainly going to reference it because C-13 was given after the meeting, which arguably was part of the interactive process.
>
> . . . .
>
> MR. SCHROEDER: And that's all wrapped up in that chronology of events. She argued, and this goes to lack of malice, et cetera, and also just to intent, right?
>
> THE COURT: Lack of malice. You said this yesterday, too. So when you say lack of malice, meaning that Dartmouth was making an effort to reach some type of a severance agreement with her?
>
> MR. SCHROEDER: Exactly, just like they did with the other two physicians at the time.
>
> THE COURT: Okay, **but the argument during closing is not going to be** -- I just want to be really clear -- **it's not going to be making the point that if they should**

>**find damages, it's going to be reduced by the amount of the severance agreement?**
>
>MR. SCHROEDER: **No, I have no intent of saying that, your Honor.**
>
>THE COURT: Okay.
>
>MR. SCHROEDER: But I want to come back to the fact that this document, I certainly have the ability to discuss it as much as I want, I believe, in terms of admitted evidence into the record, and it relates exactly to the chronology of events. It actually rebuts many of the things that Dr. Porter testified to. I never talked to anybody. Never talked to anybody. Well, no, actually you did. You talked to the head of HR.
>
>THE COURT: Okay.
>
>MR. SCHROEDER: So I want to know that I have free [rein] to at least talk about the document, **not its import in terms of damages**, but I do want to know that I don't have to go rewrite my closing to deal with the fact that I'm addressing -- and I'm going to put it on the screen. Admit it an exhibit. We're not going to have a PowerPoint, but we're going to put in exhibits on the screen, and I want to make sure that I have full carte blanche to discuss what he said in that agreement.
>
>. . . .
>
>THE COURT: All right. So then it sounds like we have clarity on this. Mr. Schroeder, just to be clear then, your discussion of the document, as you said in the ways that you have described, will be fine. We're just talking about the mitigation of the damages issue and the amount of the severance agreement.
>
>MR. SCHROEDER: Understood.

(Doc. 322 at 14:14–15:7, 16:5–17:21, 18:12–20) (emphases added).

Without a limiting ruling, there is no error warranting a new trial. *See, e.g.*, *Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018) ("[A]fter our examination of the record, we conclude that the district court never decided whether Kunkle could testify at trial. . . . Inasmuch as the district court made no decision and issued no ruling, it could not have made an error or otherwise created an issue for appeal."); *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009) (citation modified) ("By failing to request that the district court rule on the admissibility of that

15

evidence, Basham has waived this argument. . . . It would be difficult to see how the district court committed plain error when it never even issued a ruling to be found in error.").

Because the Court did not issue a ruling limiting use of the severance agreement in the manner Dartmouth Health describes—and at trial Dartmouth Health affirmatively represented that it was not seeking to use the agreement as part of a failure to mitigate defense—its argument that the Court committed error on this issue is without merit and a new trial is not warranted on this ground.

## Conclusion

For the reasons explained above, Dartmouth Health's Motion for a New Trial Related to Damages Issues (Doc. 308) is DENIED.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

*/s/ Kevin J. Doyle*
United States Magistrate Judge
