UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, MD,      )
                                  )
            Plaintiff,            )
       v.                         )   2:17-CV-194
                                  )
DARTMOUTH-HITCHCOCK MEDICAL       )
CENTER, DARTMOUTH-HITCHCOCK       )   March 24, 2025
CLINIC, MARY HITCHCOCK MEMORIAL   )
HOSPITAL, and                     )
DARTMOUTH-HITCHCOCK HEALTH,       )
                                  )
            Defendants.           )
                                  )

_____

BEFORE THE HONORABLE KEVIN DOYLE
UNITED STATES DISTRICT JUDGE

_____

TRIAL

VOLUME 1    Pages 1 to 189

APPEARANCES:

For the Plaintiff:

ERIC JONES
GEOFFREY J. VITT
SARAH H. NUNAN


For the Defendants:

DONALD W. SCHROEDER
MORGAN McDONALD
TRISTRAM J. COFFIN


Jan-Marie Glaze, CCR, RPR, CRR      Certified Court Reporter

**PROCEEDINGS INDEX**

**Proceeding:**                                              **Page**

Jury Selection                                                4
Opening Statement Mr. Vitt                                  145
Opening Statement Mr. Schroeder                            156

Monday, March 24, 2025

Morning Session

* * *

THE CLERK:  Your Honor, the matter before the Court is Civil Case No. 17-CV-194, Misty Blanchette Porter vs. Dartmouth-Hitchcock Medical Center, et al. Present on behalf of the plaintiff are attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan.  Present on behalf of Defendants are attorneys Tristram Coffin, Morgan McDonald and Donald Schroeder.  We are here for jury draw and a trial.

THE COURT:  Okay.  Good morning, everyone.

MR. VITT:  Good morning, Your Honor.

THE COURT:  Let me begin.  Can everyone in the back of the courtroom hear me okay?  Okay.  I'm getting the thumbs-up from the back row.  All right.

Good morning to everyone in the courtroom and welcome to the U.S. District Court for the District of Vermont.  You know, I ask that question at the beginning, if anyone can hear me; I'm glad you can.  If there's anyone that may require an assistive device or anything of that nature to hear, you should feel very free to speak up about that now, and we can make sure that you get anything that you might need.  So let me just ask if anyone is making that request now.  There's

kind of a column over there and over there, so I can't see everyone behind it, but I'm assuming no hands raised. We're good? Okay.

All right. So my name is Kevin Doyle, and I am the judge in this case, and I'm going to speak to you this morning about what you can anticipate your experience will be if you are selected as a juror and what's going to be happening today, because I'm sure for those of you who have never done this before, you're probably wondering that, and these are reasonable things to be wondering about.

So first, let me thank you for being here. We cannot do this without you. Our jury system is really the envy of the world, and we are asking certain of you to participate in that process today, and I truly mean it when I say we cannot do this process without you. I'm sure some of you may be thinking, I'm a busy person, right, or I have things to get done or perhaps even thinking why me? Why am I being called here? And the short answer is that we have an obligation under the U.S. Constitution to have a jury that is comprised of a fair cross-section of the public, a jury of one's peers. And that's why we cast a broad net for jury service. So I can tell you sincerely, we want to have all sorts of people, all sorts of occupations,

non-occupations, ages, races, genders, and we don't want to exclude anyone just because they have something else to do.

If this is a hardship for you in terms of distance that you have to travel or lack of transportation, I also want to tell you that we can work with you on that. Okay? We will put you up in a nearby hotel if that's necessary for you. We will pay for any transportation that you might require to get here. It's that important that if you can serve, you should serve.

So let me talk to you a little bit now about reasonable accommodations. Okay. So, of course, we have an obligation -- the Court does -- under the law to reasonably accommodate you. And we have had jurors who have required sign language interpreters. We've had jurors who require more frequent restroom breaks. We've had jurors in wheelchairs or on crutches. Whatever we can do reasonably to facilitate your full participation, we will do. You just need to let me know, and I will give you an opportunity to do that in private if that's how you would prefer to address it, if this may in fact be an issue for you.

That said, there are some things that, of course, we cannot accommodate. If you are unable to read,

which is actually a fairly common issue for a variety of reasons, we cannot accommodate that. We cannot ask one juror to read a document for another juror because we can't be sure that the reading juror, frankly, is doing an adequate job of conveying information. And in this case, I can tell you there will be documents to read.

If you cannot see the evidence, that would also be a problem. If you can't hear the evidence, that would be an issue as well, and so, as I said a moment ago to you though, we will do everything in our power to accommodate any hearing impairment that might exist, though it doesn't appear that there is one today.

Ultimately, adequate perception is very important because you are going to be a judge, in a sense, in this case. So just as you would want the judge to be able to see, hear, and read the evidence, we have to ask the same of you.

You may be asking yourself, Why doesn't the judge handle the trial by himself? And that's a good question. And the reason is, the parties have asked for a jury trial, which is a very normal request in both our civil and criminal cases. Parties to a case are essentially requesting that people such as yourselves come off the street with their varied life

experiences and decide the case, and that's what the founders envisioned when they set up our system.  They didn't want a judge to make all the decisions for a variety of reasons.  Instead, they wanted the citizens to decide the really important issues, and that's why we have this jury system.

You will notice that as the judge, my job is to ensure a fair trial.  I don't have any interest in the outcome.  I just have the attorneys here in the courtroom present their case, and if you're selected as a juror, you hear the case that the lawyers present.  And, as I said, my job is just to ensure that the proceeding is fair.

One thing we don't ask jurors to do in federal court is ask questions.  For those of you who may have done jury service before in different courts, occasionally that happens, but your role here will be to be attentive to the evidence as it is presented during the trial.  You will have to judge that evidence.  You will have to weigh it.  You will have to judge the credibility of witnesses, and it's a difficult job judging credibility of witnesses.  Judges do it every day, and you will have the opportunity to do the same.

I will not be telling you what I think of the

evidence or the witnesses.  I'll give you some suggestions at an appropriate time as to how credibility is determined, how evidence is weighed, but, ultimately, you will be the ones doing that, and some people don't think they would be comfortable with that, with making credibility determinations.  Some people may even have religious objections to it.  I'm going to give you the opportunity today to tell me whether that is a genuine issue for you, but I will tell you that almost every day of your lives you are judging credibility.

For example, you're making a credibility determination when you determine to count the change that you receive from the cashier or not to count it.  You assess credibility when it comes to your children.  You do it with your neighbors.  You do it when you engage in business transactions.  So this idea of judging credibility, it's going to be more familiar to you than you think.

Let me talk to you a little bit about the nature of trial.  So a trial is not entertainment.  Sometimes, trials in movies or on television suggest that a trial is entertainment, but it isn't.  This is serious, and the parties are here for a serious reason.  Consistent with the seriousness of trials, civility and respect is

the order of the day in the courthouse.  Everybody here will treat you with respect.  We don't let people abuse each other in the courtroom.  All of the parties to this case, as I say, are here for a serious reason. Nobody is going to be acting unprofessionally, as you may have seen on television.

That said, sometimes jurors can become a little frustrated with what is called the Federal Rules of Evidence, and these rules are a comprehensive system of principles that help a judge determine what evidence is admissible at trial and what evidence is not admissible in a trial.  There may be occasions during trial when the judge conferences with the attorneys about a question of evidence, and that may interrupt the flow of the trial, but I can assure you that the application of the rules of evidence is essential.

The rules are designed to assure that only reliable evidence is presented in court.  I have to follow the rules of evidence.  The attorneys have to follow the rules of evidence, and the goal is to make sure, as I say, that only reliable evidence gets to you.  So don't hold it against the attorneys if they object to evidence.  They're doing their job.  If the attorneys do not object during trial and then raise the issue on appeal, the first question the appellate court

asks is:  Did you object?  And if they didn't, the appellate court is likely to say, Well, if you didn't object how is the trial judge to correct it, if you didn't raise it with him?  So that's what the attorneys are doing when they object and, again, please don't hold that against them.

On the topic of the attorneys, you will notice that the attorneys are not particularly friendly to you.  They don't stop and talk to you; they're not allowed to talk to you about the case, so they're not going to engage in pleasantries with you because that can easily turn into a conversation that should not take place.  In fact, nobody in this courthouse should be talking to you about the case -- not the court security officers, not the people who screen you in, no one.  The only evidence that you are going to receive is in the courtroom.  You're going to take an oath that you will base your verdict only on the evidence in the courtroom.

So I'll now just say a few words about juror misconduct.  So there's no homework when you're a juror.  You're not going to be home and Google people, Google the law, or otherwise try to figure things out on your own.  That's completely impermissible and completely unfair.  It may cause a mistrial.  You

should ask yourself what kind of juror would you like if you had a case in court?  Would you like to know that the jurors had based their verdict on what was presented in the courtroom, or would you like jurors who have done independent research that may or may not be correct?  You wouldn't know what the juror may have learned, so there's no way to address that information in court and that would be a problem because the constitution gives you the right to confront the actual evidence against you.

I'll talk to you a little bit about evidence.  So as I noted earlier, the evidence comes from the parties.  Neither I nor you have anything to do with evidence gathering.  You will be presented with the evidence over the course of the trial, and the evidence comes in piece by piece.  It's not like what you may have seen on television where all the evidence comes in through one witness.  Evidence may be presented not in chronological order.  Perhaps you might not even be clear on why you're hearing a particular piece of evidence at a particular time.  It's not until the end of the case that you will put it all together, and the attorneys will try to show you how to put it together in closing arguments.  That's why it's very important not to jump to conclusions and to keep an open mind.

If you are the type of person who tends to leap to conclusions or to credit the first thing you hear, that wouldn't be fair.  The plaintiff presents evidence first and the defendant next.  So it's critical that you keep an open mind until all of the evidence is in.

So I'll speak to you a little bit now about what I call knowledge.  So Vermont is a small place, as we all know.  Some of you may know each other.  You may know something about the area where this case arises.  You may know something about the facts.  You may know something about the case.  You may know something about the witnesses.  Sometimes this knowledge is enough to disqualify you as a juror.  Sometimes it's something that we can all agree is not a big deal.  Sometimes a potential juror knows something about the law or some other specialized topic.  This is referred to as specialized knowledge.

So, for example, if a case raises an issue involving chemistry and a professor of chemistry is on the jury panel.  If, due to the juror's specialized knowledge the juror thinks the testifying expert is wrong and the juror couldn't set aside their specialized knowledge to consider the evidence as presented, you can see how that might present an issue.  But whatever your knowledge might be relevant to this

case, we can't address it unless you disclose it.

You're going to hear the names of the anticipated witnesses.  You're going to hear a little bit about the case.  You might be asked if you read any media reports, and you're going to have an opportunity to disclose any knowledge that you might have on those topics.  It may be that in the middle of trial you discover that you know too much about the case, and can't be a juror.  That can happen on occasion, but the goal is not to have that happen once you've been picked.

I'll talk to you a little bit about the law now.  Where does the law come from that will be used to decide the issues in this case?  The law comes from federal and state statutes; it comes from judicial decisions that lay out the relevant legal principles.  At the appropriate time, I will be giving you the relevant law.  You will be receiving a full explanation and written explanation of the law.  You must not research the law on your own.  Once I have given you that explanation of the law, you will apply the law to the facts in this case.

Some people cannot follow the law and will not follow the law.  This doesn't strike me as the type of case that will raise that type of issue, but maybe it

is for you, and that's something that should be talked about.  You'll hear enough about this case during the jury selection process to make any determinations on that.

I'll talk to you a little bit about deliberations. So deliberations refers to the time in the case when you have all the evidence, you have the law, and you have a conversation with your fellow jurors about the evidence.  If you are the kind of person who will not listen to other people's opinions, you will not be able to deliberate.  You really have to be able to have an open conversation and be respectful of other people's point of view.  If you are somebody who is unable to be firm in your beliefs, it's okay, but we need to know about it.

Sometimes people are candid about their tendency to go along with a majority view even if they don't agree with it.  If you are that type of person, you are not going to be able to fulfill your duty as a juror. In short, you do need to be able to deliberate and talk with other jurors about the case and weigh the evidence but also form your own opinion and be firm if that's your assessment of the evidence, even if others disagree.

All right.  So now I'll talk to you about the jury

selection process, why you're here this morning.  This process is sometimes referred to as voir dire.  It's the only time during a trial process that the attorneys are permitted to have an interactive discussion with you.  You will be placed under oath to ensure that the Court and the attorneys receive truthful answers to the questions about your qualifications to serve as jurors.

I'll just acknowledge, often potential jurors are not comfortable with this part of the process because it involves answering questions, and that's also understandable, but I can assure you that the process is not intended to put anyone on the spot for no reason.  It is simply intended to select jurors who will be fair and impartial during trial, so that's what the questioning is about, but if there comes a time when you feel uncomfortable speaking about something in front of others, you can ask to approach the bench and speak with me and the attorneys outside of the presence of others in the courtroom.  So it's very important that you feel free about speaking up, and we can take steps to ensure that you are not placed in a situation that you may find embarrassing.

I will give you just a brief example of how juror candor promotes the selection of a fair and impartial jury.  So one of the instructions that the Court gives

in criminal cases is that law enforcement officers should not be treated any differently from other witnesses. In other words, law enforcement is not entitled to any more credibility simply because the witness is a law enforcement officer; likewise, an officer should not be deemed not credible simply because of their status as a law enforcement officer.

A jury is allowed to take a law enforcement officer's education, experience, training into consideration when assessing credibility, but they don't get any special status. We have had cases where an attorney will ask the potential panel whether they agree with those principles when it comes to assessing law enforcement credibility. Everyone remains silent. No one makes eye contact with the lawyers, but that as the questioning proceeds, a juror raises her hand and says that she's married to a chief of police and would like to go back to that question about assessing credibility. She ultimately says that she believes law enforcement is more credible than other witnesses, by virtue of their office. Another juror then raises her hand and says she's been stopped so many times by the police she's skeptical of anything that law enforcement says. That's the kind of candor and openness that we need to pick the jurors. So there's no wrong answer,

just truthful answers.

So when the jury selection process begins, I will be giving you a brief description of the case.  You'll have an opportunity to discuss with me why you are unable to be here during trial.  I will tell you upfront that if that is your request, it will have to be a good excuse.  Okay?  The jurors selected will take an oath that essentially asks you to confirm that you will base the verdict on the evidence presented in the courtroom and that you will apply the law the judge gives to the facts of the case; that you will keep your deliberations private, and that you will render a true and just verdict.  If you are unable to fulfill your oath, you're going to need to let us know that as well.

Once the trial begins, we'll start with what's called opening statements of the attorneys.  The opening statements are a general statement of the case. After opening statements, then we begin with the plaintiff's case.  The plaintiff will present its witnesses and conduct direct examinations of those witnesses.  The defendant will have an opportunity to cross-examine those witnesses if they choose to do so. The plaintiff may ask the witness further questions then on what is called redirect.  The defendants will have another opportunity to cross-examine on recross

until we're finished with the witness.  That's the general way the evidence is presented in the courtroom.

We'll go through all of the plaintiff's witnesses before we hear from any Defense witnesses.  At some point in the trial, the plaintiff rests, and then the defense has an opportunity to present its case, and then the same process occurs then -- direct examination, cross-examination, redirect, recross.

Once the defense case is complete, the plaintiff may elect to put on what's called a rebuttal case in which case they call witnesses to rebut the defendant's case.  Rebuttal tends to be shorter, but again, the same process is followed.  Then when all the evidence is in, the Court will close the evidence, and I will instruct you on the law.  The jury then retires to the jury room to deliberate.

So that's the general process of how a trial works.

So the final reminder on juror misconduct with a few examples:  So such misconduct can consist of talking about the case to anyone, including other jurors, until the case is in the deliberations phase after all evidence has been presented and you have been instructed on the law.  Another example would be doing any independent research on the case, trying on your

own time to learn more about any of the testifying witnesses, the attorneys, the judge.  All of that is prohibited.  It's simply not fair to the parties in this case who are relying on you basing your decision only on what has been presented in court.

So I believe that you will find this to be a rewarding fulfillment of your civic duty.  You will feel like you have played an important role in service of our jury system.  You can expect that this Court will use your time productively.  The trial day will go from 9:00 to 4:30 each day.  I will be meeting with the attorneys on our time, which is typically going to be before you arrive for trial or maybe during a break, and there will be mid-morning breaks, mid-afternoon breaks, a lunch break.  So those may be opportunities for me to be speaking with Counsel.  We can't get started each day without all the jurors here.  You also cannot deliberate without all the jurors here.  So we're counting on you to be here promptly each day.

All right.  So before we continue any further, I'm going to take a brief break.  I'm going to meet with counsel in the robing room here.  The deputy clerk can direct you where that is.

                    (The following proceedings occurred in
                         the robing room.)

THE COURT:  Good morning.

MR. SCHROEDER:  Good morning.

THE COURT:  I wanted to talk to you about the joint statement of the case.  I have to read something to them.  I have the plaintiff's statement and Defense statement, and they're not agreed to.  Not sure why there isn't a joint statement.  I mentioned this to you at the pretrial.

MR. VITT:  It's principally my fault, but certainly we didn't write something till this morning and -- I did write something, and I apologize.

THE COURT:  Okay.  What are we going to do now, because I'm not going to create a statement myself?

MR. SCHROEDER:  I think it will be helpful, Your Honor, if we had a copy of the handwritten statement.

THE COURT:  Yes.  Absolutely.  So you haven't seen it?

MR. SCHROEDER:  We've seen it.  I had to give it back to him.

THE COURT:  I think it's fairly bare bones.

MR. JONES:  Which was our goal, quite frankly.  We felt that the defense statement was argumentative and relied on disputed facts.  So we

think a bare-bones approach, which is generic --

THE COURT:  Yeah.  We want to lay out the parties, the facts of the case.  Nothing that is remotely argumentative.  Parties, nature of claims, you can name them if you want, the claims, but that's really it.

MR. SCHROEDER:  Understood.

THE COURT:  Does that make sense?

MR. SCHROEDER:  Yes.  I think this is the only copy.

THE COURT:  Yeah.

THE CLERK:  How many copies do we need?

MR. SCHROEDER:  Just three.

THE COURT:  So, logistically, everyone is still out there.  I mean, in terms of where you go to do this, we could probably find you a side room if you would like.

MR. SCHROEDER:  Yeah.  I don't think that will be too hard for us.

THE COURT:  We can do this.

MR. SCHROEDER:  I'm pretty confident on that, Your Honor.  I'm not confident on a lot of things.

MR. COFFIN:  We'll see.

MR. VITT:  While we're here --

THE COURT:  Yes.

MR. VITT:  -- I mentioned to the clerk and to Mr. Schroeder that I intend to quote from some of the e-mails in my opening, and I gather there's some objection to that.  You know, every one of those quotes is in the Second Circuit opinion, so I don't think it's going to be controversial.  I'm not going to spend a lot of time reading quotes, but there's a few that I want to use.  I can summarize them but, frankly, I think the quotes are better.

THE COURT:  This is objected to?

MR. SCHROEDER:  I did object like ten minutes later yesterday when it was raised with me.  The Second Circuit opinion is not admissible evidence in and of itself.

THE COURT:  Correct.  And I planned on taking this up with you before opening started, and we can do that now.  We have a little bit of time.  I read Defendants' submission distinguishing between Rule 56 and trials.  I want to be clear; there's no intention -- I don't imagine this is the case, but I want to be clear on the record -- there's no intention of referencing the Second Circuit opinion in opening statements.  There's no intent to reference any judicial fact finding that was made by Judge Crawford or the Second Circuit.  I took that as part of the

concern that Dartmouth was raising.  So I want to be clear about that.

With respect to the exhibits, the first thing I'm thinking, is are they admissible?  I took a look at them.  They're between and among Dartmouth.

MR. SCHROEDER:  Yes.

THE COURT:  Do you anticipate this not being admissible during trial?

MR. SCHROEDER:  No.  I think they will be admissible during trial, but I think it gets the cart before the horse, Your Honor.  They're not in the trial yet.  They have to be put in through witnesses --

THE COURT:  That's true.

MR. SCHROEDER:  -- some of whom are Plaintiff witnesses, not my witnesses.

THE COURT:  Right.

MR. SCHROEDER:  So I'm not going to quote from any documents, and I purposefully am not doing that.  I personally decided not to do that because the exhibits aren't in evidence yet.

THE COURT:  Right.  And I understand that point, though the use of exhibits in an opening statement is not unheard of.

MR. SCHROEDER:  Totally agree with you.

THE COURT:  I'm not hearing you say it's

improper, and there's no agreements.  I'm going to have to make a decision on this.  This goes in the category of no surprise, by the way.  This is something that should be spoken about between the parties.  This is a late submission.  I'm not saying it's a reason to disallow it, but if this is something that you know is to be teed up for a decision by me -- I'm getting PDFs of exhibits given to me saying that the plaintiff intends to introduce this at trial.

As of Friday, I didn't know that.  This is not how we're going to proceed.  If this is how we're going to proceed for the next three weeks, this is going to be a slog for everyone, and mistakes are going to be made.  I'm not in the market of doing that.  You can chat with each other before you do your openings.  See if this is something that you can resolve.  If not, I can make a decision on it.  I'm hoping we can work a little more cooperatively when it comes to the evidence.

I will talk now or later about some of the things raised at the pretrial about foundations for exhibits.  Both sides have admitted tons and tons of e-mails, so I would like to get a handle on whether there are -- this kind of theory of why all this stuff is objectionable.  I have theories about why it's admissible or perhaps objectionable.  But, again, if there is a way that this

can be worked out, that will make for a smoother presentation in what you're telling me is a three-week trial.

Mr. Schroeder?

MR. SCHROEDER:  I was chomping at the bit.

THE COURT:  Mr. Schroeder, please.

MR. SCHROEDER:  Thank you.  On that -- I have a few other preliminary issues that we will be able to run through quickly, but on this issue, we received all -- one of your things that you said to me -- said to us was, we want to run this thing smoothly, quickly. You know, we got three weeks, we want to make sure, Mr. Schroeder, you can't address on authenticity grounds, you're going to slow this down if there's no basis to do it, on every single one.

I will tell you, and I'll defer to Ms. McDonald in a second, we received Plaintiff's exhibits in one PDF. In one whole PDF.  The exhibits have multiple exhibits attached to them.  So, for instance, Exhibit 7 may have a bunch of different e-mails that are not related to each other, and are not actually complete.  We gave that list -- we did all our homework, then we gave the list to them.  It's still not correct.  So we've tried extremely hard to fix issues with Plaintiff's exhibits. We've done everything by the book in that regard.  And

so if there's a slow down on authenticity, it's because of that very issue, that there's a handful -- not even a handful, more than a handful of exhibits that are just put together, and it's in one PDF never mind metadata or anything like that.  They're not actually documents that were actually given or sent to somebody that were all just conglomerated together.

MS. McDONALD:  That's correct.  Nothing really to add to that.

THE COURT:  How many are we talking about, a handful?

MS. McDONALD:  It's more than a handful.  We have a chart.

MR. SCHROEDER:  We did that last week.  I'm not, like, casting afoul here.  The issue is we had to do a lot of work to kind of fix those issues.  I'm not saying that it's just a matter of course, so that's why it's more difficult to go as quickly.  I think we'll be able to stipulate to a lot of these on authenticity, may have some objection on hearsay on their admissibility, but our intent was to stipulate to everything on authenticity, but you just can't give me four different documents that were never together in the first place and say that's an exhibit.  It just doesn't work that way, as far as I know.

THE COURT: Okay. Just for the record, to the extent that you may have said that I said you're not going to be able to challenge authentication, if I did say that, that is wildly incorrect. Of course, you can.

MR. SCHROEDER: No. I understood your intent was to, if we're going to move this thing along and make sure that the defendant has enough time, you wanted to make sure that I understood that, you know, procedural objections were going to slow this down.

THE COURT: Right. Ms. Nunan?

MS. NUNAN: I'm Sarah Nunan, and we did receive their chart with all of the objections, and we spent a day and a half going through and making adjustments to that, including we had an agreement that we would do additional redactions to any HIPAA information that was in. We did that. We corrected the court documents. We had to get the documents to the Court by Friday afternoon, so we sent everything over.

We tried to be helpful with the redactions as well as the changes to the documents that we felt were most important, given the time that we had. We got on and had an additional Zoom to make sure that we were really clear about that, and we identified which ones were

still out there and said that in the time now we would -- we would get the information that we could and respond to the other ones, but the ones that were most important to us, which we intend to submit, were corrected before we turned in the books Friday afternoon.

THE COURT:  Okay.  So then in light of that, has there been some progress on some of the exhibits that you had problems with prior?

MR. SCHROEDER:  Certainly progress, Your Honor.  Just Day 1, I would have expected us to have it all done.  I have no doubt Ms. Nunan is doing her level best to get it in order with her team.  We just -- it's a procedural thing, and we just gotta work through, and there's still some irons in the fire, so to speak, to just fix, so hopefully that will be done quickly.

THE COURT:  And you're not presenting all your evidence today.

MR. COFFIN:  Sorry.  No, but...  One tidbit I had.  Great juror educational video.  I loved your remarks too.  One thing that you said, and the video didn't really cover though, is you described jurors should not do their own investigation of things, shouldn't look at social media and things and media and internet.  For years, Judge Sessions has had a standard

instruction to jurors that he repeats every day at the close of evidence. "Don't read the news, watch media about this --"

THE COURT: Right.

MR. COFFIN: I would ask the Court if it's inclined, or recommend that the Court follow that practice. This is a story that has had some media coverage, and we'd hate for the trial to be tainted by somebody picking up news coverage.

THE COURT: Absolutely. When we get our 12 jurors selected, and I give them their preliminary instructions, I'm going to be telling them that if they've read anything, spoken to anyone. It's a reasonable suggestion, and I do plan on doing that.

MR. VITT: And I think there will be extended coverage in several -- I think there will be coverage during the trial.

MR. SCHROEDER: Well, you were quoted, I think, over the weekend, so I'm pretty sure it's going to happen. I think one of the concerns I had, Your Honor, about that issue was the fact that we're going to try the case in court, not in the public arena.

Mr. Vitt was quoted about it, not reproductive health, but a specific issue in the case. We're not speaking to the press. I would like to understand what

the ground rules are.  Obviously, that can impact what people see at the end of the day when they get online. And there's no quotes in any of the articles from Dartmouth.  In fact, we make no comments on ongoing litigation.  So they're not supposed to do that, but then Plaintiff's counsel is actually doing interviews with the papers.  So I would like some understanding of what the Court's rules are.

MR. VITT:  I complied to the letter with the ethics rules.  There is not one thing that I said that even gets close to the borderline, and I'm entitled to comment on information that has appeared in the public. So, I mean, I'm -- I don't expect to be interviewed again, but I don't want some implication that anything that I did is inconsistent with the ethics rules, not even close.

THE COURT:  All right.  So candidly, I don't know what the law might be about lawyers during trial speaking to the media about what's going on in the trial.  I can't imagine that is considered okay.

MR. VITT:  I don't plan to do that.

THE COURT:  Okay.  So, again, these are obvious points I feel like I'm covering, but whatever about your First Amendment rights, and I respect those, but I just don't think there should be any speaking to

the media about that.  And if I'm wrong, please let me know that.

MR. SCHROEDER:  On that point, or corollary to that, we received from one of our witnesses recently a letter that was left in her -- she's a key witness in this case.  A letter that was left in her mailbox.  It was left there last year, but I didn't learn about it until very recently, and it's a very threatening letter, I would say.  It was left in her mailbox.  Not marked.  It says some things about this case.

MR. VITT:  I don't know.

MR. SCHROEDER:  I have no doubt that Plaintiff's counsel has nothing to do with it, and it attaches one of the news articles, so I wanted to share that with the Court.  I haven't shared it with Plaintiff's counsels yet.  I have copies of it.  The concern about media attention and the fact that someone is leaving something in one of our witnesses' mailboxes, albeit last year, but it was a news article, I want to make sure that that doesn't happen, and the Court is mindful about it.

THE COURT:  Okay.  I'm not hearing a request of any sort, but there's nothing I can do about it.

MR. VITT:  This is news to me, and I don't know about it.

THE COURT:  Okay.  Is there anything else? We can speak again before openings.

MR. SCHROEDER:  Sure.  Two questions on the voir dire?

THE COURT:  Yes.

MR. SCHROEDER:  I read Judge Crawford -- Judge Sessions -- I know you'll do -- I want to make sure because I know you mentioned in one of our earlier pretrials, but I want to make sure that I have it now in my memory.  Voir dire, you'll do some first and the parties will go up and ask?

THE COURT:  Yeah.  Basically, what I'll do now, I will have very little to say, but it's really attorney-directed voir dire.

MR. SCHROEDER:  I gave them a copy of our proposed voir dire.

THE COURT:  Okay.

MR. SCHROEDER:  I think we filed it with the Court now.

MR. JONES:  We did not request anything because we thought it was lawyer conducted.

THE COURT:  Yeah.  And as I said to you at the pretrial conference, and you'll abide by it, it shouldn't be argumentative.  Not getting into the law. No one will be saying, "If this were shown to you,

would you find in favor of my client?"  Right?
Similarly, on Defense side.  We want to get fair and
impartial jurors, so those are the things that we're
getting at.  I prefer not to have to interrupt you in
your voir dire when you're attempting to establish some
type of rapport when you're attempting to get
information from them.  It's not a warning, but maybe
it is a warning.  I will, if you're starting to get to
the point where you're trying to get to that.

     So do you have copies?

          MR. SCHROEDER:  We do have copies.

          THE COURT:  Is there anywhere that counsel
can go into a side conference so they could not go --
out into the side conference room?

          THE CLERK:  The jury lounge is unoccupied.

          THE COURT:  It's empty?

          THE CLERK:  Yeah.  Yeah.

               (Break taken.)

          THE COURT:  Okay.  So we're back on the
record, and Ms. McDonald has handed me a statement of
the case.

     Mr. Schroeder, are you in agreement with the
statement?

          MR. SCHROEDER:  Yes.

          THE COURT:  Were you the point person for

these things?  I want to make sure that I'm asking the appropriate person.

MR. SCHROEDER:  It's a team, Your Honor.

THE COURT:  I don't want to offend anyone --

MR. SCHROEDER:  You're not offending.

THE COURT:  -- when Ms. McDonald is supposed to be speaking.

MS. McDONALD:  Mr. Schroeder is the point person.

THE COURT:  Okay.  Mr. Vitt and Ms. Nunan, are you okay with this?

MR. JONES:  Yes.

THE COURT:  This is an employment lawsuit. Brought against Dartmouth-Hitchcock Medical Center. Dr. Porter claims that she was terminated...  Because of her whistleblower complaints about conduct by other physicians and because of her disability.  Dartmouth claims that it had a legitimate non-discriminatory... And Dr. Porter, in conjunction with closure of its reproductive endocrinology and fertility division.

Okay.  I think I'm good.  All right.  So I will go out there.  Read this to them and then ask the deputy clerk to seat the jurors.  I'll be asking them questions about qualifications.  I'll take up excuses first.  I probably won't rule on excuses.  I'll save

all of that until we come back here, and we can all talk about it because sometimes excuses are going to be, I'm going to be three weeks in such and such.  It's child care related and such and such.  So maybe it's better to talk about it and see who should be excused.  So excuses and qualifications, and then I'll turn it over to the plaintiffs.

MR. JONES:  So we'll do the first panel and come back here and have a discussion.

THE COURT:  No.  So they're going to seat 28.  So there will be 12 in the box and then enough to make 28 in front of the box, and voir dire will be to all 28, and we'll come back here and we'll do for-cause challenges to all 28 and then make any adjustments to the box that we have to to fill it back to 12 and then peremptories on the 12 in the box.  But you will make your for-cause challenges to everyone that you speak to during voir dire.

The people in the gallery, I'll be telling them, listen to the questions the lawyers are talking about, because if we have to go to the gallery to get people in, you don't have to go back through all of your questions.

MR. SCHROEDER:  The 12 in the box, those would be the -- that will be -- we'll know that from

the chart, I guess.

THE COURT:  Right.  So you're going to get a chart -- I have a copy of mine, but you'll get a copy of the chart that has the names and numbers of all the jurors.  So, as I say, direct your voir dire to everyone sitting in front of you, and the gallery will be advised to listen carefully to what you're saying to those that you're examining.

MR. SCHROEDER:  Okay.

MR. JONES:  We have three peremptories per side?

THE COURT:  You each have three.

MR. JONES:  If we use all three during the first 28 and then we need -- we're down to 10, say, now we bring in other people, no more peremptories?

THE COURT:  Right.

MR. JONES:  But is it "use it or loose it"?  So if I don't use my last peremptories --

THE COURT:  It is "use or lose it."

MR. JONES:  So once I've passed --

THE COURT:  If you pass, then you've waived.  If Plaintiff passes and Defendant passes, peremptories are over.

MR. COFFIN:  We have a jury.

THE COURT:  Does that make sense?  We won't

have to rush through this.  I'm sympathetic to how this could be.  The reason that we're back here is so we can be a little bit more methodical about it.

MR. JONES:  But if I pass and Don does not...

THE COURT:  If you pass and he does not, it goes back to him.

MR. JONES:  So I don't loose it forever.

THE COURT:  No.  Only if both pass.  You can use a peremptory, uses a peremptory, passes, you can use another peremptory.

MR. SCHROEDER:  I tell you, Judge Crawford's thing said one thing on the front page, and it said what I considered to be completely opposite on the other, and I've had a lot of different jury trials where it's gone different ways.  So I would appreciate the ability to make sure that I got the rules right when we are doing it again.

THE COURT:  Is that clear?  I'm happy to answer any questions.

MR. SCHROEDER:  Got it.

MR. JONES:  Yeah.

THE COURT:  Okay.  Then I will see you out there in a moment.

(The following proceedings occurred in the courtroom.)

THE COURT: Okay. Thank you, everyone, for your patience. First day of trial is things that we have to take care of to make sure that everything runs smoothly after that first day. All right.

So, at this time, the deputy clerk is going to begin calling names to seat people in the jury box and in the chairs in front.

THE CLERK: Juror No. 1, Jenel Clement. You're going to start us off in this last row at the top. Eric Morin. Mark Pendergrass. Kevin Bataille. Gianna Roque. Molly Yanus. Kevin Reid, and Kattie LaFontaine. Mr. Reid, you might want to scoot the chairs. There's a couple chairs up there. Just take the closest. Ashley Turka. Malachi Brennan. And Mr. Brennan, if you can wait just one second and let Ashley go first. Thank you. You'll start us off. Thank you.

Edward Gale. Collin Desautels. Julie Butler. Sonja Severance. Ashley Mulcahy. Joseph Call. Michael Fagan. Laura Zambarano. Jason Smith. Carolyn Ellenberger. Anna DeGreenia. Mr. Smith, sorry. You're going to start that row. Thank you.

Michael Wetherell. John Pepin. Clark Agnew. Benjamin Lowe. Hillary Viens. McKayla Marble. And Karen Dean. Thank you, folks.

THE COURT:  Okay.  Now I'll ask the deputy clerk to swear in the venire panel.

THE CLERK:  So if everyone would stand and raise your right hand, and I'm going to include the folks in the gallery too, please.  If you will stand and raise your right hand.

(Prospective jurors sworn.)

THE CLERK:  Thank you.

THE COURT:  Okay.  Good morning and welcome again to the federal court here in Burlington.  So I'm now going to read to you a statement of the case.  So this is just a basic statement the attorneys have agreed upon to provide you just a very basic outline in nature, of this case.

This is an employment lawsuit brought by Dr. Misty Blanchette Porter against Dartmouth-Hitchcock Medical Center.  Dr. Porter claims that she was terminated by Dartmouth-Hitchcock because of her whistleblower complaints about conduct by other physicians and because of her disability.  Dartmouth-Hitchcock claims that it had a legitimate non-discriminatory business reason for terminating employment of Dr. Porter in conjunction with the closure of its reproductive endocrinology and infertility division.

So I'm now going to be asking the jurors who are

seated in the gallery, so that's everyone kind of in the back, to please listen and pay attention to the questioning process that I and the attorneys will be engaging in with the potential jurors seated up here in the box and in front of the box.  Sometimes we can speed the process up because if it turns out that those of you in the gallery are eventually called up here, you will have listened to the questions that were asked to this group, and so you can just be asked to kind of make any comments that you would like to based on questions that have already been asked.  So if you would please pay attention in the back.

All right.  So for the group here, sitting in the jury box and in front, is there anybody who absolutely cannot attend this trial?  It's going to start today, and it's going to continue each weekday through Friday, April 11th.  Okay.  Seeing no hands that there are no excuses, at least in terms of ability to be here during that time.

All right.  So now I'm going to read to you the qualifications to serve as a juror.  So these are kind of the basic requirements that you must meet to be eligible to serve as a juror.

To sit on this jury, you must be a United States citizen at least 18 years of age.  You must have

resided in Vermont for one year.  You must be able to speak, read, write and understand the English language. You must be able to fully participate in the trial physically and mentally, with or without a reasonable accommodation, and you must not currently be subject to any state or federal charges which carry a potential term of imprisonment of more than one year, or you must not have been convicted of a state or federal crime carrying a potential penalty of more than one year imprisonment unless your civil rights have been restored.

So I'll just advise you that under Vermont state law there are some misdemeanors that are crimes that carry a statutory maximum penalty of two years or less. So it may be called a misdemeanor, but it's punishable by more than one year, and so that could be a disqualifying factor as well.  I just want to point that out to you.

And then three groups are exempt from federal jury service -- members of the armed services on active duty, members of professional fire and police departments, and public officials -- public officers of federal, state, or local government who are actively engaged full-time in the performance of public duties. Does anyone have any issues with respect to these

qualifications?  Okay.

Seeing no hands raised, Plaintiff may inquire.

MR. JONES:  Thank you, Your Honor.  Good morning.  My name is Eric Jones, and it is my privilege today to represent the plaintiff in this action, Dr. Misty Blanchette Porter.  She looks forward to presenting her case to whoever is selected to serve on the panel.

Before I get started, I just want to echo some remarks from Judge Doyle that I thank you, and my client thanks you for this.  We know jury duty is not something that we look forward to, but it is essential, and we really value your participation.

THE COURT:  Mr. Jones, I'm sorry to interrupt.  May I ask you to pull the microphone a little closer to your mouth for the people in the back?

MR. JONES:  No problem.  Thank you.

THE COURT:  Thank you.

MR. JONES:  So the goal of this process is to impanel a jury of people who can be impartial, and so we'll be discussing relationships you may have with parties or with the case.  We'll be exploring attitudes and opinions that you may have.  I want to clarify that no one is questioning your ability to be fair.  It's just that this process recognizes that we all come

today with our own life experiences, our own histories, our own perspectives.  So we just want to make sure that people impaneled on the jury are appropriate for the type of case that we'll be presenting.

So I want to start by exploring the issue of relationships just to see who may know people involved in the case.  So my client, the plaintiff in this action, Dr. Misty Blanchette Porter, is a gynecologist and a fertility doctor.  She is an attending physician at University of Vermont Medical Center, and she teaches at University of Vermont Medical School.  Does anybody know her?  So far so good.  Her husband is Tom Porter.  He's a contractor, a builder.  Does anybody know Tom Porter?

So I'm Eric Jones.  I work for the law firm Langrock Sperry & Wool.  Does anybody know me, my firm, or people who work at my firm?  I suspected Mr. Brennan.  Can you tell me how you know me or my firm?

THE COURT:  Let's just identify him for the record.  So is this Mr. Malachi Brennan?

PROSPECTIVE JUROR 10:  That's right.

THE COURT:  In seat 10.

PROSPECTIVE JUROR 10:  I'm an attorney.  It's a small state.  I've appeared as counsel of record in

cases involving both Mr. Jones and in other cases with his firm, same thing with defense counsel.

THE COURT:  When you say "defense counsel," Mr. Brennan, who in particular?

PROSPECTIVE JUROR 10:  Several matters with Downs Rachlin Martin, and actually the same case as Mr. Jones.  Attorney Coffin was on the case as well.

THE COURT:  Thank you.

MR. JONES:  To be clear, that was a case where you, me, and Mr. Coffin each represented different parties?

PROSPECTIVE JUROR 10:  That's right.

MR. JONES:  Anything about your knowledge of me from that case, or generally as members of the Bar, that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 10:  No, that wouldn't color my judgment at all, and I would answer the same if I was asked by the other side.

MR. JONES:  All right.  Thank you.

Somebody else knew me or my firm?

PROSPECTIVE JUROR 18:  My name is Laura Zambarano.  I just recognized the name of your firm, and I was not certain if it was where a friend of mine worked, but it's not a close -- it's a distant

connection, but you asked and I was like ooh, I wonder if I should say.

THE COURT:  I will be clear for the record, this is Ms. Zambarano in Seat 18.

MR. JONES:  So with me representing Dr. Porter is Geoffrey Vitt and Sarah Nunan from the law firm Vitt & Nunan.  Does anybody know Mr. Vitt or Ms. Nunan or anybody who works at their firm?

So Dr. Porter, as I mentioned, works at University of Vermont Medical Center and University of Vermont Medical School.  Is anybody here employed by either of those institutions?

Yes.  Ms. Dean?

PROSPECTIVE JUROR 28:  I am employed by the University of Vermont Medical Center.

MR. JONES:  In what department?

PROSPECTIVE JUROR 28:  Employee and Family Assistance Program.

MR. JONES:  Okay.  But you don't know Dr. Porter?

PROSPECTIVE JUROR 28:  No.

MR. JONES:  It's a big institution.

PROSPECTIVE JUROR 28:  It is.

MR. JONES:  Would your employment with University of Vermont Medical Center impact your

ability to be fair and impartial in this case?

PROSPECTIVE JUROR 28:  I don't think so.

MR. JONES:  You'll be able to hear the evidence and weigh the evidence and ultimately apply the law as the judge will instruct without any regard to the fact that you're both employed by the same institution?

PROSPECTIVE JUROR 28:  Yeah, I believe so.

MR. JONES:  Thank you.

So I -- I'm going to read a somewhat lengthy list of potential witnesses in this case.  So I'll read a name, the question is the same for everyone:  Do you know them?  And if so, we'll talk and figure that out. No. 1, Dr. Judith McBean; No. 2, Sharon Parent; No. 3, Navid Esfandiari; Eunice Lee; Dr. Julia MacCallum; Donna Bedard; Dennis Dela Cruz; Dr. Leslie DeMars; Dennis Seguin; Jenice Gonyea; Kris Stohbehn; Karen George; Ira Bernstein; Emily Baker; Michele Russell; Victoria Maxfield; Barry Smith; Katrina Thorstensen; Dr. Joanne Conroy; Dr. Ed Merrens; Maria Padin; Daniel Herrick, and then finally Robert Bancroft.

All right.  That was pretty smooth.  So the defendants in this case, there's actually four corporate entities, they are Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary

Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health, and they're sometimes known as Dartmouth Health, or just Dartmouth-Hitchcock, kind of collectively for the institution.

Is anybody here employed by Dartmouth Health? Anybody here have any close family member employed by Dartmouth Health? Does anybody here receive medical services from Dartmouth Health? Let's start with, I believe it's Mr. Lowe? I don't want to invade your privacy, and I don't want you to disclose medical details. Are you able to give me like generally when you sought their services and what the general nature was?

PROSPECTIVE JUROR 25: This was, like, two or three years ago, and I had jaw surgery.

MR. JONES: Okay. Jaw surgery. Based on that experience, do you have a particularly favorable or unfavorable opinion of Dartmouth Health?

PROSPECTIVE JUROR 25: They treated me good.

THE COURT: I'm sorry, Mr. Lowe. Can you say that again?

PROSPECTIVE JUROR 25: They treated me respectfully.

THE COURT: Okay.

MR. JONES: Would the fact that you had what

you believe was successful services from them affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 25:  I don't think so.

MR. JONES:  I believe, Ms. Yanus, is that right?  Did you raise your hand?  Again, I don't want you to disclose more than you're comfortable disclosing, but --

PROSPECTIVE JUROR 6:  ENT surgery.

MR. JONES:  Again, would that -- having received that service, would that impact your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 6:  No.

MR. JONES:  I'm sorry.

PROSPECTIVE JUROR 22:  Michael Wetherell. Ten years ago.  No concerns about them.

MR. JONES:  Will not affect your ability to hear the case and be impartial?  Thank you.

Okay.  So Dartmouth Health is represented by Mr. Don Schroeder, Morgan McDonald Ramos from the Foley & Lardner firm in Boston.  Does anybody know them or their firm?  So the other lawyer at the table is Tris Coffin from the Vermont law firm of Downs Rachlin Martin or DRM.  Does anybody know Mr. Coffin or his law firm?

PROSPECTIVE JUROR 10:  I know --

MR. JONES:  We discussed.

THE COURT:  That is Mr. Brennan.  If you could identify them by name and seat number, please.

MR. JONES:  Yes.  I'm sorry.

Does anybody know anybody who is employed by Downs Rachlin Martin or DRM?

PROSPECTIVE JUROR 22:  Both your firms.  I'm familiar with your firm because my wife is an attorney, so...

MR. JONES:  Okay.

PROSPECTIVE JUROR 22:  But I don't directly know anybody specifically, but...

MR. JONES:  So your wife is a lawyer so you've heard the names of the law firms, but you don't particularly know Mr. Coffin or me?

THE COURT:  Mr. Jones, which juror is this?

PROSPECTIVE JUROR 22:  Michael Wetherell.

MR. JONES:  This is Mr. Wetherell, sorry.

In this case, there will be -- you will hear about two particular physicians, and I'll add their names and ask if you know them.  Dr. Albert Hsu, that's H-s-u, and Dr. David Seifer.  And before I move on to the issues in the case, I want to ask if any of you knows each other.  Did you come here today and recognize somebody else on the panel?  Do you know anybody else,

one of your colleagues as a potential juror?

This is Ms. Marble.

PROSPECTIVE JUROR 27:  I believe Ben and I went to high school together.

MR. JONES:  Ben being Mr. Lowe?

PROSPECTIVE JUROR 27:  Yeah.

PROSPECTIVE JUROR 25:  Also my cousin.

MR. JONES:  Your cousin?

PROSPECTIVE JUROR 25:  Yeah.

MR. JONES:  Who is your cousin?

PROSPECTIVE JUROR 25:  Josh Rushford.

MR. JONES:  In the gallery?

THE COURT:  If you could identify that for the record, right here, in the front.

MR. JONES:  Oh, I'm sorry.  I thought I did. Mr. Lowe.  Seat 25.

PROSPECTIVE JUROR 11:  Edward Gale and --

MR. JONES:  So just for the record, this is Mr. Gale and who?

PROSPECTIVE JUROR 11:  Kevin Bataille and Brent Pearson, who is in the gallery, are in the same hockey group.

MR. JONES:  How do you know each other?

PROSPECTIVE JUROR 11:  Play hockey together.

MR. JONES:  Play hockey.  Okay.

THE COURT:  Who is that, the third person?

PROSPECTIVE JUROR 11:  Brent Pearson.

THE COURT:  And you're Mr. Gale?

PROSPECTIVE JUROR 11:  Correct.

THE COURT:  Okay.  Thank you.

MR. JONES:  And, Ms. Clement.

PROSPECTIVE JUROR 1:  This is actually going back to a prior question.

MR. JONES:  Okay.

PROSPECTIVE JUROR 1:  I'm not employed by Dartmouth, and I've never had care there, but I do work at the VA in White River Junction so I do interact with quite a few of the medical residents and some of the physicians at Dartmouth.

MR. JONES:  Okay.  So just some common relationships with residents and others; is that what you're saying?

PROSPECTIVE JUROR 1:  Yeah.  Residents who rotate there as part of their residency experience.

MR. JONES:  Okay.  So you may know some people who are either working with or affiliated with Dartmouth Health?

PROSPECTIVE JUROR 1:  It's possible.  I don't recognize the names that you listed.

MR. JONES:  All right.  Thank you.  So would

that affiliation that the VA has with Dartmouth Health, would that impact your ability to be impartial?

PROSPECTIVE JUROR 1:  I don't believe so.

MR. JONES:  Thank you.

Those of you who identified other members of the panel that you know, would that affect your ability to listen to the case, hear the evidence, weigh it, be impartial, apply the law ultimately as the judge will instruct?

Have you ever worked as a nurse?  Have you ever worked as a doctor?  Have you ever worked as a healthcare administrator?  Any other work in the healthcare field?

I'll start with you, Ms. Marble.

PROSPECTIVE JUROR 27:  I work as an LNA at the Congress Home here in Burlington.

MR. JONES:  Do you currently work there?

PROSPECTIVE JUROR 27:  Yes.

MR. JONES:  Is there any affiliation with your work as an LNA with either UVM Medical Center or Dartmouth?

PROSPECTIVE JUROR 27:  No.  I occasionally will send residents to the University of Vermont, but no direct contact with them.

MR. JONES:  Okay.  And with that -- would

that job affect your ability to hear the evidence in this case impartially?

PROSPECTIVE JUROR 27:  No.

MR. JONES:  Thank you.  I think there was somebody else.  Let me see if I can get this right.  Mr. Pendergrass.

PROSPECTIVE JUROR 3:  I worked at a hospital 15 years ago.  I was a special educator in a psychiatric hospital in Tennessee when I lived there.  So I don't think that's a close enough association that would cause any bias.

MR. JONES:  All right.  Would that impact your ability to hear -- there won't be a lot of medicine in this case, but it does arise from a healthcare clinic.

PROSPECTIVE JUROR 3:  I don't believe so.

MR. JONES:  Ms. Viens.

PROSPECTIVE JUROR 26:  I was a social worker for UVM Emergency Department, but I left that job about a year ago.

MR. JONES:  About a year ago?  Okay.  Were you on good terms with them?

PROSPECTIVE JUROR 26:  Yeah.

MR. JONES:  Are you able to hear the evidence in the case impartially?

PROSPECTIVE JUROR 26:  Yes.

MR. JONES:  And, Ms. Mulcahy?

PROSPECTIVE JUROR 15:  Mulcahy, yes.  I was an LNA in high school 20-whatever years ago, and I worked at St. Alden's, in a small nursing home, and it would not affect my judgment.  I just wanted to -- I did work in healthcare for a brief moment.

MR. JONES:  Okay.  Thank you.
Ms. LaFontaine?

PROSPECTIVE JUROR 8:  I worked for a mental health facility.  Sometimes we send residents to UVM and do behind-the-scenes medical coordination.

MR. JONES:  Again, the follow-up question: Would that affect your ability to be impartial?

PROSPECTIVE JUROR 8:  No.

MR. JONES:  Okay.  There's more?  Okay.
Ms. Clement?

PROSPECTIVE JUROR 1:  I'm a pharmacist for the VA.

MR. JONES:  Pharmacist.  Okay.
   Anybody else?  Yes, Ms. Turka?

PROSPECTIVE JUROR 9:  This is tangential, but I work in pharmaceuticals in drug development, so I've worked with the various hospitals to conduct clinical trials.

MR. JONES:  Okay.  You work with various hospitals but not UVM Medical Center or Dartmouth Health?

PROSPECTIVE JUROR 9:  Dartmouth, if I did it, it was like ten years ago.  It was a while.

MR. JONES:  Again, would that experience impact your ability to be impartial?

PROSPECTIVE JUROR 9:  No.

MR. JONES:  Okay.  Mr. Reid?

PROSPECTIVE JUROR 7:  I worked in the lab of St. Alden's Northwestern Hospital about 20 years ago for nine months.  It won't affect my judgment.

MR. JONES:  Okay.  Thank you.

Okay.  We have Ms. Dean.

PROSPECTIVE JUROR 28:  I'm a clinical social worker, and so I support employees through -- the employee assistance program at the medical center.

MR. JONES:  Again, the magic question:  You can be fair and impartial?

PROSPECTIVE JUROR 28:  Yeah.  I don't think it will affect my ability to be fair and impartial.

MR. JONES:  Thanks.  Who else?  Mr. Wetherell again.

PROSPECTIVE JUROR 22:  Similar to the other juror, worked as an LNA 20 years ago in a care home in

Wisconsin, so no concerns.

MR. JONES:  Okay.  So this is a case where, as the judge explained very generally, Dr. Porter alleges discrimination and retaliation.  Have any of you experienced discrimination or retaliation at work?  Yeah, is it Zambarano?

PROSPECTIVE JUROR 18:  Yes.

MR. JONES:  Again, I don't want to invade your privacy.

PROSPECTIVE JUROR 18:  Yeah.  It was an employment issue.  It was regarding something that took place when I was not an employee but a student of the district.

MR. JONES:  Okay.

PROSPECTIVE JUROR 18:  It was a school issue with a former coach, now teacher.

MR. JONES:  And was that resolved in any way?

PROSPECTIVE JUROR 18:  They were asked to resign.  They have no record in the state system anymore as ever being a teacher.

MR. JONES:  Okay.  So were you a complainant in that matter or were you more of a witness?

PROSPECTIVE JUROR 18:  No, I was called as a witness sort of.  Actually, yes.

MR. JONES:  Would that experience have an

impact on your ability to hear the claims of discrimination in this case and to be impartial?

PROSPECTIVE JUROR 18:  I would like to think not.

MR. JONES:  Okay.  Thank you.

Yes, Mr. Morin?

PROSPECTIVE JUROR 2:  Not me directly, but my sister-in-law was a -- she was a nurse at Rutland Regional Medical Center until she got injured by a patient.  She went out on a disability and then was harassed -- she was harassed to come back before she was fully healed and then eventually was harassed on the job so she left.

MR. JONES:  Okay.

PROSPECTIVE JUROR 2:  To my knowledge, I believe she looked into filing a suit against them, but was unable to get coworkers to come forward in her defense.

MR. JONES:  Okay.  That was going to be my next question is whether she pursued that matter legally.  The answer was no; is that right?

PROSPECTIVE JUROR 2:  She did not, no.

MR. JONES:  She did not.  Okay.  This was your sister, you said?

PROSPECTIVE JUROR 2:  My sister-in-law.

MR. JONES:  Sister-in-law.  Are you particularly close with your sister-in-law?

PROSPECTIVE JUROR 2:  Not especially.

MR. JONES:  Okay.  Would her experience and the fact that somebody close to you, in your family, had an experience like that, would that impact your ability to hear the evidence in this case where Dr. Porter alleges that she was discriminated against because of her disability?

PROSPECTIVE JUROR 2:  I would hope not, but I know it's kind of close to the similar situation here, so I thought I would bring it up.

MR. JONES:  Okay.  Do you think you could hear the evidence as it comes in, weigh the evidence and make decisions without regard to your sister's experience?

PROSPECTIVE JUROR 2:  Yeah, I think so.

MR. JONES:  Anybody else?

Have any of you ever been responsible at work for hiring, disciplining, or firing employees?  Let's start with Ms. Yanus.  What kind of position was that?  What kind of job?

PROSPECTIVE JUROR 6:  I own a consulting company, so I hire and let people go regularly.

MR. JONES:  So you own the consulting

company?

PROSPECTIVE JUROR 6:  Yes.

MR. JONES:  That's a current ownership?

PROSPECTIVE JUROR 6:  Yes.  It's current.

MR. JONES:  How many employees do you have?

PROSPECTIVE JUROR 6:  Currently, seven.

MR. JONES:  Seven?  How often have you had to let people go?

PROSPECTIVE JUROR 6:  I've let four people go in six years.

MR. JONES:  Four people in six years.  Did any of them, after being let go, file a claim against you or your company?

PROSPECTIVE JUROR 6:  No.  Well, unemployment.

MR. JONES:  Obviously.  They filed for unemployment benefits, but no wrongful termination lawsuit?

PROSPECTIVE JUROR 6:  No, I have excellent relationships with three of the four.

MR. JONES:  Excellent.  Okay.  Do you think, in light of your being a business owner, would you be able to hear the evidence fairly and impartially?

PROSPECTIVE JUROR 6:  I believe so.

MR. JONES:  Thank you.  I think there were

other hands.  For the record, Mr. Agnew?

PROSPECTIVE JUROR 24:  Yes, on the order of a 35-person construction consulting firm.  Chair of the human resources committee, and so I'm often hiring, fired some folks.  I deal with all matters community services, we have a consultant that we consult with as well.

MR. JONES:  Okay.  Does that -- so just so I understand, you said a 35-employee firm.

PROSPECTIVE JUROR 24:  Yes.

MR. JONES:  And there's an HR committee?

PROSPECTIVE JUROR 24:  Yes.

MR. JONES:  You serve on that committee?

PROSPECTIVE JUROR 24:  Yes.

MR. JONES:  Is that committee responsible for such things as establishing HR policies?

PROSPECTIVE JUROR 24:  Yes.

MR. JONES:  HR training?

PROSPECTIVE JUROR 24:  Yes, I do most of those things.

MR. JONES:  Okay.  How long have you had that position?

PROSPECTIVE JUROR 24:  Four or five years.

MR. JONES:  In that time, how many people have you had to let go?

PROSPECTIVE JUROR 24:  Three.

MR. JONES:  Did any of them file a claim or make a demand?

PROSPECTIVE JUROR 24:  Nope.

MR. JONES:  Have you ever had to deal with accommodating an employee with a disability who needed reasonable accommodations?

PROSPECTIVE JUROR 24:  Yes.

MR. JONES:  Does the HR committee handle reasonable accommodation requests?

PROSPECTIVE JUROR 24:  We do, yes.

MR. JONES:  How often -- like, for example, every year, how many disability accommodation requests do you get?

PROSPECTIVE JUROR 24:  I've had one for hip surgery, so the person needed to stay home, work remotely.  I had several parents give birth, so to allow those parents to come up with schedules to stay home and work a flexible work schedule.

MR. JONES:  And have you been able to accommodate people when they needed accommodations?

PROSPECTIVE JUROR 24:  Yes.

MR. JONES:  Have you ever had to deny a reasonable accommodation request?

PROSPECTIVE JUROR 24:  I don't believe I

have, no.

MR. JONES:  Ms. Yanus, same question to you:
Have you ever had one of your employees ask for
reasonable accommodation?

PROSPECTIVE JUROR 6:  Yes.

MR. JONES:  Have you been able to grant them?

PROSPECTIVE JUROR 6:  Yes.

MR. JONES:  You've never had to deny them?

PROSPECTIVE JUROR 6:  Never had to deny.

MR. JONES:  Mr. Agnew, does the HR committee,
do they also handle reasonable accommodation requests?

PROSPECTIVE JUROR 24:  Yes.

MR. JONES:  You mentioned you worked as a
consultant involved as well.  Is that a human resources
specialist?

PROSPECTIVE JUROR 24:  No.  I'm sorry, the
consultant that we work with is a human resources
specialist, yes.

MR. JONES:  Okay.  And had there been times
that we had to consult legal counsel on an employment
matter?

PROSPECTIVE JUROR 24:  No legal counsel, but
we are often in contact with them to understand the
laws of the states.  So we have three offices in New
York, New Hampshire, and Vermont.  So the New York

office the laws are very specific.

MR. JONES:  Sure.

PROSPECTIVE JUROR 24:  So we're in touch with them often about those laws -- what we can say, what we can't say.

MR. JONES:  Okay.

PROSPECTIVE JUROR 24:  You know, that sort of thing.

MR. JONES:  Got it.  And, Ms. Yanus, have you ever had to consult an HR specialist or a labor lawyer to help with an employment matter?

PROSPECTIVE JUROR 6:  No.

MR. JONES:  All right.  I think --
Mr. Wetherell?

PROSPECTIVE JUROR 22:  I work as a finance and operations manager for a non-profit.

MR. JONES:  Okay.

PROSPECTIVE JUROR 22:  And so I'm involved with hiring people on our team.

MR. JONES:  Okay.  And have you had to let somebody go?

PROSPECTIVE JUROR 22:  I have not personally.

MR. JONES:  Have you made decisions based on employee requests for reasonable accommodations for a disability?

PROSPECTIVE JUROR 22:  Similar to the other juror in terms of family leave and things like that; we've made accommodations for them, but beyond that...

MR. JONES:  Were you able to grant those requests?

PROSPECTIVE JUROR 22:  Yes.

MR. JONES:  Okay.  And I'm sorry.  Ms. Viens?

PROSPECTIVE JUROR 26:  I currently am the deputy director of a non-profit, and I make most hiring and termination decisions.

MR. JONES:  And how many employees does the non-profit have?

PROSPECTIVE JUROR 26:  Currently 12.

MR. JONES:  12.  Okay.  Have you had to let somebody go in the last year?

PROSPECTIVE JUROR 26:  Yeah.  I had to do a reduction in workforce due to a new administration, about 12 folks.

MR. JONES:  Okay.  How many folks did you have to let go?

PROSPECTIVE JUROR 26:  12.  We have 12 left, and we did a reduction in workforce of 12.

MR. JONES:  Got it.  Okay.

PROSPECTIVE JUROR 26:  And I've had other positions in my career where I've been tasked with

hiring and terminations, but I've been in this role for a year.

MR. JONES:  Okay.  We have more names.  Ms. Zambarano?

PROSPECTIVE JUROR 18:  Just listening to other jurors, I wanted to share that my husband is a small business owner of, on average, 40 employees and growing, and this has been ongoing 30 years, my entire relationship with him.  So I'm not directly involved with the hiring and firing process, but I do hear it; I'm exposed to it.  I just felt like I should share that.

MR. JONES:  I appreciate it.  Thank you.  Do you know whether he or his company has ever been sued by a former employee for wrongful termination?

PROSPECTIVE JUROR 18:  Not sued directly but just, what is it? -- when there's like a medical -- I can't think of the term.  When you get hurt at work.

MR. JONES:  Workers' compensation?

PROSPECTIVE JUROR 18:  Yes.

MR. JONES:  Okay.

PROSPECTIVE JUROR 18:  We had one that dragged on for a really long time.

MR. JONES:  Okay.  All right.  I guess, for those who have already disclosed their roles with

hiring and firing, have you or your business been sued for wrongful termination?

Okay.  I think there were still more names who had not spoken to us.  Is this Ms. Severance?  I got it wrong.  Ms. Butler?

PROSPECTIVE JUROR 13:  I work for a federal agency and previously worked for a state agency and was responsible for hiring.

MR. JONES:  Okay.

PROSPECTIVE JUROR 13:  Didn't have to fire anybody.

MR. JONES:  Oh, wow.  Congratulations.  Okay. Who else?  Okay.  Down here, we have Ms. Dean.

PROSPECTIVE JUROR 28:  So I'm a supervisor with a EFAP, so I am in charge of hiring and firing.  I have hired, and I have not fired fortunately.  I also suggest and support folks going for ADA accommodations as part of my work.

MR. JONES:  Okay.  Have you generally been able to accommodate people when they need accommodations?

PROSPECTIVE JUROR 28:  I'm not making the decision; I'm supporting them going through the steps of applying for it within the organization.

MR. JONES:  Oh, I see.  I'm sorry.  Have you

been in the situation where you were supporting somebody seeking an accommodation whose request was denied?

PROSPECTIVE JUROR 28:  Not that I know of. It doesn't mean that it wasn't denied.

MR. JONES:  Understood.  Understood.

Ms. LaFontaine?

PROSPECTIVE JUROR 8:  I am a supervisor so hiring, and can be part of potential feedback that leads to a -- yeah, firing.  Yeah.  I work with State of Vermont and there's an HR department that we have a specific person that helps us navigate that.  And, yes, I've had accommodation requests that I've had to work on, and we've always been able to kind of come up with an agreement that works for all parties.

MR. JONES:  Excellent.  Okay.  Thank you. Anybody else?  Yes, Mr. Pendergrass?  Are you Mr. Bataille?

PROSEPCTIVE JUROR 3:  Pendergrass.

MR. JONES:  I'm always one box off.  I apologize.  Mr. Pendergrass, yes?

PROSPECTIVE JUROR 3:  I'm a middle school science teacher.  I work at a small private school. I've been involved with hiring committees before, so doing interviews to hire new employees at the school

but I've not been involved with letting anyone go.

MR. JONES:  Not termination decisions, right?

PROSPECTIVE JUROR 3:  Right.  Just hiring decisions.

MR. JONES:  Yes, Ms. Turka.

PROSPECTIVE JUROR 9:  Hi.  I've had direct reports at various times over my years and I've been on various hiring panels.  So, lots of hiring; I've never had to fire anybody, and I always have an HR department to refer people to for reasonable requests.

MR. JONES:  Excellent.  All right.  Do we have more?  Okay.  So I guess for all of you -- and thank you very much.  That was a robust conversation.

I mean, you know where I'm going with this.  Is anybody's experience with that, everything we just discussed, is that going to have an impact on your ability to be fair and impartial in hearing the evidence in this case which does involve a claim of wrongful termination?  All right.  Thank you.

Okay.  So Dr. Porter is suing under a variety of discrimination and whistleblower laws.  I just want to ask some general questions about people's attitudes.

Does anybody here feel that there are already too many employment laws?  Does anybody here feel that there are too few employment laws?  All right, just

about right?  Okay.

So Dr. Porter worked at Dartmouth Health in the OB/GYN department and she worked in a division that was called the Reproductive Endocrinology and Infertility Division, or the REI division.  Is anybody familiar with the medical care provided by REI clinics?  Okay.

Does anybody here have strong personal, moral, religious, or political beliefs or feelings about fertility healthcare?  Yes, Ms. Zambarano?

PROSPECTIVE JUROR 18:  Yeah.

MR. JONES:  You have strong feelings about that area?  Can you tell us?

PROSPECTIVE JUROR 18:  It's just something that -- I mean, I don't really know if there's a specific -- I just, you know, believe in -- I don't know.  I just -- it stirs something up in me is kind of the best way to describe it.  I think that everyone goes about things as they should, but me personally, like it just --

MR. JONES:  Okay.

PROSPECTIVE JUROR 18:  I'm not really doing a great job.  I apologize.

MR. JONES:  No, it's fine.  I understand.  So to be a little more direct, so some of what the REI clinic provided, and some of the services that

Dr. Porter provides, is to work with couples who are -- women who are struggling with infertility issues, want to have a baby.  So that can be as simple as artificial insemination or it can be IVF or invitro fertilization. So does anybody have strong feelings about those types of services and whether they should be provided?

Okay.  So you probably recall as part of your jury service you had to complete a jury questionnaire, and one of the questions was:  Are there issues that you feel so strongly about that you don't think you could be fair and impartial?  And there were some general comments by multiple people with regard, generally, to women's health issues or reproductive care issues.  And I wanted to have a discussion about that because I don't know if that means that it's a concern about the constitutional and political issues about access to certain healthcare procedures on the one hand, which this case is not about, okay, I want to be very clear that we're not talking about access to or right to abortion issues or any of those kind of more third-rail political issues.  But this case does arise from a reproductive healthcare clinic.  So Dr. Porter provided that kind of care.  You're going to hear from nurses and physicians who provide that kind of care, so this issue just simply arises from a clinic that provided

that kind of care.

Really, the question is, for people who are concerned that reproductive health or women's health issues might be something that they feel so strongly about that it might affect your impartiality, in light of the clarification that I've just given, does that remain true?  Is there anybody who still is concerned that those issues are just too strongly held to be fully impartial in this case?

And, Ms. Zambarano, I don't want to pick on you, but in light of your issues, do you feel you can still hear this case?

PROSPECTIVE JUROR 18:  I don't -- I'd like to think yes.  I don't know enough -- I mean, I don't know anything about this case, obviously, which I can tell you I really don't.

MR. JONES:  Sure.

PROSPECTIVE JUROR 18:  You know, is it insurance?  Is it -- you know, there's so many aspects to women's health, and there are -- you know, we all have different opinions.

MR. JONES:  Of course.

PROSPECTIVE JUROR 18:  I like -- I do believe in families and creating children and -- but I -- you know, I definitely -- I don't know.  I wish I could say

I could be unbiased and fair, and I hope that I would be, but I -- I just -- I don't know.

MR. JONES:  Sure.  I appreciate that.  Thank you.  Thank you for sharing.

PROSPECTIVE JUROR 18:  Yeah.

MR. JONES:  Anybody else?

Has anybody here or a close family member had a medical condition that limited or prevented your ability to work for a period of time?

PROSPECTIVE JUROR 3:  I had to have a -- I had a cyst.  It's called pilonidal cyst, and I had to have it removed.  I was bedridden.

MR. JONES:  I'm unfortunately very familiar with those.

PROSPECTIVE JUROR 3:  It was a long time ago; it's fine now.

MR. JONES:  Yeah.  Understood.  And were you able to get the time off from work that you needed?

PROSPECTIVE JUROR 3:  Yes.  Yes.  I was.

MR. JONES:  No one else?

I'm sorry.  Ms. Roque?

PROSPECTIVE JUROR 5:  I'm sorry.  What was the end part of your question?  I couldn't hear it.

MR. JONES:  I was asking whether you've had a medical condition that prevented your ability to work

or limited your ability to work.

PROSPECTIVE JUROR 5:  Correct.  Yes.  I have severe asthma.

MR. JONES:  Okay.

PROSPECTIVE JUROR 5:  So I've had to have quite a few hospitalizations, and I have been accommodated for it though and got the time off for it.

MR. JONES:  Okay.  So you've never had a problem getting the accommodation you needed to get the treatment done?

PROSPECTIVE JUROR 5:  Correct.

MR. JONES:  Thank you.

Yes, Mr. Smith?

PROSPECTIVE JUROR 19:  For knee surgery.  I was out for a few days, and I was accommodated.

MR. JONES:  No problems getting the time off?

PROSPECTIVE JUROR 19:  No.

MR. JONES:  Yes?

PROSPECTIVE JUROR 11:  Edward Gale.  My kids' mom had several oncology events that she needed to get time off.

MR. JONES:  I'm sorry to hear that.  You were able to get the time off that you needed?

PROSPECTIVE JUROR 11:  She was --

MR. JONES:  I'm sorry.  She was?

PROSPECTIVE JUROR 11:  She was able to get the time off she needed, yes.

MR. JONES:  Got it.

I want to talk a little bit about damages.  Part of this case is --

MR. COFFIN:  Your Honor, if we could approach for a moment?

THE COURT:  Yes.

(Bench conference.)

MR. COFFIN:  I didn't mean to interrupt the flow of my brother.  We've had about 40 minutes, and I was wondering, we're backing up against the lunch hour, and they're not going to want to hear from us for another 40 minutes, so maybe staggered -- maybe you're near done?

THE COURT:  How much more do you have?

MR. JONES:  Ten minutes?

THE COURT:  Okay.  Do you have any sense, you have no idea how long yours is going to take?

MR. SCHROEDER:  I think the lunch break would be a good opportunity to pare down and make sure that I'm not going to hear the questions that my brother had, so just to know that we're probably going to go to the lunch hour, and I'll try to condense what I have. I'm trying to keep track to take down the answers.

THE COURT:  You're saying that you would continue jury draw after the lunch break?

MR. SCHROEDER:  Yes, in light of where we are right now.

MR. JONES:  You have ten more minutes which will take us pretty close to the lunch break.  Ten more minutes, and then give you -- and we'll come back and pick up with you.

MR. SCHROEDER:  Sure.

THE COURT:  All right.  Thank you.

(End of bench conference.)

MR. JONES:  May I proceed?

THE COURT:  Please go ahead, Mr. Jones.

MR. JONES:  Thank you.  I want to ask a couple questions about damages.  In this case, at the conclusion of the case, Dr. Porter will ask the jury that's impaneled to rule in her favor and to award damages.  I want to explore some attitudes that some people have; I want to see what your attitudes are.

Does anybody here have strong moral, religious, or political beliefs that prevents you from assessing damages against a defendant?

Does anybody believe that there should be a limit on damages?  Does anybody -- has anybody heard about a damages award in the news that you thought was just way

too much?  How about way too low?  Yes.

PROSPECTIVE JUROR 18:  My brother was awarded damages from the State of Vermont, and I thought they were ridiculously low.

MR. JONES:  You thought they were too low?

PROSPECTIVE JUROR 18:  Yeah.

MR. JONES:  The fact that you felt his damages were too low, would that affect your ability to hear Dr. Porter's claim for damages in this case?

PROSPECTIVE JUROR 18:  I don't believe so.

MR. JONES:  Anybody else?

If Dr. Porter is able to convince you that she is entitled to damages under the law as the judge will instruct you at the end of the case, does anyone have any hesitation to award damages?  Among the damages that Dr. Porter will be seeking are damages for emotional distress.  Does anyone have strong feelings that might prevent them from awarding emotional distress damages?  Ms. Zambarano?

PROSPECTIVE JUROR 18:  Yes.  I lost a brother.  My brother was in a car accident.  He was the one who committed the accident, I guess, and the person that was hit didn't die; my brother did and so did the passenger of my brother, and the person that they hit did not die, but they wanted a lot of money for

emotional damages, so I --

MR. JONES:  Okay.  Understood.

PROSPECTIVE JUROR 18:  -- I struggle with that.

MR. JONES:  Anybody else?  And how about same question with regard to punitive damages?  Which, again, I don't want to summarize the standards, that's the judge's job at the end of the case.  But, generally, it's a form of damages to punish the defendant and deter the defendant from similar behavior.  Does anybody have any hesitation in awarding that type of damages?

All right.  There has been some media coverage of this case, so I want to ask:  Has anybody in the panel seen any media or read anything about this case?  Yes, Mr. Morin?

PROSPECTIVE JUROR 2:  Yes.  I've seen a couple of news reports on it.  I've also read some of the filings on the court listing here.

MR. JONES:  So you went to the court filings and got some of the filings?

PROSPECTIVE JUROR 2:  Yes.  There isn't really much out there, but...

MR. JONES:  Right.  Right.  Okay.  Anybody else?

PROSPECTIVE JUROR 11:  I read the article in the *Valley News*.

MR. JONES:  The recent one or from a while ago?

PROSPECTIVE JUROR 11:  One was in January, and maybe one was recent.

MR. JONES:  Okay.  So you read about the story in the *Valley News*?

PROSPECTIVE JUROR 11:  Correct.

MR. JONES:  Anybody else seen any of the media coverage?

PROSPECTIVE JUROR 6:  I went to the court schedule to see what case, and I looked it up.  And so I read maybe three or four sentences on the fact that it was Dartmouth and a doctor and that they closed the fertility clinic.

MR. JONES:  Okay.  Did you open up one of the court filings and read it, or what were you reading?

PROSPECTIVE JUROR 6:  It's AI generated at the top of the Google results.

MR. JONES:  Okay.  Was this recent?

PROSPECTIVE JUROR 6:  I looked up the schedule maybe on Friday or Saturday to figure out what we were coming into.

MR. JONES:  Got it.  Okay.  Could you tell it

was this case, or were you just looking up the court docket to see what cases were out there?

PROSPECTIVE JUROR 6:  Yep.  I looked to see what court cases were out there, and I saw DHCMBP (sic).

MR. JONES:  Okay.  So you said you read about three sentences.  Did you learn about the facts of the case?

PROSPECTIVE JUROR 6:  That it was Dartmouth and a doctor, and that it was a fertility clinic.

MR. JONES:  That's the extent of the information that you believe --

How about you, Mr. Morin?  Did you learn some details about the facts of the case based on what you read?

PROSPECTIVE JUROR 2:  A little bit.

MR. JONES:  I'm not asking you to recite them.  I just want to know whether you acquired that knowledge.

PROSPECTIVE JUROR 2:  Yeah, a little bit.

MR. JONES:  Yeah.  Okay.  Anybody else read the media coverage?

So I have one more question for you and that is:  Is there any question I have not yet asked?  If you were sitting in my client's seat and you know something

about yourself as a juror, or a potential juror, what would you want to know? What have I not asked that would affect your ability to hear this case?

Mr. Agnew?

PROSPECTIVE JUROR 24: Yes.

MR. JONES: Got it.

PROSPECTIVE JUROR 24: So we're a civil structural engineering firm. We do a lot of work directly with UVM and Dartmouth College, so -- usually with their facilities departments.

MR. JONES: Okay. Ever with any of their healthcare facilities or hospitals?

PROSPECTIVE JUROR 24: Oh, yes, UVM.

MR. JONES: UVM's hospital and Dartmouth's hospital?

PROSPECTIVE JUROR 24: I think it's mostly for the college, unless it's involved with the facilities office.

MR. JONES: Would that business relationship affect your ability to hear a case against Dartmouth?

PROSPECTIVE JUROR 24: I don't think so.

MR. JONES: Okay. But you have a financial relationship with the Dartmouth entities?

PROSPECTIVE JUROR 24: Yes.

MR. JONES: Okay. Thank you. Anybody else?

Anything I didn't ask?  Okay.  Thank you very much for your time.

That's all I have, Your Honor.

THE COURT:  Okay.  Thank you, Mr. Jones.

Okay.  So we are coming close to the lunch break, so what we're going to do is take an hour break for lunch, and then we're going to return and then the defendants will have an opportunity to do the same thing with you.  So, again, you shouldn't be talking at all to anyone about anything that has happened in the courtroom today.  Okay?  All right.  So we'll rise for the jury.

For your scheduling, so it is 11:45, so if you would please be back in your seats, the folks in the back as well, at 12:45, no later than.  Okay?

(Jury exits.)

(Noon recess taken.)

March 24, 2025

Afternoon Session

* * *

THE COURT: Okay. Hello again. Welcome back. Did you all have a nice lunch? And now we will turn it over to the defendants for an opportunity to ask you some questions.

MR. SCHROEDER: Thank you, Your Honor. Good afternoon. My name is Don Schroeder. I'm here with my colleague, Morgan McDonald, Ed Merrens who is the chief medical director of Dartmouth Health, as well as Tris Coffin, one of my partners in this case. We are representing Dartmouth Health in this case. There's a number of integrated entities that are part of the Dartmouth Healthcare system.

I'm going to ask you a couple of questions as a follow-up to Mr. Jones, and some of them are going to be repeats because I either didn't catch the full answer, and so I may need you to say it once again. So I apologize up front. I tried to take the lunch break as an opportunity to try to figure out how to streamline this a little bit.

This is a case involving employment discrimination and retaliation claims. It's a civil case, and one of the issues that has arisen as a result of this case, is

what happened?  What happened at Dartmouth Health?  What happened at Dartmouth Health, very briefly, is that there was a closure of the REI division.  You've heard Mr. Jones make a few comments about that.

REI -- reproductive endocrinology and infertility is the name of the division.  A number of people were terminated including Dr. Porter and two other physicians.  That's what this case is about.  The plaintiff has claimed discrimination and retaliation.  It's Dartmouth Health's position that they had a legitimate reason for closing down the division, and it resulted in the termination of all three physicians including Dr. Porter.

Now, this is a civil case, so it's not about a crime, and it involves employment claims.  Has anybody -- I'm going to start with kind of the categories that I'll ask you questions about.  You, a family member or close friend, family friend, ever filed an employment discrimination case?  Okay.  You, a family member, or close friend ever file any sort of employment litigation against an employer?

PROSPECTIVE JUROR 19:  Does unemployment count?

MR. SCHROEDER:  Good question.  I was going to get there.  There's a series of kinds of claims that

you could file that are separate and apart from just an employment discrimination case, which this case is. One of those is a workers' compensation case where somebody's been injured at work, and they file a claim because the injury happened while they were at work.

Has anybody filed -- has anybody or a family member or close friend that you know of ever filed a workers' compensation claim? Okay. I guess I'll start from the back. I've got my -- I've got my list with me. I feel like this is the Price is Right. I'll start from the back.

Mr. Morin.

PROSPECTIVE JUROR 2: Yes. It was my sister-in-law.

MR. SCHROEDER: Okay. And I do recall you making a statement about that. Can you just remind me; it was your sister-in-law.

PROSPECTIVE JUROR 2: And she was a nurse at Rutland Regional Medical Center, was injured by a patient and then filed a claim, a workers' comp claim, for that injury and then was pressured by her management to return to work before she was fully healed and then eventually quit.

MR. SCHROEDER: I just lost that last part. Was she eventually asked to leave?

PROSPECTIVE JUROR 2:  She was pressured by her management to return to work before she was healed and was given -- my understanding is she was given work schedules that exceeded her abilities, given her injury and eventually quit because of that.

MR. SCHROEDER:  And did you have discussions with her?  Like, what did you know about the case?  You say you weren't especially close to her, but...

PROSPECTIVE JUROR 2:  Not especially close, but I have spoken to her specifically about that.  She has given descriptions about it.

MR. SCHROEDER:  Okay.  Anything else about that?

PROSPECTIVE JUROR 2:  No.

MR. SCHROEDER:  Next person at the top?  Was there somebody who also raised their hands about a workers' comp claim?

PROSPECTIVE JUROR 4:  Yeah.  I got injured a long, long time ago working on the job and --

THE COURT:  Is this Mr. Bataille?

MR. SCHROEDER:  Yes, Your Honor, Bataille.

PROSPECTIVE JUROR 4:  Yeah.  Had some dental work, and the town reimbursed me, and there wasn't -- I didn't lose too much time on the job, and this was probably about 30 years ago, so...

MR. SCHROEDER: Okay. Well, it's a good time of music back then because that's all I listen to.

So anyone else who had either filed or a close family member or relative workers's comp claim? Yes, ma'am. Hold on, I want to -- all right. I'll start over here, right here. Ms. Turka?

PROSPECTIVE JUROR 9: My husband's worked in restaurants, and he's been a butcher, so he's injured himself numerous times over the years. There's never been a serious issue, just stitches, workman's comp, not a big deal.

MR. SCHROEDER: Okay. Would that impact your ability to decide this case?

PROSPECTIVE JUROR 9: No. It's always been a smooth process, so no.

MR. SCHROEDER: 10? Ma'am. No. 10 -- I'm sorry. I'm going the wrong way. Ms. Butler. Okay. No. 13. That's why I went to law school. Nobody is good at math. Go ahead.

PROSPECTIVE JUROR 13: Yeah. I've claimed a couple of times. Sometimes it goes smoothly; other times, they deemed that I had a pre-existing medical history, so the insurance did not cover the treatment.

MR. SCHROEDER: Okay. So sometimes it went smoothly; sometimes it didn't go smoothly?

PROSPECTIVE JUROR 13:  Yeah.

MR. SCHROEDER:  Did that color your judgment in terms of either the healthcare system that you were working through or any related entities that color your judgment one way or the other?

PROSPECTIVE JUROR 13:  Well, I wasn't stoked about them not covering chiropractic but, no, I don't think it colored my view of the healthcare system.

MR. SCHROEDER:  Okay.  Would it impact your ability to be fair and impartial in this case where the defendant is a hospital system?

PROSPECTIVE JUROR 13:  No.  I don't believe so.

MR. SCHROEDER:  Okay.  That's the other thing I should have given some statements about this up front.  I'm going to try to be as -- and I will get to you next; we'll go around the room.

I'm going to be as unintrusive as possible.  There's some sensitive topics.  There's some sensitive topics in this litigation related to reproductive endocrinology and infertility, and I have to ask you some questions about that as a result.  I'm not trying to pry.  If at some point you feel -- I don't necessarily want to air it out here in the foyer, so to speak, or the jury room, and need to go in front of the

judge, we can certainly make that happen.  But I wanted you to know that up front, that I'm trying to be as cautious in that regard as well and we can certainly use the judge for that reason.

With respect to workers' comp, I'm sorry, ma'am?

PROSPECTIVE JUROR 14:  Severance.

MR. SCHROEDER:  Yes, Ms. Severance.

PROSPECTIVE JUROR 14:  My husband hurt his knee and everything went smooth; things went well.

MR. SCHROEDER:  No issues there?

PROSPECTIVE JUROR 14:  No.

MR. SCHROEDER:  Wouldn't impact your ability to be fair and impartial?

PROSPECTIVE JUROR 14:  (Shakes head.)

MR. SCHROEDER:  Anyone in the second row whether or not there was you, family member, or close relative?  And I don't know if there's anybody in the first row.  Yes, ma'am.  Ms. Viens?  Yes.

PROSPECTIVE JUROR 26:  My mother was in an elevator at work which fell three floors.

MR. SCHROEDER:  That's one of my worst nightmares.

PROSPECTIVE JUROR 26:  That was the late '90s, and that was workman's comp.

MR. SCHROEDER:  I'm sorry.  Who was that?

PROSPECTIVE JUROR 26:  My mother.

MR. SCHROEDER:  Mr. Lowe?

PROSPECTIVE JUROR 25:  My dad got injured on an excavating job and had to file a claim; didn't go very well.

MR. SCHROEDER:  Do you think that experience would impact your ability to be fair and impartial here with respect to a hospital system?

PROSPECTIVE JUROR 25:  It might.  It wasn't a very good situation.

MR. SCHROEDER:  I'm sorry about that.  How long ago was that?

PROSPECTIVE JUROR 25:  Like, ten years at this point.  He still has issues, like, with his shoulder.

MR. SCHROEDER:  So there's continuing issues?

PROSPECTIVE JUROR 25:  Yeah.

MR. SCHROEDER:  So negative issues about that continue?

PROSPECTIVE JUROR 25:  Yeah.

MR. SCHROEDER:  Ms. Veins, would that impact your ability to be fair and impartial?

PROSPECTIVE JUROR 26:  I don't think so.

MR. SCHROEDER:  Now, you get a workman's comp claim and another part of litigation out there is a

medical malpractice claim.  Has anyone -- this is not a medical malpractice case, but it obviously is dealing with doctors and healthcare and hospital system.  So has anyone or family member or close friend -- I say family member and not close family member because we all have those members of our families, including myself.  You or a family member or close relative -- close friend ever filed a medical malpractice claim?  Okay I'll start back there and work my way around.  Mr. Morin, No. 2.

PROSPECTIVE JUROR 2:  My father filed a medical malpractice claim for advice he had received regarding how quickly he should seek treatment.  And eventually that case was settled before trial in his favor.

MR. SCHROEDER:  And that experience, would that color your judgment in that regard?

PROSPECTIVE JUROR 2:  I don't think so.

MR. SCHROEDER:  In terms of hospital systems and dealing with healthcare?

PROSPECTIVE JUROR 2:  No.

MR. SCHROEDER:  Sir.  Mr. Bataille.

PROSPECTIVE JUROR 4:  Yes.  One of my best friend's wife, after giving birth, had severe headaches which were reported and ignored by the hospital, and

she died of an aneurysm as a result, and I believe there was litigation that he won --

MR. SCHROEDER: Okay.

PROSPECTIVE JUROR 4: -- based on that.

MR. SCHROEDER: Does that experience or knowing that, does that color your judgment one way or the other?

PROSPECTIVE JUROR 4: I don't think so, no.

MR. SCHROEDER: How long ago did that happen?

PROSPECTIVE JUROR 4: Oh, that was about ten years ago.

MR. SCHROEDER: Okay. Now I know everybody's heard a series of names. Did it involve any of the parties?

PROSPECTIVE JUROR 4: No. No. No. This was, I think, in Florida.

MR. SCHROEDER: Okay. Okay. On the top row, anyone else on medical malpractice claims?

Second row? I'm sorry. Ms. Severance?

PROSPECTIVE JUROR 14: My grandfather was in a car accident and broke his neck about 25 years ago and they missed the broken neck and were unable to fix it after it healed, so he won his lawsuit.

MR. SCHROEDER: Do you think that experience would impact your judgment one way or another?

PROSPECTIVE JUROR 14:  No.

MR. SCHROEDER:  Okay.  Would you be able to take the facts as they come in here?

PROSPECTIVE JUROR 14:  Absolutely.

MR. SCHROEDER:  Anyone else on the second row with respect to that issue?

Anyone on the third row?  Ms. Viens, okay.

PROSPECTIVE JUROR 26:  My mother filed a suit after she was improperly diagnosed.  She ended up having colon cancer and it had progressed to the point where she couldn't get treated.  And she won.

MR. SCHROEDER:  Does that experience impact your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 26:  No.  I think it was a specific event, situation.

MR. SCHROEDER:  Okay.  Anyone else?  I think I got everybody there.

So with respect to the healthcare system in general, does anyone have -- I realize everyone's had a few comments about family members, close friends, or perhaps themselves about medical issues.  Does anyone have any strong feelings one way or the other about hospitals in general?  So set aside UVM Medical Center and Dartmouth Health, does anyone have any strong feelings one way or the other -- really positive,

really negative -- about the healthcare system and specifically hospitals at this point?  I realize that's a general question, and it's a pretty open-ended question.  But to the extent that you have any strong feelings one way or the other that may impact your ability to listen to the evidence in this case and make a decision?

Okay.  Now, in this case, and you've already heard some instructions briefly from Judge Doyle.  The plaintiffs go first.  And that's always the way it is.  Plaintiff goes first, they get to put on evidence, and then the defendants get to go.  And you've heard also that this may be a three-week trial.

The fact that that sequence of events happens -- the plaintiff goes first, they get to put their story in first, they get their witnesses and cross exam, direct, et cetera, and then the defense goes.  And, obviously, this takes a lot longer than any of the TV shows that Judge Doyle referenced.  It takes days, not hours.  Does that fact alone, will you be able to be impartial by waiting for all the evidence coming into the case before making a decision?  Does anybody have a strong feeling one way or the other there?

There was a series of names that were asked of you with respect to the lawyers in this case, and I know

one of them, I think, was one of my co-counsel, Tris
Coffin.  Can I just have somebody, whoever said
something about him -- Mr. Brennan?

PROSPECTIVE JUROR 10:  Yes.

MR. SCHROEDER:  Mr. Brennan, I think you said
you had a case with Mr. Jones and Mr. Coffin's firms?

PROSPECTIVE JUROR 10:  That's right.  I've
had a number of matters with their firms, but there was
one case that was all counsel, for different clients.

MR. SCHROEDER:  So you guys all had different
clients.  Were you aligned with one of those clients,
like, where sometimes two of the defendants may be
aligned and one may not be?

PROSPECTIVE JUROR 10:  Yes, I represented an
individual; Mr. Jones represented his wife.

MR. SCHROEDER:  Okay.  So pretty connected.

PROSPECTIVE JUROR 10:  They were very
aligned.

MR. SCHROEDER:  Okay.  So very aligned.
Okay.  And was that a -- how long did that litigation
last?

PROSPECTIVE JUROR 10:  I'm going to give a
rough guess of two years, and this was about three
years ago.

MR. SCHROEDER:  Would you describe it as

contested litigation?

PROSPECTIVE JUROR 10:  Yes.

MR. SCHROEDER:  Hotly contested be a fair way to describe it?

PROSPECTIVE JUROR 10:  That would be fair, yes.

MR. SCHROEDER:  Okay.  And that lasted, you said, a few years?

PROSPECTIVE JUROR 10:  Yeah.

MR. SCHROEDER:  Okay.  And your firm was aligned with Mr. Jones' firm?

PROSPECTIVE JUROR 10:  That's right.

MR. SCHROEDER:  Okay.  Anyone else that had any knowledge of any of the lawyers in this case -- Mr. Vitt, Ms. Nunan, Mr. Jones?  I think we had comments that people knew about the law firms in general, but myself, Ms. McDonald?  Anyone else?  I didn't believe there was.  Okay.

I have to rattle off this list of names because there's some additional names that -- beyond the list that Mr. Jones had.  So in order to make sure that we're complete and we're not missing anybody and no one is surprised to see somebody come in as a witness, you know, two weeks from now, which could cause a problem, I just want to make sure we know who -- whom everybody

knows.

So the first name is Emily Baker. Robert Bancroft. Now, some of these names you've heard before, some you haven't, so just bear with me. Donna Bedard. Ira Bernstein. Debra Birenbaum. Karen Boedtker. Jocelyn Chertoff. Aimee Claiborne. Joanne Conroy. Dennis Dela Cruz. Leslie DeMars. Navid Esfandiari. Karen George. Jenice Gonyea. Heather Gunnell. Daniel Herrick. Albert Hsu. Michele King. Eunice Lee. Julia MacCallum. Kathleen Mansfield. Victoria Maxfield. Judith McBean. Edward Merrens, who is seated right at our table. Kelly Mousley. Maria Padin. Sharon Parent. You've already been asked about the plaintiff, Dr. Porter. Michele Russell. Dennis Seguin. David Seifer. Barry Smith. Judy Stern. Kris Stohbehn. Katrina Thorstensen. And the last one, Elizabeth Todd. Nobody has raised their hands.

PROSPECTIVE JUROR 6: I think I know of Michele Russell.

MR. SCHROEDER: Let me see if I could follow up on that.

THE COURT: Identify the witness, Mr. Schroeder.

MR. SCHROEDER: I'm sorry, yes. No. 6.

PROSPECTIVE JUROR 6: Molly Yanus.

MR. SCHROEDER:  It's like I'm playing Battleship here.  No. 6.

PROSPECTIVE JUROR 6:  Molly Yanus.

MR. SCHROEDER:  I don't know.

PROSPECTIVE JUROR 6:  She is 35, she has two kids.  She lives in Vermont.  She's got two boys and a husband.  She used to work with me at Choice Care Works.

MR. SCHROEDER:  And do you know if she's in the healthcare world?

PROSPECTIVE JUROR 6:  She was, like, an assistant, so that's the only reason I would know.

MR. SCHROEDER:  When you say "assistant," what do you mean?

PROSPECTIVE JUROR 6:  She was, like, a sales assistant and a buyers assistant.

MR. SCHROEDER:  Do you know if she had ever, at any point, any affiliation with Dartmouth Health?

PROSPECTIVE JUROR 6:  Not that I'm aware of.

MR. SCHROEDER:  Okay.  Any employment with Dartmouth Health?

PROSPECTIVE JUROR 6:  Not that I'm aware of.

MR. SCHROEDER:  Okay.  Thank you.

So this is a civil case, and you will be given instructions from the judge about the burden of proofs,

et cetera, you were asked a series of questions from Mr. Jones about, well, would you have a problem doing this or would you be fair about this?  And what I want to focus on is, do you understand that in civil cases the plaintiff goes first, but that the plaintiff has the burden of proof?  Does anybody have a problem understanding that concept?

Okay.  And do you understand that even if the defendants offered no evidence, but if Dr. Porter did not prove her case, that the defendants could still win?  Does anybody have a problem with that?

Okay.  Now just because the defendants in this case, it's the hospital system, various entities that are interconnected.  Just because the defendants were sued in the underlying case does not mean they did anything wrong.  And if the plaintiff fails to prove her case, does anybody have a problem rendering a verdict for the defense?  Does anybody have a problem doing that?

Now, would anybody have a problem setting aside any potential sympathy for the plaintiff in this case if, by applying the facts to the law of the case, there was a basis to rule in favor of the defense?  Does anybody have any issue about being impartial and fair?

I want to switch gears, and I know there was some

questions about this, but I need to ask a few additional questions about the topic of -- and we'll use the acronym of REI, instead of saying reproductive endocrinology and infertility every single time, but REI.  That includes artificial insemination, invitro fertilization which is IVF; as well as ART, artificial reproductive technology.  Does anyone have any strong feelings one way or the other about this topic?  I realize that may be treading on ground that we covered a little bit, but I have some follow-up questions.

Does anybody have any feelings one way or the other -- strong feelings one way or the other on the topic of IVF and REI either for religious, family, political reasons?

Yes, ma'am.  Ms. Zambarano?

PROSPECTIVE JUROR 18:  Yeah.  I just question often -- it's an individual choice for sure, so it's just -- it's personal to me, and I mentioned that previously, so I felt I should say the same to you.  And, you know, I don't know that it would affect how, you know, I would feel in the case of a court matter, but, you know, it's definitely something that I -- stirs up emotion in me.

MR. SCHROEDER:  Yeah.  And if I may, and if I get too personal and we gotta do a sidebar, then we can

certainly do that.  I don't want to do that.

I just want to follow up.  When you say it stirs an emotion in you, like is it a positive emotion or negative emotion?

PROSPECTIVE JUROR 18:  Both, actually.  I have friends and family members who have had positive experiences, different roots, and, you know, unfortunately, negative experiences as well.  So I just wanted to --

MR. SCHROEDER:  I appreciate that.

PROSPECTIVE JUROR 18:  -- be clear that it does, you know, bring up emotion.

MR. SCHROEDER:  Okay.  As a follow-up, you kind of spurred a question which is:  Has anyone or a family member or close friend pursued IVF or REI for purposes of having a child?  Yes, sir.  Hold on.  Mark Pendergrass.  Yes.

PROSPECTIVE JUROR 3:  That's it.  Yeah.  My brother-in-law and his wife pursued invitro fertilization.

MR. SCHROEDER:  Okay.  And I don't want to get too intrusive.  Was it a positive or negative experience?

PROSPECTIVE JUROR 3:  I think I would echo the other juror's comment is that it was both.  In

their particular case, it did not -- they did not get pregnant in that way, but they later became pregnant without it.  So, you know, it's my niece, so that's a strong feeling right there.

MR. SCHROEDER:  Absolutely.

PROSPECTIVE JUROR 3:  And then just, additionally, because I think I mentioned before that I'm a middle school science teacher, and I do teach sex ed so I do teach about those things, and I think as medical technologies, they're really amazing, incredible and they can make a big difference in a lot of people's lives.

MR. SCHROEDER:  Okay.  Any -- I'm sorry. I'll go to No. 1 for a second and then come right to you.

Ms. Clement?

PROSPECTIVE JUROR 1:  Just similar.  My sister-in-law became pregnant via invitro, and I have a niece as a result.

MR. SCHROEDER:  And I guess to both of you and really all of you, would that impact your ability to be fair and impartial in rendering a verdict?

PROSPECTIVE JUROR 3:  I don't think so.

MR. SCHROEDER:  Ms. Yanus, right?

PROSPECTIVE JUROR 6:  Same thing.  Had a

friend, IVF was successful.  Two close kids.

MR. SCHROEDER:  Let me just finish that question, and then I'll come back, I have another question on that, but the second row, I know Ms. Zambarano, who was No. 18.  Was anyone else?  Okay.  Sir?  Mr. Pepin.

PROSPECTIVE JUROR 23:  My brother has been through it.  He was diagnosed with testicle cancer and his wife had to go through IVF three times, and I have two nephews and a niece because of it.

MR. SCHROEDER:  Sir.  Yes, Mr. Smith?

PROSPECTIVE JUROR 19:  My wife and I tried to use the services.  We were unsuccessful but led to my wife's diagnosis of cancer, and we were successful with her treatment and have successfully adopted.  So it's impartial as far as that goes.

MR. SCHROEDER:  Okay.  Thank you.  Anyone else on this front row?  Sir?  Yes, Call.  Mr. Call?  No. 16?

PROSPECTIVE JUROR 16:  Yeah.  To go back on -- like, you went on to that question from the question before on the feelings of it.

MR. SCHROEDER:  Yes.

PROSPECTIVE JUROR 16:  So, like, was that branch shut down due to political reasons?

MR. SCHROEDER:  No.

PROSPECTIVE JUROR 16:  No.  Okay.

MR. SCHROEDER:  No, it wasn't.  But that does beg the question, so in this case, the REI division was shut down which led to the termination of three individuals including Dr. Porter.  Does the fact that my client, for legitimate reasons, shut down its division, the REI division, will that impact your ability to be fair and impartial towards my client with respect to this case?  Thank you.  Thank you for that follow-up.

One of the issues that resulted in this -- one of the things that happened as a result of shutting down the REI division is that three physicians were terminated, including Dr. Porter.  And so there was a layoff; there was a reduction in force.  And I know there was some questions from Mr. Jones earlier about the subject, but I want to follow up on that really quick.

Have you or a family member or close friend experienced a reduction in force or layoff situation?  Okay.  I'm going to start on the top floor, and I'll work my way down.  Ms. Clement.

PROSPECTIVE JUROR 1:  I have not experienced a layoff yet, but as a VA employee, it's looming.

MR. SCHROEDER:  Right.

PROSPECTIVE JUROR 1:  And they're saying no one is safe, so...

MR. SCHROEDER:  Right.  So you have anxiety about that or concern about that?

PROSPECTIVE JUROR 1:  Yeah, it's on my mind very much.

MR. SCHROEDER:  The rest of the top.  Mr. Morin.

PROSPECTIVE JUROR 2:  My department at work had a layoff last week.  We lost two good people.

MR. SCHROEDER:  I'm sorry.  Say that again.  You lost...

PROSPECTIVE JUROR 2:  We lost two good people.

MR. SCHROEDER:  Okay.  And there are two people -- were you close to them?

PROSPECTIVE JUROR 2:  Yes.

MR. SCHROEDER:  And they were laid off?

PROSPECTIVE JUROR 2:  Yes.

MR. SCHROEDER:  Okay.  And I think we had somebody else up here.  Ms. Yanus, No. 6.

PROSPECTIVE JUROR 6:  My husband got laid off during COVID, and it ended up working out well for my family because my kids were at home, and he had to find

another job, and it was actually an okay experience for us.

MR. SCHROEDER: Okay. Ms. Turka.

PROSPECTIVE JUROR 9: Turka, yeah. I've never been laid off due to reduction in force, but in my industry, it's extremely common, and so I've seen a lot of colleagues come and go because of it.

MR. SCHROEDER: Yes, sir. Hold on a second. Desautels.

PROSPECTIVE JUROR 12: Desautels.

MR. SCHROEDER: Desautels. Sorry.

PROSPECTIVE JUROR 12: I've been laid off. I have a few friends that have also. My father has before.

MR. SCHROEDER: Anyone else on the second row? Ms. Butler?

PROSPECTIVE JUROR 13: Yeah, I'm going to echo with what the first juror said about being a federal employee and reduction in force kind of on the way.

MR. SCHROEDER: Yeah. Not knowing the instability of that.

PROSPECTIVE JUROR 13: Yeah.

MR. SCHROEDER: Okay. Thank you. Anyone else?

PROSPECTIVE JUROR 18:  For budget cuts, was once placed on, was it a pink slip or a rift note?  I forget, but the budget passed and I was able to keep my job, but it was a budget thing but still, a potential layoff or loss of job.

MR. SCHROEDER:  Understood.

Anyone else in the first row?  I'll start this way and go that way.  Ma'am?  Ms. Marble?

PROSPECTIVE JUROR 27:  Yes.  I have a partner that got laid off just due to cuts from the company.

MR. SCHROEDER:  Do you know whether they received severance or --

PROSPECTIVE JUROR 27:  No.

MR. SCHROEDER:  Do you think that would affect your ability to be impartial here?

PROSPECTIVE JUROR 27:  Not at all.

MR. SCHROEDER:  Ms. Viens.

PROSPECTIVE JUROR 26:  Yeah.  I have never been laid off, but I stated earlier that I had to lay off 12 people and I have throughout my career.

MR. SCHROEDER:  Right.  Anyone else down here?  Yes, Wetherell, yes.

PROSPECTIVE JUROR 22:  I worked for a non-profit, and we've had a couple times where funding has decreased over the years and we've had to lay off

people, sometimes severance, sometimes not, and we're in a similar situation that she's describing -- where trying to start to lose some of our federal funding that will likely contact our funding.

MR. SCHROEDER:  Thank you for that.  The fact that there was a reduction in force, would that impact your ability to be fair and impartial in this case? Because that's one of the things that did happen, a number of people were terminated, including Dr. Porter, at the time the REI division was closed.  Does anybody have any concerns that they might not be able to be fair and impartial in listening to the defendant, my client's defense, as to why it happened?

Okay.  Thank you.  Now, just a few more follow-up questions very quickly.  Have you or a family member ever been accused -- you, a family member, or close friend ever been accused of discrimination against an employee in either a charge of discrimination or a discrimination lawsuit?

Have you or a family member, close friend ever made a discrimination or a retaliation claim at work, just an internal complaint?  Have you, a family member, close relative ever made a complaint against your employer regarding a medical leave of absence?  So not a workers' comp claim or anything like that, but an

actual claim of discrimination or retaliation because of being on a medical leave of absence? I think, Mr. Morin, you testified to that, your sister-in-law. Okay. Anyone else?

Now, if a person with a disability is terminated from his or her job, would anyone assume that that person's status as having a disability was the reason that they were terminated? Just right away, a gut reaction? Or would you consider other things that may be at play? Does anybody have an issue about being fair and impartial in that regard?

This is a broader stroke question. Do you have an opinion, whether positive or negative, about former employees suing their employer for employment discrimination? Does anyone have a strong feeling one way or the other?

Can you -- these are broader in this sense, that you were asked a series of questions about Mr. Jones before lunch, and my question is whether or not anything after lunch you realized, Well, maybe I need to add something to a prior question that came up because you thought about it a little bit more? Did anybody have any of that ah-ha moment at all? Can you think of anything in your own respective lives that reminds you of this case at all?

THE COURT:  There's a hand in the back.

MR. SCHROEDER:  I'm sorry, Mr. Pendergrass.

PROSPECTIVE JUROR 3:  Something I just feel I should share is that my partner, my wife, is a medical doctor.  She's a physician.  She worked for the University of Vermont Medical Center.  So I guess I -- in hearing about her interactions with her work, you know, it's not as, you know, employees and employers don't always see eye-to-eye on everything.  So I guess I just -- I have had the experience of hearing some of the positive and not so positive things about her interaction with her employer.

MR. SCHROEDER:  How long has she been at UVMMC?

PROSPECTIVE JUROR 3:  So it would be 14 years or 15 years depending on whether you count her residency.  She was a resident at the University of Vermont as well.  So that would have started in 2010.

MR. SCHROEDER:  Okay.  So she's had a long-time affiliation with UVM Medical Center.

PROSPECTIVE JUROR 3:  Correct; that's right.

MR. SCHROEDER:  As a result of that, you've heard a lot of her stories, good, bad, indifferent, I guess?

PROSPECTIVE JUROR 3:  Correct.

MR. SCHROEDER:  And did that relate to, like, workplace issues between employees and managers, et cetera?

PROSPECTIVE JUROR 3:  I think sometimes, yes.

MR. SCHROEDER:  Okay.  And I don't want to put words in your mouth, were they negative experiences, or was she talking to you about positive experiences?

PROSPECTIVE JUROR 3:  Well, my wife is involved in family medicine.  I think it's generally considered that those physicians have quite a lot of work to do and, in the medical system, bear a lot of the load.  So, you know, I do think sometimes they have not been all positive experiences.

MR. SCHROEDER:  Okay. Fair enough.  Thank you.  Anyone else?  Sorry I missed you initially. Anyone else?

PROSPECTIVE JUROR 18:  Can you ask the question again, or can you repeat the question?

MR. SCHROEDER:  Of course I can.  Let me see if I've got it.  Actually, it did slip my mind.  The issue of whether anybody worked in an employment setting, specifically a healthcare setting, and had workplace disputes as part of their experience.  Does that --

THE COURT:  Ms. Zambarano, did you say no?

MR. SCHROEDER:  Yes, she said no.  I got the (indicating).

I know what it was.  Here's the question.  I knew I would get there.  Can you think of anything that reminds you of this case, and Mr. Pendergrass brought up the fact his wife is at UVM Medical Center.  That was a general question, so you made me stay on my game there.

Does anyone have any strong feelings one way or the other about money damages awarded in litigation? Do you feel like they're too high, too low or anything?

Ms. Zambarano?

PROSPECTIVE JUROR 18:  I stated that already, but, yes, I don't -- from personal experience, it hasn't happened in our family where -- you know, a death resulted on my side.  The cause was our family's side, or my brother specifically, and the person who was not physically injured but emotionally injured went for, you know, large sums of money due to social damage, emotional damage.

MR. SCHROEDER:  Okay.  And did you think that was fair, unfair, not right?

PROSPECTIVE JUROR 18:  At the time, I felt it was unfair because they used the system and waited

until the last possible moment.  I don't know the exact term for that but, you know, there's a period where you can sort of make that claim or file it --

MR. SCHROEDER:  Yes.

PROSPECTIVE JUROR 18:  -- and they waited until, like, the last 24 hours of that.

MR. SCHROEDER:  Okay.  And did that sway your opinion about that particular subject?

PROSPECTIVE JUROR 18:  I was very young at the time.  I was 24, so I feel like I'm in a better place, but I just feel like I need to disclose that information.

MR. SCHROEDER:  I appreciate your disclosure.  I think all of us do.  And I think Mr. Jones said it upfront and forgive me for not saying it upfront.  You know, we obviously take our cases seriously, and we work really hard, but we appreciate you being part of this process and your time commitment, and we know that, you know, time is very valuable.  So thank you.  Thank you for your disclosure.

PROSPECTIVE JUROR 18:  I just wanted to add one other piece.  Again, as a disclosure, I have another brother who was hit by a state plow.  He's alive.  He's recovered, but they had a limit on what they could give.  So here, you know, when it's private

you can go to the moon, yet in this case when the State was involved, there was a very set --

MR. SCHROEDER:  A cap.

PROSPECTIVE JUROR 18:  Yeah, a cap for sure. An unrealistic cap in some opinions.  But, again, that was when I was in my -- he was 25, so...

MR. SCHROEDER:  At that time, did you have strong feelings about that?

PROSPECTIVE JUROR 18:  I was disappointed, knowing the injuries that were sustained.  But, again, just I wanted to disclose that to you.

MR. SCHROEDER:  Now, one of the other things about this case is that the hospital made a business decision to shut down the REI division, which some people may think was unpopular, popular, not a good idea.  Would that in any way impact your ability to be fair and impartial in this case to listen to the evidence about why it was shut down and render a verdict that's fair and impartial?

PROSPECTIVE JUROR 4:  Depends on why it was shut down.

MR. SCHROEDER:  Right.  Right.  But you have an open mind to listening to the hospital system's defense --

PROSPECTIVE JUROR 4:  Right.  Mm-hm.

MR. SCHROEDER:  -- in terms of why it did what it did?

PROSPECTIVE JUROR 4:  Yes.

THE COURT:  That's Mr. Bataille.

MR. SCHROEDER:  That is Mr. Bataille, yes.

THE COURT:  Okay.

MR. SCHROEDER:  Is there anybody -- and this is the last question.  Is there anything else that -- anything else -- so this is a really open-ended question.  Anything else that you think you believe might make it difficult for you to be fair and impartial in this case?  Anything?  Ms. Tarka?

PROSPECTIVE JUROR 9:  Turka.

MR. SCHROEDER:  Turka.  I'm sorry.

PROSPECTIVE JUROR 9:  I want to go back to the list of witnesses, Katrina Thorstensen.  Sorry.

MR. SCHROEDER:  Thorstensen.

PROSPECTIVE JUROR 9:  I don't know this person personally, but I'm wondering if my inlaws know her.  It's very distant.  That's all.

MR. SCHROEDER:  Other than that?

PROSPECTIVE JUROR 9:  Other than that, I mean, they're all in the medical field, but I have never met this person.

MR. SCHROEDER:  Do you know anything about

her?

PROSPECTIVE JUROR 9:  I mean, other than she's friends with my inlaws, if it's the same Katrina.  No.

MR. SCHROEDER:  Okay.  Good, bad?

PROSPECTIVE JUROR 9:  No.

MR. SCHROEDER:  Well, thank you.  Thank you very much for your time.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

At this time, I am going to be giving the attorneys some time to consult their notes about all of the information that they have gathered between this morning and this afternoon.  Now would be a time, if you would like, you can take a facilities break, but I would ask that you, kind of, return to the courtroom as soon as you possibly can, because the lawyers sometimes like to see your faces here so they can remind themselves of who said what as they review their notes.  Okay.  Again, we won't be talking about anything that's going on here until we return.

(Recess taken.)

(The following proceedings occurred in the robing room.)

THE COURT:  Ms. Degreenia, I know that you requested to meet with me.  I asked the attorneys to

come back here as well because I'm assuming it has to do with whether you think you can serve.

PROSPECTIVE JUROR 21:  Right.

THE COURT:  Are you comfortable speaking to us now?

PROSPECTIVE JUROR 21:  So I live 88 miles from here.  I live in Concord.  I have three dogs at home, and I don't have anyone to take care of them.  And my husband was killed at work, and we had to sue the insurance company to get them to pay.  And I just didn't want to say anything, but I don't think -- like, I don't think the man is bad, but like I'm certainly not the kind of person you probably want deciding because I'm still pretty bitter.  It's been eight years, but it's like it was yesterday.  He was killed making snow at Burke Mountain.

THE COURT:  I'm sorry.

PROSPECTIVE JUROR 21:  We had to do a wrongful death suit.

THE COURT:  This is Anna DeGreenia who is Seat 21.  Would any counsel like to ask Ms. Degreenia any questions?

MR. SCHROEDER:  Sorry for your loss.

THE COURT:  Thank you, Ms. Degreenia.  I would ask that you go back to the courtroom for now and

we'll be out shortly.

PROSPECTIVE JUROR 21:  Sure.

(Juror exits.)

THE COURT:  I think Emerson left, but when he comes back, I wanted to let you know that Ms. Zambarano in Seat 18 said to him, "Is it okay if I say hello to you?"  Apparently, they used to be neighbors when Emerson was a kid.

MR. SCHROEDER:  I was like, I don't think she was my neighbor in Jersey.  I don't think.

THE COURT:  So I can let Emerson provide any more details.

MR. SCHROEDER:  I think I saw it.

THE COURT:  Emerson, would you like defense counsel to know about Ms. Zambarano?

THE CLERK:  Yeah.  Ms. Zambarano was an ex-neighbor of mine when I was a kid.  I thought the 20 years and beard probably made it so she wouldn't recognize me, but I was mistaken.  So she just asked me, you know, where I was living and how many kids I had, what I was up to, that sort of a thing.  I tried to keep it short, but just so everyone knew.

MR. SCHROEDER:  I think you're off the jury.

THE COURT:  Okay.  Thank you.

MR. SCHROEDER:  Thank you for that.

So, typically, we would start with excuses, there were no requests to be excused from the jury, so no excuses to discuss. No one raised a hand when I raised qualification questions. So there is nothing to discuss about that, so we'll start with -- I should find you another seat.

MS. McDONALD: I'm all right.

THE COURT: Start with for-cause challenges. As I mentioned to you earlier, we do for-cause challenges for the entire venire, so it won't just be the 12 in the jury box. All 28. And the way we'll do this, you can just kind of remember this, so when it's your turn to go, I'll ask you if you have any for-cause objections. You'll tell me the person that you object to. Might save us some time then if you consult with opposing counsel to find out if there's objection to it. If all parties are in agreement, then that person can be used. If there is a disagreement about it, then the one who raises the for-cause challenge can tell me why that's the case, hear from the other side, rule on it and move to the next one. Okay?

So why don't we start with Plaintiffs, Mr. Jones.

MR. JONES: Thank you. Yep. I'll start at 1, and working my way up, we would move for cause to excuse Eric Morin.

THE COURT:  Is there an objection to Mr. Morin in Seat 2?

MR. SCHROEDER:  No objection.

THE COURT:  Okay.  So Mr. Morin will be excused.

MR. JONES:  Our next objection for cause is No. 6, Molly Yanus.

THE COURT:  Is there an objection to that?

MR. SCHROEDER:  Yeah.  We object.

THE COURT:  Okay.  So, Mr. Jones?

MR. JONES:  Frankly, she acknowledged that she's done some research into the case, and she went onto PACER and reviewed filings.  I find that to be inappropriate for a member of the jury.

MR. SCHROEDER:  She didn't actually say PACER.  She did Google AI.  She didn't go onto the case like Mr. Morin.  He went onto the case docket.  She just did a Google search.

MR. JONES:  I think that's right.  But she was still doing research on the case.

THE COURT:  Okay.  So let me just consult my own notes.  That consisted of 20 pages of notes here, so please be patient with me.  So I did have Ms. Yanus saying that she read three to four sentences from some type of AI generated news and, therefore, knew the case

was about a doctor and involving fertility.

MR. COFFIN:  That's exactly what I wrote, or shockingly close.

THE COURT:  Based on the fact that she has consulted some type of outside source to get information on this case, I will sustain the challenge for cause with Ms. Yanus, so she will be removed from Seat 6.

All right.  Mr. Jones.

MR. JONES:  My next challenge for cause will be Ms. Zambarano.

THE COURT:  Okay.  Objection to that from the defendants?

MR. SCHROEDER:  Object.

THE COURT:  Okay.  Mr. Jones?

MR. JONES:  She said multiple times in response to my questioning and again during Mr. Schroeder's questioning that she had strong feelings about REI although she wasn't particularly specific about it, but she did say multiple times that she had very strong feelings about it but she hoped it wouldn't influence her ability to be impartial.  That was my primary objections, Your Honor.

THE COURT:  Okay.  Mr. Schroeder?

MR. SCHROEDER:  Yeah.  I don't recall her

having -- I think she was all over the map, quite frankly. I think she said -- I asked her, and she said it was up to the individual's case and happy that kids are able to have families. I think we're all in agreement that we don't know truly what her opinion is one way or the other, but she didn't let on that that would be a basis to be a for-cause strike.

THE COURT: Okay. So my notes for Ms. Zambarano, when she was first questioned, she said she would like to think she can be fair. When she was asked additional questions, she said REI, I have as a quote, "stirs something up in me. I would like to think I would be fair and impartial. I don't know. I hope I can be fair. I just don't know."

So I think based on that, I am going to take the for-cause challenge on Ms. Zambarano that is No. 18.

Mr. Jones?

MR. JONES: Yeah. No. 24, Clark Agnew.

THE COURT: All right. Any objection to No. 24, Clark Agnew?

MR. SCHROEDER: Object.

THE COURT: Okay. Mr. Jones?

MR. JONES: Yeah. He stated that his business has financial ties to Dartmouth including the hospital; that he runs an engineering consulting firm

that does work with Dartmouth generally.  I asked him if that also includes the hospital and he said, Oh, yes, that includes the hospital.  So he has financial ties to the defendant.

THE COURT:  Mr. Schroeder or Mr. Coffin?

MR. SCHROEDER:  I was just going to say that I think that his company -- I don't believe that he's the owner of the company.  He works at a company that does work with Dartmouth-Hitchcock.

MR. COFFIN:  My notes and recollection are that his company is doing work with the hospital, but he identified UVMC, and he identified work that they're doing with Dartmouth College.

MR. JONES:  And I further inquired.

THE COURT:  One at a time.  One at a time.

MR. COFFIN:  And you did follow up, but it seemed like he made a distinction between the first and second answer that the New Hampshire office for his business is the one that would know about the precise disposition of the work, and that he wasn't directly involved.  Maybe that's an inference.  I don't know how he's a for-cause challenge because he's not, like, the leader and director of the sole company.  He's working here in Vermont for some division of this company that does work mostly with UVM and Dartmouth.

THE COURT:  Mr. Coffin's recollection is consistent with mine.  I recall the question being asked whether he could be fair and impartial, and he did answer yes, that he could be fair and impartial.  So I will overrule the for-cause challenge for Mr. Agnew.

Mr. Jones?

MR. JONES:  His next door neighborhood.  Benjamin Lowe, No. 25.

THE COURT:  Is there an objection to that, Mr. Schroeder?

MR. SCHROEDER:  If I may have one moment to consult my esteemed partner?

(Pause.)

MR. SCHROEDER:  We'll agree to that, Your Honor.

THE COURT:  Okay.  So Mr. Lowe in Seat 25 will be removed.  Any further for-cause challenges from the plaintiff?

MR. JONES:  I have nothing further.  Thank you.

THE COURT:  Okay.  And for-cause challenges from the defense?

MR. SCHROEDER:  We have a few.  The first one was Mr. Pendergrass.  I think -- I know that

Mr. Long -- Mr. Jones asked the question early on if anybody was affiliated with any of these entities, anybody have anybody work there. Only when I asked the question on my end: Yeah, my wife has been there for 14 years. She works in family medicine. She's been involved in a number of workplace disputes. I think that's a little too close to home given everything that's in play. She works at UVM. That's where the plaintiff works. She works in family medicine. I'm sure there's some knowledge of her, but that was in answer -- that came up much later in the inquiry. And I know people were asked whether they had, you know, any affiliation with these entities, and I think he's being honest, but I think the more you probe, the more it's, Yeah, she talks to me about all the workplace disputes in the context of UVM Medical Center; that's where the plaintiff works right now. I don't see how this guy is going to be unbiased.

THE COURT: Mr. Jones.

MR. JONES: Well, first of all, I think his wife works for UVM Medical Center, not Dartmouth, who is not a party to the case, when I asked him the question, if anybody works for the hospital. Mr. Schroeder asked does a family member work for the hospital, that's when he answered, so he wasn't

withholding information.  He also answered the question, Would that affect your ability to be fair and impartial, and he said, No, I don't believe so.

THE COURT:  I do recall the first round of questioning being if people themselves worked at Dartmouth.  I'm not concerned with that coming out later.

MR. SCHROEDER:  I don't have that concern either.

MR. COFFIN:  The thing that was most concerning to me is that he talked about having conversations with his wife, her role, the dealings with management there, and that those were not all positive in any way, but she had kind of talked about the hospital bureaucracy, and that's an important part of this case, and he's married to somebody who is, I believe, deeply involved with that.

MR. JONES:  If it was Dartmouth that was her employer, I would see the point.

THE COURT:  I can see that there might be subject matter relatedness, Dartmouth and UVM, the spouse does work at UVM, and he was expressly asked can you be fair and impartial, and he did confirm that.  So I will leave him on the jury.  So that is Mr. Pendergrass in Seat 3.

All right. Mr. Schroeder, next for cause?

MR. SCHROEDER: Yes. The next one was Malachi Brennan, No. 10. I know he had some pretty guarded answers on the first go round. I do know that his law firm does employment discrimination cases, but the fact that he had this hotly contested litigation involving Mr. Coffin and Mr. Jones' firm and Mr. Jones' firm and his firm were aligned, I'm not sure how much more close you can get to the potential bias there, and it was a hotly contested litigation over a couple of years. You know, I think his -- I had to get it out of him, but the fact that his firm is aligned with Mr. Jones' firm, I think, speaks for itself.

MR. COFFIN: Not just aligned but joint defense agreement aligned for years, and Langrock was a little late to the party.

MR. JONES: Very late.

MR. COFFIN: And so really, just very tough litigation for years with Sheehey and John Rose and whatever they were calling that firm then. And, you know, just was not just an incidental run-of-the-mill case. It was a really tough case where we were adversaries, and they were members of the joint defense.

THE COURT: If I could just ask you to pull

that out, if you would.  So in terms of visibility to serve as a juror, what are you saying?

MR. COFFIN:  First of all, he's an attorney, and the practice is in this area, and I worry about his ability to remain fair and impartial in applying the legal instructions.  But aside from that, I just have a hard time thinking that our side will get the same kind of treatment as Mr. Jones' side.  He's such a nice, friendly, wonderful guy.  It was a very acrimonious piece of litigation.

MR. SCHROEDER:  Also, you represented the husband, and he represented the wife or vice versa, but either way, it's husband and wife.  I don't know how much more you can be in terms of joint defense.

MR. JONES:  It doesn't affect counsel's ability to be fair and impartial.  And everybody on that panel knows what it means to be fair and impartial.  He's a lawyer, and he was very clear he could remain fair and impartial.  He was opposing counsel in a case.  Okay.  First of all, he was the associate doing the writing.  He was not lead counsel.  Mr. Rose was counsel.  There's no acrimony between Mr. Brennan and Mr. Coffin at all.  It's a small bar.  We all have opposing cases against each other, if you're fighting, it doesn't mean that you're impartial.

There's nothing to suggest that Mr. Brennan couldn't be unfair or impartial in this case just because he was an associate on a case.

MR. COFFIN:  It wasn't just any case is the problem.  I wouldn't raise it --

MR. JONES:  It wasn't extraordinary either.

THE COURT:  Mr. Schroeder, do you have something?

MR. SCHROEDER:  I was going to say I wouldn't downplay the significance of associates on cases.  I'm just --

MR. JONES:  I'm just saying Malachi and Tris were not getting at it.

MR. SCHROEDER:  I understand.  Only when I asked specifically the relationship between his firm and --

THE COURT:  One at a time.  Please be mindful of the court reporter.

MR. SCHROEDER:  They were aligned and had a joint defendant -- never mind husband and wife -- they were representing.  They were aligned on a litigation matter that was hotly contested where my co-counsel who was on the other side -- you know, I think that's --

MR. JONES:  Are you done?

MR. SCHROEDER:  I'm good.

MR. JONES: Quite frankly, I entered a joint defense agreement with Mr. Coffin's firm many times. That doesn't mean that it becomes an issue of partiality here, so -- okay? So our clients were aligned. They were married. Okay. That doesn't mean that Mr. Brennan is somehow suddenly questionable in terms of being fair and impartial in this case.

THE COURT: I don't recall there being any questions to Mr. Brennan about whether this kind of joint defense agreement and alignment of interests in this case did actually mean that he has some special affection for Mr. Jones -- professional affection for Mr. Jones, unless I'm mistaken. Did anyone else hear that?

MR. COFFIN: Inferentially, I would be concerned in jury deliberations, you know, him making statements about different lawyers in the case and what they're saying. And I just worry that given his adverse position strongly to this in this very big and very vigorously contested piece of litigation would require him to be impartial.

THE COURT: Yeah. I understand your point on that. There's also a certain amount of speculation to that, that I would be reluctant to indulge right now to remove this juror. So I'm going to leave him on.

That's Mr. Brennan.

All right.  Mr. Schroeder?

MR. SCHROEDER:  Nothing else for cause.

THE COURT:  Okay.  So then my list has that we are removing Mr. Morin, Seat 2; Ms. Yanus, Seat 6; Ms. Zambarano, Seat 18; and Mr. Lowe, Seat 25.

So now what we are going to do is fill all of those seats with jurors beginning with Box 13.  So Mr. Howe, I'll ask that you make sure that I don't make a mistake here.  I'm sure the lawyers will let me know this as well.  So Julie Butler from Box 13 goes to Seat 2.  Sonja Severance from Seat 14 goes to Seat 6, and we do not need to replace Ms. Zambarano.  She's, of course, removed but doesn't need to be replaced because she's not in the group of 12.

MR. COFFIN:  Do we need to replace Juror 13, Butler?

THE COURT:  We should not have to replace 13 because we're going to have 12 jurors.

MR. COFFIN:  Alternates?

THE COURT:  We don't do alternates.

MR. COFFIN:  We can do 12.  Thank you for answering the question.

THE COURT:  Right.  Right.  So I just told you what I'm going to do, and I never wrote them down.

So let me -- Julie Butler is going in Seat 2, and Sonja Severance is in Seat 6, and that gives us 12 jurors. No alternates. So we're in good shape. So the for-cause challenges, Mr. Schroeder? No further for-cause challenges?

MR. SCHROEDER: No, sir.

THE COURT: All right. Okay. Then we'll move now to peremptories.

Mr. Howe, is this looking good to you?

THE CLERK: Yes, Your Honor.

THE COURT: So as I mentioned to you this morning, each side has three peremptories. We'll start with the plaintiff.

MR. JONES: Thank you, Your Honor. We'll start with No. 12, Dollin Desautels.

THE COURT: Right. And your peremptories are now in the 1 through 12. So then Dollin Desautels is struck from Seat 12.

Mr. Schroeder?

MR. SCHROEDER: Our peremptory is No. 3, Mark Pendergrass.

THE COURT: Okay. Mark Pendergrass is struck from Seat 3.

Mr. Jones.

MR. JONES: We're only focusing on Jurors 1

through 12 right now?

THE COURT: Right.

MR. JONES: We pass.

THE COURT: Pass?

MR. JONES: Yes.

THE COURT: Mr. Schroeder?

MR. SCHROEDER: No. 10, Malachi Brennan.

THE COURT: Okay. Malachi Brennan is struck from Seat 10. And final peremptory.

MR. COFFIN: They just passed.

THE COURT: They passed and then it goes --

MR. COFFIN: Once they pass, they're done.

THE COURT: They passed, and it comes back to you.

MR. SCHROEDER: We're going to get this system down.

MR. COFFIN: Exactly. We'll contest it later.

MR. JONES: Can I ask Mr. Vitt a question?

THE COURT: Sure.

MR. JONES: I'm sorry, thank you. Yeah. We're going to -- we'll strike Ms. Severance.

THE COURT: All right. Sonja Severance is struck from Seat 14.

THE CLERK: Seat 6, Your Honor.

THE COURT:  Oh, I'm sorry.  Thank you very much.  Seat 6.  Sonja Severance is struck from Seat 6.  She had been moved.

All right.  Mr. Schroeder?

MR. SCHROEDER:  One second, Your Honor.

MR. COFFIN:  So who -- won't we have -- don't we have to fill Seat 6?

THE COURT:  We will after all the strikes are done, then I can go and slide them up.

MR. COFFIN:  That's our order of worship.  Got it.

(Pause.)

MR. SCHROEDER:  Because we want to make the chart even more messy, we're going to exercise a peremptory challenge on Julie Butler in Seat No. 2.

THE COURT:  Okay.  So that concludes the peremptories.

MR. JONES:  I have one more.

THE COURT:  He did.  You passed, and they should -- am I losing count of this?

MR. JONES:  I did one.

THE COURT:  You did one.

MR. JONES:  I passed, and then they did one.

MR. COFFIN:  Don't you lose it when you pass, but --

MR. JONES:  I want to clarify that as long as you didn't pass -- if it was two passes that ended the proceedings, but if a pass was followed by a strike, I still have a strike.  That's how I understood it from this morning.

THE COURT:  Okay.

MR. JONES:  I would like to strike No. 16 Joseph Call.

THE COURT:  So that is beyond the 12.

MR. JONES:  Because he's going to slide in --I could wait until we shuffled people I guess, but I wanted to make sure that I didn't waive a strike. Enough people have been moved with peremptories that he will now be within the 12, I believe.

MR. SCHROEDER:  Well, somebody has to go in No. 10 first.

MR. JONES:  My three and your two left vacancies that need to be filled with 13 through 17.

THE COURT:  Okay.  So we have Jenel Clement in Seat 1.  In Seat 2 -- needs to be filled, right?  So that will be filled then with Ashley Mulcahy from Seat 15.  Seat 3 also needs to be filled, and that will be filled with Joseph Call, Box 16.  Seat 4 is Kevin Bataille.  Seat 5 is Gianna Roque.  Seat 6 needs to be filled, according to my notes, and that gets filled

with Michael Fagan --

THE CLERK:  Yeah.  That's my fault.

THE COURT:  Michael F-a-g-a-n.  Seat -- well, 7 is Kevin Reid.  8 is Kattie LaFontaine.  9 is Ashley Turka.  10 is to be filled by Jason Smith.  11 is Edward Gale, and 12 is filled by -- 12 is filled by Carolyn Ellenberger.

MR. JONES:  Correct.  And then I move to strike Joseph Call.

THE COURT:  Because Joseph Call is in Seat 3.

MS. NUNAN:  Jason Smith.  And --

THE COURT:  And then Joseph Call is -- so we have an agreement that Anna DeGreenia would be excused by all parties.  So then Michael Wetherell.

MR. JONES:  Yep.

MR. COFFIN:  He goes into 3 where Call was.

THE COURT:  Michael Wetherell in Seat 3.  Okay?

MR. JONES:  I guess we have a jury.

THE COURT:  This is our jury.  So we'll go out, excuse the appropriate people, excuse the people in the gallery and then administration of the oath, and we should talk now about what happens after that in terms of opening statements.

So it's 2:40.  By the time we go out there and

take care of this, administer the oath, provide the preliminary charge to the jurors, excuse everyone else, we can expect that to be a little after three, probably, by the time all of that gets done. Are the parties contemplating doing their openings today?

MR. JONES: We're ready.

THE COURT: And Defense?

MR. SCHROEDER: Ready.

THE COURT: Okay. So we'll do those, and then the final thing then -- well, the only outstanding item I think is the exhibits and the opening statement.

MR. VITT: Yes. I will not quote from the exhibits. I'm going to describe, you know, kind of the substance, but I'm not going to get into "Ed Merrens wrote an e-mail that said X."

THE COURT: Okay. So then does that require the exhibits to be used at all?

MR. VITT: No. I mean, I can summarize -- I mean, I know what they said. Basically they're internal e-mails saying that there's a nursing shortage and people expressed, you know, doubts about the accuracy about that or something. I'll be a little more succinct than that, but you get the idea. But I don't think -- we don't run into the issue of me theoretically using an exhibit, although I think if

push came to shove, but assuming you would let me, so I'm trying to avoid having, you know, an issue where there's an objection.

I think I'll certainly be talking about what was going on at Dartmouth-Hitchcock that led to this decision, why Misty Porter wasn't offered a position despite her credentials, et cetera, but I don't think the objection I heard before is one that is still, kind of, on the table. I'm working to avoid it.

THE COURT: Okay. Mr. Schroeder?

MR. SCHROEDER: That's fair.

THE COURT: Okay. So then there's no issue about introducing the exhibits. It will be more what I call a Stanford opening. This is what you can expect the evidence to show, and the exhibits are a non-issue. Okay.

Anything else at this time? All right. And then after openings, as I mentioned to you, I'll excuse the jury. That will probably be all we get through for today, and if you want to wait around, we can talk a little bit about what we anticipate to happen tomorrow in terms of witnesses and things like that.

MR. SCHROEDER: That would be great.

(The following proceedings occurred in the courtroom.)

THE COURT: Okay. Thank you again for your patience. At this time, I'm going to ask the deputy clerk to read the names of those who have been selected to serve on this jury. Please wait for Mr. Howe to finish reading that list. If you do not hear your name, at the conclusion of these 12 names, that means you have not been selected, and you may get up at that time and leave. So I will thank you in advance, if you are not serving on the jury, for being here today and for your service. And, of course, thank those who have been selected for your anticipated service.

Mr. Howe.

THE CLERK: Jenel Clement, Ashley Mulcahy, Michael Wetherell, Kevin Bataille, Gianna Roque, Michael Fagan, Kevin Reid, Kattie LaFontaine, Ashley Turka, Jason Smith, Edward Gale, and Carolyn Ellenberger.

THE COURT: So, again, those are the names of the selected jurors. If your name is not on that list, you may leave now.

UNIDENTIFIED SPEAKER: Sir, we can leave the building, right, not just go back there?

THE COURT: Yes. You may leave the building.

UNIDENTIFIED SPEAKER: Thank you all very much for all you do.

THE CLERK:  I'm going to line you up in order.  Ms. Clement, you can stay where you are.  Next to Ms. Clement will be Ashley Mulcahy.  Michael Wetherell, you're next to Ashley.  We have Mr. Bataille and Ms. Roque.  And last on that top row is Michael Fagan.  So where Ms. Turka is sitting, Kevin Reid will be sitting followed by Kattie LaFontaine.  Then Ms. Turka followed by Jason Smith, Edward Gale.  And lastly, Carolyn Ellenberger.

Thank you, folks.  And if you will all stand and raise your right hand, I'm going to administer the oath.

(Jurors sworn.)

THE CLERK:  Thank you.

THE COURT:  Okay.  Before we proceed with opening statements, I'm going to be reading to the jury preliminary jury instructions.  The deputy clerk will be handing a copy of this preliminary charge now.

Okay.  Preliminary jury instructions.  Do not discuss, either among yourselves or with anyone else, anything related to this case until it is time for deliberations.  If anyone talks to you about the case or you hear or read something about the case, you must notify the court officer immediately.

You also must not Google or otherwise search for

any information about the case or the law which applies to the case or the people involved in the case including the plaintiff, the defendant, witnesses, the lawyers or the judge.  Do not read, view or listen to any accounts or discussions in the case reported by newspapers, television, radio, the internet, or any other news media.

Do not attempt to research any fact, issue or law related to this case whether by discussion with others, by research in the library or on the internet, talking with others, or by any other means or source.  In this age of instant electronic communication and research, I want to emphasize that in addition to not conversing with anyone face-to-face about the case, you must not communicate with anyone about the case by any other means including by telephone, text messages, e-mail, internet chat or chat rooms, blogs, or social websites such as Facebook or X.

Prior to your resolution of the case and your discharge as jurors, you must not provide any information about the case to anyone by any means whatsoever.  This includes a prohibition on the posting of information about this case or what you are doing in the case on any device or internet site including blogs, chat rooms, social media, or any other means.

Do not at any time during the trial request, accept, agree to accept, or discuss with any person the receipt or acceptance of any payment or benefit in return for supplying any information concerning the trial.  You must promptly report directly to the court officer any incident within your knowledge involving an attempt by any person improperly to influence you or any member of the jury.

Now, ladies and gentlemen, I want you to understand why these rules are so important.  Our law does not permit jurors to converse with anyone else about the case or to permit anyone to talk with them about the case because only jurors are authorized to render a verdict.  Only you have been found to be fair, and only you have promised to be fair.  No one else has been so qualified.

In addition, if you talk to others about the case, it may attempt to influence your decisions or may provide you with information that did not come from evidence introduced in the courtroom.  This, in turn, makes the trial unfair as the parties are unaware of and cannot fairly address this outside information that may be influencing you.

Our law also does not permit jurors to converse among themselves about the case until the Court tells

them to begin deliberations because premature discussions can lead to a premature final decision. In addition, all jurors must be present during deliberations. If you and another juror are discussing a case without your fellow jurors, you are deliberating in private, which is forbidden.

Finally, our law requires that you not read or listen to any news accounts of the case and that you not attempt to research any fact, issue, or law related to the case. Your decision must be based solely on the evidence and other testimony presented in this courtroom. It is not fair to the parties to base your decision upon some reporter's view or opinion or upon information you may acquire outside the courtroom. The parties have no knowledge of what you may have learned and no opportunity to address, confront, or correct it.

These rules are designed to help guarantee a fair trial, and our law accordingly sets forth serious consequences if the rules are not followed. I trust you understand and appreciate the importance of following these rules and in accord with your oath and promise, I know you will do so.

A word on juror note taking. You may take notes during trial if you wish to do so. I neither encourage nor discourage you from taking notes. You may decide

whether taking notes would be helpful to you.  The Court keeps a record of everything that is said in the courtroom and, if necessary, you may ask to review the record during deliberations.  Please do not try to take notes verbatim.  You cannot do this and fully concentrate on the witness at the same time.  If you do not take notes, you should rely on your own memory, and you should not be influenced by the fact that another juror has taken notes.  It is important for you to listen carefully throughout this trial.  Do not become so preoccupied with note taking that you miss any of the testimony or your opportunity to observe the demeanor of each witness.

When you receive your pad, as you have, please print your name on the first page of the notepad and then keep your notes on the inside.  Your notes will be collected at the end of the day.  The Court will keep your notes confidential, and you must also keep your notes confidential.  The only time you may reveal the content of your notes is during the deliberations in the jury room.  When the trial is over, your notes will be collected and destroyed.

So I think you'll find your families and your friends, they're going to want to know what you're doing here, serving as jurors.  If you start that

conversation, they will provide you with information that comes from outside the courtroom. You can tell your friends and family that this is a civil case, but you should not tell them any other details of the case that you have heard today. Every day when you come to the courtroom, I'm going to ask you if anyone has talked to you about the case or if you have heard anything about the case.

You must disregard news reports or any media coverage that might occur in this case. You have to come here every day with a clean slate, uninfluenced by outside information so that your knowledge of the case comes only from what you see and hear in this courtroom. In the event that something happens or somebody says something to you, write a note to me, give it to the court officer, and we'll deal with it, but the goal is really not to start these conversations at all.

All right. At this time, we will proceed to opening statements.

MR. VITT: Could we have a short bathroom break? We went right out here from the chambers.

THE COURT: Okay. We'll take a short bathroom break.

(Recess taken.)

Opening Statement by Mr. Vitt

**OPENING STATEMENT**

MR. VITT:  May it please the Court.  Good afternoon, members of the jury.  My name is Geoffrey Vitt.  We meet today, with my partner Sarah Nunan, and you've already met Eric Jones.  Also in the courtroom is Dr. Misty Blanchette Porter.  I may occasionally call her Dr. Porter, but this case has been pending almost eight years, and I know her as Misty, and actually before this case, I called her Misty.  And I think that what you'll find is that a number of witnesses who come here today will use that name when addressing and talking about her.

This is a lawsuit against a large institution, Dartmouth-Hitchcock Medical Center.  And the basis of the lawsuit is the unlawful termination of Misty's employment after 21 years at Dartmouth-Hitchcock.  The unlawfulness consists of two things:  One, they discharged her because of her disability and, more important, and probably you'll hear more about it, is she was discharged because she was a whistleblower.  She spoke truth to power, and it cost her.

We'll introduce evidence that Dartmouth-Hitchcock fired Misty Porter because she refused to be quiet and ignored the incompetence of two doctors in the REI division.  As a result, she lost a job she loved.  She

Opening Statement by Mr. Vitt

has suffered the indignity and the emotional distress of losing her job; and although she eventually found work here in Burlington at the University of Vermont Medical Center, she's had to spend long tracks of time away from her home, away from her family, away from her husband in Vermont, in Norwich.

As I said, this case has been pending for almost eight years.  It's been a long road.  And after you hear the evidence, we're going to ask you to hold Dartmouth-Hitchcock accountable for the way that it's treated her and the harm that it caused.

Before turning to the lawsuit, I want to talk for just a few moments about Misty and her background. Misty decided when she was in high school, that she wanted to be a doctor.  And while she was in high school, the first IVF baby was born, and she wrote a paper about it, and she decided then that she wanted to be a doctor, and that's what she wanted to specialize in.  She wanted to specialize in helping women be able to give birth.

Misty has pursued that career ever since she went through medical school.  She has decided that's how she wants to spend her career.  "I want to be the best fertility doctor that I can possibly be."

Misty is an exceptional doctor.  That's been true

for about 30 years, but for 21 of those years, she was a doctor at Dartmouth-Hitchcock in the reproductive endocrinology and infertility division, and the short form is the REI division.  Without question, she was the most successful doctor in the REI division using IVF to help women get pregnant.  In fact, she got so adept at it, that there's a term that was widely used: "Misty Magic."  She helped some people get pregnant who had basically given up hope.

Misty was also the go-to doctor when other physicians needed help interpreting ultrasounds, particularly those in the first trimester.  You're going to hear that doctors literally lined up outside her office to get her help.  There was an expression -- someone came back with an ultrasound, I think I'll run it past Misty.  And, finally, Misty could perform complicated gynecological surgeries that no one else in the department could perform.  She could do laparoscopic robotic surgeries that nobody else at Dartmouth-Hitchcock was capable of performing.

Misty loved her work, she was good at it, and she found it rewarding.  She'll describe going to soccer games for her children and somebody across the field holding up a baby that she had helped them conceive.

Part of what made the job special for her was

Opening Statement by Mr. Vitt

being part of a community and knowing that she had been able to help someone have a child, what a gift.  A committed, competent caring doctor with a unique set of skills.

You would think that Dartmouth-Hitchcock would be pleased at having a doctor with that competence with literally a reputation worldwide in some areas.  Apparently not, because in May of 2017, she was called to a meeting with senior Dartmouth-Hitchcock management and told two things:  First, we're going to shut the REI division; and No. 2, after 21 years of exceptional service, you no longer have a job.  You'll be on the payroll for 30 days.

So how did Misty end up in this situation in which Dartmouth-Hitchcock decides to close the REI division and terminate her employment?  The place to start is probably in 2014 when Albert Hsu -- that's H-s-u -- joins the REI division as an attending division.

Now, to be an attending physician, it is expected that you have the knowledge and the experience to be able to see patients, diagnose their problems, and be able to treat them.  Misty hadn't interviewed him.  The first she met him is when he showed up at work, and she quickly figures out that he doesn't have close to the knowledge and experience to be able to do the job for

Opening Statement by Mr. Vitt

which he was hired.

Misty says, Well, I better make the best of this, so for six months she volunteers to take call. When Albert Hsu shows up at nights and weekends and holidays, Misty shows up as well. She wasn't required to do it, but she thought, Well, he's going to be seeing patients, I need to help. The six months' period -- and we'll get to that in a minute -- helped a little, but it certainly didn't get Dr. Hsu to the point he needed to be to be able to appropriately treat patients.

The second doctor you're going to hear about is David Seifer. He also lacked the skills necessary to be able to provide the care for women who came to him for IVF services. In May 2016, the chair of the OB/GYN department, Dr. DeMars -- and you're going to hear that name fairly often during this trial, believe me -- insisted that he be hired as the director of the REI division. There are irregularities in his hiring, and Dr. DeMars had to come before the credentials committee and try and explain these irregularities.

The committee allowed Dr. Seifer to work, but the chair of the committee made it clear to Dr. DeMars that she was responsible to ensure his success. If he failed, if he was not successful, the chair said, "This

is on you," and it was clearly understood that Dr. DeMars' tenure as the chair of the OB-GYN department would be in jeopardy.

Within two months of his hiring, Dr. DeMars, in private e-mails expressed concern about, This person is incompetent, I don't know what he's been doing, but it sure isn't IVF.

Shortly after Dr. Seifer was hired, Dr. DeMars goes to Misty and says, I want you to write a comprehensive, thoughtful report on Albert Hsu. Tell me and tell Dr. Seifer about his competence. What can you tell us?

Misty spent a couple of days. She thought about it carefully, and she wrote an 11-page report that will be in evidence, and you'll get to see it. Misty made it clear that Albert Hsu should not see patients because he is incompetent, and he should no longer be employed at Dartmouth-Hitchcock. She sent a copy of the report to Dr. DeMars. Here's my opinion. Despite the conclusion that Albert Hsu simply lacked the ability to competently perform, Dr. DeMars did nothing, allowed him to continue to see patients, allowed him to continue to operate, and allowed him to continue to go into the ER.

You will hear the testimony of Dr. Julia

MacCallum, who worked with Dr. Hsu in the operating room. Her testimony will be unsettling. She and other doctors reported that he was causing real patient harm, and he should not be permitted to operate. They did nothing.

So what you're going to learn in this case, and what the evidence will demonstrate, is that both of these doctors are not competent and neither of them should have been permitted to see patients, and you have a chair who is compromised. If she says something about Seifer, she risks losing her job, so she says nothing.

Meanwhile, you have women who show up for IVF treatment. Somewhere between 50 and 60 percent of them are paying for this out of pocket, and they hoped to get treatment and the experience of doctors at Dartmouth-Hitchcock to make them pregnant, and it doesn't work. Their pregnancy rates were awful. That is an ugly situation.

In the April-May 2017 period, the DH administrators decide to close the REI division. That decision will come up repeatedly during the course of this trial. You're going to hear a lot about the decision to close the REI division.

When the Dartmouth-Hitchcock witnesses start

telling you that it was necessary to close the REI division and fire Misty Porter, I want you to keep several things in mind.  First, the division was profitable.  They weren't losing money.  Second, the need of girls and women for competent reproductive endocrinology care and treatment does not go away just because Dartmouth-Hitchcock decides to shut the division.

Now, is IVF part of what they do?  No question.  But it's probably 10, 15 percent, no more.  Women, girls have other needs other than just trying to get pregnant through IVF.  And for years, the REI division was the place to go if you needed appropriate reproductive healthcare.  And third, Misty provided care and expertise that no one else -- I'll say it again:  No one else in the OB/GYN department could provide.  She was available and was already working doing a substantial amount of her time in the REI division.  There was no reason whatsoever not to reassign her, and what we're going to demonstrate is why didn't they reassign her?  Two things:  Perception is she had a disability and that she was a whistleblower.

As I mentioned, you're going to hear a lot about the decision to close the REI division, and if there's

Opening Statement by Mr. Vitt

one request that you remember, it's this:  Use your common sense.  Nurse shortages happen, but you make do.  You figure out a way to keep going; you don't shut a division.  Maybe you pull somebody from another section.  You hire somebody to train, you bring back somebody who was perhaps retired who wants to come back and work.  There are ways to avoid taking drastic action to shut down an entire division, and you're going to be hearing about that.

Now, the reason that Dartmouth-Hitchcock provided to people about why it was shutting down the division was, Well, we couldn't recruit and train and maintain a nursing staff, and we had to shut it down.

The person who was involved, the principal person involved who made the decision to close the decision is Ed Merrens.  He's the person at the table over here.  And in a private e-mail, he describes this reason of shutting it down as pretty thin.  He mentions that UVM Medical Center has an REI division.  They manage to have all the nurses they need.  They recruit them; they train them.  What's the difference?  And even if -- and we don't accept it for a moment -- but even if there was a valid reason to shut the REI division, there was no reason that Misty Porter could not have been reassigned to the OB-GYN department.  She was already

spending about 80 percent of her time doing work there.

The nurses and the doctors and in the OB-GYN department wrote a series of emotional, sort of, pleading e-mails saying, We need her; we don't have anyone who has the same set of skills. We rely upon her for reading ultrasounds. We rely upon her for doing surgery that nobody else can do. We absolutely need her. And even if there was a solid reason for shutting down the REI division, there was no reason that Misty Porter could not have been reassigned. Excuse me. I'm going to get some water.

So you have an REI division with two unqualified doctors. What were the options for Dartmouth-Hitchcock? Well, they could have been honest about it and said, Look, we've got two doctors who don't know how to do the job; we need to get rid of them. They might have had to prove it at a for-cause hearing, the doctors might have sued, but that would have at least been the honorable way to proceed.

They don't go this route. They say, Look, we're just going to shut the division, get rid of the two incompetents. And we can get rid of Misty Porter who has been a thorn in our side.

If there is anything that everyone says about Misty Porter is that she is honest and direct, and she

Opening Statement by Mr. Vitt

calls it the way she sees it.  And at some point, the people in the administration were tired of her complaining and explaining that these doctors could not do the job.

There will be a series of e-mails that we'll introduce into evidence where when this issue comes up about what are we going to do with Misty?  And there's several of them that say, Well, we're not sure that she would be interested in going to work in OB-GYN if the job did not involve infertility, which had been her particular area of expertise and passion.

What's surprising about the e-mails is if you were unsure if she was interested in a job, it's not hard to figure out.  She worked in the same facility.  Go down the elevator and talk to her.  Shoot her an e-mail and say let's get together and talk.  Nobody from the administration asked her whether she would be interested in taking a position.  And the answer was "absolutely."  She ended up writing a letter saying, Look, I'm interested, I want that job.  I don't want to lose my job.  No one did.

At one point in this process, there were a series of e-mails, private e-mails, one went to Leslie DeMars saying -- and we will introduce it into evidence, and she says, in this e-mail to management of

Opening Statement by Mr. Vitt

Dartmouth-Hitchcock, that her life would be easier if Dr. Porter were facing a loss of her license to practice medicine.  They had worked together for 20 years.  Who writes something like that?

A fundamental principle of practice of medicine is do no harm.  Doctors take an oath that includes this obligation.  Misty could not and would not turn her back and ignore the harm being done by Dr. Seifer and Dr. Hsu.  She persisted in complaining and got fired as a result.  At the end of this case, you, the jury, will get a chance to say that's not right.  That's not justice.  Thank you.

THE COURT:  Mr. Schroeder.

MR. SCHROEDER:  Thank you.

Good afternoon.  It's getting late, but I want to get both our openings in today, and it was important to make a few comments about our case because this is our opportunity to tell our story.  And let me start by saying we really do appreciate your willingness to be here for as long as it takes to get this case done.  It's an honor to be here in court, and we really do appreciate it.

I want to briefly introduce who I'm here with because you're going to hear from them as well.  Right here is Tris Coffin.  He is a Vermont lawyer and also

part of our team.  Right next to him is Ed Merrens.  Ed Merrens, you're going to hear from throughout the case.  He's going to be here as well as you guys for the duration.  He is the Chief Clinical Officer for Dartmouth Health, our client, and then my able partner, Morgan McDonald, who you will hear from as well.  It's been my privilege of representing Dartmouth-Hitchcock for almost the last ten years, and I'm privileged to be able to represent them here today.

What we get to do in opening statement right now, one thing that I mentioned in -- when we were doing jury selection, in voir dire -- some of my colleagues call it voir dire down in Houston -- is the fact that you're going to hear from Dr. Porter first.  She's going to put on her case in chief, and then Dartmouth Health will get its turn.  It's kind of like a good movie:  Sometimes you have to wait till the end to see the whole deal and see the important parts, because there is a whole story here.

And before I get into kind of the machinations, right, and some of the key facts that we believe will come out in the evidence.  I think you should know the players involved, not just the people in the courtroom here, but a little bit about my client, the institution, right?

Opening Statement by Mr. Schroeder

Dartmouth Health is an integrated non-profit healthcare system that operates as a charitable trust. It's been around for over 200 years. It provides healthcare services to patients across northern New England. Six community hospitals. Five multi-specialty community practice groups. It's got New Hampshire's only academic medical center. Dartmouth Cancer Center is one of only 57 NCI designated comprehensive cancer centers in the U.S. And in addition to all that, it has nursing, rehab, hospice and personal healthcare services throughout northern New England.

As I mentioned before, the person with no tie on is Dr. Edward Merrens. He is, in addition to being a key witness, he is the face of Dartmouth Health, right? Corporations don't have a face, but we do; it's Dr. Merrens. He's been with Dartmouth Health since 1998 holding various leadership roles.

2005, he was the section chief for hospital medicine. 2012, chief medical officer. 2015, system chief medical officer; and the current title that he has since 2016, so approximately nine years, he was promoted to chief clinical officer. He is responsible on a daily basis for being in charge of 1,500 physicians, which, that's almost as bad as being in

Opening Statement by Mr. Schroeder

charge of 1,500 lawyers.  It's probably worse.  It's probably close to, you know, herding cats at many times.  He's had this role for nine years.

You're also going to hear testimony from a number of other former employees of Dartmouth Health, so a number of people that are no longer here.  This case has been going on very long, and a number of those people in management at Dartmouth Health are in various other roles.

Daniel Herrick he is thankfully retired at this point.  He is the former vice president of perioperative and surgical services.  He's the business process guy, so he would tell you, or you will hear testimony about the fact that he's a Lean Six Sigma black belt, and so of course, I thought, he looks pretty fit, but I don't really know what that meant.  And he, of course, explained that's really about business processes, how a business works and how you do it efficiently and effectively.

He oversaw, when he was in that role, and during the relevant time period here, 31 operating rooms, 25 ORs, and six ambulatory surgery centers, surgical centers, performing 23,000 surgeries a year.  He had 800 employees reporting directly or indirectly to him.

He oversaw a number of other directors:  Director

of surgery, director of OB-GYN, director of anesthesia, director of orthopedics, director of perioperative services, and the director of scheduling.  That's Daniel Herrick.

Dr. Leslie DeMars, you heard Mr. Vitt reference her before.  Dr. Porter and Dr. DeMars had a close friendship, and you'll hear more facts relating to their friendship.  Dr. Porter referred to her as her biggest ally and her close friend.  In fact, they were best friends, and you'll hear testimony to that effect.

And Dr. DeMars actually credits Dr. Porter for her efforts in facilitating her own ability to have a second son through IVF, which she had successfully. They had a very close, somewhat complicated, relationship.

Now, at one point, there wasn't this reporting relationship, but at some point Dr. DeMars became -- was promoted to the chair of the OB-GYN department, and now Dr. Porter reported to Dr. DeMars.  This development created what you will call a natural awkwardness just in light of all the history of their relationship.

You'll see evidence that Dr. Porter manipulated this close friendship for her own devices, and Dr. DeMars, by her own admission, struggled in this

Opening Statement by Mr. Schroeder

role.  There's no question about that.  Sometimes people that could be really good physicians might not be good managers and vice versa.  No question she was an ineffective leader at various points.  She will acknowledge those shortcomings; you'll hear testimony from her.

Dr. Maria Padin, that's another individual you'll hear from.  She was named the chief medical officer of Dartmouth-Hitchcock Medical Center in November of 2015.  She's presently a member of the board of trustees at Dartmouth Health.  In her role, she's focused on clinical and physician-related responsibilities specific to the academic center.  She's got five M.D. reports, 382 clinicians who are indirect reports, and along with each southern region COO, she oversees 13 sites and 90 clinics.

I tell you all of this because all of these individuals you will hear from; they're all in administration; they take their jobs seriously, and those jobs are very difficult from time to time and they have to make difficult calls.

In addition to the fact that she oversees 600,000 patient visits per year and 300 surgical cases, she's also a generalist in the OB-GYN once a week.  She wears many hats.

Based on Mr. Vitt's opening statement it was anticipated, and now we know it to be true, that there are many references to these two former REI doctors -- Albert Hsu and David Seifer. For whatever reason, the physicians Dr. Porter complained about on a routine basis are not listed as trial witnesses by the plaintiff, Dr. Porter.

And just so we're clear, and you'll hear testimony, anticipated testimony about this, Dr. Seifer at this point is an REI physician at a small college called Yale University. Dr. Hsu is an associate professor at University of Cincinnati College of Medicine where he's also the IVF medical director at UC Health. Just an aside.

Then, of course, it's anticipated you'll hear from Dr. Porter. Now, as an initial matter, I want to be really clear about this: No one questions Dr. Porter's credentials, expertise, or technical skills. Her credentials, suffice it to say, she's very talented. Her curriculum vitae, resume, is a mile long. There's no doubt about that. But -- and this is a big but -- being a great technical physician is not enough in a health system. You've got to be a great team player. You've got to be a collaborator. You've got to be able to work well with others, and that's where Dr. Porter's

grades were marginal at best. While she was named interim division director of the REI division, which she held for a number of years, she was never promoted to the permanent position. And after hearing all of the evidence, you will understand why.

No question she resented the fact that another individual -- you heard about David Seifer, right? David Seifer -- and this is the tough part of the case where a lot of names are being bandied about and you gotta pay attention along the way, and you'll see the documents that actually go hand-in-hand with these individuals, but knowing who they are upfront is helpful, hopefully.

After hearing all the evidence, you'll see, there's no question that she resented that another individual, David Seifer, was brought in to be the director of the REI division in mid 2016.

Dr. Porter's counsel used a nice story casting Dr. Porter as a victim, but Plaintiff would have you believe that there's some kind of big conspiracy here by my client to create a ruse, or cover story, for the specific purpose of creating an excuse to terminate her employment.

You heard early on about the fact that this case is about claims of discrimination and retaliation, and

it relates to when Dr. Porter was a physician in the REI division. What you didn't hear in total was the fact that in the wake of a dire shortage of nurses in the REI division, Dartmouth Health made the decision to shut down the REI division entirely. All three physicians -- so Dr. Hsu, Dr. Seifer, Dr. Porter -- were all terminated at the same time. Period. Full stop. There's no question about that. And there's no question that they shut down the REI division at the same time. In fact, they were all given, or afforded, generous severance packages. So you heard testimony in opening statement about 30 days' pay. They were actually given upwards to six to nine months in the case of Dr. Porter.

Now, you've heard a number of things about the REI division. And what I think is important is to preview some of the key events, right? So I think in order for you to know what to expect and what's the anticipated testimony, documents you're going to see, it's our position that Dr. Porter cannot overcome several undisputed facts which are fatal to her claims of discrimination and whistleblower retaliation.

Now, what is the catalyst for Dr. Porter's lawsuit? The REI division was permanently closed in May of '17. Dartmouth-Hitchcock announced the closure

in early May of '17.  This is the first time where Dartmouth Health closed an entire division.  It's a pretty pivotal move right there.  I want to say that again.  First time they closed an entire division. That's a pretty significant event to happen.  This was a tough business decision made by Dartmouth Health's chief clinical officer.  You'll hear testimony, you'll see e-mails about it that Dr. Merrens made the ultimate call.  It may not have been popular.  Right?  Sometimes business decisions are not popular, but it was the right decision at the time.  It wasn't made over night. It affected a number of internal and external constituencies.  The three doctors -- Dr. Seifer, Dr. Porter, Dr. Hsu; so the division director was Dr. Seifer -- all three of them were terminated at the same time.

While in the fall of 2017 there had been some preliminary discussions about the concept of a re-imagined REI division, they decided against it. And, in fact, Dartmouth Health still does not have an REI division to this day nor are there any current plans to have one.  So eight years later, we still don't -- my client still does not have another REI division; it never opened again.

It is clear that Dr. Porter disagrees with the

decision to close down the REI division. In fact, we heard it from her counsel. Right? And others certainly agreed and felt that, Well, this is not a good idea. But that was within the province of Dartmouth Health, and that was one of the decisions that Dr. Merrens had to make at the time, based upon all of the relevant facts, and we'll put all those facts into evidence in this case.

This was a business decision. It may have been unpopular, and it resulted in difficult decisions that impacted the employment of several individuals, but it was not discriminatory or retaliatory.

Now, how did we get to this point? How do you get to the point where a division closes down, and you haven't even opened it up eight years later? What led to that? And it wasn't one thing. Because, like most big business decisions, it doesn't come down to one thing. There's multiple factors, it's multifactorial, if you will.

Number one, you have a history that the REI division as a small, rural program, not a high volume of patients by any stretch. There had been a good amount of turn over in nurses and physicians between 2015 -- 2005 and 2015. Current and former DH employees will testify in this case that the REI division was a

Opening Statement by Mr. Schroeder

tough environment to work in.

In the early years of the REI division there were two factions -- it's a small group. There was the Misty faction -- the Misty group faction. That's Dr. Porter, Sharon Parent, Beth Todd. Sharon Parent is a nurse; Beth Todd is a nurse practitioner. And then the other camp consisted of all the other people. Lots of splitting behavior you'll hear about -- criticisms, rumor mills, communication breakdowns.

Other than her supporters, Dr. Porter was critical of a slew of nurses and physicians, many of them junior and less experienced than herself. And that happened over a long period of time. And the reason why it's important to highlight that fact is because, yes, Dr. Porter had complaints about Dr. Hsu. Yes, Dr. Porter had complaints about Dr. Seifer. She had complaints about everybody over a very, very long period of time. In fact, the comments about Dr. Hsu happened almost immediately. They actually happened before he even got there. So you'll see the evidence of that. And so that was the kind of environment that the REI division was at that time, and despite the fact that she was in outright conflict with her superiors from time to time, Dartmouth Health tried its best -- they brought in facilitators, mediators to try to

mediate the disputes between Dr. Porter and everyone else.  And sometimes that worked for a little bit, and then it would fall apart.

In Dr. Porter's world, it was her way or the highway.  There was only one way of doing things for REI; it was her way.  You'll hear testimony to that effect.

Now, fast forward.  REI division, 2014 to 2017. It shuts down in May of 2017, and you'll see a bunch of documents and to help with the timelines.  The level of tension, poor communication, discord, internal strife, increased dramatically in the REI division with the arrival with a new, junior, less experienced physician by the name of Albert Hsu.

He joined in 2014.  From the start, Dr. Porter was hypercritical of Dr. Hsu's performance to everyone. She was critical of him even before he began at Dartmouth Health.  And the evidence will show, we believe, that she was poisoning the well, so to speak. Dr. Porter complained about Dr. Hsu to anyone who would listen, and those complaints continued in 2014, 2015, 2016, and 2017 when the REI division was closed.

But Dr. Porter was not the only one who complained about Dr. Hsu.  It's anticipated you'll hear testimony that others complained about Dr. Hsu as well as a whole

other range of issues.  So Dr. Porter certainly complained about these individuals.  Many others did as well.

Things got even worse upon the arrival of the new REI division director, David Seifer, because he took the top position in the division now.  Up until that point, Dr. Porter had been the interim division director, and so she was no longer the interim division director.  It was now David Seifer.

Now what you had in the REI division was literally a soap opera of sorts because you had three different sides -- you didn't have two factions, you had three silos because you had Dr. Hsu had his way of doing things; Dr. Porter's criticism of her new boss, David Seifer, began almost immediately; and her criticisms ran the gamut:  His technique is poor, he didn't communicate well, his view of the practice was wrong.  Really everything.  Nothing Dr. Seifer did was satisfactory or was up to Dr. Porter's expectations.  This was a classic example of back stabbing 101, and the people that will testify here during this trial will say as much.  Dr. Porter could have taught a course in it.  But, again, there is nothing new because Dr. Porter had run into prior members of hospital administration in prior years.

You'll see many, many e-mail communications, probably too many, from Dr. Porter herself where she is, at a minimum, abrupt, but in most cases just oppositional and rude to her colleagues. This was an unhealthy team dynamic. So set aside everything else, it was not working. The REI division was not working the way it was currently constituted. The lack of collaboration and team work created a really negative environment.

You will hear the word "dysfunction" to describe the REI division. It's not attributable to one individual. Everybody used it. I actually looked it up on the Google. I know you're not supposed to be on the Google, I got on the Google to figure this out. "Dysfunctional" is defined as not operating normally or properly. That is an understatement. This was a division that had a lot of divisions in it. And, you know, when trying to give some alliteration to what it was like, it would be like the Land of Misfit Toys from one of the Santa movies that we all grew up with.

That brings us to the major events leading to the REI division closure. Why did this happen? Late 2016, you have an REI nursing shortage. And REI nurses are a very specialized nurse. They have very specialized attributes compared to, say, a nurse in another

Opening Statement by Mr. Schroeder

division.  So it takes a lot of learning to become very skilled in that area.  What happened in late of 2016, because there's this confluence of events that led to the division closure?  Like I said before, it wasn't one thing; it was a couple of things, a couple of really important things.  The first one was, they lost a bunch of their REI nurses.  One of the nurses was fired in November of 2016.  Another nurse retired in December of 2016.  Now, this was already a pretty small group of people.  So you've lost now two REI nurses.  And despite the fact that they were trying for a very long period of time to recruit REI nurses into the division, they were unsuccessful.

It had an impact on services provided on a more limited basis.  They had to move patients around.  They had to defer new infertility evaluations.  The REI division struggles continued.  They couldn't find replacement nurses.

What happened then?  Well, in late 2016 -- remember closure happens in May.  In late 2016, they issue a memo, and the evidence will show, that they deferred starting dates for new IVF treatment.  So, at this point, the wheels are starting to fall off.  They're really not able to do the patient evaluations that they were supposed to do.  They have to push off

Opening Statement by Mr. Schroeder

and pause, as they called it, new evaluations of patients who had already submitted their paperwork and were ready to go and were really, you know, ready to go to the next step of the evaluation process. And that couldn't happen at that point. They were going to take care of the patients that they had in the course of where they were, but they literally had to pause handling new patients in January and February. And Dr. Seifer made it clear that they weren't going to see any new patients; they were going to limit appointments because they don't have the capacity to do it.

Now, in addition to this -- you've got this issue going on -- you have to have enough specialized nurses to actually do the procedures and also help with the evaluations and the IVF cycles.

What was happening at that time, though, Dartmouth Health wasn't just saying, Well, we're not going to do anything about it. They have a thing called the Value Institute, which is part of the organization that is geared towards helping people get along with each other, interpersonal dynamics. Right? There was no question that there was a problem between the doctors talking. And this isn't all on Dr. Porter. Okay? I want to be really clear. This was all three doctors, three different silos, and they were, as a result of

that, not working well together, not collaborating, not engaged in teamwork.

You'll see e-mails to that effect.  That they then had to go through this process.  They had these retreats in January and February of 2017.  And what happened as a result of those retreats?  Nothing got fixed.  In fact, the people that were helping run these little institutes got to the point where like, you know, this is really almost unfixable at this point.  People are not able to actually work well together.  And that's on everybody.  That's not just on Dr. Porter.  That's on everybody.  The three physicians, right, they should be able to work together.

So there's a lack of success with the DH Value Institute.  You've got a nursing shortage at this point, which is even more dire than it was before.  And then in April of 2017, the last most-qualified REI nurse says, I'm outta here.  They have two operations -- one in Lebanon, one in Bedford.  Bedford is where this particular nurse is.  She said I'm outta here.  I'm going to another job.  So now they were down to one less-than-qualified and trained REI nurse for the entire operation.  It was untenable to continue at that point.  In addition -- and they made that clear

throughout.  The nursing shortage was clear.  It was enunciated all of the time.

And when they get down to the final straw, right, they're down to one nurse who is not completely fully qualified for REI work, she only had been in the division for about a year.  What happens next?  Well, they have to shut it down, and that decision is made by Dr. Merrens, and I'll get to that in a second, but I want to talk a little bit, very quickly, about the claims.

It's our position that there's no disability discrimination relating to Dr. Porter's termination.  There's no question that in late 2015, Dr. Porter was dealing with a scary, difficult condition with extremely challenging symptoms, oftentimes making it difficult for her to get out of bed.  Setting aside the stark differences between both sides in this case, it is, without question, a great thing that she is back to 100 percent normal, and I say that with all genuine sincerity.  If you don't have your health, you have nothing.

With respect to the disability discrimination claim, though, you will hear testimony, you will see evidence, that Dartmouth Health met its obligation to provide reasonable accommodations to Dr. Porter

Opening Statement by Mr. Schroeder

throughout her treatment for her condition in 2015, '16, and early 2017. And it's good to have some perspective on when Dr. Porter was even at Dartmouth Health during the relevant time period.

From December of '15 -- 2015 to May of 2017, 18 months, essentially, she was on a leave of absence for nine of those 18 months, and when she was there, she was working from time to time, but she also received full-time -- full short-term disability benefits, and, as well as that, long-term disability benefits. She actually qualified for long-term disability benefits and started receiving that in June of 2016.

The OB-GYN chair, I mentioned this before, Dr. DeMars, was Plaintiff's best friend and worked to make sure that Plaintiff's schedule was sufficiently limited. In fact, there's texts between them. They texted all the time. They were very good friends.

There was 15 to 16 different accommodations that Dr. Porter requested in June of '16. They were approved and authorized by Dr. DeMars. That included protected quiet, private office space. Very well-described limited duties, limited clinical duties, currently limited to GYN ultrasound and -- gynecology ultrasound -- and IVF-related activity only. No main OR or OSC cases, no outpatient consults, no call, no

Opening Statement by Mr. Schroeder

teaching responsibilities, paced activities, additional breaks, ergonomic accommodations, and then some accommodations related to work-related e-mails and no work e-mails from home. And there's no dispute -- there's no dispute that Dr. Porter asked for those accommodations, and that Dr. DeMars approved and authorized all of them in June of '16 when she returned from a six-month absence. It allowed her to work from home on occasion, allowed her space to work by herself in the hospital. She essentially created her own schedule.

Why is all this important? Remember, there's a disability discrimination case and a whistleblower retaliation claim. Those are the two big buckets that Mr. Vitt referred to, and that is, in fact, the case, right.

The decision makers, the people that shut down the REI division, specifically Dr. Merrens, had no knowledge of what Misty Porter's -- Dr. Porter's -- disability was. He didn't know that. He's in charge of 1,500 clinicians. He doesn't know every single surgeon or every single doctor within the health system of 15,000 employees to know exactly when somebody may be on a leave of absence, maybe somebody's not on a leave of absence. He had no idea what her issues were.

Opening Statement by Mr. Schroeder

He was aware though, certainly, that there was a level of discord within the REI division, the fact, that individuals had -- the physicians had a problem getting along, but at the end of the day, it will be undisputed that Dr. Merrens made the final call.  He made the final call because, at that point, there was less than one full-time REI nurse for the entire division.  That's a fact.  That's not spin.  There was no one else to do it.  And that was the last straw. There had been a number of other issues relating to how the group was getting along, but this was the last straw because without the REI nurses, you're not able to do the job.

So Dr. Merrens didn't know about her medical conditions.  In fact, he'll testify that the terms and conditions of Dr. Porter's employment had nothing to do with his decision to close the division.  The division closed.  Three physicians were terminated, including Dr. Porter.  They happened in concert.

There's no evidence that Dr. Porter's medical condition had anything to do with her termination. What about the potential accommodations that Dr. Porter thinks she should have received at the time of the REI closure, right?  So there's no -- she was still dealing with this condition, and she was out for varying

periods of time.  One of the things that -- it's anticipated that Dr. Porter will present testimony on is, Well, I have a dual appointment in OB-GYN and radiology, I can do ultrasounds in radiology.  Well, you'll hear testimony from Jocelyn Chertoff.  She's traveling all the way from Portland, Oregon, to testify in this case.  She's the former chair of radiology, and you'll hear testimony about the fact that there was no basis to have somebody part-time doing that job at that point.  They already had a sufficient number of radiologists; they didn't need anyone else.

Dan Herrick, the VP of perioperative, the kind of business operations guy, will tell you that there was no economic basis to do it.  The next one is, Well, wait a minute, when you closed the division, you had a nurse practitioner, Elizabeth Todd -- Beth Todd -- and you moved her over into OB-GYN.  Well, why not Misty Porter, right, she had the dual appointment?  At the time -- facts matter.  At the time Beth Todd was already splitting her time with OB-GYN well before the REI division was closed down.  So she was already working in OB-GYN and providing services as a generalist.  She was further absorbed into OB-GYN than before, and she was the only one that went over.  The three physicians were all terminated.

Opening Statement by Mr. Schroeder

It's anticipated you will see some testimony and evidence that, you know, OB-GYN had an opening later on in '17.  Like, why couldn't Dr. Porter have had that?  Well, that was for Obstetrics.  You will hear from Dr. Padin, who is the chief medical officer, and she'll explain.  And this was a lesson -- that's why I like this area of law, because you're always learning something about a new client.  I didn't understand the issue of credentialing and privileges and how that really worked in terms of Well, why couldn't Dr. Porter be in this role?  Well, she didn't have the credentialing privileges at that point to go into that role that opened up in OB/GYN.

Like the other two physicians, Dr. Porter's last day of employment was June 3rd, 2017.

Now, that disability discrimination.  Very quickly.  Retaliation.  Other claims by Dr. Porter are that, Well, you know, I made these complaints, and I lost my job, and I believe that's retaliation.  That's the quick and dirty of that.

Dr. Merrens will testify, you'll hear testimony from him, about having no knowledge of her long trail of internal complaints about the other REI physicians.  This is a small division out of a whole, big system, and it's not something that Dr. Merrens would have any

Opening Statement by Mr. Schroeder

wherewithal about.

Whistleblower claim, you cannot establish whistleblower liability unless the decision maker knew the individual had a whistle in the first place. And it's important to know that Dr. Merrens had no knowledge of Dr. Porter's history of internal complaints.

The lack of knowledge that she engaged in protected activity making these complaints about other people. It was his decision to close the REI division. He knew nothing about her complaints or concerns about the other two physicians specifically. And Dr. Porter who knew Dr. Merrens and actually had dealt with him previously, and we'll get into that, didn't make any complaints to Dr. Merrens. She never sought him out. The same is true for Dan Herrick who is also part of the business decision to close down the REI division. He didn't know about those complaints. He's dealing with all these surgeries throughout the system. And Plaintiff admits that Dr. DeMars hid complaints about Dr. Hsu and Seifer from Dr. Merrens and Mr. Herrick.

The last point is really that there's no causal connection between her complaints and the termination, right? You have to have -- a retaliation claim, you have to have a causal connection. There's a long

history of complaints with no temporal proximity. Meaning, Dr. Porter had been complaining about a number of people -- Dr. Hsu, Dr. Seifer -- but well before that, maybe about ten years, she complained about other people's practices, as physicians, as nurses. Not surprising that she had complaints about Dr. Hsu and Dr. Seifer. But either way, she made those complaints all along the way, and she wasn't fired, she wasn't retaliated against, and that had nothing to do, just like it didn't then, didn't now when they closed down the division. You'll also hear testimony from other individuals that she had complaints about Dr. Hsu and Seifer as well. They didn't face retaliation.

Finally, bottom line -- and I appreciate that it's late in the day -- Dartmouth Health's closure of the REI division in 2017 was done after thoughtful deliberation relating to its continuing viability. It wasn't an easy decision, it wasn't a popular decision, but it was the right decision at the time. As a leader of a large complex health system, sometimes you have to make difficult, unpopular decisions, and that's the burden that was on Dr. Merrens, and he accepted it. It was not about Dr. Porter. It was about an unsustainable program.

And while Dr. Porter will attempt to show that

there was something nefarious and that Dartmouth Health changed its story as to the reasons for the REI division closure, the fact that such a significant decision was based on more than one factor is logical and common sense.  It doesn't even come down to one factor, it's just that the nursing shortage was the final, culminating factor.

And at the end of the day, Dr. Porter walked away with a generous severance package.  She obtained gainful employment at a nearby comparable healthcare system, UVM Medical Center, almost immediately.  And while she may believe that she was somehow wronged by Dartmouth Health, just because she truly thinks it does not make it so, and cherry-picking words from a slew of e-mails made after the fact also do not demonstrate discrimination or retaliation.  To be sure, there is no duty under federal or state law to create a new position out of whole cloth, and that will be our position.

Documents and testimony but current and former Dartmouth Health employees will show that she was treated in the same manner as the other two REI physicians who were let go.  It is our hope that at the end of the day, you will rule in Defendants' favor because Plaintiff will be unable to show discrimination

Opening Statement by Mr. Schroeder

and retaliation.  Thank you for your time.

THE COURT:  Okay.  So that concludes opening statements for today.  We're going to finish for today at this time.  I'm going to be asking you to go back to the jury room, if you would.  We are at a few minutes before 4:30.  The jury administrator would like to speak to you about some kind of logistical issues related to your service as jurors.  And just a reminder, if you could leave your notebooks in the courtroom please.  And remember, when we come back tomorrow, I'll be asking you if you have spoken to anyone about this case, so please do not speak to anyone about it and do no research, right, as I've said many times today.  So have a good evening.

(Jury exits.)

THE COURT:  Okay.  So before we break for the day, this might be a good time for us to talk about any issues that you may like to address at this time.  And also before we leave, I would like to get a sense from Plaintiffs as to who are the witnesses for tomorrow.  If we can start with that.

MR. JONES:  Yes, Your Honor.  Tomorrow we will be calling Sharon Parent and Julia MacCallum.  And time permitting, we'll start with Plaintiff, Dr. Porter.

THE COURT: Okay. So three witnesses for tomorrow. So these will each be lengthy witnesses, it sounds like.

MR. JONES: I think the first witness will not be terribly lengthy, but the other two will be, yes.

THE COURT: Okay. All right. Any issues to take up today from either side?

MR. SCHROEDER: Yes. Thank you, Your Honor. Two issues. Witness sequestration, when they're on the stand -- well, first of all, they're not in the courtroom before they're called, right? I just wanted to go over that rule. I know we talked about it briefly. And then when they're still on the stand, what's the Court's guidance on that? Because I've had different Courts have different leeway in terms of whether they can talk to anybody while they're still on the stand or the direct is over but the cross hasn't started. I assume that that is verboten, but I wanted to make sure of that.

THE COURT: Yes.

MR. SCHROEDER: Because I had a run-in with a particular lawyer on a different case.

Then, in terms of the direct and the cross, there are some witnesses where they're going to be called as

a cross by the plaintiff, perfectly fine.  In terms of the scope of the direct that will come on after that, there may be times where we just want to deal with the matter of the cross as it is and doing the direct related to that and saving for our case in chief later to handle all the other issues that weren't dealt with, or we may just want to have the witness on the stand and just do everything.  But there's a couple witnesses that are not employed by Dartmouth Health anymore, and so we're pulling them in from different places, and they have other jobs and so we may want to just do their direct and cross all -- or do the direct, full direct right then.  So we just wanted to get a sense of how you wanted us to handle that.

THE COURT:  Okay.  Mr. Vitt, do you have any ideas on that issue?

MR. VITT:  I think that sounds fine. We've -- if they want to recall somebody later, they certainly have that option during their case in chief. I'm sure we can cooperate and work out scheduling and timing.  We've been talking about, you know, what are convenient times to put Dartmouth-Hitchcock people on. So that sounds okay with us.

THE COURT:  Okay.  Sounds like -- great. Thank you.

MR. SCHROEDER: Thank you.

THE COURT: And your other question was about sequestration with the witness on the stand. So, certainly, after the witness has been tendered for cross-examination, there wouldn't be any discussion with that witness between whoever called the witness and the witness.

With respect to -- so you're saying the witness is on the stand for direct examination and there's a break, should there be further discussion at all with that witness? I think traditionally there's not a bar on there being conversation between the person who called the witness while the witness is on the stand. So I would be inclined to say that definitely on cross-examination, they shouldn't be talking to them, and on direct examination, that would be okay. Is there disagreement from the parties on that?

MR. VITT: Fine with us.

MR. SCHROEDER: Just wanted to know where the line was, Judge. Thank you for that.

THE COURT: Okay. Anything else?

What about evidentiary issues for tomorrow? Do we anticipate -- so we got these three witnesses tomorrow. Is there anything that we should be discussing ahead of time? It's fine if we don't, but anything that you

anticipate being an issue tomorrow?

MR. VITT:  Certainly going to be introducing exhibits through a number of these witnesses.  I hope it goes smoothly, but there's always hope.

THE COURT:  Okay.  Mr. Schroeder, anything from your perspective?

MR. SCHROEDER:  Not at this point, Your Honor.

THE COURT:  Okay.  And, obviously, as we talked about this morning during the conference in the robing room, if there's any agreements and understandings that can be reached between counsel, it's obviously best.

A little concerned about three witnesses for tomorrow and only three witnesses.  I trust Plaintiff understands their case and the length of their directs, but we definitely -- you know what I'm about to say.  We don't want to be in a position tomorrow where the direct examinations go more quickly than anticipated, and it's 2:00 and there isn't another witness waiting outside.

MR. VITT:  I think you have no worry about tomorrow.  Given the three witnesses, it's improbable that we will go through all of them.

THE COURT:  Okay.  I'll hold you to that,

Mr. Vitt.  All right.  Anything else?

MR. SCHROEDER:  Nothing, Your Honor.

THE COURT:  All right.  Thank you very much.

(Court at recess for the day.)

CERTIFICATE


        I, Jan-Marie Glaze, RPR, CRR, Pro-Tem Court

Reporter for the United States District Court for the

District of Vermont at Burlington, do hereby certify that I

was present in court during the foregoing matter and

reported said proceedings stenographically.


        I further certify that thereafter, I have caused

said stenographic notes to be transcribed under my direction

and that the foregoing pages are a true and accurate

transcription to the best of my ability.




                                _____
                                JAN-MARIE GLAZE
                                COURT REPORTER