UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, MD,           )
                                       )
               Plaintiff,              )
          v.                           )  2:17-CV-194
                                       )
DARTMOUTH-HITCHCOCK MEDICAL            )
CENTER, DARTMOUTH-HITCHCOCK            )  March 25, 2025
CLINIC, MARY HITCHCOCK MEMORIAL        )
HOSPITAL, and                          )
DARTMOUTH-HITCHCOCK HEALTH,            )
                                       )
               Defendants.             )
                                       )

_____

BEFORE THE HONORABLE KEVIN DOYLE
UNITED STATES DISTRICT JUDGE

_____

TRIAL

VOLUME 2    Pages 190 to 416

APPEARANCES:

For the Plaintiff:

ERIC JONES
GEOFFREY J. VITT
SARAH H. NUNAN


For the Defendants:

DONALD W. SCHROEDER
MORGAN McDONALD
TRISTRAM J. COFFIN


Jan-Marie Glaze, CCR, RPR, CRR    Certified Court Reporter

## TABLE OF CONTENTS

### EXAMINATION INDEX

**Witness:**                                                      **Page**

**Sharon Parent:**
    Direct Examination By Mr. Jones                198
    Cross Examination By Ms. McDonald             229
    Redirect Examination By Mr. Jones             251

**Julia MacCallum:**
    Direct Examination By Ms. Nunan               255
    Cross Examination By Mr. Coffin               308

**Misty Blanchette Porter:**
    Direct Examination By Mr. Vitt                339

### EXHIBITS

**Exhibit No.**                                           **Page Admitted**

Exhibit C14                                                  254
Exhibit V                                                    248


Exhibit No. 37                                               358

Tuesday, March 25, 2025

Morning Session

* * *

THE COURT:  Okay.  Good morning, everyone. As you probably heard we were waiting for a juror; that juror has arrived.  We will get started momentarily.

I just thought, before, we bring the jury in, I know there was maybe a question raised by Defense about their exhibits, and I just wanted to get some clarification from the parties.

Yesterday at the conclusion of the day, there appeared to be agreement between both sides about certain witnesses essentially -- please correct me if I'm misunderstanding this.  Basically, a witness will be examined by the plaintiff, crossed by the defendant, and then that witness may also have relevance to the defendant's case.  So there's kind of a request to deal with that kind of particular witness kind of all at once.  Mr. Schroeder, am I accurate?

MR. SCHROEDER:  Yes, Your Honor.  Because of the fact that some of the witnesses are no longer employed by DH and have other responsibilities and jobs outside of here, instead of calling them back --

THE COURT:  Right.

MR. SCHROEDER:  -- we just wanted to make

sure that we weren't getting into an argument about the scope.  Because on some, we would like to just finish them while they're here.

THE COURT:  Right.

MR. SCHROEDER:  And on others, we would bring them back in our case in chief.

THE COURT:  Okay.  So the ones that you're proposing to deal with all at once, is there kind of a distance issue with them?  I know you mentioned one witness yesterday from Oregon.  But are some of these others kind of local witnesses that you're still proposing to do all at once?

MR. SCHROEDER:  We do have some distance issues.  We have some that have other -- like, their job responsibilities outside of this proceeding, and they're not employed by us anymore.  Certainly -- and to the extent that perhaps some of our own people are called in Plaintiff's case in chief, because they are slated to be called, we want to have the ability to, you know, limit the scope of the examination at that point but reserve the right to call them in our case in chief.

MR. VITT:  Your Honor, I thought the discussion was principally about this latter category, where if we call somebody in our case, that they would

have the option, obviously, to call them back when they're putting their case on.  I'm not sure what -- once you start putting on witnesses and we cross-examine them, you want an opportunity to call them back again?  I'm not sure where you're going with this.

MR. SCHROEDER:  No.  The issue is you're going to call somebody on cross, which you have the right to do, as a hostile witness.  I want the ability to ask some questions but then call them back in --

MR. VITT:  Absolutely.

MR. SCHROEDER:  I think we're in agreement, but I want to make sure that the Court -- it's your call, right.

THE COURT:  Yeah.  No.  No.  I just want to be clear on kind of what the rules of the game will be. So if Mr. Vitt is calling, as you say, an adverse witness, like Merrens, and is questioning him, then you will do your questioning of him kind of in relation to the direct exam, if you want to call it a direct or a cross by Mr. Vitt at that point in time, we'll be clear about that.  He'll leave the stand, and when he comes back in the defendant's case in chief, he's your witness.  You'll do a direct of him, he can be crossed by Mr. Vitt.  I want to make sure that we're not

muddying the waters in any one presentation of that witness; that we're still kind of following the rules of the game each time that witness is appearing.

MR. SCHROEDER:  Sure.  That's why I raised it, Your Honor.  Because there are witnesses where I believe we'll just want to do a "one and done," so to speak; that we would like the breadth of not just doing the direct, but the redirect.  And we'll tell them during the -- like, when we do the witness.  I would like to be able to tell them that when they're called; that I want to be able to go beyond the scope of their cross and do the direct.

MR. VITT:  Do we know who those witnesses are now?

MR. SCHROEDER:  No, not necessarily.  I mean, I think -- you know, Leslie DeMars may be one of them. I haven't made my final judgment on that.  I haven't made the final judgment on that, so I'm not ready to tell you today.

THE COURT:  None of the witnesses today fit into this category though, right?

MR. VITT:  That is correct.  They do not fit into this category.

THE COURT:  Okay.  So let's keep this in mind at the end of each day so we have a sense, as we've

been doing, or will be doing, what the witnesses are for the next day, and if these witnesses are implicated we can be just in front of that.

MR. SCHROEDER:  That sounds great.  Thank you, Your Honor.

THE COURT:  So are there any other issues then with respect to your exhibits, Mr. Schroeder?  I know you were taking it up with the deputy clerk, and you were working on that.

MS. McDONALD:  Your Honor, we had a question. Should we just have -- for the witnesses, we have notebooks, binders of all of our exhibits.  Does it make sense for us to just keep those binders up for the witness or to hand them individual exhibits as we go?

THE COURT:  So if it was a binder up there, then you would be directing the witness to turn to a certain exhibit within that binder at any one time?

MS. McDONALD:  Correct.

THE COURT:  Mr. Vitt, do you have an objection to that?

MR. VITT:  I think that's fine.  There are a fair number of exhibits and going through each one individually is going to be a challenge, and I think we will probably decide that some of the exhibits that we have in the book are not going to be -- we're not going

to move their admission.  But the way you describe it sounds perfectly fine with us.

THE COURT:  Okay.  So then the binder is marked as an exhibit and then those are kind of subs within the binder?

MS. McDONALD:  Correct.  They're tabbed within our -- by exhibit number.

THE COURT:  Okay.  That's fine.

MS. McDONALD:  Thank you.

THE COURT:  All right.  So we will see if the jury is ready to come in.

(Jury present.)

THE CLERK:  Your Honor, the matter before the Court is Case No. 17-CV-194, Misty Blanchette Porter vs. Dartmouth-Hitchcock Medical Center, et. al. Present on behalf of Plaintiff are attorneys Geoffrey Vitt, Eric Jones, and Sarah Nunan.  Present on behalf of Defendants are attorneys, Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We are here for a jury trial.

THE COURT:  Good morning.  Members of the jury, as I mentioned to you yesterday, I'm going to begin by asking you a question:  Has anybody talked to you about this case since you left the courthouse yesterday, or have you read any information about this

case since you left the courthouse yesterday?  Okay.  Seeing no hands raised.  Thank you.

Also just a reminder about your promptness for trial days.  Okay?  I understand that there are things that arise, but just a reminder, please, please build in enough time so that you can be here so that we're ready to go at 9:00.  It's important that we be efficient in the conduct of the trial.  Okay?

All right.  So at this time, Plaintiff may call its first witness.

MR. JONES:  Thank you, Your Honor.  Plaintiff calls Sharon Parent.

THE CLERK:  If you would raise your right hand, please.

**Sharon Parent**, witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you.  You may have a seat.  And once seated, please state and spell your name.

THE WITNESS:  Sharon Parent, P-a-r-e-n-t.

**DIRECT EXAMINATION**

**BY MR. JONES:**

Q    Good morning.

A    Good morning.

Parent - Direct by Mr. Jones

Q    Ms. Parent, are you currently employed?

A    No, I'm retired.

Q    How long have you been retired?

A    Eight years.

Q    Congratulations.

     Before retiring, what was your occupation?

A    An RN.

Q    Is that a registered nurse?

A    Yes.

Q    And where did you work as an RN?

A    At Dartmouth-Hitchcock for 41 years.

Q    41 years at Dartmouth-Hitchcock?

A    41 years.

Q    Did you work as an RN anywhere else, or was your entire career at Dartmouth-Hitchcock?

A    Entire career at Dartmouth-Hitchcock.

Q    Did you have multiple departments that you were assigned to during that time?

A    Yes.

Q    Where did you start?

A    When I graduated, I started in 1976 in med-surg nursing.  And after that, I went to labor and delivery for 21 years.

Q    Okay.  What is med-surg?

A    Medical-surgical nursing.

Parent - Direct by Mr. Jones

Q   Okay.

A   It's where I got my teeth in nursing and learned my skill.

Q   Okay.  And then you went from there to labor and surgery?

A   Labor and delivery.

Q   And you were there for how long?

A   17 years -- 21 years.

Q   Okay.  And then after labor and delivery, did you transfer to another department?

A   I did, to OB-GYN, the Department of Reproductive Medicine.

Q   Okay.  Am I correct that the department was the OB-GYN department, but there was a division within the department called the REI division?

A   Correct.

Q   And what does REI stand for?

A   Reproductive endocrinology and infertility.

Q   And how long did you work in the reproductive endocrinology and infertility division?

A   17 years.

Q   So can you explain for the jury -- you're the first witness -- what is reproductive endocrinology and infertility?

A   Well, in a nutshell, it helped people become pregnant,

Parent - Direct by Mr. Jones

and that takes a lot of diagnostic testing to determine the cause of why they're not conceiving.

Q    And what kinds of therapies or treatments are offered in an REI clinic?

A    That really is dependent upon why they're not conceiving.  It could be as simple as they're not having menstrual cycles, so they have to have hormonal replacements.  Is it because their uterine cavity has filling defects which could affect implantation?  So -- and or is it an egg issue?  Is it sperm issue?

Q    Okay.  And so the particular treatment might depend on what the cause of the fertility is, but what are the different paths that might be available to a patient?

A    If all things are working fairly well, they could do intrauterine insemination, which is taking the sperm and injecting it into the uterus and letting nature take its course, or in vitro fertilization where they take an egg out of the female and put a sperm together with it in a petri dish, and fertilization occurs there, and then implantation happens when they return that embryo to the uterine cavity.

Q    Did the REI clinic treat patients not only for people who were seeking to conceive but had other needs that the REI clinic could help?

A    If indeed they had hormonal issues, fibroid issues,

Parent - Direct by Mr. Jones

implantation, different things like that, yes.

Q   As an REI nurse, can you describe what your primary duties were?

A   To assist doctors with the diagnostic workup to allow the patients to really understand the process.  It's pretty overwhelming to sit there and learn different things.  So it's the how, the when, the why, and to support them through that whole process.

Q   Yeah.  So was part of your responsibilities to explain to a patient or a couple what they could expect going forward?

A   Yes.

Q   So how would you explain to a patient or a couple what they might be able to expect with REI treatment?

A   Well, you know, it's very time-consuming.  It's costly. They have to be all-in for the process to proceed, and that's really challenging for couples, and these women are pretty desperate to become pregnant.  They're overwhelmed, stressed.  If they have to do with anything financial, they have to take out loans, borrow money from family.  So it's assisting them through all of those trials and tribulations.

I taught them how to do injections that they would have to do, all the appointments, trying to arrange it so that they could continue to be working.  Many of

Parent - Direct by Mr. Jones

them are driving an hour or more to get to the clinic, so they had to be aware they had to keep working through the whole process.

Q   So kind of backing up a bit, so if a patient or a couple comes to the REI, like, what's their initial appointment look like?  How does that introduction to the division -- what's that look like?

A   The first appointment was with one of the physicians that would review any workup they had done with their primary physicians and then proceed from there, any updated information we need, so that we would know what the best method would be for them to proceed.

Q   Okay.  And would there be any testing ordered or any further diagnostic --

A   There would be lab testing, evaluation of the uterine cavity; that is the first blush.

Q   Okay.  And at what point in the process is there a decision made about which path to take in terms of insemination or in vitro fertilization?

A   Right.  If we determine the uterine tubes were open, then we would certainly proceed with inseminations if you had adequate sperm count, if you knew you didn't have any filling defects, and you didn't have any hormonal issues.

Q   And for a patient who elects to go down the path of in

Parent - Direct by Mr. Jones

Q   vitro fertilization, is there a hormone regimen associated with that?

A   Yes, there is.  For multiple weeks, they're doing injections twice a day, and then after they've taken some of the medications, they need to then proceed with ultrasounds that are depend -- you know, those are based on what the medication regimen has accomplished. So they could do it once a day -- once a week, twice a week, three times a week knowing that all that travel time and away from work has an impact.

Q   Yeah.  So you had mentioned in response to one of my earlier questions that a lot of the patients are stressed, and this can be difficult.  Can you expand on that a little bit and talk to me about the -- like describe the emotional state of the population that the REI clinic serves.

A   Yeah.  They're desperate to become pregnant.  They wanted it yesterday.  They don't want to wait until next week, next month; they wanted it yesterday. They've been trying on their own for months or years, and they're very stressed emotional.  Then you add hormones into the mix, and there's even more emotion involved.

Q   Yeah.  You also touched upon financial stressors.  From your experience working in the REI clinic, did you have

Parent - Direct by Mr. Jones

a sense of how many of the patients were paying for these treatments out of pocket without insurance?

A   About 60 percent were paying out of pocket, and about 40 percent had insurance.

Q   And did the patients tell you how they were able to get the money to pay for those treatments?

A   Well, you know, if they had their own home, they took out some second mortgages; they borrowed and had loans from other areas, and a lot of them borrowed from family members, and it's how it's presented an issue. Then you had more stress because what if you didn't get pregnant?  You borrowed this money from your family, and now you're not conceiving.

Q   Okay.  I would like to switch gears a little bit.

     This is a case brought by Dr. Misty Porter.  Do you know Dr. Misty Porter?

A   Yes, I do.

Q   How long have you known her?

A   Since she started in about late 1990s, when she started in labor and delivery.

Q   Okay.  That was when you were still working in labor and delivery?

A   Yes.

Q   And did you have an opportunity to start working together with her at that time?

A    I did, yes.

Q    And did you work closely with Dr. Porter in labor and delivery?

A    Not closely.  I was working part-time at that point, so not as frequently, no.

Q    Okay.  And then eventually you transferred to REI; is that right?

A    Correct.

Q    And, at some point, Dr. Porter also ended up at REI?

A    Yes.

Q    Do you recall who went first?

A    Dr. Porter.

Q    Okay.  And then you joined the REI team?

A    Yes, in 2000.

Q    2000.  Okay.  And, at that time, did you work more closely with Dr. Porter?

A    Yes.  I was assigned to be her nurse coordinator.

Q    Okay.  So you became Dr. Porter's nurse coordinator?

A    Yes.

Q    And was that true all the way from 2000 until the time you retired?

A    Yes.

Q    And where was your office in relation to Dr. Porter's office?

A    I was diagonally across from her office and directly

across from the ultrasound reading room.

Q   Were you able to see and hear the comings and goings from Dr. Porter's office from your office?

A   Frequently, yes.

Q   And were there comings and goings from Dr. Porter's office?

A   Frequently, yes.

Q   Can you describe the comings and goings?

A   There were consultations in the ultrasound reading room for patients that other physicians wanted Dr. Porter's expertise to determine what would be the best course of treatment for that patient.  They may have the ultrasound report from the radiologist, but Dr. Porter was able to help them direct patient care.

Q   Okay.  So just so I'm clear, these are other OB-GYNs who were seeking Dr. Porter's consultation with regard to reading ultrasounds?

A   Yes.

Q   Did that happen frequently that people sought her consultation?

A   Daily, yes.

Q   And was she amenable to that and willing to spend the time?

A   Yes.

Q   Can you give us a sense of, like, how many people would

seek her consultation?

A    That's really hard to say.  It varied day to day.  She wasn't in the ultrasound reading room every day.  She would be in her office or doing surgery, so it would be a variety of people.

Q    Let me ask it this way:  Were there ever times when your work was interrupted because others were seeking consultation?

A    Yes.  You know, daily, I had to meet with Dr. Porter to review the patient care that I needed to address, and many times I had to wait my turn when physicians were getting consultations.

Q    Based on your observations, was there any particular skill that Dr. Porter had that the other physicians were seeking out?

A    Both definitely reading the ultrasounds but, as she's a gifted surgeon, they were trying to determine what surgery would be the best way to proceed as well.

Q    Did you ever observe her turn people away and not be willing to help her out?

A    Well, you had to have your ducks in a row.  You couldn't go in willy-nilly and expect Dr. Porter to interrupt her work if you weren't presenting your case efficiently, and I knew that, just being her nurse coordinator; you needed to be ready for her.

Parent - Direct by Mr. Jones

Q   Yeah.  But, generally, would you consider her a team player?

A   Absolutely.  Why else would she discuss all the patient care with all the OB-GYNs that she did?

Q   And how would you describe Dr. Porter as a professional colleague?

A   Meticulous.  Gifted surgeon.  Dedicated to do -- have a very high level of standard for patient care.

Q   Okay.  I would like to direct your attention now to another physician who worked for a time in the REI clinic, Dr. Albert Hsu.  Did you know Dr. Hsu?

A   Yes.

Q   And how did you know Dr. Hsu?

A   When he started in the clinic, 2014, 2015, somewhere in that range.

Q   What was his role when he started?

A   He was an REI physician, but he was straight out of fellowship.

Q   Was he an attending physician?

A   He was an attending physician, yes.

Q   This was his first job out of the fellowship?

A   Correct.

Q   Did you have occasion to work with Dr. Hsu?

A   Yes.

Q   Did you assist him during procedures?

A    Yes.

Q    What kind of procedures did you assist him in performing?

A    The IVF egg retrieval, or harvests, and embryo transfers.

Q    Did you work with him sufficiently often that you were able to observe his work?

A    Yes.  There's only two or three nurses that would do procedures, so we rotated through the procedure rooms.

Q    How would you describe his skills at performing those procedures?

A    Initially, he was green.  He needed to have some assistance in the retrievals and the transfers.  All fellowship programs don't provide the skill set that you maybe need when you come out of fellowship.

Q    So it may be common for someone to not start off on Day 1 with a full set of skills but evolve?

A    Absolutely, yes.

Q    Did Dr. Hsu evolve, though?  Did he progress and improve?

A    Not really, no.

Q    Did that lack of progress concern you?

A    Absolutely did, yes.

Q    Can you explain why?

A    Well, the patients are putting in a lot of money, time,

and effort here, and his skills were lacking and didn't proceed as we might have wanted.

Q   Did you ever observe actual adverse impact on patients due to Dr. Hsu's performance of procedures?

A   He had some skills that would precipitate some more cramping post-operatively for patients.  And for the embryo transfers, there definitely was some difficulties with that.

Q   What were the difficulties with the embryo transfers?

A   For the embryo transfers, it's done under ultrasound guidance.  You need to know where you're positioning the embryo inside the uterus, so you have a ultrasound technician that is directing that by putting little calipers, marking the uterus, so you know where to place the embryo.  You don't want to place it too low or too high.

Dr. Hsu, he had difficulty really determining the placement of the embryo, was in constant discussion with the ultrasound technicians, "Am I in the right place?  Am I there?  Am I there?"  And only when the ultrasound technician let him know that he was in the right place, he would then inject, but when he did that, he always had a little twitch or another movement when the embryo went in, and that had an effect that could precipitate some cramping.

Parent - Direct by Mr. Jones

Q   Okay.  So this twitch or additional movement that you described, how often would that occur during his embryo transfers?

A   Every one I ever saw.

Q   And would that cause pain to the patient?

A   It could cause cramping, if the tip of the catheter went towards the top of the uterus, yes.

Q   You say it could.  Were there times when you observed that it caused the patient pain?

A   Yes.

Q   And going back a little bit to the -- what we've been talking about, the embryo transfers, but earlier we were talking about egg retrievals.  You mentioned that when Dr. Hsu performed egg retrievals, there was more cramping than normal.  What is the normal cramping in an egg retrieval procedure?

A   Well, you're going through the ovary with a needle, so there's going to be some cramping.

Q   Yeah.

A   And you want to make as few movements in and out of the ovary as you can; you slide through it, and you're not jerking around a lot.  And I think Dr. Hsu was still new in that technique and learning it.  His egg counts initially were a little on the low side.  That did get better over time; however, the cramping and the amount

Parent - Direct by Mr. Jones

of bleeding that could happen was pretty much a constant.

Q   So I want to understand.  His egg counts improved but not the cramping and bleeding that was caused by his procedures?

A   Correct.

Q   Talk to me about the bleeding.  Did you observe bleeding with his procedures?

A   Some --

Q   Yeah.

A   -- yes.

Q   More than usual?

A   More than I was used to seeing, yes.

Q   How did that make you feel being in the procedure room with Dr. Hsu?

A   Distressed.  I wanted to have a better outcome for the patients.  Anesthesia would have to give more medications when they woke up for decreasing the cramping.  I could provide a hot pack, but they had to -- they had to tolerate it.

Q   I would like to switch gears and direct your attention now to another physician who worked for a time in the REI clinic -- Dr. David Seifer.  Do you know Dr. David Seifer?

A   Yes.

Q    Who is Dr. Seifer?

A    Dr. Seifer started in the Department in 2016, came in as the division director for IVF.

Q    Okay.  Did you have a chance to work with Dr. Seifer?

A    Yes.

Q    And, again, did you assist him during procedures?

A    Yes.

Q    With which procedures did you assist Dr. Seifer in performing?

A    Mostly, the egg retrievals.  He did some transfers but not as many.

Q    Okay.  And how would you describe his skills with regard to egg retrieval procedures?

A    Dr. Seifer had a lot of movement when he placed the ultrasound probe.  The needle went in and out of the ovary multiple times.  I think part of that -- this is my opinion -- that he was used to using the double lumen needle, and we had proceeded to a single lumen needle, so the technique was a bit different, but his movements within the ovary were very rough.

Q    Was there an adverse impact on the patients with his rough technique?

A    A lot more bleeding.  A lot of bleeding.  A lot of cramping.

Q    And was that true during the entire time that you

assisted him performing these procedures?

A    Yes.

Q    And how did that make you feel, performing procedures with Dr. Seifer?

A    Horrified and distressed a lot.

Q    Can you explain that?

A    It just felt like it didn't have to keep occurring for the patients.

Q    Was there anything that you could do for the patient during the procedure while this was happening?

A    No.  Not during the procedure at all, no.

Q    Okay.  So we've talked about Dr. Hsu and Dr. Seifer and their skills at performing these procedures.  In contrast, how would you describe egg retrievals and embryo transfer procedures that Dr. Porter performed?

A    Smooth, sleek, in and out and done efficiently, accessing the ovary very gently and sliding through it like butter.

Q    And did you observe the same level of patient pain and bleeding?

A    Everyone will have some cramping and some bleeding, but very little with Dr. Porter's patients.

Q    Okay.  And were you familiar with Dr. Porter's pregnancy rates?

A    I'm sorry?

Q    Were you familiar with Dr. Porter's pregnancy rates?
You had mentioned that Dr. Hsu's were somewhat low in
the beginning.

A    His egg counts were low in the beginning.

Q    I'm sorry.  Egg counts.  I'm sorry.  Yeah.

A    Yes, Dr. Porter had a very high egg count.

Q    You said it's common to have some cramping after a
procedure, even with Dr. Porter.
        What's a normal period of time that a patient
might experience some discomfort after a procedure?

A    Definitely when they wake up from the anesthesia, for
the next day usually.  By Day 2, very little.

Q    Okay.  Do you have a sense of how that compared to the
pain experienced by Dr. Seifer's patients?

A    They were reporting discomfort Days 3, 5, 7 days after
a procedure.

Q    Okay.  And that was unusual?

A    Unusual...?

Q    I mean, compared generally to the practice of REI.

A    Yes.

Q    But not unusual with regard to Dr. Seifer's procedures?

A    Correct.

Q    Okay.  So -- you had concerns about Dr. Hsu and
Dr. Seifer.  Did you report that to anybody?

A    I had discussions with my nurse manager, Katie

Mansfield.

Q   So she was your nurse manager in the REI division?

A   She was.  She oversaw all the OB-GYN department nurses.

Q   Okay.  So she was the OB-GYN nurse manager?

A   Correct.

Q   And you, as an REI nurse, were one of the people she managed?

A   Reported to her.

Q   Got it.

A   Yes.

Q   So you went to her with your concerns?

A   I did.

Q   What did you tell her?

A   That it just felt like there needed to be further oversight and that I was pretty distressed by what I was seeing.

Q   How many times did you talk to Nurse Manager Mansfield about this?

A   Several times.  Several times.

Q   As far as you could tell, did anything happen as a result of your reporting?

A   I think, as a nurse manager, she felt like she was supporting us in having the discussion, but she didn't have the ability to make change.

Q   Okay.

Parent - Direct by Mr. Jones

MS. McDONALD:  Objection.  Speculation, move to strike.

THE COURT:  Why don't you rephrase the question, Mr. Jones.

MR. JONES:  I'm sorry.  I didn't hear the objection.

MS. McDONALD:  Speculation.

THE COURT:  Speculation.

MR. JONES:  Sorry.  Fair point.

Q   (By Mr. Jones) In addition to Nurse Manager Mansfield, did you report your concerns to anybody else at the hospital?

A   Yes.

Q   Who was that?

A   Heather Gunnell.

Q   Who is Heather Gunnell?

A   She was the practice manager.

Q   So you went to Ms. Gunnell as well.  What did you tell her?

A   I reported to her what I was seeing for Dr. Hsu and Dr. Seifer.

Q   Okay.

A   And the discussion, what exactly we were seeing and how that was impacting the patients and how it felt for me as a nurse.

Parent - Direct by Mr. Jones

Q    And how did she respond to your report?

A    Well, she took notes.  I mean, I think it was -- she took notes.  I didn't see any change in the practice.

Q    Okay.  Did she say anything to you about what you were saying?

A    Not a lot.  She just took notes.

Q    Okay.  And how often did you go to Ms. Gunnell?

A    I can't recall exactly, but probably two or three times.

Q    Okay.  Anybody else that you reported your concerns to?

A    I talked with Dr. Porter about them.

Q    What did you tell Dr. Porter?

A    What I was witnessing in the procedure rooms.

Q    Okay.  And what did she say?

A    To report to Dr. Leslie DeMars.

Q    And who was Dr. Leslie DeMars?

A    She was chair of the OB-GYN department.

Q    Okay.  And did you, in fact, report your concerns to Dr. DeMars?

A    Yes, I did.  I set up a meeting to meet with her.

Q    Okay.  And did you, in fact, have that meeting?

A    Yes.

Q    What do you recall of that meeting?

A    It was after hours, and she came down to my office, and there was another nurse that was present.  Casey Dodge

Parent - Direct by Mr. Jones

was there.

Q    Okay.

A    We expressed our concerns to her.

Q    And how did you describe to her what your concerns were?

A    Well, as we discussed, the procedures and the difficulty and the patient discomfort, also for the embryo transfers, how that was happening.

Q    Okay.  Did you tell her how you felt about having to be a part of these procedures?

A    I sure did.  I just told her my moral compass was going off the charts, and I just felt I couldn't keep witnessing this without having someone do something about it.

Q    Do you believe that you were blunt and direct with Dr. DeMars?

A    Absolutely.

Q    And what did Dr. DeMars say in response to your report?

A    That every physician operated differently, and that I needed to know that that was occurring.  And I understood there was lots of variance in people's techniques, but this wasn't it.  This was more difficult to witness.

Q    Okay.  So you explained to her that you didn't think that this was just a difference in how doctors do

Parent - Direct by Mr. Jones

things?

A    I did not.

Q    How did the meeting conclude?

A    Well, she -- Dr. DeMars said that Dr. Porter set a very high bar and that I needed to accept that there would be differences in practice.  And I said to Dr. DeMars at that time, would she accept that within her practice in oncology.

Q    And what did she say?

A    I was very blunt.

Q    And what did she say?

A    She didn't respond to that.

Q    Okay.  What did you think of Dr. DeMars' reaction to your report?

A    I thought she was blowing us off and making excuses; that she wasn't really keying in to what I was trying to address with her.

Q    After you met with Dr. DeMars to report your concerns about Drs. Hsu and Seifer, did they continue to perform procedures on patients?

A    Yes.

Q    And was that true throughout the rest of your time?

A    Yes.

Q    I'm going to direct your attention to another topic.
      Did there come a time when Dr. DeMars asked you to

Parent - Direct by Mr. Jones

gather information about pregnancy rates?

A    Yes.

Q    Can you tell us about that?  What did she say?

A    She asked me to gather the data for Dr. Hsu and Dr. Seifer's pregnancy rates for the embryo transfers.

Q    Okay.  Did that strike you as unusual?

A    Quite unusual, because the lab director for the embryology lab could have provided that information easily to her.

Q    Nevertheless, did you gather the information she requested?

A    As best I could, yes.

Q    Okay.  And what did the data show?

A    That Dr. Hsu had very low pregnancy rates from his embryo transfers, and Dr. Seifer, while he had less embryo transfers, his rates were a bit below what our normal standards had been.

Q    Okay.  Did the REI division keep records of pregnancy rates with regard to insemination procedures?

A    Yes.  The nursing staff actually did all the inseminations, so we did have ability to track all the inseminations that we did as nurses.  New nurses would come in, we wanted to make sure that they were hitting the targets, so to speak.

Q    So you yourself performed insemination?

Parent - Direct by Mr. Jones

A    I did.

Q    How were your rates?

A    "Sure Shot Sharon."

Q    "Sure Shot Sharon."  Okay.

      Ms. Parent, I want to circle back now to what you started out with.  You said that you're retired?

A    I am.

Q    When did you retire?

A    December of 2016.

Q    How much notice did you provide Dartmouth-Hitchcock that you would be retiring?

A    A year.

Q    A full year?

A    A full year.

Q    And why did you give them so much time?

A    Historically, it took a while to have a replacement nurse.  It also took about six months to train someone in the REI division.  It was my hope that I would be able to train my replacement while I was there.

Q    Did that happen?

A    It did not.

Q    To your knowledge, did the hospital post your position?

A    They posted it on the interweb within the department. It initially was posted just as a general RN position, so it didn't indicate that it was for the REI team

Parent - Direct by Mr. Jones

specifically, not even what the role was.

Q   Did you see that it was posted nationally anywhere?

A   It was not, no; not that I'm aware of.

Q   Did you have any concerns about the efforts that were being made to replace you?

A   Yes.

Q   And did you talk to anybody in the department about that?

A   Went back to my nurse manager, Katie Mansfield, particularly when I saw the initial job search was not indicating what the job really was.  You have to understand, it's a seven-day-a-week operation.  So anyone who wanted to move to the clinic had to know that that was what the job was about.

Q   And what did Katie say after you spoke to her?

A   Oh, HR didn't post it as they needed it; they would be looking into it.

Q   Okay.  Is there a journal with regard to reproductive medicine that is commonly consulted by professionals in that field?

A   Yes.

Q   What's that called?

A   Assisted -- ASRM, American Society for Reproductive Medicine.

Q   Okay.  And does that journal post openings in the field

throughout the country?

A   Yes, it does.

Q   And do you read that journal?

A   I did.

Q   And did the hospital post the position in that journal?

A   They didn't.  We had suggested that.  The nurse practitioner, Elizabeth Todd, and I had requested that they perhaps would find someone that would be able to fill the REI position.

Q   And what was -- you made that suggestion.  Did they take it?

A   They were going to have to spend money to do that, and they weren't willing to do that.

Q   Who told you that?

A   I think it was Katie Mansfield.

Q   Okay.  So you retired in December of 2016.  Did you plan for that to be just an "I'm done and I'm going to go on with my life now," or did you think about having some continued connection with the hospital?

A   I was expecting to work per diem.

Q   How would that work?

A   I needed to have 90 days of separation of practice before I could return in the per diem role.

Q   And what's that about?  Do you understand that rule of 90 days?

Parent - Direct by Mr. Jones

A    Something to do with my pension and separation for being able to collect my pension and participate in care.

Q    Okay.  So who told you about that, that procedure?

A    The HR department.

Q    Okay.  So did you speak with HR about coming back as a per diem?

A    Yeah, many times, so that I could understand the process of what I needed to do.  I had to maintain my licensure.  I had to be rehired in the OB-GYN department because I had terminated my employment there.

Q    Okay.  To your knowledge, did other nurses who had retired continue to work on a per diem basis?

A    Many times that happens, yes.

Q    Yeah.  So if you retired in December of 2016, and you had to be out for 90 days, does that -- am I correct that you would have been eligible for per diem work starting around March of 2017?

A    Correct.

Q    So throughout this case, Dartmouth-Hitchcock has claimed that it had to shut the REI division --

        MS. McDONALD:  Objection.  Mischaracterizes our position.

        THE COURT:  I'll ask that you rephrase the

Q    question, Mr. Jones.

MR. JONES:  Okay.

Q    (By Mr. Jones) Have you heard anyone explain that a reason for closing the REI division was a nursing shortage?

A    I had heard that, yes.

Q    Okay.  But, to be clear, you were prepared to continue working in the division?

A    I was.

Q    And you had talked to HR about coming back as a nurse in the REI division?

A    Right.  And I had talked to Katie Mansfield and Heather Gunnell about what I expected I could do, working weekends to help the nursing staff not have to cover a weekend call so that they could work a Monday-through-Friday shift.

Q    Okay.

A    And I gave them the number of hours I was willing to work, and it just went -- from there, it just was in limbo for a period of time.

Q    Okay.  But starting in March of 2017, you could have worked as a per diem nurse in the REI division; is that right?

A    Yes.

Q    And you would have been willing to train anybody they

needed?

A   Yes.

Q   Were you -- it was in limbo for a while.  Was there ever any closure to that situation?

A   In late February, I had been in contact with both Heather Gunnell and Katie Mansfield.  They had indicated to me with what I first thought I wanted to do was the weekend call, they had indicated that the physicians were going to start doing that weekend call and that they didn't think they would be able to hire me as the weekend call person.  I indicated I was willing and able to do weekend procedure work, and they indicated they weren't willing -- weren't able to proceed at that time.

Q   Okay.  So they didn't take you up on your offer?

A   Not in February, no.

Q   Okay.  After the REI division was closed, did you have another conversation with Dr. DeMars?

A   I did.

Q   Can you tell us about that?

A   I requested an appointment with her.  I was the egg donor nurse coordinator, and I had some concerns about that egg donor program and some of the funds in the program, and I wanted to have a discussion with her about the disbursement of that or what she knew about

Parent - Direct by Mr. Jones

the egg donor fund.  I also wanted to ask her why I wasn't rehired back into the REI division.

Q   What did she say?

A   She indicated she was protecting me from all the things that -- this happened after the closure of the REI department had been announced.  So she was protecting me from what was to come.

Q   Did you think you needed protecting?

A   I didn't think I needed protection from that, no.

Q   Okay.  Ms. Parent, thank you.

MR. JONES:  Your Honor, I have no further questions at this time.

THE COURT:  Ms. McDonald, any cross?

MS. McDONALD:  Yes.  Is it okay if we approach the witness with the exhibit binders?

THE COURT:  Yes.

MS. McDONALD:  I promise I'm not going to make you look at all of these.

**CROSS-EXAMINATION**

**BY MS. McDONALD:**

Q   Hi, Ms. Parent.  How are you?

A   Good morning.

Q   Good morning.  My name is Morgan McDonald.  Thank you for being here.

So you testified that you worked with Dr. Porter

Parent - Cross by Ms. McDonald

for a number of years, correct?

A   Yes.

Q   I think you said since the late '90s?

A   Yes.

Q   And during that time, you became friends, correct?

A   Yes.

Q   You've never been Dr. Porter's supervisor, correct?

A   I have not, no.

Q   And you haven't been a supervisor to any other physicians at Dartmouth Health?

A   No.

Q   And that's, in part, because you haven't had any formal training that would allow you to do that, correct?

A   Correct.

Q   You haven't been to medical school?

A   No.

Q   So your impression is that Dr. Porter is a great doctor and a great surgeon, but assessing her technical skills would not be within the scope of your qualifications, correct?

A   Yes.

Q   But you do support her as a good doctor and as your friend, right?

A   As an excellent doctor, yes.

Q   Okay.  And to that end, Dr. Porter asked you to meet

Parent - Cross by Ms. McDonald

Q   with her attorneys in advance of this trial, correct?

A   I'm sorry.  I have a hearing deficit.

Q   To that end, Dr. Porter asked you to meet with her attorneys in anticipation of this trial, correct?

A   Correct.

Q   And you did meet with them?

A   Yes.

Q   And they prepared you for your testimony?

A   Yes.

Q   With respect to the REI division, you would agree with me, right, that the REI division was a fairly large group of people and it required successful -- excuse me -- strike that.

    You would agree with me that the REI division was a large group of people, correct?

A   No, it would not.

Q   No?  But at least it would require -- successful operation of the REI division would require interaction among a group of people, correct?

A   Yes.

Q   And that would include doctors?

A   Yes.

Q   Nurses?

A   Yes.

Q   Lab directors?

Parent - Cross by Ms. McDonald

A    Yes.

Q    Embryologists?

A    Yes.

Q    Secretaries?

A    Yes.

Q    Schedulers?

A    Yes.

Q    Financial assistants?

A    Yes.

Q    And they would all have to work together to run a successful program, correct?

A    Yes.

Q    And each of those roles is important, and each of them is sort of interdependent, right?

A    Correct.

Q    And it was never your role to be a supervisor of the entire department, correct -- excuse me, the division, correct?

A    No, it would not have been.

Q    In fact, you have never led a practice group at Dartmouth Health, correct?

A    I have not.

Q    So it's never been your responsibility to manage a number of personalities within a department or a division at Dartmouth Health, correct?

A   Correct.

Q   So you would agree with me that even if Dr. Porter was an excellent physician that doesn't mean that the REI division was functioning appropriately, correct?

A   I'm not understanding the question.

Q   Sure.  So Dr. Porter, your testimony is that she was an excellent physician, correct?

A   Yes.

Q   But Dr. Porter being an excellent physician in and of itself wouldn't make a REI division a successful division, correct?

A   Yes, it would.

Q   Dr. Porter, in and of herself, your testimony is, correct -- excuse me, would be that the entire division was successful just because Dr. Porter was an excellent physician?

A   No, that's not what I'm saying.

Q   Okay.  Can you clarify?

A   I'm saying that her position as an excellent physician would have directly impacted the program.

Q   Certainly, but in and of itself it wouldn't be enough to create a successful program, correct?

A   It had a large part to do with it.

Q   But in and of itself, the program wouldn't be successful just because Dr. Porter was a great

Parent - Cross by Ms. McDonald

physician?

A   I suppose not.

Q   And if the team, the REI division, the entire team is not functioning appropriately, that could impact patient services and safety, correct?

A   Yes.

Q   And if patient safety is affected, Dartmouth Health leadership would have a responsibility to respond to that, correct?

A   They should have, yes.

Q   And leadership needs to make those kind of decisions in order to improve the hospital, correct?

A   Correct.

Q   So while you might have an opinion about what direction the division should go in, you would agree that it's leadership's role to make the decision about whether a particular group should continue, correct?

A   Yes.

Q   All right.  Switching gears a little bit.  You testified today that you are aware of certain criticisms Dr. Porter had of Dr. Hsu and Dr. Seifer, correct?

A   I'm sorry?

Q   You testified today that you're aware of certain criticisms Dr. Porter had of Dr. Hsu and Dr. Seifer,

correct?

MR. JONES:  Objection, Your Honor.  That's mischaracterizing the testimony.  There was no testimony of Dr. Porter's criticism.

THE COURT:  The objection is sustained.

Q   (By Ms. McDonald) You testified today that you retired in 2016, correct?

A   Correct.

Q   So -- and you're aware that the division shut down in May of 2017, correct?

A   Correct.

Q   So you were not around at the time the division shut down?

A   I was not.

Q   And you hadn't been around for several months at that point?

A   Correct.

Q   And you testified today that you gave Dartmouth Health a year's notice, correct?

A   Yes.

Q   Okay.  And you did that so that you would be available to train a replacement, right?

A   Yes.

Q   And you said, I think, it takes about six months to train an REI nurse?

Parent - Cross by Ms. McDonald

A    Yes.

Q    Because being an REI nurse is a fairly specialized role, correct?

A    Correct.

Q    And it requires sort of specific training?

A    Yes.

Q    You can't, I guess, just take any nurse off the street and make her an REI nurse?

A    Correct.

Q    You testified today that no one really asked you for your help finding a replacement for you, correct?

A    I'm sorry.  I'm not understanding.

Q    You testified today that Dartmouth Health did not ask for your help finding a replacement for you after you retired, correct?

A    My help?  In what way?  I'm not sure what way you're going.

Q    Sure.  Actually, you previously provided a statement under oath in connection with this litigation, correct?

A    Correct.

Q    Okay.  And do you remember what -- the statements that you made in that declaration?

A    I don't know where you're headed, no.

Q    Okay.  Do you recall in your statement that you made under oath, you stated that no one ever asked for your

Parent - Cross by Ms. McDonald

advice on how to find a nurse to replace you.  Do you recall that?

A   I don't recall that, no.

Q   I would ask you to turn to C2 in your binder.  I think it should be -- I'm not sure what volume that is.

A   Help me out here.  There's...

Q   Yeah.  C2.

MR. VITT:  Can we get the number, please?

MS. McDONALD:  C2.

THE COURT:  Ms. McDonald, this is Defendant's Exhibit C2, correct?

MS. McDONALD:  C2, correct.

THE WITNESS:  We're on C3.

MS. McDONALD:  I'm sorry.

THE WITNESS:  C2.  Okay.

Q   (By Ms. McDonald) I'll ask you to take a minute to review that.

A   What am I looking for exactly?  Do you have a certain page you want me to refer to?

Q   Sure.  I would ask -- I would direct you specifically to Page 3, specifically Paragraph No. 7.

A   So I see the statement that no one asked my opinion after the initial search had been posted, and I responded to them that it hadn't been posted correctly. There wasn't any further request of me on how to make

Parent - Cross by Ms. McDonald

that a more informed posting.

Q    Okay.  But in your declaration, you just said, "No one asked my advice on how to find a nurse to replacement (I had ideas on how to find someone)," right?

A    Right.

THE COURT:  So, Ms. McDonald, I would just ask that you ask some questions to give us some context of when and where and the time of this particular statement.

MS. McDONALD:  Sure.  Sure.

Q    (By Ms. McDonald) Ms. Parent, can you flip to the back and tell me when you signed this particular statement?

A    Where would that be?

Q    That would be at Page 5.

A    Of...?

Q    Of the same document.

A    Of C2.

Q    Of C2.

A    Okay.  February 28th, 2020.

Q    Thank you.

I'm now going to ask you to turn to Document C14, please.  I believe that's in the same binder.  I may be mistaken about that.  Not the same one?

THE COURT:  I'm going to ask counsel to approach.

Parent - Cross by Ms. McDonald

(Bench conference.)

THE COURT:  I just want to be clear on what we're doing here.  So you're impeaching Ms. Parent with a prior inconsistent statement.  You're not offering this as evidence, but you're asking her to read from the exhibit in the courtroom.  Is that the plan?

MR. SCHROEDER:  Yeah.

THE COURT:  But you're not seeking to admit this?

MS. McDONALD:  No.

THE COURT:  Just if you're going to keep referring to exhibits in the binder, it's important we have context as to when the statement was made, on the dates.

MR. JONES:  I'm having a hard time hearing your exhibit numbers.

MS. McDONALD:  Sorry.

MR. JONES:  If you could turn around maybe and face the courtroom.

MS. McDONALD:  Sure.  There's a lot of them.

THE COURT:  And identifying what it is.  You referred to it as a declaration.  Is this a deposition?

MS. McDONALD:  This is actually in summary judgment briefing; it's an affidavit.

THE COURT:  All right.  Thank you.

Parent - Cross by Ms. McDonald

Q    (By Ms. McDonald) Ms. Parent, have you had a chance to review Exhibit C14?

A    Sure.  I can now.  I didn't because I wasn't sure how you were proceeding.

Q    Sure.  If you need to, take a moment to review it, please.

A    (Witness complies.)

Q    Okay.  All right.  Do you recognize this document?

A    No.  I do not.

Q    Okay.  All right.  Is -- can you take a look at the recipients of this e-mail.

A    I see my name as listed on it, yes.

Q    Sure.  So is this an e-mail that you received from David Seifer?

         MR. JONES:  I'm sorry, Your Honor.  I don't have a C14.

         MS. McDONALD:  Should.  Sorry.

         MR. JONES:  C7 is the last...

         THE WITNESS:  You have a new booklet.

         (Attorneys conferring.)

Q    (By Ms. McDonald) Is this an e-mail that you received from David Seifer?

A    Not that I recall.

Q    If you look about four lines down on the CC line, your

name is listed there, correct?

A   Yes, it is.

Q   Okay.  And the sender is David Seifer?

A   Yes.

Q   Do you have any reason to believe that you didn't receive this e-mail?

A   No.  I just don't recall it.

MS. McDONALD:  We would move to admit C14.

THE COURT:  Is there any objection?

MR. JONES:  Well, she doesn't recall receiving it.  I'm not sure it's appropriate through this witness, if she doesn't even remember receiving it.  Other than that, I don't object to the authenticity.

MS. McDONALD:  I think we're going to have an issue in this case if every time the witness doesn't recall receiving an e-mail from 2017 that it can't be admitted.

THE COURT:  I'm going to ask counsel to approach again, please.

(Bench conference.)

MR. JONES:  I'm sorry, part of the problem is I just got this because I didn't have it in my book.

MS. McDONALD:  We provided it to you.

MR. JONES:  I'm not saying you didn't.  I'm

saying it's part of my flatfootedness.

THE COURT:  You want to be very careful about making comments from the podium that "we're going to have problems."  But, at the same time, Ms. McDonald has a good point.  This is going to be a recurring issue in this case.  We're going to have problems, even if they don't recall the e-mails, even though they're the recipient of them.  Does that render it inadmissible for lack of foundation?

MR. JONES:  Having had a chance to review it, I would not object.  I will retract my objection because I would like to not set a precedence of simply starting that process.

THE COURT:  I understand you may have different views on how this works, but perhaps outside the presence of the jury, we should have some conversations about it.

MR. COFFIN:  Very briefly, we stipulated to the authenticity that -- the two parties have, so it's just a question of admissibility, and it's hearsay.  If there's objections on those grounds.

THE COURT:  Thank you for that.  So authenticity has been stipulated to for every exhibit?

MS. McDONALD:  No.  That's not -- if we stipulate to the authenticity of every complete

Parent - Cross by Ms. McDonald

exhibit, there's a number of exhibits on the exhibit list that we do stipulate to.

MR. SCHROEDER:  I mentioned that yesterday, Your Honor.

THE COURT:  We're going to take this document by document in terms of stipulation.

MR. SCHROEDER:  I think a lot of them are stipulated as to authenticity.  We had to get an HR CHRO assistant on our witness with respect to this line of questioning to testify.  She can say all these documents are business records, so they would fall within that.

THE COURT:  I don't know.  There's a slate of authority on that whether e-mails are automatically business records.

MR. SCHROEDER:  I understand whether they're automatically, but if we lay a foundation with her, and she's the highest ranking CHRO Human Resource Officer, I understand that you can't say just because it's --

THE COURT:  I understand that you understand that, but at the same time, as you know, there's fairly strong cases made at the time when these type of records are typically generated.  So I would have some questions about whether an HR director would be the custodian to get them in because in terms of business

Parent - Cross by Ms. McDonald

records, that is something that I would definitely need a foundation, clear foundation.

MR. SCHROEDER:  Understood.  I think the B issue is ripe, and we're going to raise that we're going to have a lot of objections as to authenticity and we need to move ahead, and we understood your direction.

MR. JONES:  I want to emphasize, because if you stipulate to authenticity -- you want us to, document by document, stipulate to foundation -- even though I have a foundational objection here, I'm going to withdraw it.  I'm hoping we can have that kind of cooperation.

MR. SCHROEDER:  Absolutely.

THE COURT:  So the objection is withdrawn to C14?  All right.  Thank you.

(End of bench conference.)

THE WITNESS:  I would love to have an opportunity to respond to a few of those statements on that page.

Q   (By Ms. McDonald) Sure.  I'll ask a few questions.

A   Okay.

Q   So just returning to C14, and I'll ask you to turn to Page 2 of this document.  And this is your -- the first e-mail in the chain is an e-mail from Heather Gunnell

Parent - Cross by Ms. McDonald

asking for a time to meet and discuss the plan for covering nursing tasks and recruiting, correct?

A   I guess, yeah.

Q   Well, that's what it says, right?

A   I'm not sure where you're saying -- where on this page. I'm looking at the beginning and --

Q   Sure.  C14(002)?

A   Correct.

Q   E-mail beginning with Heather Gunnell.

A   Okay.

Q   She writes, "Hello, REI clinical team."  Correct?  "I would like to find a time, Friday or Monday, whichever works best for the team, for us all to meet and discuss the plan for covering the nursing tasks and for recruiting."  Did I read that right?

A   Yes.

Q   Okay.  And that is from November 3rd, 2016, correct?

A   Correct.

Q   And then there are a few e-mails back and forth, and I will ask you to turn back to Page 1.  And that's an e-mail from David Seifer, correct?

A   Correct.

Q   And sent to a number of recipients, right?

A   Correct.

Q   Including yourself?

Parent - Cross by Ms. McDonald

A   Yes.

Q   And about mid way through the page, he writes, "In the interest of heading off people's anxiety about our current nursing shortage, we want to have a brief -- and initial brief meeting tomorrow, Friday, so that we can hear what is currently being explored."  Did I read that correctly?

A   Yes.

Q   "Let's continue to meet weekly on Wednesdays at noon where there will be updates and reiterations of strategies at least once weekly."  Did I read that right?

A   Right.  Correct.

Q   And about mid way through he says, "Below are six potential pools of recruiting a nurse."  In italics, "If anyone has any more ideas, please send them around by e-mail."  Did I read that right?

A   Correct.

Q   Okay.  So, here, David Seifer is asking you directly for your opinion on how to recruit nurses, correct?

A   Correct.

Q   Okay.  So that's in direct conflict with your statement that no one ever asked you for your advice on how to recruit nurses, correct?

A   No one from nursing requested it.

Parent - Cross by Ms. McDonald

Q   But that's not what you said in your declaration, right?

A   I guess not.

Q   Right.  And that statement was made under oath, correct?

A   Yes.

Q   So it's fair to say that Dartmouth Health did ask you for your advice on how to find a nurse to replace you, correct?

A   Yes.

Q   You also testified today that, and in your declaration, that Dartmouth Health did not post the position externally, correct?

A   Correct.

Q   And, specifically, you said that they did not post it in the American Society for Reproductive Medicine, correct?

A   Correct.

Q   I'll ask you to turn to Exhibit V, please, and I believe that's a different book for you.

        MS. McDONALD:  May I approach?

        THE COURT:  Yes.

        MS. McDONALD:  Thank you.  I don't think I gave you that one.

        MR. SCHROEDER:  If you could enunciate.  I

Parent - Cross by Ms. McDonald

feel like we're playing a game of Bingo here.  B-7.

(Attorneys conferring.)

Q    (By Ms. McDonald) Okay.  I'm handing you what's been marked as Exhibit V, as in vinegar.  V, as in vinegar.

Do you recognize this document?

A    I do not.

Q    Okay.  Looking at the sender and the recipients, you're listed -- your name is listed on the third line of recipients, correct?

A    Correct.

Q    And it was sent by Katie Mansfield on July 18th, 2016?

A    I guess so.

Q    Okay.

MS. McDONALD:  We would move to admit Exhibit V.

THE COURT:  Objection?

MR. JONES:  No objection, Your Honor.

THE COURT:  Okay.  It's admitted.

Q    (By Ms. McDonald) Okay.  This is an e-mail that you received from Katie Mansfield, correct?

A    It would appear so, yes.

Q    And the subject line is:  "REI job is posted in ASRM. Please forward to anyone else you think may want to see it."  Correct?

A    Correct.

Parent - Cross by Ms. McDonald

Q   Okay.  And this is a posting for an REI staff nurse position that was posted with the American Society for Reproductive Medicine, correct?

A   It appears to be, yes.

Q   Okay.  And Katie Mansfield reached out to you to ask you to forward this particular posting, correct?

A   Forward it?

Q   Yes.  The subject line is "Please Forward."

A   To see it, you mean?

Q   I'm sorry?

A   Forward it to who?

Q   The subject line is, "REI RN job is posted in ASRM. Please forward to anyone else you think may want to see it."  Correct?

A   Correct.

Q   Okay.  So the American Society for Reproductive Medicine is a resource outside of Dartmouth Health, correct?

A   Correct.

Q   So this is not an internal posting; this is an external posting.

A   Correct.

Q   Okay.  So you would agree with me that your sworn statement that Dartmouth Health never posted this position externally is incorrect, right?

Parent - Cross by Ms. McDonald

A    To a certain point, yes.  Can I clarify that point?

Q    No, that's all right.

MS. McDONALD:  Your Honor, can I take a moment to confer?

THE COURT:  Yes.

(Pause.)

Q    (By Ms. McDonald) You would agree with me that the American Society for Reproductive Medicine is a prestigious organization, correct?

A    Yes.

Q    And it's the case that Richard Reindollar, who is the former chair of the division went on to work for the American Society for Reproductive Medicine, correct?

A    Yes.

Q    Okay.  Part of the reason that it's hard to find REI nurses is that it's not a nine-to-five job, correct?

A    Correct.

Q    It's not Monday to Friday?

A    Correct.

Q    There are weekend shifts that need to be taken?

A    Yes.

Q    It's kind of a 24/7 job, correct?

A    Yes.

Q    Okay.  Going back a little bit, you testified today that you reported concerns about Dr. Hsu and Dr. Seifer

to Dr. Porter, correct?

A    Yes.

Q    Did she agree with you?

A    Yes.

Q    Did Beth Todd also raise complaints about Dr. Hsu and Dr. Seifer to Dr. Porter?

A    Yes.

Q    So the three of you together all had concerns about Dr. Hsu and Dr. Seifer, correct?

A    Yes.

Q    Okay.

MS. McDONALD:  No further questions.  Thank you.

THE COURT:  Okay.  Redirect.

MR. JONES:  Yes.

**REDIRECT EXAMINATION**

**BY MR. JONES:**

Q    Ms. Parent, Ms. McDonald just asked you whether Beth Todd also complained.  Did you have an opportunity to have a procedure with Dr. Seifer and Beth Todd at the same time?

A    Yes, I did.

Q    And after that procedure, did Ms. Todd observe her observations to you?

MS. McDONALD:  Objection.

MR. JONES:  She brought up Beth Todd's complaints.

THE COURT:  Ms. McDonald, basis?

MS. McDONALD:  Hearsay.

THE COURT:  Overruled.

MR. JONES:  Thank you.

Q   (By Mr. Jones) So what did Ms. Todd say to you?

A   She expressed concern.  It was an egg retrieval with Dr. Seifer, and she said, Please tell me this isn't how it always happens --

Q   And what did you say?

A   -- in regards to the amount of bleeding that occurred for the patient.  And I said, Yes, that was fairly standard.

Q   So Ms. McDonald showed you an affidavit you signed five years ago and then showed you another e-mail showing that perhaps someone did ask you for your input.

Despite that --

MS. McDONALD:  Objection, mischaracterizes her testimony and leading.

THE COURT:  All right.  Sustained.

Q   (By Mr. Jones) Is your testimony this morning about your observations of Dr. Hsu's procedures and Dr. Seifer's procedures true?

A   Yes.

Q    And is the testimony that you gave about reporting your concerns true?

A    Yes.

MS. McDONALD:  Objection.

MR. JONES:  I think she can answer that, that it's truthful.

THE COURT:  Overruled.  Do you still have a question, Mr. Jones, pending?

Q    (By Mr. Jones) I said, and is the testimony that you gave about reporting your concerns true?

A    Yes.

Q    And then there was an exhibit, Exhibit V, which appears to have been an ACRM (sic) posting of the position, but just to be clear, after you retired, you were willing to come back and work at the REI division, correct?

A    Correct.

Q    You were willing and able to do that, and you informed them of that fact.

A    Absolutely, yeah.

MR. JONES:  No further questions.

THE COURT:  Ms. McDonald, anything further?

MS. McDONALD:  No, thank you.  But Mr. Schroeder reminded me, I may not have moved for the admission of C14.

MR. JONES:  I was considering an objection,

Parent - Redirect by Mr. Jones

then we had a conference, and I withdrew the objection.

THE COURT:  Right.  That was my understanding.  C14, objection withdrawn, so it was admitted.

MS. McDONALD:  Thank you.

THE COURT:  Okay?  All right.  Thank you, Ms. Parent.  You can step down.

Okay.  At this time, we'll take our morning break.  Please be back by 10:55, about 15 minutes.

(Jury exits.)

(Recess taken.)

THE CLERK:  Your Honor, we're back on the record.  I'll get the jury.

(Jury present.)

THE COURT:  Okay.  Plaintiff may call your next witness.

THE CLERK:  Good morning.  If you would raise your right hand, please.

**Julia MacCallum**, witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you.  Have a seat, please. And then please state and spell your name for the record.

Parent - Redirect by Mr. Jones

THE WITNESS:  My name is Dr. Julia MacCallum.
That's Julia, J-u-l-i-a.  MacCallum is
M-a-c-C-a-l-l-u-m.

**DIRECT EXAMINATION**

**BY MS. NUNAN:**

Q    Good morning.  My name is Sarah Nunan.  Dr. MacCallum,
thank you for being here this morning.

A    Thank you.

Q    Can you please tell us a little bit about your
education?

A    Yes, I was -- attended the University of Wisconsin
School of Medicine in Public Health.  Graduated from
there in 2012.  And then went on to residency at
Dartmouth-Hitchcock Medical Center, which I had from
2012 to 2016.  And then after my graduation from OB-GYN
residency, I went on to do an additional residency
program at Dartmouth-Hitchcock which was called
Leadership Preventive Medicine Residency.  And through
that I got a Master of Public Health degree at
Dartmouth College, in addition to completing other
residency training at the time.  Completed that program
in 2018.

Q    Where did you go after that?

A    Since then, moved to western New York state to be
closer to family and took a position at the University

of Rochester Medical Center where I'm an assistant professor of OB-GYN, and currently, also, in 2024 transitioning to working at a smaller community hospital in my area called FF Thompson Hospital which is based in Canandaigua, New York.

Q   Will you describe your job as you have it now?

A   My job as I have it now is primarily functioning as a generalist OB-GYN physician which means I provide full-spectrum care for obstetric and gynecologic concerns for people who can get pregnant and women.

Q   I want to go back to your time as a resident in OB-GYN at Dartmouth Health.  First off, I would like to kind of go over some of the basics.

Could you tell all of us what a resident is?

A   So once you graduate medical school, you get your MD or DO degree, you're a physician, but you require more training in whatever specialty you have chosen to pursue in your career, and so you go on to a residency, which is essentially a training program which is like an apprenticeship, where you work with experts within your field, which we call attending physicians who have completed their training program, and they help to get you to a place where you can function independently in your specialty.  So, for me, that was OB-GYN.

Q   This morning, we're going to be talking about, at some

MacCallum - Direct by Ms. Nunan

point, a fellow or a fellowship. Could you give us a definition of what that is?

A So once you've completed your residency, you've graduated, you're able to practice in that specialty in general, but there are niches within many of our medical specialties. So, for example, internal medicine to cardiology is one that many people are familiar with. For OB-GYN there are a number of subspecialties that you can pursue after you finish your general training program, and some of these are reproductive endocrinology and infertility, REI, maternal fetal medicine, which we love our acronyms in our specialties, is MFM; gynecology-oncology, care of people who have gynecologic cancers, et cetera and so forth.

So when you are in that additional training program after residency, your title is "fellow." So you're still a trainee at a higher level. When you graduate from that training program, then you're qualified to perform independently in your subspecialty field.

Q All of those subspecialties that you mentioned, those are all divisions that were under the OB-GYN department at Dartmouth Health; is that correct?

A Correct.

MacCallum - Direct by Ms. Nunan

Q    Got it.  Okay.

So in -- you were a resident from 2012 to 2016.  I would like to talk about that a little bit.  Can you tell me a little bit about your first year as a resident?

A    So in residency programs, you start more basic, and you develop your knowledge and skill set over the course of however many years your program is to be ready to practice independently.  For OB-GYN, it's a four-year program.  So in your first year, you're doing the foundational basics:  Learning about obstetrics; care of people in pregnancy, childbirth, and post-partum; and then gynecology, so care of outside of pregnancy for reproductive health for women.  And you're kind of just doing the basics.

In the surgical realm, you're, in large part, assisting and observing and doing some simple, basic surgeries yourself.  In that first year, it's more elementary.  And then in second year, you start to develop more complexity and get a little bit more into subspecialty work, so you work -- you have rotations where you work with subspecialty experts, like in REI and in gynecologic-oncology, in our second year in Dartmouth Health at the time.

Q    Year three and four, what did those look like?

MacCallum - Direct by Ms. Nunan

A    Year three, you spend a lot of time in subspecialties at the time, Dartmouth Health, this is how the program is organized.  So we spent time in gyn-oncology with MFM and then again with REI, as well as doing higher level care in general with OB-GYN.

Fourth year, again, kind of going to an overarching basics of OB-GYN but at a higher level, kind of bringing all of the pieces together so that you're more prepared to leave that practice and practice independently and work on educating your fellow residents and educating medical students and assessing their progress, so you can learn how to be a teacher throughout this training program too.

Q    And so the times that you spent the most time in the REI division, was that -- what years were those?

A    So it's a month in the second year of OB-GYN residency at the time at Dartmouth Health, and a month in the third year.

Q    And why is spending time in the REI division important to residents for your training?

A    So for all of our subspecialties in medicine, if you are going to go out and be a generalist, you need to have a sense of the depth and breadth of the specialty so that you understand what your subspecialists call these students, so that you can refer to them

appropriately.  You need to know the foundational work to do to get your patient safely into their care, which is kind of what I took away from the experience.

You may get exposure to that subspecialty and decide you want to go into that and then you pursue that as your career and go on to fellowship.  This is also key and critical information that you then have to apply to take your board examinations to be a board certified OB-GYN.

Q    And when in your residency did you first work with Dr. Porter?

A    I began working with Dr. Porter on a limited basis in my first year of residency, when she would be on call for the GYN service, and I was on kind of a general GYN service in the hospital I would encounter her occasionally.

Q    What was that like?

A    Honestly, it was a little intimidating at first when I was a junior resident in those first two years particularly.

Q    Why?

A    She was exacting.  She had high standards.  She didn't want people to be let off the hook.  She wanted people to come prepared -- her trainees to become prepared to work, having had all of the background that

they should have on their patients; that they knew them very well, and they knew what we were going to do and the purpose of what we were doing. And really laying the foundation down so you could continue to build skill as you go forward, requires that you have -- you don't set bad habits and you start having rigor right from the jump. That is really scary when you're a new graduating doctor and you're just trying to get your sense of place in a new hospital and you're meeting all these new people and you're trying to do all of the medicine as well. Very challenging work. So she held you to a high standard which is really scary.

Q    Was she demanding?

A    She was demanding, yes. She held us to the high standard, and she wanted us to rise to that occasion. She would assess where you were at, and then she would push you to continue to build your skills and gain experience, skills, procedural knowledge as a result.

Q    And how did your perception of Dr. Porter change over time?

A    So as I became a more seasoned trainee and got into my third and fourth year of residency, I had the ability to look retrospectively at the first two years, how I was feeling, where I was as a young physician in my training and what my knowledge and skills were. And

what I found was often when I was really challenged by someone, really intimidated or afraid, it was often a reflection of where I was in my training; that I just didn't have the knowledge and the skills yet, and it can be really challenging to be pushed when you're still building that knowledge. But then I kind of could understand, looking back, why the rigor, why that high level of integrity was there. Just because we're at a training center, an academic medical center, where there are a lot of learners involved doesn't mean we should hold anyone to a lower level of care. In fact, we should be elevating that care to a higher level because our patients deserve that, and they deserve that kind of attention and thoroughness. And these are skills that, foundationally, make very good independent practicing physicians, if you start building them right from the jump.

Q    Would you describe Dr. Porter as protective of her patients?

A    Absolutely. I mean, I think all good doctors are. They're there to teach you in an academic hospital and guide you through learning and growing, but their job is always to make sure, foundationally, that patients are safe and well cared for, despite the fact that it's a learning environment where people are building

MacCallum - Direct by Ms. Nunan

skills.

Q   So what kind of procedures did you witness Dr. Porter perform?

A   So in my residency, I saw Dr. Porter perform a number of procedures within the REI clinic space related directly to IVF care and fertility care, like egg retrievals, oocyte retrievals, and embryo transfers.

In an ultrasound space, I saw her perform many ultrasound-based procedures and also perform ultrasounds herself.  And in the OR, I was involved in both procedures with a large incision, which we call open procedures, and -- like, myomectomies, for example, for fertility.  But also minimally invasive surgeries where you have the small cuts on the abdomen for fertility-related procedures, as well as hysteroscopy, which is a procedure using a small camera on a small scope to look inside the uterus, look at the cavity of the uterus.

Q   And who else was doing these complex procedures, these surgical procedures, at Dartmouth-Hitchcock at the time?

A   When I began working with Dr. Porter in my second year of residency, she was the sole REI physician in the division at the time.  She was the only one.  But there was never anyone outside the REI division that was

performing these particular procedures.

Q   And what were some of the procedures or skills that Dr. Porter taught you as a resident?

A   So Dr. Porter, you know, walked me through a number of surgeries as a young trainee and taught me the importance of very precise technique, the reason being, particularly in fertility-related care, that precision, minimizing blood loss as much as possible and maximizing the fine detail of your technique, helps to avoid injury, complication, extra bleeding, but then may help to serve the patient in enhancing their fertility.

Having tissue damage that you have to recover from causes, like, an inflammatory response in the tissue that can cause scarring.  Blood inside the belly cavity can also cause irritation and scarring, and that can sometimes affect a person's fertility.  So having that really fine attention to detail is extraordinarily important when you're doing any sort of surgical procedure, of course generally, but it's particularly important in the fertility space.

Q   And when we're talking about egg retrievals and embryo transfers, that kind of precision and quiet manipulation is key, right?

A   Yes, it's very --

MacCallum - Direct by Ms. Nunan

MR. COFFIN:  Objection.  It's getting a lot of leading; that's all, Your Honor.

THE COURT:  Yeah.  Sustained.

Q    (By Ms. Nunan) Did you feel safe with Dr. Porter in the OR?

A    Yes, I felt safe with Dr. Porter in the OR with any of these fine-detailed procedures that required a high level of care.

As a resident, when you're building these surgical skills, you have to practice to learn them, right?  And there's no other way to do that but on a real human in a real OR, but you're always kind of pushing the limits of your skill and gaining a little bit more skill.

The attending surgeon who is there supervising you directly and walking you through, their role is to make sure that the train is always on the tracks, the patient is safe and well cared for, and that the, kind of, maneuvers that you're making in the surgery are keeping everyone safe so that you can center the patient's well-being and their outcome at the end of the day while you're learning.

Q    So why is that important as a resident to feel safe in the OR?

A    You need to have that safety and security to have a safe environment to learn in, to know that you're going

MaccCallum - Direct by Ms. Nunan

to -- ultimately, as a learner, you're going to sometimes fail; you're going to sometimes make mistakes.  And the job of the attending physician, the attending surgeon in a surgical or procedural environment is to make sure that no harm comes to the patient; is to recognize, because of their expertise, what your limitation is so that they can prevent any harm from reaching a patient, although you are learning; to make sure that train always stays on the tracks and that your patient is safe and well cared for while you are learning.

Q   I would like to switch now to talk about Dr. Porter's ultrasounds.  What did you learn under Dr. Porter about her skills, and what did you learn yourself?

A   When I was a younger resident, I would not always understand -- we would have -- there was a darkened room where we would read ultrasounds, and we would sit with our ultrasound experts in the department, including Dr. Porter, to review ultrasound images and interpret them.

And as a younger resident, I kind of wouldn't understand sometimes why there was a line of people literally, sometimes, outside of her door of other faculty, attending physicians who had finished their training, to ask her questions or follow-up.  And the

reason being was that she not only was an OB-GYN, but a member of the radiological staff at Dartmouth Health. So she worked in the radiology department too, which means that she was qualified to read and interpret ultrasounds.

So, for example, at the institution I work at now, we have radiologists who read our imaging reports and give them back to us as gynecologists. But it's rare to have someone who straddles both lines, who is in radiology and can also practice gynecology and can kind of create the interpretation that brings everything together.

So what that means is you get that ultrasound report, all of that verbiage, now in your patient portal, and you read it as a patient. Well, we do the same things as your doctors. We read that report and look at the images independently, but the important thing to be able to do is to take that information and distill it down to the interpretation and where to go with that, to help to take care of the person.

So bridging that gap between the reading and what to do with that information was a particular place where Dr. Porter has shown, in ultrasound, to the extent that other confident experts in the department -- other generalists, OB-GYNs, et cetera --

MacCallum - Direct by Ms. Nunan

would be very frequently running things by her, showing her images, having her independently review them and give her additional interpretation on a prior report and help to bridge that gap and put the pieces together.

Q    Did her expertise level go beyond Dartmouth-Hitchcock?

A    It did.  She is nationally and internationally recognized in not only ultrasound but also substantial amount of fertility-related procedural work as well.

     She's written some -- co-authored some really important ultrasound articles for the field of OB-GYN that are used at national and international level to help take care of people, written books on these subjects, and presents frequently at national and international conferences to help educate other experts in ultrasound.

Q    And so you essentially learned ultrasound from her? That was one of the things you did as a resident?

A    That's correct.

Q    All right.  In terms of other surgeons in the OB-GYN department, as a resident, who else did you observe?

A    In a surgical residency program, basically, everyone who is an attending surgeon who is taking patients to the OR for procedures, you will generally operate with at some point within the years of training that you're

there, and so I -- it's important to acknowledge, just like in any other profession, there's a spectrum of skill sets.  So there's a spectrum of skill sets within the surgeon profession as well, you know.

And I always felt very, on a whole, safe and cared for in the OR, so that I knew that the patient was going to be safe and the surgeon that I was working with in the OB-GYN department was going to keep everything on focus so that the patient would have a good outcome while I was learning to perform these procedures.

So, overall, it was a good experience.  But, you know, there is this kind of like upper echelon, that spectrum that you see, where Dr. Porter and just maybe a handful of other people in the department were up there as some of the most talented surgeons that I have worked with still today.  You know, reflecting back on her skill set having had more experience, it's even more notable how skilled she is in the OR.

Q   I would like to turn now to your experience with Dr. Albert Hsu.  When did you first work with Dr. Hsu?

A   I worked with Dr. Hsu in my third year of residency in the winter of 2014.

Q   And how much training had Dr. Hsu had at that point?

A   Dr. Hsu had completed his OB-GYN residency and then had

completed and graduated from his REI fellowship.  So he was a subspecialist REI physician at that time.  And, to my knowledge, this was his first position out of his graduating from his fellowship.

Q   As an attending?

A   Yes, as an attending REI physician.

Q   All right.  Let's go back to the definitions.  What's an attending?

A   So an attending is one who has completed their training program.  So for a residency, that would be kind of a general OB-GYN, and if you choose to go on to a fellowship and get a higher level of expertise to kind of create a smaller niche for yourself, this is what Dr. Hsu did -- he went to an REI fellowship to gain another three-plus years of experience in REI then graduated from that program.  And once you graduate from that program, then you're an attending; you're essentially a content expert in that subspecialty.

Q   I want to talk about the different ways that you interacted with him.  How did you interact with him in the REI division?

A   I interacted with him in the clinical space, when he saw patients in the outpatient clinic, and also in the operating room.

Q   And how would you describe his clinical skills as you

observed them?

A    It was very hard to follow his train of thought.  He was very disorganized, long-winded, and not analytical to the point where I was concerned about his knowledge and skills because I would have expected him -- as a third-year resident still in training, I would have expected him to be more solid in his knowledge of how to take care of people in the clinic since he had had so much more training than I.  But he was also just so disorganized in his thoughts and how he explained things to patients, having seen him explain, you know, complicated conditions to patients that sometimes they would come back to me in clinic or after he left the room, I would have to sit down and unpack things and try to repackage and re-explain to patients what had happened in the visit and what the plan was.  It was just a little bit chaotic and messy and hard to follow the logical train of thought, as someone who is in OB-GYN, which made it that much harder for somebody who is not medical to kind of figure out what was going on.

Q    And how would you describe his notes in the patients' charts?

A    I mean, they were a reflection of those clinical experiences where I saw him talk to patients.  They were very long-winded.  They were very hard to break

MacCallum - Direct by Ms. Nunan

down and make sense of.  And a friend of mine describes it as this, which how I felt about reading his notes too, which is --

MR. COFFIN:  Objection, this is hearsay.

THE COURT:  Sustained.

Q  (By Ms. Nunan) You found the notes hard to follow?

A  They were hard to follow.  It was very uncomfortable to try to figure out what was going on in his head, and it was hard to be in that space and operate in that space trying to interpret his notes.

Q  Okay.  How else did you interact with Dr. Hsu in the REI division?

A  I also interacted with him in the operating room.

Q  And what was your experience with Dr. Hsu in the OR?

A  I performed five to ten procedures with him in the OR, on that order, some minimally invasive with the small incisions and some with larger incisions.  It was very scary as a trainee to be in the operating room with him.  It was very unsafe.

Q  Why?  Why would you say that?

A  He had a very limited understanding of some of the basic steps that I had been taught to date on how to do some of these surgeries, to the point where even before we started, when I asked him questions about how we were going to proceed, I was concerned that he wasn't

MacCallum - Direct by Ms. Nunan

going to know what to do next.

And, of course, that's not my role, ultimately, in that room as the trainee. But I specifically recall a procedure where we made a large incision called myomectomy, which is a procedure to remove the benign growths from the uterus called fibroids which affect lots of women, but in fertility care, they can affect fertility.

So in the context of REI, you're doing that procedure to help restore someone's fertility or improve fertility, when you're removing fibroids. And I recall, you know, starting the procedure, having done this before, in the same way that I had been taught by Dr. Porter and applying techniques from other surgeons I've worked with as well. Meticulously, carefully step-by-step, layer-by-layer minimizing the amount of injury to the tissue, irritation to the tissue, minimizing the blood loss so we could maximize the good outcome for this person who was seeking to be pregnant, and he interrupted me and started kind of using brute force techniques to operate on this person.

I remember him literally taking sharp instruments and grabbing the fibroids from the uterus, which I had always been taught, you know, you need to shelve them out very carefully, slowly, and meticulously to

MacCallum - Direct by Ms. Nunan

minimize blood loss, minimize damage to the uterus so this person can get pregnant. And he was literally grabbing this tissue crudely and yanking it brute force at the body, tearing tissue, causing blood vessels, which can be very large, feeding fibroids to bleed, without any control. And there were these points, particularly in that case, where it was evident that we could get, with his technique, which was extraordinarily imprecise and scary, that he could take us to a place where I was not equipped to help get out of the injury, out of the bleeding complication that we were potentially arriving at.

So that's a very unsafe place to be as a resident trainee because now the train is completely off the tracks, and you're the, potentially, most experienced person in the room to try to right it, and you may not have the skill set, nor should you be expected to have the skill set to bring this back to a place of safety.

It's that attending surgeon's responsibility to create safety in that OR space, so it was profoundly scary.

Q    This was way outside the bounds of normal from what you had been taught and seen?

A    I mean, like I said, there's a spectrum, right?

MR. COFFIN: Objection, Your Honor, leading.

MacCallum - Direct by Ms. Nunan

THE COURT:  Sustained.  Sustained.

Q    (By Ms. Nunan) I want to follow up on the reason in this environment that it is so important not to have scar tissue for embryo transplants for women that are trying to get pregnant?

A    Yeah.  So, for all patients that we operate, obviously, it's good technique to try to minimize any scarring that you create as a part of the procedure.  Some of that is not always under your direct control as a surgeon, but anywhere it is, you want to use very precise, exacting technique so that you are not creating more irritation and inflammation that leads to the development of scars, could cause an inability to get pregnant, could lead to, potentially, the need for something like a hysterectomy or other complications of surgery.

Q    But from a basic standpoint, if you have scar tissue, an embryo can't transplant?

A    It might be harder to get pregnant; it might be impossible.

Q    Okay.  So what steps -- after this experience, what steps would you take to prepare for going into the OR with Dr. Hsu?

A    I mean, we were dealing essentially with an unprecedented scenario, I was -- you know, I had never

seen anyone operate like this before.  I've never seen anyone operate like this since.  It was really profoundly scary for me.  And still thinking back, really profoundly scary to think about that, you know a trainee who was in that spot.

So to protect myself, when I knew I had a case coming with him, I would start to create some safety parameters that I could start to activate if I thought we were getting into trouble because I knew that I wasn't the most experienced person in the room to take care of any potential danger to the patient.  I had to create safety.  So I would find out what other surgeons for OB-GYN were in the OR, maybe operating on a different case that might be close by physically that could come into the room, and I would check to see on our call schedule who might be on for some of our more complex surgical services like gyn-oncology that would be masterful helping dealing with complications of surgery, so I would know who we could call on at a moment's notice to help us out in a dangerous scenario, and therefore kind of creating contingency to create safety.  Because I knew that we were essentially in danger every time I walked into the OR with him of having a serious complication.

Q    Were you the only person that witnessed this?

MacCallum - Direct by Ms. Nunan

A    No.  This was not a secret.  You know, our residency program had 16 residents in it.  There's a number of us who worked with him in the OR, and we don't --

MR. COFFIN:  Objection.  This is calling for hearsay.

THE COURT:  Overruled.

THE WITNESS:  And we developed this safety plan, to some extent, together because we were a team.  You know, we were trying to create safety in the OR for our patients, ultimately, and to create safety for ourselves to learn, and we knew that, as it stood, it was not safe for us.

Q    (By Ms. Nunan) How concerned were you?

A    I mean, I was extraordinarily concerned.  I was really concerned that if he continued to operate, particularly -- I mean, the clinic, knowledge base stuff notwithstanding, that was worrisome too.  But particularly in the operating room, if he continued to operate the way he was, it was inevitable that at some point, in my opinion, it was inevitable that he would create an injury that would result in some kind of catastrophic outcome like:  Hemorrhage; the need for a hysterectomy when you're doing a procedure to save someone's fertility, ICU, blood transfusion, even death.  I mean, we are talking about the most serious

MacCallum - Direct by Ms. Nunan

complications that can result from surgery was what I was worried about.

Q   Understood.

So what did you do?  Who did you tell?

A   So in, you know, our training, there's a culture of safety in the OR, as well as in our clinical spaces. And what that tries to do -- and this was in our Dartmouth Health yearly updates where we would try to understand what policy was -- anyone who sees a concern in the OR, whether it's staff, whether it's a physician, a trainee -- should reach out and call it like they see it by reporting it to their direct supervisor.  So taking that mandate seriously because I really was concerned, I spoke to my direct supervisor at the time whose name was Dr. Karen George.  She was the residency director at Dartmouth for OB-GYN.  She was a generalist OB-GYN physician, but she had this significant administrative role in managing the residency.

Q   Okay.  And how did she respond?

A   She was sympathetic.  She listened to my report.  She said that she would take it seriously and look into it.

Q   And who else did you speak to?

A   I also spoke to Dr. Porter, who was, you know, in the division of concern, and she similarly said that she

would take it -- you know, take it seriously and look into it further and thanked me.

Q    As a resident, is there some sort of a barrier between you and the attendings?

A    Always.  Yeah.  Medical training, in general, and very hierarchical -- bottom of the hill is the medical student, and then you kind of rise through the ranks. But one of these things that is really important in medical training is deference and respecting that hierarchy when you're reporting concerns.

It's true in medicine in general, but especially when you're training, that you want to make sure that you're not overstepping your boundaries when you're doing reporting for example.

Q    And how would you describe Dr. Porter's response to you?

A    She was concerned.

Q    And who else did you speak to?

A    I spoke to Dr. Leslie DeMars who was the department chair at the time.

Q    How many times did you speak to Dr. DeMars?

A    Once.

Q    And what did you tell her?

A    I told her the concerning things that I had witnessed directly regarding his performance.

MacCallum - Direct by Ms. Nunan

Q    And how did she respond?

A    Neutral -- not dissimilarly to the other people I'm talking about, you know.  Just saying, We'll take it under advisement; we'll look into it.  Just kind of generally.  Not necessarily my place to follow up with the next steps of how that would be handled.

Q    And after you reported Dr. Hsu, what changed from what you saw?

A    From what I could see, nothing really changed.  He was still in the operating room unsupervised by any other attending surgeon.  He was still performing procedures and working in the clinic.  His technique was the same.  It was highly concerning.

Q    But you were still concerned?

A    Correct.

Q    Okay.  Why didn't you go back to Dr. DeMars again?

A    Calling back to that question of the hierarchy, when you're a resident and you're a trainee, you are moving through these four years, and then you need to get a job, and you need to be employed.  So you're in this position of being a little destabilized by the power differential in that relationship between you and your attendings who are training you.

        So you want to make clear when you have a concern or a problem, but pushing too far too fast -- I mean, I

MacCallum - Direct by Ms. Nunan

depended on these attending physicians, including Dr. DeMars really critically as the department chair, to provide a letter of recommendation and a good recommendation for me to get that next job out. And so, you know, you feel disempowered to really push when you have a concern and you're in this scenario.

Q   You're now an attending with experience of your own.

A   Mm-hm.

Q   Should something have been done in the moment that you went and reported?

A   No question. It wasn't safe. It hurt people.

Q   Okay. I would like to switch over to Dr. Porter. As of right now, how long have you known Dr. Porter?

A   I've known her for over a decade.

Q   Okay. And how has your relationship with Dr. Porter evolved?

A   So as I kind of covered, generally, I had, in my early years of residency, a feeling of intimidation and, you know, as I gained skill and confidence in my skill set, really developed more professional enjoyment working with her in those third and fourth years of residency because I could understand the value behind what she was teaching me in that trainer/trainee relationship, and it was extraordinarily valuable to me and are principles that I still, kind of, withhold today in

terms of continually trying to improve and learn.

And, you know, when I was wrapping up my second month with REI as a reflection on a few of the more personal conversations we had had and professional conversations, I wrote her a letter thanking her for the experience, and we became closer after that.

Q    How else did your relationship change at the end of your residency?

A    Well, you know, as I graduated from my OB-GYN residency, then the dynamic changes with the whole peer group of physicians who trained you, generally speaking. You're now a peer among them and not in a trainer/trainee relationship, although there's certainly professional mentorship there.

Q    In 2015, were you married?

A    I was, yes.

Q    Were you trying to have a family?

A    Yes. I was starting to consider building my family with my husband.

Q    Okay. And was there an issue?

A    Yes. So between us, my husband and I, we have a genetic condition that we can pass down to future offspring that is really desirable to avoid passing on if you can. So there are some very advanced genetic techniques that are out there that use IVF, where you

MacCallum - Direct by Ms. Nunan

have, essentially, the gene of concern, or the abnormality, is identified and then you can stimulate your ovaries to produce eggs, have an oocyte retrieval, make embryos, and you can actually have those embryos biopsied and look for the gene of concern. And then you can assure as much as humanly possible that the embryo that you are going to grow is an unaffected embryo by this genetic concern.

So our goal was to pursue REI care for me and for my partner so that we could avoid passing down this genetic condition to our children.

Q    And who did you pick to do your IVF work?

A    Well, it was 2015, early 2015. My options in the Department were Dr. Albert Hsu and Dr. Porter, and that was an extraordinarily simple decision as far as I was concerned to have Dr. Porter to be my REI and fertility specialist when I sought care.

Q    So you started the process in 2015. What happened?

A    The process of doing these, you know, complex gene probes and things like that takes time. It was relatively newer technology at the time. It's more commonly employed today. So it took some months to get through that process, and then in the fall of 2015, we were in a place where we could think about getting ready for stimulating my body to have the oocyte

MacCallum - Direct by Ms. Nunan

retrieval, to have the egg retrieval process.

And then, unfortunately, in the fall of 2015, Dr. Porter developed some symptoms, vision problems, headaches, fatigue, that were pretty profound, and ultimately took a leave, a medical leave to look into these.

Q   And what did that do to your process?

A   It halted it in its tracks.  You know, we had had the gene probe, it's called, prepared and the genetic lab was all ready to go, but -- so I was on the precipice of moving forward with egg retrieval and moving forward with an embryo transfer, but then my only option was Dr. Hsu.  And that is essentially not an option, as far as I was concerned, because I knew I didn't trust his knowledge base, his clinical decision making.  I certainly didn't trust him to do a procedure on me, to put a needle inside of my body to take out eggs.  And so that was essentially a hard stop.  You know, this was -- it put a complete stop on the process because I was waiting for Dr. Porter to return after her illness had resolved.

Q   So she did get some treatment, and she did return. What happened next?

A   Well, she ultimately was found to have a dural leak, a CSF leak.  So when I learned this, I was -- I always

knew that she was going to come back at some point. Many of us are familiar with epidurals for birth or spinal anesthesia for a C-section.

So sometimes as a complication of those procedures, you can have a small hole made in this sack that surrounds the brain and surrounds the spinal cord called the dura. And so if you have a hole in that dura and a little fluid leaks out, you can have all these terrible, you know, severe side effects like, you know, debilitating headaches and vision changes and et cetera and so on and so forth. But, you know, from my obstetric experience, having dealt with people who have had dural leaks before, this is a curable, treatable condition once you diagnose it for what it is and get the right treatment, and there are a number of treatments that you can employ, but people improve and they get back to their baseline status of health once that leak is fixed. So it was just a matter of time for her to get the right treatment before she would be back to fully functioning and able to help me.

MR. COFFIN: Objection, Your Honor. Could we approach, please?

THE COURT: Yes.

(Bench conference.)

MR. COFFIN: I want to make sure. This is an

MacCallum - Direct by Ms. Nunan

undisclosed expert opinion providing medical testimony. It is getting into --

THE COURT:  Dr. Porter's condition.

MR. COFFIN:  -- Dr. Porter's condition, and we object.

THE COURT:  She's speaking about Dr. Porter's diagnosis.  I don't think that's appropriate.

MS. NUNAN:  Okay.  That is when you ask her a question, you get every single thought process along the way.  My apologies.  I will redirect her.  It is just part of the process when you ask her a question.

THE COURT:  I understand.  I was waiting for an objection about not answering the question.

MR. COFFIN:  That's why I posed it that way.

MS. NUNAN:  That's fair.  We're going to get back to her experience.

THE COURT:  Okay.  Thank you.

(End of bench conference.)

Q    (By Ms. Nunan) Dr. MacCallum, did Dr. Porter perform an egg harvest on you in 2016?

A    She did.  She performed an oocyte retrieval from me in the spring of 2016.

Q    And were you still working at Dartmouth-Hitchcock at this time?

A    I was.  I was in that second residency program.  So I

MacCallum - Direct by Ms. Nunan

was completing my -- back up the timeline.  I was completing my OB-GYN residency at the time in the next few months, and then I was slated to go on to the second residency program that I mentioned.

Q   Okay.  So you successfully got pregnant.  When was your daughter born?

A   I got pregnant in the summer of 2016, and then my daughter was born in April of 2017.

Q   And did you go on to have a second child?

A   I did.  I came back.  Dr. Porter was then at UVM, and ultimately, after some additional procedures that Dr. Porter performed due to complications from my first birth creating scar tissue and creating infertility for me, she was able to restore my fertility and transfer another set of embryos this time which resulted in the birth of my daughter Chloe in 2020.

Q   So where were you when the REI division was closed?

A   So when the REI division was shuttered, this was, I had given birth in April of 2017, early April of 2017, so I was on maternity leave at that time and when -- a month later when the division was closed.  And I was at Simon Pearce with my dad; we had just had my new baby and got a phone call from Dr. Porter that the division had been closed.

Q   Got it.  Dr. Porter called you on the day of her

MacCallum - Direct by Ms. Nunan

termination?

A   Yes, correct.

Q   Got it.  Would you talk to me -- we had asked -- I had asked you earlier about this evolution of your relationship with Dr. Porter.

A   Yeah.  As I had graduated from my residency program and that trainer/trainee relationship kind of turns into more of a peer relationship, we became closer as we kind of realized we had a lot of the same values and kind of perspectives, and we became friends.  So we became close over the ensuing.

Q   But you were also her patient.  Did you have to silo that?

A   I think it's really important, especially in a small community, especially when seeking expert levels of care, and when you're already a physician, you often will know the people who are treating you on some sort of personal and professional level.  And so keeping those relationships separate is actually really key and crucial to defining them so that not only you as the patient, but your physician as their physician can be objective and can look at this medical care not through a lens of a professional relationship or a personal friendship but taking -- a doctor taking care of their patient to the best of their ability.  So I think

siloing is the way to go about it, or trying to create divisions and boundaries between those relationships.

Q   Give me one or two quick examples of how you silo when you're Dr. Porter's patient versus her resident or her friend.

A   So there are normal ways that you contact your doctor when you have a question, right?  So when I was having IVF care, I was getting lab work all the time; I was getting ultrasounds all the time.  So the correct protocol for getting interpretation of those labs and next steps is to contact the clinic, talk to the nurse or potentially the advanced-practice provider who is working and get feedback on next steps.  And so instead of, you know, texting my friend and colleague on the phone for what these results should mean and what the interpretation is, I would go through normal patient pathways because that's the appropriate way to receive the most objective care and not overstep bounds and -- yeah.

Q   I want to be clear.  When you lodged the complaints with Dr. George, Dr. Porter, Dr. DeMars, you were still a resident?

A   Correct.

Q   And this was before your pregnancy?

A   This was before my fertility care began in February of

2015, and it was before Dr. Porter was my patient or my close friend.

Q    So I want to go back to the closure.  You heard about it through Dr. Porter?

A    Correct.

Q    And how did this make you feel when you heard this news that the REI division had been shuttered, and she had been terminated?

A    I truly misunderstood her when she first explained it. I thought maybe they were putting a hold on IVF procedures or something like that, while they kind of figured out next steps for the division.  So I was completely baffled, and I think I had to have her repeat herself more than once to fully come to the understanding that no, the division is closed; the intention is for it to be permanently closed, and all of the physicians are fired.  Like, it was completely shocking and out of left field, how it could go from a functioning division that just gave me my first child to nothing for this community.

Q    And I want to ask you what you can remember about your interactions with Dr. Porter that summer after she was terminated?

A    So, you know, again, maternity leave was in April.  I had a few months where I was really free and then went

into a new program where I had more -- I was in this new program where I had more administrative time. So I had the ability to kind of be there and be by Misty's side in those early days, weeks, months after the division closure. So I, you know, in the late spring/summer of 2017, I was with her at her home, you know, once a week, if not more than once a week spending time with her.

Q    And what was Dr. Porter like during these visits?

A    Confused, baffled, shocked, profoundly hurt, often very teary, often trying to work out the "why" behind all of this.

You know, how had she come from being a multi-decade, you know, expert in this area to being fired and looking for a new job? She had built, you know, a professional career at Dartmouth Health. She had really dedicated her professional life to building up this division, and then it was ripped from her, and then she was lumped in with these other doctors, Dr. Hsu and Seifer who, you know, it was not a secret in the department that they had profound struggles with the clinical care they provided. This was kind of widely known. Why would she, as a physician who had a really profound skill set, be kind of in that same grouping and lose her position as well.

MacCallum - Direct by Ms. Nunan

Q    So you would say she was distressed?

A    She was extraordinarily distressed.  I mean, crying, trying to make sense of it all, and it seems impossible to find the logic behind it.

Q    Who is Joan Barthold?

A    Dr. Joan Barthold is a generalist OB-GYN, similar to myself, and was -- is now retired but was a professor and trainer of me when I worked in the residency at Dartmouth-Hitchcock.

Q    And where were you with Misty when Dr. Barthold called?

A    When Dr. Barthold called Misty, we were at her home, one of our visits, and saw the name come up on the caller ID -- this was in the weeks following her firing -- and so she stepped away to take the call.

     It was clear that they were talking about a procedure --

          MR. COFFIN:  Objection, Your Honor.  No foundation, hearsay.  She stepped away to take the call.  Is this witness even competent to talk about this?

          THE COURT:  Sustained.

Q    (By Ms. Nunan) Can you tell me what you -- what discussion you had with Misty when she returned from this call?

A    Sure.

MaccCallum - Direct by Ms. Nunan

MR. COFFIN:  Hearsay, objection.

THE COURT:  Overruled.

THE WITNESS:  So I could -- you know, she was, you know, near me when she took this call, and I could hear that they were talking about a procedure. And in the context, she was talking about procedural steps, and so when Misty returned from the call, discussed with me how Dr. Barthold had called Misty to ask her to walk her through the steps of a procedure called hycosy, which is a long -- it's short for a long term, hyster-salpingo contrast sonography, which is a specialized kind of ultrasound where you put saline with bubbles in it essentially into the uterine cavity to look at the shape of the cavity and look at the tubes, the fallopian tubes, or uterine tubes, to make sure that they are open.

MR. COFFIN:  Objection, Your Honor.  This is all a hearsay statement.  This witness is going to testify here today.  She can provide testimony to that, but she can't tell her what this witness told her.

THE COURT:  Yeah, sustained.

Q   (By Ms. Nunan) Okay.  So you walked away from Misty's house that day with an understanding of what about what had happened?

A   My understanding was that Dr. Barthold had asked Misty

MacCallum - Direct by Ms. Nunan

to walk her through a procedure that Dr. Barthold had never performed before.

MR. COFFIN:  Objection, Your Honor.  This is just a different way of trying to get the information that the Court has already ruled is inadmissible.

THE COURT:  Sustained.

Q   (By Ms. Nunan) What emotions did you see Misty have after she was called?  What did you take away from being called by a colleague?

A   I mean, obviously, it's a strange situation to be called by a former colleague when you've been terminated to ask for help with work, you know.

MR. COFFIN:  I would ask the Court to limit this, please, and we can come approach if that's appropriate.

THE COURT:  I would just direct the witness to answer the question asked.

THE WITNESS:  She was baffled and she was confused as to why she had been called, why, you know, this was her responsibility to help lead Dr. Barthold through a procedure.  And I think shocked.  There's obviously a structure about behind residency and fellowship training and procedural training.

MR. COFFIN:  Your Honor, I would object.  This is all her perception of a reaction of the

witness.  I don't think -- this is going quite beyond that.

THE COURT:  Okay.  I'm going to ask counsel to approach.

(Bench conference.)

MR. COFFIN:  So my objection is that to try and keep it to get her reaction of perception of another person on a very limited amount of non-hearsay, observation testimony that this witness is competent to provide, and we have gone beyond that into -- I was very shocked this person is -- this conversation is what she didn't hear.  She's just perceiving the reaction of this witness and her reaction to it, and it has a perception of how she felt.

MS. NUNAN:  There's an emotional distress component to our damages.  She was there, and Misty told her that she had been asked to walk her through a procedure, which is -- it would be, you know, to understand the extent of having an expert ask to walk somebody over the phone through a procedure because one of her patients had been -- had been kept on the schedule, and somebody who was not qualified to perform that was asked to do that procedure, and she spoke to Dr. Julia MacCallum about it, and she saw the phone call, and she saw the reaction, I think the emotional

MacCallum - Direct by Ms. Nunan

reaction to having just been fired.

THE COURT: It seems it is very difficult to get into a description through this witness of a reaction of Dr. Porter when, kind of, the underlying facts that lead to that reaction are not admitted.

MS. NUNAN: Even if she told her what had happened?

MR. COFFIN: Because that's actually hearsay, and she barely describes that's what happened. Your question was: What was your reaction when Dr. Porter came back to you, and then went into describing what the content of the hearsay conversation was, but that shouldn't be in either. I think it was very far afield.

THE COURT: Again, I think you should move on from this topic with this witness.

Let's also talk a little bit about scheduling. It's noon. How much more do you think you have on direct?

MS. NUNAN: I don't have a lot. Would you like --

MR. VITT: It's a chunk.

MS. NUNAN: Well --

MR. VITT: I'm looking over your shoulder.

MS. NUNAN: I would say nothing is quick

MacCallum - Direct by Ms. Nunan

here. So why don't we take a break for lunch and then we'll -- then I would be happy to finish up after lunch.

THE COURT: So if it's 15 minutes worth you might have, then we can do that and take a break. They came back at 11, so they've only been here for an hour.

Is there an agreement to break now?

MR. COFFIN: What do you want to do?

MS. NUNAN: Break now and finalize after lunch.

THE COURT: Break now? Thank you.

(End of bench conference.)

THE COURT: Okay. So, at this time, we are going to take our lunch break. It is 12:00, so we will be back in the courtroom and ready to go at 1:00 p.m. Okay. Thank you.

(Jury exits.)

THE COURT: Okay. So we are returning at 1:00. The witness is still on the stand, so I assume counsel did not want to discuss anything with the Court at this time. I just want to be clear on that.

Mr. Coffin?

MR. COFFIN: Of course, Your Honor. Thank you.

THE COURT: Okay. Mr. Vitt? Ms. Jones?

MaccCallum - Direct by Ms. Nunan

Ms. Nunan?

MR. JONES:  We're all good.

THE COURT:  All right.  We'll see you back at one.

(Noon recess taken.)

March 25, 2025

Afternoon Session

* * *

THE COURT:  Before we bring the jury in, the jury administrator, during lunch break, received a note or a comment from a juror asking if the microphones where the attorneys speak can be turned up.

MR. COFFIN:  Turned up?

THE COURT:  Yeah, so --

MR. COFFIN:  That's encouraging.

THE COURT:  I think it's less about us turning up the volume on it than just being mindful of it when you're speaking into the microphone.  I know when you're at the podium and you're looking at your exhibits and everything else, you can stray from it.  So if you can just keep that in mind, I think that will probably solve the problem.

MR. COFFIN:  Great.  Thank you.

THE COURT:  All right.  So we can put the witness back on stand and call the jury in.

Mr. Vitt, before you leave, the deputy clerk also says that there's an issue with a demonstrative exhibit -- or maybe not an issue, but do you plan on -- I'll let you speak for yourself.

MR. VITT:  Should I talk into the microphone?

MacCallum - Direct by Ms. Nunan

THE COURT:  Sure.

MR. VITT:  Dr. Porter will be testifying today.  And as part of her testimony, we have prepared a one-page demonstrative exhibit that shows the stages or the steps associated with somebody coming in for, potentially, IVF services.  And there's steps that, you know, you do this the first time and the second visit and the third visit.

It just lays out when they come in, and there's some questions about when certain procedures are performed.  So I don't want it admitted.  It would just help people -- I mean, we could do it without it, but it will help the understanding, believe me, to have something that says, Oh, I got it.  The first time they show up, you run some tests, you have an interview; second time, here's what you do.

But I think it's pretty straightforward, but I think it will help the understanding of the jurors.

THE COURT:  Okay.  Did you speak to opposing counsel about this?

MR. VITT:  Not yet.  As soon as I started, I thought, I should have done that first.  I apologize.

THE COURT:  Definitely, when it comes to things like demonstrative exhibits, you should be speaking to opposing counsel about that process.  This

MacCallum - Direct by Ms. Nunan

is something, if it really is as benign as you are representing it should be, perhaps it could be something that could be agreed to, but I see Mr. Schroeder standing up behind you, so I'm not sure if he does agree.

MR. SCHROEDER:  Here's the issue I want to alert the Court to and something you brought up yesterday, Your Honor.

Plaintiff's counsel reached out to you on Friday afternoon about using exhibits in the opening, I think was the representation that was made.  We were not informed of that until Sunday afternoon at about 4:30 when they said they wanted to use it.  So this is just another example of -- if you have to use a demonstrative exhibit, just ask or, certainly, there shouldn't be ex parte communications.  And here, we knew that Dr. Porter was going to be on the stand.  Sure, I would like to review it; I haven't seen it yet, and I'm not going to -- I doubt I will have an objection, just based on the representation about what it's about.  But, you know, you made it very clear in January, and I try to go by this rule anyway, we're not going to have any surprises here.  So that is my issue.

THE COURT:  Yes.  We aren't going to have any surprises.  So this is the kind of thing, Mr. Vitt,

that you have to reach out to the other side.

This is for Dr. Porter when she testifies?

MR. VITT:  This afternoon.

THE COURT:  I don't know, Mr. Schroeder, if you are asking for an opportunity to at least look at it and make a decision about it?

MR. SCHROEDER:  Yes.

THE COURT:  Okay.  So we're definitely not going to be presenting a demonstrative exhibit until Defense has had an adequate opportunity to take a look at this and make a decision, and if we have to delay things a little bit, we can come back to court and talk about it then, but --

MR. SCHROEDER:  I haven't seen it yet.

THE COURT:  -- yeah.  We'll leave it at that. We're not going to do things this way.  Okay?  That, in itself would be a basis for me to say "no" to this, okay, flat out.

With respect to the ex parte matter, I want to be clear about that, because that's obviously a serious word when it comes to trial and treating everyone equitably, which the Court is completely committed to doing, and the deputy clerk is sitting here so he can confirm this for me -- and I don't mean to put him on the spot -- I believe those exhibits that were proposed

MacCallum - Direct by Ms. Nunan

to be used in opening statements were submitted to the clerk's office. Just so you know, Mr. Schroeder, I can give you assurances there was no communication with chambers, with me, with the law clerks, at all.

Mr. Howe, I just want to get confirmation from you, if you recall.

THE CLERK: They were e-mailed directly to me as I recall. I was pulling up the e-mail.

MR. SCHROEDER: My representation to the Court, I have no doubt that the Court would not have entertained it. It came as a shock when you mentioned the fact of a Friday communication because we weren't on that communication. And the first we learned about it was Sunday afternoon at 4:30.

THE COURT: Okay. I'm not going to belabor the point, all right, but we're going to spend three weeks together, and things like this are going to be coming up. There has to be communication with the other side. All right? I'm just going to say that as a general statement. You must reach out to the other side.

I don't know about how you feel about the efficiency of the trial so far. I feel like we've had bench conferences when it's appropriate, but to the extent that we can be more efficient about this, this

MacCallum - Direct by Ms. Nunan

is how it gets done, by reaching out to the other side and attempting to reach some type of agreement on that.

MR. VITT:  Thank you, Your Honor.

THE COURT:  Let's please make that be the way that we proceed going forward in this.  No surprises.  Surprises will be a basis for denial.

MR. VITT:  Okay.  Thank you.

MR. SCHROEDER:  Understood.

THE COURT:  Okay?  Thank you.

MR. VITT:  I'm going to get the witness.

THE COURT:  Okay.

(Jury present.)

THE COURT:  Okay.  Good afternoon.  We will resume with Plaintiff's direct examination of Dr. MacCallum.

Dr. MacCallum, I'll remind you that you are still under oath.

THE WITNESS:  Thank you.

Q    (By Ms. Nunan) When we left off, the REI division had been closed.  And when did you return to work after maternity leave?

A    I returned to work that -- early that July, in 2017.

Q    And remind me:  You had graduated at this point?

A    I had graduated from my OB-GYN residency in the summer of 2016.

MacCallum - Direct by Ms. Nunan

Q    So what was your role?

A    I was completing a leadership preventive medicine residency getting my Master's in Public Health degree at Dartmouth College.  And as part of that program, I worked about 80 percent administratively in that residency studio, and about 20 percent in the OB-GYN department as a generalist OB-GYN.

Q    So how would you describe how you felt when you returned to the OB-GYN department?

A    I felt that there was a lot of tension in the department.  It had not ever made sense to me, the reasons that were given, for the shuttering of the REI division.  And so it seemed like many of us, myself included, were kind of walking on egg shells because there was a sense that we didn't know what would happen next or if there was going to be some other sudden move made by administration that we didn't anticipate, that we didn't understand why.

Q    Was it your understanding there was a gap in the care?

A    Yes, there was a gap in care.  So there was some procedures that the REI division performed that no one else in the department performed.  So complex ultrasound procedures, fertility-based procedures of course like IVF and other procedures related to that sphere.  But also in the OR, some complex

fertility-related surgeries like robotic-assisted laparoscopies for these complicated minimally invasive surgeries for fertility, myomectomies and complex hysteroscopy, which is that little camera inside the uterus, were all services that is REI provided to people outside of fertility care in general that were not available anymore at the institution.

Q   And what was your observation about the impact on the residents in the department?

A   There was a real concern from alumni, such as myself, that there was going to be an educational gap.  In residency programs, there's a mandate.  And, obviously, they're accredited, they go through kind of a process making sure they have all the component pieces that you need to educate a good OB-GYN physician.

MR. COFFIN:  Objection, Your Honor.  She's speaking about alumni; she's here to testify from her own knowledge and experience and that she not be importing out-of-court witnesses of unnamed alumni.

THE COURT:  Yes.  The witness should testify to her personal knowledge.

THE WITNESS:  Sure.

Q   (By Ms. Nunan) Did you sign a letter with other alumni?  Did you sign a letter personally from the alumni?

A   Yes, I personally signed a letter along with 20 alumni

MacCallum - Direct by Ms. Nunan

expressing our concern about the educational gap that this would believe behind, and there were no plans. Even as of the fall of 2017, I was receiving e-mails about the development potentially, plans for REI education in the department, but there was no plan when the division of REI was shuttered of how we would continue to educate young OB-GYN physicians in this important subspecialty.

Q   How did the closure of the REI impact how you felt about Dartmouth-Hitchcock?

A   I mean, the REI division closure was a shock to me. And, you know, I had really loved my residency program in many ways. I felt well supported. I felt well educated by it and felt like the education that I received was well-rounded; that this was a place that really supported each other and knew me and knew how to support me to learn to the best of my ability, and it felt very foreign to me that there was this disconnect between the department itself and administration at the department. It felt like there was this -- to me, it felt maybe there was an ethical or moral decay in place because it seemed like there was no concern to these -- there was no concern given to the real worries that I had raised among the people about the physicians in the REI division, and then to have this -- these important

services, not just fertility services, but other surgeries, ultrasound procedures just completely gone overnight. I mean, it -- it felt like the department was not what I had recognized once anymore. It had been changed.

MS. NUNAN: That's all I have. Thank you.

THE COURT: Okay. Cross-examination.

MR. COFFIN: Thank you, Your Honor. It will take just a minute to get organized, please.

THE COURT: Okay. The witness has asked for some water.

MR. COFFIN: Oh, sure. Take a drink.

THE WITNESS: Oh, thanks.

MR. COFFIN: Shall I proceed?

THE COURT: Yes.

**CROSS-EXAMINATION**

**BY MR. COFFIN:**

Q   Good afternoon. My name is Tris Coffin. I represent Dartmouth-Hitchcock. You're Dr. MacCallum, nice to meet you. We have never met before, correct?

A   Correct.

Q   I listened closely to your direct testimony. I had a couple of questions just sort of following up on your background. You're currently at a place called Thompson Health; is that right?

MacCallum - Cross by Mr. Coffin

A    Yes.  The --

Q    I'll ask some questions, and then if you can answer them, that would be good.

     So you're at Thompson Health?

A    Correct.

Q    And you've been there since January of '24; is that correct?

A    That's correct.

Q    And before then, you did your residency at Dartmouth-Hitchcock, correct?

A    Before then, I was assistant professor of OB-GYN at University of Rochester Medical Center.  From 2018 to --

Q    Okay.  2012 to 2016 you did your residency in OB-GYN at Dartmouth; is that correct?

A    Correct.

Q    And then from there, from 2016 to 2018, you did another educational course; is that right?

A    That's correct.

Q    What was that, again?  Preventive Health...?

A    Yes.  It's called Leadership Preventive Medicine Residency.

Q    What did that consist of?

A    It consisted of, again, a Master of Public Health degree which is a two-year program through Dartmouth

MacCallum - Cross by Mr. Coffin

College through the Dartmouth Institute where we learn about biostatistics and the way that public health affects us all and the importance of public health and how to administer it. People go on to do many things with this degree, but it was helpful to get more perspective.

Q It sounds like it's a little bit hospital administrative oriented; is that right?

A Potentially.

Q And 80 percent of that was administrative; is that correct?

A Of the time that I spent in the leadership preventive medicine residency, 80 percent was dedicated to the tasks of that residency program. A large part of that was administrative, like taking classes, and 20 percent was in the OB-GYN department.

Q Okay. And before then, as a resident for four years, you were in OB-GYN working clinically, essentially; is that correct?

A Correct.

Q And I'll ask you a few questions about that in a bit.

After you completed this second course of graduate medical education, you then got a job at -- in Rochester; is that right?

A Correct.

MacCallum - Cross by Mr. Coffin

Q   And what was your position in Rochester?

A   I still am an assistant professor of OB-GYN in the department of OB-GYN at University of Rochester.

Q   Were you at a different hospital than you are now though?

A   Yes, I was based -- you know, it's a system just like Dartmouth Health is, so I worked in several hospitals in the system, including the one that I'm working at now primarily.  But I worked at Strong Memorial Hospital as my primary site.

Q   Where is that located?

A   In Rochester, New York.

Q   Is that the main satellite campus?

A   Yes, it's the large academic center.  The largest academic center in Rochester, yes.

Q   And you were hired as a generalist attending OB-GYN?

A   Correct.

Q   Is that right?

A   That is fair.

Q   And not specializing in the subspecialty of REI; is that correct?

A   That is correct.

Q   And so when you were at Dartmouth in your first-year residency called an internship, right?

A   Yes, that's correct.

MacCallum - Cross by Mr. Coffin

Q   That's a very generalized introduction to I think you described it as the core fundamental elements of obstetrics and gynecological practice; is that right?

A   Yes.

Q   And part of that would be gynecology and OB-GYN, but isn't it correct, as an intern, you're sort of introduced to the broader role of physicians in the hospital as well?

A   Focused within the context of the OB-GYN sphere.

Q   Okay.  But nothing particularly related to REI during your whole first year; is that correct?

A   We touched on it, yes.

Q   Okay.  But you touched on it, correct?

A   Mm-hm.  There was not dedicated time just for REI in the first year.

Q   Second year though, you were in a -- your second year resident program, you are introduced at a deeper level to the broader aspects of OB-GYN practice; isn't that right?

A   Yeah.  You start to explore for depth, I agree.

Q   Aren't I correct that there are a number of rotations that you go through over the course of your one-year period; isn't that correct?

A   Yep, through all four years.

Q   And what are some of those things that you're looking

MacCallum - Cross by Mr. Coffin

at, in your second year in particular I'm pointing to?

A    In the second year, at that time in Dartmouth Health, in the program, we spent nine months working out of Nashua, New Hampshire, at Southern New Hampshire Hospital -- I think I got that name right -- in Nashua, New Hampshire.  And then the remainder of the three months that are left, we spent two months in gyn-oncology at Dartmouth Health, and one month at REI.

Q    Okay.  So out of your whole second year residency, you spent one month in REI; is that correct?

A    That's correct.

Q    Out of that one month in REI out of your rotation, you would do a number of roles in REI; isn't that correct?

A    Yes.

Q    Some of that, though, as you described, was working with Dr. Porter; isn't that right?

A    That's correct.

Q    And some of that involved actually being involved in surgeries with her; isn't that correct?

A    Yes.

Q    But you also were doing ultrasounds with her; is that right?

A    Correct.

Q    And working with nurses and taking care of patients in other ways during your one-month period; is that

MacCallum - Cross by Mr. Coffin

correct?

A   Yes.

Q   And aren't I correct that during the one-month period, there would be different days of the week assigned to, sort of, different tasks in the REI division?

A   Certainly.

Q   Okay.  So, for example, just a guess, but maybe one day a week would be devoted to operations?

A   I can't recall the details at that granular level but...

Q   Pretty close?

A   Certainly, there would be days where we had clinic, days where we had operating --

Q   Right.  Well, a lot of hospitals -- I think, you tell me.  You're a doctor; I'm not -- but the practice is, okay, this is the operating day.

A   Mm-hm.

Q   Is that familiar with you?

A   In bigger hospitals, sometimes it's multiple days of the week.

Q   Okay.  But you're not disputing with me there was a day or two a week were devoted to operations in the REI division; is that right?

A   As I said, I can't recall to that granular level.  I'm sorry...

MacCallum - Cross by Mr. Coffin

Q   So you're not disputing?

A   I don't recall.

Q   And some of that day would be devoted to clinical work, seeing patients and office visits; is that correct?

A   Yes.

Q   And some might be devoted to dealing with ultrasounds and those kind of things; is that correct?

A   Yes.

Q   Okay.  My point is, it's not like you were in the operating room with Dr. Porter for, you know, dozens and dozens of times over months and months or even years; isn't that correct?

A   I was in the OR with Dr. Porter over a number of cases. I'm not sure -- I can't recall how many.

Q   But it was over, essentially, that one-month period in your second year residency; isn't that right?

A   Expand upon that a little bit.  In the --

Q   You've answered my question -- isn't that right, yes or no?

A   I disagree.

Q   Okay.  You said before that you had worked in the REI division for about a month during your second year residency.  Did I have that right?

A   That's correct.

Q   Okay.  And so during that period of time, I think

you've testified, that you were working with Dr. Porter when you were operating in the REI division; is that correct?

A   That's correct.

Q   Okay.  And you wanted to expand, please, about why it was broader than that.  Could you please do so briefly?

A   Yeah.  We have that dedicated month every day in REI in different facets, as you described generally, in the second year and the third year at the time, but then in your third and fourth year you're in a higher level complexity surgical role in general.  So when you are on a gynecology part of that two-year cycle, third and fourth year of residency, you are assigned to more complex procedures as the assisting surgeon.

For example, if Dr. Porter had a case, I wasn't on REI necessarily at that time, but I was on my gynecology rotation.  I could be assigned by the fourth year resident to do additional cases with her.  So there were additional surgical and surgical care related tasks that I did outside of those two months.

Q   Okay.  I was asking essentially about your second year residency and your experience with Dr. Porter during your second year residency.

A   Sure.

Q   I'm correct, aren't I, from what you just said that

MacCallum - Cross by Mr. Coffin

really there was one month doing --

A   That's correct.  In my second year, I can pretty confidently say that was isolated to that one month.

Q   In your third year, that rotation, I think you testified just a few minutes ago, was similarly just one month with the REI division for the whole year; is that right?

A   That's correct.

Q   Okay.  And, during that time, you were introduced to Dr. Hsu; is that correct?

A   Yes.

Q   And Dr. Hsu was a new person, correct?

A   Yes.

Q   Yes?

A   Yes.  Sorry.

Q   And Dr. Hsu was an attending who had just arrived at Dartmouth; is that correct?

A   Yes, he was new to us.

Q   Just out of his fellowship; correct?

THE COURT:  You have to answer.

THE WITNESS:  Yes.

Q   (By Mr. Coffin) Green?

A   It's hard for me to be the ultimate judge of that.

Q   Okay.  Inexperienced?

A   I would agree with that.

MacCallum - Cross by Mr. Coffin

Q    Perhaps learning his way?

A    Perhaps.

Q    And you, at this point in your career, were learning your way too; is that correct?

A    That is correct.

Q    And indeed you probably would say you are still learning your way.

A    I think that if don't continue to still learn our way, we're not being good physicians.

Q    But particularly in large, complex jobs like that, you would agree that somebody early in that stage can grow a lot from where they begin to where they may end up?

A    I think that's true, yes.

Q    And, indeed, you were lucky to have an excellent mentor in Dr. Porter who had very good experience and a lot of talents and a lot of skills, I think you testified, essentially, right?

A    I did.

Q    Okay.  Now, you had heard about Dr. Hsu before he even came to the hospital; isn't that right?

A    I don't believe so.

Q    You don't think you had heard rumors among the residents that this guy was a problem?  Strike that. Let me rephrase.

     Before you worked with Dr. Hsu at Dartmouth you

MacCallum - Cross by Mr. Coffin

had heard some bad reports from some of your
colleagues; is that fair to say?

A   I don't recall the sequence of whether I had worked
with him first before I had talked to my colleagues
about him.

Q   It's possible you did though?

A   It's possible.

Q   And I think you testified a little bit earlier that the
residents were kind of against this new guy pretty soon
after his arrival.

A   I would characterize it as a concern that we all had
about his skill set.

Q   Now, you, at that point, had -- I think you testified
you'd spent five to ten operations with Dr. Hsu?

A   Along that area, yes.

Q   And during your third year residency; is that correct?

A   And fourth.

Q   Okay.  And I thought you testified earlier -- I might
have wrote it down wrong or missed it -- but that you
operated during the winter of 2014?

A   Mm-hm.

Q   Is that right?

A   That is true, yes.

Q   Was that your third year residency?

A   That was my third year residency.

MacCallum - Cross by Mr. Coffin

Q   I think you're saying now that maybe you might have had a few operations with him in your fourth year?

A   It is possible, but my concerns were raised after the initial experiences with him, yes.

Q   So you're not sure whether you actually operated with him during your fourth year; is that right?

A   I can't recall.

Q   Now, you and Dr. Porter pretty early on struck up a friendship, or at least a mentor/mentee relationship early on; is that fair to say?

A   I think that's fair.  In the third year, the mentor/mentee relationship deepened, yes.

Q   Okay.  In your second year, you wouldn't describe that relationship as mentor/mentee though, right?

A   Correct.

Q   Because I think some of the words you used were that she was -- is that too loud?  Am I too close?

            THE COURT:  I think that's excellent.

            MR. COFFIN:  That's better.

            THE COURT:  You've been straying away from the microphone.

            MR. COFFIN:  I apologize.  I'm sorry.

Q   (By Mr. Coffin) Some of the words I think you used to described her for residents when you first started with her is intimidating.

MacCallum - Cross by Mr. Coffin

A    Yes.

Q    Really scary?

A    Not to describe her specifically, but the idea of being challenged on your knowledge.

Q    Did you testify earlier in regards to Plaintiff's counsel that it was really scary to be in her presence --

A    I was intimidated.

Q    -- when you were first introduced to her; is that right?

A    I was intimidated to her -- by her, yes.

Q    And she was demanding?

A    Yes.

Q    Did other people react to her that way?

A    Other people...?

Q    Yeah.  Let me be clear.

     Did other residents have those same concerns with her?

A    Other residents also were intimidated and found her demanding.

Q    Okay.  And how about colleague?

A    I wouldn't say I would know to that level, yeah.

Q    Nurses?

A    Again, I wouldn't have known the nurses that were involved with her enough to know that information.

MacCallum - Cross by Mr. Coffin

Q    Okay.  But some of the residents might have been
intimidated by her?

A    Yes.

Q    You said, I think, that really it was in your third
year residency program that your mentor/mentee
relationship sort of fostered; is that correct?

A    That's correct.

Q    And isn't it true that that relationship is sort of a
thing in medicine?

A    It's true, yes.

Q    Maybe in other professions too, but it's kind of a
thing in medicine is my understanding, right?

A    Yeah.  It's an apprenticeship model, so professional
mentorship is a piece of that.

Q    And often your mentor will advocate for you in future
positions throughout your career; is that right?

A    Not necessarily, no.  It's possible.

Q    Did Dr. Porter ever recommend you for anything?

A    Not to my knowledge.

Q    She didn't have anything to do with your current
position or anything like that?

A    I don't recall that, no.

Q    I think you described that your friendship grew in 2017
after the termination of the REI program.  And I'm
going to talk a little bit more with you about that in

MacCallum - Cross by Mr. Coffin

a minute.  But I guess by way of a little awkward segue, let's go back to your reporting to Dr. DeMars.

Did Dr. Porter have anything to do with encouraging you to make that report to Dr. DeMars?

A   Dr. Porter recommended that I report also to my direct supervisor --

Q   Okay.

A   -- which I did do, in Dr. Karen George.

Q   And so Dr. Porter, as you recall it, suggested that you report your concerns to Dr. George and to Dr. DeMars?

A   I don't recall to Dr. DeMars, but certainly to Dr. George.

Q   Okay.  How did you come to report your concerns to Dr. Porter?

A   Could you explain more, how did I come to --

Q   Yeah.  I'm sorry.  You developed these concerns about Dr. Hsu after being in some operations with him; is that correct?

A   Mm-hm.

Q   And I think you testified that you became concerned after being in operations with him five to ten times; is that correct?

A   That is correct.

Q   And so it didn't take long for you to get concerned; is that correct?

MacCallum - Cross by Mr. Coffin

A    It certainly did not.

Q    And you were -- at that point, your experiential basis about REI surgery was a relatively small number of surgeries during a one-month rotation with Dr. Porter; is that correct?

A    That's correct.

Q    And you made the decision that you were so concerned that you needed to report those that you spoke to Dr. Porter; is that correct?

A    That's correct.

Q    And you spoke to Dr. George; is that correct?

A    That is correct.

Q    And you spoke to Dr. DeMars; is that correct?

A    Correct.

Q    Now, I think you described Dr. DeMars' reaction to your report to her.

A    Mm-hm.

Q    And I'm sort of paraphrasing what you said, but I want to make sure that I get the general core of it right. She listened to your concerns?

A    That's correct.

Q    She took them seriously.  Let me --

A    She expressed that she took them seriously.

Q    That's how I was going to rephrase that.  She indicated an interest in taking them seriously.

MacCallum - Cross by Mr. Coffin

A    That's correct.

Q    She didn't treat you as being frivolously reporting these things?

A    Correct.

Q    And she was the chair of the OB-GYN department; is that correct?

A    Yes.

Q    But she also didn't say, Okay, third-year resident, this is what I'm going to do about that.

A    Yeah.  Certainly not her role to me in that relationship.

Q    And that's sort of my point.  That wasn't your expectation, isn't your expectation, that she's going to explain to you this is exactly what I'm going to do about the thing; is that right?

A    That's correct.

Q    And your interest is to try to get the hospital to solve the problem; isn't that correct?

A    To create patient safety.

Q    Further patient safety, which is really important, absolutely.

       The -- so, for example, if she had inquired further about Dr. Hsu's performance, that would have been a reasonable thing for her to do, in your mind?

A    To me or to -- to others?

MacCallum - Cross by Mr. Coffin

Q   To you.

A   Certainly, if she had wanted to follow up.

Q   Or if she had sought additional training with him; is that correct, for him?

A   Would I think that was appropriate?

Q   I'm sorry.  I'll rephrase the question.

    Would it be a reasonable next course for Dr. DeMars to do, to try and get Dr. Hsu to improve his skills with additional training?

A   Hospitals often have professional improvement programs for physicians, just like people would have in any other job, so there's usually an official pathway to do these things.  I can't say that I was intimately familiar with the details of how that would look like at Dartmouth Health, at the time.

Q   Sure.  Find him some mentoring?

A   In my opinion, would those be reasonable things to do?  Sure.  But I don't know what that would actually consist of at Dartmouth Health.

Q   Fair enough.  Again, not really your role; I'm just sort of asking you what your big-picture hopes would be or plans would be.

A   Okay.  My hope would be to pause him operating while you try to figure this out, if I had to make a choice independently at that time, but that was not my role.

MacCallum - Cross by Mr. Coffin

Q    But, ultimately, they did terminate him; isn't that correct?

A    They did.

Q    And you're not really aware of the steps they went through to see if they could turn this new doctor they recruited into this highly specialized position in New Hampshire, what steps they would take before they terminated him; isn't that right?

A    That's correct, that was not my role.

Q    Now how many physicians are there in Elliott's REI group?

A    In Elliott's REI group?

Q    Yeah.

A    In Manchester, New Hampshire?

Q    I'm sorry, excuse me.  Thompsons.  I apologize there.

A    Okay.  I'm like, I don't know; I never worked there.

     So at Thompson Health, a very small community hospital, there are zero REI physicians.

Q    Correct.  There are none?

A    That's correct.

Q    And I don't know much about the area, but I know it's a little bigger than here, Rochester, right?

A    Rochester is bigger.  Canandaigua, where Thompson Health is, is much smaller.

Q    And Canandaigua is even smaller, right?

MacCallum - Cross by Mr. Coffin

A   Yes.

Q   So I imagine that that area, while bigger than us, but being on the periphery of these areas, has real challenges attracting specialty physicians to that area; isn't that right?

A   I think -- I can't speak to that.

Q   Okay.  Now, at the time the decision was made to close REI, you understood that that had gone through a high-level administrative decision-making process?

A   I did not understand that.

Q   Oh, you did not understand that?

A   No, it was just announced.

Q   Okay.  Well, you understand that running an academic medical center like Dartmouth or University of Vermont or University of Rochester is a monumentally complex undertaking; fair to say?

A   I think that's a reasonable statement.

Q   Because you've got a zillion specialty sub groups, correct?

A   There's many.

Q   And many, many different tiers of healthcare providers, correct?

A   That's correct.

Q   And you've got some incredibly phenomenally skilled people in all different levels, correct?

A   Absolutely.

Q   Super smart, right?

A   Sure.

Q   Certain they know how to do things?

A   I don't follow.

Q   And I imagine that you could expect that it might be hard to make all those things mesh together for a leadership group; isn't that right?

A   I cannot speak from a leadership position and kind of tell you how hard their job is or isn't.  It would be really supposition on my part, having never had such a role.

Q   Okay.  And if there is a medical group that is just not working right -- let's assume that -- isn't -- doesn't there have to be a decision that is made regardless of the talents of a particular practicing physician there?

            MS. NUNAN:  I'm going to object, speculation.

            THE COURT:  Overruled.

            MR. COFFIN:  It's cross-examination.

            THE COURT:  Overruled.

            THE WITNESS:  Could you repeat?  I'm sorry.

            MR. COFFIN:  He just overruled, so let me ask a different question.

            THE WITNESS:  Okay.

Q   (By Mr. Coffin) You acknowledge that in your experience

MacCallum - Cross by Mr. Coffin

as an attending physician at a couple hospitals in Rochester and having multiple degrees at Dartmouth and medical degree at University of Wisconsin, also a phenomenal medical institution, that it requires a level of administration to make that complex organization run; isn't that right?

A   Administration is a part of any kind of medical center, yeah.

Q   And so if something is not working, efforts have to be made to improve it; isn't that correct?

A   Absolutely.

Q   And sometimes those efforts may run counter to the individual interests of even a particularly good doctor.

A   That isn't part of my decision-making process, right, because I'm not an administrator.  I can't really speak to that.

Q   Now, when you informed people at Dartmouth -- Dr. George, Dr. DeMars, and I think there was another one that you brought your concerns to --

A   Dr. Porter.

Q   -- and Dr. Porter, yes.  No one retaliated against you for blowing the whistle, did they?

A   Not to my knowledge.

Q   Well, they seemed -- you seemed to have gone on and had

MacCallum - Cross by Mr. Coffin

Q    a successful career after Dartmouth, right?

A    I would agree with that.

Q    And you are unaware anyways of somebody trying to do something to --

A    I can say that I am unaware of that, yeah, sure.

Q    You did say that?

A    I can say that I am unaware of any retaliation.

Q    And your complaints about Dr. Hsu were made back in 2014?

A    Mm-hm.

Q    Okay.  Is that right?

A    Yeah.

Q    And the REI division closed, you know, several years later; is that correct?

A    That's correct.

Q    And so there's not really a timing sequence there that shows a linkage between those things; is that correct?

A    I think I can't speak to that.

Q    Okay.  Now, you testified that when the REI division closed in May of 2017, Dr. Porter was the first person to call you?

A    I heard it from her, yes.

Q    Okay.  Was it your impression you were one of the first people that she called, from that conversation?

A    It's hard for me to know.

MacCallum - Cross by Mr. Coffin

Q   Okay.

A   Yeah.

Q   But you had developed a close bond, which is only commonsensical from your medical treatment during your pregnancy; is that correct?

A   You know, we had developed our close bond kind of outside the patient care context.

Q   I was going to go there next.  You have your, kind of, unique patient/physician context which has got to be very meaningful, but you also independently had developed a close friendship with her, I think was the term that you used; is that right?

A   Yes.

Q   And a level of respect; is that correct?

A   Absolutely.

Q   It seems like you both see the world in the same ways, fair enough?

A   I think that's fair.

Q   And medically feel like "I agree with her values and perspectives"; is that right?

A   Medically, I feel like -- I'm sorry.  Can you tell me a little more?

Q   I was going to say in terms of the way she practices medicine, how she is as a doctor you respect; is that correct?

MacCallum - Cross by Mr. Coffin

A    That's correct, yes.

Q    And maybe as a friend, you could broaden that a little bit to say even as a person; is that fair to say?

A    That's fair.

MR. COFFIN:  If I could just have a moment, Your Honor?

THE COURT:  Okay.

Q    (By Mr. Coffin) Do you recall her having any kind of medical conditions during your friendship during 2017 and 2018 that you might have discussed?

A    Specifically during that time period?

Q    Yeah.

A    I can't recall the exact timing sequence of events of when she had her procedures and things like that, but she certainly had surgeries related to her CSF leak.

Q    Yes, you testified about some of that on direct examination.

A    Yes.

Q    So she had the CSF and some recovery from that, perhaps some other medical conditions?

A    I wouldn't be aware of the -- perhaps the full breadth of that.  I'm aware of the details -- you know, some of the general details of the CSF leak and some very general details of the fact that she had procedures for that condition.

MacCallum - Cross by Mr. Coffin

Q   And those could have been -- I imagine that was very stressful for her to be undergoing, separate and apart from whatever was going on with REI, correct?

A   I mean, I think any time you undergo a surgery, there's a level of stress, as a human.

            MR. COFFIN:  One more moment, please.

                    (Pause.)

Q   (By Mr. Coffin) Just very briefly.

        Did you prepare for today's hearing?

A   Can you expand on that?

Q   Yeah.  Did you meet with the lawyers?

A   I spoke with the plaintiff's counsel.

Q   Okay.  When and for about how long?

A   It's -- it was part of the process of preparing testimony to meet with the attorneys involved.

Q   If you can estimate, please, when and for about how long?

A   For a few hours a week over the last several months, perhaps.

Q   Okay.  A few hours a week over the last several months you met with the plaintiff's lawyers; is that right?

A   That's correct.

Q   Was Dr. Porter there?

A   No.

Q   Okay.  And by "the lawyers," I mean the lawyers who are

MacCallum - Cross by Mr. Coffin

here --

A    Yes.

Q    -- for the plaintiff here today.

A    Correct.

Q    Okay.  And you're here today to advocate for your friend, right?

A    I'm here to advocate for patient safety and best practice in medical care and administrative integrity.

Q    Okay.

MR. COFFIN:  Thank you, Your Honor.

THE COURT:  Redirect?

MS. NUNAN:  No, thank you.

THE COURT:  Okay.  No redirect.  Okay.

Thank you.  You're done.  You may step down.

THE WITNESS:  Thank you.

THE COURT:  All right.  So members of the jury, I know you only got back at 1:00, but I'm going to give you a short break now.  I have to take up a couple of legal issues with the attorneys for the case.  It will be a short one, about ten minutes, so we'll be back here at 2:00.  Thank you.

(Jury exits.)

THE COURT:  Okay.  So the issue of the demonstrative exhibit, Mr. Vitt, have you provided a copy to defense counsel?  No.

MacCallum - Cross by Mr. Coffin

MR. VITT:  We're pulling it up right now.

THE COURT:  Okay.  So then I am going to, obviously, step off the bench and give you both an opportunity to review that, particularly defense counsel, and I'll come back, and if there isn't agreement on it, we'll talk about it then as to what's going to happen.  Okay?

MR. SCHROEDER:  Sounds great, Your Honor.

MR. VITT:  Thank you.

(Recess taken.)

THE CLERK:  Your Honor, we're back on the record.

THE COURT:  Okay.  Mr. Schroeder?

MR. SCHROEDER:  Your Honor, we object to the use of the demonstrative exhibit for a number of reasons.  We just received, I guess, the laptop version of this document because that's the only one that exists apparently, and Plaintiff's counsel acknowledged that they were still taking stuff on and off of this exhibit.  I have no idea how this in any way relates to an employment discrimination and retaliation case.  And my concern is that we're going to get -- this looks like something that maybe would be happening in a medical malpractice case, but this is so far afield, number one, so I don't think it has any relevance.

MacCallum - Cross by Mr. Coffin

Number two, I assumed when they said "we wanted to put a demonstrative up" well, maybe it came out of the American Society of Reproductive Medicine, like something to be a reference point, a demonstrative. This is, I believe, Dr. Porter's own version of what she believes this process involves for REI, IVF. So I have no idea how I would rebut it or what I would do to put on the stand, but then we're getting so far afield, kind of comes back to relevance again. We just got this at 1:55. They've got 193 exhibits. We have half that. We're trying to keep the trains on the track, but I do not see how this has any bearing on this case whatsoever.

THE COURT: All right. Mr. Vitt?

MR. VITT: Thank you, Your Honor. Let me start first with the relevance. Dr. Porter will explain, and it will help, frankly, if she has this in front of her and the jury can look at it because most of them are probably unfamiliar with the process that's involved if somebody comes in and might potentially want IVF.

What we will demonstrate is that this process, as reflected, demonstrates that Albert Hsu and Seifer were overbilling consistently because what they were doing was performing a procedure that in about 75 percent of

MacCallum - Cross by Mr. Coffin

the cases had no useful purpose whatsoever. So is it relevant? Yes. One of the complaints that Dr. Porter made repeatedly was, these doctors are overbilling. And this document is a way to demonstrate, can you explain that? Yeah. Could we do it just orally? Of course. Will this make it, frankly, easier and shorter? Without question.

THE COURT: Okay. As I said to you before the break though, right, my concern is late disclosure on this. So perhaps this is something later in the case, perhaps at closing or something like that, you should talk to your opposing counsel if you do seek to use something like this in closing, not suggesting that you should. But I'm not going to allow the demonstrative at this point in time. It's too late. I'm not entirely, frankly, clear on what all the representations are on this document. I've heard what you're saying, but I'm going to -- to not allow the demonstrative at this time. Okay?

So we'll call for the jury.

(Jury present.)

THE COURT: Okay. Plaintiff may call its next witness.

MR. VITT: Thank you, Your Honor, the Plaintiff calls Dr. Porter.

MacCallum - Cross by Mr. Coffin

THE CLERK:  Good afternoon.  If you would raise your right hand, please.

**Misty Blanchette Porter**, witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you.  You may have a seat.  If you could state and spell your name, please.

THE WITNESS:  My name is Misty, M-i-s-t-y, Blanchette, B-l-a-n-c-h-e-t-t-e, Porter, P-o-r-t-e-r.

**DIRECT EXAMINATION**

**BY MR. VITT:**

Q   Good afternoon.

A   Good afternoon.

Q   Would you state your name, please?

A   Misty Blanchette Porter.

Q   What's your profession?

A   I'm an attending physician at the University of Vermont.

Q   Medical Center?

A   Medical Center.

Q   Where is your home?

A   Norwich, Vermont.

Q   How long has that been your home?

A   30 years.

Q    What's your immediate family?

A    My husband is Tom Porter, and I have three children --
a daughter, and two sons.

Q    Are they living at home?

A    One is in the apartment over my garage, and one lives
about a mile from us, and my daughter lives in Maine.

Q    How long have you worked at University of Vermont
Medical Center?

A    I started per diem initially for about a year, year and
a half, and then -- approximately seven years.

Q    And what's your current position?

A    Attending physician at the University of Vermont
Medical Center.  I am the vice chair for education and
for faculty in the department of OB-GYN, and I am a
complex gynecologic surgeon.

Q    Tell me, what does it involve being the vice chair?

A    For vice chair, I oversee the education of medical
students with the clerkship directors for the third and
fourth year medical students that are coming through to
experience OB-GYN, and I work with their directors.

I oversee the residency at OB-GYN, and work with
the residency directors; there are two of them.  And I
also oversee the fellowship directors, and then I'm
also -- I have a role in mentorship of junior faculty
and representing the faculty at the University of

Porter - Direct by Mr. Vitt

Vermont Medical Center, in the department, when there are challenges or there are issues with the faculty that they would like to bring forward to administration for resolution.

Q   And you're often the person that's kind of the spear point or the head point for that?

A   Yes.  I am the defined person.

Q   Okay.  Do you enjoy working with the residents and the students?

A   Yeah.  I very much love it.  It's the way that we give the gift of our knowledge back to those that are going to care for our daughters, for our mothers, for ourselves.  And so, yes, I very much like -- these many years of experience, I'm able to pass on knowledge and to support them through their growth.

Q   Let me go back to when you were growing up and thought about what you wanted to be.  When did you decide you wanted to be a doctor?

A   I decided in high school I wanted to be a doctor.

Q   And what do you think led you to that?

A   My mother's a doctor.  She had three kids really young, and then went back on -- back into education and got her -- first her undergraduate degree and then an MD, and then she did her internal medicine residency at Dartmouth.  And so I got to see first-hand what she was

Porter - Direct by Mr. Vitt

doing for work and how she really loved it.  She went on to do a fellowship at Harvard in geriatric medicine, and then -- we had lots of conversations about how fulfilling it is to care for patients.

So I decided in high school.  And she and I have this joke that I see them in, and she sees them out.  It's meaning that and it's giving the gift of children to people in their lives.  And so I read about Louise Brown, who was the first IVF baby born in the world, and I thought in high school, This is -- I have a natural interest in science.  I said this is really wonderful.  We can take science and technology and then help individuals have a baby.  And so I knew pretty early on that I would go into reproductive medicine and infertility.

Q   Is fertility preservation still part of what you do in your job?

A   Yes, and in a different way now.

Q   Okay.  How about now?

A   So I work very closely as a surgeon to help individuals maintain their fertility, especially with GYN oncology. I scrub with an GYN oncologist for young individuals who have cancer.  It may be ovarian cancer or uterine cancer, and we do fertility-sparing surgeries side-by-side.  My office mate is a GYN oncologist.

Porter - Direct by Mr. Vitt

And I also counsel individuals about fertility-sparing procedures, and also help individuals -- I do a lot of ultrasound work, and so some of the things we do is to do screening. We follow women who have had, say, ovarian cancer in their 20s or their 30s, and they have one ovary out, so we're screening them to look for recurrence. So I counsel those individuals.

Q  Let me go back to some of the starting of the education. Where did you go to medical school?

A  I went to Dartmouth-Hitchcock Medical School, the Geisel School of Medicine.

Q  All right. And how about a residency and fellowship following that?

A  I did both my OB-GYN residency and my fellowship in reproductive medicine and infertility at the University of Vermont.

Q  Okay. And what was the residency and fellowship in?

A  The residency was in OB-GYN.

Q  Right.

A  And the fellowship was in reproductive endocrinology and infertility.

Q  Okay. So the term reproductive endocrinology comes up quite a bit in this case. Can you give a brief description of what that entails?

A    Yes.  So reproductive endocrinology and infertility is basically anything to do with hormones that affects the reproductive tract.  So in my fellowship, we took care of individuals who were girls who had pubertal disorders or birth defects of the reproductive tract all the way through the reproductive lifespan, and then did complex menopause consults.

And reproductive endocrinology is also surgery.  It's also, besides the hormonal aspects of it, and then while a really important part of what we do and very cherished part of what I do is IVF, it's really only a sliver of what REI actually does.

Q    Would it be -- I've heard you use this before, would you say that IVF is no more than 10 to 15 percent of reproductive endocrinology?

A    Yes, it's an important part of it.

MR. SCHROEDER:  Objection, Your Honor.

THE COURT:  Hold on.

MR. SCHROEDER:  Overly -- there's no testimony on it.

THE COURT:  It's background to the discipline.

MR. VITT:  Thank you.

THE WITNESS:  So, yes, IVF is an important part, and a cherished part, of what we do, but it's

really only a sliver of what a global REI service is.

Q   (By Mr. Vitt) When you were doing the residency and the fellowship, did you have a chance to develop your surgical skills?

A   Yes.  I -- all through residency, I knew that I had a marked interest in surgery, and so my mentor all through surgery -- all through residency was John Brumsted, and he became -- he was my fellowship director.  I stayed to work with John in the OR because he's an amazingly talented, or was an amazingly talented surgeon, and he brought new technologies to the University of Vermont and a really excellent set of really complex laparoscopic, open and hysteroscopic skills, and so I had -- when I was considering fellowship, I had him promise me that he would stay all through fellowship so that I could get that training.  And there was two ten-hour OR days in my fellowship from anything from -- and we were the benign gynecologists, we were the benign GYN surgeons.

Q   When you say "benign" -- I'm sorry to interrupt you -- what does that mean?

A   So when we consider where patients might get shuttled there's GYN oncology, and they do the cancer surgery, ovarian cancer, uterine cancers; whereas for benign surgery, that might be individuals with abnormal

uterine bleeding, fibroids, endometrioses, infertility surgery, ovarian cysts, adnexal masses, those are the things, anything that in any age group -- and I operate on kids as well as post-menopausal women -- that have a non-cancerous GYN problem.

Q   Okay.  You mentioned laparoscopic surgery?

A   Yes.

Q   Can you provide a quick set of -- a snapshot of what that is?

A   Yeah.  So laparoscopic surgery is a minimally invasive approach, so we can do quite complex surgery with little, tiny incisions, so a little tiny incision in the belly button, and two or three other little incisions in the abdomen; and, really, oftentimes, we can do fairly extensive surgery with that.

Q   In order to become adept at laparoscopic surgery, what amount of effort is involved?

A   There's a fair amount of effort and practice, both as Dr. MacCallum was talking about in kind of the staged, progressive, advancing your surgical skills with something simpler, and then you move forward.  We also have an ability in a non-human model to operate and practice.

        And so there's -- in residency, the residents have to take an extra test at the end to look at whether or

Porter - Direct by Mr. Vitt

not, for example, in a plastic model can they tie a knot with laparoscopic instruments kind of outside off of video screen?  So we do lots of surgery with a patient that's mentored and progressive, but we also do a lot of training outside to be able to hone our skills over time.

Q   And do you do robotic surgery as well?

A   Yes, I'm a robotic surgeon for benign GYN surgery.

Q   And when you use the term "robotic surgery," what does that entail?

A   So what I like to tell patients is that it's just a fancy laparoscopy, and then I'll bring up pictures to show them what the difference is, but there's some really complicated surgeries that we can do with the use of the robot by taking advantages of the robot. And so the robot, on a regular laparoscope, it's just one camera; and a robotics procedure, it's two cameras side by side.  And so we get this 3D view of what we're doing, better depth perception, and we get much better detail of the anatomy, and so there's less blood loss associated with it.  And we can also dissect.  And then I get my wrist back when I'm operating with a robot.

So, for example, if I'm taking a fibroid out of the uterus, which is a benign muscle tumor, we can remove it, and then we have instruments that are just

like the open instruments where we can use our wrist. It's called what's called wristed, so I can do a lot of suturing with that, and a lot more fine dissection given those characteristics. So that's what robotic surgery is.

Q   Do you still perform those surgeries?

A   Yes, absolutely.

Q   Okay. And is it -- is it necessary for you to stay up to date on, you know, the changes in the technology and any and other changes that affect how that surgery is done?

A   Always. The technology rapidly changes, instruments change; and so, yes, we are regularly keeping up to date.

Q   How did you end up at Dartmouth-Hitchcock?

A   So when I was a third-year resident here, my husband is part of a multi-generation building firm. He's a contractor/builder, and he was in business with his father, which is why we're in Norwich, Vermont. And Barry Smith was the chairman of the OB-GYN at Dartmouth at the time, and I had trained there, and Barry called me out of the blue one day and just said we have a job, and we'll keep it for you for a year. We just want to know what your plans are.

And so I talked to my husband, and I approached

Porter - Direct by Mr. Vitt

John and I said I would like to stay for fellowship here, you know, given that, you know, my husband is a seventh-generation Vermonter and very deeply rooted here, he's in business with his father, I can go off and do fellowship elsewhere, but I would really like to stay, and I wouldn't have stayed if it wasn't a really good, quality education, and it was.

Q   Okay.

A   And so I then called Barry back and said I'm thinking about doing this fellowship, but I would like to know that I have a job when I'm done.  And so Barry said let me talk to everyone, and he called me back.  He said he'd spoken with Dr. Manganiello who had established the REI program at Dartmouth, and I had worked with Paul when I was a medical student, and then he had gone to the head of the clinic to make certain I would have a job after the fellowship.  And, at the time, that was Dr. Steve Plume, and Steve said Yep, we'll take her, absolutely.

Q   When did you start the job?

A   I started in 1996.

Q   There's been series of comments in the trial about your disability, and I want to turn to that for a few minutes.

A   Mm-hm.

Porter - Direct by Mr. Vitt

Q   Tell me about the first symptoms that you experienced and when that happened.

A   So in November, early November, mid November of 2015, I was the most fit ever in my life.  I was running half marathons and swimming on a regular basis, and in the pool I noticed that I had blurred vision, a headache and saw my primary who told me she thought I had maybe a complex migraine or meningitis.

Then by Thanksgiving, I couldn't even get out of bed.  I couldn't sit up without excruciating pain in my head and neck and the sensation that things were dragging.  In fact, I had said to the kids at that point, well, either you guys can cook Thanksgiving and I'll lay on the couch and point to what to do, or we'll have to wait a few days.  And I had the beginnings of ringing in my ears and I had some pressure in my ears and some real blurred vision, but my primary said, hmm, this should go -- this should get better on its own, and so -- with rest and with this particular illness, laying down flat and hydrating, really pushing fluids, the symptoms get better.  It's very, what we call, dependent from laying down to standing up.

Q   So ultimately what was the diagnosis of the cause of this problem?

A   Ultimately, the diagnosis was a cerebral spinal fluid

leak.  The -- there's a layer of fluid around the brain and the spinal column.  That's typically a connective tissue layer around that that holds that fluid all into place, and I had a tear in that.

Q  Sometimes it's called a dural spinal leak?

A  Yes.  It's called a dural leak, mm-hm.

Q  Did these symptoms impact your ability to work?

A  Absolutely, yeah.

Q  You made a trip to Dallas, I think in November?

A  Right after Thanksgiving, for 20-plus years, I think, almost 25 years, I was an oral board examiner for the American College of OB-GYN, and there are weeks where the board examiners fly in to the testing center in Dallas.  And so my travel to Dallas at that time, I still know better, and my primary had reassured me that, you know, you probably just have a viral meningitis and you can go off.

Q  Did anybody from Dartmouth accompany you?

A  On that trip, Dr. Leslie DeMars was also there, yes. And she had nominated me to be an oral board examiner.

Q  Did the two of you share a room?

A  We had shared a room.

Q  At some point, did you go on short-term disability?

A  Yes, so when I was in Dallas, I started getting double vision, and just towards the end of that week, and I

Porter - Direct by Mr. Vitt

had worsening headaches.  I lost all depth perception. I noticed when I was walking down the sidewalk, I couldn't tell where the end of the sidewalk was and where it ended.  And Leslie actually got on a plane and flew back on her own for an emergency meeting at Hitchcock, and I was in Dallas by myself.

And I called my primary and she said, Well, you can go to the ED in Dallas or come home, and so I said, Well, I'm not going in the ED in Dallas by myself with nobody else here.  I was afraid I had a brain tumor is what I was worried I had.

So when I got back, I called my primary, and she saw me.  That was about mid December, and she ordered an emergent MRI.  So I had the MRI that evening.

Q   And then from the short-term disability, that eventually became a long-term disability?

A   Yeah.  So six months I was on short-term disability receiving care at Dartmouth-Hitchcock, and then I was not better, and it converted to long-term disability.

Q   So you say you started the care when you were at Dartmouth-Hitchcock, right?

A   Correct.

Q   And then did it transition to some other place?

A   Yeah.  So the care I received at Dartmouth was not successful, and I had a new neurologist after my

Porter - Direct by Mr. Vitt

neurologist retired.  And the new neurologist was a headache specialist from the Cleveland Clinic, and he was working part-time at Dartmouth, and I walked in to see him just as an established-care appointment because my retired neurologist told me that I was completely healed and I could return to work, but that I might have some persistent symptoms for a while.

Q   Did that turn out to be right?

A   No.  It was absolutely not right.

Q   And did you get referred to the Mayo Clinic?

A   Yeah.  Dr. Tepper saw me, and within three minutes of walking into his office, he said to me, I've read your chart; I know what's wrong with you.  This is 100 percent curable.  I can tell you're leaking, that you're still leaking.  If you were my wife, you would have been on a plane six months ago.  We are getting you on a plane, and I literally walked a hundred yards down the hallway, and I had a phone call from the Mayo Clinic, and I went to the Mayo in Rochester.  And to be clear, I had been asking to go to the Mayo Clinic for six months.

Q   So when you got to the Mayo Clinic, you ended up with a major surgery, correct?

A   I did.

Q   And how long was the rehab on that, that first surgery?

Porter - Direct by Mr. Vitt

A    I was on strict bed rest in the Mayo Clinic for 36 hours. I couldn't even sit up. Then my husband and I stayed for another four or five days in a hotel room until I could get well enough. I had a spinal surgery where they had removed a little piece of bone from the back of my spine and had patched the dura, which was -- it was a tear down in my lower back -- and then I was on modified bed rest for six weeks at home. I could get up to go to the bathroom and to eat, but they wanted me to be hydrating and relatively -- relatively still until the bone healed well and correctly.

Q    So when you got back home and was starting to get better, when did you begin to return to work from the long-term disability?

A    I had a graded plan for my providers at Dartmouth-Hitchcock, so I began to return to work several weeks later as I was allowed to return. And, you know, when -- I was trying to go back. I really wanted to go back to work, and one of the biggest reasons was that I had patients who had delayed their attempts at pregnancy to wait for me to come back, and it was the balance of I know I need to get well, and I know I can do this, but these people are potentially moving out of the area, and they delayed their life for me to come back. And so it was -- I know it's odd to

say come back seven hours a week, but it was for specific reasons to come back in that time frame.

Q   All right.  So by the time you came back and were working this reduced schedule, did you still have some symptoms?

A   Yeah.  I still had -- the first surgery I had cured about 90 percent of my symptoms.  And because I had been leaking for so long, the neurosurgeon that I talked to on the phone, his team said to me, It may take a while for things to re-equilibrate.  You know, meaning, I had some swelling in the tissue in the covering in all of that.  My brain was absolutely fine.  There was never any question about that.  It was the other related symptoms.

Q   Were you worried that you might not be able to return to do the surgery that you had been doing for so long?

A   No.  Because the team at the Mayo Clinic were experts in the field, and everyone there told me, This is 100 percent fixable.  You will be back to yourself; we just have to get it right.  Sometimes it's more than one surgery.  Sometimes we have to do another blood patch, but you will be 100 percent yourself.  In fact, I was one of nine patients they had seen that week with this.  It was like the common cold to them.

Q   You mentioned a blood patch.  What is that?  Can you

describe it?

A   Yeah.  So a blood patch is where they prep your arm and they take a sample of blood from your arm, and then they, under imaging, inject that at the site of the leak using your own blood and the parts of the blood that help you coagulate to help you clot over it to help form a patch or a clot or, you know, a little healing area in that area.

Q   When you came back and were considering going into the operating room, was there a need or a desire to have a proctor to be with you?

A   Absolutely.  So I wanted it, right?  I had been out for a really long time, and they had told me, "You will be absolutely fine."  But it's a normal thing for someone to have been out that long to kind of re-proctor them back in.

Q   So when I use the term "proctor" in this context, what does it mean?

A   So I would book the case.  I would see the patient in the clinic, book them, and I was disclosing there would be another surgeon with me there, and then you ask another senior surgeon to come watch you, and they're not necessarily scrubbed.  They're just watching how do you organize things?  How do you communicate with the staff?  How are you able to do the procedure?

Porter - Direct by Mr. Vitt

MR. VITT:  I'm going to show Dr. Porter Exhibit 30, our Plaintiff's Exhibit 37.  I don't know if I should do this through paper or electronically.

THE COURT:  Go ahead and show the witness the paper.

Q   (By Mr. Vitt) I'm going to show you what's been marked as Exhibit 37.  Can you tell me what it is, please?

A   So I sent an e-mail to Dr. Maria Padin who is -- is the chief medical officer at the time and also working one day a week in OB-GYN.  And part of when you have your proctor, part of it is finding a person who's available to evaluate you who has some ability to watch you in the OR.

Q   Right.  Did she watch you?

A   Yes.  So I had to keep -- Dr. DeMars had given me the goal of do three minor procedures and do three major procedures proctored, which is pretty standard when someone is coming in.  And so I wrote her a note saying, "Maria, thank you for proctoring and for your kind encouragement."

Q   And -- go ahead.  I'm sorry.

A   "I dictated the operative report.  Please let me know if the report needs signature."

THE COURT:  Mr. Vitt, this isn't admitted yet?

Porter - Direct by Mr. Vitt

MR. VITT:  No, I'm going to move its admission.

THE COURT:  But the witness is reading from it.

MR. VITT:  Right.  I would like to move the admission of Exhibit 37.

THE COURT:  Any objection?

MR. SCHROEDER:  No objection, Your Honor.

THE COURT:  Okay.  It's admitted.

THE WITNESS:  What it says is, "Misty, you are a talented surgeon.  Thanks for inviting me to your case."

Q   (By Mr. Vitt) Okay.  Thank you.

I want to turn now to how you dealt and what you did with Dr. Albert Hsu.  When did Dr. Hsu join the practice?

A   Roughly 2014, in the summer, fall.

Q   And what was his position when he arrived?

A   He was an attending physician.

Q   Had you interviewed him before he came to work?

A   No.

Q   Did you assess his skills as he entered the practice?

A   Yes.

Q   And what did you discover?

A   I had discovered that in speaking with him before he

Porter - Direct by Mr. Vitt

came that he had not completed the appropriate number of procedures in order to graduate from fellowship. And, from my perspective, that wasn't necessarily his fault. The Jones Institute where he trained is a very well-known IVF program, and it was the first in the United States to have an IVF baby, but the year that Dr. Hsu graduated, that program was put on probation for poor fellow experience, and when I spoke with him, it was very clear that he had not met even minimum numbers in order to be able to sit as an attending.

Q    So when he showed up at work, and you had a chance to talk to him and evaluate his level of experience and expertise, what did you decide to do?

A    It's -- sometimes individuals just need a little bit more exposure and a little bit more encouragement, and that's what we do as faculty, right? We take someone to where they are and then bring them up from there.

And so I decided that, to be fair to Albert, I would sit with him and do additional procedures. And I offered myself to do -- to take call with him 24/7 for the next six months and to sit and teach him IVF procedures and embryo transfer procedures. And when he came in, he had done half of 20 egg harvests, which is less than half of what he should have done, and he had done zero embryo transfers. He had only seen five

Porter - Direct by Mr. Vitt

trial or mock transfers. And so I tried to see if we could give him the experience needed to be able to act as an attending physician.

Q So over six months, did you take call with him nights, weekends, holidays? If he was on call, were you on call?

A 24/7 for six months.

Q Had you been asked by anyone in the administration to do this?

A No.

Q Did you let the chair at least know that you were going to do this; you were going to take call so that in an effort to train him?

A Yes. So I had spoken to him October before he came that next summer, and because he was going to be seeing patients with me in clinic, he was going to be doing procedures with me in the IVF suite and procedures in the OR, we could not book him an independent schedule, and so what I arranged with Dr. DeMars and with Heather Gunnell is that he would be with me largely and then we would progressively increase his schedule and increase his responsibilities.

Q He was an attending physician when he came?

A He was an attending physician.

Q Is it unusual for a newly hired attending physician to

have somebody on the staff basically at their side for six months of taking call?

A   It's highly unusual.  It's extraordinarily rare.

Q   What did you find out about his skill level?  Was he trainable?

A   From an IVF procedure standpoint, he could actually do a reasonable egg harvest.  I didn't have any concern about that.  I did a number of ultrasound-guided trial or mock transfers on our IVF patient population with him, and then we did embryo transfers with me standing behind him.  And when I was behind him, he had a reasonable pregnancy rate.

I teach IVF procedures nationally at ultrasound conferences.  I teach the technique of embryo transfer, and so I have a teaching deck of slides.  I got those out, and we went through those, and the issue became when he needed to be independent.

I felt that he was fine for oocyte retrieval.  We, as part of our quality assurance for the IVF clinic, we -- every quarter followed pregnancy rates for individuals both with frozen embryo transfers -- embryos that had been frozen previously, and what we call fresh, or embryos that had never been frozen.  So every provider had their statistics done quarterly, and Albert's very quickly dropped off and were less than a

third of the other attendings.

Q   So when he was on his own, right, without you looking over his shoulder, did he perform up to acceptable standards?

A   For an egg retrieval, yes, but for the clinic, the OR, and for embryo transfers, he wasn't able to make that transition.

Q   How about his method of practice?  Was he organized?

A   He was extremely unorganized.

Q   How about his charts?  Were they acceptable?

A   No.  He was regularly on the list from our administration for individuals who were at risk for being suspended, which caused a huge amount of problems in the office because he had office -- I know, a full office schedule, and he also had OR cases and IVF responsibilities.  And so very regularly he was down to the wire of coming off the suspension list.

Q   In terms of, kind of, an approach to medicine and the safety of patients, is it important that charts be kept current?

A   Absolutely, for a couple of reasons.  One is, we depend on those notes when you come in for a follow-up visit to know what your health information is, especially for a procedure.  So it's a patient safety issue if those notes aren't available.  And oftentimes I was finding

Porter - Direct by Mr. Vitt

myself in ultrasound for a procedure without a note.

Also, that's the way we communicate with referring care providers or we get someone ready to the OR so we have a good review of your personal health history.

But we did what we could to help him. So he got an extra hour at the end of every day that none of the other attendings had for documentation. We had someone from IT come up and help him to learn to be more efficient with our computerized medical record. In fact, he had what's called at-the-elbow help for that, which is someone with him in clinic. And then also we -- I gave him my templates from the computerized medical record for him to then alter or change for his own habits so that we can try and facilitate the development of these skills.

Q    Were there patient complaints about Dr. Hsu during the first six months of his practice?

A    Absolutely, yes.

Q    And what were the nature of those complaints, in general?

A    The most predominant patient complaint was that his embryo transfers were painful. And when we do an embryo transfer, the chance for pregnancy is dependent upon how atraumatic you place that embryo into the sweet spot of the uterus. So meaning, everything needs

to be quiet.  We put a speculum in atraumatically.  We don't manipulate the cervix.  We're careful under ultrasound guidance, because there's really good data that the more the uterus contracts, the lower the pregnancy rate is, and so patients were complaining about both not achieving pregnancy and also the amount of pain they were having at the time of the embryo transfer.

Q   If the embryo transfer is properly done, should it be painful?

A   No.  In fact, just the opposite.

Q   So you've got these patient complaints, you've got somebody who doesn't get his notes in on time.  What did you do?

A   So I met with him and Dr. DeMars, because I was the acting division director at the time, and we came up with strategies to help him become more successful, and I had been asked to fill out evaluations for him, and Dr. DeMars also was sending in some kind of remediation step-wise plans for him.

Q   Did the additional training help?

A   No.

Q   Did you conclude that he was untrainable?

A   Yes, for some things.  Yes.

Q   And then you got your illness and went out on

Porter - Direct by Mr. Vitt

disability, right?

A   Yes.

Q   And he was left on his own?

A   Yes.

Q   Did that go well?

A   It did not go well.

Q   How do you know that?

A   I had multiple reports from multiple individuals at the hospital.  It was nothing I could do.  I was sick, you know.  And I know that Dr. DeMars tried to cut back his schedule and make sure he was just focused on certain things and decreased his responsibilities at the academic medical center which included decreasing his teaching responsibilities, et cetera.

Q   So eventually you came back to work, right?

A   Mm-hm.

Q   And were you asked to write an assessment about Dr. Hsu to go to David Seifer who was then the division director?

A   I was, by Dr. Seifer first and -- so that you know, I asked Leslie if I should really write this now.  She and I over all of these months had been having conversations about all of the issues for Albert, so it was not new information.  It was a summary of conversations she and I had had with Albert and that

Porter - Direct by Mr. Vitt

she and I had had between each other, and so she wrote me back an e-mail and said please write an assessment, and I did.

Q   All right.  How long did you take to think about and write the assessment?  How long did this process take?

A   About two or three days.  I had kept a list of some concerns, because I was doing his evaluations, and I had a list of patient medical record numbers to be able to illustrate what the specifics were, and so I wrote the evaluation.

Q   I'm going to hand you what's been marked as Plaintiff's Exhibit 123.  It's a June 3, 2016, letter from you to Dr. Seifer.

MR. SCHROEDER:  Your Honor, may we be heard on an objection relating to authenticity and completeness?

THE COURT:  Okay.  You may approach.

(Bench conference.)

MR. SCHROEDER:  Really quick, Your Honor.  We know that this is a letter addressed to a variety of different DH executives, but when it was produced, it was not produced with the cover page which we've now received, we have, where she was sending it to herself, but there is no evidence of when she sent it to everyone else.  It's just a rule of completeness issue.

Porter - Direct by Mr. Vitt

This goes to having a full record.  It's not controversial.  It's just that it's not -- it's a letter addressed to a variety of individuals, but it just by itself without any indication of who it was e-mailed to.

THE COURT:  Is there a request that the cover letter be part of the exhibit?

MR. SCHROEDER:  Yes.

THE COURT:  Could I please see it?

MR. SCHROEDER:  I don't have it right in front of me.

THE COURT:  Any objection to that, Mr. Vitt?

MR. VITT:  I don't mind a cover letter.  It's fine.

THE COURT:  We'll just take a look at it.

MR. VITT:  Okay.  Thank you.

THE COURT:  I noticed a lot of these exhibits, when they're getting admitted, they're not being published.  I assume that's by design.  I'm saying that to both sides.  If that's something that you would like done, you should ask for permission to do it, and once it's admitted, it will be given and Emerson, he can publish to the jury.

MR. SCHROEDER:  I was going to ask at the end of today how we're numbering these documents because

Porter - Direct by Mr. Vitt

we're just doing it by 1, 2, 3, but I know we haven't published anything yet.

THE COURT:  Right.

MR. SCHROEDER:  And I was keeping track and C-14 will be Exhibit 2, or something like that.  I wanted to make sure.  I was attentive to it.  I wanted to wait to have that discussion at the end, but whatever procedure you want us to follow, we'll follow.

THE COURT:  Yeah.  And you'll be talking to Emerson at the end of the court day today, and you'll be coordinating to be sure that we're all on the same page about what has been admitted and what the numbers are and all of that.

MR. SCHROEDER:  Sounds great.

THE COURT:  So this is the evaluation.  Right?  And, Mr. Schroeder, are you saying that it was produced to you with another --

MR. SCHROEDER:  Well, we know that there's an e-mail cover showing it emailed from her to herself.

THE COURT:  Right.  Right.

MR. SCHROEDER:  So it's addressed to these people.

THE COURT:  Okay.

MR. SCHROEDER:  But the lack of foundation and lack of completeness is going to be an issue.

Porter - Direct by Mr. Vitt

MR. VITT:  Do you want the e-mail that she has to herself?

MR. SCHROEDER:  It's addressed to all of these individuals, and what I'm saying is from a foundation standpoint, right, it's addressed to all of these individuals and then receiving it, and you can ask questions about it, but the chain of custody that they actually have is presented by Misty Porter is really the issue, and I know there's a cover e-mail from one investigation of this that has from Misty Porter to herself, but it's not --

MR. JONES:  She's forwarding it to herself when she sent it.

MR. SCHROEDER:  Right, but I guess the issue is that it's addressed to all of these individuals, but that's not -- it's not an e-mail, it's not clear that it went to all of these individuals based on that.

MR. VITT:  The production of documents in this case, which goes back aways, occasionally it's not as, I don't know, comprehensive or coherent as you might like.  We can try and find the cover e-mail in which Misty may have sent it to herself.  I don't know. I can establish that she is confident that it went to Dr. Seifer and Leslie DeMars.

MR. SCHROEDER:  Okay.

Porter - Direct by Mr. Vitt

MR. VITT:  But I'm not sure that I -- I mean, you're referring to a document that I'm not sure I've seen.

MR. SCHROEDER:  Well, we produced 29 -- 26,000 pages.  I've seen it.  It's an e-mail transmission cover page from Dr. Porter to herself at her own personal e-mail address, and so this is addressed to all these individuals, and I'm sure you would say, Well, it was given to them, but I want to -- I do know that there's this e-mail.

MS. NUNAN:  I can get the e-mail.  I mean, I can get the cover letter.  They can go into what they gave me.

THE COURT:  So there's two e-mails.  There's a cover letter to this letter where she's sending it to various people at Dartmouth, and then there's the "cover" cover letter of Dr. Porter sending this to herself.

MR. SCHROEDER:  Correct.  I think that --

MS. McDONALD:  I believe that's correct, Your Honor.

THE COURT:  And the -- what you're asking for is for this exhibit to be admitted, if it's going to be admitted, with everything that was on it.  I want to be clear what the request is.  And if we can't find this

cover letter right now, what's the proposal for this witness with this exhibit? Are you objecting to its admission and consideration subject to the remaining documents being presented?

MR. SCHROEDER: Let me just ask my esteemed co-counsel.

(Pause.)

MR. SCHROEDER: Ms. McDonald just reminded me of this: So this is whatever you want to call it, kind of a self-serving assessment by Dr. Porter of her colleague Albert Hsu that she drafted on her own, and so I would object that it's filled with hearsay in and of itself on top of the completeness issue.

THE COURT: Okay. But it's definitely relevant to the whistleblower claim, right?

MR. SCHROEDER: Mm-hm.

THE COURT: This is the fact that it is sent, the plaintiff's claim is that the fact that it was sent is partially responsible for the alleged discharge and retaliation based on whistleblower, right? So the letter is not really about its truth so much as the fact that it was written and submitted to Dartmouth.

MR. SCHROEDER: Then I guess the line of questioning would be limited to the fact that it was sent in so then we're not getting into the nitty-gritty

of everything in it or isn't that the hearsay that -- I understand the admission of something to show that it happened, right?  I think it's a stretch to say that something that happened in June of 2016, and the closure happened almost a year later, that that gets you there, but I have to make that argument.

But I think the issue is that whether or not it's -- if he starts asking about every single topic in there, that's beyond the fact that the Complaint was made.  It goes to the substance and the truth of whether or not those things are valid.

THE COURT:  I don't think it does.  I think even if he asks questions about that, it's not necessarily indicia that this is true; it's, again, just the fact that the report was made.

MR. SCHROEDER:  Okay.

THE COURT:  That's my take on it.  Mr. Vitt?

MR. VITT:  I agree.

MR. SCHROEDER:  Yeah.  Understood.

THE COURT:  All right.  So we don't have the cover letter, two cover letter e-mails.  So what do you propose?

MR. SCHROEDER:  I don't want to slow us down.

THE COURT:  No, I understand.  But you have the right to --

Porter - Direct by Mr. Vitt

MR. SCHROEDER:  Here's what -- you're not going to be done with her.  It's 3:07.

MS. NUNAN:  I will look for it tonight.  I can pull up the number that you guys complained about.  And a lot of them are blank pages at the end of e-mails so you can see why I stopped that process because I thought it was a waste of my time.

MR. SCHROEDER:  No.  No.  I can tell you that -- I can tell you exactly what these are.  Trust me.

MR. JONES:  Maybe I can find it.

THE COURT:  We've got to get back to this.  Is your proposal that we not --

MR. SCHROEDER:  Wait until the morning.

THE COURT:  It's not admitted at this time, either, so we'll deal with that tomorrow and go on to something else.

MR. VITT:  Right.  Right.  I've got plenty.

MR. SCHROEDER:  I assumed as much.  Thank you.

(End of bench conference.)

Q   (By Mr. Vitt) I'm going to return -- I shouldn't say "return."  I'll ask you questions about the letter at a later point.

A   Okay.

Porter - Direct by Mr. Vitt

Q    But I do want to focus on Dr. Hsu's practice after the date of that letter, which is, what, June 3, 2016?

A    Correct.

Q    Did Dr. Hsu continue the scope of the practice that he had had before June 3, 2016?

A    Yes.

Q    And did complaints continue?

A    Yes.

Q    Did the residents complain about Dr. Hsu's action in the OR?

A    Frequently.

Q    Did that concern you?

A    Absolutely.  We have a responsibility for safe patient care, and we have a responsibility to our trainees to not put them in that position.

Q    Did you talk to Leslie DeMars?

A    Multiple times.

Q    And describe what the substance was of the conversations that you had with Leslie DeMars about Albert Hsu.

A    I told her it gave me no joy to have these conversations with her; that this person had gone through many years of training and wasn't able, in my view, to function at the level of an attending, and that our responsibility, to our core, we take an oath

Porter - Direct by Mr. Vitt

for the care and protection of patients; that we should talk to Albert about what brings him satisfaction in work.

He's a smart person. He has an MIT degree, and I had been told by his mentor in residency that he had a real knack for research, and that I had suggested to Leslie that helping him in a compassionate way with kindness transition into a position where he could use his strengths and his skills would be the appropriate thing to do, and so we had many conversations around perhaps being in a primary research position, perhaps looking for a job in industry, in biotech, to help, you know, develop new medications, something to help him transition. And I also talked to her about it was unfair to patients and unfair to the residents to allow him to continue in clinical practice.

Q   Did she do anything to investigate the claims that you made?

A   Initially, she looked into many of the concerns, and I asked her to follow up directly with the individuals who had come to me with concerns so that she could do her own checking and background.

Q   Did you find out whether or not she had done that?

A   Initially, she said that she was, and when I asked her, she said she was in process, but I never had a

definitive plan from her.

Q    Well, did she do anything to reflect that she had investigated in the slightest?

A    Not really.

MR. SCHROEDER:  Objection, Your Honor.

THE COURT:  Yes...

MR. SCHROEDER:  Leading.  He can certainly ask what she told her, Dr. Porter, or what she observed her do, but just a blatant statement that, well, did she do that, and I think there's a lack of foundation as well.

THE COURT:  All right.  Sustained.

Q    (By Mr. Vitt) I want to turn now to the issue of what the steps are when either a couple or a woman comes in and is interested potentially in proceeding with IVF, okay?

A    Or infertility care?

Q    Yes, or infertility care.

So assuming that a person actually gets to the point of proceeding with IVF, how many visits are usually included in this process of actually getting to the point of doing the IVF?

A    In a new individual --

Q    New individual.

A    -- or a couple comes in, there's an initial consult

Porter - Direct by Mr. Vitt

with a provider, and that could be our nurse practitioner or one of the physicians, and then we describe the recommended testing.

Q  I'm going to interrupt you.  So let's start with the number.  One, two, or three?

A  There's one consultation, there's a second follow-up.

Q  Right.

A  And then they decide what treatment they want.

Q  Okay.  So it's -- in this process, we can reasonably expect that there will be three visits, assuming that they don't stop after the first one, right?

A  Correct.

Q  Okay.  So let's talk the first visit is they come in.  Let's assume it's a couple.  What do you do?

A  We review their histories.  We had a several-page questionnaire that patients would fill out before they came in, so we would review that.  We would review their medical history, both medical and surgical.  We would also review their family histories for genetics to see if there was anything that we wanted to test for, and there were recommendations for offering genetic screening.  We'd also recommend a consult with their insurance to know what their coverage was before they proceed, and then we would review lifestyle modifications that might affect fertility, and we would

talk to them about blood testing, semen analysis, and an assessment of the shape of the uterus and whether the fallopian tubes were open or not.

Q   Okay.  So you've got the first visit, and some people decide it's not for me for whatever reason, right, they can't afford it or not interested, or they just don't go down it, right?

A   Correct.

Q   Okay.  What percentage, approximately, of the patients who come in decide it's not for me, I don't want to do it?

A   About 10 percent.  10 to 15 percents would say that it's too much, or we're going to continue to try on our own, or it's too expensive.

Q   Okay.  So let's go to Step No. 2, right?  They decide, you know, they're not going to go away, they actually decide they might come back.  What's the second option that you cover?

A   So when we get the testing back, we'll have an idea if they're dropping an egg, or ovulating, every month. We'll have an idea about the shape of the uterus or whether the tubes are open or not, and the semen parameters, because some male parameters, there's just a mild motility issue, a mild count issue, and they may respond to just washed intrauterine insemination.

Porter - Direct by Mr. Vitt

And then there is a group of individuals who will come in who will require IVF for fertility preservation, and so we were doing, oftentimes, same-day or next-day consults from the Norris Cotton Cancer Center for people with cancer who wanted to freeze eggs or sperm or embryos, but there's some individuals who have blocked tubes or bad endometriosis, who or are older or have a genetics issue and are going to go straight to IVF.

Q   Okay.  So you have this second group of individuals who come in and some of them go with IUI, right?

A   Mm-hm, intrauterine insemination, IUI.

Q   Okay.  So what's the approximate percentage of the people who show up who fall into this second category?

A   About 50 to 60 percentile in our population because some were just single women who wanted access to the donor sperm program, so there wasn't any barriers.  So we wouldn't necessarily -- we would tailor the evaluation just for what was necessary for them.  And then some were just not ovulating, so they might need a little oral tablet a few days a month to help them ovulate.  So it was a fair number of individuals who would be in that middle category.

Q   I got it.

And then you've got the third category of people

who are actually going to go with the IVF approach, right?

A    Correct.

Q    Okay.  So what's the percentage, and I realize these numbers are not exact, but the rough percentage of the people who fall within the final category, third category?

A    It's 10 to 20 percentile.

Q    Okay.  So let's assume that they're attempting or intend to proceed with IVF.  Is part of the process of proceeding with IVF going through something called a mock transfer?

A    Yes.  So there's a -- it's called mock, or trial, embryo transfer, yes.

Q    All right.  And in brief terms, what's included in a mock transfer?

A    It's an ultrasound-guided procedure where we take an empty embryo catheter and pass it through the cervix to make sure there's no barriers in the cervix and to get measurements of the uterus so that when we actually have an embryo loaded, we're efficient.

Q    Okay.  And is there a charge to the patient for this mock transfer?

A    Yes.  There's a charge both from the imaging side.

Q    Right.

Porter - Direct by Mr. Vitt

A    And then there's a professional side for the physician.

Q    All right.  And round numbers, what's the charge, about?

A    If you take the whole thing to count it's about $1,200.

Q    Okay.  So to do one of these mock transfers it's about $1,200, right?

A    Mm-hm.

Q    Okay.  And the people who need it, who might actually get some use from it, are people who are going to proceed with IVF, right?

A    Correct.

Q    And that's about 10 to 20 percent, correct?

A    Correct.

Q    Okay.  Now, when you are out on disability, was there a change in the point in the process where the mock transfer was performed?

A    Yes.  Dr. Hsu and Dr. Seifer had changed the infertility evaluation so that all patients coming in for their ultrasound tubal study were getting mock transfers.

Q    All right.  And while we're talking about the cost of these various procedures and processes, when you were at Dartmouth-Hitchcock, round numbers, what's the rough amount for the cost of proceeding with IVF?

A    It was between 12 -- well, 10 to $15,000 an attempt.

Porter - Direct by Mr. Vitt

Q    Okay.  And what percentage of the persons going through the process were paying out of pocket?

A    About 50 to 60 percentile.

Q    So as I listened to your testimony.  The 10 to 15 percent who decide they don't want to go forward and the 50 to 60 percent who go with IUI, do they get any benefit whatsoever proceeding with a mock transfer?

MR. SCHROEDER:  Objection, Your Honor.  I've allowed a lot of leading questions, but now we're getting way beyond the typical leading question, and it's -- it really looks like cross-examination examination, if you will.

THE COURT:  Yeah.  This is direct examination, Mr. Vitt, open-ended questions.

MR. VITT:  All right.

Q    (By Mr. Vitt) Did you object to the process that Dr. Seifer -- Dr. Seifer and Hsu installed, or put in place, to do the mock transfer at the start instead of in the third stage when you used to do it?

A    Yes, absolutely objected.

Q    And why did you object?

A    The predominant reason is that most of our patients were paying out of pocket.  And what that means is they're exhausting their savings to have a baby.  They are borrowing from their family to have a baby.

Porter - Direct by Mr. Vitt

They're second mortgaging their house to have a baby. And so we had to be mindful that we wanted to give them the best chance for pregnancy and to conserve all of their resources, whether it be emotional or financial. And when you do unnecessary and frequent testing, you risk exhausting their financial resource well before they ever get to treatment or limiting their treatments.

Q   Let me ask you:  What was the experience of the patients while you were there, assuming that it's done competently, what's the average number of attempts that have to be made before a patient gets pregnant?

A   With IVF or other --

Q   With IVF, I'm sorry.

A   Yeah.  So it's between two to three attempts, on average, usually three, and then I'm going to qualify that to say there's fresh where we stimulate eggs and inseminate them to make embryos, and then some couples get frozen embryos from that cycle, and they can come back if they're not pregnant or for a future pregnancy with those frozen embryos, and that was about $3,500. So we wanted to make certain we were optimizing their IVF and giving them the best shot.

Q   To whom did you object that wasn't proper, in your view, to be billing for mock transfer for each time

they come in?

A   I spoke directly with Dr. Hsu and Dr. Seifer.  I spoke with Leslie DeMars.  I spoke with -- and sent e-mails.  I spoke with Heather Gunnell, and I also brought it up at the Value Institute, when we were looking at processes, to say this is not right.

Q   How many times did you bring it up with Dr. Seifer and Hsu?

A   Multiple.

Q   What was their response?

A   "Well, the patients might need this, so we're going to do it."

Q   Did that make any sense to you?

A   No.

Q   Did they tell you what they meant by it?

A   No.

Q   When you raised the issue with Leslie DeMars, what did she do?

A   She said she would talk with them about it.

Q   Did the practice continue?

A   Yes.

Q   All right.  Did you talk to her more than once about it?

A   Absolutely.

Q   Did you have a view about the propriety or the

Porter - Direct by Mr. Vitt

appropriateness of billing this way for people who were coming in to try and get pregnant?

A   It was absolutely not right.

MR. VITT:  Your Honor, can we have an afternoon break?

THE COURT:  The plan was to go all the way through to the end of day.

MR. VITT:  All right.  We're going to go to 4:30?  That's fine.

THE COURT:  To 4:30.

MR. VITT:  All right.

Q   (By Mr. Vitt) One other point I meant to raise before: What's ASRM?

A   The American Society for Reproductive Medicine.  It's a national governing body that oversees reproductive medicine and infertility recommended practice.

Q   Did they have a recommended process as to when to do the mock transfer?

A   They had a recommended process for the appropriate evaluation of a new couple, and they have suggestions for the appropriate evaluation pre-IVF.

Q   I want to turn now to another issue that concerns Dr. Seifer and Dr. Hsu and that is the performing of procedures and the issue of patient consent.

A   Yes.

Q    When a patient comes in to see you, is the issue of
patient consent something that you address?

A    If they're electing a procedure, yes, absolutely.

Q    And tell me the process that you've followed in both
advising the patient and obtaining their consent.

A    When we're preparing to do a procedure, whether it's a
minor outpatient procedure or a more extensive
inpatient procedure, typically, I will discuss with the
patient their evaluation thus far and what the options
will be for them in terms of observation, medical
treatment options, and surgical options, so they have
an understanding of what -- more common options and
what the guidelines say around recommendations.

And then if they choose to proceed, then we talk
about the options and the types of procedures we might
do, and then -- I oftentimes we have screens in
clinic -- I'll bring up a picture to show them what the
possible options are for treatment and then walk
through that procedure in terms of how we would expect
to do it, what the more common complications might be,
what a standard recovery might look like for them, and
then I ask some questions to make certain that they're
comfortable with the information and they've processed
it all so that they understand, and then allow them to
ask questions.

Porter - Direct by Mr. Vitt

Q    Do you discuss with them whether the procedure might be painful or uncomfortable?

A    Absolutely.

Q    Is the issue of patient consent fundamental to the practice of medicine?

A    It's foundational to what we do.  Patients have a right to decide for their own body what decisions they'll make.  It's called body autonomy.

Q    Is the consent reflected in anything that the patient signs?

A    Yes.  We have a patient sign either a written document, or we have electronic documents.

Q    You've ordered a lot of ultrasounds over the years, haven't you?

A    Absolutely.

Q    And you're familiar with the staff at Dartmouth-Hitchcock who perform the ultrasounds?

A    Yes.

Q    Were they competent?

A    Extremely competent.

Q    Experienced?

A    Very experienced.

Q    Do you have confidence in their abilities?

A    Absolutely.

Q    And you see them handle ultrasounds, have you not?

Porter - Direct by Mr. Vitt

A    Yes, for many years.  I was there 21 years.

Q    When the patient arrives to have an ultrasound, what's the process?  What happens?

A    They check in.  The sonographer -- and there's often, not always, but oftentimes there's an assistant that helps them clean the rooms and room the patient.  They will double-check the procedure to be performed, and then the patient is brought in to the room, and there's a description of what they need to do, whether it's get undressed or whatnot, and then the sonographer will perform the ordered ultrasound.

Q    Were you in the ultrasound read room right after Albert Hsu had performed a procedure?

A    Yes, came in to cover clinic that afternoon in the ultrasound suite.

Q    When you arrived in the ultrasound suite, who was there?

A    Jenice Gonyea, who is a very experienced ultrasound technician, and Jenny Carpenter had been there earlier in the morning.  I'm not sure if she was still there.

Q    Have you worked with Jenice Gonyea for a while?

A    Many years.

Q    All right.  Can you describe what you observed when you arrived?

A    When I arrived to the ultrasound clinic Jenice who is

Porter - Direct by Mr. Vitt

normally very composed, very professional, was jittery. Her voice was high-pitched. She was markedly distressed when I walked in.

Q   Did you ask her why?

A   Yes.

Q   What did she tell you?

MR. SCHROEDER:  Objection, Your Honor, hearsay.

MR. VITT:  I think what's critical here is Dr. Porter's state of mind because she's going to be making complaints.

THE COURT:  We should have a discussion about this outside the presence of the jury, if it's going to be an extended conversation, so I'll ask you to approach.

MR. VITT:  Okay.

(Bench conference.)

MR. SCHROEDER:  I think Jenice Gonyea, there's one thing, that if something is said by Dr. DeMars or Dr. Seifer that's one thing, but for some ultrasound tech who I don't even know what level she is, but they've listed her as a witness, she can certainly testify to her own personal knowledge as to what she said, but we're getting far afield here.

THE COURT:  It sounds like the objection is

it's not a valid statement of the party opponent because this ultrasound technician probably is not properly considered an agent of Dartmouth-Hitchcock to make this statement.

MR. SCHROEDER:  You said that much more succinctly under Second Circuit precedent.  Thank you.  I understand the rules.

THE COURT:  This person is an ultrasound tech?

MR. VITT:  Right.  She is the person, she had like 15 years experience, and she obviously observed what had happened, and she will show up and provide a description.  But Dr. Porter took the information that she provided and then contacted a very senior official saying this is totally unacceptable.  They performed a procedure deliberately after having been told that the patient hadn't consented to it; they went forward anyway.

MR. SCHROEDER:  Ms. Gonyea can certainly testify to that, but Dr. Porter has no knowledge of that then.

MR. VITT:  Look, I can ask, I think, what she did.  I mean, that is, Look, the fact that she went and complained.  I mean, we're saying, look, she went and told people that what is going on here is simply not

acceptable; you have to take some actions.  And part of the whistleblower, you know, it's been reflected widely that people -- that doctors performed procedures without obtaining patient consent, and is certainly one of the basis for the whistleblower claim.

THE COURT:  I understand your relevance argument, but I think the objection being raised is whether this witness should be able to testify to the statements that the tech made.  That's the narrow objection that I understand it.

MR. SCHROEDER:  It is a narrow objection, and I only made it after they were dancing close to the line, and then it was what --

MR. COFFIN:  She can say what she did.

THE COURT:  I'm wondering if you can ask the witness, as a result of that conversation, without eliciting the statement, what action did she take after that and doesn't elicit the statement.

MR. COFFIN:  But I would suggest that isn't it, right, Judge; that the statement, asking the witness can't then say, Well, I went to these people and told them that this person said X because that's reporting the hearsay statement.  She can say she reported the hearsay statement, and you can call that witness.

Porter - Direct by Mr. Vitt

MR. JONES:  Can I be heard?  It's not my witness.

THE COURT:  No.  No.  Everyone is jumping in.

MR. JONES:  I submit, at this stage, we're not offering it for the truth of the matter.  When the witness comes in with the first-hand knowledge, she will, at that point, be offering it for the truth of the matter asserted.  At this point, we are offering it to prove facts that then explain Dr. Porter's next step of reporting.  So we don't have to get into the details of it, but I do think to Mr. Vitt's point, when we explained what she reported, I think the content of the report does go to the whistleblower claim, and we are going to have the witness show up and cure any remaining reliability issue that, at that point, we'll be offering it for the truth of the matter asserted.  But, at this point, it's more of a verbal act.

MR. SCHROEDER:  Okay.  Maybe that witness shows up, and maybe they don't, but that's a bridge that we haven't gone over yet.  So it's still hearsay right now by a non-agent, and so I'm saying asking her "what did she say" is an inappropriate question.

THE COURT:  Okay.  I think you can get there by not asking her for that particular statement to be made.  I understand Mr. Jones' argument about it not

Porter - Direct by Mr. Vitt

being offered for the truth, but it is true that the witness speaking to this statement has not testified. I assume the person will.  Let's hold off for that person to come in and testify to that statement, but the statement shouldn't be elicited through Dr. Porter at this time.

Before you all scatter.  So you had asked for a break.  I don't know -- is everyone okay going through to 4:30?

MR. SCHROEDER:  Yeah.

THE COURT:  I just want to make sure the jury is --

MR. SCHROEDER:  I could tell that they were tired towards the end of my opening.  Maybe that's on me.  I know we're getting to the late hour, or the witching hour, so to speak.

THE COURT:  So they have to power through for another 50 minutes.

MR. VITT:  15 or --

THE COURT:  50, five-zero.  So I wonder if we should take a short restroom break.

MR. VITT:  That's what --

THE COURT:  That's what you were thinking about too.

MR. VITT:  I was thinking about it, but I'm

Porter - Direct by Mr. Vitt

fine.

(End of bench conference.)

THE COURT:  So earlier, members of the jury, you may have heard me say plans to power through to 4:30, and I thought maybe I saw some looks on your faces.  So I'm going to give you all a very brief five-minute break, if you wanted to stretch your legs, use the restroom.  We'll come back very quickly.  We just have about 45 minutes left of your trial day.  So, thank you.

(Jury exits.)

(Recess taken.)

(Jury present.)

Q   (By Mr. Vitt) I am not asking you now to tell me what Jenice Gonyea said.  She will appear as a witness in the next day or two, and she will describe the substance of the conversation.  But after you left the ultrasound room, did you take any steps to report anything to anybody in administration?

A   I immediately went to Heather Gunnell and explained the situation, and Heather is a non-medical person, so I spent some time going through with her what was reported to me and that, in my view, it was an absolute violation of our responsibility as healthcare providers.

Porter - Direct by Mr. Vitt

I also spoke with Leslie DeMars a little bit later in the day. I also spoke with Jenice, and I suggested that she go directly to her immediate supervisor who was Dennis Seguin who oversaw all the ultrasound technicians and report her observations and concern. And then I suggested that this was a severe enough fundamental violation of patient rights that they should go to the head of ultrasound and the head of radiology.

My conversation with Leslie DeMars was that it should be reported to risk management as well because I felt that it was severe enough they should know and that the provider who was involved, there should be an investigation, there should be education, and that the patient should be contacted, the situation explained, and an apology extended and have their questions answered.

Q   So when you used the term "provider," in this context it means doctor, right?

A   Yes.

Q   I'll move to a new topic. I'm going to show you what's been marked as Plaintiff's Exhibit 9.

MR. VITT: I'm not going to be introducing it. I just want to show it to the witness.

MR. SCHROEDER: Judge, I apologize --

Porter - Direct by Mr. Vitt

MR. VITT:  I'm sorry, pardon?

MR. SCHROEDER:  Objection.  But I would like to be heard on it.

THE COURT:  Okay.

(Bench conference.)

MR. SCHROEDER:  It's hearsay, and also she's not a party to that text message, so it's rank hearsay.  It's between Leslie DeMars and Richard Reindollar.  Now, can he ask Leslie DeMars about that text message?  Of course he can, but not Dr. Porter.

THE COURT:  You've marked this for identification; you're showing it to the witness but --

MR. VITT:  I'm not.  What I could do is basically say, Look...

THE COURT:  Can I see this a second?

MR. VITT:  Yes.  By July 2016, which is a relatively short period of time after David Seifer showed up, Leslie DeMars basically says he's not clinically competent, and I've been receiving reports of bloody aspirates; that basically this person is a problem.

That conclusion is not a conclusion that she told Dr. Porter or anyone else in the department about, basically because of the circumstances under which David Seifer was hired which we're going to get to.

Porter - Direct by Mr. Vitt

She was conflicted because if she said anything, she risked losing her job as the chair of the OB-GYN department.

So what I want to talk to Dr. Porter about is, okay, let's look at this point:  What was Leslie DeMars telling you about your views of David Seifer's confidence, and what was she telling you about the reports that she was receiving?

THE COURT:  Okay.  But this isn't between Leslie DeMars and Dr. Porter.  So you can ask her about what Dr. DeMars may have said to her, but I don't see how you can get into this document with Dr. Porter on direct.

MR. VITT:  Well, I don't want to introduce it, but I think I'm entitled to go to some degree of saying, look, what was Leslie DeMars telling you two months after this person's hired, and in her view he was clinically incompetent?  Were you getting that from her?

THE COURT:  Okay.  I don't want to belabor this, but if this were to be allowed to use with this witness, what exactly are you trying to do with this witness?  Are you going to make reference to it or ask her to read it?

MR. VITT:  Well, I would ask her to read it.

THE COURT:  That can't happen.

MR. VITT:  All right.

THE COURT:  I think you have to -- you're free to ask her questions, obviously, about Dr. DeMars. That's totally fair game.  I don't see this being used in the capacity that you're suggesting it.  It's not admitted in evidence.

MR. VITT:  I wasn't -- I understand that Leslie DeMars will be here, and it's her text and presumably she'll admit that she wrote it, and I'll be asking her, you know, what's the basis of your conclusion he wasn't clinically competent?  But I think I -- without getting into using the exact language, I can say, you know, you and Leslie DeMars talked about clinical competence and, you know, David Seifer, he had been there two months, what was she telling you?

THE COURT:  Why don't you just ask that question?

MR. VITT:  I can do that.

THE COURT:  Okay.  All right.

MR. SCHROEDER:  That's not going to go in front of Dr. Porter?

THE COURT:  No.  No.  You should withdraw this exhibit.

MR. VITT:  All right.

Porter - Direct by Mr. Vitt

MR. SCHROEDER:  Thank you.

(End of bench conference.)

Q   (By Mr. Vitt) After David Seifer was hired as the division director, did you and Leslie DeMars talk periodically about his suitability for the job, his competence, how he was measuring up?

A   Yes.  Before he started with us.  It was completely coincidental, Leslie and I were at the boards together again, a different year.  And at the boards there was a lunch break, and the examiners all are at tables of 10 or 12 people, and I was sitting next to a group of REIs and a physician who had been a medical student here at UVM who was now in Portland, Oregon, and I was just chatting with them about who was joining us, and the physician who was from Portland perked up, and said we need to have a conversation --

MR. SCHROEDER:  Objection.

THE COURT:  Sustained.

Q   (By Mr. Vitt) Let me interrupt.  I'm not sure we want to get to that right now.

A   Okay.

Q   So I understand that you had a conversation with somebody at the board meeting?

A   Yeah.

Q   What I want to focus on now is after he was hired, he's

Porter - Direct by Mr. Vitt

in the job, he's acting as division director --

A    Yeah.

Q    -- did you and Leslie DeMars periodically talk about: Is this person capable of doing the job as the division director?

A    Absolutely.

Q    All right.  And what did you say to Dr. DeMars about your view of his competence?

A    I was really worried that he was not competent; that he was incompetent.

Q    All right.

A    And that he appeared disoriented at times.

Q    And did you cover or discuss what the lab was reporting about the quality of the retrievals that he was -- or the aspirates that came back in the egg counts?

A    There was multiple reports from several of the embryology staff, including Dr. Esfandiari, directly to me, and I was IVF medical director at the time so he would come to me with problems as would the embryologists, and they reported two things:  One, the egg count, we can usually predict to plus or minus a few what the number of eggs we expect, based on testing beforehand, ultrasound, blood work.  The egg counts were repetitively low, and that's important because it significantly decreases someone's chance for pregnancy

if we're not getting all the eggs that we can get.  And they were complaining about how bloody the fluid was in the traps with clots.  And why that's important to them is if the egg is stuck in a big clot, they risk damaging it as they're trying to isolate the eggs out of the follicular aspirates.  And occasionally there will be bloody traps, but it should not be at all a regular finding.  Normally, a trap -- which is a plastic tube that we collect the aspirates in -- is the color of champagne, and they were markedly concerned about the number and the appearance and the difficult work they were having trying to isolate the eggs.

Q   What does the presence of blood tell you about the likelihood that you're going to have a successful transplant or planting of the embryo?

A   Well, in a trap, it significantly decreases the number of embryos that we'll get, and that significantly decreases the chance for pregnancy.

Q   And is the presence of blood, in particular, harmful for the chances of successful --

A   Well, within the trap itself, yes, it increases a likelihood the eggs will not be dissected out properly and they will be injured in that process in the lab.  And there is also a different type of blood in the coldus (phonetic) that can be a real problem.

Porter - Direct by Mr. Vitt

Q    Did you discuss with Dr. DeMars whether it was ethical for the division to be offering IVF services if David Seifer was doing retrieval?

A    Yeah.  I told her that he needed to be pulled and pulled quickly.

Q    When you say "pulled," what do you mean?

A    That he needed to have his credentials pulled for doing IVF.  She had asked me to go in and observe his procedures.  And it was, you know, fine because there was this possibility that maybe he wasn't as familiar with the technique, so we demonstrate the technique.

And I went in to watch him for three procedures on the same day, and the first one, it was very clear he didn't know how to use our particular equipment, so I sat down and demonstrated.  It was very odd because we had not used -- in an IVF needle, it can have one opening all the way down called a single lumen or two. We had not regularly used a double lumen needle in more than ten years.  And a single lumen needle is standard IVF practice right now with very rare use of a double lumen.

And he appeared to really be struggling with reading the ultrasound images, which should, again, be extremely standard practice.  And then I demonstrated in the second one, and then I did half of the third

Porter - Direct by Mr. Vitt

one, and had him do the other half to go through the procedure for the third one.

Q  Was Leslie DeMars receptive to your idea of restricting or limiting his ability to perform these?

A  No.

Q  Did you ask her why?

A  Yes.

Q  What did she say?

A  She said, "You have a different skill set, and your bar is too high."

Q  Okay.  Since I've mentioned Leslie DeMars, let me spend a few minutes talking about your history of dealings with her professionally and outside the hospital.

A  Mm-hm.

Q  When did you meet her?

A  She started around the same time in 1996 at Dartmouth.

Q  And by 2017, you had almost 20 years of working with her?

A  Yes.

Q  How would you describe your working relationship?

A  We largely didn't see much of each other unless we were at a faculty meeting or scrubbed on an occasional case together, but it was collegial.  It was a collegial working relationship with respect for each other's skill.

Porter - Direct by Mr. Vitt

Q    When you say you scrubbed together...?

A    Oh, we did OR cases together, occasionally, yeah.

Q    Okay.  And those would be cases where the patient had some cancer?

A    Cancer or a really complicated benign surgery where I thought the risk of injury to other structures was quite high.  And that's not uncommon for us to call in a gynecologic oncologist if, for example, the tube that comes from the kidney under the uterus is really stuck, we will call them in so we don't injure it.  It's planned.  We know in advance we need them.

Q    Okay.  Did your work overlap with her in the division over the years?

A    Yes.

Q    Okay.  As the chair of the OB-GYN department, what did you understand were her main duties?

A    She was responsible for all of the faculty, overseeing the educational mission, and overseeing the finance and budgets of the department.

Q    Okay.

A    And representing the department in the greater organization.

Q    Do you know of a situation where Dr. DeMars implemented performance improvement plans for surgeons where you were involved?

Porter - Direct by Mr. Vitt

A    Yes.

Q    Can you describe that, please?

A    Yes.  So Leslie was also head of GYN oncology, and she had a junior female partner who, over the course of many years, had really struggled in being able to maintaining, retaining operating room nurses, meaning, she was so verbally abusive to them, that they could not get faculty -- I mean, I'm sorry, they could not get scrub techs and OR nurses to go into her room.  And it became a patient safety issue because there would be a big cancer case scheduled, and the nurses would come in to see their assignments and refuse to go in with her.

Q    And did you have some role in trying to work with this surgeon?

A    Yes.  Leslie DeMars felt that she had failed in her efforts and that she had involved Human Resources to provide appropriate counseling for this individual, and so she asked me to sit as -- I was -- at Dartmouth I was vice chair for perioperative services.  I, for more than 20 years, sat on the OR, operating room, committee, and in that role, she asked me to sit with this provider and do some counseling to try and provide some active feedback and to look over the next several months at her performance in the OR, the ability to

Porter - Direct by Mr. Vitt

support and retain staff.

Q   So did you meet the four times?

A   We met four times for about an hour and a half with a representative from Human Resources to -- three of us, in this physician's office to provide feedback and counseling.

Q   Did it work out?

A   Initially, she would get better, and then she would repetitively have problems.  And, ultimately, it did not work out for this physician over the course of the next several years.  She was terminated.

Q   So I want to turn to your understanding of Leslie DeMars' responsibilities as the chair of OB-GYN.  Who do you believe had the responsibility to investigate the multiple reports of the incompetence of Dr. Hsu and Dr. Seifer?

A   Leslie DeMars.

Q   If it was reported that they were not following the ASRM guidelines, whose obligation would it be to make sure that they changed their progress?

A   Leslie DeMars.

            MR. SCHROEDER:  Objection, Your Honor.  Assumes facts not in evidence, lack of foundation, and leading.

            THE COURT:  I'll allow it.

Porter - Direct by Mr. Vitt

Q    (By Mr. Vitt) There have been discussions about --

THE COURT:  Mr. Vitt, was the question answered?

THE WITNESS:  Leslie DeMars is responsible.

Q    (By Mr. Vitt) Thank you, Doctor.

Whose obligation was it to prevent patient harm that was caused by the failures of these doctors?

A    Leslie DeMars.

Q    How often would you say you went to Dr. DeMars with complaints about Dr. Seifer and Dr. Hsu?

A    Weekly.

Q    She get tired of seeing you?

A    Yes.

Q    Did she tell you that?

A    Yes.

Q    You keep going back?

A    Yes.

Q    Why?

A    To our core, we are to protect and care for patients.

Q    At some point did she tell you that she had spoken to folks in management, and that Dr. Seifer was going to leave or go?

A    Yes.

MR. SCHROEDER:  Objection, Your Honor.

THE WITNESS:  She told me that she had

spoken --

MR. SCHROEDER:  Objection, Your Honor.

MR. VITT:  Hold on.

THE COURT:  Hold on.  Overruled.  Go ahead.

Q   (By Mr. Vitt) All right.  Go ahead.

A   Yes.  It was really concerning to me that she did not seem to be taking the appropriate steps to provide a safe environment for patients or for our learners, and at one point, we had an argument.  I set up a meeting, and I met with her in her office, and I told her, This is not right.  We had an obligation.  We need to protect our patients.  We need to protect our learners. There's a way to compassionately counsel people and get them into the right position and fix --

Q   When was this conversation?

A   Around February before the -- before the program closed, that year, so February 2017.  And that's when she started saying to me, "I've had a conversation with Maria Padin.  I've spoken with Ed Merrens.  Dave is going to go."  And I -- and I said to her, "Good."  And I said, "About Albert?"  And she would say to me, "Keep your head down; stay out of it.  You need to work on getting well and do your job."

Q   How often did this topic of you need to do -- you need to work on getting well, how often did that come up?

Porter - Direct by Mr. Vitt

A     Every time I met with her.

Q     And do you have -- what did you understand that to mean?

A     I thought it was a two-pointed message, which was, You've reported it to the appropriate person; this is not your concern now.  But also, You've been sick, you've been out on disability, and you need to focus on getting well.

Q     Did you tell her that you were doing fine, you were recovering, and you're perfectly capable of doing, you know, complicated surgeries?

A     What I told her at that time was that while I was about 90 percent healed from my initial surgery, I was going back to the Mayo Clinic periodically for blood patches.  I would be gone for a few days and come back to work part-time.  She knew that this was 100 percent curable.  And, at that point, she was expressing a desire for me to -- to get well.

Q     All right.  To the 100 percent curable, was that information you got from the folks at the Mayo?

A     Yes.

Q     And you passed that along to Dr. DeMars?

A     Absolutely and Dr. Tepper, my new neurologist at Dartmouth, said to me, "This is 100 percent curable."

Q     So you got that advice from two sources --

Porter - Direct by Mr. Vitt

A   Yes.

Q   -- first at Dartmouth-Hitchcock and the folks at the Mayo Clinic, right?

A   Yeah.  At all levels at Mayo Clinic, I had four different providers at the Mayo Clinic.

Q   Okay.  And at some point you had to go back for what I call a touch-up surgery?

A   Right.  After the third blood patch, I still had about 10 percent of my symptoms, and they said this is 100 percent curable.  And, at that point, they said, you know, it's probably time for you to go back for a second surgery; it's not uncommon.  You know, sometimes people need two or three surgeries.  Not a surgery I wanted to do again, which is why I was patient with the blood patches.

    You know, I think people might know Steven Kerr, who is a professional basketball coach, had three surgeries to repair his leak.  100 percent.  He coached the Olympic team.

Q   So when you were out at the Mayo Clinic the last time, do you recall -- I think it was the last time, do you recall being on the table and thinking, I'm not going to let this have an affect on my career?

A   Yeah.

Q   Tell me about that.

Porter - Direct by Mr. Vitt

A    I had been sick for a really long time.  I was trying really hard to come back, and I was sitting there for my third blood patch toward the end of the day, and you're in a little holding room, in one of those awful hospital Johnnies.  My whole arm was painted up with Betadine, and I had two big IVs in, and I had always wanted my career.  I highly value my career.  It brought me great joy.  And I knew the possibilities were to stay out on long-term disability or to get well, and I, for all kinds of reasons, made the choice.  I said, I do not want this illness to keep me from doing the job that I love, and off I went for my third blood patch.

Q    Okay.

        MR. VITT:  I've got a new section.  Do you want me to move on, or do you want to break?

        THE COURT:  How much time do you think you have with that new section?

        MR. VITT:  It's going to take a little while.  I mean...

        THE COURT:  Okay.  More than 12 minutes?

        MR. VITT:  Probably.

        THE COURT:  All right.  Okay.  Then we'll break here for today, about 4:20.  So I'll just, again, remind the jury:  Please don't talk to anyone about the

Porter - Direct by Mr. Vitt

case or read anything about the case.  Please make every effort tomorrow to be back here so that we can get going at 9:00 a.m., and I'll excuse you for the evening.  Have a good evening.

(Jury exits.)

THE COURT:  Dr. Porter, you may step down.

THE WITNESS:  Thank you.

THE COURT:  Okay.  So in terms of witnesses for tomorrow, Mr. Vitt, obviously, Dr. Porter is not complete.  That will be the remainder of the direct and cross-examination.  Any other witnesses?  I'm sure there are.  Who are your other witnesses tomorrow?

MR. VITT:  Robert Bancroft will be on tomorrow.

THE COURT:  Okay.

MR. JONES:  For the remaining -- if there's time after Dr. Bancroft tomorrow, for that and for Thursday, I think we need to have a conversation with Don and his team about the potential availability of some Dartmouth witnesses.

THE COURT:  Okay.  So tomorrow, then, is Dr. Porter and Dr. Bancroft, those are the only anticipated witnesses?

MR. JONES:  The only anticipated known witnesses, subject to a conversation.

Porter - Direct by Mr. Vitt

THE COURT:  So there might be more witnesses tomorrow?

MR. JONES:  Potentially.  But I don't know how -- as you pointed out, we need to finish the direct, cross, redirect, and then Dr. Bancroft will take a couple of hours, certainly.

THE COURT:  Okay.  Just make sure that people are lined up.  Okay?  I don't want to end two hours early tomorrow.

MR. JONES:  No.  Understood.  We'll have a conversation with them.

MR. SCHROEDER:  Just on that point, Your Honor, and I'm reading the tea leaves here as to -- they had a list of 25 witnesses, and they're calling Leslie DeMars on Monday and Ed Merrens and Joanne Conroy on Tuesday and Maria Padin on Friday.  I don't know if they're thinking that they're going to be calling other witnesses on their list or that they're resting their case.  I'm not sure how to interpret that, because if he's asking about my witnesses, DH witnesses, they have trial subpoenas for certain people.  They will comply with them.  We've worked out that schedule.  That schedule is Friday, not Thursday, and so I'm just --

MR. VITT:  We're definitely calling other

Porter - Direct by Mr. Vitt

witnesses.

THE COURT: Okay.

MR. VITT: We have some witnesses who we need to move some things around, but we're definitely calling other witnesses.

THE COURT: Tomorrow and Thursday, before the ones anticipated for Friday? Okay.

MR. SCHROEDER: I want to be clear that if they're calling off these other witness who are coming in from other places and obviously they want Dr. DeMars, Merrens, and Conroy next week, that we're not going to start our case in chief, at the earliest, Wednesday morning.

MR. VITT: I don't think that's what we're saying. I think we can -- we don't need to involve the judge.

MR. SCHROEDER: No. This is why I want the judge involved because you don't communicate with me and then it goes to the judge, and then we have to have a discussion after the fact. So either you have witnesses for Thursday, and if you do, that's great; I just want to know who they are so we can prepare for it, but they're not my witnesses. They're not my witnesses. So that's my only point.

THE COURT: Mr. Jones? Mr. Vitt?

MR. JONES:  I think having a conversation with Don and his team would be helpful.  I thought during a break we had discussed that we would have that conversation.  I think that will help resolve some of these issues.

THE COURT:  Okay.  Well, you know, I'm going to be very mindful that this is an issue I have already kind of expressed this to you, you know, having an orderly, kind of, efficient presentation of witnesses. We've had a fair number of bench conferences and everything, which is fine, it happens in cases, but I am very mindful of making sure that there's enough time for everyone to put -- for the plaintiffs to put in their case, and for the defendants to have an opportunity to present their case.  We're allotted for three weeks, so this really needs to be front of mind to make sure that we're efficient about this.

Okay.  Is there anything else to take up before we break for this evening?

MR. SCHROEDER:  Nothing from our side, Your Honor.

THE COURT:  Okay.  Mr. Vitt?

MR. VITT:  Nothing.

THE COURT:  Okay.

(Court at recess for the day.)

Porter - Direct by Mr. Vitt

CERTIFICATE


        I, Jan-Marie Glaze, RPR, CRR, Pro-Tem Court Reporter for the United States District Court for the District of Vermont at Burlington, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.


        I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


                                    _____
                                    JAN-MARIE GLAZE
                                    COURT REPORTER