UNITED STATES DISTRICT COURT
                              FOR THE
                       DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, MD,      )
                                  )
            Plaintiff,            )
        v.                        )   2:17-CV-194
                                  )
DARTMOUTH-HITCHCOCK MEDICAL       )
CENTER, DARTMOUTH-HITCHCOCK       )   March 26, 2025
CLINIC, MARY HITCHCOCK MEMORIAL   )
HOSPITAL, and                     )
DARTMOUTH-HITCHCOCK HEALTH,       )
                                  )
            Defendants.           )
                                  )
    _____

                BEFORE THE HONORABLE KEVIN DOYLE
                 UNITED STATES DISTRICT JUDGE

    _____

                              TRIAL

               VOLUME 3   Pages 417 to 644

APPEARANCES:

For the Plaintiff:

ERIC JONES
GEOFFREY J. VITT
SARAH H. NUNAN


For the Defendants:

DONALD W. SCHROEDER
MORGAN McDONALD
TRISTRAM J. COFFIN


Jan-Marie Glaze, CCR, RPR, CRR    Certified Court Reporter

**TABLE OF CONTENTS**

**EXAMINATION INDEX**

**Witness:**                                                    **Page**

**Misty Blanchette Porter:**
      Direct Examination By Mr. Vitt            428
      Cross Examination By Mr. Schroeder        486

**EXHIBITS**

**Exhibit No.**                                     **Page Admitted**

Exhibit A8                                        596
Exhibit A10                                       611
Exhibit A16                                       554
Exhibit A17                                       559
Exhibit A20                                       564
Exhibit A26                                       585
Exhibit B2                                        576
Exhibit B5                                        599
Exhibit B7                                        604
Exhibit B12                                       434
Exhibit H                                         626
Exhibit T                                         633
Exhibit W                                         638
Exhibit X                                         590

Exhibit No. 68                                    481
Exhibit No. 69                                    482
Exhibit No. 86                                    482
Exhibit No. 94                                    482
Exhibit No. 103                                   458
Exhibit No. 138                                   574

March 26, 2025

Morning Session

* * *

THE COURT: Okay. Good morning. So I understand there might be something to discuss this morning about scheduling; is that accurate?

MR. JONES: That is accurate, Your Honor.

THE COURT: All right, Mr. Jones.

MR. JONES: I would like to start with two pieces of good news which is, yesterday afternoon, counsel for the parties had a very cooperative and good conversation. I think that is favorable that we're communicating effectively.

THE COURT: Okay.

MR. JONES: Second, we've been taking a real hard look at streamlining this case, and I think we are going to be successful in doing that. And, at this point, we actually can predict, it looks like sometime Tuesday afternoon we'll be in a position to potentially rest.

THE COURT: Okay.

MR. JONES: We have far fewer witnesses and exhibits than were originally planned. We're in the process of streamlining that. Part of that, however, was taking witnesses off of our list. So we have a

problem scheduling witnesses this week.  So I wanted to have a conversation with counsel for the defense, and I did yesterday.

What we discussed was -- and my understanding is this, please correct me if I'm wrong, gentlemen, but between what Mr. Vitt needs to do to complete the direct of the plaintiff and what the defense plans for cross and then for redirect, that will take the bulk of today; and, therefore, the thinking was we will not bring back Bancroft in today because this will take most of today.  We will then bring Dr. Bancroft in tomorrow morning.  He will take a few hours, but regrettably we don't have anybody tomorrow after Dr. Bancroft.  We do have a very full Friday.

Part of what happened was witnesses we were counting on being available Thursday are no longer available Thursday.  We were talking to them yesterday. One of them has, for example, a ten-hour shift on a medical facility, can't be here tomorrow, other problems with them getting here tomorrow.  So I am loathe to appear to waste the Court's time or the jury's time, and I am sorry for that, but we don't have anybody after Dr. Bancroft tomorrow.

THE COURT:  Okay.  When you say the bulk of tomorrow, I believe you said, or the bulk of today.

MR. JONES:  The bulk of today should be the plaintiff's testimony.

THE COURT:  When you say "bulk," I mean, I know it's hard to predict this, but you're not saying 2:00?  That's the bulk of the day.  We're going to get as close as we can to 4:30.  Very, very reluctant to be canceling half of a trial day tomorrow.  I understand what you're saying, and believe me, I'm not trying to be unreasonable here.  But, you know, given that there has been -- I'm not going to say it's been slow but -- I appreciate counsel's efforts by the way, to streamline things.  I think we all probably appreciate that that's necessary, at least my sense of the case at this point in time.  But to send the jury home tomorrow for four and a half hours is something that I really would like to avoid, so I don't know what you're able to do to see -- and I hear what you're saying about certain of your witnesses, doctors, apparently, and other people in the medical field.  I'll just say it's early in the day today, and I know there's a lot on the agenda, but I'm reluctant to cancel a full --

MR. JONES:  I hear you.  I had tried to explore with counsel about the possibility of some DH witnesses, but my understanding is the people who were scheduled for next week just can't come here this week,

and I understand that as well.  We're trying every angle.

THE COURT:  Okay.  All right.  Well, thank you.

Mr. Schroeder?

MR. SCHROEDER:  I kind of predicted this yesterday, and I was concerned about it.

Just a couple things.  We've already gone to great lengths and partially because my clients had other challenges in the subpoena schedule, but we've already moved up Maria Padin from Monday to Friday which she needed to do because her sister has a surgery appointment that day and she's the legal guardian, or durable power of attorney.  So we've already moved up Maria Padin from March 31 to Friday, March 28th.

And Joanne Conroy was supposed to be on April 2nd pursuant to the subpoena.  I did check that, by the way; I'm right on that, so you owe me a lunch.  And it's actually April 1, Tuesday.  So we've gone above and beyond, and when I heard the indication, well, I want to check on DH witnesses, we'll put our case on when the plaintiff's case is over.  They sent subpoenas, including one to my client, Leslie DeMars, right before Christmas, without telling us, for March 31.  So she'll be here March 31; she'll testify

on Monday.

I realize this isn't Mr. Jones' fault regarding trial subpoenas, because I don't even think he wasn't in the case yet.  But we've gone to great lengths to be flexible, but there's, at some point, a limit to that.

MR. JONES:  I'm not faulting you.  I just asked you the question yesterday, that's all.

THE COURT:  Okay.  By a limit, are you meaning a gap in the trial schedule?  Is that what you mean tomorrow?

MR. SCHROEDER:  Correct, Your Honor.  But to then say to us we should somehow make our witnesses available in their case in chief on the fly is unreasonable and unfair and prejudicial.

THE COURT:  So these are Dartmouth witnesses that, you're saying you're attempting --

MR. JONES:  I was just exploring, in light of the gap, maybe we can get them here, but apparently not.

MR. SCHROEDER:  In my opinion, Your Honor, the likelihood of Dr. Bancroft lasting more than two and a half hours tomorrow morning is unlikely.  I saw this iceberg coming, which is why I had a concern about it yesterday afternoon, and obviously -- the Court's discretion on these issues, but I want to be very clear

that we have been flexible -- our need to be flexible was actually to their benefit because those witnesses have moved up as a result of other issues.

MR. JONES: Your Honor, quite frankly. I think we're being flexible as well. One of my suggestions was Dr. Merrens is right here, but Mr. Schroeder will explain that because he was planning to have him next week and he needed the weekend to prepare, I respect that, I get that. So I'm trying to work with counsel here. I'm not trying to -- I'm trying to be cooperative.

THE COURT: And on your kind of predicted trial schedule at this point I think you said streamlining the case, you anticipate that the plaintiff's case would end on Tuesday.

MR. JONES: We could potentially rest on Tuesday. The one issue is we did subpoena Dr. Merrens for next week. We discussed the possibility of rather than us calling him in our case in chief, just allow him to testify as part of their case and I would cross him, but I would just want to reserve the right to have his testimony be considered part of our case for purposes of evidentiary burdens. But we can just simply rest conditioned on that. And that way, he only testifies once, and we don't need to call him before we

rest.  That could happen.

MR. SCHROEDER:  Just on that point, Your Honor, I had actually suggested calling him in our case in chief, but Mr. Jones wanted to reserve the right to use whatever Dr. Merrens testified to in their case in chief.  That prevents me then from a potential motion for directed verdict at the end of Plaintiff's case in chief.  So I don't want any strings attached to it.  He will testify in our case in chief, and we can do it "one and done," but it's going to be in our case in chief.  I'm not going to leave a door open for their case.  Certainly, they'll have evidentiary objections, et cetera.  But that is one way of doing it is that they rest, and then we put our witnesses on.  I represented to them that Dr. Merrens will testify in our case in chief, and then they can cross him then.  And we've also made him available to testify on cross Monday night even though his subpoena is for Tuesday.

So we've tried to be as flexible as possible in that.  You know, they wanted to call a bunch of our witnesses in their case in chief.  They have a right to do that, but they've got to plan accordingly, and I don't think that plan has actually played out.  I appreciate that they're trying to streamline their case, but putting 25 witnesses out there and then

suddenly we only need a handful, I have real concerns about that.

THE COURT:  Mr. Jones.

MR. JONES:  I would just say, frankly, my proposal for resting subject to Dr. Merrens' testimony would only defer their motion for directed verdict until his testimony was completed.  It's not that much of a procedural problem, in my mind.

THE COURT:  Okay.  Well, I'm going to give some thought to that particular procedural issue.  Mr. Schroeder?

MR. SCHROEDER:  I don't -- no.  I just realized that I just sat down, and you were still talking, and I thought I would be respectful.

THE COURT:  Okay.  For this morning, I do want to get the jury back so we can continue with what you're doing.  So we have a full trial in front of us now.  With respect to tomorrow, looking one day ahead, I don't know what can be done, but I am going to tell you, I would like to see witnesses tomorrow afternoon.  Okay?  We will most definitely take this up at the conclusion of the trial day today.  I just want to be clear with everyone that I think we need to roll along.  I'm hoping someone -- Mr. Jones -- might be able to work something out for tomorrow, and I will look for an

update by the end of the day, and we'll just deal with it then.  Okay?

MR. JONES:  We'll do what we can.

THE COURT:  Okay.  All right.  Anything else at this time?

MR. SCHROEDER:  Nothing, Your Honor.

THE COURT:  All right.  Then I'll ask for the jury to be brought in, please.

(Jury present.)

THE CLERK:  Your Honor, the matter before the Court is Case No. 17-CV-194, Misty Blanchette Porter, vs. Dartmouth-Hitchcock Medical Center, et al.  Present on behalf of Plaintiff are attorneys Geoffrey Vitt, Eric Jones and Sarah Nunan.  Present on behalf of the defendants are Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We are here for a jury trial.

THE COURT:  All right.  Good morning, members of the jury.  I'll ask you, as I did yesterday:  Has anyone talked to you about the case?  Have you heard anything about the case outside of the courtroom since you left here yesterday?  Okay.  Seeing no hands, Mr. Vitt, you may resume your direct examination of Dr. Porter.

MR. VITT:  Thank you.

THE COURT:  Since it's a new trial day, I'll ask the deputy clerk to swear Dr. Porter in again.

**Misty Blanchette Porter**, witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you.

**DIRECT EXAMINATION**

**BY MR. VITT:**

Q   All set?

A   All set.

Q   Good morning.

A   Good morning.

Q   I want to circle back to something that came up yesterday.  Who is Joan Barthold?

A   Joan Barthold is a general OB-GYN at Dartmouth-Hitchcock Medical Center.

Q   Did you receive a phone call from Joan Barthold in the summer of 2017 after you had been terminated?

A   Yes, I did.

Q   What did she want from you?

A   Joan called to ask me to explain to her how to do an ultrasound-guided tubal patency study.

Q   Is this sometimes called a hycosy?

A   Yeah.  Short is the hycosy which is hystero, referring

Porter - Direct by Mr. Vitt

to uterus; contrast, using fluid in bubbles to look at the tubes, whether they're open or not, so we call it a hycosy.

Q    And she wanted you to explain this over the phone?

A    Yes.  She called me and asked me -- she told me that she had been asked to do the procedure in ultrasound for a patient that had been scheduled, and she had never seen one or done one before.

Q    What was your first thought when you got this request to walk through this procedure over the phone?

A    Joan and I had been friends and colleagues for a long time, and so I felt badly for her, but I also was like -- felt badly for the patient, but it seemed to me, this is nutty.  They have a patient need, and patients are still going to require these services and no one available to provide the services.

Q    How long did you train to learn how to perform this procedure?

A    We trained in fellowship to learn to do the x-ray variation of this, so I had done hundreds in fellowship down in radiology with an attending behind me.  And there are parallel skills to be able to do this, but the ultrasound version itself has its own variants, and I actually teach how to do these procedures nationally, and I have for years.  And so it's not as easy as see

Porter - Direct by Mr. Vitt

one, do one, teach one for these types of procedures. It requires months of learning, both didactically and then learning as you're doing it for patients.

Q    Were you the only doctor at Dartmouth-Hitchcock at this time who was performing hycosy?

A    I was the only person in the department, and then I taught Albert to do them.

Q    As a general rule, what would be the basic steps in, say, an attending physician trying to learn how to do a new procedure like this?

A    In any procedure is the question?

Q    Well, let's say hycosy.

A    Well, in hycosy. So learning by reading, at a national meeting, demonstration -- and that's what I do; I teach how they're done and the advantages and disadvantages and complications of them -- then standing behind somebody else who is doing them for demonstration purposes, and then having an experienced person stand behind you to do them all under consenting the patient so that they're aware who is in the room and what is being done and what the expectations are, and then also learning from your procedures what went well, what didn't go well and how you might optimize that care.

Q    In a situation like this where the doctor has never performed a procedure that she's going to perform on a

Porter - Direct by Mr. Vitt

patient, what would you expect that the patient would have to be told?

A   That that individual had never done that procedure before to be fully advised is part of the informed consent procedure.

Q   How did you make it clear to Dartmouth-Hitchcock that you should have been kept on to do non-infertility work after the closure of the REI division?

A   I wrote a letter to administration, and there are a few different things stating the ways in which I felt that I could contribute to the care of patients, to the academic mission, and there had been raised a concern about Dr. DeMars that she couldn't keep me because I was on long-term disability; that it would compromise my disability, so I wrote -- in that letter, I wrote a letter saying that my understanding, having spoken with legal counsel, is that it would not compromise my disability to stay as faculty.

MR. VITT:  Your Honor, could we approach the bench about the admission of this letter?

THE COURT:  Yes.

(Bench conference.)

MR. VITT:  This is -- this is a letter that we discussed yesterday, and we found, you know, we actually have the letter.  Dartmouth-Hitchcock said,

Porter - Direct by Mr. Vitt

well, it's not complete, there's a cover, and we were able to find the -- you can explain this better than me.

MS. NUNAN: The e-mail with the letter was attached to. It's the Bates stamp before the letter that we have.

THE COURT: So this is the full e-mail to herself?

MS. NUNAN: Yes. It is --

THE COURT: What's under that is the letter that she testified that she sent to the administration about her willingness to stay on and do other things? Okay.

MS. NUNAN: Yes. So it is DH 2804, and the letter starts at 2805.

MR. SCHROEDER: Yes, and if you looked at our exhibits, it's B12. The entire exhibit is there.

MS. NUNAN: Okay. I didn't hear you mention that yesterday.

MR. SCHROEDER: Well, I wasn't prepared to mention that, and I found it last night.

MS. NUNAN: Got it. Cool.

THE COURT: My understanding yesterday was -- during the bench conference, was if this cover e-mail was produced during the e-mail, you had a rule of

Porter - Direct by Mr. Vitt

completeness?

MR. SCHROEDER:  Right.

THE COURT:  You would not object to this, is part of your --

MR. SCHROEDER:  Right.

MS. NUNAN:  So we will use B12 so it's complete; we will use your exhibit.

MR. SCHROEDER:  Yes.

MR. VITT:  Give me just a second.  I have that.

THE COURT:  All right.  Thank you.

(End of bench conference.)

MR. SCHROEDER:  No objection.

Q   (By Mr. Vitt) Ms. Porter, I'm going to show you what is marked at the bottom B-12, and it's a -- well, you can tell me what it is.

Let me show you what's been marked as Defendants' Exhibit B-12.  So what's the first page?

A   The first page is just the cover e-mail.

Q   That you wrote?

A   Yes.

Q   And how about the letter that's attached to that?  Is that your letter?

A   It's the letter, yes.

MR. VITT:  I would like to move its

Porter - Direct by Mr. Vitt

admission, Judge.

THE COURT:  Okay.  Mr. Schroeder, no objection?

MR. SCHROEDER:  No objection.

THE COURT:  Okay.  It's admitted.

Q   (By Mr. Vitt) Did you make it clear that you were willing to work in the OB-GYN department even if the job didn't involve infertility?

A   Absolutely, yes.

Q   Did anyone from Dartmouth-Hitchcock reach out to you and work through, in some sort of interactive process because you were on long-term disability, how this would work?

A   No.

Q   Why do you believe that you were not reassigned to the OB-GYN department?

A   Because I was on long-term disability.

Q   Were you available to meet with officials at Dartmouth-Hitchcock to explain the work that you were prepared to do in the OB-GYN department?

A   Yes.  I had been working mostly in gynecology for the last several months, and working with my nurse practitioner who had been my nurse practitioner for 16 years in a joint complex OB-GYN practice and she was ept (sic).

Porter - Direct by Mr. Vitt

Q   When you say a complex OB-GYN practice, what do you mean?

A   Our shared clinics.  She would do things such as annual exams, and then my patients had abnormal bleeding, endometriosis, consults for all types of surgery, difficult IUD placements, meaning anything that was beyond annual exams, she and I were a team together in clinic.

Q   All right.  When did you first hear that the REI division was going to be closed?

A   On the day that I was called into an unexpected meeting.

Q   How did you learn that there was going to be a meeting?

A   I received an e-mail that was just an Outlook Calendar request by Dr. DeMars at like 7:00 or 8:00 at night.

Q   And the date of the meeting was what?

A   I believe May 4th.

Q   All right.  And when you arrived, who was there?

A   When I arrived, it was Leslie DeMars, Dr. Ed Merrens, Dr. David Seifer and Albert Hsu, Elizabeth Todd, and a member of HR, who I believe is Steven Woods.

Q   And what happened next after everybody gathered?

A   Leslie stood up and read a short, like three-sentence, statement saying that the REI division was going to be closed, and she left the room.  And then Elizabeth Todd

Porter - Direct by Mr. Vitt

left the room, and I was directed to stay with Dr. Merrens and the representative from HR, and the other two physicians were instructed to go to their offices.

Q   And what happened?

A   They read a statement saying that we were being terminated and that there was information in a folder that had a separation agreement and some information about my pension plan.  I completely dissolved.  I was just sobbing, and it was completely unexpected, and I had been ill for many months trying to get well and get back to my career, and had been given many reassurances by Dr. DeMars that the program would -- either slow down or pause, but that it wouldn't be a termination, and that, in fact, the day before, we met and she told me I would be okay and to keep my head down and that we would be opening back up.  So to go into this was completely unexpected and completely shocking.

Q   And did Dr. DeMars -- excuse me, did Dr. Merrens say anything to you in the meeting?

A   Yes.  I was sobbing, and Steven Woods was sitting across to me reading.  Dr. Merrens was sitting to the right, and he said to me to "stay out on disability," and at first I was like, you know, that's never what I wanted.  I always wanted to go back to work.

Porter - Direct by Mr. Vitt

And as they're reading, I was just sobbing, and he said it again:  "Stay out on disability, Misty."  And I was thinking, That's never what I wanted.  I want to work.  And after he said it a second time, Steven was -- kind of paused and then he continued reading and talking a little bit about what my next steps would be, and Dr. Merrens, a third time said, "Stay out on disability, Misty," and that's when Steven Woods stopped and shot him a look like, you know, this is -- you know, you shouldn't be saying that or whatnot.  He didn't say anything, but --

MR. SCHROEDER:  Objection, Your Honor.

MR. VITT:  I'll move on.

Q   (By Mr. Vitt) What were you told was the reason that the REI division was being closed?

A   None of it made any sense to me because there was a series of various reasons that were given, none of which were foundational at all.  There was this question about nursing coverage which was not accurate.  There was a comment about in-fighting which was not accurate.  There was this whole series of reasons that, in my experience of 21 years being there and being the REI medical director had no basis.

Q   All right.  What happened next?

A   I went to my office, and because they had told us, and

Porter - Direct by Mr. Vitt

we had actively cycling IVF patients, we had patients going through infertility care, and if you think about how fragile these people are to hear that we're closing the program in the same few weeks that you're getting this very intimate care was very ungrounding for them.

I tried as hard as I could just to keep it together because of all things, I felt I could try and help them through it, and also leave well with my integrity intact. And so I grabbed my things out of the office, and I went out to the car and sat there and sobbed.

Q   You eventually made it home?

A   Eventually. I had to be out in the car for a while before I felt safe enough to drive.

Q   When was the next time that you saw Leslie DeMars?

A   There was about a two- or three-week period after that. There's a sidewalk and parking garage between the staff parking and the clinic building, and we passed each other on the sidewalk, and I was sobbing when I saw her and, again, trying to keep it together and trying to be the best person I could be for patients and staff. And Leslie gave me a big, huge hug as I was crying, and looked me in the eye and held my hand up and said, "Mostly, I want you to get well." And I said to her, "You could have kept me." And she knew my abilities in

gynecology. She knew my abilities in ultrasound, and she said to me, "I couldn't have because of your disability. That would have compromised your long-term disability."

And that didn't make any sense to me because I had been working really hard to come back and reporting my hours as I was coming back and reporting to the disability company. And I early on had hired, because of how sick I was, I had hired an attorney in Boston to help me manage the complexities of the disability claim so I would understand it, and she had said to me that working with --

MR. SCHROEDER: Objection, Your Honor.

THE WITNESS: -- would not.

THE COURT: Hold on. Objection. Basis?

MR. SCHROEDER: Hearsay.

THE COURT: This is Dr. DeMars?

THE WITNESS: No, my attorney in Boston.

THE COURT: Okay. Sustained.

THE WITNESS: Okay. But Dr. DeMars said it would compromise my disability if she had kept me as an employee.

Q    (By Mr. Vitt) Did Dr. DeMars tell you that your employment was being terminated because of splitting behavior or anything about your behavior?

A   Absolutely not.

Q   Had Dr. DeMars ever spoken to you about your behavior and, sort of, being critical?

A   Never.

Q   Had you ever been put on a performance improvement plan?

A   Never.

Q   In the parking lot, did Dr. DeMars tell you that your inability to work full-time was the reason that you were not being kept on?

A   No.

Q   Did she mention anything about you no longer being -- having the ability to be a worker bee or anything like that?

A   No.

            MR. SCHROEDER:  Objection, Your Honor, overly leading.

            THE COURT:  Sustained.

Q   (By Mr. Vitt) Was there any discussion with Dr. DeMars about you going to work at UVM?

A   No.  We were training UVM fellows at that time and IVF at Dartmouth, and I had an appointment as the on-site fellowship director.  We were teaching them IVF and to increase their IVF volume as the -- there was a prior practice that opened up in Burlington, and that the

fellows had lost a huge amount of volume, so we took that responsibility at Dartmouth to train those fellows.

Q    At any point in the middle of May, 2017 onward, did Ed Merrens set up a meeting with you and discuss whether you would be willing to do OB-GYN work if it did not involve infertility?

A    No one asked to meet with me.

Q    If you had been asked by anyone at Dartmouth-Hitchcock whether you were interested in doing OB-GYN work that did not involve infertility, what would you have said?

A    Yes.  My husband and I had been married 36 years, and I would want a job that I had for 21 years, yes.

Q    Were you already, at the time that you were terminated, spending most of your working time doing what I would call regular OB-GYN work?

A    Yes.  I was more than 80 percent doing ultrasound, complex ultrasound, GYN ultrasound, and complex GYN in the office.

During the Value Institute, they had asked the providers if they would shift their responsibilities away from fertility care while they reorganized, and I raised my hand and said, "I'm already doing that.  I will do that no problem.  It's easy for me to do that. I've done that my entire career."

Porter - Direct by Mr. Vitt

Q   And had you made it clear to Leslie DeMars that the surgery that you were going to have at the Mayo Clinic would result in 100 percent you being cured of the problem you had before?

A   Multiple times.  I had multiple conversations with Leslie that this was 100 percent curable.

Q   So we've talked, I guess yesterday, about OB-GYN departments relying upon your expertise to read ultrasounds.  I want to turn for a minute or two about the surgeries that you are able to perform that no one else at Dartmouth-Hitchcock could perform.  Were there surgeries that you could perform in the OB-GYN area that no one else could perform?

A   Yes.

Q   How do you know that?

A   I'm the -- I was the -- at Dartmouth, I was the vice chair of perioperative services, and part of that vice chair role, we had a departmental operative committee that met every week to review cases and case volumes. And so I knew intimately what people were doing within the department and at what volume because we met weekly to look at how many cases there were, what type of cases, and how we were booking our operating room efficiency.  So I knew what people were doing on a regular basis.  And I also knew that my training was

Porter - Direct by Mr. Vitt

unique and that I was receiving referrals from just about every division in the department to perform surgeries that other people didn't perform.

Q   Currently, are you able to perform surgeries that are not capable of being performed by any of the doctors at Dartmouth-Hitchcock?

A   Yes.

MR. SCHROEDER:  Objection, foundation.

THE WITNESS:  I --

THE COURT:  Objection sustained.

Q   (By Mr. Vitt) Let me try to -- do you get referrals from Dartmouth-Hitchcock to perform surgeries?

A   Yes.  Regularly.

Q   And do you know why those referrals go to you instead of being kept at Dartmouth-Hitchcock?

A   Yes.  Because they don't have the capacity or ability to do them.

Q   All right.

A   I'm getting referrals from Manchester, New Hampshire, within the Dartmouth-Hitchcock network to do surgery. I'm getting referrals regularly from Dartmouth-Hitchcock providers.

Q   Are the surgeries that you are being asked to perform what I would call -- are they complicated surgeries?

A   Yes.

Porter - Direct by Mr. Vitt

Q   Are they important?

A   Yes.  It's anywhere from women and girls who are born with birth defects or variants of the reproductive tract, and so recreating a normal tract or trying to significantly impact both their hygiene and ability to have a normal pregnancy.  That's what we call a uterine mullerian anomalies.

Also, some women, very early in life, have a disorder where they get multiple fibroids which causes pain and bleeding and can potentially significantly impact their fertility.  And that's something that I've done for many years.  And so as a fertility specialist and a complex gynecologist, the myomectomy Dr. MacCallum described, I do these procedures both robotically and open, and I get regular referrals for those and also pelvic pain and endometriosis surgery for complex patients with advanced stage endometriosis. I also get referrals to have a second look at ultrasounds.  So across the board, I'm getting consults and referrals.

Q   You mentioned the surgery where somebody might have two linings of the uterus?

A   Yes.

Q   And you, as part of the surgery were removing one of those linings?

Porter - Direct by Mr. Vitt

A    We are -- women are sometimes, about one in a hundred women are born with a different shape of their uterus and vagina, and sometimes there's a little arc at the top, and sometimes it's a septum; it's an extra wall that comes down, and it can vary how far it comes down. So on ultrasound, it looks like two linings, and we can put, through a little telescope in the cervix, we can put scissors in to take that extra wall down to create that more triangular shape.  I do that very regularly especially in consultation with the high-risk OB service at Dartmouth, because some of those patients have delivered preterm, sometimes profoundly preterm and have affected babies.  Sometimes they detect it before they get pregnant, so they're sent up to me to help decrease the likelihood they're going to miscarry or decrease the likelihood that they're going to have a preterm delivery.

Q    Okay.  And you're still getting referrals from Dartmouth-Hitchcock with respect to surgeries like this?

A    Yes.  Just before I went to prepare for this, I had a consult for Manchester, New Hampshire.  And I get consulted for Boston IVF providers who aren't operating.

Q    I want to turn for a minute to the importance of taking

an accurate family history when a doctor is interviewing a new patient.

Can you tell me why it's important to get an accurate family history?

A    As part of our routine, when we were talking yesterday about that first visit that people come in as part of the routine medical history is that genetics screening history; that -- their own but also their family, and we're looking for, is there any specific reason that we would want to offer or recommend they get blood testing to look to see if they carry a gene that would affect their ability to conceive and have a healthy baby or affect a potential offspring.

Q    Let me ask you about teaching residents about REI since you've been at UVM.

A    Yes.

Q    Have you taught reproductive endocrinology to Dartmouth-Hitchcock residents since you've been at UVM?

A    Yeah, absolutely.  In all three forums, which is in the clinic, they've been in REI clinic with me.  In the operating room, I've had Dartmouth-Hitchcock residents scrubbed with me, and also in ultrasound in our complex GYN ultrasound clinics that I participate in.

Q    Let me back up.  Is there an understanding, as you understand it, that Dartmouth-Hitchcock residents would

receive the reproductive endocrinology instruction through you?

MR. SCHROEDER:  Objection, foundation.

THE COURT:  Overruled.

THE WITNESS:  So when I -- when I started at UVM, I started per diem because there wasn't per se a job here for me, and I had felt from an integrity and honesty standpoint the chair knew that I would need more surgery as the division head, and what I understood, I started three days a week here, was that while Boston IVF could provide -- again, we talked about that sliver of IVF and infertility that's part of reproductive endocrinology -- it could not provide the other full spectrum of what we should provide our young trainees and residents about the care of girls and women all through the hormonal aspects and surgery and whatnot.  And so within my first week of starting at UVM, I had a Dartmouth resident in clinic and in our reproductive medicine didactics, because that's the other part, is having them learn the full aspect and have some exposure.  So they were in didactics with us, and they were also in clinic, the OR, and in ultrasound.

Q   (By Mr. Vitt) All right.  So was there an understanding that Dartmouth-Hitchcock residents would actually come

to UVM to receive their reproductive endocrinology instruction through you?

A   As part of the team.  They did not come before the shutting of the program at all.  We were providing that at Dartmouth, but when the program shut, because this is an essential women's healthcare service, and it's required by the ACG, meaning the national governing board, that our residents are exposed to the full spectrum of REI, our chair received a phone call, as did the division head, from the residency director at Dartmouth.

MR. SCHROEDER:  Objection, Your Honor.  Calls for hearsay.

THE COURT:  Sustained.

THE WITNESS:  And so --

Q   (By Mr. Vitt) Hold on.  Let me try it this way.

A   Okay.

Q   Did there come a time when, on a regular basis, the Dartmouth-Hitchcock residents would come to UVM to receive instruction in reproductive endocrinology?

A   Yeah.  And they still come, eight years later.

Q   Okay.  How often do they come to -- up to the University of Vermont Medical Center to receive the instruction?

A   It is continuous.  Meaning, I think it's Monday through

Thursday for two months, I believe they're here.  It's somewhere in there, six to eight weeks.

Q   Okay.  So the instruction that you're providing to them at the University of Vermont Medical Center is the same instruction you were providing when you were an employee at Dartmouth-Hitchcock, right?

A   Absolutely, yeah.

Q   The only difference is they have to come from Lebanon, New Hampshire up to UVM to get the instruction, right?

A   Right.  They're also spending that part of the week in a hotel to get this experience.

Q   Did Dartmouth-Hitchcock have the option of simply not providing reproductive endocrinology instruction to its residents?

        MR. SCHROEDER:  Objection, foundation.

        THE COURT:  I'll sustain the objection.  If you could rephrase the question, Mr. Vitt.

        MR. VITT:  Sure.

Q   (By Mr. Vitt) Is reproductive endocrinology instruction an essential component of the training of residents?

A   Absolutely.  It's a requirement by the ACGB and the American Board of OB-GYN.

Q   And who was in charge of providing the scope of the reproductive endocrinology instruction when you were employed at Dartmouth-Hitchcock?  Who was the person

who was in charge of that?

A   It was the responsibility of the division to provide that in conjunction with our residency director as part of their overall residency curriculum.  And Dr. DeMars was responsible for our departmental educational mission, but there is a representative of ACGB at Dartmouth-Hitchcock and at UVM that's responsible for all of the training of all of the residents and fellows.

Q   Were you the person who was the principal person to provide the instruction on that?

A   For a very long period of time, yes, but it was a shared responsibility within the division.

Q   I want to turn to -- moving on to the question of the economic or financial effects of you losing your job and having to get a position at UVM.  All right?

    Did you hire an expert to provide assistance to you in connection with providing a report on the economic consequences of losing your job?

A   Yes.

Q   And who did you hire?

A   Dr. Robert Bancroft.

Q   And did you understand that he had been associated with the faculty of UVM for a number of years?

A   Yes.

Porter - Direct by Mr. Vitt

Q   Did you provide him with access to your financial records?

A   Yes.

Q   Paystubs and, you know, W-2s and things like that?

A   Extensively.  I worked for months and months collecting paystubs, tax records, all of my expenses at the condominium, as you can imagine are extensive, and also we talked about things like commuting, and I lived intermittently in a hotel, meaning three days a week for the first year and a half that I was at UVM.

Q   All right.  And the information that you provided him is up to date?

A   Yes.

Q   And you understand that he provided a recent report within the past week or ten days?

A   Yes.

Q   All right.  I want to discuss several of the assumptions that appear in that report.  All right?

A   Okay.

Q   The report assumes that you would have been promoted to full professor --

        MR. SCHROEDER:  Objection, Your Honor.  This is overly leading.  May we be heard?

        THE COURT:  Okay.  Please approach.

            (Bench conference.)

Porter - Direct by Mr. Vitt

MR. SCHROEDER:  Judge, you've got a very good perspective of my reluctance to actually get to say something on occasion.  This is so overly leading.  Sorry, overly leading.

THE COURT:  Okay.

MR. SCHROEDER:  He's trying to get expert testimony through this witness.  He can ask about assumptions, but he's literally trying to get the report in through Dr. Porter, and that's inappropriate.

THE COURT:  Mr. Vitt?

MR. VITT:  I'm not trying to get the report in through Dr. Porter, but there are certain assumptions.  For example, it assumes that she would have been promoted to full professor.  What's the basis of that?  She's entitled to explain.  You know, they're not going to cross-examine Bancroft about the assumptions.  But based on the discussion we had, he spent a lot of time -- what's the basis of that assumption?  What's the basis, I want to go to .6.?  There's a series of assumptions, and I want to ask her.  There was a report that's, So you were going to go to no call and .6.  That's changed.  Why?  And --

MR. COFFIN:  It shouldn't be in a leading way.  Ask open-ended questions, and get her to answer them.

Porter - Direct by Mr. Vitt

MR. SCHROEDER:  I want to tell you, here's the assumption.  Can you verify that?  You do that on cross-examination, which I will hopefully get a chance to do today.  These questions are like what you ask on cross-examination, not on direct examination.

THE COURT:  I'm giving Mr. Vitt some leeway here because --

MR. SCHROEDER:  I understand that.

THE COURT:  -- some of this is difficult to elicit.  I understand that it could be asking for a yes-or-no answer, but that's not necessarily the rule about a question being inappropriate.  And I understand both sides.  I think if there's a way for you to phrase your questions that are a little less -- basically saying:  This is the assumption, do you agree, then I think it's not going to be objectionable.  Yeah.  So that's basically my point.  So is there a way that you can do that?

MR. VITT:  Yeah.  But I -- if I raise the issue of, for example, you prepared a report -- Dr. Bancroft prepared a report that assumed that she was going to earn .6 with no call.  That had a profound affect on her pay.  There are reasons why that was not acceptable to UVM.  So based upon UVM saying it's not going to work for us, she said okay, I'm going to stay

at .75 and explain.  So I can't just say, Tell me what the assumptions are.  I've got to sort of point out, we put down .6 with no call.  What was the basis for that?  Here's what I hope to do.  Did that change?  Yeah.  UVM said that wouldn't work, and there's a reason -- people are out, and et cetera et cetera.

THE COURT:  It seems like there's probably a way for you to kind of elicit the facts that ended up going into the assumptions that were incorporated into the report instead of it being let's talk about the report through the witness.

MR. SCHROEDER:  It's been a long time since I had evidence in law school, but it's who, what, where, when, why.  I have yet to hear those questions.

THE COURT:  I've spoken about that.  There's basically some basic rules between direct and cross.

The witness has requested a bathroom break.  Are we all right with that?

MR. SCHROEDER:  Of course.

THE COURT:  So, yeah.  I think I have to be a little bit practical about some of the stuff, but I am keeping an eye on whether -- you know, you certainly can't be asking questions that suggest the conclusion and yes/no.

MR. VITT:  No.

MR. COFFIN:  Just so we don't waive.  We may be making some objections as we go along, so I want to foreshadow that.

THE COURT:  Objections to the form of the questions?

MR. COFFIN:  Yes.

MR. SCHROEDER:  Just so we're clear.  The .6 to .75 I think that just showed up last week, so I'm not sure how those assumptions -- if the assumptions were made five years ago and somehow that didn't happen, well, that should have been in an updated report five years ago, not last week.  That seems to be the implication, because that's an assumption that was just made last week.

THE COURT:  Okay.

MR. VITT:  Do you want me to explain that?

THE COURT:  I think I know the explanation.

MR. VITT:  Yeah.  Basically, she had planned to go to .6.  She made a request to UVM.  They said, We need people to do call; it's essential.  And, oh, by the way, we've lost three people recently and one person quit, and we're so backed up.  The answer is no, it's not going to work.  So she said okay.

THE COURT:  So my proposal, as I said before is to allow you to ask the -- again, try to get out

these questions but instead of phrasing the questions, there was a report generated, there's certain assumptions, instead of you assume, the assumptions were made on X fact, these are the terms, and you can talk about how that changed.  Obviously, Dr. Bancroft is going to speak to that.

So we'll take -- I guess why don't we do our mid-morning break to allow the witness to use the restroom.

(End of bench conference.)

THE COURT:  Okay.  So at this time, we'll take our mid-morning break.  We'll be back and ready to go at 10:15.  Okay?

(Jury exits.)

(Recess taken.)

THE COURT:  Dr. Porter can retake the stand. Thank you.

(Jury present.)

THE COURT:  Okay.  Mr. Vitt.

MR. VITT:  Thank you.

Q    (By Mr. Vitt) Dr. Porter, did you make a request to UVM to change your schedule to go to a .6 instead of a 1.0, full-time equivalent job, and be excused from call?

A    I did.

Q    And when did you make that request?

Porter - Direct by Mr. Vitt

A    I believe it was last spring.

Q    And why did you want to make that request?

A    For two reasons, one is this has been many years of commuting, and the challenges of commuting through Vermont winters and trying to balance that with my responsibilities.  So I have to be at the OR by 7 a.m. on those days, and I have to be at conference by 7 a.m. and that means, given the weather, I usually need to come up the night before, so it's more time away from home and my husband and friends.

The second reason is that the intensity of call is really markedly increased, and I have a very strong work ethic that I come by rightly from my parents, and I had worked full-time my entire career, but the community hospitals now are not doing anywhere near as much surgery in the middle of the night, and so I'm getting called in on a really regular basis for ruptured ectopic pregnancies or cases that need to go within a half hour to an hour for ovaries being twisted on their blood supply and things like that and still working a full day the next day.

Q    Did you get a response from UVM?

A    They were initially willing to consider it as one of my peers had done the same, but given some long-term health issues of some of my partners, they denied it.

Porter - Direct by Mr. Vitt

Q    So as a consequence of them denying it, what is the full-time equivalency that you're currently working?

A    .75, which --

Q    Go ahead, I'm sorry.

A    .75 is what my current --

Q    Does that involve a call obligation?

A    100 percent of this .75.  Your call is prorated based on your equivalency.

Q    So you've been continuing to provide call obligations under the terms of your employment with UVM?

A    Yes.

Q    And do you intend to continue doing that going forward?

A    Yes.

Q    I would like to show you what is marked as Plaintiff's Exhibit 103.  It's a May 27th, 2017, e-mail from Dr. Merrens to a number of people including Dr. Porter.

        MR. SCHROEDER:  No objection.

        THE COURT:  Okay.  It's admitted.

Q    (By Mr. Vitt) All right.  I'm going to put it on the screen and see if I -- you got that Misty?

A    Yes.

Q    I'm going to back up just a moment and ask you about the session that you had with Dr. Merrens, Dr. DeMars, Steve Woods, right, where you were terminated.

        Was there any discussion during the course of that

meeting about in-fighting or problems among the doctors?

A   No.  I misspoke if that's what I said.  I would correct that record.  No.  That was my error.  I was thinking in general.

Q   In looking at the letter you got from Dr. Merrens, or the e-mail?

A   I can't see it, sorry.

Q   Do you recall that there was a --

THE COURT:  Mr. Vitt, I'll ask you to pause. I can see Dr. Porter's screen, and it's black.  So the exhibit is not appearing there.  Just give us a moment to figure this out, the technological.

MR. VITT:  I've got an extra copy.

THE COURT:  Give Mr. Howe a moment.

THE WITNESS:  I'll try not to bump the cable.

MR. VITT:  Okay.  All right.  Okay.

THE COURT:  Do you have it?

THE WITNESS:  Yes, I do, thank you.

Q   (By Mr. Vitt) Okay.  Do you recall that there was a Vermont Public Radio article about the closure of the REI division?

A   Yes.

Q   And could you just read that first sentence of the e-mail, please?

Porter - Direct by Mr. Vitt

A    "Dear colleagues:  Regrettably, Vermont Public Radio published an article yesterday indicating that I made comments to the effect that the program was being ended due to interpersonal issues amongst the physicians."

Q    Okay.  And then Dr. Merrens' next sentence, please?

A    "Nothing could be further from the truth, and in the recorded interview I did with him two weeks ago, there was no such statement whatsoever."

Q    Thank you.  I want to go to a new topic.  Zika?

A    Okay.

Q    What is Zika?

A    So Zika is a virus that in the midst of an infertility practice is really critical to know and understand.

Q    And what are the consequences of potentially being exposed to Zika virus?

A    The consequences if a patient has -- the person carrying the baby has a Zika infection is the potential, anyways for a continuum of potential issues anywhere from a baby born with a very small brain that doesn't function well and very small head to, if it's a milder form, potential learning disabilities in school.

Q    Was it something that the REI division was following closely in 2016 and 2017?

A    Yes.  So the jury will understand with our recent pandemic that the information is rapidly changing, and

Porter - Direct by Mr. Vitt

as time went on, we learned a lot more information about Zika, but we had in warmer areas, in South America, through the Caribbean and as far north as Miami and I believe Orlando, there was an outbreak of the mosquitoes that carried this virus.  And so we were actively, every patient who came in, counseling them against travel to those areas, which at the time was really a problem because it was common for people to go to destination weddings.  And also we weren't clear exactly how people could get this virus and how it would potentially affect pregnancy.  But every week, we were getting e-mails from our national organization to every two or three weeks as the things changed and also intermittently was getting information from the Centers for Disease Control, and World Health Organization about counseling patients especially pre-conceptually to avoid what was a huge outbreak in South America with many women being -- having babies affected with these very small heads and brain abnormalities.

Q    Did this become an issue with a patient in the REI division in 2017?

A    It did, and I was the IVF medical director, so our lab director, Dr. Esfandiari brought a case for me to review and asked me to look at it.

Q    And with this particular situation, was the exposure

Porter - Direct by Mr. Vitt

avoidable?

A    Yes.

MR. SCHROEDER:  Objection, foundation.

THE COURT:  Rephrase the question, objection sustained.

MR. VITT:  Sure.  Okay.

Q    (By Mr. Vitt) Can you elaborate on the situation that the lab director presented to you?

A    At the time that it was presented to me, there was a couple seeking care in the infertility division who had suffered many losses.  I don't mean pregnancy losses, but just had an extensive infertility history, and they were patients of my partners.  I didn't know them or see them initially.  And they had created embryos at an outside donor egg facility.

It wasn't uncommon for us to send a specimen of prepared sperm frozen from our lab to an outside egg bank and have that egg bank make embryos with that sperm and send those embryos back to us, and it also was extraordinarily common for us, either for fertility preservation or for travel reasons to see -- or even a basic evaluation, to see a couple in clinic and have the male partner collect a specimen that same day for evaluation and/or freezing.

So in terms of this couple, what had happened is

Porter - Direct by Mr. Vitt

they had been seen in clinic by one of my partners and they knew at that visit the next day they were flying to Brazil where there was a huge outbreak of Zika.

Q   Okay.  When you use the term "partners," do you mean Dr. Hsu and Dr. Seifer?

A   Yes.

Q   Go on, I'm sorry.

A   And no specimen was collected before they flew and went on vacation.  And when he got back, that specimen was collected and that specimen was then stored in our lab tank, and then that specimen was sent to the embryology bank or the donor egg bank to make embryos.  And so the question was, is it possible -- and we just didn't know; there was no test to be able to tell us -- that those embryos would be affected with Zika.

But also at the same time, there was a regular set of standards and guided recommendations that were coming out about how long people should wait, how long the female partner should wait, whether they had symptoms or not, and the thing that really changed is how long the male partner should wait.  And when I was in clinic, I realized that the handout that was in all of our clinic rooms about Zika for patient education was not current.  It was behind several months and not current with the current guidance.  And the reason why

it wasn't current was that it was reported that while men can have very mild symptoms, much like COVID, you can have very mild symptoms and still be affected, men could have very mild symptoms, have a negative blood test for Zika exposure, but they could concentrate the Zika into their semen and sperm, and so they could still pass on Zika to their partners.

And so my -- when I reviewed this, I said the recommendations that had been made to that couple were old guidance.  The new guidance had come out saying men should wait six months.  And also when I reviewed it, it was clear, because I had spoken with my partners, that no one had counseled the couple to have protected intercourse, and they had gone on a second vacation in the Caribbean where Zika was endemic.

So there was all these various things.  So to get to was it avoidable, my thought was, we should have collected that day when he was there, and it would have avoided the whole issue.  And in the absence of that, we, as part of informed consent, we should talk to them about this and also offer -- because when I came back, Dr. DeMars had given me several couples for me only to take care of because my partners had made some errors in decision making that had led to poor outcomes in their IVF.  So we had already established that we were

Porter - Direct by Mr. Vitt

offering a compensatory IVF cycle for free, and -- to make up for the errors in decision making that led to the poor outcome.

Q   Going back to the Zika situation, what did you believe was the appropriate course of action that should be taken?

A   I believed that we should have offered the couple the compensation to wait the six months, make sure they were having protected intercourse.  They could check their blood test, but, again, men could have a negative blood test and still have positive semen, and also the testing for semen was not verified.  So even if you tested semen for Zika and send it off to a national organization, it might come back negative, but none of those tests were verified to be negative.  So I thought at least in part of informed consent, we should offer them a cycle for free, compensate them, and wait six months before we did that.

Q   Did you feel strongly that that was the right course of action?

A   I felt strongly that offering them and giving them the informed consent choice was the right course of action given that the potential for this couple and their offspring would be at least, you know, theoretically catastrophic, and that we had a responsibility to offer

that option to them and that six months, given that it was an egg donor situation where those eggs would be good for a really long time, would not necessarily significantly delay their conception, and we would provide the financial support.

Q   Did you go to risk management about this?

A   I did.

Q   Did you go to Leslie DeMars?

A   I did.

Q   What did she say?

A   She said she would investigate it.  That was it.

Q   Can you name for me, please, the different subjects that you went to Leslie DeMars to complain about in 2016 and 2017?

A   It was extensive.  It was, as we covered yesterday, periodic conversations about Dr. Hsu and his performance.  And understand, it didn't -- it gave me no joy to do this.  And, in fact, I was encouraging everyone else who had concerns to go where they needed to go to report.  It is our duty to report, and it is part of what we train annually at every medical institution about the duty to report.  I also feel that it's our duty to keep patients safe, and the duty to report is in keeping them safe, and I believe it's the duty of academic and other medical centers to report

Porter - Direct by Mr. Vitt

and to make certain that we are keeping the patients' interest and patients' safety as our first priority.

Q   You mentioned Dr. Hsu.  Did you also mention Dr. Seifer?

A   Yes.  From early on, I had lots of conversations with her about Dr. Seifer, the multiple complaints I was receiving from everywhere.  It was -- it was uniform.  And it was from places that we never get complaints from.  So very early on, it was from the nurses on a really regular basis who were in IVF procedure room with him, and it was the nurses in clinic.  It was the ultrasound techs, multiple of them, who worked with him.  It was the embryology staff.  It was also genetics, the genetics counselors, it was the maternal fetal medicine staff, and then it was also the anesthesiologist which is really like, in all my years there, I had never received a concern expressed by the anesthesia staff.  So I was talking regularly, per as my duty to report this to her, and to Heather Gunnell oftentimes.

    I talked to her at length about multiple issues in terms of billing issues and my concerns about compliance, billing compliance.  I talked to her about the Zika issues.  I talked to her about the trainees and the residents and the issues that we were facing

and the issues that patients were facing in that.  So, yes.

Q  Thank you.  I want to turn for a few minutes and talk about the impact that the firing at Dartmouth-Hitchcock had upon you.

A  Mm-hm.

Q  Can you tell me what was your -- you or your attachment or your connection to the REI division?

A  I'm a Dartmouth Medical School graduate.  I had a lot of pride in being a graduate of the Geisel School of Medicine.  I worked really hard to get there, and I worked really hard while I was there.  I had a lot of pride working with Dartmouth-Hitchcock and helping grow an IVF program from 25 cycles to just under 200 cycles, and it was all aspects of it from nursing, marketing the embryology lab, to bringing on a computerized medical record to all of that.

I had a lot of pride working at that organization and for years, 20, maybe more I think, early on I was identified as the person to work on the perioperative surgery committee, and that had different iterations over the years, but I was the OB-GYN representative to that and became vice chair of perioperative services.  And those meetings were oftentimes early morning, late evening, but I felt like I was contributing to the

Porter - Direct by Mr. Vitt

mission of the organization financially that way.  And I felt like I was contributing to the educational aspects of it and the research aspects of it.

So when I lost my job, I was in process of establishing at Dartmouth the first or second -- I believe first -- U.S. site for a research project as part of a multi-international project looking at the treatment of ovarian masses and ovarian cysts that could be non-cancerous versus cancerous.  It's called the International Ovarian Tumor Analysis Group.  And I was the first U.S. member that was invited to their meetings.  So I felt like I was contributing to the research aspects of what we do, and that cutting-edge research has changed how we evaluate and we treat women with ovarian masses through all age groups.  So I felt like I was contributing a good deal.

Q    Had you ever heard of a division being closed or shuttered at Dartmouth-Hitchcock before?

A    No.

Q    Tell me how being terminated from your position, from your job, how did that feel?

A    If I -- if I go back there, it was absolutely devastating.  I think I cried all summer.  I was trying to drive to UVM and meet their needs.  I was trying to sort out where I was with my illness at the time.  I

had been told that I would be 100 percent cured, but I knew that I was going back to the Mayo Clinic for another surgery which in itself is scary.  None of us voluntarily jump up on the operating room table, you know.  And I was not sleeping well.

I was trying to maintain some semblance of being normal for my children.  I had lots of colleagues reaching out and coming over, but it was also, you know -- I had been there 20 years.  I had patients that entire 20 years.  And so it was a loss of that community.  I had colleagues for 20 years, and they cared for me, and I cared for them, and we had that connection.

Q    I mentioned in the opening about the importance of being part of a community and going to a soccer game and having somebody across the field hold up a child.  Can you talk about that?

A    Yeah.  One of the great gifts of being in a small community is that I was able to -- and understand HIPAA.  I was able to see the children and the families that were created, you know, from individuals who were really sad and oftentimes depressed, to have the joy of children in their lives.  So I could go to the grocery store or a soccer game or a football game or even at my own dinner table was one of my IVF babies.  And he told

my son that he was an IVF baby, so there was no HIPAA. I still see him. He's in medical school now. He comes home from medical school and has dinner with us. And that was a really fulfilling great joy, and I still see them, you know.

Individuals who work and live in the community and these many years later, I still get holiday cards and Christmas cards of these children as they grow and lots of thank yous and how their life has changed.

Q   What were your choices in terms of jobs after you lost the position at Dartmouth-Hitchcock?

A   I was on long-term disability.

Q   Right.

A   Which meant that there was no way I was ever going to be able to get a personal loan to open a private practice in the community. I was on long-term disability, and I thought it not likely that any other academic center or private practice would hire me. So it was because I had an open-door policy at the University of Vermont that -- and they had a fellowship training need that I was able to work per diem at UVM until I proved that I was well.

Q   How long did it take for you to get off the per diem and go to actually becoming a full-time employee?

A   Over a year, I would say. 14 to 16 months, something

like that.

Q   Okay.  And when you began, after becoming a full-time
employee, you were at .8, correct?

A   Yes.

Q   Okay.  And full-time is 1.0, right?

A   1.0, yes.

Q   All right.  So why did you want to work a .8 instead of
a 1.0?

A   My life is in Norwich.  You know, I have now -- I had
to re-establish myself with work colleagues here, but I
have been with my husband 40-something years and
married over 36, and I've also had children who were
home for the summers and home for holidays, and I
wanted to be able to make certain that, given the
physical distance and the requirement for being here
when I'm on call within 30 minutes of the hospital,
that I was still able to spend time with those that I
love and to maintain my marriage and to make sure that
I was the mother I wanted to be with my children.

Q   Did your former colleagues still contact you and ask
for help?

A   Yes, regularly.  I've had long-term relationships with
many of these physicians, and so as always in my
practice I'm more than happy if I have the ability and
not on work restrictions, to help them.

Porter - Direct by Mr. Vitt

Q    Give me some range of the description of the range of questions that you get from them when they contact you.

A    Anywhere from recently from the Manchester Hitchcock clinic, which is in the southern region, an individual -- a lot of what I did at Hitchcock was complicated first trimester pregnancy problems.  As the resource for the network they would come to us.  So Manchester had a patient with a cesarean scar pregnancy, so the pregnancy was not actually in the uterine cavity.  It was in the C-section scar which is a life-threatening location, and so they consulted me about how to treat that.

I've received patients in referral for huge, large uterine fibroids and to do them, the removal of those fibroids from the uterus, for endometriosis and pelvic pain for medical management or surgical management, for how to provide reliable contraception for a patient -- in patient who was admitted with a blood clot at Dartmouth.

I, you know, we like to make certain that these patients are also registered here so that I can write a quick note to make sure that they communicate with the Dartmouth.  Many patients with birth defects of the reproductive tract.  I consult on for the high-risk OB service, I do consults and do that collaborative work.

Q    Let me make sure that I get this right.  What you're
describing are contacts that are coming to you now from
Dartmouth-Hitchcock physicians to ask you for your help
and expertise, correct?

A    Correct.

Q    When you first took the job at UVM, where were you
staying when you had to come up and spend several days?

A    I was staying in a hotel.  I would go in -- I think I
was working usually around three days a week.  So I
went usually Tuesday, Wednesday, Thursday, sometimes
other days.  Sometimes I was helping cover the IVF
service over the weekends up here, but I was staying in
a hotel.

Q    And then eventually did you and your husband decide to
buy a condo to avoid the hotels?

A    Yeah.  I had to wait until UVM could have an official
job.  So one, I wanted to wait until I had my second
surgery because I felt, for my integrity, that I
shouldn't offer myself to be a full-time faculty
position until I knew I was back to who they told me I
would be.  So Dr. Bernstein and I had several
conversations around that.  I had my second surgery in
September of 2017.

Q    Is Ira Bernstein the chair of the OB-GYN department?

A    Yeah.  And I had to go back through the proctor system

Porter - Direct by Mr. Vitt

that we had described before, so I was proctored in the OR, which I fully welcomed. It's the natural process of bringing someone back in. I would have had to do fewer cases if I was a brand new faculty, but in -- I would say that was perfectly acceptable, but it was to prove to me and to my colleagues, yep, she's back on her game and she can take a full-time job.

Q You were back on your game?

A I was absolutely back on my game. And I think that if I reflect on it, in many ways, I'm better.

Q How so?

A I'm more patient, you know -- and they had told me at Mayo that how you problem solve may be different. And so when I think about OR cases, I do think I have a different perspective in terms of how to solve a problem, which is better. I'm more patient with myself. I'm more patient with how we get things through challenges. But what happened is it was not an official job. So Dr. Bernstein had to submit for a faculty position for me through the physicians workforce which took a while, and then it had to go over to the university to go through the provost office to get it. So that's why. Once that was done, then I started on faculty, and I had to be on -- because I had been on long-term disability I had to be on faculty

before we could re-mortgage our house in Norwich to be able to afford a down payment for a condominium in Burlington.

Q    All right.

MR. VITT:  Will the Court indulge me for a second?

THE COURT:  Yes.

(Pause.)

Q    (By Mr. Vitt) You mentioned that it was a stressful time during the summer after your termination.

A    Yes, very.

Q    Any physical manifestations of how that stress played out?

A    Yeah.  I had a marked clinical depression.  I spent as I said most of the summer crying.  I was grinding my teeth so much at night that, despite my best efforts, I cracked a molar and ended up with a dental abscess and a pulled tooth and a year later a dental implant after multiple courses of antibiotics to try and help cure the abscess.

I lost a ton of weight in that period of time, and I had to go back to the Mayo in that situation to -- had the tooth pulled because I had to go back for another neurosurgery, and I couldn't have an active infection and have my second surgery.

Porter - Direct by Mr. Vitt

Q    All right.  Going back to the economic effects of the termination, were you making less money at the University of Vermont than you were being paid at Dartmouth-Hitchcock?

A    Yes.

Q    So there was a period of time you were on per diem, correct?

A    Yeah.

Q    Yes?

A    Yes.  Yeah.

Q    And then you went to a .8 which was less than you were being paid at Dartmouth-Hitchcock, correct?

A    Yes.  Yes.

Q    If you stayed at Dartmouth-Hitchcock, would you have been promoted, in your view, to full professor?

A    I met the criteria to be promoted to full professor when I was there.  I had been working at it with this international research group, and I had been the head of the American Institute of Ultrasound and Medicine GYN of community practice, that was six years.  So I had national recognition, and I was teaching nationally and internationally in GYN ultrasound and writing book chapters and writing papers on a whole host of GYN ultrasound to infertility-related ultrasound.  So in terms of the checkboxes that you need for a promotion,

Porter - Direct by Mr. Vitt

I had met them.

The issue I had is that the standards for promotion at the University of Vermont is that you have to be on faculty for five years before you can be promoted, and so as soon as Ira -- as soon as I met that criteria -- in that first year, I was per diem because of my illness.  As soon as Ira was able to put me up, he put me up for a promotion, and I easily was promoted, but that takes a year.

Q    But if you had stayed at Dartmouth-Hitchcock, given the publishing and the speaking that you've referred to, do you believe you would have been promoted to full professor?

A    Yes.

Q    Did you receive raises each year at Dartmouth-Hitchcock?

A    For the most part, yes.

Q    And let me talk for a minute about how long you intend to work.  You're how old now?

A    62.

Q    And how long do you expect to continue to work?

A    I expect to work at least until 2033 at this point, and while many people would retire at 65 and then available for a significantly reduced pension from Dartmouth, so one of the fallouts -- I was on the old pension plan, I

Porter - Direct by Mr. Vitt

never converted.  One of the fallouts of my termination is that my pension plan significantly altered both when I can take it and how much money I would get.

My mother is 80, and she is still working two jobs.  She is the -- she was the chair of geriatric medicine at the University of Hawaii and is the medical director for nine nursing homes, and she also does consulting memory work.  My grandmother was 86 when she finished working her job.  And so in my lifetime, it will be the balance of the pressures of commuting and call and the joy I have with working and training trainees.

Q   You're still enjoying the work that you do at UVM?

A   I do, yes.

Q   You still enjoy the surgery?

A   Very much so.

Q   You're still doing the complicated surgeries you did before?

A   Yes.

Q   Laparoscopic and robotic?

A   Laparoscopic, robotic, open, combined with GYN oncology, hysteroscopic.

Q   Okay.  I want to show you what's been marked as an exhibit as Plaintiff's Exhibit 68.  Maybe we'll go with paper?  How do we want to proceed?

THE COURT:  If it's not in evidence yet, you should show it to the witness.

MR. VITT:  It is not.

THE COURT:  And not publish it.

MR. SCHROEDER:  Objection, Your Honor.  Hearsay, foundation.

THE COURT:  Okay.  I don't think Mr. Vitt has asked any questions yet.

MR. SCHROEDER:  That's true.

MR. VITT:  Not yet.  But I can accommodate him.

Q   (By Mr. Vitt) Can you tell me, is the top part of that document an e-mail that you received?

A   Yes.

Q   From whom?

A   Katrina Thorstensen who, when I was at Dartmouth in the clinic, each advanced practice provider, whether it be the midwives, the nurse practitioners, the physicians assistants were mentored and teamed with an attending staff physician to run questions by and talk about clinical care and also help them in clinic when they were having trouble.  And so Katrina was a midwife, or is a midwife, who provides largely gynecologic care in clinic, and so she was one of the two -- Elizabeth Todd was the other one -- the two mid-level, I would say

Porter - Direct by Mr. Vitt

advanced practice providers, that I was supporting and mentoring in clinic.

Q    Is the bottom part the letter that she wrote to folks in the administration?

A    Yes.  Yeah.

MR. VITT:  I would like to move the admission of this, Judge.

THE COURT:  Objection?

MR. SCHROEDER:  Objection, hearsay, Your Honor.

THE COURT:  Objection, overruled.  I'll allow this.

MR. VITT:  I'm going to show 69, and while you're doing it 86 and 94 as well.

MR. SCHROEDER:  I'm sorry.  What was the other one, P69 --

MR. VITT:  Sure.  It's 69 and 86 and 94.

MR. SCHROEDER:  Okay.  Just give me a second, please.

MR. VITT:  You bet.

MR. SCHROEDER:  No objection.

THE COURT:  All right.  So no objection to 69, 86, and 94, just to be clear?  Well, 69 you already objected to, if I'm not mistaken.

MR. SCHROEDER:  No.  That was 68.  These

are -- I think that Mr. Vitt has are 69, 86, and 94.

THE COURT:  Okay.  And there's no objection to all three of those?

MR. SCHROEDER:  No objection.

THE COURT:  Okay.  Then they are admitted.

Q   (By Mr. Vitt) Looking at 69 in front of you, right?

A   Yes.

Q   Who is that e-mail from?

A   Kathy Jacobson who was also a nurse practitioner at Dartmouth-Hitchcock Medical Center at the time.

Q   Let me hand --

A   I'm sorry, Kathy Jacobs.

Q   Okay.  86 is from whom?

A   Debra Birenbaum who is an MD at -- was, she's retired now, at Dartmouth-Hitchcock Medical Center.

Q   While I was up there I should have given you the other one.

This is Exhibit 94.  Tell me who that is?

A   Sharon A. Hart Silveira.  She's an OB-GYN and generalist at -- I believe she was at Dartmouth-Hitchcock Manchester or Nashua.  In the south.

MR. VITT:  Excuse me, Your Honor.

Q   (By Mr. Vitt) Without getting into the details of the letters and the e-mails, can you describe for us the

Porter - Direct by Mr. Vitt

substance of what you were hearing from the persons at Dartmouth-Hitchcock with whom you had worked?

A   Following the announcement of my termination, I had multiple e-mails, and multiple individuals who were coming to see me in clinic in shock and dismay, and a couple of the very senior people came to me and said, independently, We would like to go upstairs and talk on your behalf and meet with Dr. Merrens and senior leadership to make a case for you to stay.  And we just want to know if you would stay, given everything that's happened, and I said absolutely.

You know, this is my community, my -- my work family, my community colleagues and also the community that I raised my children and where my husband's business is.  And multiple of these e-mails go through -- these are all the things that she does for us from reinterpreting ultrasounds and putting that in the context of clinical care.

I'm -- not to not sound humble, but I'm a GYN ultrasound expert, and even general radiologists will do a general interpretation, but in all national guidelines, one of the things you can do before you take someone under surgery or do an expensive additional test is to run it by an expert.  And so that's a way to avoid excessive surgery and excessive

imaging.  So I was the resource for that in the department.  Also, extensive different surgeries that I was referred.  And so there were many requests to keep me and to keep those skills at Dartmouth-Hitchcock.

Q    Okay.  This case has gone on for a long time.

A    Mm-hm.

Q    Bringing a case like this takes a little out of you doesn't it?

A    It's taken a lot out of me at times.

Q    So why are you doing it?

A    It's many reasons.  The first is that I should not have lost my job for reporting patient safety issues.  It is our duty to report.  I should not have lost my job while I was on long-term disability and working really hard to come back.  I should not have lost my job when I had translatable skills to the rest of the Department.

        I also wanted to shine the light on the administrative errors that were made here and those that were responsible.  And I say that in the context that it was not easy to make a decision to submit a lawsuit.  It was a real challenge for me, especially when I was sick, and I did so with very careful contemplation.

        My mother has been a chief medical officer.  My

Porter - Direct by Mr. Vitt

mother has been the CEO of a major large medical practice, and she has been dean of clinical services at the University of Hawaii, and she looked at me and she said, What happened to you is not right. She had lots of experience to draw from. This is not fair. This is not right.

And I think the other reason why this has been important to me, and there's been significant financial loss, no doubt. I sought some counsel before to understand that it wasn't just a matter of severance, it was a significant financial loss. But the other reason I felt really motivated, and it's continued to be really important to me, is the why. Why did this happen to me? Why? Because what was being said made absolutely no sense to me.

I had grown an IVF cycle from 25 cycles a year and we had one nurse for many of those years. And there was things being said that was just really incongruous. Like I couldn't put the two together, and I learned that a lot of things in discovery that were painful, but really important in my life for me to know, and understand, and so that's been the reason whys. While some of these things are really painful, it's essential for me to understand it.

MR. VITT:  No further questions.

MR. SCHROEDER:  If we could have just five minutes to get my computer system set up here?

THE COURT:  All right.  I'll give the jury a five-minute break, if you'd like to stretch your legs. Maybe you can stay in the courtroom, if it's just going to be five minutes to settle?

MR. SCHROEDER:  Yeah.  I had that request from my paralegal.

THE COURT:  Okay.  Feel free to stand at your seats.

There's a request for Dr. Porter to take a bathroom break.

MR. SCHROEDER:  I think that's appropriate. That would be ideal.

(Pause.)

MR. SCHROEDER:  I would just ask, Your Honor, just a question of Plaintiff's counsel on an exhibit that I wanted to share just to make sure we kind of dealt with that upfront.  Let me just find out where we are in that.

THE COURT:  Okay.

MR. SCHROEDER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. SCHROEDER:**

Q    Good morning, Dr. Porter.

A    Good morning.

Q    And I would like to bring up, if I may, one of the last exhibits that you were shown, which is it was Plaintiff's Exhibit 86, and this was a document that was shown to you by your counsel, correct?

A    Correct.

Q    Okay.  And I would like you to read just the first sentence of that e-mail for the record.

A    The first sentence says:  "I don't think anyone in our department was surprised by the decision to close down the infertility service."

Q    Oh, sorry.  The second sentence as well.

A    "We have been aware of the dysfunction and lack of consistent care and support for a long time."

Q    And who is Debra Birenbaum?

A    Debra Birenbaum is a colleague of mine at Dartmouth-Hitchcock, and she has remained a friend.

Q    Okay.  She was a colleague of yours at DH.  Was she a physician?

A    Yes.

Q    And was she in the OB-GYN department?

A    Yes.

Q    And she refers to the fact that there was dysfunction in the REI division, right?

A    She refers to it.

Porter - Cross by Mr. Schroeder

Q   Right.  And she uses that word, right?

A   She uses that word.

Q   And she is somebody that was in -- so in the OB-GYN department, underneath that would have been a couple of divisions, correct?

A   There are several divisions, yes.

Q   Okay.  And I just want to make sure I understand them. So one of them was the REI division, right?

A   One, yes.

Q   What were the other ones?

A   General OB-GYN.

Q   Yes.

A   Uro-gynecology.

Q   Okay.

A   GYN oncology, and maternal fetal medicine.

Q   Okay.  So it looks like there were five different parts to the OB-GYN department?

A   And the midwives.  I'm sorry, the APPs, the advanced practice providers, yes.

Q   So six?

A   Yes.

Q   Okay.  And your group when you were employed by Dartmouth-Hitchcock, you were in the REI division, correct?

A   I was in the REI division doing a lot of complex

Porter - Cross by Mr. Schroeder

gynecology.

Q   Right.  But you were in that specific division, correct?

A   I was in that specific division.

Q   And Dr. Birenbaum, which division was she in?

A   She was in the general OB-GYN group.

Q   Okay.  And according to her e-mail to you -- and this is dated May 12th, 2017, right?

A   May 15th, 2017.

Q   Well, it's -- okay.  Right below that is the e-mail from Debra Birenbaum?

A   May 12th, yes.

Q   Okay.  So this is shortly after the closure of the REI division, correct?

A   Correct.

Q   Okay.  And she's referring to the fact, quote, "We've all been aware of the dysfunction and lack of consistent care and support for a long time."  Right?  You read that into the record?

A   I read it.

Q   And she's actually in a different division.  She wasn't in the REI division, but she was part of the overall OB-GYN department --

A   Correct.

Q   -- right?

Porter - Cross by Mr. Schroeder

And so she knew that there were problems in the REI division at that point, right?

A    She states so.

Q    Right. And she's a friend of yours, and that's not the first time you heard that, correct?

A    I -- I wouldn't -- I wouldn't go there, no.

Q    You wouldn't go there? Well, she was a friend of yours. She sends this e-mail to Dr. Merrens and Mr. Herrick, and she says, yeah, we've been aware of the dysfunction for a while. So --

A    That was the first time I heard her say it.

Q    So you never had any discussion with her ever before May 12th?

A    Not using the word "dysfunction."

Q    Okay. Had you had discussions -- but you did have discussions with her about problems in the REI division in general as opposed to the word "dysfunction"?

A    No.

Q    Never?

A    No, not to my recollection.

Q    Okay. So this is the first time out of the blue where she says, "We've all been aware of the dysfunction." That's the first time that you're ever hearing about that?

A    From Debbie, yes. I was shocked that she put it down.

Porter - Cross by Mr. Schroeder

But from Debbie, yes, to my recollection.

Q    Okay.  Now, you testified earlier about a couple of things, and I'm going to try and -- I may jump around, and I'm going to try to -- to the extent that you may need a minute to digest something, let me know.

In May of 2017, you said that the REI division closure and announcement was, I wrote, completely unexpected, right?

A    Yes.  For me, yes.

Q    Okay.  And for you it was completely unexpected?

A    Yes.

Q    You said you knew there was a slowdown or a pause might happen, right?

A    That Leslie and I had a discussion the day before there may be a slowdown or a pause, yes.

Q    But the pause actually, in the REI division, had actually already happened back in December of 2016, right?

A    Not to my knowledge.

Q    You never heard the word REI division pause or pause on admitting new patients?

A    No.  It was not -- not to my recollection, no.

Q    Well, was there a pause in the admission of new patients in December of 2016?

A    Not to my knowledge, no.

Porter - Cross by Mr. Schroeder

Q   Okay.  And you said -- when you were given reasons for the REI closure, you said one of them was the nursing shortage and your response from Mr. Vitt's question was "not accurate," right?

A   Correct.

Q   And your -- another reason that you said was mentioned was in-fighting, right?

A   I correct that.

Q   Oh, you corrected that?

A   Not in that meeting, but I thought he said more globally so we just corrected that.  It was not in that meeting, no.

Q   Not in that meeting.  I'm just asking about in general. Other issues that were in the REI division, did you not identify in-fighting as one of the reasons that was given?

A   Not my personal reason, no.  It was something that was in the media.

Q   Not your personal reason, but you were aware of that being one of the reasons, because there's only two that were listed here.

A   No, I wasn't aware of any in-fighting in REI at all.

Q   You weren't aware of any interpersonal issues between the REI division between you and Dr. Hsu and Seifer?

A   There were no personal issues in terms of in-fighting.

I wouldn't define it that way.

Q   Well, I understand you wouldn't define it that way, but would you say that there was conflict between you and Dr. Hsu and Dr. Seifer in terms of how procedures were done and in general?

A   I would not characterize it as conflict.

Q   Not -- so no conflict whatsoever?

A   Not interpersonal conflict; I would not characterize it that way.

Q   Okay.  Well, did you get along with Dr. Hsu and Dr. Seifer?

A   I got along with them, yes, but I also was reporting repeated patient safety and patient care issues.

Q   Okay.  But in terms of just your overall personalities, you got along otherwise?

A   I would characterize it as not a conflict with them.

Q   And not a dissension amongst the ranks between you?

A   I would not characterize it as a dissension.

Q   How would you characterize it?

A   Not a conflict.  If I were to go back and characterize it, it was trying to do my work and maintain patient safety and to report, as I had a duty to report, and also trying to get well and follow my requirements of my team.

Q   Okay.  Just so that the jury has an understanding of

Porter - Cross by Mr. Schroeder

the time period, in May of 2017 is when the REI division was closed, correct?

A    Mm-hm.

Q    And you were given notice of that on May 4th --

A    Correct.

Q    -- right?

And the other two physicians, Dr. Hsu and Seifer, were given notice of that on May 4th, correct, at the same time?

A    To my knowledge.

Q    Well, you were with them, right?

A    They weren't in the room.  They went off and I went into another place.  So we were not together in the room when we were counseled out of the job, no.

Q    But the termination of the REI division was announced to all three of you at the same time, correct?

A    Yes.

Q    Okay.  So you understood that the division that the three of you were in was closing, correct?

A    And I also understood that Elizabeth Todd who I had worked with for many years and shared many patients in complex GYN was staying.

Q    Okay.  But you understood that you and Dr. Hsu and Dr. Seifer were all being terminated otherwise?

A    Correct.

Porter - Cross by Mr. Schroeder

Q   And Ms. Todd, she had actually a dual appointment.  She
had been working part of her FTE status, so her
full-time equivalency, part of her hours were with the
OB-GYN department, correct?

A   No.  I have no knowledge of that.

Q   You didn't know that?

A   She was in REI, and she was in REI for 16 years from
when I trained her, or 12 years, whenever it was.

Q   But you don't know whether or not she -- her hours were
being charged to the overall OB-GYN department as
opposed to the REI division, you don't know that?

A   Not to my knowledge, but for many years she was housed
entirely in REI.

Q   I understand many years, but you don't have any
personal knowledge as to whether or not, at the time of
the closure, her hours were being charged to OB-GYN, or
she was committing hours to OB-GYN as opposed to the
REI division?

A   We were both doing complex GYN in the clinic.  And, in
fact, I was doing 80 percent GYN and ultrasound in the
clinic at the time of the closure.

Q   I understand that.  But my question is, you're not
aware of whether or not her other hours, some of her
hours, her work hours, were part of her appointment
within the OB-GYN department?  You don't know how those

Porter - Cross by Mr. Schroeder

hours were charged?

A   I understood she was 100 percent REI, and I don't know if her hours had changed over time, but the long-term history was that she was in REI.

Q   I understand the long-term history, but I just want to get to that point in time, not the long-time history. That point in time, you do not have any personal knowledge, one way or the other, that's fine, of how her hours were charged, whether she was committing hours to OB-GYN department in addition to the REI division.  At that specific point.

A   I don't know.

Q   Okay.  Thank you.  I want to get a few questions about, it sounds like, at this point, you are an empty nester; is that a fair statement?

A   Our son lives in the apartment over our garage.  So I'm not an empty nester.

Q   Okay.  You've never -- so even though he's above the garage, all three of your kids are out of college, right?

A   Yes.

Q   Okay.  And one -- was that the son -- I have two boys and a girl as well.  Was that the son who went to UVM at the time that you were working at UVM?

A   No.

Porter - Cross by Mr. Schroeder

Q   That was another child?

A   Mm-hm.

Q   Okay.  And so when you bought the condo in Burlington, you also had a -- one of your kids was at UVM for a couple of years?

A   Correct.

Q   What years was your child at UVM?

A   He -- he was at UVM prior to my starting at UVM, and he had one year left when I started on faculty.  No, I needed to be on faculty for a full year before we would get any tuition remission.

Q   Okay.  And you were on -- so there was another year that he was there after that, right?

A   No.  I got one semester of tuition remission.

Q   Okay.  And so he was there for part of the time that you started working -- he was already there at UVM.

A   Yeah.  He was already at UVM living off campus.

Q   Okay.  All right.  He didn't want to live with you, right?

A   What college boy wants to live with his mother?

Q   Well, apparently one does now, but I may have that same issue.

    So there was a part of the time that you were there you had one of your kids was there at UVM, right?

A   Yes.

Porter - Cross by Mr. Schroeder

Q    Okay.  Now I want to turn your attention to a document that's been marked B12, if we could put that up.

     Now, you were shown this document by Mr. Vitt, correct?

     And we can go to the next page, please.  Thank you.

     Now, this was a letter that you sent to Ms. Giglio, Dr. Merrens, and Dr. Padin and Dr. DeMars, correct?

A    Correct.

Q    At some point, but first you sent it to yourself, right?  That was the first page?

A    I wrote this at home.

Q    Understood.  I just -- the first e-mail in this sequence, which is B-12(001) which is an e-mail sent to yourself and then the letter is attached.

A    I think there are multiple copies of this, and so I -- one of the issues with the challenges is that when I reviewed the documents, there are multiple.  So, you know, we got, I don't know, 30,000 documents at some large number and there are multiple copies of all of it.  So I can't say whether -- it looks like I did e-mail this particular one to myself.

Q    That's all I'm asking.

A    Okay.

Porter - Cross by Mr. Schroeder

Q   That's all I'm asking.  I understand your point about documents, but this was a document that you e-mailed to yourself, right?  That's all I'm asking.

A   It appears so.

Q   Thank you.  Okay.  And you wrote this on or about May 25th, correct?

    We could go to the next page.

A   I did spend several days writing it, but that was the final copy.

Q   Understood.  It was a long letter, and you took several days to write it, right?

A   Correct.

Q   And, in fact, this is several weeks after you had received notice of your termination, correct?

A   Termination was May 4th notice.  This was submitted May 25th.

Q   Right.  And my question was this was several weeks after you received notice of your termination?

A   I would define it as two weeks.

Q   Well, May 4th and May 25, I think that's three.

A   Okay, three.

Q   Okay.  Several weeks, right?

A   Three weeks.

Q   Okay.  And you took several days to write it, right?

A   Correct.

Porter - Cross by Mr. Schroeder

Q    And I just want to ask you about the individuals you've
     identified here.  Ms. Giglio, who is she?

A    I believe her name has changed since then, but she was
     the interim director of Human Resources.

Q    Did you -- actually, her name has changed.  It's Aimee
     Claiborne.  So I'll refer to her as Aimee Claiborne if
     that's okay with you.  She was the interim head of HR.
     CHRO?

A    Correct.

Q    So she was the highest ranking person in HR, as far as
     you knew?

A    As far as I knew.

Q    And Dr. Merrens, we've spoken about him.  And then
     Dr. Padin and Dr. DeMars, right?

A    Correct.

Q    Okay.  Now, you had said on your direct testimony that
     no one -- no one at DH ever spoke to you about this
     letter.

A    That's not what I said.

Q    You didn't say that?

A    I said no one reached out to me.

Q    Okay.

A    I reached out to them and I asked for a meeting with
     Ms. Claiborne.

Q    Okay.

Porter - Cross by Mr. Schroeder

A   So it's a matter of did anyone contact me and ask me about the content of this letter?  No.  Did I reach out and ask for a meeting?  Yes.

Q   And, in fact, that meeting was held -- so Ms. Claiborne, you reached out to her, and she said fine, let's have a meeting, right?

A   Correct.

Q   And that meeting happened just a few days later, correct?

A   I don't recall.

Q   And -- but she didn't say, No, I'm not going to meet with you, right?

A   Correct.

Q   And she was the head of HR at that point, correct, for Dartmouth Health?

A   She was, I believe, the interim director, yes.

Q   Right.  The interim head.  Right.  Okay.
     And you then proceeded to highlight in this letter a number of issues, correct?  You looked at this letter before --

A   I have not read through it in the last couple of days, no.

Q   Okay.  Well, you know you were going to be asked about it on your direct examination, right?

A   Yes.

Porter - Cross by Mr. Schroeder

Q    Okay.  So you know you were going to be asked about the specific document.  And you raised -- do you recall raising four different points, and if you want to read it --

A    Yeah, I would like to re-read it.

Q    Okay.  That's fair.

MR. SCHROEDER:  Just take a minute for her to read it.

THE COURT:  Yes.

MR. SCHROEDER:  Thank you.  And just let me know when you're finished, Dr. Porter.

THE WITNESS:  There's only one page here, can I see the entire document?

MR. SCHROEDER:  Absolutely.

MS. McDONALD:  It's in Volume 1.

MR. SCHROEDER:  I'm sorry.  May I approach the witness?

THE COURT:  Yes.

MR. SCHROEDER:  Okay.  Apologies, so that one and --

THE WITNESS:  Please take it out for me.

MR. SCHROEDER:  Sure.

(Pause.)

THE WITNESS:  Okay.

Q    (By Mr. Schroeder) Okay.  You've had a chance to review

that?

A    Mm-hm, yes.

Q    Okay.  I'll just ask you a few quick questions.  One of the first points that you wanted the hospital to reconsider -- this was your -- I think it was seven pages, right?  I counted them.  I think I'm right.  But as a lawyer, math is not my specialty.

A    They're not page numbered.

Q    Okay.  Well, I counted.  It was seven, but you could verify it on a break.  We're almost there.

A    Okay.

Q    One of the things that you said in your statement to these four individuals -- and you raised this letter, by the way with Ms. Claiborne, correct, when you met with her a few days later, right?

A    I don't recall.

Q    You don't recall raising this seven-page letter?

A    I know I had sent it to her.  I don't recall if I raised it to her at the time.

Q    Okay.  You wrote a seven-page letter.  You asked for a meeting with her.  The meeting happened two days later.

A    I don't recall.

Q    Are you telling me you don't recall having any discussion with her about the letter, the contents of the letter?

Porter - Cross by Mr. Schroeder

A    I don't recall specifically reviewing the letter, no.

Q    Or any of its contents?

A    I don't remember that, no.

Q    Okay.  But you did have that meeting in person with Ms. Claiborne, correct?

A    Correct.

Q    And at that point, in May, you had -- so this is May of 2017.  And I want to just make sure that the jury understands the time sequence of things.  Your first surgery -- just to get the perspective of the time, your first surgery was in December of 2015?

A    I had a blood patch in December of 2015.

Q    Okay.

A    My first surgery was not until September of 2016.

Q    Okay.  And when you had that blood patch in December of 2015, were you out on short-term disability at that point, or did you go out on short-term disability?

A    Yes.

Q    And you were out for approximately six months?

A    On short-term disability, yes.

Q    Right.  And short-term disability is, generally speaking, a six-month policy.  Are you aware of that?

A    For all providers, there are -- for all employees at Dartmouth-Hitchcock, I believe that's correct.

Q    Okay.  And so you were out on short-term disability

Porter - Cross by Mr. Schroeder

from mid December, right, so mid June of 2016, right?
Mid December of --

A   I was out on short-term disability for six months, yes.

Q   Okay.  I want to make sure we have a perspective of time here.  Mid December of 2015 to roughly mid June of 2016?

A   Mid December 2015 to six months later.

Q   Okay.  And the -- at this point in time, which is the letter that's in front of you, this is May 2017.  I just want to make sure that we have the -- so mid December 2015 to mid June or so of 2016, that's six months, right?

A   Correct.

Q   Okay.  I just want to make sure that -- we'll come back to this document in a minute, but I just want to make sure that from just a perspective issue and chronology of events.  So you were out for that period of time.  You came back to work sometime in June of 2016, right?

A   I believe I came back earlier.

Q   And you were part -- well, you just said you were out for six months on short-term disability, so I'm just trying to track this in general terms right now.

A   Well, we can pull the timeline if you would like to be specific.

Q   I'm just trying to get answers as to how long you were

Q   out on short-term disability.  You said six months?

A   I was on short-term disability for six months.

Q   Okay.

A   I would refer to the timeline that's published for the exact numbers and hours of when I returned.

Q   Understood.  You came back at some point in the summer of 2016, correct?

A   Correct.

Q   And then your first surgery was in the fall of 2016?

A   Yes.

Q   Okay.  And do you recall you were out for a couple of months at that point?

A   I was on modified bed rest for six weeks --

Q   Okay.

A   -- after my surgery.

Q   And that was sometime -- was that sometime in August to November of 2016?

A   I was at the Mayo Clinic in August of 2016 and then out on modified bed rest, but I started attending team meetings by phone, and I wrote a book chapter, and I was doing some work in that period of time.

Q   Okay.  And then you were gradually coming back at various levels in January, February, March, April of 2017, correct?

A   I had a programmed return schedule that I had to meet

Porter - Cross by Mr. Schroeder

certain criteria of complexity by my healthcare team and followed that.

Q    Okay.  I understand that.  I just want -- I want you to just answer the question.

You were gradually increasing your hours over that period of time?

A    Yes.

Q    And that happened to be pursuant to the instructions from your healthcare team at the Mayo Clinic?

A    No, my healthcare team at Dartmouth.

Q    Okay.  Your healthcare team at Dartmouth.

But then your first surgery, you said, was where? Was that at Mayo?

A    I had a spinal surgery at the Mayo Clinic in September of 2016.

Q    Okay.  That's what I thought.  So you had a healthcare team at the Mayo, and then you had a healthcare team at Dartmouth Health?

A    Correct.

Q    Okay.  And pursuant to that, you were increasing the number of hours that you were working at Dartmouth Health in January, February, March, April, right?

A    Yes.

Q    Now, in fact, and you alluded to this, or you testified to this before, the fact that you had to have a second

Porter - Cross by Mr. Schroeder

surgery at the Mayo Clinic.

A    Correct.

Q    And that was in the fall of '17.  This is after the REI division is closed, correct?

A    Correct.

Q    And as a result of that second surgery, that was the fall of 2017; that was September to, say, mid November when you were out?

A    Yes.

Q    Okay.  Prior to that, before it came to a head that you had to have this second surgery, do you recall having a few visits for varying lengths of time at the Mayo immediately after the REI division closure?

A    I did not immediately afterwards go.  I went to the Mayo in September for my second surgery, but I was not physically there, to my recollection, no.

Q    Right.  But in May through -- May 29th through June 13th of 2017 and then June 28th to July 11th, do you recall having to go out to the Mayo for various visits?

A    In 2017?

Q    Right.

A    No.

Q    You don't recall that at all?

A    No.

Porter - Cross by Mr. Schroeder

Q    Okay.  Were you experiencing symptoms related to your condition at that point?

A    Yes.

Q    Okay.  Now, with respect to -- and I would like to go back to your letter.  The second reason that you gave or differentiate -- the second reason or factor that you wanted the four individuals to consider was that Dr. Seifer and Hsu have a limited scope of practice, correct?

A    Correct.

Q    And I want to go to just the -- let's see here.

     Now, to the extent -- would you agree with me that if a doctor has a limited scope of practice or doesn't feel that they should do something or some sort of practice that, in fact, it's safer for them not to perform that procedure?

A    I think that's speculative.

Q    You think it's speculative?

A    I think that it would depend on what they thought their abilities were and what procedure we were talking about.

Q    In this letter, you're making a statement to these four individuals that comparatively speaking, they had a limited scope of practice, correct?  You say that, correct?

Porter - Cross by Mr. Schroeder

A    Dr. Seifer didn't do any GYN surgery nor was he credentialed to do ultrasound, and Dr. Hsu did not do complex robotic surgery, and he also was not an ultrasound expert.

Q    Right.  I'm just asking whether or not, and we've highlighted here for you on the screen, whether you said -- on the screen there, on the screen -- both the other two clinicians have a very limited scope of practice, right?  You said that?

A    Correct.

Q    And you were differentiating yourself from the other two physicians, correct?

A    Correct.

Q    And you understood, though, that you and the other two physicians were being terminated at the same time, right?

A    Correct.

Q    Now, at the time, you had -- you were going through proctored surgeries, correct?

A    Correct.

Q    And that meant having other physicians in the room with you?

A    Correct.

Q    As a result of the second surgery, I think you testified on direct exam, you had to go through that

Porter - Cross by Mr. Schroeder

whole proctoring process again, correct?

A    I volunteered to do it, yes.  And as a new faculty at UVM, it was an expectation.

Q    Okay.  And you would have had to do that -- would you have had to do that as well at Dartmouth Health just because of the second surgery, if you were still there?

A    Most likely, and I would have accepted it.

Q    Okay.  I just wanted to know "yes" or "no" whether you were doing it.

In looking at the seven-page letter that you wrote, you do not make any claims in here of disability discrimination, right?

A    I wanted my job back, and at that point, a lot of the data and information about the disability discrimination was still evolving.  So I wanted my job. And it was very clear to me in the three times that Dr. Merrens said it at that meeting where I was terminated, he said three times to me to stay out on disability, and when I saw Dr. DeMars on the sidewalk, she also said to me, she could not have kept me because of my disability.

Q    My question though, just my question, was not about comments that Dr. Merrens did or did not make or Dr. DeMars.  In fact, you don't reference any of those conversations in this specific document, right?

Porter - Cross by Mr. Schroeder

A    Not that I recall.

Q    Well, you just read it and you were -- you knew you were going to be asked it on direct exam by your counsel because it was an exhibit; it was one of the few exhibits that came in.  You knew you were going to see this document, so when you say you don't recall, you've read it, right?

A    So I would like to read you the part of the letter that might answer your question.

Q    No.  I would appreciate it if you just answer my questions.  Your counsel can ask you questions afterwards.

My question to you though was:  You do not refer or make any claims of disability discrimination, those words, or retaliation anywhere in this document, right?

A    That's not how I interpret it, no.

Q    Whether you interpret it -- how you interpret it is not the question.  The question is, you do not use those words in any which way, right?

A    "The termination of my employment will impact my recovery from the debilitating condition I suffered last year."

Q    Okay.  That --

MR. SCHROEDER:  I would ask the Court just for instruction, just answer my question.

Porter - Cross by Mr. Schroeder

THE COURT:  Dr. Porter, you should answer the question that's being asked of you by counsel.

Q   (By Mr. Schroeder)  Okay?  Nowhere in this document do you use the phrase "disability discrimination" or "retaliation," right?

A   No.

Q   Okay.  And at that point you already had legal counsel, correct?

A   Yes.

Q   Okay.  I think --

MR. SCHROEDER:  Your Honor, if it's okay, before I switch to another topic, I think this would be --

THE COURT:  Yes.  It's about lunch break.  So we'll take our one-hour break for lunch.  I have 12:05, so we'll start again at 1:05.  All right.  Thank you.

(Jury exits.)

THE COURT:  Okay.  Dr. Porter, you may step down.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Is there anything to take up before the lunch break?

MR. SCHROEDER:  No.

THE COURT:  Okay.  I'll see you all back around 1:00.

Porter - Cross by Mr. Schroeder

MR. SCHROEDER:  Thank you.

(Noon recess taken.)

Porter - Cross by Mr. Schroeder

March 26, 2025

Afternoon Session

* * *

THE COURT:  Okay.  So I understand counsel has asked to meet before we bring the jury back.  I don't know who is making the request or both sides are making the request, but...

MR. SCHROEDER:  Both.

THE COURT:  Okay.  Mr. Jones.

MR. JONES:  I'll start.  After our discussion this morning, I got Your Honor's message loud and clear that we were expected to have witnesses tomorrow afternoon, so we spent the lunch break working on putting together a list of witnesses we could bring tomorrow afternoon.  My office is currently preparing subpoenas and witness checks and will get them out.

I asked Mr. Schroeder, since four of them are current DH employees, if he would simply accept service or arrange for notice to them, and then he wanted to talk to you.

THE COURT:  Okay.  Mr. Schroeder?

MR. SCHROEDER:  Thank you, Your Honor.  Sorry, had a mint in my mouth.

At the end of the day, Your Honor, this is unfairly prejudicial to, at the last minute, when

Porter - Cross by Mr. Schroeder

Plaintiff's counsel, I understand that they will be done, I think, by late morning tomorrow at least for tomorrow, and now at the last minute to try to serve subpoenas on people that they weren't even going to call but for the fact that you want to make sure that we have a full day. That's highly prejudicial to us, to accept service of a subpoena less than 24 hours before they're expected to be here. I have no idea what the schedule of these people are. They might be DH employees. I saw the list very quickly, but --

THE COURT: So these individuals were not subpoenaed before? Am I correct about that?

MR. SCHROEDER: Correct.

THE COURT: Because you said -- I think I heard you say, Mr. Schroeder, that they were not even going to be called. So these were never intended to be trial witnesses?

MR. JONES: Well, to be clear, they were on the witness list that we produced however many weeks ago, but I think I told Your Honor this morning that one of my pieces of good news was that we had streamlined our case and had identified people we no longer intended to call. It is true in that world these are people that we decided to take off our list.

THE COURT: Okay.

Porter - Cross by Mr. Schroeder

MR. JONES:  But when you give me an admonition to make sure that the time is full, then...

THE COURT:  Right.  Okay.  So there's some competing concerns here.  Yes, obviously, I want to have full trial days.  On the other hand, Plaintiff is saying that they have apparently figured out a way to streamline the case.  You are streamlining -- if your streamlining of the case is now causing you to attempt to bring witnesses in that you were not inclined to call after your streamlining, then this puts -- kind of puts us in a little bit of a situation.  I hear you, Mr. Schroeder, as well about potential prejudice, so I wonder --

MR. SCHROEDER:  Your Honor, one other issue.

THE COURT:  Yes.

MR. SCHROEDER:  Yesterday you, I think, implored counsel for both parties to talk about, okay, what -- who were the witnesses coming up, right, for the rest of the week.  That's what spurred this whole conversation.  These witnesses were never discussed last night.  These are -- I mean, they were on their list; their list is 25 long.  Okay?  But we haven't -- the first I heard of these four people was about five minutes ago, so never mind the trial subpoenas, we had an agreement as to how today was going to go.  I think

Porter - Cross by Mr. Schroeder

everybody recognized -- at least I recognize that the likelihood of Mr. Bancroft being all day tomorrow was highly unlikely.  But to then jam us up because there's a gap in time to avoid having you be angry at Plaintiff's counsel and then expect us -- I mean, I was less than happy about just even the expectation that I would accept service of a subpoena less than 24 hours before having somebody come here, regardless of whether or not they're even around, so it's highly prejudicial.

MR. JONES:  I don't know how else to bring witnesses, which I understood to be the request you made.

THE COURT:  Okay.  So first, I'm going to state for the record, I'm not angry at Plaintiff's counsel, nor am I angry at Defense counsel.  Be clear about that.  I almost wonder then if what the best solution is that what Mr. Jones proposed if tomorrow afternoon we do have this gap if it's not necessary. I'm hearing you say that your, kind of, new game plan -- streamlined game plan for your case doesn't have to involve them.  It seems like there is the potential of prejudice to the defendants if we were to kind of go forward with the subpoena service today for their testimony tomorrow.

So it's my suggestion, what I think I'm going to

Porter - Cross by Mr. Schroeder

do is, just have that gap tomorrow.  So we'll have Dr. Bancroft in the morning, and you're all telling me that you think that that would be concluded in three or four hours -- and that's everything, cross, redirect?

MR. SCHROEDER:  That's right, Your Honor.

THE COURT:  Okay.  And Dr. Porter is anticipated to finish today as a witness.  Is that still...?  If not, that's okay.  We have some time to play with in the afternoon.

MR. SCHROEDER:  Yes.  I -- I have a good amount of ground to cover, but I talk pretty quickly, but we'll try to move things along.  We might have a little bit of overhang for tomorrow with their redirect and perhaps a little bit of recross, but it sounds like we'll fill some -- at least some or most of the time tomorrow overall.

THE COURT:  Okay.  So it sounds like we'll have plenty of time tomorrow to do, possibly finishing up Dr. Porter and then finishing up Dr. Bancroft.

Thinking to myself really, this just occurred to me now, what other use we might be able to make of that time tomorrow afternoon.  So Plaintiffs are saying their case may come in more quickly.  Obviously, that means that Defense case would start sooner than anticipated.  So certainly not holding you to it, but

Porter - Cross by Mr. Schroeder

this is potentially a case that is done by the end of next week?

MR. SCHROEDER:  I hadn't gone that far ahead in my head yet, Your Honor, but I certainly think, you know, Mr. Jones, has been very clear about, Hey, you guys will probably be done by Tuesday, so, you know, it was a good heads-up to us to make sure that we're ready to go Wednesday.  Possibly by the end of next week, but I don't -- I mean, to go to a jury, I don't think -- I don't think we're going to be done, done, not that I wouldn't like that, including my daughter who wants me to come down for her parents -- Father's Day weekend the following weekend.  So, yeah, there's a lot of reasons why I would like to be done earlier.  I think our closings may go into the start of the next week.

THE COURT:  Okay.  All right.  I was thinking if we were really on, kind of, an accelerated plan here, then we should probably think about talking about jury instructions, things like that.  I'll just kind of plant the seed.  I don't know if this is where it may end up going, but is there any possibility of stipulations involving the jury instructions as to any elements or anything like that?  Not looking for an answer now, but something that, you know, maybe you want to think?  I was initially thinking, well, we

Porter - Cross by Mr. Schroeder

could maybe start talking about this tomorrow afternoon. It might be too soon, particularly if we think it might bleed into the third week, as originally planned.

MR. SCHROEDER: I think your idea is a good one for us to at least start having a conversation to figure out what the general framework of what some of the jury instructions might be to the extent we could stipulate. It's not lost on me, but I personally had not thought that far ahead yet.

THE COURT: All right. Well, then let's bring the jury back so we can continue making progress on this, and then at the end of the day, we'll talk again maybe a little bit about Friday, and I'm advised that there has been a recent filing --

MR. COFFIN: Yes, Your Honor. I filed a brief motion in limine of the admissibility of Bancroft's report or whether that is hearsay. It's been served on the other side. It's just been served.

THE COURT: So I anticipate then that we will be meeting tomorrow morning well ahead of when the jury comes in, to take that issue up. Obviously, you're going to need a ruling on that before Dr. Bancroft is on the stand, so -- okay.

Bring the jury in, please.

Porter - Cross by Mr. Schroeder

MR. SCHROEDER:  Your Honor, may I approach the podium?

THE COURT:  Yes.  Dr. Porter.  You may take the stand as well.

(Jury present.)

THE COURT:  Go ahead.

MR. SCHROEDER:  Thank you, Your Honor.

Q   (By Mr. Schroeder) Good afternoon, Dr. Porter.  I want to go back to that May 25th letter that you had sent to those four individuals, right, Aimee Claiborne -- I'm not going to ask you anything specific about it so you don't have to read it.

A   I would like to have it if we're going to talk about it.

Q   Okay.  I'm not going to ask you a specific question about the document.  I'm just asking you about the four people.  So there was Aimee Claiborne, Dr. DeMars, Dr. Merrens, and Dr. Padin, correct?

A   Correct.

Q   Okay.  And you approached -- out of the four, you immediately approached, or I should say, a few weeks later approached Ms. Claiborne, correct?

A   I asked for a meeting with her, yes.

Q   Okay.  And that meeting happened sometime in that time frame after your May 25th letter, correct?

Porter - Cross by Mr. Schroeder

A    Correct.

Q    Now, was that the only -- that was the only person you specifically reached out to regarding this letter to have a meeting about, right?

A    Correct.

Q    Okay.  And up until that point, you knew Dr. Merrens, correct?

A    I don't know Dr. Merrens.  Well, I know who he is, yes.

Q    You know who he is, but you knew him, right?

A    Yes.  I hadn't talked to him in years, but yes.

Q    Right.  It had been a couple years since you talked to him regularly, right?

A    No, it had been many years, I believe.

Q    Many years?

A    To my knowledge; to my recollection, yes.

Q    Okay.  But you knew him, correct?

A    I knew who he was, yes.

Q    Well, you had prior dealings with him, right?

A    Yes.

Q    You'd had interaction with him by e-mail, right?

A    Yes.

Q    You met with him in person, correct?

A    Many years ago, yes.

Q    You say "many years ago."  Well, we'll get to that later, but your dealings with him in that prior

Porter - Cross by Mr. Schroeder

instance, you had -- you were able to communicate with him, right?  You looked to him for guidance on certain issues?

A   I had a conversation with him.

Q   You had more than one conversation, didn't you?

A   I don't recall.

Q   Okay.  We'll try to refresh your recollection later. But it had been a couple years, right, since you hadn't had any dealings with him in say 2014, 2015, 2016, right?

A   When I started taking the fellows, I got an e-mail from him, and that's all I recall at this point.

Q   In that time period?

A   In that time frame.

Q   Okay.  But other than an e-mail about the fellows -- and do you remember when that was?

A   No, I don't.

Q   Okay.  Other than that one e-mail about the fellows, in that three-year time period, you don't recall any other interactions with Dr. Merrens, right?

A   Not to my recollection currently, no.

Q   Right.  And with respect to 2017, you didn't have any interaction with him in January, February, March or April, right?

A   Not to my recollection.

Porter - Cross by Mr. Schroeder

Q    One of the questions I asked you earlier about was when you were on short-term disability and long-term disability, and I just want to be sure we're clear on the time frames.  So if we could pull up Exhibit U.

MS. McDONALD:  We're having a little bit of a technical difficulty at the moment.  The program appears to be frozen.

THE COURT:  Are you asking to bring up something that's not in evidence?

MR. SCHROEDER:  It's not in evidence yet.

THE COURT:  Do you mean just for the witness stand?

MR. SCHROEDER:  Oh, because it would be over here.

THE COURT:  Right.

MR. SCHROEDER:  I got it.

THE COURT:  So you have a paper copy; you can hand that to the witness.

MR. SCHROEDER:  We could do that.

THE COURT:  Or I'm sure we could have it on the screen just for the witness.

MR. SCHROEDER:  I don't want to make -- I think we have enough technical problems as it is.  Let me get a hard copy of it.

MS. McDONALD:  It should be Volume 1.

Porter - Cross by Mr. Schroeder

Q    (By Mr. Schroeder) Okay.  I'm showing you a document that's been marked Exhibit U.  Do you recognize that document?  Just one page.

A    I don't.

Q    Okay.  Is that an e-mail from you to somebody in Provider Services on July 5th, 2016?

A    July 6th, 2016, correct.

Q    Right.  And that's your e-mail address, correct?

A    When I was at Hitchcock, correct.

Q    Okay.  Do you have any reason to doubt its authenticity?

A    No.

MR. SCHROEDER:  Move for admission.

THE COURT:  Any objection?

MR. VITT:  No objection.

THE COURT:  Okay.  It's admitted.

MR. SCHROEDER:  Thank you.  May I now put it up on the screen?  I'll get this down.  We're still having technical difficulties.

MS. McDONALD:  Do you want to do it on the Elmo?

MR. SCHROEDER:  I'll just have her read it into the record.

Q    (By Mr. Schroeder) Let me just ask you to read the e-mail into the record Ms. -- Dr. Porter, dated

Porter - Cross by Mr. Schroeder

Tuesday, July 5, 2016, from you to Provider Services regarding the subject "Disability."

A   "I've been on long-term disability, returned to work 9 to 11 hours a week as of 6/14."

Q   Does that refresh your recollection that -- and I think you testified to this, and I want to make sure that the jury understands the chronology because we go back and forth.  December 15 of '15, thereabouts, to June 14 of 2016 is about six months.  Is that about the time period that you were on short-term disability?

A   I was on short-term disability for six months, yes.

Q   Okay.  After short-term disability, were you qualified at some point for long-term disability?

A   Yes.

Q   And did that -- whether or not it happened in right sequential order, was there a gap in coverage, or did the short-term disability, after you had those benefits, convert then to long-term disability?

A   I believe there wasn't a gap in coverage, but to the best of my knowledge there wasn't.

Q   Okay.  There was not?

A   Yes.

Q   Okay.  With respect to -- so then you went on long-term disability sometime in June of 2016, correct?

A   I believe so.

Porter - Cross by Mr. Schroeder

Q    Okay.  And did you have long-term disability benefits then until the summer of 2018, thereabouts?

A    I had continued long-term disability while I was on per diem, yes.

Q    Okay.  So when the division closed in May or June of 2017, you were already on long-term disability benefits at that point, correct?

A    Correct.

Q    And you were receiving compensation through that, I'll call it, LTD plan?

A    I was receiving part of my salary as being on long-term disability, yes.

Q    Okay.  And despite the termination or the closure of the REI division and your termination of employment, you continued to receive long-term disability benefits until somewhere in the summer of 2018; is that right?

A    I received partial -- I received long-term disability benefits that were prorated based on the amount I was working, and I also had to pay my own health insurance.

Q    Okay.  My question though is that the long-term disability benefits still -- there was no gap even after the closure of the REI division, they carried forward into the period after your termination of employment all the way through until May or June of 2018?

Porter - Cross by Mr. Schroeder

A    I had partial reimbursement from long-term disability, and I was also earning per diem salary, yes.

Q    Right.

A    And until my primary care provider approved I come off long-term disability, yes.

Q    And that happened when?

A    Well, let's look at the deposition to be sure, but it was the spring of 2018, I believe, spring/summer.

Q    We'll get to the deposition if we have to, but I just want -- this isn't a trick question.  I'm trying to figure out for chronology for the jury when you came off long-term disability and you had a full clean bill of health.

A    Well, when my primary care provider had me come off long-term disability.

Q    And was that in and around May, June 2018?

A    I believe so.

Q    Okay.  And, at that point, you were working at UVM, correct?

A    On per diem, yes.

Q    Right.  And with respect to your long-term disability benefits, whatever the plan was, you said they were prorated.  Was it prorated because if you worked there would be a deduction from your benefit?

A    Correct.  I was submitting what I was earning, and they

Porter - Cross by Mr. Schroeder

would be reduced based on my -- The Hartford and the disability would reduce my payments based on my income.

Q   Right.  So in September, October, and November, that time period right after you had your second surgery, you were out completely, you were receiving the full long-term disability benefit, right?

A   Correct.

Q   Okay.

MS. McDONALD:  Would you like a copy for the Elmo?

MR. SCHROEDER:  Sure.  Your Honor, a quick second so I can kind of figure this one out.

THE COURT:  Yes.

Q   (By Mr. Schroeder) Now, I would like to turn to you working in the REI division.  You said when the REI division, when you started there, were you one of the first people there?

A   I joined -- Dr. Manganiello was the first person there, and I joined several years after he had been there.  I think he started in late '70s and I started in '96.

Q   Okay.  Was it a fairly -- so when you got there, there was just Dr. Manganiello?

A   And myself, yes.

Q   Okay.  So just the two of you?

A   Yeah.

Q   Okay.  So is it fair to say that that was a pretty small program at that point?

A   The REI service itself was actually pretty global.  He was a specialist in genetics and menopause and everything else, so it was not particularly small.  The IVF, again, which is that sliver of REI, was small.

Q   Okay.

A   IVF was, but not the infertility service per se.

Q   Okay.  But other than you and Dr. Manganiello it was just the two of you, right?

A   And we had nurse practitioners.  We had one or two nurse practitioners as well.

Q   Okay.  So it was you, one other doctor, and one or two nurse practitioners, right?

A   Correct.

Q   And that was the REI division, right?

A   Correct.

Q   Okay.  So when I said it was small, would you agree with me that a handful of people is a small program, say, compared to you mentioned before Boston IVF, right?

A   They're not equivalent.

Q   Right.  Boston IVF is a fairly large program, right?

A   Boston IVF does IVF; it's not a reproductive medicine program, no.

Porter - Cross by Mr. Schroeder

Q   So compared to what the REI division was at that time, which did IVF at Dartmouth Health?

A   If you're looking at the comprehensive reproductive medicine program, that's not Boston IVF.

Q   Okay.  Let me turn your attention to the REI division in 2016.  We'll go back in time in a second, but with respect to the REI division -- and this is before David Seifer becomes division director of the REI division, okay.

A   Mm-hm.

Q   So just time period.  So early 2016, there's yourself -- and I just want to go by the doctors for a second.  I want to make sure the jury understands who is in the division, who is not.  You had -- and I'm just talking about physicians and nurses that are providers within the REI division.

    So at that point, you have yourself and Dr. Hsu, correct?

A   And our nurse practitioner Elizabeth Todd.

Q   Beth Todd?

A   Yes.

Q   So those are the three, right.  So it's you, Albert Hsu and Beth Todd?

A   And I believe we had fellows with us as well.

Q   Okay.  And do the fellows go in and out of the program?

Porter - Cross by Mr. Schroeder

A   We had a fellow assigned each year for three years, and they would be assigned for a year.  Some would come down for certain days.  And one of the fellows, Dr. Joe Finlay, was there assigned the entire year.

Q   So Dr. Finlay was there the entire 2016?

A   He was there during his fellowship when he came.  So he had -- he was mostly there in 2016, I believe, yeah.

Q   Okay.  And how many days a week?

A   It varied based on whether the IVF schedule was up or not.  So when I was there, he was there operating in the OR with me.  He was doing IVF with me in clinic.  If IVF wasn't there, I would have to look back at the dates specifically, but we had Dr. Dundee from here.  We had Joe Finlay, and we had Ranju Raj that were fellows here, and I would have to go back and look at the specific dates they were there.  They were there variably to get exposure to REI and IVF.

Q   But they were -- I'm sorry.  They were fellows, correct?  They weren't full-fledged, full-time positions?

A   But they were working in the division, yes.

Q   Right.  But you weren't there, though, for the first five and a half months of 2016, right?

A   Correct.

Q   Okay.  I want to ask you about the nurses in the REI

Porter - Cross by Mr. Schroeder

division specifically --

A    Mm-hm.

Q    -- during that time frame.

And I want to just see if I've got the right number and verify this. So early 2016, you had Casey Dodge, right?

A    I believe so.

Q    Okay. Sharon Parent?

A    I believe so.

Q    Was Marlene Grossman there?

A    No.

Q    Okay. And then a woman by the name of Julie?

A    I suppose so.

Q    Okay.

A    Marlene may have been -- Marlene was not at Hitchcock clinic proper campus, ever. She was down in Manchester/Bedford office outpatient only.

Q    Right. So she was -- was she handling the southern sphere of New Hampshire?

A    Not completely, no.

Q    Well, no. Not completely, but was that -- out of the REI nurses, that one in particular was stationed at the Manchester/Bedford location?

A    She was employed down there.

Q    Yes. She was part of your team, right?

A   Not completely.  She also did GYN services.

Q   She had other responsibilities?

A   Yes.

Q   Is that because the REI services there were not a high enough volume to fill her plate?

A   No.  It was expected that the nurses would cross cover each other.

Q   So it had nothing to do with volume of patients?

A   No.

Q   Okay.  I would ask you to -- I want to ask you about specifically who is in and who's out of the REI service at that point.

MR. SCHROEDER:  If I may approach the witness to show her another document?

THE COURT:  Yes.

MR. SCHROEDER:  This is J.  Just so I know what I'm doing here, Emerson, do I just put it down flat or upside down.  I feel like I'm back in eighth grade.

THE CLERK:  Text up.

Q   (By Mr. Schroeder) Well, before I put it on the screen, let me show you -- I'm showing you Exhibit J, and that is -- can you identify -- are you -- is this e-mail string to and from you, Dr. Porter.

A   I believe it's to Karen George and from me.

Q   Right.  And that's May 4th, 2016, right?

A   Yeah.

Q   And then it goes -- and there's a series of e-mails and I'll start from the back and I'll move my way up.

A   I'm not sure I have the complete one.

Q   You do, it's just in the book.

A   Okay.

THE COURT:  It's not an admitted exhibit.

MR. SCHROEDER:  Understood.  I was just going to move for admission.

THE COURT:  Okay.

MR. VITT:  Give me a second.  I'm sorry.

MR. SCHROEDER:  Sure.

MR. VITT:  Have you moved to admit this?

MR. SCHROEDER:  That's what I was seeking. That's what I thought you were doing.

MR. VITT:  No objection.

THE COURT:  Okay.  So Defendants' Exhibit J is admitted.

MR. SCHROEDER:  Thank you.  May I use the Elmo to put this on the screen?

THE COURT:  Yes.

MR. SCHROEDER:  Thank you.

Q   (By Mr. Schroeder) This is the third page of the exhibit, J(003), and do you see that e-mail?

Porter - Cross by Mr. Schroeder

A    Yes.

Q    Okay.  And it is from Kathleen Mansfield, correct?

A    Yes.

Q    And you testified about her yesterday.  She goes by Katy?

A    I don't remember testifying about her, but, yes.

Q    Okay.  But my question is she goes by Katy, right?

A    I believe so, yes.

Q    You had regular interaction with her, right?

A    Right.

Q    Over a period of years?

A    Yes.

Q    Okay.  So if we go to Page 2, I'll put that in front of you.  At the bottom, it's from Katy Mansfield and that's the e-mail, Marti and Green Team.  Does that refresh your recollection that Marti Lewis was joining the REI division at that point?

A    I don't have a recollection of this series of communications, no, but she did join REI service.

Q    Okay.  Does that refresh your recollection by looking at this document that that was communicated to you, among others, that she was joining the division?

A    I don't remember it coming through here, but she did join us.

Q    Well, you got the e-mail, right?

A    It appears so.

Q    Well, do you have any reason to doubt it?

A    No.

Q    Okay.  And you state -- sorry, the Elmo is not close enough to the mic.

     You state here on May 4th, 2016, from you to Karen George -- and who is Karen George?

A    Karen George is a generalist who also was the residency director.

Q    Okay.  So the residency director for the REI program, or just the residency director for OB-GYN?

A    So we had trainees in general OB-GYN, 16 of them, and Karen George was their director.

Q    And you wrote an e-mail to her, correct?

A    I've written several e-mails to her.

Q    Right.  Well, this particular e-mail though says, "Okay.  You'll need to let me know the story.  They did an intervention with Julie and switched out Marti. We've had so many failures and this one is particularly demoralizing for Sharon.  Really, the job is much too big and needs to be remodeled.  We need someone just for prior authorizations, comma, and triage."  Did I read that correctly?

A    I believe so.

Q    Okay.  So Julie was one of the REI nurses at that point

Porter - Cross by Mr. Schroeder

and she was being switched out, right?

A   Correct.

Q   This is May 2016, correct?

A   Correct.

Q   So this is just about -- actually, it's one year from the date that the REI division is closed, correct?

A   Correct.

Q   And at this point, Marti is coming into the division, the REI division, right?

A   Correct.

Q   You go to the top and there's an e-mail from Karen George where she says, "She is terrible as a generalist triager. Maybe the focused subspecialty will be better. She really has bad communication skills, dot dot dot." Did I read that correctly?

A   Which page are you looking at?

Q   Page 2, right at the top. Right at the top. It's actually on your screen. Right at the top.

A   Yes, May 4, yes, from Karen George, yes.

Q   Okay. You then respond to her, right?

A   Yeah.

MR. SCHROEDER: And, Emerson, is there a way to get this --

THE CLERK: Are you looking to zoom?

MR. SCHROEDER: Yeah, a little bit because

Porter - Cross by Mr. Schroeder

it's not... and I don't want it the whole page with my hand there.

THE CLERK:  That's as far out as it will zoom.  You can also zoom in and out on the device itself.

MR. SCHROEDER:  Now you're really challenging me.  Thank you.

Q   (By Mr. Schroeder) This is the whole e-mail.  If you're looking at this, at the bottom, it's you to Karen George, May 4th, 2016.  Can you read that into the record for me?

A   Do you want me to start from the very bottom one?

Q   No.  Yes.  I'm sorry, yes.  Where at 12:34 p.m. from you to Karen George, and it's "Re: Marti and Green Team."

A   "Well, that won't work.  The REI workload is huge, multiple software programs, physiology, procedures and airway management -- or airways, et cetera, et cetera. The patients require and demand good communication skills and, frankly, it is a nightmare in REI right now with Albert Hsu and Julie.

    "There were some human resources reasons that Heather and Katy wanted to do the switch.  Julie completely melted down, and there were multiple documentation of patient safety issues.  She needs to

have a very narrow scope of responsibilities, and not much interest in learning new things."

Q   At this point, you're a year out from the closure of the REI division. You've got one nurse who is failing; is that a fair statement, Julie?

A   Julie, yes.

Q   Okay. And you're switching out and putting Marti into the REI division. I'm not saying you specifically, but she's being placed into the REI division, right?

A   Yes.

Q   And the early critiques of her from Dr. George are, let's say, less than favorable?

A   Yes.

Q   And you seem to agree, right, because you say, well, that won't work, right?

A   Yes.

Q   Karen George then says to you above that on May 4th at 12:35 p.m. "I'm sorry that I got you worked up. The nursing situation on all fronts is a nightmare." Did I read that correctly?

A   Correct.

Q   Right. And so at that point, you got some issues with the REI nurses because you're switching out one and now you're bringing somebody in who is -- doesn't have the skill set yet to be an REI nurse; is that a fair

Porter - Cross by Mr. Schroeder

statement?

A   Correct.

Q   Okay.

MR. SCHROEDER:  May I approach the witness?

THE COURT:  Yes.

MR. SCHROEDER:  With respect to Exhibit J, I want to make sure we've admitted that into evidence, correct, Your Honor?

THE COURT:  Yes.  That was the one that you just admitted.

MR. SCHROEDER:  Yes.  That's what I thought. The other one that I want move to admit.

THE WITNESS:  This was one of my care providers.  Can we admit it?  This is one of my healthcare providers.

THE COURT:  There isn't a pending question.

MS. NUNAN:  We're not sure what she's looking at.

MR. SCHROEDER:  We are on Exhibit K. Exhibit K.

THE WITNESS:  Yes, she is a healthcare provider of mine.

MR. SCHROEDER:  I understand that.  Your Honor, I was reminded by my able co-counsel, Ms. McDonald, that I didn't ask to admit Exhibit U.

Porter - Cross by Mr. Schroeder

Move for admission of U.

THE COURT:  Mr. Howe is telling me that it was previously admitted.

MR. SCHROEDER:  Apologies.

THE COURT:  Exhibit U.  But now you are dealing with Exhibit K with the witness, not admitted.

MR. SCHROEDER:  Not admitted, and I'm going to ask a few questions to hopefully get it admitted.

THE WITNESS:  This one?

Q   (By Mr. Schroeder) Yes, Exhibit K that I just put in front of you.

A   She's a healthcare provider of mine.

Q   I understand that and I'm asking you whether this was a back-and-forth between you and your healthcare provider on May 10th?

A   Yes.

Q   Okay.  And does this refresh your recollection as to the back-and-forth that you were having with getting short-term disability and long-term disability benefits approved?

THE COURT:  Okay.  So you're asking questions of the witness about this document that's not in evidence?

MR. SCHROEDER:  Right.

MR. VITT:  May we approach the bench?

Porter - Cross by Mr. Schroeder

THE COURT:  Sure.

(Bench conference.)

MR. VITT:  There's a discussion here of various medications and symptoms and, you know, one has a little -- I'm not sure what the term is, anticariogenic effect, so I'm not sure that we're having a discussion of her meds in here.

MR. SCHROEDER:  The only reason I'm asking -- I wanted to ask her questions about it, it had nothing to do with the actual body of her e-mail.  It had to do with the fact that the problem nurse had been fired last week, it was a mess, patients left without care.

This is K, that's all I'm going to ask.  And I'm not going to seek -- and I would seek for its admission but to the extent that I need to redact it so that it doesn't refer in any way to anything relating to herself, I wasn't -- I wasn't seeking to ask her questions about any of that.

THE COURT:  So assuming the redactions, do you object to the exhibit?

MR. VITT:  It's fine.

MR. SCHROEDER:  We'll take care of it.

THE COURT:  It will be admitted.  You can talk to her about the exhibit.  I'm not going to put it up because it's not redacted.

Porter - Cross by Mr. Schroeder

Q   (By Mr. Schroeder) I'm not going to ask you anything about your personal health information at all. I'm just referring to one specific sentence in it.

MR. SCHROEDER: Correct.

THE COURT: I want to be clear. I'm creating a record here for your appeal, and so I want to make sure that when the -- or their appeal, just to be fair. Just so that we're clear on what's going on with the record here, so before it goes back to the jury as an exhibit it will be redacted. Is that overkill?

MR. SCHROEDER: No. I'm just dealing with the fact that technology is not being my friend right now. So I'm dealing with the old-school way of doing things.

(End of bench conference.)

Q   (By Mr. Schroeder) I'm not going to ask you anything about your personal health information at all. I'm just referring to one specific sentence in it.

MR. SCHROEDER: And I ask move for admission before I do that.

THE COURT: Right. Any objection to the admission of Defense Exhibit K?

MR. VITT: After it's redacted, no.

THE COURT: Right. So it will be admitted now, Defense Exhibit K admitted without objection, except for redactions that will be made before the exhibit is available to the jury.

Q   (By Mr. Schroeder) Just so that we focus on the one

Porter - Cross by Mr. Schroeder

specific part that has nothing to do with yourself, Dr. Porter, am I correct that in one of your e-mails on May 10th, 2016, you say, "Sharon back now from vacation. Beth and Sharon will be holding down the fort. Problem nurse fired last week. It was a mess. Patients left without care."

A   Correct.

Q   Okay. Thank you.

MR. SCHROEDER: We'll submit a redacted version of that.

Q   (By Mr. Schroeder) Do you recall, Dr. Porter -- so at that point, Marti comes into the REI division, Julie's out, right?

A   Correct.

Q   And this would be -- right. This would be sometime in the May 2016 time frame?

A   Correct.

Q   And, at that point, the nurses that are in the division are Casey, Marti, Sharon, and Marlene in the south; is that accurate?

A   No.

Q   That's not accurate?

A   No. Because we had involved a lot of other nurses who were working with us per diem, and we had other nurses from the outpatient clinic also working with us. So it

Porter - Cross by Mr. Schroeder

wasn't just those nurses.

Q   Okay.  But with respect to the ones that were working full-time -- and that's a fair question, fair point. The ones that were working full-time in the REI division at that point:  Casey, Marti, Sharon, Marlene. Am I missing anybody?

A   I couldn't tell you if the others were working full-time, but we had a whole cadre of other nurses who were working from same-day surgery were coming up to work with us from the clinic, and the other individuals who were floating with us in all different roles.  So it wasn't just them, and I couldn't comment on the full-time status or not.

Q   Okay.  But the people that you were working with on a regular basis, on a daily basis --

A   We were working on a daily basis with all kinds of other nurses, yes.

Q   I understand that.  But were they assigned on a full-time basis to the REI division?

A   Some of them, yes.

Q   Some of them I identified, correct?  Casey, Marti, Sharon, Marlene, right?

A   There were other nurses working with us, and I couldn't tell you if they were on a full-time basis just to us or not, but there were several other nurses working

Porter - Cross by Mr. Schroeder

with us, yes.

Q   Well, in May 2016 -- this is right around the time that Dr. Seifer is close to joining the REI division, correct?

A   Correct.

Q   Okay.  So up until that point, it's you and Dr. Hsu in the REI division, right?

A   And nurse practitioner, yes.

Q   And Beth Todd?

A   Yes.

Q   Okay.

A   And the fellows.

Q   Right.  And the full-time positions were you and Dr. Hsu, right?

A   I was on disability part of that, correct.

Q   Right.

A   Yes.

Q   Right.  So, actually, in 2016 before Dr. Seifer gets there, it's just down to Dr. Hsu?

A   For a short time, yes, for that time that I was on disability, yes.

Q   Right.  So for that six-month time period, December of 2015 through June of 2016, right, the only REI doctor in the REI division was Dr. Hsu?

A   Correct.

Q   So any REI services in the REI division were being run through Dr. Hsu during the time that you were out?

A   No, because Elizabeth Todd was doing REI services, and the nurses were doing REI services, so...

Q   Right.  I'm just talking about physicians.

A   Dr. Hsu was the only physician.

Q   Okay.  I asked you earlier about whether or not before May of -- during the time frame of May 2017, there was a pause or you thought there would be a pause, right, in April?

A   There are multiple different iterations of a pause versus limiting the scope of some services.  So it wasn't just a pause.  There was different iterations being presented, yes.

Q   And that was in the April 2017 time frame?

A   Correct.

Q   And that's what the information you received from Dr. DeMars, correct?

A   She gave me different information over the course of time.  So she gave me the information that we were going to continue with, as I said, REI services; that we were going to continue with a lot of the infertility services, and that we would take a pause of the IVF services.  She said that to me at one point.  In fact, even the day before the close, that's what she said to

Porter - Cross by Mr. Schroeder

me.

Q    Right.  And that was the first time that you were hearing the word "pause"; is that right?

A    There were various iterations.  That was the first time that I remember at this point, yes.

Q    Okay.  I ask you to go back to --

          MR. SCHROEDER:  I would ask if I may approach the witness with her deposition transcript?

          THE COURT:  Yes.

          MR. SCHROEDER:  And this is, for counsel's standpoint, this is -- for counsel's sake, June 11, 2019, deposition.  This is the first version.

          THE COURT:  Is there an exhibit number or letter?

          MR. SCHROEDER:  No.  This is the deposition transcript.  I'm just asking her to read something.

Q    (By Mr. Schroeder) Now, I know that -- I just want to refresh your recollection.  You were deposed two different occasions?

A    Yes.

Q    Okay.  And obviously this predates the pandemic, so everything seems like it was a really long time ago.

     I would ask you to turn your attention to Page 125.

A    (Witness complies.)

Porter - Cross by Mr. Schroeder

Q   Okay.  Do you see that?

A   Yes.

Q   Okay.  Now, at the top of Page 125, I'm asking you about your -- the announcement that was made, and that announcement was the May 4th, 2017, announcement, correct?

A   Correct.

Q   And then I ask you:  "It was a short meeting, and that is the first time -- that was the first time as far as you know that any of you -- David, Albert, and Elizabeth Todd -- were informed that the REI division was being closed?"

A   Closed.

Q   Right.  I read that correctly, right?

A   What lines are you on?

Q   The lines?  Line 9 through Line 13.  Do you see that?

A   I'm reading it.  Correct.  Being closed.

Q   All right.  And what was your answer in response?

A   "Leslie told me that the division was going to be paused, not that we were closing up."

Q   Okay.  And then I asked you:  "When did she tell you that?"  And what was your answer?

A   "Starting the late winter, early spring of that year."

Q   Actually it says, "Starting the winter, comma, late winter, comma, early spring of that year," right?

Porter - Cross by Mr. Schroeder

A   Right.

Q   So the idea of a pause had been discussed or mentioned to you and others in the REI division well before April of 2017, right?

A   Yes.

THE COURT:  So, Mr. Schroeder, I would just ask that that be marked for identification.  I don't think there's any mark on it now, so it's a document that's been used for the witness but not identified by exhibit number, there needs to be a record of that.

MR. SCHROEDER:  How would you like me to refer to that?

THE COURT:  I'm just saying that putting a letter or number on it, just something so that we can keep a record of the fact that this was used.

MR. SCHROEDER:  Understood.

THE WITNESS:  I would like to place some context that there was various conversations that we had, and --

THE COURT:  So, Dr. Porter, I'm sorry.  I'm just going to stop you there.  There isn't a question pending as far as I know.

THE WITNESS:  Okay.  I was trying to provide some clarity.

MR. SCHROEDER:  There was no question

pending, Your Honor.  I was waiting -- I wanted to be polite about that.

Q   (By Mr. Schroeder) With respect to the REI division, and specifically the services that the REI division was giving to its patients, do you recall a slow down or a pause in certain kinds of services that the REI division was giving to its patients in December of 2016?

A   No.

MR. SCHROEDER:  May I approach the witness?

THE COURT:  Yes.  Is this also same thing, a document that's not going to be admitted?

MR. SCHROEDER:  It will be admitted, but I have to show it to her first, and I want to make sure that --

THE COURT:  Right.  Mr. Howe has exhibit stickers for you for the last document that was used so we can keep track of this now so we won't lose track of it.

MR. SCHROEDER:  Just put that on there?

THE CLERK:  Yes, please.

MR. SCHROEDER:  Sure.  May I leave this right here for now?

THE COURT:  Yes.

MR. VITT:  Is there an exhibit number?

Porter - Cross by Mr. Schroeder

MR. SCHROEDER:  I'm going to tell you in a minute.  It is A16.

Q   (By Mr. Schroeder) I'm showing you a document that's been marked A16(001), and I would ask you whether you recognize this document as being something that was sent to you on December 6th, 2016?

A   I don't have a recollection of it, but my name is on it.

Q   Okay.  And that is your e-mail address, correct?

A   That was my work e-mail address, correct.

Q   Right.  And, at that point, were you back to performing services for Dartmouth Health?

A   I would have to look at the timeline.  I believe so.

Q   Okay.  Did you routinely look at your e-mails?

A   Yes.

Q   Okay.

MR. SCHROEDER:  Move for admission of Exhibit A16.

THE COURT:  Any objection?

MR. VITT:  No objection.

THE COURT:  It's admitted.

MR. SCHROEDER:  Thank you.

Your Honor, if I may have a second, so I can switch to the other technology.

THE COURT:  Yes.

Porter - Cross by Mr. Schroeder

MR. SCHROEDER:  Hopefully, we'll go a little bit quicker now.

Q   (By Mr. Schroeder) So this was a document that was sent to you among others, right, Dr. Porter?

A   Correct.

Q   And I will like to highlight the first two paragraphs, and I'll read them into the record.  It's sent on behalf of Dr. DeMars and Dr. Seifer, right?

A   Correct.

Q   And this was December 6th, 2016, right?

A   Correct.

Q   And it states:  "To all:  We are facing an imminent REI nursing crunch that will require significant changes in nursing workflow and task allocation.  With Casey and Sharon's departures, we have fewer resources to maintain the quality of care our patients expect."  Did I read that correctly?

A   I believe so.

Q   Okay.  Now Casey, was Casey Dodge, correct?

A   Correct.

Q   And she left in and around the time frame of November of 2016.

A   I believe so.

Q   Okay.  And Sharon Parent was leaving in December of 2016 pursuant to her retirement, right?

A    Correct.

Q    Now it states in the second paragraph:  "Effective immediately, we will focus our efforts to provide excellent patient care on the patients who currently have a tentative start date for IVF/FET or IUI in December or January.  For the patients who are waiting for start dates, we will defer their scheduled start dates ideally until February.  This will give Marlene and Marti a chance to catch up on the patients that are on the schedule.

"Pregnancy rates are fantastic and that is why we come to work each day.  Despite the outstanding pregnancy rates, we need to make adjustments for the present staffing as we make every attempt to recruit."  Do you see that?

A    Yes.

Q    Does that refresh your recollection that in and around that time frame there was an effort in the REI division to slow down the intake of patients through the system in light of nursing staffing challenges?

A    My recollection of this is that we changed some patient dates in terms of their start date and that we also had other nurses that were resourced to help us in this period of time so that we wouldn't have to push too many back; that we had some adjustments following this.

Q   Okay.  But at that point, the only two nurses that are identified here are Marlene and Marti, correct?

A   No.

Q   They're not?

A   Those are the IVF nurse coordinators.  We had nurses who were coming up from same-day surgery to help us. We had other nurses who are also in clinic who were helping us.  So we had a whole cadre of nurses.  When you say Marlene and Marti, you're speaking specifically of the IVF nurse coordinators, not about the whole cadre of nurses that we had helping us.

Q   I understand that.  He's referencing Marlene and Marti here and no one else, right?

A   Correct.

Q   And there is an attempt to slow down the intake of patients from IVF services by way of this e-mail, right?

A   There was a reorganization of start dates in what we were going to do; and that's what happened, yes.

Q   And, at that point, you were working a handful of hours a week?

A   Yes.

Q   Like three or four?

A   No, I think a bit more.

Q   Less than ten though, right?

Porter - Cross by Mr. Schroeder

A    I believe so. I would have to go back. And if you would like to look at my exact hours, it's in the deposition. I'm happy to get that out.

Q    Sure. I don't need you to do that right now, and I don't know that we need to go through every single calendar entry.

So but at that point, you were not working part-time; you were not working full-time, correct?

A    I was working part-time, I believe. I would have to go back and look.

Q    Okay. You don't know that off the top of your head though?

A    No. Because what happened is I went in and out of work.

Q    I understand that.

A    That's -- as my physicians allowed me to come back, because there were patients who were waiting for me to come back. There was a period of time that I was out definitely, yes. And it -- I would have to go back and look at the dates.

Q    Sure. Okay. I'd just appreciate it, Dr. Porter, just answer the question asked and this will move a lot quicker.

MR. SCHROEDER: With respect to A -- if I may show the witness a document marked A17, may I approach

Porter - Cross by Mr. Schroeder

the witness?

THE COURT:  Yes.

MR. SCHROEDER:  And with respect to this, A16, just want to make sure that it's moved for admission.

THE COURT:  A16 is admitted.

MR. SCHROEDER:  Yes.  Okay.  Great.  So the next one is A17.

MR. VITT:  Give me a sec.

MR. SCHROEDER:  Sure.

MR. VITT:  No objection.

MR. SCHROEDER:  Thank you.

THE COURT:  Exhibit A17 is admitted.

MR. SCHROEDER:  Thank you.

Q   (By Mr. Schroeder) Now, with respect to this document, this is a document from David Seifer dated December 14th, 2016, correct?

A   Correct.

Q   And it relates to an REI division meeting, right?

A   Correct.

Q   And did these meetings happen on a regular basis in the REI division?

A   Yes.

Q   Okay.  And I want to refer you to specifically 2(b).

MR. SCHROEDER:  Just highlight that, Ray.

Porter - Cross by Mr. Schroeder

THE WITNESS:  Yeah.

Q   (By Mr. Schroeder) Do you see that?

A   2 subparagraph --

Q   Yeah.  Just highlighting it.  And just for your assistance, Dr. Porter, I'll try, when we can to highlight this so that you can see it on the screen as well, just to cut to the chase.

So here, it says, quote, "As e-mail from Dr. DeMars and DBS said, looking at a, quote, halfway pause, end quote, to reduce patient load coming through so that the team can have several chunks of time to review things with Value Institute and Process Improvement Group to review workflows."  Right?

A   Correct.

Q   So there was some form of pause that was being -- now, this is --

A   Halfway pause.

Q   Right.

A   We were reorganizing some dates, yes.

Q   Right.  And so slowing down the intake of IVF patients through the long cycle that they go through, correct?

A   I wouldn't characterize it that way, no.

Q   Well, it says to reduce the patient load coming through.  How else do you interpret that?

A   I think you're confusing new IVF patients coming in for

evaluation and reorganizing the actual retrieval and transfer dates so that we could have chunks of time to do retrievals called up weeks and chunks of time to have time with the Value Institute.

So if I understood you correctly, we weren't changing how new IVF patients were coming in, we were altering the weeks that once they were in the system allowing for some time to go to Value Institute.

Q   And the Value Institutes, the Dartmouth Health Value Institute, that's actually a process improvement group within Dartmouth Health, right?

A   Yes.

Q   And they are sometimes called upon to attempt to schedule retreats with members of a specific group to go over process improvement plans, right?

A   Yes.  I look at them as, for example, if we need instruments cleaned more efficiently in the operating room, that they would model that for us versus looking at the dynamics of biology and patient care.  Their models weren't as readily accessible to understanding the subspecialty like REI.

Q   Did you have an understanding that the point of these Value Institute meetings that were going to take place in January and February of 2017, that the specific purpose of them was to deal with workplace dynamic

Porter - Cross by Mr. Schroeder

issues internal to the REI division?

A   No, I didn't understand that, no.

Q   You had no understanding of that?

A   It was one of the stated missions among many, but I didn't understand that is what the issue was, no.

Q   Hang on a second.  You just said it was one of the stated missions for the meetings, but then you didn't understand that that was one of the stated missions?

A   Go ahead and re-ask your question for me because I thought you said it was, in isolation, that that's what the issue -- that's what they were trying to address.

Q   I didn't say the word "isolation" at any point.

    Dr. Porter, let's just listen to the question and try to answer it.  One of the reasons for having this Value Institute retreat, if you will -- there was a series of daytime meetings, correct?

A   Yes.

Q   Okay.  One of the reasons for it, not all of them, but one of them, was to deal with workplace dynamic issues and collaboration and team work?

A   Correct.

Q   Right?  Yes?

A   Correct.

Q   So that was happening, that was already being scheduled in January and February of 2017, right?

Porter - Cross by Mr. Schroeder

A   Correct.

Q   In Subparagraph C here, (2)(c).

MR. SCHROEDER:  If you could highlight that, Ray?

Q   (By Mr. Schroeder) We're still looking at A17.  "We've had open positions for seven to eight months, and we haven't gotten applicants for a while.  Look at it comprehensively.  Look at workflow in way that makes sense.  Try to streamline it."

Did you have an understanding that the REI division was seeking full-time nurses throughout this time period?

A   The entire hospital was seeking full-time nurses.

Q   Dr. Porter, I just ask you to please answer the question.  This will go a lot quicker.

I asked you:  Was the REI division seeking REI nurses specifically during this time frame?

A   Yes.

Q   Okay.  And the reason they were seeking REI nurses during this time frame is because Casey Dodge left, right?

A   Correct.

Q   And Sharon Parent was in the process of retiring --

A   Correct.

Q   -- right?

Porter - Cross by Mr. Schroeder

MR. SCHROEDER:  May I approach the witness?  The next exhibit I would like to show the witness is A20.

THE COURT:  Yes.

MR. SCHROEDER:  Any objections to its admission?

MR. VITT:  No objection.

THE COURT:  Okay.  Defendants' A20 is admitted.

MR. SCHROEDER:  Okay.

Q   (By Mr. Schroeder) I'm showing you a document, Dr. Porter, dated 12/16/2016 from David Seifer, and it is -- you're among the people it's addressed to, correct?

A   Correct.

Q   Okay.  And the subject line says, quote, "Pause," end quote in "January and week in February."  Do you see that?

A   Correct.

Q   Okay.  And the first line of the -- this e-mail is to -- well, let me --

Before I get there, I just want to ask you:  You keep talking about these other nurses and other physicians and fellows.  I'm just looking to see who is getting this e-mail.  So let's just go back up to that

Porter - Cross by Mr. Schroeder

for a second.  I'll get into the body of that in a second.  First you have Katy Mansfield, right?

A    Correct.

Q    For the jury's edification, she's the -- one of the nurse managers, patient manager?

A    Yes.

Q    Okay.  And then you have Kelly Mousley, right?

A    Yes.

Q    What was her role?

A    She was a supervisor for the support staff.

Q    Okay.  She was a supervisor just like Katy Mansfield, correct?

A    She was -- Katy was the supervisor for the nurses, and Kelly Mousley was the supervisor for our administrative support such as scheduling secretaries, OR secretaries, et cetera.  She was more the administrative portion of it.

Q    Okay.  That's helpful.  So those two are managers that are part of the REI division, but they're not performing REI services, right?

A    No.

Q    Then you have Albert Hsu, right?

A    Correct.

Q    David Seifer, right?

A    Correct.

Porter - Cross by Mr. Schroeder

Q   Who is Dennis Dela Cruz?

A   Dennis Dela Cruz is one of the embryologists.

Q   I'm sorry, the younger...?

A   He's an embryologist.

Q   Embryologist, okay.  So he's in the lab?

A   Yes.

Q   Okay.  So he's dealing with whenever embryos and, really, helping with the REI process but in the lab specifically, correct?

A   Correct, yeah.

Q   Okay.  So he's not a nurse or a fellow or anybody like that.

        Donna Bedard, she's a secretary, right?

A   She was our program secretary, yes.

Q   And you have Beth Todd, she's a nurse practitioner, right?

A   Mm-hm.

Q   And then you have Heather Gunnell?

A   Correct.

Q   And then you have Jennifer Blakelock?

A   She was in embryology.

Q   She was in the embryology as well as Dennis.  So those people are in the lab, correct?

A   Correct.

Q   Okay.  And then you have Judy McBean.  She was a per

Porter - Cross by Mr. Schroeder

diem physician?

A   Yes.

Q   And so from time to time she would assist in the REI division?

A   Actually, we should have amended that Judy was one of the physicians as well.  I had forgotten to add that.

Q   Did you know that she worked a total of 20 hours in the year 2017 for Dartmouth Health?

A   I didn't know that.

Q   Okay.  You didn't know that?

A   No.

Q   Marlene Grossman.  We talked about her.  She's in the southern part.  She's in either the Manchester or Bedford location, right?

A   Right.

Q   Then we had Marti Lewis, right?

A   Yes.

Q   And that's -- she's the nurse that came in to the REI division just a few -- about six months prior?

A   Correct.

Q   Then you have yourself, then you have Navid Esfandiari. He's the director of the lab, right?

A   Correct.

Q   And then you have Casey Dodge is in this e-mail, but she's long gone at this point, right?

Porter - Cross by Mr. Schroeder

A   Yes.

Q   Pavel Zagadamof (phonetic)?

A   He was an embryologist.

Q   So he's in the lab as well.  And Sara Gibson.  Is she in the lab?

A   Yes.

Q   Okay.  So four of those people that I just mentioned are in the lab; the other people are either the physicians, the nurse practitioner, or the nurses or the staff assistant or the two managers, right?

A   Correct.  And so the other nurses that --

Q   No.  That is my only question.  That's -- I don't have a question pending.

    This e-mail is addressed to "Hello, REI team," right?

A   It's missing several people.

Q   Okay.  But the people that are on it are all part of the REI team, right?

A   Well, you said Casey Dodge was gone at that point.

Q   Right.  You agreed with me.  Well, sometimes people's e-mails still are on the system.

    Other than Casey Dodge, who is no longer there.  And Sharon Parent is she on this?  She is on this, right?  She had already left?

A   Right.  So it's not an accurate accounting of the

Porter - Cross by Mr. Schroeder

individuals who were working there.

Q    Okay.  Either way, you got this e-mail, right?

A    I believe so.

Q    You don't have any reason to doubt that, right?

A    No, but I don't recall getting it.

Q    Okay.  And it says in the first line, "Dr. DeMars, Heather and I met with leadership from the Value Institute this morning and now have more information regarding our plan for focused process improvement.

"During the months of January and February, we will not see any new patients, and will be limiting our patient appointments to only those necessary for the patients currently in cycle who will need retrievals or transfers in January or February."

Did I read that correctly?

A    You read it correctly.

Q    And, in fact, there's also an accounting by days of when in January and February it was expected that the REI division would be doing its Value Institute workshop, right?

A    Correct.

MR. SCHROEDER:  Take that down.  Thank you.

Q    (By Mr. Schroeder) Now, you understood that this Value Institute was coming up, and that it had been on the back burner at that point because there was some

Porter - Cross by Mr. Schroeder

suggestions that it would happen earlier than January and February of 2017, right?

A    I'm sorry.  Clarify your question for me.

Q    Sure.  You understood that the idea of having the Value Institute run at a retreat program for the REI division had been communicated back in the fall of 2016, you said.

A    I wouldn't characterize it that way, no.

Q    How would you characterize it?

A    We had a different team that did a retreat sometime in the fall, and then we had these series suggested, and I had suggested that we wait until I get back because I wasn't going to be able to participate fully because of my work restrictions, and I wanted to participate fully in all of this as the most longitudinal individual who understood how to run an IVF program and who had functioned with a single nurse previously for a very long time and had drawn in resources from other parts of the institution in order to support the service.

    We would have patients go to labor and delivery to recover from their retrievals.  We had patients going to same-day surgery to recover.  We had same-day surgery nurses coming up to recover the patients to take the burden off of the IVF nurses.  And, in fact, that's how Casey Dodge came to work for us.  So there

Porter - Cross by Mr. Schroeder

was a mechanism by which we could make this service work which included one of the same-day nurses, Mary Martin, was working with us, and she wanted to do more work.  In fact, she went to Ed Merrens's office to say she would do more work.  And Sharon wanted to come back.

So we had a very functional way to be able to run this service in a way that I had experienced previously.  So I don't agree that we didn't have enough nurses because we had Jamie Florence coming from clinic and wanted to do more work with us and was actually going to school to get her RN.

We had Mary Martin coming up from same-day surgery to work with us who wanted to do more work and had a conversation with Dr. Merrens about doing more work.

We had Sharon who wanted to come back from retirement to both train and do work.  So we had a real way to make this program function.

MR. SCHROEDER:  Your Honor, move to strike that as nonresponsive.

Q   (By Mr. Schroeder) Do you even know the question that I asked you, Dr. Porter?  Do you know what I just asked you?

A   No.

Q   Right.

Porter - Cross by Mr. Schroeder

MR. SCHROEDER:  I would move to strike the answer.

THE COURT:  So I'm going to strike the last response, and I am going to direct the witness to respond to the questions.  Mr. Vitt, you're standing?

MR. VITT:  No.  That's perfectly -- I agree with that.

MR. SCHROEDER:  Thank you.

If we could -- Plaintiff's Exhibit 138.  Do you have an objection?

MR. VITT:  We haven't been able to...

No objection.

MR. SCHROEDER:  Thank you.  May I approach the witness?

THE COURT:  What exhibit is this?

MR. SCHROEDER:  This is P138.

THE COURT:  Okay.  No objection from Mr. Vitt, then P138 is admitted.

MR. SCHROEDER:  Thank you, Your Honor.

Q    (By Mr. Schroeder) Showing you, Dr. Porter, Exhibit marked P138.

MR. VITT:  Your Honor, may I interrupt for just a second?  May I approach?

THE COURT:  Yes.

(Bench conference.)

Porter - Cross by Mr. Schroeder

MR. VITT:  In light of your admonition to make sure that we had witnesses here, we have Dr. Bancroft who just came in because I thought -- I didn't know how long they were going to go, and we still don't know how long they were going to go with Dr. Porter.  And I didn't want to be in a situation where we finish at 3:15.  And Dr. Bancroft is in the back, and I don't know if you want to rule, but --

MR. SCHROEDER:  I was in the middle of a question.

MR. VITT:  I didn't want a situation where --

THE COURT:  Mr. Bancroft is sitting in the back of the courtroom.  Do you have a view on whether he can be in the courtroom?

MR. SCHROEDER:  It's called witness sequestration.

THE COURT:  He's an expert, but the ruling was all non-testifying witnesses should be out of the courtroom.  So you should tell him --

MR. VITT:  I apologize.  I didn't want a situation where I had seen him --

THE COURT:  While we're all here, we should talk about a break.  Would you like to continue?

MR. SCHROEDER:  I would like a break.  I'm in violent agreement with a break.

Porter - Cross by Mr. Schroeder

MR. VITT:  You get a break.

(End of bench conference.)

THE COURT:  Okay.  So at this time, we'll take our afternoon break, and we'll reconvene at 2:45.

(Jury exits.)

(Recess taken.)

THE COURT:  Okay.  Please go ahead, Mr. Schroeder.

MR. SCHROEDER:  Thank you, Your Honor.  I think we moved for admission of Plaintiff's 138, but I just want to make sure that before I --

MR. VITT:  I think I said yes.

MR. SCHROEDER:  Okay.

THE COURT:  Okay.  Then it's admitted.

MR. SCHROEDER:  Admitted?

Emerson, can you switch it out?  Thank you.

Q   (By Mr. Schroeder) Do you have Exhibit 138 in front of you?

A   Correct.

Q   Okay.  I want to turn your attention to the e-mail below.  That's January 12th, 2017, and it's with you and Heather Gunnell?

A   Correct.

Q   Do you see that?

And just highlight the response or I should say

Porter - Cross by Mr. Schroeder

the question. It says, "Heather can you please clarify the purpose of this exercise? What are the goals and what are the roles she will play during meeting with us. How long and when does she plan to meet and what are the end goals? Agree I have not received any agenda or time commitment or stated purpose for her participation." Did I read that correctly?

A   Correct.

Q   Is it fair to say that you were less than enthused about doing this Value Institute?

A   I wouldn't characterize it that way.

Q   Okay. So this question wasn't meant to be in any way criticizing the process?

A   I wouldn't characterize it as a criticism, no. It was a statement of interest.

Q   Okay.

THE COURT: Dr. Porter, I would ask that you sit up to the microphone, please and make sure the jury can hear you.

THE WITNESS: My apologies. I'm sorry.

Q   (By Mr. Schroeder) Okay. Turn your attention --

MR. SCHROEDER: If I may approach the witness to show her Exhibit B2?

THE COURT: Yes. And this is Defense Exhibit B2?

Porter - Cross by Mr. Schroeder

MR. SCHROEDER:  Yes, Your Honor.  We're trying to follow the number sequence for Plaintiffs and letter sequence for Defendants.

Any objection?

MR. VITT:  No objection.

MR. SCHROEDER:  Thank you.

THE COURT:  Okay.  Defendants' B2 is admitted.

MR. SCHROEDER:  Thank you.

Q  (By Mr. Schroeder) Showing you a document that's been marked Defendants' Exhibit B2, and it is an e-mail that you wrote.  It's rather long.  I'm only going to ask you about the first four paragraphs, maybe the fifth paragraph.  So if you want to let me know when you're done just reading the e-mail to yourself, I may have other questions, so just that so you feel comfortable that I've given you the ability to read all of it, I would appreciate you letting me know.

A  (Witness reading.)

Q  Let me know when you're finished.

A  Okay.

Q  Okay.  If, Ray, you could just -- before you go to that, I just want to get the date up there, of the e-mail.

It's the an e-mail, to you, Dr. Porter, to Leslie

Porter - Cross by Mr. Schroeder

DeMars, correct?

A   Correct.

Q   And then at some point, subsequent to the termination of the REI division, you sent it to your personal home address, right?

A   Correct.

Q   Your other e-mail address?

A   Correct.

Q   And I want to focus on the first four paragraphs at least initially.

MR. SCHROEDER:   And if you could blow them up, Ray, I would appreciate it.

Q   (By Mr. Schroeder) And you wrote this on February 20th, 2017, right?

A   Correct.

Q   And that comes on the heels of a series of retreat days with the Value Institute, right?

A   Correct.

Q   And would it be fair to say that the Value Institute exercise and retreat program was not successful?

A   I wouldn't characterize it that way.

Q   You wouldn't?  Would you say that it was a rousing success?

A   I wouldn't characterize it that way.

Q   Okay.  You wrote this e-mail though, right on the heels

of that particular series of retreats, and you say, "Dr. DeMars, the tenure of Dr. Seifer's leadership has been a difficult one for the REI service with resulting consequences for the Department, the service line and the greater DH institution.  Long-established systems that were in place, the efficient delivery of skilled RE services, and the foundation and infrastructure of the division have nearly dissolved."  Did I read that correctly?

A    Yes.

Q    Those are your words, right?

A    Those are my words.

Q    Right.  And then you say -- I think yesterday you were asked this question, and I'm pretty sure that the pregnancy rates were really not good, right?

A    I wouldn't characterize it that way, no.

Q    Oh, you didn't characterize it that way?  They weren't low?

A    They were low for Albert Hsu and mine were really good.  So if you took an average, you would get to an average.  So Dr. Hsu's pregnancy rates were repetitively, over the long time, with a low pregnancy rate.  That's what I said.

Q    Okay.  Well, actually, what you really said was, "While it is true the overall pregnancy rates have improved,

Porter - Cross by Mr. Schroeder

this positive aspect of the care we deliver is to be attributed to the work of Dr. Esfandiari and his lab in providing the best quality embryos available for transfer." You said that, correct?

A   That's correct, and I can provide some context.

Q   No, thank you.

You don't say these rates are improving because of just you, right, in this sentence?

A   I didn't say that in this particular e-mail, no.

Q   Right. Right. And then you say, "It should not be mistaken for an improvement in any other aspect of the process of IVF. Indeed, the program is close to dissolution." Right?

A   Correct.

Q   So as of February 20th, 2017, you were acknowledging to the chair of the OB-GYN department your belief that the IVF program is close to dissolution, right?

A   In response to the confidential review for David Seifer, yes.

Q   Well, regardless of the confidential review, those are your words, right?

A   Those are my words.

Q   Now, with respect to the volume of patients. I just want to -- on that same page at the bottom, the second to last paragraph -- the last full paragraph, which

Porter - Cross by Mr. Schroeder

starts, "There is not enough," on that page?

A  "There is not enough IVF at Dartmouth."

Q  Right.  "There is not enough IVF at DHMC --" that stands for Dartmouth-Hitchcock Medical Center, right?

A  Correct.

Q  "Nor has there ever been despite heavy efforts in marketing and outreach for many providers with RE to focus only on IVF.  I had this conversation with him during his interview last winter, before he started at DHMC."

   There you're commenting on the fact that the volume of patients within the REI division hasn't been very high; is that a fair statement?

A  I wouldn't characterize it that way, no.

Q  Okay.  Well, you -- let's not get into characterizing, let's go to your words.  "There's not enough IVF at DHMC nor has there ever been despite heavy efforts in marketing."  You said that, right?

A  I believe you asked me about REI.  Can you restate your question please for clarity because REI, again, is this whole global service, and we talked about IVF being a small specific part of it.

Q  Right.  It's a small and important part of it, right?

A  Correct.

Q  In vitro fertilization, and that's related to

Porter - Cross by Mr. Schroeder

infertility, right?

A   It's a portion of the global infertility services, correct.

Q   And the REI has, in its name, reproductive endocrinology and infertility, right, division?

A   IVF is a small portion of infertility services.

Q   Regardless of the size of the IVF program, you were painting a really dire picture for the REI division at this point; fair to say?

A   I'm painting a really dire picture of Dr. Seifer's leadership.

Q   And you say it's been a difficult one for the REI service, correct?

A   It's been a difficult -- this was to put some context on this.

Q   No.  I really -- I don't -- your counsel can ask you questions.  I want you to just answer my questions if that's okay.  Okay?

    At this point, February of 2017, you'd been -- in a previous year, you were out from December 15th to June 14th, thereabouts, six months, and then you were slowly coming back to work, and then you were out again in September -- or I should say August to sometime in November of '16, right?

A   Yes.

Porter - Cross by Mr. Schroeder

Q   So roughly about nine months out of the last, say, 14 months, close to -- ballparking it?

A   Ballpark.

Q   Right.  9 out of the 14 months.  And it was your belief at this point that his tenure as the division director was a disaster, right?

A   It was a disaster.  It wasn't just my belief.  It was a disaster.

Q   Well, I'm just asking for your belief because you're the only one that's testifying right now.  We can ask other people later.  But, at this point, in that last 14 months, nine of those you weren't even there, and he got there --

A   I wouldn't qualify that nine of it I wasn't there.

Q   Well, I just went through the math.  Six and three equals nine, and nine out of 14 which would be January 1 of '16 through February of '17 is 14 months. So I'm just trying to keep the math simple.

A   I would go back to the timeline in my deposition to tell you what hours I was working.

Q   Okay.  That's not the question I asked.  I'm talking about when you were there and when you were definitely not there, so 9 out of 14 months.

        And you're doing this review of Dr. Seifer.  Now, you had serious reservations about Dr. Seifer well

before February of 2017, right?

A    Correct.

Q    Like, almost from the get-go; is that a fair statement?

A    Correct.

Q    And, at that point, Dr. Seifer became the division director in May or June of 2016?

A    Correct.

Q    And prior to that time, you'd been the interim division director?

A    Correct.

Q    And that had been for a number of years.

A    Correct.

Q    And you had been appointed to that position by Richard Reindollar?

A    Correct.

Q    And you were in that position for a couple years but you weren't made permanent, the permanent division director, by Richard Reindollar, correct?

A    No.

Q    And you weren't made the permanent division director of the REI division by Leslie DeMars?

A    Correct.

Q    And Leslie DeMars was the chair of the OB-GYN department right after Richard Reindollar, correct?

A    Correct.

Porter - Cross by Mr. Schroeder

Q   And you had a series of issues dealing with Dr. Reindollar as well; is that fair to say?

A   I wouldn't say a series but, yes, there were issues with Dr. Reindollar, yes.

Q   When I say "series," you had conflict and disputes with him, correct?

A   I was in mediation with Dr. Reindollar, yes.

Q   Mediation internally to DH, correct?

A   Correct.

Q   And you were in mediation with Dr. Reindollar.  And this is back in 2012, 2013, right?

A   Potentially, yes.

Q   Well, he left by the end of December of 2013, right?

A   I don't remember when he left.

Q   And you were happy to see him go?

A   I was very happy to see him go.

Q   Right.  And he became -- after he left Dartmouth Health he became the chair of ASRM, correct?

A   No.

Q   Oh, he didn't?

A   No, he was the CEO.

Q   Okay.  The CEO?

A   Yes.

Q   Of, is it the American Society for Reproductive Medicine?

Porter - Cross by Mr. Schroeder

A    Yes.

Q    That's ASRM?

A    Correct.

Q    And so he left Dartmouth Health and became the CEO of ASRM?

A    Correct.

Q    Is that the gold standard for the guidelines and regulations of how doctors in the REI field work?

A    Correct.

MR. SCHROEDER:  Just give me a second, Your Honor.  I'm just trying to find the right binder here. If I may approach the witness to show her a document marked Defendants' Exhibit A26?

THE COURT:  Yes.

MR. SCHROEDER:  Any objection?

MR. VITT:  Give me a second, if you will.

MR. SCHROEDER:  Sure.

MR. VITT:  No objection.

THE COURT:  Okay.  Then A26 is admitted.

MR. SCHROEDER:  Thank you.  Your Honor.

Q    (By Mr. Schroeder) Showing you a document, Dr. Porter, marked A -- Defendants' Exhibit A26, and I specifically -- it's a long series of e-mails, and I don't want to go through each one of them, but just on the -- around this time period, do you recall there was

Porter - Cross by Mr. Schroeder

some kind of HR review in February of 2017 relating to the departure of Casey Dodge?

A   I was out when that happened.

Q   Okay.  Were you part of that HR review?

A   No.

Q   Well, at the bottom of the page, it's an e-mail from you to Leslie DeMars, and it says, "Leslie, thank you. Should I contact Dr. Fuhrman about his concerns?  Dave is not able to tell me what to fix and does not respond to my e-mails.  You should speak with Jude, but she told me she would not come to DH with Albert here. This week was very difficult.  Dichotomous to have a Casey HR review one afternoon and be in the Value Institute meetings the next morning.  My head is down, and I'm very relieved to be out of the Casey review. You can tell on the faces of Katy and Heather it has been really tough."  Did I read that correctly?

A   Correct.

Q   You were part of some kind of review at that point, right?

A   No.

Q   No?

A   It says, "My head is down, and I am very relieved to be out of the Casey review."

Q   Right.  It says, "And very relieved to be out of the

Porter - Cross by Mr. Schroeder

Casey --" so you had nothing to do with that?

A   No, I wasn't in it.  I wasn't part of it.

Q   Got it.  But you understand that there was an internal HR issue related to her departure?

A   I did, yes.

Q   Was that a distraction, at least from you on the outside of it --

A   No --

Q   -- to the REI division?

A   -- it was not a distraction to me personally, no.

Q   Now, in this e-mail exchange, you actually -- this is one of the e-mails that you sent to yourself on May 21, right?

A   Yes.

Q   You sent a whole slew of e-mails to yourself on May 21, right?

A   I did.

Q   And halfway through in the middle of the first page, February 19th, there's an e-mail from Leslie DeMars to you, and she mentioned, "Just had a great conversation with Dan Grow.  He wants to be a full-time clinician again.  He's a full-scope REI doctor."  Do you see that?

A   Yes.

Q   Okay.  Did you have -- did you have an understanding

Porter - Cross by Mr. Schroeder

from Leslie DeMars that she was hoping to recruit additional REI physicians to the REI division?

A   Yes.

Q   Okay.  And you were aware of the fact that that didn't go anywhere, correct?

A   My understanding is she wasn't allowed to talk to him right before the closure is what she told me.

Q   Okay.  Well, based on this e-mail, she did talk to him, right?

A   He actually came on campus and interviewed, and we took him to dinner.

Q   Okay.  And that -- do you know where he ended up?

A   Yeah.  I think he's in Connecticut somewhere.

Q   And he had a series of offers at that point, correct?

A   I'm sorry, I don't know that.

Q   You had dinner to potentially court him --

A   As division head, yes, to come in.  Leslie, in February, when he was coming in, Leslie and I took him to dinner in Lebanon, New Hampshire to recruit him to be the division head, yes.

Q   And you're not aware of him talking to anybody else in leadership at DH, correct?

A   She told me that he was going to have several meetings in both research and in -- within the organization in kind of mid-level and research areas, yes.

Porter - Cross by Mr. Schroeder

Q   But you, yourself, are not aware ever him having any actual meetings with anybody in DH leadership other than --

A   I was not present at those meetings, no.

Q   Right.  And you're not aware of those meetings, right other than what Leslie told you?

A   I was there when he was on the floor of OB-GYN and going to those meetings because I spoke with him, and he made grand rounds before that meeting.

Q   Who did he go to speak with?

A   I don't recall.

Q   Okay.  So you don't know?

A   I don't recall who he met with, but I know he had a series of meetings.

Q   I want to show you --

        MR. SCHROEDER:  If I may approach the witness -- first have that admitted into evidence.  I think we already did.

    If I may approach the witness to show her Exhibit X, Defendants' Exhibit X?

        THE COURT:  I just confirmed it's admitted.

        MR. SCHROEDER:  Thank you.

        THE COURT:  No, that has not been admitted.

        MR. SCHROEDER:  I had a distinct memory or recollection that it had not been.  If I may move for

admission of A26 first.

THE COURT:  Is there any objection?  Oh, to A26?  That was already admitted.

MR. SCHROEDER:  That I was concerned about, Your Honor.  Just to Exhibit X.

MR. VITT:  No objection.

THE COURT:  Okay.  Exhibit X is admitted.

MR. SCHROEDER:  Move for admission.  Thank you.

THE WITNESS:  Which, where is it?

MR. SCHROEDER:  Oh, may I approach the witness?

THE COURT:  Yes.

Q   (By Mr. Schroeder) Showing you a series of documents, Dr. Porter, that relate to the July 24, 2016, time frame, and you had sent -- you had a series of back-and-forths with Dr. DeMars, correct, about Dr. Seifer?

A   Yes.

Q   Okay.  And I want to focus on the first page, really the last few sentences of the first e-mail exchange. Where you say, "Leslie, have a blast in Fenway.  I can talk by phone.  I'm in tomorrow 1 to 4.  I can come in at lunch.  I'm in Thursday and Friday.  While I'm gone, I favor having Albert do the harvests and freezing a

Porter - Cross by Mr. Schroeder

lot of embryos.  I do not favor David doing harvests and transfers while I'm gone.  I suspect David has not done a clinical medicine in some time.  David is far worse than both Paul and Richard in cycle management, clinical management and harvest skill."  Did I read that correctly?

A   You did.

Q   And Paul is whom?

A   Paul Manganiello.

Q   And was that the first doctor of the REI division?

A   Yes.

Q   Okay.  Richard is Richard Reindollar?

A   Correct.

Q   So based on this e-mail, is it fair to say that you were critical of the cycle management, clinical knowledge and harvest skill of Paul and Richard?

(Court reporter asks for a repeat.)

Is it fair to say, based on this e-mail exchange where you say "David is far worse than both Paul and Richard in cycle management, clinical knowledge and harvest skill," that you had negative opinions or critical comments about all three of them?

A   I wouldn't characterize it, no, I didn't have that.  That's not what I'm saying there.

Q   Okay.  So you weren't being critical of either Paul or

Porter - Cross by Mr. Schroeder

Richard?

A   No.  I was being critical of David.

Q   Just David, right?

A   Yeah.

Q   In July 24, 2016, that's about two months after he started working there?

A   Yeah.  She had asked me to go in and observe his IVF skills because she was concerned.

Q   Okay.  And you said he's far worse than those two, right?

A   Correct.

Q   Okay.  That's Paul Manganiello and Richard Reindollar, right?

A   Correct.

Q   Did you have criticisms or negative opinions about the work performance of Richard Reindollar?

A   No.

Q   No?

A   Not his clinical skill, no.

Q   Well, here it's cycle management, clinical knowledge, and harvest skill, right?

A   For David is who I'm referring to.

Q   Got it.  Okay.  And this was literally less than two months after he's got there, correct?

A   Yes.  It was very clear from the very beginning there

Porter - Cross by Mr. Schroeder

was something catastrophically wrong.

Q    Okay.  And with respect -- just asking whether -- the time period, but thank you.

The -- he was made the division director, and you didn't even interview him, correct?

A    No.  I interviewed David.

Q    Oh, you did?

A    Yeah.

Q    Okay.  And were you supportive of his hiring or not?

A    I knew from a conversation I had before that there were problems with his prior employment, so I was not supportive from that -- from that viewpoint.  I welcomed a new division head, not David.

Q    Okay.  You made that clear to Leslie DeMars?

A    Yes.

Q    Okay.  And that was before he got hired?

A    Before and after, yes.

Q    Right.  And when I deposed you, because you keep talking about the deposition, you recall the fact that I asked you, you wanted to be division director at some point, correct?

A    Initially, when we had a candidate who was finishing from University of Michigan who was from Rutland, I had said let's make me division head and bring this Erica Mahahey (phonetic) was her name and bring her in as a

Porter - Cross by Mr. Schroeder

junior person to be with Albert.  So then she had called me five or six times as she was finishing her fellowship because her father is a predominant urologist in Rutland, and she wanted to come back.  But Leslie then made me the women's health service line chief of GYN ultrasound, which is my passion and love, and so I gladly said if that is what you would like me to do for quality improvement and to expand our infertility ultrasounds in the south to expand our GYN ultrasound and procedures throughout the whole network, I would love to have that job; please bring in another division head.  And, at that point, I was really ready to give Albert's mentorship over to somebody else.  So I was happy to have another division head come in.

Q   Do you remember my question?

A   Yes.

Q   Yeah.  I asked you whether or not you wanted to be division head at some point.

A   I did, and I answered it.

Q   That's all I need to know, "yes" or "no."  I don't need the whole monologue.

MR. SCHROEDER:  If we could go to A8, Defendants' Exhibit A8, please.

If I may approach the witness?

THE COURT:  Yes.

Porter - Cross by Mr. Schroeder

THE WITNESS:  Please take it out for me.

MR. SCHROEDER:  Okay.

Any objection to its admission?

MR. VITT:  No objection.

THE COURT:  I'm going to ask counsel to approach, please.

(Bench conference.)

THE COURT:  So I'm going to the process here -- what's going through all of your minds.  These exhibits are being offered, no foundation is being laid.  That's fine because you're immediately asking the other side if they object.  Almost invariably the answer has been no.  I'm not sure why all of this isn't stipulated to because this is slowing the process down because if you say "I'm going to admit Exhibit A8," and then you turn to counsel and you're asking him if there's an objection, not me, which is odd, and then you do say "I do object," then you're going to have to lay a foundation with the witness, and I'm going to have some basis to make the rulings.

So maybe just going forward -- sorry to be pointing at everyone here, but I think you should be talking about these exhibits tonight for tomorrow.  So if it's going to be a bunch of e-mail exhibits through Dartmouth-Hitchcock people and no one has an objection,

I think you need to work this out.  Is there a disagreement?  This is not the way to do this.  This is very inefficient.

MR. SCHROEDER:  We're trying to move this along.

THE COURT:  I'm not attributing bad faith to anyone.  From my perspective, this is a very inefficient way to be doing this.  Okay.  So I want to say that now because it keeps happening over and over again, and I keep thinking I'm going to say something, so I chose to say something now.

MR. SCHROEDER:  It's a fair point.  From now on I'll ask you to move first.

(End of bench conference.)

THE COURT:  So is admission still pending?

MR. SCHROEDER:  I believe it is, Your Honor, I would like to move for admission of Exhibit A8.

THE COURT:  Okay.  Mr. Vitt.

MR. VITT:  No objection, Your Honor.

THE COURT:  Okay.  A8 is admitted.

MR. SCHROEDER:  Thank you.

Q   (By Mr. Schroeder) Dr. Porter, I'm just showing you what's been marked as Defendants' Exhibit A8.  I just want to go to the back page for a second, the second page.  There is an e-mail from yourself to, it looks

Porter - Cross by Mr. Schroeder

like, Donna Bedard, Heather Gunnell, and other people. After Donna Bedard says it looks like everybody is going to be available to have this meeting and you say, "I am out of town until Monday.  I prefer Monday." Right?

A   Yeah.

Q   And on the next page, first page forward, and this is November of '16, the first line of the e-mail from Dr. Seifer, if you go back to the first page, thank you.  The e-mail dated November 3, 2016, at 12:34 p.m., it states, "In the interest of heading off people's anxiety about our current nursing shortage, we want to have this initial brief meeting tomorrow, Friday, so that we can hear what is currently being explored."  Do you see that?

A   Yes.

Q   Okay.  So your response is meeting tomorrow is not possible, right, for me, is not possible, right?

A   Correct.

Q   Right.  So and you say, "Since I have --" it looks like a spelling error.

A   Typo.

Q   We all have them.  "Since I have the most experience with nursing on the service, it would seem a missed opportunity.  Minutes do not make for discussion."

Porter - Cross by Mr. Schroeder

That was your response, correct?

A   Right.

Q   Is that a rather curt, abrupt response?  No?

A   I wouldn't characterize it that way.

Q   And even though you were out of town, you would have been able to call in for the meeting, right?

A   No.

Q   You wouldn't have been able to do that?

A   No.

Q   Okay.  The previous e-mail, though, you say, "I prefer Monday," not that it had to be Monday.  You said, "I prefer Monday," right?

A   Correct.

Q   But -- so you then, just I guess a few minutes later you're saying well, no, I can't do Monday, or it has to be Monday.  I can't do tomorrow.

A   Correct.

Q   If we could turn to --

        MR. SCHROEDER:  I would like to show the witness Exhibit B5, marked B5.  May I approach the witness?

        THE COURT:  Yes.

Q   (By Mr. Schroeder) Is that an e-mail that you sent?

A   Yes.

Q   Okay.  And that's dated February 23, 2017?

Porter - Cross by Mr. Schroeder

A    Correct.

MR. SCHROEDER:  Your Honor, move for admission.

THE COURT:  Any objection?

MR. VITT:  No objection.

THE COURT:  Okay.  It's admitted.

Q    (By Mr. Schroeder) Now, I just want to understand this. You sent this e-mail on February 23rd to David Seifer, Heather Gunnell, Kelly Mousley, and Donna Bedard, correct?

A    Correct.

Q    And is it fair to say -- you say in here:  "David, Kelly and Heather:  Please come to me if you have questions about my schedule and work return.  I will share the transition with the appropriate individuals." Did I read that correctly?

A    Correct.

Q    And further down, where it starts "yesterday," it says, "Yesterday, Donna sent out my schedule to David, Albert, and Kelly without my permission as I am told at the request of David.  Please do not ask Donna to send out e-mails with regards to my schedule."  That seems like a rather curt, abrupt e-mail by you, correct?

A    No, I wouldn't characterize it that way.

Q    You wouldn't characterize it that way?

Porter - Cross by Mr. Schroeder

A   No.

Q   Would it be fair to say that you were annoyed that your schedule had been shared with your colleagues?

A   No.

Q   Not at all?

A   I was on work restrictions.  And Dr. Seifer was violating my work restrictions.  If you look at the sentence above, it says, My schedule is in EDH, which is our computerized medical record, and Qgenda, which was our scheduling for all physicians, residents, et cetera.  So my schedule was available in two digital formats that David, Heather, and Kelly could easily check.  When it was e-mailed, David would not leave me alone when I was supposed to be resting.

Q   Okay.  So even though it was in two other formats, by e-mailing it to you -- by e-mailing it to this group, you felt that violated your work restrictions?

A   I felt that David was violating my work restrictions.

Q   But wouldn't the schedule tell everyone what your work restrictions were?

A   No.  It was telling when I was clinically active.  When I was resting and when I was clinically active.  So I had, from my care providers, I had a programmed schedule for returning which included a period of time of working and, as you recall, I had dependent

Porter - Cross by Mr. Schroeder

symptoms, meaning the longer that I was standing up, the worse headache I would get, the more symptoms I would get. So I had to lay down for a period of time, and then I could work.

So I was functioning very well as long as I didn't get overfatigued. And David would come into my office and follow me around the clinic. So I was actually -- I don't know. Can I add more without --

Q I think we're way beyond the question at this point.

A Okay.

Q This is -- so there's three iterations of your schedule. Three of two that were on the system?

A Right.

Q And there's this one that was by e-mail from Donna, right?

A Mm-hm.

Q And even though people could have accessed your schedule otherwise through these two other avenues, this third avenue, you believe was inappropriate?

A Right, because it didn't have my rest periods in it.

Q Got it.

A And he was bothering me on my rest periods.

Q Right. And so without knowing when your rest periods were, he could still bother you, right? Because if he didn't know the rest periods, how would he know not to

Porter - Cross by Mr. Schroeder

bother you?

A   The rest periods were documented in here.  So --

Q   Documented in where?  In where?

A   The rest periods were scheduled into my schedule for when I was seeing patients, and then when I wasn't seeing patients, but the e-mail that went out didn't have the rest periods in it, to my recollection.

Q   Okay.

A   And that's what I was worried about was that I -- my care providers had told me that if my fatigue was such that if I couldn't do normal activities at home when I got home, they would pull me out of work, and I didn't want to be pulled out of work.  So I was trying to be compliant with my work restrictions.

Q   With respect to your work restrictions and your rest schedule and everything you just said in this answer, none of that is highlighted in this e-mail, right?

A   No.

Q   Thank you.

        MR. SCHROEDER:  You can take that down.

Q   (By Mr. Schroeder) Turning your attention --

        MR. SCHROEDER:  If I may approach the witness to show her an exhibit marked Defendants' Exhibit B7?

        THE COURT:  Yes.

Q   (By Mr. Schroeder) I've just shown you a document

Porter - Cross by Mr. Schroeder

marked Defendants' Exhibit B7.  Do you recognize that document?

A    I don't right now.

Q    You're on that e-mail exchange, correct?

A    Yes.

Q    And it relates to, if you go to the bottom onto the next page, an e-mail to Heather Gunnell dated April 27th.

A    I don't have that.

MR. VITT:  I don't have a next page.

MR. SCHROEDER:  I'm sorry.  On the back page to it, you don't?

MR. VITT:  No.

MR. SCHROEDER:  Give me one second.  I just need one second, Your Honor.  We're missing a page.

THE CLERK:  Mr. Schroeder, my copy doesn't have a second page.

MR. SCHROEDER:  I may myself have been using the wrong document.  So we're going to go with just this one page.  I was looking at another document that had another page.  We'll stay with this one.

Q    (By Mr. Schroeder) This is an e-mail that you received on April 27th, correct?

A    Yes.  May I read it?

Q    Of course you can.

Porter - Cross by Mr. Schroeder

MR. SCHROEDER:  I would like to move for admission of B7, Your Honor.

THE COURT:  Okay.  Any objection?

MR. VITT:  I don't think so, but I want to be clear.  This is just the one-page document, right?

MR. SCHROEDER:  It is.  I myself have a multipage document.  That was my fault.

MR. VITT:  I have no objection.

THE COURT:  Okay.  Then B7 is admitted.

MR. SCHROEDER:  Could you put that up on the screen, Ray?

Q   (By Mr. Schroeder) Let me know when you're finished reviewing.

A   Okay.

Q   Okay.  So this was a document dated April 27th, 2017, right?

A   Correct.

Q   And this is approximately one week or so before -- excuse me, before you and Albert Hsu and Dr. Seifer were informed of the closure of the REI division, right?

A   And Elizabeth Todd.

Q   And Elizabeth Todd, right; is that correct?

A   Correct.

Q   I just want to go through the various points that are

raised by Dr. DeMars who had Heather Gunnell send this e-mail. So the first one is, "As you all know, we have a critical staffing issue in REI," right?

A   That's what she says.

Q   Right. You didn't respond to this e-mail in any way to say that's not true, right? That's what she says, right?

A   I don't recall.

Q   Well, at this point, in April of 2017, late April, April 27, 2017, Marlene Grossman had given her resignation, notice, right?

A   I suppose so, yes. I don't remember the date.

Q   I understand you might not remember the date, but in this time frame --

A   In the time frame, yes.

Q   Right. So that left just Marti Lewis as a full-time REI nurse, right?

A   The full-time IVF nurse coordinator, not a full-time IVF nurse. We had other IVF nurses.

Q   Okay.

A   REI nurses, I'm sorry.

Q   Who were those other REI nurses?

A   We had nurses who were working from the general clinic in the REI division.

Q   Okay. And --

Porter - Cross by Mr. Schroeder

A   Marti was the trained IVF nurse coordinator.

Q   Right.  She was performing REI nursing duties as well, correct?

A   Please clarify your question.

Q   Well, you said that she's the REI nurse coordinator, right?

A   Correct.  That's a sliver of what REI does, and so she was doing IVF nurse coordination.

Q   Right.

A   Yes.

Q   So, at that point, will you agree with me that she was the only REI nurse doing IVF?

A   No.

Q   Oh, there were other nurses?

A   She was doing the coordination of the cycles.

Q   Okay.

A   But we had other nurses doing planning, retrievals, transfers, and other aspects of IVF including Mary Martin and Jamie Florence and one or two others that I can't remember.  So Marti was doing the cycle coordination, which is a portion of overall IVF services.

Q   Right.  Despite these other people, Dr. DeMars says, "We have a critical staffing issue in REI."

A   That was her characterization.

Porter - Cross by Mr. Schroeder

Q   Right.  At that point, she was the chair of the OB-GYN department, right?

A   Correct.

Q   Right.  And that was her characterization that related to the REI nursing, right?

A   That's what she states.

Q   Right.  Because at that point, Casey Dodge, Sharon Parent, Marlene Grossman, are now no longer working in the REI division, right?

A   They weren't coordinating at that time, no.

Q   Right.  And the REI division -- you were here for the testimony of Dr. MacCallum, right?

A   Correct.

Q   And there was -- either Dr. MacCallum or Sharon Parent, it may have been Sharon Parent, but my colleague showed one of them the ASRM staff REI nurse job posting from June of 2016.  Do you remember that?

A   There was a posting, and it quickly came off.

Q   Oh.  And when you say "quickly came off," you don't believe that they were actually trying to hire an REI nurse?

A   No, I believe they were actually trying to hire.  I don't think that the posting stayed on as it should to re-enroll.

Q   Oh.  And how do you know that?

Porter - Cross by Mr. Schroeder

A   I was checking and letting them know.  I would have to go back and look at the specific dates, but I was letting Katy Mansfield know that it had come off the posting periodically.

Q   So did you understand that she was trying to make sure that it went back up?

A   I asked her to, and she said she would, but I don't -- I don't believe it came up in a timely fashion.

Q   Okay.  And you have a specific recollection on this particular point that it wasn't posted?

A   Yeah.  Because I talked to her about it, yes.

Q   Yeah.  Okay.  Thank you.

With respect to the other points in here, it's like "the remaining patients" -- we can highlight that, Ray.

"The remaining patients May-July are currently under review and updates will be forthcoming."

The next paragraph says, "We will complete evaluations of patients who are in the process of their infertility evals, follow-up visit, testing, et cetera, but they will not be given a time frame or date for ART cycle including IUI."

ART stands for what?

A   Assisted reproductive technologies.

Q   And IUI?

A    Intrauterine insemination.

Q    Just wanted to make sure we got all the acronyms.

The last paragraph states, "No further patients will be scheduled for an ART cycle until we are able to offer the patients the care they deserve and expect." Did I read that correctly?

A    Correct.

Q    So it's true at this point that you are, or I should say, the REI division is certainly putting more than just a pause on IVF services, wouldn't you agree?

A    No.

Q    You think it was a pause?

A    That's what she told me.  And also I know that despite this e-mail, there were patients still coming in to the service.  So it was -- there was a disconnect between this and what actually happened.  So that -- this is her stated mission, and what she was telling me personally was very different than what was on this piece of paper.

Q    Okay.  But that's April 27th.  And then May 4th, the REI division is announced that it's going to be closed, right?

A    Correct.

Q    So what you're saying is perhaps some new patients came in the door between April 27th and May 4th?

Porter - Cross by Mr. Schroeder

A    For REI, yes.

Q    Okay.  And they would have been told within a couple days that they were not going to be able to proceed, right, because the REI division is closing?

A    As of May 4th, yes.

Q    Right.

          MR. SCHROEDER:  If I may approach the witness, Your Honor, to show her Defendants' Exhibit A10?

          THE COURT:  Yes.

          MR. SCHROEDER:  Thank you.

Q    (By Mr. Schroeder) Showing you a document that's been marked Defendants' Exhibit A10, it's an e-mail from you -- down below it's an -- up top it's an e-mail from you to you, but the one below it is from you to Heather Gunnell.  Do you see that?

A    Heather Gunnell and Katy Mansfield, yes.

Q    Right.  It's dated November 4th, 2016, right?

A    Correct.

Q    Any doubt that you sent that e-mail to yourself?

A    Not at all.

          MR. SCHROEDER:  Your Honor, move for admission of Exhibit A10.

          THE COURT:  Okay.  Any objection?

          MR. VITT:  No, Your Honor.

Porter - Cross by Mr. Schroeder

THE COURT: Okay. It's admitted, A10.

Q (By Mr. Schroeder) So this is November -- I realize we're jumping around a little bit on time frames. This goes back to November -- early November of 2016, specifically November 4th. And you state to Heather and Katy, the first two paragraphs, if we can highlight them. "I know this is a particularly difficult time for all involved with recent decisions and departures. I personally do not have all of the information nor do I have any expectation I will have more than I do currently. I believe Leslie's e-mail that it was a decision made with many involved and with careful thought and with that knowledge trust the right decisions were made.

"It does leave us in a critical shortage of skilled and trained nursing at a time when our program was in decline and the competition within the region is well organized and patient centered. Our patients are largely cash paying and can choose to go where they like and they will."

Did I read that correctly?

A Correct.

Q Okay. So at this point, is this in and around the time that Casey Dodge is -- her employment is terminated?

A Yes.

Porter - Cross by Mr. Schroeder

Q    Okay.  And was that the impetus for the subject line "nursing"?

A    Yes.  I was advocating to bring Sharon back.

Q    Okay.  And you wanted to bring Sharon back because there was a critical shortage of skilled and trained nursing, right?

A    Correct.

Q    For the REI division program, right?

A    Correct.

Q    And you weren't talking about any of the nurses that you talked about earlier in any of your responses to me throughout the Dartmouth Health system?  You don't refer to any of those people?

A    I'm sorry, rephrase.  I lost you.

Q    In this e-mail communication, you don't refer to any other nurses like the ones that you referred to earlier that may work in the OB-GYN department; here you're referring to critical shortage of skilled and trained nursing at a time when our program is in decline.  Those are your words, right?

A    Yes.  And --

Q    I'm just asking.  Those are your words, right?

A    Those are my words.

Q    Right.  So isn't it true, based on that language, that you're identifying a nursing shortage within the REI

Porter - Cross by Mr. Schroeder

division?

A   For a trained IVF nurse coordinator.

Q   Okay.

A   Nurses are more global than that.

Q   I understand that.  "Skilled and trained nursing" is what you say, correct?

A   For IVF nurse coordination.

Q   That's not what you say, Dr. Porter.  That's not what you say.

A   That was the intent.

Q   Okay.  But that's not what you said, right?

A   That's not what I said there.

Q   Right.  At this point, on November 4th, 2016, Dr. Seifer was the division director, correct?

A   Correct.

Q   And you didn't send it to him, right?

A   No.

          MR. SCHROEDER:  You can take that down.  Thank you.

Q   (By Mr. Schroeder) Dr. Porter, you were asked a series of questions about Dr. Albert Hsu by your counsel earlier today.  And you had a series of complaints about his performance throughout his employment, correct?

A   I wouldn't characterize it that way.

Porter - Cross by Mr. Schroeder

Q   You wouldn't characterize the things that you would report to Dr. DeMars as complaints about Albert Hsu?

A   I wouldn't characterize it as complaints. I would characterize it as observations about his clinical skill.

Q   Well, you had concerns even before he got there?

A   I did.

Q   Right?

A   Yes.

Q   In fact, you signed a declaration in this case where you talked about the fact that you spoke to him well before he even got there, right?

A   Correct.

Q   And you had a less -- you were concerned about his skill set, right?

A   I was concerned he had inadequate training.

Q   And that was based upon a conversation with him, correct?

A   And other conversations that I had with his previous mentors, yes.

Q   His previous mentors?

A   Yeah.

Q   Okay.

        MR. SCHROEDER:  May I approach the witness with a new exhibit?  It's Defendants' Exhibit C3.

Porter - Cross by Mr. Schroeder

THE COURT:  Yes.

MR. SCHROEDER:  Defendants' Exhibit C3.

Q   (By Mr. Schroeder) I would just ask you to review that document that I just put in front of you and let me know when you've had a chance to review.

A   (Witness complies.)

Q   Just let me know when you've had a chance to finish reviewing it.

A   Okay.  (Witness reading.)  Okay.

Q   Does that refresh your recollection that out of the gate, right, even before he got there in the fall of 2013, you called him -- he was already slated to come work there, right, in 2014?

A   He was slated to start, yes.

Q   Right.  And he had gone to MIT, right?

A   Correct.  Yes.

Q   And he had a fellowship in IVF?

A   No.  Fellowship in reproductive endocrinology and infertility.

Q   So REI?

A   Yes.

Q   So the broader part as opposed to IVF?

A   That's what the fellowship is, is the global context of REI, yes.

Q   Right.  Right.  So just based on talking to him, you

Porter - Cross by Mr. Schroeder

made certain conclusions about whether or not he had the clinical skills to join the REI division, right?

A   I made the assessment based on what he told me in terms of his numbers; that he did not meet the training criteria by our national standards and organization before he got there; that that fellowship had gone on probation.

Q   Right.  And you -- did you interview him?

A   No.

Q   Okay.  And yet he was selected to be an REI physician, right?

A   Yes.

Q   And so right out of the gate, you're concerned about his numbers, right?

A   Yes.

Q   And you're concerned about his training, right?

A   Yes.

Q   And, in fact, you raise those concerns, whether you call them complaints, grievances, concerns, comments about his performance dating all the way back to 2014, right?

A   I didn't comment about his performance.  I was making plans for his training.

Q   I'm asking about when he got there, right?  So first of all, your first impression of him isn't great just

Porter - Cross by Mr. Schroeder

based on one call with him because you're concerned about his training and whether or not he's up for being an REI physician at DH?

A    I would not characterize it that way, no.

Q    Well, you had less than favorable opinions about his training, right?

A    I wouldn't characterize it that way.

Q    Okay.  Well, how would you characterize it?  Would you characterize it as less than positive?

A    No.

Q    You wouldn't?  Okay.  But you made it clear that -- or you had this call with him -- you didn't interview him. You had this call with him, and you had concerns about his training and his numbers, right?

A    I had concerns about his exposure, yes, and his ability to act independently, yes.

Q    And those concerns about Dr. Hsu continued after he joined the REI division sometime in mid 2014, right?

A    Yes.

Q    And those -- you raised those concerns to Dr. DeMars, right?

A    Yes.

Q    And you raised those concerns to Heather Gunnell, right?

A    Yes.

Porter - Cross by Mr. Schroeder

Q   I don't recall anyone else you raised concerns to about his work product and how his technique, et cetera.  Any other members of leadership?

A   I was responsible for filling out his evaluations, which there were several as part of being the interim division head, and so I did write those evaluations carefully, and so those would have gone to the individuals within administration responsible for -- to evaluating those.  So, yes, there was some written documentation, and then there was some written communications and verbal communications with our departmental leadership, yes.

Q   Right.  And those communications, whether they're formal performance evaluations or e-mails or conversations with Dr. DeMars, all of those were critical of Dr. Hsu in one way or the other, right?

A   I wouldn't characterize it as critical.

Q   So if his ratings were he needs -- performance needs improvement, you don't consider that critical?

A   I consider that an observation and a goal to help him move forward, yes.

Q   You wouldn't consider that critical?

A   I wouldn't characterize it that way.

Q   You wouldn't characterize it that way?  So if he received any ratings from you, and I really don't want

Porter - Cross by Mr. Schroeder

to go through all the ratings with you, but assuming he did receive ratings of "performance needs improvement," you don't consider that to be a negative comment about his work product?

A   I would -- I would say that it is negative in terms of he needs improvement, yes.

Q   Okay.  And you raise those concerns, and -- so they're negative.  So would you agree with me that the word "negative" could be synonymous with critical?

A   No.

Q   No, you don't think so?

A   No.

Q   Okay.  So we'll go with your word then, negative.  So your reviews of him were in 2014, 2015, 2016, correct?

A   I don't recall.

Q   Well, you just told me two minutes ago that you did reviews for him, right?

A   I don't recall the dates.  You asked me --

Q   I didn't ask you the dates.  I didn't ask you the dates.  I asked you whether you do reviews in 2014, 2015, 2016.

A   I don't recall the exact dates.

Q   Okay.  But you did do reviews of him, right?

A   Yes.

Q   And they contained negative comments about Dr. Hsu?

Porter - Cross by Mr. Schroeder

A    They contained observations that were concerning and patient safety issues, yes.

Q    All right.  All right.  Patient safety issues would be an alarm bell, right?

A    Yes.

Q    And those alarm bells, you were ringing all the way back in 2014, shortly after he got there?

A    I wouldn't characterize it that way, no.

Q    Right.  I understand you wouldn't characterize it that way, but weren't you making comments that were negative about Dr. Hsu dating back to the time he first got there?

A    No.

Q    You weren't?

A    No.

Q    So we're going to go through all those documents, every single one, where you made critical comments about Dr. Hsu.

A    As I said, I was asked to fill out the evaluations for him that I thought about and carefully, as needed, and then when requested.  So I filled out that letter at the request of Dr. Seifer and Dr. DeMars.  I wouldn't characterize that as critical per se, but an honest assessment of what his skills were.

Q    I understand --

Porter - Cross by Mr. Schroeder

A   To my recollection, yes.

Q   Right.  I understand it may be an honest assessment, but it was a negative assessment, was it not?

A   Yes.

Q   Right.  And in one of those negative assessments that you gave to Dr. Seifer and Dr. DeMars, that was in early June 2016, right?

A   Yes.  Yes.  I don't remember the date.

Q   Well, you were shown the document, I think yesterday -- you've seen the document, right?

A   I have.  I do not remember the date.

Q   But it would have been around the time that Dr. Seifer joined the practice, right?

A   Yes.

Q   Okay.  And that was around June of 2016, right?

A   Correct.

Q   And you gave Dr. DeMars and Dr. Seifer negative comments about Dr. Hsu's technique, right?

A   Yes.

Q   His skills, right?

A   Yes.

Q   His clinical knowledge, right?

A   Yes.

Q   And you did that based on historically working with him, but you were out of the office on leave from mid

December to mid June -- mid December of 2015 to mid June of 2016.  So all of your comments about his work related to a time period at least six months earlier, right?

A  I was coming back for part of that week, you can check the dates, but I wouldn't characterize it that way, no.

Q  Well, you were out, though, from December of '15 to June of '16, right?

A  No, I was coming back sooner.  And, again, my deposition will have the exact dates.

Q  Sure.  You testified earlier, I think three times, that it was a six-month leave, short-term disability, right?

A  Right, but I was coming back part-time.  It doesn't mean that I was out all of that.

Q  Okay.  With respect to Dr. Hsu those, those negative comments about his clinical skill, technique, just overall performance, those negative comments date back to shortly after he got there, right?

A  No, I didn't -- in the first six months, I observed him.  In the first six months, I tried to help him.  And so I would have to look to go back and see when I started collecting it, but in the first six months, I was actually really trying to help him.

Q  I understand that, but you had concerns even when you were trying to help him as his -- mentoring him that he

Porter - Cross by Mr. Schroeder

wasn't up for the task, right?

A    That's correct, yes.

Q    Okay.  You shared those concerns with other members of Dartmouth Health leadership, correct, including Dr. DeMars?

A    I shared them with Dr. DeMars, and I filled out his evaluations, yes.

MR. SCHROEDER:  Give me a second, Your Honor. I'm just trying to transition here.

THE COURT:  Okay.

MR. SCHROEDER:  I would ask to approach the witness to show her Defendants' Exhibit H?

THE COURT:  Yes.

MR. SCHROEDER:  Thank you.

Q    (By Mr. Schroeder) Showing you a document that's been marked Defendants' Exhibit H, Dr. Porter, and it's a series of e-mails between you and Leslie DeMars, correct?

A    A series of e-mails between -- there's two e-mails, Leslie DeMars at the top, and the bottom is Leslie DeMars, Navid Esfandiari, and Elizabeth McGee.

Q    Let me ask you this before we proceed:  Elizabeth McGee, does she go by the name Lisa McGee?

A    Yes.

Q    Who is she?

Porter - Cross by Mr. Schroeder

A   Lisa McGee, at the time, was the fellowship director for REI at University of Vermont, and we had a joint fellowship training program.

Q   She's at the University of Vermont Medical Center?

A   She's on leave currently, but, yes, she was at that time, yes.

Q   Okay.  Well, I'm not worried about that time necessarily, but she's at UVM -- she may be on leave, but she's at the University of Vermont Medical Center?

A   To my knowledge, yes.

Q   Do you stay in contact with her?

A   Now?

Q   Yeah.

A   No.

Q   No contact with her?

A   No.  I haven't for months.

Q   Okay.  So she's on leave of absence right now?

A   Correct, as far as I know.

Q   But back then, in 2016, you -- were you in regular contact with her?

A   All the time because of the fellowship.

Q   And as a result of the joint fellowship between UVM Medical Center and Dartmouth Health, would it be fair to say that there was close ties between those REI programs at that time?

A    Yes.

Q    Okay.  And you developed relationships, or continued relationships, with people at UVM dating back to the time that you were a fellow there, correct?

A    Dating back to the time that I was a resident there, yes.

Q    Right.  Right.  So you had been a resident at UVM Medical Center and you had been a fellow at UVM Medical Center, right?

A    Yes.

Q    And at that time you were still living in Norwich, Vermont, but you were doing your fellowship here at UVM Medical Center in Burlington?

A    No, we were living in Montpelier.

Q    Oh, okay.  All right.  So you did your residency at UVM Medical Center.  You did your fellowship there.  And then, certainly, in 2016, you had close connections between the Dartmouth Health REI program and the UVM Medical Center program, right?

A    Correct.

Q    And those close relationships carried over into 2017, right?

A    Correct.

Q    Now, in the lower e-mail, this is January 30th -- before we go any further --

MR. SCHROEDER:  Can I move for admission, Your Honor?

THE COURT:  Is there any objection?

MR. VITT:  No objection.

THE COURT:  Okay.  Then Exhibit H is admitted.

MR. SCHROEDER:  Thank you.

Q   (By Mr. Schroeder) So showing you Exhibit H, there's two e-mails.  Let me start with the bottom one, and then we'll go up.

The bottom one is an e-mail from you to Elizabeth McGee, Lisa McGee, right, Leslie DeMars, and Navid Esfandiari, right?

A   Correct.

Q   At this point, you are -- you, yourself, were on a leave of absence, right?

A   Correct.

Q   So you weren't at work at all during January of 2016?

A   Correct.

Q   Okay.  Now, the third paragraph down it says, quote, "This would be a potential win/win for both programs.  It provides extra support and much needed relief for Albert and thus ease his stress, provide some collegial support."  Do you see that?

A   Yes.

Porter - Cross by Mr. Schroeder

Q    You wrote that, correct?

A    I did.

Q    Because, at that point, right, when you were out on your leave of absence, December of '15 to sometime around June of '16, on your short-term disability leave of absence, the only doctor in the REI division was Dr. Hsu, right?

A    At Dartmouth-Hitchcock, and Judy McBean was doing some work, I understand.

Q    You understand she was doing some work; she was a per diem, though, correct?

A    Right, filling in where she could.

Q    Right.  And where is she located?

A    She's in a practice in Brattleboro, Vermont.

Q    And how far away is that from --

A    About an hour from Dartmouth-Hitchcock.

Q    Okay.  And do you know how often she was there in 2016?

A    I can't off the top of my head say.

Q    Right.  And you don't know how often she was there in 2016 or 2017 I think you said, right?

A    I don't know.

Q    Right.  And so here, you're saying also, further down, "I know Judy McBean has been a huge help as has Leslie with decisions and surgery, and I am tremendously thankful."  You appreciated the efforts by Dr. McBean

Porter - Cross by Mr. Schroeder

and Dr. DeMars, correct?

A    Correct.

Q    And, in fact -- but then you go up top, and you have an e-mail just with Leslie DeMars and halfway down or towards the end of that, it says, quote, "I'm hearing from multiple sources that Albert, despite relatively open schedules, is not coping that well.  He's also on the list to be suspended again despite relatively light schedules."

     Now, at that point to the extent that you were learning anything, it was through other people that were working in the REI division, correct?

A    Or e-mails.

Q    Or e-mails, correct?

A    Yeah, I was getting e-mails still.

Q    Okay.  And in terms of being suspended, was it related to getting the charts in on time?

A    Yes.  He didn't close his documentations in a timely fashion.

Q    Right.  And if you get too high up on the amount of days your charts aren't up to date, you could be suspended?

A    Correct.

Q    Okay.  And so, at that point, he -- other than Judy McBean who is working on a per diem basis, he's the

only one performing REI physician services in the REI division of Dartmouth Health, right?

A   I wouldn't characterize it that way.  Judy was around and we had the fellows from -- and Lisa and -- from UVM at the same time to provide some support.

Q   But to the extent that there was support or not support at that point, you weren't there, right?

A   No.

Q   Okay.  So you don't have any first-hand knowledge of what was happening on a daily basis, first-hand knowledge?

A   I was not physically with him then, no.

Q   Okay.  You were not physically there either, right?

A   Right.

MR. SCHROEDER:  If I may approach the witness to show her Defendants' Exhibit R?

THE COURT:  Yes.

Q   (By Mr. Schroeder) Showing you a document marked Exhibit R, Dr. Porter, it is a number of e-mails on one page between yourself and Heather Gunnell and Leslie DeMars and Donna Bedard.  You were part of these e-mails, correct?

A   Correct.

Q   Okay.

MR. SCHROEDER:  Your Honor, I would like to

Porter - Cross by Mr. Schroeder

move for admission of Exhibit R.

THE COURT:  Any objection?

MR. VITT:  No objection.

THE COURT:  Okay.  Exhibit R is admitted.

Q   (By Mr. Schroeder) Halfway down the page you say to Leslie, "Today did not go well.  I suspect I will be pulled back out of work if we cannot make this trial work."  By "trial," you meant the fact that you were coming back a couple hours a week, right?

A   I was coming back on limited work restrictions as outlined by my physicians.

Q   Right.  That's what I said, correct?

A   Correct.

Q   Now, halfway down, you said, "I spoke with Heather two weeks ago and asked her to be certain Albert was set up in his office; that she make it clear to him that he needs to be out of the ultrasound --" US space, I assume that's ultrasound?

A   Ultrasound.

Q   "He is covering ultrasound.  This should include the consult rooms.  He's seeing clinic patients in US consult space," right?

A   Correct.

Q   And you were annoyed that he was doing so?

A   I wouldn't characterize it that way.

Porter - Cross by Mr. Schroeder

Q   Well, the last sentence of your e-mail says, "In the end, is it frustrating me to tears that I can't seem to make this work?"  You were frustrated, right?

A   I was really disappointed.  I was -- Yeah.

Q   And you were frustrated because Dr. Hsu wasn't listening to you?

A   No.  I wouldn't characterize it that way.

Q   Okay.  And either way, that day in the office didn't go well, correct?

A   They weren't compliant with my work restrictions the first or second day I came back.

Q   Right.  And this first or second day that you came back is right around that mid June time period, correct?

A   Correct.

Q   And you recall going over your work restrictions in person with David Seifer and Albert Hsu specifically?

A   I went over in person with Leslie DeMars, with --

Q   I asked you -- please answer the question.

A   I recall going over my work restrictions with David Seifer, yes.

Q   Just David Seifer?

A   Right.

Q   Okay.  Not Albert Hsu?

A   Not specifically, no.

Q   Right.  In fact, when I asked you about going over it

Porter - Cross by Mr. Schroeder

with Albert Hsu and David Seifer the first person you said was Leslie DeMars, neither of them were the people that I asked you about, right?

A   She sent an e-mail out to the group.

Q   I understand that.  My question though was whether or not you personally said to David Seifer and Albert Hsu, Hey, listen.  I'm coming back, and here's my list of work restrictions.  You didn't do that, right?

A   I wouldn't characterize it that way, no.

MR. SCHROEDER:  Your Honor, I've got another big section coming up.  I'm not sure whether -- I'm going to try to condense my questions, but if you want me to keep going, I'll keep going, but --

THE COURT:  Let's keep going.

MR. SCHROEDER:  Okay.  Sure.  May I approach the witness to show her Exhibit T?

THE COURT:  Yes.

Q   (By Mr. Schroeder) Okay.  Showing you Defendants' Exhibit T.  This is a series of e-mail communications with you on them, right?

A   Yes.

Q   And I just want to ask you --

MR. SCHROEDER:  I actually move for admission of Exhibit T.

THE COURT:  Any objection?

Porter - Cross by Mr. Schroeder

MR. VITT: None.

THE COURT: Exhibit T is admitted.

Q    (By Mr. Schroeder) Now, this is a series of e-mail communications between you and Leslie DeMars, right?

A    Correct.

Q    And you were frustrated, right, in this series of e-mail communications about the fact that Albert Hsu was continuing to use the ultrasound space, right?

A    I wasn't frustrated. I wouldn't characterize it that way; I was disappointed.

Q    Well, you're disappointed, and you felt the need to write this e-mail to her, right?

A    Yes.

Q    Right. And then Leslie DeMars responded to you, correct?

A    Correct.

Q    And then you responded, "I'm really sorry, but I'm laughing."

A    Yeah. I was responding to her coming in to clean out his office so he could move there --

Q    Okay.

A    -- and take care of patients in his own office rather than the ultrasound room.

Q    Okay. Now, to that, June 2016, would it be fair to say that you had a pretty close relationship with Leslie

Porter - Cross by Mr. Schroeder

DeMars?

A   We were friendly, yes.

Q   You were more than friendly, weren't you?

A   I would not characterize her as my best friend, as you did on opening in no way. We were friendly work colleagues.

Q   Well, you texted with each other all the time, didn't you?

A   No, I wouldn't characterize that.

Q   Really? Okay. Well -- you both bought and purchased the same kind of car, right?

A   Yes.

Q   Right? Porsche Macan?

A   No, she has --

MR. VITT: Objection, Your Honor. Do we really need to go down this road?

MR. SCHROEDER: I'll show -- we'll go through the text messages, Your Honor.

THE COURT: Overruled.

MR. SCHROEDER: Thank you.

Q   (By Mr. Schroeder) You were friendly with her -- she wasn't your best friend, right?

A   No.

Q   But you certainly got together with her outside of work, right?

Porter - Cross by Mr. Schroeder

A   No, not very often.

Q   Okay.  Well, I want to go to the first e-mail at the top.  So, yes, we do have to go into this question.

This is you saying, "I'm really sorry, but I'm laughing.  I'm really sorry it has to be this way.  I'm going to go to the lake mid afternoon before the graduation ceremony, if you want a place to relax, iced tea or a beer or glass of wine in between."  Right?

You did get together with her outside of work, right?

A   Not very often at all.  This was the evening before graduation, which was within a ten-minute drive from our lake cabin, so I was saying, If you want to come up, fine, because these other people are coming too.  So it wasn't specific to her.

Q   Okay.  But you would get together with her outside of work, right?

A   Not in a really long time.

Q   No.  No.  No.  I'm not asking a really long time.

A   No, other than work-related things and the boards.

Q   In 2017 -- I'm talking about 2016, not in a really long time since a really long time closures of the REI division, pandemic, et cetera.  I'm talking about 2016, you were very friendly with her in that time frame?

A   We were friendly, yes.

Q   And you would do things together and get lunch, get

Porter - Cross by Mr. Schroeder

dinner, maybe go for drinks, right?

A   No.  Just work-related activities.

Q   Just work-related?

A   Mostly, yes, I would say.  Uh-huh.

Q   Mostly or always?

A   We rarely got together for social things that weren't work related in that time frame.

Q   Okay.  Well, and is it your testimony that you did not exchange regular texts?  You weren't in a regular text message string with Dr. DeMars?

A   I would say that I text her about specific things frequently, yes, but not regularly like every day or every evening like I do my children or my best friend who I do clinic -- I mean, I run trails with.  So it wasn't that type of a relationship, no.

Q   Okay.  I understand that it's not a type of relationship like your family or your kids or your best friend.

A   Right.

Q   But setting aside that small group of people, she was certainly in the upper tier of your friends in terms of regularly texting with her; is that fair to say?

A   I wouldn't characterize it that way, no.

Q   You wouldn't characterize it that way?

A   No.

Porter - Cross by Mr. Schroeder

Q    Okay.  This is an e-mail exchange between you and Dr. Porter -- I'm sorry, Dr. DeMars, and in this e-mail exchange you say that you did, at the bottom, explain your work restrictions to David over the phone, right?

A    Correct.

Q    The real issue -- and then you say, "The real issue is Albert camping in the reading room and using it as his personal office."  And then further down you say, "Albert has been asked not to use these spaces unless for their intended purposes.  He ignores the request. While the billing issues are likely to go unnoticed, if we are audited, it could be a problem."

Was this really kind of a big bugaboo for you that he was using spaces that you didn't believe he should be in?

A    What he was doing was not complying with billing practice.

Q    And that really bothered you, right?

A    I wouldn't characterize it that way.

Q    Okay.

MR. SCHROEDER:  I want to just, if I may, Your Honor, show Dr. Porter Exhibit W, Defendants' Exhibit W.

THE COURT:  Yes.

Q    (By Mr. Schroeder) Now --

Porter - Cross by Mr. Schroeder

A   I would like some time to read this please.

Q   Sure.  Let me know when you're finished.

A   (Witness reading.)  Okay.

Q   Thank you.  I just -- I wanted to ask you a few quick questions.  So this is July of -- late July of 2016, right?

A   Correct.

Q   And you write, "This weekend suggestions going forward."  And you were giving Dr. DeMars kind of a review of Dr. Seifer, in your mind, right?

A   At her request, yes.

Q   Okay.  I understand that.  It was at her request, and you were giving -- and your comments, would you consider them to be negative or critical?

A   I wouldn't characterize it that way.  I would say I was concerned.

Q   You were concerned then, right?

A   I was concerned about patient safety, yes.

Q   Right.  And you say -- now, go to the second page --

        MR. SCHROEDER:  I'm sorry.  I didn't ask for admission first.

        MR. VITT:  No objection.

        MR. SCHROEDER:  Move for admission.

        THE COURT:  Okay.  Exhibit W is admitted.

        MR. SCHROEDER:  Thank you.

Porter - Cross by Mr. Schroeder

Q    (By Mr. Schroeder) Go to the second page, Dr. Porter. Right before you state the options, you state, quote, "The larger issue to be addressed is the ongoing concern surrounding David's technical abilities and the ongoing team, quote, no confidence, end quote, in him." Did I read that correctly?

A    Correct.

Q    And then further down at the end of number one, you say, quote, "I suspect that the ongoing team worry about David's technical ability, this option may not work/be challenging."  At this point, he's been there a handful of months, right, Dr. Seifer?

A    Correct.

Q    And he was the division director, right?

A    Correct.

Q    Right.  And did you feel like you reported to him or no?

A    Yes.

Q    You did?  Okay.  And your comments about him, you wouldn't characterize them as negative or critical, just concerned, right?

A    I would characterize them as patient safety issues.

Q    Okay.  And you then say -- but the ongoing team -- at this point you had just come back from a six-month short-term disability, just back in June, right?

Porter - Cross by Mr. Schroeder

A    I was coming back earlier hours, yes, and starting to return in a more concerted fashion, yes.

Q    Well, when I showed you the document earlier, your first day back was around June 14th, 2016.

A    Well, let's go back to the timeline in my deposition, and it will give you the detailed --

Q    Well, we don't really have time for that, but what I'm asking you is:  Your comments about Dr. Seifer's performance happened within six weeks of you coming back a few hours a week, right?

A    Yes.

Q    Okay.

         MR. SCHROEDER:  I'm going into another subject, Your Honor.  I don't want -- I'll keep going; I'm good.

         THE COURT:  No, I think we're done.  It's 4:32.

         MR. SCHROEDER:  Okay.  I just want --

         THE COURT:  Yes, thank you.

     Dr. Porter, you may step down.

         THE WITNESS:  Thank you.

         THE COURT:  All right.  So thank you, jurors, for your patience.  We're two minutes late tonight.  I did want to let you know, tomorrow, we are very likely to finish early.  By "early," I mean perhaps early

Porter - Cross by Mr. Schroeder

afternoon early. Okay? We're doing our best to kind of keep you busy while you're here, but it's hard for me to predict to you exactly when we would end. But, as I say, it could be as early as lunchtime or 1:00 or thereabouts. I say that, but I can't promise you an exact time, but it will be earlier tomorrow than what we're typically doing. Okay. I'll let you know that for your personal schedules.

JUROR NO. 11: Can I ask if we're planning something at 12:00 lunch, should we not do that?

THE COURT: I'm sorry?

JUROR NO. 11: I was making a plan for 12:00 for lunch. Should I not do that?

THE COURT: No, you'll have your lunch, so even if you leave early for the day, you'll have your lunch as normal.

JUROR NO. 11: Okay. Thank you.

THE COURT: All right. We'll stand for the jury.

(Jury exits.)

THE COURT: Okay. So Dr. Bancroft will be testifying tomorrow after Dr. Porter has concluded. As I noted at the last break, Defendants have filed a motion. I'm not sure if Plaintiffs have seen it yet or have had an opportunity to review it. It was filed

Porter - Cross by Mr. Schroeder

this afternoon, basically around the lunch hour.

MR. JONES:  I only saw that it was in fact. I got the PACER notice.  I have not had a chance to read it.

THE COURT:  No, I didn't think you would have.  Obviously, you will have an opportunity to review that and file a written response, and I would propose that we meet here in the courtroom at 8:30 to take up that issue before the trial day starts.  Okay?

MR. JONES:  That's fine.

THE COURT:  Okay.

MR. SCHROEDER:  Yes, Your Honor.  I will attempt to endeavor to consolidate my continued cross, so hopefully we'll be fairly brief.

THE COURT:  Okay.  All right.  I think that is all I had.  And, you know, the point I made at the bench conference just about exhibits, so if there isn't a stipulation at the start of the day, then you should as Mr. Schroeder was doing towards the end of the afternoon, which is lay the foundation, right?  If not, you're referencing an exhibit and then just talking to opposing counsel and saying, Do you object to it?  It's definitely unorthodox.  So if there's a stipulation, obviously, it could be admitted, and then -- I don't need to tell experienced counsel how this will work,

but then when you go and provide that exhibit to the witness, you can say, I'm offering into evidence what has been admitted.  We can deal with stipulations before the trial date starts.  If that's something that can be done, it seems that it would be more efficient.  Absent that, definitely should be laying the traditional foundation with the witness of time and parties to have communication, things of that nature.

I think that was all I had.  Anything from the parties at this time?

MR. JONES:  Not from the plaintiff.

MR. SCHROEDER:  Nothing, Your Honor.

THE COURT:  All right.  Thank you, and I will see you tomorrow.

(Court at recess for the day.)

CERTIFICATE


         I, Jan-Marie Glaze, RPR, CRR, Pro-Tem Court Reporter for the United States District Court for the District of Vermont at Burlington, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.


         I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


                                    _____
                                    JAN-MARIE GLAZE
                                    COURT REPORTER