UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, MD,      )
                                  )
              Plaintiff,          )
         v.                       )   2:17-CV-194
                                  )
DARTMOUTH-HITCHCOCK MEDICAL       )
CENTER, DARTMOUTH-HITCHCOCK       )   March 27, 2025
CLINIC, MARY HITCHCOCK MEMORIAL   )
HOSPITAL, and                     )
DARTMOUTH-HITCHCOCK HEALTH,       )
                                  )
              Defendants.         )
                                  )

_____

BEFORE THE HONORABLE KEVIN DOYLE
UNITED STATES DISTRICT JUDGE

_____

TRIAL

VOLUME 4    Pages 645 to 787

APPEARANCES:

For the Plaintiff:

ERIC JONES
GEOFFREY J. VITT
SARAH H. NUNAN


For the Defendants:

DONALD W. SCHROEDER
MORGAN McDONALD
TRISTRAM J. COFFIN


Jan-Marie Glaze, CCR, RPR, CRR     Certified Court Reporter

## TABLE OF CONTENTS

### PROCEEDINGS INDEX

**Proceeding:**                                                   **Page**

Motions in Limine                                                647

### EXAMINATION INDEX

**Witness:**                                                      **Page**

**Misty Blanchette Porter:**
        Cross Examination By Mr. Schroeder              687
        Redirect Examination By Mr. Vitt                774
        Recross Examination By Mr. Schroeder            783

### EXHIBITS

**Exhibit No.**                                           **Page Admitted**

Exhibit B12                                                      783
Exhibit C6-A                                                     756
Exhibit C13                                                      687
Exhibit C15 Pages 1, 4-8, 39, 40, 83                            718
Exhibit C16                                                      687


Exhibit No. 123-A                                                783
Exhibit No. 126                                                  687

Thursday, March 27, 2025

Morning Session

* * *

THE CLERK:  Your Honor, the matter before the Court is Case No. 17-CV-194, Misty Blanchette Porter vs. Dartmouth-Hitchcock Medical Center, et al. Appearing on behalf of the plaintiff are attorneys Geoffrey Vitt, Eric Jones, and Sarah Nunan.  Present on behalf of Defendants are attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We are here currently for a hearing on a motion in limine and a jury trial.

THE COURT:  Good morning.

Just to confirm, Plaintiffs haven't filed a written response to the defendants' motion.

MR. JONES:  We have not.

THE COURT:  Okay.

MR. COFFIN:  I think we have an agreement on that, Your Honor.

THE COURT:  Oh, okay.

MR. COFFIN:  I'm happy to speak to it. Please correct, Mr. Jones, if I get anything wrong.  As of this morning, I believe the plaintiff's position is they're agreeable to removing the narrative report portion from Dr. Bancroft's submission, and that that

would not be introduced into evidence.  So they would, I guess, not oppose our motion in limine.

Remaining for some discussion at the appropriate time is how we handle the chart and the assumptions and whether those are a demonstrative exhibit that they talk about in front of the jury or actually are introduced into evidence in which case it would go back to the jury room.  I believe our position will be, although I would like to see how the evidence rules out a little bit, that we will oppose the chart and the assumptions being used as substantive evidence, but we do not oppose them as being demonstrative evidence.  That's our view on things.

THE COURT:  Okay.  So then the expert, Dr. Bancroft, could make reference to his chart, he could make reference to his assumptions on the stand, just that neither one of those documents would --

MR. COFFIN:  That's right -- sorry.

THE COURT:  Neither of those documents would go back to the jury?

MR. COFFIN:  Yes.  But I think more than that, I assume he would display them and use them as part of his testimony and then we will have a discussion at the appropriate time whether to admit them as substantive.

MR. JONES:  We do intend to offer it as substantive evidence and have it admitted as an exhibit.  We will have that disagreement at some point, but everything else that Mr. Coffin said, I believe, is correct.  We have a new marked Exhibit 1B.  We recently removed the cover report, but the remainder of his report we propose to use both as substantive and demonstrative evidence.

THE COURT:  And that consists of the chart and the assumptions?

MR. JONES:  Correct.

THE COURT:  Okay.  So when you say "at the appropriate time," when Dr. Bancroft takes the stand and Mr. Jones attempts to show him his chart and wants that to be shown, you're saying that's not something we need to discuss because it won't be opposed at this time for him to be able to look at his chart during his testimony.

MR. COFFIN:  Correct.  And my request would be that the Court hear his testimony both on direct and cross and then make a decision about whether it is appropriate to submit as demonstrative evidence.  At the end of our -- when we hear what he testifies to on direct and cross, we may not oppose as admitting it as substantive evidence.

THE COURT:  Okay.

MR. COFFIN:  At this point, he can use it as demonstrative evidence.

THE COURT:  Okay.  Mr. Vitt?

MR. VITT:  I'm on my feet because I'm going to be putting Dr. Bancroft on the stand.

THE COURT:  Okay.

MR. VITT:  I want to be certain that I can show him his chart and it will come up in front of the jury because he has to explain what's on the chart, and nobody -- well, I don't want to say "nobody," but most people can't keep those numbers in their head; they have to look at it.  So I want to be clear, he gets on the stand, I show him the chart, it comes up in front of all the jurors.

MR. COFFIN:  Certainly.  The only question is whether, at the end of the trial, it goes back into the jury room with the other exhibits as substantive evidence.

THE COURT:  Right.

MR. VITT:  We can deal with that later.

THE COURT:  Right.  So for purposes of today, we're on the same page about it can be used.  We'll make a decision at the appropriate time as to whether it's substantive evidence, demonstrative.  And then if

it's only used as a demonstrative kind of a question, and if it's not back in the jury room, and assuming the jury wants to reach the question of damages in this case, if they ask to come back out and look at it as a demonstrative, presumably that would be -- is it a distinction without a difference?  Are they still essentially kind of the same?

MR. COFFIN:  I need to process that a little bit, Your Honor.  It feels like a bridge we can cross when we get there.

THE COURT:  Yeah.  Okay.  All right.  Well, that was easier than we thought.

Mr. Schroeder?

MR. COFFIN:  Buckle up.

MR. JONES:  We try to cooperate where we can.

MR. SCHROEDER:  Judge, we gave an initial list of stipulated exhibits.  I have three or four more.  I'm going to try to get with Plaintiff's counsel and try to streamline that upfront so that hopefully when we start at nine, we'll be able to move things along.  If we have to put them in, we'll put them in, but hopefully at the front end, we can just have them marked and then we'll proceed, but I'll confer with Plaintiff's counsel on that.

THE COURT:  So before I bring the jury back

in, you can let me know if you've reached an agreement, and then obviously you would be free to introduce them as admitted.  I can make a ruling on that before the jury comes in.  Not a ruling, you know, essentially just acknowledge that they have been stipulated to; not the contents of course, but just for admissibility.

MR. SCHROEDER:  Right.  Or we can go back to the way I was doing it yesterday which was somewhat cavalier.  But no -- yes, Your Honor, we'll do it -- we will try to get agreement on that.

THE COURT:  Okay.  All right.  Good.  And do we anticipate -- do you have a sense of how much more with Dr. Porter?

MR. SCHROEDER:  I think less than -- certainly less than an hour.

THE COURT:  Okay.  And then redirect.  So maybe Dr. Bancroft will go on after the break or so?

MR. VITT:  He's going to be here at 10 a.m., so I thought that was a safe assumption.  So it appears that it is.

MR. SCHROEDER:  I think that it is, Your Honor.

THE COURT:  Okay.  Great.  All right.  Thank you.

(Recess taken.)

THE COURT: Okay. I thought there was going to be an announcement. Is there something to take up about an exhibit?

MR. SCHROEDER: Yes, Your Honor. There's a series of exhibits that we, I think, stipulated to, the first set. The only ones that are open for discussion and you're ruling on are A, B, D, and E of Defendants' exhibits. They were at the front end of our first few exhibits that we had on our exhibit list from March 10th. And I heard from Mr. Jones that we had -- that they have an objection on relevancy grounds. So I don't know whether you want him to go first or me to go first, but I'm happy to present why I believe that they're relevant but also probative.

THE COURT: Okay. Go ahead.

MR. SCHROEDER: And I guess I would like to have that discussion outside the presence of -- I'm not sure whether we have a discussion on objections related to relevance outside the presence of the plaintiff for purposes of me making this arguments, because otherwise it's just a preview of -- normally, we would be by the bench to have this argument. So I'm not sure how you want to proceed.

THE COURT: So you're saying having the discussion in front of Plaintiff now is problematic

because --

MR. SCHROEDER:  Well, normally, it would be by the bench, and I would be able to have that in front of you on an objection, so I don't -- I'm still -- she's still on cross --

THE COURT:  Oh, understood, understood.

MR. JONES:  We can have her step into the hallway?

THE COURT:  Sure.  I think that's probably easiest without calling you all up.

MR. SCHROEDER:  Thank you.

THE COURT:  Okay.

MR. SCHROEDER:  So these series of exhibits which have been on our list since March 10th, so they're not new, there's no motion in limine on them, they go directly to impeachment of the witness. Specifically, a dispute and conflict that she's already testified about with respect to Dr. Reindollar, who was the chair of the OB-GYN.  This happened not that long ago, 2012 and 2013.  And Dr. Merrens was attempting to mediate that dispute, if you will, and had a series of e-mail communications with the plaintiff where she had very -- she had a lot of things to say about Dr. Merrens that, I think, will be contrary to what comes out in this case.

And so I want the ability to impeach her on that evidence. It's certainly probative in this case because it goes to the issue that is actually before this Court, which -- and sometimes I feel I think we may be in a med-mal case, but it's actually disability discrimination and retaliation. And there's a series of complaints that she had back in the day -- and "back in the day" being just 2012 and 2013. Hsu came on board -- well, he was called by the plaintiff in late 2013. But no retaliation happened. Nothing happened. So this goes to our defense, Your Honor, and it comes in for that reason and, certainly, I have the ability to impeach her.

At first, when I asked her a question, she acted like she didn't even know Dr. Merrens. I want to establish that she did, in fact, know Dr. Merrens, and I have the right to ask her about things that she said in those e-mails which are -- the temporal proximity is there because it's not that long ago. And for that reason, among multiple reasons, we have the ability to do that.

If Plaintiff's counsel -- these exhibits have been at the front end of our exhibit list since March 10th. There's no motion in limine to keep this out. And, frankly, based on her testimony already on direct and

cross, she's opened the door to these discussions back in 2012 and 2013, specifically A, B, D, and E of our exhibits.

THE COURT:  Okay.  Mr. Vitt?

MR. VITT:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. VITT:  The dispute involving the hiring of Dr. Hsu and Seifer, closing the REI division, the failure to reassign Dr. Porter is complicated.  It involves a large number of documents.  I'm not sure we needed to show up with as many as we did, but be that as it may, there's certainly a lot of documents.

Going back four years for some unrelated dispute is -- if there's relevance, it is so marginal.  I don't see it.  But if there is relevance, it's so marginal that we don't need to get into yet another dispute.  I mean, it really has nothing to do with the dispute that we're litigating today.  And the fact that Dr. Merrens was involved, yeah, so be it.  But I don't see that has any particular relevance to what we're trying to resolve in this case.  So argue is, to the extent that there is relevance, it's so marginal and not worth the effort and time.

THE COURT:  Okay.  I haven't read these exhibits yet.  I've heard the arguments.  I'm going to

take a moment to go read them so I can make the assessment myself in terms of relevancy.  Okay?

MR. VITT:  All right.

MR. SCHROEDER:  Thank you, Your Honor.

(Recess taken.)

THE COURT:  Okay.  Having had a chance to read the exhibits, I think it might have worked better had I read them before I heard your arguments.

So, Mr. Schroeder, I'm going to ask you again:  So the relevancy here is you want to use these e-mails for impeachment, or is it your plan to attempt to get these e-mails admitted, kind of, as substantive evidence to discuss the substance of the e-mails?

MR. SCHROEDER:  No.  It's not so much the substance of the e-mails, Your Honor.  It's the fact that she made complaints about individuals that were in management of the OB-GYN department.  She sought -- Dr. Merrens was involved in mediating that dispute.  So it goes to the fact that she made a complaint, and she was not retaliated against for any of those instances. It's highly relevant.  It goes to impeachment.

I'm not getting into the substance about what the dispute is about other than the fact that she's acknowledged, kind of, that she had some conflict with Dr. Reindollar who was the chair of the OB-GYN

department.  But it goes to the fact that she made these complaints before and she wasn't retaliated then. Her whole case is, "I made these complaints, and I was retaliated against."  It's certainly relevant, but I want to limit it to just impeachment for purposes of the witness.  That's it.  I'm not going to get into the substance of the underlying dispute, and I'll be able to go in and out of that fairly quickly.

THE COURT:  But how are you going to impeach the witness without getting into the details of it?

MR. SCHROEDER:  Well, getting into the details of her statements to Dr. Merrens in the body of these e-mails.  I mean, I could bring her back in my case in chief and cross her after we hear all this evidence in this case, but I think we know that based on all the e-mails that Plaintiff's counsel has submitted that we're going to get into the credibility of Dr. Merrens and Dr. DeMars.  So this issue goes to the heart of our defense which is she wasn't retaliated against.

You made complaints, you're still employed.  You made complaints about your bosses.  In fact, you had your counsel, the same counsel.  So I think she's -- one, I get to ask that on cross-examination for impeachment purposes, and how far I go into the

substance -- I mean, I don't expect to go into the underlying substance of that dispute, but this goes to the heart of our defense which is that we didn't retaliate against her.  In fact, you made complaints earlier -- by the way, earlier is 2012/2013.  Reindollar leaves at the end of 2013, and then we go into the next set of disputes which is Hsu and Seifer.

But our defense is, we didn't retaliate, so it goes to that issue.  We're not getting into -- whether or not her complaint was true or not and the exact nature of those complaints, we're limiting it to impeaching her -- when I asked her the first question, she acted like she had no idea who Dr. Merrens was.

THE COURT:  Yeah.  That's why my first question was:  Were you going to attempt to use this really to kind of establish that there was prior dealings with Dr. Merrens?  That I understand.  As I read the e-mails though, it's not entirely clear what the context is of this.  So that's why my question to you is how deeply you would get into this.  That's my concern.  If it's going to be introduced to say, Look, in 2012 you were e-mailing with Dr. Merrens about certain issues just essentially, to use your word, to maybe kind of maybe impeach the fact that yesterday she may have indicated that she didn't really know

Dr. Merrens very well, this then establishes going back years there is interaction with Dr. Merrens.

I'm really just kind of thinking about, I don't know if prejudice is the word for it, but it is four years before.  Doesn't necessarily make it irrelevant, but how you get into this questioning without getting kind of fairly deep into the details of this.

MR. SCHROEDER:  Okay.  So on the first point, Your Honor, it's not four years before, respectfully. Her complaints about Dr. Hsu started in 2014 when he started.  Her complaints about Dr. Reindollar are 2012, 2013.  So there's more temporal proximity than Plaintiff's counsel has alluded to.

Plaintiff's counsel said, you know, before this case, I knew Misty.  Yeah, he knew Misty because he just had a prior case with her or didn't actually lead to legal issues, there's no settlement communications. What I want to really focus on, Your Honor, is just her comments about Dr. Merrens because that is at the heart of our defense.  We didn't retaliate, and she makes a series of comments in these e-mail communications, that's all I really want to focus on, is those series of communications in writing to Dr. Merrens.

"I think you could be my neutral in this mediation."  This goes to the heart of impeaching the

witness at this point. And I don't want to get into the substance of them. I don't even know, quite frankly, Your Honor -- I don't know the substance of the Reindollar dispute. I just know that she had a series of disputes with other people prior to Dr. Hsu and Seifer, and she was not retaliated against, and that goes to the heart of our defense.

THE COURT: Okay. And so your examination then, what I'm hearing you say, is it's going to be fairly limited if you get into these details.

MR. SCHROEDER: Yes.

THE COURT: Establishing the fact that was -- I just want to understand your position. I want to hear from Mr. Vitt again on this as well. But establishing prior communications, contact with Dr. Merrens with respect to this previous workplace issue. But you're telling me that you are not going to be exploring at all the details -- frankly, having read the e-mails, I'm not clear at all as to what this dispute is. So I would be concerned about attempting to get too deeply into this when I'm not really sure about the relevance of it in terms of the substance of the complaint.

MR. SCHROEDER: The issue, Your Honor, is -- and I'll acknowledge what the purpose of these exhibits

is.  And by the way, you know, there have been no surprise on this issue.  These are the first four exhibits in our -- we asked her about it in her deposition.  It's certainly relevant in this case, so there's no surprise here.  But to the specific issue you're asking about, this goes exactly to her statements about Dr. Merrens to Dr. Merrens in e-mail communications.  And the fact of the matter, Your Honor --

THE COURT:  What are those?  What do you mean?  Just spell that out for me.

MR. SCHROEDER:  Sure.  Well, Exhibit A, quote, "I'm appreciative of your care, gentleness, and kindness," end quote.

That's Exhibit A.  Exhibit B.  Quote, "Kindness and sensitivity in the process."  That's Exhibit B.

At the end of it, she says, quote, "It's hard for me to see how you would not be neutral," end quote.

Exhibit D, quote, "Thank you for your response, time, and consideration to the issues," end quote.

Exhibit E -- this does go to -- now, we get to the relevance issue, Your Honor, because I should have mentioned this before.  The relevance to this is the fact that there's going to be evidence in this case, and I think she's alluded to the fact that Ms. Todd,

Elizabeth Todd, Beth Todd as she was known, is known, raised complaints as well. We're getting into nuances as to what the word "complaint" means, even though this is a whistleblower retaliation case, but concerns, issues --

This is Exhibit E, February 8th, 2013. By the way, Your Honor, there was testimony that she had a call with Hsu and kind of grilled him on his credentials in October of 2013. So in terms of temporal proximity, I think we're pretty close.

She says in here, quote "We --" meaning her and Beth Todd, "We believe it is essential that structural changes be made within the division of reproductive medicine. We also believe that changes need to be made soon," end quote.

So I think I heard Plaintiff's counsel say this is what this case is about. It is what this case is about. She had these concerns in 2013. She was employed in 2013 and not retaliated against.

THE COURT: Okay. Again, for impeachment value?

MR. SCHROEDER: Exactly.

THE COURT: So do you intend to move for the admission of these exhibits?

MR. SCHROEDER: I don't need to -- no, Your

Honor.

THE COURT:  Because, typically, right?  As you know, under impeachment, you're asking her the question; it's not going into evidence.

MR. SCHROEDER:  Right.  Well, I guess on that topic, Your Honor, because I know we got -- I think we've got our technology issues figured out.  I'm going to show her that document, and I guess it's not admitted into evidence, right; I'm going to ask her questions about the document.  And I guess the line is, am I allowed to put it on the screen even though it's not admitted quote/unquote into evidence and ask her about it.  I understand your point about it.

THE COURT:  Right.  So you wouldn't ordinarily, right?  I don't think that would be proper, it seems to me.

MR. SCHROEDER:  Right.

THE COURT:  So if this is truly for impeachment value, right, and you are presenting -- I think what you are essentially saying is that it's a prior inconsistent statement or something along those lines, right?

MR. SCHROEDER:  Yes, Your Honor.

THE COURT:  So you would be presenting that -- you're kind of exhaling loudly.  Am I

frustrating you?  I mean, this is important to get through.

MR. SCHROEDER:  No.  No.  No.  I'm exhaling just because I haven't had a lot of sleep in the last few months.

THE COURT:  Yeah.  Okay.  So I want to be clear on mechanics here, right, so you would be showing that to her and maybe asking questions about it.  It wouldn't be published to the jury; it's not admitted into evidence.

MR. SCHROEDER:  Right.  Right.

THE COURT:  It would really just be -- you know, there wouldn't be a lot of further kind of discussion of extrinsic evidence, meaning, like, what was the Reindollar dispute about?  And what -- you know, not at all.

MR. SCHROEDER:  Judge, I would be going into uncharted territory that I don't know the nature of it.

THE COURT:  You don't.  I think I understand your position.

Mr. Vitt, on the relevancy topic with respect to timeline, Mr. Schroeder says, and I think the testimony is consistent with that, that some of the initial perhaps involvement or interaction from Dr. Porter with Dr. Hsu, when I said four years, I was tying that to

the actual closure date of REI.

MR. VITT:  I understand.

THE COURT:  But it sounds like there is interactions with Dr. Hsu much earlier than that, so in terms of the timeline issue, it may be tighter --

MR. VITT:  A little bit.

THE COURT:  -- than I initially anticipated. So kind of a pointed question to you:  If I were to allow Mr. Schroeder to inquire as to these exhibits but they don't go into evidence, there is no getting into details of this dispute that, frankly, the e-mails don't give us enough of an indication of what it is -- I think it would be confusing to me and to the jury -- so limited questioning on that topic, mostly to show, as I understand it, that there is a prior relationship with Dr. Merrens, that a complaint was made before, and that this was the kind of --

MR. VITT:  Here's where I have a problem. They're saying she wasn't retaliated against before and therefore what happened in connection with the closing, it shows that, Oh, my gosh, we just don't retaliate.

This -- even to call it a dispute is probably too strong of a word.  There was a performance improvement plan for Sharon Parent who testified.  Apparently, Dr. Porter thought this is, What's going on here?  It

doesn't make any sense. And it was a minor issue, not close to what we're talking about here -- closing a division, firing physicians. I mean, what happened with the REI division is a big deal no matter how you cut it. And this is a little, sort of, side show, and I don't see the relevance on the issue of, Well, we don't retaliate because we're Dartmouth-Hitchcock, and that's not what we do. So if it's only she actually had some dealings with Dr. Merrens before, okay. You know, that's it. That's two questions. But I'm concerned, as soon as you start to drill down and to make the argument that, Well, we didn't retaliate before, you have to get into the substance to know whether that's a valid argument.

Our position is it's not even close. It is not an argument that should be made to the jury because it's extraneous. It will take some energy. As you said yourself, when I first read these, I thought what's going on here, I couldn't figure out what the dispute is. I mean, I've learned about it by talking to people. But to get into enough information to be able to make a coherent argument that this is a similar dispute and we didn't retaliate against you, that's going to take considerable amount of work, and it is simply irrelevant.

MR. SCHROEDER: Your Honor, I've got e-mails, which I'm happy to share with the Court, between Mr. Vitt and Dartmouth Health that talk about discrimination and retaliation related to Dr. Porter. This has nothing to do about Ms. Parent. She's not even mentioned in these e-mails. This is about Dr. Porter and Ms. Todd and the fact they had retained Mr. Vitt -- I don't know how he doesn't know about this, because he's retained and he's actually mentioned in these e-mails. And I have the e-mails to show -- and I'm happy to dig them out -- that go to the issue of discrimination and retaliation. So I would submit, Your Honor, that this is exactly what this case is about. And it's on all fours.

I'm not getting -- hold on. I'm not getting into the substance of this, but if we -- if the Court wanted to understand the more relevance to this, I'm happy to get those e-mails out. I didn't put them on our list because I don't need them, this is more to the impeachment of the witness. So I'm not getting into the substance of it, but to say to the Court that this is about Sharon Parent and a dispute involving her, why would Ms. Porter -- yeah, Dr. Porter be asking, well, I want to show up with my counsel and Ms. Todd, and he represents both of us, to talk about Ms. Parent? They

were trying to get a mediation.  Didn't happen.  So there's no inadmissible settlement communication that happened.  But to say that this is not about this particular witness and her credibility, that's not true.

THE COURT:  Okay.  But to Mr. Vitt's point about, you know, how -- how do you manage to make your point, as I understand it, which is to say you raised a prior employee dispute with Dr. Merrens in 2012.  I don't know if you intend to ask the ultimate question on this cross-examination, namely, "And you weren't retaliated against, right?"  Maybe you are planning on doing that.  If you are, then there is a little bit of a question here about whether the nature of that non-retaliation is on the same standing as the allegations made in this case.

And then my concern is, how do you do that without getting into more of the detail for it to be fair, for it to be fair, so that we understand the full context of what you're trying to establish by these three e-mails?

MR. SCHROEDER:  Sure.  We know that she did not like Dr. Reindollar.  She's already said that.  She had concerns about Dr. Reindollar.  I don't have to ask her whether or not she was retaliated against.  You

continued to be employed there.  I mean, that's a fact.  Right?  So I'm not getting into the substance.  Quite frankly, my series of questions relates to these quotes about -- about Dr. Merrens and the fact that there was a dispute.  I'm not getting into the underlying dispute, but I just wanted to be clear on the record on what that dispute was about.  It was not about Ms. Parent.  It was about Dr. Porter and Ms. Todd.  And by way of Exhibit E, where she says, "We believe it is essential that structural changes be made within the division of reproductive medicine," I mean that's certainly germane to this case.  It's relevant to this case, and you made these complaints.  You continued to be employed there, and you continued to receive salary increases.

THE COURT:  Okay.  All right.  So -- yes, Mr. Vitt?

MR. VITT:  All I really need to do is establish that you actually knew Dr. Merrens.  And now he's saying, no, no, no, we want to get into this whole question of re-structuring the division of reproductive medicine.  Look, this dispute didn't have anything to do with patient care, with the harm to patients, with what we've been talking about.  It involved principally nurses.  Now, I disagree with Mr. Schroeder about the

details of this dispute, but this is a side show, if ever there was a side show, and it will take real time to get into it.  You can't just say, well, isn't it a fact that you didn't get fired without having some sort of context.

THE COURT:  But I don't hear Mr. Schroeder saying that's a question that's going to be asked, or is it?

MR. SCHROEDER:  Right.  No.  Your Honor, you keyed in on the relevant fact, right?  Dr. Porter is sitting up there saying -- she acted like she wouldn't even know Dr. Merrens if she passed him on the street, frankly.  And I'm going to establish that she knew him, she actually said favorable comments to him in the context of this other dispute.  She already testified about having a conflict with Reindollar.  I think it's germane to our defense that there were other complaints that you made previously, and we will have testimony about current and former employees of Dartmouth Health that will testify that she complained about a whole range of doctors over the years.

Now, it would be certainly more germane -- and this goes to the issue -- I think, we gave him this list because I know you wanted us to deal with this issue outside of having a sidebar where we're crowded

around you in a cramped space.

We're trying to establish through impeachment that she knew Dr. Merrens and that she said color -- said very favorable things about him to him in the context of these e-mails. I'm not getting into -- as I've represented to the Court, I have no idea what the nature of the Reindollar dispute is. I don't. And so it would be really hard for me to get into, and I'm not going to ask her questions about something that I don't even know about. I'm just getting -- quite frankly, this is a small topic where I ask her questions about statements she made about Dr. Merrens, and they are the quotes that I just referenced in these four exhibits.

THE COURT: Okay. And when you talk -- you just said your case, you intend to introduce evidence of prior complaints made by Dr. Porter?

MR. SCHROEDER: Yes.

THE COURT: So you're talking about prior complaints that go back to roughly this same time frame?

MR. SCHROEDER: Well, they go -- yeah. They go -- it's over that span of time, yeah.

THE COURT: 2012, '13, '14?

MR. SCHROEDER: Yeah.

THE COURT: Okay. So I don't know if that's

going to be disputed or if there is a problem with that, but if there is, by the way, this should be fronted well ahead of time. I don't want to have a bench conference about Dartmouth has exhibits that go back to 2012 and '13 where Dr. Porter made previous complaints about people and whatever happened with that happened. That would then seem to make this particular series of e-mails more relevant then if that is going to be the nature of the evidence that comes in on Defendants' case in chief.

MR. VITT: I don't know what complaints they're referring to, and so it's very hard for me to respond coherently to some complaints that she made that demonstrate -- I don't know what they're trying to show, so I can't even respond in a way that I think will help resolve this. I don't know what other complaints they've got in their bag.

MR. SCHROEDER: Judge, just so we have -- I understand you want to move the trains on the tracks; I totally get that. You asked us, and they wanted to move all these dates up, right, it actually was a good thing because I had to get these motions in limine on file. We had March 10th. Right? We submitted our exhibit list. These are the first four or five exhibits on our exhibit list. There was no discussion

about, Hey, we're going to file a motion in limine on this. That was 17 days ago. We filed our motions timely. This should have been, really, a basis for a motion in limine if what they're saying is their position.

The testimony on this subject is going to be very limited. It is certainly relevant and germane to this case. People have testified under oath in depositions. None of this is a surprise. We could have kept this as impeachment documents and presented them at the appropriate time. We didn't, based on your instruction: Hey, I don't want any surprises. We made it very clear up front, Hey, these are the documents we're going to ask about. For impeachment purposes, you don't have to do it ahead of time. I did it ahead of time based on your specific instruction, Judge, because I took it to heart that we don't want to have surprises.

They're the first five exhibits from March 10th, and now it's like, Oh, this is a surprise to us that you're getting into the topic. One, I discussed it in her deposition; and two, they're the first five exhibits on our list.

THE COURT: Okay.

MR. VITT: Judge, the motion in limine

were -- I'm trying to get the number of dates.  We got the exhibit list on the 10th, so I don't see that somehow we've gummed up the works by not having filed a motion in limine on the exhibits.  I really don't understand the complaint that we did something out of the ordinary.

THE COURT:  Okay.  So with respect to these exhibits, then, I will allow Mr. Schroeder to examine -- cross-examine Dr. Porter on these, but based on the assurances or representations of counsel here today about the nature of that inquiry, I am going to expect it to be for the narrow purpose of impeachment to get into specifically the issue that came up yesterday with respect to Dr. Porter perhaps not knowing Dr. Merrens as well as maybe you thought she did.  These e-mails are relevant to getting into that area.  If you're asking -- I think you can ask her about a prior complaint.  I hear that that's what you're asking you want to ask her about.

MR. SCHROEDER:  Yes.

THE COURT:  None of the details of this particular issue at all, no discussion of prior interactions with her counsel.  I know Mr. Vitt is referenced in one of these e-mails.

MR. SCHROEDER:  Understood.

THE COURT:  So I'm hearing the request as being a very narrow one, as they say, to establish kind of the relationship between Dr. Porter and Dr. Merrens, and the fact that Dr. Merrens apparently interacted with Dr. Porter in the past to help resolve some type of employee dispute.  You've told me the language that you want to use from that is basically what I think is fair to characterize as a positive assessment of Dr. Merrens.  Is that really the purpose of eliciting that testimony?

MR. SCHROEDER:  Yes, Your Honor.  Yes.

THE COURT:  But I just don't want you to get into any of the substance of the dispute because it will be -- I think it will be irrelevant and it will be very hard for that to be covered on cross-examination in a meaningful way.  Yes?

MR. VITT:  And the reason I'm on my feet now is if you ask Dr. Porter about wasn't there a dispute, she will have a coherent explanation.  She'll want to provide that explanation, and I don't want to be the person who is saying, wait a minute, that's beyond the scope.  So if it's just, Did you know Ed Merrens, and did you say things?  That's fine.

If we start going down the path, knowing Dr. Porter, she will have -- and I hope we cut her off

so that we don't end into the morass of what the dispute involved with Dr. Reindollar and nurses.

MR. SCHROEDER:  I'm happy to preface the question but, I mean, to be honest with you, Your Honor, the level of patience that I tried to exercise, maybe it wasn't the best, I tried really hard.  The non-responsive answers, I would have asked you to move to strike at least 50 times.  They were non-responsive. So I can't really control their witness.  She's -- she goes off on tangents.  At one point, I asked her:  Do you even know what the question was?  And she's like, I don't know.  I can certainly preface the -- I'm sorry, Your Honor.

THE COURT:  I was going to say, some of them were definitely non-responsive.  Some of the questions were how's and why's.  You're not going to get a "yes" or "no" to a, How is that; why is that?

MR. SCHROEDER:  Understood, but we counted 50 times.

THE COURT:  But if it does happen again today, I just will tell the parties, I am going to be instructing Dr. Porter to answer yes-or-no questions with yes's and no's, and she will have an opportunity to be examined by her counsel afterward.  We attempted to do that yesterday; it wasn't always effective.

Yes/no questions get yes/no answers.

Mr. Vitt's point, though -- we really have to get the jurors back in here -- on redirect, if there's any kind of discussion that kind of broaches the substance of those complaints, then Mr. Vitt is going to want to come back on redirect and ask Dr. Porter to provide all kind of context for this particular dispute. So I think that's kind of a caution for you, not a caution for me, you know what I mean, that if that happens, it may end up opening up a much larger discussion and something that you should think about in the cross. Right? Because if you keep it as limited as I am instructing you to do, then the redirect is going to be equally limited, and it will establish those narrow purposes that you have articulated you want to do.

If it goes any broader than that, then we are going to get into this 2012 employment dispute, and Dr. Porter will provide all kinds of context about why it's different in nature to what she's alleging here.

MR. SCHROEDER: Your Honor, I'm just asking for your guidance on this, refer to it as a workplace issue involving Dr. Reindollar; is that fair? I'm just trying to -- I don't want to -- I understand your point. Right? We want to get to Dr. Bancroft. I have to have some context of what it was about, right, why

she's having these e-mail communications with Dr. Merrens, but it's very limited to, Was there a workplace issue that Dr. Merrens was involved in? Does that seem like -- I want to make sure I'm not up against the line with your instructions.

THE COURT: Yeah. No. If that's what you do, though, I think it will be hard to limit the plaintiff from coming back on redirect and getting into the details of that. If you mention the doctor that that dispute is about and then don't get into any more detail, as I assume you will not want to do on cross, he's going to have the opportunity to come back on redirect and get context.

MR. SCHROEDER: Sure. I -- well, You had that communication with Dr. Merrens, and you said these things about him. Right? You're dealing -- I'm trying to --

THE COURT: Yeah. I'm trying to help the parties too here about how you get into this without it kind of prejudicing everyone's kind of rights here. I think if you want to -- if you want to ask her about these e-mails and say that, you know, wasn't there an issue at that time without maybe naming the doctor -- I'm just thinking out loud about a way that you might be able to ask these questions without opening up a

huge can of worms.

MR. SCHROEDER:  I understand that, and really I don't want us to get on a tangent there.  I get that.  I want to be careful about what I ask her about in that regard.  And so -- I would try to limit it, Your Honor, in light of the Court's instructions and guidance, to comments she made about Dr. Merrens and try to keep it very tight in that regard.

THE COURT:  Okay.  Mr. Vitt?

MR. VITT:  Let's hope.

THE COURT:  Okay.  You should anticipate from an e-mail from 2012 there's going to be "no recollection," right?  But you've been dealing with that.  You've been saying, Do you have any reason to doubt that you are a recipient or a sender of this e-mail?  And the responses have been, No, I have no reason to doubt it.

MR. SCHROEDER:  Right.  And I can ask her specifically about things that she said to Dr. Merrens.

THE COURT:  Okay.

MR. SCHROEDER:  Right?  I mean, I'm really -- cat's out of the bag on what I'm trying to do, but it's very limited, and I understand the Court's guidance and I'm going to try -- it shouldn't to be hard to tell her to stay well within -- not even near the line, well

within the line on that subject.

THE COURT:  Okay.

MR. SCHROEDER:  Can we have a bathroom break for -- like, five minutes before we go?

THE COURT:  Sure.  I'm going to stay here, so go ahead.

(Pause.)

MR. SCHROEDER:  Do we need to go through stipulated exhibits or just go normal course?

MR. JONES:  Just go normal course.

THE COURT:  How many are stipulated at this point, roughly?

MR. SCHROEDER:  I thought we had a few, but I'm not sure about the text messages.

MR. JONES:  I think they're all stipulated to except -- our one reservation was there was two large stacks of text messages, and Don did give us a reduced range of those to look at.  And we didn't have a chance to fully digest them, so we kind of want to see the context in which they come up.  I don't think there will be much of a dispute.  The others are all stipulated to.

MR. SCHROEDER:  There are three exhibits. I'm sorry, Your Honor.  There are three exhibits that we would, I think, stipulate to, C-16, Plaintiff's

Exhibit 126 and C-13.

MS. NUNAN: That's correct.

MR. SCHROEDER: Okay. And then the ones that I think we'll have the discussion on but we -- there were a wide range of text messages by Dr. Porter to various -- her own copy, and then there's a series of text messages from Dr. DeMars to Dr. Porter. I wanted to make sure beforehand, that's why I raised it yesterday, like, Hey, I don't want to bring Dr. Porter back to talk about text messages Leslie DeMars produced in this case, which Dr. Porter was there for and saw and reviewed. So that's why I raised it yesterday. And what we've tried to do to avoid getting into any other areas is really reduce it to a limited set so that we have the time of the text message and it may be a few pages later to the actual relevant portion, but I tried to be very narrow in that regard.

THE COURT: And you're still working that out?

MR. SCHROEDER: Well, I gave them the list early this morning, but they haven't had a chance to review. But I gave them specific page numbers of both sets, so that they knew which ones I was going to put in -- what I will like to put in is a truncated version to show Dr. Porter and to put into evidence as well.

THE COURT: Okay. All right. Before we bring the jury in, so as you heard me yesterday, I did tell them that we anticipate ending early today. That was under the assumption that we would have started at 9:00 and Dr. Bancroft would probably be going on after the break.

So I just want to get your views on whether I should stick to that, because I have told the jury that they would be leaving early today. It sounds like, by the time Dr. Porter is concluded, Dr. Bancroft goes on, we probably could go the rest of the day today or close to it, but I'm concerned about the expectations that the jurors might have at this point that I told them that they will be leaving early. Is there an objection to still trying to end a little bit early today, or do you think it's not an issue?

MR. SCHROEDER: I have no objection. I was hopeful, cautiously.

THE COURT: Ending early?

MR. SCHROEDER: Cautiously optimistic in light of where we were in our expectations. So I'll try to run very quickly on my cross, and hopefully the redirect is fairly quick.

THE COURT: No. No. Don't take that message as meaning you need to rush. Do what you need to do.

MR. SCHROEDER:  I'm not suggesting that at all, Your Honor.  I am cognizant of the time, I think everybody understands the instructions you gave the court -- you gave the jury, and I will be cautiously hopeful that we will be early.

THE COURT:  Okay.  Plaintiffs okay with that; that we still end early even if maybe not as early as we thought?

MR. JONES:  I think that's right.  I think we'll know a lot more once Dr. Porter is off the stand.

THE COURT:  Sure.  I just wanted to front that with you.

Okay.  Let's bring the jury in, please.

(Jury present.)

THE CLERK:  This is Case No. 17-CV-194, Misty Blanchette Porter vs. Dartmouth-Hitchcock Medical Center, et al.  Present on behalf of the plaintiff are attorneys, Geoffrey Vitt, Eric Jones, and Sarah Nunan.  Present on behalf of the defendants are attorneys, Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We are here for a jury trial.

THE COURT:  Okay.  Good morning, members of the jury.  Obviously we start at 9:00; and this morning we're starting at 10:00, much later than anticipated.  I just want to tell you that sometimes issues arise

that I need to take up with the lawyers.  This happens throughout trial.  I apologize to you that it's a later start than what I told you, but these are discussions that the Court has to have.  I can assure you that it's not just that, "We'll start at ten today."  That's not how it goes.  So thank you for your patience in that regard.

I do still anticipate that there will be -- there won't be a full trial day, as I mentioned to you yesterday.  So it we will still having kind of an early departure.  I know one of the jurors had asked about a lunch engagement today.  Sir, I think you said it was around 12:15?

JUROR NO. 11:  Well, assuming that we would stop at 12.

THE COURT:  Yes.  So if we are going to go a little bit after lunch in terms of trial, you will still have your lunch break, so you will be able to make your lunch engagement.  Okay?  Does that answer your question?

JUROR NO. 11:  Yes, but it sounds like I would be holding up others who might be able to get out early.

THE COURT:  No.  No.  What I would mean is, you would still get your lunch break if we anticipated

continuing the trial to finish a witness maybe into the afternoon, but that doesn't mean that you don't get lunch. So you will still have your 12-to-1 period. And you will not be holding up your fellow jurors, so thank you for that.

I will ask you, as I do every morning, have you spoken to anyone about this case or have you heard any information about this case since you left the courthouse yesterday? Okay. Seeing no hands raised, Mr. Schroeder, you may resume.

Mr. Schroeder, the deputy clerk will need to re-swear Dr. Porter.

**Misty Blanchette Porter**, witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you.

MR. SCHROEDER: Your Honor, the parties before we met, counsel agreed that exhibits -- Plaintiff's Exhibit 126 will be the next exhibit that we've agreed to, admitted exhibits, and for the -- for Mr. Howe's ability to track them, the next one would be Plaintiff's Exhibit 126, which I believe is stipulated to admission. After that, Exhibit C16, which is DH 14254. And the third one that's been stipulated to is

C13.

THE COURT:  Okay.  So then all of those are not objected to for admission, Mr. Vitt?

MR. VITT:  That's correct, Your Honor.

THE COURT:  Okay.  Then they're all admitted, and you can make for use of those.

MR. SCHROEDER:  Just so I'm tracking this correctly, I believe that's 28 -- it will be trial Exhibit 28, 29, and 30?  I'm asking that as a question, not as a declarative statement.

THE CLERK:  I don't have the ability to track it that way at this point.

THE COURT:  The deputy clerk is saying that he doesn't have the ability to track the exhibits that way.

MR. SCHROEDER:  Okay.  I just wanted to make sure that I was staying with the Court.  May I proceed, Your Honor?

THE COURT:  Yes.

**CROSS-EXAMINATION**

**BY MR. SCHROEDER:**

Q    Dr. Porter, the first exhibit I would like to show you is P126.

MR. SCHROEDER:  If I may approach, Your Honor?

Porter - Cross by Mr. Schroeder

THE COURT:  Yes.

MR. SCHROEDER:  I want to see if the plaintiff's exhibits are up here.  I don't know that they are.

Q   (By Mr. Schroeder) Dr. Porter, I'm showing you a one-page document marked -- originally marked Plaintiff's Exhibit 126.  It's an e-mail exchange between yourself and Dr. DeMars on June 30, 2016; is that right?

A   Yes.  I would like to read it first.

Q   Sure.  Take your time.  Just let me know when you're finished.

A   (Witness reading.)

MR. SCHROEDER:  Your Honor, may I have this published for the jury?

THE COURT:  Yes.

THE WITNESS:  Okay.

Q   (By Mr. Schroeder) Okay.  And this was a document that was marked by your counsel for this trial, correct?

A   Yes.

Q   You saw this before testifying today, correct?

A   Correct.

Q   Okay.  And I want to focus on the second page, which is up on the screen.  At this point, you had just returned to the office recently, correct, June 30, 2016?

Porter - Cross by Mr. Schroeder

A    As I said, I was going in and out, but, yes, I was
     trying to return a bit more frequently, but I was
     increasing my hours over time, yes.

Q    Okay.  And this -- were you still exhibiting symptoms
     related to your condition at that time?

A    Yes.

Q    Okay.  And the second paragraph, you state, "He is
     sending me to the Mayo Clinic and thinks I may still be
     leaking despite my normal recent MRI.  He thinks I am
     not clinically behaving as if I'm healed.  No wise
     cracks," smiley face, right?

A    Right.

Q    The fourth paragraph that starts with "I am keeping,"
     do you see that?

A    Yes.

Q    "I am keeping an open mind and trying very hard to be
     partner and colleague.  I've learned from my own
     mistakes in the past.  I am certainly willing to look
     at new ways of doing things, but would like to look at
     the literature and be clear the literature supports the
     change.  He does have some reasonable requests."
         Were you talking about Dr. Seifer there?

A    Yes.

Q    Okay.  And so in terms of his skills and techniques
     and -- he had different ways of doing things than you,

Porter - Cross by Mr. Schroeder

correct? Is that a fair statement?

A   Correct.

Q   However -- now, he had just joined, right?

A   Yes.

Q   You then say in the paragraph right after that, quote "I'm concerned that David perhaps -- that David perhaps going in the wrong direction in looking into the ins and outs of the IVF program. He seems to take limited data and make broad assumptions." You said that statement, right?

A   Correct.

Q   Did you consider that statement to be negative or critical about Dr. Seifer?

A   I wouldn't characterize it that way.

Q   Okay. If we may proceed --

        MR. VITT: Could you get a little closer to the microphone?

        THE WITNESS: Oh, I'm sorry.

        MR. SCHROEDER: I thought Mr. Vitt was talking about me and I was, like, I can't get any closer.

Q   (By Mr. Schroeder) So the next exhibit is C16, and that's --

        MR. SCHROEDER: If I may approach, Your Honor?

Porter - Cross by Mr. Schroeder

THE COURT: Yes. The deputy clerk may not have a copy of that exhibit. You may know that.

MR. SCHROEDER: I actually anticipated this one. If I may approach?

THE COURT: Yes.

MR. SCHROEDER: May I have it published for the jury?

THE COURT: Yes.

Q (By Mr. Schroeder) Let me know when you've had a chance to review this e-mail, Dr. Porter.

A (Witness reading.) Okay.

Q Okay. Thank you.

So this is an e-mail dated July -- July 14, 2016, correct?

A Correct.

Q And it's titled "Observations," right?

A Observations, yes.

Q And this was an e-mail between you and Dr. DeMars, correct?

A Correct.

Q And were you out of the office -- between the last e-mail which was, I think, June 30 and then July 14, were you -- had you gone to the Mayo Clinic in the interim?

A Had I gone to the Mayo Clinic in the interim? No.

Q   Okay.  At this point you tell Dr. DeMars:  "All is not well with the ART program."

A   Correct.

Q   And that's part of the REI division, correct?

A   Yes.

Q   And just ART stands for what?

A   Assisted reproductive technologies.

Q   Okay.  And was that a criticism about the state of affairs with the ART program within REI division?

A   It was a list of concerning observations.

Q   And Dr. Seifer had just gotten there, correct?

A   Yes.

Q   Now, further down in the --

A   I believe he started in May.

Q   Okay.  And he wasn't actually in the OR until June sometime, correct?

A   I couldn't swear to when he started, but sometime very -- around then, yes.

Q   Because he had to get his credentialing privileges, correct?

A   Yes.  He started seeing patients before he had credentials.

Q   Okay.  So if we go down further, you say -- there's a line that starts "there has been."  Do you see that?

A   I'm sorry?

Porter - Cross by Mr. Schroeder

Q    It's right below No. 2.  Can you highlight that on the screen there?

A    "There has been too frequent testing, repeating labs that have been done and imaging."  Yes.

Q    Right.  And then you say, "This is an expense to the patient and will drive us out of the market."

A    Correct.

Q    Right?

You testified earlier that you had a difference of opinion as to what tests and how many tests were being done by Dr. Seifer, correct?

A    Yes.

Q    Right.  And -- but in the last e-mail I showed you, you said, well, he's got some new ways of doing things, right?

A    Correct.

Q    And I think you said, "I'm trying to keep an open mind. I've learned from my own mistakes in the past," right? You did say that?

A    Correct.

Q    Okay.

MR. SCHROEDER:  You can take that down. Thank you.

Next Exhibit is C13.  If I may approach the witness, Your Honor?

Porter - Cross by Mr. Schroeder

THE COURT:  Yes.

MR. SCHROEDER:  Publish this for the jury?

THE COURT:  Yes.

MR. SCHROEDER:  You can go to the next page, Ray.  Thank you.

Q    (By Mr. Schroeder) I'm only going to ask you questions about the cover page --

A    Wait.  Wait.  I would like to read it, please.

Q    I know that.  I just wanted to direct your attention -- there's an agreement behind it.  I'm not going to ask you any questions about it.  I'm just going to ask you about this particular page that's up on the screen.  Let me know when you're done.

A    Okay.  (Witness reading.)  Okay.

Q    Okay.  Thank you.  So this is -- the name -- the date of this letter is June 5th, 2017, correct?

A    Correct.

Q    And in the first line, this is from Aimee Giglio, her name is now Aimee Claiborne, as you correctly pointed out.  The first sentence says, "This letter serves as a response to your letter dated May 25, 2017, and to questions posed during our meeting together with your husband on Friday, May 26, 2017."  Correct?

A    Correct.

Q    So you sent this letter, which we've already referred

Porter - Cross by Mr. Schroeder

to in prior testimony, on May 25th, and then the interim chief human resources officer, you have no reason to believe -- she was the highest person in HR, correct?

A   To my knowledge.

Q   Okay.  And you reached out to her, you wanted to have a meeting.  She set the meeting up for the next day, correct?

A   Apparently, yes.

Q   Okay.  Well, you don't have any reason to doubt that, correct?

A   No.

Q   In fact, it's only a week or so later when she sends you the letter and attachment.  And then she goes on to say in the second paragraph, "First on behalf of Dartmouth-Hitchcock, I would like to thank you for your years of service to DH and to our patients and for your many accomplishments over the years, as you outlined in your letter which have supported DH's clinical and academic mission."  She says that, right?

A   Correct.

Q   And she sent sentiments along those same lines on April -- I'm sorry, on May 26, right?

A   I don't recall.  I think so, but I don't recall.

Q   And when you had that meeting with Ms. Claiborne, you

Porter - Cross by Mr. Schroeder

didn't raise any concerns or use the phrase, I should say -- strike that.

You didn't say that you believed you had been discriminated against on the basis of your condition or that you had been retaliated against, correct?

A    I can't recall what I said or not in that meeting.  I was very emotional.

Q    It's possible you didn't say anything about it, right?

A    I can't recall.

Q    Right.  It's possible, as a result of the fact that you can't recall, that you said none of those words, right?

A    It's possible.

Q    Okay.  Now, the fourth paragraph down, it states, "In addition, in our meeting, you had requested an increase in the severance amount.  After considering this request, DH is willing to extend severance to 36 weeks of severance."

Now, I want to ask you:  When I deposed you, and you referenced your deposition a couple times, you -- do you recall testifying that you thought that initial severance package was a nominal amount?

A    I don't recall that, no.

Q    Okay.

MR. SCHROEDER:  Your Honor, may I approach with the deposition transcript for Dr. Porter?

Porter - Cross by Mr. Schroeder

THE COURT:  Yes.  Mr. Schroeder, is that marked for identification at this time?

MR. SCHROEDER:  I think it was originally. There were two days, so I don't know if the full transcript was marked, but...

MS. McDONALD:  Day 1 was marked as ID 1.

THE COURT:  I believe that is an exhibit that the deputy clerk has if that's the same exhibit you're using, if you want to --

MR. SCHROEDER:  Yes, I believe it is, and I've got a copy of it to hand to the witness, if I may.

Q   (By Mr. Schroeder) I would like to turn your attention to Page 130.

A   Okay.

Q   Okay.  Specifically, Lines 3 through 17, if you would just review that, I'll have some specific questions.

A   I'm sorry, which lines?  I lost you.

Q   3 through 17.

A   3 through 17.

Q   Yeah.  It's basically Page 130.

A   Okay.

Q   Okay.  So I want to refresh your recollection on our discussion during your deposition on this topic of severance, and I asked you:  "Did you during that meeting with Aimee Giglio ask for more severance?"  And

Porter - Cross by Mr. Schroeder

your answer was:  "I told her what was offered was not adequate," right?

A    Correct.

Q    And then I asked:  "And what was offered?"  Your answer was:  "I don't remember exactly, but it was a nominal amount for my years of service," right?

A    Correct.

Q    So you did say that the first offer of severance was a nominal amount?

A    Correct.

Q    And that was the meeting that you had with her on May 26, correct?

A    Correct.

Q    I then asked you:  "Do you recall whether or not DH increased that offer?"  Your answer:  "Which offer are you referring to?"  I said:  "The severance offer," and you said, quote, "There was a nominal amount that was offered initially, and it was barely altered in the subsequent documents that were e-mailed to me."  Did I read that correctly?

A    You did.

Q    All right.  So, at that point, in your deposition, you said that the first amount was a nominal amount, right?

A    That's correct.

Q    Not adequate, right?

Porter - Cross by Mr. Schroeder

A    It was a nominal amount --

Q    Right.  And the --

A    -- for my years of service, is what I said.

Q    Right.  I understand that.  And, at first, you didn't recall though that you said it was a nominal amount.

The first offer was six months of severance, correct?

A    I'm not certain about that.

Q    You're not -- you're not certain about that?

A    No, I'm not.

Q    Assuming it was six months of severance, at that time, you were earning close to 300,000 -- maybe a little bit over?

A    Correct.

Q    Okay.  So if it was six months of service -- if it was six months of severance, it would be a little over 150,000 give or take?

A    Okay.  Yeah.

Q    Do you agree with me?

A    Okay.  Yes.

Q    Then, if we go back to this document, specifically that paragraph --

A    Which one, I'm sorry?

Q    The one that's right up on the screen that's highlighted.

Porter - Cross by Mr. Schroeder

A    Well, I can't see it very well there, so I would like to see it in front of me.

Q    Okay.  It's the fourth paragraph on the fourth page there, "In addition."

A    Okay.

Q    I will read for you -- I've already read it, but I'll read it again.  "In addition, in our meeting, you had requested an increase in the severance amount.  After considering this request, DH is willing to extend severance to 36 weeks of severance," right?

A    Correct.

Q    So is 36 weeks, roughly nine months of severance?

A    Correct.

Q    And so if you take a $300,000 salary and nine months of severance, that's a little bit over $200,000, right?

A    Okay.  Yes.

Q    Do you have any reason to doubt me on the math on that one?

A    No.

Q    Okay.  And, in addition, if we go to the next paragraph down, Ms. Claiborne references the fact that you were part -- you were still receiving long-term disability benefits correct?

A    I was, yes.

Q    And those long-term disability benefits had been

Porter - Cross by Mr. Schroeder

approved in or about June or July of '16?

A   Correct.

Q   And so you were still receiving them in June of '17, correct?

A   Correct.

Q   And they ended in June of '18 or thereabouts?

A   Correct.

Q   Okay.  Now, she refers to the fact that you -- in your direct testimony, I think you said that you had to pay for your own health insurance during that time post-termination, right?

A   I had to pay because I was considered an employee on leave by -- it wasn't -- I mean, this is just is a descriptive because I had been terminated.  But while I was on long-term disability, I had to pay the full, or close to the full, premium for my entire family for insurance, as soon as I went from short-term to long-term, and I carried all five of us.  So I had to pay the entire premium and as well, when I was on long-term disability and during per diem, I had to pay the entire premium for everybody.

Q   Well, this says here that in that paragraph halfway down, "Please note that you will remain responsible for the portion of the medical and dental insurance premiums that all active employees are responsible for.

Porter - Cross by Mr. Schroeder

And then all premiums for medical and dental insurance are billed directly to you for as long as you continue to -- continue long-term disability payments."
Correct?

A   That's what it says.

Q   Okay.  And did you follow up with Ms. Claiborne to confirm that you were eligible -- you just have to pay your portion of the premium as a typical active employee?

A   Well, the interesting thing is that one of the things that was so emotional for me as a physician and mother is that initially she gave me the wrong information.  So, in that meeting, it seemed like a real moral wound that I would be dropped from insurance.  And I have to admit I was extremely emotional during that time, and what I understood, because as soon as I went to long-term disability and I was an employee on leave, I was responsible for a good, huge portion of the health premium that covered dental and -- but to me, again, she did not give me the accurate information in that meeting, and then this letter came, and so I was paying what I had been paying previously on long-term disability.

Q   Okay.  And that was pursuant to the long-term disability plan, whatever the plan documents say?

Porter - Cross by Mr. Schroeder

A    Yes.

Q    Okay.  And you were receiving long-term disability -- you were receiving salary -- a portion of your salary, correct?

A    Yes.

Q    Close to 70 percent, or was it more than that?

A    It was -- what was it?  Two thirds plus it was reduced by the amount that I was working.  So every paystub I had to send in to insurance, and they would reduce my payment based on how much I was working.

Q    Right.

A    So it didn't go above that, yes.

Q    Right.  If you weren't working at all for the periods of time that you were out completely, you would receive the full long-term disability payment for that relevant time period.

A    The portion of my salary that was due based on disability insurance, yes.

Q    Understood.

        MR. SCHROEDER:  Okay.  You can take that down, thank you.

Q    (By Mr. Schroeder) Now, with respect to your current situation at UVM -- or I should say your current employment at UVM Medical Center, I think on your direct testimony, you'd referenced the fact that you

Porter - Cross by Mr. Schroeder

were .8, but was it really .75?

A   I had varied between .75 and .85, and the -- there's a transition recently with the new chair that because of the Green Mountain Care Board's ruling that UVM all individuals have to reduce their academic time.  So I was .8, and my chair, just in the last few weeks, has asked me to cut back my academic time to go .75.

Q   And .75 means that you work four days a week?

A   Well, it means that I work -- not -- it's not necessarily four days a week, but it is -- it's .75 of a 1.0, and it varies based on call and other obligations and responsibilities.

Q   And you receive your -- but it's less than full-time, correct?

A   Correct.

Q   So it's not -- that's not five days a week, right?

A   Correct.

Q   And so if it's .75, would you agree with me that's roughly four days a week or somewhere around there?

A   Yes.

Q   At UVM Medical Center, you receive a pension?  You're eligible for a pension?

A   No.

Q   You're not eligible at all for a pension?

A   No.

Porter - Cross by Mr. Schroeder

Q   So if we had documents that show that you're eligible for a pension at some point, they would be wrong?

A   I don't believe I'm eligible for a pension.  I have a 401(k) or a 403(b) but --

Q   And you receive a matching contribution for that, right?

A   A part, yes.

Q   Right.  Upwards of nine, ten percent?

A   No, I believe -- I looked it up right before the Bancroft report, and what I gathered off it was seven match.

Q   So if the documents say ten, then the documents are wrong, from UVM?

A   That portion, I recently looked back up again, and it may have changed in that period of time.

Q   Okay.

A   So I looked it up just three or four days ago.

Q   Your current salary --

A   I would like to correct something.  I think I can put in three percent and they can put in seven percent, and maybe that's where that ten percent comes from.

Q   That wasn't a question, but thank you.

    With respect to your current salary, your full salary at 1.0, FTE, full-time equivalent, I realize you're not working at a full-time equivalent of 1.0,

Porter - Cross by Mr. Schroeder

but your full-time salary is in the range of 340, $340,000?

A   Potentially, yes, because part of it is variable, and that variable varies from year to year. So it depends on the financial productivity of the institution and the department. So the variable is not a given.

Q   Okay. Last year though, you made over $300,000, correct?

A   I would have to look at my W-2s.

Q   Okay. Well, we'll take a break and pull them out. Does that refresh your recollection -- do you have a recollection of making over $300,000?

A   No.

Q   You have no recollection of that whatsoever?

A   I need to check my W-2s, yes.

Q   Okay. I want to specifically ask, so you received two W-2s for 2024, right?

A   Yes.

Q   And you just produced those through your counsel recently, right?

A   The most recent ones yes.

Q   Well, 2024, right?

A   Correct.

Q   Right. So you received them -- so unless they do things differently for UVM, you received your W-2s

Porter - Cross by Mr. Schroeder

fairly recently, right?

A    Correct.

Q    And so you produced them to your counsel recently, right?

A    Correct.

Q    And so you knew what they were, right?

A    Yes.

Q    Just a one-page document, correct?

A    Correct.  Well, two pages -- one from UVM and one from UVMMC.

Q    Right.  You received compensation from UVM and UVM Medical Center, correct?

A    Correct.  Yeah.

Q    Now, with respect to UVM, do you receive a pension from any of those entities?

A    My understanding from my chair, since a small portion of my salary comes from UVM, that I would not be eligible for the pension for UVM is the way I understand it.

Q    So when I asked you about whether or not you were eligible for a pension, you said no, no pension.  Now you're saying to me that, well, now I understand that I may not be eligible because of only so much work that I do at UVM; is that right?

A    I'm sorry, say it again.  I lost you in there.

Porter - Cross by Mr. Schroeder

Q   I asked you initially whether you're eligible for a pension. You said nope, nope, no pension, right?

A   Correct.

Q   Right. And then I just asked you a specific question though about UVM Medical College or any of these entities that you receive W-2s from, right?

A   Correct.

Q   I just asked you that.

A   Correct.

Q   And then you said, Well, my understanding is that I wouldn't be eligible for the pension based on my current status; is that right?

A   That's correct.

Q   Okay. So you are potentially eligible for a pension if your status changed to say 1.0 FTE?

A   Not from my discussion with Dr. Bernstein who is chair, because a majority of my salary overwhelmingly comes out of UVM Medical Center, and a very small portion comes out of UVM as part of my responsibility for teaching. So when I spoke with Ira and I took the job, he said that because of the structure, his understanding was that I would not be eligible for the UVM pension. That's the counseling I received.

Q   Right. You didn't look at any documents to determine whether that was true, right?

Porter - Cross by Mr. Schroeder

A   I believe Ira, because he's been responsible for the financial compensation, for all of the physicians.

Q   What's his title?

A   Ira was my chairman of OB-GYN, and he was also head of the finance committee at UVMMC, and so he has -- for many years, he was head of finance committee so he has a very good understanding of compensation packages.

Q   I'm just asking you what his title was.  That's all my question was.

A   Well, I'm giving it to you.

Q   That's all I wanted.  Thank you.

MR. SCHROEDER:  Your Honor, I would like to approach the witness, C15.

THE COURT:  Yes.

MR. SCHROEDER:  I've given a copy of the truncated version of this group of messages, and I just want to check with counsel.  I would move for admission of them so I can -- as well.  Initially, I thought we had a stipulation, but I just want to make sure we're okay on whether I can move for admission so that I can publish it to the jury.

MR. VITT:  Your Honor, we do not agree to the admission of these.  And I certainly don't agree to them in bulk, and I think perhaps we ought to approach before we get into a discussion of --

Porter - Cross by Mr. Schroeder

THE COURT:  Yes, please approach.

(Bench conference.)

THE COURT:  These are the exhibits that you were talking about this morning before the jury came in to hear back from Plaintiffs.

MR. SCHROEDER:  I was initially told that we had a stipulation on them because those are the ones -- hold on a second.  Those are the ones that I had given them a copy of early this morning.  I specifically highlighted the dates, numbers.  They hadn't had a chance to look at them, so I understood that.  I know that they've had a chance to look at them now because there's a very specific number.  There's a very -- he says truncated.  I can tell you it's this, out of -- out of a stack of text messages.

THE COURT:  That's the exhibit that you're trying to use?

MR. SCHROEDER:  That's the exhibit.  Correct.  I've given them the Bates numbers of those specific ones.  I think it's -- I think it's roughly ten pages.

THE COURT:  Okay.

MR. VITT:  I don't understand the purpose of these documents.  There's a discussion here about, "do you have a radar detector?  I got stopped.  No, I've got Catholic guilt."  There's back-and-forth, which

Porter - Cross by Mr. Schroeder

it's a mystery to me what this has to do with the case.

I mean, I don't understand this. I mean, they claim they're friends. Okay. There might be some slight difference between the extent of their friendship, but getting into the details of, you know, why somebody bought a particular car, and how fast somebody was driving, it's just got nothing -- we're down a rabbit hole here.

THE COURT: So you object to the entire exhibit?

MR. VITT: I do.

THE COURT: Well, I don't know what's in the exhibit so I'm at a loss.

MR. SCHROEDER: I'm sorry. I do have a copy for you, Your Honor. Right here. And what I would submit, Your Honor. The relationship between Dr. DeMars and Dr. Porter is central to this case, and nobody can say otherwise. We've had this whole discussion in a motion in limine about whether she was the ultimate mastermind here. So this goes to the relationship.

She has been very coy, I would submit. Well, what kind of relationship? Not my best friend. Kind of my friend. I can tell you that on November 20, which is the first page of this, I only put it there because to

Porter - Cross by Mr. Schroeder

show -- it's really a subset of a subset because I'm just trying to show the date of these text messages because they're not on each page, but they go in sequential order. And so I'm just trying to show, November 21, 2013, she says, well, yeah, they're a friend. She exchanged 42 text messages that specific day.

And so that goes to the nature of the relationship, and she has -- I certainly have the ability to impeach her on that issue because she's -- well, she's not -- you said in your opening we were best friends. No, they were more than that. They were actually very, very close.

THE COURT: So the purpose of this e-mail is to establish the nature of the friendship?

MR. SCHROEDER: Specifically, yes.

THE COURT: So the concerns are given to, I think yesterday, you were saying "Did you buy the same car?" Things of that nature. Are you going to be questioning about the car she bought and that kind of thing, or is this more to show that Dr. Porter and Dr. DeMars have spoken by text message frequently?

MR. SCHROEDER: I can avoid the Porsche Macan, even though I'm jealous I don't have one. I have to be honest, they're talking about buying the

same car together; that's not a workplace relationship.

MR. VITT:  Maybe I'm missing this here.  What exactly does the degree of the friendship got to do with the claims that are being asserted in this case?

MR. SCHROEDER:  Okay.  I'll get there.  On direct examination, she testified -- and if you actually read the documents that I produced early this morning, you would see that there's a reference to the December 15 trip, right, to Dallas.  That's when she first exhibited symptoms.  Hold on a second.

MR. VITT:  I didn't say anything.

MR. SCHROEDER:  Well, you looked like you were saying something.

She testified, Well, you know, Leslie left me there.  Like, we shared a room; she left me there, like, high and dry.  And she had exhibited symptoms.  She had to go to an ER, and she had to go home and the inference was Leslie didn't really care about her.  She just left.  Actually, what these messages show is that there was no discussion about that.  They were texting throughout that trip.  They were talking about getting massages, et cetera.  They shared a room.  And Leslie left, and I had all these symptoms and the inference being, well, she didn't really care.  She just left.  And that's not what the text messages say.

Porter - Cross by Mr. Schroeder

So it goes to impeachment, number one.  Number two, the other text message -- really, I'm looking at we're probably spending more time talking about it. I'm only asking her a handful of questions.  The last one is C83, and she said, quote, "I'm texting as your friend.  I am really very sorry this has been so hard and the RE service has been a sequence of problems, not small ones at that.  No need to reply."  That's 2013. I would like to hear the relevance objection on that one.

THE COURT:  Explain to me, you said the centerpiece or the main part of the defense is the nature of the relationship between the two of them?

MR. SCHROEDER:  Not the main part.

THE COURT:  A strong part.  So explain to me so I know, for future reference, why the relationship between the two of them is so integral.

MR. SCHROEDER:  Well, part of it goes to -- one of the claims is that Leslie DeMars basically threw Misty Porter down the river, so to speak, and lied to her about the REI division closing and whether or not she would have a job later.  They had a very complicated relationship and so, it goes to -- she's going to be a central piece.  They want to call her in her case in chief, so she's a pretty relevant person,

if they're calling her in their case in chief, for a full day on Monday. The relationship is a very complicated one, and this goes to the complications of that, and also it goes to impeachment.

(Clerk and Judge confer.)

THE COURT: We should give the jurors a five-minute break too.

MR. SCHROEDER: Absolutely.

THE COURT: And I can take a closer look at these e-mails -- text messages, sorry.

MR. SCHROEDER: Okay.

THE COURT: I'm not that much of a dinosaur. All right. I'll release the jury for five or ten minutes, and then we can take a look at them.

(End of bench conference.)

THE COURT: Okay. Members of the jury, we are going to take a brief five- to ten-minute bathroom break and return momentarily.

(Jury exits.)

THE COURT: Okay. So I suggest, give me a few minutes just to review these, and then I'll come back, and we can talk further about it. Mr. Coffin, you wanted to say something?

MR. COFFIN: I was peremptorily standing, Your Honor, for your departure. That's all.

Porter - Cross by Mr. Schroeder

THE COURT:  Oh, okay.  Thank you.

(Recess taken.)

MR. SCHROEDER:  Thank you, Your Honor.  In an effort to move it along, I've pared down the pages I want to reference out of that.  The full exhibit would be in front of Dr. Porter.  It's just I'm only going to limit it to Pages 1 through 4 -- I'm sorry, Pages 1, 4 through 8, 39 through 40 and 83.  I've communicated that to Plaintiff's counsel, and I believe we have a stipulation on the admissibility of that, just those pages.

MR. JONES:  For those pages -- if we limit it to those pages, then we're okay.

THE COURT:  So what are those pages?  So what I'm looking at here, C15 with a No. 4 on it.  Is that Page 1?

MR. SCHROEDER:  Well, no, Your Honor.  I'm going to -- if I may hand it up to you.  I realize that because we were trying to truncate the exhibit, that we didn't have the front page so that I could show it to you.

Your Honor, you had asked me the pages.  It would be 1, 4 through 8, 39 through 40, and 83.  So the pages that would not be discussed with Dr. Porter would include Pages 13 and 32 and 36, 37 that were originally

Porter - Cross by Mr. Schroeder

in the packet that I handed to you.

THE COURT:  Okay.  So Plaintiffs have no objection to the admission of these specific exhibits that Mr. Schroeder mentions?

MR. VITT:  Yes.  That's where we are.

THE COURT:  Okay.  All right.  So if relevancy objections, going forward, are going to be related to the nature of the relationship between Dr. DeMars and Dr. Porter, I'm going to need to have a better understanding of that, if you anticipate future issues like this coming up related to that particular question.  I know you said, and I won't belabor it now, but I know you said that's kind of an important part of the defense, but until I have kind of a better handle on exactly what that is, the assessment of relevancy can be a difficult one for me right now with some of these proposed exhibits.

MR. SCHROEDER:  I understand, Your Honor.  I think the issue becomes -- and I'm really trying to avoid putting Dr. Porter up on the stand at the end of the case, but one of the arguments that we had on motions in limine at length was the issue of the cat's paw theory, right?  And so the cat's paw theory -- and the plaintiffs were clear that they wanted to potentially pursue that line of questioning, or line of

inquiry and argument.  And if that's the case, then what they're saying is Dr. DeMars is the ultimate decision maker.  So the relationship between Dr. Porter and Dr. DeMars then becomes centerpiece for explaining the credibility of the witnesses, right?

So I -- I understand the Court's hesitancy.  I'm trying to avoid, at the end of our case in chief, bringing Dr. Porter back, and then that's why I presented these text exchanges to them a few days ago, the 25th, but I've raised it yesterday with Plaintiff's counsel because I don't want to get in an argument about it, and so I'm trying to be very tailored and avoid bringing her back, if I can.  And it was for that reason.

THE COURT:  Okay.  All right.  Well, there's no objection to the particular documents Mr. Schroeder describes, so then they'll be admitted, and we'll bring the jury back in and Dr. Porter on the stand.

(Jury present.)

THE COURT:  Go ahead.

MR. SCHROEDER:  Thank you, Your Honor.  Pursuant to the parties' stipulation on the admissibility of certain pages of C15, may I approach the witness to show her C15?

THE COURT:  Yes.

Q    (By Mr. Schroeder) Dr. DeMars, this --

A    I'm sorry?

Q    Excuse me?

A    I think you called me Dr. DeMars.

Q    I'm sorry.  Dr. Porter, these are Dr. DeMars' text messages between you and her, and I just want to ask you a series of questions.  A portion of these have been admitted into evidence, and I'm only going to ask you specific pages, which I'll put up on the screen pursuant to a stipulation with your counsel.

     Your -- and these are text messages that were from Dr. DeMars to you, and I just want to highlight the first page.  Where it says "Participants, 802-296-1701."  Is that your cell phone number?

A    That is.

Q    And the first page here is dated November 20, 2013?

A    Correct.

Q    Right?  And you attended Dr. DeMars' deposition in this case, right?

A    Yes.

Q    And you were -- your counsel asked Dr. DeMars questions about these text messages, correct?

A    I don't recall that but possibly, yes.

Q    You were there for the whole deposition, correct?

A    I was.

Porter - Cross by Mr. Schroeder

Q   And you were aware that one of the things that happened was in this case, in discovery, as you recall us referring to, is that Dr. DeMars produced her text messages to and from you, correct?

A   Correct.

Q   So on this first page, and I'll be very brief on the pages. They're all in sequential order as produced because as a printout -- the first page, there is an identity of the code name "Earth Giver." Is that Dr. DeMars?

A   That's Dr. DeMars.

Q   Okay. And then, obviously, you're the recipient of the e-mail, correct?

A   Correct.

Q   So you're in the light gray coloring; Dr. DeMars is in the dark gray coloring?

A   Dr. DeMars is in the darker color, yes.

Q   Right. And you're in the lighter color, correct?

A   Correct.

Q   Okay. And at the bottom of the page, and this is November 20, 2013.

A   Right.

Q   You refer to Albert as a limited surgeon, correct?

A   Correct.

Q   And this is November of 2013, and he hadn't even

Porter - Cross by Mr. Schroeder

started with the REI division yet, right?

A    Correct.

Q    He'd been interviewed and accepted a position, but you hadn't seen him do anything in the OR?

A    I never interviewed him, and it was based on a conversation I had with him.

Q    That wasn't my question.  My question was:  You'd never seen him do anything in the OR at this point?

A    No.

Q    And this was based on a single conversation you had with him?

A    No.

Q    How many conversations did you have with him in this time period?

A    I don't recall.

Q    You don't recall testifying that you had one conversation with him in that time period?

A    I had a conversation with him, but you asked if I had others, and I don't recall if I had more than that, but the IVF planning and schedule was based on a conversation I had with him, yes.

Q    You do recall one conversation, but you don't recall any others, specifically?

A    Correct.

Q    And do you recall during this time frame having regular

Porter - Cross by Mr. Schroeder

text messages with Leslie DeMars?

A   Correct.

Q   And it wouldn't surprise you that on this particular day that you had upwards of 30 to 40?

A   Perhaps, yes.

Q   Okay.

A   I don't recall.

Q   Okay.  But perhaps you did.

A   Perhaps.

Q   Yeah.  And so you regularly texted with her, at least during this time frame, late 2013, right?

A   I had text conversations with her, yes.

Q   Right.  And would you say not necessarily daily, but certainly on a regular basis, right?

A   Sure.

Q   Okay.  Turning your attention to Page 4, and I'm just doing -- all I'm asking you here is just to -- well, all I'm pointing out to you is -- this date is November 21, 2013, right?

A   I'm sorry?

Q   The date in the middle of the page is Thursday, November 21; 2013?

A   Yes.

Q   Okay.  And that follows, obviously, November 20th, 2013, which was the previous set of messages.

Porter - Cross by Mr. Schroeder

Now, if --

A     A week later.  No, a day later.  Okay.

Q     It's a day later, right?

A     Yeah.

Q     So they're in sequential order.  And that's how they were produced to you and to us.

If you go to Page 8, please.

A     I'm sorry.

Q     So Page 4 goes all the way from 4 to 5 to 6 to 7 to 8, and Page 8 is still in this string on November 21, 2013.

MR. SCHROEDER:  And just go back for a second, Ray, to Page 4.  Okay.  And proceed through each page just one at a time.

Q     (By Mr. Schroeder) So Page 4, that's November 21.  It's a series of text messages between you and Dr. DeMars.

MR. SCHROEDER:  Go to Page 5.  Page 5?  Thank you.

Q     (By Mr. Schroeder) You see more text messages that same day.  Go to Page 6.  More text messages that same day, go to Page 7.  More text messages that day, and then go to Page 8.  Now, on Page 8, seems like it's pretty rapid succession.  Page 8, you're talking about -- Dr. DeMars says something, "That's what we said about Richard."  Do you see that about halfway down the page?

Porter - Cross by Mr. Schroeder

A    I'm sorry.  I lost you.

Q    Sure.  Page 8?

A    Page 8, yes.

MR. SCHROEDER:  Ray, if you could highlight that:  "That's what you said about Richard," by Dr. DeMars, and the one below it, please.  Actually -- Ray told me this before, and I didn't remember it.

Q    (By Mr. Schroeder) I'm just asking you about that exchange.  Leslie DeMars says, "That's what we said about Richard."  And your response was: "Yes I've outlasted him and now I can sense a relief.  Finally, good riddance.  He'll leave me with some big mess."  And then without Dr. DeMars responding, you say, "But he will be gone," right?

A    Correct.

Q    So is that fireworks after that.  I can't tell if that's a firework or an ice cream cone.  Fireworks?

A    I don't know.

Q    Well, you wrote it, so I'm just asking you.

A    In 2013.

Q    I know, but you used emojis, right?  You know what that emoji is, I would assume.

A    I'm not clear.

Q    Okay.  And then right below that, Leslie says, "But no rules to encumber you.  Ha, ha, ha."  And then you

Porter - Cross by Mr. Schroeder

wrote, "No asshole narcissist comments," right?

A    Mm-hm, yes.

Q    Is that a dancing figure and a bunch of smiley faces?

A    Perhaps, yes.

Q    Perhaps, or it is?

A    I don't know.  I know it looks like dancing figures.  I can't see the others.

Q    You can't see the smiley faces?

A    It's not clear here, but it does look like it here, yes.

Q    Well, you can read the screen, right?

A    I can read the screen, yes.

Q    Okay.  And those are smiley faces, right?

A    Correct.

Q    Okay.  Thank you.

      I would ask you to turn to Page 39.  I'm going to ask you very quick questions at the bottom of the page, and we're going to go to the next page in a second. This is December 1, 2015.  So from November of 2013 through December of 2015, you would have periodic text messages with Leslie DeMars, correct?

A    Correct.

Q    And were these your personal phones or your work phones; do you know?

A    I believe personal phones.

Porter - Cross by Mr. Schroeder

Q    Okay.  So if you had -- would you separate your work matters from your personal matters?  Meaning did you have another phone for work matters?

A    I did not.  The division had another phone for weekend call, but I didn't use it.

Q    Okay.  This one, on December 1, 2015, you had testified on direct exam about going to Dallas, correct?

A    Correct.

Q    And you went to Dallas because that was a conference or, was it, oral boards, board of examiners?

A    Yes.  One week a year we went to the oral boards.

Q    Okay.  And this was -- this would be the time period when you were going to the oral boards in 2015?

A    Yes.

Q    Okay.  Go to the next page, please -- actually, go back for a second.  So you were talking to her about, Hey, do you want to get massages.  We'll take care of that, manis, pedis, et cetera, correct?

A    Correct.

Q    Go to the next page, please.  And in here you're talking about the fact that your husband is going to drive both of you to the airport, right?

A    I'm sorry, where are you?

Q    Just at the top.  If you go to the previous page. We're just dealing with 39 and 40.  At the bottom it

Porter - Cross by Mr. Schroeder

says, "Tom is going to drive us to Manchester."  That's your husband, right?

A    Yes.  Yes.  Yes.

Q    And then you have a series of exchanges that same day, and then December 6th, I guess, is that weekend, right?

A    Yes.  We were there, I believe.

Q    And you were there that week -- were you there for the whole week?

A    I was; she was not.

Q    Right.  And you said that you guys shared rooms?

A    Yes.

Q    Okay.  And at some point, Dr. DeMars had to go back to New Hampshire for, was it, a patient emergency?

A    No, it was an emergency meeting called by the DHMC administration, and it is highly unusual to leave the boards for any reason because once you're there, you are assigned for the entire week, and she left towards the end of the week, either Wednesday or Thursday, without fulfilling her obligations at the board and when I had developed double-vision.

Q    Okay.  There's no mention of any of your symptoms in this exchange with her, correct?

A    I don't know.  I haven't read all the way through it, but --

Q    Well, actually, we can tell based on this one page.

Porter - Cross by Mr. Schroeder

Porter - Cross by Mr. Schroeder

And, by the way, Dr. Porter, when you produced text messages in this case with Dr. DeMars, you only produced a handful of text messages --

MR. VITT:  Objection.

THE COURT:  Sustained.

MR. SCHROEDER:  Okay.

Q    (By Mr. Schroeder) With respect to this exchange here, it goes from December -- it goes December 6th, December 10th, and Dr. DeMars is referring to the fact that she's going to the airport, right?

A    Yes.

Q    And so does that refresh your recollection that that was when she was leaving Dallas?

A    Yes.

Q    Okay.  And then the next exchange referred to here is January 8th, 2016, right?

A    Correct.

Q    There's no discussion in this text message string of anything relating to the fact that you came down with symptoms related to your condition.

A    Not within the text, no.

Q    Right.  Okay.  Thank you.  Just ask you to go to Page 83, and I'm only going to ask you a question about the bottom text message.

MR. SCHROEDER:  Ray, if you could just

Porter - Cross by Mr. Schroeder

highlight that.

THE WITNESS:  I'm not certain that we can --
it's not completely redacted --

Q  (By Mr. Schroeder) We're going to produce a redacted
portion of this and only this page, so there's not
going to be any -- that's why we produced this as a
redacted portion, and so --

A  My copy is not completely redacted.

Q  I understand that.  The parties have already stipulated
to the admissibility.  We're going to handle that on a
break.

I'm asking you about one specific comment.  On
Thursday, February 23, 2017, you wrote to Dr. DeMars,
quote, "I'm texting as your friend.  I'm really very
sorry this has been so hard and the RE service has been
a sequence of problems, not small ones at that.  No
need to reply."  You wrote that, correct?

A  I did.

Q  And you didn't say IVF; you just said RE, right?

A  Correct.

Q  And RE meant reproductive endocrinology, right?

A  Correct.

Q  And you were referring to the division, correct?

A  Correct.

Q  And this was late February of 2017, right?

A    Correct.

Q    Thank you.

MR. SCHROEDER:  We could remove that document.

Q    (By Mr. Schroeder) Dr. Porter, I was asking you about -- during the cross-examination yesterday afternoon about Dr. Merrens.  Do you recall that?

A    Yes.

Q    And, initially, when I asked you about Dr. Merrens, you didn't recall your interaction with him earlier than 2017, right?

A    No, I believe I said an interaction several years before.

Q    Several years before, okay.

A    Yeah.

Q    I want to ask you --

A    Very, very long time ago, yes.

Q    Okay.  I want to ask you specifically about that interaction with Dr. Merrens.

MR. SCHROEDER:  Your Honor, may I approach to show her Exhibit A?

THE COURT:  Yes.

THE WITNESS:  Can you please take it out?

Q    (By Mr. Schroeder) Sure.

A    Thank you.

Porter - Cross by Mr. Schroeder

Q    I just want to refresh your recollection to the time frame when you were dealing with Dr. Merrens.  This is an e-mail dated September 28, 2012?

A    Correct.

Q    Okay.  And you were having a series of e-mail exchanges with Dr. Merrens, correct?

A    Correct.

Q    And the subject line of it says "Thanks," right?

A    Yes.

Q    And you told him in this e-mail exchange, quote, "I'm appreciative of your care, gentleness and kindness." Correct?

A    Correct.

               MR. SCHROEDER:  Now, if I may show the witness Exhibit B?

Q    (By Mr. Schroeder) During this time period, you had a series of exchanges with Dr. Merrens, correct?

A    Correct.

Q    And those were positive exchanges, correct?

A    I would have to review it, but my recollection is initially they were positive, yes.

Q    Okay.  And you trusted his guidance, did you not?

A    I wouldn't characterize it that way.

Q    Let me go back to Exhibit A for a second.  Do you still have that in front of you?

A    Is that the text messages?

Q    No, the exhibit I just showed you.

A    I think you put it back.

Q    Okay.  We'll hold out Exhibit A.  I'm sorry, Exhibit B.
     I'll give you Exhibit A.

          Actually, you know what, I apologize.  Go to
     Exhibit B, please.  If you go to Exhibit B, it's a
     series of e-mails between you and Dr. Merrens, correct?

A    Correct.

Q    And subsequent to that -- that was initially September
     of 2012, and you were still dealing with him in
     November of 2012, correct?

A    Correct.

Q    And if you go to the second page --

A    Can I read the whole thing to refresh my memory?

Q    Sure.  I'm only going to ask you very specific
     questions.

A    Yes.  I would like to read it so I can answer those
     truthfully.

Q    Okay.

A    (Witness reading.)

Q    Let me know when you're finished, please.

A    (Witness reading.)  Okay.

Q    Okay.  I would ask you to read -- the second page of
     that is an e-mail from you to Dr. Merrens dated

Porter - Cross by Mr. Schroeder

November 1, 2012, right?

A    Correct.

Q    And you wrote, "Hi, Ed."  Right?

A    Yes.

Q    Okay.  You didn't call him Dr. Merrens.  You certainly knew him, right?

A    Correct.

Q    And you said, "I appreciate your kindness and sensitivity in this process," right?

A    Correct.

Q    Okay.

MR. SCHROEDER:  If I may approach the witness, Your Honor, and show Dr. Porter Exhibit D?

THE COURT:  Yes.

Q    (By Mr. Schroeder) Actually, let's stay there before we go to D.  Let's stay with B for a second.

On the first page, you reference the fact that you thought that he was -- he could be a neutral person, right?

A    Yes.  I was hoping he would be, yes.

Q    Right.  Well, actually you believed he would be, right?

A    I wouldn't characterize it that way.

Q    Well, let's just go to the statement then.  It says, quote -- these are your words, right?  "It's hard for me to see how you would not be neutral," end quote.

Porter - Cross by Mr. Schroeder

Did I read that correctly?

A    That was the statement.  There was more behind it.

Q    I understand it.  You made that statement?

THE COURT:  I'll advise the witness, when the question calls for a yes-or-no answer, you should give a yes-or-no answer.  Your attorney will have an opportunity to ask you additional questions.

THE WITNESS:  Yes.  Thank you, Judge.

THE COURT:  Go ahead, Mr. Schroeder.

THE WITNESS:  That's my statement.

Q    (By Mr. Schroeder) Right.  Those are your words.  Thank you.

MR. SCHROEDER:  Your Honor, may I approach the witness to show her Exhibit D, Defendants' Exhibit D?

THE COURT:  Yes.

Q    (By Mr. Schroeder) Is it fair to say during this time period of September, November, December, you were in regular communication with Dr. Merrens?

A    I had some e-mails with him, yes.

Q    You had conversations with him?

A    I had -- I don't recall exactly -- two conversations with him, and then some e-mail exchanges, yes.

Q    Okay.  My only question to you on this exhibit, at the bottom of Page 1 -- it is an e-mail message from you

Porter - Cross by Mr. Schroeder

dated December 14, 2012, to Dr. Merrens, right?

A    Yes.

Q    My only question to you about this document, you state, "Ed, thank you for your response, time and consideration to the issues," right?

A    I'm not seeing that right now.

Q    It's on the next page.

A    On the next page.

Q    At the top of the page.  So it's December 14, 2012, a few months later from the first e-mail I showed you.  And you say, do you not --

A    Yeah.

Q    "Thank you for your response, time, and consideration to the issues."

A    Correct.

Q    Okay.

            MR. SCHROEDER:  May I approach the witness to show her Exhibit E?

            THE COURT:  Yes.

            MR. SCHROEDER:  Could I have a sidebar, Your Honor?

            THE COURT:  Yes.

                (Bench conference.)

            MR. SCHROEDER:  In my continuing effort to stay within the guardrail of our earlier discussions, I

Porter - Cross by Mr. Schroeder

don't know where we landed on this issue, and I wanted to be careful about it, but there's a quote which I referred to in one of our discussions in oral argument about structural changes to the division of reproductive medicine. Now, that doesn't have anything to do with any disputes with any individuals, but it's at the top, and that is all I would like to ask her -- ask her about and leave it there, but I don't think it goes into -- I want to be very mindful of the Court's instructions and guidance on that, and I don't want to have a redirect and recross on this other than the fact that she raised some issues related to the REI division structure.

THE COURT: Yes. You're going to ask her to confirm that's the statement in the e-mail to Dr. Merrens?

MR. SCHROEDER: That's it.

THE COURT: That's fine.

MR. VITT: All right.

MR. SCHROEDER: Thank you. I just wanted to make sure.

(End of bench conference.)

Q   (By Mr. Schroeder) Dr. Porter, did I put Exhibit E in front of you?

A   No.

Porter - Cross by Mr. Schroeder

MR. SCHROEDER: May I approach, Your Honor?

THE COURT: Yes.

Q    (By Mr. Schroeder) Now, I asked you earlier --

A    Wait. May I read it, please?

Q    Sure.

A    Okay. (Witness reading.) Correct. Okay.

Q    So just one e-mail, right? Just one page?

A    Yes.

Q    Okay. And this is dated -- this is an e-mail that you sent on February 8, 2013?

A    Correct.

Q    And the subject line was "meeting follow-up," right?

A    Yes.

Q    Okay. So you'd had a series of e-mail communications with Dr. Merrens in September, November, December, and now February of 2013, right?

A    Correct.

Q    And you say in the second paragraph -- this is the only thing that I want to ask you about, and just confirm that you said this -- quote, "We believe it is essential that structural changes be made within the division of reproductive medicine. We also believe that the changes need to be made soon," end quote.

A    Correct.

Q    And that was February of 2013, correct?

Porter - Cross by Mr. Schroeder

A    Correct.

Q    And this predated Dr. Hsu's arrival, even, I think consideration of his candidacy, right?

A    Correct.

Q    And certainly predated Dr. Seifer joining the REI division in 2016?

A    Correct.

Q    All right.  Thank you.

MR. SCHROEDER:  Your Honor, I would like to approach the witness to show her Exhibit C6.

THE COURT:  Yes.

MR. SCHROEDER:  And I've shared with counsel for the plaintiff a specific subset of that, and I would like to move for its admission.

THE COURT:  Any objection?

MR. VITT:  Just a second, please.  May we approach the bench?

THE COURT:  Yes.

(Bench conference.)

MR. VITT:  This is C6.

MS. McDONALD:  We gave you a list of the specific pages within it that we would like to use.

MS. NUNAN:  I think that was on the chart that you gave me.

MS. McDONALD:  Yes.

Porter - Cross by Mr. Schroeder

MS. NUNAN:  I pulled them out.

MR. SCHROEDER:  I put it in the front just to note the dates.  I'm only going to -- there's a handful of exhibits out of that.  It will literally take me five seconds to go through these questions and I can give you the page numbers specifically -- 897, 921, 927, 936, 946, 950, 954 through 56.

MR. JONES:  That's more than a few.

MR. SCHROEDER:  And 1061.

MR. JONES:  Okay.

MR. SCHROEDER:  So, by my count, that's less than ten pages of that document.

THE COURT:  Do you need a chance to review those, go back to counsel table and take a look at those?  It's a huge exhibit; it's been winnowed down.  It's apparently been windowed down further.  Take some time to review it.

MR. SCHROEDER:  Just to be clear, these are their client's text messages.

THE COURT:  No, I know.

MR. SCHROEDER:  It's not like -- I understand that.  To your point, I gave them a list this morning, but...

MR. VITT:  We'll go back and look.

(Pause.)

Porter - Cross by Mr. Schroeder

MR. VITT:  We've taken a quick look at these. I'm trying to figure out what the purpose is of these e-mails.  I mean, these text messages, they've been all over the line, and I thought before he was trying to show that there was some close relationship between Dr. DeMars and Dr. Porter, and these seem mostly business related, but maybe I can get some help explaining where you're going with all this.  I don't understand.

MR. SCHROEDER:  Well --

THE COURT:  These are being offered into evidence not for impeachment or for both?

MR. SCHROEDER:  Both.  Both.

THE COURT:  There's some documents that you have shown and not published because they're impeachment, haven't sought admission.

MR. SCHROEDER:  Yes.  Party admissions.  Yes.

THE COURT:  Okay.  To be clear.

MR. SCHROEDER:  That's a fair point, Your Honor.  She makes a series of comments about former doctors that worked in the division.  She makes a series of comments about Dr. Hsu and Dr. Seifer.  And she has said, I didn't have any personal issues with them, it was just about my concerns about their practice.

Porter - Cross by Mr. Schroeder

She had a personal animus towards these individuals and this is a statement by a party opponent, so I want to use them for impeachment but also for admissibility because they are text messages, in the relevant time frames, so 2017.

THE COURT:  So I was going to ask you:  So they're from 2017?

MR. SCHROEDER:  Yes.  February, March, and April.  Sorry, Your Honor.  It's your bench.

THE COURT:  No.  Go ahead.

MR. SCHROEDER:  Number one, these are her text messages.  So this isn't -- this isn't a line of surprise.  I've told them a specific subset of them because I wanted to just cut to the chase, but you can see, on those specific pages references to Dr. Hsu and Seifer, among other things.  So I know you would like to know where I'm going.  It's not really my obligation to tell him where I'm going on cross-examination, but nice to ask, but the bottom line is that these go to her comments in the relevant time frame about Dr. Hsu and Dr. Seifer, and specifically her comment that she hopes Albert Hsu will fail his boards.

THE COURT:  So what are the pages of these exhibits?  I know you gave them to Mr. Jones.

MR. SCHROEDER:  I can cut it down even

further, Judge. 897 --

THE COURT: All right. Hang on a second. Too much material up here. 897.

MR. SCHROEDER: 936, 946, 950, 954 through 956, and 1061.

The other thing I want to highlight, Your Honor, is the fact that the last few, 954 through 956, are exchanges between her and Lisa McGee before the closure of the REI division where she's being offered a job.

THE COURT: And she gave them --

MR. SCHROEDER: Some high-up muckety muck at -- I can't wait to see that transcript. Some high-level official at UVMMC.

THE COURT: So when I'm looking for your page numbers here.

MR. SCHROEDER: It's really hard upfront. Yeah. They're just in the middle. I'm sorry. Right here, Your Honor, if I may. We just produced it the way it was produced to us, but 954 through 56 are specific references to April and May of 2017.

THE COURT: Those are all DeMars --

MR. SCHROEDER: I'm sorry?

THE COURT: DeMars to Porter.

MR. SCHROEDER: No, Porter to DeMars.

THE COURT: Well --

Porter - Cross by Mr. Schroeder

MR. SCHROEDER:  Correct.  Correct.

MS. McDONALD:  The entire exhibit is not.

MR. SCHROEDER:  No, just these specific pages, yes, correct.

THE COURT:  Are you still objecting to this particular exhibit?  Fine if you are.  I just want to be clear about it.

MR. VITT:  I think the answer is yes.

THE COURT:  Okay.  Okay.  So they're all business related.  I don't see anything in there that's non-business related or otherwise.  He's objecting to it.  So you'll have to go through the process of laying a foundation with the witness, and I'm going to ask if it's objected to, and he'll object and make a ruling before you can actually get it admitted into evidence.

MR. SCHROEDER:  So just seek its introduction?  I'm sorry.  Ask her to show what it is, right?

THE COURT:  You'll have to ask all the foundational questions -- who are they between, what's the time frame --

MR. SCHROEDER:  Right, I understand that.

THE COURT:  -- to establish.  I mean, it sounds like you're going to seek its admission as an admission by a party opponent.

Porter - Cross by Mr. Schroeder

MR. SCHROEDER:  Right.

THE COURT:  So you'll have to lay the foundation in terms of the time, the date, who they're between, and then formally move admission, and I'll make a ruling on the record that way.  I could do it here, but I think it's better if you do it from the podium, if that makes sense.

MR. SCHROEDER:  Yes.  Do you want us to give you a subset of the actual pages?

THE COURT:  I think it would be helpful to have these.

MR. SCHROEDER:  I'm mindful of where we are right now, and I don't want to be the one responsible for somebody missing a lunch appointment.

THE COURT:  Is this your final line?

MR. SCHROEDER:  Yes.  We're on the precipice of finality.

THE COURT:  Okay.  So after these particular exhibits are dealt with, you have more lines of inquiry?

MR. SCHROEDER:  No, I'm actually right there.

THE COURT:  And how long do you think this would take?

MR. SCHROEDER:  I was hoping it would take a few minutes, but if I've got to go through all the

motions, then I'll go through the motions.

THE COURT:  I'm wondering do we break now and come back?

MR. SCHROEDER:  I would like to break so I could curtail this to a very small set of issues.

MR. VITT:  And my redirect will be less than ten minutes.

THE COURT:  Okay.  We'll take --

MR. VITT:  I'm told 12.

MS. NUNAN:  So we're down to that list that you gave him, right?

MR. SCHROEDER:  Correct.

MS. NUNAN:  Is that what he wrote down?

MR. SCHROEDER:  Right.  There's no issue on authenticity because I think we've stipulated to that because they're her text messages, but...

THE COURT:  You agree as far as authentication?

MR. VITT:  Absolutely.

THE COURT:  I'll get through the copy of the sub --

MR. SCHROEDER:  We'll do that right now.

THE COURT:  And you'll get that to me.  We'll take a break and --

MR. SCHROEDER:  I want to make sure, Your

Porter - Cross by Mr. Schroeder

Honor, that you have a chance to review them for specifically the reasons I stated, but I mean, I didn't put my whole outline out there, but it's a five-minute line of questioning.

THE COURT:  Okay.

MR. SCHROEDER:  But it goes to the two issues of not just impeachment but a statement by a party opponent.

THE COURT:  All right.  Thank you.

MS. McDONALD:  Thank you, Your Honor.

(End of bench conference.)

THE COURT:  Okay.  We are so close to lunch, I think rather than forge ahead, we're going to give you your lunch break now, and we'll reconvene at 1 p.m.  Okay?  Thank you.

(Jury exits.)

THE COURT:  Okay.  I don't think there's anything else, right, to address at this time?

MR. SCHROEDER:  No, Your Honor.  We're pulling that set of documents for you, if we could give them to Emerson and then make sure that you get them, we'll make those arrangements right now.

THE COURT:  Okay.  Thank you.  Anything from the plaintiffs at this time -- the plaintiff?

MR. VITT:  No, Your Honor.

THE COURT:  All right.  Thank you very much.

(Noon recess taken.)

March 27, 2025

Afternoon Session

* * *

MR. SCHROEDER:  Judge, I believe after discussing with counsel that we've got stipulation of admissibility of a small subset of documents.

THE COURT:  Okay.

MR. SCHROEDER:  With respect to C6.

THE COURT:  Okay.

MR. SCHROEDER:  What I would like to do with the Court's permission, opposing counsel's permission, is just reference certain pages for dates and get to those, just so we know what date we're talking about, because some of these pages are in sequential order over a period of time in one day, so they're not -- there's not a date on every page, so I just want to do that.  So my seeking admissibility and request to publish to the jury is just limited to these pages.

THE COURT:  Okay.  So does that mean then that this exhibit that you gave me before lunch is even further reduced, or you're only going to seek to publish certain pages from this?

MR. SCHROEDER:  I believe that what you were given, Your Honor, is what we would seek to have published, and that is what has been shared with

opposing counsel.

THE COURT:  Mr. Vitt?

MR. VITT:  As long as it's limited to the pages he gave us up at the bench, that's fine by us, chance to move this along, I hope.

THE COURT:  Yes.  All right.  And do we have a record then of what those particular pages are?

MR. SCHROEDER:  Not yet.

THE COURT:  Okay.

MR. SCHROEDER:  But for purposes of just making sure that the witness knows what dates we're talking about, there's a couple pages in the full copy that I just want her to reference the date.  I'll direct her.  Some pages have the dates, but some of them don't.  I can refer to them for the record if that -- whatever -- however you would like me to do it.

THE COURT:  I just want to make sure that we're all on the same page as far as what the exhibit consists of.  So what you gave me before the lunch break is what Mr. Vitt agreed to, or Mr. Jones.

MR. VITT:  It's the same group, we're fine.

THE COURT:  Okay.  All right.

Next issue, just scheduling-wise.  So we were going to be ending early today.  I think that was under the assumption that Dr. Bancroft would be concluded

today.  Obviously, he hasn't even gone on yet.  We do have this issue of, you know, the jury being advised yesterday that they would be leaving early today. Counsel appears to also be okay with that.  I think, Mr. Schroeder, you said that earlier.  So just kind of want to get your opinion on what we do for the remainder of today.  So Dr. Porter will finish her cross.  There will be redirect.  I am assuming that will all be done before 2:00?

MR. VITT:  I believe it will be.

THE COURT:  Okay.

MR. SCHROEDER:  Yes.

THE COURT:  So then the question becomes:  Do we put Dr. Bancroft on for the direct, come back for the cross?  Do we put Dr. Bancroft on tomorrow?  So I know this is probably going to implicate pushing back witnesses on your schedule, so I just want to be cognizant of that and ask Plaintiffs in particular what that might do to Friday's trial schedule.

MR. JONES:  Right.  I had asked you this morning whether you intended to have a lengthy cross of Dr. Padin because we were going to call her tomorrow.

MR. SCHROEDER:  Yes.

MR. JONES:  If that's going to be a short cross, then we might have some time to do Bancroft

cross or whatever tomorrow.

MR. SCHROEDER:  I think that makes sense, Your Honor.  I did represent to Mr. Jones that we would expect to call Dr. Padin in our case in chief and so, therefore, I would limit the cross, or I should say the direct -- I'm not even sure what you call it, Your Honor.  After 30 years, you would think I would know.  My questioning after cross would be limited just to the topics covered by the cross, and I would call her back in our case in chief at the appropriate time to cover the topics that we want to cover, so she would be a short witness.

They have a number of other witnesses tomorrow, and you are correct that I was on board with perhaps a shorter day today.  Maybe we did a little bit of his direct; I don't know.  I'm open to suggestions, but I also would leave it up to the plaintiffs to tell me what they would like to do, and I'll respond.

THE COURT:  Okay.  Maybe someone step to the microphone so that we can all hear it.

MR. JONES:  Yeah.  Mr. Vitt is checking Mr. Bancroft's availability for tomorrow, first of all.

THE COURT:  All right.

MR. JONES:  So, I mean, perhaps, I think we might want to explore, I might need a couple of minutes

to meet with my team.  Maybe put the direct on of Bancroft today, take a break, and start tomorrow with the cross of Bancroft.  We do have five witnesses for tomorrow, but some of them are not expected to be lengthy witnesses.

MR. SCHROEDER:  My only request to Plaintiff's counsel and to the Court is that if we could get Dr. Padin on right after Bancroft, I would appreciate it just because of her schedule.

MR. JONES:  Our problem is we have witnesses who are only available in the morning.

MR. SCHROEDER:  Well, just give me some understanding.

MR. JONES:  Yeah.  I was thinking she would be on after lunch, but...  That's before we put the Bancroft cross --

MR. VITT:  He's available.  He's available tomorrow morning.

MR. JONES:  I guess, our proposal is just to defer Dr. Bancroft and have him -- rather than have him sit here today and come back tomorrow, just have him defer to tomorrow and then we'll do tomorrow tomorrow.  If we have to reshuffle a bit, we'll reshuffle.  The idea is to defer him to tomorrow.

MR. SCHROEDER:  My only concern is that

because Dr. Padin -- and you guys were gracious about moving her up because of her sister's surgery appointment for cancer on Monday, I really do -- she's coming in tonight.

MR. JONES:  I commit to putting Dr. Padin on tomorrow in adequate time so that she can be gone tomorrow.

MR. SCHROEDER:  Okay.  I just want to make sure.  The earlier the better would be great.

THE COURT:  So your concern, Mr. Schroeder, is that Dr. Padin go on tomorrow, whether it's morning or afternoon, I know there's a preference, as early as possible.

MR. SCHROEDER:  Yeah.  She's the chief medical officer for the whole system, so she's got a few other things going on.  We just want to move ahead.

THE COURT:  Okay.  So then the proposal is to put Dr. Bancroft off till tomorrow?

MR. VITT:  Yeah.

THE COURT:  That's what I'm hearing.

MR. SCHROEDER:  My able co-counsel, Mr. Coffin, he's just waiting to talk today, has agreed to that, Your Honor.

THE COURT:  Okay.  All right.  Then we'll conclude after Dr. Porter is done for today.

MS. McDONALD:  Can we ask who the other witnesses tomorrow will be?  Is it the same ones that we discussed the other day, that includes Barry Smith?

MR. JONES:  Potentially.  We might reconsider that in light of this conversation.  We'll talk to you before we leave today.

MR. VITT:  May I be excused to talk to Dr. Bancroft and let him go?

THE COURT:  Yes.  And Ms. McDonald read my mind.  Of course, I was going to be asking Plaintiff's counsel before we leave for the day who the witnesses were.

MR. SCHROEDER:  She really keeps me on my toes, Your Honor.

THE COURT:  Dr. Porter, do you want to get on the stand there please?

(Jury present.)

THE COURT:  Okay.  Please go ahead, Mr. Schroeder.

MR. SCHROEDER:  Thank you, Your Honor.

Your Honor, I would like to approach the witness to show her Exhibit C6.

THE COURT:  Yes.

Q   (By Mr. Schroeder) I don't want the jury to think that I'm going to ask you about that really large group of

Porter - Cross by Mr. Schroeder

documents all together, but that large group of documents, is that -- do you recall in this case producing a series of -- groups of text messages for everyone that you had text messaged with during the relevant time period?

A   I turned in my phone, and the text messages were taken off that, yes.

Q   Okay.  And that's why the label in the corner, separate from the label for C6, which is a different page number and is the exhibit for the trial, the -- it says Porter, the first one I have -- one of the first ones, but the first one is 894.

A   I have 897.

Q   Right.  That's the subset of the -- I'm only going to ask you a very small subset of questions related to the subset that is in front of you.

So you turned in your phone and you were able to download all the text messages, correct?

A   My attorneys did, I believe, yes.

Q   Okay.  Yeah, I understand.  You wouldn't have done it. I certainly wouldn't know how to do it.

So I'm just going to ask you a very few questions, but these are the text messages that are all labeled with the Porter label so those are documents that were produced through your counsel, right?

A    Yes.

Q    I would ask you to turn your attention --

MR. SCHROEDER:  And, Your Honor, through stipulation with counsel, there's been an agreement on moving for admission of this exhibit with just the specific pages that were referenced in the sidebar.

THE COURT:  Right.  So is there going to be another exhibit number on this, because C6 is much larger?

MR. SCHROEDER:  Correct.  Yes.

THE COURT:  Okay.  So what is this identified then as now?

MR. SCHROEDER:  This would be a subset of Dr. Porter's text messages.

THE COURT:  Right.  No.  I understand that.  But putting a specific number on it other than C6 because that's a lot of documents.

MS. McDONALD:  C6-A.

THE COURT:  Okay.  So then the subset is marked as C6-A.  So C6-A is admitted without objection.

MR. SCHROEDER:  Your Honor, should I just read off some of the Bates labels so that we are clear on what's coming in?  I'll use the exhibit tabs from the -- from Dr. Porter's production of documents.  So Porter 897, 936, 946, 950, 954 through 56 and 1061.

Porter - Cross by Mr. Schroeder

Thank you.

THE COURT:  Thank you.

MR. SCHROEDER:  Your Honor, may I publish 6-A, a series of text messages -- may I publish that for the jury?

THE COURT:  Yes.  A particular page, right?

MR. SCHROEDER:  Yes.  A specific page.  And specifically Page 897 is the first one.

Q   (By Mr. Schroeder) So just going back to series of text messages, Dr. Porter, and I'm actually -- I'll represent to you on some of these that I'm showing you, and it's a very small handful, but on the ones that I am showing you, there's certain days where the date may not be on it, but I'll represent to you the date if we need to look in the bigger group of documents to just corroborate me, we can do that, but I'll represent to you the dates.

And this particular one, this is 8 -- 4 -- April 8, 2016, right?

A   Correct.

Q   Okay.  And this is with Leslie DeMars, correct?

A   Correct.

Q   And in the bottom, the second to the last text message from -- and you're -- in this one, you're in the dark text on the screen, and she's in the white text; is

that right?

A   Correct.

Q   Okay.  And the second to last text message there, you say, "You know you have -- you know you have been exceedingly kind and caring through this."  And "this" is in reference to the fact of your condition at the time, right?

A   I don't recall.

Q   Well, at this time in April, you've been out for five or six months?

A   Since December.

Q   Okay.

A   Mid December.

Q   And you don't know whether "this" is related to you being out and coming back?

A   I don't know what this is in reference to, because it's taken out of context.

Q   Okay.  Well, these are your text messages though, right?

A   Yes.

Q   And right above it is the text message from Leslie DeMars.

        MR. SCHROEDER:  Ray, if you could highlight that.

Q   (By Mr. Schroeder) "You're so nice to let Tom borrow

Porter - Cross by Mr. Schroeder

your car.  I'm excited to have you back."  I don't know, looks like fireworks or ice cream cone to me. "No overdoing it."  So she's saying to you really excited to have you, back, right?

A    Correct.

Q    And then your response is, "You know you've been exceedingly kind and caring through this."  Does that refresh your recollection --

A    Yes.

Q    -- or point you to the fact that "this" relates to the fact that you've been out, and she's really excited to see you back?

A    Right.  So it does establish that I was back 4/16 and you've been saying July or June.

MR. SCHROEDER:  Your Honor, motion to strike; that's non-responsive.

THE COURT:  Okay.  I'll strike the response but there may have been a reference to July earlier. Is that true?

MR. SCHROEDER:  No, there wasn't a reference to July.  No.

THE COURT:  Okay.

Q    (By Mr. Schroeder) If I could have you turn to Porter 936, and I'll reference for the record that this is February 4th, 2017, and the way we know that is if you

go to 930.  And we don't need to put this on the screen, so stay on this, Ray, but for purposes of your understanding, Dr. Porter, 931 shows it's a string of text messages that were printed between you and Lisa McGee, correct?

A    I'm on 936.  I don't have 9 --

Q    That's in a small subset, but in the big group of documents that I pulled out of the binder, right, if you go to 936 in that, I just want to verify for the record -- I'm sorry, 931 -- that that's the string of text messages between you and Lisa McGee.

            THE COURT:  That's in C6?

            MR. SCHROEDER:  Correct, Your Honor.  And that was put beside Dr. Porter.

Q    (By Mr. Schroeder) Is that right?

A    I'm looking at it, yes.  It's from Ms. McGee, yes.

Q    Right.  It says, "Chat with Lisa McGee" and then export details and then the participant, right, on 931?

A    Say that again, please?  You lost me.

Q    The document that you're looking at in front of you out of the big group of documents which is C6 --

A    Yes.

Q    -- this is the group of text messages between you and Lisa McGee that were printed through your cell phone provider?

Porter - Cross by Mr. Schroeder

A    Yes.

Q    Okay.  And the first date there is January 31, 2017, right?

A    Yes.

Q    Okay.  And if you go a little bit further in that stack, still in that stack, is 933, the big stack, C6, 933 has a date of February 4, 2017.  I just want to reference so that you know what date I'm talking about when we get to 936 because if you move forward all the way to 936, and that's the one in front of you, we're still on that date February 4, 2017.  Okay?

A    Yes.

Q    Thank you.  So if you go to 936, this is text exchanges between you and Lisa McGee.

     Now, Lisa McGee, her full name is really Elizabeth McGee, correct?

A    Elizabeth McGee, yes.

Q    And at the time of 2017, where was she employed?

A    University of Vermont.

Q    Medical Center?

A    Medical Center, yes.

Q    What was her role?

A    She was -- she was head of fellowship and division head.

Q    Division head of what?

A   Reproductive endocrinology and infertility.

Q   So at UVM Medical Center she was the head of REI?

A   Yes.

Q   So, at that time, in 2017, she's the REI division director at UVM Medical Center, and David Seifer is the REI division director at Dartmouth Health?

A   Correct.

Q   All right.  And at the bottom of this exchange, it's a series of text messages between you and Lisa McGee. Did you regularly text with her?

A   Intermittently.

Q   Okay.  Well, I went back to Page 933, which is where this date started, and it looks like you had a series of text messages in one particular day, upwards of 40 or so.

    With respect to 936 though in front of you on the screen, at the bottom, you're having a discussion with her about, I think, candidates for positions.  And you say -- if we could highlight the "maybe I'm in," and the one below it.  "Maybe I'm smarting because she swore how clinically good Sophia was and what a wonderful surgeon," and then you immediately text, "And she was horrible at both, plain horrible."  Do you see that?

A   Yes.

Q   And Sophia, is that one of the former doctors in the
REI division?

A   Where?

Q   At Dartmouth Health?

A   Yes.

Q   Okay.  You knew what I was talking about, right, when I
said Sophia, right?

A   I was asking you to be specific, yes.

Q   But you knew exactly who I was talking about because
she was employed in the REI division with her husband
Neil, right, at some point?

A   Yes.

Q   And you had less than favorable things to say about
Sophia in this text string, correct?

A   Yes.

Q   Go to 945, just in your book, in the bigger book, and
not 945, Ray, but 946, Ray.  945 will show you the date
that I'm talking about.

THE COURT:  That's in C6, Mr. Schroeder.  I'm
sorry to interrupt you, I just want to be clear.

MR. SCHROEDER:  I agree with you, Your Honor.
I appreciate it.  Yes, C6, just -- take that page down.

Q   (By Mr. Schroeder) If you look in the book, so it's
April 5, 2017, right, on Porter 945, which is part of
C6.

Porter - Cross by Mr. Schroeder

A    I'm sorry, I'm losing you.  So --

MR. SCHROEDER:  May I approach, Your Honor?

THE COURT:  Yes.

Q    (By Mr. Schroeder) 945 is right in front of you.  This is the big group of documents, I'm not going to ask you about the big group of documents.

MR. SCHROEDER:  So the Court understands, it's C6, but we're going to refer to specific texts in C6-A.

THE WITNESS:  Yeah.

Q    (By Mr. Schroeder) So just clarifying on Porter 945 to your right, if you look to your right, Dr. Porter, the date there is April 5, 2017, right?

A    Correct.

Q    Okay.  If we go to 946 --

MR. SCHROEDER:  If you can bring that up on the screen, Ray.

Q    (By Mr. Schroeder) When I was having a discussion with you yesterday on your cross-examination, Dr. Porter, I had asked you about your interactions with Dr. Hsu and Seifer; do you remember that?

A    Correct.

Q    And I asked you about whether or not there was any in-fighting in the REI division, and you said no, there wasn't, right?

Porter - Cross by Mr. Schroeder

A   Correct.

Q   And that there were no personal issues in terms of in-fighting, right?

A   Correct.

Q   And you wouldn't characterize that as a conflict, right, no interpersonal conflict?

A   Correct.

Q   And you said -- when I said well -- I said, "Okay." And then I said, "Well, did you get along with Dr. Hsu and Seifer?" You said, "I got a long with them, yes," right?

A   Right.

Q   I want to ask you, a specific reference to what you were talking about with Lisa McGee. So we're still talking -- these are text messages between you and Lisa McGee in April of 2017, right, correct?

A   April 2017, correct.

Q   Okay. And you're talking about somebody taking boards named Jennifer?

A   Yes.

Q   And then -- was Dr. Hsu taking the board -- scheduled to take the board exams at that time?

A   I don't recall.

Q   Okay. But you say, regardless of whether he was or not, you say in response to Lisa McGee saying, "Not

Porter - Cross by Mr. Schroeder

sure whether Jenn has passed," you say, "Gives me hope Albert will fail," right?

A   Correct.

Q   And you were talking about him taking board exams, right?

A   Correct.

Q   Okay.  So he must have been scheduled at some point fairly soon to take the board exams, correct?

A   I don't recall.

Q   I would ask you to turn to Page 950, which is still on April 5th, 2017, still with Lisa McGee, and there's a conversation about some meeting coming up.  Do you see that, up top?

A   I'm sorry.  Where are you?

Q   I'm on Page 950, which is on the screen right in front of you, and it is still April 5th, 2017, with Lisa McGee.

     And what I'm asking you on this specific string of text messages --

A   Yeah.

Q   -- is -- there was some scheduled meeting with the various REI doctors at UVM Medical Center and Dartmouth Health, right?

A   I don't recall.

Q   Well, let's see if we can refresh your recollection.

Porter - Cross by Mr. Schroeder

So here you say, "Not certain how David and Albert were invited." You were referring to David Seifer and Albert Hsu, correct?

A   Correct.

Q   And then it's -- Lisa McGee says, "The cast may be different for the next one," and your response was, "But in the end, spending an entire day with them would be horrible." Now, you were referring to David Seifer and Albert Hsu, right?

A   I don't recall.

Q   Well, you don't recall, but just look at the line right below it. It says -- these are your words, right, you're in the dark text here?

A   Yes.

Q   Right? You say, "David is insane, and Albert is pompous," right?

A   Yes.

Q   Those are your words?

A   Those are my words.

Q   And then you say, "And not as bright as he thinks he is," right?

A   Yes.

Q   And then you say, "Hearing him pontificate about his research would be torture," right?

A   Correct.

Porter - Cross by Mr. Schroeder

Q   And when you say "research and torture," you were talking about Albert Hsu, correct?

A   I don't recall.

Q   Well, it's one of the two, though, right?  It's either David Seifer or Albert?

A   Most likely.

Q   Well, is there anybody else that it could be?

A   Yes, there were many people at that meeting.

Q   But in this specific string you literally are talking about David and Albert?

A   I presume.

Q   Well, you just talked about, in an earlier string message on the same day, with Lisa McGee that you hoped that Albert would fail his board exams, right?

A   That's what it says, right.

Q   Well, you said it, right?

A   It's in the text, yes.

Q   Okay.  All right.  We're almost done.

        955, please, if you could go to that page. Actually, 954, first.

        Now, you're texting with Lisa McGee a whole series of text messages on April 5th.  You've now got a series of text messages on April 13th.  And Lisa McGee, at the bottom of 954 -- and this is the subpart of -- it's one of the pages for C6-A, she says the following and I

Porter - Cross by Mr. Schroeder

just want to highlight this. "Hey, I remembered something Dottie told me today. There is a business plan position that is going before the workforce committee next week, it was Zahers which is why I didn't connect it while we were talking, but it is open rank and there is leeway to tweak it. I think if you come, we should shoot for professor. You have international presence now, but I have a lot to work out first to make things work. Do what you need to do but leave some time to come talk with us before you make any solid plans, and we don't know what could happen down your way either." Did I read that correctly?

A    I believe -- yes.

Q    Right. And so in April of 2017, is it fair to say that Lisa -- you were having discussions with Lisa McGee, at least exploratory, about potentially working at UVM Medical Center?

A    Yes.

Q    And this predates the actual closing a few weeks later of the REI division, correct?

A    Yes.

Q    Okay. And if you go to the next page, 955, at the top, you say, "I appreciate the follow-up, it sounds promising. We'll see what happens here, but your

Porter - Cross by Mr. Schroeder

suggestions are interesting."

So when you said it sounds promising, there was some potential for a position at UVM Medical Center in April of 2017 that you were at least exploring, right?

A   Correct.

Q   And you were exploring it because you knew that the REI division was likely to close, or at least the IVF program would be on pause or some combination of the two, right?

A   No.

Q   You didn't know that, but you were still dipping your toe in the water, if you will, for a potential new job?

A   No.

Q   You weren't?

A   No.

Q   Okay.  Well, let's go to 956.  And, by the way, so these dates are in -- that last one, 955, was still on April 13th.  And now we go to 956, if we could bring that up on the screen, and this is May 5th, 2017, so this is the day after you were notified of the REI division closing, right?

A   Correct.

Q   And you said -- this is Lisa McGee, not you, Lisa McGee says to you, "Hi, Misty.  I spoke with Ira this morning --" and by the way, Ira is Ira Bernstein?

Porter - Cross by Mr. Schroeder

A   Correct.

Q   And in that time period, in May of 2017, what was his position?

A   He was chair of OB-GYN.

Q   Chair of OB-GYN of UVM Medical Center?

A   Correct.

Q   Okay.  And she says, "Hi, Misty.  I spoke with Ira this morning, and he agreed."  Now, I'm assuming that's the same Ira, right?

A   Yes.

Q   Okay.  "If you want it, we can do a per diem arrangement pretty quickly for June.  This could give you some breathing room to have time to think things through and make longer term decisions.  It could start later too.  No strings attached to longer term, so you could still take the Boston option if it suits your needs better.  We are here for you."  Did I read that correctly?

A   Correct.

Q   Okay.  So the day after the REI division closure is announced to you and Albert Hsu and David Seifer, because you're all being terminated, you're having a text string with Dr. McGee about a potential position immediately, almost immediately with UVM Medical Center, right?

Porter - Cross by Mr. Schroeder

A   Correct.

Q   And, in fact, even though your announcement -- the announcement of the division closure was May 4th, you were -- your employment would not terminate until June 3rd at Dartmouth Health, right?

A   Correct.

Q   Okay.  And she also mentioned here "you could still take the Boston option."  So were you also looking at another option at another program during that time frame?

A   No.

Q   So do you know what she's talking about here?

A   No.

Q   No idea?

A   No idea.

Q   Okay.  "No strings attached for longer term so you could still take the Boston option if it suits your needs better."  And you have no idea what she's talking about?

A   No.

Q   And you traded lots of text messages in this time period with Lisa McGee, and you still have no idea?

A   Correct.

            MR. SCHROEDER:  If I may have a minute to talk to my co-counsel, Your Honor?

Porter - Cross by Mr. Schroeder

THE COURT:  Yes.

MR. SCHROEDER:  I have nothing further at this time, Your Honor.

We will ensure that C6-A has the relevant pages that were published to the jury.

THE COURT:  All right.  Thank you.

MR. SCHROEDER:  Thank you.

THE COURT:  Mr. Vitt.

MR. VITT:  Thank you.  Your Honor, when Dr. Porter was on the stand before, we sought to introduce into evidence Exhibit 123, which is the May 25 -- sorry.  June 3, 2016, letter to Dr. Seifer regarding Albert Hsu, and the concern was that there was a cover e-mail directing who that letter went to that we didn't have.  I now have that cover e-mail, and we've marked that full set as 123-A, and I'm hoping we can now get that admitted into evidence.

THE COURT:  Okay.  Is there any objection?

MR. SCHROEDER:  No objection.  If I could have a full copy of that, that would be great.

THE COURT:  Of course.

MR. SCHROEDER:  I would just like to see it.

MR. VITT:  Oh, here.

MR. SCHROEDER:  Thank you.

THE COURT:  So then Plaintiff's Exhibit 123-A

Porter - Cross by Mr. Schroeder

is admitted.

MR. VITT:  May I approach the witness?

THE COURT:  Yes.

**REDIRECT EXAMINATION**

**BY MR. VITT:**

Q   Misty, I've given you what's been marked as Exhibit 123-A.  Why did you write that letter?

A   Dr. Seifer asked me if I would write an assessment for Albert, and it turns out that Leslie DeMars had instructed him to ask me.

Q   When you returned from your disability, what did Leslie DeMars ask you to fix?

A   Oh, a whole host of things she asked me to fix.  In part, there were several patients who had very poor outcomes with their IVF, and there were several patients who had requested reimbursement and/or had errors in Albert's management of their IVF, and they were requesting financial remuneration, meaning free cycles of IVF, and/or threatening lawsuit through risk management, and she decided to provide those free IVF cycles and asked me to take those patients specifically.

Q   Did you do that?

A   I did.

Q   Things work out all right?

A   Yes.

Q   Okay.  When you wrote that letter, was that a current assessment of Dr. Hsu?

A   Yes.

Q   And your evaluation of him was current as of that date, correct?

A   Correct.

Q   There's been mention of Elizabeth Todd.  Who was she?

A   She was the nurse practitioner that I worked very closely with in REI and in general GYN.  She was on service for 15, 16 years, something like that.

Q   Had you worked with her for that period of time?

A   Yes, very closely.

Q   You were asked earlier in your examination whether Elizabeth Todd had a dual appointment in the OB-GYN department at the time of closure of the REI division.  Did she have a dual appointment as you understood the term?

A   Not as I understood it, no.

Q   Do you have a dual appointment?  Do you have a dual appointment?

A   In my current job?

Q   I'm sorry.  When you were at Dartmouth Health in the REI division --

A   Yes, I had a dual appointment.

Porter - Redirect by Mr. Vitt

Q   What was the dual appointment in?

A   In OB-GYN and in radiology.

Q   All right.  What happened to Elizabeth Todd when the REI division was closed?

A   She was retained to work in OB-GYN.

Q   So she was essentially reassigned over to OB-GYN?

A   She was retained within the department, yes.

Q   All right.  I want to turn to Defendants' B2.

MR. VITT:  May I approach the witness, Your Honor?

THE COURT:  Yes.

MR. SCHROEDER:  Mr. Vitt, could you tell me the number?  I didn't hear your number.

MR. VITT:  B2.  B, as in boy, 2.

MR. SCHROEDER:  Thanks.

Q   (By Mr. Vitt) Could you turn to the third page, please.  Who asked you to write that document?

A   Leslie DeMars.

Q   And was that part of a formal review?

A   Yes.

Q   If you go to the end of that, there were a number of persons who were asked to comment or provide a review, correct?

A   Correct.

Q   Basically, everyone in the REI division?

Porter - Redirect by Mr. Vitt

A   The majority of the individuals in the REI division.

Q   And that's at the bottom of Page 2, correct?

A   Correct.

Q   So this evaluation didn't come out of the Value Institute at all, did it?

A   No.

Q   It was a response that was directed initially to the whole department?

A   To the majority of the individuals.

Q   All right.  Would you read, please, for me at the bottom of Page 1 starting "there is not enough IVF work in DHMC"?

A   "There is not enough IVF at DHMC nor has there ever been, despite heavy efforts in marketing and outreach, for many providers within RE to focus only on IVF.  I had conversations with him during his interview last winter before he started at DHMC."

Q   Who is the him?

A   David Seifer.

Q   Why is this a problem for him?

MR. SCHROEDER:  Objection, Your Honor.  Calling for getting into the mind of Dr. Seifer.

THE COURT:  Sustained.  I'll ask you to rephrase the question, Mr. Vitt.

MR. VITT:  Sure.

Porter - Redirect by Mr. Vitt

Q    (By Mr. Vitt) Was there sufficient IVF work within the REI division for Dr. Seifer?

A    No.

Q    Why not?

A    Dr. Seifer could not do a basic infertility evaluation, complete it himself.  REI is a very broad subject matter for subspecialty.  It -- the IVF itself is an important but small section of what REI does, and there was not enough work to do only IVF consultation, which is what he was able to do within his scope of practice.

Q    What percentage of the infertility work was actually limited to IVF?

A    About 10 to 20 percent, in my -- my view, yes.

Q    What percentage of the work that you did within the REI division had to do with IVF?

A    10 to 15 percent.

Q    All right.  Is there a problem conflating REI and infertility?

A    Absolutely.  REI is a very global subject, you know, from pediatrics all the way through menopause, hormonal issues, microsurgery, surgery, you know, consultative for contraception, et cetera.  And IVF is that small portion of it.

Q    You stated yesterday that you wanted to give the context of the e-mail that Mr. Schroeder didn't want

Porter - Redirect by Mr. Vitt

you to.  What else would you like to add --

MR. SCHROEDER:  Objection, Your Honor.

THE COURT:  Sustained.

MR. SCHROEDER:  Come on.

Q   (By Mr. Vitt) Well, what's the context of the e-mail?

A   This one?

Q   Yes, the one you have there.

A   Yeah.  This was a confidential review that Leslie DeMars asked of the majority of the REI division in response to ongoing evaluations and performance reviews of Dr. Seifer.

Q   So I'm going to --

MR. VITT:  May I approach the witness?

THE COURT:  Yes.

Q   (By Mr. Vitt) I'm going to hand you what's been -- it's Defendants' Exhibit A10.  I think it's been admitted.

MR. SCHROEDER:  A10?

THE COURT:  It has been admitted.

MR. SCHROEDER:  As has B2.

Q   (By Mr. Vitt) Could you read out loud the last paragraph starting with "I have knowledge that the restrictions" --

A   "I have knowledge that the restrictions from working at DHMC can be waived, and have been in the past, specifically with ultrasound techs.  To this end, I

Porter - Redirect by Mr. Vitt

would encourage that we pursue this with HR and make plans to have continuity for the service matters and commit to our patients.  We can provide the most consistent care available to us."

MR. SCHROEDER:  Objection, Your Honor, just -- the document was admitted, but this is beyond the scope of the cross.  I did not get into this subject, not that it's relevant.

THE COURT:  Overruled.

Q    (By Mr. Vitt) Did you have thoughts about how the REI division should handle the nursing shortage?

A    Yes.

Q    And what were they?

A    The thoughts that I had were that we had, for many years, had a single IVF nurse coordinator, and that we functioned in the context of a major medical center and had resources that we were able to provide the patients for consistency of care.  And, in fact, we had Nurse Mary Martin from same-day, who wanted to do more work with us, and had asked to do more work with us, and had met with Dr. Merrens shortly after the closure to explain, and she told me that directly.

Also, there was the opportunity to bring Sharon Parent back, and she was willing to do that, and I was aware that both in the OR and in ultrasound that while

Porter - Redirect by Mr. Vitt

there was this waiting period for pension and retirement, there had been letters written, and there were several individuals who were allowed to come back within that three-month period, and I knew that an ultrasound tech, Sheila Foote, was able to come back in that time frame to provide that care when it was considered a critical shortage.

Q   I'm going to show you what's been marked as Plaintiff's Exhibit 86.

MR. VITT:  Approach the witness, Your Honor?

Q   (By Mr. Vitt) The first two sentences of that first paragraph were read to you yesterday during your exam. Could you read the remainder of that first paragraph?

A   "However, many of us were totally shocked, and unprepared for your decision to terminate Misty Porter. Misty has been here -- has been her entire career here and has developed an active gynecologic practice in addition to her infertility practice."

Q   Thank you.  And I'm going to show you Defendants' B12. It's an eight-page document.  Yesterday, you were asked if you referred in that document to alleged disability discrimination, and I think there was a place you wanted to refer to.

MR. SCHROEDER:  Objection, Your Honor. Overly leading.

Porter - Redirect by Mr. Vitt

THE COURT:  Sustained.

Q   (By Mr. Vitt) In that letter, do you believe that you provided to Dartmouth-Hitchcock a reference to the claims that you may have against the hospital?

A   Yes.

Q   Where?

A   B12(006).

Q   Can you read it, please?

A   "The termination of my employment will impact my recovery from the debilitating condition I suffered last year.  Despite the disability from which I am currently suffering, I have been working diligently to a full recovery of my clinical responsibility at DH since the onset of my illness in November 2015.  At that time, I received notice -- at the time that I received notice of my termination of my employment, less than 10 to 20 percent of the 20 hours a week I had been working have been dedicated to the performance of infertility and IVF with 60 to 70 percent of my time dedicated to the performance of gynecologic ultrasound and procedures and the remainder complex REI consults, complex benign gynecology, and gynecologic surgical consults."

THE COURT:  Mr. Vitt, this is not an admitted exhibit.  I don't know if you're aware of that.

Porter - Redirect by Mr. Vitt

Q    (By Mr. Vitt) Can I see the letter a second?

          MR. VITT:  I would like to move its admission; it hasn't been admitted.

          THE COURT:  Is there any objection?  B12?

          MR. SCHROEDER:  No objection, Your Honor.

          THE COURT:  Okay.  Defendants' B12 is admitted.

          MR. VITT:  Thank you, Your Honor.

Q    (By Mr. Vitt) One last thing on this letter.  If you could go to Page 7 at the bottom.  The sentence at the bottom, could you read that, please?

A    "If Dartmouth-Hitchcock decides not to reconsider the termination decision, I will be in touch about my rights as a member and under federal and state law."

Q    Thank you.

          MR. VITT:  No further questions, Judge.

          THE COURT:  Okay.  Thank you.  Any recross?

          MR. SCHROEDER:  Just one minute, Your Honor?

          THE COURT:  Yes.

                    **RECROSS-EXAMINATION**

**BY MR. SCHROEDER:**

Q    Just very specific questions related to the redirect from Mr. Vitt, Dr. Porter.

     You're not aware of any litigation involving any of the care that Dr. Hsu or Dr. Seifer provided while

Porter - Recross by Mr. Schroeder

they were employed by Dartmouth Health, right?

MR. VITT:  Objection.  It's beyond the --

MR. SCHROEDER:  You asked -- may I be heard?

THE COURT:  Overruled.  Go ahead.

MR. SCHROEDER:  Thank you.

Q   (By Mr. Schroeder) You're not aware of any litigation brought by anyone against Dartmouth Health related to the care by Dr. Hsu or Seifer?

A   I am not aware, no.

Q   And with respect to Ms. Todd, she had similar concerns as you relating to Dr. Hsu and Seifer, correct?

A   Yes.

Q   Right.  She had complaints about them, correct?

A   Correct.

Q   And she -- despite those complaints -- and those complaints happened in 2017, correct?

A   Correct.

Q   And despite those complaints, she was retained by Dartmouth Health as a nurse practitioner, right?

A   Correct.

MR. SCHROEDER:  Thank you.

MR. VITT:  Nothing further.

THE COURT:  Thank you, Dr. Porter.  You may step down.

Okay.  So we are going to break here today, as I

mentioned, earlier, an early break today at 2:00.  So you are free to go.  Thank you.  And, again, reminder: Please don't talk to anyone about the case or research the case or try and gain any knowledge about the case on your own.  Okay?  Thank you.

(Jury exits.)

THE COURT:  Okay.  So, Mr. Vitt, I'm sorry I broke up your examination.  B12 was admitted.  It was admitted.  I was informed by the deputy clerk after I took it upon myself to say it wasn't.  So my apologies.

MR. SCHROEDER:  I think it's No. 4, Your Honor.

THE COURT:  No. 4.

MR. SCHROEDER:  No.  Your Honor, it's B12.  No. 4 as the exhibit.  Okay.  I'm going off my internal list, Judge.

THE COURT:  Okay.  All right.

So as far as tomorrow goes, then, who is in the lineup for witnesses?

MR. JONES:  I believe this is the lineup for tomorrow.  Jenice Gonyea, Vicki Maxfield, Karen George, Maria Padin, Bob Bancroft, and time permitting, but highly unlikely, Barry Smith.

THE COURT:  Okay.  So we'll begin with Dr. Bancroft, of course.  Right?

MR. SCHROEDER:  Just on that point, if I may?

THE COURT:  Yes.

MR. SCHROEDER:  Are you telling me that Jenice Gonyea, Victoria Maxfield, and Karen George all have to go before Dr. Padin?

MR. JONES:  It's my understanding of their schedules.

MR. SCHROEDER:  Well, I'm going to ask them that.  I mean, we have her as subpoenaed tomorrow.  Putting her fourth in the slot is not an effort to move things along.

MR. JONES:  Our expectations of the first three witnesses is that they will not be time-consuming witnesses.  I would not be surprised if Dr. Padin was on before lunch, no later than 1:00.  I already gave you my commitment that she would be on and off tomorrow.

MR. SCHROEDER:  Okay.  Thank you.

THE COURT:  Okay.  Anything else to take up at this time?  Nothing from Plaintiff.

MR. SCHROEDER:  Nothing, Your Honor.

MR. VITT:  Nothing.

THE COURT:  All right.  Then we'll see you at nine tomorrow.

(Court at recess for the day.)

CERTIFICATE


        I, Jan-Marie Glaze, RPR, CRR, Pro-Tem Court

Reporter for the United States District Court for the

District of Vermont at Burlington, do hereby certify that I

was present in court during the foregoing matter and

reported said proceedings stenographically.


        I further certify that thereafter, I have caused

said stenographic notes to be transcribed under my direction

and that the foregoing pages are a true and accurate

transcription to the best of my ability.


                                    _____
                                    JAN-MARIE GLAZE
                                    COURT REPORTER