UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, MD,      )
                                  )
              Plaintiff,          )
        v.                        )   2:17-CV-194
                                  )
DARTMOUTH-HITCHCOCK MEDICAL       )
CENTER, DARTMOUTH-HITCHCOCK       )   March 28, 2025
CLINIC, MARY HITCHCOCK MEMORIAL   )
HOSPITAL, and                     )
DARTMOUTH-HITCHCOCK HEALTH,       )
                                  )
              Defendants.         )
                                  )

_____

BEFORE THE HONORABLE KEVIN DOYLE
UNITED STATES DISTRICT JUDGE

_____

TRIAL

VOLUME 5   Pages 788 to 981

APPEARANCES:

For the Plaintiff:

ERIC JONES
GEOFFREY J. VITT
SARAH H. NUNAN


For the Defendants:

DONALD W. SCHROEDER
MORGAN McDONALD
TRISTRAM J. COFFIN


Jan-Marie Glaze, CCR, RPR, CRR      Certified Court Reporter

**TABLE OF CONTENTS**

**EXAMINATION INDEX**

**Witness:**                                                      **Page**

**Jenice Gonyea:**
    Direct Examination By Ms. Nunan            792
    Cross Examination By Mr. Coffin            802
    Redirect Examination By Ms. Nunan          817
    Recross Examination By Mr. Coffin          817

**Victoria Maxfield:**
    Direct Examination By Ms. Nunan            819
    Cross Examination By Mr. Schroeder         831

**Karen George:**
    Direct Examination By Ms. Nunan            848
    Cross Examination By Mr. Coffin            862

**Maria Padin:**
    Direct Examination By Mr. Jones            883

**Robert Bancroft:**
    Direct Examination By Mr. Vitt             929
    Voir Dire By Mr. Vitt                      953

**EXHIBITS**

**Exhibit No.**                                        **Page Admitted**

Exhibit No. 3                                            890
Exhibit No. 6                                            896
Exhibit No. 15                                           906
Exhibit No. 16                                           909
Exhibit No. 83                                           819
Exhibit No. 96                                           924

Friday, March 28th, 2025

Morning Session

* * *

THE COURT:  Good morning.  Just very briefly, a couple of things to take up with you.  Yesterday, not a lot of use was made of the screens for admitted exhibits.  That may be your choice but just wanted to remind you that admitted exhibits, of course, you can ask the deputy clerk to place those on the screens for the jury to see.  Your choice, of course, how you choose to do that.

Also just -- I'll call it a gentle reminder not to have audible reactions to rulings on objections.  That happened at least once yesterday in front of the jury, an expression of frustration, so I ask that you be mindful of that.

And there was an exhibit yesterday you may recall I think it was on cross-examination of Dr. Porter, a series of text messages, and there was what I would call PII in there since the patient was identified.  I think everyone is aware of this, but just a reminder that a redaction was going to be made, so let's not forget that.

And that's all I have at this time.  Anything from the parties at this point?

MR. VITT:  No, Your Honor.

MR. SCHROEDER:  No, Your Honor.

THE COURT:  Okay.  So the agreement, with respect to Dr. Bancroft, just want to be clear on this, so the chart, based on the conversation yesterday morning is something that there's no objection to that being used at least as a demonstrative for purposes of today.  Mr. Coffin?

MR. COFFIN:  Yes, and the assumptions and the assumptions underlying it, Your Honor, but not the underlying report portion.

MR. VITT:  The answer is yes.

THE COURT:  So the assumptions also are okay between the parties.  Okay.  All right.  Thank you.  Then we'll bring the jury in.

(Jury present.)

THE CLERK:  Your Honor, the matter before the Court is Case No. 17-CV-194, Misty Blanchette Porter vs. Dartmouth-Hitchcock Medical Center, et al.  Present on behalf of Plaintiff are attorneys Geoffrey Vitt, Eric Jones, and Sarah Nunan.  Present for the defendants are attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We're here for Day 5 of the jury trial.

THE COURT:  Good morning.  Has anyone spoken

to you about the case since we left yesterday?  Have you heard any information about this case outside of the courtroom?  Okay.  Seeing no hands raised, the plaintiff may proceed with its next witness.

So I'll ask you announce your next witness.

MS. NUNAN:  Yes.  The next witness is Jenice Gonyea.

THE CLERK:  Before you're seated, if you would raise your right hand, please?

**Jenice Gonyea**, witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you.  You may have a seat. If you could just state and spell your name please, once seated.

THE WITNESS:  Hi.  I'm Jenice Gonyea. J-e-n-i-c-e G-o-n-y-e-a.

**DIRECT EXAMINATION**

BY MS. NUNAN:

Q    Good morning.

A    Good morning.

Q    Are you currently employed at Dartmouth-Hitchcock?

A    I am.

Q    What is your role there?

A    I'm a sonographer.

Q    Which department do you work for?

A    I work for ultrasound.

Q    Is that in the radiology department?

A    It is.  Yeah.  It's a subset of radiology.

Q    When did you start at Dartmouth-Hitchcock?

A    I started at Dartmouth-Hitchcock in 2001.

Q    And how would you describe your job as a sonographer?

A    I love my job.  I've been doing it, I don't even know, 25-plus years.  It's a career that I'm well suited for, and I love my job, and I love Dartmouth.

Q    Can you tell me some of the things that you do as a sonographer?

A    As a sonographer, it's ultrasound.  I scan abdominal ultrasound as well as OB-GYN ultrasound.

Q    Where do you take these images?

A    I take them in two different places.  We have a hospital setting at Level 3 where we scan abdominal ultrasound, and then we have an OB-GYN clinic in a different part of the hospital that I scan specifically OB-GYN.

Q    Do you ever go to the OR?

A    I do.

Q    Procedure room?

A    Yes.

Gonyea - Direct by Ms. Nunan

Q   How long have you known Dr. Misty Porter?

A   I've known Dr. Porter the entire time.  She was actually one of the physicians that I interviewed with upon being hired.

Q   And so what's the time span that you worked with Dr. Porter?

A   The whole time that she was there from the minute I started in June of 2001.

Q   Until --

A   Until the program ended.

Q   And during that time frame, how many days a week were you working with her?

A   I worked with her one and a half days a week every week.

Q   Okay.  And the same -- were you working on the same thing during those time periods, or was there different areas?

A   Well, I mean, occasionally, she would ask our assistance in the OR.  So, occasionally, I would scan for her, do ultrasound as she did her OR, for guidance, and then I worked with her exclusively in the OB-GYN clinic doing procedures and transvaginal ultrasounds for her.

Q   How would you describe Dr. Porter's ultrasound capabilities compared to others in the radiology

Gonyea - Direct by Ms. Nunan

department?

A    Dr. Porter is the single most amazing physician I've ever had the opportunity to work with.  Her skill is unmatched.  She was -- I've learned so much from my craft from what she has taught me.  If I had questions from my scan, she would go through OR notes and describe to me what she had done in the OR and what I was seeing under ultrasound, and that just changes you in your career in your knowledge base and what you have, and I have since taught others that same knowledge.

Q    How would you describe Dr. Porter as a colleague?

A    She's wonderful.  She's supportive.  She is -- feels -- you could approach her with any question that you have.  She would take time to answer them and explain things.

Q    She was pretty busy.  Could she be brusk at times?

A    She was very busy.  Her procedure time was 30 minutes, and that included changing the patient, doing the procedure.  So she was very, very busy.  I don't think she was ever abrupt, no, I don't.

Q    I would like to switch topics and talk about when Dr. Hsu first started at DHMC.  When did you start working with Dr. Hsu?

A    I started working with Dr. Hsu as soon as he started working in ultrasound with clinics and as he was

Gonyea - Direct by Ms. Nunan

training to do clinic as well, because he was a physician that would work with us.

Q  And how would you describe his skills when he first started?

A  I mean, he was a fresh -- he was a new grad, so his skills, you know, were not very good because when you start, you just don't know as much.

Q  How uncommon is that for people to come out of programs and not be --

A  I mean, it's not terribly uncommon, but maybe his skill was less than most in the beginning.

Q  And how did Dr. Hsu progress over the course of that first year?

A  He did not.  He was the same in the procedures as his first day that he was training with Dr. Porter.

Q  And how is this different from your experience as a sonographer up to that point?

A  Most physicians, after a couple of times doing procedures, become very comfortable with them.  You know, these are all procedures they've done through their residency in medical school, so they come with a base knowledge anyway.  So, you know, usually even one session in the clinic, they're able to perform their own clinics on their own.

Q  In general, how comfortable were you with doing

Gonyea - Direct by Ms. Nunan

procedures with Dr. Hsu as time progressed?

A    As a sonographer, I always dreaded working with Dr. Hsu. He needed a lot of mentorship that most physicians do not need from us.

Q    How did that present itself?

A    Um...

Q    So would he ask you questions?

A    Oh, yeah. He asked questions. The -- sorry.

Q    That's okay. We're all nervous. It's not a problem.

A    This is not an easy thing to do.

Q    It's okay. I understand that.

Why don't we go on to the incident in which there was no consent. Can you tell me what happened to the point that you felt you need to report Dr. Hsu?

A    So I worked with a case with Dr. Hsu where I brought a patient in the room and identified the patient's name, had her change, we were doing what's called a sonohysterogram, which is where we put some saline inside the uterus to look at the cavity, brought Dr. Hsu in. He did the sonohysterogram. And then after the sonohysterogram, I heard him shaking a tube which would signal to me that we were going to do a different study, a tubal study, called a hycosy. And I told him that this is an SHG only to give him the clue that we were not doing any other study; this was the

only study, and we had already performed it, and he proceeded to do the tubal study on the patient anyway.

Q    Okay.  I would like to unpack that a little.

A    Yeah.

Q    Okay.  So when a patient has to have a procedure, what is the written documentation for that single procedure?

A    So when we have an order to do a study on a patient, we do that study on a patient.  In this case, it was a sonohysterogram.  When we do tubal studies, we always do a sonohysterogram first, because we look at the cavity, and then we do the tubal study second.

In this case, this patient came in for a tubal history only -- sorry, a sonohysterogram only, not a tubal study, and I informed him, and he proceeded to do it anyway.

Q    Sure.  So the sonohysterogram, would that be for the purposes of infertility?

A    Sometimes.  We can do sonohysterogram for all different reasons.  We can do a sonohysterograms on a post-menopausal patient just to look for if there's anything in her cavity that's making her bleed.  We can do sonohysterograms for multiple reasons.  We don't just do them with tubal studies.  And those orders are specific.  Like, when a physician orders a study, we have a specific study that we do, and that's it.  So

Q  for our purposes, we can't decide to do other studies. We have to do what's ordered on a patient.

Q  So is it possible that Dr. Hsu had gotten consent without you being aware of it or in the room?

A  That is impossible.  I'm with the patient the whole time.  I room the patient.  We walk in together.  He leaves, and I exit the patient.

Q  Did you approach and say something?  What did you say to Dr. Hsu after the procedure?

A  I was very, very upset after the procedure, and I explained to him that it was not okay to do a tubal study on a patient when it's not ordered; that we only can bill and do the study that's ordered.

Q  What's the other issue at play when you do a procedure with --

A  It's fraud.  So it may seem odd, but it's illegal to under bill just as illegal to over bill.  So if we are billing this patient for a sonohysterogram, whether or not she could benefit from the tubal study, it's -- we can't do it, and he didn't seem to understand that. And so I had to go above him and approach my supervisor and tell my supervisor, Dennis Seguin, about this because he just -- even after explaining it, he didn't understand that that was wrong.

Q  How would you describe patient consent in the medical

Gonyea - Direct by Ms. Nunan

field?

A   Patient consent, before we do anything, anything at all on a patient, we fully explain to the patient what we're doing.  And, in this case, we only explained to the patient that we're doing a sonohysterogram because that was the only study that was ordered.

Q   So you said that you went to your supervisor, Dennis Seguin?

A   Yes.

Q   Did you speak to anybody else about it?

A   I did.  I spoke to a couple different people in OB-GYN including Dr. Porter.

Q   And what did you tell her?

A   I told Dr. Porter the story I just told you.  She being the IVF coordinator, would possibly be able to help him understand what we did was wrong and if any other action needed to be taken at that point.

Q   Who else did you talk to?

A   Beth Todd.  There could have been other people.  I was very, very upset, and I needed people to know that this is a wrong -- this was wrong.

Q   Do you know if anybody that you reported to reported it further up the chain?

A   I mean, Dennis Seguin, my boss, is very, very good at documentation and reporting it, yes.

Gonyea - Direct by Ms. Nunan

Q    Did that ever happen again with Dr. Hsu?

A    I think it happened more than once.  This one time, I remember crystal clear, so that's all I can -- I can attest to.  I am positive it happened more than once in different ways, but this I remember clearly.

Q    Fair.  So I would like to go back to -- there were other things in the ultrasound reading room.  How would you say that Dr. Hsu occasionally asked you questions that were outside the scope of your practice?

A    So Dr. Hsu, on a particular day, was looking at an ultrasound, and asked me if he should take this patient to the OR, and I told Dr. Hsu, I'm not a physician, I'm not a surgeon, I have no idea.  I do ultrasound for a living.

It made me uncomfortable because physicians should not ask -- or colleagues should never ask someone to be out of their scope.  We practice what we practice.  I am very good at ultrasound.  If you ask me an ultrasound question, I can talk to you all day long about it, but I cannot speak to other things.  That's not my job.

MS. NUNAN:  Okay.  Can I have just a minute, please?

THE COURT:  Yes.

MS. NUNAN:  That's all I have.  Thank you.

Gonyea - Direct by Ms. Nunan

                    THE WITNESS:  Thank you.

                    THE COURT:  Okay.  Cross-examination.

                    MR. COFFIN:  Thank you, Your Honor.

                    **CROSS-EXAMINATION**

BY MR. COFFIN:

Q    Hello, Ms. Gonyea.  My name is Tris Coffin, I represent
     Dartmouth.  Nice to see you today.

A    Nice to see you.

Q    I'm going to move up to the podium here.

          So you've been doing ultrasounds as a sonographer
     since 2001?

A    At Dartmouth since 2001, and I was a sonographer also
     in Florida.

Q    Where were you in Florida?

A    In West Palm Beach.

Q    Okay.  How long were you doing your --

A    I was registered in '99.

Q    Okay.  And what type of hospital were you working in?

A    I was working at a Trauma 1 facility in Florida,
     St. Mary's.

Q    And from -- describe briefly your training before that
     please.

A    Before that?

Q    Mm-hm.

A    I went to ultrasound school at Broward Community

                    Gonyea - Cross by Mr. Coffin

College.

Q   And then went to -- what was the hospital called again?

A   St. Mary's Hospital in West Palm Beach.

Q   And you were there from when to when?

A   Well, I was an x-ray tech there first.

Q   Okay.

A   I -- it was probably '94.  I don't know the year that I graduated from x-ray school.

Q   Okay.

A   I think it was '94.  It was a long time ago.

Q   How long were you at the hospital in Florida for?

A   I was there the whole time as an x-ray tech, and as ultrasound tech, and then we moved here.

Q   What year did you move here?

A   2001.

Q   2001, right.  And you interviewed with Dr. Porter actually for that job; is that correct?

A   I did.

Q   So she had a hand in your being hired for that position that you're now in at Dartmouth?

A   Yes.

Q   And you're happy at Dartmouth?

A   I am very happy at Dartmouth.

Q   It sounds like you are relatively enthusiastic about it as an institution; is that fair to say?

Gonyea - Cross by Mr. Coffin

A    I am.

Q    Excellent hospital?

A    It is.

Q    Excellent radiology department?

A    Yes.

Q    With great sonographers like you as a key part of it, right?

A    Correct.

Q    Not to brag, but just to state where things are at, right.

A    Right.

Q    And you enjoyed working with Dr. Porter?

A    I did.

Q    Describe to me how you work as a sonographer with a physician in the OB-GYN.

A    In the procedure room?

Q    Yeah, just generally.  I guess I'll reference my own frame of reference which is attending sonographers with my wife for my kids.  The sonographer will typically do the sonogram, and then they may or may not have an OB-GYN physician in the room.  They sometimes would leave, when I was present with my wife, but I would assume they would be consulting with the doctor at that point.  And then either the doctor or they would come back and give a report on the sonogram.  Is that

basically what we're talking about?

A   Yeah, sometimes.

Q   Okay.

A   So if I'm doing just an ultrasound, I'll do an ultrasound on a patient, and then I'll go out and the physician and I will review the ultrasound, and then I'll let a patient go.  In a procedure, I -- the physician and I are in the room together at the same time.

Q   Okay.  All right.  And I'm going to talk about the procedures at issue.  But describe to me what you mean by a procedure, and what generally the roles are between you and the physician in those procedures.

A   So a procedure is, you know, in this case, an SHG or a tubal study, and in that case, the physician will insert a tube and instill saline, and I will ultrasound while they're doing that, live, with everybody in the room.

Q   Okay.  And by "ultrasound," that means putting the lubricant on, if that's the right word, the gel?

A   Yeah.

Q   And then taking the sensor and then, kind of, passing it over the relevant body part; is that right?

A   Correct.

Q   Okay.  And that's for an HSG (sic) you described;

Gonyea - Cross by Mr. Coffin

that's basically what is going on?

A    A sonogram -- a transvaginal ultrasound for an SHG?
Yes.

Q    Yes.  Okay.
The tubal study --

A    Yes.

Q    -- is there any other aspect of that that involves a differing interaction physically with the patient?

A    Well, I'm not exactly sure what you're asking with that.

Q    Well, does it -- does either the sonographer or the physician, to do the tubal study, the one that you said was not ordered in that incident that you were describing, does there have to be any additional physical manipulation of the patient, insertion of dye, or anything like that?

A    We don't insert dye, but they do take saline and inject micro air bubbles which is more uncomfortable to a patient than just a sonohysterogram.

Q    Okay.  So there is some additional physical interaction with the patient?

A    There is, correct.

Q    Now, if Dr. Hsu, as the attending physician, had concluded that this person needs this tubal study and had wanted to order that, could he have ordered it?

Gonyea - Cross by Mr. Coffin

A    While a patient is in the middle of a sonohysterogram, no. I don't believe he could. I mean, if he and the patient talked about it while in the middle of it, which most people can't tolerate talking while having this procedure.

Q    Let's leave the consent issue aside.

A    Okay.

Q    Would it be within his power, as the attending physician taking care of this patient, to order that test?

A    This particular case was an outside physician that ordered this test. I do not know if he, as a physician, has the right to do that or not.

Q    Okay. So fair to say you do not know whether his role as the attending physician taking care of this patient for Dartmouth would have the actual authority to order that or not, right?

A    Well, he --

Q    "Yes" or "no."

A    Well, he didn't change the billing, so I'm not understanding where your question is. I'm sorry.

Q    If you could please answer the question that I asked.

A    I'm trying.

Q    And then maybe it would be easier to follow.
         My question was: This test that was ordered, you,

in your role as the ultrasound sonographer, really don't know whether he had the authority, as the attending physician in OB-GYN for Dartmouth-Hitchcock, to order that test or not?

A   I do not know.

Q   Okay.  So if he had ordered this test and if it had been medically necessary for the patient in his judgment, this patient would have had to return another time to get the test if the consent wasn't obtained as you described, correct?

A   I do not know the answer to that.

Q   Okay.  But if you couldn't do the test that day, right -- answer verbally, please.

A   Yes.

Q   And if the test was required, right?

A   I guess.  I'm --

Q   Just answer the questions.

A   -- I'm unclear.

Q   If the test was required, assume that, you understand that?

A   Okay.

Q   And the patient would have to come back another day to be tested; isn't that right?

A   Yes.

Q   And isn't that sometimes an issue that's important in

Gonyea - Cross by Mr. Coffin

patient care, their follow-up and the convenience of
the patient?

A   Oh, of course.

Q   Now, Dr. Hsu -- did you ever talk with him about the
failure to have consent after this incident with him?

A   I did.

Q   When was that?

A   Right after.

Q   Okay.  Other than the conversation right after, did you
have any subsequent follow-up with him?

A   I did not.

Q   And it's common, isn't it, that even though these
physicians that you deal with come to you right out of,
you know, a lot of years of schooling, a lot of times,
they don't have that much actual real-life experience
in hospitals, right?

A   Yes.

Q   So it's not an uncommon role for you to spend educating
and bringing along the greener physicians; isn't that
right?

A   It is.

Q   And you have some understanding that that's an
important part of your process in a teaching hospital?

A   Of course, we're a teaching hospital.

Q   Exactly.

Gonyea - Cross by Mr. Coffin

Now, you describe working closely with Dr. Porter one and a half days a week over the time that you worked together --

A   Correct.

Q   -- in the REI division, correct?

A   Correct.

Q   But you were also doing ultrasounds for the general radiology practice?

A   Oh, all over the place, yes.

Q   And what portion of your practice was dedicated to the REI as opposed to other ultrasounds?

A   I don't know the actual number, but we had a clinic one day -- one and a half days a week, and we also came in the weekends to do embryo transfers.

Q   Okay.  And the balance of your workweek is spent doing ultrasounds for all kinds of activities, correct?

A   Correct.

Q   Many are for OB-GYN but not in the REI division; is that right?

A   Correct.

Q   Now, you talked to -- I want to see.

    You talked to Dennis Seguin about this right afterwards; is that correct?

A   I did.

Q   And you also spoke with Dr. Porter; is that correct?

Gonyea - Cross by Mr. Coffin

A    I did.

Q    And then I didn't quite understand the last name of the person you spoke to, Beth Todd?

A    Beth Todd, yeah.

Q    She was a nurse?

A    She's a nurse practitioner.

Q    Nurse practitioner, okay.

A    Yep.

Q    In the REI division at that time, right?

A    Correct.

Q    Got it.  When did this incident happen that you had this alleged failure to obtain the consent of the patient?

A    The exact day, I do not know.

Q    Year?

A    A year ago?  Oh, no.

Q    No.  What year was it?

A    I do not know.

Q    Can you put any time frame on it?

A    2017, '16.

Q    Okay.  So sometime 2017, 2016 is your, sort of, best guess?

A    Correct.

Q    And this interaction with Dr. Hsu when he was shaking the tube, and you said, Hey, what are you doing,

Gonyea - Cross by Mr. Coffin

there's not adequate consent for that, it looks like you're trying to do another procedure, how long is that interaction with him?

A   I mean, it was a few seconds.

Q   That's what I thought.  I was going to say, like, at most, 20 seconds?

A   Yeah.  I mean, it's not very long.

Q   Very brief.  Okay.

And you went and you talked to Dr. Porter for how long about this?

A   I do not know.  I mean probably 20 minutes.  I do not know.

Q   And you reported it to Dennis Seguin?

A   I did.

Q   And how long did you spend with him talking about it?

A   Probably equally as long, maybe half an hour.

Q   And how long did you talk to Beth Todd about it?

A   Probably pretty briefly.  I don't know.  I was visibly very upset.

Q   A few minutes?

A   Probably, yeah.

Q   And I think your testimony was that you could testify that this happened once with Dr. Hsu; is that right?

A   What I remember --

Q   Based on your knowledge?

Gonyea - Cross by Mr. Coffin

A   Yes.

Q   I want to be really clear about that.  What you're providing here today is your knowledge of this is a one-time incident, right?  "Yes" or "no"?

A   I can 100 percent remember this instance, so, yes.

Q   Now, have you talked with Dr. Porter after she left the REI?

A   I did not.  I have lost all contact with her.

Q   Lost all contact with her?

A   Yes.

Q   So you had been reconnected with them years later through the lawyers; is that right?

A   Yes.  Correct.

Q   And I think you said that Dennis Seguin was good about documenting and following up on issues that happen; is that correct?

A   Correct.

Q   Now, I gotta believe at a complex hospital anywhere, but Dartmouth included and UVM included, any complex hospital -- your hospital in Florida -- things happen, don't they?

A   Of course, mistakes happen all the time.

Q   And the important thing is that there is appropriate follow-up to address the mistake and correct the course and protect the patients; is that right?

Gonyea - Cross by Mr. Coffin

A   Correct, always.

Q   And that follow-up doesn't always mean one mistake and you're done; isn't that right?

A   I mean, I would not know.  I'm not in charge of following up what happens to people.

Q   Right.  But in your experience, I think you testified earlier, it's common for younger doctors to become good doctors to learn and you learn by doing, right?

A   Yeah.

Q   And once you start something, you aren't always perfect at it right out of the gate?

A   Correct.

Q   Doesn't mean it's an unreasonable patient safety concern, but it means there's always opportunities to improve your skills and learn; isn't that right?

A   Correct.

Q   There are processes for reporting problems at Dartmouth; isn't that right?

A   There are.

Q   And do you believe you complied with those processes in this situation?

A   I do.

Q   Right.  Because what you did sounds responsible.  You reported it to, kind of, the head of radiology, the non-physician staff; is that right?

Gonyea - Cross by Mr. Coffin

A    Correct.

Q    You also reported it to a physician that you trusted?

A    Correct.

Q    Right?

You went ahead and reported it to a nurse practitioner who was involved in the REI?

A    Yes.

Q    And your understanding was they were going to make, sort of, appropriate further-on reports commensurate with their responsibilities; isn't that right?

A    Correct.

Q    And at Dartmouth there's an anonymous hotline to make concerns known about things like patient safety or improper billing practices or medical procedures; isn't that right?

A    I mean, there is now, and I'm aware of them now.  I -- just it is very different than many years ago.

Q    Do you recall whether or not that existed?

A    I do not know if that -- I mean, it might have existed.  I do not know back then.

Q    Okay.  You don't happen to know.  If there was someone who said it did exist, doesn't sound like you would deny that?

A    No, of course not.

Q    Yeah.  But you didn't choose that route in this case;

Gonyea - Cross by Mr. Coffin

isn't that right?

A   I did not because I reported it publicly to my supervisor, so I did not feel the need to report it anonymously -- or it wouldn't make sense to me.

Q   Right.  Because you had reported it to the responsible authorities within the chain of treatment?

A   Yes.

Q   At Dartmouth-Hitchcock; is that right?

A   Correct.

Q   And you understood that it would be appropriately followed up on, whatever that was to mean; is that right?

A   I do.

Q   And what that follow-up was, was not really within your role as an awesome sonographer, right?

A   Not at all.

Q   But part of your role was to make sure that you let the decision makers know --

A   Yes.

Q   -- what the situation was so they could follow up as needed?

A   Correct.

Q   Okay.

              MR. COFFIN:  Just a second, Your Honor.

              THE COURT:  Yeah.

Gonyea - Cross by Mr. Coffin

MR. COFFIN:  If I may have a moment, please?

THE COURT:  Yes.

MR. COFFIN:  That's all, Your Honor.

THE COURT:  Okay.  Redirect, Ms. Nunan.

**REDIRECT EXAMINATION**

BY MS. NUNAN:

Q    Two more questions, and then you're done.

A    Okay.  Thanks.

Q    When you spoke to Dr. Hsu after the procedure, did he
     tell you he had consent?

A    He did not.

Q    How certain are you that Dr. Hsu performed that
     procedure without consent?

A    100 percent certain.  There was no possibility he could
     have gotten consent in the makeup of what we do.

Q    Thank you for your time.

A    You're welcome.

THE COURT:  Mr. Coffin?

MR. COFFIN:  Yeah.  Just very, very briefly,
Your Honor.

**RECROSS-EXAMINATION**

BY MR. COFFIN:

Q    Informed consent, do you understand that to be a legal
     construct?

A    I do.

MR. VITT:  Object -- I'm sorry.

MS. NUNAN:  Objection.

MR. COFFIN:  She's already answered, and it's based on her knowledge.

THE COURT:  Sustained -- excuse me, overruled.

MR. COFFIN:  Thank you.

Q    (By Mr. Coffin) And you really don't know whether or not Dr. Hsu complied with the legal requirements for obtaining informed consent, do you?

A    I'm not a lawyer; I would not know.

MR. COFFIN:  Thank you.

THE COURT:  Okay.  You may step down.

THE WITNESS:  Thank you.

THE COURT:  You can call the next witness.

MS. NUNAN:  The next witness is Vicki Maxfield.

THE CLERK:  Good morning, raise your right hand, please.

**Victoria Maxfield**, witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Thank you.  You may take a seat. If you could state and spell your name once seated,

Gonyea - Recross by Mr. Coffin

please.

THE WITNESS:  Victoria Maxfield, V-i-c-t-o-r-i-a M-a-x-f-i-e-l-d.

THE COURT:  Ms. Maxfield, I would ask you to lean into the microphone, please, so we can hear you. Please proceed.

### DIRECT EXAMINATION

BY MS. NUNAN:

Q    Good morning.

MS. NUNAN:  I'm going to offer Plaintiff's Exhibit 83 into evidence.

MR. SCHROEDER:  Give me a second, Sarah. No objection.

THE COURT:  No objection?

MR. SCHROEDER:  No objection.

THE COURT:  Okay.  Exhibit admitted.

MS. NUNAN:  May I approach the witness?

THE COURT:  Yes.

Q    (By Ms. Nunan) I'm going to hand you what's marked as Plaintiff's Exhibit 83.

MS. NUNAN:  Can we have the Elmo up?

Q    (By Ms. Nunan) Good morning, Ms. Maxfield.

A    Good morning.

Q    Are you currently employed at Dartmouth-Hitchcock?

A    I am.

Q    What is your role there?

A    I am a uro-gyn nurse coordinator.

Q    Okay.  Are you a registered nurse?

A    I am.

Q    And when did you start at Dartmouth-Hitchcock?

A    June of 2000.

Q    And which department do you work for?

A    OB-GYN.

Q    Can you tell me a little bit about the different roles you've played in OB-GYN since 2000?

A    I started out as an OB-GYN nurse triage, and then in 2008, I became the uro-gyn nurse coordinator for that division and also was charge nurse of Side 2 for a period of time.

Q    What is a charge nurse?

A    Just in charge of the floor staff on the floor.  I was in charge of any issues that would arise with patients or physicians.

Q    I would like you to take a look at this e-mail that's in front of us, Plaintiff's Exhibit 83.  The bottom of this e-mail, do you recognize that?  Do you recognize that as an e-mail you wrote?

A    Yes.

Q    Who is it written to?

A    Dr. Merrens.

Maxfield - Direct by Ms. Nunan

Q   Okay.  And at the top of the e-mail, is that an e-mail
that you received?

A   Yes.

Q   Okay.  From Dr. Merrens?

A   Yes.

Q   You said in the opening line, "Thank you for taking the
time and explaining the recent closing of the REI
division."  Did I read that correctly?

A   Yes.

Q   Okay.  When did Dr. Merrens take the time to explain
recent events?  What are you referring to?

A   He took the time -- it was shortly after the closure of
REI.  He met with the whole department.  The --
everybody.  The OB-GYN department, he met with all of
us.

Q   Where was that meeting held?

A   One of the auditoriums at Hitchcock.

Q   And approximately when was this meeting?

A   It had to be between closure and my -- between my
e-mail.

Q   Right.  So your e-mail is dated May 12th, 2017?

A   Yes.

Q   And the closure happened May 4th -- or it was announced
on May 4th.

A   Yes.

Maxfield - Direct by Ms. Nunan

Q    So sometime in that time frame?

A    Yes.

Q    Okay.  Great.  And so you believe that there were --
the entire OB-GYN department was there?

A    Correct.

Q    Okay.  And can you kind of name the different people
who made up the OB-GYN department that attended?

A    It would be providers, the nursing staff, low staff,
secretaries, management, it would be all of us.

Q    When you say "providers," does that mean doctors and
nurse practitioners and physician's assistants?

A    Correct, except we do not have any PAs in our
department.

Q    And who spoke at this meeting?

A    Dr. Merrens.

Q    All right.  I would like you to read the paragraph that
starts with, "I have been employed here in the OB-GYN
clinic."  Could you please read that whole paragraph
for us?

A    "I have been employed in the OB-GYN clinic up to 18
years, and in the past eight years being the nurse
coordinator for the uro-gyn and charge nurse.  I have
known Dr. Porter for the past 18 years, but during the
past five to six years, I have also been her GYN
surgical nurse taking care of all of her post-op

Maxfield - Direct by Ms. Nunan

patients due to staffing issues in REI.  Working with Dr. Porter has been an honor.  She also expressed appreciation for assisting her in the care of her patients.  Her expertise in gynecologic ultrasounds, myomectomies, hysteroscopies, and GYN surgeries provide a level of care to women that is not available from other members of the gynecology staff.  She also provides reproductive endocrinology expertise separate from infertility.  Dr. Porter has been a part of us for over 20 years, and her skills in REI and GYN will be missed."

Q    When did you first meet Dr. Porter?

A    When I first started back in 2000.

Q    And was there a period of time -- where was your office for a period of time?

A    When I -- we moved, we were at 5B, and then we moved to the new building in 5L, and then when I became the nurse coordinator for uro-gyn, my office was in the same hallway as the other nurses in REI, and my office was right beside Sharon Parent's.

Q    Got it.  So for a while, your office was in the REI division?

A    Yes.

Q    So you saw a lot of Dr. Porter during that time period?

A    Yes.

Maxfield - Direct by Ms. Nunan

Q   In this sentence -- the paragraph that you just read to us, what did you mean when you wrote, "I have been her GYN surgical nurse"?  Would you please explain that?

A   So Dr. Porter didn't just do infertility.  She had GYN patients and of the surgical patients that she did, I followed her patients.  So patients who stayed overnight, the next day I would go visit, do discharge instructions, and then we would -- our criteria was then to do a post-op phone call the day after their discharge, and then I would follow them up until their hospital check with Dr. Porter, and if they had questions, concerns, the phone calls would be directed to me.

Q   Okay.  So how much back-and-forth was there with Dr. Porter while you were working on her cases?

A   We always had direct care.  After her surgeries, she would give me an update with the patient, if there was any complications or not.  Sometimes we would go over the same day to see the patients, then she would go see her others, and I would stay to follow through.  We were always in contact, as they were our patients.  So if I had any issues, I would go directly to Dr. Porter.

Q   And you reference in this paragraph that there were staffing issues in REI.  How were there staffing issues?

Maxfield - Direct by Ms. Nunan

A    It was the volume that the nurses had for them to take on the GYN patients was a lot because they had worked so much with the infertility that that's where I came in to help support them in the GYN, surgical patients.

We started this whole regime of the visiting patients and post-op phone calls, and it was a positive effect with the uro-gyn department, and Dr. Porter felt it would be beneficial for her patients too, and that's where we started this whole regime of having the post-op phone calls and visits and stuff.

Q    Great.  So you were one of the nurses that wasn't specifically involved with the REI infertility cycle care?

A    No.

Q    That wasn't your role?

A    No.

Q    But you were working with her?

A    Yes.

Q    And you stated that working with Dr. Porter was an honor.  Why?

A    She was an excellent surgeon.  And I have surgeons now that -- I'm very honored to work with all my surgeons, and she was one of them.  She gave good care to her patients.  She was always approachable.  I look up to working with her.

Maxfield - Direct by Ms. Nunan

Q    She was a team player?

A    Absolutely.

Q    How would you describe her style or her standards?

A    She was a straight shooter.  I am too.  She respected me, respected my care for the patients, so we worked well together, and she was always very approachable, and would listen thoroughly to if I had any issues with a patient and my direction to what I would do, she would give me.

Q    How did you witness other OB-GYN generalists use Dr. Porter's expertise?

A    So we have what's called two work rooms in our department, and in the work room I was often in, because my other surgeons would work there, and so would the other OB generalists, and there was always word of going to Dr. Porter, whether it was an enlarged fibroid, they had a question.  I know maternal fetal medicine used them a lot.  The OB, if they had any question, they would go to Dr. Porter.

Q    So that would be about things like ultrasound?

A    Correct.

Q    Correct?

A    Or fibroids.  Any issues with -- that they had question with, they would go to Dr. Porter.

Q    Okay.  In this e-mail, you state that, "Dr. Porter

Maxfield - Direct by Ms. Nunan

provided reproductive care separate from infertility." Can you explain what you meant about that, or expand on that?  What other services did she provide besides infertility?

A    GYN care, reproductive.  So she is a specialty doctor. If there's clarification, all the physicians are OB-GYN when they leave, and then you will -- some will go to gyn-onc, gynecology oncology, uro-gyn.  They go to special training for two to three years of fellowship, and that's where you get the reproductive endocrinology, which is a whole different specialty that OB-GYN physicians do not go further on.  So that's a specialty that she carried on.

Q    How would a patient present that would need those kind of -- like, can you give me some examples?

A    Not using too many medical terms.  I mean, if a person came in with PCOS, polycystic ovary syndrome, that's a specialty that Dr. Porter did.  Any issues with endocrinology, pituitary gland, trying to get pregnant. Those are all things that she would do, which we did not have anybody else.

Q    Was there anybody else -- who else at Dartmouth-Hitchcock in the OB-GYN department was doing benign surgeries like what you've been talking about?

A    Other generalists, they'll do like an ovariectomy,

Maxfield - Direct by Ms. Nunan

removal of ovaries, tubal ligations.  They can do hysterectomies.  They -- the generalists would, but we weren't fully staffed there either, but she had a different level.  I believe, at the time, she was doing robotic surgery, which we did not have any other surgeons except for gyn-onc; they would do robotic.

Q   So myomectomies?

A   That's removal of fibroids.

Q   Okay.  What was your hope in writing this letter?

A   That we would get her back into GYN and stay in our department.

Q   Anyone ask you to write this letter?

A   No.

Q   What -- I'm going to read to you Dr. Merrens' response.  "Victoria, thanks for your e-mail.  The recommendation around closing the program and its staff were at the recommendation of Dr. DeMars.  As you know, Dr. Porter currently works at 20 percent of her time currently, and I'm not sure of her interest in staying on if the infertility part were to cease.  I'm clearly aware of how difficult this is for patients and staff.  I have been answering e-mails all week, heartfelt, concerned and sad at this transition.  I completely understand.  Sincerely, Ed."  Did I read that correctly?

A   Yes.

Maxfield - Direct by Ms. Nunan

Q    Okay.  You had clearly stated the need for Dr. Porter's
     skills in your e-mails.  How well do you feel that
     Dr. Merrens addressed this in his response?

A    I didn't get the answer I wanted.  I was very
     appreciative that he did respond back to me, because I
     knew it was a very busy time and was getting probably a
     lot of e-mails -- I wasn't sure of that -- but it
     wasn't the answer, again, that I wanted.  But I did
     feel -- I was appreciative that it was at least
     addressed.

Q    When the REI division was closed and Dr. Porter was
     terminated, could the OB-GYN department have used the
     services described in your e-mail, her services?

A    Yes.

Q    And in what way was the OB-GYN department short-staffed
     in May of 2007, you reference that?

A    We were short-staffed through the -- across the whole
     board, uro-gyn, maternal fetal medicine, and OB-GYN, we
     did not have enough physicians.  And people have to
     understand with the OB-GYN, those physicians, their OR
     schedule is a lot different than what Dr. Porter or my
     physicians have.  They have cross board between a
     clinic, the birthing pavilion, and then the OR.  So
     they're not always as available as our other surgeons
     are, so we were short-staffed.

Maxfield - Direct by Ms. Nunan

Q   Who is Beth Todd?

A   Beth is -- was a nurse practitioner in the REI department.

Q   So in 2017 -- in May of 2017, she was in the REI division?

A   Yes.

Q   Okay.  What happened to Beth Todd when the REI division was closed?

A   She remained.

Q   Okay.  So she came to the OB-GYN department --

A   Yes.

Q   -- and worked?  She was reassigned?

A   Yes.

Q   Okay.  And I asked you this before, but how are nurse practitioners viewed in terms of the OB-GYN department are they considered providers?

A   Yes.

Q   Okay.  Why was Beth Todd kept employed and reassigned and not Misty Porter?

A   That's a good question.  I don't know that answer.

              MS. NUNAN:  I have no further questions.

              THE COURT:  Okay.  Thank you.

           Cross-examination.

              MR. SCHROEDER:  Thank you, Your Honor.

           Emerson, do you mind switching over to the other?

THE CLERK:  Sure.

MR. SCHROEDER:  Thank you.

**CROSS-EXAMINATION**

**BY MR. SCHROEDER:**

Q   Good morning, Ms. Maxfield.

A   Good morning.

Q   My name is Don Schroeder.  I represent Dartmouth Health.  We've never spoken or seen each other before, as far as you know?

A   No, we haven't.

Q   Okay.  I didn't think so.  Just briefly, you're an RN nurse, correct?

A   Yes.

Q   And if you're like my mother-in-law, you have a bachelor's degree?

A   Associate's degree in science of nursing.

Q   Okay.  Any additional certifications, special certifications?

A   SANE nurse.  Sexual assault nurse examiner.

Q   Okay.  Anything else?

A   No.

Q   And you've been a nurse for a relatively long time?

A   Over 40 years.

Q   I think you're right up there with my mother-in-law.

In preparation for today, you'd obviously reviewed

Maxfield - Cross by Mr. Schroeder

this e-mail ahead of time, right?

A   Yes, I have.

Q   And you've spoken with Plaintiff's counsel?

A   Yes.

Q   Okay.  And I want to ask you just a few questions about your e-mail, specifically -- prior to -- on May 12th -- between May 4th and May 12th, right, there was a meeting that Dr. Merrens had with the entire OB-GYN staff, right?

A   Yes.

Q   And you were appreciative of him communicating with the staff, correct?

A   Yes.

Q   And he was explaining to you that the REI division was closed, correct?

A   Correct.

Q   And recall anything else out of that meeting?

A   That's the one thing I'm having a little trouble, is remembering all that was discussed at it.

Q   Right.  That makes sense, because it's pre-pandemic, right?  I can only imagine what you had to deal with during that.  You don't have any specific recollection of anything there?

A   No.  If I had more to say -- I don't think I would have written the e-mail if I had more of the answers as to

Maxfield - Cross by Mr. Schroeder

why it all was closing.

Q   Okay.  But you said to him in this e-mail, right, that there was -- this was not -- you said -- this is the second line, "I know this was not an easy decision to make, it was not made hastily, and had to be done at this time," right?

A   Yeah.

Q   So you knew three things:  It was not an easy decision to make, it wasn't made hastily, and had to be done at this time, right?

A   Evidently, yes.

Q   Right.  Well, you wrote it, and it was really close in time to the events happening?

A   (Nods.)

          THE COURT:  You'll have to answer verbally.

          THE WITNESS:  Excuse me?

Q   (By Mr. Schroeder) I'm sorry.  You weren't deposed to this matter, Ms. Maxfield, right?

A   What do you mean?

Q   A deposition in this case.

A   No.

Q   So one of the rules in a deposition is you go over making sure that you verbalize your answers, so even though we're in close proximity, and I know you said --

A   Yes.  I said yes.

Maxfield - Cross by Mr. Schroeder

Q    Right.  So you had no reason to doubt the reasoning
behind the closure, right?

A    I wasn't quite sure -- it was all hearsay as to why
they were closing it.

Q    Right.  But you didn't -- nice use of the word hearsay.
You didn't have any reason, though, to doubt that
it was done for a legitimate reason, right, because you
said not an easy decision, not made hastily, had to be
done at this time, right?

A    Yes.  Evidently it was -- they had to make this
decision.

Q    Right.  And you knew that, and you were aware of that.
You even mention it in your e-mail.  In fact, this
e-mail was May 20th at 1:20, and Dr. Merrens -- had you
dealt with him before?

A    No.

Q    Never before, right?

A    No.

Q    And he responded back to you, actually, in just
under shy of an hour, I think, right?
Did you have any further correspondence with
Dr. Merrens?

A    No.

Q    And -- but you were appreciative of the fact that he
reached out to you very quickly?

Maxfield - Cross by Mr. Schroeder

A    Yes, for upper management, for up above to get a response to little old me, yeah.

Q    Well, he understood the importance of your e-mail, right?

A    Yeah.

Q    Would you -- is that your interpretation, that he understood the importance of your e-mail by responding to you within an hour?

A    I believe so, yes.

Q    And you were asked some questions, Ms. Maxfield, about this specific line which is further down, and I would ask you to -- it's in the middle of the paragraph, the second paragraph, where it says, "Due to staffing issues in REI."  Do you see that?

It just got clicked off -- do you see that now or no?

A    Nope.

THE COURT:  The e-mail is on the screen; it's not highlighted.

MR. SCHROEDER:  Oh, I'm sorry.

THE WITNESS:  I don't have my glasses, so I can't look here, so I'm looking on the screen.

Q    (By Mr. Schroeder) Is it easier to look on the screen?

A    It is.

Q    I want to be sure that you're comfortable being able to

see it.  Because I have glasses for distance, but I don't need them for reading, so I have to keep taking my glasses off.

A    Do you want me to look at, "Unfortunately, employee jobs had to be laid off, and the one that was most disturbing --"

Q    Nope, I'm going to bring it up right here.  Here it is. "Due to staffing issues in REI," do you see that?

A    Yes.

Q    Now, you are a nurse, right?

A    Yes.

Q    And you were -- I think your direct testimony was you were performing nursing functions with Dr. Porter, correct?

A    Yes.

Q    And she was in the REI division, right?

A    Yes.

Q    And so when you refer to staffing issues in REI, you're referring to a nursing shortage in REI, are you not?

A    They did have a nursing shortage in the REI.

Q    Okay.  That's what I thought.  Thank you.

Now, further down -- let me see if I can do this -- the next sentence -- two sentences down, I think, "Her expertise in gynecological ultrasounds, myomectomies, hysteroscopies, and GYN surgeries," do

Maxfield - Cross by Mr. Schroeder

you see that?

A    Yes.

Q    Now, I just want to ask:  You're still in the same capacity that you were in 2017, you're still performing the same services today that you were then?

A    Yes.

Q    Okay.  Just got to make sure you verbalize your answers.  You're doing great.

And in terms of gynecologic ultrasounds, there are doctors that are within the OB-GYN department that perform those services, correct?

A    The maternal fetal medicine will do their OB ultrasounds.  So, other physicians, they'll go through radiology who they get read through radiology physicians.

Q    Understood.  That was a poor question by me.  So within the OB-GYN department, there's maternal fetal medicine?

A    Yes.

Q    That's one group, right?

A    Yes.

Q    And then there's another group, the radiology department, right?

A    Yes.

Q    And then at that time, Dr. Jocelyn Chertoff was the chair of the radiology department?

Maxfield - Cross by Mr. Schroeder

MS. NUNAN:  Objection.

THE COURT:  Basis?  Or do you want to approach?

MS. NUNAN:  Sure.

(Bench conference.)

MS. NUNAN:  This is a small point.

THE COURT:  I called you up to avoid a standard objection in front of the jury.

MS. NUNAN:  I appreciate that.  This is a small distinction, but it's important to me, which is the OB-GYN department is a department, and the radiology department is also a separate department.  You just listed it as a division of the OB-GYN department which is not accurate.  So I just want to make sure, Dr. Porter had a dual appointment in two different departments.

MR. SCHROEDER:  I'm aware of that.

MS. NUNAN:  You said that radiology was a division within OB-GYN; it's not.

MR. SCHROEDER:  Okay.  I'm happy to correct that.

MS. NUNAN:  Okay.  Thank you.  Sure.

(End of bench conference.)

Q   (By Mr. Schroeder) Ms. Maxfield, there was the OB-GYN department, right?

Maxfield - Cross by Mr. Schroeder

A    Mm-hm.

Q    And the separate department is the radiology department, right?  Maternal fetal medicine is under the OB-GYN department, right?

A    Correct.  It's one of the divisions.

Q    Right.  And one of the divisions under OB-GYN, right?

A    Correct.

Q    And that was where the REI division was a division under OB-GYN as well?

A    Correct.

Q    Right?  And you were in --

A    Uro-gyn.

Q    Uro-gyn, is that another division?

A    Yes.  Do you want me to tell you all of them, because you have gyn-onc, which is gynecology oncology; you have maternal fetal medicine; there's OB-GYN; there's uro-gyn; and then there was REI.

Q    The OB-GYN, was that generalists?

A    That's the generalists.

Q    Right.  And I appreciate you doing that for me because it is helpful, I think, for the jury to understand.

     With respect to OB-GYN generalists, was that -- would that be doctors that were delivering babies, generally speaking?

A    That's correct.

Maxfield - Cross by Mr. Schroeder

Q   Okay.  So labor and delivery?

A   Correct.  Except we do have a few generalists that did not do OB delivery, but just a few at that time.

Q   Okay.  But, generally speaking, if you're in that group --

A   Yeah.

Q   -- and they would handle like C-sections?

A   Correct.

Q   Been through that process three times, or I should say my wife has been through that process; I was just the stand-by.

So your labor and delivery, the generalists would be the people that many people, perhaps in this room, have had dealings with with respect to delivery of babies?

A   Correct.

Q   Okay.  I just want to go back to this line though -- gynecologic ultrasounds, myomectomies, hysteroscopies and gyn surgeries.  Gynecologic ultrasounds, you mentioned before you work with a lot of excellent doctors, right?

A   I do.

Q   Very proud of Dartmouth Health, aren't you?

A   Of my division team, I'm very.

Q   Right.  And very proud of the OB-GYN department, right?

Maxfield - Cross by Mr. Schroeder

A    Yes.

Q    Yes.  You've been there 41 years?

A    No.  No.  No.  I've only been there for 25, but I've been a nurse for over 40 years.

Q    Oh.  Congratulations.

A    Thank you.

Q    With respect to gynecologic ultrasounds, there are excellent doctors at Dartmouth Health at that time that were able to perform that procedure, correct?  They may not be -- they may have been in maternal fetal medicine or the radiology department, right?

A    So radiology would read the ultrasounds of the OB-GYN generalists with the exception of Dr. Porter also would do ultrasound reading within our department whether it was a generalist, her own, but she also did readings along with the radiologists at DHMC.

Q    Right.  Okay.  That's very helpful.

     There were other excellent doctors at Dartmouth Health who performed that kind of procedure, gynecologic ultrasounds?

A    To be honest with you, I worked closely with Dr. Porter and, you know, yes, we do -- do we have good radiologists at Dartmouth-Hitchcock?  Absolutely.  But my expertise and knowledge base goes with Dr. Porter.

Q    Right.  I just want to make sure though -- and I

Maxfield - Cross by Mr. Schroeder

understand that, and that's a fair point, but there are other -- you're aware of -- I know you may not have worked with, but you're aware of other excellent doctors at Dartmouth Health that perform gynecologic ultrasounds, right?

A   Yes, a radiologist.

Q   Yes?

A   Yes.

Q   And that was back in that time period of May 2017?

A   Yes.

Q   And there were also excellent doctors at Dartmouth Health back in 2017 that did myomectomies, correct?

A   I did not know of how many of our generalists -- I would have to do research on that, but Dr. Porter was one of the ones who pretty much everybody -- depending on the fibroid, how big, I mean, we're going to get really technical over this.

Q   No, I don't need you to.

A   Would be where Dr. Porter would actually take over a case, or a generalist may even go to Dr. Porter to take over a case.

Q   Are you aware, myomectomies were being done -- were done at Dartmouth Health back in that time period, right?

A   Yes.  Yes.

Maxfield - Cross by Mr. Schroeder

Q   And even after the REI division was closed, myomectomies were being done at Dartmouth Health by excellent doctors?

A   Well, yes, they had to continue.

Q   Right.  Right.  Those procedures were still being done?

A   Yes.

Q   At Dartmouth Health.

A   I believe so.

Q   Right.

A   Yes.  They had to have been.

Q   I'm deferring to you on this one.

    Hysteroscopies, those procedures were being done after the REI division closure at Dartmouth Health by other excellent doctors, right?

A   They continued.

Q   And the same with gyn surgeries, correct?

A   Yes.  They had to continue.

Q   And in terms of robotic surgeries within the OB-GYN department, they -- robotic surgeries, Dartmouth Health has doctors doing those robotic surgeries within the OB-GYN department, correct?

A   As of -- I do not know at that time if we even had any surgeons who were doing robotic surgery except for the gynecology-oncology team.  They have been doing robotic surgery for quite a period of time.

At the time Dr. Porter was there, I believe she was the only one doing robotic, but don't quote me, either my uro-gyn surgeons, none of them were doing robotic surgery; that, I do know. But the generalists, we would have to look that up.

Q   Okay. That's perfectly fine. This is eight years ago, so the fact that you don't necessarily know -- you don't know one way or the other whether other doctors were doing robotic surgery?

A   Yeah, I believe not. Except for gyn-oncology.

          MR. SCHROEDER: Give me one second, Your Honor.

          THE COURT: Yes.

Q   (By Mr. Schroeder) This may be a difficult question to answer, but I'm going to ask it anyway: Did you know specifically what Dr. Porter's privileges were in May of 2017?

A   No.

Q   Okay.

          MR. SCHROEDER: I have nothing further, Your Honor. Thank you, Ms. Maxfield.

          THE COURT: Okay. Redirect?

          MS. NUNAN: I have nothing further.

          THE COURT: Okay. Ms. Maxfield, you may step down.

Maxfield - Cross by Mr. Schroeder

MS. NUNAN:  Your Honor, we asked our next witness to be here at 10:30.

THE COURT:  Well, we're going to take our mid-morning break at this time.  So we'll be reconvening at 10:30.

(Jury exits.)

(Recess taken.)

THE COURT:  Okay.  Is there an issue to take up?

MR. SCHROEDER:  Just really quick.  First issue, I want to follow up on the comment earlier about PII.  I went back through the text messages that are actually admitted into evidence.

THE COURT:  Yes.

MR. SCHROEDER:  I actually had my team as well as myself, and I didn't see any PII in there.  The C6, the 300 pages, may have some of it, but that didn't go back -- that was not an admitted exhibit.

THE COURT:  Okay.

MR. SCHROEDER:  I want to make sure that I'm doing -- following the Court's instructions on that.

THE COURT:  Okay.  Yeah.  I thought there was a text message that might have been up on the screen, whether somehow that was just shown to the witness for kind of impeachment type thing, and it wasn't admitted.

MR. SCHROEDER:  Okay.  It may have been just the date.

THE COURT:  You may be right, so...

MR. SCHROEDER:  I just went through -- I wanted to make sure that you were talking about just text messages because I went back through C6-A and C15, the admitted exhibits which are truncated versions of the entire group of text messages.  I don't know if perhaps when we were showing a date, there might have been a reference to something.  I was trying to be very, extremely careful on that.

THE COURT:  I thought it was like the first name of someone who may have had a baby in the practice, because I remember Dr. Porter had said, "This isn't redacted."  And I thought you had responded, "We know about that.  We're going to be making a redaction."

MR. SCHROEDER:  Okay.  Yes.  I can assure you that anything that went back to the jury, I believe -- and we will triple check it again to make sure that it's right.  I want to make sure that I knew what you were asking about.

THE COURT:  Okay.

MR. SCHROEDER:  The other minor issue is one of the witnesses on their witness list, I don't think

they're going to call her now, but she was in the courtroom, Dr. Debra Birenbaum, and I wanted to just confirm, we're still under a sequestration order --

THE COURT:  We are.

MR. SCHROEDER:  -- and just confirm she's not testifying in this case.  I assume that's the case.

THE COURT:  Okay.

MS. NUNAN:  Yeah.  We're not calling her in this case.

THE COURT:  Okay.

MR. SCHROEDER:  Thank you, Your Honor. That's all.

THE COURT:  Okay.  If we're ready, we'll bring the jury in.

(Jury present.)

THE COURT:  Okay.  Plaintiffs may call their next witness.

MS. NUNAN:  The next witness is Dr. Karen George.

THE CLERK:  Good morning.  If you would raise your right hand, please.

**Karen George**, witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you.  If you could have a seat and state and spell your name once seated.

THE WITNESS:  My name is Karen George, K-a-r-e-n G-e-o-r-g-e.

**DIRECT EXAMINATION**

**BY MS. NUNAN:**

Q    Good morning, Dr. George.

A    Good morning.

Q    Thank you for being here.  Where do you currently work?

A    I currently work at the University of Vermont Larner College of Medicine.

Q    How long have you been there?

A    I have been there for about two and a half years.

Q    What is your role?

A    I'm the associate dean for students.

Q    Can you give me a little bit of your history, where you went to medical school?

A    Sure.  I went to the Ohio State University in Columbus, Ohio.

Q    Did you do a residency?

A    I did.  I did a residency in obstetrics and gynecology at the University of New Mexico.

Q    When did you come to Dartmouth-Hitchcock?

A    I came to Dartmouth-Hitchcock in 1999.

Q    Okay.  And when did you leave Dartmouth-Hitchcock?

A    I was there until the very beginning of 2017, so January, February.

Q    Okay.  Just under 20 years?

A    Right.

Q    Okay.  In what capacity did you work at Dartmouth-Hitchcock?

A    So I was a generalist.  I did obstetrics and gynecology about six days out of the time, and I was also the residency program director.

Q    When did you start that?

A    In obstetrics and gynecology.  I started that role as the practice director around 2001.

Q    Okay.  And what percentage of the time did you spend working as a generalist and what percentage of time as a director?

A    Yeah.  About 40 percent as the program director, and then about 60 percent as a generalist.  But a lot of that time that I was -- as a generalist, I was also, like, working with the residents, so I had a lot of access to them in the clinical setting.

Q    The in-between time when you left Dartmouth-Hitchcock before you came to UVM, what did you do then?

A    So, I moved to Washington, D.C.  I worked at George Washington University three days a week, and then I also worked at the Institute for Medicaid Innovation as

George - Direct by Ms. Nunan

a policy fellow.

Q    Circling back to the residency program at Dartmouth-Hitchcock.  What were your duties as the residency program director at Dartmouth-Hitchcock?

A    So my duties were to oversee the training of residents, so people who had just graduated from medical school, until their graduation.  So I oversaw their education.  I did their scheduling for their day-to-day activities.  I did assessment of their performance.  I did a lot of their teaching schedule, their didactics schedule, that sort of thing.

Q    How many did you have at a time?

A    I had four per year, and it's a four-year program, so 16 total.

Q    So basically four first year, four second year, four third year, four fourth year?

A    Right.  Most of the time.  Sometimes, we were down but that was the usual number.

Q    Okay.  What ways did you assess the residents?

A    So the residents are assessed in very standardized processes -- medical knowledge exams, clinical skills exams, but we also assessed them, you know, really at the point of care and day-to-day observation of their performance, you know, looking at their knowledge and skills and abilities.

George - Direct by Ms. Nunan

Q    Okay.  And, you know, at the end of the day, what was
     your goal with them?

A    My goal, obviously, was to, you know, take them from --
     from essentially just finishing medical school to
     independent practice, and so ensuring that they were
     ready for independent practice.

Q    How did you check in with the residents about their
     experience?

A    In many ways, really.  I -- I met with them as -- as a
     large group, pretty much every Friday we would have
     just a check-in.  We would also check in, you know,
     sort of quarterly for just administrative meetings.  I
     would meet with them individually at least quarterly to
     see how they -- to see how things were going, and to,
     you know, assure that they were meeting both my goals
     and their goals for them.  And, honestly, I saw them
     every day, you know, in a clinical setting, in labor
     and delivery and operating room and clinic.

Q    Part of your job as director was to talk to them about
     their experience, correct?

A    Absolutely, yeah.

Q    All right.  I would like to switch own to Dr. Porter.
     When did you first meet Dr. Porter?

A    I met Dr. Porter first when I started.  It was part of
     my interview process.  We had dinner together at

George - Direct by Ms. Nunan

somebody else's home.

Q   So this is in the late '90s?

A   Yeah, sorry.

Q   No.  No.

A   Yeah.  It was in '99, yeah.

Q   And how would you describe Dr. Porter as a physician?
You worked with her for a long time.

A   Sure, yeah.  I spoke -- had the honor of working with
her.  I would describe her as a very competent,
meticulous clinician, surgeon, ultrasonographer, and
she sets a very high standard, I think, for herself and
all around her.  She is very compassionate and very
honest, I would say.  I think she has tremendous
clinical skills.  She's really one of the best
clinicians that I've ever worked with.

Q   And how would you describe her as a colleague?

A   I would describe her as collaborative.  She was
always and has continued always to be very helpful.
She and I had a complex patient who had had an
ultrasound.  She always takes the time to look at them
with me, read through them.  She is, you know, very
generous with her time.  I -- you know, when I was
taking call at night, I would call her in the middle of
the night and ask questions.  I think that she was
always available to me whenever I had any questions.

George - Direct by Ms. Nunan

Q    How was she as a trainer of the residents?

A    I think that the residents really enjoyed working with her.  So when -- in our program, they would work with her as second years and then again as fourth years.

     The second year was really in the clinical setting, and I think she spent a lot of time teaching them how to do ultrasounds, and then the fourth year was more -- more operative, I would say.  So they worked with her in the operating room.

     I think she -- you know, she ran a tight ship. She had very high expectations of how they should be progressing and performing.  I think, you know, sometimes that can be intimidating, but I also think that she set a very high standard.  You know, her patient care, patient safety was really a priority.

Q    And if there was an issue, would she come to you quickly?

A    Yeah.  Yeah.  We were, like, three doors down from each other, and she would definitely stop by frequently to let me know how things were going.

Q    Was that a good thing with residents?

A    Absolutely.  It was important that I know what they were -- what they were up to.  That was my job.

Q    How good was she at assessing residents?

A    I think she has a unique ability to figure out what

George - Direct by Ms. Nunan

residents are doing wrong.  You know, she could make the -- she's an excellent coach.  She could make very simple yet clear corrections in the way they were holding their hand or the way that they were holding an instrument, and she -- I think her input to them was really invaluable in terms of their professional identity formation and their growth as surgeons.

Q    Was she really good at figuring out and meeting them at where they were in their skill set at the time?

MR. COFFIN:  Objection.  There's a lot of leading, Your Honor.

THE COURT:  Sustained.

Q    (By Ms. Nunan) So what role did Dr. Porter play in the training of the residents, the different portions of the hospital?

A    Yeah.  So like I said, she would work with them both in the clinic in terms of, you know, taking care of both reproductive endocrinology patients and infertility patients, teaching them about the workup of those patients, which a very important part of general gynecology and something that they really needed to know in terms of their independent practice in the future.

And she was, you know, as I mentioned, I think a very strong supporter of their surgical growth.  She

really -- she really took a lot of -- a lot of time,
you know, working with them to learn those skills they
needed to become better surgeons.

Q   How would you describe Dr. Porter with her patients and
patients that overlapped with yours?

A   I think she had very good, long-standing relationships
with patients.  I mean, I know now I see patients, even
here in Burlington, who were her patients who -- who
talk about how -- how important she was in their
journey through, you know, infertility.

     I took care of a lot of her patients when they
became pregnant.  She referred a lot of patients to me,
and they were very grateful to them -- to her for the
care that they received.

Q   How would you describe Dr. Porter's manner toward her
fellow team members?

A   I think in general, she was collaborative.  I think
she -- as I mentioned, she had very high standards of
herself and others.  And, you know, I think that
sometimes she would rub people the wrong way, I would
say, but for the most part, I think that it was a very
collaborative practice, and that we all basically got
along.

Q   I will like to turn now to Dr. Albert Hsu?

A   Mm-hm.

Q   How did you first meet Dr. Albert Hsu?

A   I met Dr. Hsu, actually, when he started.  He arrived, and I went in to introduce myself and talk to him.  He had a lot of pre-prepared lectures, and I was really kind of excited because I was always looking for faculty to give lectures to residents.  He was excited to do that, so I was generally excited that he was there and was willing to take on some of that teaching or that didactics teaching role.

Q   Is he good at that?

A   He was.  He was.

Q   So you met him initially.  What happened next?

A   So once he started to get busy clinically, some of the residents started to come with concerns about -- about some of the things that he was doing, some things he was saying to patients in clinic, and I guess more concerningly, about some of the things that were happening in the operating room.  They were starting to feel a little bit concerned about what they were seeing.  They were worried about their own safety and the patient's safety in those -- in those settings.

Q   So how many residents reported to you their concerns about Albert Hsu?

A   I don't know the exact number.  I think it was mostly the chief residents, which, you know, is often the case

George - Direct by Ms. Nunan

in a residency where the chiefs would sort of speak for the rest of the group.

Q   Okay.

A   Chief residents are the most senior of the residents.

Q   How soon after his arrival did you start receiving these reports as the director of the residency program?

A   I would estimate that it was within months of his arrival.

Q   When there was a real problem within the OB-GYN department, who did people go to?

A   So I'm assuming you mean problem with a patient.  So, you know, I would say that Dr. Porter and Dr. DeMars were the two people that any of us would go to if we had a really complex patient where we needed help.  Those were sort of our go-to faculty.

Q   What information did you learn from the residents that rose to a level of concern that you felt like you had to report it?

A   Can you repeat that, please?

Q   Sure.  What information did you hear from the residents about Dr. Hsu -- I'll be more specific -- about Dr. Hsu and the concerns that you mentioned a minute ago that rose to a level of concern like you felt like you had to report it?

A   I was hearing situations where Dr. Hsu would be in the

middle of a case and start to freeze and wouldn't really know what the next steps would be, and the residents felt like they had to be the ones to help him out of that, and they felt really uncomfortable in that.

Q   So who did you report the residents' concerns to?

A   I talked to Dr. DeMars about it.  She was the chair at that time when this was going on.

Q   How many times did you go to her?

A   It's hard to say at this point how many times.  It was sort of an ongoing conversation.

Q   Okay.  And the concerns that you were reporting about Dr. Hsu, you considered serious?

A   Yeah, I did.

Q   Okay.  Who else did you talk to about this?

A   I talked to Misty.  I talked to my other colleagues, faculty in the program.  I talked to the residents about it, about their concerns, and how to navigate that, you know, ways in which we could ask for help if they needed it.  You know, residency is very hierarchical, and residents don't always feel like they could speak up, but I gave them some hints on how to speak up if they needed help.

Q   So you worked with them to figure out what to do in these situations?

George - Direct by Ms. Nunan

A    Yes.

Q    How many times did you hear patient concerns about Dr. Hsu's care?

A    I -- I can't really estimate the number of times, but I definitely would hear patient concerns.  So patients who I had referred to reproductive endocrinology and infertility would come back to me and say that it didn't go very well, and was there somebody else I could refer them to?  But -- or patients that I would see, you know, in the OB setting would say that they had a strange encounter with Dr. Hsu.

Q    Was that part of what you reported to Leslie DeMars in some of these conversations?

A    Yes.  Yes.

Q    I would like to switch gears to the REI division and the role it played with the residents' education.  How would you describe the role that the REI division played with their education?

A    Reproductive endocrinology and infertility is a really important part of resident education and, to be honest, I felt that it was -- the division that we had was one of the jewels of the program.  It was a way in which I recruited the best and the brightest to Dartmouth.

         I was really proud of the fact that we were able to send residents to competitive fellowships, so after

their training, they were accepted to be subspecialists in endocrinology because of the training that they got in REI.

Q   And Dr. Porter was part of that training?

A   Oh, yeah, absolutely.  She was very, very instrumental in that.

Q   And how would you describe the emphasis of the REI division, meaning, not just infertility?

A   Like I said, reproductive endocrinology is a really important part of the training of an obstetrician gynecologist.  It's, you know, understanding how, you know, ovaries work, and the menstrual cycle is a really important part, and all of the ways in which those systems can go wrong.  And so I think -- you know, when you look at the role of a generalist, those are -- those are key and critical portions of training for a generalist obstetrician gynecologist.

Q   Understanding where the edge is, where they need to refer it out?

A   Sure.  Absolutely.

Q   What did you see happening in the REI division in 2016?

A   In 2016, Misty was -- you know, away with illness -- Dr. Porter, excuse me, was away with illness, and it was really Dr. Hsu and I can't remember the other -- Dr. Seifer was the other one who was there.  And I --

George - Direct by Ms. Nunan

you know, I think that Dr. Seifer, as a division director, was not particularly effective, and I sort of felt like things were falling apart in the division.

Q   And who understood that the REI division was kind of falling apart, to use the words that you just used?

A   I think everyone understood.

Q   Okay.

A   Meaning, like, the faculty and the residents.  I think there was a lot of concern with most everyone.

Q   How did you feel when you heard about the closure of the REI division?

A   So I was already gone.  I left before that happened. And when I heard about it, I was very sad about it.  I felt that it was a huge loss for the training of the residents.  I spoke to Dr. Fisher who took over in my role after I left, and talked to -- you know, he reached out to me to find out, you know, if I had ideas about how we could fill some of those gaps and to kind of lay out his plan.  So I felt really disappointed and sad.

            MS. NUNAN:  That's all I have for questions.

            THE COURT:  Okay.  Thank you.

         Cross-examination.

            MS. NUNAN:  Thank you.

////

George - Cross by Mr. Coffin

**CROSS-EXAMINATION**

**BY MR. COFFIN:**

Q   Good morning, Dr. George.

A   Good morning.

Q   My name is Tris Coffin.  I'm a lawyer representing Dartmouth-Hitchcock.  Thank you for coming in today.

A   Yes.

Q   You're now the provost at the Larner College of Medicine; did I get that right?

A   You got that wrong.

Q   Wrong.  That's why I asked.  You have some position at Larner --

A   I am the Associate Dean for Students.

Q   Okay.  Thank you.  Associate Dean for Students.  And I think I have your biography that you came to Dartmouth-Hitchcock in 2001 after a residency at the University of Mexico; is that right?

A   I came to Dartmouth in 1999 after -- I was on faculty at the University of Mexico for about six years before I came.

Q   Okay.  Thank you.  And then you described your role at Dartmouth, and then you left in early January or February 2017; is that right?

A   That's correct.

Q   And then you went to, I think you said, a couple

George - Cross by Mr. Coffin

positions down in Washington it sounded like?

A   Correct.

Q   What were those, again?

A   So George Washington University, I was a generalist there. I did labor and delivery and saw patients in clinic.

Q   Okay. Practicing MD in GW Hospital?

A   Practicing MD at the GW Hospital and faculty practice, and then I was also part-time at the Institute for Medicaid Innovation as a health policy fellow.

Q   Okay. I see. And then you came back to Vermont at UVM; is that right?

A   Correct.

Q   And did Larner College of Medicine?

A   Yes.

Q   For -- your position there is now Associate Dean of Students?

A   That's correct.

Q   And it sounds like that's sort of building on some of the experiences you had as an administrator of the residency program in OB-GYN in -- at Dartmouth; is that correct?

A   That's correct.

Q   Although it's dealing with what you would call undergraduate medical students.

George - Cross by Mr. Coffin

A    That's correct.

Q    Gotcha, even though they've had, like, a million years of school already, they're still in medical school.

A    Yeah.  It's like being a program director on steroids in a way.

Q    Any clinical practice at all in your role at UVM?

A    Yes.  I practice in the outpatient setting half a day a week.

Q    Half day a week.  Okay.  Is that how it's been since you've been back at UVM?

A    That's correct, yes.

Q    Got it.  Thank you.  So you described before that you were the residency program director at the OB-GYN department at Dartmouth-Hitchcock; isn't that right?

A    Correct.

Q    And when did you take up that role?

A    It was in 2001.

Q    2001.  So really very soon after you arrived at Dartmouth-Hitchcock; is that correct?

A    That's correct, yes.

Q    And I think you mentioned, just for the record, that Dr. Porter was part of the recruitment team for you; is that right?

A    I don't know if she was recruitment or she was just coming to dinner.

George - Cross by Mr. Coffin

Q    I guess that was an inference I made.

A    Yeah.

Q    She was one of the people who took you out to dinner and wined and dined you in Hanover -- I didn't mean to say that pejoratively.  Took you out to dinner.

A    It wasn't really wine and dine.  It was more like all the kids got together and we had a nice dinner at someone's house.

Q    Okay.  All the kids.

A    All the kids -- so it was like a family.  I brought my kids, her kids came.  It was like a very nice, collegial get together.

Q    Okay.  I understand.  So -- because your family is thinking about making a really big move at that point, right?

A    Correct, yeah.

Q    Big transplant from New Mexico to Vermont, how are we all going to like this?

A    Correct.

Q    And she was part of the introduction to life in Vermont or New Hampshire, basically?

A    Yes.  Correct, yeah.

Q    I understand.

     So in your role as the residency administrator for the OB-GYN department at Dartmouth-Hitchcock, you held

George - Cross by Mr. Coffin

that from 2001 to early 2017, correct?

A    Correct.

Q    And it strikes me that that is a role that's sort of more in the administration side of healthcare than a straight clinical role; is that right?

A    Yeah.  It was a mixed role, I would say.  I got to do both things.

Q    Right.  And I think you described yourself as being about 60 percent clinical and 40 percent was your administrative role?

A    Correct.

Q    Was that kind of -- I know it's hard.  You don't measure these things on a meter with precision over time, but generally does that describe kind of the breakdown in your responsibilities?

A    Yes.

Q    And in the OB-GYN role, similar to when you were in New Mexico, you were a generalist OB-GYN; is that right?

A    That's correct.

Q    And even within that, were you more GYN or OB?  Can you break it down like that?

A    I was both.  I got to do both.

Q    Okay.  I see.

Now, you acknowledge that being a healthcare administrator requires you to deal with some sort of

George - Cross by Mr. Coffin

different sets of perspectives than dealing with a one-on-one patient situation as a clinician.

A   Yes.

Q   And indeed, there are some excellent clinicians who are crucial to successful medical outcomes who may not be the best medical administrators?

A   Correct.

Q   And indeed, sometimes, medical administrators are selected because they might have those set of skills that make them good at organizing, communicating, team building, things like that, that were required to establish and run a medical program?

A   Correct.

Q   Okay.  And, really, aren't I correct that modern medicine, especially at an academic medical institution like Dartmouth or University of Vermont is really based on a team interdisciplinary approach?

A   Yes.

Q   And indeed, you know, you've got teams of different skill sets among physicians and physician assistants and nurse practitioners and nurses and technologists and everybody up and down the food chain in all sorts of different specialties, correct?

A   Correct.

Q   And even within one specialty, like OB-GYN, you've got,

you know, numerous different subspecialties, correct?

A   Correct.

Q   And lots of different organizational considerations to make, top to bottom, vertically if you will, from the most experienced, world-class specialized surgeon to the, you know, entry, just-out-of-high-school LNA?

A   Yes.

Q   And arranging all those things requires, I would think, a fairly important, but perhaps different than a clinician, skill set?

A   Correct.

Q   And I presume because you've done so well at that administrative role in a lot of different capacities, you must have some of those attributes?

A   I hope so.

Q   Not to brag, but, of course, you do, right?

A   Yes.

Q   Yeah.  So I would think those would require, like being a skilled communicator?

A   Yes.

Q   A really good listener?

A   Yes.

Q   And that sort of intangible ability to smooth things out to prevent small problems from becoming big problems?

George - Cross by Mr. Coffin

A     Correct.

Q     I'm just a lawyer, but that sounds like life to me --

A     Correct.

Q     -- but particularly in a complex medical organization like we're talking about here.

A     Yes.

Q     Now, I think you described Dr. Porter as a demanding clinician who set high standards.

A     Yes.

Q     I'm not sure that was verbatim, but I tried to write it down, but I tried to remember.  You wouldn't argue with that?

A     Yes.  I would not argue.

Q     Okay.  And she can be intimidating?

A     I would say occasionally, yes.

Q     Okay.  Somebody who was expecting to have things done her way because she was right about how they should be done sometimes?

A     I don't -- I don't see it quite that way.  I think that, like I mentioned, I think she has high standards, and she follows the standard of care, and I think her demands were that, the standard of care.

Q     And that's important because, you know, the bottom line you're all trying to do here is to provide better outcomes for patients at the most efficient manner

George - Cross by Mr. Coffin

possible; isn't that right?

A    The most efficient and the safest, yes.

Q    Yeah.  So those considerations are incredibly important for a clinician, right?

A    Correct.

Q    Along with, you know, being a really hard worker and being available all the time, those kind of things, right?

A    Correct.

Q    But, as we know, as people, there are situations where we got collective endeavors going on, and you can try and work out problems in a way that makes them less likely to recur and makes them less inflammatory; isn't that right?

A    Sure.

Q    And that may not be -- despite Dr. Porter's incredible skills, that may not be, in the judgment of some of her colleagues, one of her strong suits; isn't that correct?

A    I don't know -- I don't know what others would say to that.

Q    Okay.  Now, I think you said that -- well, first of all, in -- since you left in February 2017, you were not around for sort of the months leading up to the closure of the REI; is that correct?

George - Cross by Mr. Coffin

A    That is correct.

Q    You were off site --

A    I was gone.

Q    -- down in GW doing things in Washington, correct?

A    Correct.

Q    Now -- and you heard that the REI division had been closed, right?

A    That is correct.

Q    And you were asked by -- you know, what was your reaction when it closed?  And I believe your answer my reaction was "I was sad," right?

A    Yes.

Q    Is that your testimony?

A    Yes.

Q    But you didn't note in response to that question that your reaction was surprised, right?

A    I was surprised.

Q    But that isn't what you said when you answered the answer, correct?

A    I mean --

Q    "Yes" or "no"?

A    Right.  Correct.

Q    And you described earlier that your understanding in 2016 was that the REI division was going through some difficult problems?

George - Cross by Mr. Coffin

2:17-cv-00194-kjd   Document 348   Filed 12/19/25   Page 85 of 194   872

A   Correct.

Q   And I think the words you used was it was falling apart, right?

A   Correct.

Q   And everyone understood that, didn't you say that just now?

A   Everyone -- I don't know if everyone understood that.

Q   Everyone might have been literal, but do you recall saying that?

A   Did I say that?  I don't remember saying that.

Q   Would you agree that it was widely understood in the REI division that it was undergoing significant problems?

A   I would agree that it was clear that it hadn't been the same that it had been in the past; that -- with Misty out and two people sort of running the division, that we were not providing the same level of care that we had provided in the past.

Q   Okay.  And this was going on while you were still there, prior to your departure in early 2017, correct?

A   Correct.

Q   And Dr. Seifer and Dr. Hsu, it was understood, were essentially dysfunctional as leaders of the organization, the REI unit?

A   I think that's a word I would choose as well,

George - Cross by Mr. Coffin

dysfunctional.

Q    Okay.  And there's probably a lot of different ways to elaborate on it, but Dr. Seifer was not a particularly skilled clinician, correct?

A    Correct.

Q    And not really effectively leading the program; is that correct?

A    That is correct.

Q    And Dr. Hsu, it appeared, had a number of clinical deficiencies?

A    Correct.

Q    Even though he apparently was an excellent researcher, is that consistent with your knowledge?

A    I think he was a researcher.  I don't know that much about his scholarship.

Q    Okay.  I think you mentioned that his didactic lectures were something that you were looking forward to being a positive introduction into the residency program?

A    That's correct.

Q    Now, one of the challenges of being in an academic medical institution such as Dartmouth-Hitchcock or the University of Vermont, and maybe New Mexico, I don't know, but rural health particularly, is attracting and keeping subspecialists, whether they're physicians and others, to keep your program going; isn't that right?

George - Cross by Mr. Coffin

A    That is correct.

Q    And indeed, that's something that the University of Vermont struggles with, just as Dartmouth-Hitchcock has; isn't that right?

A    That is correct.

Q    And aren't I right that how you put all those pieces together is one of the important challenges facing hospital administrators at UVM and Dartmouth every single day?

A    Sure.  You are --

Q    And that -- that as we discussed before, involves making reconcile, balancing, an enormous number of variables; isn't that correct?

A    Yes.

Q    And aren't I correct that sometimes hard decisions have to be made by those hospital administrators about how they're going to team up a joint practice and support it appropriately?

A    Yes.  That is correct.

Q    And whether they're going to do that; isn't that correct?

A    Whether they're going to do that?  How and whether --

Q    Whether they're going to supports a particular subspecialty.

A    Sure.  But, you know, with population health, I think

George - Cross by Mr. Coffin

that it's -- it is still a goal.

Q   It's a goal.  But there are people who spend their lives -- just as you're spending your life working on various problems at your medical institution, there's people who spend their lives working on these issues at Dartmouth-Hitchcock; isn't that right?

A   Sure.

Q   And they may make some decisions; you know, they may be wise, maybe unwise, but they have to be made; isn't that right?

A   Yes.

Q   You're friends with Dr. Porter?

A   I would say we are friendly colleagues.

Q   Okay.  You worked with her for a couple decades?

A   Yeah.

Q   And that's how you describe her, so friendly colleagues?

A   Yeah.  I mean... Yes.

Q   And I didn't phrase that very clearly.  I apologize. But I was hoping to elicit sort of a temporal aspect of that?

A   Sure.

Q   Do you remain friendly colleagues after working with her for --

A   Yes, absolutely, yes.  I have the pleasure of

George - Cross by Mr. Coffin

continuing to work with her.

Q   In your current role, you're not working in a clinical capacity except for a half day a week.  But do you have involvement with her administratively?

A   We sit on a committee together, a residency education committee together, I see her in grand rounds.  That sort of thing.

Q   Okay.  So it sounds like kind of bumping into her in the hospital, going to and from, and a relatively limited committee interaction, correct?

A   Correct.

Q   But not really sort of general working with her in your capacity at Larner; is that right?

A   No.  We still work together.  I refer patients to her for surgery here.  I -- when she's reading scans, sometimes she reviews scans with me in ultrasound.

Q   Okay.

A   So we still have a collegial working relationship.

Q   I'm going to show you, please, what's been already admitted as J001 to J003.

            MR. COFFIN:  And with the Court's permission, we'll put it up for the witness screen and for the jury.

            THE COURT:  Yes.  Can you give us those numbers again, Mr. Coffin?

George - Cross by Mr. Coffin

MR. COFFIN:  Sorry, J001 to J003.

Q   (By Mr. Coffin) Okay.  And, Dr. George, this is a -- if you could take a look at this document please.  This is admitted into evidence in the case, and Ray will scroll down for you to access parts of it.  Go ahead and just scroll through.

A   Wait, was this -- I mean.  I need him to go slower.

Q   Take your time.  I'm a very slow reader, so I get that.

A   Okay.

Q   And so it's an e-mail chain, so the weird way these are produced is that the earlier timed ones are at the bottom, and so is this an example of an e-mail communication that you may have -- that you had with Dr. Porter?

A   Apparently, yes.

Q   Do you recall this situation at all?

A   I do not.

Q   Because this is kind of an example of the kind of things that you would be talking about sometimes; is that correct?

A   Correct.

Q   And so this one involves an announcement from a Katy Mansfield that a nurse named Marti was going to be moving over to REI, isn't that what was going on here?

A   I don't remember a Marti, to be honest with you.

George - Cross by Mr. Coffin

Q   Okay.

A   I would have to think about that.

Q   Okay.  So as you see this, whether you remember it as Marti or not, just looking at the situation is involving, hey, good news a nurse is joining REI?

A   Okay.

Q   Does it look like that's what that is about, from Katy Mansfield?  You can go down and read it.

A   Okay.

Q   Is that right?

A   Yes.

Q   And Nurse Mansfield anyway says she's excited about that.

A   Okay.

Q   Right?

A   Yes.

Q   That's what she says?  And if you scroll upwards, this was an e-mail to you by Dr. Porter, and Dr. Porter and then you appear not to be as excited about that transfer.

A   Oh, right.  Apparently, I didn't think much of her, but I don't remember.  Honestly, I don't remember this.

Q   So Dr. Porter describes in her May 4th, 2016, e-mail at 12:54 that the REI workload is huge.  Do you see that where she says that?

George - Cross by Mr. Coffin

A    Mm-hm.

Q    And, "Frankly, it is a nightmare in REI right now with A.H. and Julie."

A    Okay.

Q    Do you know who A.H. and Julie are, as you sit here?

A    I would have to think about --

Q    It's been a number of years and a couple of institutions.

A    Nine years and a lot of institutions.

Q    But in any event, this is more about, you know, not what the particulars are but to note what the reactions are that there are some problems in REI way back in May of 2016, right?

A    Right.

Q    Does that surprise you or not?

A    I mean, in -- I would say, in general, in medicine, there are -- it is always hard to manage all the people.

Q    Not to say it's always a nightmare, but there are a lot of difficulties that come along, right?

A    Right.  Yes.  Yes.

Q    And then you write on -- in 12:35 p.m. on May 4th, 2016, "I'm sorry that I got you worked up.  The nursing situation on all fronts is a nightmare," right?

A    Apparently, I wrote that, yes.

George - Cross by Mr. Coffin

Q   Okay.  You don't remember that?

A   Thank you for making it big for me.

    I don't remember writing that, no.

Q   Okay.  And how about her response:  "I was worked up when Julie confronted me last week when I came in for a transfer."  Do you remember that?

A   No.

Q   This isn't ringing any bells?

A   It's not ringing any bells, yeah.

Q   Okay.  Would you agree with me that, as you read this now, not understanding the context of it, sounds like all is far from well in the REI division with regard to the nursing situation?

A   I would say, in general --

Q   "Yes" or "no" to my question.

A   Oh, yes.  Yes.

Q   And after you left in February of 2017, when you had understood that there was significant problems going on with the REI division at the time of your departure, did you understand that there was some additional problems with regard to obtaining qualified nursing in that department?

A   I don't recall that, to be very honest with you.

Q   Because perhaps that came to fruition or escalated after you left?

George - Cross by Mr. Coffin

A    Perhaps.  I mean, I would -- if I may say that in every institution I've been in and every year at Dartmouth as well, there are always problems keeping nurses.  It's just a hardship of medical care right now.

Q    It's one of the many incredibly difficult problems with medical care; would you say that it's particularly accentuated in a rural healthcare setting -- in an academic setting in a rural healthcare situation?

A    I found it also to be hard in an urban setting.  I would say it's bad everywhere, if I may.

         MR. COFFIN:  If I could just have a moment, please?

         THE COURT:  Yes.

Q    (By Mr. Coffin) So I think you testified that in the team approach of interdisciplinary medicine, you've got a lot of variables that need to work together --

A    Yes.

Q    -- fair?

    And with regard to the REI division in particular, we're talking about a dysfunction was how you described it; isn't that right?

A    Yes.

Q    And the dysfunction was related to how the physicians interacted, isn't that right?

A    That was part of it.

MR. COFFIN:  That's all I have, Your Honor.

THE COURT:  Redirect?

MS. NUNAN:  No, we're done.

THE COURT:  Okay.  Thank you.  You may step down, Dr. George.

THE WITNESS:  Thank you.

THE COURT:  Okay.  Next witness.

MR. JONES:  Your Honor, the plaintiff calls Dr. Maria Padin.

MR. SCHROEDER:  Your Honor, if I may go out and get Dr. Padin and get set up?  Thank you.

THE CLERK:  Good morning.  If you would raise your right hand, please.

THE WITNESS:  Sure.

**Maria Padin**, witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you.  You may have a seat. If you could state and spell your name once seated, please.

THE WITNESS:  Yes.  My name is Maria Padin, P-a-d-i-n.

////

////

Padin - Direct by Mr. Jones

**DIRECT EXAMINATION**

**BY MR. JONES:**

Q    Good morning, Dr. Padin.

A    Good morning.

Q    My name is Eric Jones.  I'm one of the lawyers for Dr. Porter, and I'll be asking you some questions this morning.

     What is your current employed employment?

A    I'm employed with Dartmouth-Hitchcock.

Q    In what capacity?

A    I am the chief medical officer for the community group practices in the southern part of the state.

Q    Does that include Dartmouth-Hitchcock Medical Center?

A    No, not Dartmouth-Hitchcock Medical Center.  We are part of that, but we're separate.  We have 13 clinics in the southern part of the state.  13 sites, 19 clinics.

Q    Okay.  Before the current role, what was your previous role with Dartmouth-Hitchcock?

A    I was chief medical officer at the IVF family medical center.

Q    And that includes the Dartmouth-Hitchcock Medical Center?

A    That's correct.

Q    And were you the chief medical officer of

Dartmouth-Hitchcock Medical Center in the 2016, 2017 time frame?

A   I was.

Q   Just generally speaking, what are your duties as chief medical officer, or what were they then?

A   My duties as chief medical officer was really to look and work on utilization management, bed management at the hospital, transfer center, care management, and also some of the functions of the medical staff office.

Q   Okay.  Did you have any role in the credentialing process?

A   I was a member of the credentialing committee.

Q   And what did the credentialing committee do?

A   The credentialing committee is responsible for overseeing and the verification and validation of the training and licensure requirements and requirements to be members of the medical staff.

Q   Okay.  So if the hospital requires a new physician who would be performing clinical care, do they have to go through a credentialing process?

A   Yes.

Q   And what does that process look like?

A   So that process includes an application from the provider, which also will be accompanied by their curriculum vitae.  It will include providing references

Padin - Direct by Mr. Jones

as it relates to their prior clinical experience or work experience. It will also include requirements of providing disclosures as it relates to any claims that they may have had. It also includes verification of their licensure and their board certification, if applicable.

Q Thank you. At Dartmouth-Hitchcock Medical Center, was there a bylaw provision for due process in the event there was a need to terminate a physician?

A So all bylaws tend to have a due process that is elicited primarily by the chair or whoever is the section chief. There are provisions for termination that are not necessarily associated with medical staffing in the employment specific for cause or without cause.

Q Okay. And as chief medical officer, did you have any particular role with regard to overseeing the due process complaints?

A Yes. If there is a request for due process because of a clinical concern that is raised by a chair, for example, and a formal request from the medical staff office, separation or termination of clinical privileges in the institution and membership to the medical staff, then under our bylaws, the medical -- chief medical officer is responsible for actually

Padin - Direct by Mr. Jones

conducting their own individual investigation separate from the department and making a determination that that action is warranted and would be supported.

Q   So that's something that you would undertake in that situation?

A   Yes.

Q   In a typical case, how long would that take you to do your own investigation and look into that?

A   So there are time frames for that investigation, if it is requested formally by the department, and we typically try to have a determination within 30 days.

Q   Would there be any kind of hearing?

A   Yes.  If it is -- if the decision is made that there is cause, then the member of the medical staff is entitled to, again, a hearing process.

Q   Something like an evidentiary hearing almost like this where witnesses come and present?

A   Fortunately, I have not had one in the years that I was there but, yes, my understanding is that there would be representation that they would be able to select from medical staff members and other members of the medical staff that would be part, as colleagues, of that hearing.

Q   Okay.  So in addition to whatever time you would need to spend investigating a matter, what other types of

Padin - Direct by Mr. Jones

Q resources would be needed to investigate one of these situations?

A So if, you know, out of that, probably if there were clinical concerns, right, associated with that, we would want to have a refresher review of those clinical concerns. So there are ways of addressing any clinical concerns that are brought forth through the quality assurance program of the hospital. It could be by a root-cause analysis, by clinical case reviews, by other colleagues through the professional practice enhancement committee, or it could be an external review if the department is relatively small or there is a sense that the review is not being unbiased.

Q If there was an external review, would you have to pay somebody to have to come in and provide that oversight?

A There are agencies nationally that are recognized and approved to actually do peer review, and those agencies are contracted specifically for that, and the reviews are typically done by individuals who are external to the organization, have no conflict but are considered leaders in the field.

Q But would the hospital have to pay for someone's cost or time to do that?

A When there's a review, yes, there is a payment done for the time of those reviewers.

Padin - Direct by Mr. Jones

Q    Okay.  Would there also be legal review?  Would lawyers get involved?

A    Not for clinical case care -- case reviews as part of the quality assurance peer review process.

Q    Okay.  If there was a finding of just cause and if a physician required a hearing and ultimately the decision was to sustain the just-cause finding, the doctor could still file a lawsuit, right?

A    I have not been in that circumstance, but I think it's always possible for anyone to file a lawsuit.

Q    Okay.  So we've been talking about a situation where a physician made a request to have a finding of just cause made by a chair or somebody.  Is there a similar process if a physician loses their job because of a program closure?

A    No, there is not.

Q    Okay.  So is it fair to say that it's less costly and less burdensome to terminate a physician through a program closure than through a just-cause process?

A    Well, it's not -- a program closure is not specifically directed at a physician.  There's broader sense of discussion that happens with regards to why a decision is made to close that program.

Q    Okay.  I would like to go back to credentialing issues. When you were the chief medical officer of the

Padin - Direct by Mr. Jones

hospital, were you on the credentialing committee for the hiring of Dr. David Seifer?

A   I was on the credentialing committee.

Q   And were there any other initial concerns you had as part of that process?

A   There were concerns raised as it relates to Dr. Seifer, and that we had not received the breadth of recommendations that we typically like to see as part of the file.

MR. JONES:  Your Honor, may I approach the witness to show her an exhibit?

THE COURT:  Yes.

MR. SCHROEDER:  Which number?

MR. JONES:  Plaintiff's Exhibit 3.

Q   (By Mr. Jones) Dr. Padin, have you had a chance to review Plaintiff's Exhibit 3?

A   Yes.

Q   And this appears to be two e-mails, the first one an e-mail dated March 2nd, 2016, from Kayla Hollis to three people, Edward Merrens, Maria Padin, and Jocelyn Chertoff.  Did Ms. Hollis in fact send you this e-mail on that date?

A   Yes.

Q   And the -- I guess -- I'm sorry, there's three e-mails. The next e-mail, it looks like you forwarded the e-mail

to Dr. Leslie DeMars and had a comment; is that correct?

A   I had a comment that I was concerned, correct, about not having additional recommendations.

Q   Okay.

A   Yeah.

MR. JONES:  I would move the admission of Plaintiff's 3.

THE COURT:  Any objection?

MR. SCHROEDER:  No objection, Your Honor.

THE COURT:  Plaintiff's 3 is admitted.

MR. JONES:  I would ask my co-counsel, if we could publish the exhibit.

Q   (By Mr. Jones) So if we -- actually, if we -- I'm sorry.  If we go down to Ms. Hollis' e-mail to you -- first of all, who was Ms. Hollis?

A   So Ms. Hollis is one of our staff members in the medical staff office who is responsible for bringing and putting the files together before they come to committee.

Q   As part of credentialing?

A   As part of credentialing.

Q   So the recipients of this e-mail from Ms. Hollis, Dr. Merrens, yourself, and Dr. Chertoff -- is that the committee?

Padin - Direct by Mr. Jones

A   No.   The committee is much broader than that. Dr. Chertoff was the chair of the credentials committee.  I was on the committee as the CMO of Mary Hitchcock Memorial Hospital, and Dr. Merrens as the chief clinical officer.

Q   Okay.  If we look at Ms. Hollis' e-mail, it says, "Good afternoon.  It was requested that I sent a credentialing application to David Seifer for the director of the REI position that's currently open."  Then she says, "This is a very unusual circumstance in which the department chair is who completed the telephone reference and is the one requesting that I initiate the credentialing process."

What was unusual about that?

A   So, typically, we get more than one recommendation before initiating the process.  There's a pre-employment process that we have where we like to see some additional recommendations before moving forward with a full credentialing process of the provider.

Q   Okay.

A   Okay?  So that was what that was referencing.

Q   Okay.  So she seems to say here that what she finds unusual is that the department chair is who completed the telephone reference and the one who requested that

Padin - Direct by Mr. Jones

I initiate the credentialing process.  Would that be unusual that the department chair did both a telephone reference and a request of the initiation of the credentialing process?

A    Not necessarily.  We have, many times due to the section chiefs or department chair, before the individual goes through the credentialing process, verify and/or speak with someone who the candidate has actually asked that they contact.

Q    Okay.  And then Ms. Hollis states, "So I'm looking for your guidance as the reference came back with negative feedback."  Did that concern you that the reference came back with negative feedback?

A    Yes, that did, and that is the reason why I said I had some concerns.

Q    Okay.

A    Mm-hm.

Q    And one of the -- further down in Ms. Hollis' e-mail, she appears to be transcribing some notes.  At the bottom of the first page, apparently someone from Dr. Seifer's prior institution said, "I either had to fire the rest of the division or find a new told (sic) for Dr. Seifer because he was not going to be successful leading this division."  Did that trouble you?

A   So leading a division, not everyone is a leader, you can be a great clinician but not be a great manager. And so that did raise some concerns. We wanted to seek to understand that, which was why we requested that there be additional references obtained.

Q   To be clear, Dr. Seifer was, in fact, being brought in to lead a division, correct?

A   He was being brought in to help lead a division; that's correct.

Q   Okay. So a problem with leadership skills would be a problem, right?

A   Well, that was the opinion of one reference, which is why we wanted to ascertain if there were other concerns brought forward by other references.

Q   Okay. At the end of Ms. Hollis' e-mail -- so if we go to Page 2 at the top -- it says, "On a related note, I was asked if we can waive the need for current letters of recommendation as he is unable to provide them from his current practice."

    So it appears -- well, first of all do you know who --

        MR. SCHROEDER:  Objection.

        MR. JONES:  I'm sorry?

        THE COURT:  There wasn't a question.

        MR. JONES:  I'm sorry.

Padin - Direct by Mr. Jones

Q    (By Mr. Jones) It appears that someone made a request to waive the need for current letters of recommendation.  Do you know who that was?

A    No, I do not, and I would not speculate.

Q    And do you know anything about the inability to provide references from his current practice?

A    I do not know what the inability was, which is again why we were requesting additional references.

Q    Okay.  The lack of a reference, would you -- is it fair that you would characterize that as a red flag in the process?

A    Whenever we -- we would like to see full references. Whenever there is not a set of references, we want to understand why.  So yes, I would say, yes, we would see that as a red flag.

Q    Were there any other red flags discovered during the credentialed process for Dr. Seifer?

A    Not that I can recall.

          MR. JONES:  I will like to show the witness what's been marked for identification as Plaintiff's Exhibit No. 6?  May I approach the witness?

          THE COURT:  Yes.

Q    (By Mr. Jones) Dr. Padin, have you had a chance to review what we've mark as Plaintiff's Exhibit 6?

A    I'm still reviewing it.

Padin - Direct by Mr. Jones

Q   Take your time.

A   I've had a chance to review it.  Thank you.

Q   Yeah.  Thank you.  So, again, this is a multiple e-mails chain.  So if we go back to the -- on Page 2 is the beginning of the communication.  And, again, this is an e-mail from Kayla Hollis.  It appears to be directed to Dr. DeMars with a CC to a group of people including you; is that correct?

A   The initial one, yes.

Q   And the initial one was dated May 4th, 2016?

A   That's correct.

Q   And did you, in fact, receive this e-mail on that date?

A   Do I recall?  No.  It's been a long time.

Q   Understood.

A   But it's clearly listed, so...

Q   You don't doubt it?

A   I don't doubt it.

Q   Okay.  And then the response e-mail from Dr. DeMars to Kayla also includes you on the CC, and this response was dated May 8th, 2016.  Again, any reason to doubt that you received this e-mail on that date?

A   No.

         MR. JONES:  Your Honor, the plaintiffs would move the admission of Plaintiff's 6.

         THE COURT:  Any objection?

Padin - Direct by Mr. Jones

MR. SCHROEDER:  No objection.

THE COURT:  Plaintiff's Exhibit 6 is admitted.

Q   (By Mr. Jones) Dr. Padin, if we could go back to the initial e-mail on Page 2 from Ms. Hollis to Dr. DeMars copying you.  It starts off:  "Good afternoon, Dr. DeMars.  While credentialing Dr. David Seifer, I received an evaluation from a peer that requires your review," and then she identifies some issues.  The first bullet point:  "Have you ever received any compliant against this individual?  Answer:  Yes."  Bullet Point No. 2 -- first of all, is that correct?  Is that what Ms. Hollis was reporting?

A   Excuse me.  Can you repeat that question?

Q   Did I correctly read that, that Ms. Hollis was reporting to Dr. DeMars, copying you, in response to a question about whether there was complaints against this individual that there was a response, "yes"?

A   That's correct.

Q   And then the second bullet point:  "Were there problems with the requested privileges being carried out satisfactorily at your institution?"  Again, it said, "Yes," noting "substandard ultrasound skills"; is that correct?

A   I see that, yes.

Q    Did you consider this another red flag for Dr. Seifer?

A    Well, I think we would want to understand what was the determination that provided the assessment that he had substandard ultrasound skills, and I think we see that response in the response that Dr. DeMars provided the members of -- some of the members of the committee.

Q    So Dr. DeMars herself followed up and provided the answers to these questions for the committee; is that correct?

A    Yes.  Based on her conversations with Dr. Aaron Caughey.

Q    Dr. DeMars, she was advocating that the committee approve the credentialing and hire Dr. Seifer, correct?

A    Yes.  As a chair, she was advocating for his hiring.

Q    Was there anything unusual about the way that Dr. DeMars had gone about the process of hiring Dr. Seifer?

A    Not that I'm aware of.  Chairs are responsible for hiring and recruiting into their department.

Q    Do you recall whether she initially hired him into an administrative role and then sought to get him credentialed for clinical work?

A    I believe he was hired for both.

Q    You don't recall anything inappropriate or unusual about the way that went down?

Padin - Direct by Mr. Jones

A   That sometimes does occur where people are initiating their administrative role before they actually are doing their clinical work.

Q   Okay.  Did there come a time when the credentialing committee expressed concerns to Dr. DeMars about this hire?

A   So there were questions, additional questions, that were presented to Dr. DeMars.  I think some of them, as you see in this exhibit you've given me, as it relates to the ultrasound skills, the definition of why they felt they were not appropriate or not satisfactory.  He had come from an institution where he did not personally do the ultrasound.  It was a tech, but then at OHSU, in that division, it was the responsibility of actually the provider, many times, of doing it without a tech.

So it was -- it doesn't necessarily mean that he did not have the ability to interpret ultrasound. There are many institutions where the techs do the ultrasound and the reads are done separately from that and not by the one who is actually the performer of the ultrasound itself.

Q   Okay.  Did -- Dr. DeMars, he was on the committee, correct?

A   It's a she.

Padin - Direct by Mr. Jones

Q    I'm sorry.  I don't mean Dr. DeMars -- I mean Dr. Merrens.

A    Dr. Merrens was on the committee.

Q    Correct.  Do you recall that during the committee's time handling the credentialing request for Dr. Seifer that Dr. Merrens expressed to Dr. DeMars that he was concerned about this hire?

A    I do not.  I was not part of any of those conversations, so I can't comment about that.

Q    Do you recall anything along the lines of Dr. Merrens expressing to Dr. DeMars that Dr. Seifer's success was something she needed to ensure?

A    I believe I did see an e-mail, but I can't comment on a conversation that I wasn't a witness to.

Q    Okay.  And do you recall anything along the lines of Dr. Merrens telling Dr. DeMars that if Dr. Seifer failed, quote, "This is on you"?

A    I remember seeing an e-mail, but I do not recall being part of that conversation.

Q    Okay.  So if Dr. Merrens confirms that, you have no reason to dispute that, correct?

A    I was not part of the conversation, so if he confirms that, that's correct, I would not dispute that.

Q    Okay.  So, eventually, the committee approved Dr. Seifer's credentialing; is that right?

Padin - Direct by Mr. Jones

A   Yes.  Eventually, the committee -- the full committee -- approved his full credentialing and recommended him for privileging.

Q   Did the committee have any ongoing oversight of Dr. Seifer in the first few months of his employments?

A   So there is a process that is part of our bylaws for every provider, and it is a joint commission requirement that when you have a member of the medical staff who begins in your institution, there is initially what is called a focused professional practice evaluation.

That focused professional practice evaluation can occur between a three- and six-month period.  The department is responsible for overseeing the performance of that provider, and each department sets their own criteria and then reports, through a form that is provided to the department, the status of the focused professional practice evaluation back to the medical staff.

Q   And by "back to the medical staff," that's the credentialing committee?

A   Not the credentialing committee.

Q   Oh, okay.

A   The credentialing committee is responsible for verifying the references, verifying the training,

Padin - Direct by Mr. Jones

verifying the licensure.  They vet the candidate, make a recommendation.  That recommendation then goes to the medical executive committee of the hospital, which is comprised of various physicians of multiple specialties, who upon actually receiving that verification of the qualifications of the provider, then actually are the ones that recommend privileging based on the privileges of either the department, the specialty, or those that have been requested by the provider.  And, ultimately, they make that recommendation to the board, and the board of trustees ultimately is the one that grants those privileges.

Q   Okay.

A   Yeah.

Q   And then with regard to the focused professional practice evaluation, did I get it right that the chair then submits that evaluation to the medical staff; is that right?

A   To the medical staff office --

Q   Office.

A   -- correct, yeah.

Q   Were you a part of the medical staff office?

A   Yes.

Q   So did you have a role in reviewing whatever the chair would submit as part of the focused professional

Padin - Direct by Mr. Jones

practice evaluation?

A   When they are submitted, they are presented, generally, to the -- again, the medical executive committee is responsible for overseeing the OPPE and the FPPE; the FPPE being the first, the focused professional practice, and then after that initial three to six months -- if you think about it, in a job, you get a three- or six-month review, right? So after that happens, then there is an ongoing annual review required by the joint commission, and that is called the ongoing professional practice evaluation, and that happens at a minimum on a yearly basis is the requirement.

Q   Okay. And it's also a requirement that every new hire with clinical privileges has that initial focused professional practice evaluation?

A   Yes, it is.

Q   You said it takes three to six months. Is that the average time frame for this process, or do some people get a three-month process and some people get a six-month process?

A   So the department made a determination based also on the frequency of what they're trying to observe. So, for example, if you have a provider who is full-time who may have a greater volume, they may be able to be

observed doing something much faster than if you have someone who comes on who is part-time who you may need to observe longer in order to get enough volume to say, yes, they're competent in doing that procedure or their assessments are competent in terms of how they've arrived at what their thought process is for the diagnosis and the treatment.

Q   Am I correct that for Dr. Seifer, he was on a six-month focused professional practice evaluation?

A   So Dr. Seifer, I don't recall exactly the timeline, but I believe that he received his initial focused professional practice evaluation in the fall, early fall.

MR. JONES:  I would like to hand the witness what has been marked as Plaintiff's Exhibit 15.  I apologize, I forgot to ask for permission to approach...

THE WITNESS:  (Witness reading.)

Q   (By Mr. Jones) Have you had a chance to review the Plaintiff's Exhibit 15?

A   Mm-hm.

Q   What is Plaintiff's Exhibit 15?

A   So this is a response -- this has a couple of documents in here.

Q   Okay.

Padin - Direct by Mr. Jones

A    One of the documents is actually the focused professional practice department summary submitted by Dr. DeMars.  And with that are the different attachments of the evaluation done by his proctors during his initial focused professional practice evaluation which are inclusive of Dr. Hsu.  There is one that is from Dr. Porter, it states here.  And there is -- well -- and then just the generalized form that was filled by the department chair as well as it relates to the focused professional practice evaluation.

Q    Okay.

A    So those are all attached.

Q    Yep.

A    There were two specific pieces that were proctored, or overseen, as part of his focused professional practice evaluation.  One was an embryo transfer, and the other was oocyte retrieval.  These were the two specific procedures for which Dr. Hsu, and it states here, Dr. Porter --

THE COURT:  I'm sorry, Dr. Padin, to interrupt you, but we shouldn't speak about the documents until it's admitted.

MR. JONES:  Yeah.  I'm sorry.  I wasn't intending to get into the substance.

Q    (By Mr. Jones) Dr. Padin, if I could just direct your attention to the first page of the exhibit.  It appears to be an e-mail -- it begins with an e-mail dated November 23rd, 2016; is that correct?

A    That's correct.  It's 11/23/16.

Q    It's from Michele -- how do you pronounce Michele's last name?

A    Scearbo.

Q    Scearbo?  It's to Dr. DeMars.  And, again, you were one of the people who received a CC; is that correct?

A    Mm-hm.

Q    And who is Michele Scearbo?

A    She also works in the medical staff office.

MR. JONES:  Your Honor, I would move the admission of Plaintiff's 15.

THE COURT:  Any objection?

MR. SCHROEDER:  Just, Your Honor, just on the rule of completeness.  To the extent that Plaintiff's counsel is going to use Plaintiff's Exhibit 16, which is obviously not before the Court yet, but assuming that Plaintiff's counsel is going to use Exhibit 16 next --

MR. JONES:  Yes.

MR. SCHROEDER:  -- for the rule of completeness to make sure that the sequence is all

Padin - Direct by Mr. Jones

there, then I have no objection.

THE COURT:  Okay.  So Plaintiff's Exhibit 15 is admitted.

Q    (By Mr. Jones) Dr. Padin, if I could direct your attention to the first page.  So there's an item here under Item No. 1, it's a question about proctoring and you had mentioned proctoring earlier.  Before we get into the document, can you explain what proctoring is?  What does that mean?

A    So that means you have a clinician who has privileges in the same area or department, or to do that specific procedure, who observes the provider when they are doing their procedure to determine if they are doing it appropriately, and if it's meeting, sort of, the requirements or the standards of that.

Q    Okay.  And going to Ms. Scearbo's e-mail, she's writing to Dr. DeMars indicating that progress was reviewed today by Ed Merrens, Maria Padin, and Jocelyn Chertoff in preparation of bringing to the credentials process committee.  So would the evaluation go back to the credentials committee?

A    It goes back to the medical staff office, right?  It goes back as a follow-up and then back to the executive committee, but the credentials committee doesn't make any decision; the credentials committee has already

credentialed them.

Q    That's what I thought you said earlier.

A    Yeah.  The credentials committee has already credentialed him.

Q    Okay.

A    That is moved, again, to the medical staff office.

Q    Okay.  So Ms. Scearbo is asking Dr. DeMars some questions.  "First, why was Albert Hsu proctoring some of the procedures when he was under a proctoring plan also?"  That's one of the questions that she asked Dr. DeMars?

A    Yes.  That was a question that was raised.

Q    Number 2, "The FPPE --" first of all, is that a used acronym for focused professional practice evaluation?

A    That is a used acronym.

Q    It says, "The FPPE that was signed by you left No. 8 blank."  And the question that was left blank was, "Has the practitioner been the subject of repeated complaints by patients, hospital staff, or members of the medical staff?"  Do you see that?

A    Yes, I do see that.

Q    If we turn to -- if you look at the bottom right-hand number, those are numbers called Bates numbers, the first page of this exhibit has DH0025549.  I would like to ask you to flip to about ten pages or so in,

DH0025561.

A    Mm-hm.

Q    Do you see that?

A    Yes.

Q    Is this the focused professional practice evaluation form that Ms. Scearbo appeared to have been referencing?

A    Yes, that's correct.

Q    And Dr. DeMars has answered Questions 1 through 7, correct?

A    She has answered Questions 1 through 10 with the exception of Question 8.

Q    Okay.  Yes.  Fair point.  I was going to start with 1 through 7 and then say 9 and 10.  In the end, of the ten questions she answered all but No. 8; correct?

A    That's correct.

Q    Did that trouble you that she didn't answer the question, "Has the practicer been the subject of repeated complaints by patients, hospital staff, or members of the medical staff?"

A    That's why we asked the question back.

Q    So you were concerned?

A    We were asked the question back because it could have been an omission, but, again, I'm not going to speculate.  We wanted the answer to that question.

Padin - Direct by Mr. Jones

MR. JONES:  As promised, I would now like to show the witness Plaintiff's Exhibit 16.  May I approach?

THE COURT:  Yes.

Q   (By Mr. Jones) Have you had a chance to review Plaintiff's Exhibit 16?

A   Mm-hm.

Q   Do you recognize this document?

A   Yes, I've seen this document before.

Q   So this is an e-mail from Dr. DeMars to Michele Scearbo dated November 30, 2016; is that correct?

A   Yes, it is.

Q   And it appears to be answering the questions that we just went over that Ms. Scearbo had asked; is that correct?

A   That's correct.

MR. JONES:  Your Honor, Plaintiff would move to admission of 16.

THE COURT:  Any objection?

MR. SCHROEDER:  No objection, Your Honor.

THE COURT:  Plaintiff's 16 is admitted.

Q   (By Mr. Jones) So if we look at the, I guess, second paragraph of Dr. DeMars's response, she says, "Since this was an initial evaluation, I left No. 8 blank reflecting the positive and negative comments in my

Padin - Direct by Mr. Jones

narrative.  Dr. Seifer has not been the subject of repeated complaints by patients, staff, or DH colleagues."  Do you see that?

A   I do.

Q   Now -- okay.  So she answered the question saying, there haven't been repeated complaints, but I didn't answer it because it was an initial evaluation.  Did that make sense?

A   I believe that she said she reflected them in the comments in her narrative, but what we were interested was she -- "he has not been the subject of repeated complaints by patients, staff, or DH colleagues."

Q   In fact, isn't it true that from the date of this document, November 30th, 2016, until today, you have since learned that, in fact, there were repeat negative complaints about Dr. Seifer, correct?

A   I have heard of some of them complaints, but at the time of this document, this was the information we had.

Q   But since then, you have learned that this was not accurate, correct?

A   I did not hear --

         MR. SCHROEDER:  Objection, Your Honor. Mischaracterizes her testimony.

         MR. JONES:  I'm sorry, what?

         MR. SCHROEDER:  I said objection, you

were mischaracterizing her testimony.

MR. JONES:  I don't think I was characterizing the testimony; I thought I was --

THE COURT:  The witness can answer.

THE WITNESS:  Since that time, I have learned that there were some concerns raised by some of his colleagues.  I have not heard of additional patient complaints.

Q   (By Mr. Jones) If we can turn back to Plaintiff's Exhibit 15 for a second, and if you go to, I believe, Page 4.  The number at the bottom is DH002552, and if we scroll down to the new applicant section, there you go, the three -- do you see under "new applicant" there are three provisions with lines next to them?

A   Yes.

Q   And the one that has an X next to it says, "Current competence and clinical activity does not meet the guidelines as determined in the FPPE policy."  Do you know what that means?

A   It means that he was going to require some oversight and proctoring.

Q   Because at the time of the FPPE, he was not meeting the guidelines, correct?

A   At that time, we could not verify that he was meeting those guidelines, correct.

Padin - Direct by Mr. Jones

THE COURT:  Mr. Jones, we are at the lunch break.  Is this a good time to break?

MR. JONES:  It is a very good time to break, yes.

THE COURT:  All right.  So we'll reconvene at 1:15.

(Jury exits.)

THE COURT:  Okay.  So just in terms of scheduling, after Dr. Padin, what is the -- I know Dr. Bancroft is today?

MR. JONES:  That's correct.  After Dr. Padin will be Dr. Bancroft.

THE COURT:  Is that it for the day for Plaintiff's witnesses?

MR. JONES:  Probably.  I mean, we do have one just in case, but... I expect Dr. Bancroft will conclude our day.

THE COURT:  Okay.  All right.  Thank you.

MR. SCHROEDER:  I would like to get an understanding of time.  Dr. Padin has three and a half hours to travel home, and I want to make sure that she gets on the road early.

MR. JONES:  20, maybe 30 minutes.

MR. SCHROEDER:  Okay.  Thank you.

THE COURT:  Okay.  Thank you.

Padin - Direct by Mr. Jones

(Noon recess taken.)

Padin - Direct by Mr. Jones

March 28, 2025

Afternoon Session

* * *

(Jury present.)

THE COURT:  All right.  Mr. Jones.

Q    (By Mr. Jones) Dr. Padin, if a department chair -- for example, Dr. Leslie DeMars -- has received complaints from the medical staff in the department about a physician that may be causing patient safety issues, is that something that that chair should bring to your attention?

A    So the chair has different avenues for bringing that forward.  They can bring it forward to the officer of quality within the institution; they can bring it up to the CMO.  But, yes, they can bring up those concerns.

Q    Okay.  But that's something that would be appropriate to come to your attention, correct?  It's not outside the chain of command for any reason?

A    It would be appropriate to bring it to any of the officers.

Q    Okay.  At what point would you expect that an issue is -- a complaint is sufficiently serious that a department chair had an obligation to bring it to your attention?

A    So if there are -- there are criteria.  For example, if

Padin - Direct by Mr. Jones

there were any serious safety events, those are usually reported, and so those would come up through quality.

If there are concerns around the clinical competency and complications that are associated with the objective and can document those, those would also come forward. So, certainly, anything that has to do with the quality of care delivered within the department that is recurrent and/or any, again, clinical concerns that are voiced that are consistent would be reasonable to bring forward.

Q   Okay. Isn't it true that Dr. Porter, in fact, made complaints meeting those criteria to Dr. DeMars?

A   I was not privy of those conversations or of any communication while I was in my role as it relates to that.

Q   Never went -- never in your role did you hear that; is that what you said?

A   So, if the department chair, yes, can have communications with individuals, but we don't know what is not raised to us --

Q   Right.

A   -- above the department.

Q   Are you saying that Dr. Porter's concerns that she raised with Dr. DeMars, that you did not learn about that during your time as chief medical officer? Is

that what you said?

A    While we were there, I did not have any direct communications specifically, at that point, saying that there were really specific concerns that could be delineated.

Q    Okay.  So but you did learn through other means, however, while you were still chief medical officer that Dr. Porter had, in fact, made such reports to Dr. DeMars, correct?

A    The reports I learned were more around the communication in the department and the challenges.

Q    Were you a -- the chief medical officer of Dartmouth-Hitchcock Medical Center on September 25th, 2019?

A    Of September 25th, 2019, yes.

Q    Do you recall giving deposition testimony in this case?

A    I do recall giving a deposition testimony.

Q    And at that deposition, isn't it true, at that time, you were the chief medical officer?

A    I was the chief medical officer.

Q    And do you recall during that deposition Dr. Porter's lawyer showing you documents reflecting Dr. Porter's complaints to Dr. DeMars and Seifer?

A    I don't recall that.  It's been a long time.

            MR. JONES:  Your Honor, I have a copy of the

Padin - Direct by Mr. Jones

witness' -- the transcript of the witness' deposition. Can I consult briefly with the deputy -- the courtroom deputy to discuss appropriate identification markings?

THE COURT:  Yes.

(Pause.)

MR. JONES:  Your Honor, we have marked the transcript of Dr. Padin's deposition as ID 2, and may I approach the witness to provide it to her?

THE COURT:  Yes.

Q   (By Mr. Jones) Dr. Padin, have you seen this before, the transcript of your deposition testimony?

A   Yes, I have.

Q   When was the last time you reviewed it?

A   Probably last week.

Q   Last week?  Okay.  So can you -- can you turn to Page 127 of your deposition transcript?

A   (Witness complies.) 127?

Q   And at the bottom of Page 127, Line 16, there's a question:  "Did you ever become aware of Dr. Porter's evaluation of Dr. Hsu from June 2016?"  And then an exhibit was marked, and then if you move on to Page 128, it reflects, at Lines 7 through 9, that you had a chance to review the document at the deposition, and then you were asked the question at Line 9, "What is your overall impression of this document?"  Do you

see that?

A   Yes, I do.

Q   And can you read for the jury what your answer was?

A   Yes.  At that point, in 2019 my answer was -- and you said Line... "I think these concerns are significant, and I think that these concerns should have risen to the level and Dr. DeMars, as the chair, should have brought them to our attention."

Q   So at least at the time of your deposition when you were shown Dr. Porter's evaluation of Dr. Hsu, you acknowledged that the report raised serious concerns, correct?

A   At that point.

Q   And they should have been raised to you, to your attention, from Dr. DeMars?

A   Before.  That's correct.

Q   Do you recall during your deposition also learning of a report from a Dr. McBean?

A   I don't recall.

Q   Okay.  So if you turn to Page 135 of your deposition, please.

          MR. SCHROEDER:  Your Honor, may we have a sidebar?

          THE COURT:  Yes.

               (Bench conference.)

Padin - Direct by Mr. Jones

MR. SCHROEDER: Thanks. Just so we didn't have an objection in the court because I know where he's going. This is a line of questioning related to Judy McBean, and it's a specific e-mail that Dr. McBean was not on. So it's hearsay. And in terms of a hearsay issue, Judy McBean is a per diem that only worked 20 hours in 2016, so it's a broad statement by a party opponent.

So he's trying to backdoor in hearsay evidence related to document that she hadn't seen it before in 2019, and now she's going to have to say again "I haven't seen this document before." It's hearsay, but the underlying document is hearsay.

MR. JONES: I do not intend to submit the document -- I'm not going to submit it. I'm not going to offer it. I do intend to ask the witness if she recalls learning at the deposition that Dr. McBean had made a complaint concerning patient safety and endangering patients.

THE COURT: Okay. So I thought what you were doing was attempting to impeach Dr. Padin on whether she knew that Dr. Porter had made complaints to Dr. DeMars. That was the purpose, it seems to me.

MR. SCHROEDER: It didn't work, but, yes.

THE COURT: So I'm not sure, then, what are

Padin - Direct by Mr. Jones

you impeaching?

MR. JONES:  I guess I need a foundational question about Dr. McBean.

THE COURT:  What about the foundational issue?  You're asking this witness about a document that she was not a party to.  I think that's a bit problematic.  Am I hearing an objection?  I'm sustaining an objection.

MR. SCHROEDER:  Sounds like it.  But I know you didn't want us to have a conversation in open court.

THE COURT:  Definitely not.  Okay.  Thank you.

(End of bench conference.)

Q   (By Mr. Jones) But nevertheless, if a department chair was aware that a doctor was expressing a complaint about patient safety, you would expect that to be escalated, correct?

A   Yes, I would expect if there was a concern, that it would be escalated --

Q   Okay.

A   -- so that we would further investigate whether it was valid or not.

Q   After learning about Dr. Porter's complaints at your deposition and you had that information, did you do

Padin - Direct by Mr. Jones

anything with it?

A   Well, Dr. Porter was no longer at the institution, or any of the providers.

Q   Okay.  So you weren't concerned?

A   There was no action to be taken at that time.

Q   Okay.  Do you recall after Dr. Porter had started to return from her time off on disability proctoring a surgical procedure that she performed?

A   Yes, I did.

Q   Why did Dr. Porter need a proctor?

A   My understanding was she had been out on medical leave, and when someone is out for an extended period of time, we -- when they come back, it is a requirement that we oversee, or proctor, to make sure that they, just like we did with the FPPE and the OPPE, that they indeed are undertaking the care and procedure or the surgical intervention appropriately.

Q   Do you recall the procedure Dr. Porter was performing that you proctored?

A   Yes.  She did an operative hysteroscopy for a patient that had Asherman's syndrome.

Q   And isn't it true that that's a complex surgery?

A   Yes, it is.

Q   How did Dr. Porter perform?

A   She performed well.

Q   I would like to show you a document that's already been admitted into evidence as Plaintiff's 37.

MR. JONES:  Your Honor, may I approach?

THE COURT:  Yes.

Q   (By Mr. Jones) So, Dr. Padin, this -- Exhibit 37 is a series of e-mails starting on April 11th at 10:12 a.m. from Dr. Porter to you where she's thanking you for being a proctor.  Do you see that?

A   Mm-hm.

Q   And then you responded.  Could you read for the jury how you responded?

A   Yes.  "You are a talented surgeon.  Thanks for inviting me to your case."

Q   And Dr. Porter was a talented surgeon, correct?

A   Dr. Porter was a talented surgeon.

Q   Does Dartmouth-Hitchcock -- or did Dartmouth-Hitchcock have a process for department chairs to report to your level, or to you, behavioral issues that they may be having with physicians?

A   Our professional practice evaluation policy which exists does have an area where clinicians are -- have a process for reporting professional issues, and it is a sequential process, meaning that the ownership is still within the department, and it's only when those issues are recurrent and not being resolved that then there is

Padin - Direct by Mr. Jones

a formal process called a TFPPE, which is a trigger professional practice evaluation. And that would be like a performance improvement plan.

Q   Okay. And, say, within the 2016/2017 time frame, are you aware of Dr. Porter ever being on a performance improvement plan?

A   I am not aware of her being on a performance improvement plan.

Q   So after the REI division was shuttered, it was short-staffed, right?

A   The -- the whole division was short-staffed at that time, and all of the department was short-staffed.

Q   Yeah. But my question was poor. I apologize.

But after the REI was shuttered, the OB-GYN department, what was left of it, was short-staffed still, correct?

A   It was still short-staffed.

Q   In fact, you're a gynecologist, correct?

A   I'm an obstetrician gynecologist, correct.

Q   I'm sorry. Thank you. And, at that time, you rolled up your sleeves to pitch in and help, correct?

A   That's correct.

MR. JONES:   I would like to show the witness what's been marked as Plaintiff's Exhibit 96. And may I approach, Your Honor?

Padin - Direct by Mr. Jones

THE COURT: Yes.

Q   (By Mr. Jones) Do you recognize this document?

A   I do.

Q   Okay.  It starts -- well, first of all, it's -- the front page at the top is an e-mail from you to Ed Merrens dated May 22, 2017; is that correct?

A   That's correct.

Q   And you, in fact, sent this e-mail?

A   I did.

MR. JONES:  Your Honor, Plaintiff moves the admission of Plaintiff's 96.

THE COURT:  Any objection?

MR. SCHROEDER:  No objection, Your Honor.

THE COURT:  All right.  Plaintiff's 96 is admitted.

MR. JONES:  Thank you.

Q   (By Mr. Jones) If we start with where this chain starts, which I believe is the bottom of Page 2 -- I'm sorry.  Technically, it begins at the bottom of Page 3, but I want to direct your attention to the bottom of Page 2.  An e-mail from Emily to Ed.  Do you know who Emily is?

A   Yes.  She's one of our maternal fetal medicine clinicians.

Q   Is she still employed?

Padin - Direct by Mr. Jones

A    I think she's retiring this year.

Q    So she writes to Ed, about the -- am I correct that this appears to be about the REI closure?

A    I think this appears to be around the stressors around the lack of staffing in the department in general.

Q    She says, "I feel pretty ambivalent about meeting.  I don't know if I'm more angry or more sad.  The magnitude of what our department and DHMC is losing, I do not think is yet recognized."

So at that time, the only thing that the department was losing was the REI division, correct?

A    They were also losing other staff members who were leaving for other reasons as well.

Q    Okay.

A    And they also had a fair amount of people who were going on leaves for maternity, for example.

Q    Okay.  So you did not read this as being about the closure of the REI division; is that what your testimony is?

A    That was inclusive in part of that.

Q    Okay.

A    Yes.

Q    She goes on:  "There will be harm to each of our divisions and our education mission.  The infertility care is the least of my concerns.  The general OB-GYNs,

Padin - Direct by Mr. Jones

as few as they are, cannot pick up the subspecialty medical care. Women will not get their needs met. Although there is more to say, I will not go on." Do you see that?

A    Yes, I do.

Q    Fair to say that Ms. Baker was basically stating that the loss of the REI would lead to a loss of services, and women would not get their needs met?

MR. SCHROEDER: Objection, Your Honor.

Q    (By Mr. Jones) That's what it says, correct?

THE COURT: Basis?

MR. SCHROEDER: He's interpreting what the -- he's giving his own interpretation, so he's mischaracterizing the actual document; the document speaks for itself.

THE COURT: You can ask the witness what she believes the importance of this document is.

MR. JONES: Thank you.

THE WITNESS: I will say that the needs of the patients could be still met. That's a -- I cannot speculate as to why she was saying that specifically, but there are, as part of general gynecology, you are actually trained to take care of patients more broadly. While we don't have the expertise of in vitro fertilization or some of the infertility components,

Padin - Direct by Mr. Jones

the treatment of conditions that are associated with reproduction are in our scope of practice.

For example, when you asked me beforehand why I assisted, as a proctor, Dr. Porter it is because I was privileged to do the procedure, and I could intervene if there was a concern intraoperatively. So it is within my scope of practice, as well as other obstetricians, to do operative hysteroscopy, for example, and some of those procedures that I think you are indirectly alluding to.

Q   (By Mr. Jones) Okay. And if you go to the top of Page 1, you end up writing to Ed -- and in the fourth sentence, "I am willing to increase my clinical FTE during the summer to help meet some of their needs."

So I started this line of questioning by asking: You rolled up your sleeves and pitched in; this is you offering to do that, correct?

A   That's correct.

Q   Isn't it true that Dr. Porter herself could have also provided those services to help out the department?

A   I think the department had other needs as well, because one of the other big needs that the department had was obstetrical coverage, which Dr. Porter alludes to as part of this -- not Dr. Porter, Dr. Baker alludes to in part of this e-mail.

Padin - Direct by Mr. Jones

Certainly, they were also having challenges with coverage in obstetrics, and Dr. Porter would not have been able to really provide that part of obstetrical coverage call.

MR. JONES:  Your Honor, I have no further questions at this time.

THE COURT:  Okay.  Cross.

MR. SCHROEDER:  Your Honor, I don't have any questions at this time.  We'll reserve the right to call Dr. Padin in our case in chief.

THE COURT:  Okay.  Thank you, Dr. Padin.  You may step down.

MR. VITT:  I'll get the next witness.

THE COURT:  Okay.

THE CLERK:  Raise your right hand, please.

**Robert Bancroft**, witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you, sir.  Counsel, do we still need ID 2 up at the witness stand, the deposition of the previous witness?

MR. JONES:  Is it still up there?

THE CLERK:  I believe so, yes.

Sir, if you would state and spell your name

Padin - Direct by Mr. Jones

please.

THE WITNESS:  My name is Robert Lewis Bancroft.

THE COURT:  If you would spell your name, sir.

MR. VITT:  Spell your name.

THE WITNESS:  B-a-n-c-r-o-f-t.  I apologize, I'm hard of hearing and I even have hearing aids in, but driving too many tractors.

MR. VITT:  I'll try and speak up, and if I'm not loud enough, give me a high sign.

**DIRECT EXAMINATION**

**BY MR. VITT:**

Q    What's your name, please?

A    Robert Bancroft.

THE COURT:  Dr. Bancroft, can you hear me?

THE WITNESS:  Beg your pardon?

THE COURT:  Over here.  Could you please speak into the microphone?  Thank you.

THE WITNESS:  Robert Bancroft.

Q    (By Mr. Vitt) And where do you live?

A    In Westford, Vermont.

Q    What's your occupation?

A    Semi-retired, but I am still doing some consulting as an economist.

Q   Were you hired by Dr. Porter to calculate her lost earnings by reason of losing her employment at Dartmouth-Hitchcock?

A   I was.  I was retained by -- actually, by you for her.

Q   I was acting on behalf of Dr. Porter, right?

A   Yes.

Q   Okay.  A little bit of background.  Could we start with your education and start with college?

A   Okay.  College, I have a bachelor's in economics from the University of Vermont.  I have a master's in agricultural economics from the University of Vermont, and I have a Ph.D. in agricultural economics from Purdue.

Q   So can you provide kind of a sketch of what agricultural economics is?

A   Well, a lot of it deals directly with agriculture, but an agricultural economist deals with just about everything that a normal economist.  I think they -- the generally accepted difference is that agricultural economists tend to be more practical oriented as opposed to theoretical, and agricultural economists deal with labor, international trade, natural resources all across the board.

Q   Could we turn to your work experience?  After getting the Ph.D., what did you do?

Bancroft - Direct by Mr. Vitt

A   Well, for a little while, I was getting my Ph.D., I had an opportunity to go to Washington, D.C. They wanted me to build an econometric model, which I went down there, and as -- for my dissertation to get a Ph.D. so I worked down there after I got my Ph.D., worked at Economic Research Service in Washington, D.C. And then I had the opportunity to return back to Vermont in '81 to the University of Vermont where I was an assistant professor in the Department of Agricultural and Resource Economics which is now Community Development and Applied Economics.

Q   You mentioned that the work at the Department of Agricultural involved econometric forecasting?

A   Yes.

Q   In a brief over-sketch, what does that entail? Can you do it simply?

A   This is, I feel like, a six-credit course. It entails looking at historical data and seeing if you can determine trends and use those trends and that information then to develop models that will forecast what people will do given certain criteria.

Q   So in August of 1981 you became an assistant professor at UVM, correct?

A   Yes.

Q   And you remained an assistant professor for how long?

A   Until 1991.

Q   So ten years in that, right?

A   Yes.

Q   And then did you become an adjunct professor?

A   After I left in '91, I was an adjunct professor for about five years.

Q   So a total of 15 years teaching at UVM, correct?

A   Yes.

Q   Okay.  When did you begin offering testimony calculating economic loss?

A   Well, my first -- I came back to Vermont in August of '81, and I got my first economic consulting assignment in September, but we didn't have to do with litigation. My first involvement with forensic, or litigation, work was in 1982.

Q   All right.  And have you continued to do work in the litigation area since then?

A   Oh, yes.

Q   And in what types of cases have you worked?

A   Well, a variety.  The bulk of them are personal injury, wrongful death, employment, and commercial lost business profits.  Those are the major ones, but there's been some unusual ones.  I've been retained by the IRS to look at whether a rational person would make a certain investment.  And I've done things like viewed

a red herring prospectus for a company that was going public.

Q   So you -- have you developed or used a methodology for calculating lost earnings?

A   Yes.  Yes.  It's a pretty standard methodology, nothing unique about it.  Any forensic economist uses the same basic -- same basic methodology.  Different approaches to it, but it's still -- you could distill it down to it's projecting out what the person would have earned and compare that with what they're likely to earn.

Q   All right.  Have you appeared often in the courts of Vermont as an expert witness?

A   Yes, I have.  I've testified in every single court in Vermont except for Essex County.

Q   So all the state courts in Vermont other than Essex you've testified in, right?

A   Yes.

Q   And have you been an expert witness in courts in the federal courts in Vermont?

A   Yes, I've testified in all three -- this courthouse, Rutland, and Richland.

Q   Did you prepare a report recently to calculate Dr. Porter's economic loss that has been sustained as she'll continue to sustain reflecting her losses because she's no longer an employee at

Dartmouth-Hitchcock?

A    Yes, I did.

MR. JONES:  Your Honor, what we've done is taken the report that you've seen before and we removed the first page, and it's been marked as Plaintiff's Exhibit 1-B, and what I would like to do is to show the report to Dr. Bancroft -- can you indulge me one second?

THE COURT:  Yes.

MR. VITT:  We can pull it up on the monitor.

THE COURT:  Exhibit 1-B has been shown to opposing counsel?

MR. VITT:  Yes, they have.

MR. COFFIN:  Your Honor -- a couple things, if you could just speak a little louder, I'm having a hard time discerning what you're saying.  And you keep saying "report."  I think you're talking about the chart?

MR. VITT:  Chart.

MR. COFFIN:  Charging assumptions because we have an evidentiary ruling on that.  1-B.

MR. VITT:  Yep.  1-B.  What I think I would like to do is move its admission now.

THE COURT:  Okay.  So that raises a question.  Would you like to approach?

MR. COFFIN:  If we can approach.

THE COURT:  Yes.

(Bench conference.)

THE COURT:  So when you say "admission," you're treating it like an exhibit that's in evidence.

MR. VITT:  So I want to be able to obviously show it to the jury.

THE COURT:  Right, and the agreement is that it can be shown to the jury as a demonstrative.

MR. VITT:  And at the end, we'll figure out whether it's --

MR. COFFIN:  It specifically should be -- I suggest our position would be, it needs to be made clear to the jury that this is being shown to you for illustrative or demonstrative purposes but it is not admitted into evidence until it is.  There's a distinction there.

THE COURT:  All right.  So when you do that, when you ask it to be put up, we'll make that statement then.

MR. VITT:  Close enough.  I'll get to it.

(End of bench conference.)

Q   (By Mr. Vitt) I believe that the agreement is that the report, Exhibit 1-B, will be shown to you and it will appear on the screens so the jury has a way to follow

your testimony, but it is not, at this time, being offered in evidence?

THE COURT:  Yes.  This exhibit, I'll instruct the jury is meant to be illustrative.  It is not in evidence at this time.

MR. VITT:  Thank you.

Q   (By Mr. Vitt) What's the date, Dr. Bancroft, of the most recent report that you prepared?

A   March 19th of this year.

Q   And is the -- what's been marked as Exhibit 1-B that report?

A   I assume so, I don't see a mark on this.  Oh, I do now.

Q   All right.  So is this the most recently report you prepared, correct?

A   Yes.

Q   And does it reflect your analysis of Dr. Porter's lost earnings by reason of losing her employment at Dartmouth-Hitchcock and then becoming employed at UVMMC?

A   Yes.

Q   And the lost earnings are for what period of time?

A   From year 2017 through -- I made projections through the year 2033.

Q   All right.  You're not asserting that Dr. Porter would necessarily work until she's 70, correct?

A    That's correct, I'm not.

Q    But you simply provided, by year, what the losses would be up to that age, correct?

A    Yeah.  That's correct.  You can look at any particular year, and there's a loss associated with it.

Q    And how do you begin your analysis?

A    Well, to begin my analysis, I have to get information. The support that I get, biographical information, date of birth, education level, and obviously in employment cases, termination cases, I need a date of termination. And then once I sort of understand the -- some of the parameters of the case, I'm going to require additional information regarding the employment that the person was terminated from.

     I need information regarding wages that the person was receiving, and information on fringe benefits.  I need tax returns.  And then if the person, as in this case, they have found alternative employment, sometimes that's not the case, but I do the same thing.  I look at what their salary is, or wages, and the fringe benefits associated with it.  And I didn't mention income tax returns right up to present.

Q    And did you receive from Dr. Porter the information you described, the tax returns, W-2s, the information that allowed you to calculate what she was earning at

Dartmouth-Hitchcock?

A   Yes.

Q   And did you also receive that same information from University of Vermont and University of Vermont Medical Center?

A   Yes.  Dr. Porter provided that to me, yes.

Q   Okay.  Can you explain how you undertook your analysis and reached your conclusions?

A   Sure.  As I mentioned, the -- if you will, kind of two basic steps.  First step is to estimate out what the person what I believe is a reasonable estimate what the person would have made if they had continued employment.  In this case, continued -- Dr. Porter had continued her employment at Dartmouth-Hitchcock.  And then from that, I need to estimate out what -- actually, I'll have her actual earnings, and then going forward, I've got to project out what she would likely to make now that she's no longer there.  Then I've got to compare those two, and then there's several steps before I get to what I would classify the present value of the losses in any particular year.  I can go through those individual steps if you would like.

Q   Yeah.  If you can continue on the individual steps, I would appreciate it.

A   Yeah.  Right.  Looking at the chart, I think the first

column -- well, the first column is year.  Second column is age.  The first column that requires some forecasting is under the Dartmouth-Hitchcock Medical Center, and it's under the gross earned income.  And here, this is where I developed the projections of what I believe are reasonable estimates of what I believe Dr. Porter would've made if she continued to work at Dartmouth-Hitchcock.

In developing those estimates, I looked at what her past earnings were, what her current contract was, and then there was a little -- 2017 was a bit unusual because she was on disability for part of the year, so I had to take that into account for 2017, but --

Q    For 2017, did you include the amount she received in disability payments when you're calculating the gross income for the year?

A    Yes, I did.  But then starting in 2018, I just based on what she would receive as a salary as a doctor at Dartmouth-Hitchcock.  In developing those forecasts, I used -- in most years, I used -- I assumed that her wages would grow at an annual rate of 2.5 percent.

Q    Did you believe that was reasonable?

A    Yeah.  That's significantly below what the average wages have grown.  I don't care what -- any length of period.  If you use 10, 15, 20, 30 years, it's up in

Bancroft - Direct by Mr. Vitt

the three to three and a half percent.

Q   So the number you chose was lower than historic data?

A   Yes.  Yes.

MR. COFFIN:  Objection, Your Honor.  This is all totally leading, and I understand that he needs to set the foundation, but the witness should be testifying, not Attorney Vitt.

THE COURT:  Okay.  Sustained.

You'll have some leeway, Mr. Vitt.  I understand it's an expert witness.

Q   (By Mr. Vitt) Will you continue, please?  We were at the 2018 -- you assumed an increase of 2.5 percent.

A   Yes.  I assumed -- for most years, I assumed an increase of 2.5 percent.  There were three exceptions to that annual increase of 2.5.  The first one was -- and I assumed the increases would happen in July of each year; that's the fiscal year for Dartmouth and that's when raises went into effect, in July.

I assumed that in the year July of 2018 that she would receive a 5 percent salary increase because she would be promoted to a full professor.

And then the other two exceptions were in the years 2000 and 2021, I assumed no increase.

Q   2020 and 2021?

A   2020, and 2021.

Bancroft - Direct by Mr. Vitt

Q   Go ahead.

A   That there would be no increases, and that was based on information that was provided by Defense saying that there were no increases during those two years.

Q   Those were the COVID years?

A   Yes.

Q   And so, essentially, Dartmouth-Hitchcock, the representation was, that there would be no raises, and we were prepared to accept that, right?

A   I had -- yes.  I accepted it, and I had no way to verify it, so I accepted it.

Q   And did you make an assumption about whether there would be raises subsequent to the COVID years to essentially make up for the two years of, you know, no raises?

A   No.  I used the conservative two and a half percent, you know, recognizing that, you know, when you can forecast out into the future, you pick what you think is a reasonable rate.  You're not saying that every single year would be exactly that rate, but on average, over the forecasting period, that it would -- would be what you're assuming.  In this case, I'm assuming two and a half percent which, again, I believe to be a very conservative estimate of --

Q   Just to be -- to recap it, for those two years, the

COVID years, 2020 and 2021, your report assumes no raise for Dr. Porter, right?

A   That's correct, yes.

Q   Okay.  Continue, please.

A   So anyway, I took her basically -- for 2018, I took her salary that she had -- contracted salary in 2017 -- actually it went from July of 2017 through June of 2018, so I used that as the basis, and then I applied a two and a half percent in 2018.  2019 I applied the 5 percent.  Then no increases in '20 and '21, and then after that, an increase of two and a half percent. That's how I was able to develop that first column there on the gross earned income under the Dartmouth-Hitchcock Medical Center estimates.

Q   So the June 2017 date was used because that's when she ceased to be employed by Dartmouth-Hitchcock, correct?

A   That's correct, yes.

Q   Okay.

A   The next column over is my estimate of the fringe benefits that she would have received if she remained employed at Dartmouth.  Typically, there are three fringe benefits that I'm generally interested in.  One is the employer's contributions to Social Security, the employer's contribution to health insurance, and the employer's contribution to retirement.

In this particular case, I wasn't concerned about Social Security because that contribution only goes up to about -- currently it's about $150,000, so the earnings were all over that, so there's no loss on that contribution that Dartmouth would have made to Social Security, because there's a similar contribution being made at UVM.

Q   So because the contribution was equal, there's no loss, correct?

A   Correct.  It washes so it was excluded from my estimates at Dartmouth and also when I get to the UVM, it was excluded from the UVM fringe benefits.

And then the next one was I looked at was medical insurance.  And medical insurance, the only years that I put Dartmouth's contribution to medical insurance was the six months or so of 2018 after she was let go, and then for, I think, it was through April of 2018, because after April, she got a position at UVM where she got medical insurance.  So, again, going forward from May of 2018, the value of Dartmouth's medical insurance was equivalent to the value of the UVM contribution of medical insurance, so it's a complete wash.

Q   All right.

A   So it's not included in there.

Bancroft - Direct by Mr. Vitt

Q    All right.

A    The other factor that is included in there is Dartmouth's contribution to retirement which, based on my analysis, is equivalent to about 12 percent of her earned income. And in her case, she was actually able to be grandfathered in. She has what is called -- referred to as a defined benefit package. That is it's -- not many of those around anymore; State of Vermont has one -- where your retirement is based on the average of three to five years, your number of years of creditable service, and then some percentage. And she was able to be grandfathered into that. Dartmouth, at that time, in that 2017 period, was moving to a defined contribution where she would put in an X amount of money every year into an account.

Q    What I'm hearing you say is that Dr. Porter qualified for a defined benefit plan at Dartmouth-Hitchcock, right?

A    Yes, she did.

Q    And if she had remained at Dartmouth-Hitchcock, she would have been eligible to receive the payments under that plan, correct?

A    Yes.

Q    And did you calculate -- I realize it's not reflected in the report, but did you calculate what would have

been the payment to her yearly if she retired when she was 65 under the terms of that plan?

A   I did at 65.  I did it for several years.

Q   All right.

A   I looked at if she retired at 65.  I actually looked at it earlier.  There's a reduction in your benefits if you retire before 65.

MR. COFFIN:  Objection, Your Honor.  If we could approach, please?

THE COURT:  Yes.

(Bench conference.)

MR. COFFIN:  The fact that she would lose a pension is nothing that was raised in the report.  And, in fact, our evidence is that she is going to get a pension.  She would get a pension that is somewhat smaller than if she had stayed at Dartmouth but prorated, based on her contributions and her years there.  So for him to -- if you would, please.  For him to, at the very last minute, offer all these changes in this report that this is a new undisclosed expert opinion is improper.

THE COURT:  Go ahead.

MR. VITT:  This was simply predicate for to get Dr. Bancroft to say, essentially, that the calculation in that report reflects the damages.  We

Bancroft - Direct by Mr. Vitt

are not asking for any more. It was simply an example of why there is -- in the report, there is an analysis that reflects the loss of the retirement benefit. It's already in there. It's baked into those numbers, so I'm not saying that there's an additional loss. It's simply saying, okay, what would she have received, having calculated that it is reflected in the report.

MR. COFFIN: It is not spelled out as such in the report so it's completely opaque. It should have been noticed early. And, in addition, I think it's untrue.

MR. VITT: Okay. Well, you took his deposition. You had an opportunity to call an expert witness if you wanted to put somebody on who was going to prepare a report to say that. You were entitled to do that. We think the report is accurate. You can cross-examine him on it, but this is not something that we hid or tried to sneak in.

MR. COFFIN: It's an undisclosed expert opinion. I don't know what your motives were, but it was not disclosed.

THE COURT: It's not this is something that was in the assumptions is that your --

MR. COFFIN: Yes.

MR. VITT: He has described how he calculated

it.  This amount is in there.  It is already baked into his analysis.

THE COURT:  Was this something that was discussed at the evidentiary hearing?

MR. VITT:  No.

MR. COFFIN:  And let's not forget, there's been five reports, the deposition of this expert occurred in 2019.  There was one in August 2024 which, as you know from the hearing, we had significant problems with, which resulted four days after our cross-examination of him, him offering a new report which reduced his calculations by $2.6 million, and that's a significant change.

And so, like, for them to come in today and offer a new additional opinion, there's another hidden time bomb in our opinion.  I think is not what expert opinion is for.

THE COURT:  It does seem to be kind of a new aspect of the analysis that I haven't heard of before.

MR. VITT:  Judge, we didn't get to this level of detail.  He can explain the report that you received, and the report that we gave to them had this in there.  That is -- he can describe how it's 12 percent and he has calculated this loss.  This is not new, not new at all.  This is -- this isn't some

sort of something that we're pulling out of the air. This is the analysis that was reflected in that report, and it was reflected in the earlier report, Judge.

MR. COFFIN:  It just wasn't stated that anybody could know about it except Mr. Vitt and Dr. Bancroft, and that's not what the purpose of expert discovery and disclosure and reports are for.  This is a problem we've had throughout this particular expert witness' reports and testimony.  It just seems like there's a lot of undisclosed information.

THE COURT:  All right.  So, you know, it seems like this is kind of a premise of the report that I'm hearing is undisclosed.  And I'm kind of reluctant to allow this expert to testify to something that the other side hasn't had an opportunity to kind of probe.

MR. VITT:  Judge, they had every opportunity -- it was in the first report.  It has been in every report.  This is not new.  If they'd asked the question -- maybe the thing to do, Judge, so that I can -- instead of -- I think we should excuse the jury; I can have him explain it.  It was in all the reports, this -- the loss of -- the loss of retirement amounts because Dartmouth-Hitchcock had a better plan than UVM has been in all the reports.

THE COURT:  Okay.  When you say has been in

all the reports, what I'm hearing, the objection is this hasn't been spelled out as an assumption.

MR. COFFIN:  Or articulated in the narrative report describing what his calculations are.  It's hidden in the numbers which are numerous columns and repeated over 30 years.  It's not something set forth.  It's something you have to find, and I think that is not right.

MR. VITT:  If he had been asked these questions, he would have been -- this is not something that we've been trying to hide.  I mean, there is no reason that we would hide this, Judge.  The loss, because we have -- and he has been saying Dartmouth-Hitchcock had a more generous retirement plan than UVM, and that loss is reflected in this.  He has been saying that.

MR. COFFIN:  My proffer to the Court would be that our expert would say that he is -- she -- she is going to get a continued benefit from this, and if we'd known this was spelled out, it might have been another reason to call an expert.  This is half-baked.

MR. VITT:  Wait a minute.  I haven't said that the there will not be a continued benefit; there will.  It is simply lower.

MR. COFFIN:  I thought you did say that to

him.

MR. VITT:  No.

MR. COFFIN:  Well, it sure sounded like it was going to be lower, and that's when I stood up.

THE COURT:  In light of that, Mr. Coffin, is there any way that he can continue to testify about this?  Is this based on a mishearing of what he said?

MR. COFFIN:  Partially, perhaps that little portion of it.  But I still think it's an undisclosed expert opinion, and we've tolerated many, repeated disclosures of expert opinions as the assumptions have changed right up to the eve of trial, and we asked for our own expert and were not permitted to provide that kind of rebuttal.  So for them to change and disclose this other stuff is, to me, concerning.

MR. VITT:  Judge, the prior report reflected a significantly larger loss because Dr. Porter was planning to go to a .6 FTE and no call.  UVM wouldn't, and we're going to have this explained.  UVM would not accept it and, as a result, she's testified, I've stayed at .75, with call.  So she'll be working with call.

So, yes, has there been a reduction?  Significant.  Because she had planned, if UVM had agreed to it, she would have gone to .6 with no call, and as she can

testify, and as Dr. Bancroft would testify, call is a big issue. They need people to take call. So if you're not prepared to take call, you can still be employed but at a significantly reduced salary. So we took the new information, which I'm kind of surprised they're complaining we reduced the demand.

MR. COFFIN: I'm not complaining about it. I'm complaining about the timing of it.

MR. VITT: Well, the decision for UVM to say no is quite recent, so it's not like we were hiding this.

THE COURT: Okay. So this is a bit of a problem that we have here, it seems. This particular feature of his testimony is something that I'm hearing that the defense did not really have, and you're saying it's been in the report, but I'm not hearing it being articulated as it was kind of spelled out that this was kind of part of the analysis, and I would be reluctant to allow him to continue to testify on this point if the defense is telling me that they didn't really quite appreciate this facet of his analysis. It seems only fair that they should have that ability to probe that, but they're hearing about it now for the first time is what they're telling me.

MR. VITT: Judge, I think that the only

Bancroft - Direct by Mr. Vitt

reason that they're hearing about it for the first time is they didn't ask. So rather than have me try and explain it, you know, to the best I can, if I could suggest perhaps the jury be excused and I can have him explain how this is baked into this report. It's been -- it's been true from Day 1. It's been true from the first report that we submitted. The first report had a loss associated with the retirement. First report. Seven years or whatever it was.

MR. COFFIN: If it was hidden then and it's still hidden, the fact that we have this and are just learning this on Day 5 of the trial doesn't solve our problem of prejudice.

THE COURT: All right. Well, I would be inclined to hear from him just so I have a better understanding of kind of the factual argument which is not prepared, and we can hash it out more outside the presence of the jury.

MR. COFFIN: Fair enough. As a joinder as you listen, remember that we will be listening to this for the first time as you will.

THE COURT: Okay.

(End of bench conference.)

THE COURT: So, members of the jury, I'm going to ask you to retire to the jury room. There is

Bancroft - Direct by Mr. Vitt

some items that I need to discuss with counsel, so I'll ask you to retire at this time.

(Jury exits.)

THE COURT:  So, Mr. Vitt, you were going to conduct an examination of Dr. Bancroft on this specific issue.

MR. VITT:  Right.

**VOIR DIRE**

**BY MR. VITT:**

Q    Dr. Bancroft, I want to focus now on the retirement loss that Dr. Porter will experience by reason of the facts that she will not be eligible to receive the full, sort of, package that she would have received had she continued until she was 65.  All right?

A    Yes.

Q    Is the -- do you make an assumption that Dr. Porter would receive -- would continue to receive, a retirement amount from Dartmouth-Hitchcock even though she was terminated?

A    Yes.  She's qualified for a pension -- I don't know if you want to call it a pension or retirement fund, annuity -- based on her employment up to 2017.

Q    And has that analysis been reflected in all of the reports that you've prepared for Dr. Porter?

A    Yes.

Q   Can you explain how that's factored into the analysis?

A   What -- in my analysis, I looked at what the additional benefits would be upon retirement over and above what she is entitled to for the years that she did work there.  I looked at those benefits over her lifetime.  I made projections for each year, and then based on that, I looked at how much would have to be contributed in each year beyond 2017 to be able to fund that future retirement stream, and that's how I derived up with the 12 percent figure.  That's the value each year, 12 percent of her salary would be, if you will, invested, and in return it will generate a higher retirement income for her.

Q   And that analysis has been included in all of your reports, has it not?

A   Yes.

Q   All right.  And if you had been asked in your deposition "how did you factor in the retirement loss?" you would have provided exactly that explanation, would you not?

A   Yes.

THE COURT:  Anything further?

MR. VITT:  I -- no.  I'm not sure how to proceed now.  That is, when -- I hear what the lawyers for Dartmouth-Hitchcock are saying.

Bancroft - Voir Dire

THE COURT:  Well, at this time, I'll give an opportunity for Defense to speak to Dr. Bancroft.

MR. VITT:  All right.

MR. COFFIN:  I have a few questions, if I may, of the witness.

THE COURT:  Yes.

MR. COFFIN:  Very few.  I'd like to do it up there, Geoff, if that's okay.  I'll sort of park here.

MR. VITT:  I'll move over.  You need the mic anyway.

**BY MR. COFFIN:**

Q    All right.  Dr. Bancroft, how are you?  Good to see you.

So what I heard you say just now was a little different than what I thought I heard you say before we left -- excused the jury, and that is you have considered and calculated into your analytical chart that she does receive some residual benefit --

A    Yes.

Q    -- even though she's left Dartmouth, right?  Is that right?

A    Yes.  I'm estimating what the value is of the additional benefits.  That's what I did.

Q    Okay.

A    Additional benefits.

Bancroft - Voir Dire

Q   Okay.  And what is your amount for the additional benefits per year?

A   12 percent.  Each year that she worked beyond 2017, the value of the contribution that Dartmouth would have made that she ultimately would have been able to draw on when she took retirement is equivalent to 12 percent of her salary.  That's not -- that's just the additional benefits that she received for working one more year.

Q   Okay.  I'm asking a slightly different thing, which is, for her defined benefit, which I'll call her pension that she would continue to receive anyways, even though she's now an UVMMC employee, that she would continue to receive from Dartmouth, what's the annual amount that you've assessed that at?

A   What was her --

Q   Yeah.

A   I don't remember exactly what her -- I saw it.  There was a calculation provided to her for what her benefit would be based on her time at Dartmouth up through 2017.  It was over $100,000 a year, but I don't remember -- I don't remember the precise figure.

Q   Okay.  So you don't remember that figure even though you're prepared to come in and testify about this chart today, right?  "Yes" or "no," right?

Bancroft - Voir Dire

A    Yeah.  I can't tell you the precise figure.  It's over $100,000.

Q    And you agree, I think, that it's not spelled out in your narrative report, correct?

A    Well, I don't know how you want to interpret that. What I estimate is the additional value of her working another year at Dartmouth, what the value of Dartmouth's contribution would be to her retirement plan.

Q    I'm asking a different question.  Nowhere in your four different narrative reports was this fact stated, correct?

A    Not in the words you have, but I don't state it that way.

Q    Okay.  That's an answer to my question.  Thank you.

Next question:  It's not stated from the face of your analytical chart that you have shown the jury, is it?  "Yes" or "no."

A    I'm not saying that.  But what I do say is that I'm estimating the additional benefits.  Implied in that is that there are some basic benefits.

Q    And it's not stated in the assumption that is you've provided to us in those five -- four different reports?

MR. VITT:  I object.  It is in the assumptions.

Bancroft - Voir Dire

THE COURT:  All right.  You can have an opportunity to speak to Dr. Bancroft again.  So I know this is kind of cross-examination, I really want to get at -- I want to allow him to answer so I can really understand the nature of the analysis instead of limiting it to "yes" or "no."

MR. COFFIN:  Fair enough.  I appreciate that, Judge.  Understand that I'm seeking the same thing, and I'm trying to get him to answer some questions with some precision for me as well, and I apologize for that.  And I have, really, kind of just one more set of questions, and maybe just one question.

Q   (By Mr. Coffin) So to calculate her benefit from that, you would need to reduce to present value, wouldn't you, her future earnings of this pension that she's going to receive anyway from Dartmouth, as part of the value of the benefit she still gets from Dartmouth, right?

A   Ultimately, that happens when I compute by adding -- estimating what the additional value of her retirement is, which I came to the 12 percent, then I carry that through across the table, and then it does get present value.  So in there, if you will, technically, it's looking at the present value of those future streams. I don't project those future streams out on a sheet,

Bancroft - Voir Dire

but that's how I arrive at the 12 percent figure.

MR. COFFIN:  Those are all the questions I have, Your Honor.  I'm sure you have more, but I would say that is barely comprehensible to me and hard to define from the report in the middle of a trial.

THE COURT:  Okay.  Mr. Vitt?

**BY MR. VITT:**

Q   Do you have the assumptions there?

A   I do.

Q   Footnote 2?

A   Yes.

Q   Go to the end.  You describe what the Dartmouth-Hitchcock retirement plan contribution is assumed to be.  Do you see that?

A   Yes.

Q   So it's assumed to be 12 percent of her earned income, right?

A   That's right.

Q   And you calculate that for each year?

A   Each year, yes.

Q   And then you come to the present value of that, right?

A   Eventually, yes, along with her earnings.

Q   Right.

A   And certain calculations in between there, but, ultimately, I'm determining the present value.  And

Bancroft - Voir Dire

included in that present value is the value of Dartmouth's contribution to her retirement plan, if you will, after she left in 2017.

THE COURT:  And for how many years forward?

THE WITNESS:  I'm sorry?

THE COURT:  For how many years forward do you apply that assumption in the analysis?

THE WITNESS:  Each one of these years, that's why I have the 12 percent.  In each year, I assume the value of what -- in order to fund the retirement for her, the additional amount, so she -- let's just -- for the sake of discussion, let's assume that she's going to get $100,000 a year for the work that she did.  Now, for each additional year that she works, I'm estimating that what she would get for benefits upon her retirement are equivalent to 12 percent in each year. So if she worked just 2018 -- well, 2018 -- let's have some medical in there.  So 2019, I'm estimating that Dartmouth's value of their contribution to her retirement is almost $39,000.  That $39,000 would have to be invested, and then if she was to retire and not work anymore and retire at age 65, she would -- they would need $39,000 invested at -- I forget what I used -- I think, six percent to generate the additional amount that she would receive.

Bancroft - Voir Dire

It's the same as -- it's not much -- the analysis I'm doing is very similar to a defined contribution, and UVM has a defined contribution. They're contributing nine percent. There's no guarantee with UVM because -- what the end value is going to be unlike Dartmouth with a defined benefit; they're guaranteeing what the value is going to be. Implicit in that, when their actuarial sat down and said, Well, we think we could earn this kind of benefit for the retirement. For each year she worked longer, we understand her retirement benefits are going to go up, and this is how much we need now invested so when she gets to 65, she'll be able to get those values. And I don't do it just for 65; I do it for 66, 67, 68, 69 and 70.

Q   (By Mr. Vitt) Right. I understand that and each of the reports that you prepared had the same analysis that we have just gone over, correct?

A   Yes.

THE COURT:  Mr. Coffin, you were standing?

MR. COFFIN:  At the appropriate time, I had a couple more questions.

THE COURT:  For the witness?

MR. COFFIN:  Yeah, questions for the witness.

THE COURT:  Okay.

MR. COFFIN:  If now is the time.

Bancroft - Voir Dire

THE COURT: Sure.

BY MR. COFFIN:

Q   But, Dr. Bancroft, your report calculations that you've just described, those attribute a continuing benefit every year to Dr. Porter without considering the present value of the fact that she's still going to get a pension from them, albeit a slightly reduced one because she isn't contributing to it anymore.

A   I don't have to do that. All I am interested in is what the additional value is going to be. That's all I'm estimating, is what is the additional value of that retirement; that is, if she works one more year at a certain salary, how much more is she going to get in retirement benefits? And then I say, okay, this is how much she's going to get in retirement benefits. How much is needed in that particular year to be invested, and I believe I used six -- I might have used seven -- that would generate that additional value.

Q   Well, that's not spelled out in that, and it further raises the question that, you know, the whole point of this exercise is to compare the value of her income stream and benefits from UVM with those at Dartmouth, and that analysis doesn't take into the fact that she isn't just, you know, paying more into the Dartmouth fringe benefits. She's going to get an income stream

for the rest of her life that is considerable and isn't accounted for in your analysis. And so that means that the damages between her UVM salary and her Dartmouth salary and fringe benefits are exaggerated.

A   No. Absolutely not. I am -- I'll say it for the umpteenth time, I am estimating what the additional value is of her retirement over and above what she's going to get; whatever she's going to get, whether it's $100,000 or $150,000, all I'm interested in, if she works one more year, how much is that going to go up?

So let's assume it's $100,000 she's going to get. She works one more year, she's going to get $125,000 a year. How much money needs to be invested now to generate that 125,000? That's all I'm estimating is -- what I'm estimating here is what she's lost by not working another year. I'm doing that with the income. I'm doing that for her salary. I'm doing that with the retirement.

MR. COFFIN: This is still an undisclosed expert opinion that we're getting in mid trial preceded by serial undisclosed expert opinions, and I don't think we should be subjected to it, Your Honor.

BY MR. VITT:

Q   Dr. Bancroft, when did you submit -- remind me, the first report was in 2018 or 2019?

A      I believe it was '18, I believe.

MR. VITT:  So from 2018 through the present, the analysis has been the same, Judge.  We're not citing anything, and I -- it's not a charge that I take lightly.  You know, we didn't hide anything in this case.  We turned over all the information; we turned it over quickly.  We've made Dr. Bancroft available.  Have there been other reports?  Of course, there have been.  When the case is pending eight years, you have to account for the interest and account for other changes, and the -- there was a recent change in the bond.  You know, we tried to figure out present value.  We tried to bring this up to date so that it's current today.

And, apparently, Dartmouth-Hitchcock has an expert that hasn't been disclosed, and they're getting some different information, but that's not something that we can deal with.  All we can deal with is put Dr. Bancroft on the stand and say it's the same analysis he's had from the get-go, Judge.  And having this created at the list minute is unsettling, at best, and I don't think it's fair to us.  You know, it's been a long road here.  We've been straight up with Dr. Bancroft.  We've made him available.  We haven't tried to hide one single thing.

THE COURT:  All right.  Mr. Coffin?  By the

way, what has been the previous, kind of, analysis of the expert's report?  Was there a deposition?  Was there previous questioning of this topic in the deposition?  It's certainly, or at least hinted at in the assumptions, that there's a reference to retirement plans and percentages.  So no questions at deposition to further refine the understanding --

MR. COFFIN:  I was not deeply involved -- if I might, Mr. Vitt? -- I was not deeply involved in the deposition process.  I've been getting involved with this more recently.  But realize, Your Honor, obviously, the procedural posture of this case is unusual.  It came out from a pause, and in August 2024, Mr. Bancroft issued a new opinion, which had raised the total economic loss at $4.3 million.

We had the hearing, we had some issues with the report, as you know.  As a result of the hearing, we had what I would say is a completely different report which came out on March 19th, which we're looking at now, which moved the loss figure from $4.3 million to $1.7 million.  So some big changes.  And nowhere in there was this mentioned or spelled out.  And, in a way, this is kind of one of the -- this is not the massive issue in the context of the other problems with the report, some of which we'll get with, but we just

have just not had disclosure on this, and that's not how expert discovery is supposed to work.

THE COURT:  Okay.  I'm going to take a brief recess.  I'll be back in a moment.

(Recess taken.)

MR. VITT:  May I say something, Judge?

THE COURT:  Yes.

MR. VITT:  We went back and got the deposition of Dr. Bancroft.  It was taken by somebody in Mr. Schroeder's firm.  October 30th, 2019.  And we begin asking about Footnote 2 which is the footnote we were talking about.

THE COURT:  Oh, footnote is part of the assumptions.

MR. VITT:  Yes.  Yes.  And then on Page 65, they say, "Could you walk me through how you came up with the 12 percent?" which was what Dr. Bancroft was just talking about.  Didn't spend long on it, but they knew about it in 19 -- sorry, 2019.

There is just no surprises here, and Mr. Jones and I and my partner, Sarah Nunan, take pretty seriously to disclose items and not hide the ball from somebody, particularly this late in the game to be hearing that somehow that we're trying to pull a fast one.  That didn't happen.  We didn't do it.  And they had an

opportunity, when they took the deposition to go through exactly the calculations that Dr. Bancroft was talking about.  And if they didn't do it, that's on them.

THE COURT:  Okay.  So on that point, right, the 12 percent issue, so there's the percentage figure that he used in terms of the DHMC contributions, but what I'm hearing the argument today by Defendants -- and correct me if I'm wrong, is that the issue is about, kind of, the offset with respect to what she might -- Dr. Porter might continue to be receiving in her employment with UVMMC and kind of how that affects then the damages calculation in terms of the offset.

MR. COFFIN:  Both of the issues are in play, Your Honor.  That's an issue that I would raise with that, but still the late disclosure.  And my brother wants to say something.

MR. SCHROEDER:  May I be heard, Your Honor?

THE COURT:  Yes.  Why don't you come to the podium.  I've heard you, Mr. Vitt, and you can have every opportunity to respond, if you'd like.

MR. VITT:  I'll sit.

MR. SCHROEDER:  It's interesting Mr. Vitt referred to the fact that Mr. Jones was involved in the case, I don't think Mr. Jones got involved in the case

until about two months ago.  In 2019, one of the associates in my group took -- at the time before she went in house -- took the deposition.  And what's interesting is, when you look at the calculations for the fringe benefits and you compare what would be at Dartmouth Health and then what there is for post-termination projections, there's zeros in that column in that report in October 1, 2019.

So, yes, he was deposed October 30, 2019.  And at that time -- at that time, the projections were it looks like somewhere 5. -- the numbers have gone all over the place, Your Honor.  In 2019, I think it was 5.4 or 6.4.  The copy I have is really hard to read.

The assumptions that were made, no matter what they were, are drastically different than the assumptions that are in the current report.  So whatever happened at the October 30th, 2019, deposition could not have anticipated five, six years later new assumptions that, in fact, don't reflect this one specific issue that my brother has said, Mr. Coffin.  In fact, the chart has zeros in that one column on fringe benefits.

So, you know, what's interesting is this case started -- at one point, the report said through 2033 the damages were 6.5 million.  Now they're down to

1.7 million.  That in and of itself suggests that there's a lot of inconsistencies with how we got to where we are today.  Setting aside the fact that we're on our fourth report, but the last two reports came well after Mr. Bancroft's deposition.  Thank you for letting me be heard.

THE COURT:  Sure.  Okay.

Mr. Vitt?

MR. VITT:  In terms of whether there's been a change, I'd have to defer to Dr. Bancroft.  I don't see it.

THE WITNESS:  No.  I don't have that report in front of me, but I believe that my projections at Dartmouth are the same numbers.

MR. VITT:  Right.

THE WITNESS:  The only difference being that new information that I got on the no increase for 2000 and 2001.

MR. VITT:  2020 and 2021.

THE WITNESS:  2020 and 2021 are the only changes in that column.  There are significant changes over in the UVM, but that's based on information that Dr. Porter provided me about how long -- how much, kind of, equivalent she was going to work.  The August report had her working .6 with no call, earning half of

what she's earning now or under half.  That's why the numbers were higher.

MR. VITT:  Right.

THE WITNESS:  There's been eight changes from the August report, five of them are due to the passage of time.

THE COURT:  Okay.  If you're done?

MR. VITT:  I think so.  I mean, if you have other questions.

THE COURT:  No, I don't have other questions, but look.  So given the nature of the issue of being raised by the defendants right now, right, so there's an allegation there was a non-disclosure.  I'll tell you, I'm not sure if this is a non-disclosure that really rises to the level of that impacts this report.  I don't know that right now.  But it is an allegation that I'm not going to rush to make a judgment on right now.

So I want to hear from the parties in a written submission.  I want this to be filed by Sunday afternoon.  And I want to understand the exact nature of what the alleged non-disclosure is here.  I want to get Plaintiff's perspective.  I know you've articulated it to me today why you think it's always been part of the report, and Defendants had an opportunity to

examine it.

My law clerk did try to look through some of the deposition history in the case when we took a recess. I am not at all speaking definitively on this issue, but there does appear to be a section of the deposition which might be the same section you're referring to, Mr. Vitt, where whoever is doing the deposition for the Defendants kind of raises the contributions in terms of retirement, but then the next question then pivots to medical benefits and things of that nature.

So I'm not really clear on what the discovery history in this case, particularly as it pertains to this particular issue and, frankly, what the law might be on this. I mean, there's some law out there. We've kind of found a little bit of law in the last ten minutes, which I am very reluctant to rely on definitively right now, but that at least suggests, you know, an expert doesn't have to read from his chart, as in this case, like a script. There is, perhaps, an ability to explain and elucidate some of those concepts there. So issues here that I want to see kind of spelled out, and I really want to have an opportunity to think about this. I'm not going to rush to make a judgment on it.

I'm not really sure what the request is, by the

way, from the defendants.  If their allegation is true, that, obviously, potentially has significant impact on what we're doing here in this trial.  If it doesn't, if the law suggests that this is not what perhaps it seems to be, and this is not as significant an issue, well, then we go down a different road.  But as I say, I know it's going to slow it down, but this is not the kind of issue that should be rushed through.

Mr. Coffin?

MR. COFFIN:  Totally agree.  I'm sorry not to have raised this beforehand; just didn't foresee it. And one and two, I imagine that as part of our briefing, the Court would like some, sort of, proposed remedies and practical solutions of what to do.

THE COURT:  Yes, of course.  I very much would like to hear that.  So I look forward to your submissions.  I plan on reading them this weekend and give this some considered thought.  All right, so we're kind of bouncing all over.

Mr. Jones?

MR. JONES:  Yeah.  I'm sorry.  It seems to me -- until I hear what that request is, it's hard to respond to it.  Can we somehow do a briefing schedule?

THE COURT:  I've thought about that, whether I ask the defendants to file their brief and then you

respond to it.  You know, it is the weekend, but you're all in trial.  So it won't shock you to be doing work over the weekend.  Perhaps, it does make some more sense to do it as Defendants articulate their position -- it technically is their objection, so what do you see as the problem here -- and then have a response to it.

Mr. Coffin?

MR. COFFIN:  Sure.  Whatever the -- we serve at the pleasure of the Court, so whatever you want.

THE COURT:  Yeah.  You know, that makes some sense.  I also want to be reasonable.  I know it's the weekend.  So if I ask the defendants to have their brief on file by tomorrow at four p.m.?

MR. COFFIN:  I certainly would like at least -- well, I was going to say Sunday or something, but...

MR. JONES:  We're Sunday.

THE COURT:  The only thing is...  So I don't want to --

MR. COFFIN:  If you want to do this so the witness can testify on Monday.

THE COURT:  Exactly, and I don't want to receive Plaintiff's response Monday morning because their brief was filed, you know, Sunday evening.

MR. COFFIN:  If 4:00 works.

THE COURT:  I can do it a little bit later.

MR. COFFIN:  Yeah.  Maybe give us 7:00?

THE COURT:  All right.  So how about Defendants will file their brief by seven p.m. tomorrow evening.  And then, Plaintiffs, your response then will be due by 5:00 on Sunday.

MR. JONES:  We'll have it.

THE COURT:  Okay.  So now, obviously, what that means for now, is that Dr. Bancroft is not going to continue testifying right now.  So I do want to talk to the parties.  The jury is coming back.  So Dr. Bancroft can be off the stand when the jury comes back, and what is your suggestion about what I say to the jury because, obviously, I do not want anyone to be prejudiced by them coming back and Dr. Bancroft is not on the stand.

MR. VITT:  Whatever you think is best.

THE COURT:  What I could say to the jurors -- and let me know how you feel about this.  So I'll say: As you can see, Dr. Bancroft is not on the stand right now.  I have asked the parties to address a legal question for me, and because of that, I've asked that Dr. Bancroft not continue his testimony today until I can have answers to that question I have.

Mr. Vitt, does that work for the plaintiffs?

MR. VITT:  That works fine.

THE COURT:  Defendants?

MR. SCHROEDER:  Certainly acceptable, Your Honor.  I suspect that no one on the jury is going to object to leaving early today.

THE COURT:  Yeah.  I think that's probably true.

And then I think Plaintiff said that there's another witness in the wings.  Do you have someone who can go on today?

MR. VITT:  I don't think so.  Hold on.

(Pause.)

MR. VITT:  I think not, Judge.  If it's all right with the Court.

THE COURT:  No.  This is obviously unpredictable.

MR. VITT:  Right.  It is.

THE COURT:  That's not a problem.  Okay.  So then, they'll come back in, I'll explain to them what happened and say that the trial day is over for today.  Okay?  All right.

THE WITNESS:  Up and out?

THE COURT:  Yes.

THE CLERK:  Yes, Dr. Bancroft.  Thank you.

(Jury present.)

THE COURT:  Good afternoon, members of the jury.  I'm sorry for the extended break.  You'll see that Dr. Bancroft is not on the stand right now, and that's only because I have asked the parties to address a legal issue with me, and I had actually asked for some kind of written submissions from the parties on it.  So until I get that, I've asked that Dr. Bancroft not continue until this particular question that I have is addressed.  Okay?

There is not another witness lined up today, so the long and short of it is, you're going to be dismissed early today, 3:10, so an early weekend for you.  Thank you very much for your attention today, and let me, as always, remind you:  Please don't talk to anyone about the case or do any independent research on the case over the weekend.  So have a good weekend.

(Jury exits.)

THE COURT:  Question:  Mr. Howe was asking whether we should be telling the jury to be coming in Monday a little bit later because presumably we are going to be taking up this issue in the morning.  So if we do what we've been doing, meeting at 8:30, then 9:00 is unlikely to be the start time.  We could meet earlier.  That's up to the parties.  I mean, we could

meet in court at 8:00, if you want, and then we could probably get going by nine.

MR. SCHROEDER:  Judge, it's your --

THE COURT:  No.  No, I know.  I want to be considerate.  People have --

MR. JONES:  My only reaction is if I'm submitting a brief by 7:00 on Sunday, and I have to prepare some more witness examinations for the next day, then it's cutting it a little tight.

THE COURT:  Okay.  We can bring the jury back in and I can tell them to be prepared to go at 10:00.

MR. COFFIN:  Dumb question.

THE COURT:  Yes?

MR. COFFIN:  Maybe this gets too much for the scheduling, but is there any reason that Bancroft has to go on Monday that might give a chance for you to do your witness preparing, the Court can make a ruling, and we'll have them -- does that work for our schedule?

MR. SCHROEDER:  I'm here.

THE COURT:  That's true.

MR. SCHROEDER:  No, I'm saying I'm here all weekend.  So I'm not going anywhere.

THE COURT:  I was kind of operating under the assumption that you wanted to put him back on on Monday, but if there's some flexibility.

MR. JONES:  I think that's right, but, frankly, once Monday morning starts, I mean, I'm preparing for the next day every night anyway.  So there's no benefit whether he's Monday morning or whatever.

MR. COFFIN:  Okay.

MR. JONES:  I think it's best if we continue with Dr. Bancroft after this issue is resolved, get that done, and then we get back on track with the other issues.

THE COURT:  So then assuming the issue is resolved on Monday morning, we would go --

MR. JONES:  Fair point.

THE COURT:  I have heard your arguments, but, like I said, I haven't read your written thoughts on this.  So, I guess at this point, we can plan to have Dr. Bancroft here.  If not, what's the alternative? You could have other witnesses lined up.

MR. SCHROEDER:  Just on that point, Your Honor.  They're calling Dr. Leslie DeMars on Monday pursuant to a subpoena.  She'll be here Monday, but she's got commitments after Monday into the following week.  So, you know, she's got another job, and her subpoena is for Monday, so I want to make sure that she gets to testify.

THE COURT: Right. And presumably she's going to be a fairly lengthy witness.

MR. SCHROEDER: I suspect so.

THE COURT: Yeah. Yeah. So Dr. Bancroft on Monday, why don't we meet then at 8:00 in the morning, see if we can resolve it that way.

MR. SCHROEDER: I think that would be great.

THE COURT: Okay. I will see you Monday at 8:00. Is there anything else to take up? This might be enough?

I had mentioned to you a few days earlier just about jury instructions. So, you know, I'm working on jury instructions in the case and have been all week. I think I mentioned to you about to the extent that there's any aspects of the charge that there might be agreement on, right, that it would be very helpful if counsel could confer with each other and determine whether there's a need for me to have, you know, a full page and a half, let's say, for items that are not going to be contested, and I'm not really thinking about the bigger items, you know, like is the person an employer; is such and such an adverse employer? You know those kinds of issues would be helpful.

And, Plaintiff, I also wanted to mention, I know you had changed your witness list and I think, kind of,

streamlined things.  It would be helpful to have an amended exhibit (sic) list that lays out who is still on your list going forward.

MR. JONES:  Amended witness list?

THE COURT:  Your witness list, yeah.

And also, if you can identify the witness just with a title, that's helpful too.  Right?  There's many witnesses in this case -- "many" might not be the right word -- I haven't seen before.  So it's not really clear to me who they are.  It would be good for me to know if there's a DHMC employee, if it's someone who -- you know...  Whatever, it is, it obviously is relevant to decisions that arguably might need to be made if objections are raised during trial.  Does that make sense?  All right.  Anything else?

MR. COFFIN:  No, thank you.

THE COURT:  Well, then, have a good weekend.

(Court at recess for the day.)

CERTIFICATE


                I, Jan-Marie Glaze, RPR, CRR, Pro-Tem Court

Reporter for the United States District Court for the

District of Vermont at Burlington, do hereby certify that I

was present in court during the foregoing matter and

reported said proceedings stenographically.


                I further certify that thereafter, I have caused

said stenographic notes to be transcribed under my direction

and that the foregoing pages are a true and accurate

transcription to the best of my ability.




                                    _____
                                    JAN-MARIE GLAZE
                                    COURT REPORTER