# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

      Plaintiff,

      v.                                                    Civil Action No. 2:17–cv–194

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

      Defendants.

## ORDER
(Docs. 198, 235)

Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health") filed a Motion *In Limine* to exclude in full the testimony of Plaintiff's expert witness, Dr. Robert Bancroft. (*See generally* Doc. 198.) Dr. Porter seeks to introduce Dr. Bancroft's testimony on her economic losses, including lost wages, lost benefits, compensatory damages, and future lost income. (*See* Doc. 208 at 3.)

Dartmouth Health asks the Court to exclude Dr. Bancroft's testimony for two reasons. First, Dartmouth Health argues that Dr. Bancroft is unqualified because he lacks sufficient experience with employment cases and because his expert report relies on speculation and opinion. (*See* Doc. 198-1 at 4–6.) Second, Dartmouth Health contends that Dr. Bancroft's testimony is not reliable because his expert report incorporates several of Dr. Porter's predictions regarding her future earning potential and because Dr. Bancroft assumes that Dr. Porter's damages should be increased to account for taxes (that is, "grossed up"). (*Id.* at 7.)

Dr. Porter opposes Dartmouth Health's Motion. (*See generally* Doc. 208.) The Court held an evidentiary hearing on March 14, 2025. On March 20, 2025, Dartmouth Health filed its Renewed Motion to Preclude the Testimony of Robert Bancroft Based on New March 19, 2025 Report. (Doc. 235.) Dr. Porter filed her memorandum in opposition to the Renewed Motion on March 21, 2025. (Doc. 236.)

### Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 obligates the court to serve as a gatekeeper for expert testimony, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

Although the proponent of the expert testimony bears the burden of establishing by a preponderance of the evidence that the demands of Rule 702 are met, "the district court is the ultimate gatekeeper," *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted), and the court has "broad latitude" to admit or exclude proffered expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142, 153 (1999). "[T]he Second Circuit has espoused a particularly broad standard for the admissibility of expert testimony," *Sec. Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 275 (S.D.N.Y. 2016)

2

(internal quotation marks and alterations omitted), where exclusion is "the exception rather than the rule." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (quoting Fed. R. Evid. 702 Advisory Comm. Note (2000)).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also United States v. LaVictor*, 848 F.3d 428, 444 (6th Cir. 2017) (holding that "[a]ny emerging prejudice [from an expert witness's testimony] was addressed during cross-examination").

To determine whether the requirements of Rule 702 have been satisfied, the Court considers: (1) the proposed expert's qualifications; (2) whether the expert's opinion is based on reliable data and methodology; and (3) whether the expert's testimony will assist the trier of fact. *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005).

## A.     Dr. Bancroft's Qualifications

A witness may give opinion testimony if "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The Court first asks "whether the proffered expert has the educational background or training in a relevant field by looking at the totality of the witness's background." *I.M. v. United States*, 362 F. Supp. 3d 161, 192 (S.D.N.Y. 2019) (internal alterations and quotation marks omitted). Next, the Court "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony to ensure that the expert will actually be testifying on issues or subject matters within his or her area of expertise." *Id.* (internal quotation marks omitted). "Courts in the Second Circuit liberally construe the expert qualifications requirement, and generally will not exclude expert testimony provided the expert has educational and experiential qualifications in a

general field closely related to the subject matter in question." *Id.* (internal quotation marks omitted); *see also United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (holding that the qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the Rule").

Dr. Bancroft has extensive education and work experience in a field relevant to Dr. Porter's economic losses: applied economics. Dr. Bancroft holds a bachelor's degree in economics from the University of Vermont ("UVM"); a Master of Science in agricultural economics from UVM; and a Ph.D. in agricultural economics from Purdue University. (Doc. 198-4 at 2, 4:15–19.) Agricultural economics focuses more on practical application of economics than on economic theory. (*Id.* at 2–3, 4:20–5:8.) Individuals with advanced degrees in agricultural economics work in a range of disciplines including labor, natural resources, and business management. (*Id.*)

From June 1979 until August 1981, Dr. Bancroft worked for the United States Department of Agriculture to develop an econometric forecasting model to forecast farmers' participation in certain government programs and to provide testimony and research to the U.S. House of Representatives. (*Id.* at 3, 6:8–8:3.) Next, Dr. Bancroft began work as an assistant professor in the Department of Agriculture and Resource Economics—later renamed the Department of Community Development and Applied Economics—at the University of Vermont in August 1981. (*Id.*) Dr. Bancroft continued as an assistant professor of economics until 1991, when he became an adjunct professor. (Doc. 230 at 10:5–11.) He worked as an adjunct professor of economics until 1996. (*Id.*)

Dr. Bancroft's proffered testimony on economic losses falls squarely within his area of expertise. While at UVM, Dr. Bancroft started a solo practice as an economic consultant in

October 1981. (Doc. 198-4 at 3, 8:4–7.) His practice as an economic consultant has been his primary occupation since approximately 1986. (Doc. 230 at 10:12–16.) Dr. Bancroft estimates that 70% of his work in his thirty-eight years as a consultant has been in the field of forensic economics. (Doc. 198-4 at 5, 14:3–15.) In the last five years, that percentage has increased to "pretty much 100%." (*Id.* at 14:25–15:19.) Dr. Bancroft has been retained in over 2,500 lawsuits. (*Id.*) Since the early 2000s, Dr. Bancroft estimates that 20% of his cases relate to employment lawsuits. (*Id.*) Considering Dr. Bancroft's extensive credentials in the field of applied economics, including his education, experience, and general knowledge of the subject matter, the Court finds him qualified to offer expert testimony on Dr. Porter's damages.

Although Dartmouth Health points out that Dr. Bancroft has not testified in many, if any, employment cases over the last several years, (Doc. 198-1 at 4–5), that does not impact Dr. Bancroft's qualifications as an expert witness. The threshold question under Rule 702 is "whether the witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions," not whether the expert has recent experience testifying at trial. *Nimely*, 414 F.3d at 396, n.11 (internal quotation marks omitted); *see also, e.g.*, *First Marblehead Corp. v. House*, 541 F.3d 36, 41 (1st Cir. 2008) (although defendant's expert witness was not certified financial planner who focused entirely on individual investment decisions, expert, who had extensive consulting experience in economics, finance, and strategy and provided investment advice to employees and accredited investors, was qualified to testify about how individuals choose investments and arrange portfolios); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) ("It is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."); Dr. Porter

5

has shown that Dr. Bancroft is qualified by education and experience to give his opinion on

Dr. Porter's economic losses. Such a showing is sufficient for the first step in the Court's inquiry.

Dartmouth Health also contends that Dr. Bancroft is unqualified because he relies on

subjective experience and speculation for his opinions. (Doc. 198-1 at 5–6.) In particular,

Dartmouth Health contends that Dr. Bancroft's opinions are speculative because: (1) he relied on

"imprecise statistical evidence," including a 2.5% annual salary increase, to support his findings;

(2) he considers multiple possibilities for Dr. Porter's career; (3) he "assumes that Dr. Porter

would remain employed at Dartmouth Health on a full-time basis until 2033;" (4) his most recent

report, in which he assumes that Dr. Porter will not leave her full-time position at UVM until

January 2025, differs from an assumption used in an earlier report; (5) "Dartmouth Health is

unfairly held responsible for . . . Dr. Porter's voluntary decision to fundamentally alter her work

arrangements with UVM by assuming a part-time position;" and (6) he inappropriately applied

Vermont's statute requiring 12% prejudgment interest. (*Id.* at 6); (Doc. 223 at 3.)

The Court does not find that any of these objections warrant excluding Dr. Bancroft's

testimony in its entirety. Although a court should exclude expert testimony "if it is speculative or

conjectural," or "based on assumptions that are so unrealistic and contradictory as to suggest bad

faith or to be in essence an 'apples and oranges comparison,' other contentions that the

assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v.

U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (per curiam) (internal citations and

quotation marks omitted). Dartmouth Health challenges Dr. Bancroft's use of information from

the U.S. Bureau of Labor Statistics ("BLS") regarding average annual salary increases of 2.5%

nationwide as "imprecise statistical evidence," but courts have frequently upheld use of similar

statistics by both lay and expert witnesses. *See, e.g.*, *id.* at 23 (internal quotation marks and

6

alterations omitted) ("Statistical charts, such as the mortality tables and the work-life expectancy tables prepared by the United States Department of Labor are often deemed authoritative. . . ."); *Carroll v. Xerox Corp.*, 294 F.3d 231, 240 (1st Cir. 2002) (holding that a plaintiff might have shown that he was limited from other jobs besides his own using expert vocational testimony or publicly available labor market statistics); *Higgins v. Kinnebrew Motors, Inc.*, 547 F.2d 1223, 1225–26 (5th Cir. 1977) (upholding expert witness's use of statistics from the BLS instead of a couple's actual expenses); *Kenealy v. Saul*, No. 19-cv-40-jdp, 2019 U.S. Dist. LEXIS 206866, at *17 (W.D. Wis. Dec. 2, 2019) (internal quotation marks omitted) ("An expert can support her estimates by drawing on knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources or from placing workers in jobs."). The same is true for Dr. Bancroft's use of data on work-life expectancy to predict that Dr. Porter may continue to work until the year 2033. (*See* Doc. 198-4 at 26, 98:18–99:25); *see also Boucher*, 73 F.3d at 23; *Weil v. Seltzer*, 873 F.2d 1453, 1465 (D.C. Cir. 1989) ("Statistics, such as those prepared by the Department of Labor on work-life expectancy, are only one tool which may be used by an expert in forming an opinion.").

Nor does the Court find that Dr. Bancroft's choice to consider multiple possible future career paths for Dr. Porter or to update the assumptions used in his August 2024 report render his opinion testimony too speculative. Dr. Porter's most recent filing clarifies that the "internal inconsistencies" in Dr. Bancroft's expert reports resulted from new information that impacted Dr. Bancroft's economic loss analysis:

> While Dr. Porter initially projected that she would resign her full-time position at UVM to find a part-time job closer to her Norwich home in 2021, that did not happen. Instead, she remained in her full-time position and changed her projected horizon for a change to 2025. Dr. Bancroft merely updated his report to reflect these facts as they arose.

7

(Doc. 208 at 9–10.) Dr. Bancroft's decision to update his expert reports after receiving new information was entirely appropriate, as was his decision to include multiple scenarios for Dr. Porter's potential damages depending on how many years she continues to work. *See Rosario v. City of New York*, No. 18 Civ. 4023 (LGS), 2021 U.S. Dist. LEXIS 91675, at *15 (S.D.N.Y. May 13, 2021*)* ("[E]xperts may provide opinions tailored to different factual scenarios that the jury may consider.")

The Court is also not persuaded that Dr. Porter's plan to decrease her work at UVM from full-time employment ("FTE") to .6 FTE is too speculative for Dr. Bancroft's use. Dr. Bancroft "may base an opinion on facts or data in the case." Fed. R. Evid. 703. Dr. Porter is the most reliable—perhaps the only—source of information on whether and when she intends to decrease her working hours. And as Dr. Bancroft testified, Dr. Porter has a reasonable explanation for why she intends to decrease her hours at UVM: she finds it more stressful to commute from her home in Norwich, VT, to Burlington (as opposed to Lebanon). (Doc. 230 at 37:2–17, 38:21–39:1; *see also* Doc. 198-4 at 11, 37:10–18 (testimony that Dr. Porter said that she didn't know how long she would stay at UVM because she enjoyed the work but "didn't like being away from her family and having to commute")).

As to Dartmouth Health's argument that it has "no legal obligation to finance Dr. Porter's voluntary decision to fundamentally alter her work arrangements with UVM by assuming a part-time position," (Doc. 198-1 at 6), the Court finds this objection goes to the weight of Dr. Bancroft's testimony rather than its admissibility. It appears to pertain more to Dr. Porter's duty to mitigate damages than to Dr. Bancroft's qualifications as an expert. *See, e.g.*, *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998). Dr. Bancroft may properly rely on Dr. Porter's assumption that she will decrease her work at UVM to .6 FTE because this

8

assumption is "not so unrealistic and contradictory as to suggest bad faith" given that the substantial commute from Norwich to Burlington apparently increases her stress and reduces time with her family. *See Boucher* 73 F.3d at 21; *cf. Bergerson v. New York State Off. of Mental Health, Cent. New York Psychiatric Ctr.*, 526 F. App'x 109, 111–12 (2d Cir. 2013) (summary order) (finding district court erred in concluding that employee failed to mitigate damages when she resigned from employment located two and a half to three hours from her home because employee "was not obligated to mitigate damages by pursuing or continuing employment located such an unreasonable distance from her home"). Considering the broad standard for admissibility of expert testimony in this Circuit, the Court declines to find Dr. Bancroft unqualified on this basis. Dartmouth Health will have the opportunity to challenge Dr. Porter's alleged damages through cross-examination or the presentation of conflicting evidence at trial. *See Daubert*, 509 U.S. at 596.

Dartmouth Health further contends that Dr. Bancroft's opinion relies on subjective experience and speculation because he applies 9 V.S.A. § 41a(a), which mandates a prejudgment interest rate of 12% per year, in the absence of an agreement as to the rate of interest, to his analysis. (Doc. 223 at 3.) Dartmouth Health argues that Dr. Bancroft should not have used Vermont's statutory prejudgment interest rate to calculate Dr. Porter's damages because the statute only applies to a "sum certain" and not an "unquantifiable, indirect or disputable sum." (*Id.*) The Court disagrees for two reasons.

First, the Court anticipates that the Vermont Supreme Court would hold that prejudgment interest is available as of right in this case. Prejudgment interest is "awarded as of right when the principal sum recovered is liquidated or capable of ready ascertainment and may be awarded in the court's discretion for other forms of damage." *Hirchak v. Hirchak*, 2024 VT 81, ¶¶ 36–37,

___ Vt. ___, ___ A.3d ___ (internal quotation marks omitted). The Vermont Supreme Court has

upheld a trial court's award of mandatory prejudgment interest for lost wages and medical

expenses as "reasonably ascertainable" [1] because the plaintiff's "salary was known with

reasonable certainty, as was the general nature of her injuries and the likely course of treatment."

*See Smedberg v. Detlef's Custodial Serv., Inc.*, 2007 VT 99, ¶¶ 37–39, 182 Vt. 349, 940 A.2d 674

(2007). Noting that "reasonable ascertainment" does not mandate that "the amounts be precisely

or infallibly ascertainable," the *Smedberg* court rejected the defendant's "proposed rule, which

would appear to limit prejudgment interest to a very narrow class of cases in which a known sum

of money was converted to the tortfeasor's use on a precisely known date" because

"[p]rejudgment interest on compensatory damage awards is meant to restore—to the extent

possible—harmed plaintiffs to the financial position they would have enjoyed but for the tort,

and should not be limited to such a tiny fraction of tort cases." *Id.* at ¶¶ 38–39. Under *Smedberg*,

Dr. Porter's compensatory damages—comprised of lost earnings and extraordinary employment

costs—are "reasonably ascertainable" because they can be "measured against a reasonably

certain standard." (S*ee* Doc. 198-5 at 5–6); *Smedberg*, 2007 VT at ¶ 37. Therefore, Dr. Porter is

likely entitled to prejudgment interest as of right under 9 V.S.A. § 41a(a).

Second, even if Dr. Porter could not receive prejudgment interest as of right under 9

V.S.A. § 41a(a), a jury may still award her prejudgment interest in a discretionary capacity. *See

Est. of Fleming*, 724 A.2d at 1030 (emphasizing that the trier of fact has the discretionary

capacity to award prejudgment interest in cases where damages are not liquidated or reasonably

ascertainable "where it is required to make the plaintiff whole"). Therefore, Dr. Bancroft's use of

---

[1]  The Vermont Supreme Court has acknowledged that the terms "readily ascertainable" and "reasonably
ascertainable" are substantively similar with respect to an award for prejudgment interest. *See Est. of Fleming v.
Nicholson*, 724 A.2d 1026, 1030 n.2 (Vt. 1998).

the statutory prejudgment interest rate in 9 V.S.A. § 41a(a) is not based on unreliable data and methodology, and the Court declines to exclude Dr. Bancroft's testimony on this basis.

In short, the Court finds Dr. Bancroft qualified to give testimony on Dr. Porter's economic losses and proceeds to the next step of the analysis: whether Dr. Bancroft's testimony is reliable.

## B. Whether Dr. Bancroft's Testimony Is Based on Reliable Data and Methodology

Dartmouth Health asks the Court to find that Dr. Bancroft's testimony is not reliable for two reasons. First, Dartmouth Health argues that Dr. Bancroft's analysis "relies on Dr. Porter's subjective belief that she would be promoted by Dartmouth Health to a full professor and receive a 5% salary increase in 2017" without considering whether this belief is reasonable. (Doc. 198-1 at 7.) Second, Dartmouth Health argues that Dr. Bancroft's report impermissibly "grosses up" Dr. Porter's damages to account for federal and state taxes. (*Id.*)

"[W]here lost future earnings are at issue, an expert's testimony should be excluded . . . if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Sinkov v. Americor, Inc.*, 419 F. App'x 86, 90–91 (2d Cir. 2011) (summary order) (internal quotation marks omitted), quoting *Boucher*, 73 F.3d at 21. It is within the district court's discretion to "determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Shatkin v. McDonnell Douglas Corp.,* 727 F.2d 202, 208 (2d Cir. 1984). While a court may exclude opinion evidence when the "court concludes that there is simply too great an analytical gap between the data and the opinion proffered," the Second Circuit has noted that "[f]requently . . ., gaps or inconsistencies in the reasoning leading to the expert's opinion go to the weight of the evidence, not to its admissibility." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (internal quotation marks and alterations omitted).

11

On this record, the Court does not find that Dr. Porter's assumption that she would have been promoted to full professor and received a 5% salary increase in 2018 is unrealistic such that Dr. Bancroft's opinion testimony is unreliable. Dr. Porter's professional skills are widely recognized. Dr. Porter began working as a staff physician at Dartmouth Health in 1996. (Doc. 139-3 at 4.) One year later, she was promoted to Medical Director of the IVF/ART program and appointed jointly to Dartmouth Health's Department of Radiology. *Porter v. Dartmouth-Hitchcock Med. Ctr.* 92 F.4th 129, 133 (2024). Dr. Porter became a senior voting member of Dartmouth Health's Professional Staff in 2001. *Id.* In 2011, she became Acting Director of the REI Division and continued in that role until Dr. David Seifer was appointed Director in May 2016. *Id.* at 134. Before Dr. Porter became ill, she also served as Vice Chair of Perioperative Services and Director of Gynecological Ultrasound. (Doc. 139-4 at 28–30, 27:3–29:20.) Dr. Leslie DeMars, the chair of the OB/GYN Department and Dr. Porter's supervisor at Dartmouth Health, has described Dr. Porter as "an amazingly gifted and dedicated reproductive endocrinologist and infertility specialist" and described her skills using the term "Misty magic." (Doc. 140-8 at 3, 42:25–43:10.) Other providers at Dartmouth Health have also attested to the high quality of Dr. Porter's professional skills. (*See, e.g.*, Doc. 140-5 at 2–4; Doc. 140-6 at 2; Doc. 140-4 at 2–6.)

In short, while the Court does not express an opinion on whether Dr. Porter would indeed have been promoted to full professor at Dartmouth Health, "the possibility . . . was hardly so unlikely as to preclude the jury from considering it." *See Sinkov*, 419 F. App'x at 90–91 (upholding damages award based on expert analysis providing three alternative calculations of loss of earning potential, including that of a secondary schoolteacher and a typical man with either an associate's or a bachelor's degree, because expert's appraisals were "rooted in the

12

evidence" that individual had already earned educational credits towards his associate's degree and stated his intention to become a teacher). In fact, after leaving Dartmouth Health Dr. Porter did get promoted to full professor at UVM Medical Center, a "similar, rural academic REI center" to Dartmouth Health. (*See* Doc. 230 at 28:7–29:3; Doc. 140-19 at 2.)

Moreover, Dr. Porter's possible promotion at Dartmouth Health differs from the types of assumptions the Second Circuit has considered speculative because it is rooted in record evidence. *See Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 511 F. App'x 54, 56–57 (2d Cir 2013) (summary order) (finding no error in district court's exclusion of expert testimony composed of "sweeping statements that were detached from the actual evidence"); *Boucher*, 73 F.3d at 22 (overturning damages awards when expert estimated lost earnings based on assumptions that plaintiff would work full-time every week with fringe benefits and regular pay increases for the rest of his career when plaintiff's "sporadic employment had yielded fluctuating low levels of income, with long spells of no income whatsoever" and few, if any, fringe benefits). Dr. Bancroft reasonably assumed that Dr. Porter would be promoted to full professor at Dartmouth Health in 2018, and any gaps in the reasoning go to the weight of the evidence, not to its admissibility. *See Shatkin*, 727 F.2d at 208; *Restivo*, 846 F.3d at 577.

As to Dartmouth Health's argument that Dr. Bancroft's use of a 5% increase in salary from becoming a full professor is speculative, Dr. Bancroft's analysis may properly rest on his personal knowledge and experience. (*See* Doc. 230 at 21:10–22:6) (testimony of Dr. Bancroft that in his experience, a promotion to full professor at UVM tended to include a 5% increase in salary). The Court declines to strike Dr. Bancroft's testimony on this basis.

Finally, Dartmouth Health argues that Dr. Bancroft's analysis is not based on reliable methods because it "artificially inflat[es]" Dr. Porter's damages through a "post-tax calculation

13

where state and federal taxes should be deducted from compensation attributable to back pay or front pay." (Doc. 198-1 at 7.) Dartmouth Health challenges Dr. Bancroft's assumption that Dr. Porter's total damages award should include funds to cover state and federal taxes because the salary numbers that he uses "are all drawn from W2 and other salary information that are amounts before taxes." (Doc. 226 at 6.) Therefore, "there is no need" to account for tax liability from a damages award because the salary numbers Dr. Bancroft uses "already include the amounts [Dr. Porter] would need to pay in taxes in them." (*Id.*) In other words, Dartmouth Health argues that Dr. Bancroft is double counting. (*Id.*)

The Court need not exclude Dr. Bancroft's testimony on this point as unreliable. To the Court's understanding, Dr. Bancroft's analysis estimates and subtracts federal and state income taxes from Dr. Porter's damages before calculating the current present value of Dr. Porter's lost earnings. (*See* Doc. 198-5 at 4–5, n.7–9.)[2] In other words, Dr. Bancroft uses a post-tax potential damages award to calculate the estimated settlement tax Dr. Porter would incur. (*See id.* at 4–6, n.9.) Thus, Dr. Bancroft's analysis appears to account for tax liability only once rather than double-counting. Dr. Bancroft has explained that he uses this method because the progressive income tax causes an individual who receives lost earnings as a lump sum award to pay higher taxes on that award than she would have if she had received the same amount divided over several years as part of her salary. (*See* Doc. 230 at 41:4–18; Doc. 198-4 at 12, 41:24–43:24.)

---

[2] In addition to challenging the substance of Dr. Bancroft's testimony, Dartmouth Health characterizes Dr. Bancroft's expert report dated August 26, 2024, as "inadmissible hearsay" and asks the Court to preclude him from using the Lost Earnings Chart (Doc. 198-5 at 4) at trial because Dr. Porter "has not identified [it] as substantive or demonstrative evidence in relation to" the expert report. (Doc. 223 at 2–3.) Dr. Porter's Exhibit List identifies "Bancroft Analysis" as Exhibit 1. (Doc. 219 at 1.) The descriptor "Bancroft Analysis" adequately identifies the Lost Earnings Chart because Dr. Bancroft's "analysis" encompasses the detailed breakdown of each step of his damages calculations contained within the Chart. And Dr. Bancroft's expert report, including the Chart, is "not inadmissible hearsay, because it reflects his own opinions. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 980 F. Supp. 2d 425, 442 (S.D.N.Y. 2013); *see also Muto v. Cty. of Mendocino*, Case No. 20-cv-06232-SK, 2022 U.S. Dist. LEXIS 80131, at *31 (N.D. Cal. May 3, 2022) ("It is axiomatic that the opinion of an expert witness is not hearsay.").

For the reasons explained above, the Court finds that Dr. Bancroft's proffered testimony on Dr. Porter's damages is based on reliable data and methodology.

## C.    Whether Dr. Bancroft's Testimony Will Assist the Trier of Fact

Finally, the Court must determine whether Dr. Bancroft's opinion will assist the trier of fact. The Court must make a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) (internal quotation marks omitted).

Dartmouth Health does not appear to contest that Dr. Bancroft's testimony would assist the trier of fact. (*See generally* Docs. 198, 223.) The Court finds that Dr. Bancroft's testimony would be helpful to a jury. The use of a damages expert at trial "is . . . commonplace and may be essential." *In re KeySpan Corp. Sec. Litig.*, No. CV 2001-5852 (ARR) (MDG), 2005 U.S. Dist. LEXIS 29068, at *21 (E.D.N.Y. Aug. 25, 2005). Dr. Bancroft's testimony would benefit a jury because the advanced economics and mathematics required to calculate lost earnings goes beyond the knowledge of the average juror. (*See* Doc. 198-4 at 11–12, 39:23–43:24) (describing Dr. Bancroft's methodology for projecting gross loss, present value, and estimated tax liabilities); *see also*, *e.g.*, *Jackson v. State Farm Fire & Cas. Co.*, Civil No. 1:23-cv-24-HSO-BWR, 2024 U.S. Dist. LEXIS 38993, at *27 (S.D. Miss. Mar. 6, 2024) (internal alteration and quotation marks omitted) ("Generally speaking, expert testimony on damages frequently will help the trier of fact because damage calculations often involve complex aspects of economics and mathematics.").

15

**D.      Dartmouth Health's Request to Present Its Own Expert Economist**

Dartmouth Health has requested that, if the Court does not preclude Dr. Bancroft's testimony in full, Dartmouth Health be permitted to "present its own expert economist to provide analysis of the discrete universe of financial documents in the case." (Doc. 235 at 7.) In general, before a party can introduce expert testimony at trial, it must disclose the expert at least ninety days before the date set for trial. Fed. R. Civ. P. 26(a)(2)(D)(i). Moreover, Rule 26(a)(2)(B) requires that the disclosure of the expert must be accompanied by a written report prepared and signed by the witness. According to the most recent scheduling order, Dartmouth Health's deadline to submit any expert reports was December 15, 2018. (Doc. 138 at 2.) If the party fails to make a timely disclosure, the undisclosed witness cannot testify at trial unless the failure to disclose was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).

The Court cannot find that Dartmouth Health's untimely disclosure is substantially justified or harmless. Dartmouth Health has not identified or provided any information about its expert witness and that witness's expected testimony or explained why it did not disclose an expert witness sooner in compliance with the Federal Rules. Courts in this Circuit have ruled that the failure to disclose an expert witness may prejudice the opposing party. *See, e.g.*, *Evans v. United States*, 978 F. Supp. 2d 148, 153 (E.D.N.Y. 2013); *Palma v. Pharmedica Commc'ns, Inc.*, No. 00-CV-1128 (AHN), 2002 WL 32093275, at *2 (D. Conn. Mar. 27, 2002). The untimely disclosure and the absence of an expert report may prejudice Dr. Porter by denying her a clear understanding of the expert's intended testimony and compromising her ability to prepare effective cross-examination or rebuttal evidence. Under these circumstances, the Court cannot find that Dartmouth Health's disclosure of a potential expert witness four days before trial is

16

substantially justified or harmless. The Court therefore declines Dartmouth Health's belated request "to present its own expert economist." (Doc. 235 at 7.)

### Conclusion

For the reasons explained above, Dartmouth Health's Motion *In Limine* to Preclude the Testimony of Robert Bancroft (Doc. 198) and Renewed Motion to Preclude the Testimony of Robert Bancroft Based on New March 19, 2025 Report (Doc. 235) are DENIED.

Dated at Burlington, in the District of Vermont, this 21st day of March 2025.

*/s/ Kevin J. Doyle*
United States Magistrate Judge

| 03/26/2025 | 249 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 3) held on 3/26/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 9:01 am and jury enters at 9:11 am. Plaintiff Misty Blanchette Porter sworn. Jury excused for lunch at 12:05 pm. Court reconvenes at 1:07 pm and jury enters the courtroom at 1:15 pm with Plaintiff on the witness stand. Jury excused at 4:33 pm and court adjourns at 4:36 pm. ORDERED: Hearing re: 248 MOTION in Limine *to Preclude the Expert Report* to be held 8:30 am 3/27/2025 outside presence of the jury. Trial to resume 3/27/2025 at 9:00 am. (Court Reporter: Jan-Marie Glaze) (eh) (Entered: 03/27/2025) |

| 03/27/2025 | 251 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Motion Hearing held on 3/27/2025 re 248 MOTION in Limine *to Preclude the Expert Report* held outside presence of jury. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court makes inquiries and counsel make statements. Parties stipulate to modified version of expert report and will revisit demonstrative/evidentiary admissibility at a future point in trial. ORDERED: Court defers ruling on 248 MOTION in Limine *to Preclude the Expert Report* re: demonstrative/evidentiary admissibility pending further argument by counsel. (Court Reporter: Jan-Marie Glaze) (eh) (Entered: 03/28/2025) |

| 03/27/2025 | 252 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 4) held on 3/27/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 9:00 am and jury enters at 10:03 am. Plaintiff Misty Blanchette Porter sworn. Jury excused for lunch at 11:57 am. Court reconvenes at 1:07 pm and jury returns at 1:17 pm with Plaintiff on the witness stand. Jury excused for 2:02 pm and court adjourns at 2:03 pm. ORDERED: Trial to resume 3/28/2025 at 9:00 am. (Court Reporter: Jan-Marie Glaze) (eh) (Entered: 03/28/2025 |

| 03/28/2025 | 253 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 5) held on 3/28/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 9:01 am. Jury enters courtroom at 9:04 am. Jenice Gonyea, Victoria Maxfield, Karen George, and Maria Padin sworn as plaintiff witnesses. Jury excused for lunch and court reconvenes at 1:17 pm with Maria Padin on the witness stand. Robert Bancroft sworn as plaintiff witness. Jury exits the courtroom at 2:16 pm. Court and counsel make inquiries of Robert Bancroft re: report. Court takes recess and reconvenes at 2:57 pm outside presence of the jury. Counsel make statements and court makes findings. ORDERED: Deft to submit written submissions re: R. Bancroft report disclosure by 7:00 pm 3/29/2025. Plaintiff to file a response by 5:00 pm 3/30/2025. Jury reenters courtroom at 3:11 pm and is discharged for the day. Court adjourns at 3:37 pm. ORDERED: Oral arguments re: R. Bancroft report disclosure to be held 8:00 am 3/31/2025 outside presence of the jury. Jury trial to resume 9:00 am 3/31/2025. (Court Reporter: Jan-Marie Glaze) (eh) (Entered: 03/28/2025) |

| 03/31/2025 | 258 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Motion Hearing held on 3/31/2025 re 254 MOTION in Limine *Regarding Undisclosed Expert Opinions of Bancroft* held outside presence of jury. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court makes inquiries and counsel make statements. Court makes findings ORDERED: 254 MOTION in Limine *Regarding Undisclosed Expert Opinions of Bancroft* is denied. (Court Reporter: Sunnie Donath) (eh) (Entered: 03/31/2025) |

| 03/31/2025 | 259 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 6) held on 3/31/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 9:21 am. Robert Bancroft sworn as plaintiff witness. Jury excused for lunch at 12:26 pm and court reconvenes at 1:32 pm. Jury reenters courtroom at 1:40 pm with Robert Bancroft on the witness stand. Leslie DeMars sworn as plaintiff witness. Jury excused for the day at 4:30 pm. ORDERED: Jury trial to resume 9:00 am 4/1/2025. (Court Reporter: Sunnie Donath) (eh) (Entered: 03/31/2025) |

| 04/02/2025 | 261 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 8) held on 4/2/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Jury enters the courtroom at 9:04 am. Edward Merrens sworn as plaintiff witness. Jury takes morning break at 10:16 am; Plaintiff rests and parties make statements re: admissibility of R. Bancroft exhibit and chart. Court makes findings. ORDERED: R. Bancroft exhibit and chart are not admitted into evidence but can be used for demonstrative purposes. Deft makes motion for directed verdict. Court takes recess at 10:27 am and reconvenes at 10:43 am. Jury reenters at 10:48 am and is excused for lunch until 1:00 pm. Counsel make oral arguments re: Defendant's Oral Motion for Directed Verdict. Court takes recess at 11:57 am and reconvenes at 12:51 pm. Court makes findings. ORDERED: Defendant's Oral Motion for Directed Verdict is denied. Jury enters courtroom at 1:04 pm. Judith Stern, Kathleen Mansfield, and Kelley Mousley sworn as defendant witnesses. Court adjourns at 4:02 pm. ORDERED: Jury trial to resume 9:00 am 4/3/2025. (Court Reporter: Sunnie Donath) (eh) (Entered: 04/02/2025) |

| 04/07/2025 | 272 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Charge Conference (Trial Day 11) held on 4/7/2025.. Attorneys Eric Jones and Geoffrey Vitt present on behalf of Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court makes inquiries and counsel make statements re: 270 Court's Proposed Jury Instructions and 271 Court's Proposed Verdict Form. Court makes inquiries and counsel make statements re: 266 MOTION requesting (i) a jury instruction to the effect that the jury should not include pre-judgment interest in connection with any damages awarded to Dr. Porter, and (ii) that, if the jury determines that Dr. Porter is indeed entitled to damages, the Court apply the federal interest rate and 267 MOTION to preclude any reduction of damages based on conditional offer of severance pay. Court makes findings. Court revisits ruling re: R. Bancroft exhibit and does not allow document to be used as an exhibit or for demonstrative purposes. ORDERED: 266 MOTION requesting (i) a jury instruction to the effect that the jury should not include pre-judgment interest in connection with any damages awarded to Dr. Porter, and (ii) that, if the jury determines that Dr. Porter is indeed entitled to damages, the Court apply the federal interest rate is denied as moot. 267 MOTION to preclude any reduction of damages based on conditional offer of severance pay is taken under advisement. Parties to meet at 8:30 am 4/8/2025 to review revised jury instructions and verdict form. Trial to commence 9:00 am. (Court Reporter: Sunnie Donath) (eh) Text clarified on 4/9/2025 (eh). (Entered: 04/07/2025) |

| 04/08/2025 | 274 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Jury Trial (Day 12) held on 4/8/2025. Attorneys Eric Jones, Geoffrey Vitt, and Sarah Nunan present with Plaintiff. Attorneys Tristram Coffin, Morgan McDonald, and Donald Schroeder present for Defendants. Court convenes at 8:36 am to review revised jury instructions and verdict form. Counsel makes statements re: 267 MOTION to preclude any reduction of damages based on conditional offer of severance pay. Court makes findings. ORDERED: 267 MOTION to preclude any reduction of damages based on conditional offer of severance pay is granted in part and denied in part based on limitations provided on the record. Jury enters the courtroom at 9:10 am. Plaintiff and Defendant make closing statements, Plaintiff makes rebuttal. Jury excused at 11:37 am for lunch. Court reconvenes at 12:50 pm. Defendant moves to strike rebuttal statement. Court takes a brief recess and reconvenes at 1:10 pm. Court makes findings. OREDERED: Defendant's Oral Motion to Strike Rebuttal Statement is denied. Jury enters courtroom at 1:11 pm. Court reads jury charge and appoints foreperson. Jury exits the courtroom at 2:13 pm and reenters at 2:15 pm to receive instructions from the court re: time for deliberation. Jury exits the courtroom at 2:18 pm and begins deliberations. Court officers sworn. Court receives jury note #1 and convenes at 4:31 pm. Jury enters the courtroom at 4:32 pm and are excused at 4:33 pm. ORDERED: Deliberations to resume 9:00 am 4/9/2025. (Court Reporter: Sarah Bentley, Capitol Court Reporters) (eh) (Entered: 04/09/2025) |

# UNITED STATES DISTRICT COURT

for the
District of Vermont

Misty Blanchette Porter, M.D.

*Plaintiff(s)*

v.

Dartmouth-Hitchcock Medical Center, Dartmouth-
Hitchcock Clinic, Mary Hitchcock Memorial Hospital,
and Dartmouth-Hitchcock Health

*Defendant(s)*

)
)
)
)
)
)
)
)
)

Civil Action No. 2:17-cv-194

# JUDGMENT IN A CIVIL ACTION

☑ **Jury Verdict.**

☐ **Decision by Court.**

**IT IS ORDERED AND ADJUDGED** that pursuant to the Jury Verdict Form (Doc. 281) filed April 10, 2025, Defendants were not liable to Plaintiff Misty Blanchette Porter under the New Hampshire Whistleblowers' Protection Act, the Americans with Disabilities Act, the Rehabilitation Act, the New Hampshire Law Against Discrimination, and New Hampshire State Law prohibiting Wrongful Discharge. Defendants were liable to Plaintiff under the Vermont Fair Employment Practices Act.

Plaintiff was awarded One Million Dollars ($1,000,000.00) for economic damages and One Hundred Twenty-Five Thousand Dollars ($125,000.00) for non-economic damages. JUDGMENT IS HEREBY entered in the amount of One Million One Hundred Twenty-Five Thousand Dollars ($1,125,000.00) for Plaintiff Misty Blanchette Porter, against Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health.

The effective post-judgment interest rate is 3.98%

Date: April 24, 2025

*JEFFREY S. EATON*
*CLERK OF COURT*

JUDGMENT ENTERED ON DOCKET
DATE ENTERED: 4/24/2025

*/s/ Emerson Howe*

Signature of Clerk or Deputy Clerk

**UNITED STATES DISTRICT COURT**

**OFFICE OF THE CLERK**

DISTRICT OF VERMONT
FEDERAL BUILDING
**BURLINGTON, VERMONT 05402-0945**

☒ P.O. BOX 945
BURLINGTON 05402-0945
(802) 951-6301

☐ P.O. BOX 607
RUTLAND 05702-0607
(802) 773-0245

**JEFFREY S. EATON**
CLERK

Civil Action: 2:17-cv-194                    Date:  April 24, 2025

Blanchette Porter v. Dartmouth Hitchcock Medical Center et al.

<u>NOTICE TO LITIGANTS</u>

If you wish to appeal the enclosed judgment or order, you must file a Notice of Appeal within 30 days after entry of the judgment or order appealed from (or 60 days if the United States or an officer or agency of the United States is a party).  Fed. R. App. P. 4(a)(1).  The fee for filing an appeal is $605.00.

If you wish to appeal but are unable to file your Notice of Appeal within 30 days [or 60 days if applicable] after the date of entry shown on line 2 below, then you have an additional 30 days to file a Motion for Extension of Time.  The Motion for Extension of Time **must** be filed within 30 days after the date on line 3 below.  Every Motion for Extension of Time must contain an explanation which demonstrates "good cause" or "excusable neglect" for failure to file the Notice of Appeal within the time limit required. Fed. R. App. P. 4(a)(5).

**PLEASE TAKE NOTICE**

    1.   Judgment filed                        April 24, 2025

    2.   Date of Entry of Judgment on the docket of this court             April 24, 2025

    3.   Notice of Appeal **MUST** be filed on or before            May 27, 2025

*/s/ Emerson Howe*
*Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.

Dartmouth-Hitchcock Medical Center et al.,

    Defendants.

Civil Action No. 2:17–cv–194–kjd

## ORDER
(Doc. 305)

Defendants (Dartmouth Health) filed a motion to alter or amend the judgment or, in the alternative, for a new trial on Dr. Porter's claim of disability discrimination under the Vermont Fair Employment Practices Act (VFEPA). After a three-week trial, a jury found by a preponderance of the evidence that Dr. Porter's disability was a motivating factor in Dartmouth Health's decision to terminate Dr. Porter's employment in violation of VFEPA. (Doc. 281 at 3.) Judgment on this claim entered for Plaintiff on April 24, 2025. (Doc. 297.) Dartmouth Health seeks relief under Rule 59 on the grounds that the Court erroneously instructed the jury to apply the "motivating factor" causation standard to the VFEPA claim rather than the higher "but-for" standard. (Doc. 305 at 1.) Dartmouth Health asks the Court to certify the question of the appropriate causation standard to the Vermont Supreme Court. (*Id.* at 11.) Dartmouth Health further contends that the jury instructions contained an incorrect statement of law regarding the "motivating factor" test. (*Id.* at 10.) Dr. Porter opposes the motion, asserting that Dartmouth Health did not preserve all of its objections and that Vermont has consistently applied the "motivating factor" standard to claims under VFEPA. (Doc. 314.)

For the reasons explained below, Dartmouth Health's motion (Doc. 305) is DENIED.

## Standard

A district court has broad discretion in determining whether to grant a motion to alter or amend the judgment. *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000). Appellate courts review the district court's decision for abuse of discretion and will reverse only if the court's judgment was based on clearly erroneous factual findings or erroneous legal conclusions. *Id.*

A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 112 n.34 (2d Cir. 2013) (citation modified). Denial of a motion for a new trial under Rule 59 will not be reversed unless denial constituted an abuse of discretion. *See Mirlis v. Greer*, 952 F.3d 36, 48 (2d Cir. 2020).

## Analysis

### I.    The Court correctly instructed the jury to apply the "motivating factor" standard to the VFEPA claim instead of the "but-for" standard.

Dartmouth Health contends that the Court should alter the judgment or grant a new trial because the instruction "as to the causation standard for violation of the VFEPA was just plain wrong." (Doc. 305 at 7 (citation modified).) According to Dartmouth Health, "[t]he jury should have been instructed" that Dr. Porter must prove "that her disability was a 'but-for' cause of Dartmouth Health's decision to terminate her employment." (*Id.*) Dartmouth Health notes that VFEPA's disability discrimination provisions "are patterned after the federal Rehabilitation Act, which in turn incorporates standards from the federal Americans with Disabilities Act (ADA)," and contends that the proper standard is "but-for" causation because courts in the Second Circuit apply "but-for" causation to ADA and Rehab Act claims. (*Id.* at 7–8.)

VFEPA provides:

It shall be unlawful employment practice . . . [f]or any employer . . . to harass or discriminate against any individual because of race, color, religion, ancestry,

2

national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age *or against a qualified individual with a disability*.

21 Vt. Stat. Ann. § 495(a)(1) (emphasis added).

With respect to discrimination claims under VFEPA, the Vermont Supreme Court has repeatedly held and recently reiterated that the standards and burdens of proof to be applied under VFEPA are identical to those applied under Title VII of the Civil Rights Act of 1964. *See, e.g.*, *Hammond v. Univ. of Vt. Med. Ctr.*, 2023 VT 31, ¶ 24, 218 Vt. 250, 308 A.3d 421; *Kelly v. Univ. of Vt. Med. Ctr.*, 2022 VT 26, ¶ 17, 216 Vt. 445, 280 A.3d 366; *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 16, 176 Vt. 356, 848 A.2d 310; *Lavalley v. E.B. & A.C. Whiting Co.*, 692 A.2d 367, 370 (Vt. 1997); *Gallipo v. City of Rutland*, 656 A.2d 635, 640 (Vt. 1994); *Hodgdon v. Mt. Mansfield Co.*, 624 A.2d 1122, 1128 (Vt. 1992); *Graff v. Eaton*, 598 A.2d 1383, 1384 (Vt. 1991). Title VII employs the "motivating factor" standard of causation—that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Moreover, the Vermont Supreme Court has consistently applied the "motivating factor" test to claims under VFEPA, including at least one disability discrimination claim. *See, e.g.*, *Hammond*, 2023 VT at ¶¶ 26, 34; *Robertson*, 2004 VT at ¶¶ 18, 22; *Gallipo*, 656 A.2d at 640; *Hodgdon*, 624 A.2d at 1128; *Graff*, 598 A.2d at 1385.

Dartmouth Health argues that the "but-for" standard should apply because after the Second Circuit's decision in *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019), "the equivalent federal claims—namely, the ADA and the Rehabilitation Act—utilize 'but-for' causation rather than 'motivating factor' causation." (Doc. 305 at 8.) The Court disagrees.

3

First, the Vermont Supreme Court has never suggested that a different causation standard applies to disability discrimination than to the other categories protected by VFEPA. To the contrary, the Vermont Supreme Court recently had the opportunity in *Hammond* to apply "but-for" causation to a disability discrimination claim post-*Natofsky* and did not do so. *Hammond* involved race and disability discrimination claims and a retaliation claim under VFEPA. 2023 VT at ¶ 21. The Vermont Supreme Court outlined "the legal framework applicable to employment discrimination and retaliatory discharge claims under Vermont's FEPA"—drawing no distinction between the disability discrimination and race discrimination claims—and stated that VFEPA "makes it unlawful for an employer to discriminate against any individual based on race or disability." *Id.* at ¶ 24. *Hammond* also reaffirmed that "the standards and burdens of proof under [the] FEPA are identical to those under Title VII." *Id. Hammond* does not reference the ADA or the Rehabilitation Act at all.

Second, state courts interpreting statutes similar to VFEPA have applied the "motivating factor" standard to disability discrimination claims, not the "but-for" standard. *See Lavalley*, 692 A.2d at 369 (citation modified) ("Federal decisions represent persuasive authority on the proper interpretation of FEPA. They are not, however, the only sources of persuasive authority. Many states have enacted employment discrimination laws patterned in whole or in part on Title VII. Decisions from the courts of those states are also sources of persuasive authority."). Vermont prohibits employment discrimination with a comprehensive statute covering a series of protected traits. *See* Sandra F. Sperino, *Revitalizing State Employment Discrimination Law*, 20 Geo. Mason L. Rev. 545, 567 (2013) (describing such an approach as a "unified statutory regime"). By contrast, federal "civil rights protections against employment discrimination are scattered" across several statutes that protect different traits, resulting in "numerous fractures in

4

the federal law . . . depending upon the statute involved." *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 10 (Iowa 2014). Courts in states with similar unified employment discrimination statutes, in the absence of statutory language providing the causation standard, have applied the "motivating factor" standard to disability discrimination claims. *See, e.g.*, *Wallace v. Caring Sols., LLC*, 278 A.3d 586, 602 (Conn. App. Ct. 2022); *McClure v. E. I. du Pont de Nemours & Co.*, 23 N.W.3d 33, 41 (Iowa 2025); *Stoughton Trailers, Inc. v. Lab. & Indus. Rev. Comm'n*, 2007 WI 105, ¶¶ 36, 70–71, 303 Wis. 2d 514, 735 N.W.2d 477. Dartmouth Health has not cited any cases in which a state court applied "but-for" causation to a disability discrimination claim brought under a unified statutory regime such as VFEPA.

Third, the plain text and the remedial purpose of VFEPA support the "motivating factor" standard. As the Connecticut Appellate Court recently observed, a legislature's choice to enact one comprehensive employment discrimination law indicates that lawmakers intended a single uniform standard to apply to all protected classes:

> Our legislature has chosen not to follow the legislative approach taken by Congress of adopting different statutes to address different types of employment discrimination with varying causation burdens. Our legislature's decision to include multiple types of unlawful employment discrimination within a single statutory provision, without setting out distinctive standards for the different types, leads to the logical conclusion that it intended that the same standard of proof be applied to all the types of discrimination set forth in [the employment discrimination statute].

*Wallace*, 278 A.3d at 602 (citation modified). Moreover, the motivating factor standard—as opposed to the higher "but-for" standard—is "consistent with the remedial purpose of [VFEPA] to deter and to eradicate discrimination in the state." *See Payne v. U.S. Airways, Inc.*, 2009 VT 90, ¶ 21, 186 Vt. 458, 987 A.2d 944 (citation modified).

The Court is not persuaded by Dartmouth Health's argument that "the plain language of the VFEPA distinguishes between those categories protected by Title VII and the categories

protected by the ADA." (Doc. 324 at 4.) VFEPA makes it unlawful for an employer "to harass or discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability." 21 Vt. Stat. Ann. § 495(a)(1). Dartmouth Health appears to argue that because under VFEPA an employer shall not "harass or discriminate . . . against a qualified individual with a disability," the statute reserves the causation language—"because of"—for the non-disability traits. In other words, Dartmouth Health posits that by excluding disability from the "because of" clause, the legislature distinguished between disability discrimination claims and other claims under VFEPA. But the Vermont Supreme Court has consistently applied the "because of" causation language to disability claims under VFEPA. *See, e.g.*, *Hammond*, 2023 VT at ¶¶ 35, 37; *Gates v. Mack Molding Co., Inc.*, 2022 VT 24, ¶ 16, 216 Vt. 379, 279 A.3d 656; *Knapp v. State*, 729 A.2d 719, 720 (Vt. 1998).

Further, the cases Dartmouth Health cites do not compel the conclusion that the "but-for" standard applies to discrimination claims on the basis of disability under VFEPA. Dartmouth Health cites *Newton v. Kohl's, Inc.*, Case No. 5:21-cv-268, 2024 WL 4986303, at *13 (D. Vt. Nov. 12, 2024), to argue that "[t]he jury should have been instructed that, for Dr. Porter to succeed on her VFEPA claim, she must have proven that her disability was a 'but-for' cause of Dartmouth Health's decision to terminate her employment." (Doc. 305 at 7.) The Court disagrees. *Newton* first cited *Hammond* to observe that "[t]he VFEPA is patterned after Title VII . . . and uses identical standards and burdens of proof as Title VII." *Newton*, 2024 WL 4986303, at *4. Later in the decision, the court noted that VFEPA's disability-discrimination provisions "are patterned after the federal Rehabilitation Act, which in turn incorporates standards from the federal Americans with Disabilities Act." *Id*. at *13. And in summarizing the *federal* anti-

6

discrimination framework, the court explained that the ADA applies the "but for" standard. *Id*.

However, *Newton* noted that "the court looks to both state and federal case law to guide its

analysis" of VFEPA's disability discrimination provisions. *Id*. The Court does not read *Newton*

to hold that disability discrimination claims under VFEPA must meet the "but-for" standard.

*Newton* did not reach the question of the causation standard under VFEPA because the employee

did not establish a prima facie case of disability discrimination. Specifically, Newton could not

show that she was an "individual with a disability" and, consequently, she could not demonstrate

that she suffered an adverse employment action because of her disability. *Id.* at *14.

Dartmouth Health cites several cases for the proposition that "Vermont courts have

consistently held that the VFEPA follows the standards and burdens of proof articulated for the

equivalent federal disability discrimination claims." (Doc. 305 at 7.) Each of the cited cases is

distinguishable. *Gates v. Mack Molding Co., Inc.*, 279 A.3d 656 (Vt. 2022) and *Mueller v.

Rutland Mental Health Servs., Inc.*, 2006 WL 2585101 (D. Vt. Aug. 17, 2006) both address

failure-to-accommodate under VFEPA, a claim that has different elements from the claim at

issue in this case. *Caldwell v. Champlain Coll. Inc.*, 2025 VT 17, ¶ 12, 336 A.3d 423, 427 (Vt.

2025). The standards and burdens of proof under VFEPA are identical to those under the ADA

for failure-to-accommodate claims, *Mueller*, 2006 WL 2585101 at *2, but that is simply because

Title VII does not contain provisions related to reasonable accommodations for disability.

In *Kennedy v. Department of Public Safety*, 719 A.2d 405, 406 (Vt. 1998), the Vermont

Supreme Court did not discuss the legal standards or burdens of proof applicable to VFEPA

claims, noting only that it looks to interpretations of the Rehabilitation Act "in determining

whether plaintiff has met the elements of his [VFEPA] claim." Finally, *State of Vermont v. G.S.

Blodgett Co.*, 656 A.2d 984 (Vt. 1995) considered a failure-to-accommodate claim under

VFEPA. The court generally observed that its consideration of VFEPA disability discrimination claims "look[s] to federal case law to guide [its] interpretation, the allocations of burdens and standards of proof," but the court did not examine the causation standard for disability discrimination claims under VFEPA because the parties agreed on every element of the claim except whether the employee was a "qualified handicapped individual." *Id.* at 988.

In short, longstanding precedent, recent case law, the plain language and purpose of VFEPA, and decisions of other state courts interpreting similar statutes support the application of the "motivating factor" standard to disability discrimination claims under VFEPA. Dartmouth Health has not demonstrated that the Court erred in its "motivating factor" instruction on the VFEPA claim.

## II. The Court properly instructed the jury that Dartmouth Health could not avoid liability under VFEPA by proving that it would have terminated Dr. Porter's employment in the absence of a discriminatory motivation.

Dartmouth Health contends that "the jury in this matter was instructed *exactly the opposite* of what the Vermont Supreme Court said is required of motivating factor causation." (Doc. 305 at 10.) Dartmouth Health argues that the jury should have been instructed that a defendant may avoid liability under the "motivating factor" standard by proving "that it would have made the same decision 'even absent the discriminatory motive.'" (*Id.* (quoting *Knapp v. State*, 168 Vt. 590, 592, 729 A.2d 719, 721 (1998)) (emphasis omitted).) Because the jury instructions provided that "an employer cannot avoid liability by proving that it would still have taken the same adverse action in the absence of discriminatory motivation," Dartmouth Health contends that it is entitled to an amended judgment. (Doc. 305 at 10.)

As a threshold matter, Dartmouth Health did not preserve this objection at trial. *See, e.g., John Wiley & Sons, Inc. v. Kirtsaeng*, 654 F.3d 210, 223 (2d Cir. 2011) (citation modified) ("Failure to object to a jury instruction prior to the jury retiring results in a waiver of that

8

objection."), *rev'd and remanded on other grounds*, 568 U.S. 519 (2013). Dartmouth Health objected to the use of the "motivating factor" standard rather than the "but-for" standard (Doc. 295 at 51:2–9), but it did not request any other changes to the instruction (*id.* at 51:10–12). Dartmouth Health did not raise an objection that "sufficiently called the court's attention" to the language in the instruction that Dartmouth Health now challenges. *See Ashley v. City of New York*, 992 F.3d 128, 142 (2d Cir. 2021).

In any event, the Court finds no error in the instruction. As discussed above, the standards and burdens of proof to be applied under VFEPA are identical to those applied under Title VII. Title VII expressly permits liability even if the defendant proves it would have "taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B)(i). The jury instruction properly reflected the standards and burdens of proof established in Title VII.

*Knapp* does not compel a different conclusion. *Knapp* expressly "based [its] determination on *Price Waterhouse v. Hopkins*, [a 1989 decision] where the Supreme Court held that [shifting the burden to the employer to show that it would have taken the same adverse action in the absence of discriminatory motive] was appropriate in employment discrimination cases" under Title VII. *Knapp*, 729 A.2d at 721. But Congress amended Title VII to overrule the portion of the *Price Waterhouse* burden-shifting framework upon which *Knapp* relied. As one district court explained:

> In 1991, Congress amended Title VII and partially overruled *Price Waterhouse* when it enacted the Civil Rights Act of 1991. Section 107 of the 1991 Act permitted a finding of liability if the plaintiff demonstrated that "race, color, religion, sex, or national origin was a motivating factor" for the adverse employment decision, "even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). Section 107 also provided that, once a plaintiff established a violation under § 2000e–2(m) by demonstrating that race, color, religion, sex, or national origin

9

was a motivating factor for the defendant employer's adverse employment deci-
sion, the employer would not be absolved of liability by proving it would have
made the same decision even in the absence of such consideration . . . .

*King v. United States*, 694 F. Supp. 2d 1020, 1023 (N.D. Iowa 2010) (citation modified).[1] Since

*Knapp*, the Vermont Supreme Court has reiterated several times that VFEPA applies the

standards and burdens of proof of Title VII. *See, e.g.*, *Hammond*, 2023 VT at ¶ 24; *Kelly*, 2022

VT at ¶ 17; *Robertson*, 2004 VT at ¶ 16. Moreover, the Vermont legislature has amended

VFEPA several times since Congress amended Title VII, but it has not opted to distinguish

VFEPA's standards and burdens of proof from those of Title VII or to codify the language from

*Price Waterhouse* that Congress overruled. *See State v. Messier*, 2005 VT 98, ¶ 10, 178 Vt. 412,

885 A.2d 1193 (citation modified) ("We must presume that the Legislature made changes in the

law in light of the relevant decisions of this Court, and with knowledge of prior legislation on the

same subject.").

Because the challenged jury instruction tracks the standards and burdens of proof

established by Title VII, Dartmouth Health has not shown error warranting an amended

judgment.

### III. Vermont precedent is adequate for this Court to determine the VFEPA causation standard without certification to the Vermont Supreme Court.

Dartmouth Health asks the Court to "certify to the Vermont Supreme Court the question

of the appropriate causation standard for a disability discrimination-based VFEPA claim." (Doc.

305 at 11.)

---

[1] As the court further explained, while an employer could not avoid liability by showing that it would have made the same decision even in the absence of the prohibited consideration, "such proof merely restricted the remedies to which a plaintiff who proved a violation . . . was entitled." *King*, 694 F. Supp. 2d at 1023 & n.5. This limitation of remedies under the amended Title VII is immaterial to the damages award in this case. Unlike Title VII, VFEPA draws no distinction between "motivating factor" remedies and "but for" remedies. *See* 21 V.S.A. § 495b(b) ("Any person aggrieved by a violation of the provisions of this subchapter may bring an action . . . seeking compensatory and punitive damages or equitable relief, including restraint of prohibited acts, restitution of wages or other benefits, reinstatement, costs, reasonable attorney's fees, and other appropriate relief.").

10

The Court may certify "an unsettled and significant question of state law that will control the outcome of a pending case" to the Vermont Supreme Court. L.R. 74(a); *see also* Vt. R. App. P. 14(a) ("The Vermont Supreme Court may answer a question of Vermont law certified to it by a federal court if the answer might determine an issue in pending litigation and there is no clear and controlling Vermont precedent."). Certification is appropriate "where state law is not clear and state courts have had little opportunity to interpret it, where an unsettled question of state law raises important issues of public policy, where the question is likely to recur, and where the result may significantly impact a highly regulated industry." *Jenkins v. Miller*, Case No. 2:12-cv-184, 2017 WL 4402431, at *7 (D. Vt. Sept. 29, 2017), *modified*, 2018 WL 11418392 (Aug. 29, 2018).

However, courts should "resort to certification only sparingly, mindful that, in diversity cases that require [the court] to apply state law, it is [the court's] job to predict how the [state's highest court] would decide the issues before" the court. *Amerex Grp., Inc. v. Lexington Ins. Co.*, 678 F.3d 193, 200 (2d Cir. 2012) (citation modified). "Certification is to be used in those cases where there is a split of authority on the issue or when presented with a complex question of state common law for which no state authority can be found." *Knapik v. Mary Hitchcock Mem'l Hosp.*, Case No. 5:12-cv-175, 2014 WL 12717446, at *1 (D. Vt. May 30, 2014) (citation modified). Even when state law is unclear or uncertain, courts should not certify questions of law when "sufficient precedents exist for [the court] to make a determination." *See Amerex Grp., Inc.*, 678 F.3d at 200 (citation modified).

As discussed above, the Vermont Supreme Court has repeatedly held that the standards and burdens of proof to be applied under VFEPA are identical to those applied under Title VII, including in the disability discrimination context. *See, e.g.*, *Hammond*, 2023 VT at ¶ 24. There is

no dispute that Title VII requires the "motivating factor" standard. 42 U.S.C. § 2000e-2(m). Considering Vermont precedent on this issue, this Court predicts that the Vermont Supreme Court would apply the "motivating factor" test to a disability discrimination claim under VFEPA.

Therefore, the Court denies Dartmouth Health's request to certify this question of law to the Vermont Supreme Court.

### Conclusion

For the reasons explained above, Dartmouth Health's Motion to Alter or Amend the Judgment and, in the Alternative, for a New Trial on Plaintiff's VFEPA Claim (Doc. 305) is DENIED.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

*/s/ Kevin J. Doyle*
United States Magistrate Judge

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

    Plaintiff,

    v.                            Civil Action No. 2:17–cv–194–kjd

Dartmouth-Hitchcock Medical Center et al.,

    Defendants.

## **ORDER**
(Doc. 308)

Contending that the Court committed several errors during the trial of this case, Defendants (Dartmouth Health) move under Federal Rule of Civil Procedure 59 for a new trial limited to the issue of Dr. Porter's damages. First, Dartmouth Health argues that the testimony of Dr. Porter's damages expert, Dr. Bancroft, should have been excluded due to untimely disclosure under Rule 26. Second, Dartmouth Health challenges the Court's jury instructions on economic damages for failing to clearly instruct the jury to consider Dr. Porter's earnings from her job at the University of Vermont Medical Center (UVMMC). Third, Dartmouth Health objects to the Court's exclusion of a note written by Dr. Bancroft on cross-examination. The note consists of three numbers Dr. Bancroft wrote after defense counsel requested that he perform alternative damages calculations. Finally, Dartmouth Health claims that the Court improperly restricted its closing arguments concerning a severance offer Dartmouth Health extended to Dr. Porter. Dr. Porter opposes Dartmouth Health's Motion.

For the reasons explained below, Dartmouth Health's Motion (Doc. 308) is DENIED.

## Standard

"A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 112 n.34 (2d Cir. 2013) (citation modified). In reviewing a motion for a new trial, the Court must view the evidence in the light most favorable to the nonmoving party. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 624 (2d Cir. 2001).

## Analysis

### I. Dartmouth Health has not shown error under Rules 26 and 37 warranting a new trial.

Dartmouth Health contends that the Court erred by admitting testimony and exhibits offered by Dr. Porter's expert damages witness, Dr. Bancroft, because Dr. Porter failed to timely disclose several of his expert opinions under Rule 26. According to Dartmouth Health, "[p]laintiff was permitted multiple, late, unjustified revisions to her expert reports and opinions to be presented [at] trial," including "a drastic revision less than a week before trial," and Dartmouth Health "thus had to face unwarned, constantly evolving, weakly-based and sharply prejudicial expert opinions and was not permitted" to "disclose its expert economist to appropriately rebut these repeated, new opinions." (Doc. 308 at 4.) Dartmouth Health argues that Dr. Porter's Rule 26 violations warranted exclusion of Dr. Bancroft's testimony in its entirety.

Rule 26(e)(1) provides:

A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Rule 26(e) "does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect." *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011). A party's duty to "supplement its initial expert report does not arise when [the party] seeks to bolster its earlier submission, but rather, arises only if the expert *subsequently* learns of information that was previously unknown or unavailable, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete." *Levinson v. Westport Nat. Bank*, Civil Action No. 3:09-CV-1955(VLB), 2013 WL 3280013, at *4 (D. Conn. June 27, 2013) (citation modified) (alteration in original). Therefore, "if an expert's report does not rely on any information that was previously unknown or unavailable to him, it is not an appropriate supplemental report under Rule 26." *Id.* at *5 (citation modified). In other words, Rule 26 permits supplemental expert reports after the deadlines provided in the Rule "only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Minebea Co., Ltd. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005).

With respect to the August 26, 2024 supplemental report, a motion for a new trial may be based only on the grounds on which the party objected at the time the evidence was offered for admission. *See Rivenburgh v. CSX Transp.*, 280 F. App'x 61, 63–64 (2d Cir. 2008) (summary order); Fed. R. Evid. 103. Dartmouth Health did not object under Rules 26 and 37 to the timeliness of the disclosure of Dr. Bancroft's August 26 report in motions in limine or at trial. (*See, e.g.*, Doc. 198.) Dartmouth Health challenged Dr. Bancroft's testimony under Rule 702. (*Id.*) For this reason, Dartmouth Health has waived its timeliness arguments concerning the August 2024 report.

Even assuming Dartmouth Health has not waived its arguments, it has not shown that the timing of the August 2024 disclosure warrants a new trial. The October 1, 2019 expert report calculated Dr. Porter's lost earnings and employment costs assuming that she left her full-time position at UVMMC in June 2021 to obtain a position closer to her home in Norwich, Vermont. (Doc. 198-3 at 2.) Dr. Porter ultimately remained at UVMMC full-time longer than she had anticipated. However, this Court granted summary judgment for Dartmouth Health on all claims on November 4, 2020. (Doc. 153.) In other words, Dr. Porter did not submit an updated expert report because her case was not expected to proceed to trial at that time. On February 27, 2024, the Second Circuit vacated judgment on Dr. Porter's claims of disability discrimination, whistleblower discrimination, and wrongful discharge and remanded the case for trial. (Doc. 157-1 at 100.) After remand, Dr. Porter supplemented her expert's report based on information that was not available in 2019—that she would continue working full-time at UVMMC. This is precisely the type of correction that Rule 26(e) requires.

The Court further finds that the timing of the disclosure of Dr. Bancroft's March 19, 2025, supplemental report does not warrant a new trial. The March 2025 supplemental report was a direct response to defense counsel's cross-examination of Dr. Bancroft at a hearing on Dartmouth Health's motion to exclude Dr. Bancroft from testifying as an expert witness at trial. Cross-examination elicited that Dr. Bancroft was unaware of certain information relevant to his calculations, including that Dartmouth Health instituted salary freezes in 2020 and 2021 and that Dr. Porter received a $7,698 tuition credit for her son's undergraduate education at UVM in 2019. Dr. Bancroft subsequently updated his report on March 19 to incorporate this new information. Dartmouth Health plainly knew this information before Dr. Bancroft issued his March 19 report, as defense counsel raised the issue at the evidentiary hearing. *Cf. Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1332 (10th Cir. 2004) (citation modified) ("On occasion it may be appropriate to permit the

4

party using the expert to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning.") Moreover, Dr. Bancroft did not change the substance of his opinion. He used the same methodology in his March supplemental report as in his prior reports, changing only the inputs to produce updated damages calculations.

The Court does not share Defendants' view that Dr. Bancroft issued his corrective March 2025 report because his testimony at the March 12 evidentiary hearing revealed that his August 2024 report "had not included key facts and assumptions . . . such as Dr. Porter's promotion to full professor in July 2023 and her most recent earnings from UVMMC at a higher rate of pay than what Dr. Bancroft had projected." (Doc. 308 at 3.) Rather, Dr. Bancroft testified at the hearing that although he was uncertain whether he knew at the time of his August 2024 report that Dr. Porter became a professor in summer 2023, he *did* know Dr. Porter's compensation for the relevant period of time after she became a professor and used that information to predict her annual salary. (*See* Doc. 230 at 28:7–29:24, 45:24–46:14.) Dr. Porter's salary—not her job title—appropriately factored into Dr. Bancroft's assessment of her damages.

Even if the disclosures were untimely, admitting Dr. Bancroft's testimony was not error because the disclosures were substantially justified or harmless under Rule 37. The Second Circuit has identified a broad range of non-exclusive factors to consider when deciding whether to preclude evidence as a sanction for failure to disclose. *Negron v. Cigna Health & Life Ins. Co.*, No. 3:16-cv-01702 (JAM), 2021 WL 2010788, at *4 (D. Conn. May 20, 2021). In one case, the Second Circuit instructed courts to consider: (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Funk v. Belneftekhim*, 861 F.3d 354, 366 (2d Cir. 2017). In another case, the non-exclusive factors included: (1) the party's explanation for the failure to comply with the

disclosure requirement; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new evidence; and (4) the possibility of a continuance. *See Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (citation modified). Any sanctions imposed under Rule 37 must be "just," and their severity must be "commensurate with the non-compliance." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007).

The first factor—the willfulness of the non-compliance regarding the March 2025 report and the reason for the noncompliance—does not weigh definitively in either party's favor. Dr. Porter knew well before March 2025 that she had received a $7,698 tuition credit for her son's undergraduate education at UVM in 2019, and Dr. Bancroft could have included that information in his August 2024 report. On the other hand, Dartmouth Health knew that it had approved salary freezes in 2020 and 2021, and Dartmouth Health does not allege that Dr. Porter or Dr. Porter's expert had that information until March 2025. Dr. Porter also explained that she had asked UVMMC to adjust her schedule to a .6 FTE with no call obligation, but UVMMC had not yet agreed to that arrangement as of trial. (Doc. 236 at 2.) Therefore, Dr. Porter worked .75 FTE instead of the predicted .6 FTE with no call, and the March 2025 report accounted for this change in Dr. Bancroft's revised damages calculations. The first factor is therefore inconclusive.

The efficacy of lesser sanctions and the possibility of a continuance weigh against excluding Dr. Bancroft's testimony. Dartmouth Health's proposed alternative—introducing its own expert witness to rebut Dr. Bancroft's supplemental report—was simply not feasible only four days before a three-week trial. *See* Fed. R. Civ. P. 26(a)(2) (providing for disclosure of expert witnesses and specifying deadlines for disclosures of experts and rebuttal experts). Dartmouth Health did not identify or provide any information about its proposed expert witness or explain why it did not disclose an expert witness sooner in compliance with the Federal Rules.

Nor did Dartmouth Health offer any proposals for reopening discovery in the middle of trial beyond suggesting that it could "offer the Plaintiff the opportunity to depose its expert economist witness prior to testimony, perhaps over one of the weekends during trial." (Doc. 235 at 7 n.3.) Dartmouth Health itself acknowledged it was "not yet able to determine" whether it was "fully viable" to produce an expert witness only four days before trial. *Id.* at 7. As the Court previously explained, "[t]he untimely disclosure and the absence of an expert report may prejudice Dr. Porter by denying her a clear understanding of the expert's intended testimony and compromising her ability to prepare effective cross-examination or rebuttal evidence." (Doc. 238 at 16.) Nor was the Court obligated to continue an anticipated three-week trial—with multiple out-of-state witnesses scheduled to testify—to cure the potential prejudice, particularly when Dartmouth Health did not make this request. *See Patterson*, 440 F.3d at 118 (citation modified) ("Though a continuance might have cured the alleged prejudice to Patterson, Balsamico cannot rely on this possibility when there is no indication in the record that he requested a continuance at the time. Given the fact that, after almost four years of litigation, the case was set for trial within ten days of Balsamico's Rule 26(a)(3) disclosure, we cannot say that the district court was obligated to continue the trial on its own initiative.").

The duration of noncompliance factor is inconclusive. As discussed above, although Dr. Porter was aware of some information that impacted her expert's damages calculations well in advance of the March 2025 report, other information was only in the possession, custody, or control of Dartmouth Health until the March evidentiary hearing. Dr. Bancroft submitted his updated report one week after the evidentiary hearing.

The Court is unaware of any previous warning to Dr. Porter that an untimely supplemental expert report could result in exclusion of the expert witness. This factor weighs against excluding Dr. Bancroft's testimony.

The importance of Dr. Bancroft's testimony also weighs against excluding his testimony. Without Dr. Bancroft's testimony, Dr. Porter would have been severely disadvantaged in quantifying her claimed economic damages. Such a sanction would have been disproportionate to the alleged noncompliance given that the late disclosure had a reasonable basis; Dr. Bancroft's methodology did not change from one report to the next, and Dr. Bancroft's final report substantially reduced Dr. Porter's estimated damages.

The potential for prejudice to the opposing party further weighs against excluding Dr. Bancroft's testimony. As discussed, Dartmouth Health already had a significant amount of the updated information Dr. Bancroft relied on for his March 2025 supplemental report. It is difficult to conceive how admitting the March 2025 report, or Dr. Bancroft's testimony consistent with that report, prejudiced Dartmouth Health given that the report estimated substantially lower damages figures than any of Dr. Bancroft's previous reports.

In sum, the relevant factors weigh against excluding Dr. Bancroft's testimony. On this issue, Dartmouth Health has not demonstrated a seriously erroneous result or a miscarriage of justice warranting a new trial.

## II. Dartmouth Health has not shown that the Court erred in its instructions to the jury on damages.

Dartmouth Health contends that the Court incorrectly instructed the jury on the assessment of damages. "Instructions are erroneous if they mislead the jury as to the correct legal standard or do not adequately inform the jury of the law." *Hudson v. New York City*, 271 F.3d 62, 67 (2d Cir. 2001) (citation modified). When considering challenges to jury instructions, the Court must "review[] the charge as a whole to see if the entire charge delivered a correct interpretation of the law" and, if the charge contains an error, determine whether "the error was prejudicial." *See United States v. Vargas-Cordon*, 733 F.3d 366, 379 (2d Cir. 2013) (citation modified).

8

Dartmouth Health contends that the Court "did not clearly and directly inform the jury that it could account for and deduct the amount of salary that Dr. Porter received" from her work at UVMMC "from her loss of salary damages." (Doc. 308 at 5.) Dartmouth Health's theory of damages "was that Dr. Porter found another job—with the help of Dartmouth Health medical staff—in her highly specialized subspecialty, and did mitigate her damages." *Id.* at 6. Dartmouth Health challenges one instruction in particular: "If you find that Dr. Porter failed to mitigate her damages, you must reduce your award of damages, if any, by the amount you find she could have avoided." (Doc. 275 at 30.) According to Dartmouth Health, the jury instructions do "not similarly instruct the jury to reduce [Dr. Porter's] damages by the amount she actually avoided through successful mitigation." (Doc. 308 at 6.) In other words, Dartmouth Health contends that "[f]rom these instructions, the jury could read this as, 'we found she mitigated her damages, so we don't need to reduce the award because of this mitigation.'" *Id.*

Dartmouth Health appears to combine two distinct legal concepts: 1) that Dr. Porter's lost earnings after termination from Dartmouth Health were reduced by earnings from her new job at UVMMC; and 2) that Dr. Porter suffered economic damages from termination but, according to Dartmouth Health, those damages should be reduced because Dr. Porter failed to take reasonable steps to minimize her losses ("failure to mitigate"). The instruction Dartmouth Health challenges accurately informs the jury to deduct any damages Dr. Porter could have avoided—by, for example, taking another job—from the damages award. (*Jury Charge*, Doc. 275 at 29-30) ("A plaintiff ordinarily has a general duty to mitigate the damages she incurs, meaning she has a duty to take steps to try to minimize the harm or prevent it from increasing further. In this context, that means Dr. Porter has a duty to attempt to secure or to secure employment that is a suitable alternative to her employment at Dartmouth Health.").

9

Dartmouth Health contends that the Court should have further instructed the jury to reduce the award by the amount Dr. Porter earned at UVMMC. But the Court had already instructed the jury on how to calculate Dr. Porter's economic damages: "Economic damages include such items as lost income and medical expenses . . . . Dr. Porter is entitled to damages for any earnings lost in the past . . . caused by Dartmouth Health's conduct." (Doc. 275 at 29.) The terms "lost income" and "lost earnings" informed the jury to consider the difference between what Dr. Porter would have earned at Dartmouth Health and what she earned at UVMMC when calculating damages. By definition, "lost earnings" excludes earnings that Dr. Porter actually received. Additional instruction was unnecessary to explain the concept. Dr. Porter's UVMMC earnings are necessarily excluded from what Dr. Porter "lost."

Moreover, the Court is unaware of—and Dartmouth Health has not offered—any authority recommending or applying Dartmouth Health's requested instruction. *Cf. Vt. Civ. Jury Instructions* § 11.5 (Vt. Trial Ct. Civ. Jury Instruction Comm.) (emphasis added) (a plaintiff "is entitled to compensation for *any earnings lost* in the past, and any probable loss of ability to earn money in the future, because of" defendant's violations); Dinse, Berger, & Lane, *Vt. Jury Instructions—Civil & Criminal* § 7.43 (1993) (emphasis added) (a plaintiff "is entitled to be compensated for *all lost earnings or wages* to date caused by the injuries resulting from" defendant's violations).

Even assuming the jury instructions did not adequately inform the jury on how to calculate Dr. Porter's economic damages, the error did not prejudice Dartmouth Health. Dr. Bancroft's expert testimony explicitly subtracted Dr. Porter's actual earnings at UVMMC from the damages projections. (*See* Doc. 235-2 at 3, n. 4–7); (Doc. 290 at 39:3–10, 47:1–8.) And the jury's economic damages award suggests that the jury deducted Dr. Porter's actual earnings when calculating damages. The damages period for back wages alone spanned more than seven years—

10

from Dr. Porter's termination in 2017 to trial in March 2025. Dr. Bancroft projected Dr. Porter's total earnings at Dartmouth Health in 2024 as $391,779, and Dr. Porter actually earned $341,457 at UVMMC that year. (Doc. 235-2 at 3.) But the jury awarded $1,000,000 in economic damages—a much smaller amount than would be expected if the jury had double-counted Dr. Porter's Dartmouth Health income and UVMMC income for several years. The relatively lower award suggests that the jury correctly understood the Court's instructions on lost earnings. Viewing the evidence in the light most favorable to Dr. Porter as the non-moving party, the Court is not "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *See In re Methyl*, 725 F.3d at 112 n.34.

The cases Dartmouth Health cites do not alter the Court's decision. In *Jones v. Consol. Rail Corp.*, 800 F.2d 590 (6th Cir. 1986), the court addressed whether jury instructions properly explained that the plaintiff was entitled to the difference between what he would have earned at his prior job and what he might have earned at a potential new job. *See id.* at 594. *Jones* held that the jury instructions did not adequately explain the law. Specifically, the instruction that the jury "must not award [plaintiff] damages for loss of whatever earnings for the period of time during which he might have worked . . . could refer just as easily to his previous railroad job's wages as to his potential new job's wages." *Id.* (citation modified). As discussed above, however, the phrase "lost earnings" in this case could not reasonably be interpreted to include both Dr. Porter's earnings from UVMMC and her projected earnings at Dartmouth Health. Finally, Dartmouth Health's reliance on *Moysis v. DTG Datanet*, 278 F.3d 819 (8th Cir. 2002) is misplaced because, as Dartmouth Health acknowledges, the case addressed whether an award of front pay constituted an unnecessary windfall. *Id.* at 829.

Dartmouth Health has not shown error in the jury instructions warranting a new trial.

III. **The Court correctly excluded Exhibit C-19 from evidence because the exhibit did not fairly or accurately represent Dr. Bancroft's testimony.**

At trial, Dartmouth Health "sought to elicit key testimony undermining Dr. Bancroft's damages opinions by having him calculate what his projected salary would be if he assumed Dr. Porter [were] working a 1.0 position at UVMMC in three years." (Doc. 308 at 7.) During cross examination, defense counsel provided Dr. Bancroft a calculator and directed him to enter specific numbers, perform certain calculations, and write down the results. (Doc. 290 at 127:7–128:25.) Dartmouth Health subsequently moved to admit that document, marked for identification as C-19, into evidence. The Court denied Dartmouth Health's motion. Dartmouth Health also requested to use Exhibit C-19 as a demonstrative exhibit during closing argument. The Court also denied this motion. Dartmouth Health contends that these denials were "not evenhanded, violated the rules of evidence, and [were] inequitable" because "the figures showed that if" Dr. Porter had worked a 1.0 position at UVMMC, "Dr. Bancroft's damages calculations were essentially fully mitigated by year 2025 or 2026." (Doc. 308 at 7, 8.)

Dartmouth Health primarily argues that Exhibit C-19 was admissible as an admission of a party opponent. (*Id.* at 8-9.) During the trial, the Court explained its reasoning on the record for excluding Exhibit C-19 as substantive evidence and as a demonstrative exhibit. (Doc. 295 at 78–82.) The Court has considered Dartmouth Health's cited authorities and finds no basis to revisit the ruling. The Court further observes that while the note was excluded, counsel was of course free at closing to make use of Dr. Bancroft's testimony associated with the creation of the note. (*Id.* at 82.)

Apart from its admissibility as an evidentiary matter, the Court properly excluded Exhibit C-19 from evidence because of the danger of confusing the issues or misleading the jury. *See* Fed. R. Evid. 403. Assuming Exhibit C-19 is properly considered a "chart," "[s]ummary charts should

12

not be admitted unless a proper foundation is established connecting the numbers on the chart with the underlying evidence." *United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986). "Courts have long required that district courts ascertain that summary charts fairly represent and summarize the evidence upon which they are based. Unless this requirement is met, the chart is more likely to confuse or mislead the jury than it is to assist it." *Id.* (citation modified). A similar requirement applies to demonstrative aids. A court may only exercise its discretion to permit the use of demonstrative aids "accurately summarizing the content of primary testimony." *See Castaldi v. Land Rover N. Am., Inc.*, 363 F. App'x 761, 762 (2d Cir. 2009) (summary order) (citing *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988)).

Dartmouth Health did not demonstrate that the handwritten note fairly represented the testimony at trial. As the Court previously explained in its verbal decision excluding Exhibit C-19, "the circumstances of the testimony that resulted in the generation of the note raised a significant question about whether it accurately summarizes the testimony. Dr. Bancroft acquiesced in performing the requested calculations while protesting that the calculations were not correct." (Doc. 295 at 81–82, 1050:25–1051:5); (*see also* Doc. 290 at 127:8–25) (testimony by Dr. Bancroft that the calculation defense counsel asked Dr. Bancroft to perform would not accurately reflect Dr. Porter's earnings at UVMMC for 2025 if she had worked a 1.0 FTE position and that Dr. Bancroft would "do it anyways, but it's not correct").

Because Exhibit C-19 did not amount to a fair representation of Dr. Bancroft's testimony, the Court did not err by excluding the exhibit from evidence and denying Dartmouth Health's request to use it as a demonstrative aid.

**IV.    Dartmouth Health voluntarily limited its use of the severance offer in its closing argument, and the Court made no express ruling restricting its use.**

Dartmouth Health contends that the Court improperly "limited the extent to which Dartmouth Health could argue at closing that Plaintiff could have mitigated her damages if she had taken" the severance package and that it should have been able to "freely refer[]" to the severance package "in arguing the proper amount of compensatory damages in closing." (Doc. 308 at 9.) The Court first notes that while it raised concerns regarding counsel's intended use of the severance agreement at closing, it made no express ruling barring Dartmouth Health from using the proposed severance agreement as part of a failure to mitigate defense. Further, the colloquy between the Court and Dartmouth Health's counsel on this issue is clear that Dartmouth Health itself elected not to use the severance package as part of a failure to mitigate defense:

> THE COURT: Okay, and then I'll turn now to the plaintiff's motion to preclude any reduction of damages based on conditional offer of severance pay. So having heard the arguments yesterday and considering this, I think that it would be inappropriate to comment on the severance agreement. To the extent I don't know what the defendants might actually argue so I can't really speak specifically to perhaps what the intention is. But would you like to let me know, or I can give you my thoughts on it first? Mr. Schroeder?
>
> MR. SCHROEDER: Sure, Your Honor. I want to make sure we're clear on that. The evidence in the record is that C-13, I believe, I'm certainly going to reference it because C-13 was given after the meeting, which arguably was part of the interactive process.
>
> . . . .
>
> MR. SCHROEDER: And that's all wrapped up in that chronology of events. She argued, and this goes to lack of malice, et cetera, and also just to intent, right?
>
> THE COURT: Lack of malice. You said this yesterday, too. So when you say lack of malice, meaning that Dartmouth was making an effort to reach some type of a severance agreement with her?
>
> MR. SCHROEDER: Exactly, just like they did with the other two physicians at the time.
>
> THE COURT: Okay, **but the argument during closing is not going to be** -- I just want to be really clear -- **it's not going to be making the point that if they should**

14

**find damages, it's going to be reduced by the amount of the severance agreement?**

MR. SCHROEDER: **No, I have no intent of saying that, your Honor.**

THE COURT: Okay.

MR. SCHROEDER: But I want to come back to the fact that this document, I certainly have the ability to discuss it as much as I want, I believe, in terms of admitted evidence into the record, and it relates exactly to the chronology of events. It actually rebuts many of the things that Dr. Porter testified to. I never talked to anybody. Never talked to anybody. Well, no, actually you did. You talked to the head of HR.

THE COURT: Okay.

MR. SCHROEDER: So I want to know that I have free [rein] to at least talk about the document, **not its import in terms of damages**, but I do want to know that I don't have to go rewrite my closing to deal with the fact that I'm addressing -- and I'm going to put it on the screen. Admit it an exhibit. We're not going to have a PowerPoint, but we're going to put in exhibits on the screen, and I want to make sure that I have full carte blanche to discuss what he said in that agreement.

. . . .

THE COURT: All right. So then it sounds like we have clarity on this. Mr. Schroeder, just to be clear then, your discussion of the document, as you said in the ways that you have described, will be fine. We're just talking about the mitigation of the damages issue and the amount of the severance agreement.

MR. SCHROEDER: Understood.

(Doc. 322 at 14:14–15:7, 16:5–17:21, 18:12–20) (emphases added).

Without a limiting ruling, there is no error warranting a new trial. *See, e.g.*, *Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018) ("[A]fter our examination of the record, we conclude that the district court never decided whether Kunkle could testify at trial. . . . Inasmuch as the district court made no decision and issued no ruling, it could not have made an error or otherwise created an issue for appeal."); *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009) (citation modified) ("By failing to request that the district court rule on the admissibility of that

evidence, Basham has waived this argument. . . . It would be difficult to see how the district court committed plain error when it never even issued a ruling to be found in error.").

Because the Court did not issue a ruling limiting use of the severance agreement in the manner Dartmouth Health describes—and at trial Dartmouth Health affirmatively represented that it was not seeking to use the agreement as part of a failure to mitigate defense—its argument that the Court committed error on this issue is without merit and a new trial is not warranted on this ground.

## **Conclusion**

For the reasons explained above, Dartmouth Health's Motion for a New Trial Related to Damages Issues (Doc. 308) is DENIED.

Dated at Burlington, in the District of Vermont, this 26th day of November 2025.

*/s/ Kevin J. Doyle*
United States Magistrate Judge

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Misty Blanchette Porter, M.D.,

     Plaintiff,

     v.

Dartmouth-Hitchcock Medical Center,
Dartmouth-Hitchcock Clinic,
Mary Hitchcock Memorial Hospital, and
Dartmouth-Hitchcock Health,

     Defendants.

Civil Action No. 2:17–cv–194

**AMENDED JUDGMENT IN A CIVIL ACTION**

☒ **Jury Verdict**

☐ **Decision by Court**

**IT IS ORDERED AND ADJUDGED** that pursuant to the Jury Verdict Form filed on April 10, 2025 (Doc. 281), Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health are liable to Plaintiff Misty Blanchette Porter, M.D., under the Vermont Fair Employment Practices Act; and Defendants are not liable to Plaintiff under the New Hampshire Whistleblowers' Protection Act, the Americans with Disabilities Act, the Rehabilitation Act, the New Hampshire Law Against Discrimination, and New Hampshire's laws prohibiting wrongful discharge.

Pursuant to the jury verdict, Plaintiff is awarded $1,000,000 for economic damages, and $125,000 for non-economic damages, for a total of **$1,125,000**. By Order of the Court (*see* Doc. 334), Plaintiff is also awarded prejudgment interest on that amount through April 24, 2025, at the rate of 12%, totaling **$225,340.62**.

In addition, by Order of the Court (*see* Doc. 335), Plaintiff is awarded **$1,173,621.92** in attorney fees, plus **$12,808.38** in costs.

Accordingly, JUDGMENT IS HEREBY ENTERED in favor of Plaintiff and against Defendants in the total amount of **$2,536,770.92**.

Post-judgment interest is to be calculated from the date this judgment is entered until the date of payment, in accordance with the formula set forth in 28 U.S.C. § 1961.

Date:   12/2/2025

*JEFFREY S. EATON*
*CLERK OF COURT*

*/s/ Carl Crawford*
*Signature of Clerk or Deputy Clerk*

<span style="color:red">JUDMENT ENTERED ON DOCKET
DATE: 12/2/2025</span>

(108 of 993), Page 108 of 993    Case: 25-1382    12/22/2025, DktEntry: 35.4, Page 60 of 945
2:17-cv-00194-kjd    Document 253    Filed 03/15/25    Page 60 of 945

1

```
 1                   UNITED STATES DISTRICT COURT
                              FOR THE
 2                      DISTRICT OF VERMONT

 3

 4    Misty Blanchette Porter,     )
                                   )
 5                                 )
      v.                           )  Case No. 2:17-cv-194
 6                                 )
                                   )
 7    Dartmouth-Hitchcock Medical  )
      Center, et al.               )
 8    _____  )

 9

10    RE:  Hearing on Motions in Limine (Docs. 198, 200-202),
      Motion to Quash Dr. Joanne Conroy's Trial Subpoena (Doc. 199),
11    Motion to Amend Complaint (Doc. 213), and an Evidentiary
      Hearing on the Motion in Limine to Preclude the Testimony of
12    Robert Bancroft (Doc. 198)

13    DATE:  March 14, 2025

14    LOCATION:  Burlington, Vermont

15    BEFORE:  Honorable Kevin J. Doyle
                   Magistrate Judge
16

17    **APPEARANCES**:

18    Eric D. Jones, Esq.
      Langrock, Sperry & Wool, LLP
19    210 College Street
      PO Box 721
20    Burlington, VT 05402-0721

21    Geoffrey J. Vitt, Esq.
      Vitt & Associates
22    8 Beaver Meadow Road
      PO Box 1229
23    Norwich, VT 05055-1229

24                       - Continued on Next Page -

25
```

```
 1    Donald W. Schroeder, Esq.
      Morgan McDonald, Esq.
 2    Foley & Lardner LLP
      111 Huntington Avenue, Suite 2500
 3    Boston, MA 02199

 4    Tristram J. Coffin, Esq.
      Downs Rachlin Martin PLLC
 5    199 Main Street
      PO Box 190
 6    Burlington, VT 05402-0190

 7

 8

 9

10             TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                     United States District Court Reporter
11                        verbatim@vermontel.net

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      INDEX OF EXAMINATION

 2     Witness            Examined By          Page       Line

 3     Robert Bancroft    Atty. Coffin          8          17

 4                        Atty. Jones          44          13

 5

 6

 7

 8

 9                        *   *   *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       (A portion of the beginning of the hearing was not

2       recorded.  The following transcript is where the audio

3       recording begins.)

4           ATTORNEY COFFIN:  -- August 26th 2024, and they'll

5   have that go to the jury and explain that to the jury either as

6   substantive or demonstrative evidence.  You know, we'd submit

7   that there are problems with the chart such that it really

8   can't be produced or introduced in a way that is fair expert

9   testimony.  It's either, you know, adding up pretty basic

10  numbers that don't need an expert, or it's expert analysis that

11  really is not sensible, logical, or grounded in information.

12          And so I'll go through kind of a focused presentation of

13  our issues with the report, but our briefing lays out some of

14  those as well, but there will be some additional ones, Your

15  Honor.

16          THE COURT:  Okay.

17          ATTORNEY JONES:  Happy to have Vermont as well.

18          THE COURT:  Sure.

19          ATTORNEY JONES:  It appears to us that defendants'

20  objections to Dr. Bancroft's analysis is that they challenge

21  his assumptions.  They're not challenging his basic

22  methodology.  They're not challenging his basic qualifications.

23  We think the qualifications and methodology are clear.  It's

24  not junk science.  This is the same methodology he's been

25  applying for 40 years in all types of cases, including

2:21-cv-00144-kjd    Document 52:3    Filed 03/15/25    Page 54 of 945

5

1    employment cases.

2          What they're challenging is the factual assumptions.  That

3    is often, if not always, the case with expert testimony, and

4    it's the party proffering the opinion, us, that bears the

5    burden of proving those facts, and we believe that we will, but

6    it's the adversary process of cross-examination that allows the

7    jury to make decisions about what to accept and what not to

8    accept with regard to those assumptions.  But, with regard to

9    Dr. Bancroft's qualifications and his methodology, there's no

10   serious question that he is a qualified expert.  He's testified

11   in this court.  Judge Crawford recently adopted his report.

12   And so we think he's fully qualified, and, if they have

13   concerns about the assumptions, that's for the trial.

14          THE COURT:  Okay.  Mr. Coffin?

15          ATTORNEY COFFIN:  And very brief volley back.  The

16   Court will need to assess the relevance of his testimony based

17   on testimony or the testimony that's actually offered at the

18   trial.  So probably it may not be something that the Court can

19   fully decide after today's hearing, and we're going to have to

20   wait to hear what the testimony that lays the foundation for

21   his testimony is should the Court rule that he is qualified to

22   even go forward.

23          That leads to an interesting problem, though, because he's

24   got a very detailed, elaborate chart which was produced in

25   August of 2024.  And so I think that the plaintiffs are either

1    in a, you know, hundred percent win or nothing comes in in

2    terms of a chart from him.  Because it's too late for further

3    expert disclosures and opinions with regard that.

4         ATTORNEY JONES:  Yeah, Judge, *Daubert* talks about the

5    Court's gatekeeping function, about whether the expert should

6    be allowed to testify in the first instance.  They asked for a

7    *Daubert* hearing.  Here we are.  I think the Court, as of

8    today's hearing, is in a position to make that ruling about

9    whether or not he is able to testify.  Again, all these issues

10   are trial issues, not expert qualification issues.

11        THE COURT:  Right.  It is a gatekeeping function for

12   the Court, as the parties are well aware of.  So are you asking

13   me at this point then to essentially make that gatekeeping

14   assessment and then, assuming it goes in plaintiff's favor,

15   then Dr. Bancroft testifies and cross-examination is how you

16   attack assumptions and all the other things that you have

17   raised in your brief?

18        ATTORNEY COFFIN:  Well, respectfully we haven't posed

19   this as a *Daubert* issue.  It's not just the qualifications of

20   the witness.  It's the substance of his testimony with the

21   analytic chart.  And so the Court may, for example, may reach a

22   decision today, Okay, I'm going to let him go forward saying

23   that it's possible that he won't provide junk science here.

24   But, you know, after the testimony is laid at trial, the Court

25   may well decide, Hey, that chart, based on what you hear at

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 66 of 945
2:21-cv-00147-kjd    Document 53-3    Filed 03/15/25    Page 66 of 945

7

1    this hearing and what you hear at the trial, is unfair to

2    present to the jury because it's filled with problems.

3         And that's certainly I would say a *Daubert* hearing.  It's

4    more a relevance and a 403 issue that the probative value of

5    his testimony or at least as documented in that chart endorsed

6    as provided by an expert witness outweighs the probative value.

7              THE COURT:  Okay.  So Dr. Bancroft is here.  Would

8    you like to examine him today at all, or is this just -- I was

9    under the impression that we were --

10             ATTORNEY COFFIN:  Yeah, well, I don't think we asked

11   for the hearing.

12             THE COURT:  I thought you did ask for an evidentiary

13   hearing.  No, no.  It's in the briefing, if I'm not mistaken.

14             ATTORNEY COFFIN:  I don't think it is.

15             THE COURT:  All right.  Let's --

16             ATTORNEY COFFIN:  No, it's not.  Yeah, we were

17   wondering where that came from.

18             THE COURT:  Yeah.  Defendants hereby request an

19   evidentiary hearing on this motion pursuant to Rule 702.

20             ATTORNEY COFFIN:  We did?  So I guess we did.

21             ATTORNEY JONES:  If they're withdrawing it, we agree

22   that he can do this at the trial.

23             THE COURT:  Okay.  So you're not seeking an

24   evidentiary hearing at this time?

25             ATTORNEY COFFIN:  Well, let me just confer with

1    counsel.

2              THE COURT:  Okay, sure, sure.

3              ATTORNEY COFFIN:  We'd like to proceed now, and, if

4    it makes sense, we'd have additional voir dire of him at trial,

5    but we've had this hearing now, which lays a good groundwork,

6    and the judge can, you can make rulings accordingly.

7              THE COURT:  Okay, all right.  So then would you like

8    to call Dr. Bancroft at this time?

9              ATTORNEY COFFIN:  We're going to call Dr. Bancroft.

10             THE COURT:  Okay.  Dr. Bancroft.

11                        ROBERT BANCROFT,

12             having been duly sworn to tell the truth,

13                     testifies as follows:

14             ATTORNEY COFFIN:  May I approach, Your Honor, with

15   the exhibit binders?

16             THE COURT:  Yes, yes.

17               DIRECT EXAMINATION BY ATTORNEY COFFIN

18   Q.   Good afternoon, Dr. Bancroft.

19   A.   Good afternoon.

20   Q.   I'm not sure if you remember me, but we've worked together

21   before many years ago now, but good to see you again.

22   A.   I certainly remember you.

23             ATTORNEY COFFIN:  Good.  So we'd like marked as an

24   exhibit to this a binder of exhibits which is, are numbered 1

25   through 6, and Number 6 is a placeholder for the deposition

(116 of 993), Page 116 of 993
Case: 25-1382  12/22/2025  DktEntry: 35.4  Page 68 of 945
2:21-cv-00144-kjd  Document 35-33  Filed 03/15/23  Page 68 of 945

9

1  that I didn't stick the whole deposition in there, but we'd

2  move that Dr. Bancroft's deposition of October 30, 2019 be

3  submitted as an exhibit here today, please.

4             THE COURT:  Mr. Jones, any objection?

5             ATTORNEY JONES:  No objection.

6             THE COURT:  Okay.  It's admitted.

7  BY ATTORNEY COFFIN:

8  Q.    And, Dr. Bancroft, if you look at that notebook in front

9  of you that's been marked as Exhibit 1, and I guess these are

10  subexhibits -- wait.  Let's make that -- I'd suggest we make

11  that Exhibit A and then Exhibits 1 through 6 in the binder.

12  The first exhibit there is under Tab 1.  Do you recognize that

13  as your CV?

14  A.    Yes.

15  Q.    Okay.  And that sets forth your qualifications as you'd

16  assert them here today to provide the testimony in this case?

17  A.    Yes.

18  Q.    Okay.  And you've been a witness many, many times before

19  as an economic analyst; is that right?

20  A.    Yes.

21  Q.    Now, aren't I right, though, your actual academic training

22  is a masters in 1976 in agricultural economics from the

23  University of Vermont?

24  A.    I did get a masters, yes, in '76, yes.

25  Q.    And then a PhD from Purdue in 1981?

(117 of 993), Page 117 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 69 of 945
2:17-cv-00194-kjd Document 335-3 Filed 03/19/25 Page 69 of 945

10

1    A.   Yes.

2    Q.   And you spent some time with USDA, but it was quite some

3    time ago; is that fair to say

4    A.   I spent some time with the economic research service, yes.

5    Q.   Okay.  And you were adjunct professor of economics at UVM

6    until 1996; is that right?

7    A.   I was an assistant professor until '91 and then an adjunct

8    after to '96.

9    Q.   Okay.  An adjunct is more part-time than an assistant; is

10   that fair to say?

11   A.   Yes.  I taught one course a year.

12   Q.   So, essentially, from basically 1996 to the present, your

13   primary occupation has been providing these sorts of expert

14   opinions to litigants; is that right?

15   A.   It has been my primary, but it was my primary probably

16   from about '86 on.

17   Q.   Okay.  And fair to say you provide expert analysis in all

18   sorts of cases; is that correct?

19   A.   Yes.

20   Q.   But your expert analysis in employment matters is a fairly

21   small subset of your overall practice; is that right?

22   A.   No.

23   Q.   Okay.  You list a number of different topics here that

24   you've provided, and I see about ten, and in there is wrongful

25   discharge.  You don't think that's a, that makes a small part

(118 of 993), Page 118 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 70 of 945
2:17-cv-00094-kjd    Document 323.3    Filed 03/19/25    Page 70 of 945

11

1      of your practice?

2      A.    No, I don't think it's a small part of my practice, no.

3      Q.    Would you say your practice is about 10 to 20 percent

4      employment matters?

5      A.    I would say that it varies.  I think, probably, over the

6      last 30 years, it's probably been 20, 25 percent.  Right now

7      it's actually almost 50 percent.

8      Q.    Okay.  And are you fully engaged as an economic consultant

9      at this point?

10     A.    I'm not looking for cases, no.

11     Q.    Okay.  And you've handled 2,500 cases over the course of

12     your career, I think, was your testimony; is that correct?

13     A.    Yes.

14     Q.    And about how many cases are you working on right now?

15     A.    I have 22 cases right now that I'm actively working on

16     that I know, and then there's maybe as many as another 20 that

17     I have worked on in the last, oh, six to eight months.  I've

18     rendered reports.  I assume they're still active, but I don't

19     know.

20     Q.    Okay.  And, during the bulk of your career, you said 20 to

21     25 percent was related to employment matters; is that correct?

22     A.    Yes.  And since -- let me qualify that.  Since the late

23     1990s.

24     Q.    Okay.  I imagine a fairly small subset of those dealt with

25     physicians at academic teaching hospitals; is that right?

(119 of 993), Page 119 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 71 of 945
2:17-cv-00094-kjd Document 133-3 Filed 03/05/25 Page 12 of 945

12

1   A.   I've had some, but as a, in the grand total, yes, it's a

2   small, obviously a small percent.

3   Q.   Okay.  And how about cases involving the transfer of a

4   physician who is terminated at one academic teaching hospital

5   in New England to another?

6   A.   I've had other cases, not many, but I've had similar ones.

7   Q.   One or two?

8   A.   I can't say for sure, but at least one and more likely

9   two.

10  Q.   Okay.  So at least one, possibly two, that are closely

11  parallel to this case in that they involved some sort of a

12  personnel action of a physician at one academic teaching

13  hospital in New England transferring to another; is that right?

14  A.   Yes.

15  Q.   Now, you've prepared a series of reports per your work in

16  this case; is that right?

17  A.   Yes.

18  Q.   And those are set forth at, on the binder that's Exhibit

19  A, at Exhibit 3, 4 and 5.  Do you see those?  Sorry, 2, 4, and

20  5.

21  A.   Yes, I see them.

22  Q.   Am I correct that a lot of information in that report was

23  based on conversations you had with plaintiff and her counsel?

24  A.   Yes.

25  Q.   And conversations you had, but with plaintiff and her

(120 of 993), Page 120 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 72 of 945
2:17-cv-00094-kjd   Document 33-3   Filed 03/10/25   Page 182 of 945

13

 1    counsel; is that correct?

 2    A.   Yes.

 3    Q.   And there's some additional materials, but you're not

 4    denying that you rely heavily on what the plaintiff told you

 5    for reaching your conclusions as asserting in these reports; is

 6    that correct?

 7    A.   On projecting out what her earnings would be

 8    post-termination, yes.

 9    Q.   Okay.  And the basic -- so directing your attention,

10    please, to the August 26th 2024 report --

11         THE COURT:  I don't want to interrupt your flow,

12    Mr. Coffin, but so you have moved for the admission of Exhibit

13    6?

14         ATTORNEY COFFIN:  I'm sorry.  I had meant to move for

15    the admission of all of A, which is a the whole binder.

16         THE COURT:  Okay.  Mr. Jones, any objection to 1 to 6

17    in Exhibit A?

18         ATTORNEY JONES:  No objection.

19         THE COURT:  Okay.  So then Exhibit A in its entirety

20    is admitted.  Go ahead.

21    BY ATTORNEY COFFIN:

22    Q.   Thank you.  Directing your attention to Tab 2, Exhibit 2

23    of A, is that your report dated August 26th 2024?

24    A.   Yes.

25    Q.   And that's the last report you prepared that was submitted

(121 of 993), Page 121 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 73 of 945
2:17-cv-00194-kjd    Document 133-3    Filed 03/19/25    Page 73 of 945

14

1    to the defense in this case; do you understand that?

2    A.    That's the last report I prepared, yes.

3    Q.    And the report includes a two-page narrative section; is

4    that right?

5    A.    Yes.

6    Q.    And then a, what looks like a table called "Projected Lost

7    Earnings for Dr. Misty Blanchette Porter" -- is that correct --

8    on the third page of --

9    A.    Yes.

10    Q.    -- Exhibit 2?  Yeah.  And then there's a couple of pages

11    of assumptions; is that correct?

12    A.    Yes.

13    Q.    And then a finally last table; is that right?  A last

14    table, last table entitled "Additional University of Vermont

15    Employment-Related Costs".

16    A.    Yes.

17    Q.    Is that right?  Okay.  And you prepared other reports

18    dated October 30th and October 1st; is that right?  Excuse me.

19    October 30th 2018 and October 1st 2019; is that right?

20    A.    Yes.

21    Q.    Okay.  And those are submitted and are at Tabs 4 and 5 of

22    Exhibit A; is that right?

23    A.    Appears to be, yes.

24    Q.    And your methodology for these reports and all of your

25    reports is fairly consistent in that you're essentially looking

1    for what her earnings were at the place from which she was

2    subject to the personnel action, Dartmouth-Hitchcock, and

3    comparing them with her earnings at the new place -- is that

4    right --  UVM Medical Center?

5    A.   Yes.  And I have issue with the adjective fairly.  They

6    are exactly the same methodology.

7    Q.   Okay.  Exactly the same methodology.  But, essentially,

8    you're comparing what she was earning at Dartmouth and what she

9    was earning and is expected to earn at UVM to determine the

10    difference between the two, which would be her loss; is that

11    correct?

12    A.   Yes.  I projecting out what her earnings would have been

13    at Dartmouth, and I'm projecting out -- well, I know what she's

14    actually earned at least as of the last year.

15    Q.   Right.

16    A.   And then I'm making projections of what I think she will

17    earn based on information she provided me.

18    Q.   Right.  And then you convert it to present value by adding

19    an amount of money to make up the difference of current dollars

20    for inflation; is that right?  Future.

21    A.   Well, you know, some of it's historical, which I add

22    interest onto, and some of it's future, which I discount back

23    to the present.

24    Q.   Okay.  So let's talk about the past earnings.  The damages

25    that you assessed to her that happened previously, you add an

(123 of 993), Page 123 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 75 of 945
2:17-cv-00194-kjd Document 333-3 Filed 03/05/25 Page 16 of 194

1    adjustment for inflation; is that correct?

2    A.    Not for inflation.  I add an interest factor on.

3    Q.    Okay.  And what is the interest factor for if it's not for

4    inflation?

5    A.    I don't know it's not for inflation, but it's a -- I think

6    you'd have to go back and look at back in the 70s when the

7    Vermont legislature, in its wisdom, decided that prejudgment

8    interest should be calculated at 1 percent per month, simple

9    interest.

10   Q.    Okay.  So that's how you came up with 12 percent as

11   applicable for the interest on the past damages; is that right?

12   A.    12 percent simple interest, annual interest, or 1 percent

13   Vermont.

14   Q.    Got it, okay.  Now, you would agree with me that 12

15   percent interest is an unnaturally high level of interest per

16   in today's climate?

17   A.    All depends on the risk.  I understand where you're going

18   with it.  It's a high rate, but there are interest rates that

19   are higher than that, but, again, they are risk-dependent.

20   Q.    Okay.  As an economist, are you aware of interest rates

21   that are commonly available in the market that are lower than

22   that?

23   A.    Yes.

24   Q.    Consumer price index?

25   A.    That's not an interest rate.

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 76 of 945
2:17-cv-00914-kjd    Document 133.3    Filed 03/19/25    Page 76 of 945

17

1    Q.   Well, let's leave -- is it ever used to calculate

2    interest?  Treasury bonds?

3    A.   There are inflation index treasury bonds, yes.

4    Q.   Okay.  If you go to a bank, what they do return for a CD?

5    A.   It all depends on when and what the terms are.

6    Q.   Is it anywhere approaching 12 percent?

7    A.   I don't believe so.

8    Q.   Okay.  More like 2 or 3 percent?

9    A.   I just got one yesterday for 3.9.

10   Q.   What's the interest rate on a treasury bond right now?

11   A.   I haven't looked it up in a couple of weeks, but what year

12   and how many?  What are we talking about?

13   Q.   Approximately -- well, you know, a standard, you know,

14   United States treasury bond, what would that go for right now?

15   A.   Well, it varies on how it paid.  From, are you talking 6

16   months or are you talking 30 years?

17   Q.   Well, how about 10 years?

18   A.   Ten years is around 4 percent, give or take.

19   Q.   Okay.  20 years?

20   A.   Slightly higher, but not much.

21   Q.   Okay.  So it's not uncommon for the interest rate to be

22   somewhere in the order of 2 to 3, maybe 4 percent; is that

23   correct?

24   A.   5 percent, yeah.

25   Q.   And yet you in, in your chart, have used 12 percent as --

(125 of 993), Page 125 of 993    Case: 25-1382    12/22/2025, DktEntry: 35.4, Page 77 of 945
22117600009244j00    Document 3303    Filed 03/05/25    Page 18 of 945

18

1    glasses.  Sorry.  You've used 12 percent as your interest

2    adjustment for all of the loss on the right side of your chart;

3    is that correct?

4    A.    For all the loss?

5    Q.    Sorry.  Let's go through your chart.  Your chart at

6    Exhibit 2 on the table, the projected lost earnings, the third

7    page -- oh, yeah.

8    A.    Thank you.  Yes.  I'm sorry

9    Q.    Okay.  You've applied a 12 percent inflation, interest

10   adjustment added to your calculation of losses for the losses

11   from 2017 through 2024; is that right?

12   A.    Yes.

13   Q.    And that's set forth in one of your assumptions on the

14   next page, Assumption 1; isn't that right?

15   A.    I think it actually states it in Assumption 10.

16   Q.    Okay, yeah.  I apologize.  Right.  The simple interest

17   rate of 12 percent is used to commute interest on the

18   historical earnings losses.  Thank you.  That's right.

19         Let's go through the chart just a little bit.  I

20   apologize.  I meant to do that.

21   A.    Okay.

22   Q.    Just so everybody's on the same page.  Directing your

23   attention to Exhibit 2, the projected lost earning chart, so

24   what you've done here is for each year you've calculated what

25   the plaintiff's gross income was at Dartmouth, her fringe

(126 of 993), Page 126 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 78 of 945
2:17-cv-00194-kjd Document 333-3 Filed 03/05/25 Page 78 of 945

19

1    benefits and her total earnings; is that correct?

2    A.    Yes.  I project -- yes.

3    Q.    Okay.  And then you went on and did the same thing for her

4    post-termination projections at UVM; is that correct?

5    A.    Yes.

6    Q.    And so, and then on the left there's an index that goes by

7    year.  So 2017 to 2033 is what you have on here; is that right?

8    A.    2033.

9    Q.    And then you go from there, and then you make an

10   adjustment for the difference between those two, which is, is

11   between the UVM and the Dartmouth losses, and that is what

12   you've described as gross adjusted loss earnings; is that

13   right?

14   A.    Yes, that's the difference between the two.

15   Q.    Okay, good.  And then I'll ask you some questions about

16   some of the these later columns later on, but you sort of

17   accumulate these and make some additions to them and ultimately

18   come out with a column on the far right which is what you call

19   the total economic loss; is that correct?

20   A.    Yes.

21   Q.    And in the lower right-hand corner where it says 4.329,

22   258 million is what you estimated the total economic loss for

23   Dr. Porter; is that right?

24   A.    If she was to work out to age 70, yes.

25   Q.    Yes.

```
 1    A.   But I'm not opining that she would work out to age 70.
 2    Q.   Okay.  Because so, for example, if she were only to work
 3    to age 65 in 2028, the loss figure you project would be 2.542;
 4    is that right?
 5    A.   Yes.
 6    Q.   Okay.  Now, the loss earnings you have are based on her
 7    W-2 reported income; is that right?
 8    A.   I report her W-2 income, yes.
 9    Q.   Yes, you drew those figures from her actual W-2s which
10    include pretax dollars; is that right?
11    A.   Yes.
12    Q.   And from that she'd have to pay whatever income tax she
13    owed, right?
14    A.   Yes.
15    Q.   Okay.  And you analyzed from, in your chart from 2017.  I
16    think you said you used up through 2023 W-2s; is that right?
17    A.   I think so, yes.
18    Q.   Now, you assume a 3 percent increase for periods in the
19    out years in her pay; is that correct?
20    A.   Yes.
21    Q.   And by out years I mean years beyond which you don't have
22    W-2s, correct?
23    A.   Yes.
24    Q.   And so anything after 2023 you're assuming there is a 3
25    percent increase in her pay; is that right?
```

(128 of 993), Page 128 of 993    Case: 25-1382    12/22/2025, DktEntry: 35.4, Page 80 of 945
22117-cv-00094-kjd    Document 133-3    Filed 03/05/25    Page 280 of 945

21

```
 1    A.   Yes.

 2    Q.   Okay.  And that would go out to 2033 --

 3    A.   Yes.

 4    Q.   -- is that right?  And I think you also assumed that in,

 5    again, drawing from your assumptions on -- this is assumption

 6    Number 1 on the third page of Exhibit 2.  You make an

 7    assumption that she would become a full professor at Dartmouth

 8    in 2019; is that correct?

 9    A.   Yes.

10    Q.   And that she would then get a 5 percent salary increase;

11    isn't that correct?

12    A.   Yes.

13    Q.   Aren't I correct that you drew your information that she

14    would get that promotion in 2019 to full professor from

15    Dr. Porter; isn't that correct?

16    A.   Yes.

17    Q.   And aren't I also correct that you got the information

18    that she would get a 5 percent increase from being made a full

19    professor from Dr. Porter?

20    A.   Yes.

21    Q.   What, if anything, do you know from your expert knowledge

22    of economics about her likelihood of getting a promotion or how

23    much pay increase she would get as a result of that?

24    A.   I can't opine on the likelihood of whether she would have

25    got a promotion.  I haven't done a study to it, but a 5 percent
```

(129 of 993), Page 129 of 993    Case: 25-1382    12/22/2025, DktEntry: 35.4, Page 81 of 945
22-1776cv    Document 133-3    Filed 03/09/23    Page 221 of 945

22

1    increase based on my experience at least at UVM, when one got a

2    promotion like that, they tended to be at least 5 percent.

3    Q.    Okay.  So if it was a -- your experience is based on your

4    working on cases for a long time, and, in particular, you said,

5    Well, at UVM it would be 5 percent?

6    A.    Yes, I'm familiar with that.  As I indicated earlier, I've

7    only worked on maybe one or two other cases where we've had a

8    doctor.  Actually, I worked on a lot more than that because I

9    worked on some personal injury cases with doctors involved.

10   But I, those people weren't necessarily at a university.

11   Q.    Okay.  And in your chart the way that 5 percent bump would

12   be reflected is, if she had stayed at Dartmouth -- you know,

13   she left Dartmouth.  When did she leave Dartmouth?

14   A.    2017, sometime in that period.

15   Q.    Okay.  So all of those projections on, for Dartmouth are

16   not her actual W-2s from Dartmouth; they're your estimates of

17   what her W-2s would be based on your assumption that she would

18   get a 2 and a half percent annual pay increase, she would

19   become a full professor in 2019 and get a 5 percent increase

20   from that; isn't that right?

21   A.    Yes.

22   Q.    Now, and your projection on the 2 and a half percent pay

23   increase in based on just your -- I think from your deposition

24   you said it was based on your looking at US Labor Department

25   statistics; is that right?

2:17-cv-00094-kjd    Document 333-3    Filed 03/19/25    Page 82 of 945

```
 1    A.   Yes, I looked at the average wage increases across the
 2    board, yes.
 3    Q.   Across the board meaning all professions, correct?
 4    A.   Yes.
 5    Q.   All regions, correct?
 6    A.   Yes.
 7    Q.   Throughout the United States --
 8    A.   Yes.
 9    Q.   -- correct?  And that's what you projected that to be the
10    basis for, correct?
11    A.   I did use -- that 2 and a half percent was based on a
12    review of that.
13    Q.   Okay.  Now you produced in your, as part of the deposition
14    process a lot of working papers that you used to base your
15    opinion on; is that correct?
16    A.   I assume so.  I don't remember.
17    Q.   The tools that you relied on, correct?
18    A.   I don't remember what you've, what was given to you.
19    Q.   Okay.  Well, maybe this will refresh your memory.  We
20    understood from these to be materials that you relied on in
21    reaching your opinions.  And so do you recall some analysis of
22    Dr. Porter's pension situation at Dartmouth?
23    A.   Yes.
24    Q.   And a pension table?
25    A.   Yes.
```

(131 of 993), Page 131 of 993   Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 83 of 945
22117cv00092kjld   Document 35.3   Filed 03/05/25   Page 283 of 945

24

1    Q.   And something called a Dartmouth-Hitchcock Clinic

2    Calculation Summary of Pension Plan of Employees?

3    A.   I don't remember the title, but I did look at stuff from

4    Dartmouth on pensions.

5    Q.   Okay.  Look at, please, in Tab 3 of your book.  Go to the,

6    go to the last three pages from the back, please.  Okay.  Do

7    you remember seeing this document?

8    A.   I believe I saw this document.  I mean, it doesn't jump

9    out to me that I saw it, but I do believe I have seen something

10   like this, yes.

11   Q.   Okay.  Looking on the left, there's a column that says

12   "Year" and has the years 2008 to 2017 and then something says,

13   the next column says total pensionable pay and something

14   qualified pensionable pay.  Do you see these columns?

15   A.   Yes.

16   Q.   Okay.  Total pensionable pay, doesn't that look like her

17   full earnings from Dartmouth-Hitchcock?

18   A.   Her pension pay or the total pension pay?

19   Q.   Total pensionable pay, doesn't that look like her W-2

20   income from Dartmouth-Hitchock?

21   A.   I don't have her W-2s in front of me, but I wouldn't

22   disagree.  It looks like that would be -- it looks like it's

23   consistent with what my recollection is.

24   Q.   Okay.  And, if you note, the numbers there do not go

25   steadily up by 2.5 or 3 percent.  Do you see that?

2:17-cv-00194-kjd    Document 33.3    Filed 03/05/25    Page 25 of 945

25

```
 1    A.   Yes.

 2    Q.   In fact, they go up and down, right?

 3    A.   Yes.

 4    Q.   So this shows her actual experience at Dartmouth-Hitchcock

 5    with a salary that does not go up 2 or 3 percent every year,

 6    right?

 7    A.   It doesn't go up by two and a half percent every year, no.

 8    Q.   And it goes up and down, correct?

 9    A.   Yes, it goes down a couple or two years, three years.

10    Q.   But your projections in Exhibit 2 on the chart don't go up

11    and down; isn't that right?

12    A.   No, they don't, no.

13    Q.   They go up 3 percent every year; isn't that correct?

14    A.   Yeah, whatever the increase is, yes.

15    Q.   Plus the amount for her professorship, correct?

16    A.   Well, that went up at one time.

17    Q.   Well --

18    A.   One time only.

19    Q.   You made an upward adjustment based on an assumption that

20    she would become a professor; isn't that correct?

21    A.   Yes.

22    Q.   Okay.  Now, and your testimony is that was worthy of a 5

23    percent increase in her salary from Dartmouth?

24    A.   When she got the promotion, she would get a 5 percent

25    increase.
```

1  Q.  And that is repeated throughout that table on the left
2  column at Exhibit 2, right?
3  A.  Well, it's, it's baked into the numbers in the future, but
4  every year it's not a 5 percent increase.
5  Q.  No, but -- yeah, exactly, that's my point.  Thank you.  It
6  gets baked in and amplified based on that each year at a higher
7  rate --
8  A.  Yes.
9  Q.  -- right?  And it's better for the plaintiff to have a
10  higher salary from her prior employer, right?
11  A.  Yes.
12  Q.  Because, if she has a higher salary and gets a lower
13  salary, she has lost more based on your calculations; isn't
14  that correct?
15  A.  Well, based on anybody's calculations.
16  Q.  Fair enough.  And so the flipside of that is, to the
17  extent her salary at University of Vermont is lower than it
18  otherwise would be, that also would answer a benefit in your
19  loss calculations; isn't that right?
20  A.  If her, because her salary is lower than it would be, my
21  projections at Dartmouth, yes, there is a loss.
22  Q.  Right.
23  A.  That's what I'm trying to measure is the loss.
24  Q.  Exactly.  And, if her salary is lower at the new place
25  than the old place, the lower it is, the greater the loss;

1    isn't that right?

2    A.   Yes.  Simple math.

3    Q.   Simple math.  Now, you don't calculate any professorial

4    increase from Dr. Porter's promotion to a full professorship at

5    UVM?

6    A.   I thought there was something in there where she got

7    promoted historically.

8    Q.   There is, there is something in your chart that shows a 5

9    percent bump from her becoming a professor at the University of

10   Vermont?

11   A.   I used what she actually earned up through -- well,

12   actually, I didn't have the stuff through 2024.

13   Q.   Oh, 2024?

14   A.   Well, I didn't have the W-2 for 20 --

15   Q.   You don't have the W-2 for 2024?

16   A.   Oh, yeah.  Yes.  I'm sorry.  2026.  I apologize.

17   Q.   Not '26.  Let's, the 2024 W-2.  I would just say that we

18   don't have the W-2 for 2024.  Do you?

19   A.   No.

20   Q.   Okay.  As an economic expert coming to court to provide

21   expert information, wouldn't it be sensible for you to have the

22   W-2 for her last earnings?

23   A.   Well, yes, but I did this report in August of '24, so how

24   could I get a W-2 for 2024 if I did it in August?

25   Q.   Well, you're testifying about her salary information for

1    then.  Could you have asked for it and gotten it when it came

2    out this year?

3    A.   I could have, yes, and I will be asking for that when this

4    moves on to trial.  I will be looking at all that information,

5    and I assume at the request of plaintiff's counsel I'll be

6    updating my analysis.

7    Q.   Had you been told that Dr. Porter became a full professor

8    at UVM in August of 2023, July of 2023?

9    A.   I believe, I believe I have been.

10   Q.   Okay.  Is that reflected on your report?

11   A.   I have her actual earnings for 2023, and I have what she,

12   what her contract was for '24.

13   Q.   You have her full professor contract for '24?

14   A.   That was what I based my projections on is the contract or

15   what she had earned under the new contract.  I had, may have

16   annualized it up.

17   Q.   Do you have an employment contract for her after she had

18   been promoted to a full professor at UVM Medical Center?

19   A.   I don't remember if I have a, if I had a contract, but I

20   did have what she actually earned after she got the promotion.

21   Then based -- I don't know how many months that was, but let's

22   assume that it was four months.  Then I would annualize it up

23   to a 12-month figure.

24   Q.   I don't see anything in your report or your assumptions

25   describing the effect of her promotion to full professor at UVM

1    Medical Center sort of analogous to the 5 percent inflator you

2    gave her when she became a full professor at

3    Dartmouth-Hitchcock.

4    A.   Well, I disagree, but if you read --

5    Q.   Where does it say that?

6    A.   Well, it does not say that in that many words because I, I

7    don't know if I had that, but what I did, what it does say in

8    Footnote 2, Footnote 4, is that I looked at what her earnings

9    were and used that as a basis to forecast forward.

10   Q.   But you don't -- I think what you just said is, I don't

11   know if I had that or not.

12   A.   I don't know if I have her contract.

13   Q.   I don't know if I had the information about her becoming a

14   full professor, yes or no, did you have that?

15   A.   I don't know.

16   Q.   Okay.  Because, if you did have that, you would have said,

17   Oh, I need to make the adjustment in my projections for UVM and

18   add 5 percent on top of her about $300,000 salary for all of my

19   projections going forward; isn't that right?

20   A.   No.  I've tried to explain to you that I took a look at

21   what she was getting for pay after that happened, and, while I

22   did not have a full calendar year of her earning at that level,

23   I did have some period of time where she was earning at that

24   level which I then annualized.

25   Q.   Okay.  You didn't have her 2023 W-2s that showed an

Case 2:17-cv-00194-kjd   Document 133-3   Filed 03/10/25   Page 89 of 945

1   increase in salary there on enough of the time that you could

2   make an annualized projection, though, right?

3   A.   No.   If I just, if I rely just on the W-2 for 2023, no.

4   Q.   Because you just didn't know.   They didn't tell you that

5   she'd gotten this promotion, right?

6   A.   I don't know.   I don't remember.   That was a long time

7   ago.

8   Q.   If her salary was increased by 5 percent from 2023, July

9   2023 through the end through 2023 and it isn't reflected in

10   your chart because you didn't understand that, wouldn't that

11   make your numbers in here completely wrong?

12   A.   Well, I disagree that I didn't understand that.   But,

13   obviously, if you put a higher inflator in there, the numbers

14   are going to be greater.

15   Q.   Okay, great.   Which means the numbers for UVM are greater,

16   which means the loss figure between her job at Dartmouth and

17   her job at UVM is less significant; isn't that right?

18   A.   Well, only if, only if you're correcting your assumption.

19   Q.   Correct.   What if there was a limit on the funding that

20   went to physicians at Dartmouth-Hitchcock during the Covid

21   years, say 2021 to 2022?   Let's say that Dartmouth held flat on

22   the amount of money we're going to pay doctors.   Wouldn't that

23   mean that perhaps your numbers in here are inaccurate?

24   A.   If there was -- if that's the case, if they gave no

25   increases, obviously, those projections for those years that

(138 of 993), Page 138 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 90 of 945
2:17-cv-00194-kjd    Document 323-3    Filed 03/05/25    Page 90 of 945

31

1    are based on a 2.5 to 3 percent increase would not be right.

2    Q.    Now, let's talk a little bit about fringe benefits.  You

3    have a calculation in Column 2 of the fringe benefits at

4    Dartmouth-Hitchcock and Column 5 of the fringe benefits at

5    University of Vermont; is that correct?

6    A.    Yes.

7    Q.    And I think your analysis simplified the fringe benefits

8    to say, well, I'm only going to look at contributions to

9    pension and health care plans; is that correct?

10   A.    Yes.

11   Q.    Okay.  Now, directing your attention again to that

12   document that was in Tab 3, the table that is the pension plan

13   of employees of Dartmouth-Hitchcock clinical calculation

14   summary --

15   A.    Where is that located?

16   Q.    I'm sorry.  Yeah.  I have a harder time than you even.

17   It's in Tab 3 about three pages from the back.

18   A.    Yes.

19   Q.    Do you see that document?

20   A.    I see it, yes.

21   Q.    And aren't I correct that, in developing your table for

22   the August 2024 report, you calculated the costs of her

23   pensions at 12 percent of total pensionable pay; is that

24   correct?

25   A.    Yes.

(139 of 993), Page 139 of 993

2:17-cv-00094-kjd    Document 133-3    Filed 03/05/25    Page 32 of 945

```
1    Q.   Okay.  Now, doesn't it make more sense to do 12 percent of
2    qualified pensionable pay?
3    A.   I'm trying to remember.  I'd have to go back and look at
4    the documents.  There was an explanation in one of the
5    documents about how pensions were calculated, and --
6    Q.   It seems --
7    A.   May I finish?
8    Q.   Oh, sure.  I thought you were done.  Sorry.
9    A.   There was an explanation that, for people going over a
10   certain amount, there was a bump.
11   Q.   Okay.  So you seem to recall an explanation that you can't
12   describe in detail that conveniently answers my question; is
13   that what you're saying?
14   A.   I don't know if it conveniently answers your question.
15   All I'm saying is that there is a document in there that says
16   this is what they will contribute on a pension plan and, if
17   your income is above a certain level, which hers were, there
18   would be an additional contribution made on behalf.
19   Q.   Oh, okay.
20   A.   And I don't have that document in front of me to tell you
21   exactly what that percentage is, but I believe that is where I
22   derived the 12 percent from.
23   Q.   Okay.  I would be interested in seeing that.  So, if you
24   identify that, send that to me, please.  Qualified pensionable
25   pay, doesn't this look like what I think, and I'm not that
```

(140 of 993), Page 140 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 92 of 945
2:17-cv-00194-kjd Document 35-3 Filed 03/05/25 Page 33 of 945

33

1    knowledgeable about pensions, but, you know, it seems like

2    that's an amount of pay that you're going to qualify for your

3    pension purposes and then above that they don't kick in any

4    more.  Is that consistent with that?

5    A.    That's your assumption, not mine.  I don't know.  I'm

6    telling you what I believe is another document that goes

7    through and talks about what percentage Dartmouth will

8    contribute of an employee's salary and that there are two,

9    there is a bump-up if you're over a certain percentage.

10   Q.    If the theory that I'm positing is correct that qualified

11   pensionable pay is the amount of salary you can earn up to the

12   point at which the institution will kick in in its maximum

13   matching contribution, if I'm correct about that and the amount

14   that is on your fringe benefit for pensions is 12 percent of

15   qualified pensionable pay as opposed to 12 percent of total

16   pensionable pay, doesn't your report overstate the value of the

17   Dartmouth fringe benefits?

18   A.    I don't know.  I can't tell from that, your hypothetical

19   here.  I mean, obviously, if you multiply 12 percent times the

20   qualified pension play, pay, it's going to be a smaller number

21   than the total pension pay.  But I'm not saying -- I'm not

22   agreeing with you.  That's what I did, and that's how I derived

23   the 12 percent.

24   Q.    Are you familiar with a program at UVM to provide tuition

25   remission to UVM employees?

2:17-cv-00194-kjd    Document 123-3    Filed 03/05/25    Page 93 of 945

34

```
 1    A.   Yes.
 2    Q.   Okay.  And that applies for UVM graduate schools, too, to
 3    your knowledge?
 4    A.   I assume so.
 5    Q.   Okay.
 6    A.   I have never had the opportunity to look at it.
 7    Q.   Okay.  Are you aware that the plaintiff had tuition
 8    remission for one of her sons in an amount of, you know, about
 9    $17,000?
10    A.   No.
11    Q.   Okay.  Do you recall seeing in any of your review
12    materials that you reviewed to prepare these opinions a
13    reference to that?
14    A.   No.
15    Q.   Okay.  Directing your attention, please, just go to the
16    next page on that tab on Exhibit 3 on the next page after that
17    where you see where --
18    A.   What tab are we on?
19    Q.   I'm sorry.  We're on Exhibit 3.  It's actually the last
20    page before Exhibit 4 starts.  It states at the last thing I
21    read here it says, I also received benefits as being part of
22    the faculty at UVM Medical School from the university besides
23    pay.  My son's tuition is compensated this year.  No tuition
24    for senior year.  Yikes.  Or yippee.  Sorry.  About the college
25    tuition.
```

(142 of 993), Page 142 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 94 of 945
2:17-cv-00194-kjd   Document 133-3   Filed 03/05/25   Page 354 of 945

35

1    A.    I don't know where you're reading that from.  I'm sorry.

2    Q.    Okay.

3    A.    Oh, I see it now, okay, at the bottom, yeah.

4    Q.    Okay.  And just to -- you recall these were questions you

5    posed to her counsel and her counsel passed to Ms. Porter to

6    answer; is that right?

7    A.    I'm not sure what your question is.

8    Q.    My question is, Is that what that document is, questions

9    you provided to Ms. Porter's counsel and she provided to

10   Ms. Porter to provide you information so you could render an

11   expert economic opinion in this case?

12   A.    I don't know what you're referring to.  I don't think I've

13   seen this.

14   Q.    Okay.  You don't recall that as being part of --

15   A.    No, no.  I don't remember seeing this, no.

16   Q.    Okay.  So it would be news to you that the plaintiff, in

17   2019, had her tuition paid for by the University of Vermont for

18   her son?

19   A.    Yes.  You asked me that, and I said, no, I was not aware

20   of that.

21   Q.    Okay.  And I'm just showing you this because there are

22   references to that in your reliance materials.  Do you have an

23   explanation for why you may not have seen a reference to that

24   in the reliance materials?

25   A.    I don't remember seeing this, no.

1    Q.   If Ms. Porter had received a $17,000 fringe benefit

2    increase in 2019, that would have increased her UVM fringe

3    benefits for that year; isn't that correct?

4    A.   Yes.

5    Q.   And, due to your methodology, it would have carried

6    forward?

7    A.   Yes, but I would have had a crucial question that needed

8    to be asked before I did that.

9    Q.   Are you aware of the ages of her children?

10   A.   No.

11   Q.   How many children does she have?

12   A.   I don't know.

13   Q.   Directing your attention back to the chart which is at

14   Exhibit 2, third page in, I note that her earnings for UVM

15   dropped dramatically in 2025.  Do you see that?  On, if you

16   look at 2025 and then Column 6, she goes from to $195,411 when

17   the year before it's $338,000.  Do you see that?

18   A.   I'm not seeing your number, but I see for 2024 I have at

19   UVM $305,506, and then in 2025 it drops down to $162,750.

20   Q.   Okay, fair enough, for the earnings.  Thank you.  That's

21   Column 4.  I'd gone for total earnings.  But aren't I correct

22   there that you have that drop-down there based on an assumption

23   set forth in your report that she would, on January 1, 2025,

24   start working only a .6 time position at University of Vermont

25   Medical Center so her earnings would drop; is that right?

(144 of 993), Page 144 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 96 of 945
2:17-cv-00194-kjd    Document 133-3    Filed 03/19/25    Page 96 of 945

37

1    A.   Yes.

2    Q.   And yet your chart for Dartmouth projected out into the

3    future shows that her earnings would continue based on an

4    assumption that, if she was at Dartmouth, she'd work full time,

5    but, if she was at the University of Vermont having just

6    received a full professorship and everything, she would go to

7    .6 time?

8    A.   Yes.  Based on her information, she said that she was,

9    this was very stressful being in the community up into

10   Burlington as opposed to being able to commute to Dartmouth.

11   Q.   Based on the information she provided you; is that

12   correct?

13   A.   She took -- she provided me, said that, that what her

14   plans were was that, starting January of 2025, she was going to

15   be working 65 percent.

16   Q.   Okay.

17   A.   60 percent.

18   Q.   Okay.  And that she told you that either verbally or in an

19   email; is that correct?

20   A.   One or the other, yes.

21   Q.   It was not based on any kind of independent corroborative

22   information at all; isn't that right?

23   A.   I did not do any research on that, no.

24   Q.   And she didn't provide you any information that would

25   substantiate that that's what her plan was; isn't that correct?

(145 of 993), Page 145 of 993 Case: 25-1382  12/22/2025, DktEntry: 35.4, Page 97 of 945
2:17-cv-00194-kjd    Document 133-3    Filed 03/15/25    Page 38 of 945

38

```
 1    A.    No, I don't think so.
 2    Q.    Okay.  And doesn't that dramatically increase the loss
 3    damages for her?
 4    A.    Yeah, yeah.
 5    Q.    Right?  So she goes from, like, well under a hundred
 6    thousand dollars a year in the difference between her Dartmouth
 7    and UVM salary to, you know, a couple hundred thousand dollars
 8    a year; is that correct?
 9    A.    Yes.
10    Q.    Extending out forever; is that correct?
11    A.    Well, not forever.
12    Q.    Well, true, fair enough.  2033, it will be here before we
13    know it, but it's a long way out, right?
14    A.    Well, yeah, it's '33.
15    Q.    Okay.  So that seems like that makes up -- that that
16    adjustment in your projections, you know, accounts for a huge
17    amount of her loss; isn't that correct?
18    A.    Yes.
19    Q.    Doesn't she benefit by going to a .6 position
20    nonmonetarily?
21    A.    Well, she obviously is saying that that's what she would
22    like to do given the situation that she's in.  It's my
23    understanding from my conversations with her she'd like to be
24    back at Dartmouth working full time and that, and that we have
25    had several conversations about her working at UVM and how
```

(146 of 993), Page 146 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 98 of 945
2:17-cv-00094-kjd Document 153-3 Filed 03/05/25 Page 39 of 945

39

1    stressful it was and this was not her preferred position.

2    Q.   Okay.  And that was based entirely on her saying, Yeah,

3    that's what I want to do, and that's what it's going to be,

4    correct?

5    A.   Yeah, that assumption is based on what she told me, yes.

6    Q.   Her say-so?

7    A.   Yes.

8    Q.   And, if you didn't use that dramatic change to .6 from

9    full-time employed while she's at UVM, wouldn't your chart be,

10   you know, very, very different in its entries?

11   A.   It would be different.  The losses would be smaller, yes.

12   Q.   A lot smaller?

13   A.   Explain a lot.

14   Q.   Well, a lot is a normative term, but, you know, I'm just a

15   simple lawyer.  You know, when you're talking, like, $4

16   million, that's not a lot -- that is a lot.

17   A.   It wouldn't have been up by $4 million, not even close.

18   Q.   Have you done an analysis about what it would be?

19   A.   No.

20   Q.   Why not?

21   A.   Because I was asked to assume that she would go to a .6

22   appointment starting January of 2025, and that's what I

23   assumed, and my analysis is predicated on that assumption.

24   Q.   Let's talk about your cumulative present value and

25   settlement tax and your total economic loss columns.  See those

(147 of 993), Page 147 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 99 of 945
2:17-cv-00194-kjd    Document 133-3    Filed 03/05/25    Page 99 of 945

40

1    columns?  Those are 11, 12 and 13 on the chart.

2    A.    Yes.

3    Q.    Okay.  So what I understood from your deposition testimony

4    is this was an attempt to gross up her losses so that she would

5    be fairly compensated if a judgment was rendered and she had to

6    pay taxes on that judgment; isn't that right?

7    A.    Yes, because she does have to pay taxes on it.

8    Q.    Sure.  But aren't the salary calculations in here pretax,

9    i.e., they include an amount from which one will pay their

10   taxes?

11   A.    Yeah.  I back out taxes.

12   Q.    Okay.

13   A.    In Column 8 I am backing out the taxes that she would have

14   to pay on the difference between the Dartmouth gross income and

15   the UVM gross income.  So I'm backing out taxes, and I'm coming

16   up, and it's a key to this analysis is I'm coming with up with

17   a tax-adjusted lost earnings.  That is Column 9.  Taxes are

18   then backed out.  And, if this was like a personal injury case

19   or a wrongful death case which is not taxable, then all I would

20   do is convert the present values and have a running total, and

21   I wouldn't have to do a settlement income tax.  But the point

22   is that employment cases are taxable.  The awards are taxable.

23   Q.    Fair enough.  But the amount of earnings that you've used

24   to determine her taxable compensation are in pretax, i.e.,

25   they're already grossed up; they don't need to be grosses up a

(148 of 993), Page 148 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 100 of 945
2:21-cv-00444-jkjd    Document 535    Filed 03/15/25    Page 100 of 945

41

1    second time?

2    A.    That's not true.  I just explained to you that in Column 8

3    I'm backing taxes out, and Column 9 is after-tax loss.

4    Q.    How about settlement income tax; where does that come

5    from?

6    A.    That comes from how much additional money would Dr. Porter

7    need in order to ensure that she received a specified after-tax

8    amount.  If you want to use the year 2023, the present value of

9    her loss out through the year 2033 is $2,210,000.  That's in

10    after-tax dollars.  If there was no tax consequences, end of

11    story.  There wouldn't be a Column 12, and there wouldn't be a

12    Column 13.  It would be just like if this was a wrongful death

13    or personal injury case.

14         But it is taxable, and because we have a progressive

15    income tax here, if I get money all in a lump sum, I am going

16    to be forced into the highest tax bracket relatively quickly,

17    and, secondly, what's insidious about this is you're going to

18    end up paying taxes on the taxes.

19    Q.    Well, that's where it kind of doesn't all add up, because

20    it comes up to roughly half of your total damages number.  Your

21    total economic loss is $4.3 million in your August 2024 report,

22    but your settlement tax, just the tax on the tax, is $2.1

23    million, correct?

24    A.    That's right.  But we, now, you remember you have now put

25    this person in the highest marginal tax bracket, both federal

1     and state.

2     Q.    But she's in a pretty darn high tax bracket to begin with.

3     A.    Yeah, she is.

4     Q.    So it's not like getting it in a lump sump increases her

5     marginal tax rate for, you know, huge portions of her income.

6     A.    No, it doesn't, in her case, it does not increase that

7     marginal tax bracket, but it does increase her taxable income

8     significantly.  And what those numbers in that column, Column

9     12, represent is the additional sums that she would need.

10          So, for instance, going back to the year 2033, I am saying

11    that, in order to make her whole, that is so that if she would

12    receive an award of $2,210,258 without any tax consequences,

13    she would need an additional $2,119,000, bringing the total

14    amount that she would need as a settlement of $4,329,258.  When

15    she filled out her income tax, she would put down, I received

16    $4,329,258, and after she put in her income and her husband's

17    income, the additional amount of taxes I'm estimating that she

18    would have to pay would be around $2,200,000.

19    Q.    Do you have worksheets that show how you reached this

20    calculation?

21    A.    I have tables, yes, that are to the -- I think I explained

22    in my deposition that to the right of this table are a set of

23    columns that look at what the taxes would be, a calculation of

24    the taxes give a particular settlement.

25    Q.    Would it surprise you to learn that we had some economists

1    look at this and they couldn't make heads or tails of this?

2    A.   I don't know who your economist was.  I've seen lots of

3    economists that couldn't make heads or tails out of anything.

4    Q.   Now, your projections conclude that, even though she went

5    to .6 position at University of Vermont, she would continue

6    working full time, not just through age 65, but through age 70;

7    is that correct?

8    A.   I'm not -- again, we went over that.  I'm not assuming

9    that.  I'm leaving that entirely up to the trier of fact to

10    determine how far out into the future she would work.  I'm not

11    implying that she would work to 70.  I'm not implying that she

12    would work to age 65.  I'm leaving it to the trier of fact to

13    determine that, and, if the trier of fact buys the underlying

14    assumption in my calculations, then they can use that table to

15    calculate a loss.

16    Q.   Okay.  But, if the trier of fact concluded that, you know,

17    she probably would stop working at age 65 or earlier, your loss

18    calculations would be, as they indicate for those years, for

19    that year further into the right-hand column of 11, 12 and 13;

20    is that right?  I didn't ask a very good question.  I can

21    rephrase it if you want.

22    A.   Well, I think I get what you're driving at.  Yeah, if she

23    retires -- if the trier of fact says, I believe she would

24    retire or it's reasonable to assume she would retire at 65,

25    then you need to go over to Column 13 and go down to age 65 and

(151 of 993), Page 151 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 103 of 945
2:21-cv-00044-jjk-jd Document 352 Filed 03/15/25 Page 44 of 945

44

1    look at the number, and that is $2,542,019.

2    Q.   Right.  Again, assuming that she would keep working at

3    Dartmouth 100 percent of the time while opting for this

4    part-time position at University of Vermont given her full

5    professorship?

6    A.   Yeah, starting in January of this year at the .6, yes.

7         ATTORNEY COFFIN:  Just a second, Your Honor.

8         THE COURT:  Okay.

9         ATTORNEY COFFIN:  Those are all the questions I have

10   right now, Your Honor.

11        THE COURT:  Okay.  Mr. Jones?

12             CROSS-EXAMINATION BY ATTORNEY JONES

13   Q.   Good afternoon, Doctor.

14   A.   Good afternoon.

15   Q.   Just a couple of questions to follow on up on Mr. Coffin.

16   Mr. Coffin asked you a couple of times whether the source of

17   the information for your assumptions was Dr. Porter or her

18   lawyers, and you said yes.  Is that common in the cases that

19   you work on?

20   A.   Absolutely, sure.

21   Q.   You don't see her role as being a finder of fact or a

22   trier of fact?

23   A.   No.  You know, over the 2,500, 3,000 cases I've worked on,

24   there may have been a few of them where I have actually given

25   the task of looking up something, but they're unusual cases,

1  but 95 percent of the personal injury, wrongful death cases,

2  and employment cases, unless the person has found a job that

3  everybody feels comfortable with that this is indicative of

4  what they'll be able to do in the future, then there has to be

5  some assumptions made of what this person might do and might

6  work, and it is not my role to, to question them.  It's my -- I

7  accept them.  If I'm asked to assume a certain thing, I will

8  assume it, but I, it's not my responsibility to defend it.

9  Q.    Thank you.  Mr. Coffin also asked you a couple of times.

10  There's been some suggestion in the briefing that your analysis

11  has some form of double-dipping because past earnings would be

12  taxable.  Just to be clear, does your analysis take into

13  account that past earnings would be taxable?

14  A.    Yes.

15  Q.    And you've backed out the taxes, all the past earnings?

16  A.    I've backed out the taxes on past earnings, and I've

17  backed out taxes on future earnings.

18  Q.    To get present value?

19  A.    And then the next step for me is to determine the present

20  value of a after-tax number.

21  Q.    Okay.  So there's no double-dipping or triple-dipping in

22  your numbers?

23  A.    No.

24  Q.    And then Mr. Coffin asked you a lot of questions about the

25  fact that Dr. Porter, in fact, became a professor at UVM in

1    2023.  I think you said it.  I want to make sure it's clear.

2    In your August 2024 report, the numbers you used for her UVM

3    earnings were, in fact, the actual earnings she was making with

4    that professorship; is that correct?

5    A.    That's right.  I used those.  Yes, I used that

6    information, scaled it up, and then used that as the basis to

7    go forward.

8    Q.    Right.  So, if you were then to add another 5 percent,

9    wouldn't that be improper because you already had the actual

10   numbers?

11   A.    Well, yeah, it would be inappropriate to do that.  It

12   would unjustly inflate the number.

13   Q.    Because you have the actual numbers already?

14   A.    I have the actual, yes.

15   Q.    There's also been questions, at least in the papers, about

16   whether you have an appropriate level of expertise in

17   employment cases.  Does -- backing up a little bit, is what you

18   do in almost all of the cases you've worked in is provide

19   earnings projections?

20   A.    Yes.  Yeah.  That's why I, I it's hard for me when I'm

21   asked a question, How many employment cases have you worked on,

22   or, How many wrongful death cases have you worked on, or, How

23   many personal injury?  They're all lost income, and they're

24   all, with the exception -- there's one exception with

25   employment cases, but all of them deal with projecting out a

1    stream of income, whether it be before termination or before

2    injury or before death, at least in the injury cases and in the

3    employment cases, and then projecting out what is a reasonable

4    expectation of what a person would earn over their lifetime.

5        The difference being is, when we get to that gross-up for

6    taxes.  If it's a personal injury case, once you back out the

7    taxes for each individual year, you turn the present value on

8    that, end of story, but this one has an extra step involved.

9    Q.   So, before you get to the gross-up, which is unique to the

10   employment earnings, is it true that your methodology and

11   approach to an earnings projection is the same regardless of

12   whether it's employment, wrongful death, personal injury?

13   A.   Yes.  If this was a personal injury case and all the

14   underlying assumptions were the same, you know, for whatever

15   reason, can't work at Dartmouth and can't work at UVM under

16   this and that, that table would be the same, except Column 13

17   and 14 would not be there.

18   Q.   Yeah.  And, finally, providing the gross-up issue, that is

19   unique to the employment cases.  The numbers we're talking

20   about in Dr. Porter's earnings are somewhat larger than usual,

21   but can you walk the Court through an example of why grossing

22   up is essential to make a person whole with, say, smaller

23   numbers, for example, a $50,000 loss?

24   A.   Sure.  An example that I've used before is if we have a

25   situation where a person has lost $50,000, and let's assume

1    that people conclude that or reasonably conclude that they

2    would have lost this $50,000 at least in the next ten years,

3    ignoring inflation and that.  So the taxes on $50,000 for a

4    single person, just federal taxes -- and I'm not, I won't get

5    into state taxes, but the same concept applies here -- is

6    around $4,000, one year.

7         So if we were to go out ten years, multiply that by ten,

8    it comes out to be about $40,000.  If, instead of that $50,000

9    over the next ten years you were to award the person five, a

10   half a million dollars, that is $50,000 for each of those ten

11   years.  That's a half a million dollars.  The tax on that would

12   be about $125,000, about three times larger than it would be if

13   that money was paid out over ten-year period.

14   Q.   So the impact really is huge?

15   A.   It is huge.  And what really leverages these cases up is

16   that you've got to pay taxes on the taxes.  So, for instance,

17   in the example that I just gave, so I went through and so I

18   said, okay, well, if the persons needs $125,000 to pay taxes on

19   that.  So I plug that in, and, if you will, I do the tax

20   return.  I plug that $125,000 in with the settlement.  Wait a

21   minute.  They've got to pay more taxes because now that

22   $125,000 that I said was the tax is, they've got to report as

23   income, and so there's going to be tax on that.

24        So, eventually, it's going to be an iterative process

25   where you finally reach a point where you say, okay, the

(156 of 993), Page 156 of 993  Case: 25-1382  12/22/2025, DktEntry: 35.4, Page 108 of 945
2:21-cv-00044-jdp  Document 653  Filed 03/13/25  Page 498 of 945

49

1    process is 125 is too low.  So I'll increase it 150.  That's

2    still too low.  I increase it to 175.  That's too high.  I come

3    back down to 165.  That's too high, and then I come to 160.

4    Bingo.  So there it is.  So, if you give the person 160, they

5    will get out whatever their after-tax loss is.

6              ATTORNEY JONES:  Yeah, thank you.  Your Honor, if I

7    could have one second to consult with counsel.

8              THE COURT:  Okay.

9              ATTORNEY JONES:  We have no further questions.

10             THE COURT:  Okay.  Any further questions?

11             ATTORNEY COFFIN:  No further questions.  Thank you,

12   Your Honor.

13             THE COURT:  Thank you, Dr. Bancroft.  Okay.  Now, is

14   there any further argument at this time?  Mr. Coffin, you had

15   said in the beginning, I think you said this isn't a *Daubert*

16   motion, but you are ultimately objecting to the use of this

17   expert.

18             ATTORNEY COFFIN:  Yeah, I would say I don't know if

19   it's a *Daubert* motion, but it's a little bit a hybrid, I guess

20   I would say.  You know?

21             THE COURT:  Okay.

22             ATTORNEY COFFIN:  We do object to his qualifications

23   and think it is improper for him to provide this testimony in

24   this case because his qualifications do not reach the level

25   that's necessary for to reach this gatekeeper function for the

(157 of 993), Page 157 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 109 of 945
2:21-cv-00044-kjd Document 353 Filed 03/15/23 Page 109 of 945

50

1    Court.

2         Plus, as we've heard today, there are a number of

3    significant substantive problems with his report.  And so, if

4    the plan is, and we don't know what the plan is, that he is

5    going to testify about this chart that we've been talking about

6    so much, I think that is, you know, extremely prejudicial

7    without probative value given the testimony that you've heard

8    here today.  You know, and we would just, you know, ask the

9    Court to focus on, you know, the 12 percent mark-up, the .6

10   employment, the 2.5 percent pay increases assumed.  No

11   accounting for the, you know, promotion to professor, not even

12   knowing that.

13        You know, not knowing what the current W-2 is despite what

14   my brother had him testify to here today.  I think that the

15   record is he probably doesn't have it, and we certainly don't

16   have it, Your Honor, and that's a discovery issue that we do

17   need to get right away.  The gross-up issue, does that really

18   account for $2.1 million in the total damages?

19        Again, we may need to -- the Court may think it's wise to

20   hear what the testimony is that lays the foundation and what he

21   can testify to and make a decision after cross about whether

22   that chart can come in or not, whether there's some level of

23   testimony he can provide, but right now I don't think he's met

24   his threshold.

25             THE COURT:  Okay.

(158 of 993), Page 158 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 110 of 945
2:21-cv-00144-jdp Document 53.33 Filed 03/15/25 Page 110 of 945

51

1          ATTORNEY JONES:  Your Honor, can I make a few points?
2          THE COURT:  Please, go ahead.
3          ATTORNEY JONES:  Almost everything Tris just talked
4    about is an issue for trial.  Those would be great questions
5    for trial.  That would be great arguments for the jury, but it
6    does not go to the gatekeeping issue that really is what we're
7    dealing with pretrial is whether or not Dr. Bancroft can
8    testify, and I don't think any of the issues they've raised go
9    to his qualifications or to the reliability of his methodology.
10   So all the issues we've been talking about this afternoon, I
11   imagine that would be their trial position, and we'll deal with
12   it at trial, but it does not go to whether or not Dr. Bancroft
13   can testify in the first instance.
14       With regard to the 12 percent issue, that's a statute.
15   This is not some expert using discretion or pulling a number
16   out of the air.  The law says it's 12 percent.
17       With regard to the issue of her professorial promotion,
18   Dr. Bancroft used the actual earnings.  So that's a red
19   herring.  And, finally, with regard to the gross-up issue
20   there's plenty of law, and we're prepared to brief it if you
21   would like it, but the Third Circuit, Seventh Circuit, Ninth
22   Circuit, Tenth Circuit, Federal Circuit all have held in
23   employment cases grossing up earnings to account for the tax
24   liability is appropriate. So all of this, the legal stuff is
25   clear legal stuff.  The factual stuff is for a jury.

1          THE COURT:  Though it appears that courts in this

2     circuit have gone both ways on the grossing up question, which

3     I'm sure you know, and there's, in fact, a circuit split on

4     grossing up right now.  And I was going to ask Mr. Coffin, Is

5     it so much that you're disagreeing with the grossing-up notion

6     as a theory or kind of the, you know, based on your questioning

7     of Dr. Bancroft, you have an issue with respect to how it's

8     calculated?

9          ATTORNEY COFFIN:  We don't know how it's calculated.

10          THE COURT:  Right.

11          ATTORNEY COFFIN:  And I think there is not some law

12     in this circuit about whether you do it and the circumstances

13     you do it and how you do it, and I think it's important that

14     the W-2 income is grossed up to begin with, and, if the notion

15     is, okay, you're going to gross it up for -- if the logic is

16     you're going to gross it up because you get a lump sum that

17     changes your marginal tax rate, this is a person who actually

18     has a pretty high marginal tax rate to begin with.

19          THE COURT:  Right.

20          ATTORNEY COFFIN:  And I do want to make one more

21     point when the Court is ready for me.

22          THE COURT:  Okay.  So I was just going to say, so it

23     sounds to me like your argument is more about the accuracy of

24     the calculations as opposed to whether grossing up is an

25     acceptable theory?

(160 of 993), Page 160 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 112 of 945
2:21-cv-00044-kjd   Document 352-3   Filed 03/15/25   Page 112 of 945

53

1                ATTORNEY COFFIN:  Is ever appropriate, right,

2                THE COURT:  Right, okay.  Was there another point?

3                ATTORNEY COFFIN:  Yeah, the point I wanted to make

4       was on the 12 percent and the sum certain.  12 percent is the

5       statutory interest rate, but, of course, the case law is that

6       the 12 percent is only to be applied when you have a sum

7       certain.  So it's a very different situation where you got a

8       promissory note of $20,000 which somebody has stiffed you on

9       and they've sat on that for three years as opposed to this very

10      complicated set of facts and premises about what they were

11      supposed to pay and when.

12           And, in addition, in this case, it's particularly unfair

13      because we won at summary judgment back in 2020.  You know,

14      what were we supposed to do, pay her the money after we won?

15      You know, and the Court, for a lot of reasons, the Court is

16      quite familiar with it just took a while for us to get back

17      here.  So that portion, I think, should not be considered of

18      the 12 percent.  But, really, I think 12 percent, based on my

19      review of the Vermont case law and how I've seen Vermont courts

20      handle this, they wouldn't dream of giving 12 percent in this

21      very complicated case.

22                THE COURT:  Okay.  And the complexity that you're

23      talking about here is not just because it's limited to the

24      medical community, right?  The point of your questions for

25      Dr. Bancroft was asking him about how much experience he has in

(161 of 993), Page 161 of 993    Case: 25-1382   12/22/2025   DktEntry: 35.4   Page 113 of 945
2:21-cv-00044-kjd   Document 532    Filed 03/19/25   Page 54 of 945

54

1    the hospital setting, but the nature of these disputes is not

2    something that's unique to the hospital setting; is that fair?

3         This goes to the gatekeeping function, right?  So, if

4    Dr. Bancroft testifies that, you know, No, I haven't done

5    dozens of projections of loss amounts in the context of

6    hospital care, that means that he shouldn't testify in this

7    case and he should be excluded kind of under the gatekeeping

8    role?

9         ATTORNEY COFFIN:  Well, I mean, I do think his

10   limited qualifications in this kind of a case make him

11   particularly lacking in qualifications that would permit him to

12   testify here.  But, you know, I would say that the complexity

13   of this matter for assessing whether a 12 percent prejudgment

14   interest, which under Vermont case law is only to be applied

15   when there's a sum certain, would not be appropriate at all

16   here because we don't have a sum certain here.

17        You know, we've got, we have three different reports in

18   three different years, each of which is quite different with

19   different methodologies.  We've landed on this notion that the

20   losses are primarily driven by the fact that she is going to

21   work .6 at UVM, but, if she'd stayed at Dartmouth, she would

22   have worked full time until age 70.  You know, and we didn't

23   know that about that, and presumably neither did she, until

24   August of this year.  How can that be a sum certain for us to

25   pay?

1          THE COURT:  Yeah.  No.  I have to say that doesn't

2     strike me as going to his qualifications.  That's

3     cross-examination material, it would seem to me.  And, as you

4     well know, I mean, the standard for allowing an expert to

5     testify, there's definitely some principles of law that apply

6     there, but it's not particularly onerous.  Certain threshold

7     requirements have to be met, of course, but it's more typical

8     that an expert is allowed in and subject to the able

9     cross-examination that you just did of Dr. Bancroft here in

10    court.

11         All right.  Is there anything further on this particular

12    motion at this time?  It's going to be taken under advisement.

13    I'll be issuing written rulings on all of these, in fact, but,

14    if there's anything else you'd like to --

15          ATTORNEY COFFIN:  No, thank you, Your Honor.

16          ATTORNEY JONES:  Nothing further, Your Honor.

17          THE COURT:  All right.

18          ATTORNEY JONES:  Dr. Bancroft can leave?

19          THE COURT:  Yes.  I have all of your motions here in

20    a separate folder, so it's a matter of picking which one we go

21    to next.  Let's, I guess let's turn to the issue of

22    Dr. Porter's qualifications.  So, Mr. Coffin, I've read all the

23    briefing here.  I mean, we don't need to belabor what has been

24    written.  I'm sorry, Mr. Schroeder.  Are you arguing this

25    particular motion?

(163 of 993), Page 163 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 115 of 945
2:21-cv-00044-jkjd Document 353 Filed 03/13/25 Page 55 of 945

56

1          ATTORNEY SCHROEDER:  Yes, I am, and I won't belabor
2      anything, Your Honor, go ahead.
3          THE COURT:  Yeah.  No.  You stood, so I'm happy to
4      hear from you on everything.  I was just going to say I've read
5      everything.  I'm familiar with the issues, but I may have a
6      question or two here or there, but go ahead.
7          ATTORNEY SCHROEDER:  I'll keep it short, Your Honor.
8      This really goes to probative evidence and part of a bigger
9      issue as well regarding something I raised in January, which
10     was the fair distribution of time for our three-week trial, and
11     having done just a few of these over the years in various
12     courts, right now, we know that -- we have the exhibit lists
13     and the witness lists.  The witness list has 34 total people.
14     Plaintiffs have 20, actually 25.  Five of them are our
15     witnesses.  And I would submit, Your Honor, that, if you look
16     at the witness list, at least ten of them go to the issue of
17     character evidence because they certainly didn't come up in the
18     course of discovery in this case, but they go to issues of
19     working with Dr. Porter and presumably about the skills of
20     Dr. Porter and qualifications.
21          When you judge where we are and what we expect to handle
22     in this case and specifically what we, jury selection, opening
23     statements.  Dr. Porter, I suspect, will be on the stand until
24     at least Wednesday, and then you couple that with all of these
25     character witnesses -- and I count ten off this list from

(164 of 993), Page 164 of 993 Case: 25-1382  12/22/2025, DktEntry: 35.4, Page 116 of 945
2:21-cv-00444-kjd   Document 533   Filed 03/19/25   Page 116 of 945

57

1    plaintiff's witness list -- I do not see from a timing

2    perspective how we're going to get fair distribution of time to

3    put on our case in chief, including the fact that, if you take

4    her 25 witnesses, 5 of them she's calling on in their case in

5    chief our witnesses on cross, two on March 31, one on April 1,

6    full day, Dr. Merrens, and one on April 2nd, Dr. Conroy at

7    least of right now, and then presumably, if Dr. Bancroft is

8    allowed to testify, somewhere in there.

9        I'm merely -- one of the reasons for doing this is to say

10   the witness list actually bears out our concern, Your Honor,

11   about cumulative evidence that I can tell from the witness list

12   is going to happen.

13           THE COURT:  So, when you refer to them as character

14   witnesses, do you mean that you anticipate their testimony to

15   be primarily or exclusively to get on the stand and talk about

16   what a good doctor Dr. Porter is, or do they have other

17   relevance as to what they're testifying to and as part of their

18   testimony, they might say, my experience with Dr. Porter is

19   such and such and this is what kind of doctor she is?

20           ATTORNEY SCHROEDER:  I think it's the former, Your

21   Honor.

22           THE COURT:  The former?

23           ATTORNEY SCHROEDER:  The former.  Because we did a

24   lot of discovery in this case, a lot of -- I think we produced

25   over 30,000 pages of documents, and looking at a number of

(165 of 993), Page 165 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 117 of 945
2:21-cv-00444-jjt Document 533 Filed 03/15/25 Page 51 of 945

58

1    these people that never came up in the course of discovery, I

2    submit, okay, maybe, maybe seven out of ten.  Maybe I have

3    overshot my numbers, but I can tell you, looking at knowing

4    this case from a -- Mr. Vitt and myself are the only two that

5    have been in the case since the start.

6          I can tell you that one of them is a patient.  I can tell

7    you that a number of them are former employees in different

8    departments, radiology, urology.  Those are not part of the REI

9    division, right?  So she had interactions with these people.

10   The only conclusion -- maternal fetal medicine, these are

11   different midwife and OB/GYN.  These are not part of this case

12   in terms of the relevant issues before the court.  And we had a

13   concern that this may happen when there was a suggestion that

14   they'd have 20 to 30 witnesses.

15         Well, now we know, and if we're starting on the 24th and

16   we know that the following week, Monday, Tuesday, Wednesday,

17   are already slated for them to do cross of our witnesses, well,

18   then assume for sake of argument that we somehow keep going

19   plaintiff's case.  We're going to have maybe a week to put on

20   our case, and they get two, and I think that's my concern in

21   foreshadowing what I suspect will happen, and I think this list

22   actually proves my point.

23         THE COURT:  Okay.  And so, talking about what your

24   proposal is, though, as I read your papers, you're willing to

25   stipulate to the qualifications of Dr. Porter on the one hand,

(166 of 993), Page 166 of 993   Case: 25-1382   12/22/2025, DktEntry: 35.4, Page 118 of 945
2:21-cv-00447-jdjd   Document 5533   Filed 03/13/25   Page 118 of 945

59

1    right, or, in the absence of a stipulation, some type of

2    limitation.

3        Curious to hear how you would propose that that be limited

4    based on what you are saying now.  Are you saying certain

5    witnesses should not be allowed to testify at all, like,

6    excluded or

7            ATTORNEY SCHROEDER:  I would submit, Your Honor, they

8    are for purposes of character evidence qualifications --

9            THE COURT:  Yeah.

10           ATTORNEY SCHROEDER:  -- that we would have some

11   limitation on this.  My concern is just we've got three weeks

12   and --

13           THE COURT:  I hear you.

14           ATTORNEY SCHROEDER:  And this is a robust list of

15   witnesses.  I expect to call, I think, at least most of my

16   witnesses, and I would say the lion's share of my witnesses.

17   So with their list it's 25.  I think we had 13 or 14.  There's

18   five that are overlap.  We're obviously going to call those

19   five in our case in chief and/or on cross-examination depending

20   upon their availability.

21       But, when you look at those numbers and you look at the

22   people that are listed here who are either current or former

23   employees in other divisions, not REI division, I think it's a

24   fair assumption that that evidence will be duplicative and

25   cumulative.  Of course, if they perhaps have some relevance to

1    part of this case, the material facts of this case, I could

2    understand why that would be allowed, but, if we're looking at

3    three weeks, I just don't want to be a position where April 3rd

4    or April 4th -- my daughter's 19th birthday.  She'd be happy

5    that I said something about that in court -- that we're looking

6    at just putting on our case in chief the week of April 7th

7    where a lot of time was wasted on talking about Dr. Porter's

8    qualifications.

9        We've asked to submit that she's -- we even said eminently

10   qualified.  We even give a few adverbs in there, but the fact

11   of the matter is we've got three weeks, and we've got to try

12   this case 9:00 to 4:30, and I don't see how, based on that

13   list, against our motion which was -- you know, certainly

14   thought this is what was going to happen.  I just don't want to

15   be at April 4th having this discussion again when we're trying

16   to figure out how to jam all of our witnesses in one week.

17           THE COURT:  Your list of witnesses in your filing are

18   these people that you refer to them as plaintiffs seeks to

19   parade in front of the jury, I just want to be clear on that.

20   Are these witnesses that you're suggested shouldn't be

21   testifying?

22           ATTORNEY SCHROEDER:  I would say -- from their list?

23           THE COURT:  I think it is.  Isn't it?

24           ATTORNEY SCHROEDER:  Yes.  So I would submit that

25   there are a number of witnesses on this witness.  List we

1    obviously filed our motion before getting the exhibit list.

2              THE COURT:  Right.

3              ATTORNEY SCHROEDER:  But the exhibit list bears out

4    our concern, and having reviewed their list in ETL with my

5    client, I'd rather drop at least nine to ten people.  I

6    actually had ten that would be cumulative because, from

7    everything I know about the discovery in this case, that's all

8    it would go to would be the qualifications issue.

9              THE COURT:  Okay.  I mean, on the stipulation topic,

10   obviously, I can't force the other side to stipulate.  You know

11   that.  And that's also kind of been a little bit of tension

12   with the case law that talks about a plaintiff's right to kind

13   of present the case and present the facts, too, right?  So a

14   stipulation is, it happens, but in this kind of a case in

15   particular, I feel like a stipulation might not be workable, it

16   seems to me, but that's just my kind of preliminary --

17             ATTORNEY SCHROEDER:  I understand, Your Honor, and I

18   understand the tension there.

19             THE COURT:  Yeah.

20             ATTORNEY SCHROEDER:  But I have seen this play out

21   before this way, And I don't -- I'd like to be wrong that, you

22   know, we start to get our case in chief on earlier, but, even

23   by their own trial subpoenas -- which, by the way, they gave a

24   trial subpoena for one of my witnesses which we can deal with

25   later who is one of, somebody that's represented by us and gave

1   a trial subpoena to them in December and didn't even give us

2   notice of it and didn't even tell us about it.  So we'll deal

3   with that, a few minor issues or major issues later on.

4        But the fact of the matter is they're calling our

5   witnesses.  They have a right to do that.  I understand that,

6   but even based o their math, Monday, Tuesday, Wednesday of the

7   second week the likelihood that we'll even be able to get all

8   four of those witnesses done just in those three days is

9   somewhat Herculean.  And so this is just a foreshadowing of our

10  concerns in that regard.

11       THE COURT:  Yes.  If your sense of what these

12  witnesses is going to testify is correct, if -- I'm very

13  interested to hear from Mr. Vitt on this.  I mean, if they are

14  actually being called just to testify to what you refer to as

15  character, well, then, yeah, I would have some concerns about

16  cumulative evidence or duplicative evidence, but I think it

17  will be useful to hear from the other side, who I'm sure is

18  going to tell me now that this is catastrophization.  Right,

19  Mr. Vitt?

20       ATTORNEY SCHROEDER:  I only heard that word a few

21  times in the papers, yes.  Thank you, Your Honor.

22       THE COURT:  Mr. Vitt?

23       ATTORNEY VITT:  Thank you, Judge.  May it please the

24  Court, we do not intend to parade, to use their term, those 13

25  witnesses on the stand.  We intend to try this case

(170 of 993), Page 170 of 993   Case: 25-1382   12/22/2025, DktEntry: 35.4, Page 122 of 945
2:21-cv-00044-kjd   Document 153-3   Filed 03/15/25   Page 122 of 945

63

1   efficiently.  We intend to try it in a way to keep the jury's
2   attention, and I do not expect we will get to a situation where
3   Dartmouth-Hitchcock is jammed up in the slightest in terms of
4   being able to put on their case.
5        Do we intend to call some of their witnesses?  Yes.  Do we
6   expect them to take a day, a half day?  No, absolutely not.  We
7   intend to try this case efficiently, and the witnesses we're
8   calling are not character witnesses as that term has been used
9   in my experience, period.  Now --
10           THE COURT:  Are they purely qualifications witnesses?
11           ATTORNEY VITT:  Well --
12           THE COURT:  I think we are using the word character
13   but what we're talking about is qualifications.
14           ATTORNEY VITT:  No.  Look, these are people who were
15   involved in some way in this situation.  How do you know
16   Dr. Porter?  For example, I don't -- back up just a second.
17   Dartmouth-Hitchcock says the crux of this case is whether the
18   decision to close the REI division and terminate Dr. Porter's
19   employment was a pretext for disability discrimination or
20   whistleblower retaliation.  That is not what the Second Circuit
21   held.  Is that part of the case?  Yeah.  Is it the crux of the
22   case?  No way.
23        The court and the jury must consider why Dr. Porter was
24   not retained or reassigned to OB/GYN.  That's going to be a
25   significant part of this case, and to do that one of the things

64

```
 1    we need to establish are, What are the qualifications and the
 2    skills that she had that no one else had within the OB/GYN
 3    department?  For example, she could read ultrasounds in a way
 4    nobody else could.  She could do surgeries that no one else at
 5    the institution could perform.  She had an experience in
 6    endocrinology that simply was lacking within the department.
 7         And there are quite a number of emails.  Victoria Maxfield
 8    is going to testify she spent 18 years at OB/GYN, and she says
 9    Dr. Porter's expertise in gynecological ultrasound,
10    myomectopies, hysteroscopies and GYN surgeries provide a level
11    of care to women that is not available from other members of
12    the gynecology staff.  Now, as part of her testifying, will she
13    talk about this experience and her skills?  Of course she will.
14    Will it take a long time?   No.
15         But, in order for the jury to assess whether the decision
16    not to reassign Dr. Porter made any sense whatsoever, we need
17    to explain why it should have happened.  And so that's not
18    going to take a long period of time, and, to the extent we get
19    to a point where somebody thinks we're duplicating, we'll deal
20    with it then.  We don't intend to duplicate.  We intend to try
21    this case efficiently.
22         Now, the part of the motion that I found surprising --
23    there are some other words that come to mind.  They say you
24    should not mention Misty Magic, and it would be a serious
25    mistake to allow a description from the chair of the OB/GYN
```

(172 of 993), Page 172 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 124 of 945
2:21-cv-00044-jdp Document 553-3 Filed 03/13/25 Page 124 of 945

65

1    department, which happens to have been something that was

2    quoted in full by the Second Circuit.  And they say, and I

3    wrote this down, we're trying to glorify her abilities in an

4    effort to mislead and confuse the jury into making a decision

5    based off emotion rather than the merits of the case.

6        That is an extraordinary prank.  You're going to introduce

7    testimony that is so glowing that it ought to be prohibited or

8    restricted in some way.  What principle of law is this court

9    supposed to apply in deciding that this type of evidence should

10   be rejected?  None that I'm aware of.

11       And will Misty Magic be mentioned?  Of course it will.  It

12   was it was the kind of a common expression within the

13   department.  You know, she was able to accomplish things nobody

14   else could, and there is nothing improper and certainly

15   shouldn't be restricted as some sort of prohibition on, you

16   know, being overly -- I don't know -- generous, you know.  So

17   that part of the motion is easy to deny and, in terms of the

18   schedule, we do not intend to bog this down.  Mr. Schroeder

19   will have all the time he needs.  Thank you.

20            THE COURT:  Okay.  Mr. Schroeder?

21            ATTORNEY SCHROEDER:  Just very quickly, Your Honor.

22   I know we've got a pretty robust motions coming.

23       Two of the people that were just identified on the witness

24   list, Eunice Lee who was apparently a former patient of

25   Dr. Porter, they were just identified for the first time.  And

(173 of 993), Page 173 of 993  Case: 25-1382  12/22/2025, DktEntry: 35.4, Page 125 of 945
2:21-cv-00044-jjd  Document 5283  Filed 03/15/25  Page 625 of 945

66

1    Chris Strogain who was is a doctor at Dartmouth-Hitchcock who
2    was just identified on the exhibit list.  Never disclosed
3    before, never identified.
4        So perhaps, certainly, they're going to consider
5    discussions about what was referred to by Leslie Demars and
6    cross-examine her on that.  I understand that, but it goes to
7    the bigger issue of how much evidence are we going to have
8    related to qualifications, et cetera, and if it's going to her
9    care as a patient, well, why is that particular individual as
10   well as the doctor at Dartmouth-Hitchcock who is not, was in
11   the REI division, why are they just being disclosed now at this
12   eleventh hour?
13       One additional one, Your Honor, and we did put this in our
14   papers was Dr. Bornstein who has never worked at
15   Dartmouth-Hitchcock as far as I know.  And he's, what else is
16   he other than a character or qualifying witness for the
17   plaintiff here where he never even worked at
18   Dartmouth-Hitchcock?  He works at UVM.  That's where he is.
19   So, you know, I hope we're on schedule to be done April 11th
20   but my fear is, just looking at a handful of these examples,
21   it, you know, the proof is in the pudding, so to speak.  Thank
22   you.
23           THE COURT:  Okay.  Are you also arguing the quash the
24   subpoena issue?
25           ATTORNEY SCHROEDER:  Yes, I am.

(174 of 993), Page 174 of 993, Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 126 of 945
2:21-cv-00044-jdp   Document 352   Filed 03/19/25   Page 126 of 945

67

1          THE COURT:  Do you want to just stay there then?

2          ATTORNEY SCHROEDER:  I do, but I got to get another

3     group of documents here, Your Honor.  Thank you.  I'll try and

4     be short, Your Honor.  I know we've got obviously a few more of

5     these to go through.  With respect to the motion to quash,

6     we've highlighted this fact before, which is Dr. Porter was

7     announced her, was given notice of her termination May 4th.

8     Her final day of employment was June 3rd 2016.  Dr. Conroy

9     didn't come there until August 7th 2017.  Those are undisputed

10    facts in the record whether you look at Second Circuit or the

11    trial court.  She has no first --

12         And one of the arguments, Your Honor, and I'd ask you to

13    review Document Number 89, which was plaintiff's submission on

14    June 3rd 2019 which seems like a really, really long time ago.

15    However, in that submission, where we had sought a motion for

16    protective order because we said we didn't believe that

17    Dr. Conroy should have to testify.  They said, well, you know,

18    there's, she has a unique perspective on the needs and values

19    of the institution and if the REI -- this was their submission

20    of pretext -- that the REI division was closed for other

21    reasons, perhaps as an opportunity to clean house with regards

22    to Dr. Porter and the other physicians under a, under a pretext

23    and then reopening shortly thereafter, that would be, you know,

24    something that would be worth putting before the Court.  Now

25    that was 2019 which is pretty close to the closing of the REI

(175 of 993), Page 175 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 127 of 945
2:21-cv-00444-jdj Document 532-3 Filed 03/15/25 Page 62 of 945

68

1    division.

2        The REI division closed, and that hasn't been opened in

3    eight years.  So that whole pretext theory that served as the

4    basis for them to get the deposition in the first place, that

5    has gone away.  They haven't opened the REI division.  It

6    hasn't even been discussed of opening the REI division over the

7    last eight years, and so that's where we are.  So that the

8    underlying assumption or submission for purposes of even

9    getting the deposition hasn't been borne out because the REI

10   division hasn't been opened, again, in eight years.

11       With respect to Dr. Conroy's deposition, we had the fact

12   that she was asked numerous hypotheticals, really being asked

13   to be a Monday morning quarterback, documents that she'd never

14   seen before, asked those questions.  They had the right to do

15   the deposition.  I think it was for three hours.  They did it,

16   but they were all hypotheticals because she wasn't on those

17   documents.  And, in fact, when you look at their opposition in

18   this case, they refer to emails by Dr. Merrens and emails by

19   Dr. Levine, all of which happened before Dr. Conroy got there.

20       And, in fact, they have already put in trial subpoenas to

21   have Dr. Merrens testify and Dr. Levine testify.  So you have

22   the argument of cumulative as well, never mind 401 or 401 and

23   403.

24           THE COURT:  Right, but the argument, right, is that

25   there's potentially an inconsistent explanation for the

(176 of 993), Page 176 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 128 of 945
2:21-cv-00144-jjd  Document 53-3  Filed 03/19/25  Page 128 of 945

69

1    closing.  I think that's the point, right?

2         ATTORNEY SCHROEDER:  Absolutely.  And I would ask

3    Your Honor to just review the deposition testimony that's been

4    submitted against the actual article, because it's not always

5    quoting Dr. Conroy, and I would submit there's a number of

6    instances where it actually is a misrepresentation by the

7    plaintiff of what actually she said and the implications of it.

8         For example, they had an issue with respect to one of the

9    issues they say is any inconsistency with respect to providers,

10   and here the issue of providers she actually explained that

11   that included nurses, and one of the issues, when you close a

12   division of this magnitude and they'd never close a division

13   before -- so Dartmouth-Hitchcock has 15,000 employees, $3.5

14   billion enterprise at this point, has never closed a division

15   before.  Of course, there's multiple reasons, but in those

16   multiple reasons she was consistent in what she explained out

17   of a five-minute conversation with Dr. Merrens after the fact,

18   after the fact.

19        And so, if you look at the deposition testimony against

20   the actual quotes from an article in September of 2017, they

21   extrapolate, well, these reasons are different.  I understand

22   that there might be a inconsistency.  There is not

23   inconsistencies, actually between her deposition testimony.  So

24   they finally got the chance to do it, and they have nothing to

25   show for it.

(177 of 993), Page 177 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 129 of 945
2:21-cv-00444-jjd    Document 352-3    Filed 03/15/25    Page 129 of 945

70

1      This is somebody who is in charge of 15,000 employees, has
2   a huge, you know, $3.5 billion in revenue, six community
3   hospitals in New Hampshire and Vermont, five multi-specialty
4   community group practices, only academic center in New
5   Hampshire, Dartmouth-Hitchcock Medical Center, only children's
6   hospital.  Dartmouth Cancer Center being one of 57 NCI
7   designate comprehensive cancer centers in the United States.
8   She's got huge responsibilities.
9      It's one thing to do her deposition in her office down the
10  hall for two or three hours.  It's another thing to basically
11  take her out of commission for at least one workday.  And so,
12  in terms of the undue burden under Rule 45(D)(3)(a), little 4,
13  it's clear in the case law that having Dr. Conroy testify on a
14  five-minute conversation that she had with doctor Dr. Merrens
15  well after the closure of the REI division where she actually
16  is consistent with those reasons, is duplicative, cumulative,
17  and an undue burden for somebody of her stature at this point
18  in this case.
19         THE COURT:  Okay.  Thank you.
20         ATTORNEY SCHROEDER:  Thank you.  I'm going to try to
21  keep all my presentations under five minutes.  I'm going to see
22  if I can do that.  I've got a few more I think to do.
23         ATTORNEY VITT:  Okay.  May it please the Court,
24  Dartmouth-Hitchcock physicians have been that, although the REI
25  division was marginally profitable, it needed to be closed

1    because there was a shortage of nursing staff.  Ed Merrens, who

2    made decision to close the REI division, admits that pinning

3    the dissolution of the REI division on failure to maintain and

4    recruit nurses for this work is rather thin.

5        So why does the explanation even matter?

6    Dartmouth-Hitchcock says, Look, we had a legitimate business

7    reason to shut the REI division, get rid of all the doctors and

8    cease providing reproductive endocrinology care to women and

9    children who otherwise would have gone to Dartmouth-Hitchcock

10   to get that medical help.

11       We say this is pretext, pure and simple.  It was a way to

12   get rid of two incompetent doctors who they worried would raise

13   some sort of just cause complaint or be, you know, hearing God

14   knows what, and they could get rid of the doctor who was the

15   thorn in their side who simply wouldn't tolerate and wouldn't

16   be quiet and insisted that something had to be done to deal

17   with the situation with these doctors and, Oh, by the way, she

18   was on disability.  We can just get her out the door.

19       Now, the explanation about why they closed it is thin.

20   Joanne Conroy didn't have to say a word, but she volunteered to

21   sit down at a apparently two -- it's a little unclear, but met

22   with the press.  There were reports.  She certainly understood

23   that this issue was a big issue and was likely to be asked

24   about, and she gets a briefing from Ed Merrens, and she comes

25   up with an explanation that is different than what Ed Merrens

(179 of 993), Page 179 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 131 of 945
2:21-cv-00444-jjd Document 53-3 Filed 03/15/25 Page 131 of 945

72

```
 1    testified about.
 2         And I'd like to hand up just one document.  There's, it
 3    was marked as Exhibit 2 during the Conroy deposition.  There is
 4    an email from David Seifer, one of the doctors who was
 5    terminated who we say couldn't do the job, and the other is
 6    from Leslie Demars who was the chair of OB/GYN and ended up
 7    losing her job because of this situation.  So may I hand it up,
 8    please?
 9         THE COURT:  Yes.  Mr. Schroeder, do you have a copy
10    of this?
11         ATTORNEY VITT:  I gave it to him, yes.
12         ATTORNEY SCHROEDER:  I just got it, yes, Your Honor.
13         THE COURT:  Okay.
14         ATTORNEY VITT:  So, beginning at the bottom, David
15    Seifer writes to Leslie Demars saying, I wasn't aware we closed
16    because we couldn't recruit new providers.  Where does revised
17    information like this come from?  And LRD, which is Leslie
18    Demars, says, I met with Joanne and told her that I hoped that
19    she'd been misquoted in the article because, if that is the
20    information that's been given her, it is completely untrue and
21    now a different narrative that is in the public eye.
22         I understand Joanne Conroy is busy and a billion this and
23    15,000 employees, and I get all that, but the way we see it,
24    Judge, Dartmouth-Hitchcock can't keep its story straight.
25    There may be an innocent explanation why this other excuse was
```

1    provided, but it's fundamental to this case, and our view is

2    Joanne Conroy needs to show up and describe and provide answer.

3    Thank you.

4           THE COURT:  Okay.  Thank you.  Are you replying or

5    moving on to the next motion?

6           ATTORNEY SCHROEDER:  Touche, Your Honor.  I'd just

7    want if I may, very quickly.  I think I was under my five

8    minutes, so I'm just going to use that extra 30 seconds.  This

9    goes to the issue, Your Honor, which we've raised separately,

10    but the fact of the matter is they're tying to do character

11    assassination through emails where they didn't even depose Dr.

12    Seifer.  They didn't depose Dr. Su, and Joanne Conroy, nothing

13    is attributed to her in this email exchange as far as comments,

14    nothing that Joanne said, blah, blah, blah.  It's discussion

15    back and forth between two people.  Joanne Conroy, there's

16    nothing attributable to her in this email other than, I told

17    her this.

18        And, certainly, they're going to have Leslie Demars on the

19    stand.  It's perfectly appropriate to cross-examine her on

20    that.  If they had called or deposed Dr. Seifer, they could

21    have perhaps done the same thing, but he's not a witness in

22    this trial.  It's just Leslie Demars.  They've done a trial

23    subpoena.  This is overkill, and it's between two people

24    talking about what they think as opposed to what Joanne Conroy

25    said.  It's, it proves the point.  Thank you.

1          THE COURT:  Okay, all right.  We've been talking

2     about character evidence so let's move on to the actual

3     character evidence motion.

4          ATTORNEY McDONALD:  Thank you, Your Honor.  I'll also

5     try to keep it pretty brief.  I'm mostly going to respond to

6     the opposition to the motion.

7          THE COURT:  Okay.

8          ATTORNEY McDONALD:  As you know from our papers and

9     it's in the evidence about the performance of Dr. Su and Dr.

10    Seifer, based on undue prejudice, relevance, hearsay, and

11    character evidence.

12         THE COURT:  So how is it hearsay?

13         ATTORNEY McDONALD:  What's that?

14         THE COURT:  How is it hearsay?

15         ATTORNEY McDONALD:  Well, a lot of the documents I

16    think that they intend to introduce, there will be no witnesses

17    able to testify as to the contents of those documents.

18         THE COURT:  So like Exhibits 10 and 11, you're

19    talking about, those are hearsay?

20         ATTORNEY McDONALD:  Correct.  I think there's a lot

21    of issues about those documents.  I think the biggest issue is

22    undue prejudice.

23         THE COURT:  Okay.  Your hearsay point that you still,

24    you maintain that those are hearsay because of not having a

25    declarant; is that what you said?

1           ATTORNEY McDONALD:  Correct.

2           THE COURT:  Okay.

3           ATTORNEY McDONALD:  So in the opposition it basically

4     says that evidence regarding the performance of these doctors

5     is, by definition, admissible because we did not,

6     Dartmouth-Hitchcock, did not object to the evidence being

7     included in the summary judgment briefing.

8           That's a misrepresentation of Rule 56(c) which states that

9     a party may object to the material cited in the summary

10    judgment motion on the grounds that it may not be, it is not

11    presented in a form that's admissible to the court.  There's

12    no, there's no law that would suggest that we've waived our

13    ability to contest the admissibility of that evidence at trial,

14    and the suggestion that the Second Circuit has also determined

15    that it's admissible is also complete inaccurate.  The word

16    admissible does appear in the Second Circuit opinion.  So to

17    suggest that, because it's in the Second Circuit opinion, it

18    comes into this trial, I think, is totally incorrect.

19          THE COURT:  Though it is interesting, right?  The

20    Second Circuit considered this information.  It's kind of hard

21    then to say at trial we shouldn't consider it, isn't it?

22          ATTORNEY McDONALD:  Well, I think, on the point of

23    relevance, sure, but I think there's still an undue prejudice

24    issue.

25          THE COURT:  I see, okay.

(183 of 993), Page 183 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 135 of 945
2:21-cv-00444-jjd Document 533 Filed 03/19/25 Page 135 of 945

76

1          ATTORNEY McDONALD:  And, also, we'll have to deal

2     with the hearsay issue as well.  When the Second Circuit

3     decided that, it had no sense of who was going to be called at

4     trial.  When we did our briefing, we had no sense of who was

5     going to be called at trial.  Now we know that Dr. Su and Dr.

6     Seifer are not witnesses.  They cannot, they are not going to

7     be called to testify regarding the information in the

8     documents.  And, as I said, there is no, there's nothing in the

9     Second Circuit decision that speaks to admissibility.

10          THE COURT:  Okay.

11          ATTORNEY McDONALD:  Plaintiff's opposition also

12     suggests that Su and Seifer's performance goes to

13     Dartmouth-Hitchcock's motivation to close the division.  We

14     were a little confused by that point.  Dartmouth-Hitchcock's

15     position is that there were a number of reasons that led to the

16     decision to close the division, one of which was interpersonal

17     strife among the physicians.  So, to the extent that there is

18     evidence regarding, you know, infighting among the physicians,

19     that would actually support Dartmouth-Hitchcock's position.  So

20     more, we didn't really understand that point.

21          And, to the point that it goes, this evidence goes to

22     Dr. Demars putting herself on the hook for the performance of

23     Dr. Su and Dr. Seifer, the allegation that Dr. Demars was

24     putting herself on the hook for Dr. Su is new to us.  We always

25     understood their argument to be related to Dr. Seifer, that Dr.

1   Demars was on the hook for Dr. Seifer's performance.  And I

2   think that this is probably an eleventh-hour pivot so that they

3   can argue for the admissibility of Exhibit 10, which is the

4   self-serving 12-page email of all of Dr. Su's perceived

5   failures.  Again, defendants don't contest that Dr. Porter made

6   complaints about these physicians.

7        THE COURT:  And isn't that very relevant to the

8   whistleblower claims and the retaliation claims and the alleged

9   unlawful termination?

10       ATTORNEY McDONALD:  Certainly the fact that she made

11  those reports, and we don't contest that.

12       THE COURT:  Right.

13       ATTORNEY McDONALD:  I think the specific nature of

14  the allegations is an undue prejudice issue.

15       THE COURT:  Prejudice how?

16       ATTORNEY McDONALD:  Prejudice, this is an attack on

17  Dartmouth-Hitchcock in a way.  This is ten pages that Dr.

18  Porter herself wrote about all of the perceived failures of

19  Dr. Su.  It doesn't go to whether she made these reports.  It

20  goes to an attack on Dartmouth-Hitchcock as a whole and is

21  trying to make, attack Dartmouth-Hitchcock and trying to make

22  Dartmouth-Hitchcock look bad.

23       THE COURT:  Okay.

24       ATTORNEY McDONALD:  So I think Exhibit 11 is another

25  example of that.  It's an email from Dr. McBean to Dr. Demars.

(185 of 993), Page 185 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 137 of 945
2:21-cv-00444-jjd    Document 53    Filed 03/19/25    Page 73 of 945

78

1    I don't understand.  We don't understand why a complaint about

2    another provider that was not Dr. Porter is relevant to Dr.

3    Porter's complaints in this case.

4           THE COURT:  Okay.

5           ATTORNEY McDONALD:  So, now that we've received the

6    exhibit list, the exhibit list has at least 15 examples of

7    documents we've counted of documents that relate to specific

8    complaints that Dr. Porter made about Dr. Seifer and Dr. Su, as

9    well as other providers and other staff at Dartmouth-Hitchcock.

10   So it seems that this is going to be a major issue that they're

11   going to try to push this through, this theory through.

12          THE COURT:  Okay.  And are you still maintaining the

13   Rule 404 objection to this?

14          ATTORNEY McDONALD:  Yes.

15          THE COURT:  And the objection is under both 404(a)

16   and (b)?

17          ATTORNEY McDONALD:  Yes, that's right.

18          THE COURT:  So it's impermissible character evidence

19   as to Dr. Su and Dr. Seifer?

20          ATTORNEY McDONALD:  Correct.

21          THE COURT:  Okay.  Why don't you explain that one to

22   me?  Because I'm a little bit unclear as to why that's

23   impermissible character evidence under the first prong 404(a).

24          ATTORNEY McDONALD:  Certainly.  I think that this

25   evidence goes to specific incidents that she raises in these

1   papers goes to the suggestion that these two were prone to

2   making poor decisions and endangering patients, and that was an

3   issue that continued to crop up for years within Dr. Porter's

4   tenure at Dartmouth-Hitchcock.  So I think that she is

5   attempting to use these specific instances to argue that, for

6   the entirety of her time there, Dr. Su and Dr. Seifer were

7   creating an unsafe environment.

8          THE COURT:  Okay.  So under 404(a) you're saying that

9   that is evidence that would be sought to be used to prove that,

10  on a particular occasion, the person acted in accordance with

11  that character or trait?

12         ATTORNEY McDONALD:  I think our argument under 404(b)

13  is stronger, but 404(a) correct.

14         THE COURT:  Okay.  And then your argument under

15  404(b), so, if evidence of any other wrong or act is not

16  admissible to prove a person's character to show that on a

17  particular occasion they acted in accordance with character,

18  you've just made that argument, but, of course, there's

19  alternative bases for something to come in under 404(b).  So,

20  for example, here it seems knowledge.  Isn't this about

21  knowledge of decision makers at the hospital?

22         ATTORNEY McDONALD:  I think so, but I didn't think

23  that anyone the people to whom Dr. Porter reported these are

24  able to testify.  They are able to testify to whether they

25  report this to anyone else.  I don't think the contents of the

1    reports speaks, the complaints goes to the knowledge of anyone

2    who's higher up at Dartmouth-Hitchcock.

3            THE COURT:  Okay.  But, I mean, they are pretty

4    strongly worded assessments.

5            ATTORNEY McDONALD:  Certainly.

6            THE COURT:  So I think the knowledge notion there is

7    Dr. Porter writes these letters to decision makers at the

8    hospital, and she reports, she makes some fairly she delivers

9    some fairly strong opinions about what she views as substandard

10   performance by them.  The relevance then of the knowledge of

11   Dartmouth people receiving those and then the allegation is

12   taking adverse employment action against Dr. Porter seems like,

13   to me, that would be very much squarely within 404(b)'s rule.

14           ATTORNEY McDONALD:  Understood.

15           THE COURT:  All right.  Anything else on this?

16           ATTORNEY McDONALD:  Thank you so much.

17           THE COURT:  Thank you.

18           ATTORNEY VITT:  May it please the Court, as a

19   technical matter, I think motions in limine are not properly

20   filed to exclude evidence unless the evidence is clearly

21   inadmissible, and this is not one of those situations.  What I

22   think Your Honor has identified what's the principal argument

23   that I would have which is, Look, there are over 30 separate

24   references in the Second Circuit opinion of the competence of

25   Dr. Seifer and Dr. Su.  And the Second Circuit is critical -- I

1    could probably use a stronger term -- to describe the

2    hospital's failure to do anything despite this behavior.

3         So I really don't understand the motion, and I don't

4    understand the idea that somehow we can't refer to this as just

5    some sort of far-fetched claim and, you know, seems to me that

6    this is a big part of what the case is about.  There were

7    problems with these doctors.  The institution looked bad.  They

8    were reported, not only by Dr. Porter, but by a number of

9    witnesses who we're going to be calling to the stand.  That's

10   the case.  I mean, that's certainly a big part of the case.

11   That's the whistleblower case in part.

12        THE COURT:  Sir, did you want to address the

13   argument, though, that Dartmouth is saying the Second Circuit

14   included all those references as a matter of relevance but they

15   weren't taking into account the matter of prejudice?  The

16   argument was made.  Curious if you have a response to that.

17        ATTORNEY VITT:  I don't think I'm prepared to say

18   that the Second Circuit ignored that issue of prejudice.  Is

19   the evidence prejudicial?  Of course, it is prejudicial.

20   That's what this case is about.  It ought to be prejudicial.

21   It's not unfairly prejudicial.  It's not like we're talking

22   about somebody abusing, you know, a child or something.  I

23   mean, you know, this is -- it's damaging testimony, and is it

24   prejudicial?  Yeah, and it ought to be.

25        THE COURT:  Okay, all right.  Thank you.

1          ATTORNEY McDONALD:  One brief point.  The Second

2     Circuit decision was considering a summary judgment record.

3     They were considering the fact in the light most favorable to

4     Dr. Porter not, and as they would be perceived at trial.

5          THE COURT:  Right.  Yes, thank you.  Just want to be

6     clear.  Are you Ms. McDonald?

7          ATTORNEY McDONALD:  I am, yes.

8          THE COURT:  Okay.  Thank you.  All right.  Yes and

9     the next one cat's paw theory.  So, Mr. Schroeder, you're

10    arguing that one?  Okay.

11         ATTORNEY SCHROEDER:  Yes.

12         THE COURT:  I'll say as you walk up to the podium,

13    I'll give you something to think about.

14         ATTORNEY SCHROEDER:  Two things at once, Your Honor.

15    Okay.  I got you.

16         THE COURT:  So your initial motion talks about how

17    cat's paw theory may or may not be available under state law in

18    New Hampshire and Vermont.  There is, we'll call it a

19    concession, but just a statement of the law where you say that

20    it applies federal claims.  The reply brief comes in now and

21    says it only applies in certain federal claims and not these,

22    right?  It doesn't apply to the ADA and the Rehab Act, but it

23    applies in Title Seven.

24         ATTORNEY SCHROEDER:  Right.  And, yes, in cases --

25    yes go ahead.  Want me to explain?

 1                THE COURT:  Yeah, I mean, was that kind of a, upon

 2      further thought, we looked into this a little more deeply and,

 3      actually, we're going parse it out more narrowly about which

 4      federal claims it applies to?

 5                ATTORNEY SCHROEDER:  Well, I think the issue was

 6      replying to their point that this should come in through the

 7      federal claims and responding to their opposition where they

 8      raise these cases under Title Seven and Eucera and I think an

 9      age discrimination case.  So quite frankly, it was in response

10      to that.

11           Whether or not it can come in under federal claims or

12      federal claims we understand that the Second Circuit has

13      weighed in on this in terms of Title Seven.  It's not a Title

14      Seven case, and so for the, for the -- I think everybody's in

15      agreement that New Hampshire and Vermont have not adopted this

16      doctrine yet, okay.  And so that hopefully it's four out of six

17      of the claims.  So the other two claims you're addressing their

18      point, well, yeah, we've got these federal claims.  I think it

19      certainly could be confusing to the jury, right, to explain the

20      difference between, well, these claims have this theory, but

21      this claim has this theory.

22           But set that aside.  The Zorro decision out of Connecticut

23      in 2020 says that the Second Circuit has not yet addressed

24      whether the cat's paw theory applies to claims brought under

25      the ADA or Section 504 of the Rehab Act.  Our reply was to

1   really address their issue of, well, we can still bring it
2   under federal claims.
3       They wanted to bring it under state claims as well, and I
4   think that's pretty clear, but, in terms of the federal claims,
5   they're out of luck there as well because it hasn't been
6   adopted by the Second Circuit.  So whether it's been adopted by
7   other circuits and whether or not it's not been applied to
8   Title Seven and Eucera claims, there's only ADA and Rehab Act
9   here as federal claims, and so I don't see the avenue or the
10  lane through which they can drive that theory at this point.
11      And, in light of the lack of adoption by New Hampshire and
12  Vermont, in light of the lack of adoption of this theory to ADA
13  and rehab claims, I don't see -- and, even if they -- we'll get
14  to the motion for leave to amend, but it's not applicable
15  anyway because that's a Vermont claim, and that hasn't been
16  adopted there.  I do not see a path, Your Honor, for them to
17  get there.
18          THE COURT:  Okay.  You say in your brief it's clear
19  that Dr. Merrens made the closure decision, and so the record
20  doesn't support the cat's paw theory, separate from your legal
21  argument about whether it applies, but you say, as a matter of
22  fact, it's clear that Dr. Merrens made this decision so cat's
23  paw would not be applicable here.
24      The Second Circuit decision, though, I think it's fair to
25  say, kind of opined that, you know, there is a little bit of a

1    fact question on this issue, isn't there?

2              ATTORNEY SCHROEDER:  They have laid that out, Your

3    Honor, as every inference in favor of the nonmoving party.

4    I'll acknowledge that.  But it's Rule 56.  It's whether or not

5    there's a factual dispute that gets you to the jury trial.  But

6    here Dr. Merrens has testified that he was the ultimate

7    decision maker and that he made the decision, and there's this,

8    obviously, this theory that they're now going, well, we think

9    it could be -- if it's not, if Dr. Merrens isn't at fault for

10   whistleblower retaliation and disability discrimination, well,

11   you know what?  It's really because he was the puppet, and

12   Dr. Demars was the puppeteer, right?  And that's really what

13   they're saying at the end of the day and that she had it out

14   for Dr. Porter.

15        Either way, none of their claims have case law that

16   supports the use of that theory here today in this circuit.

17   And I'd submit that, as a result, we don't, I don't want to

18   have to, midstream in trial, have to brief this issue.  We know

19   it was put out there.  We actually didn't even believe that it

20   actually had been briefed by the plaintiff.  But the Second

21   Circuit obviously disagreed with that, and they referenced it,

22   and I think, because that's in play, we want to address it now.

23   It's not like the Second Circuit said, well, you know, you can

24   definitely use this theory.

25              THE COURT:  Right.  And so on that question, right,

1   like, if I were now to rule on the cat's paw theory in the

2   context of a motion in limine, right, I mean, it's a little bit

3   unusual that a legal theory gets kind of excluded at the outset

4   of trial, but you make the point that, if the cat's paw theory

5   were to be excluded, that would affect the evidence that comes

6   in.  Can you give me a little bit of a sense of how a decision

7   on cat's paw at the outset of the trial would affect what comes

8   in in terms of the evidence?

9        ATTORNEY SCHROEDER:  Well, I think it goes to the

10  issue of the amount of evidence, right, that is before the

11  Court on any particular theory.  I agree with you that the

12  legal theory in and of itself isn't typically brought in the

13  context of a motion in limine.  I think this is a really rather

14  unique situation where you actually have case law under state

15  and federal law.  So it would limit, I think, perhaps, but not

16  necessarily, limit -- it depends on what Leslie Demars

17  testifies to and Dr. Merrens testifies to.

18       But I think, in terms of jury instructions and I think how

19  that plays out -- so I understand the Court may want to see how

20  the evidence plays out before making a decision on that issue,

21  but we're going to begin with jury instructions ahead of time

22  and what theories they're going to be able to use in terms of

23  proving their case.  And so it goes to the elements of their

24  claim, and I'd submit that, if you can't use the cat's paw

25  theory, well then you've got -- you can still put in evidence

(194 of 993), Page 194 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 146 of 945
2:2:2-cv-00044-kjd Document 53 3 Filed 03/19/25 Page 87 of 945

87

1    as, well, we think this person made the decision, we think that

2    person made the decision, not at cat's paw theory, but we

3    really think this person was responsible for the decision and

4    certainly put that evidence in.

5         THE COURT:  So it may mean that the evidence wouldn't

6    change, that the evidence will still come in.  There will be

7    Dr. Demars.  There will be Dr. Merrens.  All that evidence will

8    come in however it comes in, and then at the jury instruction

9    stage, as you say, right, which makes some sense, after we see

10   how the evidence comes in, a decision can be made, and I'm

11   going to have to decide or determine whether it's legally

12   available, right, so not just as a factual matter.

13        ATTORNEY SCHROEDER:  Right.  And so factually --

14        THE COURT:  Yeah.

15        ATTORNEY SCHROEDER:  -- they can certainly elicit

16   testimony on that point, Your Honor.  It's just we know based

17   upon -- and this is unusual, right, that this legal theory has

18   been adopted in other places but courts have stated that it

19   hasn't been adopted in New Hampshire, Vermont or the Second

20   Circuit.  So we want to limit the amount of all the different

21   legal theories that are going to be at play in the jury

22   instructions.  Well, one of those theories merely isn't

23   applicable under the law.  Let's deal with it now ahead of time

24   which is, you know, why we would do it as a motion in limine.

25   I realize it's a rather unique, but it's just a precursor to,

(195 of 993), Page 195 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 147 of 945
2:21-cv-00044-kjd Document 523 Filed 03/15/25 Page 84 of 945

88

1    well, we're going to make that same argument at the jury

2    instruction stage.  It's not going to change, and for that

3    reason we think it's, it's relevant and probative to deal with

4    it today.  Thank you.

5              THE COURT:  Okay.  All right.  Thank you.  Mr. Jones?

6              ATTORNEY JONES:  Thank you, Your Honor.  Defendant

7    seeks to preclude the so-called cat's paw theory.  This theory

8    has an odd name.  It's not an odd concept.  It's not an unusual

9    theory at all.  It's not even really controversial.  We can

10   thank Judge Hollingsworth for the metaphor and the name.  At

11   the end of the day they're talking about the simple law of

12   agency and a body of law that has remained unchanged for

13   hundreds of years.  As the Supreme Court clarified in Staub

14   versus Proctor Hospital, this theory is just the application of

15   agency to an employment decision where more than one person

16   participated or influenced the decision.  That's it.  We're

17   just talking about agency law here.  It's not some weird novel

18   thing that some circuits have to struggle with, do we accept it

19   or not, or states have to accept it.  It's just agency law.

20             THE COURT:  But it applies differently in federal law

21   depending on the cause of action.  So, even if it is a general

22   agency principle, apparently the case law says it applies to

23   certain types of federal claims, but not all.

24             ATTORNEY JONES:  Right.

25             THE COURT:  So is it really an agency principle that

1    carries across all cases?

2              ATTORNEY JONES:  Well, it is.  It's an application of

3    agency to -- and in those indications, the courts that have

4    questioned its application, for example, at ADA have said,

5    well, does that really in a but-for context?  Does that agency

6    principle apply in this causation context?  So it's still

7    agency law at the end of the day.  It's not some weird, novel

8    theory, and, because of that, it's not remarkable that every

9    federal circuit court of appeals who looked at it squarely has

10   recognized it.

11        Similarly, every state Supreme Court case where the court

12   has squarely addressed the issue has recognized it.  Nowhere in

13   their papers is a single court that rejects it.  There are

14   plenty of courts that, as a matter of judicial conservatism

15   say, I don't have to get to it because, even if we accept it,

16   the facts don't exist in this case, but no one's rejected it.

17        So, well, anyway, there's no example of a court rejecting

18   it.  That being the case, there is no reason to think that the

19   New Hampshire Supreme Court or the Vermont Supreme Court would

20   reject the theory if it was squarely brought to their

21   attention.  Both courts have had occasion to look at it.  Both

22   courts have analyzed it but then found in those cases

23   insufficient evidence that even if it was recognized, it could

24   fly.

25        But they never said we reject it, and there is no indicia

(197 of 993), Page 197 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 149 of 945
2:21-cv-00449-kjd Document 53 Filed 03/19/25 Page 149 of 945

90

1     or anything to think that they would reject it.  Notably, both
2     New Hampshire Supreme Court and Vermont Supreme Court have held
3     that their states' respective discrimination laws look to
4     federal law for guidance.  So it has been recognized under some
5     federal law claims.  I understand the issue with the case that
6     was cited, and it has been universally recognized by the states
7     that have squarely considered it.  In light of those two
8     factors, it is the most compelling reason to expect that both
9     Vermont Supreme Court and the New Hampshire Supreme Court, if
10    pushed to resolve the issue, would recognize it.
11    Again, it's not a weird theory.
12         With regard to the factual dispute which I think Your
13    Honor had made the point I was going to make so I won't belabor
14    it, but the Second Circuit did find that a reasonable juror
15    could, in fact, based on the record evidence, reach a
16    conclusion directly opposite from the very factual foundation
17    of defendants' motions.  They say Dr. Merrens was the decision
18    maker and Dr. Demars was not a part of the decision and, in
19    fact, fought for Dr. Porter, and the Second Circuit said, no, a
20    reasonable junior could find the other way on both those
21    policies.  So this is not the time to exclude a theory based
22    upon hotly disputed facts.
23         THE COURT:  And do you think either way, if it was
24    excluded or allowed in limine, that would impact the way the
25    evidence comes in or the nature of the evidence that comes in?

1          ATTORNEY JONES:  Well, if you were to rule that it's

2     excluded that, under Vermont and federal law, well, to the

3     extent we are argue it's still viable under federal law, no.  I

4     think the case comes in, the case comes in, and we can argue

5     the law at jury charge, as you pointed out.  But this is not a

6     motion in limine resolution situation.

7          THE COURT:  Okay, all right.  Thank you.

8          ATTORNEY SCHROEDER:  Very briefly, Your Honor, just

9     to retort on that?

10          THE COURT:  Yes.

11          ATTORNEY SCHROEDER:  There's been a lot of comments

12     made by plaintiff's counsel about the import of the Second

13     Circuit decision.  Well, interestingly enough and one of the

14     points you raised in January was to hear the significance or

15     lack of significance of that decision.  We'll have a bench memo

16     to you this coming week on that issue because I think it's

17     important.  It was a summary judgment case.

18          They repeatedly talked about how important that decision

19     was to say this, that, or the other thing, but what it doesn't

20     say is that the cat's paw theory applies under Second Circuit

21     case law.  I mean, they took 100 pages to talk.  They could

22     have used a few words on that, and they don't, and I think

23     that's informative.  They also say, If it's even available

24     under New Hampshire law, and, yes, we could wait for the jury

25     instructions phase of this case to deal with it, but that will

(199 of 993), Page 199 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 151 of 945
2:21-cv-00444-kjd    Document 552-3    Filed 03/13/25    Page 151 of 945

92

1    be after perhaps that evidence has all come in, and I want to

2    be clear about what, how this case is going to be tried and

3    what legal claims and theories each party, you know, they're

4    allowed to go into.

5            THE COURT:  Right.  Which is why I keep asking that

6    question.  I want to know what impact it will have on the

7    actual presentation of evidence, and I don't mean to press you

8    on this, you know, unnecessarily, but that's relevant, right?

9            ATTORNEY SCHROEDER:  It is relevant, Your Honor.  I

10   understand that.  I think it goes to what can be said in the

11   opening statements, right?  I think it could have some

12   significance there and perhaps in closing statements, and I

13   want to deal with the jury instructions.  I think it's, it,

14   given the fact that the law it hasn't been adopted state and

15   federal on these claims that are before us, it's not germane to

16   even have it in play at all as a theory in the case.

17       Is it necessarily going to change what questions are asked

18   or not asked?  I don't know yet.  I don't think so.  But, if

19   we're going to have to deal with this at the jury instruction

20   stage, why can't we deal with it now where it's one less issue

21   to deal with down the line and we'll, the point of doing this

22   pretrial, in part, is to try to narrow what's before the Court,

23   right, and, to the extent that that's possible and is fair and

24   reasonable and judge's discretion, obviously.

25       So I would submit that the, you know, Second Circuit could

(200 of 993), Page 200 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 152 of 945
2:21-cv-00044-jdp Document 528 Filed 03/19/25 Page 152 of 945

93

1    have taken any number of liberties on this one, and they

2    didn't, and I think that's because it's not adopted in the

3    Second Circuit for that, for these particular claims.

4            THE COURT:  Right.  And, with respect to the state

5    law claims, they said it may apply, almost suggesting that a

6    trial court then might make the decision to predict what the

7    state high courts might do on this issue for purposes of trial,

8    right?

9            ATTORNEY SCHROEDER:  Absolutely, yeah, I think it's

10   up to your discretion.

11           THE COURT:  Yeah.  Short timing, though, to make that

12   kind of a decision with trial starting in a week.

13           ATTORNEY SCHROEDER:  Correct.  I understand that.

14           THE COURT:  Right.  Okay.

15           ATTORNEY SCHROEDER:  Thank you.

16           THE COURT:  Thank you.  All right.  So what remains

17   is the motion to amend the complaint.  Am I missing a motion?

18           ATTORNEY COFFIN:  No, that's it.

19           ATTORNEY VITT:  That's it.

20           ATTORNEY SCHROEDER:  No, Your Honor.  That's the last

21   one.

22           THE COURT:  Okay.  So, Mr. Vitt, obviously, I'll hear

23   from you at this point on this one at this point, or, sorry,

24   Mr. Jones.  I shouldn't assume.  You're going to predict the

25   obvious question.  We are a week out from trial now.  A new

1   legal theory is being added to a case that's been around for

2   eight years.  I'm trying to understand why.  I've read, I've

3   read the pleadings.  I was trying to figure out, Is there some

4   additional remedy available under the Vermont whistleblower

5   statute?  Is that what this is about?

6           ATTORNEY JONES:  Yeah.

7           THE COURT:  Because you're saying that there's no

8   additional facts.  There's no change in the showing that would

9   have to be made.  I don't know this myself.  I haven't

10  researched the statute, but that's what you're saying.  I'm

11  kind of, I'm just wondering why?  Why this late?

12          ATTORNEY JONES:  Yeah, to be very transparent, you

13  got it.  We believe that, under the Vermont whistleblower

14  statute, remedies are simply much clearer, specifically with

15  regard to the availability of punitive damages.  But it does

16  not change any of the legal theory.  It does not change a

17  single fact, and allowing the case to proceed will not change

18  the way this case is tried at all.

19      In fact, I would submit that, even if we tried the case

20  under the current pleadings, you would be able at the

21  conclusion of evidence to file a motion to amend the pleadings

22  to conform to the evidence.  The facts would be identical.

23  They tick off the elements.  It changes nothing.  And, yes, it

24  makes clear what the available remedies are in a way that the

25  New Hampshire statute doesn't.

1          THE COURT:  Okay.  And what about the legal elements

2    of the claim?  Are they the same as New Hampshire's?

3          ATTORNEY JONES:  They are the same.  The only

4    difference is that in the Vermont statute the specific language

5    that, with regard to protective whistleblower conduct it

6    applies, not just to recording violations of law but reporting

7    substandard patient care.  Now, while that language is not in

8    the New Hampshire statute, the Second Circuit has clearly

9    defined the claim under the New Hampshire statute as improving

10   the Court's substandard patient care.  So, to the extent that a

11   slightly difference in the two statutes, that's already in the

12   case.

13      So there's literally no difference in factual or legal

14   presentation of the case.  We're just adding another theory

15   that's available on the same elements with the same factual

16   finding.

17          THE COURT:  Okay.  All right.

18          ATTORNEY SCHROEDER:  I should note, Your Honor, I'm

19   not sure.  Either there is a new theory, or there is not a new

20   theory, and I guess it seems like there's a different theory

21   that they're going on under Vermont statute.  You know, we laid

22   out the chronology on this, Judge.  They wanted to have a

23   status conference in October.  You agreed that that was not

24   really necessary because I suspect you had a pretty heavy

25   caseload as did the rest of us.  And then that January 8th.

1    Then we have we had a submission from them on January 8.  No

2    mention of that.  Then January 13th, pretrial conference.  No

3    Mention of that.

4         We really want to get these deadlines done.  We really

5    want to brief everything.  No surprises.  That was the theme,

6    right?  We all agree on what, how we're going to do it, and

7    then we, not even the eleventh hour, like 11:58, they are now

8    saying, well, you know, I know we have a Vermont statute claim,

9    but we're going to add another claim under Vermont law.

10        We are going to have to amend our answer.  We obviously,

11   based on just what he said, we're go going to have to have jury

12   instructions amended to deal with that issue, and there's a lot

13   to do in one week, and adding this to that pile is under the

14   standard, right, for denying to leave to amend.  In fact, two

15   of the cases they cited actually deny leave to amend.

16        Undue delay, bad faith, undue prejudice, we hit the

17   trifecta, Your Honor.  I submit we hit the trifecta on that,

18   and it is going to open up a Pandora's box of stuff that we

19   have to deal with because they've now come up with this new

20   theory that they want under Vermont statute relating to, I

21   guess, substandard patient care.

22        Either way, and I thought I heard him say punitive

23   damages.  So, if that's really true, I haven't analyzed Vermont

24   case law on this particular claim yet.  Obviously, we will.

25   But, to then add another damages theory, how is that not

(204 of 993), Page 204 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 156 of 945
2:21-cv-00449-kjd    Document 353    Filed 03/15/25    Page 156 of 945

97

```
 1    different if the supposition is, well, we can't get punitive

 2    damages perhaps under New Hampshire law, but we might be able

 3    to get it under Vermont law if we add this claim.  That, that's

 4    adding a whole new realm of briefing.

 5              THE COURT:  So is that what you're referring to in

 6    your papers when you talk about it would inevitably involve

 7    problems of proof?  Do you mean as to damages --

 8              ATTORNEY SCHROEDER:  Yes.

 9              THE COURT:  -- or the way the evidence would come in

10    generally?

11              ATTORNEY SCHROEDER:  No.  It would come down to

12    proof.  It would come down to jury instructions.  And they've

13    even said it's another legal theory.  Well, if it's another

14    legal theory, then it's not based upon everything else that's

15    already in the case if it's another legal theory.  So it's too

16    little, too late, I would submit.  We've been down this road

17    already.  We set up this schedule to do all these things ahead

18    of time.  And to then say, you know, 11:58, well, you know,

19    we're going to add this claim as well.  Perhaps maybe they have

20    a basis to do it at the end of the evidence, but they certainly

21    don't have a basis to do it right now, we would submit.  Thank

22    you.

23              THE COURT:  Thank you.

24              ATTORNEY JONES:  Just one comment.  Punitive damages

25    have been a part of this case since day one.
```

1           THE COURT:  Right.  It was in the demand for relief.

2           ATTORNEY JONES:  Yes.

3           THE COURT:  Yes, in the beginning, but -- yeah, okay.

4    Have we covered everything?  We have.  Okay.  All right.  Well,

5    thank you.  Helpful to have the conversation.  Yes Mr. Vitt?

6           ATTORNEY VITT:  I have one question.  It's not a

7    question.  It's a -- we're trying to honestly put our exhibit

8    list together, and we've gotten there.  There's a question of

9    authentication, right, and I'm hoping that the parties can

10   agree that the documents exchanged in discovery are authentic.

11   If that's not going to be the case, we're going to have to

12   serve subpoenas early next week on multiple officials at

13   Dartmouth-Hitchcock.  I'd just as soon not go through that, but

14   I've raised this issue before, and I don't want to be in a

15   situation where we get stuck trying to get evidence admitted

16   and there is the question about, you know, we're not

17   stipulating to authenticity.

18          THE COURT:  So you mean like all the emails, things

19   like that?

20          ATTORNEY VITT:  Yeah, basically, it's what they

21   produced.  I mean, all of them have a stamp.  You know, we

22   produced them with ours and they produced it with theirs.  And,

23   yeah, these are, there's a ton of emails, as you can imagine,

24   and it's mostly emails we're talking about here.

25          THE COURT:  So, when you say you've raised it before,

(206 of 993), Page 206 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 158 of 945
2:21-cv-00944-jkj    Document 153    Filed 03/15/25    Page 158 of 945

99

1    you mean with counsel?

2              ATTORNEY VITT:  Yeah and the only reason I'm raising

3    it now is we're getting close to trial.  I would suggest

4    subpoenas served.  I would prefer not to go that route, but I'm

5    surprised we don't have it resolved.

6              THE COURT:  All right.  Mr. Schroeder?

7              ATTORNEY SCHROEDER:  Judge, two issues.  Well,

8    there's a couple of issues with that.  First of all, they just

9    raised it this week.  I think it was this week or maybe like

10   late week.  That was the first time they asked us to stipulate

11   to authenticity.  And, to the extent they might have an

12   authenticity problem, well, that's their problem at trial, and

13   we'll deal with it at trial, but to then say to us, we expect

14   you to stipulate to every single thing, they did not produce

15   any of their documents with any metadata.  So how am I supposed

16   to stipulate to or I'm willing to stipulate to that

17   authenticity of their documents?

18        It's one thing to be emails.  Perhaps that will be true

19   that we'll stipulate to the authenticity of that, but to come

20   in here and say, well, I hope we don't have to worry about that

21   next week.  Well, that's not my fault that you didn't ask about

22   this issue beforehand and you asked about this week while we're

23   were getting ready for motions to be heard today.  I said we

24   would be available to discuss -- guys, I just have to say,

25   Judge.  Throughout today, they've been back-benching the whole

(207 of 993), Page 207 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 159 of 945
2:17-cv-00944-kjd Document 325-3 Filed 03/05/25 Page 159 of 945

100

1    time, and it's really disruptive, and I don't want to do it at

2    trial, and I certainly don't do it in front of any judge, but

3    they've been doing it the whole time, and it's inappropriate.

4            THE COURT:  Okay.  So, listen, are you saying that

5    there are certain types of documents that Dartmouth is willing

6    to stipulate to?

7            ATTORNEY SCHROEDER:  I'm sure there will be documents

8    that we will stipulate to, yes, Your Honor.

9            THE COURT:  All right.  So you may be able to work

10   through at least some of these?

11           ATTORNEY SCHROEDER:  Right.

12           THE COURT:  And, for the ones that you can't, then

13   witnesses will be called to lay a foundation for these

14   documents to get in.  And you, yourself, raised the question

15   about whether you're going to have enough time to put your case

16   in, too, so additional witnesses --

17           ATTORNEY SCHROEDER:  I don't --

18           THE COURT:  -- to establish authenticity and

19   foundations.

20           ATTORNEY SCHROEDER:  I understand that, but then they

21   have to have the witnesses for foundation, Your Honor, because

22   they're trying this case without a number of people that

23   they're engaging in character assassination about that they

24   never deposed and never had them here for trial and they could

25   have done all those things.

(208 of 993), Page 208 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 160 of 945
2:17-cv-00944-kjd Document 323.3 Filed 03/05/28 Page 160 of 945

101

```
 1         So, yes, you're right, but they did not produce their

 2    documents with any metadata.  So, for me to say I stipulate to

 3    the authenticity of that document, for example, there is a

 4    document that where Misty Porter sent it to her own personal

 5    email.  Well, how am I -- I don't know that she did it on that

 6    particular day and whether or not that's authentic.  That's

 7    just one example.

 8         But do I think that we will be able to stipulate to a fair

 9    amount, obviously, a lot of these emails that there's a fair

10    amount of crossover?  Absolutely.  But there's also ten

11    examples of duplicate emails that they put in their exhibit

12    list.  So, you know, we didn't do that.  There's ten.  So

13    there's a lot to be done.  I already said that we would be

14    available on Tuesday to go over authenticity and stipulation

15    issues.  I sent that email, I think, Wednesday night at 11:30.

16         So we've already said that we would have that meeting.

17    We're just not doing it on his timeline, but so be it.  We're

18    certainly going to be dealing with it ahead of trial.  Thank

19    you.

20         THE COURT:  Okay, all right.  Anything further,

21    Mr. Vitt?

22         ATTORNEY VITT:  Nothing further, Judge.

23         THE COURT:  Okay.  I mean, with respect to the

24    comment about the back-benching and everything, you know,

25    you're going to be in front of a jury.  So I don't expect the
```

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 161 of 945
2:17-cv-00944-kjd    Document 325.3    Filed 03/05/25    Page 102 of 195

1    alleged back-benching to be happening at the trial.  That would

2    not be good for either side, right?  So all right.  Well, I

3    will see you then Monday.  There will be rulings on all of

4    these, yes, not this Monday.

5         ATTORNEY SCHROEDER:  Sorry, Your Honor.  Ms. McDonald

6    just raised one question. Sequestration, your rules on that and

7    how we should comport ourselves with respect to witnesses and

8    having them sequestered?  Obviously not Dr. Porter or if it's

9    going to be Dr. Merrens, it's Dr. Merrens.  There's a corporate

10   representative.  But for everyone else we just want to be

11   mindful of where they should go to before they get called so

12   that we can actually make sure we're moving things on.

13        THE COURT:  Right, right.  I mean, typically, your

14   witnesses will be sequestered, except for the ones that you

15   just identified, presumably the expert as well.  Typically, the

16   way it functions is they are outside the courtroom.  You know,

17   don't forget, we're not going to be in this courtroom.  We're

18   going to be in the first floor courtroom, and there's kind of a

19   lobby area there, and someone on your trial team, when you know

20   that that person is next up, can go out and get that person.

21   After they testify, obviously, they can stay in the courtroom.

22        ATTORNEY SCHROEDER:  Sure.  And, Your Honor, just on

23   that point, is it your expectation that we'll have some kind of

24   discussion between the parties during, you know, at the end of

25   the day, like, okay, we've got this many witnesses?  They don't

(210 of 993), Page 210 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 162 of 945
2:17-cv-00194-kjd    Document 325-3    Filed 03/05/25    Page 103 of 194

103

```
 1    have to tell me necessarily who they're going to call.

 2              THE COURT:  Yeah, I think --

 3              ATTORNEY SCHROEDER:  But they go first, so I just

 4    want to make sure we know.

 5              ATTORNEY VITT:  We'll let them know.

 6              THE COURT:  Yes, that's typically how it goes.

 7              ATTORNEY VITT:  Absolutely.

 8              THE COURT:  At the end of every day, whoever is

 9    putting their case in chief on will give some indication of who

10    they expect to testify the next day.

11              ATTORNEY VITT:  Absolutely.

12              THE COURT:  Sounds like Mr. Vitt plans on doing that.

13    So, yeah, we'll have a sense of the dramatis personae for the

14    next day.  Okay.  All right.  Thank you.

15              (Whereupon the hearing was adjourned.)

16

17

18

19

20

21

22

23

24

25
```

(211 of 993), Page 211 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 163 of 945
2:17-cv-00194-kjd    Document 323-3    Filed 03/05/25    Page 104 of 104

104

```
1                    C E R T I F I C A T E

2                    I, Sunnie Donath, RMR, Official Court Reporter

3        for the United States District Court, District of Vermont, do

4        hereby certify that the foregoing pages are a true and accurate

5        transcription of an audio recording of the hearing taken in the

6        above-titled matter on March 14, 2025 to the best of my skill

7        and ability.

8

9

10

11

12                                   Sunnie Donath, RMR

13                    --------------------------------

14                         Sunnie Donath, RMR

15

16

17

18

19

20

21

22

23

24

25
```

VOLUME: 6
PAGES: 1-221

1

2                          UNITED STATES DISTRICT COURT
                                    FOR THE
3                             DISTRICT OF VERMONT

4

5     Misty Blanchette Porter        )
                                     )
6                                    )
      v.                             )  Case No. 2:17-cv-194
7                                    )
                                     )
8     Dartmouth-Hitchcock            )
      Medical Center, et al.         )
9     _____)

10

11    RE:  Day 6 of Jury Trial

12    DATE: March 31, 2025

13    LOCATION: Burlington, Vermont

14    BEFORE:  Honorable Kevin J. Doyle
                Magistrate Judge

15

16    **APPEARANCES**:

17    Geoffrey J. Vitt, Esq.
      Sarah H. Nunan, Esq.
18    Vitt & Nunan, PLC
      8 Beaver Meadow Road
19    Norwich, VT 05055

20    Eric D. Jones, Esq.
      Langrock, Sperry & Wool
21    210 College Street, Suite 400
      Burlington, VT 05410

22

23    Donald W. Schroeder, Esq.
      Morgan McDonald, Esq.
      Foley & Lardner, LLP
24    111 Huntington Avenue, Suite 2500
      Boston, MA 02199

25
                          - Continued on Next Page -

(213 of 993), Page 213 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 165 of 945
2:17-cv-00494-kjd Document 35-4 Filed 04/25/25 Page 165 of 945

2

VOLUME: 6
PAGES: 1-221

1   Tristram J. Coffin, Esq.
    Downs Rachlin Martin, PLLC
2   199 Main Street, Suite 600
    Burlington, VT 05401-8339
3

4

5

6           TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                    United States District Court Reporter
7                       *verbatim@vermontel.net*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(214 of 993), Page 214 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 166 of 945
2:21-cv-00049-jkd-jd Document 35296 Filed 04/25/25 Page 166 of 945

3

VOLUME: 6
PAGES: 1-221

1                  INDEX OF EXAMINATION

2   Witness            Examined By         Page     Line

| Witness | Examined By | Page | Line |
|---|---|---|---|
| Robert L. Bancroft | Atty. Vitt | 38 | 4 |
| | Atty. Coffin | 61 | 3 |
| | Atty. Vitt | 145 | 22 |
| | Atty. Coffin | 150 | 3 |
| Leslie DeMars | Atty. Nunan | 153 | 10 |

8                   INDEX OF EXHIBITS

9                                     Page    Admitted

10   Plaintiff Exhibits

| | Page | Admitted |
|---|---|---|
| 2 | 164 | Y |
| 7 | 174 | Y |
| 9 | 216 | Y |
| 11 | 214 | Y |
| 28 | 185 | Y |
| 52 | 206 | Y |
| 89 | 157 | Y |
| 148 | 192 | Y |

16   Defense Exhibits

| | Page | Admitted |
|---|---|---|
| B21A | 116 | Y |
| B21B | 116 | Y |
| C18 | 70 | Y |
| C18A | 77 | Y |
| C19 | 141 | Y |

21              *   *   *   *   *

22

23

24

25

(215 of 993), Page 215 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 167 of 945
2:17-cv-00094-jkd Document 35298 Filed 04/25/25 Page 167 of 945

4

VOLUME: 6
PAGES: 1-221

 1                    (Court opened at 8:09 a.m.)

 2          COURTROOM DEPUTY:  Your Honor, this is Case Number

 3   17-cv-194, Misty Blanchette Porter versus Dartmouth-Hitchcock

 4   Medical Center.  Present on behalf of the plaintiff are

 5   Attorneys Geoffrey Vitt and Eric Jones and, excuse me, Attorney

 6   Sarah Nunan.  Present on behalf of defendants are attorneys

 7   Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We are

 8   here on a motion in limine regarding undisclosed expert

 9   opinions of Dr. Bancroft.

10          THE COURT:  Good morning.

11          ATTORNEY COFFIN:  Good morning, Your Honor.

12          THE COURT:  Okay.  So I have received the parties'

13   submissions over the weekend.  Plaintiff filed twice, right, to

14   add your exhibits yesterday evening?  I received that.  Thank

15   you.  Defendants have received a second copy with the exhibits,

16   I assume.  Mr. Coffin, you've received the second filing?

17          ATTORNEY COFFIN:  Oh, yes, Your Honor.

18          THE COURT:  Okay, all right.  So, as I say, I have

19   read both sides' filings.  Happy to hear if there's any

20   additional argument.  I may have some questions for you, but,

21   Mr. Coffin, your motion.  Would you like to be heard?

22          ATTORNEY COFFIN:  Thank you, Your Honor.  I think our

23   position is pretty well laid out the papers, but just to sort

24   of briefly recap, if this was implicit in the expert analysis

25   as it's evolved over the years from Dr. Bancroft, it was not

1    spelled out with adequate clarity as required under the rules,

2    and, you know, fundamentally, we're just dealing with an issue

3    where we have to wait until what we hear coming out of

4    Dr. Bancroft's mouth as he testifies and as this evolves, and

5    we have to wait until another report comes in that changes

6    things, and that's not how it's supposed to go.  It's very

7    difficult to manage that situation in trial because, you know,

8    I don't know what he's going to say until it comes out, and I

9    don't even know kind of completely what he's going to say

10   requiring me to object or waive.

11        I will say that the plaintiff's explanations of how he

12   looked at the fringe benefits and kind of the proffer of

13   testimony that I was able to see in writing, you know, albeit

14   only last night after 7:00 o'clock, or 6:30 or so, was helpful.

15   That's just not exactly how we're supposed to run the railroad

16   here, and I think some of the cases we've cited, the case, the

17   Judge Sessions opinion and the Judge Reiss opinions, kind of

18   talk about the way this is supposed to be done under the rules.

19   So and, you know, we provided some additional information to

20   the Court about the level of disclosure that we've seen in

21   addition under the, under the discovery rules for experts.

22        And so we'd submit that there, you know, we're prejudiced

23   because this is kind of a slow-rolling thing that's coming out.

24   What the Court should do about it is, practically, is a, is a

25   more difficult question, and we've made some suggestions, but

VOLUME: 6
PAGES: 1-221

1    obviously, the opinions by Judge Reiss and Judge Sessions talk

2    about limiting or even excluding testimony.  Some of the

3    lawyers in those decisions are here today, and so they've had

4    some probably more notice than I have about the import of those

5    decisions.

6        But, you know, I'd suggest that, you know, something,

7    something ought to be done to provide some limits and some

8    guidance to Dr. Bancroft's testimony, and, to me, the theme

9    that goes throughout these is that, like, they're allowed to

10   disclose and change their analysis and add to the bottom line

11   and, in the most recent case, reduce it a week before trial by

12   $2.6 million, and we're just meant to sort of respond to that a

13   little bit on the fly.

14       You know, so I've proposed some possible resolutions to

15   the Court, and, really, you know, I look to the wisdom of the

16   Court of what the fair thing to do here is, but, to me,

17   fundamentally, you can't say that this is an obligation that

18   was a sum certain like in a sort of more normal employment case

19   because of the new opinions, the new position, the new

20   analytical models.  And so I just, I think, fundamentally, the

21   thing that's really unfair is to say, Oh, well, Dartmouth

22   should have been able to foresee these changes, which, again,

23   are based largely on whatever the plaintiff happens to be

24   telling Dr. Bancroft at the moment.

25       Let's go back to the most recent report last Tuesday which

1    occurred three or four days after the evidentiary hearing where

2    Dr. Bancroft was confronted and crossed on some information.

3    The two big things that came out of that hearing -- well, there

4    are many big things that came out of that hearing, but two of

5    the bigger things that came out of the hearing is he had not

6    been informed that Dr. Porter was promoted to full professor at

7    UVM, which happened in July of 2023, and he had not been

8    provided the most recent tax return information for her fiscal

9    year 2024.

10           That was information that was uniquely in the hands of the

11   plaintiff and her counsel, and Dr. Bancroft, being a

12   prestigious economist, you think he might have followed up and

13   asked those questions because he was analyzing that she would

14   become a professor at Dartmouth based on what she was telling

15   him, and he didn't -- and that would cause a 5 percent increase

16   in her pay and would not, did not opine at all what would

17   happen with her at UVM.

18           Well, guess what?  She became a professor at UVM, and he

19   did not project the 5 percent increase.  And, fundamentally,

20   the, two of the key variables here, of course, are the

21   plaintiff is trying to show that she would have made more at

22   Dartmouth than she made at UVM and the bigger difference

23   between those results in larger damages calculations.  So,

24   fundamentally, Your Honor, I think the Court needs to address

25   in some fashion, and we would accept the Court's wisdom on

1     this.

2             THE COURT:  Okay.  So the idea of preclusion in these

3     circumstances is not a general issue.  It gets really in the

4     weeds about the specific allegation of the nondisclosure.  So

5     what specifically are you claiming is the new opinion that was

6     not disclosed, okay?

7             So I've reviewed everything that has been attached to the

8     plaintiff's filing.  You have the preliminary report issued

9     sometime in 2018.  You have defense counsel deposing

10    Dr. Bancroft in 2019.  There is a discussion of the methodology

11    that he applies to reach his kind of loss projections.  Then

12    you have a lengthy period of time where the case, as you know

13    better than I, is dealing with summary judgment proceedings and

14    appellate proceedings and everything but eventually comes back.

15            A new report is issued in August 2024.  I've looked at the

16    assumptions and the cover letter of the August 2024 report.

17    I've looked at the March 2025 report.  The assumptions are

18    basically the same.  The methodology is basically the same.  So

19    I'm almost wondering, you know, having taken a look at the

20    hearing transcript from Friday, what the initial impetus was

21    for the objection, and I wonder if it perhaps -- maybe I'm

22    wrong, but I wonder if it was perhaps a misperception of what

23    Dr. Bancroft was saying.

24            Let me explain what I think this might mean.  So it

25    appeared that, that your objection was that Dr. Bancroft might

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 172 of 945
2:21-cv-00494-jkd Document 35.4 Filed 04/25/25 Page 9 of 2945

9

1    be claiming that there is not going to be a continuing

2    Dartmouth-Hitchcock pension benefit going forward, which,

3    obviously, would be a different type of premise to his ultimate

4    opinion.  But you'll look at the chart, the chart going back to

5    August, the chart in March, and there are continuing

6    projections for the Dartmouth-Hitchcock pension plan going

7    forward, offset by what Dr. Porter eventually makes at UVM

8    Medical Center.

9        So, you know, I've read your case law, too, right?  So,

10    for example, the *Parma* case, *Town of Parma* I think, you know,

11    quite different on the facts, right?  So, in that case, it's a

12    complex environmental matter.  The expert apparently opines in

13    his first report on one aspect of environmental damages, and

14    then, later on down the road, has a whole new assessment of

15    environmental damages with new assumptions, new mathematical

16    calculations.  I'm not so sure that I see that here.

17        And the case that you mentioned with Judge Sessions also

18    involving Dr. Bancroft, so there Judge Sessions says the theory

19    of damages is so novel, almost getting back to the 702 kind of

20    analysis, getting back towards the liability, seems like it's

21    not, again, on all fours with what we have here.

22        So, I guess, let me come around to a question.  What is

23    the specific claim of inconsistency here or the new

24    information?

25            ATTORNEY COFFIN:  Sure.  Let me try to speak to

VOLUME: 6
PAGES: 1-221

1    those, Your Honor.  Your Honor is correct that, to a degree, in

2    part correct that the thing that sort of prompted me was my

3    concern of where he was going that he was not going to

4    acknowledge that she would get a damages or would get a pension

5    if she continued on at Dartmouth or, sorry, if she had left and

6    wasn't acknowledging that and where that was going to go in his

7    testimony.

8         That was clarified at sidebar and by additional testimony

9    and in the briefing.  It doesn't -- that was not my only

10   concern.  My concern is on the pensions issue as exemplary, but

11   on all of these issues we need to read between the lines for

12   what his opinion is going to be, and, you know, in the 2019

13   report there was, like, no calculation of fridge benefits, and

14   I'm concerned that the Court --

15             THE COURT:  Did that report precede the deposition?

16             ATTORNEY COFFIN:  Yes, it did, by less than a month.

17             THE COURT:  So there was no mention in the 2019

18   report about fringe benefits involving pension, but yet there

19   was questions at the deposition about percentages and

20   assumptions on the pension plan?

21             ATTORNEY COFFIN:  There was some questioning at, some

22   questioning in the deposition.

23             THE COURT:  So where did the defense -- where did

24   counsel get this information about asking about the 9 percent

25   and the 12 percent assumptions in the various pension plans

(222 of 993), Page 222 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 174 of 945
2:21-cv-00444-jjd Document 3293 Filed 04/25/25 Page 174 of 245
11
VOLUME: 6
PAGES: 1-221

1     with no report?

2            ATTORNEY COFFIN:  I don't know the answer to that

3     question myself.  Perhaps Mr. Schroeder can speak to that.  I

4     was not involved in that deposition.

5            ATTORNEY SCHROEDER:  I think the fundamental issue on

6     it, Judge, if you look at the October 1, 2019 report and

7     whether or not there's an offset, right, there's nothing in the

8     column for fringe benefits for UVM at all, and that's maybe

9     taken into account later in the August 2024 fringe benefit

10    column for UVM, but there is no offset for it in the earlier

11    reports.  There's zeros.

12           THE COURT:  So then why -- I'm looking at Page 40 of

13    the deposition, Document 257-1 attached to plaintiff's

14    opposition.  There's an extended explanation by Dr. Bancroft as

15    to the offset.  So where is this coming from if it's not in a

16    report?  Why is counsel questioning Dr. Bancroft about this if

17    counsel has no basis to even understand how he was calculating

18    damages?

19           ATTORNEY COFFIN:  I don't know the answer to that

20    question, but I would suggest that that's, to a degree,

21    immaterial because the expert report is supposed to provide the

22    basis for their opinions and the actual opinions that are

23    rendered, and whether or not that lawyer had some level of

24    knowledge of that, I don't know, but I'd suggest that that is

25    actually immaterial to whether or not the plaintiff still has

1    discovery obligations on expert disclosures.

2        You know, the fact is Dr. Bancroft's reports in seriatim

3    are extremely bare bones, and then the chart is very, very

4    thorough giving him a lot of leeway, if the Court were to not

5    require disclosure of the report, for deposing counsel to have

6    to sort of guess at what he's about, and questioning counsel

7    would have to guess what he's about.

8        And, you know, to see these reports evolve and change, you

9    know, both as to substance and methodology, but, you know, even

10   if it's only as to substance, you know, they change radically

11   because, Oh, I do the same thing.  I provide a 12 percent

12   markup on whatever it is, but yet his information has changed

13   so the bottom line to us has changed radically and requires a

14   different analysis that we're not on notice of.

15           THE COURT:  Okay.  But you say the methodology has

16   changed.  How has the methodology changed?

17           ATTORNEY COFFIN:  The methodology --

18           THE COURT:  That is critical to the case law, right?

19   If it's new methodologies, new assumptions, then that might

20   lead to a preclusion result, but if there's not new

21   methodology, that would seem to then fall on the side of the

22   ledger that says it doesn't need to be.  So I really want to

23   narrow it down on, What is the changed methodology?

24           ATTORNEY COFFIN:  I guess I would say, Your Honor,

25   I'm not confident it's not changed methodology because where he

1    describes where the methodology is is so de minimis and hidden
2    in the report that I'm just not confident.  I haven't run the
3    numbers enough to really know that.  But I would suggest that I
4    disagree with your reading of the case law because it's really
5    both things.  If he radically changes the information and it
6    hasn't been disclosed to us, I do think those cases show that,
7    you know, that, too, is a failure to update information in his
8    expert report.

9         THE COURT:  Definitely.  So what information hasn't
10   been disclosed?

11        ATTORNEY COFFIN:  So, for example, the changes in, in
12   the salary, the changes in her professor, the changes in
13   position, the allocation of the income in 2004 updated at the
14   very end.  And, with regard to the pension, I don't see a
15   discounting to present value for the income stream coming on.
16   And, again, this is all stuff to have disclosed well beforehand
17   so one can understand it and think it through, but I believe
18   she can claim a pension right now at Dartmouth and could be
19   receiving that income stream, and that would be something
20   that's part of her income and would change the damages
21   calculation.

22        THE COURT:  Okay.  And the discounting of present
23   value, so the fact that the chart does talk about a present
24   value, that is inadequate?  Third-to-last column seems to have
25   a calculation as to present value, but that, is in your view,

1      inadequate?

2              ATTORNEY COFFIN:  Yeah, because depends what you mean

3      by inadequate, inadequate without further explanation and

4      guidance what it is.  Because these are, you know, these are

5      numbers on the chart, and we get them, you know, a week before

6      trial.  We get them after the case has been in hibernation for

7      years, and, you know, we're supposed to penetrate what these

8      numbers amount for and, you know, be prepared to, you know, get

9      whatever we can from cross-examination on the witness,

10     essentially unguided, and, you know, kind of take, take it on

11     the fly what the math is.

12             THE COURT:  Okay.

13             ATTORNEY SCHROEDER:  Judge, I think, just big

14     picture-wise --

15             THE COURT:  Yes.

16             ATTORNEY SCHROEDER:  -- when you look at the October

17     1, 2019 report, right, if there's a calculation for, well, you

18     should be getting income from Dartmouth, right, going forward,

19     they, they don't account for that as an offset for UVM.

20     There's zeros all the way down, so that's one issue.  But here,

21     big picture, big picture, when you look at -- I mean, we

22     highlighted this in the outline.  The numbers go from, like,

23     4.3 to 4.4 to 6.4 as of August 2024, and the number now is 1.8

24     million in economic damages?  By itself, Your Honor, by -- and

25     this is eight years later, right?  It, there's an incongruity

1     that falls out of the assumptions that Dr. Bancroft has made.

2     Like, on its face it is, it is a far cry from a clear

3     methodology and clear assumptions.

4          And, to the extent that the assumptions are new and the

5     numbers are lower, okay, I guess, good for Dartmouth-Hitchcock,

6     right?  But we got those assumptions on March 19th of 2025, and

7     there's no way that that, that that can't be calculated within

8     the judge's decision and consideration of all the issues that

9     are before the Court.  These are assumptions that were made

10    March 19th, and the only reason they were made -- and, by the

11    way, one of those assumptions is that Dr. Porter became a

12    full-time professor in May or June of 2023.  Well, is that

13    reflected in Dr. Bancroft's August 2024 report?  No, it wasn't,

14    and it's inexplicable why.  It's a year later.

15         And so I would submit that, to the extent -- and I think

16    it's a far cry, Your Honor, to say -- I've had a lot of cases

17    with expert reports where there's actually writing in the

18    report as opposed to, Here's my list of a few assumptions and

19    some methodology and, here's the chart.  This is the most bare

20    bones report I've ever seen, and I've seen it before from

21    Dr. Bancroft because I've had other cases with him dealing with

22    plaintiff's counsel.

23         So this is about as bare bones as you get.  It's not a

24    quote, unquote, report because there's not really a lot of meat

25    on the bones.  And so you take that and you couple that with

(227 of 993), Page 227 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 179 of 945
2:21-cv-00044-kjd   Document 329-3   Filed 04/25/25   Page 16 of 245

16

VOLUME: 6
PAGES: 1-221

1   the assumptions that are made on March 19th 2025 and on the

2   heels of trial, brand-new assumptions, I mean, they obviously

3   lower the economic value of the case.

4          THE COURT:  And, with respect to those assumptions,

5   I'm looking at the cover letter March 19th.  Assumption 1, no

6   DHMC salary increases for 2020 and 2021.  So that assumption

7   was put into this report based on Mr. Coffin's

8   cross-examination at the motion in limine, correct?

9          ATTORNEY SCHROEDER:  Correct, on March 14th.

10         THE COURT: So, Number 2, an additional UVM fridge

11  benefit of $7,698 for the son's UVM tuition, that was also in

12  response to Mr. Coffin's cross-examination at the motion in

13  limine, correct?

14         ATTORNEY SCHROEDER:  Correct.

15         THE COURT:  Okay.  The no loss of DHMC's medical

16  insurance contributions beyond April 2018, does that derive

17  from the evidentiary hearing?

18         ATTORNEY SCHROEDER:  I don't recall.  With such an

19  exquisite cross-examination from Mr. Coffin, I may have been

20  lost in that.  I'm not entirely sure, Your Honor.

21         THE COURT:  Okay.  Then I just want to understand

22  what the genesis is of the various changes in the report.

23         ATTORNEY SCHROEDER:  Yeah.

24         THE COURT:  So Dr. Porter's actual -- I'm sorry.

25  UVM's retirement contribution is equal to 9 percent of her

1    income.  So that is relatively similar to the assumption listed

2    in the August report, if not the same, right?  One was 8.5

3    percent.  The other was 9.

4          ATTORNEY SCHROEDER:  Yes, I think you're right.

5          THE COURT:  Okay.  So this change is not particularly

6    --

7          ATTORNEY SCHROEDER:  Meaningful.

8          THE COURT:  Right, okay.  Dr. Porter's actual 2024

9    UVM earned income, now, this was a topic explored at the motion

10    in limine hearing about, and I believe Dr. Bancroft essentially

11    was saying, Well, I don't have the W-2 yet.  He was

12    cross-examined on that.  Clearly, he, not clearly, but he must

13    have received a W-2 after that hearing and made this adjustment

14    to the report.  Do you have that information, the W-2?

15          ATTORNEY SCHROEDER:  We got it.  We got it after we

16    wrote to them that week right before trial.  And just on that

17    point, Your Honor --

18          THE COURT:  I just want to finish this list.  All

19    right.  So with that, though, what that amounts to is what

20    perhaps was initially a projection of lost income in 2024 Has

21    now been substantiated for the actual amount earned in that

22    year based on the W-2, right?

23          ATTORNEY SCHROEDER:  I would assume so, Your Honor.

24    The problem I have is that it should have been disclosed in

25    January of 2025 when everybody, I believe, that is a W-2

(229 of 993), Page 229 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 181 of 945
2:21-cv-00144-jjd Document 529-3 Filed 04/25/25 Page 181 of 245

18

VOLUME: 6
PAGES: 1-221

1    employee gets their W-2 delivered to their house or through

2    their employer.  It wasn't disclosed.  It wasn't disclosed.

3         THE COURT:  Okay.  And then 6, the assumption that

4    Dr. Porter will go to a 75 percent part-time position, as I

5    recall, there may have been some questions.  I'm not sure if it

6    got to this point, though, at the motion in limine hearing.

7         ATTORNEY SCHROEDER:  This is -- I don't know whether

8    it came up then or in his cross-examination on Friday, Your

9    Honor, but there is no question that that assumption standing

10   alone is brand new.  And, and there's been some testimony as

11   to, Well, I couldn't do this, I couldn't do that.  All those

12   things, whether that's true or not, are things that have

13   apparently or allegedly happened within the last six months.

14     I don't know when that happened.  But you can't say that a

15   deposition in October of 2019, you know, would suffice to be

16   able to say, Well, I've got to be a fortune teller and figure

17   out what it would look like.  That assumption is brand-new.

18        THE COURT:  Right.  Of course, that kind of an

19   assumption, I guess, could change over time based on the

20   plaintiff's kind of plans for her life, couldn't it?  So, if

21   you have -- I mean we're in a little bit of a tough spot here,

22   right?  Because I hear your point about how, at a deposition in

23   2019, how are you to kind of know what the report might be?

24   You wouldn't have known that the final report is going to come

25   out some six years later.

(230 of 993), Page 230 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 182 of 945
2:21-cv-00044-jjj Document 52-3 Filed 04/25/25 Page 182 of 245

19

VOLUME: 6
PAGES: 1-221

1         ATTORNEY SCHROEDER:  Understood.

2         THE COURT:  And, I guess, you know, on the one hand

3  -- obviously, you can see what I'm getting at here -- some of

4  these revised assumptions were because of issues raised at the

5  evidentiary hearing.  So what am I to do to not permit those

6  types of changes to be made in response to questioning,

7  legitimate questioning of the witness if I didn't -- or not

8  that I have anything to do with whether a revised report was

9  issued, but, once it was issued if somehow I were to say that

10  that's inappropriate, then wouldn't there kind of be a separate

11  issue then there too?  Mr. Coffin?

12        ATTORNEY COFFIN:  Not to come up in here, Your Honor,

13  but with the Court's permission, I'd just like to add.  The

14  Court views our eliciting of this information at

15  cross-examination as somehow something that should redound to

16  the benefit of the plaintiffs here.  On the contrary, this is

17  stuff, every single one of those they should have disclosed

18  earlier on, in my view.

19        ATTORNEY SCHROEDER:  And just, Your Honor, one last

20  point just to jump on -- no, you used word redound very well.

21  Thank you.  The issue we have is one assumption was made, one

22  assumption that he makes is based on a fact from May, June of

23  2023.  There is no question about that, that Dr. Porter assumed

24  a full-time, received a promotion to a full-time professor at

25  UVM.  We may have learned that fact by way of great

20

VOLUME: 6
PAGES: 1-221

1    cross-examination by my brother, Mr. Coffin.  However, that

2    fact should have been disclosed certainly before the August

3    2024 report, right?

4         In terms of this going to a .75, I don't believe there is

5    any testimony that that just happened magically in the last two

6    months, that she could only go, that Dr. Porter could only go

7    to .75 and not .6.  That is not what the testimony was, I

8    believe, in the record.  So that's another assumption that -- I

9    understand, things change over time, but they need to be timely

10   disclosed, Your Honor, and that was not timely disclosed.

11        And, in terms of the W-2, the only reason we knew that

12   there was -- well, we had asked for the W-2, and it should have

13   been disclosed when the W-2 was issued, and unless they do

14   things differently in Vermont, I'm pretty sure that most W-2s

15   get issued in January, and they should have been disclosed well

16   in advance of March 19th or, actually, after March, around

17   March 19th when we asked for the documents.  Where are the

18   documents?  We shouldn't have to ask for those documents.

19   Those should be disclosed on a timely fashion.  They weren't.

20   They came out of that March 14th hearing.

21        And, to Mr. Coffin's point, well, because we were able to

22   examine Dr. Bancroft and elicit that testimony, that shouldn't

23   inure to the plaintiff's benefit because they were late in

24   disclosing these things.  Leave it up to the Court's discretion

25   on how that's dealt with with Dr. Bancroft, but that's the

1    conundrum we're in.

2            THE COURT:  And, in practical effect, so before you

3    actually get a W-2 for that year -- this is kind of the point I

4    was making before or trying to make before.  Until you get the

5    actual income as established by that W-2, before that you're

6    working off of an income projection, right?

7            ATTORNEY SCHROEDER:  Yes, but here's the other issue,

8    though.  In 2023, right, there would be a W-2 for 2023 which

9    would, which would show a jump in salary assumption.  Now, you

10   wouldn't necessarily see that.  You'd have to, you know, the

11   baked-in figures.  And, by the way, there was no report until

12   August of 2024, and I don't believe -- so there's a disclosure

13   issue on the, on that issue because you're talking about two

14   years of data, the W-2 for 2023 and the W-2 for 2024.

15       You are making projections, but the problem is the

16   projections, I don't believe, are being, are taken into account

17   and certainly not disclosed in any way in the August 2024

18   report, and that would have related to a year earlier when she

19   was appointed to full professor.

20           THE COURT:  Right.  But, as to the more recent

21   information, my point is simply, what was projected income

22   becomes actual income now based on that W-2 --

23           ATTORNEY SCHROEDER:  Yes, Your Honor.

24           THE COURT:  -- in terms of prejudice to the defendant

25   on that point?

(233 of 993), Page 233 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 185 of 945
2:21-cv-00044-jkd Document 359 Filed 04/25/25 Page 185 of 245

22

VOLUME: 6
PAGES: 1-221

1          ATTORNEY SCHROEDER:  Correct, Your Honor, yes.

2          THE COURT:  Okay.

3          ATTORNEY JONES:  May I?

4          THE COURT:  Yes, Mr. Jones.

5          ATTORNEY JONES:  I'm not sure where to begin, but let

6    me start with this.  The kerfuffle on Friday was triggered by

7    questions about the pension.  Everything else that they

8    mentioned this morning was part of their renewed motion to

9    preclude Dr. Bancroft's testimony that they filed before trial.

10   You've already ruled on that, so I don't know why we are

11   relitigating all that stuff, okay?  That was already dealt

12   with, first of all.

13       Second of all, you're absolutely correct, Your Honor.

14   Nothing has changed about the fundamental assumptions.  Nothing

15   has changed about the methodology.  There has been no change.

16       Third, the October 2019 report did, in fact, have

17   information about the pension, which is why Attorney Joseph

18   inquired of it.  The columns that my colleague seems so

19   obsessed about under UVM having zero was because, at that time,

20   my client was a per diem, not eligible for that benefit.  But,

21   in the August report and the most recent report, we have that

22   data.  No one is hiding anything.  The only surprise, frankly,

23   is that this happened last Friday.

24          THE COURT:  Okay.  Did you want to speak to the point

25   about the full-time professorship and the part-time?

VOLUME: 6
PAGES: 1-221

```
 1          ATTORNEY JONES:  Well, that was part of the pretrial

 2     renewed motion that was an account then.  At the hearing on

 3     October, on March 14th, Dr. Bancroft actually even addressed

 4     that, at that time, he was using current pay stubs so that he

 5     already had the salary reflecting her promotion so he no longer

 6     had to add a 5 percent increase.  I think I even asked him the

 7     question, Because he was using actual pay stubs, it would be

 8     inappropriate to then add 5 more percent, and he said "yes".

 9          So that was part of the pretrial rulings on this issue

10     that have been heard and resolved already.  The only thing that

11     blew up on Friday was this pension issue, and that wasn't new.

12          ATTORNEY COFFIN:  I'd just say we have received no

13     pay stubs from 2025 or 2024, any reliance materials since prior

14     to the deposition, not for the 20, August 2024 report and

15     certainly not related to the basis for Dr. Bancroft's

16     testimony.  So, if he was basing them on those, we haven't been

17     provided that reliance material.

18          THE COURT:  Mr. Jones?

19          ATTORNEY JONES:  On what material?

20          ATTORNEY COFFIN:  You said that -- I think you just

21     said in court that Dr. Bancroft based his opinion about the

22     full professorship and her salary going forward on recent pay

23     stubs.  I have seen no pay stubs like that.

24          ATTORNEY JONES:  After that hearing you asked us for

25     the W-2s, which we promptly provided, and those are the full
```

 1    year's actual salary.

 2           ATTORNEY COFFIN:  I guess, my misunderstanding.  I

 3    thought pay stubs are different than W-2s.  W-2 is a report of

 4    your yearly earnings for the IRS, is my understanding, and pay

 5    stubs are the stubs you get with your pay.  I, I, we haven't

 6    received pay stubs.

 7        And, of course, I believe -- you know, we'd have to check

 8    the transcript, but I believe, in response to questioning by

 9    Mr. Vitt, Dr. Bancroft described reviewing pay stubs, W-2s, tax

10    return information.  That would surprise me because we have

11    received none of that in recent times and none, no pay stubs,

12    essentially, no pay stubs from earlier times.

13           ATTORNEY JONES:  After the hearing Mr. Coffin asked

14    us for some documents.  We gave him every document.

15           THE COURT:  When you say after the hearing --

16           ATTORNEY JONES:  After the March 4th motion in limine

17    hearing.

18           THE COURT:  Okay.  What did you provide, Mr. Jones?

19           ATTORNEY JONES:  I'm sorry.  After the March 14th

20    motion in limine hearing, Mr. Coffin sent us a list of

21    documents he wanted.  We gave it to him, and they're all

22    actually now on defendant's exhibit list.  So, I mean, not only

23    do they have it, it's on their exhibit list.

24           THE COURT:  Consisting of, what, though?  Are these

25    W-2s?

(236 of 993), Page 236 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 188 of 945
2:21-cv-00444-jljd Document 352-9 Filed 04/25/25 Page 188 of 245

25

VOLUME: 6
PAGES: 1-221

1          ATTORNEY JONES:  It's the W-2s.  It's the letter

2     memorializing Dr. Porter's promotion to her full professorship.

3     I forget what else.

4          ATTORNEY COFFIN:  There is nothing else.  Well, the

5     the letter request was more fulsome than that, but one thing --

6          THE COURT:  Mr. Jones.  Go ahead, Mr. Coffin.

7          ATTORNEY COFFIN:  The letter requested certain

8     things.  There was a follow-up letter sent on Monday or

9     Tuesday.  I did mention to them after the hearing on Friday

10    that we wanted the most recent pay information, including the

11    W-2s.  We were told that would be coming.  We did not

12    immediately receive it over the weekend, so we sent a letter.

13    I think the next day we got the contract between UVM and

14    Dr. Porter for her full professorship, and we got the most

15    recent 2024 W-2s.

16      I believe that was all.  Checking and verifying.  That's

17    all we got.  Our request for pay information was broader than

18    that.  But, in any event, it specifically requested the W-2s,

19    and we only got the W-2s and the pay contract.

20          THE COURT:  And that's for 2024 and 2023?

21          ATTORNEY COFFIN:  Yes.  From the time of her full

22    professorship, which was she was appointed, I believe, in May

23    2023, effective July 1, 2023.

24          THE COURT:  Okay.  Are you suggesting that the W-2s

25    are, or the pay stubs are required in addition to the W-2s and

(237 of 993), Page 237 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 189 of 945
2:21-cv-00044-jjd Document 3293 Filed 04/25/25 Page 26 of 245 26

VOLUME: 6
PAGES: 1-221

1    that you're somehow prejudiced without getting pay stubs as

2    opposed to W-2s?

3         ATTORNEY COFFIN:  I would suggest that a qualified

4    economist may need to look at those and that Dr. Bancroft

5    testified that he did, and plaintiff's counsel said that, on

6    direct examination, a question implying that he was provided

7    them to him and followed up by Mr. Jones making the same

8    implication here.  All I'm saying is we would have requested

9    those as materials that Dr. Bancroft relied on and had not been

10   provided to them.  They had not been provided to us.

11        THE COURT:  Okay.  Anything further?  Mr. Jones?

12        ATTORNEY JONES:  No, Your Honor.

13        THE COURT:  Okay.  I'm just going to take a very

14   brief five minutes.  I want to collect something, and I'll be

15   right back.

16    (A recess was taken from 8:43 a.m. to 9:01 a.m.)

17        THE COURT:  Okay.  So, just beginning with a couple

18   of the factual issues that were discussed this morning, with

19   respect to the pay stubs issue, so I do not think pay stubs

20   were brought up at the motion in limine hearing from a review

21   of the transcript.  Just kind of putting that out there.

22    With respect to pay stubs mentioned on Friday as part of

23   direct, so the transcript that I received, of course, of

24   Friday's hearing is incomplete.  It's just an excised portion

25   of that transcript.  But, based on that transcript, limited

1    though it is, there is no reference to pay stubs there.  I

2    don't have a recollection myself about the mention of pay

3    stubs.  Look, if it turns out that the full transcript says

4    otherwise, it is what it is.  But, at least in terms of what I

5    can recall sitting here today, I don't recall mention of that.

6         With respect to the discussion about the 2019 Dr. Bancroft

7    report, particularly the section that has zeros in it with

8    respect to UVM pension plans, after 2021 I believe that report

9    then has a series of zeros.  The assumption in that 2019

10   report, though, I believe, was that Dr. Porter would leave UVM

11   in July of 2021, which would appear to account for the fact

12   that that earlier report has zeros from the summer of 2021 and

13   beyond.

14        The August 2024 report, however, does again, as you know,

15   picks up the UVM benefits from 2021 on, to reflect what, in

16   fact, happened, which was that Dr. Porter did not leave UVM.

17   So that is an explanation for that particular observation made

18   earlier.  So it does seem to me then that defendants did have

19   pension information relevant to both Dartmouth-Hitchcock and

20   UVM prior to that deposition in 2019.

21        With respect to the full professorship, I believe the

22   suggestion was that Dr. Bancroft didn't know about the full

23   professorship and didn't include it in his August 2024 report

24   but that it was included in the March 2025 report in response

25   to questioning.  But, as I recall from the motion in limine

(239 of 993), Page 239 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 191 of 945
2:21-cv-00044-jjd   Document 529-3   Filed 04/25/25   Page 191 of 221
28

VOLUME: 6
PAGES: 1-221

 1    hearing, Dr. Bancroft had said he used the 2023 W-2 and

 2    information from UVM as to what salary Dr. Porter would earn as

 3    a result of the full professorship.  There was discussion of

 4    the letter that the University of Vermont sent detailing that,

 5    and, as I understand it, that is in the possession of counsel.

 6    And then the updated report in March of 2024 incorporates that

 7    W-2, but that does not mean that Dr. Bancroft did not have

 8    knowledge of that full professorship at the time that he

 9    rendered his report.

10         So, with respect to the decision now, I'm just going to

11    create a record here as to what brings us here.  So Plaintiff's

12    counsel, on Friday, began his direct examination of

13    Dr. Bancroft on Friday, March 28th.  When counsel began to ask

14    Dr. Bancroft questions about his assessment of damages as it

15    related to a retirement plan Dr. Porter participated in while

16    employed at Dartmouth Health, defendants objected.

17         The apparent basis for the objection at that time was

18    defendants' assertion that Dr. Bancroft's retirement plan

19    analysis was not included in the expert report, and that report

20    included his stated assumptions on the line report and the

21    chart representing the results of his analysis and that the

22    chart did not take into account the present value of the

23    benefit plaintiff would obtain by receipt of lifelong payments

24    from her Dartmouth Health pension plan.

25         The Court excused the jury and heard from the parties on

1    their respective positions.  Dr. Bancroft was also examined on

2    the issue, and the Court ultimately reserved judgment on the

3    issue and directed the parties to file written submissions over

4    the weekend, which the parties did.

5        In the case cited by defendants, *McLaughlin v. Langrock,*

6    *Sperry & Wool*, 2020 Westlaw 3118646, this court cited authority

7    for the proposition that, quote, "Although experts must

8    supplement their reports if incorrect or incomplete, they're

9    not free to continually bolster, strengthen, or improve their

10   reports by endlessly researching the issues they already opined

11   upon or to continually supplement their opinions.

12   Supplementation under Rule 26(e) is thus generally only

13   appropriate when the expert learns of information that was not

14   previously made known or available to him or her."

15       In this case, it appears that Dr. Bancroft's initial

16   expert report issued more than five years ago.  Plaintiff's

17   exhibit list for this trial includes a revised analysis dated

18   August 26th 2024, and the cover letter of the report suggests

19   that, in part, the reason for the revised analysis was to

20   account for new data acquired since the last report was issued

21   years earlier.  As I mentioned earlier, there were obviously

22   summary judgment proceedings in this court and then appealed to

23   the Second Circuit, which accounts for a period of years

24   between the report issued in 2019 and the revised analysis in

25   August of 2024.

VOLUME: 6
PAGES: 1-221

1        In a second case cited by defendants, *Chart v. Town of*
2    *Parma*, 2014 Westlaw 4923166 at Star 20, the court stated, "An
3    expert should be precluded from testifying about previously
4    undisclosed opinions, particularly where they expound a wholly
5    new and complex approach.  In contrast, expert testimony can
6    provide additional information or elaborate on previously
7    expressed opinions so long as the testimony is within the scope
8    of the expert's report."
9        *Chart v. Town of Parma* provides an illustration of the
10   type of subsequent opinion that warrants preclusion of the
11   expert's subsequent report.  There, in the context of a case
12   involving contaminated soil in a town park and complex
13   mathematical calculations of potential risk to human health,
14   the court precluded certain portions of the subsequent opinion
15   stating as follows:
16       "The human health risk assessment contained in the second
17   report is an untimely new opinion because it is supported by
18   different calculations and assumptions."
19       In this case, the evidence does not amount to a previously
20   undisclosed opinion that expounds a wholly new and complex
21   approach.  Rather, the testimony objected to on Friday is an
22   elaboration on a previously expressed opinion, and the
23   testimony was within the scope of the expert's report.
24   Dr. Bancroft was deposed on October, in October of 2019.  At
25   the deposition defendant's counsel, Jessica Joseph, asked

1    Dr. Bancroft what documents he had reviewed to reach his

2    damages opinion.

3         He responded that he had reviewed a benefits statement

4    from Dartmouth-Hitchcock dealing with pensions and a letter

5    from Dartmouth-Hitchcock to Dr. Porter regarding her pension

6    benefits at the time of her termination.  And that's at

7    Document 257-1 at 3, using the ECF page numbers.

8         Also, at deposition Dr. Bancroft explained to counsel the

9    analytical process he followed, explicitly stating that it

10   included accounting for gross earnings at Dartmouth-Hitchcock,

11   which was salary plus fringe benefits, and offsetting that

12   amount by the value of total benefits received

13   post-termination, again, including salary and fringe benefits.

14   Dr. Bancroft confirmed that he has used this approach for

15   estimating loss for some 20 or 25 years and that the approach

16   was generally accepted by economists.

17        Defendant's counsel also inquired about the basis for

18   assuming that Dartmouth-Hitchcock would contribute 12 percent

19   to retirement.  Counsel also inquired about the basis for the

20   assumption in the report that UVM's contribution to

21   Dr. Porter's retirement plan would be 9 percent.  That is at

22   Document 257-1 at 19.

23        The August 2024 report assumes Dartmouth-Hitchcock Medical

24   Center's retirement plan contributions to be 12 percent of

25   earned income.  It also assumes UVM's contribution to a

1  retirement plan to equal 8.5 percent of income.  The report

2  also assumes, quote, "the difference between DHMC and

3  post-termination projections of total earnings".  That is

4  Assumption 7.

5      The March 19th 2025 updated analysis similarly assumes a

6  12 percent Dartmouth-Hitchcock Medical Center contribution and

7  a slightly higher UVM contribution at 9 percent.  The report

8  again assumes, quote, "the difference between DHMC and UVMMC

9  post-termination projections of total earnings".

10      In terms of changes to the most recent report, as

11  discussed with counsel this morning, these appear to be either

12  in response to issues counsel explored with Dr. Bancroft at the

13  motion in limine evidentiary hearing on March 14th, for

14  example, no salary increases from 2020 to 2021, tuition

15  remission at UVM in 2019, and actual earned income in 2024.

16  More additional information reflecting Dr. Porter's actual 2024

17  income and adjusted assumed settlement date to account for the

18  timing of this trial and the current interest rate.

19      Importantly, Dr. Bancroft confirmed that his methodology

20  had not changed across all his reports, and that is at 257-2 at

21  5, that the exercise is to determine total earnings at DHMC and

22  offset it by total earnings post-termination.  And Dr. Bancroft

23  was also questioned about fringe benefits at DHMC and UVM.  The

24  August 2024 report and March 2025 reports reflect this

25  particular aspect of the analysis, which appears to have been

(244 of 993), Page 244 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 196 of 945
2:21-cv-00444-jkjd Document 5293 Filed 04/25/25 Page 196 of 245
VOLUME: 6
PAGES: 1-221

33

1    consistent over time.

2         So, having addressed some of the factual issues at the

3    outset and explaining why I think this does not fit within the

4    scope of the cited case law, I am not going to preclude

5    Dr. Bancroft from testifying further this morning or otherwise

6    impose any other sanction related to his testimony.  So I'm

7    going to ask that the jury be brought in.

8              ATTORNEY VITT:  I have a scheduling issue, Your

9    Honor, and I hesitate, and I do mean hesitate, to raise this

10   issue, but I think it's best that I get it out on the table

11   now.  Dr. Bancroft is here.  We are prepared to put him on and

12   proceed with his direct and, what I expect and have been told,

13   maybe a lengthy cross-examination.  In addition, Dr. Leslie

14   DeMars is here, at least I think so.  I saw somebody out in the

15   lobby that I think was Leslie DeMars.

16        And the reason I'm up here now is I've been told that she

17   has a need to absolutely finish her testimony today, got to be

18   done.  She has to leave.  She has an appointment or something.

19   I don't know what it is.  But, anyway, the representation is

20   she has to finish her testimony today, and, in light of that

21   and the amount of time that I think it's going to take with

22   Leslie DeMars -- this is not going to be a short exam.  There

23   are multiple exhibits.  Her testimony, you know, her name comes

24   up repeatedly.

25        And we'd suggest that, all right, Dr. Bancroft lives

1    locally.  He's made a number of trips here, and, if necessary,

2    we can do him, you know, after Leslie DeMars, but I gather that

3    that's not possible, and I just don't want to be in a situation

4    where it gets to the end of the day, we're not finished, and

5    our position is, until she's excused, she needs to be back

6    here.  So I'm raising this issue now.  Again, I hesitated to do

7    it, but I thought, Let's get this issue on the table before we

8    start the testimony.

9         THE COURT:  Okay.  Mr. Schroeder?

10        ATTORNEY SCHROEDER:  Your Honor, it's our position

11   that Dr. Bancroft's on the stand, right?  He's under

12   examination right now, and we believe that we should proceed

13   with that.  They sent the subpoena for Leslie DeMars -- they

14   didn't even tell us about it, even though it's my client -- on

15   December 19th, right?  Purposeful, obviously, even though her

16   testimony wasn't going to be until today.  It doesn't say

17   "March 31 and continuing thereafter", which I have had

18   subpoenas say.

19        She's here today.  She has another job, an important job.

20   She had to take a vacation day to be here.  She also has travel

21   at the end of the week going into next week into Massachusetts

22   to where the company is located.  She shouldn't have to take

23   two vacation days to be here because of a timing issue by

24   plaintiff's counsel in how they put witnesses on.  They had a

25   list of 25.  They went down miraculously to a much smaller

1    list.

2         They've always had her.  They decided they wanted to call

3    her in their case in chief, which they have the  right to do,

4    but they've got to do it today.  That's our submission.  We'll

5    obviously defer to the Court's discretion and ruling, and but,

6    you know, on the one hand, they want to have their cake and eat

7    it too.  I mean, not really on the one hand.  On both hands,

8    right, they want to have their cake and eat it too because they

9    want to call her in their case in chief.

10         We have said from day one, Your Honor, that we would call

11   her in our case in chief if they wanted to wait because then

12   they could cross-examine her as long as they wanted, but they

13   can't have it both ways, Your Honor, and they've been

14   manipulating the schedule up through now, and we are doing our

15   level best to -- and we actually told them last week a number

16   of witnesses that we had taken off of our list so that they

17   could go act accordingly and not have to worry about prepping

18   for those witnesses because we were trying to streamline our

19   case.  We told them that last week.

20         THE COURT:  All right, okay.  Well, Friday we

21   obviously ended early and unexpectedly, right?  Dr. Bancroft

22   was supposed to be finished on Friday.  This issue was raised.

23   I think the jury left around 2:00 o'clock, before 2:00 o'clock.

24         ATTORNEY SCHROEDER:  3:00 o'clock, Your Honor.

25         THE COURT:  3:00 o'clock, it was that late?  Okay.

1    And, as a result of that, that obviously set us back a bit on

2    the timing of getting Dr. Bancroft done.

3        So I certainly hear what you're saying, but we're also

4    kind of in a little bit of a situation here where there's very

5    little choice, given that we didn't get through everything that

6    we were going to get through on Friday.  So let's start with

7    Dr. Bancroft, see what kind of progress we can make, and

8    hopefully get Dr. DeMars on the stand as quickly as possible.

9            ATTORNEY SCHROEDER:  She's here, Your Honor.

10           THE COURT:  She is here now?

11           ATTORNEY SCHROEDER:  She is.

12           THE COURT:  Okay.  So is there any -- I don't know if

13   you spoke to this already, Mr. Vitt.  Is there any suggestion

14   that -- we already have Dr. Bancroft on the stand, so I guess

15   we can't adjust that.  So, all right, go ahead with

16   Dr. Bancroft.

17           ATTORNEY VITT:  Excuse me, Your Honor, a second.

18           THE COURT:  So I just want to let the parties know

19   the deputy clerk has advised me that one of our jurors has a

20   family member in the hospital, and the juror, at this time, is

21   fine to be here, but I just wanted to put that on the people's

22   radar screens in case those circumstances change.  Just wanted

23   to mention that to you.  We're going to go forward at this

24   time.

25           ATTORNEY VITT:  All right.  And is Your Honor leaving

(248 of 993), Page 248 of 993   Case: 25-1382   12/22/2025, DktEntry: 35.4, Page 200 of 945
2:17-cv-00194-jjd   Document 329   Filed 04/25/25   Page 200 of 245                    37

VOLUME: 6
PAGES: 1-221

1    for another moment the issue of whether Dr., if we do not

2    finish Dr. DeMars, whether she comes back tomorrow?  That issue

3    is kind of on the table but not being resolved now?

4              THE COURT:  Perhaps it's one that won't need to be

5    resolved depending on how things go.

6              ATTORNEY VITT:  There's always hope.

7              THE COURT:  I think we'll put Dr. Bancroft on the

8    stand and then bring the jury in.

9              (The Jury enters the courtroom.)

10             COURTROOM DEPUTY:  Your Honor, the matter before the

11   Court is Case Number 17-cv-194, Misty Blanchette Porter versus

12   Dartmouth-Hitchcock Medical Center.  Present on behalf of the

13   plaintiffs or plaintiff is Attorneys Geoffrey Vitt, Eric Jones,

14   and Sarah Nunan.  Present on behalf of the defendants are

15   Attorneys Tristram Coffin, Morgan McDonald, and Donald

16   Schroeder.  We are here for day six of a jury trial.

17             THE COURT:  Okay.  Good morning, everyone.  Over the

18   weekend, have you spoken to anyone about the case or otherwise

19   heard about this case since Friday?  Okay.  Seeing no hands

20   raised.

21        Dr. Bancroft is back on the stand.  As I mentioned to you

22   on Friday, sometimes it's necessary for the Court to speak with

23   the lawyers.  That has happened, and we are ready to proceed.

24   So thank you for your patience.  Mr. Vitt.  We can swear in

25   Dr. Bancroft again.

(249 of 993), Page 249 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 201 of 945
2:21-cv-00144-jkj DocumentCourt3293 Filed 01/25/23 Page 20 of 291245

38

VOLUME: 6
PAGES: 1-221

 1                    Robert L. Bancroft,

 2            having been duly sworn to tell the truth,

 3                  testifies as follows:

 4            DIRECT EXAMINATION BY ATTORNEY VITT

 5    Q.   Good morning, Dr. Bancroft.

 6    A.   Good morning.

 7            ATTORNEY VITT:  Your Honor, when Dr. Bancroft was on

 8    the stand before, I think we had Plaintiff's Exhibit 1B on the

 9    screen.  If that could come back up, I'd appreciate it.

10            THE COURT:  Okay.

11            ATTORNEY VITT:  Actually, I've got a paper copy.

12            ATTORNEY JONES:  I'm sorry.  We're going to have to

13    use the projector.

14    BY ATTORNEY VITT:

15    Q.   Just to recap where we were when we had the little break,

16    the analysis that you did reflects lost earnings for what

17    years?

18    A.   From 2017, actually, from June 3rd of 2017 through 2033.

19    Q.   2033?

20    A.   Yes.

21    Q.   And, at that point, Dr. Porter would be 70 years old?

22    A.   Yes, that's correct.

23    Q.   All right.  And you're not projecting or predicting that

24    she would work up until she's 70, right?

25    A.   No, I'm not.  I'm leaving that to the jury to decide

(250 of 993), Page 250 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 202 of 945
2:21-cv-00444-jjd Document 329 Filed 04/25/25 Page 202 of 945

39

VOLUME: 6
PAGES: 1-221

1   what's a reasonable expectation on how long she's going to

2   work.

3   Q.   And could you briefly recap how you proceeded with your

4   analysis and reached your conclusions?

5   A.   Sure.  Just a quick overview, what I'm doing is projecting

6   out what her earnings, what I believe her earnings would be if

7   she continued to work at Dartmouth.  That's being offset by her

8   actual earnings to date or through 2024, and then I'm

9   projecting what her earnings could be in the future, and that's

10  based on her continuing employment at UVM.  And then I make

11  some other calculations, back out taxes, determine present

12  value, and have to look at settlement taxes that would be

13  assessed on a settlement.

14  Q.   Okay.  What assumption -- I'm going to back up.  Excuse

15  me.  Did you make assumptions about the raises that Dr. Porter

16  would receive at UVM?

17  A.   Yes.  In developing my projections of her earnings, which

18  is -- and I'm going to refer to the footnotes as the column

19  numbers, but in Column 1 under the Dartmouth-Hitchcock Medical

20  Center gross earned income, there are assumptions about how her

21  income would have grown over time.  It's predicated for the

22  most part with prior to 2017 is predicated on what her salary

23  was in 2017.

24  Q.   Right.

25  A.   Most of the years have a 2.5 percent salary inflator.

(251 of 993), Page 251 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 203 of 945
2:21-cv-00044-jjd   Document 529   Filed 04/25/23   Page 40 of 221
40

VOLUME: 6
PAGES: 1-221

1    There are two exceptions, well, three exceptions to that, if

2    you will.

3    Q.   Okay.

4    A.   One is in 2019.  Instead of 2.5, I assumed that the

5    increase would be 5 percent based on Dr. Porter's

6    representation that she would have been promoted to a full

7    professor.

8    Q.   And, in fact, she was promoted to full professor, correct?

9    I'm sorry.  This was for 2019?

10   A.   This is 2019.

11   Q.   I'm sorry.  At Dartmouth, okay.

12   A.   Yes.  And then the other two exceptions are in the year

13   2000 and 2021.  Based on representation from defense counsel

14   that there were no wage increases during those two years, I

15   eliminated the 2.5 percent figure.  And then that, starting in

16   2022, I used the 2.5 percent wage salary inflator.

17   Q.   Did you make an assumption about whether there would be a

18   raise to try and make up for the Covid years?

19   A.   No, I didn't.  I, again, I went back and used the 2.5.

20   Q.   Okay.  So, using the report, can you explain your analysis

21   by year and what you're attempting to do?

22   A.   Sure.  So, as I just discussed, the first three columns

23   are under the Dartmouth-Hitchcock Medical Center, and what I'm

24   estimating there is what I believe the value which she would

25   have earned and the value of fringe benefits if she continued

(252 of 993), Page 252 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 204 of 945
2:21-cv-00044-jjd Document 329 Filed 04/25/25 Page 204 of 245

41

VOLUME: 6
PAGES: 1-221

1    to work at Dartmouth.

2       The first column, the gross earned income, I think I

3    pretty much went over, but it's, for all intents and purposes,

4    it's based on her salary in 2017 at the time she was terminated

5    and a 2.5 percent inflator for most years with, with three

6    exceptions.  the 5 percent in 2019, when I, based on her

7    representations, she would have been promoted to a full

8    professor, and then no increases for 2000 and 2021.

9       2017 was a little different because she was, obviously,

10    she worked part of the year, but she was on disability, and the

11    expectation is that she wasn't going to go back full time until

12    the fall.  And so that's, those numbers are relatively small,

13    and, actually, there's minimal loss in the year 2017.

14    Q.   And the disability income that she received, is that

15    reflected in your chart?

16    A.   Yes.

17    Q.   You also project fringe benefits do you not, Column 2?

18    A.   Yes.

19    Q.   How did you do that?

20    A.   So the Column 2, for all intents, for most every single --

21    in every single year I have assumed, estimated the value of

22    Dartmouth's contribution to her retirement plan for the years

23    2018 going forward, very simple.  In 2018 they made everybody

24    go onto a defined contribution plan, and Dr. Porter, if she was

25    there, would have received a, 12 percent of her salary would

1    have been put into a 403(b).

2        In 2017, if she continued to work for that additional

3    seven months, she would have been under their prior defined

4    benefit program.  And so in that year I had to estimate what,

5    how much her, her pension would go up if she had worked that

6    additional seven months, and it turned out it was around -- I

7    think it was about $3,000 or $4,000 a year.  And then I had to

8    do some calculations, how much money would Dartmouth need to

9    have put into the defined benefit program that would fund that

10   additional three, the additional $3,000 when she retired, and

11   that turned out to be about 12.4 percent.  But I just, I used

12   12 percent to be, to be consistent with the other years.

13   Q.   You mentioned two types of plans, a defined benefit versus

14   defined contribution.  Can you describe briefly what the

15   differences are?

16   A.   Sure.  The defined benefit program, there's not many of

17   those around.  State employees of the  State of Vermont have a

18   defined benefit.  Teachers have a defined benefit.  And that's,

19   there's a formula for it.  In Dartmouth's case, you have to

20   take the average of your high five years of earnings, and then

21   there is a formula that you break the earnings down between

22   some covered and some -- I forget what the term they use for

23   it.

24       Basically, the first 10 percent, roughly 10 percent is,

25   there's a factor of 1.75 percent.  It's multiplied by that

1    number, and then for the 90 percent the factor is 2.3 percent,

2    and both, both calculations also have the number of years that

3    the employee has served.  In Dr. Porter's case, she had served

4    20.69 years.  So you go through that calculation.  There's

5    basically two calculations, one for the 1.75 percent and the

6    other one for the the 2.3 percent.

7    Q.   Will Dr. Porter still receive a retirement payment, will

8    be eligible to receive a retirement payment from

9    Dartmouth-Hitchcock when she turns 65?

10   A.   Yes, she would be.  She, that's locked in.  The defined

11   benefit plan locks that number in.  And so whether, even if she

12   had continued working on, she would have received what she,

13   what she was entitled to up through June 3rd of 2017, and then

14   she would have got a little bit more if she continued to work a

15   little bit more under that defined benefit plan until the end

16   of 2017.  And then in 2018 Dartmouth moved all, everybody into

17   a defined contribution plan, and she would get 12 percent.

18   Q.   If she had remained an employee at Dartmouth-Hitchcock,

19   would the retirement payments that she would be entitled to

20   receive be higher?

21   A.   Oh, absolutely.

22   Q.   And you've taken that into account when you're analyzing

23   the fringe benefit component on your chart, right?

24   A.   Yes.  I'm measuring the additional benefit that she has.

25   She has, still has a benefit that she's going to receive when

1    she retires or decides to draw on that retirement.  I'm only

2    interested in how that would have increased, what was the value

3    of the increases over time.  So I'm looking at the marginal or

4    the additional value of that benefit.

5        I should also point out that in the fringe benefits in the

6    year 2017 and 2018, I do have Dartmouth's, some measure of

7    Dartmouth's contribution to a health insurance.  For the first

8    seven, for the last seven months of 2017, She had no health

9    insurance, and then for the first four months of 2018, she had

10   no health insurance.  So I put in the value of Dartmouth's

11   health insurance.  Going forward, I eliminated it because she

12   was getting coverage at UVM and so it was a wash.

13   Q.   Is it your understanding that, while she was a per diem

14   employee before she was a full-time employee, UVM did not

15   provide her with health insurance?

16   A.   That's correct.

17   Q.   And that, after she became a full-time employee, did you

18   understand that health insurance was part of the package?

19   A.   That's right, yes.

20   Q.   So, going back to your chart --

21   A.   Okay.  So the third column there, it's a mathematical

22   calculation.  It's adding the numbers from Column 1 and Column

23   2.  So that's my estimate of what the total value of her

24   earnings would be if she continued to work at Dartmouth.

25   Q.   You've done that for each year?

VOLUME: 6
PAGES: 1-221

1    A.   Added it up for each year, yes, correct.  And then the
2    next three columns over are my, are the post-termination.  I
3    title them post-termination projections UVM although for '17
4    through 2024 I'm using her actual earnings.  So my notes start
5    projecting until the year 2025, and the projections on 2025 are
6    based on what she earned in 2024 and Dr. Porter's
7    representation that she would go to a 75 percent part-time
8    position where she's currently at an 8 percent.
9         So in 2025 I've got, I have a 3 percent wage inflator that
10   I'm assuming in the UVM projections.
11   Q.   Do you believe that's reasonable?
12   A.   Yes, and I, the reason that I had 3 percent, half a
13   percent higher than I had in the Dartmouth one was, when I
14   initially did this analysis in 2018 and then I did do an update
15   early in 2019, she'd just started at UVM it's been me
16   experience that new employees, at least initially for one, two
17   years get slightly above average wage increases, assuming they
18   prove themselves.  So I used the 3 percent and to, I just
19   continued on using it, although, you know, probably to be
20   consistent I really probably should have used 2.5 percent
21   starting in 2005, but I didn't.
22   Q.   But you using 3 percent instead of 2.5 reduces the loss of
23   Dr. Porter, right?
24   A.   Yeah, because it increases her earnings at UVM.  So, in
25   determining the 2025 earnings at UVM I had, there was two

(257 of 993), Page 257 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 209 of 945
2:21-cv-00044-jjd Document 529 Filed 04/25/25 Page 46 of 221

VOLUME: 6
PAGES: 1-221

46

 1    operations.  In July 1, because the raise, UVM is on a fiscal

 2    year, July 1 to June 30th.  So I assumed that she would get a 3

 3    percent increase on June 1 of 2025, but, at that point, she

 4    would go from an 80 percent part-time employment to a 75

 5    percent, which that's really about a 6 percent reduction, and

 6    so I reduced it by 6 percent.  And then, going forward from

 7    that, I used that number as a basis for a forecasting forward

 8    with a 3 percent annual salary inflator that goes into effect

 9    every July 1.

10    Q.   I want to make sure I've got this right.  So, going

11    forward, the assumption is that Dr. Porter would work at a .75,

12    75 percent of a full-time position, right?

13    A.   Yes, starting in July 1 of this year.

14    Q.   Right.

15    A.   And so the next -- so that's how I developed the gross

16    earned income under the post-termination projections.  The next

17    column over, it's fringe benefits, and for the only fringe

18    benefit I've included in here in this analysis is UVM's

19    contribution to a retirement plan, which is 9 percent.  And

20    then the next column over would be 6.  It is nothing more than

21    the addition of prior two columns, the gross earned income and

22    the fringe benefits, and so that's added up each one of the

23    years out through 2033.

24    Q.   So that's Column 6, right, on your report?

25    A.   Yes.

1    Q.   All right.  And what does Column 7 reflect?

2    A.   Column 7 is another simple mathematical calculation, and

3    what it does is it takes the numbers from Column 3, the total

4    earnings for Dartmouth-Hitchcock, and then I subtract out the

5    total earnings under the post-termination projections.  So it's

6    a, it's a, I subtract Column 6 from Column 3 to come up with

7    what I'm titling as the gross, and that's a key word, the gross

8    adjusted lost earnings.

9    Q.   And then, going to the next column, which is --

10   A.   Yes.  The next column is I back out income taxes.  And so

11   the premise here is that, if Dr. Porter had earned this

12   additional money at Dartmouth, she'd earned more at Dartmouth

13   than she would have at UVM, which she did for all the years

14   except for one, she would have to pay taxes on that money.

15   Q.   Right.

16   A.   So I estimated what would be a tax liability of earning

17   this additional money, and, and that calculation is based on

18   looking at the difference between Column 1 and Column 3.

19   Fringe benefits aren't taxable.  You will notice that in one

20   year, the year 2021, it's not a negative number.  It's a

21   positive number, because in that year, in 2021, she actually

22   earned more at UVM than she did at, or would have, my

23   projections of what she would have earned at Dartmouth.  And

24   that's primarily because of no wage increases for 2000 and

25   2021.

1          So that's actually a credit that her, her taxes would have

2     been $1,600 less.  So it's a, I'm crediting her with that, if

3     you will.  It offsets the other taxes that she would have had

4     to pay.  So that's how I estimated Column 8 was estimating what

5     she, what she would have to pay in taxes, and in doing that I

6     look at what the income that I looked at, you know, prior tax

7     returns, and I look at what income she earned.  Well, I know

8     what I'm projecting what her income, but then her husband's

9     income and what their taxes would be based on that, and then I

10    recalculate with the additional loss and see how much the taxes

11    would go up, and that's what Column 8 is measuring is the

12    additional taxes.

13    Q.   Then what does Column 9 reflect?

14    A.   That's a simple mathematical calculation there.  It's

15    subtracting the income taxes from the gross adjusted lost

16    earnings.  So it's a, I'm titling it tax adjusted lost

17    earnings.

18    Q.   Right.  This column reflects the income assuming that

19    Dr. Porter pays the income taxes owed on the additional amount,

20    right?

21    A.   Yes.  In each year if she earned higher income, she would

22    have to pay taxes on it, and so I'm backing those taxes out.

23    If you will, the numbers in Column 9 are what I believe she

24    should be made whole if she received those numbers depending on

25    which year you pick or, well, in each one of the years, and

(260 of 993), Page 260 of 993 Case: 25-1382 12/22/2025 DktEntry: 35.4 Page 212 of 945
2:21-cv-00444-jkj Document 5293 Filed 04/25/25 Page 212 of 245

49

VOLUME: 6
PAGES: 1-221

1    there were no tax consequences of receiving a settlement.

2    Q.    Sorry.  So, if we could go to Column 10 which is entitled

3    "Present Value" --

4    A.    Yes.

5    Q.    -- what is that?

6    A.    So what I'm doing there is I'm converting those numbers to

7    how much would be needed now to -- I'm not sure how to explain

8    this -- what the present value is, and there's two components

9    to that.  One is the historical.  So that's from 2017 up

10   through 2024 Is historical.  And the law in Vermont passed by

11   the legislature is that interest on past losses are to be

12   calculated at the rate of 1 percent per month simple interest.

13   So --

14           ATTORNEY COFFIN:  Objection, Your Honor.  We have to

15   approach for a second, please.

16           THE COURT:  Yes.

17           (Bench conference begins.)

18           ATTORNEY COFFIN:  I don't mean to slow things down,

19   but I think we need to clearly cross this bridge or figure out

20   what we're going to do.  First of all, Dr. Bancroft shouldn't

21   be providing legal opinions about what the law in Vermont is,

22   and we ask that to be struck.

23       Secondly, the 12 percent interest statute that's, you

24   know, supported by case law only applies to a sum certain.  I

25   would renew strenuously or our continued objection that, you

1    know, we do not have a sum certain that can be applied here,

2    and it really is the for the jury to determine based on

3    examination of the Witness what the proper interest rate to be

4    applied, if any, is and if anything that changed from the

5    August '24 report coupled to the change to the report last week

6    demonstrates that there is, you know, no way one could have

7    come up with a sum certain in this case.

8            THE COURT:  Okay.  So, if we strike his answer with

9    respect to his representation as to the law that Vermont

10   requires and then his testimony just talks about what interest

11   rate he applied, does that satisfy your concern?

12           ATTORNEY COFFIN:  Yeah, that's fine, as long as the

13   way he answers it does not indicate there's some sort of rule

14   or authority for that but that he, in his expertise, applied 12

15   percent.

16           ATTORNEY VITT:  That's fine.  As Your Honor, I'm

17   sure, appreciates, we disagree, and I'm sure we'll brief this

18   at the appropriate point saying it's 12 percent in this

19   situation, period, but, for purposes of the testimony, saying,

20   you know, the Court will instruct the jury on the law or

21   however you want to do it is fine.  And then, obviously, the 12

22   percent is included.  So he's done that calculation.  So I just

23   want to make clear that that's, he's included that calculation

24   in the information that appears on the report.

25           ATTORNEY COFFIN:  Very good.  And I would just ask

 1    the ability, as described by the case law, to be able to

 2    cross-examine him on that point.

 3              THE COURT:  Yes.  So what I'll indicate then is that

 4    I'm striking the last answer to the extent that it makes a

 5    representation about what Vermont law requires.  Is that --

 6              ATTORNEY VITT:  Fine with me.

 7              ATTORNEY COFFIN:  Yes.  And then, you know, I will,

 8    and I'm sure I can take care of it.  That's good.  Thank you.

 9              THE COURT:  Okay.  Thank you.  We're good.

10              (Bench conference ends.)

11              THE COURT:  Okay.  So, before we proceed, I am going

12    to strike the Witness's last answer to the extent that it made

13    a representation about what Vermont law requires with respect

14    to interest rate, okay?  Mr. Vitt.

15    BY ATTORNEY VITT:

16    Q.   Dr. Bancroft, without getting into what the law is, what

17    you did was you used 12 percent as the calculation for each of

18    these, for each year in the calculation, right?

19    A.   Yes.  So 1 percent per month.

20    Q.   Per month?  Okay, got it.  And was there any other part of

21    the answer that you --

22    A.   No.

23    Q.   -- didn't get to in terms of calculating the present

24    value?

25    A.   Present value?  Yes.  Going forward, what I want to do is

VOLUME: 6
PAGES: 1-221

1    convert those numbers.  Just the opposite of adding interest, I

2    want to convert them back to a present value, and, basically,

3    what I'm calculating there in each one of those years is how

4    much money would be needed right now to generate that, that

5    figure in that future year.

6         So I'm looking at, for instance, in order for -- let's

7    take the year 2033 because it's at the bottom of the page and I

8    can read it.  In 2033 I'm estimating that the after-tax loss is

9    $51,744.  I'm, after calculating the present value of that, the

10   number is $41,329, and what that's saying is that, if you take

11   $41,329 and you invested it into a tax-free municipal bond

12   paying around 2.8 percent, that would generate, in the year

13   2033, $51,744.

14   Q.   Is this process or approach that you've just described

15   standard for economists who are trying to evaluate future

16   losses?

17   A.   Yes, it is.

18   Q.   And then you've got, I believe the next column is

19   settlement income tax, correct?

20   A.   Well, the next, actually, the next column is the

21   cumulative present value --

22   Q.   I'm sorry.

23   A.   -- which is nothing more than a running total, just taking

24   the numbers from Column 10 and adding them up over time.  And I

25   should point out that I think it's important to understand

1  that, if this was a personal injury case, in a personal injury

2  case, the award is not taxable.  That would be -- the table

3  would end there.  There wouldn't be -- the next two columns

4  would be, would not be necessary because the awards are not

5  taxable.  But in an employment case, the awards are --

6          ATTORNEY COFFIN:  Objection, Your Honor.  Approach?

7  I think it's a legal issue.

8          THE COURT:  Yes.

9              (Bench conference begins.)

10          THE COURT:  Similar objection?

11          ATTORNEY COFFIN:  Yeah, similar.  I just don't think

12  he should be providing, you know, legal opinion.  You can, you

13  can ask and he can answer the question based on sort of an

14  understanding that such-and-such.

15          THE COURT:  Right.  You can just ask him generally

16  about the fact that the settlement income tax figure -- so,

17  obviously, he should not be testifying as to the difference

18  legally between a personal jury case and an employment case,

19  but he can testify generally to the fact that he did do a

20  settlement income tax calculation.

21          ATTORNEY VITT:  All right.

22          ATTORNEY SCHROEDER:  I still feel like he's doing the

23  direct and the cross.  I'm not quite sure what the question

24  was.  I mean, we're trying to move this along.  Not really

25  getting there with the long-winded answer that has nothing to

VOLUME: 6
PAGES: 1-221

1    do with the question when he starts going off on personal

2    injury.

3            THE COURT:  So he's not going to be talking about

4    personal injury.

5            ATTORNEY VITT:  All right.  That's fine.

6                (Bench conference ends.)

7            THE COURT:  Yes, proceed.

8    BY ATTORNEY VITT:

9    Q.   So the settlement income tax, I've got a quick question.

10   Can you explain the difference in taxes calculation when

11   they're paid each year versus in a lump sum?

12   A.   Sure.  Obviously, in calculating the taxes in Column 8,

13   I'm looking at one year, the loss in one year where, if you

14   move over to Column 11 where I have a cumulative total, I'm

15   looking at lumping several years together.

16   Q.   Right.

17   A.   And so it's critical to understand that in column the

18   present values in Column 10 are after-tax dollars because I've

19   already backed taxes out.  So now, because it's taxable, I need

20   to calculate the taxes, and, because I'm getting so much more,

21   my taxes are going to be significantly higher.

22           I'll give you an example.  If an individual has lost, has

23   lost, somebody caused somebody to lose $50,000 a year for the

24   next ten years, the taxes on, for a single person, just federal

25   taxes -- lower for state taxes -- the taxes for that individual

1    would be about $4,000.  The federal tax would be about $4,000.

2    Q.    That's per year?

3    A.    That's per year.

4    Q.    All right.

5    A.    So over the ten years they would pay about $40,000.  Now,

6    if they were to receive that $50,000 for all ten years at once,

7    that's $500,000 all at once.  When they report that on their

8    income tax, they're going to be kicked up into the -- some of

9    them actually might be in the highest tax bracket, and in that

10   case, assuming they earned no other income that they were -- so

11   that, the tax on that would be, I think, about $125,000, three

12   times higher than it would be if it was spread out over time.

13        And the higher the income is, the greater that difference

14   becomes.  So that's what I, in calculating the settlement

15   income tax, I've had to estimate, determine what kind of taxes

16   Dr. Porter would have to pay if she was to receive a

17   settlement.  And so Column 13 is the addition of the cumulative

18   values in 1 and the settlement taxes.  So let me go through an

19   example in case there's some confusion.

20   Q.    Go ahead.

21   A.    So, in the year 2033 I'm estimating that the total

22   economic loss is $1,787,722.

23   Q.    That's if she works up to when she's 70?

24   A.    Yes.  I'm not saying that she would, but I'm just using it

25   as an example.  So, if she was to be awarded that amount when

1    she filled out her income taxes in 2005, she would put that

2    down along with her other income, her income this year at UVM

3    and any investment income, plus her husband's in income.

4        I took that into account.  I made an estimate of what

5    their income would be, what kind of taxes they would pay on

6    this income.  And so what I'm now estimating is that, if she

7    was to get this award of $1,787,000 on top of her other income,

8    she would have to pay $878,000 in income taxes on that, that

9    over and above the income taxes she'd pay on her salary and her

10   husband's business income.  And so, if you subtract the

11   $878,000 from the $1,787,722, you get cumulative present value

12   in that column for 2033 of $909,722.  And so it's my contention

13   that then she would be made whole.

14   Q.   I want to make sure that the point you covered when we

15   were talking about the income taxes and the tax adjusted lost

16   earnings that's Column 9, right?

17   A.   Yes.

18   Q.   That column assumes that Dr. Porter has paid the income

19   taxes on that lost income, correct?

20   A.   That's correct.  Yes.

21   Q.   All right.  So the taxes have already been paid, and what

22   you're calculating is -- tell me if I got this right.  You're

23   calculating the additional amount that would be incurred

24   because it comes in a lump sum at a later date?

25   A.   That's correct, yes.  What, getting all that income lumped

1    in one year, what the impact would be.  Now, if excuse me.  I

2    hope this doesn't complicate things, but, if she was to be paid

3    in each one of those years in the year that the loss occurred,

4    -- you'd have to go back to 17 --

5    Q.   Right.

6    A.   -- then there you could eliminate the Column 8, But that's

7    not the case.  She's going to receive one payment.  Assuming

8    she prevails, she's going to receive one payment, and so,

9    therefore, because of the marginal tax bracket, both federal

10   and state, significant tax consequences.

11   Q.   Your last column reflects total economic loss, and the

12   amount through 2033 is what?

13   A.   Yes.  That's my projections of what her total economic

14   loss is.  That takes into account what her present value

15   cumulative loss is, plus whatever, in each year, what the

16   income tax, income tax liability would be.

17   Q.   Can you bring up the last page which is entitled

18   "Additional University of Vermont Employment-Related Costs"?

19   It's the last page of the exhibit.

20           COURTROOM DEPUTY:  I don't have the ability to bring

21   it up here.  You can -- can you put it up on the ELMO?

22           ATTORNEY VITT:  I can put it up.  Does that show up?

23           COURTROOM DEPUTY:  Yes.

24           ATTORNEY VITT:  Will that show up on all the --

25           COURTROOM DEPUTY:  Yeah.

VOLUME: 6
PAGES: 1-221

1    BY ATTORNEY VITT:

2    Q.   I would like to direct your attention to the page of the

3    chart that appears on your screen there, at least I hope it

4    does.

5    A.   Yes, I see it, yes.

6    Q.   Okay.  Tell me what that reflects, please.

7    A.   It reflects the additional costs, employment costs that

8    Dr. Porter has incurred, basically by having to set up

9    housekeeping, if you will, in the Burlington area, Chittenden

10   area and that she has to commute and her husband are commuting

11   from their home in Norwich.  The costs were provided by Dr.

12   Porter to me what her costs were.

13        For the first year or so when she was up here, she was

14   renting, and then they ended up buying a place.  I didn't

15   include anything associated with the buying.  But so she had

16   provided information on what she was having to pay utilities on

17   their house, well, in their apartment initially and then on

18   their house and then what they had to pay in heat, again, on

19   the rental unit and then on the house.  And then the rent, she

20   provided me information on the rent.

21   Q.   The rent's only for two years, right?

22   A.   Beg your pardon.

23   Q.   The rent is for two years?

24   A.   Well, it's not even two years.  It was a partial year in

25   2018.  Well, both years were partial.

1    Q.   Okay.

2    A.   Both years were partial.

3    Q.   And, when she bought a home or a condominium, there was

4    there was no rent component, correct?

5    A.   That's correct, no rent component.  And then, moving

6    across the table, the next two columns are travel, and that is

7    based on the number of miles that Dr. Porter represented to me

8    that she traveled on a weekly basis, monthly basis -- I scaled

9    it up to an annual basis -- traveled between Norwich and her

10   place in her condominium, well, in her rental unit, condominium

11   here in Chittenden County and also her husband assuming the

12   assumption.  She said that he came up as much as she did.

13        So that's, those were the one, two, three, four,

14   categories of additional expenses, and so Column 6 is the

15   addition of those five.  And then I go through the same

16   exercise that I talked about on the previous table of

17   determining the present value, the historical amounts from 2017

18   to 2024.  That's, I'm using that 12 percent simple interest

19   rate figure and then going forward, 2005 out to 2033.  I'm

20   discounting those numbers and discounting.  The interest rate

21   that I'm using to discount that is based on tax-free municipal

22   bonds, Triple A value.

23   Q.   You've got a number under the travel column.  Do you see

24   that?

25   A.   Yes.

1    Q.  How do you come up with that number?  What does it

2    reflect?

3    A.  What I did was I took the mileage that Dr. Porter gave me

4    and multiplied it by the federal mileage rate over, in each one

5    of the years.  I went and got the historical mileage rate in

6    each year, and I multiplied the mileage times that federal

7    mileage rate.

8    Q.  And it appears to go up each year.

9    A.  Beg your pardon.

10    Q.  It appears to go up each year, the amount?

11    A.  Yes.  I used, in all the columns, I used an inflator of

12    2.5 percent, which inflation over this period has averaged

13    historically.  If you look at the last, since the year 2000,

14    inflation has been increasing on average about 2.65 percent a

15    year, but I used 2.5.  The mileage rate has increased at around

16    3.2 percent.  Average increase has been around 3.2 percent, but

17    I used the 2.5 percent inflator on this to be conservative.

18    So I forget where we were, but so I determined the present

19    value, and then if you want me, the last column is a running

20    total.

21    ATTORNEY VITT:  Excuse me a second, Your Honor.

22    THE COURT:  Yes.

23    ATTORNEY VITT:  Nothing further, Your Honor.

24    THE COURT:  Okay.  Cross-examination?

25    ATTORNEY COFFIN:  Thank you, Your Honor.  Give me a

(272 of 993), Page 272 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 224 of 945
2:21-cv-00444-kjd Document 529-3 Filed 04/25/25 Page 224 of 945

61

VOLUME: 6
PAGES: 1-221

1      moment to make the move here.

2              THE COURT:  Yes.

3                  CROSS-EXAMINATION BY ATTORNEY COFFIN

4      Q.   Good morning, Dr. Bancroft.

5      A.   Good morning.

6      Q.   Are you able to get a drink water and clear your throat a

7      little bit?  Good.

8      A.   I just did.  Hopefully it will work.

9      Q.   Perfect.  Thank you.  Good to see you again.  You've been

10     qualified as an expert economist many times, isn't that right?

11     A.   Yes.

12     Q.   And, particularly, your credentials that we went through a

13     little bit with plaintiff were that you got a BA in economics

14     at UVM in '74, right?

15     A.   Yes.

16     Q.   And then you got a masters in agricultural economics at

17     UVM in '76; is that right?

18     A.   Yes.

19     Q.   And then you got a PhD in agricultural economics from

20     Purdue in 1981; is that correct?

21     A.   Yes.

22     Q.   And you served as a policy analyst at USDA for a time in

23     the 70s and 80s before your PhD was awarded; is that right?

24     A.   Yes.

25     Q.   Okay.  And that was essentially analyzing agricultural

VOLUME: 6
PAGES: 1-221

1    economic policy?

2    A.    Well, it wasn't, it wasn't analyzing actual policy.  It

3    was developing an econometric statistical model, a forecasting

4    model.

5    Q.    Okay.  For agricultural?

6    A.    Agricultural, yes.  Yeah.

7    Q.    Okay.  And then you had an assistant professorship from

8    August 1981 to July of 1991 in the department of agricultural

9    and resource economics at UVM; is that right?

10   A.    Yes.

11   Q.    Okay.  Again, oriented towards agricultural economics,

12   isn't that right?

13   A.    Well, some of it was, but not all of it.

14   Q.    Okay.  But you were in the department of agricultural and

15   resource economics?

16   A.    Yes, I was.  There was a small business program.

17   Q.    It says that on your CV, right, that you were in the

18   department of agricultural and resource economics?

19   A.    Yes.

20   Q.    Okay.  And then you were an adjunct professor in the

21   department of community development and applied economics at

22   UVM from 1992 to 1996; isn't that right?

23   A.    I think from July of '91 when I left UVM into 1996.

24   Q.    Okay.  Now, throughout that time, though, your primary

25   role has been to be an economic consultant in litigation; isn't

(274 of 993), Page 274 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 226 of 945
2:21-cv-00444-kjd Document 529-3 Filed 04/25/25 Page 226 of 245

63

VOLUME: 6
PAGES: 1-221

1    that right?

2    A.   Well, during the first -- it grew from --

3         ATTORNEY VITT:  Objection, Your Honor.  Can he finish

4    the answer, please?

5         THE COURT:  He's rephrasing the question.

6    BY ATTORNEY COFFIN:

7    Q.   Yeah, I'm just trying to expedite things.  I should have

8    said, since about 1986 to present, your primary role in

9    economics has been as an economic litigation consultant; isn't

10   that right?

11   A.   Yes, but that '86 to '91 I would say that my earnings at

12   UVM were equivalent to what I was earning in consulting.  I

13   might have earned a little bit more in consulting, but,

14   basically, but then after '91 that really did become the

15   predominant source of my income.

16   Q.   So, basically, from 1991 until the present, your primary

17   income as a consulting litigation witness; isn't that right?

18   A.   Well, over that year -- so the, the consulting income, the

19   majority of it -- I'm going to say -- I don't know what the

20   percent is -- 80 percent came from forensic, but I did a lot of

21   other types of consulting over those years that were

22   nonlitigation types of work.

23   Q.   My question was -- it will go quicker if you answer my

24   questions -- is, from 1986 to the present, the majority of your

25   income has been made by being an economic litigation

1    consultant; isn't that right?

2    A.   Yes.

3    Q.   Now, am I correct that you've worked on, as of the time

4    you were deposed in this case in 2019 -- there's been some

5    hiatus -- but you gave a figure of about 2,500 cases at that

6    time you'd served as a litigation witness?

7    A.   That's my estimate back then, how many cases I worked on.

8    Q.   And so that's going back now, like, 30 years or so; is

9    that right?

10   A.   Back to my first litigation case was in 1982.

11   Q.   Okay.  So however long that is, right?

12   A.   Yes.

13   Q.   Quite a long time?

14   A.   Yes.

15   Q.   Okay.  And how much do you charge per hour for your work

16   as a litigation consultant?

17   A.   Today, I assume?

18   Q.   Yes.

19   A.   $400 an hour.

20   Q.   Say that again.

21   A.   $400 an hour.

22   Q.   Okay.  And since, you know, about 2010 to the last time

23   your rates changed, were they the same, or how did they differ?

24   A.   They've grown.

25   Q.   In say 2010 to 2025, how would you describe your rates

1    other than they've grown?

2    A.   I don't remember what they were in 2010, but I'm going to

3    say maybe they were around 200.

4    Q.   About 200?

5    A.   I'm, I don't know that for sure, but --

6    Q.   $200 an hour?

7    A.   $200 an hour, yes.

8    Q.   Do did you charge a difference for court testimony or

9    deposition testimony and review or --

10   A.   No.  It's the same rate across for everything I do except

11   for travel, and I basically charge half rate for travel.

12   Q.   Okay.  And, between 2000 and 2010, were your rates the

13   same as during the later period of 2010 to 2020?

14   A.   No.  My rates were, but may I go back to the previous

15   question?  I should point out that, recently, in the last four

16   or five years, I, my rate for depositions is, is half again as

17   higher than my regular rate.  That's to take account of

18   reviewing the depo, deposition.

19   Q.   Okay.  Meaning it's more than $400 an hour?

20   A.   Yes.  It would be $600 an hour.  I used to charge for both

21   the deposition time and reviewing it, and so now I just,

22   instead of having to put in the time for reviewing it.

23   Q.   Okay.  So, currently, you charge $400 an hour for your

24   work on the case, right?

25   A.   Yes.

VOLUME: 6
PAGES: 1-221

1     Q.   For deposition testimony it's $600 an hour; is that right?

2     A.   Yes.   Now it is.

3     Q.   How about trial testimony?

4     A.   $400.

5     Q.   $400?   Okay.   And, you know, to the best you can kind of

6     reconstruct it from about 2000 to 2010, what were your hourly

7     rates?

8     A.   2000 to 2010?   I don't know.

9     Q.   $200 an hour?

10     A.   Well, I said that I'm guessing that in 2010 they were

11     $200, but I don't remember what they were in 2000.

12     Q.   Can you give me an approximation?

13     A.   Yes.   Somewhere between 150 and 50.

14     Q.   Okay.   So your testimony here today is, from 2000 to 2010,

15     your expert witness rates were somewhere between $50 and $150?

16     A.   I'm guessing.   I don't know what --

17     Q.   Could it be that they were higher than that?

18     A.   It might have been, yeah.   I think you have a bill that I

19     submitted to, to in this case that goes back to 2019, and on

20     that has my hourly rate.   I don't remember offhand what it is,

21     but you have it.

22     Q.   Okay.   About how many cases would you estimate you've

23     served as an expert witness on?

24     A.   Well, as I indicated, it's probably closer to 3,000 now.

25     Back when in 2019 when my deposition, I was saying

1    approximately 2,500.  I have not kept a, you know, an itemized

2    number.  I am estimating.

3    Q.   This is a question that you're asked regularly in

4    depositions, though, isn't it?

5    A.   No, not necessarily, no.

6    Q.   Not necessarily?

7    A.   No.

8    Q.   But regularly?

9    A.   Actually quite seldom.

10   Q.   Say that --

11   A.   Quite seldom am I asked about the number of cases I worked

12   on.

13   Q.   So in the 3,000 or so cases you've done, that's a question

14   that's asked seldomly?  That's a question you're seldom asked

15   in depositions?

16   A.   Yeah.  That's, yes.

17   Q.   And about how many times have you given a deposition out

18   of the 3,000 cases you've served as an expert consultant?

19            ATTORNEY VITT:  Could Mr. Coffin closer to the

20   microphone?  It's a little hard to hear.

21            ATTORNEY COFFIN:  Maybe I'll turn it this way.

22   Apologize.  Thank you.  Sorry.  Sometimes I can be a low talker

23   too.

24            THE WITNESS:  I wouldn't have the foggiest idea over

25   that from '82 to present how many depositions I've given, but

1    there have been many.

2    BY ATTORNEY COFFIN:

3    Q.   Would you say thousands?

4    A.   No, I wouldn't say thousands.

5    Q.   High hundreds?

6    A.   I don't know if I'd go high hundreds, but I'd certainly

7    say it's well into the hundreds.

8    Q.   Okay.  And am I correct that you do about 75 percent of

9    your work for the plaintiff's side in your litigation

10   consulting?

11   A.   Yeah.  Yes.  Currently, that's what it is.  If you went

12   back to -- if you looked at the longer period of time, it would

13   be slightly less for plaintiffs.  Back in the 90s if you asked

14   me that question, I would say that it was 65 percent defense.

15   Q.   But for, like, the last 20 years, about 75 percent

16   plaintiffs?

17   A.   I'd say the last 20 years about 75 percent, yes.

18   Q.   Okay.  And the work that you do is all sorts of

19   plaintiff's side litigation; is that right?

20   A.   Well, I do defense work too.

21   Q.   And so some defense work?  Fair enough, okay.

22   A.   Yeah.

23   Q.   But it's the broad spectrum of litigation; is that right?

24   A.   Yes.  Predominantly personal injury, wrongful death,

25   employment cases, and lost business profits, and then there are

1    a couple of other types in there.

2    Q.   More unusual types?

3    A.   More unusual.

4    Q.   And am I correct that about 20 percent of your litigation

5    consulting work in the last 10 or 15 years has related to

6    employment claims?

7    A.   I would think that's a reasonable estimate.  Again, I

8    haven't kept count of it, but it's a reasonable estimate

9         ATTORNEY COFFIN:  We're not publishing anything.  I

10   wanted to display for the parties Dr. Bancroft's December 30,

11   2024 invoice preliminary to its introduction.

12        COURTROOM DEPUTY:  Just the parties?  Who should be

13   seeing this?

14        ATTORNEY COFFIN:  Oh, I'm sorry.  Witness, judge, and

15   litigants.

16        COURTROOM DEPUTY:  Oh, okay.  Thank you.

17   BY ATTORNEY COFFIN:

18   Q.   Dr. Bancroft, you mentioned an invoice for your work

19   previously.  I'm showing you a document dated December 30th

20   2024 which is a unsigned letter from you to Geoffrey Vitt.

21   Does that appear to be an invoice for work you've done on this

22   case?

23   A.   Yes.

24        ATTORNEY COFFIN:  We'd move its admission, Your

25   Honor.

VOLUME: 6
PAGES: 1-221

1           THE COURT:  Any objection?

2           ATTORNEY VITT:  No objection.

3           THE COURT:  Okay.  It's admitted.

4           ATTORNEY COFFIN:  If we could publish to the jury,

5    please.

6           THE COURT:  Yes.  Do we have an exhibit number for

7    that?

8           ATTORNEY COFFIN:  I'm not sure we do.  C18, Your

9    Honor.

10          THE COURT:  Okay.  Defendant's C18 is admitted.

11   BY ATTORNEY COFFIN:

12   Q.   Okay.  Dr. Bancroft, is this an exhibit or, sorry, an

13   invoice for work you've done on this case?

14   A.   Yes.

15   Q.   And by an invoice it describes generally the nature of the

16   work you've done and the amount you've done and charged for the

17   case; is that correct?

18   A.   Yes.

19   Q.   And I note that it's not signed.

20   A.   No.

21   Q.   What do you make of that?

22   A.   Well, you requested a copy of the file, and I went in my

23   computer and printed it off, but, when I sent one out, it was

24   signed.

25   Q.   Okay, okay.  When did you print this out and provide it?

(282 of 993), Page 282 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 234 of 945
2:1-cv-00144-jjd Document 529-3 Filed 01/25/25 Page 234 of 945

71

VOLUME: 6
PAGES: 1-221

1    A.   This one was printed out last, sometime last week.

2    Q.   Okay.  So scrolling up, please, the date on this is

3    December 30th 2024, right?

4    A.   Yes.

5    Q.   And so that describes work that you've done this calendar,

6    in the calendar year of 2024; is that right?

7    A.   It turns out it was all done in '24.

8    Q.   It turns out --

9    A.   Everything was done, in this particular case, everything

10   was done in '24.

11   Q.   Okay.  And by that you mean everything that was done was

12   done in '24, you know that you issued three prior reports in

13   this case.  They were done in '24?  I'm not following.

14   A.   No, no.  All I'm saying is that many times the bills that

15   I send out may include a couple of years.  This one only

16   included time that I spent in 2024.

17   Q.   Okay.  I see what you're saying.  Okay.  So this describes

18   accurately the work you've done on the case and did in the case

19   in 2024 then?

20   A.   Yes.

21   Q.   And this work involved $6,650 worth of work; is that

22   right?

23   A.   Yes.

24   Q.   And the reports that you generated in 2024 were one dated

25   August 26th 2024; is that right?

1    A.    Yes.

2    Q.    And so this would be the work that went into that report;

3    is that correct?

4    A.    Yes.  Yeah.  I was -- I had, was contacted by Mr. Vitt in

5    the first part of 2024, and I had thrown my file away.

6    Q.    Okay.

7    A.    So I had to resurrect my file.  I had to, if you will,

8    kind of reinvent the wheel.

9    Q.    Okay.  You had thrown your work file away; is that what

10   you're testifying here today?

11   A.    Yes, yes.  I had my electronic file, but I had a file

12   with some notes in it from over the years, and I, after not

13   hearing anything for five years, I assumed the case had, had

14   gone away, and I had a house fire last April, and I believe it

15   may have gotten destroyed then too.

16   Q.    Okay.  But you don't have your original work file in this

17   case; is that what you're telling me?

18   A.    I don't have those original handwritten notes, no.

19   Q.    And we didn't receive in discovery any other invoices for

20   your work in this case.  How come?

21   A.    When Mr. Vitt asked me to print out my invoices, I thought

22   I'd printed out both of them.  It appears what I did was I

23   printed out this one twice, but I provided him today with the

24   invoice from 2019.

25              ATTORNEY COFFIN:  Okay.  I hate to do this, Your

(284 of 993), Page 284 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 236 of 945
2:21-cv-00044-jdp Document 520 Filed 04/25/23 Page 236 of 945

73

VOLUME: 6
PAGES: 1-221

1    Honor, but could we approach, please?

2              (Bench conference begins.)

3              ATTORNEY COFFIN:  I truly don't want to take more

4    time than we need to, but this document was specifically

5    requested.  It was requested in discovery.  Should have been

6    produced then.  It was requested in seriatim many times over

7    the last few days, and for me to be hearing from this witness

8    on the stand that Mr. Vitt has a copy of this and it wasn't

9    provided to us is, shall I say, extremely surprising.

10             THE COURT:  Mr. Vitt?

11             ATTORNEY VITT:  I just got this this morning.  I

12   don't -- Your Honor, this is a bill for $2,648 going back to

13   November of 2019.  I don't see this as a particularly shocking

14   or surprising document, you know, and I'm not sure it was

15   requested either, but we're certainly not hiding the ball.

16             THE COURT:  So, Mr. Vitt, I received this document

17   this morning from your witness, but you didn't provide it to

18   opposing counsel?

19             ATTORNEY JONES:  He literally handed it to me as he

20   was walking to the stand.  I didn't have a chance to give it to

21   Mr. Vitt or do anything because the jury was seated, and we

22   were walking to the stand.  I was hoping for a break.

23             ATTORNEY COFFIN:  Just to be really clear, it's not

24   really so much the size of the document that's the issue.  You

25   know, I asked many Mr. Vitt -- Sorry.  Sometimes I can be a

(285 of 993), Page 285 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 237 of 945
2:21-cv-00044-jkjd Document 529-3 Filed 04/25/25 Page 24 of 245

74

VOLUME: 6
PAGES: 1-221

1    loud talker.

2            THE COURT:  A little less loud.

3            ATTORNEY COFFIN:  I asked Mr. Vitt and Mr. Jones

4    specifically about this.  Mr. Jones deferred me to Mr. Vitt.  I

5    followed Mr. Vitt last week, had, you know, some

6    back-and-forths with him, was told by him on Friday, Oh,

7    there's only this one invoice, there aren't other invoices,

8    which was different than what he had told me before.  And so,

9    you know, I'm just surprised that, given the weekend's work on

10   these, briefing these issues, given the hour-long conference on

11   these issues today, to find this out on direct examination of a

12   witness.  But this is what it's been like for this witness, and

13   it's not okay.

14           THE COURT:  Okay.  So this is the same line of

15   questioning, obviously, for this witness.  I hear your

16   objection.  I agree.  I'm not sure why this wasn't turned over

17   before.  That's not acceptable.  The request was made.  It

18   wasn't disclosed.  I'm not hearing a good reason why it wasn't

19   disclosed.

20       That said, it's impeachment of this witness along the same

21   lines of what you're doing now.  I'm happy to give you a break

22   if you want to review this.  We're coming close to a break.

23   You know, I want to allow you make to make full use of this if

24   that's what you'd like to do.

25           ATTORNEY COFFIN:  Sure, yeah.  I haven't seen it yet.

VOLUME: 6
PAGES: 1-221

```
 1    Just looking over his shoulder, it appears to be something that

 2    I can absorb quickly and incorporate quickly.  It's 10:30.  If

 3    the Court wants to take a break, I'm totally good with that.

 4              THE COURT:  Why don't we take the morning break, and

 5    then you can take a look at that?

 6              ATTORNEY COFFIN:  Can I get a copy?

 7              ATTORNEY VITT:  You can have this one.

 8              ATTORNEY COFFIN:  Oh, this is for me?  Okay.

 9              THE COURT:  Okay.

10              (Bench conference ends.)

11              THE COURT:  Okay.  At this time, we're going to take

12    our morning break.  So I will see you back here at 10:40.

13       (A recess was taken from 10:27 a.m. to 10:42 a.m.)

14              THE COURT:  Okay.  Anything to take up before I bring

15    the jury back?

16              ATTORNEY COFFIN:  No, Your Honor.  Thank you.

17              THE COURT:  Okay.  Plaintiff?

18              ATTORNEY VITT:  No.

19              THE COURT:  Okay.

20              (The Jury enters the courtroom.)

21              THE COURT:  Mr. Coffin?

22              ATTORNEY COFFIN:  Thank you, Your Honor.

23    BY ATTORNEY COFFIN:

24    Q.   Good morning, Dr. Bancroft.

25    A.   Good morning.
```

1    Q.   When we took a break, I was asking you about invoices you

2    prepared in this case, right?

3    A.   Yes.

4    Q.   And I think you mentioned that you had thrown out your

5    entire file for this case because you thought the case was

6    over; is that right?

7    A.   Yes.

8    Q.   And you mentioned that there was a fire at your house?

9    A.   Yes.

10   Q.   Which I apologize for that.  I'm sorry for you.  You're

11   not sure whether these, the file was destroyed in that fire,

12   were you?

13   A.   No, I'm, I'm not sure.  When I first was contacted about

14   the case, I knew that I -- I went and looked at the electronic

15   file, and then sometime after that, a month or two months, I

16   said, Well, I'll see if I can find the paper file, the notes

17   that I had, and I wasn't able to find it.

18   Q.   Okay.  I'd ask you to please answer my yes-or-no questions

19   with a "yes" or "no" if you can, please.  So the bottom line is

20   you know your file disappeared; is that right?

21   A.   Yes.

22   Q.   And you don't -- you're not saying it was because of the

23   fire here today?

24   A.   No, I'm not saying it's because of the fire.

25   Q.   And it sounded from the import of your answer, but I want

VOLUME: 6
PAGES: 1-221

1    to probe you jut a second on that, is you think that you

2    thought the case was over so you got rid of those materials?

3    A.   Yes.

4    Q.   But, at Mr. Vitt's request, you dug up two invoices

5    related to the case; is that right?

6    A.   Yes.

7    Q.   And one was the one we admitted into evidence December

8    30th 2024, correct?

9    A.   Yes.

10   Q.   And there was another one that you provided to Mr. Vitt

11   dated November 19th 2019; is that correct?

12   A.   I believe that's correct, yes, the date.

13            ATTORNEY COFFIN:  Your Honor, I'd ask that the

14   document that the Witness provided and attorneys provided that

15   we had a sidebar on be introduced into evidence at this time,

16   and let's call it C18-A.

17            THE COURT:  Okay.  Any objection?

18            ATTORNEY VITT:  No objection.

19            THE COURT:  Okay.  C18-A is admitted.

20            ATTORNEY COFFIN:  And, with the Court's permission

21   and help from the deputy clerk, I'd like to display it on the

22   ELMO.

23            THE COURT:  Yes.

24   BY ATTORNEY COFFIN:

25   Q.   And so this is an invoice, is it not, Dr. Bancroft, for

(289 of 993), Page 289 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 241 of 945
2:17-cv-00044-jkjd   Document 529   Filed 04/25/23   Page 241 of 945
78
VOLUME: 6
PAGES: 1-221

1    $2,628 for work you've done on this case; is that correct?

2    A.   Yes.

3    Q.   And it lists the dates and the nature of the work you did;

4    is that right?

5    A.   Yes.

6    Q.   Okay.  Specifically, it says, "Economic analysis,

7    consultation, and report update, $1,352".  Is that what it

8    says?

9    A.   Yes.

10   Q.   And noting the billable hour was $260 an hour; is that

11   right?

12   A.   Yes.

13   Q.   So down from the $350 an hour you were charging in your,

14   under the prior invoice; is that right?

15   A.   I'm sorry.

16   Q.   That's less than the $350 an hour you charged in your 2024

17   invoice that we looked at, right?

18   A.   Yes.

19   Q.   Okay.  Now, it says report update, doesn't it?

20   A.   Yes.

21   Q.   And that would imply that there was work done on a report

22   prior to this that wasn't a report update, wouldn't it?

23   A.   There were two reports that I generated.

24   Q.   Well --

25   A.   The last one -- well, that --

VOLUME: 6
PAGES: 1-221

1   Q.   There were four reports that you generated, right?

2   A.   Yes.

3   Q.   Okay.  And what I think you're saying is that this bill is

4   meant to reflect the work done on one of those reports; is that

5   right?

6   A.   No.

7   Q.   Okay.  And there was another report that was done in 2018;

8   is that right?

9   A.   Yes.

10   Q.   Okay.  And this report -- strike that.

11        Does this invoice cover and bill for the work done on the

12   initial report in 2018?

13   A.   Yes.

14   Q.   Okay.  And so --

15   A.   At least I was not able to find in my billing file another

16   invoice.

17   Q.   Okay.  Are you here today testifying that you're sure you

18   sent an invoice as to that 2018 report or that you didn't?

19   A.   I don't remember.

20   Q.   One way or the other?

21   A.   Yeah.  Because it's not in the file, my computer file, I

22   would suspect that this covers both reports.

23   Q.   Even though it says it's a bill for a report update?

24   A.   Yes.

25   Q.   Okay.  So the billings you've sent to Mr. Vitt in this

VOLUME: 6
PAGES: 1-221

1    case are this bill that's on Exhibit 16A for --

2              THE COURT:  I think it's 18A.

3    BY ATTORNEY COFFIN:

4    Q.   I apologize.  18A, right?

5    A.   Yeah.

6    Q.   And the amount that you provided for $6,650 on C18, is

7    that right?

8    A.   I believe that's correct.

9    Q.   And so those cover three of the four reports that have

10   been done in this case, correct?

11   A.   Yes.

12   Q.   And now you issued another report more recently; is that

13   right?

14   A.   Yes.

15   Q.   The one that has been introduced into the, well, the

16   report, the chart that has been introduced into evidence

17   earlier through Mr. Vitt; is that correct?

18   A.   Yes.

19   Q.   And you haven't submitted an invoice yet for that work; is

20   that right?

21   A.   That's correct.

22   Q.   You plan to, though?

23   A.   Yes.

24   Q.   And for your time here today; is that correct?

25   A.   Yes.

VOLUME: 6
PAGES: 1-221

1    Q.   Now, so we've got for three reports, a tick under $10,000;

2    is that right?

3    A.   Yes.

4    Q.   And, with another report coming, that would be another 3

5    or $4,000, estimated, with your testimony time?

6    A.   Maybe.  I don't know.  I don't know.  I haven't written

7    the time down, but that seems high, but I don't know.

8    Q.   What would you approximate it as?

9    A.   I don't know.  I just don't remember the amount of time

10   I've got put in, and I've been down to the courthouse here

11   several times.

12   Q.   So that would strike me as maybe it's higher than --

13   A.   I don't know.  It's, I --

14   Q.   Just guessing, you can't estimate?

15   A.   No.

16   Q.   Okay.  So, if I said that the, suppose that that report

17   will be worth $5,000 when that invoice is in, would you argue

18   with me about that?

19   A.   Yeah, I would.  I hope it is, but I'm sure it is.

20   Q.   Okay.  $2,500, how about that?

21   A.   It's probably at least $2,500.

22   Q.   Okay.  At least $2,500.  So the work that you've done in

23   the case for the three reports and the report you've done now

24   is about $12,000; is that right?

25   A.   Yes.

VOLUME: 6
PAGES: 1-221

1   Q.   Okay.  So you've worked on about 3,000 of these cases over

2   the years?

3   A.   I've been involved in about 3,000 litigation cases, yes.

4   Q.   And I presume that a $10,000, $12,000 bill is on the high

5   end of the report and billing services that you charge; is that

6   fair to say?

7   A.   Extremely high.

8   Q.   Okay.  And more average is about 4 or $5,000?

9   A.   No, less than that.

10  Q.   Okay.  $3,000?

11  A.   Less than that.

12  Q.   $2,000?

13  A.   Between 2 and now, with my current rates, it's between 2

14  and 3,000 for a normal wrongful termination case.

15  Q.   Okay.  So, if we called it 3,000 to make math simple,

16  3,000 times 3,000 cases --

17           ATTORNEY VITT:  Objection.  Can we approach the

18  bench?

19           ATTORNEY COFFIN:  Equals --

20           THE COURT:  He's in the middle of a question, but

21  come on up.

22           ATTORNEY COFFIN:  Well, if I can finish the question

23  -- equals $9 million?

24           THE COURT:  Okay.

25           THE WITNESS:  No, that ain't no $9 million.  You're

1   multiplying my rate now to what I got back in '82?

2   BY ATTORNEY COFFIN:

3   Q.   I asked you what your average case was, and I think you

4   said $2,000 to $3,000.  So the exact question, Doctor, is,

5   What's 3,000 times 3,000?

6            ATTORNEY VITT:  Objection.

7            THE WITNESS:  Maybe I misunderstood you.  I thought

8   you were talking about how much I would be a normal case today.

9   I can't tell you what a normal case was 25 years ago, what the

10  bill was.  Today, a wrongful employment case is going to be

11  somewhere, assuming there's nothing unusual in the case and I

12  don't have to spend a lot of time on the phone, it's going to

13  be somewhere between 2 and $3,000.

14           THE COURT:  So there's a request for a bench

15  conference.  Is that still the request?

16           ATTORNEY VITT:  Yes, please.

17           THE COURT:  All right.  Please approach.

18           (Bench conference begins.)

19           ATTORNEY VITT:  Your Honor, I understand that counsel

20  gets considerable latitude, but going back this far, and,

21  basically, I'm not even sure what the argument is.  25 years of

22  work, how much do you charge in each one, trying to come up

23  with some sort of number.  What is the point that this is

24  driving toward?  I don't understand it.

25           ATTORNEY COFFIN:  It's driving towards the obvious

(295 of 993), Page 295 of 993   Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 247 of 945
2:21-cv-00494-jkjd   Document 6529G   Filed 04/25/25   Page 84 of 2145

84

VOLUME: 6
PAGES: 1-221

1    point that he's fiscally biased because of the millions of

2    dollars he's made through his expert analysis, and it's totally

3    appropriate, relevant cross-examination on, Are you unbiased?

4    And Dr., Mr. Vitt can ask his questions to clarify it, even

5    though, I would say, just like Dr. Bancroft has expanded beyond

6    my cross to provide a lot of his rationale as well.

7           THE COURT:  It's valid on cross-examination.  I'll

8    allow it.  You can ask him questions on redirect.

9           (Bench conference ends.)

10   BY ATTORNEY COFFIN:

11   Q.   Okay.  Again, my questions, I think, will go more quickly

12   if you answer "yes" or "no", please, to them.  You estimated on

13   direct that sort of your average case in recent times, maybe

14   not going back to the 1980s, but recent times was $2,000 to

15   $3,000 a case; isn't that right?

16   A.   No.

17   Q.   You didn't?  Okay.  And you estimated that you'd done

18   about 3,000 cases; isn't that right?

19   A.   Yes, since '82.

20   Q.   So, if you'd done, your average for a case was $3,000 a

21   case and you've done 3,000 cases, what would that be in terms

22   of the amount of compensation you've received from doing these

23   cases?

24   A.   Well, if you did that calculation, if that was correct,

25   that would be a lot of money, and I'm sure, if I'd earned

VOLUME: 6
PAGES: 1-221

1    $3,000 in each one of those cases, I'm pretty sure I wouldn't

2    be here now.

3    Q.   Well, you know the math is the math, right?  So 3,000

4    times 3,000 is what, $9 million?

5    A.   You are twisting this around.  I did not charge --

6         THE COURT:  Dr. Bancroft, I'll direct you to answer

7    the question, please.

8         THE WITNESS:  I did not charge $400 an hour back in

9    1982.  My charge in '82 was probably well less than $50, and

10   it's grown over that period of time.

11   BY ATTORNEY COFFIN:

12   Q.   We've had testimony significantly about your rates and

13   case work in the 2000s, and I'll ask you again.  If your

14   average remuneration for a case was $3,000 and you'd done 3,000

15   cases, wouldn't be that be $9 million?

16   A.   I'll take your word for it, but I haven't earned anywhere

17   near that, not anywhere near that.

18   Q.   Now, you have worked with Attorney Vitt before?

19   A.   Yes, I think one time before.

20   Q.   Okay.  And what was the nature of that case?

21   A.   I believe it was an employment case.

22   Q.   Was it also an employment case involving my client,

23   Dartmouth-Hitchcock?

24   A.   I don't remember.

25   Q.   Okay.  It was an employment case where you were asked to

1    provide opinions related to a resident who was terminated from

2    the residency program; is that correct?

3    A.   I don't know.  I said I don't know if it was against

4    Dartmouth or not, so I can't answer the question.

5    Q.   And do you recall a judge ruling on your opinions in that

6    case?

7    A.   No.

8    Q.   No.  You don't recall the judge excluding your opinions

9    based on improper speculation?

10           ATTORNEY VITT:  Objection.  Can you repeat the

11   question, please?  I'm sorry.

12   BY ATTORNEY COFFIN:

13   Q.   Do you recall a judge ruling your opinions were not to be

14   admitted due to improper methodology and speculation on your

15   part?

16   A.   No.  I remember that there was one time that it was not

17   allowed in because it was too, the disclosure was too late.

18   Q.   And so that's the only case you've worked on with

19   Mr. Vitt; is that right?

20   A.   That's the only one I remember.

21   Q.   Oh, okay.  Think hard.  Can you remember any others where

22   you've worked with him as a retained expert witness in his -- I

23   don't know -- 20-plus years of practicing law?

24   A.   I'll think real hard on it.  That's the only one I

25   remember.

VOLUME: 6
PAGES: 1-221

1    Q.   Okay.  How about the firm Langrock Sperry; have you ever

2    done work for them?

3    A.   Yes, a lot.

4    Q.   A lot of work for them?

5    A.   Yes.

6    Q.   Okay.  And Langrock Sperry is the firm that Mr. Jones is a

7    partner at; is that right?

8    A.   Yes.

9    Q.   And what do you mean by doing a lot of work for them?

10   A.   Well, over the years, I think probably I go back into the,

11   you know, in the 90s and maybe into the 80s that I had some

12   cases with them.  But, over the years, I've had some cases with

13   them, and I suspect it's less than 20, but maybe more than 10.

14   Q.   Less than 20 and more than 10?

15   A.   Over a 30-some-odd-year, 40-year period.

16   Q.   Okay.  And same assumption.  Assuming you're charging

17   three, just to make the math easy, $3,000 per case and you've

18   had 20 cases or so with them, that firm; is that right?

19   A.   I've had 20 -- I don't know if it's 20 cases or not, but

20   I'm --

21   Q.   You're estimating?

22   A.   I don't know.  I think it's probably somewhere between 10

23   and 20.

24   Q.   So we'll call it 15, 15 cases with them where you've made

25   $3,000 a case?

1    A.   No.

2    Q.   That comes out to about -- well, or your average case, if,

3    if you assume it's $3,000 a case, and you fight that

4    assumption, but let's, for the sake of discussion, assume that

5    it is.  You would have made some $45,000 on cases from Langrock

6    Sperry; is that fair to say?

7    A.   No, nowhere close to that, because the average over the 40

8    years that I have worked and done cases for Sperry Langrock,

9    the average value was not $3,000.  And I'm not sure that I ever

10   had a case with Sperry Langrock that had to do with employment.

11   Q.   Okay.  Now, do you have any cases with Mr. Vitt's firm

12   other than this now?

13   A.   No.

14   Q.   And how about with Langrock Sperry?

15   A.   I don't think I do, but there's one that I haven't thrown

16   the file away.  It's been a couple years since I've heard

17   anything about it, so I'm not sure if it's still active.

18   Q.   Now, you described that about 20 percent, maybe 25 percent

19   of your cases are employment discrimination cases, correct?

20   A.   In recent years, yes.

21   Q.   Now, we had a hearing last week where I asked you a bunch

22   of questions about things.  Do you remember that?

23   A.   Yes.

24   Q.   And do you recall me asking you some questions about your

25   work on academic medical cases involving the transfer of a

VOLUME: 6
PAGES: 1-221

1    physician from one academic medical institution to another?

2    A.    Vaguely.  I think that was a topic, but I don't remember

3    much about it, but --

4    Q.    Okay.  Do you remember testifying that you had maybe one,

5    maybe two of those cases in your experience prior to this?

6    A.    An employment -- let me make sure I understand you.  An

7    employment case where we're dealing with a doctor in a

8    hospital, is that --

9    Q.    Yes, transferring employment.

10    A.    I think that's probably fair.  I don't remember, but I'm

11    going to say it's probably at least maybe three.

12    Q.    You wouldn't fight me if you said at the hearing it was

13    one, maybe two?

14    A.    Well, maybe.  I don't remember, so --

15    Q.    Now, you prepared four reports in this case; isn't that

16    correct?

17    A.    Yes.

18    Q.    And am I correct that one was on October 30th 2018?  Is

19    that correct?

20    A.    I'll take your word for it, yes.

21    Q.    And, in all of the reports, you have a chart similar to

22    the chart that's been introduced here today or shown to the

23    jury today.  It's not in evidence yet, but shown to the jury

24    today, right?

25    A.    Yes.

VOLUME: 6
PAGES: 1-221

1   Q.   And the right column is kind of the ultimate loss column

2   where it says "Total Economic Loss"; is that fair to say?

3   A.   Yes.

4   Q.   And it's divided up by years; is that right?

5   A.   Yes.

6   Q.   Now, in the October 30, 2018 report, do you agree that you

7   calculated the total economic loss there in this case for as

8   $3,000,022?

9   A.   I'll take your word for it.  I don't have it in front of

10   me.

11   Q.   Okay.  And how about would you take my word for it that,

12   on October 19, 2019, you calculated the loss at $4,835,000?

13   A.   I'll take your word for it.

14   Q.   Similarly, August 26th 2024, would you take my word that

15   you calculated a loss of $4,329,258?

16   A.   I'll take your word for it.

17   Q.   And then, most recently on March 19th, last Tuesday, you

18   calculated a total economic loss of $1,787,722; is that right?

19   A.   Yes.

20   Q.   That's right?

21   A.   Yes.

22   Q.   So your loss figures dropped by almost $2.6 million

23   between August 26, 2024 and your most recent report last week;

24   isn't that right?

25   A.   Dropped how much?

VOLUME: 6
PAGES: 1-221

1    Q.   About $2.6 million.

2    A.   Okay.  I'll take your representation, yes.

3    Q.   Well, do you agree with that?

4    A.   I don't, I don't have them in front of me so I can't tell

5    you, but I'll take your word for it.

6    Q.   Do you want me to put it in front of you?

7    A.   Sure.

8    Q.   Can you show him --

9                   (Brief pause.)

10        Let me keep going.  We can circle back to this.  In any

11   event, I'll refresh your recollection with it, but I don't hear

12   you saying that you disagree with my assertion that your August

13   26, 2024 report had a total economic loss of $4,328,258.

14   A.   No.  I think that's in the area, yeah.  I know it was, it

15   was much larger than this one.

16   Q.   Okay.  And so the most recent report from last week

17   dropped it down to $1,787,722.  That sounds right?

18   A.   Yes.

19   Q.   Okay.  And you report that you did most recently made

20   eight substantive changes from your report before; is that

21   right?

22   A.   Yes.

23   Q.   And four were due to new information, and four were due to

24   the passage of time?

25   A.   Yeah, I think it's four and four.  It might be five and

VOLUME: 6
PAGES: 1-221

```
 1   three.  I think it's three and five, but I may have said four
 2   and four.
 3            ATTORNEY COFFIN:  Okay.  Can we please display the
 4   March 19th 2025 report?  It's been admitted for identification.
 5   I believe that has been shown to the jury, hasn't it?  I just
 6   want to make sure I'm not --
 7            THE COURT:  Talking about the chart?  The chart has
 8   been.
 9            ATTORNEY COFFIN:  Okay.  Not the report, but the
10   chart?
11            THE COURT:  Right.
12            ATTORNEY VITT:  Could we move for the admission of
13   that chart now?  Will that be possible, or should I wait until
14   I redirect?
15            ATTORNEY COFFIN:  Objection for reasons we've gone
16   over thoroughly.
17            THE COURT:  I'll reserve ruling on that at this time.
18            ATTORNEY COFFIN:  Please put it up for the Witness,
19   the judge, and myself, please.
20            COURTROOM DEPUTY:  Hold on one second.
21   BY ATTORNEY COFFIN:
22   Q.   Okay.  Does everybody have it?  Okay, good.  Thank you.
23   Now, Dr. Bancroft, directing your attention to the screen, this
24   is your March 19th 2025 projected lost earnings for Dr. Porter
25   chart; is that right?
```

VOLUME: 6
PAGES: 1-221

1    A.   Yes.

2    Q.   And you described the structure of the report as it goes

3    along on direct examination.  Now, am I correct that your

4    reports as you generate them, all these reports, are based

5    significantly on what the plaintiff and her lawyers have told

6    you?

7    A.   Yes, that and Dr. Porter, primarily on UVM side.

8    Q.   Dr. Porter, what Dr. Porter and her attorneys have told

9    you; is that correct?

10   A.   Yes.

11   Q.   Like, in conversations, right?

12   A.   Yes.

13   Q.   In emails, right?

14   A.   There probably was some emails.  I'm not sure.

15   Q.   Okay.  It's not all based on sort of objective economic

16   financial information; isn't that right?

17   A.   Well, I don't know.  You'll have to talk with Dr. Porter

18   on this.  What she's was basing it on, I don't know, but I took

19   her, I took her word that this is what her employment was going

20   to be in the future.

21   Q.   Right.  And so the point is the transmission to you is you

22   are relying on what she is telling you; is that correct?

23   A.   Absolutely.

24   Q.   You're basically a microphone for what she is telling you

25   is her career situation; isn't that right?

1    A.   Well, I might put it a different way, but I'll stipulate.

2    I'll agree.

3    Q.   And she's ultimately your client, isn't she?

4    A.   Ultimately, I guess, yes.

5    Q.   You're getting paid pretty well for providing her a

6    microphone for her views; is that right?

7    A.   I am representing -- I was detained by her to estimate

8    what her losses were, yes.

9    Q.   Well, one of the things that's embedded in your report is

10   the assumption that in 2019 she would become a full professor

11   at Dartmouth; isn't that right?

12   A.   Yes.

13   Q.   And that would have resulted in a 5 percent increase in

14   her salary at Dartmouth; is that correct?

15   A.   Yes.  Technically, it would have been a 2.5 percent

16   increase because there would have been a 2.5 percent normal

17   increase irrespective of being promoted.

18   Q.   But it would be 5 percent for that year because of the

19   midyear timing of that; is that your point?

20   A.   Yes.

21   Q.   But, ultimately, the net from that is a 5 percent increase

22   for her for becoming a professor at Dartmouth, right?

23   A.   Yes.

24   Q.   And you're not on the credential committee or the

25   professor review committee or anything like that at Dartmouth,

VOLUME: 6
PAGES: 1-221

1   correct?  And so you don't know whether she can qualify to be a

2   professor at Dartmouth or not, right?

3   A.   No, I did not look into it, no.

4   Q.   No, because you relied on what she told you, right?

5   A.   Yes, and I wouldn't -- I don't know how I'd even begin to

6   do it.

7   Q.   Now, she ultimately wasn't selected to be a professor at

8   Dartmouth because her employment was terminated when the REI

9   division ended; isn't that right?

10   A.   I don't know about that.

11   Q.   Now, you did not include -- so the chart, just to kind of

12   make it simple for me anyways, essentially, your, one of your

13   primary tasks here is to compare what she would have made at

14   Dartmouth to what she would be making and did make at the

15   University of Vermont, correct?

16   A.   Yes, that's the primary objective.

17   Q.   Because you want to compare the difference between the two

18   so, if her pay at Dartmouth was higher than her pay at UVM she

19   may have sustained some damages from that, correct?

20   A.   Yes.

21   Q.   And she has a duty to mitigate her damages; you understand

22   that, correct?

23   A.   I'm not a lawyer here, but that's my understanding, that

24   the plaintiff does have an obligation to mitigate.

25   Q.   You know, in your 3,000 cases, all of them have dealt with

1    the issue that a plaintiff can't just let the damages

2    accumulate, they need to do what they can reasonably to make up

3    for those damages; is that correct?

4    A.   Well, no.  I've had cases where a person had a very unique

5    profession and it was unreasonable for them to pick up their

6    family and move cross-country to mitigate their losses.

7    Q.   Okay.

8    A.   And by that several, I've had several over the, over the

9    30 years that I've been doing employment cases where that

10   situation has arisen.

11   Q.   Okay.  But that's in contrast to the general rule where an

12   employee who is wrongfully terminated needs to attempt to gain

13   gainful employment, right?

14   A.   It's my understanding, within reason.

15   Q.   Yes.  Now, you, at the time of the hearing we had last

16   week when I asked you some questions, you had issued a report

17   in August of 2024, as I discussed, that outlined the damages as

18   being $4.3 million, correct?

19   A.   As of, yes, 2033.

20   Q.   Yeah.  And one of the things I pointed out to you in the

21   report is that we at least had not received the 2004 pay

22   information from Dr. Porter.  Do you remember that?

23   A.   No, I don't.

24   Q.   Do you remember that you testified under oath like you are

25   today that you had not used the 2004 (sic.) pay information in

(308 of 993), Page 308 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 260 of 945
2:21-cv-00944-jkjd Document 529-3 Filed 04/25/25 Page 260 of 245

97

VOLUME: 6
PAGES: 1-221

1    calculating your August 2004 report?

2    A.   Yeah, I did use the information that I had on her earnings

3    up, in 2004 up to about the time that I issued my report.

4    Q.   But, when you came into court, you had not received her

5    W-2 from 2004; isn't that right?

6    A.   It would be pretty hard to receive her W-2 for 2004 in

7    August of 2004.  W-2s aren't generated until the end of the

8    year.

9    Q.   Yes, but you, but you didn't obtain the 2004 and update

10   your report until I specifically pointed that out to you; isn't

11   that right?

12   A.   No.  I had received her W-2 after the 1st of the year.  I

13   had that in my possession before I came to court last week, the

14   W-2.

15   Q.   You had the 2024 W-2 in your possession before you came to

16   court last week?

17   A.   Yes.

18   Q.   Had you provided it to Ms. Porter, Dr. Porter's counsel?

19   A.   I received it from Dr. Porter's counsel, I believe, or Dr.

20   Porter.  I don't remember which one sent it to me.

21   Q.   In your August 2024 analysis, you hadn't used the most

22   recent numbers; is that correct?

23   A.   I used what she had for information up to this point in

24   time.  I looked at what she had earned and what her earnings

25   were after July 1 and used that as a basis to forecast forward.

1    Q.   Okay.  And you also hadn't been made aware that, in July

2    of 2023, she became a full professor at the University of

3    Vermont; isn't that right?

4    A.   I don't remember.  I'm sure that I was told that, but I

5    don't remember that.

6    Q.   Your testimony here today under oath is that you were told

7    that and you just don't remember that?  Is that, is that what

8    your testimony is?

9    A.   I believe I was -- I don't remember.  I assume that I was

10   told.  I had extensive, as the bill demonstrates, I had, the

11   reason that bill is so high is I spent an inordinate amount of

12   time on the phone with attorneys and with Dr. Porter.  It's

13   hard to remember everything that was said and/or provided to me

14   in 2024.

15   Q.   Your August 2024 report which was heading into a big

16   settlement conference with, at the hospital, by the way, showed

17   $4.3 million, correct?

18            ATTORNEY VITT:  Your Honor, objection.  I don't think

19   there's any testimony about some big settlement conference.

20            THE COURT:  Please approach.

21               (Bench conference begins.)

22            THE COURT:  So what's your point here?

23            ATTORNEY VITT:  I don't think -- I don't believe that

24   there's some big settlement conference.  I mean, I'm not sure

25   what he's referring to.

VOLUME: 6
PAGES: 1-221

```
 1              ATTORNEY SCHROEDER:  There was a mediation on
 2    September 9th.
 3              ATTORNEY VITT:  Yes.
 4              ATTORNEY SCHROEDER:  Yes.
 5              ATTORNEY VITT:  Well, I wouldn't describe that as a
 6    big settlement conference.  I don't want to get into the
 7    discussion of it, but I think we have a different view about
 8    how things shook out.  I mean, he certainly prepared a report
 9    to try.  You know, the case came back to the Second Circuit.
10    We tried to, you know --
11              THE COURT:  Okay.  You're going to --
12              ATTORNEY COFFIN:  I'm not going to go into it, but it
13    is relevant, I think, for the reasons that we've outlined and
14    can explain those if necessary.  I'm not going to go into it
15    much more, but it's not improper at all to ask that he made a
16    report really high before the settlement conference to try and
17    leverage this.
18              THE COURT:  She's telling me she can hear you.
19              ATTORNEY COFFIN:  I apologize.  And try and leverage
20    a settlement and, after that, when he's got to put it on for
21    trial, he drops it down a lot.
22              THE COURT:  I just want to be clear about the comment
23    you just made.  Did you not hear that the law clerk could kind
24    of overhear?  I want to be clear on the record.  So, basically,
25    if Mr. Coffin going to be asking not much more on this topic
```

VOLUME: 6
PAGES: 1-221

1    and certainly not getting into the substance of that, but,

2    basically the point is, in preparation for mediation, I think

3    the point he's trying to make is, Wouldn't you have gotten up

4    to speed on exactly what your report says?

5              ATTORNEY SCHROEDER:  There's a court record that

6    reflects the fact that there was a mediation on September 9th

7    before John Schraven, because he charged moneys by both sides

8    to conduct that mediation here in Burlington, just for the

9    record.

10             THE COURT:  Right.  Just a little bit concerned about

11   getting into that --

12             ATTORNEY COFFIN:  I don't need to get into it.

13             THE COURT:  -- to any more degree.  Frankly, even

14   another mention if this gave me pause because now the jury is

15   hearing that there was prior proceedings in the case that

16   didn't involve litigation.  So I think it's something we should

17   be frankly steering clear of.

18             ATTORNEY COFFIN:  I can steer clear.

19             THE COURT:  While we're still here, with respect to

20   the other claim that was made, I think it was about the W-2,

21   you asked him questions about whether it was presented before

22   the hearing.  Are you talking about the motion in limine

23   hearing?

24             ATTORNEY COFFIN:  Yeah.

25             THE COURT:  His first testimony on Friday in this

(312 of 993), Page 312 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 264 of 945
2217cv00094kgd Document329.3 Filed04/23/25 Page1204of2945

101

VOLUME: 6
PAGES: 1-221

1  trial?

2      ATTORNEY COFFIN:  I'm talking about the motion in

3  limine hearing.  I needed to clarify that.

4      ATTORNEY SCHROEDER:  March 14th?

5      THE COURT:  March 14th.  That's the W-2 that was then

6  disclosed to you?

7      ATTORNEY COFFIN:  Yes, right.

8          (Bench conference ends.)

9  BY ATTORNEY COFFIN:

10  Q.  Now, in your, in your practice calculating income and lost

11  income, you believe it's important to get the most accurate and

12  immediate payroll information, correct?

13  A.  I agree, yes.

14  Q.  Because how much money someone's making at the time is

15  important if you're going to compare a prior employer to a

16  current employer; isn't that right?

17  A.  It's important to have, yeah, appropriate and current

18  information.

19  Q.  A simple yes-or-no will suffice.  I don't mean to cut you

20  off, but we're taking a long time.

21      And you did that when you obtained the information that

22  went into your report that I have on the screen before you now,

23  which is the March 19th 2025 report, correct?

24  A.  I had what?  What did I have?

25  Q.  You obtained her most recent payroll information from 2024

(313 of 993), Page 313 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 265 of 945
2217-cv-00094-kjd   Document 329-3   Filed 04/23/25   Page 1265 of 945
102

1   when you prepared this report that's on the screen in front of

2   you from March 19th 2025, right?

3   A.   Yes.

4   Q.   And you did didn't choose to do that when you prepared

5   your 2024 report; isn't that right?

6   A.   I beg your pardon.

7   Q.   When you prepared your August 2024 report.

8   A.   Yes.  What did I do?  What are you saying I did?

9   Q.   Aren't I correct, Dr. Bancroft, that, when you prepared

10  your August 2024 report, you did not consider Dr. Porter's most

11  recent payroll information?

12  A.   I considered her payroll information at the time I did the

13  report.

14  Q.   From 2023, correct?

15  A.   No, from 2024.  I had information of what she'd earned up

16  through -- I don't -- I assume up through July.  I don't know

17  exactly when I had it up to, but I had her earnings that she

18  earned in 2024 for a significant part of the year.

19  Q.   Okay.  And was that provided to you by counsel?

20  A.   I don't remember if it was provided by counsel or directly

21  from Dr. Porter.

22  Q.   Okay.  You did not get the information that she'd actually

23  been elevated to full professor a year before that in July of

24  2023, though, did you?

25  A.   I had --

VOLUME: 6
PAGES: 1-221

```
 1    Q.   Yes or no, please.

 2    A.   Well, it's not -- I can't answer the question yes or no.

 3    I'm sorry.

 4             THE COURT:  Dr. Bancroft, it is a yes-or-no question.

 5    You're going to have to answer the question yes or no.  Your

 6    attorney will have an opportunity to ask you further questions

 7             THE WITNESS:  No.

 8    BY ATTORNEY COFFIN:

 9    Q.   You didn't have that information --

10    A.   Yes.

11    Q.   -- correct?  And am I correct that you did not have that

12    information?

13    A.   I don't know.  I don't know how to answer the question.

14    Q.   Okay.  In any event, your report in August 2024 did not

15    include any assumed 5 percent pay bump from becoming a

16    professor at UVM correct?

17    A.   I used her current earnings at the time I issued the

18    report.

19             ATTORNEY COFFIN:  And, Your Honor, please ask the

20    Witness to be responsive.

21             THE COURT:  Answer the question, Dr. Bancroft.

22             THE WITNESS:  No.

23    BY ATTORNEY COFFIN:

24    Q.   Okay.  And you did assume a 5 percent pay increase for her

25    professorship, which she never even got when she was at
```

1    Dartmouth, correct?

2    A.    I did, yes.

3    Q.    And changing those numbers matters because it is, again,

4    if she's making more at Dartmouth and less at UVM the

5    difference between the two is greater, correct?

6    A.    Yes.

7    Q.    And so you chose not to include that information on the

8    report in August of 2024 for UVM but you did for Dartmouth; is

9    that right?

10   A.    No.

11   Q.    Now, your report in March of 2025 does include some

12   increase in her salary while she's at University of Vermont

13   from your August 2024 report, doesn't it?

14   A.    Yes.

15   Q.    Now, the March 2025 report includes a number of new

16   assumptions.  Well, you assume -- just put the chart up.  You

17   assume that there are -- if you can turn that, please.  You

18   assume that, for a couple of years, pay was stable at Dartmouth

19   due to, due to Covid; is that correct?

20   A.    Yes.

21   Q.    You assume that she received $8,000 for one semester, a

22   little less than $8,000 for one semester of tuition remission

23   for her son?

24   A.    Yes.

25   Q.    Okay.  And that wasn't done in your prior report, correct?

VOLUME: 6
PAGES: 1-221

1   A.   No, it was not.

2   Q.   And who pointed that out to you?

3   A.   You did.

4   Q.   Yes.  And same thing with the Covid increases?

5   A.   Yes.

6   Q.   And how about the professor, did I point to that out to

7   you too?

8   A.   I don't remember if you did or not.

9   Q.   Oh, you don't remember me in court on March 14th telling

10  you that Dr. Porter had been, had become a professor and asking

11  you if you knew that?

12  A.   I don't specifically remember that.  I'm not saying it

13  didn't happen.

14  Q.   Now, this report on the right-hand column, total economic

15  loss, uses a compound interest rate to account for the

16  expansion in dollar amounts due to inflation, basically; isn't

17  that correct?

18  A.   I'm not sure I understand your question.

19  Q.   The right-hand column, total economic loss, provides a

20  running total of losses that increases in part due to

21  compounding that value using an interest rate; isn't that

22  right?

23  A.   Only on the historical.

24  Q.   Okay.  And the historical rate you chose to use was 12

25  percent; isn't that correct?

```
 1    A.   Yes.

 2    Q.   And there are other interest rates an economist could use,

 3    correct?

 4    A.   Not in Vermont.

 5         ATTORNEY COFFIN:  Your Honor, I think we need to have

 6    a quick approach on that.

 7         THE COURT:  Yes.

 8              (Bench conference begins.)

 9         THE COURT:  Okay.  So this obviously is going to lead

10    him to testifying something about Vermont law again.  I think

11    that's the concern.

12         ATTORNEY COFFIN:  Yeah, and, really, the witness

13    should have been instructed.

14         ATTORNEY VITT:  Excuse me.  I'm sorry.  It's loud

15    enough that everybody can hear.

16         ATTORNEY COFFIN:  I would have expected that the

17    witness, during a break, would have somehow been instructed

18    about the Court's rulings, but, regardless, he should not be

19    testifying with the tone, Vermont says this, and Vermont says

20    that.  It's not his role.  It's an implication that it's a

21    Vermont law thing, and we need to unwind that.

22         THE COURT:  He was on the stand on cross-examination

23    when the break happened, right?

24         ATTORNEY COFFIN:  Well, I still think he's -- I would

25    say there's a difference between discussing substantive
```

1    testimony and informing him about the Court's rulings about

2    guiding and limiting their testimony.

3         ATTORNEY VITT:  I understand that the defendants want

4    to argue that there is some other rate that ought to be

5    applied.  We will address that on substance.  I think they're

6    dead wrong, but we're going to deal with that, and we're happy

7    to brief the issue, Judge.  Dr. Bancroft understands that his

8    job is to determine in Vermont what's the amount that somebody

9    normally gets in terms of interest rates, and he says it's 12

10   percent.  He's not saying necessarily it's the law, but is he

11   saying that's what he does on employment cases?  Yeah.  Every

12   case is 12 percent.  That's what he does.  He calculates 12

13   percent interest on back pay.  I don't know how to avoid that.

14        THE COURT:  He believes Vermont law requires it?

15        ATTORNEY COFFIN:  Well, he shouldn't be testifying

16   law.

17        THE COURT:  No, totally.

18        ATTORNEY COFFIN:  And I would say this case has

19   federal law, Vermont law, and New Hampshire law, and it's an

20   open question.  You know, Attorney Vitt and I may not see

21   eye-to-eye on what the ruling on it for, right ruling on it is

22   for the law that applies, but it is not what Dr. Bancroft says

23   it's going to be.  That's not how it works.

24        ATTORNEY VITT:  He was in the legislature for eight

25   years.  He's got some familiarity with these issues.  So I'm

1    not saying he's an expert, but --

2          THE COURT:  I am going to have to instruct him about

3    not testifying as to what the law requires.  I've already

4    stricken an answer from earlier saying that he testified that

5    he felt that's what Vermont law requires.  So I may instruct

6    the witness to say, As you answer questions, answer Mr.

7    Coffin's questions on this topic, you shouldn't be speaking as

8    to your understanding of the law but just as to what your

9    analysis is.

10         ATTORNEY COFFIN:  I think you need to remove the

11   geographic reference because that as well -- I would just say

12   to cure it, you know, he can't say -- he said, Well, that's

13   what it is in Vermont, like, implying there's some sort of

14   Vermont rule, and I think you need to be clear that, you know,

15   even just talking about law, because he might not understand

16   that, but and also strike the reference to Vermont or somehow

17   modify it.  I don't have a verbatim suggestion for Your Honor,

18   but I think you get my import.

19         THE COURT:  Mr. Vitt?

20         ATTORNEY VITT:  I'm certainly fine with Dr. Bancroft

21   avoiding it, and you're right.  I didn't talk to him on the

22   break.  I didn't think it was my position to do that.  Avoiding

23   saying, you know, this is what Vermont requires, but this is

24   what happens all the time in Vermont, that's fine.  He does, as

25   a matter of practice when it's an employment case in Vermont,

1    use 12 percent.  I happen to think he's right, but we'll get to

2    that another day.

3          THE COURT:  I mean, on the other hand, it feels like

4    he has the right to testify how he makes use of this particular

5    rate, and it's a tough question to balance here.  I don't think

6    he can provide a backbone opinion on it.

7          ATTORNEY COFFIN:  He can say he used it because he

8    thought it was appropriate, but he can't say, Well, it's

9    because my understanding of law is such-and-such because it

10   just is too much of an open legal question, especially on this

11   record, and, you know, I'll just restate my concerns about, you

12   know, repeated admissions of discovery failures here, and it's

13   a little concerning.

14         THE COURT:  Okay.  So then I'm going to do my best to

15   -- he shouldn't be testifying as to what he thinks the law and

16   particularity the law in Vermont requires.

17         ATTORNEY COFFIN:  Perfect.  Okay.

18         ATTORNEY SCHROEDER:  Will you strike the answer as

19   well?  Because he said, In Vermont it is blank.

20         THE COURT:  Right, yeah.  I think I'll have to.

21         ATTORNEY SCHROEDER:  Thank you.

22              (Bench conference ends.)

23         THE COURT:  Okay.  So the Court is going to strike

24   the previous answer to the extent that it references what the

25   State of Vermont, in the Witness's view, requires, and I'll

(321 of 993), Page 321 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 273 of 945
2:17-cv-00194-kjd    Document 329-3    Filed 04/23/25    Page 273 of 945
110

VOLUME: 6
PAGES: 1-221

1    also direct the Witness not to, not to answer any of the

2    questions along this line involving your understanding of the

3    law or particularly what Vermont law requires.

4           THE WITNESS:  Okay.

5    BY ATTORNEY COFFIN:

6    Q.   All right.  You said, Dr. Bancroft, that you used the 12

7    percent figure as an interest rate for accounting for inflation

8    on past damages in your total economic loss column; is that

9    right?

10   A.   If I got to answer yes or no, no.

11   Q.   Okay.  Aren't I correct that you used the figure of 12

12   percent as an inflator as an adjustment in your total economic

13   loss column?

14   A.   I used 12 percent interest, right.

15   Q.   12 percent interest, okay.  Sorry about that.  And so, if

16   you had used another interest rate such as 3 percent, wouldn't

17   the damages on past economic loss be about a quarter of what

18   you have opined here?

19   A.   Well, I don't think they'd be a quarter, but they'd be

20   lower.

21   Q.   A lot lower?

22   A.   Um, no.  I don't know if you want me to deal with a

23   particular year, try to give you an idea what.

24   Q.   Well, yeah.  So, like, each year your total economic loss,

25   you adjust the amount of the prior year's loss by 12 percent,

(322 of 993), Page 322 of 993

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 274 of 945

2:17-cv-00944-kjd    Document 329-3    Filed 04/23/25    Page 114 of 245

111

VOLUME: 6
PAGES: 1-221

1    and my question to you is, If you adjusted it by a quarter of

2    that, say 3 percent, wouldn't the total economic loss be

3    essentially a quarter of your projection for a particular year?

4    A.   No.

5    Q.   No?

6    A.   No.  It's going to reduce the present value.  It will

7    reduce the interest part, but the basic loss that is in Column

8    9 is going to stay the same.  The interest, if you use 3

9    percent as opposed to 12 percent, the interest on that

10   component will be about a quarter.

11   Q.   Okay.

12   A.   But you've still got the base loss.

13   Q.   Okay.

14   A.   So you can't, you can't just go over to the further column

15   and say, If I use 3 percent, that number is going to be reduced

16   by 75 percent.

17   Q.   Okay.  So it wouldn't be a full reduction there, but,

18   basically, all of the accumulating interest in those losses

19   would be reduced by a quarter if you used 3 percent instead of

20   12 percent; is that right?

21   A.   Yes.

22   Q.   Okay.  And you wouldn't describe that as a significant

23   difference?

24   A.   Yes.

25   Q.   You would describe it as a significant difference?

1    A.   Yes.

2    Q.   Okay.  And so that would make, if the economic loss

3    figures were significantly different as a result of using 3

4    percent versus 12 as an inflator, basically, everything in your

5    chart is not correct; isn't that right?

6    A.   Yes, because it has a cumulative total, and the present

7    value numbers out through 2024 would be smaller.

8    Q.   Okay.  And you described in Assumption 10 of the March

9    19th 2025 report which is C11, if you could go to the second

10   page of the assumptions, please.  You described a discount rate

11   of 2.79 percent, five-year tax-free Triple A municipal bonds,

12   March 19th, is used to derive the present value for future

13   income, right?

14   A.   Yes.

15   Q.   And so that's an example of another interest rate one

16   could use based on those tax-free municipal bonds, right?

17   A.   I guess you could use whatever interest rate you wanted

18   to.

19   Q.   Now, your exercise on the fringe benefits attempted to

20   compare the value of her fringe benefits at Dartmouth to the

21   value of her fringe benefits at UVM; is that correct?

22   A.   Yes.

23   Q.   And, again, a lot of that was dependent on what she told

24   you, correct?

25   A.   No.

1  Q.   She didn't tell you, for example, that she got a fringe

2  benefit from the University of Vermont for tuition remission,

3  free tuition for her son; is that correct?

4  A.   That part is true.  I did not know that until you brought

5  it up.

6  Q.   I told you that, right?

7  A.   Yes, you did.

8  Q.   And okay.  And she continues to have the benefit of

9  tuition-free school for her kids going forward; isn't that

10  right?

11  A.   I assume she does.

12  Q.   And I'm not sure if she has any kids in school or not.  Do

13  you know?

14  A.   No, I don't.

15  Q.   Okay.  But you don't account for that specifically in your

16  report, right?

17  A.   Well, it would be speculation.

18  Q.   Now, can we please put up Page 34 of the Exhibit 5 of the

19  deposition testimony?  Okay.  And this should just go to the

20  witness, the judge.  And do you recognize this document,

21  Dr. Bancroft?

22  A.   I do.

23  Q.   And is this a part of your work papers that was produced

24  in discovery?

25  A.   I believe, yes, it was, and I had it in my initial file,

1    yes.

2    Q.   And we talked a little bit about this at the hearing on

3    March 14th, didn't we?

4    A.   I think we did.  I don't know if we talked about this

5    specific piece of paper.

6    Q.   Maybe this will refresh your memory.  This document looks

7    like it's a page of something called "Pension Plan of Employees

8    of Dartmouth-Hitchcock".  See that?

9    A.   Yes.

10   Q.   And you reviewed information about the pension in her

11   fringe benefits isn't that correct?

12   A.   Yes, I did.

13   Q.   Okay.  And I think you testified that the amounts you put

14   in her fringe benefits were 12 percent of her pay; is that

15   correct?

16   A.   Yes.

17   Q.   And, and, really, not so much her past pay, but your

18   projections of her future pay; isn't that right?

19   A.   Yeah, not her past pay, only on what she would, my

20   projections of what she would have earned at Dartmouth.  The

21   contribution to a defined contribution is spent, laid right out

22   by the Dartmouth document as 12 percent.

23   Q.   And my question is, So the, the, first of all, the total

24   pensionable pay that you see there, from your review of the

25   records, those look like her earnings at Dartmouth; is that

1    fair to say?

2    A.   Well, that's what they're using to calculate with.

3    Q.   Okay.  Do you remember testifying that you thought those

4    were her earnings at the hearing last week?

5    A.   I don't -- no.  I don't remember seeing this.

6    Q.   Okay.

7    A.   This wasn't up there last week.

8    Q.   And do you recall -- strike that.

9         Would her qualified pensionable pay, is that the amount of

10   her salary above which they no longer pay additional fringe

11   benefits to her retirement program, to your knowledge?

12   A.   Run that by me again.

13   Q.   Yeah.  So the total pensionable pay on the column on this

14   document is larger than the qualified pensionable pay, isn't

15   it?

16   A.   What numbers are you referring to?

17           ATTORNEY COFFIN:  First of all, may I move this

18   document's admission?  We're getting into it more than I

19   expected.

20           THE COURT:  Okay.  Any objection?

21           ATTORNEY VITT:  I didn't hear the question.  I'm

22   sorry.

23           THE COURT:  Asking for the admission into evidence of

24   this document.

25           ATTORNEY VITT:  Can we get a little more information

1    about where it came from?

2             ATTORNEY COFFIN:  I believe the witness, the witness

3    testified it was part of his work papers.  You produced it in

4    discovery.

5             ATTORNEY VITT:  No objection.

6             THE COURT:  And is this B21, Mr. Coffin?

7             ATTORNEY COFFIN:  Yeah, let's call it that.  Yes.

8             THE COURT:  All right.  Then Defendant's B21 is

9    admitted.

10         (Defense Exhibit B21 is admitted into evidence.)

11    BY ATTORNEY COFFIN:

12    Q.   Okay.  So qualified pensionable pay is lower throughout

13    the total than total pensionable pay; do you see that?

14    A.   No, I don't see that it's lower.  Oh, yeah, I do see that.

15    There's two columns here.  Yes.  There's different calculations

16    for this.  The column over on the right-hand side is by law.

17    Law specifies the maximum amount of income that you can

18    calculate a pension on.

19    Q.   Okay.  And so, if you make more than that, it doesn't

20    calculate in your pension; is that what you're saying?

21    A.   That's correct.

22             ATTORNEY COFFIN:  Okay.  And so -- oh, yeah, yeah.

23    Yes.  Can we publish this to the jury?  Thank you?

24             THE COURT:  Yes.

25    BY ATTORNEY COFFIN:

1    Q.   Sorry.  So here we see total pensionable pay, qualified

2    pensionable pay years 2008 to 2017, right?

3    A.   Yes.

4    Q.   Okay.  And so, if, and you note that throughout here

5    qualified pensionable pay is lower than total pensionable pay,

6    correct?

7    A.   Yes.  There's a formula for calculating that.  You can see

8    at the bottom of the, at the bottom of the original document

9    you had up there.

10    Q.   Okay.  And on the right there's sort of a cap that occurs

11    above which you don't get your income to count towards your

12    increased pension; is that right?

13    A.   Yes.

14    Q.   Okay.  And so, when you calculated her fringe benefits

15    going forward, you calculated them to be 12 percent of her

16    total pay; isn't that right?

17    A.   Yes, because that is what the defined contribution, not,

18    not the defined benefit package.  This right here is the

19    defined benefit package that ended at December 31st of 2017.

20    Going forward, it's a defined benefit package, which there's a

21    document that was in my folder back in my deposition that laid

22    it right out.  It was published.  It was a colored folder that

23    laid out that Dr. Porter was eligible, not eligible, would

24    receive contributions to a 403(b) equivalent to 12 percent of

25    her actual earnings.

1  Q.  Actual earnings, not qualified pensionable pay?

2  A.  Not qualified pensionable pay, because this is under a

3  different, whole different law.  It's a defined benefit

4  package.

5  Q.  Okay.  And still you have made the assumption in assessing

6  what her fringe benefits would be that they'd be 12 percent of

7  the, of your estimated pay that she would receive from

8  Dartmouth?

9  A.  I'm using --

10  Q.  Yes or no?

11  A.  Yes.

12  Q.  Okay.  And so, to the extent that she would not receive

13  2.5 percent increases every year, that may result in a lower

14  salary from Dartmouth and mean your 12 percent figure is

15  exaggerated; isn't that right?

16  A.  Well, it would lower the fringe benefits, yes, but it

17  would still be 12 percent of whatever the number is in that

18  first column.

19  Q.  But it's of whatever the number is, not necessarily your

20  projections, correct?

21  A.  It's 12 percent times the number, the income projection.

22  Q.  Now, you don't calculate -- you can take that down.  You

23  don't calculate -- well, actually, put it back up really

24  quickly.  Sorry.  Just real quick, one more question on this,

25  maybe two.

(330 of 993), Page 330 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 282 of 945
2217cv00044kjd Document 329.3 Filed 04/23/25 Page 182 of 945

1    The earnings in this column do not go up uniformly 2.5

2    percent each year; isn't that correct?

3    A.   As I said before --

4    Q.   Yes or no, isn't that correct?

5    A.   They do not.  They, pensionable income does not go up by

6    law.  It goes up by a set amount that's specified each year by

7    law, not by what Dartmouth wants to do.

8    Q.   Let's go to -- you can take that down, please.  Do you

9    know whether Dr. Porter qualifies for a pension from UVM

10   Medical Center or UVM Medical College, also known as the

11   College of Medicine or the Larner College of Medicine?

12   A.   Yeah, there's a 403(b) plan at UVM of which UVM

13   contributes 9 percent of her salary into it so she will have a,

14   when she retires, she can draw on that fund just as if she

15   could if she continued working at Dartmouth.  She could draw on

16   that fund that they contributed 12 percent to.

17   Q.   Do you know whether she would qualify for a pension as a

18   professor of OB/GYN at the University of Vermont?

19   A.   No.  There's no such thing.  I don't know what your

20   definition of pension is.  If your definition -- I believe, if

21   I remember correctly -- it may have been last week -- the

22   pension you associated with the defined benefit package where

23   there's a formula to determine it.  That's not the case at UVM

24   nor is it the case at Dartmouth now.

25   Q.   Okay.  Not talking about Dartmouth now.  I'm asking about

(331 of 993), Page 331 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 283 of 945
2217rev00094kjd Doocumeent32903 Fritated041205258 Fragge 128300f2945

120

VOLUME: 6
PAGES: 1-221

```
1    UVM

2    A.   Well, it's the same thing.  There's a 403(b) plan of which

3    money is put in.  UVM puts money into that plan, and that's her

4    money and she can start withdrawing that at -- I forget

5    exactly.  I think there's some qualification where you might be

6    able to draw it before 65, but that's her money, and she can

7    decide how she wants to withdraw it.

8    Q.   And how much is her yearly benefit from that?

9    A.   It's whatever she wants to withdraw.  There will be, there

10   are rules and regulations.  There's a required minimum

11   withdrawal specified by law, but you can take the minimum, and

12   you don't have to start taking that until 73, or you can take

13   more, but it's entirely up to the individual how they want to

14   receive that money.

15   Q.   Can you put up 34, please?  And just for the judge, the

16   witness, and the -- page, oh, I'm -- 35, 35 is what I wanted.

17   Sorry.  Looking at this document, does that refresh your

18   recollection about what the withdrawal would be for certain

19   years?

20   A.   On, yes, on her old plan.

21   Q.   Yes.

22   A.   The one that they, they eliminated as of January 1 2018.

23   Q.   Right.  And what does that say?

24   A.   It says --

25            ATTORNEY COFFIN:  Can we move the admission, please?
```

(332 of 993), Page 332 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 284 of 945
2:17-cv-00244-kjd Document 329-3 Filed 04/23/25 Page 284 of 945

121

VOLUME: 6
PAGES: 1-221

1            THE COURT:  Any objection?

2            ATTORNEY VITT:  No objection.

3            THE COURT:  All right.  And what is -- hold on,

4    Dr. Bancroft.  What is the number on this exhibit?

5            ATTORNEY McDONALD:  This is a different page from the

6    same exhibit.

7            THE COURT:  So C?

8            ATTORNEY McDONALD:  B21.

9            THE COURT:  Oh, so this has already been admitted?

10           ATTORNEY COFFIN:  I think that's next page of the

11   same exhibit, and only those two pages should be admitted.  We

12   can clear that up at a break, Your Honor.

13           THE COURT:  Okay.  So then C21 is admitted, this

14   page.

15           ATTORNEY McDONALD:  B21, Your Honor.

16           ATTORNEY COFFIN:  I apologize, Your Honor.  It's B21.

17           ATTORNEY McDONALD:  B, as in boy, 21.

18           THE COURT:  Okay, thank you.  B21 is admitted.

19   BY ATTORNEY COFFIN:

20   Q.   Dr. Porter, does that say that -- excuse me, Dr. Bancroft,

21   does this say that Dr. Porter gets a pension from Dartmouth

22   still?  Even though she's separated from them, she's eligible

23   for a pension where she could get a single life annuity worth

24   $9,431?

25   A.   Yes, she's entitled to that for the work that she did up

(333 of 993), Page 333 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 285 of 945
2217cv00094kjd Document32963 Filed04/23/258 Page 285 of 945

122

VOLUME: 6
PAGES: 1-221

1    to '17.

2    Q.    Okay.  And so she's entitled to that, and she could be

3    getting that even now, correct?

4    A.    Well, there is a, there's penalties if she was to take it

5    before 65.  They're quite severe.

6    Q.    And no penalties at 65?

7    A.    No penalties at 65.

8    Q.    Your chart doesn't show that addition to her income, does

9    it?

10   A.    No.  Don't need to.  I'm only interested in that, in

11   estimating what the loss is.  I'm not going to -- I don't need

12   to put down on the chart what she earned in the past --

13   Q.    Okay.

14   A.    -- both as income and as benefits.  This program is done.

15   She's going to receive, depending on how they she ticks it, if

16   she ticks a single life annuity, she's going to get $9,400, but

17   the issue is, How much more would she get from a 403(b) if she

18   continued to work at Dartmouth?

19   Q.    Now you can take that down and put up the chart from March

20   19th 2025, please.  Now, this chart goes to the out years of

21   2033; isn't that right?

22   A.    Yes.

23   Q.    And you testified at the beginning that you're not

24   projecting that she'll work until age 70; is that correct?

25   A.    Yes, correct.

1   Q.   And, however, you have underlined the amounts at age 70;

2   isn't that right?

3   A.   Yes.

4   Q.   And it says in a little note at the bottom, "The year

5   2033", underlined, "is consistent with the work life of a

6   62-year-old female with a graduate degree"; is that correct?

7   A.   Yes.

8   Q.   And that's the basis for your emphasis of that; is that

9   correct?

10   A.   Yes, yes.

11   Q.   But you're not estimating that she would work this long;

12   is that correct?

13   A.   No, I'm not.  I put that in there to help the jury.  It's

14   some additional information.

15   Q.   Because you have breakdowns for each year.  So at 65, for

16   instance, it's the, the total economic loss would be 1.360,

17   correct?

18   A.   Yes.

19   Q.   You know, not accounting for the higher compound interest

20   rate than I've suggested you might be appropriate; isn't that

21   right?

22   A.   Repeat that last part.

23   Q.   Yeah.  It's 1.3 million, but that doesn't take any amount

24   you might reduce if you used an interest rate of, say, 3

25   percent versus 12 percent?

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 287 of 945
2:17-cv-00944-kjd    Document 329.3    Filed 04/23/25    Page 124 of 245

1    A.   No, it takes -- that represents a 12 percent on historical

2    losses.

3    Q.   Right.  And, if you used a lower rate, you'd have a lower

4    number?

5    A.   Yes.

6    Q.   And, looking at this, you have the gross earned income

7    from Dartmouth in Column 1 and the gross earned income from UVM

8    in Column 4; is that correct?

9    A.   Yes.

10   Q.   And looking at between '24 and '25, the gross income from

11   Dartmouth or, excuse me, from UVM drops from $313,000 to

12   $302,000; isn't that correct?

13   A.   Yes.

14   Q.   And that is to reflect, is it not, the change in her work

15   from full-time, 1.0, to .75; isn't that correct?

16   A.   No.

17   Q.   No, it's not?

18   A.   No.

19   Q.   Why does it go down after that?

20   A.   She's moving from a .8 part-time position.  She is not

21   working full time.  She works .8, and she's moving down to a

22   .75.

23   Q.   I see.  I see.  And so the salary numbers that you used in

24   there reflecting a .8 position, not a full-time position; is

25   that correct?

(336 of 993), Page 336 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 288 of 945
2217cv00094kgd Document3293 Filed04/23/25 Page 288 of 945

125

1   A.   Her --

2   Q.   Yeah, the numbers you put in there -- strike that.

3        For 2017 to '24, the numbers you put in there are assuming

4   a .8 position?

5   A.   Well, from 2017 to 2024, the numbers in that gross earned

6   income column under the UVM are her actual earnings.  I'm not

7   doing any forecasting.  Those are her actual earnings out

8   through the year 2024.  Projections start in 2025.

9   Q.   Okay.  And actual being a 1.0 position?

10  A.   No, I don't think she was 1.0.  It's, I don't know if she

11  ever had a 1.0.  I know recently it's .8.  But what I'm

12  concerned about, well, not concerned -- the important thing is

13  I need to put in what she actually earned.

14  Q.   Yes.

15  A.   And I did.

16  Q.   But you do more than that, because you project going

17  forward earnings at what you calculated would be a .75 position

18  at UVM isn't that right?

19  A.   Yes.  I went forward forecasting.  Starting at 2025, I'm

20  starting to forecast, project out what her earnings, what I

21  believe her earnings would be, and I, that's based on starting

22  July 1 on a .75 part-time appointment.

23  Q.   Okay, okay.  Got you.  Just a second, please.  Did you --

24  you must have come up with this number by reducing to .75 from

25  what you, her, her projection was for her; isn't that right?

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 289 of 945
2:17-cv-00234-kjd   Document 329-3   Filed 04/23/25   Page 289 of 945

1    A.   Yes.

2    Q.   Okay.  So you'd done that math before, correct?

3    A.   I'm not sure what quite what your question is, but, if

4    you're talking about 2025 --

5    Q.   Yeah.

6    A.   As I explained on direct, two-step process.  The first

7    thing I did was increase her 2024 income by 2.5 percent, and

8    then, starting on July 1, I reduced it by a little over 6

9    percent, reflecting her moving from a .8 to a .75 position.

10    Q.   Okay.  So what I would like to do is just have you do a

11    little math with me, please.  Take the numbers of her total

12    earnings from -- I'll give you a pad you can write on in a

13    second.

14    ATTORNEY VITT:  I'm having a hard time hearing.  I'm

15    sorry.

16    BY ATTORNEY COFFIN:

17    Q.   I apologize.  Doing the math, from 2005 to 2027 and

18    looking at gross earned income, I'm going to have you divide

19    that by .75, which would give you the figure for a 1.0

20    position.

21    THE COURT:  So, Mr. Coffin, I'll ask you to pull the

22    microphone a little closer to you.  People are having a

23    difficulty hearing you.

24    ATTORNEY COFFIN:  I apologize.  Do I need to repeat

25    that?

1    ATTORNEY VITT:  We couldn't hear it.  I'm sorry.

2    ATTORNEY COFFIN:  Yeah, I apologize.  I'll try and

3    project.

4    THE COURT:  If you want to discuss it with the

5    Witness at the stand, you might be able to take his microphone.

6    BY ATTORNEY COFFIN:

7    Q.   Share?  Do you mind if I share?  Thank you.  Okay.

8    Dr. Bancroft, I'm showing you the -- you have before you the

9    March 19th 2025 chart, and I'd like you, with the calculator,

10   and I'm going to get you a pad so you can write it down in a

11   second, to calculate what the gross earned income for a .75

12   position you have in there is for a 1.0.  So you divide 302 by

13   .75 for that, for year 2025.  And I'll be back in a second.

14   You can use my calculator.  Let me just get a pad and --

15   A.   Well, may I comment?  The 2025 figure includes six months

16   at .8 and six months at .7.  So calculation is not as simple as

17   dividing it by .75.  Now, when I get to year 2026 and forward,

18   I can divide that by .75 to see what a full-time position is.

19   Q.   Just for rough, rough cutting here, can you please do what

20   I asked you to do and divide the $302,000 that is on your chart

21   for her total earnings at UVM for 2024 by .75, which would give

22   you what 1.0 is for that figure?

23   A.   No, it will not.

24   Q.   Well, can you just do it and --

25   A.   I'll do it anyways, but it's not correct.

(339 of 993), Page 339 of 993
2117cv00194kjd     Document 329-3     Filed 04/23/25     Page 291 of 945
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 291 of 945

```
 1              (The Witness uses the calculator.)

 2    Q.   That's $403,000?

 3    A.   Yes.

 4    Q.   I'll go put a star by that so because you've raised some

 5    points about how you calculated that.  Do the same thing for

 6    2006 and 2027.  I'll let you write it.

 7              (Witness complies.)

 8    A.   I'll let you write it.

 9    Q.   What is it?

10    A.   $427,888.

11    Q.   $427,888?  That's a 1.0 position for 2026 at University of

12    Vermont Medical Center --

13    A.   Yes.

14    Q.   -- correct?  2027, please.

15    A.   That was 2027.

16    Q.   Can you do 2026 then?

17    A.   Oh, I'm sorry.

18    Q.   That was 2027?  You're sure?

19    A.   No, I'm not.  Hold on just a second.

20    Q.   Sure.

21    A.   That number I gave was for '27.

22    Q.   Okay.  $427,888 for 2027; is that right?

23    A.   Yes.  And '26 --

24    Q.   What's 2026?

25    A.   $415,425.
```

1    Q.   Okay, thank you.  I'll take my phone.  So you calculated a

2    full-time position for 2025 with a couple of notes that, you

3    know, you had differing methodologies for the first half of the

4    year, second half of the year, but the .75 to 1 conversion was

5    $403,000, approximately, right?

6    A.   I'll take your word for it.  I don't have in front of me.

7    Q.   2026, the calculation of a full-time position, and, again,

8    here looking at the chart -- what is this exhibit number, by

9    the way?  C11, looking at this chart that's C11 and going down

10    to 2026, the amount you have written there for a gross income

11    from Dartmouth at or from UVM you have at a .75 position.  If

12    that was a full-time position, 1.0, the amount you calculated

13    would be $415,925; isn't that correct?

14    A.   I don't know.  I'll take your word for it.

15    Q.   Okay.  And 2027, the calculation if you converted the .75

16    gross figure from $320,000 to 1.0 would be $427,888, correct?

17    A.   Take your word for it.

18    Q.   Okay.  So I note that all three of those years her

19    earnings at Dartmouth if she was a 1.0 employee, a full-time

20    employee, would be higher, excuse me, at UVM would be higher

21    than what it was at Dartmouth; isn't that right?

22    A.   Higher than what I'm projecting, yes.

23    Q.   Okay.  And so, by that time, she would have fully

24    mitigated her losses and, going forward, luckily for her, she's

25    going to be making more at the University of Vermont than she

(341 of 993), Page 341 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 293 of 945
2:17-cv-00194-kjd Document 329-3 Filed 04/23/25 Page 293 of 945

130

VOLUME: 6
PAGES: 1-221

1   is at Dartmouth?

2          ATTORNEY VITT:  Objection.  It's speculation, Judge.

3          THE COURT:  Overruled.

4          ATTORNEY COFFIN: Can you read the question back,

5   please?

6          (Question read by the reporter.)

7          THE WITNESS:  She would be making more at UVM based

8   on a full-time position than my projections at Dartmouth.

9   BY ATTORNEY COFFIN:

10  Q.   Okay.  Now, thank you.  Now I'd like you to make another

11  --

12         THE COURT:  I'm sorry, Mr. Coffin Dr. Bancroft, can

13  you please pull the microphone closer?

14         THE WITNESS:  Sorry.

15         ATTORNEY COFFIN:  And I think we'll be done with

16  cross soon if that's okay, Your Honor.  I don't have a lot more

17  to do.

18         THE COURT:  All right.  Go ahead.

19  BY ATTORNEY COFFIN:

20  Q.   Now, more math, but you're a math guy.  You're an

21  economist.  36 weeks is 9 months, approximately?

22  A.   What's that?

23  Q.   36 weeks equals 9 months, approximately?

24  A.   Yeah.

25  Q.   Yeah.  Four weeks in a month, right?

1    A.    A little over, yes.

2    Q.    And nine months is about three-quarters of a year?

3    A.    Yes.

4    Q.    Okay.  Now, you estimated that, at Dartmouth, when she

5    left Dartmouth, she would have been making a gross income of

6    $309,000 in 2018; is that right?

7    A.    That's my estimate.

8    Q.    Okay.

9    A.    I don't know because I have to estimate it.

10    Q.    Okay.  And so you might be able to do this in your head,

11    but we'll do with it with the calculator.  .75 times $309,000

12    is what?

13    A.    I don't know.  You have the calculator.  What am I

14    supposed to do here?

15    Q.    .75 times $309,000, your 2018 projection.

16    A.    319,000?  $232,019.

17    Q.    Okay.  So in 2018 if she had received three-quarters' pay

18    for the year, that means that that would be, like, $232,000; is

19    that right?

20    A.    Well, that's the -- the math works out that way.

21    Q.    Right, right.  Fair enough.  And you never heard -- well,

22    strike that.

23          Wouldn't all of your assumption be thrown radically off

24    course if she had received $228,000 in the second half 2017 and

25    had been able to keep working at UVM?

VOLUME: 6
PAGES: 1-221

1    A.    Run that by me again.

2    Q.    Yeah.  Assume, please, that in 2017 -- strike that.

3          In the second half of 2017 and into early 2018, she had

4    received $228,000, just gift, but had been able to pursue her

5    now current employment which started then at University of

6    Vermont Medical Center.  Assume that.  How, wouldn't that mean

7    that your calculations here are completely thrown out the

8    window?

9    A.    Well, if you're going to assume less Dartmouth earnings,

10   obviously, my numbers are going to be off because my numbers

11   are predicated on my projections of what she would have earned

12   at Dartmouth, and so, if you change those numbers, it's going

13   to change the total economic loss.

14   Q.    Correct.  And you base a lot of your projections both for

15   Dartmouth and UVM on what she told you, correct?

16   A.    Yes.

17   Q.    And what Counsel Vitt told you, correct?

18   A.    Yes, I mean, but, but most of the times I talked with

19   counsel, Dr. Porter was on the line.

20   Q.    Okay.  No one mentioned to you, I presume, that anything

21   well -- strike that.

22         Can you please show what's been admitted as C6A?  And I'm

23   publishing this to the jury, Your Honor.

24              THE COURT:  Okay.  It's published.

25              ATTORNEY COFFIN:  And now please publish C13.  Blow

VOLUME: 6
PAGES: 1-221

1    up that paragraph on severance pay.

2                ATTORNEY VITT:  May we approach the bench, Judge?

3                THE COURT:  Yes.

4                    (Bench conference begins.)

5                ATTORNEY VITT:  I think what they're doing is taking

6    the severance offer if she had agreed to waive her rights and

7    accept the money. They can't take the severance offer and say,

8    Well, you should have taken that and, therefore, the payment

9    would have been greater.  That is -- I just figured out what

10   they're doing here.

11               ATTORNEY COFFIN:  Well, I'm asking this economic

12   expert to describe another "what if", which is, What if she had

13   taken the severance offer, which has been admitted into the

14   evidence without objection, and say whether he could project

15   how that would affect her future earnings.  And, of course, it

16   would affect them greatly because he doesn't, it appears he

17   doesn't know about that because he's relying on selective

18   information from the plaintiff, which is all impeachment.  It

19   goes to his credibility, and it goes to the substance of what's

20   going on here.

21               ATTORNEY VITT:  She has no obligation to accept a

22   severance offer that asks her to give up her various rights.

23   She had no obligation.  You can't say, Well, we made a decent

24   offer; you had to give up your rights, you know,

25   confidentiality.  I mean, you know, there's settlement offers,

(345 of 993), Page 345 of 993   Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 297 of 945
2217cv00094kjd   Document 329-3   Filed 04/25/25   Page 134 of 245

134

VOLUME: 6
PAGES: 1-221

1    I've seen these before.  Basically, you know, you have to be

2    quiet.  You can't disclose the amount.  You can't talk, you

3    know, nondefamation clause in there.  Absolutely not.  You

4    don't get to say, Here's a settlement offer, and, oh, by the

5    way, when it comes time for damages, we're going to consider

6    that and you should have accepted it, and this somehow affects

7    your damages.

8            ATTORNEY COFFIN:  So we have been asked to deal with,

9    on the fly, repeated last-second reports, nondisclosure,

10   varying economic opinions, and that's all supposed to be good

11   for us, and we're supposed to deal with it, but the remedy for

12   that, of course, is cross-examination on these documents, and,

13   if this information has been already submitted without

14   objection, it's relevant, already found, already admitted to

15   the case for any purposes, no limiting purposes.  I think it's

16   a fair point.

17           THE COURT:  It's in evidence.  So, Mr. Vitt, it would

18   be very difficult for me to limit cross-examination on this

19   when it's before the jury already and has been since last week.

20   You'll obviously have an opportunity to speak to your witness

21   again on redirect and examine him on this.

22           ATTORNEY VITT:  All right.  Thank you.

23           (Bench conference ends.)

24

25   BY ATTORNEY COFFIN:

2217rcdv0029944kjgd   Document 329.3   Filed 04/23/2558   Page 298 of 2945

 1   Q.   Now, Dr. Bancroft, you saw, as we published to the jury,

 2   the last two exhibits which are -- find I piece of paper here

 3   -- C6A and C13, correct?

 4   A.   Yeah, I believe so.  I'm seeing C13.

 5   Q.   Yes or no, you see them?

 6   A.   I see 13.

 7   Q.   Before you were just shown C6A.

 8   A.   I'll take your word for it.

 9   Q.   Would you like to see it again?

10   A.   If you want me to, absolutely, sure, yes.

11   Q.   Could you put up C6A, please?  And, directing your

12   attention to that first paragraph -- the rest is on another

13   issue -- you've read that now?

14   A.   Yes.

15   Q.   And look at, please -- we're going to put C13 up again.

16   And, directing your attention to the highlighted paragraph,

17   which there it is, this paragraph describes that they're

18   willing to give a severance to 36 weeks, see that?

19   A.   Yes.

20   Q.   Did Dr. Porter or Attorney Vitt discuss anything about the

21   payment of $228,000 in 2017 to Ms. Porter, Dr. Porter, excuse

22   me, with you prior to your testifying here today?

23   A.   I don't remember if they specifically talked about it, but

24   what I looked at is what she actually earned, and if you'll

25   notice in 2017 I'm saying her loss is, what, $600.

(347 of 993), Page 347 of 993ase: 25-1382, 12/22/2025, DktEntry: 35.4, Page 299 of 945
2217fedve000044kjdd  Dodcumeent329c3  Fileed041235288  Fragge139500f2945

136

VOLUME: 6
PAGES: 1-221

 1    Q.   Yes-or-no questions are really important here, not side

 2    tours, please.  You cannot testify that they provided this

 3    information that she was offered a $228,000 severance in 2017

 4    today, correct, yes or no?

 5    A.   I don't see that number, so I don't know what she was

 6    offered.

 7    Q.   Excuse me.  Yes or no, please?

 8         ATTORNEY COFFIN:  Can you read me my question back,

 9    please?

10              (Question read by the reporter.)

11    A.   I don't remember.

12    Q.   If they had described a 228-some-odd-thousand-dollar

13    payment that would be made then, would that have affected your

14    economic analysis?

15    A.   No.

16    Q.   Okay.  And so, if Dr. Porter had received -- can you put

17    up the 2025 chart, please?  If Dr. Porter had received a

18    $228,000 payment in 2017, your gross earnings figure for that,

19    assuming it was earnings, your gross earnings figure for that

20    year would have gone up by $228,000; isn't that right?

21    A.   Well, if you were to add those two together, it would, but

22    I looked at what she actually received.

23    Q.   I understand what you did.  I'm just asking you a

24    hypothetical.

25    A.   If it's a hypothetical, yes, it's a hypothetical.

(348 of 993), Page 348 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 300 of 945
2:17-cv-00994-kjd Document 329-3 Filed 04/25/25 Page 300 of 945

137

VOLUME: 6
PAGES: 1-221

1  Q.   Okay.  And so that increased earnings capacity or that

2  lump sum earnings --

3            ATTORNEY VITT:  Objection, Your Honor.

4            ATTORNEY COFFIN:  Would have --

5            ATTORNEY VITT:  Accepting a severance payment to give

6  up your claims is not --

7            THE COURT:  Well, Mr. Vitt, instead of a speaking

8  objection, I'd ask you to come up.

9                 (Bench conference begins.)

10           THE COURT:  I understand your point.  I think what

11 you're asking to say is accepting a severance --

12           ATTORNEY VITT:  Is not an increased earnings

13 capacity.

14           THE COURT:  He's asking him this as a hypothetical,

15 if she had accepted the severance pay, right?  Why can't you

16 come back on redirect and reestablish what he's saying now,

17 which is that she --

18           ATTORNEY VITT:  Severance, but it's not, it doesn't

19 increase her earnings capacity.  That's what that increases

20 earnings capacity.  No, it doesn't.  She's simply accepting a

21 severance, giving up rights that she otherwise has.  That

22 doesn't increase her earning capacity.

23           THE COURT:  I don't know that your questioning is to

24 make the point that it increases earning capacity.

25           ATTORNEY COFFIN:  No, it's not.

VOLUME: 6
PAGES: 1-221

```
 1              THE COURT:  It would have been in red of that

 2     particular amount.

 3              ATTORNEY COFFIN:  Yes, and he should and she would

 4     have had less to mitigate, and she would have been able to

 5     mitigate earlier, though it's crazy how quickly she did

 6     mitigate.

 7              ATTORNEY VITT:  There wouldn't have been a lawsuit.

 8              ATTORNEY COFFIN:  It might have been in her interest

 9     to take that, but, yes, it's a legitimate cross.

10              THE COURT:  As I said before, you can come back on

11     redirect, and he'll make that point for you.  It sounds like

12     she didn't accept it and his basis of calculation is what she

13     actually received.

14              ATTORNEY COFFIN:  This is probably the one or two, if

15     I can spit them out, and then we're done.

16              ATTORNEY VITT:  Take a break and then --

17              THE COURT:  Yes.

18              (Bench conference ends.)

19     BY ATTORNEY COFFIN:

20     Q.   Dr. Bancroft, if Dr. Porter had received a payment of

21     $280,000 as earnings in 2017, that would have increased her

22     earnings column in Column 1, Line 1 on 2017 by some $228,000;

23     isn't that correct?

24     A.   I'm not sure of that.  I can't answer yes or no.  I don't

25     know.  I'd have to see the circumstances what she got.  I told
```

VOLUME: 6
PAGES: 1-221

 1   you the measure I have there is actual earnings.

 2   Q.   Okay.  I'm asking for a hypothetical.

 3   A.   Okay.

 4   Q.   Okay.  So please answer my question.

 5   A.   Make it clearer to me that it's a hypothetical.

 6   Q.   Okay, I'll try.  If she, if, if, hypothetically, she had

 7   received $228,000 in earnings in 2017 and that would be in

 8   something using the methodology you've talked about here, you

 9   would add it to her gross earned income, right?

10   A.   No.  Maybe.  I don't know.  I can't answer.  I don't know,

11   no.

12   Q.   You can't say that, if it's earnings and she had it, you'd

13   consider it?

14   A.   I put in her actual earnings.

15   Q.   Well, let's assume she actually earned that, she got,

16   actually got a $228,000 payment in 2017, she actually got that

17   as reflected by the letter offering her that, for example,

18   right?  Then you would have that added to the gross earned

19   income column, correct?

20   A.   If it's not already taken into account.

21   Q.   Okay.  And from there that flow-down would be moneys that

22   she could use to offset other deficiencies in her earnings

23   later on, correct?

24   A.   Yes.  So you're assuming that she would have, she would

25   have left Dartmouth?

(351 of 993), Page 351 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 303 of 945
2217cv00094kjd Document 329-3 Filed 04/23/25 Page 303 of 945

140

VOLUME: 6
PAGES: 1-221

1  Q.  Let's assume what happened happened, she left and she went

2  to UVM

3  A.  Yeah, I'm just trying to understand your hypothetical.

4  Q.  Okay.  Apologize.  And she's working away at Dartmouth for

5  a while, but she leaves and is offered a position, you know,

6  pretty much right way at UVM and she works there and has a

7  successful career there, correct?

8  A.  Yes.

9  Q.  But maybe in the first couple of years it's a little bit

10  less than what she was making at Dartmouth, correct?

11  A.  Quite a bit.

12  Q.  Okay.  But $228,000 could do quite a lot to fill up that

13  divot; isn't that correct?

14  A.  If this is some new money that she would have received,

15  yes.

16       ATTORNEY COFFIN:  Okay.  Those are all I got, Your

17  Honor.

18       THE COURT:  Okay, all right.  So we'll take our lunch

19  break.  We'll be ready to go at 1:30, please.

20       (A recess was taken from 12:26 p.m. to 1:32 p.m.)

21       THE COURT:  Okay.  Mr. Coffin

22       ATTORNEY COFFIN:  On very minor matter, Your Honor.

23       THE COURT:  Yes.

24       ATTORNEY COFFIN:  In the rush to get jury and all of

25  us to lunch, I wanted to move the admission of what I'm calling

VOLUME: 6
PAGES: 1-221

1    C19, which is the little handwritten chart that Dr. Bancroft

2    prepared during his cross.  I propose that this be admitted at

3    this time as demonstrative evidence and that we likely will

4    follow with asking for it be substantive evidence should the

5    plaintiff's chart be admitted as substantive evidence.

6              THE COURT:  Is there any objection, Mr. Vitt?

7              ATTORNEY VITT:  Well, we certainly object to it being

8    admitted into evidence under any circumstances.  Dr. Bancroft

9    said it was inaccurate.  So, to the extent it's been used

10   demonstrably, fine, but I don't know about admitting as

11   demonstrative.  I don't know what that means.

12             THE COURT:  So a demonstrative would be that,

13   obviously, he did some calculations on cross-examination.  It

14   could be shown to the jury for, for whatever purpose the

15   defense has asked him to do those calculations.  If it's

16   admitted as a demonstrative now, then on redirect, if you

17   choose, you can make use of that as well to speak to

18   Dr. Bancroft about that.

19             ATTORNEY VITT:  I don't intend to use it at all.

20             THE COURT:  Okay.  Do you object to it?

21             ATTORNEY VITT:  I do.

22             THE COURT:  Okay.  Can I actually see it?  I haven't

23   --

24             ATTORNEY COFFIN:  If I might approach, Your Honor.

25             THE COURT:  Yes of course.  This is

(353 of 993), Page 353 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 305 of 945
2117cv00094kjd Document329.3 Filed 01/23/26 Page 305 of 945

142

VOLUME: 6
PAGES: 1-221

1          ATTORNEY COFFIN:  This is the only copy in the world.

2          THE COURT:  So it says very little, but I know it's

3     because your questions were kind of prompting.  So this is the

4     ultimate sum total on the cell phone of the calculations you

5     directed him to make?

6          ATTORNEY COFFIN:  Yes.  These were the calculations

7     that were made using the addition based on the cell phone

8     calculator and written in.

9          THE COURT:  Okay.  And, if this were to be admitted

10     as a demonstrative now, Mr. Vitt objects to that, but he is

11     also not going to be making any use of it.  Is there any reason

12     why we can't take this up at a later time?

13          ATTORNEY COFFIN:  No.  I just didn't want him to be

14     deprived of it on redirect.  We just created it, and I wanted

15     him to be aware of it.

16          THE COURT:  Given that he's not going to use it, I

17     guess I won't rule on this right now, but let's not forget it.

18          ATTORNEY COFFIN:  Okay.  I do view this as important

19     cross-examination admissions of this witness, by the way.

20          THE COURT:  Okay.  But, again, Mr. Vitt, you have no

21     intentions of using this on redirect?

22          ATTORNEY VITT:  None.

23          ATTORNEY SCHROEDER:  Judge, I also asked Emerson if

24     we could come in a little bit early, just to go over, knowing

25     that we have a lineup for tomorrow.  I've spoken with

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 306 of 945
2:17-cv-00194-kjd   Document 329-3   Filed 04/23/25   Page 306 of 945

VOLUME: 6
PAGES: 1-221

1    Dr. DeMars about, Hey, I don't think the other side is going to

2    be done with you today.  Can you figure out how to come back

3    tomorrow?  She's making arrangements to do that.

4        But then we have Dr. Conroy, CEO, coming, and it's really

5    important to get her on and off since Dr. DeMars is sitting out

6    there for the whole day since 9:00 a.m. without her phone.  So

7    she doesn't have the ability to get any work done.  The same is

8    going to be true for Dr. Conroy.  I know of they have a few

9    other witnesses that may or may not have some other issues,

10   Dr. DeMars was here for today.  We're making arrangements to

11   have her back tomorrow morning.  But, given the fact that they

12   don't have the ability to sit out there and do work while

13   they're here, it is really important for us that Dr. Conroy

14   then gets on right after and gets off quickly.  Because I don't

15   think that's going to take more than 15 minutes.

16            THE COURT:  Okay.  And Dr. Conroy is for tomorrow?

17            ATTORNEY SCHROEDER:  Correct.

18            ATTORNEY NUNAN:  Well, okay.  So we had given

19   Michelle Russell a subpoena for 9:00 o'clock tomorrow, which we

20   understand she would go on after Dr. DeMars, and we had been

21   accommodating to allow Dr. Conroy to come on Tuesday instead of

22   Wednesday.  So, again, I do not think that Dr. Russell will

23   take long, but she does have childcare duties at the end of the

24   day in the Upper Valley, and I am going to try to get her on,

25   like I told her, as soon as possible in the morning.  And she

(355 of 993), Page 355 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 307 of 945
2217cv0029kgd Document32963 Filed04205288 Page1347of2945

144

1    also will be without her phone and not able to work in the

2    lobby.

3              THE COURT:  Okay.  So Dr. DeMars, after the remaining

4    redirect today, possibly coming back in the morning if

5    necessary.  Plaintiff then intended to call Dr. Russell after

6    that and then Dr. Conroy, right?

7              ATTORNEY NUNAN:  Right.

8              ATTORNEY SCHROEDER:  Yes.

9              THE COURT:  Dr. Conroy after that.  So thank you for

10   letting me know.  Let's see how the day goes, see what we get

11   through, and I'll be asking the same questions at the end of

12   the day.  Anything else?

13             ATTORNEY McDONALD:  One minor exhibit issue.  I think

14   the Court admitted the entirety of B21.  I've spoken with

15   opposing counsel, and I think the intention was just that two

16   pages from that larger set be admitted.  So they have agreed

17   that B21A should be Page 34 from B21 and B21B should be Page 35

18   from the original B21 but that the entirety of B21 not be

19   admitted.

20             THE COURT:  Okay.  Mr. Vitt, is that accurate?

21             ATTORNEY VITT:  Yes.  Thank you, Your Honor.

22             THE COURT:  Okay.  So then B21A and B21B are

23   admitted, B21A being Page 34 and B21B being Page 35.

24             ATTORNEY McDONALD:  Thank you, Your Honor.

25             THE COURT:  Okay.  The bench conferences, I have to

```
 1    tell you.  It's, it's a little cacophonous up here.
 2              ATTORNEY COFFIN:  I apologize, Your Honor.
 3              THE COURT:  Yeah, I know we have to be very much on
 4    top of this.  If people are not going to keep the volume down,
 5    I'm just going to have to ask the jury to leave every time we
 6    have a bench conference.  I honestly don't know what else I can
 7    do in that circumstance.  Please be mindful of it.  I certainly
 8    have noticed -- how could you not notice it -- that there does
 9    seem to be a fair amount of tension here between the lawyers.
10    I know you're both advocates for your position, but it
11    certainly hasn't gone unnoticed.  This really is, it seems to
12    me, anyway, among some of the more contention interactions
13    between the lawyers.
14         Again, I'm not trying to rein people in in terms of being
15    zealous advocates, but, when it comes to things like this,
16    let's please do our best to keep it within the bounds of normal
17    in terms of volume level, okay?  All right.  We'll bring the
18    jury in.
19              (The Jury enters the courtroom.)
20              THE COURT:  Mr. Vitt, redirect?
21                   REDIRECT EXAMINATION BY ATTORNEY VITT
22    Q.   Thank you.  Dr. Bancroft, all set?
23    A.   Yes.
24    Q.   You were asked on cross-examination if you had worked with
25    my firm and Eric Jones's firm on other employment matters,
```

1    correct?

2    A.    Yes.

3    Q.    Do you also with work with Downs Rachlin Martin, the firm

4    Mr. Coffin is associated with?

5    A.    Yes.

6    Q.    For how long a period?

7    A.    I believe my first litigation case for them was in 1984,

8    and I just finished up one with them in January of this year.

9    Q.    I'd like to direct your attention, if I may, to the 2023

10   earnings for Dr. Porter.  Had you obtained documents from Dr.

11   Porter to support the earnings data that you provided in your

12   report?

13   A.    Yes.

14   Q.    Was it relevant whether Dr. Porter was a full professor or

15   not, so long as you had accurate salary information for her for

16   that year?

17   A.    No, it wasn't relevant.  What I want is the actual.

18   Q.    All right.  And you actually had the actual numbers that

19   you obtained from documents provided by Dr. Porter?

20   A.    Yes.

21   Q.    There is a question or two about reductions in

22   Dr. Porter's salaries in 2016 and 2017 at Dartmouth-Hitchcock.

23   Was she on disability during those years?

24   A.    Yes.

25   Q.    Did that have an impact on her salary?

1    A.    Yes.

2    Q.    I'm going to show you what has been marked as -- I think

3    it's C13.  It's defendant's June 5, 2017 letter to Dr. Porter

4    and then a number of documents, including a confidential

5    separation agreement and general release.  Hand that up to you.

6         Over the years in working on employment cases, have you

7    seen settlement documents that include a general release?

8    A.    I'm sorry.

9    Q.    Have you seen settlement documents that include a general

10   release over the years in working on employment cases?

11   A.    I probably have.  None come to mind.

12   Q.    All right.  If you look at that, there is a reference to,

13   I think, Paragraph 4, a general release.  Do you see that,

14   Paragraph 4?

15   A.    Paragraph 4 on the June 5, 2017 --

16   Q.    Yes

17   A.    -- letter?

18   Q.    Well, actually, it's in the document.  I'm sorry.  My

19   fault.  Okay.  I'll get it for you.  Hold on.  What's the title

20   of that paragraph?

21   A.    Paragraph 4?

22   Q.    Yes, please.

23   A.    Release by physician.

24        THE COURT:  Mr. Vitt, I'm not seeing this exhibit.

25   Did you intend to show this exhibit or just ask the witness

1    about it?

2              ATTORNEY VITT:  Actually, if I could show it, I would

3    appreciate it, Judge.

4              THE COURT:  Okay.  This is admitted?

5              ATTORNEY VITT:  Yes, C13.

6              THE COURT:  Yes.

7              ATTORNEY VITT:  If that's the case, if you'll give

8    that back to me, it will show up here on your screen.

9              THE WITNESS:  Do you want the whole packet?

10   BY ATTORNEY VITT:

11   Q.   Thanks.  I realize you're an economist and don't spend a

12   lot of time reading general releases and documents like that,

13   but are you aware generally that, when employment cases get

14   settled, the person receiving money is expected to release any

15   and all claims that they have against the employer?

16   A.   That's sort of roughly my understanding, but, again, I

17   have all I can do to handle the economics.

18   Q.   And, right, and if you go to Paragraph 5, there is a move

19   to Paragraph 5.

20   A.   It's not here.

21   Q.   Oh, it's not on your screen?  Let me put it here.  Thank

22   you.  Do you see that?

23   A.   Paragraph, what's the first couple words?  The term?

24   Q.   Paragraph 5 confidential physician --

25   A.   Oh, yes okay.  Yes.

(360 of 993), Page 360 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 312 of 945
2:17-cv-00194-kjd Document 329-3 Filed 04/25/25 Page 149 of 245

149

VOLUME: 6
PAGES: 1-221

1    Q.   "Physician agrees to keep the terms and conditions

2    relating to this agreement confidential", do you see that?

3    A.   Yes.

4    Q.   Okay.  And then I'm going to put Paragraph 6 up here

5    entitled "nondisparagement".  Do you see that?

6    A.   Yes.

7    Q.   The first sentence, "Neither physician nor anyone acting

8    on physician's behalf will make derogatory, disparaging, or

9    critical statements about employer or any employer releasee".

10   Do you see that?

11   A.   Yes, I do.

12   Q.   So, given the obligations that Dartmouth-Hitchcock sought

13   to impose on Dr. Porter in order to receive this payment of

14   $228,000, did you see any reason that that $228,000

15   hypothetical payment should be reflected in your report?

16             ATTORNEY COFFIN:  Objection, totally leading.

17             THE COURT:  I'll allow it.

18             THE WITNESS:  No.

19             THE COURT:  Go ahead.  You may answer the question.

20             THE WITNESS:  No.

21   BY ATTORNEY VITT:

22   Q.   No reason to include it, correct?

23   A.   No.

24             ATTORNEY VITT:  Nothing further.

25             THE COURT:  Any recross, Mr. Coffin?

(361 of 993), Page 361 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 313 of 945
2:17-cv-00194-kjd    Document 329-3    Filed 04/23/25    Page 151 of 245

150

VOLUME: 6
PAGES: 1-221

1          ATTORNEY COFFIN:  Yeah, briefly, Your Honor.

2              RECROSS-EXAMINATION BY ATTORNEY COFFIN

3     Q.   You testified that, beginning in 2025 for this analysis,

4     one of your assumptions is the plaintiff would be working .75

5     hours for her position at UVMMC; isn't that right?

6     A.   Yes, starting July 1.

7     Q.   And yet you continued when she was at Dartmouth from 2025

8     until your posited age of her retirement in 2033 --

9              ATTORNEY VITT:  Objection.

10    BY ATTORNEY COFFIN:

11    Q.   -- that she would be working in a full position; isn't

12    that right?

13             ATTORNEY VITT:  Objection, Judge.  This is beyond

14    scope.

15             THE COURT:  No, I'll allow this.

16             ATTORNEY VITT:  All right.

17             THE WITNESS:  Yes, I'm assuming.  Based on her salary

18    at the time she was terminated, I've used that number to go

19    forward, and I'm assuming that was for a full-time position.

20    BY ATTORNEY COFFIN:

21    Q.   Your assumption is, while at Dartmouth, she would work

22    from 2025 until her posited retirement age in 2033 full time,

23    correct?

24    A.   Yes, I think that's the case.

25    Q.   While at UVM she would work from 2025 until the time of

(362 of 993), Page 362 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 314 of 945
2117-cv-00194-kjd    Document 329-3    Filed 04/23/23    Page 314 of 945

151

VOLUME: 6
PAGES: 1-221

1    her retirement in 2033 only at .75; isn't that correct?

2    A.   Yes.

3    Q.   And that's based on what she told you; isn't that correct?

4    A.   Yes.

5    Q.   Now, the difference between what she's making at Dartmouth

6    as a full-time employee and what she's making at UVMMC as a

7    theoretical .75 employee you calculate each year as damages

8    incurred by the plaintiff; isn't that right?

9    A.   Yes.

10   Q.   So, if she's working less than full time at UVMMC, her

11   damages are increased just because of that hypothesis?

12   A.   If she's working -- yes.

13   Q.   And we went through some of the numbers which showed, if

14   you converted the .75 first to full time during her '25 through

15   '27 UVMMC employment, she actually would be making more in

16   salary at UVMMC; isn't that right?

17   A.   Yes.

18   Q.   Now, we talked a little bit about your cases, your prior

19   work as an expert witness, and we talked about 2,500 cases, and

20   it was hard to pin down some amounts related to your less

21   recent work.  Let me ask you about your more recent work.

22        If we take the 500 cases or so that you've described doing

23   since the time of your deposition in October of 2019, I think

24   you said that was your estimate about the number of cases

25   you've done, correct?

(363 of 993), Page 363 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 315 of 945
2:17-cv-00944-kjd    Document 329-3    Filed 04/23/25    Page 315 of 945

152

VOLUME: 6
PAGES: 1-221

1              ATTORNEY VITT:  Objection.

2              THE WITNESS:  That was what is on my resume.

3              THE COURT:  Dr. Bancroft, please don't answer the

4       question.

5              ATTORNEY VITT:  Objection, Judge.  This is well

6       beyond scope of what I covered in my redirect.

7              THE COURT:  Sustained.

8              ATTORNEY COFFIN:  No further questions.

9              THE COURT:  All right.  Dr. Bancroft, you may step

10      down.  Plaintiff may call the next witness.

11             ATTORNEY NUNAN:  We call Leslie DeMars.

12                   Leslie DeMars,

13             having been duly sworn to tell the truth,

14                testifies as follows:

15             THE COURT:  Please proceed.

16             ATTORNEY NUNAN:  Just a technical issue, can we shut

17      the ELMO off?  I'm going to plug in my computer.  The document

18      that's going to come up first has already been admitted, 83.

19             THE COURT:  Okay.

20             ATTORNEY SCHROEDER:  Sorry, Sarah.  What number is

21      that?

22             ATTORNEY NUNAN:  83.  Sorry.

23             ATTORNEY VITT:  If you could get a little closer to

24      the microphone --

25             ATTORNEY NUNAN:  Yeah, not a problem.  I have one

VOLUME: 6
PAGES: 1-221

1    more thing.  I'd like to get Dr. DeMars a book of the documents

2    so that she can read the paper version in full before I ask her

3    questions about them.  Is that okay?

4         THE COURT:  Okay.

5         ATTORNEY NUNAN:  Easier to read them in paper than it

6    is to review them all.  So the only two that are in the second

7    notebook are here.  So I'll just direct you when the time

8    comes.

9              DIRECT EXAMINATION BY ATTORNEY NUNAN

10   Q.   Good afternoon, Dr. DeMars.  My name is Sarah Nunan.  Will

11   you please tell me your medical education history?

12   A.   So I was a medical student at the University of Vermont.

13   I then did my residency and fellowship at the University of

14   North Carolina, Chapel Hill.

15   Q.   And did you come to Dartmouth-Hitchcock about 1996?

16   A.   1997.

17   Q.   Great.  Was that your -- let's see.  What was your

18   specialty when you got there?

19   A.   Gynecologic oncology.

20   Q.   And you worked in the OB/GYN department?

21   A.   Yes.  GYN oncology is a subspecialty of obstetrics and

22   gynecology.

23   Q.   And you came to Dartmouth-Hitchcock the same time as

24   Dr. Porter?

25   A.   Approximately, yes.

1   Q.   And when did you leave Dartmouth-Hitchcock?

2   A.   End of December 2018.

3   Q.   2018?  Okay.  Are you a board examiner?

4   A.   Not anymore.

5   Q.   Were you for a period of time?

6   A.   Yes.

7   Q.   How many years?

8   A.   20.

9   Q.   Okay.  Any other honors that you had over the course of

10  your career?

11  A.   None that I would count as being subspecialty oriented.

12  Q.   Great.  If you want to open up your notebook to Tab 83, I

13  have most of the documents here, but, if you like the paper

14  copy, it's there.  You all set?

15  A.   Yes.

16  Q.   Okay.  This is the email that Dr. Merrens received from

17  Nurse Victoria Maxfield.  Do you know who she is?

18  A.   Yes.

19  Q.   And he makes statements at the top of the page to Nurse

20  Maxfield.  He says, "As you know, Dr. Porter currently works at

21  20 percent of her time".  Do you see that?

22  A.   Yes.

23  Q.   So this was in May of 2017.  Dr. Porter was back working.

24  Do you know if that is a correct statement?

25  A.   It's difficult to put exactly together how many hours

1    Dr. Porter was working from month to month, and the timeline is

2    really hard to remember.  Dr. Porter was working a limited

3    number of hours in a limited capacity.

4    Q.   Fair.  If I, if I said to you that she was not working one

5    day a week, but that she was working four days a week, she was

6    working approximately 50 percent of the time, would you

7    disagree with me?

8    A.   I would disagree with you.

9         ATTORNEY SCHROEDER:  Objection.  Calls for

10   speculation.  I realize this is on cross, but --

11        THE COURT:  Sustained.  I

12        ATTORNEY SCHROEDER:  And, Dr. DeMars, just wait until

13   the objection is handled by the judge.  Thank you.

14   BY ATTORNEY NUNAN:

15   Q.   Dr. Merrens says here, "The recommendation around the

16   closing of the program and its staff, and its staff were at the

17   recommendation of Dr. DeMars".  Do you agree with that

18   statement?

19   A.   I disagree that I recommended to close the division.  We

20   had recommended that we close temporarily the IVF services at

21   DH.

22   Q.   Was it your experience that the administration conflated

23   IVF and the other resources, the other services that the REI

24   division provided?

25        ATTORNEY SCHROEDER:  Objection, Your Honor.  Assumes

(367 of 993), Page 367 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 319 of 945
2217cv00194kjd    Document 329.3    Filed 04/23/25    Page 159 of 945

156

VOLUME: 6
PAGES: 1-221

1    facts not in evidence.

2            THE COURT:  Sustained.  I'll ask you to rephrase the

3    question.

4    BY ATTORNEY NUNAN:

5    Q.   Okay, sure.  When there were discussions about closing the

6    division, was it your experience that they were saying to you

7    that the IVF portion was what the REI doctors did?

8    A.   I don't think that's an accurate representation.

9    Q.   Okay.  How much of the REI division was IVF?

10   A.   I can't give you a percentage because each, each REI

11   division member had their own particular interests.

12   Q.   Would it be fair to say that it was somewhere between 10

13   and 20 percent?

14           ATTORNEY SCHROEDER:  Objection, Your Honor.  Assumes

15   facts not in evidence.

16           THE COURT:  Overruled.

17           THE WITNESS:  That may have represented Dr. Porter's

18   practice, but it probably did not represent the practice of the

19   other members of the division.

20   BY ATTORNEY NUNAN:

21   Q.   Okay.  Will you take a look at what time Dr. Merrens sent

22   this email?  Do you agree it's sent at 2:19 p.m.?

23   A.   Yes.

24           ATTORNEY NUNAN:  Okay.  I would like to show the

25   Witness Exhibit 89.

(368 of 993), Page 368 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 320 of 945
2:17-cv-00194-kjd    Document 329-3    Filed 04/23/25    Page 320 of 945

157

1          THE COURT:  Is that admitted in evidence, Ms. Nunan?

2          ATTORNEY NUNAN:  It is not.

3          THE COURT:  Okay.

4      (Plaintiff Exhibit 89 was shown to the Witness.)

5   BY ATTORNEY NUNAN:

6   Q.   Dr. DeMars, is this an email that you sent to Daniel

7   Herrick?

8          ATTORNEY SCHROEDER:  Counsel, just, I don't want to

9   interrupt your question, but it's a pretty long email.  So I'd

10  just, if you want her to read it, all of it, that's fine.  I

11  just --

12         ATTORNEY NUNAN:  Sure.  I'd like to get it admitted

13  in evidence before she starts reading it.

14  BY ATTORNEY NUNAN:

15  Q.   I'm sorry.  At the top is this an email that you sent to

16  Ed Merrens?

17  A.   It's a series of emails that I sent to Ed Merrens, yes.

18  Q.   And the date is May 14th 2017?

19  A.   There's one from May 12th and one from May 14th.

20         ATTORNEY NUNAN:  Sure.  I'd like to move this into

21  evidence.

22         THE COURT:  Any objection?

23         ATTORNEY SCHROEDER:  No objection.

24         THE COURT:  Okay.  Plaintiff's 89 is admitted.

25      (Plaintiff Exhibit 89 is admitted into evidence.)

(369 of 993), Page 369 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 321 of 945
2217ecv0094kjd Document 32903 Filed 041235258 Page 321 of 2945

158

1    BY ATTORNEY NUNAN:

2    Q.   So I'd like to go to the last page on Page 3.  We had

3    mentioned in Exhibit 83 that Ed Merrens had sent an email May

4    12th at 2:19, and this email at the very bottom, he turns

5    around at 2:27 and sends you an email; is that correct?

6    A.   Yes.

7    Q.   Is it says, "Leslie, I'm getting inundated with heartfelt

8    and long emails wondering why Misty can't stay on to do her

9    ultrasound complex operative and teaching role even if we end

10   REI.  I suspect that you considered this in the evaluation of

11   the program and your knowledge of Misty.  I just need to know

12   how to better answer these, this question".

13        Did I read that correctly?

14   A.   Yes.

15   Q.   I'd like you to turn to the first page now where you

16   respond at 5:59 p.m.  You say, "Yes, there has been enormous

17   backlash, mostly heartfelt based on Misty's longevity and with

18   only a token nod to the elephant in the room of her disruptive,

19   slash, splitting behavior that everyone has seen.  They are

20   angry and fearful that, if Misty could be terminated, any of us

21   could be".

22        And I'm going to skip down to the second highlighted part

23   that says, "Everyone is also remembering Misty as a full-time

24   employee wearing three hats and not the one who has been out

25   for almost 18 months".  Did I read that correctly?

VOLUME: 6
PAGES: 1-221

1    A.    Yes.

2    Q.    Being out for 18 months, you're referring to her

3    short-term then long-term disability?

4    A.    That she has not been work full term for almost, full time

5    for almost 18 months.

6    Q.    And, when you say three hats, what do you mean?

7    A.    That Misty was a skilled gynecologic surgeon, she was a

8    skilled ultrasonographer, and she was a skilled infertility

9    physician.

10   Q.    I'd like turn to turn to the next page.

11         ATTORNEY SCHROEDER:  And, just for the record,

12   Counsel, is this your highlighting as opposed to the actual

13   document that's been admitted?

14         ATTORNEY NUNAN:  It is.  It is.  In my attempt to run

15   my own exhibits.

16         ATTORNEY SCHROEDER:  Nothing wrong with that.

17         ATTORNEY NUNAN:  I asked Geoffrey to, but I decided I

18   needed a little guidance.  So please forgive me.  This is my

19   highlighting to keep me on track.

20         ATTORNEY SCHROEDER:  Just wanted the record to

21   reflect that.  Thank you.

22   BY ATTORNEY NUNAN:

23   Q.    Yeah, okay.  So this paragraph that's highlighted is one,

24   two, three, four down.  It's not going to be highlighted on

25   your paper document, but you can see it on the screen.  I'm

(371 of 993), Page 371 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 323 of 945
22117cv0029144jjd Document32963 Filed04/23/25 Page1523012945

160

VOLUME: 6
PAGES: 1-221

1    going to read what you wrote here:  "Misty's medical disability

2    has been devastating, and I'm not sure that she should or will

3    really ever be able to do the complex hysteroscopy or

4    laparoscopy that she once did.  That being said, there are a

5    few full-spectrum REI docs that could bring similar surgical

6    skills, but they are hard to find.  I think that the best

7    outcome of this termination is the chance for Misty to actually

8    be out on leave with no intervening responsibilities so she can

9    assess how much she, how much improvement she might gain".

10          Did I read that correctly?

11   A.    You did.

12   Q.    That was your decision to make for Misty?

13   A.    Excuse me.

14   Q.    That was your decision, the best outcome of the

15   termination was for Misty to go off?

16   A.    That was -- I disagreed with the decision to close the

17   division.  Heather Gunnell and I, with Daniel Herrick, were

18   trying to put a plan in place by which we could pause IVF

19   services, maintain Misty as an employee, and eventually reopen

20   IVF services.  Those plans we were unable to present to

21   leadership, and those plans were designed to be, to allow Misty

22   to recover on her own time.  My statement that her termination

23   would allow her to recover was my heart speaking that she was,

24   she would be allowed to recover without the stress and chaos of

25   the IVF service.  It was never my intention that I thought she

2:17-cv-00194-kjd    Document 329.3    Filed 04/23/25    Page 162 of 245

161

VOLUME: 6
PAGES: 1-221

1    would be better off by being terminated, nor did I agree that

2    she should be terminated.

3    Q.   You didn't agree that she should be terminated?

4    A.   I did not.

5    Q.   Okay.  I would like to go down to the next paragraph.  It

6    says, "As much as it hurts, it was the right decision to

7    include her in the terminations, and I don't want to change

8    that decision".

9    A.   At this point, the decision had been publicized.  I

10   disagreed with it.  I was unable to argue my disagreement, and

11   I was unable to turn back the fact that the actions had been

12   taken, the terminations actions had been taken, and it had been

13   publicized.

14   Q.   Further down you say, "If she doesn't really get better

15   and can only work 16 to 20 hours a week, she will have to

16   choose between ultrasound and REI and will be an effective

17   teacher for the REI fellowship at UVM".

18        So you're telling me that you are not -- you wanted her to

19   stay on at Dartmouth-Hitchcock?

20   A.   I absolutely wanted her to stay on.  I had a job for her

21   that I was trying to plan.

22   Q.   And you do not see Dr. DeMars's (sic.) email on the third

23   page as asking you why she can't do those other three items

24   that you counseled she was so skilled at?

25   A.   I was not allowed to present that plan before the decision

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 325 of 945

2:17-cv-00194-kjd    Document 329-3    Filed 04/28/25    Page 1525 of 2945

VOLUME: 6
PAGES: 1-221

1   was made to terminate the decision -- the division.  If I said

2   decision, sorry.  I think Misty was an incredible, valuable

3   department member.

4   Q.   I have another question for you.  Dr. DeMars writes back

5   to you that what you've written is a comprehensive, thoughtful,

6   and appropriate insight.  Do you see that?

7   A.   Yes.

8   Q.   "Ultimately, once the dust settles, we'll be in a better

9   position with all of this, including Misty."

10       Did you think Misty was in a better position being

11  terminated?

12  A.   That's a really hard question to answer.

13  Q.   Okay.  I'll ask you another question.  Was Misty not as

14  useful to you when she could not wear three hats because of her

15  disability?

16  A.   It wasn't about me.  Misty was on leave, and my job was to

17  protect her leave and help her and allow her to get better.

18  Q.   So that was your decision, to terminate her so that she

19  could recover?

20  A.   It was not my decision to terminate her.

21  Q.   But you agreed that terminating her would allow her to

22  recover?

23  A.   She would have remained on leave.  Had she not been

24  terminated, she still would have been on leave.

25  Q.   Are you referring to the fact that she came to you in late

```
 1    April and said she had to have another surgery?

 2    A.    No.   That she wasn't fully recovered yet and she was still

 3    on leave and she would have been on leave throughout much of

 4    2017.  We had no idea what was to come, but she was still not

 5    back to being fully recovered, and she would have still been on

 6    leave, and I wanted to protect a position for her.

 7    Q.    Okay.  I'd like you to turn to Document 2 in your book.

 8    This is Plaintiff's Exhibit 2.  Dr. DeMars, this is an email

 9    written to you.

10    A.    I'm not even close to that yet.  Sorry.

11    Q.    Thank you for letting my know.  You let me know when

12    you've reviewed it.

13          ATTORNEY SCHROEDER:  And just give her a hot second

14    to actually read the text.

15          THE COURT:  I'm going to ask counsel to approach,

16    please.

17          (Bench conference begins.)

18          THE COURT:  So you may want to object, but I'm not so

19    sure you should be giving a narrative of what the Witness

20    should do.  That's my job.  So you can make an objection or

21    have a bench conference instead of talking to the Witness.

22          ATTORNEY SCHROEDER:  Understood.

23          THE COURT:  All right.

24          (Bench conference ends.)

25    BY ATTORNEY NUNAN:
```

1    Q.   Are you set?

2    A.   Yes.

3    Q.   Great.  You received this -- no.  You sent this email to

4    Dr. Reindollar on September 17th 2015; is that correct?

5    A.   Yes.

6         ATTORNEY NUNAN:  I'd like to move for the admission

7    of Plaintiff's Exhibit 2.

8         THE COURT:  Any objection?

9         ATTORNEY SCHROEDER:  No objection.

10        THE COURT:  Plaintiff's Exhibit 2 is admitted.

11   (Plaintiff Exhibit 2 is admitted into evidence.)

12   BY ATTORNEY NUNAN:

13   Q.   I'm going to read to you starting at, "I need some

14   advice".  "I need some advice about unbiased performance

15   evaluation.  Albert is still struggling.  Technical competence,

16   ovulation induction plans, basic endocrine and infertility

17   knowledge, timely completion of medical records, and he hasn't

18   told us if he's passed his written boards, parentheses, I know

19   the results are out.  UVM can't review his clinical competence

20   in infertility world, in the infertility world.  Does ASRM have

21   resources to evaluate clinical practice?  I can't go by MBP's

22   evaluation, and I do think that she has been good" -- I think

23   you mean at, but -- "a providing guidance, at least initially".

24   Did I read that correctly?

25   A.   Yes.

VOLUME: 6
PAGES: 1-221

```
 1    Q.   Okay.  First off, is Albert referring to Dr. Albert Hsu?

 2    A.   Yes.

 3    Q.   And is MBP Dr. Porter?

 4    A.   Yes.

 5    Q.   Okay.  And I want to start with the last phrase about what

 6    I believe is Dr. Porter, "And I do think that she has been good

 7    at providing guidance, at least initially".

 8         Dr. Porter spent six months training Dr. Hsu when he first

 9    arrived, didn't she?

10    A.   Yes.

11    Q.   Okay.  He came out of the Jones Institute?

12    A.   Yes.

13    Q.   He had had a fellowship?

14    A.   Yes.

15    Q.   It was of poor quality?

16    A.   According -- Dr. Porter had concerns about Dr. Hsu coming

17    to Dartmouth because of the experience that he would have had

18    at the Jones Institute.

19    Q.   And she spent six months of nights and weekends working

20    with him.  He didn't have his own independent schedule; is that

21    right?

22    A.   I don't remember.

23    Q.   Okay.  Do you remember her spending six months of nights

24    and weekends and call with him?

25    A.   I don't remember, but that I wouldn't be surprised.
```

VOLUME: 6
PAGES: 1-221

1    Q.   Okay.  And what you're saying, I believe, here is that she

2    worked hard with him, she gave him good guidance?

3    A.   Initially.  I think that it was her responsibility to

4    bring Dr. Hsu up to a level of competence.

5    Q.   And she trained residents?

6    A.   She trained residents.

7    Q.   And, eventually, she trained fellows as well?

8    A.   Eventually, yes.

9    Q.   Okay.  And you saw her?  That was her responsibility?

10    A.   Yes.

11    Q.   Okay.  And she was competent to do that?

12    A.   Yes.

13    Q.   So I'm going to direct you to the first statement which

14    is, "I need some advice about unbiased performance evaluation",

15    and then down below you say, "I can't go by MPB's evaluation".

16    Why?

17    A.   There were two conversations that I had with before I, I

18    -- excuse me.  There were two conversations that I had that

19    concerned Dr. Porter's history of being critical and

20    undermining members of the REI division.

21    Q.   Okay.  Let's start with her being critical.  Was she

22    demanding?

23    A.   Yes

24    Q.   Did she have high standards?

25    A.   She had her standards?

VOLUME: 6
PAGES: 1-221

1    Q.   Which were high?

2    A.   Which I think were high.  We all have to understand that,

3    when we are trying to evaluate competence as we try to evaluate

4    competence at our board exams, that there is a spectrum of what

5    is competent and what is not competent, and there is a very

6    wide spectrum of competence.  I believe Dr. Porter had a very

7    high standard of competence and was very critical of anyone who

8    did not rise to her standard or she didn't expect could rise to

9    her standard.  That caused friction among department members,

10   division members.  It caused friction among division

11   physicians, and it was a longstanding behavior.

12   Q.   So her standard of care for her patients was too high?

13   A.   Her standard of care was her standard of care.

14   Q.   Fair enough.

15   A.   She refused to acknowledge that there was a range of what

16   is standard of care.

17   Q.   And, when people in the department came to you over the

18   next two years and reported concerns about Albert Hsu and

19   patients, is that explanation right there the one that you gave

20   them?

21   A.   I'm not sure I understand your question.

22   Q.   Sure.  Sharon Parent testified that she came to you and

23   said, "I am watching Dr. Seifer" -- this is not Dr. Hsu -- "I'm

24   watching Dr. Seifer hurt patients, hurt the women that come to

25   this department, and I have concerns", did you tell her what

VOLUME: 6
PAGES: 1-221

1    you just said here, which is Dr. Porter's standards are too

2    high, and you have to understand that some doctors are

3    different than Dr. Porter and we have to accept that?

4    A.    I never said that Dr. Porter's standards were too high,

5    first of all.

6    Q.    Okay.  I think Dr. Porter is an excellent physician.  She

7    is a fantastic physician.

8    Q.    I agree with that.

9    A.    I think that I was told very early on that Dr. Porter had

10   a very long history --

11   Q.    Is there any -- excuse me.  I'm going to interrupt you.

12   Is this by Dr. Reindollar?

13   A.    It's by more than Dr. Reindollar.

14   Q.    Who?  Who told you this?

15   A.    Dr. --

16            ATTORNEY SCHROEDER:  Objection, Your Honor.

17            THE COURT:  Okay.  Basis?

18            ATTORNEY SCHROEDER:  Not allowing her to finish her

19   answer.

20            ATTORNEY NUNAN:  Excuse me.  Go ahead.

21            THE COURT:  To the extent that's the objection,

22   sustained.

23   BY ATTORNEY NUNAN:

24   Q.    So I'm hearing Dr. Reindollar and Dr. Manganiello?

25   A.    And Dr. Manganiello.

(380 of 993), Page 380 of 993

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 332 of 945

2:17-cv-00194-kjd   Document 329-3   Filed 04/23/20   Page 169 of 245

169

VOLUME: 6
PAGES: 1-221

1    Q.   Dr. Manganiello left the practice in 2009; is that

2    correct?

3    A.   Maybe.

4    Q.   And Dr. Reindollar, I'm not going to get this quite right,

5    but approximately at the end of 2013?

6    A.   Yes.

7    Q.   I'd like to get back to what you're saying about Albert

8    Hsu here.  You list a pretty wide range of issues that he is

9    having; is that correct?

10   A.   Yes.  I think I'm reflecting what, what Misty had, what

11   Dr. Porter had reported to me.

12   Q.   Okay.

13   A.   And I'm trying to find some, some way of an unbiased

14   performance evaluation because I've been told that Dr. Porter's

15   performance evaluations can be biased, can be deliberate, and

16   they can be, they can be designed to split the division and to

17   cause discord within the division.  So I'm looking for

18   independent confirmation of what Dr. Hsu's competence is.

19   Q.   But Dr. Hsu -- you don't attribute these statements to Dr.

20   Porter; is that correct?  And you have the knowledge here that

21   he is struggling?

22   A.   So I don't know what these, what these exact points, to

23   whom I should be attributing those to at this point, no.

24   Q.   Okay.  At the point that you wrote this email, Dr. Porter

25   hadn't gone out on disability yet -- is that right -- September

VOLUME: 6
PAGES: 1-221

1    2015?

2    A.    I don't know.

3    Q.    Okay.  Did you go to Dallas with Dr. Porter Novemberish of

4    2015 to the board examiners?

5    A.    Probably December.

6    Q.    Normally, you go in November, December?

7    A.    Normally, we went December.

8    Q.    Okay.  And that's something the two of you had done for

9    years?

10   A.    Yes.

11   Q.    Okay.  And in 2015 do you remember Dr. Porter developing

12   double vision and headaches while she was at the boards?

13   A.    I have a vague recollection of it, yes.

14   Q.    And is it your recollection that she went out on

15   short-term disability in December of 2015 and, while she might

16   have worked a little bit in the next six months, she was out

17   for approximately six months on short-term disability?

18   A.    For the first half of 2016, yes.

19   Q.    Okay.  You do remember that?

20   A.    Yes.

21   Q.    Okay.  Dr. Karen George testified that Dr. Porter was

22   excellent at assessing where a resident was in their skill set

23   and then advancing them.  Do you agree with Dr. George's

24   assessment of Dr. Porter?

25             ATTORNEY SCHROEDER:  Objection, Your Honor.

VOLUME: 6
PAGES: 1-221

```
 1                THE COURT:  Okay.  Basis?

 2                ATTORNEY SCHROEDER:  She wasn't here for that

 3     testimony, and I think this is -- well, can I be heard sidebar?

 4                THE COURT:  Yes.

 5                (Bench conference begins.)

 6                ATTORNEY SCHROEDER:  Sure.  The objection is that

 7     she's characterizing the testimony that has been heard as if

 8     that is the testimony, and I don't know that that's -- she's

 9     saying this is what she said.  I don't believe that that's

10     necessarily the case.

11                THE COURT:  Do you have a reason to think it's

12     inaccurate?

13                ATTORNEY SCHROEDER:  Well, I think it's -- I don't

14     know that it's accurate, and I don't know that -- it's a

15     long-winded question relating to something that obviously she

16     can ask, If she said this, would you agree with that?  I'm just

17     struggling with the fact that, yes, it's on cross.  I

18     understand that.  But saying that this is what this person

19     testified to as a declarative statement without any

20     verification of that, I don't recall her saying exactly those

21     words, so, you know, I don't recall it specifically.

22          I just, if we're going to have all these questions based

23     upon testimony that this witness would not have heard because

24     she wasn't here because she was sequestered -- she can ask, If

25     this person testified this way, would you agree with it?
```

(383 of 993), Page 383 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 335 of 945
2:17-cv-00194-kjd Document 329-3 Filed 04/23/25 Page 335 of 945

172

VOLUME: 6
PAGES: 1-221

1    That's perfectly fine, but to say this is what this person

2    testified to, you know, unless she's got a record in front of

3    her of the transcript, I'm not going to feel comfortable saying

4    that that's exactly what was said, and I think it's a fair

5    objection just based on the circumstances of this being a

6    person being called as for cross.

7          ATTORNEY NUNAN:  I believe that it's evidence that is

8    in the record.  Dr. George said that one of Dr. Porter's skills

9    was assessing residents where they stood and advancing them.  I

10   thought that was in evidence.

11         THE COURT:  I think that's his point is that he's not

12   sure if it's in evidence as you are describing it.  So,

13   apparently, if you say to her, If the Witness has testified to

14   the following, would you agree with that --

15         ATTORNEY SCHROEDER:  Right.  And I think that's a

16   fair statement and, correct, that's a fair question, just so

17   that I'm not coming up here for objections on this point.  But

18   thank you.

19         THE COURT:  Right.

20         (Bench conference ends.)

21   BY ATTORNEY NUNAN:

22   Q.   If Dr. Karen George testified that Dr. Porter was

23   excellent at assessing residents' abilities and helping them

24   develop their skills in REI, would you disagree with that

25   statement?

VOLUME: 6
PAGES: 1-221

1    A.   I would not.  I would confine it to REI.

2    Q.   Thank you.  I'd like to look at the bottom paragraph where

3    you state, "Also, I need to find an REI doctor with seniority

4    who could put Albert under his wing".  Is this the email that

5    eventually led to the recommendation of David Seifer?

6    A.   It led to opening up the search.

7    Q.   Dr. Reindollar did not give you a recommendation?

8    A.   No.

9    Q.   And the search turned up David Seifer?

10   A.   The search eventually turned up David Seifer.  We had

11   searched before.  We had had a search open for quite some time,

12   and, ultimately, we did hire Dr. Seifer.

13   Q.   You and Dr. Porter interviewed Dr. Seifer in the fall of

14   2015?

15   A.   I don't know when the dates were, honestly, at this point.

16   He was interviewed by more than Dr. Porter and myself.

17   Q.   I'd like you to turn to Exhibit 7 in your book.  Have you

18   reviewed it?

19   A.   Yes.

20   Q.   Okay.  Is this an email that you wrote to Maria Padin?

21   A.   Yes.

22   Q.   Okay.  On May 12th 2016?

23   A.   Yes.

24        ATTORNEY NUNAN:  I'd like to move the admission of

25   Plaintiff's Exhibit 7.

174

VOLUME: 6
PAGES: 1-221

1          THE COURT:  Any objection?

2          ATTORNEY SCHROEDER:  No objection.

3          THE COURT:  Plaintiff's 7 is admitted.

4      (Plaintiff Exhibit 7 is admitted into evidence.)

5   BY ATTORNEY NUNAN:

6   Q.   You write here, "Maria, I would like to meet or talk with

7   you as soon as possible to discuss David's assessment.  His

8   position is essential to keeping the REI division afloat, and I

9   do feel the evaluation that he received from his peers", and

10  you put that in quotes, "were vindictive and not a good

11  representative, and not a good representation of his value and

12  ability.  The picture that I received from David, the chair

13  Aaron Caughey, and the laboratory director just don't mesh with

14  his past performance or with the person.  I am concerned that,

15  if we cannot hire Dr. Seifer, that I will have to shut the

16  program down with Misty Blanchette Porter still out on medical

17  leave and Albert Hsu, my junior member, hanging by a thread.

18  Even with Misty returning, we need different leadership."

19      Did I read that pretty much correctly?

20  A.   Yes, you did.

21  Q.   Is it fair to say that, in January to the time you wrote

22  this email, Dr. Hsu was not doing well in the REI division?

23  A.   Dr. Hsu was overworked, overstressed, and had no support.

24  Q.   It was not going well; is that a fair characterization?

25  A.   It was really difficult for him.  He, if you back up to

2:17-cv-00944-kjd    Document 329.3    Filed 04/23/25    Page 338 of 945

VOLUME: 6
PAGES: 1-221

```
 1    his hiring, he was a junior faculty member who came from a

 2    program that didn't give him the requisite experience that he

 3    needed to be, to be able to hit the ground running.

 4    Q.   I have a question for you.  When Dr. Porter finished her

 5    six months, nights, weekends with Dr. Hsu, did she talk to you

 6    then about Albert Hsu?

 7    A.   I don't remember.

 8    Q.   And did he then go out and have his own schedule?  He was

 9    no longer -- he was actually independent?

10    A.   I don't remember.

11    Q.   Okay.  And, if I represented to you that, when he went out

12    on his own after that six months and his skills reverted, is

13    that a conversation you remember having with Dr. Porter?

14    A.    If the timing is correct, six months would have been

15    somewhere at the beginning of 2015, and, if his skills had

16    reverted, then it was back to Dr. Porter for additional

17    training and support.

18    Q.   Wasn't he brought in in the beginning of 2014?

19    A.   No.

20         ATTORNEY SCHROEDER:  Objection, Your Honor.

21    BY ATTORNEY NUNAN:

22    Q.   Okay.  So, if Dr. Porter saw his skills revert and she got

23    out her teaching slides and then went over them again with him

24    and had a discussion with you, do you remember that discussion?

25    A.    No.  But this was her responsibility to bring his skills
```

1    back up.

2    Q.   Do you remember Dr. Porter telling you he was untrainable?

3    A.   I don't remember that.  I also don't believe anyone is

4    untrainable who makes it that far.  I think that's a fairly

5    inflammatory statement and, again, in keeping with some of the

6    behavior that I was told Dr. Porter had done over the years.

7    Q.   I'd like you to turn to Document 123.  We have 123A.  I

8    think your notebook only has 123, but I will -- actually, I

9    think it's right up there.  You're right.  123A, I did get a

10    copy.

11    I'd just like to ask Emerson.  If my management of this is

12    unbearable, will somebody speak up?

13    COURTROOM DEPUTY:  No.  You're good.  Yes, thank you.

14    ATTORNEY NUNAN:  Great.  This document is admitted,

15    right, so I can show the jury?

16    THE COURT:  Yes, 123A is admitted.

17    (Witness reading.)

18    BY ATTORNEY NUNAN:

19    Q.   Okay.  Are you finished?

20    A.   Yes.  Skimming through it, yes.

21    Q.   Thank you.  Did you ask Dr. Porter to write an assessment

22    of Dr. Hsu?

23    A.   I don't remember.

24    Q.   Do you remember telling Dr. Porter to have a discussion

25    with Dr. Seifer about Albert Hsu?

 1    A.   I don't remember.

 2    Q.   Okay.  Do you remember Dr. Seifer being hired about May of

 3    2016?

 4    A.   Yes.

 5    Q.   And do you remember Dr. Porter returning in a more

 6    consistent fashion about June, May or June of 2016 from her

 7    short-term disability?

 8    A.   No.

 9    Q.   You don't remember that?

10    A.   No, she didn't return in a more consistent fashion.  She

11    returned in a very limited fashion and primarily to do

12    ultrasound.

13    Q.   Okay.  But she was in the REI division --

14    A.   Yes.

15    Q.   -- at that time?  And do you believe that that document

16    there was a document she was asked to write?

17    A.   I can't tell you that.

18    Q.   Okay.  And what is the overall conclusion Dr. Porter comes

19    to in that eleven-page document?

20    A.   Dr. Porter concludes, "With the clinical demand and his

21    observed deficiencies, it is not appropriate for Dr. Hsu to be

22    employed at DHMC".

23    Q.   Was Dr. Porter in a position to assess Dr. Hsu?

24    A.   She was in a position to provide her opinion.  She was in

25    a position to provide her observations of Dr. Hsu directly.  I

1    think what is most challenging is interpreting her opinion and

2    the reports of anything that was going on between January of

3    2016 and June of 2016 where she was primarily not at DH and she

4    was on medical leave.

5    Q.   I'm glad you brought that up.  I'm going to ask you a

6    question about that.  When she got back from her disability,

7    did you ask her to take over the care of some patients that had

8    not been well cared for by Albert Hsu?

9    A.   I would have asked her to take over care of some of the

10   patients if those were patients that were, that may have been

11   previously her patients.  They may have previously been

12   Dr. Hsu's patients.  We had several patients that were, that

13   were quite challenging IVF patients that, again, Dr. Porter is

14   a fantastic IVF doctor.

15   Q.   That didn't quite answer my question.  My question was --

16   A.   Well, I'm not sure I can answer that question.

17   Q.   Do you remember discussing with Dr. Porter giving free IVF

18   cycles to people who had been treated by Dr. Hsu while she was

19   out on disability?

20   A.   We had, we, as in the department, had made the decision to

21   provide an uncompensated IVF cycle to at least one couple that

22   I can remember.  The circumstances around that uncompensated

23   cycle, to me, weren't very clear, and it made more sense to be

24   able to offer an uncompensated cycle to that particular couple.

25   A second one I don't remember.

(390 of 993), Page 390 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 342 of 945
2:17-cv-00194-kjd   Document 329-3   Filed 04/25/25   Page 342 of 945

179

VOLUME: 6
PAGES: 1-221

1   Q.   So, when you receive a document -- I would like to go

2   through kind of some of the elements, just the points in this

3   document.  On Page 3 she says, "Below are my observations and

4   opinions with regard to her performance".  She lays it all out

5   there.  It's comprehensive, isn't it?

6   A.   Yes.

7   Q.   She has, "One, marked global fund of knowledge deficiency

8   in REI and general gynecology."  On Page 6 -- give you a second

9   to turn there -- she has, "two, critical thinking".  She says,

10  "Most concerning to me has been my observation that Dr. Hsu

11  struggles with critical thinking and assessment.  He has

12  difficulty identifying pieces of data in a patient's or

13  couple's evaluation which are the most salient and require

14  attention".

15  A.   What you skipped over also is that Dr. Hsu passed his oral

16  general board exams which --

17  Q.   But not his written, right?

18  A.   He had to have passed his written general board exams to

19  be able to take his oral board exams.  So he passed his oral

20  board exams in general obstetrics and gynecology, which

21  directly assesses his ability to synthesize information, and

22  general obstetrics and gynecology directly assesses his ability

23  and performance of general gynecology.

24  Q.   So that fact alone tells you that whatever is written in

25  this document shouldn't be taken seriously?

(391 of 993), Page 391 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 343 of 945
2:17-cv-00194-kjd    Document 329.3    Filed 04/23/25    Page 180 of 221
180

VOLUME: 6
PAGES: 1-221

1          ATTORNEY SCHROEDER:  Objection, Your Honor.

2          THE COURT:  I'll allow it.

3          THE WITNESS:  I think that it needs to be taken as

4     Dr. Porter's opinion and with a grain of salt.

5     BY ATTORNEY NUNAN:

6     Q.   Can you explain one more time why I need to take a grain

7     of salt with this?  I'm not sure I could articulate that.

8     A.   Because she is assessing his -- her opinion is that he was

9     deficient in his knowledge of general obstetrics and

10    gynecology, which is completely distinct from REI, and the fact

11    that he had passed his general boards says that he had an

12    adequate fund of knowledge and defended that fund of knowledge

13    and ability to synthesize plans and problems in general

14    obstetrics and gynecology to the satisfaction of the national

15    examiners.

16    Q.   Okay.  So I understand that, the general OB/GYN, but you

17    go on to do a fellowship and work in a subspecialty.  REI is a

18    subspecialty, is it not?

19    A.   Yes.

20    Q.   Okay.  So that is knowledge beyond general OB/GYN, what

21    you were just describing?

22    A.   So I'm not disputing that.  What I'm disputing is the

23    general idea that he's unable to synthesize general facts.

24    Q.   She goes on on Page 7, "B, preoperative planning and

25    assessment".  She talks about that.  Page 8, she talks about

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 344 of 945
Document 329-3    Filed 04/23/25    Page 344 of 945

VOLUME: 6
PAGES: 1-221

```
 1   professionalism.  Did you take anything that she wrote under
 2   "Professionalism" seriously, or did you take that with a grain
 3   of salt?
 4   A.   So we had actually been in, in the areas of
 5   professionalism, we had been working on his timely completion
 6   of medical records.  That had been an ongoing --
 7   Q.   He was always behind in his charts, and that was a
 8   problem, wasn't it?
 9   A.   That was a not, an uncommon problem for many of the
10   faculty members.  He was not out of range of what, of other
11   faculty members, but it was a consistent problem for Dr. Hsu.
12   Q.   He was often on the list that said his chart, he was
13   behind in his charts; is that correct?
14   A.   Among many other providers.
15   Q.   Got it.  And that's a problem for billing, isn't it?
16   A.   In a very broad sense, because bills are not generated as
17   soon as a, as a note is completed.
18   Q.   How about a problem of team communication?  Is it a bigger
19   problem in a division where women are coming in routinely and,
20   when you call up that woman's chart and it hasn't had the last
21   entry by Dr. Hsu that's a problem, is that an issue, a
22   communication issue?
23   A.   I think that was a problem with the, with the division in
24   general, that there was very poor communication among team
25   members, because not, because not always, that the plans were
```

(393 of 993), Page 393 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 345 of 945
2117cv00094kjd    Document 3293    Filed 04/23/25    Page 345 of 945

182

VOLUME: 6
PAGES: 1-221

1    not always documented actually in a note.

2    Q.    Was Dr. Porter behind on her charts regularly?

3    A.    She's actually very good at her charting.

4    Q.    Thank you.  Okay.  I'd like you to turn to 9, Page 9,

5    where she goes over his technical skills.  Okay.  "I have

6    addressed some of the issues with his fundamental deficits in

7    IVF ART, but it cannot be overstated that my observation is he

8    has trouble integrating the technical skills that he has been

9    sufficiently taught."

10        The next paragraph says, "Most relevant to our practice,

11   he has regressed considerably in his ability to perform embryo

12   transfers."

13        So my understanding -- please correct me if I'm wrong --

14   is IVF is egg harvest and then embryo transfer.  Is that a

15   basic understanding?

16   A.    Yes.

17   Q.    Thank you.  And this was written in June of 2016; is that

18   correct?

19   A.    Yes.

20   Q.    And Albert Hsu had been in the practice for 2014, 2015,

21   and 2016, to June of 2016; is that correct?

22   A.    Yes, under Misty's guidance.

23   Q.    Except when she was out on disability?

24   A.    Which was primarily 2016.

25   Q.    Okay.  When you received notice from Misty that he had

(394 of 993), Page 394 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 346 of 945
2:17-cv-00944-kjd Document 329-3 Filed 04/25/23 Page 184 of 294 5

183

VOLUME: 6
PAGES: 1-221

1  regressed considerably in his ability to perform embryo

2  transfer, that's a pretty basic skill for an REI specialist,

3  isn't it?

4  A.   Yes.

5  Q.   Okay.  So you have been put on notice that you have a

6  doctor that has problems with women who are coming to the

7  clinic to become pregnant and he has performance problems?

8  A.   This is, also, this is a provider who has been under

9  Dr. Porter's tutelage for 2014 and 2015 and, if she identified

10 that he has regressed in his skills, there needs to be some

11 sort of remediation that, if she's unable to do it, then it's

12 another senior member who is able to provide that remediation.

13 Q.   Okay.  So you're not saying that his regression is Misty's

14 fault?  That's not what you're saying?

15 A.   Absolutely not.

16 Q.   Okay.

17 A.   But, if that were the case, if there was regression in

18 technique, then there needs to be remediation to get back to an

19 appropriate technique.

20 Q.   And who was responsible for putting that plan in place?

21 A.   That would have been Dr. Seifer coming in.

22 Q.   Okay.  We'll get to Dr. Seifer, but did you, as chair,

23 have an obligation, given that Dr. Seifer had just arrived and

24 Misty Porter was back from disability, did you have an

25 obligation to do something with a report like this?

1    A.   I think my obligation is to make sure that there is a

2    remediation plan in place for Dr. Hsu.

3    Q.   Did you put one in place in June of --

4    A.   That's not my --

5    Q.   -- June of 2017?

6    A.   That is not my role.

7    Q.   Did you direct Dr. Seifer to put one in place in 2017, in

8    2016?

9    A.   In 2016 that would have been his responsibility.

10   Q.   Did he?

11   A.   That would have been part of his responsibility.  I don't

12   know what he, what the details, but I know one of his

13   responsibilities was to assess the performance of Dr. Hsu.

14   Q.   What I'm hearing from you is it was not your

15   responsibility.

16   A.   It was not my responsibility.  I don't have the skills or

17   ability to put that remediation plan in place.  This requires a

18   skilled physician in REI.

19           THE COURT:  Ms. Nunan, it's time for our afternoon

20   break.  So we'll return at 3:15.

21       (A recess was taken from 3:03 p.m. to 3:16 p.m.)

22           THE COURT:  Please go ahead.

23   BY ATTORNEY NUNAN:

24   Q.   We established this letter was written in June of 2016,

25   correct?

VOLUME: 6
PAGES: 1-221

```
 1    A.   Yes.

 2    Q.   And Dr. Albert Hsu was allowed to continue practicing with

 3    no restrictions from this time until the division closed in May

 4    of 2017; is that correct?

 5    A.   Yes.

 6    Q.   I'd like --

 7    A.   Because he --

 8    Q.   I'd like you to turn to Exhibit 28, please.  Have you had

 9    a chance to review it?

10    A.   Yes.  Trying to put it into context, yes.

11    Q.   So this is an email thread that starts on December 3rd

12    2016 at the bottom of Page 1 and carries over into December 4th

13    2016 and then finally December 5th 2016, and the last one is

14    between you and Judith McBean; is that correct?

15    A.   Yes.

16    Q.   Okay.  I would like to move Plaintiff's Exhibit 28.

17              THE COURT:  Go ahead.

18              ATTORNEY NUNAN:  Are we good?

19              THE COURT:  Any objection?

20              ATTORNEY SCHROEDER:  No objection, Your Honor.

21              THE COURT:  Okay.  Plaintiff's 28 is admitted.

22         (Plaintiff Exhibit 28 is admitted into evidence.)

23    BY ATTORNEY NUNAN:

24    Q.   All right.  So Dr. Porter writes to you on December 3rd

25    2016.  She says, "There are two patients that I have discussed
```

1    with all you who had HyCoSy/SHGs to evaluate the cavity that

2    were read as septums.  Neither patient has a septum.  One

3    normal uterus, one arcuate, which is a considered a normal

4    variant."

5         Okay.  So we are talking about uterus septi, is that

6    correct, or septum?

7    A.   No.

8    Q.   No?

9    A.   Well, we're, we are, we're discussing uterine cavity shape

10   and uterine cavity normal versus abnormal.

11   Q.   Thank you.  Thank you.  Do you remember receiving this

12   email and remember this issue?

13   A.   In detail, no, not at all.

14   Q.   Okay.  So, if I was to say to you that Dr. Hsu had

15   assessed two patients to say that they had septums or abnormal

16   septums that needed maybe surgical repair, is that close to

17   being the case here?

18   A.   I don't know that Dr. Hsu read these.

19   Q.   Okay.

20   A.   And, also, that the, the ultrasounds were not performed

21   properly.

22   Q.   Oh.  So this could be an ultrasound tech's fault, not

23   Albert Hsu's fault?

24   A.   Correct.

25   Q.   Got it.  All right.  I would like you to come up to the

1    top where you write back where you say, "I had a pointed

2    discussion with Albert yesterday on two issues".

3        Does that refresh your recollection that this was an issue

4    about Albert?

5    A.   No.

6    Q.   It doesn't?  Okay.  You just responded to this about

7    Albert, nothing related?  You don't think there is a connection

8    there?

9    A.   I don't know.

10   Q.   Okay.  Thank you.  I'm going to read what you wrote.  You

11   have two points, and then down here you write, "I can't tell

12   him not to do it because I'm not the content expert, but I

13   would suggest Beth that you call her and suggest that she

14   postpone and see Judy or Misty, if Misty you believe the images

15   have been overread.  I don't want her to be harmed.  She works

16   here and should be able to pop in for another visit."

17       So my understanding of this email is that a woman was

18   scheduled for surgery who didn't need it.  Is that your

19   understanding of this issue?

20   A.   I don't know that for sure.  One a patient appears to have

21   been scheduled for surgery for a metroplasty.  There is, there

22   is discordance or a difference in how the ultrasound images

23   were read.  I don't know whether Dr. Hsu read these images or

24   was present when these ultrasounds were done.  Albert had --

25   Dr. Hsu, excuse me.  Dr. Hsu had had a habit of, if he were

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 351 of 945

188

VOLUME: 6
PAGES: 1-221

1    called in to look at an ultrasound, if he were reading

2    ultrasounds or called in to see a patient, that he would

3    convert that to a formal consultation, which we had discouraged

4    him.  That, we had told him that that is not proper practice

5    that, if the patient needed to be seen by him, that that

6    patient should be scheduled for a separate appointment.

7    Q.   So right.  That's a maybe a billing or a -- that's, that

8    is a separate issue.  I get that.  That's point one.  But point

9    two, you have a patient who he was going to do surgery on who

10   didn't need it, and you state, "I don't want her to be harmed";

11   is that correct?

12   A.   So what I am being told is that a patient who had a, who

13   was diagnosed as having a septum, which is a uterine, an

14   intrauterine abnormality, was scheduled to have that corrected.

15   I don't know -- and then I was informed by Misty that these

16   ultrasounds were not performed correctly and that this perhaps

17   was not the correct interpretation because of the, the

18   ultrasounds not being performed correctly.

19        The part about harm, absolutely, you never want to have a

20   patient undergoing a surgical procedure, any procedure, any

21   visit that is not necessary.  Part of what is required before

22   you take a patient to the operating room is a preoperative

23   consultation and that you bring that patient in for the

24   appropriate counseling of what the problem is, what the options

25   are for treating that problem, what the implications are for

(400 of 993), Page 400 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 352 of 945
2217cv00944kjd Document 329-3 Filed 04/23/25 Page 352 of 945

189

1    not treating the problem, or what the implications are for

2    treating it.  So you give them a full idea of what is truly the

3    medical issue, how to fix it if it requires fixing, and what

4    are the risks to fix it?

5    Q.    Thank you, Dr. DeMars.  I appreciate that.  Will you read

6    the top line that you wrote about your conversation with

7    Albert?

8    A.    That goes back to --

9    Q.    I'd like you to read it, please.

10   A.    Yes.  Sorry.  I didn't hear you.

11   Q.    That's okay.  Could you please --

12   A.    Yes.

13   Q.    -- read the top line that I have highlighted?  Please

14   excuse --

15   A.    "The most unfortunate part of my conversation with Albert

16   is it became clear that, even if he passes his written exam, he

17   would not pass the oral exam."  So the oral exam is when you

18   sit before, again, national experts to discuss --

19            THE COURT:  So, Dr. DeMars, I'm going to direct you

20   to only answer a question that has been asked.

21            THE WITNESS:  Sorry.

22   BY ATTORNEY NUNAN:

23   Q.    Thank you.  So this email, this last email was with Judith

24   McBean.  Can you tell me who Judith McBean was?

25   A.    Judith McBean is a colleague of ours who had completed an

1    REI fellowship at UVM at about the same time that Dr. Porter

2    did and was, had an OB/GYN practice in Brattleboro, and she

3    would refer her infertility patients up to DH for their

4    procedures.

5    Q.   She also worked per diem since 2005 to 2017 in the REI

6    division; isn't that correct?

7    A.   Per diem is -- she worked on a very limited basis.

8    Q.   I appreciate you saying that, but she was in the

9    department, and she was included on REI division emails as part

10   of the department; isn't that correct?  Do you know?

11   A.   I don't know.

12   Q.   Thank you.  My understanding -- correct me if I'm wrong --

13   is that Dr. McBean would come up on Fridays and, because REI

14   was a seven-day-a-week operation, she would cover the weekends

15   sometimes, not always, but sometimes.  Does that sound correct

16   to you?

17            ATTORNEY SCHROEDER:  Objection, Your Honor.

18            THE COURT:  Okay.  Basis?

19            ATTORNEY SCHROEDER:  Foundation.  Assumes facts not

20   in evidence.

21            THE COURT:  Yeah.  You should ask a question instead

22   of a narrative leading into a question.

23   BY ATTORNEY NUNAN:

24   Q.   Sure.  This issue of uterine septum, septi -- I'm probably

25   not --you smiled.  I'm probably not pronouncing that correctly.

 1    Do you recall a conversation with Judith McBean about a uterus

 2    septum surgery that Albert Hsu had performed on one of her

 3    Brattleboro patients?

 4    A.    No.

 5    Q.    You don't remember her --

 6    A.    No.

 7    Q.    -- coming to you?

 8    A.    No.

 9    Q.    Not at all?

10    A.    No.

11    Q.    Okay.  You do not remember her saying that the patient had

12    believed she'd had her septum removed by Dr. Hsu?

13    A.    I do not remember a conversation whatsoever.

14    Q.    Did you have an email exchange with her?

15    A.    I do not remember this.

16    Q.    Do you remember her stating that she'd gone in and done a

17    second surgery to remove the septum that the patient thought

18    she'd had removed by Albert Hsu?

19    A.    Do not remember that.

20    Q.    I'd like you to turn to document -- just confirm this --

21    148, please.  I believe it's up top because it was in the

22    second notebook.  Great.  That last exhibit we looked at was

23    Exhibit 28 was written on 12/5/2016.  That was exactly six

24    months after you'd written, you'd received an eleven-page

25    assessment from Dr. Porter about Dr. Hsu, right?  That was six

1    months later?

2    A.   Yes.

3    Q.   This is an email thread that starts on January 29th 2017

4    and goes until February 19th 2017.  This top email is from

5    Misty Porter to you.  Do you recognize this email?

6    A.   Yes.

7            ATTORNEY NUNAN:  I'd like to move Plaintiff's Exhibit

8    148 into evidence.

9            THE COURT:  Any objection?

10           ATTORNEY SCHROEDER:  No objection.

11           THE COURT:  Plaintiff's 148 is admitted.

12       (Plaintiff Exhibit 148 is admitted into evidence.)

13   BY ATTORNEY NUNAN:

14   Q.   I'd like you to turn to the last page where there is a

15   chart, please.

16   A.   Yes.

17   Q.   Okay, great.  My understanding is FET on the top left-hand

18   side stands for frozen embryo transfer; is that correct?

19   A.   Yes.

20   Q.   And on the right-hand side "fresh" means not frozen?

21   A.   Correct.

22   Q.   Great.  Got that right.  Was this sent by Navid

23   Esfandiari?

24   A.   This was sent by Dr. Porter.

25   Q.   Okay.  The way I read it just above the chart it says on

```
 1    January 29th 2017, 2:12 p.m., Navid Esfandiari wrote.  So the

 2    original document looks like -- the chart looks like it was

 3    from Navid.

 4    A.   Correct.

 5    Q.   Who is Navid; can you tell us?

 6    A.   Navid Esfandiari was our IVF lab director.

 7    Q.   He was an embryologist as well?

 8    A.   Yes.

 9    Q.   Okay.  Did he track all the statistics in a program called

10    Baby Sentry?

11    A.   I don't know that they were in Baby Sentry.

12    Q.   Okay.  On this chart MB stands for Misty Blanchette?

13    A.   Yes.

14    Q.   DS stands for David Seifer?

15    A.   Yes.

16    Q.   AH, Albert Hsu?

17    A.   Yes.

18    Q.   And JMB, Judy McBean?

19    A.   Yes.

20    Q.   And I'm just going to highlight the numbers for Albert Hsu

21    here.  I think I am.  Do we agree that the percentages as you

22    go across are 28 percent, 28 percent, over under "Fresh", 21

23    percent, and 19 percent?

24    A.   Yes.

25    Q.   And on the right-hand side where it says 19 percent, the
```

(405 of 993), Page 405 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 357 of 945
2117-cv-00194-kjd    Document 329-3    Filed 04/23/25    Page 357 of 945

194

VOLUME: 6
PAGES: 1-221

1    numbers above it are 78, excuse me, 58 percent, 57 percent, and

2    57 percent for the other three providers?

3    A.    Yes.

4    Q.    Okay.  I'd like you to move to the bottom of Page 3.

5    Dr. Porter writes to you, "Leslie, pregnancy rates from 2016.

6    Albert has a very low rate and a lot of biochemical pregnancies

7    suggesting traumatic, slash, poor technique.  Albert's

8    pregnancy rates are not going up.  David has been aware of the

9    trend, and I've spoken to David about this issue.  It is unfair

10   to patients to allow Albert to continue to transfer."

11          Did you know how many of the REI IVF patients were paying

12   out-of-pocket?

13   A.    No.

14   Q.    No idea?

15   A.    No idea.

16   Q.    If I said 50 to 60 percent of the women were paying

17   out-of-pocket, would you disagree with that?

18   A.    I have no basis to agree or disagree.

19   Q.    Were you aware that people were paying out-of-pocket, a

20   large percentage were paying out-of-pocket?

21          ATTORNEY SCHROEDER:  Objection.

22          THE COURT:  Okay.  Basis?

23          ATTORNEY SCHROEDER:  Foundation.

24          ATTORNEY NUNAN:  I didn't hear him.  I'm sorry.

25          THE COURT:  Foundation.

2:17-cv-00944-kjd    Document 329-3    Filed 04/26/23    Page 358 of 945

VOLUME: 6
PAGES: 1-221

```
 1              ATTORNEY NUNAN:  Foundation?  I'm trying to get to
 2      the basis of why it's unfair to the patients.
 3              THE COURT:  Overruled.  I'll let you ask the
 4      question.
 5              ATTORNEY NUNAN:  Okay.
 6              THE WITNESS:  I'm sorry.
 7      BY ATTORNEY NUNAN:
 8      Q.   So you can answer the question.  Could you read back my
 9      question?
10              (Question read by the reporter.)
11      A.   So I didn't, I don't know what the percentage of patients
12      who were paying out-of-pocket.  New Hampshire does not have
13      favorable infertility laws requiring insurance coverage.  So it
14      may be that patients truly were paying out-of-pocket if they
15      weren't working for a family-friendly company.
16      Q.   Okay.  You respond to Dr. Porter above on February 18th.
17      You state, "It's worth looking at the month-to-month trend.  I
18      know that the FET rate January to June was horrible,
19      attributable to both technique and poor embryos per Navid".
20      We're talking about 2016 here, right?
21      A.   Yes.
22      Q.   And you know that his rates from January to June were
23      horrible?
24      A.   Yes, attributable to primarily poor embryos.
25      Q.   Well, it says both technique and poor embryos.  So do you
```

(407 of 993), Page 407 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 359 of 945
2:17-cv-00194-kjd   Document 329-3   Filed 04/23/25   Page 359 of 945

196

VOLUME: 6
PAGES: 1-221

1    have an understanding of how embryos can become poor if they're

2    poorly harvested?

3    A.   I would not even try to answer that question.  Embryos are

4    poor based on their, their many other things other than their

5    harvest.

6    Q.   On Page 2 Dr. Porter writes back to you.  I'm going to go

7    -- if you can see on the screen, I want to make sure you're

8    following me, the part I've highlighted.  "The fresh PR" -- PR

9    stands for pregnancy rates?

10   A.   Yes.

11   Q.   "The fresh PR numbers say it all.  Navid and the nurses

12   have been aware of his PR and have expressed repeated concerns

13   about Albert.  I have had comments from patients about pain

14   during the transfers when Albert does the transfers.  If the

15   uterus contracts, rates go down.  He knows this.  I have

16   reviewed teaching slides with him and counseled him.  The same

17   quality fresh embryos have been given to all of us.  Albert did

18   a lot of fresh cycles, ETs.  He is one-third PR as compared to

19   the rest of us.  It's not new."

20        So this is February of 2017, and you are getting, yet

21   again, reports about Albert Hsu.  How concerned are you about

22   this?

23   A.   So I think, once again, this is -- there are many reasons

24   why pregnancy rates can be low.  Dr. Esfandiari was a fantastic

25   embryologist, so I think he tried to give the best quality

(408 of 993), Page 408 of 993          Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 360 of 945
2:17-cv-00944-kjd     Document 329.3     Filed 04/23/25     Page 360 of 945

197

1    embryos that he could have, but women have different quality

2    embryos, that women, that pregnancy rates differ depending on

3    the age of the, the age of the oocytes, the age of the eggs.

4    There are many things that call into what a pregnancy rate is

5    going to be and to attribute it only to transfer technique is

6    an unfair characterization.

7    Q.   You're in a position to assess that over Dr. Porter?

8            ATTORNEY SCHROEDER:  Objection, Your Honor.

9            THE COURT:  Overruled.

10           THE WITNESS:  What I'm saying is that that is an

11   unfair characterization because she also knows that there are

12   many factors that come into poor pregnancy rates other than

13   transfer technique.

14   BY ATTORNEY NUNAN:

15   Q.   Let me try it this way.  What would you have had to hear

16   from someone that would have made you pull Albert Hsu from

17   treating patients?

18   A.   This entire time I was trying to find someone who would be

19   able to provide experienced supervision of Dr. Hsu and an

20   unbiased assessment of Dr. Hsu.

21   Q.   That's not quite what I was asking.

22   A.   That's what it would require, someone who is unbiased,

23   skilled, and understood the complete picture of pregnancy

24   rates, infertility, IVF.

25   Q.   So you could not take that from Dr. Porter?

VOLUME: 6
PAGES: 1-221

1   A.   I was unwilling to take that as written from Dr. Porter.

2   Remember, Dr. Porter spent decades cutting down members of her

3   division.

4   Q.   Let's talk about Dr. Porter's behavior since you bring

5   that up.  This is, what, the second time you've brought up her

6   behavior, alleged behavior?

7   A.   Her behavior, yes.

8   Q.   Okay.  I heard you use the word "splitting" before.

9   A.   Yes.

10  Q.   Okay.  So did you ever have a doctor while you were chair

11  that had behavior problems that was not Dr. Porter?

12  A.   Yes.

13  Q.   Okay.  So talk to me about the process, the DH policies

14  that you followed when you went, when you had a doctor that had

15  behavior problems.

16  A.   We actually had a process in place by which there was a

17  graduated correction plan in that, if there was a complaint or

18  problem that was identified, you would immediately have a

19  discussion with the provider that, that had the complaint

20  against them.  And it was done in a nonjudgmental way as a,

21  This was raised.  Can you review this incident in your mind and

22  see where, where the basis of this complaint could lie?  And we

23  expect that whatever that behavior was would not continue.

24  Q.   Perfect.  I would like to talk about one of your partners

25  in the urogyn department that had just this behavior.  Her

 1    initials are EF.  I would prefer not to say her -- do you know

 2    that surgeon that had a problem?

 3              ATTORNEY SCHROEDER:  Objection, Your Honor.  May we

 4    approach?

 5              THE COURT:  Yes.

 6              (Bench conference begins.)

 7              ATTORNEY SCHROEDER:  I've got a series of objections.

 8    The first one of which is I have no idea what she's asking

 9    about.  She's going to ask a question and hope that Dr. DeMars

10    knows who she's talking about, yet I have no idea who she's

11    talking about.  There's no foundation.  Assumes facts not in

12    evidence.  There is no -- I don't even know what we're even

13    talking about.

14              ATTORNEY NUNAN:  Sure.  I'm happy to explain.  So I

15    am aware of a situation in the OB/GYN department that

16    Dr. DeMars dealt with properly when there was a behavior issue.

17    She had a surgeon.  She counseled her on her behavior.  She put

18    her on a pit plan.  She had Dr. Porter counsel her.  Then she

19    sent her to Acumen.  The behavior did not stop.  She knows the

20    proper process in which a doctor with a behavior problem should

21    be handled, and this is where I'm headed with this which is,

22    every time I turn around, I hear her say there's a behavior

23    problem with Dr. Porter, and, as far as I know --

24         I'm interested.  She's, believe me, I bet we're going hear

25    more, Every time I turn around I hear -- and I should keep my

1    voice down.  Excuse me.  I believe that I have a right to show
2    that she knows the process and that Dr. Porter was not afforded
3    that due process, that this was an excuse.  I hope I've done a
4    good job explaining that.
5              ATTORNEY SCHROEDER:  I don't know.  I think she, at
6    one point, was testifying for Dr. DeMars as to how many times
7    she complained about her behavior.  She certainly has the right
8    to ask her about all these questions, but to say that there's
9    this unknown person X --
10             ATTORNEY NUNAN:  Would you like me to use her name?
11   I would prefer not to.  I don't think that's fair.
12             ATTORNEY SCHROEDER:  But I don't know.  I don't know
13   who we're talking about.  So I don't even --
14             ATTORNEY NUNAN:  Evelyn Fleming, who was terminated
15   from the urogyn department.
16             ATTORNEY SCHROEDER:  Okay.  You can use maybe her
17   initials.
18             ATTORNEY NUNAN:  I just did.
19             ATTORNEY SCHROEDER:  I didn't hear you.
20             ATTORNEY NUNAN:  That's what I though I said.  Maybe
21   I wasn't clear.  I used her initials.  I'm trying to be super
22   respectful here, but I do think that that is a major point I'd
23   like to make with her because that notion that this is a
24   behavior problem, I'm not buying it.
25             ATTORNEY SCHROEDER:  Hold on.  You have every right

201

VOLUME: 6
PAGES: 1-221

1    to cross-examine her, but you can't then say you've said it

2    twice in the course of two hours of testimony.  So, if she said

3    it twice, fine, but characterizing her testimony, that's fine.

4    You have the right to ask that.  If you're going to go by

5    initials, I have no problem with that.  I just wanted to

6    understand.

7            THE COURT:  Ask questions, okay?  There tends to be a

8    little bit of kind of narrative, and please don't take this as

9    a criticism, but you want to really stay focused, and I know

10   you're trying to pivot from topic to topic.  You really, you

11   can have a little bit of leeway there, but you should be asking

12   questions instead of saying, My understanding, and kind of a

13   narrative and then asking for that to be informed.

14           ATTORNEY NUNAN:  Okay.  I will take that.  I

15   appreciate that.  I do feel like her talking early on, I think

16   the jury watching her come up with these excuses is not --

17           THE COURT:  I understand your opinion, but in terms

18   of the Rule of Evidence --

19           ATTORNEY NUNAN:  Sure, I will ask questions.

20           ATTORNEY SCHROEDER:  My early issue, Your Honor, was

21   just make sure -- and it's hard to do because I've had this

22   issue too -- just making sure she lets her finish her answer.

23   She has what I would call a pregnant pause in her, just how she

24   talks.  She just does and so --

25           THE COURT:  The Witness?  No pun intended.

1          ATTORNEY SCHROEDER:  Yeah.  No.  This is, like, just

2    how she talks.  So what?  No pun intended, exactly.

3          THE COURT:  Yeah.  So just make sure.  There is a

4    kind of long, pregnant pause at the end of the first part of

5    the answer, and then she starts.

6          ATTORNEY SCHROEDER:  I understand that.

7          ATTORNEY NUNAN:  I should be jumping in and

8    controlling it more.

9          ATTORNEY SCHROEDER:  I'm not going to talk to the

10   Witness afterwards other than to say which I've said before,

11   just, once you starts your answer, just let you finish your

12   answer, and we need to move along.

13         THE COURT:  So it sounds like the objection is, not

14   so much that she's going to ask about this, but that she used

15   initials, which she can.

16         ATTORNEY SCHROEDER:  Well, now at least I understand

17   who she's talking about because I would have had no context.

18   There's no context.  So I understand the context.  So I think

19   we can proceed with the initials.  Thank you.

20         THE COURT:  Objection overruled.

21         ATTORNEY SCHROEDER:  Thank you.

22              (Bench conference ends.)

23   BY ATTORNEY NUNAN:

24   Q.   Dr. DeMars, you had a physician within the urogyn division

25   who was a surgeon whose initials were EF.  Do you know who I'm

(414 of 993), Page 414 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 366 of 945
2217-cv-00094-kjd Document 329-3 Filed 04/23/25 Page 366 of 945

```
1    talking about?

2    A.   Within urogyn?

3    Q.   I believe so.  Am I wrong?  Do you know somebody who is

4    just in OB/GYN?

5    A.   I know another physician who was not in urogyn that we --

6    Q.   Okay.  And did this physician have trouble in the OR with

7    the staff?

8    A.   Yes.

9    Q.   Okay.  And this is a situation, a behavior issue that you

10   dealt with?

11   A.   Yes.

12   Q.   Okay.  So did you speak to this physician about her

13   behavior pointedly?

14   A.   Yes.

15   Q.   Did you ask Dr. Porter to counsel her four times?

16   A.   I may have.  I don't know.

17   Q.   Did you put this physician on a performance improvement

18   plan?

19   A.   I don't think we got that far.

20   Q.   Okay.  Did this physician go to bad doctor school, for the

21   lack of another word, Acumen?  There's schools that help with

22   behavior issues?

23   A.   Not during that time.  I think, ultimately, she may have,

24   but not during the time I was with her.

25   Q.   Okay.  So there are regulated ways or that you deal with
```

(415 of 993), Page 415 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 367 of 945
2117-cv-00194-kjd    Document 329-3    Filed 04/23/25    Page 204 of 945

204

VOLUME: 6
PAGES: 1-221

1    physicians with behaviors; is that correct?

2    A.    Yes.

3    Q.    Okay.  If Dr. Porter's supposed behavior problems that

4    you've referenced rose to such a problematic level as you

5    claim, why wasn't she given an opportunity to address those

6    problems like you did with this other physician?

7    A.    That goes back to the conversation that I had with

8    Dr. Manganiello that I had --

9    Q.    In 2009?

10   A.    No, I had that conversation in 2014 after he had retired.

11   Because I --

12   Q.    And that conversation somehow overrid Dr. Porter's ability

13   to understand that you thought she had a behavior problem?

14   A.    Say that again.

15   Q.    Sure.  I'm sorry it wasn't clear.  So, Dr. Porter, if you

16   thought she had a behavior problem, had a right to understand

17   what you thought that problem was, right?

18   A.    This was probably one of the biggest mistakes that I made.

19   Q.    You didn't tell Dr. Porter that you thought she had a

20   behavior problem?

21   A.    Correct.

22   Q.    You did not give her an opportunity to address or fix that

23   behavior problem?

24   A.    I was, I was unwilling in 2014 to address that

25   immediately.

205

1    Q.   How about in 2015?

2    A.   In 2015 there weren't -- the beginning of 2015, I would

3    say, in 2015 the -- no, I didn't.  I would say that that was

4    probably one of the biggest mistakes that I made was not to

5    address the behavior problems that were occurring at the time.

6    Q.   If they were occurring at all?

7    A.   They were occurring.  They were occurring, that there was

8    team Hsu, and there was team Porter within the general, within

9    the REI division.  That was part of the general behavior of

10   creating sides and creating disharmony among the division.

11   Q.   Okay.  I'd like to move on to Exhibit 52, please.  To the

12   best of your knowledge, Dr. Porter was never on a performance

13   improvement plan, correct?

14   A.   That's correct.

15   Q.   Okay.  This email is from you to Daniel Herrick, correct?

16   A.   Yes.

17   Q.   Who is Daniel Herrick?

18   A.   Daniel Herrick was the sort of the operations manager for

19   the department of obstetrics and gynecology and also for

20   anesthesia.

21   Q.   Okay.  And this email was written on April 25th 2017,

22   correct?

23   A.   Yes.

24        ATTORNEY NUNAN:  I'd like to move the admission of

25   52, Plaintiff's 52, into evidence, please.

```
1            THE COURT:  Any objection?

2            ATTORNEY SCHROEDER:  No objection, Your Honor.

3            THE COURT:  Plaintiff's 52 is admitted.

4        (Plaintiff Exhibit 52 is admitted into evidence.)

5    BY ATTORNEY NUNAN:

6    Q.   In April, by April 25th 2017 had the decision been made to

7    close the REI division?

8    A.   No.

9    Q.   What date would you put to that decision?

10   A.   I would put it later in April.

11   Q.   You write to Daniel Herrick, "Ed is also lumping Albert

12   into, quote, 'he's been a problem since day one', end quote.

13   This is not a fair characterization of Albert.  Again, Misty

14   has decided that she no longer wants to work with him or teach

15   him and she's bullying him.  He did an amazing job by himself

16   January to August of 2016."

17       Is that a correct statement, that he did an amazing job by

18   himself from August, from January to August of 2016?

19   A.   This is a very frustrated email.  Dr. Hsu, who we knew had

20   limitations, was by himself from January essentially to August

21   of 2016, and he was overworked, overstressed, and was trying to

22   do the job of two people when he couldn't actually do the job

23   thoughtfully.  And I -- did he do an amazing job?  It was

24   incredibly hard to watch him trying to work during that time.

25   Q.   Okay.  I'd like to direct your attention back to what you
```

(418 of 993), Page 418 of 993  Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 370 of 945
2217-cv-00194-kjd    Document 329-3    Filed 04/23/25    Page 370 of 945

207

1    wrote two months earlier which is, "I know that the FET rate

2    January to June was horrible", correct?

3    A.   Yes, frozen.

4    Q.   Frozen?  That's fine.  From a patient standpoint, did you

5    have an obligation to keep Albert from trying when he was

6    failing to do these embryo transfers?

7              ATTORNEY SCHROEDER:  Objection, Your Honor.

8              THE COURT:  Basis?

9              ATTORNEY SCHROEDER:  I think she's mischaracterizing

10   Dr. DeMars's prior testimony and also mischaracterizing, I

11   think, the actual statement that she's referring to.

12             THE COURT:  Overruled.

13             THE WITNESS:  Ask the question again, please.

14             (Question read by the reporter.)

15             THE WITNESS:  I think that to characterize that

16   embryo transfers were the reason for poor pregnancy rates is a

17   gross oversimplification, and I would disagree with that

18   statement.

19   BY ATTORNEY NUNAN:

20   Q.   Two lines later you state, "Despite the dysfunction, the

21   pregnancy rates were excellent".  Is that true?

22   A.   Yes.  They went up in 2016.

23   Q.   Why did they go up in 2016?

24   A.   Because of Dr. Esfandiari.

25   Q.   So what I'm noticing here is that what you say to

1    Dr. Porter and what you say to top administration officials is

2    different; is that correct?

3                    ATTORNEY SCHROEDER:  Objection, Your Honor.

4                    THE COURT:  Sustained.

5                    ATTORNEY NUNAN:  Okay.  I would like to turn to a

6    document that I believe is already admitted.  Can we check?

7    Defendant's Exhibit W.

8                    THE COURT:  That is admitted.

9                    ATTORNEY NUNAN:  Okay.  I'm not sure that you have a

10   paper.  Do you have a paper copy?  I don't think you do, so I'm

11   going to have you read it on the screen.  I apologize for that.

12   If you guys have a paper copy for her, I would appreciate it.

13                   ATTORNEY SCHROEDER:  Give me one second, and we'll --

14                   ATTORNEY NUNAN:  Sure.

15                   ATTORNEY SCHROEDER:  I think it's Volume 1.  There's

16   a notebook up there, I think.

17                   ATTORNEY NUNAN:  Okay.  If you would like a paper

18   copy, there is a Volume 1 of defendant's, and that should have

19   a W under it.  Sorry.

20                   THE WITNESS:  It's empty.

21                   ATTORNEY NUNAN:  Okay.

22                   ATTORNEY SCHROEDER:  We've got a copy to hand up if

23   you'd like.

24                   ATTORNEY NUNAN:  Okay, great.  I'm actually going to

25   switch gears on you.  I apologize.  Is Exhibit 7 admitted?

(420 of 993), Page 420 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 372 of 945
2:17-cv-00944-kjd    Document 329-3    Filed 04/23/25    Page 209 of 945

209

1          THE COURT:  No.

2          ATTORNEY NUNAN:  Okay.  Will you please look at

3    Plaintiff's Exhibit 7?

4          THE COURT:  Correction.  The Deputy Clerk tells me it

5    is admitted in evidence.

6    BY ATTORNEY NUNAN:

7    Q.   Okay, thank you.  I'd like to switch now to David Seifer.

8    If you could please read Exhibit 7, that would be great.  Set

9    this here for the future.  Okay.  We've looked over this

10   document already today, right?

11   A.   Yes.

12   Q.   Okay.  In March of 2016, the credentialing committee

13   received a negative report about David Seifer, correct?

14   A.   Yes.

15   Q.   Dr. Amato had written a negative evaluation?

16   A.   He had, yes.

17   Q.   You asked the credentialing committee that the requirement

18   of current letters of recommendation be waived because Dr.

19   Seifer could not provide them, right?

20   A.   I don't know.  I may have.

21   Q.   Did you go in front of the credentialing committee and

22   state that you wanted to hire David Seifer?

23   A.   Yes.

24   Q.   Okay.  Is it fair to say that the credentialing committee

25   had concerns about Dr. Seifer?

1   A.   Yes.

2   Q.   Who was on the credentialing committee at the time?

3   A.   I don't remember.

4   Q.   Was Dr. Maria Padin?

5   A.   I don't, I don't remember for sure.

6   Q.   Do you remember?

7   A.   Probably.  She was, she was chief of the medical staff.

8   Q.   Do you remember Jocelyn Chertoff being on there?

9   A.   I don't remember.

10  Q.   Do you remember Dr. Ed Merrens being on the credentialing

11  committee?

12  A.   No, I don't.  Honestly, I don't remember.  That was a

13  while ago.

14  Q.   Okay.  Do you remember what the credentialing committee

15  told you about David Seifer's hire?

16  A.   No.

17  Q.   Okay.  Do you remember Dr. Ed Merrens saying to you that

18  David Seifer's success, quote, "was on you"?

19  A.   Yes.

20  Q.   He made that statement?

21  A.   I'll say "yes".

22  Q.   Okay.  In fact, you, you, in the past, have described that

23  as the charge you were given?  Does that ring a bell?

24  A.   No.

25  Q.   Okay.  I'm going to read from your deposition.  Do I mark

1    this as ID3?  I believe.

2              THE COURT:  You should mark it, yes.

3              ATTORNEY NUNAN:  This is the deposition transcript of

4    Leslie DeMars.

5    BY ATTORNEY NUNAN:

6    Q.   You were asked, "Did you appear before the credentialing

7    committee to explain your rationale for Dartmouth-Hitchcock to

8    hire Dr. Seifer?"  Your answer was, "Yes, I went before the

9    committee because, at that point, we had one physician in the

10   division.  We had Dr. Hsu who could not continue working at the

11   pace he was working, nor was it appropriate for him as a junior

12   provider to continue to try to keep the division going.  We had

13   had a search for several years for another REI provider, and

14   Dr. Seifer was the only candidate interested in coming to work

15   at Dartmouth."

16        You were then asked, "Did you represent to the committee

17   that you would take personal responsibility that Dr. Seifer

18   would be a success?"  And you answered, "I was given that

19   charge".  And the question was, "They told you that?"  The

20   answer was, "Yes."

21        Do you remember that now?

22   A.   Honestly, I don't remember that now, but that would have

23   been my responsibility if I went before the, the credentialing

24   committee.  It was my responsibility for his hire.

25   Q.   Is it a little unusual that his success is tied to your

(423 of 993), Page 423 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 375 of 945
2:17-cv-00194-kjd    Document 329-3    Filed 04/23/25    Page 375 of 945

212

VOLUME: 6
PAGES: 1-221

1   success?

2            ATTORNEY SCHROEDER:  Objection, Your Honor.

3            THE COURT:  Sustained.

4   BY ATTORNEY NUNAN:

5   Q.   We'll come back to that.  When did Dr. Seifer start

6   working in an administrative capacity?

7   A.   May or June of '16.

8   Q.   And did he have to wait to see patients?

9   A.   Yes.

10  Q.   Okay.  Why was that?

11  A.   Because he wasn't licensed or credentialed as yet.

12  Q.   And this was about the same time that Dr. Porter was

13  returning in a limited capacity?

14  A.   In a very limited capacity.

15  Q.   Okay.  And did you ask Dr. Porter at that point to assess

16  Dr. Seifer's skills?

17  A.   So part of the credentialing process is that a certain

18  number of specialty procedures have to be observed.

19  Q.   Proctored?

20  A.   Observed.

21  Q.   And there's a form you fill out --

22  A.   Yes.

23  Q.   -- called an FPPE assignment form?

24  A.   That may be the name of it, but, yes, there is a, there is

25  a formal process by which particular procedures need to be

VOLUME: 6
PAGES: 1-221

1    observed.

2    Q.   I would like to turn to W now if I can find it.  Can you

3    please read W?  Do you remember receiving this email?

4    A.   Do I remember it?  Specifically, no.

5    Q.   Dr. Porter says here, "I watched retrievals this week.  It

6    has either been some time since DS did retrievals regularly and

7    he is rusty, unfamiliar with the setup.  He's been doing half

8    the cases with Albert.  Technically, he is poor and/or some

9    combination of these.  He has some fairly old concepts of

10   retrieval techniques, quote, 'you need to curette the

11   follicle'".  Did I read that correctly?

12   A.   Yes.

13   Q.   Farther down she says, "I took the opportunity to pull him

14   aside Thursday and ask questions about his embryo transfer

15   preferences.  He gave me a blank stare when I asked which

16   transfer technique he prefers".

17        So, when you received this email, do you remember being

18   worried or concerned?

19   A.   I remember discussing it, discussing with Dr. Seifer.

20   Q.   You had a discussion with Dr. Seifer?

21   A.   Yes.

22   Q.   Did you have a discussion with Dr. Porter about this?

23   A.   No.  I had a discussion with Dr. Seifer.

24   Q.   Okay.  I want to turn -- I'd like to look at Exhibit 11,

25   please.  I do not think it's admitted.  Okay?

VOLUME: 6
PAGES: 1-221

1    A.   Yes.

2    Q.   Who -- so this is an email from Dennis Seguin to you; is

3    that correct?

4    A.   Yes, Seguin.

5    Q.   Thank you.  July 28th 2016?

6    A.   Yes.

7         ATTORNEY NUNAN:  I'd like to move the for the

8    admission of Plaintiff's Exhibit 11.

9         THE COURT:  Any objection?

10        ATTORNEY SCHROEDER:  No objection.

11        THE COURT:  Plaintiff's 11 is admitted.

12        (Plaintiff Exhibit 11 is admitted into evidence.)

13   BY ATTORNEY NUNAN:

14   Q.   Tell me, who is Dennis?

15   A.   Dennis was the head ultrasonography tech at DH.

16   Q.   He writes here, "Misty and I spoke earlier today, and she

17   has asked m me to forward you some of the details about the

18   recent, about a recent embryo transfer performed by Dr. Seifer.

19   The details of my observation only regarding this procedure.

20   The embryo transfer did not go well.  Dr. Seifer, while he

21   performed the procedure using sterile technique, his skill set

22   was somewhat alarming to me".

23        The ultrasound techs are in on all of these embryo

24   transfers, right?

25   A.   Yes.

(426 of 993), Page 426 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 378 of 945
2217-cv-00094-kjd    Document 329-3    Filed 04/05/25    Page 316 of 945

215

VOLUME: 6
PAGES: 1-221

1    Q.   He would have seen many, many?

2    A.   I don't know.

3    Q.   He was experienced?

4    A.   I don't know how many he would have seen.

5    Q.   Got it.  Do you think he was an experienced ultrasound

6    tech?

7    A.   He is an experienced ultrasound tech.

8    Q.   Okay.  He says farther down here, "While I am not an

9    expert, this was clearly not a well-performed embryo transfer.

10   I later learned that the patient was paying out-of-pocket for

11   the entire procedure.  While this does not influence my message

12   to you, it does make me unhappy to see, quote, 'our patients

13   not receiving the best care'".

14        Were you concerned when you received this email?

15   A.   I went and talked to Dennis.

16   Q.   And what was the content of that conversation?

17   A.   As I recall, Dennis recounted his experience with this

18   embryo transfer.  He backtracked a bit on the details, but he

19   recalled essentially that he thought that this transfer was

20   not, not the same as what he would see if Dr. Porter or

21   Dr. McBean would do a transfer.

22   Q.   Did you have reason to doubt his ability to say whether or

23   not this embryo transfer was not well-performed?

24   A.   I think it goes back to what is, what is the level of,

25   what is excellent?  What is good?  What is acceptable?  What is

1    unacceptable?  And does, does Dennis have that ability to

2    judge?  No, he does not.

3    Q.   How do you know that?

4    A.   Because he is not an REI physician.

5    Q.   I would like you to look at Exhibit Number 9.  Is this a

6    text message exchange with Richard Reindollar and yourself?

7    A.   Yes, it is.

8    Q.   On Thursday July 28th 2016?

9    A.   Yes.

10        ATTORNEY NUNAN:  I'd like to move for the admission

11   of Plaintiff's Exhibit 9.

12        THE COURT:  Any objection?

13        ATTORNEY SCHROEDER:  No objection, Your Honor.

14        THE COURT:  Plaintiff's Exhibit 9 is admitted.

15   (Plaintiff Exhibit 9 is admitted into evidence.)

16   BY ATTORNEY NUNAN:

17   Q.   The highlighting is mine.  You write, "Richard, I am not

18   sure that DS is clinically competent.  I don't know what he's

19   been doing for 25 years, but I'm not sure it was IVF".  Then

20   you write further down, "I am trying really hard, because I

21   spoke to many people who were highly supportive, and I am

22   always relentlessly optimistic.  I have heard separately voiced

23   concerns from nursing, anesthesia, and ultrasound techs.  The

24   lab folks complain about bloody aspirates and low egg counts.

25   I haven't talked to Navid to get true data because Navid is on

1    vacation.  He is scared to death of OHSS and has very slow

2    induction regiments".

3         Please turn to the next page.  You write, "I'm venting and

4    I really want to help him be successful".  This is a private

5    text message with Richard Reindollar, right?

6    A.   Yes, it is.

7    Q.   And what you describe here is a little inconsistent with

8    the conversation you had with Dennis Seguin, isn't it?

9    A.   This actually happened right after my conversation with

10   Dennis.

11   Q.   Because the date of Dennis's exhibit is also the 28th?

12   A.   Yes.

13   Q.   Great.  Okay.  So you had a conversation with Dennis, and

14   then you went and wrote this email?

15   A.   Because I'm trying to get independent, some sort of

16   independent assessment or -- I am not the medical expert for

17   competence for REI physicians.  I am trying to get some idea of

18   how I can determine from an independent assessor whether our

19   physicians are competent.

20        ATTORNEY NUNAN:  Give me just a second, please.

21        THE COURT:  Yes.

22   BY ATTORNEY NUNAN:

23   Q.   I'll return to that.  So this is July 28th of 2016, and,

24   as chair of the OB/GYN department, at this point, you had

25   notice that David Seifer was not clinically competent, your

1   words, and you had notice a month or two months earlier from

2   Dr. Porter that there were significant problems with Albert

3   Hsu.  So you were on notice that you had two physicians in the

4   REI division the summer of 2016 that were problematic, right?

5   A.   The summer of 2016 was right when Dr. Seifer started.

6   Q.   How long was Dr. Seifer at his former employment, do you

7   know?

8   A.   A couple of years.

9   Q.   In Washington?

10  A.   Oregon.

11  Q.   Oregon?

12  A.   I think Oregon.

13  Q.   How long was he in Oregon?

14  A.   Couple of years.

15  Q.   He was not there for a matter of months before they pulled

16  his credentials?

17  A.   I don't believe so.

18            ATTORNEY SCHROEDER:  Objection, Your Honor.

19            THE COURT:  Basis?

20            ATTORNEY SCHROEDER:  Foundation.

21            THE COURT:  Overruled.

22  BY ATTORNEY NUNAN:

23  Q.   So the complaints during the credentialing process that

24  you heard, what was your understanding of what had happened in

25  Oregon?

(430 of 993), Page 430 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 382 of 945
2217rcv000944kjd Document329.3 Filed04/26/25 Page382of945

219

VOLUME: 6
PAGES: 1-221

1    A.   My understanding was that Dr. Seifer was hired in Oregon

2    to be the division director in Oregon and that there were,

3    there was a physician who was the division director there who

4    was retiring and he was brought in to be the new division

5    director.  The three remaining providers there, one of them

6    wanted to be the division director, and the three of them

7    essentially rejected that David was going to be their division

8    director.

9    Q.   Is that what the evaluation you heard from Dr. Amato

10   stated?

11   A.   So Dr. Amato, he was the physician who wanted to be the

12   division director, and that was inconsistent with what I had

13   heard from both the lab director as well as the chair of the

14   department.

15   Q.   And the reports you're hearing at this time in late July,

16   Dr. Porter, Dennis, your reporting it to Richard Reindollar,

17   aren't those reports consistent with the same thing you were

18   hearing out of Oregon that you had to go in front of the

19   credentialing committee about?

20   A.   No.

21   Q.   They were different?

22   A.   No.

23            THE COURT:  So, Ms. Nunan, it's 4:30.  Is this an

24   okay time?

25            ATTORNEY NUNAN:  This is a great place to stop.

(431 of 993), Page 431 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 383 of 945
2:17-cv-00194-kjd    Document 329-3    Filed 04/23/25    Page 283 of 945

220

VOLUME: 6
PAGES: 1-221

1    Thank you.

2              THE COURT:  All right.  Thank you.  Okay.  So we'll

3    break for the day.  See you tomorrow at 9:00 o'clock.  Please

4    don't speak to anyone about the case or do any independent

5    research on the case yourselves.  Thank you.

6              (The Jury leaves the courtroom.)

7              THE COURT:  Thank you.  Okay.  So, just generally on

8    the topic of scheduling, so Dr. DeMars is still on the stand,

9    and I believe there is -- is it Dr. Russell that you had said?

10             ATTORNEY NUNAN:  Dr. Russell, yes.

11             THE COURT:  Dr. Russell, Dr. Conroy.  Any other plans

12   for tomorrow on plaintiff's?

13             ATTORNEY NUNAN:  I doubt we'll get to Ira Bernstein,

14   but we have him on as well.  We've asked him to be available

15   for the afternoon.

16             THE COURT:  Okay.  And how many witnesses do you

17   anticipate after those four?

18             ATTORNEY NUNAN:  Just Dr. Merrens, and then we will

19   be done.

20             THE COURT:  Okay.  So maybe Wednesday?

21             ATTORNEY NUNAN:  Sounds good to me.

22             ATTORNEY JONES:  That's my best guess.

23             THE COURT:  All right.  Anything else to take up?

24   Mr. Schroeder, did you want to take up any scheduling issues

25   today?

VOLUME: 6
PAGES: 1-221

 1              ATTORNEY SCHROEDER:  I mean, I always like to take up

 2      scheduling issues, Your Honor.  Just, the only thing is that

 3      Dr. Conroy, we've just got to make sure, if you're going to put

 4      Dr. Russell on, I want to give her some clarity on when she

 5      needs to be here because I want her to be able to work outside

 6      of the courthouse and then get here when you need her to

 7      testify.

 8              ATTORNEY NUNAN:  I think that it's safe to say not

 9      until 1:00 o'clock.

10              ATTORNEY SCHROEDER:  Okay.  That's fair.

11              THE COURT:  This is for Dr. Conroy?

12              ATTORNEY SCHROEDER:  Yes.

13              THE COURT:  Okay.  Thank you, everyone.

14          (Whereupon at 4:32 p.m. the hearing was adjourned.)

15                  C E R T I F I C A T E

16              I, Sunnie Donath, RMR, Official Court Reporter

17      for the United States District Court, District of Vermont, do

18      hereby certify that the foregoing pages are a true and accurate

19      transcription of my stenographic notes of the hearing taken

20      before me in the above-titled matter on March 31, 2025 to the

21      best of my skill and ability.

22

23      *Sunnie Donath, RMR*
        --------------------------------

24              Sunnie Donath, RMR

25

(433 of 993), Page 433 of 993   Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 385 of 945
2:17-cv-00194-kjd   Document 352-4   Filed 04/25/25   Page 385 of 545
432

VOLUME: 8
PAGES: 432-646

1                      UNITED STATES DISTRICT COURT
                              FOR THE
2                        DISTRICT OF VERMONT

3

4    Misty Blanchette Porter        )
                                     )
5                                    )
     v.                              ) Case No. 2:17-cv-194
6                                    )
                                     )
7    Dartmouth-Hitchcock             )
     Medical Center, et al.          )
8    _____)

9

10   RE:  Day 8 of Jury Trial

11   DATE: April 2, 2025

12   LOCATION: Burlington, Vermont

13   BEFORE:  Honorable Kevin J. Doyle
                 Magistrate Judge

14

15   **APPEARANCES**:

16   Geoffrey J. Vitt, Esq.
     Sarah H. Nunan, Esq.
17   Vitt & Nunan, PLC
     8 Beaver Meadow Road
18   Norwich, VT 05055

19   Eric D. Jones, Esq.
     Langrock, Sperry & Wool
20   210 College Street, Suite 400
     Burlington, VT 05410
21
     Donald W. Schroeder, Esq.
22   Morgan McDonald, Esq.
     Foley & Lardner, LLP
23   111 Huntington Avenue, Suite 2500
     Boston, MA 02199

24

25                   - Continued on Next Page -

(434 of 993), Page 434 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 386 of 945
2:17-cv-00094-kjd Document 352-1 Filed 04/25/25 Page 386 of 945

VOLUME: 8
PAGES: 432-646

433

1    Tristram J. Coffin, Esq.
     Downs Rachlin Martin, PLLC
2    199 Main Street, Suite 600
     Burlington, VT 05401-8339
3

4

5

6              TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                      United States District Court Reporter
7                         *verbatim@vermontel.net*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(435 of 993), Page 435 of 993
2:21-cv-09449-dkd Document 35292 Filed 04/25/25 Page 387 of 945

434

VOLUME: 8
PAGES: 432-646

1                    <u>INDEX OF EXAMINATION</u>

2    <u>Witness</u>         <u>Examined By</u>          <u>Page</u>      <u>Line</u>

3    Edward Merrens    Atty. Jones          436        24
                       Atty. McDonald       484         2
4

5

6    Judith Stern      Atty. Schroeder      542        13
                       Atty. Jones          563         6
7

8    Kathleen Mansfield
                       Atty. Schroeder      570         1
9                      Atty. Jones          602        14

10   Kelly Mousley     Atty. Schroeder      607         1
                       Atty. Nunan          626        20
11                     Atty. Schroeder      643        13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME: 8
PAGES: 432-646

1                        INDEX OF EXHIBITS

2                                            Page      Admitted

3        Plaintiff Exhibits

4              3                              441          Y
               6                              443          Y
5              27                             640          Y
               28                             630          Y
6              60                             462          Y
               63                             456          Y
7              79                             460          Y
               83                             454          Y
8              89                             476          Y
               103                            467          Y
9              109                            465          Y
               110                            467          Y

10

11       Defense Exhibits

12             A6                             584          Y
               A9                             588          Y
13             A16                            593          Y
               A24                            595          Y
14             B3                             616          Y
               B5                             620          Y
15             C14                            586          Y
               V                              582          Y

16

17

18

19

20

21

22

23

24                        *    *    *    *    *

25

(437 of 993), Page 437 of 993     Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 389 of 945
2:17-cv-00494-jkd   Document 35292   Filed 04/25/25   Page 389 of 945

VOLUME: 8
PAGES: 432-646                                                    436

```
 1                    (The trial began at 9:02 a.m.)

 2              THE COURT:  Good morning.  So, as I understand it,

 3      there's nothing to take up this morning.  Okay.  Plaintiff?

 4              ATTORNEY JONES:  Not for us.

 5              THE COURT:  Okay.  Then we'll get the jury, please.

 6                    (The Jury enters the courtroom.)

 7              COURTROOM DEPUTY:  Your Honor, the matter before the

 8      Court is Civil Case number 17-cv-194, Misty Blanchette Porter

 9      versus Dartmouth-Hitchcock Medical Center, et al.  Present on

10      behalf of the plaintiff are Attorneys Geoffrey Vitt, Eric

11      Jones, and Sarah Nunan.  Present for the defendants are

12      Attorneys Tristram Coffin, Morgan McDonald, and Donald

13      Schroeder.  We are here for day eight of a jury trial.

14              THE COURT:  Good morning, members of the jury.

15      Again, as I always do, since you left the courthouse yesterday,

16      have you spoken to anyone about this case, or have you learned

17      anything about the case?  Okay.  Seeing no hands raised,

18      plaintiff may call the next witness.

19              ATTORNEY JONES:  Thank you, Your Honor.  Plaintiff

20      calls Dr. Ed Merrens.

21                         EDWARD MERRENS,

22              having been duly sworn to tell the truth,

23                    testifies as follows:

24              DIRECT EXAMINATION BY ATTORNEY JONES

25      Q.   Good morning, Dr. Merrens.
```

(438 of 993), Page 438 of 993    Case: 25-1382    12/22/2025, DktEntry: 35.4, Page 390 of 945
2:17-cv-00049-kjd    Document 35.4    Filed 04/25/25    Page 390 of 945

VOLUME: 8
PAGES: 432-646

437

 1    A.    Good morning.

 2    Q.    We've sat across the courtroom for a week and a half, but

 3    we haven't actually met.  So I'm Eric Jones.  I'll be asking

 4    you some questions this morning.

 5    A.    Thanks, Eric.

 6    Q.    Dr. Merrens, what is your current employment?

 7    A.    I'm employed by Dartmouth Health.

 8    Q.    In what capacity?

 9    A.    I'm the chief clinical officer.

10    Q.    And how long have you been the chief clinical officer?

11    A.    Since 2016.

12    Q.    Okay.  Can you just tell us briefly what your

13    responsibilities are as chief clinical officer?

14    A.    I oversee all clinical operations for the Dartmouth Health

15    system, including all reporting relationships from the chairs,

16    center directors, clinical operations at five critical access

17    hospitals, a community group practice, information technology,

18    quality, compliance, and a range of other things.

19    Q.    Okay.  So all of the department chairs, though, they are

20    direct reports to you; is that correct?

21    A.    Yeah, I'm the designee for the CEO of the organization.  I

22    report directly Dr. Joanne Conroy.

23    Q.    Okay.  And we heard over the last couple of days from

24    Dr. DeMars.  When she was the chair of the OB/GYN department,

25    she reported directly to you, correct?

(439 of 993), Page 439 of 993

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 391 of 945

2:17-cv-00949-jkd Document 352-1  Filed 04/25/25  Page 391 of 945

438

VOLUME: 8
PAGES: 432-646

1    A.    That is correct.

2    Q.    Okay.  And, in your capacity as chief clinical director,

3    officer, do you have a role with regard to patient care issues

4    or patient safety issues?

5    A.    They do sometimes roll up to me, and I'm the -- I may

6    become involved in things, but we have mechanisms for dealing

7    with that across a broad range.

8    Q.    And how about doctor competence issues, would that come to

9    your attention?

10   A.    If they needed to.  I oversee over 1,500 physicians across

11   our system, as well as nurse practitioners.  We have a broad

12   range of mechanisms of dealing and with quality and

13   competence.

14   Q.    Okay.  And, as chief clinical officer, do you have a role

15   in the credentialing process?

16   A.    I do not.

17   Q.    Did you serve on the credentialing committee in 2016?

18   A.    I did.

19   Q.    Okay.  In what capacity?

20   A.    I was a member of the committee.

21   Q.    So that wasn't by virtue of you being the chief clinical

22   officer; you were just a member?

23   A.    Correct.

24   Q.    How long were you on the credentialing committee?

25   A.    Maybe about five or six years.  I had been in a previous

(440 of 993), Page 440 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 392 of 945
2:21-cv-00494-jkd Document 35.4 Filed 04/25/25 Page 392 of 945
439

VOLUME: 8
PAGES: 432-646

1    role, and I transitioned off that committee as I took on this

2    role as the chief clinical officer.

3    Q.   Okay.  And, during that five to six years, how many times

4    would you estimate the committee oversaw the process of hiring

5    a division head?

6    A.   There were certainly several opportunities to hire both

7    division heads and section chiefs.  Over that period of time,

8    there might have been maybe, maybe ten.

9    Q.   Can you tell us what the normal process would be for

10   Dartmouth Health recruiting a division head and then having

11   that person go through the credentialing process?

12   A.   Well, there would be a recruitment process in which, you

13   know, people would be, there would be ads and people would

14   reply.  We would have our talent acquisition team involved, and

15   people from the department and outside the department would

16   interview people.  Once it got to the point where -- the

17   credentialing process is really reviewing, you know, what

18   training someone's done, their board status, where they've

19   worked.  That's really comes in terms of where you present kind

20   of your credentials, everything that says you can do what you

21   can do, and that's where it would come to that committee for

22   review.

23   Q.   Okay.  Were you on the committee when Dr. Seifer's

24   application to the credentialing committee was processed?

25   A.   I was.

VOLUME: 8
PAGES: 432-646

1    Q.   And that was not a normal process, was it?

2    A.   No.

3    Q.   Can you explain what was abnormal about it?

4    A.   I think the, Dr. Seifer had been recruited to be a

5    division chief but to oversee from an administrative standpoint

6    and had been hired, and then later on there was a desire and a

7    presentation to the credentials committee that he play a

8    clinical role, and that's why the credentials and the review of

9    his application came to that committee.

10   Q.   But it was unusual that he was first brought in in an

11   administrative capacity and then was presented to the

12   committee?

13   A.   Correct.

14   Q.   Okay.  That's not the normal way things are done, right?

15   A.   Correct.

16   Q.   But Dr. DeMars did it that way, correct?

17   A.   Correct.

18   Q.   Is there a reason to do it that way?

19   A.   I don't know.

20   Q.   Would it make it more difficult for the committee to deny

21   credentialing if someone had already been brought on at the

22   administrative capacity?

23   A.   No.

24   Q.   Was there anything unusual about Dr. Seifer's

25   credentialing process in terms of information you received from

(442 of 993), Page 442 of 993   Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 394 of 945
2:21-cv-00144-kjd   Document 529   Filed 04/25/25   Page 394 of 945

441

VOLUME: 8
PAGES: 432-646

1   the prior employer?

2   A.   Yes.

3   Q.   What was that?

4   A.   I think there were concerns about, expressed about his

5   practice and whether he was, about his style and practice and

6   his expectations were conveyed.

7   Q.   And those concerns were expressed by members of his

8   previous employer, correct?

9   A.   That is my understanding.

10  Q.   Dr. Merrens, I'm going to show on the monitor a document

11  that's been admitted as Plaintiff's Exhibit 3.  If you prefer

12  we also have a hard copy in the binder for you.

13  A.   Yeah, whatever.

14  Q.   Yeah, that's fine.  So I'm, this has been admitted so --

15  So, Dr. Merrens, I want to start about halfway down that first

16  page with the email from Kayla Hollis to you, Dr. Padin, and

17  Dr. Chertoff.  Ms. Hollis worked for the medical staff office,

18  correct?

19  A.   Yes.

20  Q.   Okay.  So in this email she is telling you in the first

21  paragraph, second sentence, "This is a very unusual

22  circumstance in which the department chair who has completed a

23  telephone reference and is the one requesting that I initiate

24  the credentialing process".  Is that unusual?

25  A.   I don't think so, actually.

1    Q.   Okay.  So it would be normal for the department chair who

2    is requesting that the process be commenced also be the one who

3    completed the telephone interview?

4    A.   It would not be -- for a division director or a section

5    chief, this would be a person reporting directly to the chair,

6    and that person would have called and done reference checks.

7    That is a higher level position.  So I don't think it's that

8    unusual, but I respect that's what's written here.

9    Q.   Okay.  And then Ms. Hollis notes in the italicized

10   paragraph, "Dr. Seifer is leaving his position as division

11   director at OHSU after less than two years".

12        Would that strike you as unusual, that you were

13   considering a candidate who had left his prior position in less

14   than two years?

15   A.   No.

16   Q.   Okay.  There's a comment here from somebody from the prior

17   employer, "I either had to fire the rest of the division or

18   find a new role for Dr. Seifer because he was not going to be

19   successful leading the division".  Did you see that?

20   A.   Yes.

21   Q.   And, as, when you received this email, did that concern

22   you?

23   A.   Yes.

24   Q.   Why did that trouble you?

25   A.   Well, I think any information around someone's success

(444 of 993), Page 444 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 396 of 945
2:21-cv-00944-jkjd Document 529-3 Filed 01/25/25 Page 396 of 945

443

VOLUME: 8
PAGES: 432-646

1    would be of concern and would require additional information.

2    Q.   And, at the bottom on Page 2 at the end of the email,

3    Ms. Hollis notes, "On a related note, I was asked if I can, we

4    can waive the need for current letters of recommendation as he

5    is unable to provide them for his current practice".

6         Did that concern you, that he was unable to get letters of

7    recommendation?

8    A.   Yes.

9    Q.   Would you agree with Dr. Padin that this is a red flag?

10   A.   Yes.

11   Q.   I'd like to show you now what's been admitted in evidence

12   as Exhibit 6 that will be on the screen in a minute.  And,

13   again, if we go to Page 2 of the exhibit, again, Ms. Hollis is

14   writing what's the email to Dr. DeMars but then CCing other

15   members of the committee, including yourself.  Do you see that?

16   A.   I do.

17   Q.   Okay.  And she is reporting that she received some

18   information including a response to the question, "Have you

19   ever received any complaints against this individual?"  And the

20   answer was "Yes".  Do you see that?

21   A.   I do.

22   Q.   And then the second bullet point says, "Were there any

23   problems with the requested privileges being carried out

24   satisfactorily at your institution?"  Answer, "Yes.  Noted

25   substandard ultrasound skills".  Do you see that?

1   A.   I do.

2   Q.   And did that also trouble you when you were processing

3   this application?

4   A.   I think it required further information.

5   Q.   And, again, do you agree with Dr. Padin that that was also

6   a red flag?

7   A.   Correct.

8   Q.   Did other members of the committee share your concerns, to

9   your knowledge?

10   A.   I believe it required more information to be able to

11   better understand, and that was the consensus of the committee.

12   Q.   All right.  But, despite some of these concerns that were

13   being raised in the process, Dr. DeMars insisted and advocated

14   that the committee approve the application, correct?

15   A.   Correct.

16   Q.   She testified yesterday that she had a conversation with

17   you where she essentially had to assure Dr. Seifer's success.

18   Do you recall that?

19   A.   Yes.

20   Q.   Can you tell us about that conversation from your

21   perspective?

22   A.   Well, we required additional information to better

23   understand what Dr. Caughey at Oregon Health Science was

24   relating and wanted to better understand some of the concerns,

25   and those were fully further detailed understanding his

1    practice and a range of things, and it was our understanding

2    that, if, if we were going to do this, that we wanted her to

3    ensure that he was going to be successful in this endeavor,

4    understanding a lot more of the details that were raised.

5    Q.   And the process she was following was not usual.  We've

6    already discussed that, correct?

7    A.   Correct.

8    Q.   And some red flags came up during the process, correct?

9    A.   Correct.

10   Q.   Nevertheless, she wanted you to go ahead and approve his

11   credentials, correct?

12   A.   With additional information.

13   Q.   Yeah.  And isn't it true that you told her that the

14   committee would proceed to approve his application but this was

15   on her?

16   A.   To some effect, yes.

17   Q.   Did you use that language, "This is on you"?

18   A.   I can't remember the exact language, but I made it very

19   clear that his success was, and supporting him and

20   understanding what he would need to be successful given the

21   different practice style, was certainly something I was

22   counting on her to achieve.

23   Q.   And, by indicating that it was on her and that she had to

24   ensure his success, isn't it true that what you meant by that

25   was that her job was on the line if he was unsuccessful?

(447 of 993), Page 447 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 399 of 945
2:21-cv-00144-jjd Document 3293 Filed 04/25/25 Page 399 of 945

446

VOLUME: 8
PAGES: 432-646

1    A.   Yes.

2    Q.   And did you also -- isn't it true that you also told

3    Dr. DeMars that you were not pleased with the process that she

4    used to recruit Dr. Seifer?

5    A.   Correct.

6    Q.   You explained earlier that the department chairs report

7    directly to you?

8    A.   Correct.

9    Q.   Can you talk to me a bit about what authority the

10   department chairs themselves have when running their

11   departments?

12   A.   Can you be more specific?  I mean, they have the ability

13   to -- they have reporting relationships with division and

14   sectional directors underneath them.  They're involved in

15   understanding programs of care, developing research

16   allocations, mentoring individuals, developing training

17   programs, working with trainees on various levels.  They

18   oversee all the actives of the department.

19   Q.   Are they authorized to handle complaints about physician

20   competence?

21   A.   Yes.

22   Q.   And are they authorized to handle complaints about patient

23   care and patient safety?

24   A.   Yes.

25   Q.   Okay.  Is there a point at which they're expected to

VOLUME: 8
PAGES: 432-646

1    escalate those matters, or do they have the authority to

2    resolve them on their own?

3    A.    It would be at the discretion of the chair or any other

4    concerns, but those concerns do not need to go through the

5    chair.  If there are significant concerns, we have mechanisms.

6    We have, we have anonymous compliance and risk hotlines for

7    anyone to raise concerns.  So, while it does go to the chair,

8    and that is the initial point, there are many other

9    opportunities for expressing concerns about patient care.

10   Q.    Okay.  And how about with regard to employment decisions,

11   hiring, discipline, firing, what level of authority do

12   department chairs have?

13   A.    I think they have the ability to raise those issues, and,

14   certainly, levels of hiring and firing are things that are

15   discussed with other members of leadership, including the chief

16   medical officer.  So hiring comes before a committee, and a

17   termination would be, of an individual, would be cause for more

18   broad discussion.  It wouldn't just happen with a single

19   individual.

20   Q.    Okay.  And so for hiring we've discussed that

21   particularly, for example, with Dr. Seifer that Dr. DeMars

22   decided she wanted to hire Dr. Seifer and then she presented

23   the case to the committee, correct?  But she recommended the

24   hire, correct?

25   A.    Correct.

(449 of 993), Page 449 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 401 of 945
2:21-cv-00144-jjj    Document 5293    Filed 04/25/25    Page 401 of 945

VOLUME: 8
PAGES: 432-646

448

```
 1    Q.   And does the department chair's recommendation have

 2    weight?

 3    A.   Well, they've gone through a search process.  They've

 4    identified a candidate.  And that candidate would have

 5    interviewed with a number of people, and they've recommended

 6    that individual.  Coming to the credentials committee is a step

 7    around ensuring that they have the training and the capability

 8    to serve in a clinical role.

 9    Q.   But the fact that a department chair wants to hire

10    somebody and recommends the hire, that carries some weight for

11    the perspective of the credentialing committee?

12    A.   Correct.

13    Q.   Like, for example, with Dr. Seifer we discussed that you

14    had concerns that Dr. DeMars didn't follow the right process,

15    there were some red flags.  Nevertheless, Dr. DeMars

16    recommended the hiring, wanted it, and, ultimately, the

17    committee agreed but said, "This is on you"?

18    A.   Yeah, there was a fair amount of other information that

19    was provided, and all the positions that come to the

20    credentialing committee have the approval of their department

21    chair.

22    Q.   While the committee ultimately approved it, this was a

23    decision she wanted and recommended, correct?

24    A.   Correct.

25    Q.   With regard to discipline, we heard some testimony about
```

 1   performance improvement plans.  Do department chairs have the

 2   authority to put a provider on a performance improvement plan

 3   alone?

 4   A.   It's usually in collaboration with the chief medical

 5   officer or other supports, depending on what the deficiency or

 6   issue is.

 7   Q.   Okay.  Do department chairs need your permission to put a

 8   doctor on a PIP?

 9   A.   They do not.

10   Q.   And, if there is an issue with regard to termination, say

11   a department chair has concluded that there is cause to

12   terminate an employment relationship with a provider, do they

13   make that recommendation to you?  How does that work?

14   A.   A termination for cause would be a discussion with human

15   resources, with general counsel, with the chief medical

16   officer.  It would be -- we would have to understand the

17   situation around it in terms of kind of what was going on.  It

18   wouldn't be a single determination, and it might not rise to

19   me.  We have mechanisms for understanding things, and we have

20   bylaws that have language around this.

21   Q.   Okay.  So this getting support from HR and general

22   counsel.  I understand that.  But do I understand your

23   testimony that, assuming that there was consultation with HR

24   and general counsel, that there are times when a department

25   chair can make a termination decision without your signing off

1    on it?

2    A.   Correct.

3    Q.   And, when Dr. Padin testified, she testified about the

4    just cause process.  Would it be a department chair that

5    initiates that process?

6    A.   Can you describe -- I'm not sure what you're describing.

7    Q.   Well, if a department chair concludes that they have what

8    they believe is cause to terminate a provider, there's a just

9    cause process at the hospital?

10   A.   Correct.

11   Q.   Would it be the department chair that initiates that

12   process?

13   A.   Correct.

14   Q.   I want to talk now about the decision to close the

15   reproductive endocrinology and infertility unit, division.  Who

16   was involved in that decision?

17   A.   It was myself; it was Dr. DeMars; it was Heather Gunnell,

18   the director of OB/GYN; and Daniel Herrick who was the vice

19   president for surgical and perioperative services was our core

20   group of people, and there were others involved in the

21   discussion.  Dr. Padin had been involved in some of it, yeah.

22   Q.   Okay.  But others that may have been involved in some

23   parts?

24   A.   That's the core group.

25   Q.   That group of four is the core group?

(452 of 993), Page 452 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 404 of 945
2:21-cv-00194-jjd Document 292 Filed 04/25/23 Page 20 of 215

451

VOLUME: 8
PAGES: 432-646

1    A.    Correct.

2    Q.    And Dr. DeMars's role as the chair of the OB/GYN, I mean,

3    she had an important role in those discussions, correct?

4    A.    Correct.

5    Q.    But is it true that this was the only time in Dartmouth

6    Health's history that it ever closed a division?

7    A.    No.

8    Q.    Oh, it's not?  Okay.  When else has Dartmouth Health

9    closed a division?

10   A.    Well, we have closed other offerings at the hospital and

11   member hospitals in the past.

12   Q.    Closed offerings?  I'm talking about an established

13   division, a subdivision of a department.

14   A.    I would say that this is the first time that an entire

15   division was closed.

16   Q.    So this was the first time?  Just the four of you were

17   involved as the core group?

18   A.    Yes.

19   Q.    How long would you say it took for that core group to

20   start its discussions and then ultimately conclude it was going

21   to shutter the program?

22   A.    Probably within a month.

23   Q.    The notice of the closure was in early March of 2017; does

24   that sound right, the announcement?

25   A.    No.

(453 of 993), Page 453 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 405 of 945
2:17-cv-00944-kjd   Document 5293   Filed 01/25/25   Page 205 of 245

VOLUME: 8
PAGES: 432-646

452

1    Q.   I'm sorry.  May.  If I said March, I'm mistaken.  Early

2    May of 2017; is that right?

3    A.   The program was closed on May 4th, and there was a

4    subsequent announcement.

5    Q.   And you say it took about a month for that decision to be

6    made?

7    A.   There were discussions leading up to that that were

8    probably several weeks.

9    Q.   So is it fair to say starting early April was when --

10   A.   There were discussions and understandings in April, I

11   believe.

12   Q.   Okay.  So there were these four people in the core group.

13   Isn't it true that you have said Leslie was ultimately the

14   person that made the decision?

15   A.   No.

16   Q.   That's not true?  Do you recall giving deposition

17   testimony in this case?

18   A.   Yes.

19   Q.   The date of the transcript is July 30, 2019.  Does that

20   sound familiar?  That sound correct?

21   A.   Yes.

22        ATTORNEY JONES:  No reason to doubt that?  Your

23   Honor, the transcript of Dr. Merrens's deposition has been

24   marked as ID4.  May I deliver it to the Witness?

25        THE COURT:  Yes.

VOLUME: 8
PAGES: 432-646

1   BY ATTORNEY JONES:

2   Q.   So, Dr. Merrens, you recall giving a deposition.  Do you

3   recall that you were sworn and put under oath in that

4   deposition?

5   A.   Correct.

6   Q.   Just like this morning?

7   A.   Yes.

8   Q.   I'd like to direct your attention to Page 21 of the

9   transcript.  When you're there, if you could direct your

10  attention to Line 24:

11       "Q.  What was Leslie DeMars's role in the decision to

12  close the REI division?"

13       Do you see that?  Do you see that?

14  A.   Yes.

15  Q.   Page 22.

16       "A.  Quote, so Leslie was ultimately the person that

17  made the decision, that made the announcement to the group.

18  This was a decision that we supported after looking at the

19  information."

20       That was your testimony in response to that question,

21  correct?

22  A.   Correct.

23            ATTORNEY McDONALD:  Objection.

24            THE COURT:  Basis?

25            ATTORNEY McDONALD:  Incomplete response.  Read the

1    entirety of his response.

2           THE COURT:  Is there more to the response?  I'm

3    talking now to Mr. Jones.

4           ATTORNEY JONES:  I'm sorry.  I'm listening.

5           THE COURT:  I think the objection is that there's

6    more to the response in the deposition transcript.

7           ATTORNEY JONES:  There's a lot more, but those were

8    the first two sentences of your answer, correct?

9           THE COURT:  So objection overruled.

10          THE WITNESS:  Yes, followed by, "Ultimately, this was

11   my decision".

12   BY ATTORNEY JONES:

13   Q.   I'd like to direct your attention to a document that's

14   been admitted in this case as Plaintiff's Exhibit 83.  You can

15   either look at the hard copy, or your monitor has it now,

16   whatever you prefer.

17   A.   Just move the notebooks around.

18   Q.   One of those notebooks is quite uncumbersome, cumbersome.

19   I'm sorry.

20   A.   Yeah.

21   Q.   So this document begins as an email from Vicky Maxfield to

22   you.  Do you recall receiving this email?

23   A.   Yes.

24   Q.   And we discussed this email with Ms. Maxfield herself.

25   But, basically, it starts with her writing to express her

VOLUME: 8
PAGES: 432-646

1    concern about the decision not to retain Dr. Porter.  Does that

2    sound right?

3    A.    Correct.

4    Q.    And in your response you say, "Victoria, thanks for your

5    email.  The recommendations around closing the program and its

6    staff were at the recommendation of Dr. DeMars".  Do you see

7    that?

8    A.    I do.

9    Q.    So is it correct to conclude that you were telling

10   Ms. Maxfield that the recommendations around closure of the

11   program and the termination of Dr. Porter were Dr. DeMars's

12   recommendations?

13   A.    That's what I stated in the communication.  This is a

14   nurse who worked in the department.  I'm under no obligation to

15   tell her the number of people, the decision making process, or

16   how we ended up on the decision.  I wanted her to understand

17   this was really involving her chair involved in this decision.

18   Q.    Okay.  But you communicated to Nurse Maxfield that it was

19   on Dr. DeMars, right?

20   A.    I think we produced 30,000 pages of documents in this and

21   there are numerous statements, like in my deposition, in which

22   I said this was my decision.

23   Q.    Dr. Merrens, this email to Nurse Maxfield, you said the

24   recommendations around the closing of the program and

25   terminating its staff were on Dr. DeMars.

(457 of 993), Page 457 of 993

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 409 of 945

2:21-cv-00414-jdj   Document 5193   Filed 01/25/25   Page 25 of 215

456

VOLUME: 8
PAGES: 432-646

1     A.   Correct.

2     Q.   I'd like to discuss about some of the reasons that have

3     been provided for the decision to close the REI division.

4     Isn't it true that you have said the key issue is we just

5     didn't have nurses anymore?

6     A.   Correct.

7     Q.   But you were here on day one of the trial when Nurse

8     Sharon Parent testified that she wanted to continue working,

9     correct?

10    A.   Correct.

11    Q.   So you did have a nurse, an REI, a trained and experienced

12    REI nurse willing to continue working in the division, correct?

13    A.   I wasn't aware of Nurse Parent's intentions when this

14    decision was made.

15    Q.   Any reason to doubt her testimony?

16    A.   I have no reason to doubt.

17    Q.   I'd like to direct your attention to a document that has

18    not yet been admitted into evidence, and so I'd like it to be

19    put on the screens only for the judge, the witness, and the

20    litigants.  And this is Plaintiff's Exhibit 63.  There we go.

21         Dr. DeMars -- I mean, I'm sorry, Dr. Merrens, there is a

22    -- well, the first email is unrelated to the substance of the

23    primary email.  The primary email appears to be an email from

24    Steven Woods to you and Dr. DeMars.  Do you see that?

25    A.   I do.

(458 of 993), Page 458 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 410 of 945
2:21-cv-00044-jkjd Document 329 Filed 04/25/23 Page 26 of 215

VOLUME: 8
PAGES: 432-646

457

1    Q.   This is dated May 4th 2017?

2    A.   I do.

3    Q.   Who is Steven Woods?

4    A.   He works in employee relations.

5    Q.   That's basically HR?

6    A.   Yes.

7    Q.   And you, in fact, received this document?

8    A.   I did.

9         ATTORNEY JONES:  Your Honor, we move the admission of

10   Plaintiff's 63.

11        THE COURT:  Any objection?

12        ATTORNEY McDONALD:  No objection.

13        THE COURT:  Okay.  Plaintiff's 63 is admitted.

14        ATTORNEY JONES:  Thank you.  May we publish it to the

15   jury now?

16        THE COURT:  Yes.

17   BY ATTORNEY JONES:

18   Q.   So, Dr. Merrens, the REI division was closed May 4,

19   correct?

20   A.   Say it again.

21   Q.   The REI division was closed May 4, 2017?

22   A.   Correct, yes.

23   Q.   And did you have a meeting that day with the providers of

24   the division?

25   A.   Yes.

(459 of 993), Page 459 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 411 of 945
2:21-cv-00444-jkjd    Document 5293    Filed 01/25/25    Page 27 of 195

458

VOLUME: 8
PAGES: 432-646

```
 1    Q.   And this document from Mr. Woods says, "Dear Doctors
 2    Merrens and DeMars, attached is the meeting script for this
 3    afternoon".
 4         So did Steven Woods provide a script for you and
 5    Dr. DeMars for the meeting when you met with the providers?
 6    A.   We met with him to develop talking points to make sure
 7    that we were complete in the discussion, and Steve worked to
 8    put this document together.
 9    Q.   Okay.  And he sent you the final version?
10    A.   Correct.
11    Q.   It says at the bottom of the middle paragraph, "I believe
12    we have" --
13    A.   It's not on the screen.
14    Q.   Oh, I'm sorry.
15    A.   It's not on my screen.  I'm sorry.  Okay.
16    Q.   That's okay.  So the email starts, "Dear Doctors Merrens
17    and DeMars", and I was going to ask you a question about the
18    middle paragraph that starts --
19    A.   Sure.
20    Q.   -- "I will make sure".  So at the end it says, "I believe
21    we have worked out the issues with Misty's notice letter".
22    What were those issues, do you know?
23    A.   I'm unaware.
24    Q.   So, if you could turn to the fourth page of this document
25    which bears a Bates number of DH0010541 -- that's it.  Looking
```

1    at the bullet points of the meeting script, it starts by

2    saying, "We need to give you the difficult news that we are

3    ending the REI program", correct?

4    A.   Correct.

5    Q.   And then the next bullet point:  "An inability to maintain

6    the highly specialized clinical resources required for an

7    infertility program makes it increasingly difficult to offer

8    the kind of care DH is committed to offering".  Do you see

9    that?

10   A.   Yes.

11   Q.   So a reason, the reason identified in this bullet point is

12   an inability to maintain the highly specialized clinical

13   resources; is that right?

14   A.   Correct.

15   Q.   And then the next bullet point, "Based on this assessment,

16   we have determined that the REI program is not sustainable".

17   Do you see that?

18   A.   Yes.

19   Q.   So the, at least based on the script -- did you stick to

20   the script at the meeting?

21   A.   Yes.

22   Q.   So the only reason you provided for closing the division

23   was an inability to maintain the highly specialized clinical

24   resources, correct?

25   A.   Correct.

(461 of 993), Page 461 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 413 of 945
2:21-cv-00443-kjd Document 152-3 Filed 04/25/25 Page 29 of 195

VOLUME: 8
PAGES: 432-646

460

1    Q.   Nothing about infighting among the providers?  That wasn't

2    listed, right?

3    A.   No.

4    Q.   And there is nothing here listed about dysfunction in the

5    department, right?

6    A.   No.

7    Q.   There's nothing listed in here about alleged splitting

8    behaviors, correct?

9    A.   No.

10   Q.   Okay.  I'd now like to direct your attention to another

11   exhibit that has not yet been admitted.  So I'd like to have a

12   limited appearance, not before the jury at this time.

13   Plaintiff's Exhibit 79.  Dr. Merrens, do you recognize

14   Plaintiff's Exhibit 79 on the monitor?

15   A.   I do.

16   Q.   Okay.  It appears to be an email from you dated May 11,

17   2017 to the entire OB/GYN staff.  Is that correct?

18   A.   Correct.

19           ATTORNEY JONES:  Your Honor, Plaintiff moves the

20   admission of Plaintiff's 79.

21           THE COURT:  Any objection?

22           ATTORNEY McDONALD:  No objection.

23           THE COURT:  Okay.  Plaintiff's Exhibit 79 is

24   admitted.

25           ATTORNEY JONES: Dr. Merrens -- I'm sorry.  Can we

(462 of 993), Page 462 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 414 of 945
2:21-cv-00494-kjd Document 5293 Filed 04/25/25 Page 30 of 215
461

VOLUME: 8
PAGES: 432-646

1    have it published to the jury?

2              THE COURT:  Yes.

3    BY ATTORNEY JONES:

4    Q.   Dr. Merrens, the subject line on this email is

5    "Clarifications about decision to close REI program".  Do you

6    see that?

7    A.   Indeed.

8    Q.   I don't intend to read the entire document, but is it fair

9    to conclude that you were explaining in this email to the

10   entire OB/GYN department the reasons for the decision that you

11   had taken?

12   A.   I was providing clarifications.

13   Q.   Okay.  And among that clarification was reasons for your

14   actions?

15   A.   Correct.

16   Q.   Okay.  And, if you look at the second paragraph that

17   begins "first and foremost", you start by saying, "This was a

18   difficult decision that was not taken lightly".  Do you see

19   that?

20   A.   Indeed.

21   Q.   And then, if you go down to the fourth line, there's a

22   sentence that says, "But because it has been difficult to

23   maintain clinical resources and staffing at the appropriate

24   level, we finally concluded we could no longer keep the program

25   open".  Do you see that?

VOLUME: 8
PAGES: 432-646

1    A.   Correct, yeah.

2    Q.   Again, you're telling the entire OB/GYN department in this

3    email that the reason was based upon the difficulty in

4    maintaining clinical resources and staffing, correct?

5    A.   Correct.

6    Q.   Nothing about infighting among the providers, correct?

7    A.   Correct.

8    Q.   There's nothing listed here about dysfunction of the

9    department, correct?

10   A.   Correct.

11   Q.   And nothing here about alleged splitting behaviors,

12   correct?

13   A.   Correct.

14   Q.   I'd like to direct your attention now to another document

15   that's not yet in evidence.  This is Plaintiff's Exhibit 60.

16   Again, I'll ask that the document be presented to the judge,

17   the witness, and the litigants.

18        Dr. Merrens, do you recognize this document?

19   A.   I do.

20   Q.   It's an, well, it's an email that begins with some

21   redacted communications.  Is Kimberly Troland an attorney?

22   A.   Yes.

23   Q.   Yeah.  So it starts with some attorney-client privileged

24   information, but then the next communication we have is an

25   email from Amy Giglio.  Is that how you pronounce her name?

VOLUME: 8
PAGES: 432-646

1    A.    "Jill-yo".

2    Q.    Ms. Giglio to you, and then next email up you have a

3    response email dated May 2nd 2017 that you respond to

4    Ms. Giglio and copy some other people.  Do you see that?

5    A.    I do.

6    Q.    And you sent this email?

7    A.    Yes.

8              ATTORNEY JONES:  Your Honor, we'd move the admission

9    of Plaintiff's 60.

10             THE COURT:  Any objection?

11             ATTORNEY McDONALD:  No objection.

12             THE COURT:  Okay.  Plaintiff's Exhibit 60 is

13   admitted.

14   BY ATTORNEY JONES:

15   Q.    Dr. Merrens, so starting on the second paragraph -- I want

16   to make sure I publish it to the jury.  Can we do that?

17             THE COURT:  Yes.

18   BY ATTORNEY JONES:

19   Q.    In the second paragraph you state to Ms. Giglio, "While on

20   the surface we are pinning the dissolution of our reproductive

21   endocrinology program on our failure to maintain and recruit

22   nurses for this work, it is ultimately the dysfunction of the

23   physicians who work in this area for years, as well as recent

24   hires, and ultimately a failure of leadership, comma, for which

25   I hold Leslie fully accountable".

(465 of 993), Page 465 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 417 of 945
2:21-cv-00044-jkd   Document 352-3    Filed 04/25/25    Page 33 of 215

464

VOLUME: 8
PAGES: 432-646

1       You wrote that, correct?

2   A.   Correct.

3   Q.   And Leslie is Dr. DeMars?

4   A.   Correct.

5   Q.   So you state, "It is ultimately the dysfunction of the

6   physicians and ultimately a failure of leadership, for which I

7   hold Leslie fully accountable".  Are you holding Leslie fully

8   accountable for both the dysfunction of the physicians and

9   ultimately the failure of leadership or --

10  A.   Yes.

11  Q.   Okay.  Isn't it true that part of what Dr. DeMars

12  considered to be dysfunction in the department was the fact

13  that Dr. Porter was complaining about the incompetence of two

14  of her colleagues?

15  A.   That's what she stated.

16  Q.   And isn't it true that some of the dysfunction was the

17  fact that Dr. Porter was complaining about the fact that her

18  colleagues were causing patient harm?

19  A.   I don't recall.  Well, I had no knowledge of this at the

20  time.

21  Q.   At that time, but you do now?

22  A.   Correct.

23  Q.   Do you recall stating that you believed Dr. DeMars was the

24  architect of the dysfunction?

25  A.   No.

(466 of 993), Page 466 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 418 of 945
2:21-cv-00044-jdl    Document 529    Filed 04/25/25    Page 418 of 945

465

VOLUME: 8
PAGES: 432-646

1    Q.   If you still have your deposition transcript in front of

2    you, I'd like to direct your attention to Page 166.  When

3    you're there, if I could direct your attention to Lines 15 and

4    16:

5            "Q.  When you say the architect of the dysfunctional

6    program, you're referring to Leslie DeMars?

7            "A.  I am talking about Leslie DeMars."

8        Do you see that?

9    A.   I do.

10   Q.   So does that refresh your recollection that you did, in

11   fact, refer --

12   A.   I believed that, yes.

13   Q.   Okay.  Yesterday afternoon we saw information about a

14   newspaper article in the "Valley News" in which CEO Conroy was

15   quoted as identifying declining birth rates as a reason for the

16   closure of the REI division.  Do you recall that?

17   A.   I recall the article.

18   Q.   And in that article, and I'm reading from what's been

19   admitted as Plaintiff's Exhibit 109.  The article, CEO Conroy

20   is quoted as saying, "We were just affected by the declining

21   birth rate in this area".  Do you recall that quote?

22   A.   Yes.

23   Q.   Was that true?

24   A.   No.

25   Q.   Okay.  She testified that the sole source of her knowledge

466

VOLUME: 8
PAGES: 432-646

1    about the closure of the REI was you.  Do you remember that?

2    A.   Correct.

3    Q.   Okay.  So you did not tell her that the declining birth

4    rates was a reason for the closure of the REI division?

5    A.   I did not.

6    Q.   What did you do to correct her quote upon reading it?

7    A.   I, it was not something that I informed her about.

8    Q.   Did you read the newspaper article when it came out?

9    A.   Yes

10   Q.   Were you aware of the quote she had given?

11   A.   Yes.

12   Q.   Did you discuss with her that she had been misquoted?

13   A.   I can't remember.  I think her understanding -- I think

14   she was just talking about in general.  She has a broad

15   perspective on health care in the United States.  I think she

16   was -- I think her comments why broad and not necessarily about

17   this.  I don't recall correcting her about her comments.

18   Q.   So you read a newspaper article in which she gave a reason

19   to the public for closing the REI division and, when you read

20   it, you didn't feel the need to have that corrected somehow?

21   A.   I don't remember or recall correcting her about her

22   statement.

23   Q.   Okay.  And we also heard from Dr. DeMars yesterday that,

24   when she read the article, she also thought it was incorrect,

25   what was stated in the newspaper article.  Do you recall that?

VOLUME: 8
PAGES: 432-646

1    A.   Yes.

2    Q.   And, in an email from Dr. DeMars that was admitted into

3    evidence as Plaintiff's 110, she wrote to Dr. Seifer, "I hope

4    that she had been misquoted in the article because, if that's

5    the information that has been given to her, it is completely

6    untrue", and it was completely untrue, correct?

7    A.   Correct.

8    Q.   I'd like to direct your attention to a document that has

9    been admitted into evidence.  This is Plaintiff's 103, and my

10   colleague will bring it up on the screen.

11        So, in addition to the "Valley News" article, there were

12   other media reports of the closure of the REI division,

13   correct?

14   A.   Correct.

15   Q.   And one of those was from Vermont Public Radio, correct?

16   A.   Correct.

17   Q.   Do you recall what they published?

18   A.   Yes.

19   Q.   In an article published by Vermont Public Radio, and, if

20   we go to Page 2 of Plaintiff's Exhibit 103 to the kind of

21   grayed-out section in the middle of page -- there we go.  It

22   says, "Dr. Edward Merrens, the chief clinical officer at

23   Dartmouth-Hitchcock, says that the program is being disbanded

24   because of infighting between doctors and nurses.  Quote, 'This

25   wasn't a program that was losing money.  In fact, this was a

(469 of 993), Page 469 of 993
2:11-cv-00194-kjd   Document 35-3   Filed 04/25/25   Page 421 of 945
468

VOLUME: 8
PAGES: 432-646

1   program that makes money', says Merrens.  'Ours was basically a

2   decision that was, Could we continue a high level of care and

3   coordination that we needed to do seven days a week across our

4   system?'"

5       Is that the quote that was in the article?

6   A.   That's the quote in the article.  It is not what I said.

7   Q.   Okay.  Let's start with the part about money, though.  I

8   mean, did you, in fact, tell the reporter that the program was

9   not losing money?

10  A.   Yes.

11  Q.   And did you, in fact, tell the reporter that the program

12  makes money?

13  A.   I may have.

14  Q.   And those statements are true, correct?

15  A.   Yes.

16  Q.   The REI division was profitable, correct?

17  A.   Correct.

18  Q.   And financial considerations had nothing to do with the

19  closure, correct?

20  A.   Correct.

21  Q.   So now we go back to the first page of Plaintiff's Exhibit

22  103, and you write to Dr. Porter, Dr. Hsu, and Dr. Seifer.  You

23  say, "Dear colleagues, regrettably Vermont Public Radio

24  published an article indicating that I made comments to the

25  effect that the program was being ended due to interpersonal

(470 of 993), Page 470 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 422 of 945
2:21-cv-00044-jjj Document 5293 Filed 04/25/25 Page 32 of 135

469

VOLUME: 8
PAGES: 432-646

1    issues amongst the physicians".  Do you see that?

2    A.    Correct.

3    Q.    Okay.  You state next, "Nothing could be further from the

4    truth, and, in the recorded interview I did with him two weeks

5    ago, there was no such statement whatsoever".

6          So this, this statement here, you are telling the

7    providers who just lost their jobs that the comment that the

8    program was being ended due to interpersonal issues among the

9    physicians, nothing could be further from the truth, correct?

10   A.    I didn't make that comment, and it was redacted.  Vermont

11   Public Radio apologized and made a correction.

12   Q.    Okay.  Because it was incorrect, right?

13   A.    The statement was never attributed to me.  It wasn't part

14   of the recording or the discussion.

15   Q.    Okay.  But, when you say, when your -- when the article

16   attributes to you the comment that the decision was based upon

17   interpersonal issues among the physicians, you wrote to the

18   providers, "Nothing could be further from the truth".

19   A.    That I, that I made that statement to Vermont Public.

20   Q.    Well, you said, "Nothing could be further from the truth,

21   and, in the recorded interview I did with him two weeks ago,

22   there was no such statement".

23   A.    That's correct.

24   Q.    In this statement here, you're denying both that you made

25   that statement to the reporter and that nothing could be

(471 of 993), Page 471 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 423 of 945
2:21-cv-00044-jjd    Document 529-3    Filed 01/25/25    Page 42 of 215

470

VOLUME: 8
PAGES: 432-646

1   further from the truth, right?

2              ATTORNEY McDONALD:  Objection.

3              THE COURT:  I'll allow it.

4              THE WITNESS:  I stand by my statement.

5   BY ATTORNEY JONES:

6   Q.   Okay.  I want to go back to Plaintiff's Exhibit 60, which

7   was the email exchange between you and Ms. Giglio.  We had

8   discussed earlier the second paragraph starting, "While on the

9   surface we are pinning the dissolution of our reproductive

10  endocrinology program on our failure to maintain and recruit

11  nurses".

12       I want to focus now on the next paragraph.  You state,

13  "The fact that failures of such programs due to a, due to

14  nursing shortages are not common and we'll be referring

15  patients to a similar rural academic REI center in Burlington

16  Vermont will make our explanation to the public patients and

17  media, well, rather thin".  You wrote that, right?

18  A.   Correct.

19  Q.   Okay.  And you're saying here that the explanation with

20  regard to the nursing shortage, you're acknowledging that is,

21  "Well, rather thin"?

22  A.   I was embarrassed that we had to close a program because

23  of a nursing shortage, and I explained the reasons why.

24  Q.   Okay.  And then you acknowledged that your explanation to

25  the public, patients, and the media were rather thin?

(472 of 993), Page 472 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 424 of 945
2:21-cv-00044-jjd Document5293 Filed 04/25/25 Page 424 of 945

471

VOLUME: 8
PAGES: 432-646

1    A.   That's what I stated in the communication.

2    Q.   And in response Ms. Giglio writes, "I appreciate your

3    candor".  Do you see that?

4    A.   I do.

5    Q.   I'd like to direct your attention now to a document that's

6    been admitted in evidence as Exhibit 83.  If we, this is the

7    email between you and Vicky Maxfield.  We discussed the first,

8    well, the second sentence.  We discussed the recommendation

9    around closing the program and its staff were at the

10   recommendation of Dr. DeMars.

11       The next sentence now I want to talk about:  "As you know,

12   Dr. Porter currently works at 20 percent of her time

13   currently".  Did you believe that to be the case when you wrote

14   the email?

15   A.   I did.

16   Q.   Do you believe that to be the case now?

17   A.   I do.

18   Q.   Okay.  Isn't it true that she wasn't working 20 percent,

19   but was working 20 hours a week?

20   A.   My recollection at the time that over 18 months and at

21   periods of time Dr. Porter would come back and work between 7

22   to 10 hours per week in a limited capacity.  I think it was a

23   calculation based on that.

24   Q.   Okay.  Then you state, "I'm not sure of her interest in

25   staying on if the infertility part were to cease".  Do you see

1    that?

2    A.    I do.

3    Q.    Did you ask Dr. Porter?

4    A.    I did not.

5    Q.    You could have picked up the phone, correct?  If you were

6    interested in knowing whether she would be interested, you

7    could have picked up the phone and asked her, correct?

8    A.    Sure.

9    Q.    You could have sent an email, correct?

10   A.    It was an assumption about the nature of the practice.

11   Q.    It was an assumption you made, but you're telling

12   Ms. Maxfield that you're not sure of Dr. Porter's interest.

13   I'm asking you, It would have been pretty easy to figure out

14   whether or not Dr. Porter was interested, correct?

15   A.    Correct.

16   Q.    All you would have had to do was ask somehow, correct?

17   A.    Yes.

18   Q.    Okay.  And, in fact, she did eventually send a letter

19   explicitly stating that she would be interested in staying on

20   even if the infertility part were to cease, correct?

21   A.    Correct.

22   Q.    And, regardless of whether it was 20 percent or 20 hours,

23   the fact is that the time she wasn't working her regular

24   schedule was because of her disability, correct?

25   A.    Correct.

(474 of 993), Page 474 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 426 of 945
2:21-cv-00494-jdj Document 529-3 Filed 01/25/25 Page 426 of 945

473

VOLUME: 8
PAGES: 432-646

1  Q.  So you're explaining to Ms. Maxfield, in response to her

2  question about why we can't keep Dr. Porter, you're explaining,

3  "As you know, Dr. Porter currently works 20 percent of her time

4  currently", right?

5  A.  Correct.

6  Q.  And that's a reference to her disability leave, correct?

7  A.  I was just commenting on her current, what her current

8  status and what she was, what she was working.

9  Q.  And her current status was she was on partial disability

10  leave, correct?

11  A.  Absolutely.

12  Q.  In the spring, April, May timeframe of 2017, the OB/GYN

13  department was short-staffed, right?

14  A.  Yes.  It's a broad department, so I'm not sure what you're

15  talking about in terms of what category of short-staffed.

16  Q.  Okay.  How about, well, after you closed REI, there were

17  then five divisions remaining, correct, within OB/GYN?

18  A.  Correct.

19  Q.  Are you aware of any of those divisions being adequately

20  staffed?

21  A.  I don't have knowledge about their staffing

22  Q.  Do you know whether or not the general OB/GYN

23  practitioners were overstaffed or understaffed?

24  A.  I don't have information about, about them.

25  Q.  Okay.  Well, you were here when Dr. Padin testified,

(475 of 993), Page 475 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 427 of 945
2:21-cv-00494-jkjd Document 5293 Filed 04/25/25 Page 42 of 215

VOLUME: 8
PAGES: 432-646

474

1    correct?

2    A.   Correct.

3    Q.   And do you recall her testifying that she, herself, even

4    rolled up her sleeves and chipped in?

5    A.   I do.

6    Q.   And that was because OB/GYN was short-staffed and she

7    could help?

8    A.   Indeed.

9    Q.   And Dr. Porter had general gynecological skills as well,

10   correct?

11   A.   I think Dr. Padin served as a generalist in terms of labor

12   and delivery and generalist GYN-related skills.  I'm not aware

13   of Dr. Porter's capability in that sense.

14   Q.   Okay.  Do you dispute that she had skills that could have

15   been used by the OB/GYN department after May of 2017?

16   A.   I don't know that.

17   Q.   So you can't dispute it?

18   A.   I'm --

19   Q.   If you don't know, you can't dispute it, correct?

20   A.   I think Dr. Porter's skills as a surgeon, as an

21   ultrasonographer were centered around her reproductive

22   endocrinology and fertility related work.

23   Q.   You were here when she testified, correct?

24   A.   Correct.

25   Q.   All right.  So are you questioning her testimony that a

(476 of 993), Page 476 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 428 of 945
2:21-cv-00144-jkjd  Document 5293  Filed 04/25/25  Page 428 of 945

475

VOLUME: 8
PAGES: 432-646

1    lot of her work was not related to IVF or infertility?

2    A.   No.

3    Q.   Who was Nurse Elizabeth Todd?

4    A.   I think she was a nurse practitioner who worked in the

5    department.

6    Q.   And she was retained in the OB/GYN department, correct,

7    after the REI closed?

8    A.   Correct.

9    Q.   And she had been primarily an REI nurse practitioner

10   before the closure, correct?

11   A.   Correct.

12   Q.   And then after the closure she nevertheless did work in

13   the OB/GYN department generally, correct?

14   A.   Correct.

15   Q.   And Dr. Porter could have done the same thing, correct?

16   A.   She was not a nurse practitioner.

17   Q.   Well, as a doctor, she could have done the same thing.

18   When the REI division was closed, she could have been retained

19   in the OB/GYN department, correct?

20   A.   I don't know if that's the case.

21   Q.   Do you know of any reason why she couldn't?

22   A.   I'm saying that we ended the division and its function and

23   the physicians that worked in it.

24   Q.   But do you have any reason to believe that she could not

25   then provide necessary services to the OB/GYN department?

```
 1              ATTORNEY McDONALD:  Objection, asked and answered.

 2              THE COURT:  Overruled.  Go ahead.

 3              THE WITNESS:  I don't know the nature of the,

 4    distinct nature of the skills that she would provide that were

 5    not associated with reproductive endocrinology and fertility

 6    related work.

 7    BY ATTORNEY JONES:

 8    Q.   I'd like to turn to another document.  I'd like to direct

 9    your attention to Plaintiff's Exhibit 89 which is in evidence.

10    Do you recall this document, Dr. Merrens?

11    A.   I do.

12    Q.   So this document begins on the third page with an email

13    from you to Dr. DeMars dated May 12th 2017; is that correct?

14    A.   Correct.

15    Q.   And you state, "Leslie, I am getting inundated with

16    heartfelt and long emails wondering why Misty can't stay on to

17    do her ultrasound, complex operative and teaching role even if

18    we end REI".  You see that?

19    A.   I do.

20    Q.   And were you getting inundated with phone calls and

21    letters?

22    A.   I did.

23    Q.   From what, what types of people were sending you emails

24    and making phone calls?

25    A.   I think there were physician colleagues and some nurses.
```

1    Q.   Okay.  Any patients?

2    A.   No.  Um.  Yes, there were patients, yes.

3    Q.   So patients, nurses --

4    A.   Yeah.

5    Q.   -- physicians?  So you were hearing this from a lot of

6    different classes of people, correct?

7    A.   Correct.

8    Q.   And then you say to Dr. DeMars, "I suspect you considered

9    this".  You're asking whether she took that into account,

10   correct?

11   A.   Correct.

12   Q.   Okay.  "In the evaluation of the program and your

13   knowledge of Misty.  I just need to know how to better answer

14   this question."

15        So, before you wrote this email to Dr. DeMars, how were

16   you answering the question that you felt needed improvement?

17   A.   How was I answering which question?

18   Q.   The question of why Misty can't stay on to do her

19   ultrasound, complex operative and teaching role even if we end

20   REI.

21   A.   I wanted to have a better understanding of some of the

22   nature of the other work that Dr. Porter was engaged in that

23   was referenced in those communications.

24   Q.   Okay.  You end this email to Dr. DeMars by saying, "I just

25   need to know how better to answer the question".  That would

1    suggest that you had answered the question and felt that it

2    need to be better.

3    A.   I needed more information.

4    Q.   Okay.  So how were you answering the question before you

5    got more information?

6    A.   That we ended the program and the physicians that were

7    engaged in it and I understood that they did a wide range of

8    things.

9    Q.   So, after getting more information from Dr. DeMars, did

10   you have a better way to answer the question?

11   A.   I did.

12   Q.   Okay.  So, taking a look at Dr. DeMars's response, the

13   lengthy one, Almost a page and a half single spaced.  Starting

14   at the first paragraph, it says, "Yes, there has been an

15   enormous backlash, mostly heartfelt based on Misty's

16   longevity".  It goes on.  Two sentences down, "Make no mistake,

17   though, that Misty hasn't been contributing to those emotions".

18        So Dr. DeMars is suggesting Misty herself is responsible

19   for some of those emotions, correct?

20   A.   In her statement, yes.

21   Q.   Yeah.

22        ATTORNEY McDONALD:  May we approach the bench?

23        THE COURT:  Yes.

24        (Bench conference begins.)

25        ATTORNEY McDONALD:  I just want to make sure we've

VOLUME: 8
PAGES: 432-646

1   giving the witness enough time to review the document before

2   flying into questions.  If you could just give him a minute

3   once he gets there.  Thank you.

4            ATTORNEY JONES:  Okay.  I can do that.

5            ATTORNEY McDONALD:  Great, thank you.

6            (Bench conference ends.)

7   BY ATTORNEY JONES:

8   Q.   Dr. Merrens, back to this first paragraph, Dr. DeMars then

9   states -- I want to go down to the last two sentences of this

10  paragraph.  It says, "Everyone also is remembering Misty as a

11  full-time employee wearing three hats and not the one who has

12  been out for almost 18 months.  What she has done in those 18

13  months is help several members of the department have babies".

14       So she's saying everyone, the people, the backlash, the

15  people who want to bring Misty back are wondering why she can't

16  be retained.  According to Dr. DeMars, "Everyone is remembering

17  Misty as a full-time employee wearing three hats and not the

18  one who has been out for almost 18 months".

19       Is it your understanding that her reference to Misty being

20  out for almost 18 months, that's a reference to her disability

21  leave?

22            ATTORNEY McDONALD:  Objection, calls for speculation.

23            ATTORNEY JONES:  Is that how you understood it?

24            THE COURT:  Objection overrule.  The witness can

25  answer if he know.

(481 of 993), Page 481 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 433 of 945
2:21-cv-00447-jjd Document 359.3 Filed 04/25/25 Page 433 of 945
480

VOLUME: 8
PAGES: 432-646

1          THE WITNESS:  Yes.

2     BY ATTORNEY JONES:

3     Q.   And she says, "What's the talking point?  My suggestion is

4     we are working with each physician on their employment options

5     as well as what is best for DH and DH OB/GYN.  I don't know how

6     you say, quote, I understand you are angry, but this decision

7     was made in the best interests of the division and Misty".

8     Do you see that?

9     A.   I do.

10    Q.   Okay.  And then she says, "Even if that's the truth, no

11    one will buy it at the moment".

12         So, with regard to her reference to what's the best

13    interest of Misty, did you have a reaction when Dr. DeMars

14    suggested that what was happening was in the best interest of

15    Misty?

16    A.   This decision was not made in the best interest of Misty.

17    It was made in the best interest of her patients.

18    Q.   Right.  And then, if we turn to the next page, right in

19    the middle in the fourth, fifth paragraph down beginning

20    "Misty's medical disability", Dr. DeMars writes, "Misty's

21    medical disability has been devastating, and I'm not sure she

22    would or will really ever be able to do the complex hister" --

23    I'm sorry.  I'm not a physician.  I'm not even --

24    A.   Hysteroscopy.

25    Q.   And --

 1    A.    Laparoscopy.

 2    Q.    -- there you go -- "that she once did".  So Dr. DeMars is

 3    now directly referring to Dr. Porter's disability, correct?

 4    A.    She's reflecting she's not sure she's going to be able to

 5    return to do these procedures.

 6    Q.    Okay.  Exactly.  So she has concluded, she's expressing

 7    doubt about Dr. Porter's ability to become fully recovered and

 8    return to her former skills, correct?

 9    A.    Correct.

10    Q.    And then says, "I think that the best outcome of this

11    termination is the chance for Misty to actually be out on leave

12    with no intervening responsibilities".  Do you see that?

13    A.    I do.

14    Q.    Despite what Dr. DeMars thinks would be best for Dr.

15    Porter, you heard Dr. Porter testify that she wanted to return

16    to work, correct?

17    A.    Correct.

18    Q.    So Dr. DeMars is purporting to opine on what she thinks is

19    best for Misty and that Misty losing her job would be best for

20    Misty.  You respond to this email, and you say, "Leslie, I

21    didn't get it, get back to you when you sent this on Friday,

22    but I think it's a comprehensive, thoughtful, and appropriate

23    insight".

24         Do you think everything we just covered there was

25    appropriate and thoughtful?

VOLUME: 8
PAGES: 432-646

1    A.   It was her response, and I appreciated everything that she

2    put into it.

3    Q.   You think her opining on what she thinks best for Misty is

4    appropriate and thoughtful?

5    A.   I didn't say that.

6    Q.   But you said that her responses was comprehensive,

7    thoughtful, and appropriate, correct?

8    A.   It was appropriate to frame her perspective for me, and

9    that's all I asked for.

10   Q.   Okay.

11   A.   I didn't say it was the decision maker.  I said it was

12   really appropriate for her to frame everything that she was

13   thinking.

14   Q.   I'd like to direct your attention now to a different

15   topic.  I'd like to talk about Dr. DeMars.  Isn't it true that

16   you have stated that Dr. DeMars is not an accurate reporter of

17   information?

18   A.   Correct.

19   Q.   You said that in your deposition, correct?

20   A.   Correct.

21   Q.   And you have stated that she's not a good leader?

22   A.   Correct.

23   Q.   And you have stated that you hold her accountable for the

24   REI's failure?

25   A.   Correct.

(484 of 993), Page 484 of 993   Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 436 of 945
2:21-cv-00044-jkjj   Document 529   Filed 04/25/25   Page 436 of 945

483

VOLUME: 8
PAGES: 432-646

1    Q.   And, in fact, after the REI's closure, you asked her to

2    step down, correct?

3    A.   Correct.

4    Q.   Because you had lost faith in her leadership, correct?

5    A.   Correct.

6    Q.   But you still followed her recommendation to close the

7    REI, correct?

8    A.   No.

9    Q.   No?

10   A.   I included her perspective as part of the decision to

11   close the division.

12   Q.   Okay.  And you followed her recommendation to terminate

13   the employment of Dr. Porter?

14   A.   I followed her recommendation, along with the other people

15   that we spoke about, and we formulated a plan to close the

16   division and terminate the employment of three physicians.

17   Q.   Okay.  And you relied upon her input as part of the

18   process --

19   A.   Correct.

20   Q.   -- to decide not to keep Dr. Porter in some other capacity

21   in OB/GYN?

22   A.   Correct.

23            ATTORNEY JONES:  Your Honor, if I may have --

24            THE COURT:  Yes.

25            ATTORNEY JONES:  No further questions, Your Honor.

```
 1              THE COURT:  Okay.  Ms. McDonald.

 2                  CROSS-EXAMINATION BY ATTORNEY McDONALD

 3   Q.   Hi, Dr. Merrens.

 4   A.   Hello.

 5   Q.   Who made the decision to the close the REI division?

 6   A.   I did.

 7   Q.   Is there a distinction in your mind between the IVF

 8   program and the REI division?

 9   A.   I think one, I think the REI division encompasses the

10   provision of IVF-related services.

11   Q.   I'll ask you to take a look back at Exhibit 83 which

12   Mr. Jones just showed you.  Do you have that in front of you,

13   or do you need it on the screen?

14   A.   I can find 83.

15   Q.   Thank you.  Okay.  I'll ask you to take a look back at the

16   first few lines of that email.  Mr. Howe, could you publish

17   that for the jury?  This one's in evidence, 83.

18              COURTROOM DEPUTY:  From where?

19   BY ATTORNEY McDONALD:

20   Q.   From Ray's computer.  All right.  The second sentence

21   there where you say, "The recommendations around closing the

22   program and its staff were at the recommendation of Dr.

23   DeMars".

24        When you say program, are you referring to the IVF program

25   or the REI division?
```

(486 of 993), Page 486 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 438 of 945
2:21-cv-00044-jdj Document 5293 Filed 04/25/25 Page 438 of 945

485

VOLUME: 8
PAGES: 432-646

1    A.   The REI division.

2    Q.   In the discussions about closing the REI division, did you

3    consider information that Dr. DeMars provided you?

4    A.   Yes.

5    Q.   What kind of information did you consider?

6    A.   Issues with availability to see patients, nursing,

7    staffing, the ability of the team to coordinate and to be

8    effective in terms of providing care.

9    Q.   At the time that you made the decision to close the REI

10   division, did you have any knowledge about the specific nature

11   of Dr. Porter's disability?

12   A.   No.

13   Q.   Did you have any knowledge about specific complaints that

14   Dr. Porter made about Dr. Hsu or Dr. Seifer?

15   A.   I did not.

16   Q.   In your role would you expect to hear certain specific

17   complaints about physicians as the chief clinical officer?

18   A.   Not specifically, unless it was significant and -- no.

19   Q.   I think you -- how many physicians reported to you in,

20   reported to you indirectly or directly at this time?

21   A.   Probably close to 1,500.

22   Q.   If you had been aware of Dr. Porter's desire to stay on in

23   a noninfertility capacity, would that have changed your

24   decision about whether Dr. Porter should be terminated?

25   A.   No.

1    Q.   You testified today that discussions about closure of the

2    REI division began around the April of 2017 timeframe.  Prior

3    to April of 2017, were you aware of issues with the REI

4    division?

5    A.   I was not.

6              ATTORNEY McDONALD:  If I could just have one moment.

7              THE COURT:  Yes.

8              ATTORNEY McDONALD:  Nothing further.  Thank you.

9              THE COURT:  Okay.  Thank you.  Any further questions,

10   Mr. Jones?

11             ATTORNEY JONES:  Nothing further.

12             THE COURT:  Okay.  Dr. Merrens, you may step down.

13   Okay.  So, at this time, we will take our midmorning break.

14   This break may be a little bit longer than typical, I'll just

15   let you know.  Maybe it won't be, but maybe.  So I don't want

16   you to be surprised by that, all right?

17             (The Jury leaves the courtroom.)

18             THE COURT:  Does the plaintiff have any more

19   witnesses to call?

20             ATTORNEY JONES:  That's it, Judge.  We're done with

21   our case in chief.

22             THE COURT:  So you rest?  Okay.

23             ATTORNEY JONES:  We rest.

24             THE COURT:  Defense, Mr. Schroeder?

25             ATTORNEY SCHROEDER:  Yes, Your Honor.  We'd like to

(488 of 993), Page 488 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 440 of 945
2:21-cv-00144-kjd   Document 529-3   Filed 04/25/25   Page 440 of 945

487

VOLUME: 8
PAGES: 432-646

1    move under Rule 50 for a motion for -- oh, I will apologize.

2    My co-counsel wanted to deal with an admission of an exhibit

3    issue.

4         ATTORNEY COFFIN:  Yeah.  Your Honor, we would like to

5    renew our request to admit what I think has been marked C19,

6    but it's the chart that Dr. Bancroft made on cross-examination.

7         THE COURT:  Okay.  Could I see a copy of that again?

8    I do have questions about what exactly it shows.

9         ATTORNEY COFFIN:  Sure.  Just a second, Your Honor,

10   if I might.

11        THE COURT:  Yes.

12        ATTORNEY VITT:  To refresh my recollection, can I see

13   that for a second, please?

14        THE COURT:  Let me just take a quick look.  I think I

15   know exactly -- yeah.  Okay, thank you.  All right.  So,

16   Mr. Coffin, you're requesting admission of C19 into evidence as

17   some type of demonstrative?

18        ATTORNEY COFFIN:  Yes, correct.

19        THE COURT:  Okay.  So why is this different than

20   Dr. Bancroft's chart which has been offered as a demonstrative?

21        ATTORNEY COFFIN:  It may or may not be, but we want

22   this into evidence.  I do think it's different because it is

23   impeachment.  It's a statement by a party opponent.  It goes

24   directly to his methodology in how he calculated the loss

25   figure, and he chose to do it in a way that is not readily

1    apparent.  And, in fact, it shows that she was actually, if you

2    used the same amount of employment, 1.0 at Dartmouth and 1.0 at

3    UVM, that she mitigated her damages by 2025.  So I think it's a

4    statement by a party opponent, impeachment, and directly

5    relevant to the case.

6         THE COURT:  Okay.  Impeachment doesn't necessarily

7    mean it's evidence, right?

8         ATTORNEY COFFIN:  No, but it is substantive if it

9    goes to the core matter in the case, which is the damages for

10   this witness.  It is admissible.  It's his statement of -- it's

11   sort of a parallel way of doing the chart and statement about

12   that.

13        THE COURT:  Okay.  I'm just concerned about this

14   going back to the jury room as is and the jury picking this up.

15   I mean, I understand what you did with it with the Witness when

16   the Witness was testifying.  This seems to me to be more in the

17   category, if it's going to be any type of an exhibit, it would

18   be a demonstrative, perhaps, that you would be able to

19   reference during closing, but it just doesn't real speak for

20   itself.

21        ATTORNEY COFFIN:  Well, but the Witness testified

22   about it extensively and explained what he was doing without

23   objection, and it would be, I think, helpful to the jury to

24   remember that important testimony and have those numbers there.

25   We will use a demonstrative exhibit to explain it, but I don't

VOLUME: 8
PAGES: 432-646

1    see any basis for excluding it from evidence.  It's clearly

2    relevant, certainly not more prejudicial than probative, and

3    it's not confusing to the jury.  And, indeed, in comparison,

4    the testimony and the, you know, charts that were put, provided

5    at the very last minute to us and after discovery violations,

6    by the way, and we were asked to respond to, though, I don't

7    think it's unreasonable for us to seek its admission as

8    substantive evidence.

9          THE COURT:  Okay.  Mr. Vitt or whoever wants to argue

10    this point?

11          ATTORNEY VITT:  We object, Judge.  It's inaccurate,

12    it's incomprehensible, and I see no reason this should go back

13    to the jury at all.  It shouldn't be admitted.  Dr. Bancroft

14    said it was inaccurate.  In his testimony, he said it's simply

15    inaccurate.  So we object.

16          THE COURT:  Okay.  Do you have any objection to this

17    being used as a demonstrative?

18          ATTORNEY VITT:  I mean, in closing?

19          THE COURT:  Yes.

20          ATTORNEY VITT:  I think I do.  I want to think about

21    that, but, certainly, for purposes of admissibility now, we

22    disagree.

23          THE COURT:  All right.  So this is being brought up

24    now because of the anticipated motion.  So is this kind of your

25    -- you want this to be part of the record right now so that,

VOLUME: 8
PAGES: 432-646

1    because it's relevant to your Rule 50?

2         ATTORNEY COFFIN:  I'm worried that, if we proceed

3    with our motion and we rest without this being introduced, we

4    may not be able to get it introduced into evidence in our case.

5    So we raised this before when this first came up with this

6    witness, and the Court deferred a ruling on it.  I just didn't

7    want to lose our opportunity to have it admitted.  I do think

8    it is directly impeachment.  Doesn't matter that Dr. Bancroft

9    disagreed with it.  That's the point.  We should be able to

10   show that.  You know, we've been left with the remedy of

11   cross-examination as an alternative to present his projections,

12   and I think this is part and parcel to that.

13        THE COURT:  Okay.  So, at this time, I'm going to

14   decline the request to make it substantive evidence admitted

15   into evidence in the case.  The issue of whether it can be used

16   as a demonstrative is something I'm certainly open to

17   considering at a later time in the case, but, at this time,

18   anyway, not as substantive evidence.

19        ATTORNEY VITT:  While we're on the issue of the

20   Bancroft report and the chart, I think you might have deferred

21   the issue of admissibility, and I want to make sure.

22        THE COURT:  Yes, at the request of defense counsel,

23   right?  Mr. Coffin?

24        ATTORNEY COFFIN:  Oh, I didn't realize that look was

25   asking for me to comment.

1    THE COURT:  Well, I don't know.  Mr. Vitt's bringing

2    it up.  I do recall that --

3        ATTORNEY COFFIN:  I do think you had deferred that.

4        THE COURT:  Yes.

5        ATTORNEY COFFIN:  I disagree that they are exactly

6    equivalent, but the plaintiffs have now rested, and I don't

7    know what the Court's plan to do with that deference, and I

8    don't know what Mr. Vitt's request to the Court.  I don't think

9    I've heard him say that he now wants to seek its admission or

10   permission to use it as demonstrative evidence.  Perhaps that's

11   where he's going, but I haven't quite heard that from him.

12       THE COURT:  Okay.  Mr. Vitt?

13       ATTORNEY VITT:  Well, we're to the point of resting,

14   and I don't want to leave it sort of hanging out there.  If

15   it's going to be resolved at a later time, that's fine, as long

16   as we're not prejudiced in any way not getting it admitted now.

17       THE COURT:  Okay.  As I recall -- please correct me

18   if I'm wrong -- I thought Mr. Coffin said, We may be okay with

19   it being a demonstrative, we may be okay with it coming in as

20   substantive evidence, and the request was that I wait in ruling

21   on it, and I thought I was going to be hearing back from

22   defendants on that issue.  I figured you were waiting for your

23   cross-examination of Dr. Bancroft.

24       ATTORNEY COFFIN:  Well, I guess what I was waiting

25   for was what the plaintiffs were going to seek the Court to do,

1    and they've now rested without renewing their motion to admit

2    it.  I don't know if that formality matters or not, but we

3    wanted to make sure that we were able to have that document

4    admitted as substantive evidence, and I'll leave it to them to

5    sort of decide what they want to do with their document.

6        You know, we continue to think that their chart with its

7    various iterations and the discovery problems and the late

8    disclosures and the very elaborate analysis is unclear and

9    misrepresentative and should not be admitted as substantive

10   evidence.  To the extent that their chart is admitted as

11   substantive evidence, certainly, ours should be, and, you know,

12   I leave it to the Court's discretion about whether the

13   appropriate thing to do with both is to admit them only as

14   demonstrative evidence.

15       I would urge the Court, though, to see ours just a little

16   differently, because that was direct impeachment on something

17   that was incredibly important and central to the case, and it's

18   a statement by the Witness on the stand, and it's sort of a

19   different category of item.

20           THE COURT:  Okay, all right.  So, with respect to the

21   Bancroft chart, so I will not allow its admission as

22   substantive evidence.  It can be used as a demonstrative

23   exhibit, which is parallel and the equivalent of the ruling

24   with respect to C19 that was made today.  So both can be used

25   as demonstrative exhibits, okay?

```
 1               ATTORNEY COFFIN:  Thank you, Your Honor.

 2               THE COURT:  You're welcome.

 3               ATTORNEY COFFIN:  May I approach to grab that?

 4               THE COURT:  Yes, of course.

 5               ATTORNEY JONES:  And, Mr. Coffin, could we get a copy

 6     at some point?  Because you have the only copy that exists

 7     right now.

 8               ATTORNEY COFFIN:  Fair enough.  We'll make you a

 9     copy.

10               ATTORNEY SCHROEDER:  Your Honor, if we may, at this

11     point, defendants would like to move for directed verdict

12     pursuant to Rule 50.  I'd appreciate if we had perhaps a quick

13     break, because this will, I think, be rather lengthy.

14               THE COURT:  Okay.

15               ATTORNEY SCHROEDER:  If we could have five minutes,

16     I'd appreciate that, to come back, and if you are prepared to

17     hear oral argument on that.

18               THE COURT:  Okay.  So five minutes, is that what

19     you're asking?

20               ATTORNEY SCHROEDER:  That would be ideal.

21               THE COURT:  Okay.  We'll do that.

22               ATTORNEY SCHROEDER:  Thank you.

23          (A recess was taken from 10:27 a.m. to 10:42 a.m.)

24               THE COURT:  Mr. Schroeder?

25               ATTORNEY SCHROEDER:  Thank you, Your Honor.  May I
```

494

VOLUME: 8
PAGES: 432-646

1    approach to the podium?

2              THE COURT:  Yes.

3              ATTORNEY SCHROEDER:  Thank you.  Thank you, Your

4    Honor.  We are, as defense counsel and on behalf of the

5    defendants, all defendants, making a Rule 50 motion for

6    directed verdict.  As the Court well knows and --

7              THE COURT:  Oh, I'm sorry, Mr. Schroeder.  I meant to

8    take an issue up preliminarily, but I apologize.  The jury, I

9    don't know how long this is going to take.  I was going to ask

10   the parties how you feel about perhaps my letting them go now

11   to come back a little later.

12             ATTORNEY SCHROEDER:  I think that's appropriate, Your

13   Honor.  I was going to raise that after we had oral argument.

14   My concern, so we've got three witnesses this afternoon.

15             THE COURT:  Yeah.

16             ATTORNEY SCHROEDER:  They're, one is here.  The other

17   two will be here at 1:00 o'clock.  But, based upon

18   representations by plaintiff's counsel that they were going to

19   be done around lunchtime with Dr. Merrens and we've got people

20   flying in from other places and coming in from other places,

21   those three witnesses, I think, are fairly short.  Not knowing

22   how long this process would take and your consideration of our

23   motion, plaintiff's opposition, obviously, I certainly think

24   having them take a break for at least a couple of hours seems

25   appropriate, but I'd defer to the Court.

1          THE COURT:  Yeah, I was thinking maybe ask them to

2     come back at 12:30 so they get kind of a longer-than-usual

3     lunch, but I could say 1:00.  I mean, if you were planning on

4     plaintiff's case being done by noon, so you wouldn't get going

5     until 1:00 anyway.

6          ATTORNEY SCHROEDER:  That was the concern, Your

7     Honor, and I think the three witnesses maybe will get done a

8     little bit earlier than 4:30, but we have everything lined up

9     for the next few days to, to go in real cadence, so to speak,

10    and I'm confident that we'll have the people available and

11    ready to go in that order just given that.  Sure, I actually

12    was thinking closer to 2:00 o'clock, but I, once again, I defer

13    to the Court.  I'm not sure how long, Judge, you will need to

14    consider our motion.

15         THE COURT:  Okay, all right.  So, plaintiffs, I think

16    I'll tell the jury to return at 1:00 o'clock at this time,

17    okay?

18         ATTORNEY JONES:  That's fine.

19         ATTORNEY VITT:  That's fine.

20         THE COURT:  So sorry about that, Mr. Schroeder.  You

21    came up to the podium to argue your motion.  I should bring the

22    jury in and let them know that.

23         ATTORNEY SCHROEDER:  Can I leave my stuff up here?

24         THE COURT:  Yes, yes.  Okay.

25              (The Jury enters the courtroom.)

(497 of 993), Page 497 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 449 of 945
2:21-cv-00414-jkd  Document 529-3  Filed 04/25/25  Page 63 of 135
496

VOLUME: 8
PAGES: 432-646

1    THE COURT:  Okay.  So there are some items that I'm

2    going to need to speak to counsel about.  So I'm going to be

3    releasing you early for lunch today, as in now, and you can be

4    prepared to get going again at 1:00 o'clock.  All right?  Thank

5    you.

6              (The Jury leaves the courtroom.)

7         THE COURT:  Mr. Schroeder?

8         ATTORNEY SCHROEDER:  Thank you, Your Honor.  Your

9    Honor, pursuant to Rule 50, as the Court knows, and we are now

10   making a defendant's motion for directed verdict pursuant to

11   Rule 50.  As the Court knows, if a party, as it states under

12   the rule, if a party has been fully heard on an issue during a

13   jury trial and the Court find that a reasonable jury would not

14   have a sufficient evidentiary basis to find for the party on

15   that issue, then the defendants would be entitled to a verdict

16   on this case.

17        Just by way of overview, Your Honor, and just as an

18   overview of the case, the entire REI division was shut down in

19   May of 2017, resulting in the termination of both Dr. Porter

20   and the two other physicians as of June 3rd 2016.  DH had

21   legitimate business reasons for closing the REI division.

22   There were longstanding issues with recruitment and staffing

23   shortages of skilled nurses, and we've heard, I think,

24   unrebutted testimony on this point.

25        Between 2016 and 2017, June 2017 or May, REI experienced a

 1   particularly critical shortage of trained nurses, and we heard

 2   testimony relating to November and December of 2016 that DH,

 3   Dartmouth Health, was forced to defer new patients between

 4   December 2016 and February 2017 to allow remaining nurses to

 5   catch up.  The last fully trained REI nurse left Dartmouth

 6   Health in April 2017.  That was the Nurse Marlene Grossman who

 7   was covering the Bedford location, so the southern part of the

 8   state.

 9        Dartmouth Health doesn't dispute that Dr. Porter made

10   complaints about her colleagues.  In fact, there were patient

11   complaints about all REI physicians, including Dr. Porter

12   herself.  One individual who you've heard testimony about,

13   Nurse Practitioner Beth Todd, she had had complaints as well,

14   and she is still employed by Dartmouth Health.  So there's no

15   evidence of retaliation there.

16        But, also, there is testimony in the record that the

17   evidence relating to complaints by Dr. Porter, that they far

18   predated even Dr. Hsu's arrival in May, June of 2014.  In fact,

19   complaints that Dr. Porter had relating to various individuals

20   in the REI division, as well as the former chair of the OB/GYN

21   department, Dr. Richard Reindollar.

22        Dr. Merrens just testified that he had no knowledge,

23   specific knowledge of Dr. Porter's complaints and no knowledge

24   about the details of her disability and that he was the

25   ultimate decision maker in deciding to terminate the REI

(499 of 993), Page 499 of 993 Case: 25-1382 12/22/2025 DktEntry: 35.4 Page 451 of 945 2:21-cv-00044-jjd Document 255-3 Filed 04/25/25 Page 451 of 945

498

VOLUME: 8
PAGES: 432-646

1    division and the three individuals that were terminated at that

2    time:  Dr. Porter, Dr. Hsu, and Dr. Seifer.

3         Now, that brings us to the claims in the case, Your Honor,

4    and there are six claims in the case, a handful of claims

5    under, under the New Hampshire law as well as an ADA claim,

6    Section 504 Rehabilitation Act claim, and a Vermont disability

7    discrimination claim as well.  I think there's really two

8    buckets here, Your Honor, that this case is about, and we've

9    had preliminary arguments or, I should say, pretrial arguments

10   on this issue.  There's disability discrimination on the one

11   hand, and then there's this retaliation case on the other, and,

12   if you put -- if I may start with the disability

13   discrimination, I'll work my way to the retaliation part.

14        With respect to disability discrimination in particular,

15   whether we're dealing with New Hampshire claim, Vermont claim,

16   or the ADA/Rehab Act claim, you have the issue of, Is somebody

17   disabled under the ADA?  And I don't think there's any dispute

18   about Dr. Porter, at the time, being disabled under the ADA.  I

19   think, for purposes of this motion at least, we would assume

20   that she was a person with a, Dr. Porter was a person with a

21   physical or mental impairment that substantially limits a major

22   life activity.  I think, just given the fact that she was on

23   long-term disability benefits all the way through the summer of

24   '18, so another 12 to 14 months after the closure of the REI

25   division, kind of speaks for itself.  So we can assume that she

1   was disabled under the ADA for purposes of this motion.

2       But then that begets the question of qualified individual

3   with a disability, which is the next part of this.  And,

4   because this case is now down to the issue of termination, so

5   disability discrimination and an alleged failure to reasonably

6   accommodate in the context of termination, that's specifically

7   what's left in this case, you then get to the issue of, Well,

8   was she a qualified individual with a disability?  Was she able

9   to perform the essential functions of her position with or

10   without reasonable accommodation?

11       And so, specifically, we're now dealing with just the

12   issue of reasonable accommodation upon termination, and there

13   has been a significant amount of litigation under the ADA since

14   1993.  The term "reasonable accommodation", according to 42

15   U.S.C. Section 12111(9)(B) states the following:  "The term

16   reasonable accommodation may include, subpart B, job

17   restructuring, part-time or modified work schedules,

18   reassignment to a vacant position, acquisition or modification

19   of equipment or devices, appropriate adjustment or modification

20   of examinations, training materials or policies, the provision

21   of qualified readers or interpreters and other similar

22   accommodations for individuals with disabilities."

23       And I really want to focus on reassignment to a vacant

24   position and why the disability discrimination claims brought

25   by Dr. Porter fall apart at this stage of the proceedings

 1      without defendants having to put on their case in chief.

 2      Specifically, in this case, we come back to the fact that the

 3      REI division was closed and, I think, the fact that Dr. Porter,

 4      Dr. Hsu, Dr. Seifer, were all terminated in conjunction with

 5      the closure of the REI division.  And I think we've heard

 6      undisputed evidence at this point that this was the first time

 7      a division had been closed completely by Dartmouth Health.

 8      This was a fairly significant decision.  It impacted a lot of

 9      people's lives, and, as Dr. Ed Merrens testified, it related to

10      the issue of not having the right level of clinical resources

11      for the patients in ensuring excellent patient care.

12          What this then comes down to, though, what we have not

13      heard, though, other than Dr. Porter's own subjective opinion

14      and belief that she could have remained in some job in the

15      OB/GYN department or could have gone into the radiology

16      department, there is no evidence in the record of an open,

17      vacant position that was available that Dr. Porter could have

18      been slotted into.  And we've heard testimony of Dr. Porter,

19      and they've called a number of our witnesses in their case in

20      chief, Dr. Padin, Dr. DeMars, and now Dr. Merrens.  There is

21      not one piece of record evidence that there was an open, vacant

22      position that Dr. Porter could have been reassigned to as a

23      reasonable accommodation to her disability at the time of the

24      termination of the REI division.

25          What's instructive here, Your Honor, is *Graves v. Finch*

(502 of 993), Page 502 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 454 of 945
2:21-cv-00044-kjd    Document 35.3    Filed 04/25/25    Page 454 of 945

501

VOLUME: 8
PAGES: 432-646

1    *Pruyn*.  It's a Second Circuit 2006 decision which states,

2    quote, "The ADA lists reassignment to an existing vacant

3    position as a possible re, possible reasonable accommodation,

4    comma, 42 U.S.C. Section 1211(9)(B)", which I just quoted, "but

5    the ADA does not require creating a new position for a disabled

6    employee".  And, in fact, Your Honor, that's Second Circuit

7    precedent.

8              THE COURT:  Do you have a citation for that?

9              ATTORNEY SCHROEDER:  I do, Your Honor.  457 F.3d 187,

10   string cite -- I'm sorry -- 181 to 187, Second Circuit 2006.

11   *Graves v. Finch Pruyn*, P-R-U-Y-N and Company, Inc.

12        In addition, Your Honor, there are cases from the Sixth

13   Circuit, *Cooper v. DolgenCorp*, LLC, 93 F.4th 360, 371, 372

14   Sixth Circuit 2024 decision.  You can now tell by the citation

15   I'm dating myself because I remember when it was F Supp 2d, so

16   we've come a long way, apparently, in the treatises of law.

17   And, in that case, *Cooper v. DolgenCorp*, it was, "When the

18   requested accommodation is a job transfer, employers have a

19   duty to locate suitable positions for employees with

20   disabilities pursuant to the ADA.  However, this duty does not

21   require employers to create new jobs or displace existing

22   employees from their positions to accommodate a disabled

23   individual, nor does a reasonable accommodation require

24   employers to eliminate or reallocate an essential job

25   function."

(503 of 993), Page 503 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 455 of 945
2:17-cv-00014-kjd Document 329-3 Filed 04/25/25 Page 455 of 945
502

VOLUME: 8
PAGES: 432-646

1        In addition, *Ehlers v. University of Minnesota*, 34 F.4th

2    655, Eighth Circuit 2022, and that stands for the proposition

3    that an employer is not required under the ADA to create a new

4    position or move other employees from their jobs in order to

5    open up a position as accommodation for an employee's

6    disability.  Rather, reassignment to another position is

7    required accommodation only if there is vacant position for

8    which the employee is otherwise qualified.

9        Finally, the *Perdue v. Sanofi-Aventis U.S.*, case 999 F.3d

10   954, comma, 960.  It's a Fourth Circuit 2021 case.  "The ADA

11   does not require that the employer create new positions for

12   disabled employees.  Moving employees to part-time work may be

13   reasonable accommodation under the ADA only when the employer

14   has part-time jobs readily available.  That is, when part-time

15   positions, when a new part-time position does not need to be

16   created."

17       And I want to hearken back to Dr. Padin's testimony in

18   conjunction with Dr. Porter's testimony.  Dr. Porter said,

19   Well, I could have stayed on in the OB/GYN department.  She did

20   not identify a specific position that she was qualified to go

21   into at the time the REI division was closed.  She was on a,

22   she was on intermittent leaves of absence and, actually, as she

23   testified, she was out of the office on two different leaves to

24   go to the Mayo Clinic post-termination and then a second

25   surgery in the fall of 2017, and she remained on long-term

(504 of 993), Page 504 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 456 of 945
2:21-cv-00044-jjd   Document 529-3   Filed 01/25/25   Page 456 of 945
503

1    disability for, until the following summer of 2018.

2         So set aside whether or not she'd be able to actually come

3    back in whatever capacity.  So set aside that issue.  She's

4    testified that she could.  And then there's her history,

5    chronological history or timeline, of her actual condition and

6    the periods of time that she was out.  But set that aside for a

7    second.  There is no testimony that there was a open, vacant

8    position for her in the OB/GYN department.

9         Dr. Padin, who testified under cross-examination, was

10   asked, Well, what about the OB/GYN department?  Wasn't there a

11   need for doctors in that department, right, and overall?  And

12   so this gets into whether a doctor has credentialing or

13   privileges for the specific needs of the department at the

14   time, one of which was generalist, which was, and really was

15   the only major area of need.  And Dr. Padin testified, Well, I

16   don't believe she had, that Dr. Porter didn't have privileges

17   for obstetrics at that point because you need to be up to

18   speed, so to speak, credentialed and privileged for the

19   specific area that you would like to have a job in.

20        And so, to the extent that there is testimony in the

21   record that there were open positions in the OB/GYN department

22   or that there was a need for additional assistance, there is no

23   evidence in the record that Dr. Porter was privileged or had

24   credentials at that point in obstetrics, which was the need

25   that Dr. Padin has testified to.  And there's an email string

1   or an email that actually Mr. Jones referred to the fact that

2   Dr. Padin that summer did assist.  Well, she was privileged in

3   that specific area and that's why she was jumping in to assist.

4       So there is no evidence in the record at the end of the

5   day that there was an open, vacant position for Dr. Porter to

6   be reassigned to within either the OB/GYN department or the

7   radiology department.  There has not been any testimony on the

8   radiology department at all.  It's really come down to the

9   OB/GYN department.  And Dr. Padin, I think, has offered

10   unrebutted testimony that where the need for additional

11   doctors, physicians was doctors and physicians that were

12   actually had privileges at that point in obstetrics.

13       There was testimony about the fact that the Alice Peck Day

14   acquisition had happened the year before and the labor and

15   delivery part, which was what Alice Peck Day was known for, was

16   rolled into Dartmouth Health and so, at that time, there was

17   certainly a need for obstetrical privileged physicians, and Dr.

18   Porter was not one of those.

19       So we come back to Dartmouth Health was not under a duty

20   to create a new vacant position for Dr. Porter, and, as a

21   result, her claims for disability discrimination should be

22   dismissed at this stage of the case.  And, if I may, Your

23   Honor, move on to issue of retaliation.

24       THE COURT:  Yes.

25       ATTORNEY SCHROEDER:  Now, with respect to

(506 of 993), Page 506 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 458 of 945
2:21-cv-00144-jjd Document 529 Filed 04/25/25 Page 458 of 945
505

VOLUME: 8
PAGES: 432-646

1   retaliation, there is a claim for wrongful discharge under New

2   Hampshire law.  There is a claim for whistleblower retaliation

3   under New Hampshire law.  There is a claim for retaliation, I

4   believe, under Vermont law as well, and what it comes down to,

5   Your Honor, is the following:  There is, in this case, three

6   elements for a prima facie case.  Protected activity, and it

7   doesn't matter whether we're under New Hampshire, Vermont or

8   federal law on this point, but, in order to have a prima facie

9   case for retaliation, there must be protected activity and an

10  adverse employment action and a causal connection between the

11  two.

12       For purposes of this motion, I'll assume that there's

13  sufficient evidence on protected activity and there is an

14  obviously an adverse employment action as a result of the REI

15  division closure impacting Drs. Porter, Hsu, and Seifer all at

16  the same time.  However, what is lacking is a causal connection

17  between the two.  There is sufficient evidence in the record

18  that Dr. Porter's complaints about a slew of different

19  physicians, nurses, et cetera, date back many, many years, and

20  with Dr. Hsu it actually relates to October, November of 2023

21  where she already was critical of Dr. Hsu before he even gets

22  there.

23       But, regardless of that particular sequence of events,

24  there is no question that her complaints about Dr. Hsu began

25  and continued over a very long period of time in 2014, 2015,

1   2016, and 2017.  And so there is no temporal proximity between

2   her complaints, whether they're about Hsu or Seifer.  And, by

3   the way, I'm on Dr. Seifer.  Those started before he got there

4   as well.  I mean, there's a continuing theme here that, you

5   know, that the deck was stacked against both of them.

6        THE COURT:  But, even if it continued through 2017 as

7   you say now, that's not enough to create the temporal proximity

8   to allow the jury to find causation?

9        ATTORNEY SCHROEDER:  I don't believe so, Your Honor,

10  because the evidence in the record in terms of -- because then

11  you would have, then you basically have, like, a retaliation

12  claim for 10 to 15 years potentially because she made complaint

13  about those individuals.  I think the lack, the temporal

14  proximity if Dr. Porter -- if the evidence in the case was,

15  First time I made complaints about Dr. Hsu and Seifer were in

16  January of '17 or February or March or April, and then my

17  employment was terminated, well, then I think the case is

18  really clear that there would be a temporal proximity

19  connection there.  But, where the evidence in the case

20  demonstrates that, that Dr. Porter made complaints about

21  Dr. Hsu certainly dating back to 2014, there is case law that

22  even an eight-month period of time between a complaint and

23  adverse employment action, that there's no causal, that there

24  is no temporal proximity.

25       But set that aside.  Here we know, based on upon testimony

(508 of 993), Page 508 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 460 of 945
2:21-cv-00044-jjd Document 329-3 Filed 01/25/25 Page 460 of 945

507

VOLUME: 8
PAGES: 432-646

 1    by Dr. Porter, that she had complaints about Dr. Reindollar

 2    relating back to 2012, 2013, and then you go into 2014.  And so

 3    I think the temporal proximity falls, argument falls apart when

 4    you look at all the record evidence in this case.  The evidence

 5    is that Dr. Porter had complaints about other individuals

 6    dating back to 2012 all the way up until 2017.  And so, unlike

 7    all the other cases out there, which there's a lot of a wealth

 8    of case law on this, this case stands differently compared to

 9    those cases.

10          THE COURT:  So you don't think that there's a

11    substantive difference between complaints that might have been

12    made in 2014-15 about which we don't really have much in the

13    way of detail, but then the Hsu and Seifer complaints, a jury

14    might be justified in inferring that those were complaints of a

15    different kind, they took it to a different level?  I mean, if

16    I'm not mistaken, there's no, you say there's evidence of

17    comments about or criticisms of people, but is it of the same

18    type and substance, say, as the long letter about Dr. Hsu and,

19    you know, kind of the extended comments about those physicians

20    that do seem, when you think about the common law New Hampshire

21    claim or the whistleblower claim, that do seem to raise public

22    policy type issues, right, the Zika virus, the informed

23    consent.  I don't think there's as much information about prior

24    complaints going back to 2014-15, but what's your take on that?

25          ATTORNEY SCHROEDER:  Well, Your Honor, certainly, if

1    we have to get to that part of this case, there will be.

2    Here's what I would say.  The Zika virus matter, I believe, was

3    2015.  I think it was.  Yeah, I'm fairly confident on that,

4    Your Honor, that the Zika virus one was 2015.  I would submit

5    to you, and I believe the evidence is clear that the complaints

6    about Hsu, the same complaints about Hsu's technique, his

7    abilities, his clinical knowledge, his skill set, all of those

8    were consistent dating back to 2014 when he got there.  There

9    is no difference between -- and, in fact, the Zika virus one, I

10   think, was in 2015, and that's almost at least 18 months, if

11   not longer, between that complaint and the termination of the

12   division and the closure of the REI division.

13        And so I believe, Your Honor, if you look at the whole

14   history of the evidence in the case of specific complaints,

15   that one, they don't really differentiate -- there's not a

16   differentiation between them.  So whether they were for public

17   policy reasons or not, I believe that those public policy

18   related complaints also were in the same group.  I don't think

19   there is a differentiation based on record evidence before the

20   Court between complaints in 2014 and '15 and complaints in 2016

21   and '17 With respect to Dr. Hsu and Seifer.  I just, I think

22   they were the same.

23        Dr. Porter was very specific in all of her emails, and

24   there were fairly lengthy ones relating to Dr. Hsu, and so, for

25   your, for your example, Your Honor, with respect to Dr. Hsu,

(510 of 993), Page 510 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 462 of 945
2:21-cv-00044-jkd   Document 529-3   Filed 04/25/25   Page 462 of 945

509

VOLUME: 8
PAGES: 432-646

1    that was an eleven-page report that was dated June 3rd 2016.

2    That's almost a year, and I don't -- I believe the case law is

3    fairly robust on that point that the lack of temporal proximity

4    in that regard where it's June 3rd versus May, June of the

5    following year.

6         But I will say, Your Honor, that, and I think the evidence

7    that, emails that are all in from Dr. Porter date back far

8    before June of 2016 where Dr. Porter testified that she told

9    Dr. DeMars on a routine basis about issues with Dr. Hsu's

10   clinical skill, competence, knowledge, abilities, and they date

11   back to 2014 and 2015.  So I think it's all consistent along

12   the way, which is why I think, I don't think you can parse out,

13   Well, these complaints in 2016 and 2017 are any different from

14   the complaints she had about Dr. Hsu and Seifer previously.

15            THE COURT:  I'm assuming there's authority out there,

16   though, that causation can still be found on a timeline such as

17   we have here.  I don't hear you saying, as a legal matter,

18   courts looking at this kind of fact pattern -- how could you

19   say that, right -- say that there is not the required temporal

20   proximity for causation to be found, and if you can't say that,

21   then why isn't it a question for the jury to determine?

22            ATTORNEY SCHROEDER:  And I agree.  You were going to

23   ask me a question, then I answered it, and you're correct, Your

24   Honor, right?  So then that gets us to the second part, right?

25   That gets us to the legitimate nondiscriminatory reasons,

510

VOLUME: 8
PAGES: 432-646

1    right?  And so, setting aside the prima facie case, if you

2    shift gears to legitimate nondiscriminatory reasons, it's

3    unrebutted testimony that the REI division was closed as of

4    June 3rd 2017.  That's unrebutted testimony.  It's also

5    unrebutted that that division hasn't reopened or been any

6    plans, concrete plans, to reopen this division for the last

7    eight years.

8        And so that, standing alone, that's a legitimate

9    nondiscriminatory reason for why Dr. Porter, Dr. Seifer, and

10   Dr. Hsu were all terminated at the same time.  And, remember,

11   this is not just Dr. Porter we're dealing with here.  The

12   context of this is that all three individuals were terminated

13   at the same time.  There is no -- that's unrebutted.  And so

14   it's undisputed that the division was closed and that all three

15   physicians were terminated at the same time.

16       Also, there's testimony in the record that, despite the

17   fact that Beth Todd had complaints about -- everybody had

18   complaints about Dr. Hsu and Seifer but, and including Beth

19   Todd.  Beth Todd is still employed by Dartmouth Health today.

20   So that's another indicia of legitimate nondiscriminatory

21   reasons for why the complaints don't suffice to get further,

22   and, if you go to the third step of pretext, that falls apart

23   at that stage as well.

24       But the fact that the REI division was closed, that was a

25   seminal event.  Three physicians were terminated, all at the

(512 of 993), Page 512 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 464 of 945
2:21-cv-00044-jjd Document 329 Filed 04/25/25 Page 80 of 215

511

VOLUME: 8
PAGES: 432-646

1   same time.  They're all in the same capacity, including the

2   division director.  So this is not even a differentiation

3   between, say, a leader and people that are in nonleadership

4   positions.  It's all of them, all three physicians, and that's

5   unrebutted.  There is no testimony that somehow the, that there

6   is any, any pretext relating to the actual decision.

7        And what it comes down to then when you get back to, Well,

8   what about that decision?  And Dr. Merrens testified he didn't

9   have any knowledge of specific complaints about Hsu or Seifer

10  from Dr. Porter, and that makes sense given his, the fact that

11  he oversees 1,500 physicians.  And he didn't know anything

12  specific about her disability other than she'd been out on a

13  leave of absence.  And, so when you take all of that evidence,

14  Your Honor, I'd submit that the retaliation claims in this case

15  also fall apart.

16       Finally, if I may be heard just on the specific issue of

17  --

18            THE COURT:  So I assume then, right, the assumption

19  in the argument is that this cat's paw notion is not at play,

20  right?

21            ATTORNEY SCHROEDER:  I don't think there is, I don't

22  think there's sufficient evidence to even -- there's no cat,

23  Judge, never mind the paw.  There's no cat, no cat.  Never mind

24  the fact that I don't like cats, for the record, but there's no

25  cat in play here.

(513 of 993), Page 513 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 465 of 945
2:21-cv-00144-jjjd  Document 529-3  Filed 04/25/23  Page 465 of 945

512

VOLUME: 8
PAGES: 432-646

1          THE COURT:  And, when you say the cat, let's just be

2     clear what we're talking about.  Are you talking about the

3     upper level decision maker and the paw is the midlevel decision

4     maker?  So is the paw Dr. DeMars?

5          ATTORNEY SCHROEDER:  Well, it's interesting, Your

6     Honor.  I actually didn't even know what the fable stood for.

7     I always thought, cat's paw, it must be a cat pawing after the

8     string, right?  Then I had to read the fable as enunciated in

9     their papers.  Here I think the implication was that Dr. DeMars

10    was somehow the mastermind and puppeteer and Dr. Merrens was

11    the puppet, and I think Dr. Merrens has been very clear, like,

12    you know, a number of people were included in the, in the

13    recommendation process, but he made the, he made the call at

14    the end of the day.

15         THE COURT:  He did, but there is a factual issue on

16    this point, isn't there?  There's emails to suggest that

17    Dr. Merrens is making communications about Dr. DeMars actually

18    being -- I know what this testimony was today, but, in terms of

19    whether there's a question for a jury on this issue, right,

20    there's emails where he's telling people it was Dr. DeMars.

21         ATTORNEY SCHROEDER:  Well, I think there's a

22    recommendation by Dr. DeMars, and he's testified to that.

23    However, you also have the, you also have, you know, the

24    testimony of Dr. DeMars, right, I didn't want to close it down.

25    And they tried their best on cross-examination to rattle her,

(514 of 993), Page 514 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 466 of 945
2:21-cv-00044-jjd Document 352-3   Filed 04/25/25   Page 366 of 545

513

VOLUME: 8
PAGES: 432-646

1    and she was unrattled.  She said, Listen, I didn't want to do

2    this.  I didn't want to go ahead with it.  And whether

3    Dr. DeMars tells a nurse that there's a recommendation, at the

4    end of the day, there's no dispute that, there's no evidence

5    that he didn't make the ultimate decision.

6        So set aside the recommendations or whatever because we'll

7    obviously have more testimony on this if this proceeds on this

8    point, but Dr. DeMars was clear that he was the ultimate

9    decision maker and whether there was recommendations relating

10   to just IVF or REI, you heard the testimony of Dr. DeMars.

11   Yes, she recommended the IVF program had to be paused.  There

12   was certainly a wealth of information on this.  Dr. Merrens

13   didn't go into detail vis-a-vis an email to a nurse not even in

14   that group as to what was his thinking.

15       But he also -- I want to really differentiate between --

16   and there's this issue of, well, they said this to the press,

17   and they didn't say this to the press.  Whether or not --

18   there's no obligation on the part of any business to say, I've

19   got to tell the media everything that we're doing and why we're

20   doing it.  There's just no obligation, and that doesn't create

21   a pretext for a discrimination and retaliation case.  It just

22   doesn't.

23       Listen we've, Your Honor, you denied our motion to have

24   Dr. Conroy testify.  That was a nothing burger.  That went

25   nowhere.  And that just goes to show that their entire case is

1    trying to parse words from, from articles in the media.  That

2    does not mean that that's what happened or exactly how things

3    happened or that the employer was under any obligation to

4    disclose everything about its decision making with respect to

5    important decisions before it.

6            THE COURT:  Sure, but isn't that separate from the

7    factual kind of record?  When the employer is not under an

8    obligation, we only have what we have in terms of the evidence,

9    right?

10           ATTORNEY SCHROEDER:  Sure.

11           THE COURT:  And there's some evidence to suggest that

12   that might be a disputed issue.

13           ATTORNEY SCHROEDER:  Well, I think, Your Honor, most

14   of the evidence has gone back to the "Valley News" articles and

15   whether or not you can parse specific decisions out of that and

16   as opposed to what actually happened, right?  Because that's

17   what is at the heart of this case.  And so I would submit that,

18   up until now, plaintiff's case had been built largely upon,

19   Well, we've got this email here.

20       All of these emails, by the way, postdate the actual

21   termination decision and the actual implementation of that

22   decision, and you heard testimony from Dr. DeMars of what she

23   did and how she did it, and I think with her text messages

24   proves out that she was looking out for Dr. Porter all along

25   the way, regardless of the fact that the REI division was being

VOLUME: 8
PAGES: 432-646

1     closed.  But I got a little far away from your question.

2         I believe, Your Honor, that the evidence that plaintiffs

3     have shown rests largely on parsing out, out of context,

4     certain comments from news articles, and I think that, in and

5     of itself, is insufficient to get them to a jury on the

6     specific issue of whether or not there was sufficient evidence

7     of retaliation.  Because, remember, the prima facie case, even

8     if they get past the temporal proximity argument, and I'd

9     submit that they don't because there's not sufficient causal

10    connection, we had a legitimate nondiscriminatory reason for

11    doing what we did.  We implemented that.  Dartmouth Health

12    implemented that.

13        And now they've get to show pretext.  Is there sufficient

14    evidence of pretext here?  And on the issue of news articles

15    and whether or not they divulged all of the real, all of the

16    reasons for why something happened doesn't suffice to establish

17    evidence of pretext for purposes of establishing retaliation.

18             THE COURT:  Okay.  But it's more than just the news

19    article, right?

20             ATTORNEY SCHROEDER:  I'd submit, Your Honor, that

21    there are email communications that were, that postdate actual

22    decisions in this case, but they relate back, in large part, to

23    -- so, yes, there are emails to that point, but the lion's

24    share of them, I believe, relate to, in some way, what was said

25    or not said in, to the "Valley News".  That goes back to

(517 of 993), Page 517 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 469 of 945
2:21-cv-00444-jjd Document 529-3 Filed 01/25/25 Page 456 of 245

VOLUME: 8
PAGES: 432-646

516

1    Dr. DeMars's email to Dr. Seifer, et cetera.

2         And, if I may, just on the issue of damages, Your Honor?

3              THE COURT:  Yes.

4              ATTORNEY SCHROEDER:  I don't believe, I don't believe

5    -- we submit that there is clearly no basis for punitive

6    damages under Vermont law or under federal law on the facts in

7    this case.  There is no basis to show that anything was done in

8    a reckless, malicious, willful, wanton way, and punitive

9    damages are only, are a remedy that should, are extraordinary

10   and should not have the, should not be before the jury at this

11   point if the case goes forward on the disability discrimination

12   retaliation claims.  So we'd submit that the punitive damages

13   claim should be struck, at minimum.

14             THE COURT:  So, if the jury were to conclude that

15   administrators at Dartmouth-Hitchcock were aware of physician

16   conduct that may have had a potentially harmful effect on

17   patients, that wouldn't be sufficiently outrageous for punitive

18   damages?

19             ATTORNEY SCHROEDER:  I think, Your Honor, if that was

20   the --

21             THE COURT:  Were aware of it and did nothing.  I

22   guess I should complete the thought.  If the jury thinks that

23   the evidence shows that, you know, Dr. Hsu and Dr. Seifer

24   communications were brought to a higher level within

25   Dartmouth-Hitchcock to say, Look at all the stuff that's going

VOLUME: 8
PAGES: 432-646

1    on, and, if the jury were to credit that and say, Yeah, what

2    was done about that, that would not be enough for them to find

3    punitives?

4            ATTORNEY SCHROEDER:  I don't think so on the, on this

5    record, Your Honor.  I think under your hypothetical that could

6    be possible, but on this record where -- your hypothetical

7    assumed high-up decision makers, right?  And what we have heard

8    is that Dr. Merrens made this decision, was not aware of any

9    patient safety concerns about Hsu or Seifer, had no knowledge

10   of those.  So the ultimate decision maker made the decision.

11   He doesn't have knowledge of those complaints, and, therefore,

12   that, this fact patter that's the record evidence is different,

13   I'd submit respectfully, to your hypothetical.

14           THE COURT:  Okay.  Yeah, I mean, I guess, if you

15   accept, if the jury accepts that Dr. Merrens is the final

16   decision maker -- and this goes back to what I said before, the

17   DeMars factor.

18           ATTORNEY SCHROEDER:  Yes.

19           THE COURT:  And, you know, if they look at the

20   evidence and say, Well, I'm not so sure.  I mean, yes, I know

21   what you're saying, that he signs the dotted line, so to speak,

22   in terms of making the final decision, but, if there's evidence

23   in there to show that Dr. DeMars was very influential in that

24   that decision, then is that, if the jury were to credit that,

25   is that sufficient if Dr. DeMars knew that and made her

```
 1    recommendations?

 2              ATTORNEY SCHROEDER:  So two points on this, Your

 3    Honor.  One, Dr. DeMars was very clear, and she was not shown

 4    any contradictory evidence that, while she really wanted --

 5    this is parsing out REI versus IVF.  She said, you know, IVF

 6    had to be paused.  In fact, they did make several moves to

 7    pause it, right?  She was very clear, I was not in favor of the

 8    REI division closure, right?  That's the record testimony from

 9    Dr. DeMars, and there's nothing rebutting that in the record in

10    terms of emails where Dr. DeMars is -- you know, she certainly

11    went along with the decision.  She had to because her boss made

12    the decision.

13         And so, on that point, I would submit that she is the one

14    that said, I was in favor of pausing IVF.  I did not want to

15    shut down the entire division.

16              THE COURT:  Isn't there email evidence, though, that

17    it's the other way, that she was fine with the closure of the

18    division?

19              ATTORNEY SCHROEDER:  She does say in May, after the

20    division has been announced and after she has recommended Dr.

21    Porter for a position at UVM, she certainly goes along with it

22    on May 12th and thereafter.  There's no doubt about that,

23    Judge, but those are all postmortem comments, and she

24    acknowledges those comments.  She didn't dispute that she sent

25    those emails, but those are postmortem comments where her boss
```

(520 of 993), Page 520 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 472 of 945
2:21-cv-00474-kjd Document 152-3 Filed 04/25/25 Page 89 of 203

519

VOLUME: 8
PAGES: 432-646

1    has made that decision, right?

2        So does she go along with it at that point?  Well, the

3    decision's already been made.  So all of those emails that

4    plaintiffs have put before the Court, the lion's share, and not

5    even the lion's share, the ones that have been really put front

6    and center, if you look at the dates of those and what

7    Dr. DeMars says in response, those all postdate the actual

8    announcement of the closure.  There's nothing for her --

9    there's nothing to rebut.  At that point, the horse has left

10   the barn, to stay with animals today.

11       And so I'd submit against that record there's no basis for

12   punitive damages under either the one Vermont claim or under

13   the ADA, regardless of the fact that there's a cap on it.

14           THE COURT:  Okay.

15           ATTORNEY SCHROEDER:  Thank you for allowing me to

16   indulge the Court.

17           THE COURT:  Absolutely.  All right.  Plaintiff?

18           ATTORNEY JONES:  Your Honor, obviously, there's a few

19   points that I want to make.  I kind of feel like I had a brief

20   read to me right now.  I'm trying respond on the fly.  Let me

21   start by saying, for the most part, much of the arguments that

22   Mr. Schroeder has made are positional, and our position is that

23   there is plenty of evidence in the record from which a

24   reasonable juror could reach an opposite conclusion.

25       One example is the whole discussion we were having about

(521 of 993), Page 521 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 473 of 945
2:21-cv-00044-jjd Document 529-3 Filed 04/25/25 Page 89 of 195

VOLUME: 8
PAGES: 432-646

520

1    the decision maker.  Was it DeMars, or was it Merrens, and who

2    is pointing at who?  This morning Dr. Merrens, he confirmed his

3    deposition testimony where he said Dr. DeMars made the

4    decision.  We approved it.  I understand he backtracked and

5    has, at other times, given inconsistent testimony, but we have

6    a statement from Dr. Merrens saying it was Dr. DeMars's call.

7    We have multiple emails where Dr. Merrens either refers Nurse

8    Maxfield to, It was DeMars's call, in response to her question.

9    We have Dr. DeMars herself saying, I don't want to change that

10   decision.

11          So, I mean, there's plenty of evidence in the record from

12   which a reasonable juror could conclude it was DeMars, and,

13   frankly, DeMars, as the department chair, certainly has enough

14   authority in the organization that her discriminatory actions

15   bind the employer.  So whoever made the call binds

16   Dartmouth-Hitchcock here, right?  From that perspective,

17   whether there's a cat or a paw doesn't matter.  They are both

18   sufficiently authorized to bind the organization with their own

19   animus.  So all we have to prove is one of them had it.

20          And I think there's plenty of evidence that Dr. DeMars

21   certainly had plenty of animus, both with regard to disability

22   and with regard to whistleblower.  With regard to Dr. Merrens,

23   there's evidence that he specifically cited Dr. Porter's

24   disability as a reason for not considering retaining her in

25   some capacity.  There is evidence that he refers to the

1    dysfunction of the department, and that, in part, refers to

2    complaints that Dr. Porter was making.  So we think there's

3    plenty of record evidence from which a reasonable juror could

4    find factually in favor of Dr. Porter in this case.

5        I would also point out that the extensive trial record

6    that we have now put on in eight days or seven-and-a-half is

7    not identical, but very much, very closely tracks and is much

8    more robust than the record that was submitted to the Second

9    Circuit Court of Appeals.  And so, you know, a lot of the

10   Second Circuit identified as being foundational for a

11   reasonable juror's belief that would support Dr. Porter's case

12   is evidence in this case as well.

13       So that covers a general global statement.  Those are the

14   comments I have.  With regard to the -- there was a discussion

15   about whether there was a sufficient temporal inference and

16   that Mr. Schroeder was suggesting that many of these complaints

17   go back many years.  Your Honor noted that the salient

18   complaints that bring us here were, in fact, made in the

19   mid-2016 to, summer of 2016 to late winter, early spring of

20   2017, this eight- to nine-month period before the REI was

21   closed and Dr. Porter was terminated.  So that's clearly within

22   the zone of a sufficiently proximate time zone to be the basis

23   of discriminatory animus.

24       I also just want to clarify.  Despite Mr. Schroeder's

25   confidence, the testimony was very clear that the Zika virus

(523 of 993), Page 523 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 475 of 945
2:21-cv-00447-jdp Document 529 Filed 07/25/25 Page 475 of 945

522

VOLUME: 8
PAGES: 432-646

1    issue was 2017.  So the complaints of billing, improper

2    billing, unlawful billing, those were made when Dr. Porter

3    returned from her disability leave on a partial basis and

4    discovered that this had been going on.  Again, we're talking

5    2017, I believe.

6        So the salient complaints with regard to the providers

7    were there, complaints about Dr. Hsu that go back to the time

8    he got there, going back, even more disturbing and critical,

9    when Dr. Seifer shows up in 2016, and then the complaints are

10    coming in the context of Dr. Seifer's review, and people are

11    screaming that he's not dealing with Dr. Hsu.  So it's in that

12    context that things are taking on a much weightier, much more

13    weight.

14        And, frankly, no one is saying that, because Dr.

15    Porter made one complaint about Dr. Hsu, Dr. DeMars decided to

16    get rid of her, but she sure as hell had a growing frustration

17    that was building over the years that Dr. Porter just wouldn't

18    stop, and it was getting -- she became a real thorn in her

19    side.

20        And it's, you know, quite frankly, I think the jury saw

21    what could be characterized as contempt.  You know, she would

22    not credit Dr. Porter reporting patient harm because she just

23    said, It's just more splitting behavior.  The jury saw that.

24    So I think it's, you know, there's plenty of evidence from

25    which a juror could conclude that Dr. DeMars developed

VOLUME: 8
PAGES: 432-646

1    retaliatory animus due to Dr. Porter's protected conduct.

2         I, just want to see if I have anything else on

3    whistleblower before I switch over the disability.  Let me just

4    touch a little bit on the damages issue.  We believe there's

5    plenty of evidence to support a punitive damages instruction in

6    this case, not only what you mentioned about the fact that this

7    is a case that includes repeated complaints to senior

8    administrators of patient harm and nothing was done, in fact,

9    Dr. DeMars hid it.

10        She was motivated to hide it because, as Dr. Merrens

11   confirmed this morning, her job was on the line.  If Dr. Seifer

12   fails, she loses her job.  It was on her.  Dr. Seifer's success

13   is on her, so she's motivated, because of an act of an even

14   more senior official, she's now motivated to not do the

15   responsible, lawful, or appropriate thing in response to the

16   complaints of patient harm.  So, yeah, that is outrageous.

17        Second of all, Dr. DeMars, you know, she wrote in an email

18   that her life would be easier if Dr. Porter lost her license.

19   That email alone is malicious.  I was stunned when, on the

20   stand, she confirmed that that's how she feels.  I would have

21   thought she would have backed off and said, Oh, I wrote this in

22   frustration.  I don't really mean that.  She said, Yeah, my

23   life would have been easier if my so-called friend lost her

24   license to practice.  I think a juror could conclude that

25   that's malice.

VOLUME: 8
PAGES: 432-646

524

1              THE COURT:  So what about the reasonable

2      accommodation question?

3              ATTORNEY JONES:  That's what I was moving to.  So I

4      want to touch on the reasonable accommodation issue.  I guess,

5      first of all, I don't think the plaintiff views the

6      reassignment issue as being limited to a request for a

7      reasonable accommodation.  Rather, we look at the decision to

8      take the extraordinary step of closing a division at the first

9      and only time it's ever happened at Dartmouth-Hitchcock and get

10     rid of all the providers and keep none of them.  We believe, in

11     part, that was motivated by disability discrimination.

12          Our claim, our claim that they could have and should have

13     retained Dr. Porter is not really, Oh, she made a request for a

14     reasonable accommodation, and it was denied.  This isn't that

15     case.  This is, we believe the evidence would support a finding

16     that Dartmouth found itself with two incompetent doctors

17     causing patient harm and one person who was just annoying the

18     heck out of everybody about it because they weren't doing

19     anything and they just decided, You know what?  The heck with

20     all of them.  We're just going to close this place down, fire

21     them, and we're not keeping her.  And, when pushed about why

22     they couldn't keep her, Dr. DeMars said, I want to keep the

23     decision the way it is.  I don't want her coming back.

24          We believe all of that is the discriminatory, the

25     discriminatory animus that leads to all of that decision

1   making.  So it's not purely a request for accommodation that's

2   denied case.  It's a case that they, not only fired her, but an

3   extraordinarily talented physician who had unique skills, they

4   felt so strongly about getting rid of her that they wouldn't

5   even consider retaining her, even in those areas that were not

6   related to REI that she was already performing.  So we think

7   that's part of the termination decision, really.

8       But, with regard to accommodation -- I will acknowledge,

9   I've been an employment lawyer for a very long time.  I will

10  acknowledge that there is, you know, the statute and

11  regulations provide that, you know, there's no obligation to

12  create a new job to accommodate, true.  And, you know, but the

13  regulations say reassignment to a vacant position can be a

14  reasonable accommodation.  So then we get into the question of,

15  What can be a reasonable accommodation?  I have been to CLE

16  course where the materials are thicker than the notebooks we

17  gave in our exhibits of case law about what can be a reasonable

18  accommodation.  It can be anything.

19      So I think, in this case, certainly, at the time of the

20  decision to close the REI, the information that Dr. Porter's

21  physicians were providing here was that her condition was 100

22  percent curable and she was on the way back to 100 percent

23  reentry.  So it can be a reasonable accommodation to provide

24  somebody a short-term alternate arrangement until they come

25  back full-time.  It can be a reasonable accommodation, and it

1    can be a reasonable accommodation to create a new job.

2        Just because the statute says that there's no obligation

3    to do it doesn't mean it can't be a reasonable accommodation as

4    part of the interactive process, and I've sure seen a lot of

5    employers do it, and, in this case, Nurse Practitioner Todd was

6    given the opportunity to be reassigned.  So we think there's

7    enough facts in the record to support a finding of

8    discrimination for all those reasons.

9        THE COURT:  Okay.  So then you obviously disagree

10   with Mr. Schroeder's point, I think, all the F.4th recent case

11   law that he cited to me really stands for the proposition that,

12   according to him, that you need to demonstrate that there was

13   actually a position available and there's no need to create a

14   position, the defendant doesn't have to create a position.  It

15   has to be available, and you have to identify a position that

16   Dr. Porter could have been reassigned to.

17       ATTORNEY JONES:  Correct.  I do not think that that's

18   the strict legal finding under the facts of this case.

19       THE COURT:  And, as a legal matter, though, I mean,

20   it's not -- you're saying that the, that the notion of

21   reassignment is broader and more flexible than -- you have to

22   identify a particular position that was available at the time,

23   and you didn't get it?

24       ATTORNEY JONES:  Yes.  I also think the concept of

25   reasonable accommodation is far broader than simply, you know,

VOLUME: 8
PAGES: 432-646

1    reassignment to a vacant position.  It can be that the parties

2    can discuss and come to terms of what's reasonable to both

3    people.

4              THE COURT:  And here, though, your general position

5    is that she could have stayed within OB/GYN in a more general

6    role?

7              ATTORNEY JONES:  Absolutely.

8              THE COURT:  And there's evidence in the record of

9    that?

10             ATTORNEY JONES:  Well, OB/GYN and radiology.  She was

11   dual appointed.  There was plenty of ways she could have been

12   fully engaged, and it's all set forth the letter where she

13   submitted Dr. Merrens where she said, Even if you don't have me

14   working in fertility, look at all the things I've been doing

15   and could do.

16             THE COURT:  Okay.  All right.

17             ATTORNEY JONES:  I think I probably have more points,

18   but I'd rather just answer any questions you have.

19             THE COURT:  Well, let's make sure we've hit -- so you

20   talked about causal connection with legitimate

21   nondiscriminatory reasons.  Mr. Schroeder made the argument

22   that the evidence in the record is clear that there was a

23   business reason for doing it.  Does that kind of end the

24   inquiry as a jury question?

25             ATTORNEY JONES:  That's clearly a jury question.  We

```
 1    don't accept that that -- Dr. Merrens confirmed this was the
 2    only time they've ever closed a division.  Dr. Bernstein, he
 3    said that, even when they lost their providers, they found a
 4    way to rebuild because you just don't close divisions.  It is
 5    an extraordinary thing to close a division.  The idea that it
 6    was just because we had a nursing shortage, which, by the way,
 7    can be rejected factually.  Sharon Parent testified she wanted
 8    to keep working, and Dr. Merrens said he has no reason to doubt
 9    her testimony.
10         So the jury can reasonably find that that was just bunk
11    from the beginning.  So we just don't think that there was a
12    legitimate nondiscriminatory reason to take an extraordinary
13    act of closing a division.  We believe the record evidence
14    shows that that decision was made for the discriminatory
15    reasons I discussed earlier.  But, yeah, we, we do not accept
16    that there was a legitimate nondiscriminatory reason, and, even
17    if they have articulated it enough to continue the analysis, we
18    believe that the record is replete with pretext.
19              THE COURT:  Okay.  Thank you.
20              ATTORNEY JONES:  Thank you.
21              THE COURT:  Mr. Schroeder?
22              ATTORNEY SCHROEDER:  Quick retort, Your Honor?
23              THE COURT:  Yes.
24              ATTORNEY SCHROEDER:  Certainly available to answer
25    any question you have, Your Honor, but I just wanted to make a
```

529

VOLUME: 8
PAGES: 432-646

1    few responses relating to what Mr. Jones just said.  We get to

2    the issue of legitimate nondiscriminatory reasons, and he

3    immediately pivoted to Dr. Bernstein.  Dr. Bernstein is

4    employed by, as far as I know, UVM Medical Center and

5    acknowledged on the stand that they've actually closed

6    programs.  So that has nothing to do at all with the decision

7    by Dartmouth Health to close a division, which is --

8         And, to his point, I am in violent agreement that it was

9    an extraordinary event.  Yes, it was.  The evidence is

10   unrebutted and undisputed that they hadn't closed an entire

11   division like this ever before, and that's compelling evidence.

12   I believe, or we submit, that Dartmouth Health had legitimate,

13   nondiscriminatory reasons for doing it.  It goes to the issue

14   of a number of things that were going on at that time, nursing

15   shortage, the issue of dysfunction.

16        I know he said, Mr. Jones, said, Well, you know, there's

17   the issue of dysfunction, and that was, that could be evidence

18   that Dr. Merrens knew about the complaints of others.  That's

19   what the Second Circuit inferred on a summary judgment record.

20   That's not what the evidence is before the Court, and I would

21   submit that the evidence before the Court is markedly different

22   and a lot less, and anything that the Second Circuit, quote,

23   unquote, inferred may or may not be true because it has to be

24   admissible evidence at the end of the day.

25        With respect to the ADA, and I think this is really

(531 of 993), Page 531 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 483 of 945
2:21-cv-00944-kjd   Document 35-3   Filed 01/25/25   Page 483 of 945

530

VOLUME: 8
PAGES: 432-646

1    compelling, Your Honor, you asked Mr. Jones to answer the, the

2    fact that there is case law in four circuits, four or five

3    circuits, at least, that we found, at least, in response to

4    this, including the Second Circuit, and he said, Well, you can

5    certainly create a new job, and the phrase "reasonable

6    accommodation" is very broad.  The regulations are very clear.

7    It has to be a vacant position, and the case law that's

8    developed since that time -- so that's the regulations pursuant

9    to the statute -- the case law is very clear.  There's no,

10   there is no split on this issue.  You've got to identify a new,

11   vacant position.

12        And, in fact, the corollary to that is the plaintiff

13   doesn't get to decide, Well, I think this will be a reasonable

14   accommodation.  The employer has a duty to implement an

15   effective accommodation pursuant to the law, not necessarily

16   whatever -- whatever the plaintiff wants doesn't magically

17   become a reasonable accommodation.  At the end of the day, the

18   record in this case before you has no evidence that there was a

19   vacant, part-time or full-time position in OB/GYN that Dr.

20   Porter was privileged and qualified for.  Remember, you have to

21   be a qualified individual with a disability.

22        We will assume, for sake of argument -- we don't even have

23   to worry about the issue of what stage her condition was at.

24   We will assume, for sake of argument, that she was disabled,

25   but the next prong in that or the next step in that is a

(532 of 993), Page 532 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 484 of 945
2117cv00594kgd    Document 329.23    Filed 04/25/25    Page 484 of 945

531

VOLUME: 8
PAGES: 432-646

1    qualified individual with a disability.  So you have to have

2    the ability to do a potential job, and the only job in the

3    record before you that Dr. Porter might be considered for but

4    couldn't, according to Dr. Padin, was the issue of an OB/GYN

5    generalist position because they needed that in obstetrics, and

6    Dr. Padin offered unrebutted evidence on that point that Dr.

7    Porter did not have the credentialing or privileges for that.

8         So, to the extent that there is any evidence of possibly a

9    position, and I would submit that there isn't, but, even if you

10   went one step further and said, Well, there was testimony about

11   the OB/GYN department needing additional help, the only

12   testimony about that is the need for a physician with

13   privileges in obstetrics.

14             THE COURT:  Okay.

15             ATTORNEY SCHROEDER:  Thank you, Your Honor.

16             THE COURT:  All right.  Thank you.  So, in terms of

17   timing, I want to make sure everyone, including myself, has a

18   little time for lunch.  Should we return at 12:30?  Does that

19   work for everyone?

20             ATTORNEY SCHROEDER:  Your Honor, my able co-counsel

21   just reminded me about something.  Do you mind if I add one

22   specific point?

23             THE COURT:  Go ahead.

24             ATTORNEY SCHROEDER:  We made these arguments on the

25   motion in limine.  This relates to the cat's paw theory, and we

(533 of 993), Page 533 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 485 of 945
22117cv000944kjd    Document 329-23    Filed 04/23/25    Page 485 of 945

532

VOLUME: 8
PAGES: 432-646

1    resubmit the arguments that we already briefed on, which is

2    that the cat's paw theory isn't available under New Hampshire

3    and Vermont law as of today, and, to the extent that it is

4    recognized by federal law, it has been recognized in claims

5    under Title VII and USERRA and ADEA, but it has not been

6    recognized for claims under the ADA or Rehab Act, which are the

7    claims that are before the Court now.  Thank you for allowing

8    me to --

9            THE COURT:  So what's the difference, though?  I

10   think Mr. Jones, at the motion in limine hearing, had talked

11   about how it's not just -- maybe using this term "cat's paw"

12   makes it sound like more of a novelty than it really is, that

13   it's really just a general agency principle.  So do general

14   agency principles apply across the claims, I guess, is the

15   question.

16           ATTORNEY SCHROEDER:  I think, Your Honor, the way it

17   was raised at -- and, just procedurally, the way it was raised

18   by plaintiff's counsel was at the Second Circuit as a theory

19   under cat's paw where they enunciated the actual Aesop's fable.

20   So that was their argument.  I submitted that it hadn't even

21   been raised before, but they raised it there.  Second Circuit

22   said you can raise it.

23           THE COURT:  Yeah.

24           ATTORNEY SCHROEDER:  And the way it's been enunciated

25   throughout this case and throughout the papers leading up to

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 486 of 945
2:17-cv-00194-kjd    Document 329.23    Filed 04/25/25    Page 486 of 945

VOLUME: 8
PAGES: 432-646

1    this is not, quote, unquote, agency, it's -- because, at the

2    end of the day, who is the agent here?  The decision maker,

3    right, is Dr. Merrens, or at least the record evidence supports

4    that.  And then the only way you would then be able to go down

5    one step to Dr. DeMars is through this cat's paw theory, and I

6    would submit that that's the argument they've raised all along.

7    I don't think it's any different just because you use the word

8    "agency".  I think it's the same thing.

9        THE COURT:  So then you don't think, for purposes of

10    corporate liability, someone at Dr. Merrens's level and someone

11    at Dr. DeMars's level both occupy sufficient positions within

12    the organization that they could be agents of the corporation?

13        ATTORNEY SCHROEDER:  Well, certainly, Dr. DeMars

14    could be an agent of the corporation, but I think, on the facts

15    in the case and in the record, there's, it's unrebutted that

16    Dr. DeMars made the ultimate call.  Like, so regard -- and so

17    then the only way you can penetrate that for purposes of

18    corporate liability would be through this cat's paw theory

19    because then you're saying, Well, he wasn't really the decision

20    maker.  He must have been taking some discriminatory animus

21    from some other agent of the corporation and been poisoned by

22    it, and that's the cat's paw theory.  And so, you know, they've

23    presented it that way at the Second Circuit and since then,

24    even in their motion in limine papers.  So, yes, as a corollary

25    argument, they have this agency argument, but it's really just

(535 of 993), Page 535 of 993     Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 487 of 945
2:17-cv-00194-kjd     Document 329.23     Filed 04/25/25     Page 487 of 945

534

VOLUME: 8
PAGES: 432-646

1    the same thing in a different color, so to speak.

2              THE COURT:  Okay.  Thank you.  Anything from the

3    plaintiffs?

4              ATTORNEY JONES:  No, Your Honor.

5              THE COURT:  Okay.  All right.  So then I'll see you

6    back here at 12:30.  Like I said, if there is an interest in

7    having a little more time, we can, probably.  I just want to

8    make sure, since the jury's been out for a while, that we get

9    going close to 1:00, if we can come back at 12:45.

10             ATTORNEY SCHROEDER:  That's fine, Your Honor.  I was

11   thinking about what you had told the jury.  So apologies. 12:45

12   would be ideal.

13             THE COURT:  Okay.  We'll do that.

14             (A recess was taken from 11:57 a.m. to 12:51 p.m.)

15             THE COURT:  Okay.  So defendants have moved under

16   Federal Rule of Civil Procedure 50 for a directed verdict

17   judgment as a matter of law.  To succeed on a Rule 50 motion

18   for judgment as a matter of law, the moving party must show

19   that, after a full hearing on an issue at trial, there is no

20   legally sufficient evidentiary basis for a reasonable jury to

21   resolve the issue in favor of the nonmoving party.  In

22   considering a Rule 50 motion, the Court may consider all of the

23   record evidence, but, in doing so, it must draw all reasonable

24   inferences in favor of the nonmoving party and may not make

25   credibility determinations or weigh the evidence.

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 488 of 945
2217:cv-00094-jkd   Document 329-23   Filed 04/23/25   Page 488 of 945

1      With respect to the New Hampshire Wrongful Discharge and

2    Whistleblowers' Protection Act claims, this requires a showing

3    of a discharge in violation of public policy.  Generally

4    speaking, there are two elements:  One, that a defendant's

5    termination of the plaintiff was motivated by bad faith,

6    malice, or retaliation; and, two, that the defendant terminated

7    the plaintiff because she performed one or more acts that

8    public policy would encourage.  And bad faith is malice and is

9    established by discharge for pursuing policies condoned by the

10    employer or if the record does not support the stated reason

11    for discharge or if there is disparate treatment administered

12    to a similarly situated employee.

13      The New Hampshire Whistleblowers' Protection Act prohibits

14    an employer from discharging or otherwise discriminating

15    against an employee regarding employment because the employee,

16    in good faith, reports or causes to be reported, verbally or in

17    writing, what the employee has reasonable cause to believe is a

18    violation of any law or rule adopted under state law or federal

19    law.

20      So, with respect to the evidence that has come in at this

21    trial, this is not an exhaustive list of the evidence, just

22    enough to demonstrate that there is a sufficient evidentiary

23    basis for a reasonable jury to find in favor of the nonmoving

24    party.  So, in this case, we have plaintiff's testimony that

25    she reported to Dr. DeMars her belief that Dr. Hsu and Dr.

VOLUME: 8
PAGES: 432-646

1    Seifer were not meeting the standard of care for physicians in

2    the practice and placing patients at risk.

3          In evidence is the June 2016 letter Dr. Porter wrote to

4    Dr. Seifer reporting on, among other things, her reasons for

5    believing that Dr. Hsu's conduct presented a risk to patients.

6    There has also been evidence that Dr. Porter reported to Dr.

7    DeMars her concerns about Dr. Seifer's work.

8          There is evidence in the record for the jury to infer

9    Dr. Merrens's knowledge of Dr. Porter reporting complaints

10   about other physicians.  Dr. Merrens's use of the word

11   "dysfunction", which should be noted, as the Second Circuit has

12   already found, could be interpreted as a code word to refer

13   whistleblower and public policy reporting activity.

14         There has been testimony by Dr. Porter regarding her

15   reporting of what she believed were violations in the law, in

16   particular, her testimony regarding the transfer and

17   implantation of an embryo when she believed the transmission of

18   Zika virus was a known risk, her further testimony that Dr. Hsu

19   performed procedures on patients without obtaining informed

20   consent, and her testimony regarding her belief that there were

21   billing improprieties.

22         So, with respect to the New Hampshire claims, I find that

23   that is sufficient for that issue, the issues under those

24   claims to go to the jury.

25         With respect to the disability discrimination and

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 490 of 945
2217ccv000094kjd Document 35.23 Filed 04/23/25 Page 490 of 945

VOLUME: 8
PAGES: 432-646

1    retaliation claims under federal and state law, I'll just begin

2    with a brief statement of the law.  The ADA and Rehabilitation

3    Act prohibit covered employers from discriminating against

4    qualified individuals on account of disability.  The ADA

5    prohibits discrimination against a qualified individual on the

6    basis of disability with respect to the discharge of employees.

7        The Rehabilitation Act provides that no otherwise

8    qualified individual with a disability shall solely by reason

9    of her disability be excluded from participation in, be denied

10   benefits of, or be subjected to discrimination under any

11   program or activity receiving federal financial assistance.

12   And the ADA defines a qualified individual as a person who,

13   with or without a reasonable accommodation, can perform the

14   essential functions of the employment position that such

15   individual holds or desires.

16       And disability, I recognize, is not disputed here, but it

17   is defined as a physical or mental impairment that

18   substantially limits one or more of the major life activities

19   of such individuals or a record of such impairment or being

20   regarded as having such an impairment.  And the Second Circuit

21   has explained that the Rehabilitation Act uses essentially the

22   same definition and the Rehabilitation Act also uses the same

23   standards as those applicable to employment discrimination

24   claims under the ADA.

25       The ADA and the Rehabilitation Act require covered

(539 of 993), Page 539 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 491 of 945
22117cv00194kjd    Document 329 23    Filed 04/23/25    Page 491 of 945

538

VOLUME: 8
PAGES: 432-646

 1    employers to make reasonable accommodations to the known

 2    physical or mental limitation of an otherwise qualified

 3    individual with a disability who is an employee, unless the

 4    employer can demonstrate that the accommodation would impose an

 5    undue hardship on the operation of its business.  And

 6    reasonable accommodation may include reassignment to a vacant

 7    position, and, if there has been no showing of an undue

 8    hardship, the denial of a reasonable accommodation is

 9    prohibited discrimination.

10         So, with respect to the evidence related to this aspect of

11    the claims, Dr. Russell testified that Dr. Merrens convened a

12    meeting of the OB/GYN staff to explain the closing of the REI

13    division.  She testified that, when asked why Dr. Porter was

14    being terminated rather than retained, Dr. Merrens responded

15    that Dr. Porter was, quote, "on disability".  Dr. Porter

16    testified that, during the meeting when she was informed that

17    her employment was being terminated, Dr. Merrens told her

18    several times, "Stay on disability, Misty".

19         Also in evidence is a May 12th 2017 email exchange between

20    Nurse Victoria Maxfield and Dr. Merrens in which Nurse Maxfield

21    expresses her hope that, notwithstanding the closure of the REI

22    division, Dr. Porter could remain in some other capacity in the

23    gynecologic practice.  Dr. Merrens responded, "As you know, Dr.

24    Porter currently works at 20 percent of her time currently".

25         Also in evidence is a May 12th 2017 email exchange between

1     Dr. DeMars and Dr. Merrens in which Dr. Merrens seeks guidance

2     on how to answer inquiries about retaining Dr. Porter, despite

3     the closure of REI.  In that exchange, Dr. DeMars states that

4     those inquiring were, quote, "Remembering Misty as a full-time

5     employee wearing three hats and not the one who has been out

6     almost 18 months".

7          With respect to the evidence pertaining to the denial of a

8     reassignment accommodation, Dr. Porter testified that she

9     communicated with Dr. Merrens her interest in an OB/GYN

10    position that did not center on infertility.  There has been

11    testimony and email evidence recognizing Dr. Porter's skills as

12    a physician.  There was testimony from Dr. Padin that the

13    OB/GYN department, in June of 2017, sought permission to hire a

14    new gynecologist.  The May 2017 email from Nurse Maxfield to

15    Dr. Merrens advises of OB/GYN being short-staffed and that her

16    department was in the interviewing process.  Dr. Porter

17    testified that she communicated to Dr. Merrens her interest in

18    an OB/GYN position that was not focused on infertility.

19         And, as already mentioned, there are statements by

20    Dr. Merrens and Dr. DeMars in which Dr. Porter's disability is

21    referenced in the context of termination versus retention.  So,

22    given these items from the evidentiary record in this trial, I

23    think that is sufficient for the matter to go to the jury.

24    There is a sufficient evidentiary basis for a jury to find in

25    favorite of the nonmoving party.

(541 of 993), Page 541 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 493 of 945
2:17-cv-00194-kjd Document 329.23 Filed 04/25/25 Page 493 of 945

540

1        Finally, with respect to damages, the defendant's Rule 50

2    motion focuses on punitive damages.  With respect to punitive

3    damages, the law generally provides that punitive damages are

4    associated with conduct that is outrageous, and there must also

5    be a showing of malice which generally is outrageous conduct

6    that was deliberate and motivated by bad motive or ill will.

7        To the extent that the jury might find discrimination and

8    retaliation in this case, there is evidence in the trial record

9    from which a reasonable jury could find bad motive or ill will.

10   In particular, there is email evidence in which Dr. DeMars

11   expresses a desire for Dr. Porter to be terminated.  There is

12   an email from Dr. DeMars to Dr. Merrens in which she says that

13   people were remembering Dr. Porter as a person wearing 3 hats

14   and not someone who has been out for 18 months, as opposed to

15   the prior period when she was not disabled.

16       To the extent that the jury finds wrongful discharge,

17   there is evidence in the trial record from which a reasonable

18   jury could find outrageous conduct in that administrators were

19   aware of physician conduct that harmed patients and did not

20   take action to remedy it.  There is evidence that, evidence

21   that was discussed during this trial of Dr. Seifer's failure

22   being on her, meaning on Dr. DeMars, which is at least

23   suggestive that there could be a lack of incentive to remedy

24   the complaints that were lodged against Dr. Seifer.  And there

25   is evidence in the record of Dr. DeMars saying that her life

VOLUME: 8
PAGES: 432-646

1    would be easier if Dr. Porter lost her license.

2         So I think there is, assuming a finding of, of liability

3    on relevant claims, the evidence in the record is sufficient,

4    provides a sufficient evidentiary basis for reasonable jury to

5    resolve this issue in favor of the nonmoving party as well.

6    So, for all of these reasons, I'm going to deny defendant's

7    motion for judgment as a matter of law under Rule 50.

8         Mr. Vitt, before the defense presents its case, when I

9    bring the jury back in, for the record in front of the jury,

10    I'll ask you if there's any more witnesses to be called, and

11    you can establish that you don't have any further witnesses and

12    that you rest.

13         ATTORNEY VITT:  Thank you.

14         THE COURT:  And then I'll advise the jury of what

15    happens next, okay?

16         ATTORNEY VITT:  Thank you, Your Honor.

17         THE COURT:  All right.  Then we'll bring the jury in.

18              (The Jury enters the courtroom.)

19         THE COURT:  All right.  The plaintiff may call the

20    next witness, if they have one.

21         ATTORNEY VITT:  We have no further witnesses, Your

22    Honor.

23         THE COURT:  Okay.  Does the plaintiff rest?

24         ATTORNEY VITT:  We do rest.

25         THE COURT:  Okay.  So the plaintiff has rested, which

(543 of 993), Page 543 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 495 of 945
2:21-cv-00194-jdd  Document 329.23  Filed 04/23/25  Page 495 of 945
542

VOLUME: 8
PAGES: 432-646

1    means now the defendants will have an opportunity to present

2    their case.  Mr. Schroeder?

3              ATTORNEY SCHROEDER:  Thank you, Your Honor.  The

4    first witness for the defendants is Judy Stern, if I may go get

5    her from the lobby.  Thank you.

6              THE COURT:  Yes.

7                       JUDITH STERN,

8              having been duly sworn to tell the truth,

9                    testifies as follows:

10             COURTROOM DEPUTY:  Thank you.

11             ATTORNEY SCHROEDER:  May I proceed?

12             THE COURT:  Yes

13             DIRECT EXAMINATION BY ATTORNEY SCHROEDER

14   Q.   Good afternoon.  Dr. -- Ms. Stern, are you a doctor?

15   A.   A PhD doctor, yes.

16   Q.   Okay.  And you go by Dr. Stern?

17   A.   Yes.

18   Q.   And what is you PhD in?

19   A.   Zoology.

20   Q.   Okay.  Did you -- where are you currently employed?

21   A.   Right now?  I'm retired.

22   Q.   Congratulations.

23   A.   Thank you.

24   Q.   Were you employed at some point by Dartmouth Health?

25   A.   Yeah.  They were called Dartmouth-Hitchcock then and

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 496 of 945
2:17-cv-00194-kjd   Document 329-23   Filed 04/25/25   Page 496 of 945

VOLUME: 8
PAGES: 432-646

1    several other names in between, but, yes, I was employed by

2    them from 1984 until 2010, no, 2014, and then I transitioned

3    over to Dartmouth College and then back to Dartmouth Health

4    under a research job.

5    Q.    So, Dr. Stern, you were employed at Dartmouth Health or

6    Dartmouth-Hitchcock from 1984 to 2014 --

7    A.    Yeah.

8    Q.    -- correct?

9    A.    Yes.

10   Q.    Okay.  Make sure you verbalize your answers.

11   A.    Yes.

12   Q.    Okay, thank you.  And then you assumed employment at

13   Dartmouth College?

14   A.    Yeah.  I had a federal research grant, an NIH grant.  I

15   was the principal investigator on that grant.  I was a faculty

16   member at Dartmouth all along through my medical employment at

17   Dartmouth Health, and, when I retired from running the

18   laboratory at Dartmouth Health, I transitioned over to college

19   employment being paid under that grant that I had.  And then,

20   because of complications between Dartmouth and Dartmouth

21   Health, they moved me back to Dartmouth Health, but that was

22   something they did to everybody in the clinical departments who

23   was a researcher.

24   Q.    Okay.  So let's focus just to differentiate the two stints

25   that you had.  So the first stint that you had with Dartmouth

(545 of 993), Page 545 of 993

1   Health was about 20 years, correct?

2   A.   Yeah, it was longer than that, but --

3   Q.   Actually, no.  You know what?  It's my math.

4   A.   Yeah.

5   Q.   Lawyer math. 30 years?

6   A.   30 years.

7   Q.   30 years.  Sorry.  Short-changing you there.

8   A.   Yeah.

9   Q.   30 years --

10  A.   Um-hum.

11  Q.   -- at Dartmouth Health.  And what was your last role

12  there?

13  A.   My first and last role there was as director of the human

14  embryology and embryology, human embryology and andrology

15  laboratory, which was the laboratory that performed in vitro

16  fertilization.  If you want me to explain what embryology and

17  andrology are, I could do that quickly.

18  Q.   Okay.  Well, let's hold on.  Hold on.  Let's, one step at

19  a time here.  The, you were the director of embryology and

20  andrology, correct?

21  A.   Yes, of the laboratory.

22  Q.   Of the laboratory?

23  A.   The laboratory.

24  Q.   And did that become known as the IVF lab at some point?

25  A.   Well, it was the IVF Lab initially.  We changed the name

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 498 of 945

1    to the human embryology and andrology early on because there

2    were other IVF labs in the northeast that were starting, and we

3    wanted to differentiate ourselves, but basically that's what it

4    was was the IVF lab.

5    Q.   Okay, thank you.  Was it generally known by everyone as

6    the IVF lab --

7    A.   Yeah, yeah.

8    Q.   -- internally?

9    A.   Yeah.

10   Q.   Okay.  And what were your duties as the director of

11   embryology and andrology?

12   A.   So that laboratory is the laboratory that grows the

13   embryos in culture.  We prepare the sperm samples for

14   inseminating the eggs when they first come out of the patient.

15   We did embryo freezing.  We did a variety of things like that.

16   Part of running that laboratory involved quality control work

17   within the laboratory, making sure all the conditions in the

18   lab were appropriate for growing the embryos and making sure

19   that, that our protocols and procedures were written and

20   functional and doing what they needed to do.

21   Q.   And, in terms of the work that you were doing, you had

22   that same title throughout your employment, correct?

23   A.   Um-hum.

24   Q.   You need to say --

25   A.   Yes.

(547 of 993), Page 547 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 499 of 945
2217-cv-00094-kjd Document 329-23 Filed 04/25/25 Page 499 of 945

```
 1    Q.   With respect to other divisions that you worked with,
 2    could you identify which divisions you would work with under
 3    the OB/GYN --
 4    A.   Well --
 5    Q.   -- umbrella?
 6    A.   I worked with the REI division, the reproductive
 7    endocrinology and infertility division.  That's the, the
 8    laboratory was part of that division.  The IVF program involves
 9    physicians, laboratory, nurses, and secretaries and a whole
10    variety of different people that are part of that division.
11    That was the division I worked with all along.
12         We occasionally did some work for somebody else.  For
13    example, we occasionally did work for urologists who wanted to
14    get sperm frozen for a patient who was, might lose his
15    fertility, something like that.  So we would do sperm freezing
16    for those people, but most of the work involved the REI
17    division of the OB/GYN department.
18    Q.   Okay.  And let me just focus on that.  Your work with the
19    REI division, was that on a regular, routine basis, on a daily
20    basis?
21    A.   Yes.
22    Q.   Okay.  And, in terms of the different roles and the
23    different actors or players, if you will, that have to interact
24    with each other to assist in helping a patient become pregnant,
25    who are all the players there?  So first explain the IVF lab
```

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 500 of 945
2:17-cv-00944-kjd   Document 329-23   Filed 04/23/25   Page 500 of 945

1    people that work there and then help the jury understand who

2    they interact with within the REI division.

3    A.   Okay.  I think it might be easier to start with the

4    physicians as opposed to the laboratory.

5    Q.   Whatever works.

6    A.   The physicians see the patients.  They do a preliminary

7    testing with those patients.

8    Q.   The REI physicians?

9    A.   The REI physicians.

10   Q.   Just so that the jury understands.

11   A.   Yes.  And then a diagnosis is made, infertility diagnosis

12   of some sort.  There is an assessment of what procedures will

13   work for that patient.  At that point, not only is the woman

14   evaluated, but the husband is evaluated.  So that's where the

15   lab starts to come in.  We do semen analysis and determine

16   whether or not the sperm are appropriate for fertilization to

17   occur and so forth.

18       At that point, once the patient has gone through those

19   preliminaries, there is a determination of what needs to be

20   done to help them achieve a pregnancy, and that can be a

21   variety of different things.  The laboratory is involved, was

22   involved with several different procedures.  One is called

23   intrauterine insemination, which involved preparation of the

24   sperm to be put within a woman's uterus.  This is not the same

25   as IVF.  This is, this is a simpler procedure in which the

(549 of 993), Page 549 of 993

1    sperm are just placed within the uterus, or the womb, of that

2    woman to help her achieve pregnancy.

3        If those things don't work, or there's other procedures as

4    well, but, if the preliminary procedures don't work, then the

5    patient often goes on to IVF, and the IVF procedure involves

6    providing hormonal supplementation for this woman so that she

7    can make multiple eggs.  The eggs are then retrieved from that

8    woman.  When the eggs are retrieved, they come into the

9    laboratory, and that's where the laboratory is most involved.

10       We collect, we collect the fluids that are retrieved

11   during that regular egg retrieval procedure.  She, once the

12   fluids come into the lab, the lab assess those fluids to find

13   the eggs, and, once we find the eggs, there's a variety of

14   things we could do with them.  One might be adding the sperm

15   directly to the eggs.  Another might be intracytoplasmic sperm

16   injection, which is a procedure where we take the egg and we

17   pick up a sperm and inject it directly into the egg.  You've

18   probably seen pictures of this on TV.  And that, these

19   procedures are to help get fertilization to occur.

20       Once fertilization occurs, the laboratory is involved with

21   maintaining those eggs in culture or those now embryos in

22   culture and growing them for several days.  And, when they're

23   ready to be transferred back to the woman, the laboratory

24   personnel pick them up into the catheter and pass them to the

25   physician who then puts them back into the patient to hopefully

(550 of 993), Page 550 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 502 of 945
2217cv000594kjd  Document 329.23  Filed 04/25/25  Page 502 of 945

549

VOLUME: 8
PAGES: 432-646

1    achieve a pregnancy.

2        So that's the IVF procedure, and these procedures all

3    involve a variety of staff.  So there's always the physicians,

4    the laboratory, nursing staff.  Anesthesiology was involved

5    with the retrieval procedures.  So there's a variety of

6    personnel.

7    Q.   So there's a variety of different groups from different

8    parts --

9    A.   Yeah.

10   Q.   -- of Dartmouth health involved?

11   A.   Yeah, sort of, yes.

12   Q.   Well, you say "sort of".

13   A.   Well, it's, most of the people involved were involved from

14   the REI division.  We did, for a retrieval and an

15   anesthesiologist would be necessary.  So there are a few

16   additional people that are brought in, but the majority of the

17   personnel involved with these procedures are REI division

18   personnel.

19   Q.   Right.  And that's part, and that includes the IVF lab?

20   A.   Yes.

21   Q.   And in the IVF lab how many employees were under your

22   direct or indirect supervision?

23   A.   Well, during the course of that timeframe, somewhere

24   between one and four at various points in time.

25   Q.   Toward the end of your stint there, was it more than --

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 503 of 945
2:17-cv-00194-kjd   Document 329-23   Filed 04/23/25   Page 503 of 945

1    A.    Yes.

2    Q.    Okay.  Closer to four?

3    A.    Yeah.

4    Q.    And how important is it that all of these players from

5    either the IVF lab, the REI physicians all work together

6    closely?

7    A.    It's critically important that the staff from these

8    different parts of the unit work together and work together

9    well.  One of the things that came out very early when IVF

10   first began is that people started to realize that this

11   procedure is a little bit different than your standard medical

12   procedure.  In most situations, a physician works alone.  They

13   see the patient.  They deal with the patient.  And they might

14   have a nurse with them, but it's, it's a sort of simple

15   straight line from the initial encounter to the, to the later

16   treatment.

17        IVF is a little more complicated.  First of all, it

18   involves people like me, a PhD trained very differently than

19   the physicians and the lab staff, and people realized early on

20   that this was a different dynamic, and one of the things that's

21   needed in a situation like that is a lot of coordination

22   between the different groups.  And there are multiple

23   appointments the patient needs to have.  There is a lot of

24   coordination between the different groups, making sure

25   everybody is in the right place at the right time, making sure

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 504 of 945
2:17-cv-00194-kjd   Document 329.23   Filed 04/28/25   Page 504 of 945

551

VOLUME: 8
PAGES: 432-646

1    that all of these individuals are working together to do the

2    best job for the patient.

3    Q.    Okay.  With respect to the REI division, and I want to

4    focus more in the 2010 forward timeframe, okay?  Do you recall

5    team meetings occurring on a regular basis?

6    A.    Team meetings occurred on a regular basis all the time,

7    yes, even from early on.

8    Q.    Okay.  And I want to focus more into 2010 forward, Just

9    for purposes of my discussion of questions.

10   A.    Okay.  Um-hum.

11   Q.    You would have regular team meetings in the REI division?

12   A.    Yes.

13   Q.    And was the expectation that the REI physicians, the REI

14   nurses, the REI staff, as well as the members of the IVF lab

15   met in those meetings?

16   A.    Yes.

17   Q.    Okay.  And, at some point during this timeframe, was

18   Richard Reindollar the head, the chair of the OB/GYN

19   department?

20   A.    Yes.  He was the chair of the OB/GYN department.  He was

21   also an REI physician who had come to us from Boston IVF, which

22   is a huge program down in the Boston area.  They do about 1,000

23   procedures a year, and he had a lot of experience and was a

24   part of our division, and he was part of our meetings, yes.

25   Q.    Okay.  So, in addition to being the chair of the OB/GYN

(553 of 993), Page 553 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 505 of 945
2217:cv00944kjd    Document 329.23    Filed 04/23/23    Page 505 of 945

552

VOLUME: 8
PAGES: 432-646

1    department, Dr. Reindollar's expertise was actually in REI?

2    A.    Yes.

3    Q.    Okay.  And he attended these regular team meetings?

4    A.    Most of the time, not all the time.

5    Q.    Okay.  And did -- and the plaintiff in this case is

6    Dr. Misty Porter.  Do you know her?

7    A.    Yes, yes.

8    Q.    And was she part of the REI division at this time?

9    A.    She was part of the REI division at that time, yes.

10   Q.    And, in terms of Dr. Porter, and did you have regular

11   interaction with Dr. Porter during that time?

12   A.    Yes.

13   Q.    And how would you describe Dr. Porter's style or

14   communications?

15   A.    Dr. Porter is not a team player.

16   Q.    What do you mean by that?

17   A.    The team meetings, the goal of the meetings was to get

18   everyone together to talk about the patients coming up, to talk

19   about what things might be improved in the unit, what things

20   weren't working.  Dr. Porter's style was, I want it to be done

21   my way, and that caused, that caused a lot of problems for the

22   unit over time, a lot of frustration for me, I have to say, and

23   a lot of, a lot of difficulty, interactive difficulty between

24   the different people involved.

25   Q.    And did you experience that frustration and difficulty in

553

VOLUME: 8
PAGES: 432-646

1    those team meetings?

2    A.   Oh, yes, yes.

3    Q.   In what ways?

4    A.   There were, there were numerous situations, numerous times

5    when I wanted something done a particular way, and we never got

6    there.  I can give you an example of a --

7    Q.   Hold on a second.  Hold on.

8    A.   Yeah, yeah.

9    Q.   Slow down.  We're not in a rush here.

10   A.   Yeah, okay.

11   Q.   We, I want to ask you about an example of where there was

12   some conflict that you experienced or you were part of

13   involving Dr. Porter.

14   A.   The kinds of, the kinds of situations would be, and I'm

15   not -- this was a long time ago, so I'm not going to remember

16   certain specifics, but I know that there were numerous

17   situations in which, in which we needed to discuss something,

18   we needed to get something worked out amongst ourselves, and we

19   just never got there.  We just never got those things done.  We

20   never got them finished because that was not what she wanted to

21   do.  And I'm sorry to say it that way, but that's --

22   Q.   Okay.

23   A.   That's what happened.

24   Q.   And did that continue through the years that --

25   A.   Yes.

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 507 of 945
2:17-cv-00194-kjd   Document 329-3   Filed 04/23/25   Page 507 of 945

VOLUME: 8
PAGES: 432-646

1    Q.   You have to wait until I finish the question.

2    A.   Okay.

3    Q.   Did that happen throughout your employment as the director

4    of the IVF lab?

5    A.   Yes.

6    Q.   Okay.  And, in terms of, We never got there, we never

7    accomplished this or that, and then you said she, and what I'm

8    -- hold on.  What I'm trying to understand is, What was the --

9    who were you talking about, first of all?

10   A.   So I should -- Dr. Porter and I worked okay together.  We

11   did things.  There were times when we made changes.  There were

12   times when we did things that, that improved and changed the

13   program and so forth, but it wasn't a consistent thing that

14   could be counted on.  Because, if she wanted to do something,

15   if Dr. Porter wanted to do something a particular way, Dr.

16   Porter did it Dr. Porter's way.  And that was regardless of my

17   opinion or the opinion of other physicians in the division,

18   including Dr. Reindollar, and there were a number of other

19   physicians over the years.

20   Q.   Well, I want to ask you about that.  The other -- do you

21   recall any conflicts between Dr. Reindollar and Dr. Porter,

22   either at these team meetings or in conjunction with the

23   normal, everyday REI division work?

24   A.   The main -- there's one particular incident that I

25   remember very clearly that happened.

(556 of 993), Page 556 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 508 of 945
2217-cv-00194-kjd    Document 329    Filed 04/23/25    Page 508 of 945

1    Q.    And what was that incident?

2    A.    And that incident involved a meeting which was not a full

3    team meeting.  It was a meeting that included the physicians in

4    the department, and, at the time, it was Dr. Mangianello,

5    Dr. Reindollar, Dr. Porter, Dr. Mahoot and Dr. Ulal, as well as

6    Dr. Nadia, I believe -- I believe he was there -- who was a

7    urologist that worked with us, dealt with the male infertility,

8    and myself.

9         And we were in a meeting, and the goal of that meeting was

10    -- Dr. Reindollar had called the meeting, if I recall

11    correctly.  He wanted everybody in the unit to use a particular

12    intake form, the physicians in particular, the REI physicians

13    in particular, to use a particular intake form that he had.  It

14    was modified some from what he had used at Boston IVF.

15    Q.    What was the purpose of having this intake form?

16    A.    The purpose of the intake form, when, with that number of

17    physicians in the department, and we had a number of them at,

18    you know, at the time, obviously, it's always possible that the

19    person who initially saw the patient was not the person who did

20    the egg retrieval or was not the person who did the transfer or

21    had some reason to interact with the, with the patient at

22    another time during their cycle that was an emergency, and that

23    was the person and there was a different person on call or

24    something.

25         So what was very important was that information be

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 509 of 945
2:17-cv-00194-kjd   Document 329-23   Filed 04/23/25   Page 509 of 945

1   conveyed from one physician clearly to another so that they all

2   were on the same page when something happened and everybody

3   would know how to deal with the patient that they were treating

4   at that particular moment.  So the goal of this form was to

5   have a structured form that everybody used that was the same

6   for everybody that would make it easy for the other physicians

7   to know what was going on with that patient and that, that way,

8   they wouldn't have to go through the chart, either the physical

9   chart and look things up on paper, or even the medical record,

10   the, the electronic medical record, which can be sometimes

11   rather obtuse to find things in.  And this would be an easier

12   way to do it.

13        And we, we had this meeting that Dr. Reindollar called.

14   There had already been some conflict in the department at this

15   point.

16   Q.   What conflict are you talking about?

17   A.   Well, there had been conflict at other meetings.  There

18   had been conflict between -- I don't know the specifics of it,

19   but there had been conflict between the physicians, and so he

20   called this meeting, in part, because of this.

21   Q.   I know you don't know the specifics.  Did that conflict,

22   were you aware of whether or not that conflict with the other

23   physicians involved Dr. Porter and those other physicians?

24   A.   Yes.

25   Q.   Okay.  We're just going to go to this meeting now.  What

VOLUME: 8
PAGES: 432-646

1    happened at that meeting?

2    A.    So Dr. Reindollar presented the form, and Dr. Porter said,

3    "I will not use that form", and that was the end of the

4    meeting.  Everybody's mouth kind of dropped open, and that was

5    the end of the meeting.

6    Q.    So that kind of interaction or tension, did that happen on

7    other occasions with Dr. Porter?

8    A.    I don't think it happened quite that dramatically any

9    other time that I can recall.  I think that's why it stuck in

10   my head, because it was so dramatic.  But there was conflict

11   often, and there was conflict between various members of the

12   team often.

13   Q.    I want to focus just on Dr. Porter and any other

14   physicians.  So there were a number of other physicians, you

15   said, Sophie --

16   A.    Sophia Ulal.

17   Q.    Sophia Ulal and Neil --

18   A.    Neil Mahoot.

19   Q.    Okay.  Are you aware of whether or not Dr. Porter had

20   conflicts with those physicians?

21   A.    I am indirectly aware of that because Dr. --

22           ATTORNEY JONES:  Objection.

23           THE WITNESS:  -- Mahoot in particular talked to me.

24           ATTORNEY JONES:  Your Honor, she's getting into

25   hearsay.

VOLUME: 8
PAGES: 432-646

1          THE COURT:  Well, I don't know yet, but, I guess,

2     sustained.  Maybe you could rephrase the question.

3     BY ATTORNEY SCHROEDER:

4     Q.   Were you aware -- I just want to -- just listen to the

5     question.  Were you aware of instances where Dr. Porter had

6     conflict with other physicians in the REI division?

7     A.   I remember another conflict that, that happened in that

8     division about transfer, about the embryo transfer, which is

9     where you take the embryos and put them back into the uterus.

10    Q.   Did you have -- did it involve Dr. Porter?

11    A.   It involved Dr. Porter.

12    Q.   What was the nature of that conflict?

13    A.   The, Dr. Reindollar did the embryo transfers for some

14    patients differently from the way Dr. Porter did them, and what

15    he did was --

16    Q.   A different technique?

17    A.   He, when you do the embryo transfer, there's a catheter,

18    and there's, the catheter involves two pieces.  There's an

19    outer catheter which is called the stylet which is a sort of

20    more rigid catheter to help, and what that catheter does it is

21    it helps move the catheter through the cervix, through the

22    opening into the uterus so that you can thread it through the

23    cervix easily so that the embryos can be placed in the uterus.

24    The inner catheter is a very flexible catheter, and that's the

25    catheter that we actually put the embryos into.  The one

1    catheter would be inserted into the other.

2        Dr. Porter did all of her embryo transfers with the

3    stylet, and Dr. Reindollar didn't, and she did not, Dr. Porter

4    was not happy with that.  She was not willing to try anything

5    else, and there was a certain amount of conflict.  She felt he

6    was doing it wrong doing it that way.

7    Q.  Now, prior to that time, Dr. Reindollar was at Boston IVF?

8    A.  Um-hum.  Yes.

9    Q.  Okay.  And his specialty, actually, his subspecialty was

10   REI?

11   A.  Yes.

12   Q.  And was he the, was he the de facto division director

13   because of being the chair of the OB/GYN but also the

14   subspecialty, or was there somebody else, if you know?

15   A.  I don't, I don't remember.  I think he called himself the

16   REI director, but I don't remember whether that's --

17   Q.  Either way, he was --

18   A.  -- the structure.  He was still the chair of the

19   department.

20   Q.  Okay.

21   A.  Yes.

22   Q.  And was it your testimony that Dr. Porter did not agree

23   with the technique and style of Dr. Reindollar?

24   A.  Yes.

25   Q.  Okay.  And did she voice that criticism?

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 513 of 945
2:17-cv-00194-kjd    Document 329-23    Filed 04/25/22    Page 513 of 945

560

VOLUME: 8
PAGES: 432-646

1   A.   Yes.

2   Q.   Okay.  More than once?

3   A.   I'm sure.

4   Q.   Okay, okay.  And, in terms of conflict between

5   Dr. Reindollar and Dr. Porter, are you aware of an occasion

6   where facilitators were brought in to deal with the dynamics of

7   the REI division?

8   A.   Yes.  There was an outside consulting company that was

9   brought in.  Actually, at the meeting that I told you about

10  with the, with the form, we had a Dartmouth-Hitchcock

11  facilitator at the meeting, and she left.  She got actually

12  quite upset with what happened at that meeting, felt she

13  couldn't handle it because it was such direct conflict.  But we

14  had brought in a, Hitchcock had brought in a consulting team

15  before that.

16  Q.   And what was the purpose of bringing the consulting team,

17  if you know?

18  A.   To deal with the problems within the division, the

19  problems being clear conflict that was going on and to figure

20  out what that conflict was about.

21  Q.   And what did you believe the conflict was about?

22  A.   I thought it was the fact that Dr. Porter would not give

23  in to any of the other opinions of any of the other physicians.

24  Q.   Okay.  Now, fast forward a little bit here to when you are

25  now in a research position.  There comes a period of time where

VOLUME: 8
PAGES: 432-646

1    you then became reaffiliated with Dartmouth Health after --

2    A.    Yeah.

3    Q.    -- no longer being at the IVF lab, correct?

4    A.    Yes.  I wasn't at the IVF lab, but I was in the department

5    of OB/GYN the whole time.  It's just an administrative thing as

6    to which entity I was working for.

7    Q.    Understood.

8    A.    I don't want to confuse things with that, but --

9    Q.    Okay, that's fine.  But, and did you become aware of

10   criticisms or conflict that Dr. Porter had with some of the

11   newer physicians like Dr. Hsu?

12   A.    I knew that there was conflict there, yes.

13   Q.    Right.  Were you working with Dr. Hsu at some point on

14   research?

15   A.    Yes.  Dr. Hsu had actually gotten a grant from NIH, not

16   from NIH, I'm sorry, from the American Society for Reproductive

17   Medicine, to do a research project.  He worked with me a little

18   bit in writing that grant.  He asked for my help in mentorship

19   in doing the work on that grant, and so I was working with him

20   on that project at that point.

21   Q.    And did you encounter or understand that Dr. Porter had

22   critical comments about Dr. Hsu's technique and skills?  Did

23   you become aware of that?

24   A.    I became aware of that.  I mean, I don't want to get into

25   the hearsay thing.

VOLUME: 8
PAGES: 432-646

 1    Q.    Well, I just want to know.  Just answer the question.

 2    A.    Yes.

 3    Q.    Did you become aware of it?

 4    A.    Yes, I was aware of it.

 5    Q.    And you were working with Dr. Hsu on a regular basis on

 6    these research issues?

 7    A.    Yes.

 8    Q.    Okay.  And did you understand, upon becoming aware of it,

 9    that Dr. Porter had criticisms of Dr. Hsu's skills and

10    performance and technique?

11    A.    Yes.

12    Q.    Court's indulgence.  I don't have a question right now,

13    but did you want to finish an answer there?

14    A.    I just wanted to say that Dr. Porter had criticisms of all

15    the physicians in the division.

16    Q.    Was that your experience throughout the time?

17    A.    That was my experience throughout the time.  She also had

18    a lot of criticisms about the nursing staff, often about some

19    of my lab staff, they didn't do things the way she thought I

20    would have done them.

21    Q.    And she would bring those to your attention?

22    A.    The lab staff stuff, absolutely.

23    Q.    Okay.

24    A.    Yes.

25                ATTORNEY SCHROEDER:  Thank you.  If I may have one

(564 of 993), Page 564 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 516 of 945
2:17-cv-00144-jdd Document 329-23 Filed 04/23/25 Page 132 of 945

563

VOLUME: 8
PAGES: 432-646

1    second, Your Honor?

2                THE COURT:  Yes.

3                ATTORNEY SCHROEDER:  Nothing further at this time,

4    Your Honor.

5                THE COURT:  Okay.  Cross-examination?

6                    CROSS-EXAMINATION BY ATTORNEY JONES

7    Q.   Dr. Stern, good afternoon.

8    A.   Good afternoon.

9    Q.   My name is Eric Jones, and I'll ask you some questions

10   this afternoon.  If I understood your testimony, your first

11   stint running the lab for the hospital ended in 2014; is that

12   right?

13   A.   Yes.

14   Q.   And Dr. Hsu was relatively new at that time, right?

15   A.   Yes.

16   Q.   And that was before Dr. Seifer arrived, correct?

17   A.   Yes.  I was still in the division when Dr. Seifer arrived,

18   though.

19   Q.   Okay.  Well, he arrived in 2016, right?

20   A.   Maybe that's -- I don't know.  I do know that I

21   interviewed him.

22   Q.   If the evidence in the case is that he started in 2016,

23   you would have been over at Dartmouth College, right?

24   A.   Yeah.  Although I was sitting in, you know, still in the

25   OB/GYN area.  I mean, I was still around, yes.

(565 of 993), Page 565 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 517 of 945
2217cv00194kjd    Document 3923    Filed 04/23/25    Page 517 of 945

564

VOLUME: 8
PAGES: 432-646

1   Q.   Okay.  That, in your role running the lab, you were not in

2   the procedure room when the physicians performed, like, egg

3   retrieval, for example, right?

4   A.   The way, the way the, the unit was set up, the procedure

5   room here, the laboratory with an open door was right there.

6   So we weren't, technically speaking, in the same room, but we

7   were in the same space.

8   Q.   Okay.  But, during a procedure, you were not in the room

9   when an egg retrieval was being done, correct?

10  A.   Yes, that's correct.

11  Q.   Okay.  And that's also true of embryo transplants,

12  correct, or transfers?

13  A.   Sometimes we would walk into the embryo transfer room and

14  actually press the plunger of the, of the stylet, of the

15  catheter to push the embryos in.  It depended on the, whether

16  the physician wanted us to do that.  Some did, and some didn't.

17  Q.   Okay.  And, if it was a physician who wanted you to do

18  that, you'd come in for that brief moment?

19  A.   Yes.

20  Q.   And then leave, correct?  So you would -- I'm sorry.

21  Correct?

22  A.   Yes, correct.

23            ATTORNEY SCHROEDER:  If you could just let her answer

24  the question.

25  BY ATTORNEY JONES:

(566 of 993), Page 566 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 518 of 945
2:17-cv-00944-kjd    Document 329-23    Filed 04/25/25    Page 518 of 945

565

VOLUME: 8
PAGES: 432-646

1    Q.    I thought I did.  But my point is, if, like, for example,

2    if Dr. Hsu was performing a procedure, you were not in the room

3    for the entirety of the procedure, correct?

4    A.    As I said, I wasn't specifically in that room, but I would

5    be in the adjoining room with the door open so that --

6    Q.    I understand.

7    A.    Yes.

8    Q.    You do not --

9    A.    Correct.  I was not standing next to the, next to her or

10    next to the physician.

11    Q.    Let me try this.  Can we try to answer yes-or-no, confine

12    it to yes-or-no questions?

13          THE COURT:  Before you ask you question, let me just

14    say, please, you have to let the attorney ask the question

15    fully, and, Mr. Jones, let the Witness answer fully before you

16    ask a question.

17    BY ATTORNEY JONES:

18    Q.    I apologize.  Isn't it true that you do not have direct

19    personal knowledge of Dr. Hsu's skills performing egg

20    retrievals because you were not in the room when he did them?

21    A.    Correct.

22    Q.    And the same thing with regard to embryo transfers,

23    correct?

24    A.    Correct.

25    Q.    Okay.  And, for the same reason, you do not have a basis

1   upon which to judge Dr. Hsu's skills, correct?

2   A.   Technically correct, yeah.

3   Q.   Okay.  If there was patient harm occurring in the

4   procedure room and you weren't in the room, you wouldn't know

5   about it, correct?

6   A.   Until afterwards.

7         ATTORNEY SCHROEDER:  Objection, Your Honor.  Calls

8   for speculation.

9         THE COURT:  What was the question, Mr. Jones?

10         ATTORNEY JONES:  I said, if a patient was harmed

11   during a procedure, she wouldn't know because she was not in

12   the room.

13         THE COURT:  I'll let her answer that.  Objection

14   overruled.

15   BY ATTORNEY JONES:

16   Q.   You wouldn't know that, right?

17   A.   I wouldn't know that at the time.

18   Q.   Would you consider yourself close to Dr. Reindollar at the

19   time?

20   A.   No.

21   Q.   You worked closely with him when he was working in the

22   department?

23   A.   He was working in the department, and I worked with him,

24   and I worked well with him.  I don't know what you mean by

25   close, I guess, is the truth.

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 520 of 945
2:17-cv-00194-kjd   Document 329-23   Filed 04/23/20   Page 568 of 945

VOLUME: 8
PAGES: 432-646

1    Q.   You were aware of his views of Dr. Porter?

2    A.   At the time, no.

3    Q.   Okay.  Later?

4    A.   Later, yes.

5    Q.   Okay.  Not favorable, right?

6    A.   Correct.

7    Q.   Okay.  With regard to this big conflict at the meeting

8    about the intake form, isn't it true the department already had

9    an intake form and the department was transitioning to

10   computer-based intake?

11   A.   Part of the, part of the objective of that form, as I

12   understand it, was to have an easy way of facilitating the

13   computer intake if the computer was not available immediately.

14   Q.   But, yes or no, isn't it true that the department already

15   had an intake form that did that?

16   A.   Not an intake form that was as comprehensive as the one

17   that was presented.

18   Q.   Okay.  You know, with regard to this other conflict you

19   mentioned about a difference between Dr. Reindollar and Dr.

20   Porter in terms of their methodology for embryo transfers,

21   there was testimony in the case that, from Dr. DeMars, that

22   different doctors have different ways of doing things, and

23   that's okay.

24        Understanding that, isn't it true that the conflict

25   between Dr. Reindollar and Dr. Porter was that Dr. Reindollar

(569 of 993), Page 569 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 521 of 945
2:17-cv-00944-jdd    Document 329-23    Filed 04/23/25    Page 521 of 945

568

VOLUME: 8
PAGES: 432-646

1    was insisting that Dr. Porter do it his way?

2    A.   I think he was suggesting that Dr. Porter do it his way,

3    and what happened was she wouldn't.

4    Q.   Okay.  She had her own way of doing it, correct?  Yes or

5    no?

6    A.   I assume so.

7    Q.   Okay.  Now, with regard to this situation where an outside

8    facilitator had to come help mediate with the conflict, you

9    said you thought that that was, that the reason for that was

10   that Dr. Porter just wasn't going along or playing along well,

11   something like that.  Were you aware --

12           ATTORNEY SCHROEDER:  Objection, Your Honor.  He's

13   making a comment about her testimony.  If he has a question,

14   that's fine.

15           THE COURT:  All right.  Sustained.  Ask the next

16   question, Mr. Jones.

17   BY ATTORNEY JONES:

18   Q.   With regard to the outside company having to come in to

19   mediate, what's your understanding of how that conflict arose?

20   A.   I think there was ongoing conflict within the division,

21   and, after discussion of that conflict with leadership,

22   leadership decided to bring in a consulting company.

23   Q.   Okay.  Do you know whether or not REI nurses had

24   complained to human resources about Dr. Reinhart --

25   A.   Reindollar.

(570 of 993), Page 570 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 522 of 945
2:17-cv-00944-kjd Document 329-3 Filed 04/26/23 Page 138 of 245

569

VOLUME: 8
PAGES: 432-646

1    Q.   -- Reindollar's behavior that they thought was abusive and

2    harassing?

3    A.   I have no recollection of that, nor do I have any

4    recollection of Dr. Reindollar being harassing.

5    Q.   Okay.  But you don't, you have no knowledge that these

6    complaints were made to HR?

7    A.   No.

8    Q.   Okay.  And do you have any knowledge about any complaints

9    that Beth Todd may have had about Dr. Reindollar?

10   A.   No.

11   Q.   Okay.  So, well, one last question.  Did you meet with

12   Dartmouth Health's counsel to prepare for your testimony today?

13   A.   Very briefly.

14              ATTORNEY JONES:  Okay.  No further questions.

15              THE COURT:  Any redirect?

16              ATTORNEY SCHROEDER:  No questions, Your Honor.

17              THE COURT:  Okay.  Dr. Stern, you may step down.

18              ATTORNEY SCHROEDER:  Next witness, Your Honor, if I

19   may escort Dr. Stern out, is Kathleen Mansfield.

20                        KATHLEEN MANSFIELD,

21              having been duly sworn to tell the truth,

22                   testifies as follows:

23              ATTORNEY SCHROEDER:  May I proceed, Your Honor?

24              THE COURT:  Yes.

25

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 523 of 945
2:17-cv-00194-kjd   Document 329-23   Filed 04/25/25   Page 523 of 945

VOLUME: 8
PAGES: 432-646

```
 1              DIRECT EXAMINATION BY ATTORNEY SCHROEDER

 2    Q.    Thank you.  Good afternoon.

 3    A.    Good afternoon.

 4    Q.    Do me a favor, Ms. Mansfield, if you could bring that a

 5    little bit closer, not all the way.  That's fine.

 6    A.    Okay.  Better?

 7    Q.    Thank you.  Ms. Mansfield, where you are you currently

 8    employed?

 9    A.    Dartmouth-Hitchcock.

10    Q.    And how long have you been employed by

11    Dartmouth-Hitchcock?

12    A.    30 years.

13    Q.    Okay.  Is it okay if I use Dartmouth Health?

14    A.    Sure.  Sorry.  Yes, Dartmouth Health.

15    Q.    Same entity?

16    A.    Yes.

17    Q.    Okay.  And you've been there 30 years?

18    A.    Correct.

19    Q.    And currently, just currently, in what capacity are you

20    employed by Dartmouth Health?

21    A.    I am currently a case manager for hematology, oncology,

22    and medicine services.

23    Q.    Okay.  That's a rather long title.  When did you take on

24    that position?

25    A.    December of 2019.
```

VOLUME: 8
PAGES: 432-646

1    Q.   And, just briefly, what does that job entail?

2    A.   I help patients get discharged from the hospital, whether

3    it's rehabs, visiting nurses, medical equipment, gathering

4    guardianships or long-term care, Medicaid to get them placed

5    for long-term care.

6    Q.   And, prior to 2019 when you were employed by Dartmouth

7    Health, what position were you employed in?

8    A.   I was the nurse manager in the OB/GYN department.

9    Q.   And, as the nurse manager in the OB/GYN department, how

10   long were you in that position?

11   A.   About five years, from 2014 to 2019.

12   Q.   Okay.  Do you recall the time period roughly -- and I

13   realize this is now eleven years ago -- what time of the year

14   you joined the OB/GYN department the nurse manager?

15   A.   In 2014, I think it was, around May, but I can't honestly

16   remember the date.

17   Q.   Sometime in that time period?

18   A.   Yes.

19   Q.   Okay.  Just briefly, before I ask you a few more questions

20   about that specific time period, could you just tell the jury a

21   little bit about yourself?  Where did you go to school?

22   A.   I went to college at University of New Hampshire, got my

23   bachelors in nursing in 1995, and then I went to Plymouth State

24   University and got a masters in business administration in

25   2004.

(573 of 993), Page 573 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 525 of 945
2:17-cv-00494-kjd   Document 329.23   Filed 04/25/25   Page 125 of 2945
572

1   Q.   Okay.  And did you assume employment with Dartmouth Health
2   at that point?
3   A.   No.  I had started in 1994 as a licensed nursing assistant
4   and worked on weekends while I attend school at UNH.
5   Q.   Okay.  And then, after you graduated from UNH, did you
6   assume full-time employment at Dartmouth Health?
7   A.   Yes, I did.
8   Q.   Okay.  And then, at some point, you got your MBA from
9   Plymouth State in 2004?
10  A.   Yes.
11  Q.   And, when you worked -- prior to being in management, if
12  you will, were you a nurse?
13  A.   Yes, I was.
14  Q.   And performing nurse duties?
15  A.   Correct.
16  Q.   And what department or division were you in at Dartmouth
17  Health?
18  A.   Prior to OB/GYN, I was a liver, kidney, pancreas
19  transplant coordinator.  I did that for about five or six
20  years.  Prior to that I was on 4 West, which is a surgical
21  floor, taking care of surgery patients post-op, and before that
22  I was a dialysis nurse as an RN.
23  Q.   Okay.  Kind of a wide range of areas you were in?
24  A.   Yes.
25  Q.   And then, and then you got promoted to the nurse manager

(574 of 993), Page 574 of 993

1   role in mid-2014?

2   A.   Correct, correct, yes.

3   Q.   And then, since that time -- and you were in that nurse

4   manager role in the OB/GYN department from mid 2014 to late

5   2019?

6   A.   Yes, December, I left, of 2019.

7   Q.   And that's when you became your current job, case manager?

8   A.   Correct, yes.

9   Q.   And that's outside of the OB/GYN department?

10  A.   Yes.

11  Q.   Okay.  Now, I just want to ask you a few things about your

12  duties as a nurse manager in the OB/GYN department.  First of

13  all, as a nurse manager in the OB/GYN department, how many

14  employees directly or indirectly reported to you?

15  A.   I had about 26 at the time.  You know, it varied if people

16  left, coming and going, but 26 nursing assistants, LPNs, and

17  RNs.

18  Q.   What's an LPN?

19  A.   Licensed practical nurse.

20  Q.   Okay.  And --

21  A.   Licensed nursing assistant.

22  Q.   And RN is, obviously, a registered nurse?

23  A.   Yes.

24  Q.   And in the, say, 2014 to 2017 timeframe in the OB/GYN

25  department, how many divisions were there?

VOLUME: 8
PAGES: 432-646

1    A.   Six.

2    Q.   Okay.  Can you name them for the Court?

3    A.   Yes.  Gynecology, oncology, maternal fetal medicine, the

4    midwives, general OB/GYN, urogynecology, and REI.

5    Q.   And, at this time, who did -- you were the nurse manager.

6    Who did you report to?

7    A.   Heather Gunnell.

8    Q.   And what was her title?

9    A.   She was the director.  I believe she started as practice

10   manager and then moved up to director.

11   Q.   Okay.  Were you the practice manager?  No, you were the

12   nurse manager?

13   A.   Nurse manager.

14   Q.   Okay.  And so you reported up to Heather Gunnell?

15   A.   Yes.

16   Q.   And, as the manager, generally speaking, what you were job

17   duties?

18   A.   Helping to train staff, making sure we had enough staff,

19   interviewing for new employees, helping make processes, improve

20   processes through the clinic.

21   Q.   Did you work with the individual divisions as a result?

22   A.   Yes.  You mean each division would have the -- each

23   division usually had different meetings that we would need to

24   attend, myself or the charge nurses or you know.  So, if we

25   were invited to the meeting to help make things, you know,

VOLUME: 8
PAGES: 432-646

1    improve the processes.

2    Q.   When you joined the OB/GYN department in 2014 as the nurse

3    manager, did you have an understanding of the dynamics,

4    interpersonal dynamics of the REI division specifically?

5    A.   I was made aware of it from nursing staff, yes.

6    Q.   Okay.  What was your understanding, without getting into

7    what they said, what was your understanding of the reputation

8    of the REI division?

9    A.   That it was a difficult division and that there was,

10   people didn't get along very well within the division.

11   Q.   When you became the nurse manager of the OB/GYN department

12   and you were responsible for the RNs and LPNs in the REI

13   division, what did you experience in terms of the interpersonal

14   dynamics of the REI division?

15   A.   Well, the nurses, the two nurses that were there had

16   different views on how things should be done, and they didn't

17   really interact well together.  They got the job done, but they

18   didn't always, you know, see eye to eye.

19   Q.   And who were those nurses?

20   A.   Casey Dodge and Sharon Parent.

21   Q.   Casey Dodge and Sharon Parent?

22   A.   Um-hum.  Yes.

23   Q.   And how do you know that those two nurses specifically

24   didn't get along?

25   A.   Because they were in my office a lot talking about how

(577 of 993), Page 577 of 993

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 529 of 945

2:17-cv-00044-kjd    Document 329-23    Filed 04/23/25    Page 529 of 945

576

VOLUME: 8
PAGES: 432-646

```
 1    things were going each day, and I was behind closed doors a lot
 2    with each of them.
 3    Q.   Out of all the divisions that you were responsible for,
 4    those six divisions, how would you characterize the amount of
 5    time you devoted to the REI division versus all the other ones?
 6    A.   Definitely more time trying to work with the nurses to get
 7    along better with REI than other groups.  Other groups did have
 8    issues as well, but not as much.
 9    Q.   Not as many issues?
10    A.   Not as many, yes.
11    Q.   I want to come back to that account in a second, but I
12    just want to ask you a little bit about the plaintiff in this
13    case.  Do you know Dr. Misty Blanchette Porter?
14    A.   Yes.
15    Q.   And how was your -- how would you characterize your
16    professional relationship with her?
17    A.   I was intimidated as a new nurse manager, at first.  You
18    know, I felt that, you know, I needed to make everything right,
19    you know, for her as well as other providers.
20    Q.   Okay.  How would you compare her style compared to the
21    other providers that you worked with?
22    A.   I think, as I said, as a new nurse manager, I felt, you
23    know, I had to do everything for everybody and get it done.  So
24    but Dr. Porter, you know, you know, if she came to my office, I
25    would feel intimidated that I needed to get it done what she
```

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 530 of 945
2:17-cv-00944-jgd   Document 329-23   Filed 04/23/23   Page 580 of 945

VOLUME: 8
PAGES: 432-646

1    needed to get done.

2    Q.   Did she express that to you?

3    A.   That she --

4    Q.   Did she express her -- did she make demands upon you?

5    A.   She, if she asked for things, yes, and, usually, if it was

6    something that I couldn't do myself, I'd go to Heather and say,

7    How do we, you know, get this done, you know, if it was

8    something out of my realm as a middle manager.  I didn't have

9    the final say in anything, really.

10   Q.   And, with respect to Dr. Porter, were there times where

11   you didn't get something done for her and she expressed

12   disappointment, frustration, or what did she say?

13   A.   If we didn't get it done, she would probably come back and

14   ask why, but, you know, then we'd, I'd work with Heather and

15   try to figure out if we could figure out the issue.

16   Q.   Did she ever, in your mind, go over your head, so to

17   speak?

18   A.   I don't think so.  I think she would come to me about

19   nursing issues, and then, if it was bigger than I could manage,

20   then that's when I would talk to Heather.

21   Q.   Okay.  Did you have an opinion of -- well, do you recall

22   when Dr. Seifer was made the division director of the REI

23   division?

24   A.   Yes.  I don't know what date, but I remember him being

25   hired on.

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 531 of 945
2:17-cv-00194-kjd   Document 329-23   Filed 04/25/25   Page 531 of 945

578

VOLUME: 8
PAGES: 432-646

1    Q.   Okay.  And, after he was hired, do you recall Dr. Porter

2    having any reaction to Dr. Seifer's hiring as a division

3    director as opposed to herself?

4    A.   No, not, nothing personal to me.

5    Q.   Okay.  I want to go back to the REI division for a second.

6    In terms of Sharon -- you jut said there was conflict between

7    Sharon Parent and Casey Dodge?

8    A.   Yes.

9    Q.   And did you witness any tension among the providers, the

10   doctors, in the REI division?

11   A.   They seemed to have different styles of work, and, you

12   know, they liked to work with certain nurses.  So each provider

13   kind of had a certain nurse they liked to work with.  Dr.

14   Porter liked to work with Sharon, it seemed like, and Beth

15   Todd, and then Casey was more working with Dr. Hsu and Dr.

16   Seifer when he arrived.

17   Q.   Would it be fair -- now, that's how things happened,

18   right, that they developed these -- would it be fair to say

19   clique?  How would you describe it?

20   A.   They, I feel they worked better, they liked working better

21   with that provider than the other provider, and each of them

22   got -- you know, so it was like silos, maybe.

23   Q.   Okay.  You know, and did that impact the ability to get

24   things done by having these silos or no?

25   A.   I don't think so, no.  I mean, if one of the doctors

VOLUME: 8
PAGES: 432-646

```
 1    wasn't there, the other nurse would pick up.  You know, they
 2    weren't going leave patient care.  Neither nurse would leave a
 3    patient stranded because it was someone else's patient.
 4    Q.   And are you aware of -- well, did the conflicts with the
 5    nursing, the nurses Sharon Parent and Casey Dodge, did that
 6    continue throughout the time that you were nurse manager?
 7    A.   Yes.
 8    Q.   And so 2014, 2015, 2016, did those conflicts occur?
 9    A.   Yes.
10    Q.   Now, do you recall a period of time when an entity or
11    organization within Dartmouth Health called the Value Institute
12    was involved with the REI division?
13    A.   Yes.
14    Q.   Okay.  What was your understanding -- when was that, do
15    you recall?
16    A.   2016, I believe.
17    Q.   Okay.  And did it carry forward into 2017?
18    A.   I believe we had, like, three meetings.  I, honestly, I
19    can't remember that far back.
20    Q.   Okay.  Did -- well, let me ask you this.  Would you have
21    attended those meetings as a nurse manager?
22    A.   Yes.
23    Q.   And were these meetings specifically for the REI division?
24    A.   Yes.
25    Q.   And do you recall that these meetings being conducted by
```

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 533 of 945
2:17-cv-00944-jdd    Document 329-23    Filed 04/23/23    Page 533 of 945

1    the Value Institute were to work on interpersonal dynamics

2    within the REI division?

3    A.    Yes.

4    Q.    And was one of the purposes to create more teamwork

5    between the different groups?

6    A.    Yes.

7           ATTORNEY JONES:  Your Honor, a bit of leading.  Maybe

8    we could have some direct questions?

9           THE COURT:  Okay.  Sustained.

10   BY ATTORNEY SCHROEDER:

11   Q.    What was your understanding, if you had one, of the reason

12   for those meetings?

13   A.    To try to bring the group together and be able to function

14   well within the division and work better together.

15   Q.    What, if any, end result happened as a result of those

16   meetings in 2016 and 2017?

17   A.    I don't think it changed anything.

18   Q.    Okay.  You don't believe it changed anything?

19   A.    No.  The, the relationships with my nurses seemed to be

20   the same until people, until nurses started leaving.

21   Q.    Okay.  Let me ask you about that topic, nurses leaving.

22   In the late 2016 early 2017 timeframe, do you recall what, if

23   any, shortages there were in the REI division in terms of

24   nurses?

25   A.    So we had two nurses.  Sharon and Casey were the main

VOLUME: 8
PAGES: 432-646

```
 1    nurses, and then they hired Naomi Moyer for a short time
 2    period.  She was from the Birthing Pavilion that came over, but
 3    she didn't last long.  She went on to something else.  And then
 4    Casey -- I don't know the actual -- I can't remember the dates,
 5    but Casey was let go, and then Sharon retired shortly after
 6    that.
 7    Q.   Okay.  Was that in the -- do you recall whether or not
 8    this was in the late 2016 timeframe?
 9    A.   Yes.
10    Q.   And do you recall even prior to the late 2016 timeframe a
11    shortage of nurses in general?
12    A.   Yes, and that's -- yes.
13    Q.   Okay.
14    A.   For performing the procedures and things.
15    Q.   And performing procedures for the REI division, correct?
16    A.   Correct.
17    Q.   And, in terms of the skill set for REI nurses and given
18    your background in nursing, they've got to learn a certain
19    skill set to do that job; is that fair to say?
20    A.   Yes.
21    Q.   And there's specific things that nurses need to learn in
22    order to be an REI nurse, right?
23    A.   Yes.
24    Q.   And the REI division, with respect to nursing
25    capabilities, do they operate on a Monday-through-Friday
```

(583 of 993), Page 583 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 535 of 945
2117-cv-00094-kjd    Document 329-23    Filed 04/23/25    Page 535 of 945

582

1    schedule, or is it throughout the week?

2    A.    Not, they did have people on call if they needed to do

3    procedures during the weekend, so Monday through -- you know, I

4    think they did -- I can't remember that, but I know there was

5    people on call for the weekends to do procedures if they needed

6    to do things.

7    Q.    Okay.  So a 24/7 kind of operation?

8    A.    Not at night, I don't think.

9    Q.    Not at night, just on the weekend?

10    A.    Yes.

11          ATTORNEY SCHROEDER:  Okay.  If I could put up on the

12    screen Defendant's Exhibit V, has already been admitted, and

13    ask to show the Witness as well as the jury.  May I approach

14    the Witness to show her a hard copy?

15          THE COURT:  Yes.

16    BY ATTORNEY SCHROEDER:

17    Q.    Ms. Mansfield, I'm showing you a document which is

18    Defendant's Exhibit V, as in Victor.  It's already been

19    admitted into evidence, and I'm not going to ask you about all

20    of the documents behind it.  There's more than one.  But this

21    is an email from you dated July 18th 2016 to a variety of

22    people, including Dr. Porter Dr. Hsu and Dr. Seifer.  Do you

23    see that?

24    A.    Um-hum.  Correct, yes.

25    Q.    Does that refresh your recollection as to any efforts

VOLUME: 8
PAGES: 432-646

1    being made to recruit new REI staff nurses?

2    A.    Yes.

3    Q.    And what do you recall specifically about that subject?

4    A.    Well, we met, I believe, meeting with the division to

5    determine how we were going to do the recruiting, and I know

6    Heather worked with Leslie DeMars and HR to figure out how to

7    recruit as quickly and easily as we could and how many areas to

8    place the, you know, job posting.

9    Q.    And was, were you involved in making sure that the job

10   postings were placed at various places on the Google, so to

11   speak?

12   A.    No, that was through HR.

13   Q.    Through HR?  Okay.

14   A.    So we, I think what happened was the clinic and us

15   determined what we needed, sent it to HR, and they would post

16   it to where it was needed to be, because that was not part of

17   my role.

18   Q.    To your knowledge, was this posting that's listed here for

19   the American Society for Reproductive Medicine, was that the

20   place -- do you know whether or not this posting was given to

21   HR for purposes of recruiting REI nurses?

22   A.    Yes.

23   Q.    Okay.  And this was done sometimes in the July 2016

24   timeframe, correct?

25   A.    Correct.

1    Q.   And did the REI division, during that timeframe and into

2    the fall and winter, have meetings to discuss recruiting REI

3    nurses?

4    A.   Yes, we had meetings, and we had, you know, trying to

5    figure out how to get more nurses and, you know, would it be

6    from within Dartmouth and train them, or would we, you know,

7    post in this, you know, American Society to look for outside

8    resources?

9    Q.   And was this American Society for Reproductive Medicine,

10   was this one of the places that was selected to attempt to find

11   REI nurses?

12   A.   Yes.

13            ATTORNEY SCHROEDER:  Okay, thank you.  You can take

14   that -- you can close that for now.  Your Honor, I'd like to

15   show the Witness and the Court, just the litigants, Defendant's

16   Exhibit A6.

17            THE COURT:  Okay.

18            ATTORNEY SCHROEDER:  If I may approach the Witness.

19            THE COURT:  Yes.

20   BY ATTORNEY SCHROEDER:

21   Q.   This is a document dated November 3, 2016.  Do you

22   recognize it?

23   A.   Yes, I do.

24   Q.   And do you recall being a recipient of this?

25   A.   Yes.

(586 of 993), Page 586 of 993      Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 538 of 945
2217-cv-00194-kjd      Document 329-23      Filed 04/26/23      Page 154 of 245

585

1          ATTORNEY SCHROEDER:  Okay.  I'd move for admission of

2    he document marked Defendant's Exhibit A6.

3          THE COURT:  Any objection?

4          ATTORNEY JONES:  No objection.

5          THE COURT:  Defendant's A6 is admitted.

6          ATTORNEY SCHROEDER:  Thank you, Your Honor.  May I

7    have it published for the jury?

8          THE COURT:  Yes.

9    BY ATTORNEY SCHROEDER:

10   Q.   And the subject of this email is Casey Dodge, right?

11   A.   Yes.

12   Q.   And it's dated November 3, 2016, right?

13   A.   Yes.

14   Q.   And you'll recall at some point you were trying to

15   remember when she left the REI division at Dartmouth Health.

16   Does this refresh your recollection of the timeframe?

17   A.   Yes.

18   Q.   Okay.  At the -- and this is a message from Heather

19   Gunnell, and it says, "Hello, I wanted to inform you that Casey

20   Dodge resigned her position in REI as of yesterday.  Katy and I

21   will be working with the team to help provide coverage for the

22   division until we are able to hire someone".

23   A.   Yes.

24   Q.   When she refers to Katy, is that the name you go by?

25   A.   Yes, it is.

1    Q.   Understood.  And so were you working with Heather Gunnell

2    for continuing efforts to recruit REI nurses at that time?

3    A.   As well as, yes, recruiting REI nurses with HR, as well as

4    trying to find resources within the clinic to help keep the

5    program, you know, the division running.

6    Q.   Okay.  And, at that time, do you recall whether the REI

7    division was struggling to have enough nursing coverage for all

8    of its procedures?

9    A.   Yes, it was.

10            ATTORNEY SCHROEDER:  Okay, thank you.  Your Honor, if

11   I may, Defendant's Exhibit C14, it's already been admitted, if

12   we can put that up on the screen, and may I approach the

13   Witness to show her?

14            THE COURT:  Yes.

15   BY ATTORNEY SCHROEDER:

16   Q.   Ms. Mansfield, you can look either at the screen or hard

17   copy, whatever is easier for you.  This is a document dated

18   November 3, same date.  Do you recognize this document from Dr.

19   Seifer?

20   A.   Yes, I do.

21   Q.   And below it halfway down there's a list of six items.

22   A.   Yes.

23   Q.   Do you see that?

24   A.   Yes.

25   Q.   Okay.  And do you recall what this involved, why Dr.

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 540 of 945
2:17-cv-00944-kjd    Document 329-23    Filed 04/23/25    Page 540 of 945

VOLUME: 8
PAGES: 432-646

1    Seifer was sending this information out to the entire REI

2    division?

3    A.   Because, at that time after Casey left, we were down to

4    one nurse, Sharon, who was then actually planning her

5    retirement.

6    Q.   And it says here, "Below are six potential pools of

7    recruiting a nurse", and it highlights, recontact previous

8    applicants as Number 1 if they took jobs elsewhere within DH or

9    outside DH; is that right?

10   A.   Yes.

11   Q.   Two, headhunter.  Did Dartmouth Health use headhunters

12   from time to time?

13   A.   Yes, they did, I believe.  I'm not sure on this case,

14   though.  I don't remember.

15   Q.   Three, recruit a current internal GYN or OB nurse at DH or

16   out of the outpatient surgery center, right?

17   A.   Yes.

18   Q.   And then there's three more, recruiting a GYN or OB nurse

19   from a DH southern location, right?

20   A.   Yes.

21   Q.   UVT, what does that relate to?

22   A.   I'm unsure.

23   Q.   Okay.  It's one of the items, but -- and then the sixth

24   one is explore part-time options, right?

25   A.   Yes.

1    Q.   And were you responsible for undertaking efforts to

2    recruit at that point as well?

3    A.   Yes.  So my, my role in that was this was to try to figure

4    out within the department who we could look at to pull to help

5    with procedures and other things within the department, patient

6    care.

7    Q.   And did you engage in efforts to -- do you recall engaging

8    in efforts to aggressively recruit for REI nurses?

9    A.   Within the department?

10   Q.   Well, within the department and outside the department,

11   correct.

12   A.   Yeah, mine was mostly, as I said, in the department, but

13   Heather was working with HR and Leslie outside the department

14   with HR.

15   Q.   And you're aware that, excuse me, that Heather Gunnell and

16   Leslie DeMars were working with HR to identify ways to recruit

17   REI nurses?

18   A.   Yes.

19          ATTORNEY SCHROEDER:  Okay, thank you.  You can take

20   that down.  Your Honor, I'd like to introduce Exhibit A,

21   Defendant's Exhibit A9 to show the Witness, the Court, and

22   lawyers.  May I approach the Witness?

23          THE COURT:  Yes.

24   BY ATTORNEY SCHROEDER:

25   Q.   Showing you a document that's been marked A9, Defendant's

```
 1    Exhibit A9, it's an email from Heather Gunnell to you,

 2    Ms. Mansfield, dated November 4, 2016.  Do you recognize this?

 3    A.   Yes, I do.

 4              ATTORNEY SCHROEDER:  Okay.  Your Honor, I'd move for

 5    admission of Defendant's Exhibit A9.

 6              THE COURT:  Okay.  Any objection?

 7              ATTORNEY JONES:  No objection.

 8              THE COURT:  Defendant's A9 is admitted.

 9              ATTORNEY SCHROEDER:  May I have that Exhibit A9

10    published for the jury?

11              THE COURT:  Yes.

12    BY ATTORNEY SCHROEDER:

13    Q.   Thank you.  Okay.  Can you describe what the nature of

14    this email communication is, the back-and-forth, related to?

15    A.   Yes.  Heather was letting me know that she had been

16    approved through Steve Boyce, who was a VP, that we could post

17    for a traveler.

18    Q.   Okay.  And, just so that the jury understands and the

19    Court, a traveler is what?

20    A.   A traveler is a nurse who works through a travel agency,

21    and they do different assignments at different hospitals and

22    are trained in a variety of nursing specialties.

23    Q.   And, in terms of the traveler nurse, would, are they

24    usually -- do hospitals employee them on a, on a sporadic basis

25    to fill gaps?
```

1    A.   They employ, a lot of hospitals employ a lot of travelers,

2    but you have to be able to find the right ones for the specific

3    area of specialty.

4    Q.   Right, specific area of specialty, and also somebody

5    that's in the Lebanon, New Hampshire area, right?

6    A.   No.  A traveler could be anywhere --

7    Q.   Oh, they can be anywhere?

8    A.   -- and work for a travel agency, and Dartmouth hires

9    through the travel agency.

10   Q.   Were you able to secure a traveler to perform REI nursing

11   at this point?

12   A.   No.

13   Q.   Did you undertake efforts to try to find a traveler

14   through some of these travel staffing agencies?

15   A.   That's an HR role.

16   Q.   Okay.  Did you have --

17   A.   But, yes, they were, they were looking for one.

18   Q.   Okay.

19   A.   Yes, HR was looking for a traveler.

20   Q.   Okay.  You understood that HR was responsible for looking

21   for a traveler?

22   A.   Correct, yes.

23   Q.   I want to turn your attention to the email that was

24   forwarded to you, but it's the first paragraph under -- we're

25   on this document.  Sorry.  Where it says, "Hi, Belinda",

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 544 of 945
2:17-cv-00194-kjd   Document 329-23   Filed 04/25/25   Page 154 of 245

VOLUME: 8
PAGES: 432-646

1   there's a paragraph there if you could just highlight that for
2   the jury and the Court.
3        Ms. Mansfield who is Belinda Peavey?
4   A.   Belinda worked for HR, but I'm not 100 percent sure.
5   Q.   Was Steve Boyce in HR?
6   A.   Steve Boyce was a VP.
7   Q.   Oh, a VP?
8   A.   Vice president over -- I believe he was over the OB/GYN
9   division.
10  Q.   Okay.  A VP in HR over the OB/GYN?
11  A.   No, a VP in medicine like over --
12  Q.   Okay.  But over the OB/GYN department?
13  A.   Yes.
14  Q.   Now, in this first paragraph it says, "Within OB/GYN there
15  are 3 nurse positions to care for reproductive endocrinology
16  and infertility patients.  While this is 3 of 25 nurses in all
17  of OB/GYN, the other 22 are not capable of covering because
18  they do not have the technical skills.  The rest of my approval
19  is based on this nurse practice assumption.  I have Karen
20  Clement CCed, and she can weigh in if she wants".
21       So, at that point, does this refresh your recollection
22  that, after Casey Dodge has left, there was Sharon Parent,
23  right?
24  A.   Correct.
25  Q.   And do you recall two other nurses by the names of Marlene

(593 of 993), Page 593 of 993

1    Grossman and Marti Lewis?

2    A.    Yes.  Well, Marlene worked in the southern region, so I

3    didn't know Marlene or manage her.

4    Q.    Okay.  When you say the southern region, southern region

5    of New Hampshire?

6    A.    Sorry, yes.

7    Q.    Okay.  Just want to make sure.  Was that Bedford,

8    Manchester?

9    A.    Manchester, Bedford.  I can't recall which office they

10   were actually in, but southern New Hampshire, Marlene worked

11   down there.

12   Q.    So Marlene Grossman worked in the southern New Hampshire

13   facility of Dartmouth Health in the REI division?

14   A.    Yes.

15   Q.    Okay.  But you weren't responsible for managing her?

16   A.    No.

17   Q.    Okay.  Marti Lewis?

18   A.    Yeah, Marti Lewis, she was a nurse that was in under

19   regular OB/GYN doing, you know, basic OB/GYN and showed an

20   interest in learning REI, so we moved her over to try to get

21   her trained.

22   Q.    Okay.  And, at this point, was the REI division in the

23   process of trying to train Marti Lewis to be an REI nurse?

24   A.    Yes.

25   Q.    So that was still in the process, correct?

(594 of 993), Page 594 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 546 of 945
2217-cv-00194-kjd Document 329-23 Filed 04/23/25 Page 152 of 245

593

1    A.   Yes.

2    Q.   And then Sharon Parent was retiring at the end of

3    December, correct?

4    A.   Yes.

5    Q.   And then the last paragraph, it says, "In fact, since the

6    section is already down by one of three specialized nurses and

7    another is leaving in three weeks, the situation is desperate

8    enough to require a traveler if there are no other internal

9    strategies to provide a nurse"; is that correct?

10   A.   Yes.

11   Q.   And did you agree with that?

12   A.   Yes.

13   Q.   So it was pretty desperate at that point?

14   A.   Yes.

15           ATTORNEY SCHROEDER:  Your Honor, if I may have the

16   Court or may I put up on the screen Defendant's Exhibit A16,

17   which is already admitted?

18           THE COURT:  Yes.

19           ATTORNEY SCHROEDER:  Thank you.  May I approach the

20   Witness to show her?

21           THE COURT:  Yes.

22   BY ATTORNEY SCHROEDER:

23   Q.   Okay.  I'm showing you a document that's been marked

24   Defendant's Exhibit A16.  It's dated December 6, 2016 from

25   Heather Gunnell.  Do you recall this email communication?

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 547 of 945
2217rev000944kgd   Document329.23   Filed04/23/25   Page547of945

VOLUME: 8
PAGES: 432-646

1   A.   Yes, I do.

2   Q.   And take a second to review it if you need a minute just

3   to understand it.  I just have a few questions.

4   A.   Okay, thank you.

5   Q.   Okay.  I want to direct your attention to the first

6   paragraph and, just, if we could highlight that.  So this is

7   from Heather Gunnell, and she was sending this on behalf of

8   Dr. DeMars and Dr. Seifer.  Did that happen from time to time

9   that communications would come from, Ms. Gunnell would be

10  responsible for sending out communications for them?

11  A.   Yes, yes.

12  Q.   In this particular email communication, it states, "We are

13  currently facing an imminent REI nursing crunch that will

14  require significant changes in nursing work flow and task

15  allocation.  With Casey and Sharon's departures, we have fewer

16  resources to maintain the quality of care our parents expect".

17  Did I read that correctly?

18  A.   Yes.

19  Q.   Do you recall -- well, did you agree with that statement

20  that there was an imminent REI nursing crunch?

21  A.   Yes.

22  Q.   Okay.  And were you doing your level best in your role as

23  nurse manager of OB/GYN to assist in recruiting for that REI

24  nursing position?

25  A.   Yeah.  Well, through HR, yes.  They did that.  But I was

1    also trying to figure out nurses I could pull from the clinic

2    to help with procedures as needed.

3    Q.   Okay.  Would it be fair to say that this was a stressful

4    time period for you?

5    A.   Yes.

6         ATTORNEY SCHROEDER:  Okay, okay.  If we could, next

7    exhibit which I'd just like to show the Court or introduce is

8    Defendant's Exhibit A24.  It is not admitted yet.  May I

9    approach the Witness, Your Honor?

10        THE COURT:  Yes.

11   BY ATTORNEY SCHROEDER:

12   Q.   Ms. Mansfield, I'm showing you a document that's dated

13   January 17th 2017 from an individual Stephanie Jackson to you.

14   Do you recognize this document?

15   A.   Yes, I do.

16        ATTORNEY SCHROEDER:  Okay.  Your Honor, I'd move for

17   admission of Defendant's Exhibit A24.

18        ATTORNEY JONES:  Just popped up on my screen, if I

19   could have one second.  No objection.

20        THE COURT:  Okay.  So Defendant's A24 is admitted.

21        ATTORNEY SCHROEDER:  Thank you, Your Honor.  Can I

22   have it published to the jury?

23        THE COURT:  Yes.

24   BY ATTORNEY SCHROEDER:

25   Q.   Thank you.  This document is, it's dated November, I'm

VOLUME: 8
PAGES: 432-646

1    sorry, January 17th 2017.  Do you recognize this?

2    A.    Yes, I do.

3    Q.    What is it?

4    A.    It's from recruiting letting me know that they have, want

5    to meet with me to discuss the needs of the division in order

6    to hire nursing.

7    Q.    And did you work with Stephanie Jackson to ensure that

8    this ad was placed in the appropriate places?

9    A.    I do not remember this specific meeting, but I know I did

10   meet with, with them.  I'm not sure who was in the meeting, but

11   I know we discussed having it go as many places as we could,

12   but I don't remember the actual meeting.

13   Q.    Okay.  That's fair enough.  That's over eight years ago,

14   so that's fair.  But the point of the meeting was to finalize

15   an ad for an REI staff nurse, correct?

16   A.    Correct, yes.

17   Q.    And, to your knowledge, was HR and specifically the

18   recruiter in talent acquisition, charged with finding a staff

19   nurse?

20   A.    Yes, posting it and recruiting and doing the initial

21   interviews.

22   Q.    And was that effort successful?

23   A.    No.

24   Q.    Switching gears, do you remember -- well, you testified

25   earlier about a nurse, Sharon Parent, correct?

(598 of 993), Page 598 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 550 of 945
2217icv000194kjd   Doocuumeenntt3325923   Fifilee0041225258   Paaggee155000f2945

1   A.   Yes.

2   Q.   And do you recall having meetings with her to discuss her

3   potentially working on a per diem basis after her retirement?

4   A.   She did talk to me about that.  However, I deferred her

5   back to Heather and Leslie DeMars, Heather Gunnell and Leslie

6   DeMars, as that was out of my scope to approve that.

7   Q.   And, when you say out of your scope, what do you mean?

8   A.   As a nurse manager, I'm not able to, you know, hire

9   someone without HR's approval.

10  Q.   Okay.  And --

11  A.   And -- oh, go ahead.

12  Q.   Go ahead.

13  A.   And, as I was saying, usually, at Dartmouth after you

14  retire, you have to wait, I think it's three months, or I don't

15  know if the rules have changed, but a certain period of time

16  before you can come back and work per diem once you've -- you

17  have to leave for an extended period of time before you can

18  come back.

19  Q.   Okay.  And did you understand, at least at that point,

20  that that was the policy as you --

21  A.   Yes.

22  Q.   But, in terms of dealing with that policy and its impact

23  on Ms. Parent, that was outside your authority --

24  A.   Yes.

25  Q.   -- to deal with?

(599 of 993), Page 599 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 551 of 945
2217-cv-00194-kjd   Document 329-23   Filed 04/23/25   Page 151 of 945

598

VOLUME: 8
PAGES: 432-646

1    A.   Yes.

2              ATTORNEY SCHROEDER:  I've got a few more topics, Your

3    Honor.  I don't know whether you want to take a break or

4    whether we push through.

5              THE COURT:  Yeah, why don't we take our afternoon

6    break?  So we'll be back at 2:45.

7       (A recess was taken from 2:32 p.m. to 2:48 p.m.)

8              THE COURT:  Get the jury.

9       (The Jury enters the courtroom.)

10             THE COURT:  Okay, Mr. Schroeder.

11   BY ATTORNEY SCHROEDER:

12   Q.   Thank you, Your Honor.  Ms. Mansfield, just a few more

13   questions.  I want to specifically focus on the 2016-2017

14   timeframe.

15   A.   Okay.

16   Q.   Do you recall when David Seifer was hired as the division

17   director in REI?

18   A.   Yes.

19   Q.   And did you ever form an opinion about Dr. Seifer's

20   leadership skills or clinical skills?

21   A.    I didn't work with him clinically, and he would come to me

22   with things he needed in the division, but I didn't work with

23   him clinically.

24   Q.   Okay.  And did anyone come to you with any concerns or

25   complaints about Dr. Seifer from the REI division?

(600 of 993), Page 600 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 552 of 945
2:17-cv-00094-kjd    Document 323    Filed 04/23/25    Page 552 of 945

599

VOLUME: 8
PAGES: 432-646

1    A.    A lot of people felt that -- some people, yes.  Some

2    people did come to me concerned about, you know, his -- he was

3    kind of ramped up a bit and, you know, wanted things done, you

4    know, and we didn't always have the answers, you know, that he

5    needed.

6    Q.    When you say people would come to you, who would come to

7    you?

8    A.    Nursing, Sharon and Casey.

9    Q.    Okay.  Anyone else?

10   A.    No.

11   Q.    Okay.  On this particular point, were they in agreement

12   with each other, well, just with respect to what Dr. Seifer was

13   asking for?

14   A.    Yes, yes.

15   Q.    Okay.  And, in terms of their conflict that they had up

16   until the time that both of them leave, what was the -- was

17   there a general description of the conflict between the two of

18   them, what it related to?

19   A.    They just, they just didn't, they didn't see eye to eye in

20   -- you know, they each felt the other one, you know, could do

21   things differently.  I think it was more personality-wise than

22   -- you know, I mean, they both knew their jobs.  They did their

23   jobs their own way.  I mean, as sometimes always two ways to

24   get to the same endpoint, you know, and I just don't think they

25   agreed on how each other would do things.

(601 of 993), Page 601 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 553 of 945
2:17-cv-00194-kjd     Document 329-23     Filed 04/23/25     Page 553 of 945

1    Q.   Okay.  And did Dr. Porter ever raise any specific concerns

2    to you about Dr. Seifer?

3    A.   Not directly to me, no.

4    Q.   Well, indirectly?

5    A.   No, I mean, no.

6    Q.   Okay.  So never raised any concerns to you about

7    inappropriate testing or billing or issues relating to patients

8    that might be exposed to Zika, anything like that?

9    A.   Nothing directly that I remember.

10   Q.   Okay.

11   A.   I would believe those would probably go above me.

12   Q.   But you didn't receive any reports from Dr. Porter?

13   A.   No.

14   Q.   How would you describe Dr. Porter's relationship with Dr.

15   Seifer if you could?

16   A.   I didn't see much interaction with them, so I don't really

17   know how to describe that.

18   Q.   Were you aware of whether or not Dr. Porter agreed with

19   Dr. Seifer's techniques or how he did his skill set?

20   A.   That, I do not know.

21   Q.   Fair enough.  In terms of Dr. Hsu, did you have any

22   interaction with him with respect to either his clinical work

23   or what he was doing in the REI division?

24   A.   No.  Again, I didn't work directly with him clinically.

25   He was -- I don't even know who -- I believe his mentor was Dr.

(602 of 993), Page 602 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 554 of 945
2:17-cv-00944-kjd   Document 352-3   Filed 04/23/25   Page 554 of 945

601

VOLUME: 8
PAGES: 432-646

 1    Porter, and, you know, I don't know where, how he was trained.

 2    You know, he was there before me as well, so I can't really

 3    speak to that.

 4    Q.    Okay.  And you don't know what, if any, training Dr.

 5    Porter, as his mentor, gave him?

 6    A.    No.  I don't know anything about his training.

 7    Q.    And did Dr. Porter raise any concerns to you about

 8    testing, issues with testing or billing by Dr. Hsu or anyone at

 9    his direction?

10    A.    No.

11    Q.    I want to ask you about the REI closure, REI division

12    closure, and that was announced publicly May 4th 2017.  Do you

13    recall when that was announced?

14    A.    Yes.

15    Q.    And do you recall, at some point after that announcement,

16    that there was a big meeting for the OB/GYN department?

17    A.    Yes.

18    Q.    Okay.  Did you attend, do you recall, that meeting?

19    A.    Yes.

20    Q.    Did you attend that meeting?

21    A.    Yes, I did.

22    Q.    Okay.  And were you there for the whole meeting?

23    A.    Yes.

24    Q.    And do you recall that Dr. Merrens spoke during the

25    meeting?

1    A.    Yes.

2    Q.    Okay.  And do you recall any specific statements

3    Dr. Merrens made about Dr. Porter at any point?

4    A.    No.

5    Q.    Okay.  And you don't recall him referencing anything about

6    Dr. Porter's condition or anything like that, right?

7    A.    No.

8    Q.    Okay.  And, if Dr. Porter, Dr. Merrens had made a comment

9    about, say, for example, Dr. Porter's disability status or

10   where she was out on leave, you'd recall that, wouldn't you?

11   A.    I believe, yes, I would recall something like that.

12              ATTORNEY SCHROEDER:  Thank you, Your Honor.

13              THE COURT:  Okay.  Cross-examination?

14                 CROSS-EXAMINATION BY ATTORNEY JONES

15   Q.    Thank you, Your Honor.  Good afternoon, Ms. Mansfield.

16   A.    Good afternoon.

17   Q.    Just a few moments ago, Attorney Schroeder was asking you

18   about people, whether people came to you to complain about

19   either Dr. Hsu or Dr. Seifer.  Do you remember that question?

20   A.    Yes.

21   Q.    Isn't it true that Sharon Parent came to you and expressed

22   some concerns that she had about Dr. Hsu?

23   A.    She may have had concerns about working with him, but as

24   medically, I, those, I can't answer to his medical care.

25   Q.    Isn't it true she came to you to complain that she felt

VOLUME: 8
PAGES: 432-646

1    his procedures were causing patients more pain than usual?

2    A.    I don't recall that.

3    Q.    And more blood than usual?

4    A.    I don't recall that.

5    Q.    Okay.  And do you recall -- isn't it true she complained

6    to you about Dr. Seifer, same problem, that his procedures were

7    causing, they were very bloody and very painful to patients?

8    A.    That, I don't remember.

9    Q.    Okay.  Do you recall -- isn't true that -- well, do you

10   recall a conversation with Dr. Porter where you discussed what

11   was going to happen about the complaint that Nurse Parent had

12   made about Drs. Hsu and Seifer?

13   A.    Can you repeat that question?

14   Q.    Well, do you recall a conversation with Dr. Porter about

15   nursing complaints, nurses' complaints about Drs. Hsu and

16   Seifer and what was happening with those complaints?

17   A.    If, I don't remember specific conversation about with Dr.

18   Porter, but, if she had come to me about nursing at any time in

19   general, we would, probably, I would have discussed that with

20   Heather and how we would manage it because, as I said, I can't

21   speak to Dr. Hsu or Seifer's abilities.  So that was, should

22   have gone to way above me.

23   Q.    So are you saying you don't recall telling Dr. Porter that

24   Dr. DeMars wasn't doing anything so you were going to go to the

25   head of nursing to try to escalate the matter?

VOLUME: 8
PAGES: 432-646

1    A.   No.

2    Q.   With regard to the questions you were asked about the

3    nursing shortage issue, Attorney Schroeder showed you an

4    exhibit, Exhibit V, which was a posting for a nurse position

5    that was posted in the ASRM.  Do you recall that?

6    A.   Yeah.

7    Q.   Isn't it true that that particular ad was just on the

8    online version of the ASRM journal and not in the print

9    publication?

10   A.   That, I would not know.  That would have been through HR.

11   Q.   And isn't it true that that was taken down in less than

12   three months?

13   A.   I do not know that.

14   Q.   Okay.  Do you recall how much notice Nurse Sharon Parent

15   gave that she was going to be retiring?

16   A.   I don't know the exact timeframe, but it had been, she had

17   been talking about it for a bit of time.  So we knew.

18   Q.   She testified she gave a year.  Does that sound right?

19   A.   Possibly.  I don't recall the exact timeframe.  I mean,

20   she had been, she'd been there forever, so she'd been talking

21   about it.

22   Q.   Okay.  And she retired in December of 2016; is that right?

23   A.   Yes, I believe that was December.

24   Q.   And some of the documents that Mr. Schroeder was showing

25   you about meetings to discuss recruiting, those were in

1    November of 2016, right?

2    A.   November, and I thought before that as well, but November,

3    some of these.

4    Q.   All right.  But almost eleven months after Sharon Parent

5    gave notice that she was going to be retiring?

6    A.   Yes.

7    Q.   Isn't it true that both Dr. Porter and Beth Todd gave the

8    names of two people who were potentially willing to work as REI

9    nurses?

10   A.   I believe they talked about people who had worked there

11   before, yes.

12   Q.   And isn't it true that you did not call them to see if

13   they would be interested?

14   A.   I can't remember.

15   Q.   So you don't remember calling them?

16   A.   No.

17   Q.   Okay.  And, finally, isn't it true that Sharon Parent

18   wanted to come back on a per diem basis to work in the REI?

19   A.   That is what she said, yes.

20   Q.   Yeah.  And you mentioned that your understanding is that

21   she would have to wait three months before she could do that,

22   right?

23   A.   Yes.

24   Q.   And she retired in December of 2016, so, if my lawyer math

25   is right, she would have been eligible to come back around

(607 of 993), Page 607 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 559 of 945
2:17-cv-00194-kjd Document 329-23 Filed 04/25/25 Page 559 of 945

606

VOLUME: 8
PAGES: 432-646

```
 1    March of 2017; is that correct?

 2    A.   Yes.

 3    Q.   And the decision to close the REI was announced in May of

 4    2017, right?

 5    A.   Yes.

 6    Q.   So, at that time, Sharon Parent was available to work in

 7    the REI, correct?

 8    A.   If that's the HR rules, yes.

 9              ATTORNEY JONES:  All right.  No further questions.

10              THE COURT:  Okay.  Any redirect?

11              ATTORNEY SCHROEDER:  Nothing, Your Honor.

12              THE COURT:  Okay.  Ms. Mansfield, you may step down.

13    Thank you.  Okay.  The next witness?

14              ATTORNEY SCHROEDER:  Thank you, Your Honor.

15    Defendants call individual Kelly Mousley.  I'm going to go out

16    and get her if that's okay.

17              THE COURT:  Okay.  And, Mr. Schroeder, I'll just note

18    that there are exhibit binders open on the witness stand right

19    now.

20              ATTORNEY SCHROEDER:  I can close them up until I need

21    them, if I may.

22              THE COURT:  Yes.

23                        KELLY MOUSLEY,

24              having been duly sworn to tell the truth,

25                   testifies as follows:
```

VOLUME: 8
PAGES: 432-646

```
 1              DIRECT EXAMINATION BY ATTORNEY SCHROEDER
 2    Q.    Good afternoon.
 3    A.    Good afternoon.
 4    Q.    Can you just, Ms. Mousley, just state your full name for
 5    the record again?
 6    A.    Kelly Mousley.
 7    Q.    Thank you.  And, Ms. Mousley, where are you currently
 8    employed?
 9    A.    At the Upper Valley Aquatic Center in White River
10    Junction.
11    Q.    Sorry.
12    A.    The Upper Valley Aquatic Center in White River Junction.
13    Q.    And what is your title there?
14    A.    The HR director.
15    Q.    And what do you do for them?
16    A.    I oversee their HR department, so employer relations,
17    recruiting, payroll, benefits.
18    Q.    And, with respect to your role in HR at the Upper Valley
19    Aquatic Center, how long have you held that position?
20    A.    Almost five years.
21    Q.    Okay.  Sometime -- when did you join them, if you recall?
22    A.    February 4th of 2020.  I initially started out in another
23    role and then went into HR, so it's been almost five years in
24    that role.
25    Q.    So about five years in the HR role?
```

1    A.   Yes.

2    Q.   Prior to joining the Upper Valley Aquatic Center, do you

3    recall working for Dartmouth Health?

4    A.   Yes.

5    Q.   And was that directly preceding your current position?

6    A.   Yes.

7    Q.   Okay.  And what was your position at Dartmouth Health

8    previously?

9    A.   I was the clinic support manager.

10   Q.   How long had you been employed at Dartmouth Health, total?

11   A.   Total?  It was March of 2015.

12   Q.   So March 2015 to February 2000?

13   A.   2020, Yeah.

14   Q.   2020, I'm sorry.

15   A.   So just about five years.

16   Q.   Just about five years?  And did you leave voluntarily?

17   A.   I did.

18   Q.   Okay.  And, when you were employed by Dartmouth Health as

19   the clinic support manager, was that for the entirety of the

20   time you were employed at Dartmouth Health?

21   A.   No.  I started out as the administrative supervisor in

22   radiation and oncology.

23   Q.   Okay.  And then when did you become the clinic support

24   manager?

25   A.   In August of 2016.

(610 of 993), Page 610 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 562 of 945
2211:7cv000944kjd    Document 329.23    Filed 04/23/25    Page 562 of 945

609

VOLUME: 8
PAGES: 432-646

1    Q.    Okay.  So August 2016 you become the clinic support

2    manager, and for which department?

3    A.    OB/GYN.

4    Q.    Okay.  And, as the clinic support manager for the OB/GYN

5    department in August of 2016, what were your job duties?

6    A.    So I had some of the operation responsibilities within the

7    department, but my main role was oversight of the

8    administrative staff, specifically the scheduling secretaries.

9    Q.    And, with respect to the scheduling secretaries, would

10   that include the secretaries or assistants throughout OB/GYN

11   department?

12   A.    Yes, it was all of them, all the administrative ones.

13   Q.    Okay.  So, in terms of your management role, you were in

14   charge of the administrative staff within the OB/GYN

15   department; is that correct?

16   A.    Yes, yes.  Um-hum.

17   Q.    And, at the time, there were six divisions?

18   A.    Yes.

19   Q.    Okay.  And do you recall, in your capacity as the clinic

20   support manager for the overall OB/GYN department, working with

21   the REI division staff?

22   A.    Yes.

23   Q.    And how would you describe the interpersonal dynamics of

24   that group?

25   A.    So you mean providers as well as the scheduling staff?

(611 of 993), Page 611 of 993   Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 563 of 945
2217cv00194kjd    Document 329.23    Filed 04/23/25    Page 563 of 945

610

1    Q.   Yes, to the extent you have personal knowledge about that

2    and know about it, yes.

3    A.   Okay.  So, when I first started, Dr. Porter was on leave,

4    and Dr. Seifer and Dr. Hsu were there, and then there was one

5    scheduling secretary in that area.

6    Q.   Who was that?

7    A.   What was the name?

8    Q.   Yes.

9    A.   Donna, Donna Bedard.

10   Q.   Okay.

11   A.   And then there was a backup person that, when she took

12   breaks and things like that.  And, as soon as I started, you

13   know, I was responsible for all of the divisions.  There were

14   secretaries at this point -- Dartmouth changed it while I was

15   there, but, at this point, they were kind of scheduling just

16   for their particular areas, right?  So there would be an REI

17   secretary and a, you know, urogyn secretary, that type of

18   thing.

19        And right from the beginning people were speaking to me

20   and saying, like, as far as the scheduling secretaries, they

21   would say to me, We won't schedule down there.  We won't go

22   down.  It was kind of the end of the clinic.  We won't go down

23   there and schedule.  It's too dysfunctional.  There's too much

24   -- it's too intimidating.  The word they used, it's too

25   intimidating to be down there.

1      And so, initially, right from the start, I had a hard time

2      finding people that would be willing to go down and cover down

3      there, and then the dynamic within the providers, it just felt

4      dysfunctional.  People, like, I felt like, whether it was

5      nursing staff or some of the secretarial staff, would say to me

6      right from the start, you know, like, there's two camps.  Try

7      to stay out of it.  Don't get in the middle of it and --

8   Q.   Who were the two camps?

9   A.   Amongst the providers, right?  So there was Dr. Porter and

10      Elizabeth Todd, and then there was Dr. Hsu and Dr. Seifer.  So

11      there was kind of this division of providers.

12  Q.   Okay.  And who was in Dr. Porter's camp?

13  A.   For another provider was Elizabeth Todd.

14  Q.   Okay.  And she was a nurse practitioner?

15  A.   Yes.

16  Q.   Any nurses that would were in, quote, unquote, Dr.

17      Porter's camp?

18  A.   Yeah, I didn't know the nurses very well, but there was --

19      yes, there was, there were two nurses, I believe, when I

20      started that were specific to REI, and their names were Sharon

21      and Casey, I believe.

22  Q.   Do you recall whether or not Ms. Parent, Sharon Parent,

23      was in Dr. Porter's camp or not?

24  A.   That was my understanding.  I didn't work closely with the

25      nurses, but that was my understanding.

VOLUME: 8
PAGES: 432-646

1    Q.   And what about -- but you were responsible for Donna

2    Bedard, correct?

3    A.   Yes, she reported to me.

4    Q.   Okay.  And she was an assistant or secretary for the REI

5    division?

6    A.   Yes.

7    Q.   And did you have -- did there come a need for you to try

8    to get additional secretarial help for the REI division?  You

9    said nobody would want to go down there.

10   A.   Yeah, well, we, everyone kind of had their own areas, but

11   we had been to a little bit interchangeable, right?  If someone

12   was out or if someone was on vacation, just covering breaks,

13   and so they had to learn to also be interchangeable and say, I

14   can take the phones line for that division as well as the phone

15   lines for my own division, and people didn't want to.  So I ran

16   into a problem with that right away.

17   Q.   Okay.  And did you have any encounter, any problems with

18   Donna Bedard's performance as the only secretary for the REI

19   division?

20   A.   Um-hum.  Yeah.  She was defensive with me.  I was trying

21   to learn the department, learn the divisions, learn how REI

22   worked, and she was just extremely protective of her work, and

23   it was almost like she wanted to me to keep my hands off of it,

24   that they had their routine, they had their way of doing

25   things, and that it wasn't really my place to be involved.

2117cv0094kjd   Document 329.23   Filed 04/26/25   Page 15 of 245

VOLUME: 8
PAGES: 432-646

 1   Just let her do her thing.  She'd been there a long time, and

 2   she didn't need my interference, but that's not how it really

 3   worked.  I was responsible for ensuring that all the provider

 4   schedules were full.  That was my main responsibility.

 5   Q.   Okay.  It's a lot there, so I just want to unpack it a

 6   little bit.

 7   A.   Sorry.

 8   Q.   With respect to Donna Bedard, did you encounter any

 9   instances or incidents where she was favoring, engaging in

10   favoritism towards one of the providers versus the other

11   providers?

12   A.   Well, that's how I ended up getting a little bit more

13   involved in it, because I was hearing, whether it was Dr.

14   Seifer or Dr. Hsu, they were saying that there was an instance

15   where a patient was on Dr. Seifer's schedule and then suddenly

16   it wasn't, and he can couldn't understand why his schedule

17   wasn't getting filled up.

18        And so, when I tried to have a conversation with Donna to

19   understand it, there was, there was -- it was almost like a

20   side list outside of EDH, outside of the scheduling system of,

21   like, a waiting list of patients.  It was almost like this

22   vetting system, and patients were being put onto this list for

23   when there was availability with Dr. Porter, even though there

24   were clear openings on EDH with Dr. Seifer and Dr. Hsu.

25        And so I was trying to understand, as the person that's

VOLUME: 8
PAGES: 432-646

1 responsible for that, like, why would we have gaps on a waiting

2 list.  It didn't add up for me.  And so, when I tried to

3 intervene and I tried to understand and find out, like, this

4 policy that we're using, this isn't okay, I received an email

5 that, from Dr. Porter saying that I needed to not involve

6 myself, that I needed to not be requesting copies of her

7 schedule.

8 Q. Okay.  So you'd requested Dr. Porter's schedule trying to

9 figure out how to deal with scheduling patients across the

10 board, correct?

11 A. Yes.  It was just, it was an across-the-board.  It was

12 really just trying to understand what was happening, why

13 patients weren't getting in when we clearly had openings.

14 Q. And what did you surmise based upon seeing this side list

15 with Donna Bedard?

16 A. Yeah, I felt that Donna felt very protective of Dr. Porter

17 and felt that, in her mind, that these patients would be best

18 served with Dr. Porter, and so she was going to ensure that the

19 patients who they saw with whatever method she needed to do to

20 try to work around the system.  And then I did -- sorry.

21 Q. Go ahead.

22 A. I did, at one point, have to give her a written warning

23 because she was making her feelings toward those physicians

24 clear in a -- you know, she was sharing it verbally, and it

25 came back to my office, and I did have to give a warning about

(616 of 993), Page 616 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 568 of 945
2217cv00094kjd        Document 329-23    Filed 04/23/25    Page 568 of 945

615

VOLUME: 8
PAGES: 432-646

 1    that, that we have to support all the physicians equally.

 2    Q.   And, when you say her feelings, was she making comments

 3    about Dr. Hsu and Seifer?

 4    A.   Yes.

 5    Q.   Because of that you gave -- I'm assuming they weren't

 6    positive, were they?

 7    A.   No, they weren't positive.

 8    Q.   And, because of that, did you give her some disciplinary

 9    action?

10    A.   Yes.

11    Q.   So did the favoritism or effort at favoritism by doctor,

12    by Ms. Bedard towards Dr. Porter, did that continue despite the

13    written warning?

14    A.   I can't give any specific examples of that, whether they

15    did.  It was just a, it was kind of an ongoing struggle with

16    Donna and myself of me trying to be involved and understand,

17    just like I would with any of the divisions.

18    Q.   Okay.  Did you spend more time dealing with the REI

19    division and these administrative struggles than the other

20    divisions?

21    A.   There were periods of time that I felt like it was my

22    full-time job.

23    Q.   Dealing with the REI division?

24    A.   The REI division was part of it, yeah.

25         ATTORNEY SCHROEDER:  All right.  Your Honor, I'd like

(617 of 993), Page 617 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 569 of 945
2:17-cv-00194-kjd  Document 329-23  Filed 04/23/25  Page 569 of 945

616

VOLUME: 8
PAGES: 432-646

1    to introduce Defendant's Exhibit B3 and show the Witness.

2              THE COURT:  Yes.

3              ATTORNEY SCHROEDER:  Thank you.  May I approach?

4              THE COURT:  Yes.

5    BY ATTORNEY SCHROEDER:

6    Q.  Ms. Mousley, I'll just ask you to review the document I

7    put in front of you.

8    A.  Okay.

9    Q.  And let me know when you've had a chance to review it.

10   A.  Okay, okay.

11   Q.  Had a chance to review it?

12   A.  Um-hum.

13   Q.  Does that refresh your recollection of an email you sent

14   on February 20, 2016?

15   A.  Yes.

16             ATTORNEY SCHROEDER:  Your Honor, I'd like to move for

17   admission of Defendant's Exhibit B3.

18             THE COURT:  Any objection?

19             ATTORNEY NUNAN:  No objection.

20             THE COURT:  Okay.  Exhibit B3 is admitted.

21             ATTORNEY SCHROEDER:  Thank you, Your Honor.  May I

22   have it published for the jury?

23             THE COURT:  Yes.

24   BY ATTORNEY SCHROEDER:

25   Q.  Ma'am, if you could, I want to direct your attention to

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 570 of 945
2:17-cv-00944-kjd    Document 329-23    Filed 04/25/25    Page 560 of 945

VOLUME: 8
PAGES: 432-646

1    the paragraph titled "REI Team Potential" and blow that up.

2    Now, you were asked by Leslie DeMars to do a review of Dr.

3    Seifer, correct?

4    A.   Yes.

5    Q.   And that's DS review feedback, right?

6    A.   Yes.

7    Q.   Okay.  Now, you write in here that on the REI team

8    potential, "With the current provider structure we have in

9    place, the future of the REI service and patient/staff

10   experience is in jeopardy".  Is that true?

11   A.   Yes, I did feel that way.

12   Q.   You believed that to be accurate?

13   A.   Um-hum.

14   Q.   And you say, "The providers are divided, entrenched in

15   their way of doing things".  Were you talking, when you

16   mentioned the providers, who were you talking about?

17   A.   The four providers, so Dr. Hsu and Seifer and Dr. Porter

18   and Elizabeth Todd.

19   Q.   Okay.  And then it says, "on one side we have two

20   providers that have a long history with the program and will

21   continue to sabotage any suggestion of progress".

22        Who were you talking about there?

23   A.   The providers that had been there a long time were Dr.

24   Porter and Elizabeth Todd.

25   Q.   And what do you recall was the basis for you saying that

618

VOLUME: 8
PAGES: 432-646

1    they would continue to sabotage any suggestion of progress?

2    A.   Because my experience was strictly on the administrative

3    side, right, and it's the things that I described.  Like, I

4    felt like they weren't working as a team.  They weren't trying

5    to figure out how to take care of the patients by filling the

6    schedule and getting patients in.  And so we had this

7    administrative person that was, for whatever reason, working

8    with two providers and trying to support their services and

9    then, for some reason, the other two providers just the

10   opposite, right?

11       And so I felt like they, the people that had been there a

12   long time -- so I'm including Donna in that.  The people that

13   had been there a really long time, they felt like, This is the

14   way we've done things for a long time.  These are our patients.

15   This is our history, and weren't necessarily open to new people

16   being in the roles.

17   Q.   Did you experience this level of struggle or lack of

18   professionalism in the other divisions to this extent?

19   A.   No, nothing like this.

20   Q.   Would this be kind of an outlier compared to the other

21   divisions in terms of the administrative support?

22   A.   It was an outlier for me in my role, yes.

23   Q.   Okay.  Now, the next sentence says, "The other two are new

24   and floundering, which leaves the team with no clear leader".

25       Who were you talking about there?

1    A.   Dr. Hsu and Dr. Seifer.

2    Q.   And then you go on, "Do they follow the voice that is the

3    loudest and most intimidating or the leader who has the title

4    on paper?"

5         Who are you referring to there?

6    A.   So the title on paper was Dr. Seifer, and the loudest and

7    the most intimidating was based on Dr. Porter.

8    Q.   And you had personal experience with that, correct?

9    A.   So I had personally met Dr. Porter in person one time.  We

10   had a meeting not long after I had started there.  So I was

11   really basing that on the secretaries not being willing to

12   cover the line or to go down and cover that division for me and

13   people telling me that, if I met with Dr. Porter, to stand my

14   ground and not allow her to intimidate or bully me, to do what

15   was right, and so that's what I was basing it on.

16   Q.   Was there a consistent theme from the people that were

17   voicing their concerns to you?

18   A.   Yeah, they were just kind of trying to warn me to be

19   prepared.

20   Q.   Okay.

21   A.   To be strong.

22   Q.   Now, it says here then, "Either of those scenarios feels

23   like a lose-lose and leaves the team looking for support and

24   direction.  I can see the team are all just doing their best to

25   hold the pieces together for the patients.  The majority of the

VOLUME: 8
PAGES: 432-646

1    team wants and needs to see something done to shake things up

2    and allow them to truly hit the reset button for the sake of

3    the program, their job satisfaction, and the patients".  And

4    then you say, quote, "If you keep doing what you have always

5    done, you will keep getting what you have always gotten", end

6    quote, "Very true when I think of REI".

7    A.    Um-hum.

8    Q.    And you believed that at that time, correct

9    A.    I did.

10   Q.    And, during the following months after February 2017, did

11   this infighting or struggles that you witnessed or heard about

12   or received complaints about, did that continue?

13   A.    Yeah.  I mean, I don't recall a time where it felt smooth

14   in the time that I was there.

15   Q.    Okay.  I'd like to put up on the screen, it's a document

16   that's already been admitted, Defendant's Exhibit B5.  Showing

17   you a document that's already been admitted into evidence,

18   Ms. Mousley, if you could just review that and let me know when

19   you're finished.

20   A.    Okay.

21   Q.    Finished?

22   A.    Yes.

23   Q.    Do you recognize this document?

24   A.    I don't.

25   Q.    Okay.  In looking at it, though, it's dated February 23,

VOLUME: 8
PAGES: 432-646

1    2017.  It's a couple of days after that last email I showed

2    you.  Was it unusual for Dr. Porter to be directing an email to

3    you, David, and Heather at the same time?

4    A.   I must be looking at the wrong document.

5              ATTORNEY SCHROEDER:  It's B5.  If I may approach the

6    witness, Your Honor.

7              THE COURT:  Yes.

8    BY ATTORNEY SCHROEDER:

9    Q.   There you go.  That's my fault.

10   A.   Okay.

11   Q.   Let me know when you've finished reviewing that email.

12   A.   Okay, okay.  Yes.

13   Q.   Okay.  Do you recall this email --

14   A.   I do.

15   Q.   -- exchange?

16   A.   I do.  Yes, yes.

17             THE COURT:  Ms. Mousley, I'll just ask you to keep

18   your voice up, please.  Thank you.

19   BY ATTORNEY SCHROEDER:

20   Q.   Just to make sure the record's clear, do you recall this

21   particular email?

22   A.   I do, yes.

23   Q.   You mentioned earlier your efforts to figure out

24   everybody's schedule, correct?

25   A.   Um-hum.

1   Q.   You have to verbalize your answers.

2   A.   Okay.  Yes.

3   Q.   And were, was this the timeframe in which you were trying

4   to figure out the doctors' schedules so that you could ensure

5   equilibrium with respect to patient flow?

6   A.   Yes.  This was the result of what I had said before of Dr.

7   Seifer saying, Why aren't people on my schedule?  I thought I

8   saw a name on my schedule.  It's not there.  Those types of

9   things were coming to me, and so I started to try to do a

10  little legwork.

11  Q.   Okay.  And in legwork you were trying to figure out the

12  schedules of everybody's patients, correct?

13  A.   Right, yes.

14  Q.   Okay.  And in that process you found the side note in that

15  process that Donna Bedard had for patients?

16  A.   Yes.

17  Q.   Okay.  And you were also asking for all the providers to

18  provide their schedules, correct?

19  A.   Yes.

20  Q.   And this was the response that you received from Dr.

21  Porter, correct?

22  A.   Yes.  I didn't speak directly to Dr. Porter.  I had spoken

23  to Donna, and it looks like, based on the email that I

24  received, that she had then conveyed that to Dr. Porter, that I

25  had requested the schedule.

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 576 of 945
2:17-cv-00944-kjd    Document 329.23    Filed 04/23/25    Page 576 of 945

 1    Q.   And was it pretty unusual to receive an email from Dr.

 2    Porter at the same time as, say, David and Heather?  Does this

 3    stand out as something unusual?

 4    A.   I don't recall if it was unusual in how, if she, if that's

 5    how she would choose to communicate.

 6    Q.   Okay.  But she didn't reach out to you?  Dr. Porter didn't

 7    reach out to you, right?

 8    A.   No, she didn't reach out to me directly, other than the

 9    email.

10    Q.   Right.  The only thing you received from Dr. Porter was

11    that email, and the first sentence says, "Please come to me if

12    you have questions about my schedule and work return.  I will

13    share the transition with the appropriate individuals"?

14    A.   Right.

15    Q.   Did you have a reaction to that sentiment?

16    A.   Well, I thought I was an appropriate individual, and

17    that's why I had inquired about the schedule, because that was

18    my responsibility.

19    Q.   Okay.

20    A.   Yes.

21    Q.   Did you --

22    A.   So I was surprised by it, yes.

23    Q.   All right.  You were surprised by it.  Were you, did you

24    have a -- how did you interpret this email other than being

25    surprised by it?

(625 of 993), Page 625 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 577 of 945
2:17-cv-00194-kjd    Document 329    Filed 04/23/25    Page 577 of 945
624

VOLUME: 8
PAGES: 432-646

 1    A.   I was a little taken aback of, like, Well, I have to be
 2    involved.  I have to be involved, as I would with any of the
 3    secretaries and the work they're doing.
 4    Q.   And did you interpret this email -- how, if at all, did
 5    you interpret this email from Dr. Porter as an indication that
 6    you needed to go through her versus Donna?
 7    A.   Right.  I mean, I could tell that -- I read between the
 8    lines that she was upset with me about it.
 9    Q.   Okay.  And it says at the end, "Please do not ask Donna
10    send out emails with regard to my schedule", right?
11    A.   Right.
12    Q.   Did you interpret that to be drawing a line in the sand,
13    if you will?
14    A.   Yes, that almost as if Donna doesn't report to me.  That's
15    the way I interpreted it.
16    Q.   Right.  But, at that time, Donna Bedard did report to you,
17    correct?
18    A.   Yes.  She did the entire time I was in the clinic.
19    Q.   Okay.  What, if anything, did you do to address the
20    administrative imbalances and favoritism that you saw Donna
21    Bedard was engaging in?
22    A.   I just would go down and address it, and, as I said, at
23    one point I gave her the written warning, but I, I just would
24    go down and address it.  I didn't hide behind it.  I didn't
25    stand back.  I just kept trying to move forward and making sure

```
 1    people's schedules were filled.
 2    Q.    Okay.  And were you successful at getting past those
 3    challenges, or did you keep meeting those challenges?
 4    A.    I'm not sure that we ever got past the challenges.  It
 5    never felt smooth.
 6    Q.    Okay.  Do you recall -- so, for purposes -- you can take
 7    that down.  For purposes of the time period, May 4th was the,
 8    May 4th 2017 was the announcement of the closure of the REI
 9    division.  Do you recall sometime in that timeframe a meeting
10    held for the entire OB/GYN department?
11    A.    I mean, it's vague, but I know there was a meeting, yes.
12    Q.    And did you attend that meeting?
13    A.    I'm sure that I did.
14    Q.    Okay.
15    A.    I wouldn't have not gone.
16    Q.    What's that?
17    A.    I wouldn't have not gone.
18    Q.    Okay.  So, if there was a meeting and it was for the
19    OB/GYN department and you were a clinic nurse manager, you
20    would have gone to that meeting?
21    A.    Right.
22    Q.    And I realize it was a long time ago.  Do you recall
23    Dr. Merrens speaking at that meeting about the REI division
24    closure?
25    A.    As much as I remember the meeting, yes, that he would have
```

(627 of 993), Page 627 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 579 of 945
2217      cv00344kjd      Document 329.23      Filed 04/25/25      Page 579 of 945

626

1   spoken at that, yes.  I knew that he was the one involved.

2   Q.   Okay.  Do you recall Dr. Merrens making any mention of Dr.

3   Porter's condition, whether she was out on a leave of absence

4   or anything related to her?

5   A.   I never heard anything about any communication about her

6   leave, right?  All leave communication that I ever had or heard

7   was all in regards to kind of what I have described, which was

8   kind of the dysfunction between the group of providers which

9   kind of bled into nurses and staff, but I did not hear him make

10  any statement like that.

11  Q.   Okay.  And so, if there was a meeting that you would have

12  attended, you didn't hear him make any statement about Misty

13  Porter's condition or anything about her personally?

14  A.   No.  I feel like that's something I would remember.  Yeah,

15  that feels big.

16         ATTORNEY SCHROEDER:  Okay, thank you.  Mr. Jones or

17  Ms. Nunan may have a few questions for you.  Thank you, Your

18  Honor.

19         THE COURT:  Okay.  Cross-examination?

20             CROSS-EXAMINATION BY ATTORNEY NUNAN

21  Q.   Hi, Ms. Mousley.  My name is Sarah Nunan.

22  A.   Hi.

23  Q.   I represent Misty Porter.  Can you tell me what medical

24  training you have?

25  A.   I don't have medical training.

(628 of 993), Page 628 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 580 of 945
2:17-cv-00044-kjd    Document 329-23    Filed 04/26/23    Page 580 of 945

627

VOLUME: 8
PAGES: 432-646

1    Q.    Okay.  And would it be possible for you to put B5 back up?

2    I don't have a digital copy of it.  Would that be possible, the

3    last exhibit that was just up?

4           ATTORNEY SCHROEDER:  Sure.  Just give us a second.

5    BY ATTORNEY NUNAN:

6    Q.    Yeah. Did you understand that Dr. Porter was returning

7    from long-term disability?

8    A.    Yes, I knew that she was coming, like, it's a gradual

9    schedule, a gradual return.

10   Q.    Got it.  And did you understand that she had had

11   accommodations as she was coming back into the clinic?

12   A.    I can vaguely recall those, that I knew that Donna was

13   making phone calls and having conversations with Dr. Porter in

14   regards to her schedule.  Because it wasn't just a straight,

15   like with Dr. Seifer and Dr. Hsu, where it was just in EDH and

16   it was kind of flooded and we filled it, and that's where the

17   disconnect was for me was trying to understand, trying to

18   understand what it was going to look like.

19   Q.    Right.

20   A.    Yeah.

21   Q.    Did you understand, as part of her accommodations, she

22   needed rest periods during the day?

23   A.    I don't think I knew that.

24   Q.    Got it.  And did you understand that the rest periods were

25   on these two EDH and QGendas?

(629 of 993), Page 629 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 581 of 945
2217fcv00094kjd    Document 329.23    Filed 04/23/25    Page 581 of 945

628

VOLUME: 8
PAGES: 432-646

 1   A.   If it was in EDH, if there was a mention in there, I would
 2   have seen that, yes, but I don't recall that.
 3   Q.   You don't recall that?
 4   A.   No.
 5   Q.   But, if I said that there were rest periods built into her
 6   schedule, would that surprise?
 7   A.   No, that wouldn't surprise me, no.
 8   Q.   And were you aware that Dr. Seifer was repeatedly
 9   violating her accommodation restrictions and those rest
10   periods?
11   A.   No.
12   Q.   And did you understand that the reason she asked you not
13   to send out her schedule was because the schedule you sent out
14   didn't have the rest periods built in?
15   A.   No, there was no mention of that.
16   Q.   Got it.  And did you come to Dr. Porter and say, Could you
17   explain to me what's going on here?
18   A.   No, I didn't.  I mean, I think that every, we both were
19   communicating through Donna.
20   Q.   Got it.  So there could have been a reason for her asking
21   you to do this that you didn't understand; is that correct?
22   A.   Yes, that's possible.
23   Q.   Great.  Thank you.
24        ATTORNEY SCHROEDER:  No questions, Your Honor.
25        ATTORNEY NUNAN:  I'm not done.

VOLUME: 8
PAGES: 432-646

1          ATTORNEY SCHROEDER:  I thought you were.

2          ATTORNEY NUNAN:  Nice try.  Okay.

3          ATTORNEY SCHROEDER:  Sorry.

4          ATTORNEY NUNAN:  No, no not a problem.

5    BY ATTORNEY NUNAN:

6    Q.   So you talked about this side list that Donna was

7    creating --

8    A.   Yes.

9    Q.   -- that you found, and you start in August of 2016?

10   A.   Yes.

11   Q.   Okay.  Did you hear in the department anything about

12   complaints of patient harm?

13   A.   I heard customer-service-related complaints, and I think I

14   covered them in that document that I just read few minutes ago

15   about him, he had a strange style, right, of communicating with

16   people.

17   Q.   That's a little different than what I'm asking.  I'm

18   asking you if you heard complaints of patient harm by Dr.

19   Seifer.

20   A.   I didn't know anything about the clinical side of that.  I

21   don't know about harm but definitely about demeanor.

22   Q.   Okay, right.  Did you know complaints about Dr. Hsu,

23   problems with patient harm with him?

24   A.   I didn't know about patient harm.  I don't recall

25   anything.

(631 of 993), Page 631 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 583 of 945
2:17-cv-00944-kjd   Document 329-23   Filed 04/23/25   Page 583 of 945

630

VOLUME: 8
PAGES: 432-646

 1    Q.  Got it.  So that's not something that, when you spoke to

 2   Donna, that she said back to you that there were issues about

 3   patient harm?

 4   A.  I don't recall that.

 5            ATTORNEY NUNAN:  Okay, yeah.  So I'd like to show an

 6   exhibit that is in evidence, 28.  Just confirming.

 7            COURTROOM DEPUTY:  Yes.

 8   BY ATTORNEY NUNAN:

 9   Q.  I'm going to describe this situation.  This is an email

10   between Dr. Porter, Dr. Leslie DeMars, who was chair of the

11   department.  Did you know that?

12   A.  Yes.

13   Q.  Judy McBean, did you understand she was a doctor in the

14   REI division?

15   A.  Yeah.  I didn't really know her, but yes.

16   Q.  And Beth Todd?

17   A.  Yes.

18   Q.  So the jury has seen this document before.

19            THE COURT:  So Ms. Nunan --

20            ATTORNEY SCHROEDER:  Objection, Your Honor.

21            ATTORNEY NUNAN:  Sorry.  Is it not coming up?

22            THE COURT:  Objection because the document is not on

23   the screen or something else?

24            ATTORNEY SCHROEDER:  Objection related to the

25   document, if I may be heard at sidebar.

(632 of 993), Page 632 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 584 of 945
2:17-cv-00194-kjd    Document 329-23    Filed 04/25/25    Page 584 of 945

631

VOLUME: 8
PAGES: 432-646

1        (Bench conference begins.)

2        THE COURT:  So, when you took the exhibit down, I

3   didn't know if that's --

4        ATTORNEY SCHROEDER:  It's admitted, Your Honor, no

5   question about that.  Beyond the scope of the direct.  It's

6   also asking her a question about a document she's not on.

7   She's characterizing the document and characterizing what the

8   jury was told.  And so I object on those grounds as well.

9        ATTORNEY NUNAN:  So here's my intent.  I would like

10  to show her the fact that Dr. DeMars was directing Beth Todd to

11  switch around the schedule, taking a patient off Dr. Hsu's

12  schedule and getting Beth Todd or Misty or Judy to deal with

13  the situation and that this is exactly what was going on, that

14  this speaks to what she's been talking about in terms of stuff

15  coming up.  I don't think she's aware of it, and this is a

16  prime example that the jury knows about that I would like to

17  mention this side list that was going on and this

18  back-and-forth.  She doesn't appear to have any knowledge, and

19  I want to make the point that that's what was going on here.

20       THE COURT:  Okay.

21       ATTORNEY SCHROEDER:  Just for the record, she does

22  have knowledge of the side note, and maybe I can understand the

23  that, the line of questioning, but characterizing the document

24  --

25       THE COURT:  Can you put the exhibit up for me?  Thank

(633 of 993), Page 633 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 585 of 945
2:17-cv-00044-kjd    Document 329-23    Filed 04/23/25    Page 585 of 945

632

VOLUME: 8
PAGES: 432-646

1    you.  So I know what we're talking about.  It never appeared in

2    front of me.

3            ATTORNEY SCHROEDER:  Okay.  I didn't really -- I was

4    actually just looking down at it when I raised the objection.

5            ATTORNEY NUNAN:  So the top of Page 2 is where

6    they're talking about Dr. Hsu has identified a patient who

7    needs surgery for a septum, and Dr. DeMars -- we went over this

8    yesterday -- above that is saying, you know, You need to -- I

9    don't want to create patient harm.  I don't want this patient,

10   I don't want there to be surgery on this patient, so, Beth

11   Todd, will you please take care of this, take her off the

12   schedule?  There was a lot of this going on in the background.

13   I don't think she saw it, and I would like to make it clear to

14   the jury that, while she has an experience, she didn't have the

15   full view.

16           THE COURT:  Okay.  Well, all right.  I'm going to

17   allow her to question on this.

18           ATTORNEY SCHROEDER:  Totally understand your

19   position, Judge, and we'll proceed accordingly.  But, if I may,

20   Donna Bedard is not on this email exchange.  So I think I

21   understand the scope.  I still make my objection on scope and a

22   continuing objection to the extent that we, Donna Bedard is not

23   even on this email.  So I understand her point of argument, but

24   that's argument, not -- you know, she's not on the,

25   Ms. Mousley, is not on this email.  Donna is not on this email.

(634 of 993), Page 634 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 586 of 945
2:17-cv-00944-kjd    Document 329-23    Filed 04/23/25    Page 586 of 945

633

VOLUME: 8
PAGES: 432-646

1    There's nothing about this, quote, unquote, theory related to

2    this.  And so I just want to be careful that the testimony,

3    it's not characterizing prior testimony in the form of

4    declarative statement as opposed to a question.  She has

5    cross-examination.  That's fine, but --

6            THE COURT:  Okay.  And you'll be speaking, obviously,

7    about this email in your --

8            ATTORNEY NUNAN:  I will speak to that email.

9            THE COURT:  While I have everyone here,

10   scheduling-wise, is Ms. Mousley your last witness?

11           ATTORNEY SCHROEDER:  Yes.

12           THE COURT:  So after that I'll take your -- I just

13   wanted to make sure I didn't do it and you had another witness

14   lined up.

15           ATTORNEY SCHROEDER:  Thank you.

16           (Bench conference ends.)

17   BY ATTORNEY NUNAN:

18   Q.   Can everybody see 28?  Not yet.  Ms. Mousley, this is an

19   email that was written in over a couple of days in the

20   beginning of December of 2016.  I'm going to read from the top

21   of the second page:  "There are two patients that I have

22   discussed with all of you".  I'm sorry.  "There are two

23   patients that I have discussed with all you who had HyCoSy SHGs

24   to evaluate the cavity that were read as septums.  Neither

25   patient has a septum."

634

1        And I'm not going to finish the sentence because I was

2    corrected last time as to how I pronounced it, but essentially

3    what's going on here is Dr. Hsu misread ultrasounds and

4    scheduled a patient to do surgery on himself, okay?  And --

5                ATTORNEY SCHROEDER:  Objection, Your Honor.

6                THE COURT:  Yeah, sustained.

7                ATTORNEY SCHROEDER:  Thank you.

8    BY ATTORNEY NUNAN:

9    Q.   Okay.  Above, I'm going to read to you what Dr. DeMars

10   wrote back to Dr. Porter, Judy McBean, and Elizabeth Todd, and

11   I'm going to direct you right, starting right here:  "I can't

12   tell him not to do it, because I am not the content expert, but

13   I would suggest, Beth, that you call her and suggest that she

14   postpone and see Judy or Misty if, Misty, you believe that the

15   images have been overread.  I do not want her to be harmed.

16   She works here and should be able to pop in for another visit."

17        So they are redirecting that to come off Dr. Hsu's

18   schedule and for Beth Todd.  Did you have --

19                ATTORNEY SCHROEDER:  Objection, Your Honor.  That is

20   not --

21                THE COURT:  Sustained, sustained.

22                THE COURT:  Maybe counsel should approach at this

23   time.

24                ATTORNEY NUNAN:  Okay.  Sorry.

25                (Bench conference begins.)

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 588 of 945
2:17-cv-00944-kjd   Document 329.23   Filed 04/23/25   Page 588 of 945

VOLUME: 8
PAGES: 432-646

```
 1           THE COURT:  So I asked you come up because I
 2   understand what you want to do with this line of questioning,
 3   and, obviously, I'm allowing you to do it, but I'm a little
 4   concerned about how you're going to go about doing this without
 5   explaining the context of this email, which is you testifying,
 6   and I can't have that.
 7           ATTORNEY NUNAN:  Okay.  So, if I ask her if she had
 8   knowledge of why people were being removed from schedules, is
 9   that fair?
10           THE COURT:  Did she have knowledge unrelated to this
11   email?
12           ATTORNEY NUNAN:  Yeah.
13           THE COURT:  So what's your question?  Were you going
14   to say --
15           ATTORNEY NUNAN:  I'm not sure I'm doing a good job
16   with this.
17           THE COURT:  No.
18           ATTORNEY NUNAN:  So without -- so I've said what my
19   understanding is.  I've said, I have described the situation,
20   but my point is this was part of the reason the schedule,
21   people were being taken off David Seifer's schedule and Albert
22   Hsu's schedule.  And she's testified there was this side list,
23   and we didn't -- you know, she disciplined Donna Bedard for
24   things that were going on that she didn't understand.  There
25   was clearly direction behind the scenes, so --
```

(637 of 993), Page 637 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 589 of 945
2117cv00094kjd Document 329.23 Filed 04/23/25 Page 589 of 945

636

VOLUME: 8
PAGES: 432-646

 1          THE COURT:  I understand that, and I think this is

 2     similar to what you said when you were last up here, and I

 3     understand the general line.  I'm just, I don't see how you're

 4     going to do this the way you've been attempting to do it.  So,

 5     you know, if you want to -- I'm not going to tell you what to

 6     do, but, if you want to ask a question generally about whether

 7     she was aware of other kinds of scheduling issues potentially

 8     --

 9          ATTORNEY SCHROEDER:  Judge, if I may be heard?

10          THE COURT:  Yeah.

11          ATTORNEY SCHROEDER:  This is all argument, okay?  She

12     wants to make that -- if Sarah wants to make, Ms. Nunan, wants

13     to make these points in closing argument, she can do that.

14     She's trying to do her closing argument by way of this witness

15     and this document.  She's not on -- we're way beyond the scope

16     at this point.  We came up here for this conference, and it's

17     like deja vu all over again, right?  It's like we're here

18     discussing the same exact issue.  I'm going to continue to

19     object, and I don't want it to be considered kind of badgering

20     of Ms. Nunan by doing that, but this is wholly inappropriate,

21     way beyond the scope.

22          THE COURT:  I do -- I'm not sure how I see this

23     happening, so --

24          ATTORNEY NUNAN:  All right.  I'll take it down.

25     That's fine.

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 590 of 945
2:17-cv-00494-kjd Document 329-23 Filed 04/23/25 Page 590 of 945

```
 1              THE COURT:  Okay, thank you.

 2              (Bench conference ends.)

 3   BY ATTORNEY NUNAN:

 4   Q.   I'm going to take this exhibit down.  Would it be possible

 5   that the patients would be taken off of Dr. Seifer's schedule

 6   for medical reasons?

 7   A.   I just feel like it's something that should have been

 8   communicated when I was trying to find out why Donna was

 9   creating this list, and that was not shared with me.  So I had

10   to treat it for what it was, which was that they weren't

11   putting patients on Dr. Seifer and Dr. Hsu's schedule.

12   Q.   But it's possible you don't know the whole story?

13   A.   I guess it's possible, yeah.

14   Q.   So you said that you didn't have any medical training?

15   A.   I don't.

16   Q.   Okay.  And you don't have any understanding of the ASRM

17   guidelines; is that right?

18   A.   Correct.

19   Q.   Okay.  So, if you witnessed provider disagreement, is it

20   possible that you didn't understand the medical disagreements

21   that were going on behind the scenes?

22   A.   It's possible I didn't understand the medical

23   disagreements, but just kind of professional communication and

24   etiquette and all of that, that I understand very well, and

25   that's what was missing between the team of providers.
```

(639 of 993), Page 639 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 591 of 945
2117     Case 2:22-cv-00944-kjd    Document 329.23    Filed 04/23/25    Page 591 of 945

638

 1    Q.   Sure.  I'd like to put back up what we've already looked

 2    at.  It's, for us, it is -- I only have a copy of Plaintiff's

 3    Exhibit 19.  I don't believe it's been admitted.  It's the same

 4    document that defense put up before.  Can I, can you turn to

 5    Exhibit 19 in the book, please?

 6    A.   Is it B19?  Is that --

 7    Q.   No.  I'm sorry.  So sorry.  Plaintiff's 19.  Turn back to

 8    19.

 9    A.   Yeah.  I'll get there.

10    Q.   Sorry.  They are not easy.

11              THE COURT:  So, just to be clear, Ms. Nunan, so

12    Plaintiff's 19 has not been admitted, but you're saying that

13    this particular exhibit has been admitted under a different

14    number?

15              ATTORNEY NUNAN:  It has.  I'd just like to go over it

16    with her again.  The only copy that I have and can show and

17    review with her is ours.  I don't have to admit this because

18    it's already been admitted.

19              THE COURT:  Just, in terms of publishing it, if that

20    was your intent.

21              ATTORNEY NUNAN:  Please.

22              THE COURT:  The only thing is we don't know what

23    number it is.  So if we could get that --

24              ATTORNEY NUNAN:  What number the defendants?

25              THE COURT:  Yes.

(640 of 993), Page 640 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 592 of 945
2:17-cv-00194-kjd    Document 329-23    Filed 04/25/25    Page 208 of 945

639

VOLUME: 8
PAGES: 432-646

```
 1              ATTORNEY SCHROEDER:  B3.

 2              ATTORNEY NUNAN:  B3, please.

 3              THE COURT:  Thank you.

 4    BY ATTORNEY NUNAN:

 5    Q.   So this is the same document you saw before --

 6    A.   Yes.

 7    Q.   -- dated 2/20/2017.  This is your assessment of David

 8    Seifer; is that right?

 9    A.   Yes.

10    Q.   Okay.  I'm going to put that back up.  So I'd just like to

11    read from the middle paragraph here.  Under "Leadership" you

12    wrote:  "Leadership, David seems unable to bring his team

13    together, and his actions, or lack thereof, often has the

14    opposite effect.  His lack of direction and guidance from

15    facilitating a team meeting to making a decision when the team

16    is looking for closure continues to have a negative impact on

17    the team's progress.  He requires constant coaching and

18    feedback and validation before he can move forward.  It can be

19    exhausting working alongside him."

20         Those are some of the challenges you had?

21    A.   Yes.

22    Q.   Is it possible that those were some of the challenges Dr.

23    Porter had with him?

24    A.   Possible.

25    Q.   Great, okay.  I would like you to turn to the book,
```

VOLUME: 8
PAGES: 432-646

1     Plaintiff's Exhibit 27, please.  This is an email from you to

2     Heather Gunnell; is that right?

3     A.   Yes.  Can I read it?

4     Q.   Absolutely.  Take your time.

5              THE COURT:  Ms. Nunan, is there a way for you to put

6     that up for me and for counsel?

7              ATTORNEY NUNAN:  If I plug it in, you can control

8     that?

9              COURTROOM DEPUTY:  Yes.

10             THE COURT:  Okay.  Thank you.

11    BY ATTORNEY NUNAN:

12    Q.   Okay?

13    A.   Yeah.

14    Q.   Do you recognize this email?

15    A.   I don't.  I mean, I can see obviously I did it, but --

16    Q.   You wrote it?

17    A.   Yes.

18             ATTORNEY NUNAN:  It's dated November 10th 2016, and

19    it is a list of patient complaints.  I'd like to move for the

20    admission of Plaintiff's Exhibit 27.

21             THE COURT:  Any objection?

22             ATTORNEY SCHROEDER:  Objection, Your Honor, hearsay.

23             THE COURT:  All right.  I'll ask you to approach.

24             (Bench conference begins.)

25             ATTORNEY NUNAN:  I'm causing a lot of trouble.

1    Sorry.

2            THE COURT:  Okay.  So what's the hearsay objection?

3            ATTORNEY SCHROEDER:  These are all comments by three

4    different patients.  I don't know.  So these are, this is just

5    a recording of what patients reported.  I don't know

6            ATTORNEY NUNAN:  To her.

7            ATTORNEY SCHROEDER:  I don't know that.  These are

8    comments that are made to a nonclinical person.  This is, these

9    aren't medical records or diagnoses where they're made to where

10   they would fall within the hearsay exception under 804.

11   They're just a series of patient comments that Kelly is, I'm

12   sorry, Kelly Mousley is communicating to Heather Gunnell, but

13   the underlying comments by the patient, whatever they are, are

14   hearsay.

15           THE COURT:  So this is just an email that Kelly

16   wrote, right?

17           ATTORNEY NUNAN:  Right.  And I got to ask the

18   circumstances under which she was aware of -- I mean, did she

19   take those calls?  How did she know this?  It seems to me like

20   there's quite a bit of awareness of Dr. Seifer's issues here.

21           THE COURT:  Okay.  I'll allow you to question her on

22   this.

23               (Bench conference ends.)

24           ATTORNEY NUNAN:  So are we allowed to publish to the

25   jury, or I'm just going to ask questions?

(643 of 993), Page 643 of 993     Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 595 of 945
2:17-cv-00194-kjd     Document 329-23     Filed 04/25/25     Page 595 of 945

VOLUME: 8
PAGES: 432-646

642

```
 1              THE COURT:  Yeah.  So objection overruled, and it
 2    would be admitted, Plaintiff's Exhibit 27.
 3    BY ATTORNEY NUNAN:
 4    Q.   Ms. Mousley, do you remember the circumstances under which
 5    you wrote this email?
 6    A.   I don't remember exactly, but I'm assuming that I had
 7    received information from a patient or through a secretary to
 8    get this information.
 9    Q.   Okay.  Do you remember if this would have been through
10    phone calls that you had taken or somebody else?  Do you have
11    any recollection of how you gathered this information?  It's
12    pretty specific.
13    A.   Yeah, I don't remember exactly how I got this, but, if I,
14    when I did receive this type of information, it would have been
15    either a call came through to someone in OB/GYN, some
16    administrative person and they would have sent it to me, or
17    they would have come to me and said, Hey, I have a patient on
18    the phone.
19    Q.   Okay.  And is it fair to characterize that these are
20    complaints about David Seifer?
21    A.    Yeah, it seems like that, yeah, Dr. Seifer, the changing
22    of nurses, Dr. Hsu, Beth Todd.  Looks like there were several
23    concerns.
24              ATTORNEY VITT:  Can you speak into the microphone,
25    please?  It's a little hard to hear.
```

(644 of 993), Page 644 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 596 of 945
2:17-cv-00194-kjd   Document 329-23   Filed 04/23/25   Page 596 of 945

643

1           THE WITNESS:  Oh, I'm sorry.  Yes.

2     BY ATTORNEY NUNAN:

3     Q.   And this was in November of 2016?

4     A.   Yes, according to this.  I don't recall sending the email,

5     but --

6           ATTORNEY NUNAN:  Okay, great.  I have no further

7     questions.

8           THE COURT:  Okay.  Any redirect?

9           ATTORNEY SCHROEDER:  Real quick, Your Honor.  Just at

10    the end of this document, if we could put up Plaintiff's

11    Exhibit 27 --

12          ATTORNEY NUNAN:  I can put it up.

13          REDIRECT EXAMINATION BY ATTORNEY SCHROEDER

14    Q.   Just the second page.  I'm going to refer to the last

15    part.  Can we go to the second page at the top?

16         I know Ms. Nunan said that there was a series of

17    complaints about Dr. Seifer, but I want to direct your

18    attention to the last few lines that relate to these notes.  It

19    says, "The second time she saw him she brought her husband with

20    instructions that he help her get her questions answered before

21    Dr. Seifer ran out of the room.  However, Dr. Seifer was much

22    different and answered their questions and gave a thorough

23    explanation.  So they left feeling much different about their

24    experience.  She also enjoyed working with Marti for her last

25    visit and wants to bring her a fruit basket."

1       That was a positive response, correct?

2   A.   Correct.

3   Q.   Okay.  Now, thank you.  With respect to any concerns that

4   you may have raised to Ms. Gunnell in Plaintiff's Exhibit 27 or

5   in later February 20th 2017 when you gave a review of Dr.

6   Seifer with some critical comment, did you ever suffer any form

7   of retaliation or poor treatment by Dartmouth Health after

8   being, after giving those reviews?

9   A.   No.

10  Q.   And, in fact, you remained employed there until when?

11  A.   February of 2020.

12  Q.   Thank you.

13          THE COURT:  Any further cross?

14          ATTORNEY NUNAN:  None.

15          THE COURT:  Okay.  Ms. Mousley, you may step down

16  thank you.  Okay.  So, members of the jury, this is where we'll

17  conclude for today a little bit earlier.  We'll see you again

18  tomorrow ready to go at 9:00.  Please don't speak to one

19  another or anyone else about the case or do any type of

20  independent research about the case.  Have a good evening.

21          (The Jury leaves the courtroom.)

22          THE COURT:  Okay.  So tomorrow's witnesses?

23          ATTORNEY SCHROEDER:  Sure, Your Honor.  Let me just

24  consult with my --

25          THE COURT:  Yes.

(646 of 993), Page 646 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 598 of 945
2:17-cv-00194-kjd    Document 329-23    Filed 04/25/25    Page 598 of 945
645

```
 1              ATTORNEY SCHROEDER:  -- co-counsel here.  Your Honor,
 2    I expect we'll see Dr. Merrens again, Heather Gunnell, and, if
 3    we have time, Jocelyn Chertoff.
 4              THE COURT:  Okay.  So you expect those three, then,
 5    to take the bulk of the day?
 6              ATTORNEY SCHROEDER:  I think so, Your Honor.
 7              THE COURT:  Okay, all right.
 8              ATTORNEY SCHROEDER:  We've got, we've had to move
 9    some people around, given that, initially, this was looking
10    like a three-week trial, and I think we're, both sides have
11    condensed it, but some of our witnesses are coming from rather
12    far.  So we've had to try to make sure that we can fill the
13    time on each of these days, and I think that will be
14    appropriate and fill most of the day tomorrow.
15              THE COURT:  Okay, all right.  Thank you.  Anything
16    else to take up at this time?
17              ATTORNEY JONES:  Not from the plaintiff.
18              ATTORNEY SCHROEDER:  Nothing, Your Honor.  Thank you.
19              THE COURT:  Thank you.  Have a good evening.  be
20
21
22              (Whereupon at 4:02 p.m. the hearing was adjourned.)
23
24
25
```

(647 of 993), Page 647 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 599 of 945
2:17-cv-00194-kjd Document 329-23 Filed 04/23/25 Page 599 of 945

646

```
 1              C E R T I F I C A T E

 2              I, Sunnie Donath, RMR, Official Court Reporter

 3     for the United States District Court, District of Vermont, do

 4     hereby certify that the foregoing pages are a true and accurate

 5     transcription of my stenographic notes of the hearing taken

 6     before me in the above-titled matter on April 2, 2025 to the

 7     best of my skill and ability.

 8

 9

10

11

12                        Sunnie Donath, RMR
                 --------------------------------
13

14                       Sunnie Donath, RMR

15

16

17

18

19

20

21

22

23

24

25
```

(648 of 993), Page 648 of 993   Case: 25-1382   12/22/2025   DktEntry: 35.4   Page 600 of 945
2:12-17-cv-00194-kjd   Document 355   Filed 04/23/25   Page 600 of 945

970

VOLUME:  11
PAGES:  970-1056

1                    UNITED STATES DISTRICT COURT
                             FOR THE
2                       DISTRICT OF VERMONT

3

4   Misty Blanchette Porter        )
                                    )
5                                   )
    v.                              ) Case No. 2:17-cv-194
6                                   )
                                    )
7   Dartmouth-Hitchcock Medical     )
    Center, et al.                  )
8   _____)

9

10  RE: Day 11 of Jury Trial, Charge Conference

11  DATE: April 7, 2025

12  LOCATION: Burlington, Vermont

13  BEFORE:  Honorable Kevin J. Doyle
                 Magistrate Judge

14

15  **APPEARANCES**:

16  Geoffrey J. Vitt, Esq.
    Sarah H. Nunan, Esq.
17  Vitt & Nunan, PLC
    8 Beaver Meadow Road
18  Norwich, VT 05055

19  Eric D. Jones, Esq.
    Langrock, Sperry & Wool
20  210 College Street, Suite 400
    Burlington, VT 05410
21
    Donald W. Schroeder, Esq.
22  Morgan McDonald, Esq.
    Foley & Lardner, LLP
23  111 Huntington Avenue, Suite 2500
    Boston, MA 02199

24

25                   - Continued on Next Page -

VOLUME:  11
PAGES:  970-1056

1    Tristram J. Coffin, Esq.
     Downs Rachlin Martin, PLLC
2    199 Main Street, Suite 600
     Burlington, VT 05401-8339

3

4

5

6

7

8

9              TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                      United States District Court Reporter
10                        verbatim@vermontel.net

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(650 of 993), Page 650 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 602 of 945
2:12-17-cv-00194-jdkjd Document 345    Filed 04/05/25    Page 602 of 945

972

VOLUME:  11
PAGES:  970-1056

1                 (The hearing began at 1:03 p.m.)

2                 COURTROOM DEPUTY:  Your Honor, the matter before the

3      Court is Civil Case Number 17-cv-194, Misty Blanchette Porter

4      versus Dartmouth-Hitchcock Medical Center, et al.  Present on

5      behalf of the plaintiff are Attorneys Geoffrey Vitt and Eric

6      Jones.  Present on behalf of the defendants are Attorneys

7      Tristram Coffin, Morgan McDonald, and Donald Schroeder.  We are

8      here for a charge conference.

9                 THE COURT:  Good afternoon.  Nice to see everyone

10     again.  Okay.  So, turning to the charge conference, so just

11     kind of for your knowledge, I've kind of set aside about 90

12     minutes.  I'm hoping that that should be enough to get through

13     this.  So let's start with the actual charge, of course, and

14     particularly the "General Instructions" beginning on Page 1.

15     I'll just go through kind of what I'll call, you know, the more

16     general charges that this court issues in pretty much every

17     case just to make sure that people are okay with that for the

18     record.

19                 So, in terms of Page 1 as well as leading onto Page 2,

20     "Jurors as Finders of Fact/Rulings of the Court", do plaintiffs

21     have any comments or objections to those?

22                 ATTORNEY JONES:  No objection.

23                 THE COURT:  Okay.  Defendants?

24                 ATTORNEY COFFIN:  No, Your Honor.

25                 THE COURT:  Okay.  "Sympathy/Prejudice" is the next

1    category, as well as "Evidence in the Case".  Plaintiffs have
2    any objections to that?
3              ATTORNEY JONES:  No objection.
4              THE COURT:  Okay.  And defendants?
5              ATTORNEY COFFIN:  No, Your Honor.
6              THE COURT:  All right.  Page 3,
7    "Arguments/Statements/Objections of the Attorneys", "Court's
8    Rulings on Objections", and "Evidence: Direct or
9    Circumstantial", does plaintiff have any objections?
10             ATTORNEY JONES:  No, Your Honor.
11             THE COURT:  Okay.  And defendants?
12             ATTORNEY COFFIN:  No.
13             THE COURT:  Okay.  On Page 4, "Credibility of
14   Witnesses", plaintiff, any objections to that charge?
15             ATTORNEY JONES:  No.
16             THE COURT:  And defendants?
17             ATTORNEY COFFIN:  No, Your Honor.
18             THE COURT:  On Page 5, "Impeachment of a Witness",
19   plaintiff, any objections to that?
20             ATTORNEY JONES:  No, Your Honor.
21             THE COURT:  And defendants?
22             ATTORNEY COFFIN:  No.
23             THE COURT:  Okay.  Page 6, "Expert Witnesses", any
24   objections from the plaintiff?
25             ATTORNEY JONES:  None.

(652 of 993), Page 652 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 604 of 945
2:12-cv-00104-jdkjd Document 355-25 Filed 04/23/25 Page 604 of 945

974

VOLUME: 11
PAGES: 970-1056

1                THE COURT:  And defendant?

2                ATTORNEY SCHROEDER:  Just a minor edit, Your Honor,

3     and, if it pleases the Court on this one, we've got our red

4     lines that we actually did so that, to the extent that they

5     would be beneficial to the Court to understand our position on

6     a few things.

7                THE COURT:  Do you mean red lines with law or just

8     kind of a proposed --

9                ATTORNEY SCHROEDER:  Just proposed red lines of your

10    instructions.  We just figured that was the most efficient way

11    to do it if you --

12               THE COURT:  Okay.  Well, let's see how it works if

13    you just explain to me what your proposals are.

14               ATTORNEY SCHROEDER:  Sure.  I would just say in the

15    first line it would be better read to say, "You may have heard

16    from one witness -- you have heard from one witness, Dr. Robert

17    Bancroft, who was presented by Dr. Porter as an expert

18    witness".  I don't think saying "who was known as an expert

19    witness" is necessarily appropriate.  So this is more of a

20    proposed revision.

21               THE COURT:  Okay.

22               ATTORNEY SCHROEDER:  That's it on that one.

23               THE COURT:  That's it?  Okay.  Plaintiff, any

24    objection to that proposed change?

25               ATTORNEY JONES:  No.  That would be acceptable.

(653 of 993), Page 653 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 605 of 945
2:12-cv-00194-wdkjd Document 1255 Filed 04/25/25 Page 605 of 945

975

VOLUME: 11
PAGES: 970-1056

1            THE COURT:  Okay, all right.  And then the next

2    charge, "Number of Witnesses", plaintiff, any objection?

3            ATTORNEY JONES:  No, Your Honor.

4            THE COURT:  And defendant?

5            ATTORNEY SCHROEDER:  No, Your Honor.

6            THE COURT:  Okay.  The next category, "Personal

7    Knowledge and Experience of Jurors", plaintiff, any objection

8    to that?

9            ATTORNEY JONES:  No.

10           THE COURT:  Okay.  And defendants?

11           ATTORNEY SCHROEDER:  None.

12           THE COURT:  Page 7, "Burden of Proof: Preponderance

13   of the Evidence", any objections, plaintiff?

14           ATTORNEY JONES:  No.

15           THE COURT:  And defendants?

16           ATTORNEY SCHROEDER:  Your Honor, minor comments.  At

17   the -- so I would just go through them very quickly.  At the

18   bottom, "If you find that the credible" -- it's the last

19   paragraph, "If you find that the credible evidence on an issue

20   is evenly divided between the parties, you must decide that

21   issue", I would just say "against Dr. Porter", because it is

22   her burden, instead of just "the party having the burden of

23   proof".

24           THE COURT:  Okay.

25           ATTORNEY SCHROEDER:  The same, just inserting

(654 of 993), Page 654 of 993   Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 606 of 945
2:12-cv-00004-jdkjd Document 35.4   Filed 04/23/25   Page 606 of 945
976

VOLUME:  11
PAGES:  970-1056

 1    "Dr. Porter" instead of "he or she", and then at the end of the

 2    second full paragraph on Page 8 --

 3              THE COURT:  And where is that, "he or she"?

 4              ATTORNEY SCHROEDER:  I'm sorry.  Right at the top,

 5    Your Honor, of Page 8, "simple equality of the evidence, he or

 6    she", I would just put "Dr. Porter".  And the first full

 7    paragraph would suggest language at the end that says, "You

 8    must find for Dartmouth Health on those claims", period.

 9              THE COURT:  Okay.  Where exactly are you in that

10    section?

11              ATTORNEY SCHROEDER:  Sure.  Oh, I'm looking at Page 8

12    before "Corporation Acts Through Its Employees".

13              THE COURT:  Yes.

14              ATTORNEY SCHROEDER:  I would request, respectfully

15    request, "You must find for Dartmouth Health on those claims",

16    at the end of that paragraph, just inserting the words "on

17    those claims".

18              THE COURT:  Oh, okay.  Just so I'm clear, so on Page

19    7 at the bottom of that line, are defendants proposing that the

20    second clause of that sentence read, "You must decide that

21    issue against Dr. Porter", period, and then the next sentence,

22    "That rule follows from the fact that the party bearing this

23    burden must prove more than simple equality of evidence:  Dr.

24    Porter must prove the element at issue"?

25              ATTORNEY SCHROEDER:  Yes, Your Honor.

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 607 of 945

2:12-cv-00104-jdk jd Document 655-25 Filed 04/23/25 Page 607 of 945

```
 1              THE COURT:  And then the final sentence of that

 2      section, the final clause, "Then Dr. Porter has failed to

 3      sustain her burden, and you must find for Dartmouth Health on

 4      those claims", or on these claims?

 5              ATTORNEY SCHROEDER:  I'm agnostic on that part, Your

 6      Honor.

 7              THE COURT:  Plaintiff, any objections to that

 8      proposal?

 9              ATTORNEY JONES:  Well, I think it should be "on that

10      claim".  Otherwise, it sounds like it's global, like a failure

11      to meet a burden of proof on one means it affects others.

12      Otherwise, I don't have a problem with that concept.

13          With regard to the remaining edits, my concern is that

14      there are affirmative defenses in this case on which Dartmouth

15      Health bears the burden of proof.  So I don't think it's

16      accurate to say that only Dr. Porter bears the burden of proof

17      on all issues before the Court.

18          So I would argue that you retain the language at the

19      bottom of Page 7, "the party having the burden of proof",

20      because, for example, mitigation of damages is an issue on

21      which Dartmouth Health has that burden.  On Page 8 I understand

22      getting rid of "he", but maybe it should be, "Dr. Porter or

23      Dartmouth Health must prove the element" to be accurate with

24      regard to multiple burdens of proof in this case.

25              THE COURT:  Dr. Porter or Dartmouth Health?
```

(656 of 993), Page 656 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 608 of 945
2:12-cv-00194kjd Document 35.4 Filed 04/23/25 Page 608 of 945

978

VOLUME: 11
PAGES: 970-1056

1          ATTORNEY JONES:  Correct.

2          THE COURT:  Yeah, it is true there are affirmative

3     defenses in the case, right?

4          ATTORNEY SCHROEDER:  Well, there's only -- I believe

5     it's affirmative defense of mitigation of damages, but there

6     are six claims in this case, and all six are plaintiff's

7     burden.  So is there an affirmative defense at the end?  Yes,

8     but you have a specific jury instruction to that point.  But

9     this isn't a case of claims and counterclaims, right?  It is

10    six claims.  All of them are Dr. Porter's.  That, I think, is

11    the general point of why, raising that up front.  I think you

12    deal with it, quite honestly, Your Honor, to the extent that

13    there is an affirmative defense, it is at the end of the jury

14    instructions relating to just that one issue.

15         ATTORNEY JONES:  I would just be concerned, Your

16    Honor, that, if the jury is thinking about that and there's a

17    question in the jury room about who does bear the burden of

18    proof and they go back to your burden of proof section and

19    there's no reference to the fact that both parties may bear a

20    burden depending on the issue, that it could be confusing to

21    the jury.

22         THE COURT:  So on the top of Page 8, Mr. Jones, where

23    you have suggested, I believe, "Dr. Porter or Dartmouth

24    Health", right?

25         ATTORNEY JONES:  That's correct, but, also, at the

VOLUME: 11
PAGES: 970-1056

1    bottom of Page 7, I would just retain the language you had that

2    refers to, "You must decide that issue against the party having

3    the burden of proof", because it depends on who has the burden

4    of proof on that issue.

5           THE COURT:  Okay, all right.  So this particular

6    issue, let me take a look at the later instructions and figure

7    out what I'll do there, and you'll have another opportunity to

8    see that.  So, just by the way, if it turns out -- looks like

9    there may be some edits that we'll have to make,

10    unsurprisingly, and, if that happens, what I'll do is we're

11    going to get you another copy this evening of any changes that

12    were made, and, because it will be later tonight, hopefully

13    we'll get you a red line kind of track changes version as well

14    so you can see whatever has been made, and then we can come

15    back tomorrow morning a little bit on the earlier side.  This

16    way, if you want to lodge any additional objections, you'll

17    have an opportunity to.

18           ATTORNEY SCHROEDER:  Thank you, Your Honor.  That's

19    why we did the red line as well and give copies to the Court so

20    that, if I'm not as articulate as our red lines are, you'll at

21    least know what I was speaking about today.

22           THE COURT:  Okay, all right.  "Corporation Acts

23    Through Its Employees", plaintiff, any objection to that?

24           ATTORNEY JONES:  No objection.

25           THE COURT:  And defendants?

(658 of 993), Page 658 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 610 of 945
2:21-cv-00949-kjd Document 352-3 Filed 04/25/25 Page 610 of 945
980

VOLUME:  11
PAGES:  970-1056

```
 1          ATTORNEY SCHROEDER:  Your Honor, one change there,
 2     and, actually, it really relates to the next paragraph.  The
 3     next paragraph, we would agree to the whole paragraph but move
 4     it up first, because I think it actually flows, like first
 5     stating "All Persons Equal Before the Law" and then
 6     "Corporation Acts Through Its Employees".
 7          And then, with respect -- but more specifically on just
 8     this paragraph, "Corporation Acts Through Its Employees", the
 9     third sentence, "Therefore, the act", I think the law is more
10     appropriate to say that the act of a high-level Dartmouth
11     Health employee that occurred while he or she was on duty and
12     acting within the scope of his or her employment duties.
13          I mean, otherwise, you could hold Dartmouth Health liable
14     for any act of any employee, and I don't think that's -- even
15     with the more liberal standard of agency law under the Second
16     Circuit precedent, it needs to be a high-level employee acting
17     within the scope.
18          THE COURT:  Okay.  Plaintiffs, do you have any
19     objection to that?
20          ATTORNEY JONES:  Well, I guess that begs the question
21     of what's a high-level employee, and how is that going to be
22     defined and how is that going to provide guidance to the jury?
23          THE COURT:  Mr. Schroeder, is that the specific
24     language you're proposing is the words "high-level"?
25          ATTORNEY SCHROEDER:  That's what we have here, but,
```

(659 of 993), Page 659 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 611 of 945
2:17-cv-00494-jkjd Document 35293 Filed 04/25/25 Page 611 of 945
981

VOLUME: 11
PAGES: 970-1056

1    you know what, Your Honor?  I would be inclined to put

2    executive.

3              THE COURT:  Executive?

4              ATTORNEY JONES:  I think that's a very limited

5    statement of the law.

6              THE COURT:  Yeah.  Is executive the same as

7    supervisory?  I don't think so.

8              ATTORNEY JONES:  Officials well below the executive

9    level can bind a corporation.

10             THE COURT:  That seems true.

11             ATTORNEY SCHROEDER:  Management level then, I guess,

12   would be -- management level, Your Honor?

13             THE COURT:  It seems like supervisory would work

14   better there, little more --

15             ATTORNEY SCHROEDER:  Maybe I'll let Ms. McDonald

16   argue since she's the one that actually suggested that

17   language.  But very well, Your Honor.

18             THE COURT:  Mr. Jones?

19             ATTORNEY JONES:  We would agree to that.

20             THE COURT:  Okay.  And, again, in the section,

21   "Corporation Acts Through Its Employees", then the last

22   sentence of that section, "Therefore, the act of any

23   supervisory level Dartmouth Health employee" is the agreement?

24             ATTORNEY JONES:  Yeah.

25             THE COURT:  Okay.  And, Mr. Jones, what about the

(660 of 993), Page 660 of 993   Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 612 of 945
2:17-cv-00494-jkd   Document 352-3   Filed 04/25/25   Page 612 of 945

982

VOLUME:  11
PAGES:  970-1056

1    proposal that the two sections be kind of --

2              ATTORNEY JONES:  That's fine.

3              THE COURT:  So then the "All Persons Equal Before the

4    Law" would precede "Corporation Acts Through Its Employees".  I

5    believe Mr. Schroeder has already indicated no substantive

6    objections to "All Persons Equal Before the Law".

7              ATTORNEY SCHROEDER:  Correct, Your Honor.

8              THE COURT:  And, plaintiff, any objections to the

9    language in "All Persons Equal Before the Law"?

10             ATTORNEY JONES:  No objection.

11             THE COURT:  Okay, all right.  So those are kind of

12   the general charges.  On Page 9 then, "Influenced

13   Decision-Maker", plaintiff have any objection to that?

14             ATTORNEY JONES:  No objection.

15             THE COURT:  Defendants?

16             ATTORNEY SCHROEDER:  Continuing objection, Your

17   Honor, just on the inclusion of anything relating to the cat's

18   paw theory.  One of the supplemental jury instructions that we

19   sent the Court, which was not a case that we cited before but

20   we did cite in the supplemental jury instructions, was

21   *Gentleman v. State University of New York Stony Brook*, Second

22   Circuit, May 9, 2022, Westlaw cite 2022 WL 1447381.

23        In that the court said, quote, "We have never determined

24   whether the 'cat's paw' theory of liability can apply under the

25   'but-for' standard of causation applicable to claims under the

983

VOLUME: 11
PAGES: 970-1056

1  ADA and Rehab Act", end quote.

2      And so I'd submit, Your Honor, that that should not be

3  before the Court.  Obviously, you've heard our arguments -- I'm

4  not going to repeat them -- on New Hampshire and Vermont law,

5  but this, I think, is, this particular case, I think, from it

6  you can glean that that is not a theory that has been

7  recognized under ADA and Rehab Act cases as opposed to Title

8  VII cases, which this case is not, and so I'd submit that the,

9  that the entire instruction is inappropriate.

10      In addition, I don't think it's appropriate to say, use

11  the words "without reassignment to another position at

12  Dartmouth Health" in this particular section, but that's a

13  separate issue that we would raise.  So I would remove that

14  language in both places, but I think that the overall

15  objection, Your Honor, is based on Second Circuit precedent

16  that, where we're talking about ADA or Rehab Act claims, and

17  what I understood from earlier hearings that it is, the cat's

18  paw theory, is recognized under Title VII as well as ADA and

19  USERRA claims.  This case, though, the *Gentleman* case, I think,

20  is helpful guidance or instructive guidance for the Court on

21  why the cat's paw theory shouldn't be given to the jury.

22      The other issue separate and apart from that, the law, is

23  just from the facts in the record, Your Honor, that,

24  respectfully, unlike the Second Circuit, which made lots of

25  inferences in its decision, there is a stark difference between

VOLUME: 11
PAGES: 970-1056

1   what was inferred by the Second Circuit and the record evidence

2   in this case.  And I don't believe there is any evidence to

3   suggest even remotely that somehow Leslie DeMars was playing

4   the role of the supervisor under, you know, the supervisor with

5   animus under the cat's paw theory.

6           THE COURT:  Okay, all right.  Obviously, that all

7   depends on what the jury makes of the facts that have been

8   presented, but let me just be clear, Mr. Schroeder, on the

9   objection.  So you are objecting globally, first off, to the

10  instruction.  I think I got that much.  To the extent that the

11  instruction is included, then your objection is more

12  specifically to the last words of that section, "without

13  reassignment to another position at Dartmouth Health"?

14          ATTORNEY SCHROEDER:  Right.  And then further down it

15  actually says "without reinstatement to another position at

16  Dartmouth Health".  So that's, I think that's inappropriate,

17  anyway.

18          THE COURT:  Oh, sorry.  So let me just be clear about

19  that.  So in the second paragraph, fourth line up where the

20  sentence begins, well, not the sentence begins, but the line

21  begins "unlawful bias" --

22          ATTORNEY SCHROEDER:  Yes.

23          THE COURT:  -- "or retaliatory motive to terminate

24  Dr. Porter", you object to "without reinstatement to another

25  position at Dartmouth Health"?

(663 of 993), Page 663 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 615 of 945
2:21-cv-00049-jkd   Document 35.293    Filed 04/25/23    Page 615 of 945

985

VOLUME:  11
PAGES:  970-1056

 1          ATTORNEY SCHROEDER:  Correct.

 2          THE COURT:  And then the next line you also object to

 3    "without reassignment to another position at Dartmouth Health"?

 4          ATTORNEY SCHROEDER:  There as well as at the -- yes,

 5    Your Honor, but also at the second line of that paragraph where

 6    it also says "without reassignment to another position at

 7    Dartmouth Health", so it's actually three places.

 8          THE COURT:  And, just so I'm clear, the basis for

 9    that objection is what if this instruction were included?

10          ATTORNEY SCHROEDER:  I think where the cat's paw

11    theory -- the cat's paw theory, to the extent that it's been

12    employed, is with respect to termination, and I, we'll get into

13    the issue of where the ADA relates to, and Rehab Act, relate to

14    disability discrimination in the context of termination and

15    potential claims for disability discrimination relating to

16    retaliation or a failure to reassign to another vacant, open

17    position.

18       I think part of my issue here, Your Honor, is that the law

19    is really clear on this, the statute's clear, the case law is

20    clear that it has to be a vacant, existing, open position.  It

21    has to be an available position, and I think throughout the

22    charge it's stated as reassignment to another position.  That's

23    not the, that's not what the statute says, and it's certainly

24    not what the case law that's developed under the statute since

25    1993 has held.

(664 of 993), Page 664 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 616 of 945
2:17-cv-00049-kjd    Document 35293    Filed 04/25/25    Page 616 of 945

986

VOLUME:  11
PAGES:  970-1056

1     So my general objection, really, and, again, it flows

2     through our red line, is to the issue of, to the extent that

3     the Court is going to insert language on potential

4     reassignment, potential reassignment to an open, vacant,

5     existing position, that would be in concert with the law, as

6     opposed to just saying reassignment or, in this case,

7     reinstatement to another position.  That's not, that's not

8     consistent with the ADA, in our opinion.

9          THE COURT:  Okay, all right.  So I will take another

10    look at the *Gentleman* case that you cited, but, at this time,

11    I'm going to leave the "Influenced Decision-Maker" section in,

12    but I've heard your objections and will take that into

13    consideration after the hearing.

14        So, with respect to "Overview of Claims" on Page 9,

15    plaintiff, any objection to that section?

16         ATTORNEY JONES:  No objection.

17         THE COURT:  Okay.  Defendants?

18         ATTORNEY SCHROEDER:  Just at the last line, Your

19    Honor, of that paragraph, I would propose or will propose right

20    before the next heading to say, "regarding potential damages,

21    if any".

22         THE COURT:  Oh, where it now says "and regarding

23    damages", you're saying "and regarding potential damages"?

24         ATTORNEY SCHROEDER:  If any.

25         THE COURT:  Plaintiff, what's your view on that?

VOLUME:  11
PAGES:  970-1056

1           ATTORNEY JONES:  I think we prefer the existing

2      language.  I think that it's standard language.  I think

3      injecting the phraseology of potential coming from a judge kind

4      of suggests to the jury that maybe there aren't any.  So I

5      think the language currently is neutral and that makes it less

6      than neutral.

7           THE COURT:  Though, in the damages section of the

8      instruction, there is language "if any".

9           ATTORNEY JONES:  Exactly.  That's fine, talking about

10      the damages there, that's fine.

11           THE COURT:  Okay, all right.  I'll take that under

12      consideration too.  I see the arguments on both sides there.

13      Okay.  Now, getting into the substance, "New Hampshire

14      Whistleblowers' Protection Act", plaintiff, any objections?

15           ATTORNEY JONES:  No objection, Judge.

16           THE COURT:  Okay.  Defendants?

17           ATTORNEY SCHROEDER:  Your Honor, a couple of points

18      here.  I'm not necessarily going to go in the same order.

19      Well, let me start at the top.  In the first paragraph, and

20      I'll just go according to the chronology of paragraphs here.

21      The second-to-last line of the first full paragraph it states,

22      "asserts that it had a legitimate business reason".  I think

23      we've put sufficient evidence on in the case to say it had

24      legitimate business reasons.  It was not one reason.

25           In terms of the next paragraph, I think the third

1    sentence, "its purpose", I don't think that's necessary for

2    purposes of the instruction, but, obviously, it's the

3    discretion of the Court in terms of whether that's necessary or

4    not.  I don't believe it's necessary.

5                THE COURT:  Okay.

6                ATTORNEY SCHROEDER:  But the bigger issue, Your

7    Honor, really comes down to the elements, the first, second,

8    third elements and specifically, not the first, but on the next

9    page, the Whistleblower Act claim as alleged in the first

10   amended complaint does not include in it a failure to reassign

11   her to another job at Dartmouth Health, and so it's our

12   position that that would be inappropriate to include that as

13   part of the elements.  It's a Whistleblower Act claim.  When

14   you look at the first amended complaint, it does not include

15   any allegations regarding that statement there in the second

16   and third elements.

17            In addition, with respect to "Termination of Employment",

18   which is Paragraph 2, I don't -- I, I think there is a, perhaps

19   a disagreement in terms of whether or not we agree on the

20   second element.  I think saying that Dartmouth Health

21   terminated Dr. Porter's employment and did not reassign her to

22   another job at Dartmouth Health leaves out the fact that there

23   was an REI division closure and she was terminated along with

24   two other physicians.

25            And so whether it just says "Dartmouth Health terminated

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 619 of 945
2:21-cv-00494-jkd Document 35.4 Filed 04/25/25 Page 619 of 945

VOLUME: 11
PAGES: 970-1056

1    her employment", period, that would perhaps be a secondary or

2    alternative statement, but I think getting into whether or not

3    we even had a duty to reassign and the fact that it doesn't say

4    anything about the REI division closure, as well as the fact

5    that, the undisputed fact that two other physicians were

6    terminated at the same time, I think, if the Court was going to

7    say that we agreed to certain language, I think it would be, it

8    needs to be more comprehensive than as currently constituted.

9        THE COURT:  But doesn't closure go to the kind of

10   legitimate business reason part of the instruction?

11       ATTORNEY SCHROEDER:  It does, but I think putting in

12   there "and did not reassign her to another job at Dartmouth

13   Health", once again, that's not part of the Whistleblower Act

14   claim as it's been alleged in this case.

15       THE COURT:  Okay.  Anything else for --

16       ATTORNEY SCHROEDER:  Yes.  I think, on the next page,

17   which is Page 12, still in the top paragraph, I'm not sure I

18   understand the last sentence of the first paragraph on Page 12.

19   It states, "Other ways you may find causation could be through,

20   A, Dartmouth Health's disparate treatment of fellow employees

21   who engaged in similar conduct as Dr. Porter".  I'm not sure.

22   I would think that that would say, "Other ways you may find

23   causation does not exist would be disparate treatment of fellow

24   employees".  I think it might need some wordsmithing.

25       The other issue is relating to subparagraph B,

VOLUME:  11
PAGES:  970-1056

1    "deficiencies in Dartmouth Health's articulated".  I would

2    recommend language that says "actual", and I think here, Your

3    Honor --

4            THE COURT:  Let me just stop you, Mr. Schroeder.

5    Where are you in the --

6            ATTORNEY SCHROEDER:  Sure.  It's still in that same

7    paragraph, Your Honor.

8            THE COURT:  So Page 12 at the top?  Okay.

9            ATTORNEY SCHROEDER:  Yeah, right at the top in the

10   second-to-last.  The last sentence says, "Other ways you may

11   find causation could be through Dartmouth Health's disparate

12   treatment of fellow employees who engaged in similar conduct as

13   Dr. Porter".

14           THE COURT:  Right.

15           ATTORNEY SCHROEDER:  It's actually the inverse.  It's

16   that, you know, our -- causation, if other people who had

17   complained were not fired or terminated or subject to adverse

18   employment action, well, that would obviously go against

19   causation, actually.  Subparagraph B, our suggested language is

20   actual instead of articulated reasons, because articulated

21   reasons doesn't make the distinction, and, obviously, we've put

22   a lot of evidence in front of the jury.

23        What you say to the media or what you say to a nurse who

24   is not in that division in an email or what you say to the

25   media in terms of whether or not you share all the information,

(669 of 993), Page 669 of 993

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 621 of 945

2:21-cv-00049-kjd   Document 35.4   Filed 04/25/25   Page 621 of 945

991

VOLUME:  11
PAGES:  970-1056

1    that doesn't make it pretext because you do that.  They can

2    argue that, but to say "articulated reasons" is a loaded term,

3    I believe, and it should be "actual reasons", because that's,

4    that's our position in this case, and it's also a way to rebut

5    a whistleblower claim.

6              THE COURT:  Okay.  But then aren't I kind of

7    crediting then kind of your theory of the case in the

8    instructions if I leave it as actual, kind of saying, This

9    what was proffered, and it's the actual reasons?

10             ATTORNEY SCHROEDER:  No.  I think they're still going

11   to argue that, Well, they said this in writing, so isn't that

12   their actual reasons?  And we obviously have explained why what

13   is said to the media and what may or may not be attributed as a

14   quote to the media does not suffice.  If it's articulated, I

15   think that's a loaded term as it is.

16        Actual, they can still argue, and they have argued, that,

17   Well, look at what they say in this email to this one nurse,

18   and look what they say to the media, and I think they, based on

19   that, saying the actual reasons, and they have to determine

20   that, right?  They either believe Dartmouth Health, or they

21   don't, and they may determine that the actual reasons are

22   contrary to what we say, but that's open for dispute by both

23   sides, and I think it's neutral in that regard.

24             THE COURT:  Okay.  Anything else for that section?

25             ATTORNEY SCHROEDER:  I think further down, Your

(670 of 993), Page 670 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 622 of 945
2:21-cv-00049-jjd Document 35293 Filed 04/25/25 Page 622 of 945

992

VOLUME: 11
PAGES: 970-1056

1    Honor, on that page, on Page 12, the last full paragraph starts
2    "Dartmouth Health claims it did not terminate Dr. Porter
3    because of her whistleblowing activity".
4        Now, she's claimed a lot of different things, but saying,
5    "i.e. reporting that two Dartmouth Health physicians were
6    engaging in conduct that she thought was unlawful, unethical,
7    or dangerous to patients", I think the "i.e." clause is
8    inappropriate because she's -- and I would just leave it at
9    whistleblowing activity because she's complained about a lot of
10   things, and whether or not that rises to the level of
11   whistleblowing activity is for the jury to decide, but saying
12   "i.e. reporting that two Dartmouth Health physicians were
13   engaging in conduct that she thought was unlawful, unethical,
14   or dangerous", I think we're getting into parsing the facts in
15   the record through testimony and emails as opposed to leaving
16   it to the jury to decide.
17       THE COURT:  I can't recall exactly what the
18   allegations were in the first amended complaint under this
19   particular claim, but is it along those lines where that's
20   specifically articulated?
21       ATTORNEY SCHROEDER:  I think, Your Honor, it goes
22   above and beyond that.  In the first amended complaint, I think
23   it -- well, I have it in front of me.  It's 35 pages.  Page 31
24   relates to this issue, relates to the compensation,
25   participating in activities she believed in good faith violated

(671 of 993), Page 671 of 993      Case: 25-1382  12/22/2025  DktEntry: 35.4  Page 623 of 945
2:21-cv-00949-jkd  Document 35293  Filed 04/25/28  Page 623 of 945

993

VOLUME:  11
PAGES:  970-1056

1    the law.

2              THE COURT:  A, B, C, and D, that's Dr. Hsu and Dr.

3    Seifer, isn't it?

4              ATTORNEY SCHROEDER:  That is Dr. Hsu and Dr. Seifer,

5    but she's not enunciate -- I just think we're getting into,

6    Well, are we guiding the jury on what plaintiff's claims are at

7    this point as opposed to anyone else -- specifically pointing

8    out "i.e.", I would just say it should be whistleblowing

9    activity.  They've got to determine that.  You've got

10   instructions on that.

11             And further in that paragraph, to this, to the point of

12   "but rather made a business decision to close its REI division

13   resulting in the termination of all three physicians in the REI

14   division".  It then goes on to say, "and that there was no

15   other suitable position for Dr. Porter at Dartmouth Health".

16   That's not the standard under a whistleblower claim, and I

17   would just delete the phrase "and that there was no other

18   suitable position for Dr. Porter at Dartmouth Health".  That's

19   not part of a whistleblower claim.

20             The same holds true, Your Honor, and this is all reflected

21   in what we'll give you so that the Court understands our

22   position, but the last full sentence of that section which goes

23   on to Page 13 then says, quote, "and not reassigning her to

24   another job at Dartmouth Health", end quote.  That's not the

25   standard under -- that's not a whistleblower claim, but, also,

(672 of 993), Page 672 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 624 of 945
2:21-cv-00949-kjd   Document 65-3   Filed 04/25/25   Page 624 of 945

994

VOLUME:  11
PAGES:  970-1056

1    it's not the standard under the ADA, and my fear, our fear is

2    that we need to make sure that the standard -- well, first of

3    all, what is the requirement under each claim?  And that's

4    certainly not part of their whistleblower claim, but also

5    that's kind of a watered-down version of what the law is under

6    the ADA and Rehab Act for purposes of reasonable accommodation.

7             THE COURT:  All right.  So that's kind of a global

8    concern you've raised for that particular charge.  Obviously,

9    I'm going to give that consideration.

10            ATTORNEY SCHROEDER:  I understand that.  Thank you.

11            THE COURT:  Yeah, yeah.  No.  I understand your

12    objections.  I just wanted to be clear on them.  So,

13    plaintiffs, let's go back to this particular --

14            ATTORNEY JONES:  Can I just start with that global

15    issue?

16            THE COURT:  Yes.

17            ATTORNEY JONES:  Because, from our perspective, the

18    nonreassignment issue is very much part of the whistleblower

19    claim.  In fact, from our perspective, it's part of all the

20    claims, that this is a case where Dartmouth Health terminated

21    Dr. Porter and failed to retain her in some capacity, either in

22    retaliation for whistleblower activities or as a form of

23    discrimination or retaliation with regard to the disability

24    issue.  So we believe that is part of all of the claims.  It's

25    not limited to the ADA.

VOLUME:  11
PAGES:  970-1056

1        And I would also note that the Second Circuit was very

2    clear in its articulation of all the various claims, and they

3    also used that language.  So, from our view, you have correctly

4    identified the claims.  So that's the global issue.

5                THE COURT:  Okay.

6                ATTORNEY JONES:  Did you want to start from the

7    beginning?

8                THE COURT:  Yes.  So, so the first objection on Page

9    10 in the first paragraph, the last sentence, I believe the

10   objection was, not "a legitimate business reason", but

11   "legitimate business reasons".

12               ATTORNEY JONES:  Well, I mean, I guess it's disputed

13   as to whether it had any legitimate business reason or how many

14   there may have been, but that's not a hill I need to die on.

15   So, if the Court were inclined to take that correction, I

16   wouldn't object.

17               THE COURT:  Okay, all right.  And then, and then the

18   next paragraph, Dartmouth is claiming that the sentence

19   beginning "its purpose is to encourage employees", the purpose

20   is not necessary in the charge.

21               ATTORNEY JONES:  I disagree.  I think the purpose is

22   important.  It explains why we have whistleblower protection

23   laws.  So I think, I think it's valuable to have it in there,

24   and I don't see any prejudice from it.

25               THE COURT:  I'm going to leave the purpose sentence

(674 of 993), Page 674 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 626 of 945
2:17-cv-00494-jkd Document 365-3 Filed 04/25/25 Page 626 of 945
996

VOLUME: 11
PAGES: 970-1056

1    as it is for that.  And, with respect to the one that we just

2    talked about in the first paragraph, you know, reason versus

3    reasons, I'll, you know, take that under consideration and make

4    a decision about that.  So I think, I think those were all of

5    them, if I'm not mistaken, for that section.

6         ATTORNEY JONES:  Well, there was the issue of, on

7    Page 12 at the bottom of the first paragraph, Mr. Schroeder

8    wants to change the word "articulated" to "actual".  I would

9    object to that.  As Your Honor points it out, that, that does

10   seem to credit their case.  But, more importantly,

11   Mr. Schroeder calls it a loaded term.  I call it a legal term.

12   Every case I think I've ever read that refers to, you know, an

13   employer's burden in these cases, that the employer must

14   articulate a legitimate business reason.  So it's, it's the

15   articulation that is the legal standard.  So I think that

16   should stay in.  That's the accurate statement of the law.

17        THE COURT:  And that's why the term, frankly, was

18   used, so I'm going to leave that term in there.  And then,

19   going down two paragraphs, the "i.e." clause --

20        ATTORNEY JONES:  Well, I think that that is her

21   claim, and, as was discussed, that's in the complaint.  Again,

22   that's also exactly how the Second Circuit describes her claim.

23   So I, I don't see any -- I think it's accurate.  I'd note that

24   the remainder of the paragraph is a full description of their

25   defenses.  So if, you know, if they get to talk about -- well,

(675 of 993), Page 675 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 627 of 945
2:17-cv-00494-jkd Document 352.93 Filed 04/25/26 Page 627 of 945

997

1    if the Court is going to talk about the defenses of closing the

2    REI, terminating all the other physicians, I don't see any

3    problem with the balance of accurately describing what her

4    claim is.

5          THE COURT:  Yeah, that was in the Porter decision, if

6    I'm not mistaken.

7          ATTORNEY SCHROEDER:  Judge.

8          THE COURT:  No, the description.  I'm not talking

9    about the facts how they came in.  I understand your point on

10   that, I do.

11         ATTORNEY SCHROEDER:  Right, right.  If I may just on

12   this one point, because I knew it was going to come up and --

13   well, you know, the Second Circuit said this, and the Second

14   Circuit said that.  We put a bench memo on that issue, Your

15   Honor, which didn't even receive a response, so -- because I

16   think the law is clear, right?  They were talking about the

17   summary judgment standard, all inferences in favor of the

18   nonmoving party.  That is not what happened here.  That is --

19         THE COURT:  No, no.  Mr. Schroeder, I am crystal

20   clear on your point in that regard, but, to the extent that the

21   Second Circuit has described the whistleblower activity as the

22   reporting on those two physicians, that has nothing to do with

23   the summary judgment standard versus the standard at trial.

24         ATTORNEY SCHROEDER:  It doesn't, Your Honor, other

25   than the fact that there was evidence in the trial of

(676 of 993), Page 676 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 628 of 945
2:17-cv-00949-kjd Document 35293 Filed 04/25/25 Page 228 of 945

998

VOLUME:  11
PAGES:  970-1056

1    complaints about a whole range of things, not just -- I don't

2    believe it was just complaints about those two physicians.  She

3    complained about Dr. DeMars.  She complained about a whole

4    range of issues, including Dr. Reindollar, including the former

5    physician Sophia.

6         So I think limiting it to the two physicians is, would be

7    inappropriate because then you're basically -- that's different

8    from, and this is why this goes back to what was in the Second

9    Circuit decision and what was put in front of the jury was the

10   complaints to Reindollar, the conflicts with Reindollar, the

11   complaints about other physicians.

12        We had Judy Stern, Kelly Mousley, Katy Mansfield, all of

13   those people, so I think it's way beyond that, Your Honor, and

14   limiting it to, well, the two physicians, yes, she did make

15   those complaints, no question.  I don't even think we disputed

16   that.  I think we even acknowledged it in the opening

17   statement, but the evidence of whistleblowing activity is much

18   broader than that, and hyperfocusing on just the two

19   physicians, I think, would be inappropriate.

20             ATTORNEY JONES:  Your Honor, if I may.

21             THE COURT:  Okay.

22             ATTORNEY JONES:  The way you have it actually

23   describes the complaints that we say were the whistleblowing

24   activity.  All the other complaints they're talking about is

25   their attempt to say she complained about everything.  The

VOLUME: 11
PAGES: 970-1056

1    petty complaints they're talking about, that's not our

2    whistleblowing.  She wasn't blowing the whistle over that

3    stuff.

4         THE COURT:  Yeah, and, in particular when you look on

5    Page 11, Number 1, "Reported in good faith", I mean, that kind

6    of, you know, provides a little bit more in the way of context

7    as to what type of reporting fits within a whistleblower claim.

8    It's not simply kind of complaining about other people

9    generically, it's about the types of things that she reported

10   in her letters about Dr. Hsu and Dr. Seifer, isn't it?

11        ATTORNEY SCHROEDER:  It could be.  I think it's way

12   beyond just that, and there are other complaints.

13        THE COURT:  So whistleblowing -- I just want to be

14   clear.  So, in your view, there is other evidence in the record

15   of whistleblowing activity, legitimate kind of -- legitimate,

16   that suggests the answer, I guess, but, in terms of the charge,

17   this particular charge, you're saying there's other evidence in

18   the record that meets the legal definition of reported in good

19   faith other than the commentary on Dr. Hsu and Dr. Seifer?

20   There's other evidence of whistleblowing activity?

21        ATTORNEY SCHROEDER:  I think there's evidence that

22   they could argue is whistle -- listen, I don't believe any of

23   this meets the definition of a whistleblower retaliation claim,

24   Your Honor.  Let me be clear about that.  My point is that

25   whistleblowing activity, stating that just in and of itself is

VOLUME:  11
PAGES:  970-1056

1   sufficient, and then to say "i.e." and making a specific

2   reference to just those two physicians leaves out all the other

3   times in evidence.

4        Because, when we get into a retaliation case, one of those

5   issues further on down the line is temporal proximity, right?

6   So there is evidence of complaints, and we could assume for

7   sake of argument for this purpose that they were legitimate

8   back to 2012 with Dr. Reindollar and conflicts and disputes

9   about skills and techniques.  So my only point here is that

10  you're hyperfocusing the jury on one specific item that was in

11  the record, and I'm not disputing that it was in the record,

12  but calling attention to it, I think, is inappropriate in the

13  jury instruction.

14        THE COURT:  Okay, all right.  And, you know, as I

15  said, you know, the complaint under this section, though, does

16  essentially zero in on the Hsu/Seifer information, and that's

17  in large part why this instruction reads the way it does,

18  right?  Because that's what the claim is focusing on in the

19  complaint.

20        ATTORNEY SCHROEDER:  I understand your point, Your

21  Honor.

22        THE COURT:  Okay, all right.  So, I mean, we'll, at

23  least I'll take another look in terms of the way it's phrased

24  in terms of the "i.e.", but, at this point, I'm going to leave

25  that in there but take under consideration, as I say, your

(679 of 993), Page 679 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 631 of 945
2:21-cv-00494-jkd Document 35.93 Filed 04/25/25 Page 631 of 945

1001

VOLUME: 11
PAGES: 970-1056

1    arguments in that regard.

2         Mr. Jones, I'm not sure if you responded to everything, or

3    maybe you did.  No other suitable position, I have in my notes

4    here on Page 12, the last full paragraph.

5              ATTORNEY JONES:  Yeah, that's part of my global.  I

6    addressed that.

7              THE COURT:  Got it.

8              ATTORNEY JONES:  Like I said, it's part of our case.

9              THE COURT:  Yeah, yeah.

10             ATTORNEY JONES:  I don't see anything else that we

11   haven't covered here.

12             ATTORNEY SCHROEDER:  And, just on that last point,

13   Your Honor --

14             THE COURT:  Yes, yes.

15             ATTORNEY SCHROEDER:  Thank you for your indulgence.

16   We're either going to live by the first amended complaint, or

17   we're not, and I understand the Court's highlighting of the

18   various things that can be related to Hsu and Seifer, but, if

19   the Court is so indulged in that point, well, there is nothing

20   about reassignment as part of a whistleblower claim in this

21   case.  There's just nothing.  And that's not part of what a

22   typical whistleblower claim.  It's discrimination and

23   termination or retaliation with respect to termination.

24        But adding in this commentary about there was no other

25   suitable position, that's not what the law says.  It's, Did you

VOLUME: 11
PAGES: 970-1056

1   retaliate by terminating somebody, period?  And so I'd submit

2   that that's going way beyond the pale.  It's also not in their

3   claim.

4        THE COURT:  Okay.  So you're saying as a legal

5   matter, though, reassignment is not part of this particular

6   claim?  As a matter of law, you're saying that can't be part of

7   it?

8        ATTORNEY SCHROEDER:  Correct, reassignment, correct,

9   Your Honor.  One, it's not pled that way.  Two, it's never been

10  alleged that way in any of, in any of the discovery in this

11  case.  Three, the reassignment issue goes to the ADA and Rehab

12  Act claims and disability discrimination claims.  It does not

13  go to, well, reassignment is something that should be

14  considered in the context of a whistleblower claim.  I've never

15  -- so, yes, I would submit legally that that would not be an

16  appropriate remedy or a suitable part of the elements of the

17  claim.

18       THE COURT:  Excuse me.  So I was just handed a copy

19  of the actual New Hampshire statute.  So it reads, "No employer

20  shall harass, abuse, intimidate, discharge, threaten, or

21  otherwise discriminate against any employee regarding

22  compensation, terms, conditions, location, or privileges of

23  employment".

24       So, in your view, that particular language is not broad

25  enough to encompass that aspect of the claim?

(681 of 993), Page 681 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 633 of 945
2:21-cv-00494-jkd Document 354-3 Filed 04/25/25 Page 633 of 945

1003

VOLUME: 11
PAGES: 970-1056

1    ATTORNEY SCHROEDER:  Reassignment to another suitable

2    position as it's stated three or four times in this instruction

3    is not an appropriate basis for relief under the whistleblower

4    statute.

5    ATTORNEY JONES:  And we would submit that it is a

6    form of otherwise discriminating against a covered employee.

7    Also, in this case, I've heard Mr. Schroeder argue this many

8    times, but this has been a part of the case for many years.  It

9    was part of the appellate proceedings, and the Second Circuit

10   certainly has characterized all the claims as including that

11   part of it.  This has been part of the case for a very long

12   time.  I know Mr. Schroeder wants to box this issue into a

13   sliver of ADA land where a reasonable accommodation can be

14   reassignment to a vacant position.  That's not this case.  So I

15   think you understand our position.

16   THE COURT:  Right.  We've been over that before,

17   yeah, that particular argument.  All right.  So "Americans With

18   Disabilities Act", I'm on Page 13.  Plaintiff, maybe we should

19   take it piece by piece.

20   ATTORNEY JONES:  I'll make it easy for you.  No

21   objection.

22   THE COURT:  To the whole charge?

23   ATTORNEY JONES:  The whole thing's acceptable to us.

24   THE COURT:  Okay.  Defendants?

25   ATTORNEY SCHROEDER:  This is not my first rodeo,

(682 of 993), Page 682 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 634 of 945
2:21-cv-00949-kjd   Document 35.493   Filed 04/25/25   Page 634 of 945

1004

 1    Judge.  I knew that this was going to be the way that we would

 2    be doing jury instructions.  Most of the time plaintiff, in

 3    every other case I've had, usually agrees to the jury

 4    instructions, and I seem to be standing up making suggested

 5    recommendations on revisions to language.

 6        If we go by the compliant, the ADA claim is disability

 7    discrimination and retaliation.  There's not three types;

 8    there's two types, first of all, as just a threshold issue.

 9    Saying that Dr. Porter may prove that Dartmouth Health

10    retaliated against her for making a reasonable accommodation

11    request, if we're going to go back to the Second Circuit

12    decision, they were very clear.  The issue of reasonable

13    accommodation only comes up in the context of termination.  All

14    of the other claims relating to reasonable accommodation were

15    dismissed or affirmed dismissal at the Second Circuit, and I

16    think the Court was clear on that.

17        So saying, well, making it retaliating against her for

18    making a reasonable accommodation request, I think that's the

19    third type.  I think it's only disability discrimination in the

20    context of termination and retaliation.

21            THE COURT:  But isn't kind of failure to accommodate

22    and the allegation of retaliating against someone for

23    accommodations two separate kind of conceptually distinct

24    things?

25            ATTORNEY SCHROEDER:  I think they are, Your Honor,

(683 of 993), Page 683 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 635 of 945
2:17-cv-00949-kjd Document 352-3 Filed 04/25/23 Page 635 of 945

1005

1    but I think there's two types of allegations here, not three.

2    And so I've never interpreted this case to be -- and, if I'm

3    wrong, I'm wrong, and you'll certainly correct me, but I don't

4    believe that there were three types of disability

5    discrimination claims in this, that were brought in this case.

6    It was disability discrimination and retaliation, and I think

7    breaking it down in that regard would be inappropriate.  I have

8    a few other comments.

9            THE COURT:  Okay, yeah.  Please go ahead.

10           ATTORNEY SCHROEDER:  Okay.  Bear with me a second

11   here.  This is just a general statement on the "Otherwise

12   qualified to perform essential functions", 1.3, subsection 14.

13   So under the ADA the definition of -- first, you have to show

14   that somebody's disabled.  Then you have to -- then the

15   plaintiff has to show that they're a qualified individual with

16   a disability, meaning they can perform the essential functions

17   of the job with or without reasonable accommodation.

18       We don't agree that they are otherwise, that Dr. Porter

19   was otherwise qualified to perform the essential functions of

20   her job because there was no job.  And what I don't think

21   anybody's disputing that, at the time she was terminated, that

22   she could do her job, but then it gets to the issue of

23   reasonable accommodation, and we believe there was -- it's our

24   position, as shown by the evidence, that there was no

25   reasonable accommodation.  So, therefore -- for her, there was

VOLUME:  11
PAGES:  970-1056

1   no open, vacant position for her to go to.  Under that scenario

2   she is not considered an otherwise qualified individual with a

3   disability under the ADA.

4        THE COURT:  Okay.  So this comes back again, though,

5   to the position, your position about there needing to be an

6   open, vacant position.  This is your global issue?

7        ATTORNEY SCHROEDER:  Correct.

8        THE COURT:  And, therefore, your 1.3 objection

9   derives from that?

10       ATTORNEY SCHROEDER:  Correct.  But also then, not --

11  I don't think anybody's disputing that, at the time she, her

12  position was terminated, that she could perform the essential

13  functions of her job, but she was not a qualified individual

14  with a disability, meaning able to perform the essential

15  functions of her job with or without reasonable accommodation.

16  There was no position for her at that point.  That's our

17  position, and so, therefore, there was no reasonable

18  accommodation for her.

19       THE COURT:  Right, okay.  So is there a proposal

20  about what that should look like?

21       ATTORNEY SCHROEDER:  Yes, yes, Your Honor.

22       THE COURT:  Okay.

23       ATTORNEY SCHROEDER:  That paragraph, we would submit,

24  should read, "You must determine whether Dr. Porter was

25  qualified to perform the essential functions of the job she

(685 of 993), Page 685 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 637 of 945
2:21-cv-00949-kjd Document 35293 Filed 04/25/26 Page 637 of 945
1007

VOLUME: 11
PAGES: 970-1056

1     held". So it's getting into that's just on the essential

2     functions part. So, "You must determine whether Dr. Porter was

3     qualified to perform the essential functions of the job she

4     held", that's not the whole story, but that's how we would read

5     it there in that particular place.

6           THE COURT: Okay. So obviously not agreed?

7           ATTORNEY SCHROEDER: Yes, Your Honor.

8           THE COURT: Okay.

9           ATTORNEY SCHROEDER: In the next paragraph, 1.4, I

10    think the second paragraph there, the first two lines, I think,

11    blur the distinction. I mean, this is a but-for. We've gone,

12    we've had some discussion about the ADA but-for causation

13    standard. I think that actually blurries it or blurs the lines

14    there when it says, quote, "Keep in mind that an employee does

15    not need to prove that discrimination was the only or even the

16    predominant factor that motivated an employer. You may decide

17    that other factors were involved in the decision to terminate

18    Dr. Porter's employment". I think the earlier instruction, I

19    think, is very clear that you've got to, it's got to be

20    but-for, but for her disability, this would not happen, as

21    opposed to you could look at other motivations, et cetera.

22      So we would submit that we would strike those two lines

23    after "as you assess causation" and just then proceed to, "For

24    Dr. Porter to meet her burden, you must conclude". Going on to

25    the next page at the end of that sentence, we would, we would

(686 of 993), Page 686 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 638 of 945
2:17-cv-00949-kjd Document 35293 Filed 04/25/28 Page 638 of 945

1008

VOLUME: 11
PAGES: 970-1056

1    submit that it should say, "She would not have been terminated

2    but for her disability", just to be consistent with Second

3    Circuit precedent.

4            THE COURT:  Okay.  So the bottom of Page 14 it would

5    read, "For Dr. Porter to meet her burden, you must conclude

6    that she has proved by a preponderance of the evidence", and

7    you're proposing taking out the next clause?

8            ATTORNEY SCHROEDER:  No, no.  There are -- everything

9    is fine until the last part of it.  I would just say she would

10   not have been terminated but for her disability, just to be

11   consistent with *Natofsky*.

12           THE COURT:  Okay.  Again, something I'll take a look

13   at, but I'm inclined to leave that in.  We also researched the

14   law on this pretty exhaustively.  We're not employment lawyers

15   like you are, but I'm going to leave it for now, and, like I

16   said, we'll take a look at that.  Next paragraph?

17           ATTORNEY SCHROEDER:  In the middle of the paragraph

18   on Page 15, there is a phrase "however misguided they may

19   appear to you".  We would strike that part of the sentence.

20           THE COURT:  That didn't come from your proposed

21   charges?

22           ATTORNEY SCHROEDER:  I don't think so.

23           THE COURT:  I think it did.

24           ATTORNEY JONES:  I think it's in there.

25           ATTORNEY SCHROEDER:  Well, if it is, I would, then I

1  guess we'll keep it in, Your Honor.  I didn't have a chance to

2  go -- I mean, this took a little while to get through 30 pages

3  this morning.

4           THE COURT:  No, I understand.  Because, when I first

5  read it, too, I was thinking, trying to be down the middle, and

6  I'm almost positive I checked defendants' charge and that was

7  in there.

8           ATTORNEY SCHROEDER:  Your Honor, if it's in there,

9  then let's keep it.  That's one less thing that we have to

10  worry about or the Court needs to consider.

11           THE COURT:  I'll just turn to the law clerks here.

12  Am I mistaken about that?  No, it was in your proposed charge.

13           ATTORNEY SCHROEDER:  I take everybody's word for

14  that.

15           THE COURT:  Okay.

16           ATTORNEY SCHROEDER:  The last paragraph before Number

17  2 on Page 15, once again, this goes to whether you believe

18  Dartmouth Health's reasons for the decision.  If you do not

19  believe Dartmouth Health's reasons, you may consider whether

20  the reasons are so unbelievable that they are a cover-up to

21  hide the true discriminatory reason for the decision.  So I

22  just want to make sure that globally that it's reasons, because

23  there were reasons.  It wasn't just one reason.

24           THE COURT:  Okay.  This is the last paragraph before

25  2, right?

VOLUME:  11
PAGES:  970-1056

1    ATTORNEY SCHROEDER:  Correct, Your Honor.

2    THE COURT:  And doesn't -- so the "for example"

3    sentence, is that the one that you're -- towards the bottom of

4    that paragraph?

5    ATTORNEY SCHROEDER:  Yes, right before that there is,

6    it starts, For example, you may consider whether you believe

7    Dartmouth Health's reasons for the decision.  If you do not

8    believe Dartmouth health's reasons, you may consider whether

9    the reasons are so unbelievable.

10    THE COURT:  So they're plural now, and that's your

11    suggestion, right?

12    ATTORNEY SCHROEDER:  Yes.

13    THE COURT:  Okay.  So no change?

14    ATTORNEY SCHROEDER:  I was just wordsmithing a little

15    bit there, Your Honor, but --

16    THE COURT:  Okay, all right.  Now I'm in 2 on Page

17    15, "Failure to grant reasonable accommodation request".

18    ATTORNEY SCHROEDER:  No issues there.  No issues in

19    2.1.  No issues in 2.2.  In 2.3 where it states "first" in the

20    second line, we would remove everything after "first" and put

21    that she was, put the following:  "That she was able to perform

22    the essential functions of her job with or without reasonable

23    accommodation".

24    THE COURT:  Okay.

25    ATTORNEY SCHROEDER:  On the top of Page 17, Your

VOLUME: 11
PAGES: 970-1056

1    Honor -- so nothing in 2.3.1 other than the, 2.3.1, other than

2    at the end of that paragraph which goes on to the top of Page

3    17.  We would ask that "with or without a reasonable

4    accommodation" as opposed to just "an accommodation".

5            THE COURT:  Okay.  Top of Page 17, second line, "with

6    or without a reasonable accommodation" is the request?

7            ATTORNEY SCHROEDER:  Correct.

8            THE COURT:  Okay.

9            ATTORNEY SCHROEDER:  In 2.3.2 "Essential Functions",

10   at the end of the first paragraph, we would just put what this

11   case is about, which is really the only reasonable

12   accommodation is, may include job reassignment or reassignment,

13   just include reassignment.  Because that's really the only

14   issue before the jury.

15           THE COURT:  So, even if that is generally part of the

16   law of what a reasonable accommodation could be, do you think

17   that should come out?

18           ATTORNEY SCHROEDER:  I do, Your Honor, because

19   there's no -- I think they can get confused by part-time or

20   modified work schedule or job restriction.  Those are certainly

21   under the statute, Section 12111(B), (9)(B), they are listed as

22   potential reasonable accommodations, no question about that.  I

23   just think this case is all about reassignment, and I don't

24   want, I don't want the jury to think that there are other

25   things at play here in this particular case, because there's no

VOLUME:  11
PAGES:  970-1056

1  evidence to suggest that there was a part-time or modified work

2  schedule or a job restructuring.  There's no evidence of that

3  in the record.

4          THE COURT:  Okay.

5          ATTORNEY SCHROEDER:  In terms of the end of Paragraph

6  17 which goes on to 18, I don't think that the parties are

7  disputing the job functions and whether they're essential.  So

8  I don't -- I think it's superfluous to put in, "In determining

9  whether a job, particular job function is essential", and then

10  it goes all the way to the middle of Paragraph 18.  I don't

11  think it's necessary to go through all that with them because

12  we're, really, what the case is about is whether or not there

13  was reassignment to a vacant, open position.

14      And so, obviously, these instructions are long.  I just

15  did not think in this particular case that we were talking

16  about whether or not something was an essential function or

17  whether or not it was a marginal job function, which is in play

18  in a lot of ADA cases, but that's not really at play in this

19  case.

20          THE COURT:  So you're saying A through H, all of that

21  should come out?

22          ATTORNEY SCHROEDER:  Yes, Your Honor.

23          THE COURT:  And the objection, though, is just

24  superfluous, not legally inappropriate?

25          ATTORNEY SCHROEDER:  Correct.  I think it's not

VOLUME: 11
PAGES: 970-1056

1    really an issue that this jury needs to worry about, and,

2    obviously these are 30 pages long, and I just --

3            THE COURT:  I thought they'd be longer.

4            ATTORNEY SCHROEDER:  Yeah.  Well, I'm doing my level

5    best to hopefully keep it short with you.  So that, that's just

6    a suggestion just based upon what's before the Court.

7        In 2.4 our suggestion is the following, that that first

8    paragraph and second paragraph should be limited to the

9    following:  So delete what's there and put, "You must determine

10   whether Dartmouth Health failed to make a reasonable

11   accommodation for Dr. Porter by reassigning her to a vacant,

12   existing position", period.

13       Once again, I think putting in language about the term

14   "reasonable accommodation", I think it's redundant with the

15   following paragraph where you actually do have language about

16   what a reasonable accommodation may include and that we're not

17   objecting to that or the following paragraph.  But I think the

18   whole case comes down to whether or not Dartmouth Health had a

19   duty to reassign her to a vacant, open position, and so --

20           THE COURT:  So, to the extent that that's your

21   objection, I think we've established now that you have your

22   view on that.  It may be a little bit more fluid and a little

23   bit more nuanced than that.  That's my understanding of the law

24   as well.  So, to the extent that that is your objection, I

25   mean, obviously, make those objections for the record as you

VOLUME: 11
PAGES: 970-1056

1  will, I know, but, you know, again, I'm not, I'm not certain

2  that that's something that the Court agrees with on that point.

3  So but I hear your position.

4          ATTORNEY SCHROEDER:  Just on that, Your Honor, and

5  I'm not trying to belabor this point, but the *Graves v. Finch*

6  case, the *Payne v. Cornell University* case, the *Finch v. New*

7  *York City Department of Persons* case, the *Noll v. International*

8  *Business Machines Corp.* case, all of those are Second Circuit

9  decisions on this specific issue, and I know I mentioned them

10  in my motion for directed verdict in fairly quick fashion, but

11  they go right to the heart of that issue, and I realize that

12  I'm making somewhat of a continuing objection in that regard,

13  but and I appreciate the Court's indulgence.

14          THE COURT:  Okay.  So are we still on 2.4 with your

15  --

16          ATTORNEY SCHROEDER:  Yes, Your Honor, the middle of

17  Page 19 now.  The paragraph, there's two paragraphs identifying

18  the term "reasonable accommodation".  We have no objections

19  there.  What we object to, though, is the third paragraph which

20  starts "an employer has a duty".  We would strike that entire

21  paragraph with the exception of the last part which is, "Both

22  employer and employee must cooperate in the interactive process

23  in good faith".

24      The law on the ADA, specifically physical disabilities as

25  opposed to mental disabilities, is that the employee has a duty

(693 of 993), Page 693 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 645 of 945
2:21-cv-00949-kjd Document 65-93 Filed 04/25/25 Page 645 of 945
1015

VOLUME:  11
PAGES:  970-1056

1   to request an accommodation.  The only place where the duty

2   kind of falls back to the employer is on the issue of mental

3   health disabilities because, as courts have logically said,

4   well, if somebody's got a mental health disability, they may

5   not be in a position to actually ask for an accommodation.  So

6   I don't believe that that paragraph as written is consistent

7   with the law on that point.

8           THE COURT:  Okay.  So your proposal is to strike the

9   entire paragraph except for the --

10          ATTORNEY SCHROEDER:  The last sentence.

11          THE COURT:  -- last sentence?

12          ATTORNEY SCHROEDER:  Which is true.  The last

13   paragraph on that page we would strike the last sentence which

14   is, states, quote, "An employer, by failing to engage in a

15   sufficient interactive process, risks not discovering a means

16   by which an employee's disability could have been accommodated

17   and thereby increases the chances of failing to reasonably

18   accommodate the employee".  I think that's making a judgment

19   call, and I'm not sure why we would be calling out one side

20   versus the other there.  I think it's inappropriate to have

21   that sentence.

22          THE COURT:  Okay.  So I'm hearing your objections,

23   but I, I know they're based on kind of your view of the law, so

24   I'm not kind of ruling on these particular ones with respect to

25   the ADA until revisiting some of these legal questions.  So

(694 of 993), Page 694 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 646 of 945
2:17-cv-00949-kjd Document 35.4 Filed 04/25/25 Page 646 of 945

1016

VOLUME: 11
PAGES: 970-1056

 1    that's the bottom of Page 19?

 2              ATTORNEY SCHROEDER:  Yes, Your Honor.

 3              THE COURT:  Okay.  So I know plaintiffs indicated no

 4    objection at all to this section.  Any comments on the

 5    objections that have been raised?

 6              ATTORNEY JONES:  Well, the last two proposed

 7    revisions would completely eliminate all reference to the

 8    interactive process from the instructions, which I think would

 9    be highly inappropriate.  We do think there was a failure to

10    engage in the interactive process here, and that's part of our

11    alleged violation.  With regard to all the others, I think our

12    global position on the nature of the case we've already

13    articulated and the Court understands.

14              THE COURT:  Okay, okay.  So now sub 3, "Retaliation",

15    on Page 20, defendants, any objection?

16              ATTORNEY SCHROEDER:  Yes, Your Honor, not in

17    subsection "Retaliation", but further down in "Protected

18    Activity", 3.1 on Page 20.  The second paragraph, "The parties

19    have agreed on the first element:  that Dr. Porter made a

20    reasonable accommodation request", I think that's -- well,

21    first of all, "for changes to her work schedule and

22    environment", those were parts of the things that she asked for

23    during her, the term of her employment.  The Court has already

24    dismissed those.  So I don't think this is one that we've, that

25    it would be -- we could say that she's made a reasonable

VOLUME:  11
PAGES:  970-1056

1    accommodation request and leave it at that.

2              THE COURT:  Okay.

3              ATTORNEY SCHROEDER:  The second point is in 3.2,

4    "Aware of Activity".  Once again, this is not about work

5    schedule or environment.  It's made a reasonable accommodation

6    request.  I would delete the rest of that sentence and put the

7    following:  "Seeking reassignment to the OB/GYN department or

8    radiology department", period.  And that's consistent with the

9    evidence in the record.

10             THE COURT:  Okay.  And so are you saying then that

11   the parties are in agreement on the second element with those

12   proposed changes; is that the idea?

13             ATTORNEY SCHROEDER:  No, no, I didn't suggest, I

14   didn't suggest that plaintiff's counsel agree to it.  I'm, I

15   bet I can predict that they would be fine with keeping it as

16   is, but I would submit that that is what this case is about and

17   that, therefore, we're only dealing with termination on

18   accommodation and whether or not there is a position available

19   for her, available position available at the time that the REI

20   division was closed.

21             THE COURT:  All right.  "Adverse action", 3.3?

22             ATTORNEY SCHROEDER:  With respect to that one, Your

23   Honor, this is the point we raised earlier, and I'm not going

24   to belabor it.  We would just have it state, instead of that we

25   agree to that element, just that, in conjunction with the

(696 of 993), Page 696 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 648 of 945
2:21-cv-00494-jkd Document 352-93 Filed 04/25/25 Page 648 of 945
1018

VOLUME: 11
PAGES: 970-1056

1  closure of the REI division, Dartmouth Health terminated Dr.

2  Porter along with two other physicians, and whether it says

3  "along with two other physicians", I don't think we want to say

4  adverse employment action.  I would just say terminated her

5  employment.

6           THE COURT:  That's the language of the law, though,

7  isn't it, adverse action?

8           ATTORNEY SCHROEDER:  I think it's easier for a jury

9  to understand what the law is based on that, but I'd defer to

10  the Court on that.

11           THE COURT:  And the closing of the REI division, it's

12  kind of similar to an objection you made earlier that kind of

13  goes to the legitimate --

14           ATTORNEY SCHROEDER:  Understood.

15           THE COURT:  I know.  Kind of you have similar

16  arguments, and I have similar responses, so --

17           ATTORNEY SCHROEDER:  I just have to put them on the

18  record, Your Honor.

19           THE COURT:  No, I totally understand that.

20  Mr. Jones, did you have any comments on these?

21           ATTORNEY JONES:  No.  We were content with the

22  language as it was.  I do think adding that language, "in

23  conjunction with the closure of the REI division" makes it very

24  one-sided and it becomes inaccurate in terms of the nature of

25  plaintiff's claim.

(697 of 993), Page 697 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 649 of 945
2:21-cv-00049-jdk-jd Document 352-3 Filed 04/25/25 Page 50 of 85
1019

VOLUME: 11
PAGES: 970-1056

1    THE COURT:  Okay.  "Causal connection", 3.4?

2    ATTORNEY SCHROEDER:  In the second paragraph of 3.4,

3    Your Honor, we would delete the first sentence.  I think it, it

4    confuses it for the jury because it gets away from the but-for

5    standard for the ADA claims.  I think the rest of the paragraph

6    reads well and actually is consistent, but I don't think that

7    the first sentence of that paragraph is appropriate.

8    THE COURT:  Okay.  And that's related to the argument

9    you made earlier about causation, the but-for standard?

10   ATTORNEY SCHROEDER:  Correct, Your Honor.

11   THE COURT:  Okay, all right.  The Rehabilitation Act

12   claim, so, as you can see, it's a shortened section just

13   because of how it follows the ADA.  So, plaintiffs, no

14   objections, I'm assuming, to that?

15   ATTORNEY JONES:  Correct.

16   THE COURT:  Okay.  And, Mr. Schroeder, how do you

17   want to do this with respect to the Rehab Act?  Are you

18   basically the same objections that you raised to the ADA you

19   raise to the Rehab Act section?

20   ATTORNEY SCHROEDER:  Exactly, Your Honor.

21   THE COURT:  Okay, all right.  Then "Disability

22   Discrimination Claims Under New Hampshire State Law", Page 22,

23   plaintiff, any objections?

24   ATTORNEY JONES:  No objection.

25   THE COURT:  Okay.  And defendants?

(698 of 993), Page 698 of 993      Case: 25-1382  12/22/2025, DktEntry: 35.4, Page 650 of 945
2:17-cv-00494-jkd   Document 35293   Filed 04/25/25   Page 650 of 945

1020

VOLUME:  11
PAGES:  970-1056

```
 1                ATTORNEY SCHROEDER:  Nothing.

 2                THE COURT:  Okay.  "Disability Discrimination Claims

 3      Under Vermont State Law", Page 22, plaintiff?

 4                ATTORNEY JONES:  No objection

 5                THE COURT:  Okay.  Defendants?

 6                ATTORNEY SCHROEDER:  Your Honor, our submission would

 7      be just an objection for the record on whether or not it should

 8      be motivating factor versus but-for.  So we're just stating

 9      that objection for the record.

10                THE COURT:  Okay.  But no, no specific changes other

11      than that objection to that particular legal standard?

12                ATTORNEY SCHROEDER:  Correct, Your Honor.

13                THE COURT:  Okay, okay.  "Wrongful Discharge under

14      New Hampshire Law", Page 24, plaintiff, any objection?

15                ATTORNEY JONES:  No objection, Judge.

16                THE COURT:  Okay.  Defendants?

17                ATTORNEY SCHROEDER:  Just a second, Your Honor.

18                THE COURT:  Yes.

19                ATTORNEY SCHROEDER:  Your Honor, we'd submit that the

20      third paragraph on Page 24 that that's really what should be

21      above the paragraph on the prevailing rule.  Because,

22      otherwise, if you read the prevailing rule section first, it

23      looks like there's only one element, and we want to make sure

24      that the jury is aware there's two.

25                THE COURT:  Okay.  So no objection to the substance
```

(699 of 993), Page 699 of 993   Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 651 of 945
2:21-cv-00494-jdc   Document 365.3   Filed 04/25/25   Page 52 of 945

1021

VOLUME:  11
PAGES:  970-1056

 1    of the paragraph that contains the elements, just where it's

 2    located?

 3                  ATTORNEY SCHROEDER:  Yes.

 4                  THE COURT:  Plaintiff, any objection to moving that

 5    around?

 6                  ATTORNEY JONES:  I mean, I think it makes sense as it

 7    currently is if it's kind of a background of the nature of

 8    at-will employment and that there are exceptions to that nature

 9    of employment, and then it explains that one of those

10    exceptions is this bad faith exception that is then explained.

11    I think it makes logical sense the way it currently reads.  I

12    think that actually would be more confusing if it's altered the

13    way that Mr. Schroeder suggests.

14                  THE COURT:  Okay.  I'm going to leave it the way it

15    is for now, and we'll also take another look at that after

16    reading all of them together.  Number 1, "Termination motivated

17    by bad faith, malice, or retaliation", Mr. Schroeder?

18                  ATTORNEY SCHROEDER:  On that one, Your Honor, the

19    first element, the first subparagraph, little I, I don't -- I

20    think that's circular, "an employee is discharged for pursuing

21    policies condoned by the employer"?  I'm not -- maybe I'm,

22    maybe I'm misreading that, but I'm not sure if that's what was

23    meant there.

24                  THE COURT:  So you're saying little I is circular?

25                  ATTORNEY SCHROEDER:  I'm going to remove that

VOLUME: 11
PAGES: 970-1056

1    objection, Your Honor.

2              THE COURT:  Okay, all right.

3              ATTORNEY SCHROEDER:  Nothing else in subparagraph 1

4    at all.

5              THE COURT:  Okay.  Subparagraph 2, "Acts that public

6    policy would encourage", plaintiff, any objection to that?

7              ATTORNEY JONES:  No objection.

8              THE COURT:  Okay.  Defendants?

9              ATTORNEY SCHROEDER:  Your Honor, I think it's on Page

10   26.  There's a couple of examples of what could be, you know,

11   what could be considered acts that public policy would

12   encourage, but I think it's prejudicial to then say after the

13   third example, "Other examples of acts that public policy would

14   encourage could be reporting physician conduct that is illegal,

15   fraudulent, unethical, or unlawful to patients; ensuring that a

16   medical provider or medical facility obtain patient consent

17   before performing procedures on patients; and objecting to

18   improper patient billing procedures".

19       We would agree to the first three examples, but I think

20   now we're getting into how the jury is going to interpret the

21   evidence in the record and apply it to the law.  I think now we

22   are getting into multiple examples beyond the three that are

23   there, and I think that would be unfairly prejudicial to us.

24             THE COURT:  And, obviously, these acts are this case,

25   right?

VOLUME:  11
PAGES:  970-1056

1    ATTORNEY SCHROEDER:  I'm not suggesting they aren't,

2    Your Honor.

3    THE COURT:  No, no.  I understand that.  I understand

4    that.  I'm just wondering if part of the objection is the

5    example begins to become too much about the facts of this case,

6    which may not be improper, but that's part of your objection,

7    presumably?

8    ATTORNEY SCHROEDER:  Correct, that, that we are

9    getting into the nitty-gritty of what we're alleging, and, if

10   we're not going to get into the REI division closing and three

11   physicians terminated at the same time, well, I'd submit that

12   we can't get into this specific issue, which obviously is part

13   of the plaintiff's case.

14   THE COURT:  Yeah, but, again, we're going to go round

15   and round, you know, on this, but that's, that wouldn't be an

16   act that public policy would encourage, the closure of the

17   division, right?

18   ATTORNEY SCHROEDER:  I agree with you, Your Honor,

19   except that that's the fourth, fifth, sixth example.  I don't

20   think we need to give the jury six examples.  I think there's

21   three already, and I think that it's unfairly prejudicial of

22   our case.

23   THE COURT:  Okay.  Plaintiff, any response?

24   ATTORNEY JONES:  We think it's simply a description

25   of the claim and it's appropriate, and we would note that the

(702 of 993), Page 702 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 654 of 945
2:21-cv-00949-kjd Document 35.4 Filed 04/25/25 Page 654 of 945
1024

VOLUME: 11
PAGES: 970-1056

1    sentence starts, "Other examples of acts that public policy

2    would encourage could be".  I mean, you're not saying it is; it

3    could be.  And it just simply summarizes the claim made.  So I

4    think it's okay as written.

5            THE COURT.  All right.  I'll take a look at that.

6    "Damages", Page 26, plaintiff?

7            ATTORNEY JONES:  No objection.

8            THE COURT:  And defendants?

9            ATTORNEY SCHROEDER:  We would strike the second

10   bullet point at the bottom of Page 27.

11           THE COURT:  That's a different section, right?  I was

12   just talking about the first paragraph.

13           ATTORNEY SCHROEDER:  Oh, I'm sorry, Your Honor.

14           THE COURT:  Yeah, "Damages" on 26, 27?

15           ATTORNEY SCHROEDER:  No, no objection, Your Honor.

16           THE COURT:  So the next section, "Economic and

17   Non-Economic Damages", plaintiff, any objections?

18           ATTORNEY JONES:  No objection.

19           THE COURT:  Okay.  Go ahead, Mr. Schroeder, on this

20   section.

21           ATTORNEY SCHROEDER:  Sure.  The first bullet point

22   and the third bullet point we would have it state that Dr.

23   Porter "may be entitled to damages" as opposed to "is entitled

24   to damages", and we would strike the second bullet because

25   there has been no evidence put forth in the record about

(703 of 993), Page 703 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 655 of 945
2:17-cv-00949-kjd Document 35.293 Filed 04/25/25 Page 655 of 945
1025

VOLUME: 11
PAGES: 970-1056

1  medical care and treatment relating to her claims.  There's

2  just no --

3          THE COURT:  Yeah, I was going to ask about that.  I

4  mean, this is obviously coming from a, you know, more general

5  charge relating to these kinds of damages, so I appreciate that

6  information.

7          ATTORNEY SCHROEDER:  Understood.

8          THE COURT:  Is there any objection to that?

9          ATTORNEY JONES:  No objection.  There's no claim here

10  for medical expenses.

11          THE COURT:  So then the second bullet will be

12  removed.  And the first, Mr. Schroeder, your objection to the

13  first bullet is "may be entitled"

14          ATTORNEY SCHROEDER:  Yes, the same as the third, Your

15  Honor.

16          THE COURT:  So what about above, in the paragraph

17  right above it, "These damages may include compensation for

18  past and future harm, depending on the evidence", doesn't that

19  kind of make the point that it's certainly not required, but

20  it's based on the evidence in the case?

21          ATTORNEY SCHROEDER:  Your Honor, it's a fair point.

22  I just, I think I just want to make sure they understand that

23  it's not a fait accompli.

24          THE COURT:  Okay.  So, for the reason that I've just

25  said, I'm just going leave it, the first bullet, as "Dr. Porter

(704 of 993), Page 704 of 993
2:17-cv-00949-kjd Document 35-4, Page 656 of 945
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 656 of 945
2:17cv00949kjd Document 265.193 Filed 04/25/28 Page 656 of 945
1026

VOLUME: 11
PAGES: 970-1056

1  is entitled" because I think the paragraph before makes the

2  point that damages are not required.  The third bullet,

3  anything there?

4         ATTORNEY SCHROEDER:  Just the same suggestion as

5  before, Your Honor, "may be".

6         THE COURT:  Okay.  The "is entitled" language?

7  Mr. Schroeder, I was just confirming.

8         ATTORNEY SCHROEDER:  I'm sorry.  I didn't hear you,

9  Your Honor.

10         THE COURT:  Okay.  The third bullet, your objection

11  is to the "is entitled" language?

12         ATTORNEY SCHROEDER:  Right, correct, Your Honor.  I'm

13  sorry.  I didn't hear you.

14         THE COURT:  All right.  Okay. "Mitigation of

15  Damages", Page 28, plaintiff, any objections?

16         ATTORNEY JONES:  No objection.

17         THE COURT:  Okay.  Defendants?

18         ATTORNEY SCHROEDER:  Your Honor, in the first

19  sentence as well as the sentence, "If you find", we would just

20  -- the first sentence -- well, let's start with the first

21  sentence.  It's Dartmouth Health's position that Dr. Porter has

22  mitigated or could have fully mitigated her damages.  It's not

23  that she's failed to mitigate or minimize.  We know she's

24  mitigated some of her damages, if not all of them.  In fact, we

25  believe, based upon the demonstrative that we want to show that

(705 of 993), Page 705 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 657 of 945
2:21-cv-00049-kjd Document 352-3 Filed 04/25/25 Page 58 of 945

1027

VOLUME: 11
PAGES: 970-1056

1   we talked about before, that she has mitigated all of her

2   damages.  So stating that she has mitigated or could have fully

3   mitigated her damages would be appropriate there.

4           THE COURT:  Sorry.  Has mitigated or --

5           ATTORNEY SCHROEDER:  Could have fully mitigated her

6   damages.

7           THE COURT:  Mr. Jones?

8           ATTORNEY JONES:  I mean, I'm not sure I understand

9   that so I'm not sure the jury would understand it.  I mean, the

10  way this is phrased is the law of the duty to mitigate.  So

11  then rephrasing it as the defense claims that she mitigated her

12  damages, that just seems illogical.

13          THE COURT:  Yeah, it does seem to be -- I don't know

14  about illogical, but I don't know if it works given that this

15  section is all about the duty to mitigate and we're saying

16  Dartmouth Health claims that Dr. Porter did mitigate.

17          ATTORNEY SCHROEDER:  Well, I think we put -- the

18  evidence in the record is clear, at least from our standpoint,

19  that, based upon her ability to get this other job right away,

20  have it right away, that she had mitigated her damages, and, in

21  fact, if you compared her at a 1.0 FTE at Dartmouth Health,

22  which is how her expert assumed it, and you did the same for

23  UVM Medical Center, she's actually making more money as of 2025

24  going forward.

25          So we are making the -- we're not suggesting that she

(706 of 993), Page 706 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 658 of 945
2:17-cv-00494-kjd Document 352-3 Filed 04/25/25 Page 658 of 945

1028

VOLUME: 11
PAGES: 970-1056

1  hasn't mitigate her damages.  We believe she's fully mitigated

2  her damages, to the extent that there were any.

3          THE COURT:  Okay.  Mr. Jones?

4          ATTORNEY JONES:  I mean, that sounds like an argument

5  that they're making that she has not suffered damages, which I

6  think is somewhat different than the mitigation issue.  I do

7  think it's important to have something about the mitigation

8  issue, however, in an instruction because a big part of this

9  case, you know, their argument that she suffered no losses or

10 has fully mitigated her damages assumes that she should have

11 been working a full-time position.  We argue that for her to do

12 a full-time FTE at University of Vermont would have required

13 her to relocate, and that's not reasonable, and the duty to

14 mitigate doesn't require that.

15     So I think we need to be able to argue to the jury what

16 the duty to mitigate is, what it requires, what's reasonable,

17 what is not reasonable, and to explain to the jury that her

18 actions exceeded any duty to mitigate that she had and she

19 still suffered significant financial loss.

20          THE COURT:  Okay.  I'm going to leave it as worded

21 right now.  Anything else in that section?  I think that -- was

22 that the only objection from the defendants?

23          ATTORNEY SCHROEDER:  Yes.

24          THE COURT:  Okay.  Next section, Page 29, "Punitive

25 Damages", plaintiff?

(707 of 993), Page 707 of 993   Case: 25-1382   12/22/2025   DktEntry: 35.4   Page 659 of 945
2:21-cv-00949-kjd   Document 352-3   Filed 04/25/25   Page 659 of 945

1029

VOLUME:  11
PAGES:  970-1056

 1              ATTORNEY JONES:  No objection.

 2              THE COURT:  Okay.  Defendants?

 3              ATTORNEY SCHROEDER:  Yes, Your Honor.  I think that

 4     we would suggest halfway down in the, where it says second,

 5     well, "Second", comma, halfway down it says, "You may also find

 6     malice even if Dartmouth Health's motivation behind the

 7     intentional, outrageous conduct was to benefit itself".  We

 8     would add "in a way tantamount to a crime" rather than "to harm

 9     Dr. Porter".

10              THE COURT:  So the fact that the second paragraph in

11     that section lays out this "to a degree of outrage frequently

12     associated with a crime", that's not sufficient?

13              ATTORNEY COFFIN:  If I might, Your Honor.

14              THE COURT:  Yes.

15              ATTORNEY COFFIN:  The concern there is that to

16     describe that punitive damages are appropriate where Dartmouth

17     Health has done something to benefit itself, you know,

18     obviously, a legitimate business reason, part of the reasons

19     they're doing that is to benefit the institution, and we just

20     thought that that needed a little bit more elaboration, that

21     the benefit has to be something, you know, commensurately

22     outrageous, immoral, like a, tantamount to a crime.

23         The "tantamount to a crime" language, there's nothing

24     magic about that, but I do think that, if you just leave that

25     implication that a benefit could be, Hey, if they benefit, that

(708 of 993), Page 708 of 993   Case: 25-1382   12/22/2025, DktEntry: 35.4, Page 660 of 945
2:17-cv-00949-jkd   Document 35293   Filed 04/25/28   Page 660 of 945
1030

VOLUME: 11
PAGES: 970-1056

 1      could be subject to punitive damages, is not the law.

 2              THE COURT:  Okay.  So the proposal then is "in a way

 3      tantamount to a crime" rather than "to harm Dr. Porter"?

 4              ATTORNEY COFFIN:  Yes.

 5              THE COURT:  Okay.  Mr. Jones?

 6              ATTORNEY JONES:  We believe that the language as

 7      written is appropriate.  The second paragraph already provides

 8      for the basic standard, which concludes the language up to a

 9      degree of outrage, frequently associated with a crime.  I don't

10      think that needs to be reinforced here.  So we would stick with

11      the language as drafted.

12              THE COURT:  Is the "in a way tantamount to a crime"

13      linked to the outrageous conduct or to the benefit?  Is your

14      idea that it's both?

15              ATTORNEY COFFIN:  Sort of both, but I think that the

16      notion fundamentally more, if you can split it, is that the

17      receiving a benefit in those circumstances in that context

18      would be extreme bad behavior rather than, you know, reasonable

19      business behavior which benefits the company.

20              THE COURT:  Okay.  I'm just going to leave that the

21      way it is for now and, again, take that under consideration.

22      "Remaining Damages Issues", plaintiff?

23              ATTORNEY JONES:  No objection.

24              THE COURT:  Okay.  And defendants?

25              ATTORNEY SCHROEDER:  Just, Your Honor, before you get

1031

VOLUME: 11
PAGES:  970-1056

1    there, at the last part of "Punitive Damages", the

2    second-to-last paragraph had a provision, "Where the management

3    of the corporation has knowledge of wrongful conduct by

4    lower-level employees, the corporation may be deemed to have

5    permitted the conduct", we don't believe that that's consistent

6    with Vermont law on punitive damages.  Specifically, the issue

7    of punitive damages in this case only comes up in the context

8    of the ADA and, obviously, the Rehab Act then because of the

9    ADA, but there's a cap limit.

10        There are a couple of cases under Vermont law,

11   specifically *Shortle v. Central Vermont Public Service*

12   *Corporation*, *Sparrow v. Vermont Savings Bank*, which relate to

13   -- and these were not FEPA claims, but they go to the issue of

14   punitive damages and whether or not the malicious or unlawful

15   act relied upon is that of a governing officer.  So just

16   saying, Well, the management of the corporation knew what

17   somebody was doing, I think that has kind of watered down the

18   standard of what it takes to hold a corporation liable for

19   punitive damages.

20            THE COURT:  Okay.  And do you have citations for your

21   cases?

22            ATTORNEY SCHROEDER:  I do, Your Honor.  137 Vt. 32,

23   and 95 Vt. 29.  That's a rather old case from 1921.  The first

24   one is *Shortle v. Central Vermont Public Service Corp.*  That's

25   from 1979.  These are not FEPA claims, but they go to the issue

(710 of 993), Page 710 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 662 of 945
2:17-cv-00949-kjd Document 35293 Filed 04/25/25 Page 662 of 945
1032

VOLUME:  11
PAGES:  970-1056

 1    of punitive damages and when they may be assessed against a

 2    corporation.

 3            THE COURT:  Okay, all right.  I'll take a look at

 4    those cases.  And then is there a proposal for that particular

 5    sentence?

 6            ATTORNEY SCHROEDER:  My, the proposal, Your Honor, is

 7    to delete that sentence.

 8            THE COURT:  Oh, delete it?  Okay, all right.  And

 9    "Remaining Damages Issues", plaintiff, any objection?

10            ATTORNEY JONES:  No objection.

11            THE COURT:  Okay.  Defendants?

12            ATTORNEY SCHROEDER:  No objection.

13            THE COURT:  "Insurance and Taxes", plaintiff?

14            ATTORNEY JONES:  No objection.

15            THE COURT:  Okay.  Defendants?

16            ATTORNEY SCHROEDER:  No objection.

17            THE COURT:  "Final Instructions", plaintiff?

18            ATTORNEY JONES:  Not an objection but just a

19    suggestion.

20            THE COURT:  Yes.

21            ATTORNEY JONES:  I think it would be best if we could

22    clarify that the jury is expected to answer "yes" or "no" with

23    regard to each of the Roman numeral I through VI items on the

24    form.  I just want to avoid a situation where the jury answers

25    some of them and not all of them and then there's confusion

(711 of 993), Page 711 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 663 of 945
2:17-cv-00949-jkd   Document 365-3    Filed 04/25/25    Page 663 of 945

1033

VOLUME:  11
PAGES:  970-1056

1   about what the jury did.

2          THE COURT:  Okay.  So are you saying the third line

3   of that section, "The answer to each question" should be more

4   specific about, like, listing the actual issues?

5          ATTORNEY JONES:  Well, I might -- I have here my

6   handwritten notes are to add a fourth sentence.  After saying,

7   "The answer to each question on the form must be the unanimous

8   answer of the jury", I would say, "In addition, each question

9   numbered Roman numeral I through VI must be answered".

10         THE COURT:  Okay.  Defendants, any objection to that?

11         ATTORNEY SCHROEDER:  Just a second, Your Honor.

12         THE COURT:  Yes.

13         ATTORNEY SCHROEDER:  No issue, Your Honor.

14         THE COURT:  Okay.  So we'll add that.  And everything

15  else with the "Final Instructions" section, no objections?

16         ATTORNEY JONES:  Yeah, correct, no further

17  objections.

18         ATTORNEY SCHROEDER:  Yes, Your Honor.

19         THE COURT:  Okay, all right.  Let's turn to the

20  verdict form then.  So I'll just take, I guess, objections from

21  each side all at once.  Seven-page document.  Plaintiff have

22  any objections?

23         ATTORNEY JONES:  No objections.

24         THE COURT:  Okay.  Defendants?

25         ATTORNEY SCHROEDER:  Yes, Your Honor.

(712 of 993), Page 712 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 664 of 945
2:21-cv-00949-kjd Document 35.93 Filed 04/25/25 Page 664 of 945

1034

VOLUME:  11
PAGES:  970-1056

 1              THE COURT:  Okay.

 2              ATTORNEY SCHROEDER:  With respect to Roman Numeral I,

 3      we would delete the phrase, "and failed to reassign her to

 4      another position at Dartmouth Health", for all the reasons

 5      we've stated previously.

 6              THE COURT:  Right.

 7              ATTORNEY SCHROEDER:  There are no changes to Roman

 8      numeral II.  Roman numeral III, "Rehabilitation Act", we would

 9      insert the word "intentionally".

10              THE COURT:  Before "terminated"?

11              ATTORNEY SCHROEDER:  Yes.  Because the Rehabilitation

12      Act requires intentional violation.  That's the *Loeffler v.*

13      *Staten Island University Hospital* decision from the Second

14      Circuit, 582 F.3d 268.  So we would insert the word

15      "intentionally" in each subparagraph A, B, and C.

16              THE COURT:  Even though the legal instructions

17      section for them to make the finding lays that out?

18              ATTORNEY SCHROEDER:  From the jury instructions, Your

19      Honor?

20              THE COURT:  Yes.

21              ATTORNEY SCHROEDER:  Well, I think, you know, there's

22      one thing to go through 30 pages of jury instructions and then

23      you've got the verdict form.  So I think, you know, I think

24      saying it more than once would be appropriate, especially since

25      that's what the law requires.

(713 of 993), Page 713 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 665 of 945
2:17-cv-00949-jkd Document 35293  Filed 04/25/25  Page 665 of 945

1035

VOLUME:  11
PAGES:  970-1056

```
1     THE COURT:  Okay.

2     ATTORNEY SCHROEDER:  Ms. McDonald just referred to

3   the fact that she did not believe that the jury instructions

4   actually refer to the word "intentionally".

5     THE COURT:  Okay.

6     ATTORNEY SCHROEDER:  In Roman numeral IV, I think --

7   and this is a continuing rephrasing of subparagraph B for Roman

8   numeral IV and Roman numeral V.  we would just have it say,

9   instead of "by reassigning her to another department instead of

10  terminating her employment", we would have it say "by

11  terminating her employment instead of reassigning her in

12  violation of the law", so by terminating her employment instead

13  of reassigning her in violation of whatever law we're talking

14  about, whether it's Roman numeral IV or Roman numeral V.

15        And we, certainly like the jury instructions, we'll send

16  Your Honor, too, red-lined provisions.

17        ATTORNEY McDONALD:  In the punitive damages question,

18  Section 3, where it states, "If you checked 'yes' to any of the

19  questions in parts 2, 4, or 5 above", we would strike the Roman

20  numeral IV.

21        THE COURT:  Yes, I had a feeling you might say that,

22  but please go ahead, let me hear why.

23        ATTORNEY McDONALD:  We don't -- we believe that's a

24  New Hampshire claim.  We don't believe that punitive damages

25  are available under that claim.
```

(714 of 993), Page 714 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 666 of 945
2:21-cv-00949-kjd Document 35293   Filed 04/25/25   Page 666 of 945
1036

1  THE COURT: Right. So we found the same, but there
2  is a -- what's the term of art for it -- kind of like excess
3  compensatory damages under New Hampshire law.
4  ATTORNEY VITT: I think it's enhanced.
5  THE COURT: Enhanced, that's it, enhanced
6  compensatory damages. The legal distinction between the two,
7  there must be one, but I think, as I understand it from the
8  law, that's kind of New Hampshire's kind of way of getting at
9  that concept.
10  ATTORNEY McDONALD: It's, we do have a case, and it's
11  State v. Hynes, which is 159 N.H. 187, a 2009 case, and at Page
12  198 there's a quote, "Enhanced compensatory damages are, as
13  their name indicates, compensatory and not punitive in nature".
14  THE COURT: Yeah. So what's the difference between
15  punitive damages and enhanced compensatory damages, or what's
16  the difference between compensatory damages and enhanced
17  compensatory?
18  ATTORNEY SCHROEDER: Well, I think compensatory goes
19  the issue of back pay, front pay. Perhaps you add emotional
20  distress in there. But it certainly doesn't include the
21  category of punitive, which has its own standard no matter what
22  state we're in, and compensatory is always considered looking
23  back and saying, all right, How do we -- whether it's back pay,
24  front pay, reimbursement for expenses, it is not anything
25  that's, quote, unquote, punitive.

 1          THE COURT:  Okay.  Mr. Jones, any thoughts on that?

 2          ATTORNEY JONES:  Well, admittedly it's been a while

 3   since I did extensive research into the New Hampshire law of

 4   enhanced compensatory damages.  My recollection -- and my first

 5   bar license was in New Hampshire -- is that this really is New

 6   Hampshire's attempt to get at a similar notion that, in cases

 7   involving particularly egregious behavior, there is the ability

 8   to have the jury award an extra amount to take that into

 9   account, and they call that enhanced compensatory damages.

10          THE COURT:  That was kind of my understanding as well

11   with some research this morning on this.  This came up for me

12   this morning, so that's why the form you have didn't even make

13   that change to it.  But, Ms. McDonald, do you --

14          ATTORNEY McDONALD:  I was just going add.  I think

15   also enhanced compensatory damages relate to they're in lieu of

16   an administrative fine, right?  So I think the amount, that

17   goes to the amount of the --

18          THE COURT:  So you're looking at the statute?

19          ATTORNEY McDONALD:  Yes.

20          THE COURT:  So I'm at the same provision, "Except

21   that in lieu of an administrative fine, enhanced compensatory

22   damages may be awarded when the court finds the respondent's

23   discriminatory conduct to have been taken with willful or

24   reckless disregard of the charging party's rights under this

25   chapter".

VOLUME: 11
PAGES: 970-1056

1       Seems kind of cognate of punitive to some degree. I'm not

2    saying they're the same, but it seems like New Hampshire's way

3    of getting at similar type conduct. But we're looking at this,

4    and I will make an adjustment to that and any necessary kind of

5    adjustments to the jury instructions in that regard. Is that

6    it for the verdict form, defendants?

7       ATTORNEY SCHROEDER: Yes, Your Honor.

8       THE COURT: Okay. And, plaintiffs, you're good with

9    it?

10       ATTORNEY JONES: We are, yes.

11       THE COURT: Okay. So the motions, then, filed over

12    the weekend. So, first, taking up Document 266, defendant's

13    memorandum regarding law applicable to a potential award of

14    prejudgment interest, I'm wondering if this is kind of mooted

15    out just because you have probably seen the instructions say

16    that interest is not to be taken into account?

17       ATTORNEY COFFIN: Yes, that was our understanding,

18    Your Honor, and they've agreed to that instruction, so this

19    would be mooted out.

20       THE COURT: Okay, thank you. And then the other one,

21    267 filed by plaintiffs, so motion to preclude any reduction of

22    damages based on conditional offer of severance pay. So what

23    is the request here, right? So I understand your argument,

24    certainly, right, that her decision to forego a severance

25    agreement or severance payment in favor of proceeding with

1    legal claims means she made her decision and that is her

2    decision and she shouldn't be, you know, any award of damages

3    she might receive in this case shouldn't be reduced by that

4    amount.  Is that --

5              ATTORNEY JONES:  Correct.  And we want to make sure

6    that there's no argument that, as a matter of mitigation of

7    damages, that somehow the duty to mitigate would have required

8    her to accept a severance payment when that would have required

9    her to sign a general release of all her claims.  And the idea

10   that you have to sign a separation agreement with a general

11   release to comply with the duty to mitigate would seem to be

12   legally contrary, and so I think that would be confusing if

13   that were allowed to be an argument to the jury, that the duty

14   to mitigate somehow required her to or that she should

15   otherwise somehow be penalized and that the damage award should

16   be reduced by what she would have been offered.

17        Had she accepted a severance payment without a general

18   release, then obviously that payment would be a reduction of

19   her damages, but in this case the fact that she was offered it

20   in exchange for a general release we don't think should be used

21   in argument to the jury as a way to offset, reduce, or

22   otherwise be a part of the duty to mitigate.

23             THE COURT:  Okay.  So this is not a request for any

24   kind of an instruction, it is more of a statement about what

25   you think they should be able to argue at closing relative to

1  this?

2         ATTORNEY JONES:  Correct.

3         THE COURT:  So, defendants, so your response is all

4  about Rule 408.  I'm not sure that this is really a Rule 408

5  question so much as it is mitigation.  408, right, as I

6  understand it, is just about you shouldn't be introducing

7  evidence of settlement.  I understand the severance issues are

8  in evidence.

9         ATTORNEY COFFIN:  Yeah, I wasn't sure exactly what

10 they were seeking, and so we responded substantively.  One, the

11 information was admitted without any kind of an objection by

12 them and without any kind of request that it be so limited.  I

13 think, at that point, the parties are able to point to the

14 evidence before the jury and present the matter and reasonable

15 inference is drawn from the evidence in the case, including

16 damages and including mitigation.  They did offer and question

17 witnesses following up on that with regard to the contours of

18 the severance and what's normal in a severance situation and so

19 forth.

20        Furthermore, we've cited in that memo two cases that

21 discuss, you know, in very similar circumstances that the 408

22 does not apply in this context because they are not actually

23 offers to compromise a dispute.  And the Ninth Circuit case we

24 cited there, *Cassino*, actually found that the offer of

25 severance could be presented in favor of mitigation.

1    And the Second Circuit case is very similar.  It tracks

2    that and cites it approvingly, the *Tripler* case.  So I don't

3    understand how the evidence being admitted and the jury having

4    heard testimony about this that damages are, and mitigation of

5    damages are kind of such a central issue in the case that we

6    should be limited in reasonably pointing to the inferences that

7    can be drawn from the evidence in the case.

8        THE COURT:  But what are those inferences?  I guess

9    I'm curious what that would look like in closing, right?  She's

10   offered severance.  She chooses not to take severance.  She

11   chooses to bring legal claims.  Is the argument going to be,

12   not to put words in your mouth, but is the argument going to

13   essentially she could have taken the severance agreement, and

14   that would have reduced her damages?  I feel like that's a

15   tough spot, isn't it, for the plaintiff to be in for you to

16   argue that when she chose to pursue legal claims instead of

17   severance.

18       ATTORNEY SCHROEDER:  Well, first of all, Your Honor,

19   there was no objection to the admission of that evidence in

20   this case.  They could have made that argument before.  So it's

21   in.

22   But it also goes to the issue of meeting with the

23   plaintiff after the letter that went -- actually, she

24   references it in her letter about going to meet with Aimee

25   Claiborne to go over whether or not, you know, what's going to

1    happen with her job, and it's a fact that she did not accept

2    the severance package.  They've heard that testimony.  I think

3    that it's, it's -- how I present it, I mean, I think we're

4    certainly open to present it however we want because it's

5    evidence in the record.

6        THE COURT:  I don't know about that.  Truly, I don't

7    know the answer to that, but to make the argument that she

8    failed to mitigate because she didn't accept the severance

9    package, which is her right --

10       ATTORNEY SCHROEDER:  No, no, I'm not really getting

11   -- I'm not saying it for just fact of failure to mitigate, Your

12   Honor.  I think one of the issues is that she had a severance

13   package on the table.  She sought more money, and she didn't

14   take it, period, full stop.  I don't have to get into, Well,

15   she didn't mitigate her damages.  I wasn't going to make that

16   statement.  But the facts in the record, C13 is a document in

17   the record, and so I certainly feel I have the ability to refer

18   to the actual language of it.

19       She's already admitted that on the stand, Well, it was a

20   nominal amount.  Well, I mean, that just goes to, you know,

21   some of our, some of the statements that we'll make

22   specifically on the issue of she was asking for additional

23   money at the time in addition to what she had in the letter

24   that she was sending to a number of individuals, and this was

25   their response.  They did meet with her.  They enunciated that

(721 of 993), Page 721 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 673 of 945
2:17-cv-00049-jkd Document 35.293 Filed 04/25/28 Page 673 of 945

1043

VOLUME: 11
PAGES: 970-1056

1    there was no position for her.  It's all in that document.

2         In addition, at the end of that severance agreement, there

3    was testimony by Heather Gunnell, the fact that it states that

4    Beth Todd was already a point, was already working in the

5    OB/GYN department, was part of the OB/GYN department, and was

6    assumed back into the OB/GYN department on a full-time basis.

7    That goes to our defenses, Your Honor.  She made complaints

8    about Dr. Hsu and Seifer.  That's in the record.  But that

9    document has already been -- the horse has left the barn on

10   that.  How do we not have the liberty of at least referring to

11   it, not necessarily to say, Well, she failed to mitigate her

12   damages?

13        I'm not, I don't need to say that, nor was I planning on

14   it, but, certainly, referring to the sequence of events and

15   what the company did, what they were prepared to do in terms of

16   severance.  I mean, this whole case is about intent, right?

17   Well, they put a severance package on the table.  She rejected

18   it.  They said, Okay, you know what?  We've reconsidered.

19   We're going to put $228,000 on the table for you.  How do I not

20   get to talk about that?  This whole case is about intent,

21   respectfully.

22        THE COURT:  I guess the question is just how you go

23   about using it.  I still have questions about that.  Mr. Vitt?

24        ATTORNEY VITT:  If I may be heard, Judge.  Yes, the

25   severance document was introduced really on the issue of, Was

1   there some offer?  It wasn't sort of minimal.  But, when they

2   made this argument, it was stunning.  The idea that a defendant

3   can present a discharged employee with a severance agreement

4   which requires confidentiality, no disparagement, and a total

5   waiver of all of her rights and then go to a jury and say, We

6   offered, whatever it is, a hundred, $150,000, and that should

7   be deducted from whatever damages you're going to give her.

8        There is simply no law in the Second Circuit and no law

9   that we could find that supports that.  And, as you said, it

10  puts the plaintiff in a terrible position.  It's absolutely

11  outside the bounds, and it shouldn't happen.  They should not

12  be able to make that argument.

13          THE COURT:  Mr. Coffin?

14          ATTORNEY COFFIN:  Mr. Vitt says there is no Second

15  Circuit case law on this.  There is.  The *Tripler* case

16  discusses this, and the *Cassino* case, you know, in very similar

17  circumstances provides that the offer of severance which wasn't

18  rejected could be offered into evidence in that case and was

19  used to mitigate damages.  You know, so I do think there is law

20  on this.  I think the cases that he cited for various reasons

21  just are not factually specific and don't hold, as these two

22  cases we found do hold, that this evidence is admissible.

23        You know, furthermore, we're not even at that point

24  because this evidence has been admitted, and I don't see why

25  it's not proper impeachment of Dr. Bancroft, of the information

VOLUME: 11
PAGES: 970-1056

1   the plaintiff was telling him and whether that was

2   cherry-picked or not.  And, of course, you know, we have this

3   version of events from Dr. Bancroft which is highly transmitted

4   from the plaintiff to him, and, if they're allowed to describe

5   all of these ramifications of what would happen with her salary

6   and her position and her pay and her damages, this seems to me

7   to be totally legitimate cross-examination, which was admitted

8   and the jury has now heard and it's part of the case, and we

9   should be able to argue it from there.

10        I don't see prejudice here, at least I've not heard kind

11   of what the prejudice is other than it is, you know, frankly

12   powerful evidence that she had a chance to bridge over to a

13   good position which she had at the time and that it would have

14   helped her carry through and not have kind of damages in the

15   case.

16        ATTORNEY SCHROEDER:  One other point, Your Honor.

17   This harkens back to earlier in the case when Dr. Porter was on

18   the stand.  She opened the door to this subject for a lot of

19   reasons, but one of which was, I had to take a second mortgage

20   on my home in order to buy this condo in Vermont.  So, one, she

21   opened the door to it.  Two, the evidence is in the case.

22   Like, how do I not have the ability, Your Honor?

23        And, certainly, obviously, I do not want to be interrupted

24   in my closing argument, not as I'm sure plaintiff's counsel

25   doesn't want to be interrupted.  So I certainly want to deal

(724 of 993), Page 724 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 676 of 945
2:17-cv-00949-jkd   Document 35293   Filed 04/25/23   Page 676 of 945
1046

VOLUME:  11
PAGES:  970-1056

1   with this ahead of time.  Not to say, I mean, this is a small

2   part of my closing argument because, obviously, our position is

3   she's not entitled to any damages, but, based upon the somewhat

4   all-over-the-map presentation by Dr. Bancroft, how do I not

5   have the opportunity?  How do I not have the ability to refer

6   to, This is what was on the table.  They had this discussion?

7        She said, Nobody talked to me about this.  She actually

8   refers to it in her letter.  You know, I don't want to -- this

9   is going to be a really small part of the presentation because,

10  like I said, I don't really feel that we need to get into

11  damages very much, but, certainly, it's part of the case.  It's

12  going to be part of my closing, and the fact that it's in the

13  case makes it germane to my closing argument.

14        THE COURT:  Okay.  Well, I'm definitely going to take

15  -- it's *Tripler*, I believe, is the case that Mr. Coffin cites?

16  I'm just curious.  Is it, procedurally, is it similar?  You say

17  the court there says the evidence of the severance agreement is

18  relevant to come in for similar purposes, that there are, there

19  was kind of a, a waiver of the severance in favor of, say,

20  discrimination claims, and the Court found that the severance

21  information was still relevant to come in in a case like that?

22        ATTORNEY COFFIN:  I think that the *Cassino* case is

23  more relevant to the facts that the Court is describing.  The

24  Second Circuit case had similar facts, but it cited *Cassino*

25  approvingly for that proposition.

(725 of 993), Page 725 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 677 of 945
2:21-cv-00449-jkd Document 35293 Filed 04/25/23 Page 677 of 945

VOLUME: 11
PAGES: 970-1056

1047

```
 1              THE COURT:  Okay, all right.  Well, as you can tell,
 2    I mean, I do have, I have some questions about that.  I'm going
 3    to read those cases, and I think I understand both sides of the
 4    argument.  Okay.  I think that was it as far as motions go.
 5              ATTORNEY JONES:  Yes.
 6              THE COURT:  Right?
 7              ATTORNEY SCHROEDER:  Yes, Your Honor.  The only thing
 8    I would ask -- obviously up to your discretion, but I want to
 9    know exactly where my bounds are in terms of my closing
10    argument.
11              THE COURT:  Right.
12              ATTORNEY SCHROEDER:  And, if you do need us to come
13    in early to discuss that, I'd rather know today, but I
14    understand that you have to consider it, and that is
15    understandable.  I just, I want to make sure that I am
16    following the Court's instruction.
17              THE COURT:  Right.  No, I think, if you come in a
18    little early tomorrow to receive kind of the final version of
19    the jury charge so you can see where things ended up in light
20    of the objections that were made, we'll have a talk about that
21    at that time as well.  So I certainly understand your desire to
22    have kind of guidance.
23              ATTORNEY SCHROEDER:  One last point, it's kind of
24    corollary to that, and I realize, Your Honor, you set aside
25    only 90 minutes, and so I want to be mindful of that.  We would
```

1048

VOLUME: 11
PAGES: 970-1056

1    like the opportunity to do a very short PowerPoint

2    demonstrative of what the evidence we believe shows.  And,

3    obviously, we'd be prepared to show it to the plaintiff's

4    counsel.  We haven't drafted it yet, so there's nothing to

5    share right now.  But a very short PowerPoint which would --

6         You know, one of the demonstratives is the issue of her

7    pay at 1.0 FTE, which is the document that we've had various

8    discussions about.  We'd like to be able to show that but, in

9    conjunction with that, a very short PowerPoint that would lay

10   out some of the facts as we see them and as far as the record

11   is reflecting them.

12         THE COURT:  Okay.  So, obviously, plaintiff needs to

13   see it and determine -- you know, obviously, if you have the

14   consent of plaintiff, it's kind of an easy issue.  In that

15   regard, it has to, obviously, you know, the standard has to

16   accurately summarize the testimony and kind of the evidence in

17   the case.  So I'll leave that to you to confer with plaintiff

18   on it.

19         On the related topic, though, C19, that's the other

20   exhibit you're talking about, the Dr. Bancroft letter.  So I

21   want to tell you I've reconsidered that issue.  I'm not going

22   to allow it as substantive evidence or as a demonstrative, and

23   I'm going to read into the record right now why, okay?  I've

24   been able to give this more thought.

25         So, by oral motion during a break in the trial, defendants

VOLUME:   11
PAGES:   970-1056

1   requested that a handwritten note generated by Dr. Bancroft

2   during cross-examination be admitted into evidence or,

3   alternatively, that it be permitted as a demonstrative aid.

4   That exhibit has been marked as Exhibit C19.  The Court ruled

5   that C19 would not be admitted into evidence but that it could

6   be used as a demonstrative aid during closing.  As I said,

7   since that ruling, I've had an opportunity to review the

8   transcript of Dr. Bancroft's testimony pertaining to the

9   generation of the note, as well as consider the legal arguments

10  of defendant's counsel for its proposed admissibility.

11      So, as to the factual setting of the generation of this

12  note, Dr. Bancroft was asked to explain his forecasting of

13  plaintiff's earnings.  As part of the cross-examination,

14  counsel asked Dr. Bancroft to perform specific calculations

15  using numbers provided by counsel.  Before performing the

16  requested calculations, Dr. Bancroft disagreed that the

17  proposed calculations would result in the conclusion counsel

18  sought to establish.

19      He was directed to perform the calculations anyway.

20  Dr. Bancroft specifically stated, quote, "I'll do it anyways,

21  but it's not correct".  That's at Page 91 of the transcript,

22  Lines 1 to 3.  He then wrote down the numbers on the paper.

23  That paper is C19.

24      So, first, I reaffirm the ruling that the handwritten note

25  will not be admitted as evidence, finding that the note is not

(728 of 993), Page 728 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 680 of 945
2:17-cv-00494-jkd Document 35.4 Filed 04/25/25 Page 680 of 945
1050

VOLUME: 11
PAGES: 970-1056

1     admissible as a statement by a party opponent under Rule 801.

2     Dr. Bancroft is not a party for purposes of Rule 801(d)(2)(A).

3     The note he generated on cross-examination is also not

4     admissible under 801(d)(2)(C) as the statement of an agent

5     authorized to speak on behalf of the party.

6          Courts have been skeptical of the notion that an expert is

7     an agent of the party who retained them.  As one example, I

8     cite *Kirk v. Raymark Industries*, 61 F.3d 147, Third Circuit

9     1995.  The circumstances of this note do not raise the

10    reasonable possibility of an adopted admission under the rules.

11    Defendants have asserted, at the time of the argument last

12    week, I believe, on this, that it is impeachment evidence.

13    Defendants may comment on the calculation to argue that the

14    damage calculations are flawed, but it is not evidence in the

15    case.

16         As to whether it is proper for the note to be used as a

17    demonstrative exhibit, as I say, I'm altering the ruling to

18    find that it may not be used as a demonstrative.  The general

19    rule is that the Court may allow the use of demonstrative aids

20    such as charts or tables, so long as those charts or tables

21    accurately summarize the content of the primary testimony and

22    do not misstate the testimony of the expert witness or

23    otherwise mischaracterize the expert's opinion.

24         For that I'll cite *Castaldi*, 363 Fed.App'x 761, a Second

25    Circuit decision from 2009.  So here the circumstances of the

VOLUME: 11
PAGES: 970-1056

1    testimony that resulted in the generation of the note raised a

2    significant question about whether it accurately summarizes the

3    testimony.  Dr. Bancroft acquiesced in performing the requested

4    calculations while protesting that the calculations were not

5    correct.  Under these circumstances, I don't think it's

6    appropriate to permit C19 to be used as a demonstrative

7    exhibit.  Obviously, it was his testimony at the trial, and, if

8    counsel wants to discuss his testimony on that point, that's

9    fine.  Mr. Schroeder?

10        ATTORNEY SCHROEDER:  Your Honor, just on a related

11   point, with respect to the demonstrative exhibits that the

12   plaintiff wanted to use in this case, obviously, you've heard

13   from my partner here, Mr. Coffin, on the issue of the federal

14   rate of interest versus the state equivalent.  For that reason

15   and that reason among maybe 50 other reasons, then

16   Dr. Bancroft's chart should not be used as a demonstrative

17   exhibit in plaintiff's closing because it relies upon the 12

18   percent interest rate in coming to those calculations among

19   other things that we've objected to already.

20        THE COURT:  Right, but, when an expert is subject to

21   cross-examination and the cross-examination lays out perhaps

22   flaws in the analysis, you're saying that's a reason for a

23   demonstrative aid for the expert's primary testimony on direct

24   not to come in?  I mean, experts are undermined all the time in

25   their cross-examinations.

VOLUME:  11
PAGES:  970-1056

1    ATTORNEY SCHROEDER:  I understand.  This just goes to

2  the demonstrative exhibit, Your Honor, and whether or not the

3  plaintiffs can use his chart as a demonstrative in the closing.

4        THE COURT:  Right.

5    ATTORNEY SCHROEDER:  Since Dr. Bancroft's testimony,

6  we have put in motions regarding the issue of prejudgment

7  interest and whether or not, which one should be used.  Well,

8  if they get to put in a chart that includes the 12 percent

9  calculation embedded into their numbers, how is that not

10  prejudicial to us?

11        THE COURT:  Well, I mean, that was part of kind of

12  the analysis that he generated.  I understand you disagree with

13  it.  This was created on cross-examination with numbers that he

14  did not even agree were accurate predicates for the

15  calculations.  Arguably, all Bancroft did on the stand was

16  perform certain calculations with certain numbers.  He didn't

17  draw any conclusions as to what those numbers showed.  I think

18  they're substantively different.  Mr. Coffin?

19        ATTORNEY COFFIN:  Yeah.  So I guess I parsed Dr.

20  Bancroft's testimony a little differently.  First, there was

21  really only, as I see it, only as to 2025 that he had a

22  colorable claim to disagree with it.  Because all we did was

23  take the numbers from his chart for three years and divide them

24  by .75 to equal what the numbers he used would be at 1.0.

25        And I would suggest his protestations that, Oh, that's

VOLUME:  11
PAGES:  970-1056

 1    going to be wrong; Oh, that doesn't make sense; I don't agree

 2    with it, you know, were actually very effective impeachment for

 3    the jury because they could see what was going on with him, and

 4    it was really a credibility assessment that they should be

 5    allowed to make.

 6         Nonetheless, that was just for one year and, again, for

 7    sort of a, a reason that didn't have a lot of water to it,

 8    which was, in 2025 for half the year, he used a calculation

 9    before he had adopted the assumption that she would go to .75

10    in July.  So you had sort of like a half year that there really

11    wasn't a full year at 1.0, and yet the difference in the salary

12    was something like close to $50,000.  So it was a lot more than

13    reasonably could be found to have been the difference.

14         You know, I would ask the Court, if we took out year 2025,

15    could we present our chart with just 2026 and 2027, you having

16    read the testimony closely?  So that's one comment I'd make,

17    but, overall, I do think it's important impeachment as to him

18    and what he's about.  And, again, we had this rapidly evolving

19    chart, and we're forced to kind of take assumption after

20    assumption, you know, a week before trial that just radically

21    changed by millions of dollars his conclusions, and our remedy,

22    since we didn't disclose an expert five years ago, is to

23    cross-examine.  Well, I think we should be entitled to that

24    remedy, Your Honor.

25         And I, so I would sort of ask the Court what the Court's

1    view on our demonstrative chart were we to use 2026 and 2027,

2    which he didn't have that problem with.

3          THE COURT:  Yeah.  I mean, it's not really a chart.

4    That's also part of the problem.  It's minimal.  It's, it's, he

5    puts a couple of numbers down with the years next to it.  I

6    don't know how that's kind of a summary of testimony in the

7    same way that the plaintiff's kind of chart is.

8          ATTORNEY COFFIN:  Well, if I might politely push back

9    on that, Your Honor --

10          THE COURT:  Sure.

11          ATTORNEY COFFIN:  You know, a chart isn't defined by

12    having lots and lots of parts and lots and lots of columns.

13    It's designed by, defined and considered to be useful to the

14    jury by kind of the information that can import, and, really,

15    this just shows what two years of his particular earnings.  And

16    we could have done, you know, out ten years, but, you know,

17    three, we thought, made the point.

18          And so I don't think the fact that the chart is simple and

19    understandable is the basis for the Court to allow or disallow

20    it.  It's whether it's something that the jury would find

21    reasonable and probative.  So I would suggest that we do be

22    allowed to use a '26 and '27 year chart.  And then sort of my

23    follow-on is I just want to get clarification on behalf of Don,

24    I think, which is what I do understand the Court to be saying.

25    While we can't use the chart, we can still point to

(733 of 993), Page 733 of 993      Case: 25-1382  12/22/2025  DktEntry: 35.4  Page 685 of 945
2:17-cv-00094-kjd  Document 365.3  Filed 04/25/25  Page 685 of 945

1055

VOLUME:  11
PAGES:  970-1056

1   Dr. Bancroft's testimony, the Court's, sorry, the Court's

2   ruling on it; is that correct?

3           THE COURT:  Right, right.  Yes.  No.  You're

4   obviously allowed to talk about what was said on the stand

5   during cross-examination, but I've ruled on the, on the chart,

6   on C, whatever, C19.  So that will remain the ruling, but it

7   can be commented on at closing.

8           ATTORNEY COFFIN:  All right.  Thank you, Your Honor.

9           THE COURT:  Okay.  Does that cover everything, two

10  hours later?

11          ATTORNEY JONES:  From our perspective, yes, Your

12  Honor.  Thank you.

13          THE COURT:  Okay.  Defendants, Mr. Schroeder?

14          ATTORNEY SCHROEDER:  Yes, Your Honor.

15          THE COURT:  Okay, all right.  So, as I said, we will

16  get you a new version of the jury instructions, and why don't

17  we plan to meet at 8:30, if that works for everyone, tomorrow?

18  Thank you.

19

20          (Whereupon at 3:03 p.m. the hearing was adjourned.)

21

22

23

24

25

(734 of 993), Page 734 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 686 of 945
2:17-cv-00049-kjd Document 35293 Filed 04/25/25 Page 686 of 945
1056

VOLUME: 11
PAGES: 970-1056

1    C E R T I F I C A T E

2          I, Sunnie Donath, RMR, Official Court Reporter

3    for the United States District Court, District of Vermont, do

4    hereby certify that the foregoing pages are a true and accurate

5    transcription of my stenographic notes of the hearing taken

6    before me in the above-titled matter on April 7, 2025 to the

7    best of my skill and ability.

8

9

10

11

12                            *Sunnie Donath, RMR*

13          --------------------------------

14                       Sunnie Donath, RMR

15

16

17

18

19

20

21

22

23

24

25

1

<pre>
                    IN THE UNITED STATES DISTRICT
                     FOR THE DISTRICT OF VERMONT
</pre>

1

2

3    MISTY BLANCHETTE PORTER, M.D., )
                                    )
4                      Plaintiff, )
                                    )
5         vs.                       )
                                    ) CASE NO. 2:17-cv-194
6    DARTMOUTH-HITCHCOCK MEDICAL    )
     CENTER, DARTMOUTH-HITCHCOCK    )
7    CLINIC, MARY HITCHCOCK         )
     MEMORIAL HOSPITAL, and         )
8    DARTMOUTH-HITCHCOCK HEALTH,    ) Closing Arguments
                                    )
9                      Defendants.  ) Jury Charge
     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

10

11

12        Continuation of trial held on Tuesday, April 8,

13   2025, at 8:30 a.m., Burlington, Vermont, before

14   Honorable Kevin J. Doyle, Magistrate Judge.

15

16

17

18

19   Clerk of Court:  Emerson F. Howe

20

21   Sarah M. Bentley, CCR-B-1745
       Registered Professional Reporter and Notary Public

22

23

24
                         BENTLEY COURT REPORTING
25                         sbireland7@gmail.com

2

```
 1                    A P P E A R A N C E S

 2      For the Plaintiff:

 3              GEOFFREY J. VITT, ESQ.
                SARAH N. NUNAN, ESQ.
 4              Vitt & Nunan, PLC
                8 Beaver Meadow Road
 5              Norwich, Vermont  05055-1229
                  (802) 649-5700
 6                gvitt@vittnunanlaw.com
                  snunan@vittnunanlaw.com
 7

 8              ERIC D. JONES, ESQ.
                Langrock, Sperry & Wool, LLP
 9              210 College Street
                Burlington, Vermont  05402-0721
10                (802) 864-0217
                  ejones@langrock.com
11

12      For the Defendants:

13              DONALD W. SCHROEDER, ESQ.
14              MORGAN MCDONALD-RAMOS, ESQ.
                Foley & Lardner, LLP
15              Suite 2500
                111 Huntington Avenue
16              Boston, Massachusetts  02199
                  (617) 342-4041
17                dschroeder@foley.com
                  mmcdonald@foley.com
18

19              TRISTRAM J. COFFIN, ESQ.
                Downs, Rachlin, Martin, PLLC
20              199 Main Street
                Burlington, Vermont  05402-0190
21                (802) 863-2376
                  tcoffin@drm.com
22

23      Also Present:

24              Edward Merrens, Chief Medical Officer
25                (Dartmouth-Hitchcock Medical Center)
```

3

I N D E X

                                                              PAGE

Charge Conference                                               4

Closing Argument on behalf of Plaintiff                        24

Closing Argument on behalf of Defense                          62

Rebuttal Closing Argument on behalf of Plaintiff              121

Conference with the Court regarding arguments                 125

Jury Charge by the Court                                      132

4

```
 1                    P R O C E E D I N G S

 2

 3

 4           (The following took place in open court

 5       without the jury present.)

 6           THE CLERK:  Your Honor, the matter before

 7       the court is Civil Case No. 17-cv-194, Misty

 8       Blanchette Porter vs. Dartmouth-Hitchcock

 9       Medical Center, et. al.

10           Present on behalf of the plaintiff are

11       Attorneys Geoffrey Vitt, Eric Jones, and Sarah

12       Nunan.

13           Present on behalf of the defendants are

14       Attorney Tristram Coffin, Morgan McDonald, and

15       Donald Schroeder.

16           This morning we're here for a charge

17       conference.

18           THE COURT:  Okay.  Good morning.  So just

19       to confirm for the record that all parties have

20       received the revised copy of the jury

21       instructions.

22           Plaintiff?

23           MR. JONES:  Yes, we received it.

24           THE COURT:  And defendants?

25           MR. SCHROEDER:  Yes, your Honor.
```

5

1          THE COURT:  Okay.  So at this time I'll

2     give you an opportunity, if you'd like, to kind

3     of make any objections to the instructions as

4     received last night.

5          I'll also tell you that you'll have

6     another opportunity after the charge is

7     administered to the jury to make any objections

8     to the charge as given, meaning the way it was

9     read.

10          But, if you would, I'll leave it up to

11     you as to what you'd like to do to preserve your

12     objections.  If you'd like to say anything now,

13     feel free.

14          Plaintiff?

15          MR. JONES:  We have no objections to the

16     proposed instructions.  One I just wanted to

17     address with the Court is we noticed that on the

18     proposed jury verdict form there was a revision

19     made of plaintiff damages, to strike the

20     reference to New Hampshire law.

21          THE COURT:  Right.

22          MR. JONES:  And so I had understood from

23     our conversation yesterday that there was a

24     sense that enhanced compensatory damages were

25     similar, not the punitive.  They would kind of

(740 of 993), Page 740 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 692 of 945
2:21-cv-00494-jkd Document 35323    Filed 05/15/25    Page 692 of 945

6

1    be dealt with together.  If that's not the case,

2    then I do think now we do the enhanced damages

3    instructions, if we're separating out.  I think

4    it could be very simple.  We could put it right

5    after the punitive damages section.

6            I think it could be as simple as, If you

7    find for plaintiff on the New Hampshire claim,

8    you may award enhanced compensatory damages for

9    wanton, malicious, or oppressive conduct,

10   something like that.

11           THE COURT:  So you're correct that it

12   doesn't address that, and that was -- first,

13   there really wasn't much in the way of law

14   provided on this topic.  It seems like enhanced

15   compensatory kind of came up yesterday, frankly.

16           MR. JONES:  Right.

17           THE COURT:  They weren't asked for in the

18   proposed instructions from the plaintiff.

19           Some legal research done on it yesterday,

20   maybe the parties are aware of this, but there's

21   certain kind of questions that have been raised

22   about the credibility of those particular

23   damages in New Hampshire.

24           There was a federal court case from a few

25   years ago, I believe it's McPatten, where the

7

1     district judge in that case was addressing the

2     application of this particular damages provision

3     in New Hampshire and ultimately ended up asking

4     certification from the New Hampshire Supreme

5     Court on this topic.  And several of the

6     questions listed in the certifications order

7     from the district judge I think are relevant

8     from what we have going on here.  It appears the

9     case settled before the New Hampshire Supreme

10    Court could answer the certified questioning.

11         So this was kind of my thinking at this

12    point and on this -- is this a jury question,

13    too, or is it a court question?

14         At least the plain language of the

15    statute talks about how the Court may so, you

16    know, frankly this really was omitted from the

17    instructions because it just seems like there is

18    a lot of unknowns about that.  And the issue, as

19    I say, really only percolated to the surface

20    yesterday, and that's why it was omitted.

21         But, so with that said, is plaintiff then

22    objecting to the fact that it's not included?

23         MR. JONES:  Yes, your Honor.

24         THE COURT:  Okay.

25         Defendants on that topic?

8

1          MR. COFFIN:  I think the Court's approach

2     to that is practical.  There doesn't seem to be

3     a lot of law on it, and the statute does speak

4     to the Court decision.

5          THE COURT:  All right.  So I'll leave it

6     the way it is.  Again, if there is other

7     authority provided to the Court, I would suggest

8     that it is appropriate here.  Of course I will

9     review that, but none that you found and none

10     was provided.

11          Anything else from plaintiffs in that

12     regard?

13          MR. JONES:  Nothing further, your Honor.

14          THE COURT:  Okay.

15          The defendants?

16          MR. COFFIN:  We had just a couple brief

17     items, your Honor.

18          THE COURT:  Yes.

19          MR. COFFIN:  First of all, on Page 9,

20     under the topic of corporate acts through its --

21     corporation acts through its employees, I

22     thought we had agree to an insertion of the term

23     advisory Dartmouth health employee as to any.

24     That seems to have not have made it into the

25     draft.

9

1          THE COURT:  To say that a corporation

2     acts through its supervisory employees.

3          MR. COFFIN:  Therefore, the act -- I

4     thought we had agreed that the term any

5     supervisory.

6          We had suggested, you know, management

7     level or upper level and various formulations,

8     and I thought we had landed on the modifier

9     "supervisory" to be put in there, and it did not

10    appear to have made it in there.

11         THE COURT:  Right.  So there's the

12    question of -- you know, there's the question of

13    liability for the corporation, which probably

14    can't be premised on just the act of an employee

15    versus an act of a supervisor.  This

16    instruction, the intention here was to make a

17    much more general point.  Corporations act

18    through people, just in terms of corporate acts,

19    which I see as separate from the notion of

20    liability based on acts.

21         MR. COFFIN:  Very good.  I just raise

22    that only as -- I wasn't sure if that was an

23    intentional measure or not and, of course, it

24    was planned.

25         THE COURT:  Anything else?

(744 of 993), Page 744 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 696 of 945
2:21-cv-00144-jjd   Document 5123   Filed 00/13/25   Page 696 of 945

10

1          MR. COFFIN:  Yes, briefly as well.

2          On Page 13, third line down from the top,

3     I thought we had said, agreed to again language

4     that we had.  The modifier "suitable" position

5     in front of the word "position".  Other

6     position, where it says there is no other

7     position.  I thought we had agreed that the term

8     "suitable" was going to be inserted there.

9          I think that does track the statute and

10    the instructions the Court would intend to

11    agree.  It isn't just any position.  It's a

12    particular kind of position.

13          THE COURT:  Okay.  I don't recall that

14    being an agreed-upon change.

15          Was it, plaintiffs?

16          MR. JONES:  I don't recall it being.

17          THE COURT:  And then the --

18          MR. COFFIN:  Okay, I'm corrected.  We

19    don't think it was agreed upon.  I apologize.

20          THE COURT:  Okay.

21          MR. COFFIN:  But we would assert that

22    that is an appropriate modifier.

23          THE COURT:  Okay.  So I'm going to leave

24    that charge as it is.

25          Mr. Coffin, anything else?

(745 of 993), Page 745 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 697 of 945
2:21-cv-00144-jdjd Document 322-3 Filed 08/15/23 Page 59 of 95

11

1          MR. COFFIN:  Yes, one final thing, Judge.

2          On page -- on the mitigation of damages

3     section, which begins on Page 30 and spills over

4     to 31, this is all past in terms of if you find

5     that Dr. Porter failed to do such-and-such, then

6     which requires sort of a preliminary finding

7     that she failed to do.

8          You know, our proof and our argument to

9     the jury is that she did mitigate her damages,

10    so that it's kind of a threshold question of

11    whether she failed to do something or not

12    doesn't necessarily come up in a way that's

13    confusing to the jury.  And we'd like some sort

14    of an assertion there that says basically if you

15    find the plaintiff mitigated her damages, that

16    that should be deducted from the damages award.

17         And rereading some of the cases on our

18    motion last night actually prompted me to think

19    that I think that is something that is required

20    under the law for the instruction to say

21    something like -- just to make it clear to the

22    jury that if you find mitigation, that should be

23    deducted.  And then, you know, sort of making

24    them preliminarily find whether she did or did

25    not abide by the term "mitigate".

12

1          So what I would say is, you know, that

2     last sentence above the punitive damages award,

3     something along the lines of, If you find that

4     she did mitigate damages, you may reduce your

5     award accordingly.

6          THE COURT:  So I'm just a little unclear

7     about -- this argument was made yesterday, too.

8     So affirmative defense in the case was failure

9     to mitigate.  The discussion yesterday about

10    severance agreement and things related to that

11    seems to suggest failure to mitigate.

12          What I'm hearing yesterday and today is

13    that Dartmouth's position is that she mitigated?

14          MR. COFFIN:  Well, it is, and that was

15    clearly our position at trial because she got

16    hired for a well-compensated subspecialty

17    position at an eminent academic teaching

18    hospital and was making, within a few years, we

19    would assert, more money than she was at

20    Dartmouth.

21          And so really she did mitigate her

22    damages, you know, by perhaps 2021 but call it

23    2025, and Dr. Bancroft's chart, of course,

24    having had her losses continuing on until her

25    retirement age at Age 70.

13

1          And so like our position is that she --

2      it wasn't a question of whether she failed to or

3      not.  She did mitigate her damages, and we

4      shouldn't be attributed to having those

5      continuing damages into perpetuity.  That's just

6      not allowed.

7          THE COURT:  Mr. Jones?

8          MR. JONES:  Your Honor, I think that

9      argument yesterday and today confuses an

10     argument that there was no loss but the issue of

11     mitigation of damages.

12         If they want to argue that there was no

13     loss for those reasons that's one thing, but the

14     proposed change in the language that they've

15     made confuses the whole defense of failure to

16     mitigate.  As you mentioned, comes under the

17     failure to mitigate.  So I don't think it would

18     be appropriate to make that position.

19         THE COURT:  That is my concern, too.  I'm

20     just not going to make that change to that

21     particular instruction.

22         All right.  Anything further from the

23     defendants on that?

24         MR. SCHROEDER:  No, your Honor.  We

25     incorporate all of the objections that we put on

14

1          the record yesterday, including but not limited

2          to the case law relating to the ADA,

3          specifically Section 12111 and the fact that an

4          employer can only be held to a reasonable

5          accommodation or reassignment to a vacant

6          position, as the statute says and as the five

7          circuit cases, including the 2nd Circuit, have

8          said already.

9               THE COURT:  All right.  Well, then that

10         concludes that portion.  As I've said, you'll

11         have an opportunity after the instructions are

12         given to list any additional objections at that

13         time.

14              Okay, and then I'll turn now to the

15         plaintiff's motion to preclude any reduction of

16         damages based on conditional offer of severance

17         pay.

18              So having heard the arguments yesterday

19         and considering this, I think that it would be

20         inappropriate to comment on the severance

21         agreement.  To the extent I don't know what the

22         defendants might actually argue so I can't

23         really speak specifically to perhaps what the

24         intention is.  But would you like to let me

25         know, or I can give you my thoughts on it first?

15

1        Mr. Schroeder?

2        MR. SCHROEDER:  Sure, your Honor.  I want

3    to make sure we're clear on that.

4        The evidence in the record is that C-13,

5    I believe, I'm certainly going to reference it

6    because C-13 was given after the meeting, which

7    arguably was part of the interactive process.

8        You may recall Dr. Porter said, Well, I

9    set up a meeting with Amy Claiborne.  She then

10   sends the May 25th letter, and then on May 26th

11   she meets with Ms. Claiborne.  And that's the

12   genesis of that.

13       There's a couple things.  First of all,

14   the severance agreement is admitted in evidence.

15       THE COURT:  Right.

16       MR. SCHROEDER:  And they didn't object to

17   it, and we can't undo that, unring that bell.

18   So I don't intend to discuss it in the context

19   of mitigation of damages --

20       THE COURT:  Okay.

21       MR. SCHROEDER:  -- but it's certainly

22   something that was presented to her, and she

23   rejected it.

24       They can make their arguments as to why

25   she rejected it, that's fine, but the bottom

16

1      line is she asked for it in that meeting.  And

2      in fact, the letter says that she asked for more

3      severance.

4           THE COURT:  Okay.

5           MR. SCHROEDER:  And that's all wrapped up

6      in that chronology of events.  She argued, and

7      this goes to lack of malice, et cetera, and also

8      just to intent, right?

9           THE COURT:  Lack of malice.  You said

10     this yesterday, too.  So when you say lack of

11     malice, meaning that Dartmouth was making an

12     effort to reach some type of a severance

13     agreement with her?

14          MR. SCHROEDER:  Exactly, just like they

15     did with the other two physicians at the time.

16          THE COURT:  Okay, but the argument during

17     closing is not going to be -- I just want to be

18     really clear -- it's not going to be making the

19     point that if they should find damages, it's

20     going to be reduced by the amount of the

21     severance agreement?

22          MR. SCHROEDER:  No, I have no intent of

23     saying that, your Honor.

24          THE COURT:  Okay.

25          MR. SCHROEDER:  But I want to come back

(751 of 993), Page 751 of 993
2:1:1-cv-00144-kjd Document 3523 Filed 08/15/25 Page 703 of 945
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 703 of 945

17

1    to the fact that this document, I certainly have

2    the ability to discuss it as much as I want, I

3    believe, in terms of admitted evidence into the

4    record, and it relates exactly to the chronology

5    of events.

6         It actually rebuts many of the things

7    that Dr. Porter testified to.  I never talked to

8    anybody.  Never talked to anybody.  Well, no,

9    actually you did.  You talked to the head of HR.

10        THE COURT:  Okay.

11        MR. SCHROEDER:  So I want to know that I

12   have free reign to at least talk about the

13   document, not its import in terms of damages,

14   but I do want to know that I don't have to go

15   rewrite my closing to deal with the fact that

16   I'm addressing -- and I'm going to put it on the

17   screen.  Admit it an exhibit.  We're not going

18   to have a PowerPoint, but we're going to put in

19   exhibits on the screen, and I want to make sure

20   that I have full carte blanche to discuss what

21   he said in that agreement.

22        THE COURT:  Okay.  I understand your

23   argument.  I appreciate that.  Thank you.

24        So plaintiff, ultimately the memorandum

25   concludes by saying the mitigation issue, it

18

1      should not be -- they should not be allowed to

2      talk about the severance agreement to the extent

3      that damages are found to reduce the damages

4      amount.  So based on that proffer, what we

5      talked about in closing, that seems then to

6      be -- what's your view on that?

7          MR. JONES:  No, I agree.  Our request was

8      that it simply not be brought up for the

9      purposes of saying that there should be an

10     offset or a reduction of the damages by that

11     amount.

12         THE COURT:  All right.  So then it sounds

13     like we have clarity on this.

14         Mr. Schroeder, just to be clear then,

15     your discussion of the document, as you said in

16     the ways that you have described, will be fine.

17     We're just talking about the mitigation of the

18     damages issue and the amount of the severance

19     agreement.

20         MR. SCHROEDER:  Understood.

21         THE COURT:  Okay.

22         MR. SCHROEDER:  Just on that subject,

23     your Honor, and I don't want to put the cart

24     before the horse here, but on the issue of

25     talking about the cross-examination of

19

1          Dr. Bancroft, I realize we're not putting the

2     chart as a demonstrative and it's not in

3     evidence, but I want to make sure I'm okay to

4     discuss, and I believe I am, the

5     cross-examination and to the extent that he was

6     asked to make figures that he may not agree

7     with, but they actually show that if he did an

8     apples-to-apples comparison, you know, she's

9     actually making more at UVM.  And that's really

10     the import of that.

11          I'm not -- I'm not going to be putting

12     any documents up or anything in that regard or

13     even showing the numbers, for that matter.  But

14     that was what I understood you were saying

15     yesterday, and I just wanted to make sure.

16               THE COURT:  Yes.  That was my intention.

17               Mr. Jones?

18               MR. JONES:  I think that that's fine

19     except to the extent that part of that

20     cross-examination was examining Dr. Bancroft on

21     the issue of whether he considered the severance

22     amount and, if she had taken that amount,

23     wouldn't have that reduced her damages.  That

24     was the genesis of our motion.

25               THE COURT:  Okay.

20

1          MR. SCHROEDER:  That's a completely

2     separate topic.  We're talking about the issue

3     of going to UVM at a 1.0 FTE as opposed to

4     Dartmouth-Hitchcock, which is where he did his

5     damages, at a 1.0, and then incorporates it at

6     .75 magically in July of 2025, and so that's the

7     issue.

8          I'm not talking about the severance issue

9     this in that regard.

10          MR. JONES:  That's fine.

11          THE COURT:  That sounds fine to me, too.

12          Anything -- so you mentioned PowerPoints,

13     so you're not doing a PowerPoint?

14          MR. SCHROEDER:  No, your Honor.  The only

15     thing we would show on the screen are admitted

16     exhibits as I reference them and that's it.  And

17     just listening to me.

18          THE COURT:  Okay.

19          Anything else from the plaintiffs to take

20     up at this point?

21          MR. JONES:  Nothing further, Judge.

22          THE COURT:  So just generally, talking

23     more about the jury once they get the case, I

24     just want to kind of give you a sense of kind of

25     what I'll be telling them.

21

1        So in terms of how long they deliberate,

2   you know, I can tell them or probably will tell

3   them that it's up to them.  If they want to

4   deliberate into the night they can but they

5   don't have to, is what I plan on telling them.

6        And that if they decide to kind of stop

7   deliberating for the evening, they should send a

8   note, let us know.  I'll bring them back in,

9   give them kind of the admonishments that I have

10   been giving each day at trial; just about not

11   talking about it, not doing any research.  Also,

12   not doing any research in the jury room, like

13   those kinds of topics.

14        And then I'll tell them to come back.  If

15   they come back tomorrow, come back at 9:00 in

16   the morning, like they would for kind of any

17   other day.  And then, obviously, the contact

18   between all of us and them will be basically

19   zero unless we get a note from them.

20        It will come as no surprise to you if I

21   do get a note from the jury I'm not going to

22   deal with it.  I'm going to come back here and

23   first talk to you, unless it's something

24   extremely minor like can we have an extra

25   notebook.  I'll make sure they get an extra

22

1    notebook, but anything greater than that I'll

2    talk to counsel about any notes received.

3            Any objections to that kind of procedure?

4            MR. JONES:  None.

5            MR. SCHROEDER:  No objection, your Honor.

6            THE COURT:  Okay.  Well, I'm not sure if

7    everyone is here.  We do have a few minutes so

8    I'll just briefly step off, and we'll be ready

9    to go as soon as they all get here.

10           (End of conference without the jury

11   present at 8:55 a.m.)

12           THE CLERK:  All rise.

13           (Honorable Doyle entered the courtroom.)

14           THE CLERK:  Please be seated.

15           (Brief pause.)

16           THE CLERK:  All rise for the jury.

17           (The jury entered the courtroom.)

18           THE CLERK:  Please be seated.

19           Your Honor, the matter before the Court

20   is Case Number 17-cv-194, Misty Blanchette

21   Porter vs. Dartmouth-Hitchcock Medical Center,

22   et al.

23           Present on behalf of plaintiffs are

24   Attorneys Geoffrey Vitt, Eric Jones, and Sarah

25   Nunan.

23

1          Present on behalf of the defendants are

2     Attorneys Tristram Coffin, Morgan McDonald, and

3     Donald Schroeder.

4          We are here for a jury trial.

5          THE COURT:  Okay.  Good morning, Members

6     of the Jury, and welcome back.

7          I'll ask you, as we always do, since we

8     were last in court last week have you heard

9     anything about this case?

10          Have you researched the case in any way,

11     or have you spoken to anyone about the case?

12          Okay, I see no hands raised.

13          So, Members of the Jury, we're now going

14     to be hearing closings arguments from the

15     attorneys.  And the rules, so to speak, are as

16     follows.

17          So the plaintiff will argue first, and

18     then the defendants will have an opportunity.

19     After the defendants are done the plaintiff will

20     have an opportunity to make a short rebuttal

21     argument.  In other words, the plaintiff has the

22     burden of proof so the plaintiff gets to argue

23     first.

24          Okay.  Plaintiff, you may proceed.

25          MS. NUNAN:  Good morning.

24

1          THE JURY:  Good morning.

2          CLOSING ARGUMENT ON BEHALF OF PLAINTIFF:

3          MS. NUNAN:  Dr. Porter's disability and

4     her whistleblowing activities caused her to lose

5     the job that she loved, the job that she held

6     for 21 years.

7          When Dr. Porter heard reports of nurses,

8     residents, nurse practitioners, ultrasound techs

9     and other doctors, reports of Dr. Hsu and

10    Dr. Seifer's incompetence, endangering patients,

11    she had a duty to report.  She spoke up often

12    and loud.  She hounded Dr. DeMars as chair of

13    the department.  She put it all in writing.

14          In addition, despite her best efforts to

15    work as much as possible while she was

16    recovering, Dr. Porter's disability made her

17    extraordinary skills worthless to Dr. DeMars and

18    Dr. Merrens.  Quote, Everyone is also

19    remembering Misty as a full-time employee,

20    wearing three hats and not the one that's been

21    out for almost 18 months, Dr. DeMars wrote.

22          In response to this and other astonishing

23    statements in that e-mail about Dr. Porter's

24    disability, Dr. Merrens wrote back that this was

25    a thoughtful and appropriate insight.

25

1          Individuals as well as corporations have

2     choices when things go sideways.  They can look

3     at a situation and they can do what they can do

4     to remedy it, to fix it, to make it right, or

5     they can choose to double down on their initial

6     position, deny responsibility, and find somebody

7     to blame.  Dartmouth Health had chosen the

8     latter.  Eight years has elapsed since it made

9     the decision to close the REI division.

10         When you heard last weak from Maria

11    Padin, Daniel Herrick, Josselyn Chertoff, and Ed

12    Merrens, they were all the same lines.  Closing

13    the REI division was the right decision in 2017,

14    and it's the right decision now.  The decision

15    to terminate Dr. Porter was the right decision

16    in 2017, and it's right decision now.

17         It was not the right decision.  Dr. Julia

18    MacCallum described in detail the harm that

19    Dr. Hsu caused in the OR.  Sharon Parent told

20    you her moral compass was going off the charts

21    when she watched Dr. Seifer perform the

22    procedures.  She had been in the REI division

23    for 17 years at that point.  Both women reported

24    what they saw to multiple superiors, and yet

25    Dr. Merrens still claims, I'm not aware of

26

1    actual harm.

2           Dr. Hsu performed a procedure on Eunice

3    Lee six months and one day after Dartmouth

4    Health was in possession of Dr. Porter's 11-page

5    assessment of him, stating that he should not be

6    performing such procedures.  He caused harm.

7           Dartmouth Health did not ask

8    Dr. MacCallum on the stand about the harm she

9    saw in the OR.  Dartmouth Health did not ask

10   Sharon Parent about the details of Dr. Seifer's

11   harm in the procedure room.  Silence.

12          Instead, Dartmouth Health dug up everyone

13   who Dr. Porter has annoyed in the past 15 years.

14   What did we hear?  That Dr. Porter refused to

15   use a paper intake form when there was a

16   perfectly good electronic system available.  She

17   preferred her own tools and her own approach.

18   She was abrupt with some people.  Her standard

19   of care was too high.  She stood up to

20   Dr. Reindollar.  She did not want her schedule

21   e-mailed to Dr. Seifer.

22          This is what Dartmouth Health chose to

23   investigate and present to you.  Not seeking out

24   the patients who did not give informed consent

25   to Dr. Hsu; not looking into the free IBF cycles

27

1       that were given out to compensate for Dr. Hsu's

2       mistreatment; not looking into the excessive

3       pain claims or the statements by Dr. McBean that

4       Dr. Hsu's surgical skills endangered patients.

5            The deal.  Maria Padin described to us

6       the role of the credentialing committee as

7       verifying a broad list of qualifications about a

8       candidate.  She said when someone applies to be

9       part of the medical staff, there's a process

10      that you want to validate that what they say

11      they can do and who they say they are is actual,

12      and part of this is checking on their letters of

13      recommendation from their last employer.

14           What we heard was that in the spring of

15      2016 Dr. Seifer did not meet this criteria.  The

16      e-mail sent to the credentialing committee by

17      his prior provider stated, quote, I either had

18      to fire the rest of the division or find a new

19      role for Dr. Seifer because he was not going to

20      be successful at leading the division.

21           There had been complaints about

22      Dr. Seifer.  They could not comment on his

23      surgical skills, but they did note that he had

24      substandard ultrasound skills.  Maria Padin

25      admitted there were red flags.

28

1      The members of the credentialing

2      committee -- Maria Padin, Joselyn Chertoff, Ed

3      Merrens -- should have denied Dr. Seifer the

4      right to proceed.  Instead, a deal was struck.

5      The deal was that Dr. DeMars could hire

6      Dr. Seifer, but she had to ensure his success.

7      As Ed Merrens pointedly told Leslie DeMars;

8      Dr. Seifer's success is on you.  This put into

9      motion, predictably, the inevitable coverup when

10     Dr. Seifer turned out to have all the red flag

11     qualities and concerns raised during the

12     credentialing committee.

13          This shifted the responsibility of the

14     assessment and the success of Dr. Seifer away

15     from the committee onto Dr. DeMars.  With her

16     job on the line, who would expect Dr. DeMars to

17     report honestly when she received almost

18     immediate negative reports on Dr. Seifer's

19     skills?  They knew in the summer of 2016.

20     Dr. DeMars knew in July, 2016.

21          She reported in a private text; quote,

22     I'm not sure DS is clinically competent.  I

23     don't know what he's been doing for 25 years,

24     but I'm not sure it's IVF.

25          Eight weeks earlier she had been given

29

1       full report on Dr. Hsu.  Leslie DeMars did

2       nothing to restrict Dr. Hsu or Dr. Seifer's

3       practice.  They were allowed to continue, until

4       the closure of the division one year later, to

5       perform procedures on women; women like Eunice

6       Lee.

7               There's been a lot of testimony in the

8       last two weeks, and there's a pile of documents

9       that we've put together.  My job this morning is

10      to provide you with a roadmap to address the

11      various claims and testimony in these exhibits.

12      Let's get started.

13              I'm going to walk through the claims.

14      Dr. Porter's first claim is for whistle-blowing

15      retaliation.  She asserts she was not terminated

16      and not reassigned because she reported conduct.

17      She reported the conduct of Dr. Hsu and

18      Dr. Seifer, conduct that she reasonably

19      considered to be illegal, fraudulent, unethical

20      and harmful to patients.  To prevail on that

21      claim, Dr. Porter must demonstrate the following

22      elements.

23              One, Dr. Porter in good faith reported

24      what she reasonably believed was a violation of

25      law or legal rule.

30

1          Two, Dartmouth Health terminated

2     Dr. Porter's employment and failed to reassign

3     her.

4          And, three, there is a causal connection

5     between Dr. Porter's reports and her termination

6     without reassignment.

7          The evidence Dr. Porter presented during

8     this trial supports a finding in her favor of

9     those elements.  Here we go.

10          For number one, Dr. Porter made multiple

11     reports raising concerns about patient harm and

12     unlawful conduct that Dr. Hsu and Dr. Seifer

13     were causing.

14          First, she reported substantial

15     medical -- substandard, excuse me, medical care

16     causing patient harm, including the fact that

17     they were not following the ASRN standards.  She

18     reported procedures without patient consent.

19     She reported there was improper billing going on

20     and that Dr. Seifer and Dr. Hsu were ordering

21     excessive testing.

22          Dr. Porter tried to stop Dr. Seifer from

23     using sperm that was possibly contaminated with

24     Zika.  This was a situation that had been

25     preventable from the start, and she tried to get

31

1       Dr. Seifer and Dartmouth Health's risk

2       management to follow the most recent Zika

3       guidelines to avoid harm to the future fetus.

4       These were the concerns that needed to be raised

5       and addressed.  When Dartmouth-Hitchcock did not

6       respond, Dr. Porter blew her whistle louder and

7       more persistently.  She did not stop.

8            Number two.  Dartmouth Health terminated

9       Dr. Porter and failed to reassign her.

10      Dr. Porter was terminated on May 4th, 2017, as

11      you will see in Exhibit 50-A, we hope.  Please

12      look at the highlighted parts.

13           As evidenced in Exhibit 50-A, in April,

14      on April 21st of 2017, in the plans listed,

15      there is a column for the current staff in which

16      Dr. Porter was listed as 0.4 GI ultrasound/REI.

17      And then on the right hand, in the column that

18      says future staff with complete REI shutdown,

19      this is the scenario in which they put

20      Dr. Porter, with 0.4 GYN/ultrasound.

21           Dr. Porter was already doing

22      non-fertility IVF work, non-fertility REI, REI

23      work, and she could have easily been reassigned

24      to do the work she was already doing in the

25      OB/GYN department.

32

1          Exhibit 52.  Dr. DeMars was annoyed and

2     dismissive and discredited Dr. Porter's

3     complaints.  She wanted Dr. Porter to be quiet,

4     but Dr. Porter was a thorn in her side.

5     Dr. DeMars acknowledged in this e-mail, the

6     highlighted part at the bottom, We could have

7     offered her ultrasound-only position, but

8     keeping her out of any real building plans would

9     be impossible.  She wouldn't be quiet.

10          Further, on the second page of

11     Exhibit 52, Dr. DeMars stated that her life

12     would be easier if Dr. Porter lost her license,

13     and her testimony at trial confirmed this.

14          Exhibit 89, Dr. DeMars states on the

15     second page, on the second page, As much as it

16     hurts to say, it was the right decision to

17     include her in the terminations.  I don't want

18     to change that decision.  If I had tried to

19     make -- if I had made a decision to try to keep

20     her, I think that Heather, our new nurse

21     supervisor, and our other administrator would

22     have quit because she's tried to intimidate each

23     of them and they are done with the behavior.

24          Dr. Porter in good faith reported

25     problems to Heather Gunnell and Katie Mansfield,

33

1      as reported here, the new nursing supervisor.

2      Dartmouth Health has tried to minimize

3      Dr. Porter's reports and complaints, but there

4      were other people that came before you that

5      corroborated Dr. Porter; Nurse Sharon Parent,

6      Dr. MacCallum, Dr. George, Dr. Russell, and

7      Ultrasound Tech Janice Gonyea.  They all spoke

8      to the harm or the unconsented treatment given

9      by Dr. Hsu.

10            Dartmouth Health brings up during the

11     trial this idea that there were complaints by

12     others in the department about Dr. Seifer and

13     Dr. Hsu, specifically referring to the feedback

14     in the fall of 2016 and the spring of 2017, in

15     response to Dr. DeMars's request for feedback.

16     They keep saying, Well, these people complained,

17     and we didn't fire them.  They still have no

18     explanation for why they ignored all of these

19     people.  And Dr. Porter was the one who

20     persistently, persistently would not stop

21     bringing these issues to the forefront.

22            The third element that I brought up at

23     the beginning, making a causal connection

24     between Dr. Porter's reports and her termination

25     without reassignment.  In Exhibit 60,

34

1      Dr. Merrens brings up and admits that

2      dysfunction was a reference to Dr. Porter's

3      complaint.  He brings this up in his testimony

4      as well.  Dr. Merrens says, Well, on the surface

5      we are pinning the dissolution of our

6      reproductive endocrinology program on our

7      failure to maintain and recruit nurses for this

8      work.  It is ultimately the dysfunction of the

9      physicians who worked in this area for years, as

10     well as recent hires.

11          Dr. Merrens' testimony.  He was asked, So

12     you state it was ultimately the dysfunction of

13     the physicians and ultimately a failure of

14     leadership for which I hold Leslie fully

15     accountable.

16          Closing the REI division and firing all

17     the providers was an extraordinary act.  It had

18     never been done before.

19          In Exhibit 52 you will see that Amy

20     Giglio says, We've never closed a service at D-H

21     before.  This was so extraordinary it can only

22     be explained as discriminatory or retaliatory in

23     its motive.

24          Dartmouth Health argued in its opening

25     statement that it was a reduction in force and

35

1          that all three doctors were treated equally.

2          This doesn't make sense.

3               Dartmouth-Hitchcock had two incompetent

4          doctors that were causing harm, and they had

5          Dr. Porter who was world renown for her

6          ultrasound skills, her complex surgical skills,

7          and she is the one that tried to stop the harm

8          and clean up the mess created by others, but

9          their argument is they treated them all the

10         same.  Talk about throwing the baby out with the

11         bath water.

12              Wrongful termination under New

13         Hampshire's law.  Dr. Porter also claims

14         wrongful termination under the common law of New

15         Hampshire.  For this claim she prevails if she

16         shows, one, Dartmouth Health's termination of

17         her employment was motivated by bad faith,

18         malice, or retaliation.

19              Dartmouth Health terminated Dr. Porter's

20         employment because she performed one or more

21         acts that public policy would encourage.  We

22         submit that the evidence we discussed under the

23         previous whistleblower claim also supports this

24         claim, this common law claim.

25              Finally, I want to turn to the disability

36

1     discrimination claim.  Dr. Porter alleges

2     disability discrimination, a failure to

3     accommodate, and retaliation was in violation of

4     several laws, including two federal laws, a New

5     Hampshire state law, and a Vermont law.  The

6     claims are very similar under each one of these

7     laws, so I will address them all at once.

8          Number one, under these laws an employer

9     may not terminate an employee because of an

10    employee's disability.

11         Two, in addition, an employee may show a

12    violation of law if the employer failed to

13    provide reasonable accommodation.

14         Finally, three, the disability laws

15    prevent an employer from retaliating against an

16    employee for seeking a reasonable accommodation.

17         The evidence that supports the disability

18    discrimination.  Dr. Porter testified that

19    Dr. Ed Merrens stated three times during her

20    termination meeting, quote, Stay out on

21    disability, Misty.  During his testimony

22    Dr. Merrens did not deny the fact that he

23    referenced her disability during that meeting.

24         Three.  Dr. Porter told Dr. DeMars in the

25    parking lot -- this is her testimony -- You

37

1      could have kept me, meaning she could have been

2      reassigned.  Dr. Porter testified that

3      Dr. DeMars said in response, I couldn't have

4      because of your disability.  That would have

5      compromised your long-term disability.

6      Dartmouth Health did not put on testimony

7      opposing Dr. DeMars on this point.

8           You saw the testimony of Dr. Russell, who

9      stood up and asked Dr. Merrens in the

10     post-closure OB/GYN meeting why Dr. Porter had

11     not been kept out to do her non-infertility

12     work.  Dr. Merrens referred -- Dr. Merrens'

13     response referred to Dr. Porter as being on

14     disability.  Dr. Russell remembers this comment

15     because she was the one that asked the question,

16     and she was absolutely stunned that he would say

17     that in a public meeting.

18          All Dartmouth Health has offered in

19     response were witnesses that could not recall

20     the statement.  Further evidence of disability

21     discrimination is on Exhibit 83.  If you

22     remember, Victoria Maxfield wrote to

23     Dr. Merrens, asking why Dr. Porter could not be

24     kept on for all of her non-infertility work.

25          In response to Victoria Maxfield's

38

1          e-mail, Dr. Merrens writes, As you know,

2          Dr. Porter currently works at 20 percent of her

3          time.  This is a reference to her disability.

4                    In Exhibit 89, Dr. DeMars writes to

5          Dr. Merrens, again, quote, Everyone also is

6          remembering Misty as a full-time employee

7          wearing three hats and not the one who has been

8          out for almost 18 months.

9                    On Page 2, Dr. DeMars writes, Misty's

10         medical disability has been devastating, and I'm

11         not sure that she should or will really ever be

12         able to do the complex hysteroscopy or

13         laparoscopy that she once did.  That being said,

14         there are few full-spectrum REI docs that could

15         bring similar surgical skills, but they're hard

16         to find.  I think the best outcome of this

17         termination is a chance for Misty to actually be

18         out on leave with no intervening

19         responsibilities so she can assess how much

20         improvement she might gain.  This is a clear

21         reference to her disability.

22                   Dr. Porter's disability was a significant

23         reason for Dartmouth Health's decision to fire

24         her and not reassign her.

25                   I'd like to talk for a minute about the

39

1      denial of reassignment and the denial of the

2      interactive process.

3             When an employee has a disability, an

4      employer may have a duty to make a reasonable

5      accommodation.  The discussion to explore the

6      possible accommodation is called an interactive

7      process.  You will hear an explanation of this

8      law.

9             If the employer knows or should have

10     known that the employee was disabled, the

11     employer is obligated to engage in an

12     interactive process with the employee to

13     determine whether the possible reasonable

14     accommodation exists.  Both employer and

15     employee must cooperate in this interactive

16     process in good faith.

17            We submit Dartmouth Health did not even

18     attempt to participate in the interactive

19     process with Dr. Porter.  They brought her into

20     a room and told her she was fired.

21            Further evidence of lack of engaging in

22     the interactive process is, if you look at

23     Exhibit B-12, Dr. Porter wrote a letter after

24     her termination telling Dartmouth Health

25     administrators that she was willing and able to

40

1       work in other capacities at Dartmouth Health,

2       and they would not engage in the interactive

3       process.

4            There was no testimony by Dartmouth

5       Health witnesses about engaging in the

6       interactive process with Dr. Porter.  There was

7       testimony from Dr. Merrens.  He stated he did

8       not ask Dr. Porter if she was interested in

9       staying on in a non-infertility capacity.

10           There was the testimony of the following

11      women:  Dr. Julia MacCallum, Victoria Maxfield,

12      Dr. Michelle Russell, and Dr. Karen George all

13      spoke to Dr. Porter's non-infertility

14      reproductive endocrinology skills and her

15      ultrasound skills and her benign complex

16      surgical skills that were needed in the summer

17      of 2016 in the D-H OB/GYN department.

18           If you look at Exhibit 96, Emily Baker

19      states that they had lost GYN ultrasounds, and

20      it was very much needed and that the radiology

21      department was no substitute.

22           If Dartmouth Health had engaged in the

23      interactive process, the parties would have

24      likely found a reasonable accommodation.

25      Dartmouth Health made no effort whatsoever to

41

1       explore these options with her.  This failure is

2       a refusal to accommodate and violates the

3       disability laws.

4              I want to talk for a minute about who the

5       decisionmaker was.  You have heard, and you will

6       hear, Dartmouth Health said Dr. Merrens was the

7       only decisionmaker.  They assert that

8       Dr. Merrens did not know about Dr. Porter's

9       complaint of Dr. Hsu and Dr. Seifer or the

10      details of her disability.  There is evidence

11      that disputes those assertions, and I will

12      discuss those in a minute.

13             This argument does not help Dartmouth

14      Health avoid the liability for the actions of

15      Dr. DeMars.  Both Dr. Merrens and Dr. DeMars

16      were senior administrators, and when they acted

17      they were acting on behalf of Dartmouth Health.

18      So if either took an action that resulted in an

19      adverse employment action against Dr. Porter,

20      Dartmouth Health is responsible.  From this

21      perspective it does not matter who the ultimate

22      decisionmaker was.  They both had the ability to

23      bind the institution.

24             Let's talk about the evidence.  Let's

25      talk about Dr. DeMars as the decisionmaker; the

42

1      evidence that Dr. DeMars either made the

2      decision or significantly recommended the

3      termination of Dr. Porter.

4              If you look at Exhibit 83, at the top

5      Dr. Merrens attributes the decision to

6      Dr. DeMars.  Quote, The recommendation around

7      the closing of the program and its staff were at

8      the recommendation of Dr. DeMars.  You'll

9      remember that almost immediately after writing

10     this e-mail Dr. Merrens turns around and writes

11     to Leslie DeMars in Exhibit 89.  He asks how to

12     better answer the questions that he's receiving.

13     If he had been the sole decisionmaker, why would

14     he have needed to ask Dr. DeMars?

15             In Exhibit 89 Dr. DeMars responds, As

16     much as it hurts, it was the right decision to

17     include her in the terminations.  I don't want

18     to change that decision.  If I had made the

19     decision to try to keep her -- and then she goes

20     on to list negative consequences.  This is the

21     answer of someone who's made a significant

22     contribution to the decision, if not made the

23     decision itself.

24             Dr. Merrens, at the top of Page 1 in

25     Exhibit 89, responds to these statements.  He

43

1    says, I think it's a comprehensive, thoughtful,

2    and appropriate insight.  Thanks for taking the

3    time to do this.  Ultimately, once the dust

4    settles, we'll be in a better position with all

5    of this, including Misty.

6         When shown his deposition transcript,

7    Dr. Merrens was asked if he had made the

8    following two statements.  He acknowledged he

9    did.

10        The first statement was, quote, Leslie

11   was ultimately the person that made the

12   decision.  And the second statement was, This

13   was a decision we supported after looking at the

14   information.  This is further evidence that

15   Dr. DeMars and Dr. Merrens were responsible for

16   this decision.

17        Next we move on to pretext.  Dartmouth

18   Health claims it had a legitimate business

19   reason to close the REI division, to fire all

20   the REI doctors and to not reassign Dr. Porter.

21   We maintain that this is not true.

22        The evidence presented in this trial

23   shows that Dartmouth Health's reason is a

24   pretext and that the real reason was retaliation

25   for Dr. Porter's whistleblowing and

44

1    discrimination based on her disability.

2         When thinking about pretext, you look at

3    Exhibit 60.  Amy Giglio responds to Ed Merrens

4    on May 2nd.  She says, Let's discuss this in the

5    morning.  I appreciate your candor and

6    recognition of the issues.  PR here is very

7    sensitive, it goes without saying.  We need to

8    manage the internal and external message --

9    messaging and issues.

10        So you're going to see a lot in the

11   record of messaging, internal and external, and

12   talking points.

13        This is the same concept used by

14   Dr. DeMars when asked by Dr. Merrens how to

15   better respond to the heartfelt messages he was

16   receiving.

17        At the bottom of Page 89, Dr. DeMars

18   candidly answers, quote, What's the talking

19   point?  My suggestion is we are working with

20   each physician on their employment options as

21   well as what's best for D-H and D-H OB/GYN.  I

22   don't know how you say, quote, I understand

23   you're angry, but this decision was made in the

24   best interest of the division and Misty.  Even

25   if it's the truth, no one will buy it at the

45

1          moment.

2                External messaging and talking points.

3          What Dr. Merrens says in public to the public is

4          spin.  It's polished spin, but it's spin

5          nonetheless that serves the best interest of the

6          corporation.  It's not always the truth.

7                How do you know that Dartmouth Health's

8          reason is pretext?  First, Dartmouth Health

9          keeps changing the reason.  This alone is

10         evidence of pretext.  Second, the reasons that

11         they give are inconsistent.  Again,

12         inconsistency is evidence of pretext.  Third,

13         some of the reasons, like when COE Conroy says

14         that it's due to declining birth rates, were

15         reasons that even Dr. Merrens said were not

16         true.  Some of these reasons were just not

17         supported by the evidence.

18               I want to talk for a minute about the

19         evidence that goes against the idea that the

20         nursing shortage was the official reason for

21         closing the REI division.  The list is long; my

22         apologies.

23               Sharon Parent gave one year's notice that

24         she was leaving.  This was her testimony.  That

25         would have been in December of 2015.  She told

46

1     them it would take six months to train the REI
2     division nurse.
3            When you look at the documents that
4     Dartmouth Health put in front of you about
5     approval of the nursing, you will note that
6     those documents are dated November of 2016; one
7     month before Sharon Parent leaves, one year
8     after she gave notice, or 11 months after she
9     gave notice.
10           It's Dr. Porter's testimony that she has
11     knowledge of what the REI division has done in
12     the past when they've been down on nurses, and
13     she offers up solutions.
14           Dr. Porter also testified that the IVF
15     nurses had specialized training, but there was a
16     whole other group of nurses who could support
17     the REI services that were non-IVF.  Victoria
18     Maxfield was one of those nurses.  There were
19     others.
20           Dr. Porter testified that only 10 to
21     20 percent of what the REI division did was IVF.
22           Victoria Maxfield testified that she was
23     one of a group of nurses who supported
24     Dr. Porter in the non-IVF capacity in the REI
25     division.  She also stated until her e-mail,

47

1       Exhibit 83, that during the past five to six

2       years I have also been her GYN surgical nurse,

3       taking care of all of her post-op patients due

4       to the staffing issues in REI.  Again, further

5       evidence that other nurses were capable of

6       supporting the REI division.

7              You've seen plenty of testimony that what

8       Dr. Porter did was not just infertility work.

9       You also heard the testimony of Sharon Parent,

10      who said she was willing and able to come back

11      to work after her retirement not only to work as

12      a nurse in the REI division but also to train

13      and support less experienced nurses.

14             Sharon Parent said she had done her due

15      diligence about how to return in a per diem

16      fashion.  She returned near the end of the

17      90 days and spoke to Heather Gunnell and Katie

18      Mansfield but was rebuffed.

19             You'll note in Exhibit 23 that Dr. McBean

20      worked -- Dr. McBean, who you'll remember worked

21      per diem in the REI division, wrote a review of

22      Dr. Seifer regarding his technical skills, his

23      standard of care, and his leadership.

24             If you look at the bottom of the first

25      page of 23, you will see that she says,

48

1          Dr. Seifer was disrespectful to Sharon as she

2      prepared for retirement.  After Casey was

3      unexpectedly let go, we were critically

4      shorthanded.  Sharon has both the depth of

5      knowledge and the long-term clinical experience

6      necessary to help solve this problem and train

7      our newest nurse.  She was willing to stay and

8      help in a more limited basis but was

9      marginalized and not encouraged to continue

10     working.  We are now in a crisis situation.

11          You also heard the testimony of

12     Dr. Merrens that he was aware that Sharon Parent

13     had offered -- he was unaware, excuse me -- he

14     was unaware of the fact that Sharon Parent had

15     offered and was willing to come back.

16          If you turn to Exhibit 60, please.

17     Dr. Merrens writes, While on the surface we are

18     pinning the dissolution of our reproductive

19     endocrinology program on the failure to maintain

20     and recruit nurses for this work, it is

21     ultimately the dysfunction of the physician who

22     worked in this area for years, as well as recent

23     hires, and ultimately a failure of leadership,

24     for which I hold Leslie fully accountable.  The

25     fact that failures of such programs due to

49

1     nursing shortages are not common and will be

2     referring patients to a similar rural academic

3     REI center in Burlington, Vermont will make our

4     explanation to the public, patients and media,

5     well, rather thin.

6          Dr. Porter testified that there were

7     other -- there was a nurse from another unit

8     that spoke to her about coming and working in

9     the REI division.  Sharon Parent testified that

10    Leslie DeMars interfered and told her she was

11    protecting her by keeping her from coming back.

12         I would like to turn to other evidence of

13    pretext.  In Exhibit 60, I just read to you a

14    moment ago that Dr. Merrens wrote, While on the

15    surface we're pinning the dissolution of our

16    reproductive endocrinology program on the

17    failure to maintain and recruit nurses for this

18    work, it is ultimately the dysfunction of the

19    physicians who worked in this area for years, as

20    well as recent hires.

21         If you look at Exhibit 103, Dr. Merrens

22    writes, Regrettably, Vermont Public Radio

23    published an article yesterday indicating I made

24    comments to the effect that the program was

25    being ended due to interpersonal issues amongst

50

1      the physicians.  Nothing could be further from

2      the truth.

3              Dr. Merrens also stated in his testimony

4      that Leslie was the architect of the

5      dysfunction.

6              Dr. Conroy stated that there were

7      declining birthrates and that was the reason

8      that the REI division had closed.  All of these

9      arguments are pretext for what was really going

10     on.

11             They closed the REI division and

12     terminated all of the providers as a clever

13     solution to getting rid of three problem

14     physicians.

15             I'd like to turn next to the damages

16     section.  If you find in favor of Dr. Porter on

17     any of her claims, then your next task will be

18     to consider and award appropriate damages.

19             In this case Dr. Porter is seeking

20     damages to compensate her for her financial

21     losses and to re-dress her emotional distress.

22     In addition, Dr. Porter is asking you to award

23     punitive damages.

24             Economic losses.  With regard to economic

25     losses for Dr. Porter, you may award damages for

51

1    any lost earnings that Dr. Porter suffered in

2    the past and any probable loss of ability to

3    earn money in the future.  You heard from

4    Economist Dr. Bancroft.  He analyzed these types

5    of losses.  We're going to pull up Exhibit 1-B,

6    the chart.

7         Dr. Bancroft summarized his opinions in

8    this chart.  This is where he calculated

9    Dr. Porter's losses by being terminated from

10   Dartmouth Health.  His methodology was

11   relatively simple.  He started with what

12   Dr. Porter would have earned had she been

13   allowed to continue her career at Dartmouth

14   Health.  Then he compared that to what she had

15   already earned and what she was likely to earn

16   going forward at UVM.

17        He made conclusions about the amounts

18   Dr. Porter would need to receive in order to be

19   made whole for Dartmouth Health's wrongful

20   conduct.

21        You may consider Dr. Porter's expected

22   work life when calculating her losses.  You

23   heard Dr. Porter say that she plans to work

24   until she's 70.  That would be until 2033.  If

25   you find that testimony credible, then you can

52

1    go to the bottom of the page, the bottom line on

2    the chart and look in the far right column for

3    Dr. Bancroft's calculation of what her losses

4    are.  As you will see, he calculates that figure

5    to be 1,787,722.

6              When Mr. Coffin cross-examined

7    Dr. Bancroft, he suggested that if you changed

8    the numbers used in the analysis, then the

9    conclusion is different.  That would seem

10   obvious, but that misses the point.  Because if

11   you use accurate numbers, then you get an

12   accurate conclusion.  I submit that Dr. Bancroft

13   used accurate numbers.

14             You have also heard throughout this trial

15   that lawyer math is suspect.  So when you hear

16   about the calculator math done at the stand with

17   Mr. Coffin's calculator and his framework, I

18   would encourage you to think about whose math

19   you want to follow; the lawyer or the economist.

20             Remember, when doing Mr. Coffin's

21   calculation, Dr. Bancroft stated, I'll do it,

22   but this is not correct.

23             Please show Exhibit 1-B, Page 4.

24             Dr. Bancroft prepared a chart showing the

25   extraordinary expenses that Dr. Porter incurred

53

1    by having to commute to Burlington from Norwich.

2    To make her whole, we request an award to

3    compensate her for those expenses as well.  The

4    amount is $366,553.

5         Duty to mitigate.  Dartmouth Health

6    argues that Dr. Porter's damages should be

7    limited because of what is called a duty to

8    mitigate.  You will hear that when someone is

9    seeking damages to compensate them for losses,

10   they have what is called a duty to mitigate

11   damages.  But this duty only applies to those

12   damages that Dr. Porter could have avoided with

13   reasonable effort and without undue burden or

14   expense.  She's not required to undertake

15   extraordinary measures.

16        So in this case Dr. Porter had a duty to

17   take reasonable steps to minimize or reduce her

18   losses.  The evidence shows that she complied

19   with this duty by taking a job at UVM.

20   Dr. Porter testified she was on long-term

21   disability and could not get a loan to be able

22   to set up her own IVF clinic in the Upper

23   Valley.  The robotic equipment with which she

24   does her complex surgeries are only available at

25   big teaching hospitals at UVM or Boston -- like

54

1     UVM or Boston, excuse me.  So for her to do her

2     work, she had to relocate to either Boston or

3     Burlington.

4           Being a 1.0 FTE, however, would require

5     her to move.  Dr. Porter testified that in order

6     to keep her household running, her home in

7     Norwich, she needed to be home at least one day

8     a week so 0.8 was all she could handle.

9           She has deep roots in the Upper Valley

10    community where she lives.  The house that she

11    and her husband built, her husband's

12    multigenerational business that he runs in our

13    community all made it impractical for her to

14    move to Burlington, and it would not be

15    reasonable to expect her to move to Burlington.

16    She has done all she can to mitigate her losses.

17    Dr. Porter maintains that there should be no

18    further reduction in her damages.

19          You will hear from Dartmouth Health that

20    she should have taken a 1.0 FTE job, but this

21    would not have been practical unless she moved.

22    And she's not required to move just to mitigate

23    her damages because that would be unreasonable

24    and an extraordinary burden and expense.

25          Two more sections.

55

1    Emotional distress.  In addition to

2    damages for economic losses, Dr. Porter seeks

3    damages for her emotional distress.  You may

4    award damages for noneconomic harm, such as loss

5    of enjoyment of life, mental anguish, anxiety,

6    humiliation, and other mental or emotional

7    distress.

8         The following evidence was put on during

9    this trial that Dr. Porter, indeed, suffered

10   emotional distress.

11        I'd like to start with Dr. Porter first.

12   It was her testimony that being fired caused her

13   to cry all summer.  She was clinically

14   depressed.  She ended up grinding her teeth to

15   the point she ended up with a tooth abscess, and

16   that had to be repaired.

17        Being away from her family, the

18   uncertainty of it all, having to drive to

19   Burlington and stay in a hotel while dealing

20   with all of these emotions by herself.  She was

21   away from her family, she was away from her

22   Dartmouth Health work colleagues.  It was awful.

23        All of this time she was still working to

24   recover from her disability.  It was pretty

25   quite admirable, actually.  You heard Julia

56

1          MacCallum testify that she witnessed Dr. Porter
2      the summer after she was terminated.  You heard
3      her talk about the crying.  You heard her talk
4      about the emotional turmoil.  You heard her talk
5      about receiving a phone call and Dr. Porter's
6      state of mind after she returned -- she received
7      that phone call.
8          Dr. Porter testified that she had been
9      asked to walk a colleague through doing a HyCoSy
10     procedure over the phone after she was
11     terminated.  The colleague had never done the
12     procedure before, and it was -- a patient of
13     hers was put on the schedule.
14          You heard Michelle Russell testify that
15     Dr. Porter would annually show up and pick
16     raspberries in her patch.  She said that 2017
17     was memorable because Dr. Porter was crying and
18     try to wrestle with what had happened to her at
19     Dartmouth Health.  According to Dr. Russell,
20     Dr. Porter was, indeed, distressed.
21          We leave it to your collective wisdom to
22     determine the amount of damages to compensate
23     Dr. Porter for her noneconomic loss.
24          Final section of damages is punitive.
25     Dr. Porter seeks an award of punitive damages.

57

1    Punitive damages are meant to punish a defendant

2    for its clearly outrageous conduct and stop

3    others from acting in a similar manner in the

4    future.  You may award punitive damages if you

5    find Dartmouth Health's conduct was outrageous.

6    That means morally deserving the blame.

7         And if you find that Dartmouth Health

8    acted with malice in deciding whether a

9    corporation acted with malice, you may consider

10   the actions of its managers who acted on behalf

11   of the corporation.  Dr. Porter submits that

12   these standards have been met in this case.

13        The evidence of ill will and malice.  In

14   Exhibit 52 you saw that Leslie DeMars wrote, My

15   life and messaging would be easier, and then a

16   little farther on, if essentially Dr. Porter

17   lost her license to practice medicine.

18        Dr. DeMars claimed to be a friend of

19   Dr. Porter's, and yet she not only put this in

20   Exhibit 52, she said it on the stand.  She stood

21   by what she said; that, yes, it would have made

22   her life easier if Dr. Porter had lost her

23   license.

24        Dr. DeMars in Exhibit 89 stated that she

25   chose not to change her decision.  Quote, As

58

1          much as it hurts to say, it was the right

2          decision to include her in the decision -- in

3          the termination, and I do not want to change

4          that decision.

5              Most disturbing are the comments about

6          Dr. Porter's disability in Exhibit 89.  The

7          comments about the three hats and nobody

8          remembering that she's been out.  The comments

9          about her disability being devastating and she

10          needed to go away and figure out what she could

11          actually do.  The fact that Dr. Merrens

12          responded to this; that it was appropriate and

13          thoughtful insight.  That's outrageous.

14              Also outrageous is the fact that the

15          responsibility of the credentialing committee

16          was circumvented; that Dr. Merrens told

17          Dr. DeMars that Dr. Seifer's success was, quote,

18          on you and he, therefore, created the incentive

19          for Dr. DeMars to cover up the clinical

20          incompetence and ignore patient harm.

21              The administrators of Dartmouth Health

22          were put on notice of patient harm, and they

23          took no action to restrict Dr. Seifer and

24          Dr. Hsu from performing procedures or protecting

25          patients from harm.

59

1          Dr. Merrens testified that Dartmouth

2     Health offered Dr. Hsu and Dr. Seifer placement

3     services after being terminated to help them

4     find now employment.  He passed the problem

5     along.

6          Daniel Herrick testified that they did

7     not fire doctors for cause but closed the

8     division instead.  For the women who were

9     harmed, like Eunice Lee, for the women with the

10    procedure without consent, and for the woman who

11    was impregnated with a thyroid problem who lost

12    her baby, these were all outcomes that we submit

13    could have been prevented.  That's outrageous.

14         Dr. DeMars, in her FPTE of Dr. Seifer,

15    whitewashed all of Dr. Porter's comments.  She

16    used Dr. Hsu to evaluate Dr. Seifer when he

17    clearly -- when she clearly had information in

18    the 11-page assessment that he should not be

19    doing the procedures himself.  She used him to

20    assess Dr. Seifer, and the credentialing

21    committee allowed it.

22         In the summer of 2016 you had an 11-page

23    assessment of Dr. Hsu by Dr. Porter stating that

24    he could not do this work, and you had a text

25    message on July 28 from Leslie DeMars stating

60

1     that Dr. Seifer was clinically incompetent.  And

2     yet they allowed these individuals to perform

3     procedures on women for the following year.

4     This is outrageous.

5           These women were paying out-of-pocket and

6     were desperate to get pregnant.  You saw in one

7     of those e-mails where Dr. Porter was pointing

8     out how poor the pregnancy rates were for 2016.

9           If you decide that it was the right

10    decision, if you decide that Dr. Porter -- I'm

11    sorry, excuse me.  If you decide that these

12    statements, this evidence is outrageous, you can

13    award punitive damages.

14          Conclusion.  Finally.

15          Dartmouth Health had a choice as to how

16    it handled the REI division issues and closure.

17    It chose what probably seemed at the time as a

18    clever solution.  There were consequences to

19    these choices.  There was harm caused to

20    patients.  There was harm caused to the

21    community.

22          I keep coming back to the testimony of

23    Daniel Herrick.  Why are we applying car

24    manufacturer processes to women's healthcare?

25    Daniel Herrick could not tell you how many women

61

 1          and girls his decisions impacted.  Where does

 2          that leave you?

 3                When you go back to the jury room to

 4          deliberate, this becomes your case, too.  This

 5          is where you get to write the final chapter.

 6          You get to decide what happened, who you

 7          believe, and what harm was caused.  Then you get

 8          to decide an appropriate remedy for Dr. Porter.

 9                Unfortunately this case does not give you

10          an opportunity to remedy the harm to patients,

11          but you do have a chance to make Dartmouth

12          Health think twice before it turns the other way

13          the next time patients receives -- it receives

14          reports of harm by its medical staff.

15                Thank you.

16                THE COURT:  Okay.  At this time we'll

17          just take a very brief five-minute restroom

18          break, and we'll come back for the next

19          statement.

20                THE CLERK:  All rise for the jury.

21                (The jury left the courtroom at

22          10:10 a.m.)

23                THE CLERK:  Please be seated.

24                (A recess was taken from 10:11 a.m. to

25          10:20 a.m.)

62

1            THE CLERK:  All rise.

2            (The judge entered the courtroom.)

3            THE CLERK:  Please be seated.

4            (Brief pause.)

5            THE CLERK:  All rise for the jury.

6            (The jury entered the courtroom at

7    10:20 a.m.)

8            THE CLERK:  Please be seated.

9            THE COURT:  Defense make their closing

10   argument.

11           MR. SCHROEDER:  Thank you, your Honor.

12           (Brief pause.)

13           MR. SCHROEDER:  Emerson, may I have

14   control of the exhibits?

15           Thank you.

16           CLOSING ARGUMENTS ON BEHALF OF DEFENSE:

17           MR. SCHROEDER:  Good morning.  First I

18   want to say a few words of thanks.  Thank you

19   for your attention this entire two weeks, two

20   and a half weeks, and I'm sure it seems to you

21   that it has been a very long time.  And it has.

22           We've had 20 witnesses; 21, 20 witnesses,

23   90 exhibits.  On behalf of my client and on

24   behalf of Laurie and Ray and Tris and Ed and

25   Megan, we really appreciate your time and

63

1          attention to everything.  You've been extremely

2          attentive, and we really appreciate that.

3                   So I only get one chance to talk.  You

4          may actually like that, I don't know, but it's

5          one; one and done.  Kind of like the NC double A

6          tournament.

7                   Members of the jury, you've heard a great

8          deal over the course of this trial, most

9          recently some very emotional testimony from a

10         patient who took the stand and shared a deeply

11         personal and painful experience.  But her

12         testimony, like the testimony of Dr. Ira

13         Bernstein, related to topics that are not

14         pertinent to the actual claims in this case.

15                  You'll hear the jury instructions from

16         Judge Doyle.  I'm not going to go through all of

17         the elements of each claim.  You'll have a

18         chance to match the facts in the case to the

19         law.

20                  But I want you to remember that that

21         individual's testimony, as well as the testimony

22         of Dr. Ira Bernstein, related to topics that are

23         not related to this case.

24                  This is an employment discrimination and

25         retaliation case.  It is not a medical

64

1      malpractice case.  And while counsel for

2      Dr. Porter had attempted to distract from the

3      actual issues by presenting evidence that is

4      designated to elicit sympathy and fear, this is

5      quite frankly an emotional Hail Mary and a

6      shameless attempt by Dr. Porter to leverage a

7      patient's difficult fertility journey for her

8      own financial gain.

9           What's more, Dr. Porter has flooded the

10     record with evidence of how talented she is as a

11     surgeon, despite the fact that Dartmouth Health

12     has never asserted anything to the contrary.  In

13     fact, there were lots of testimony by Dr. Porter

14     and her friends; Dr. Russell, Sharon Parent,

15     Dr. MacCallum about how Dr. Porter was such a

16     skilled surgeon.

17          I want to harken back to my opening

18     statement.  We didn't dispute it then.  We don't

19     dispute it now.  She is a talented surgeon, but

20     that is not the whole calculus for determining

21     who is a great provider in a system where you

22     have to work with people day in and day out.

23     Different people and different titles, different

24     positions and different departments.

25          Everyone must remember why we're here.

65

1        This is a case about employment decisions, about

2        whether Dartmouth Health wrongfully terminated

3        Dr. Porter, retaliated against her for

4        whistleblowing, or discriminated against her

5        because of her disability.

6            And while Dr. Porter has brought

7        witnesses to the stand who have evoked emotion

8        and stirred sympathy, the stories they've told

9        don't provide any evidence to support her

10       disability discrimination and retaliation

11       claims.  They are not connected to the legal

12       questions before you.

13           Because at the end of the day you are

14       going to be asked to marry the facts to the law.

15       That is going to be your duty.  And with care

16       and respect, I suggest to you that some of the

17       emotional testimony, however genuine, draws

18       focus away from the core issues before you.

19           And on those issues it's our position

20       that the plaintiff has failed, simply failed to

21       present sufficient evidence to meet her burden

22       of proof.  And you'll hear about the burden of

23       proof and the standard for that.

24           The plaintiff has the burden on all of

25       her claims, we submit, based upon the record in

66

1    this case after two weeks of testimony,

2    20 witnesses, 90 exhibits, that she fails to

3    meet her burden of proof.

4         And let me just say a few words about the

5    showing of exhibits that you saw before.  I

6    counted seven, I think.  There are multiple

7    iterations or multiple references to a number of

8    exhibits.  There are only seven references in

9    the closing statement by Ms. Nunan.  However,

10   there are 90 exhibits in this case, and we want

11   you to take a look at them.  And look at the

12   totality of the circumstances.

13        Now, one thing that Mr. Nunan didn't

14   mention in her closing is really the ballgame

15   here.  It's credibility.  It's credibility of

16   the witnesses, and that is all within your

17   domain.  You get to determine the credibility of

18   the witnesses.  You've been with us for two

19   weeks, over two weeks.  During that time you've

20   heard from a whole range of witnesses, and no

21   doubt you've made assessments about whether you

22   found them credible.  Because credibility is

23   everything in this case.

24        And I'd like to take some time now to

25   review the testimony of a few key witnesses as

67

1          it relates to credibility.

2                    Let me start with Dr. Porter.  As you

3          heard from both Dr. Porter's witnesses and

4          Dartmouth Health witnesses, including

5          Dr. DeMars, Dr. Porter is a very smart, very

6          talented, has the potential to -- potential to

7          be a great provider.

8                    However, you also heard from both

9          Dartmouth Health's witnesses and Dr. Porter's

10         witnesses she is not a team player and is not

11         someone who could be relied on to put her needs

12         over the group or the team.  Not surprisingly,

13         she might have a fairly large ego and can be

14         thin-skinned, manipulative, and demanding.

15         These characteristics work against an effective

16         team.  As a result, Dr. Porter simply could not

17         be the leader of the REI division.

18                   Indeed, Richard Reindollar, the former

19         chair of the OB/GYN division, who then became

20         the chair of the ASRN, indeed told Leslie DeMars

21         in no uncertain terms that making Dr. Porter the

22         director of the REI division would be a mistake.

23                   This is way before Dr. Hsu and Dr. Seifer

24         got there.  And you may recall we went through

25         the chronology of events in very good detail,

68

1     and we did that because the timing of events and

2     the chronology of events is important for you to

3     understand.

4          Dr. Reindollar made his assessment long

5     before Dr. Porter developed her brain injury and

6     long before she made complaints about Dr. Hsu

7     and Seifer.  Her personality characteristics and

8     not her disability led her superiors at

9     Dartmouth Health to consistently judge her

10    incapable of carrying the responsibility of

11    moving the REI division forward in a leadership

12    role.  That was back in 2012, 2013.

13         Indeed, after testifying on direct

14    examination pursuant to a carefully drafted

15    script, we saw an indication of Dr. Porter's

16    true personality on cross-examination.  To say

17    she was combative would probably be an

18    understatement.

19         This was even the case when I even asked

20    Dr. Porter about noncontroversial topics.  She

21    said, quote, I would not characterize it that

22    way, end quote, 36 times.  I thought it was

23    more, but we checked the record.

24         After viewing that testimony, I hope you

25    asked yourselves just a few simple questions.

69

1          Would you want to work with this person?  Do you

2          think this person is a team player?  Do you

3          think there is any setting in which Dr. Porter

4          would view her colleagues as being competent?

5                I recall that Dr. Porter's own witness,

6          Dr. Ira Bernstein, testified that Dr. Porter was

7          continuing to complain and criticize her

8          colleagues even now that she's at an entirely

9          new hospital.  And at the end of the day this

10         case comes down to credibility, and Dr. Porter

11         simply is not credible.

12               And, remember, you say a number of

13         exhibits, and they were shown to you multiple

14         times in Ms. Nunan's closing statement.  Why?

15         Because that's all they had is a handful of

16         exhibits.  You've got to look at all the

17         testimony, all of the exhibits in the case and

18         make your determination on credibility.

19               What about Leslie DeMars, who's chair of

20         the OB/GYN department?  Dr. Porter denied that

21         she was ever friends with Dr. DeMars and refused

22         to even acknowledge that they were anything

23         beyond collegial co-workers, but the evidence

24         revealed the following.  They texted regularly.

25         Their children played together.  Their boys did

70

1      Boy Scouts.  They bought the same fancy luxury

2      cars.  Dr. Porter went above and beyond to help

3      Dr. DeMars get pregnant with her second son.

4      That was a personal fact that Dr. DeMars was

5      willing to share with you.

6            And on top of all that, they shared --

7      they went away every single year for 10 to

8      15 years and shared a hotel room.  You know, who

9      does that if they're not really close friends?

10     By the way, I wouldn't do that with my close

11     friends.  I'm not sure about you.

12           As Dr. DeMars testified, Dr. Porter was

13     the kind of friend she would have called at

14     4:00 a.m. in the event of an emergency.

15           When I asked her about Dr. Seifer and

16     Dr. Hsu, she testified she had no personal

17     issues with Albert Hsu or David Seifer.  More

18     specifically, she stated the following.  Once

19     again, this comes down to what was the witness

20     testimony and what were the documents that were

21     put in front of you.

22           What did she say?  I wasn't aware of any

23     infighting in REI at all.  There were no

24     personal issues in terms of infighting.  I would

25     not characterize it as conflict.  I got along

71

1      with them, yes.

2           And you may recall she said, My

3      complaints about Dr. Hsu brought me no joy.  She

4      said that multiple times, and I just want you to

5      remember what was said and testified to in

6      determining the credibility of the witnesses.

7           But Dr. Porter could not deny the text

8      messages where she told her now UVM colleague,

9      Lisa McGee, that she hoped Albert Hsu would fail

10     his Boards.  She said Dr. Seifer was insane and

11     Albert Hsu was pompous and not as bright as he

12     thinks he is.  Hearing him pontificate about his

13     research would be torture.

14          Dr. Porter testified that she was

15     completely taken aback by the closure of the REI

16     division.  Remember when I asked her that?

17     Really?

18          Exhibit C-6-A is an excerpt of

19     Misty Porter's text messages.  Dr. Porter was

20     trading text messages with Lisa McGee at UVM

21     about a potential position at UVM Medical Center

22     on April 13th.  We went through all of the

23     chronology of this case because chronology of

24     events matters, and when things happened

25     matters.

(806 of 993), Page 806 of 993
Case: 25-1382  12/22/2025, DktEntry: 35.4, Page 758 of 945
2:21-cv-00044-jdj  Document 352.3  Filed 08/15/25  Page 758 of 945

72

1          On April 13th, almost three weeks before

2     she was notified that the REI division was being

3     closed, Lisa McGee says to her, Do what you need

4     to do but leave some time to come talk with us

5     before you make any solid plans.

6          And then one day after the REI division

7     closure, on May 5th, 2017; so the REI division

8     closure is announced May 4th, then you have

9     May 5th.  Lisa McGee texted Misty to say the

10    following:  Hi, Misty.  I spoke with Ira.  We

11    all know who Ira is at this point.

12         I spoke with Ira this morning, and he

13    agreed.  If you wanted, we could do a per diem

14    arrangement pretty quickly for June.  This could

15    give you some breathing room to have time to

16    think things through and make longer-term

17    decisions.  You could start later, too.  No

18    strings attached for longer term so you could

19    still take the Boston option if it suites your

20    needs better.  We are here for you.

21         Dr. Porter couldn't remember exactly what

22    the Boston option was.

23         What about Dr. Merrens?  Obviously I told

24    you upfront that Dr. Merrens was going to be

25    here for the entire of the trial with all of

73

1      you, and I submit on the opposite end of the

2      credibility spectrum is where Dr. Merrens sits.

3      He testified on two different dates.  He was

4      consistent.  He was articulate.  He was frankly

5      believable.  And make no mistake about it,

6      Dr. Merrens made the decision to close the REI

7      division and terminate Dr. Porter's employment.

8           Now, why is that important?  Because at

9      the time that he made the decision he had no

10     knowledge of either the specific nature of

11     Dr. Porter's disability or the complaints she

12     raised about Dr. Hsu and Dr. Seifer.

13          In fact, there's no evidence in the

14     record to the contrary, and that's what this

15     case comes down to; the evidence in the record.

16          You've been presented with a whole lot of

17     information in this case, but I'll represent to

18     you that this information is the most critical

19     of everything that you have heard.  How could

20     Dr. Merrens possibly have discriminated or

21     retaliated against Dr. Porter if he didn't have

22     any specific knowledge of it in the first place?

23          And remember, the REI division, the REI

24     division was closed.  First time they've ever

25     closed a division in the entirety of Dartmouth

74

1    Health's history, as far as anybody can testify

2    to.  There was no -- there was no dispute about

3    that.  And three positions were fired all at the

4    same time.  They were let go.

5         Now, how you judge Dr. Merrens'

6    intentions?  And Ms. Nunan glossed over these

7    exhibits, but I would ask that you please review

8    them when you're back in the deliberation room.

9         Exhibits B, C and D.  Easy to remember.

10   When Misty -- Misty Porter was involved in a

11   dispute with a former chair of the OB/GYN

12   department, Richard Reindollar, back in 2012 and

13   2013, she thought that Dr. Merrens was helpful,

14   respectful, a good sounding board to address her

15   conflicts with Dr. Reindollar.  Her e-mail

16   responses demonstrate that he was a caring,

17   thoughtful, and solid leader then and as well as

18   further on down the line, three and a half years

19   later.  He helped her back then.

20        She never approached him again after

21   that.  They didn't stay in contact over the next

22   three and a half years, but she certainly knew

23   that she could go to him as a neutral sounding

24   board.

25        Let me review a few of the key events

75

1     here.  We went -- there was a lot of testimony

2     on a number of these key issues, and this goes

3     to the heart of the case.  Dr. Porter cannot

4     overcome several undisputed facts, which are

5     fatal to her claims of whistleblower retaliation

6     and disability discrimination.

7          Remember, the REI division closed,

8     permanently closed in May of 2017.  That was

9     eight years ago.  Almost eight years ago.

10         Dartmouth Health announced the closure of

11    its REI division in early May, 2017.  Multiple

12    people testified this was the first time that it

13    had ever happened.  There's no -- there's no

14    dispute about that.

15         Well, Dr. Porter apparently believes that

16    this first-of-its-kind closure, which involves

17    the termination of multiple positions, not just

18    herself, came after a series of formal and

19    informal attempts to fix the REI division.

20         What you heard from Ms. Nunan is their

21    case.  Well, this was a big reach.  This was a

22    big conspiracy.  Really what they were trying to

23    do was terminate Dr. Porter, and so they

24    concocted this big scheme of shutting down a

25    division, which they had never done before, in

76

1         order to get rid of Dr. Porter.

2                And what you heard was -- from

3         Dr. Merrens was this was a tough business

4         decision made by Dartmouth Health's chief

5         clinical officer.  That's part of his job

6         responsibilities in running a healthcare system.

7         This was not an overnight decision, and it

8         impacted a number of people internally and

9         externally as well.  He understood the gravity

10        of the decision, and he made these decisions

11        even though they're unpopular.

12                To suggest that all of this was done just

13        to target Dr. Porter is another example of her

14        ego getting in the way.  This was not about her.

15        Three physicians were terminated; Dr. Seifer,

16        the division director, Dr. Misty Porter,

17        Dr. Albert Hsu.  All three positions were

18        terminated one month after notice of its

19        closure.  Each of them was offered a severance

20        package.

21                When Dr. Porter asked her for severance

22        they gave it to her.  Nine months of her base

23        salary; $228,000.

24                If we could bring up C-13.

25                You may recall the testimony about this

77

1    time of events, this sequence of events.  There

2    was the May 25th letter from Dr. Porter to a

3    series of individuals.  She said, Well, I never

4    talked to anybody from Dartmouth Health.  I

5    never reached out to them.  I never heard from

6    them.

7         Well, when you see this letter there's a

8    couple of really important things in it.

9         Number one, Dr. -- Ms. Giglio, her name

10   is now Claiborne, Amy Claiborne says, This

11   letter serves as a response to your letter dated

12   May 25th, 2015, and questions posed during our

13   meeting together with your husband on Friday,

14   May 26th.

15        She also says to her she'd like to thank

16   her for her accomplishments and also let's her

17   know that, I reviewed your request with clinical

18   and operational leadership, and this related to

19   wanting to reconsider her employment termination

20   date.  And she's informed that, no, they can't

21   do that.

22        But then she says, In addition -- and

23   this is in the fourth full paragraph -- in our

24   meeting you had requested an increase in the

25   severance amount.  After considering this

78

1    request, D-H is willing to extend severance to

2    36 weeks of severance.  That was offered to her.

3    That shows Dartmouth Health's intent.

4         Actually the amount of money, or I should

5    say the number of months was certainly more than

6    the other two positions received.

7         And remember, again, Dartmouth Health

8    hasn't reopened this division, nor does it have

9    any current plans to do so.  The closure is now

10   almost eight years ago.  So any speculation that

11   this closure was like a short-term fix to get

12   rid of Dr. Porter and then, well, we can go back

13   and open the REI division, that still hasn't

14   happened eight years later.  So I'd submit that

15   that theory, that conspiracy theory has gone out

16   the window.

17        Now, it's clear that Dr. Porter disagreed

18   with the decision to close the REI division.  No

19   doubt about that, and a lot of other people

20   disagreed with it.  But this was a business

21   decision that was made by Dartmouth Health and

22   specifically a business decision made by the

23   chief clinical officer, Dr. Ed Merrens.

24        You'll hear the judge explain the

25   business judgment rule during his charge to you.

79

1    You may not agree with the decision.  It may not

2    be popular.  It may not be something that you

3    want to happen or others wanted to happen or the

4    media said shouldn't have happened, but

5    Dartmouth Health had the responsibility and

6    certainly within their province to decide

7    whether or not it made sense to keep the REI

8    division open any longer.

9         And just because a business decision may

10   be unpopular and result in difficult decisions

11   that impact the employment of the individuals

12   does not make it discriminatory or retaliatory.

13        Remember what this case is about.  It's a

14   disability discrimination and whistleblower

15   retaliation case.  And you may have thought at

16   some point when you were listening to the

17   evidence, like what are we listening to?

18   Because there were a number of witnesses where

19   it was really unclear to me whether or not we

20   were actually talking about an employment

21   discrimination and retaliation case.

22        Upfront I gave you a little bit of a

23   preview of the evidence to say, well, here's

24   what happened.  I suspect at this point you can

25   see how we got here.

80

1          Now, through a series of e-mails that
2     were sent, shown to you a couple of times in the
3     closing, the same e-mails, plaintiff attempts to
4     cast doubt on the legitimate basis for the REI
5     division closure, and I submit that they fall
6     flat.
7          Let's go over the issue of the REI
8     division closure itself and the reasons for it.
9     There's been a lot of testimony about the
10    reasons for the REI division closure.
11         Plaintiff's counsel tried to demonstrate
12    that Dr. Merrens or others like Dr. Conroy were
13    not credible because they did not articulate
14    each and every reason for the closure when they
15    spoke to the employees or the media.
16         You heard from Dr. Conroy.  She had a
17    five-minute conversation with Dr. Merrens.  This
18    happened before she even got there as the CEO,
19    and that goes to the heart, the credibility of
20    this case and the lack of evidence to support
21    the claims.  She didn't have anything to add in
22    that regard.
23         Ms. Nunan brought up declining
24    birthrates, declining birthrates.  She talked
25    about the lack of providers in that interview.

81

1       She didn't know anything about the REI division

2       closure other than what Dr. Merrens told her.

3            Plaintiff's counsel also wondered why

4       their public comments made no mention of

5       infighting among the physicians, dysfunction in

6       the REI division, interpersonal conflicts.  Why

7       didn't we say that to the public and to the

8       media?

9            Does that really -- just step back and

10      listen to that line of reasoning.  Does that

11      really make sense to you?

12           Would you have really expected

13      Dr. Merrens to put a spotlight on all of the

14      underlying reasons for the closure when he spoke

15      to employees outside of the REI division?  Or

16      when he spoke to the media?

17           His messaging to staff was meant to

18      provide some details, not all the reasons why.

19      It was high level.  It would have been

20      unprofessional and, quite frankly, caused even

21      more reputational harm if he went into detail

22      about the fact that all three of these

23      physicians couldn't get along in the sandbox

24      together.  They couldn't get along and

25      collaborate and engage in teamwork.

82

1          And, by the way, this isn't just

2      Dr. Porter.  It's all three of them, right?  I

3      referred to the land of misfit toys upfront

4      because that's just what I think of when I think

5      of this group of individuals who all bear

6      responsibility for the dysfunction in the REI

7      division.  It's not one person.  We're not in

8      any way saying, well, this is all Dr. Porter.

9      No.  All three of them share some level of

10     responsibility and culpability for why the REI

11     division wasn't working.

12          And, to be sure, e-mails don't tell the

13     full story, especially ones that are -- that are

14     sent postmortem after the fact of the closure

15     had happened.

16          And Dr. Merrens testified.  He was asked

17     pointblank.  I was embarrassed.  I was

18     embarrassed that this happened; that this

19     division couldn't get its act together for a

20     variety of different reasons, but the

21     dysfunction was the root cause for the real

22     problem, which was an inability to recruit and

23     retain highly specialized nurses.

24          As he testified, they were inextricably

25     linked.  And I think Ms. Nunan asked you about

83

1    Exhibit 60, if we can pull that up.

2          Thanks, Ray.

3          As Ms. Nunan noted, it's ultimately the

4    dysfunction of the physicians who worked in this

5    area for years, as well as recent hires, and

6    ultimately a failure of leadership, for which I

7    hold Leslie fully accountable.

8          Certainly Dr. DeMars has some culpability

9    here for her failure of leadership.  No doubt.

10   No doubt.  And part of the problem is having two

11   friends where one is now the supervisor of the

12   chair of the OB/GYN department.  That made it

13   awkward.  A natural awkwardness is probably an

14   understatement.  And because of the fact that

15   there was this dysfunction, they did not have

16   sufficient nursing assistance.

17         Ms. Nunan was trying to call into

18   question Dr. Merrens and, well, why didn't he

19   share something with the public and why didn't

20   we say something to the public or to the media?

21   He was under no duty to do that.  And the fact

22   that he didn't do that doesn't call into

23   question the legitimacy of his decision-making

24   or, for that matter, raise a question of his

25   overall credibility.

84

1          The same holds true in terms of where

2     Dr. Porter's counsel tried to call into question

3     the basis for Dr. Porter's termination.

4     Dr. Merrens was crystal clear on this point.

5     The REI division closure resulted in the

6     termination of all three positions, no question,

7     including Dr. Porter.

8          And plaintiff's counsel had one witness

9     who testified that in a big audience of members

10    of the OB/GYN department, she asked about

11    Misty's termination.  Dr. Merrens said she was,

12    quote, on disability, end quote.  Now, does that

13    really make sense?

14          Now, that's Dr. Russell who said, well, I

15    then saw her fairly shortly thereafter, and I

16    think I referred to it as the raspberry patch.

17    She never makes any mention of this alleged

18    comment by Dr. Merrens.

19          And Dr. Merrens could not be any more

20    clear.  He never discussed anyone's status and

21    certainly nothing specific about Dr. Porter.

22    He's the chief clinical officer of a hospital

23    and had been for a number of years.  He wasn't a

24    rookie at this.  He understood how to make

25    presentations to staff and what he would and

85

1    would not say.  And he was clear; he never said

2    that.

3            And, in fact, Dr. Porter's suggestion

4    that this experienced, high-level executive

5    would go before a room of 30 or 40 people and

6    announce that Dr. Porter had been terminated

7    because of her disability is just plain

8    illogical.  It doesn't -- it doesn't make sense.

9            And, in fact, while you had one person

10   say that with respect to -- on behalf of

11   Dr. Porter, you had Kelly Mousley, who doesn't

12   work for Dartmouth Health.  And by the way, I

13   think six out of ten Dartmouth Health's

14   witnesses don't work for Dartmouth Health

15   anymore, one of whom, Ms. Gunnell, had been laid

16   off.

17           So when you look at credibility, I really

18   want you to look at the credibility of the

19   witnesses.  I mean, she certainly didn't want to

20   be here.  She got laid off a couple years ago.

21   Does anybody really think they want to be

22   testifying in a court case if they had been laid

23   off by that same employer?  But she was

24   credible.  She was believable.

25           Let's go back to that issue of the big

86

1    OB/GYN department meeting.  Katie Mansfield who

2    attended the meeting, Ms. Nunan said, well, they

3    didn't recall it.  What did Katie Mansfield

4    actually say?  She testified that Dr. Merrens

5    did not say that, and she would have recalled

6    something like that.  Quote, And she would have

7    recalled something like that, end quote.

8         Kelly Mousley, another former Dartmouth

9    Health manager, testified in no uncertain terms

10   that Dr. Merrens said nothing about Misty

11   Porter's condition or anything about her

12   personally.  In her words, quote, I feel like

13   that's something I would remember.  Yeah, that's

14   big, end quote.  That was her testimony.  This

15   just didn't happen.

16        Let me give you a few comments just about

17   the state of the REI division because

18   plaintiff's entire case rests on this conspiracy

19   theory.  They concocted this idea that we're

20   just going to get rid of a division, get rid of

21   all three positions.  Ms. Nunan said, yep, the

22   baby out with the bath water.  All because of

23   Dr. Porter.  The evidence doesn't support it.

24   The facts don't support it.  The testimony

25   doesn't support it.

87

```
1          Let's go back to what the REI division
2    was and was not.  It's undisputed that this was
3    a small rural program.  It didn't have a high
4    volume of patients.  It had a good amount of
5    turnover of physicians and nurses between 2005
6    and 2015.  And as I predicted in the opening
7    statement, current and former Dartmouth Health
8    employees testified that the REI division was a
9    tough environment to work in.  And REI's
10   reputation far and away preceded it.
11         I think we all know, and have in our own
12   respective businesses where we may work,
13   examples of, well, that department is pretty
14   tough.  I don't want to really deal with them.
15   That's exactly what the case was with the REI
16   division.
17         In the early years of the REI division
18   there were two factions.  There was the Misty
19   Porter team.  There was Sharon Parent, her
20   nurse, and then the other team.
21         And later on it became three different
22   camps and three different silos, right?  And it
23   was clear and certainly clear from the evidence
24   that Dr. Hsu and Dr. Seifer didn't help to
25   bridge the gap in teamwork and collaboration
```

88

1       along with Dr. Porter.

2              You may recall that Sharon Parent was the

3       first witness to testify in support of

4       Dr. Porter.  You might also recall that

5       Ms. Parent's testimony about the recruitment of

6       nurses to the REI division was proven to be

7       totally false.  She testified -- this is

8       Ms. Parent.  She was the first witness, which I

9       realize, I'm not sure if it was true for all of

10      you, that seems like that was months ago.  She

11      testified no one ever asked her for ideas on how

12      to recite nurses, and Dartmouth Health never

13      posted the position externally.

14             But then she was presented by

15      Ms. McDonald with evidence of the contrary;

16      that, in fact, there was an e-mail showing that

17      they had been looking for ways, Dr. Seifer had

18      been looking for ways to recruit nurses to the

19      REI division.  And this predated the

20      November/December time period.  There's postings

21      that were sent out in June of 2016.

22             In fact, I'd ask you to look at

23      Exhibit V, if you'd bring that up, Ray.

24             This was the posting that went out in

25      June of 2016.  They had been looking for REI

1    division nurses for a really long time.  And

2    Ms. Parent said, Well, it should take you about

3    six months to find somebody.  They didn't.  They

4    couldn't find anybody.  That's the reality.

5         Now, in terms of the atmosphere within

6    the REI division, the environment, they had a

7    number of people come up before you.  Again,

8    Dr. Judy Stern, the retired director of

9    embryology, and I think you all agree she was an

10   honest broker, unvarnished and heartfelt, and

11   right out of the gate without any prompting said

12   Dr. Porter is not a team player.  She worked

13   with her for 10 to 15 years.

14        A couple of times I'm not sure who was

15   asking the questions, me or Dr. Stern, because

16   she wanted to explain the environment that

17   they -- everybody was operating in.  She

18   testified she worked with Misty Porter for many

19   years, and her comments were credible.

20        She stated, quote, I just wanted to say

21   that Dr. Porter had criticisms of all the

22   physicians in the division, end quote.  And that

23   that was her experience throughout the time she

24   was there.

25        She said that Dr. Porter had a lot of

1    criticisms about the nursing staff, often about

2    some of her lab staff, and they didn't do things

3    the way she thought they should be done.  And,

4    yes, she gave one example about an internal form

5    that the chair of the department wanted to use.

6    And that may seem like meaningless to some

7    people, but it's just par for the course on how

8    the dynamic in this group was.  It was

9    untenable.  There was a lot of tension.  And

10   that happened before Dr. Hsu came on the team,

11   it was before Dr. Seifer came on the team, and

12   before Dr. Porter had her disability or her

13   condition, her medical condition.

14        What about Kelly Mousley?  Another former

15   D-H employee who was asked to testify.  She was

16   direct.  She was forthright.  She was clear.

17   The nurses didn't get along.  She talked about

18   the fact that she supervised the administrative

19   staff across all six OB/GYN divisions and

20   testified about the REI division.  There were

21   periods of time, in her words that, quote, I

22   felt like it was my full-time job, end quote.

23        You also heard that from Ms. Gunnell,

24   right?  Corroboration of testimony.

25   Corroboration of the fact that to the extent

91

1   that there were individuals that had

2   responsibility for the REI division as well as

3   other divisions within the OB/GYN department,

4   they spent the lion's share of their time on

5   dealing with conflict, disagreements, disputes

6   in the REI division.

7          I asked Kelly Mousley if she experienced

8   this level of struggle or lack of

9   professionalism in other divisions.  No.  Quote,

10  no, nothing like this.  It was an outlier, end

11  quote.

12         People warned Ms. Mousley of Dr. Porter.

13  She said, quote, People telling me that if I met

14  with Dr. Porter to stand my ground and not allow

15  her to intimidate or bully me, to do what's

16  right.  Quote, Try to warn me to be prepared and

17  to be strong.

18         Now, remember, she doesn't work for

19  Dartmouth Health.  She came in to testify about

20  her experiences in that division.  There was no

21  coordination between teams on how to handle

22  incoming patient calls.  And you heard a lot

23  about that, this territorialness.  Well, if a

24  patient came in and it wasn't for that

25  particular provider, it didn't get over to the

1    other provider.  I mean, hopefully the evidence

2    as you saw it demonstrated that this group had

3    no teamwork, no collaboration whatsoever.  There

4    was lots of dissension.

5         And then other than her few supporters,

6    her team, if you will, Dr. Porter was critical

7    of a slew of physicians and nurses, many of them

8    junior and less experienced.  You heard the

9    testimony about the fact that Dr. Porter

10   criticized some of the other former physicians;

11   a woman by the name of Sophia as well as her

12   husband, Neil.  You saw many, many e-mail

13   communications from Dr. Porter herself where she

14   is, at a minimum, critical and, at worse,

15   downright mean-spirited.

16        Now, let me just turn to the two

17   physicians who were subjected to, if you will,

18   character assassinations throughout this trial.

19   I told you that Dr. Porter didn't call them as

20   witnesses, and I think that's telling.

21        With respect to Albert Hsu, where do we

22   begin with him?  Dr. Porter had a negative view

23   of Dr. Hsu before he even got there.

24   Dr. Porter, whether she was his formal mentor or

25   not, seemed to give up on Dr. Hsu after his

(827 of 993), Page 827 of 993
Case: 25-1382  12/22/2025  DktEntry: 35.4  Page 779 of 945
2:1:1-cv-00144-kjd  Document 5523  Filed 00/15/25  Page 93 of 945

93

1       first six months.  She testified, the first six

2       months I was there for call, et cetera, and then

3       let him go on his own to be independent and

4       then, well, he didn't do things according to the

5       way that she thought they should be done.

6              What should she have done?  She's there

7       as the more senior person in the division.  So

8       even though she had been out for six months on

9       her leave of absence, December of '15 through

10      June of '16, in June she writes this long letter

11      basically gaslighting Dr. Hsu for all the

12      shortfalls of his practice; clinical skills,

13      competency, et cetera.

14             And when David Seifer came on the scene

15      right in that same time period, he gets this

16      long list of basically trashing Dr. Hsu.

17             Now, Dr. Seifer got the job that

18      Dr. Porter always coveted but was never

19      considered for, and there had to be just a tinge

20      of jealousy masked by some of her numerous

21      critical comments.

22             She immediately found everything wrong

23      with his clinical knowledge, his skills, his

24      technique.  Of course, Dr. Seifer joined a small

25      REI program where the lines had been drawn well

94

1      before he got there.  No one was as great as

2      Dr. Porter in her mind.  Dr. Seifer's brief

3      11-month tenure was probably doomed from the

4      start.

5           Now, Dr. Seifer had his own problems with

6      proper social graces and communication skills,

7      I'm not minimizing those issues, but needless to

8      say the lack of collaboration and teamwork

9      created a negative environment which really

10     expedited the eventual demise and closure of the

11     REI division just a few months into 2017.

12          And what about the REI division?  What

13     about the reasons why they closed it?  Now,

14     there's not just one reason, and that's

15     understandable, right?  You're -- there's not

16     one reason why something happens that's a really

17     complex critical decision that's going to affect

18     a number of people.

19          The final six months Dr. Porter calls

20     into question, well, there wasn't really a

21     nursing shortage.  There wasn't really a

22     problem.  There are ways to fix the nursing

23     shortage.  They should have been able to do it,

24     but time and again the testimony across the

25     board was consistent and it was corroborated by

95

1      multiple e-mail communications and documents.

2           And despite claiming it was somehow

3      artificially manufactured, even Dr. Porter had

4      to reluctantly acknowledge it.  Remember, by

5      late 2016 the REI division was down two people.

6      Casey Dodge had been terminated or resigned.

7      Sharon Parent retired in December of 2016.

8           And Dr. Porter's counsel repeatedly

9      suggested that had Sharon Parent been allowed to

10     return from retirement, the nursing shortage

11     would have been solved.  You saw documents and

12     heard evidence establishing that that simply was

13     not true.  The REI division was looking for

14     additional nursing support at that time above

15     and beyond Ms. Parent, and when she did retire

16     the shortage only became more dire.

17          And Heather Gunnell testified; remember

18     she was the individual who had been laid off by

19     Dartmouth Health.  She was asked whether Sharon

20     could have solved the nursing crisis, and her

21     testimony was clear.  Absolutely not.  That was

22     not -- that was a small Band-Aid on a major,

23     major problem.  And by April of 2017 it's

24     undisputed that they were left to one

25     less-than-fully-trained REI nurse.

96

1          Exhibit J, if we could pull that up, that
2     was an exchange between Dr. Porter and Karen
3     George.  You heard testimony from Karen George.
4     They both acknowledged that they -- quote,
5     Nursing situation on all fronts is a nightmare.
6     Nursing needs to change.
7          Now, you then saw, if we can bring up
8     A-16, and I'll run through this fairly quickly
9     because the evidence of this was overwhelming.
10    December 6th there's a message from Dr. DeMars
11    and Dr. Seifer about the imminent REI nursing
12    crunch and requiring significant changes in
13    nursing workflow and task allocation.  And that
14    they had to focus their efforts on providing
15    excellent patient care for those who already had
16    a tentative start date, and they were pushing
17    off the start dates for other people.  This is
18    December, right?  Early December.  Mid-December.
19          A-20, if we could.
20          December 16th.  This is the e-mail from
21    Dr. Seifer, just ten days later.  During the
22    months of January and February we will not see
23    any new patients, and we will be limiting our
24    patient appointments to only those necessary for
25    the patients currently in cycle who will need

97

```
1     retrievals or transfers from January or
2     February.
3          Once again, Dr. Porter's whole case rests
4     on this was a conspiracy to get her out.  They
5     created this entire rouse.  So all of these
6     documents, the 90 documents you saw, were all a
7     rouse and conspiracy to get Dr. Porter out of
8     Dartmouth Health.
9          But then you have not just those events
10    where they're really slowing down or pausing new
11    patient referrals, right?  Because they don't
12    have capacity to handle it.  You then have the
13    January/February, 2017 Value Institute.  And in
14    that there are a couple things that happened.
15    There's a couple of meetings in December, or I
16    should say the fall of 2016 and then January and
17    February of 2017, and they have a couple of
18    retreat dates.
19          And Dr. DeMars testified that the
20    evaluation by the Value Institute was twofold.
21    One was that the division was unsalvageable.
22    And, two, that if she was going to keep
23    Dr. Porter on in the department that she had to
24    do two things.  First was to very clearly
25    confront her that she was central to the
```

98

1    dysfunction and that, if she were to continue,

2    that it could not be in a leadership role.

3        And Dr. DeMars testified, quote, I

4    remember looking at the person who talked to me

5    about this and saying, This would have been the

6    hardest thing I would ever have to do, end

7    quote.

8        Heather Gunnell and Daniel Herrick both

9    testified that this was not salvageable; that

10   this -- that the report out of the Value

11   Institute was that we couldn't do anything about

12   it.  It was not -- we couldn't fix it at the end

13   of the day.

14       Go to B-2 for a second.  Then you have

15   Dr. Porter's comments about the program itself,

16   and those comments are particularly telling.

17   She said, Indeed, the program is close to

18   dissolution.

19       Further on down she says, There's not

20   enough IVF at DHMC, nor has there ever been,

21   despite heavy efforts at marketing and outreach

22   for many providers within REI to focus only on

23   IVF.  Again, these are her words.

24       And by April the writing was on the wall,

25   if we could bring up B-7.

99

```
 1              This is April 27.  This is the e-mail
 2        from Ms. Gunnell to Dr. Porter regarding patient
 3        scheduling.  Actually it's to everybody, and it
 4        was sent on behalf of Dr. DeMars.  We have a
 5        critical staffing issue in REI, and once again
 6        they're deferring new infertility evaluations.
 7        They're not scheduling any patients for an ART
 8        cycle.  And the remaining patients, May through
 9        July, are currently under review.  Updates will
10        be forthcoming.
11              And this was just the final straw.
12        Because by that date Marlene Grossman, who was
13        the one REI, full-time REI nurse in Bedford;
14        Bedford/Manchester, New Hampshire, she resigned,
15        and so now you're left with one
16        less-than-fully-trained nurse.
17              I want to turn your attention to the
18        claims in this case, right?  I said upfront the
19        claims in this case are employee discrimination
20        and retaliation.
21              Based upon the evidence in the record
22        Dr. Merrens was the ultimate decisionmaker on
23        the REI closure.  He didn't know anything about
24        Dr. Porter's medical status or condition at that
25        point.  He didn't know anything about any
```

1    complaints she made about Dr. Hsu or Dr. Seifer.

2    And so when you're looking at the analysis, the

3    legal analysis that you're being asked to

4    perform, remember those facts.  Because that's

5    factually what the record reveals.

6         And despite trying to rattle him by

7    calling them in their case, Dr. Merrens was

8    emphatic.  I received recommendations from

9    Daniel Herrick -- who by the way is no longer

10   employed by Dartmouth Health -- to close the REI

11   division.

12        Leslie DeMars, while plaintiff's counsel

13   also called her in their case-in-chief, which

14   they have a right to do.  They tried to

15   challenge her on various points on

16   cross-examination right out of the gate.  She

17   was unflappable.  She told you what happened and

18   where she was in the recommendation process.

19        She recommended the closure of IVF but

20   not the REI division.  She was clear about that.

21   And she also said that she disagreed with the

22   decision to close the division.  Quote, I

23   disagree with it.  I was unable to argue my

24   disagreement, and I was unable to turn back the

25   fact that the actions had been taken, the

101

1    termination actions had been taken and it had

2    been publicized, end quote.

3           Quote, I was not allowed to present that

4    plan before the decision was made to terminate

5    the division, end quote.

6           And with regard to Dr. Porter, Dr. DeMars

7    testified, I absolutely wanted her to stay on.

8    I had a job for her that I was trying to plan

9    for.  You saw that Exhibit 50-A, if we could

10   pull that up for a second.

11          Because this gets down to your analysis

12   of what was available for her, what position

13   could she potentially go to.  And there was

14   testimony by Heather Gunnell who testified that

15   she and Daniel drafted this theoretical plan to

16   retain Dr. Porter at the request of Dr. DeMars.

17          But the record is clear on a couple

18   points.  One, this document never went to

19   Dr. Merrens, so he didn't consider it in his

20   decision.  And, two, Dr. Chertoff will

21   testify -- testified, and remember she's the

22   doctor that travelled from Portland, Oregon by

23   planes, trains and automobiles to get here,

24   albeit a day later.  She testified that they

25   already had gynecological ultrasound experts in

(836 of 993), Page 836 of 993

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 788 of 945

2:17-cv-00094-kjd    Document 53.23    Filed 01/18/25    Page 102 of 145

102

1        the radiology department.

2             And it would be -- when it became clear

3        that Dr. Merrens was unwilling to keep the REI

4        division open, Dr. DeMars called a colleague at

5        UVM to get her a job.  You saw those text

6        messages asking her to help her friend.  Yeah,

7        you should call our friend.  There's no unlawful

8        animus here.  There's no discriminatory motive

9        at play here.  Just a conflicted individual

10       who's struggling to do right by her friend while

11       also doing the right thing for the OB/GYN

12       department.

13            But at the end of the day, at the end of

14       the day she didn't make the decision.  She just

15       didn't make the decision.  That was Dr. Merrens.

16            You saw him testify.  He testified on two

17       days, not one.  And the evidence throughout this

18       case sustained that Dr. DeMars's friendship with

19       Misty was a complicated one and one that created

20       numerous challenges for her leadership.

21            Dr. DeMars was fully aware of the issues

22       Dr. Porter created within the REI division, and

23       she kind of put up with it for a long period of

24       time.  And it even went so far as to approach

25       human resources to ask him to prepare a

(837 of 993), Page 837 of 993
2217ev00094kjd Document3123 Filed01188258 Page1089 of 945
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 789 of 945

103

1    memorandum of expectation about Dr. Porter's

2    behavior.  You remember seeing that.  She said,

3    Well, it's the biggest mistake of my life.  I

4    really should have held her accountable, but she

5    couldn't.  She was her friend.  She actually

6    helped Dr. DeMars get pregnant with her second

7    son.  Like how conflicted can you be?  Never

8    mind a friendship and the fact that they shared

9    rooms together.  Dr. Porter helped Dr. DeMars

10   get pregnant with her second son.  That's

11   undisputed.

12       And if anybody doesn't think that that

13   created a level of conflict, awkwardness to deal

14   with her friend and colleague who was difficult

15   to deal with from a teamwork and collaboration

16   standpoint, I don't know what is.

17       She didn't deliver the memo to Dr. Porter

18   and testified that was her biggest mistake.  And

19   Dr. Merrens didn't rely on any recommendation by

20   Dr. DeMars with respect to the REI closure.  In

21   fact, he testified he, quote, completely lost

22   faith in her as a leader.

23       So you're being asked before, well, you

24   know, Dr. DeMars harbored this animus towards

25   Dr. Porter and that should be imputed to

104

1    Dr. Merrens and, therefore, Dartmouth Health

2    should be held responsible.  How can that be?

3    Dr. Merrens was really clear.

4           At this point Dr. DeMars, her judgment

5    and inability to actually run the OB/GYN

6    department was clear.  She couldn't do it.  And

7    he saw that, and he certainly wasn't listening

8    to her.  In fact, she testified, hey, I think we

9    should shut down the IVF department but not the

10   REI division.  She was clear about that.

11          And he made the decision, I'm shutting

12   down the entire thing.  And he did that even

13   though it was unpopular, but it needed to be

14   done for a lot of reasons.

15          Now, what about the potential

16   accommodations that Dr. Porter thinks she should

17   have received at the time of the REI closure?

18   I'm not going to go into all of the law here

19   because you're going to hear that from Judge

20   Doyle.  But under the ADA, the Rehab Act, the

21   disability discrimination laws, if somebody has

22   a disability, you might have -- you've got a

23   duty to reasonably accommodate them.  And

24   "reasonably accommodate" includes reassignment

25   to a vacant position.  That's what the law

105

1    states.  Reassignment to a vacant position.

2    Those words are really important for you to

3    understand.

4            There are a number of other things that

5    could be a reasonable accommodation, but here

6    this is a big issue, right?  You receive a

7    charge from the Court that the ADA does not

8    require creating a new position with somebody,

9    even somebody with a disability.

10           Now, I don't want to -- even though there

11   was not a significant amount of testimony on

12   this topic, it goes to intent, motive,

13   et cetera, I want you to remember what Dartmouth

14   Health did to reasonably accommodate Dr. Porter

15   from December 15 to the closure of the REI

16   division in May of 2017.  That's about

17   18 months.  She was on two leaves of absence for

18   nine months total.

19           And when she was there it was a fairly

20   sporadic, reduced schedule while she was on

21   long-term disability, which started in June of

22   2016.

23           If we can show Exhibit 129, Ray, I'd

24   appreciate that.

25           This just highlights the laundry list of

106

1      accommodations that she sought and Dr. DeMars

2      approved and authorized for her.  Dr. Porter

3      does not dispute that Dr. DeMars approved and

4      authorized all of the requested accommodations

5      in June of '16; allowed her to work from home,

6      allowed her to have space at work by herself.

7      She had essentially created her own schedule.

8      You heard testimony about the fact that she

9      didn't want anybody else knowing her schedule.

10            While she blames the termination of her

11     emotional well-being over the summer of 2017,

12     she acknowledged that after the REI division had

13     been closed she had two separate visits to the

14     Mayo Clinic for two-week periods.  So two

15     two-week periods; June/July, July/August.  And

16     then she had another surgery in September of

17     2017 and was on another leave of abscess, albeit

18     at UVM, from September to November of '17.

19            Now, I went back to the opening statement

20     in this case, and Mr. Vitt referred to the fact

21     that Dr. Porter did surgeries that no one could

22     perform.  He said it a couple times.  What's the

23     actual evidence in this case?

24            There was no vacant position in the

25     radiology department.  Leslie DeMars testified

107

1      that she went to the chair of the radiology

2      department, at the time Joselyn Chertoff, to

3      inquire about any potential vacancies for her

4      friend, Misty Porter.  And she went to the

5      radiology department and asked her, and then you

6      heard not just from Leslie DeMars, you heard it

7      from Dr. Chertoff.  And she testified in May of

8      2017 there were no open positions in our

9      radiology department.  They already had a

10     sufficient number of radiologists, and there's

11     no evidence in the record to suggest otherwise.

12          Remember, it's the plaintiff's burden

13     here.  Plaintiff has to show that there was a

14     vacant position available to be reassigned to.

15     It was glossed over in Ms. Nunan's initial

16     statement, but it's important for you to

17     remember because that's the law.

18          If somebody has a disability and the

19     employer has a reasonable duty to accommodate in

20     this particular place, Dr. Porter is asserting

21     that, well, I should have been reassigned.  I

22     should have been reassigned to OB/GYN.  I should

23     have been reassigned to radiology.  I'll get to

24     OB/GYN in a second.

25          Let's just stay with radiology for a

(842 of 993), Page 842 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 794 of 945
2:17-cv-00124-kjd   Document 33-23   Filed 01/16/25   Page 108 of 195

1    second because there's two different places that

2    she could have ended up.  Dr. Chertoff was clear

3    and articulate that she, as well as many other

4    physicians in the radiology department,

5    interpreted gynecologic and early obstetric

6    ultrasounds on a routine and regular basis.  So

7    Dr. Porter's skills were not unique, special, or

8    missing after she left Dartmouth Health.

9         And the testimony by friends, many of

10   Dr. Porter's friend that testified were all in

11   other divisions or other subdivisions of

12   Dartmouth Health.  That doesn't change the fact

13   that Dr. Porter was not a unicorn.

14        And to be sure, you heard Dr. Chertoff,

15   right?  She testified she's interpreted over

16   10,000 gynecologic and early obstetric

17   ultrasounds.  That's undisputed.  That's

18   unrebutted testimony.  There's nothing to

19   contradict that.

20        But Dr. Chertoff was already clear that,

21   you know, I wasn't the only one, but as the

22   chair she certainly had that expertise.  And

23   they routinely handled gynecologic and early

24   obstetric ultrasounds on a daily, weekly,

25   monthly basis.  They have six ultrasound rooms

109

1      there.

2              Now, what about possible reassignment to

3      the OB/GYN department?  Dr. Porter testified

4      that three weeks after the REI division closure

5      she wrote a letter to Dr. Merrens, Dr. Padin and

6      others.  Exhibit B-12.  That's the May 25, 2017

7      letter, okay?  This is a key document.

8              There's a lot of important documents in

9      this case, but I would submit that this is a key

10     document.  And it's interesting, out of the

11     seven exhibits that we heard in the initial

12     closing statements, this was not one of them.

13     This is a key document for you to review because

14     why?

15             Dr. Porter send it three weeks after she

16     received notification in person that the REI

17     division was being shut down.  She obviously

18     took a long time to write the letter.  It's

19     important for what is in it and what is not in

20     it.  Please review it when you can.

21             She doesn't mention anything about being

22     treated differently by Dartmouth Health as a

23     result of her condition or any complaints about

24     anything; patient harm, patient safety, anything

25     about Dr. Hsu or Seifer.

110

1          If anything, all she does is try to show,

2     well, you know, compared to the other two

3     doctors I'm much more superior, and you should

4     keep me in some capacity.

5          Now, as you heard, she had the same legal

6     counsel in this case, Mr. Vitt, as she did back

7     in 2013, and she had every opportunity in this

8     letter, three weeks after, to raise any issues

9     in this letter on the claims that are now in her

10    lawsuit.  She didn't raise them in the letter,

11    and she didn't raise them in her meeting with

12    the head of human resources.  Think about it.

13         We can go back to C-13 for a second, and

14    then I'll come back.  We'll go to the second

15    page.

16         This is a letter where she meets with the

17    head of HR, the head of HR for the entire

18    Dartmouth Health system.  This is in response to

19    your letter dated May 25 and to the questions

20    she posed during this meeting on May 26th,

21    right?

22         Okay, now, go back to the B-12 for -- if

23    you would.

24         In the document she says, quote, As a

25    gynecologic surgeon I perform complex

111

1    hysteroscopic -- this is definitely

2    challenging -- laparoscopic and robotic

3    procedures not offered by many, if not most of

4    the other gynecologists, end quote.  That was

5    Dr. Porter's words.

6           Now, what can you glean from those words?

7    Well, one, she's actually admitting that other

8    people at Dartmouth Health actually do these

9    things, right?  Other people.  Not many, if not

10   most, but that leads you to think, well, there's

11   a couple people that do that.

12          And Dr. -- we'll get to Dr. Padin in a

13   second.  And you heard from her, right?

14   Dr. Padin, she testified not once but twice.

15   And during her first round of testimony

16   Dr. Padin could not be more clear.

17          In 2017, June/July, 2017 the hospital

18   needed a generalist to assist in labor and

19   delivery.  And despite Dr. Porter's dual

20   appointment in OB/GYN and radiology, she didn't

21   have current credentials or privileges in

22   obstetrics.  There is no dispute about that.

23   This is not a factual dispute.  Dr. Porter did

24   not have privileges in obstetrics, period, full

25   stop.

112

1          When Dr. -- and it's clear from the

2     record that because she didn't have those

3     privileges, she was not qualified to be

4     reassigned to that position in the OB/GYN

5     department in the summer of 2017.

6          And during her second stint of testimony

7     Dr. Padin, this past Friday, which also seems

8     like a long time ago, Dr. Padin says she

9     performed many procedures under the umbrella of

10    the reproductive endocrinology, advanced

11    laparoscopies -- I'm definitely saying that

12    wrong -- myomectomies, robotic surgeries.

13    Right?  She said all these things.  She

14    performed these surgeries.

15         And, remember, Dr. Padin is the one that

16    proctored that surgery back in April for

17    Dr. Porter, and she proctored it because she has

18    those privileges.  She does those surgeries.

19         There was no vacant, open, existing open

20    position for Dr. Porter at that point.  And

21    under the law we submit, under the ADA Rehab

22    Act, the state disability discrimination laws,

23    there was no open vacant position for her to be

24    reassigned to as a potential reasonable

25    accommodation.

113

1           Let me turn to whistleblower retaliation

2      and why Dr. Porter cannot establish pretext, and

3      you heard a little bit about that from

4      Ms. Nunan.

5           Dr. Merrens had no knowledge of

6      Dr. Porter's long trail of complaints about the

7      other REI positions, meaning Dr. Hsu and Seifer,

8      which dated back many years.

9           And, by the way, when we look at

10     retaliation, think about that issue for a

11     second.  Well, her complaints about Dr. Hsu

12     started in 2013, and somehow, even though she

13     had complaints in 2013, '14, '15, '16, '17 about

14     Dr. Hsu, somehow those complaints are the reason

15     why she was terminated in May of '17.  It

16     doesn't ring true.  It just doesn't.

17          Again, the evidence in the record, the

18     exhibits before you, the witness testimony,

19     which is corroborated, all of the points that

20     I've presented to you.

21          She can't be considered a whistleblower

22     because here Dr. Merrens had no knowledge of

23     Dr. Porter's history of complaints.  His

24     decision to close the REI division was his

25     decision alone, and Dr. Porter didn't make any

114

1    comments to Dr. Merrens.  And think about that,

2    right?

3            Back in 2012, 2013, she's got this

4    dispute with the OB/GYN chair.  She has

5    Dr. Merrens there as kind of a neutral.  She

6    says very glowing things about him in

7    Exhibits B, C and D, which are admitted into

8    evidence, and then she doesn't go back to him

9    when she's having any problems with anyone else

10   in the REI division.

11           While she -- the record is clear.  While

12   she had relied upon his counsel and guidance on

13   other earlier occasions, she had not spoken to

14   him in a couple years.  She certainly knew that

15   she could reach out to him.  She didn't do it.

16           Now, what about the other people

17   involved?

18           Daniel Herrick, he says he didn't have

19   any knowledge of complaints or concerns about

20   Dr. Porter on anything.  Heather Gunnell, ditto.

21           Now, Leslie DeMars certainly had been in

22   communication with Dr. Porter about her range of

23   grievances with Dr. Hsu and Seifer, but she

24   was -- the record is clear in this case that she

25   didn't tell Merrens, Herrick, or Gunnell about

115

1          Dr. Porter's complaints regarding Dr. Hsu and

2      Seifer.

3               Let me just say that one more time

4      because it's important.  She didn't tell

5      Merrens, Herrick, or Gunnell about Dr. Porter's

6      specific complaints regarding Hsu and Seifer.

7               And that brings you then to the reason

8      why there's no causal connection, right?

9      There's an issue of engaging in protected

10     activity.  There's an adverse employment action.

11     But the third prong of that, of a prima facia

12     case for retaliation is a causal connection

13     between the two things.  There has to be a

14     causal connection.

15              Dr. Porter's complaints about other

16     physicians and nurses dates back at least ten

17     years, and you heard from Dr. Stern, Kelly

18     Mousley, Katie Mansfield, so it's not surprising

19     that Dr. Porter had complaints about her newer

20     colleagues.

21              And from shortly after Dr. Hsu started

22     until the time of her termination, Dr. Porter

23     reported concerns to Dr. DeMars.  We're not

24     saying that she didn't do that.  We're not

25     saying that.  We're just saying that those

116

1      complaints, whatever they are, had nothing to do

2      with her termination of her employment when they

3      closed the REI division.

4              Because, remember, to the extent that

5      Dr. Porter raised complaints in 2014, in 2015,

6      in 2016 about Dr. Hsu, nothing negative happened

7      to Dr. Porter during any of those periods of

8      time.

9              You also heard testimony, and this is

10     important for purposes of understanding the

11     evidence and whether or not Dr. Porter meets her

12     burden of proof.  There were similar complaints

13     by others in the REI division; Beth Todd,

14     numerous complaints about Dr. Hsu and Seifer.

15             And while Dr. Porter complains she was

16     retaliated against for making those identical

17     complaints and for failing to be reassigned to

18     an unknown, unspecific position, Beth Todd is

19     still gainfully employed at Dartmouth Health

20     today.

21             And you saw in Exhibit C-13, the last

22     page talked about the fact that Beth Todd

23     actually had a dual appointment and actually did

24     a lot of work in OB/GYN, and she's the one

25     person, the nurse practitioner who remained

117

1    employed at Dartmouth Health.

2         Finally -- and I appreciate everybody's

3    patience in listening and attentiveness -- let

4    me get to the subject of damages.

5         We didn't put an expert on the stand

6    because we don't think you should even get to

7    the subject of damages at all, but let me make a

8    few comments about it.

9         You heard from Dr. Bancroft, Dr. Porter's

10   quote, unquote, hired gun.  You have to make a

11   decision on whether or not he was credible after

12   multiple iterations of multiple reports and

13   multiple conclusions about multiple numbers.

14        Yes, it's true, lawyers aren't great at

15   math, but I'm not sure that this guy is either.

16   And some of the members of the jury would

17   remember an SNL character by Jon Lovitz who

18   always said, Yeah, that's the ticket, and that's

19   exactly who Dr. Bancroft is.  Anything that

20   Dr. Porter said or Dr. Porter's counsel said to

21   him, he created new assumptions, he created new

22   facts, and that's how he came up with his

23   numbers.

24        You remember he said, Well, actually I

25   didn't even have the documents initially.  I

118

1    threw them away.  But then he said my house

2    burned down, and then he wasn't sure where they

3    were.  But on cross-examination he admitted that

4    he hadn't been told some critical information.

5         Now, what is in the record is the fact

6    that his opinions vary dramatically over the

7    years.  At one point he said it was 4.3 million

8    dollars, and then it dropped all the way down to

9    1.7 million dollars but it was still a grossly

10   inflated number.

11        And then you get to the retirement age.

12   In his earlier reports he said, well, you should

13   look at 65 years old as the date she would

14   retire.  But when he had to actually reduce all

15   of these assumptions for her potential damages

16   all the way through 2033, he now says,

17   magically, well, you got to assume that she was

18   going to work until she was 70.

19        But it didn't stop there in terms of his

20   manipulation of the assumptions.  All of this is

21   speculation and in an obvious attempt to juice

22   up the numbers because he's moving the -- it's a

23   sliding scale, and all of his reports are all

24   over the place based on different assumptions.

25        And only this latest analysis, which he

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 805 of 945

2:17-cv-00194-kjd    Document 35.23    Filed 06/16/25    Page 805 of 945

1    did five days before trial where he had to now

2    acknowledge that Dr. Porter was a full-time

3    professor, doesn't really come through.

4         He now had -- he also tries to make an

5    assumption.  Well, she was going to reduce her

6    schedule from 1.0 to .75 in July of this coming

7    year.  But when Mr. Coffin actually asked him to

8    do the analysis, to do an apples-to-apples

9    comparison, like, okay, if you're making

10   assumptions that she was going to be 1.0 FTE,

11   full-time equivalent at Dartmouth Health, you

12   should at least do the same when she was working

13   at UVM.

14        If he did the math, and he asked him to

15   do it, and whether he disagreed with him or not,

16   there was no basis for economic damages because

17   by 2025 and further on she was actually earning

18   more at UVM.  There's no basis for economic

19   damages.  There's no basis for emotional

20   distress.  There's no basis for punitive

21   damages, which is even an higher standard that

22   Dr. Porter can't meet.

23        Because, remember, this comes back to

24   credibility of witnesses and corroboration of

25   evidence.

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 806 of 945

2:17-cv-00194-kjd    Document 353-23    Filed 06/18/25    Page 120 of 145

1          There are 90 exhibits and 20 witnesses.

2     All of you listened to the evidence intently,

3     took notes throughout the trial.  Everybody

4     appreciates that.

5          My final thoughts.  Dartmouth Health's

6     closure of the REI division in 2017 was done

7     after thoughtful deliberation relating to its

8     continuing viability.  Dr. Merrens, Dr. Padin,

9     Daniel Herrick, Heath Gunnell all testified it

10     was the right call.

11          Dr. Merrens was here with you throughout

12     the entire trial.  You've got to judge his

13     credibility, too, right?  His testimony was

14     unwaivering.  He was emphatic.  He made the

15     decision to shut down the REI division

16     altogether.  He had no knowledge, no knowledge

17     of Dr. Porter's disability, no knowledge of her

18     complaints regarding Dr. Hsu and Seifer.  Yet,

19     he's the one that made the decision, and that's

20     where legally Dr. Porter's claims fall apart.

21          He made the decision to shut down the REI

22     division because it was a dumpster fire, for

23     lack of a better term.  It was never about

24     Dr. Porter.  It was about an unsalvageable

25     program.  That's what the Value Institute said.

121

```
 1              And plaintiff's theory of the case

 2      consists of the following.  Dartmouth Health

 3      concocted a plan to terminate her by closing an

 4      entire division, something it had never done

 5      before.

 6              Ask yourself, would Dartmouth Health

 7      really have shut down a whole division,

 8      something it's never done before, just to get

 9      rid of one employee, especially a talented

10      surgeon like Dr. Porter?

11              And I want you to look at the record.

12      Look at the testimony and the exhibits against

13      the credibility of the witnesses who came before

14      you.

15              Respectfully we request that you render a

16      verdict on behalf of Dartmouth Health in this

17      case on all of Dr. Porter's claims.

18              Thank you.

19              THE COURT:  Okay.  Any rebuttal from the

20      plaintiff?

21              REBUTTAL CLOSING ARGUMENT ON BEHALF OF

22      PLAINTIFF:

23              MS. NUNAN:  Attorney Schroeder stated

24      that Dr. Porter had shamelessly exploited

25      Patient Eunice Lee.
```

BENTLEY COURT REPORTING

122

1          I specifically asked Eunice Lee why she

2     had chosen to come forward and tell her very

3     personal and painful story about her experience

4     at Dartmouth Health.  She was harmed by Dr. Hsu.

5     Her response was, I'm one of many women, and I

6     do not want to be a faceless name on a billing

7     statement.

8          Her testimony came in the face of

9     Dr. Merrens' statement at this trial:  I am not

10    aware of any actual harm.  D-H does not want to

11    talk about patient harm.  It does not want you

12    to consider patient harm, and this is why

13    Dr. Porter spoke up.  She could not tolerate it.

14    She would not be quiet about it, and she could

15    not watch these two doctors operate

16    incompetently.

17         If Dr. Porter had accepted the severance

18    package that Dr. -- that Attorney Schroeder

19    keeps pointing out, all of this would have been

20    swept under the rug.  She wouldn't have been

21    able to talk about it.

22         Attorney Schroeder labeled the women who

23    came forward; Sharon Parent, Julia MacCallum,

24    Vicky Maxfield, Janice Gonyea, and Dr. Karen

25    George as Dr. Porter's friends.  This is

123

1    insulting.  These are women who have decades of

2    professional experience as nurses and doctors

3    who take their duty to report seriously, their

4    duty to come and speak in public about these

5    issues seriously.  They are not Dr. Porter's

6    friends first.  They're professionals first.

7          Dr. Julia MacCallum testified that she

8    reported what she saw in the OR at Dartmouth

9    Health in 2015; Dr. Hsu's ripping and yanking in

10   surgery.  She reported that as a resident way

11   before she became close with Dr. Porter.

12         Hospital transparency matters.  It

13   matters all the way to the top.  What

14   Dr. Merrens says, what Dr. Conroy says, the

15   public has to trust what top administrators --

16   that they're going to tell the truth.

17         What he says, what Dr. Merrens says to

18   the staff and what he says to the media matters.

19   The public has to trust that when they go to D-H

20   to get services, women -- women like you, like

21   your mom, your daughter, that the people who are

22   there performing the procedures are qualified.

23         Dartmouth administrators had noticed in

24   the summer of 2016 that they had two incompetent

25   doctors on their hands.  They allowed them to

124

1    perform procedures on women for another

2    12 months.

3         This case is about patient harm and

4    Dr. Porter holding Dartmouth Hitchcock

5    accountable by speaking up loudly about it.

6         THE COURT:  Okay, so that concludes

7    closings arguments.

8         The next part of the case I'll be

9    instructing you on the law.  We're going to take

10   our lunch break before I do that, but I do want

11   to remind you, you do not have the case yet for

12   deliberation, so you should not be speaking with

13   each other.  You should not be researching the

14   case.  You should not be talking to anyone about

15   the case.

16        I'll ask you to come back and be ready to

17   go at 12:45, at which time I will provide you

18   instructions.

19        Okay?  Thank you.

20        THE CLERK:  All rise for the jury.

21        (The jury left the courtroom at

22   11:38 a.m.)

23        (Court officers were administered their

24   oath by the Clerk of Court.)

25        THE CLERK:  All rise.

(859 of 993), Page 859 of 993
2217tev00094kjd Document35123 Filed06/18/258 Page121 of 145
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 811 of 945

1           (Judge Doyle entered the courtroom.)

2           THE COURT:  Issue to be taken up?

3           MR. SCHROEDER:  Yes, your Honor.

4    Defendants want to move to strike the rebuttal

5    statement for this specific reason; that what

6    Ms. Nunan said quoting Eunice Lee was not

7    actually what she said in the trial, as evidence

8    in the record.

9           What Ms. Nunan said was, quote,

10   attributing it to Ms. Lee, I'm one of many

11   women, and I don't want to be a faceless name on

12   a billing statement, end quote.  That's not what

13   she said.

14           In fact, she said, I can't be the only

15   woman who is finding out about this way and the

16   only woman who for years has been wondering did

17   I do something wrong and was this my fault.

18           So, first of all, one, it wasn't said,

19   and so attributing a quote to evidence in the

20   record.  All of our quotes were from the actual

21   transcript, number one.

22           Number two, it wasn't said, and so

23   there's the assumption that that was said, as if

24   that's evidence.

25           Three, it implies that there's other --

126

1    there's other patients or other women that had

2    made any complaints about Dr. Hsu.

3           And, fourth, it contradicts actually what

4    she testified to.  She has no idea.

5           So I wasn't going to do it during her

6    rebuttal because I think that's poor form, but

7    we're moving to strike that statement from the

8    rebuttal statement because it is not accurate.

9    It's not what the evidence in this record is.

10   It's highly prejudicial, and it leaves -- it

11   leaves sentiments of something that there is no

12   evidence in the record to support.

13          THE COURT:  Okay.  Can you read again for

14   me the statement that was made during rebuttal

15   and the statement that you believe was made

16   during the trial?

17          MR. SCHROEDER:  Yes, your Honor, we

18   checked with the court reporter.

19          The statement made during rebuttal was,

20   and attributing to Eunice Lee, quote, I'm one of

21   many women, and I don't want to be a faceless

22   name on a billing statement, end quote.

23          THE COURT:  Okay.

24          MR. SCHROEDER:  That was never said in

25   the trial of this case.

127

1           What she did say in the transcript of the

2     trial of this case is, I can't imagine what --

3     well, two things.

4           I can't be the only woman who is finding

5     out about it this way and the only woman who for

6     years has been wondering did I do something

7     wrong or was this my fault, question mark, and

8     not knowing what.

9           Further down in her answer, I can't

10    imagine what other women are going through, and

11    I kept thinking there has to be a face to this

12    and a person who was assigned to this that --

13    that this is what it has caused and the pain is

14    still here and just as raw after ten years, end

15    quote.

16          THE COURT:  Okay.

17          Plaintiff?

18          MR. JONES:  We're trying to pull up the

19    transcript, but I believe it is a very fair

20    summary of what was said.

21          There were two statements that Ms. Lee

22    made in her testimony.  One was referencing

23    other women and that she was one of other women,

24    and the other one was that she, when asked why

25    she was doing this, there was a reference to not

128

1          just being a faceless name on a billing

2          statement.  That was, I believe, in the

3          testimony.

4                   MR. SCHROEDER:  Judge, we actually

5          ordered the transcript.

6                   MR. JONES:  So did we.

7                   MR. SCHROEDER:  The whole transcript?

8          You did?

9                   MR. JONES:  Parts.

10                  MR. SCHROEDER:  Parts.  You didn't order

11         that part.

12                  Judge, I would ask the Court to just

13         please review this issue.  It's highly

14         prejudicial.  That testimony should -- we've

15         already had our arguments on that issue of

16         whether or not the testimony should have even

17         happened, but this is now going one step beyond

18         even that, and I respectfully ask the Court to

19         please review it.

20                  THE COURT:  Okay.  And are you asking for

21         it to be stricken and not replaced by the actual

22         testimony on that point?  Just stricken?

23                  MR. SCHROEDER:  I ask that it be stricken

24         completely.  I don't think it should be replaced

25         at all.

129

1     THE COURT:  Okay.  So I am going to want

2     written copies of the two statements that you

3     just mentioned.  I didn't write it down.  I was

4     listening to you.

5          MR. SCHROEDER:  That's okay.  I'll be

6     happy to get that.

7          Well, I'd have to ask the court reporter

8     to print it out first, but we took it down

9     verbatim.

10         THE COURT:  Okay.  Anything further from

11    plaintiff in response to this about a potential

12    remedy?

13         MS. NUNAN:  Okay.  And, but the third

14    party, and maybe this -- like the most important

15    part for me is I keep thinking, what about us?

16    Like what about the patients?  I can't be the

17    only woman who is finding out about it this way

18    and the only woman who for years has been

19    wondering did I do something wrong, and was this

20    my fault?  And not knowing what, and just like

21    anger and disappointment and sadness.  I didn't

22    want us to just be nameless patients out of like

23    a billing statement.

24         THE COURT:  That's the trial testimony?

25         MS. NUNAN:  This is on Page 19 of the

130

1    trial transcript of Eunice Lee.

2            THE COURT:  So please provide me with

3    both statements.  I'm going to take a look at it

4    before we bring the jury back.  Okay?

5            THE CLERK:  All rise.

6            (Judge Doyle left the courtroom at

7    12:56 p.m.)

8            (The court reporter provided Judge Doyle,

9    in chambers, the statement from Ms. Nunan's

10   closing argument.)

11           (The following took place in open court

12   without the jury present, at 1:08 p.m.)

13           THE COURT:  Okay.  So with respect to the

14   request to strike the statement made during

15   rebuttal, I have reviewed the trial testimony of

16   Ms. Lee as well as the statement that was made

17   in plaintiff's rebuttal.

18           So with respect to the trial testimony,

19   this is a reference to Page 19, the relevant

20   part, Lines 4 to 20.  In the trial testimony

21   Ms. Lee, again in relevant part, said, I can't

22   be the only woman who is finding out about it

23   this way and the only woman who, for years, has

24   been wondering did I do something wrong and was

25   this my fault.  And not knowing that, and it

1    just -- I have like anger and disappointment and

2    sadness, and I didn't want us just to be these

3    nameless patients out of like a billing

4    statement.  So that is the trial testimony.

5         The statement on rebuttal is, quote -- by

6    Ms. Nunan attributing this to Ms. Lee -- I am

7    one of many women, and I don't want to be a

8    faceless name on a billing statement.

9         So I don't think -- well, first off,

10   counsel is permitted to summarize testimony that

11   came in at trial.  It certainly can't be

12   inaccurate, but I don't think in comparing these

13   two statements that the message is frankly that

14   inconsistent.

15        It's a reference to other women not being

16   a faceless name on a billing statement, so I

17   just don't think that rises to the level that I

18   need to strike it.  So I won't be striking that

19   statement from the record.

20        Okay.  Is there anything else to take up

21   at this time, or can we bring the jury in?

22             MR. JONES:  Not from us.

23             MR. SCHROEDER:  Nothing, your Honor.

24             (The jury entered the courtroom at

25   1:11 p.m.)

132

JURY CHARGE BY THE COURT:

1

2          THE COURT:  Members of the jury, at this

3     time I'm going to be providing you with my

4     instructions that will guide your deliberations.

5          As you can see on your seats, you have

6     also received a written copy.  This is the jury

7     instructions charge that I will be reading to

8     you now so you can follow along.  It is a

9     33-page document, so it may take a little while,

10    but okay.

11         Now that you have heard the evidence and

12    arguments, it is my duty to instruct you on the

13    applicable law.  My instructions come in two

14    parts.

15         The first part consists of general

16    instructions about the task of the jury and the

17    rules and principals that should guide you in

18    your deliberations.  The second part consists of

19    instructions that apply to the specific claims

20    and defenses in this case.  I ask that you pay

21    equal attention to both parts.

22         It is your duty as jurors to follow the

23    law and to apply it to the facts as you find

24    them from the evidence presented in the

25    courtroom.  You are not to single out one

133

1    instruction alone as stating the law but must

2    consider the instructions as a whole.

3         You are not to be concerned with the

4    wisdom of or reason behind any rule of law

5    stated by the Court.  Regardless of any opinion

6    you may have as to what the law is or ought to

7    be, it would be a violation of your sworn duty

8    to base a verdict on any view of the law other

9    than that given to you in these instructions.

10        It would also be a violation of your

11   sworn duty as judges of the facts to base a

12   verdict upon anything other than the evidence

13   presented during the trial.

14        The lawyers have referred to some of the

15   rules of law in their arguments.  If any

16   difference appears between the law as stated by

17   the lawyers and the law as stated by the Court

18   in these instructions, you must follow the

19   Court's instructions.

20        Our judicial system requires that you

21   carefully and impartially consider all of the

22   evidence, follow the law, and reach a just

23   verdict regardless of the consequences.

24        Jurors as finders of fact/rulings of the

25   Court:

134

1          You and you alone are the triers of the

2     facts.  Each of you as jurors must determine the

3     facts for yourself in reaching a verdict.  By

4     the rulings that I made during the course of the

5     trial I did not intend to express my own views

6     about this case.

7          Sympathy/prejudice:

8          Neither sympathy nor prejudice for or

9     against the parties or any other person involved

10    with this case should influence you in any

11    manner in reaching your verdict.  Your

12    deliberations should be well reasoned and

13    impartial.

14          Evidence in the case:

15          The evidence in this case consists of the

16    sworn testimony of the witnesses, the exhibits

17    admitted into evidence and any stipulated facts,

18    regardless of which party presented the

19    evidence.

20          When the attorneys on both sides

21    stipulate or agree to the existence of the fact,

22    you must, unless other instructed, accept the

23    stipulation and regard that fact as proved.  You

24    may give the stipulated fact, like any other

25    evidence, the weight you think it deserves.

1       Any evidence that has been stricken or

2  excluded, as when an objection is sustained by

3  the Court, must be disregarded, and you may not

4  consider it in rendering your verdict.

5       Arguments, statements, objections of the

6  attorneys:

7       The opening statements and closing

8  arguments of the attorneys, their questions and

9  objections and all other statements they made

10  during the course of the trial are not evidence.

11  The attorneys have a duty to object to evidence

12  that they believe is not admissible.  You should

13  not draw any conclusions or make any judgment

14  from the fact that an attorney has objected to

15  the evidence.

16       The Court's ruling on objections:

17       From time to time the Court has been

18  called on to determine the admissibility of

19  certain evidence following the attorney's

20  objections.  You should not concern yourself

21  with the Court's reason for any rulings on

22  objections.

23       Whether offered evidence is admissible is

24  purely a question of law for the Court and not a

25  concern of the jury.  In admitting evidence to

136

1    which objections have been made, the Court does

2    not determine what weight should be given to

3    that evidence, nor does it assess the

4    credibility of the evidence.

5         If the Court excludes evidence in

6    response to an objection, attorney's objection,

7    you will dismiss the evidence from your mind

8    completely and entirely, and you will refrain

9    from the speculation about the nature of any

10   exchange regarding the evidence between the

11   Court and the attorneys held out of your

12   hearing.

13        Evidence, direct or circumstantial:

14        There are two types of evidence from

15   which you may find the facts of this case;

16   direct and circumstantial.

17        Direct evidence is the testimony of

18   someone who asserts actual knowledge of a fact,

19   such as an eyewitness.

20        Circumstantial evidence is prove of a

21   chain of facts and circumstances tending to

22   prove or disprove an issue in the case.

23        For example, if a witness were to testify

24   that he or she had seen cows in a field, that

25   would be an example of direct evidence that

137

1       there were cows in a field.

2               On the other hand, if a witness were to

3       testify that he or she had seen cow tracks in

4       the field, that would be an example of

5       circumstantial evidence that there had been cows

6       in the field.

7               The law does not require a party to prove

8       its claims or defenses by direct evidence alone.

9       Rather, one or more of the essential elements of

10      each of the claims or defenses may be

11      established by a reasonable inference from other

12      facts which are established by direct testimony.

13              And circumstantial evidence alone may be

14      sufficient proof.  The law makes no distinction

15      between the weight to be given to direct or

16      circumstantial evidence, nor is a greater degree

17      of certainty required with circumstantial

18      evidence than of direct evidence.  You should

19      consider all the evidence in the case and give

20      it as much or as little weight as you think it

21      deserves.

22              Credibility of the witnesses:

23              You are the sole judges of the

24      credibility of the witnesses, and the weight to

25      give their testimony is up to you.  In

138

1      considering the testimony of any witness, you

2      may take into account his or her ability and

3      opportunity to observe, his or her demeanor

4      while testifying, any interest or bias he or she

5      may have, and the reasonableness of his or her

6      testimony considered in light of all the

7      evidence in the case.

8           Consider, also, any relation each witness

9      may bear to either side of the case, any bias or

10     prejudice, the manner in which each witness

11     might be affected by the verdict, and the extent

12     to which each witness's testimony is either

13     supported or contradicted by other evidence in

14     the case.

15          Inconsistencies or discrepancies in the

16     testimony of a witness or between the testimony

17     of different witnesses may or may not cause you

18     to discredit a witness's testimony.  Two or more

19     persons witnessing an incident or transaction

20     may see or hear it differently.  It is your duty

21     to reconcile conflicting testimony, if you can.

22          In weighing the effect of a discrepancy

23     consider whether it pertains to a matter of

24     importance or to an unimportant detail and

25     whether the discrepancy may result from innocent

(873 of 993), Page 873 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 825 of 945
2:17-cv-00044-kjd   Document 35.23   Filed 01/16/25   Page 135 of 145

1    error or intentional falsehood.

2         You may give the testimony of each

3    witness the amount of weight you think it

4    deserves.  You may believe all of it, part of

5    it, or none of it at all.  You do not have to

6    accept the testimony of any witness, even if it

7    is uncontradicted.  It is for you to say what

8    you believe and disbelieve.

9         In other words, what you must try to do

10   in deciding credibility is to size up a witness

11   in light of his or her demeanor, the

12   explanations given, and all the other evidence

13   in the case.  Always remember that you should

14   use your common sense and good judgment.

15        Impeachment of a witness:

16        A witness may be discredited or impeached

17   by contradictory evidence by a showing that the

18   witness testified falsely concerning a matter or

19   by evidence that at some other time the witness

20   said or did something inconsistent with the

21   witness's present testimony.

22        It is your exclusive province to give

23   testimony of each witness whatever degree of

24   credibility or amount of weight you think it

25   deserves.  If you find that a witness testified

(874 of 993), Page 874 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 826 of 945
2:17-cv-00044-kjd Document 33-23 Filed 01/18/23 Page 826 of 945

140

1          untruthfully in some respect, you may consider

2          that fact in deciding what credence to attach to

3          other testimony from that witness.

4               Considering that fact, as well as all

5          other relevant evidence, you may accept or

6          reject testimony of the witness in whole or in

7          part.  In making this determination, you may

8          consider whether the witness purposely made a

9          false statement or merely made an innocent

10         mistake, whether the inconsistency concerns an

11         important fact or a small detail, and whether

12         the witness had a reasonable explanation for the

13         inconsistency.

14               Expert witnesses:

15               You have heard evidence from one witness,

16         Dr. Robert Bancroft, who is known as an expert

17         witness.  An expert witness is a person who has

18         special knowledge, experience, training, or

19         education in his or her profession or area of

20         study.  Because of his expertise, an expert

21         witness may offer an opinion about one or more

22         of the issues in the case.

23               In evaluating the testimony of

24         Dr. Bancroft in this case you should evaluate

25         his credibility and statement just as you would

141

1    for any other witness.  You should also evaluate

2    whether Dr. Bancroft's opinion is supported by

3    the facts that have been proved and whether the

4    opinion is supported by Dr. Bancroft's

5    knowledge, experience, training, or education.

6         You are not required to give the

7    testimony of Dr. Bancroft any greater weight

8    than you believe it deserves just because he has

9    been referred to as an expert witness.

10        Number of witnesses:

11        The fact that one side may have called

12   more witnesses than the other side is of no

13   significance.  Your task is to evaluate the

14   credibility of witnesses and to weigh all of the

15   evidence.

16        Personal knowledge and experience of

17   jurors:

18        In deliberating you are not expected to

19   put aside your common sense, nor your own

20   observations and life experience.  However, a

21   juror having special knowledge of a subject may

22   neither state this knowledge to fellow jurors,

23   nor act upon it himself or herself in arriving

24   at a verdict.  You must not tell your fellow

25   jurors about matters that are based on your own

142

1       special knowledge concerning an issue in a case

2       that did not come from the evidence received in

3       the courtroom.

4             As jurors your job is to decide this case

5       based solely on the evidence presented during

6       the trial and my instructions to you.  As you

7       were instructed at the beginning of the trial,

8       you are not to investigate or research the law

9       or facts relevant to the trial.

10            I remind you that you must not seek or

11       receive any information about this case from the

12       internet, including Google, Facebook, Wikipedia,

13       or any other websites or from any other source,

14       including newspapers, magazines, law books or

15       dictionaries.  Do not search for or receive any

16       information from the party, the lawyers, the

17       witnesses, the evidence, the law, or any place

18       or location mentioned in the trial.

19            Until I tell you that your jury service

20       is completed, do not communicate with anyone,

21       including your family and friends, about the

22       evidence or issues in this case.

23            Burden of proof/preponderance of the

24       evidence:

25            Because Dr. Porter is the one bringing

(877 of 993), Page 877 of 993 Case: 25-1382 12/22/2025 DktEntry: 35.4 Page 829 of 945
2:17-cv-00194-kjd Document 33-23 Filed 01/18/28 Page 123 of 195

143

1    this case, she has the burden of proof.  She

2    must prove each essential element of the claim

3    she alleges by what is known as a preponderance

4    of the evidence; i.e., the greater weight of the

5    evidence.

6         To establish a fact by a preponderance of

7    the evidence means to prove that the fact is

8    more likely true than not.  In other words, a

9    preponderance of the evidence means evidence

10   that, when considered and compared with the

11   evidence opposed to it, has more convincing

12   force and produces in your minds a belief that

13   what is sought to be proved is more likely true

14   than not true.

15        A preponderance of the evidence refers to

16   the quality and persuasiveness of the evidence,

17   not to the number of witnesses or documents.

18        In determining whether a claim has been

19   proven by a preponderance of the evidence, you

20   may consider the relevant testimony of all the

21   witnesses regardless of who called them, and all

22   exhibits received into evidence regardless

23   perform who submitted them.

24        If you find that the credible evidence on

25   an issue is evenly divided between the parties,

144

1      you must decide that issue against the party

2      having the burden of proof.  That rule follows

3      from the fact that the party bearing its burden

4      must prove more than simple equality of

5      evidence.  He or she must prove the element at

6      issue by a preponderance of the evidence.

7           On the other hand, the party with its

8      burden of proof need prove no more than a

9      preponderance.  So long as you find that the

10     scales tip, however slightly, in favor of the

11     party with its burden of proof, meaning what

12     that party claims is true is more likely true

13     than not true, then that element will have been

14     proven by a preponderance of the evidence.

15          If, after considering all the evidence,

16     you are satisfied that Dr. Porter has carried

17     her burden on at least one of the claims she

18     alleges, then you must find for Dr. Porter on

19     that, those claims.

20          On the other hand, if after such

21     consideration you find the evidence to be in

22     balance or equally probable, or if you find the

23     evidence tips in favor of Dartmouth Health, then

24     Dr. Porter has failed to sustain her burden and

25     you must find for Dartmouth Health on those

145

1      claims.

2              All persons equal before the law:

3              The fact that Dartmouth Health is a

4      corporation and Dr. Porter is an individual must

5      not enter into or affect your verdict.  This

6      case should be considered and decided by you as

7      a dispute between parties of equal standing in

8      the community.  All persons, both corporations

9      and individuals, stand equal before the law and

10     are to be treated as equals in a court of

11     justice.

12             Corporation acts through its employees:

13             Defendants Dartmouth Hitchcock Medical

14     Center, Dartmouth-Hitchcock Clinic, Mary

15     Hitchcock Memorial Hospital, and

16     Dartmouth-Hitchcock Health referred to

17     throughout this trial and in this document as

18     Dartmouth Health are corporate entities.

19             A corporation acts through its employees.

20     Therefore, the act of a Dartmouth Health

21     employee that occurred while he or she was on

22     duty and acting within the scope of his or her

23     employment duties shall be consider the act of

24     Dartmouth Health.

25             Influenced decisionmaker:

146

1           An employee may be liable for unlawful

2      acts even when so-called neutral decisionmakers

3      made a final decision regarding the act if the

4      employee proves by a preponderance of the

5      evidence that the neutral decisionmaker relied

6      on a supervisor who had an unlawful bias or

7      retaliatory motive against the employees.

8           In other words, if you find that

9      Dr. Merrens was the decisionmaker regarding the

10     termination of Dr. Porter's employment without

11     reassignment to another position at Dartmouth

12     Health and if you find that Dr. Merrens did not

13     personally have an unlawful bias or retaliatory

14     motive against Dr. Porter, Dartmouth Health may

15     nonetheless be held liable if you find, by a

16     preponderance of the evidence, that a supervisor

17     of Dr. Porter's, like Dr. DeMars, had an

18     unlawful bias or retaliatory motive to terminate

19     Dr. Porter without reassignment to another

20     position at Dartmouth Health and Dr. Merrens

21     relied on that supervisor when deciding to

22     terminate Dr. Porter's employment without

23     reassignment to another position at Dartmouth

24     Health.

25           Overview of claims:

(881 of 993), Page 881 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 833 of 945
2:11-cv-00194-kjd   Document 33123   Filed 01/16/25   Page 133 of 145

147

1        As you have seen and heard in this trial,

2    this is an employment lawsuit brought by

3    Dr. Misty Blanchette Porter against Dartmouth

4    Health.  Dr. Porter claims that she was

5    terminated by Dartmouth Health because of her

6    whistleblower complaints about conduct by other

7    physicians and because of her disability.

8        Dartmouth Health claims it had

9    legitimate, non-discriminatory business reasons

10   for terminating employment of Dr. Porter in

11   conjunction with the closure of Dartmouth

12   Health's Reproductive, Endocrinology and

13   Infertility (REI) Division.

14       Now I will instruct you regarding each of

15   Dr. Porter's claims; one, violation of the New

16   Hampshire Whistleblowers' Protection Act; two,

17   disability discrimination and retaliation under

18   the Americans with Disabilities Act (ADA), the

19   Rehabilitation Act, and the applicable laws of

20   New Hampshire and Vermont; three, wrongful

21   discharge under New Hampshire law; and, four,

22   retaliation under the applicable laws of New

23   Hampshire.  I will also instruct you regarding

24   Dartmouth Health's defenses and regarding

25   damages.

148

1           New Hampshire Whistleblowers' Protection

2       Act.   Dr. Porter alleges that she was terminated

3       by Dartmouth Health and was not reassigned to

4       another position at Dartmouth Health in

5       retaliation for her reporting about and/or

6       advising others to report about the conduct of

7       two physicians at Dartmouth Health that she

8       reasonably believed to be illegal, fraudulent,

9       unethical, or harmful to patients in violation

10      of New Hampshire's Whistleblowers' Protection

11      Act.

12          Dartmouth Health denies these claims and

13      asserts that it had legitimate business reasons

14      for its decision to terminate Dr. Porter's

15      employment and not reassign her to another

16      position with Dartmouth Health.

17          New Hampshire's Whistleblowers'

18      Protection Act prohibits employers from

19      retaliating against an employee for reporting

20      what he or she reasonably believes is a

21      violation of the law.   The act safeguards

22      employees from being discriminated against for

23      making a good faith report verbally or in

24      writing.

25              Its purpose is to encourage employees to

149

1        come forward and to report violations without

2        fear of losing their jobs and to ensure that as

3        many alleged violations as possible are resolved

4        informally within the workplace.

5             In order to establish a claim under New

6        Hampshire's Whistleblowers' Protection Act,

7        Dr. Porter must demonstrate by a preponderance

8        of the evidence the following three elements:

9             First, Dr. Porter, in good faith,

10       reported or caused to be reported what she had

11       reasonable cause to believe was a violation of

12       any law or rule adopted under the laws of New

13       Hampshire, a political subdivision of New

14       Hampshire or the United States.

15            Second, Dartmouth Health terminated

16       Dr. Porter's employment and failed to reassign

17       her to another job at Dartmouth Health.

18            And, third, there was causal connection

19       between Dr. Porter's reporting and her

20       termination from Dartmouth Health without

21       reassignment to another job at Dartmouth Health.

22            One, reported in good faith.

23            In this context good faith means absence

24       of malice and honesty of intention.  Reporting

25       in good faith means the employee reasonably

150

1    believed that a violation of a law or a rule was

2    happening.  The employee did not prove that a

3    violation of a law or rule was, in fact,

4    happening.

5            In other words, the act does not require

6    an actual violation of a law or rule but only

7    that an employee reasonably believed that such a

8    violation has occurred.

9            In regarding a violation to her employer,

10    the employee is not required to reference any

11    specific law or rule that the employer has

12    allegedly violated.  The employer is presumed to

13    be familiar with the laws and regulations

14    governing its business and to consider a report

15    to have been made if a reasonable employer would

16    have understood from an employee's complaint

17    that the employee was reciting a violation of

18    law.

19            Two, termination of employment.  You must

20    decide whether Dartmouth Health terminated

21    Dr. Porter's employment and did not reassign her

22    to another job at Dartmouth Health.

23            Three, causal connection.  To find in

24    favor of Dr. Porter on this claim, you must find

25    a causal connection between her termination and

151

1    her reporting about and/or advising others to

2    report about the conduct of two physicians at

3    Dartmouth Health that she reasonably believed to

4    be illegal, fraudulent, unethical, or harmful to

5    patients.

6            In other words, you must find that

7    Dr. Porter's termination occurred because of her

8    reporting.  This may be shown by circumstantial

9    evidence.

10           For example, you may find that there is

11   sufficient causation through temporal proximity;

12   that is, that Dartmouth Health's termination of

13   Dr. Porter followed shortly after Dartmouth

14   Health became aware of Dr. Porter's reporting.

15           Other ways you may find causation could

16   be through, A, Dartmouth Health's disparate

17   treatment of Dartmouth fellow employees who

18   engaged in similar conduct as Dr. Porter or, B,

19   deficiencies in Dartmouth Health's articulated

20   reasons for terminating Dr. Porter.

21           In addition, to support the required

22   finding of causation for this claim you must

23   find that Dr. Porter reported the alleged

24   violations to a person having supervisory

25   authority over her.

(886 of 993), Page 886 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 838 of 945
2:11-cv-00094-kjd    Document 33.23    Filed 01/16/25    Page 838 of 945

152

1          In other words, at least one supervisor

2     or decisionmaker at Dartmouth Health must have

3     known that Dr. Porter had reported about and had

4     advised others to report about the conduct that

5     she believed to be illegal, fraudulent,

6     unethical, or harmful to patients.

7          Dartmouth Health claims it did not

8     terminate Dr. Porter because of her

9     whistleblowing activity; here, reporting that

10    two Dartmouth Health physicians were engaging in

11    conduct that she thought was unlawful,

12    unethical, or dangerous to patients, but rather

13    because it made a business decision to close its

14    REI division, resulting in the termination of

15    all three physicians in the division, and that

16    there was no other position to which Dr. Porter

17    could be reassigned at Dartmouth Health.

18         Dr. Porter asserts that the reasons given

19    for her termination are not the true reasons but

20    instead are a pretext or excuse to cover up

21    Dartmouth Health's unlawful retaliation against

22    her for whistleblowing.

23         If you do not believe the reasons that

24    Dartmouth Health has offered for termination of

25    Dr. Porter's employment and not reassigning her,

153

1     then you may, but are not required to, infer

2     that retaliation was a factor that made a

3     difference in Dartmouth Health's decision to

4     terminate Dr. Porter's employment and not

5     reassign her to another job at Dartmouth Health.

6              Americans with Disabilities Act (ADA)

7     claim.

8              In this case Dr. Porter claims that

9     Dartmouth Health terminated her employment and

10    did not reassign her to another division because

11    of her disability.  Dr. Porter has reported

12    three distinct but related types of disability

13    discrimination claims.

14             First, Dr. Porter may prove that

15    Dartmouth Health would not have terminated her

16    employment but for her disability.

17             Second, Dr. Porter may prove that

18    Dartmouth Health failed to reasonably

19    accommodate her disability by reassigning her to

20    another division instead of terminating her

21    employment.

22             Third, Dr. Porter may prove that

23    Dartmouth Health retaliated against her for

24    making a reasonable accommodation request.

25             You must determine whether Dr. Porter has

154

1    proven that Dartmouth Health discriminated

2    against her because of her disability in any or

3    all of these ways or none of these ways.

4         For Dr. Porter to prove her ADA claim

5    against Dartmouth Health, she must prove that

6    Dartmouth Health discriminated against her in at

7    least one of these ways:

8         One, but-for discrimination.  To prevail

9    under this theory, Dr. Porter must prove all of

10   the following by a preponderance of the

11   evidence.

12        First:  Dartmouth Health is an employer

13   subject to the ADA.

14        Second:  Dr. Porter has a disability

15   within the meaning of the ADA.

16        Third:  Dr. Porter was otherwise

17   qualified to perform the essential functions of

18   her job, either with or without reasonable

19   accommodation.

20        Fourth:  Dr. Porter was terminated

21   because of her disability.

22        To prevail under this theory Dr. Porter

23   must prove all of the following by a

24   preponderance of the evidence:

25        1.1.  Employer.  The parties have agreed

155

1        on the first element that Dartmouth Health is an

2        employer subject to the ADA.  Thus, the first

3        element is satisfied.

4               1.2.  Disability.  The parties have

5        agreed on the second element; that Dr. Porter

6        has a disability as defined by the ADA.  Thus,

7        the second element is satisfied.

8               1.3.  Otherwise qualified to perform

9        essential functions.  You must determine whether

10       Dr. Porter was a qualified individual to satisfy

11       this element.

12              Dr. Porter must prove two things by a

13       preponderance of the evidence.  First, that she

14       was otherwise qualified for the position she

15       held and, second, that either with or without

16       reasonable accommodation she could perform the

17       essential functions of that position.

18              1.3.1.  Otherwise qualified.

19              An individual is otherwise qualified if

20       they have the requisite skill, experience,

21       education, and other job-related requirements of

22       the employment position involved in the case.

23              If Dr. Porter cannot satisfy this

24       standard, then she is not a qualified

25       individual, even if the reason that Dr. Porter

(890 of 993), Page 890 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 842 of 945
2:17-cv-00044-kjd    Document 33.23    Filed 06/18/25    Page 156 of 195

156

1    is not qualified is solely a result of her

2    disability.  The ADA does not require an

3    employer to hire or retain an individual who

4    cannot perform the job in question, either with

5    or without an accommodation.

6              1.3.2.  Essential functions.

7              If you find that Dr. Porter was otherwise

8    qualified, then the next step is to determine

9    whether she has proven by a preponderance of the

10   evidence that she was able to perform the

11   essential functions of the position either with

12   or without reasonable accommodation.

13             A reasonable accommodation may include

14   job restructuring or part-time or modified work

15   schedule.  To make this determination, you will

16   need to determine the essential functions of the

17   employment position.

18             The essential functions of an employment

19   position are the basic fundamental duties of a

20   job that a person must be able to perform to

21   hold a particular position.  Essential functions

22   do not include marginal job duties or position.

23             A job function may be considered

24   essential for any of several reasons.  These

25   include but are not limited to the following.

(891 of 993), Page 891 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 843 of 945
2217cv00094kjd    Document 35.23    Filed 01/16/25    Page 843 of 945

1          One, the reason that the position exists

2     is to perform that function; two, there are a

3     limited number of employees available among whom

4     the performance of that job function can be

5     distributed; and, three, the job function is

6     highly specialized, and the person in that

7     position is hired for their expertise or ability

8     to perform that particular job function.

9          In determining whether a particular job

10    function is essential, you may, along with all

11    of the evidence that has been presented to you,

12    consider the following factors.

13          A.  The employer's judgment as to which

14    functions of the job are essential.

15          B.  Written job instructions prepared by

16    the employer for advertising or position.

17          C.  Written job instructions prepared by

18    the employer for use in interviewing applicants

19    for the position.

20          D.  The amount of time spent performing a

21    function.

22          E.  The consequences of not requiring the

23    person holding the position to perform the

24    function.

25          F.  The terms of any collective

158

1      bargaining agreement.

2            G.  The work experience of the past

3      employees who have held the position.

4            And H.  The work experience of current

5      employees who hold similar positions.

6            An employee must have been able to

7      perform all of the essential functions of the

8      position either with or without reasonable

9      accommodation at the time of their termination.

10            An employer may not base an employment

11      decision upon speculation that the employee's

12      disability might worsen to the extent that they

13      would not be a qualified individual at some time

14      in the future.

15            On the other hand, an employer is not

16      required to speculate that an employee's

17      condition will improve if that employee is not

18      able to fulfill all of the essential functions

19      of the position at the time in question.

20            1.4.  You must determine whether

21      Dartmouth Health terminated Dr. Porter's

22      employment because of her disability.  An

23      employee must prove that the employer would not

24      have terminated their employment but for that

25      disability.

159

1          To determine that Dartmouth Health

2      terminated Dr. Porter because of her disability,

3      you must decide that Dartmouth Health would not

4      have terminated Dr. Porter had Dr. Porter not

5      had a disability but everything else had been

6      the same.

7          An employee does not need to prove that

8      discrimination was the only or even the

9      predominant factor that motivated an employer.

10     You may decide that other factors were involved

11     in the decision to terminate Dr. Porter's

12     employment.  But, for Dr. Porter to meet her

13     burden, you must conclude that she has proved by

14     a preponderance of the evidence that, although

15     there may have been other factors, she would not

16     have been terminated if she had not had a

17     disability.

18          An employer may not discriminate against

19     an employee because of the employee's

20     disability.  But an employer may terminate an

21     employee for any other lawful reason, good or

22     bad, fair or unfair.  An employer is entitled to

23     make subjective policy and business judgments,

24     and an employer may therefore terminate an

25     employee, even an outstanding employee, for

160

1      reasons that it considers to be in its best

2      interests.  An employer is entitled to make its

3      own personnel decisions, however misguided they

4      may appear to you.

5           If you believe Dartmouth Health's reasons

6      for its decision to terminate Dr. Porter and

7      find that its decision was not because of

8      Dr. Porter's disability, you must not substitute

9      your own judgment, even if you do not agree with

10     Dartmouth Health's decision.

11          As I have explained, Dr. Porter has the

12     burden to prove that Dartmouth Health's decision

13     to discharge her was because of her disability.

14     I've explained to you that evidence can be

15     direct or circumstantial.  To decide whether

16     Dartmouth Health's decision to discharge

17     Dr. Porter was because of her disability, you

18     may consider the circumstances of Dartmouth

19     Health's decision.

20          For example, you may consider whether you

21     believed the reasons Dartmouth Health gave for

22     their decision.  If you do not believe the

23     reasons it gave for the decision, you may

24     consider whether the reasons were so

25     unbelievable that they are a coverup to hide the

161

1    true discriminatory reason for the decision.

2           Two.  Failure to grant reasonable

3    accommodation request.

4           An employee may also establish a claim

5    under the ADA by showing that the employer

6    failed to provide a reasonable accommodation.

7    To establish such a claim, Dr. Porter must prove

8    each of the following elements by a

9    preponderance of the evidence.

10          First:  Dartmouth Health is an employer

11   subject to the ADA.

12          Second:  Dr. Porter has a disability

13   within the meaning of the ADA.

14          Third:  Dr. Porter was otherwise

15   qualified to perform the essential functions of

16   her job, either with or without reasonable

17   accommodation.

18          Fourth:  Dartmouth Health failed to make

19   a reasonable accommodation.

20          2.1.  Employer.

21          The parties have agreed on the first

22   element; that Dartmouth Health is an employer

23   subject to the ADA.  Thus, the first element is

24   satisfied.

25          2.2.  Disability.

162

1          The parties have agreed on the second

2     element; that Dr. Porter has a disability as

3     defined by the ADA.  Thus, the second element is

4     satisfied.

5          2.3.  Otherwise qualified to perform

6     essential functions.

7          You must determine whether Dr. Porter was

8     a qualified individual.  To satisfy this element

9     Dr. Porter must prove two things by a

10    preponderance of the evidence.  First, that she

11    was otherwise qualified for the position she

12    desired and, second, that either with or without

13    reasonable accommodation she could perform the

14    essential functions of that position.

15         2.3.1.  Otherwise qualified.

16         An individual is otherwise qualified if

17    they have the requisite skill, experience,

18    education, and other job-related requirements of

19    the employment position involved in the case.

20    If Dr. Porter cannot satisfy the standard, then

21    she was not a qualified individual, even if the

22    reason that Dr. Porter is not qualified is

23    solely a result of her disability.

24         The ADA does not require an employer to

25    hire or retain an individual who cannot perform

163

1      the job in question, either with or without a

2      reasonable accommodation.

3              2.3.2.  Essential functions.

4              If you find that Dr. Porter was otherwise

5      qualified, then the next step is to determine

6      whether she has proven by a preponderance of the

7      evidence that she was able to perform the

8      essential functions of the position either with

9      or without reasonable accommodation.

10             A reasonable accommodation may include

11     job restructuring or part-time or modified work

12     schedules.  To make this determination, you will

13     need to determine the essential functions of the

14     employment position.

15             The essential functions of an employment

16     position are basic fundamental duties of a job

17     that a person must be able to perform to hold a

18     particular position.  Essential functions do not

19     include marginal job duties of a position.

20             A job function may be considered

21     essential for any of several reasons.  These

22     include but are not limited to the following:

23             One.  The reason that the position exists

24     is to perform that function.

25             Two.  There are a limited number of

164

1      employees available among whom the performance

2      of that job function can be distributed.

3              And 3.  The job function is highly

4      specialized, and the person in that position is

5      hired for their expertise or ability to perform

6      that particular job function.

7              In determining whether a particular job

8      function is essential you may, along with all of

9      the evidence that has been presented to you,

10     consider the following factors.

11             One, the employer's judgment as to which

12     functions of the job are essential.  Sorry,

13     that's i, not one.

14             j.  Written job descriptions prepared by

15     the employer for advertising or posting new

16     position.

17             k.  Written job descriptions prepared by

18     the employer for use in interviewing applicants

19     for the position.

20             l.  The amount of time spent performing

21     the function.

22             m.  The consequences of not requiring the

23     person holding the position to perform the

24     function.

25             n.  The terms of any collective

(899 of 993), Page 899 of 993
Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 851 of 945
2:17-cv-00944-kjd    Document 35.23    Filed 06/18/25    Page 851 of 945

165

1    bargaining agreement.

2              o.  The work experience of past employees

3    who have held position.

4              And p.  The work experience of current

5    employees who hold similar positions.

6              An employee must have been able to

7    perform all of the essential functions of the

8    desired position either with or without

9    reasonable accommodation at the time of their

10   termination.

11             An employer may not base an employment

12   decision on speculation that the employee's

13   disability might worsen to the extent that they

14   would not be a qualified individual at some time

15   in the future.

16             On the other hand, an employer is not

17   required to speculate that an employee's

18   condition will improve if that employee is not

19   able to fulfill all of the essential functions

20   of the position at the time in question.

21             2.4.  Failed to make a reasonable

22   accommodation.

23             You must determine whether Dartmouth

24   Health failed to make a reasonable accommodation

25   for Dr. Porter by reassigning her to another

166

1       department instead of terminating her

2       employment.

3            The term "reasonable accommodation" means

4       making modifications to the workplace that

5       allows a person with a disability to perform the

6       essential functions of the job or allows a

7       person with a disability to enjoy the same

8       benefits and privileges as an employee without a

9       disability.

10           A reasonable accommodation may include

11      job restructuring, part-time or modified work

12      schedules, reassignment to a vacant position, or

13      other similar accommodations for individuals

14      with disabilities.  A reasonable accommodation

15      does not require an employer to create a new

16      position for an employee.

17           The term "reasonable accommodation" does

18      not include efforts that can cause an undue

19      hardship; an action requiring significant

20      difficulty or expense on an employer.  An

21      employer must show special, typically case

22      specific, circumstances to demonstrate undue

23      hardship in a particular case.

24           An employer has a duty to make a

25      reasonable accommodation for an employee if the

167

1    employer knows or reasonably should have known

2    that the employee was disabled, even if the

3    employee did not explicitly request an

4    accommodation.

5         If the employer knows or should have

6    known that the employee was disabled, the

7    employer is obligated to engage in an

8    interactive process with the employee to

9    determine whether a possible reasonable

10   accommodation exists.  Both employer and

11   employee must cooperate with this interactive

12   process in good faith.

13        Neither side can prevail in this case

14   simply because the other did not cooperate in

15   the interactive process.  However, you may

16   consider whether the party cooperated in good

17   faith in evaluating the merit of that party's

18   claim that a reasonable accommodation did or did

19   not exist.

20        An employer, by failing to engage in any

21   sufficient interactive process, risks not

22   discovering means by which an employee's

23   disability could have been accommodated and

24   thereby increases the chance of failing to

25   reasonably accommodate an employee.

168

1          3.  Retaliation.

2          The ADA prohibits an employer from

3     discriminating against an employee because the

4     employee has opposed an unlawful employment

5     practice under the ADA.  This is called

6     retaliation.  To establish retaliation

7     Dr. Porter must prove each of the following

8     elements by a preponderance of the evidence.

9          First:  Dr. Porter engaged in activity

10    protected by the ADA.

11         Second:  Dartmouth Health knew that

12    Dr. Porter engaged in protected activity.

13         Third:  Dartmouth Health took adverse

14    action against Dr. Porter.

15         Fourth:  The causal connection exists

16    between the adverse action and the protected

17    activity.

18         3.1.  Protected activity.

19         A protected activity is an act that

20    opposes any perceived discriminatory practice

21    made unlawful by the ADA.  Protected activity

22    includes making a request for a reasonable

23    accommodation.

24         The parties have agreed on the first

25    element; that Dr. Porter made a reasonable

2:17-cv-00194-kjd Document 35.23 Filed 01/18/23 Page 855 of 945

169

1    accommodation request.  Thus, the first element

2    is satisfied.

3              3.2.  Aware of activity.

4              The parties have agreed on the second

5    element; that Dartmouth Health was aware that

6    Dr. Porter made a reasonable accommodation

7    request seeking reassignment to the OB/GYN

8    Department or the Radiology Department.  Thus,

9    the second element is satisfied.

10             3.3.  Adverse action.

11             You must determine whether Dartmouth

12   Health took adverse action against Dr. Porter by

13   terminating her employment.

14             3.4.  Causal connection.

15             You must determine whether there is a

16   causal connection between Dr. Porter's

17   reasonable accommodation request and Dartmouth

18   Health's decision to terminate Dr. Porter's

19   employment.  Dr. Porter must prove that

20   Dartmouth Health would not have terminated her

21   employment but for her reasonable accommodation

22   request.

23             To determine there is a causal connection

24   between Dartmouth Health's decision to terminate

25   Dr. Porter's employment and Dr. Porter's

170

1     reasonable accommodation request, you must

2     decide that Dartmouth Health would not have

3     terminated Dr. Porter if Dr. Porter had not made

4     a reasonable accommodation request but

5     everything else had been the same.

6         Dr. Porter does not need to prove that

7     retaliation was the only or even the predominant

8     factor that motivated Dartmouth Health.  You may

9     determine that other factors contributed to

10    Dartmouth Health's decision to terminate

11    Dr. Porter's employment.  But, in order to

12    return a verdict in favor of Dr. Porter on her

13    ADA retaliation claim, you must conclude that

14    she has proved by a preponderance of the

15    evidence that, even if other factors contributed

16    to the decision, Dartmouth Health would not have

17    terminated her employment if she had not made a

18    reasonable accommodation request.

19        Rehabilitation Act claim.

20        Dr. Porter has already brought disability

21    discrimination claims under Section 504 of the

22    Rehabilitation Act, 29 U.S.C. Section 794.

23    Section 504 of the Rehabilitation Act applies to

24    entities that receive federal funds, and it

25    prohibits these entities from excluding or

1    discriminating against individuals based on

2    their disability.

3         Dr. Porter has brought claims for

4    discriminatory termination, failure to make a

5    reasonable accommodation, and retaliation under

6    Section 504 of the Rehabilitation Act.  The

7    elements and instructions for these claims are

8    the same as those under the ADA.  Thus, the

9    instructions I previously gave you on disability

10    discrimination under the ADA apply equally to

11    the claims under Section 504 of the

12    Rehabilitation Act.

13         Disability discrimination claims under

14    New Hampshire state law.

15         In addition to the federal claims, there

16    are also claims in this case for disability

17    discrimination under New Hampshire's law against

18    discrimination.  New Hampshire state law

19    prohibits discrimination in employment based on

20    disability.

21         Dr. Porter has brought claims for

22    discriminatory termination, failure to make a

23    reasonable accommodation, and retaliation under

24    the New Hampshire law against discrimination.

25    The elements and instructions for these claims

(906 of 993), Page 906 of 993 Case: 25-1382 12/22/2025 DktEntry: 35.4 Page 858 of 945
2:17-cv-00194-kjd Document 335.23 Filed 06/18/25 Page 172 of 195

172

1    are the same as those under the ADA.  Thus, the

2    instructions I previously gave you on disability

3    discrimination under the ADA apply equally to

4    the claims under the New Hampshire law against

5    discrimination.

6             Disability discrimination claims under

7    Vermont state law.

8             In addition to the federal claims and the

9    claims under New Hampshire state law, there are

10   also claims in this case for disability

11   discrimination under Vermont's Fair Employment

12   Practices Act (FEPA).  Vermont state law

13   prohibits discrimination in employment based on

14   disability.

15            Dr. Porter has brought claims for

16   discriminatory termination, failure to make a

17   reasonable accommodation, and retaliation under

18   Vermont's FEPA.  The elements and instructions

19   for these claims are mostly the same as those

20   under the ADA.  However, there is one important

21   difference in the claim for discriminatory

22   termination.

23            For the fourth element the FEPA uses the

24   "motivating factor" test instead of the "because

25   of" test used under the ADA.  For example,

173

1          Dr. Porter must prove the following by a

2     preponderance of the evidence:

3              First:  Dartmouth Health is an employer

4     subject to the FEPA.

5              Second:  Dr. Porter has a disability

6     within the meaning of FEPA.

7              Third:  Dr. Porter was otherwise

8     qualified to perform the essential functions of

9     her job, either with or without reasonable

10    accommodation.

11             Fourth:  Dr. Porter's disability was a

12    motivating factor in Dartmouth Health's decision

13    to terminate her employment.

14             Under the "motivating factor" test an

15    employee must prove that their disability was a

16    motivating factor that prompted the employer to

17    terminate the employment.  It is not necessary

18    for the employee to prove that disability was

19    the sole or exclusive reason for the employer's

20    decision.  It is sufficient if the employee

21    proves that the alleged disability was a

22    motivating factor in the employer's decision.

23             A motivating factor is a factor that

24    played some part in an employer's adverse

25    employment action.  Under the "motivating

174

1    factor" test an employer cannot avoid liability

2    by proving that it would still have taken the

3    same adverse action in the absence of

4    discriminatory motivation.  This is a difference

5    between "motivating factor" test and the

6    "because of" test.

7            You should apply the "motivating factor"

8    test, not the "because of" test to Dr. Porter's

9    claim for discriminatory termination under the

10   FEPA.  With this exception, the instructions I

11   previously gave you on disability discrimination

12   under the ADA regarding failure to make a

13   reasonable accommodation and retaliation apply

14   equally to the claims under the FEPA.

15           Wrongful discharge under New Hampshire

16   law.

17           Based on Dartmouth Health's termination

18   of Dr. Porter's employment at

19   Dartmouth-Hitchcock Medical Center, Dr. Porter

20   has brought a claim for wrongful discharge

21   against Dartmouth Health under New Hampshire

22   law.

23           The prevailing rule in New Hampshire is

24   that where, as here, there is no employment

25   contract between employer and employee, the

(909 of 993), Page 909 of 993Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 861 of 945
2:17-cv-00194-kjd    Document 33-23    Filed 06/16/25    Page 176 of 195

175

1      relationship is termed "at will".

2           In an at-will employment situation both

3      parties are generally free to terminate the

4      employment relationship at any time with or

5      without cause, and it is implied that the

6      parties will carry out their obligations in good

7      faith.

8           But there is an exception to this at-will

9      rule.  An employer termination of an employee

10     that is motivated by bad faith or malice, or is

11     based on retaliation, is not in the best

12     interest of the economic system of the public

13     good and is therefore unlawful.  An employer's

14     interest in running his business as he sees fit

15     must be balanced against the interest of the

16     employee in maintaining his employment and the

17     public's interest in maintaining a proper

18     balance between the two.

19          In order to establish a claim for

20     wrongful discharge under New Hampshire law,

21     Dr. Porter must prove the following two elements

22     by a preponderance of the evidence:

23          First:  Dartmouth Health's termination of

24     Dr. Porter was motivated by bad faith, malice,

25     or retaliation.

176

1          And, Second:  Dartmouth Health terminated

2     Dr. Porter because she performed one or more

3     acts that public policy would encourage.

4          One.  Termination motivated by bad faith,

5     malice, or retaliation.

6          For purposes of this claim, bad faith is

7     the equivalent of malice and may be established

8     where, one, an employee is discharged for

9     pursuing policies condoned by the employer; two,

10    the record does not support the stated reason

11    for the discharge; or, three, disparate

12    treatment was administered to a similarly

13    situated employee.

14          Bad faith can also be discerned from the

15    course of events surrounding an employee's

16    discharge, the manner in which the plaintiff was

17    discharged, or shifting reasons for an

18    employee's termination.

19          Stated another way, malice or bad faith

20    may be shown where the employer's decision to

21    terminate an employee was without reasonable

22    cause or excuse as the facts would have appeared

23    to a reasonable person and that the termination

24    was willful and intentional.  That is, the

25    employer knew that the termination was

177

1     unreasonable and still decided to terminate the

2     employee's employment, or that the termination

3     was motivated by ill will or a purpose to

4     harass.

5          Bad faith or malice may therefore be

6     established by proof that the evidence does not

7     support the stated reason for the discharge.

8          The general meaning of retaliation is the

9     act of doing someone harm in return for actual

10    or perceived injuries or wrongs.  In other

11    words, revenge.

12         Two.  Acts that public policy would

13    encourage.

14         Public policy as used in this claim

15    includes a wide range of society goals,

16    including safety and public welfare, protection

17    of an at-will's employee's promised

18    compensation, and good faith reporting of

19    reasonably perceived improper activity.

20         The employee need not show a strong and

21    clear public policy, and the public policy may

22    be based on statutory or non-statutory policies

23    at the state or federal level.  An employee's

24    mere expression of disagreement with a

25    management decision, however, is not an act

1       protected by public policy.

2               Moreover, the public policy exception to

3       termination of at-will employment does not

4       deprive an employer of the right to make

5       business decisions which are not necessary to

6       effectuate the efficient and profitable

7       operation of its business, nor does the public

8       policy exception interfere with an employer's

9       ability to hire and retain those individuals

10      best qualified for the job.

11              An example of a case where an employee is

12      terminated for doing an act that public policy

13      would encourage is an employee being terminated

14      for refusing to provide to his or her employer

15      private medical reports and personal health

16      information on patients.

17              The second example is an employee

18      terminated for missing work because they

19      reported to jury duty.

20              A third example is an employee being

21      terminated for protecting employees who worked

22      under him from workplace hazards that could

23      cause serious physical harm to those employees.

24              Other examples of acts that public policy

25      would encourage could be reporting physician

(913 of 993), Page 913 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 865 of 945

2:11-cv-00024-kjd   Document 35.23   Filed 01/06/25   Page 865 of 945

179

1          conduct that's illegal, fraudulent, unethical,

2          or unlawful to patients; ensuring that a medical

3          provider or medical facility obtain patient

4          consent before performing procedures on

5          patients, and objecting to improper patient

6          billing procedures.  In these cases if the

7          termination is because of the act that public

8          policy encourages and the employer acted with

9          malice and bad faith or in retaliation, the

10         employee is entitled to recover damages for

11         wrongful termination.

12               It is your job to determine if Dartmouth

13         Health terminated Dr. Porter because of her

14         performance of one or more acts that public

15         policy would encourage.  In determining whether

16         Dr. Porter performed an act that public policy

17         would encourage, you are not limited to the

18         above examples, nor must you find that the facts

19         support the above examples in this case.

20               In order to find in favor of Dr. Porter

21         on this claim, you not only must find that

22         Dr. Porter performed one or more acts that

23         public policy would encourage and that Dartmouth

24         Health's termination of Dr. Porter was motivated

25         by bad faith, malice, and retaliation, you must

180

1        also find that Dr. Porter was terminated because

2        of her performance of an act that public policy

3        would encourage.

4              Thus, Dr. Porter must show a causal link

5        between her performance of an act that public

6        policy would encourage and her termination.

7              Damages.

8              If you decide in favor of Dartmouth

9        Health on all claims, you will not consider

10       these instructions about damages.  But if you

11       decide for Dr. Porter on any claim, you must

12       determine the amount of money that will

13       compensate her for each item of harm that was

14       caused by Dartmouth Health's conduct.  This

15       compensation is called damages.

16             Please keep in mind the following general

17       principles as you deliberate.  Remember that

18       Dr. Porter has the burden of proving damages by

19       a preponderance of the evidence.  Damages may

20       not be based on sympathy, speculation, or

21       guesswork.  In making your decision, you should

22       be guided by the evidence, common sense, and

23       your best judgment.

24             Economic and noneconomic damages.

25             Damages for Dr. Porter's claims can fall

181

1        into two different categories; economic damages
2        and noneconomic damages.
3             Economic damages includes such items as
4        lost income and medical expenses.  Non-economic
5        damages include such items as lost enjoyment of
6        life, mental anguish, pain and suffering,
7        disability, and disfigurement.  These damages
8        may include compensation for past harm and
9        future harm, depending on the evidence.  If you
10       find that Dr. Porter is entitled to damages, you
11       must determine the total amount and place that
12       amount on the verdict form.
13            There is no precise standard for
14       calculating these damages.  Your damages
15       determination must be just and reasonable in
16       light of the evidence.  In determining the
17       damages that Dr. Porter has suffered as a result
18       of her injuries, you should consider the
19       following items:
20            Dr. Porter is entitled to damages for any
21       earnings lost in the past and any probable loss
22       of ability to earn money in the future caused by
23       Dartmouth Health's conduct.  When considering
24       Dr. Porter's future earnings, you should
25       consider Dr. Porter's expected working lifetime.

182

1              Dr. Porter is entitled to damages for any

2        lost enjoyment of life, mental anguish, and pain

3        and suffering caused by Dartmouth Health's

4        conduct.  These damages may include any pain,

5        discomfort, fears, anxiety, humiliation, lost

6        enjoyment of life's activities, and any other

7        mental and emotional distress suffered by her in

8        the past or likely to be suffered in the future.

9              Mitigation of damages.

10             Dartmouth Health claims that Dr. Porter

11       has failed to mitigate, or minimize, her

12       damages.  A plaintiff ordinarily has a general

13       duty to mitigate the damages she incurs, meaning

14       she has a duty to take steps to try to minimize

15       the harm or prevent it from increasing further.

16       In this context, that means Dr. Porter has a

17       duty to attempt to secure or to secure

18       employment that is a suitable alternative to her

19       employment at Dartmouth Health.  This duty

20       applies only to those damages that Dr. Porter

21       could have avoided with reasonable effort and

22       without undue risk, burden, or expense, as the

23       duty to mitigate requires only reasonable,

24       practical care and diligence, not extraordinary

25       measures.

183

1          The burden is on Dartmouth Health to

2     prove this affirmative defense by a

3     preponderance of the evidence.  As part of

4     bearing this burden, Dartmouth Health must

5     present evidence not only that Dr. Porter did

6     not make reasonable efforts to obtain employment

7     but also that suitable work existed.  To sustain

8     its burden Dartmouth Health must present

9     concrete evidence.  Mere speculation is not

10    sufficient.

11         If you find that Dr. Porter failed to

12    mitigate her damages, you must reduce her award

13    of damages, if any, by the amount you find she

14    could have avoided.

15         Punitive damages.

16         Punitive damages are meant to punish a

17    party for its clearly outrageous conduct and to

18    stop others from acting similarly in the future.

19    In order to award punitive damages, you must

20    find two things.

21         First, you must find that Dartmouth

22    Health's wrongful conduct was outrageously

23    reprehensible.  That is, that the conduct,

24    whether acts or failures to act, was egregious,

25    morally deserving of blame, to a degree of

(918 of 993), Page 918 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 870 of 945
2:11-cv-00094-kjd Document 352-3 Filed 06/18/25 Page 184 of 195

184

1    outrage frequently associated with a crime.

2         Second, you must find that Dartmouth

3    Health acted with malice.  You may find malice

4    if you find that Dartmouth Health's

5    reprehensible conduct was intentional and

6    deliberate.  That is, that the conduct was the

7    result of Dartmouth Health's bad motive, ill

8    will, or personal spite or hatred toward

9    Dr. Porter.  You may also find malice even if

10   Dartmouth Health's motivation behind the

11   intentional, outrageous conduct was to benefit

12   itself rather than to harm Dr. Porter.

13        Alternatively, you may find malice if

14   Dartmouth Health's wrongful conduct was not

15   intentional but instead was done with a reckless

16   or wanton disregard of the substantial

17   likelihood that it would cause egregious harm to

18   Dr. Porter.  That is, if Dartmouth Health acted

19   or failed to act with conscious and deliberate

20   disregard of a known, substantial, and

21   intolerable risk of harm to Dr. Porter, with the

22   knowledge that the conduct was substantially

23   certain to result in the threatened harm.

24        Where the defendant is a corporation, as

25   is the case here, in order to find that the

185

1          corporation must pay punitive damages you must

2          find that conduct justifying punitive damages

3          was corporate conduct or was conduct permitted

4          by a corporation.

5                 Where the management of the corporation

6          was involved in the conduct itself, it may be

7          considered to be corporate conduct.  Where the

8          management of the corporation has knowledge of

9          wrongful conduct by lower-level employees, the

10          corporation may be determined to have permitted

11          the conduct.

12                 If you find either corporate conduct or

13          conduct permitted by the corporation, you may

14          find the corporation must pay punitive damages.

15                 In determining the amount of punitive

16          damages to award, if any, you may consider such

17          factors as the nature of Dartmouth Health's

18          conduct, the nature of the resulting harm to

19          Dr. Porter, Dartmouth Health's wealth or

20          financial status, and the degree of malice or

21          wantonness in its acts.

22                 Remaining damages issues.

23                 It is solely the province of the jury to

24          decide the amount of any damages award.  I am

25          giving you these damages instructions so you

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 872 of 945

186

1    will know how to proceed if you reach this point

2    in your deliberations.  But by giving you these

3    instructions I do not intend to suggest that an

4    award is appropriate or what the amount of that

5    award should be.

6         Where the amount of damages can be

7    calculated in specific dollar terms, the parties

8    seeking damages must present evidence to

9    demonstrate the appropriate amount.  With

10   certain types of damages, however, there is no

11   precise measurement, and it is up to you to

12   decide what is fair monetary compensation for

13   those damages.  Under no circumstances may you

14   award damages that are speculative or

15   conjectural.

16        I remind you that any amount of recovery

17   that may have been suggested by the attorneys is

18   not evidence.  Moreover, you need not adopt the

19   approaches the attorneys have suggested for

20   calculating damages.  As the jury it is your

21   obligation to arrive at an amount which is

22   supported by the evidence and fair to both

23   parties.  The amount of damages, if any, is a

24   determination for the jury.

25        You should not add any sum for interest

187

1          to the damages awarded in this case.  The Court

2          will make such award, if appropriate.

3                Similarly, you must not include in your

4          reward any costs that Dr. Porter may or may not

5          have incurred due to her filing of this lawsuit

6          or her attorney's fees.  These are matters for

7          the Court.

8                You should not award damages for one item

9          that duplicates an award for another item.  In

10         other words, a party is entitled to only one

11         recovery for his or her damages.

12               Insurance and taxes.

13               You should not speculate about whether

14         Dartmouth Health or Dr. Porter has any insurance

15         that might cover or has covered any damages that

16         you find Dr. Porter has experienced.  You also

17         should not speculate about what taxes Dr. Porter

18         might owe on any damage award.

19               You have heard testimony from

20         Dr. Bancroft that Dr. Porter's damages include

21         amounts owed in taxes on any damages award.  You

22         may or may not take this into account in

23         assessing the amount of Dr. Porter's damages, if

24         any.

25               The rules that jurors are not to

188

1    speculate about insurance and taxes are special

2    rules that apply to lawsuits.  Those issues are

3    not relevant to your task here.  Your job is to

4    award the amount of damages that you determine

5    has been established by the evidence presented

6    to you.  Any other issues that have to be

7    resolved are my job, not yours.

8            Final instructions.

9            This completes my instructions to the

10   jury.  I will now provide a copy of these

11   instructions to you -- you already have a

12   copy -- and you will retire to the jury room to

13   deliberate in privacy about the issues in this

14   case.

15           I will also provide a verdict form to

16   guide you in your deliberations.  The answer to

17   each question on the form must be the unanimous

18   answer of the jury.  This means you cannot

19   answer a question on the verdict form unless and

20   until all 12 of you agree on the answer.  Each

21   question Numbered 1 through 6 must be answered.

22           You will also receive the exhibits which

23   are admitted into evidence.

24           I appoint Kattie Lafontaine as your

25   foreperson.  She will be responsible for making

(923 of 993), Page 923 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 875 of 945
2:17-cv-00234-kjd Document 35.23 Filed 06/18/25 Page 875 of 945

189

1    sure that deliberations occur in an orderly

2    fashion and that every juror has an opportunity

3    to participate.

4          She will record the unanimous answers of

5    the jury on the verdict form and date and sign

6    the jury form.  She will also be your

7    spokesperson here in court.

8          If you need to communicate with the

9    Court, please do so in writing.  I will then

10   confer with the lawyers about your question and

11   send a written response to you.

12         Please advise the court officer after you

13   reach a verdict but do not tell the court

14   officer or anyone else what the verdict is until

15   you return to the courtroom, at which time I

16   will receive the verdict form from your

17   foreperson.

18         So that concludes the instructions.  At

19   this time I'll ask that the jury retire to the

20   deliberation room, and the exhibits will be

21   provided to you for your consideration of the

22   case.

23         THE CLERK:  All rise for the jury.

24         (The jury left the courtroom at

25   2:13 p.m.)

190

1          THE CLERK:  Please be seated.

2          THE COURT:  Okay, so at this time I'll

3     take any objections from the parties to the

4     instructions as given.

5          MR. JONES:  Only with regard to the issue

6     with regard to New Hampshire enhanced

7     compensatory damages, renewing that issue.

8          THE COURT:  Yes, okay.  Thank you.

9          Mr. Schroeder?

10         MR. SCHROEDER:  Your Honor, not to review

11    all the previously stated on objections related

12    to the jury instructions, included but not

13    limited to the instructions regarding the ADA,

14    reassignment to a vacant position, we

15    incorporate herein all of the prior objections

16    that we've stated on the record.

17         THE COURT:  Okay.  All right.  Thank you.

18         Anything else from either side at this

19    point?

20         MR. SCHROEDER:  Just logistics, your

21    Honor.

22         THE COURT:  Yes.

23         MR. SCHROEDER:  Where you would like us

24    to remain?  What's the assigned period?  How

25    close you would like us to remain?  Just your

191

1    general decorum rules on that.

2            THE COURT:  I think so long as Mr. Howe

3    has cellphones, contact information for you.

4    Cellphone I think probably is the best.  You

5    certainly don't have to stay here in the

6    courtroom.  You can leave the building

7    certainly, but as long as you can be back in a

8    five- to ten-minute time period if you do get a

9    call from me about a note, that would be fine.

10            MR. SCHROEDER:  Should we report back

11   here at 4:30 or -- well, you tell us.

12            THE COURT:  Right.  So I don't -- you

13   know, I haven't spoken to them.

14            Well, I haven't spoken to them about

15   that, about how long they want to deliberate

16   for.  As I mentioned to you this morning, I

17   probably should mention that to them at this

18   time, so that will answer your question.

19            So I'll ask for the jury to be brought

20   back in so I can speak to them about that.

21            THE CLERK:  All rise for the jury.

22            (The jury entered the courtroom at

23   2:15 p.m.)

24            THE CLERK:  Please be seated.

25            THE COURT:  So you may be wondering how

192

1     long you would be deliberating.  That's up to

2     you ultimately, but in terms of how far you go

3     into the evening it's up to you.

4          If you would like to deliberate past, say

5     the 4:30 cutoff time, that's entirely up to you;

6     whatever decision you make in that regard.

7          If as a group you determine to stop

8     deliberating at any point in time this evening,

9     I'd ask that you provide a note to the court

10    security officer advising me that that is what

11    you intend to do, and then I'll bring you back

12    into court briefly to speak to you before you

13    leave for the evening.

14         And then if your deliberations carry over

15    until tomorrow, then 9 a.m. if you would come

16    back to court and report to the jury room as you

17    always have, and you will not be seeing us or

18    the attorneys during your deliberations.  Okay?

19         Any issues that arise during your

20    deliberations, as I say, provide a note to the

21    court security officer, and it will be taken up

22    here.

23         Okay.  Thank you.

24         THE CLERK:  All rise for the jury.

25         (The jury left the courtroom at

193

1    2:17 p.m.)

2        THE CLERK:  Please be seated.

3        THE COURT:  So, having said that, I don't

4    know that I'll direct you to come back at 4:30

5    because it may be too early, it may be too late.

6    I'll let you -- who knows, so we'll be in touch

7    with you.

8        MR. SCHROEDER:  Thank you, your Honor.

9        THE COURT:  Okay.  Thank you.

10        (The jury started their deliberations at

11    2:18 p.m.)

12        (A note was received from the jury, and

13    the following is in open court without the jury

14    present at 4:31 p.m.)

15        THE COURT:  Okay, so we received a note,

16    and I'm going to read the note to you.  It's

17    written by the foreperson, and it simply reads:

18        We collectively would like to leave at

19    4:30 p.m. tonight.

20        So I called you back to let you know

21    that, and now I'm going to call the jury in and

22    I'm going to honor their request.

23        (The jury entered the courtroom at

24    4:32 p.m.)

25        THE COURT:  Okay, so I received your

(928 of 993), Page 928 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 880 of 945
2:11-cv-00094-kjd Document 35.23 Filed 01/06/25 Page 1940 of 1945

194

1    note, and I shared the contents of the note with

2    counsel.  So, of course, you can leave at 4:30

3    tonight.

4            So as you know, you are in deliberations

5    now so really now, more than ever, it's

6    absolutely critical that you not talk to anyone

7    about the case or take in any other information

8    about the case or let anyone talk to you about

9    the case.  You shouldn't speak to family or

10   friends, court officers; no one about the case.

11           So you'll return tomorrow at 9 a.m., and

12   please remember that you cannot resume

13   deliberations unless everyone is present.  Okay?

14           All right.  Well, have a good evening.

15           THE CLERK:  All rise for the jury.

16           (The jury left the courtroom at

17   4:33 p.m.)

18           THE COURT:  I'm assuming we're all good

19   at this point?

20           (All counsel nodded their heads.)

21           THE COURT:  All right.  Have a good

22   evening.

23           (End of court proceedings on April 8,

24   2025, at 4:33 p.m.)

25

195

1                    C E R T I F I C A T E

2

3            I, SARAH M. BENTLEY, Certified Court

4    Reporter, Registered Professional Reporter and Notary

5    Public, do hereby certify that the said proceedings

6    were taken in machine shorthand by me at the time and

7    place aforesaid and were thereafter reduced to

8    typewritten form under my direction, Pages 1 - 195;

9    that the foregoing is a true, complete, and correct

10   transcript of said proceedings.

11           I further certify that I am not employed

12   by, related to, nor counsel for any of the parties

13   herein, nor otherwise interested in the outcome of

14   this litigation.

15           IN WITNESS WHEREOF, I have affixed my

16   signature and seal this 31st day of May, 2025.

17

18

19                    /s/ Sarah M. Bentley, RPR

20                    SARAH M. BENTLEY, CCR-B-1745

21

22

23

24

25

(930 of 993), Page 930 of 993    Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 882 of 945
2:17-cv-00194-kjd   Document 551-2   Filed 10/24/25   Page 882 of 945

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

MISTY BLANCHETTE PORTER, M.D.,        )      CIVIL ACTION NO.
                    Plaintiff,        )      2:17-cv-194
                                      )
           v.                         )
                                      )
DARTMOUTH-HITCHCOCK MEDICAL CENTER,   )
*et al.*                              )
                    Defendants.       )


POSTTRIAL MOTIONS
Tuesday, July 1, 2025
Burlington, Vermont


BEFORE:

     THE HONORABLE KEVIN J. DOYLE,
     Magistrate Judge


APPEARANCES:

GEOFFREY J. VITT, ESQ., and SARAH H. NUNAN, ESQ., Vitt & Nunan,
     PLC, 8 Beaver Meadow Road, P. O. Box 1229, Norwich, VT
     05055, Counsel for the Plaintiff

ERIC D. JONES, ESQ., Langrock, Sperry & Wool, LLP, 210 College
     Street, 4th Floor, Burlington, VT 05402-0721, Counsel for
     the Plaintiff

DONALD W. SCHROEDER, ESQ., MEGAN E. MARTINEZ, ESQ., and MORGAN
     McDONALD-RAMOS, ESQ., Foley & Lardner LLP, 111 Huntington
     Avenue, Suite 2500, Boston, MA 02199, Counsel for the
     Defendants


Johanna Massé, RMR, CRR
Transcriber
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

(Proceedings recorded by electronic sound recording, transcript
produced by transcription service.)

 1  Tuesday, July 1, 2025

 2       (The following was held in open court at 10:30 AM.)

 3          COURTROOM DEPUTY:  Your Honor, this is civil case

 4  number 17-CV-194, Misty Blanchette Porter v.

 5  Dartmouth-Hitchcock Medical Center, *et al.*  Present with the

 6  plaintiff are Attorneys Eric Jones, Geoffrey Vitt, and Sarah

 7  Nunan; and present on behalf of the defendants are Attorneys

 8  Donald Schroeder, Megan Martinez, and Morgan McDonald.

 9     The matter before the Court is a hearing on plaintiff's

10  motion for prejudgment interest, Document No. 296; motion for

11  attorney fees, Document No. 300; motion to alter judgment,

12  Document 302; plaintiff's bill of costs, Documents 301 and 319;

13  defendants' motion to alter judgment and motion for new trial

14  on plaintiff's VFEPA claim, Document 305; and the motion for

15  new trial related to damages issues, Document 308.

16          THE COURT:  Good morning.

17          MR. JONES:  Good morning, Judge.

18          MS. McDONALD:  Good morning, Your Honor.

19          MR. SCHROEDER:  Good morning.

20          THE COURT:  Nice to see everyone again.

21          MS. McDONALD:  Nice to see you.

22          THE COURT:  All right.  So let's start with

23  defendants' motion to alter the judgment on the FEPA claim.

24          MR. SCHROEDER:  Your Honor, would you like me to

25  approach or --

 1          THE COURT:  It's up to you, Mr. Schroeder.  Whatever

 2   you prefer.  If you want to be near your papers, fine to argue

 3   from the table.

 4          MR. SCHROEDER:  Okay.

 5          THE COURT:  Okay?

 6          MR. SCHROEDER:  Thank you, Your Honor.

 7          THE COURT:  All right.

 8          MR. SCHROEDER:  Good morning.

 9          THE COURT:  Good morning.  So I'll just start with

10   some language in your motion.  So page 1 and 2, you refer to

11   the jury instruction as an "inexplicable departure from federal

12   and state court precedent," suggesting that the law is clear,

13   but then you're looking to certify the question to the Vermont

14   Supreme Court.  Is that a conceptual inconsistency?  And I

15   think as we talk about the merits of this, that will be teased

16   out.

17          MR. SCHROEDER:  Thank you, Your Honor.  You want me to

18   start there?

19          THE COURT:  Yes, please.

20          MR. SCHROEDER:  Sure.  I don't think it's an internal

21   inconsistency or -- or inconsistency at all.  I think as a

22   primary matter, it's our position that the jury instruction was

23   improper and that not only Second Circuit precedent, federal

24   district court precedent in this court, and Vermont state court

25   precedent all support Dartmouth Health's position that the

1  appropriate causation standard should be but-for, not

2  motivating factor.

3          THE COURT:  Okay.  So it sounds like this is based on

4  *Natofsky*, right?  This is the Second Circuit decision that

5  suggests that but-for should apply after the Supreme Court

6  decisions under the ADA that applied but-for.  This is the 2019

7  Second Circuit decision, right?

8          MR. SCHROEDER:  Correct.

9          THE COURT:  We know that FEPA in Vermont follows Title

10  VII standards.  After the 2019 Second Circuit decision, we have

11  the Vermont Supreme Court's *Hammond* decision in 2023, and that

12  reiterates the pre-*Natofsky* observations of the case law that

13  says we still follow Title VII.  Makes no reference to the ADA.

14  So why wouldn't -- why wouldn't it be fair to kind of assume

15  that the Vermont Supreme Court would continue to apply the

16  precedent it always has:  We're following Title VII; the

17  express language of Title VII is motivating factor?

18          MR. SCHROEDER:  I think a couple reasons, Your Honor.

19  And if I may jump back, it's not just -- it's not just the

20  Second Circuit *Natofsky* decision but also the federal court

21  cases *Newton v. Kohl's* and Judge Crawford's decision in the

22  underlying *Porter* case as well as an earlier decision, *Mueller*.

23  But let's take it from where you started.  Okay?

24      This is not a Title VII case, and if you look at the

25  statute, one of the things that plaintiff's counsel brought up

5

1  in their opposition brief was a Connecticut Court of Appeals

2  decision, and it talked about -- now, in that case the issue

3  was whether the "because of" language in the statute requires

4  but-for causation.  And the Connecticut statute had "because

5  of" language which was tied to all of the protected categories,

6  including disability.

7      However, the Vermont statute, and that's really where you

8  start, doesn't say that.  It actually says the following:  "It

9  shall be an unlawful employment practice . . . for any employer

10 . . . to harass or discriminate against any individual because

11 of race, color, religion, ancestry, national origin, sex,

12 sexual orientation, gender identity, place of birth, crime

13 victim status, or age or against a qualified individual with a

14 disability."

15     And so it's our position that -- and in fact, when you

16 look at all of the case law, Vermont state court -- and there

17 are cases regarding this.  So if the *Hammond* -- The *Hammond*

18 decision didn't discuss the issue of disability, and so if you

19 look at the case -- the Vermont state court cases that do say

20 that, the disability discrimination -- this is the *Gates v.*

21 *Mack Molding*, *Kennedy v. Department of Public Safety* --

22         THE COURT:  But wasn't *Hammond* a disability

23 discrimination case?

24         MR. SCHROEDER:  I don't recall, Your Honor.  Hold on a

25 second.  But it did not discuss the issue of -- it discussed

6

the issue of Title VII, not the issue of the ADA and Rehab Act
in terms of federal court precedent assisting the Court in
deciding these issues.  If you --

       THE COURT:  Right.  And which is why I ask you the
question, though, right?  They know that the federal precedent
exists, but yet I'm on page 430 of that decision.  It says "The
FEPA 'is patterned on Title VII of the Civil Rights Act of
1964, and the standards and burdens of proof under the FEPA are
identical to those under Title VII'" in an employment -- in a
disability discrimination case.  Why is that not a definitive
statement of the law from the Vermont Supreme Court?

       MR. SCHROEDER:  Well, what's interesting, Your Honor,
is that this Vermont -- we already have a Vermont federal court
case in this court by this court in November of 2024, so --
that goes to the issue of what the proper standard is, and in
fact, it is the --

       THE COURT:  This is *Newton*, right?

       MR. SCHROEDER:  -- *Newton v. Kohl's* case where Judge
Crawford said that the proper standard for a FEPA claim is
but-for causation based upon federal court precedent, ADA,
Rehab Act, and if you look at the -- so you've got a trifecta
here of not just Vermont -- not just Second Circuit precedent,
but then you also have the persuasive decisions from this
court, *Newton v. Kohl's*, which actually is after the *Hammond*
decision, and in fact --

 1          THE COURT:  Did *Newton* reach the question of causation

 2  actually?

 3          MR. SCHROEDER:  It does.  It actually says, Your

 4  Honor, "a plaintiff need only show that her disability" -- it

 5  didn't get to this issue --

 6          THE COURT:  Right.

 7          MR. SCHROEDER:  -- but it states it.  "A plaintiff

 8  need only show that her disability was a but-for cause of the

 9  adverse employment action."  And in fact, that's consistent

10  with the judge's ruling -- I guess this was predating *Hammond*,

11  but if I go back to -- go back to the *Hammond* decision where

12  they were -- where there was a discussion of this, Your Honor,

13  I would submit that it is not definitively determined, because

14  then why would this court in a case that's a year later refer

15  to FEPA having a but-for causation standard?

16      And in fact, that's consistent -- what's interesting is

17  plaintiff's counsel actually made this argument at the Second

18  Circuit.  It actually was for New Hampshire and Vermont

19  state -- state laws.  They've since abandoned the -- the New

20  Hampshire state law issue, but they made that argument there,

21  and so we believe that it's actually clear, and this goes to

22  your first issue of the consistency or inconsistency, because I

23  have thought this through.

24      We submit that the proper causation standard, which was

25  the -- which should have been the same for all -- was the same

1   for all the other disability discrimination statute claims in

2   this case.  We had three other claims, right?  ADA, Rehab Act,

3   New Hampshire state law, disability discrimination claims.

4            THE COURT:  Right.

5            MR. SCHROEDER:  There's no basis to say, oh, we have

6   to use but-for causation for just -- that we don't have to use

7   but-for causation for purposes of the Vermont state law claim.

8   I'm like, why -- why is that outlier?  And I don't believe that

9   *Hammond* is -- is dispositive of that issue.

10           And in fact, this -- this own court made a ruling a year

11   later that said FEPA's standard should be but-for causation on

12   the fourth element, and so when you look at -- and I'll get to

13   the issue of certification in a second.

14           When you get to the issue of where we are and what our

15   position is, you've got four out of -- four of the claims

16   included disability discrimination as a theory.  The jury

17   rejected five out of six claims, correct?  And one of the

18   claims -- out of the five claims Dr. Porter lost on, three of

19   them were federal or state disability discrimination claims.

20           The jury verdict form had "No" on 13 out of 14 claims.

21   There's only one theory of one state law disability

22   discrimination claim, and it's FEPA, on this issue of whether

23   or not the termination was based upon disability, and so we

24   would submit that one -- in this particular case, but-for

25   causation follows federal law -- well, first of all, Second

1  Circuit precedent, number one; number two, decisions from this

2  court as late as November of 2024; as well as the Vermont

3  Supreme Court in terms of dealing with disability

4  discrimination cases.  In fact, you have the *Gates v. Mack*

5  *Molding* case, which I realize is a year before the *Hammond* --

6          THE COURT:  And that's a reasonable accommodation

7  case.

8          MR. SCHROEDER:  Right.  Except that the Court says the

9  disability discrimination provisions under the FEPA are

10 patterned after the federal Rehab Act, which in turn

11 incorporates standards from the federal Americans with

12 Disabilities Act.

13         THE COURT:  Right.  So what I have to do,

14 Mr. Schroeder, right, is predict what the Vermont Supreme Court

15 would do if I don't certify the question, right?  That's what

16 has to happen here.  The Vermont Supreme Court has said federal

17 precedent in interpreting or construing these statutes is

18 relevant but not necessarily controlling.  It's persuasive

19 authority.  And the Vermont Supreme Court routinely looks to

20 other state courts that apply similar statutory regimes.

21    So I want to ask you about this question of the unified

22 statutory regime question that's been raised, right?  So as I

23 understand this concept, the idea is Vermont has chosen not to

24 kind of have this fractured causation issue, the way the case

25 law refers to it, in federal antidiscrimination law.  Depending

1  on the statute, different standards are applied.

2      So in Vermont, there's a whole series of protected

3  characteristics.  They have this unified regime meant to

4  prevent discrimination, and they want to apply one causation

5  standard, right?  So assuming that that one causation standard

6  is the motivating factor test, right, and other courts from

7  other states who have unified statutory regimes, same thing,

8  also apply a motivating factor test, why is it not reasonable

9  to assume that the Vermont Supreme Court would follow the same

10 approach?

11      MR. SCHROEDER:  So a couple reasons.  One, I think if

12 you look at the statute in this particular case -- so I

13 understand -- on the countervailing argument -- first of all,

14 plaintiff's counsel actually argued to the Second Circuit that

15 it's undecided, right?  It's undecided.  We think it should be

16 certified.  And the only excuse they -- so this goes to the

17 issue of we think it's actually clear.  We think it actually is

18 clear.  Second Circuit precedent; this own court, Judge

19 Crawford; as well as Vermont Supreme Court precedent, okay?  We

20 think that's clear.

21      In the alternative, obviously if the Court disagrees,

22 which obviously it seems inclined to, we believe that this case

23 is ripe to go to the Vermont Supreme Court and have them decide

24 it.  This is ripe for that.  And the only excuse -- this is

25 like an excuse that, like, I don't know --

1          THE COURT:  So it's ripe for certification if I

2     disagree that federal law is controlling.  It's not ripe for

3     certification based just kind of on an objective view of the

4     law being unclear.

5          MR. SCHROEDER:  I think -- there's an argument that

6     the law is unclear, so in that -- if that -- if the law is

7     unclear, as an alternative argument, we'd submit, put it up to

8     the Vermont Supreme Court.  Plaintiff's counsel asked twice in

9     their brief, twice to the Second Circuit, well, we think it's

10    undecided; we think it should be mixed motive, but it's

11    undecided.

12          There's no case post-*Natofsky*, and of course, we raised

13    that issue and then, of course, there's the *Newton v. Kohl's*

14    case which obviously is a year after the *Hammond* case where the

15    Court, this court, says exactly that:  that FEPA applies a

16    but-for causation standard.  So if it -- if there is any

17    concern one way or the other, well, then, we -- we ask for it

18    to be submitted to the Vermont Supreme Court.  This is exactly

19    the kind of issue if the Court accepts that it's undecided and

20    we have to make a judgment call.

21          The other issue, Your Honor -- and this goes back to that

22    Connecticut case that plaintiff's counsel referred to.  That

23    statute where you talk about uniform application of the motive

24    and you have "because of" all of those categories, that is not

25    what the Vermont statute says.  It says because of those

(941 of 993), Page 941 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 893 of 945
2:21-cv-00049-kjd Document 35.2 Filed 07/23/25 Page 893 of 945

12

1  protected categories or against a qualified individual with a

2  disability, and it's well established, well established, that

3  Title VII has this line of cases regarding motivating factor

4  but that the ADA and Rehab Act, a disability discrimination

5  case, stands on the other side.  Now --

6        THE COURT:  So the "because of" language in the

7  statute you're saying should not apply to the disability

8  discrimination aspect of FEPA.

9        MR. SCHROEDER:  Correct.

10        THE COURT:  Okay.  So what else in the statute

11  language-wise can you point to that would help me determine

12  what the causation standard was intended by the Vermont

13  Legislature?

14        MR. SCHROEDER:  Well, I think that "or against a

15  qualified individual with a disability" derives from federal

16  court precedent, which gets you back to the *Natofsky* decision.

17  So it's kind of -- it brings you back to federal court

18  precedent, the ADA and the Rehab Act, where -- which talk about

19  "or against" -- you know, discriminating against somebody on

20  account of their being a qualified individual with a

21  disability.  This is "or against."  Why does it not say, like

22  Connecticut statute, which plaintiff's counsel referred to,

23  because of blank blank blank or disability?  Right?  It doesn't

24  say that.  "Or against a qualified individual with a

25  disability."  And when you untether that from the rest of the

1 statute, you get that analysis.

2      Now, to the extent that there seems to be -- we personally

3 believe -- or I should say we submit that this case is clear

4 based upon -- and we made this argument at court.  We objected

5 to it.  It's inconsistent also, which is the whole -- we talk

6 about uniform application of the law.  Federal Rehab Act claim,

7 ADA claim, New Hampshire state law claim all have but-for

8 causation, but now we have this outlier on a -- on the FEPA

9 claim that, well, on this particular claim, we're going to have

10 a motivating factor?  I mean, if we're talking about uniform

11 application of the laws, I would submit that that would be the

12 most consistent application and uniform application of the law.

13      THE COURT:  Well, no, but that's the whole reason why

14 we're here, aren't we, that different laws have different

15 causation standards.  I mean, the fact that the remaining

16 claims that went to the jury all applied but-for, there's not

17 something, like, impermissibly anomalous about the fact that

18 one of the claims that went to the jury had a different legal

19 standard.  And frankly, I think the statutory language, the

20 state court interpretations, the federal court interpretations,

21 if nothing else, shows that perhaps this is not quite as clear

22 as you think it is.  Right?

23      MR. SCHROEDER:  Your Honor, I -- I respectfully

24 disagree.

25      THE COURT:  Okay.

1          MR. SCHROEDER:  But -- but you asked me, well, then,
2   why are you asking for certification?

3          THE COURT:  Yeah.

4          MR. SCHROEDER:  Because in the alternative, this is --
5   this case is ripe for certification.  Plaintiff's counsel asked
6   for it twice, and for them to say right now, "Well, you know,
7   time has passed by and things have changed," is that really --
8   that's their -- that's the rebuttal argument.  That's the
9   rebuttal argument in this case for why it shouldn't be
10  certified, and that's not a legitimate rebuttal.

11         THE COURT:  Okay.

12         MR. SCHROEDER:  There's no basis to -- because they've
13  already said it in court papers.

14         THE COURT:  Okay.  But, I mean, I have to make my own
15  decision on whether it gets certified, right?

16         MR. SCHROEDER:  Absolutely, Your Honor.

17         THE COURT:  The fact that a party -- the fact that a
18  party years later may shift its position on the question of
19  certification shouldn't really be controlling as to what I do,
20  right?

21         MR. SCHROEDER:  No, Your Honor, but --

22         THE COURT:  It's a legal decision.

23         MR. SCHROEDER:  -- I think -- no.  Of course -- of
24  course it's your decision, Your Honor.

25         THE COURT:  But not mine.  I say it's a legal -- well,

1  I guess it's mine, but it's a legal decision, right?

2         MR. SCHROEDER:  It's an -- right.

3         THE COURT:  Yeah.

4         MR. SCHROEDER:  But it is very -- I think it's very

5  persuasive and instructive for the Court to consider that

6  plaintiff's counsel made the same exact argument for

7  certification, so therefore -- and that was in -- we had oral

8  argument in 2022.

9         THE COURT:  Um-hum.

10        MR. SCHROEDER:  So the decision came down in 2024.  So

11 for all those reasons, I would submit that -- it's our position

12 that we believe that the case law is clear where the Vermont

13 Supreme Court would come out, but if the judge is unwilling to

14 accept my magic ball view of things, well, then, let's go to

15 the Vermont Supreme Court.  How is this not one of those issues

16 if we get -- if there is this uncertainty as to whether or not

17 but-for should apply or not?  Because this case is so unique in

18 how the jury verdict came down.

19        THE COURT:  Right.

20        MR. SCHROEDER:  There's just one theory of one claim,

21 and it's on this specific issue.  Obviously if plaintiff won on

22 the whistle-blower case or the other disability discrimination

23 cases, we wouldn't have any of these arguments, but that's not

24 what happened, and so this one -- the jury took the instruction

25 I assume at face value because it was different from everything

 1  else, and you made it clear to the -- to the jury that it was

 2  different from -- from everything -- the other -- the other

 3  disability discrimination claims, and if that's the case, look

 4  what happened.  It's one theory on one claim, and this is -- if

 5  there -- if there was ever a case that was ripe for -- for

 6  going up to the Vermont Supreme Court, this would be it,

 7  setting aside my arguments about why it shouldn't need to go

 8  there.

 9       You know, there -- I didn't grow up in Boston, but, you

10  know, there's a -- there's a movie *The Verdict*, right, and Paul

11  Newman says, in character -- I suspect, Your Honor, you might

12  know it.  My colleagues, Megan and Morgan, did not know it.

13  But he says in that case, "There is no other case.  This is the

14  case."  And ironically, we were just talking about this this

15  morning, and Ms. McDonald made a comment that actually jogged

16  my memory of that -- of that movie because I've watched it

17  about 50 times.  This is that case.  It's one specific theory

18  of one specific claim.

19           THE COURT:  Okay.

20           MR. SCHROEDER:  And so for that reason, I'd submit

21  that it's ripe for going to the Vermont Supreme Court.

22           THE COURT:  Okay.

23           MR. SCHROEDER:  And if you have anything else --

24           THE COURT:  Yeah.  I'm just curious.  This question

25  that I asked you before about the unified statutory regime

(946 of 993), Page 946 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 898 of 945
2:17-cv-00094-kjd Document 35.3.2    Filed 07/23/25    Page 898 of 945

17

1  thing, so as I said before, right, the Vermont Supreme Court

2  can look to federal court precedent on how it's going to

3  interpret the statute.  It can also look at other state supreme

4  courts.  It appears, based on our research, that there are

5  other states that have this kind of unified statutory regime

6  approach involving similar language not applying but-for but

7  applying motivating factor.

8      I'm curious if you are aware of any cases from those other

9  similar unified statutory regime jurisdictions where the Court

10  has applied but-for in the face of the suggestion that

11  motivating factor is the appropriate standard.

12          MR. SCHROEDER:  The only case that actually came up

13  that we -- we saw was this Connecticut case, Your Honor.

14          THE COURT:  Okay.

15          MR. SCHROEDER:  And the statutory language in that is

16  not the same as the statutory language in Vermont.  That was

17  raised by plaintiff's counsel.  We didn't uncover any other

18  cases in that regard, but I have to come back to:  What about

19  New Hampshire?  Like, what about that issue?  It's one of the

20  other state law claims in this case.  And plaintiff's counsel

21  made that argument to the Second Circuit:  "Well, we think it

22  should be motivating factor."  Well, somehow that was abandoned

23  because of -- of precedent in New Hampshire, so that state uses

24  but-for causation, and that's one of the claims in this case.

25      So in terms of looking to what would be most persuasive in

(947 of 993), Page 947 of 993 Case: 25-1382 12/22/2025 DktEntry: 35.4 Page 899 of 945
2:21-cv-00049-kjd Document 35.2 Filed 07/03/25 Page 899 of 945

18

1  this case where you actually had another claim from another

2  contiguous state that was in this case, how would that not be

3  more persuasive than perhaps Connecticut, which actually

4  doesn't even have the same statute in terms of the language?

5  And I keep going back to "or against a qualified individual

6  with a disability."

7          THE COURT:  Okay.  Is there anything else on this

8  point?  I think you had a secondary argument about, you know,

9  even if discrimination were -- were shown, the employer can

10  avoid liability by showing they would have taken the same --

11          MR. SCHROEDER:  Yes.

12          THE COURT:  -- same action.  Is that still part of

13  your argument, that that should have been part of the

14  instruction?

15          MR. SCHROEDER:  Well, that that part of the

16  instruction was in our position or our argument, it was

17  incorrect.  I know plaintiff's counsel has argued, well, that

18  was waived.  No.  We actually objected to the motivating factor

19  causation standard itself.  We don't have to go to every single

20  corollary to that, because this was subsumed within the

21  motivating factor.  We objected to it being used at all.

22      But one of the subsets of the jury instructions was the

23  fact that the jury was instructed that under the motivating

24  factor test, an employer cannot avoid liability by proving that

25  it would still have taken the same adverse action in the

1   absence of discriminatory motivation.

2       In fact, the *Knapp* case from the Vermont Supreme Court in

3   1998 held that the jury should have been instructed that if an

4   employee showed that her handicap was a motivating factor in

5   employer's decision to terminate her employment, then the

6   employer had to prove that it would have made the same decision

7   even absent the discriminatory motive.  So that's certainly a

8   secondary argument, Your Honor.

9           THE COURT:  But is that still good law is my question.

10  I don't think it is.  *Knapp* is a 1998 case.

11          MR. SCHROEDER:  Reversing and remanding.  Correct.

12          THE COURT:  That particular legal principle is derived

13  from *Price Waterhouse*, isn't it?  *Price Waterhouse* is overruled

14  by the 1991 amendments to Title VII.

15          MR. SCHROEDER:  Title VII, yeah.  1991 amendments.

16          THE COURT:  And the 1991 amendments say that that is

17  no longer a possible -- a possible legal principle that

18  applies.  So I'm not sure that *Knapp* is still good on this.

19          MR. SCHROEDER:  While plaintiff's counsel has a chance

20  to say something, Your Honor, let me just take a quick second

21  to review that.

22          THE COURT:  All right.  Well, I think --

23          MR. SCHROEDER:  I'd submit that that --

24          THE COURT:  Go ahead.

25          MR. SCHROEDER:  -- that is a secondary argument to

1  the --

2         THE COURT:  Okay.

3         MR. SCHROEDER:  -- primary one that we made.

4         THE COURT:  All right.  I don't think there was

5  anything else that you wanted to address.  I mean, I certainly

6  want to hear from plaintiffs on this, but is there any -- any

7  other points that I have missed?  You've addressed

8  certification.  Was there anything else that you wanted to make

9  on this particular motion?

10        MR. SCHROEDER:  I don't believe so, Your Honor.

11        THE COURT:  Okay.  All right.  Mr. Jones.

12        MR. JONES:  Good morning, Your Honor.

13        THE COURT:  Good morning.

14        MR. JONES:  I'd like to start by addressing the *Newton*

15 *v. Kohl's* case.  I think Mr. Schroeder cited it somewhere

16 between seven and ten times - I lost count - for the

17 proposition that this court has already resolved this issue.

18 Not true.

19     First of all, as I think you were hinting, the Court never

20 even got to the issue of the standard, never applied the

21 standard, disposed of the case on the issue of whether or not

22 there's a disability and never got to it.

23     But secondly, more importantly, the judge was not

24 purporting to define the standard of causation.  He was just

25 providing a general statement of the standards.  And in fact,

(950 of 993), Page 950 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 902 of 945
2:17-cv-00094-kjd Document 353.1 Filed 07/23/25 Page 902 of 945

21

1   when referencing the but-for issues that the plaintiff pretty

2   much -- well, I'm not sure it was the sole reason but a but-for

3   reason, and the only citation Judge Crawford made was to *Porter*

4   *v. Dartmouth Health* Second Circuit decision, so we know what

5   that court already held, and that court asked you to decide it.

6   So the *Kohl's* case means absolutely nothing.  It's not

7   precedential value for the proposition that it's being used.

8       So we go back to, as you outline, Vermont law on this

9   issue is actually quite clear.  We've had multiple decisions in

10  the disability context post-*Natofsky* holding that the standard

11  to be applied is -- it would date back, so we think it's clear.

12      THE COURT:  So the idea that this one claim that was

13  found in favor of plaintiff is somehow anomalous to the others

14  and that that should inform the analysis, did you want to speak

15  to that?

16      MR. JONES:  [Unclear].  That one claim had a different

17  statutory standard pursuant to the law, so it's an outlier

18  because of the law that applies to the claims at issue.  So

19  but-for causation applied to the other claims.  We acknowledge

20  that and didn't object to the jury instruction.  But for the

21  FEPA case, the Court properly concluded that motivating factor

22  is the established standard [unclear].

23      With regard to certification, again, I think the issue is

24  clear there's no need for certification.  You know,

25  Mr. Schroeder keeps saying, well, we argued differently in the

1  Second Circuit years and years ago.  First of all, that was an

2  alternative argument.  Mr. Schroeder is making an alternative

3  argument that the law is unclear enough that it requires

4  certification.  We were arguing before the Second Circuit that

5  the motivating factor standard should apply.  In the

6  alternative, if the Court found a lack of clarity, then we

7  suggested certification, but that was years and years ago.

8       At this point, yeah, things have changed.  It's been eight

9  years.  A jury has now ruled in favor of Dr. Porter, and

10 there's no need for the additional consumption of time.  You

11 know, quite frankly, I think if Mr. Schroeder had his strategic

12 way, this case would become *Jarndyce and Jarndyce* from Dickens'

13 *Bleak House* [unclear].  But we would prefer a more streamlined

14 and reasonable approach, and there's absolutely no reason to

15 certify the question to the Vermont Supreme Court.

16        THE COURT:  What about the question of *Knapp* that I

17 asked Mr. Schroeder?  I want to make sure I'm correct about

18 that.  This is with respect to this "an employer can avoid

19 liability by proving it still would have taken the same adverse

20 action in the absence of discriminatory motivation."  I want to

21 make sure I'm reading the amendments to the statute correctly.

22 It seemed to me that *Knapp* is no longer kind of good because of

23 the amendments to the statute.  Do you agree with that?

24        MR. JONES:  We do agree with that.

25        THE COURT:  All right.  Okay.

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 904 of 945
2:21-cv-00049-kjd   Document 353-1   Filed 07/23/25   Page 204 of 645

1          MR. JONES:  So with regard to the unified statutory

2     regime, I think the Court has accurately stated the law.  Those

3     states that have a unified regime have one standard, and for

4     all the reasons the Connecticut Supreme Court identified, so we

5     don't think there's any reason to think that the Vermont

6     Supreme Court would have a different approach.

7          THE COURT:  You think -- do you think this does kind

8     of boil down to whether the Court is required to follow federal

9     precedent on this issue or whether the Court could predict that

10    the Vermont Supreme Court might look to other states' supreme

11    court decisions?  I mean, it seems like, yes, it's clear

12    that -- that courts in Vermont, when interpreting the statute,

13    do look to federal decisions, but those federal decisions are

14    not necessarily binding in terms of the definitive

15    interpretation that the Vermont Supreme Court might choose to

16    give it.

17         MR. JONES:  That's exactly right.  And we quoted -- I

18    can't think of the case off the top of the head right now, but

19    we quoted the case where the Vermont Supreme Court said just

20    that, that we look at federal cases as precedential but not

21    binding.  Clearly Vermont is not bound by the Second Circuit's

22    application of the federal law.

23         THE COURT:  Okay.  All right.  Thank you.

24      Mr. Schroeder, any response?

25         MR. SCHROEDER:  Just two quick things, Your Honor.

1          THE COURT:  Yes.

2          MR. SCHROEDER:  One, on the *Hammond* case --

3          THE COURT:  Yup.

4          MR. SCHROEDER:  -- I think that dealt with the issue

5    of whether or not somebody actually had a disability and

6    whether or not there was a failure to accommodate.  I don't

7    see -- I don't recall there being, and I confirmed, any

8    discussion about the causation standard in that regard.  They

9    were terminated because of their disability based on an adverse

10   employment action, went through the prima facie case.  That

11   discussion was on a page and a half, and perhaps I'm missing

12   something, but I didn't see anything in there regarding the

13   but-for or versus motivating factor standard, so I don't

14   think --

15         THE COURT:  No.  I appreciate that.  But, you know,

16   the language I read to you earlier from page 430, right, I

17   mean, I acknowledge -- I think I agree with the point that

18   you're making that that is kind of a general statement of the

19   law.  In fact, that paragraph begins, "We begin by reviewing

20   the legal framework."  But then they talk about FEPA being

21   patterned on Title VII and they say we apply the standards and

22   burdens of proof under Title VII.

23      If in fact the Vermont Supreme Court felt that the ADA

24   kind of modulates their interpretation of this statute,

25   wouldn't that be the place to comment on it?

(954 of 993), Page 954 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 906 of 945
2:17-cv-00094-kjd Document 35-32   Filed 07/29/25   Page 206 of 645

25

1          MR. SCHROEDER:  I think -- now I think we're just

2  surmising, Your Honor.

3          THE COURT:  But only -- it's a discrimination case.

4          MR. SCHROEDER:  I understand that.

5          THE COURT:  They say we're applying the standards of

6  Title VII.  If *Natofsky* and other cases say, yes, as mediated

7  by ADA, which applies a but-for standard of causation, I mean,

8  I certainly understand your point, but, boy, to leave the

9  statement of the law out there that, kind of, generally without

10 drawing that distinction, if it's not in fact true that all of

11 Title VII standards apply to FEPA, wouldn't the Vermont Supreme

12 Court say that?

13         MR. SCHROEDER:  Well, but if -- if it was in fact the

14 law --

15         THE COURT:  Yeah.

16         MR. SCHROEDER:  -- then we wouldn't even be here

17 discussing the issue, Your Honor.  I mean, I think you're

18 asking me to surmise what -- why the Vermont Supreme Court

19 didn't weigh in on this.  There's no question that Title VII

20 cases are treated differently from ADA cases and disability

21 discrimination cases.

22         THE COURT:  Right.

23         MR. SCHROEDER:  That is very well established.  And

24 just to go back to your point about *Knapp v. State*, I went back

25 to check to make sure there's Shepardizing, that it was still

 1  good law.  This is still good law.  That's a state law claim.

 2  So to the extent that Title VII of -- of federal law claims are

 3  treated a certain way under Title VII, that doesn't carry

 4  forward necessarily to the Vermont state law claim.  So maybe

 5  I'm missing something, but --

 6          THE COURT:  So --

 7          MR. SCHROEDER:  -- we checked out the law in *Knapp*,

 8  and it's still good law as far as we can tell, and --

 9          THE COURT:  Yeah, so -- but if that's no longer

10  allowable under Title VII as a statutory matter, then how is

11  that still good?

12          MR. SCHROEDER:  Well, we have Vermont state law claims

13  that have -- that have different standards, right?  So --

14          THE COURT:  That interpret their laws according to

15  Title VII.

16          MR. SCHROEDER:  But here, Your Honor, you have the

17  statute that -- if you look at the statutory language, because

18  of all of those protected categories, you see the same ones

19  under Title VII or against a qualified individual with a

20  disability.  The statute -- so we start there.  The statute has

21  distinct language.  It doesn't have, like Connecticut -- which

22  is the only state that was discovered by either party that had

23  this issue of uniformity or how they applied it, at least that

24  was raised by either party.  Connecticut says because of -- and

25  it has in that language, Your Honor, the fact that it was

1  because of all those protected categories, including

2  disability.  So it's separate -- it is distinct.

3       So I understand the argument about uniform application of

4  the law.  I don't believe that *Hammond* stands for that, that

5  you take the jump then that, well, it applies even to

6  disability discrimination cases.

7       And if you look at all the persuasive authority at the

8  Second Circuit and the *Newton v. Kohl's* case, whether it was --

9  I guess the argument from plaintiff's counsel was that it was

10  *dicta*.  The Court was clear, at least in that language, but-for

11  causation for a FEPA claim for disability discrimination.  So I

12  think that, one, *Hammond* doesn't stand for the proposition that

13  this has been a decided issue or that -- or that it actually is

14  persuasive for the Court, and respectfully submit that the

15  Court takes the leap that this is what Vermont would say.

16       We never asked for certification of this question at the

17  Second Circuit.  They did.

18            THE COURT:  Right.  Okay.

19            MR. SCHROEDER:  And, yes, times may change and maybe

20  they have a different -- difference of opinion now, but just

21  because they don't want to doesn't make that a legitimate

22  rebuttal, respectfully.

23            THE COURT:  Okay.  All right.  It's an interesting

24  question.  It is.

25       All right.  Let's move on to the motions pertaining to

1  damages issues.  Defendants' motion.  Mr. Schroeder, I wonder

2  if I should take these motions out of order so I can give

3  Mr. Jones the opportunity to jump up so that you can take a

4  breather.

5          MR. SCHROEDER:  Yeah.  Don't worry.  This is -- this

6  is -- other than the prejudgment interest, Ms. McDonald and

7  then plaintiff's counsel will have a chance.  I'll do whatever

8  you want.  It does go in this -- I figured this was the order

9  that you were probably picking.

10          THE COURT:  Okay.

11          MR. SCHROEDER:  Because obviously if you decide the

12  first matter --

13          THE COURT:  Right.

14          MR. SCHROEDER:  -- a certain way, then the other

15  things probably don't matter until later point.

16      Very quickly, Your Honor, and a number of these arguments

17  obviously were made during trial, they were made during

18  objections.  Mr. Coffin is somewhere with his family, so I

19  said, hey, we'll take this -- this up in his stead.

20      So a couple -- a couple bases.  And if -- Your Honor, if

21  you've got something you want me to address first --

22          THE COURT:  No.  Go ahead, please.

23          MR. SCHROEDER:  I'll try to be very quick, because

24  obviously I want to be mindful of time.

25      We have a couple of reasons why we would ask for a new

1  trial on the issue of damages.  Number one, plaintiff failed to

2  abide by her expert discovery and disclosure obligations, and

3  the Court admitted this crucial and prejudicial testimony.  You

4  may recall, Your Honor, that discovery in this case ended

5  December 2019.  Dr. Bancroft issued entirely new report in

6  August of 2024.  We had a *Daubert*-like hearing, for lack of a

7  better description, on March 12th, and the Court allowed

8  cross-examination of Dr. Bancroft, which revealed two important

9  facts that completely gutted his third report, because that was

10 the one from August of 2024.

11      One, he never -- and he did it in August of 2024.  He

12 never referred to the fact that Dr. Porter was given a

13 full-time appointment, professorship.  Number two, didn't

14 include anything about her earnings in 2022 and 2023.  And the

15 Court allowed basically a do-over at the last minute for

16 plaintiff to -- even though they'd been cross-examined and

17 everything had been decimated in terms of his underlying

18 premises, and in fact his own new report demonstrates that --

19 because it went from 4.3 million to 1.787, but the Court

20 allowed them to put that report in and have Dr. Bancroft talk

21 about that report, in our estimation improperly.  We didn't

22 have a chance to actually put on a rebuttal expert.

23      Now, the Court may say, "Well, you didn't have an expert

24 up front."  You're right, we didn't have an expert in December

25 of 2019 because we didn't think we would need one, and

1 that's -- that was our prerogative, but because the Court

2 allowed the plaintiff to put in a fourth report -- this is a

3 single-plaintiff discrimination case -- fourth report which

4 completely -- it's not like it went from 4.3 million to, say, I

5 don't know, 4.8 million, which you would expect in a plaintiff

6 case where, time delay, many times the number goes up.  In this

7 case it was dramatically different.

8     So not only was the *Daubert* hearing, *Daubert*-like hearing,

9 effective- -- was used for the purpose that it exists, which is

10 to determine whether or not this person is qualified to give an

11 expert opinion, all of his opinions were gutted.

12     He then gets -- he pivots and puts a new report in on

13 March 19th, five days before trial.  How is that not

14 prejudicial to defendants in this case?  And you could submit,

15 Your Honor, "Well, you didn't have an expert before."  Well,

16 obviously we didn't have an expert back five years ago, nor did

17 we think that the expert, despite the rules, would be allowed

18 to amend their report so much so that we'd never have the

19 opportunity to cross -- to depose him again and establish a

20 record for purposes of cross-examination at trial, and so we'd

21 submit that that is the first issue for which we believe that

22 we should be entitled to a new trial.

23     The second one -- and this gets to the issue of -- of

24 mitigation of damages, Your Honor, and our position was that

25 when you get to the -- this goes to what the Court said in

1  terms of page 30 of the jury charge on April 8th, and it was --

2  the jury was told, "If you find that Dr. Porter failed to

3  mitigate her damages, you must reduce your award," dot dot dot,

4  and that was page 30, ECF No. 275.

5       And our position was, yes, failure to mitigate,

6  affirmative defense, no question.  But we should have been

7  given the opportunity, and the instruction should have included

8  language, and we objected to this, the -- a number of times,

9  the fact that she actually did mitigate her damages, but you

10  need to actually consider that in terms of deciding the award.

11      Now, we can talk about the severance issue subsequent- --

12  we'll get to that issue, but in terms of mitigating her

13  damages, it was like -- it was the inverse of what defendants'

14  position was, which was actually Dr. Porter did a good job of

15  mitigating her damages.  We only learned that because of the

16  March 12th hearing, really.  And we should have been able to

17  establish that -- or that should have been an instruction to

18  the jury so they can understand how mitigation of damages works

19  so that if they -- we say failure to mitigate because that's an

20  affirmative defense that an employer would always have, but we

21  also wanted to establish that, assuming she did mitigate, you

22  certainly can take that into account in determining her actual

23  damages on the back end if you find a violation.

24      The third issue was the fact that the Court -- and this

25  goes to the demonstrative exhibit issue, page -- Exhibit 3 to

1  our motion.  The Court improperly declined introduction of

2  Dartmouth Health's demonstrative exhibit and limited argument

3  at closing about crucial mitigation evidence.  Whether

4  Dr. Bancroft disagreed with the underlying assumptions, that

5  argument could be made by plaintiff's counsel in closing, but

6  the fact that the Court originally said we could introduce the

7  demonstrative evidence, just like they were allowed to in their

8  closing, but the fact that we could and then it was rescinded,

9  just in and of itself, that was -- we believe the first call

10  was the right call, that in fact that was an admission.

11  Whether -- whether there was color to it or not, he did the

12  exercise, and it was on a piece of paper.  It was submitted as

13  C19.

14      The Court initially ruled we could refer to it and show it

15  as a demonstrative - it's not going back with the jury - but

16  then flipped -- reversed course the next day or a few days

17  later, and we believe that that was inappropriate, because

18  there was a legitimate basis for putting it in.  It was

19  admitted -- it was cross-examination of the plaintiff's expert,

20  and we should have been able to refer to that at least as a

21  demonstrative exhibit, just as the Court originally ruled.

22      The other issue and the final issue in terms of seeking a

23  new trial is C13, the severance agreement.  And I went back to

24  the transcript, and I know -- I was very mindful of the judge's

25  ruling and instruction, and I wanted to be extremely careful

 1  about what I said about the severance agreement, and the Court

 2  was very clear that there were certain areas that we were not

 3  allowed to go into on the severance agreement in terms of

 4  mitigation of damages at the closing.  However, Your Honor,

 5  what I submitted at the time, and certainly cross-examined

 6  Dr. Porter without objection, the document was admitted.  I

 7  should have had no restrictions whatsoever about what I said

 8  about the severance agreement.

 9        THE COURT:  So it's interesting you raise the

10  transcript.  I was going to raise it with you.  I wonder if

11  we're talking about the same lines of the transcript.  Because

12  I want to make sure I fully understand your argument on the

13  severance agreement.  Are you -- are you arguing now that you

14  should have been able to talk about basically mitigation in

15  terms of, you know, reduction of damages based on the severance

16  agreement?  So as I look at this, and I don't know if you have

17  the transcript in front of you, but --

18        MR. SCHROEDER:  I did.

19        THE COURT:  -- page 16, Document 322:

20    "THE COURT."  I am saying that "the argument during

21  closing is not going to be . . . making the point that if they

22  should find damages, it's going to be reduced by the amount of

23  the severance agreement?"  I don't know if you -- if you're

24  following along.

25        MR. SCHROEDER:  Judge, I do -- if you just give me one

1   second, Your Honor.

2          THE COURT:  Yes, of course.

3          MR. SCHROEDER:  Let me just refer to it.

4          THE COURT:  Yeah.

5          MR. SCHROEDER:  I've got, like, various transcripts.

6          THE COURT:  Yeah.

7          MR. SCHROEDER:  Which --

8          THE COURT:  It's Document 322, page 16, beginning

9   around line --

10          MR. SCHROEDER:  What day was it, Your Honor?  I think

11   it was the 7th?

12          THE COURT:  You know, I don't have the -- I have an

13   excerpt.  The deputy clerk is telling me it was -- when was it?

14          COURTROOM DEPUTY:  Day 12.

15          THE COURT:  Day 12.

16          COURTROOM DEPUTY:  April 8th.

17          MR. SCHROEDER:  So that would be April 8th.

18          COURTROOM DEPUTY:  8th.

19          MR. SCHROEDER:  Just give me one second, Your Honor.

20          THE COURT:  Yes.

21          MR. SCHROEDER:  I -- I did -- I did review it this

22   morning.

23      Do you have it right there?

24      Just give me one second.  Page 16?

25          THE COURT:  Yes.  Page 16, line 16.

1          MR. SCHROEDER:  Yes.

2          THE COURT:  See where it says "THE COURT:  Okay, but

3  the argument during closing is not going to be . . . to be

4  making the point that if they should find damages, it's going

5  to be reduced by the amount of the severance agreement?

6     "MR. SCHROEDER:  No, I have no intent of saying that, your

7  Honor."

8          Next page.  Middle of the page.

9     "MR. SCHROEDER:  So I want to know that I have free reign

10 *[sic]* to at least talk about the document, but not its import

11 in terms of damages."

12     So that, in your view, is not acquiescing?  You're telling

13 me that you're following the Court's order at that point?

14          MR. SCHROEDER:  I -- I actually was, Your Honor.

15 You made -- I raised it because I wanted to know where the line

16 was and whether I said, "Well, Your Honor, I object for the

17 record and let's put this on the record," you made it very

18 clear and I -- that that was a no-go zone, and so -- and that

19 was your ruling, and -- and so I would submit that, one, I

20 should have had the opportunity to discuss the severance

21 agreement in any way I wanted to because it was an admitted

22 exhibit and it was admitted into evidence, and so I should have

23 had free rein to say whatever I wanted about it, specifically

24 the number as well as any description to it.  But to the

25 extent -- I wasn't going to violate the Court's instruction on

 1  that, which is why I asked for real clarity on that, and you

 2  made it very clear where I could and could not go, but I raised

 3  it for that very reason.

 4          THE COURT:  Okay.

 5          MR. SCHROEDER:  And I submit that because it was an

 6  admitted exhibit with no objection, that it was open season to

 7  discuss it in any way I wanted to for -- for the jury's

 8  consideration in any way they might apply it, not even have to

 9  say mitigation.  So I understood that you didn't want me to say

10  anything about mitigation, but the import of your ruling was

11  that I steered very clear and I did not want -- and the reason

12  why I raised it is because I've seen this happen.  We have a

13  sidebar during closing arguments, right, and that's just -- I

14  want to avoid that at all costs, and that was the reason for

15  why I made that inquiry.

16          THE COURT:  Okay.  And with respect to your other

17  arguments about the note, the demonstrative, everything else, I

18  was fairly clear at trial in terms of what the ruling was on

19  that, which is why I'm not kind of engaging with you right now.

20          MR. SCHROEDER:  Understood.

21          THE COURT:  You kind of know what my view was on that.

22  I don't foresee myself changing my perspective on that, but I

23  certainly understand your position on that.  Okay?

24          MR. SCHROEDER:  Thank you.

25          THE COURT:  All right.  Plaintiff.

1          MR. JONES:  I think I'll be pretty brief, Judge.  You

2   know, on the -- on the Bancroft issue, there's nothing new in

3   the motion that hasn't already been decided multiple times by

4   Your Honor.  I think you got it right the first time you ruled,

5   and they haven't given you a reason now to change that.

6       Just a couple of quick points on that.  They keep saying

7   things like it was revealed at the *Daubert* hearing that

8   Dr. Bancroft never mentioned or referenced the fact that

9   Dr. Porter had received a promotion.  He testified on the stand

10  in this room - I remember it - very clearly that while he did

11  not know if she had received a promotion in that year, he was

12  relying on actual wage data from her.  So it's the numbers and

13  the salary that's being reported that matters, not the fact

14  that she got a different salary because she got promoted.

15  Again, it's the same red herring being recycled.

16      You know, nothing was hidden.  Dr. Bancroft never changed

17  the basic methodology of his analysis, as you have noted many

18  times before, so I don't believe there's any grounds to that

19  argument.

20      The mitigation instruction, we think the jury instruction

21  accurately reflects the law and was not confusing at all.  As

22  we noted -- quite frankly, I heard Mr. Schroeder, again, make

23  the argument "I'm still confused by what their argument is."  I

24  think they are confusing a lack of damages argument with a

25  failure to mitigate, but the failure to mitigate was the

1  instruction you gave.  It was accurate.  It was appropriate.

2  Not confusing.

3       Again, for the reasons we've already said, we don't think

4  the handwritten notes prepared at Mr. Coffin's instructions

5  under a protest by the witness was probative at all and was

6  properly limited.

7       And then with regard to the severance agreement, we went

8  over it at length that morning, so I don't think I have more to

9  add than that, but it would have been unduly confusing and

10 prejudicial to suggest that a plaintiff should be punished for

11 not having accepted a severance agreement that would have

12 included a release of all of her claims and prevented the trial

13 at all from ever having happened, that that's somehow relevant

14 to -- under the [unclear] analysis [unclear].

15      For all those reasons, we think the motion should be

16 denied.

17          THE COURT:  All right.  Thank you.

18      Mr. Schroeder, anything in reply?

19          MR. SCHROEDER:  Nothing, Your Honor.

20          THE COURT:  Okay.  All right.  So now plaintiff's

21 motion for prejudgment interest I believe is the last -- well,

22 there's attorney's fees as well, but let's start with the

23 prejudgment interest motion, plaintiff.

24          MR. JONES:  I think I'll be just as brief.

25          THE COURT:  So could I just ask you right out, so

1    your -- your papers talk about prejudgment interest through the

2    end of the year 2024.  I just had a question generally about is

3    there a reason why prejudgment interest request is not being

4    made into 2025, or maybe there's a legal rule here or principle

5    that I'm just not aware of as to why that -- that's the case.

6         MR. JONES:  Honestly, I don't know.

7         THE COURT:  Okay.

8         MR. JONES:  It would seem to make sense that it be --

9    well, I think prejudgment interest should run up until

10   judgment.  Maybe they're referring to the chart we gave where

11   we were suggesting how the million dollars could be allocated

12   over different years and [unclear] on that.

13        THE COURT:  Yeah.  I thought there was a -- I can find

14   it here in all this paper, but I thought there was a 2024 date

15   in there for the time frame for which that interest was being

16   requested, so I guess I would -- I would ask you today, to the

17   extent that this -- this were granted, are you going to be

18   seeking interest for any period into 2025 up until the

19   judgment?

20        MR. JONES:  Yeah.  We -- we believe judgment *[sic]*

21   should run up until the day of judgment.

22        THE COURT:  Okay.

23        MR. JONES:  And the reason is, as the prevailing party

24   and to make plaintiff whole, interest is appropriate.

25   Particularly in a lost wages and economic loss case, as the

 1  million dollar portion of the judgment is, in order to make

 2  Dr. Porter completely whole, interest is required.

 3       We also believe that the -- the damages are sufficiently

 4  ascertainable to trigger the Vermont 12 percent mandatory rate

 5  as well.  We believe -- the basic methodology here has never

 6  been that complex.  Now, with the passage of eight years,

 7  complicating factors can arise, but essentially if you want to

 8  find out what the economic loss is on any particular day, you

 9  calculate the salary she would have earned, you calculate the

10  salary she actually earned and the economic benefits she

11  earned, you subtract that, you have your number.  At any point

12  in time that analysis could have been done.  We think that is

13  sufficient in an employment case for the 12 percent.

14       We note that the Vermont Supreme Court has also held

15  precision is not needed for reasonably ascertainable.  So

16  reasonable certainty is enough.  We think calculating lost

17  wages is a relatively straightforward process, so therefore the

18  damages are reasonably ascertainable and the 12 percent rate

19  should apply.

20          THE COURT:  And so if it's awarded, is it your view

21  there's no kind of discretion in terms of a rate?  So the

22  defendants have made some arguments about a windfall, and I

23  know the Supreme Court has kind of -- Vermont Supreme Court has

24  spoken to this issue a little bit.

25          MR. JONES:  Yeah.

```
 1          THE COURT:  But 12 percent is the statutory rate in
 2 Vermont.
 3          MR. JONES:  Right.
 4          THE COURT:  If prejudgment interest is awarded, must
 5 it be 12 percent, or is there any -- any room for it to come
 6 down?
 7          MR. JONES:  We believe, because damages are reasonably
 8 ascertainable, that triggers the "shall" language of the
 9 Vermont [unclear] interest statute, that the interest rate
10 shall be 12 percent.  There is no discretion under the Vermont
11 statute in those circumstances.
12          THE COURT:  Um-hum.  And this kind of other argument
13 that Dartmouth is making, I believe it was in this motion about
14 kind of extraordinary circumstances, this case has been around
15 for a long time.
16          MR. JONES:  Right.
17          THE COURT:  There was the COVID pandemic in the middle
18 of it all.  Things were kind of on hold for a certain period of
19 time.  Is that a sufficient basis to -- to amend that
20 percentage?
21          MR. JONES:  We don't believe so, Judge.  We think as
22 between the victim of discrimination who was denied receipt of
23 the damages she was lawfully entitled to and the wrongdoer who
24 was found by a jury to engage in discrimination, that the law
25 puts the burden on that passage of time on the defense.
```

1         THE COURT:  Okay.  Anything further?

2         MR. JONES:  No.  Thank you, Judge.

3         THE COURT:  All right.  Mr. Schroeder?

4         MR. SCHROEDER:  Thank you, Your Honor.

5    The statute is clear that it requires that damages be

6 readily or reasonably ascertainable at the time of accrual of

7 cause of action to be awarded as of right and that, in the

8 alternative, the Court has discretion.  We certainly think this

9 falls within the discretionary end of things.

10    What you have here is four different reports from

11 Dr. Bancroft.  The numbers are all over the place:  3.0, 4.8,

12 4.3, then 1.787.  So the final figure, by the way, is

13 $1 million.  It is not tied to anything.  It is not tied to any

14 evidence in the record regarding her salary at any given point

15 or between Dartmouth Health and working at UVMMC, and so we'd

16 submit there's no -- there is nothing in the record to support

17 that this number was readily ascertainable.  We'd submit that

18 it was actually, you know, just a number that they came up with

19 out of thin air, because it's a million dollars.  It was not

20 tied to any piece of record evidence in this case, nor is it

21 tied to anything in Dr. Bancroft's report.

22         THE COURT:  Well, I guess a question for you.  How --

23 how closely does the jury's damages award have to be correlated

24 to, say, the conclusion of the expert, right?  I think the

25 number you had mentioned earlier, the final report from

 1  Dr. Bancroft, where does that come in at for damages?  1.4?

 2          MR. SCHROEDER:  1.787.

 3          THE COURT:  1.787.  Okay.  So the jury returning a

 4  verdict for $1 million, you're saying that's kind of -- the

 5  basis for that, it's an irrational verdict, there's no -- all

 6  the testimony of Dr. Bancroft as to, in his view, what

 7  justified the damages that he reached, that's insufficient?

 8          MR. SCHROEDER:  Well --

 9          THE COURT:  I understand your point about the various

10  reports.  I understand that point.  But that was insufficient

11  to -- to assess whether it was a rational verdict?

12          MR. SCHROEDER:  Well, I don't see how it becomes -- I

13  mean, the statute's clear, right, Your Honor?  And I want to

14  go -- shift to discretionary in a second.  And I understand

15  you're -- maybe perhaps that could lead to the discretionary

16  standpoint, but it certainly is not readily or reasonably

17  ascertainable that 1 million versus 1.8 million is somehow in

18  the same ballpark.  It's just not.  And so we think that not

19  only were they not readily ascertainable because of -- the

20  million dollar number, right, it was just -- it literally

21  was -- it's not like -- and I've had awards where it's -- in

22  fact, Ms. McDonald and I had an award where it was $1,020,000

23  and change.  Like, okay.  They obviously did some math there.

24  They -- they actually put pen to paper.  But putting a million

25  dollars on a piece of paper and saying that that's somehow

 1  readily ascertainable, I don't think it meets the sniff test on

 2  that one.

 3      In terms of discretion and where it flies, you latched on

 4  to a very good point:  Well, we should be looking at 2024.  Now

 5  they want to shrink the period of time -- they want to increase

 6  the amount of back pay, right?  Before it was -- her retirement

 7  date's all over the place.  Sometimes it's 65.  Sometimes it's

 8  66.  Sometimes it's 70.  Well, if you do 70 and you go out to

 9  2033 and you actually took the million dollar award and put it

10  out across that evenly, not to say that that's the right way to

11  do it, but their attempt to kind of massage the numbers to make

12  it fit so that they get a 35 percent kicker on top of the

13  million dollars, the two are not tethered appropriately under

14  the circumstances, and so their math is almost as bad -- or

15  actually, it's worse than -- probably on par with

16  Dr. Bancroft's math.

17      But there's nothing that gets them there, and they're just

18  massaging the numbers and condensing it so that they get the

19  most back pay to be awarded for purposes of applying the

20  prejudgment interest rate.

21      THE COURT:  So are you saying that's kind of part of

22  the analysis that the ultimate amount -- the sum total of any

23  prejudgment interest awarded, if it amounts to, I think you

24  said, a 35 percent -- 35 percent of the jury award --

25      MR. SCHROEDER:  Yes.

1          THE COURT:  -- is that somehow relevant to whether

2  that amount should be awarded?  I'm just wondering, is there

3  some proportionality?  It doesn't seem like there is if you

4  have a statutory rate, and I recognize your distinction between

5  mandatory and discretionary.

6          MR. SCHROEDER:  Right.

7          THE COURT:  But once prejudgment interest is applied

8  under state law, it has to be applied at a certain rate.

9          MR. SCHROEDER:  Yes.

10          THE COURT:  And where that falls in terms of what it

11  amounts to in terms of the percentage of the jury verdict, is

12  that something the Court can consider or should consider?

13          MR. SCHROEDER:  I think it should consider that.  I

14  think a prejudgment interest award of 35 percent of the overall

15  jury verdict, I think that's way out of bounds.  And it's way

16  out of bounds because when you actually use the modeling that

17  they use, they've now manipulated the facts in a certain way to

18  get to that number.  And it's -- it's contradictory to the

19  record evidence on this subject.  And to the extent that the

20  Court is looking at this from a discretionary standpoint, then

21  I think that everything's in play.  Everything's in play in

22  that regard.

23          THE COURT:  Is there -- do you know if there's law on

24  that?  I don't know myself, so I'm just --

25          MR. SCHROEDER:  I believe --

1          THE COURT:  Is there law on that question?

2          MR. SCHROEDER:  -- in terms of --

3          THE COURT:  You know, the percentage, you know, what

4  ends up getting --

5          MR. SCHROEDER:  Oh.

6          THE COURT:  -- potentially awarded as prejudgment

7  interest in comparison to the entire jury award.

8          MR. SCHROEDER:  I think the *Estate of Fleming v.*

9  *Nicholson* case, 168 Vt. 496 *[sic]*, 1998 case, it is in place to

10  avoid injustice, not to award windfall.  Prejudgment interest

11  is in place to avoid injustice, not to award a windfall.

12      And I think that -- I think the other case that's

13  instructive is *Windsor School District*.  It's a 2008 Vermont

14  case as well on that issue.  I think certainly not meant to be

15  a windfall to the plaintiff.  That's not what it's for.

16      And I think, Your Honor, you touched on another part of

17  this case, right?  This is a rather unique case.  There's not

18  going to be another -- I think a fact pattern necessarily,

19  certainly not in Vermont federal court, from what I can tell,

20  of where we have this eight-year gap between when it was filed

21  and when it goes up to court.

22      You have the fact that the Vermont -- the FEPA claim

23  wasn't even filed until almost a year later into the case, so

24  set that aside for a second.  You have the fact that summary

25  judgment was awarded November of 2020, went up to the Second

1  Circuit, pandemic, *et cetera*.  You don't get a decision back

2  until 20- -- February of 2024, so for that time period I

3  understand the argument, well, you know, the plaintiff

4  ultimately won, but somehow that period of time should count

5  for the plaintiff because defense won during that period of

6  time?  And it was through no fault of their own.  Oral argument

7  happened in February of '22.  It took two years for the Second

8  Circuit to issue their decision, and so I'd submit that when

9  you're -- when you're looking at the big picture from a

10 discretionary standpoint, I think the Court has a lot of

11 discretion.  And one theory of one claim.

12      You know, that gets to some issues that Ms. McDonald will

13 address on the attorney's fees, *et cetera*, so I don't want to

14 steal her thunder, but I'd submit that that all needs to be

15 taken into account.  We certainly submitted where it's not

16 readily ascertainable -- and, yes, the Court has discretion.

17 It's kind of wide-open discretion.  I don't think there's a

18 mandate that, well, we've got to apply 12 percent.  We gave the

19 Court various options.  I know I looked at -- the adjusted

20 prime rate yesterday was 7.5 percent.  12 percent's a very

21 draconian amount, and -- but this case does not warrant

22 application of that for an eight-year period.

23      THE COURT:  So there's a case in the Vermont Supreme

24 Court, *Gritman*, 2016, and some of the relevant language there:

25 "'there is no constitutional mandate that the statutory

1 interest rate' be pegged to the national prime rate. . . .  The

2 argument that a fixed 12 percent rate creates a windfall to

3 plaintiffs and is punitive to defendants in periods like the

4 present when market interest rates are low is more

5 appropriately presented to the Legislature."

6     It seems like the Vermont Supreme Court has kind of

7 rejected the idea of there being discretion to prevent a

8 windfall, at least -- at least according to that -- that

9 language from that decision.

10         MR. SCHROEDER:  Your Honor, I think that when we are

11 talking about this particular case and the actual procedural

12 history, it's rather unique, and to, one, use the -- the math

13 as it was applied by the plaintiff I think would be

14 inappropriate just based upon the record evidence, but I think

15 the record evidence demonstrates that for purposes of trying to

16 increase her damages case, she was trying to say that she was

17 going to work to at least 70.  And you may recall, and it

18 stands out distinctly to me, that I believe the plaintiff's

19 mother was working well into her 80s, and that was evidence in

20 the case.  So we can't have it both ways at the end of the day.

21         THE COURT:  Okay.

22         MR. SCHROEDER:  Thank you.

23         THE COURT:  All right.  Thank you.

24     Mr. Jones, so what about this idea that there was -- you

25 know, the case goes up to the Second Circuit, it's pending

Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 930 of 945
2:21-cv-00949-kjd   Document 353.1   Filed 07/23/25   Page 930 of 945

1 there for a while.  You know, is there -- do they have a point

2 in terms of that prejudgment interest running while the case is

3 in stasis?

4       MR. JONES:  No.  Because during that time Dr. Porter

5 didn't have access to the money that was rightfully hers.  The

6 result here is that Dr. Porter was the victim of discrimination

7 and suffered economic losses in the amount of a million

8 dollars.  She did not have the use of that money for eight

9 years.  They did.  So it's not a windfall.  It's to make her

10 whole.  And as I said before, as between the wrongdoer, the

11 party that the jury found to have engaged in discrimination

12 against federal law, and the victim, the law says, you know,

13 the interest goes to the victim to make her whole.  She is not

14 made fully whole if she's denied interest on the years that she

15 doesn't have that money.

16       THE COURT:  Okay.  What about the -- the argument

17 Mr. Schroeder makes about discretion in terms of the rate?  He

18 talks about the uniqueness of this case, years it was pending,

19 everything else.  Are you aware of any authority that -- that

20 permits the Court to exercise that kind of discretion?

21       MR. JONES:  I don't -- I'm not aware of any.  I think

22 the statute is clear that once you decide that damages are

23 reasonably ascertainable, the statute is the interest rate

24 shall be 12 percent.  I'm not aware of cases that [unclear]

25 discretionary [unclear].

1       I wanted to address one issue about -- Mr. Schroeder

2  referenced on multiple occasions his belief that this million

3  dollars was just pulled out of thin air and it's untethered and

4  the jury didn't do math.  Actually, when we came up with our

5  chart, one reason why they picked, you know, 65 being the end

6  point is if you remember Dr. Bancroft's chart, the final column

7  on the right side was the cumulative total of losses based upon

8  which year the jury concludes the plaintiff would have retired.

9  If you look at 65, pretty darn close to a million bucks.

10      So we thought the best way to tie an analysis to what the

11 jury seems to have actually done was perhaps they accepted

12 Mr. Schroeder's arguments that she would not have worked until

13 70, and maybe the reason they didn't give her 1.78 was because

14 they concluded she would have retired at 65, in which case

15 damages were a million dollars.

16      So that's why our chart uses that analysis, and that's why

17 we believe this verdict makes complete sense, that it's not

18 completely arbitrary.  So we're not trying to gin up the chart

19 to maximize damages.  We're just trying to find a way to

20 reconcile the jury's award with the evidence.

21          THE COURT:  Okay.

22          MR. JONES:  Thank you.

23          THE COURT:  Mr. Schroeder, anything further on that

24 point?

25          MR. SCHROEDER:  One final point --

1          THE COURT:  Yes.

2          MR. SCHROEDER:  -- Your Honor, and I'll rest.  The

3  chart actually says 2024, not 2027, so when you look at the

4  math, it doesn't add up, and the only reason is because they're

5  putting all the back pay up front so that they can get a higher

6  prejudgment interest award.  Thank you.

7          THE COURT:  Okay.  Thank you.

8      Okay.  Attorney's fees.

9          MR. JONES:  I will finally give the Court a break from

10  my voice.

11          THE COURT:  Mr. Vitt.

12          MR. VITT:  Good morning, Your Honor.  May it please

13  the Court.

14      We're here on Dr. Porter's motion that seeks an award for

15  1,738,341 in attorney's fees.  In view of the years of work and

16  the result, that attorney's fees request is reasonable.  This

17  case has been long and difficult.  We've been working on it for

18  over eight years.  The case is complex.  That should not be

19  disputed, and I expect, given the number and length of the

20  pretrial motions, the *Daubert* hearing, and a jury trial that

21  lasted over two weeks, the Court will agree about it being

22  complex.  But if there were a doubt, the number and length of

23  the posttrial motions should provide an answer.

24      The case has been hard fought.  Dartmouth-Hitchcock

25  adopted a strategy of resistance and a no-holds-barred

(981 of 993), Page 981 of 993 Case: 25-1382 12/22/2025 DktEntry: 35.4 Page 933 of 945
2:17-cv-00194-jdl Document 353-1 Filed 07/25/25 Page 933 of 945

52

1  approach.  It was apparent pretty much from the jump that

2  discovery would be a struggle.  Dartmouth-Hitchcock decided to

3  fight everything.  A case with one or two motions to compel is

4  unusual.  A case with eight motions to compel is unheard of.

5  Dartmouth-Hitchcock took a hard line from the outset, and that

6  approach continued through trial, and we see it now in the

7  posttrial filings.

8       The lawyers and paralegals who worked on the case kept

9  careful track of their time.  The total for their years of work

10 comes to a lodestar figure of the 1,738,341.  That is a

11 considerable sum for sure, but given the hard work and the jury

12 verdict that exceeds $1 million, that is a reasonable amount

13 for the attorney's fees.

14      I'll turn in a moment to some of Dartmouth-Hitchcock's

15 specific criticisms about the fee application, but before I do

16 that, I want to suggest that the Court focus on the basics and

17 ask:  Is this a reasonable total given the case complexity, the

18 aggressive defense, and a jury verdict of $1,125,000?

19      An indicator of whether this is a reasonable lodestar

20 would be what Dartmouth-Hitchcock spent in its defense.

21 Dartmouth-Hitchcock claims that the amount sought in attorney's

22 fees for eight years of work is astounding, especially given

23 what it describes as the, quoting now, "limited damages award"

24 of only 1,125,000.

25      Dartmouth-Hitchcock is sharply critical of our

1  overstaffing, our inefficiencies for not appropriately using

2  associates, and our overall performance.  We've responded to

3  those charges.  But before doing that, I suggest we take a step

4  back and say, given the case complexity, the delays, none of

5  which Dr. Porter caused, and the no-holds-barred approach by

6  Dartmouth-Hitchcock, is the lodestar amount of 1.7 million

7  reasonable?

8      The Second Circuit and the Vermont Supreme Court have held

9  that the lodestar number is a presumptively reasonable fee.  We

10  believe that our lodestar request falls well within the

11  reasonableness standard.  In view, however, of the sharp

12  criticisms by Dartmouth-Hitchcock and the claims that the total

13  fee request is way out of line, it would be instructive to

14  require the defendants to provide their rates and hours in the

15  case.

16      There is support in the Second Circuit for requiring a

17  defendant in a case similar to this to provide the Court with

18  information about the fees and hours charged.  In *Frommert*, a

19  New York district court case, there had been two appeals to the

20  Second Circuit; a defendant that was represented by two

21  substantial law firms, just as in this case; and a defendant

22  that was highly critical of the plaintiffs' fee request.  In

23  deciding to require disclosure, the district court said,

24  "because of the unique and long history of this case, I believe

25  that rates and fees charged and paid by defendants . . . are

(983 of 993), Page 983 of 993 Case: 25-1382, 12/22/2025, DktEntry: 35.4, Page 935 of 945
2:17-cv-00094-kjd Document 363-2 Filed 07/23/25 Page 535 of 545

54

1   clearly relevant and would be helpful to this Court in

2   determining the amount of fees that should be awarded to

3   plaintiffs' counsel."  Dartmouth-Hitchcock insists that

4   plaintiff's hours and charges are way out of line, and given

5   that criticism, we think it is fair to demand, or to suggest,

6   that we see the defendants' fees.

7       Dartmouth-Hitchcock has multiple criticisms of how we

8   staffed the case and inefficiency in the way we spent our time.

9   The principal argument, however, is that Dr. Porter was,

10  quoting now, "overwhelmingly unsuccessful" with a "limited

11  damages award."  Dartmouth-Hitchcock performs a series of

12  calculations and concludes that the lodestar amount should be

13  adjusted downward by no less than 83.3 percent or as much as

14  92.86 percent, two decimal points.  In arguing for this

15  downward adjustment, Dartmouth-Hitchcock bears the burden.

16      Now, the parties agree that the Supreme Court's decision

17  in *Hensley* is the correct starting point.  In *Grant v.*

18  *Martinez*, the Second Circuit discusses the analytic framework

19  mandated by *Hensley* for evaluating whether there should be a

20  reduction because of a partial success.  In step one, the Court

21  looks to see if there are totally unrelated claims that were

22  unsuccessful, and in step two, the Court determines whether

23  there are unsuccessful claims interrelated with the successful

24  claims, and if there are unsuccessful claims, the Court must

25  decide whether the level of success warrants a reduction in the

1 attorney's fees.  The Second Circuit includes, "If a plaintiff

2 has obtained excellent results, however, the" attorney's fees

3 "should be fully compensated."

4     Step one is an analysis whether the plaintiff failed to

5 succeed on any claims wholly unrelated to the claims on which

6 plaintiff succeeded.  If there are wholly unrelated claims that

7 plaintiff lost, they must be deducted from the lodestar

8 calculation.

9     In this case, there were no unrelated claims.  There's not

10 a separate HIPAA claim or a malpractice claim.  There are no

11 wholly unrelated claims.  All of her claims, by Dr. Porter,

12 focus on why she was terminated, and we had to review thousands

13 of pages of documents produced, take multiple depositions, and

14 review hundreds of pages of depositions to figure out what had

15 happened at Dartmouth-Hitchcock such that a doctor with 21

16 years of impeccable service was terminated.

17     What many of them reveal is that there were multiple

18 reasons that Dr. Porter was fired.  They often cite both her

19 disability and her whistle-blowing claims, many in the same

20 e-mail.  The Court, I believe, will remember Dr. Leslie DeMars'

21 statements in Exhibit 89.  That's a series of exchange between

22 her and Dr. Merrens.

23     In her first paragraph, Dr. DeMars cites to Dr. Porter's

24 disability and whistle-blowing as a reason she was terminated

25 and should not be retained.  Quoting briefly:  "Yes, there has

1   been an enormous backlash, mostly heartfelt based on Misty's

2   longevity, and with only a token nod to the elephant in the

3   room of her disruptive . . . behavior that everyone has

4   seen. . . . Everyone is also remembering Misty as a full time

5   employee wearing 3 hats, and not the one who's been out for

6   almost 18 months. . . . As much as this hurts to say, it's the

7   right decision to include her in the termination, and I don't

8   want to change that decision."

9      This references both Dr. Porter's disability and the

10   whistleblower claim, and Exhibits 82 -- excuse me, 52 and 83

11   include similar comments about Dr. Porter, referring to both

12   her disability and whistle-blowing. They were all together.

13      Now, returning to the *Hensley* analytic framework, in step

14   two the Court must determine if there are unsuccessful claims

15   interrelated with the successful claims, and if so, the Court

16   must determine whether the level of success warrants a

17   reduction in the fee award. In the *Grant* case, the Second

18   Circuit relies on *Hensley*. Quoting now, "If a plaintiff has

19   obtained excellent results, however, the attorneys should be

20   fully compensated."

21      A judgment on behalf of a single plaintiff in an

22   employment case for $1,125,000 is an excellent result, period.

23   But there's no reason to believe that Dr. Porter would

24   receive -- would have received a dollar more if she prevailed

25   on the whistleblower claims. The measure of damages was the

 1 | same.  There was no separate instruction.  Her economic loss
 2 | would not have changed had she prevailed on those claims.
 3 | The Supreme Court in *Hensley* directs that "the most
 4 | critical factor is the degree of success obtained," and using
 5 | that metric, a lodestar calculation of 1.7 million for eight
 6 | years of work is a reasonable fee.  That 1.7 million number
 7 | obviously was as of May 8th, and there's been time spent since
 8 | then, and at the appropriate time, we'll be submitting
 9 | something.
10 | Now, Dartmouth-Hitchcock complains about our inefficient
11 | overstaffing, and it cites the two examples.  First, it says
12 | that two partners were present at every deposition.  This is
13 | incorrect.  I was the only partner present at those
14 | depositions.  Katie Kramer was present as a contract employee
15 | at an hourly rate of 175, and given that she had two federal
16 | court clerkships and over five years of experience, 175 is
17 | certainly reasonable, and in fact, it's a bargain rate.
18 | And second, our staffing was criticized because of zero
19 | associates, which, according to Dartmouth-Hitchcock, is a --
20 | they say it's a clear sign of inefficiency.  First --
21 | THE COURT:  So, Mr. Vitt, I'm just going to ask you to
22 | keep an eye on the time.  We're going on an hour and a half, so
23 | how much --
24 | MR. VITT:  I've got about 15 seconds.
25 | THE COURT:  Okay.

```
 1              MR. VITT:  Maybe 20.

 2              THE COURT:  All right.

 3              MR. VITT:  We had three timekeepers.  They had five.

 4   There were zero associates.  We only had zero associates

 5   because in 2021 Sarah Nunan became a partner and we lost our

 6   only associate.  We have no associates.  We staffed the case

 7   with the three individuals we had, Sarah Nunan, Eric Jones, and

 8   myself, and our rates are reasonable, and the fee request we

 9   believe is totally within the reasonable realm.  We believe it

10   should be granted.

11       Thank you.

12              THE COURT:  All right.  Thank you.

13       Ms. McDonald.

14              MS. McDONALD:  Thank you, Your Honor.  I'll stay here,

15   if that's okay.

16              THE COURT:  Yup.  Absolutely.

17              MS. McDONALD:  As Mr. Vitt suggests, the touchstone

18   for an award of attorney's fees in this case is reasonableness.

19   In this case the request for over $1.7 million in a claim in

20   which Dr. -- in a case in which Dr. Porter won one of her six

21   claims, one out of 13 jury questions, and she lost on the

22   claims that Mr. Vitt in his opening statement described as the

23   most important to her case, $1.7 million is simply not

24   reasonable.

25       Mr. Vitt is attempting to characterize this case as highly
```

1  complex.  Ultimately, this is a single-plaintiff employment

2  discrimination case.  This is not a highly complex case that

3  would warrant some sort of upward adjustment.

4        As Mr. Vitt previewed, the standard here is a calculation

5  of a reasonable amount of hours multiplied by a reasonable fee

6  reduced by any fees that were not reasonably incurred.  And

7  then step two would be the upward or downward adjustment.  We

8  take issue not with the -- the hourly rate but with the amount

9  of fees both at step one and at step two.

10       We highlighted some of the major areas where we think that

11 there were -- was excessive billing in our opposition.  I'm

12 happy to go through them if you'd like to hear them, but I'm

13 mindful of time.  Okay.

14       At step one, we think that work unrelated to the

15 unsuccessful claims should be reduced at step one, and we think

16 the easiest way to do that is to remove all of the fees that

17 were incurred prior to the addition of the VFEPA claim.

18 Certainly there is some factual intermingling there, but I

19 think that that's probably the easier way to calculate it as

20 opposed to going through time by time and trying -- time entry

21 by time entry and trying to figure out which entry refers to

22 which claims.  And the bills before the VFEPA claim were added

23 are -- total approximately $150,000 in fees, so we think that

24 that part should be reduced in step one.

25       So after the Court excludes all of the -- the

1  unnecessarily incurred fees, we think that a downward

2  adjustment is appropriate based on the degree of success in

3  this case.  I'm going to quote from Mr. Vitt's opening

4  statement:  "The unlawfulness in this case consists of two

5  things:  One, they discharged her because of her disability,

6  and more important, and you'll probably hear about it, is that

7  she was discharged because she was a whistle-blower."  As the

8  Court knows, the jury did not find in Dr. Porter's favor on

9  either of the whistle-blower claims.  She also lost on three of

10 her four disability discrimination claims and on her claim

11 under the VFEPA that she should have been transferred to

12 another position.

13       THE COURT:  And so, of course, your position is not

14 that there should be no compensation for the claims for which

15 there was no liability found but that somehow there should be a

16 reduction for those claims?

17       MS. McDONALD:  Well, I think if the Court can easily

18 identify anything that went strictly to the other claims, then,

19 yes, certainly, but I understand the point that it's difficult

20 to do --

21       THE COURT:  Right.

22       MS. McDONALD:  -- with mathematical certainty.

23       THE COURT:  Right.

24       MS. McDONALD:  And -- and I don't think the law

25 suggests that it needs to be done with --

1          THE COURT:  Right.

2          MS. McDONALD:  -- mathematical certainty.

3      As we put in our brief, the lodestar amount we believe

4  should be reduced by between 83 percent and 93 percent.

5      With respect to the amount of claims that were won, on the

6  idea that the damages award was extremely successful, as you've

7  heard many, many times, Dr. Porter's -- originally -- her

8  expert originally requested -- or said she was entitled to over

9  $4 million in damages.  Her award was ultimately 1 -- about a

10 quarter of that, so I don't think that that can be said to be

11 an extremely successful measure either.  I would actually say

12 that's extremely unsuccessful with respect to the damages award

13 that she was seeking originally.

14         THE COURT:  So that's how you measure success?

15         MS. McDONALD:  In part.

16         THE COURT:  What was ultimately awarded versus what

17 was anticipated to be the damages to begin with as opposed to

18 maybe some type of an objective assessment of a dollar amount

19 awarded?

20         MS. McDONALD:  I think -- I think there are a lot of

21 things that you can consider, and I think that's one of them

22 that you can consider in making your decision.

23     And then just on this request for prejudgment interest on

24 the attorney's fees, there's no -- there's no case law that

25 would support that that's the case.  Dr. Porter cites to a

(991 of 993), Page 991 of 993   Case: 25-1382   12/22/2025, DktEntry: 35.4, Page 943 of 945
2:21-cv-00049-jkd   Document 353-3   Filed 07/29/25   Page 943 of 945

62

1  District of Massachusetts decision in support of that claim,

2  and I believe she does that in the motion to amend judgment

3  rather than in this motion, but that case refers to the -- an

4  award of prejudgment interest on attorney's fees as "clearly

5  not the norm."  I don't want to belabor this point because I'm

6  not sure that Dr. Porter actually believes that this is a

7  reasonable avenue.

8       And on the request for Foley's attorney -- excuse me, for

9  Dartmouth Health's attorney fees, this is a different case.

10 Dartmouth Health was facing -- had to defend itself against

11 claims that put its reputation at stake.  They are related to

12 claims of patient safety.  This is more than just a

13 single-plaintiff employment case as to Dartmouth Health.  Its

14 reputation was on the line.  Moreover, Dartmouth Health was not

15 paying a contingency fee basis, so it's sort of an

16 apples-to-oranges comparison.  Our client determined our fees

17 were reasonable.  They paid our fees.  I think that's a

18 different situation than a contingency fee situation.

19            THE COURT:  So then you would oppose the request to --

20            MS. McDONALD:  We would oppose that request.

21            THE COURT:  Okay.  Okay.

22            MS. McDONALD:  Oh, and, I'm sorry, one more point.  We

23 would just move to strike the supplemental brief that they

24 filed significantly after the deadlines --

25            THE COURT:  Okay.

```
 1              MS. McDONALD:  -- that cites old law.

 2              THE COURT:  All right.  Thank you.

 3              MS. McDONALD:  Thank you, Your Honor.

 4              THE COURT:  Any response, Mr. Vitt?

 5              MR. VITT:  No, Your Honor.

 6              THE COURT:  Okay.  I think that covers everything.

 7    Have I missed anything?  It's been an hour and a half.

 8              MR. JONES:  No, Your Honor.

 9              THE COURT:  Okay.  All right.  Well, obviously I'll

10    take it under advisement, actively working on all of these

11    motions.  Thank you very much for the argument today.  I

12    appreciate everyone's preparation and kind of helping me to

13    kind of think through these issues.

14        All right.  If there's nothing else, then have a nice

15    holiday weekend coming up, and maybe I'll be seeing you again

16    soon.

17              MR. JONES:  You too.  Thank you, Your Honor.

18              MS. McDONALD:  Thank you, Your Honor.

19              MR. SCHROEDER:  Thank you, Your Honor.

20              COURTROOM DEPUTY:  All rise.

21        (Court was in recess at 11:57 AM.)

22

23

24

25
```

1                    C E R T I F I C A T I O N

2   I certify that the foregoing is a correct transcript from the

3   audio recording of proceedings in the above-entitled matter.

4

5   July 24, 2025                    Johanna Massé  Digitally signed by Johanna
                                                     Masse
                                                     Date: 2025.07.24 15:38:13 -04'00'

6                                    Johanna Massé, RMR, CRR

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25